DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Eli J. Vonnegut
James I. McClammy
Marc J. Tobak
Christopher S. Robertson
Gerard X. McCarthy

*Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **PURDUE PHARMA L.P.,** *et al.*, | **Case No. 19-23649 (RDD)** |
| **Debtors.**[1] | **(Jointly Administered)** |

**DEBTORS' REPLY IN SUPPORT OF MOTION FOR AN ORDER AUTHORIZING
AND APPROVING SETTLEMENT TERM SHEET**

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

# TABLE OF CONTENTS

PAGE

PRELIMINARY STATEMENT ................................................................................. 2

ARGUMENT ............................................................................................................ 5

I.    The Term Sheet Is in the Best Interest of the Estates and Consistent with the
      Bankruptcy Code ........................................................................................... 5

      A.    The SOAF Payments Are Not Estate Property ...................................... 8

      B.    The SOAF Payments Do Not Alter the Plans' Equal Treatment of Claims ........... 9

      C.    The Term Sheet Is Not a *Sub Rosa* Plan ............................................ 11

      D.    The Term Sheet Is Not an Amended Plan ........................................... 13

II.   The Bankruptcy Court Has Jurisdiction to Approve the Term Sheet ............... 15

III.  The Motion Does Not Seek an Advisory Opinion........................................... 18

IV.   Payment of the Nine's Professional Fees Is Clearly Warranted ..................... 20

CONCLUSION ....................................................................................................... 22

## TABLE OF AUTHORITIES

### CASES

PAGE(S)

*Ad Hoc Comm. of CTA Bondholders v. Cont'l Airlines, Inc. (In re Cont'l Airlines)*,
1994 WL 828457 (D. Del, June 8, 1994) ............................................................ 13

*In re Am. Solar King Corp.*,
90 B.R. 808 (Bankr. W.D. Tex. 1988) ................................................................ 14

*In re ASARCO LLC*,
441 B.R. 813 (S.D. Tex. 2010) .......................................................................... 21

*In re Bd. Of Dirs. Of Hopewell Int'l Ins.*,
258 B.R. 580 (Bankr. S.D.N.Y. 2001) ................................................................ 15

*In re Braniff Airways, Inc.*,
700 F.2d 935 (5th Cir. 1983) .............................................................................. 12

*In re Breitburn Energy Partners LP*,
582 B.R. 321 (Bankr. S.D.N.Y. 2018) .................................................................. 9

*In re Chrysler LLC*,
405 B.R. 84 (Bankr. S.D.N.Y. 2009) .................................................................. 12

*In re Crowthers McCall Pattern, Inc.*,
114 B.R. 877 (Bankr. S.D.N.Y. 1990) ................................................................ 12

*In re DBSD North America, Inc.*,
634 F.3d 79 (2d Cir. 2011) ................................................................................... 8

*In re Emergency Beacon Corp.*,
58 B.R. 399 (Bankr. S.D.N.Y. 1986) ............................................................ 15, 17

*In re Empire Generating Co.*,
No. 19-cv-5721 (CS), 2020 WL 1330285 (S.D.N.Y. Mar. 23, 2020) .................... 12

*In re Enron Corp.*,
2004 Bankr. LEXIS 2549 (Bankr. S.D.N.Y. July 15, 2004) ................................ 14

*In re Hagel*,
184 B.R. 793 (BAP 9th Cir. 1995) ...................................................................... 17

*In re ICL Holding Co.*,
802 F.3d 547 (3rd Cir. 2015) ......................................................................... 8, 10

*In re Iridium Operating LLC*,
478 F.3d 452 (2d Cir. 2007) ......................................................................... 11, 12

*In re Kendrick Equip. Corp.*,
    60 B.R. 356 (Bankr. W.D. Va. 1986) ................................................................... 17

*Maresse v. Am. Acad. of Orthopedic Surgeons*,
    470 U.S. 373 (1985) ............................................................................................. 17

*In re Millennium Glob. Emerging Credit Master Fund Ltd.*,
    471 B.R. 342 (Bankr. S.D.N.Y. 2012) ................................................................. 18

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. N.Y. State Dep't of Envtl. Conservation*,
    79 F.3d 1298 (2d Cir. 1996) ................................................................................ 19

*In re Motors Liquidation Co.*,
    555 B.R. 355 (Bankr. S.D.N.Y. 2016) ................................................................. 19

*In re New Century Holdings*,
    2013 WL 5755058 (Bankr. D. Del. Oct. 16, 2013) ............................................. 15

*In re Nunez*,
    2000 WL 655983 (E.D.N.Y. Mar. 17, 2000) ...................................................... 19

*In re Prudential Lines, Inc.*,
    170 B.R. 222 (S.D.N.Y. 1994) ....................................................................... 15, 17

*In re Sabine Oil & Gas Corp.*,
    2016 WL 4203551 (S.D.N.Y. Aug. 9, 2016) .................................................. 15, 17

*SCH Corp. v. CFI Class Action Claimants*,
    597 F. App'x 143 (3d Cir. 2015) ......................................................................... 13

*In re Tower Auto., Inc.*,
    241 F.R.D. 162 (S.D.N.Y. 2006) ......................................................................... 12

*In re Tower Auto., Inc.*,
    342 B.R. 158 (Bankr. S.D.N.Y. 2006) ................................................................. 11

*In re Transtexas Gas Corp.*,
    303 F.3d 571 (5th Cir. 2002) ............................................................................... 17

*In re TSIC, Inc.*,
    393 B.R. 71 (Bankr. D. Del. 2008) ................................................................... 8, 10

*U.S. Trustee v. Bethlehem Steel Corp. (In re Bethlehem Steel Corp.)*,
    2003 WL 21738964 (S.D.N.Y. July 28, 2003) .............................................. 20, 21

*Windels Marx Lane & Mittendorf, LLP v. Source Enters. (In re Source Enters.)*,
    392 B.R. 541 (S.D.N.Y. 2008) ............................................................................ 10

## STATUTES & RULES

Bankr. Code § Section 363(b) ............................................................................... 4, 20

Bankr. Code § Section 503(b) ................................................................................. 20

Bankr. Code § 1123(a)(4) .................................................................................... 9, 10

Bankr. Code § 1125 ............................................................................................. 13, 14

Bankr. Code § 1127 ......................................................................................... 9, 13, 14

Bankr. Code § 1129(a)(3) ......................................................................................... 7

Fed. R. Bankr. P. 3019 .............................................................................................. 9

## OTHER AUTHORITIES

9 Collier on Bankr. 113019.01 (15th ed. rev. 2004) ....................................................14

Purdue Pharma L.P. ("**Purdue**") and its affiliate debtors (collectively, the "**Debtors**")

submit this omnibus reply in further support of the Debtors' Motion for Entry of an Order

Authorizing and Approving Settlement Term Sheet, Bankr. Dkt. No.[1] 4410 (Mar. 3, 2022) (the

"**Motion**") and in response to the objections to the Motion.[2]

---

[1] All references to "Bankr. Dkt. No." refer to filings in *In re Purdue Pharma, L.P.*, Case No. 19-23649-rdd (Bankr. S.D.N.Y.).

[2] State of Florida's Objection to Debtors' Motion, Bankr. Dkt. No. 4413 ("**Florida Objection**"); the Identical Joinders to Florida's Obj. (Bankr. Dkt. Nos. 4433 (Louisiana), 4435 (Nebraska), 4437 (Ohio), 4440 (Alaska), 4443 (Montana), 4445 (North Dakota), 4447 (Arkansas), 4449 (South Carolina), 4451 (Kansas), 4453 (Arizona), 4458 (Kentucky), 4461 (Georgia), 4462 (Tennessee), 4464 (Utah), 4465 (Texas), 4468 (Mississippi), 4470 (Missouri), 4472 (Alabama), 4478 (Puerto Rico), 4480 (American Samoa)) (together, the "**Florida Joinders**"); State of West Virginia's Objection to Debtors' Motion and Joinder to Florida's Objection, Bankr. Dkt. No. 4417 ("**West Virginia Objection**"); State of Indiana's Objection to Debtors' Motion and Joinder to Florida's Objection, Bankr. Dkt. No. 4418 ("**Indiana Objection**"); Teresa VomSaal Letter Regarding Negotiations with Purdue Pharma Settlement, Bankr. Dkt. No. 4412 ("**VomSaal Objection**"); Ellen Isaacs' Objection to Debtors' Motion, Bankr. Dkt. No. 4441 ("**Isaac Objection**"); Claimants' Objection to Debtors' Motion, Bankr. Dkt. No. 4455 ("**Claimants Objection**"); Maria Ecke's Objection to Debtors' Motion, Bankr. Dkt. No. 4456 ("**Ecke Objection**"); Ad Hoc Committee's Limited Objection to Debtors' Motion, Bankr. Dkt. No. 4471 ("**AHC Objection**"); Objection by Creditors Creighton Bloyd, Stacey Bridges, and Charles Fitch to Debtors' Motion, Bankr. Dkt. No. 4473 ("**Individual Creditors Objection**"); Tribal Leadership Committee's Objection to Debtors' Motion, Bankr. Dkt. No. 4474 ("**Tribal Leadership Objection**"); Nassau County's Joinder to the AHC Objection, Bankr. Dkt. No. 4483; U.S. Trustee's Objection and Reservation of Rights to Debtors' Motion, Bankr. Dkt. No. 4484 ("**UST Objection**"); Trumbull and Lake Counties' Objection to Debtors' Motion, Bankr. Dkt. No. 4485 (together with the Nassau County Joinder, the "**AHC Joinders**"); Limited Objection of Certain Canadian Municipal and First Nation Creditors to Debtors' Motion, Bankr. Dkt. No. 4487 ("**Canadian Objection**"); Carrie McGaha Objection to Debtors' Motion, Bankr. Dkt. No. 4489 ("**McGaha Objection**," together with VomSaal's, Issacs', and Ecke's Objections, the "**Pro Se Objections**") (collectively, the "**Objections**").

## PRELIMINARY STATEMENT

1.      The limited relief the Debtors seek is necessary to implement a mediated

agreement between the Sacklers and the Nine[3] that will provide the Debtors, their estates, and

their creditors with remarkable economic and non-economic benefits.  These benefits include:

- a guaranteed $898 million in incremental consideration, including $175 million on the Effective Date, which would replace the Plan provisions that require certain changes to the members of existing Sackler-established non-profit foundations, and remove the need to procure the approval therefor from multiple governmental entities (a condition precedent and risk to consummation;

- the potential to receive up to $1.398 billion in total incremental consideration;

- distribution of all of these incremental settlement proceeds to MDT, through the agreed and unchanged trust and allocation procedures established under the Plan;

- agreement by the Sacklers that any institution or organization in the United States can remove the Sackler name from physical facilities and academic, medical, and cultural programs, scholarships, and endowments, subject to certain conditions set forth in the Term Sheet;

- attendance by representatives of the Sackler families at a public hearing (scheduled for tomorrow, March 10), at which personal injury victims (including those who have lost loved ones, as well as children born with NAS and/or their parents or guardians) can address the Sacklers directly; and

- agreement that the Nine will consent to the Plan's third-party releases, and that, following entry of the order granting the Motion, the Nine will not file briefs in the appeals pending before the Second Circuit or further participate in the appeals, which will facilitate the emergence of the Debtors from Chapter 11 and has the potential to accelerate the conclusion of these cases substantially.

Unsurprisingly, these vast and manifold benefits to the Estates and their creditors—including

lowering the risk of liquidation, in which billions of dollars for abatement and victims would be

irretrievably lost—are uncontested.

---

[3] Where applicable, the Debtors adopt the defined terms included in the Mediator's Fourth Interim Report, Bankr. Dkt. No. 4409 (Mar. 3, 2020) (the "**Mediator's Report**").

2.      The Objectors focus instead all but exclusively on the separate agreement by the

Sacklers to pay—directly and from their own funds—$276,888,888.87 over 18 years to a

"supplemental opioid abatement fund" (the "**SOAF**" and, the agreed payments to SOAF, the

"**SOAF Payments**") that will be established and administered by the Nine, and the Debtors'

agreement to pay a modest quantum of professional fees of the Nine.  Like them or not, the

Sackler SOAF Payments are the necessary key to unlock the $898 million - $1.398 billion of

incremental consideration to the estates and for the Nine to withdraw from the appeal.  The only

question then is whether these payments by third parties to third parties are somehow unlawful.

They are not.

3.      Critically, the Debtors do <u>not</u> ask the Court to affirmatively endorse the SOAF or

the quantum of the SOAF Payments.  Neither the Debtors' property nor the Debtors' business

judgment is at issue as to this facet of the outcome of mediation, which is entirely among third

parties.  Rather, the Debtors request only that the Court conclude (as the Debtors believe) that the

SOAF Payments do not contravene any prior orders of the Court in these Cases or any provision

of the Bankruptcy Code.

4.      The Debtors fully recognize that the Plan and the Shareholder Settlement are the

result of extraordinary efforts by many states, committees, and other parties, including the

Objectors.  In point of fact, certain of the Objectors have played among the largest and most

important roles in the successes of these chapter 11 cases.  And the Debtors likewise recognize

that states and other stakeholders—some of whom labored for years beginning well before this

bankruptcy—did not seek or obtain any separate payments from the Sacklers for themselves

alone, but rather sought to increase the amount to be paid to the Debtors' estates for distribution

under the Plan.  The Objectors' ire over the SOAF Payments is understandable.  But it does not make their objections legally meritorious.

5.      The Objectors' arguments that the SOAF Payments are inconsistent with the Code rest on a fundamentally (and obviously) false premise:  that the SOAF Payments are Plan or Debtor distributions that amend the allocations under the Plan, or that they somehow alter the Plan's treatment of creditors in Classes 4 and 5.  This is simply not so.  The SOAF Payments are not made by a Debtor.  They are not made to a Debtor.  They are not made through a Debtor. They are not made from or on account of estate property.  They are not made or distributed under the Plan.  Rather, they will be made pursuant to an agreement entirely among third parties to which no Debtor will be a party.  These transfers of value exclusively among non-Debtor parties cannot and do not alter the Plan's treatment of Classes 4 and 5—or any other—creditors under the Plan.

6.      The Objectors' challenges to this Court's jurisdiction also fail, as they largely rest on the same false premise—that the SOAF Payments directly by the Sacklers to the Nine somehow effect an amendment to the Plan's allocation and distribution structure.  While courts have held that a lower court is typically divested of jurisdiction to vacate or modify an order on appeal, it is equally true that bankruptcy courts retain jurisdiction to decide issues different from those on appeal.  The crux of the current appeals is whether this Court had the authority to approve non-consensual third-party releases.  That issue remains on appeal, and it and the Plan releases are untouched and undisturbed by the relief sought in the Motion.  This Court retains jurisdiction to issue the Approval Order.  Moreover, it is crystal clear that the Approval Order is not an advisory opinion.  The relief sought in the Approval Order is needed imminently, as

parties need to undertake significant steps <u>this week</u>, including apprising the Second Circuit of

the resolution and, for the States, not filing appellate briefs on the March 11 appellate deadline.

7.      Finally, the Debtors' request to pay a modest amount of professional fees of the

Nine—likely less than 5% of the fees paid to the advisors of other governmental entities at their

request under the exact same Code provisions—is plainly a sound exercise of the Debtors'

business judgment, and safely within the scope of Section 363(b) of the Code and the law of the

case in these proceedings.  The Court authorized the Debtors to pay fees of the Ad Hoc

Committee in November 2019, fees of the Multistate Governmental Entities Group in April 2021,

and certain fees of the Non-Consenting States Group in November 2021.[4]  Objectors have

offered no reason why the Debtors' decision to reimburse the fees at issue (currently

approximately $2.5 million) is any less appropriate.

8.      For all of the foregoing reasons, and for the reasons set forth in the Motion, the

Debtors respectfully request that the Court enter the proposed Order.

## <u>ARGUMENT</u>

**I.      The Term Sheet Is in the Best Interest of the Estates and Consistent with the
Bankruptcy Code**

9.      It is unchallenged and undisputed that the settlements embodied in the Term Sheet

contemplate massive benefits for the estates and their creditors.  No party objects to the

agreement to increase the economic consideration to the estates by a minimum of $898 million,

up to a maximum of $1.398 billion, and to remove the foundations contingency that could have

---

[4] Order Granting Motion Authorizing the Debtors to Assume the Reimbursement Agreement and Pay the Fees and Expenses of the AHC, Bankr. Dkt. No. 553 (Dec. 2, 2019); Order Authorizing Debtors to Enter into Term Sheet with and Pay Certain Fees and Expenses of the MSGE, Bankr. Dkt. No. 2695 (Apr. 22, 2021); Order Granting Debtors' Motion to Approve Payment or Reimbursement of Certain Fees and Expenses of the Non-Consenting States Group, the AHC and the MSGE, Bankr. Dkt. No. 4185 (Nov. 30, 2021).

blocked emergence. (*See, e.g.*, Fl. Obj. at 2; Claimants Obj. at 2.) All of that consideration will

be paid to the estates or their successor under the Plan, become estate property, and be

distributed in accordance with the confirmed Plan and the extant MDT and Plan allocations.

Similarly, and unsurprisingly, no Objector has taken issue with the Debtors' agreement to

expand the scope of documents to be provided to the document repository (which does not

require court approval), the materially expanded Sackler naming rights concession, and the

agreement of the Nine to consent to the third-party releases under Section 10.7 of the Plan or to

withdraw their appeals. Where the Term Sheet agreements touch upon the Plan, they do so very

lightly and only enhance its benefits to creditors. For example, the addition of the $277 million

in SOAF Payments over 18 years to the obligations secured by the collateral securing the

Shareholder Settlement is a modest dilution of a $5.5 to $6 billion obligation, relevant only in the

unlikely event of a breach and outweighed many times over by $898 million to $1.398 billion of

incremental cash consideration.[5]

10.       As the Court and all parties are fully aware, the Term Sheet agreement is the

product of a nearly nine-week, brutally intense, Court-ordered mediation among the "Mediation

Parties"—the Sacklers and the Nine—under the supervision and through the extraordinary and

unceasing daily and nightly efforts of a sitting federal judge. Judge Chapman's Mediators'

Reports disclose that she devoted more than 320 hours to mediation efforts over the two months

---

[5] The Ad Hoc Committee argues that the Sacklers and the Nine cannot enter into the Direct Settlement Agreement without certain minor amendments to the Shareholder Settlement Agreement, and that these amendments cannot be made without the Ad Hoc Committee's consent—which it will refuse to give. (AHC Obj. ¶ 24.) The Ad Hoc Committee argues, in effect, that because the Sacklers also agreed to pay and collateralize the $277 million in SOAF Payments, $898 million to $1.398 billion of extra consideration for the estate should be rejected because the estate cannot accept this extra money absent consent that the Ad Hoc Committee is unwilling to give. Given this radical asymmetry between the small highly contingent risk of collateral dilution compared to the massive benefits of the settlement, the Debtors believe that should the Court grant the relief requested, a resolution of this issue will be found.

of the mediation, and that the mediation involved "countless" teleconferences, video conferences, and two days of in-person mediation sessions.  (Fourth Mediator Report ¶ 3.)  The unsupported and unsupportable claim that the Term Sheet was "orchestrated" by the Debtors is flatly false, as well as a meritless insult to the mediator.

11.     The crux of the Objections focuses on an aspect of the Term Sheet that does not, other than glancingly, even relate to the Plan, the Plan's treatment of creditors, or any property of the Debtors' estates.  Objectors argue that the SOAF Payments, which will be made by the Sacklers for the benefit of the Nine and the State of New Hampshire (and exclusively for abatement), allegedly modifies creditor treatment under the Plan (or, even more implausibly, constitutes a new plan) and gives the Nine and New Hampshire disproportionately favorable Plan treatment.  (*See, e.g.*, Fl. Obj. ¶¶ 15, 27-28; Claimants Obj. ¶¶ 10, 26-27; AHC Obj. ¶¶ 19-22; Isaacs Obj. ¶¶ 1, 15, 27-28.)  But these Objections all rest on a false premise.  The uncontroverted facts and basic principles of bankruptcy law demonstrate that the SOAF Payments are not estate property.  Nor are they being paid under a plan.  Rather, they are direct payments by third parties to other third parties.  The Sacklers' direct SOAF Payments to the Nine are not "treatment" of the chapter 11 claims of the Nine or New Hampshire, and do not alter or affect the Plan's treatment of all Class 4 creditors.[6]  The only change to the treatment of creditors under the Plan is $898 million to $1.398 billion of new distributions under the Plan's extant allocation mechanisms.

---

[6] West Virginia obliquely accuses the Debtors and the Mediation Parties of negotiating the Term Sheet in bad faith and in violation of section 1129(a)(3) of the Code.  (*See* W. Va. Obj. ¶ 3.)  The Court has already concluded that the Plan was proposed in "good faith" as required by Section 1129(a)(3).  *See* Confirmation Order, ¶ N.  The fact that the Sacklers and the Nine, in mediation before a sitting judge, agreed to the SOAF Payments—which are not part of the Plan or a distribution to or from the Debtors' estates, *see* Points I.A, I.B below—cannot possibly undermine this Court's conclusion that the Plan was proposed in good faith, particularly where the Term Sheet benefits the estates by hundreds of millions of more dollars.

### A.    The SOAF Payments Are Not Estate Property

12.    Even cursory consideration of the Term Sheet and SOAF Payments demonstrates that the funds paid into SOAF, the value distributed out of SOAF, and SOAF itself were not, are not, and will never be property of the Debtors' estates.  The Sacklers will make the SOAF Payments to SOAF, not to the Estates.  The Sacklers will use their own funds, not estate property, to make the SOAF Payments.  The Sacklers will make those payments pursuant to the Direct Settlement Agreement, an agreement to which the Debtors will not be a party.  SOAF itself will be established and administered by the Nine, not by the Debtors, their successors, or any plan proponent.  Under these circumstances, it is clear that the SOAF Payments are neither estate property nor made under the Plan.

13.    It is well established that a third party may use its own property to make payments to a creditor to resolve contested or other matters in chapter 11 cases, without making those third-party payments subject to the horizontal and vertical distributional strictures of the Bankruptcy Code.  The Third Circuit expressly rejected an argument very much like the objectors in *In re ICL Holding Co., Inc.*, 802 F.3d 547, 556 (3d Cir. 2015).  There, secured creditors credit bidding for debtors' assets agreed to establish a trust for the benefit of unsecured creditors; in exchange, the unsecured creditors' committee agreed to drop objections to the sale. *Id.* at 551.  Exactly as here, an objector (in that case, the United States) argued that the sellers' payment to unsecured creditors "was property of the estate" and thus violated the Code's priority scheme.  *Id.* at 552.  The Third Circuit affirmed the bankruptcy court's determination that the settlement funds were not estate property:  they were "not proceeds from [purchasers'] liens, did not at any time belong to [the debtor's] estate, and will not become part of its estate even as a pass-through."  *Id.* at 556.  Because the Code's "creditor-payment hierarchy only becomes an issue when distributing estate property," the bidders' use of their own property to pay unsecured

8

creditors did not implicate the Code.  *Id.* at 558; *see In re TSIC, Inc.*, 393 B.R. 71 (Bankr. D. Del.

2008) (concluding that a similar payment from a successful bidder to unsecured creditors was

"non-estate property" because they "are not proceeds from a secured creditor's lien, do not

belong to the estate, and will not become part of the estate" even if the settlement at issue there

was not approved); *see also In re DBSD N. Am., Inc.*, 634 F.3d 79, 98 (2d Cir. 2011) (explaining

that where estate liquidation proceeds received by secured creditor were "treated . . . as no longer

property of the estate," such proceeds "belonged to the secured creditor alone" with which

secured creditor could "do what it pleased," including sharing with a junior class of creditors).

Like the payments at issue in those and many other cases (in many of which the funds at issue

actually were—unlike here—distributed under the plan and/or were the debtor's legal property

but also the secured creditor's collateral), the SOAF Payments are not proceeds of the estate, do

not belong to the estate, will not become part of the estate even if the Term Sheet is not approved,

and will not pass through the estate for distribution.[7]

### B.    The SOAF Payments Do Not Alter the Plans' Equal Treatment of Claims

14.    At confirmation, the Court concluded that the Plan provides for the "same

treatment of each claim in Class 4" through the uniform procedures of the MDT and the Plan's

allocation formulae.  (Modified Bench Ruling, Bankr. Dkt. No. 3786 at 52.)  Under the Term

Sheet, these allocation formulae and trust procedures will remain <u>entirely unchanged</u> for all

---

[7] The only aspects of the Term Sheet that in fact relate to Plan provisions are the increased payments by the Sacklers to the Master Distribution Trust pursuant to the Shareholder Settlement Payment, and the agreement to remove the Plan's provisions that require certain changes to the members of Sackler-established nonprofit foundations in exchange for $175 million in day 1 incremental consideration—a significant economic benefit and de-risking of the Plan that benefits all estate stakeholders.  (*See* Plan § 5.7(l).)  For obvious reasons, no party has objected to these aspects of the Term Sheet.  In any case, these modifications may be made if the order vacating the Confirmation Order is reversed, as they are permissible Plan modifications which do not require resolicitation under section 1127 or Federal Rule of Bankruptcy Procedure 3019.

funds flowing under the Plan.  Only the amounts subject to these formulas and procedures will change—massively and favorably—reflecting the $898 million to $1.398 billion in incremental consideration to be provided under the Sackler Settlement Agreement.

15.    The SOAF Payments to be made by the Sacklers directly to the Nine and New Hampshire do not alter the Plan's treatment of creditors.  Objectors argue that "equality of treatment" for purposes of section 1123(a)(4) requires that all class members "receive equal value" in proportion to their claims and "pay the same consideration in exchange."  (Fl. Obj. ¶ 21 (citing *In re Breitburn Energy Partners LP*, 582 B.R. 321, 357-58 (Bankr. S.D.N.Y. 2018)).)  That standard is plainly met:  all Class 4 creditors are receiving their NOAT distributions "in exchange for" the Plan's discharge of the Debtors and third-party releases under Section 10.7 of the Plan.  The Nine and New Hampshire are receiving nothing more under the Plan than other Class 4 creditors from the Debtors or their Estates, and are agreeing to the same releases that bind every other creditor.[8]

16.    The Nine and New Hampshire will, of course, separately receive the SOAF Payments from the Sacklers—which are not distributions of estate property.   Objectors offer no argument, and cite no authority, for their oft-repeated but false claim that SOAF Payments should or could be considered "treatment" that implicates section 1123(a)(4).  To the contrary, the law is clear that payments from third parties do not constitute "treatment" under a plan.  *See, e.g.*, *Windels Marx Lane & Mittendorf, LLP v. Source Enters. (In re Source Enters.)*, 392 B.R.

---

[8] Not a single dollar of estate recoveries are being "diverted" away from the Tribe Trust that benefits Class 5 claimants.  The Tribe Trust, using the Tribes' stated 3% allocation, will receive between $26.94 million and $41.94 million in additional funds from the Sacklers' incremental payments to the Master Disbursement Trust contemplated by the Term Sheet—and is giving up nothing.  The Tribe Trust simply has no right to *also* receive 3% of the SOAF Payments that the Sacklers have agreed separately to pay to third parties.

541, 557 (S.D.N.Y. 2008) (a third party's agreement to provide a creditor certain benefits, and to

which debtors were not a party, does not constitute plan "treatment" of the creditor's claim); *In

re ICL Holding Co.*, 802 F.3d at 556; *In re TSIC, Inc.*, 393 B.R. at 75.

17.     Objectors' motivating concern appears to be that the SOAF Payments "will

undermine the ability of attorneys general to resolve litigation against other opioid defendants"

by upsetting settled allocation expectations.  (Fl. Obj. at 3.)  The Debtors neither have nor

express any view on the consequences of the SOAF Payments on other unrelated litigations other

than to note that the interstate settlement dynamics in unrelated matters have no bearing on the

very narrow ruling that the Court is being asked to make in the case at bar.  This Court is not

being asked to endorse, pass judgment on, or even form a view as to the SOAF Payments with

two narrow and limited exceptions:  that the SOAF Payments do not contravene any prior orders

of the Court in these cases or any provision of the Bankruptcy Code.

### C.     The Term Sheet Is Not a *Sub Rosa* Plan

18.     The State Objectors contend that the SOAF Payment reflected in the Term Sheet

constitutes a *sub rosa* plan because it allegedly "modif[ies] the distribution and allocation model

of the Plan."  (Fl. Obj. ¶ 27 ("By modifying the distribution and allocation model of the Plan and

favoring the Nine by providing only those states with an extra $276,888,888.87, the Debtors are

seeking to short circuit the requirements of Chapter 11." (internal quotation marks omitted)).)

The Objectors' reliance on the *sub rosa* plan doctrine is deeply misplaced.

19.     As set forth above, the SOAF Payments are not estate property, and do not amend

the Plan or modify its allocation or distribution scheme in any way.  That alone dispatches the

Objectors' *sub rosa* plan arguments in toto.  But it should not pass without mention, again, that

the Term Sheet does not do anything, as the Objectors put it, "to the detriment of the other

States."  (Fl. Obj. ¶ 28.)  To the contrary, what the Term Sheet does do is deliver multiple

material benefits, including $898 million to $1.398 billion in additional contributions by the

Sacklers to the Debtors' estates through the existing Shareholder Settlement Agreement—funds

that will in turn be funneled to the Master Disbursement Trust in its current form with its

allocations unchanged to be used for desperately needed opioid abatement across the country.   It

also removes risk related to the foundation change of control and replaces it with $175 million of

guaranteed day 1 cash, and provides that the Debtors will contribute additional documents to the

document repository (which does not require court approval).  It is not a new or *sub rosa* plan—

it is the exact plan already confirmed, albeit with more money and less risk.

      20.     Even a brief review of the cases addressing the *sub rosa* plan doctrine confirms its

inapplicability.  Transactions have been rejected as *sub rosa* plans of reorganization only in

"extreme circumstances," *In re Tower Auto., Inc.*, 342 B.R. 158, 163 (Bankr. S.D.N.Y. 2006),

where the transaction will, "in effect, 'short circuit the requirements of [c]hapter 11 for

confirmation of a reorganization plan.'"  *In re Iridium Operating LLC*, 478 F.3d 452, 466 (2d Cir.

2007) (internal citation omitted).  For these reasons, as this Court has observed, "[t]he cases

where a *sub rosa* plan argument has succeeded are . . . quite limited."  (Nov. 17, 2020 Hr'g Tr.

236:1-4.)  That is further evidenced by the State Objectors' own brief, where five of the six cases

cited in support of their *sub rosa* plan claims rejected the rarely accepted argument.  *See In re

Empire Generating Co.*, No. 19-cv-5721 (CS), 2020 WL 1330285, at *11 (S.D.N.Y. Mar. 23,

2020) ("[T]he RSA does not constitute a [*s*]*ub* [*r*]*osa* [*p*]lan [of reorganization]."); *In re Iridium*,

478 F.3d at 466 ("The settlement agreement is not a *sub rosa* plan [of reorganization]"); *In re

Chrysler LLC*, 405 B.R. 84, 113 (Bankr. S.D.N.Y. 2009) ("[T]he Court finds that the Sale

Transaction is not a *sub rosa* plan . . . ."); *In re Tower Auto. Inc.*, 241 F.R.D. 162, 169 (S.D.N.Y.

2006) ("[T]he Retiree Settlements are not the type of transactions that courts have found to be

impermissible *sub rosa* plans."); *In re Crowthers McCall Pattern, Inc.*, 114 B.R. 877, 890

(Bankr. S.D.N.Y. 1990) ("[T]he Agreement . . . is not a *de facto* plan.").  Even priority-impairing

settlements have been found not to constitute *sub rosa* plans.  *In re Iridium*, 478 F.3d at 466.

21.    The lone case cited in the State Objectors' brief holding that a transaction

constituted a *sub rosa* plan is the almost 40-year-old *In re Braniff Airways, Inc.*, 700 F.2d 935,

940 (5th Cir. 1983).  In *Braniff*, the relevant agreements (i) mandated that "[t]he reorganization

plan would have to allocate the [transaction consideration] according to the terms of the . . .

agreement or forfeit a valuable asset," (ii) "required [secured creditors] to vote a portion of their

deficiency claim in favor of any future reorganization plan approved by a majority of the

unsecured creditors' committee," and (iii) "provided for the release of claims by all parties

against [the debtor], its secured creditors and its officers and directors."  *Id.*  The Fifth Circuit

determined that "[w]ere this transaction approved, and considering the properties proposed to be

transferred, little would remain save fixed base equipment and little prospect or occasion for

further reorganization."  *Id.*  More simply put, the transaction was "in fact a reorganization," and

the Fifth Circuit thus rejected it.  *Id.  Braniff*, however, is far afield from the case at hand, and the

Objectors do not claim otherwise.  Among so many other things, the $277 million is to be paid

directly by third parties to third parties and is a small fraction of the many billions being paid out

under the actual plan of reorganization (which includes not only Sackler payments, but also the

significant value delivered by the Company).  The Objectors' *sub rosa* plan argument should be

rejected.

      **D.    The Term Sheet Is Not an Amended Plan**

22.    The United States Trustee's argument that the Motion seeks confirmation of an

amended or modified plan is even further afield, as it rests on a basic misunderstanding of the

relief sought in the Motion.  Despite the U.S. Trustee's assertion that "the Court is being asked to

confirm—on a contingent basis—a revised plan or a new plan" (UST Obj. at 12) or to modify the

Plan pursuant to section 1127 (*id.* at 13), the Motion requests no such relief.  The Court has

already confirmed the Plan; the Confirmation Order is currently vacated by the District Court's

order of December 16, 2021; the District Court's order is on appeal to the Second Circuit.  The

Debtors have not sought entry of any order confirming a "revised plan or a new plan."  Nor does

the Motion seek authority to make any present modification to the Plan that would implicate the

plan modification procedures of section 1127 or the solicitation requirements of section 1125.[9]

Rather, by its plain terms, the Debtors have requested authority to implement the Term Sheet in

the future:  in the words of the proposed order, "upon the entry of one or more orders by the

Court of Appeals for the Second Circuit or the United States District Court for the Southern

District of New York permitting the consummation of the Plan as enhanced by the Term Sheet."

(Proposed Order ¶ 3.)

23.    Even were the Motion construed as a motion to amend the Plan pursuant to

section 1127, the U.S. Trustee errs in suggesting the Debtors must resolicit creditors pursuant to

section 1125.  A proposed plan modification requires resolicitation only if it is materially adverse

to creditors, such that it "so affects a creditor or interest holder who accepted the plan that such

entity, if it knew of the modification, would be likely to reconsider its acceptance." *In re Am.*

*Solar King Corp.*, 90 B.R. 808, 824 (Bankr. W.D. Tex. 1988) (citation omitted); *see also In re*

*Enron Corp.*, No. 01-16034 (AJG), 2004 Bankr. LEXIS 2549, at *259 (Bankr. S.D.N.Y. July 15,

---

[9] The U.S. Trustee relies on two cases for the proposition that a "plan modification titled as a settlement remains a plan modification."  (UST Obj. at 13 (citing *SCH Corp. v. CFI Class Action Claimants*, 597 F. App'x 143, 148-49 (3d Cir. 2015) and *Ad Hoc Comm. of CTA Bondholders v. Cont'l Airlines, Inc. (In re Cont'l Airlines)*, No. 93-252-SLR, 1994 WL 828457, at *5 (D. Del. June 8, 1994)).)  These cases—which stand for the unremarkable proposition that settlements that resulted in material changes to a plan were subject to section 1127's procedures for plan amendments—have no application here because the Motion and proposed order do not presently amend the Plan.

2004) ("The best test is the modification so affects any creditor or interest holder who accepted the plan that such entity, if it knew of the modification, would be likely to reconsider its acceptance.") (quoting 9 Collier on Bankr. 113019.01 (15th ed. rev. 2004) (internal quotation marks omitted)).  No creditor's treatment under the Plan is adversely affected by the enhancements contemplated by the Term Sheet—in fact, all creditors receive the same or better recoveries than under the current Plan.  These enhancements do not trigger any duty to resolicit the plan.

## II.   The Bankruptcy Court Has Jurisdiction to Approve the Term Sheet

24.     Certain Objectors claim that this Court lacks jurisdiction to enter the Proposed Order because the order substantively modifies the Plan, "including releases, payment of attorney's fees, the allocation model, and treatment of creditors in Class 4."  (Fl. Obj. ¶ 11.)  The U.S. Trustee also claims that this Court lacks jurisdiction to enter the Proposed Order.[10]  (UST Obj. at 8-9.)  They err.

25.     To be sure, courts have held that a lower court is typically divested of jurisdiction to vacate or modify an order that has been appealed during the pendency of the appeal.  *See, e.g.*, *In re Emergency Beacon Corp.*, 58 B.R. 399, 402 (Bankr. S.D.N.Y. 1986) ("Once a notice of appeal is filed no lower court should be able to vacate or modify an order under appeal . . . ." (internal quotation marks and citation omitted)).  The purpose of that rule is to prevent the "confusion and waste of time that might result from putting the same issues before two courts at

---

[10] In a separate argument, the U.S. Trustee claims that this Court cannot enter the Proposed Order because the "Term Sheet does not cure the statutory and constitutional infirmities raised in the United States Trustee's objections to confirmation, including the lack of statutory authority for the non-consensual third-party releases that caused the district court on appeal to vacate this Court's confirmation order."  (UST Obj. at 10-11.)  That, however, is no impediment to entry of the Proposed Order, which expressly envisions reversal of the district court's decision. (Proposed Order at 3.)

the same time." *Id.*; *see also In re Sabine Oil & Gas Corp.*, No. 16-CV-2561 (JGK), 2016 WL 4203551, at *6 (S.D.N.Y. Aug. 9, 2016) (holding that "the divestiture doctrine precludes a bankruptcy court from deciding the same issue a second time while the first decision is on appeal"). The divestiture rule is designed to "preserve the integrity of the appeal process." *Galope v. New Century Mortg. Corp. (In re New Century TRS Holdings, Inc.)*, No. 07-10416 (KJC), 2013 WL 5755058, at *3 (Bankr. D. Del. Oct. 16, 2013) (internal quotation marks and citation omitted). It is equally well-established, however, that courts "retain jurisdiction to decide issues different from those on appeal." *In re Sabine*, 2016 WL 4203551, at *6; *In re Bd. of Dirs. of Hopewell Int'l Ins. Ltd.*, 258 B.R. 580, 583 (Bankr. S.D.N.Y. 2001) ("[N]otwithstanding the pendency of an appeal, bankruptcy courts are not divested of jurisdiction to decide issues and proceedings different from and collateral to those involved in the appeal."). This second principle is particularly important in ensuring the orderly and timely administration of chapter 11 cases, which usually involve "the court's issuance of innumerable orders involving a myriad of issues, one or more of which may be on appeal at any given moment." *In re Prudential Lines, Inc.*, 170 B.R. 222, 244 (S.D.N.Y. 1994).

26.     The State Objectors' primary jurisdictional argument is seemingly that the SOAF Payments significantly amend the Plan on appeal, including by altering releases, "revising the allocation models," and "altering the equality of distributions under Plan." (Fl. Obj. ¶¶ 11, 15.) None of these assertions is true. The SOAF Payment does not alter the Plan releases in any way. Not a sentence, word, letter, or comma of any of the Plan releases nor the relevant confirmation order provisions are changed. Nor, as detailed at length above, do the SOAF Payments touch or revise the Plan's distributional scheme. To the contrary, as explained above, the SOAF payments will be made pursuant to a new direct settlement agreement exclusively among the

Sacklers and the Nine that does not involve a penny of estate assets and will not be paid under or

through the Plan.  To the extent the Approval Order authorizes the Debtors to perform certain

other actions with respect to the Plan, such as revising the Shareholder Settlement Agreement to

allow for incremental payments to flow into the estate if the Plan is cleared for consummation or

to replace the foundation provision with $175 million of cash on the Effective Date, those

massive benefits are unsurprisingly not challenged by the State Objectors and, in any event and

as the U.S. Trustee concedes, such actions are effective only <u>after</u> the appeals are resolved.  (*See*

Proposed Order ¶ 3.)

27.     That the divestiture rule is no impediment to the entry of the Approval Order is

further underscored by the fact that the Approval Order does not threaten or undermine the

integrity of the appellate process, a point made plain by the State Objectors' own briefing.  The

State Objectors correctly identify the principle issue on appeal, namely, whether this Court "had

the authority to approve non-consensual third-party releases to non-Debtors."  (Fl. Obj. ¶ 14.)

The Section 10.7 releases remain exactly as they are, and that issue remains squarely on appeal

and is undisturbed by the Approval Order.  The parties did not agree to (and the settlement does

not) amend the releases—the Nine merely agreed to stop fighting them.[11]  Indeed, a favorable

---

[11] The Ad Hoc Committee argues that the Sacklers' agreement to pay Term Sheet consideration under an "alternative mechanism" if the Plan cannot be consummated amounts to a "contingent exception" for the Nine to the releases under Section 10.7 of the Plan.  (AHC Obj. ¶ 21.)  This is simply wrong.  The Plan's release provisions will fully apply to claims of the Nine, and nothing in the Term Sheet remotely purports to change the effect of those releases.  Indeed, the Term Sheet makes clear that the Nine have agreed to be bound consensually by the Plan's release provisions.  (Term Sheet at 4.)  Nor does the Term Sheet alter the channeling provisions of the Plan in any way.  Nowhere does the Term Sheet, Motion, or proposed order suggest that any claims will be channeled to or assumed by the SOAF, nor do the channeling provisions of the Plan bar the Sacklers from agreeing to make payments to third parties.

ruling from the Second Circuit on this issue—exactly as it currently sits before the Court of

Appeals— is necessary for the Plan to go effective and be consummated.

28.     For all of the foregoing reasons, the jurisdictional arguments (which, it bears

emphasis, largely rest on cases that found <u>no</u> divestiture of jurisdiction[12]) should be rejected.

## III.    The Motion Does Not Seek an Advisory Opinion

29.     Certain Objectors assert that the Motion seeks some sort of advisory opinion from

this Court.  (Fl. Obj. ¶¶ 16-19.)  Not so.  There is no abstract disagreement here, and the Court is

not being asked to decide arguendo or hypothetical questions that do not affect the rights and

actions of the litigants.  To the contrary, entry of the Approval Order will result in the Debtors

---

[12] *See In re Sabine Oil & Gas Corp.*, 2016 WL 4203551, at *6 (holding that an argument that the court lacked jurisdiction to confirm a plan of reorganization that contained third-party releases while an appeal of a denial of an *STN* motion was pending was "without merit"); *In re Prudential Lines, Inc.*, 170 B.R. at 243 (concluding that "the bankruptcy court retained jurisdiction to undertake [the challenged] actions"); *In re Emergency Beacon Corp.*, 58 B.R. at 402-03 (determining that court had jurisdiction to consider subsequent motion to dismiss a Chapter XI petition because it sought dismissal on a different ground than the first motion, then on appeal); *Maresse v. Am. Acad. of Orthopedic Surgeons*, 470 U.S. 373, 379 (1985) (holding that appeal of contempt order did not prevent court from certifying a denial of a motion to dismiss for interlocutory appeal, and observing that "[t]he District Court's amendment of its initial denial of the motion to dismiss did not interfere with but instead facilitated review of the pending appeal from the contempt order"); *In re Hagel*, 184 B.R. 793, 798-99 (BAP 9th Cir. 1995) (rejecting argument that bankruptcy court lacked jurisdiction to dismiss chapter 13 case where order denying plan confirmation was on appeal).  The cases that held that jurisdiction to enter the challenged order was lacking involved situations where the issues at the center of the appeal were essentially the same as those implicated by the challenged order.  *See In re Transtexas Gas Corp.*, 303 F.3d 571, 576, 580 n.2 (5th Cir. 2002) (determining that bankruptcy court lacked jurisdiction to enter supplemental orders that essentially "reiterate[d] a provision of the confirmation order" then on appeal, and observing that the portions of the confirmation order challenged on appeal were "indisputably" the same portions addressed by the supplemental orders); *In re Kendrick Equip. Corp.*, 60 B.R. 356, 358-59 (Bankr. W.D. Va. 1986) (determining that court lacked jurisdiction to reimpose automatic stay while appeal of lifting the automatic stay remained pending); *In re Millennium Glob. Emerging Credit Master Fund Ltd.*, 471 B.R. 342, 348 (Bankr. S.D.N.Y. 2012) ("[T]he motion to vacate the order appealed from [an order recognizing a foreign proceeding] obviously involves the propriety of that order and the very substance of the appeal [of that order].").  Here, no relief of any kind is being requested with respect to the releases of section 10.7 of the Plan or any other issue currently on appeal.

and other parties taking immediate action of great value to <u>all</u> stakeholders in these chapter 11

cases, including apprising the Second Circuit of the settlement and, in the case of the States,

refraining from filing appellate briefs due on Friday, March 11, 2022.  (Debtors Mot., Ex. B

("Upon the effectiveness of this settlement and subject to the settlement not having been

terminated, each Member of the Nine agrees . . . that after the filing of a joint notice by the Nine

and the Debtors advising the Court of Appeals for the Second Circuit that the Nine's non-

opposition to the Appeal is contingent upon the terms of this settlement . . . [the Nine] will not

file any brief with or present any argument to the Second Circuit panel hearing the appeal of the

District Court's Decision and Order issued on December 16, 2021[.]").)

30.    Moreover, the fact that certain obligations under the Term Sheet are subject to

conditions precedent (as was the Debtors' and virtually every plan of reorganization ever

confirmed) does not render the Term Sheet constitutionally unfit for adjudication.  Nor does the

Debtors' and the Approval Order's appropriate acknowledgment of the obvious appellate

conditions precedent amount to an admission of such.  (*See* Fl. Obj. ¶ 19 ("The Debtors readily

admit that the Motion does not present an actual case [or] controversy, and state 'none of this

will be relevant unless the Court of Appeals for the Second Circuit or the District Court, as

applicable, issue orders or rulings allowing the consummation of the Plan as materially enhanced

by the Term Sheet.'").)  Even a cursory search of the cases on settlement approval reveals that

bankruptcy courts routinely approve settlement agreements with conditions precedent.  *See, e.g.*,

*In re Motors Liquidation Co.*, 555 B.R. 355, 360-61, 364 (Bankr. S.D.N.Y. 2016) (approving a

settlement agreement conditioned on securing acceptable financing terms notwithstanding

several objections to approval on ripeness grounds).  It is thus no surprise that the Objectors offer

no support for their argument to the contrary, other than to make threadbare recitals of black

letter principles wholly unmoored from the present circumstances. *See Motor Vehicle Mfrs.*

*Ass'n of U.S., Inc. v. N.Y. State Dep't of Envtl. Conservation*, 79 F.3d 1298, 1305 (2d Cir. 1996)

(rejecting challenge to "non-existing [regulatory program] on non-existing cars"); *In re Nunez*,

No. 98-cv-7007 (CBA), 2000 WL 655983, at *6-7 (E.D.N.Y. Mar. 17, 2000) (vacating opinion

that party engaged in unauthorized practice of law because it was rendered well after the relevant

bankruptcies had been resolved and because the decision of whether a party engaged in the

unauthorized practice of law was the province of the New York State attorney general and bar

associations).  The relief requested is needed now, including so that briefs do not get filed this

Friday.

## IV.    Payment of the Nine's Professional Fees Is Clearly Warranted

31.    Governmental creditors (and in particular States) have played a unique role in

these chapter 11 cases, and the Debtors had and have a sound business purpose in agreeing to

pay certain professional fees of public creditor groups in advancing various universally shared

goals, including maximizing the value of these estates for, and the likelihood that they can be

exclusively dedicated to, opioid abatement and victim compensation.  Indeed, the Court so ruled

in November 2019 in its ruling granting the Debtors' motion to pay the fees of the Ad Hoc

Group.  (*See* Nov. 12, 2019 Hr'g Tr. 160:25-161:3 (explaining that the "states have a unique role

in these cases"); *id.* at 164:9-10 (holding that the agreement to pay professional fees of the Ad

Hoc Committee is a sound exercise of business judgment under section 363(b)).)  As the case

developed, and as successive public creditor groups, including the Multi-State Governmental

Entities Group and the 15 members of the formerly Non-Consenting States Group, came on

board as the Plan improved, the Debtors sought, and this Court authorized, payment of certain

professional fees for these additional creditor groups.  (*See supra* note 4 (listing orders

authorizing Debtors' assumption of fees).)

32.    The Debtors are dumbfounded that Objectors have argued that the Debtors'

agreement to pay the Specified Payments to the Nine (described in the Motion as under $4

million to date) cannot be authorized under section 363(b), given that many of these Objectors

are members of or allied with groups that themselves have received tens of millions of dollars of

professional fee reimbursements from the estate pursuant to orders entered under the self-same

section 363(b).  Indeed, the procedures pursuant to which the Debtors seek authorization to make

the Specified Payments are the very ones that have been applicable to the Ad Hoc Committee's

and other professionals.

33.    As an initial matter, the assertion of the Objectors that section 503(b) is the "sole

available avenue" to pay professional fees of the Nine is contrary to law of this case.  (Fl. Obj.

¶ 33.)  As this Court rightly articulated in approving payment of the Ad Hoc Committee's

professional fees, "there are a number of cases under the Bankruptcy Code and fact patterns

under the Bankruptcy Code where Courts have approved payments of ongoing fees and expenses

not under Section 503(b) but under Section 363(b) . . .[,] [t]he most common is in connection

with the debtor's request for approval or a restructuring support agreement that has garnered the

support of some but not all of the debtor's creditors. "  (Nov. 11, 2019 Hr'g Tr. 156:1-4; *see also*

*U.S. Trustee v. Bethlehem Steel Corp. (In re Bethlehem Steel Corp.)*, No. 02 CIV. 2854 (MBM),

2003 WL 21738964, at *11 (S.D.N.Y. July 28, 2003) ("The authorization of certain payments

under § 363(b) is not prohibited simply because there is another section of the Bankruptcy Code

related to the same type of payment.").)[13]

---

[13] The Objectors' attempts to distinguish *Bethlehem*, *ASARCO*, and *AMR Corporation*—tellingly relegated to a rambling footnote—amounts to little more than a grab bag of irrelevant facts from each of those cases and thus merits only a cursory response.  (Fl. Obj. ¶ 33 n.5.)  For example, in highlighting that the fee applications in *Bethlehem*, *ASARCO*, and *AMR Corporation* had the support of their respective creditors' committees, the objectors appear to have overlooked the

34.     The assertion that there are no sound business purposes to make the Specified

Payments on account of the professional fees of the Nine fares no better.  As detailed above, the

Term Sheet settlement reached between the Nine and the Sacklers provides $898 million to

$1.358 billion of _incremental_ value to the estates as well as critically important non-economic

benefits.  As disclosed in the Motion—but ignored by Objectors—the Specified Payments to the

Nine were estimated to total less than $4 million; presently, the Specified Payments are

approximately $2.5 million, and such fees will be of limited scope after entry of the order

granting the Motion.  It is unquestionably a sound exercise of business judgment to agree to pay

these sums as part of obtaining the vast economic and non-economic benefits to the estates of the

Term Sheet, including the non-objection of the Nine to the current Plan.  The Debtors' history of

paying significantly larger amounts for professional fees of other supporting governmental

creditor groups proves this point beyond contest.

## **CONCLUSION**

For the reasons set forth herein, the Debtors respectfully request entry of the Proposed

Order attached as Exhibit A to the Motion and such further relief as the Court may deem just and

appropriate.  If the requested relief is not granted, the Sacklers will keep $1.175 to $1.675 billion

that otherwise could be dedicated to abatement, and to improving, and hopefully saving,

---

fact that the Creditors Committee here also supports the fee application, in light of the enormous
value the Term Sheet would deliver to its constituents.  (Fl. Obj. ¶¶ 29-33; Claimants Obj.
¶¶ 28-32; Isaacs Obj. ¶¶ 29-33; WV Obj. ¶¶ 9-10; Ind. Obj. ¶ 6; Ecke Obj. at 2-3.)

The Objectors also highlight the fact that the courts in _Bethlehem_ and _ASARCO_ capped the
professional fees at certain amounts as purported support for their argument that the professional
fees here should be denied.  (Fl. Obj. ¶ 33 n.5.)  But neither _Bethlehem_ nor _ASARCO_ stand for
the proposition that fee caps are necessary for approving payment of fees.  _In re Bethlehem_, 2003
WL 21738964, at *1-2, *10-11 (S.D.N.Y. July 28, 2003); _In re ASARCO LLC_, 441 B.R. 813,
821 (S.D. Tex. 2010).  Moreover, this Court has already approved payment of certain
professional fees in this case without a cap.  The Objectors' reliance on these cases is thus
misguided.

American lives, and the existing Plan—crafted and supported by so many—will have a lower

probability of succeeding.


Dated:    March 9, 2022
          New York, New York


                                        DAVIS POLK & WARDWELL LLP

                                        By:   /s/ Marshall S. Huebner_____

                                        450 Lexington Avenue
                                        New York, New York 10017
                                        Telephone: (212) 450-4000
                                        Facsimile:  (212) 701-5800
                                        Marshall S. Huebner
                                        Benjamin S. Kaminetzky
                                        Eli J. Vonnegut
                                        James I. McClammy
                                        Marc J. Tobak
                                        Christopher S. Robertson
                                        Gerard X. McCarthy


                                        *Counsel to the Debtors
                                        and Debtors in Possession*