AKIN GUMP STRAUSS HAUER & FELD LLP
Arik Preis
Mitchell P. Hurley
Sara L. Brauner
Theodore James Salwen
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
apreis@akingump.com
mhurley@akingump.com
sbrauner@akingump.com
jsalwen@akingump.com

*Counsel to the Official Committee of*
*Unsecured Creditors of Purdue Pharma L.P.*, et al.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| PURDUE PHARMA L.P., *et al.*, | Case No. 19-23649 (RDD) |
| Debtors.[1] | (Jointly Administered) |

**STATEMENT OF THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS IN SUPPORT OF MOTION OF DEBTORS PURSUANT
TO 11 U.S.C. §§ 105(a) AND 363(b) FOR ENTRY OF AN ORDER
AUTHORIZING AND APPROVING SETTLEMENT TERM SHEET AND
JOINDER IN THE DEBTORS' REPLY IN SUPPORT THEREOF**

The Official Committee of Unsecured Creditors (the "Official Committee") appointed in the chapter 11 cases (the "Chapter 11 Cases") of the above-captioned debtors and debtors in

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF L.P. (0495), SVC Pharma L.P. (5717) and SVC Pharma Inc. (4014).

possession (collectively, the "Debtors"), by and through its undersigned counsel, hereby submits this statement (the "Statement") in support of the *Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a) and 363(b) for Entry of an Order Authorizing and Approving Settlement Term Sheet* [ECF No. 4410] (the "Supplemental Settlement Motion").[2] In support of this Statement, the Official Committee respectfully states as follows.

### STATEMENT

1. The Court now has before it a settlement (the "Supplemental Settlement") that, if approved, would facilitate a streamlined appellate process and potentially accelerate that long-awaited day when Purdue's assets and at least **5.5 billion dollars** in additional value from the Sacklers will be put to use to compensate victims and abate the Opioid Crisis, which has crippled this country for decades. The magnitude of this result—which has taken more than two years of exhaustive efforts by countless parties in interest, mediators and this Court to achieve—cannot be overstated, and is clearly in the best interests of the estate and its creditors, taken as a whole. By the Supplemental Settlement Motion, the Debtors seek confirmation that the carefully crafted agreement reached among the Nine and the Sacklers and documented in the Term Sheet does not

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Supplemental Settlement Motion or in the *Twelfth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [ECF No. 3726] (the "Plan"), as applicable. This Statement also serves as the Official Committee's response to the objections filed by: Florida [ECF No. 4413]; West Virginia [ECF No. 4417]; Indiana [ECF No. 4418]; the Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants (the "AHC") [ECF No. 4471]; and the Tribal Leadership Council [ECF No. 4474], joinders filed by Louisiana [ECF No. 4433]; Nebraska [ECF No. 4435]; Ohio [ECF No. 4437]; Alaska [ECF No. 4440]; Montana [ECF No. 4443]; North Dakota [ECF No. 4445]; Arkansas [ECF No. 4447]; South Carolina [ECF No. 4449]; Kansas [ECF No. 4451]; Arizona [ECF No. 4453]; Kentucky [ECF No. 4458]; Georgia [ECF No. 4461]; Tennessee [ECF No. 4461]; Utah [ECF No. 4464]; Texas [ECF No. 4465]; Mississippi [ECF No. 4464]; Missouri [ECF No. 4470]; Alabama [ECF No. 4472]; Puerto Rico [ECF No. 4478]; American Samoa [ECF No. 4480]; Nassau County, New York [ECF No. 4483]; and two Ohio counties [ECF No. 4485] (collectively, the "Joinders" and, together with the Florida Objection, the West Virginia Objection and the Indiana Objection, the "Government Objections" and the claimants that filed such objections, the "Objecting Governments"), the objection filed by the United States Trustee [ECF No. 4484] (the "UST Objection") and the separate objections filed by Ellen Isaacs [ECF No. 4441]; various claimants represented by the Tate Law Group [ECF No. 4455]; Maria Ecke [ECF No. 4456]; three claimants represented by Frank Ozment [ECF No. 4473]; certain Canadian municipalities and First Nation creditors [ECF No. 4487]; and Carrie McGaha [ECF No. 4489] and joinder in the *Debtors' Reply in Support of Motion for an Order Authorizing and Approving Settlement Term Sheet* [ECF No. 4491] (the "Debtors' Reply").

2

run afoul of the Bankruptcy Code or this Court's orders—particularly its orders approving the preexisting settlements embodied in the Plan. The Official Committee submits that it does not. The Supplemental Settlement provides more than an additional billion dollars in value to abate the Opioid Crisis; it also offers numerous non-monetary benefits, including additional documents to be added to the Document Repository and a forum for the crucially important victim impact statements that will be heard in connection with the hearing to consider the Supplemental Settlement Motion. Finally, the Supplemental Settlement is essential to preserving the billions of dollars in critical value the Plan will provide to more than one hundred thousand personal injury claimants and countless opioid abatement programs across the country—value which remains at risk in the ongoing appeals of the order confirming the Plan, endangering compensation and abatement funding to the detriment of all.

2.  This unalloyed good is opposed by the Objecting Governments,[3] despite the fact that the Term Sheet offers each the opportunity to *increase* its own recovery in these cases, together with additional consideration in exchange for the Nine's agreement to withdraw from participating in the ongoing appeals. These parties who are now endeavoring to defeat the Supplemental Settlement previously supported the settlement embodied in the Plan, which would have provided them with *less* funding for these crucial programs than they now stand to obtain. They simply cannot credibly pretend that the Term Sheet provides them with less than they had before. Accordingly, they argue that the Nine and New Hampshire will receive ***too much***—too much

---

[3] Despite the number of pages used, the arguments presented by each Government Objection are largely the same, except that the Objection of the Tribal Leadership Council seeks different economic concessions than those of the other Objecting Governments. The Joinders, each substantially identical, add no legal or factual argument to the Florida Objection, which is not surprising given that the vast majority of them (all except those of Texas, Missouri and Alabama).were filed by an attorney who until two days ago only represented the State of Florida in the Chapter 11 Cases. *See Notice of Appearance and Request for Service of Papers* filed by Christopher B. Spuches on behalf of Florida, dated September 16, 2019 [ECF No. 19]; *cf., e.g. Notice of Appearance and Request for Service of Papers* filed by Christopher B. Spuches on behalf of Louisiana, dated March 7, 2022 [ECF No. 4432].

money with which to combat the opioid crisis and achieve the public good desired by all. Taken in the abstract and divorced from the facts of these unique cases, the Official Committee understands the Objecting Governments' visceral reaction—the allocation in the Plan and the associated Intensity Fund were arrived at through painstaking negotiations, in which Florida was a central participant, and it may well have been preferable to retain those arrangements in any deal that emerged from the Mediation. And, indeed, this Court is not asked to determine whether it may be better in our collective fight against the opioid crisis for certain States to receive more of the new Sackler money than others.

3. The Term Sheet was not presented to the Official Committee, and is not now presented to the Court, as a menu from which parties can order à la carte. It is itself a carefully and painstakingly crafted agreement that must be accepted in whole or rejected in whole, and on the whole it offers a singular path to help an estate of which "every person in the range of the Debtors' opioid products, sold throughout the United States, was a potential creditor."[4] The Government Objections, while perhaps understandable, are lacking in legal foundation and, more importantly, are disconnected from the interests of all other claimants represented by the Official Committee. They also threaten to demolish the good that can be accomplished in these cases—which does not cease to be good just because some additional money flows to particular States. Indeed, the Supplemental Settlement will remove the Nine from the appellate process in a manner that may result in faster implementation of the Plan itself which, for better or worse, offers the only extant path to recoveries for private claimants and governments embodied therein. As the Official Committee has urged throughout these cases, and notwithstanding the piecemeal approach demanded by the Objecting Governments, neither political infighting nor distaste for how results

---

[4] *In re Purdue Pharma L.P.*, 633 B.R. 53, 58.

were achieved should stand in the way of the overwhelming value promised by the Plan and the further benefits of the Supplemental Settlement.

4. The Term Sheet is the result of months of hard work by multiple parties and the tireless efforts of the Honorable Shelley Chapman as Mediator. Its general terms are not a surprise to anyone, including the Objecting Governments. Indeed, as was discussed prior to the Mediation and directed by the Court, the primary component is an economic agreement between and among ***non-Debtor third parties***—the Nine on the one hand and the Sacklers on the other hand—in connection with which the Nine will cease their present efforts to prevent the Plan from going effective, including through the appeal of the Confirmation Order currently pending before the Second Circuit.

5. In exchange, the Sacklers will, among other things, provide additional funding for the vital governmental abatement programs already contemplated under the Plan, including those that will be funded and operated ***by the Objecting Governments themselves***.[5] No such parallel monetary benefit will accrue to the "private" claimants, the trusts for whose benefit will continue to be funded in fixed amounts under the terms of the Plan. But to be clear, no element of this economic arrangement harms any creditor, or otherwise limits the rights of any party either under the Plan (should it be reinstated following the ongoing appellate process) or if the parties are required to negotiate a new plan under less fortunate circumstances. Rather, it achieves the opposite by providing more than a billion dollars in additional value for abatement programs without negatively affecting any creditor constituency and does so within the confines of applicable law and this Court's prior orders.

---

[5] The AHC's outraged analogy to the situation where a settlement would "divert money from one class of creditors to the objecting creditors," AHC Obj. ¶ 22 n.3, is thus fully divorced from reality.

6. The Objecting Governments decry the fact that in addition to these benefits, the Term Sheet also includes *additional* value that will be used exclusively for abatement programs by the Nine and New Hampshire. They object not to their own improved treatment (which they seem to welcome, albeit without acknowledging the efforts of the Nine to create it), but to supplemental funding provided to their sister States. But the opioid crisis does not stop at State borders, and this Court heard extensively at the hearing on confirmation of the Plan about the "multiplier benefits" to all claimants from abatement spending.[6] As such, all parties and this country as a whole will almost assuredly benefit from even the value nominally earmarked for the Nine and New Hampshire. And the Term Sheet does not only include these economic improvements. Under the Term Sheet, the Sacklers have also agreed to waive certain rights to object to the removal of the Sackler name from various institutions, buildings, museums and fellowships, and the Debtors have agreed to include in the already-extensive Public Document Repository to be established under the Plan certain additional categories of documents. Finally, and perhaps most significantly for personal injury claimants—who, unlike the Objecting Governments, have *not* demanded or received a share of the additional settlement value that the Nine have obtained for governmental claimants collectively—in connection with the settlement hearing, a limited number of individual victims of the opioid crisis will be provided an opportunity to address key members of the Sackler families, who must sit and listen as members of the public explain the harm that they have experienced. From the perspective of creditors, the Term Sheet provides substantial incremental benefits and imposes no obligations.

---

[6] *See In re Purdue Pharma L.P.*, 633 B.R. at 81 (Bankr. S.D.N.Y. 2021); Transcript of Aug. 12, 2021 Hearing at 228:14–29:18 (testimony of Mr. Gowrisankaran) (describing "spillover" benefits from distributions in the form of abatement funding).

7.     The purpose of this Statement is not to reiterate the absence of legal merit in the Government Objections, which is adequately addressed in the Debtors' Reply and largely self-evident even on the face of the Government Objections.[7]  Rather, the Official Committee writes separately to highlight the incongruity of the Government Objections in the context of these Chapter 11 Cases and in light of the extraordinary benefits afforded to all claimants—including the Objecting Governments themselves—by the concessions from both groups of parties to the Term Sheet.

### Response to the Government Objections

8.     The Supplemental Settlement is inseparable from the context out of which it arises. Indeed, the Debtors proposed, the Official Committee supported, the overwhelming majority of creditors accepted and the Court confirmed a Plan that presented—and still presents—the best (but not perfect) alternative to put the Debtors' assets to use for benefit of creditors and for the common good.  That Plan was the subject of an appeal by the Nine and others, in which the Nine asserted, among other things, that the "State police and regulatory power claims" of nonconsenting States are uniquely exempt from the possibility of third-party releases.[8]  The District Court reserved decision on the arguments unique to the States' claims,[9] and that appeal is now before the Second Circuit on other issues, with the Debtors, the Official Committee and numerous other supporting

---

[7] The Supplemental Settlement Motion is not a plan subject to Bankruptcy Code section 1123.  To the extent the Term Sheet impacts the Plan at all, it does so by enhancing the treatment afforded to certain creditors (*i.e.* those, including the Objecting Governments, whose recoveries flow through the NOAT).  And because this modification is exclusively favorable—***increasing*** the money to which the Objecting Governments are entitled above the amount for which they would have settled under the Plan—the Objecting Governments cannot successfully object to treatment that is objectively better than the treatment this Court already found satisfied the confirmation requirements.  Nor does it dictate the terms of a future plan in violation of the *sub rosa* doctrine.

[8] *See, e.g.*, Brief of Appellants the States of Washington, Connecticut, Delaware, Rhode Island and Vermont, *In re Purdue Pharma L.P. Bankruptcy Appeals*, Case No. 7:21-cv-07532-CM [ECF No. 101] (S.D.N.Y. Oct. 26, 2021).

[9] *In re Purdue Pharma, L.P.*, 2021 U.S. Dist. LEXIS 242236, at *235 (S.D.N.Y. Dec. 16, 2021).

7

parties as appellants and the Nine as appellees.[10] Depending upon the outcome at the Second Circuit, there remains a possibility that Plan supporters could be required, even after a favorable decision, to return to the District Court to address the Nine's "federalism" argument. In turn, this could further delay abatement and compensation or, at worst, provide another basis for vacating the Plan.[11] The Nine's concessions in connection with the Supplemental Settlement resolve this potential dispute and remove one of the impediments to letting the Plan go effective.

9.  And of course, the substantial concessions by the Sacklers provide significant additional benefits to creditors. Most obviously, claimants whose recoveries under the Plan flow through the NOAT—*i.e.*, States, municipalities and Native American Tribes—will receive a collective ***$898 million increase*** in those recoveries.[12] That is nearly one billion dollars in additional funding that was simply unavailable prior to March 3rd. And all creditors will also benefit from the further nonmonetary consideration that the Sacklers have agreed to in connection with the Term Sheet.

10.  In other words, and contrary to the Objecting Governments' contentions, this Court need not consider whether the Supplemental Settlement is an appropriate use of estate property (which it does not use to satisfy the Nine's claims) or whether the constraints it imposes on the terms of distributions under a future plan (which do not exist) are consistent with the Bankruptcy Code. The Term Sheet neither does nor purports to do either of those things. Rather, the Term Sheet imposes burdens only on the Sacklers and the Nine and provides them with benefits in return

---

[10] *Purdue Pharma L.P. v. State of Washington*, et al., Case No. 22-85 (2d Cir. 2022).

[11] The Official Committee continues to consider this argument to be entirely wrong as a matter of law, and said as much before the District Court.

[12] Term Sheet at 1, "Incremental Economic Consideration and Accommodations" ¶ 1(e) ($723 million of the $1 billion in incremental cash), ¶ 3(i) ($175 million in lieu of obligations related to the Foundations). And the total consideration for claimants including the Objecting Governments could be more if the IACs are sold for a sufficiently high price. *Id.* ¶ 3(ii).

for their respective, substantial concessions; *other creditors receive only benefits from both sides*. And no provision of the Bankruptcy Code or this Court's orders, no matter how the Objecting Governments endeavor to contort their text, prohibits the Sacklers and the Nine from providing those benefits to the estates and to one another at their own expense.



11.     This limited relation between the Supplemental Settlement, on the one hand, and the Debtors' estates and creditor recoveries, on the other, is telling.  A Plan has already been confirmed based on findings that each creditor was receiving a fair recovery at a shareholder settlement value nearly a billion dollars *less* than what may be made available as a result of the Term Sheet.  Now, certain States object to that settlement being enhanced, not because it will impair their rights,[13] but because it will give nine other States and the District of Columbia—each of which is agreeing to give up unique rights—additional value.

---

[13] For the avoidance of doubt, the Official Committee does recognize that the Term Sheet arguably has a negligible (if not approaching zero) potential impact on the Plan.  In that way, one could view the Supplemental Settlement Motion is properly before this Court as a proposed transaction involving the Sacklers' funds that, in a theoretical sense,

9

12. None of the Objecting Governments appealed the Plan. In fact, over two years ago the AHC and a significant fraction of the other Objecting Governments explicitly supported a plan framework calling for Sackler payments that would have been $1.5 billion *less* than provided for under the Plan, and at least $2.2 billion less than contemplated under the Term Sheet, even disregarding the additional value for the Nine and New Hampshire.[14] The Debtors, the Official Committee, the Nine and the Sacklers now ask this Court only to confirm the obvious: that compelling the Sacklers to pay additional money to the estates *and* to the Nine does not harm the treatment to which the Objecting Governments and other States are already to be bound if the Plan is reinstated on appeal.

13. The Government Objections do not address this question. Instead, and tellingly, in the form Joinders each Objecting State represents that it takes no issue with the portion of the Supplemental Settlement that provides the Master Distribution Trust and NOAT with $898 million, objecting only to the $277 million flowing to the Nine and New Hampshire.[15] Even if the Term Sheet could be carved apart in this manner, adopting the position that the Nine should have settled

---

could affect their ability to pay under the Plan. Therefore, just as when the Sacklers sought a settlement with the Department of Justice, this Court has a role under both the *Amended and Restated Case Stipulation Among the Debtors, the Official Committee of Unsecured Creditors and Certain Related Parties* [ECF No. 518] and the Plan to ensure that the proposed supplemental payments under the Term Sheet will not endanger creditors' recoveries. *See Notice by the Sackler Families of Settlement with the United States Department of Justice and Motion To Confirm that Payment by the Sackler Families Under Settlement with the United States Department of Justice Is Not Prohibited by this Court* [ECF No. 1833]; *cf. In re ICL Holding Co.*, 802 F.3d 547, 555 (3d Cir. 2015) (approving a transaction in which a purchaser of the debtors' assets transferred purchased cash to general unsecured creditors and clarifying that "[t]he Code's distribution rules don't apply to nonestate property," even where that money could be involved in transactions with the estate); *In re TSIC, Inc.*, 393 B.R. 71, (settlement of potential official committee objection in exchange for payment of purchaser's cash from purchaser to unsecured creditors outside of plan did not violate Bankruptcy Code and was proper exercise of committee's fiduciary duties). The Official Committee is more than satisfied in this respect given: (i) the contemporaneity of the payments to the SOAF and Master Distribution Trust; (ii) the fact that the additional payments fall almost exclusively in years outside the scope of the Plan settlement; (iii) the manner in which the Sacklers' payment obligations were negotiated (including as between Side A and Side B); and (iv) the Official Committee's extensive investigation into the Sacklers' finances.

[14] *See Notice of Filing of Term Sheet with Ad Hoc Committee* [ECF No. 257].

[15] *See, e.g.*, Louisiana Joinder at 2 ("The State of Louisiana does not object to settlement insofar as it seeks to provide States with additional value to be dedicated to desperately needed opioid abatement efforts.").

with the Sacklers in exchange for *less* overall abatement funding (*i.e.*, for only the additional consideration to the Master Distribution Trust) is unconscionable under the desperate circumstances of the opioid crisis.

14.  The AHC's Objection goes farther, grasping at its technical rights in an effort to put force behind the legally empty arguments of the Objecting Governments.  In addition to a host of repetitions of the other Objecting Governments' arguments, the AHC threatens to withhold its consent from certain technical modifications to the Shareholder Settlement Agreement necessary to effectuate the provisions of the Term Sheet.[16]  The AHC does not suggest that it is concerned by the actual implications for the existing Plan settlement (which amount to nearly a billion dollars in additional payments subject to slight technical modifications in the credit support agreement flowing from alterations to the obligations of each Sackler "pod"[17]); rather, it flatly states that it "will not consent absent" unrelated changes to the Supplemental Settlement, including the elimination of the SOAF.

15.  To be sure, this Court has not been called upon to police the dealings between third parties merely because the parties to those dealings are also participating in the Chapter 11 Cases.  And the safeguards inherent in the payment schedule under the Term Sheet more than ensure that the Supplemental Settlement Motion satisfies any concerns under the standard this Court must apply.  Moreover, the Government Objections remain unpersuasive on a factual basis.  Indeed, the Objecting Governments would have this Court believe that they simultaneously:

---

[16] *See* AHC Obj. ¶ 24; *id.* ¶ 22 n.3 (identifying "[t]he Schedule of Sacklers payments [to the Master Distribution Trust]" as an element of the Shareholder Settlement Agreement that would need to occur to consummate the Supplemental Settlement).

[17] The Official Committee believes that the AHC's concern regarding priority of payments will be addressed in the documentation of any new intercreditor agreement.

11

- wholeheartedly support implementing the existing Plan if the District Court's order is reversed, subject to the risk of full-throated opposition from the Nine and following the delay prompted by additional issues to be litigated in further appellate proceedings; but

- steadfastly oppose implementing the same Plan as enhanced by an increased Sackler contribution, and with less appellate risk and delay, *unless their sister States are deprived of additional funding to implement critical abatement programs*.

The opioid crisis is a national, not a state-by-state, problem. It is simply not believable that public servants would deprive all citizens (including those in their own States) of abatement programs—to say nothing of the compensation owed to personal injury victims—because their sister States may have extra money to implement similar programs. Moreover, the AHC's proclaimed refusal to consent to this additional value—and thereby reject an additional billion dollars for the public good rather than see some portion of it spent towards their shared goals by other States—would destroy everything the parties have worked so hard to achieve through the Plan.[18]

16.  There can be no dispute that the Term Sheet preserves and enriches the Objecting Governments' (and all other claimants') rights under the Plan. As such, it should be approved. Any efforts to frame the Supplemental Settlement as either legally improper or harmful to the Debtors' estates strain credulity and should not be countenanced by this Court, particularly when so much hangs in the balance.

---

[18] The Objecting Governments also raise concerns that the Nine will also receive "[p]ayment of an unspecified and unbudgeted amount of attorneys' fees." *See, e.g.*, Florida Obj. ¶ 9. This is simply untrue: as the Official Committee demanded when the AHC sought reimbursement of what would actually have been practically unlimited fees in connection with a far less fully-baked "settlement," the Nine's fees will be subject to multiple levels of review under the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Retained Professionals* [ECF No. 529]. *See* Supplemental Settlement Motion Ex. A (Proposed Order) ¶ 4; *cf. Debtors' Motion To Assume the Prepetition Reimbursement Agreement with the Ad Hoc Committee and To Pay the Fees and Expenses of the Ad Hoc Committee's Professionals* [ECF No. 394]; *Objection of the Official Committee of Unsecured Creditors of Purdue Pharma L.P., et al., to Debtors' Motion To Assume the Prepetition Reimbursement Agreement with the Ad Hoc Committee and To Pay the Fees and Expenses of the Ad Hoc Committee's Professionals* [ECF No. 459].

**Response to the UST Objection**

17.     Like the Government Objections, the UST Objection attempts to cast the Supplemental Settlement as something that it is not and objects to it on grounds that do not make sense.  Specifically, the U.S. Trustee attempts to argue that—because the Term Sheet is *conditioned on* the Second Circuit overturning the District Court decision for which the U.S. Trustee lobbied—granting the Supplemental Settlement Motion somehow *violates* the District Court's ruling.  The Debtors have rather asked this Court to permit parties to *agree on the consequences of such a ruling from the only court now vested with jurisdiction over the appeal of the Confirmation Order: the Second Circuit.*[19]  To be clear, unless and until such a decision is handed down by the Circuit, no modifications to the Plan or the related documents will or could be effective, regardless of the status of the parties' commitments to make such modifications contingent on such a result.  It is unthinkable that the U.S. Trustee, which spends more time before this Court than any party, would suggest (or believe) to the contrary.

18.     Moreover, the U.S. Trustee's proposed remedy for this imagined defect—namely to defer a ruling on the Supplemental Settlement Motion to a later date—is indefensible, if not wholly irrational.  Indeed, as the U.S. Trustee is aware, to defer a ruling on the Supplemental Settlement Motion is tantamount to denial of the motion, and thus to the denial for all claimants of the benefits of the Supplemental Settlement.  The *sole consideration* provided by the Nine under the Term Sheet is their agreement not to participate in the present appeal, in which their briefs are due this Friday.  If the Supplemental Settlement Motion is not granted now, the Nine will file their briefs—violating the Term Sheet—at which point the Sacklers will no longer be required to

---

[19] This cannot be the first time the U.S. Trustee has heard this Court make provision for an uncertain appellate outcomes—as when, for example, this Court sets a reserve to be established pending an ongoing appeal, which would also be beyond its jurisdiction according to the U.S. Trustee's formulation.

13

provide an additional $1.175 billion in abatement funding.[20] The Court, of course, would have no basis to rule after the conclusion of the once-again lengthened appeals whether the then-dead Supplemental Settlement would have been permissible. In this case, justice delayed by even two days will be justice denied.

## RESERVATION OF RIGHTS

19. For the avoidance of doubt, the Official Committee expressly reserves all rights in respect of whether any subsequent motion or request seeking approval of any future settlement between and among the parties in interest in the Chapter 11 Cases is subject to or satisfies the requirements of the Bankruptcy Code or any other applicable law.

## CONCLUSION

20. For the foregoing reasons, the Court should grant the Supplemental Settlement Motion and grant any other relief as may be just and proper.

[*The remainder of this page has been left blank intentionally.*]

---

[20] It is not lost on the Official Committee—or any other party in these cases—that unlike all other parties in interest, the US Trustee has no economic interest in the maximization of estate value. Its sole aim throughout these cases has been vindication of its bedrock principle that third-party releases are impermissible as a matter of law. It therefore has a strong interest in ensuring that the Nine are not able to settle with the Sacklers, and **must** file their appellate briefs in opposition to the Plan, so as to ensure a full slate of allies in the appeal.

| | |
|---|---|
| Dated: March 9, 2022<br>New York, NY | AKIN GUMP STRAUSS HAUER & FELD LLP<br><br>By: /s/ *Arik Preis*<br>Arik Preis<br>Mitchell P. Hurley<br>Sara L. Brauner<br>Theodore James Salwen<br>One Bryant Park<br>New York, New York 10036<br>Tel: (212) 872-1000<br>Fax: (212) 872-1002<br>apreis@akingump.com<br>mhurley@akingump.com<br>sbrauner@akingump.com<br>jsalwen@akingump.com<br><br>*Counsel to the Official Committee of Unsecured Creditors of Purdue Pharma L.P.*, et al. |