

Ernst & Young LLP          Tel: +1 860 247 3100
20 Church Street           Fax: +1 860 725 6040
Hartford, CT  06103        ey.com

Mr. Terrence Ronan                                    March 4, 2022
Executive Vice President and Chief Financial Officer
Purdue Pharma L.P.
One Stamford Forum
Stamford, CT 06901

Dear Mr. Ronan:

1.  This agreement (together with all attachments hereto, the "Agreement") confirms the engagement of Ernst & Young LLP ("we" or "EY") to audit and report on the consolidated financial statements of Purdue Pharma L.P. and its wholly owned subsidiaries (collectively, the "Company") for the year ended December 31, 2021, and the related notes ("Consolidated Financial Statements"), subsequent to the Company's filing a petition under Chapter 11 ("Chapter 11") of the United States Bankruptcy Code ("Bankruptcy Code") on September 15, 2019 with the United States Bankruptcy Court for the Southern District of New York ("Bankruptcy Court"). Purdue Pharma L.P. and its wholly owned subsidiaries included in the Consolidated Financial Statements are listed on Exhibit B to the agreement.  All of the services described in this Agreement are referred to collectively as either the "Audit Services" or the "audit." Our performance of Audit Services is contingent upon the Bankruptcy Court's approval of our retention in accordance with the terms and conditions that are set forth in this Agreement. This Agreement shall be effective as of January 1, 2022.

**Audit responsibilities and limitations**

2.  We will conduct the audit in accordance with auditing standards generally accepted in the United States ("GAAS"), as established by the American Institute of Certified Public Accountants ("AICPA"). Those standards require that we are independent and that we fulfill our other ethical responsibilities that are relevant to our audit. Should conditions not now anticipated preclude us from completing the audit and issuing an auditor's report, we will advise you, the Audit Committee of the Board of Directors of Purdue Pharma L.P. ("Audit Committee"), and the Bankruptcy Court promptly and take such action as we deem appropriate.

3.  The objective of the audit is to obtain reasonable assurance about whether the Consolidated Financial Statements as a whole are free from material misstatement, whether due to fraud or error, and to issue an auditor's report that includes our opinion on whether the Consolidated Financial Statements are presented fairly, in all material respects, in conformity with U.S. generally accepted accounting principles. Reasonable assurance is a high level of assurance but not absolute assurance and therefore is not a guarantee that an audit conducted in accordance with GAAS will always detect a material misstatement when it exists. The risk of not detecting a material misstatement resulting from fraud is higher than for one resulting



from error, as fraud may involve collusion, forgery, intentional omissions, misrepresentations, or the override of internal control. Misstatements are considered material if there is a substantial likelihood that, individually or in the aggregate, they would influence the judgment made by a reasonable user based on the financial statements. As part of an audit in accordance with GAAS, we exercise professional judgment and maintain professional skepticism throughout the audit. We also identify and assess the risks of material misstatement of the financial statements, whether due to fraud or error, design and perform audit procedures responsive to those risks. Such procedures include examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. There are inherent limitations in the audit process, including, for example, the use of judgment and selective testing of data and the possibility that collusion or forgery may preclude the detection of material error, fraud or non-compliance with laws and regulations. Accordingly, because of the inherent limitations of an audit, together with the inherent limitations of internal control, an unavoidable risk exists that some material misstatements may not be detected, even though the audit is properly planned and performed in accordance with GAAS. Also, an audit is not designed to detect error or fraud that is immaterial to the Consolidated Financial Statements.

4.  As part of the audit, we will also:

    •   Consider, solely for the purpose of planning the audit and determining the nature, timing and extent of our audit procedures, the Company's internal control. This consideration will not be sufficient to enable us to express an opinion on the effectiveness of internal control or to identify all significant deficiencies and material weaknesses.
    •   Evaluate the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluate the overall presentation of the Consolidated Financial Statements, including the related disclosures, and whether the Consolidated Financial Statements represent the underlying transactions and events in a manner that achieves fair presentation.
    •   Conclude, based on the audit evidence obtained, whether there are conditions or events that, considered in the aggregate, raise substantial doubt about the Company's ability to continue as a going concern as defined by U.S. generally accepted accounting principles for a reasonable period of time.

5.  In accordance with GAAS, we will communicate certain matters related to the conduct and results of the audit to the Audit Committee. Such matters include:

    •   Our responsibility under GAAS for forming and expressing an opinion on the Consolidated Financial Statements that have been prepared by management with the oversight by the Audit Committee and that such an audit does not relieve management and the Audit Committee of their responsibilities.



- An overview of the planned scope and timing of the audit, including the significant risks that we have identified.
- Significant findings from the audit, which include: (1) our views about the significant qualitative aspects of the Company's accounting practices, including accounting policies, accounting estimates, and financial statement disclosures; (2) significant unusual transactions, if any; (3) significant difficulties, if any, encountered during the audit; (4) significant corrected and uncorrected misstatements, other than those we believe are trivial; (5) disagreements with management, if any, whether or not satisfactorily resolved; (6) significant matters subject to management's consultations with other accountants, if any, and (7) other matters, if any, arising during the audit that are, in our professional judgment, significant and relevant to the Audit Committee regarding the oversight of the financial reporting process, including significant matters in connection with the Company's related parties.
- Circumstances that affect the form and content of our auditor's report

Changes to the scope of the Audit Services may occur as a result of the issuance of new standards and interpretations or inspections findings. We will communicate any significant changes in the scope of the Audit Services and related procedures to management and the Audit Committee on a timely basis.

6. If we are made aware of evidence that fraud or possible non-compliance with laws and regulations may have occurred, that could have a possible material and adverse impact to the Consolidated Financial Statements, we will bring such matters to the attention of the appropriate level of management. If we become aware of fraud involving senior management or fraud (whether committed by senior management or other employees) that causes a material misstatement of the Consolidated Financial Statements, we will report this matter directly to the Audit Committee. We will determine that the Audit Committee and appropriate members of management are adequately informed of instances of non-compliance with laws and regulations that come to our attention. We also will inform the Audit Committee and appropriate members of management of significant corrected misstatements and uncorrected misstatements noted during our audit procedures other than those that are clearly trivial. Notwithstanding the foregoing, we will inform appropriate members of management of uncorrected misstatements above $1.0 million that we obtain actual knowledge of during our audit procedures.

7. We will communicate in writing to management and the Audit Committee all significant deficiencies and material weaknesses identified during the audit, including those that were remediated during the audit. We also will communicate any significant deficiencies and material weaknesses communicated to management and the Audit Committee in previous audits that have not yet been remediated.



**EY**
Building a better
working world

8.  We also may communicate other opportunities we observe for economies in or improved controls over the Company's operations.

### Circumstances that affect the form and content of our auditor's report

9.  The final form and content of our auditor's report will reflect the results of our final audit findings and conclusions. We will communicate to management and the Audit Committee all circumstances affecting the final form and content of our auditor's report.

### Management's responsibilities and representations

10. The Consolidated Financial Statements (including related disclosures) are the responsibility of management. Management also is responsible for the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free of material misstatement, whether due to error or fraud, for properly recording transactions in the accounting records, for safeguarding assets, and for the overall fair presentation of the Consolidated Financial Statements, in conformity with U.S. generally accepted accounting principles. Management also is responsible for the identification of, and for the Company's compliance with, laws and regulations applicable to its activities.

11. Management is responsible for adjusting the Consolidated Financial Statements to correct material misstatements. Management also will affirm to us in its letter of representations certain representations made to us during the performance of the Audit Services, including that the effects of any uncorrected misstatements aggregated by us during the current audit and pertaining to the latest period presented are immaterial, both individually and in the aggregate, to the Consolidated Financial Statements as a whole.

12. Management is responsible for communicating to us on a timely basis all instances of alleged, identified or suspected non-compliance with laws and regulations, unauthorized access to information technology systems, including of reports submitted by third parties (including regulatory agencies, law enforcement agencies and security consultants) in either case that could have an effect on the financial statements or the effects of which should be considered by management when preparing the financial statements, and all instances of alleged, identified or suspected financial improprieties, of which management or the Audit Committee is aware (regardless of the source or form in which they may have been discovered or communicated to them and including, without limitation, instances identified by "whistle-blowers") and providing us full access to information, any internal investigations, and any intended public or regulatory communications related to them. Such instances include, without limitation, manipulation of financial results by management or employees, misappropriation of assets by management or employees, intentional circumvention of internal controls, inappropriate influence on related party transactions by related parties, intentionally misleading EY, or other alleged, identified or suspected illegal acts or fraud that could result in



a misstatement of the Consolidated Financial Statements or otherwise affect the financial reporting of the Company by an amount in excess of $1.0 million. If the Company limits the information otherwise available to us under this paragraph (based on the Company's claims of attorney/client privilege, work product doctrine or otherwise), the Company will immediately inform us of the fact that certain information is being withheld from us. Any such withholding of information could be considered a restriction on the scope of the audit and may prevent us from opining on the Company's Consolidated Financial Statements; alter the form of report we may issue on such financial statements; or otherwise affect our ability to continue as the Company's independent auditors. We will disclose any such withholding of information to the Audit Committee.

13. Management is responsible for providing us access to: all information of which management is aware that is relevant to the Audit Services, (including information obtained from outside of the general and subsidiary ledgers) such as records, documentation and other matters to complete the Audit Services on a timely basis; additional information that we may request from management for purposes of the audit; and unrestricted access to persons within the Company from whom we determine it necessary to obtain audit evidence. We will provide the Company with notice, to the extent reasonably possible and consistent with our professional obligations prior to seeking such access. Management's failure to do so may cause us to delay our report, modify our procedures, or even terminate the Audit Services.

14. As required by GAAS, we will make specific inquiries of management about the representations contained in the Consolidated Financial Statements. GAAS also require that, at the conclusion of the applicable Audit Services, we obtain a letter of representations from certain members of management about these matters and to represent that management has fulfilled its responsibilities as set forth in this Agreement, including that all material transactions have been recorded in the accounting records and are reflected in the financial statements. The responses to those inquiries, the written representations, and the results of our procedures comprise evidence on which we will rely in completing the applicable Audit Services.

15. Management shall promptly assist EY in identifying the Company's affiliates, as defined in the AICPA Code of Professional Conduct, officers and directors.

16. Management shall make appropriate inquiries to determine whether the Company has a business relationship with EY or any other member firm of the global Ernst & Young organization (any of which, an "EY Firm") other than one pursuant to which an EY Firm performs professional services.

17. Management shall discuss any independence matters with EY that, in management's judgment, could bear upon EY's independence.



18. The Company shall be responsible for its personnel's compliance with the Company's obligations under this Agreement.

**Audits of the Company and Participating Associated Companies Retirement Savings 401(k) Plan and Pension Plan**

19. In addition to the Audit Services, we also will audit and report on the financial statements, related notes and supplemental schedules of the Company and Participating Associated Companies Retirement Savings 401(k) Plan and Pension (collectively, the "Plans"), for which the Company acts as the sponsor (in this capacity, the "Plan Sponsor"), for the year ended December 31, 2021 (the "Plan Audit Services" or the "Plan Audit" or the "Plan Engagement" or the "ERISA Section 103(a)(3)(C) audit"), which are to be included in the Company's Form 5500 filing with the Employee Benefits Security Administration of the Department of Labor (the "DOL"). In connection with the Plan Audit Services, references to "management" shall mean management of the Plan Sponsor.

20. You have elected to have the audit of the Plan's financial statements performed in accordance with ERISA Section 103(a)(3)(C) pursuant to 29 CFR 2520.103-8 of the DOL's Rules and Regulations for Reporting and Disclosure under the Employee Retirement Income Security Act of 1974 ("ERISA"). Therefore, as permitted by ERISA Section 103(a)(3)(C), the audit need not extend to any statements or information related to assets held for investment of the Plan by a bank or similar institution or insurance carrier that is regulated, supervised and subject to periodic examination by a state or federal agency, provided that the statements or information regarding assets so held are prepared and certified to by the bank or similar institution or insurance carrier in accordance with 29 CFR 2520.103-5 of the DOL's Rules and Regulations for Reporting and Disclosure under ERISA.

21. We will conduct the Plan Audit in accordance with GAAS. Those standards require that we are independent and that we fulfill our other ethical responsibilities that are relevant to our audit. Should conditions not now anticipated preclude us from completing the Plan Audit and issuing an auditor's report, we will advise you and the Audit Committee promptly and take such action as we deem appropriate. The Plan Audit will not extend to the certified investment information, except for obtaining and reading the certification, comparing the certified investment information with the related information presented and disclosed in the financial statements, and reading the disclosures relating to the certified investment information to assess whether they are in conformity with the presentation and disclosure requirements of U.S. generally accepted accounting principles. Accordingly, the objective of the ERISA Section 103(a)(3)(C) audit is not to express an opinion about whether the financial statements as a whole are presented fairly, in all material respects, in conformity with U.S generally accepted accounting principles.



22. Except for the investment information that the ERISA Section 103(a)(3)(C) permits to be certified by a qualified institution, the objective of the ERISA Section 103(a)(3)(C) audit is to obtain reasonable assurance about whether the financial statements as a whole are free from material misstatement, whether due to fraud or error, and to issue an auditor's report that includes our opinion on whether (a) the amounts and disclosures in the financial statements, other than those agreed to or derived from the certified investment information, are presented fairly, in all material respects, in conformity with U.S. generally accepted accounting principles and (b) the information in the financial statements related to assets held by and certified to by a qualified institution agrees to, or is derived from, in all material respects, the information prepared and certified by an institution that management determined meets the requirements of ERISA Section 103(a)(3)(C). Additionally, the objective of the ERISA Section 103(a)(3)(C) audit is to express an opinion on whether (a) the form and content of the supplemental schedules, other than the information in the supplemental schedules that agreed to or is derived from the certified investment information, are presented, in all material respects, in conformity with the DOL's Rules and Regulations for Reporting and Disclosure under ERISA and (b) the information in the supplemental schedules related to assets held by and certified to by a qualified institution agrees to, or is derived from, in all material respects, the information prepared and certified by an institution that management determined meets the requirements of ERISA Section 103(a)(3)(C). Reasonable assurance is a high level of assurance but not absolute assurance and therefore is not a guarantee that an audit conducted in accordance with GAAS will always detect a material misstatement when it exists. The risk of not detecting a material misstatement resulting from fraud is higher than for one resulting from error, as fraud may involve collusion, forgery, intentional omissions, misrepresentations, or the override of internal control. Misstatements are considered material if there is a substantial likelihood that, individually or in the aggregate, they would influence the judgment made by a reasonable user based on the financial statements. As part of an audit in accordance with GAAS, we exercise professional judgment and maintain professional skepticism throughout the audit. We also identify and assess the risks of material misstatement of the financial statements, whether due to fraud or error, design and perform audit procedures responsive to those risks. Such procedures include examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. There are inherent limitations in the audit process, including, for example, the use of judgment and selective testing of data and the possibility that collusion or forgery may preclude the detection of material error, fraud or non-compliance with laws and regulations, including prohibited transactions with parties in interest and other violations of the DOL's Rules and Regulations under ERISA. Accordingly, because of the inherent limitations of an audit, together with the inherent limitations of internal control, an unavoidable risk exists that some material misstatements may not be detected, even though the audit is properly planned and performed in accordance with GAAS. Also, an audit is not designed to detect error or fraud that is immaterial to the financial statements.



23. As part of the ERISA Section 103(a)(3)(C) audit, we will also

- Consider, solely for the purpose of planning the audit and determining the nature, timing and extent of our audit procedures, the Plan's internal control, except for the certified investment information. This consideration will not be sufficient to enable us to express an opinion on the effectiveness of internal control or to identify all significant deficiencies and material weaknesses.
- Evaluate the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluate the overall presentation of the financial statements, including the related disclosures, and whether the financial statements represent the underlying transactions and events in a manner that achieves fair presentation.
- Conclude, based on the audit evidence obtained, whether there are conditions or events, considered in the aggregate, raise substantial doubt about the Plan's ability to continue as a going concern for a reasonable period of time.

24. The provisions of paragraphs 5, 6, 7, 8 and 9 shall apply to the Plan Audit Services. Any reference to the Audit Committee shall be deemed to apply to the Audit Committee overseeing the Plan and any reference to the Company shall be deemed to apply to the Plan.

25. As a part of the Plan Audit, we will perform certain procedures, as required by GAAS, directed at considering the Plan's compliance with applicable Internal Revenue Code ("IRC") requirements for tax-exempt status, including considering whether management has performed the relevant IRC compliance tests and has corrected or intends to correct failures, as applicable. As we conduct the Plan Audit, we may become aware of the possibility that events affecting the Plan's tax status may have occurred. Similarly, we may become aware of the possibility that events affecting the Plan's compliance with the requirements of ERISA may have occurred. We will inform the Plan Sponsor of any instances of tax or ERISA noncompliance that come to our attention during the Plan Audit. The Plan Sponsor should recognize, however, that the Plan Audit is not designed, nor is it intended, to verify the Plan's overall compliance with applicable provisions of the IRC or ERISA, including but not limited to the Plan Sponsor's deduction limits, and, accordingly, we assume no responsibility for failure to detect instances of noncompliance with applicable provisions of the IRC or ERISA.

26. In accordance with GAAS, we will communicate reportable findings identified during the Plan Audit as a result of testing relevant plan provisions to the Audit Committee.

27. Management shall have the responsibilities for the financial statements of the Plan as set forth in paragraphs 10 and 11, and otherwise as set forth in paragraphs 12, 13, 14 and 18 with respect to the Plan and the Plan Audit. Any reference to the Audit Committee shall be deemed to apply to the Audit Committee overseeing the Plan and any reference to the Company shall be deemed to apply to the Plan.



28. Management has determined that an ERISA Section 103(a)(3)(C) audit is permissible under the circumstances, that the investment information is prepared and certified by a qualified institution as described in 29 CFR 2520.103-8, that the certification meets the requirements of 29 CFR 2520.103-5 and that the certified investment information is appropriately measured, presented and disclosed in the Plan's financial statements in conformity with U.S. generally accepted accounting principles.

29. Management is responsible for maintaining a current plan instrument, including all plan amendments. Management is also responsible for administering the Plan and determining that the Plan's transactions that are presented and disclosed in the financial statements are in conformity with the Plan's provisions, including maintaining sufficient records with respect to each of the participants to determine the benefits due or which may become due to such participants.

30. Management is responsible for the preparation of the supplemental schedules and the form and content of the supplemental schedules in conformity with the DOL's Rules and Regulations for Reporting and Disclosure under ERISA. For any document that contains the supplemental schedules and indicates that we have issued a report on the supplemental schedules, management will include our report on such supplemental schedules. The supplemental schedules will be presented with the audited financial statements. Management will make appropriate representations to us regarding these matters.

31. Management is responsible for informing EY about any related party transactions, including transactions with parties in interest, as defined in ERISA section 3(14) and the regulations thereunder, including sales, purchases, loans, transfers, leasing arrangements, and guarantees, and amounts receivable from or payable to related parties. We will evaluate whether prohibited transactions identified by management or as part of the Plan Audit are appropriately reported in the applicable ERISA-required supplemental schedules.

32. Management is responsible for providing us a draft Form 5500 that is substantially complete prior to the date of our auditor's report. GAAS requires that we read the draft Form 5500 to identify material inconsistencies, if any, with the audited financial statements. These procedures are not sufficient nor are they intended to determine that the Form 5500 is completely and accurately prepared. Accordingly, you understand and agree that we do not assume any responsibility for the completeness and/or accuracy of the Form 5500 as part of the Plan Audit Services.

33. Management shall promptly assist EY in identifying the Plan's affiliates, as defined in the AICPA Code of Professional Conduct, and officers and directors who serve in such capacity for the Plan.



34. Management shall make appropriate inquiries to determine whether the Plan or Plan Sponsor has a business relationship with EY or any other member firm of the global Ernst & Young organization (any of which, an "EY Firm") other than one pursuant to which an EY Firm performs professional services.

35. Management shall discuss any independence matters with EY that, in management's judgment, could bear upon EY's independence.

36. We may be requested to make certain workpapers relating to the Plan Audit available to the DOL pursuant to authority given to it by law or regulation. If requested, access to such workpapers will be provided under the supervision of our personnel. Furthermore, upon request, we may provide photocopies of selected workpapers to the DOL. We will label all workpapers as confidential and maintain control over their duplication.

37. The terms, conditions and provisions applicable to the Audit Services and the Company, as set forth in the paragraphs under "*Fees and billings", "Confidentiality",* and "*Other matters"* and in the final two paragraphs of this Agreement shall apply equally to the Plans' Services and the Plan Sponsor, and any reference therein to "Audit Services" shall be deemed to include the Plan Services, and any references therein to the "Company" shall be deemed to include the Plan or the Plan Sponsor.

**Fees and billings**

38. We estimate that our fees for the 2021 Audit Services of the Consolidated Financial Statements and the Plans will be $1,050,000 and $67,000 respectively, plus expenses. The billings for the Audit Services will be done in accordance with the timeline set forth in Exhibit C. These fee estimates are based on estimated hours of 6,200 for the audit of the Consolidated Financial Statements and 600 for the audits of the Plans. However, our actual fees may exceed the estimated amounts based on changes to the business (e.g., nature of the business or change in business entities) or additional unplanned effort. Our fees are exclusive of taxes or similar charges, as well as customs, duties or tariffs imposed in respect of the Audit Services, all of which the Company shall pay (other than taxes imposed on our income generally). We will discuss with you the nature of the hours incurred and the associated fee before any out-of-scope or incremental audit effort billings are finalized.

39. We will submit an itemized and detailed billing statement, and we will request payment of our fees and expenses, in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the Local Rules for the United States Bankruptcy Court for the Southern District of New York ("Local Rules") and any relevant administrative orders. We will submit our invoices as the work progresses and payment of them will be made upon



**EY**
Building a better
working world

receipt, or as quickly as the Bankruptcy Code, the Bankruptcy Rules, Local Rules, and any relevant administrative orders allow. We acknowledge that payment of our fees and expenses hereunder is subject to (i) the jurisdiction and approval of the Bankruptcy Court under Sections 330 and 331 of the Bankruptcy Code, any order of the Bankruptcy Court approving the retention of us and the U.S. Trustee Guidelines, (ii) any applicable fee and expense guidelines and/or orders and (iii) any requirements governing initial and final fee application.

40. Our estimated pricing and schedule of performance are based upon, among other things, our preliminary review of the Company's records and the representations Company personnel have made to us and are dependent upon the Company's personnel providing a reasonable level of assistance. Should our assumptions with respect to these matters be incorrect or should the condition of records, degree of cooperation, or other matters beyond our reasonable control require additional commitments by us beyond those upon which our estimates are based, we may adjust our fees, subject to Bankruptcy Court approval, and planned completion dates. Fees for any special audit-related projects, such as proposed business combinations or research and/or consultation on special business or financial issues, will be billed separately from the fees referred to above and will be the subject of other written agreements which shall be subject to Bankruptcy Court approval.

**Confidentiality**

41. The Company acknowledge their obligation to maintain a relationship of candor and full disclosure and to furnish or cause to be furnished to us such information as required by this Agreement or as we otherwise deem necessary in connection with our Audit Services. We hereby acknowledge and agree that information furnished to us by or on behalf of the Company, as well as any information that we may derive there from (collectively, the "Information"), is Company confidential information and will be maintained as confidential in accordance with professional standards of the accounting profession applicable to us, including, without limitation, the American Institute of Certified Public Accountants Code of Professional Conduct - Revised Section 1.700.001, in effect as of the date hereof, a copy of which is attached hereto as Exhibit A. We further agree that we will use the Information only in connection with providing our professional services to the Company.

42. Notwithstanding the foregoing, we may disclose without violation of this Agreement such portion of the Information as is required or permitted to be disclosed by law, regulation, legal process, professional standards or this Agreement. If we are required by professional standards, law or pursuant to legal process to disclose Information, or are notified that any party seeks to impose such a requirement, we will, unless otherwise prohibited by law or professional standards and to the maximum extent practicable prior to any such disclosure, promptly inform the Company of such request for disclosure and, to the extent reasonably possible and consistent with our obligations under law, regulation and professional standards, afford the Company all



reasonably practicable opportunities to protect its interests , at the Company's request and reasonable expense.

43. Upon your request, we will return to you the Information, including all copies thereof, except we may keep Information as may be required by law, the professional standards or our standard procedures. This paragraph is not intended to preclude us from maintaining copies of Information in our own working papers.

**Other matters**

44. From time to time, and depending on the circumstances, subject to Bankruptcy Court approval (1) we may subcontract portions of the Audit Services to other EY Firms (listed at www.ey.com), who may deal with the Company or certain subsidiaries of the Company directly, although EY alone will remain responsible to you for the Audit Services, and (2) personnel (including non-certified public accountants) from an affiliate of EY or another EY Firm or any of their respective affiliates, or from independent third-party service providers (including independent contractors), may participate in providing the Audit Services. Unless prohibited by applicable law, we may provide Company information to other EY Firms and their personnel, as well as third-party service providers acting on our or their behalf, who may collect, use, transfer, store or otherwise process (collectively, "Process") it in various jurisdictions in which they operate to facilitate performance of the Audit Services, to comply with regulatory requirements, to check conflicts, to provide financial accounting and other administrative support services, or for quality and risk management purposes. We shall be responsible to you for maintaining the confidentiality of Company information, regardless of where or by whom such information is Processed on our behalf. Either EY or the Company may use electronic media to correspond or transmit information relating to the Audit Services, and such use will not, in itself, constitute a breach of any confidentiality obligations.

45. The Company shall not, during the term of this Agreement and for 12 months following its termination for any reason, without the prior written consent of EY, solicit for employment or a position on its Board of Directors, or hire or appoint to its Board of Directors, any current or former partner, principal, or professional employee of EY, any affiliate thereof, any other EY Firm or any of their respective affiliates if any such professional either: (i) performed any audit, review, attest, or related service for or relating to the Company at any time (a) during the then current fiscal year of the Company up to and including the date of the auditor's report for that year, or (b) in the 12 months ended on the auditor's report date for the immediately preceding fiscal year; or (ii) influences EY's operations or financial policies or has any capital balances or any other continuing financial arrangement with EY, provided that the Company shall not breach this obligation by generally advertising available positions without targeting any specific EY personnel.



46. EY shall remain fully responsible for the Audit Services and for all of its other responsibilities, covenants and obligations under this Agreement, notwithstanding that we may subcontract portions of the Audit Services to other EY Firms or that other EY Firms may participate in the provision of the Audit Services. The Company may not make a claim or bring proceedings relating to the Audit Services or otherwise under this Agreement against any other EY Firm and EY shall not contest its responsibility for the Audit Services on the basis that any of them were performed by another EY Firm. The Company shall make any claim or bring proceedings only against EY. This paragraph is intended to benefit the other EY Firms, which shall be entitled to enforce it. Each EY Firm is a separate legal entity.

47. If we Process Company information that can be linked to specific individuals ("Personal Data"), we will Process it in accordance with paragraph 44 of this Agreement, as well as law and professional regulations applicable to us. We will also require any service provider that Processes Personal Data on our behalf to provide at least the same level of protection for such data as is required by such legal and regulatory requirements. EY is required to exercise its own judgment in determining the purposes and means of processing any Personal Data when providing the Audit Services. Accordingly, EY acts as an independent controller (or equivalent legal status), and not as a processor (or equivalent) under the Company's control or as a joint controller with the Company.  If Personal Data relating to a data subject in the UK, European Union or Switzerland (collectively, "European Personal Data") is required for EY to perform the Audit Services, the parties agree to negotiate in good faith a data transfer addendum intended to validate the transfer of such European Personal Data by the Company to EY prior to such transfer. If any Company information is protected health information under the Health Insurance Portability and Accountability Act, as amended, this Agreement is deemed to incorporate all of the terms otherwise required to be included in a business associate contract relating to such information. The Company warrants that it has the authority to provide the Personal Data to EY in connection with the performance of the Audit Services and that the Personal Data provided to us has been Processed in accordance with applicable law.

48. In order to provide the Audit Services, we may need to access Personal Data consisting of protected health information, financial account numbers, Social Security or other government-issued identification numbers, or other data that, if disclosed without authorization, would trigger notification requirements under applicable law ("Restricted Personal Data"). In the event that we need access to such information, you will consult with us on appropriate measures (consistent with professional standards applicable to us) to protect the Restricted Personal Data, such as deleting or masking unnecessary information before it is made available to us, encrypting any data transferred to us, or making the data available for on-site review at a Company site. You will provide us with copies of any Restricted Personal Data only in accordance with mutually agreed protective measures.



**EY**

Building a better
working world

49. You acknowledge that to the extent the Company is regulated by or under the supervision of a federal, state or other regulator (including, without limitation, the Board of Governors of the Federal Reserve, the Office of the Comptroller of the Currency and the New York State Department of Financial Services), you may be in possession of confidential supervisory information as defined in relevant law or regulations ("CSI"), including without limitation documents and information comprising CSI arising from, relating to, or concerning inspections and examinations by such regulator(s). As set forth in paragraph 13, we may require access to such CSI in order to perform the Audit Services. However, CSI may be subject to regulatory restrictions on disclosure to and/or use by third parties. Accordingly: (1) management will identify to EY the regulators that regulate and/or exercise supervisory oversight over the Company and have specific requirements relating to CSI (each, a "Regulator"); (2) management will identify to EY all CSI in your possession; (3) to the extent management's provision of CSI to EY is not authorized by applicable law or regulation absent Regulator approval, management will obtain authorization from the applicable Regulator to provide us access to any and all CSI for the purposes of performing the Audit Services with respect to CSI already in the Company's possession immediately following execution of this Agreement (and with respect to any later-identified CSI immediately upon learning of the examination, inspection or other activity that could result in such materials being deemed CSI); and (4) management will not provide any such access prior to having received such authorization and having identified to EY with specificity the information that constitutes CSI. You acknowledge that any failure to provide any such information could be considered a restriction on the scope of the audit, and the parties agree that they shall engage in good faith discussions regarding the effect of any withholding on the Audit Services.

50. Compliance with U.S. immigration requirements may require EY to provide certain information to the U.S. Citizenship and Immigration Services ("USCIS") to confirm that EY employees on certain visas are, in fact, EY employees and not employees of the Company or other clients of EY. This will include providing certain information regarding work locations to support compliance with the visa requirements. As such, EY may disclose to USCIS information regarding this Agreement, including the Company's identity and location, as well as a redacted copy of this Agreement. Upon providing this information, EY will request that USCIS keep any such information confidential. In further support of these legal requirements, the U.S. Department of Labor (DOL) regulations, at 20 CFR § 655.734(a)(1)(ii)(A), require the posting of notice of a Labor Condition Application (LCA) in instances where individuals holding certain visas will be working on the Company's premises. EY and the Company will work together to develop an appropriate notice as required. The Company acknowledges that EY resources will be operating at all times as an employee of and under the direction and control of Ernst & Young U.S. LLP's management, and all activities including supervision, hiring and firing decisions, and performance evaluations are controlled by Ernst & Young U.S. LLP. The Company will not have the right to control EY resources. At all times, EY resources will receive direction from an EY manager while on-site at the Company's premises.



**EY**
Building a better
working world

51. By your signature below, you confirm that the Company, through its Board of Directors, has expressly authorized you to enter into this Agreement on behalf of, and to bind, the Company. In addition, you confirm that management agrees to, acknowledges, and understands its responsibilities as outlined in "Management's responsibilities and representations." Either EY or the Company may execute this Agreement (and any supplements or modifications hereto) by electronic means, and each of EY and the Company may sign a different copy of the same document.

52. EY retains ownership in the workpapers compiled in connection with the performance of the Audit Services.

53. Amelia Caporale will be the Audit Partner responsible for the provision of the Audit Services. Amelia Caporale, Partner, Avinash Sonika, Senior Manager, and Justin Furtado, Manager, will work closely with management in performing all required Audit Services. If one or more of these individuals ceases to provide audit services to the Company pursuant to this Agreement, EY will so advise the Company and, if that professional is replaced, provide the Company with the name of that professional's replacement. Other partners and staff, not identified herein, may be utilized as required to conduct our work in an efficient manner.

54. Any controversy or claim with respect to, in connection with, arising out of, or in any way related to this Agreement or the services provided hereunder (including any such matter involving any parent, subsidiary, affiliate, successor in interest or agent of Company or its subsidiaries of EY) shall be brought in the Bankruptcy Court or the applicable district court (if the district court withdraws the reference) and the parties to this Agreement, and any and all successors and assigns thereof, consent to the jurisdiction and venue of such court as the sole and exclusive forum (unless such court does not have jurisdiction and venue of such claims or controversies) for the resolution of such claims, causes of action or lawsuits. The parties to this Agreement, and any and all successors and assigns thereof, hereby waive trial by jury, such waiver being informed and freely made. If the Bankruptcy Court, or the district court upon withdrawal of the reference, does not have or retain jurisdiction over the foregoing claims or controversies, the parties to this Agreement and any and all successors and assigns thereof, agree to submit first to nonbinding mediation; and, if mediation is not successful, then to binding arbitration, in accordance with the dispute resolution procedures as set forth in the attachment to this Agreement, which is incorporated herein by reference. Judgment on any arbitration award may be entered in any court having proper jurisdiction. The foregoing is binding upon Company, EY and any all successors and assigns thereof.

55. This Agreement, and any non-contractual matters or obligations arising out of this Agreement or the Audit Services, including (without limitation) claims arising in tort, fraud, under statute or otherwise relating to the Audit Services, or questions relating to the scope or enforceability of this paragraph, shall be governed by, and construed in accordance with, the laws of New York applicable to agreements made, and fully to be performed, therein by residents thereof.



**EY**
Building a better
working world

56. If any portion of this Agreement is held to be void, invalid, or otherwise unenforceable, in whole or part, the remaining portions of this Agreement shall remain in effect. This Agreement applies to all Audit Services (as defined in paragraph 1) and Plan Engagement (as defined, respectively in paragraphs 19), including any such services performed or begun before the date of this Agreement.

57. To the extent that EY agrees to perform Audit Services for a subsequent fiscal year and subject to Bankruptcy Court approval, the terms and conditions set forth in this Agreement shall apply to the performance of such Audit Services, except as specifically modified, amended or supplemented in writing by the parties. Changes in the scope of the Audit Services and estimated fees for such services in subsequent fiscal years will be communicated in supplemental agreements. The Company may, at its discretion, terminate performance of the Audit Services, Plan Engagement and this Agreement upon written notice. EY may terminate performance of the Audit Services and this Agreement upon written notice if we reasonably determine that we can no longer provide the Audit Services in accordance with applicable law or professional obligations but in any event, this Agreement will expire upon the effective date of the Company's confirmed plan of reorganization, or liquidation of the Company's assets, under Chapter 11 or 7 of the Bankruptcy Code, or otherwise.  Upon any termination of the Audit Services or this Agreement, the Company shall pay EY for all work-in-progress, Audit Services already performed and expenses incurred by us up to and including the effective date of such termination. The provisions of this Agreement that give either of us rights or obligations beyond its termination including, without limitation, paragraph 45, shall continue indefinitely following the termination of this Agreement and shall survive completion of the Company's bankruptcy whether through a confirmed plan of reorganization under Chapter 11, liquidation of the Company's assets under Chapter 7 of the Bankruptcy Code, or otherwise.

58. By agreement to the provision of the Audit Services, we are not providing a guarantee to you that our performance of these services pursuant to the terms and conditions set forth in this Agreement will guarantee your successful reorganization under Chapter 11.

EY appreciates the opportunity to be of assistance to the Company. If this Agreement accurately reflects the terms on which the Company has agreed to engage EY, please sign below on behalf of the Company and return it to Amelia Caporale, 20 Church Street, 19th Floor, Hartford, CT 06103.

Very truly yours,

*Ernst & Young LLP*



Agreed and accepted by:

Purdue Pharma L.P.

By its general partner, Purdue Pharma Inc.

By: _____

    Terrence Ronan
    Executive Vice President and Chief Financial Officer



## Dispute resolution procedures

### Mediation

A party shall submit a dispute to mediation by written notice to the other party or parties. The mediator shall be selected by the parties. If the parties cannot agree on a mediator, the International Institute for Conflict Prevention and Resolution ("CPR") shall designate a mediator at the request of a party. Any mediator must be acceptable to all parties and must confirm in writing that he or she is not, and will not become during the term of the mediation, an employee, partner, executive officer, director of or beneficial owner with decision-making capacity over any EY Firm audit client.

The mediator shall conduct the mediation as he/she determines, with the agreement of the parties. The parties shall discuss their differences in good faith and attempt, with the mediator's assistance, to reach an amicable resolution of the dispute. The mediation shall be treated as a settlement discussion and shall therefore be confidential. The mediator may not testify for either party in any later proceeding relating to the dispute. The mediation proceedings shall not be recorded or transcribed.

Each party shall bear its own costs in the mediation. The parties shall share equally the fees and expenses of the mediator.

If the parties have not resolved a dispute within 90 days after written notice beginning mediation (or a longer period, if the parties agree to extend the mediation), the mediation shall terminate and the dispute shall be settled by arbitration. In addition, if a party initiates litigation, arbitration, or other binding dispute resolution process without initiating mediation, or before the mediation process has terminated, an opposing party may deem the mediation requirement to have been waived and may proceed with arbitration.

### Arbitration

The arbitration will be conducted in accordance with the procedures in this document and the CPR Rules for Non-Administered Arbitration ("Rules") as in effect on the date of the Agreement, or such other rules and procedures as the parties may agree. In the event of a conflict, the provisions of this document will control.

The arbitration will be conducted before a panel of three arbitrators, to be selected in accordance with the screened selection process provided in the Rules. Any issue concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of any of these procedures, shall be governed by the Federal Arbitration Act and resolved by the arbitrators. No potential arbitrator may be appointed unless he or she has agreed in writing to these procedures and has confirmed in writing that he or she is not, and will not become during the term of the arbitration, an employee, partner, executive officer, director of or beneficial owner with decision-making capacity over any EY Firm audit client.



The arbitration panel shall have no power to award non-monetary or equitable relief of any sort or to make an award or impose a remedy that (i) is inconsistent with the agreement to which these procedures are attached or any other agreement relevant to the dispute, or (ii) could not be made or imposed by a court deciding the matter in the same jurisdiction. In deciding the dispute, the arbitration panel shall apply the limitations period that would be applied by a court deciding the matter in the same jurisdiction, and shall have no power to decide the dispute in any manner not consistent with such limitations period.

Discovery shall be permitted in connection with the arbitration only to the extent, if any, expressly authorized by the arbitration panel upon a showing of substantial need by the party seeking discovery.

All aspects of the arbitration shall be treated as confidential. The parties and the arbitration panel may disclose the existence, content or results of the arbitration only in accordance with the Rules or applicable professional standards. Before making any such disclosure, a party shall give written notice to all other parties and shall afford them a reasonable opportunity to protect their interests, except to the extent such disclosure is necessary to comply with applicable law, regulatory requirements or professional standards.

The result of the arbitration shall be binding on the parties, and judgment on the arbitration award may be entered in any court having jurisdiction.



## Exhibit A

### Rule 1.700 Confidential Information

### 1.700.001 Confidential Client Information Rule

.01 A member in public practice shall not disclose any confidential client information without the specific consent of the client.

.02 This rule shall not be construed (1) to relieve a member of his or her professional obligations of the "Compliance With Standards Rule" [1.310.001] or the "Accounting Principles Rule" [1.320.001], (2) to affect in any way the member's obligation to comply with a validly issued and enforceable subpoena or summons, or to prohibit a member's compliance with applicable laws and government regulations, (3) to prohibit review of a member's professional practice under AICPA or state CPA society or Board of Accountancy authorization, or (4) to preclude a member from initiating a complaint with, or responding to any inquiry made by, the professional ethics division or trial board of the Institute or a duly constituted investigative or disciplinary body of a state CPA society or Board of Accountancy. Members of any of the bodies identified in (4) above and members involved with professional practice reviews identified in (3) above shall not use to their own advantage or disclose any member's confidential client information that comes to their attention in carrying out those activities. This prohibition shall not restrict members' exchange of information in connection with the investigative or disciplinary proceedings described in (4) above or the professional practice reviews described in (3) above. [Prior reference: paragraph .01 of ET section 301]

### Interpretations Under the Confidential Client Information Rule 1.700.050 Disclosing Client Information in Connection with a Review of the Member's Practice

.01 For purposes of the "Confidential Client Information Rule" [1.700.001], a review of a member's professional practice includes a review performed in conjunction with a prospective purchase, sale, or merger of all or part of a member's practice. Such reviews may threaten a member's compliance with the "Confidential Client Information Rule." To reduce the threat to an acceptable level, a member must take appropriate precautions (for example, through a written confidentiality agreement with the prospective purchaser) to help ensure that the prospective purchaser does not disclose any confidential client information obtained in the course of the review.

.02 Members who perform such reviews shall not use to their advantage or disclose any confidential client information that comes to their attention during the review. [Prior reference: paragraph .04 of ET section 301]

[Effective December 15, 2014]



## Exhibit B

List of Subsidiaries within the Consolidated Financial statements, as defined in the first paragraph.

Nayatt Cove Lifescience Inc.

Purdue Pharmaceuticals L.P.

Purdue Neuroscience Company

Purdue Pharma of Puerto Rico

Purdue Transdermal Technologies L.P.

Avrio Health L.P.

Purdue Pharmaceutical Products L.P.

Purdue Pharma Manufacturing, L.P.

Imbrium Therapeutics L.P.

Greenfield BioVentures L.P.

Adlon Therapeutics L.P.

Rhodes Pharmaceuticals L.P.

Rhodes Technologies

Seven Seas Hill Corp.

Ophir Green Corp.

Button Land L.P.

Rhodes Associates L.P.

Paul Land Inc.

Quidnick Land L.P.

UDF LP

SVC Pharma LP

SVC Pharma Inc.



## Exhibit C

### 2021 Consolidated Audit

| | | |
|---|---|---:|
| Upon Bankruptcy Court Approval | $ | 300,000 |
| February 15, 2022 | | 300,000 |
| March 1, 2022 | | 300,000 |
| April 1, 2022 | | 150,000 |
| **Total** | $ | 1,050,000 |

### 2021 Employee Benefit Plans

| | | |
|---|---|---:|
| June 1, 2022 | $ | 33,500 |
| July 1, 2022 | | 33,500 |
| **Total** | $ | 67,000 |