Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

4    In re:

5                                        Chapter 11

6    PURDUE PHARMA L.P., et al.,         Case No. 19-23649-rdd

7                                        (Jointly Administered)

8           Debtors.

9    - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

10

11                   United States Bankruptcy Court

12                   300 Quarropas Street

13                   Room 147

14                   White Plains, NY 10601

15

16                   March 9, 2022

17                   1:05 p.m.

18

19

20

21    B E F O R E :

22    HON ROBERT D. DRAIN

23    U.S. BANKRUPTCY JUDGE

24

25    ECRO:   UNKNOWN

Page 2

1    HEARING re Notice of Agenda for March 9 and 10, 2022 Hearing

2    at 1PM (ECF #4466)

3

4    HEARING re Opposition Limited (related document(s)4410,

5    4411) filed by Allen Joseph Underwood II on behalf of

6    Certain Canadian Municipality Creditors and Canadian First

7    Nation Creditors. (ECF #4487)

8

9    HEARING re Response to Motion to Approve Settlement Term

10   Sheet (related document(s)4410) filed by Todd E. Phillips on

11   behalf of Multi-State Governmental Entities Group. (ECF

12   #4486)

13

14   HEARING re Objection to Motion to Approve Settlement Terms

15   (related document(s)4410) filed by Hunter J. Shkolnik on

16   behalf of Lake County, Trumbull County. (ECF #4485)

17

18   HEARING re Objection to Motion U.S. Trustee's Opposition and

19   Reservation of Rights to Debtors' Motion for an Order

20   Authorizing and Approving Settlement Term Sheet (related

21   document(s)4410) filed by Paul Kenan Schwartzberg on behalf

22   of United States Trustee. (ECF #4484)

23

24   HEARING re Objection to Motion to Approve Settlement Term

25   Sheet (related document(s)4410) filed by Hunter J. Shkolnik

Page 3

1   on behalf of Nassau County. (ECF #4483)

2

3   HEARING re Motion to Approve / Motion of Debtors Pursuant to

4   11 U.S.C. § 105(a) and 363(b) for Entry of an Order

5   Authorizing and Approving Settlement Term Sheet filed by Eli

6   J. Vonnegut on behalf of Purdue Pharma L.P. (ECF #4410)

7

8   HEARING re Motion to Shorten Time / Debtors' Ex Parte Motion

9   for Entry of an Order Shortening Notice with Respect to the

10   Motion of Debtors Pursuant To 11 U.S.C. §§ 105(a) and 363(b)

11   for Entry of an Order Authorizing and Approving Settlement

12   Term Sheet (related document(s)4410) filed by Eli J.

13   Vonnegut on behalf of Purdue Pharma L.P. (ECF #4411)

14

15   HEARING re Objection to Motion of Debtors Pursuant to 11

16   U.S.C. § 105(a) and 363(b) for Entry of an Order Authorizing

17   and Approving Settlement Term Sheet (ECF No. 4410) and

18   Joinder to The State of Florida's Objection to Motion of

19   Debtors Pursuant to 11 U.S.C. § 105(a) and 363(b) for Entry

20   of an Order Authorizing and Approving Settlement Term Sheet

21   (ECF No. 4413) (related document(s)4410) filed by

22   Christopher B Spuches on behalf of The Territory of American

23   Samoa. (ECF #4480)

24

25   HEARING re Objection to Motion of Debtors Pursuant to 11

1   U.S.C. § 105(a) and 363(b) for Entry of an Order Authorizing

2   and Approving Settlement Term Sheet (ECF No. 4410) and

3   Joinder to The State of Florida's Objection to Motion of

4   Debtors Pursuant to 11 U.S.C. § 105(a) and 363(b) for Entry

5   of an Order Authorizing and Approving Settlement Term Sheet

6   (ECF No. 4413) (related document(s)4410) filed by

7   Christopher B Spuches on behalf of The Commonwealth of

8   Puerto Rico. (ECF #4478)

9

10  HEARING re Objection to Motion for Entry of an Order

11  Authorizing and Approving Settlement Term Sheet (related

12  document(s)4410) filed by Peter D'Apice on behalf of Tribal

13  Leadership Committee. (ECF #4474)

14

15  HEARING re Objection to Motion to Approve Terms (related

16  document(s)4410) Filed by James Franklin Ozment I on behalf

17  of Creighton Bloyd. (Ozment, James) (ECF #4473)

18

19  HEARING re Objection to Motion The State of Alabama's

20  Joinder to The State of Florida's Objection to Motion of

21  Debtors Pursuant to 11 U.S.C. § 105(A) and 363(B) For Entry

22  of an Order Authorizing and Approving Settlement Term Sheet

23  [ECF No. 4413] (related document(s)4410) filed by Eric J.

24  Snyder on behalf of State of Alabama. (ECF #4472)

25

```
1    HEARING re Objection to Motion / Ad Hoc Committee's Limited

2    Objection to Debtors' Motion to Approve Settlement Term

3    Sheet (related document(s)4410) filed by Kenneth H. Eckstein

4    on behalf of Ad Hoc Committee of Governmental and Other

5    Contingent Litigation Claimants. (ECF #4471)

6

7    HEARING re Objection to Motion of Debtors Pursuant to 11

8    U.S.C. § 105(a) and 363(b) for Entry of an Order Authorizing

9    and Approving Settlement Term Sheet (ECF No. 4410) and

10   Joinder to The State of Florida's Objection to Motion of

11   Debtors Pursuant to 11 U.S.C. § 105(a) and 363(b) for Entry

12   of an Order Authorizing and Approving Settlement Term Sheet

13   (ECF No. 4413) (related document(s)4410) filed by

14   Christopher B Spuches on behalf of State of Missouri, by its

15   Attorney General Eric S. Schmitt. (ECF #4470)

16

17   HEARING re Objection to Motion of Debtors Pursuant to 11

18   U.S.C. § 105(a) and 363(b) for Entry of an Order Authorizing

19   and Approving Settlement Term Sheet (ECF No. 4410) and

20   Joinder to The State of Florida's Objection to Motion of

21   Debtors Pursuant to 11 U.S.C. § 105(a) and 363(b) for Entry

22   of an Order Authorizing and Approving Settlement Term Sheet

23   (ECF No. 4413) (related document(s)4410) filed by

24   Christopher B Spuches on behalf of The State of Mississippi.

25   (ECF #4468)
```

Page 6

1    HEARING re Objection to Motion The State of Texas's Joinder

2    to the State of Florida's Objection to Motion of Debtors

3    Pursuant to 11 U.S.C. § 105(a) and 363(b) for Entry of an

4    Order Authorizing and Approving Settlement Term Sheet

5    (related document(s)4410) filed by Rachel R Obaldo on behalf

6    of The State of Texas, acting by and through the Attorney

7    General of Texas, Ken Paxton. (ECF #4465)

8

9    HEARING re Objection to Motion of Debtors Pursuant to 11

10   U.S.C. § 105(a) and 363(b) for Entry of an Order Authorizing

11   and Approving Settlement Term Sheet [ECF No. 4410] and

12   Joinder to The State of Florida's Objection to Motion of

13   Debtors Pursuant to 11 U.S.C. § 105(a) and 363(b) for Entry

14   of an Order Authorizing and Approving Settlement Term Sheet

15   [ECF No. 4413] (related document(s)4410) filed by

16   Christopher B Spuches on behalf of State of Utah. (ECF

17   #4464)

18

19   HEARING re Statement / Joinder of the State of Tennessee to

20   the State of Florida's Objection to Motion of Debtors

21   Pursuant to 11 U.S.C. 105(A) and 363(B) for Entry of an

22   Order Authorizing and Approving Settlement Term Sheet

23   (related document(s)4413) filed by Marvin E. Clements Jr. on

24   behalf of Tennessee Attorney General's Office. (ECF #4462)

25

Page 7

1    HEARING re Objection to Motion of Debtors Pursuant to 11

2    U.S.C. § 105(a) and 363(b) for Entry of an Order Authorizing

3    and Approving Settlement Term Sheet [ECF No. 4410] and

4    Joinder to The State of Florida's Objection to Motion of

5    Debtors Pursuant to 11 U.S.C. § 105(a) and 363(b) for Entry

6    of an Order Authorizing and Approving Settlement Term Sheet

7    [ECF No. 4413] (related document(s)4410) filed by

8    Christopher B Spuches on behalf of The State of

                        Georgia. (ECF

9    #4461)

10

11    HEARING re Objection to Motion of Debtors Pursuant to 11

12    U.S.C. § 105(a) and 363(b) for Entry of an Order Authorizing

13    and Approving Settlement Term Sheet [ECF No. 4410] and

14    Joinder to The State of Florida's Objection to Motion of

15    Debtors Pursuant to 11 U.S.C. § 105(a) and 363(b) for Entry

16    of an Order Authorizing and Approving Settlement Term Sheet

17    [ECF No. 4413] (related document(s)4410) filed by

18    Christopher B Spuches on behalf of The Commonwealth of

19    Kentucky. (ECF #4458)

20

21    HEARING re Objection to Motion /Maria Ecke's Objection to

22    Debtors' Motion to Approve Settlement Term Sheet (related

23    document(s)4410) filed by Maria Ecke. (ECF #4456)

24

25    HEARING re Objection to Motion to Approve (related

1  document(s)4410) filed by Mark Tate on behalf of Westchester

2  Heavy Construction Laborers Local 60 Health & Welfare Fund,

3  et al. (ECF #4455)

4

5  HEARING re Objection to Motion of Debtors Pursuant to 11

6  U.S.C. § 105(a) and 363(b) for Entry of an Order Authorizing

7  and Approving Settlement Term Sheet [ECF No. 4410] and

8  Joinder to The State of Floridas Objection to Motion of

9  Debtors Pursuant to 11 U.S.C. § 105(a) and 363(b) for Entry

10 of an Order Authorizing and Approving Settlement Term Sheet

11 [ECF No. 4413] (related document(s)4410) filed by

12 Christopher B Spuches on behalf of State of Arizona. (ECF

13 #4453)

14

15 HEARING re Objection to Motion of Debtors Pursuant to 11

16 U.S.C. § 105(a) and 363(b) for Entry of an Order Authorizing

17 and Approving Settlement Term Sheet [ECF No. 4410] and

18 Joinder to The State of Florida's Objection to Motion of

19 Debtors Pursuant to 11 U.S.C. § 105(a) and 363(b) for Entry

20 of an Order Authorizing and Approving Settlement Term Sheet

21 [ECF No. 4413] (related document(s)4410) filed by

22 Christopher B Spuches on behalf of The State of Kansas. (ECF

23 #4451)

24

25

1    HEARING re Objection to Motion of Debtors Pursuant to 11

2    U.S.C. § 105(a) and 363(b) for Entry of an Order Authorizing

3    and Approving Settlement Term Sheet [ECF No. 4410] and

4    Joinder to The State of Florida's Objection to Motion of

5    Debtors Pursuant to 11 U.S.C. § 105(a) and 363(b) for Entry

6    of an Order Authorizing and Approving Settlement Term Sheet

7    [ECF No. 4413] (related document(s)4410) filed by

8    Christopher B Spuches on behalf of The State of South

9    Carolina. (ECF #4449)

10

11   HEARING re Objection to Motion of Debtors Pursuant to 11

12   U.S.C. § 105(a) and 363(b) for Entry of an Order Authorizing

13   and Approving Settlement Term Sheet [ECF No. 4410] and

14   Joinder to The State of Florida's Objection to Motion of

15   Debtors Pursuant to 11 U.S.C. § 105(a) and 363(b) for Entry

16   of an Order Authorizing and Approving Settlement Term Sheet

17   [ECF No. 4413] (related document(s)4410) filed by

18   Christopher B Spuches on behalf of The State of Arkansas.

19   (ECF #4447)

20

21   HEARING re Objection to Motion of Debtors Pursuant to 11

22   U.S.C. § 105(a) and 363(b) for Entry of an Order Authorizing

23   and Approving Settlement Term Sheet [ECF No. 4410] and

24   Joinder to The State of Florida's Objection to Motion of

25   Debtors Pursuant to 11 U.S.C. § 105(a) and 363(b) for Entry

Page 10

1   of an Order Authorizing and Approving Settlement Term Sheet

2   [ECF No. 4413] (related document(s)4410) filed by

3   Christopher B Spuches on behalf of The State of North

4   Dakota. (ECF #4445)

5

6   HEARING re Objection to Motion of Debtors Pursuant to 11

7   U.S.C. § 105(a) and 363(b) for Entry of an Order Authorizing

8   and Approving Settlement Term Sheet [ECF No. 4410] and

9   Joinder to The State of Florida's Objection to Motion of

10  Debtors Pursuant to 11 U.S.C. § 105(a) and 363(b) for Entry

11  of an Order Authorizing and Approving Settlement Term Sheet

12  [ECF No. 4413] (related document(s)4410) filed by

13  Christopher B Spuches on behalf of The State of Montana.

14  (ECF #4443)

15

16  HEARING re Objection to Motion /Ellen Isaacs' Objection to

17  Debtors Pursuant to 11 U.S.C. § 105(a) and 363(b) for Entry

18  of an Order Authorizing and Approving Settlement Term Sheet

19  (related document(s)4410) filed by Ellen Isaacs. (ECF #4441)

20

21  HEARING re Objection to Motion of Debtors Pursuant to 11

22  U.S.C. § 105(a) and 363(b) for Entry of an Order Authorizing

23  and Approving Settlement Term Sheet [ECF No. 4410] and

24  Joinder to The State of Florida's Objection to Motion of

25  Debtors Pursuant to 11 U.S.C. § 105(a) and 363(b) for Entry

1   of an Order Authorizing and Approving Settlement Term Sheet

2   [ECF No. 4413] (related document(s)4410) filed by

3   Christopher B Spuches on behalf of The State of Alaska. (ECF

4   #4440)

5

6   HEARING re Objection to Motion of Debtors Pursuant to 11

7   U.S.C. § 105(a) and 363(b) for Entry of an Order Authorizing

8   and Approving Settlement Term Sheet [ECF No. 4410] and

9   Joinder to The State of Florida's Objection to Motion of

10  Debtors Pursuant to 11 U.S.C. § 105(a) and 363(b) for Entry

11  of an Order Authorizing and Approving Settlement Term Sheet

12  [ECF No. 4413] (related document(s)4410) filed by

13  Christopher B Spuches on behalf of Ohio Attorney General.

14  (ECF #4437)

15

16  HEARING re Objection to Motion of Debtors Pursuant to 11

17  U.S.C. § 105(a) and 363(b) for Entry of an Order Authorizing

18  and Approving Settlement Term Sheet [ECF No. 4410] and

19  Joinder to The State of Florida's Objection to Motion of

20  Debtors Pursuant to 11 U.S.C. § 105(a) and 363(b) for Entry

21  of an Order Authorizing and Approving Settlement Term Sheet

22  [ECF No. 4413] (related document(s)4410) filed by

23  Christopher B Spuches on behalf of The State of Nebraska.

24  (ECF #4435)

25

Page 12

1   HEARING re Objection to Motion of Debtors Pursuant to 11

2   U.S.C. § 105(a) and 363(b) for Entry of an Order Authorizing

3   and Approving Settlement Term Sheet [ECF No. 4410] and

4   Joinder to The State of Florida's Objection to Motion of

5   Debtors Pursuant to 11 U.S.C. § 105(a) and 363(b) for Entry

6   of an Order Authorizing and Approving Settlement Term Sheet

7   [ECF No. 4413] (related document(s)4410) filed by

8   Christopher B Spuches on behalf of The State of Louisiana.

9   (ECF #4433)

10

11  HEARING re Objection /State of Indiana's Objection to

12  Debtor's Motion to Approve Settlement Term Sheet and Joinder

13  to the Objection filed by the State of Florida filed by

14  Heather M Crockett on behalf of State of Indiana. (Crockett,

15  Heather). (Related document(s) 4410,4413) (ECF #4418)

16

17  HEARING re Objection /State of West Virginia's Objection to

18  Debtors' Motion to Approve Settlement Term Sheet and Joinder

19  to Objection by the State of Florida (related

20  document(s)4410, 4413) filed by Aaron R. Cahn on behalf of

21  State of West Virginia, ex. rel. Patrick Morrisey, Attorney

22  General. (ECF #4417)

23

24

25

Page 13

1    HEARING re Objection (related document(s)4410) filed by

2    Christopher B Spuches on behalf of Attorney General, State

3    of Florida. with hearing to be held on 3/4/2022 (check with

4    court for location) (Spuches, Christopher) (ECF #4413)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

1  A P P E A R A N C E S :

2

3  DAVIS POLK WARDWELL LLP

4       Attorneys for the Debtors

5       450 Lexington Avenue

6       New York, NY 10017

7

8  BY:  MARSHALL SCOTT HUEBNER (TELEPHONICALLY)

9       ELI VONNEGUT (TELEPHONICALLY)

10

11  AKIN GUMP STRAUSS HAUER FELD LLP

12       Attorneys for the Official Committee of Unsecured

13       Creditors

14       1 Bryant Park

15       New York, NY 10036

16

17  BY:  ARIK PREIS (TELEPHONICALLY)

18

19  UNITED STATES DEPARTMENT OF JUSTICE

20       Attorneys for the U.S. Trustee

21       201 Varick Street, Suite 1006

22       New York, NY 10014

23

24  BY:  NAN EITEL (TELEPHONICALLY)

25       KENNETH ECKSTEIN (TELEPHONICALLY)

Page 15

1    FRANK OZMENT LAW

2         Attorneys for Creighton Bloyd, Stacey Bridges, Charles

3         Fitch

4         2400 Regions Harbert Plaza

5         1901 Sixth Avenue North

6         Birmingham, AL 35203

7

8    BY:  FRANK OZMENT (TELEPHONICALLY)

9

10   LITE DEPALMA GREENBERG & AFANADOR

11        Attorneys for Certain Canadian Municipality Creditors

12        and Canadian First Nation Creditors.

13        570 Broad Street, #1201

14        Newark, NJ 07102

15

16   BY:  Allen Joseph Underwood II (TELEPHONICALLY)

17

18   TATE LAW GROUP

19        Village of Amityville, NY, et al.

20        Local 60 Health & Welfare Fund, et al.

21        25 Bull Street, Second Floor

22        Savannah, GA 31401

23

24   BY:  MARK A. TATE (TELEPHONICALLY)

25

1    MILBANK, TWEED, HADLEY & MCCLOY LLP

2        Attorneys for

3        55 Hudson Yards

4        New York, NY 10001

5

6    BY:  GERARD UZZI (TELEPHONICALLY)

7

8    LEVENFELD PEARLSTEIN, LLC

9        Attorneys for the Ad Hoc Committee of NAS Children

10        2 N LaSalle Street, Suite 1300

11        Chicago, IL 60602

12

13    BY:  HAROLD ISRAEL (TELEPHONICALLY)

14

15    CAPLIN & DRYSDALE

16        Attorneys for the MSGE Group

17        1 Thomas Circle NW, Suite 1100

18        Washington, D.C. 20005

19

20    BY:  KEVIN MACLAY (TELEPHONICALLY)

21

22

23

24

25

Page 17

1    FLORIDA DEPARTMENT OF JUSTICE

2         Attorneys for the State of Florida

3         Office of the Attorney General

4         State of Florida

5         PL-01 The Capital

6         Tallahassee, FL 32399

7

8    BY:  JOHN GUARD (TELEPHONICALLY)

9

10   CARTER LEDYARD MILBURN LLP

11        Attorneys for the State of West Virginia

12        2 Wall Street

13        New York, NY 10005

14

15   BY:  AARON R. CAHN (TELEPHONICALLY)

16

17   ALSO PRESENT TELEPHONICALLY:

18   JILL S. ABRAMS

19   BROOKS BARKER

20   GEOFF MULVIHILL

21   BERNARD ARDAVAN ESKANDARI

22   EVAN M. JONES

23   JAMES THOMAS BOFFETTI

24   MELISSA L. VAN ECK

25   CATHERINE STEEGE

Page 18

1   ERIC J. SNYDER

2   ELIZABETH SCHLECKER

3   MEGAN PARIS RUNDLET

4   MARION QUICK

5   STEVEN POHL

6   EDWARD E. NEIGER

7   BRIAN S. MASUMOTO

8   DAVID HART

9   LAWRENCE FOGELMAN

10   BRIAN EDMUNDS

11   MARION QUIRK

12   ELIZABETH SCHLECKER

13   ROXANA ALEALI

14   MICHAEL ATKINSON

15   MITCHELL JAY AUSLANDER

16   JASMINE BALL

17   KATHRYN BENEDICT

18   ANDREW BENJAMIN

19   SCOTT R. BICKFORD

20   JASON B. BINFORD

21   DAVID E. BLABEY

22   JAMES THOMAS BOFFETTI

23   LOUIS BOGRAD

24   SARA BRAUNER

25   DAVID BROWN

1    SAUL BURIAN

2    ALAN CARRILLO

3    JULIUS CHEN

4    DANIEL CONNOLLY

5    DYLAN CONSLA

6    GEOFFREY COUTTS

7    HEATHER M. CROCKETT

8    MELANIE L. CYGANOWSKI

9    PETER D'APICE

10   STEPHANIE EBERHARDT

11   SANDER L. ESSERMAN

12   GILLIAN FEINER

13   ROBERTO FINZI

14   CAROLINE GANGE

15   GILL GELDREICH

16   MAGALI GIDDENS

17   MATTHEW J. GOLD

18   IRVE GOLDMAN

19   GARY GOTTO

20   JOHN GUARD

21   BENJAMIN J. HIGGINS

22   AUTUMN D. HIGHSMITH

23   JAN HOFFMAN

24   MITCHELL HURLEY

25   ELLEN ISSACS

1   HAROLD D. ISRAEL

2   EVAN M. JONES

3   GREGORY JOSEPH

4   BENJAMIN S. KAMINETZKY

5   MARC KESSELMAN

6   DARREN S. KLEIN

7   ALEXANDER LEES

8   OWEN LEFKON

9   NICOLE A. LEONARD

10  MARA LEVENTHAL

11  DAVID LI

12  JEFFREY A. LIESEMER

13  GERARD MCCARTHY

14  JAMES I. MCCLAMMY

15  CARRIE L. MCGAHA

16  SHANNON M. MCNULTY

17  MICHELE MEISES

18  MAURA KATHEEN MONAGHAN

19  AISLING MURRAY

20  DANIEL NEGLESS

21  GEORGE O'CONNOR

22  MICHAEL PATRICK O'NEIL

23  RACHEL R. OBALDO

24  JENNIFER PEACOCK

25  STEVEN POHL

1  KATHERINE PORTER

2  KARL RACINE

3  JOSEPH RICE

4  RACHAEL RINGER

5  CHRISTOPHER ROBERTSON

6  JEFFREY J. ROSEN

7  MICHAEL PARIS RUNDLET

8  JEFF RUPERT

9  KATHRYN SABATINI

10  JAMES SALWEN

11  HANNES SCHENK

12  GABRIEL SCHLABACH

13  ELIZABETH SCHLECKER

14  PAUL KENAN SCHWARTZBERG

15  LUCAS H. SELF

16  J. CHRISTOPHER SHORE

17  RICHARD SHORE

18  MARC F. SKAPOF

19  STEVEN J. SKIKOS

20  LAURA SMITH

21  JOSEPH SORKIN

22  ERIC STODOLA

23  HENRY SUN

24  MARC JOSEPH TOBAK

25  ESTHER TOWNES

Page 22

1    KELLY TSAI

2    ALICE TSIER

3    ANDREW D. VELEZ-RIVERA

4    JORDAN A. WEBER

5    MARTIN WEIS

6    THEODORE WELLS

7    JACQUELYN KNUDSON

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 23

1                    P R O C E E D I N G S

2              THE COURT:  Okay, good afternoon.  This is Judge

3    Drain, and we're here in In re: Purdue Pharma LP et al.

4    This hearing is being held remotely, primarily by Zoom,

5    unless someone doesn't have access to a screen, in which

6    case they're appearing by telephone.

7              There are two matters on the calendar today.

8    They're closely related.  The first is the Debtor's motion

9    for entry of an order shortening notice with respect to the

10   other motion on the calendar, which is the Debtor's motion

11   for entry of an order authorizing and approving a settlement

12   term sheet under 11 U.S.C. Section 363(b) and 105(a).  So, I

13   guess we should address the first motion first.

14             You're on mute.

15             MR. HUBENER:  Sorry.  Many buttons to press on

16   this end, Your Honor.

17             THE COURT:  That's fine.

18             MR. HUBENER:  Can you hear me clearly now?

19             THE COURT:  Yes.  Yeah, I can.

20             MR. HUBENER:  Your Honor, for the record, Marshall

21   Huebner, Davis Polk & Wardwell, on behalf of the Debtors.

22   And, Your Honor, no party objected to the motion to shorten

23   time.  And I think as the Court knows, objections have

24   actually begun coming in, in fact, within about seven hours

25   of the motion being filed, in part because various parties

Page 24

```
 1    who had advance notice, to some extent, to the best of our

 2    ability to provide it, given the confidentiality

 3    (indiscernible).  The fact that there are, I believe, 35

 4    objections (indiscernible) on the docket, I think speaks to

 5    the fact that people had an opportunity to craft the

 6    objections that they believed appropriate.  But most

 7    importantly, there are no objections at all to the motion to

 8    shorten time, so we would ask as (indiscernible) matter that

 9    that be granted.

10           THE COURT:  Okay.  Just if you can, Mr. Huebner,

11    you're kind of fading in and out.  I'm not sure if you can

12    bring your microphone closer.  I did hear you, but I think

13    if you don't do that, there's a risk that going forward, you

14    won't be picked up.

15           MR. HUBENER:  Yep.

16           THE COURT:  So, you're right, there have been no

17    objections to the motion to shorten, and in fact there are

18    35 filed objections to the underlying motion.  And the

19    motion to shorten does state, I believe, cause to shorten

20    the notice period, namely the -- one of the benefits of the

21    settlement term sheet is time sensitive, although frankly,

22    all of them are, given the deadlines that were short but

23    extended four times in the mediation, recognizing the need

24    to conclude the mediation promptly.  The benefit, besides

25    doing that, was to -- was the agreement by the settling
```

Page 25

1   states and the District of Columbia to withdraw their

2   appeals, as set forth on the terms of the term sheet, so I

3   will grant the motion to shorten.

4           MR. HUBENER:  Thank you, Your Honor.  I am closer

5   to the mic now.  Is that better?

6           THE COURT:  Yes.

7           MR. HUBENER:  Okay, terrific.  So, Your Honor, one

8   other (indiscernible) matter or program matter before I

9   start.  Number one, in connection with the hearing, just so

10  the Court is aware, we established 1,000 phone lines on the

11  (indiscernible) Debtor's side to allow for as much

12  participation as --

13          THE COURT:  You're still fading in and out.  I'm

14  sorry.

15          MR. HUBENER:  Hold on, let me -- I have this

16  super-fancy thing, but I guess it's not working very well.

17          THE COURT:  Well, sometimes, fancy things don't.

18          MR. HUBENER:  Yeah, I know.  I usually just do it

19  with my headphones on, and I've never had a problem.  I now

20  have this Poly speaker basically right next to me.  Is this

21  clear?

22          THE COURT:  Yes.

23          MR. HUBENER:  Okay.

24          THE COURT:  Okay.

25          MR. HUBENER:  I'll do my best to sort of keep it

Page 26

1    right nearby.

2              THE COURT:  Okay.

3              MR. HUBENER:  So, Your Honor, I was starting to

4    say, and I apologize, we did arrange for 1,000 phone lines

5    to allow for as much participation as possible, especially

6    given, obviously, tomorrow's victim portion of the hearing.

7    We did want to thank various parties who worked with us on

8    that.

9              In that regard, although I know that your chambers

10   and deputy indicated at the outset, I do want to reiterate,

11   especially in terms of tomorrow, I think that there will

12   likely be some unbelievably searing, difficult, and personal

13   statements that will take an incredible amount of courage

14   for people to give, you know, with hundreds or 1,000 people

15   listening.  Obviously, as Your Honor noted last week, it is

16   a court proceeding, and so screenshots and making audio

17   recordings or making video recordings of the screen I think

18   would be, not only I think illegal, but do an unbelievable

19   disservice to the victims, who certainly have a right to

20   expect that their privacy will be respected within the

21   context of a very large and important hearing.

22             So, whatever the official channels are, I know

23   people are working to broaden those as much as possible, it

24   would be impossible to overstate how much we agree with

25   that.  But it is also important that nobody undertake to

Page 27

1   violate legal rules and procedures with unofficial channels,

2   you know, and God forbid, capturing and posting on YouTube

3   the victim statements for their own separate purposes.  And

4   so, just because that was stated before the Court got on, I

5   thought it was important to quickly mention that and

6   (indiscernible) the record and the transcript.

7              THE COURT:  Okay.

8              MR. HUBENER:  Third, Your Honor, as our motion

9   makes clear, and as I think all parties are aware, the

10  motion, and really the term sheet underlying it, are the

11  result of nine weeks of really literally around the clock,

12  virtually every single day, every Saturday, every Sunday,

13  every week day, very difficult, often hard fought

14  negotiations, primarily among and between the Sacklers and

15  the -- well, we'll call it the nine, just the eight

16  appealing states, all of which were guided by the

17  indefatigable hand of Judge Shelley Chapman and her clerks.

18  And I at least want to stop before we begin to thank Judge

19  Chapman for her just extraordinary, extraordinary, unceasing

20  efforts -- 3:00 in the morning, 2:00 in the morning, until

21  1:00 in the morning -- and her dedication not only to this

22  mediation, but to its also very important predecessor

23  mediation that resulted in the settlement prior to this one.

24             THE COURT:  Well, I agree with that.  Both to

25  Judge Chapman and to her staff, her clerk, I and everyone in

Page 28

1    this case really has a real debt of gratitude.

2            MR. HUBENER:  Your Honor, one last thing before I

3    jump into the merits, which really, I guess, arises out of

4    the agenda letter.  We are obviously aware that there are 35

5    objections, and that is unfortunate, and this we'll talk

6    about in a few minutes because, you know, we understand, and

7    we have some sympathy for some of those objections.

8            It should also be noted, though, that because the

9    reply deadline was very recently, given the extremely short

10   time, there are also some very important supporting

11   statements that were filed on the docket, one by the MSGE,

12   which represents the munis, who are, in fact, very material

13   beneficiaries, I think in their mind, of in fact a majority,

14   the plurality of the consideration being provided under the

15   plan and a very important constituency.  The UCC, of course,

16   which is the official DOJ-appointed representative of every

17   unsecured creditor in this case, because we have no secured

18   creditors -- they actually represent the entire creditor

19   body -- and we have the joinders filed by the NAS and the

20   hospitals.

21           I also think it's important to note, Your Honor,

22   that there are a huge number of parties, both states -- you

23   know, 29 or so of them -- and many other parties who did not

24   object.  The fact that a form of joinder that is virtually

25   identical was filed by a single law firm makes it clear that

Page 29

1    efforts were clearly undertaken, which we fully respect, to

2    facilitate as many parties objecting as could be, you know,

3    talked to and encouraged to do so.  And obviously, there are

4    618,000 filed claims in this case, and obviously, we've had

5    many hearings with very robust participation.  And whether

6    the sort of silent super, super majority who did not appear

7    today did so because they (indiscernible) support the relief

8    or because they've decided not to object to the relief,

9    maybe even reluctantly decided not to object, I don't know,

10   and it's not for me to say.  But it should be remembered,

11   when confronted with an agenda letter that -- virtually, a

12   couple of pages listing the objections in a case of this

13   extraordinary size, scope, and complexity, that in no way,

14   shape, or form speaks for the majority of the creditors in

15   this case, not even remotely.

16         Your Honor, I'd like to spend a few minutes

17   turning to the actual underlying substance.  As we noted in

18   our reply brief, what is actually being asked of the Court

19   in terms of the relief granted is, in fact, quite narrow.

20   But what is at issue if the relief is granted is actually

21   quite extraordinary.  And I also want to talk about what

22   everyone, including every one of the objectors, stands to

23   lose if the proposed order is not granted.

24         If the motion is granted and the plan settlement

25   is enhanced by the agreements of the term sheet ultimately

Page 30

1    go effective, the estates will receive a guaranteed minimum

2    of $898 million more, up to a total maximum of $1.398

3    billion in incremental settlement payments by the Sacklers

4    for opioid abatement, all to improve and save lives.  If

5    today's relief is denied, the Sacklers will keep every penny

6    of those funds.

7            If today's relief is granted, every institution

8    and organization in the United States can erase the Sackler

9    name from their buildings, programs, scholarships,

10   endowments.  If today's relief is denied, many of those

11   institutions will likely face the legal risks

12   (indiscernible) of donor naming rights policies and possible

13   litigation.

14           If today's relief is granted, a material and

15   currently unresolved contingency to the effectiveness of the

16   current plan, the need to obtain approvals from multiple

17   governmental entities to change the membership of existing

18   Sackler-established foundations is removed, and the hard-

19   fought and important foundation agreements obtained by the

20   group of 15 in the last round of mediation will be replaced

21   by something yet better:  $175 million, in cash, on the

22   effective date.  If today's relief is denied, that currently

23   unresolved contingency (indiscernible) remains unresolved.

24           Your Honor, I am hearing feedback.  I'm not sure

25   if other people are unmuted, or maybe even, for some reason,

Page 31

1    it's the Court's microphone, which I apologize.  I do note

2    that I've never heard that before.  It's always been silent,

3    and there is a lot of feedback today.

4              THE COURT:  I'm hearing you fine, and I'm not

5    hearing feedback.

6              MR. HUBENER:  Perfect.

7              THE COURT:  I'm sorry if you're hearing it.  If

8    others are --

9              MR. HUBENER:  Well, as long as the Court can hear,

10   it doesn't matter what happens to me.

11             If today's relief is granted, the nine will

12   consent to the plan releases, forego filing their appeal

13   briefs due this Friday, and otherwise cease participating in

14   the appeals, which also removes multiple issues from the

15   appeals, although the appeals will not be issues before the

16   Second Circuit, but potential issues on further remand after

17   that.  Although the appeals will, unless we can convince the

18   other appellants to stand down, still proceed on the

19   schedule set by the Second Circuit, having the nine withdraw

20   from the appeals will hopefully go a long way to

21   facilitating the Debtors' emergence from Chapter 11 and may

22   well accelerate the conclusion of these cases, potentially

23   by several months.

24             In short, it is undeniable, and in fact it is

25   uncontested that the term sheet will deliver, at basically

Page 32

1   zero cost to and zero concession from the Debtors and their

2   estates, multiple, massive, direct and indirect benefits to

3   the estates and all of their creditors, including by

4   lowering the risk of a value-destructive liquidation, in

5   which even the $4.325 billion already committed to the

6   estates under the existing settlement agreement, as well as

7   the Debtors themselves, could likely be lost.

8           THE COURT:  So, can I interrupt you?  You phrased

9   this portion of your argument in two ways.  One is, if

10  approval of this motion is granted, the following will

11  happen; and then, if it is not, what will happen.  But I

12  want to be clear in my understanding.  If I grant this

13  motion, those things won't happen; rather, conditions to

14  those things happening will happen, right?  The relief,

15  under the term sheet, is conditioned upon an order

16  confirming the plan, or a plan, that is currently on appeal,

17  and that appeal would have to be successful, right, for

18  those benefits of the term sheet to apply, right?

19          MR. HUBENER:  Your Honor, there is a single --

20          THE COURT:  With the exception of the withdrawal

21  of the appeals by the nine.

22          MR. HUBENER:  Yeah, Your Honor, I would say this.

23  I think the order, we hope, was quite carefully drafted to

24  make clear which things are conditional, which is actually

25  most of it, on the appellate process going the right way,

Page 33

1    and as it were, clearing the plan for takeoff.  The thing

2    that is not conditional is a ruling that is required today -

3    - or tomorrow -- as a predicate to the nine not filing their

4    briefs, that the direct payments contemplated to be made by

5    the nine to the Sacklers don't contravene prior orders of

6    this Court or the Bankruptcy Code.

7              THE COURT:  Well, could I -- I want to ask you

8    about that point as well.  The order does say that, the

9    proposed order.  The term sheet, as I read its definition of

10   the "approval order," doesn't say that.  It does not include

11   in it a requirement that the Court find that "the agreements

12   do not contravene any prior orders of the Court in these

13   cases."  It just says that they do not contravene any

14   provision of the Bankruptcy Code.

15             MR. HUBENER:  Yeah, Your Honor, that's true.  I

16   think that, you know, as you might imagine, the proposed

17   order was sent around to parties, and someone put that in.

18   Candidly, I can't think of a prior order of this Court that

19   it would contravene, and I can't imagine that Your Honor

20   would allow it, if you thought it violated an order you had

21   entered.  And no objector has alleged, out of the 35

22   objections, that it contravenes any prior order of this

23   Court.  They merely believe -- and we'll talk about that at

24   some length in a few minutes -- that it potentially violates

25   various sections of the Bankruptcy Code.

Page 34

1           So, you're right; I think in that respect, the

2    form of order has a clause in it that is not in the term

3    sheet.  I would imagine that if Your Honor found that to be

4    a problem, we probably aren't getting through today

5    successfully in any event.  But if you feel that it's

6    important to strike it because you simply can't or won't

7    review in your mind or otherwise every order you've ever

8    entered for possible conflict, given that it does go beyond

9    what's in the term sheet, I'm just going to take a flier

10   from the podium that people will be content to have the

11   order actually do what the term sheet contemplated that it

12   does.

13           THE COURT:  Okay, well, that was my concern.  I've

14   entered a lot of orders in this case.  The docket is almost

15   5,000 entries long.  Those aren't all orders, of course.

16   But that is a concern of mine.

17           And the other language, "any provision of the

18   Bankruptcy Code," I think is what was in the definition of

19   approval order.  And, more importantly, since the agreements

20   set forth in the term sheet do contemplate, as far as the

21   release and injunctive provisions, reversal on appeal at the

22   Second Circuit, I can understand the logic of that clause.

23   Because I'm obviously not being asked to overrule Judge

24   McMahon.  I couldn't possibly do that, you know, as a matter

25   of jurisdiction.  And I couldn't also decide the appeal

Page 35

1   before the Second Circuit.  That's equally bizarre.  But the

2   term sheet doesn't contemplate that in asking for this

3   relief, because it contemplates, as a condition to the

4   effectiveness of the transactions, except for the withdrawal

5   of the appeal and the agreement to pay the professional

6   fees, which would be effective now, that -- the condition

7   subsequent, that there be a ruling by the Second Circuit

8   that would enable the plan to be confirmed.

9            MR. HUBENER:  Yeah, so, Your Honor, just to sort

10  of triple down on that, right, not only is there no whisper

11  of a hint of a peppercorn of a request that you in any way,

12  shape, or form touch the 10.7 releases, Judge McMahon's

13  decision, the issues on appeal, or anything before the

14  Second Circuit, which would of course be unthinkable for

15  reasons anyone who went to law school would understand, the

16  order is quite clear on its face in Paragraph 3, and that

17  was exactly the point, which is that it is effective only

18  upon entry of one or more orders by the Court of Appeals for

19  the Second Circuit or the United States District Court for

20  the Southern District of New York permitting the

21  consummation of the plan, as enhanced by the term sheet.

22            And so, you're right, I actually -- you elegantly

23  corrected me.  There are two things that are relevant now.

24  One is the paragraph that relates to the statement that the

25  direct payments don't contravene the Bankruptcy Code.  The

Page 36

1    second is the approval, subject to their compliance with all

2    applicable fee reimbursement mechanics and procedures to the

3    payment of the fees and expenses of the nine, which is what

4    we'll talk about in a few minutes, currently standing at

5    $2.5 million, and I think are probably going to end up being

6    a very, very small fraction of similar (indiscernible) paid

7    for other similarly situated groups and parties.

8              Your Honor, is that helpful?

9              THE COURT:  Yes.  Yeah, no, it is.

10             MR. HUBENER:  And again, I will touch some of

11   these things as we go through, because obviously, the

12   objections, I think in many respects, either misunderstand

13   or mischaracterize what we are and are not seeking to do

14   (indiscernible) the appeal.

15             And so, Your Honor, at the end of the day, no

16   objection actually objects to the overwhelming majority of

17   what is contained in the sort of business deal in the term

18   sheet.  Rather, they virtually all focus on one provision,

19   which is the direct agreement by the Sacklers to pay, from

20   their own funds and not in any way, shape, or form under the

21   plan, through the plan, or via the plan, approximately $277

22   million over 18 years to a supplemental opioid abatement

23   fund, or SOAF, established and administered by the nine for

24   abatement.

25             Your Honor, the Debtors fully recognize that these

Page 37

1    contemplated SOAF payments, by third parties, to third

2    parties, even though they are for abatement and to alleviate

3    harm and misery, are nonetheless offensive to many.  So many

4    parties have worked for so long for the common good in these

5    cases, and the objectors are of course completely correct

6    that no party has, to date, requested incremental separate

7    consideration of this type for what they helped achieve.

8           Let me be both clear and direct, so there is no

9    possibility of confusion or misunderstanding.  The Debtors,

10   like many of the objectors, would likewise very strongly

11   have preferred to see 100 percent of the new consideration

12   being paid by the Sacklers under the term sheet given to the

13   estates and distributed in accordance with the plan, which

14   would have likely made today's hearing all but uncontested.

15   But, as set forth in our reply brief, neither the Debtors'

16   nor the objectors' preference, no matter how laudable or

17   understandable, have any bearing on the legality of the SOAF

18   payment under the Bankruptcy Code, the only question

19   actually up for today, or on the far, far larger

20   overwhelming and unquestionably lawful and uncontested

21   benefits to the estates and their creditors contained in all

22   the rest of the provisions of the term sheet.

23          The nine appealed this Court's order confirming

24   the plan.  They were the only states to do so.  And to the

25   shock and horror of so many, they temporarily have

Page 38

1    prevailed.  The term sheet includes, among many other

2    things, payments by the Sacklers from their own funds to the

3    appellants to resolve, among several other things, the

4    appellants' appeals.  Every single day, in courthouses all

5    across our great country, appeals are settled by litigants

6    paying other litigants money.  This aspect of the term sheet

7    is as quotidian and ubiquitous as it is lawful.

8              Indeed, as a hopefully helpful thought experiment,

9    imagine the following scenario.  There was no court-ordered

10   mediation, and we all woke up two or three weeks ago and

11   read in the newspapers that the Sacklers and the nine had

12   settled their issues for a direct payment of $277 million,

13   and that, having gotten their wire transfer the prior

14   evening, the nine had withdrawn their appeals and no longer

15   contested being bound by the plan (indiscernible).  Would

16   any party be able to credibly assert in a signed pleading

17   that that was -- that that direct settlement was an

18   amendment to the plan, or that it was a payment by the

19   Debtors, or that it was a payment by the Debtors that was a

20   distribution under the currently not consummated -- and in

21   fact, locked on appeal -- 12th amended plan?  Of course not.

22             That the nine insisted that, in addition to their

23   direct settlement payment of $277 million, all for

24   abatement, that the Debtors' estates also receive between

25   $898 million and $1.39 billion does not and could never

Page 39

1    transmogrify the $277 million direct payment from a workaday

2    and lawful direct settlement payment, entirely and

3    exclusively among third parties, into an unequal plan

4    distribution by Debtors under a plan of reorganization.  And

5    that simple fact, ultimately, is fatal to virtually every

6    legal provision and argument cited by the objectors, so I

7    will now walk through them.

8              One, the SOAF payments are neither funded with

9    estate assets nor being made under the plan.  All of the

10   objectors assert, again and again, that the direct payments

11   amend the allocations under the plan or alter the plan's

12   treatment of creditors under Class 4.  These statements are

13   untrue and unfounded, and have no possible source in the

14   actual document at issue.

15             The term sheet could not be more clear.  The SOAF

16   payments are not being made by a Debtor or from any Debtor's

17   assets.  The SOAF payments are not being made to a Debtor or

18   through a Debtor.  The SOAF payments are not being made from

19   or on account of estate property.  The SOAF payments are not

20   being made pursuant to or even mechanistically distributed

21   under any plan of reorganization.  The SOAF payments require

22   no changes to the existing shareholder settlement agreement,

23   other than with respect to layering them in as a very small

24   -- about 5 percent -- additional secured party, which is

25   never, ever expected to have any relevance to or impact on

Page 40

1    any other party, as it only has potential relevance if the

2    Sacklers default.  And given the rights and remedies for

3    which we all negotiated, the notion that they would default

4    we believe to be quite unlikely.

5              Number two, 1123(a)(3) simply has no relevance to

6    the instant motion.  Out of the 35 objectors, only West

7    Virginia, and quite briefly at that, alleges that the term

8    sheet is a revised plan that is being proposed in bad faith,

9    in violation of Section 1123(a)(3).  Not remotely so.  First

10   of all, there is no "revised plan" at all, as our colloquy a

11   few minutes ago makes perfectly clear, and as the papers and

12   the term sheet all make clear.

13             Second, and more importantly, the notion that a

14   settlement that was fiercely negotiated in a mediation

15   amongst third parties before a sitting federal judge, and

16   that results in massive additional value for the Debtors to

17   distribute under the existing plan allocation, and contains

18   myriad other benefits to the Debtors' estates was proposed

19   either by the Debtors or in bad faith is implausible.

20             As I said earlier, the Debtors understand and

21   empathize with the objectors' frustrations about there being

22   SOAF payments.  But the SOAF payments just don't involve

23   estate assets and are not being made under the plan or any

24   plan, and the term sheet is massively beneficial to the

25   estate.  West Virginia's accusation that the Debtors have

Page 41

 1    proposed a new plan in bad faith has no merit and should be

 2    rejected.

 3           Three, there is no unequal plan treatment under

 4    1123(a)(4).  Your Honor, I can't say it more plainly than

 5    this.  Nothing in the term sheet changes the relative

 6    allocation or treatment of any creditor in any class,

 7    including Classes 4 and 5, as to which it does one thing.

 8    It increases materially the funds being distributed to them

 9    under the otherwise unaltered plan and distributional

10    mechanics.

11           Your Honor, they wish they were getting yet more

12    new money, $1.175 instead of $898 and $1.675 billion instead

13    of $1.398 billion.  I understand.  But that does not a

14    cognizable 1123(a)(4) objection make.  All Class 4 creditors

15    are getting their distributions from NOAT in exchange for

16    the plan's discharge of the Debtors and the third-party

17    releases under Plan Section 10.7.  Nothing in the term sheet

18    gives the nine or New Hampshire one penny more than any

19    other class creditor under the plan or otherwise from the

20    Debtors or their estates, other than their share of the

21    increased money coming into the MDT.

22           And of course, the nine and New Hampshire are now,

23    at long last, agreeing to consent and be bound to the exact

24    same releases that bind every other creditor, and that no

25    other Class 4 creditor appealed.  The various allocation

Page 42

1    formulae and trust distribution procedures remain entirely

2    unchanged by the term sheet.  It does only one thing with

3    respect to the plan's treatment of creditors in Class 4 and

4    Class 5.  It increases the amount they will get to share

5    under the plan's mechanics by $898 million to $1.398

6    billion.

7          Your Honor, those are the actual facts, which ends

8    the inquiry.  But the law is no less clear and no less

9    helpful.  As we lay out in our brief, courts have repeatedly

10   and uniformly held that payments to select creditors from

11   and by third parties do not constitute "treatment" under

12   1123(a)(4).  You have ICL from the Third Circuit in 2015.

13   You have TSIC from Delaware in 2008.  And you have DBSD from

14   the Second Circuit, which is highly instructive on this

15   point.  The Second Circuit drew the line between what is and

16   is not an actual payment by a third party, but left no

17   mistake of any kind that if it's an actual payment by a

18   third party, 1123(a)(4) has no relevance.

19          Indeed, quite and in fact emphatically, unlike

20   here, in many of those cases, the challenged payments were

21   actually being made under the plan, and they were being made

22   from assets that were actually the Debtors' assets but were

23   sort of deemed not the Debtors' assets because they were

24   also the collateral of a secured creditor.  Here, we have

25   neither of those two wavy attributes that many courts

Page 43

1    nevertheless permit.  Third parties settling with and paying

2    third parties directly from their own money is leagues and

3    leagues away from the boundaries of what is permissible

4    under 1123(a)(4).

5             Four, the term sheet is not a sub rosa plan.  A

6    few of the objectors contend that the SOAF payments somehow

7    constitute a sub rosa plan, relying again on the false claim

8    that the SOAF payments "modify the distribution and

9    allocation model of the plan," and those are the critical

10   words.  I've already covered this, and the documents are

11   clear.  The SOAF payments do no such thing.  They are

12   payments by third parties to third parties from their own

13   assets, and do nothing to change the distribution and

14   allocation model of the plan.

15            I otherwise rest on our papers on the sub rosa

16   issue, except to note one point.  In every single case cited

17   by the objectors except for one, the sub rosa objector lost.

18   I think that's pretty telling.  And the only case that,

19   seemingly, any objector found where a sub rosa objection

20   ever succeeded happened 39 years ago in the Fifth Circuit in

21   Braniff, which is so different I'm not going to actually

22   take time to distinguish it.  I think our papers make the

23   point sufficiently.

24            Number five, jurisdiction.  Your Honor, we believe

25   that this argument, yet again, rests on the same fundamental

Page 44

1   misunderstanding or mischaracterization of the limited

2   relief requested today.  It is thoroughly addressed in our

3   papers, including a detailed discussion of the case law,

4   including, once again, their case law, which, once again,

5   virtually all found jurisdiction proper in circumstances

6   relatively analogous to the ones (indiscernible).

7            Simply stated, and as we discussed at the outset,

8   under the term sheet, there are de minimis changes to

9   discrete sections of the settlement agreement attached to

10  the plan, if and when we are cleared for takeoff by the

11  Second Circuit.  The order is clear on its face, which is

12  why what we seek today does not remotely implicate any of

13  the cases cited by the objectors.

14           Your Honor, as we said in our brief, not a

15  sentence, not a word, not a letter, not a comma of the plan

16  releases currently on appeal is being changed, touched,

17  amended, revised, broadened, narrowed; absolutely nothing.

18  Nor does anything in the term sheet revise the plan's

19  distributional scheme or any party's distributional rights

20  under the plan.  Unless the Court has questions, I will rest

21  on our papers for the rest of jurisdiction, as we think the

22  answer is quite clear.

23           Number six, Your Honor, and there's only seven,

24  which came from only a couple of the objectors, I believe --

25  although maybe I have that wrong -- is that this is an

Page 45

1    advisory opinion and that today's hearing isn't ripe and

2    could be heard at some time in the future.  I think we've,

3    in fact, already discussed this, based on Your Honor's

4    questions.  But for the avoidance of doubt, the requested

5    order is in no way advisory.  Its entry will result in

6    multiple parties taking immediate action highly beneficial

7    to the Debtors' estates, including notifying the Second

8    Circuit of the settlement and the case of nine refraining

9    from filing their appellate briefs that are due this Friday

10   and withdrawing from the appeal.

11          In attempting to argue otherwise, the objectors

12   strangely assert that the fact that there are conditions

13   precedent to the effectiveness of some -- but notably, Your

14   Honor, by no means all -- of the agreements in the term

15   sheet somehow renders it constitutionally unready for

16   adjudication.  That is, of course, wrong.

17          Indeed, just about every plan of reorganization

18   ever confirmed in U.S. bankruptcy history, including ours,

19   contains various conditions precedent.  It would be quite

20   the revelation to the U.S. legal system if every plan ever

21   confirmed that had a condition precedent or confirmation

22   order violated the Constitution, and of course, that's not

23   the case.  And for that reason, it's not a surprise the

24   objectors have no support whatsoever for this contention.

25          Number seven, payment of the nine's professional

Page 46

1    fees.  Your Honor, I will rest exclusively on our papers for

2    this point, except to note one thing.  It is the law of this

3    case three times over that Section 363 is entirely

4    appropriate as the basis for these Debtors to pay certain

5    fees for select groups and committees.  I cannot imagine

6    that the state objectors, many of whom have been the primary

7    beneficiary of these orders and payments made in material

8    sums over the last two and a half years on a monthly basis,

9    in fact remotely want this Court to revisit this issue.  We

10   request the approval to pay these relatively modest sums

11   that, as I said before, currently total $2.5 million,

12   pursuant to appropriate procedures, be approved.

13              Your Honor, if it pleases the Court, that

14   completes my opening argument, other than to note one final

15   thing.  It would be unthinkable and crushing to so many, for

16   so many reasons, if today's relief were denied and the

17   Sackler family kept $1.175 to $1.675 billion, instead of

18   those sums going to abatement, and if the probability of

19   success of these cases that so many parties, including so

20   many of the objectors, have worked so hard for so long to

21   bring to fruition became materially less likely to come to

22   fruition.  And so, other than reserving time to address

23   anything from the objectors' oral presentations, Your Honor,

24   I would propose to stop it.

25              THE COURT:  Okay.  Thank you.  I've read all of

Page 47

1    the pleadings, I believe, that have been filed on this

2    motion, including those in support of the motion that were

3    filed by the official creditors' committee, joined in by the

4    ad hoc committee of NAS children's -- of NAS children and

5    the ad hoc group of hospitals, which also joined in it.  And

6    I've also read the response of the multi-state governmental

7    entities group, or the MSGE, in support of the motion.  They

8    may want to speak in support of the motion, or they can rest

9    on their papers and just reserve time if they want to

10   respond to something someone else said.

11             I lost the picture.  I don't know.

12             CLERK:  You're still on.

13             THE COURT:  Okay.  But I'm happy to hear from

14   them, too, if they want to.  Or, again, they can just wait

15   to speak, if some objector says something that they want to

16   respond to.

17             MR. PREIS:  Good afternoon, Your Honor.  This is

18   Arik Preis --

19             THE COURT:  You're coming in faintly, too, Mr.

20   Preis.  I'm not quite sure why, but --

21             MR. PREIS:  Is this any better?

22             THE COURT:  Yes, much better.

23             MR. PREIS:  I'm sorry about that.  So, can you

24   hear me now?

25             THE COURT:  Yes.

Page 48

1           MR. PREIS:  Your Honor, I think -- for right now,

2     I think the UCC would like to make just a few comments in

3     support of the Debtors, and then we'll reserve time for our

4     reply at the end.

5           THE COURT:  Okay.

6           MR. PREIS:  Okay.  Good afternoon, Your Honor,

7     Arik Preis from Akin Gump for the record, on behalf of the

8     Official Committee of Unsecured Creditors.

9           At the outset, we'd like to make something clear.

10    We appreciate all the hard work that the various AGs,

11    including the state of Florida, engaged in to build

12    consensus and to create the so-called intensity fund, the

13    small states fund, and the state political subdivision

14    arrangement in this case.  Nothing that we've said in our

15    papers or that we're going to say today could in any way be

16    viewed as a criticism, belittling, or denigration of those

17    efforts.  And, although we've had our differences with the

18    AGs in these cases, and continue to do so, we can also

19    appreciate when they are constructive, they work together,

20    and they reach positive (indiscernible).

21          We also want to be clear about something else.

22    Like the Debtors, we would of course have preferred that the

23    nine had not settled for SOAF, but rather, followed the pre-

24    agreed NOAT allocation for the $277.  And we say this,

25    obviously, like Mr. Huebner said, because it would have

Page 49

1   obviated the need for the hearing today and allowed for a

2   settlement that is unquestionably in the best interests of

3   the estate to be approved on an almost uncontested basis.

4         That being said, we support the entry of the

5   settlement motion.  In that regard, the only questions in

6   front of the Court are the following:  one, whether the

7   settlement motion presents a settlement that violates the

8   Bankruptcy Code; two, whether the Court has the ability to

9   enter the order; and three, whether the settlement is in the

10  best interests of the estate.  I suppose, potentially,

11  there's a question of whether the AHC's threat not to

12  consent to any modifications to the shareholder settlement

13  agreement is made in good faith, but I'll get to that later.

14        With regard to the first and second questions, I'm

15  not going to repeat the arguments that Mr. Huebner went

16  through.  With regard to the third question, there is no

17  question the answer is yes.  The settlement is a landmark

18  accomplishment in a case that has now dragged on for more

19  than 800 days.  And as we pointed out in our papers, this

20  historic event is remarkably accomplished without the estate

21  giving up anything, indeed, without the creditors in this

22  case having to do anything other than support the same plan

23  they supported six months ago.

24        They get the following if the Second Circuit

25  reverses the District Court:  one, $1 billion in new money

Page 50

1    from the Sacklers, to be used for abatement.

2           Two -- and I want to be specific about this -- the

3    Sacklers' agreement to convert $175 million of the

4    charitable contribution (indiscernible) to an actual cash

5    payment on the effective date, again, to be used for

6    abatement.  I point out that this is a huge concession and

7    has a huge impact for the public side, given the way that

8    the distribution of funds is set forth in the plan.  It also

9    buttons up a potential issue that could have arisen under

10   the 12th amended plan.

11          Third, the Sacklers' agreement with regard to the

12   ability of institutions, museums, and other entities to take

13   down the Sackler name, a concession that has been sought for

14   years, and that has a very, very meaningful impact on

15   personal injury claimants, as you'll hear tomorrow.

16          Fourth, the Debtors agree to populate the document

17   repository with certain additional categories of documents,

18   furthering the goal we've had since day one.

19          And fifth, the Sacklers agree that, during the

20   course of the hearing, to allow victims a period of hours to

21   address them publicly, openly, and honestly about how

22   Oxycontin has affected their lives and the lives of their

23   loved ones, as well as to speak directly to the Sacklers

24   about their feelings and emotions.  No one can possibly

25   underestimate just how historic tomorrow's session and

Page 51

1    important it will be.

2              And all creditors, other than the nine, are

3    getting a sixth very important, immediate thing.  The nine

4    are agreeing not to pursue their appeal to the Second

5    Circuit, which removes many, but not all, of the appellees,

6    leaving only a non-creditor, along with three pro se

7    victims.  Again, no one is being asked to give up anything

8    meaningful in return for these gets.

9              And so, now we come to the objections by the AHC

10   and the states.  With regard to the states, as I mentioned

11   earlier, we fully appreciate the work that went into the

12   intensity fund and their view that that is a fair and

13   appropriate way to distribute funds.

14             That being said, and putting aside the fact that

15   the Sackler payments to the SOAF are being done outside of

16   the plan, the bottom line is that the approximately $220

17   million of SOAF money that would not have gone to the nine

18   anyway is being used for abatement.  And while the money may

19   not be going to the states based on the intensity fund, from

20   the UCC's perspective, it is money that is going to fight

21   the opioid epidemic, and therefore is tremendously

22   beneficial for the American public, which is really the

23   creditor body in the case.

24             I want to make four points about this.  First, the

25   U.S. is a transient society.  We have artificial sate lines

Page 52

1    that divide us, but people cross from state to state all the

2    time.  Looked at in this way, we should all be pleased that

3    money is coming in from the Sacklers to fight the opioid

4    epidemic.

5              For instance, let's take the following example,

6    which is a actual example from a PI case.  A family that

7    lives in California sends their child to school in Nebraska.

8    While in Nebraska, the child takes Oxycontin and,

9    tragically, dies.  Which state gets credit for purposes of

10   the intensity fund for that?

11             Another example:  a person lived in Maryland, one

12   of the nine, goes to Florida for a rehab program, and,

13   again, tragically dies of an overdose.  Who gets the credit

14   for that?  There's no right answer for that.  The point is

15   that, from the point of view of the estate, any money coming

16   in for opioid abatement is good.

17             Second, and while we don't denigrate the

18   seriousness with which the objections are pursued, it's just

19   not that believable that any objecting state will seriously

20   oppose a result that nets them significantly more money and

21   provides all the other benefits I listed previously because

22   they don't like that other states are getting too much.

23             Third, something that may be overlooked:  while

24   the nine are benefitting from the SOAF and 20 states are

25   objecting, all the others have stayed silent, as Mr. Huebner

1    pointed out.  This includes Massachusetts, New York,

2    Colorado, Pennsylvania, North Carolina, and others, who have

3    been among the most vocal in these cases for the last two-

4    plus years, opposing a lot of things early on, until they

5    reached a settlement.  And yet, now they are silent.  Does

6    this mean that they agree or like the SOAF?  No, not at all.

7    But it does mean that they looked at the situation, balanced

8    the various factors, and determined that for the good of the

9    American public, they will hold their noses and not object.

10          Perhaps this is because they're looking at the

11   situation from the point of view of all of us against the

12   Sacklers, and have realized that if the settlement is not

13   approved, we're in a worse position than we are without the

14   extra concessions.  And as an estate fiduciary, we

15   appreciate their position.

16          Similarly, we would note that not one, not one

17   private-side claimant, including the PIs, has objected to

18   the settlement, and some are going to speak out or have

19   filed statements in support.  This is because they, too,

20   understand that this settlement is unquestionably better for

21   the estate and brings us all one step closer to our goal of

22   victim compensation and opioid abatement.

23          Four, we understand the issue raised by Florida

24   that introducing a SOAF into this settlement could have a

25   detrimental effect in the other intra-AG negotiations in

Page 54

1    other opioid cases and other non-opioid cases.  And we know

2    that if the nine were the 20 and the 20 were the nine, then

3    the nine would likely be objecting to the SOAF for the 20.

4    But we are estate fiduciaries in only these cases, and while

5    we're sympathetic to that issue, it's not an issue that goes

6    into the calculus of what is in the best interests of the

7    estate (indiscernible).

8           With regard to the AHC, they made two objections.

9    First, they would like the nine to use the money in

10   connection with the pre-agreed TDP and the MBT.  In a sense,

11   it's the same quasi-objection that (indiscernible).  If this

12   were purely an issue of what an individual creditor believes

13   is preferable for itself, we understand.  But that's not a

14   legal objection; it's a want-to-have.  And from our

15   perspective, as I said, as long as the money is being used

16   for the opioid epidemic in a manner consistent with

17   applicable law, I see no reason why any of the nine needs to

18   follow the pre-agreed TDP.

19          Indeed, I would note that Attorney General Tong

20   with Connecticut has gone on record a few times saying he is

21   looking to use Connecticut's money to set up a victims' fund

22   or a victims' trust.  If his goal is to use the money going

23   to Connecticut from the SOAF to provide additional

24   compensation to victims in Connecticut, I can assure you

25   that the PI victims across the country would applaud those

Page 55

1    efforts, even if, as it turns out, the AHC would not.

2         The second objection that the AHC raises is that

3    it wants to ensure the SOAF money doesn't jump the line to

4    be pari passu with earlier money due in the event of a

5    default.  On this, we agree, and we've told the Debtors, and

6    through them, the nine.  Indeed, it would be contrary to

7    everything that was previously agreed among the privates and

8    the publics, in the event that one of the Sackler

9    (indiscernible) defaults and that we need to collect from

10   them, and as we go about collecting, we rejigger the payment

11   (indiscernible) between publics and privates.  I don't think

12   that's what the (indiscernible), and I can't imagine that

13   that is at all what's part of the settlement.  The AHC --

14        THE COURT:  Well, could we stop on that point?

15        MR. PREIS:  Sure.

16        THE COURT:  I don't see any jumping -- I don't see

17   this settlement changing, at all, the terms of the PI

18   treatment under the plan.

19        MR. PREIS:  Well, the -- that's what I believed,

20   and I've heard nothing else.  The only question is whether

21   the nine believes that, by virtue of their payments being

22   pari passu in the event of an acceleration, that they would,

23   in some way, jump the line and undo the public/private

24   allocation.  Again, I don't believe there's anything in the

25   term sheet that says that, and we -- that's exactly what the

Page 56

1    deal is now and it should be going forward.

2            THE COURT:  Okay.  And I recognize that the term

3    sheet does contemplate the drafting of an inter-creditor

4    agreement in good faith, in which the Debtor will

5    participate.  But I would think that that really would deal

6    with simply the rights of the NOAT and the S-O-A-F, or SOAF,

7    in the event of a default, as opposed to the separate

8    provisions of the plan that deal with the upfront payments.

9    And I'll note that the timing on the payments is consistent

10   with that, as laid out in the -- with that inference, as

11   laid out in Attachment A.

12           MR. PREIS:  Thank you, Your Honor.

13   (indiscernible).  I'm not done yet, but I didn't know if he

14   wanted to say something.

15           MR. VONNEGUT:  Your Honor, this is Eli Vonnegut of

16   Davis Polk.  I just wanted to confirm that's correct.  The

17   inter-creditor agreement will govern those issues.

18           THE COURT:  Well, issues as between the

19   enforcement rights of the NOAT and the -- and the SOAF.  But

20   it would be a very different settlement if the proposal

21   would be to change the timing of the payment of the $700

22   million to the personal injury trust.

23           MR. VONNEGUT:  Understood, Your Honor.  That

24   timing will not be changed.

25           THE COURT:  Okay.  All right, thanks.

Page 57

1           MR. PREIS:  Okay, with that, Your Honor, I

2      (indiscernible).  But first, their legal arguments are

3      unavailing.  Mr. Huebner went through them; I'm not going to

4      repeat them.

5           Second, it's no surprise, however, that the U.S.

6      Trustee is objecting.  They undoubtedly do not want to be

7      the only party, other than three pro ses, left appealing

8      confirmation of a plan that would now be supported by every

9      state in the union, as well as every non-governmental group

10     in the case.  It would be unfathomable for the U.S.

11     Government to stand in the way of a plan that is devoted to

12     fighting the opioid epidemic and is supported by every

13     economic creditor in the case because the U.S. Trustee's

14     office is using this case to fight nonconsensual third-party

15     releases.

16          In sum, Your Honor, there's simply no legal reason

17     not to approve a settlement that is in the best interests of

18     the estate.  And while we completely understand and are

19     sympathetic to many of the nonlegal arguments being made, we

20     are only fiduciaries for this case, this settlement, and

21     this agreed-upon allocation.  In that capacity, no one would

22     argue that this settlement is an unbelievable improvement

23     for the American public.

24          The last thing I want to say, Your Honor, is like

25     Mr. Huebner said, we very much appreciate Judge Chapman's

Page 58

1    time, her dedication to this mediation, her spirit, her hard

2    work, and the way that she invested herself personally over

3    the last two months.  Thank you, Your Honor.

4              THE COURT:  Okay.  Thank you.  Again, I'm happy to

5    hear from the other supporters of this, but you shouldn't

6    feel that you have to say anything.  But if you want to, you

7    can go ahead.

8              MR. ISRAEL:  Good afternoon, Your Honor, Harold

9    Israel on behalf of the ad hoc committee of NAS children.

10   We rest on our papers.

11             THE COURT:  Okay.  Thank you.

12             MR. MACLAY:  And, Your Honor, this is Kevin Maclay

13   for the MSGE group, and I would just like to make a couple

14   of very high-level comments, and then reserve until

15   rebuttal.

16             THE COURT:  Okay.  Go ahead.

17             MR. MACLAY:  Okay.  Your Honor, I think our paper

18   makes very clear our concern that, as parties' positions

19   rapidly become entrenched and as people sort of disagree

20   about some of the details of the deal, what could be lost is

21   the enormous benefit that the deal provides to every

22   relevant party, as well as to the country as a whole.  I

23   think that probably shines through pretty clearly from our

24   papers.

25             We agree with both the Debtors and the UCC that it

Page 59

1   would have been better if there hadn't been a separate SOAF,

2   but all of the additional funds had been sent to the NOAT.

3   It would have seemed more consistent with the sort of unity

4   of purpose and public mindedness that have really motivated

5   almost all of the actors in this case since the onset.  But

6   it's not something that should dynamite the substantial

7   progress that Judge Chapman oversaw, and it shouldn't

8   detract from the fact that what the nine have helped

9   accomplish here is extremely laudable, and we applaud them

10  for their efforts and what has resulted from those efforts.

11  And so, I think that's big picture number one.

12          Big picture number two, Your Honor, is the term

13  sheet is very clear about one thing.  It says in its very

14  first numbered paragraph under the increased economic

15  consideration and accommodations -- incremental economic

16  consideration and accommodations, "Funds in the SOAF shall

17  be devoted exclusively to opioid-related abatement."  That,

18  obviously, is a very important term.  I think, again, all of

19  the parties in this case, it's very consistent with your

20  observations very early on in this matter that we didn't

21  want to have a re-do of the tobacco settlement situation,

22  where funds that were supposed to be used to help those

23  harmed instead were used for political vanity projects, et

24  cetera.  And we have here this statement, and we would

25  assume and hope and for people to correct us if we're wrong,

Page 60

1    that that statement means that the multiyear process of

2    negotiating and fine tuning, crafting the NOAT, which is

3    designed to provide abatement to the various jurisdictions

4    within it, which is all of them, would also be reflected in

5    the SOAF.  Or, to put it another way, Your Honor, we

6    (indiscernible) the term sheet to suggest that the SOAF is

7    some kind of a political slush fund that would really be

8    used for abatement.  We believe it's going to be used

9    essentially as a mirror of the NOAT, and if that isn't true,

10   I would hope we would hear from (indiscernible) that it

11   isn't true, that they're going to use the SOAF in some other

12   way.

13         But assuming that it's going to be used for

14   (indiscernible) which should be the abatement structure

15   agreed to and fine-tuned over years and many negotiations

16   and from some very fine mediators, you know, obviously, this

17   is just a (indiscernible) for everyone and there will be

18   some details that remain to be ironed out because this just

19   a term sheet -- Obviously, the SOAF doesn't yet exist and so

20   no doubt there will be (indiscernible) further down the pike

21   that I hope (indiscernible) together with a unity of purpose

22   (indiscernible).  But in terms of what Your Honor is facing

23   here today and the approval of the term sheet, we believe it

24   represents a dramatic and positive step forward, and,

25   obviously, you know, the funds should be used for abatement

Page 61

1    and we're confident that with the Court's assistance and

2    further negotiations, you know, we can ensure that they are

3    used in a way that they're used consistently with a NOAT

4    structure that was agreed to by all parties over the course

5    of many months.

6            Thank you, Your Honor.  I reserve the rest of my

7    time for rebuttal.

8            THE COURT:  Okay.  I would just note that the

9    settlement term sheet states that funds in the SOAF shall be

10   "devoted exclusively to opioid related abatement including

11   support and services for survivors, victims, and their

12   families, and each member of the nine shall have the right

13   to direct allocation of the SOAF funds for such purposes."

14           So the overall use of the funds, I think, is clear

15   and, frankly, I think that is one aspect of the settlement

16   that I'm being asked to approve today in a way that is a

17   building block for a plan if a plan is found to be

18   confirmable here on appeal.  And, obviously it reflects, I

19   think, the view of the settling states and the District of

20   Columbia that the funds should be and must be used in that

21   way under this agreement.  I'm assuming that though the

22   details will be clarified that overall purpose is clear and

23   I think there would be, as always has been discussed in this

24   case to distinguish it from, for example, the tobacco

25   settlements, a provision in the confirmation order that

Page 62

1    would, in essence, make that a binding aspect of the plan,

2    if again the plan were to be found to be confirmable by the

3    Circuit.

4            Okay.  I think I've heard then from those who have

5    filed statements in support of the motion.  I'm happy to

6    hear from the objectors.  I would like to take just a very

7    short break, literally 30 seconds.  I just left something in

8    the office that I want to have in front of me, so if you

9    could bear with me, Mr. Guard, I'll be back in under a

10   minute.

11           (Off the record)

12           Okay.  This is Judge Drain.  We're back on the

13   record.  I think that was less than 30 seconds.  So, again,

14   I'm happy to hear the objectors at this point, although I

15   will reiterate that I've read each of the objections, as

16   well.  I know a number of them simply adopt one or the other

17   of the objections, in most cases the state of Florida's, and

18   I don't think every objector should feel the need to speak,

19   especially those that have adopted someone else's objection

20   here on record as having done so and I've read their

21   pleading.

22           So I think it makes sense for the state of Florida

23   to go first.  It filed a substantive objection that has been

24   adopted by a number of other objectors, so you can go ahead,

25   sir.

Page 63

1            MR. GUARD:  May it please, Your Honor, John Guard,

2       Chief Deputy Attorney General, State of Florida.

3            Your Honor, I would start by first noting that Mr.

4       Huebner made a point of how the objections among this case

5       largely copied it and adopted a joinder that was filed by

6       Florida's counsel.  I would note for the last two and a half

7       years, Mr. Huebner has not objected to Florida, Tennessee,

8       or Texas gathering the supporting states and getting them to

9       file things when they support the Debtor.  Just now, it's

10      only that we object to something the Debtor's proposed that

11      he has a problem with that.

12           But moving on to the actual substantive arguments,

13      I think Mr. Huebner overblows the relief that this motion

14      gives.  The appeal continues.  The Court's confirmation

15      order is still vacated and there is a substantial risk if --

16      even this Court grants this motion that this Court's -- that

17      the district court's decision will be affirmed and this

18      Court's decision will remain vacated.  This motion does

19      little to mitigate that risk.  There's still a substantial

20      probability that the $4 billion-plus that the plan provided

21      to Americans for abatement won't occur.

22           It is possible -- he also overblows the result of

23      you not granting this motion today.  The reality is even if

24      the nine file their briefs, negotiation could continue.

25      This time instead of just being the Sacklers and the nine,

Page 64

1    it could include the other states and the discussions and

2    negotiations include all, and maybe we could avoid having

3    almost half of America -- or half of the states -- objecting

4    to the result.

5              The same or similar relief could be obtained

6    against the Sacklers and the reality is until the Second

7    Circuit rules, there is still time -- and in fact, I believe

8    the Second Circuit is going to likely grant mediation.  I

9    apologize, Your Honor.  I'm --

10             THE COURT:  Well, the Second Circuit grants

11   mediation on every appeal, but it's quite different than the

12   mediation that the parties in this case have gone through in

13   four different tranches.  But, Mr. Guard, can I just -- it

14   seems to me that because so much of this settlement in terms

15   of the actual payments out is conditioned upon confirmation

16   of a plan that the issue raised -- the primary issue --

17   raised by the state of Florida and those joining in the

18   objection, which I have no problem with and I don't think

19   the Debtor did either -- the format that that was done in --

20   could go forward too by its own terms.

21             1123(a)(4) says that as a caveat to the

22   requirement that plan provide that same treatment for each

23   claim or interest of a particular class, "unless the holder

24   of a particular claim or interest agrees to less favorable

25   treatment of such particular claim or interest."  So it

Page 65

1     seems to me that the negotiations, if there is a prospect of

2     them, could continue because that objection still exists.

3     There wouldn't be a ruling on that objection before a plan

4     was before the Court -- that 1123(a)(4) objection -- and the

5     only consequence is that the parties would be negotiating

6     knowing that there is a sum that is anywhere from a billion

7     to a billion and a half greater than the sum that's in the

8     plan that's on appeal.

9              MR. GUARD:  I think the problem with that, Your

10    Honor, is they're kind of asking you to prejudge that

11    objection and in the term sheet, I believe there is a

12    statement is (indiscernible) the side payment is reversed or

13    overruled in a court of competent jurisdiction, the payment

14    still gets made, and so I think there are consequences to

15    approval.

16             If the Court is going to withhold on that issue,

17    then --

18             THE COURT:  Well, let's look at the settlement

19    agreement because I think this is -- or the term sheet.

20    This is an important point.  So I think you're referring to

21    paragraph 11, right, on the -- in the term sheet on -- well,

22    the pages aren't numbered.  I have a fax page so it's -- at

23    the top -- 32 of 38.

24             MR. GUARD:  I believe so, Your Honor.  I'm trying

25    to get to it.

Page 66

1          THE COURT:  All right.  So it says, "If any

2     payments or consideration or amounts allocated to any of the

3     nine under the settlement proposal cannot be effectuated

4     because the approval order is reversed by a final order of a

5     court of competent jurisdiction, the Sackler family member

6     or trust shall pay such consideration" -- which is the SOAF

7     consideration, I believe -- "pursuant to one or more

8     alternative mechanisms."

9          Although later in the section it refers to

10    mechanisms which would be attached to the definitive

11    documents on or before the effective date of the plan.  So I

12    think that could be read two ways, although, one could read

13    it to say that even if the approval order is reversed, this

14    payment is made, but again, it's a payment that's being made

15    by the Sackler family members and I just -- to me, that's --

16    frankly, if the Circuit did not reverse the district court's

17    confirmation order, I think everyone else would be free to

18    negotiate with the Sackler family members individually in

19    the chaos theory because at that point, I find it hard to

20    believe that I would continue the preliminary injunction.

21          So to me, it's -- I think what it's meant to do is

22    highlight that this is a payment by the Sackler members and

23    not the estate, but I don't see why, in all the most likely

24    scenarios, it would preclude negotiations.

25          MR. GUARD:  Well, I think negotiations --

Page 67

1              THE COURT:  -- of a plan because I don't think --

2       because again, I think if the Circuit doesn't find a pathway

3       to confirm a plan with the release of third-party claims,

4       there won't be any negotiations except on a sort of dog-eat-

5       dog basis.  The only plan negotiations would be where the

6       Circuit says, "yes, we agree that in Metromedia and Manville

7       and in the church cases and the partnership cases and about

8       ten other cases, we and the lower courts following us have

9       authorized third-party releases under appropriate scenarios.

10      This is one of them."

11             Then the plan goes back to me and you have your

12      confirmation argument, and you can negotiate.  And maybe

13      I'll grant your objection and maybe I won't if you're not

14      able to meet your (indiscernible).

15             MR. GUARD:  Well, Your Honor, likely, may be

16      retired by then.  I don't --

17             THE COURT:  Well, someone will.  I'm sure there's

18      someone who could just as easily interpret the case law and

19      deal with the issue.

20             MR. GUARD:  I think that -- our concern is that

21      the nine and the Debtors and everyone else is going to

22      indicate that by approving this today if that objection is,

23      you know, either been already decided and determined in a

24      way and therefore, you know, we're not going to be able to

25      make it or the negotiation as you've just referred to it is

Page 68

1   going to be very different than a negotiation that could

2   occur now where you have not decided.

3            THE COURT:  Well, I think the negotiation would be

4   different.  There's no doubt about that, but that's a

5   consequence of life.  I mean, I don't think that's an issue.

6   But I don't see how I could definitively rule on the

7   1123(a)(4) issue today in that I don't have a plan before

8   me.  What I have before me is a term sheet that I need to

9   evaluate the reasonableness of, and if I felt that the

10  1123(a)(4) argument that you're making is, you know, likely

11  to prevail or strongly likely to prevail, I probably

12  wouldn't approve it, but that doesn't mean that I've decided

13  the issue.  It's not a matter of collateral estoppel.  It's

14  in the context of approving a settlement.

15           MR. GUARD:  And to kind of go on, you mentioned --

16  I'll move on from it -- this argument, Your Honor.  We just

17  have deep concerns about how this is going to, in the end,

18  play out and we think that they're asking kind of on the

19  front end for something that they can then later use on the

20  back end.

21           But we were talking about a minute ago or you

22  mentioned a minute ago that the money is not coming from the

23  estate and is the Sackler money.  I would kind of point out

24  as I know Your Honor is well aware, more than -- I think

25  it's more than 80 percent of the money that is funding this

Page 69

1   plan is Sackler money, and -- so there is no difference

2   between this $277 million that is being paid on the side to

3   the nine versus the other $4 billion-plus that is being paid

4   to all the states.  It is all coming from the same sources,

5   and so while I appreciate the argument and the effort to try

6   to subvert and get around the prohibition and pay a premium

7   to these states, we have grave concerns that not only is

8   this going to make future deals in -- outside of this

9   bankruptcy -- more difficult, but it invites a certain level

10  of abuse inside the bankruptcy process where affiliates or

11  others associated with debtors could strike side deals to

12  either discourage appeals or to obtain confirmation, and,

13  obviously, that's not what the Bankruptcy Code is meant to

14  do.

15          It's not what 1123(a)(4) was meant to stop, and so

16  that -- we would ask for that reason to reject the Debtor's

17  argument about the money is not coming from the estate,

18  it's coming from the Sacklers.  We think that distinction is

19  unavailing given the fact since day one this bankruptcy is

20  going to have been funded by the Sacklers or largely by the

21  Sacklers.

22          THE COURT:  Well, but the Sacklers' assets aren't

23  the estate assets.  They're the Sacklers' assets.

24          MR. GUARD:  I get that, Your Honor.  But in order

25  to get these releases, they pledged their assets and, you

1    know, on multiple occasions indicated that they had -- that

2    they were not going to pay more and so -- and on multiple

3    occasion we stopped.  On multiple occasions they increased

4    it trying to get more states on board, and now they're

5    paying a side deal to the last nine.

6              THE COURT:  Well, except -- look.  There are two

7    sets of claims against the "Sacklers."  I'm using the term

8    broadly.  It includes the trusts and the other companies

9    that the Sacklers have covered in the -- as released

10   parties.  The first, as we all know, are the estate's

11   claims, which are essentially fraudulent transfer claims

12   although there are also veil piercing and the like estate

13   claims.  And then the second, very importantly, are third

14   party claims which are being settled in the plan as well.

15             And I think the response to your point is

16   particularly two-fold.  The first is, like the Debtors, like

17   the creditors committee, I fully understand why your state

18   and the other objecting states are angry that the allocation

19   formula so carefully negotiated in this case, essentially in

20   the mediation or finished in the mediation with Mr. Feinberg

21   and Judge Layn -- Layn Phillips, excuse me -- isn't being

22   followed here in this settlement, but I think that is just

23   an expression of frustration.  I don't think that's a legal

24   principle, and certainly in the subsequent negotiation that

25   you have over an allocation anything when there's a national

Page 71

```
1    issue, I don't see any reason why you can't take it out on
2    these nine states.  You know, that's a separate deal, that's
3    a separate issue in the future.
4              So I'm really just focusing on this case, and as
5    far as this case is concerned, except for these nine states
6    and the District of Columbia, I don't have objections to the
7    release of the third-party claims; and the settlement of the
8    estate's claims is done.  There was no objection to that,
9    and, in fact, one could argue that some recent case law
10   highlights that there really wouldn't be more money put on
11   the table for that settlement, arguably, which deals
12   specifically with -- and denies -- an argument that tax
13   payments in a pass-through entity could be fraudulent
14   transfers.  That's In re F-Squared Investment Management,
15   633 B.R.663 (Bankr. D Del. 2022).
16             So I think what we're talking about here is pretty
17   close if not the same as the hypothetical that Mr. Huebner
18   spun out, which is that to get a consensual release, just
19   like there've been no objections by the other states to the
20   release as per the $4.5 billion deal, the Sacklers could
21   have gone out and gotten that consensual release separately
22   and they're not doing it through the plan.  They are
23   amending the settlement agreement.  I understand that issue.
24   But to me, that goes to 1123(a)(4) and the dynamics there,
25   and it's hard for me to believe that that issue, as far as
```

Page 72

1    the intercreditor enforcement rights are concerned, won't

2    get resolved in the drafting.

3             I'm having a hard time seeing how, as disagreeable

4    as it is in terms of allocation, it's improper, because I

5    think it is not estate property.  It's not hidden estate

6    property.  It's not an opportunity that the estate had that

7    is being settled, you know, under the table.  It's different

8    than Jevic.  It's different than DBSD.  You know, it -- each

9    of those cases involved property of the estate.  Jevic

10   involved a settlement of a fraudulent transfer lawsuit.

11   That's been settled here.  That money was already paid under

12   the old plan.  So I think, while I told you that I would

13   have and that my successor would have an open mind when the

14   confirmation hearing came up under 1123(a)(4), as a

15   settlement -- and the courts have said even with settlements

16   -- even though 1123(a)(4) and confirmation provisions don't

17   apply when you're considering a settlement -- I certainly do

18   want to consider fundamental premises of the Bankruptcy Code

19   which include the general proposition of equality of

20   treatment -- the money's not coming from the estate.

21            MR. GUARD:  Your Honor, first, we're not mad.  I

22   want to be clear about that.  We are disappointed.

23            THE COURT:  Well, I would be mad.  I mean, you can

24   say disappointed.  I don't -- I would be mad if I spent

25   months negotiating something and then it's different, but

Page 73

1    you're more diplomatic than I am or maybe less volatile.  So

2    "disappointed" is fine.

3              MR. GUARD:  Well, I mean, Your Honor, the reason

4    why -- or part of the reason why we're objecting, other than

5    the bankruptcy grounds is, the states collectively and

6    collaboratively have now settled opioid actions for over $27

7    billion and this settlement -- this -- $1 billion most of

8    which is paid between years 10 through 18 imperils and

9    impairs the ability of any future settlement which they're -

10   - I mean, Purdue is just one of many.

11             I know that is not a bankruptcy consideration, but

12   it is a very much a consideration, and you know, this is

13   money that is much needed.  It is money that is going to

14   save lives and if these other settlements are delayed or not

15   happen, you know, that is a concern.  That is a policy

16   concern.  Again, I know it's not a bankruptcy concern.  And

17   so that is part of the reason why you've gotten the level of

18   objection that you've gotten here.

19             I mean, again -- I guess if what Your Honor is

20   saying is that there's going to have to be another plan and

21   there's going to be a resolicitation and there's going to

22   the --

23             THE COURT:  I'm not sure there would be a

24   resolicitation, and I haven't said that.  But there does

25   have to be, I think, at least an amendment to the plan to

Page 74

```
1    reflect the increased payment to the NOAT.  So there will be
2    another plan, but the case law is, I think, quite clear that
3    you don't need to resolicit where there are improvements.
4            MR. GUARD:  But if they're -- well, depending, I
5    guess, on how -- because we do not know how -- we have a
6    term sheet here and I know you've talked about the
7    intercreditor agreements, and there's basically a security
8    issue with the pari-passu.  I mean, there -- well, I guess
9    what I would say -- (indiscernible) what I would say is,
10   right now, the nine are in the exact same situation as the
11   other 41.  The plan has been vacated so we still have --
12   unless there is a reversal -- our individual claim and, you
13   know, I guess it is possible or conceivable that the 20
14   states that are objecting could, you know, decide to file
15   amicus briefs in the Second Circuit advocating for the
16   opposite position.  I guess that is possible.  I don't think
17   it's likely.
18           THE COURT:  I don't think that's likely either.  I
19   mean, honestly, if the Second Circuit reverses, what would
20   you rather have, a plan that has a maximum of 4.5 billion or
21   a plan that adds another 898 million to 1.398 billion to it?
22           MR. GUARD:  Well, I guess --
23           THE COURT:  It doesn't matter, right, so you
24   wouldn't want to argue against the appeal.
25           MR. GUARD:  Well, Your Honor, I guess my point is
```

Page 75

1    that we're -- I guess part of the Debtor's argument is that

2    we are somehow differently situated than the nine and Your

3    Honor kind of made that point too, and the reality is right

4    now, sitting here, we are not because the plan has been

5    vacated, and you know, barring certain things happening, we

6    are -- you know, very well could end up in -- having to

7    propose a completely different plan and -- with a different

8    kind of release in a different situation.  And, obviously,

9    I'm not asking you to rule in advance on whether the

10   modification requires (indiscernible) or resoliciting but,

11   you know, I'll hold those argument until we see how things

12   shake out.

13           But I think that from our point of view and the

14   Debtor's conceded this, he is actually seeking some

15   modifications here and this Court does not have jurisdiction

16   because that order is under appeal.  And I don't think you

17   can parse that issue and say, well, it's not the particular

18   provision in that order that is actually up on appeal.  The

19   whole order has at this point in time been vacated --

20           THE COURT:  No, but I don't --

21           MR. GUARD:  -- not just one --

22           THE COURT:  I don't think the Debtor has stated

23   what you've said and I don't think the motion seeks any

24   change to a plan.  There's no plan before me.  What the

25   motion seeks to approve is the settlement term sheet which

Page 76

1    has, I think, four items in it that are to go into effect

2    upon such approval, and the rest of it is conditioned upon,

3    first, the grant of the appeals that are before the Court --

4    of the appeal before the Court -- and then the confirmation

5    of a plan that includes the additional funding for the NOAT.

6    There's no amendment to the plan that's before me today.

7            MR. GUARD:  But the term sheet implies that --

8    well, I understand it may be conditional, but it is -- I

9    mean, on proposed order of paragraph 3, authorized the

10   Debtor to revise the shareholders' settlement agreement

11   which of course has been made a part of and is integral to

12   the plan at section 12.6 of it.

13           THE COURT:  But that's revised from the draft

14   (indiscernible), to prepare it.  It can't go into effect

15   until the -- a plan's confirmed.  It's just like the

16   authorization that I gave to do the preliminary work on the

17   trust.

18           MR. GUARD:  But this Court's order today will

19   likely foreclose arguments against those changes or

20   arguments -- so that is our fear and that is why we --

21           THE COURT:  No, I know that's your fear, but I

22   think I've alleviated it other than by saying that I think,

23   ultimately, although this is just in terms of my evaluation

24   of whether the settlement is worth pursing or alternatively

25   is, you know, colloquially a pig in a poke, the Debtor has a

Page 77

1    better argument under 1123(a)(4); but that's not to decide

2    the issue.

3              MR. GUARD:  Yes, Your Honor.  And quickly on fees

4    and then I'll conclude my arguments.  On fees, our argument

5    is simply under the Bethlehem Steel case since the nine --

6    the difference between the MSGE or the AAC orders that you

7    have entered pursuant to 363(b) where those committees were

8    working for the benefit of all, here you have a committee or

9    a group of people working that have benefited themselves,

10   and under the principles of Bethlehem Steel, that we think

11   that makes 363(b) unavailable, and I'll end the argument

12   there.

13             THE COURT:  898 million to 1.398 billion seems to

14   be a pretty big benefit for all.

15             MR. GUARD:  And $277 million in -- Your Honor --

16             THE COURT:  I understand, but I think one is -- we

17   can all agree one's about 75 percent greater than the other.

18   Look, I mean, I -- to me, the going forward work is quite

19   equivalent, I think, to the basis for approving the work in

20   Bethlehem Steel, and, frankly, approving the work to the AHG

21   and the 15 non-consenting states, et cetera.  It's to-do

22   work that will enable a plan to go effective promptly and to

23   negotiate the relatively minor open points like the

24   intercreditor point on the collateral pending the appeal.

25   As far as the latter work, I appreciate it's being sought

Page 78

1      under 363 but to me, this is -- this really does fit into, I

2      believe, the 503(b) case law, including the McLean

3      Industries case and the Granite Partners case.  McLean

4      Industries is 888 B.R. 36 38-39 (Bankr. S.D.N.Y. 1988).  The

5      courts have always recognized a couple of different grounds.

6      One is fostering and enhancing the progress of

7      reorganization, of successful confirmation of the plan

8      rather than being a pest and retarding it.  That means, you

9      know, working as a group to negotiate key terms and key

10     documents.

11           The other is literally enhancing the estate which

12     was McLean Industries, and yes, when you enhance the estate,

13     there is some value that spills over to you and when you

14     enhance the estate in a way that leaves you with more value

15     than others from the estate, you may run into a different

16     issue as far as the unequal treatment doctrine.  But we're

17     talking about the estate of course, and the estate's being

18     enhanced here by a lot of money.  So I'm really not that

19     troubled by the payment of the fees.

20           MR. GUARD:  Well, they had moving on a --

21           THE COURT:  Put it differently.  Two and a half

22     million for 898 to 1.398 billion is a pretty good trade.

23           MR. GUARD:  Your Honor, if there were -- under

24     503(b) and the fees were being limited to just what time was

25     spent during the mediation, that would be one thing, but I

1    think the time period goes back further.  And I understand

2    the relative size difference point that you're making, but

3    they did not argue for it under 503(b).  And --

4            THE COURT:  Well, I understand, but I'm

5    comfortable with it because I think it would fit under

6    503(b), subject of course to what's in the term sheet, which

7    is the level of review as to reasonableness that the AHG and

8    others have.  The -- clearly, the leverage here to get this

9    agreement from the Sacklers came from the work that they did

10   in objecting to the plan and appealing.  That's where they

11   got the leverage.  Just like your group got its leverage by

12   fighting so hard in the MDL and negotiating.

13           MR. GUARD:  Your Honor, I guess I will conclude by

14   saying, you know, after spending two and half years trying

15   to act in the best interest of all states and, frankly, all

16   creditors, you know, it is a shame that a relative few have

17   chosen to do something that I think is going to cause

18   massive harm inside and outside this case.  And, you know,

19   with that, Your Honor, we rest on our papers.

20           THE COURT:  Okay.  Again, I understand the

21   frustration and there may be harm outside of the case,

22   although that's something I really can't comment on, but

23   inside the case, I just -- I'm looking at the numbers and

24   I'm looking where the money's coming from and I don't see

25   it.

Page 80

```
 1              MR. HUEBNER:  Your Honor, not to respond to Mr.

 2   Guard, which I will do later when everyone is done, but I

 3   have something that is I guess a concession, because I think

 4   there's been some confusion but I think may make many

 5   objectors lives here and today shorter about some of your

 6   (indiscernible) with Mr. Guard.  And so --

 7              THE COURT:  Okay.

 8              MR. HUEBNER:  -- I thought it might be helpful to

 9   do that.  Your Honor, you had it exactly right and I want to

10   be clear and this actually really -- I hope will others as

11   well.  This is not an 1127 motion.  That would actually not

12   be okay right now, because our plan is on appeal and you

13   have no authority to amend it.  Your view of what that

14   paragraph of what our proposed order does is exactly right.

15   It's mechanistic.

16              And if this order is entered today and if, as we

17   hope and expect given the 83 decisions lined up on one side,

18   the Second Circuit reverses Judge McMahon and we are clear

19   for take-off, we will make an 1127 motion at that time to

20   make the extremely minor and unbelievably favorable plan

21   amendments that are reflected in this term sheet, to swap

22   out the foundation promise for cold hard cash on day one, to

23   amend -- get authority to amend the settlement agreement

24   which is an attachment and incorporated to allow for an

25   extra 900 to $1.4 billion adding that schedule and to deal
```

Page 81

```
 1    with the collateral issues -- that is not up today.  And I

 2    think that's why we found the jurisdictional arguments so

 3    puzzling.  So let there be no doubt to any objector,

 4    including Mr. Guard whose efforts I think I extolled at some

 5    length in my opening remarks as part of the group that got

 6    us a long way to where we are -- that's not today's relief

 7    being sought.

 8             Today's relief being sought is extremely modest,

 9    the way Your Honor believed it to be with the 1127(b)

10    hearing and obviously, we'll talk about -- we think the Code

11    and the Rules and the cases are very clear on their face,

12    that we will not remotely need resolicitation.  I would

13    imagine and I hope at that time that nobody will object to

14    something whose benefits (indiscernible) outweigh by a

15    factor a 100 (indiscernible) but today is not that day.

16             So hopefully, that concession about what the Court

17    is not being asked to do -- and I think a lot people

18    probably saw the absence of 1127 anywhere in our -- this

19    order had read it exactly the way the Court did.  I do hope

20    that gives people comfort, that that issue will be back only

21    when there is jurisdiction for it to be back.

22             THE COURT:  Okay.  Well, that's right.  It's not a

23    concession.  I think it was implicit in the relief that was

24    sought from the beginning, but I appreciate the reiteration

25    of it.
```

Page 82

1              MR. HUEBNER:  Yes, Your Honor.  You're right.

2       It's a clarification.  That's a much better word than the

3       one I chose.

4              THE COURT:  Okay.  All right.  So I see a couple

5       people on the screen.  I don't know -- before I hear from

6       the AHG which also filed a -- not a joinder but its own

7       limited objection -- again, I have noted all of the joinders

8       and you should feel free to speak, but again, I've noted the

9       joinders and you can also just rest on those.  So I don't

10      know who wants to go next.

11             MR. CAHN:  Your Honor, this is Aaron Cahn.  May I

12      be heard?

13             THE COURT:  Sure.

14             MR. CAHN:  For the State of West Virginia.  Can

15      you hear me clearly, Judge?

16             THE COURT:  Yes, I can.

17             MR. CAHN:  Good.  Thank you.  This is Aaron Cahn

18      of Carter Ledyard & Milburn for Patrick Morrisey, Attorney

19      General for the State of West Virginia.

20             Judge, I want to say very briefly and I don't want

21      to indulge in any of the precatory language if I may call it

22      that about frustration and disappointment, whether or not

23      the objecting states should be grateful for the increase

24      that we did get and shut up about the rest of it.  I don't

25      want to talk about any of that.

1          I want to address the issue where the money's

2     coming from.  And you, Your Honor, and Mr. Guard discussed

3     this briefly during Mr. Guard's presentation and I just want

4     to pick up the trail from there and say that in point of

5     fact and obviously despite the settlement that was entered

6     into since everything is now open season again, there are

7     potentially active fraudulent transfer claims that are

8     maintainable against the Sackler family, and, please, Your

9     Honor, please indulge me since we only received Debtor's

10    legal argument two hours before the start of this hearing.

11    I haven't had time to put anything in writing or perhaps

12    make a more polished argument than I would have like to

13    make.

14          So if Your Honor will bear with me, I only want to

15    say that it's not at all clear to me -- I don't think it's

16    clear to a lot of other people -- that we're not actually

17    disposing of estate assets when the nine plus one takes

18    close to $300 million of Sackler money.  It's clear --

19    again, without doing the deep dive into the merits of the

20    fraudulent transfer claims, it just seems on the surface

21    with claims in this bankruptcy case exceeding -- well, we

22    know they're in the trillions, right, because the states' --

23    the 50 states proofs of claim alone was in excess of $2

24    trillion and I am sure that the personal injury claimants

25    and the other claims of the other 618,000 creditors would

Page 84

1    dwarf that $2 trillion number.  And this was accomplished

2    over a large number of years with -- and many of the states,

3    including West Virginia, having been in litigation with

4    Purdue for probably 15 to 20 years prior to the start of

5    this bankruptcy case.

6            So fraudulent transfers of corporate profits which

7    very likely -- again, without doing a lot of -- without

8    having the ability to do a lot more research than we've had

9    the opportunity to do since the bulk of the money -- maybe

10   all of it -- is -- represents corporate distributions or the

11   proceeds of those distributions to investments and whatever.

12   On the surface, there would seem to be a very compelling

13   case that there are -- all the money that the Sacklers have

14   or whatever hasn't been paid in taxes is recoverable as a

15   fraudulent transfer.

16           Now, again, we're not here to litigate the merits.

17   We can't litigate the merits of that claim, but I want to

18   speak on this point to say that the assumption that this is

19   just Sackler money, had no relationship to the estate and

20   therefore the Sacklers can do what they want with it -- I

21   don't think that's a correct assumption, and I think that

22   ought to be seriously taken in account before we approve the

23   settlement.  This is not -- I'm not talking disappointments.

24   I'm not talking about how angry or disappointed -- whichever

25   word you'd like to use -- the various objecting states and

Page 85

1    probably a lot of states that haven't objected.  Sorry, Mr.

2    Preis, I don't think anybody's silence, you know, should be

3    taken as indicative of any position.

4            So this is -- I think this is a real issue, and I

5    don't think we can assume that this is just -- this is not a

6    (indiscernible), right.  This is not an unrelated investor

7    coming in to purchase a position.  This is not like it was

8    in the ICL and some of the other cases that Mr. Huebner

9    cited in his brief.  This is not a secured creditor making a

10   bid and throwing a few dollars to the unsecured creditors in

11   order to smooth the way to plan confirmation.  This is not

12   that.

13           This is a genuine problem where potentially

14   recoverable estate assets are being diverted solely to the

15   use of a small group of state creditors.  And whether it be

16   used for opioid abatement or not -- and by the way, I don't

17   think anybody disputes that.  I don't think it was necessary

18   for any of the previous speakers to say that.  We've all

19   been operating on the assumption that all this money is

20   going to be used for abatement or other relevant purposes.

21   Everybody has been working towards that goal for the past

22   two and a half years and in fact long before then.

23           But that's not the point.  The point is, it needs

24   to be -- this needs to be taken into account for a state

25   like West Virginia -- and I hate to say this, Judge.  I

Page 86

1   really do but the fact of the matter is, we've all

2   acknowledged, West Virginia is unfortunately the face of the

3   opioid crisis with due deference given to all the other

4   states who've also been massively affected.  But West

5   Virginia's sole focus during this entire case has been the

6   allocation issue.  We didn't object to the releases of the

7   Sacklers.  Our "no" vote on the plan was based solely on

8   dispute with the (indiscernible) state allocation which as

9   you, Your Honor, knows very well was more population

10  centered that it -- than it probably ought to have been.

11          So West Virginia has scratched and clawed for

12  literally every dime to try to increase its ability to deal

13  with the very large segment of its own population that's

14  adversely affected by the opioid crisis.  So to see this

15  grab -- the cash grab.  It's a cash grab.  I mean, if we're

16  going to attribute silence -- give legal effect to silence -

17  - I have to note that none of the nine have appeared on this

18  motion.  None of them have filed any papers in support and

19  none of them have explained what considerations drew them to

20  create this special fund.  And again, if we're using Mr.

21  Preis's interpretation of evidentiary rules, we could

22  perhaps attribute that there was no reason other than the

23  desire to glom some additional money when they had the

24  chance.

25          So with all of that, Your Honor, and I apologize

Page 87

1    for going off on a rant.  I actually hadn't meant to do

2    that.  But the fact of the matter is that that there's a

3    severe, in my opinion -- in our opinion -- a severe legal

4    objection to Mr. Huebner has made the -- everybody provide -

5    - there's a legal objection to the settlement and that is

6    these are -- at least potentially -- estate assets that are

7    going to (indiscernible).

8              THE COURT:  Okay.  But the key word here --

9              MR. CAHN:  Thank you, Your Honor, for your

10   indulgence.

11             THE COURT:  The key word there, Mr. Cahn, is

12   "potentially," and I'm not deciding that issue today.  All

13   I'm deciding is whether I should approve a settlement that

14   enables that issue to be raised in the context of another

15   billion to a billion and a half going into the estate and

16   the 277 million into opioid abatement.  This isn't -- as we

17   just heard, and I'm not going to say it again -- a

18   confirmation hearing.  And ultimately, when people look at

19   this more carefully, I guess they could come up with a

20   rationale as to why the 277 million is estate property.  I

21   think others will probably say, well, but what we're back

22   here on is a plan whose confirmation was affirmed, right,

23   and that plan provided for 4.5 million and this is just

24   better.  And the people who settled their claims and the

25   estate that settled its claim is -- really don't have a

Page 88

1   basis to say we want more because they settled their third-

2   party claims in the $4.5 billion plan and the estate settled

3   its claims in the $4.5 billion plan.  So the issue is -- I

4   appreciate it -- is -- it takes some thought, but I could

5   certainly see the rationale that the Debtors have given

6   which is that this isn't really estate property because the

7   fraudulent transfer suit was already settled.

8          But again, it's not an issue --

9          MR. CAHN:  Thank you for the indulgence.

10         THE COURT:  -- it's not an issue for today.  The

11  issue for today, should I approve this agreement which has

12  three or four, depending on how you look at them, elements

13  to be implemented now and the rest to be implemented either

14  -- well, depending on the how Second Circuit rules -- either

15  if the Second Circuit affirms the district court's opinion

16  in which case there's going to be complete chaos and West

17  Virginia can fight for whatever it wants along with

18  everybody else, or the Circuit upholds the $4.5 billion plan

19  except now it's a $6 billion plan, and confirmation issues

20  will be decided at that point.

21         MR. CAHN:  We're not interested in creating chaos,

22  Your Honor.

23         THE COURT:  I appreciate that.  Your client came

24  across to me as a very dedicated public servant.  I get

25  that, really.  So anyway, I'm just responding -- I've

Page 89

1    thought about this point.  I actually was thinking about it

2    before the briefing because I had to assume from reading

3    between the lines in the mediator's reports that there was

4    perhaps something like this issue going to raise its head,

5    which it did.  So I understand your arguments.  I think

6    they're arguments for another day, not for today.

7            MR. CAHN:  Thank you very much, Your Honor.

8            THE COURT:  Okay.  So -- now the state of West

9    Virginia did file a separate objection as did the AHC but --

10   so Mr. Eckstein, I don't know if you want to go next or --

11           MR. ECKSTEIN:  Your Honor, good afternoon.  I'm

12   happy to let any other states that want to make any

13   remaining comments do so and then I'll just try to wrap up.

14           THE COURT:  Okay.  That's fine.

15           MR. ECKSTEIN:  Just didn't want to lose the

16   opportunity.

17           THE COURT:  So do any of the joining states want

18   to add to the remarks by Mr. Guard and Mr. Cahn?  Okay.  I

19   guess not.

20           MR. ECKSTEIN:  Your Honor, in that case, thank

21   you.  Kenneth Eckstein, Kramer Levin, co-counsel for the ad

22   hoc committee of government complainants and I appreciate

23   the opportunity to make a few remarks.

24           I'm sure Your Honor appreciates from reading the

25   motion and reading the pleadings that this is in fact one of

Page 90

1    several very, very difficult issues that have come up in

2    this case and it's interesting that we continue to have

3    these complexities and challenges that come up even post-

4    confirmation while we're in the midst of an appeal.

5              THE COURT:  And I do appreciate that issue, Mr.

6    Eckstein, and I think because of the difficulty of it, what

7    the parties are focused on is roughly a 20 to 25 percent

8    variation as opposed to a 70 to 75 percent variation or

9    more.  I have to believe -- I have no reason to know, but I

10   have to believe that these same points which make the

11   rather, I think, simple proposal by the Sacklers much more

12   difficult, not because of the Sacklers, but because of the

13   allocation issue.  And I think that's reflected in the

14   relative percentage of the SOAF versus the rest.

15             MR. ECKSTEIN:  I think that's correct.

16             Your Honor, before making several substantive

17   observations, I do want to take a moment to, number one,

18   acknowledge on behalf of the ad hoc committee what we know

19   as the prodigious efforts and commitment that Judge Chapman

20   provided to this case.  We know firsthand that the amount of

21   time and effort and energy that had to go into throwing

22   herself into the midst of a case of this complexity and

23   challenge does not go unnoticed, and we have great respect

24   for her efforts and dedication.

25             And the same is true for the Court and

Page 91

1    (indiscernible) parties that I know worked very hard, and I

2    know Your Honor appreciates that the ad hoc committee is one

3    of several entities that has devoted its efforts as Mr.

4    Huebner says, I think day and night for two and a half years

5    to make a successful plan in this case.  And I believe as

6    the Court appreciates, the ad hoc committee has participated

7    actively before Judge McMahon and has filed a

8    (indiscernible) briefs in front of Second Circuit

9    (indiscernible) an effort to try to make sure that this case

10   ultimately is successful.

11         Your Honor also knows the ad hoc committee was

12   instrumental in developing and implementing the various

13   intercreditor settlements that Your Honor, in connection

14   with confirmation, appropriately recognized (indiscernible)

15   part of the building blocks of this plan.  And I know Your

16   Honor appreciates that Mr. Guard was a critical witness at

17   confirmation and testified in support of the allocation and

18   other settlements that were embodied in the plan and were

19   important elements of the plan, and as Your Honor

20   recognized, without which, this plan could not have been as

21   successful as it was, notwithstanding the hopefully

22   temporary setback that we've suffered along the way in

23   connection with the third-party release.

24         So the reaction that Your Honor has seen to the

25   opposal in this amendment should not come as a surprise.

Page 92

1   There were certain principles that guided how parties

2   approached this case.  As Mr. Guard indicated, great care

3   was given at every step of the way to try to enhance this

4   estate as effectively as possible.  Many, many parties had a

5   hand in that, but one of the hallmarks of the plan -- all of

6   the building blocks -- was that the plan was proposed,

7   number one, with an eye for devoting all of the funds to

8   abatement, which makes this plan unique; and number two, was

9   done in a manner that provided the maximum amount of

10  equality and openness and consensus as possible and that is

11  why notwithstanding the controversy surrounding the third-

12  party release issue, there was such overwhelming consensus

13  ultimately for the extraordinarily complex plan, and it did

14  not go without a lot of effort.

15          But that was a major achievement, and

16  unfortunately, what we're being confronted is a significant

17  impairment of one of the building blocks of this plan and

18  this important to this case.  That is important to the

19  integrity of the way a bankruptcy case proceeds.  The fact

20  of the matter is, this is post-confirmation while an appeal

21  was pending, but had this proposal come to the Court in

22  connection with the confirmation hearing, I'd be hard

23  pressed to think that the Court would seriously be able to

24  even entertain this kind of relief.  And the fact that it's

25  coming up now one might (indiscernible) to suggest the facts

Page 93

1    are different but the reality is, the impact on creditors

2    and the impact on the (indiscernible) is not that different.

3            Mr. Huebner made, I thought, an interesting

4    observation trying to crystalize why this is not really a

5    big deal.  He said had the Sacklers gone out and simply

6    agreed with the nine to have paid them $277 million in

7    consideration for them not pursuing their appeal, they could

8    do so, but I think we all know -- Mr. Huebner knows as well

9    -- that they couldn't have (indiscernible) in this case.

10   This case was premised upon a preliminary injunction that

11   has been in place for two and a half years.  It's premised

12   upon an agreement that the Sacklers made with the creditors

13   committee and the Debtor and ultimately approved that they

14   wouldn't divert assets, that they wouldn't go out and pay

15   creditors away from the plan and away from the case.

16           And we all know that 80, 85, 90 percent of the

17   assets that are going to be distributed to creditors through

18   this plan are coming from the Sackler distributions, and so

19   to suggest that somehow the Sacklers are paying $277 million

20   away from this plan is -- frankly, I find it disingenuous.

21   But -- I heard the argument but I can't go without a

22   response that this case is about Sackler payments, and we

23   all understand and what makes this difficult is, there is no

24   question the benefits of this settlement are massive.

25           Of course, we all want $1 billion extra from the

Page 94

1    Sacklers.  It makes a previously outstanding plan that much

2    better and everybody understands that including in the ad

3    hoc committee and that's what makes this so difficult

4    because we're faced with really a Hobson's choice.  There's

5    no good answer.  Nobody wants to lose the benefits of the

6    settlement.  I understand that, Mr. Guard understands.

7    Everybody on the ad hoc committee understands that, but

8    there was a right way to do this.  That is the way the NCSG

9    negotiated these modifications was a model.

10            They negotiated improvements to this plan.  They

11   were material.  They were done in advance of confirmation,

12   that it did not involve separate payments.  There are ways.

13   There are ways to have accomplished to recognition

14   confirmation.  Your Honor, the ad hoc committee did not to

15   Mr. Huebner.  We were concerned that the term sheet when we

16   read it indicated sort of an open-endedness and in the

17   motion, the Debtor clarified that the fees only applied to

18   outside counsel.  The ad hoc committee had no objection to

19   that.  I understand before the motion was -- before the

20   motion maybe was read carefully, initial objections got

21   filed that included that point and I understand Your Honor's

22   comments and I can understand the discretion of it, but

23   that's not what this objection (indiscernible).

24            And there are ways in the Bankruptcy Code to

25   provide for essentially compensation or recognition for a

Page 95

1    contribution that was made by creditors to a case.  This is

2    not such a motion.  This is not asking for substantial

3    contribution or such other recognition, all of which would

4    have probably not been controversial.

5            This is an attempt to essentially after the fact

6    fundamentally change the way in which creditors are being

7    treated under this plan and that is why Your Honor saw such

8    broad-based objections and ultimately, we believe it is

9    crucial that it be brought to the Court's attention as to

10   where these objections stem.  And I sympathize with the

11   challenge of this motion and the objections because they're

12   not easy and they raise difficult problems because as I

13   said, we recognize the fact that, at the end of the day,

14   this should be an -- this should have been an easy situation

15   that would have been applauded.

16           The nine states negotiated an enhancement.  The

17   enhancement runs through the plan.  It runs through NOAT.

18   All parties would have done better.  The Sacklers would have

19   made a greater contribution, which was something that both

20   this court and Judge McMahon encouraged.  It would

21   facilitate greater certainty at the circuit court level and

22   I believe it would have been the -- an appropriate way to

23   have capped off what hopefully will be the success of this

24   case.

25           This is an unfortunate sort of chink in the armor

1    of where this case has developed and it unfortunately has

2    provoked this kind of an issue that does go to the heart of

3    the way a bankruptcy case proceeds as well as the broader

4    issue that Mr. Guard raised about how settlements,

5    particularly class action settlements that require

6    predictability and stability of rules, how they're going get

7    handled.  It's unfortunately the case this kind of action

8    rewards that kind of -- essentially, rewards poor behavior

9    of grabbing for oneself, and it makes it difficult for

10   parties to reach settlements.

11          Now Your Honor, I believe in the colloquy with Mr.

12   Guard I thought had suggested -- at least it would seem to

13   me potentially to be a path forward, and that is that this

14   is not an amended plan and I agree with Mr. Huebner.  This

15   is not an 1127 motion.  And the 1123(a)(4), I would agree,

16   can properly be addressed when the plan is amended and it

17   doesn't have to be addressed today.  And I think that that

18   may be the appropriate way to handle this, which is, to

19   ensure that the payments are going to be available and to

20   the extent it ultimately is determined that 1123(a)(4) is at

21   odds with diverting 25 percent of this sort of enhanced

22   payment away from the estate, that the Court can deal with

23   it at the appropriate time.

24          And I'm comfortable seeing that as the path

25   forward.  I share Mr. Guard's concern that we don't want to

Page 97

1    be inconsistent about it, but that could well be a

2    possibility where we can move ahead with, hopefully, a

3    largely consensual appeal.  The estate will be enhanced and

4    we can determine at a subsequent stage, assuming the Second

5    Circuit reverses and we're in the position for this plan to

6    go effective to deal with an amendment at that time -- I

7    would agree with Your Honor it doesn't necessarily require

8    resolicitation.  We can address that issue at the time as

9    well.

10          But I think the Court can consider the question

11   and doesn't have to make those kinds of rulings today.  But

12   I do think it's important to not be -- I don't want to be

13   disingenuous about essentially what that relief would mean.

14   It would be two steps.  I happen to think that two steps is

15   appropriate, and I think that it would provide the best

16   outcome for everybody.  It would allow for the appeal to

17   proceed the way we all hoped it would proceed.  It would

18   allow for the value to come into the estate and it would

19   allow the nine to essentially try to be credited for the

20   value that they're actually contributing and we could

21   consider it in the context of the amended plan.

22          The only other two things we raised, Your Honor,

23   in our objection, both of which we tried to indicate we

24   thought were easily resolvable -- one was, to the extent any

25   monies are going into a SOAF, we believe that the SOAF

Page 98

 1    should, in addition to saying the monies are going to be

 2    used for abatement, they should be agreeing that those

 3    monies are going to be applied consistent with the

 4    procedures that were carefully put in place by all of the

 5    states and all of the local governments for abatement.

 6    There was a very careful procedure.  Each of the nine states

 7    participated in that process, and nobody objected to it.

 8    And it would be surprising to me if there was any

 9    disagreement about that, but that is not the term sheet was

10    written and so we would ask for clarification of that.  And

11    at least as of today, we haven't gotten firm clarification,

12    although, I know that in discussions prior to today's

13    hearing there seemed to be growing consensus around this

14    issue, and we think that issue could be clarified and should

15    not be all that controversial.

16             The third issue --

17             THE COURT:  Can I just interrupt you?  I mean, to

18    me, that's one of the reasons why the payment of the legal

19    fees is appropriate so that people can talk about those very

20    important issues and try to resolve the documentation of

21    them.  But go ahead.

22             MR. ECKSTEIN:  But I would ask, Your Honor, that

23    in connection with today's hearing, there should be

24    clarification that, to the extent there are any monies that

25    are going into a separate fund that's going to be created

**Page 99**

1    through this case, that those monies should also be

2    distributed consistent with the allocation and distribution

3    procedures that were built into and made part of the plan of

4    reorganization which was something that all states endorsed

5    and all the governments endorsed and we shouldn't be

6    creating more damage, it seems to me, to a structure that

7    was already put in place.

8           THE COURT:  Well, let me say this.  That structure

9    was approved by me with ample evidence from very credible

10   witnesses, and there's a great benefit to that work already

11   having been done.  So I can understand, not only your

12   position on that, but also Mr. Maclay's position on behalf

13   of the MSGE group.

14          MR. ECKSTEIN:  Your Honor, the last issue that we

15   had raised, which again, I know has gotten some discussion

16   and again, I -- I think we suggested in our papers, we

17   thought it would be a relatively easy issue to resolve

18   really went to the terms of the settlement agreement, in

19   particular as to the sharing of collateral.  I think as Your

20   Honor knows, a lot of work went into negotiating with the

21   Sacklers for collateral that would be posted to secure

22   payments that were going to be made over ten years.

23          At the time, we only really had sort of two

24   parties who were looking to receive distributions under the

25   plan.  The MDT was going to essentially be the party that

1    was supposed to be responsible for collecting the payments.

2    They were going to then make payments to the private trusts

3    and they were going to then make payments to the NOAT and

4    payments were also going to the PIs, and that was all laid

5    out very carefully and everybody had amounts that were being

6    distributed on an annual basis.

7              If we're going to inject a new party, so to speak,

8    into this -- a SOAF -- then it actually raises a fair amount

9    of complexity that presumably will be reflected in the

10   intercreditor agreement.  (indiscernible) to make it clear

11   that that significant interest in that, but one of the

12   issues which I'll complete my thought -- one of the specific

13   issues that we were concerned about was that there are some

14   payments that are proposed to go to this SOAF that are early

15   and then the bulk of the payments are being made in the

16   later years, years 11 to 18.

17             And there's a very specific provision in the plan

18   documents that (indiscernible) to enforce (indiscernible)

19   collateral, and while all parties may have an interest in

20   the collateral, we did not want there to be a suggestion

21   that by enforcing -- if the MDT is enforcing against the

22   collateral, that should not give rise to an acceleration of

23   payments that are due in years 11, 12, 17, or 18, that the

24   waterfall, so to speak, will not be ignored.

25             Obviously, if there's an acceleration and if there

Page 101

1    is what we call the snapback and parties are pursuing their

2    individual remedies, then at that point in time, people can

3    do whatever they want and the plan preserves that and that

4    would be true for all of the state.  But in the event that

5    there has not been a snapback and really looking to the

6    collateral, that should give rise to an out-year payment

7    accelerating its right and competing with early payment.

8    (indiscernible)

9              THE COURT:  Well, as you've noted, the settlement

10   agreement doesn't spell that out.  It contemplates that a

11   proper intercreditor agreement is to be negotiated in good

12   faith, and I think I tend to agree with you as well as the

13   Debtors and the committee that that issue is kind of a high-

14   class issue.  If that were the only issue, I don't think

15   there would be -- I think that would be resolved, let's put

16   it that way.  But the order that's being sought here doesn't

17   lock in a particular result on that, although, I have

18   confirmed that there's no contemplation of changing the

19   first pay-out provisions for the personal injury claimants.

20             Okay.  Thank you.

21             MR. ECKSTEIN:  Your Honor, with that, I would rest

22   on our papers and thank the Court for the opportunity.

23             THE COURT:  Okay.  Very well.  Thank you.  All

24   right.  I think I see counsel for the U.S. Trustee.  Do you

25   want to go next?

Page 102

1          MS. EITEL:  Yes, Your Honor.  Thank you.  Nan

2     Eitel, Department of Justice and Executive Office for U.S.

3     Trustees.

4          As set forth in the U.S. Trustee's brief, no one

5     could really dispute that more money to abatement of the

6     opioid crisis which OxyContin played such a major role is a

7     very good thing, and we commend the nine and the parties for

8     the resolve to get the Sackler family to give back more of

9     the money that they took out of Purdue in its profits.

10          But I'm going to make I think a very different

11     argument this afternoon than I thought I was going to make

12     as of 11:00 a.m. and I hope the Court will bear with me

13     because the sands have shifted quite a bit since then.

14     There are legal impediments to approving this term sheet as

15     set forth in the brief, but I think there are additional

16     ones that arise as a result of the statements

17     (indiscernible) today.  I'm encouraged to hear Your Honor

18     say that there would be a plan that have to come back before

19     you at some point in time after the appeals are concluded

20     and that confirmation objections are reserved and nobody's

21     rights are being prejudiced by what's being done today.  So

22     that does eliminate some portion of the objection as filed

23     by the U.S. Trustee.

24          But now I have the question of, why are we even

25     here?  Mr. Huebner went out of his way to say that this is

Page 103

1    not a estate property.  This is deal between two third

2    parties, has nothing to do with the Debtor.  We had the

3    unsecured creditors committee say in paragraph 15 of their

4    brief filed this morning that the parties -- that the

5    Court's not being asked to police the conduct of third

6    parties.  And so do we even have related to jurisdictions --

7              THE COURT:  Of course we do.  This is a settlement

8    whereby over a $1 billion is going to come into the estate -

9    - into the estate under an amended plan.

10             MS. EITEL:  Your Honor, but the Debtors want to

11   have their cake and eat it too or pretend like this has

12   nothing to do with the estate, and I would agree with you,

13   it does have to --

14             THE COURT:  They're talking about the 277 million.

15             MS. EITEL:  Well, I -- and the 277 million like --

16   I know you disagree that Jevic is applicable here -- but the

17   Sackler family doesn't care how the money gets distributed.

18   They only care about what the value that get paid out.

19             THE COURT:  In the first paragraph of Justice

20   Breyer's opinion it says this was property of the estate and

21   it was.  It was a settlement of a fraudulent transfer claim.

22   Maybe if the U.S. Trustee actually had money in the game it

23   would understand these issues, but I don't think it does,

24   because it doesn't.

25             MS. EITEL:  Your Honor, I understand that you take

Page 104

1    a different very view of these issues than the United States

2    Trustee.  I just want to make the point that I don't think

3    it's definitive that the 277 million is a (indiscernible).

4            THE COURT:  I agree with that but that's all the

5    Debtors were talking about, is that amount of money.

6            MS. EITEL:  And one of the difficulties that we

7    find ourselves in today -- and this goes to the point about

8    a future plan is -- we're in no man's land.  We don't have

9    definitive documents.  We don't have definitive agreements.

10   There are issues that are left to be (indiscernible) unless

11   anyone thinks that not having documents is a hypothetical

12   concern.

13           When the plan confirmation hearing started back in

14   August, the Debtors were on their sixth amended plan.  They

15   took five tries during the confirmation hearing to get to a

16   plan that Your Honor thought could be confirmed.  By the

17   time we got to the bench ruling in September 1, they still

18   hadn't done it, not the way that the Court thought it should

19   do, and you ruled contingent upon them filing a plan as you

20   very much directed.

21           So I'm concerned that we are going forward on some

22   kind of a term sheet that may or may not deal with the

23   Debtors' property, that may or may not preclude rights in

24   the future and determine things that are very important, and

25   we don't have documents.  We -- it's 1127 plan modification

Page 105

1    motion.  We don't have a new plan.  We don't have a new

2    disclosure statement assuming one might be needed.  I

3    understand the Court has not decided that issue yet and will

4    decide it at the time that the Debtors make their

5    propositions.

6              But the -- in addition to -- I understand you

7    dispute the related to jurisdiction, but there's a Stern

8    problem here too.  If this is just a dispute that's being

9    settled between the Sackler family and the nine states, then

10   -- and there's no relationship -- it's not an estate cause

11   of action, the Court could not adjudicate that, and so just

12   as the Court could not adjudicate the Sackler family dispute

13   with nine states, if it's truly not estate property, then

14   how can the Court approve a settlement today that does

15   precisely that?  So I think in addition to the related to

16   jurisdiction issue, that there's a Stern problem as well.

17             I'll just briefly touch on the arguments that were

18   raised in our brief, Your Honor.  I understand that you

19   disagree and that you do not want to hear from the United

20   States Trustee --

21             THE COURT:  It's just such a fantasy.  I mean,

22   it's just not real.  I'm sorry.  At some point, the U.S.

23   Trustee actually has to look out for the interest of people

24   that are actually getting money under this plan and not just

25   throwing up ways to kill it.  This is just -- I just find

Page 106

1    this reprehensible.  I'm sorry.  I have to say it.  It's

2    just not right to be raising --

3                 MS. EITEL:  Your Honor --

4                 THE COURT:  -- issues like, "we don't know this,

5    we don't know that, we don't know something else."  Well,

6    try to figure it out.

7                 MS. EITEL:  Your Honor, if we had the documents we

8    could but we don't.

9                 THE COURT:  I'm sorry.

10               MS. EITEL:  That's the difficulty.

11               THE COURT:  You know what?  What is the difference

12   between this term sheet and a plan support agreement?  None.

13   We have the documents.

14               MS. EITEL:  Your Honor, there are --

15               THE COURT:  The document's right here.  It's the

16   settlement term sheet.  That's what it is.

17               MS. EITEL:  Your Honor, going into today's

18   hearing, it wasn't even clear that the Debtors were going to

19   file another plan.  Mr. Huebner had to clarify that.  Again,

20   it gets to the --

21               THE COURT:  Of course, it -- well, I'm sorry.  He

22   didn't have to clarify it unless someone really wasn't

23   paying attention.  It was perfectly clear to me and anyone

24   else who read this that this was not a plan modification

25   motion.  And so I don't really appreciate creating issues

Page 107

1    when they're not there or coming up with hypotheticals or

2    professions of ignorance as opposed to focusing on the

3    actual issues before the Court and the money that would be

4    going out to the American people.

5              MS. EITEL:  Your Honor, we're not confessing

6    ignorance and we're not making up hypotheticals.  We have a

7    very contingent deal here.  It's neither fish nor fowl.  We

8    don't have all the documents.  We have the outline of this--

9              THE COURT:  Right.  I've heard you on this before

10   and you can know what I think about it.  Why don't you move

11   on?

12             MS. EITEL:  I will move on, Your Honor.  One of

13   the findings the Court's being made -- asked to make is that

14   no provision of this term sheet that's being approved

15   contravenes the Bankruptcy Code.  The Court can't make that

16   finding because the term sheet still maintains the section

17   10.7 releases that were vacated on appeal and the district

18   court says there was no authority.

19             THE COURT:  It's -- we -- were you listening at

20   the beginning of the hearing?  Apparently not.  It's

21   contingent upon the reversal of the district court's order

22   and therefore, necessarily is --

23             MS. EITEL:  But the entry of the --

24             THE COURT:  -- contingent upon a finding the

25   releases are proper.  Period.

Page 108

1           MS. EITEL:  Your Honor, the finding that you're

2   being asked to make in the proposed order today is that no

3   provision in the term sheet --

4           THE COURT:  I know the finding and I've just said

5   what it consists of.  Move on.  I already clarified this

6   with Mr. Huebner at the beginning of the hearing two and a

7   half hours ago.

8           MS. EITEL:  Your Honor, for the same reason that

9   the term sheet contravenes the -- excuse me -- the order

10  asks the Court to make the finding that it does not

11  contravene the Code, then they don't make it contingent on

12  that.  The rest of the deal is contingent.  The rest of the

13  deal is contingent upon them ultimately prevailing on

14  appeal, but there's -- one thing that nobody's --

15          THE COURT:  The term sheet itself is contingent

16  upon that in multiple places -- on the approval of the --

17  the grant of the appeal by the Second Circuit and

18  confirmation of a plan.

19          MS. EITEL:  Your Honor, I'll leave it at this.

20  It's not clear based on the shifting sands today whether --

21          THE COURT:  It's clear to everyone except the U.S.

22  Trustee and I think that's because everyone else actually

23  has money in the game.

24          MS. EITEL:  Your Honor, Congress created the

25  United States Trustee for a reason because --

1              THE COURT:  I understand and I think that there's

2     nothing wrong with what the U.S. Trustee generally does.  I

3     do think that in this case, the U.S. Trustee should be

4     asking itself one simple question.  Does it want to be

5     fighting about the potential reversal where there's 4.5

6     billion for the American people or does it want to be

7     fighting about the potential reversal where there's 6.5

8     billion for the American people?

9              MS. EITEL:  There's no doubt --

10             THE COURT:  Or does it just want a reversal

11    period?  Or does it want chaos?  It should be asking that

12    question and be acting accordingly.

13             MS. EITEL:  The United States Trustee in no way

14    wants chaos and the U.S. Trustee also finds it very

15    (indiscernible) objected to have additional money to abate

16    the opioid crisis, but Your Honor, I will end with this.

17    The ends cannot justify the means.  The most noble goal and

18    the most (indiscernible) cannot eviscerate the Code.  That

19    is simply it.  There are rules that are set out in the Code

20    and the parties need to abide by them, and as we sit here

21    today, we have no plan and we are awaiting a result of

22    appeal and the Court is being asked to do something that's

23    very unorthodox.

24             Again, the rules matter.  The Code matters.  The

25    rule of law matters and I am sorry that that is really so

1  irritating to everyone here but that's the role of the U.S.

2  Trustee --

3          THE COURT:  I believe I am applying the law,

4  ma'am.  What I'm asking you to do is to focus on the actual

5  facts as opposed to raising what I believe are willful

6  statements that you don't understand what's going on and

7  arguments that simply just don't make sense like the Court

8  doesn't have jurisdiction.  It just doesn't -- it really --

9  it doesn't make sense.

10          MS. EITEL:  Well, it doesn't make sense for the

11  Debtors to want to have their cake and eat it too.  They

12  want to pretend like this has nothing to do with the estate

13  but they want the Court to exercise 363 authority to approve

14  the deal because it's using property of the estate.  I mean,

15  there is some portion of this that should either just be

16  struck and not approved by the Court because it has nothing

17  to do with the estate or it's just -- I find that

18  incomprehensible and with that, Your Honor, I rest.

19          THE COURT:  Okay.  Very well.

20          All right.  There were other objections.  There

21  were -- there was an objection by the committee and

22  creditors and there was an objection on behalf of certain --

23  objections -- on behalf of certain personal injury

24  claimants.  So Mr. Underwood, do you want to go ahead?

25          MR. UNDERWOOD:  Certainly, Your Honor.  Thank you.

Page 111

1    Good afternoon, Your Honor.  This is Allen Underwood of the

2    firm of Lite DePalma Greenburg & Afanador on behalf of

3    certain Canadian municipal and first nation creditors.

4            First I want to make clear, Your Honor -- thank

5    you for your time today, by the way -- but also to make

6    clear, the counsel for the nine states have done a

7    remarkable job in this case, and the document that we filed

8    is not a direct opposition to the settlement that is

9    proposed here or the result of the settlement in principle.

10   I think where the Canadian creditors are coming from today

11   is entirely different from the position that every other

12   creditor has -- that has objected has come at this issue.

13           Everyone else seems to be interested as to where

14   the funds are ultimately going, how they'll be distributed

15   and so forth.  Our question really has to do more with the

16   source of the funds for this settlement.  And obviously,

17   disclosure is the hallmark of bankruptcy.  The source of

18   these funds are clearly insider related funds.  Mr. Huebner

19   stated repeatedly that this is the Sacklers paying from

20   their own funds, the Sacklers paying with their own assets.

21           The fact of the matter is, it's unclear from the

22   documents that were filed exactly -- exactly, I think --

23   where these funds are coming from.  And the crux of the

24   Canadian objection and at its heart is simply that there is

25   a -- it's not in the term sheet.  It's in the application

Page 112

1    and it states the Sacklers will pay an additional 723 so

2    forth billion dollars to the MDT to an additional 500

3    million consisting of 90 percent in the amount at which --

4    that's if (indiscernible) net proceeds from the sale of the

5    IACs exceed $4.3 billion.

6              Now if were we to look at the IACs on a global

7    basis, that's fine, but there is an exception, I think,

8    which should apply here with respect to Canada because the

9    Canadian claims or the causes of action the creditors have

10   in Canada have been restrained.  The matter is subject to a

11   CCAA proceeding in Canada and it's subject to a related

12   party order in Canada.  So the Sacklers have had the benefit

13   of certain protections over these --

14             THE COURT:  Well, can I interrupt you, Mr.

15   Underwood, because I think this is really a question to ask

16   the Debtors.  Is it intended that this settlement modify or

17   violate any order that's in effect in the CCAA proceeding in

18   Canada?

19             MR. HUEBNER:  Your Honor, the answer clearly is

20   no.  Nothing -- I mean, the order asked really for no relief

21   with respect to the 277 except that it doesn't violate the

22   Bankruptcy Code.  I'll talk about that in a few more

23   minutes.

24             Mr. Underwood's concern that somehow this is

25   giving license to a fraudulent transfer in Canada or evading

Page 113

1    Canadian law or applicable judicial rulings -- we don't --

2    we didn't understand the argument.  Obviously, there can't

3    even be a legitimate claim (indiscernible) something in the

4    one line that is relevant to this in our order permits the

5    Sacklers to violate non-U.S. law or non-U.S. legal

6    proceedings.  There's certainly nothing remotely supported

7    (indiscernible) to the contrary.

8             THE COURT:  Okay.  And frankly, it wouldn't

9    violate -- I mean, that's how I took it.  Well, I read this

10   objection to maybe saying two things, Mr. Underwood.  The

11   first was the one that I asked Mr. Huebner about which is,

12   is this addressed -- is this relief addressed in any way to

13   any order of the Canadian court and the CCAA?  And I think

14   clearly the answer is no.  I wouldn't grant such relief.  I

15   don't have the power to change those orders, but I wouldn't

16   grant such relief.

17            Secondly, I don't view the relief that's being

18   sought here as overturning applicable non-bankruptcy law as

19   far as, you know, fraudulent transfers, preferences, et

20   cetera.  That's not what's being sought here.

21            MR. UNDERWOOD:  No, I understand, Your Honor.  I

22   think the concern ultimately is -- and I think it's a

23   representation that the Sacklers and the Debtors could make

24   is that they're not going to employ Canadian funds as

25   opposed to global funds --

Page 114

1            THE COURT:  No, that's a different point.  That

2    goes too far.  But I think a legitimate point is that this

3    doesn't override the Canadian court's orders or applicable

4    non-bankruptcy law as to transfers.

5            MR. UNDERWOOD:  All right, Your Honor.  Thank you

6    very much.  I appreciate your time.

7            THE COURT:  Okay.  All right.  I'm not quite sure

8    who's next.

9            MR. TATE:  Judge, I'll -- I guess I'll just go

10   next and I will be extraordinarily brief.  I'm here because

11   I represent 35 unions.  That's over 100,000 union members.

12   I represent 69 incorporated government entities on Long

13   Island.  That's a population of about 3 million folks.  I

14   represent a number of hospital authorities and a number of

15   entities -- governmental entities -- in New Jersey.  And New

16   Jersey, of course, is a very proud -- in a very proud

17   position right now because of work that a number of good

18   firms did to get them up to 100 percent participation level

19   of the MDL National Opioid Settlement deal.

20            I filed my objection.  I want to narrow it just to

21   a couple of things.  First of all, I'd like to -- in

22   addressing and modifying the objection that I filed on

23   behalf of my clients -- note that we do not believe that

24   there is a problem with the lawyers who represent the nine

25   in getting paid.  There are two concepts that I love more in

Page 115

1    life than many things that I should probably love more, but

2    I love the concept of more and I love the concept of right

3    now.  And I think those that work so hard to make those two

4    concepts come to fruition -- I think they should get paid.

5              Our sole issue and sole problem here is, given the

6    populations that we represent and the number of folks that

7    we represent and the entities that we represent, we believe

8    that the increasing -- and the increase, the amount of money

9    being paid by the Sackler family, especially in this

10   situation where there may be some issues about

11   enforceability of judgments against them -- we think it's

12   great to get more.

13             On behalf of my clients, we simply believe as many

14   do who have objected that the money obtained by the nine

15   should be distributed according to the plan that this Court

16   approved and is now up on appeal.  And that's why we filed

17   our objection and that's what we're urging here.  And

18   obviously, the Court has discretion to determine what's done

19   here and we respect that but on behalf of my clients we were

20   simply compelled to raise that to the Court.  And I

21   appreciate you -- I appreciate the Court allowing us to have

22   the time to make these statements.

23             THE COURT:  All right.  I read this objection and

24   it has a long footnote listing the clients, and I did want

25   to ask you, they seem to me to fall into three different

Page 116

```
1    buckets.  I may not -- I may be wrong about that, but the

2    class in which the nine states and the District of Columbia

3    that would be sharing in the 277 million reside is class 4,

4    which is the non-federal governmental entities.

5              I may be wrong, but I think, while some of your

6    clients fall into that class, others don't.  Am I right

7    about that?

8              MR. TATE:  Yes, Judge, you are correct about that.

9    The Court is right, some of them do not fall into that

10   class, and I understand that to the extent that they were

11   dropped in footnote which is a lengthy footnote which I

12   detest seeing on this, but the Court is correct that not all

13   of them fall into that class.  And, obviously, our objection

14   should be modified in that regard and I'm happy to do it in

15   writing or do it here on the record.

16             THE COURT:  That's fine.  I do think the law is

17   clear.  In fact, I think the statute's clear that if one

18   were to be objecting --

19             MR. TATE:  They got to have standing.

20             THE COURT:  They would have to have standing, and

21   therefore they would have to be in class that's affected by

22   the carve out and some are and some aren't.

23             MR. TATE:  That's correct, Judge, and we can

24   clarify that.

25             THE COURT:  All right.
```

Page 117

1          MR. TATE:  They were listed in that fashion simply

2     as an anchor to windward and that's done.

3          THE COURT:  I just -- the authority for that stems

4     ultimately from Kane v. Johns-Manville Corp, 843 F2d 636,

5     654 (2d Circuit 1988).  There's another case that's even

6     more on point on the classification issue which is 1199 SEIU

7     National Benefit Fund v. Akorn Industries -- I'm sorry --

8     U.S. Inc. -- I'm sorry -- Akorn, Inc., 2021 U.S. Dist. LEXIS

9     108 -- I'm sorry -- 180788 at page 33 (D. Del. September 22,

10    2021), and 7 Collier on Bankruptcy at paragraph

11    1123.01(a)(1)[4][B] also says it.  But you got it.

12         That's no -- I understand we're on the same

13    wavelength.  And on the other points, I think it's -- I'm

14    not going to -- I think it's the same points that I've

15    raised with Mr. Guard and Mr. Eckstein and Mr. --

16         MR. TATE:  Judge, it indeed is.  I'm simply making

17    those statements on behalf of my clients.

18         THE COURT:  Right.  That's fine.  Thank you.

19         MR. TATE:  Thank you, Judge.

20         THE COURT:  Okay.  There were other objectors.  I

21    don't know if anyone else wants to supplement their

22    objection or have oral argument in addition to their

23    objection?  I read each of these objections, again.

24         MR. OZMENT:  Your Honor, this is Frank Ozment.  In

25    relation to your comment regarding Mr. Tate's clients, I

Page 118

1    acknowledge that Stacy Bridges and Crayton Bloyd and Charles

2    Fitch are not secured creditors as we noted in our footnote.

3    We have -- hope to achieve that status in one form or

4    another.  Thank you for clarifying the impact of today's

5    hearing regarding issues that would otherwise be adjudicated

6    under 1127.

7           In that regard, I would like briefly to add that I

8    think what you will hear tomorrow which will likely be a

9    very painful day of testimony or at least remarks is that

10   many of the people who are testifying or speaking about

11   their experiences as survivors of people who died from

12   opioid deaths or opioid overdoses would give everything if

13   their clients or, I'm sorry, their family members had had

14   adequate treatment.  And in the event that there is some

15   sort of reconfiguration regarding how this money --

16   additional money -- is to be spent, I think that ought to be

17   taken into account.

18          I think the other thing that you'll hear from them

19   in all likelihood tomorrow is that many of them, you know,

20   supported confirmation or at least did not object to

21   confirmation because they thought this is as good as it

22   gets.  If it gets better, I think they'd like to see more

23   benefits going directly to those claimants who are opioid

24   use disorder victims in active recovery.  But that's all I

25   have.

Page 119

1            THE COURT:  Okay.  Well, I will reiterate the

2     standing point.  Your clients are not in class 4 and

3     therefore the equal treatment issue wouldn't apply based on

4     the same authorities that I previously cited, and when we do

5     get to 1127, I just want to point out to people that as long

6     --

7            MR. OZMENT:  I understand.

8            THE COURT:  -- it's not being taken away from you

9     but really added into what others are getting, it's not

10    really a material adverse modification.

11           And the other thing I'll say is that I think it is

12    important that the roughly 20, 25 percent of this settlement

13    that is not going into the NOAT trust, which is clearly a

14    trust for abatement, treatment, et cetera, is also to be

15    dedicated as I've read a couple times from the term sheet

16    and I think this is -- it's worth repeating -- "shall be

17    devoted exclusively to opioid related abatement, including

18    support and services for survivors, victims, and their

19    families."

20           As Mr. Eckstein said, hopefully some flesh will be

21    put on those bones to clarify the nature of that.  But that

22    is an important promise that the states do not have to make,

23    and really has not been made until this case.  So, thank

24    you, Mr. Ozment.

25           MR. HUEBNER:  Your Honor, if now is the right

Page 120

1    time, I think that (indiscernible) common benefit, it would

2    probably make sense to spend a few minutes addressing, in

3    brief, a few of the items raised.

4                THE COURT:  Okay.

5                MR. HUEBNER:  I think it will also give parties

6    comfort and we minimize future discomfort.

7                THE COURT:  Okay.

8                MR. HUEBNER:  Let me begin with Mr. Guard, for

9    whom, as I believe, I made clear at the outset.  We have

10   enormous respect and full well understand his extraordinary

11   efforts for many years.  First of all, with respect to the

12   joinders, I actually believe that I said it in an

13   appreciative way as opposed to getting it from two different

14   briefs, there were joinders and I certainly have no problem

15   with that and, in fact, we appreciate the courtesy of Mr.

16   Guard framing the issues earlier for the Court and the other

17   parties who, in fact, accorded with his articulative

18   objection filing joinders instead of xeroxing it or putting

19   it on the word processing systems and filing any one of

20   them.  So, I do want to be clear, I intended that somewhere

21   between mutual and thank you, but it's not otherwise

22   perceived.

23                Number two, Your Honor, Mr. Guard suggested that

24   Your Honor could simply not rule today because if there's no

25   problem if the Second Circuit briefs get filed because we

1    could just figure stuff out later and maybe cut a different

2    deal.  With all due respect, that is not the Debtors' deal.

3    The reason we moved to shorten notice, which nobody objected

4    to, is precisely because we believe quite passionately that

5    having this ruling today or tomorrow -- tomorrow, not today,

6    after the rest of the hearing happens and before the briefs

7    hit the docket, is actually of great importance in terms of

8    having the Second Circuit understand where things lie and

9    the like and I'll just leave it at that.  I think it's

10   pretty obvious why, I think it's, nine briefs filed by

11   sovereigns is different than having filed at some point in

12   the future.

13              THE COURT:  Well, it locks --

14              MR. HUEBNER:  With respect to --

15              THE COURT:  I mean, I think, equally important, it

16   locks in a billion -- a billion to a billion and a half

17   dollars.  I mean, that's --

18              MR. HUEBNER:  I was going to get to that next.

19              THE COURT:  All right.

20              MR. HUEBNER:  Which is, the estate is giving up

21   nothing other than the payment of a few million dollars of

22   legal fees in exchange for locking in, hopefully, $1.4

23   billion to be distributed under the Plan and a higher and

24   hopefully faster probability of success on the merits of the

25   Second Circuit, which every single party in the entire case,

Page 122

1    except for about 12, now, we believe, is aligned with.  Your

2    Honor, with respect to the arguments made both by Mr. Guard

3    and by Mr. Cahn with respect to, maybe this isn't really the

4    Sacklers' money, there actually is a Code provision that

5    actually governs what is property of the estate.  And

6    541(a)(3) is quite clear that once property is recovered by

7    the Debtors, it becomes property of the estate.  But

8    541(a)(4) is clear, that is that if property is preserved or

9    transferred to the estate, it becomes property of the

10   estate.  So, there's a very interesting argument one could

11   have whether the Sacklers' first $4.325 billion is already,

12   somehow, property of the estate because we have a

13   settlement, but for worse or for better, they've reported

14   that they have many billions in excess of that.

15           And the argument that right now, with a settlement

16   that, whose primary economic terms are not objected to by

17   actually anybody other than the nine, but all of the rest of

18   the Sacklers' money, out of which they're paying the 277 is

19   somehow already the estate's money and that therefore, maybe

20   they're paying the 277 out of the estate's money is just not

21   -- it's not the law because there are Code provisions that

22   are directly on point.  So more importantly, we all agree,

23   including every single objector here today who spoke, to

24   accept $4.325 and to accept that as the settlement and to

25   now say -- and Mr. Cahn pointed out that West Virginia

Page 123

1    objected, only to the allocation.  We confirmed yet again

2    today that that objection was resolved and that they had no

3    problem with the $4.325.  So, to now come and say, but maybe

4    the other $277 million is also currently owned by the estate

5    and is deemed settled and paid for with estate funds is

6    simply a dissonance that I think cannot be allowed to stand.

7              THE COURT:  Look, I think if what were being

8    settled in this settlement agreement were not only the

9    third-party release issues, but the estate's fraudulent

10   transfer claims, it would be a different story, right?  We

11   agree on that.

12             MR. HUEBNER:  Exactly, Your Honor.  That's my

13   point.  The estate claims, which are ours, were settled

14   several months ago, with universal creditor support, and the

15   only issue left was a small number of parties asserting that

16   their separately owned claims could not be resolved without

17   their individuated consent, and nine of those parties have

18   now settled that.  Mr. Guard's next point that, as a

19   bankruptcy policy matter, something about the resolution

20   that was reached encourages side-deals, leads me to, sort

21   of, two different streams of thought.  One is, with respect

22   to bankruptcy policy, Your Honor, it is very often the case

23   that individual creditors of a debtor also have different

24   rights against third-parties.  They have guarantees, they

25   have LC's, they have keepwells, they have intercreditors,

Page 124

1    they subordination agreements, and the like.  And the

2    reality is that right now, the nine were differently

3    positioned than others and they cut a deal that on the main,

4    is of inordinately majority benefit to all creditors and

5    also contains a benefit for them.  I would note the irony

6    that had the almost universally supported confirmation order

7    not being reversed, the ability to do that would not have

8    even existed, which is why we believe so passionately that

9    third-party releases in very rare circumstances were

10   appropriately justified and are actually critical to

11   bankruptcy policy because they prevent the problem of -- why

12   don't we just say the differentiated holdout party.

13           Your Honor, with respect to what I'll just call

14   the penumbra of 1127 issues, I'm going to combine a couple

15   of objectors here and I don't have many points, just so the

16   Court knows.  You know, you can read our motion and order as

17   many times as you want, you won't see a reference to 1127 in

18   the relief requested, you won't see any provisions in the

19   order that allow for and direct or permit the amendments to

20   the plan.  Like, for example, swapping out the foundation

21   promise for cash on the Effective Date, which is a plan

22   amendment.  It's just not there, and it's not there for a

23   reason.  We've looked very hard at the caselaw and went back

24   and forth about whether, at this juncture, it was

25   appropriate to keep the 1127 relief on a contingent basis

Page 125

1    and decided that it was not, that the better view was to ask

2    for as little as possible of the Court today.

3            And when the time is right, I want to be very

4    clear about this, if the Second Circuit reverses judgment

5    matter or more importantly, the Second Circuit affirms Your

6    Honor and simply says, "Clear for takeoff.  Confirmation

7    order is back in force," we will then make an 1127 motion

8    and it will be seeking extremely modest relief, I guess, of

9    the sort.  There is an unthinkable benefit to everybody

10   because it will swap the foundations for cash, it will add

11   $898 million to $1.398 billion of new money.  It will --

12   it'll address some technical weaving this into the deal

13   issues, there's a (indiscernible), it's actually more

14   complicated, but that's just a corporate law thing that

15   people who need to, already know what needs to be done, and

16   it will allow for the collateral and then we will have the

17   discussions that were referred to by Mr. Preis and Mr.

18   Eckstein.  If somebody wants to object to that and say, "No,

19   we don't want $900 million to $1.4 billion", or they believe

20   that somehow, they're maybe worse off by the estate getting

21   hopefully over a billion dollars more to save American

22   lives, they are welcome to make that objection at the time

23   and we look forward to addressing it for whatever court is

24   going to be there to hear it.  But today is not that day and

25   there are no shifting sands of any kind.

Page 126

1           With respect to Mr. Eckstein, just really want to

2     just choose very quick, tiny points.  Number one, with

3     respect to the mutiny issue and this blends also with the

4     U.S. Trustee's point, the 277, as I've now said about 40

5     times in 40 different contexts, is not the estate's money,

6     it's not the Debtors' money.  And so, I don't know that the

7     Court has the right and I don't think anybody's requested

8     that the Court order how the nine spend their money.  The

9     good news is, we're almost all the way there on these sub-

10    issues.  Obviously from the beginning, it was a big news

11    because we were not agreed to move forward with something

12    and I think it was a shared vision, as it has been for two

13    and a half years that every dollar that doesn't go to

14    victims goes to abatement related issues.  Most of the

15    states have already confirmed among the nine and it's a

16    little bit more complicated, but in broad brushstrokes, that

17    they'll be using the money more or less consistent with or

18    similar to or the like.  The issue is that they're threading

19    state law issues and that's why that's not already there in

20    black and white.  But the social goals, I actually think are

21    shared by everybody.  But to the extent possible, there's

22    going to be a fair involvement because the Court's stay its

23    active part through localities and boots on the ground and

24    the like.  And then on to the U.S. Trustee --

25              THE COURT:  Can I interrupt you on this point?  I

Page 127

1    agree with -- that makes perfect sense to me.  I understand

2    that point.  I do think that, to avoid second guessing in

3    the future, they -- and I trust this is what people will be

4    focusing on, will probably want something fairly carefully

5    drafted either in supplement to the plan or an order so that

6    some person who says, "Well, you're not doing it right,

7    you're unauthorized to do this, you didn't agree to do this,

8    you agreed to do something else, and we disagree with it" --

9    I think they'll probably want that, the parameters of what

10   they agreed to do laid out, and I think that's part of the

11   work that needs to be done and it's part of why the Debtors

12   are agreeing to pay attorneys' fees to focus on things like

13   that.

14          MR. HUEBNER:  And Your Honor, I firmly can't over

15   speak for the nine.  They are certainly not my clients, but

16   I think the general (indiscernible) issue appears to be one

17   of shared vision.  I mean, I am confident that that will get

18   worked out.

19          THE COURT:  Okay.

20          MR. HUEBNER:  The U.S. Trustee raised, I guess,

21   both Stern v. Marshall and jurisdiction issues.  Those, I

22   don't think, need much time.  To be fair, Stern v. Marshall

23   has no applicability when there is consent when coming

24   before the bankruptcy court.  And to the extent that there

25   are parties to the legality under the Bankruptcy Code, which

Page 128

1    is a uniquely Bankruptcy Code issue, it is the nine, the

2    Sacklers, and sort of the Debtors, have clearly consented to

3    this being brought before the Bankruptcy Court.  So, I

4    can't, for the life of me, understand how there could be a

5    Stern v. Marshall problem when the affected parties

6    consented.  I would also note, for the reasons we put in our

7    briefing to the District Court, to the Second Circuit, this

8    is a "mini-me", as it were, of the much larger issues, for

9    which we believe passionately certain Stern v. Marshall

10   issues in the first place.

11        With respect to general jurisdiction, I would just

12   note that one need not actually look farther than Judge

13   McMahon's own ruling, which ruled for the Debtors down the

14   line on jurisdiction and noted that SPV Osus says, the

15   governing Second Circuit law says, that if something has any

16   conceivable effect on the Debtors, jurisdiction applies.

17   Having nine briefs not filed on Friday, an appeal in which

18   hundreds or thousands of American lives, not just money but

19   lives are probably at issue through the good that the

20   creditors in this case hope to do, coupled with getting $900

21   to $1.3 billion more money to save American lives through

22   the Plan's existing allocation mechanics, we think we don't

23   have to say much more about their being any conceivable

24   effect on the Debtors' estates.

25        Your Honor, I don't even really understand the

Page 129

1    sort of (indiscernible).  Honestly, the 277, as I've

2    described before under 541(a)(3) and (a)(4) and the existing

3    plan, the settlement of estate claims, it's not the Debtor's

4    money.  There's nothing remotely even intellectually

5    interesting here, but the states will not stand down from

6    filing their briefs on Friday unless they are given some

7    comfort in this Court and this not view these payments as

8    violating the Bankruptcy Code, and given that we had a bunch

9    of objections whose motivating emotion we not only fully

10   understand, but we agree with and empathize with, was

11   exactly that and actually proved why they were asking for

12   this ruling/comfort order.

13           And Your Honor, in that respect, I should note

14   that similar arguments were raised with respect to the PI

15   Order in particular that Mr. Eckstein raised at the time of

16   the DOJ settlement and Your Honor actually held two lengthy

17   hearings that addressed, including among other things,

18   whether the Sacklers open public settlement with the DOJ for

19   $225 million implicated, or worse, violated, the anti-

20   secretion provision.  You issued an order on November 18,

21   2020, entitled, "Order Confirming the Payment by the Sackler

22   Families Under Settlement with the United States Department

23   of Justice is not prohibited by this Court's Preliminary

24   Injunction," and the second paragraph says that exactly.

25   So, just so that everyone understands, we thought about all

Page 130

1    these issues and obviously got ourselves comfortable.

2          We would never ask relief of any court, let alone

3    this Court who has labored with all of those for two and a

4    half years, to do the right thing here, but we did not think

5    it was appropriate and we think this is, frankly law of the

6    case, not as a settlement with the DOJ at the time and

7    hopefully (indiscernible) had tremendous benefits for the

8    estate.  This is a settlement with nine states, of which we

9    believe the same is true.  The Court went on in that order,

10   because the fraudulent transfer claims had not yet been

11   settled, to put in place, sort of, "but this and if then, if

12   X then Y," none of those are actually applicable anymore now

13   that the claims have been settled and the Sacklers are

14   pursuant to, sort of, a universally supported settlement, no

15   longer have -- in other words, I think, clearly now have

16   assets that we have agreed to cease litigating to obtain in

17   exchange for the settlement of the same claims.  But I do

18   note that, I think, there's a (indiscernible) case issue on

19   the PI --

20          THE COURT:  Well, let me -- I mean, we talked

21   about this at the beginning of the hearing.  Again, the

22   settlement agreement says that the approval order shall

23   state that the agreement doesn't contravene any provision of

24   the Bankruptcy Code, and it doesn't say "any prior orders in

25   these cases."  If the Circuit grants the appeal, I don't

Page 131

1    believe that this settlement would contravene the

2    preliminary injunction, and I am familiar with the

3    preliminary injunction.  I do think, though, that if the

4    Circuit does not grant the appeal, but upholds the District

5    Court's Order, you would need those --

6            MR. HUEBNER:  It never gets paid, Your Honor.

7            THE COURT:  No, but you -- well, I don't think it

8    would get paid, but -- except for Paragraph 11, which is a -

9    -

10           MR. HUEBNER:  No, Your Honor.  No, let me make

11   your life a lot easier.  This is the very rare reverse

12   Catch-22.  It's like a tautology that there can't be a

13   problem.  If we're cleared for takeoff, the 277 gets paid as

14   part of us getting our money and the Sacklers have the other

15   billions.  If the Second Circuit says, "No, you're not

16   allowed to emerge," the 277 never gets paid.  It's -- it can

17   never be an issue.  The provision of Paragraph 11, Your

18   Honor, does something very different.

19           THE COURT:  Okay.

20   MR. HUEBNER:  That says, if you make a ruling or an

21   appellate court reviewing were ruling, today finds that, for

22   some very specific reason, they can't pay the 277, we'll

23   just find another pathway to get a different order, but in

24   all events, that's all still entirely contingent on the plan

25   going effective.  And if you look, Your Honor, in

Page 132

```
 1    "Implementation" in Arabic 1 at the end, as Mr.
 2    (indiscernible) notes to me, you'll see it in black and
 3    white, but again, I'm happy to let you take my word for it
 4    and represent --
 5              THE COURT:  In Paragraph 2 of the Implementation,
 6    it says, "-- other than as provided in the provision
 7    beginning, 'if any payments above," which is Paragraph 11,
 8    "this Agreement shall be void --".  But what you're saying
 9    is that Paragraph 11 just deals with -- it does, in the
10    first sentence, the reversal of my order on this motion --
11              MR. HUEBNER:  Yeah.
12              THE COURT:  -- not on the -- not if the appeal is
13    denied.
14              MR. HUEBNER:  Correct, and right above 2, at the
15    very end of 1, it's all contingent upon entry upon approval
16    order and consummation of the Plan.
17              THE COURT:  Okay.
18              MR. HUEBNER:  That's what the Court is here
19    looking for.  If there's no -- so it's literally impossible
20    that the 277 gets paid out of money that the Debtors might
21    have a right to because it only gets paid when the Debtors
22    and their estates get 5.5 to 6 and the Sacklers keep the
23    balance, etc.
24              THE COURT:  Okay, well I'm glad we've cleared that
25    up.  I guess --
```

Page 133

1              MR. HUEBNER:  Well, with respect to --

2              THE COURT:  So, again, I'm uncomfortable with

3    saying it doesn't violate any order I've entered, because I

4    haven't looked at all my orders.  I don't believe it would

5    violate the preliminary injunction.

6              MR. HUEBNER:  I actually believe, based on emails

7    that we're getting in the background, that that actually is

8    what people were actually looking for now that we've all had

9    some colloquy about it.

10             Your Honor, I don't think I need to say anything

11   about Canada.  I hope that we've all relayed --

12             THE COURT:  I don't think you need to do either.

13   I think that's been clarified to Mr. Underwood.

14             MR. HUEBNER:  So, I only have two final things to

15   say.  Number one is an error side point because I think that

16   as people think about this (indiscernible) matters and I

17   actually have a whole module that I threw on the floor and

18   I'm not doing.  But let me just give you numbers to think

19   about because they're helpful.  At the low end, Your Honor,

20   if you think of the 277 or you think of the SOAF payments as

21   "side payments" or off the top or commission or whatever the

22   objectors call it, of the larger settlement, (indiscernible)

23   the way that you reference it works, is that it's somewhere

24   between 13.4 percent and, at the ultra high-end, if every

25   decision is made in the direction of someone who is upset,

Page 134

1   27.7 percent of the consideration.  So, it's not 25-30, it's

2   not 30, there is a range depending on -- because for

3   example, even the 277, 52 of that would have gone to these

4   nine states and New Hampshire had it been distributed under

5   NOAT, so 277 is actually 225.3, but again, I'm not going to

6   --

7           THE COURT:  That's a good point.  I guess I didn't

8   take that into account when I was saying 20 percent or 25

9   percent.  (indiscernible)

10          MR. HUEBNER:  Correct, and that's my point, Your

11  Honor.  If it's, you know, the net extra, as it were, of 225

12  out of, you know, the total consideration is actually 13.4.

13  If you view it as 277 full, with no crediting and you only

14  say there's a (indiscernible) because of the foundations,

15  etc., at the ultra high-end, it's 27.7.  The (indiscernible)

16  priced somewhere in the teens, I think if somebody was a

17  mediator what they would do.

18          Your Honor, I have two final things to say and I -

19  -

20          THE COURT:  Before you do that, I want to clear up

21  one point, which came up from something you said earlier in

22  your argument.  You mentioned tomorrow, when I will be

23  hearing statements by people who've been affected by

24  OxyContin.  I may be wrong about this.  I looked through the

25  settlement, though, a couple of times.  I think that the

Page 135

1    scheduling of that process was at the request of Judge

2    Chapman in her Mediation Report, which I am happy to do.  I

3    think it's important, very important.  But I don't see it as

4    a continuation of this hearing.  I see it as an element of

5    the settlement agreement.  I don't think it's evidence for

6    this hearing.  And that's important because I am ready to

7    rule today on your motion, but I want to -- maybe I'm

8    missing some provision of the settlement agreement that says

9    that this has to happen before the Court rules on the

10   hearing.  I thought it was actually an aspect of the

11   settlement.

12           MR. HUEBNER:  Yup.  Chairman, let me address that.

13   I see (indiscernible) popping on, but hopefully I will

14   address the issue for you and if not, (indiscernible) speak

15   as they need to.  Your Honor is exactly correct.  It is

16   actually not found anywhere in the term sheet.  It was not

17   part of the formal agreement among the mediation parties.

18   It was exactly as Your Honor notes, I believe Paragraph 14,

19   if my memory does not fail me, of the Mediator's Report,

20   which she very strongly recommends it.  I believe, and

21   actually (indiscernible) Mr. Preis who was previously not

22   on, I believe very strongly, I hope I'm right, that this is

23   not evidence tomorrow because these people are not

24   represented.  They are victims who have agreed and want to

25   tell their stories, their life and their traumas and their

Page 136

1    concerns and their pain, and they want to tell it.  The

2    Sacklers are watching and listening.  But that's not the

3    same, I believe, as a witness presenting evidence in support

4    of a motion because I actually don't think this testimony is

5    in support of this motion.  How I know, many of them love

6    the motion, but two don't.  I don't think that's what

7    they're here for.  But Mr. Preis, can I ask please, since

8    you have always been a primary shepherd of many individual

9    victims and circumstances like this, whether that is your

10   view, because it's actually much more important and accurate

11   than mine?

12           MR. PREIS:  Your Honor, did you want --

13           THE COURT:  I could barely hear you.  I'm sorry.

14           MR. PREIS:  Did you want to say something, or did

15   you want me to answer?

16           THE COURT:  Well, the question is, I don't -- I

17   don't -- Mr. Huebner, in his closing remarks, said that day

18   2 of this hearing or, I wouldn't be ruling on this motion

19   until I heard tomorrow's presentations.  And I'm not sure

20   that's correct.  I think that tomorrow's presentations,

21   although perhaps definitely agreed to by the Sacklers, isn't

22   in the settlement agreement, but I think it is part of the

23   settlement.  It's a recommendation by the mediator that the

24   parties to the mediation have agreed to, and the key point

25   is, I don't think it's evidence.  I think it's part of the

Page 137

1   settlement and consequently, I could rule today on the

2   motion before me.

3          MR. PREIS:  Okay.  Thank you, Your Honor.  Yeah,

4   I've heard that question.  The people who are speaking

5   tomorrow -- can you hear me, Your Honor?

6          THE COURT:  Yes.

7          MR. PREIS:  Okay.  The people who are speaking

8   tomorrow do not believe that they are testifying.

9          THE COURT:  Okay.  That's my understanding too.

10          MR. PREIS:  They (indiscernible).

11          THE COURT:  Okay.

12          MR. PREIS:  Okay, but they did believe, because

13   that's what my understanding was -- they did believe that

14   they were part of the hearing on the settlement.  If that's

15   not the case, that's perfectly fine.  I just -- I wanted --

16   so that I know what I should tell them, I'll be guided by

17   Your Honor.

18          THE COURT:  I view their presentations as an

19   element of the settlement, not that they necessarily have to

20   agree to the settlement, but it is something that the nine

21   states and the District of Columbia and the Sacklers have

22   agreed to.  And if they're willing to do it, meaning that

23   those speaking are willing to do it, I am very willing, very

24   happy to hear them.  And it's important, it'll be part of

25   the record of the case, but I don't think it's evidence for

Page 138

```
 1    the settlement.

 2             MR. PREIS:  Understood, Your Honor.

 3             THE COURT:  It doesn't, by any means -- it

 4    doesn't, by any means, limit the impact of what they're

 5    going to say.  It's just the context is not as evidence for

 6    this settlement.

 7             MR. PREIS:  Understood.

 8             THE COURT:  Okay.

 9             MR. UZZI:  Your Honor, Gerard Uzzi from Milbank on

10    behalf of the Raymond Sackler Family.  Can you hear me, Your

11    Honor?

12             THE COURT:  Yes.

13             MR. UZZI:  So, this doesn't change, I think, the

14    practicalities of what you said, but just for precision,

15    you're correct that this is not in the term sheet.  So,

16    what's going to happen tomorrow is not, in fact, part of the

17    settlement.  So, I don't think it's technically correct to

18    say we've agreed to it as part of the settlement.  What has

19    happened is, though Judge Chapman has made a recommendation

20    and we have agreed, in connection with Judge Chapman's

21    recommendation --

22             THE COURT:  Fine.

23             MR. UZZI:  -- we're clear with it the way we have.

24    We have previously --

25             THE COURT:  It's an agreement and it's part of the
```

Page 139

1    mediation.

2              MR. UZZI:  I think that's -- I just -- I don't

3    think the word "agreement" is quite correct, Your Honor, but

4    we will be there tomorrow.  Let me just say it that way.

5              THE COURT:  Well, okay.  I mean, I think it -- all

6    right, fine.

7              MR. UZZI:  Thank you, Your Honor.

8              THE COURT:  Okay.  Ms. Monaghan, do you have

9    anything to add to that?

10             MS. MONAGHAN:  No, Your Honor, I think it's been

11   clarified.  I think one of the things that we were concerned

12   about, and the only reason we're raising this point is, we

13   are certainly not planning on cross-examining any of the --

14             THE COURT:  No, this is not evidence for this

15   settlement.

16             MS. MONAGHAN:  And we don't want to be in a

17   position where not having done so implies anything for --

18             THE COURT:  That's fine.

19             MR. UZZI:  And Your Honor, just while I'm on the

20   green, at the end of this hearing if we can just take five

21   minutes to cover maybe some administrative questions for

22   tomorrow?

23             THE COURT:  I'd rather not do that as part of this

24   hearing.  If you have administrative questions, you can --

25             MR. UZZI:  We could do it at the beginning of

Page 140

1    tomorrow's hearing too.  I just want to be --

2            THE COURT:  Okay.

3            MR. UZZI:  That's fine.

4            THE COURT:  Very well.  All right, so Mr. Huebner,

5    I interrupted you.  Before you finished, I wanted to make

6    sure I understood the role that tomorrow's hearing played in

7    connection with this motion, and I do at this point.

8            MR. HUEBNER:  Sure.  I only have two final things

9    to say, then I will for sure be done.  Number one, I do want

10   to reiterate that we have a tremendous amount of sympathy

11   for the objectors, the settlement and it's (indiscernible)

12   element.  We certainly understand and I've now had this case

13   for four years and three weeks.  I understand perfectly well

14   why it raises very painful issues.  As I said in the

15   beginning, we wish there were no SOAFs, but as the fiduciary

16   from the estate side, our job is to do the greatest good for

17   the greatest number within the confines of the Bankruptcy

18   Code and our obligations under the federal legal system.  In

19   that respect, we just don't think there could be a question

20   that the benefits to the estate that would come with no

21   costs to the estate are just simply enormous and they

22   translate with money and lives.

23           The final thing I will say, Your Honor, is that

24   the Court is not being asked to like SOAF or approve SOAF or

25   encourage SOAF or anything of the like.  The Debtors'

1    business judgment was not at issue, the Debtors' use of its

2    own funds is not at issue.  (indiscernible) Motion 363 and

3    also 105.  The Court is asked to do only really one thing

4    with respect to SOAF, which is one, you've already done it,

5    which is confirm that you don't think it violates the

6    preliminary injunction, which again, based on the law of the

7    case and the case settlement, we think has to be the right

8    answer.  And two, to conclude that the SOAF does not violate

9    the Bankruptcy Code and I think that the evidence we sent in

10   our papers and as we, sort of, hopefully enhanced the

11   understanding of today, we believe that to be true.  That's

12   it, not more but also not less.  We do think it's very time

13   sensitive and which we think that every creditor benefits

14   materially.  It's the probability of avoiding a potential

15   liquidation and the loss of the Sackler settlement and, even

16   if we ultimately prevail on all issues, a longer trek

17   through the other process of Chapter 11 is avoided by this

18   settlement, in addition to its many, many other benefits

19   that are laid out in the papers.  So, with that Your Honor,

20   I have nothing further.

21            THE COURT:  Okay.  Thank you.  All right.  I have

22   before me a motion by the Debtors for an order pursuant to

23   Sections 105 and 363(b) authorizing and approving a

24   settlement term sheet, a copy of which is attached to the

25   motion, that would resolve on the terms and conditions of

1     the term sheet, the objections of the so-called nine, namely

2     the eight states that appealed confirmation of the Debtors'

3     Chapter 11 Plan and the District of Columbia and in

4     addition, the State of New Hampshire, which objected to

5     confirmation, but did not appeal.  And on the other side,

6     the Sackler parties and to a limited extent, the Debtors.

7     The Term Sheet reflects a remarkable and generally very

8     positive development in these cases, which is that, in light

9     of their victory on appeal, the nine entered into a

10    mediation ordered by the Court with the Sackler parties and

11    other parties who the mediator was authorized to add to the

12    mediation in her discretion, to see if their objection to

13    the Plan could be resolved.

14         That negotiation resulted in an agreement by the

15    Sackler parties to augment their payments in connection with

16    the Plan considerably, depending on their ability to sell

17    assets from a firm amount of a billion dollars to a billion

18    and a half dollars, again, depending on that ability.  They

19    also agreed to simply pay $175 million of incremental cash

20    under this settlement in lieu of what had previously been in

21    the Plan, which was to cause the foundations described in

22    the Plan to dedicate $175 million to opioid abatement.

23    There are material non-monetary aspects of the settlement,

24    as well, that are quite important, including Sacklers'

25    agreements as to naming rights for institutions and

Page 143

1    organizations in the U.S., rights as to the document

2    repository and what would be in it and the related agreement

3    not stated in the settlement agreement, but recommended by

4    the mediator that victim statements be made to the Court,

5    which are scheduled for tomorrow in the presence of at least

6    one member from each side of the Sackler families.

7            The agreement also provides for the payment on the

8    same terms and conditions as the payment of the AHC's fees

9    in the case for these settling parties, and it has been

10   represented that roughly $2.5 million has been incurred to

11   date and it is estimated that there will be roughly no more

12   than $2.5 million in the future.

13           The Agreement also provides for a feature, that,

14   unlike all of those other features -- which are not only not

15   controversial, but welcomed, I believe, by every party in

16   interest in this case except perhaps the United States

17   Trustee -- affect the Court's determination of this motion,

18   and it has been the centerpiece of the objections to the

19   Motion.

20           The agreement, if the conditions to it occur,

21   contemplates that, of the additional incremental value to be

22   paid by the Sackler family or the Sackler parties under the

23   Settlement, a portion of that value, namely $276,888,000.87

24   would not be paid into the so-called NOAT or Master

25   Distribution Trust, which under the Plan then would have

1    distribution to various recipients of parties for opioid

2    abatement, but rather to a, defined term, SOAF facility for

3    the benefit of the settling states and the District of

4    Columbia in the amount specified in the Agreement, a

5    Supplemental Opioid Abatement Fund.  That money, that

6    roughly $277 million, as stated in the settlement term

7    sheet, "shall be devoted exclusively to opioid related

8    abatement, including support and services for survivors,

9    victims and their families, and each member of the nine

10   shall have the right to direct allocation of the SOAF funds

11   for such purposes in the amounts set forth in Attachment D

12   to the Agreement."

13            If one viewed these funds as property of the

14   estate, as opposed to being paid by the Sacklers, that would

15   change the distribution percentage for the settling parties,

16   depending on the contingencies on payment under the

17   Agreement from what they would be getting under the Plan

18   that is presently on appeal in the Second Circuit, to a plan

19   that would implement the settlement agreement, anywhere from

20   roughly 14 percent to roughly 27 percent after taking into

21   account that some of that money, a fairly large portion of

22   it, roughly $50 million, would have been allocated through

23   the Master Distribution Trust or the NOAT if the SOAF had

24   not been created and all of the additional settlement funds

25   would be run through the NOAT.

Page 145

1           As far as the request to me for relief is

2    concerned, the context is quite important.  The Court

3    confirmed a Plan that provided for, if you count the $175

4    million agreement with regard to charitable foundations,

5    $4.5 billion to be contributed by the Sacklers in settlement

6    of both the estate's fraudulent transfer and other estate

7    claims and third-party claims as set forth in the Plan.  My

8    order confirming that Plan was reversed on appeal by the

9    District Court on the basis that the Court did not have the

10   power to grant or impose involuntary third-party releases,

11   including, importantly on the so-called nine, that is the

12   settling states and District of Columbia who took the

13   appeal, but also, realistically on the state of New

14   Hampshire which objected to confirmation on that ground.

15   That ruling by the District Court is currently on an

16   expedited appeal process to the Second Circuit.  I am not,

17   therefore, being asked now to amend or modify that Plan

18   under Section 1127 of the Bankruptcy Code.  The order

19   confirming that Plan was vacated.  I don't believe I could

20   be asked to amend or modify that Plan in any event given the

21   divestiture doctrine as set forth in, for example, In re

22   Sabine Oil & Gas Corp. 548 B.R. 674, 679 (Bankr. S.D.N.Y.

23   2016), and In re Prudential Lines, Inc. 170 B.R. 222, 243

24   (S.D.N.Y. 1994), and the cases cited therein, since it would

25   clearly overlap such a motion with a pending appeal of the

Page 146

1    same Plan except for the amendment.

2            On the other hand, I'm being asked, instead, to

3    approve the settlement agreement, which in almost all

4    respects except those that I'll list, is conditioned or

5    contingent upon a ruling by the Second Circuit upholding

6    this Court's Confirmation Order and the underlying principle

7    that, under certain limited and constrained circumstances,

8    including as set forth in the Court's decision, the

9    Bankruptcy Court does have the power under the Bankruptcy

10   Code to impose under a plan a release of third-party claims.

11   It is also, since it contemplates, ultimately, modification

12   of the Plan in material ways, contingent and conditioned

13   upon such a motion for modification being granted in the

14   future.  The settlement motion before me, the term sheet

15   motion, doesn't seek that relief.  It seeks approval of the

16   term sheet, which is ultimately conditioned on obtaining

17   such relief.

18           What would become effective upon the Court's

19   approval of the motion is the following: the parties to the

20   agreement -- that is, the Sacklers and the nine states and

21   the District of Columbia -- would be bound by the terms of

22   the agreement and its conditions; the nine would withdraw

23   their appeals as set forth on the terms of the settlement

24   agreement and not file their briefs, which are due on

25   Friday; the Debtors and the parties to the agreement would

Page 147

1    be authorized to work on the documentation, including in

2    respect of the SOAF and other relatively modest amendments

3    to the Plan contemplated by the Agreement, again, subject to

4    the conditions that I've already set forth, but that work

5    could begin; and the Debtors would be authorized and

6    directed to pay the attorneys' fees, as I previously noted,

7    of the settling parties back in the fashion set forth in the

8    agreement.

9              The agreement also seeks entry of an order that

10   states, in addition to approving the agreement, subject to

11   its conditions and terms, that the settlement agreement does

12   not contravene any provision of the Bankruptcy Code and that

13   the actions taken by the members of the Sackler families and

14   the nine or the related parties in accordance with the term

15   sheet are taken in connection with the Chapter 11 cases for

16   purposes of Section 10.7 of the Plan, which is including the

17   third-party release provisions.  The Debtors also requested

18   that in addition to that provision, they would also state

19   that such Agreement does not contravene any prior order of

20   the Court in these cases.  Given that the Court has entered

21   a great number of orders on these cases, I was concerned by

22   that provision, but the Debtors have highlighted, and I

23   think this is something that I did consider, because I did

24   not want to be directing any, or approving any, immediate

25   relief that would not be conditioned upon the Second

Page 148

1    Circuit's ruling or Plan confirmation, that the agreement,

2    settlement agreement, that is, does not violate the

3    preliminary injunction that's in effect in this case, and I

4    believe as I stated during oral argument that given the

5    conditions of the settlement agreement and the nature of

6    that preliminary injunction and my prior ruling in respect

7    of the Sackler/DOJ settlement, that in fact the settlement

8    agreement does not contravene the preliminary injunction.

9            The focus, as I stated, has primarily been by the

10   objectors on the provision in the settlement term sheet for

11   the separate distribution of approximately $276 million of

12   the billion to billion and a half dollars to the SOAF or

13   Supplemental Opioid Abatement Fund.  It's understandable

14   that those objections would be raised given the clear record

15   in this case that all of the states and governmental

16   entities, non-federal governmental entities that had

17   previously agreed the allocation of the Sacklers settlement

18   money that would be going, generally, to their class, which

19   is class 4, with a three percent spillover from that class

20   to class 5, the Native-American Tribes Class, on an agreed

21   formula.  The SOAF provision of the settlement agreement

22   would vary that formula, and no-one likes prior agreements

23   being varied in that manner.  The question for me, however,

24   is, as a settlement in this context, which again is not a

25   context seeking modification of a Plan, but merely a

Page 149

1    settlement condition knowing the conditions I've outlined,

2    with the immediate effectiveness that I've also outlined,

3    invalidate or require me to deny the motion?

4              Those objecting on the basis of the SOAF have

5    raised a number of grounds, asserting that that result

6    should occur.  The first is a jurisdictional one, again

7    asserting the so-called divestiture doctrine under the

8    caselaw that I've cited.  However, the courts have

9    recognized a distinction in the divestment of jurisdiction

10   when the matter is on appeal and arguably is nevertheless

11   being requested to be heard by the lower court between acts

12   undertaken to enforce the judgment and acts which expand

13   upon or alter it or actions which are simply not before the

14   appellate court.  Especially in bankruptcy cases, that

15   distinction is important because there are various aspects

16   of bankruptcy cases that tangentially pertain to matters

17   that may be on appeal but that frankly are quite different

18   and/or may be conditioned on, as here, on the results of

19   such an appeal, as discussed by the Court in In re

20   Prudential Lines.

21              I conclude that this motion falls into that latter

22   category and not into the category of issues where the

23   divestiture doctrine would divest the Court of jurisdiction.

24   I will note further that Bankruptcy Rule 8008 gives the

25   Court three options where the divestiture doctrine would

Page 150

1    apply.  In Bankruptcy Rule 8008(a), the Court can (1) defer

2    its ruling until the appellate court rules, it can (2) deny

3    the ruling -- I'm sorry, deny the motion, including on

4    jurisdictional bases, or (3) the Court can state that the

5    Court could grant the motion if the Court where the appeal

6    is pending remanded for that purpose, or state that the

7    motion raises a substantial legal issue.  So, the

8    divestiture doctrine in an important respect really doesn't

9    wholly divest the Court of jurisdiction since the Court can

10   give an indicative ruling in any event.  But as I've noted,

11   I believe that the doctrine does not apply to this motion,

12   but, rather, to the parties' efforts to resolve these cases

13   promptly.  And understandably they want to resolve them

14   promptly given the desire of, I believe, every single party

15   in these cases to distribute funds promptly to individual

16   claimants and to abate the opioid crisis, including

17   providing support and services for survivors, victims and

18   their families.  And, again, providing for advanced

19   contingent planning, including with a materially enhanced

20   distribution, is not the same thing as this Court treading

21   on the toes of the appellate court by ruling on issues that

22   are before it.

23          I am not being asked here, in any way, to rule on

24   the merits of the third-party release issue which is before

25   the Third Circuit -- I'm sorry, before the Second Circuit,

Page 151

1    excuse me.  So, I conclude that the divestiture doctrine

2    does not apply.  I also conclude, and it's really a no-

3    brainer, that I have jurisdiction over this motion, which

4    would, if the conditions to it -- to the settlement

5    agreement -- are fulfilled, would enhance distributions to

6    creditors in these cases by between a little under $900

7    million and a little under a billion point 4 hundred million

8    dollars.  It's frankly laughable that anyone would suggest

9    that the Court doesn't have jurisdiction over something like

10   that where the parties to the agreement have asked for a

11   ruling which seeks authority for them to do the immediate

12   things that the agreement provides for and locks them into

13   the -- locks them in, but not the estate generally, into the

14   other aspects of the agreement in the event the conditions

15   to those performance obligations occur.

16          This is clearly also not a request for an advisory

17   opinion, given that I'm being asked to approve an agreement

18   that has consequences now as I've already set forth.  The

19   settling states and the District of Columbia would withdraw

20   their appeals and not file their appellate briefs, the Court

21   would authorize the Debtors to pay their reasonable

22   attorneys' fees and authorize the Debtors to work on the

23   definitive documentation for the somewhat revised Plan,

24   which would require the occurrence of, going forward, legal

25   expenses, obviously, to be ready in case the conditions to

1    the major parts of the agreement are actually fulfilled.  In

2    that sense, this motion is little different than a motion to

3    approve a plan support agreement, which the courts in this

4    district and elsewhere routinely approve if they represent a

5    reasonable settlement and use of the debtor's funds and/or

6    are appropriately conditioned, as this one is, on, in the

7    case of plan support agreements, confirmation of a plan and

8    approval of a disclosure statement and voting, and in terms

9    of this agreement action by the Second Circuit on the appeal

10   and a motion to modify the Plan to be consistent with the

11   settlement agreement.

12           I would not approve a settlement agreement or a

13   plan modification agreement if it contemplated a condition

14   that I believed simply was contrary to applicable law.  I do

15   not believe, however, that such a problem exists here that

16   would defeat this motion.

17           It is argued that the settlement agreement would

18   violate section 1127 of the Bankruptcy Code, which

19   incorporates or requires compliance with, among other

20   sections of the Code, section 1123 of the Bankruptcy Code,

21   when one seeks to modify a plan.  Section 1123(a)(4) states,

22   "Notwithstanding any otherwise applicable non-bankruptcy

23   law, a plan shall provide the same treatment for each claim

24   or interest of a particular class unless the holder of a

25   particular claim or interest agrees to a less favorable

Page 153

1    treatment of such particular claim or interest."

2          The objectors primarily rest their objections on

3    the contention that this provision would necessarily be

4    violated as a consequence of what is ultimately contemplated

5    by the motion before me in the settlement term sheet,

6    although they understand, and I made it clear to them, that

7    I am not specifically determining that issue in the context

8    of a motion to modify the plan under section 1127 of the

9    Bankruptcy Code.

10         I've considered that argument carefully, and I

11   separated it from the different argument, which is, I

12   believe, ultimately not a legal argument but an argument

13   that is more applicable outside of this bankruptcy case, as

14   well as one that reflects a change in approach by the nine

15   states and District of Columbia from what they had

16   previously adopted in the case as far as allocations of

17   distributions to the nonfederal government entities classes.

18         First, section 1123(a)(4) does not apply except in

19   the context of a motion for modification of a plan.  It

20   doesn't apply to a motion to approve a settlement agreement

21   like this.  Nevertheless, as I've said, and will say now

22   more colloquially, if I believe that the settlement

23   agreement was leading to a plan that couldn't be confirmed

24   or was a pig in a poke, I would not approve the agreement.

25   It's also the case that while Section 1123(a)(4) by its

Page 154

1   terms doesn't apply to settlements, the equality of

2   distribution policy of the Bankruptcy Code is a strong one,

3   just as is the absolute priority policy of the Bankruptcy

4   Code, and, therefore, in approving the settlement, I believe

5   a court should consider whether the settlement does real

6   injury to that policy.  See Energy Future Holdings Corp. v.

7   Delaware Trust Company, 648 Fed. Appx. 277, 283 (3d Circuit

8   May 4, 2016), cert. denied, 137 S. Ct. 447 (2006), and by

9   analogy, In re Iridium Operating Company, which dealt with

10  the role of the absolute priority rule in considering a

11  settlement. 478 F.3d 452, 466 (2d Cir. 2007).

12            First, and most importantly, however, the

13  provision itself contemplates that the same treatment

14  requirement can be modified on consent, i.e., it says

15  "unless the holder of a particular claim or interest agrees

16  to a list favorable treatment of such particular claim or

17  interest."  It's hard to imagine, although possible, but not

18  by any means a certainty, that the objectors would

19  ultimately turn down the prompt confirmation of a plan that

20  would add an additional roughly 900 million to $1.4 billion

21  of value to be distributed pro rata to their class and would

22  instead take the plan that they had previously agreed to,

23  which would provide for that much less distribution pro rata

24  to their class.  But in any event, that is an issue for

25  another day and this motion does not contravene the Code in

Page 155

1    leaving it for another day.

2           In addition to that, the case law construing

3    section 1123(a)(4) has made an important distinction most of

4    the time between payments that are made from the estate or

5    by the estate of property of the estate as defined in

6    section 101 of the Bankruptcy Code and, on the other hand,

7    property that is paid unequally to certain members of the

8    class not from property of the estate but rather by third

9    parties.  See, for example In re ICL Holding Company Inc.,

10   802 F.3d 547, 555-56 (3d Cir. 2015) and In re Source

11   Enterprises Inc., 392 B.R. 541 (S.D.N.Y. 2008), the

12   discussion there beginning at page 556 and going through 557

13   by District Judge Stein.

14          Two cases I think highlight this distinction,

15   first Czyzewski v. Jevic Holding Corp., 137 S. Ct. 973

16   (2006), where clearly Justice Breyer's opinion refers to the

17   distribution of estate assets and the court not being

18   permitted to vary as part of the settlement, in that case a

19   settlement as part of a dismissal-of-the-case order that

20   would vary the absolute priority rule.  A similar result and

21   a similar distinction between estate property and non-estate

22   property can be found in In re DBSD North America Inc., 634

23   F.3d. 78, 98 (2d Cir. 2011).

24          Courts that have more closely looked at the

25   1123(a)(4) issue in a plan context have also reached this

Page 156

1    result, most recently in In re Mallinckrodt, PLC, 2022

2    Bankr. LEXIS 273, at pages 26 through 30 (Bankr. D. Del.

3    February 3, 2022), where it noted that the settlement money

4    that was being paid to those settling within the class was

5    being paid by third parties, insurers of the third parties,

6    rather, and therefore, would not implicate the 1123(a)(4)

7    provision.

8            Courts have noted some uncertainty in the case law

9    as to that meaning of 1123(a)(4).  The plain terms are,

10   again, that a plan must provide the same treatment for each

11   claim or interest of a particular class, again with the

12   proviso that the claimant can vary that requirement.  But as

13   discussed by Judge Scheindlin in ACC Bondholders Group v.

14   Adelphia Communications Corp. (In re Adelphia Communications

15   Corp.), 361 B.R. 337 (S.D.N.Y. 2007), there is at least a

16   question, at least there was then in the District Court's

17   mind in 2007 when considering whether it should enter an

18   order staying the effective date of the plan in Adelphia

19   pending appeal, as to whether that provision applies to the

20   treatment of claims as the plain language states or of

21   claimants which, if it were "claimants" would include not

22   only money received by the estate but on account of non-

23   estate money as well.  Again, that second interpretation is

24   contrary to the plain terms of the statute, which refers to

25   a class of claims or interests.

Page 157

```
 1              I guess a couple of other remarks are worth

 2    making.  The courts have long recognized that 1123(a)(4) is

 3    not violated if someone is getting different treatment not

 4    on account of its claim but for some other distinct purpose,

 5    such as, in In re Peabody Energy Company, agreeing to

 6    subscribe to a rights offering. 923 F.3d, 918, 925 (8th Cir.

 7    2019).  Finally, courts have also long recognized that if

 8    some parties take a settlement and others don't, but they

 9    each have the opportunity to do so, those that take the

10    settlement or those that don't are not getting disparate

11    treatment in violation of section 1123(a)(4).  That

12    includes, for example as set forth in the Energy Future

13    case, a settlement from the debtor's estate.  Here, the

14    settlement would be from -- the Debtors have argued and I

15    think pretty convincingly, although the issue is not

16    definitively before me -- that the settlement is coming from

17    non-estate funds for a non-estate claim, i.e. the claim that

18    is the subject of the appeal before the Second Circuit which

19    would be withdrawn upon my approval of this motion, namely

20    that the Court does not have the power to force a third-

21    party release on appellants -- I'm sorry, the appellees,

22    excuse me.  However, now they are agreeing to accept this

23    payment in addition to directing the remaining amounts or

24    agreeing that the remaining amounts would go into the estate

25    as set forth in the settlement term sheet.
```

Page 158

1          I think it could well be argued that all of those

2    who supported the Plan, starting with the Debtors in respect

3    to their own estate claims and those who did not object to

4    the Plan, did not appeal the plan, and/or support the plan

5    had previously settled their third-party claims under the

6    Plan.  They had the opportunity not to do so, to take the

7    risk that the settling parties took that they would get

8    nothing by defeating the Plan.  They decided not to take

9    that risk, which clearly the vast majority of parties in

10   interest agreed was too great a risk; but it is hard for me

11   to see that they should be able to complain now under the

12   foregoing case law that those who did take that risk and are

13   not reducing the recovery from the estate to anyone -- in

14   fact are agreeing that well over 70 percent of the added

15   recoveries would go to the estate -- should be denied under

16   1123(a)(4) the additional percentage they would be getting

17   under the SOAF.

18          So, for those reasons I do not believe that the

19   settlement agreement and the relief sought in this motion

20   contravene the Bankruptcy Code.

21          I also believe that the settlement agreement is

22   not a sub rosa plan, that is, a plan -- that is, an

23   agreement that dictates by its terms the terms of a plan

24   without following the requirements of plan confirmation.  By

25   its terms, except for the limited performance obligations

Page 159

1    that I've already outlined, the plan -- the settlement

2    agreement is, in fact, or does, in fact, require

3    modification of the plan in compliance with 1129 -- I'm

4    sorry, section 1127 for a modification as well as, of

5    course, a favorable ruling by the Second Circuit.  It

6    therefore complies as a building block for a plan like an

7    acceptable plan support agreement rather than being a

8    disguised or a sub rosa plan.  It is in fact the contingency

9    to the agreement that actually keeps it from being a sub

10   rosa plan and instead being simply an important, in fact

11   remarkable, building block for a plan.  See In re Tower Auto

12   Inc., 342 B.R. 158, 163 (Bankr. S.D.N.Y. 2006).

13          Certain objectors have objected to the payment of

14   professional fees, which is one of the immediate effects of

15   my granting the motion, along the lines that I've already

16   described.  I note, as have the objectors, that the motion

17   does not seek approval of the payment under section

18   503(b)(3) or (b)(4) of the Bankruptcy Code, by the so-called

19   substantial contribution provision of the Code, and have

20   contended that's the only provision under which these fees

21   can be paid.  I have already ruled on this issue not only in

22   the confirmation opinion but also earlier in the case in

23   authorizing the fees for key ad hoc committees.

24          I do not believe the Code section itself limits

25   the power under section 363(b) to seek payment of such fees

Page 160

1    under appropriate circumstances.  The case cited for that

2    proposition is a much more narrow holding, I believe, the

3    Lehman Brothers case, which dealt with payment of committee

4    expenses which were specifically dealt with as not being

5    authorized by the statutory provision.

6         It seems to me that there is important work to be

7    done on the documentation of the SOAF, as discussed on the

8    record and more flesh to be put on the bones of the

9    commitment, which is a critical one, by the settling states

10   and the District of Columbia that the funds for the SOAF

11   will be used for opioid abatement and victim purposes.  And

12   that is the type of work that the courts have recognized is

13   warranted for payment under section 363(b), including in the

14   Bethlehem Steel case that both sides discussed.

15        Moreover, given the extraordinary result obtained

16   here in light of the leverage obtained by the nine then

17   appellants, now appellees, in respect of the Plan,  it's

18   almost impossible for me to conceive that they would not be

19   entitled to a substantial contribution award for those

20   services, which would obviously precede the services that

21   I've just described for the documentation and the like.  The

22   enhancement of the estate by somewhere between roughly $900

23   million and $1.4 billion is an extraordinary enhancement of

24   value for all stakeholders and clearly fits within the case

25   law that would award a substantial contribution award for

Page 161

1   that. See In re McLean Industries, Inc., 88 B.R. 36, 38-39

2   (Bankr. S.D.N.Y. 1988).

3            I would also note that the amounts that we are

4   talking about here are minuscule in relation to the benefit

5   to the estate resulting from the funds that are coming into

6   the estate or would come into the estate if the conditions

7   to the settlement agreement were fulfilled, namely somewhere

8   between roughly 2-1/2 million incurred and the estimated

9   additional 2 to 2-1/2 million that may be incurred going

10  forward.

11           I believe that those objections that dealt with or

12  sought clarification of the term sheet, particularly the one

13  by the Canadian municipalities and First Nations, have been

14  appropriately dealt with.

15           I will turn then to the objections by others,

16  either pro se individuals or in two cases, people who were

17  represented by counsel.  To the extent that those objections

18  raised the 1123(a)(4) issue, those objections to the extent

19  that those objectors were not in Classes 4 or 5, would not

20  have standing to make such an objection because they would

21  not be affected in the class to which the 1123(a)(4) issue

22  would apply.  See 1199 SEIU National Benefit Fund v. Akorn

23  Inc. (In re Akorn, Inc.), 2021 U.S. Dist. LEXIS 180788, at

24  page 33 (D. Del. September 22, 2021).  See generally Kane v.

25  Johns-Manville Corp., 843 F.2d 636, 643 (2d Cir. 1988).  See

Page 162

1    also 7 Collier on Bankruptcy, Paragraph 1123.01[4][b].

2            Certain of objectors also contend that this extra

3    money negotiated by the states and the District of Columbia

4    should not be going to Class 4 and 5 through the NOAT or to

5    the nine states and the District of Columbia through the

6    SOAF, but, rather, at least some portion or all of it,

7    depending on the objection, should go to individuals who

8    have personal injury claims, under the Plan.  The case law

9    is quite clear that if and when one gets to a hearing on a

10   modification of the Plan under section 1127 of the

11   Bankruptcy Code, those who are not materially and adversely

12   affected by a plan modification did not have the right to

13   vote on that modification or object to it because their

14   treatment is not changed for the worse.

15           It was quite important to me from the start of the

16   mediation that the nine, so-called, would not take value

17   from the estate that had been allocated to other parties

18   including, specifically, personal injury claimants.  The

19   record is clear from today that they are not taking value

20   for personal injury claimants and that the personal injury

21   claimants' distributions under the Plan that had been

22   confirmed would not change as a result of this settlement if

23   the conditions to the effectiveness of the settlement,

24   namely affirmance by the Second Circuit and confirmation of

25   a modified Plan, would occur.  Therefore, I believe that the

1    settlement does not contravene any rights that those parties

2    would have to the distributions they would be getting under

3    the Plan, that the Second Circuit would uphold as a

4    condition, of course, to this settlement, and are no worse

5    off.

6         Indeed, given the use of the funds for abatement,

7    including for victims and their families, and the multiplier

8    effect that I previously found of the use of such funds, one

9    would argue that although the funds would not be distributed

10   necessarily directly to victims as part of a claim process,

11   there would be an enhanced benefit to the victims from such

12   additional monies being dedicated to services.

13        And again, an important agreement by the settling

14   states and the District of Columbia, which they did not have

15   to agree to and is not any requirement of the Bankruptcy

16   Code, is that they would use the money, the SOAF money for

17   abatement and treatment purposes as I previously quoted,

18   which is an extremely important and I think original

19   commitment in these cases starting with the very beginning

20   of these cases and already embodied in the NOAT and the

21   principles of the plan.

22        So, I conclude that as a settlement the settlement

23   satisfies the factors laid out by the Second Circuit in In

24   re Iridium Operating, LLC, 478 F.3d. at page 465, and, in

25   fact, those factors have really not been challenged, i.e.

1    the assessment of the merits, and that's I think explicable.

2    The Debtor is not giving up anything more as a result of the

3    settlement.  It is getting, instead, substantial monetary

4    value and nonmonetary value in agreements from the Sacklers.

5    And this settlement is in compliance with applicable law

6    which is the one Iridium factor that has been focused on as

7    opposed to the others dealing with the balance of the

8    litigation's possibility of success, future benefits of the

9    settlement, the likelihood of protracted litigation, expense

10   and inconvenience of delay, the paramount interest of

11   creditors, whether other parties in interest support the

12   settlement, the competence and experience of counsel

13   supporting the settlement, etc., and whether the settlement

14   is the product of arms-length bargaining, are all satisfied

15   here.

16          And I will reiterate that it is clear to me from

17   reading every Mediator's Report on this mediation, as well

18   as the reports on the prior mediation that she conducted,

19   these were some of the most difficult arms-length

20   negotiations any mediator has ever conducted.  So, those

21   factors are all satisfied.

22          The settlement's compliance with either the Code

23   itself or underlying principles of the Bankruptcy Code,

24   namely the principle of equality of distribution I have

25   already addressed.  So, it appears to me that under the

Page 165

1    Second Circuit law as enunciated by the court in Iridium,

2    the settlement should be approved.

3           There is certainly a proper business justification

4    for locking in these parties, including the Sacklers, to the

5    terms of the settlement subject to its conditions and for

6    the Debtor to take the relatively modest steps for which

7    they are seeking authorization now to enable the next step

8    if the Second Circuit fulfills the condition of this

9    settlement and proposes and seeks approval of the

10   modification of the plan consistent with the settlement.

11          So Mr. Huebner, you can submit the order.  I think

12   the one change would be the reference to "consistent with

13   all the orders I have entered in the case."  You can change

14   that to the plan -- "the preliminary injunction order."

15          MR. HUEBNER:  Your Honor, thank you very much.

16   Two very small things from this end.  One, only because I

17   think the transcript is going to constitute the Court's

18   ruling, with huge apologies, I believe the Court made

19   multiple references to 1123(a)(4) when you meant 1123(a)(4).

20          THE COURT:  Yes, yes.

21          MR. HUEBNER:  And just so that the record is

22   clear, I assume that is what the Court intended?

23          THE COURT:  Of course, you're right.  Thank you

24   for catching that.  I will read the transcript.  I will

25   correct typos or sics and things like that in it, but you

1      are absolutely right.  Those references were to 1123(a)(4),

2      as incorporated by 1127.

3                   MR. HUEBNER:  The second thing, Your Honor, there

4      actually is a mistake in the order that I want to call to

5      the Court's attention and ask for permission to change which

6      is the term sheet with respect to the payment of the fees,

7      the term sheet requires, in the section called "Additional

8      Terms," that we move promptly to get the payments of the

9      legal fees authorized subject to the procedures.  Paragraph

10     4 of the order contains an additional clause that says "upon

11     consummation of the plan as enhanced by the term sheet,"

12     that's actually not the business deal.

13                   THE COURT:  Right.

14                   MR. HUEBNER:  That's just a mistake in the order.

15                   THE COURT:  You're right.  And I didn't, I assumed

16     that the business deal, as I stated during my ruling, was

17     that aspect of the term sheet would become operative.

18                   MR. HUEBNER:  Correct.  So we'll delete.  It goes

19     without saying we have been working very, very quickly here

20     on many fronts.  We would like to thank, obviously, the

21     Court, the mediator and frankly all the objectors.  I will

22     say it one last time, we much more than understand where

23     many people are coming from and this is hard, but it is in

24     the estate's best interest.

25                   We are back on tomorrow morning at 10 a.m. for an

Page 167

1   equally, and maybe even more important, time before Your

2   Honor when the victims will have their opportunity, as

3   shepherded by the UCC, to have their voices heard.

4           THE COURT:  Right.  And I would say as far as

5   tomorrow is concerned that I gladly took up Judge Chapman's

6   recommendation in her last Mediation Report to hear victims

7   with Sackler family members present.  I also agreed with her

8   that those should be the victims' statements.  No one should

9   be commenting on them.  Therefore, the people who are harmed

10  by OxyContin are to speak and I don't expect comments from

11  anyone.

12          I also want to reiterate that these are statements

13  in federal court, and because of health concerns, we're

14  doing it remotely.  I wish we could do it in person but I

15  have a small courtroom and it just wouldn't work, but we

16  will be on Zoom.  But, we will still be in a federal court,

17  and I expect people -- and I don't doubt that this will be

18  the case -- to act as one would act in a federal court.

19  Obviously these are very serious statements, and I wouldn't

20  expect anything less than that in light of that and the

21  courage with which people are speaking.

22          It goes without saying, and yet I will say it

23  because it's important, that people are not allowed to

24  photograph what goes on in federal court.  You are not

25  allowed to tape what's going on in federal court or live

1    stream what's going on in federal court.  There are

2    important security reasons for that, including cybersecurity

3    reasons.  It is something that would subject anyone who

4    would do those sorts of things to serious liability.

5            So this is, I hope you'll understand this, one-on-

6    one communication and it's important one-on-one

7    communication.  So I look forward to it tomorrow.

8            (Whereupon these proceedings were concluded at

9    5:25 P.M.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 169

I N D E X

RULINGS

|                             | Page | Line |
|-----------------------------|------|------|
| Motion to Shorten Granted   | 25   | 3    |

Page 170

1                C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  March 18, 2022

[& - 276]                                                                                      Page 1

| **&** |
| --- |
| **&**   8:2 15:10,20 16:1,15 23:21 82:18 111:2 145:22 |

| **0** |
| --- |
| **01**   17:5 |
| **07102**   15:14 |

| **1** |
| --- |
| **1**   14:14 16:17 49:25 73:7 93:25 103:8 104:17 117:11 132:1,15 150:1 |
| **1,000**   25:10 26:4 26:14 |
| **1.175**   41:12 46:17 |
| **1.3**   128:21 |
| **1.39**   38:25 |
| **1.398**   30:2 41:13 42:5 74:21 77:13 78:22 125:11 |
| **1.4**   80:25 121:22 125:19 154:20 160:23 |
| **1.675**   41:12 46:17 |
| **10**   2:1 73:8 166:25 |
| **10.7**   35:12 107:17 147:16 |
| **10.7.**   41:17 |
| **100**   37:11 81:15 114:18 |
| **100,000**   114:11 |
| **10001**   16:4 |
| **10005**   17:13 |
| **10014**   14:22 |
| **10017**   14:6 |
| **10036**   14:15 |
| **1006**   14:21 |
| **101**   155:6 |
| **105**   3:4,10,16,19 4:1,4,21 5:8,11,18 |

5:21 6:3,10,13,21
7:2,5,12,15 8:6,9
8:16,19 9:2,5,12
9:15,22,25 10:7
10:10,17,22,25
11:7,10,17,20
12:2,5 23:12
141:3,23
**10601**   1:14
**108**   117:9
**11**   1:5 3:4,10,15
3:19,25 4:4,21 5:7
5:11,17,21 6:3,9
6:13,21 7:1,5,11
7:15 8:5,9,15,19
9:1,5,11,15,21,25
10:6,10,17,21,25
11:6,10,16,20
12:1,5 23:12
31:21 65:21
100:16,23 131:8
131:17 132:7,9
141:17 142:3
147:15
**1100**   16:17
**1123**   40:5,9 41:4
41:14 42:12,18
43:4 64:21 65:4
68:7,10 69:15
71:24 72:14,16
77:1 96:15,20
152:20,21 153:18
153:25 155:3,25
156:6,9 157:2,11
158:16 161:18,21
165:19,19 166:1
**1123.01**   117:11
162:1
**1127**   80:11,19
81:9,18 96:15
104:25 118:6
119:5 124:14,17
124:25 125:7

145:18 152:18
153:8 159:4
162:10 166:2
**1129**   159:3
**11501**   170:23
**1199**   117:6 161:22
**11:00**   102:12
**12**   100:23 122:1
**12.6**   76:12
**1201**   15:13
**12151**   170:7
**12th**   38:21 50:10
**13.4**   133:24
**13.4.**   134:12
**1300**   16:10
**137**   154:8 155:15
**14**   135:18 144:20
**147**   1:13
**15**   30:20 77:21
84:4 103:3
**158**   159:12
**163**   159:12
**17**   100:23
**170**   145:23
**175**   30:21 50:3
142:19,22 145:3
**18**   36:22 73:8
100:16,23 129:20
170:25
**180788**   117:9
161:23
**19-23649**   1:6
**1901**   15:5
**1988**   78:4 117:5
161:2,25
**1994**   145:24
**1:00**   27:21
**1:05**   1:17
**1pm**   2:2

| **2** |
| --- |
| **2**   16:10 17:12 83:23 84:1 132:5 132:14 136:18 |

**150**:2 161:9
**2-1/2**   161:8,9
**2.5**   36:5 46:11
143:10,12
**20**   52:24 54:2,2,3
74:13 84:4 90:7
119:12 134:8
**20005**   16:18
**2006**   154:8 155:16
159:12
**2007**   154:11
156:15,17
**2008**   42:13 155:11
**201**   14:21
**2011**   155:23
**2015**   42:12 155:10
**2016**   145:23 154:8
**2019**   157:7
**2020**   129:21
**2021**   117:8,10
161:23,24
**2022**   1:16 2:1
71:15 156:1,3
170:25
**22**   117:9 131:12
161:24
**220**   51:16
**222**   145:23
**225**   129:19 134:11
**225.3**   134:5
**2400**   15:4
**243**   145:23
**25**   15:21 90:7
96:21 119:12
134:8 169:6
**25-30**   134:1
**26**   156:2
**27**   73:6 144:20
**27.7**   134:1
**27.7.**   134:15
**273**   156:2
**276**   148:11

**276,888,000.87**
143:23
**277**   36:21 38:12
38:23 39:1 48:24
69:2 77:15 87:16
87:20 93:6,19
103:14,15 104:3
112:21 116:3
122:18,20 123:4
126:4 129:1
131:13,16,22
132:20 133:20
134:3,5,13 144:6
154:7
**283**   154:7
**29**   28:23
**2:00**   27:20
**2d**   117:5 154:11
155:23 161:25

**3**

**3**   35:16 40:5,9
76:9 114:13 122:6
129:2 150:4 156:3
159:18 169:6
**3/4/2022**   13:3
**30**   62:7,13 134:2
156:2
**300**   1:12 83:18
170:22
**31401**   15:22
**32**   65:23
**32399**   17:6
**33**   117:9 161:24
**330**   170:21
**337**   156:15
**342**   159:12
**35**   24:3,18 28:4
33:21 40:6 114:11
**35203**   15:6
**36**   78:4 161:1
**361**   156:15
**363**   3:4,10,16,19
4:1,4,21 5:8,11,18

**5:21** 6:3,10,13,21
7:2,5,12,15 8:6,9
8:16,19 9:2,5,12
9:15,22,25 10:7
10:10,17,22,25
11:7,10,17,20
12:2,5 23:12 46:3
77:7,11 78:1
110:13 141:2,23
159:25 160:13
**38**   65:23
**38-39**   78:4 161:1
**39**   43:20
**392**   155:11
**3:00**   27:20
**3d**   154:7 155:10

**4**

**4**   39:12 41:4,7,14
41:14,25 42:3,12
42:18 43:4 63:20
64:21 65:4 68:7
68:10 69:3,15
71:24 72:14,16
77:1 96:15,20
116:3 117:11
119:2 122:8 129:2
148:19 151:7
152:21 153:18,25
154:8 155:3,25
156:6,9 157:2,11
158:16 159:18
161:18,19,21
162:1,4 165:19,19
166:1,10
**4.3**   112:5
**4.325**   32:5 122:11
122:24
**4.325.**   123:3
**4.5**   71:20 74:20
87:23 88:2,3,18
109:5 145:5
**40**   126:4,5

**41**   74:11
**4410**   2:4,10,15,21
2:25 3:6,12,17,21
4:2,6,12,16,23 5:3
5:9,13,19,23 6:5
6:11,15 7:3,7,13
7:17,23 8:1,7,11
8:17,21 9:3,7,13
9:17,23 10:2,8,12
10:19,23 11:2,8
11:12,18,22 12:3
12:7,20 13:1
**4410,4413**   12:15
**4411**   2:5 3:13
**4413**   3:21 4:6,23
5:13,23 6:15,23
7:7,17 8:11,21 9:7
9:17 10:2,12 11:2
11:12,22 12:7,20
13:4
**4417**   12:22
**4418**   12:15
**4433**   12:9
**4435**   11:24
**4437**   11:14
**4440**   11:4
**4441**   10:19
**4443**   10:14
**4445**   10:4
**4447**   9:19
**4449**   9:9
**4451**   8:23
**4453**   8:13
**4455**   8:3
**4456**   7:23
**4458**   7:19
**4461**   7:9
**4462**   6:24
**4464**   6:17
**4465**   6:7
**4466**   2:2
**4468**   5:25

**447**   154:8
**4470**   5:15
**4471**   5:5
**4472**   4:24
**4473**   4:17
**4474**   4:13
**4478**   4:8
**4480**   3:23
**4483**   3:1
**4484**   2:22
**4485**   2:16
**4486**   2:12
**4487**   2:7
**450**   14:5
**452**   154:11
**465**   163:24
**466**   154:11
**478**   154:11 163:24

**5**

**5**   39:24 41:7 42:4
148:20 161:19
162:4
**5,000**   34:15
**5.5**   132:22
**50**   83:23 144:22
**500**   112:2
**503**   78:2,24 79:3,6
159:18
**52**   134:3
**541**   122:6,8 129:2
155:11
**547**   155:10
**548**   145:22
**55**   16:3
**555-56**   155:10
**556**   155:12
**557**   155:12
**570**   15:13
**5:25**   168:9

**6**

**6**   88:19 132:22
**6.5**   109:7

[60 - addressing]

**60** 8:2 15:20
**60602** 16:11
**618,000** 29:4
83:25
**633** 71:15
**634** 155:22
**636** 117:4 161:25
**643** 161:25
**648** 154:7
**654** 117:5
**674** 145:22
**679** 145:22
**69** 114:12

**7**

**7** 117:10 162:1
**70** 90:8 158:14
**700** 56:21
**723** 112:1
**75** 77:17 90:8
**78** 155:23

**8**

**80** 68:25 93:16
**800** 49:19
**8008** 149:24 150:1
**802** 155:10
**83** 80:17
**843** 117:4 161:25
**85** 93:16
**88** 161:1
**888** 78:4
**898** 30:2 38:25
41:12 42:5 74:21
77:13 78:22
125:11
**8th** 157:6

**9**

**9** 1:16 2:1
**90** 93:16 112:3
**900** 80:25 125:19
128:20 151:6
154:20 160:22

**918** 157:6
**923** 157:6
**925** 157:6
**973** 155:15
**98** 155:23

**a**

**a.m.** 102:12
166:25
**aac** 77:6
**aaron** 12:20 17:15
82:11,17
**abate** 109:15
150:16
**abatement** 30:4
36:22,24 37:2
38:24 46:18 50:1
50:6 51:18 52:16
53:22 59:17 60:3
60:8,14,25 61:10
63:21 85:16,20
87:16 92:8 98:2,5
102:5 119:14,17
126:14 142:22
144:2,5,8 148:13
160:11 163:6,17
**abide** 109:20
**ability** 24:2 49:8
50:12 73:9 84:8
86:12 124:7
142:16,18
**able** 38:16 67:14
67:24 92:23
158:11
**abrams** 17:18
**absence** 81:18
**absolute** 154:3,10
155:20
**absolutely** 44:17
166:1
**abuse** 69:10
**acc** 156:13
**accelerate** 31:22

**accelerating**
101:7
**acceleration**
55:22 100:22,25
**accept** 122:24,24
157:22
**acceptable** 159:7
**access** 23:5
**accommodations**
59:15,16
**accomplish** 59:9
**accomplished**
49:20 84:1 94:13
**accomplishment**
49:18
**accorded** 120:17
**account** 39:19
84:22 85:24
118:17 134:8
144:21 156:22
157:4
**accurate** 136:10
170:4
**accusation** 40:25
**achieve** 37:7
118:3
**achievement**
92:15
**acknowledge**
90:18 118:1
**acknowledged**
86:2
**act** 79:15 167:18
167:18
**acting** 6:6 109:12
**action** 45:6 96:5,7
105:11 112:9
152:9
**actions** 73:6
147:13 149:13
**active** 83:7 118:24
126:23

**actively** 91:7
**actors** 59:5
**acts** 149:11,12
**actual** 29:17
39:14 42:7,16,17
50:4 52:6 63:12
64:15 107:3 110:4
**ad** 5:1,4 16:9 47:4
47:5 58:9 89:21
90:18 91:2,6,11
94:2,7,14,18
159:23
**add** 89:18 118:7
125:10 139:9
142:11 154:20
**added** 119:9
158:14
**adding** 80:25
**addition** 38:22
98:1 105:6,15
117:22 141:18
142:4 147:10,18
155:2 157:23
**additional** 39:24
40:16 50:17 54:23
59:2 76:5 86:23
102:15 109:15
112:1,2 118:16
143:21 144:24
154:20 158:16
161:9 163:12
166:7,10
**address** 23:13
46:22 50:21 83:1
97:8 125:12
135:12,14
**addressed** 44:2
96:16,17 113:12
113:12 129:17
164:25
**addressing**
114:22 120:2
125:23

adds 74:21
adelphia 156:14
  156:14,18
adequate 118:14
adjudicate 105:11
  105:12
adjudicated 118:5
adjudication
  45:16
administered 1:7
  36:23
administrative
  139:21,24
adopt 62:16
adopted 62:19,24
  63:5 153:16
advance 24:1 75:9
  94:11
advanced 150:18
adverse 119:10
adversely 86:14
  162:11
advisory 45:1,5
  151:16
advocating 74:15
afanador 15:10
  111:2
affect 143:17
affiliates 69:10
affirmance
  162:24
affirmed 63:17
  87:22
affirms 88:15
  125:5
afternoon 23:2
  47:17 48:6 58:8
  89:11 102:11
  111:1
ag 53:25
agenda 2:1 28:4
  29:11

ago 38:10 40:11
  43:20 49:23 68:21
  68:22 108:7
  123:14
agree 26:24 27:24
  50:16,19 53:6
  55:5 58:25 67:6
  77:17 96:14,15
  97:7 101:12
  103:12 104:4
  122:22 123:11
  127:1,7 129:10
  137:20 163:15
agreed 48:24
  54:10,18 55:7
  57:21 60:15 61:4
  93:6 126:11 127:8
  127:10 130:16
  135:24 136:21,24
  137:22 138:18,20
  142:19 148:17,20
  154:22 158:10
  167:7
agreeing 41:23
  51:4 98:2 127:12
  157:5,22,24
  158:14
agreement 24:25
  32:6 35:5 36:19
  39:22 44:9 49:13
  50:3,11 56:4,17
  61:21 65:19 71:23
  76:10 79:9 80:23
  88:11 93:12 99:18
  100:10 101:10,11
  106:12 123:8
  130:22,23 132:8
  135:5,8,17 136:22
  138:25 139:3
  142:14 143:2,3,7
  143:13,20 144:4
  144:12,17,19
  145:4 146:3,20,22

146:24,25 147:3,8
  147:9,10,11,19
  148:1,2,5,8,21
  151:5,10,12,14,17
  152:1,3,9,11,12
  152:13,17 153:20
  153:23,24 158:19
  158:21,23 159:2,7
  159:9 161:7
  163:13
agreements 29:25
  30:19 33:11 34:19
  45:14 74:7 104:9
  124:1 142:25
  148:22 152:7
  164:4
agrees 64:24
  152:25 154:15
ags 48:10,18
ahc 51:9 54:8 55:1
  55:2,13 89:9
ahc's 49:11 143:8
ahead 58:7,16
  62:24 97:2 98:21
  110:24
ahg 77:20 79:7
  82:6
aisling 20:19
akin 14:11 48:7
akorn 117:7,8
  161:22,23
al 1:6 8:3 15:6,19
  15:20 23:3
alabama 4:24
alabama's 4:19
alan 19:2
alaska 11:3
aleali 18:13
alexander 20:7
alice 22:2
aligned 122:1
alleged 33:21

alleges 40:7
allen 2:5 15:16
  111:1
alleviate 37:2
alleviated 76:22
allocated 66:2
  144:22 162:17
allocation 40:17
  41:6,25 43:9,14
  48:24 55:24 57:21
  61:13 70:18,25
  72:4 86:6,8 90:13
  91:17 99:2 123:1
  128:22 144:10
  148:17
allocations 39:11
  153:16
allow 25:11 26:5
  33:20 50:20 80:24
  97:16,18,19
  124:19 125:16
allowed 49:1
  123:6 131:16
  167:23,25
allowing 115:21
alter 39:11 149:13
alternative 66:8
alternatively
  76:24
amend 39:11
  80:13,23,23
  145:17,20
amended 38:21
  44:17 50:10 96:14
  96:16 97:21 103:9
  104:14
amending 71:23
amendment 38:18
  73:25 76:6 91:25
  97:6 124:22 146:1
amendments
  80:21 124:19
  147:2

[america - approximately]                                              Page 5

america  64:3
  155:22
american  3:22
  51:22 53:9 57:23
  107:4 109:6,8
  125:21 128:18,21
  148:20
americans  63:21
amicus  74:15
amityville  15:19
amount  26:13
  42:4 90:20 92:9
  100:8 104:5 112:3
  115:8 140:10
  142:17 144:4
amounts  66:2
  100:5 144:11
  157:23,24 161:3
ample  99:9
analogous  44:6
analogy  154:9
anchor  117:2
andrew  18:18
  22:3
angry  70:18 84:24
annual  100:6
answer  44:22
  49:17 52:14 94:5
  112:19 113:14
  136:15 141:8
anti  129:19
anybody  85:17
  122:17
anybody's  85:2
  126:7
anymore  130:12
anyway  51:18
  88:25
apologies  165:18
apologize  26:4
  31:1 64:9 86:25
apparently
  107:20

appeal  31:12
  32:16,17 34:21,25
  35:5,13 36:14
  38:21 44:16 45:10
  51:4 61:18 63:14
  64:11 65:8 74:24
  75:16,18 76:4
  77:24 80:12 90:4
  92:20 93:7 97:3
  97:16 107:17
  108:14,17 109:22
  115:16 128:17
  130:25 131:4
  132:12 142:5,9
  144:18 145:8,13
  145:16,25 149:10
  149:17,19 150:5
  152:9 156:19
  157:18 158:4
appealed  37:23
  41:25 142:2
appealing  27:16
  57:7 79:10
appeals  25:2
  31:14,15,15,17,20
  32:21 35:18 38:4
  38:5,14 69:12
  76:3 102:19
  146:23 151:20
appear  29:6
appeared  86:17
appearing  23:6
appears  127:16
  164:25
appellants  31:18
  38:3,4 157:21
  160:17
appellate  32:25
  45:9 131:21
  149:14 150:2,21
  151:20
appellees  51:5
  157:21 160:17

applaud  54:25
  59:9
applauded  95:15
applicability
  127:23
applicable  36:2
  54:17 103:16
  113:1,18 114:3
  130:12 152:14,22
  153:13 164:5
application
  111:25
applied  94:17
  98:3
applies  128:16
  156:19
apply  32:18 72:17
  112:8 119:3 150:1
  150:11 151:2
  153:18,20 154:1
  161:22
applying  110:3
appointed  28:16
appreciate  48:10
  48:19 51:11 53:15
  57:25 69:5 77:25
  81:24 88:4,23
  89:22 90:5 106:25
  114:6 115:21,21
  120:15
appreciates  89:24
  91:2,6,16
appreciative
  120:13
approach  153:14
approached  92:2
appropriate  24:6
  46:4,12 51:13
  67:9 95:22 96:18
  96:23 97:15 98:19
  124:25 130:5
  160:1

appropriately
  91:14 124:10
  152:6 161:14
approval  32:10
  33:10 34:19 36:1
  46:10 60:23 65:15
  66:4,13 76:2
  108:16 130:22
  132:15 146:15,19
  152:8 157:19
  159:17 165:9
approvals  30:16
approve  2:9,14,24
  3:3 4:15 5:2 7:22
  7:25 12:12,18
  57:17 61:16 68:12
  75:25 84:22 87:13
  88:11 105:14
  110:13 140:24
  146:3 151:17
  152:3,4,12 153:20
  153:24
approved  46:12
  49:3 53:13 93:13
  99:9 107:14
  110:16 115:16
  165:2
approving  2:20
  3:5,11,17,20 4:2,5
  4:11,22 5:9,12,19
  5:22 6:4,11,14,22
  7:3,6,13,16 8:7,10
  8:17,20 9:3,6,13
  9:16,23 10:1,8,11
  10:18,23 11:1,8
  11:11,18,21 12:3
  12:6 23:11 67:22
  68:14 77:19,20
  102:14 141:23
  147:10,24 154:4
approximately
  36:21 51:16
  148:11

**appx** 154:7
**arabic** 132:1
**ardavan** 17:21
**arguably** 71:11
149:10
**argue** 45:11 57:22
71:9 74:24 79:3
163:9
**argued** 152:17
157:14 158:1
**argument** 32:9
39:6 43:25 46:14
67:12 68:10,16
69:5,17 71:12
75:1,11 77:1,4,11
83:10,12 93:21
102:11 113:2
117:22 122:10,15
134:22 148:4
153:10,11,12,12
**arguments** 49:15
57:2,19 63:12
76:19,20 77:4
81:2 89:5,6
105:17 110:7
122:2 129:14
**arik** 14:17 47:18
48:7
**arisen** 50:9
**arises** 28:3
**arizona** 8:12
**arkansas** 9:18
**armor** 95:25
**arms** 164:14,19
**arrange** 26:4
**arrangement**
48:14
**articulative**
120:17
**artificial** 51:25
**aside** 51:14
**asked** 29:18 34:23
51:7 61:16 81:17

103:5 107:13
108:2 109:22
112:20 113:11
140:24 141:3
145:17,20 146:2
150:23 151:10,17
**asking** 35:2 65:10
68:18 75:9 95:2
109:4,11 110:4
129:11
**asks** 108:10
**aspect** 38:6 61:15
62:1 135:10
166:17
**aspects** 142:23
149:15 151:14
**assert** 38:16 39:10
45:12
**asserting** 123:15
149:5,7
**assessment** 164:1
**assets** 39:9,17
40:23 42:22,22,23
43:13 69:22,23,23
69:25 83:17 85:14
87:6 93:14,17
111:20 130:16
142:17 155:17
**assistance** 61:1
**associated** 69:11
**assume** 59:25
85:5 89:2 165:22
**assumed** 166:15
**assuming** 60:13
61:21 97:4 105:2
**assumption** 84:18
84:21 85:19
**assure** 54:24
**atkinson** 18:14
**attached** 44:9
66:10 141:24
**attachment** 56:11
80:24 144:11

**attempt** 95:5
**attempting** 45:11
**attention** 95:9
106:23 166:5
**attorney** 5:15 6:6
6:24 11:13 12:21
13:2 17:3 54:19
63:2 82:18
**attorneys** 14:4,12
14:20 15:2,11
16:2,9,16 17:2,11
127:12 147:6
151:22
**attribute** 86:16,22
**attributes** 42:25
**audio** 26:16
**augment** 142:15
**august** 104:14
**auslander** 18:15
**authorities**
114:14 119:4
**authority** 80:13
80:23 107:18
110:13 117:3
151:11
**authorization**
76:16 165:7
**authorize** 151:21
151:22
**authorized** 67:9
76:9 142:11 147:1
147:5 160:5 166:9
**authorizing** 2:20
3:5,11,16,20 4:1,5
4:11,22 5:8,12,18
5:22 6:4,10,14,22
7:2,6,12,16 8:6,10
8:16,20 9:2,6,12
9:16,22 10:1,7,11
10:18,22 11:1,7
11:11,17,21 12:2
12:6 23:11 141:23
159:23

**auto** 159:11
**autumn** 19:22
**available** 96:19
**avenue** 14:5 15:5
**avoid** 64:2 127:2
**avoidance** 45:4
**avoided** 141:17
**avoiding** 141:14
**awaiting** 109:21
**award** 160:19,25
160:25
**aware** 25:10 27:9
28:4 68:24

**b**

**b** 1:21 3:4,10,16
3:19,22 4:1,4,7,21
5:8,11,14,18,21
5:24 6:3,10,13,16
6:21 7:2,5,8,12,15
7:18 8:6,9,12,16
8:19,22 9:2,5,8,12
9:15,18,22,25
10:3,7,10,13,17
10:22,25 11:3,7
11:10,13,17,20,23
12:2,5,8 13:2
18:20 23:12 77:2
77:11 78:2,24
79:3,6 81:9
117:11 141:23
159:18,18,25
160:13 162:1
**b.r.** 78:4 145:22
145:23 155:11
156:15 159:12
161:1
**b.r.663** 71:15
**back** 62:9,12
67:11 68:20 79:1
81:20,21 87:21
102:8,18 104:13
124:23 125:7
147:7 166:25

[background - black]                                                                    Page 7

**background**
133:7
**bad** 40:8,19 41:1
**balance** 132:23
164:7
**balanced** 53:7
**ball** 18:16
**bankr** 71:15 78:4
145:22 156:2,2
159:12 161:2
**bankruptcy** 1:1
1:11,23 33:6,14
33:25 34:18 35:25
37:18 45:18 49:8
69:9,10,13,19
72:18 73:5,11,16
83:21 84:5 92:19
94:24 96:3 107:15
111:17 112:22
113:18 114:4
117:10 123:19,22
124:11 127:24,25
128:1,3 129:8
130:24 140:17
141:9 145:18
146:9,9 147:12
149:14,16,24
150:1 152:18,20
152:22 153:9,13
154:2,3 155:6
158:20 159:18
162:1,11 163:15
164:23
**barely** 136:13
**bargaining**
164:14
**barker** 17:19
**barring** 75:5
**based** 45:3 51:19
86:7 95:8 108:20
119:3 133:6 141:6
**bases** 150:4

**basically** 25:20
31:25 74:7
**basis** 46:4,8 49:3
67:5 77:19 88:1
100:6 112:7
124:25 145:9
149:4
**bear** 62:9 83:14
102:12
**bearing** 37:17
**beginning** 81:24
107:20 108:6
126:10 130:21
132:7 139:25
140:15 155:12
163:19
**begun** 23:24
**behalf** 2:5,11,16
2:21 3:1,6,13,22
4:7,12,16,24 5:4
5:14,24 6:5,16,24
7:8,18 8:1,12,22
9:8,18 10:3,13
11:3,13,23 12:8
12:14,20 13:2
23:21 48:7 58:9
90:18 99:12
110:22,23 111:2
114:23 115:13,19
117:17 138:10
**behavior** 96:8
**believable** 52:19
**believe** 24:3,19
33:23 40:4 43:24
44:24 47:1 55:24
60:8,23 64:7
65:11,24 66:7,20
71:25 78:2 90:9
90:10 91:5 95:8
95:22 96:11 97:25
110:3,5 114:23
115:7,13 120:9,12
121:4 122:1 124:8

125:19 128:9
130:9 131:1 133:4
133:6 135:18,20
135:22 136:3
137:8,12,13
141:11 143:15
145:19 148:4
150:11,14 152:15
153:12,22 154:4
158:18,21 159:24
160:2 161:11
162:25 165:18
**believed** 24:6
55:19 81:9 152:14
**believes** 54:12
55:21
**belittling** 48:16
**bench** 104:17
**benedict** 18:17
**beneficial** 40:24
45:6 51:22
**beneficiaries**
28:13
**beneficiary** 46:7
**benefit** 24:24
58:21 77:8,14
99:10 112:12
117:7 120:1 124:4
124:5 125:9 144:3
161:4,22 163:11
**benefited** 77:9
**benefits** 24:20
32:2,18 37:21
40:18 52:21 81:14
93:24 94:5 118:23
130:7 140:20
141:13,18 164:8
**benefitting** 52:24
**benjamin** 18:18
19:21 20:4
**bernard** 17:21
**best** 24:1 25:25
49:2,10 54:6

57:17 79:15 97:15
166:24
**bethlehem** 77:5
77:10,20 160:14
**better** 25:5 30:21
47:21,22 53:20
59:1 77:1 82:2
87:24 94:2 95:18
118:22 122:13
125:1
**beyond** 34:8
**bickford** 18:19
**bid** 85:10
**big** 59:11,12
77:14 93:5 126:10
**billion** 30:3 32:5
38:25 41:12,13
42:6 46:17 49:25
63:20 65:6,7 69:3
71:20 73:7,7
74:20,21 77:13
78:22 80:25 87:15
87:15 88:2,3,18
88:19 93:25 103:8
109:6,8 112:2,5
121:16,16,16,23
122:11 125:11,19
125:21 128:21
142:17,17 145:5
148:12,12 151:7
154:20 160:23
**billions** 122:14
131:15
**bind** 41:24
**binding** 62:1
**binford** 18:20
**birmingham** 15:6
**bit** 102:13 126:16
**bizarre** 35:1
**blabey** 18:21
**black** 126:20
132:2

**blends** 126:3
**block** 61:17 159:6
  159:11
**blocks** 91:15 92:6
  92:17
**bloyd** 4:17 15:2
  118:1
**board** 70:4
**body** 28:19 51:23
**boffetti** 17:23
  18:22
**bograd** 18:23
**bondholders**
  156:13
**bones** 119:21
  160:8
**boots** 126:23
**bottom** 51:16
**bound** 38:15
  41:23 146:21
**boundaries** 43:3
**brainer** 151:3
**braniff** 43:21
**brauner** 18:24
**break** 62:7
**breyer's** 103:20
  155:16
**brian** 18:7,10
**bridges** 15:2
  118:1
**brief** 29:18 37:15
  42:9 44:14 85:9
  102:4,15 103:4
  105:18 114:10
  120:3
**briefing** 89:2
  128:7
**briefly** 40:7 82:20
  83:3 105:17 118:7
**briefs** 31:13 33:4
  45:9 63:24 74:15
  91:8 120:14,25
  121:6,10 128:17

129:6 146:24
  151:20
**bring** 24:12 46:21
**brings** 53:21
**broad** 15:13 95:8
  126:16
**broaden** 26:23
**broadened** 44:17
**broader** 96:3
**broadly** 70:8
**brooks** 17:19
**brothers** 160:3
**brought** 95:9
  128:3
**brown** 18:25
**brushstrokes**
  126:16
**bryant** 14:14
**buckets** 116:1
**build** 48:11
**building** 61:17
  91:15 92:6,17
  159:6,11
**buildings** 30:9
**built** 99:3
**bulk** 84:9 100:15
**bull** 15:21
**bunch** 129:8
**burian** 19:1
**business** 36:17
  141:1 165:3
  166:12,16
**buttons** 23:15
  50:9

**c**

**c** 14:1 23:1 170:1
  170:1
**cahn** 12:20 17:15
  82:11,11,14,17,17
  87:9,11 88:9,21
  89:7,18 122:3,25
**cake** 103:11
  110:11

**calculus** 54:6
**calendar** 23:7,10
**california** 52:7
**call** 27:15 82:21
  101:1 124:13
  133:22 166:4
**called** 48:12 142:1
  143:24 145:11
  149:7 159:18
  162:16 166:7
**canada** 112:8,10
  112:11,12,18,25
  133:11
**canadian** 2:6,6
  15:11,12 111:3,10
  111:24 112:9
  113:1,13,24 114:3
  161:13
**candidly** 33:18
**capacity** 57:21
**capital** 17:5
**caplin** 16:15
**capped** 95:23
**capturing** 27:2
**care** 92:2 103:17
  103:18
**careful** 98:6
**carefully** 32:23
  70:19 87:19 94:20
  98:4 100:5 127:4
  153:10
**carolina** 9:9 53:2
**caroline** 19:14
**carrie** 20:15
**carrillo** 19:2
**carter** 17:10
  82:18
**carve** 116:22
**case** 1:6 23:6 28:1
  28:17 29:4,12,15
  34:14 43:16,18
  44:3,4 45:8,23
  46:3 48:14 49:18

49:22 51:23 52:6
  57:10,13,14,20
  59:5,19 61:24
  63:4 64:12 67:18
  70:19 71:4,5,9
  74:2 77:5 78:2,3,3
  79:18,21,23 83:21
  84:5,13 86:5
  88:16 89:20 90:2
  90:20,22 91:5,9
  92:2,18,19 93:9
  93:10,15,22 95:1
  95:24 96:1,3,7
  99:1 109:3 111:7
  117:5 119:23
  121:25 123:22
  128:20 130:6,18
  137:15,25 140:12
  141:7,7 143:9,16
  148:3,15 151:25
  152:7 153:13,16
  153:25 155:2,18
  155:19 156:8
  157:13 158:12
  159:22 160:1,3,14
  160:24 162:8
  165:13 167:18
**caselaw** 124:23
  149:8
**cases** 31:22 33:13
  37:5 42:20 44:13
  46:19 48:18 53:3
  54:1,1,4 62:17
  67:7,7,8 72:9
  81:11 85:8 130:25
  142:8 145:24
  147:15,20,21
  149:14,16 150:12
  150:15 151:6
  155:14 161:16
  163:19,20
**cash** 30:21 50:4
  80:22 86:15,15

[cash - class]                                                                 Page 9

124:21 125:10
142:19
**catch** 131:12
**catching** 165:24
**categories** 50:17
**category** 149:22
149:22
**catherine** 17:25
**cause** 24:19 79:17
105:10 142:21
**causes** 112:9
**caveat** 64:21
**ccaa** 112:11,17
113:13
**cease** 31:13
130:16
**centered** 86:10
**centerpiece**
143:18
**cert** 154:18
**certain** 2:6 15:11
46:4 50:17 69:9
75:5 92:1 110:22
110:23 111:3
112:13 128:9
146:7 155:7
159:13 162:2
**certainly** 26:19
70:24 72:17 88:5
110:25 113:6
120:14 127:15
139:13 140:12
165:3
**certainty** 95:21
154:18
**certified** 170:3
**cetera** 59:24
77:21 113:20
119:14
**chairman** 135:12
**challenge** 90:23
95:11

**challenged** 42:20
163:25
**challenges** 90:3
**chambers** 26:9
**chance** 86:24
**change** 30:17
43:13 56:21 75:24
95:6 113:15
138:13 144:15
153:14 162:22
165:12,13 166:5
**changed** 44:16
56:24 162:14
**changes** 39:22
41:5 44:8 76:19
**changing** 55:17
101:18
**channels** 26:22
27:1
**chaos** 66:19 88:16
88:21 109:11,14
**chapman** 27:17
27:19,25 59:7
90:19 135:2
138:19
**chapman's** 57:25
138:20 167:5
**chapter** 1:5 31:21
141:17 142:3
147:15
**charitable** 50:4
145:4
**charles** 15:2 118:1
**check** 13:3
**chen** 19:3
**chicago** 16:11
**chief** 63:2
**child** 52:7,8
**children** 16:9 47:4
58:9
**children's** 47:4
**chink** 95:25

**choice** 94:4
**choose** 126:2
**chose** 82:3
**chosen** 79:17
**christopher** 3:22
4:7 5:14,24 6:16
7:8,18 8:12,22 9:8
9:18 10:3,13 11:3
11:13,23 12:8
13:2,4 21:5,16
**church** 67:7
**cir** 154:11 155:10
155:23 157:6
161:25
**circle** 16:17
**circuit** 31:16,19
34:22 35:1,7,14
35:19 42:12,14,15
43:20 44:11 45:8
49:24 51:5 62:3
64:7,8,10 66:16
67:2,6 74:15,19
80:18 88:14,15,18
91:8 95:21 97:5
108:17 117:5
120:25 121:8,25
125:4,5 128:7,15
130:25 131:4,15
144:18 145:16
146:5 150:25,25
152:9 154:7
157:18 159:5
162:24 163:3,23
165:1,8
**circuit's** 148:1
**circumstances**
44:5 124:9 136:9
146:7 160:1
**cited** 39:6 43:16
44:13 85:9 119:4
145:24 149:8
160:1

**claim** 43:7 64:23
64:24,25 74:12
83:23 84:17 87:25
103:21 113:3
152:23,25 153:1
154:15,16 156:11
157:4,17,17
163:10
**claimant** 53:17
156:12
**claimants** 5:5
50:15 83:24
101:19 110:24
118:23 150:16
156:21,21 162:18
162:20,21
**claims** 29:4 67:3
70:7,11,11,13,14
71:7,8 83:7,20,21
83:25 87:24 88:2
88:3 112:9 123:10
123:13,16 129:3
130:10,13,17
145:7,7 146:10
156:20,25 158:3,5
162:8
**clarification** 82:2
98:10,11,24
161:12
**clarified** 61:22
94:17 98:14 108:5
133:13 139:11
**clarify** 106:19,22
116:24 119:21
**clarifying** 118:4
**class** 39:12 41:6
41:14,19,25 42:3
42:4 64:23 96:5
101:14 116:2,3,6
116:10,13,21
119:2 148:18,19
148:19,20,20
152:24 154:21,24

155:8 156:4,11,25
161:21 162:4
**classes** 41:7
153:17 161:19
**classification**
117:6
**clause** 34:2,22
166:10
**clawed** 86:11
**clear** 25:21 27:9
28:25 32:12,24
35:16 37:8 39:15
40:11,12 42:8
43:11 44:11,22
48:9,21 58:18
59:13 61:14,22
72:22 74:2 80:10
80:18 81:11 83:15
83:16,18 100:10
106:18,23 108:20
108:21 111:4,6
116:17,17 120:9
120:20 122:6,8
125:4,6 134:20
138:23 148:14
153:6 162:9,19
164:16 165:22
**cleared** 44:10
131:13 132:24
**clearing** 33:1
**clearly** 23:18 29:1
58:23 79:8 82:15
111:18 112:19
113:14 119:13
128:2 130:15
145:25 151:16
155:16 158:9
160:24
**clements** 6:23
**clerk** 27:25 47:12
**clerks** 27:17
**client** 88:23

**clients** 114:23
115:13,19,24
116:6 117:17,25
118:13 119:2
127:15
**clock** 27:11
**close** 71:17 83:18
**closely** 23:8
155:24
**closer** 24:12 25:4
53:21
**closing** 136:17
**code** 33:6,14,25
34:18 35:25 37:18
49:8 69:13 72:18
81:10 94:24
107:15 108:11
109:18,19,24
112:22 122:4,21
127:25 128:1
129:8 130:24
140:18 141:9
145:18 146:10
147:12 152:18,20
152:20 153:9
154:2,4,25 155:6
158:20 159:18,19
159:24 162:11
163:16 164:22,23
**cognizable** 41:14
**cold** 80:22
**collaboratively**
73:6
**collateral** 42:24
68:13 77:24 81:1
99:19,21 100:19
100:20,22 101:6
125:16
**collect** 55:9
**collecting** 55:10
100:1
**collectively** 73:5

**collier** 117:10
162:1
**colloquially** 76:25
153:22
**colloquy** 40:10
96:11 133:9
**colorado** 53:2
**columbia** 25:1
61:20 71:6 116:2
137:21 142:3
144:4 145:12
146:21 151:19
153:15 160:10
162:3,5 163:14
**combine** 124:14
**come** 46:21 51:9
87:19 90:1,3
91:25 92:21 97:18
102:18 103:8
111:12 115:4
123:3 140:20
161:6
**comfort** 81:20
120:6 129:7,12
**comfortable** 79:5
96:24 130:1
**coming** 23:24
41:21 47:19 52:3
52:15 68:22 69:4
69:17,18 72:20
79:24 83:2 85:7
92:25 93:18 107:1
111:10,23 127:23
157:16 161:5
166:23
**comma** 44:15
**commend** 102:7
**comment** 79:22
117:25
**commenting**
167:9
**comments** 48:2
58:14 89:13 94:22

167:10
**commission**
133:21
**commitment**
90:19 160:9
163:19
**committed** 32:5
**committee** 4:13
5:4 14:12 16:9
47:3,4 48:8 58:9
70:17 77:8 89:22
90:18 91:2,6,11
93:13 94:3,7,14
94:18 101:13
103:3 110:21
160:3
**committee's** 5:1
**committees** 46:5
77:7 159:23
**common** 37:4
120:1
**commonwealth**
4:7 7:18
**communication**
168:6,7
**communications**
156:14,14
**companies** 70:8
**company** 154:7,9
155:9 157:5
**compelled** 115:20
**compelling** 84:12
**compensation**
53:22 54:24 94:25
**competence**
164:12
**competent** 65:13
66:5
**competing** 101:7
**complain** 158:11
**complainants**
89:22

**complete**  88:16
  100:12
**completely**  37:5
  57:18 75:7
**completes**  46:14
**complex**  92:13
**complexities**  90:3
**complexity**  29:13
  90:22 100:9
**compliance**  36:1
  152:19 159:3
  164:5,22
**complicated**
  125:14 126:16
**complies**  159:6
**conceded**  75:14
**conceivable**  74:13
  128:16,23
**conceive**  160:18
**concept**  115:2,2
**concepts**  114:25
  115:4
**concern**  34:13,16
  58:18 67:20 73:15
  73:16,16 96:25
  104:12 112:24
  113:22
**concerned**  71:5
  72:1 94:15 100:13
  104:21 139:11
  145:2 147:21
  167:5
**concerns**  68:17
  69:7 136:1 167:13
**concession**  32:1
  50:6,13 80:3
  81:16,23
**concessions**  53:14
**conclude**  24:24
  77:4 79:13 141:8
  149:21 151:1,2
  163:22

**concluded**  102:19
  168:8
**conclusion**  31:22
**condition**  35:3,6
  45:21 149:1
  152:13 163:4
  165:8
**conditional**  32:24
  33:2 76:8
**conditioned**  32:15
  64:15 76:2 146:4
  146:12,16 147:25
  149:18 152:6
**conditions**  32:13
  45:12,19 141:25
  143:8,20 146:22
  147:4,11 148:5
  149:1 151:4,14,25
  161:6 162:23
  165:5
**conduct**  103:5
**conducted**  164:18
  164:20
**confessing**  107:5
**confident**  61:1
  127:17
**confidentiality**
  24:2
**confines**  140:17
**confirm**  56:16
  67:3 141:5
**confirmable**
  61:18 62:2
**confirmation**
  45:21 57:8 61:25
  63:14 64:15 66:17
  67:12 69:12 72:14
  72:16 76:4 78:7
  85:11 87:18,22
  88:19 90:4 91:14
  91:17 92:20,22
  94:11,14 102:20
  104:13,15 108:18

  118:20,21 124:6
  125:6 142:2,5
  145:14 146:6
  148:1 152:7
  154:19 158:24
  159:22 162:24
**confirmed**  35:8
  45:18,21 76:15
  101:18 104:16
  123:1 126:15
  145:3 153:23
  162:22
**confirming**  32:16
  37:23 129:21
  145:8,19
**conflict**  34:8
**confronted**  29:11
  92:16
**confusion**  37:9
  80:4
**congress**  108:24
**connecticut**  54:20
  54:23,24
**connecticut's**
  54:21
**connection**  25:9
  54:10 91:13,23
  92:22 98:23
  138:20 140:7
  142:15 147:15
**connolly**  19:4
**consensual**  71:18
  71:21 97:3
**consensus**  48:12
  92:10,12 98:13
**consent**  31:12
  41:23 49:12
  123:17 127:23
  154:14
**consented**  128:2,6
**consenting**  77:21
**consequence**  65:5
  68:5 153:4

**consequences**
  65:14 151:18
**consequently**
  137:1
**consider**  72:18
  97:10,21 147:23
  154:5
**considerably**
  142:16
**consideration**
  28:14 37:7,11
  59:15,16 66:2,6,7
  73:11,12 93:7
  134:1,12
**considerations**
  86:19
**considered**
  153:10
**considering**  72:17
  154:10 156:17
**consistent**  54:16
  56:9 59:3,19 98:3
  99:2 126:17
  152:10 165:10,12
**consistently**  61:3
**consisting**  112:3
**consists**  108:5
**consla**  19:5
**constituency**
  28:15
**constitute**  42:11
  43:7 165:17
**constitution**  45:22
**constitutionally**
  45:15
**constrained**  146:7
**construction**  8:2
**constructive**
  48:19
**construing**  155:2
**consummated**
  38:20

consummation 35:21 132:16 166:11
contained 36:17 37:21
contains 40:17 45:19 124:5 166:10
contemplate 34:20 35:2 56:3
contemplated 33:4 34:11 37:1 147:3 152:13 153:4
contemplates 35:3 101:10 143:21 146:11 154:13
contemplation 101:18
contend 43:6 162:2
contended 159:20
content 34:10
contention 45:24 153:3
contested 38:15
context 26:21 68:14 87:14 97:21 138:5 145:2 148:24,25 153:7 153:19 155:25
contexts 126:5
contingencies 144:16
contingency 30:15,23 159:8
contingent 5:5 104:19 107:7,21 107:24 108:11,12 108:13,15 124:25 131:24 132:15 146:5,12 150:19

continuation 135:4
continue 48:18 63:24 65:2 66:20 90:2
continues 63:14
contrary 55:6 113:7 152:14 156:24
contravene 33:5 33:12,13,19 35:25 108:11 130:23 131:1 147:12,19 148:8 154:25 158:20 163:1
contravenes 33:22 107:15 108:9
contributed 145:5
contributing 97:20
contribution 50:4 95:1,3,19 159:19 160:19,25
controversial 95:4 98:15 143:15
controversy 92:11
convert 50:3
convince 31:17
convincingly 157:15
copied 63:5
copy 141:24
corp 117:4 145:22 154:6 155:15 156:14,15 161:25
corporate 84:6,10 125:14
correct 37:5 56:16 59:25 84:21 90:15 116:8,12,23 132:14 134:10 135:15 136:20

138:15,17 139:3 165:25 166:18
corrected 35:23
cost 32:1
costs 140:21
counsel 63:6 89:21 94:18 101:24 111:6 161:17 164:12
count 145:3
country 38:5 54:25 58:22 170:21
county 2:16,16 3:1
couple 29:12 44:24 58:13 78:5 82:4 114:21 119:15 124:14 134:25 157:1
coupled 128:20
courage 26:13 167:21
course 28:15 34:15 35:14 37:5 38:21 41:22 45:16 45:22 48:22 50:20 61:4 76:11 78:17 79:6 93:25 103:7 106:21 114:16 159:5 163:4 165:23
court 1:1,11 13:4 23:2,17,19,23 24:10,16 25:6,10 25:13,17,22,24 26:2,16 27:4,7,24 29:18 31:4,7,9 32:8,20 33:6,7,11 33:12,18,23 34:13 35:18,19 36:9 38:9 44:20 46:9 46:13,25 47:13,19

47:22,25 48:5 49:6,8,25 55:14 55:16 56:2,18,25 58:4,11,16 61:8 63:16 64:10 65:4 65:13,16,18 66:1 66:5 67:1,17 68:3 69:22 70:6 72:23 73:23 74:18,23 75:15,20,22 76:3 76:4,13,21 77:13 77:16 78:21 79:4 79:20 80:7 81:16 81:19,22 82:4,13 82:16 87:8,11 88:10,23 89:8,14 89:17 90:5,25 91:6 92:21,23 95:20,21 96:22 97:10 98:17 99:8 101:9,22,23 102:12 103:7,14 103:19 104:4,18 105:3,11,12,14,21 106:4,9,11,15,21 107:3,9,15,18,19 107:24 108:4,10 108:15,21 109:1 109:10,22 110:3,7 110:13,16,19 112:14 113:8,13 114:1,7 115:15,18 115:20,21,23 116:9,12,16,20,25 117:3,18,20 119:1 119:8 120:4,7,16 121:13,15,19 123:7 124:16 125:2,23 126:7,8 126:25 127:19,24 128:3,7 129:7 130:2,3,9,20 131:7,19,21 132:5

132:12,17,18,24
133:2,12 134:7,20
135:9 136:13,16
137:6,9,11,18
138:3,8,12,22,25
139:5,8,14,18,23
140:2,4,24 141:3
141:21 142:10
143:4 145:2,9,9
145:15 146:9
147:20,20 149:11
149:14,19,23,25
150:1,2,4,5,5,9,9
150:20,21 151:9
151:20 154:5
155:17 157:20
165:1,18,20,22,23
166:13,15,21
167:4,13,16,18,24
167:25 168:1
**court's**  31:1 37:23
61:1 63:14,16,17
63:18 76:18 88:15
95:9 103:5 107:13
107:21 114:3
129:23 131:5
146:6,8,18 156:16
165:17 166:5
**courtesy**  120:15
**courthouses**  38:4
**courtroom**  167:15
**courts**  42:9,25
67:8 72:15 78:5
149:8 152:3
155:24 156:8
157:2,7 160:12
**court's**  66:16
126:22 143:17
**coutts**  19:6
**cover**  139:21
**covered**  43:10
70:9

**craft**  24:5
**crafting**  60:2
**crayton**  118:1
**create**  48:12
86:20
**created**  98:25
108:24 144:24
**creating**  88:21
99:6 106:25
**credible**  99:9
**credibly**  38:16
**credit**  52:9,13
**credited**  97:19
**crediting**  134:13
**creditor**  28:17,18
41:6,19,24,25
42:24 51:6,23
54:12 56:3,17
57:13 85:9 111:12
123:14 141:13
**creditors**  2:6,7
14:13 15:11,12
28:18 29:14 32:3
37:21 39:12 41:14
42:3,10 47:3 48:8
49:21 51:2 70:17
79:16 83:25 85:10
85:15 93:1,12,15
93:17 95:1,6
103:3 110:22
111:3,10 112:9
118:2 123:23
124:4 128:20
151:6 164:11
**creighton**  4:17
15:2
**crisis**  86:3,14
102:6 109:16
150:16
**critical**  43:9 91:16
124:10 160:9
**criticism**  48:16

**crockett**  12:14,14
19:7
**cross**  52:1 139:13
**crucial**  95:9
**crushing**  46:15
**crux**  111:23
**crystalize**  93:4
**ct**  154:8 155:15
**current**  30:16
**currently**  30:15
30:22 32:16 36:4
38:20 44:16 46:11
123:4 145:15
**cut**  121:1 124:3
**cybersecurity**
168:2
**cyganowski**  19:8
**czyzewski**  155:15

**d**

**d**  1:22 19:22 20:1
22:3 23:1 71:15
117:9 144:11
156:2 161:24
169:1
**d'apice**  4:12
**d.c.**  16:18
**dakota**  10:4
**damage**  99:6
**daniel**  19:4 20:20
**darren**  20:6
**date**  30:22 37:6
50:5 66:11 124:21
143:11 156:18
170:25
**david**  18:8,21,25
20:11
**davis**  14:3 23:21
56:16
**day**  27:12,13
36:15 38:4 50:18
69:19 80:22 81:15
89:6 91:4 95:13
118:9 125:24

136:17 154:25
155:1
**days**  49:19
**dbsd**  42:13 72:12
155:22
**de**  44:8
**deadline**  28:9
**deadlines**  24:22
**deal**  36:17 56:1,5
56:8 58:20,21
67:19 70:5 71:2
71:20 80:25 86:12
93:5 96:22 97:6
103:1 104:22
107:7 108:12,13
110:14 114:19
121:2,2 124:3
125:12 166:12,16
**dealing**  164:7
**deals**  69:8,11
71:11 123:20
132:9
**dealt**  154:9 160:3
160:4 161:11,14
**deaths**  118:12
**debt**  28:1
**debtor**  39:16,17
39:18 56:4 63:9
64:19 75:22 76:10
76:25 93:13 94:17
103:2 123:23
164:2 165:6
**debtor's**  12:12
23:8,10 25:11
39:16 63:10 69:16
75:1,14 129:3
152:5 157:13
**debtors**  1:8 2:19
3:3,8,10,15,19,25
4:4,21 5:2,7,11,17
5:21 6:2,9,13,20
7:1,5,11,15,22 8:5
8:9,15,19 9:1,5,11

9:15,21,25 10:6
10:10,17,21,25
11:6,10,16,20
12:1,5,18 14:4
23:21 32:1,7
36:25 37:9,15
38:19,19,24 39:4
40:16,18,19,20,25
41:16,20 42:22,23
45:7 46:4 48:3,22
50:16 55:5 58:25
67:21 69:11 70:16
88:5 101:13
103:10 104:5,14
105:4 106:18
110:11 112:16
113:23 122:7
127:11 128:2,13
128:16,24 132:20
132:21 140:25
141:1,22 142:2,6
146:25 147:5,17
147:22 151:21,22
157:14 158:2
**debtors'** 31:21
104:23 121:2
126:6
**debtor's** 83:9
**decide** 34:25
74:14 77:1 105:4
**decided** 29:8,9
67:23 68:2,12
88:20 105:3 125:1
158:8
**deciding** 87:12,13
**decision** 35:13
63:17,18 133:25
146:8
**decisions** 80:17
**dedicate** 142:22
**dedicated** 88:24
119:15 163:12

**dedication** 27:21
58:1 90:24
**deemed** 42:23
123:5
**deep** 68:17 83:19
**default** 40:2,3
55:5 56:7
**defaults** 55:9
**defeat** 152:16
**defeating** 158:8
**defer** 150:1
**deference** 86:3
**defined** 144:2
155:5
**definitely** 136:21
**definition** 33:9
34:18
**definitive** 66:10
104:3,9,9 151:23
**definitively** 68:6
157:16
**del** 71:15 117:9
156:2 161:24
**delaware** 42:13
154:7
**delay** 164:10
**delayed** 73:14
**delete** 166:18
**deliver** 31:25
**denied** 30:5,10,22
46:16 132:13
154:8 158:15
**denies** 71:12
**denigrate** 52:17
**denigration** 48:16
**deny** 149:3 150:2
150:3
**depalma** 15:10
111:2
**department** 14:19
17:1 102:2 129:22
**depending** 74:4
88:12,14 134:2

142:16,18 144:16
162:7
**deputy** 26:10 63:2
**described** 129:2
142:21 159:16
160:21
**designed** 60:3
**desire** 86:23
150:14
**despite** 83:5
**destructive** 32:4
**detailed** 44:3
**details** 58:20
60:18 61:22
**determination**
143:17
**determine** 97:4
104:24 115:18
**determined** 53:8
67:23 96:20
**determining**
153:7
**detest** 116:12
**detract** 59:8
**detrimental** 53:25
**developed** 96:1
**developing** 91:12
**development**
142:8
**devoted** 57:11
59:17 61:10 91:3
119:17 144:7
**devoting** 92:7
**dictates** 158:23
**died** 118:11
**dies** 52:9,13
**difference** 69:1
77:6 79:2 106:11
**differences** 48:17
**different** 43:21
56:20 64:11,13
68:1,4 72:7,8,25
75:7,7,8 78:5,15

93:1,2 102:10
104:1 111:11
114:1 115:25
120:13 121:1,11
123:10,21,23
126:5 131:18,23
149:17 152:2
153:11 157:3
**differentiated**
124:12
**differently** 75:2
78:21 124:2
**difficult** 26:12
27:13 69:9 90:1
90:12 93:23 94:3
95:12 96:9 164:19
**difficulties** 104:6
**difficulty** 90:6
106:10
**dime** 86:12
**diplomatic** 73:1
**direct** 32:2 33:4
35:25 36:19 37:8
38:12,17,23 39:1
39:2,10 61:13
111:8 124:19
144:10
**directed** 104:20
147:6
**directing** 147:24
157:23
**direction** 133:25
**directly** 43:2
50:23 118:23
122:22 163:10
**disagree** 58:19
103:16 105:19
127:8
**disagreeable** 72:3
**disagreement**
98:9
**disappointed**
72:22,24 73:2

84:24
**disappointment**
82:22
**disappointments**
84:23
**discharge** 41:16
**disclosure** 105:2
111:17 152:8
**discomfort** 120:6
**discourage** 69:12
**discrete** 44:9
**discretion** 94:22
115:18 142:12
**discussed** 44:7
45:3 61:23 83:2
149:19 156:13
160:7,14
**discussion** 44:3
99:15 155:12
**discussions** 64:1
98:12 125:17
**disguised** 159:8
**disingenuous**
93:20 97:13
**dismissal** 155:19
**disorder** 118:24
**disparate** 157:10
**disposing** 83:17
**dispute** 86:8
102:5 105:7,8,12
**disputes** 85:17
**disservice** 26:19
**dissonance** 123:6
**dist** 117:8 161:23
**distinct** 157:4
**distinction** 69:18
149:9,15 155:3,14
155:21
**distinguish** 43:22
61:24
**distribute** 40:17
51:13 150:15

**distributed** 37:13
39:20 41:8 93:17
99:2 100:6 103:17
111:14 115:15
121:23 134:4
154:21 163:9
**distribution** 38:20
39:4 42:1 43:8,13
50:8 99:2 143:25
144:1,15,23
148:11 150:20
154:2,23 155:17
164:24
**distributional**
41:9 44:19,19
**distributions**
41:15 84:10,11
93:18 99:24 151:5
153:17 162:21
163:2
**district** 1:2 25:1
35:19,20 49:25
61:19 63:17 66:16
71:6 88:15 107:17
107:21 116:2
128:7 131:4
137:21 142:3
144:3 145:9,12,15
146:21 151:19
152:4 153:15
155:13 156:16
160:10 162:3,5
163:14
**dive** 83:19
**divert** 93:14
**diverted** 85:14
**diverting** 96:21
**divest** 149:23
150:9
**divestiture** 145:21
149:7,23,25 150:8
151:1

**divestment** 149:9
**divide** 52:1
**docket** 24:4 28:11
34:14 121:7
**doctrine** 78:16
145:21 149:7,23
149:25 150:8,11
151:1
**document** 2:4,10
2:15,21,25 3:12
3:21 4:6,12,16,23
5:3,13,23 6:5,15
6:23 7:7,17,23 8:1
8:11,21 9:7,17
10:2,12,19 11:2
11:12,22 12:7,15
12:20 13:1 39:14
50:16 111:7 143:1
**document's**
106:15
**documentation**
98:20 147:1
151:23 160:7,21
**documents** 43:10
50:17 66:11 78:10
100:18 104:9,11
104:25 106:7,13
107:8 111:22
**dog** 67:4,5
**doing** 24:25 71:22
83:19 84:7 127:6
133:18 167:14
**doj** 28:16 129:16
129:18 130:6
148:7
**dollar** 126:13
**dollars** 85:10
112:2 121:17,21
125:21 142:17,18
148:12 151:8
**donor** 30:12
**don't** 127:22
135:5 136:6

138:17 167:17
**doubt** 45:4 60:20
68:4 81:3 109:9
167:17
**draft** 76:13
**drafted** 32:23
127:5
**drafting** 56:3 72:2
**dragged** 49:18
**drain** 1:22 23:3
62:12
**dramatic** 60:24
**drew** 42:15 86:19
**dropped** 116:11
**drysdale** 16:15
**due** 31:13 45:9
55:4 86:3 100:23
121:2 146:24
**dwarf** 84:1
**dylan** 19:5
**dynamics** 71:24
**dynamite** 59:6
**d'apice** 19:9

e

**e** 1:21,21 2:10
6:23 14:1,1 18:6
18:21 23:1,1
169:1 170:1
**earlier** 40:20
51:11 55:4 120:16
134:21 159:22
**early** 53:4 59:20
100:14 101:7
**easier** 131:11
**easily** 67:18 97:24
**easy** 95:12,14
99:17
**eat** 67:4 103:11
110:11
**eberhardt** 19:10
**ecf** 2:2,7,11,16,22
3:1,6,13,17,21,23
4:2,6,8,13,17,23

4:24 5:5,9,13,15
5:19,23,25 6:7,11
6:15,16,24 7:3,7,8
7:13,17,19,23 8:3
8:7,11,12,17,21
8:22 9:3,7,9,13,17
9:19,23 10:2,4,8
10:12,14,19,23
11:2,3,8,12,14,18
11:22,24 12:3,7,9
12:15,22 13:4

**eck** 17:24

**ecke** 7:23

**ecke's** 7:21

**eckstein** 5:3 14:25
89:10,11,15,20,21
90:6,15 98:22
99:14 101:21
117:15 119:20
125:18 126:1
129:15

**economic** 57:13
59:14,15 122:16

**ecro** 1:25

**edmunds** 18:10

**edward** 18:6

**effect** 53:25 76:1
76:14 86:16
112:17 128:16,24
148:3 163:8

**effective** 30:1,22
35:6,17 50:5
66:11 77:22 97:6
124:21 131:25
146:18 156:18

**effectively** 92:4

**effectiveness**
30:15 35:4 45:13
149:2 162:23

**effects** 159:14

**effectuated** 66:3

**effort** 69:5 90:21
91:9 92:14

**efforts** 27:20 29:1
48:17 55:1 59:10
59:10 81:4 90:19
90:24 91:3 120:11
150:12

**eight** 27:15 142:2

**eitel** 14:24 102:1,2
103:10,15,25
104:6 106:3,7,10
106:14,17 107:5
107:12,23 108:1,8
108:19,24 109:9
109:13 110:10

**either** 36:12 40:19
64:19 67:23 69:12
74:18 88:13,14
110:15 127:5
133:12 161:16
164:22

**elegantly** 35:22

**element** 135:4
137:19 140:12

**elements** 88:12
91:19

**eli** 3:5,12 14:9
56:15

**eliminate** 102:22

**elizabeth** 18:2,12
21:13

**ellen** 10:16,19
19:25

**else's** 62:19

**emails** 133:6

**embodied** 91:18
163:20

**emerge** 131:16

**emergence** 31:21

**emotion** 129:9

**emotions** 50:24

**empathize** 40:21
129:10

**emphatically**
42:19

**employ** 113:24

**enable** 35:8 77:22
165:7

**enables** 87:14

**encourage** 140:25

**encouraged** 29:3
95:20 102:17

**encourages**
123:20

**endedness** 94:16

**endorsed** 99:4,5

**endowments**
30:10

**ends** 42:7 109:17

**energy** 90:21
154:6 157:5,12

**enforce** 100:18
149:12

**enforceability**
115:11

**enforcement**
56:19 72:1

**enforcing** 100:21
100:21

**engaged** 48:11

**enhance** 78:12,14
92:3 151:5

**enhanced** 29:25
35:21 78:18 96:21
97:3 141:10
150:19 163:11
166:11

**enhancement**
95:16,17 160:22
160:23

**enhancing** 78:6
78:11

**enormous** 58:21
120:10 140:21

**ensure** 55:3 61:2
96:19

**enter** 49:9 156:17

**entered** 33:21
34:8,14 77:7
80:16 83:5 133:3
142:9 147:20
165:13

**enterprises**
155:11

**entertain** 92:24

**entire** 28:18 86:5
121:25

**entirely** 39:2 42:1
46:3 111:11
131:24

**entities** 2:11 30:17
47:7 50:12 91:3
114:12,15,15
115:7 116:4
148:16,16 153:17

**entitled** 129:21
160:19

**entity** 71:13

**entrenched** 58:19

**entries** 34:15

**entry** 3:4,9,11,16
3:19 4:1,4,10,21
5:8,11,18,21 6:3
6:10,13,21 7:2,5
7:12,15 8:6,9,16
8:19 9:2,5,12,15
9:22,25 10:7,10
10:17,22,25 11:7
11:10,17,20 12:2
12:5 23:9,11
35:18 45:5 49:4
107:23 132:15
147:9

**enunciated** 165:1

**epidemic** 51:21
52:4 54:16 57:12

**equal** 119:3

**equality** 72:19
92:10 154:1
164:24

equally 35:1
121:15 167:1
equivalent 77:19
erase 30:8
eric 4:23 5:15
18:1 21:22
error 133:15
eskandari 17:21
especially 26:5,11
62:19 115:9
149:14
essence 62:1
essentially 60:9
70:11,19 94:25
95:5 96:8 97:13
97:19 99:25
esserman 19:11
established 25:10
30:18 36:23
estate 39:9,19
40:23,25 49:3,10
49:20 52:15 53:14
53:21 54:4,7
57:18 66:23 68:23
69:17,23 70:12
72:5,5,6,9,20
78:11,12,14,15,17
83:17 84:19 85:14
87:6,15,20,25
88:2,6 92:4 96:22
97:3,18 103:1,8,9
103:12,20 105:10
105:13 110:12,14
110:17 121:20
122:5,7,9,10,12
123:4,5,13 125:20
129:3 130:8
140:16,20,21
144:14 145:6
151:13 155:4,5,5
155:8,17,21,21
156:22,23 157:13
157:17,17,24

158:3,13,15
160:22 161:5,6,6
162:17
estate's 70:10
71:8 78:17 122:19
122:20 123:9
126:5 145:6
166:24
estates 30:1 32:2
32:3,6 37:13,21
38:24 40:18 41:20
45:7 128:24
132:22
esther 21:25
estimated 143:11
161:8
estoppel 68:13
et 1:6 8:3 15:19,20
23:3 59:23 77:21
113:19 119:14
evading 112:25
evaluate 68:9
evaluation 76:23
evan 17:22 20:2
evening 38:14
event 34:5 49:20
55:4,8,22 56:7
101:4 118:14
145:20 150:10
151:14 154:24
events 131:24
everybody 85:21
87:4 88:18 94:2,7
97:16 100:5 125:9
126:21
evidence 99:9
135:5,23 136:3,25
137:25 138:5
139:14 141:9
evidentiary 86:21
eviscerate 109:18
ex 3:8 12:21

exact 41:23 74:10
exactly 35:17
55:25 80:9,14
81:19 111:22,22
123:12 129:11,24
135:15,18
examining 139:13
example 52:5,6,11
61:24 124:20
134:3 145:21
155:9 157:12
exceed 112:5
exceeding 83:21
exception 32:20
112:7
excess 83:23
122:14
exchange 41:15
121:22 130:17
exclusively 39:3
46:1 59:17 61:10
119:17 144:7
excuse 70:21
108:9 151:1
157:22
executive 102:2
exercise 110:13
exist 60:19
existed 124:8
existing 30:17
32:6 39:22 40:17
128:22 129:2
exists 65:2 152:15
expand 149:12
expect 26:20
80:17 167:10,17
167:20
expected 39:25
expedited 145:16
expense 164:9
expenses 36:3
151:25 160:4

exact 41:23 74:10
experience 164:12
experiences
118:11
experiment 38:8
explained 86:19
explicable 164:1
expression 70:23
extended 24:23
extent 24:1 96:20
97:24 98:24
116:10 126:21
127:24 142:6
161:17,18
extolled 81:4
extra 53:14 80:25
93:25 134:11
162:2
extraordinarily
92:13 114:10
extraordinary
27:19,19 29:13,21
120:10 160:15,23
extremely 28:9
59:9 80:20 81:8
125:8 163:18
eye 92:7

**f**

f 1:21 21:18 56:6
71:14 170:1
f.2d 161:25
f.3d 154:11
155:10 157:6
f.3d. 155:23
163:24
f2d 117:4
face 30:11 35:16
44:11 81:11 86:2
faced 94:4
facilitate 29:2
95:21
facilitating 31:21
facility 144:2

facing 60:22
fact 23:24 24:3,5
  24:17 28:12,13,24
  29:19 31:24 38:21
  39:5 42:19 45:3
  45:12 46:9 51:14
  59:8 64:7 69:19
  71:9 83:5 85:22
  86:1 87:2 89:25
  92:19,24 95:5,13
  111:21 116:17
  120:15,17 138:16
  148:7 158:14
  159:2,2,8,10
  163:25
factor 81:15 164:6
factors 53:8
  163:23,25 164:21
facts 42:7 92:25
  110:5
fading 24:11
  25:13
fail 135:19
faintly 47:19
fair 51:12 100:8
  126:22 127:22
fairly 127:4
  144:21
faith 40:8,19 41:1
  49:13 56:4 101:12
fall 115:25 116:6
  116:9,13
falls 149:21
false 43:7
familiar 131:2
families 61:12
  119:19 129:22
  143:6 144:9
  147:13 150:18
  163:7
family 46:17 52:6
  66:5,15,18 83:8
  102:8 103:17

105:9,12 115:9
  118:13 138:10
  143:22 167:7
fancy 25:16,17
fantasy 105:21
far 34:20 37:19,19
  71:5,25 77:25
  78:16 113:19
  114:2 145:1
  153:16 167:4
farther 128:12
fashion 117:1
  147:7
faster 121:24
fatal 39:5
favorable 64:24
  80:20 152:25
  154:16 159:5
fax 65:22
fear 76:20,21
feature 143:13
features 143:14
february 156:3
fed 154:7
federal 40:15
  116:4 140:18
  148:16 167:13,16
  167:18,24,25
  168:1
fee 36:2
feedback 30:24
  31:3,5
feel 34:5 58:6
  62:18 82:8
feelings 50:24
fees 35:6 36:3
  46:1,5 77:3,4
  78:19,24 94:17
  98:19 121:22
  127:12 143:8
  147:6 151:22
  159:14,20,23,25
  166:6,9

feinberg 70:20
feiner 19:12
feld 14:11
felt 68:9
fiduciaries 54:4
  57:20
fiduciary 53:14
  140:15
fiercely 40:14
fifth 43:20 50:19
fight 51:20 52:3
  57:14 88:17
fighting 57:12
  79:12 109:5,7
figure 106:6 121:1
file 63:9,24 74:14
  89:9 106:19
  146:24 151:20
filed 2:5,10,15,21
  2:25 3:5,12,21 4:6
  4:12,16,23 5:3,13
  5:23 6:5,15,23 7:7
  7:17,23 8:1,11,21
  9:7,17 10:2,12,19
  11:2,12,22 12:7
  12:13,13,20 13:1
  23:25 24:18 28:11
  28:19,25 29:4
  47:1,3 53:19 62:5
  62:23 63:5 82:6
  86:18 91:7 94:21
  102:22 103:4
  111:7,22 114:20
  114:22 115:16
  120:25 121:10,11
  128:17
filing 31:12 33:3
  45:9 104:19
  120:18,19 129:6
final 46:14 66:4
  133:14 134:18
  140:8,23

finally 157:7
find 33:11 66:19
  67:2 93:20 104:7
  105:25 110:17
  131:23
finding 107:16,24
  108:1,4,10
findings 107:13
finds 109:14
  131:21
fine 23:17 31:4
  60:2,15,16 73:2
  89:14 112:7
  116:16 117:18
  137:15 138:22
  139:6,18 140:3
finished 70:20
  140:5
finzi 19:13
firm 28:25 98:11
  111:2 142:17
firmly 127:14
firms 114:18
first 2:6 15:12
  23:8,13,13 40:9
  49:14 51:24 54:9
  57:2 59:14 62:23
  63:3 70:10,16
  72:21 76:3 101:19
  103:19 111:3,4
  113:11 114:21
  120:11 122:11
  128:10 132:10
  149:6 153:18
  154:12 155:15
  161:13
firsthand 90:20
fish 107:7
fit 78:1 79:5
fitch 15:3 118:2
fits 160:24
five 43:24 104:15
  139:20

fl 17:6
flesh 119:20 160:8
flier 34:9
floor 15:21 133:17
florida 12:13,19
  13:3 17:1,2,4
  48:11 52:12 53:23
  62:22 63:2,7
  64:17
florida's 3:18 4:3
  4:20 5:10,20 6:2
  6:12,20 7:4,14
  8:18 9:4,14,24
  10:9,24 11:9,19
  12:4 62:17 63:6
floridas 8:8
focus 36:18 86:5
  110:4 127:12
  148:9
focused 90:7
  164:6
focusing 71:4
  107:2 127:4
fogelman 18:9
fold 70:16
folks 114:13 115:6
follow 54:18
followed 48:23
  70:22
following 32:10
  38:9 49:6,24 52:5
  67:8 146:19
  158:24
footnote 115:24
  116:11,11 118:2
forbid 27:2
force 125:7
  157:20
foreclose 76:19
forego 31:12
foregoing 158:12
  170:3

form 28:24 29:14
  34:2 35:12 36:20
  118:3
formal 135:17
format 64:19
formula 70:19
  148:21,22
formulae 42:1
forth 25:2 34:20
  37:15 50:8 102:4
  102:15 111:15
  112:2 124:24
  144:11 145:7,21
  146:8,23 147:4,7
  151:18 157:12,25
forward 24:13
  56:1 60:24 64:20
  77:18 96:13,25
  104:21 125:23
  126:11 151:24
  161:10 168:7
fostering 78:6
fought 27:13
  30:19
found 34:3 43:19
  44:5 61:17 62:2
  81:2 135:16
  155:22 163:8
foundation 30:19
  80:22 124:20
foundations 30:18
  125:10 134:14
  142:21 145:4
four 24:23 43:5
  51:24 53:23 64:13
  76:1 88:12 140:13
fourth 50:16
fowl 107:7
fraction 36:6
framing 120:16
frank 15:1,8
  117:24

franklin 4:16
frankly 24:21
  61:15 66:16 77:20
  79:15 93:20 113:8
  130:5 149:17
  151:8 166:21
fraudulent 70:11
  71:13 72:10 83:7
  83:20 84:6,15
  88:7 103:21
  112:25 113:19
  123:9 130:10
  145:6
free 66:17 82:8
friday 31:13 45:9
  128:17 129:6
  146:25
front 49:6 62:8
  68:19 91:8
fronts 166:20
fruition 46:21,22
  115:4
frustration 70:23
  79:21 82:22
frustrations 40:21
fulfilled 151:5
  152:1 161:7
fulfills 165:8
full 120:10 134:13
fully 29:1 36:25
  51:11 70:17 129:9
fund 8:2 15:20
  36:23 48:12,13
  51:12,19 52:10
  54:21 60:7 86:20
  98:25 117:7 144:5
  148:13 161:22
fundamental
  43:25 72:18
fundamentally
  95:6
funded 39:8 69:20

funding 68:25
  76:5
funds 30:6 36:20
  38:2 41:8 50:8
  51:13 59:2,16,22
  60:25 61:9,13,14
  61:20 92:7 111:14
  111:16,18,20
  111:23 113:24,25
  123:5 141:2
  144:10,13,24
  150:15 152:5
  157:17 160:10
  161:5 163:6,8,9
further 31:16
  60:20 61:2 79:1
  141:20 149:24
furthering 50:18
future 45:2 69:8
  71:3 73:9 104:8
  104:24 120:6
  121:12 127:3
  143:12 146:14
  154:6 157:12
  164:8

                g

g 23:1
ga 15:22
gabriel 21:12
game 103:22
  108:23
gange 19:14
gary 19:19
gas 145:22
gathering 63:8
geldreich 19:15
general 5:15 6:7
  11:13 12:22 13:2
  17:3 54:19 63:2
  72:19 82:19
  127:16 128:11
general's 6:24

**generally** 109:2
142:7 148:18
151:13 161:24
**genuine** 85:13
**geoff** 17:20
**geoffrey** 19:6
**george** 20:21
**georgia** 7:8
**gerard** 16:6 20:13
138:9
**getting** 34:4 41:11
41:15 51:3 52:22
63:8 105:24
114:25 119:9
120:13 125:20
128:20 131:14
133:7 144:17
157:3,10 158:16
163:2 164:3
**giddens** 19:16
**gill** 19:15
**gillian** 19:12
**give** 26:14 51:7
86:16 100:22
101:6 102:8
118:12 120:5
133:18 150:10
**given** 24:2,22 26:6
28:9 34:8 37:12
40:2 50:7 69:19
80:17 86:3 88:5
92:3 115:5 129:6
129:8 145:20
147:20 148:4,14
150:14 151:17
160:15 163:6
**gives** 41:18 63:14
81:20 149:24
**giving** 49:21
112:25 121:20
164:2
**glad** 132:24

**gladly** 167:5
**global** 112:6
113:25
**glom** 86:23
**go** 30:1 31:20 34:8
36:11 55:10 58:7
58:16 62:23,24
64:20 68:15 76:1
76:14 77:22 82:10
89:10 90:21,23
92:14 93:14,21
96:2 97:6 98:21
100:14 101:25
110:24 114:9
126:13 157:24
158:15 162:7
**goal** 50:18 53:21
54:22 85:21
109:17
**goals** 126:20
**god** 27:2
**goes** 52:12 54:5
67:11 71:24 79:1
104:7 114:2
126:14 166:18
167:22,24
**going** 24:13 32:25
34:9 36:5 43:21
46:18 48:15 49:15
51:19,20 53:18
54:22 56:1 57:3
60:8,11,13 64:8
65:16 67:21,24
68:1,17 69:8,20
70:2 73:13,20,21
73:21 77:18 79:17
85:20 86:16 87:1
87:7,15,17 88:16
89:4 93:17 96:6
96:19 97:25 98:1
98:3,25,25 99:22
99:25 100:2,3,4,7
102:10,11 103:8

104:21 106:17,18
107:4 110:6
111:14 113:24
117:14 118:23
119:13 121:18
124:14 125:24
126:22 131:25
134:5 138:5,16
148:18 151:24
155:12 161:9
162:4 165:17
167:25 168:1
**gold** 19:17
**goldman** 19:18
**good** 23:2 37:4
47:17 48:6 49:13
52:16 53:8 56:4
58:8 78:22 82:17
89:11 94:5 101:11
102:7 111:1
114:17 118:21
126:9 128:19
134:7 140:16
**gotten** 38:13
71:21 73:17,18
98:11 99:15
**gotto** 19:19
**govern** 56:17
**governing** 128:15
**government** 57:11
89:22 114:12
153:17
**governmental**
2:11 5:4 30:17
47:6 57:9 114:15
116:4 148:15,16
**governments** 98:5
99:5
**governs** 122:5
**grab** 86:15,15,15
**grabbing** 96:9
**granite** 78:3

**grant** 25:3 32:12
64:8 67:13 76:3
108:17 113:14,16
131:4 145:10
150:5
**granted** 24:9
29:19,20,23,24
30:7,14 31:11
32:10 146:13
169:6
**granting** 63:23
159:15
**grants** 63:16
64:10 130:25
**grateful** 82:23
**gratitude** 28:1
**grave** 69:7
**great** 38:5 90:23
92:2 99:10 115:12
121:7 147:21
158:10
**greater** 65:7
77:17 95:19,21
**greatest** 140:16
140:17
**green** 139:20
**greenberg** 15:10
**greenburg** 111:2
**gregory** 20:3
**ground** 126:23
145:14
**grounds** 73:5 78:5
149:5
**group** 2:11 15:18
16:16 30:20 47:5
47:7 57:9 58:13
77:9 78:9 79:11
81:5 85:15 99:13
156:13
**groups** 36:7 46:5
**growing** 98:13
**guaranteed** 30:1

**guarantees**
123:24
**guard**  17:8 19:20
62:9 63:1,1 64:13
65:9,24 66:25
67:15,20 68:15
69:24 72:21 73:3
74:4,22,25 75:21
76:7,18 77:3,15
78:20,23 79:13
80:2,6 81:4 83:2
89:18 91:16 92:2
94:6 96:4,12
117:15 120:8,16
120:23 122:2
**guard's**  83:3
96:25 123:18
**guess**  23:13 25:16
28:3 73:19 74:5,8
74:13,16,22,25
75:1 79:13 80:3
87:19 89:19 114:9
125:8 127:20
132:25 134:7
157:1
**guessing**  127:2
**guided**  27:16 92:1
137:16
**gump**  14:11 48:7

**h**

**h**  5:3 21:15
**hadley**  16:1
**half**  46:8 63:6
64:3,3 65:7 78:21
79:14 85:22 87:15
91:4 93:11 108:7
121:16 126:13
130:4 142:18
148:12
**hallmark**  111:17
**hallmarks**  92:5
**hampshire**  41:18
41:22 134:4 142:4

145:14
**hand**  27:17 92:5
146:2 155:6
**handle**  96:18
**handled**  96:7
**hannes**  21:11
**happen**  32:11,11
32:13,14 73:15
97:14 135:9
138:16
**happened**  43:20
138:19
**happening**  32:14
75:5
**happens**  31:10
121:6
**happy**  47:13 58:4
62:5,14 89:12
116:14 132:3
135:2 137:24
**harbert**  15:4
**hard**  27:13 30:18
46:20 48:10 58:1
66:19 71:25 72:3
79:12 80:22 91:1
92:22 115:3
124:23 154:17
158:10 166:23
**harm**  37:3 79:18
79:21
**harmed**  59:23
167:9
**harold**  16:13 20:1
58:8
**hart**  18:8
**hate**  85:25
**hauer**  14:11
**head**  89:4
**headphones**  25:19
**health**  8:2 15:20
167:13
**hear**  23:18 24:12
31:9 47:13,24

50:15 58:5 60:10
62:6,14 82:5,15
102:17 105:19
118:8,18 125:24
136:13 137:5,24
138:10 167:6
**heard**  31:2 45:2
55:20 62:4 82:12
87:17 93:21 107:9
136:19 137:4
149:11 167:3
**hearing**  2:1,1,4,9
2:14,18,24 3:3,8
3:15,25 4:10,15
4:19 5:1,7,17 6:1
6:9,19 7:1,11,21
7:25 8:5,15 9:1,11
9:21 10:6,16,21
11:6,16 12:1,11
12:17 13:1,3 23:4
25:9 26:6,21
30:24 31:4,5,7
37:14 45:1 49:1
50:20 72:14 81:10
83:10 87:18 92:22
98:13,23 104:13
104:15 106:18
107:20 108:6
118:5 121:6
130:21 134:23
135:4,6,10 136:18
137:14 139:20,24
140:1,6 162:9
**hearings**  29:5
129:17
**heart**  96:2 111:24
**heather**  12:14,15
19:7
**heavy**  8:2
**held**  13:3 23:4
42:10 129:16
**help**  59:22

**helped**  37:7 59:8
**helpful**  36:8 38:8
42:9 80:8 133:19
**henry**  21:23
**hidden**  72:5
**higgins**  19:21
**high**  58:14 101:13
133:24 134:15
**higher**  121:23
**highlight**  66:22
155:14
**highlighted**
147:22
**highlights**  71:10
**highly**  42:14 45:6
**highsmith**  19:22
**hint**  35:11
**historic**  49:20
50:25
**history**  45:18
**hit**  121:7
**hobson's**  94:4
**hoc**  5:1,4 16:9
47:4,5 58:9 89:22
90:18 91:2,6,11
94:3,7,14,18
159:23
**hoffman**  19:23
**hold**  25:15 53:9
75:11
**holder**  64:23
152:24 154:15
**holding**  155:9,15
160:2
**holdings**  154:6
**holdout**  124:12
**hon**  1:22
**honestly**  50:21
74:19 129:1
**honor**  23:16,20,22
25:4,7 26:3,15
27:8 28:2,21
29:16 30:24 32:19

32:22 33:15,19
34:3 35:9 36:8,15
36:25 41:4,11
42:7 43:24 44:14
44:23 45:14 46:1
46:13,23 47:17
48:1,6 56:12,15
56:23 57:1,16,24
58:3,8,12,17
59:12 60:5,22
61:6 63:1,3 64:9
65:10,24 67:15
68:16,24 69:24
72:21 73:3,19
74:25 75:3 77:3
77:15 78:23 79:13
79:19 80:1,9 81:9
82:1,11 83:2,9,14
86:9,25 87:9
88:22 89:7,11,20
89:24 90:16 91:2
91:11,13,16,19,24
94:14 95:7 96:11
97:7,22 98:22
99:14,20 101:21
102:1,17 103:10
103:25 104:16
105:18 106:3,7,14
106:17 107:5,12
108:1,8,19,24
109:16 110:18,25
111:1,4 112:19
113:21 114:5
117:24 119:25
120:23,24 122:2
123:12,22 124:13
125:6 127:14
128:25 129:13,16
131:6,10,18,25
133:10,19 134:11
134:18 135:15,18
136:12 137:3,5,17
138:2,9,11 139:3

139:7,10,19
140:23 141:19
165:15 166:3
167:2
**honor's** 45:3
94:21
**hope** 32:23 59:25
60:10,21 80:10,17
81:13,19 102:12
118:3 128:20
133:11 135:22
168:5
**hoped** 97:17
**hopefully** 31:20
38:8 81:16 91:21
95:23 97:2 119:20
121:22,24 125:21
130:7 135:13
141:10
**horror** 37:25
**hospital** 114:14
**hospitals** 28:20
47:5
**hours** 23:24 50:20
83:10 108:7
**hubener** 23:15,18
23:20 24:15 25:4
25:7,15,18,23,25
26:3 27:8 28:2
31:6,9 32:19,22
33:15 35:9 36:10
**hudson** 16:3
**huebner** 14:8
23:21 24:10 48:25
49:15 52:25 57:3
57:25 63:4,7,13
71:17 80:1,8 82:1
85:8 87:4 91:4
93:3,8 94:15
96:14 102:25
106:19 108:6
111:18 112:19
113:11 119:25

120:5,8 121:14,18
121:20 123:12
127:14,20 131:6
131:10,20 132:11
132:14,18 133:1,6
133:14 134:10
135:12 136:17
140:4,8 165:11,15
165:21 166:3,14
166:18
**huge** 28:22 50:6,7
165:18
**hundred** 151:7
**hundreds** 26:14
128:18
**hunter** 2:15,25
**hurley** 19:24
**hyde** 13:25 170:3
170:8
**hypothetical**
71:17 104:11
**hypotheticals**
107:1,6

**i**

**i.e.** 154:14 157:17
163:25
**iacs** 112:5,6
**icl** 42:12 85:8
155:9
**identical** 28:25
**ignorance** 107:2,6
**ignored** 100:24
**ii** 2:5 15:16
**il** 16:11
**illegal** 26:18
**imagine** 33:16,19
34:3 38:9 46:5
55:12 81:13
154:17
**immediate** 45:6
51:3 147:24 149:2
151:11 159:14

**impact** 39:25 50:7
50:14 93:1,2
118:4 138:4
**impairment** 92:17
**impairs** 73:9
**impediments**
102:14
**imperils** 73:8
**implausible** 40:19
**implement** 144:19
**implementation**
132:1,5
**implemented**
88:13,13
**implementing**
91:12
**implicate** 44:12
156:6
**implicated** 129:19
**implicit** 81:23
**implies** 76:7
139:17
**importance** 121:7
**important** 26:21
26:25 27:5,22
28:10,15,21 30:19
34:6 51:1,3 59:18
65:20 91:19 92:18
92:18 97:12 98:20
104:24 119:12,22
121:15 135:3,3,6
136:10 137:24
142:24 145:2
149:15 150:8
155:3 159:10
160:6 162:15
163:13,18 167:1
167:23 168:2,6
**importantly** 24:7
34:19 40:13 70:13
122:22 125:5
145:11 154:12

**impose** 145:10 146:10
**impossible** 26:24 132:19 160:18
**improper** 72:4
**improve** 30:4
**improvement** 57:22
**improvements** 74:3 94:10
**include** 33:10 64:1,2 72:19 156:21
**included** 94:21
**includes** 38:1 53:1 70:8 76:5 157:12
**including** 29:22 32:3 41:7 44:3,4 45:7,18 46:19 47:2 48:11 53:17 61:10 78:2 81:4 84:3 94:2 119:17 122:23 129:17 142:24 144:8 145:11 146:8 147:1,16 150:3,16 150:19 160:13 162:18 163:7 165:4 168:2
**incomprehensible** 110:18
**inconsistent** 97:1
**inconvenience** 164:10
**incorporated** 80:24 114:12 166:2
**incorporates** 152:19
**increase** 82:23 86:12 115:8
**increased** 41:21 59:14 70:3 74:1

**increases** 41:8 42:4
**increasing** 115:8
**incredible** 26:13
**incremental** 30:3 37:6 59:15 142:19 143:21
**incurred** 143:10 161:8,9
**indefatigable** 27:17
**indiana** 12:14
**indiana's** 12:11
**indicate** 67:22 97:23
**indicated** 26:10 70:1 92:2 94:16
**indicative** 85:3 150:10
**indirect** 32:2
**indiscernible** 24:3 24:4,8 25:8,11 27:6 29:7 30:12 30:23 36:6,14 38:15 44:6 48:20 50:4 54:7,11 55:9 55:11,12 56:13 57:2 60:6,10,14 60:17,20,21,22 65:12 67:14 74:9 75:10 76:14 80:6 81:14,15 85:6 86:8 87:7 91:1,8,9 91:14 92:25 93:2 93:9 94:23 100:10 100:18,18 101:8 102:17 104:3,10 109:15,18 112:4 113:3,7 120:1 125:13 127:16 129:1 130:7,18 132:2 133:16,22 134:9,14,15

135:13,14,21 137:10 140:11 141:2
**individual** 54:12 74:12 101:2 123:23 136:8 150:15
**individually** 66:18
**individuals** 161:16 162:7
**individuated** 123:17
**indulge** 82:21 83:9
**indulgence** 87:10 88:9
**industries** 78:3,4 78:12 117:7 161:1
**inference** 56:10
**initial** 94:20
**inject** 100:7
**injunction** 66:20 93:10 129:24 131:2,3 133:5 141:6 148:3,6,8 165:14
**injunctive** 34:21
**injury** 50:15 56:22 83:24 101:19 110:23 154:6 162:8,18,20 162:20
**inordinately** 124:4
**inquiry** 42:8
**inside** 69:10 79:18 79:23
**insider** 111:18
**insisted** 38:22
**instance** 52:5
**instant** 40:6

**institution** 30:7
**institutions** 30:11 50:12 142:25
**instructive** 42:14
**instrumental** 91:12
**insurers** 156:5
**integral** 76:11
**integrity** 92:19
**intellectually** 129:4
**intended** 112:16 120:20 165:22
**intensity** 48:12 51:12,19 52:10
**inter** 56:3,17
**intercreditor** 72:1 74:7 77:24 91:13 100:10 101:11
**intercreditors** 123:25
**interest** 64:23,24 64:25 79:15 100:11,19 105:23 143:16 152:24,25 153:1 154:15,17 156:11 158:10 164:10,11 166:24
**interested** 88:21 111:13
**interesting** 90:2 93:3 122:10 129:5
**interests** 49:2,10 54:6 57:17 156:25
**interpret** 67:18
**interpretation** 86:21 156:23
**interrupt** 32:8 98:17 112:14 126:25
**interrupted** 140:5
**intra** 53:25

introducing 53:24
invalidate 149:3
invested 58:2
investment 71:14
investments 84:11
investor 85:6
invites 69:9
involuntary
  145:10
involve 40:22
  94:12
involved 72:9,10
involvement
  126:22
iridium 154:9
  163:24 164:6
  165:1
ironed 60:18
irony 124:5
irritating 110:1
irve 19:18
isaacs 10:16,19
island 114:13
israel 16:13 20:1
  58:8,9
issacs 19:25
issue 29:20 39:14
  43:16 46:9 50:9
  53:23 54:5,5,12
  64:16,16 65:16
  67:19 68:5,7,13
  71:1,3,23,25 74:8
  75:17 77:2 78:16
  81:20 83:1 85:4
  86:6 87:12,14
  88:3,8,10,11 89:4
  90:5,13 92:12
  96:2,4 97:8 98:14
  98:14,16 99:14,17
  101:13,14,14
  105:3,16 111:12
  115:5 117:6 119:3
  123:15 126:3,18

127:16 128:1,19
  130:18 131:17
  135:14 141:1,2
  150:7,24 153:7
  154:24 155:25
  157:15 159:21
  161:18,21
issued 129:20
issues 31:14,15,16
  35:13 38:12 56:17
  56:18 81:1 88:19
  90:1 98:20 100:12
  100:13 103:23
  104:1,10 106:4,25
  107:3 115:10
  118:5 120:16
  123:9 124:14
  125:13 126:10,14
  126:19 127:21
  128:8,10 130:1
  140:14 141:16
  149:22 150:21
it'll 125:12 137:24
items 76:1 120:3
i'm 117:16 136:13
  136:19

j

j 2:15,25 3:6,12
  4:23 18:1 19:17
  19:21 21:6,16,19
jacquelyn 22:7
james 4:16,17
  17:23 18:22 20:14
  21:10
jan 19:23
jasmine 18:16
jason 18:20
jay 18:15
jeff 21:8
jeffrey 20:12 21:6
jennifer 20:24
jersey 114:15,16

jevic 72:8,9
  103:16 155:15
jill 17:18
job 111:7 140:16
john 17:8 19:20
  63:1
johns 117:4
  161:25
joinder 3:18 4:3
  4:20 5:10,20 6:1
  6:12,19 7:4,14 8:8
  8:18 9:4,14,24
  10:9,24 11:9,19
  12:4,12,18 28:24
  63:5 82:6
joinders 28:19
  82:7,9 120:12,14
  120:18
joined 47:3,5
joining 64:17
  89:17
jointly 1:7
jones 17:22 20:2
jordan 22:4
joseph 2:5 15:16
  20:3 21:3,21,24
jr 6:23
judge 1:23 23:2
  27:17,18,25 34:23
  35:12 40:15 57:25
  59:7 62:12 70:21
  80:18 82:15,20
  85:25 90:19 91:7
  95:20 114:9 116:8
  116:23 117:16,19
  128:12 135:1
  138:19,20 155:13
  156:13 167:5
judgment 125:4
  141:1 149:12
judgments 115:11
judicial 113:1

julius 19:3
jump 28:3 55:3,23
jumping 55:16
juncture 124:24
jurisdiction 34:25
  43:24 44:5,21
  65:13 66:5 75:15
  81:21 105:7,16
  110:8 127:21
  128:11,14,16
  149:9,23 150:9
  151:3,9
jurisdictional
  81:2 149:6 150:4
jurisdictions 60:3
  103:6
justice 14:19 17:1
  102:2 103:19
  129:23 155:16
justification
  165:3
justified 124:10
justify 109:17

k

kaminetzky 20:4
kane 117:4 161:24
kansas 8:22
karl 21:2
katheen 20:18
katherine 21:1
kathryn 18:17
  21:9
keep 25:25 30:5
  124:25 132:22
keeps 159:9
keepwells 123:25
kelly 22:1
ken 6:7
kenan 2:21 21:14
kenneth 5:3 14:25
  89:21
kentucky 7:19

kept 46:17
kesselman 20:5
kevin 16:20 58:12
key 78:9,9 87:8,11
  136:24 159:23
kill 105:25
kind 24:11 42:17
  60:7 65:10 68:15
  68:18,23 75:3,8
  92:24 96:2,7,8
  101:13 104:22
  125:25
kinds 97:11
klein 20:6
know 25:18 26:9
  26:14,22 27:2
  28:6,23 29:2,9
  33:16 34:24 47:11
  54:1 56:13 60:16
  60:25 61:2 62:16
  67:23,24 68:10,24
  70:1,10 71:2 72:7
  72:8 73:11,12,15
  73:16 74:5,6,13
  74:14 75:5,6,11
  76:21,25 78:9
  79:14,16,18 82:5
  82:10 83:22 85:2
  89:10 90:9,18,20
  91:1,2,15 93:8,16
  98:12 99:15
  103:16 106:4,5,5
  106:11 107:10
  108:4 113:19
  117:21 118:19
  124:16 125:15
  126:6 134:11,12
  136:5 137:16
knowing 65:6
  149:1
knows 23:23 86:9
  91:11 93:8 99:20
  124:16

knudson 22:7
kramer 89:21

**l**

l 17:24 19:8,11
  20:15
l.p. 1:6 3:6,13
labored 130:3
laborers 8:2
laid 56:10,11
  100:4 127:10
  141:19 163:23
lake 2:16
land 104:8
landmark 49:17
language 34:17
  82:21 156:20
large 26:21 84:2
  86:13 144:21
largely 63:5 69:20
  97:3
larger 37:19
  128:8 133:22
lasalle 16:10
laudable 37:16
  59:9
laughable 151:8
laura 21:20
law 15:1,18 28:25
  35:15 42:8 44:3,4
  46:2 54:17 67:18
  71:9 74:2 78:2
  109:25 110:3
  113:1,5,18 114:4
  116:16 122:21
  125:14 126:19
  128:15 130:5
  141:6 152:14,23
  155:2 156:8
  158:12 160:25
  162:8 164:5 165:1
lawful 37:20 38:7
  39:2

lawrence 18:9
lawsuit 72:10
lawyers 114:24
lay 42:9
layering 39:23
layn 70:21,21
lc's 123:25
leadership 4:13
leading 153:23
leads 123:20
leagues 43:2,3
leave 108:19
  121:9
leaves 78:14
leaving 51:6 155:1
ledanski 13:25
  170:3,8
ledyard 17:10
  82:18
lees 20:7
lefkon 20:8
left 42:16 57:7
  62:7 104:10
  123:15
legal 27:1 30:11
  39:6 45:20 54:14
  57:2,16 70:23
  83:10 86:16 87:3
  87:5 98:18 102:14
  113:5 121:22
  140:18 150:7
  151:24 153:12
  166:9 170:20
legality 37:17
  127:25
legitimate 113:3
  114:2
lehman 160:3
length 33:24 81:5
  164:14,19
lengthy 116:11
  129:16

leonard 20:9
letter 28:4 29:11
  44:15
level 58:14 69:9
  73:17 79:7 95:21
  114:18
levenfeld 16:8
leventhal 20:10
leverage 79:8,11
  79:11 160:16
levin 89:21
lexington 14:5
lexis 117:8 156:2
  161:23
li 20:11
liability 168:4
license 112:25
lie 121:8
liesemer 20:12
lieu 142:20
life 68:5 115:1
  128:4 131:11
  135:25
light 142:8 160:16
  167:20
likelihood 118:19
  164:9
likes 148:22
likewise 37:10
limit 138:4
limited 2:4 5:1
  44:1 78:24 82:7
  142:6 146:7
  158:25
limits 159:24
line 42:15 51:16
  55:3,23 113:4
  128:14 169:4
lined 80:17
lines 25:10 26:4
  51:25 89:3 145:23
  149:20 159:15

**liquidation** 32:4
141:15
**list** 146:4 154:16
**listed** 52:21 117:1
**listening** 26:15
107:19 136:2
**listing** 29:12
115:24
**lite** 15:10 111:2
**literally** 27:11
62:7 78:11 86:12
132:19
**litigants** 38:5,6
**litigate** 84:16,17
**litigating** 130:16
**litigation** 5:5
30:13 84:3 164:9
**litigation's** 164:8
**little** 63:19 125:2
126:16 151:6,7
152:2
**live** 167:25
**lived** 52:11
**lives** 30:4 50:22
50:22 52:7 73:14
80:5 125:22
128:18,19,21
140:22
**llc** 16:8 163:24
**llp** 14:3,11 16:1
17:10
**local** 8:2 15:20
98:5
**localities** 126:23
**location** 13:4
**lock** 101:17
**locked** 38:21
**locking** 121:22
165:4
**locks** 121:13,16
151:12,13
**logic** 34:22

**long** 31:9,20
34:15 37:4 41:23
46:20 54:15 81:6
85:22 114:12
115:24 119:5
157:2,7
**longer** 38:14
130:15 141:16
**look** 65:18 70:6
77:18 87:18 88:12
105:23 112:6
123:7 125:23
128:12 131:25
168:7
**looked** 52:2 53:7
124:23 133:4
134:24 155:24
**looking** 53:10
54:21 79:23,24
99:24 101:5
132:19 133:8
**lose** 29:23 89:15
94:5
**loss** 141:15
**lost** 32:7 43:17
47:11 58:20
**lot** 31:3 34:14
53:4 78:18 81:17
83:16 84:7,8 85:1
92:14 99:20
131:11
**louis** 18:23
**louisiana** 12:8
**love** 114:25 115:1
115:2,2 136:5
**loved** 50:23
**low** 133:19
**lower** 67:8 149:11
**lowering** 32:4
**lp** 23:3
**lucas** 21:15

**m**

**m** 12:14 17:22
19:7 20:2,16
**ma'am** 110:4
**maclay** 16:20
58:12,12,17
**maclay's** 99:12
**mad** 72:21,23,24
**magali** 19:16
**main** 124:3
**maintainable** 83:8
**maintains** 107:16
**major** 92:15
102:6 152:1
**majority** 28:13
29:6,14 36:16
124:4 158:9
**making** 26:16,17
68:10 79:2 85:9
90:16 107:6
117:16 157:2
**mallinckrodt**
156:1
**man's** 104:8
**management**
71:14
**manner** 54:16
92:9 148:23
**manville** 67:6
117:4 161:25
**mara** 20:10
**marc** 20:5 21:18
21:24
**march** 1:16 2:1
170:25
**maria** 7:21,23
**marion** 18:4,11
**mark** 8:1 15:24
**marshall** 14:8
23:20 127:21,22
128:5,9
**martin** 22:5

**marvin** 6:23
**maryland** 52:11
**massachusetts**
53:1
**massive** 32:2
40:16 79:18 93:24
**massively** 40:24
86:4
**master** 143:24
144:23
**masumoto** 18:7
**material** 28:12
30:14 46:7 94:11
119:10 142:23
146:12
**materially** 41:8
46:21 141:14
150:19 162:11
**matter** 24:8 25:8
25:8 31:10 34:24
37:16 59:20 68:13
74:23 86:1 87:2
92:20 109:24
111:21 112:10
123:19 125:5
149:10
**matters** 23:7
109:24,25 133:16
149:16
**matthew** 19:17
**maura** 20:18
**maximum** 30:2
74:20 92:9
**mbt** 54:10
**mccarthy** 20:13
**mcclammy** 20:14
**mccloy** 16:1
**mcgaha** 20:15
**mclean** 78:2,3,12
161:1
**mcmahon** 34:24
80:18 91:7 95:20

mcmahon's 35:12
128:13
mcnulty 20:16
mdl 79:12 114:19
mdt 41:21 99:25
100:21 112:2
mean 53:6,7 68:5
68:12 72:23 73:3
73:10,19 74:8,19
76:9 77:18 86:15
97:13 98:17
105:21 110:14
112:20 113:9
121:15,17 127:17
130:20 139:5
meaning 137:22
156:9
meaningful 50:14
51:8
means 45:14 60:1
78:8 109:17 138:3
138:4 154:18
meant 66:21
69:13,15 87:1
165:19
mechanics 36:2
41:10 42:5 128:22
mechanisms 66:8
66:10
mechanistic 80:15
mechanistically
39:20
mediation 24:23
24:24 27:22,23
30:20 38:10 40:14
58:1 64:8,11,12
70:20,20 78:25
135:2,17 136:24
139:1 142:10,12
162:16 164:17,18
167:6
mediator 134:17
136:23 142:11

143:4 164:20
166:21
mediator's 89:3
135:19 164:17
mediators 60:16
meet 67:14
megan 18:3
meises 20:17
melanie 19:8
melissa 17:24
member 61:12
66:5 143:6 144:9
members 66:15
66:18,22 114:11
118:13 147:13
155:7 167:7
membership
30:17
memory 135:19
mention 27:5
mentioned 51:10
68:15,22 134:22
merely 33:23
148:25
merit 41:1
merits 28:3 83:19
84:16,17 121:24
150:24 164:1
metromedia 67:6
mic 25:5
michael 18:14
20:22 21:7
michele 20:17
microphone 24:12
31:1
midst 90:4,22
milbank 16:1
138:9
milburn 17:10
82:18
million 30:2,21
36:5,22 38:12,23
38:25 39:1 42:5

46:11 50:3 51:17
56:22 69:2 74:21
77:13,15 78:22
83:18 87:16,20,23
93:6,19 103:14,15
104:3 112:3
114:13 116:3
121:21 123:4
125:11,19 129:19
142:19,22 143:10
143:12 144:6,22
145:4 148:11
151:7,7 154:20
160:23 161:8,9
mind 28:13 34:7
72:13 156:17
mindedness 59:4
mine 34:16
136:11
mineola 170:23
mini 128:8
minimis 44:8
minimize 120:6
minimum 30:1
minor 77:23
80:20
minuscule 161:4
minute 62:10
68:21,22
minutes 28:6
29:16 33:24 36:4
40:11 112:23
120:2 139:21
mirror 60:9
mischaracteriza...
44:1
mischaracterize
36:13
misery 37:3
missing 135:8
mississippi 5:24
missouri 5:14

mistake 42:17
166:4,14
misunderstand
36:12
misunderstanding
37:9 44:1
mitchell 18:15
19:24
mitigate 63:19
model 43:9,14
94:9
modest 46:10 81:8
125:8 147:2 165:6
modification
75:10 104:25
106:24 119:10
146:11,13 148:25
152:13 153:19
159:3,4 162:10,12
162:13 165:10
modifications
49:12 75:15 94:9
modified 116:14
154:14 162:25
modify 43:8
112:16 145:17,20
152:10,21 153:8
modifying 114:22
module 133:17
moment 90:17
monaghan 20:18
139:8,10,16
monetary 142:23
164:3
money 38:6 41:12
41:21 43:2 49:25
51:17,18,20 52:3
52:15,20 54:9,15
54:21,22 55:3,4
68:22,23,25 69:1
69:17 71:10 72:11
73:13,13 78:18
83:18 84:9,13,19

85:19 86:23 102:5
102:9 103:17,22
104:5 105:24
107:3 108:23
109:15 115:8,14
118:15,16 122:4
122:18,19,20
125:11 126:5,6,8
126:17 128:18,21
129:4 131:14
132:20 140:22
144:5,21 148:18
156:3,22,23 162:3
163:16,16
**money's** 72:20
79:24 83:1
**monies** 97:25 98:1
98:3,24 99:1
163:12
**montana** 10:13
**monthly** 46:8
**months** 31:23
49:23 58:3 61:5
72:25 123:14
**morning** 27:20,20
27:21 103:4
166:25
**morrisey** 12:21
82:18
**motion** 2:9,14,18
2:19,24 3:3,3,8,8
3:10,15,18,25 4:3
4:10,15,19,20 5:1
5:2,7,10,17,20 6:1
6:2,9,12,20 7:1,4
7:11,14,21,22,25
8:5,8,15,18 9:1,4
9:11,14,21,24
10:6,9,16,21,24
11:6,9,16,19 12:1
12:4,12,18 23:8
23:10,10,13,22,25
24:7,17,18,19

25:3 27:8,10
29:24 32:10,13
40:6 47:2,2,7,8
49:5,7 62:5 63:13
63:16,18,23 75:23
75:25 80:11,19
86:18 89:25 94:17
94:19,20 95:2,11
96:15 105:1
106:25 124:16
125:7 132:10
135:7 136:4,5,6
136:18 137:2
140:7 141:2,22,25
143:17,19 145:25
146:13,14,15,19
149:3,21 150:3,5
150:7,11 151:3
152:2,2,10,16
153:5,8,19,20
154:25 157:19
158:19 159:15,16
169:6
**motivated** 59:4
**motivating** 129:9
**move** 68:16 97:2
107:10,12 108:5
126:11 166:8
**moved** 121:3
**moving** 63:12
78:20
**msge** 16:16 28:11
47:7 58:13 77:6
99:13
**multi** 2:11 47:6
**multiple** 30:16
31:14 32:2 45:6
70:1,2,3 108:16
165:19
**multiplier** 163:7
**multiyear** 60:1
**mulvihill** 17:20

**municipal** 111:3
**municipalities**
161:13
**municipality** 2:6
15:11
**munis** 28:12
**murray** 20:19
**museums** 50:12
**mute** 23:14
**mutiny** 126:3
**mutual** 120:21
**myriad** 40:18

**n**

**n** 14:1 16:10 23:1
169:1 170:1
**name** 30:9 50:13
**naming** 30:12
142:25
**nan** 14:24 102:1
**narrow** 29:19
114:20 160:2
**narrowed** 44:17
**nas** 16:9 28:19
47:4,4 58:9
**nassau** 3:1
**nation** 2:7 15:12
111:3
**national** 70:25
114:19 117:7
161:22
**nations** 161:13
**native** 148:20
**nature** 119:21
148:5
**ncsg** 94:8
**nearby** 26:1
**nebraska** 11:23
52:7,8
**necessarily** 97:7
107:22 137:19
153:3 163:10
**necessary** 85:17

**need** 24:23 30:16
49:1 55:9 62:18
68:8 74:3 81:12
109:20 125:15
127:22 128:12
131:5 133:10,12
135:15
**needed** 73:13
105:2
**needs** 54:17 85:23
85:24 125:15
127:11
**negless** 20:20
**negotiate** 66:18
67:12 77:23 78:9
**negotiated** 40:3
40:14 70:19 94:9
94:10 95:16
101:11 162:3
**negotiating** 60:2
65:5 72:25 79:12
99:20
**negotiation** 63:24
67:25 68:1,3
70:24 142:14
**negotiations**
27:14 53:25 60:15
61:2 64:2 65:1
66:24,25 67:4,5
164:20
**neiger** 18:6
**neither** 37:15 39:8
42:25 107:7
**net** 112:4 134:11
**nets** 52:20
**never** 25:19 31:2
38:25 39:25 130:2
131:6,16,17
**nevertheless** 43:1
149:10 153:21
**new** 1:2 14:6,15
14:22 16:4 17:13
35:20 37:11 41:1

41:12,18,22 49:25
53:1 100:7 105:1
105:1 114:15,15
125:11 134:4
142:4 145:13
**newark** 15:14
**news** 126:9,10
**newspapers** 38:11
**nicole** 20:9
**night** 91:4
**nine** 27:11,15
31:11,19 32:21
33:3,5 36:3,23
37:23 38:11,14,22
41:18,22 45:8
48:23 51:2,3,17
52:12,24 54:2,2,3
54:9,17 55:6,21
59:8 61:12 63:24
63:25 66:3 67:21
69:3 70:5 71:2,5
74:10 75:2 77:5
83:17 86:17 93:6
95:16 97:19 98:6
102:7 105:9,13
111:6 114:24
115:14 116:2
121:10 122:17
123:17 124:2
126:8,15 127:15
128:1,17 130:8
134:4 137:20
142:1,9 144:9
145:11 146:20,22
147:14 153:14
160:16 162:5,16
**nine's** 45:25
**nj** 15:14
**noat** 41:15 48:24
56:6,19 59:2 60:2
60:9 61:3 74:1
76:5 95:17 100:3
119:13 134:5

143:24 144:23,25
162:4 163:20
**noble** 109:17
**nobody's** 102:20
108:14
**non** 51:6 54:1
57:9 77:21 113:5
113:5,18 114:4
116:4 142:23
148:16 152:22
155:21 156:22
157:17,17
**nonconsensual**
57:14
**nonfederal**
153:17
**nonlegal** 57:19
**nonmonetary**
164:4
**north** 10:3 15:5
53:2 155:22
**noses** 53:9
**notably** 45:13
**note** 28:21 31:1
43:16 46:2,14
53:16 54:19 56:9
61:8 63:6 86:17
114:23 124:5
128:6,12 129:13
130:18 149:24
159:16 161:3
**noted** 26:15 28:8
29:17 82:7,8
101:9 118:2
128:14 147:6
150:10 156:3,8
**notes** 132:2
135:18
**notice** 2:1 3:9
23:9 24:1,20
121:3
**notifying** 45:7

**noting** 63:3
**notion** 40:3,13
**notwithstanding**
91:21 92:11
152:22
**november** 129:20
**number** 25:9
28:22 40:5 43:24
44:23 45:25 59:11
59:12 62:16,24
84:1,2 90:17 92:7
92:8 114:14,14,17
115:6 120:23
123:15 126:2
133:15 140:9,17
147:21 149:5
**numbered** 59:14
65:22
**numbers** 79:23
133:18
**nw** 16:17
**ny** 1:14 14:6,15,22
15:19 16:4 17:13
170:23

---

**o**

**o** 1:21 23:1 56:6
170:1
**obaldo** 6:5 20:23
**object** 28:24 29:8
29:9 53:9 63:10
81:13 86:6 118:20
125:18 158:3
162:13
**objected** 23:22
53:17 63:7 85:1
98:7 109:15
111:12 115:14
121:3 122:16
123:1 142:4
145:14 159:13
**objecting** 29:2
52:19,25 54:3
57:6 64:3 70:18

73:4 74:14 79:10
82:23 84:25
116:18 149:4
**objection** 2:14,18
2:24 3:15,18,25
4:3,10,15,19,20
5:1,2,7,10,17,20
6:1,2,9,12,20 7:1
7:4,11,14,21,21
7:25 8:5,8,15,18
9:1,4,11,14,21,24
10:6,9,16,16,21
10:24 11:6,9,16
11:19 12:1,4,11
12:11,13,17,17,19
13:1 36:16 41:14
43:19 54:11,14
55:2 62:19,23
64:18 65:2,3,4,11
67:13,22 71:8
73:18 82:7 87:4,5
89:9 94:18,23
97:23 102:22
110:21,22 111:24
113:10 114:20,22
115:17,23 116:13
117:22,23 120:18
123:2 125:22
142:12 161:20
162:7
**objections** 23:23
24:4,6,7,17,18
28:5,7 29:12
33:22 36:12 51:9
52:18 54:8 62:15
62:17 63:4 71:6
71:19 94:20 95:8
95:10,11 102:20
110:20,23 117:23
129:9 142:1
143:18 148:14
153:2 161:11,15
161:17,18

objector 33:21
43:17,19 47:15
62:18 81:3 122:23
objectors 29:22
37:5,10,16 39:6
39:10 40:6,21
43:6,17 44:13,24
45:11,24 46:6,20
46:23 62:6,14,24
80:5 117:20
124:15 133:22
140:11 148:10
153:2 154:18
159:13,16 161:19
162:2 166:21
objects 36:16
obligations
140:18 151:15
158:25
observation 93:4
observations
59:20 90:17
obtain 30:16
69:12 130:16
obtained 30:19
64:5 115:14
160:15,16
obtaining 146:16
obviated 49:1
obvious 121:10
obviously 26:6,15
28:4 29:3,4 34:23
36:11 48:25 59:18
60:16,19,25 61:18
69:13 75:8 81:10
83:5 100:25
111:16 113:2
115:18 116:13
126:10 130:1
151:25 160:20
166:20 167:19
occasion 70:3

occasions 70:1,3
occur 63:21 68:2
143:20 149:6
151:15 162:25
occurrence
151:24
odds 96:21
offensive 37:3
offering 157:6
office 6:24 17:3
57:14 62:8 102:2
official 14:12
26:22 28:16 47:3
48:8
ohio 11:13
oil 145:22
okay 23:2 24:10
25:7,23,24 26:2
27:7 34:13 46:25
47:13 48:5,6 56:2
56:25 57:1 58:4
58:11,16,17 61:8
62:4,12 79:20
80:7,12 81:22
82:4 87:8 89:8,14
89:18 101:20,23
110:19 113:8
114:7 117:20
119:1 120:4,7
127:19 131:19
132:17,24 137:3,7
137:9,11,12 138:8
139:5,8 140:2
141:21
old 72:12 170:21
once 44:4,4 122:6
one's 77:17
ones 44:6 50:23
102:16
oneself 96:9
onset 59:5
open 72:13 77:23
83:6 94:16 129:18

opening 46:14
81:5
openly 50:21
openness 92:10
operating 85:19
154:9 163:24
operative 166:17
opinion 45:1 87:3
87:3 88:15 103:20
151:17 155:16
159:22
opioid 30:4 36:22
51:21 52:3,16
53:22 54:1,1,16
57:12 59:17 61:10
73:6 85:16 86:3
86:14 87:16 102:6
109:16 114:19
118:12,12,23
119:17 142:22
144:1,5,7 148:13
150:16 160:11
opportunity 24:5
72:6 84:9 89:16
89:23 101:22
157:9 158:6 167:2
opposal 91:25
oppose 52:20
opposed 56:7 90:8
107:2 110:5
113:25 120:13
144:14 164:7
opposing 53:4
opposite 74:16
opposition 2:4,18
111:8
options 149:25
oral 46:23 117:22
148:4
order 2:19 3:4,9
3:11,16,20 4:1,5
4:10,22 5:8,12,18
5:22 6:4,10,14,22

7:2,6,12,16 8:6,10
8:16,20 9:2,6,12
9:16,22 10:1,7,11
10:18,22 11:1,7
11:11,17,21 12:2
12:6 23:9,11
29:23 32:15,23
33:8,9,10,17,18
33:20,22 34:2,7
34:11,19 35:16
37:23 44:11 45:5
45:22 49:9 61:25
63:15 66:4,4,13
66:17 69:24 75:16
75:18,19 76:9,18
80:14,16 81:19
85:11 101:16
107:21 108:2,9
112:12,17,20
113:4,13 124:6,16
124:19 125:7
126:8 127:5
129:12,15,20,21
130:9,22 131:5,23
132:10,16 133:3
141:22 145:8,18
146:6 147:9,19
155:19 156:18
165:11,14 166:4
166:10,14
ordered 38:9
142:10
orders 33:5,12
34:14,15 35:18
46:7 77:6 113:15
114:3 130:24
133:4 147:21
165:13
organization 30:8
organizations
143:1
original 163:18

osus 128:14
ought 84:22 86:10
  118:16
outcome 97:16
outline 107:8
outlined 149:1,2
  159:1
outset 26:10 44:7
  48:9 120:9
outside 51:15 69:8
  79:18,21 94:18
  153:13
outstanding 94:1
outweigh 81:14
overall 61:14,22
overblows 63:13
  63:22
overdose 52:13
overdoses 118:12
overlap 145:25
overlooked 52:23
override 114:3
overrule 34:23
overruled 65:13
oversaw 59:7
overstate 26:24
overturning
  113:18
overwhelming
  36:16 37:20 92:12
owen 20:8
owned 123:4,16
oxycontin 50:22
  52:8 102:6 134:24
  167:10
ozment 4:16,17
  15:1,8 117:24,24
  119:7,24
o'connor 20:21
o'neil 20:22

**p**

p 14:1,1 23:1
p.m. 1:17 168:9
page 65:22 117:9
  155:12 161:24
  163:24 169:4
pages 29:12 65:22
  156:2
paid 36:6 37:12
  69:2,3 72:11 73:8
  84:14 93:6 103:18
  114:25 115:4,9
  123:5 131:6,8,13
  131:16 132:20,21
  143:22,24 144:14
  155:7 156:4,5
  159:21
pain 136:1
painful 118:9
  140:14
paper 58:17
papers 40:11
  43:15,22 44:3,21
  46:1 47:9 48:15
  49:19 58:10,24
  79:19 86:18 99:16
  101:22 141:10,19
paragraph 35:16
  35:24 59:14 65:21
  76:9 80:14 103:3
  103:19 117:10
  129:24 131:8,17
  132:5,7,9 135:18
  162:1 166:9
parameters 127:9
paramount
  164:10
pari 55:4,22 74:8
paris 18:3 21:7
park 14:14
parse 75:17
part 23:25 55:13
  73:4,17 75:1

76:11 81:5 91:15
  99:3 126:23
  127:10,11 131:14
  135:17 136:22,25
  137:14,24 138:16
  138:18,25 139:23
  155:18,19 163:10
parte 3:8
participate 56:5
participated 91:6
  98:7
participating
  31:13
participation
  25:12 26:5 29:5
  114:18
particular 64:23
  64:24,25 75:17
  99:19 101:17
  129:15 152:24,25
  153:1 154:15,16
  156:11
particularly
  70:16 96:5 161:12
parties 23:25 26:7
  27:9 28:22,23
  29:2 33:17 36:7
  37:1,2,4 39:3
  40:15 42:11 43:1
  43:2,12,12 45:6
  46:19 58:18 59:19
  61:4 64:12 65:5
  70:10 90:7 91:1
  92:1,4 95:18
  96:10 99:24
  100:19 101:1
  102:7 103:2,4,6
  109:20 120:5,17
  123:15,17,24
  127:25 128:5
  135:17 136:24
  142:6,10,11,15
  143:9,22 144:1,15

146:19,25 147:7
  147:14 150:12
  151:10 155:9
  156:5,5 157:8
  158:7,9 162:17
  163:1 164:11
  165:4
partners 78:3
partnership 67:7
parts 152:1
party 23:22 37:6
  38:16 39:24 40:1
  41:16 42:16,18
  57:7,14 58:22
  67:3,9 70:14 71:7
  88:2 91:23 92:2
  99:25 100:7
  112:12 121:25
  123:9 124:9,12
  143:15 145:7,10
  146:10 147:17
  150:14,24 157:21
  158:5
party's 44:19
pass 71:13
passionately
  121:4 124:8 128:9
passu 55:4,22
  74:8
path 96:13,24
pathway 67:2
  131:23
patrick 12:21
  20:22 82:18
paul 2:21 21:14
paxton 6:7
pay 35:5 36:19
  46:4,10 66:6 69:6
  70:2 93:14 101:19
  112:1 127:12
  131:22 142:19
  147:6 151:21

**paying** 38:6 43:1
   70:5 93:19 106:23
   111:19,20 122:18
   122:20
**payment** 36:3
   37:18 38:12,18,19
   38:23 39:1,2
   42:16,17 45:25
   50:5 55:10 56:21
   65:12,13 66:14,14
   66:22 74:1 78:19
   96:22 98:18 101:6
   101:7 121:21
   129:21 143:7,8
   144:16 157:23
   159:13,17,25
   160:3,13 166:6
**payments** 30:3
   33:4 35:25 37:1
   38:2 39:8,10,16
   39:17,18,19,21
   40:22,22 42:10,20
   43:6,8,11,12 46:7
   51:15 55:21 56:8
   56:9 64:15 66:2
   71:13 93:22 94:12
   96:19 99:22 100:1
   100:2,3,4,14,15
   100:23 129:7
   132:7 133:20,21
   142:15 155:4
   166:8
**peabody** 157:5
**peacock** 20:24
**pearlstein** 16:8
**pending** 77:24
   92:21 145:25
   150:6 156:19
**pennsylvania**
   53:2
**penny** 30:5 41:18
**penumbra** 124:14

**people** 24:5 26:14
   26:14,23 30:25
   34:10 52:1 58:19
   59:25 77:9 81:17
   81:20 82:5 83:16
   87:18,24 98:19
   101:2 105:23
   107:4 109:6,8
   118:10,11 119:5
   125:15 127:3
   133:8,16 134:23
   135:23 137:4,7
   161:16 166:23
   167:9,17,21,23
**peppercorn** 35:11
**perceived** 120:22
**percent** 37:11
   39:24 68:25 77:17
   90:7,8 93:16
   96:21 112:3
   114:18 119:12
   133:24 134:1,8,9
   144:20,20 148:19
   158:14
**percentage** 90:14
   144:15 158:16
**perfect** 31:6 127:1
**perfectly** 40:11
   106:23 137:15
   140:13
**performance**
   151:15 158:25
**period** 24:20
   50:20 79:1 107:25
   109:11
**permissible** 43:3
**permission** 166:5
**permit** 43:1
   124:19
**permits** 113:4
**permitted** 155:18
**permitting** 35:20

**person** 52:11
   127:6 167:14
**personal** 26:12
   50:15 56:22 83:24
   101:19 110:23
   162:8,18,20,20
**personally** 58:2
**perspective** 51:20
   54:15
**pertain** 149:16
**pest** 78:8
**peter** 4:12 19:9
**pharma** 1:6 3:6
   3:13 23:3
**phillips** 2:10
   70:21
**phone** 25:10 26:4
**photograph**
   167:24
**phrased** 32:8
**pi** 52:6 54:25
   55:17 129:14
   130:19
**pick** 83:4
**picked** 24:14
**picture** 47:11
   59:11,12
**piercing** 70:12
**pig** 76:25 153:24
**pike** 60:20
**pis** 53:17 100:4
**pl** 17:5
**place** 93:11 98:4
   99:7 128:10
   130:11
**places** 108:16
**plain** 156:9,20,24
**plainly** 41:4
**plains** 1:14
**plan** 28:15 29:24
   30:16 31:12 32:16
   32:16 33:1 35:8
   35:21 36:21,21,21

37:13,24 38:15,18
   38:21 39:3,4,9,11
   39:21 40:8,10,17
   40:23,24 41:1,3,9
   41:17,19 42:21
   43:5,7,9,14 44:10
   44:15,20 45:17,20
   49:22 50:8,10
   51:16 55:18 56:8
   57:8,11 61:17,17
   62:1,2 63:20
   64:16,22 65:3,8
   66:11 67:1,3,5,11
   68:7 69:1 70:14
   71:22 72:12 73:20
   73:25 74:2,11,20
   74:21 75:4,7,24
   75:24 76:5,6,12
   77:22 78:7 79:10
   80:12,20 85:11
   86:7 87:22,23
   88:2,3,18,19 91:5
   91:15,18,19,20
   92:5,6,8,13,17
   93:15,18,20 94:1
   94:10 95:7,17
   96:14,16 97:5,21
   99:3,25 100:17
   101:3 102:18
   103:9 104:8,13,14
   104:16,19,25
   105:1,24 106:12
   106:19,24 108:18
   109:21 115:15
   121:23 124:20,21
   127:5 129:3
   131:24 132:16
   142:3,13,16,21,22
   143:25 144:17,18
   145:3,7,8,17,19
   145:20 146:1,10
   146:12 147:3,16
   148:1,25 151:23

152:3,7,7,10,13
152:21,23 153:8
153:19,23 154:19
154:22 155:25
156:10,18 158:2,4
158:4,4,6,8,22,22
158:23,24 159:1,3
159:6,7,8,10,11
160:17 162:8,10
162:12,21,25
163:3,21 165:10
165:14 166:11
**plan's** 39:11 41:16
42:3,5 44:18
76:15 128:22
**planning** 139:13
150:19
**play** 68:18
**played** 102:6
140:6
**plaza** 15:4
**plc** 156:1
**pleading** 38:16
62:21
**pleadings** 47:1
89:25
**please** 63:1 83:8,9
136:7
**pleased** 52:2
**pleases** 46:13
**pledged** 69:25
**plurality** 28:14
**plus** 53:4 63:20
69:3 83:17
**podium** 34:10
**pohl** 18:5 20:25
**point** 33:8 35:17
42:15 43:16,23
46:2 50:6 52:14
52:15 53:11 55:14
62:14 63:4 65:20
66:19 68:23 70:15
74:25 75:3,13,19

77:24 79:2 83:4
84:18 85:23,23
88:20 89:1 94:21
101:2 102:19
104:2,7 105:22
114:1,2 117:6
119:2,5 121:11
122:22 123:13,18
126:4,25 127:2
133:15 134:7,10
134:21 136:24
139:12 140:7
151:7
**pointed** 49:19
53:1 122:25
**points** 51:24
77:23 90:10
117:13,14 124:15
126:2
**poke** 76:25 153:24
**police** 103:5
**policies** 30:12
**policy** 73:15
123:19,22 124:11
154:2,3,6
**polished** 83:12
**political** 48:13
59:23 60:7
**polk** 14:3 23:21
56:16
**poly** 25:20
**poor** 96:8
**popping** 135:13
**populate** 50:16
**population** 86:9
86:13 114:13
**populations** 115:6
**porter** 21:1
**portion** 26:6 32:9
102:22 110:15
143:23 144:21
162:6

**position** 53:13,15
74:16 85:3,7 97:5
99:12,12 111:11
114:17 139:17
**positioned** 124:3
**positions** 58:18
**positive** 48:20
60:24 142:8
**possibility** 37:9
97:2 164:8
**possible** 26:5,23
30:12 34:8 39:13
63:22 74:13,16
92:4,10 125:2
126:21 154:17
**possibly** 34:24
50:24
**post** 90:3 92:20
**posted** 99:21
**posting** 27:2
**potential** 31:16
40:1 50:9 109:5,7
141:14
**potentially** 31:22
33:24 49:10 83:7
85:13 87:6,12
96:13
**power** 113:15
145:10 146:9
157:20 159:25
**practicalities**
138:14
**pre** 48:23 54:10
54:18
**precatory** 82:21
**precede** 160:20
**precedent** 45:13
45:19,21
**precisely** 105:15
121:4
**precision** 138:14
**preclude** 66:24
104:23

**predecessor** 27:22
**predicate** 33:3
**predictability**
96:6
**preferable** 54:13
**preference** 37:16
**preferences**
113:19
**preferred** 37:11
48:22
**preis** 14:17 47:17
47:18,20,21,23
48:1,6,7 55:15,19
56:12 57:1 85:2
125:17 135:21
136:7,12,14 137:3
137:7,10,12 138:2
138:7
**preis's** 86:21
**prejudge** 65:10
**prejudiced**
102:21
**preliminary**
66:20 76:16 93:10
129:23 131:2,3
133:5 141:6 148:3
148:6,8 165:14
**premised** 93:10
93:11
**premises** 72:18
**premium** 69:6
**prepare** 76:14
**presence** 143:5
**present** 17:17
167:7
**presentation** 83:3
**presentations**
46:23 136:19,20
137:18
**presenting** 136:3
**presently** 144:18
**presents** 49:7

**preserved** 122:8
**preserves** 101:3
**press** 23:15
**pressed** 92:23
**presumably** 100:9
**pretend** 103:11
   110:12
**pretty** 43:18
   58:23 71:16 77:14
   78:22 121:10
   157:15
**prevail** 68:11,11
   141:16
**prevailed** 38:1
**prevailing** 108:13
**prevent** 124:11
**previous** 85:18
**previously** 52:21
   55:7 94:1 119:4
   135:21 138:24
   142:20 147:6
   148:17 153:16
   154:22 158:5
   163:8,17
**priced** 134:16
**primarily** 23:4
   27:14 148:9 153:2
**primary** 46:6
   64:16 122:16
   136:8
**principle** 70:24
   111:9 146:6
   164:24
**principles** 77:10
   92:1 163:21
   164:23
**prior** 27:23 33:5
   33:12,18,22 38:13
   84:4 98:12 130:24
   147:19 148:6,22
   164:18
**priority** 154:3,10
   155:20

**privacy** 26:20
**private** 53:17
   55:23 100:2
**privates** 55:7,11
**pro** 51:6 57:7
   154:21,23 161:16
**probability** 46:18
   63:20 121:24
   141:14
**probably** 34:4
   36:5 58:23 68:11
   81:18 84:4 85:1
   86:10 87:21 95:4
   115:1 120:2 127:4
   127:9 128:19
**problem** 25:19
   34:4 63:11 64:18
   65:9 85:13 105:8
   105:16 114:24
   115:5 120:14,25
   123:3 124:11
   128:5 131:13
   152:15
**problems** 95:12
**procedure** 98:6
**procedures** 27:1
   36:2 42:1 46:12
   98:4 99:3 166:9
**proceed** 31:18
   97:17,17
**proceeding** 26:16
   112:11,17
**proceedings**
   113:6 168:8 170:4
**proceeds** 84:11
   92:19 96:3 112:4
**process** 32:25
   60:1 69:10 98:7
   135:1 141:17
   145:16 163:10
**processing** 120:19
**prodigious** 90:19

**product** 164:14
**professional** 35:5
   45:25 159:14
**professions** 107:2
**profits** 84:6 102:9
**program** 25:8
   52:12
**programs** 30:9
**progress** 59:7
   78:6
**prohibited** 129:23
**prohibition** 69:6
**projects** 59:23
**promise** 80:22
   119:22 124:21
**prompt** 154:19
**promptly** 24:24
   77:22 150:13,14
   150:15 166:8
**proofs** 83:23
**proper** 44:5
   101:11 107:25
   165:3
**properly** 96:16
**property** 39:19
   72:5,6,9 87:20
   88:6 103:1,20
   104:23 105:13
   110:14 122:5,6,7
   122:8,9,12 144:13
   155:5,7,8,21,22
**proposal** 56:20
   66:3 90:11 92:21
**propose** 46:24
   75:7
**proposed** 29:23
   33:9,16 40:8,18
   41:1 63:10 76:9
   80:14 92:6 100:14
   108:2 111:9
**proposes** 165:9
**proposition** 72:19
   160:2

**propositions**
   105:5
**prospect** 65:1
**protections**
   112:13
**protracted** 164:9
**proud** 114:16,16
**proved** 129:11
**provide** 24:2
   54:23 60:3 64:22
   87:4 94:25 97:15
   152:23 154:23
   156:10
**provided** 28:14
   63:20 87:23 90:20
   92:9 132:6 145:3
**provides** 52:21
   58:21 143:7,13
   151:12
**providing** 150:17
   150:18
**provision** 33:14
   34:17 36:18 39:6
   61:25 75:18
   100:17 107:14
   108:3 122:4
   129:20 130:23
   131:17 132:6
   135:8 147:12,18
   147:22 148:10,21
   153:3 154:13
   156:7,19 159:19
   159:20 160:5
**provisions** 34:21
   37:22 56:8 72:16
   101:19 122:21
   124:18 147:17
**proviso** 156:12
**provoked** 96:2
**prudential** 145:23
   149:20
**public** 50:7 51:22
   53:9 55:23 57:23

59:4 88:24 129:18
**publicly** 50:21
**publics** 55:8,11
**puerto** 4:8
**purchase** 85:7
**purdue** 1:6 3:6,13
  23:3 73:10 84:4
  102:9
**purely** 54:12
**purpose** 59:4
  60:21 61:22 150:6
  157:4
**purposes** 27:3
  52:9 61:13 85:20
  144:11 147:16
  160:11 163:17
**pursing** 76:24
**pursuant** 3:3,10
  3:15,19,25 4:4,21
  5:7,11,17,21 6:3,9
  6:13,21 7:1,5,11
  7:15 8:5,9,15,19
  9:1,5,11,15,21,25
  10:6,10,17,21,25
  11:6,10,16,20
  12:1,5 39:20
  46:12 66:7 77:7
  130:14 141:22
**pursue** 51:4
**pursued** 52:18
**pursuing** 93:7
  101:1
**put** 33:17 60:5
  71:10 78:21 83:11
  98:4 99:7 101:15
  119:21 128:6
  130:11 160:8
**putting** 51:14
  120:18
**puzzling** 81:3

## q

**quarropas** 1:12
**quasi** 54:11
**question** 37:18
  49:11,16,17 55:20
  93:24 97:10
  102:24 109:4,12
  111:15 112:15
  136:16 137:4
  140:19 148:23
  156:16
**questions** 44:20
  45:4 49:5,14
  139:21,24
**quick** 18:4 126:2
**quickly** 27:5 77:3
  166:19
**quirk** 18:11
**quite** 29:19,21
  32:23 35:16 40:4
  40:7 42:19 44:22
  45:19 47:20 64:11
  74:2 77:18 102:13
  114:7 121:4 122:6
  139:3 142:24
  145:2 149:17
  162:9,15
**quoted** 163:17
**quotidian** 38:7

## r

**r** 1:21 6:5 12:20
  14:1 17:15 18:19
  20:23 23:1 170:1
**rachael** 21:4
**rachel** 6:5 20:23
**racine** 21:2
**raise** 89:4 95:12
  115:20
**raised** 53:23
  64:16,17 87:14
  96:4 97:22 99:15
  105:18 117:15
  120:3 127:20

129:14,15 148:14
  149:5 161:18
**raises** 55:2 100:8
  140:14 150:7
**raising** 106:2
  110:5 139:12
**range** 134:2
**rant** 87:1
**rapidly** 58:19
**rare** 124:9 131:11
**rata** 154:21,23
**rationale** 87:20
  88:5
**raymond** 138:10
**rdd** 1:6
**reach** 48:20 96:10
**reached** 53:5
  123:20 155:25
**reaction** 91:24
**read** 33:9 38:11
  46:25 47:6 62:15
  62:20 66:12,12
  81:19 94:16,20
  106:24 113:9
  115:23 117:23
  119:15 124:16
  165:24
**reading** 89:2,24
  89:25 164:17
**ready** 135:6
  151:25
**real** 28:1 85:4
  105:22 154:5
**realistically**
  145:13
**reality** 63:23 64:6
  75:3 93:1 124:2
**realized** 53:12
**really** 27:10,11
  28:1,3 51:22 56:5
  59:4 60:7 71:4,10
  78:1,18 79:22
  80:10 86:1 87:25

88:6,25 93:4 94:4
  99:18,23 101:5
  102:5 106:22,25
  109:25 110:8
  111:15 112:15,20
  119:9,10,23 122:3
  126:1 128:25
  141:3 150:8 151:2
  163:25
**reason** 30:25
  45:23 54:17 57:16
  69:16 71:1 73:3,4
  73:17 86:22 90:9
  108:8,25 121:3
  124:23 131:22
  139:12
**reasonable**
  151:21 152:5
**reasonableness**
  68:9 79:7
**reasons** 35:15
  46:16 98:18 128:6
  158:18 168:2,3
**rebuttal** 58:15
  61:7
**receive** 30:1 38:24
  99:24
**received** 83:9
  156:22
**recipients** 144:1
**recognition** 94:13
  94:25 95:3
**recognize** 36:25
  56:2 95:13
**recognized** 78:5
  91:14,20 149:9
  157:2,7 160:12
**recognizing** 24:23
**recommendation**
  136:23 138:19,21
  167:6
**recommended**
  143:3

recommends
135:20
reconfiguration
118:15
record 23:20 27:6
48:7 54:20 62:11
62:13,20 116:15
137:25 148:14
160:8 162:19
165:21 170:4
recordings 26:17
26:17
recoverable 84:14
85:14
recovered 122:6
recoveries 158:15
recovery 118:24
158:13
reducing 158:13
reference 124:17
133:23 165:12
references 165:19
166:1
referred 67:25
125:17
referring 65:20
refers 66:9 155:16
156:24
reflect 74:1
reflected 60:4
80:21 90:13 100:9
reflects 61:18
142:7 153:14
refraining 45:8
regard 26:9 49:5
49:14,16 50:11
51:10 54:8 116:14
118:7 145:4
regarding 117:25
118:5,15
regions 15:4
rehab 52:12

reimbursement
36:2
reiterate 26:10
62:15 119:1
140:10 164:16
167:12
reiteration 81:24
reject 69:16
rejected 41:2
rejigger 55:10
rel 12:21
related 2:4,10,15
2:20,25 3:12,21
4:6,11,15,23 5:3
5:13,23 6:5,15,23
7:7,17,22,25 8:11
8:21 9:7,17 10:2
10:12,19 11:2,12
11:22 12:7,15,19
13:1 23:8 59:17
61:10 103:6 105:7
105:15 111:18
112:11 119:17
126:14 143:2
144:7 147:14
relates 35:24
relation 117:25
161:4
relationship
84:19 105:10
relative 41:5 79:2
79:16 90:14
relatively 44:6
46:10 77:23 99:17
147:2 165:6
relayed 133:11
release 34:21 67:3
71:7,18,20,21
75:8 91:23 92:12
123:9 146:10
147:17 150:24
157:21

released 70:9
releases 31:12
35:12 41:17,24
44:16 57:15 67:9
69:25 86:6 107:17
107:25 124:9
145:10
relevance 39:25
40:1,5 42:18
relevant 35:23
58:22 85:20 113:4
relief 29:7,8,19,20
30:5,7,10,14,22
31:11 32:14 35:3
44:2 46:16 63:13
64:5 81:6,8,23
92:24 97:13
112:20 113:12,14
113:16,17 124:18
124:25 125:8
130:2 145:1
146:15,17 147:25
158:19
reluctantly 29:9
relying 43:7
remain 42:1 60:18
63:18
remaining 89:13
157:23,24
remains 30:23
remand 31:16
remanded 150:6
remarkable 111:7
142:7 159:11
remarkably 49:20
remarks 81:5
89:18,23 118:9
136:17 157:1
remedies 40:2
101:2
remembered
29:10

remotely 23:4
29:15 40:9 44:12
46:9 81:12 113:6
129:4 167:14
removed 30:18
removes 31:14
51:5
renders 45:15
reorganization
39:4,21 45:17
78:7 99:4
repeat 49:15 57:4
repeatedly 42:9
111:19
repeating 119:16
replaced 30:20
reply 28:9 29:18
37:15 48:4
report 135:2,19
164:17 167:6
reported 122:13
reports 89:3
164:18
repository 50:17
143:2
reprehensible
106:1
represent 28:18
114:11,12,14,24
115:6,7,7 132:4
152:4
representation
113:23
representative
28:16
represented
135:24 143:10
161:17
represents 28:12
60:24 84:10
request 35:11
46:10 135:1 145:1
151:16

requested 37:6
  44:2 45:4 124:18
  126:7 147:17
  149:11
require 39:21
  96:5 97:7 149:3
  151:24 159:2
required 33:2
requirement
  33:11 64:22
  154:14 156:12
  163:15
requirements
  158:24
requires 75:10
  152:19 166:7
research 84:8
reservation 2:19
reserve 47:9 48:3
  58:14 61:6
reserved 102:20
reserving 46:22
reside 116:3
resolicit 74:3
resolicitation
  73:21,24 81:12
  97:8
resoliciting 75:10
resolution 123:19
resolvable 97:24
resolve 38:3 98:20
  99:17 102:8
  141:25 150:12,13
resolved 72:2
  101:15 123:2,16
  142:13
respect 3:9 23:9
  29:1 34:1 39:23
  42:3 90:23 112:8
  112:21 115:19
  120:10,11 121:2
  121:14 122:2,3
  123:21 124:13

126:1,3 128:11
  129:13,14 133:1
  140:19 141:4
  147:2 148:6 150:8
  158:2 160:17
  166:6
respected 26:20
respects 36:12
  146:4
respond 47:10,16
  80:1
responding 88:25
response 2:9 47:6
  70:15 93:22
responsible 100:1
rest 37:22 43:15
  44:20,21 46:1
  47:8 58:10 61:6
  76:2 79:19 82:9
  82:24 88:13 90:14
  101:21 108:12,12
  110:18 121:6
  122:17 153:2
restrained 112:10
rests 43:25
result 27:11 45:5
  52:20 63:22 64:4
  101:17 102:16
  109:21 111:9
  149:5 155:20
  156:1 160:15
  162:22 164:2
resulted 27:23
  59:10 142:14
resulting 161:5
results 40:16
  149:18
retarding 78:8
retired 67:16
return 51:8
revelation 45:20
reversal 34:21
  74:12 107:21

109:5,7,10 132:10
reverse 66:16
  131:11
reversed 65:12
  66:4,13 124:7
  145:8
reverses 49:25
  74:19 80:18 97:5
  125:4
review 34:7 79:7
reviewing 131:21
revise 44:18 76:10
revised 40:8,10
  44:17 76:13
  151:23
revisit 46:9
rewards 96:8,8
rice 21:3
richard 21:17
rico 4:8
right 24:16 25:20
  26:1,19 32:14,17
  32:18,25 34:1
  35:10,22 48:1
  52:14 56:25 61:12
  65:21 66:1 74:10
  74:23 75:3 80:9
  80:12,14 81:22
  82:1,4 83:22 85:6
  87:22 94:8 101:7
  101:24 106:2,15
  107:9 110:20
  114:5,7,17 115:2
  115:23 116:6,9,25
  117:18 119:25
  121:19 122:15
  123:10 124:2
  125:3 126:7 127:6
  130:4 132:14,21
  135:22 139:6
  140:4 141:7,21
  144:10 162:12
  165:23 166:1,13

166:15 167:4
rights 2:19 30:12
  40:2 44:19 56:6
  56:19 72:1 102:21
  104:23 123:24
  142:25 143:1
  157:6 163:1
ringer 21:4
ripe 45:1
rise 100:22 101:6
risk 24:13 32:4
  63:15,19 158:7,9
  158:10,12
risks 30:11
rivera 22:3
road 170:21
robert 1:22
roberto 19:13
robertson 21:5
robust 29:5
role 102:6 110:1
  140:6 154:10
room 1:13
rosa 43:5,7,15,17
  43:19 158:22
  159:8,10
rosen 21:6
roughly 90:7
  119:12 143:10,11
  144:6,20,20,22
  154:20 160:22
  161:8
round 30:20
routinely 152:4
roxana 18:13
rule 68:6 75:9
  109:25 120:24
  135:7 137:1
  149:24 150:1,23
  154:10 155:20
ruled 104:19
  128:13 159:21

**rules** 27:1 64:7
81:11 86:21 88:14
96:6 109:19,24
135:9 150:2
**ruling** 33:2 35:7
65:3 104:17 121:5
128:13 129:12
131:20,21 136:18
145:15 146:5
148:1,6 150:2,3
150:10,21 151:11
159:5 165:18
166:16
**rulings** 97:11
113:1 169:3
**run** 78:15 144:25
**rundlet** 18:3 21:7
**runs** 95:17,17
**rupert** 21:8

**s**

**s** 2:4,10,15,21,25
3:12,21 4:6,12,16
4:23 5:3,13,15,23
6:5,15,23 7:7,17
7:23 8:1,11,21 9:7
9:17 10:2,12,19
11:2,12,22 12:7
12:15,20 13:1
14:1 17:18 18:7
20:4,6 23:1 56:6
154:8 155:15
**s.d.n.y.** 78:4
145:22,24 155:11
156:15 159:12
161:2
**sabatini** 21:9
**sabine** 145:22
**sackler** 30:8,18
46:17 50:13 51:15
55:8 66:5,15,18
66:22 68:23 69:1
83:8,18 84:19
93:18,22 102:8

103:17 105:9,12
115:9 129:21
138:10 141:15
142:6,10,15 143:6
143:22,22 147:13
148:7 167:7
**sacklers** 27:14
30:3,5 33:5 36:19
37:12 38:2,11
40:2 50:1,3,11,19
50:23 52:3 53:12
63:25 64:6 69:18
69:20,21,22,23
70:7,9 71:20 79:9
84:13,20 86:7
90:11,12 93:5,12
93:19 94:1 95:18
99:21 111:19,20
112:1,12 113:5,23
122:4,11,18 128:2
129:18 130:13
131:14 132:22
136:2,21 137:21
142:24 144:14
145:5 146:20
148:17 164:4
165:4
**sale** 112:4
**salwen** 21:10
**samoa** 3:23
**sander** 19:11
**sands** 102:13
108:20 125:25
**sara** 18:24
**sate** 51:25
**satisfied** 164:14
164:21
**satisfies** 163:23
**saturday** 27:12
**saul** 19:1
**savannah** 15:22
**save** 30:4 73:14
125:21 128:21

**saw** 81:18 95:7
**saying** 54:20
73:20 76:22 79:14
98:1 113:10 132:8
133:3 134:8
166:19 167:22
**says** 33:13 47:15
55:25 59:13 64:21
66:1 67:6 91:4
103:20 107:18
117:11 125:6
127:6 128:14,15
129:24 130:22
131:15,20 132:6
135:8 154:14
166:10
**scenario** 38:9
**scenarios** 66:24
67:9
**schedule** 31:19
80:25
**scheduled** 143:5
**scheduling** 135:1
**scheindlin** 156:13
**scheme** 44:19
**schenk** 21:11
**schlabach** 21:12
**schlecker** 18:2,12
21:13
**schmitt** 5:15
**scholarships** 30:9
**school** 35:15 52:7
**schwartzberg**
2:21 21:14
**scope** 29:13
**scott** 14:8 18:19
**scratched** 86:11
**screen** 23:5 26:17
82:5
**screenshots** 26:16
**se** 51:6 161:16
**searing** 26:12

**season** 83:6
**second** 15:21
31:16,19 34:22
35:1,7,14,19 36:1
40:13 42:14,15
44:11 45:7 49:14
49:24 51:4 52:17
55:2 57:5 64:6,8
64:10 70:13 74:15
74:19 80:18 88:14
88:15 91:8 97:4
108:17 120:25
121:8,25 125:4,5
127:2 128:7,15
129:24 131:15
144:18 145:16
146:5 147:25
150:25 152:9
156:23 157:18
159:5 162:24
163:3,23 165:1,8
166:3
**secondly** 113:17
**seconds** 62:7,13
**secretion** 129:20
**section** 23:12 40:9
41:17 46:3 66:9
76:12 107:16
145:18 147:16
152:18,20,21
153:8,18,25 155:3
155:6 157:11
159:4,17,24,25
160:13 162:10
166:7
**sections** 33:25
44:9 141:23
152:20
**secure** 99:21
**secured** 28:17
39:24 42:24 85:9
118:2

security 74:7
168:2
see 37:11 54:17
55:16,16 66:23
68:6 71:1 75:11
79:24 82:4 86:14
88:5 101:24
118:22 124:17,18
132:2 135:3,4,13
142:12 154:6
155:9 158:11
159:11 161:1,22
161:24,25
seeing 72:3 96:24
116:12
seek 44:12 146:15
159:17,25
seeking 36:13
75:14 125:8
148:25 165:7
seeks 75:23,25
146:15 147:9
151:11 152:21
165:9
seemingly 43:19
seen 91:24
segment 86:13
seiu 117:6 161:22
select 42:10 46:5
self 21:15
sell 142:16
sends 52:7
sense 54:10 62:22
110:7,9,10 120:2
127:1 152:2
sensitive 24:21
141:13
sent 33:17 59:2
141:9
sentence 44:15
132:10
separate 27:3
37:6 56:7 59:1

71:2,3 89:9 94:12
98:25 148:11
separated 153:11
separately 71:21
123:16
september 104:17
117:9 161:24
serious 167:19
168:4
seriously 52:19
84:22 92:23
seriousness 52:18
servant 88:24
services 61:11
119:18 144:8
150:17 160:20,20
163:12
ses 57:7
session 50:25
set 25:2 31:19
34:20 37:15 50:8
54:21 102:4,15
109:19 144:11
145:7,21 146:8,23
147:4,7 151:18
157:12,25
setback 91:22
sets 70:7
settled 38:5,12
48:23 70:14 72:7
72:11 73:6 87:24
87:25 88:1,2,7
105:9 123:5,8,13
123:18 130:11,13
158:5
settlement 2:9,14
2:20,24 3:5,11,17
3:20 4:2,5,11,22
5:2,9,12,19,22 6:4
6:11,14,22 7:3,6
7:13,16,22 8:7,10
8:17,20 9:3,6,13
9:16,23 10:1,8,11

10:18,23 11:1,8
11:11,18,21 12:3
12:6,12,18 23:11
24:21 27:23 29:24
30:3 32:6 38:17
38:23 39:2,22
40:14 44:9 45:8
49:2,5,7,7,9,12,17
53:5,12,18,20,24
55:13,17 56:20
57:17,20,22 59:21
61:9,15 64:14
65:18 66:3 68:14
70:22 71:7,11,23
72:10,15,17 73:7
73:9 75:25 76:10
76:24 80:23 83:5
84:23 87:5,13
93:24 94:6 99:18
101:9 103:7,21
105:14 106:16
111:8,9,16 112:16
114:19 119:12
122:13,15,24
123:8 129:3,16,18
129:22 130:6,8,14
130:17,22 131:1
133:22 134:25
135:5,8,11 136:22
136:23 137:1,14
137:19,20 138:1,6
138:17,18 139:15
140:11 141:7,15
141:18,24 142:20
142:23 143:3,23
144:6,19,24 145:5
146:3,14,23
147:11 148:2,5,7
148:7,10,17,21,24
149:1 151:4 152:5
152:11,12,17
153:5,20,22 154:4
154:5,11 155:18

155:19 156:3
157:8,10,13,14,16
157:25 158:19,21
159:1 161:7
162:22,23 163:1,4
163:22,22 164:3,5
164:9,12,13,13
165:2,5,9,10
settlement's
164:22
settlements 61:25
72:15 73:14 91:13
91:18 96:4,5,10
154:1
settling 24:25
43:1 61:19 143:9
144:3,15 145:12
147:7 151:19
156:4 158:7 160:9
163:13
seven 23:24 44:23
45:25
severe 87:3,3
shake 75:12
shame 79:16
shannon 20:16
shape 29:14 35:12
36:20
share 41:20 42:4
96:25
shared 126:12,21
127:17
shareholder
39:22 49:12
shareholders
76:10
sharing 99:19
116:3
sheet 2:10,20,25
3:5,12,17,20 4:2,5
4:11,22 5:3,9,12
5:19,22 6:4,11,14
6:22 7:3,6,13,16

7:22 8:7,10,17,20
9:3,6,13,16,23
10:1,8,11,18,23
11:1,8,11,18,21
12:3,6,12,18
23:12 24:21 25:2
27:10 29:25 31:25
32:15,18 33:9
34:3,9,11,20 35:2
35:21 36:18 37:12
37:22 38:1,6
39:15 40:8,12,24
41:5,17 42:2 43:5
44:8,18 45:15
55:25 56:3 59:13
60:6,19,23 61:9
65:11,19,21 68:8
74:6 75:25 76:7
79:6 80:21 94:15
98:9 102:14
104:22 106:12,16
107:14,16 108:3,9
108:15 111:25
119:15 135:16
138:15 141:24
142:1,7 144:7
146:14,16 147:15
148:10 153:5
157:25 161:12
166:6,7,11,17
**shelley** 27:17
**shepherd** 136:8
**shepherded** 167:3
**shifted** 102:13
**shifting** 108:20
125:25
**shines** 58:23
**shkolnik** 2:15,25
**shock** 37:25
**shore** 21:16,17
**short** 24:22 28:9
31:24 62:7

**shorten** 3:8 23:22
24:8,17,19,19
25:3 121:3 169:6
**shortening** 3:9
23:9
**shorter** 80:5
**shut** 82:24
**sics** 165:25
**side** 25:11 50:7
53:17 65:12 69:2
69:11 70:5 80:17
123:20 133:15,21
140:16 142:5
143:6
**sides** 160:14
**signature** 170:7
**signed** 38:16
**significant** 92:16
100:11
**significantly**
52:20
**silence** 85:2 86:16
86:16
**silent** 29:6 31:2
52:25 53:5
**similar** 36:6 64:5
126:18 129:14
155:20,21
**similarly** 36:7
53:16
**simple** 39:5 90:11
109:4
**simply** 34:6 40:5
44:7 56:6 57:16
62:16 77:5 93:5
109:19 110:7
111:24 115:13,20
117:1,16 120:24
123:6 125:6
140:21 142:19
149:13 152:14
159:10

**single** 27:12 28:25
32:19 38:4 43:16
121:25 122:23
150:14
**sir** 62:25
**sit** 109:20
**sitting** 40:15 75:4
**situated** 36:7 75:2
**situation** 53:7,11
59:21 74:10 75:8
95:14 115:10
**six** 44:23 49:23
**sixth** 15:5 51:3
104:14
**size** 29:13 79:2
**skapof** 21:18
**skikos** 21:19
**slush** 60:7
**small** 36:6 39:23
48:13 85:15
123:15 165:16
167:15
**smith** 21:20
**smooth** 85:11
**snapback** 101:1,5
**snyder** 4:24 18:1
**soaf** 36:23 37:1,17
39:8,15,17,18,19
39:21 40:22,22
43:6,8,11 48:23
51:15,17 52:24
53:6,24 54:3,23
55:3 56:6,19 59:1
59:16 60:5,6,11
60:19 61:9,13
66:6 90:14 97:25
97:25 100:8,14
133:20 140:24,24
140:25 141:4,8
144:2,10,23 147:2
148:12,21 149:4
158:17 160:7,10
162:6 163:16

**soafs** 140:15
**social** 126:20
**society** 51:25
**sole** 86:5 115:5,5
**solely** 85:14 86:7
**solutions** 170:20
**somebody** 125:18
134:16
**somewhat** 151:23
**sonya** 13:25 170:3
170:8
**sorkin** 21:21
**sorry** 23:15 25:14
31:7 47:23 85:1
105:22 106:1,9,21
109:25 117:7,8,9
118:13 136:13
150:3,25 157:21
159:4
**sort** 25:25 29:6
35:9 36:17 42:23
58:19 59:3 67:4
94:16 95:25 96:21
99:23 118:15
123:20 125:9
128:2 129:1
130:11,14 141:10
**sorts** 168:4
**sought** 50:13
77:25 81:7,8,24
101:16 113:18,20
158:19 161:12
**source** 39:13
111:16,17 155:10
**sources** 69:4
**south** 9:8
**southern** 1:2
35:20
**sovereigns** 121:11
**speak** 47:8,15
50:23 53:18 62:18
82:8 84:18 100:7
100:24 127:15

135:14 167:10
**speaker** 25:20
**speakers** 85:18
**speaking** 118:10
  137:4,7,23 167:21
**speaks** 24:4 29:14
**special** 86:20
**specific** 50:2
  100:12,17 131:22
**specifically** 71:12
  153:7 160:4
  162:18
**specified** 144:4
**spell** 101:10
**spend** 29:16 120:2
  126:8
**spending** 79:14
**spent** 72:24 78:25
  118:16
**spillover** 148:19
**spills** 78:13
**spirit** 58:1
**spoke** 122:23
**spuches** 3:22 4:7
  5:14,24 6:16 7:8
  7:18 8:12,22 9:8
  9:18 10:3,13 11:3
  11:13,23 12:8
  13:2,4
**spun** 71:18
**spv** 128:14
**squared** 71:14
**stability** 96:6
**stacey** 15:2
**stacy** 118:1
**staff** 27:25
**stage** 97:4
**stakeholders**
  160:24
**stand** 31:18 57:11
  123:6 129:5
**standing** 36:4
  116:19,20 119:2

161:20
**stands** 29:22
**start** 25:9 63:3
  83:10 84:4 162:15
**started** 104:13
**starting** 26:3
  158:2 163:19
**state** 2:11 3:18 4:3
  4:19,20,24 5:10
  5:14,20,24 6:1,2,6
  6:12,16,19,20 7:4
  7:8,14 8:8,12,18
  8:22 9:4,8,14,18
  9:24 10:3,9,13,24
  11:3,9,19,23 12:4
  12:8,11,13,14,17
  12:19,21 13:2
  17:2,4,11 24:19
  46:6 47:6 48:11
  48:13 52:1,1,9,19
  57:9 62:17,22
  63:2 64:17 70:17
  82:14,19 85:15,24
  86:8 89:8 101:4
  126:19 130:23
  142:4 145:13
  147:18 150:4,6
**stated** 27:4 44:7
  75:22 111:19
  143:3 144:6 148:4
  148:9 166:16
**statement** 6:19
  35:24 59:24 60:1
  65:12 105:2 152:8
**statements** 26:13
  27:3 28:11 39:12
  53:19 62:5 102:16
  110:6 115:22
  117:17 134:23
  143:4 167:8,12,19
**states** 1:1,11 2:22
  14:19 25:1 27:16
  28:22 30:8 35:19

37:24 48:13 51:10
  51:10,19 52:22,24
  61:9,19 63:8 64:1
  64:3 69:4,7 70:4
  70:18 71:2,5,19
  73:5 74:14 77:21
  79:15 82:23 83:23
  84:2,25 85:1 86:4
  89:12,17 95:16
  98:5,6 99:4 104:1
  105:9,13,20
  108:25 109:13
  111:6 112:1 116:2
  119:22 126:15
  129:5,22 130:8
  134:4 137:21
  142:2 143:16
  144:3 145:12
  146:20 147:10
  148:15 151:19
  152:21 153:15
  156:20 160:9
  162:3,5 163:14
**states'** 83:22
**status** 118:3
**statute** 156:24
**statute's** 116:17
**statutory** 160:5
**stay** 126:22
**stayed** 52:25
**staying** 156:18
**steege** 17:25
**steel** 77:5,10,20
  160:14
**stein** 155:13
**stem** 95:10
**stems** 117:3
**step** 53:21 60:24
  92:3 165:7
**stephanie** 19:10
**steps** 97:14,14
  165:6

**stern** 105:7,16
  127:21,22 128:5,9
**steven** 18:5 20:25
  21:19
**stodola** 21:22
**stop** 27:18 46:24
  55:14 69:15
**stopped** 70:3
**stories** 135:25
**story** 123:10
**strangely** 45:12
**strauss** 14:11
**stream** 168:1
**streams** 123:21
**street** 1:12 14:21
  15:13,21 16:10
  17:12
**strike** 34:6 69:11
**strong** 154:2
**strongly** 37:10
  68:11 135:20,22
**struck** 110:16
**structure** 60:14
  61:4 99:6,8
**stuff** 121:1
**sub** 43:5,7,15,17
  43:19 126:9
  158:22 159:8,9
**subdivision** 48:13
**subject** 36:1 79:6
  112:10,11 147:3
  147:10 157:18
  165:5 166:9 168:3
**submit** 165:11
**subordination**
  124:1
**subscribe** 157:6
**subsequent** 35:7
  70:24 97:4
**substance** 29:17
**substantial** 59:6
  63:15,19 95:2
  150:7 159:19

160:19,25 164:3
**substantive** 62:23
  63:12 90:16
**subvert** 69:6
**succeeded** 43:20
**success** 46:19
  95:23 121:24
  164:8
**successful** 32:17
  78:7 91:5,10,21
**successfully** 34:5
**successor** 72:13
**suffered** 91:22
**sufficiently** 43:23
**suggest** 60:6
  92:25 93:19 151:8
**suggested** 96:12
  99:16 120:23
**suggestion** 100:20
**suit** 88:7
**suite** 14:21 16:10
  16:17 170:22
**sum** 57:16 65:6,7
**sums** 46:8,10,18
**sun** 21:23
**sunday** 27:12
**super** 25:16 29:6
  29:6
**supplement**
  117:21 127:5
**supplemental**
  36:22 144:5
  148:13
**support** 29:7
  45:24 47:2,7,8
  48:3 49:4,22
  53:19 61:11 62:5
  63:9 86:18 91:17
  106:12 119:18
  123:14 136:3,5
  144:8 150:17
  152:3,7 158:4
  159:7 164:11

**supported** 49:23
  57:8,12 113:6
  118:20 124:6
  130:14 158:2
**supporters** 58:5
**supporting** 28:10
  63:8 164:13
**suppose** 49:10
**supposed** 59:22
  100:1
**sure** 24:11 30:24
  47:20 55:15 67:17
  73:23 82:13 83:24
  89:24 91:9 114:7
  136:19 140:6,8,9
**surface** 83:20
  84:12
**surprise** 45:23
  57:5 91:25
**surprising** 98:8
**surrounding**
  92:11
**survivors** 61:11
  118:11 119:18
  144:8 150:17
**swap** 80:21
  125:10
**swapping** 124:20
**sympathetic** 54:5
  57:19
**sympathize** 95:10
**sympathy** 28:7
  140:10
**system** 45:20
  140:18
**systems** 120:19

**t**

**t** 170:1,1
**table** 71:11 72:7
**take** 26:13 34:9
  43:22 50:12 52:5
  62:6 71:1 80:19
  90:17 103:25

132:3 134:8
  139:20 154:22
  157:8,9 158:6,8
  158:12 162:16
  165:6
**taken** 84:22 85:3
  85:24 118:17
  119:8 147:13,15
**takeoff** 33:1 44:10
  125:6 131:13
**takes** 52:8 83:17
  88:4
**talk** 28:5 29:21
  33:23 36:4 81:10
  82:25 98:19
  112:22
**talked** 29:3 74:6
  130:20
**talking** 68:21
  71:16 78:17 84:23
  84:24 103:14
  104:5 161:4
**tallahassee** 17:6
**tangentially**
  149:16
**tape** 167:25
**tate** 8:1 15:18,24
  114:9 116:8,19,23
  117:1,16,19
**tate's** 117:25
**tautology** 131:12
**tax** 71:12
**taxes** 84:14
**tdp** 54:10,18
**technical** 125:12
**technically**
  138:17
**teens** 134:16
**telephone** 23:6
**telephonically**
  14:8,9,17,24,25
  15:8,16,24 16:6
  16:13,20 17:8,15

17:17
**tell** 135:25 136:1
  137:16
**telling** 43:18
**temporarily**
  37:25
**temporary** 91:22
**ten** 67:8 99:22
**tend** 101:12
**tennessee** 6:19,24
  63:7
**term** 2:9,20,24 3:5
  3:12,17,20 4:2,5
  4:11,22 5:2,9,12
  5:19,22 6:4,11,14
  6:22 7:3,6,13,16
  7:22 8:7,10,17,20
  9:3,6,13,16,23
  10:1,8,11,18,23
  11:1,8,11,18,21
  12:3,6,12,18
  23:12 24:21 25:2
  27:10 29:25 31:25
  32:15,18 33:9
  34:2,9,11,20 35:2
  35:21 36:17 37:12
  37:22 38:1,6
  39:15 40:7,12,24
  41:5,17 42:2 43:5
  44:8,18 45:14
  55:25 56:2 59:12
  59:18 60:6,19,23
  61:9 65:11,19,21
  68:8 70:7 74:6
  75:25 76:7 79:6
  80:21 94:15 98:9
  102:14 104:22
  106:12,16 107:14
  107:16 108:3,9,15
  111:25 119:15
  135:16 138:15
  141:24 142:1,7
  144:2,6 146:14,16

147:14 148:10
153:5 157:25
161:12 166:6,7,11
166:17
**terms**   2:14 4:15
25:2 26:11 29:19
55:17 60:22 64:14
64:20 72:4 76:23
78:9 99:18 121:7
122:16 141:25
143:8 146:21,23
147:11 152:8
154:1 156:9,24
158:23,23,25
165:5 166:8
**terrific**   25:7
**territory**   3:22
**testified**   91:17
**testifying**   118:10
137:8
**testimony**   118:9
136:4
**texas**   6:6,7 63:8
**texas's**   6:1
**thank**   25:4 26:7
27:18 46:25 56:12
58:3,4,11 61:6
82:17 87:9 88:9
89:7,20 101:20,22
101:23 102:1
110:25 111:4
114:5 117:18,19
118:4 119:23
120:21 137:3
139:7 141:21
165:15,23 166:20
**thanks**   56:25
**theodore**   22:6
**theory**   66:19
**thing**   25:16 28:2
33:1 41:7 42:2
43:11 46:2,15
51:3 57:24 59:13

78:25 102:7
108:14 118:18
119:11 125:14
130:4 140:23
141:3 150:20
166:3
**things**   25:17
32:13,14,24 35:23
36:11 38:2,3 53:4
63:9 75:5,11
97:22 104:24
113:10 114:21
115:1 121:8
127:12 129:17
133:14 134:18
139:11 140:8
151:12 165:16,25
168:4
**think**   23:23 24:4
24:12 26:11,17,18
27:9 28:13,21
32:23 33:16,18
34:1,18 36:5,12
43:18,22 44:21
45:2 48:1,2 55:11
56:5 58:17,23
59:11,18 61:14,15
61:19,23 62:4,13
62:18,22 63:13
64:18 65:9,14,19
65:20 66:12,17,21
66:25 67:1,2,20
68:3,5,18,24
69:18 70:15,22,23
71:16 72:5,12
73:25 74:2,16,18
75:13,16,22,23
76:1,22,22 77:10
77:16,19 79:1,5
79:17 80:3,4 81:2
81:4,10,17,23
83:15 84:21,21
85:2,4,5,17,17

87:21 89:5 90:6
90:11,13,15 91:4
92:23 93:8 96:17
97:10,12,14,15
98:14 99:16,19
101:12,14,15,24
102:10,15 103:23
104:2 105:15
107:10 108:22
109:1,3 111:10,22
112:7,15 113:13
113:22,22 114:2
115:3,4,11 116:5
116:16,17 117:13
117:14 118:8,16
118:18,22 119:11
119:16 120:1,5
121:9,10,15 123:6
123:7 126:7,12,20
127:2,9,10,16,22
128:22 130:4,5,15
130:18 131:3,7
133:10,12,13,15
133:16,18,20,20
134:16,25 135:3,5
136:4,6,20,22,25
136:25 137:25
138:13,17 139:2,3
139:5,10,11
140:19 141:5,7,9
141:12,13 147:23
155:14 157:15
158:1 163:18
164:1 165:11,17
**thinking**   89:1
**thinks**   104:11
**third**   27:8 37:1,1
39:3 40:15 41:16
42:11,12,16,18
43:1,2,12,12
49:16 50:11 52:23
57:14 67:3,9
70:13 71:7 88:1

91:23 92:11 98:16
103:1,5 123:9,24
124:9 145:7,10
146:10 147:17
150:24,25 155:8
156:5,5 157:20
158:5
**thomas**   16:17
17:23 18:22
**thoroughly**   44:2
**thought**   27:5
33:20 38:8 80:8
88:4 89:1 93:3
96:12 97:24 99:17
100:12 102:11
104:16,18 118:21
123:21 129:25
135:10
**thousands**   128:18
**threading**   126:18
**threat**   49:11
**three**   38:10 41:3
46:3 49:9 51:6
57:7 88:12 115:25
140:13 148:19
149:25
**threw**   133:17
**throwing**   85:10
90:21 105:25
**time**   3:8 23:23
24:8,21 28:10
43:22 45:2 46:22
47:9 48:3 52:2
58:1 61:7 63:25
64:7 72:3 75:19
78:24 79:1 80:19
81:13 83:11 90:21
96:23 97:6,8
99:23 101:2
102:19 104:17
105:4 111:5 114:6
115:22 120:1
125:3,22 127:22

129:15 130:6
141:12 155:4
166:22 167:1
**times** 24:23 46:3
54:20 119:15
124:17 126:5
134:25
**timing** 56:9,21,24
**tiny** 126:2
**tobacco** 59:21
61:24
**tobak** 21:24
**today** 23:7 29:7
31:3 33:2 34:4
37:19 44:2,12
48:15 49:1 60:23
61:16 63:23 67:22
68:7 76:6,18 80:5
80:16 81:1,15
87:12 88:10,11
89:6 96:17 97:11
98:11 102:17,21
104:7 105:14
108:2,20 109:21
111:5,10 120:24
121:5,5 122:23
123:2 125:2,24
131:21 135:7
137:1 141:11
162:19
**today's** 30:5,7,10
30:14,22 31:11
37:14 45:1 46:16
81:6,8 98:12,23
106:17 118:4
**todd** 2:10
**toes** 150:21
**told** 55:5 72:12
**tomorrow** 26:11
33:3 50:15 118:8
118:19 121:5,5
134:22 135:23
137:5,8 138:16

139:4,22 143:5
166:25 167:5
168:7
**tomorrow's** 26:6
50:25 136:19,20
140:1,6
**tong** 54:19
**top** 65:23 133:21
**total** 30:2 46:11
134:12
**touch** 35:12 36:10
105:17
**touched** 44:16
**tower** 159:11
**townes** 21:25
**trade** 78:22
**tragically** 52:9,13
**trail** 83:4
**tranches** 64:13
**transactions** 35:4
**transcribed** 13:25
**transcript** 27:6
165:17,24 170:4
**transfer** 38:13
70:11 72:10 83:7
83:20 84:15 88:7
103:21 112:25
123:10 130:10
145:6
**transferred** 122:9
**transfers** 71:14
84:6 113:19 114:4
**transient** 51:25
**translate** 140:22
**transmogrify**
39:1
**traumas** 135:25
**treading** 150:20
**treated** 95:7
**treatment** 39:12
41:3,6 42:3,11
55:18 64:22,25
72:20 78:16

118:14 119:3,14
152:23 153:1
154:13,16 156:10
156:20 157:3,11
162:14 163:17
**trek** 141:16
**tremendous** 130:7
140:10
**tremendously**
51:21
**tribal** 4:12
**tribes** 148:20
**tried** 97:23
**tries** 104:15
**trillion** 83:24 84:1
**trillions** 83:22
**triple** 35:10
**troubled** 78:19
**true** 33:15 60:9,11
90:25 101:4 130:9
141:11 170:4
**truly** 105:13
**trumbull** 2:16
**trust** 42:1 54:22
56:22 66:6 76:17
119:13,14 127:3
143:25 144:23
154:7
**trustee** 2:22 14:20
57:6 101:24
102:23 103:22
104:2 105:20,23
108:22,25 109:2,3
109:13,14 110:2
126:24 127:20
143:17
**trustee's** 2:18
57:13 102:4 126:4
**trustees** 102:3
**trusts** 70:8 100:2
**try** 69:5 86:12
89:13 91:9 92:3
97:19 98:20 106:6

**trying** 65:24 70:4
79:14 93:4
**tsai** 22:1
**tsic** 42:13
**tsier** 22:2
**tuned** 60:15
**tuning** 60:2
**turn** 154:19
161:15
**turning** 29:17
**turns** 55:1
**tweed** 16:1
**two** 23:7 32:9
35:23 38:10 40:5
42:25 46:8 49:8
50:2 53:3 54:8
58:3 59:12 63:6
66:12 70:6,16
78:21 79:14 83:10
85:22 91:4 92:8
93:11 97:14,14,22
99:23 103:1 108:6
113:10 114:25
115:3 120:13,23
123:21 126:12
129:16 130:3
133:14 134:18
136:6 140:8 141:8
155:14 161:16
165:16
**type** 37:7 160:12
**typos** 165:25

|   u   |
| --- |

**u.s.** 1:23 2:18
14:20 45:18,20
51:25 57:5,10,13
101:24 102:2,4,23
103:22 105:22
108:21 109:2,3,14
110:1 113:5,5
117:8,8 126:4,24
127:20 143:1
161:23

**u.s.c.**  3:4,10,16,19
4:1,4,21 5:8,11,18
5:21 6:3,10,13,21
7:2,5,12,15 8:6,9
8:16,19 9:2,5,12
9:15,22,25 10:7
10:10,17,22,25
11:7,10,17,20
12:2,5 23:12
**ubiquitous**  38:7
**ucc**  28:15 48:2
58:25 167:3
**ucc's**  51:20
**ultimately**  29:25
39:5 76:23 87:18
91:10 92:13 93:13
95:8 96:20 108:13
111:14 113:22
117:4 141:16
146:11,16 153:4
153:12 154:19
**ultra**  133:24
134:15
**unaltered**  41:9
**unauthorized**
127:7
**unavailable**  77:11
**unavailing**  57:3
69:19
**unbelievable**
26:18 57:22
**unbelievably**
26:12 80:20
**unceasing**  27:19
**uncertainty**  156:8
**unchanged**  42:2
**unclear**  111:21
**uncomfortable**
133:2
**uncontested**
31:25 37:14,20
49:3

**undeniable**  31:24
**underestimate**
50:25
**underlying**  24:18
27:10 29:17 146:6
164:23
**understand**  28:6
34:22 35:15 40:20
41:13 53:20,23
54:13 57:18 70:17
71:23 76:8 77:16
79:1,4,20 89:5
93:23 94:6,19,21
94:22 99:11
103:23,25 105:3,6
105:18 109:1
110:6 113:2,21
116:10 117:12
119:7 120:10
121:8 127:1 128:4
128:25 129:10
140:12,13 153:6
166:22 168:5
**understandable**
37:17 148:13
**understandably**
150:13
**understanding**
32:12 137:9,13
141:11
**understands**  94:2
94:6,7 129:25
**understood**  56:23
138:2,7 140:6
**undertake**  26:25
**undertaken**  29:1
149:12
**underwood**  2:5
15:16 110:24,25
111:1 112:15
113:10,21 114:5
133:13

**underwood's**
112:24
**undo**  55:23
**undoubtedly**  57:6
**unequal**  39:3 41:3
78:16
**unequally**  155:7
**unfathomable**
57:10
**unfortunate**  28:5
95:25
**unfortunately**
86:2 92:16 96:1,7
**unfounded**  39:13
**uniformly**  42:10
**union**  57:9 114:11
**unions**  114:11
**unique**  92:8
**uniquely**  128:1
**united**  1:1,11 2:22
14:19 30:8 35:19
104:1 105:19
108:25 109:13
129:22 143:16
**unity**  59:3 60:21
**universal**  123:14
**universally**  124:6
130:14
**unknown**  1:25
**unmuted**  30:25
**unnoticed**  90:23
**unofficial**  27:1
**unorthodox**
109:23
**unquestionably**
37:20 49:2 53:20
**unready**  45:15
**unrelated**  85:6
**unresolved**  30:15
30:23,23
**unsecured**  14:12
28:17 48:8 85:10
103:3

**unthinkable**
35:14 46:15 125:9
**untrue**  39:13
**upfront**  56:8
**uphold**  163:3
**upholding**  146:5
**upholds**  88:18
131:4
**upset**  133:25
**urging**  115:17
**use**  54:9,21,22
60:11 61:14 68:19
84:25 85:15
118:24 141:1
152:5 163:6,8,16
**usually**  25:18
**utah**  6:16
**uzzi**  16:6 138:9,9
138:13,23 139:2,7
139:19,25 140:3

---

**v**

**v**  117:4,7 127:21
127:22 128:5,9
154:6 155:15
156:13 161:22,24
**vacated**  63:15,18
74:11 75:5,19
107:17 145:19
**value**  32:4 40:16
78:13,14 97:18,20
103:18 143:21,23
154:21 160:24
162:16,19 164:4,4
**van**  17:24
**vanity**  59:23
**variation**  90:8,8
**varick**  14:21
**varied**  148:23
**various**  23:25
26:7 33:25 41:25
45:19 48:10 53:8
60:3 84:25 91:12
144:1 149:15

vary 148:22
155:18,20 156:12
vast 158:9
veil 70:12
velez 22:3
veritext 170:20
versus 69:3 90:14
victim 26:6 27:3
53:22 143:4
160:11
victims 26:19
50:20 51:7 54:21
54:22,24,25 61:11
118:24 119:18
126:14 135:24
136:9 144:9
150:17 163:7,10
163:11 167:2,6,8
victory 142:9
video 26:17
view 51:12 52:15
53:11 61:19 75:13
80:13 104:1
113:17 125:1
129:7 134:13
136:10 137:18
viewed 48:16
144:13
village 15:19
violate 27:1
112:17,21 113:5,9
133:3,5 141:8
148:2 152:18
violated 33:20
45:22 129:19
153:4 157:3
violates 33:24
49:7 141:5
violating 129:8
violation 40:9
157:11
virginia 12:21
17:11 40:7 82:14

82:19 84:3 85:25
86:2,11 88:17
89:9 122:25
virginia's 12:17
40:25 86:5
virtually 27:12
28:24 29:11 36:18
39:5 44:5
virtue 55:21
vision 126:12
127:17
vocal 53:3
voices 167:3
void 132:8
volatile 73:1
vonnegut 3:6,13
14:9 56:15,15,23
vote 86:7 162:13
voting 152:8

**w**

wait 47:14
walk 39:7
wall 17:12
want 26:7,10
27:18 29:21 32:12
33:7 46:9 47:8,9
47:14,15 48:21
50:2 51:24 54:14
57:6,24 58:6
59:21 62:8 72:18
72:22 74:24 80:9
82:20,20,25 83:1
83:3,14 84:17,20
88:1 89:10,12,15
89:17 90:17 93:25
96:25 97:12
100:20 101:3,25
103:10 104:2
105:19 109:4,6,10
109:11 110:11,12
110:13,24 111:4
114:20 115:24
119:5 120:20

124:17 125:3,19
126:1 127:4,9
134:20 135:7,24
136:1,12,14,15
139:16 140:1,9
147:24 150:13
166:4 167:12
wanted 56:14,16
137:15 140:5
wants 55:3 82:10
88:17 94:5 109:14
117:21 125:18
wardwell 14:3
23:21
warranted 160:13
washington 16:18
watching 136:2
waterfall 100:24
wavelength
117:13
wavy 42:25
way 29:13 31:20
32:25 35:11 36:20
45:5 48:15 50:7
51:13 52:2 55:23
57:11 58:2 60:5
60:12 61:3,16,21
67:24 78:14 81:6
81:9,19 85:11,16
91:22 92:3,19
94:8,8 95:6,22
96:3,18 97:17
101:16 102:25
104:18 109:13
111:5 113:12
120:13 126:9
133:23 138:23
139:4 150:23
ways 32:9 66:12
94:12,13,24
105:25 146:12
we've 29:4 45:2
48:14,17 50:18

55:5 84:8 85:18
86:1 91:22 124:23
132:24 133:8,11
138:18
weaving 125:12
weber 22:4
week 26:15 27:13
weeks 27:11 38:10
140:13
weis 22:5
welcome 125:22
welcomed 143:15
welfare 8:2 15:20
wells 22:6
went 35:15 49:15
51:11 57:3 99:18
99:20 102:25
124:23 130:9
west 12:17,21
17:11 40:6,25
82:14,19 84:3
85:25 86:2,4,11
88:16 89:8 122:25
westchester 8:1
whatsoever 45:24
whichever 84:24
whisper 35:10
white 1:14 126:20
132:3
who've 86:4
134:23
wholly 150:9
willful 110:5
willing 137:22,23
137:23
windward 117:2
wire 38:13
wish 41:11 140:15
167:14
withdraw 25:1
31:19 146:22
151:19

| | |
|---|---|
| **withdrawal** 32:20 35:4 | **wrong** 44:25 45:16 59:25 109:2 116:1,5 134:24 |
| **withdrawing** 45:10 | **x** |
| **withdrawn** 38:14 157:19 | **x** 1:3,9 130:12 169:1 |
| **withhold** 65:16 | **xeroxing** 120:18 |
| **witness** 91:16 136:3 | **y** |
| **witnesses** 99:10 | **y** 130:12 |
| **woke** 38:10 | **yards** 16:3 |
| **word** 44:15 82:2 84:25 87:8,11 120:19 132:3 139:3 | **yeah** 23:19 25:18 32:22 33:15 35:9 36:9 132:11 137:3 |
| **words** 43:10 130:15 | **year** 101:6 |
| **work** 48:10,19 51:11 58:2 76:16 77:18,19,20,22,25 79:9 99:10,20 114:17 115:3 127:11 147:1,4 151:22 160:6,12 167:15 | **years** 36:22 43:20 46:8 50:14 53:4 60:15 63:7 73:8 79:14 84:2,4 85:22 91:4 93:11 99:22 100:16,16 100:23 120:11 126:13 130:4 140:13 |
| **workaday** 39:1 | **yep** 24:15 |
| **worked** 26:7 37:4 46:20 91:1 127:18 | **york** 1:2 14:6,15 14:22 16:4 17:13 35:20 53:1 |
| **working** 25:16 26:23 77:8,9 78:9 85:21 166:19 | **youtube** 27:2 |
| **works** 133:23 | **yup** 135:12 |
| **worse** 53:13 122:13 125:20 129:19 162:14 163:4 | **z** |
| | **zero** 32:1,1 |
| **worth** 76:24 119:16 157:1 | **zoom** 23:4 167:16 |
| **wrap** 89:13 | |
| **writing** 83:11 116:15 | |
| **written** 98:10 | |