*Hearing Date and Time: May 18, 2022 at 10:00 a.m. (prevailing Eastern Time)*
*Objection Date and Time: May 11, 2022 at 4:00 p.m. (prevailing Eastern Time)*

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
James I. McClammy
Eli J. Vonnegut
Darren S. Klein
Dylan A. Consla

*Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | **Chapter 11** |
| **PURDUE PHARMA L.P.,** *et al.*, | **Case No. 19-23649 (RDD)** |
| Debtors.[1] | **(Jointly Administered)** |

### NOTICE OF HEARING ON MOTION OF DEBTORS FOR ENTRY OF AN ORDER AUTHORIZING IMPLEMENTATION OF 2022 KEY EMPLOYEE INCENTIVE PLAN AND 2022 KEY EMPLOYEE RETENTION PLAN

**PLEASE TAKE NOTICE** that on April 27, 2022, the above-captioned debtors and

debtors in possession in these proceedings (collectively, the "**Debtors**") filed the *Motion of*

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

*Debtors for Entry of an Order Authorizing Implementation of 2022 Key Employee Incentive Plan and 2022 Key Employee Retention Plan* (the "**Motion**").  A hearing on the Motion will be held on **May 18, 2022 at 10:00 a.m. (prevailing Eastern Time)** (the "**Hearing**") before the Honorable Robert D. Drain, United States Bankruptcy Judge, United States Bankruptcy Court for the Southern District of New York, at the United States Bankruptcy Court for the Southern District of New York, 300 Quarropas Street, White Plains, New York 10601 (the "**Bankruptcy Court**"), or at such other time as the Bankruptcy Court may determine.

PLEASE TAKE FURTHER NOTICE that the Hearing may be continued or adjourned thereafter from time to time without further notice other than an announcement of the adjourned date or dates at the Hearing or a later hearing.  The Debtors will file an agenda before the Hearing, which may modify or supplement the motions to be heard at the Hearing.

PLEASE TAKE FURTHER NOTICE that pursuant to General Order M-543, dated March 20, 2020 (Morris, C.J.) ("**General Order M-543**"), and at the Bankruptcy Court's directive, the Hearing will be conducted **via Zoom for Government®** so long as General Order M-543 is in effect or unless otherwise ordered by the Bankruptcy Court.[2]  Parties wishing to appear at, or attend, an omnibus hearing conducted via Zoom for Government® videoconference are required to register their appearance by 4:00 p.m. (prevailing Eastern Time) the day before such omnibus hearing at https://ecf.nysb.uscourts.gov/cgi-bin/nysbAppearances.pl.

PLEASE TAKE FURTHER NOTICE that any responses or objections (the "**Objections**") to the Motion shall be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the Southern District of New York, shall be filed with the Bankruptcy Court (a) by attorneys practicing in the Bankruptcy Court,

---

[2] A copy of General Order M-543 can be obtained by visiting https://www.nysb.uscourts.gov/news/general-order-m-543-court-operations-under-exigent-circumstances-created-covid-19.

including attorneys admitted *pro hac vice*, electronically in accordance with General Order M-399 (which can be found at https://www.nysb.uscourts.gov/sites/default/files/m399.pdf), and (b) by all other parties in interest, on a CD-ROM, in text-searchable portable document format (PDF) (with a hard copy delivered directly to Chambers), in accordance with the customary practices of the Bankruptcy Court and General Order M-399, to the extent applicable, and shall be served in accordance with the *Second Amended Order Establishing Certain Notice, Case Management, and Administrative Procedures* entered on November 18, 2019 [ECF No. 498], so as to be filed and received no later than **May 11, 2022 at 4:00 p.m. (prevailing Eastern Time)** (the "**Objection Deadline**").

PLEASE TAKE FURTHER NOTICE that any objecting parties are required to attend the Hearing, and failure to appear may result in relief being granted upon default; *provided* that objecting parties shall attend the Hearing via Zoom for Government® so long as General Order M-543 is in effect or unless otherwise ordered by the Bankruptcy Court.

PLEASE TAKE FURTHER NOTICE that if no Objections are timely filed and served with respect to the Motion, the Debtors may, on or after the Objection Deadline, submit to the Bankruptcy Court an order substantially in the form of the proposed order annexed to the Motion, which order may be entered without further notice or opportunity to be heard.

PLEASE TAKE FURTHER NOTICE that copies of the Motion may be obtained free of charge by visiting the website of Kroll Restructuring Administration at https://restructuring.ra.kroll.com/purduepharma. You may also obtain copies of any pleadings by visiting the Bankruptcy Court's website at https://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

Dated: April 27, 2022
       New York, New York

DAVIS POLK & WARDWELL LLP

*/s/ Darren S. Klein*

450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
James I. McClammy
Eli J. Vonnegut
Darren S. Klein
Dylan A. Consla

*Counsel to the Debtors*
*and Debtors in Possession*

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
James I. McClammy
Eli J. Vonnegut
Darren S. Klein
Dylan A. Consla

*Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **PURDUE PHARMA L.P.,** *et al.*, | **Case No. 19-23649 (RDD)** |
| **Debtors.**[1] | **(Jointly Administered)** |

**MOTION OF DEBTORS FOR ENTRY OF AN ORDER AUTHORIZING**
**IMPLEMENTATION OF 2022 KEY EMPLOYEE INCENTIVE**
**PLAN AND 2022 KEY EMPLOYEE RETENTION PLAN**

The above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**,"

the "**Company**" or "**Purdue**"), by and through their undersigned counsel, hereby submit this

*Motion of Debtors for Entry of an Order Authorizing Implementation of 2022 Key Employee*

*Incentive Plan and 2022 Key Employee Retention Plan* (this "**Motion**"). In support of this Motion,

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

the Debtors rely on the *Declaration of Terrence Ronan in Support of the Motion of Debtors for Entry of an Order Authorizing Implementation of 2022 Key Employee Incentive Plan and 2022 Key Employee Retention Plan* (the "**Ronan Declaration**"), attached hereto as **Exhibit B**, and the *Declaration of Josephine Gartrell in Support of the Motion of Debtors for Entry of an Order Authorizing Implementation of 2022 Key Employee Incentive Plan and 2022 Key Employee Retention Plan* (the "**Gartrell Declaration**"), attached hereto as **Exhibit C**, and respectfully state as follows:

**<u>Preliminary Statement</u>**

1.      This Court has twice approved the Debtors' annual key employee incentive and retention plans, which were effectively continuations of the Debtors' longstanding annual compensation programs, subject to certain consensual reductions in payment amounts and other changes negotiated with the Debtors' key creditor constituencies.  And prior to authorizing those compensation programs, the Court had approved the continuation of the Debtors' prepetition compensation programs, similarly subject to negotiated downward modifications.  These annual compensation plans are necessary to provide Purdue's workforce with market compensation, to motivate employees to achieve demanding corporate objectives, and to ensure that key employees remain in their positions.  Preserving and maximizing the value of these estates by appropriately compensating the Debtors' employees is particularly important as the Debtors prepare to exit chapter 11 and put their assets to work abating the opioid crisis.

2.      By their nature, these compensation programs must be renewed annually, including to preserve market compensation for the Debtors' workforce.  The Debtors therefore seek authorization to renew their twice-approved key employee incentive plan (the "**2022 KEIP**") and

twice-approved key employee retention plan (the "**2022 KERP**" and, together with the 2022 KEIP, the "**2022 Compensation Plans**").

3.    Providing assurance now to the Debtors' employees that they will receive market compensation for their work in 2022 has become all the more critical in the wake of Judge McMahon's decision vacating this Court's confirmation order (the "**District Court Decision**"), which upset the expectations regarding the Company's expected near-term emergence from chapter 11.

4.    Importantly, the 2022 Compensation Plans carry forward the substantial reductions from prepetition practice that the Debtors agreed to in 2020 and again in 2021.  As the charts below demonstrate, the awards for which the Debtors now seek approval closely track and are, indeed, lower in the aggregate than the awards that this Court approved last year:

| Award Type | KEIP | | |
| --- | --- | --- | --- |
| | 2022 | 2021 (all participants) | 2021 (employees continuing to participate in 2022 only) |
| Annual Awards | $4,103,200 | $5,392,751 | $3,954,000 |
| Long-Term Awards | $1,266,892 | $1,707,087 | $1,266,892 |
| Total | $5,370,092 | $7,099,838 | $5,220,892 |

| Award Type | KERP | | | |
| --- | --- | --- | --- | --- |
| | Aggregate Authorized Amount | | Average Amount Per Participant | |
| | 2022 | 2021 | 2022 | 2021 |
| Annual Awards | $15,563,040 | $16,042,311 | $32,089 | $31,704 |
| Long-Term Awards | $5,711,257 | $5,989,264 | $52,882 | $51,190 |
| Targeted Retention Awards[2] | $7,200,000 | $7,200,000 | $68,571 | $68,571 |
| Total | $28,474,297 | $29,231,575 | $153,542 | $151,465 |

---

[2] For average cost per participant of the targeted retention awards, the Debtors assume 105 recipients.

Furthermore, the proposed performance metrics for the 2022 KEIP, in addition to being structured and designed similarly to last year's performance metrics, were informed by extensive consultation with the Debtors' key stakeholders to develop corporate objectives that appropriately incentivize Purdue's senior leadership team to maximize the value of these estates.  Indeed, the Debtors added a metric and adjusted the weighting of the originally proposed metrics specifically in response to creditor comments.

5.      The 2022 Compensation Plans amply satisfy the governing standards.  The 2022 KEIP will incentivize the Company's senior leadership team to achieve meaningful, demanding corporate objectives.  Both it and the 2022 KERP, like their predecessor programs, are designed to compensate the Debtors' workforce in line with the market, taking into account the unique circumstances of this restructuring.  This year, as in past years, the Compensation and Talent Committee (the "**Compensation Committee**") of the Board of Directors of Purdue Pharma Inc. (the "**Board**") and the Debtors' senior management benefited from the independent guidance and experience of Willis Towers Watson ("**WTW**") in designing and developing the 2022 Compensation Plans and in benchmarking this year's programs against a volatile and extraordinarily competitive labor market.  WTW's analysis revealed that the positioning of the compensation of the Debtors' insider and non-insider employees relative to median for their peers in the pharmaceutical industry has declined year-over-year.

6.      This Court extensively reviewed the Debtors' prior annual compensation programs and made detailed findings about the need for and appropriateness of such programs.  The Court recognized that these plans are "consistent with industry standards" and "necessary to compensate these employees at market in their industry."  Hr'g Tr., 138:1, 142:16–20, Sept. 30, 2020; *see also* Hr'g Tr., 51:4–5, July 29, 2021 (observing that, without last year's key employee retention

plan, "these employees would not be compensated at market"). The Court has also highlighted the importance of providing the Debtors' workforce with market compensation, since the Company's employees are "maintaining the value" of the Debtors' business "and enabling the Debtors . . . to move to a focus on, in large measure, abating the opioid crisis." Hr'g Tr., 54:21–25, July 29, 2021. So too has the Court acknowledged that the Debtors should have "a proper compensation structure," since "otherwise what they own is going to deteriorate." Hr'g Tr., 113:5–7, Dec. 4, 2019. The proposed 2022 KEIP and 2022 KERP hew closely to the structure of the compensation programs this Court approved in 2021 and 2020 and similarly should be approved.

## Relief Requested

7.      By this Motion, and pursuant to sections 363(b) and 503(c)(3) of title 11 of the United States Code (as amended, the "**Bankruptcy Code**"), the Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit A**, authorizing the implementation of the 2022 Compensation Plans.

## Jurisdiction and Venue

8.      The United States Bankruptcy Court for the Southern District of New York (the "**Court**") has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference M-431*, dated January 31, 2012 (Preska, C.J.). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), the Debtors consent to entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter a final order or judgment consistent with Article III of the United States Constitution.

9.     Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## General Background

10.     On September 15, 2019, the Debtors commenced the above-captioned chapter 11 cases (the "**Chapter 11 Cases**") by filing with the Court voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The United States Trustee for Region 2 appointed the official committee of unsecured creditors (the "**UCC**") on September 27, 2019.  *See Notice of Appointment of Official Committee of Unsecured Creditors* [ECF No. 131].  No trustee has been appointed in these Chapter 11 Cases.

11.     These Chapter 11 Cases are being jointly administered pursuant to Bankruptcy Rule 1015(b) and the *Order Directing Joint Administration of Chapter 11 Cases* [ECF No. 59] entered by the Court in each of the Chapter 11 Cases.

## The Debtors' Historical Compensation Plans

12.     The Debtors' prepetition compensation practices have been described at length in multiple prior motions.[3]  At a high level, for more than thirty years prior to the commencement of these Chapter 11 Cases, the Debtors maintained a performance-based Annual Incentive Plan (the "**AIP**") for the majority of their employees.  The AIP provided annual cash bonuses tied to the achievement of Company and individual performance metrics.  For much of that time, the Debtors also maintained a Long-Term Results Plan (the "**LTRP**" and, together with the AIP,

---

[3] *See Mot. of Debtors for Entry of an Order Authorizing (i) Debtors to (a) Pay Pre-Petition Wages, Salaries, Employee Benefits and Other Compensation and (b) Maintain Employee Benefits Programs and Pay Related Administrative Obligations, (ii) Employees and Retirees to Proceed with Outstanding Workers' Compensation Claims and (iii) Financial Institutions to Honor and Process Related Checks and Transfers* [ECF No. 6]; *Mot. of Debtors for Entry of an Order Authorizing Implementation of a Key Employee Incentive Plan and a Key Employee Retention Plan* [ECF No. 1674]; *Mot. of Debtors for Entry of an Order Authorizing Implementation of 2021 Key Employee Incentive Plan and 2021 Key Employee Retention Plan* [ECF No. 3077] (the "**2021 KEIP/KERP Motion**").

the "**Prepetition Compensation Plans**"), which provided eligible employees with annual grants that would result in cash payouts tied to achievement of corporate objectives measured over a three-year performance period.[4]  Purdue relied on the AIP and LTRP to drive performance and productivity.[5]

13.    The Debtors also maintained various retention plans in the ordinary course of business, as needed, to retain their key employees.[6]  In 2018 and 2019 in particular, the Debtors implemented retention plans for certain executive and nonexecutive employees, which were carefully calibrated to incentivize participants to remain employed with the Debtors through the end of 2020.[7]  In December 2019 this Court approved continuation of a prepetition retention plan that provided cash-based awards to approximately 120 non-insider employees and was structured to retain their services through December 31, 2020.[8]

**Court Approval of Prior Compensation Programs**

14.    For 2021, consistent with their past practice, the Debtors sought authority to implement a key employee incentive plan (the "**2021 KEIP**") and key employee retention plan ("**2021 KERP**" and, together with the 2021 KEIP, the "**2021 Compensation Plans**") and the 2021

---

[4] Additional information about the AIP and LTRP can be found in the *Second Suppl. Decl. of Jon Lowne in Supp. of the Mot. of Debtors for Entry of an Order Authorizing (i) Debtors to (a) Pay Pre-Petition Wages, Salaries, Employee Benefits and Other Compensation and (b) Maintain Employee Benefits Programs and Pay Related Administrative Obligations, (ii) Employees and Retirees to Proceed with Outstanding Workers' Compensation Claims and (iii) Financial Institutions to Honor and Process Related Checks and Transfers* [ECF No. 554].

[5] *See, e.g., Decl. of Jon Lowne in Supp. of Mot. of Debtors for Entry of Order Authorizing Implementation of 2021 Key Employee Incentive Plan and 2022 Key Employee Retention Plan* [ECF No. 3077-2] ¶ 4.

[6] *See id.* ¶ 5.

[7] *See id.*

[8] *See Suppl. Final Order Authorizing (i) Debtors to (a) Pay Certain Pre-Petition Wages, Salaries, Employee Benefits and Other Compensation and (b) Maintain Employee Benefits Programs and Pay Related Administrative Obligations, (ii) Employees and Retirees to Proceed with Outstanding Workers' Compensation Claims and (iii) Financial Institutions to Honor and Process Related Checks and Transfers* [ECF No. 629] (the "**Supplemental Final Wages Order**").

KEIP and 2021 KERP were approved by this Court in September 2021 and August 2021, respectively.[9]  The 2021 KEIP and 2021 KERP were designed to parallel the key employee incentive plan (the "**2020 KEIP**") and key employee retention plan (the "**2020 KERP**" and, together with the 2020 KEIP, the "**2020 Compensation Plans**") that had been approved by the Court the year prior.[10]  Both the 2021 Compensation Plans and the 2020 Compensation Plans, in turn, closely tracked the Debtors' Prepetition Compensation Plans, the continuation of which was approved by this Court with certain consensual modifications over the course of multiple hearings in late 2019 through early 2020.[11]

15.    Payments under the annual and long-term components of the 2021 KEIP were contingent upon the Debtors' achievement of certain performance metrics pertaining to value creation, innovation and efficiency, and people and culture that were similar to the 2020 KEIP metrics, which, in turn, were similar to the Debtors' historical metrics under their Prepetition Compensation Plans.  Under the 2021 KEIP, if the Debtors failed to achieve the performance metrics at a threshold level, no payments would be made.  Payments to the Debtors' non-insider employees under the 2021 KERP were not subject to performance criteria so as to give those

---

[9] *See Order Authorizing the Debtors to Implement 2021 Key Employee Incentive Plan* [ECF No. 3770] (the "**2021 KEIP Order**"); *Order Authorizing the Debtors to Implement 2021 Key Employee Retention Plan* [ECF No. 3571].

[10] *See Order Authorizing the Debtors to Implement a Key Employee Retention Plan* [ECF No. 1762]; *Order Authorizing the Debtors to Implement a Key Employee Incentive Plan* [ECF No. 1861] (the "**2020 KEIP Order**"); *Supplemental Order Authorizing the Debtors to Implement a Key Employee Incentive Plan* [ECF No. 2002] (the "**Supplemental 2020 KEIP Order**").

[11] *See Final Order Authorizing (i) Debtors to (a) Pay Pre-Petition Wages, Salaries, Employee Benefits and Other Compensation and (b) Maintain Employee Benefits Programs and Pay Related Administrative Obligations, (ii) Employees and Retirees to Proceed with Outstanding Workers' Compensation Claims and (iii) Financial Institutions to Honor and Process Related Checks and Transfers* [ECF No. 309]; *Supplemental Final Wages Order; Second Supplemental Final Order Authorizing (i) Debtors to (a) Pay Pre-Petition Wages, Salaries, Employee Benefits and Other Compensation and (b) Maintain Employee Benefits Programs and Pay Related Administrative Obligations, (ii) Employees and Retirees to Proceed with Outstanding Workers' Compensation Claims and (iii) Financial Institutions to Honor and Process Related Checks and Transfers* [ECF No. 783].

participants greater certainty about their compensation. The 2021 KEIP and 2021 KERP also reflected substantial reductions in total payments relative to the Debtors' historical practices.[12]

16.    Based on extensive discussions with key stakeholder groups, the Debtors agreed to push back certain payment dates under the 2021 Compensation Plans and to remove provisions accelerating payments upon emergence (which the Debtors had included in the 2020 Compensation Plans at the creditors' request). The Debtors also agreed to consult with the UCC, the Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants (the "**AHC**"), and the Multi-State Governmental Entities Group (the "**MSGE**") with respect to (a) setting corporate objectives for calendar year 2022 and (b) scoring the Company's performance under the metrics applicable to the 2021 KEIP.[13] With these changes, none of the UCC, AHC or MSGE objected to approval of the 2021 Compensation Plans.

17.    In addition, the Debtors agreed that no payments under the 2021 Compensation Plans would be made to an employee believed by the Debtors, after reasonable inquiry (including inquiry of the Company's advisors), to have (a) knowingly participated in any criminal misconduct in connection with his or her employment with the Debtors or (b) been aware of fraudulent or criminal acts or omissions at the Company and failed to report such acts or omissions internally at the Company or to law enforcement authorities. This condition will continue to apply under the proposed 2022 Compensation Plans.

---

[12] The 2021 Compensation Plans carried forward the substantial reductions from prepetition practice the Debtors conceded in 2020, which totaled $8.8 million in concessions from historical practice in the aggregate, as described in detail in paragraphs 17 and 18 of the 2021 KEIP/KERP Motion.

[13] *See Debtors' Suppl. Omnibus Reply in Supp. of Mot. of Debtors for Entry of an Order Authorizing Implementation of 2021 Key Employee Incentive Plan and 2021 Key Employee Retention Plan* [ECF No. 3744] ¶ 12 ("The Debtors will consult with the Ad Hoc Committee, MSGE Group and UCC with respect to measuring corporate performance against the 2021 Performance Metrics . . . and developing performance metrics for calendar year 2022 . . . .").

18.    In authorizing the 2021 Compensation Plans, the Court observed that, without the 2021 KERP, "these employees would not be compensated at market."  Hr'g Tr., 51:4−5, July 29, 2021.  The Court likewise found that payments under the 2021 KEIP were "required by people to be competitive and not go somewhere else" and that the 2021 KEIP payments were "essentially part of the [executives'] salary."  Hr'g Tr., 99:6−10, Sept. 13, 2021.  This Court made similar observations when authorizing earlier iterations of the compensation plans as well.  *See* Hr'g Tr., 142:16–20, Sept. 30, 2020 (observing with respect to various employee populations that "[t]he record is clear that these payments, in addition to . . . tracking a longstanding practice of over 30 years, in most cases, albeit reduced from what they were prepetition, [are] necessary to compensate these employees at market in their industry"); Hr'g Tr., 23:8–10, Oct. 28, 2020 ("[T]he revised proposal does place these executives in the middle of industry compensation for people performing jobs like theirs . . . ."); Hr'g Tr., 46:2–8, Nov. 17, 2020 ("[T]he proposed KEIP for these two individuals . . . clearly put[s] their treatment at market for similar pharmaceutical companies even though Purdue obviously is in a bankruptcy case with substantial additional tasks to be performed by these two people.").

## The Proposed 2022 Compensation Plans

19.    The Debtors are now seeking to renew their longstanding annual compensation plans for 2022—again incorporating the highly negotiated prior reductions relative to prepetition practice, subject only to small, ordinary course annual increases.  The Debtors rely on declarations by Terrence Ronan, the Company's chief financial officer, and Josephine Gartrell, a senior director at WTW, to establish that the proposed compensation programs are reasonable and necessary to maximize the value of their business.  The declaration submitted by Mr. Ronan builds upon the declarations submitted in prior years by Jon Lowne, Mr. Ronan's predecessor.

20.     The significant attrition that the Debtors have experienced even with these compensation programs in place underscores their strong belief that motivating and retaining their highly skilled workforce requires paying market-competitive compensation, and that any further reduction in compensation levels would damage the business.  Particularly during the current period of soaring inflation in the cost of goods and services, the 2022 Compensation Plans serve as an essential element of compensation for the Debtors' employees.  The Debtors continue to work tirelessly to progress these Chapter 11 Cases toward a value-maximizing restructuring, and the continued dedicated support of their employees remains necessary to complete that process and deliver as much value as possible to their stakeholders upon emergence.  Ronan Decl. ¶ 9.

21.     The 2022 Compensation Plans, like the longstanding and Court-approved programs on which they are based, address two priorities: first, the need to pay competitive compensation to motivate the Company's workforce and minimize attrition, and second, the need to tailor compensation practices to present circumstances—in particular, the current phase and trajectory of these Chapter 11 Cases, including the ongoing appeal of the District Court Decision.  Ronan Decl. ¶ 4.  The resulting package includes the following components:

(a)     the 2022 KEIP, described in Section I below, for certain insider employees that, like its predecessor programs, includes (i) an annual, incentive-based award payable in 2022 and 2023 and (ii) an incentive-based, long-term grant payable in 2023 and subject to clawback through March 2025;[14] and

(b)     the broadly applicable 2022 KERP, described in Section II below, for eligible non-insider employees that, like its predecessor programs, includes (i) an annual retention award payable in 2022 and 2023, (ii) a long-term retention grant payable in 2023 and subject to clawback through March 2025 and (iii) additional targeted retention payments for certain employees.[15]

---

[14] For the avoidance of doubt, the term "2022 KEIP" refers to the 2022 KEIP Annual Awards and the 2022 KEIP Long-Term Awards collectively.

[15] For the avoidance of doubt, the term "2022 KERP" refers to the 2022 KERP Annual Awards, the 2022 KERP Long-Term Awards and the 2022 Targeted Retention Awards collectively.

22.    The Compensation Committee and the Debtors' senior management team have again worked closely with WTW, their independent compensation consultant, to benchmark the Debtors' employee compensation against the market.  Ronan Decl. ¶ 7; Gartrell Decl. ¶ 11.

23.    The Debtors' employees continue to bear incremental burdens.  Continuing attrition has left the remaining employees to shoulder heightened workloads, operating a complex pharmaceutical business in the midst of these contentious, difficult Chapter 11 Cases.  Ronan Decl. ¶ 8.  The Company maintains lean operations, and in the face of broader challenges throughout the labor market, the Debtors have struggled to fill open positions.  Indeed, eighteen positions have opened at the Company year to date, joining five positions that opened but were not filled in 2021.  Of these twenty-three positions, eleven remain unfilled, and the twelve filled positions remained vacant, on average, for more than eighty-eight days.[16]  Ronan Decl. ¶ 8.

24.    Despite these obstacles, the Debtors' employees must preserve and grow the value of the Debtors' business by continuing to make medicines that benefit patients so that additional value can be generated for opioid abatement, while also delivering on public health initiatives that have the potential to make a meaningful difference and save lives in the context of the opioid crisis.  Departing any further from the Debtors' historical (and market-based) compensation practices during this critical and delicate juncture—including during the pending appeal of the District Court Decision—could jeopardize the Debtors' ability to maintain their business operations and timely emerge, thereby putting at risk the Debtors' ability to deliver value to their stakeholders.  Ronan Decl. ¶ 40.  Aggregate compensation under the proposed 2022 Compensation Plans remains consistent with the Company's prior Court-approved programs and generally *below* the

---

[16] Unless otherwise indicated, the employment data referenced in this Motion are current as of April 22, 2022.

compensation levels under the Debtors' Prepetition Compensation Plans, as the Debtors continue to honor reductions painstakingly negotiated in 2020 with their key stakeholders.

## I.    The Proposed 2022 KEIP

### A.    Participants

25.    The proposed 2022 KEIP would apply to (i) the Debtors' president and chief executive officer (the "**CEO**") and (ii) the Debtors' executive vice president, general counsel and secretary (the "**General Counsel**" and, together with the CEO, the "**2022 KEIP Participants**"). The Debtors' executive vice president and chief financial officer, Mr. Ronan—who was hired on December 1, 2021 in connection with the retirement of the Debtors' former executive vice president and chief financial officer, Mr. Lowne—will not participate in either of the 2022 Compensation Plans, in accordance with the terms of his employment agreement.

26.    The expertise, skills and institutional knowledge of the 2022 KEIP Participants remain essential to guiding the Debtors through their novel restructuring and maximizing the value of the Debtors' estates.  The 2022 KEIP Participants continue to perform essential functions for the Debtors, including providing critical management and legal services, and are responsible for helping determine the Debtors' strategic plan and facilitating the achievement of the Debtors' goals.  Ronan Decl. ¶ 11.  Their workloads remain elevated, both as a result of the prolongation of these Chapter 11 Cases and attrition throughout the Company (including among Purdue's senior management team).  Ronan Decl. ¶ 11.  Moreover, their leadership has been particularly critical this year in supporting employee morale following the District Court Decision and in shepherding the Company through an additional round of intense, difficult mediation that resulted in an agreement that is anticipated to deliver substantial additional value to stakeholders.  Because the 2022 KEIP Participants continue to make extraordinary efforts to maximize the value of the

13

Debtors' businesses and shepherd the Company through its incredibly complex restructuring, the Compensation Committee, the Board and the Debtors' senior management team believe that appropriately incentivizing the two 2022 KEIP Participants is necessary to ensure optimal recoveries for all stakeholders.

27.    Neither 2022 KEIP Participant will be eligible to participate in the proposed 2022 KERP (including the 2022 Targeted Retention Awards, as defined below), and the purpose of the proposed 2022 KEIP is to incentivize the 2022 KEIP Participants.  Ronan Decl. ¶ 12.

B.    Structure

28.    Each 2022 KEIP Participant will receive (i) an annual award (the "**2022 KEIP Annual Award**") and (ii) a long-term incentive compensation grant (the "**2022 KEIP Long-Term Award**"), which are collectively designed to replicate the Debtors' Prepetition Compensation Plans and renew their prior, Court-approved programs, subject to the material reductions discussed above.  Ronan Decl. ¶ 13.  The 2022 KEIP Annual Award and 2022 KEIP Long-Term Award have target values, which are also their maximum values, set forth in **Table 1** below.  All payments under the 2022 KEIP will be tied to the Debtors' achievement of corporate objectives (as discussed in more detail below, the "**2022 Performance Metrics**") at threshold or target performance levels, as applicable, with straight-line interpolation to be used if actual performance falls between those amounts.  Ronan Decl. ¶ 13.  The 2022 KEIP Participants will not receive any payments under the 2022 KEIP should the Company fail to achieve the 2022 Performance Metrics at the threshold level.  The maximum cost of the 2022 KEIP is approximately $5.4 million.  Ronan Decl. ¶ 13.

**TABLE 1**

| 2022 KEIP Participant | Target 2022 KEIP Annual Award | Target 2022 KEIP Long-Term Award | Total Target 2022 KEIP Award |
|---|---|---|---|
| President and Chief Executive Officer | $2,277,100 | $775,067 | $3,052,167 |
| Executive Vice President, General Counsel and Secretary | $1,826,100 | $491,825 | $2,317,925 |
| **Total** | $4,103,200 | $1,266,892 | $5,370,092 |

29.     Subject to achievement of the 2022 Performance Metrics at a threshold level, and subject to each 2022 KEIP Participant's continued employment through the payment date (other than as provided below), the 2022 KEIP Annual Award will be paid as follows: (i) 25% on the Company's regular payroll date on or immediately following October 1, 2022, subject to clawback of the full amount paid if the 2022 KEIP Participant resigns or is terminated for any reason other than by the Debtors without cause prior to March 15, 2023, and (ii) 75% on the Company's regular payroll date on or immediately following March 15, 2023. Ronan Decl. ¶ 14. The first payment will assume target-level performance, and the second payment will include a true-up, if needed, including a potential clawback of any amount that would not have otherwise been paid if target performance is not met. Ronan Decl. ¶ 14. A termination of employment by the Debtors without cause after September 30, 2022 will trigger acceleration at the target value, likewise subject to clawback if performance is later scored below target (such clawback to occur by March 15, 2023). Ronan Decl. ¶ 14. In the event of a termination of employment by the Debtors without cause on or prior to September 30, 2022, no payment will be due.

30.     Consistent with Purdue's longstanding compensation practices, each 2022 KEIP Participant will also receive a 2022 KEIP Long-Term Award, which is designed to mimic the

economic structure of the LTRP grant that the participant otherwise would have received in 2022.[17]

Ronan Decl. ¶ 15.  In connection with seeking approval of the long-term incentive compensation

grant component of the 2020 KEIP, the Debtors agreed to a 52.25% aggregate reduction from

historical practice and to subject the award to acceleration upon emergence.  That discount was

carried forward for the long-term incentive compensation grant component of the 2021 KEIP

(the "**2021 KEIP Long-Term Award**") while switching to a nearer-term payment date, subject to

a clawback through the historical payment date, rather than acceleration upon emergence.  The

discount, and structure, of the 2021 KEIP Long-Term Award is reflected once again in the 2022

KEIP Long-Term Award.  Ronan Decl. ¶ 15.  Payment will be made on the Company's regular

payroll date on or immediately following March 15, 2023, subject to clawback if the 2022 KEIP

Participant resigns or is terminated for any reason other than by the Debtors without cause prior to

March 2025.  As with the 2022 KEIP Annual Award, termination of employment without cause

after September 30, 2022 will accelerate the 2022 KEIP Long-Term Award at target, subject to

clawback for any amount that would not otherwise have been paid if target performance is not met.

Ronan Decl. ¶ 15.  Payouts will be tied to the same 2022 Performance Metrics that apply to the

2022 KEIP Annual Award and therefore will depend solely on the Company's performance in

2022.[18]  Ronan Decl. ¶ 15.

---

[17] As noted above, the 2022 KEIP Long-Term Award is intended to replicate the Company's prepetition Long-Term Results Plan, which provided for incentive grants that would accrue and be payable over a three-year performance period.  Last year, in connection with seeking stakeholder approval of the Debtors' compensation programs, Purdue agreed to pay its long-term award in June 2022, subject to clawback through the date the payments would otherwise have been made in 2024.  The Debtors now seek to carry forward this structure and payment timing, with an award payable in 2023 and subject to clawback through the date on which payments would otherwise have been made in 2025.

[18] As it has in each of the prior two performance periods, the Compensation Committee determined that it was in the best interest of the Debtors to apply only the 2022 Performance Metrics, rather than performance metrics for a three-year period, to pay under the 2022 KEIP Long-Term Awards, given that the Debtors are anticipated to emerge well before the completion of the typical three-year performance period for long-term awards.  Ronan Decl. ¶ 15 n.5.

C.    Metrics

31.    Consistent with its longstanding practice of approving performance metrics early in each calendar year, the Compensation Committee set the 2022 Performance Metrics in the first quarter of 2022, with guidance from WTW and following consultation with the UCC, AHC and MSGE, although the weighting of the metrics and scoring methodology for one metric was not approved until early in the second quarter of 2022 to allow additional time for creditor consultation. Ronan Decl. ¶ 16; Gartrell Decl. ¶ 19.

32.    The 2022 Performance Metrics are based on the same three strategic pillars that have long defined the Debtors' corporate objectives: value creation (representing 50% of the 2022 Performance Metrics), innovation and efficiency (40% of the 2022 Performance Metrics), and people and culture (10% of the 2022 Performance Metrics).    Ronan Decl. ¶ 17.    The 2022 Performance Metrics set by the Compensation Committee are challenging, require extensive achievement and present a meaningful risk of not being met at the threshold level required for payment.    Ronan Decl. ¶ 17.    Consultation with the UCC, AHC and MSGE—who reviewed the 2022 Performance Metrics in the context of diligence materials provided by the Debtors in response to creditor requests, along with confidential information about the Debtors' budget and operations already available to these groups—resulted in certain changes to the initially proposed 2022 Performance Metrics.    Accordingly, the 2022 Performance Metrics are the product of both the same rigorous internal process that the Debtors have used in past years and consultation with highly informed and sophisticated members of the Debtors' key creditor constituencies.    Ronan Decl. ¶ 17.    The 2022 KEIP Participants have been focused on driving the Debtors to meet these goals, and they will need to apply substantial efforts to achieve their targets throughout the rest of

this year.  Ronan Decl. ¶ 17.  The Compensation Committee set these stretch goals to ensure that

the 2022 KEIP has its intended, incentivizing effect.

        1.     Value Creation

     33.    The value creation strategic pillar measures and rewards the long-term success of

the Debtors' business based on certain nonfinancial operational goals, such as meeting certain

deadlines with respect to the Company's testing and development of non-opioid products,

including overdose treatment products.  **Table 2** below sets forth the operational and

developmental goals that the Compensation Committee approved as key to the long-term success

of the Debtors' business.  Ronan Decl. ¶ 18.

**TABLE 2**

| Value Creation Metrics | Target Date | % of Value Creation | % of 2022 Performance Metrics |
|---|---|---|---|
| − Implement Company initiatives to ensure the Company operates efficiently and sustainably so as to maximize net value generated to abate the opioid crisis. | | 50.0% | 25.0% |
| **Public Health Initiatives[19]** | | | |
| − Make the Nalmefene vial commercially available | End of Q2 2022 | 27.5% | 13.75% |
| − File the ANDA for the Nalmefene pre-filled syringe | End of Q4 2022 | | |
| − Submit FDA regulatory filing to support an increase in specification for the naloxone degradant in buprenorphine/naloxone sublingual tablets (generic Suboxone) | End of Q2 2022 | | |
| − Complete and achieve bioequivalence for OTC Naloxone | End of Q1 2022 | | |

---

[19] All medications referred to in this section are potential treatments for opioid overdose.

| Progressing the Pipeline | | | |
|---|---|---|---|
| − Initiate clinical studies of Sunobinop | End of Q2 2022 | 17.5% | 8.75% |
| − Complete Proof of Concept pharmacokinetic study for KL-01401 (epinephrine oral mucosal film) | End of Q4 2022 | | |
| **Rhodes Associates L.P. ("RALP") and Progressing the Generic Pipeline** | | | |
| − Scopolamine TDS – Submit ANDA | End of Q2 2022 | 5.0% | 2.5% |
| − Lisdexamfetamine Capsules – Complete bioequivalence and stability studies | End of Q2 2022 | | |
| − Formoterol Inhalation Solution – Submit response to FDA Complete Response Letter | End of Q2 2022 | | |
| **Total** | | **100.0%** | **50.0%** |

34. ███████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████

████    ███████████████████████████████
████    █████████████████████

████    ███████████████████████████████
████    ██████████████████████████

████    ███████████████████████████████
████    █████████████████████████████

████    ███████████████████████████████
████    ██████ ██████ ████ █████ █ ████ ████ ████
████    ███████████████████████████████
████    ███████████████████████████████



Ronan Decl. ¶ 19.

### 2.    Innovation and Efficiency

35.    The innovation and efficiency strategic pillar captures key financial and operational goals, including important business metrics such as operating profit and net sales. __Table 3__ below sets forth the financial and operational goals that the Compensation Committee and the Debtors' senior management team have identified as key to the Company's long-term business success. Ronan Decl. ¶ 21.  This year, the metric focused on properly positioning the Company for emergence from bankruptcy has been moved to the innovation and efficiency strategic pillar with an increased weighting, given the importance of this process to maximizing the value of the enterprise for the benefit of all its stakeholders and the challenges faced in preparing to emerge promptly on an uncertain timeframe.

**TABLE 3**

| Innovation and Efficiency Metrics | Target | % of Innovation and Efficiency | % of 2022 Performance Metrics |
|---|---|---|---|
| − Consolidated Total Business Operating Profit | $96 million | 55.0% | 22.0% |
| − Avrio Net Sales[20] | $105.5 million | 20.0% | 8.0% |
| − Rhodes (RALP) Operating Loss | ($39 million) | 5.0% | 2.0% |
| − Position the Company for emergence from bankruptcy when authorization is granted by updating as necessary the established process to transfer licenses, make product label changes, transfer government contracts, ensure the orderly transfer of payroll and benefits and implement orderly transfer of intellectual property, as well as preparing to take, at the appropriate time, pre-emergence actions that must occur within a specific time period of the anticipated date of the Company's emergence from bankruptcy, and ensure operational readiness to implement such initiatives. | | 20.0% | 8.0% |
| **Total** | | **100.0%** | **40.0%** |

3.    People and Culture

36.    Finally, nurturing the Debtors' human resources and organizational culture has been, and will remain, critical to keeping the Debtors on the path to emergence and beyond. To that end, the Debtors' people and culture strategic pillar metrics include (a) implementing, by the end of the third quarter, priority initiatives identified through an employee feedback program and (b) strengthening the sustainability and accountability of the Company's commitment to diversity, equity, inclusion and belonging by (i) completing foundational and people leader training by the end of the second quarter and (ii) progressing the three established employee resource groups

---

[20] Avrio Health L.P. is a wholly owned subsidiary of the Debtors that produces over-the-counter consumer health products, including Betadine (a wound care product), Colace (a stool softener), Senokot (a laxative) and SlowMag Mg (a magnesium supplement).

("**ERGs**") and supporting other colleague-requested ERGs as needed by the end of the year.[21]
These metrics will be reviewed holistically and will count for 10% of the Company's score under
the 2022 Performance Metrics.  Ronan Decl. ¶ 22.

     D.    <u>Commercial Reasonableness</u>

37.    The 2022 KEIP is consistent with the Debtors' historical compensation practices,
although lower in amount given the continuation of concessions first agreed to in 2020, while the
challenges faced by the 2022 KEIP Participants remain elevated as they continue to navigate these
protracted Chapter 11 Cases and work toward emergence.  Ronan Decl. ¶ 23.  For each 2022 KEIP
Participant, the total cost of the proposed 2022 KEIP Annual Award carries forward the annual
award component of last year's program, subject only to modest and typical year-over-year merit
increases.  Ronan Decl. ¶ 23.

38.    The LTRP has long been a crucial component of the Debtors' overall compensation
strategy.  In 2020, this Court approved a long-term grant that effectively replicated the LTRP
grants that otherwise would have been made, subject to substantial concessions.[22]  The Debtors
renewed those grants, with the same reductions from prepetition practice, last year as part of the
Court-approved 2021 KEIP.[23]

39.    This year, the Compensation Committee and the Debtors' senior management team
continue to believe that granting long-term awards, payable in 2023 and subject to clawback
through March 2025, to the 2022 KEIP Participants as part of the 2022 KEIP is necessary,

---

[21] ERGs are voluntary, self-initiated groups of colleagues who believe in or share common interests, backgrounds, goals and/or characteristics.  Any employee who does not identify as a member of a particular ERG is invited to attend as an ally—one who does not share a common characteristic but who wants to actively support, promote or advance a culture of inclusion.

[22] *See* 2020 KEIP Order and Supplemental 2020 KEIP Order.

[23] *See* 2021 KEIP/KERP Motion; 2021 KEIP Order.

appropriate and consistent with the Debtors' historical compensation practices.  Ronan Decl. ¶ 24.

The proposed amount of the 2022 KEIP Long-Term Awards once more reflects the concessions

agreed to in 2020 and carried forward last year, subject only to normal and modest annual merit

increases.  The loss of these long-term grants without substitution would represent a significant

decrease in overall compensation, which could jeopardize the Debtors' ability to incentivize the

2022 KEIP Participants and strengthen the long-term value of the enterprise.  Ronan Decl. ¶ 24.

40.    The CEO's compensation remains below median when compared to chief executive

officers at peer, non-debtor pharmaceutical companies—and actually slightly further below

median than last year—while the CEO continues to play a vital role in maximizing the value of

the Debtors' estates for the benefit of their stakeholders through his stewardship of the Debtors

during the many challenges presented by these Chapter 11 Cases.  Ronan Decl. ¶ 25; Gartrell Decl.

¶¶ 24, 25.

41.    As in years past, the General Counsel's compensation remains above-market when

compared to general counsel at peer, non-debtor pharmaceutical companies.  Gartrell Decl. ¶ 24.

But it has long been, and still is, the Debtors' business judgment that they require a general counsel

with significantly greater expertise and experience than is typical, particularly in light of the

enormous complexities of these Chapter 11 Cases, which are entirely in addition to the usual

complex legal issues attendant to running a diversified pharmaceutical business.  Ronan Decl. ¶ 26.

42.    The Court has agreed with this exercise of the Debtors' reasonable business

judgment in each of the two past years, and the Debtors urge the Court to do so again now.  As

this Court has observed, it is "clear" that the General Counsel's job description "is not comparable

to other general counsel in this industry"; that the role "requires more expertise and more work";

and that the General Counsel's compensation "reflects [his] added duties and expertise."  Hr'g

Tr., 24:18–25:5, Oct. 28, 2020.   The General Counsel's "role as general counsel is far more complex and difficult than [the] general counsel of a competitor in [the pharmaceutical industry], given the myriad complex issues that, as general counsel, he needs to deal with."   Hr'g Tr., 132:5–14, Sept. 13, 2021.   The Compensation Committee and the Debtors' senior management team continue to believe that the General Counsel's compensation is appropriate and reasonable, given the immense challenges he faces in his role with the Debtors and in light of his past experience and expertise and the other opportunities available to an individual with his qualifications.   Ronan Decl. ¶ 26; Gartrell Decl. ¶ 26.   Accordingly, the Debtors submit that the proposed 2022 KEIP with respect to the General Counsel is reasonable and should be approved.

43.     The proposed 2022 KEIP would continue to provide incentive compensation to the 2022 KEIP Participants, at levels consistent with the Company's prior, Court-approved programs and below its prepetition practice.   The 2022 KEIP, like its predecessor programs, compares reasonably to market compensation levels for the Debtors' peers.   Given the challenging roles and responsibilities that the 2022 KEIP Participants must continue to fulfill, the unprecedented difficulty that these Chapter 11 Cases continue to present and the substantial efforts that will be required to achieve the 2022 Performance Metrics at even threshold levels, it is abundantly clear that the 2022 KEIP is appropriate and necessary for the preservation of the value of the Debtors' estates.

## II.     The Proposed 2022 KERP

### A.     Participants

44.     The Debtors seek authorization to implement the 2022 KERP for virtually all incentive-eligible employees other than the 2022 KEIP Participants (the "**2022 KERP**

**Participants**").[24]  The 2022 KERP Participants have undertaken significant efforts to maintain the

value of the Debtors' business—including during the unique environment of the ongoing COVID-

19 pandemic and over the course of these protracted Chapter 11 Cases—and enable the Debtors'

progress toward a successful restructuring.  Ronan Decl. ¶ 27.  They have performed these

Herculean tasks under significant stresses, including reduced employee headcount and a very

competitive market for talent to replace departing employees.  Nevertheless, the 2022 KERP

Participants continue to deliver extraordinary business results, for which the Debtors must pay

market compensation.  Ronan Decl. ¶ 27.  Approximately 483 employees will participate in the

2022 KERP, of which eighteen will be vice president or higher and 465 will be middle

management, professional employees and support and technical staff, which include scientific

researchers as well as regulatory, compliance, quality and manufacturing personnel.[25]  Ronan

Decl. ¶ 27.

45.    This Court has repeatedly held that the Debtors appropriately distinguish between

insiders and non-insiders.  *See* Hr'g Tr., 49:20–24, July 29, 2021 ("It does not appear to me . . .

that any of the debtor's analysis here as to who is within the program and who is without it is

inconsistent with the better recent case law on this issue."); Hr'g Tr., 109:19–24, Dec. 4, 2019

("[T]he company engaged in the proper process to determine whether someone was an insider or

not.  Nothing I've heard today changes that analysis, and I'll rest on my rulings on that point.").

---

[24] A small number of employees either previously did not participate in the AIP and therefore will not participate in the 2022 KERP or currently are not eligible to participate in the 2022 KERP.

[25] In instances where the separation of existing 2022 KERP Participants from the Debtors results in newly hired employees taking on their roles or responsibilities—or if the Debtors hire employees to fill currently vacant, non-insider positions—the 2022 KERP would allow the Debtors to include such newly hired employees as 2022 KERP Participants.  The number of 2022 KERP Participants shown above excludes one non-insider employee whom the Company has identified as a 2022 Targeted Retention Awards recipient but who is not otherwise eligible to participate in the AIP or LTRP.

Applying the same criteria that the Debtors previously used to determine insider status in the past two years, no 2022 KERP Participant is an insider.[26]

B.    Payout Structure

46.    Each 2022 KERP Participant will receive (i) an amount equal to the 2022 KERP Participant's target AIP (the "**2022 KERP Annual Award**") and, (ii) where eligible, a long-term incentive compensation grant payable in 2023 (subject to clawback through March 2025) (the "**2022 KERP Long-Term Award**").  Certain 2022 KERP Participants will receive additional, targeted retention payments (the "**2022 Targeted Retention Awards**").  The Debtors also propose to accelerate certain outstanding, Court-approved long-term awards currently scheduled to be paid in March 2023, subject to clawback through the date payment otherwise would have been made in March 2023.

47.    The 2022 KERP Annual Award is equal to the target amount of the AIP award that each participant would historically have received, including modest, ordinary course merit increases.  The 2022 KERP Annual Award is not subject to performance criteria, in order to provide the 2022 KERP Participants with greater certainty about their compensation.  This is expected to help retain 2022 KERP Participants under what remain challenging and uncertain conditions.  Ronan Decl. ¶ 29.

48.    The 2022 KERP Annual Award will be paid (i) 50% on the Company's regular payroll date on or immediately following October 1, 2022 and (ii) 50% on the Company's regular payroll date on or immediately following March 15, 2023.  Ronan Decl. ¶ 30.  Other than for

---

[26] The Company categorized an employee as an insider if the employee met any one of the following five criteria.  The employee: (1) is an officer appointed by the Board; (2) holds the title of chief executive officer, chief financial officer, chief operating officer, general counsel or senior vice president; (3) reports to the Board; (4) has authority to make Company-wide or strategic decisions, including critical financial decisions; or (5) is in a position to determine his or her own compensation.  Notably, no insider employee of the Debtors is in a position to determine his or her own compensation, which is the responsibility of the Compensation Committee (and, with respect to the CEO, the Board).

hourly employees, the first payment of the 2022 KERP Annual Award is subject to clawback if the 2022 KERP Participant resigns or is terminated for any reason other than by the Debtors without cause prior to March 15, 2023.  Ronan Decl. ¶ 30.  Outstanding amounts under the 2022 KERP Annual Award will accelerate in the event that a 2022 KERP Participant's employment is terminated by the Debtors without cause after September 30, 2022.  Ronan Decl. ¶ 30.  The total aggregate payment under the 2022 KERP Annual Award is approximately $15.5 million.  Ronan Decl. ¶ 30.

49.    Consistent with past practice, certain 2022 KERP Participants will receive a 2022 KERP Long-Term Award that substantially replicates the long-term grants awarded under the Debtors' prior, Court-approved programs and mimics the economic structure of the LTRP grant that otherwise would have been granted to each eligible 2022 KERP Participant under Purdue's longstanding compensation practices.  Ronan Decl. ¶ 31.  The amount of such grant will equal 60% of the target LTRP grant that otherwise would have been granted, reflecting a discount to past practice negotiated in 2020 and carried forward ever since, subject only to modest, ordinary course annual base salary increases, promotions and other changes to the employee population.  Ronan Decl. ¶ 31.  The 2022 KERP Long-Term Award will not be subject to performance metrics.  Ronan Decl. ¶ 31.

50.    Payments due under the 2022 KERP Long-Term Awards will be made on the Company's regular payroll date on or immediately following March 15, 2023, subject to clawback (other than for hourly employees) if the 2022 KERP Participant resigns or is terminated for any reason other than by the Debtors without cause prior to March 2025.  Ronan Decl. ¶ 32.  Outstanding amounts will accelerate in the event of a termination of employment after September 30, 2022 by the Debtors without cause.  Ronan Decl. ¶ 32.  The aggregate total cost of these 2022

KERP Long-Term Awards for all 2022 KERP Participants is approximately $5.7 million.  Ronan

Decl. ¶ 32.

51.    In addition, the Debtors have previously used targeted retention awards, including

in each year since the commencement of these Chapter 11 Cases, to preserve and maximize the

value of the Debtors' estates.  Ronan Decl. ¶ 33.  Though the Debtors have continued to see

attrition with these programs in place, the evidence supporting the efficacy of these targeted

retention awards is clear: attrition among targeted retention recipients was approximately 5.7% in

2021, compared to approximately 11% in the broader Purdue population.  Ronan Decl. ¶ 33.  The

Debtors therefore seek approval of the 2022 Targeted Retention Awards in an aggregate amount

of up to $7,200,000, which is the same amount that the Court authorized last year.[27]  However,

this year, the Debtors propose that $0.78 million of such amount consist of supplemental capacity

that the Debtors may deploy to respond to changing business conditions, but only after consultation

with the UCC, AHC and MSGE, which will provide the Debtors with greater flexibility while

cabining that flexibility by subjecting any amount spent thereunder to creditor consultation.  Ronan

Decl. ¶ 33.  The 2022 Targeted Retention Awards will renew the Debtors' previous award

programs and allow the Debtors to continue their practice of making targeted retention payments

to an identified group of key employees.[28]  The Debtors will again endeavor to use only as much

---

[27] Though the targeted retention component of the 2021 KERP approved by this Court authorized the Company to spend up to $7.2 million thereunder, the Debtors, in an effort to carefully manage estate resources, ultimately awarded only $5.1 million under the program.  This restraint, however, was predicated on the assumption at the time that the Debtors would be emerging from chapter 11 in the near term.  Thus, it is the Compensation Committee's and the Debtors' senior management team's business judgment that an aggregate amount of $7.2 million remains the appropriate size for this year's proposed 2022 Targeted Retention Awards.

[28] The Debtors' management team has identified the employees most likely to require targeted retention payments over the course of this next year.  As business needs fluctuate, some variation in the targeted retention population may occur, though in no event will (a) the aggregate dollar amount of the 2022 Targeted Retention Awards exceed $7,200,000 or (b) any insider receive such an award.

of such capacity as is necessary to retain key employees, with a goal of maximizing the value of the Debtors' estates.

52.     The 2022 Targeted Retention Awards will be paid (a) 25% on the Company's regular payroll date on or immediately following December 30, 2022, (b) 25% on the Company's regular payroll date on or immediately following March 30, 2023 and (c) 50% on the Company's regular payroll date on or immediately following June 30, 2023.[29]   Ronan Decl. ¶ 34.   The 2022 Targeted Retention Awards are subject to clawback if the recipient resigns or is terminated for any reason other than by the Debtors without cause before September 30, 2023, and outstanding amounts due will accelerate upon a recipient's termination by the Debtors without cause after September 30, 2022.   Ronan Decl. ¶ 34.

C.     Commercial Reasonableness

53.     The 2022 KERP is commercially appropriate and reasonable.   The challenges of operating in chapter 11, combined with the challenges particular to Purdue's unique situation, present the 2022 KERP Participants with an ongoing, extraordinary burden.   Unless the Debtors provide their workforce with appropriate, market compensation, there is a very real risk that employees will depart for other opportunities.   Ronan Decl. ¶ 35.   Indeed, even with the Company's prior programs in place, attrition has remained high, with nineteen resignations thus far in 2022 alone, which represents a year-to-date annualized voluntary turnover rate of 12.7%.   Ronan Decl. ¶ 35.   Additional defections among the Debtors' workforce could significantly hamper their operations and possibly jeopardize the Debtors' timely emergence.   Accordingly, the Company is seeking Court approval to renew its annual compensation programs now to provide its non-insider employees with certainty regarding their compensation arrangements for this year.   Ronan Decl.

---

[29] Timing with respect to supplemental capacity may be adjusted in response to applicable business conditions.  Ronan Decl. ¶ 34 n.13.

¶ 35.  Moreover, the Debtors continue to endure significant hiring obstacles (in the face of a broadly difficult and competitive market for talent); eighteen headcount positions have opened year to date, joining five positions that opened but were not filled in 2021.  Eleven of these positions are unfilled, and it remains extremely unlikely that the Debtors will be able to find sufficient, if any, qualified replacements during this critical moment in these Chapter 11 Cases.  If not for the Company's prior annual compensation programs, the Debtors believe that the attrition rate would have been significantly higher.  Ronan Decl. ¶ 35.  Failure to implement the 2022 KERP could have a devastating effect on the Debtors' ability to retain the individuals they need to maintain their business operations and deliver a successful emergence from these Chapter 11 Cases for all stakeholders.  Ronan Decl. ¶ 35.

54.     The 2022 KERP Annual Award is consistent with the Debtors' historical compensation practices.  The 2022 KERP Annual Award substantially replicates the Company's prepetition and Court-approved annual award programs, subject only to modest, ordinary course annual merit increases.  Ronan Decl. ¶ 36.  Subjecting the first payment to clawback through March 15, 2023 provides a powerful retentive element and mimics the historical payment timing of the Company's prepetition AIP.  Ronan Decl. ¶ 36.  Similarly, the 2022 KERP Long-Term Award substantially replicates the Debtors' longstanding long-term grant program and carries forward the steep discount to past practice that this Court first approved in 2020 (subject to modest, ordinary course year-over-year increases).  Ronan Decl. ¶ 36.  Additionally, the Debtors have identified the 2022 KERP Participants most likely to require 2022 Targeted Retention Awards through a detailed and thorough process to identify the roles that are particularly critical to preserving and maximizing the value of the Debtors' estates.  Ronan Decl. ¶ 36.  The aggregate amount of the 2022 Targeted Retention Awards is consistent with the aggregate amount of prior Court-approved

targeted retention programs, which have proven effective at mitigating attrition among selected critical employees.  Ronan Decl. ¶ 36.

55.     In sum, the 2022 KERP compensates key employees in line with the Debtors' market-based historical practices and is critical to retaining the Debtors' employees, who are needed to preserve the value of the Debtors' estates.

D.     Change in Timing of Payment of 2020 KERP Long-Term Awards

56.     In 2020, the Debtors initially sought Court approval to (a) grant approximately $10.2 million in new long-term awards payable to participants in March 2023 (the "**2020 KERP LTRP Grant**") and (b) pay certain awards that had already been granted under the Company's prepetition LTRP that included approximately $0.82 million payable in March 2023 (which amount has been reduced from the originally approved approximately $1.15 million by resignations in the interim) (the "**Prepetition Long-Term Awards**" and, together with the 2020 KERP LTRP Grant, the "**2020 KERP Long-Term Awards**"). As the Court knows, following negotiations with their creditors, the Debtors modified the 2020 KERP Long-Term Awards by (a) providing for acceleration upon emergence and (b) reducing the aggregate amount of the 2020 KERP LTRP Grant to $6.12 million (of which approximately $5.00 million remains outstanding), a 40% discount to past practice.

57.     When the 2020 KERP Long-Term Awards were proposed and approved, emergence was expected to occur in approximately the second half of 2021.  The Debtors viewed the 40% discount as reasonable under the circumstances because, by linking payment with emergence, participants were expected to receive their 2020 KERP Long-Term Awards significantly sooner than they otherwise would have.  Emergence was on schedule to occur only modestly later than anticipated until the District Court Decision shifted this calculus.  Now,

emergence will not occur until the summer of 2022 at the earliest, and potentially significantly later. This means that, absent the proposed change, payment of the 2020 KERP Long-Term Awards may be subject to little or no acceleration despite a significant discount of the payment amounts that reflects a material anticipated acceleration.

58.    Accordingly, the Compensation Committee and the Debtors' senior management team believe that accelerating the March 2023 payment of the 2020 KERP Long-Term Awards to June 2022, subject to a clawback through the original payment date of March 2023, will better align the payment schedule with the initial expectations of all parties and best serve the Debtors from an employee morale and retention perspective. Ronan Decl. ¶ 39. No further discount is appropriate in connection with the proposed accelerated payment date given that the 2020 KERP Long-Term Awards were already discounted to reflect an anticipated payment date approximately a year earlier than the date sought in this Motion and that the clawback date will maintain the retention effect of these awards through the original payment date. The total amount proposed to be accelerated is approximately $5.82 million to ninety-seven participants, an average payment of $60,000 per participant. Ronan Decl. ¶ 39. For the avoidance of doubt, this proposed change will not affect the compensation of any participant in the 2020 KEIP; only non-insider employees will receive accelerated payments hereunder. Ronan Decl. ¶ 39.

**Basis for Relief Requested**

I.    **Section 503(c)(1) of the Bankruptcy Code Does Not Bar the Proposed 2022 Compensation Plans**

A.    <u>Section 503(c)(1) Is Not Applicable to the 2022 KEIP Because It Is an Incentive Plan</u>

59.    Section 503(c)(1) of the Bankruptcy Code does not apply to the 2022 KEIP because it is designed to incentivize, rather than retain, the 2022 KEIP Participants. The 2022 KEIP carries forward the economic terms and the structure of its two predecessor programs—both of which this

Court held were properly analyzed under section 503(c)(3), and not section 503(c)(1), of the Bankruptcy Code. *See* Hr'g Tr., 131:7–20, Sept. 13, 2021 (holding that last year's key employee incentive plan "is not the type of retentive bonus program that Congress had in mind in [section] 503(c)(1)"); Hr'g Tr., 24:14–16, Oct. 28, 2020.

60.    Section 503(c)(1) of the Bankruptcy Code, with limited exceptions, prohibits a transfer to an "insider of the debtor for the purpose of inducing such person to remain with the debtor's business." This provision, however, does not apply to performance-based incentive plans. *See In re Hawker Beechcraft, Inc.*, 479 B.R. 308, 313 (Bankr. S.D.N.Y. 2012) ("§ 503(c)(1) does not prevent a debtor from adopting a plan that rewards insiders for achieving financial or other targets, rather than for simply remaining in the employment of the debtor, even though the incentive plan has a retentive effect."). Under section 503(c)(1), a debtor is required to show, by a preponderance of evidence, that the key employee incentive plan "is primarily incentivizing and not primarily retentive." *In re Residential Capital, LLC*, 478 B.R. 154, 170 (Bankr. S.D.N.Y. 2012).

61.    A compensation plan that includes "some retentive effect" still passes muster under section 503(c)(1) where, as here, it is "overall . . . incentivizing in nature." *In re Dana Corp.*, 358 B.R. 567, 571 (Bankr. S.D.N.Y. 2006); *see also Residential Capital*, 478 B.R. at 171 ("When a plan is designed to motivate employees to achieve specified performance goals, it is primarily incentivizing, and thus not subject to section 503(c)(1)."). Courts routinely find that compensation plans are sufficiently incentivizing if they are "tied . . . to the achievement of particular financial milestones." *See, e.g.*, *In re Borders Grp., Inc.*, 453 B.R. 459, 471–72 (Bankr. S.D.N.Y. 2011). When evaluating whether performance goals are sufficiently challenging, courts do not analyze whether the "targets now appear achievable in hindsight" but rather "review[] a [compensation

plan] that was designed to incentivize work," even if "already partially performed." *In re Aralez Pharm. US Inc.*, No. 18-12425 (MG), 2018 WL 6060356, at *5 (Bankr. S.D.N.Y. Nov. 19, 2018).

62.    Here, the 2022 KEIP primarily incentivizes the 2022 KEIP Participants to achieve performance goals and thus is not prohibited by section 503(c)(1) of the Bankruptcy Code.  As set forth above, both components of the 2022 KEIP are incentive-based: payments under the 2022 KEIP Annual Award and 2022 KEIP Long-Term Award are tied to the Company's achievement of the 2022 Performance Metrics, with no amounts payable thereunder unless the Company achieves those metrics at least at the threshold level.  Ronan Decl. ¶ 13.

63.    The 2022 Performance Metrics feature a similar rubric and were set in a similar manner to the Company's previous annual corporate objectives.  The 2022 Performance Metrics are ambitious, with threshold targets that are difficult to achieve both individually and when considered in the aggregate.  Success under these metrics will require the 2022 KEIP Participants' diligent and committed efforts.  Ronan Decl. ¶ 17.  The 2022 Performance Metrics are tied to the same high-level categories of goals as were the prior programs, including, among other things, financial metrics, value creation and innovation—all of which impact the long-term health of the Debtors' estates.  Moreover, many of the same headwinds that resulted in additional challenges in achieving last year's corporate objectives are still present, including the difficulty of operating in chapter 11, the reputational challenges faced by the Debtors and the continued high employee attrition rate.  Ronan Decl. ¶ 35.  Moreover, the originally proposed 2022 Performance Metrics were modified following consultation with the UCC, AHC and MSGE, so the main differences from the performance metrics applicable to the Court-approved 2021 KEIP consist of changes made in negotiation with creditor constituencies, who have every interest in ensuring that the 2022 Performance Metrics are challenging and well targeted.  Ronan Decl. ¶ 17.

64.     That the Company has already begun striving to achieve the 2022 Performance Metrics in the short time between when the 2022 Performance Metrics were set and the filing of this Motion renders them no less challenging than when originally designed, which is when their incentivizing nature is measured.  *See Aralez Pharm.*, 2018 WL 6060356, at *5 (authorizing insider compensation plan based on the incentivizing nature of performance goals when originally developed).

65.     Accordingly, the 2022 KEIP should properly be evaluated under section 503(c)(3), rather than section 503(c)(1), of the Bankruptcy Code.

B.      Section 503(c)(1) Is Not Applicable to the 2021 KERP Because It Does Not Include Insiders

66.     Section 503(c)(1) likewise does not bar the 2022 KERP because that plan includes only non-insiders.  Section 503(c)(1) prohibits "a transfer made to . . . an insider of the debtor for the purpose of inducing such person to remain with the debtor's business," but it does not prohibit retention-oriented transfers to non-insiders.  *See In re GT Advanced Techs., Inc.*, No. 14-11916-HJB, 2015 WL 5737181, at *4 (Bankr. D.N.H. Sept. 30, 2015) ("Section 503(c) distinguishes between those employees who are 'insiders' and those who are not . . . . Section 503(c)(3) relaxes those requirements with respect to non-insiders, requiring only that the proposed retention payments be 'justified by the facts and circumstances of the case.'").

67.     This Court has previously held that the Debtors "engage[] in the proper process to determine whether someone was an insider," Hr'g Tr., 109:19–24, Dec. 4, 2019, and that their analysis is not "inconsistent with the better recent case law on this issue," Hr'g Tr., 49: 20–24, July 29, 2021.  Section 503(c)(1), therefore, does not prohibit the 2021 KERP.

## II.    The Proposed 2022 Compensation Plans Represent a Valid Exercise of the Debtors' Business Judgment Under Section 503(c)(3) of the Bankruptcy Code

68.    Both the 2022 KEIP and the 2022 KERP should be approved under section 503(c)(3) of the Bankruptcy Code because each is essential to the success of the Debtors' restructuring efforts and reflects the sound exercise of the Debtors' business judgment.

69.    Section 503(c)(3) of the Bankruptcy Code prohibits certain transfers "that are outside the ordinary course of business and not justified by the facts and circumstances of the case." "Courts have held that the 'facts and circumstances' language of section 503(c)(3) creates a standard no different than the business judgment standard under section 363(b)." *Borders Grp.*, 453 B.R. at 473; *see also In re Velo Holdings Inc.*, 472 B.R. 201, 212 (Bankr. S.D.N.Y. 2012) ("[T]he 'facts and circumstances' language of section 503(c)(3) creates a standard no different than the business judgment standard under section 363(b)."). A debtor satisfies the business judgment standard if it shows that the proposal "is within the fair and reasonable business judgment of the [d]ebtors and thus within the zone of acceptability." *Dana Corp.*, 358 B.R. at 572.

70.    Courts have described the business judgment standard as "deferential," *In re Alpha Nat. Res., Inc.*, 546 B.R. 348, 356 (Bankr. E.D. Va.), *aff'd sub nom. United Mine Workers of Am. 1974 Pension Plan & Tr. v. Alpha Nat. Res., Inc*., 553 B.R. 556 (E.D. Va. 2016), and a "more liberal . . . review," *In re Glob. Home Prods., LLC*, 369 B.R. 778, 783 (Bankr. D. Del. 2007). Additionally, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).

71.    In *In re Dana Corp.*, the court distilled six factors (the "***Dana II* Factors***") for determining whether a compensation proposal satisfies the business judgment test:

(a) "Is there a reasonable relationship between the plan proposed and the results to be obtained, i.e., will the key employee stay for as long as it takes for the debtor to reorganize or market its assets, or, in the case of a performance incentive, is the plan calculated to achieve the desired performance?"

(b) "Is the cost of the plan reasonable in the context of the debtor's assets, liabilities and earning potential?"

(c) "Is the scope of the plan fair and reasonable; does it apply to all employees; does it discriminate unfairly?"

(d) "Is the plan or proposal consistent with industry standards?"

(e) "What were the due diligence efforts of the debtor in investigating the need for a plan; analyzing which key employees need to be incentivized; what is available; what is generally applicable in a particular industry?" and

(f) "Did the debtor receive independent counsel in performing due diligence and in creating and authorizing the incentive compensation?"

358 B.R. at 576–77 (emphasis omitted).  All six *Dana II* factors weigh in favor of approval of the Debtors' 2022 Compensation Plans.

72.     *First*, with respect to the 2022 KEIP, the Debtors and their advisors designed the plan to incentivize the 2022 KEIP Participants to work diligently to ensure that the Debtors will remain viable and well-positioned to put the value of their estates to use upon emergence.  As described above, the Debtors carefully developed a well-balanced system of 2022 Performance Metrics, including by making certain changes following consultation with the UCC, AHC and MSGE, which are based on the same rubric as the corporate objectives under prior, Court-approved programs.  Achievement of the 2022 Performance Metrics—which emphasize value creation, innovation and efficiency, and people and culture—will enable the Debtors to best deliver value upon emergence for the benefit of all stakeholders and the American public generally.  The payments under the 2022 KEIP are directly tied to specific and measurable goals within each of

these categories. There is therefore a clear and reasonable relationship between the 2022 KEIP and the goals that the Debtors seek to achieve.

73.     Likewise, the Debtors appropriately tailored the 2022 KERP to encourage non-insider employees to remain in their positions during this critical phase of the bankruptcy process. The proposed 2022 KERP is substantially similar to the Court-approved programs that preceded it, the 2020 and 2021 KERP, which were in turn modeled on the Debtors' Prepetition Compensation Plans. The 2022 KERP, if approved, will provide the market levels of compensation necessary to retain the Debtors' key employees. Gartrell Decl. ¶ 49. Moreover, the Gartrell Declaration confirms that the compensation provided under the 2022 KERP is in line with similarly sized, non-debtor pharmaceutical companies. Gartrell Decl. ¶ 44. With a year-to-date annualized voluntary turnover rate of 12.7%, the Debtors continue to face a real and serious attrition problem and cannot risk reducing the resources devoted to addressing attrition issues at this juncture in the Chapter 11 Cases. Ronan Decl. ¶ 35. Each component of the 2022 KERP, including the 2022 Targeted Retention Awards, renews an essential and expiring program that mitigated (but could not stop) material attrition. A *reduction* in compensation would create a severe risk that the Debtors could experience an increased level of attrition that would be devastating to their business.

74.     *Second*, the 2022 KEIP is reasonable in the context of the Debtors' assets, liabilities and earning potential. The absolute maximum dollar cost of the 2022 KEIP is approximately $5.4 million, which represents 0.86% of the Debtors' projected 2022 revenue. Gartrell Decl. ¶ 28. This cost places the 2022 KEIP in line with market standards for comparably sized companies in bankruptcy: in fact, compared to similarly sized companies in chapter 11 proceedings, the 2022 KEIP, as measured by maximum cost, sits *below* the median. Gartrell Decl. ¶ 28. Though the cost

of the 2022 KEIP as a percentage of revenue has risen year-over-year, this increase is primarily attributable to the Debtors' decreased revenue throughout the duration of these Chapter 11 Cases. Ronan Decl. ¶ 23. Moreover, the aggregate cost of compensation for the 2022 KEIP Participants is consistent with the costs of the Debtors' prior, Court-approved programs, which included concessions that were painstakingly negotiated with key creditor constituencies. WTW's analysis benchmarking the 2022 KEIP's target (maximum) cost to the key employee incentive plans of comparable debtors is summarized in **Table 4** below:

**TABLE 4**

| Aggregate Cost vs. Comparable Debtors | Purdue 2022 KEIP Annual and Long-Term Awards (Target/Max) | Market 50th Percentile | | Market 75th Percentile | | Market 90th Percentile | |
|---|---|---|---|---|---|---|---|
| | | Target | Max | Target | Max | Target | Max |
| **$000s** | $5,370 | $5,100 | $7,500 | $9,800 | $15,000 | $14,200 | $28,200 |
| **Percentage of Revenue** | 0.86% | 0.44% | 0.59% | 0.72% | 1.08% | 0.95% | 1.68% |

75.     The costs of the 2022 KERP are also reasonable in the context of the Debtors' assets, liabilities and earning potential. The cost of the 2022 KERP Annual Award plus the 2022 KERP Long-Term Award is approximately $21.2 million, which represents 3.42% of projected 2022 revenue, and the maximum, aggregate cost of the 2022 Targeted Retention Awards is $7,200,000 (comprised of a $6.42 million baseline retention component and $0.78 million of supplemental capacity, as described above), which represents 1.16% of revenue. Gartrell Decl. ¶¶ 46, 47. These aggregate costs are similar to the costs of the equivalent elements of the prior, Court-approved programs and the Debtors' previous compensation arrangements for the same categories of employees. Indeed, the baseline aggregate cost of the 2022 Targeted Retention Awards is lower this year than last year—despite the continued challenges of operating in chapter

11, and with less certainty surrounding the timing of emergence—and represents only 0.99% of projected revenue.

76.    While the cost-to-revenue ratios for the various components of the 2022 KERP are above market, the facts and circumstances of these Chapter 11 Cases justify the costs.  The Debtors are managing through significant reputational challenges and a uniquely complex restructuring—including a protracted appellate process—all of which has depressed employee morale and significantly hindered the Debtors' ability to retain key employees.  As the Debtors have suffered attrition, the workload on the remaining employees has only increased.  Mitigating this attrition is vital to preserving the value of the Debtors' estates.  The Debtors have also shifted significant resources to public health initiatives aimed at combating the opioid crisis and to the development of non-opioid investigative candidates, neither of which generates current revenue but both of which require considerable employee resources.  In this context, providing appropriate compensation, even at larger-than-normal percentages of revenue, is reasonable and beneficial to all stakeholders.  And, importantly, the 2022 KERP is sized in part to make up for comparatively low base salaries relative to market compensation and will result in total direct compensation (as defined in the Gartrell Declaration) that remains competitive with the 50th percentile for relevant groups of 2022 KERP Participants, as shown below.

**TABLE 5**

| Employee Group | No. | Variance to Market TDC (Purdue Target TDC) | | | Variance to Market TDC (Purdue TTDC + Retention) | | | Variance to Market TDC (Purdue Base Only) | | | Memo: Variance to Market TDC Last Year (2021) (Purdue Target TDC) | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | P25 | P50 | P75 | P25 | P50 | P75 | P25 | P50 | P75 | P25 | P50 | P75 |
| Non-Insider (Executive Survey) | 30 | 17% | -10% | -26% | 28% | -2% | -20% | -25% | -42% | -52% | 36% | 8% | -14% |
| Non-Insider (Middle Management | 144 | 18% | 1% | -13% | 20% | 3% | -11% | -1% | -15% | -27% | 29% | 11% | -5% |

| and Professional Survey) | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

**TABLE 6**

| Aggregate Cost vs. Comparable Debtors | Purdue 2022 KERP Annual and Long-Term Awards | Market 50th Percentile | Market 75th Percentile | Market 90th Percentile |
|---|---|---|---|---|
| **$000s** | $21,200 | $11,300 | $23,000 | $33,000 |
| **Percentage of Revenue** | 3.42% | 0.63% | 1.22% | 2.46% |
| **$000s Cost per Person** | $44.0 | $47.7 | $57.3 | $86.5 |

**TABLE 7**

| Aggregate Cost vs. Comparable Debtors | Purdue 2022 Targeted Retention Awards | Market 50th Percentile | Market 75th Percentile | Market 90th Percentile |
|---|---|---|---|---|
| **$000s** | $7,200 | $2,600 | $3,600 | $7,600 |
| **Percentage of Revenue** | 1.16% | 0.20% | 0.38% | 0.66% |

77.    *Third*, the 2022 KEIP is fair and reasonable and does not discriminate unfairly.  The 2022 KEIP Participants are a subset of the participants in the Debtors' 2021 KEIP.  Moreover, the process for setting performance metrics, the nature of those performance metrics and the aggregate compensation payable on account of the proposed 2022 KEIP are all similar to those with respect to the compensation programs that this Court previously approved.

78.    The 2022 KERP is also fair and reasonable.  Consistent with past practice, all employees (other than the 2022 KEIP Participants) who would have been eligible to participate in the Debtors' Prepetition Compensation Plans (approximately 483 employees) are 2022 KERP Participants.  Ronan Decl. ¶ 27.  Considering the Debtors' current headcount, retaining all 2022

KERP Participants is critical to the Debtors' ability to survive restructuring and remain viable in the long term.

79.     *Fourth*, the Debtors engaged WTW, just as they did in connection with the design and development of their prior Court-approved programs, to ensure that both the 2022 KEIP and 2022 KERP are in line with market standards for comparably sized companies in bankruptcy.  As it has done in the past, WTW surveyed recent key employee incentive programs and continuations of broad-based programs and undertook an extensive analysis to identify market standards. Gartrell Decl. ¶¶ 27, 45.  WTW also compared the compensation of the 2022 KEIP Participants (assuming approval of the 2022 KEIP) to compensation at similar pharmaceutical companies that participated in its 2021 Pharmaceutical and Health Sciences Executive Compensation Survey Report.

80.     This benchmarking against Purdue's non-debtor peers provides essential insight into the reasonableness of the 2022 KEIP's cost.   Indeed, this Court has emphasized that compensation of similar executives at peer pharmaceutical companies outside of the chapter 11 context is an important reference point for determining the reasonableness of a key employee incentive plan.  *See* Hr'g Tr., 22:21–25, Oct. 28, 2020 (explaining "that it is important to focus as much, if not more, on whether the plan is consistent with . . . industry specific standards as opposed to bankruptcy case specific standards").  The Debtors and their compensation consultants at WTW continue to be guided by this principle.

81.     The results of this benchmarking analysis are shown in **Table 8** below, along with a comparison against the benchmarks performed last year:

**TABLE 8**

| Title | Variance to Market Target TDC | | | | | | | | |
| | Purdue Base + KEIP | | | Purdue Base + KEIP (2021) | | | Purdue (Base Only) | | |
| | P25 | P50 | P75 | P25 | P50 | P75 | P25 | P50 | P75 |
| President and CEO | 174% | -14% | -34% | 28% | -6% | -31% | 33% | -59% | -68% |
| EVP, General Counsel and Secretary | 382% | 150% | 75% | 294% | 188% | 110% | 137% | 23% | -14% |

82.     The market positioning of each 2022 KEIP Participant's total direct compensation has come down year-over-year, continuing a trend from a year prior. The CEO's compensation has dipped even further below median, notwithstanding his stewardship of the Debtors during these unprecedented Chapter 11 Cases, along with the vital role he has played in maximizing the value of the Debtors' estates for the benefit of their stakeholders. And while the General Counsel's compensation continues to exceed the market rate for an ordinary pharmaceutical company of Purdue's size, so too do his responsibilities. The General Counsel's compensation is appropriate given the other opportunities available to him and in light of his qualifications, which the Debtors continue to believe are necessary for overseeing this extraordinarily complex legal situation.

83.     Finally, WTW has also verified that the 2022 Performance Metrics are consistent with typical practices generally, and with practices in the pharmaceutical industry specifically. Gartrell Decl. ¶ 31.

84.     The Debtors determined that the cost of the 2022 KERP relative to market standards is justified by the recent high level of employee attrition that the Debtors must address and because, when considered in the context of the 2022 KERP Participants' base pay, the 2022 KERP is necessary to bring the total direct compensation of the 2022 KERP Participants in line with the total direct compensation provided to similarly situated employees of other pharmaceutical

companies.  Gartrell Decl. ¶ 44.  The 2022 KERP Participants' total direct compensation (including the 2022 KERP) remains competitive with the 50th percentile range of the market with respect to both non-insider executives and middle management, even factoring in retention awards to such employees that are not included in total direct compensation in the market survey.  Gartrell Decl. ¶ 44.

85.    *Fifth*, as it has in the past, the Compensation Committee engaged in a rigorous process to develop the 2022 KEIP and 2022 KERP, including thorough due diligence regarding their proposed terms.  Ronan Decl. ¶¶ 7, 16, 17; Gartrell Decl. ¶¶ 11, 12.  Additionally, the proposed 2022 KEIP and 2022 KERP are both essentially identical to the compensation programs that this Court approved in each of the last two years.  Those plans, in turn, closely followed the Debtors' Prepetition Compensation Plans, which have "satisfied the independent 'test of time'" and previously withstood this Court's scrutiny.  *Glob. Home Prods.*, 369 B.R. at 786 (emphasizing the "nearly identical" nature of the previously used and proposed plans under the business judgment standard).

86.    *Lastly*, the Compensation Committee and the Debtors' senior management team worked closely with WTW to design the 2022 Compensation Plans, including consulting with WTW to assess market position relative to peer non-debtor pharmaceutical companies and comparable chapter 11 debtors.  Gartrell Decl. ¶¶ 24, 27, 28, 44–47.  This rigorous process and thorough consideration of advice from outside experts regarding the 2022 Compensation Plans support the conclusion that their approval represents a reasonable business judgment on the part of the Debtors.

87.     For all of the aforementioned reasons, the Debtors exercised sound business judgment when developing the 2022 KEIP and 2022 KERP and respectfully submit that they satisfy the requirements of section 503(c)(3) of the Bankruptcy Code.

### III.   The Proposed 2022 Compensation Plans Represent a Valid Exercise of the Debtors' Business Judgment Under Section 363(b)(1) of the Bankruptcy Code

88.     The 2022 Compensation Plans should also be approved under section 363(b)(1) of the Bankruptcy Code, which empowers the Court to authorize a debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate."  To approve the use of estate property under section 363(b)(1), the Second Circuit requires a debtor to show that the decision to use the property outside of the ordinary course of business was based on the debtor's sound business judgment in light of "all salient factors" relating to the bankruptcy case.  *Comm. of Equity Sec. Holders v. Lionel Corp.* (*In re Lionel Corp.*), 722 F.2d 1063, 1071 (2d Cir. 1983) ("The rule we adopt requires that a judge determining a § 363(b) application expressly find from the evidence presented before him at the hearing a good business reason to grant such an application."); *In re Ionosphere Clubs, Inc*., 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989); *see also In re MF Glob. Inc.*, 467 B.R. 726, 730 (Bankr. S.D.N.Y. 2012) ("Although not specified by section 363, the Second Circuit requires that transactions under section 363 be based on the sound business judgment of the debtor or trustee.").

89.     As set forth above, the Debtors have adequately shown that the 2022 Compensation Plans represent reasonable exercises of their sound business judgment and are thus permitted under section 363(b)(1) of the Bankruptcy Code.  The 2022 Compensation Plans are essentially identical to predecessor programs approved by this Court, which themselves were consistent with the Debtors' prepetition compensation practices.  The 2022 KEIP and 2022 KERP, like the programs on which they are based, were developed with the assistance of independent experts and with

market benchmarks front of mind.  Both the 2022 KEIP and the 2022 KERP are necessary to the Debtors' continuing ability to operate and to preserving the value of the Debtors' estates.  Ronan Decl. ¶ 9.  Without the 2022 Compensation Plans, the Debtors would face serious risk of unsustainable attrition among their key employees—a problem compounded by the Debtors' particular difficulty in attracting new employees and by hiring issues across the pharmaceutical and other sectors more broadly.  Ronan Decl. ¶ 35; Gartrell Decl. ¶ 32.  This ominous combination would threaten the viability of the Debtors' estates, and the 2022 Compensation Plans are directed at mitigating this risk.  The Debtors believe that it is critical to renew their longstanding compensation practices in the form of these 2022 Compensation Plans, which are carefully tailored to retain key employees, whose performance of their responsibilities is essential, now more than ever.  Ronan Decl. ¶ 40.

### Notice and No Prior Request

90.    Notice of this Motion will be provided to (a) the entities on the Master Service List (as defined in the *Second Amended Order Establishing Certain Notice, Case Management, and Administrative Procedures* [ECF No. 498] and available on the Debtors' case website at https://restructuring.ra.kroll.com/purduepharma) and (b) any person or entity with a particularized interest in the subject matter of this Motion (together with the entities on the Master Service List, the "**Notice Parties**").  The Debtors respectfully submit that no further notice is required.

91.    No prior motion for the relief requested herein has been made in this or any other Court.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request that the

Court (i) enter the proposed order authorizing the Debtors to implement the 2022 KEIP and the

2022 KERP and (ii) grant such other and further relief as is just and proper.

Dated: April 27, 2022
      New York, New York

           DAVIS POLK & WARDWELL LLP

           */s/ Darren S. Klein*

           450 Lexington Avenue
           New York, New York 10017
           Telephone: (212) 450-4000
           Facsimile: (212) 701-5800
           Marshall S. Huebner
           James I. McClammy
           Eli J. Vonnegut
           Darren S. Klein
           Dylan A. Consla

           *Counsel to the Debtors*
           *and Debtors in Possession*