## Exhibit C

**Gartrell Declaration**

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
James I. McClammy
Eli J. Vonnegut
Darren S. Klein
Dylan A. Consla

*Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **PURDUE PHARMA L.P.,** *et al.*, | **Case No. 19-23649 (RDD)** |
| **Debtors.**[1] | **(Jointly Administered)** |

**DECLARATION OF JOSEPHINE GARTRELL IN SUPPORT OF THE MOTION OF DEBTORS FOR ENTRY OF AN ORDER AUTHORIZING IMPLEMENTATION OF 2022 KEY EMPLOYEE INCENTIVE PLAN AND 2022 KEY EMPLOYEE RETENTION PLAN**

I, Josephine Gartrell, being fully sworn, hereby declare that the following is true to the best of my knowledge, information and belief:

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

1.      I am a Senior Director at Willis Towers Watson PLC ("**WTW**").  Purdue Pharma
L.P. and its above-captioned wholly owned direct and indirect subsidiaries (collectively,
the "**Debtors**," the "**Company**" or "**Purdue**") engaged WTW to provide compensation consulting
services and to serve as advisors to the Compensation and Talent Committee (the "**Compensation
Committee**") of the Board of Directors of Purdue Pharma Inc. (the "**Board**").  I am familiar with
the structure of the Debtors' pre- and post-petition compensation plans, including the Debtors'
proposed 2022 key employee incentive plan (the "**2022 KEIP**") and 2022 key employee retention
plan (the "**2022 KERP**" and, together with the 2022 KEIP, the "**2022 Compensation Plans**").

2.      I submit this declaration (this "**Declaration**") on behalf of WTW and in support of
the *Motion of Debtors for Entry of an Order Authorizing Implementation of 2022 Key Employee
Incentive Plan and 2022 Key Employee Retention Plan* (the "**Motion**").[2]  I am authorized to submit
this Declaration on behalf of WTW.

3.      Except as otherwise indicated, all facts set forth in this Declaration are based upon
my personal knowledge, my review of the 2022 Compensation Plans and my team's and my
research into compensation practices at companies in the pharmaceutical industry and general
industry as well as other companies that have recently filed for chapter 11 protection, along with
information supplied to me by members of the Debtors' management team and other advisors.  For
the reasons described below, it is my opinion that the 2022 KEIP and 2022 KERP are appropriate
and reasonable.  If called upon to testify, I would testify competently to the facts set forth in this
Declaration.

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

## Qualifications and Background

### A. Qualifications

4.      I received my Juris Doctor from the University of San Diego School of Law in 1998, graduating *magna cum laude* and Order of the Coif, and my Bachelor of Arts in international business from San Diego State University in 1994.  After working at Gibson, Dunn & Crutcher LLP as an associate in the corporate practice, Pillsbury Winthrop Shaw Pittman LLP as an associate in the executive compensation practice and The Loftin Firm, P.C. as a partner and then of counsel in the corporate practice, I became an executive compensation consultant at the Hay Group LLC in 2014.  I joined WTW in 2016, where I have been continuously employed ever since.

5.      WTW is an international professional services firm that offers a wide variety of services to public and private clients, including expert analysis of executive and management compensation.  WTW designs and delivers solutions that manage risk, optimize benefits, cultivate talent, and expand the power of capital to protect and strengthen institutions and individuals. WTW focuses on two key business segments: Health, Wealth and Career and Risk and Broking.

6.      My responsibilities at WTW primarily involve advising for-profit companies and not-for-profit organizations, specifically regarding executive compensation.  I routinely assist public and private companies in various industries with compensation philosophy, pay competitiveness issues, incentive plan design and other compensation-related analyses.  I have participated in the development and design of hundreds of management and employee incentive plans for companies in and outside of bankruptcy.

7.      I am highly experienced in executive, management and employee compensation, with over twenty years of experience in the field.  During my tenure at WTW, I have worked closely with a range of companies undergoing a financial restructuring to develop a variety of

prepetition and post-petition compensation arrangements, including compensation plans and programs for senior executive and nonexecutive employees.  Specifically, I have led or co-led the review and design of key employee incentive plans, key employee retention plans, and other similar plans in a number of chapter 11 cases, including *In re Mallinckrodt plc*, Case No: 20-12522 (JTD) (Bankr. D. Del.); *In re PES Holdings, LLC*, Case No. 19-11626 (LSS) (Bankr. D. Del.); *In re Cloud Peak Energy Inc.*, Case No. 19-11047 (CSS) (Bankr. D. Del.); *In re FULLBEAUTY Brands Holdings Corp.*, Case No. 19-22185 (RDD) (Bankr. S.D.N.Y.); *In re Parker Drilling Co.*, Case No. 18-36958 (MI) (Bankr. S.D. Tex.); *In re Aegean Marine Petroleum Network Inc.*, Case No. 18-13374 (MEW) (Bankr. S.D.N.Y.); *In re Westmoreland Coal Co.*, Case No. 18-35672 (DRJ) (Bankr. S.D. Tex.); *In re ATD Corp.*, Case No. 18-12221 (KJC) (Bankr. D. Del.); *In re Claire's Stores, Inc.*, Case No. 18-10584 (MFW) (Bankr. D. Del.).

### B.  Background

8.     After the Debtors first retained WTW in 2019, my team and I familiarized ourselves with the Debtors' operations, business goals and pre- and post-petition compensation practices and since that time have become very familiar therewith.  We advised on the design, structure and cost of the key employee incentive plans and key employee retention plans that have twice been approved by this Court, and we conducted benchmarking analyses to compare the market competitiveness of pay to similar programs at peer pharmaceutical companies and to compare the cost of those programs to the cost of similar programs at other chapter 11 debtors.[3]

---

[3] *See Decl. of Josephine Gartrell in Supp. of Mot. of Debtors for Entry of Order Authorizing Implementation of a Key Employee Incentive Plan and Key Employee Retention Plan* [ECF No. 1674-3]; *Suppl. Decl. of Josephine Gartrell in Supp. of Mot. of Debtors for Entry of Order Authorizing Implementation of a Key Employee Incentive Plan and Key Employee Retention Plan* [ECF No. 1847-2]; *Second Suppl. Decl. of Josephine Gartrell in Supp. of Mot. of Debtors for Entry of Order Authorizing Implementation of a Key Employee Incentive Plan and Key Employee Retention Plan* [ECF No. 1960-2]; *Decl. of Josephine Gartrell in Supp. of Motion of Debtors for Entry of Order Authorizing Implementation of 2021 Key Employee Incentive Plan and 2021 Key Employee Retention Plan* [ECF No. 3077-3].

9.      Prior to commencing these Chapter 11 Cases, Purdue maintained a performance-based Annual Incentive Plan (the "**AIP**") for the majority of their employees.  The AIP provided annual cash bonuses tied to the achievement of Company and individual performance metrics.  The Company also maintained a performance-based Long-Term Results Plan (the "**LTRP**" and, together with the AIP, the "**Prepetition Compensation Plans**"), which provided eligible employees with annual grants that would result in cash payouts tied to achievement of corporate objectives measured over a three-year performance period.  Finally, I understand that, as needed, the Company would utilize targeted retention plans to retain their most critical employees; in 2018 and in 2019 in particular, I understand Purdue implemented retention plans for certain executive and nonexecutive employees which were calibrated to incentivize those employees to remain with the Company through the end of 2020.

10.     In 2020, Purdue replaced the Prepetition Compensation Plans with a key employee incentive plan (the "**2020 KEIP**") and key employee retention plan (the "**2020 KERP**" and, together with the 2020 KEIP, the "**2020 Compensation Plans**"), which closely paralleled the Prepetition Compensation Plans.  At a high level, payments under both the annual and the long-term award components of the 2020 KEIP were contingent on the Debtors' achievement of certain performance metrics that likewise substantially replicated the Company's prepetition corporate objectives.  Payments under the annual, long-term and targeted retention award components of the 2020 KERP were not subject to those same performance criteria, so as to give participants greater certainty about their compensation.  The Debtors renewed the 2020 Compensation Plans last year, adopting a second key employee incentive plan (the "**2021 KEIP**") and key employee retention plan (the "**2021 KERP**" and, together with the 2021 KEIP, the "**2021 Compensation Plans**").  Once more, the Debtors, in conjunction with WTW and their other advisors, designed the 2021

Compensation Plans to substantially replicate their predecessor, Court-approved programs and the Company's longstanding historical compensation practices.

11.    This year, the Debtors' proposed 2022 Compensation Plans continue to substantially replicate their historical and Court-approved compensation programs.  In developing and evaluating the 2022 Compensation Plans, WTW updated its annual pay benchmarking analysis by refreshing and analyzing relevant market compensation data, including total direct compensation offered by companies in WTW's 2021 Pharmaceutical and Health Sciences Executive Compensation and Middle Management, Professional and Support Surveys.  My team and I provided input and advice on the design, structure and cost of the 2022 KEIP and 2022 KERP, building upon our input and advice on the design, structure and total cost of the compensation programs that this Court approved in each of the last two years.  WTW worked closely with the Compensation Committee and the Debtors' senior management team and other advisors in connection with this process and leveraged our experience designing programs for similarly situated companies, both in and outside of chapter 11.  The 2022 Compensation Plans reflect the input and guidance that my colleagues at WTW and I provided.

12.    Importantly, the 2022 Compensation Plans were subject to oversight, review and approval by the Compensation Committee, and the compensation that the Debtors propose to award their CEO was approved (as is customary) by the Board.  WTW was involved in and advised on the design of the 2022 Compensation Plans, and prior to their internal approval by the Debtors, WTW presented its analysis of their appropriateness and reasonableness to senior management and the Compensation Committee.  WTW's primary goal in the course of these interactions was to independently assess whether the 2022 Compensation Plans are appropriate and reasonable in light of its understanding of the specific needs of the Debtors, relevant market data and WTW's

experience designing comparable programs for similarly situated companies.

13.     The Debtors continue to work to maximize the value of the Debtors' estates for their stakeholders.  Recognizing the unique facts of these Chapter 11 Cases, and that employee performance continues to play a critical role in achieving a favorable outcome for all parties, the Debtors, in conjunction with WTW and their other advisors, undertook a collaborative process to design appropriate and reasonable compensation programs for 2022.  The culmination of that work resulted in the 2022 KEIP, which is designed to incentivize the Debtors' CEO and General Counsel (together, the "**2022 KEIP Participants**") to achieve challenging financial and operational targets, and the 2022 KERP, which is designed to retain all other eligible non-insider employees (the "**2022 KERP Participants**") during the pendency of these Chapter 11 Cases.

**2022 Key Employee Incentive Plan**

**A.  Overview of the 2022 KEIP**

14.     The 2022 KEIP is designed to incentivize the 2022 KEIP Participants to achieve the performance metrics (the "**2022 Performance Metrics**") set out in Purdue's annual corporate scorecard (the "**Scorecard**").  The 2022 KEIP establishes a sliding scale of potential award opportunities based on the Debtors' achievement of the 2022 Performance Metrics.  The Debtors must achieve the 2022 Performance Metrics at least at a threshold level (set at 75% of the target) in order for the 2022 KEIP Participants to earn any amounts proposed to be paid thereunder. Maximum compensation under the 2022 KEIP, as in the prior Court-approved programs, is capped at 100% of target, with straight-line interpolation between 75% and 100% should the Company's performance fall in between threshold and target levels.

15.     Each 2022 KEIP Participant will receive an award comprised of (i) an annual award (the "**2022 KEIP Annual Award**") and (ii) a long-term incentive compensation grant (the "**2022**

7

**KEIP Long-Term Award**"), which are collectively designed to replicate the Debtors' Prepetition Compensation Plans and renew their prior, Court-approved programs.  The maximum cost of the 2022 KEIP is approximately $5.4 million.  The titles of the 2022 KEIP Participants, and their respective proposed award opportunities under the 2022 KEIP, are identified in **Table 1** below.

### TABLE 1

| 2022 KEIP Participant | Target 2022 KEIP Annual Award | Target 2022 KEIP Long-Term Award | Total Target 2022 KEIP Award |
|---|---|---|---|
| President and Chief Executive Officer | $2,277,100 | $775,067 | $3,052,167 |
| Executive Vice President, General Counsel and Secretary | $1,826,100 | $491,825 | $2,317,925 |
| **Total** | **$4,103,200** | **$1,266,892** | **$5,370,092** |

16.    Subject to achievement of the 2022 Performance Metrics at a threshold level, and subject to each 2022 KEIP Participant's continued employment through the payment date (other than as provided below), the 2022 KEIP Annual Award will be paid as follows: (i) 25% on the Company's regular payroll date on or immediately following October 1, 2022, subject to clawback of the full amount paid if the 2022 KEIP Participant resigns or is terminated for any reason other than by the Debtors without cause prior to March 15, 2023; and (ii) 75% on the Company's regular payroll date on or immediately following March 15, 2023.  The first payment will assume target-level performance, and the second payment will include a true-up, if needed, including a potential clawback of any amount that would not have otherwise been paid if target performance is not met. A termination of employment by the Debtors without cause after September 30, 2022 will trigger acceleration at the target value, likewise subject to clawback if performance is later scored below target (such clawback to occur by March 15, 2023).  In the event of a termination of employment

by the Debtors without cause on or prior to September 30, 2022, no payment will be due.

17.    Consistent with Purdue's longstanding compensation practices, each 2022 KEIP Participant will also receive a 2022 KEIP Long-Term Award, which is designed to mimic the economic structure of the LTRP grant that the participant otherwise would have received in 2022. In connection with seeking approval of the long-term incentive compensation grant component of the 2020 KEIP, the Debtors agreed to a 52.25% aggregate reduction relative to historical practice and to subject the award to acceleration upon emergence.  That discount was carried forward for the long-term incentive compensation grant component of the 2021 KEIP (the "**2021 KEIP Long-Term Award**") while switching to a nearer-term payment date, subject to a clawback through the historical payment date, rather than acceleration upon emergence.  The discount, and structure, of the 2021 KEIP Long-Term Award is reflected once again in the 2022 KEIP Long-Term Award. Payment will be made on the Company's regular payroll date on or immediately following March 15, 2023, subject to clawback if the 2022 KEIP Participant resigns or is terminated for any reason other than by the Debtors without cause prior to March 2025.  As with the 2022 KEIP Annual Award, termination of employment without cause after September 30, 2022 will accelerate the 2022 KEIP Long-Term Award at target, subject to clawback for any amount that would not otherwise have been paid if target performance is not met.  Payouts will be tied to the same 2022 Performance Metrics that apply to the 2022 KEIP Annual Award and therefore will depend solely on the Company's performance in 2022.

## B.    Performance Metrics

18.    The 2022 KEIP is purely incentive based.  Payments under the 2022 KEIP Annual Awards and 2022 KEIP Long-Term Awards will be conditioned on the 2022 KEIP Participants' ability to meet the 2022 Performance Metrics set out in the Scorecard, thus ensuring that the 2022

KEIP Participants are properly incentivized to work toward a value-maximizing restructuring of the Debtors' estates during this critical stage of these Chapter 11 Cases.

19.      The Compensation Committee approved the 2022 Performance Metrics in the first quarter of 2022, with guidance from WTW and following consultation with certain of the Debtors' key creditor constituencies, although the weighting of the metrics and scoring methodology for one metric was not approved until early in the second quarter of 2022 to allow, I understand, additional time for creditor consultation. The 2022 Performance Metrics rely on the same three strategic pillars that have long defined the Debtors' corporate objectives: (i) value creation (representing 50% of the 2022 Performance Metrics); (ii) innovation and efficiency (40% of the 2022 Performance Metrics); and (iii) people and culture (10% of the 2022 Performance Metrics).

20.      The value creation strategic pillar measures and rewards the long-term success of the Debtors' business based on certain nonfinancial operational goals, such as meeting certain deadlines with respect to the Company's testing and development of overdose treatment products and other non-opioid products. **Table 2** below sets forth the operational and developmental goals that the Compensation Committee approved as critical to the long-term success of the Debtors' business.

**TABLE 2**

| Value Creation Metrics | Target Date | % of Value Creation | % of 2022 Performance Metrics |
|---|---|---|---|
| – Implement Company initiatives to ensure the Company operates efficiently and sustainably so as to maximize net value generated to abate the opioid crisis. | | 50.0% | 25.0% |

| Public Health Initiatives[4] | | | |
|---|---|---|---|
| − Make the Nalmefene vial commercially available | End of Q2 2022 | 27.5% | 13.75% |
| − File the ANDA for the Nalmefene pre-filled syringe | End of Q4 2022 | | |
| − Submit FDA regulatory filing to support an increase in specification for the naloxone degradant in buprenorphine/naloxone sublingual tablets (generic Suboxone) | End of Q2 2022 | | |
| − Complete and achieve bioequivalence for OTC Naloxone | End of Q1 2022 | | |
| Progressing the Pipeline | | | |
| − Initiate clinical studies of Sunobinop | End of Q2 2022 | 17.5% | 8.75% |
| − Complete Proof of Concept pharmacokinetic study for KL-01401 (epinephrine oral mucosal film) | End of Q4 2022 | | |
| Rhodes Associates L.P. ("RALP") and Progressing the Generic Pipeline | | | |
| − Scopolamine TDS – Submit ANDA | End of Q2 2022 | 5.0% | 2.5% |
| − Lisdexamfetamine Capsules – Complete bioequivalence and stability studies | End of Q2 2022 | | |
| − Formoterol Inhalation Solution – Submit response to FDA Complete Response Letter | End of Q2 2022 | | |
| **Total** | | **100.0%** | **50.0%** |

21.     The innovation and efficiency strategic pillar captures key financial and operational goals, including important business metrics such as operating profit and net sales.  **Table 3** below sets forth the financial and operational goals that the Compensation Committee and the Debtors' senior management team have identified as critical to the Company's long-term business success.

---

[4] All medications referred to in this section are potential treatments for opioid overdose.

This year, the metric focused on properly positioning the Company for emergence from bankruptcy has been moved to the innovation and efficiency strategic pillar with an increased weighting, given the important role I understand this process to play in maximizing the value of the enterprise for the benefit of all its stakeholders and the challenges I understand the Company's employees face in preparing to emerge promptly on an uncertain timeframe.

**TABLE 3**

| Innovation and Efficiency Metrics | Target | % of Innovation and Efficiency | % of 2022 Performance Metrics |
|---|---|---|---|
| – Consolidated Total Business Operating Profit | $96 million | 55.0% | 22.0% |
| – Avrio Net Sales[5] | $105.5 million | 20.0% | 8.0% |
| – Rhodes (RALP) Operating Loss | ($39 million) | 5.0% | 2.0% |
| – Position the Company for emergence from bankruptcy when authorization is granted by updating as necessary the established process to transfer licenses, make product label changes, transfer government contracts, ensure the orderly transfer of payroll and benefits and implement orderly transfer of intellectual property, as well as preparing to take, at the appropriate time, pre-emergence actions that must occur within a specific time period of the anticipated date of the Company's emergence from bankruptcy, and ensure operational readiness to implement such initiatives. | | 20.0% | 8.0% |
| **Total** | | **100.0%** | **40.0%** |

22.    As I understand it, the people and culture strategic pillar metrics include (a) implementing, by the end of the third quarter, priority initiatives identified through an employee feedback program and (b) strengthening the sustainability and accountability of the Company's commitment to diversity, equity, inclusion and belonging by (i) completing foundational and people leader training by the end of the second quarter and (ii) progressing the

---

[5] Avrio Health L.P. is a wholly owned subsidiary of the Debtors that produces over-the-counter consumer health products, including Betadine (a wound care product), Colace (a stool softener), Senokot (a laxative) and SlowMag Mg (a magnesium supplement).

three established employee resource groups ("**ERGs**") and supporting other colleague-requested ERGs as needed by the end of the year.

## C.    Evaluation of the 2022 KEIP

23.    In assessing the appropriateness and reasonableness of the 2022 KEIP, I worked with my team to analyze competitive target/max total direct compensation, a standard benchmark that includes base salary, short-term incentives, and long-term incentives ("**Total Direct Compensation**"), for the 2022 KEIP Participants.

24.    As my primary reference point for the competitiveness of Total Direct Compensation of the 2022 KEIP Participants, my team and I analyzed the compensation opportunities of executives at relevant market comparators in the pharmaceutical industry. Specifically, my team and I matched the 2022 KEIP Participants to survey benchmarks at companies in WTW's 2021 Pharmaceutical and Health Sciences Executive Compensation Survey Report, based on our understanding of each 2022 KEIP Participant's job duties and responsibilities within the Debtors' organization.[6]  The result of this analysis, along with a comparison against last year's benchmarking analysis, is shown in **Table 4** below:

---

[6] For the 2022 Compensation Plans, WTW concluded that the single-variable regression analysis it previously used to benchmark the Debtors' compensation programs against those in the broader pharmaceutical industry failed to accurately compare the Debtors' programs to the market because the results did not meet WTW's validation procedures and were inconsistent with multiple, additional analyses of annual trends in executive compensation, suggesting that the results were likely due to changes in the composition of the survey group and/or executive turnover rather than reflecting trends in the market.  Accordingly, WTW instead used a tabular analysis, which limits the sample of companies considered to those within a revenue band of the Debtors, rather than a sample of companies within a broader revenue range with differences in revenue controlled for using the regression analysis.  WTW used tabular analysis as part of its validation procedures when considering the Debtors' prior compensation programs and frequently uses it as a primary method of analysis, including in similar circumstances in which it determines regression-based benchmarking to be unreliable.

**TABLE 4**

| Title | Variance to Market Target TDC | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Purdue Base + KEIP | | | Purdue Base + KEIP (2021) | | | Purdue (Base Only) | | |
| | P25 | P50 | P75 | P25 | P50 | P75 | P25 | P50 | P75 |
| President and CEO | 174% | -14% | -34% | 28% | -6% | -31% | 33% | -59% | -68% |
| EVP, General Counsel and Secretary | 382% | 150% | 75% | 294% | 188% | 110% | 137% | 23% | -14% |

25.    As shown above, the market position of both 2022 KEIP Participants' Total Direct Compensation declined year-over-year.  Absent Court approval of the 2022 KEIP, the CEO would be materially undercompensated compared to the market median for chief executive officers at similarly sized organizations in the pharmaceutical industry.  Failure to provide the CEO with appropriate, incentivizing, market competitive compensation could significantly undermine the Debtors' ability to motivate that individual to achieve desired business objectives.  The 2022 KEIP is, in part, designed to address some of this shortfall.  In my experience, it would be highly uncommon for a distressed entity with the Debtors' size and scope to fail to provide short- and long-term cash-based incentive opportunities for a relevant compensation period, and the 2022 KEIP is necessary to address compensation during this pay period—just as the Debtors' prior annual programs addressed compensation in 2021 and prior years.

26.    As in years past, the General Counsel's compensation under the 2022 KEIP remains above-market when compared to general counsel roles at peer pharmaceutical companies.  I understand from discussions with the Debtors and their other advisors, however, that the General Counsel remains critical to the Debtors' operations and the success of these Chapter 11 Cases.  The General Counsel's compensation under the 2022 KEIP is similar to his compensation under the prior Court-approved programs and is reasonable in light of my understanding of the importance

of his role to the Debtors' successful operation during these Chapter 11 Cases and the Debtors'

need of a highly credentialed and qualified general counsel in light of their present circumstances.

Moreover, I understand that when the General Counsel accepted his role with the Debtors, he

forewent similar opportunities at other companies offering notably higher compensation packages.

Accordingly, the General Counsel's compensation—including the 2022 KEIP—is reasonable in

light of the aforementioned facts and circumstances as I understand them to be; again, and

particularly, the immense challenges he faces in his role with the Debtors and his significant

experience and expertise.

27.    To further assess the appropriateness and reasonableness of the design of the 2022

KEIP, I also analyzed 36 comparable examples of key employee incentive plans approved by

bankruptcy courts since 2016 for debtors with annual revenues between $500 million and $5

billion.  These companies include Aceto Corporation; Appvion, Inc.; Avaya Inc.; Bristow Group

Inc.; California Resources Corp.; Celadon Group, Inc.; Ciber, Inc.; Claire's, Inc.; Cloud Peak

Energy Inc.; Cumulus Media Inc.; Diamond Offshore Drilling, Inc.; Ditech Holding Corp.; Ezra

Holdings Limited; Fairway Group Holdings Corp.; FirstEnergy Solutions Corp.; FTD Companies,

Inc.; Gander Mountain Company Inc.; GenON Energy; Gymboree Group, Inc.; hhgregg, Inc.;

Intelsat S.A.; LSC Communications, Inc.; Mallinckrodt plc; Marsh Supermarkets; Neiman Marcus

Group LTD LLC; NPC International, Inc.; Payless Inc.; PHI Inc.; Real Industry, Inc.; RTW

Retailwinds, Inc.; Speedcast International Limited; Stage Stores, Inc.; Valaris plc; Velocity

Holdings Company, Inc.; Welded Construction, L.P.; and Westinghouse Electric Company LLC.

28.    My team and I then benchmarked the proposed target cost (which is also the

maximum cost) of the 2022 KEIP against plans at these comparable debtors, expressed in the

following two ways: (i) by aggregate amount and (ii) by percentage of revenue.  The results of this

analysis can be observed in **Table 5** below:

**TABLE 5**

| Aggregate Cost vs. Comparable Debtors | Purdue 2022 KEIP Annual and Long-Term Awards (Target/Max) | Market 50th Percentile | | Market 75th Percentile | | Market 90th Percentile | |
|---|---|---|---|---|---|---|---|
| | | Target | Max | Target | Max | Target | Max |
| **$000s** | $5,370 | $5,100 | $7,500 | $9,800 | $15,000 | $14,200 | $28,200 |
| **Percentage of Revenue** | 0.86% | 0.44% | 0.59% | 0.72% | 1.08% | 0.95% | 1.68% |

29.     In conducting these analyses, I also relied upon my significant consulting experience in the analysis and design of incentive plans generally at other companies.

30.     Based on the results of these benchmarking analyses, and my experience with other incentive compensation arrangements implemented by companies in and outside of chapter 11, I believe that the 2022 KEIP—and the 2022 KEIP Participants' potential Total Direct Compensation levels—are appropriate in light of competitive market practice for pharmaceutical companies like the Debtors and reasonable in light of the Debtors' current circumstances.  Critically, the absence of short- and long-term incentive opportunities for the 2022 KEIP Participants would significantly undermine the current competitiveness of the Debtors' compensation structure, which in turn could negatively impact the Debtors' ability to motivate current management to achieve desired business objectives.

**D.     Appropriateness and Reasonableness of the 2022 KEIP**

31.     For the aforementioned reasons and based on my experience with incentive-based compensation programs employed by companies in chapter 11, I believe the design, structure and cost of the 2022 KEIP is appropriate and consistent with market practice, including in the pharmaceutical industry.

32.     The 2022 KEIP Participants continue to manage the Debtors during a time of

significant commercial difficulty, including as the Debtors seek to emerge from a prolonged, complex restructuring and in the face of a volatile and extraordinarily competitive labor market. Indeed, it is my strong impression and understanding that the Company and the 2022 KEIP Participants face immense challenges that go far beyond even those typically faced by companies in chapter 11.

33.     The 2022 KEIP remains consistent—as did its predecessor, Court-approved programs—with Purdue's historical compensation practices, although lower in amount given the continuation of concessions first agreed to by the Company in 2020.  For each 2022 KEIP Participant, the total cost of the 2022 KEIP Annual Award and 2022 KEIP Long-Term Award carries forward the annual and long-term award components of last year's program, respectively, subject only to modest and typical year-over-year merit increases.

34.     That the General Counsel would continue to receive above-market compensation under the 2022 KEIP, as he has in the past, does not alter my conclusion that the proposed payments thereunder are reasonable.  The Debtors have determined that it remains appropriate to compensate the General Counsel at a level that recognizes his extraordinary stewardship during these Chapter 11 Cases and incentivizes him to continue to lead the Debtors toward a successful restructuring.  I understand that the Debtors require a general counsel with the highest level of expertise and resilience; a true strategic advisor to the Company's CEO.  It is also my understanding that the General Counsel was an external hire who had been identified as one of the only candidates who could fill the role under the circumstances.

35.     For these reasons, and based on my experience with incentive-based compensation programs employed by companies in and outside of chapter 11, I believe that the design, structure and cost of the 2022 KEIP are reasonable.

## 2022 Key Employee Retention Plan

### A.  Overview of the 2022 KERP

36.    The 2022 KERP Participants consist of approximately 483 incentive-eligible employees, of which eighteen hold a position of vice president or higher and 465 will be middle management, professional employees and support and technical staff, which include scientific researchers as well as regulatory, compliance, quality and manufacturing personnel.  Neither 2022 KEIP Participant is eligible to participate in the 2022 KERP, and no 2022 KERP Participant is an insider.

37.    Each 2022 KERP Participant will receive (i) an annual award (the "**2022 KERP Annual Award**") that replaces the AIP award that would otherwise have been paid in 2023 and, (ii) where eligible, a long-term incentive compensation grant payable in 2023 (subject to clawback through March 2025) (the "**2022 KERP Long-Term Award**") that replaces the LTRP grant that each such 2022 KERP Participant would otherwise have received.  Certain 2022 KERP Participants will receive additional, targeted retention payments (the "**2022 Targeted Retention Awards**").  The Debtors also propose to accelerate certain outstanding, Court-approved long-term awards currently scheduled to be paid in March 2023, subject to clawback through the date those payments would otherwise have been made in March 2023.

38.    The 2022 KERP Annual Award is equal to the target amount of the AIP award that each participant would historically have received, including modest, ordinary course merit increases.  The 2022 KERP Annual Award is not subject to performance criteria, in order to provide the 2022 KERP Participants with greater certainty about their compensation.  This is expected to help retain 2022 KERP Participants under the present challenging and uncertain conditions.

39.    The 2022 KERP Annual Award will be paid (i) 50% on the Company's regular
payroll date on or immediately following October 1, 2022 and (ii) 50% on the Company's regular
payroll date on or immediately following March 15, 2023.  Other than for hourly employees, the
first payment of the 2022 KERP Annual Award is subject to clawback if the 2022 KERP
Participant resigns or is terminated for any reason other than by the Debtors without cause prior to
March 15, 2023.  Outstanding amounts under the 2022 KERP Annual Award will accelerate in the
event that a 2022 KERP Participant's employment is terminated by the Debtors without cause after
September 30, 2022. The total aggregate payment under the 2022 KERP Annual Award is
approximately $15.5 million.

40.    Consistent with past practice, certain 2022 KERP Participants will receive a 2022
KERP Long-Term Award that substantially replicates the long-term grants awarded under the
Debtors' prior, Court-approved programs and mimics the economic structure of the LTRP grant
that otherwise would have been granted to each eligible 2022 KERP Participant under Purdue's
longstanding compensation practices. The amount of such grant will equal 60% of the target LTRP
grant that otherwise would have been granted, reflecting a discount to past practice negotiated in
2020 and carried forward thereafter, subject only to modest, ordinary course annual base salary
increases, promotions and other changes to the employee population.  The 2022 KERP Long-Term
Award will not be subject to performance metrics.

41.    Payments due under the 2022 KERP Long-Term Awards will be made on the
Company's regular payroll date on or immediately following March 15, 2023, subject to clawback
(other than for hourly employees) if the 2022 KERP Participant resigns or is terminated for any
reason other than by the Debtors without cause prior to March 2025. Outstanding amounts will
accelerate in the event of a termination of employment after September 30, 2022 by the Debtors

19

without cause.  The aggregate total cost of these 2022 KERP Long-Term Awards for all 2022
KERP Participants is approximately $5.7 million.

42.     In addition, for the past several years the Debtors used targeted retention awards,
including in each year since the commencement of these Chapter 11 Cases, to preserve and
maximize the value of the Debtors' estates.  Although the Debtors have continued to see some
level of attrition with these programs in place, I understand that the evidence supporting the
efficacy of these targeted retention awards is clear, with attrition among targeted retention
recipients in 2021 roughly half of that in the broader Purdue population.  The Debtors therefore
seek approval of the 2022 Targeted Retention Awards in an aggregate amount of up to $7,200,000,
which is the same amount that the Court authorized last year.[7]  This year, however, the Debtors
propose that $0.78 million of such amount consist of supplemental capacity that the Debtors may
deploy to respond to changing business conditions, but only after consultation with the UCC, AHC
and MSGE, which would provide the Debtors with important but appropriately limited flexibility
to tailor compensation to present circumstances.  We note market prevalence for discretionary
pools like these under appropriate circumstances.  The 2022 Targeted Retention Awards will
renew the Debtors' previous award programs and allow the Debtors to continue their practice of
making targeted retention payments to an identified group of key employees.[8]

---

[7] The targeted retention component of the 2021 KERP approved by this Court authorized the Company to spend up to
$7.2 million thereunder, but the Debtors, in an effort to carefully manage estate resources, ultimately awarded only
$5.1 million under the program.  I understand that this restraint, however, was predicated on the assumption at the
time that the Debtors would be emerging from chapter 11 in the near term, and that in the Company's business
judgment an aggregate amount of $7.2 million remains the appropriate size for this year's proposed 2022 Targeted
Retention Awards.

[8] I understand that the Debtors have identified the employees most likely to require targeted retention payments over
the course of this next year, though as business needs fluctuate, some variation in the targeted retention population
may occur.  I further understand that in no event will (a) the aggregate dollar amount of the 2022 Targeted Retention
Awards exceed $7,200,000 or (b) any insider receive such an award.

43.     The 2022 Targeted Retention Awards will be paid (a) 25% on the Company's
regular payroll date on or immediately following December 30, 2022; (b) 25% on the Company's
regular payroll date on or immediately following March 30, 2023; and (c) 50% on the Company's
regular payroll date on or immediately following June 30, 2023.[9]  The 2022 Targeted Retention
Awards are subject to clawback if the recipient resigns or is terminated for any reason other than
by the Debtors without cause before September 30, 2023, and outstanding amounts due will
accelerate upon a recipient's termination by the Debtors without cause after September 30, 2022.

44.     In assessing the appropriateness and reasonableness of the 2022 KERP, I worked
with my team to analyze the competitiveness of the 2022 KERP Participants' Total Direct
Compensation.  Like with the 2022 KEIP, my team and I relied on compensation awarded to non-
insider executives and middle management and professionals at Purdue's peer, non-debtor
pharmaceutical companies as our primary reference point.  The result of this analysis, along with
a comparison against last year's benchmarking analysis, is shown in **Table 6** below:

### TABLE 6

| Employee Group | No. | Variance to Market TDC (Purdue Target TDC) | | | Variance to Market TDC (Purdue TTDC + Retention) | | | Variance to Market TDC (Purdue Base Only) | | | Memo: Variance to Market TDC Last Year (2021) (Purdue Target TDC) | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | P25 | P50 | P75 | P25 | P50 | P75 | P25 | P50 | P75 | P25 | P50 | P75 |
| Non-Insider (Executive Survey) | 30 | 17% | -10% | -26% | 28% | -2% | -20% | -25% | -42% | -52% | 36% | 8% | -14% |
| Non-Insider (Middle Management and | 144 | 18% | 1% | -13% | 20% | 3% | -11% | -1% | -15% | -27% | 29% | 11% | -5% |

---

[9] I understand that timing with respect to supplemental capacity may be adjusted in response to applicable business conditions.

| Professional Survey) | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | |

45.    To further assess the appropriateness and reasonableness of the design and cost of the 2022 KERP, I also analyzed 26 comparable examples of bankruptcy court-approved programs since 2016 for debtors with annual revenues between $500 million and $5 billion; these programs may take the form of incentive or retention programs, depending on the company.  These companies include Appvion, Inc.; Arch Coal, Inc.; ATD Corporation; Basic Energy Services; Breitburn Energy Partners LP; Bristow Group Inc.; California Resources Corporation; Cenveo, Inc.; Claire's Inc.; Cloud Peak Energy Inc.; Covia Holdings Corporation; Cumulus Media Inc.; Diamond Offshore Drilling, Inc.; Energy XXI Ltd.; FirstEnergy Solutions Corp.; Hexion Holdings LLC; Intelsat S.A.; Linn Energy; LSC Communications, Inc.; Oasis Petroleum Inc.; Real Industry, Inc.; Ultra Petroleum Corp.; Valaris plc; Verso Corporation; Westmoreland Coal Company; and Whiting Petroleum Corporation.

46.    My team and I then benchmarked the proposed cost of the annual and long-term award components of the 2022 KERP against plans at these comparable debtors, expressed in the following three ways: (i) by aggregate amount, (ii) by percentage of revenue and (iii) by average cost per participant.  The results of this analysis can be observed in **Table 7** below:

### TABLE 7

| Aggregate Cost vs. Comparable Debtors | Purdue 2022 KERP Annual and Long-Term Awards | Market 50th Percentile | Market 75th Percentile | Market 90th Percentile |
|---|---|---|---|---|
| **$000s** | $21,200 | $11,300 | $23,000 | $33,000 |
| **Percentage of Revenue** | 3.42% | 0.63% | 1.22% | 2.46% |
| **$000s Cost per Person** | $44.0 | $47.7 | $57.3 | $86.5 |

47.    Finally, to assess the appropriateness and reasonableness of the cost of the 2022 Targeted Retention Awards in particular, my team and I benchmarked the proposed cost of the program against plans at comparable debtors, expressed in the following two ways: (i) by aggregate amount and (ii) by percentage of revenue.  This comparison can be observed in **Table 8** below:

**TABLE 8**

| Aggregate Cost vs. Comparable Debtors | Purdue 2022 Targeted Retention Awards | Market 50th Percentile | Market 75th Percentile | Market 90th Percentile |
|---|---|---|---|---|
| **$000s** | $7,200 | $2,600 | $3,600 | $7,600 |
| **Percentage of Revenue** | 1.16% | 0.20% | 0.38% | 0.66% |

48.    In conducting these analyses, I also relied upon my significant consulting experience in the analysis and design of retention plans.

49.    Based on the results of these benchmarking analyses, my experience with other compensation arrangements implemented by companies in and outside of chapter 11 and my understanding of the Debtors' unique challenges (as represented by the Debtors and their other advisors), I believe that the 2022 KERP—and the 2022 KERP Participants' aggregate Total Direct Compensation levels thereunder—are appropriate and reasonable.

**B. Appropriateness and Reasonableness of the 2022 KERP, Including the 2022 Targeted Retention Awards**

50.    Based on my education, experience, and the work I have done in these Chapter 11 Cases and in similar cases, I believe that the design, structure and cost of the 2022 KERP, including the 2022 Targeted Retention Awards, are appropriate and reasonable given the facts and circumstances of these Chapter 11 Cases as I understand them.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: April 27, 2022

/s/ Josephine Gartrell
Josephine Gartrell
Senior Director
Willis Towers Watson PLC