Hearing Date and Time: May 18, 2022, at 10:00 a.m. (ET)
Objection Date and Time: May 11, 2022, at 4:00 p.m. (ET)

PILLSBURY WINTHROP SHAW PITTMAN LLP
Andrew M. Troop
Hugh M. McDonald
Andrew V. Alfano
31 West 52nd Street
New York, New York 10019

*Counsel to the Ad Hoc Group of Non-Consenting States*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| **In re:** | ) ) | Chapter 11 |
| **PURDUE PHARMA, L.P.,** *et al.*,[1] | ) ) | Case No. 19-23649 (RDD) |
| **Debtors.** | ) ) ) | (Jointly Administered) |

**THE NON-CONSENTING STATES' LIMITED OBJECTION TO MOTION OF DEBTORS FOR ENTRY OF AN ORDER AUTHORIZING IMPLEMENTATION OF 2022 KEY EMPLOYEE INCENTIVE PLAN AND 2022 KEY EMPLOYEE RETENTION PLAN**

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each of their federal tax identification number, as applicable, are Purdue Pharma Manufacturing L.P. (3821), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies K.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (6166), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143). UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' principal offices are located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

To the Honorable Robert D. Drain, United States Bankruptcy Judge:

The Ad Hoc Group of Non-Consenting States (the "Non-Consenting States")[2] hereby objects (the "Objection") to the *Motion of Debtors for Entry of an Order Authorizing Implementation of 2022 Key Employee Incentive Plan and 2022 Key Employee Retention Plan* [Docket No. 4707] (the "Motion")[3] filed by Purdue Pharma L.P. and its affiliated debtors (collectively, "Purdue"), as it applies to Purdue CEO Dr. Craig Landau ("Landau"). In support of the Objection, the Non-Consenting States respectfully state as follows:

### INTRODUCTION

1.  The Non-Consenting States again object to the payment of bonus incentives to Purdue's CEO Dr. Craig Landau. Consistent with their prior objections, the Non-Consenting States oppose the payment of $3 million[4] in bonus incentives to Dr. Landau because he is not the right person to lead Purdue and address the inherent dangers of its products and their relationship to the opioid crisis. Dr. Landau has served as an employee and executive of the Sacklers' opioid companies for two decades, and in his various roles at Purdue, Dr. Landau has failed to take appropriate action to protect the public from Purdue's products. Continuing to reward Dr. Landau sends the wrong message to victims of Purdue's crimes. The need to address Dr. Landau's failures does not depend on the plan or the appeal. Instead, it arises from the basic principle of accountability, and it should not wait. For the reasons set forth below, the Court should deny the Motion as it relates to Dr. Landau.

---

[2] California, Colorado, Connecticut, Delaware, the District of Columbia, Hawaii, Idaho, Illinois, Iowa, Maine, Maryland, Massachusetts, Minnesota, Nevada, New Hampshire, New Jersey, New York, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia, Washington, and Wisconsin.

[3] Capitalized terms used but not otherwise defined have the meanings ascribed to them in the Motion.

[4] *See* Motion, pg. 15, at Table 1 ($2,277,100 "Annual Award" and $775,067 "Long-Term Award," which sum to $3,052,167 "Total Target 2022 KEIP Award").

# OBJECTION

2. The Non-Consenting States believe that Dr. Landau should not receive a bonus and should not continue as Purdue's CEO. Based upon Dr. Landau's conduct described below, the Non-Consenting States do not think that he is the right person to lead Purdue – regardless of the outcome of the pending appeal of the plan confirmation order.

3. After several years of litigation and discovery, there is a record of Dr. Landau's conduct. The Sacklers picked Landau to be Purdue's CEO to advance their interests. Landau served the Sacklers as an employee and executive of their companies for two decades, from 1999, through Purdue's felony conviction in 2007, through the next guilty plea in 2020.[5]

4. Landau joined Purdue as Executive Medical Director and served in that and other leadership roles at Purdue until he became CEO of Purdue Canada in 2013.[6] He was a member of Purdue's Executive Committee, as well as its *OxyContin Messaging Committee* before leaving to work for the Sacklers' opioid company in Canada.[7] By 2011, he was Chief Medical Officer and the Vice President in charge of Purdue's Clinical, Medical, and Regulatory Affairs.

5. Landau had been working at Purdue for eight years at the time of the company's first felony conviction in 2007. He testified that he felt regret, surprise, and "a bit of embarrassment."[8]

---

[5] *See* Landau deposition at 28 (joined Purdue in 1999), 62 (at Purdue during the 2007 conviction), 164-166 (reported to Sacklers as CEO of Purdue Canada starting in 2013). The cited excerpts of Landau's deposition testimony taken in this bankruptcy are attached as Exhibit 1. The Non-Consenting States received consent from Dr. Landau, the Debtors, and Side B of the Sackler family prior to filing these excerpts.

[6] *See* Colorado complaint against Purdue, the Sacklers, and Landau at ¶ 47, *available at* https://www.mass.gov/doc/colorado/download.

[7] *See id.* at ¶ 47.

[8] Landau deposition at 62.

6.  Months later, the FDA told Purdue that it was aware of reports of overdose, abuse, and addiction associated with OxyContin.[9] The FDA told Purdue that, to address those serious risks, the FDA would require "that OxyContin . . . only be prescribed by prescribers who are specially certified."[10] The Sacklers put Landau in charge of an effort to "defend against strict treatment by the FDA"[11] – strict treatment that would have saved American lives. When the FDA later withdrew its request for a training requirement for OxyContin prescribers, the McKinsey & Company ("McKinsey") consultants working for Landau celebrated: "this is a very good development for Purdue."[12] It was not a good development for the public health. Prescribers were not required to be trained before prescribing OxyContin, Purdue's business continued as usual, and OxyContin sales continued unchecked.

7.  The harm inflicted by Landau and that McKinsey consulting team still matters. Last month, the U.S. House of Representatives Committee on Oversight and Reform released a report from its investigation of McKinsey and Purdue, finding that "McKinsey advised Purdue on a strategy to weaken the proposed REMS plan and avoid the proposed restrictions for opioids."[13] The House investigators report: "Documents show Purdue executives were focused on defeating

---

[9] *See id.* at 154.

[10] *Id.* at 156.

[11] "Purdue FDA Response Options," Docket No. 2012-1, at pg. 31 of 49, discussed by the U.S. House of Representatives Committee on Oversight and Reform on April 27, 2022. Additional related documents are available in the Industry Documents Library at https://www.industrydocuments.ucsf.edu/docs/#id=rghk0255, https://www.industrydocuments.ucsf.edu/docs/#id=sghk0255, https://www.industrydocuments.ucsf.edu/docs/#id=tghk0255, and https://www.industrydocuments.ucsf.edu/docs/#id=rhmd0254.

[12] December 5, 2008 email from Kenneth Yoon, *available at* the Industry Documents Library at https://industrydocuments.ucsf.edu/docs/#id=zxhk0255.

[13] House Oversight Report at 18.

FDA safety measures for OxyContin, viewing the effort as potentially 'necessary to 'save the business.'"[14]

8. Landau now admits that mandatory training for OxyContin prescribers should be required. He offers: "If I were running the business post-emergence, I would work with other sponsors and FDA to implement such a mandatory training system."[15] But the Non-Consenting States would not choose to have that public health initiative led by a man who previously worked to block it.

9. Colorado alleged that a 2008 report to the Sacklers from members of Purdue's Executive Committee, including Landau, described Purdue's "Toppers Club sales contest," awarding bonuses to sales representatives for increasing ER opioid prescriptions.[16] Notably, the same report included Purdue's own surveillance data showing "a wide geographic dispersion of abuse and diversion cases involving OxyContin in the U.S.," caused by "availability of the product" and "prescribing practices."[17] Yet, Landau showed no concern about the role prescription-based incentive programs like "Toppers Club" played in influencing prescribing practices and increasing the availability of opioids.[18]

10. Colorado also alleged that, in 2008, Purdue's Executive Committee, including Landau, forwarded their meeting notes to Richard, Mortimer, Kathe, Jonathan, Theresa, and

---

[14] *Id.* at 20. House investigators found that McKinsey worked for Landau again after he became CEO, when attention turned to protecting the Sacklers' assets through "Project Scottsdale." According to the House report, "Project Scottsdale was a secretive project to transform Purdue's business model by splitting the company into three separate entities and laying off as many as 500 employees." House Oversight Report at 27.

[15] Landau deposition at 161.

[16] *See* Colorado complaint against Purdue, the Sacklers, and Landau at ¶ 194, citing PDD9316101020-029.

[17] *See id.*

[18] *See id.*

4

Beverly Sackler, including a report from one of Purdue's strategic research agencies.[19] That report outlined "KEY MESSAGES THAT WORK" for "a compelling story to tell to the public," including the dangerous lies: "It's not addiction, it's abuse" and "It's about personal responsibility."[20]

11. In 2011, when "40 and 80mg tablet prescriptions had decreased significantly," Purdue's Executive Committee, including Landau, reported to the Sacklers that Purdue would rely on sales representatives and paid physician speakers to maintain demand for the high-dosage opioids.[21] Years later, Landau admitted that putting patients on higher doses of opioids puts them at higher risk.[22]

12. Opioid use by children and adolescents is also high risk. Most opioid use in this population is off label (prescribed for reasons not indicated on the drug's FDA approved label).[23] But, that did not stop Landau and the Sacklers from adopting as part of Purdue's 2011 goals and objectives a push to get FDA approval for the sale of OxyContin to children.[24] In 2016, the CDC found a significant increase in opioid prescribing for children and adolescents for chronic pain conditions like headaches, and acute pain resulting from sports injuries.[25] Use of prescription opioids before high school graduation is associated with a 33% increase in the risk of later opioid misuse, including the use of heroin later in life.[26]

---

[19] *See id.* at ¶ 486, citing PPLPC012000183254, 256, 259.

[20] *See id.*

[21] *See id.*

[22] *See* Landau deposition at 126 ("Q. You are aware that evidence shows that higher doses of opioids are more dangerous than lower doses, correct? A. Yes.").

[23] *See* Colorado complaint against Purdue, the Sacklers, and Landau at ¶ 81.

[24] *See id.* at ¶ 81, citing PPLPC013000286366 (email from Landau dated Jan. 5, 2011).

[25] *See id.* at ¶ 82.

[26] *See id.* at ¶ 82.

5

13. Purdue paid "Key Opinion Leaders," who promoted opioids with claims that were dangerous and false. One of them, Dr. Russell Portenoy, changed his mind and admitted that his claims about the safety of opioids were not true. When studies began surfacing around 2011 questioning the safety and efficacy of opioids, Defendants turned to Purdue Key Opinion Leaders to combat growing skepticism.[27] In a 2011 email, Craig Landau and another Executive Committee member acknowledged that because Dr. Portenoy's stance on opioids had "shifted," they now needed to "interview … select [Key Opinion Leaders] from [Purdue's] portfolio Advisory Board (already contracted and accessible)" to aide Purdue's counter-messaging about the efficacy of its opioids.[28]

14. In 2013, Executive Committee members, including Landau, reported to Richard, Mortimer, Kathe, Jonathan, Theresa, and David Sackler that OxyContin sales had declined and identified the reason for the decline as insufficient volume of visits to prescribers by Purdue sales reps.[29] To reverse this trend, Purdue's Executive Committee and staff recommended increasing the number of sales representatives, and told the Sacklers that the international consulting firm, McKinsey & Company, would be studying how to get more doctors prescribing OxyContin.[30] That is the project to "turbocharge" OxyContin that led to McKinsey's settlement with 50 States, a Congressional investigation of McKinsey, the creation of a McKinsey opioid MDL, and, in part, the Sacklers' $225 million settlement with the Department of Justice.

15. Landau is intimately tied to the Sacklers. When he was President of their Canadian company from 2013-2017, he reported to Raymond Sackler, Beverly Sackler, Richard Sackler,

---

[27] *See* Colorado complaint against Purdue, the Sacklers, and Landau at ¶ 179.

[28] *See id.* at ¶ 179, citing PTN000022181 (email from Landau dated July 12, 2011).

[29] *See id.* at ¶ 198, citing PPLPC012000431148 (email from CFO Ed Mahony to Sacklers and Executive Committee, including Landau, dated July 5, 2013), PPLPC012000431309.

[30] *See id.* at ¶ 198.

6

Jonathan Sackler, at one point David Sackler, Theresa Sackler, Mortimer Sackler Junior, Kathe Sackler, and Ilene Sackler Lefcourt.[31]  By the time he started that job, the Sacklers knew Landau so well that he does not remember whether he even had to interview for it: "having spent 13-plus years at the company, [I] was a fairly well-known person.  I can't recall if I was formally interviewed."[32]  Landau describes getting his first appointment as a CEO: "I was offered a number of positions to run companies within the network of Sackler-owned associated companies."[33]  And then again, Landau got his current job, as CEO of Purdue, without having to interview, in 2017.[34]

16.    Landau is in denial about the effect Purdue had on opioid prescribing.  "I don't know that sales representatives caused doctors to write prescriptions they would otherwise not have thought, you know, necessary to write."[35]  "I don't know that Purdue sales representatives caused physicians to write -- to do anything.  I mean, as a physician, it's hard for me to imagine that a sales representative could have that kind of influence on my practice or prescribing behavior."[36]

17.    For years, Landau had so little interest in the consequences of Purdue's conduct that *he never even heard a concern that Purdue was contributing to the opioid crisis*.  "Q. In your

---

[31] *See* Landau deposition at 165 ("Q. Yes.  Dr. Landau, if you can tell us the names of the individuals who served on the board of directors that you reported to when you were the CEO of Purdue Canada.  A. Yes.  I will do my best.  From a family – Sackler family perspective, on one side there was Dr. Raymond Sackler, Beverly Sackler, Dr. Richard Sackler, Jonathan Sackler, at one point David Sackler joined.  On the other side of the family, at that time, I think it was Theresa Sackler, Mortimer Sackler, Junior, Dr. Kathe Sackler, and I believe Ilene Sackler Lefcourt.  Independent directors, Peter Boer, Ralph Snyderman, Paulo Costa, Jacques Theurillat, I think the pronounce is correct.· Cecil Pickett.  And perhaps Judy Lewent, but I am not sure when she departed the board.").

[32] *Id.* at 164.

[33] *Id.* at 282.

[34] *See id.* at 172 ("Q. Did anyone interview you for the position of CEO of Purdue Pharma in the US?  A. Not at that time.  I believe I was considered for the position years earlier, prior to my movement to Purdue Canada.· But in June of 2017, or the days or weeks leading up to being assigned or asked to take that role, I don't believe I was interviewed.").

[35] Landau deposition at 178.

[36] Landau deposition at 179.

7

experience at Purdue, no one ever expressed to you the concern that Purdue might be contributing to the opioid crisis? A. I don't recall anyone coming to me with that concern or kind of statement."[37]

18. Landau is in denial about Purdue's legacy – as much as Kathe Sackler's infamous testimony to Congress: "there's nothing I can find that I would have done differently."[38] Landau's own testimony was: "Q. And during the time that you were working at Purdue from 1999, you know, all the way through today, was there ever a time that you did not believe in what you were doing? A. I don't like to speak in absolutes.· But I can't recall a time when I thought what I was doing was anything but appropriate and well-intentioned and good."[39]

19. As to whether Purdue caused the opioid crisis, Landau testified: "I wonder at times."[40]

20. In 2017, after the CDC issued guidelines to try to stop a national opioid crisis, Mortimer Sackler called Landau on his cell phone and asked him to make a business plan for the Sacklers' global drug companies.[41] In response, Landau wrote the plan titled ***Sackler Pharma Enterprise***.[42] Landau proposed that the Sacklers should take advantage of others' concerns about the opioid epidemic through an "opioid consolidation strategy" and become an even more

---

[37] Landau deposition at 235.

[38] The Role of Purdue Pharma and the Sackler Family in the Opioid Epidemic, Hearing Before the Committee on Oversight and Reform of the House of Representatives, Dec. 17, 2020, Serial No. 116–130, at 13 ("Q. So, I'll ask you again, will you apologize for the role you played in the opioid crisis? A. I have struggled with that question. I have asked myself over many years. I have tried to figure out, was—is there anything that I could have done differently, knowing what I knew then, not what I know now. And I have to say, I can't— there's nothing that I can find that I would have done differently, based on what I believed and understood then and what I learned from management in the reports to the board and what I learned from my colleagues on the board.").

[39] Landau deposition at 232.

[40] Landau deposition at 99.

[41] *See* Landau deposition at 327-329.

[42] *See* Landau deposition at 327.

8

dominant opioid seller "as other companies abandon the space."[43]  The Sacklers made him CEO a few weeks later.[44]

21. Landau's plan for *Sackler Pharma Enterprise* spelled out for the Sacklers the problems that all Purdue's victims face today.  One problem was financial.  Landau wrote: "The U.S. business is in a state of decline and will soon be unable to fund either/both investments or distributions going forward."[45]  Soon thereafter, the Sacklers abandoned the U.S. business, and the world learned that Purdue is indeed unable to fund investments or distributions and – more important – Purdue is unable to pay for the costs of its crimes.  Nevertheless, since Landau wrote that assessment, Purdue found the money to pay Landau more than $20 million and counting.[46]

22. Another problem facing Purdue, then and today, is that patients taking its moneymaking drugs develop opioid use disorder (OUD).  Without treatment, opioid use disorder can kill.[47]  Jonathan Sackler suggested to Landau that Purdue should "Offer a 'we stand by our patients' program of treatment/counseling for patients who were properly prescribed our products and subsequently developed an OUD."[48]  Insurance company claims filed in this bankruptcy indicate that the number of patients who are prescribed Purdue opioids and subsequently develop OUD is in the *hundreds of thousands*.[49]  But Landau never implemented Jonathan Sackler's "We

---

[43] *See* Statement of the Ad Hoc Group of Non-Consenting States Maintaining Its Objection to Purdue's Wage Motion Insofar as It Relates to Purdue CEO Craig Landau, Docket No. 557, at ¶ 13 (citing Massachusetts complaint against Purdue, Sacklers, and Landau, ¶ 485 (which cites and quotes from 2017-05-02 Landau presentation, PPLPC020001106306)).

[44] *See id.*

[45] Landau deposition at 331.

[46] *See* Monthly Operating Report, Docket No. 4694 at 15 (Purdue paid Landau $12,634,144 since September 2019); Docket No. 767 at ¶ 8 (Landau's compensation and perquisites for the 2018-2019 period was more than $16 million).

[47] *See* Landau deposition at 145.

[48] Landau deposition at 139-140.

[49] *See* Landau deposition at 108-115, 142-144 and Landau deposition Exhibit 5.

Stand By Our Patients" plan.[50]

23. The Non-Consenting States believe that, before any CEO of Purdue should receive a bonus, Purdue should identify and fire the employees who participated in the conduct giving rise to Purdue's pleading guilty to three felonies for conduct that continued from 2007 to 2017. As the Non-Consenting States have said before, Landau could not recall even one instance in which Purdue ever fired even one employee for participating in the crime wave that fueled the opioid crisis.[51] At Landau's last bonus hearing, Purdue argued that Landau could not be expected to provide that kind of accountability because he himself was accused by States of misconduct.[52] With regard to allegations of crimes at Purdue, Purdue's lawyer explained that Landau is "not disinterested."[53] Purdue should be led by someone who **is** disinterested.

24. At Landau's last bonus hearing, the Court observed that it was uncontested that "Purdue's culture that existed, you know, through some period in 2017 needed to change."[54] The Court found that: "the corporate culture of Purdue was sick, was in -- simply not the type of corporate culture that a corporation should have."[55] Landau was an author of that culture. He worked at Purdue from 1999 to 2013 (during both sets of admitted felonies), and then he went to work for another Sackler company that has been accused of the same deadly misconduct in Canada,

---

[50] Landau deposition at 146.

[51] *See* The Non-Consenting States' Limited Objection to Motion of Debtors for Entry of an Order Authorizing Implementation of 2021 Key Employee Incentive Plan, Docket No. 3625, at ¶ 2 & n.6 ("("Q. Looking back over your entire experience, can you think of anyone who was fired from Purdue for participating in a crime? A. Not that I can recall, here in 2020, no.").

[52] *See* Hearing Tr. Sept. 13, 2021, Docket No. 3790, at 81 ("While he vigorously denies the allegations against him, I think it would have been entirely inappropriate had Dr. Landau involved himself to investigation when he was, stated simply, not disinterested.").

[53] *Id.*

[54] *Id.* at 110.

[55] *Id.* at 138.

and then came back to Purdue.[56] Landau served on the Purdue Executive Committee for years before taking charge of Purdue Canada in 2013, and then returned to Chair the Executive Committee when he became President and CEO of Purdue in 2017.[57]

25. In the first months of this bankruptcy, the Non-Consenting States opposed bonus payments to Landau because investigations by Attorneys General identified him as a participant in misconduct at Purdue and because Purdue changed his contract to pump up his compensation on the eve of the bankruptcy.[58] The Non-Consenting States observed then that Purdue's decision to protect its CEO from scrutiny fell far short of other companies:

> "In many cases, a CEO accused of illegal conduct by multiple attorneys general would be subject to intense scrutiny by his own company and its Board of Directors. But Purdue has made no commitment that its own Special Committee of the Board is investigating Landau or has any plans to do so."[59]

Now, years later, the Non-Consenting States are dismayed that Landau still has not been held accountable -- he remains CEO, and Purdue continues to seek the Court's authority to pay him million-dollar bonuses, apparently without considering and evaluating his conduct. At his deposition, Landau confirmed that Purdue's Special Committee never interviewed him: "Q. Have you been interviewed by the special committee? A. Not to my knowledge."[60]

---

[56] *See* Landau deposition at 28.

[57] *See* Colorado complaint against Purdue, the Sacklers, and Landau at ¶ 28.

[58] *See* Statement of the Ad Hoc Group of Non-Consenting States Maintaining Its Objection to Purdue's Wage Motion Insofar as It Relates to Purdue CEO Craig Landau, Docket No. 557, at ¶ 5 ("The Non-Consenting States remain unwilling to withdraw their objection as it relates to Landau for two principal reasons: first, because Landau is a named defendant in lawsuits initiated by multiple states seeking to hold him personally liable for his participation in Purdue's deceptive scheme to get more and more people on Purdue's dangerous drugs, at higher and more dangerous doses, for longer and more harmful periods of time; and second, because certain modifications were made to the terms of Landau's employment contract in preparation for the filing of this case. These modifications significantly increased potential payouts to Landau under the Bonus Programs, perhaps to circumvent the restrictions set forth in 11 U.S.C. § 503(c).").

[59] *Id.* at ¶ 5.

[60] Landau deposition at 98.

26. Purdue's treatment of Landau before and during this bankruptcy falls far short of accountability:

    a. In January 2018, Landau's base salary was $1,250,000 with a target AIP of $875,000 (70% of salary) and a target LTRP of $600,000. In other words, Landau's annual compensation (exclusive of perquisites) was $2,725,000.

    b. On March 23, 2018, Purdue prepaid Landau a $6,000,000 retention payment (the "Prepaid Retention"). As originally contemplated, the Prepaid Retention was to vest 50% by March 2020 and 100% by March 1, 2022. A few months later, in June 2018, Purdue accelerated the vesting schedule so that Landau would be fully vested in the Prepaid Retention payment by March 1, 2020.

    c. On June 8, 2018, Purdue doubled Landau's base salary to $2,500,000, with a target AIP of $2,500,000 (100% of salary) and a target LTRP of $600,000. In other words, Purdue increased Landau's annual compensation (exclusive of perquisites and the Prepaid Retention) to $5,600,000.

    d. In February 2019, Purdue again increased Landau's base salary to $2,626,000, with a target AIP of $2,626,000 and a target LTRP of $1,530,000. In other words, Purdue increased Landau's annual compensation (exclusive of perquisites and the Prepaid Retention) to $6,783,000.[61]

Landau's total compensation and perks for the 2018-2019 period was more than $16 million.[62] Before the bankruptcy, Colorado sued Landau for multiple causes of action, including that those transfers violated the Colorado Uniform Fraudulent Transfer Act.[63] But that attempt to enforce the law didn't matter. The suit was enjoined, and Landau has been paid more than $12 million during the bankruptcy, not counting the bonus that Purdue is asking the Court to approve now.[64]

27. At least since the Court's ruling in 2021, Landau and all of Purdue's leadership have been under an affirmative obligation to conduct due diligence regarding whether any recipient

---

[61] *See* The Ad Hoc Group of Non-Consenting States' Continuing Objection to Purdue's Wage Motion as It Relates to Purdue CEO Craig Landau and Response to the Debtors' Second Supplemental Reply, Docket No. 768, at ¶ 6.

[62] *See id.* at ¶ 9 ("Even if one accepts the Debtors' newest proposal to defer full vesting of the $3,000,000 of the Prepaid Retention to December 2020, Landau's total compensation and perquisites for the 2018-2019 time period, excluding reimbursements for indemnification and business expenses, would be approximately $16,117,865.").

[63] *See* Colorado complaint against Purdue, the Sacklers, and Landau at ¶¶ 779-781 ("Violation of the Colorado Uniform Fraudulent Transfer Act – Preferential Transfers: C.R.S. § 38-8-106(2)").

[64] *See* Monthly Operating Report, Docket No. 4694, at 15 (Purdue paid Landau $12,634,144).

of a bonus participated in a crime or failed to report a crime.[65] To the best of the Non-Consenting States' knowledge, Landau and Purdue have *still* not identified even *one* person who participated in any of the crimes to which Purdue has admitted, or even knew about the crimes. The Motion recites that bonus compensation is subject to the Purdue's reasonable inquiry about whether each employee committed or failed to report a crime,[66] but, to the best of the States' knowledge, every single person at Purdue continues to get bonuses. That is not what accountability looks like.

28.  At McKinsey, two senior consultants who worked with Purdue, Arnab Ghatak and Martin Elling, were fired.[67] Even though Landau worked at Purdue longer and did far more to help the Sacklers push opioids than those consultants did,[68] he has continued to enjoy CEO perks and received more than twelve million dollars during this case.

29.  In earlier Landau bonus hearings, Purdue argued that Landau is an appropriate leader because Purdue fired its sales force while Landau was CEO in 2018.[69] The Non-Consenting States reject the idea that the Sacklers' choice to fire sales reps as they prepared Purdue for bankruptcy erases Landau's twenty years of culpability for building the Sackler Pharma Enterprise. Landau's consultants at McKinsey had already advised the company that they could fire the sales

---

[65] *See* Order Authorizing the Debtors to Implement 2021 Key Employee Retention Plan, Docket No. 3571, at ¶ 9 (requiring Purdue to complete a "reasonable inquiry … prior to any payments being made to the applicable 2021 KERP Participant" regarding whether each individual "knowingly participated in any criminal misconduct in connection with his or her employment with the Debtors or (y) been aware, other than from public sources, of acts or omissions of others that such participant knew at the time were fraudulent or criminal with respect to the Company's commercial practices in connection with the sale of opioids and failed to report such fraudulent or criminal acts or omissions internally at the Company or to law enforcement").

[66] *See* Motion ¶ 17, Proposed Order ¶ 12.

[67] *See* House Oversight Report at 13 ("In February 2021, McKinsey stated that it had fired both Mr. Ghatak and Mr. Elling.").

[68] *See* House Oversight Report at 6 (McKinsey worked for Purdue from 2004 to 2019); Landau deposition at 28 (joined Purdue in 1999).

[69] *See* Hearing Tr. Sept. 13, 2021, Docket No. 3790, at 116 ("he ended the company's promotion of opioids by sales reps to prescribers, and he did this without being asked to do so or directed by anyone").

13

force and retain 96% "carry-over" in their OxyContin sales.[70] The real reason that the Sacklers eliminated the sales force appears to be a presentation that was made on January 30, 2018, which has never been made public; what the public knows is that Ilene Sackler reacted to the presentation by writing: "It seems to me, based on several things presented today, that promoting any opioids, in any way, in any country should stopped immediately."[71] The Sacklers' long-time lawyer, Stuart Baker, instructed: "please do not respond to this email."[72]

30. Non-Consenting States listened to the statements that Purdue's victims delivered to the Sacklers on March 10, 2022. Purdue's Board of Directors should have listened too. A responsible Board hearing those statements (reinforced by the company's admission to multiple felonies and the undisputable fact of thousands of deaths) would remove executives picked by the Sacklers and replace them with *disinterested* outsiders. The Attorneys General of the Non-Consenting States object to this company paying a bonus to Landau.

---

[70] *See* The States' Notice of Public Health Information to Protect Purdue Patients, Docket No. 630, at 6-7 ("In November 2017, Purdue determined that OxyContin sales were "mainly from carry-over." A Purdue presentation that was uncovered in the States' investigation is attached as Exhibit 2. Purdue calculated that 96% of OxyContin prescriptions were carry-over from the past. Ex. 2 at slide 6. The presentation noted that the carryover analysis was "rigorous" and "industry standard," with results down to the level of individual doctors, and it had been validated by consultants at McKinsey, ZS Associates, and KMK Consulting.").

[71] Unsealed Declaration Exhibits, Docket No. 2169-1, at pg. 88 of 113 (email from Ilene Sackler dated Jan. 30, 2018), attached as Exhibit 2.

[72] *Id.*

14

**CONCLUSION**

For the reasons set forth above, the Court should deny the Motion as it relates to Dr. Craig Landau.

Dated: May 11, 2022  
New York, New York

Respectfully submitted,

PILLSBURY WINTHROP SHAW PITTMAN LLP

By:  /s/ Andrew M. Troop
Andrew M. Troop
Hugh M. McDonald
Andrew V. Alfano
31 West 52nd Street
New York, NY 10019
(212) 858-1000
andrew.troop@pillsburylaw.com
hugh.mcdonald@pillsburylaw.com
andrew.alfano@pillsburylaw.com

*Counsel to the Ad Hoc Group of Non-Consenting States*

**CERTIFICATE OF SERVICE**

       I, Andrew V. Alfano, hereby certify that, on May 11, 2022, I caused true and correct copies of the foregoing document to be served (i) by the Court's Case Management/Electronic Case File (CM/ECF) System to all parties who are deemed to have consented to electronic service; (ii) by email upon the parties who provided email addresses set forth in the Master Service List maintained by the Debtors in respect of these chapter 11 cases; and (iii) by email upon the chambers of the Honorable Judge Robert D. Drain (rdd.Chambers@nysb.uscourts.gov) and the Office of the United States Trustee for the Southern District of New York (Attn: Paul K. Schwartzberg, paul.schwartzberg@usdoj.gov).

                                                        */s/ Andrew V. Alfano*
                                                        Andrew V. Alfano