# Exhibit 1

1

1           UNITED STATES BANKRUPTCY COURT

2             SOUTHERN DISTRICT OF NEW YORK

3          Chapter 11 - Case No. 19-23649 (RDD)

4

5    -----------------------------------------

6    In re:

7    PURDUE PHARMA L.P., et al.,

8                Debtors.

9    -----------------------------------------

10

11

12

13

14                 HIGHLY CONFIDENTIAL

15          REMOTE DEPOSITION OF CRAIG LANDAU, MD

16             NOVEMBER 24, 2020 - 8:30 A.M. EST

17

18

19

20

21

22

23

24

25   JOB NO. 2020-89913

2

1

2

3

4          NOVEMBER 24, 2020

5          8:30 A.M. EST

6

7

8

9       REMOTE DEPOSITION of CRAIG LANDAU, MD,

10  before S. Arielle Santos, Certified Court

11  Reporter, Certified LiveNote Reporter and Notary

12  Public.

13

14

15

16

17

18

19

20

21

22

23

24

25

**Highly ConfidentialCraig Landau, MD - November 24, 2020**

28

```
 1      CRAIG LANDAU - HIGHLY CONFIDENTIAL
 2   document come to mind that refreshed
 3   your recollection?
 4          A     No.
 5          Q     You joined Purdue Pharma
 6   in 1999; is that correct?
 7          A     Yes.
 8          Q     You had had a job at
 9   another pharmaceutical company before
10   that, correct?
11          A     Correct.
12          Q     What was the job before
13   Purdue?
14          A     It was a job at Knoll
15   Pharmaceutical Company in Mt. Olive,
16   New Jersey.  I was an associate
17   medical director in clinical research.
18          Q     And approximately how long
19   did you hold that position at Knoll?
20          A     I would say between one
21   and one and a half years, or
22   thereabout; a long time ago.
23          Q     How did you come to work
24   at Purdue?
25          A     I had met -- I had met a
```

Highly ConfidentialCraig Landau, MD - November 24, 2020

                                                                62
1        CRAIG LANDAU - HIGHLY CONFIDENTIAL

2           A     This was quite sometime

3    ago.  But I believe Dr. Wright was in

4    a much higher level position and, you

5    know, overseeing multiple programs

6    through other individuals.  I am not

7    certain I ever reported directly to

8    Dr. Wright.

9           Q     When Purdue's first

10   criminal conviction happened in 2007,

11   you had been working at Purdue for

12   approximately eight years; is that

13   correct?

14          A     Yes.

15          Q     You were aware of the

16   criminal conviction about the time it

17   happened in 2007, correct?

18          A     Yes.

19          Q     How did you feel about the

20   criminal conviction at the time?

21          A     Regret.  Surprise, since

22   in my understanding, the basis for the

23   conviction was from matters that I

24   wasn't involved in obviously.  And a

25   bit of embarrassment.

**Highly ConfidentialCraig Landau, MD - November 24, 2020**

```
                                                                98
 1      CRAIG LANDAU - HIGHLY CONFIDENTIAL

 2           have no recollection based on

 3           anything other than what I would

 4           have discussed with counsel.

 5   BY MR. ALEXANDER:

 6           Q    Are you aware that

 7   Purdue's board has formed a special

 8   committee?

 9           A    Yes.

10           Q    Have you been interviewed

11   by the special committee?

12           A    Not to my knowledge.

13              MR. ALEXANDER:  Mr. Suarez,

14           you can take this exhibit down.

15   BY MR. ALEXANDER:

16           Q    Dr. Landau, you are aware

17   that there is an opioid crisis in

18   America, correct?

19           A    Yes, I am.

20           Q    And you are aware that the

21   lawsuits against Purdue include

22   allegations that Purdue caused much of

23   the opioid crisis, correct?

24           A    I believe I am aware of

25   that, yes.
```

Highly ConfidentialCraig Landau, MD - November 24, 2020

99

```
1        CRAIG LANDAU - HIGHLY CONFIDENTIAL

2            Q    Have you ever tried to

3    figure out whether Purdue caused the

4    opioid crisis?

5                MS. IMES:  Object to form.

6                THE WITNESS:  I wonder at

7            times.  But causation, from a

8            legal perspective, is -- is

9            something best left to those

10           with the experience or expertise

11           to consider.

12               My view is that the answer

13           is while our products, one or

14           another product has been the

15           subject of a significant abuse,

16           misuse, and diversion with

17           consequences, that Purdue did

18           not cause the opioid crisis.

19               The crisis is complex and

20           multi-factorial.  It's

21           acknowledged to have multiple

22           factors needing to be

23           considered, whether they be

24           sociological, financial, or

25           economical behavior, or
```

Highly ConfidentialCraig Landau, MD - November 24, 2020

100

1    CRAIG LANDAU - HIGHLY CONFIDENTIAL

2         biologic, access to healthcare,

3         and others.  It's a tragedy no

4         matter how you slice it, and we

5         are doing our best to address

6         it.

7    BY MR. ALEXANDER:

8         Q    Dr. Landau, I notice that

9    you mentioned that the product has

10   been subject to abuse, misuse, and

11   diversion; is that correct?

12        A    Yes, that is correct.

13        Q    But you did not mention

14   addiction, did you?

15        A    Not in that --

16             MS. IMES:  Objection to

17        form.

18             THE WITNESS:  I don't

19        believe I mentioned addiction in

20        the previous testimony, but that

21        is true as well.

22   BY MR. ALEXANDER:

23        Q    You didn't mention opioid

24   use disorder, did you?

25        A    I don't believe I did.

**Highly ConfidentialCraig Landau, MD - November 24, 2020**

108

```
 1      CRAIG LANDAU - HIGHLY CONFIDENTIAL

 2           of the outcomes we report on.

 3           And so if this meets your

 4           criteria, I would say the answer

 5           is yes.

 6                MR. ALEXANDER:  Mr. Suarez,

 7           please pull up document MA-05.

 8                Dr. Landau, you will also

 9           find this in the hard copy.

10           This is a public document and

11           has no Bates number.

12                THE REPORTER:  Landau 5.

13                (Landau Exhibit 5, United

14           HealthCare Insurance Proof of

15           Claim, is Marked.)

16      BY MR. ALEXANDER:

17           Q    Dr. Landau, this is a

18      proof of claim submitted in the

19      bankruptcy by United HealthCare.

20                Please direct your

21      attention to the first page.

22                At the top of the page it

23      says, "Creditor Name:  United

24      HealthCare Services, Inc."

25                Do you see that?
```

109

1    CRAIG LANDAU - HIGHLY CONFIDENTIAL

2         A    (Reviewing.)  Yes, I do.

3         Q    You are aware that United

4    HealthCare is a health insurance

5    company, correct?

6         A    I am.

7         Q    Please direct your

8    attention to page 5 of the document.

9              This page says,

10   "Attachment to Proof of Claim."

11             Do you see that?

12        A    Yes.

13        Q    The last paragraph on this

14   page begins "Debtors' scheme caused

15   millions of Americans to develop

16   Opioid-Use Disorder."

17             Do you see that?

18        A    Yes, I do.

19        Q    Do you know whether Purdue

20   caused millions of Americans to

21   develop opioid-use disorder?

22        A    I don't.  And I -- if it

23   relies upon a scheme, I am not certain

24   what scheme that's referring to.

25        Q    Do you know whether Purdue

Highly ConfidentialCraig Landau, MD - November 24, 2020

110

1      CRAIG LANDAU - HIGHLY CONFIDENTIAL

2  caused any Americans to develop

3  opioid-use disorder?

4          A    (Reviewing.)

5              MS. IMES:  Objection to

6          form.

7              THE WITNESS:  You know, I

8          am not certain I am comfortable

9          with the premise.  When -- when

10          you say "cause," it -- it

11          implies, to me as a non-lawyer,

12          it implies intent.

13              Purdue develops and makes

14          available medicines for

15          patients.  And opioids, such as

16          OxyContin, carry known

17          liability.

18              And what I can say is I am

19          certain that any number of

20          individuals, pain patients or

21          non-pain patients who have

22          secured or ingested OxyContin,

23          either developed or, you know,

24          were suffering from opioid-use

25          disorder.

**Highly ConfidentialCraig Landau, MD - November 24, 2020**

111

```
1        CRAIG LANDAU - HIGHLY CONFIDENTIAL

2    BY MR. ALEXANDER:

3        Q    Dr. Landau, you mentioned

4    pain patients and non-pain patients;

5    is that correct?

6        A    Correct.

7        Q    Has Purdue implemented a

8    strategy to blame the national opioid

9    crisis on non-pain patients?

10            MS. IMES:  Objection.

11            Asked and answered.  No

12            foundation.

13            THE WITNESS:  As far as I

14            know, absolutely not.  And if I

15            did know that that was a brewing

16            strategy, I would not have

17            signed on and approved that.

18    BY MR. ALEXANDER:

19        Q    Please direct your

20    attention to page 6.

21            The first sentence of this

22    page says, "Based on the analysis

23    undertaken to date, between January 1,

24    2008, and December 31, 2019, United

25    paid healthcare benefits and
```

Highly ConfidentialCraig Landau, MD - November 24, 2020

112

1    CRAIG LANDAU - HIGHLY CONFIDENTIAL

2    reimbursement for hundreds of

3    thousands of members who were

4    diagnosed with OUD after receiving a

5    prescription for an opioid

6    manufactured and marketed by Debtors."

7              Do you see that?

8        A    I don't actually.  I am

9    thinking your page 6 is different from

10   my page 6.

11       Q    That's why the lawyers ask

12   the question whether you see it.

13             It's the second page of

14   the attachment to Proof of Claim.

15       A    Okay.  Now I see it.

16             Sorry.  It's labeled page

17   2 in my document.  Sorry.

18   (Reviewing.)

19       Q    The first sentence on this

20   page says, "Based on the analysis

21   undertaken to date, between January 1,

22   2008, and December 31, 2009, [sic],

23   United paid healthcare benefits and

24   reimbursement for hundreds of

25   thousands of members who were

Highly ConfidentialCraig Landau, MD - November 24, 2020

113

1        CRAIG LANDAU - HIGHLY CONFIDENTIAL

2    diagnosed with OUD after receiving a

3    prescription for an opioid

4    manufactured and marketed by Debtors."

5             Do you see that?

6        A    (Reviewing.)  Yes.  Let me

7    just digest that for a moment, if you

8    don't mind.  (Reviewing.)

9             Okay.  I see that.  Sorry.

10       Q    You are aware that

11   insurance companies have data about

12   prescriptions they pay for, correct?

13       A    Yes.

14       Q    And you are aware that

15   insurance companies sometimes have

16   data related to diagnoses for

17   patients, correct?

18       A    I believe --

19            (Simultaneous Crosstalk.)

20            MS. IMES:  Objection to

21       form.

22            THE WITNESS:  I believe so.

23   BY MR. ALEXANDER:

24       Q    Purdue opioids pose a risk

25   of addiction, correct?

Highly ConfidentialCraig Landau, MD - November 24, 2020

114

1    CRAIG LANDAU - HIGHLY CONFIDENTIAL

2         A    To my knowledge, all

3    opioids pose a risk of addiction,

4    including Purdue's opioids, yes.

5         Q    Purdue opioids pose a risk

6    of addiction even as taken as

7    prescribed, correct?

8              MS. IMES:  Objection to

9         form.

10             THE WITNESS:  Yes.  And

11        that risk is -- is so labeled in

12        what I believe is a black box on

13        the product monograph.

14   BY MR. ALEXANDER:

15        Q    Being prescribed Purdue

16   opioids can put a patient at risk of

17   developing opioid-use disorder,

18   correct?

19        A    I believe so, yes.

20        Q    Opioid-use disorder is

21   dangerous, correct?

22        A    Opioid-use disorder is a

23   serious problem and can be dangerous,

24   yes.

25        Q    Do you know whether United

Highly ConfidentialCraig Landau, MD - November 24, 2020

                                                            115

1      CRAIG LANDAU - HIGHLY CONFIDENTIAL

2   paid healthcare benefits and

3   reimbursements for hundreds of

4   thousands of members who were

5   diagnosed with OUD after receiving a

6   prescription for an opioid

7   manufactured and marketed by Purdue?

8         A    I do not know.

9         Q    Has Purdue ever determined

10  how many patients who were prescribed

11  Purdue opioids developed opioid-use

12  disorder?

13        A    I don't know.

14             MR. ALEXANDER:  Mr. Suarez,

15        you can take down this document.

16  BY MR. ALEXANDER:

17        Q    Purdue is working on a

18  plan that will turn the company's

19  assets over to its creditors, correct?

20        A    Yes.

21        Q    After emergence, the

22  creditors will get the benefits of the

23  future business, correct?

24             MR. MCCLAMMY:  This is Jim

25        McClammy, counsel for the

126

```
 1        CRAIG LANDAU - HIGHLY CONFIDENTIAL

 2    guidelines.

 3              For all we know, sitting

 4    here today, these -- the prescriptions

 5    under analysis could be entirely

 6    directed towards end-of-life care or

 7    palliative care or cancer pain or

 8    Sickle Cell Disease, as unlikely as it

 9    is, which would make this completely

10    irrelevant.

11              So this is -- while

12    numerically I would agree with your

13    statement, it's, to me,

14    uninterpretable.

15         Q    You are aware that

16    evidence shows that higher doses of

17    opioids are more dangerous than lower

18    doses, correct?

19         A    Yes.

20         Q    And based on what you

21    know, you agree that higher doses of

22    opioids are more dangerous than lower

23    doses, correct?

24         A    I think generally

25    speaking, I -- I believe there is a
```

Highly ConfidentialCraig Landau, MD - November 24, 2020

                                                                    138

1       CRAIG LANDAU - HIGHLY CONFIDENTIAL

2    measures are taken, thousands of

3    Purdue patients will die of overdoses

4    during this case."

5            Do you see that?

6        A    Yes.

7        Q    It's true that whoever

8    runs the OxyContin business after this

9    bankruptcy should pay attention to

10   data about patients who are prescribed

11   OxyContin and die of overdoses,

12   correct?

13       A    I would say yes, of

14   course.  I hesitate only -- only

15   because the ability of a

16   pharmaceutical company to, using your

17   words, pay attention to individual

18   patients is, I would say, limited

19   because that's the role of the

20   treating physician.

21            If it's possible and it

22   doesn't violate HIPAA considerations

23   or laws, you know, I would say close

24   attention to all matters of such

25   import would be -- would be good.

Highly ConfidentialCraig Landau, MD - November 24, 2020

139

1      CRAIG LANDAU - HIGHLY CONFIDENTIAL

2                  MR. ALEXANDER:  Mr. Suarez,

3           please pull up document MA-09.

4                  Dr. Landau, you have this

5           in hard copy.  This document is

6           designated highly confidential

7           and bears Bates number

8           RSF00038124.

9                  THE REPORTER:  Landau 8.

10                 (Landau Exhibit 8,

11          RSF00038124 - 125, is Marked.)

12     BY MR. ALEXANDER:

13          Q    Dr. Landau, please direct

14     your attention to the top of the page.

15                 This appears to be an

16     e-mail from you to Jonathan Sackler,

17     dated November 5, 2018, correct?

18          A    Yes, that is correct.

19          Q    And your e-mail says,

20     "Thanks for following up with these,

21     Jon.  As we discussed, I will share

22     the ideas with the proper people and

23     get back to you with thoughts."

24                 Do you see that?

25          A    Yes.

Highly ConfidentialCraig Landau, MD - November 24, 2020

140

1        CRAIG LANDAU - HIGHLY CONFIDENTIAL

2            Q     Below that is an e-mail

3    from Jonathan Sackler to you.

4                  Do you see that?

5            A     I do.

6            Q     Jonathan writes, "Craig,

7    as we discussed, here is a list of

8    ideas that might be incorporated into

9    our programs."

10                 Do you see that?

11           A     Yes.

12           Q     At the bottom of the

13   e-mail, there's a list of 12 items,

14   correct?

15           A     Yes.

16           Q     In that list, item number

17   7 says, "Offer a 'we stand by our

18   patients' program of

19   treatment/counseling for patients who

20   were properly prescribed our products

21   and subsequently developed an OUD."

22                 Do you see that?

23           A     I do see that.

24           Q     OUD is an abbreviation for

25   opioid-use disorder, correct?

Highly ConfidentialCraig Landau, MD - November 24, 2020

141

```
 1      CRAIG LANDAU - HIGHLY CONFIDENTIAL
 2          A     That's my understanding,
 3   yes.
 4          Q     For as long as you have
 5   worked at Purdue, you have always
 6   known that patients who are properly
 7   prescribed Purdue opioids could
 8   develop opioid-use disorder, correct?
 9          A     Yes.  That is a clear risk
10   associated with a controlled
11   substantial such as oxycodone and
12   OxyContin, and it's clearly -- clearly
13   indicated as such in the product
14   monograph.
15          Q     Do you know how many
16   patients who were properly prescribed
17   Purdue opioids developed opioid-use
18   disorder?
19          A     I do not personally know
20   that.
21          Q     Could be thousands of
22   patients, correct?
23              MS. IMES:  Objection.
24              THE WITNESS:  I would be
25          speculating, Mr. Alexander.  I
```

Highly ConfidentialCraig Landau, MD - November 24, 2020

142

1      CRAIG LANDAU - HIGHLY CONFIDENTIAL

2          don't know.

3    BY MR. ALEXANDER:

4          Q    Could be tens of thousands

5    of patients, correct?

6              MS. IMES:  Objection.

7              THE WITNESS:  Again, I

8          would be speculating.  I have no

9          knowledge of what the number is

10         or what data source would be

11         clean enough to allow you to

12         calculate that number.

13   BY MR. ALEXANDER:

14         Q    For example, Dr. Landau,

15   if we looked at the United HealthCare

16   Proof of Claim, it could be hundreds

17   of thousands of patients, correct?

18             MS. IMES:  Objection.

19             THE WITNESS:  Yeah.  As I

20         mentioned in earlier testimony,

21         it would be, you know, being

22         unfamiliar with the basis of the

23         data behind their proof of

24         claim, one would have to

25         understand the individual

Highly ConfidentialCraig Landau, MD - November 24, 2020

143

1    CRAIG LANDAU - HIGHLY CONFIDENTIAL

2         circumstances regarding the --

3         the patient under consideration,

4         whether that was a pain patient

5         prescribed the product, whether

6         they were -- it was a history of

7         prior opioid-use disorder,

8         whether there were concomitant

9         medications involved.

10            I mean, it's -- it's very

11        detailed.  But I am not in any

12        way disputing the fact that

13        opioid-use disorder is a risk

14        associated with a, you know, a

15        Schedule II substance like

16        OxyContin.

17   BY MR. ALEXANDER:

18        Q    To the best of your

19   knowledge, has Purdue ever tried to

20   find out how many patients who were

21   properly prescribed Purdue opioids

22   developed opioid-use disorder?

23            MS. IMES:  Objection to

24        form.

25            THE WITNESS:  I am not

Highly ConfidentialCraig Landau, MD - November 24, 2020

144

1    CRAIG LANDAU - HIGHLY CONFIDENTIAL

2         certain.  We may or may not

3         have.  I am just not aware of

4         whether we have.

5    BY MR. ALEXANDER:

6         Q    In this e-mail, Jonathan

7    Sackler wrote about a program of

8    treatment/counseling, correct?

9         A    Yes.

10        Q    Do you know how much it

11   costs to provide successful treatment

12   for one patient for opioid-use

13   disorder?

14        A    I am not -- I am not

15   certain how one would define

16   "successful treatment."  But given my

17   understanding of opioid-use disorder

18   and addiction, as a chronic disease, I

19   assume it's substantial.

20        Q    Some patients have emptied

21   their savings account trying to pay

22   for treatment, correct?

23        A    I don't know that to be

24   true, but I am sure it's very, very

25   possible.

Highly ConfidentialCraig Landau, MD - November 24, 2020

145

1        CRAIG LANDAU - HIGHLY CONFIDENTIAL

2            Q    Do you know how much harm

3    opioid-use disorder inflicts on a

4    person beyond the cost of treatment?

5            A    The disease of addiction

6    is devastating.

7            Q    Opioid-use disorder can

8    cause people to lose their jobs,

9    correct?

10           A    Yes.

11           Q    Opioid-use disorder can

12   cause people to lose their housing,

13   correct?

14           A    Yes.

15           Q    Opioid-use disorder can

16   damage a marriage, correct?

17           A    Yes.

18           Q    Opioid-use disorder can

19   cause parents to lose custody of their

20   children, correct?

21           A    Yes.

22           Q    Opioid-use disorder can

23   lead to overdose and death, correct?

24           A    Yes.

25           Q    Purdue never offered a "we

Highly ConfidentialCraig Landau, MD - November 24, 2020

146

1      CRAIG LANDAU - HIGHLY CONFIDENTIAL

2    stand by our patients" program, did

3    it?

4          A    I don't believe a program

5    suggested -- the program suggested by

6    Jonathan Sackler, who is now deceased,

7    of course, was implemented.

8               I think over the years

9    Purdue was -- it's my understanding

10   that the company was, you know, very

11   active in looking for ways to address

12   the underlying issues, you know, not

13   limited to chronic pain

14   patient-related issues, but issues

15   related to abuse, misuse, diversion,

16   addiction, overdose.

17              In Jonathan's e-mail, it

18   appears to me he was obviously

19   interested and thinking about novel

20   ways in which we could address these

21   issues in a serious and helpful way,

22   and I just -- I don't believe we

23   pursued item number 7.

24         Q    Purdue never offered a

25   program of treatment and counseling

153

1      CRAIG LANDAU - HIGHLY CONFIDENTIAL

2   and Rheumatology Products.

3         Q    Now, please direct your

4   attention to the last page of the

5   document.

6              This page contains Dr.

7   Rappaport's electronic signature and

8   the date of October 3, 2008.

9              Do you see that?

10        A    Yes.

11        Q    That's some proof that Ms.

12  Imes and I are members of the same

13  profession.

14             Let's now go back to the

15  first page.

16             At the end of the third

17  paragraph, the letter says, "It will

18  be necessary for you to submit a

19  proposed Risk Evaluation and

20  Mitigation Strategy (REMS) for the

21  reasons described below."

22             Do you see that?

23        A    Yes, I do.

24        Q    While you were working at

25  Purdue in 2008, the FDA asked Purdue

Highly ConfidentialCraig Landau, MD - November 24, 2020

```
                                                      154
 1        CRAIG LANDAU - HIGHLY CONFIDENTIAL

 2    to submit a proposed REMS for

 3    OxyContin, correct?

 4         A    That's correct, yes.

 5         Q    Near the bottom of this

 6    page it says, "We have become aware

 7    postmarketing reports of overdose

 8    abuse and addiction associated with

 9    OxyContin."

10              Do you see that?

11         A    Yes.  (Reviewing.)

12         Q    I think I heard you, but I

13    wasn't sure.

14         A    I'm sorry.  Yes.  I see

15    it.  I am aware of it.

16         Q    While you were working at

17    Purdue in 2008, the FDA told Purdue

18    that it was aware of post-marketing

19    reports of overdose, abuse, and

20    addiction associated with OxyContin,

21    correct?

22         A    Yes, that is correct.

23         Q    Please direct your

24    attention to the second page.

25              There is a paragraph with
```

Highly ConfidentialCraig Landau, MD - November 24, 2020

155

1       CRAIG LANDAU - HIGHLY CONFIDENTIAL

2    the bold words, "Elements to Assure

3    Safe Use."

4              Do you see that?

5         A    I do.

6         Q    It says, "We have

7    determined that elements to assure

8    safe use are necessary to mitigate

9    serious risks listed in the labeling

10   of the drug."

11             Do you see that?

12        A    Yes.

13        Q    At the end of the

14   paragraph it says, "Your REMS must

15   include tools to manage these risks,

16   including at least the following:"

17             Do you see that?

18        A    Yes.

19        Q    While you were working at

20   Purdue in 2008, the FDA told Purdue

21   that it was required to submit a REMS

22   that must include certain required

23   elements, correct?

24        A    Yes, that is correct.

25        Q    The FDA told Purdue that

156

1      CRAIG LANDAU - HIGHLY CONFIDENTIAL

2    the purpose of the REMS was to

3    mitigate serious risks, correct?

4          A    Yes, that is correct.

5          Q    Below the language that we

6    just read, there's an item labeled

7    number 1, that says, "A plan to ensure

8    that OxyContin will only be prescribed

9    by prescribers who are specially

10   certified."

11              Do you see that?

12         A    Yes.

13              DOCUMENT TECH:   I

14         apologize.  This is the document

15         tech.  What page are we on?

16              THE WITNESS:  Page 2.

17              DOCUMENT TECH:  Okay.

18         Thank you.

19              MR. ALEXANDER:  Are you all

20         set, Mr. Suarez?

21              DOCUMENT TECH:  Yes, I am.

22         Thank you.  I apologize for the

23         interruption.

24              MR. ALEXANDER:  It's no

25         trouble.

Highly ConfidentialCraig Landau, MD - November 24, 2020

157

1    CRAIG LANDAU - HIGHLY CONFIDENTIAL

2  BY MR. ALEXANDER:

3        Q    You worked on Purdue's

4  response to that FDA request, correct?

5        A    Yes, I did.

6        Q    Richard Sackler's

7  daughter, Mariana Sackler, worked on

8  Purdue's response to that FDA request,

9  correct?

10       A    I don't believe she worked

11 on the response.  She worked

12 internally as a coordinator of sorts,

13 out of her interest to provide

14 assistance.

15       Q    Consultants from McKinsey

16 worked on Purdue's response to that

17 FDA request, correct?

18       A    I am not sure they worked

19 on the response either.  It's possible

20 that they contributed to it.  But that

21 was the -- the response was a Purdue,

22 you know, sponsor -- a sponsor's

23 response.

24       Q    The Sackler family members

25 on the board of directors were briefed

Highly ConfidentialCraig Landau, MD - November 24, 2020

158

```
1        CRAIG LANDAU - HIGHLY CONFIDENTIAL
2    on Purdue's response to that FDA
3    request, correct?
4        A    I think -- I'm sorry.  Can
5    you -- I'm sorry.  I was thinking as
6    you were speaking.  Can I ask you
7    repeat the question?  I apologize.
8        Q    It's no trouble.
9             There were Sackler family
10   members on the board of directors of
11   Purdue at the time, correct?
12       A    Yes.
13       Q    The Sackler family members
14   on the board of directors were briefed
15   on Purdue's response to that FDA
16   request, correct?
17       A    I think the -- you know,
18   the Sackler members who were Sackler
19   family members who were serving on the
20   board would have been briefed in the
21   context of board meetings where other
22   non-Sackler, you know, independent
23   directors would have been briefed.
24             I hesitate a bit because
25   I'm -- although my memory is vague,
```

Highly ConfidentialCraig Landau, MD - November 24, 2020

159

1       CRAIG LANDAU - HIGHLY CONFIDENTIAL

2    I'm not certain we actually provided a

3    response to the agency.  We were

4    certainly working on our response, but

5    I -- I'm not sure we provided a

6    response.

7               Perhaps you have documents

8    to show otherwise.

9       Q    Today, is the authority to

10   prescribe OxyContin limited to

11   prescribers who are specially

12   certified?

13        A    Sadly not.  You know, we

14   had --

15             (Simultaneous Crosstalk.)

16        Q    The FDA --

17        A    -- I was still speaking --

18             MS. IMES:  Mr. Alexander,

19        do not cut off Dr. Landau.  He's

20        answering your question.

21             THE WITNESS:  What I was

22        saying, just to go back to my

23        response, it's sadly not,

24        despite the fact that Purdue, as

25        a company, along with a variety

Highly ConfidentialCraig Landau, MD - November 24, 2020

160

1    CRAIG LANDAU - HIGHLY CONFIDENTIAL

2        of other companies both branded

3        and generic, in the context of

4        what we call the industry

5        working group, you know, formed

6        at the request of FDA,

7        recommended strongly that --

8        that REMS training for

9        prescribers be mandatory, and

10       that mandatory training be

11       linked to the DEA registration

12       and/or recertification process.

13           That was a recommendation

14       made I believe in a public

15       meeting to the combined advisory

16       committees and FDA in 2010, and

17       that recommendation was not

18       adopted by FDA.  So the REMS

19       that you see today is a product

20       of what the agency requested of

21       the industry.

22   BY MR. ALEXANDER:

23       Q    If you are still the CEO

24   and were running an OxyContin business

25   together in 2021, should we do

Highly ConfidentialCraig Landau, MD - November 24, 2020

161

1      CRAIG LANDAU - HIGHLY CONFIDENTIAL

2    anything to promote a requirement that

3    OxyContin be prescribed only by

4    prescribers who are specially

5    certified?

6         A    If I were running the

7    business post-emergence, I would work

8    with other sponsors and FDA to

9    implement such a mandatory training

10   system.  Not for a single product, but

11   inclusive of one.  But for all

12   products.

13             I feel the same way today

14   as I felt in 2010 and the intervening

15   time, that the, you know, oftentimes

16   bad outcomes start with the stroke of

17   a pen of a prescriber.  Precisely the

18   reason the industry working group,

19   again, branded businesses and generic

20   businesses, often at odds over many

21   things, recommended strongly that

22   training be mandatory.

23             So I think it would be a

24   smart thing to do.

25        Q    As the CEO of Purdue, you,

Highly ConfidentialCraig Landau, MD - November 24, 2020

164

1      CRAIG LANDAU - HIGHLY CONFIDENTIAL

2    were formal interviews, but I

3    certainly -- you know, having spent

4    13-plus years at the company, was a

5    fairly well-known person.  I can't

6    recall if I was formally interviewed.

7         Q    Did Purdue Canada have a

8    board of directors?

9         A    It did have a board of

10   directors, yes.

11        Q    Did you report to that

12   board when you were the CEO of Purdue

13   Canada?

14        A    I did, yes.

15        Q    Who was on that board when

16   you were the CEO of Purdue Canada?

17        A    As I understand -- well,

18   this is working on memory here -- but

19   the board Purdue Canada was

20   responsible to consisted of both a

21   blend -- a blend of Sackler family

22   members, as well as independent

23   directors.

24             Are you asking me for the

25   names?  Sorry.

Highly ConfidentialCraig Landau, MD - November 24, 2020

165

1    CRAIG LANDAU - HIGHLY CONFIDENTIAL

2         Q    Yes.  But just because I

3    don't know how remote depositions will

4    later appear.

5              MR. ALEXANDER:  Mr. Suarez,

6         you can take this document down

7         because we are done with it.

8    BY MR. ALEXANDER:

9         Q    Yes.  Dr. Landau, if you

10   can tell us the names of the

11   individuals who served on the board of

12   directors that you reported to when

13   you were the CEO of Purdue Canada.

14        A    Yes.  I will do my best.

15             From a family -- Sackler

16   family perspective, on one side there

17   was Dr. Raymond Sackler, Beverly

18   Sackler, Dr. Richard Sackler, Jonathan

19   Sackler, at one point David Sackler

20   joined.

21             On the other side of the

22   family, at that time, I think it was

23   Theresa Sackler, Mortimer Sackler,

24   Junior, Dr. Kathe Sackler, and I

25   believe Ilene Sackler Lefcourt.

166

1      CRAIG LANDAU - HIGHLY CONFIDENTIAL

2              Independent directors,

3      Peter Boer, Ralph Snyderman, Paulo

4      Costa, Jacques Theurillat, I think the

5      pronounce is correct.  Cecil Pickett.

6      And perhaps Judy Lewent, but I am not

7      sure when she departed the board.

8              That's to the best of my

9      memory that those were the

10     individuals.

11          Q    The whole time that you

12     worked in Canada, members of the

13     Sackler family controlled the majority

14     of the seats on that board, correct?

15          A    I don't know.  It -- if

16     the math I gave you indicates that,

17     perhaps that is the case.  But I am

18     not sure it was designed that way or

19     if that was the case all the time.

20     I -- I just don't know.

21          Q    Are there any significant

22     differences between Purdue's opioid

23     business in Canada and in the United

24     States?

25              MS. IMES:  Object to the

Highly ConfidentialCraig Landau, MD - November 24, 2020

172

```
1        CRAIG LANDAU - HIGHLY CONFIDENTIAL
2    I started my responsibilities in the
3    US in early July and simultaneously
4    transitioning out of my Canadian role
5    over a period of a few months.
6            Q    Did anyone interview you
7    for the position of CEO of Purdue
8    Pharma in the US?
9            A    Not at that time.  I
10   believe I was considered for the
11   position years earlier, prior to my
12   movement to Purdue Canada.  But in
13   June of 2017, or the days or weeks
14   leading up to being assigned or asked
15   to take that role, I don't believe I
16   was interviewed.
17           Q    In 2017, how did you find
18   out that you were going to be the CEO
19   of Purdue Pharma in the United States?
20           A    I have a vivid memory of
21   this.
22                I was called in to -- I
23   will call it the board room.  We were
24   having our mid-year meetings in
25   Greenwich, Connecticut at a hotel
```

**Highly ConfidentialCraig Landau, MD - November 24, 2020**

173

1      CRAIG LANDAU - HIGHLY CONFIDENTIAL

2    venue.  And following the -- at the

3    end of a long week of board meetings,

4    I was called back into the -- it would

5    be a ballroom or a converted board

6    room, and I was told by Mr. Stuart

7    Baker that the board had elected to

8    offer me the role of CEO in the US

9    effective immediately.

10         Q    And who else was in the

11   room besides you and Mr. Baker?

12         A    A bit of a blur at the

13   time, but I believe it was the full

14   board, perhaps minus one or two folks

15   that might have had to depart a bit

16   earlier to catch a train or a flight.

17   I can't recall, but the majority of

18   the board for sure.

19         Q    And did you accept the job

20   on the spot?

21         A    I did.

22         Q    What did you say to

23   Mr. Baker?

24         A    I don't recall precisely

25   what I said, but I remember how I felt

Highly ConfidentialCraig Landau, MD - November 24, 2020

                                                                      178

1     CRAIG LANDAU - HIGHLY CONFIDENTIAL

2            guess it's a little troubling

3            just to -- certainly more

4            prescriptions equals more

5            revenue.

6                 But the premise of the

7            question, you know, as a

8            physician, especially, you know,

9            I don't know that sales

10           representatives caused doctors

11           to write prescriptions they

12           would otherwise not have

13           thought, you know, necessary to

14           write.  But maybe that's just a

15           different way to look at the

16           role of the sales

17           representatives and the

18           physician.

19    BY MR. ALEXANDER:

20           Q    When sales representatives

21    caused prescribers to write

22    prescriptions for higher doses of

23    Purdue opioids, that increased

24    Purdue's revenue, correct?

25                MS. IMES:  Objection.

Highly ConfidentialCraig Landau, MD - November 24, 2020

179

1    CRAIG LANDAU - HIGHLY CONFIDENTIAL

2              THE WITNESS:  Yeah.  Again,

3         with all due respect, I don't

4         know that Purdue sales

5         representatives caused

6         physicians to write -- to do

7         anything.

8              I mean, as a physician,

9         it's hard for me to imagine that

10        a sales representative could

11        have that kind of influence on

12        my practice or prescribing

13        behavior.

14             But maybe as a consequence

15        of providing information, you

16        know, prescriptions that might

17        have been written for another

18        product in the category were

19        instead written for one of

20        Purdue's products or vice-versa.

21        You know, I am just not sure.

22   BY MR. ALEXANDER:

23        Q    When sales representatives

24   caused prescribers to keep patients on

25   Purdue opioids longer, that increased

Highly ConfidentialCraig Landau, MD - November 24, 2020

232

1    CRAIG LANDAU - HIGHLY CONFIDENTIAL

2          good, was sanctioned by the

3          Sackler family or the board, I

4          think we were all aligned.

5               But loyal but not blindly

6          loyal.  I mean, loyal if I

7          believed in what I was doing and

8          it corresponded to what was

9          right.

10   BY MR. ALEXANDER:

11         Q    And during the time that

12   you were working at Purdue from 1999,

13   you know, all the way through today,

14   was there ever a time that you did not

15   believe in what you were doing?

16         A    I don't like to speak in

17   absolutes.  But I can't recall a time

18   when I thought what I was doing was

19   anything but appropriate and

20   well-intentioned and good.

21               I recall literally telling

22   many people over the course of my

23   career how much I looked forward to

24   getting up in the morning and driving

25   an hour and a half to work, and then

Highly ConfidentialCraig Landau, MD - November 24, 2020

235

1      CRAIG LANDAU - HIGHLY CONFIDENTIAL

2    called attention to, at the highest of

3    levels through escalation.

4              I never imagined and I

5    never bore witness to anything I

6    considered to be illegal, unethical.

7    And never -- and don't recall having

8    any of those things brought to me as

9    an individual.

10       Q    In your experience at

11   Purdue, no one ever expressed to you

12   the concern that Purdue might be

13   contributing to the opioid crisis?

14       A    I don't recall anyone

15   coming to me with that concern or kind

16   of statement.  I think to the

17   contrary, Mr. Alexander.

18              I think -- you know, at

19   least, you know, with -- from the

20   people I was working with and

21   responsible for or associating most

22   frequently with, over the years -- and

23   again, with the exception of what the

24   company had admitted to in 2007, you

25   know, that the folks I worked with

Highly ConfidentialCraig Landau, MD - November 24, 2020

282

1       CRAIG LANDAU - HIGHLY CONFIDENTIAL

2    I had expressed my interest in

3    expanding my experience outside of

4    research and development where I had

5    spent, for all intents and purposes,

6    my entire career to date.

7              And eventually, I was

8    offered a number of positions to run

9    companies within the network of

10   Sackler-owned associated companies.

11        Q    To whom did you express

12   your interest first that you recall?

13        A    It might have been Dr.

14   Raymond Sackler, who is now deceased,

15   first.

16        Q    Other than Dr. Raymond

17   Sackler and Dr. Richard Sackler, as

18   you spoke about earlier, was there

19   anybody else you spoke to about your

20   interest in expanding the experience

21   you had outside of research and

22   development?

23        A    Yes.  I believe at one

24   point I addressed the entire board

25   about my interest, and I expressed to

Highly ConfidentialCraig Landau, MD - November 24, 2020

327

```
 1      CRAIG LANDAU - HIGHLY CONFIDENTIAL
 2              Have you finished your
 3         review or are you still paging
 4         through?
 5              THE WITNESS:  I am thumbing
 6         through.  I am looking to
 7         refamiliarize myself with the
 8         document, if you just give me
 9         30 seconds.
10              MR. SORKIN:  Take your
11         time.  Take your time.
12              THE WITNESS:  Thanks.
13         (Reviewing.)
14              Okay.  I am good.
15              BY MR. SORKIN:
16         Q    Okay.
17              And the first page of the
18    attachment in Exhibit 16 is titled,
19    "Sackler Pharma Enterprise."
20              Do you see that?
21         A    I do, yes.
22         Q    And it's then subtitled,
23    "Diagnostic and Forward Plan," with
24    your name, Craig Landau, MD.
25              Do you see that?
```

Highly ConfidentialCraig Landau, MD - November 24, 2020

328

CRAIG LANDAU - HIGHLY CONFIDENTIAL

1

2      A    Yes, I do.

3      Q    Did someone ask you to put

4   this document together?

5      A    Yes.

6      Q    Who?

7      A    Mortimer Sackler, Junior

8   requested that I put -- not this

9   particular document together -- but

10   that I convey my thoughts and ideas

11   for -- for their pharmaceutical

12   businesses together.

13      Q    When did he ask you to do

14   that?

15      A    I believe it was in March

16   of 2017.

17      Q    And how did that request

18   from Dr. Sackler come about, as far as

19   you understand it?

20      A    Well, I was about to board

21   an airplane with my family on the way

22   to -- I guess you call it a

23   spring/March vacation; I had young

24   children.  And I received a phone call

25   from a number I didn't recognize; it

**Highly ConfidentialCraig Landau, MD - November 24, 2020**

329

```
1        CRAIG LANDAU - HIGHLY CONFIDENTIAL
2    was Mortimer, and he wanted to engage
3    and he asked me in the context of that
4    conversation -- he told me he was
5    making similar requests of other
6    leadership and I consented.
7            Q    Did he convey to you what
8    the purpose was for asking for the
9    plan from others in leadership?
10           A    I don't recall if he
11   conveyed a purpose.  No.  I don't
12   recall if he conveyed a purpose.  I
13   don't recall.
14           Q    Did you understand that
15   this document might be -- well, strike
16   that.
17               Did you understand --
18   strike that.
19               Who did you understand
20   this document was going to?
21           A    It was my understanding
22   that it would -- well, that I was --
23   that ultimately it would make its way
24   to the board of directors.
25           Q    Which board?
```

Highly ConfidentialCraig Landau, MD - November 24, 2020

330

1    CRAIG LANDAU - HIGHLY CONFIDENTIAL

2         A    Well, my understanding,

3    from where I was sitting, was it would

4    be the MMP board.

5         Q    What information did you

6    use to prepare the document that is --

7    that is attached to Exhibit 16?

8         A    I don't recall.  It was

9    information available to me in my

10   position as CEO of Purdue Canada.

11        Q    And I assume you also used

12   by this time the information and your

13   experience from the 17 years as part

14   of Purdue US and Purdue Canada?

15             MS. IMES:  Objection to

16        form.

17             THE WITNESS:  I tried to

18        put my best thinking into this

19        document, which I took very

20        seriously.  And my experience as

21        an individual up to and

22        including my time in Purdue

23        Canada would have contributed to

24        it.

25   BY MR. SORKIN:

**Highly ConfidentialCraig Landau, MD - November 24, 2020**

331

1      CRAIG LANDAU - HIGHLY CONFIDENTIAL

2           Q    If you look at the second

3    page of this document, it ends in

4    Bates number 676.

5                 MR. SORKIN:  And Mr.

6           Suarez, if you can scroll down a

7           little further.

8    BY MR. SORKIN:

9           Q    I am going to ask you

10   about one of the sub-bullets,

11   Dr. Landau, under the larger bullet,

12   "The US business is in a state of

13   decline and will soon be unable to

14   fund either/both investments or

15   distributions going forward."

16                I want to look at the

17   dash, the fifth one down, that starts

18   with, "There's a high rate of employee

19   turnover..."

20                Do you see that?

21         A    Yes, I do.

22         Q    Okay.

23                That sub-bullet states,

24   "There's a high rate of employee

25   turnover, with many directors and