# EXHIBIT 3

```
                                                        1
 1            UNITED STATES BANKRUPTCY COURT

 2            SOUTHERN DISTRICT OF NEW YORK

 3         Chapter 11 - Case No. 19-23649 (RDD)

 4

 5   -------------------------------------------

 6   In re:

 7   PURDUE PHARMA L.P., et al.,

 8              Debtors.

 9   -------------------------------------------

10

11

12

13

14                  HIGHLY CONFIDENTIAL

15        REMOTE DEPOSITION OF CRAIG LANDAU, MD

16            NOVEMBER 24, 2020 - 8:30 A.M. EST

17

18

19

20

21

22

23

24

25   JOB NO. 2020-89913
```

29

```
1        CRAIG LANDAU - HIGHLY CONFIDENTIAL
2    few Purdue R&D people at scientific
3    meetings during my time at Knoll.
4             Sorry.  There is lots of
5    background noise here.
6             I had met folks from
7    Purdue at one or another scientific
8    meeting, and when I learned that the
9    parent company of Knoll was divesting
10   the pharmaceutical business, I
11   leveraged contacts that I had
12   established and the company was
13   interested in me and offered me a
14   position.
15        Q    Who were the individuals
16   you had met at Purdue before you came
17   to work at Purdue?
18        A    I think my primary --
19   primary contact was a gentleman by the
20   name of Peter Lacouture and there was
21   another person, physician.  I believe
22   her name was Ellen McCroskey.
23        Q    Who were the contacts that
24   you leveraged in the process of coming
25   to work at Purdue?
```

30

```
 1      CRAIG LANDAU - HIGHLY CONFIDENTIAL

 2          A     Peter Lacouture primarily.

 3          Q     What was your title in

 4   your first job at Purdue?

 5          A     I believe it was associate

 6   medical director in clinical research.

 7          Q     And what were your primary

 8   responsibilities in that position?

 9          A     I was recruited to Purdue

10   for a very specific role, which was to

11   help guide the development of a

12   non-opioid analgesic to be used in the

13   perioperative environment to limit the

14   use or obviate the use of opioid

15   medicines in that environment.

16          Q     You referred to an

17   "environment."

18                Could you just say that

19   term again, the environment?

20          A     I was referring to the

21   perioperative environment, before,

22   during and after an operating room

23   step for postoperative pain.

24          Q     Was the development of

25   that analgesic successful?
```

31

1      CRAIG LANDAU - HIGHLY CONFIDENTIAL

2          A    Sadly not.

3          Q    How long did you work on

4    that responsibility?

5          A    I would estimate at this

6    point about a year and a half or so.

7          Q    Who was your supervisor

8    during that work?

9          A    My initial supervisor was

10   Peter Lacouture, a person that guided

11   my entry into the company.

12         Q    Who was your supervisor

13   after Peter Lacouture?

14         A    I am not 100 percent

15   certain, but I believe it was -- I

16   believe it was either -- well, I am

17   not certain.  There were a few people

18   involved.  I can't be certain.

19         Q    Who was the CEO of Purdue

20   when you started work there?

21         A    I believe the CEO was Mr.

22   Michael Friedman, but I -- again, I

23   can't be sure.  I wasn't operating at

24   that level.

25         Q    Had you met Mr. Friedman

58

1      CRAIG LANDAU - HIGHLY CONFIDENTIAL

2      subject of which is REMS, short for

3      risk evaluation mitigation strategy.

4           Q    During what period of time

5      did you work on REMS at Purdue?

6           A    I believe the initial

7      involvement I had on REMS began soon

8      after I was -- I assumed

9      responsibility for the risk management

10     and epidemiology and regulatory

11     affairs function sometime in 2008.  So

12     that was when it began, yes.

13          Q    And how long did it

14     continue?

15          A    It continued in some form

16     until some time prior to my departure

17     from the US to the Canadian

18     organization in mid-2013.  My role had

19     changed over that period of time,

20     given the evolution of REMS, but I had

21     remained involved over that period.

22          Q    What was your job title at

23     Purdue in the United States just

24     before you left to Canada?

25          A    I don't believe it had

59

1      CRAIG LANDAU - HIGHLY CONFIDENTIAL

2    changed or changed materially since

3    the last title I was asked about in

4    2008 or so.  I would have to look at

5    my CV or be reminded.

6         Q    What were your main job

7    responsibilities at Purdue in the

8    United States just before you left to

9    go to Canada?

10        A    So my main

11   responsibilities were -- were

12   overseeing and advancing the R&D

13   pipeline.  Basically developing

14   medicines, interacting with FDA, our

15   Health Authority, you know, helping to

16   create suitable and appropriate

17   regulatory strategies, making certain

18   the organization was responsive to FDA

19   on all levels, making certain our

20   vital functions, including our risk

21   management and epidemiology function,

22   were well-funded and equipped and had

23   everything they needed, you know, to

24   do what was necessary both for the

25   company and for the public health.

60

1      CRAIG LANDAU - HIGHLY CONFIDENTIAL

2              And finally, I would say

3    searching for ways to improve our

4    understanding and ultimately our

5    approach to the practice of pain and

6    managing risk through the pursuit of

7    initiatives like objective measures of

8    pain and response to therapy,

9    objective measures of compliance with

10   medications, including, but not

11   limited to, opioids.  So a pretty

12   broad portfolio, but all science

13   based.

14        Q    Did you personally

15   interact with the FDA?

16        A    Yes.

17        Q    Who were your primary

18   contacts at the FDA?

19             MS. IMES:  Are you focused

20        on just before he went to

21        Canada, Sandy?

22             MR. ALEXANDER:  Yes.  Thank

23        you, Ms. Imes.

24             THE WITNESS:  Yeah.  The

25        company's primary contacts

**Highly ConfidentialCraig Landau, MD - November 24, 2020**

61

```
1       CRAIG LANDAU - HIGHLY CONFIDENTIAL

2            which, of course, were my

3            primary contacts, were the

4            division director and project

5            manager for the division of

6            analgesic and addiction

7            products, and that changed over

8            time depending upon the year

9            you're focused on.

10   BY MR. ALEXANDER:

11           Q    Do you recall the names of

12   any of the individuals who held that

13   position in the period before you left

14   to go to Canada?

15           A    Yes, very well.  They're

16   all very smart people.  Cynthia

17   McCormick -- Dr. Cynthia McCormick

18   early on.  Dr. Bob Rappaport following

19   her.  And Dr. Sharon Hertz following

20   Bob.

21           Q    Did you ever work with

22   Dr. Curtis Wright at Purdue?

23           A    Yes.

24           Q    What work did you do with

25   Dr. Wright?
```

```
                                              62
1        CRAIG LANDAU - HIGHLY CONFIDENTIAL

2            A    This was quite sometime

3    ago.  But I believe Dr. Wright was in

4    a much higher level position and, you

5    know, overseeing multiple programs

6    through other individuals.  I am not

7    certain I ever reported directly to

8    Dr. Wright.

9            Q    When Purdue's first

10   criminal conviction happened in 2007,

11   you had been working at Purdue for

12   approximately eight years; is that

13   correct?

14           A    Yes.

15           Q    You were aware of the

16   criminal conviction about the time it

17   happened in 2007, correct?

18           A    Yes.

19           Q    How did you feel about the

20   criminal conviction at the time?

21           A    Regret.  Surprise, since

22   in my understanding, the basis for the

23   conviction was from matters that I

24   wasn't involved in obviously.  And a

25   bit of embarrassment.
```

63

1      CRAIG LANDAU - HIGHLY CONFIDENTIAL

2          Q    You say you felt regret.

3    Why did you feel regret?

4          A    On behalf of the company

5    who, you know, admitted to a set of

6    wrongdoing.  And as part of the

7    company, I felt regret.

8          Q    Did you feel that it was a

9    serious matter at the time?

10         A    Of course.

11         Q    Are you aware that Purdue

12   paid about $700 million in the

13   settlement at that time?

14         A    Yes, I am.

15         Q    Do you think that was a

16   fair settlement?

17              MS. IMES:  Object to form.

18              THE WITNESS:  I would have

19         no -- no experience, no basis to

20         make any determination on that

21         --

22              (Simultaneous Crosstalk.)

23   BY MR. ALEXANDER:

24         Q    And did --

25         A    Go ahead.

Highly ConfidentialCraig Landau, MD - November 24, 2020

64

1      CRAIG LANDAU - HIGHLY CONFIDENTIAL

2          Q    Sorry.  We have been doing

3   a pretty good job not interrupting

4   each other so far.

5          A    So far.

6              MR. ALEXANDER:  Mr. Suarez,

7          could you please pull up

8          document MA-01.  This is a

9          public document and has no Bates

10         number.

11             THE WITNESS:  Is this one

12         of the documents I was furnished

13         with?

14             MR. ALEXANDER:  Yes,

15         Dr. Landau.  All of the

16         documents that I will be asking

17         you about you also have in hard

18         copy, and I believe it will be

19         labeled MA-01.

20             THE WITNESS:  Is it okay if

21         I pull it out now?  Is that

22         right?

23             MR. ALEXANDER:  Yes, that's

24         fine.

25             And we will have this

Highly ConfidentialCraig Landau, MD - November 24, 2020

98

1       CRAIG LANDAU - HIGHLY CONFIDENTIAL

2            have no recollection based on

3            anything other than what I would

4            have discussed with counsel.

5    BY MR. ALEXANDER:

6            Q    Are you aware that

7    Purdue's board has formed a special

8    committee?

9            A    Yes.

10           Q    Have you been interviewed

11   by the special committee?

12           A    Not to my knowledge.

13               MR. ALEXANDER:  Mr. Suarez,

14           you can take this exhibit down.

15   BY MR. ALEXANDER:

16           Q    Dr. Landau, you are aware

17   that there is an opioid crisis in

18   America, correct?

19           A    Yes, I am.

20           Q    And you are aware that the

21   lawsuits against Purdue include

22   allegations that Purdue caused much of

23   the opioid crisis, correct?

24           A    I believe I am aware of

25   that, yes.

99

1        CRAIG LANDAU - HIGHLY CONFIDENTIAL

2            Q    Have you ever tried to

3    figure out whether Purdue caused the

4    opioid crisis?

5                MS. IMES:  Object to form.

6                THE WITNESS:  I wonder at

7             times.  But causation, from a

8             legal perspective, is -- is

9             something best left to those

10            with the experience or expertise

11            to consider.

12               My view is that the answer

13            is while our products, one or

14            another product has been the

15            subject of a significant abuse,

16            misuse, and diversion with

17            consequences, that Purdue did

18            not cause the opioid crisis.

19               The crisis is complex and

20            multi-factorial.  It's

21            acknowledged to have multiple

22            factors needing to be

23            considered, whether they be

24            sociological, financial, or

25            economical behavior, or

100

1    CRAIG LANDAU - HIGHLY CONFIDENTIAL

2          biologic, access to healthcare,

3          and others.  It's a tragedy no

4          matter how you slice it, and we

5          are doing our best to address

6          it.

7    BY MR. ALEXANDER:

8          Q    Dr. Landau, I notice that

9    you mentioned that the product has

10   been subject to abuse, misuse, and

11   diversion; is that correct?

12         A    Yes, that is correct.

13         Q    But you did not mention

14   addiction, did you?

15         A    Not in that --

16              MS. IMES:  Objection to

17         form.

18              THE WITNESS:  I don't

19         believe I mentioned addiction in

20         the previous testimony, but that

21         is true as well.

22   BY MR. ALEXANDER:

23         Q    You didn't mention opioid

24   use disorder, did you?

25         A    I don't believe I did.

Highly ConfidentialCraig Landau, MD - November 24, 2020

101

1    CRAIG LANDAU - HIGHLY CONFIDENTIAL

2         Q    Has Purdue deliberately

3    tried to divert attention from the

4    addictiveness of its opioids?

5              MS. IMES:  Objection.

6              THE WITNESS:  In my

7              opinion, absolutely not, save

8              for what has been admitted to in

9              2007 in the Western District of

10             Virginia, which the subject of

11             which was misbranding by -- I

12             don't know how it's phrased -- a

13             handful of individuals, and I

14             won't recite what I know about

15             that admission.

16             We have not, as a company,

17             since that time, done what you

18             are suggesting.

19   BY MR. ALEXANDER:

20        Q    Has Purdue implemented a

21   strategy of framing the opioid

22   epidemic as a crisis of abuse?

23             MS. IMES:  I'm sorry.  I

24             missed -- I'm sorry.  A crisis

25             of abuse you said?

146

1      CRAIG LANDAU - HIGHLY CONFIDENTIAL

2   stand by our patients" program, did

3   it?

4          A    I don't believe a program

5   suggested -- the program suggested by

6   Jonathan Sackler, who is now deceased,

7   of course, was implemented.

8              I think over the years

9   Purdue was -- it's my understanding

10  that the company was, you know, very

11  active in looking for ways to address

12  the underlying issues, you know, not

13  limited to chronic pain

14  patient-related issues, but issues

15  related to abuse, misuse, diversion,

16  addiction, overdose.

17             In Jonathan's e-mail, it

18  appears to me he was obviously

19  interested and thinking about novel

20  ways in which we could address these

21  issues in a serious and helpful way,

22  and I just -- I don't believe we

23  pursued item number 7.

24          Q    Purdue never offered a

25  program of treatment and counseling

147

1      CRAIG LANDAU - HIGHLY CONFIDENTIAL

2   for patients who were prescribed

3   Purdue opioids and developed

4   opioid-use disorder, did it?

5        A    Purdue has, over the last

6   two or more years under our corporate

7   social responsibility umbrella,

8   provided substantial support to

9   third-party organizations where that

10  support is geared to funding, you

11  know, treatment, MAT recovery,

12  back-to-work training, and even care

13  for children in the context of a

14  mother or a parent, you know, who is

15  suffering from OUD.

16            But as a national program,

17  no, not in my -- not to my

18  recollection.

19        Q    Do you know the reason why

20  Purdue did not implement item number

21  7?

22            MS. IMES:  Objection to

23        form.

24            THE WITNESS:  I don't have

25        a specific explanation for --

148

```
1   CRAIG LANDAU - HIGHLY CONFIDENTIAL

2        behind the pursuit or

3        non-pursuit of any one of these.

4             What I can say is that

5        we -- by November 4th, 2018, we

6        were in the process, and far

7        down the road, of considering

8        how best to put the company's

9        resources and output to the best

10       possible use to address the, you

11       know, the issues that, you know,

12       rolled up to this public health

13       crisis.

14             And, you know, some of the

15       examples I am certain you are

16       familiar with, but providing

17       free substantial and free

18       generic Suboxone, helping to

19       develop and bring to bear

20       low-cost over-the-counter

21       intranasal naloxone, so it's

22       much more widely accessible

23       without a prescription.

24             And developing a next

25       generation opioid antagonist or
```

Highly ConfidentialCraig Landau, MD - November 24, 2020

149

1    CRAIG LANDAU - HIGHLY CONFIDENTIAL

2         opioid overdose reversal agent,

3         you know, targeted at the

4         current killer which is, you

5         know, which are often synthetic

6         opioids like fentanyl and

7         carfentanil and its derivatives.

8              So this was a matter, to

9         me, of how can the company

10        direct its most -- the most of

11        its resources and apply most of

12        its focus for the greatest good.

13   BY MR. ALEXANDER:

14        Q    You are familiar with the

15   term REMS, spelled R-E-M-S, correct?

16        A    Yes, I am.

17        Q    And in the pharmaceutical

18   context, REMS is an abbreviation for

19   risk evaluation and mitigation

20   strategies, correct?

21        A    Yes, that is correct.

22        Q    REMS can be used to

23   protect patients and to help ensure

24   the benefits of a drug outweigh the

25   risks, correct?

Highly ConfidentialCraig Landau, MD - November 24, 2020

150

1     CRAIG LANDAU - HIGHLY CONFIDENTIAL

2          A     That is the basis for

3     determining where REMS is necessary,

4     yes.

5                MR. ALEXANDER:  Mr. Suarez,

6          please pull up document MA-11.

7                And Dr. Landau, you have

8          this document in hard copy.

9          This document is public and has

10         no Bates number.

11               THE REPORTER:  Landau 9.

12               (Landau Exhibit 9,

13         Information Request Letter, is

14         Marked.)

15               MS. IMES:  Sandy, this

16         letter appears to be undated,

17         unless I am missing it.  Can you

18         make a representation about the

19         date?

20               MR. ALEXANDER:  Yes, Linda.

21         The date appears on the last

22         page of the document.  I will

23         get to it in my questions.

24               MS. IMES:  Thank you.

25               MR. ALEXANDER:  It's a

158

1    CRAIG LANDAU - HIGHLY CONFIDENTIAL

2    on Purdue's response to that FDA

3    request, correct?

4         A    I think -- I'm sorry.  Can

5    you -- I'm sorry.  I was thinking as

6    you were speaking.  Can I ask you

7    repeat the question?  I apologize.

8         Q    It's no trouble.

9              There were Sackler family

10   members on the board of directors of

11   Purdue at the time, correct?

12        A    Yes.

13        Q    The Sackler family members

14   on the board of directors were briefed

15   on Purdue's response to that FDA

16   request, correct?

17        A    I think the -- you know,

18   the Sackler members who were Sackler

19   family members who were serving on the

20   board would have been briefed in the

21   context of board meetings where other

22   non-Sackler, you know, independent

23   directors would have been briefed.

24              I hesitate a bit because

25   I'm -- although my memory is vague,

159

1      CRAIG LANDAU - HIGHLY CONFIDENTIAL

2    I'm not certain we actually provided a

3    response to the agency.  We were

4    certainly working on our response, but

5    I -- I'm not sure we provided a

6    response.

7              Perhaps you have documents

8    to show otherwise.

9         Q    Today, is the authority to

10   prescribe OxyContin limited to

11   prescribers who are specially

12   certified?

13        A    Sadly not.  You know, we

14   had --

15             (Simultaneous Crosstalk.)

16        Q    The FDA --

17        A    -- I was still speaking --

18             MS. IMES:  Mr. Alexander,

19        do not cut off Dr. Landau.  He's

20        answering your question.

21             THE WITNESS:  What I was

22        saying, just to go back to my

23        response, it's sadly not,

24        despite the fact that Purdue, as

25        a company, along with a variety

160

1    CRAIG LANDAU - HIGHLY CONFIDENTIAL

2         of other companies both branded

3         and generic, in the context of

4         what we call the industry

5         working group, you know, formed

6         at the request of FDA,

7         recommended strongly that --

8         that REMS training for

9         prescribers be mandatory, and

10        that mandatory training be

11        linked to the DEA registration

12        and/or recertification process.

13            That was a recommendation

14        made I believe in a public

15        meeting to the combined advisory

16        committees and FDA in 2010, and

17        that recommendation was not

18        adopted by FDA.  So the REMS

19        that you see today is a product

20        of what the agency requested of

21        the industry.

22   BY MR. ALEXANDER:

23        Q    If you are still the CEO

24   and were running an OxyContin business

25   together in 2021, should we do

161

1       CRAIG LANDAU - HIGHLY CONFIDENTIAL

2    anything to promote a requirement that

3    OxyContin be prescribed only by

4    prescribers who are specially

5    certified?

6           A    If I were running the

7    business post-emergence, I would work

8    with other sponsors and FDA to

9    implement such a mandatory training

10   system.  Not for a single product, but

11   inclusive of one.  But for all

12   products.

13              I feel the same way today

14   as I felt in 2010 and the intervening

15   time, that the, you know, oftentimes

16   bad outcomes start with the stroke of

17   a pen of a prescriber.  Precisely the

18   reason the industry working group,

19   again, branded businesses and generic

20   businesses, often at odds over many

21   things, recommended strongly that

22   training be mandatory.

23              So I think it would be a

24   smart thing to do.

25           Q    As the CEO of Purdue, you,

162

1      CRAIG LANDAU - HIGHLY CONFIDENTIAL

2   yourself, have said that one of the

3   causes of the opioid crisis is opioids

4   being prescribed by doctors who lack

5   the requisite training in how to use

6   them appropriately; isn't that

7   correct?

8          A    One hundred percent

9   correct.

10         Q    A requirement that

11  OxyContin be prescribed only by

12  prescribers who are specially

13  certified could mitigate serious

14  risks, correct?

15         A    I would say it could help

16  to mitigate.  It's a very good

17  starting point, Mr. Alexander.  Proper

18  training.  Just like training, you

19  know, for licensure and other -- in

20  other --

21              (Reporter Clarification.)

22              THE WITNESS:  In other

23         settings.

24  BY MR. ALEXANDER:

25         Q    A requirement that

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------x
                                                       :
In re:                                                 :        **Chapter 11**
                                                       :
**PURDUE PHARMA L.P.**, *et al.*,                      :        **Case No. 19-23649 (RDD)**
                                                       :
        Debtors.                                       :        **(Jointly Administered)**
                                                       :
-------------------------------------------------------x

**Declaration of Craig Landau, M.D., Regarding Deposition Transcript and Errata Sheet**

I, Craig Landau, M.D., pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.      I have reviewed the entire transcript of my deposition taken in the above-captioned matter on November 24, 2020, and the Deposition Errata Sheet below provides a list of the changes that I identified and the reasons for making them pursuant to Rule 30(e)(1) of the Federal Rules of Civil Procedure:

| Page | Line(s) | Original | Corrected | Reason |
|------|---------|----------|-----------|--------|
| ███ | ███ | ███████ | ███████ | ██████████ |
| ███ | ██ | ██████████ | ██████████ | ████████ |
| ███ | ██ | ████████████ | ███████████ | ██████████ |
| ███ | ██ | ███████████ | ██████████ | ███████ |
| 29 | 21 | "person, physician" | "person, a physician" | Clarification |
| 29 | 22 | "Ellen McCroskey" | "Ellen McCroskery" | Transcription Error |
| ███ | ██ | ████████████ | ██████████ | ██████████ |
| ███ | ██ | ██████████ | ██████████ | ██████████ |
| ███ | ██ | ██████████ | ██████████ | ██████████ |

| Page | Line(s) | Original | Corrected | Reason |
|---|---|---|---|---|
| ■ | ■ | ████ | ████ | ████ |
| ■ | ■ | ██ | ██ | ████ |
| ■ | ■ | ██████████████ | ███ | |
| ■ | ■ | ████ | ██████ | ████ |
| ■ | ■ | █████ | █████ | ███ |
| ■ | ■ | ████ | ████ | ████ |
| ■ | ■ | █████ | ███ | ███ |
| ■ | ■ | ████ | ████ | ███ |
| ■ | ■ | ████ | ████ | ████ |
| ■ | ■ | ████ | ███ | ████ |
| 58 | 2 | "subject of which is REMS" | "REMS" | Clarification |
| ■ | ■ | ████ | ████ | ████ |
| ■ | ■ | ██████ | ████ | ██ |
| ■ | ■ | ███ | ████ | ████ |
| ■ | ■ | █████ | █████ | ██ |
| ■ | ■ | ████ | ████ | ██ |
| ■ | ■ | ████ | ████ | ████ |
| ■ | ■ | ████ | ████ | ████ |

| Page | Line(s) | Original | Corrected | Reason |
|------|---------|----------|-----------|--------|
| ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ |
| 158 | 18 | "Sackler members who were Sackler" | "Sackler" | Clarification |
| ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ |

| Page | Line(s) | Original | Corrected | Reason |
|------|---------|----------|-----------|--------|
| ███ | ███ | ████████████ | ████████████ | ████████ |
| ███ | ███ | ████████ | ████████ | ██████████ |
| ███ | ███ | █████ | █████ | ██████████ |
| ███ | ███ | ███████ | ███████ | ██████████ |
| ███ | █ | ████████████ | ████████████ | ██████████ |
| ███ | █ | █████████ | █████████ | ██████████ |
| ███ | █ | ████████ | ██████████████ | ██████████ |
| ███ | ███ | ██████████ | ██████████ | ██████████ |
| ███ | ███ | ██████████ | ██████████ | ██████████ |
| ███ | ███ | ██████████ | ██████████ | ██████████ |
| ███ | █ | ██████████ | ██████████ | ██████████ |
| ███ | ███ | ██████████ | ██████████ | ██████████ |
| ███ | ███ | ██████████ | ██████████ | ██████████ |
| ███ | ███ | ████████████ | ████████ | ██████ |
| ███ | ███ | ████████████ | █████████ | ██████ |
| ███ | █ | ████████████ | ██████████████ | ██████ |
| ███ | █ | ████████ | ████████ | ██████████ |
| ███ | █ | ████████ | ████████ | ██████████ |
| ███ | █ | ██████████ | ██████████ | ██████████ |
| ███ | █ | ████████████ | ████████████ | ████████ |

| Page | Line(s) | Original | Corrected | Reason |
|------|---------|----------|-----------|--------|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

2.    I declare under penalty of perjury under the laws of the United States that the

foregoing is true and correct.

Executed:    January 7, 2021
             Branford, Connecticut

Craig Landau, M.D.