

Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 19-23649-rdd

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    PURDUE PHARMA L.P.,

8

9            Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                    United States Bankruptcy Court

13                    300 Quarropas Street, Room 248

14                    White Plains, NY 10601

15

16                    June 15, 2022

17                    10:05 AM

18

19

20

21   B E F O R E :

22   HON ROBERT D. DRAIN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO: UNKNOWN

1    HEARING re Notice of Agenda / Agenda for June 15, 2022

2    Hearing

3

4    HEARING re Notice of Hearing / Notice of Eighth Interim Fee

5    Hearing filed by Eli J. Vonnegut on behalf of Purdue Pharma

6    L.P.. with hearing to be held on 6/15/2022 at 10:00 AM at

7    Videoconference (ZoomGov) (ECF #4844)

8

9    HEARING re Notice of Hearing / Supplemental Notice of Eighth

10   Interim Fee Hearing (related document(s)4864, 4844)(ECF

11   #4866)

12

13   HEARING re Application for Interim Professional Compensation

14   / Eighth Interim Fee Application of Dechert LLP, as 327(e)

15   Special Counsel, for Compensation for Professional Services

16   Rendered and Reimbursement of Actual and Necessary Expenses

17   Incurred During the Period: 2/1/2022 to 4/30/2022,

18   fee:$975,235.60, expenses: $2,279.04. (ECF #4815)

19

20   HEARING re Eighth Application for Interim Professional

21   Compensation for Arnold & Porter Kaye Scholer LLP, Debtor's

22   Attorney, period: 2/1/2022 to 4/30/2022, fee:$569,257.72,

23   expenses: $19,436.20. (ECF #4800)

24

25   HEARING re Eighth Application for Interim Professional

1   Compensation for KING & SPALDING LLP, Special Counsel,

2   period: 2/1/2022 to 3/31/2022, fee:$921,129.62, expenses:

3   $0.00. (ECF #4827)

4

5   HEARING re Application for Interim Professional Compensation

6   / Eighth Interim Application of Davis Polk & Wardwell LLP

7   for Compensation for Services Rendered and Reimbursement of

8   Expenses Incurred as Counsel to the Debtors and Debtors In

9   Possession for the Period: 2/1/2022 to 4/30/2022, fee:

10  $13,397,175., expenses: $234,281.12. filed by Davis Polk &

11  Wardwell LLP. (ECF #4793)

12

13  HEARING re Seventh Application for Interim Professional

14  Compensation /Jones Day's Seventh Interim Application For

15  Allowance of Compensation For Services Rendered and

16  Reimbursement of Actual and Necessary Expenses Incurred

17  During Retention Period: 10/1/2021 to 1/31/2022,

18  fee:$1,166,724.81, expenses: $110,609.55. (ECF #4553)

19

20  HEARING re Application for Interim Professional Compensation

21  / Seventh Interim Fee Application of Ernst & Young LLP for

22  Compensation and Reimbursement of Expenses Incurred as

23  Auditors and Providers of Other Professional Services for

24  the Debtors for the Period: 1/1/2022 to 4/30/2022,

25  fee:$1,050,000.00, expenses: $0.00. (ECF #4780)

Page 4

1    HEARING re Application for Interim Professional Compensation

2    / Eighth Interim Fee Application of AlixPartners, LLP

3    Financial Advisor for the Chapter 11 Debtors, for Allowance

4    of Compensation for Professional Services Rendered and

5    Reimbursement of Expenses for the Period : 2/1/2022 to

6    4/30/2022, fee:$2,722,882.50, expenses:

7    $184,811.48. (ECF #4831)

8

9    HEARING re Fifth Application for Interim Professional

10   Compensation / Combined Monthly Fee Application of Kroll

11   Restructuring Administration LLC, as Administrative Advisor

12   to the Debtors for Services Rendered and Reimbursement of

13   Expenses Period: 2/1/2022 to 4/30/2022, fee:$3744.15,

14   expenses: $0.00. (ECF #4781)

15

16   HEARING re Eighth Application for Interim Professional

17   Compensation Eighth Interim Fee Application Of Skadden,

18   Arps, Slate, Meagher & Flom LLP For Compensation For

19   Services Rendered And Reimbursement Of Expenses As

20   Special Counsel To The Debtors For The Period: 2/1/2022 to

21   4/30/2022, fee:$1,087,509.44, expenses: $130,000.00.

22   (ECF #4842)

23

24   HEARING re Application for Interim Professional Compensation

25   / Eighth Interim Fee Application of PJT Partners LP as

1    Investment Banker to the Debtors and Debtors-In Possession

2    for Allowance of Compensation for Services Rendered and for

3    the Reimbursement of all Actual and Necessary Expenses

4    Incurred for the Period: 2/1/2022 to 4/30/2022,

5    fee:$675,000.00, expenses: $397.71. (ECF #4798)

6

7    HEARING re Application for Interim Professional Compensation

8    / Sixth Interim Application of Cornerstone Research for

9    Compensation for Services Rendered and Reimbursement of

10    Expenses Incurred as Consultant to the Debtors for

11    the Period: 10/1/2021 to 1/31/2022, fee:$81,998.00,

12    expenses: $157.07. (ECF #4524)

13

14    HEARING re Monthly Fee Statement /Thirty-First Monthly Fee

15    Statement of Brown Rudnick LLP as Co-Counsel to the Ad

16    Hoc Committee of Governmental and Other Contingent

17    Litigation Claimants for Services and Reimbursement of

18    Expenses Incurred for the Period of April 1, 2022 through

19    April 30, 2022 Filed by David Molton on behalf of

20    Brown Rudnick LLP. (ECF #4804)

21

22    HEARING re Application for Interim Professional Compensation

23    / First Interim Application of Latham & Watkins LLP for

24    Compensation for Services Rendered and Reimbursement of

25    Expenses Incurred as Special Counsel to the Debtors

Page 6

1    and Debtors In Possession for the Period: 1/13/2022 to

2    4/30/2022, fee:$601,500.60, expenses: $2,156.70.

3    (ECF #4864)

4

5    HEARING re Application for Interim Professional Compensation

6    /Eighth Interim Application of Jefferies LLC for Allowance

7    of Compensation Earned and Reimbursement of Expenses

8    Incurred as Investment Banker for the Official

9    Committee of Unsecured Creditors for the Period: 2/1/2022 to

10   4/30/2022, fee:$675,000.00, expenses: $18,639.34.

11   (ECF #4822)

12

13   HEARING re Application for Interim Professional Compensation

14   /Seventh Interim Fee Application of Cole Schotz P.C. as

15   Co-Counsel to the Official Committee of Unsecured Creditors

16   of Purdue Pharma L.P., et al., for Allowance of Compensation

17   for Services Rendered and Reimbursement of Expenses for the

18   Period: 2/1/2022 to 4/30/2022, fee:$2,061,667.80, expenses:

19   $342.51. (ECF #4817)

20

21   HEARING re Application for Interim Professional Compensation

22   /Eighth Interim Application of Province, LLC, Financial

23   Advisor to the Official Committee of Unsecured Creditors of

24   Purdue Pharma L.P., et al., for Compensation and

25   Reimbursement of Expenses for the Interim Period : 2/1/2022

Page 7

1   to 4/30/2022, fee:$2,879,945.90, expenses:

2   $948.75. (ECF #4825)

3

4   HEARING re Application for Interim Professional Compensation

5   /Eighth Interim Fee Application of Akin Gump Strauss Hauer

6   & Feld LLP as Counsel to the Official Committee of Unsecured

7   Creditors of Purdue Pharma, L.P., et al., for Allowance of

8   Compensation for Services Rendered and Reimbursement of

9   Expenses for the Period: 2/1/2022 to 4/30/2022,

10  fee:$6,637,001.00, expenses: $59,543.37. (ECF #4816)

11

12  HEARING re Application for Interim Professional Compensation

13  /Eighth Interim Fee Application of Kurtzman Carson

14  Consultants LLC as Information Agent to the Official

15  Committee of Unsecured Creditors for Allowance of

16  Compensation for Professional Services Rendered and for

17  Reimbursement of Actual and Necessary Expenses

18  Incurred: 2/1/2022 to 4/30/2022, fee:$39,203.24, expenses:

19  $4,886.86. (ECF #4828)

20

21  HEARING re Application for Interim Professional Compensation

22  /Seventh Interim Fee Application of Bedell Cristin Jersey

23  Partnership as Special Foreign Counsel to the Official

24  Committee of Unsecured Creditors of Purdue Pharma L.P.,

25  et al., for Allowance of Compensation for Services Rendered

1   and Reimbursement of Expenses for the Period:

2   2/1/2022 to 4/30/2022, fee:$201,089.50, expenses:

3   $55,090.59. (ECF #4821)

4

5   HEARING re Application for Interim Professional Compensation

6   /Eighth Interim Fee Application of Brown Rudnick LLP as

7   Co-Counsel to the Ad Hoc Committee of Governmental and Other

8   Contingent Litigation Claimants for Services and

9   Reimbursement of Expenses Incurred for the Period : 2/1/2022

10  to 4/30/2022, fee:$399,424.50, expenses: $2,965.49.

11  (ECF #4829)

12

13  HEARING re Application for Interim Professional Compensation

14  / Eighth Interim Fee Application of FTI Consulting, Inc. for

15  Compensation Earned and Expenses Incurred for the Period:

16  2/1/2022 to 4/30/2022, fee:$624,398.50, expenses:

17  $52.03. (ECF #4840)

18

19  HEARING re Application for Interim Professional Compensation

20  / Application of Otterbourg P.C. as Co-Counsel to the Ad Hoc

21  Committee of Governmental and Other Contingent Claimants for

22  Eighth Interim Allowance of Compensation for Services

23  Rendered and Reimbursement of Expenses Incurred from

24  February 1, 2021 Through and Including April 30, 2022:

25  fee:$183,544.50, expenses: $1,154.95. (ECF #4839)

Page 9

1    HEARING re Application for Interim Professional Compensation

2    / Eighth Interim Application for Allowance of Compensation

3    for Services Rendered and Reimbursement of Expenses Incurred

4    by Gilbert LLP as Co-Counsel to the Ad Hoc

5    Committee of Governmental and Other Contingent Litigation

6    Claimants for the Period: 2/1/2022 to 4/30/2022,

7    fee:$1,682,782.00, expenses: $9,214.56. (ECF #4836 & #4838)

8

9    HEARING re Application for Interim Professional Compensation

10   / Eighth Interim Application of Kramer Levin Naftalis &

11   Frankel LLP, as Co-Counsel to the Ad Hoc Committee of

12   Governmental and Other Contingent Litigation Claimants, for

13   Allowance of Compensation for Professional Services Rendered

14   and for Reimbursement of Actual and Necessary Expenses

15   Incurred for the Period: 2/1/2022 to 4/30/2022,

16   fee:$1,578,687.50, expenses: $22,132.43. (ECF #4841)

17

18   HEARING re Application for Interim Professional Compensation

19   / Seventh Interim Fee Application of Houlihan Lokey Capital,

20   Inc., Investment Banker and Co-Financial Advisor to the Ad

21   Hoc Committee, for Compensation and Reimbursement of

22   Expenses for the Period: 2/1/2022 to 4/30/2022,

23   fee:$600,000.00, expenses: $1,611.18. (ECF #4837)

24

25   HEARING re Interim Application for Interim Professional

1   Compensation / Third Interim Application of Caplin &

2   Drysdale, Chartered, for Allowance of Compensation and

3   Reimbursement of Expenses With Respect to Services Rendered

4   as Counsel to the Multi-State Governmental Entities Group

5   for the Period: 10/1/2021 to 1/31/2022,

6   fee:$1,198,286.25, expenses: $33,431.20 (ECF #4749)

7

8   HEARING re First Application for Interim Professional

9   Compensation First Interim Fee Application of Kleinberg,

10  Kaplan, Wolff & Cohen P.C. as Counsel to the State of

11  Washington and Other States for Allowance of Compensation

12  for Services Rendered and Reimbursement of Expenses Incurred

13  for the Period : 9/16/2019 to 4/30/2022,

14  fee:$2,434,808.70, expenses: $89,448.01. (ECF #4799)

15

16  HEARING re First Application for Interim Professional

17  Compensation for counsel engaged to provide professional

18  services at various times to (i) The State of CT, (ii) The

19  States of CT, DE, RI, VT, and WA; and (iii) The States of

20  CT, DE, RI, VT, OR and District of Columbia for Pullman &

21  Comley, LLC.,period: 2/25/2021 to 3/31/2022, fee:

22  $567,858.50, expenses: $1,532.18. filed by Pullman & Comley,

23  LLC. (ECF #4809)

24

25  HEARING re Application for Interim Professional Compensation

Page 11

1    -- Seventh Interim Application of Bielli & Klauder, LLC for

2    Compensation for Services Rendered and Reimbursement of

3    Expenses Incurred as Counsel to the Fee Examiner,

4    David M. Klauder, Esquire, for the Period: 2/1/2022 to

5    4/30/2022, fee:$165,000.00, expenses: $. (ECF#4802)

6

7    HEARING re Motion to File Proof of Claim After Claims Bar

8    Date re: Claim 628988 filed by Jeffrey Karl Driver with

9    hearing to be held on 6/15/2022 at 10:00 AM at

10   Videoconference (ZoomGov) (ECF #4711)

11

12   HEARING re Notice of Hearing Regarding Late Claim Motion

13   [Jeffrey Karl Driver] (related document(s)4711) (ECF #4720)

14   Response to Motion / Debtors' and The Official Committee of

15   Unsecured Creditors' Joint Response to Motions to

16   File Proofs of Claim after Claims Bar Date (related

17   document(s)4711, 4728) filed by James I. McClammy on

18   behalf of Purdue Pharma L.P. (ECF #4886)

19

20   HEARING re Motion to File Proof of Claim After Claims Bar

21   Date re: claim 629003 filed by Douglas C. Gallup with

22   hearing to be held on 6/15/2022 at 10:00 AM at

23   Videoconference (ZoomGov) (ECF #4728)

24

25   HEARING re Notice of Hearing Regarding Late Claim Motion

1   [Douglas C. Gallup] (related document(s)4728) (ECF #4739)

2

3   HEARING re Response to Motion / Debtors' and The Official

4   Committee of Unsecured Creditors' Joint Response to Motions

5   to File Proofs of Claim after Claims Bar Date (related

6   document(s)4711, 4728) filed by James I. McClammy on

7   behalf of Purdue Pharma L.P. (ECF #4886)

8

9   HEARING re Notice of Adjournment of Hearing / Notice of

10  Partial Adjournment of Hearing on Debtors Motion for Entry

11  of an Order Authorizing Implementation of 2022 Key Employee

12  Incentive Plan and 2022 Key Employee Retention

13  Plan (related document(s)4707) (ECF #4795)

14

15  HEARING re Motion to Authorize / Motion of Debtors for Entry

16  of an Order Authorizing Implementation of 2022 Key

17  Employee Incentive Plan and 2022 Key Employee Retention Plan

18  filed by Darren S. Klein on behalf of Purdue

19  Pharma L.P. (ECF #4707)

20

21  HEARING re Statement in response to the Debtors Motion for

22  Entry of an Order Authorizing Implementation of

23  2022 Key Employee Incentive Plan and 2022 Key Employee

24  Retention Plan (related document(s)4707) filed by

25  Paul Kenan Schwartzberg on behalf of United States Trustee.

Page 13

1    (ECF #4742)

2

3    HEARING re Objection to Motion / THE NON-CONSENTING STATES'

4    LIMITED OBJECTION TO MOTION OF DEBTORS FOR ENTRY OF AN ORDER

5    AUTHORIZING IMPLEMENTATION OF 2022 KEY EMPLOYEE

6    INCENTIVE PLAN AND 2022 KEY EMPLOYEE RETENTION PLAN (related

7    document(s)4707) filed by Andrew M. Troop on behalf of Ad

8    Hoc Group of Non-Consenting States. (ECF #4766)

9

10   HEARING re Statement / NOTICE OF FILING OF EXHIBIT 2 TO THE

11   NON-CONSENTING STATES' LIMITED OBJECTION TO MOTION OF

12   DEBTORS FOR ENTRY OF AN ORDER AUTHORIZING IMPLEMENTATION OF

13   2022 KEY EMPLOYEE INCENTIVE PLAN AND 2022 KEY EMPLOYEE

14   RETENTION PLAN (related document(s)4766) filed by Andrew M.

15   Troop on behalf of Ad Hoc Group of Non-Consenting States.

16   (ECF #4768)

17

18   HEARING re Statement / Debtors' Statement in Support of

19   Motion of Debtors for Entry of an Order Authorizing

20   Implementation of 2022 Key Employee Incentive Plan and 2022

21   Key Employee Retention Plan (related document(s)4707) filed

22   by Darren S. Klein on behalf of Purdue Pharma L.P.

23   (ECF #4794)

24

25   HEARING re Reply to Motion / Debtors' Reply in Support of

1    Motion of Debtors for Entry of an Order Authorizing

2    Implementation of 2022 Key Employee Incentive Plan and 2022

3    Key Employee Retention Plan [Additional Related Document

4    4766] (related document(s)4707) filed by Marshall Scott

5    Huebner on behalf of Purdue Pharma L.P. (ECF #4894)

6

7    HEARING re Notice of Agenda / Amended Agenda for June 15,

8    2022 Hearing (related document(s)4901)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

1    A P P E A R A N C E S :

2

3    DAVIS POLK & WARDWELL LLP

4         Attorneys for the Debtors

5         450 Lexington Avenue

6         New York, NY 10017

7

8    BY:  MARSHALL HUEBNER

9         CHRISTOPHER ROBERTSON

10         JACQUELYN KNUDSON

11

12    BIELLI KLAUDER, LLC

13         Attorneys for the Debtors

14         1204 N. King Street

15         Wilmington, DE 19801

16

17    BY:  THOMAS D. BIELLI

18

19    PILLSBURY WINTHROP SHAW PITTMAN LLP

20         Attorneys for Ad Hoc Group Non-Consenting States

21         31 West 52nd Street

22         New York, NY 10019

23

24    BY:  ANDREW M. TROOP

25

1   SPEARS IMES LLP

2        Attorneys for Dr. Craig Landau

3        51 Madison Avenue

4        New York, NY 10010

5

6   BY:  LINDA IMES

7

8   ALSO PRESENT TELEPHONICALLY:

9   JUSTIN R. ALBERTO

10   ROXANA ALEALI

11   ANDREW VINCENT ALFANO

12   RICHARD ARCHER

13   MICHAEL ATKINSON

14   JASMINE BALL

15   BROOKS BARKER

16   KATHRYN BENEDICT

17   DAVID BIELLI

18   DAVID E. BLABEY

19   SARA BRAUNER

20   GABRIEL BRUNSWICK

21   HAYDEN COLEMAN

22   DANIEL CONNOLLY

23   DYLAN CONSLA

24   KEVIN DAVIS

25   ANTHONY DE LEO

Page 17

```
 1   TED A. DILLMAN

 2   EDWARD DRUMMOND

 3   ERICA C. DUCAY

 4   VAN C. DURRER

 5   CHRISTOPHER W. DYSARD

 6   STEPHANIE EBERHARDT

 7   KENNETH H. ECKSTEIN

 8   BRIAN EDMUNDS

 9   JENNIFER FEENEY

10   DOUGLAS CHESTER GALLUP

11   CAROLINE GANGE

12   MAGALI GIDDENS

13   MATTHEW J. GOLD

14   IRVE GOLDMAN

15   SHAWN HANSEN

16   SARAH BARBUCK

17   AUTUMN HIGHSMITH

18   MITCHELL HURLEY

19   ALLISON C. HUXTABLE

20   GREGORY JOSEPH

21   BENJAMIN S. KAMINETZKY

22   MARC KESSELMAN

23   CHRISTIAN KLAWUNDER

24   DARREN S. KLEIN

25   ANNA KORDAS
```

```
 1   IAN S. LANDSBERG

 2   ALEXANDER LEES

 3   MARA LEVENTHAL

 4   JEFFREY LIESEMER

 5   EDAN LISOVICZ

 6   JENNIFER MADDEN

 7   GERARD MCCARTHY

 8   JAMES I. MCCLAMMY

 9   HUGH M. MCDONALD

10   SHANNON M. MCNULTY

11   SHAWN MCNALLY

12   MICHELE MEISES

13   EUNICE MIN

14   MAURA KATHLEEN MONAGHAN

15   JAMES J. NANI

16   GEORGE O'CONNOR

17   MICHAEL PATRICK O'NEIL

18   RACHEL R. OBALDO

19   STEVEN D. POHL

20   KATHERINE PORTER

21   ARIK PREIS

22   RACHAEL RINGER

23   JEFFREY J. ROSEN

24   JAMES SALWEN

25   HEATHER SAYDAH
```

```
 1   PAUL KENAN SCHWARTZBERG

 2   J. CHRISTOPHER SHORE

 3   MARC F. SKAPOF

 4   JOSEPH SORKIN

 5   GEORGE SOUTH

 6   ERIC STODOLA

 7   KAITLYN SUNDT

 8   MARCH JOSEPH TOBAK

 9   ESTHER TOWNES

10   MATTHEW FLINT ULMER

11   GERARD UZZI

12   SHMUEL VASSER

13   ELI J. VONNEGUT

14   THEODORE WELLS

15   CARTER YOUNG

16   JACQUELYN SWANNER

17   LAWRENCE FOGELMAN

18   JACOB HERZ

19   JEFFREY LIESEMER

20   GEORGE O'CONNOR

21   VITALY PINKUSOV

22   ROBIN SPIGEL

23   LEON SZLEZINGER

24   MATTHEW FLINT ULMER

25   TIRZA CARMICHAEL
```

1    WILL CHANDLER

2    MATTHEW FITZSIMMONS

3    TAYLOR HARRISON

4    JEFFREY C. JIRGAL

5    JACQUELINE KINDLER

6    JAMES MCNAMARA

7    KATE SOMERS

8    VINCE SULLIVAN

9    KAREN L. ZDANIS

10    LOWELL W. FINSON

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 21

1          THE COURT:  Okay, good morning.  This is Judge

2    Drain.  We're here in In re Purdue Pharma, L.P., et al.

3          I have the amended agenda for today's hearing and

4    will follow it.  Let me just state that this hearing is

5    being held remotely chiefly by Zoom, unless someone doesn't

6    have access to a screen, in which case, they're appearing by

7    telephone.

8          So again, I'm happy to go down in the order of the

9    amended agenda.

10         MR. HUEBNER:  Good morning, Your Honor.  Marshall

11   Huebner from Davis Polk.  Can you hear me clearly?

12         THE COURT:  Yes.

13         MR. HUEBNER:  Your Honor, today is your final

14   hearing with us after two years and nine months almost to

15   the day on what is the most complex case that I, for one,

16   have ever seen or been involved in in my 29 years of

17   practice.

18         We collectively owe you a tremendous gargantuan

19   debt of gratitude for your extraordinary above and beyond

20   work on this case, including helping keeping all parties

21   focused on the value maximizing (sound glitch) century

22   outcome.

23         We are, of course, all waiting for the Second

24   Circuit and so many hope and, frankly, pray that we will

25   soon be clear to effectuate this remarkable (sound drops),

Page 22

1     including the more than two dozen complex and interconnected

2     intercreditor (sound drops), or at least as (sound glitch)

3     settlements reached among parties with the Sacklers.

4            One final note of both appreciate and awe, and

5     then I will (sound glitch).  While I think that most people

6     on the phone are likely well aware, you have worked (sound

7     glitch) and probably know more in law than pretty much all

8     of us put together.

9            (Sound glitch) worth 6.5 hours literately without

10    even getting up once for any reason to orally compose before

11    (sound glitch) a 159-page bench ruling from the facts and

12    the law and the many binders covering your desk is without

13    any question the most extraordinary juridical accomplishment

14    I have ever seen in my life, or I will ever see in my life.

15           So thank you, most importantly, simply for being

16    you.  The bankruptcy bench will be a poorer place on July 1.

17           As this Court well knows, the massive public good

18    that will come out of these cases takes two primary forms:

19    one is billions of dollars exclusively for abatement and for

20    adult and pediatric (sound drops); the second is the

21    development of what are expected to be life saving medicines

22    through the company's public health initiatives or PHI.

23           Before I turn to the hearing agenda, which happily

24    like many of them have been, is uncontested as we resolved

25    all matters.  I would like to say just a few words about PHI

Page 23

 1    because this is an unusual week for me, which are

 2    initiatives that this Court and so many other parties have

 3    helped further facilitate and effectual.

 4            As a quick reminder, this will not take (sound

 5    drops).  There are three primary PHI endeavors: injectable

 6    (indiscernible) and opioid overdose with a (sound glitch)

 7    medication and having to provide an option to Naloxone; two,

 8    over-the-counter Naloxone, a far lower cost non-prescription

 9    intranasal spray similar to Narcan; and, three, to merit

10    Suboxone, a low-cost version of the leading treatment (sound

11    glitch).

12            Since this case began in September 2019, each

13    medication has achieved many material milestones, and I

14    think that is very important for the Court to understand as

15    it prepares to move on what is already in process (sound

16    drops).

17            With respect to injectable Nalorphine, intended to

18    be an opioid antagonist to reverse overdoses,

19    extraordinarily (sound glitch), hopefully, and longer

20    lasting than where things currently (sound glitch), Purdue

21    envisioned three different dosage points: a vial from which

22    licensed professionals could extract Nalorphine with a

23    syringe, administer it either by injection or I.V.; a

24    prefilled syringe with Nalorphine (sound glitch); and an

25    EpiPen-like auto injector that can be administered in

Page 24

1    emergency by either professionals or family, friends, or

2    even bystanders.

3                Since the petition date, we've made great progress

4    on each dosage point.  With respect to the vial, FDA

5    approval was achieved in February of 2022.  The vial has

6    been introduced to the market and literally this week --

7    this week -- wholesalers will receive their first shipments

8    of injectable Nalorphine, which many people hope will be a

9    game changer in the direct opioid overdoses.

10                The prefilled syringe is likely moving along

11   smartly with great strides and many milestones have been

12   cleared and we anticipate filing for FDA approval by the end

13   of this year.  The auto injector is also on pace and we're

14   looking and hoping for FDA approval by the end of 2023.  And

15   with respect to Nalorphine, we're also working on the unique

16   formulation that will enable even faster absorption of

17   Nalorphine and have completed those studies and milestones

18   (sound drops).

19                Number two, over-the-counter Naloxone, the non-

20   prescription much more easily accessible, hopefully, and

21   lower cost alternative to Narcan.

22                It's important, as this Court knows from several

23   motions of the Debtors have enabled HRT to be poised to file

24   with the FDA it's new drug application by the end of this

25   year, an initiative that is so important that many

Page 25

```
 1    milestones have been cleared as the cause growth ever

 2    allowed from public health experts for a more accessible,

 3    affordable, and widely available version of (sound glitch).

 4              Three, (sound glitch) Suboxone, which is a

 5    combination of morphine and naloxone, (sound glitch) there

 6    has also made very significant strides and assisting with

 7    expanded access to medication assisted treatment for

 8    patients (sound drops).

 9              2020, during the cases, the FDA approved our

10    generic version of Suboxone, and we began providing doses to

11    organizations (sound glitch).  Individuals with opioid use

12    disorder often desperately need Suboxone, but simply cannot

13    afford it or don't have insurance.  And to address this need

14    (sound glitch), the Debtors are and will be providing doses

15    at no cost to qualified organizations to reach such

16    individuals.

17              FDA approval was granted in March 2020, and since

18    then, we have donated more than 10,000 of these tablets to

19    community organizations, and these donations are making a

20    difference.  As one organization wrote, these donations from

21    Purdue, "Help them service more patients in need by

22    eliminating barriers and replacing them with safe,

23    accessible, and quality medically assisted treatment for

24    patients who desperately need it."

25              So please know, Your Honor, as you move on to the
```

Page 26

```
1    next chapter of your professional life, that much good has

2    already been accomplished and much, much more good will be

3    accomplished in the continuing transformation of these

4    entities from what they were and what they are now to what

5    is (sound glitch) they will be post emergence.

6              I imagine we could probably line up almost

7    everyone on this call to thank you for all that you have

8    done for 2 years, 8 months, and 30 days virtually without a

9    pause and assisted by a staff that is a 10th, a 15th, a 20th

10   the size of the staffs that many of us have at our beck and

11   call to deal with the issues of unthinkable complexity.  And

12   I think the world will ultimately, once the Second Circuit

13   hopefully does the right thing, will hopefully be a far

14   better place because of (sound drops).

15             THE COURT:  Okay.  Well, thank you for the report,

16   but please don't line up anyone else.  I do want to thank my

17   staff though.

18             MR. HUEBNER:  Your Honor, moving to the agenda,

19   let me again note the agenda is happily, entirely

20   uncontested, and so we should be able to move through it

21   quickly.

22             First on the agenda are uncontested fee

23   applications.  I believe Mr. Robertson of our firm, having

24   helped worthy as we have in the past, the comments,

25   questions, and concerns are the (sound glitch).
```

Page 27

1              MR. ROBERTSON:  Good morning, Your Honor.  For the

2      record, Christopher Robertson, David Polk Wardwell, on

3      behalf of the Debtors.  Can I be heard clearly?

4              THE COURT:  Yes.

5              MR. ROBERTSON:  The first matter on today's agenda

6      are the eighth interim fee applications.  I'm happy to once

7      again report that resolutions have been reached with the fee

8      examiner on every application.  As we have done for prior

9      interim applications, Davis Polk has prepared a form of

10     order that clearly reflects the agreed reductions and the

11     net amounts to be paid.

12             As was clear, Your Honor, in many cases, the

13     interim applications filed with the Court already reflected

14     voluntary write offs made by the professionals seeking

15     compensation.  The reductions agreed with the fee examiner,

16     which will be reflected in the chart appended to the

17     proposed order, are further adjustments for the amount

18     that's requested in those applications.

19             With respect to process, consistent with past

20     practice in these cases, we would propose to submit a form

21     of order to Your Honor following this hearing for Your

22     Honor's review.

23             I'm happy to address any questions that you may

24     have, and the fee examiner --

25             THE COURT:  Well, let me make sure I understand.

Page 28

```
 1     I've reviewed the interim applications.  We're now just

 2     talking about the Debtors' professionals, and as you state,

 3     they do reflect certain reductions for certain of the

 4     professionals, some of them quite large.

 5             Is what you said, should I take it then to mean

 6     that there have been subsequent reductions after these

 7     documents were filed?

 8             MR. ROBERTSON:  That's exactly right, Your Honor.

 9     So everyone filed their applications on, I believe, May

10     16th.  After those applications were filed, the examiner

11     reviewed all the applications and each professional had

12     discussions with the examiner and agreed in some cases, many

13     cases, to additional reductions from what was filed on the

14     16th.

15             THE COURT:  Okay.  All right.  Do I have the fee

16     examiner's counsel on the line or the fee examiner himself?

17             MR. BIELLI:  Good morning, Your Honor.  This is

18     Thomas Bielli.  Can you hear me clearly?

19             THE COURT:  Yes.  I hear you fine and see you.  So

20     obviously, I appointed a fee examiner in this case given the

21     number of professionals and the size of the fees, and the

22     examiner has been quite diligent during the course of the

23     case in dealing with the professionals.  But for these

24     applications, I don't know what the reductions are.

25             Having seen the examiner's work on prior
```

1    applications, I feel comfortable generally being deferential

2    to him.  But there was one application here that I had a

3    very hard time addressing because of the issue of potential

4    duplication of effort.  It's the type of issue that normally

5    I would have dug into with either extensive questioning of

6    the parties or asking the parties to go back and focus on

7    them and the like, and that was the Lathan & Watkins

8    application.  I mean, the Debtors are well represented by

9    primary bankruptcy counsel.

10            My understanding, and maybe this is flawed, is

11   that the Debtors' counsel, having handled the confirmation

12   hearing and the appeal to the District Court, also handled

13   the appeal to the Second Circuit.  I did approve Latham's

14   retention.  I wasn't quite sure exactly what Latham would be

15   doing in connection with the appeal, but the issue is

16   obvious of a potential duplication of effort there.

17            So, Mr. Bielli, is that something that the

18   examiner looked at closely?

19            MR. BIELLI:  It is, Your Honor.  Fee examiner

20   reviewed by the Latham and the Debtors' professional, Davis

21   Polk, fee applications.  Noted, besides the duplication of

22   efforts, other issues beyond the voluntary reductions, and

23   then had separate conference calls with the professionals

24   from Latham Watkins and Davis Polk and addressed those

25   issues with them.

1          We were -- during those conference calls, we were

2     able to -- the fee examiner was satisfied about the lack of

3     duplication of efforts between those professionals given the

4     voluntary reductions and the additional reductions raised in

5     his report that were accepted by those professionals.

6          THE COURT:  Okay.  So can you just summarize for

7     me how the two firms worked together to minimize

8     duplication?  Was it -- I mean, were they given separate

9     sections of the brief, for example?  I just -- that would be

10    helpful to me because I can't really get that from the time

11    records.

12         MR. BIELLI:  Your Honor, I believe we have

13    representatives from Davis Polk and Lathan Watkins that

14    might be able to address that in a little more detail than I

15    can.

16         THE COURT:  Okay.  But if you could just give me

17    your, you know, general impression and then I can hear from

18    them.

19         MR. BIELLI:  Sure.  Your Honor, we went through

20    the professionals that billed their time in the Latham

21    Watkins fee application in particular, and the advocates

22    that they used with their experience between -- before the

23    Circuit Courts and the Supreme Courts seem to be, quite

24    frankly, unmatched.  And we did go through the time entries

25    that Latham Watkins submitted, as well as those from Davis

Page 31

1    Polk, and we were able to see who did what when.  And again,

2    we had separate conversations with those professionals that

3    resulted in the fee examiner's approval after the agreed

4    reduction.

5              THE COURT:  Okay.  All right.  Can you tell me

6    what those --

7              MR. HUEBNER:  Your Honor, I'm happy --

8              THE COURT:  I'm sorry, Mr. Huebner.  Mr. Bielli,

9    can you tell me what those additional reductions were?

10             MR. BIELLI:  Yes, I can, Your Honor.  For Davis

11   Polk, the additional reductions were $50,000, and for Latham

12   Watkins, the additional reductions were approximately

13   $5,000.

14             THE COURT:  Okay.  And that's on top of the

15   roughly $245,000 from Davis Polk.

16             MR. BIELLI:  That's correct, Your Honor.

17             THE COURT:  And the Latham & Watkins discount.

18             MR. BIELLI:  That's correct, Your Honor.  That's

19   correct.

20             THE COURT:  Okay.

21             MR. BIELLI:  The Latham Watkins discount was

22   approximately -- it was a little bit under $70,000, and

23   again, Your Honor had it with respect to the Davis Polk

24   voluntary discount.

25             THE COURT:  Right, okay.  So, Mr. Huebner, you

Page 32

1      were going to say something?

2              MR. HUEBNER:  Yeah.  Your Honor, so I guess here's

3      part of the way to think about it.  Number one is we were

4      preparing for the Second Circuit argument.  You know, one of

5      the issues that we were facing was that in addition to the

6      original set of proponents, there were actually multiple

7      amicus briefs filed by different groups of professors, for

8      example, you know, raising all sorts of Constitutional

9      theories and, you know, going back to the sort of founding

10     of our nation and the like.

11              Greg Garre of Latham & Watkins, who is the primary

12     team leader on board, is a former Solicitor General of the

13     United States, and I believe has argued (sound glitch) cases

14     in front of the Supreme Court.  And given that we had, I

15     don't know, $10 billion or so on the line -- and this is,

16     hopefully, the last stop -- for finally being able to begin

17     the lifesaving work in (indiscernible), it was the clients'

18     view that bringing them on board with that very specific

19     appellant expertise to supplement our, candidly, our Polk

20     extraordinary team was the right balance.

21              We did actually have sort of separate lanes and

22     clearly, we all worked on the brief.  There were prep

23     sessions for oral argument where there are, you know,

24     particular expertise in appellant issues.  I think it was

25     certainly helpful to me as the person at the podium at the

Page 33

1    Second Circuit oral argument.  We also did divide up these

2    (sound glitch) issues and, of course, to do so at the time

3    (sound glitch) may not always, you know, say exactly what

4    sub-issues someone was researching, but we approached things

5    in what I call the pods method.

6           And so, we sort of laid out all the pods that

7    needed to be researched, which tear sheets and arguments and

8    properly getting me sort of fully up to speed had to be

9    prepared and there were no pods that we don't prepare.  You

10   know, they took sort of the pod, you know, 7, 9, 11, 13, 15,

11   17, 18, 21, and sort of we took the rest and so, there were

12   definitely meetings we attended, there were things we did

13   together.

14          But given, frankly, that there are many billions

15   at stake, that was the clients' view that, you know, the

16   extra set of experience (indiscernible) to help (sound

17   glitch) -- to help supplement the Davis Polk team was the

18   appropriate way to do it.  And there was some additional

19   expense, but obviously, you know, the matters are incredibly

20   (sound drops).

21          THE COURT:  Okay.  All right, thank you.  All

22   right.  Again, as I said, I appointed a fee examiner in this

23   case given the number of professionals and the amount of

24   professional work to be done.  That level of review is

25   difficult for a court to do in the detail that I would

Page 34

1    normally do for a smaller case.

2           I'm obviously familiar with this case having lived

3    it for a couple of years, but there are -- to used an

4    overworked phrase -- workstreams in it that really benefit

5    from an inquiry by a fee examiner at a much more detailed

6    basis than simply reading time records.

7           Based on what I've heard and subject to my

8    reviewing the order that reflects all of the examiner's

9    input, I will grant the applications in the amounts sought.

10   Again, I've reviewed the time records and the applications,

11   and my main focus was on the application that we've just

12   discussed.  But I'm satisfied based on what I've heard that

13   it should be granted in the reduced amount, as well as the

14   reductions -- related reductions on the Davis Polk

15   application.

16          MR. ROBERTSON:  Thank you, Your Honor.  We will

17   submit the form of order after the hearing.

18          THE COURT:  Okay.  Then I think the next fee

19   applications are by the official creditors committee in

20   respect to its professionals.

21          MR. ROBERTSON:  I believe that's correct, Your

22   Honor.  I think the way the form of order -- the recitation

23   is the same.  The form of order will reflect the fees

24   requested by the Debtors' professionals, including

25   professionals, the ad hoc committee's professionals and the

Page 35

```
1     nine various term sheets and settlements and motions (sound

2     drops).

3              THE COURT:  Okay.  And so, the same fact pattern

4     applies to these that applied to the Debtors' professionals.

5     The order will reflect, at least as to some firms, further

6     agreed reductions beyond those that had already been

7     voluntarily made as part of the applications?

8              MR. ROBERTSON:  That's exactly right, Your Honor.

9              THE COURT:  Okay.  All right.  Well, I have

10    reviewed these applications as well.  They cover obviously a

11    very busy period in this case involving confirmation

12    mediations that went around the clock and appellate

13    litigation.

14             So, again, based on my review of the applications

15    and my understanding as to the fairness of the fee

16    examiner's review, I will grant them in the amounts

17    ultimately sought.

18             So there'll be one aggregate order then with

19    Schedules A and B?

20             MR. ROBERTSON:  That's correct, Your Honor.

21             THE COURT:  Okay, very well.  All right.  Does

22    anyone have anything further to say on the fee applications?

23    Okay.

24             So I think the next matters on the calendar are

25    two motions by incarcerated claimants to have their claims,
```

Page 36

1    which were filed late, deemed timely filed.

2              MS. KNUDSON:  Good morning, Your Honor.  For the

3    record, Jacquelyn Knudson of Davis Polk & Wardwell on behalf

4    of the Debtors.  Can I be heard clearly?

5              THE COURT:  Yes, I can hear you fine.

6              MS. KNUDSON:  So as you stated, Your Honor, the

7    next two items on the agenda are the uncontested late claim

8    motions, which I plan to address together as I don't believe

9    either of the movants are on Zoom today.

10             Mr. Driver's motion is a Docket No. 4711 and Mr.

11   Gallup's motion is at Docket No. 4728.

12             As set forth in our joint response with the

13   creditors' committee, we are guided by the Court's remarks

14   last month regarding the planning of late claim motions as

15   we approach two years since the July 30, 2020 bar date.

16             However, based on the assertions in the motions

17   regarding the movants' incarcerations, which were confirmed

18   by the creditors' committee's diligence, lack of access to

19   information and resources and USPS delays, coupled with the

20   fact that with respect to the timing of the filing of the

21   motions and the underlying proofs of claim, Mr. Driver and

22   Mr. Gallup are similarly situated to prior late claim

23   movants who had their motions heard and granted at the May

24   omnibus.

25             The Debtors believe that there is a colorable

Page 37

1    basis for granting the requested extensions under the

2    Pioneer factors.  Importantly here, no future late claim

3    movants will be able to rely on the similarities that these

4    movants can with respect to the timing of the filing of both

5    their proofs of claim and their motions.  So for this

6    reason, the Debtors do not believe that allowing these two

7    late claims as timely will open the floodgates to additional

8    late claim motions.

9            As we've done in the past, we consulted with the

10   creditors' committee and the ad hoc group of individual

11   victims, both of which have consented to or otherwise do not

12   oppose the relief requested in the motions.

13           So, accordingly, the Debtors would request that

14   the proposed order submitted at Docket No. 4886, which is

15   consistent with prior orders for late claim motions, be

16   entered.  I'm happy to answer any questions Your Honor may

17   have.

18           THE COURT:  Let me just confirm.  You said that

19   the committee had performed due diligence as to the facts

20   asserted in these motions that the individuals were, in

21   fact, incarcerated when they said they were, one in 2010 and

22   one in early 2019, and that's the primary issue that I had.

23   They did some due diligence on that?

24           MS. KNUDSON:  That's correct, Your Honor.  Based

25   on the creditors' committee's outreach to the Washington

Page 38

1   State Penitentiary, which they also did for the May claims,

2   they were able to confirm that both of the movants were

3   incarcerated for the full bar date period.

4           THE COURT:  Okay.  All right.  I agree with the

5   Debtors and committees and the ad hoc personal injury

6   committees' conclusion that these claims should be permitted

7   to be treated as timely filed under Rule 9006, given the

8   facts laid out in the motions.  That is because, as I just

9   mentioned, each movant was incarcerated during the period

10  leading up to the bar date.  In fact, one of them appears

11  not only to have been incarcerated for a lengthy period

12  before then, but to have had his access to the public

13  severely curtailed.

14          They also filed their claims quite a while ago in

15  2020, which I think also would distinguish them from someone

16  who would think that a late claim could be treated as timely

17  filed if they sought to file such a claim now and sought

18  such relief.

19          So I will enter the order granting each of these

20  motions.  You can submit that to chambers.

21          MS. KNUDSON:  Thank you, Your Honor.  I will do

22  so.  I'll now turn the podium over to my colleague, Mr.

23  Huebner, for the next agenda item.

24          THE COURT:  Okay, very well.

25          MR. HUEBNER:  I'm back.  So, Your Honor, this

Page 39

1    brings us to our last agenda item, and I guess probably my

2    last agenda item that's before you as the judge, at least

3    (sound glitch).

4         Your Honor, we filed a revised proposed order last

5    night (sound glitch) with one objector to the one remaining

6    (sound glitch) these entire (sound glitch) 2022 (sound

7    glitch) that have now been resolved.

8         I would note, Your Honor, while I don't think we

9    need any more evidence because the evidence was never

10   challenged, just as a point of information for the Court and

11   for (sound glitch) benefit, declarations filed with the

12   motion papers reflect that with KEIP as recently structured

13   by Dr. Landau, the CEO, was 14 percent below median comp.

14        One of the concessions as I'm sure Your Honor saw

15   in the draft order is that $500,000 further reduction in the

16   2022 incentive plan for compensation, we were advised by

17   (indiscernible) that that would actually bring

18   (indiscernible) 22 percent below median comp obviously as

19   the numbers are down (sound glitch) negative variation

20   (sound glitch).

21        And I also would not want the Court to draw any

22   negative inferences to the terms on the Debtors' side with

23   respect to the fact that (indiscernible) reached out.

24   Contrary, I think it's excellent that settlement was

25   reached, and the board of directors is absolutely had

Page 40

1    confidence that Dr. Landau is the (sound glitch) leader for

2    the (sound glitch).

3             THE COURT:  You're cutting in and out, Mr.

4    Huebner.  I don't know if -- I missed the last sentence.

5             MR. HUEBNER:  Oh, I'm sorry, Your Honor.  I'm not

6    sure why.

7             I was just noting that we did, of course, as part

8    of working out these issues had the board of directors

9    involved and they reconfirmed to us and asked us to make the

10   Court understands that the board of directors at this

11   company, which, of course, is a majority of new directors,

12   does believe that Dr. Landau is the right leader for the

13   company at the present time.

14            So with that, Your Honor, I don't think I need to

15   belabor the record.  We're very delighted that the issues

16   were resolved, and we hope the order is ready for entry.

17            THE COURT:  Okay.  Well, let me make sure we have

18   that on the record, the resolution of the objection, and I

19   see Mr. Troop there, who represents the objecting states.  I

20   received, I guess overnight, the notice of revised proposed

21   order on Dr. Landau, the CEO, which was the only remaining

22   issue in connection with this motion, and it was blacklined

23   against the new form of the prior order submitted.

24            That prior order reflected the Debtors' agreements

25   that were memorialized in the statement that they had filed

Page 41

1    before the last hearing on this motion, and in addition,

2    included the following: that the aggregate payments under

3    the 2022 KEIP are capped, which reflects a $500,000

4    reduction from the maximum amount that could be earned under

5    the KEIP; that, secondly, the CEO irrevocably waives any

6    exigent rights to severance in connection with any

7    separation of the CEO from the company.

8         I'm not sure the company is defined.  I think it

9    probably should be the Debtors, but maybe there was a reason

10   why it was defined as the company.

11        And there's a parenthetical which states that such

12   severance under the company's generally applicable severance

13   plan currently would equate to $2.870,100 million, so

14   $2,870,100, and that Dr. Landau will on the effective date

15   of any Chapter 11 plan tender an undated notice of

16   retirement, which the board may accept or not as they see

17   fit, provided that any retirement under that notice will be

18   a termination without cause as of the date that it is

19   effectuated for purposes of the 2022 KEIP and all prior

20   incentive compensation and similar programs.

21        And then it says, and provided further for the

22   avoidance of doubt, that nothing in this paragraph shall

23   limit any other rights of the company or Dr. Landau with

24   respect to retirement, resignation, or termination.

25        So if can parse through this.  Is there -- the

Page 42

1    KEIP is an incentive plan.  It has various metrics.  Is the

2    $500,000 just an aggregate reduction?  That was my first

3    question.  Or is it front-end loaded, is it back-end loaded?

4             MR. HUEBNER:  Your Honor, it's sort of neither.  I

5    mean, the KEIP fundamentally has two components, and we'll

6    work out the details of it.  I think the main point is that

7    $500,000 was sort of taken off the top.  You know, I think

8    that there's an annual incentive component.  There's also a

9    (indiscernible) component.  The (sound glitch) should not

10   even make a timing difference of where you take it from, but

11   that was I think the (sound glitch) people did not get into

12   the weeds of exactly which parts were exactly which amount.

13            THE COURT:  Okay.  And then my second question is,

14   is there a reason why it's phrased as company as opposed to

15   Debtors?

16            MR. HUEBNER:  Your Honor, I don't believe Dr.

17   Landau was actually employed by all 23 Debtors, and I don't

18   think the severance plan exists.  Some of them are not

19   operating companies.  I'm happy to represent to you that

20   that means, to the extent there is anything from any of the

21   Debtors, but we think the company has to do with just the

22   main operating entity.   There are other operating entities

23   like (indiscernible), non-operating entities like the

24   governance (sound glitch).  This covers the waterfront.

25   There will no severance paid by any other Debtors.  I'm not

Page 43

1   sure which of them would be technically accurate, but we can

2   all be comfortable (sound glitch).

3           THE COURT:  Okay.  And as based on the

4   parenthetical as to what the amount of that severance would

5   currently be, the severance exceeds the KEIP amount by a

6   material amount as I read it.

7           MR. HUEBNER:  Yes, it definitely does, Your Honor.

8           THE COURT:  And that's the severance that he's

9   waiving.  And then the last point I want to make sure I

10  understand -- I think I do from the record of the prior

11  hearings on prior motions for approval of the 2020 and 2021

12  KEIP for the CEO.

13          Those had a retentive element to them in the sense

14  that payments were paid out over time, and as I recall,

15  there were some payments under the 2021 that were going to

16  be paid out as late as 2024.  But if one is terminated --

17  even though he's noticing his retirement, that's deemed

18  determination without cause, so those continue, the ones

19  that have been --

20          MR. HUEBNER:  You know --

21          THE COURT:  -- if I understand it right.

22          MR. HUEBNER:  Yeah, so mostly.  Let me say in a

23  (indiscernible).  First of all, I think that if you were

24  sort of summarizing it, it's very important to note that

25  that undated notice gets delivered on the effective date and

1    not before.  So this is to deal with the new board, which

2    Franky for everyone, will survey the situation and decide,

3    you know, who they would like to work with and for how long,

4    as is the case invariable when any Chapter 11 ends.

5         What happens in the event of a termination without

6    cause, which is what this step way and whether or not it

7    comes post-emergence would entail -- what it does for most

8    of the board, it actually accelerates the amounts that have

9    not yet been paid because obviously the point was to be

10   retentive.  But if a board says, you know, thank you so much

11   for your years of service but we've decided to make a

12   different choice, there's no retentive aspect anymore.

13        And so, contained within each of the programs that

14   the Court has approved was an exquisitely carefully

15   negotiated set of dates and timelines and clawbacks and when

16   things are lost and when things accelerate.  And so, in

17   essence, if Dr. Landau or any employee, you know, ultimately

18   part ways with the company at the request of the new board,

19   other than for cause, as would be entirely typical in any

20   corporate setting, any amounts due under prior annual plans

21   -- in most companies, they would have already been paid.

22        Here, we added a retentive element, but they are

23   accelerated and get paid and that was expressly discussed

24   among the parties and that's not a surprise to anybody.

25   That was absolutely understood to be the economic

Page 45

1    arrangement (sound drops).

2            THE COURT:  Okay.  And then the last question I

3    have, and again, I think I know the answer to this, but this

4    Paragraph 2 ends by saying, "For the avoidance of doubt,

5    nothing in this paragraph shall limit any other rights of

6    the company or Dr. Landau with respect to retirement,

7    resignation, or termination."

8            And that includes the rights under Paragraph 8 of

9    this order, I'm assuming, which is the paragraph that has

10   been in these orders for prior motions, which states that

11   under various scenarios relating to wrongdoing if those are

12   established in the future, the CEO shall not be eligible to

13   receive any payments approved by this order and all rights

14   of any to seek disgorgement of payments following the entry

15   of any final order referred to in the first clause are

16   reserved.

17           And then the CEO shall not take any action with

18   respect to the compensation under the 2022 KEIP with the

19   intent or material affect of frustrating enforcement of such

20   a judgment.  So that's part of the reservation of rights,

21   right?

22           MR. HUEBNER:  Yeah.  I mean, there's no question,

23   Your Honor, obviously with permissions of this Court's

24   orders, both prior and current, will, of course, govern

25   (sound drops).  That (indiscernible) notes for a much more

Page 46

1    quotidian purpose, which is if, for example, they're saying

2    we want you to stay for three more years and he says,

3    actually, that doesn't really work for me, that he's not

4    barred from retiring earlier.  You know, in other words, the

5    13th Amendment is still in full force and effect as far as I

6    know.

7            And so, this just means if this is the pathway

8    that the parties choose, they have the ending of notice, and

9    if that's how they work out, you know, potential future

10   separation, great.  But obviously, there are other ways of,

11   you know, that some unthinkable new job offer in a year and

12   a half and decides to leave before they've asked him to,

13   he's, of course, allowed to do that.

14           So it's actually a pretty uninteresting

15   parenthetical, but the to the Court's specific question,

16   yes, it goes utterly without saying.

17           I would note in that regard, Your Honor, that

18   there's a pretty important sentence.  It might be at the end

19   of Paragraph 4 -- I could be misremembering -- the cite

20   where I said the UCC is filing as the party that (sound

21   glitch).  They did note in their filing to this Court that

22   they know of no evidence that suggests (sound glitch) that

23   that standard was triggered, was implicated for that

24   (indiscernible), which I think is important and, as you

25   know, the Court has asked questions like that over time, so

1      I invite that.

2                This I think is an excellent resolution from many

3      perspectives from many parties and that's the issue that,

4      hopefully, done forever.

5                THE COURT:  Okay, all right.  Mr. Troop, do you

6      have anything to say on the resolution of this motion?

7                MR. TROOP:  Other than Mr. Huebner stole my line

8      about being back, and I've had to look to quotidian after an

9      earlier hearing, so I'm perfectly up to speed on what he's

10     saying.

11               Your Honor, the colloquy and summary of the

12     resolution is accurate.  I want no one to think that this

13     was an easily achieved resolution or that it actually covers

14     all of the issues that the non-consenting states have.  But

15     under the circumstances, Your Honor, it's something that

16     we've agreed to, and we would ask you to enforce the revised

17     proposed order.

18               I think Ms. Imes is on the line, Your Honor, and

19     my only -- not request of her is since given timing and

20     other things, we didn't do this by way of tripartite

21     stipulation, that Ms. Imes confirm for the Court and for the

22     record that the agreements set forth in the proposed order,

23     particularly with respect to waiver of severance and

24     otherwise that, in fact, reflect our clients that agreement.

25               THE COURT:  Okay, very well.  Thank you.  So I did

1    review the filing by Dr. Landau's counsel, Spears & Imes,

2    from the 13th, and I see Ms. Imes on the screen.  Is the

3    resolution of this motion as set forth in the proposed order

4    and on the record today, is that agreed by Dr. Landau?

5            MS. IMES:  It is, Your Honor.  And I would just

6    like to add to my representation that, you know, what

7    matters most to Dr. Landau is helping the company on the

8    work at hand.

9            In prior years, he's made a number of compromises

10   relating to his compensation as a sign both of his good

11   faith and his firm commitment to doing what's necessary to

12   advance these proceedings, including resolving disputes when

13   possible.  And these compromises, including the one on this

14   motion, are yet more evidence of his principle leadership,

15   and the provisions of this amended order are just a piece of

16   those prior compromises.

17           I think you know from our letter, Your Honor, that

18   we couldn't more strongly disagree with the things, the wild

19   caricature of Dr. Landau by the non-consenting state group

20   that they advanced in support of their argument that Dr.

21   Landau should no longer be CEO.  But, as Mr. Huebner has

22   said, the board of Purdue has total confidence that Dr.

23   Landau is the right leader for the company.

24           And with that said, in addition to everything else

25   I said in my letter which I said in order to set the record

Page 49

1    straight, we do agree.

2              THE COURT:  Okay.

3              MS. IMES:  Thank you.

4              THE COURT:  Does anyone else have anything to say

5    on this portion of the motion, which is the only portion

6    that is still open.  All right.

7              MR. HUEBNER:  Your Honor, one last thing from my

8    end.  I wouldn't want to go off with your final hearing

9    thinking that there was a picadillo.  The company is

10   actually a defined term in the motion, which is incorporated

11   by reference by the footnote of the order, that actually

12   includes all the Debtors.  So, in fact, the term -- the fact

13   is correct and works perfectly and covers all the Debtors,

14   so you didn't need my representations (sound drops).

15             THE COURT:  All right.  Well, I'm going to ask you

16   to define it in the order so that some court in the future,

17   if there's any need to, won't have to go back to the motion.

18   I think that's worthwhile.

19             MR. HUEBNER:  Sure.  We'll just change it to the

20   Debtors.

21             THE COURT:  Well, no.  You can take the same

22   definition from the motion and just put it in the order.

23             MR. HUEBNER:  Perfect.  We will do that.

24             THE COURT:  Okay.  The Debtors filed a motion for

25   entry of an order authorizing implementation of the 2020 key

1   employee incentive plan, as well as the 2022 key employee

2   retention plan for non-insider employees in April of this

3   year, on April 27, 2022.

4          Congress specifically dealt with such types of

5   compensation in Section 503(c)(1) and (c)(3) of the

6   Bankruptcy Code, severely limiting and, in fact, probably

7   making impossible, primarily retentive compensation programs

8   for insiders, but leaving open the ability of a debtor under

9   all the facts and circumstances to compensate insider

10  employees for or in a way that's primarily non-retentive,

11  which courts have construed as meaning the types of

12  compensation plans that are focused on incentivizing an

13  insider to meet certain goals that exceed the ordinary goals

14  of the job and are reasonably difficult to achieve when the

15  Court reviews that latter type of compensation program.

16         Therefore, it needs to make a determination that

17  the program is the proper exercise of business judgment,

18  specifically in the context of compensation as opposed to

19  other business decisions.  The standard for that type of

20  review, which is in the broadest sense a review under

21  Section 363(b) of the Bankruptcy Code, was established long

22  ago by Judge Lifland in In re Dana Corp., 358 B.R. 567

23  (Bank. S.D.N.Y. 2006) that has been followed by the Court

24  since then, including in In re Velo Holdings, Inc., 472 B.R.

25  201 (Bank. S.D.N.Y. 2012) and In re Borders Group, Inc., 453

1   B.R. 459 (Bank. S.D.N.Y. 2011).

2          I have, for this motion as I had for prior

3   motions, a declaration by Ms. Gartrell of the Debtors'

4   compensation personnel consultant, a seating director Willis

5   Towers Watson, describing the market compensation for senior

6   executives like the Debtors' CEO, Dr. Landau, as well as a

7   declaration by Mr. Ronan, which focuses more on the types of

8   or the elements of the incentive goals set by the board and

9   how they relate to the work that would be expected of the

10  CEO.

11         The record is clear and, in fact, undisputed that

12  even at the maximum payout under the key employee incentive

13  plan as ultimately agreed by Dr. Landau, he is not being

14  paid at the median or above the median of his peers at other

15  companies in the pharmaceutical industry.  Even before his

16  additional concession, which was laid out on the record

17  today, he was -- if he met all of the target and the 2022

18  KEIP, going to be compensated based on full compensation

19  comparable data at 14 percent under the median for his peers

20  at other pharmaceutical companies.

21         With this concession, it's been represented to me,

22  and I have no reason to doubt it, that he will be

23  compensated, again if he meets all the targets, at 22

24  percent below the median for similar executives at similar

25  companies.

Page 52

1              It is hard, therefore, to see this element of his

2      compensation, which, again, if he fully performs, would get

3      into that point as being a bonus, as opposed to an element

4      of his compensation that is more nuanced than a straight

5      salary in that he has to meet targets to achieve it, but

6      that would, when combined with his salary, put him

7      materially below market.

8              But that is not or was not the basis for the

9      objection to the motion that was filed by the non-consenting

10     state group.  The basis for their objection was a more

11     fundamental basis, which is their belief that Dr. Landau was

12     or is not the right person to be leading the Debtors as

13     their CEO.

14             The Court has dealt with now four of these

15     motions, given the timing of the Debtors' filing, which was

16     in essence in the middle of an employment year.  The non-

17     consenting states group made a similar argument with regard

18     to the 2019 KEIP for Dr. Landau, and last did so for the

19     KEIP for 2021.

20             I denied both of those objections because there

21     really was not sufficient evidence to support the argument.

22     Indeed, the last objection was after considerable, in fact,

23     unprecedently comprehensive discovery in the form of a

24     documented deposition discovery in these cases, as well as

25     the DOJ investigation that resulted in the stipulations by

Page 53

1    the Debtors.  Nevertheless, it was four pages long and was

2    not pressed in a full evidentiary hearing.

3              Nevertheless, the issues raised by the non-

4    consenting states group were serious, as I noted in my oral

5    ruling on September 13, 2021.  But as with any attack on a

6    person's leadership premised upon their character, it

7    requires more than simply making allegations for a court to

8    take action in response, and, therefore, I denied the

9    objection then.

10             Starting back in 2019, however, in light of

11   perfectly justifiable concerns given the evidence as to

12   Purdue's overall corporate culture, my orders granting these

13   motions have had, as I quoted earlier today, an important

14   paragraph that ensures that if any recipient of a KEIP or

15   KEIP payment is determined by a final order of this court or

16   any other court of competent jurisdiction to have knowingly

17   participated in any criminal misconduct in connection with

18   his employment with the Debtors or been aware, other than

19   from public sources, of acts or omissions of others that the

20   CEO knew at the time were fraudulent or criminal with

21   respect to the company's commercial practices in connection

22   with the sale of opioids and failed to report such

23   fraudulent or criminal acts or omissions internally at the

24   company or through law enforcement authorities at any time

25   during his employment with the company or believed by the

Page 54

1    company based on reasonable inquiry, including inquiry of

2    its attorneys and advisors, to have met either of the

3    standards -- kind of just recite it -- that in either case,

4    the employee shall not be eligible to receive any payments

5    approved by this order.

6         In addition, the order has consistently reserved

7    all parties' rights to seek disgorgement of payments

8    following the entry of a final order referred to under the

9    circumstances that I've described above.  And clearly given

10   the scrutiny under which at least the most senior people at

11   Purdue have been placed, one would assume that if there is a

12   record of that misconduct, it would either have come to

13   light or will come to light soon.

14        So until the parties were able to resolve the non-

15   consenting state's objection yesterday, I was fully prepared

16   for an evidentiary hearing since that is clearly what the

17   parties would have been entitled to on the issues raised by

18   the objection.  I will note that the objection mostly

19   referred and quoted from Complaints, that is legal

20   Complaints filed, which really are not evidence.  But

21   whether there is other evidence or not, I was prepared to

22   hear it.

23        However, the parties have resolved the objection

24   as set forth on the record, which includes, importantly, not

25   only a substantial additional reduction agreed to by the CEO

1    of his compensation by $500,000, but also his waiver of his

2    severance rights, which as currently calculated, actually

3    would exceed the amount under the maximum achievement, under

4    the metrics of the KEIP, Dr. Landau would be entitled to.

5    In essence, therefore, he's waiving severance in a

6    materially greater amount than the amount that this motion

7    as settled would enable him to recover if he achieves the

8    metrics under the KEIP.

9            That is, in my mind, a clearly reasonable

10   settlement of these issues.  The settlement still preserves

11   the language that I've quoted from the order, and it will

12   give the board of Purdue, upon the effective date of the

13   plan and thereafter, the option of deciding to retain Dr.

14   Landau or not, knowing that if they decided not to retain

15   him, the company would not owe him severance.

16           I believe it is appropriate, as I noted in the

17   September 2021 ruling, that these issues be dealt with in a

18   timely basis during the case.  They come up every year in

19   the first quarter of the year when the company, as most

20   companies do for their senior executives, set the targets

21   for them for the non-straight salary portion of their

22   compensation.

23           It is, of course, quite possible that these

24   Debtors may emerge from bankruptcy and have their plan go

25   effective later this summer, but I don't believe it would be

Page 56

1    appropriate to wait until then to alter the normal

2    compensation pattern for a corporation which, under

3    Congress's debtor-in-possession model, operates during the

4    bankruptcy case with corporate governance by the board but

5    review by the Court on notice to parties-in-interest.

6            The board, of course, after the effective date of

7    the plan will not be subject to Court review, but its

8    decisions during the case are and one should not delay a

9    determination to prevent that review until after the

10   effective date of a plan.

11           So knowing all of that, I think the parties acted

12   responsibly and reasonably in resolving this dispute in the

13   way that they did.  And in light of that and the lack of any

14   other objection and the evidence before me, which again is

15   uncontroverted, I will grant the motion as revised.

16           So I'll ask the Debtors' counsel to email chambers

17   the slightly revised order to reflect that ruling, slightly

18   revised from the blacklined order that I got this morning as

19   we discussed on the record.

20           So I think that concludes today's agenda.  There's

21   nothing else?

22           MR. HUEBNER:  It does, Your Honor.  We wish you

23   the very, very, very best of luck in all your future

24   endeavors, and thank you once again.

25           THE COURT:  Okay.  Well, I wish all of you the

Page 57

1    same.   One cannot predict what will happen with this case.

2    One can predict, however, that this very talented group of

3    professionals will continue to do the very best that they

4    can to make the outcome of the case as meaningful in

5    addressing the public health crisis occasioned by, in part,

6    these Debtors' products, so I want to thank you all for that

7    work.

8               MR. HUEBNER:  You too, Your Honor.

9               (Whereupon these proceedings were concluded at

10   11:12 AM)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 58

1                          **I N D E X**

2

3                              RULINGS

4                                              Page        Line

5

6    KEIP Motion Granted                       56          15

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 59

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6    *[signature: Sonya M. Ledanski Hyde]*

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  June 16, 2022