DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
James I. McClammy
Eli J. Vonnegut
Christopher S. Robertson

*Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **PURDUE PHARMA L.P.**, *et al.*, | **Case No. 19-23649 (SHL)** |
| **Debtors.**[1] | **(Jointly Administered)** |

**DEBTORS' OBJECTION TO THE MOTION OF ASCENT
PHARMACEUTICALS, INC. FOR LEAVE TO FILE LATE PROOFS OF CLAIM**

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717), and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

# TABLE OF CONTENTS

PAGE

PRELIMINARY STATEMENT ................................................................................1

BACKGROUND ....................................................................................................4

    I.     The Agreements ...................................................................................4

          A.     The Distribution and Supply Agreement ....................................4

          B.     The Patent License Agreement ..................................................5

    II.    Notice of the Commencement of the Chapter 11 Cases and the Bar Date .............6

    III.   Ascent's Adversary Proceeding and Late Claim Motion .......................................7

ARGUMENT ........................................................................................................7

    I.     Ascent Has Failed to Meet the Standard for Excusable Neglect ............................7

          A.     Ascent Had Actual Notice of the Bar Date and the Need to File
Proofs of Claim .........................................................................9

          B.     Filing A Timely Proof of Claim Was Within Ascent's Reasonable
Control and Its Reasons for Delay Fall Well Short of Being
"Excusable"................................................................................12

          C.     The Length of the Delay Is Substantial and Will Negatively Impact
These Proceedings .....................................................................15

          D.     Allowing Ascent's Late Claims Would Prejudice the Debtors and
Have An Adverse Effect on the Administration of These Chapter
11 Cases ....................................................................................16

CONCLUSION.....................................................................................................19

# TABLE OF AUTHORITIES

### C<span style="font-variant:small-caps">ASE</span>(<span style="font-variant:small-caps">S</span>)

P<span style="font-variant:small-caps">AGE</span>(<span style="font-variant:small-caps">S</span>)

*Conway Hosp., Inc. v. Lehman Bros. Holdings, Inc.*,
  531 B.R. 339 (S.D.N.Y. 2015) ...................................................................................10

*In re Dana Corp.*,
  No. 06-10354, 2008 WL 2885901 (Bankr. S.D.N.Y. 2008) ....................................16

*In re DPH Holdings, Inc.*,
  434 B.R. 77 (S.D.N.Y. 2010) .....................................................................................8

*DPWN Holdings, Inc. v. United Air Lines, Inc.*,
  246 F. Supp. 3d 680 (E.D.N.Y. 2017) .......................................................................15

*In re Eagle Bus Mfg., Inc.*,
  62 F.3d 730 (5th Cir. 1995) ........................................................................................15

*In re Enron Corp.*,
  419 F.3d 115 (2d Cir. 2005) ...............................................................................*passim*

*In re Enron Creditors Recovery Corp.*,
  370 B.R. 90 (Bankr. S.D.N.Y. 2007) .........................................................................16

*In re H.K. Porter Co.*,
  156 B.R. 16 (Bankr. W.D. Pa. 1993) .........................................................................15

*In re Houbigant, Inc.*,
  188 B.R. 347 (Bankr. S.D.N.Y. 1995) .......................................................................10

*In re Lehman Bros. Holdings, Inc.*,
  433 B.R. 113 (Bankr. S.D.N.Y. 2010) .......................................................................17

*In re Manchester Gas Storage, Inc.*,
  309 B.R. 354 (Bankr. N.D. Okla. 2004) .....................................................................14

*In re Motors Liquidation Co.*,
  598 B.R. 744 (Bankr. S.D.N.Y. 2019) ...........................................................3, 17, 18

*In re Motors Liquidation Co.*,
  600 B.R. 482 (Bankr. S.D.N.Y. 2019) .........................................................................7

*In re N. Am. Royalties, Inc.*,
  276 B.R. 860 (Bankr. E.D. Tenn. 2002) .....................................................................13

*In re Navillus Tile, Inc.*,
    634 B.R. 847 (Bankr. S.D.N.Y. 2021) ..................................................................10

*In re Nutri\*Bevco, Inc.*,
    117 B.R. 771 (Bankr. S.D.N.Y. 1990) ............................................................11, 17

*In re N.Y. Trap Rock Corp.*,
    153 B.R. 642 (Bankr. S.D.N.Y. 1993) ..................................................................15

*In re Penn Traffic Co.*,
    524 F.3d 373 (2d Cir. 2008) ...........................................................................13, 14

*In re Pettibone Corp.*,
    162 B.R. 791 (Bankr. N.D. Ill. 1994) ...................................................................15

*Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*,
    507 U.S. 380 (1993) ........................................................................................1, 7

*In re Residential Capital, LLC*,
    558 B.R. 77 (S.D.N.Y. 2016) ...............................................................................10

*Williams v. KFC Nat'l Mgmt. Co.*,
    391 F.3d 411 (2d Cir. 2004) ..................................................................................1

*In re Wireless Data, Inc.*,
    547 F.3d 484 (2d Cir. 2008) ................................................................................11

*In re Worldcom, Inc.*,
    No. 02-13533 (AJG), 2010 WL 2465362 (Bankr. S.D.N.Y. June 11, 2010) ..........14

STATUTES & RULES

11 U.S.C. § 101(5) ......................................................................................................9

11 U.S.C. § 365 ........................................................................................................14

Fed. R. Bankr. P. 9006(b)(1) ........................................................................................8

Purdue Pharma L.P. and its affiliates that are debtors and debtors in possession in these proceedings (collectively, "**Debtors**" or "**Purdue**") hereby submit this objection ("**Objection**") to the *Motion of Ascent Pharmaceuticals, Inc. for Leave to File Late Proofs of Claim* [Dkt. No. 4909] (the "**Motion**") filed by Ascent Pharmaceuticals, Inc. ("**Ascent**"),[2] and respectfully state as follows:

## PRELIMINARY STATEMENT

1.       Thirty-three months after the commencement of these cases, and twenty-three months after the Bar Date (defined herein), Ascent seeks to file contingent general unsecured proofs of claim in respect of its prepetition contracts with Purdue. It is much too late. Ascent's request plainly fails to meet the Second Circuit's "hard line" for the limited circumstances where a party's failure to adhere to a clear scheduling dictate of the bankruptcy court constitutes "excusable neglect" under the so-called "*Pioneer* factors" set forth in *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 392 (1993). *In re Enron Corp.*, 419 F.3d 115, 121 (2d Cir. 2005).

2.       The most important *Pioneer* factor is the reason for the delay. *Williams v. KFC Nat. Mgmt. Co.*, 391 F.3d 411, 415–16 (2d Cir. 2004) ("We have emphasized, however, that it is the third factor—the reason for delay—that predominates, and the other three are significant only in close cases"). Each of Ascent's purported reasons for delay fails to satisfy the stringent excusable neglect standard. As an initial matter, there is no dispute that, as a prepetition counterparty of the Debtors, Ascent received actual notice of both the commencement of these chapter 11 cases and the need to file proofs of claim ahead of the Bar Date. Instead, Ascent

---

[2] Ascent also filed a *Motion for Entry of Order Pursuant to 11 U.S.C. §§ 105(a), 107(b), and Fed. R. Bankr. P. 9018 Authorizing the Filing of Certain Information Under Seal in Connection with the Motion of Ascent Pharmaceuticals, Inc. for Leave to File Late Proofs of Claim* (June 16, 2022), Dkt. No. 4908 (hereinafter, the "**Motion**" or "**Mot.**"), which the Court granted, *see Order Granting Motion* (June 29, 2022), Dkt. No. 4930. The Debtors also have filed contemporaneously herewith a motion to seal this Objection.

argues that it (i) did not know that it had a claim until Purdue's notice of termination of the Agreements (as defined herein) and (ii) was lulled into inaction by language in the Debtors' proposed plan of reorganization regarding the assumption and rejection of executory contracts and now may be barred from recovering alleged damages.  These arguments are unpersuasive. *First*, Ascent had both actual and constructive notice as of (and prior to) the Bar Date that it held contingent claims against the Debtors as a prepetition contractual counterparty.  *Second*, Ascent's failure to file proofs of claim prior to the Bar Date cannot be attributed to the treatment of executory contracts under the Debtors' proposed plan, as the initial plan was filed seven and a half months after the Bar Date.  *Third,* Ascent's assertion that it must be allowed to file late proofs of claim in order to avoid the "absurd result that would allow the Debtors to breach would-be assumed contracts prior to the Effective Date while leaving creditors with no recourse" (Mot. ¶ 36) is simply erroneous.  The Debtors' contracts with Ascent have not been assumed or rejected.  The Debtors believe that the Distribution and Supply Agreement and Patent License Agreement (each as defined below) have terminated and that there are no amounts due to Ascent in respect of either agreement.[3]  If, however, the Agreements have not terminated and remain executory, then the Debtors will have the option to either assume (and cure any outstanding defaults) or reject either or both Agreements at any time prior to the effective date of the Debtors' proposed plan.  Should the Debtors choose to reject, Ascent would have thirty days to file a claim for rejection damages.  (*See Order Approving (I) Disclosure Statement for Fifth Amended Joint Chapter 11 Plan, (II) Solicitation and Voting Procedures, (III) Forms of Ballots, Notices and Notice Procedures In Connection Therewith, and (IV) Certain Dates with Respect*

---

[3] Ascent contends otherwise.  *See* Complaint, *Ascent Pharmaceuticals, Inc. v. Purdue Pharma L.P.*, Adv. Case No. 22-07029 (June 16, 2022), Dkt. No. 1 (hereinafter, the "**Complaint**" or "**Compl.**").

*Thereto* ¶ 2 (June 3, 2021), Dkt. No. 2988.)[4]  In other words, there are no "extraordinary circumstances" giving rise to Ascent's request.  (*See* Mot. ¶ 34).  Rather, to the extent that either of the agreements remains in effect, Ascent is in the same position as any other counterparty to an executory contract with the Debtors.

3.      Ascent fares no better with respect to the remaining *Pioneer* factors.[5]  Ascent's delay in filing the Motion is substantial—*thirty-three months* after the commencement of these cases, and *twenty-three months* after the Bar Date.  And permitting Ascent to file late claims at this time may prove to be prejudicial to the Debtors, their estates, and, ultimately, their many stakeholders because it would only encourage other commercial counterparties to make similar requests if they mistakenly believe that the Debtors are attempting to use the claims process as both a "sword" and a "shield".  The Motion should be denied.

4.      Alternatively, the Debtors request that the Court adjourn the Motion without prejudice pending final adjudication of the related adversary proceeding regarding termination of the Agreements.  Ascent concedes throughout the Motion (Mot. ¶¶ 1, 3–5, 34), that the relief it seeks is likely unnecessary.  The Debtors agree, and further believe that adjudication of the underlying contractual dispute in the adversary proceeding is likely to obviate the need (to the extent one exists) for Ascent to pursue the relief requested in the Motion.  The Debtors accordingly believe that the Motion could be adjourned until after adjudication of the adversary proceeding in the interest of judicial economy.

---

[4] *See Disclosure Statement for Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors*, Art. III(K) (June 3, 2021), Dkt. No. 2983.

[5] Although the Debtors do not agree with Ascent's characterization of the parties' underlying contractual dispute— or gratuitous interpretation of the Plan and the Bankruptcy Code—the Debtors do not address whether Ascent has acted in good faith.  However, "the presence of good faith is almost never a determinative factor in the *Pioneer* analysis." *In re Motors Liquidation Co.*, 598 B.R. 744, 759 (Bankr. S.D.N.Y. 2019).

## **BACKGROUND**

### I.    The Agreements

5.    On March 27, 2019, in order to resolve patent litigation brought by Purdue in 2018 in the United States District Court for the District of Delaware asserting Ascent's infringement of Purdue's patents for certain oxycodone products (the "**Patent Litigation**"), Purdue and Ascent entered into three agreements:  (i) a Settlement Agreement, dated as of March 27, 2019, resolving the Patent Litigation (the "**Settlement Agreement**"),[6] wherein the pending claims would be dismissed (ii) a Distribution and Supply Agreement, dated as of March 27, 2019 (the "**Distribution and Supply Agreement**" or "**DSA**"),[7] ███████████████████ █████████████████████████████████████, and (iii) a Patent License Agreement, dated as of March 27, 2019 (the "**Patent License Agreement**" or "**PLA**,"[8] and together with the DSA, the "**Agreements**"), under which ███████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████.

### A.    The Distribution and Supply Agreement

6.    Pursuant to the DSA, ████████████████████████████████ ████████████████████████████████████████████████████████████

---

[6] ████████████████████████████████████████████████████████████ ██████████████████████████████████

[7] ███████████████████████████████████████████████████

[8] ████████████████████████████████████████████████████████████ ████████████████

███████████████████████████████████████████ the DSA, ██████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████ Under its terms, the DSA

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████ under the DSA, █████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████ the DSA ████████████████████████████████

**B.    The Patent License Agreement**

7.    Pursuant to the Patent License Agreement, ██████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████ under the

PLA. ████████████████████████████████████████████████

███████████████████████████████████████████████████ The

PLA provided ████████████████████████████████████████

5

████████████████████████████████████████████████████ the

PLA █████████████████████████████

## II.    Notice of the Commencement of the Chapter 11 Cases and the Bar Date

8.      On September 15, 2019, the Debtors commenced the above-captioned chapter 11 cases by filing with the Court voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  In October 2019, Ascent was served with notice of the chapter 11 cases (the "**Notice of Commencement**") via first class mail.  (*See Notice of Commencement Affidavit of Service*, Ex. B at 584 (Oct. 10, 2019), Dkt. No. 289-2.)

9.      On February 3, 2020, the Bankruptcy Court entered the *Order Establishing (I) Deadlines for Filing Proofs of Claim and Procedures Relating Thereto, (II) Approving the Proof of Claim Forms, and (III) Approving the Form and Manner of Notice Thereof* [Dkt. No. 800], and, on June 3, 2020, the Bankruptcy Court entered the *Order (I) Extending the General Bar Date for a Limited Period and (II) Approving the Form and Manner of Notice Thereof* [Dkt. No. 1221], which set July 30, 2020 as the general bar date in the chapter 11 cases (the "**Bar Date**"). In February 2020, Ascent was served with notice of the Bar Date (the "**Bar Date Notice**") via first class mail.  (*See Bar Date Notice Affidavit of Service*, Ex. I at 735 (Feb. 24, 2020), Dkt. No. 872-1; *id.* Ex. O at 1901.)

10.     On March 15, 2021, the Debtors filed their initial disclosure statement and plan of reorganization.  In March 2021, Ascent was served with notice regarding the Debtors' disclosure statement hearing (the "**Disclosure Statement Hearing Notice**") via first class mail.  (*Affidavit of Service Notice of Disclosure Statement Hr'g*, Ex. B at 199 (Mar. 24, 2021), Dkt. No. 2560-1.) The Disclosure Statement Hearing Notice directed interested parties to review the Debtor's plan of reorganization (the "**Plan**") filed on March 15, 2021 (and to subsequent versions of the Plan

as would be modified, amended, and supplemented from time to time). (*Disclosure Stmt. Hr'g Notice*, at 1 (Mar. 16, 2021), Dkt. No. 2494.)

### III.    Ascent's Adversary Proceeding and Late Claim Motion

11.     On June 16, 2022, Ascent filed an adversary proceeding complaint in the chapter 11 cases against Purdue Pharma L.P.; The P.F. Laboratories, Inc.; Purdue Pharmaceuticals L.P.; Purdue Pharma Technologies, Inc.; and Rhodes Technologies, seeking, among other things, declaratory judgment that the DSA and the PLA are still in full force and effect, and alleging breach of contract claims relating to the DSA and the PLA that seek specific performance or, in the alternative, damages.   (Compl. ¶ 125.)  The merits of this dispute are the subject of the pending adversary proceeding.

12.     Also on June 16, 2022, Ascent filed the Motion, seeking to file late proofs of claim related to the Agreements (the "**Late Claims**").  Ascent requests that this Court extend the Bar Date as to Ascent to allow it to file the Late Claims and have them deemed timely filed. (Mot. ¶ 6.)  Ascent asserts that the "excusable neglect standard" is satisfied here because its Late Claims "did not exist" until Purdue terminated the Agreements "nearly two years after the Bar Date." (*Id.* ¶¶ 5, 31.)

### **ARGUMENT**

### I.    Ascent Has Failed to Meet the Standard for Excusable Neglect

13.     The filing of a proof of claim after the bar date "will only be permitted if the failure to file before the bar date 'was the result of excusable neglect.'"  *In re Motors Liquidation Co.*, 600 B.R. 482, 488 (Bankr. S.DN.Y. 2019), *aff'd*, No. 19-CV-5666 (JMF), 2020 WL 3120379 (S.D.N.Y. June 12, 2020) (quoting Fed. R. Bankr. P. 9006(b)(1)); *see also Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 382 (1993) (noting that

Rule 9006(b)(1) "empowers a bankruptcy court to permit a late filing if the movant's failure to comply with an earlier deadline 'was the result of excusable neglect'"). The burden of demonstrating excusable neglect falls on the late claimant, *In re Enron Corp.*, 419 F.3d at 121 (quoting *Jones v. Chemetron Corp.*, 212 F.3d 199, 205 (3d Cir. 2000)), who must prove both "neglect . . . 'caused by inadvertence, mistake, or carelessness, as well as by intervening circumstances beyond the party's control'" ***and*** that the neglect was "excusable," *In re DPH Holdings Corp.*, 434 B.R. 77, 82 (S.D.N.Y. 2010) (quoting *Pioneer Inv. Servs. Co.*, 507 U.S. at 388). In other words, "inadvertence, ignorance of the rules, or mistakes construing the rules," in themselves, "do not usually constitute 'excusable' neglect." *In re Enron Corp*, 419 F.3d at 122, 126. Moreover, a creditor's "conscious, tactical decision" about whether it needs to file a proof of claim that turns out to be based on an erroneous assumption does not constitute excusable neglect. *Id.* at 127 (quotation omitted) (rejecting late claim motion based on movant's contention that "it mistakenly re[lied] on the . . . anticipated substantive consolidation" of the Enron bankruptcies) (alterations in original).

14.    The Court's inquiry into whether a late-claimant has demonstrated excusable neglect is an "equitable one, taking account of all relevant circumstances surrounding the party's omission," and guided by the so-called *Pioneer* factors—"[1] the danger of prejudice to the debtor, [2] the length of the delay and its potential impact on judicial proceedings, [3] the reason for the delay, including whether it was within the reasonable control of the movant, and [4] whether the movant acted in good faith." *In re Enron*, 419 F.3d at 122 (quoting *Pioneer*, 507 U.S. at 395). "The Second Circuit focuses its excusable neglect standard on the third factor—the reason for the delay . . . and the other three are significant only in close cases." *In re DPH Holdings*, 434 B.R. at 83.

15.    Notably, the Second Circuit has "'taken a hard line' in applying the *Pioneer* test" because "'the equities will rarely if ever favor a party who fail[s] to follow the clear dictates of a court rule'" and, thus, "'where the rule is entirely clear, [courts] expect that a party claiming excusable neglect will, in the ordinary course, lose under the *Pioneer* test.'" *In re Enron*, 419 F.3d at 122–23 (quoting *Silivanch v. Celebrity Cruises, Inc.,* 333 F.3d 355, 366–68 (2d Cir. 2003), *cert. denied sub nom. Essef Corp. v. Silivanch,* 540 U.S. 1105 (2004)). This accords with this Court's warning that, "unless there's a good reason why the deadline could not be complied with, the request for an extension is normally denied, [especially] when there has been a lengthy [bar date] period, such as provided for here." (June 3, 2020 Bar Date Ext. Mot. Hr'g Tr. 34:7–11 (Drain, J.).) Put simply, courts rarely extend the bar date for late-claimants, and Ascent's request fails to meet the hard line drawn by the Second Circuit.

A.    **Ascent Had Actual Notice of the Bar Date and the Need to File Proofs of Claim**

16.    As a preliminary matter, Ascent does not contest—and must concede—that it had *actual* notice of both the commencement of the chapter 11 cases and the Bar Date. *See supra* ¶¶ 8-9. Notably, the Bar Date Notice included extensive information regarding who must file a proof of claim—those holding a "claim," which was defined, consistent with the Bankruptcy Code's broad definition, as "(a) a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (b) a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured." (*Bar Date Notice Affidavit of Service*, Ex. B at 2 (emphasis removed)); *see also* 11 U.S.C. § 101(5). The Bar Date Notice also had a section dedicated to

9

"executory contracts and unexpired leases," which explained that (i) "[t]he Bankruptcy Code provides that the Debtors may, at any time before a plan of reorganization or liquidation is confirmed by the Court, choose to reject certain executory contracts or unexpired leases," (ii) such rejection may result in the party having a claim, and (iii) the deadline to file such claim would be the later of the Bar Date or thirty days after entry of the order authorizing such rejection. (*Bar Date Notice Affidavit of Service*, Ex. B at 7.)

17.    As a party to a pre-petition contract with Purdue, upon the Petition Date, Ascent had a "claim" within the meaning of the Bankruptcy Code that was "contingent"—i.e., related to an "'obligation[] that will become due upon the happening of a future event that was within the actual or presumed contemplation of the parties at the time the original relationship between the parties was created.'" *See Conway Hosp., Inc. v. Lehman Bros. Holdings Inc.*, 531 B.R. 339, 342–43 (S.D.N.Y. 2015) (quoting *Ogle v. Fid. & Deposit Co. of Md.*, 586 F.3d 143, 146 (2d Cir. 2009)) (finding no excusable neglect where party to prepetition contract held a contingent, unliquidated claim at the commencement of the Lehman bankruptcy proceedings but failed to file a proof of claim until over two a half years after the bar date and over four months after plan confirmation); *see also, e.g., In re Houbigant, Inc.*, 188 B.R. 347, 359 (Bankr. S.D.N.Y. 1995) (no excusable neglect where contract counterparty failed to file a contingent claim in respect of prepetition indemnity agreement); *In re Navillus Tile, Inc.*, 634 B.R. 847, 862 (Bankr. S.D.N.Y. 2021) (Lane, J.) (finding that party's breach of contract claim was not a postpetition claim because "contract-based bankruptcy claims arise at the time the contract is executed, regardless of when the alleged breach occurs") (quotation omitted); *In re Residential Capital, LLC*, 558 B.R. 77, 85 (S.D.N.Y. 2016) (holding that parties with unsecured claims for alleged contract breaches occurring post-discharge but that were within the contemplation of the parties at the

10

time of execution of the pre-petition contract upon which the claims were based were required to file timely proofs of claims to preserve their claims).[9]   It was entirely foreseeable that the Agreements, executory as of the Petition Date, could terminate during the pendency of the chapter 11 cases and therefore not be subject to assumption or rejection.  If Ascent was concerned with preserving any prepetition claims that it might have under any of the Agreements under those circumstances, it should have submitted proofs of claim prior to the Bar Date.

18.      Importantly, even if Ascent subjectively did not know of its need to file proofs of claim to preserve claims related to the prepetition Agreements, Ascent's general lack of expertise regarding bankruptcy and the Bankruptcy Code (*see* Mot. ¶ 2)[10] does not constitute excusable neglect.  *See In re Enron Corp*, 419 F.3d at 126 ("inadvertence, ignorance of the rules, or mistakes construing the rules do not usually constitute 'excusable' neglect." (quoting *Pioneer*, 507 U.S. at 392)); Apr. 27, 2020 Omnibus Hr'g Tr. 37:19–20 (noting that even with respect to ***pro se* individuals**, "simply not knowing one's legal rights is not an excuse for missing a bar date") (Drain, J.).

---

[9] Ascent's deliberate choice not to take the "prudent" path and file a contingent proof of claim—a decision contrary to the ones made by three other parties to similar settlements (*see* KVK – Tech, Inc. Proof of Claim, No. 146820 (July 30, 2020); Sandoz Inc. Proof of Claim, No. 146463 (July 30, 2020); Teva Branded Pharmaceutical Products R&D, Inc. Proof of Claim, No. 138750 (July 26, 2020))—does not constitute excusable neglect. *See In re Wireless Data, Inc.*, 547 F.3d 484, 494 (2d Cir. 2008) (holding that general unsecured claims by successor to prepetition contract were foreclosed where the successor chose "a course of conduct that hardly seems prudent" by failing to file any proof of claim by the cure claims bar date based on its interpretation that only cure claims were barred by bankruptcy court's prior order) (citation omitted).

[10] Ascent acknowledges that it retained—ostensibly for the first time—bankruptcy counsel "to assist in evaluating its rights and remedies under the Agreements as well as how to navigate the unique procedural posture of these bankruptcy cases" only after Purdue's notice of the termination of the Agreements in April 2022, over *two and a half years* after Ascent received notice of the commencement of Purdue's bankruptcy. *See In re Nutri\*Bevco, Inc.*, 117 B.R. 771, 786 (Bankr. S.D.N.Y. 1990) (holding that "where a creditor receives a bar date order, 'its failure on its own to forward [the] same to its [a]ttorney or to communicate with its counsel was not reasonable and was a substantially contributing factor to what occurred in th[e] case,' and defeats a finding of excusable neglect." (quoting *In re AMWC, Inc.*, 109 B.R. 210, 214 (N.D. Tex. 1989))).

**B.    Filing A Timely Proof of Claim Was Within Ascent's Reasonable Control and Its Reasons for Delay Fall Well Short of Being "Excusable"**

19.    Despite receiving actual notice of these chapter 11 cases, the Bar Date, and the need to file a proof of claim before the Bar Date, Ascent nonetheless insists that its failure to file a proof of claim until June 16, 2022—nearly *two years* after the July 30, 2020 Bar Date—meets the standard for excusable neglect because its failure is the result of its "faultless omission." (Mot. ¶ 31.) It does not.

20.    Ascent argues it did not know the basis of its claim until April 6, 2022, the date on which Purdue provided notice of termination of both Agreements. (*Id.*) In other words, as Ascent argues, because the Agreements "were to be assumed under the terms of the Plan", "[p]rior to th[e] [Debtors'] purported termination, Ascent's 'claim' did not exist" and it was "therefore impossible for Ascent to file a timely proof of claim by the Bar Date or to seek prior leave to file a late proof of claim." (*Id.* ¶¶ 31, 33.) Not so. As explained above, the fact that Ascent was a contract counterparty to the Debtors should have alerted Ascent to the fact of its contingent claims against the Debtors' estates. Ascent did not need to know exactly what events might transpire in the future that might give rise to a dispute with respect to the contracts, nor did it need to know the terms of a plan of reorganization that was first proposed seven and a half months after the Bar Date, in order to reach a decision as to whether to file contingent proofs of claim on or before July 30, 2020. Even if Ascent had a plausible basis to argue that it was "impossible" for it to have filed proofs of claim by the Bar Date (and it does not), Ascent certainly was on notice that a contractual dispute might arise (and, thus, of the potential need for protective, contingent proofs of claim) once it first failed to make required royalty payments under the DSA, which occurred many months or before it filed the Motion. At the very least, Ascent must have known of a potential need by January 14, 2022, when Purdue responded to

12

████████████████████████████ under the DSA ████████████

████████████ the DSA ███████████████, nearly six months before Ascent filed its

Motion.

21.     Moreover, this excuse for Ascent sitting on its rights and now attempting to have

the Late Claims deemed timely filed misinterprets both the Bankruptcy Code and the plain

language of the Debtors' proposed Plan.  The Plan's language regarding when and how the

Debtors may assume or reject executory contracts did not, as Ascent argues, alter Ascent's need

to file a proof of claim based on purported postpetition breaches of the Agreements.  (*Id.* ¶ 31.)

The Plan provides that "[a]s of and subject to the occurrence of the *Effective Date*, all executory

contracts and unexpired leases to which any Debtor is a party . . . shall be deemed assumed by

the applicable Debtor." (Plan § 8.1 (emphasis added).)  But it also explicitly "reserve[s] the

[Debtors'] right to modify the treatment of any particular executory contract or unexpired lease

pursuant to this Plan," and states that "the Debtors may alter, amend, modify or supplement the

Schedule of Rejected Contracts and assume, assume and assign or reject executory contracts and

unexpired leases at any time prior to the Effective Date." (*Id.*)  The Debtors neither promised

Ascent that the Agreements would be assumed nor filed an assumption (or rejection) motion

regarding the Agreements.

22.     Fundamentally, the parties' contract dispute, which does not need to be resolved

in order for the Court to decide the Motion, is about whether the Agreements remain executory.

"The Code provisions permitting a debtor to accept or reject an executory contract do not alter

the parties' contractual rights," *In re Penn Traffic Co.*, 524 F.3d 373, 383 (2d Cir. 2008), and,

thus, "[t]he debtor can terminate according to the contract terms without rejecting the contract."

*In re N. Am. Royalties, Inc.*, 276 B.R. 860, 865 (Bankr. E.D. Tenn. 2002).  Therefore, "where the

contract expires by its own terms in the course of the bankruptcy, or the debtor takes action in the course of the bankruptcy to terminate the outstanding obligations, the contract's mere executory nature as of the commencement of the proceeding—without more—will not guarantee . . . the availability of § 365's assumption and rejection provisions." *In re Penn Traffic Co.*, 524 F.3d at 383; *see also In re Worldcom, Inc.*, No. 02-13533 (AJG), 2010 WL 2465362, at *4 (Bankr. S.D.N.Y. June 11, 2010). In other words, "even if a court finds an executory contract on the petition date, post-petition events may indicate that no executory contract remains for the bankruptcy plan to assume or reject at the time it takes effect." *In re Worldcom, Inc.*, 2010 WL 2465362, at *4 (citation omitted); *see also In re Manchester Gas Storage, Inc.*, 309 B.R. 354, 378 (Bankr. N.D. Okla. 2004) ("A terminated contract is no longer an executory contract and therefore it is not susceptible to being rejected.").

23.    Ascent believes that the filing of a claim is unnecessary. (Mot. ¶ 4.) Ascent is likely correct on this point. If the Agreements have terminated, then Ascent will not have any right to payment from the Debtors. On the other hand, if either one or both of the Agreements remains executory, the Debtors will be faced with a decision whether to assume the executory contract and cure any outstanding defaults or to reject. If the Debtors reject, Ascent will have thirty days to file a rejection damages claim. (*See Order Approving Disclosure Statement* ¶ 2.) To be clear, the Debtors are *not* attempting "to breach would-be assumed contracts prior to the Effective Date while leaving creditors with no recourse." (Mot. ¶ 36.)[11]  The Debtors simply cannot assume any executory contracts without curing outstanding defaults as required under section 365 of the Bankruptcy Code.

---

[11] A discussed above, the Agreements terminated or were terminated by the Debtors, ███████ the DSA ████████████████████████ The terminations of the Agreements are the subject of a pending adversary proceeding.

24.    Lastly, the cases upon which Ascent relies are inapposite because none involves a party to a prepetition executory contact or otherwise requires a different result. *See, e.g., DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*, 246 F. Supp. 3d 680, 694–97 (E.D.N.Y. 2017) (creditor's failure to file a proof of claim based on its prepetition general unsecured antitrust claim properly was discharged where it was on inquiry notice that it had a claim before the bar date); *In re N.Y. Trap Rock Corp.*, 153 B.R. 648, 652–53 (Bankr. S.D.N.Y. 1993) (finding there was a risk that the board of supervisors would be permitted to file a late claim where neither the debtor nor the board knew of the environmental hazards that could form the basis of an environmental expense claim against the debtor until after the bar date had passed).[12]

### C.    The Length of the Delay Is Substantial and Will Negatively Impact These Proceedings

25.    Ascent argues that the length of the delay here is reasonable because there is no "bright-line test governing the length of delay in filing a proof of claim" as it depends on the degree to which the delay could disrupt the judicial administration of the case, and because it promptly filed its Late Claims after Purdue terminated the Agreements. (Mot. ¶ 37). But whether Ascent filed its Motion "promptly" after Purdue's termination of the Agreements is irrelevant to the excusable neglect inquiry because, for the reasons discussed above, Ascent's claims arose based on its status as a counterparty to prepetition contracts with the Debtors and, thus, its Motion is *twenty-three*, rather than a few, months late (and, even under the most generous view, the Motion was still filed over *four months* after Purdue notified Ascent of its

---

[12] *See also, e.g., In re Eagle Bus Mfg., Inc.*, 62 F.3d 730, 733, 739 (5th Cir. 1995) (finding excusable neglect where court order requiring participation in ADR prior to any hearing on motions to lift stay likely caused personal injury claimants not to file lift stay motions prior to the bar date, which would have constituted informal proofs of claim); *In re Pettibone Corp.*, 162 B.R. 791, 800–01, 814 (Bankr. N.D. Ill. 1994) (permitting late claim where entity with potential claim for contribution against debtor was named as tort defendant only after claims bar date, otherwise had no relationship to debtor and, thus, was not aware it was a potential creditor of the debtor before or provided notice of the bar date); *In re H.K. Porter Co.*, 156 B.R. 16, 18–19 (Bankr. W.D. Pa. 1993) (discussing the possibility of "future" personal injury claimants in the asbestos context).

breach of the DSA). That length of delay undoubtedly is substantial and greatly would affect the administration of these cases.

26.     While there may be no "bright-line" yardstick for measuring the length of the delay, there are indeed limits, and Ascent's delay here exceeds the delays that courts have found to be substantial in other complex cases. *See, e.g.*, *In re Enron Corp.*, 419 F.3d at 128 (finding that "claims filed as late as two years after the bar date" represent the outer limits of what courts allow); *In re Dana Corp.*, No. 06-10354, 2008 WL 2885901, at *6 (Bankr. S.D.N.Y. 2008) (determining that a twenty-one month delay is substantial); *In re Enron Creditors Recovery Corp.*, 370 B.R. 90, 103 (Bankr. S.D.N.Y. 2007) (determining that a fifteen-month delay is substantial). Moreover, for the reasons discussed below, the impact of the delay here on administration of the cases is significant. *See In re Enron Corp.*, 419 F.3d at 130 (noting that "[m]any of the[] considerations [regarding prejudice] are . . . the same as those taken into account in evaluating the length of the delay" and courts often discuss them together) (collecting cases).

**D.     Allowing Ascent's Late Claims Would Prejudice the Debtors and Have An Adverse Effect on the Administration of These Chapter 11 Cases**

27.     Ascent maintains that the Debtors will face "little, if any" harm because "the Debtors were already planning to assume the burdens of the Agreements." (Mot. ¶ 33.) But Ascent again relies on its faulty reading of the Plan (*see supra* Section I.B), which only exacerbates the immense prejudice to the Debtors and the potential impact of allowing Ascent's claims on the proper administration of these cases.

28.     Critically, evaluation of prejudice to the Debtors by allowing Ascent's claims as timely requires consideration of *both* the impact of the claims, as well as the *potential* that allowing the claim will encourage other latecomers. *See, e.g.*, *In re Enron*, 419 F.3d at 132

16

(finding that bankruptcy court properly considered the "opening of the 'floodgates' to similar claims" and "the number of *potential* claimants who might have been prompted to file late claims in the wake of a ruling in [the movant]'s favor" in denying late claim motion) (emphasis in original); *In re Lehman Bros. Holdings Inc.*, 433 B.R. 113, 121 (Bankr. S.D.N.Y. 2010) ("[T]he prejudice to the [d]ebtors is not traceable to the filing of any single additional claim but to the impact of permitting exceptions that will encourage others to seek similar leniency."); *In re Nutri\*Bevco, Inc.*, 117 B.R. at 781 ("Bar dates protect not only the debtor's interests, but creditors' interests as well [because they] establish[] a date by which the plan proponent can determine which liabilities will be asserted against the estate."). That is particularly so in cases, like these, "where the universe of potential creditors is practically limitless." *In re Motors Liquidation Co.*, 598 B.R. 744, 759 (Bankr. S.D.N.Y. 2019); *see also* Jan. 24, 2020 Omnibus Hr'g Tr. 64:8–12 (Drain, J.) ("[T]he rationale[] here for having a bar date . . . is perhaps more important in this case than some other cases" because it is imperative to know "who individuals are who say they have a material claim."); Apr. 27, 2022 Omnibus Hr'g Tr. 31:23–32:5 ("[O]bviously bar dates in bankruptcy cases . . . are really important because [they] enable[] people to know what the universe of claimants is, and [they] help[] them to negotiate a plan that allocates value . . . and set[] the playing field on the claims side as to what people can rely on.").

29.    The risk of prejudice here is immense. Ostensibly, Ascent believes its Late Claims are worth a non-*de minimis* amount (Mot. ¶ 36), potentially in the millions—though facially that may appear negligible to the Debtors facing over $40 trillion dollars in asserted liability,[13] it is "no small amount" in light of the comparative limited value of the Debtors'

---

[13] This figure excludes the single proof of claim asserting $100 trillion in damages. *See Final Decl. of Christina Pullo of Prime Clerk LLC Regarding the Solicitation of Votes & Tabulation of Ballots Case on the Fifth Am. Joint Ch. 11 Plan of Reorganization of Purdue Pharma L.P. & its Affiliated Debtors*, ¶ 8 (Aug. 2, 2021), Dkt. No. 3372.

estates, and given that Other General Unsecured Claims (as defined in the Plan)—which Ascent's Late Claims would be categorized as if permitted to be filed—are allocated a *pro rata* share of $15 million under the Debtors' proposed Plan. *In re Enron Corp.*, 419 F.3d at 131–34; (Plan § 4.13). Under the Debtors' proposed Plan, the Debtors are free to assume or reject executory contracts at any time prior to the effective date.

30.    Further, allowing the filing of a late proof of claim on Ascent's logic would prejudice the Debtors by validating Ascent's misinterpretation of the Bankruptcy Code and the Debtors' Plan language and inviting other contractual counterparties to assert prepetition contract claims based on purported post-petition breaches. And, it would encourage a potentially unlimited universe of latecomers to try their luck at transforming their subjective misinterpretation of the Bankruptcy Code or the Plan language into a basis to assert a late proof of claim—now over two years after the Bar Date. In other words, Ascent's claim is both sufficiently large and its reason for delay—i.e., its misinterpretation of the Bankruptcy Code and the Plan language—is insufficiently distinguishable from other potential latecomers that permitting its Late Claims would unduly prejudice the Debtors. *In re Enron Corp.*, 419 F.3d at 131–34 (finding prejudice where, although a potential "$12.5 million [claim] might seem insignificant in the face of a $900 billion bankruptcy," it was nonetheless "no small amount" and could not be considered in isolation if it "would lead to 'a mountain of such claims,' [ ] which the bankruptcy court, having admitted the first claim, would be hard pressed to reject") (citations omitted). Notably, "[t]he mere prospect of litigating additional motions to file post-bar-date proofs of claim is enough to prejudice the debtor." *In re Motors Liquidation*, 598 B.R. at 759 (citation omitted). Contrary to Ascent's assertion (Mot. ¶ 34), equity does not require such a value-destructive result in these complex and important cases.

## CONCLUSION

31.    For all of the foregoing reasons, the Debtors respectfully request that this Court deny the Motion or, alternatively, adjourn the Motion until final resolution of the currently pending related adversary proceeding.

Dated:    July 19, 2022
          New York, New York

By: */s/ Eli J. Vonnegut*
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone:    (212) 450-4000
Facsimile:    (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
James I. McClammy
Eli J. Vonnegut
Christopher S. Robertson
*Counsel to the Debtors*
*and Debtors in Possession*