DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Eli J. Vonnegut
Christopher S. Robertson

*Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | **Chapter 11** |
| **PURDUE PHARMA L.P.,** *et al.*, | **Case No. 19-23649 (SHL)** |
| Debtors.[1] | **(Jointly Administered)** |

## CASE STATUS REPORT

Purdue Pharma L.P. and its affiliate debtors (collectively, the "**Debtors**" or "**Purdue**")[2]

respectfully submit this case status report to assist the Court following the transfer of the above-

captioned chapter 11 cases (the "**Chapter 11 Cases**") on July 1, 2022. This status report provides

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

[2] Greater detail with respect to the Debtors, their businesses, and the events leading up to the commencement of these Chapter 11 Cases is set forth in the *Debtors' Informational Brief* [D.I. 17]. As defined herein, the "**Petition Date**" means September 15, 2019, the date the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

a brief overview of these Chapter 11 Cases and a high-level summary of the following active matters:

## <u>List of Active Matters</u>

1. Appeals with respect to the vacated Confirmation Order [D.I. 3787] confirming the Debtors' Twelfth Amended Plan of Reorganization (the "**Plan**") [D.I. 3726], which are presently *sub judice* at the United States Court of Appeals for the Second Circuit (and are consolidated and captioned as *In re Purdue Pharma L.P., et al.*, No. 22-110-bk(L) (the "**Second Circuit Appeal**");[3]

2. Implementation of a March 2022 settlement with eight States and the District of Columbia (the "**Nine**");

3. The Preliminary Injunction [Adv. Proc. Case. No. 19-08289];[4]

4. Sentencing by the United States District Court for the District of New Jersey (the "**New Jersey District Court**") pursuant to Purdue Pharma L.P.'s ("**PPLP**") federal criminal plea agreement, which has not yet been scheduled;

5. Proceedings before the Ontario Superior Court of Justice (Commercial List) in Toronto, Ontario, Canada (the "**Canadian Court**") pursuant to the Companies' Creditors Arrangement Act in Canada (the "**CCAA Proceedings**"), along with other Canadian matters (the "**Canadian Matters**");

6. Ongoing receipt and adjudication of motions to file claims after the July 30, 2020 bar date established in these Chapter 11 Cases (the "**Bar Date**");

7. The appeal by Collegium Pharmaceutical, Inc. ("**Collegium**") of the order granting the Debtors' *Motion for Order Modifying the Automatic Stay to Permit the Debtors to Prosecute Certain Pending Patent Litigation* [D.I. 1328]; and

8. The following adversary proceedings:

---

[3] As further described below, the following parties continue to oppose the Plan and are appellees in the Second Circuit Appeal: (i) the United States Trustee, William K. Harrington; (ii) the Peter Ballantyne Cree Nation, the Lac La Ronge Indian Band, the City of Grand Prairie, the City of Brantford, the City of Lethbridge, and the City of Wetaskiwin; and (iii) a few pro se parties.

[4] The Preliminary Injunction has been extended 15 times since it was first extended on October 11, 2019.  It has not been contested as to the Debtors since October 2019, and has not been contested as to the related parties since the *Twenty-Fourth Amended Order Pursuant to 11 U.S.C. § 105(a) Granting Motion for a Preliminary Injunction* was granted on February 1, 2022. Adv. Proc. Case. No. 19-08289 [D.I. 323].

  o *Purdue Pharma L.P. et al. v. Commonwealth of Massachusetts et al.*, Adv. Proc. Case No. 19-08289 (SHL) (the adversary proceeding in which the Preliminary Injunction has been extended, *see* #3 above);

  o *Avrio Health L.P. et al. v. AIG Specialty Insurance Company (f/k/a American International Specialty Lines Insurance Company) et al.*, Adv. Proc. Case No. 21-07005 (SHL);

  o *Stacey Bridges and Creighton Bloyd et al. v. Purdue Pharma L.P., et al.*, Adv. Proc. Case No. 21-07088 (SHL); and

  o *Ascent Pharmaceuticals, Inc. v. Purdue Pharma L.P., et al.*, Adv. Proc. Case No. 22-07029 (SHL).

## BACKGROUND

I.    **Settlements That Are and Will Be Reflected in the Debtors' Plan of Reorganization That, If Consummated, Will Constitute a Comprehensive Resolution of These Chapter 11 Cases**

The Plan is the product of extensive prepetition negotiations and no fewer than four separate phases of intensive mediation resulting in many complex, interrelated settlements. Collectively, these settlements constitute a comprehensive resolution of the Chapter 11 Cases, with a hard-fought but agreed allocation among many different creditor constituencies of 100% of the Debtors' assets and $5.5 to $6.0 billion in payments from certain members of the Sackler families (the "**Sackler Families**" or the "**Sacklers**").  The Plan is either supported, or not objected to, by (1) the Official Committee of Unsecured Creditors; (2) the Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants (which includes the court-appointed Plaintiffs' Executive Committee and Co-Lead Counsel in the Ohio multidistrict litigation (where over 2,200 of the prepetition civil actions have been consolidated)); (3) the Multi-State Governmental Entities Group; (4) the Native American Tribes Group; (5) the Ad Hoc Committee of NAS Children; (6) the Ad Hoc Group of Hospitals; (7) the Ad Hoc Group of Individual Victims; (8) the Third-Party Payor group; (9) the group of ratepayer mediation participants; (10) the group of public school

districts; and (11) the 24 states and territories that formerly constituted the Non-Consenting States, including the Nine.[5]

Pursuant to the Plan, Purdue's businesses will be transferred to a newly created company, Knoa Pharma LLC ("**Knoa Pharma**"). Knoa Pharma, in turn, will be indirectly owned by two trusts (the National Opioid Abatement Trust and the Tribal Abatement Fund Trust). Among other things, Knoa Pharma will continue Purdue's in-development public health initiatives, including developing and distributing opioid overdose reversal and addiction treatment medications for no profit. To ensure that it operates its businesses safely and responsibly, Knoa Pharma will be subject to strict covenants, an operating injunction, and a monitor. The Sacklers will have no interest in or connection to the new company.

The $5.5 to $6.0 billion in payments from the Sacklers over time,[6] along with excess cash held by Purdue and 100% of its revenues and assets, will be deployed (after satisfying other obligations under the Plan) to fund certain trusts (the "**Creditor Trusts**")[7] or, with respect to certain direct payments from the Sacklers to the Nine, a supplemental opioid abatement fund (the "**SOAF**"), to abate the opioid crisis. Between $700 to $750 million will be separately distributed to compensate qualified personal injury claimants.

---

[5] As described in further detail below and pursuant to the settlement term sheet resolving the objections of the last settling States and the District of Columbia, *see* Term Sheet Motion [D.I. 4410 Ex. B], the Debtors note that the Nine and New Hampshire do not object to and will consensually be bound by the Plan's releases, but that such consent to the Plan's releases is not an indication that they agree with the legality of the Plan or of the nonconsensual third-party releases included therein.

[6] The settlement with the Debtors' shareholders and related entities is referred to throughout this status report as the "**Shareholder Settlement**." The settlement agreement attached as Exhibit AA to the *Notice of Filing of Seventeenth Plan Supplement Pursuant to the Eleventh Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 3711] is referred to herein as the "**Shareholder Settlement Agreement**."

[7] The Public Creditor Trusts (the National Opioid Abatement Trust (NOAT) and the Tribe Trust) and Private Creditor Trusts (the Hospital Trust, the TPP Trust, the NAS Monitoring Trust, the PI Trust and the PI Futures Trust), each as defined in the Plan.

The dedication of virtually all of the value of the Debtors and the payments from the Sackler families to fund opioid abatement initiatives and compensate personal injury victims is enabled, in large measure, by the terms of certain agreements with the United States. Specifically, on November 18, 2020, the Bankruptcy Court approved PPLP entering into (i) a plea agreement (the "**Plea Agreement**") between PPLP and the United States; and (ii) a civil settlement agreement between PPLP and the United States (the "**Civil Settlement**," and together with the Plea Agreement, the "**DOJ Resolution**"). Pursuant to the Plea Agreement, among other things, PPLP and the United States agreed to a criminal forfeiture judgment in the amount of $2 billion ("**Forfeiture Judgment**") that will be entered upon the acceptance of the Plea Agreement; and will be deemed to have the status of an allowed superpriority administrative expense claim against PPLP. Critically for the success of the Debtors' reorganization, the United States further agreed to provide a credit offsetting the Forfeiture Judgment ("**Forfeiture Judgment Credit**") of up to $1.775 billion for value distributed or otherwise conferred by PPLP under the Plan in respect of claims asserted by state, tribal, or local government entities. The state, tribal, and local government entities have committed to dedicate all value received by them through the Plan to abatement purposes. This credit will be earned so long as the Plan provides for the establishment of a public benefit company (or entity with a similar mission) and certain other terms and conditions described in the Plea Agreement are satisfied.[8] The establishment of Knoa Pharma and the payments to the public Creditor Trusts are, in combination, expected to allow the Debtors to realize the full benefit of the Forfeiture Judgment Credit.

A chart illustrating the post-emergence structure is set forth in **<u>Figure 1</u>** below.

---

[8] *See Disclosure Statement for the Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* at 21 [D.I. 2983] (the "**Disclosure Statement**").

Figure 1

## Overview of Plan – Post-Emergence Structure



The settlements reached in mediation also include important nonmonetary elements that are reflected in the Plan, including the establishment of a public document repository (the "**Public Document Repository**").[9]  The Public Document Repository will be hosted by an academic institution or library.  It will include more than 13 million documents (consisting of more than 100 million pages) produced in the Chapter 11 Cases and millions of other documents, including certain documents currently subject to the attorney-client privilege that would not have been produced in litigation.

## II.    Confirmation and Appeals Process

The confirmation hearing with respect to the Debtors' Twelfth Amended Plan of Reorganization commenced on August 12, 2021.  More than 95% of the Debtors' voting creditors voted in favor of the Plan,[10] which was then supported (or not objected to) by every organized creditor group in the Chapter 11 Cases.  Arrayed against this extraordinary consensus was a small group of objectors, including the Nine, a handful of Canadian municipalities and First Nations, and the United States Trustee.  Collectively, the objectors constituted less than one-fifth of one percent of the claimants in these cases.  The objectors raised several arguments, including that the Bankruptcy Court should not approve the Shareholder Settlement, that nonconsensual releases of claims against the shareholder parties (the "**Shareholder Releases**") were illegal, and that the Plan was not in the "best interests" of creditors.  The DOJ also filed a statement regarding the Shareholder Releases.[11]

---

[9] *See* Plan § 5.12.

[10] This overwhelming support represents over 114,000 creditors voting to accept the Plan following one of the largest legal notice programs ever deployed.

[11] *See Statement of Interest of the United States of America Regarding the Shareholder Release* No. 21-CV-7532(L) [D.I. 94].

On September 1, 2021, the Bankruptcy Court overruled each of the objections and confirmed the Plan in a six-hour, comprehensive oral bench ruling, which was later reduced to a written decision spanning 159 pages.  On September 17, 2021, the Bankruptcy Court formally entered its *Findings of Fact, Conclusions of Law, and Order Confirming the Twelfth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* (the "**Confirmation Order**") [D.I. 3787].

Appeals ensued.  As discussed further below, the United States District Court for the Southern District of New York (McMahon, *J.*) (the "**District Court**") vacated the Confirmation Order on December 16, 2021 (the "**District Court Decision**").  The Debtors and other plan proponents pursued expedited appeals of the District Court Decision.  Those appeals are presently *sub judice* at the United States Court of Appeals for the Second Circuit.  Although the Nine were appellants before the District Court, their objections and appeals were subsequently withdrawn following an additional phase of mediation (also described below).  The only parties now opposing the Plan are the United States Trustee, certain Canadian entities[12], and a few pro se claimants.

---

[12] The Canadian objectors represent less than 1% of the population of Canada. As discussed in greater detail in Section V below, the Debtors resolved all objections raised by the Canadian provincial governments and other Canadian creditors.

## ACTIVE MATTERS

Short summaries of material current active or pending matters in or related to the Chapter 11 Cases follow.

### I.    Appeals of Confirmation Order

The United States Trustee, the Nine, certain Canadian entities, and a few pro se claimants filed timely notices of appeal of the Confirmation Order.[13]

The appeals were administratively consolidated and heard by the District Court (McMahon, *J.*) on an expedited basis.  The District Court held oral argument on November 30, 2021, and on December 16, 2021, the District Court entered the District Court Decision vacating the Confirmation Order.   In its decision, the District Court described the Bankruptcy Court's decision as a "judicial *tour de force*," and observed that "no one challenged any of Judge Drain's findings of fact,"[14] after a confirmation hearing that involved testimony from 41 witnesses and the introduction of thousands of exhibits into evidence.  The District Court also rejected the arguments of certain appellants that the Bankruptcy Court lacked subject matter jurisdiction to approve the Shareholder Releases and that the Bankruptcy Court improperly classified the appealing Canadian creditors.[15]   Ultimately, however, the District Court held that the Bankruptcy Code does not authorize nonconsensual third-party releases in <u>any</u> circumstances outside of the asbestos context.

---

[13] *See* Notices of Appeal filed by State of Washington on 9/1/2021 [D.I. 3724]; District of Columbia on 9/1/2021 [D.I.. 3725]; Certain Canadian Municipalities on 9/15/2021 [D.I. 3774]; Certain Canadian First Nation and Metis People on 9/15/2021 [D.I. 3775];   UST's Appeal of Confirmation Order and Order Approving Disclosure Statement on 9/15/2021 [D.I. 3776]; UST's Appeal of Advance Funding Order on 9/15/2021 [D.I. 3777]; State of Maryland on 9/15/2021 [D.I. 3780]; State of Connecticut on 9/17/2021 [D.I. 3784]; Ronald Bass Sr. on 9/23/2021 [D.I. 3810]; State of California on 9/24/2021 [D.I. 3813];   State of Rhode Island on 9/28/2021 [D.I. 3832]; State of Vermont on 9/30/2021 [D.I. 3849]; State of Delaware on 9/30/2021 [D.I. 3851]; State of Oregon on 9/30/2021 [D.I. 3853]; Ellen Isaacs on 10/4/2021 [D.I. 3877]; Maria Ecke on 10/4/2021 [D.I. 3878].

[14] *Decision and Order on Appeal*, No. 21-CV-7532(L) at 81 [D.I. 279].

[15] *Id.* at 73, 137-8.

While the Bankruptcy Court ruled that the Second Circuit has held that bankruptcy courts are authorized to approve nonconsensual third-party releases in appropriate circumstances, the District Court opined that "the Second Circuit has not yet taken a position on this question" and concluded that such authority does not exist.[16]  The District Court thus vacated the Confirmation Order.

Although the Debtors believe that the District Court Decision is appealable as a matter of right, in an abundance of caution the Debtors and other plan proponents swiftly petitioned the District Court to certify, and the Second Circuit to accept, an interlocutory appeal.  The District Court certified its decision for immediate appeal to the Second Circuit on January 7, 2022,[17] and the Second Circuit granted the petitions for leave to appeal on an expedited basis on January 27, 2022.[18]  In doing so, the Second Circuit directed the parties to "address any and all issues bearing on the legal authority of the bankruptcy court—constitutional, statutory, or otherwise—to authorize the nonconsensual releases of third-party direct claims against non-debtors."[19]  The Second Circuit heard oral argument on April 29, 2022, and the matter is presently *sub judice*.

## II.    Settlement with the Nine

On March 2, 2022, the Nine and other mediation parties reached agreement on a term sheet (the "**Term Sheet**") following mediation before the Honorable Shelley C. Chapman.

Pursuant to the Term Sheet, certain Sackler family members and trusts (the "**Sackler Mediation Parties**") committed to pay (i) an additional $723,111,111.13, with potential further payments of up to an additional $500 million from the net proceeds of the sale of certain foreign

---

[16] *Id*. at 73-4.

[17] *Order Conditionally Granting Debtors' and Allied Parties' Motion for a Certificate of Appealability*, No. 21-CV-7532(L) [D.I. 301].

[18] *Order Granting Leave to Appeal and to Expedite Appeals*, Case No. 22-110 [D.I. 103].

[19] *Id*.

independent associated companies (or "**IACs**"), to the Master Disbursement Trust (to be distributed pursuant to the Plan to abate the opioid crisis); (ii) $175 million to the Master Disbursement Trust on the Effective Date in lieu of the requirements with respect to the certain Sackler charitable foundations provided for in the Plan; and (iii) $276,888,888.87 directly to SOAF (not made or distributed under the Plan), which will be established, structured, and administered by the Nine (and also benefiting New Hampshire), and devoted exclusively to opioid-related abatement, including support and services for survivors, victims and their families in each case following consummation of the Plan and on the schedule and terms described in more detail in the Term Sheet.  The Sackler Mediation Parties also agreed to material additional non-monetary terms and concessions and the Debtors agreed to further supplement the Public Document Repository.[20] As a result, the aggregate payments by the Sackler Families increased from $4.325 billion (plus transfer of control of charitable foundations with at least $175 million in assets) to a minimum of $5.5 billion with the potential to increase to $6.0 billion.

On March 3, 2022, the Debtors filed a motion seeking approval of the Term Sheet.  On March 10, 2022, the Bankruptcy Court entered an order granting the Debtors' motion (the "**Term Sheet Order**").[21]  Pursuant to the Term Sheet Order and effective only upon the entry of one or more orders by the Second Circuit or the District Court permitting the consummation of the Plan, the Debtors are authorized to (i) revise the Shareholder Settlement Agreement as needed to provide for the incremental payments to the estate agreed to by the Sackler Mediation Parties under the

---

[20] *See* Term Sheet Motion ¶ 2.

[21] *Order Pursuant to 11 U.S.C. §§ 105 and 363(b) Authorizing and Approving Settlement Term Sheet* [D.I. 4503].

Term Sheet and allow for the Direct Settlement Agreement;[22] (ii) provide the additional documents specified in the Term Sheet to the Public Document Repository once established; and (iii) take such other steps as may be necessary or desirable in furtherance of the agreements reflected in the Term Sheet and the Term Sheet Order.[23] If and when the Debtors prevail on appeal, the Debtors intend to seek entry of an order under section 1127(b) of the Bankruptcy Code to amend and enhance the Plan to reflect the settlement with the Nine.

In accordance with the Term Sheet, each member of the Nine agreed not to file any brief with or present any argument to the Second Circuit panel hearing the appeal of the District Court's Decision, and further agreed (along with New Hampshire) to consensually grant the releases provided under the Plan upon its effectiveness.[24] On March 11, 2022, the Debtors, along with representatives of each of the Nine, submitted joint notices to the Second Circuit. These Joint Notices apprised the Second Circuit that the Term Sheet had been accepted by the Debtors, the Sacklers and the Nine, and that the Bankruptcy Court had entered the Term Sheet Order.[25] In

---

[22] A new direct settlement agreement among the Sacklers and the Nine, to be entered into with respect to the payments by the Sacklers to the SOAF. *See* Term Sheet Motion ¶ 29.

[23] *See Order Granting Motion Pursuant to 11 U.S.C. § 105(a) and 363(b) Authorizing and Approving Settlement Term Sheet* [D.I. 4503].

[24] *See Motion of Debtors Pursuant to 11 U.S.C. § 105(a) and 363(b) For Entry of an Order Authorizing and Approving Settlement Term Sheet* ¶ 6 [D.I. 4410] (the "**Term Sheet Motion**").

[25] *See Joint Notice Regarding Non-Opposition by Certain Non-Federal Governmental Entities In re Purdue Pharma L.P.*, Case No. 22-110 (2d Cir. 2022), filed by the Debtors [D.I. 549]; Connecticut [D.I. 550]; Washington [D.I. 551]; California [D.I. 552]; the District of Columbia [D.I. 553]; Delaware [D.I. 554]; Oregon [D.I. 555]; Maryland [D.I. 556]; Rhode Island [D.I. 557]; and Vermont [D.I. 566] (the "**Joint Notices**"). As stated in the Joint Notices, "[p]ursuant to a settlement agreement contemplated by the Settlement Term Sheet entered into by the Sacklers and the Nine (the "Settlement"), the Nine will not file any brief with or present any argument to the Second Circuit panel hearing the Appeal (Case Nos. 22-110-bk(L), 22-113-bk(CON), 22-115-bk(CON), 22-116-bk(CON), 22-117-bk(CON), 22-119-bk(CON), 22-121-bk(CON), 22-299- bk(CON), 22-203-bk(XAP)) or in any en banc proceeding or panel rehearing that may subsequently take place in the Second Circuit in the Appeal. The Nine's nonopposition to the Appeal is contingent upon the terms of the Settlement and subject to potential termination if the Approval Order is reversed by a final nonappealable order of a court of competent jurisdiction. The parties will not argue in such circumstances that, by failing to file briefs or present arguments, the Nine no longer have standing as appellees."

addition, the State of California and the People of the State of California filed a *Statement Regarding the Filing of an Appellee Brief*, No. 22-110 (2d Cir. 2022) [D.I. 559] ("**California Statement**").[26]

## III.    Preliminary Injunction

Prior to initiating these Chapter 11 Cases on September 15, 2019, certain of the Debtors were defendants in more than 2,600 civil actions in dozens of courts throughout the country that arose from the Debtors' marketing and sale of prescription opioid medications ("**Pending Actions**").  On September 18, 2019, the Debtors commenced an adversary proceeding and filed a motion for an order (the "**Preliminary Injunction**") pursuant to 11 U.S.C. § 105(a) and Rule 7065 of the Federal Rules of Bankruptcy Procedure to enjoin the commencement or continuation of active litigation against the Debtors and certain related parties, including members of the Sackler Families.[27]  The Debtors did so both to prevent their operational and financial destruction, and to provide all parties in interest the respite necessary to productively and constructively orient constituencies toward a value-maximizing, consensual resolution to these Chapter 11 Cases.  The Debtors also asked the Court to enter a voluntary injunction against the Debtors (the "**Voluntary Injunction**") further to enforce their commitment to refrain from engaging in key aspects of the conduct implicated in the Pending Actions.[28]  At the court's suggestion, with which the Debtors

---

[26] The California Statement provided that "California's decision to forego filing a brief before this Court, and its consent to the releases in the Plan, is a function of the settlement entered into by the Sacklers, Purdue, and the Appellee States, which will provide more than $1 billion in additional funds nationally to address the effects of the opioid crisis, a right for cultural, academic, and scientific institutions to remove the Sackler name, as well as other relief, and the Plan no longer resulting in the nonconsensual release of any state's law-enforcement claims against the Sacklers. California's consent to the releases should not be misinterpreted as an indication that California agrees with the legality of the Plan, or of the nonconsensual third-party releases included therein."

[27] *See Complaint for Injunctive Relief*, Adv. Proc. Case No. 19-08289 [D.I. 1]; *Motion for a Preliminary Injunction* Adv. Proc. Case No. 19-08289 [D.I. 2] (the "**Preliminary Injunction Motion**").

[28] *See* Preliminary Injunction Motion ¶ 1.

readily agreed, a monitor (the "**Monitor**") was appointed to oversee the Debtors' implementation of the Voluntary Injunction.[29]    Thomas J. Vilsack, the current United States Secretary of Agriculture, who also held that position from 2009 to 2017, initially served as Monitor, and Stephen C. Bullock, the former Governor of Montana and Attorney General of Montana, has served as Monitor since March 2021.[30]    The Debtors took these extraordinary steps to make clear that they were not in any way using chapter 11 as an improper shield for the kind of past conduct challenged in the Pending Actions.

On October 11, 2019, the Bankruptcy Court entered an initial order granting the Preliminary Injunction.[31]    That order became final on November 6, 2019 and enjoined the pursuit of active litigation against the Debtors and their related parties through April 8, 2020.[32]    Since March 2020, the Bankruptcy Court has granted 14 extensions of the Preliminary Injunction.[33] Most recently, on April 29, 2022, at an uncontested hearing, the Bankruptcy Court extended the Preliminary Injunction through the date that is 30 days after the Second Circuit issues a decision in the appeals from the District Court Order (provided that if the Second Circuit has not issued a

---

[29] *Second Amended Order Pursuant to 11 U.S.C. § 105(a) Granting Motion for a Preliminary Injunction*, Adv. Proc. Case No. 19-08289 [D.I. 105] (the "**Second Amended Preliminary Injunction Order**").

[30] On February 13, 2020, Thomas J. Vilsack and Purdue Pharma executed the Purdue Pharma Monitoring Agreement. Secretary Vilsack filed reports with the Court on May 20, 2020, August 18, 2020, November 16, 2020, and February 3, 2021.  On March 1, 2021, the Bankruptcy Court approved the appointment of Stephen C. Bullock as Monitor.

[31] *Order Pursuant to 11 U.S.C. § 105(a) Granting, in Part, Motion for a Preliminary Injunction*, Adv. Proc. Case No. 19-08289 [D.I. 82].

[32] *See* Second Amended Preliminary Injunction Order.

[33] A group of plaintiffs from Tennessee (the "**Tennessee Plaintiffs**") took appeals from the November 6, 2019 and March 30, 2020 Preliminary Injunction orders.  On August 11, 2020, the District Court (McMahon, *J.*) issued an order in the consolidated appeals affirming the Bankruptcy Court's Preliminary Injunction.  *Decision and Order Affirming the Bankruptcy Court's Preliminary Injunction*, No. 19-CV-10941 [D.I. 29].

decision in the Second Circuit Appeal by July 15, 2022, any party in interest, for cause shown and upon proper notice, may move to shorten or terminate the Preliminary Injunction).[34]

## IV.    Plea Agreement and Sentencing

On November 24, 2020, in accordance with the terms of the DOJ Resolution, PPLP entered a guilty plea in the New Jersey District Court to an information charging it with three felony offenses: one count charging a dual-object conspiracy to defraud the United States and to violate the Food, Drug, and Cosmetic Act, and two counts charging conspiracy to violate the Federal Anti-Kickback Statute.  Consistent with the terms of the Plea Agreement, the New Jersey District Court's acceptance of the Plea Agreement has been deferred to the sentencing hearing date, which has not yet been scheduled.  Under the terms of the Plea Agreement, the Debtors cannot emerge until, at the earliest, seven days after the sentencing hearing in the District of New Jersey.[35]

## V.    Canadian Matters

On September 19, 2019, the Canadian Court entered the Initial Recognition Order (Foreign Main Proceeding) pursuant to Part IV of the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, as amended, that recognized the Chapter 11 Cases as foreign main proceedings (Court File No. CV-19-627656-00CL).

The orders issued by the Canadian Court, among other things, (i) recognized the Chapter 11 Cases as "foreign main proceedings" under the CCAA; (ii) stayed (a) all proceedings in Canada currently under way against or in respect of any of the Debtors or affecting their business or

---

[34] *See Twenty-Eighth Amended Order Pursuant to 11 U.S.C. § 105(a) Granting Motion for a Preliminary Injunction*, Adv. Proc. Case No. 19-08289 [D.I. 356].

[35] In addition, as a manufacturer of controlled substances and prescription and over-the-counter pharmaceutical products, the Debtors are subject to regulatory oversight by numerous governmental entities.  The effectiveness of a Plan will also be subject to the receipt of all authorizations, consents, regulatory approvals, rulings and documents that are necessary to implement and effectuate the Plan. This governmental approval process could take substantial time. *See* Disclosure Statement at Article VIII.A-B.

property and (b) all proceedings against certain Canadian affiliates of the Debtors, including Purdue Pharma Inc. (a Canadian corporation), Purdue Frederick Inc. (a Canadian corporation), and Purdue Pharma (a Canadian limited partnership); (iii) appointed Ernst & Young Inc. as information officer to report to the Canadian Court, creditors and other stakeholders in Canada on the status of the Chapter 11 Proceedings; and (iv) recognized certain orders entered in the Chapter 11 Cases to permit the Chapter 11 Debtors to continue operating their respective businesses during the course of the Chapter 11 Proceedings.

The CCAA Proceedings remain active, and the Debtors expect to seek recognition of additional orders from the Bankruptcy Court, including any order confirming a chapter 11 plan, from time to time.

In addition, prior to the Petition Date, certain of the Debtors and certain non-Debtor IACs entered into a conditional national class action settlement agreement (the "**Patient Settlement Agreement**") with respect to various class actions across Canada related to the sale of OxyContin and OxyNEO in Canada during the period January 1, 1996 through February 28, 2017. Pursuant to its terms and Canadian class action legislation, the Patient Settlement Agreement must be approved by the Ontario Superior Court of Justice, the Superior Court of Quebec, the Supreme Court of Nova Scotia and the Saskatchewan Court of Queen's Bench in order to become effective. The Patient Settlement Agreement has yet to receive the approval of the Saskatchewan Court of Queen's Bench (the "**Saskatchewan Court**"). The hearing before the Saskatchewan Court regarding approval of the Patient Settlement Agreement is currently scheduled for July 26-27, 2022.

On August 10, 2021, the Bankruptcy Court approved a stipulation and agreed order (D.I. 3520, the "**Stipulation and Order**") by and between the Debtors and the provincial governments

of British Columbia, Alberta, Saskatchewan, Ontario, Nova Scotia, New Brunswick, Newfoundland and Labrador, Prince Edward Island, Quebec, and Manitoba (the "**Canadian Provincial Governmental Claimants**").  The Stipulation and Order provides for a negotiated resolution resulting in the withdrawal of the claims filed by the Canadian Provincial Governmental Claimants against the Debtors and the preservation of certain "Continuing Claims" (as defined in the Stipulation and Order) against non-Debtors, including against the Shareholder Released Parties (as defined in the Plan) and the Sackler-owned Canadian independent associated companies.  The Stipulation and Order resolved the various objections of the Canadian Provincial Governmental Claimants to confirmation of the Plan. "Continuing Claims" of other creditors (including other Canadian creditors) are "Excluded Claims" under the Plan and are therefore carved out of the Plan releases.[36]

## VI.    Late Claims

### A.    Bar Date and Noticing Campaign

On February 3, 2020, the Bankruptcy Court entered the *Order Establishing (I) Deadlines for Filing Proofs of Claim and Procedures Relating Thereto, (II) Approving the Proof of Claim Forms, and (III) Approving the Form and Manner of Notice Thereof* [D.I. 800] (the "**Bar Date Order**").  On June 3, 2020, the Bankruptcy Court entered the *Order (I) Extending the General Bar Date for a Limited Period and (II) Approving the Form and Manner of Notice Thereof* [D.I. 1221] (the "**Bar Date Extension Order**"), which set July 30, 2020 as the general bar date in the Chapter 11 Cases.  In accordance with the Bar Date Order and Bar Date Extension Order, the Debtors implemented one of the largest legal notice programs ever deployed (the "**Bar Date Notice Plan**"), using virtually every form of modern media to provide publication notice to an estimated 98% of

---

[36] *See* Plan §§ 1.1, 10.6, 10.7.

all adults in the United States over the age of 18 with an average frequency of message exposure of eight times, and an estimated 86% of all adults in Canada over the age of 18 with an average frequency of message exposure of four times.  This included TV commercials serving over 1.1 billion impressions, radio commercials serving over 232 million impressions and a digital campaign serving over 1.5 billion impressions.[37]

### B.    Late Claims Motions Unlikely to Satisfy *Pioneer* Factors Moving Forward

Notwithstanding the extensive noticing campaign, the Debtors, after consultation with the Official Committee of Unsecured Creditors and Ad Hoc Group of Individual Victims, have not objected to a small number of late claim motions, primarily filed by incarcerated individuals, in instances where there was an indication that the factors outlined in *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380 (1993) were met.  As they have done in the past, the Debtors will continue to analyze the allegations in any additional late claim motions that are filed, consider the *Pioneer* factors (paying particular attention to the potential prejudice to the Debtors and their estates and the impact on the administration of these cases, including the potential to open the floodgates to additional late claim motions, as the Debtors approach the two year anniversary of the Bar Date), and consult with the Official Committee of Unsecured Creditors and Ad Hoc Group of Individual Victims.

### C.    Maria Ecke Late Claim Appeal

On January 20, 2022, Maria Ecke[38] filed the *Motion for Reconsideration* [D.I. 4296] and the *Motion to Accept the Personal Injury Claim No. 628554 for the Estate of David Jonathan Ecke* [D.I. 4297], seeking to file a late proof of claim on behalf of the estate of her son, David Jonathan

---

[37] *See* Confirmation Brief ¶ 154 (internal quotations and citations omitted).

[38] Ms. Ecke is an appellee in the Second Circuit Appeal.

Ecke, in order to start a foundation on his behalf.  On April 26, 2022, Ms. Ecke filed the *Amended Motion for Reconsideration* [D.I. 4701].  On April 29, 2022, the Bankruptcy Court entered the *Order Denying Motions for Reconsideration and to Permit Late Filing of Personal Injury Claim No. 628554 for the Estate of David Jonathan Ecke* [D.I. 4715].  On May 13, 2022, Ms. Ecke filed a *Notice of Appeal and Statement of Election* [D.I. 4783] on the Bankruptcy Court docket.  An appeal docket has been opened in the United States District Court for the Southern District of New York (Seibel, *J.*).  Ms. Ecke has taken no further steps with respect to her appeal to date.

### D.    Ascent Late Claims Motion

On June 16, 2022, Ascent Pharmaceuticals, Inc. ("**Ascent**") filed the *Motion of Ascent Pharmaceuticals, Inc. for Leave to File Late Proofs of Claim* (the "**Ascent Late Claims Motion**") [D.I. 4909].  Pursuant to its motion, Ascent seeks to file proofs of claim "to preserve the rights and claims it may have under three related and integrated agreements" that relate to prior patent litigation and that are the subject of the adversary proceeding discussed in *infra* Section VIII.D.[39] The Ascent Late Claims Motion currently is scheduled to be heard at the July 26, 2022 omnibus hearing.

## VII.    Collegium Appeal

Prior to the Petition Date, certain of the Debtors commenced certain patent infringement actions (collectively, the "**Infringement Action**") in the United States District Court for the District of Massachusetts against Collegium Pharmaceutical, Inc. ("**Collegium**").   In the Infringement Action, the Debtors asserted that Collegium's manufacture and sale of Xtampza® ER, an extended-release oxycodone-based pain medication, infringes certain of the Debtors' patents, including U.S. Patent No. 9,963,961 B2 (the "**'961 Patent**").  Shortly after the Debtors

---

[39] *See* Ascent Late Claim Motion ¶ 2.

asserted claims of infringement of the '961 Patent in the Infringement Action, Collegium filed a petition for Post Grant Review before the Patent Trial and Appeal Board (the "**PTAB**") seeking a determination that the '961 Patent was unpatentable (the "**PTAB Action**"). Both the Infringement Action and the PTAB Action were stayed upon commencement of the Chapter 11 Cases. In July of 2020, Collegium sought relief from the automatic stay to permit the PTAB Action to proceed.[40] The Debtors objected on the grounds that the PTAB Action was no longer in existence because the deadline by which Collegium was required to seek relief from the automatic stay had passed, and therefore the time for the PTAB to administer the PTAB Action had expired.[41] The Debtors also sought relief from the automatic stay to permit the Infringement Action to continue.[42]

On September 1, 2020, the Bankruptcy Court entered the *Order Granting Motions for Relief from the Automatic Stay* [D.I. 1644] (the "**Liftstay Order**"). The Liftstay Order granted relief from the automatic stay to permit both the Infringement Action and the PTAB Action to continue.[43] The Liftstay Order further provided that "(i) Collegium is barred from contending in any non-bankruptcy forum that the automatic stay under section 362(a) of the Bankruptcy Code has tolled, extended or precludes the imposition of any deadline imposed upon Collegium or upon the PTAB in the PTAB Action, and (ii) section 108(c)(2) of the Bankruptcy Code does not apply to extend any deadline in the PTAB Action unless it is determined in a non-bankruptcy forum that the PTAB Action is a "civil action" and that the PTAB is a "court" for purposes of section 108(c)

---

[40] *See Motion of Collegium Pharmaceutical, Inc. for Relief from the Automatic Stay* [D.I. 1465].

[41] *See Debtors' Omnibus Objection and Reply in Support of Debtors' Motion for Order Modifying the Automatic Stay to Permit the Debtors to Prosecute Certain Pending Patent Litigation* ¶ 2 [D.I. 1592].

[42] *See Motion for Order Modifying the Automatic Stay to Permit the Debtors to Prosecute Certain Pending Patent Litigation* [D.I. 1328].

[43] *See* Liftstay Order ¶ 2.

of the Bankruptcy Code and the other conditions of such section have been satisfied."[44]  Collegium

thereafter appealed this aspect of the Liftstay Order.[45]  At present, the parties have agreed to stay

the appeal while the PTAB Action proceeds (including an ongoing appeal to the United States

Court of Appeals for the Federal Circuit), subject to providing joint status reports to the United

States District Court for the Southern District of New York (Broderick, *J.*) at proscribed intervals.

The next joint status report is due to Judge Broderick by December 2, 2022 or within two weeks

after the conclusion of appellate review of the PTAB Action, whichever is earlier.

## VIII.    Ongoing Adversary Proceedings

### A.    *Purdue Pharma L.P., et al. v. Commonwealth of Massachusetts et al.*, Adv. Proc. Case No. 19-08289 (SHL)

This adversary proceeding is the one through which the Debtors have sought and obtained

a preliminary injunction enjoining the pursuit of active litigation against the Debtors and their

related parties.  The present status of this adversary proceeding is described in Section III above.

The last 4 extensions have been uncontested.

### B.    *Avrio Health L.P., et al. v. AIG Specialty Insurance Company (f/k/a American International Specialty Lines Insurance Company) et al.*, Adv. Proc. Case No. 21-07005 (SHL)

This adversary proceeding was initiated on January 29, 2021, by certain Debtors, the

Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases, and the Ad Hoc

Committee of Governmental and Other Contingent Litigation Claimants in the Chapter 11 Cases

(collectively, "**Plaintiffs**") against certain of Debtors' insurers ("**Defendant Insurers**") seeking

declaratory relief and damages with respect to insurance coverage for opioid-related bodily injury

claims ("**Opioid Mass Tort Claims**," as defined in the complaint).  Plaintiffs seek among other

---

[44] *Id.* ¶ 3.

[45] *Notice of Appeal and Statement of Election* [Case No. 20-7942, D.I. 1].

things an order (a) declaring the present and future rights, duties, and liabilities of Debtors and the Defendant Insurers under the Debtors' insurance policies with respect to the Opioid Mass Tort Claims; and (b) directing the Defendant Insurers to indemnify Debtors for, or pay on their behalf, damages suffered by Debtors arising out of the Opioid Mass Tort Claims.  By order dated June 29, 2021, the Court granted the *Joint Motion to Stay Claims in Favor of Arbitration* filed by certain Defendant Insurers with insurance policies containing arbitration clauses [D.I.164].  Defendant Insurers' motion to withdraw the reference was denied without prejudice by order of Judge Briccetti dated November 8, 2021. Case 7:21-cv-02674-VB [D.I. 52].

The adversary proceeding is moving forward against those Defendant Insurers whose insurance policies do not contain arbitration clauses.  Currently, the matter is in the fact discovery phase pursuant to the Court's Amended Scheduling and Pre-Trial Order entered on April 11, 2022 [D.I. 224].  The parties are discussing an extension of the fact discovery phase and, in the near future, intend to jointly seek the Court's approval of such an extension, as well as extensions of other dates in the Amended Scheduling and Pre-Trial Order that will have to be adjusted based upon an extension of fact discovery.

### C.  *Stacey Bridges and Creighton Bloyd, et al. v. Purdue Pharma L.P., et al.*, Adv. Proc. Case No. 21-07088 (SHL)

On August 30, 2021, Stacey Bridges and Creighton Bloyd, purportedly on behalf of others similarly situated, filed a *Complaint and Motion to Subordinate the Claims and Liens of the United States* [Adv. Proc. No. 21-07088, D.I. 1] (the "**Complaint**") naming Debtor Purdue Pharma L.P. and the United States of America as defendants (together, "**Defendants**" and with Ms. Bridges and Mr. Bloyd, "**Parties**").  "[I]n the interests of judicial economy and preserving resources of the estates of the Debtors, the parties have agreed to extend all Defendants' time to answer, move, or otherwise respond to the Complaint until after Debtor-Defendant [Purdue Pharma L.P.]'s

sentencing by the United States District Court for the District of New Jersey," which has not yet been scheduled. *Fourth Stipulation and Agreed Order Extending the Deadline for Defendants to Answer or Otherwise Respond to the Complaint* at 3 [Adv. Proc. Case No. 21-07088, D.I. 11]. The current deadline for each Defendant to answer or otherwise respond to the Complaint has been extended through and including September 26, 2022. [*Id.*]

### D.    *Ascent Pharmaceuticals, Inc. v. Purdue Pharma L.P., et al.*, Adv. Proc. Case No. 22-07029 (SHL) (the "Ascent Adversary Proceeding")

On June 16, 2022, Ascent filed a *Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105(A), 107(B), and Fed. R. Bankr. P. 9018 Authorizing Filing of Complaint Under Seal* (the "**Ascent Sealing Motion**") and a corresponding *Complaint* (the "**Ascent Complaint**") [Adv. Proc. No. 22-07029, D.I. 2, 3]. Per the Ascent Sealing Motion, "Ascent and Purdue are parties to certain settlement and business agreements" and the Ascent Complaint "stems from the Purdue Entities' purported termination and breach" of the same.[46] As noted above, the Ascent Complaint was filed under seal.

### CONCLUSION

On the very first day of these Chapter 11 Cases, the Debtors set forth their vision of turning over substantially all of their assets for the benefit of their creditors and to help individuals and communities across the United States that have been affected by the opioid crisis. The Plan, if consummated, will realize that vision of delivering billions of dollars, including the funds received as a result of the Shareholder Settlement, to trusts established for the benefit of States, localities, and other creditor groups to be devoted solely to opioid abatement efforts and victim

---

[46] *See* Ascent Sealing Motion ¶ 11.

compensation. The Debtors have maintained more than $1 billion of cash on the balance sheet[47] and preserved the value of their businesses while operating in a responsible manner, subject to the strictures of the Voluntary Injunction, so that additional value can be generated for opioid abatement. The Debtors have received nine favorable reports from the Monitor, each indicating that Purdue has been responsive to the Monitor's requests and concluding that the Debtors "appear to be making a good faith effort to comply with the terms and conditions of the Voluntary Injunction."[48] The Debtors are also delivering on public health initiatives that have the potential to make a meaningful difference and save lives in the context of the opioid crisis, most recently including securing FDA approval and bringing to market injectable Nalmefene.[49] The Debtors will continue to strive to emerge from chapter 11 as soon as practicable so that the assets of the estates can be put to work providing funding for opioid abatement efforts nationwide and compensating victims, and the Debtors' assets can be deployed to produce rescue medications and provide ongoing funding for the National Opioid Abatement and other Trusts.

---

[47] As of the date of the most recent Monthly Operating Report [D.I. 4929].

[48] *Initial Monitor Report* [D.I. 1175 Ex. A]; s*ee also Second Monitor Report* [D.I. 1584 Ex. A]; *Third Monitor Report* [D.I. 1956]; *Fourth and Final Monitor Report* [D.I. 2350]; *Fifth Monitor Report* [D.I. 2891]; *Sixth Monitor Report* [D.I. 3613]; *Seventh Monitor Report* [D.I. 4166]; *Eighth Monitor Report* [D.I. 4380]; *Ninth Monitor Report* [D.I. 4856].

[49] The public good expected to come out of these cases includes the development of what are expected to be lifesaving medicines through the company's public health initiatives ("PHI"). There are three primary PHI endeavors: (i) injectable Nalmefene, which is intended to be an opioid antagonist to reverse overdoses; (ii) over-the-counter Naloxone, the non-prescription and hopefully more accessible and lower cost alternative to Narcan; and (iii) Suboxone, which is a combination of morphine and naloxone. FDA approval of the generic version of Suboxone was granted in March 2020. For injectable Nalmefene, Purdue envisioned three different dosage points: a vial from which licensed professionals could extract Nalmefene with a syringe, and administer it either by injection or I.V.; a prefilled syringe with Nalmefene; and an EpiPen-like auto injector that can be administered in emergency by either professionals or family, friends, or even bystanders. With respect to the vial, FDA approval was achieved in February of 2022. The Debtors anticipate filing for FDA approval of the prefilled syringe by the end of this year. *See* Hr'g Tr., 22:17–25, 23-25: 1–24, June 15, 2022.

Dated:      July 20, 2022
            New York, New York

DAVIS POLK & WARDWELL LLP

By:    */s/ Marshall S. Huebner*                    

450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Eli J. Vonnegut
Christopher S. Robertson

*Counsel to the Debtors*
*and Debtors in Possession*