Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 19-23649-shl

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   PURDUE PHARMA L.P.,

8

9          Debtor.

10  - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11                  United States Bankruptcy Court

12                  300 Quarropas Street, Room 248

13                  White Plains, NY 10601

14

15                  July 26, 2022

16                  11:10 AM

17

18

19

20

21  B E F O R E :

22  HON SEAN H. LANE

23  U.S. BANKRUPTCY JUDGE

24

25  ECRO: JUSTIN WALKER

1   HEARING re Omnibus Hearing

2

3   HEARING re Doc. #4970 Case Status Report

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:   Sonya Ledanski Hyde

```
 1   A P P E A R A N C E S :

 2

 3   DAVIS POLK WARDWELL LLP

 4        Attorney for Debtors

 5        450 Lexington Avenue

 6        New York, NY 10017

 7

 8   BY:  MARSHALL SCOTT HUEBNER (TELEPHONICALLY)

 9

10   AKIN GUMP STRAUSS HAUER FELD LLP

11        Attorney for The Official Committee of Unsecured

12        Creditors

13        One Bryant Park

14        New York, NY 10036

15

16   BY:  ARIK PREIS (TELEPHONICALLY)

17

18   KRAMER LEVIN NAFTALIS FRANKEL LLP

19        Attorney for the Ad Hoc Committee of Governmental and

20        Other Contingent Litigation Claimants

21        1177 Avenue of the Americas

22        New York, NY 10036

23

24   BY:  KENNETH H. ECKSTEIN (TELEPHONICALLY)

25
```

Page 4

```
 1   CAPLIN DRYSDALE, CHARTERED

 2        Attorney for MSGE Group

 3        One Thomas Circle, NW, Suite 1100

 4        Washington, DC 20005

 5

 6   BY:  KEVIN C. MACLAY (TELEPHONICALLY)

 7

 8   WHITE CASE LLP

 9        Attorney for Ad Hoc Group of Individual Victims of

10        Purdue Pharma

11        1221 Avenue of the Americas

12        New York, NY 10020

13

14   BY:  J. CHRISTOPHER SHORE (TELEPHONICALLY)

15

16   US ATTORNEY'S OFFICE

17        Attorney for the United States

18        86 Chambers Street, 3rd Floor

19        New York, NY 10007

20

21   BY:  LAWRENCE FOGELMAN (TELEPHONICALLY)

22

23

24

25
```

Page 5

1  OFFICE OF THE UNITED STATES TRUSTEE

2        Attorney for the U.S. Trustee

3        201 Varick Street, Room 1006

4        New York, NY 10014

5

6  BY:  PAUL KENAN SCHWARTZBERG (TELEPHONICALLY)

7

8  SEWARD KISSEL LLP

9        Attorney for Ascent Pharmaceuticals, Inc.

10        One Battery Park Plaza

11        New York, NY 10004

12

13  BY:  CATHERINE V. LOTEMPIO (TELEPHONICALLY)

14

15  DEBEVOISE PLIMPTON LLP

16        Attorney for Mortimer Sackler, Beacon Company

17        919 Third Avenue

18        New York, NY 10022

19

20  BY:  JASMINE BALL (TELEPHONICALLY)

21

22

23

24

25

1   JOSEPH HAGE AARONSON LLC

2       Attorney for Raymond Sackler Family

3       485 Lexington Avenue

4       New York, NY 10017

5

6   BY:  MARA LEVENTHAL (TELEPHONICALLY)

7

8   KLEINBERG, KAPLAN, WOLFF & COHEN, P.C.

9       Attorney for State of Washington

10      500 Fifth Avenue

11      New York, NY 10110

12

13  BY:  MATTHEW J. GOLD (TELEPHONICALLY)

14

15  LITE DEPALMA GREENBERG & AFANADOR

16      Attorney for Certain Canadian Municipality Creditors

17      and Canadian First Nation Creditors

18      570 Broad Street, Suite 1201

19      Newark, NJ 07102

20

21  BY:  ALLEN J. UNDERWOOD (TELEPHONICALLY)

22

23

24

25

Page 7

P R O C E E D I N G S

1

2          THE COURT:  Good morning.  This is Judge Sean

3   Lane, in the United States Bankruptcy Court for the Southern

4   District of New York, and we're here for an 11 o'clock

5   hearing in the Purdue Pharma L.P. Chapter 11 case, Case

6   Number 19-23649, and I'll just start with just a minor

7   hiccup.

8          We got a couple calls in chambers from folks who

9   were using the dial-in number, and there seems to have been

10  some difficulty that a couple of people were having.  So I

11  waited a couple minutes to come out.  We were giving them

12  other information to get on using the Zoom link.  So my

13  apologies for anybody who's having any technical challenges

14  here this morning.  One of the joys of the COVID era.

15          So with that, I thought we would start as we

16  always do with appearances, folks who want to make an

17  appearance, starting with the Debtors.

18          MR. HUEBNER:  Good morning, Your Honor.  Can I be

19  seen and heard clearly?

20          THE COURT:  Yes.  I can hear you just fine.

21          MR. HUEBNER:  Okay.  For record, Marshall Huebner,

22  of Davis Polk & Wardwell, LLP on behalf of --

23          THE COURT:  All right, and on behalf of the

24  Official Committee of Unsecured Creditors?

25          MR. PREIS:  Good morning, Your Honor.  This is

Page 8

1   Arik Preis, from Akin Gump Strauss Hauer Feld, on behalf of

2   the Official Committee.  Can you hear me?

3          THE COURT:  I can hear you fine.  I will say the

4   line seems to be not ideal in terms of the audio I'm

5   getting.  I can hear people fine.  But if that becomes -- if

6   it degrades any further, we'll take a look and see where to

7   go from here.

8          And let me find out who's here.  I think there are

9   three, if I understand correctly, there are a few ad hoc

10  groups.  Let me get appearances from those folks.

11         MR. ECKSTEIN:  Good morning, Your Honor.  This is

12  Kenneth Eckstein, of Kramer Levin.  Good to see you.  I'm

13  appearing on behalf of the Ad Hoc Committee of Governmental

14  and Other Contingent Litigation Claimants in the case.

15         THE COURT:  All right.  Good morning.  Other ad

16  hoc groups?

17         MR. MACLAY:  Good morning, Your Honor.  This is

18  Kevin Maclay, from Caplin & Drysdale.  I represent the MSGE

19  Group, a group of local governmental entities, which, like

20  the AHC, is the other official governmental consent party

21  under the prior claim.  Thank you.

22         THE COURT:  All right.  Any other ad hoc groups?

23         MR. SHORE:  Good morning, Your Honor.  Chris

24  Shore, from White & Case, on behalf of the Ad Hoc Group of

25  Personal Injury Victims.

Page 9

1          THE COURT:  All right.  Good morning.  Any other

2   ad hoc groups?  All right.  Then I'll segue from that to

3   hear on behalf of the United States.

4          MR. FOGELMAN:  Good morning, Your Honor.  This is

5   Larry Fogelman, from the U.S. Attorney's Office for the

6   Southern District of New York, on behalf of the United

7   States.

8          THE COURT:  All right, and on behalf of the United

9   States Trustee's office?

10          MR. SCHWARTZBERG:  Good morning, Your Honor.  Paul

11   Schwartzberg.

12          THE COURT:  All right.  Good morning.  And from

13   Ascent Pharmaceuticals?

14          MS. LOTEMPIO:  Oh, good morning, Your Honor.  This

15   is Catherine LoTempio, from Seward & Kissel, on behalf of

16   Ascent Pharmaceuticals.

17          THE COURT:  All right, and on behalf of the

18   Sackler Family?

19          MS. BALL:  Good morning, Your Honor.  Jasmine

20   Ball, from Debevoise & Plimpton, for the Mortimer Sackler

21   side of --

22          THE COURT:  All right.  Good morning.  And there

23   are a variety of other folks who are listed here.  It's not

24   entirely clear who may be listen only or who isn't.  So I'll

25   go partially down the list to see how it goes.  On behalf of

Page 10

1    the Beacon Company?

2             MS. BALL:  Good morning, Your Honor.  That would

3    also be Debevoise & Plimpton, Jasmine Ball.

4             THE COURT:  All right.  And so --

5             MS. LEVENTHAL:  And Your Honor, I'm sorry --

6             THE COURT:  Go ahead.

7             MS. LEVENTHAL:  This is Mara -- this is Mara

8    Leventhal, from Joseph Hage Aaronson LLC, on behalf of the

9    Raymond Sackler Family.

10            THE COURT:  All right.  Good morning.  And so, at

11   this point, let me ask who else needs to make an appearance

12   this morning who has not yet done so.

13            MR. GOLD:  Good morning, Your Honor.  Matthew

14   Gold, from Kleinberg, Kaplan, Wolff & Cohen.  We represent

15   the State of Washington.  We are not here for the other

16   members of the group of states, sometimes referred to as

17   "The Nine" although we coordinate with them and report to

18   them as to every hearing.

19            THE COURT:  All right.  Thank you very much.

20   Anyone else who needs to make an appearance at this time?

21   All right.  Hearing no other parties, I understand --

22            MR. UNDERWOOD:  Your Honor?  I apologize.

23            THE COURT:  I'm sorry.  Go ahead.

24            MR. UNDERWOOD:  If I may, this is Allen Underwood,

25   from the firm of Lite DePalma Greenberg & Afanador, and I

Page 11

1    represent Certain Canadian Municipalities and First Nations.

2              THE COURT:  All right.  Good morning.  Good to

3    have you.

4              MR. UNDERWOOD:  Good morning.  Thank you.

5              THE COURT:  Any other parties who need to make an

6    appearance at this time?  All right.  I'm not hearing

7    anyone.  That doesn't mean frankly that there isn't someone

8    out there who may be having technical difficulties.  If

9    someone has not made an appearance and needs to, they can

10   chime in as they get their technical issues resolved.

11             And in the meantime, I will turn it over to

12   Debtors' counsel, Mr. Huebner, to -- we're here for a

13   status, and I have copy of the agenda that's at Docket

14   Number 4976.

15             And so, with that, let me turn it over to you to

16   set the stage, Mr. Huebner.

17             MR. HUEBNER:  Sure.  So, Your Honor, good morning

18   again and thank you for hearing us today.  You know, I think

19   it probably goes without saying that in a case of this

20   enormous complexity that is approaching its third

21   anniversary, one could easily speak really for virtually any

22   length.

23             I actually plan to speak for under two minutes

24   because to actually thoroughly give a complete history and

25   explanation and get into the highways and the byways would

Page 12

1    obviously be not only unusual but also would invite any of

2    the other 50 parties on the call who have slightly different

3    views on their particular cul-de-sac or their superhighways

4    in which they're involved to likewise express

5    (indiscernible) opening view of their sort of worldview of

6    the case.

7          What we tried to do in the transfer, the status

8    summary, was to provide an entirely factual and we believe

9    entirely unobjectionable and unequivocally accurate view of

10   where things stand and primarily to give the Court a sense

11   of what still lies ahead, which matters are still open and

12   live and will likely need to be resolved.  And so in terms

13   of the things that lie most of us think behind us, I really

14   will only take a minute.  And then obviously we'll be ready

15   to answer questions of anyone (indiscernible) that the Court

16   would find useful.

17         Your Honor, as I am guessing is probably well

18   known to the Court and probably a good slice of the legal

19   community in the country, where we are procedurally in the

20   case is (indiscernible) September 15th, approaching three

21   years ago, is that there is the plan that was confirmed by

22   Judge Drain.  That plan, I think it cannot (indiscernible)

23   truly remarkable achievement.

24         The intercreditor disputes that it resolved, of

25   which there were literally dozens, the things that it

Page 13

1    avoided, including potentially five, ten, fifteen years of

2    claim allowance, intercreditor fighting, you know,

3    subordination issues, equitable (indiscernible) issues are

4    legion, while the Sackler-facing settlements (indiscernible)

5    I think probably, you know, make sense to many, yet

6    virtually all of the press attention and the light, they're

7    really only one part of the plan.

8            And the interstate allocation, the state municipal

9    allocation, the public/private allocations and a variety

10   issues of the federal government, large and small, including

11   facing virtually every other constituency in the entire

12   case, adult PI, pediatric PI, states (indiscernible) to the

13   federal government often (indiscernible) entitlements to

14   other people's recoveries including by settlement are all

15   resolved.

16           As the Court knows, there were a small number of

17   appellants.  That number was cut by something like 60 or 70

18   percent during the appeal process where an enhanced

19   agreement was reached for which if we are ultimately cleared

20   for takeoff by the Second Circuit, which we very much hope

21   and are cautiously optimistic and hopeful that we will be,

22   we will need to come back with an 1127 motion to formally

23   incorporate the improvements into an amended plan.

24           There are all improvements -- in other words,

25   there are $898 million new dollars coming in, a number that

Page 14

1    could be as high as $1.398 billion and there are a variety

2    of other improvements and covenants based on creditors.  And

3    so where we are now with the appeal, and I will not express

4    views as to the merits, is that the U.S. Trustee's office,

5    three primary pro se claimants, a couple of whom -- I think

6    actually two of whom also are making filings on behalf of

7    other members of their family -- so you can call them three

8    pro se (indiscernible) a pro se technically can't advocate

9    on behalf of others.

10            But to be fair, it's a family (indiscernible) so

11   one individual pro se and two family pro se is another way

12   one could think about it, then Mr. Underwood's clients, who

13   constitute I believe five in total indigenous nations and

14   towns in Canada.  As we said in the status report, we have a

15   contract settled with I think either all or all but one of

16   the provinces in Canada.  We covered them -- the entire

17   populace of Canada obviously in a different direction.

18            So I don't know if (indiscernible) and I think the

19   case transfer memo is clear on this, that sort of Canada

20   writ large is objecting.  Quite the contrary, we actually

21   resolved the issues with Canada writ large a very long time

22   ago and Mr. Underwood's clients obviously are who they are.

23            And so out of 618,000, I believe, filed claims and

24   125,000 creditors, what we are essentially faced with is the

25   federal government, with whom we have an economic settlement

1    which is actually one of the cornerstones of the plan which

2    is extremely, extremely important, including government

3    creditors, because it supports the globally shared vision of

4    100 percent of the company's assets and every single dollar

5    that was obtained by negotiation, litigation and settlement

6    with the Sacklers go exclusively to abatement and victim

7    compensation and the federal government economic settlement

8    totally respects that and is in fact tremendously powerful

9    in turning over $1.75 billion of the $2 billion

10   superpriority status claim otherwise provided for through

11   plan distributions for the states and others as long as the

12   states get at least $1.75 and the company emerges as a

13   public benefit company (indiscernible).

14          Your Honor, one thing we did not put in the case

15   status point, obviously because it would have been truly

16   impossible to figure out exactly how to say in writing just

17   how many hands crafted, shaped, created, listed this plan,

18   some by coming in much earlier in the process, some by

19   coming in prepetition, some by coming in one year into the

20   case, some by coming in two years into the case, some coming

21   in only during the appeal.

22          I don't believe that the document created a

23   misimpression.  But I want to be very clear.  I'm moving

24   into my fifth year on this case, and others for whom it's

25   five or four or three or two.  But everybody involved, the

Page 16

1    amount of hard work has been really, really genuinely

2    mindboggling.  And we are where we are with something like

3    11 ad hoc committees or groups, not all of whom appear

4    today, and the UCC, all either supporting or not objecting

5    to this plan, because there is a passionate belief shared by

6    something like 99.9 percent of the people, entities and

7    groups that have appeared in this case, that we know of no

8    better outcome.

9         And while certainly one could dream of lots of

10   things that could be angelic or perfect as a potential

11   alternative, we live in the real world, and the real world

12   is complicated and messy and people have lives.  And this is

13   not Lehman where we can spend 15 years and, you know, X

14   billion dollars, you know, looking at these issues one by

15   one.  We actually have far more claimants than Lehman, far

16   more claims than Lehman.  Even discounting some

17   multitrillion-dollar claims entirely, there are over $40

18   trillion of filed claims in this case, which dwarfs anything

19   the U.S. bankruptcy system has ever seen before and will

20   hopefully see again.

21        So I do -- I do want to be very clear, without

22   naming individual committees and names and other things,

23   every ad hoc committee is actually onboard with the plan,

24   either as an active supporter of confirmation or as a non-

25   objector.  This was really not the Debtors' plan.  I think

1    that's the UCC's maybe opening line.  I don't remember

2    exactly.  I didn't go reread it.  In one of their appellate

3    briefs was this is not the Debtors' plan.  It is the

4    creditors' and victims' plan.  And they are the ones who

5    created it, crafted it, mediated it and met around in

6    negotiation and ultimately brought to the level of fruition

7    that we currently have.  And so I do want to -- leave no

8    doubt in anybody's mind that it goes without saying that the

9    Debtors not only lived it every day (indiscernible).

10        One last thing, Your Honor, just because I do

11   think it's important to note, you know, I have very long

12   said this is something about which I feel rather

13   passionately, that I am counsel to the fiduciary estate of

14   these entities and that is our job.  We are actually the

15   owner of the most valuable claims against the Sacklers

16   (indiscernible) we are the plaintiffs and they are the

17   defendants with whom we have settled.

18        The integrity of the process was never subject to

19   challenge from any party until during the case one person

20   who had appeared earlier in the case as a professor, as an

21   amicus and then later appeared with his (indiscernible)

22   client, did question the integrity of the special committee

23   process, albeit with no facts, on just very strong opinions.

24   Judge Drain nonetheless reported an examiner who was utterly

25   unknown to me, someone that I, among many others, had not

Page 18

```
 1    dealt with before and had no connection to.

 2              So I want to make sure the Court is aware the

 3    examiner did a lot of work and issued a detailed report.  I

 4    think it's fair to say he's given the special committee an

 5    A++ for integrity and utter independence and complete lack

 6    of connectivity to the Sacklers, leaving aside that the deal

 7    with the Sacklers at the mediation was an AHC represented by

 8    Mr. Eckstein, among others, the UCC, represented by Mr.

 9    Preis, among others, and the municipalities, represented by

10    Mr. Maclay, among others and the special committee opposite

11    the Sacklers.

12              The next round of mediation, 15 of the 24 formally

13    pulled out opposing members of the "nonconsenting" state

14    groups in a mediation under Judge Chapman came into an

15    enhanced (indiscernible) leaving what Mr. Gold referred to

16    as "The Nine," the eight states and the District of Columbia

17    as the only states still outside the deal.  And then during

18    the appellate process, in another mediation by Judge Chapman

19    in which the Debtors of course participated via the special

20    committee, via Davis Polk, "The Nine" separately reached the

21    final enhanced (indiscernible) that that committee is

22    awaiting hopeful successful appeal and 1127.

23              So I do want to be clear because, you know, there

24    is no crown higher than the crown of a good name, and if

25    there's no integrity in the process, then its outcome is
```

1    almost a sideshow.  I think there can be no possible

2    question, nor is there one both before and since that one

3    question that led to the special examiner being appointed,

4    there was never a question from any party in this case about

5    those issues that was not clarified through the special

6    (indiscernible) I think we're long past.

7            So, Your Honor, that's actually all I do have to

8    say.  My understanding is that there a couple other

9    constituencies who would like to say hi this morning

10   (indiscernible) surprise.

11           Let me first pause because my first goal for

12   today, there are no contested matters, which happily I may

13   be surprised, it's going to be true of most of our omnibus

14   (indiscernible) because we have worked day and night and

15   night and day to settle everything that can be settled.  And

16   on the very first day of the case, we actually issued a

17   clear clarion call on the record for people to just please

18   call us if they have an issue, a question, a concern.  Like

19   things don't get done better if someone first files papers

20   and then calls you.  They get, in my view, much better and

21   more cost effectively if people just call.

22           So it is not a coincidence or unusual that this

23   omnibus hearing is utterly uncontested.  Many of them

24   actually have called (indiscernible) in a case that

25   generates both the passion and the complexity and the

Page 20

1    serious interest implicated by the Purdue Pharma affair.  So

2    with that, Your Honor, let me be of service in whatever way

3    I can to the Court other than turning off both my microphone

4    and my camera to allow others.  But let me first see if

5    there's anything else that I can be, as Debtors' counsel,

6    can be of assistance at this conditional hearing.

7              THE COURT:  All right.  Thank you very much.  So

8    first, let me thank you for the case status report.  As I

9    think everyone on the phone knows, I'm inheriting this case

10   from Judge Drain.  I've been on the bench here in the

11   Bankruptcy Court for just about 12 years, but have not been

12   involved in this case up to this point.

13             And so the case status report, which is Docket

14   4970, I took it in the spirit in which you identified it

15   this morning, which is a factual recitation of issues that

16   are relevant for the case going forward.  And obviously it's

17   not a pleading that's advocating a particular position on

18   any particular motions or matters that may come in front of

19   me going forward.

20             It was essentially just to get an idea of what the

21   matters are.  And so everybody reserves their rights and

22   nothing that Mr. Huebner said this morning or that is set

23   forth in the case status report is intended or I have taken

24   to be as argument on any particular substantive matter.  So

25   just want to make that clear.  But as a judge, I have to

1    start somewhere in terms of getting a good handle on the

2    case.  And so it is a very helpful document to give me to

3    sort of issue spot, as they used to say in law school, of

4    the things that are on the horizon in the case.

5           So let me -- again, I appreciate that document

6    which is obviously available to anybody in the public who's

7    interested.  I have a couple of questions, one of which I

8    think I know the answer to.  So I'll start with that one

9    first.  As to the Second Circuit, my experience both on the

10   bench and in a prior life is that we don't have any sense of

11   the timing as to when that decision will come down.  I

12   assume that that's the case.

13          MR. HUEBNER:  It is, Your Honor.  The Second

14   Circuit accepted the appeal on a highly expedited schedule.

15   Both the briefing schedule and the (indiscernible) issue,

16   which they resolved, basically immediately and so it was

17   certainly accepted as something that was very time-

18   sensitive.  That said, there have been expedited appeals

19   before in which people waited, you know, four weeks and

20   appeals where people waited 12 months for resolution.  We

21   just don't know and we certainly have no indication --

22          THE COURT:  No.  That's fair.  That's fair, and

23   that's my experience as well.  It will be -- the decision

24   will be issued when the decision is issued.  So my next

25   question I think actually it does have an answer, and some

Page 22

```
1    of it is the strains of an answer sort of set forth in the

2    case status report.  But I thought it would be helpful if

3    you would discuss, as we wait, what are the things that will

4    need attention as we wait for the Second Circuit decision.

5    And you've already sort of given a preview as to when we get

6    the decision, what you hope to be able to file.  But there's

7    probably too many -- too many potential paths that may come

8    up after decision to plot those out.

9              So my question I guess is much more a cabin off,

10   which is as we wait, what do you anticipate for the next

11   three to six months of being on the horizon.

12             MR. HUEBNER:  Sure.  Your Honor, one of the

13   attributes of the case that obviously was very controversial

14   I think in the very beginning but became much less

15   controversial and has been in fact I think not really

16   controverted at all for over two years is the injunction and

17   self-injunction.  In a normal case where only the debtor is

18   at issue, all litigation, with very few exceptions, is

19   automatically stopped as a matter of law by the automatic

20   stay.

21             Here obviously because there are shareholder co-

22   defendants, which we know are currently pursuant to the

23   negotiated settlements contributing or settling and paying

24   $5.5 to $6 billion in connection with all this.  We believe

25   that unless a case was created in which the thousands of
```

1    lawsuits, of which dozens were being filed daily in the

2    weeks before the petition date were all frozen, there could

3    be no claim field on which to try to resolve the case.

4           So that litigation began contested but actually

5    became uncontested within a couple of months into the case

6    with the exception of one set of I believe it was either

7    Tennessee or Kentucky counties who appealed.  And they did

8    not prevail on appeal.  And Judge (indiscernible) I think

9    very strongly upheld the injunction.

10          The status of that injunction, which I think as

11   the case status report lays out, is that it has been

12   contested for the last three or four claims which obviously

13   spans many months and we've all been working towards these

14   common goals.  The status of that injunction currently is

15   that the order entered by Judge Drain most recently extends

16   it to 30 days after the Second Circuit rules.  So whichever

17   way they rule, all parties must (indiscernible) meaningful

18   conversation and then, you know, decide what we believe is

19   right and either litigate or file consensual papers as seems

20   appropriate.

21          There is that safety valve in there that if the

22   Second Circuit has not ruled by July 15th, a party is

23   permitted to make a motion seeking to terminate or shorten

24   the injunction.  You know, without obviously getting into

25   any privileged settlement conversations, you know, a couple

1   people said, look, what if they don't rule for a year.  What

2   if we're just sitting here forever and ever and ever?  There

3   just can't be a forever injunction.  At some point we need

4   to be able to say due to lack of a ruling (indiscernible) so

5   there is that safety valve.

6            My hope and expectation is that no party would

7   seek to avail themselves of that until (indiscernible) today

8   given that a decision could come down this afternoon or next

9   week or the week after that would hopefully allow us to

10  bring to fruition something that has taken four years to

11  build and obviously a staggering amount of professional fees

12  and dozens of parties, to shatter it on what might be the

13  half-yard line and beginning thousands of individual

14  litigations, each of which separately seeking to jump the

15  queue, including, and most importantly maybe from our

16  perspective, in competition with the estate's own claims.

17            I want to make sure that is just crystal clear,

18  which is the estate, as a matter of law, owns the fraudulent

19  transfer claims, the veil piercing claims, the alter ego

20  claims and potentially many, many other categories of

21  claims.  And, you know, one of the tragedies that this plan

22  avoided is the estate litigating for years as a competitor

23  with its own stakeholders as they litigate for years as

24  competitors with one another.

25            And so issue number one, and I'll leave it at that

Page 25

```
 1   for right now, is there is a theoretical possibility that

 2   the extraordinary self-injunction and injunction -- because

 3   when we asked for relief, Your Honor, we also asked for

 4   something that's never been done before to our knowledge,

 5   which was an injunction on the Debtors themselves to ensure

 6   that their conduct would be beyond sort of pure during the

 7   bankruptcy case in terms of the operations and the alleged

 8   conduct that led to us being here in the first place.

 9            Judge Drain said at that hearing, you know, that

10   all sounds sensible.  But shouldn't we also have a monitor

11   to be an external validation source to be comfortable that

12   your conduct as a pharma company selling narcotics remains

13   currently above reproach.  And the monitors of course can

14   speak for themselves.  But I think they all I think clearly

15   indicate good faith compliance and more and better in

16   connection with these issues.

17            So issue number one, Your Honor, which I hope is a

18   very remote incidence, is that someone decides, you know,

19   I'm done waiting.  I want to throw off the injunction and

20   thus probably the whole case so I can personally begin

21   litigating against the Sacklers myself again.  That's sort

22   of number one.

23            There are a variety of issues in the list of

24   actual matters.  For example, Your Honor, there was a

25   (indiscernible) from Ascent Pharmaceuticals matter on for
```

Page 26

```
 1    today.  Without going into detail, there is a dispute about

 2    whether a contract has been terminated and rights waived or

 3    not and (indiscernible) I would call that a discrete dispute

 4    with a counterparty.  And obviously if that is not settled,

 5    that will have to be resolved by the Court.

 6            There are insurance issues that are proceeding in

 7    adversary proceedings that I actually know the least about

 8    except to say that in general the Debtors and various other

 9    creditor groups including two who currently have pro

10    standing believe that we have very, very valuable insurance

11    rights and that that will be material to recovery in the

12    case.  I think it's fair to say that there are insurance

13    companies who believe that they have either little or no

14    obligation to pay many of these claims, and that is an issue

15    that we've had several hearings on and is proceeding.

16            There are also late claims that continue to be

17    filed.  I think in sort of broad brushstrokes, I think that

18    it's fair to say that until now (indiscernible) with the

19    transition, Your Honor, from Judge Drain to you, it has much

20    more to do with the fact that we just hit the two-year

21    anniversary of the bar date, which, you know, while time is

22    sort of arbitrary, it's just (indiscernible) motion used as

23    a measure of our existence.  It is two full years and that

24    is not trivial.

25            I mean, so I think the best way to describe it is
```

Page 27

1    that the Debtors and the UCC have taken a very thoughtful

2    and I think very pro-Claimant approach so far.  And as each

3    late claim has come in, frankly, you know, time and

4    unfortunately committee fees that may well substantially

5    exceed the ultimate recovery for the claimant have been

6    spent gathering further data and in many cases asking Judge

7    Drain to allow the late claim, it's allowed conditionally.

8    But we believe that the factors have been satisfied.

9          But it is also true, and Judge Drain himself has

10   said from the bench there comes a point after which you just

11   can't keep, you know, again and again and again spending the

12   resources which come at the expense of all of the other

13   victims who timely filed claims to be drained looking at

14   claims that are this far out from the bar date.

15         And so I think there will be I'm sure further late

16   claims because many people on the victim and creditor side

17   of the case are in unthinkable life circumstances, you know,

18   either suffering terribly from opioid use disorder, having

19   had their personal, financial, medical, mental lives

20   trammeled or destroyed in part by products that may have

21   been sold by Purdue.

22         Maybe there are many claims coming from

23   incarcerated individuals who often say they have no access

24   to the information in the media and only recently learned of

25   it.  And so I think there will continue to be because then

Page 28

1    there are hundreds of thousands for sure and potentially

2    millions of potential creditors (indiscernible) we may be

3    taking a slightly different tact going forward because,

4    again, it's money coming out of defendants to analyze and

5    potentially validate a late claim of other claimants.  So

6    it's not costless and it is coming out of the

7    (indiscernible) victims.

8              There are a couple other things that are listed in

9    the case status report.  But I think that it has been

10   happily a very, very quiet six, seven, eight weeks in Purdue

11   on all counts.  I've had virtually no conversations with

12   Purdue's many constituencies, which is a dramatic contrast

13   to the four-plus years that precedes it with usually, you

14   know, 10, 12, 14 hours virtually every day.  I think the

15   hope, including to keep the expenses way, way down at

16   present is that there should be little to nothing going on

17   until the Second Circuit rules except in a couple of

18   discrete areas like the Ascent dispute which is a highly

19   specific two-party dispute about a contract.

20             I will ask my Davis Polk colleagues in the first

21   instance, it is certainly more than possible that I have

22   omitted something that should have been the first, you know,

23   item on the list here.  And so if one of my colleagues

24   believes I have left out something that is directly

25   important and responsive, I would ask that they jump in and

Page 29

1    say, hey, you forgot this really important thing.

2            But given that I believe that the UCC and the AHC

3    at a minimum intended to say hi, and maybe a longer hi than

4    just hi, I'm also assuming since I have not (indiscernible)

5    correct or supplement what I thought (indiscernible) someone

6    may assist me if I have left something out that would be

7    responsive.

8            THE COURT:  All right.  Anything else from the

9    folks at Davis Polk?  All right.  I take that as

10   confirmation that you've covered what needed to be covered.

11   Thank you very much for your remarks.  And with that, I will

12   turn it over to the UCC to be heard.

13           MR. PREIS:  Good morning, Your Honor.  This is

14   Arik Preis.  Can you hear me?

15           THE COURT:  I can hear you just fine.  Thank you.

16           MR. PREIS:  Just again, for the record, Arik

17   Preis, from Akin Gump Strauss Hauer Feld, on behalf of the

18   Official Creditors Committee.  If Your Honor's okay, I don't

19   intend on taking any more than a couple of minutes.

20           First, I'd like to introduce the members of the

21   Creditors Committee.  The UCC currently consists of eight

22   members, a mother who has actually lost two children to

23   opioid overdose, another mother who has a child born with

24   neonatal abstinence syndrome, a grandfather whose grandchild

25   was born with neonatal abstinence syndrome, a hospital

1    system, a third-party payer, a trade creditor, a co-

2    defendant with potential claims and the PDGC.

3            Second, the UCC has taken its fiduciary duty to

4    all unsecured creditors in this case very seriously.  To

5    that end, I just want to note three things.  First, we have

6    three ex officio members, a county in Texas, a public school

7    district, the Thornton Township School District, and two

8    Native American tribes.

9            Second, we're in constant communication with the

10   Debtors as well as, as Mr. Huebner noted, the 11 or so other

11   ad hoc groups that have formed in the case as well as other

12   parties that have appeared in the case, including the DOJ,

13   the U.S. Trustee, the NAACP and others.  Third, we've tried

14   to do most of our work behind the scene, and we've been very

15   active.  We believe the record in the case kind of speaks

16   for itself, and we will continue in that regard.

17           Third, when this case started, we told Judge Drain

18   we have three goals: first, to maximize value for all

19   unsecured creditors and claimants, and you heard Mr. Huebner

20   talk about the settlement with the Sacklers as well as the

21   value of Purdue's claimants; second, to determine a fair

22   allocation of that value, that, as Mr. Huebner noted, that

23   took close to a year of mediation; and third, to focus on

24   the public health aspect of this case.

25           The case status report explains what has happened

Page 31

1    with these goals.  One of the items that Mr. Huebner

2    mentioned that is still ongoing is the insurance adversary

3    proceeding.  I know Mr. Huebner said he knows the least

4    about it.  I think Reed Smith has been the Debtors' counsel

5    involved in that, and as he correctly pointed out, it is

6    being handled on a three co-plaintiff basis by the AHC, the

7    UCC and the Debtors.  And I do believe there will be -- if

8    we wait for the Second Circuit for a while, there will be

9    items regarding the insurance adversary that may come into

10   (indiscernible) that may.

11          Finally, let me end with this.  Every day in

12   America, the number of people who die from opioid overdose

13   is akin to the number of people who die in a large plane

14   crash, and the number who suffer from opioid use disorder is

15   multiples of that, and of course the number of people who

16   are affected by the opioid crisis, whether it be family,

17   relatives, friends, acquaintances, loved ones, coworkers,

18   colleagues, teammates, classmates, et cetera, is many, many

19   multiples of that.  This has led to a significant emotional

20   and, as importantly, financial burden on our country.  It is

21   a national crisis and it's likely the worst manmade epidemic

22   of our lifetime.

23          The plan provides significant funds in respect of

24   the economic needs of abatement and victim compensation

25   (indiscernible) it provides for a document repository to be

Page 32

```
 1    created with millions of pages for learning, education,

 2    research and future litigation and that document repository

 3    board includes claimants from across the claimant

 4    constituency.  It includes a business injunction, as Mr.

 5    Huebner mentioned, that will continue.  It includes the

 6    continuation of the monitor and a new entity, I'm sure

 7    (indiscernible) will mention, dedicated to the public good.

 8               The process has been also somewhat cathartic for

 9    some victims, allowing them the chance to make claims, have

10    their voices heard and significantly, for many of them, to

11    confront the Sacklers on Zoom four months ago.  And as Mr.

12    Huebner pointed out, some incarcerated claimants continue to

13    make claims.  But we sincerely hope that this case can come

14    to a close soon so that the benefits of the plan can start

15    to be received.

16               With that, Your Honor, as I mentioned, I mentioned

17    a few things that Mr. Huebner mentioned as far as things

18    that are continuing, with regard to the insurance adversary

19    and the late-filed claims.  But other than that, I have

20    nothing to add to what Mr. Huebner (indiscernible) --

21               THE COURT:  All right.  Thank you very much for

22    your remarks.  And now seems to be an appropriate time as

23    any to just weigh in and express my sympathies to the folks

24    on your committee and the folks that they represent in terms

25    of victims of the opioid crisis, which has obviously been
```

1    the subject of extended conversation and remarks over the

2    course of this case.

3              But as someone new to the case, I wanted to add

4    that, my views as well.  So again, today is a status

5    conference, and I appreciate everybody's thoughts in terms

6    of trying to give me a preview of where we're going and

7    where we've been.

8              So let me ask who else wishes to be heard in

9    connection with the status.

10             MR. ECKSTEIN:  Your Honor, good morning.  This is

11   Kenneth Eckstein, of Kramer Levin Naftalis & Frankel.  If it

12   would be useful to Your Honor, I'm happy to briefly describe

13   the role that the Ad Hoc Committee of Governmental and Other

14   Contingent Litigation Claimants played.  I'm mindful that

15   there are many groups in the case, and I don't want to

16   belabor.  But if Your Honor would like, I can -- I can give

17   you a brief context.

18             THE COURT:  I'd say brief remarks would be fine.

19             MR. ECKSTEIN:  Thank you, Your Honor.  Your Honor,

20   the Ad Hoc Committee of Governmental and Other Contingent

21   Litigation Claimants, which you'll often hear referred to as

22   the AHC, has played a very active role throughout the case.

23   The Ad Hoc Committee consists of ten states.  That would be

24   Florida, Georgia, Louisiana, Michigan, Mississippi, New

25   Mexico, Ohio, Tennessee, Texas and Utah.

1          It also includes the court-appointed Plaintiffs'

2     Executive Committee, or the PEC, in the multidistrict

3     litigation that's pending in the Northern District of Ohio

4     before District Judge Polster, and that includes thousands

5     of cities, counties and tribes, as well as other litigants,

6     who are actively involved in the opioid litigation prior to

7     the commencement of the bankruptcy case.  There are also six

8     political subdivisions of states on our committee and one

9     federally recognized American Indian tribe.

10          Your Honor, members of the Ad Hoc Committee filed

11     complaints (indiscernible) petition against both the Debtors

12     and members of the Sackler family seeking billions of

13     dollars in damages, asserting claims of fraud, negligence,

14     per se consumer protection and racketeering statute

15     violations and other violations of state statutes.

16          The members of the Ad Hoc Committee agreed to a

17     prepetition settlement framework with the Debtors and the

18     Sacklers which had the support of 23 states, five

19     territories and countless cities, counties, municipalities

20     and tribes.  The settlement framework was designed toe

21     facilitate the contribution of billions of dollars towards

22     abating the public health crisis caused by the opioid

23     epidemic and was designed to try to avoid years of costly

24     and protracted litigation.

25          The Debtors agreed to recognize the role of the Ad

Page 35

1   Hoc Committee as a negotiating body that would help shepherd

2   the settlement framework through bankruptcy and to garner

3   the broadest possible additional outreach to other

4   creditors, the parties determined that it was essential that

5   the contemplated Ad Hoc group comprise both the negotiating

6   states and non-state governmental claimants whose interests

7   are not always aligned in the case.

8            Additionally, in light of the policy of the United

9   States Trustee that governmental entities cannot serve on

10  official creditors committees, as part of the settlement

11  structure, the Debtor agreed to reimburse the costs and fees

12  of the Ad Hoc Committee's professionals and Judge Drain

13  entered an order in December 2019 approving that arrangement

14  and recognizing the status of the AHC in the case, and that

15  order is at Docket Number 394.

16           The Ad Hoc Committee has played an active role

17  throughout the Chapter 11 case.  The committee determined

18  early on that the best use of assets under the plan was to

19  fund abatement programs, a very unusual and precedent-

20  setting approach to Chapter 11.  With this goal in mind, we

21  worked with the Debtors and the other major creditor groups

22  throughout the case to help facilitate the restructuring,

23  improve the terms of the deal with the Sacklers and obtain

24  confirmation of a plan pursuant to which substantially all

25  proceeds would be dedicated to abating the opioid crisis.

1          In addition, the Ad Hoc Committee was actively

2    involved in three separate successful mediation processes:

3    first, a six-month-long mediation over the allocation of

4    value among creditors which successful resulted in an

5    agreement on the allocation of value between public and

6    private creditors as well as among public creditors

7    themselves; two subsequent negotiations with the Sacklers,

8    the Debtors and other parties in interest to enhance the

9    terms of the Sacklers' contribution; and, as you've heard,

10   the establishment of a document repository to facilitate

11   transparency for the public's benefit.

12          The AHC was active at plan confirmation.  We

13   propounded testimony from five witnesses that Judge Drain

14   relied on in confirming the plan and submitted substantial

15   briefing in support of the plan.  The Ad Hoc Committee has

16   also been an active participant in the appeals of the

17   confirmation order and related litigation, including various

18   stay motions and the direct appeal motions.  We have

19   submitted briefs and participated in oral argument in

20   support of the plan, both before the district court and the

21   Second Circuit.

22          Your Honor, the opioid crisis, as you've heard, is

23   a significant and intractable public health emergency, one

24   that the members of the Ad Hoc Committee have been working

25   diligently to address for numerous years.  The Ad Hoc

Page 37

1    Committee remains hopeful that the Second Circuit will

2    promptly reverse Judge McMahon's decision and permit the

3    plan to go effective.  The plan represents, in our view, a

4    global resolution of many disparate issues and we believe it

5    represents the best chance to maximize value for all

6    stakeholders and address this national health crisis in an

7    extremely constructive and positive manner.

8              Your Honor, we concur with the characterizations

9    of where the case currently stands.  But I wanted Your Honor

10   to have an appreciation of the role that our group has

11   played and continues to play in the case.  I'm happy to

12   respond to any questions.

13             THE COURT:  All right.  Thank you very much for

14   your comments.  Is there any other party that would like to

15   briefly be heard as to status?

16             MR. MACLAY:  Your Honor, this is Kevin Maclay, for

17   the MSGE group.

18             THE COURT:  All right.

19             MR. MACLAY:  Okay.  Your Honor, much of what I

20   would say would mirror what Mr. Eckstein has said on behalf

21   of the AHC group.

22             As did the AHC group, the MSGE group has

23   participated in all three mediations, is a term sheet party,

24   has various consent rights as one of the two governmental

25   consent parties under the plan and, of course, is hopeful,

Page 38

1    as is the AHC, that the bankruptcy plan will be allowed to

2    move forward given its important focus on abatement and the

3    fact, of course, that hundreds of lives are being lost every

4    day, as Mr. Preis pointed out, and we would be hopeful that

5    this plan would help alleviate some of those harms.

6           So in terms of the plan status, I think, Your

7    Honor, a lot of it is, as Mr. Huebner put it, a bit of wait

8    and see to see what happens at the Second Circuit level.  In

9    terms of things that need to be done between now and then, I

10   think Mr. Preis put forward quite eloquently what could

11   arise between now and the potential remand.  And other than

12   that, Your Honor, we're all kind of waiting to see, you

13   know, when the other shoe will drop.

14          So if Your Honor has any questions, I'm obviously

15   here to answer them.  My group, by the way, the MSGE group

16   is comprised of approximately 1,300 cities, counties, tribal

17   nations, hospital districts, Independent school districts

18   and other local governmental entities across 37 states,

19   representing somewhere in excess of 16 million individuals,

20   and we are of course, you know, very, very invested in this

21   process and hopeful of a relatively quick resolution to it.

22          THE COURT:  All right.  Thank you very much.

23   Anyone else who wishes to briefly be heard as to status?

24   All right.  Hearing no further comments, let me thank

25   everybody for their comments here this morning.  I

Page 39

1    appreciate, as I said, the case status report as well as the

2    comments of folks.  I also appreciate all the hard work that

3    has gone into this case to this point.  It's an

4    understatement, given how hard folks have worked to try to

5    achieve an appropriate result in a difficult case like this.

6              I do want to make sure to say that I recognize

7    that whatever decision comes down, whatever that decision

8    is, that it will create a lot of strong feelings by a lot of

9    parties.  And what I -- my intent is, and I just want to

10   make it clear, is to hold a status conference shortly after

11   the decision comes down so that we can discuss the

12   appropriate path forward.

13             And I mention that just so that people will

14   understand that they have a forum in which to have that

15   discussion.  And so don't feel pressure to file some motion

16   or sets of motions, excuse me, or pleadings on the immediate

17   heels of a decision.  I will make sure to hear from everyone

18   as to where we go from here after the Second Circuit rules.

19             But we want to do that in an orderly, cohesive

20   process so that we can hear from everyone but try to do it

21   in an efficient way.  And so I would think that a status

22   conference is the best way to do that.  And so I wanted to

23   just get that message out here today.  It seemed an

24   appropriate message to convey, consistent with the themes of

25   the morning.

1              And so I know that there have been discussion with

2      my chambers about upcoming hearing dates.  I know we have a

3      hearing date, the next one is August 17th.  I also know that

4      there have been discussions with Ms. Ebanks in my chambers

5      about picking a hearing date for September, October,

6      November, December, just going forward.  And obviously we'll

7      get you dates that will be omnibus dates.

8              But in addition obviously, we'll set whatever

9      dates need to be set to deal with whatever developing

10     situations occur.  And again, I just say this so that folks

11     don't feel an undue pressure to file something immediately

12     so as to get the matter before me.  Again, if there's a

13     decision, my intent is to have a status conference and then

14     we can figure things out.  So that would seem to address

15     scheduling.

16             And so, with that, I'll go back to you, Mr.

17     Huebner, as to anything else that we need to address here

18     this morning.

19             MR. HUEBNER:  Your Honor, just very, very quickly.

20     Number one, the comment about the FMF, the ruling is

21     appreciated.  The reason that I think everybody here agreed

22     or chose not to object to the T-plus-30 days either way was

23     in fact to give us time to caucus.  This will obviously be

24     enormously complicated no matter what the ruling is and

25     there are also multiple permutations what the ruling might

1    say.  And I don't think anybody should know what they want

2    to do until a week or two or three after the ruling comes

3    out, unless it's obviously extremely one direction or

4    another.  And obviously with that said, we stand ready, as

5    we always do, to caucus with anybody and everybody in the

6    aftermath of the ruling.

7            The final thing I would say, Your Honor,

8    hearkening back to a topic that I addressed briefly in the

9    opening, I take it so for granted that it just didn't even

10   occur to me to mention it.  But I think it is worth to

11   mention just because there have been misperceptions and they

12   are reporting (indiscernible) the last Sackler last attended

13   a board meeting in 2018.  I think technically, you know, a

14   final letter arrived I think on January 9, 2019 formalizing

15   the final resignation that had already happened.

16           And so I do want there to be no possible mistake.

17   It's not only that the special committee was given an A++ by

18   the examiner.  The Sacklers have had no role of any kind in

19   the governance, the management, the direction, anything

20   except as frankly a counterparty and a stakeholder and, in

21   the minds of many, a defendant and now a

22   contributor/settlement party under the plan.

23           So again it probably does not need to be said.

24   But since it's in the landscape for three years, for many of

25   us four years, I did want to be clear lest there be any

Page 42

1    possible confusion.  It's not that there's a special

2    committee that's independent.  But the board itself or other

3    role that the company involved the Sacklers.  The Sacklers

4    have left the building in toto in 2019.  This is why I began

5    correctly by saying certainly as to my role, I view myself

6    as counsel for the fiduciary Chapter 11 estate, most

7    assuredly not to the shareholder (indiscernible) back in

8    time, Purdue entities (indiscernible) --

9           THE COURT:  All right.  I appreciate that comment.

10   It's consistent with sort of this morning's theme of level-

11   setting going forward.

12          MR. HUEBNER:  Yeah.  Yeah, and I have nothing

13   else, Your Honor, except to thank the Court for its time and

14   to hope that everybody stays healthy and well in these

15   challenging times.  And we will see the Court in August.

16          THE COURT:  All right.  And let me just -- in

17   light of your comments about timeframe and people may not

18   know what they think a week after the ruling, two weeks,

19   three weeks.

20          My intent would be to have a status conference

21   within a couple of days of the ruling, not before people get

22   a chance to read it and digest it within their offices and

23   talking to their clients and stakeholders.  So it wouldn't

24   be the next day.  I think that would be too soon.  But it

25   would be within a week of any ruling.  And that may be just

Page 43

```
 1    the start of a conversation, right?

 2            So it may be that we need more than one status

 3    conference to have an ongoing conversation to figure out

 4    next steps.  We'll all -- as I think you correctly said,

 5    there's too many possible permutations of what a ruling

 6    could be to gameplan and figure out appropriate responses

 7    and positions by any party, much less all of the parties who

 8    are involved in this case.

 9            So I just want to give people sort of an

10    understanding of the timeframe.  So I would think three or

11    four business days would be something that I would

12    contemplate.  And again, it may be the start of a

13    conversation where we may need to have more than one

14    conversation.  But we'll figure it all out in the fulness of

15    time.

16            But just so that people don't expect something the

17    next day.  I think that's probably too soon to digest

18    whatever ruling they say because I think the one thing

19    everyone can agree upon is that the ruling on appeal is very

20    complicated.  These issues are extraordinarily complicated.

21    And so no ruling from the Second Circuit is going to be a

22    simple matter.

23            And so, with that, we'll get there and we'll

24    figure this out as we move forward.  And again, I appreciate

25    everybody's thoughts today.  I look forward to seeing all of
```

Page 44

1    you in the future and working on the case to try to achieve

2    the best result possible, whatever that looks like

3    consistent with applicable law.

4              So on that note, I believe we've finished the

5    business for which our hearing was conveyed, and we will get

6    together in August.  And my best wishes to everyone for your

7    good -- continued good health in these strange times.  And

8    see you all soon.

9              (Whereupon these proceedings were concluded at

10   12:08 PM)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 45

```
 1                    C E R T I F I C A T I O N

 2

 3        I, Sonya Ledanski Hyde, certified that the foregoing

 4   transcript is a true and accurate record of the proceedings.

 5

 6

 7

 8   Sonya Ledanski Hyde

 9

10

11

12

13

14

15

16

17

18

19

20   Veritext Legal Solutions

21   330 Old Country Road

22   Suite 300

23   Mineola, NY 11501

24

25   Date:  July 27, 2022
```