# EXHIBIT 2

The BAS Agreements: (i) Engagement Letter, including "*Attachment A – STANDARD GRANT THORNTON LLP ENGAGEMENT TERMS*" attached thereto, dated September 27, 2022; and (ii) the "*Statement of Work (SOW) for Advisory Services*" dated September 27, 2022



**GRANT THORNTON LLP**
2001 Market Street, Suite 700
Philadelphia, PA 19103

**D**  215 561 4200
**F**  215 814 4090
**S**  linkd.in/grantthorntonus
     twitter.com/grantthorntonus

September 27, 2022

Mr. Terrence Ronan
Executive Vice President, Chief Financial Officer
Purdue Pharma L.P.
201 Tresser Boulevard
Stamford, CT 06901 - 3431

Re: Mergers & Acquisition Services

Dear Mr. Ronan:

Grant Thornton LLP ("Grant Thornton," "Firm," or "we") is pleased to provide professional services (the "Services") to Purdue Pharma L.P. (together with its affiliates that are debtors in the chapter 11 proceedings collectively referred to herein as the "Company," "Client," or "you"). The purpose of this Engagement Letter (the "Letter"), Attachment A – Standard Grant Thornton LLP Engagement Terms, any related Statement(s) of Work (collectively, the "Agreement"), is to confirm the scope and terms of our engagement based on our mutual understanding.  This Agreement is structured to allow us to offer professional services under a single agreement through the execution of a related Statements of Work for each project.

The Agreement is effective on September 27, 2022, (the "Effective Date") and will remain in full force and effect in accordance with its terms until terminated by either party in accordance with the termination provision set forth in Attachment A.

The Attachment A version is an important part of this Agreement and should be carefully read.

Given that applicable professional standards, laws, and regulations may change in the future, Grant Thornton reserves the right to amend this Agreement upon appropriate notice to you and with your prior written consent.

### Delivering the Services

The Services we provide to you under this Agreement will typically be set forth in distinct Statement(s) of Work signed by Grant Thornton and your authorized representative, specifying matters including applicable professional standards, scope, deliverables, timing, fees and payment terms.

From time to time in the course of our relationship, we may perform Services that you request without a Statement of Work. This Agreement will cover all Services rendered whether or not the parties execute a Statement of Work.  Such Services will be billed at our standard hourly rates or as otherwise mutually agreed.

If the Company fails to meet any undisputed payment obligation under this Agreement, Grant Thornton may immediately suspend performance of the Services.  If we elect to suspend our performance due to non-payment, the Services will not be resumed until your account is paid as agreed, including the payment of any retainer that we may require for continuing services.

"Grant Thornton" refers to Grant Thornton LLP, the U.S. member firm of Grant Thornton International Ltd (GTIL), and/or refers to the brand under which the GTIL member firms provide audit, tax and advisory services to their clients, as the context requires. GTIL and each of its member firms are separate legal entities and are not a worldwide partnership. GTIL does not provide services to clients. Services are delivered by the member firms in their respective countries. GTIL and its member firms are not agents of, and do not obligate, one another and are not liable for one another's acts or omissions. In the United States, visit GT.COM for details.



## Term

This Agreement shall remain in full force and effect in accordance with its terms and conditions and shall constitute legal, valid, binding, and enforceable obligations of both Grant Thornton and the Company until terminated by either party in accordance with the termination provision set forth in Attachment A. Because applicable professional standards, law, and regulations may change in the future, Grant Thornton reserves the right to amend this Agreement upon appropriate notice and your consent.

## Other Matters

This Agreement may be executed in any number of counterparts, each of which shall be an original, but such counterparts shall together constitute one and the same agreement. This Agreement may be executed and delivered by either party by electronic transmission. For purposes of this Agreement, any signature page signed and transmitted electronically shall be treated as an original document, and the signature of any party thereon, for purposes hereof, shall be considered as an original signature and the document transmitted electronically shall be considered to have the same binding effect as an original signature on an original document.

Please confirm your acceptance of this Agreement by signing below, signing the enclosed Statement(s) of Work, and returning the signed Agreement. We look forward to the opportunity to serve you.

Very truly yours,

**GRANT THORNTON LLP**

DocuSigned by:

*Glenn Barenbaum*

B0E091D095D0490...

Glenn Barenbaum

Partner

Date: 9/27/2022 | 2:16 PM CDT

## Agreed and Accepted

The foregoing letter, Attachment A, and the attached Statement(s) of Work, if applicable, fully describe our mutual understanding and are accepted by all parties.

Purdue Pharma L.P.

DocuSigned by:

*Terrence Ronan*

A6544685B4D94FF...

Terrence Ronan
Executive Vice President, CFO

Date: 9/27/2022 | 12:26 PM PDT

© Grant Thornton LLP | All rights reserved
U.S. member firm of Grant Thornton International Ltd

**Grant Thornton**

## Attachment A – STANDARD GRANT THORNTON LLP ENGAGEMENT TERMS

This Attachment A – Standard Grant Thornton LLP Engagement Terms (this "Attachment A") is incorporated into and a part of the attached Engagement Letter by and between Grant Thornton LLP ("Grant Thornton") and Purdue Pharma L.P. ("Client"). Any Statement of Work (a "SOW") attached hereto or referencing this Attachment A is incorporated into and subject to the terms and conditions of this Attachment A. The Engagement Letter, each Statement of Work, and this Attachment A are collectively referred to as the "Agreement". Any capitalized terms in this Attachment A that are not defined shall have the meanings set forth in the Engagement Letter.

1.    <u>Standards of Performance</u>. Grant Thornton warrants that it will perform the services described in each SOW (the "Services") and provide any reports, information or other documents (the "Deliverables") specified in each SOW in substantial conformity with all applicable professional standards and the terms and conditions expressly set forth in the Agreement. Accordingly, Grant Thornton's Services and the Deliverables shall be evaluated solely on Grant Thornton's substantial conformance with such terms and conditions, professional standards expressly set forth in the SOW, and applicable law. This warranty is in lieu of, and Grant Thornton expressly disclaims, all other warranties, express, implied, or otherwise, including without limitation, any implied warranties of merchantability or fitness for a particular purpose. Grant Thornton cannot and does not warrant computer hardware, software, or services provided by other parties.

2.    <u>Management Responsibilities</u>. Grant Thornton assumes no management responsibilities for Client. Accordingly, Client agrees to perform all management responsibilities and oversee the Services by designating an individual, preferably within senior management, who possesses suitable skill, knowledge, and experience, to evaluate the adequacy and results of the Services performed and accept responsibility for the results of the Services.

Because Grant Thornton cannot assume management responsibilities when providing Services, Client agrees that its management, including its designated representative, will make an informed judgment on the results of the Services and be responsible for making the significant judgments and decisions that are the responsibility of management. In addition, Client agrees to undertake: (a) all management decisions and performance of all management functions, including maintaining all internal books and records; (b) the evaluation of the adequacy and results of the Services and responsibility for such results; and (c) the establishment and maintenance of effective internal controls, including monitoring activities, retaining custody of Client's assets, and controlling Client's premises.

3.    <u>Business Risk Allocations</u>. The terms of this Section 3 shall apply regardless of the nature of any claim asserted (including but not limited to contract, statute, tort, strict liability, or negligence, whether by Client, Grant Thornton, or others) but such terms shall not apply to the extent finally determined to be contrary to applicable law.

(a)    With respect to the Services and this Agreement generally, the liability of Grant Thornton and its present, future, and former partners, principals, directors, employees, agents and contractors (collectively referred to as the "Grant Thornton Firm") for all claims, including but not limited to the Grant Thornton Firm's own negligence, shall not exceed and shall be limited to the fees payable for the portion of the work giving rise to such liability. This limitation shall not apply to the extent that it is finally determined that any claims, losses, or damages are the result of the Grant Thornton Firm's willful misconduct or fraud.

(b)    EACH PARTY HEREBY WAIVES, AND IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR, ANY INDIRECT, SPECIAL, CONSEQUENTIAL, PUNITIVE, INCIDENTAL, OR EXEMPLARY DAMAGES OR LOSS, INCLUDING WITHOUT LIMITATION, ANY LOST PROFITS, TAXES, INTEREST, PENALTIES, LOSS OF SAVINGS, OR LOST BUSINESS OPPORTUNITY.

(c)    In responding to any claim asserted, each party may avail itself of any defense available under applicable law, but in no event shall the aggregate liability of each party for any claims, losses or damages related to this Agreement exceed an amount that is proportional to the relative fault of such party that is finally determined to have caused the other party's losses.

(d)    Client shall, upon the receipt of written notice, indemnify, defend, and hold harmless the Grant Thornton Firm from and against any liability, damages, fees, expenses, losses, demands and costs (including reasonable defense costs) (collectively, "Losses") associated with third-party claims arising out of or relating to (i) misrepresentations made by, or false or incomplete information provided by, Client or its agents or representatives or (ii) such third party's use of or reliance upon the Services or Deliverables. Client agrees to



reimburse the Grant Thornton Firm for all reasonable expenses, including reasonable attorneys' fees and expenses, as they are incurred in connection with the investigation of, preparation for, or defense of, any pending or threatened claim or action or proceeding for which the Grant Thornton Firm is entitled to indemnification.

(e)    In the event of any controversy or claim against Grant Thornton arising from or related to the Services, Grant Thornton shall be entitled, at its option, to defend itself from such controversy or claim. Grant Thornton also reserves the right to participate in any settlement, administrative, or judicial proceedings. Grant Thornton's decision to abstain or defend or participate in any proceedings as set forth above shall in no way prejudice its rights to indemnification.

4.    <u>Use of Documentation and Reliance</u>.

(a)    Professional standards require Grant Thornton to maintain sufficient documentation to support its work. This documentation may include copies of Client's information. However, to the extent that Grant Thornton has copies of Client's information, Grant Thornton will protect and safeguard Client's information from unauthorized disclosure.

(b)    Unless provided for differently in the applicable SOW, all Deliverables provided by Grant Thornton to Client in performing the Services are the sole and exclusive property of Grant Thornton and are prepared solely for the internal use of Client's management, employees and board of directors. Except as provided below, upon full payment of Grant Thornton's billings, Client shall acquire a limited, perpetual, non-transferable, royalty-free license to use the Deliverables for Client's internal business purposes. Not withstanding the foregoing, Client is authorized to share Grant Thornton's draft and/or final report or other engagement deliverables with: (i) Client's professional advisors, including PJT Partners Inc. and AlixPartners LLP; and Client's outside counsel; (ii) the Official Committee of Unsecured Creditors, the Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants, and the Multi-State Governmental Entities Group in Client's chapter 11 cases, and their respective professional advisors, all of whom will receive this information subject to the *Third Amended Protective Order* [Case No. 19-23649, ECF No. 1935].

(c)    Client agrees to protect all Deliverables from unauthorized use and prevent disclosure of the Deliverables to third parties who may rely on them.  Further, Grant Thornton has not and shall not be deemed to assume any duties or obligations to any third party.

(d)    Except as otherwise permitted by 4(b) above, If Client wishes to make reference to Grant Thornton or to disclose or disseminate in any manner and in any medium (e.g., Client website), any portion of any Deliverable to a third party, Client agrees to first (i) provide Grant Thornton with a draft of the proposed disclosure, (ii) obtain Grant Thornton's advance written approval, and (iii) if requested by Grant Thornton, obtain from any third party and provide Grant Thornton with a non-disclosure agreement and/or release in a form satisfactory to Grant Thornton in its sole discretion.

(e)    Grant Thornton shall retain sole and exclusive ownership of and all right, title, and interest in and to any know-how, concepts, techniques, methodologies, ideas, processes, models, templates, tools, utilities, routines, trade secrets, and other intellectual property that (i) existed prior to, or were developed independent of, Client's engagement or (ii) may have been discovered, created, or developed by Grant Thornton as a result of its own efforts during the engagement, which are of general application and do not contain Client's confidential information (collectively, the "Grant Thornton Property"). Client shall acquire no right to or interest in the Grant Thornton Property, except for a non-exclusive, non-transferable, royalty-free right to use such Grant Thornton Property solely in connection with Client's permitted use of the Deliverables to the extent any Grant Thornton Property is incorporated therein. Client will not sublicense or otherwise grant any other party any rights to use, copy, or otherwise exploit or create derivative works from the Grant Thornton Property.

(f)    Except as expressly contemplated by the applicable SOW, Grant Thornton assumes no responsibility to update any conclusions or Deliverables.

5.    <u>Third-Party Proceedings</u>. Unless expressly provided for, the Services do not include giving testimony or appearing or participating in discovery proceedings, administrative hearings, court, or other legal or regulatory inquiries or proceedings. Except with respect to a dispute or litigation between Grant Thornton and Client, Grant Thornton's costs (including reasonable attorneys' fees) and time spent in legal and regulatory matters or proceedings relating to Grant Thornton's engagement, whether made at the Client's request or by subpoena, request for testimony, or



consultation involving private litigation, arbitration, industry, or government regulatory inquiries, will be billed to Client separately.

6.     Access to Resources and Information. Unless specified in a SOW as the responsibility of Grant Thornton to provide, Client shall have obtained on a timely basis as required for Grant Thornton's performance of the Services (i) any internal and third-party permissions, licenses or approvals (including use of any necessary software or data); and (ii) all information and assistance as may be necessary or as Grant Thornton may reasonably request. Grant Thornton's personnel assigned to any engagement shall not be assumed or deemed to have knowledge of information provided to other Grant Thornton engagement teams or third parties.

7.     Term and Termination. This Agreement will commence on the Effective Date and it will not expire, unless earlier terminated as provided in this Section. Grant Thornton and Client shall each have the right to terminate this Agreement (or applicable SOW therein), in whole or in part at any time without further obligation to the other by giving not less than thirty (30) days written notice to the other party. Further, Grant Thornton shall have the right to terminate this Agreement and/or any SOW immediately if it discovers practices by Client that it deems dishonest, fraudulent, or illegal; or Grant Thornton determines that application of or changes in applicable rules or professional standards, such as those established by the American Institute of Certified Public Accountants, Public Company Accounting Oversight Board, or U.S. Securities and Exchange Commission ("SEC"), restrict the Grant Thornton Firm's ability to complete the work.  If either party terminates this Agreement or any SOW as set forth in this Section, Client agrees to pay Grant Thornton for the Services performed, including out-of-pocket expenses and costs, rendered up to the date of such termination.  Grant Thornton retains the right to suspend or terminate the Services in the event of nonpayment.  Services will not be resumed until Client's account is paid as agreed.

8.     Third-Party Service Providers.  Grant Thornton LLP is the U.S. member firm of Grant Thornton International Ltd ("GTIL"), a global organization of member firms. Member firms are neither members of one international partnership nor otherwise legal partners with one other. There is no common ownership, control, governance, or agency relationship among member firms.  GTIL and its member firms are not agents of, and do not obligate, one another and are not liable for one another's acts or omissions. In the event Grant Thornton subcontracts some of the Services to a GTIL member firm, Grant Thornton takes sole responsibility for all work performed in relation to the applicable SOW and Client agrees that, with respect to work that is the subject of the SOW, its sole recourse is against Grant Thornton.

Additionally, Grant Thornton may use third parties to provide administrative and operational support to Grant Thornton business operations, or to provide engagement team resource services. All of these third-party service providers are subject to confidentiality obligations to protect the confidentiality of client data. Such entities may be located within or outside the United States.

9.     Electronic Communications.  During the course of the engagement, the parties may need to electronically transmit confidential information to each other and to third-party service providers or other entities engaged by either Grant Thornton or Client. Electronic methods include telephones, mobile devices, e-mail, cloud services and fax. All forms of electronic communication have inherent security weaknesses, and the risk of compromised confidentiality cannot be eliminated. Client agrees to the use of electronic methods to transmit and receive information, including confidential information. Grant Thornton shall not be liable for any loss, damage, expense, inconvenience, or harm resulting from the loss, delay, interception, corruption, or alteration of any electronic communication due to any reason beyond its reasonable control.

If applicable, Grant Thornton may use automated data gathering tools developed by it, its affiliates, or third-party providers, such as SQL scripts to extract data for further analysis for purposes of the applicable engagement.  These tools are designed to be executed by the Client's information technology professionals within the Client's information systems environment.  Client hereby consents and authorizes Grant Thornton to use these tools only for the purpose of performing the applicable engagement.

Grant Thornton shall not be responsible for any service interruptions of, or corruption or damages to, Client's or third-party information systems and the information and data contained therein, including but not limited to denial of access, and automatic shutdown of information systems caused by or resulting from Grant Thornton's performance of the Services.

10.    Management Representations. Grant Thornton's findings, conclusions, and recommendations are limited solely to the matters for which Grant Thornton was engaged. No conclusions should be inferred as to any matters not specifically covered by the applicable SOW. Further, the findings, conclusions, and recommendations are based upon

© Grant Thornton LLP | All rights reserved
U.S. member firm of Grant Thornton International Ltd

 **Grant Thornton**

the facts and information presented by Client and may be inapplicable if the actual facts differ from those presented in any respect.

Because of the importance of the information that Client provides to Grant Thornton with respect to Grant Thornton's ability to perform the Services, Client hereby releases the Grant Thornton Firm from any liability, damages, fees, expenses, and costs (including defense costs) relating to the Services, that arise from or relate to any information (including representations by management) provided by Client, its personnel or agents, that is misleading or not complete, accurate, or current.

11.    <u>Confidential Information</u>.  Each party (the "Disclosing Party") may disclose to the other party (the "Receiving Party") information that it considers confidential or proprietary, and in the case of Client, information of (i) its affiliates, (ii) entities that Client is under common ownership and control with that Client has obligations to maintain confidential and (iii) third parties that Client or its affiliates have obligations to maintain confidential (all of the foregoing referred to herein as "Confidential Information").

(a)    Confidential Information includes but is not limited to (i) reports, financial information, studies, drawings, contracts, business plans, inventions, technical information, know-how, plans, and specifications and (ii) any information or data which is disclosed by a party to the other party under or in contemplation of this Agreement which has been marked or identified as confidential or which a reasonable person would know to be confidential or proprietary due to the circumstances of its disclosure. Client will provide the minimum amount of Confidential Information and minimum access to such information necessary for Grant Thornton to perform the Services.

(b)    A party's Confidential Information shall not include information that (i) is or becomes part of the public domain through no act or omission of the other party; (ii) was in the other party's lawful possession prior to the disclosure and had not been obtained from the Disclosing Party; (iii) is lawfully disclosed to the other party by a third party without restriction on disclosure; or (iv) is independently developed by one party without use of or reference to the other party's Confidential Information. In addition, nothing contained herein shall be construed as preventing either party from using the information retained from the Confidential Information of the other party as part of its general skill, knowledge, talent, and expertise.

(c)    The Receiving Party agrees to hold in confidence and not to disclose or reveal to any person or entity except its Representatives (as defined below), the Confidential Information of the Disclosing Party.  The Receiving Party further agrees to protect the Disclosing Party's Confidential Information in the same manner it protects its own confidential information, provided no less than reasonable care shall be used.  The Receiving Party may disclose Confidential Information to its partners, principals, officers, directors, employees, professional advisors, consultants, agents, GTIL member firms, and independent contractors (collectively, its "Representatives") who have a legitimate need to review such information and who are bound by obligations of confidentiality and non-use no less stringent than those set forth herein.  The Receiving Party shall be responsible for any breach of this Agreement by its Representatives and shall take all reasonable steps to cause its Representatives to comply with the terms hereof.

(d)    If Receiving Party is requested or required by law, regulation, legal process or an oversight body to disclose Confidential Information, Receiving Party will, to the extent practical and legally permitted, notify Disclosing Party of such request or requirement so that Disclosing Party may seek an appropriate protective order or other relief.  In the absence of a protective order or other applicable relief, Receiving Party may disclose the portion of Confidential Information subject to such request or requirement without liability hereunder.

(e)    Grant Thornton may be requested to make certain documentation available to regulators, governmental agencies, or their representatives ("Regulator(s)") pursuant to law or regulations. If requested, access to the documentation will be provided to Regulators under the supervision of Grant Thornton personnel and at a location designated by Grant Thornton. Furthermore, upon request, Grant Thornton may provide photocopies of selected documentation to Regulators. Regulators may intend, or decide, to distribute the photocopies or information contained therein to others, including other governmental agencies. Client hereby authorizes Grant Thornton to allow Regulators access to, and photocopies of, the documentation in the manner discussed above. To the extent legally permissible, Grant Thornton will notify Client of any requests made by Regulators prior to granting access or release of such information to Regulators.

12.    <u>Privacy</u>.  Grant Thornton will maintain Client's personal information in confidence in accordance with professional standards and governing laws. Client will not provide any personal information unless necessary for Grant



Thornton to perform the Services. Client will strictly limit provision of personal information to that personal information essential to Grant Thornton's performance of the Services. Client will anonymize, mask, obfuscate, and/or de-identify all personal information unless Grant Thornton requires otherwise to provide the Services. Client is responsible for obtaining, pursuant to law or regulation, consents for any personal information that Client provides to Grant Thornton.

13.    Dispute Resolution.

(a)    Mediation.  Any controversy or claim arising out of or relating to the Services, related fees, or this Agreement shall first be submitted to mediation. A mediator will be selected by agreement of the parties, or if the parties cannot agree, a mediator acceptable to all parties will be appointed by the American Arbitration Association. The mediation will proceed in accordance with the customary practice of mediation and shall be concluded within sixty (60) days from receipt of written notice unless the parties agree otherwise. Any facts disclosed related to the mediation shall be kept confidential and each side shall pay its own costs of the mediation but will share equally the mediator's expenses.

(b)    Arbitration. In the event mediation is not successfully resolved, then the parties agree that such dispute(s) or claim(s) shall be settled by binding arbitration. The provisions herein supersede any contrary arbitral rules that might otherwise apply. The arbitration proceeding shall take place in Chicago, Illinois unless the parties mutually agree to a different location. The proceeding, including any issue concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of any of these procedures, shall be governed by the provisions of the Federal Arbitration Act and will proceed in accordance with the then current Conflict Prevention & Resolution ("CPR") or the similar rules of another arbitration association if one other than CPR is selected, except that pre-hearing discovery shall be limited as provided for herein or unless specifically authorized by the arbitrators. Any issue concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of any of these procedures, shall be governed by the Federal Arbitration Act and resolved by the arbitrators.

i.    To begin the arbitration process, a party shall provide written notice of the issues to be resolved by arbitration (the "Notice") within fifteen (15) days of the parties' agreement to terminate or waive mediation, and the other party shall respond within twenty one (21) days and shall add any other issues to be resolved within the arbitration. The arbitrators shall only resolve those issues identified in the Notice, and issues that are not identified shall not be arbitrated nor brought to court.

ii.    The arbitration shall be conducted by three (3) arbitrators. Each party shall select an arbitrator experienced in relevant subject matters within twenty-one (21) days of the Notice. The two (2) designated arbitrators shall then select a third neutral arbitrator within twenty-one (21) days of their selection. It is the parties' intention that the two (2) arbitrators selected by the parties be "neutrals" who will not be informed as to which party selected them. If the two (2) arbitrators cannot agree on selection of a third arbitrator within twenty-one (21) days of their appointment, the governing arbitration agency shall request a list of arbitrators and select a third arbitrator under the agency's rules within thirty (30) days. If both parties are in agreement, the dispute may be heard by one (1) arbitrator selected within sixty (60) days following receipt of the Notice.

iii.    The parties shall not be entitled to discovery except as it directly relates to the underlying Services that are at issue and shall submit a joint proposed schedule to the arbitrators within thirty (30) days of the arbitrators' selection. Other than described herein, no other discovery is allowed except by the arbitrators and only for good cause shown.

iv.    Except for impeachment-only information, each party must disclose within thirty (30) days after the selection of the arbitrators: (1) the names, addresses, telephone numbers, and email addresses of persons who have knowledge and/or discoverable information relating to the issues submitted for resolution; (2) its claims and defenses; and (3) a computation showing each element of claimed damages.

v.    The parties shall be entitled to take (i) up to three (3) depositions and (ii) the depositions of any expert witness who will testify in the arbitration proceeding.  No deposition shall exceed seven (7) hours. Each testifying expert shall provide the same materials required under Federal Rule of Civil Procedure 26(a)(2)(B). The parties must confer in good faith to resolve all discovery disputes. If they cannot resolve these themselves, the parties must attempt to do so in conference with the arbitrators. If the dispute is

DocuSign Envelope ID: 2BB5FF00-29F8-4134-9ABA-FF0CDC4AD2E8



Purdue Pharma L.P.
September 27, 2022
Page 8

not resolved in conference, the arbitrators must promptly rule on the issues. Each side may file dispositive motions without obtaining leave from the arbitrators but must confer with the other side prior to filing any dispositive motions. All motions should be filed no later than sixty (60) days prior to the arbitration hearing, unless agreed otherwise by the parties or ordered by the arbitrators.

vi.       The arbitrators shall have no authority to award non-monetary equitable relief or indirect, consequential, or punitive damages. The award of the arbitration shall be in writing and shall be accompanied by a well-reasoned opinion. The award issued by the arbitrators may be confirmed in a judgment by any federal or state court of competent jurisdiction. Each party shall be responsible for its own costs associated with the arbitration, except that the costs of the arbitrators shall be equally divided by each side involved in the arbitration. The arbitration proceeding and all information disclosed during the arbitration shall be maintained as confidential, except as required to confirm the award, or disclosed to professional or regulatory bodies, as required by law or a court of law, or in a related confidential mediation or arbitration. The parties agree that arbitration is the sole and exclusive remedy for disputes arising out of or related to this Agreement.  If arbitration is initiated and the other party declines to participate and instead initiates litigation elsewhere, doing so will constitute a default judgment.

(c)       Limitation on Period to File Claims.  It is expressly agreed by each party that any action, regardless of form, arising out of the Services, whether it be in contract, tort, or otherwise, shall be deemed waived if a claim is asserted more than two (2) years from the earlier of the date that the applicable Deliverable is issued or the Services are completed.

14.       Personnel.

(a)       During the term of a SOW and for a period of one (1) year after the Services are completed, Client agrees not to solicit, directly or indirectly, Grant Thornton's personnel performing Services hereunder without Grant Thornton's written consent. If this Section is violated, Client will pay Grant Thornton a fee equal to the hired person's annual salary in effect at the time of the violation as reimbursement for the estimated costs of replacement personnel. The foregoing shall not apply if the individual is hired in response to a general advertisement made available to the public.

(b)       For engagements subject to the SEC independence rules, Client acknowledges that hiring Grant Thornton (or GTIL) personnel participating on an engagement may be perceived as compromising Grant Thornton's objectivity, and if applicable, impairing Grant Thornton's independence. Accordingly, prior to entering into any employment discussions with such personnel, Client agrees to discuss the potential employment, including any applicable independence ramifications, with the engagement partner responsible for the Services.

15.       Miscellaneous.

(a)       No Assignment.  Neither party shall assign any rights, obligations or claims relating to this Agreement without the prior written consent of the other party, except Grant Thornton may assign this Agreement to a successor in interest upon written notice in connection with a change of control or sale of a line of business or all or substantially all of its assets.

(b)       Force Majeure.  Neither party shall be liable for any delay or failure in performance (except for payment obligations) due to any strikes, work stoppages, accidents, acts of war or terrorism, governmental actions, civil or military disturbances, pandemics, epidemics, contagious diseases, nuclear or natural catastrophes or acts of god, or other circumstances beyond its reasonable control.

(c)       No Third-Party Beneficiaries.  No third-party beneficiaries are intended under this Agreement.

(d)       Name Use.  Neither party shall use the other's name, service marks, or trademarks in external publicity materials without prior written consent.

(e)       Governing Law.  This Agreement, including its formation and the parties' respective rights and duties and all disputes that might arise from or in connection with this Agreement or its subject matter, shall be governed by and construed in accordance with the laws of the State of New York, without giving effect to its conflicts of laws rules that would require the application of another state's laws.

© Grant Thornton LLP | All rights reserved
U.S. member firm of Grant Thornton International Ltd



(f)     Independent Contractors.  Each party is an independent contractor with respect to the other and shall not be construed as having an employee/employer, trustee, joint venture, agency or fiduciary relationship.

(g)     Effect of Invalidity.  If any portion of this Agreement is held invalid, it is agreed that such invalidity shall not affect any of the remaining portions.  Moreover, if the terms of any provision hereof are determined to be unenforceable under applicable law as a result of their duration, scope, limitation, or exclusions, such provision shall be construed to the extent possible to be valid and enforceable while adhering as closely as possible to the parties intent as contemplated hereby. If because of a change in Client's status or due to any other reason, any provision in this Agreement or the Services hereunder would be prohibited by laws, regulations, or published interpretations by governmental bodies, commissions, state boards of accountancy, or other regulatory agencies, such provision shall, to that extent, be of no further force and effect, and the Agreement shall consist of the remaining portions.

(h)     Entire Agreement.  This Agreement, including any other incorporated attachments, sets forth the entire understanding between and among the parties regarding the Services and the exchange of information and supersedes all prior and contemporaneous agreements (whether written or oral), arrangements and communications which shall hereby be terminated and may not be modified or amended, except by the mutual written agreement of both parties that references and is incorporated into this Agreement. If there is a conflict between this Attachment A, the Engagement Letter, or any SOWs, this Attachment A shall control unless the applicable SOW specifically references the applicable provision of this Attachment A to be overridden. Except as otherwise agreed in an attachment to this Agreement, no "click-through," "shrink-wrap," "browse-wrap," similar agreements or other terms, whether entered into before, on, or after the date of this Agreement, will be effective to add to or modify the terms of this Agreement or alter the relationship of the parties, regardless of any party's (or its personnel's) acceptance of or agreement to such terms by electronic or other means.

(i)     Survival.   The Sections regarding confidentiality, liability limitations, third-party proceedings, indemnification, dispute resolution and any such terms that by their nature should survive shall survive any termination of this Agreement.

16.   Tax Terms and Conditions.  This Section 16 is applicable to all Tax Services provided under this Agreement.

(a)     Reportable Transactions. Taxpayers are required to disclose their participation in certain types of transactions ("Reportable Transactions") on forms filed with their federal income tax returns and/or with the IRS Office of Tax Shelter Analysis, and with agencies of certain states (or, in some cases, foreign jurisdictions) that impose similar requirements.  Failure to adhere to Reportable Transaction disclosure and filing requirements may result in the imposition of significant penalties under applicable federal, state and/or foreign law.  Grant Thornton may be a "Material Advisor" with regard to Services provided to Client and Grant Thornton may be subject to Grant Thornton's own federal and/or state reporting, registration and list maintenance obligations, which are separate and independent of any taxpayer disclosure obligation. Grant Thornton may be required to maintain and disclose to applicable federal and/or state regulatory agencies certain information regarding Client's participation in a Reportable Transaction, including Client's name and federal identification number, and other information as required.

Except as specifically stated in this Agreement, Grant Thornton does not assume any obligation to express any opinion on, provide any advice related to, or identify from any information provided by Client or obtained by Grant Thornton during the course of providing Services to Client under this Agreement, whether any particular transaction is a Reportable Transaction or the potential consequences of non-compliance with disclosure and filing requirements pertaining to a Reportable Transaction. Reliance on any opinion or advice Grant Thornton may provide regarding whether a transaction is or is not a Reportable Transaction and/or any disclosure and filing requirements may not avoid the imposition of any penalty imposed on Client under federal or state law for the failure to comply with such disclosure and filing obligations.

(b)     Privileges Relating to Taxpayer Communications. Any advice given by Grant Thornton with respect to a matter that is within the scope of Grant Thornton's authority to practice before the IRS may be privileged under federal and state laws. This privilege may be asserted in any non-criminal tax matter before the IRS and in any non-criminal tax proceeding in Federal court and may be asserted to the extent such communication would be considered privileged communication if it were between a taxpayer and an attorney. At Client's sole cost and

© Grant Thornton LLP | All rights reserved
U.S. member firm of Grant Thornton International Ltd

DocuSign Envelope ID: 2BB5FF00-29F8-4434-9ABA-FF9CDC4AD2E8



expense, Grant Thornton will cooperate with Client's efforts to assert taxpayer privileges when Grant Thornton receive a demand or inquiry for Client's information to the extent required by law.

(c)      Conditions of Confidentiality Not Imposed. Notwithstanding anything to the contrary herein, Grant Thornton imposes no conditions of confidentiality on any information it provides to Client to the extent that it concerns the tax structure or tax treatment of any transaction.

(d)      No Responsibility to Update. Tax Deliverables will be based on Grant Thornton's interpretation of the federal and state laws, regulations, administrative and judicial pronouncements, and other relevant authorities, in effect when Grant Thornton provides the Tax Deliverables. All of these authorities are subject to change, and such change may be retroactive or prospective in effect. Grant Thornton assumes no responsibility to either advise Client of, or to update conclusions, for changes in respect to federal and state laws, regulations, administrative and judicial pronouncements, and other relevant authorities expressly set forth in this Agreement and applicable law.

(e)      Tax Deliverables. Client is authorized to provide Tax Deliverables to taxing jurisdictions with respect to tax filings contemplated in a SOW.

© Grant Thornton LLP | All rights reserved
U.S. member firm of Grant Thornton International Ltd

DocuSign Envelope ID: 56E727EA-6D81-4747-AB52-2459C5993D49



<br>

**Purdue Pharma L.P.**

**Statement of Work (SOW) for Advisory Services**

This Statement of Work ("Statement of Work") dated September 27, 2022, between Grant Thornton LLP ("Grant Thornton," "Firm," or "we") and Purdue Pharma L.P. ("Client," "Company," or "you")  becomes a part of and is subject to the terms and conditions of the Engagement Letter and related Attachment A – Standard Grant Thornton LLP Engagement Terms dated September 27, 2022, between Grant Thornton and Purdue Pharma L.P. Any capitalized terms that are not defined in this SOW shall have the meanings set forth in the Engagement Letter and Attachment A – Standard Grant Thornton LLP Engagement Terms. The purpose of this SOW is to describe the scope of certain strategy and business advisory services ("Business Advisory Services" and, the "Services") the Company is requesting Grant Thornton to perform, and to set forth the agreed fee, timing and other matters related to the Services.

## I.  BUSINESS ADVISORY SERVICES

### A.  Objective of Our Business Advisory Services

We will perform certain strategy and business advisory procedures on the Company as may be requested in writing by the Company from time to time. Our approach and work plan is based on the procedures and analysis requested by you, and will be charged at our hourly rates as described below.  Our Business Advisory Services will be performed in accordance with the *Statement on Standards for Consulting Services* issued by the American Institute of Certified Public Accountants.

### B.  Scope of Our Business Advisory Work

Our Business Advisory Services will consist of reading financial statements and other records, making inquiries of the Company's management and analyzing the information obtained.  Accordingly, the completion of our report (the "Business Advisory Report") will require cooperation of the Company's management. The Business Advisory Services section below will indicate the specific areas that you have requested us to address during this engagement, subject to the additional services that the Company may request be included as further described below.

The scope of the Business Advisory Services and the work plan and the contents of our findings are solely your responsibility, and you agree that you will be responsible for determining the full scope of your business advisory procedures, and, if necessary, performing additional procedures, prior to concluding on the merits of any strategic opportunity or proposed transaction that the Company may be considering. Although we may assist, Company management is solely responsible for presenting any findings to the Board of Directors or others in governance roles if required. Consequently, we make no representation regarding the scope of the work plan either for the purposes for which our findings have been requested or any other purpose.  The decision whether to take any actions lies solely with you, and neither our work nor our findings shall in any way constitute a recommendation whether you should or should not take any specific action or on what terms.

Our Business Advisory Services do not constitute an audit or review of the financial statements or any part thereof, the objective of which is the expression of an opinion or limited assurance on the financial statements, or a part thereof, or verification of the accuracy of the Company's management responses to our inquiries.

Our Business Advisory Services should not be relied upon to disclose errors, irregularities, or illegal acts, including fraud or defalcations.

The Business Advisory Services do not include acquisition tax planning or consultation with respect to matters that may arise in the course of rendering our Business Advisory Services.  Such items may include, but are not limited to, structuring, assistance with and planning on employee share compensation plans, resolution of tax issues identified in the course of our diligence, acquisition document reviews, etc.

Our Business Advisory Services do not contemplate nor does Grant Thornton assume any obligation to express any opinion on, provide any advice related to, or identify from any information provided by you or obtained by us during the course of providing Business Advisory Services to you, whether, under the Internal Revenue Code or state or other law, any particular transaction is a Reportable Transaction or the potential consequences of non-compliance with disclosure and filing requirements pertaining to a Reportable Transaction.

DocuSign Envelope ID: 56E72FEA-6D81-4747-AB52-2459C5993D49



Purdue Pharma L.P.
Statement of Work
September 27, 2022
Page 2

Our Business Advisory Services do not contemplate consultation on legal structuring of any action.

Further, because of the importance of the information that is provided to Grant Thornton with respect to our ability to perform the Business Advisory Services, you hereby release the Grant Thornton Firm from any liability, damages, fees, expenses and costs (including defense costs) relating to the Business Advisory Services, that arise from or relate to any information (including representations by management) provided by you, or any third party, that is not complete, accurate or current.

### C. Limited Distribution of Our Business Advisory Report

The Services under this Statement of Work are intended solely for the benefit of Company and its affiliated debtors with pending cases under chapter 11 (the "Chapter 11 Cases") of the United States Bankruptcy Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), and may not be relied on by any other third party, except as otherwise expressly set forth herein.

With respect to any strategic opportunity or proposed transaction that the Company requests Grant Thornton to provide Business Advisory Services hereunder, our findings for each such strategic opportunity or proposed transaction will be communicated to you in a Business Advisory Report.  The Business Advisory Report will be supplemented with oral commentary, which will be an integral part of the presentation. The presentation of our findings to you will constitute satisfactory completion of our work.  Except as otherwise permitted herein, our Business Advisory Report cannot be distributed to third parties without our prior written approval.  Third parties, other than those expressly authorized to receive the materials herein, will be required to sign our standard release letter prior to receiving a copy of our Business Advisory Report (see Exhibit 1-A).

In addition, you agree that you will not (a) disclose information about Grant Thornton, the Business Advisory Services, or the Business Advisory Report in any filings made with the U.S. Securities and Exchange Commission ("SEC"); or (b) include the Business Advisory Report or any other report, opinion, or deliverable provided by Grant Thornton pursuant to this SOW in a filing made with any Regulators (as defined in Engagement Letter), including but not limited to, the SEC.

Notwithstanding the foregoing, Company is authorized to share Grant Thorton's draft and/or final report or other engagement deliverables with: (i) Company's professional advisors, including PJT Partners Inc. and AlixPartners LLP; and Company's outside counsel; (ii) the Official Committee of Unsecured Creditors, the Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants, and the Multi-State Governmental Entities Group in the Chapter 11 Cases, and their respective professional advisors, all of whom will receive this information subject to the *Third Amended Protective Order* [Case No. 19-23649, ECF No. 1935] (collectively, "Advisors") without them having to sign a release letter, provided such Advisors: (a) have a legitimate need to see the Business Advisory Report in connection with the Services, (b) agree that the Business Advisory Report was not prepared for their use or reliance, (c) agree to keep the Business Advisory Report confidential; and (d) are not providing insurance, financing, capital in any form, a fairness opinion, or selling or underwriting securities.

You agree to indemnify, defend and hold harmless Grant Thornton from and against any claim arising out of sharing of the Business Advisory Report with the Advisors.

### D. Conflict of Interest Disclosure

From time to time, we may encounter certain instances that in our view give rise to a potential conflict of interest between the Business Advisory Services we are going to perform and services that we may already be performing for an existing client.  In such cases, we shall notify you of such a conflict and seek appropriate advance written consent from all parties prior to providing Business Advisory Services.

Client acknowledges that Grant Thornton has been engaged by Client and its professional obligations hereunder flow to Client and not Client's equity owners.  After the completion of the Services, including after a change of control of Client, it is possible that Grant Thornton will be retained by any of the current (pre-transaction) equity owners, affiliates, officers, directors or employees of the Client (collectively, the "Related Parties").  Client hereby agrees that Grant Thornton and the engagement team hereunder may be retained by any of the Related Parties in connection with any other matter (the "Future Services").

© Grant Thornton LLP | All rights reserved
U.S. member firm of Grant Thornton International Ltd

DocuSign Envelope ID: 56E72FEA-6D81-4747-AB52-24F9C5993D49

**Grant Thornton**

Purdue Pharma L.P.
Statement of Work
September 27, 2022
Page 3

Nothing herein shall be deemed to alter or limit any conflict disclosure requirements under the Bankruptcy Code or as otherwise set forth in any order of the Bankruptcy Court approving Grant Thornton's employment in the Bankruptcy Cases.

**E.   Data Usage**

Grant Thornton is committed to enhancing our services and quality through the use of data analytics.  Company data collected to perform our Services may be retained in an anonymized format and aggregated with anonymized data of other clients for purposes of performing data analytics. Such analytics may be used in connection with services for the Company and/or other clients.  Grant Thornton will never disclose non-anonymized Company data to other clients.

**F.   Scope of Available Services**

The following is a description of Services that Grant Thornton is available to provide the Company under this Statement of Work.  Prior to performing any of the requested Services, the Company shall provide Grant Thornton in writing specifying which of the following Services the Company is requesting, and the parties shall agree on mutually acceptable timeline to complete any such Services.

The Business Advisory Services we will provide under this SOW consist of Business Advisory Services relating to strategic management planning purposes.

The specific areas that you have requested us to address during this engagement, together with key tasks we will perform, are set forth in detail below:

**I.      Business Advisory Services**
- Meet with management and understand the financial statements.
- Discuss with management and understand the business background and accounting processes/procedures.
- Read and discuss key reports used to manage the business including key performance indicators
- Understand any related party transactions, as applicable.
- Read the external accountant's workpapers (if applicable)
- Analyze EBITDA trends
- Analyze revenue and COGS trends
- Analyze operating expenses
- Analyze the balance sheet including working capital trends.
- Analyze report debt and off-balance sheet liabilities.

**II.     Strategic Operations Advisory and Support**
**1.    Interdependency Assessment**

    a.   Inter-dependency Assessment will provide in-depth overview of interdependencies for the following functional areas (as applicable)

| Finance, Accounting, Tax, Treasury, Audit | IT – Infrastructure<br>IT – Product Development / Apps | Procurement<br>Supply Chain & Logistics |
|---|---|---|
| Operations<br>Manufacturing | Legal and Regulatory<br>Risk & Compliance | Facilities and Real Estate |
| Customer Service & Support<br>Key Account Management | HR including Payroll, Benefits and Insurance | Others (e.g. Environmental, Health and Safety etc.) |
| Commercial / Strategy<br>Sales and Marketing | Medical Information/Services | |

- Analyze functional areas by people, contracts, technology and assets
- Build and obtain answers to information request lists (IRLs)

© Grant Thornton LLP | All rights reserved
U.S. member firm of Grant Thornton International Ltd

DocuSign Envelope ID: 56F72FEA-6D81-4747-AB52-2459C5993D49

**Grant Thornton**

▪ Understand functional area processes, policies, procedures and current state operating model

**2.   Other Advisory and Support Services (Illustrative)**

b.   Standalone Cost Model and One-Time Cost Analysis
▪ Identification of standalone and one-time costs and associated allocations. Determine standalone and one-time costs by giving consideration to future run-rate of company

c.   Current and Future State Operating Model
▪ Identify and document the existing scope for processes, policies and procedures by functional area, understand which processes will need to be modified / sunset / re-built for future state, Recommend a future-state operating model for each functional area

d.   Transition Services Assessment (TSA)
▪ Identify and document the scope of services required for the entity. Determine the cost of services based on underlying effort and recommend the duration in which the services will be provided

f.   Transition Services Office (TSO)

▪ Operationalize service agreements along with cross-billing and invoicing cadence. Conduct planning and provide governance of by function area. Establish a cadence of invoicing and payments with vendors and create monthly invoices. Establish a repository for all documentation required for tracking and sign-off

III.   **Business Agreement Advisory**

**1.   Agreement Input**
a.   Accounting and financial (non-legal) input on any agreement, focusing on:
i.   Price and price adjustment clauses
ii.   The basis of preparation of the statement(s)
iii.   accounts procedures and policies
iv.
v.   Financial and accounting representations and warranties
vi.   Financial definitions, including working capital and net debt
b.   Review of the accounting dispute resolution clauses.

**2.   Negotiation Support**
a.   Preparation of working capital and net debt schedules.
b.   Proactive support in establishing the "Target working capital."
c.   Commentary on the contentious areas of the price adjustments and preparation of potential arguments and justifications to align these in your favor.
d.   Assistance in agreeing the price adjustment principles.

IV.   **Strategy and Commercial solution offerings.**

**G.   Business Advisory Services Timing**

This Statement of Work and the Services provided hereunder are subject to Bankruptcy Court approval in the Chapter 11 Cases.  At the Company's request, Grant Thornton will begin providing Services under and in accordance with this Statement of Work upon filing an employment application approving this Statement of Work and related agreements with the Bankruptcy Court.  The Company agrees to assist Grant Thornton and its counsel in promptly seeking Bankruptcy Court approval of such employment application effective as of the date of filing such application, including filing and serving any pleadings in connection therewith.

DocuSign Envelope ID: 56F72FEA-6D81-4747-AB52-2459C5993D49

**Grant Thornton**

Our ability to meet any mutually agreed to schedule for providing Services designated by the Company is contingent on the full cooperation of the Company's management to provide access to information and key personnel on a timely basis.

## II.   GENERAL MATTERS

### A.   Additional Services Available – Change Order

It is understood that during the performance of the procedures, additional items may arise that you determine require additional investigation. We will be pleased to perform any additional procedures you deem necessary to the performance of Services under this Statement of Work and that Company requests in writing.  Prior to performing any additional procedures, we will discuss the scope of the procedures with you and whether such work requires any adjustments to the hourly fees provided herein, which will be put in in writing describing the additional work.  Any additional procedures performed are subject to all the terms and conditions of this Statement of Work, as well as the Engagement Agreement and Attachment A – Standard Grant Thornton LLP Engagement Terms executed in connection herewith.

### B.   Fees and Expenses

Fees are based on actual hours incurred and our discounted hourly billing rates for the resources utilized.

|  | Discounted Hourly Rates |
| --- | --- |
| Partner/Managing Director | $955 |
| Director | $785 |
| Manager | $675 |
| Senior Associate | $515 |
| Associate | $330 |

We will provide regular communication (written or verbal) on the status of our fees during the life of the engagement.

Grant Thornton will invoice Client for fees and expenses incurred in performing the Services.  From time to time, Grant Thornton may receive certain incentives in the form of bonuses and rewards from its corporate card and other vendors. Such incentives to the extent received will be retained by Grant Thornton to cover firm expenses.

Client is solely responsible for any applicable taxes for the Services. To the extent Grant Thornton is required to collect such taxes under applicable law, Grant Thornton shall collect such taxes from Client and remit such taxes to the proper jurisdictions.

Upon execution of this Statement of Work, the Company understands and agrees that Grant Thornton will invoice you monthly as time is incurred by submitting an itemized and detailed billing statement. The Company understands and acknowledges that Grant Thornton will apply for compensation for professional services to be rendered in connection with this Chapter 11 Cases and for reimbursement of expenses incurred, in accordance with applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules of the United States Bankruptcy Court for the Southern District of New York, the applicable United States Trustee Guidelines, and any applicable orders or procedures of the Bankruptcy Court (the "Payment Rules, Guidelines and Orders"). Payment of fees and reimbursement of expenses will be subject to ultimate allowance and approval by the Bankruptcy Court under Sections 330 and 331 of the Bankruptcy Code, and any additional orders governing interim payment of professionals in the Chapter 11 Cases.

In addition to the fees set forth above, Grant Thornton will bill the Company for direct expenses incurred by Grant Thornton in connection with the Services provided herein and its retention and fee applications submitted in the

© Grant Thornton LLP | All rights reserved
U.S. member firm of Grant Thornton International Ltd

DocuSign Envelope ID: 56E727EA-6D81-4747-AB52-24E9C5993D49



Chapter 11 Cases, including, but not limited to, reasonable and customary out-of-pocket expenses for items such as copies, postage, supplies, computer and technology usage, software licensing, research and library databases and similar expense items, as well as the fees and expenses that Grant Thornton's outside counsel directly bills Grant Thornton in connection with this engagement (including, without limitation, all employment and fee applications submitted by Grant Thornton). If Grant Thornton is requested or authorized by the Company, or is required by government regulation, subpoena or other legal process, to produce its documents or personnel as witnesses with respect to the Services or this Statement of Work, the Company shall, so long as Grant Thornton is not a party in the proceeding in which such information is sought, reimburse Grant Thornton for its professional time and expenses, as well as the fees and expenses of Grant Thornton's counsel, if any, incurred in responding to such requests.

### C.   Reference in Marketing Materials

Upon completion of the Services specified herein, you agree that Grant Thornton may make reference to you in marketing materials, stating that Grant Thornton has performed certain categories of Services for you. Grant Thornton may not disclose the results of such Services, the fees paid or other confidential information in connection with the above. In connection with such references, Grant Thornton may request that you provide an appropriate logo or other visual identification for use in the referenced marketing materials.

### D.   Impossibility due to Pandemic

The parties are entering into this Statement of Work at a time when a state of national emergency has been declared and the nation is responding to the Coronavirus (COVID-19) pandemic. The parties agree that each will use all reasonable efforts to complete the engagement as specified herein, so long as each can reasonably do so while also protecting the health, welfare and safety of its professionals and the public, and abiding by emergency or regular executive orders, or changes in law mandated to address the pandemic. Neither party shall be liable for any delay or failure in performance (excluding payment for fees and expenses incurred) due to circumstances resulting from the pandemic which are beyond its reasonable control.

DocuSign Envelope ID: 56E727EA-6D81-4747-AB52-24E9C5903D49

**Grant Thornton**

### E.   Entire Agreement

This Statement of Work, together with the accompanying Engagement Letter and Attachment A – Standard Grant Thornton LLP Engagement Terms, represent the parties' entire understanding with respect to the Services in this document.  This Statement of Work does not modify or amend the Engagement Letter or Attachment A – Standard Grant Thornton LLP Engagement Terms.  In the event of a conflict between this Statement of Work (including any other exhibit or attachment included in this Statement of Work) and Attachment A – Standard Grant Thornton LLP Engagement Terms, , the terms of Attachment A – Standard Grant Thornton LLP Engagement Terms shall govern.

### Agreed and Accepted

The undersigned hereby agree to the terms and conditions of the Statement of Work as of the date first set forth above.

### GRANT THORNTON LLP

DocuSigned by:

*Glenn Barenbaum*

B0E091D095D0490...

Date:   9/27/2022  |  2:13 PM CDT

Glenn Barenbaum, Partner

### Purdue Pharma L.P.

DocuSigned by:

*Terrence Ronan*

A6544685B4D94FF...

Date:   9/27/2022  |  12:30 PM PDT

Mr. Terrence Ronan, Executive Vice President, CFO

DocuSign Envelope ID: 59E72FEA-6D81-4747-AB52-2459C5993D49

Grant Thornton

8

**Exhibit 1-A:**

**Business Advisory Report Access Letter**

Attn: [[Third Party Representative]]
[[Address]]
[[City, State, Zip]]

Dear [[Name]]:

Grant Thornton LLP ("Grant Thornton") previously performed certain limited consulting procedures at the request of [[Legal Name of Client]] ("Client") solely to assist Client in connection with its consideration of the [[Limited description of work performed]]. Work performed by Grant Thornton was in accordance with instructions provided by Client as outlined in its Statement of Work ("SOW") with Grant Thornton dated [[Date of SOW]].

[[Client or Legal Name]] has requested Grant Thornton's permission to allow it to provide [[Insert Full Legal Name]] ("you") with access to Grant Thornton's report dated [[Date GT's Report was issued]] (the "Report").

Please note that your access to the Report is conditioned upon Grant Thornton's prior receipt of this letter agreement. You acknowledge that the Report was prepared at the direction of Client and that the Report may not include all procedures you may deem necessary for your purposes. Had Grant Thornton been engaged to perform additional procedures, in its professional judgment, other matters might have come to Grant Thornton's attention that would have been reported to Client. Therefore, items of possible interest to you may not have been specifically addressed. Consequently, you acknowledge and agree that Grant Thornton makes no representation to you regarding the sufficiency of the procedures performed including: (1) for the purpose for which the Report was originally requested, (2) for your purpose, or (3) for any other purpose as related to the work being performed by you.

In consideration of Grant Thornton allowing you access to the Report, related work product, underlying data, and, if requested by Client, discussing the Report with you (collectively, the "Report Access"), you acknowledge and agree that Grant Thornton's engagement has been with Client, and does not extend to you. Moreover, Grant Thornton does not assume any duties or obligations to you in connection with the Report Access. Further, you acknowledge and agree that the Report Access shall be provided solely for your internal use and you shall not, in any event, circulate, quote, refer to or distribute to any other party or use for any other purpose the Report, the discussions referenced herein, or Grant Thornton's work product, whether oral or written, in whole or in part, without Grant Thornton's prior written consent, except that you may share the Report Access with (i) other parties who have entered into an access letter with Grant Thornton with respect to the Report, and (ii) your affiliates and your and their respective officers, directors, employees, agents, professional advisors and attorneys who, in each case, (a) agree to comply with the terms hereof, (b) have a legitimate need to see the Report in connection with your review thereof, and (c) with respect to professional advisors and attorneys, are not providing insurance, financing, capital in any form, a fairness opinion, or selling or underwriting securities or otherwise obtaining a financial interest in connection with any transaction (collectively, your "Representatives"). You will be responsible for any breach of this letter agreement by your Representatives as though they were a party hereto.

Notwithstanding the foregoing, you and your Representatives may disclose the Report to the extent required to be disclosed by applicable law, regulation (including the rules of an applicable securities exchange), rule, or legal, governmental or regulatory process (including, without limitation, by deposition, oral question, interrogatories, requests for information or documents, subpoena, national security letters, civil investigative demand, or similar process), , provided that you or your Representatives, as applicable, will provide Grant Thornton with advance notice of any such required disclosure to provide Grant Thornton an opportunity to seek a protective order or other similar remedy (unless such notice is prohibited by law or regulation). No notice will be required in the event such disclosure is required pursuant to any routine regulatory audit or examination that does not target or reference the Report, Grant Thornton or Client.

Neither Grant Thornton nor any of its present, future, and former partners, principals, employees, and representatives (collectively, the "Grant Thornton Firm") shall have any liability whatsoever relating to the Report Access, including without limitation any claim based upon the alleged inaccuracy or incompleteness of the Report and/or related materials provided to you or your Representatives. You and your Representatives agree that you and they shall not sue nor make a claim against the Grant Thornton Firm arising from the Report Access or this letter agreement. If you or your

© Grant Thornton LLP | All rights reserved
U.S. member firm of Grant Thornton International Ltd

DocuSign Envelope ID: 56F72EEA-6D81-4747-AB52-24E9C5993D49

Grant Thornton

9

Representatives violate this covenant not to sue, you agree to pay all costs and expenses of defending against a suit incurred by the Grant Thornton Firm, including reasonable and documented attorneys' fees, and all further costs and fees, including attorneys' fees, incurred in connection with collection.

You agree to indemnify, defend, and hold harmless the Grant Thornton Firm, including all expenses and reasonable and documented attorneys' fees as they are incurred by the Grant Thornton Firm, from and against any third party claim arising out of your or your Representatives' breach of this letter agreement.

This letter agreement shall be governed in all respects by the internal laws of the State of New York, without regard to any of its conflict of law rules that would require the application of another state's laws.  The parties agree to the exclusive jurisdiction of the state and federal courts located in or near New York City, New York.  Each party hereby waives, to the fullest extent permitted by law, any right it may have to a trial by jury in respect of any dispute or litigation arising out of this letter agreement or the Report Access.

Very truly yours,

**GRANT THORNTON LLP**

_____          _____

[[PPMD Name]]                                                                        Date

[[Title]]


**Acknowledged & Agreed to by [[Full Legal Name]]:**

_____          _____

(Signature)                                                                            (Date)


_____          _____

(Print Name)                                                                          (Title)

© Grant Thornton LLP | All rights reserved
U.S. member firm of Grant Thornton International Ltd