# EXHIBIT 3

# WERTH DECLARATION

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| PURDUE PHARMA L.P., *et al.*, | Case No. 19-23649 |
| Debtors. [1] | (Jointly Administered) |

### THIRD SUPPLEMENTAL DECLARATION OF RAYMOND WERTH IN SUPPORT OF APPLICATION OF DEBTORS FOR AUTHORITY TO SUPPLEMENT RETENTION AND EMPLOYMENT OF GRANT THORNTON LLP FOR BUSINESS ADVISORY SERVICES EFFECTIVE SEPTEMBER 27, 2022

I, Raymond Werth, state the following under penalty of perjury:

1. I am a Partner of the firm of Grant Thornton LLP ("**Grant Thornton**"). I am duly authorized to execute this declaration (this "**Declaration**") on behalf of Grant Thornton.

2. The facts set forth in this Declaration are based upon my personal knowledge, upon information and belief, and upon client matter records kept in the ordinary course of business that were reviewed by me or other employees under my supervisions and direction. I am familiar with the matters set forth herein, and if called as a witness, I could and would testify thereto.

3. I make this Declaration in support of the Debtors' *Application of Debtors for Authority to Supplement Retention and Employment of Grant Thornton LLP for Business Advisory Services Effective September 27, 2022* (the "**Second Supplemental Application**").

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P., Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF L.P. (0495), SVC Pharma L.P. (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

This Declaration is also submitted as the statement required pursuant to Rule 2014(a) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

4.  Unless otherwise defined, all capitalized terms used herein have the meanings ascribed to them in the Second Supplemental Application.

**Grant Thornton's Prior Services to the Debtor Provided in the Ordinary Course of Business and Not Related to the Administration of the Debtors' Chapter 11 Cases**

5.  Prior to the Petition Date, since approximately June 2018, the Debtors have engaged Grant Thornton to provide tax-related services to the Debtors pursuant to the terms and conditions of that certain Prepetition MSA, dated June 1, 2018, and other related statements of work executed in connection therewith.

6.  As previously disclosed in prior filings with the Court, the Debtors retained Grant Thornton after the Petition Date to continue to provide the following tax-related services to assist the Debtors in the ordinary course of their business operations (collectively, the "**OCB Tax Services**"):

   (i) <u>Sales and Use Tax Compliance Services</u>: On August 11, 2020, the Debtors and Grant Thornton entered into that certain *Statement of Work for Sales and Use Tax Return Preparation Services*, pursuant to which Grant Thornton was retained to assist the Debtors with the generation of sales, use and other transactional tax returns by providing tax return compliance services. That August 11, 2020 statement of work was subsequently replaced and superseded by that certain *Statement of Work for Sales and Use Tax Return Preparation Services*, dated March 2, 2021.

   (ii) <u>2020 and 2021 Tax Preparation Services</u>: On December 7, 2020, the Debtors and Grant Thornton entered into that certain *Statement of Work for Tax Compliance Services*, pursuant to which Grant Thornton was retained to prepare the Debtors' federal and state tax returns, including extension calculations and estimated tax payments, for the 2020 taxable year. On January 20, 2022, the Debtors and Grant Thornton entered into that certain *Statement of Work for Tax Compliance Services*, pursuant to which Grant Thornton was retained to prepare the Debtors' federal and state tax returns, including extension calculations and estimated tax payments, for the 2021 taxable year.

        (iii)        Global Mobility Services: On June 18, 2020, the Debtors and Grant Thornton entered into that certain Statement of Work for Global Mobility Services, pursuant to which Grant Thornton was retained to provide tax compliance and consulting services for disclosures, review and execution related to United States and United Kingdom tax returns for the years 2015 through 2019.  On April 15, 2021, the Debtors and Grant Thornton entered into that certain *Statement of Work for GMS Compliance Services*, pursuant to which Grant Thornton's engagement to provide Global Mobility Services was extended to the 2020 and 2021 tax years.

7.      Because the OCB Tax Services were being provided in the ordinary course of the Debtors' business and were unrelated to the administration of the bankruptcy cases, I understood that it was not necessary for Grant Thornton to be retained in these bankruptcy cases and that payment on account of such OCB Tax Services would be paid consistent with past practices and in the ordinary course of the Debtors' ongoing business operations.

8.      Accordingly, the OCB Tax Services provided by Grant Thornton prior to entry of the Initial Retention Order were billed by Grant Thornton and paid by the Debtors in the ordinary course of business consistent with the Debtors' business practices, and as such were not prepared in accordance with, or otherwise subject to the Fee Guidelines.  Following entry of the Initial Retention Order and First Supplemental Retention Order, out of an abundance of caution and for purposes of full transparency, Grant Thornton has been disclosing, and will continue to disclose, all invoices for OCB Tax Services that Grant Thornton incurs in its monthly fee statements and interim and final fee applications.

**Grant Thornton's Initial Retention Application and First Supplemental Application**

9.      In January 2021, the Debtors requested that Grant Thornton provide additional tax structuring services that directly related to the development the Debtors' Plan.  As a result of this requested expanded scope of work, on or about January 20, 2021, Grant Thornton and the Debtors entered into that certain *Statement of Work for Tax Structuring Services*.

3

10. On April 13, 2021, the Debtors filed the Initial Retention Application, which was approved by the Court by an order entered on April 28, 2021.

11. As set forth in the Initial Retention Application, the Debtors retained Grant Thornton to provide services for tax structuring work related to the Plan, including: (a) assisting the Debtors' management in analyzing the income tax consequences to the Debtors with respect to transactions between the Debtors and NewCo anticipated to be created in the bankruptcy reorganization; (b) consulting with PPLP and its legal counsel, Davis Polk, regarding the federal and state income tax implications of transactions required by the Court (transactions as proposed by Davis Polk) effectuating the bankruptcy reorganization; (c) assisting PPLP's management in determining the federal income tax basis in the assets of the NewCo and its affiliates immediately following the bankruptcy reorganization; and (d) assisting in modeling future U.S. federal and state income tax cash tax liabilities for NewCo following emergence from bankruptcy.

12. In August 2021, the Debtors requested that Grant Thornton further expand the scope of its retention and provide additional services related to their Plan confirmation efforts. Specifically, the Debtors and Grant Thornton entered into the *Statement of Work for Advisory Services*, dated August 25, 2021, pursuant to which Grant Thornton was retained, subject to Court approval, to provide Valuation Services to the Debtors relating to the Plan and the formation of the Newco as provided therein, including, without limitation: (i) estimation of the fair values of certain tangible and intangible assets, as well as certain liabilities of NewCo, including inventory, real and personal property, and intangible assets; (ii) analysis of the components of goodwill (*e.g.*, assembled workforce, etc.); (iii) assisting the Debtors' management in the identification of the legal entities requiring discrete opinions of value for tax

4

purposes; (iv) estimation of the fair market value of the identified legal entities; (v) reconciliation of the enterprise value of NewCo and the identified legal entities; and (vi) preparation of separate narrative reports and exhibits for financial reporting and tax valuation purposes.

13.    The Debtors and Grant Thornton also entered into the *Statement of Work for Employment Tax Services & State Corporate Income/Franchise Tax Nexus Analysis Services*, dated August 26, 2021, pursuant to which Grant Thornton was retained, subject to Court approval, to provide Employee Tax Services for certain employment and other tax issues relating to the Plan and formation of the Newco, including, without limitation: (i) various payroll tax considerations with respect to transactions between the Debtors and NewCo, as well as existing entities that will be restructured post-emergence; (ii) conducting a corporate income/franchise tax nexus analysis based on "doing business" criteria and economic presence criteria; (iii) evaluating the scope of multistate sales and other business activities, office operations and location of employees to evaluate current corporate/franchise tax filing and additional jurisdictional filing requirements for certain subsidiaries.

14.    On September 10, 2021, the Debtors filed the First Supplemental Application [Docket No. 3761], which was approved by the Court on September 28, 2021 [Docket No. 3831].

## **Further Requested Expanded Scope of Grant Thornton's Services**

15.    On September 27, 2022, the Debtors and Grant Thornton entered into the BAS Agreements, pursuant to which Grant Thornton is being retained, subject to Court approval, to provide the Business Advisory Services.

16.    True and correct copies of the BAS Agreements are attached to the Second Supplemental Application as **Exhibit 2**.

5

17. The specific areas that Grant Thornton will address during the engagement, together with key tasks Grant Thornton will perform, include, but are not limited to:

I. *Business Advisory Services*

- Meet with management and understand the financial statements
- Discuss with management and understand the business background and accounting processes/procedures
- Read and discuss key reports used to manage the business including key performance indicators
- Understand any related party transactions, as applicable
- Read the external accountant's workpapers (if applicable)
- Analyze EBITDA trends
- Analyze revenue and COGS trends
- Analyze operating expenses
- Analyze the balance sheet including working capital trends
- Analyze report debt and off-balance sheet liabilities

II. *Strategic Operations Advisory and Support*

1. <u>Interdependency Assessment</u>

    a. Inter-dependency Assessment will provide in-depth overview of interdependencies for the following functional areas (as applicable)

| | | |
|---|---|---|
| Finance, Accounting, Tax, Treasury, Audit | IT – Infrastructure<br>IT – Product Development / Apps | Procurement<br>Supply Chain & Logistics |
| Operations<br>Manufacturing | Legal and Regulatory<br>Risk & Compliance | Facilities and Real Estate |
| Customer Service & Support<br>Key Account Management | HR including Payroll, Benefits and Insurance | Others (*e.g.,* Environmental, Health and Safety etc.) |
| Commercial / Strategy<br>Sales and Marketing | Medical Information/Services | |

   b. Analyze functional areas by people, contracts, technology and assets
   c. Build and obtain answers to information request lists
   d. Understand functional area processes, policies, procedures and current state operating model

2. <u>Other Advisory and Support Services (Illustrative)</u>
   a. Standalone Cost Model and One-Time Cost Analysis

6

- Identification of standalone and one-time costs and associated allocations. Determine standalone and one-time costs by giving consideration to future run-rate of company.

b. Current and Future State Operating Model
- Identify and document the existing scope for processes, policies and procedures by functional area, understand which processes will need to be modified / sunset / re-built for future state. Recommend a future-state operating model for each functional area.

c. Transition Services Assessment
- Identify and document the scope of services required for the entity. Determine the cost of services based on underlying effort and recommend the duration in which the services will be provided.

f. Transition Services Office
- Operationalize service agreements along with cross-billing and invoicing cadence. Conduct planning and provide governance of by function area. Establish a cadence of invoicing and payments with vendors and create monthly invoices. Establish a repository for all documentation required for tracking and sign-off.

III. *Business Agreement Advisory*

1. Agreement Input

    a. Accounting and financial (non-legal) input on any agreement, focusing on:

        i. Price and price adjustment clauses
        ii. The basis of preparation of the statement(s)
        iii. Accounts procedures and policies
        iv. Financial and accounting representations and warranties
        v. Financial definitions, including working capital and net debt

    b. Review of the accounting dispute resolution clauses

2. Negotiation Support

    a. Preparation of working capital and net debt schedules
    b. Proactive support in establishing the "target working capital"
    c. Commentary on the contentious areas of the price adjustments and preparation of potential arguments and justifications to align these in Debtors'/NewCo's favor
    d. Assistance in agreeing the price adjustment principles

7

    IV.    *Strategy and Commercial Solution on Offerings*

    18.    If the Debtors request Grant Thornton to perform additional services in the future not contemplated by the Initial Retention Application, the First Supplemental Application or the Second Supplemental Application, the Debtors and Grant Thornton will mutually agree in advance upon such services and fees for those services in writing in a new statement of work, which will be subject to the Court's review upon proper application.

    19.    I have informed the Debtors' management that, subject to Court approval of the Second Supplemental Application, Grant Thornton is willing to serve as the Debtors' consultant and to perform the Business Advisory Services on matters arising during these chapter 11 cases.

### **Grant Thornton's Qualifications and the Need for the Business Advisory Services**

    20.    Grant Thornton is the U.S. member of Grant Thornton International Ltd., a global audit, tax, and advisory organization of separate, independent network firms providing services in more than 120 countries (the "**Grant Thornton Network**"), including 59 offices in the United States. Each member firm is a separate legal entity.

    21.    The professionals in Grant Thornton's business advisory practice consist of senior tax, accounting, and other professionals specializing in tax, valuation, financial, business, and strategic advice to enterprises, including distressed enterprises.

    22.    Grant Thornton has significant qualifications, experience, and extensive knowledge in the fields of accounting, business advisory services, valuation and taxation for large, sophisticated companies, both in and out of chapter 11 bankruptcy. As such, I believe that Grant Thornton has the resources and experience necessary to perform the Business Advisory Services in these chapter 11 cases.

8

23. By virtue of its ongoing engagement by the Debtors prior to and during these bankruptcy cases, I believe that Grant Thornton is familiar with the Debtors' business affairs, the issues surrounding this matter, will be able to draw on its earlier data collection, and will be able to streamline its analysis under this engagement and minimize costs to the estates.

24. As such, I believe that Grant Thornton is well qualified and uniquely able to represent the Debtors with respect to the Business Advisory Services pursuant to section 327(a) of the Bankruptcy Code.

### Grant Thornton's Disinterestedness

25. On January 29, 2021, Davis Polk forwarded to our outside counsel a 109-page list of potential interested parties in the chapter 11 cases from which Grant Thornton could perform its conflict search (the "**Conflicts List**"). A summary list of the categories of potential parties in interest set forth on the Conflicts List is attached to the Initial Werth Declaration as **Exhibit 1** filed as part of the Initial Retention Application.

26. On August 25, 2022, Davis Polk forwarded to our outside counsel a supplemented Conflicts List (the "**Supplemental Conflicts List**"). Although the Supplemental Conflicts List did not add or delete any of the categories of potential interested parties as originally disclosed in my Initial Werth Declaration, it did add the names of numerous new potential interested parties.[2] For purposes of this declaration, when I refer to the Supplemental Conflicts List, such list includes both the original parties searched in the Conflicts List as part of my Initial Werth Declaration, as well as any additional new parties added to the Supplemental Conflicts List for

---

[2] Because the initial Conflicts List is 109 pages long, and the Supplemental Conflicts List is even longer, the entire list is not attached to this declaration. Rather, a summary of the Conflicts List and Supplemental Conflicts List by categories was provided for reference in my Initial Werth Declaration. A copy of the Supplemental Conflicts List may be obtained upon request or, if requested by the Court, Grant Thornton can file a supplemental declaration with the actual Supplemental Conflicts List that was used by Grant Thornton to perform its conflict check.

9

which Grant Thornton ran additional conflict searches per the procedures described herein and in the Initial Werth Declaration.

27. To perform its conflict search, Grant Thornton ran all of the names in the Supplemental Conflicts List, both initially as part of the Initial Retention Application and then more recently only with respect to any new names provided in the Supplemental Conflicts List, through its firm-wide conflicts system. With respect to the other member firms in the Grant Thornton Network, Grant Thornton ran a search of the Supplemental Conflicts List against various internal lists and databases, which yields potential "hits" in other member firms.

28. Among the internal lists and databases that are included in the searches performed are: audit, tax and advisory engagement acceptance databases, and client database; business arrangements with public companies; financial relationships or arrangements; global list of publicly traded audit clients or their affiliates; audit and attest clients; the SEC audit directors list; subcontractor lists; and a list of other entities to be aware of that may not be on one of the lists above, among others. If there is such a potential "hit" indicated for another member firm, then Grant Thornton will send a conflict check, for that entity, to the relevant member firm. The member firm then has a certain amount of time to report whether there is a relationship with that entity. If the member firm makes such a report, then it is reviewed to determine whether it will have an effect on Grant Thornton's disinterestedness.

29. "Hits" were then sent to the relevant member firms per the process described above, including to member firms in the following jurisdictions: Canada; Hungary; Israel; Poland; Sweden and the United Kingdom. If there were responses received, the "hit" was then cleared to confirm that the connection was unrelated to the Debtors or these chapter 11 cases and

10

reported on **Exhibit 2** to the Initial Werth Declaration in order for Grant Thornton to declare its disinterestedness.

30. As set forth on such **Exhibit 2**, the hits for the relevant cross-border member firms identified above are reported on **Exhibit 2** as the relevant jurisdiction and the general type of relationship, such as audit, advisory, business, forensic, tax or valuation, as the circumstances require.

31. I, or someone working under my supervision, reviewed any client connections from the Supplemental Conflicts List to the Debtors' chapter 11 cases, in accordance with the procedures set forth above, to determine whether Grant Thornton has an adverse interest to the Debtors' estates. Likewise, since the date of the Initial Werth Declaration until now, I am not aware of any additional "hits" from other member firms for either the parties in interest set forth on the initial Conflicts List or the new parties added in the Supplemental Conflicts List other than those originally disclosed in the Initial Werth Declaration.

32. Based on the results of this conflicts search, to the best of my knowledge, neither I, nor Grant Thornton or any member in the Grant Thornton Network, nor any partner or employee thereof, insofar as I have been able to ascertain, has any connection with any of the parties in interest identified in the Debtors' Supplemental Conflicts Lists, except as disclosed or otherwise described on **Exhibit 2** attached to the Initial Werth Declaration, which is incorporated herein by reference.

33. I believe that none of the connections disclosed on such **Exhibit 2** have or will affect Grant Thornton's representation of the Debtors in matters requiring the Business Advisory Services. None of Grant Thornton's representations of these parties comprises a material

11

component of Grant Thornton's practice, nor does Grant Thornton currently represent any such parties in any matter adverse to the Debtors.

34. The services that Grant Thornton performed for Millennium Trust do not relate to these bankruptcy cases. Moreover, Millennium Trust is not currently a client of Grant Thornton, and Grant Thornton has not performed any work for Millennium Trust for the past decade.

35. As part of its diverse practice, Grant Thornton appears in numerous cases, proceedings, and transactions that involve many different professionals, including attorneys, accountants, and financial consultants, who may represent claimants and parties in interest in the chapter 11 cases.

36. Grant Thornton has performed in the past, and may perform in the future, audit, tax, and consulting services for various attorneys and law firms in the legal community and has been represented by several attorneys and law firms in the legal community, some of whom may be involved in the chapter 11 cases.

37. Grant Thornton has in the past, may currently and will likely in the future be working with or against other professionals involved in these chapter 11 cases in matters unrelated to the chapter 11 cases. Based on our current knowledge of the professionals involved, and to the best of my knowledge, none of these business relationships constitute interests materially adverse to the Debtors herein in matters upon which Grant Thornton is to be employed, and none are in connection with these chapter 11 cases.

38. To the best of my knowledge, Grant Thornton has not been retained to assist any entity or person other than the Debtors on matters relating to, or in connection with, these chapter 11 cases.

39. Grant Thornton will not accept any engagement or perform any services for any entity or person other than the Debtors relating to these chapter 11 cases. Grant Thornton may, however, provide professional services to entities or persons that may be creditors of the Debtors or parties in interest in these chapter 11 cases; provided, however, that such services do not relate to, or have any direct connection with, these chapter 11 cases.

40. Despite the efforts described above to identify and disclose Grant Thornton's connections to parties in interest in these chapter 11 cases, Grant Thornton is unable to state with certainty that every client relationship or other connection has been disclosed. In this regard, if Grant Thornton discovers additional information that requires disclosure, Grant Thornton will file a supplemental disclosure with the Court as promptly as possible.

41. To the best of my knowledge, neither Grant Thornton nor its professionals hold or represent any interest adverse to the Debtors or their estates.

42. To the best of my knowledge, Grant Thornton and its professionals are "disinterested persons" under section 101(14) of the Bankruptcy Code.

43. To the best of my knowledge, (a) Grant Thornton has no connection with the Debtors, their creditors, equity security holders, or other parties in interest in these Chapter 11 Cases; (b) Grant Thornton does not hold or represent any entity having an interest adverse to the interests of the Debtors' estates or of any class of creditors or equity security holders; and (c) Grant Thornton (i) is not a creditor, equity security holder, or an insider of the Debtors, and (ii) is not or was not, within two years before the Petition Date, a director, officer, or employee of any of the Debtors. In addition, none of the Grant Thornton professionals expected to assist the Debtors in these chapter 11 cases are related or connected to any United States Bankruptcy Judge for the

13

Southern District of New York, the U.S. Trustee, or any person employed in the office of the U.S. Trustee.

44. Grant Thornton is not aware of any outstanding amounts owed for professional services rendered to the Debtors prior to the Petition Date. Additionally, Grant Thornton is not aware of any amounts paid by the Debtors to Grant Thornton in the 90 days prior to the Petition Date. As part of the Initial Retention Application, Grant Thornton agreed to waive any and all currently outstanding amounts owed for professional services rendered to the Debtors prior to the Petition Date.

## Grant Thornton's Compensation

45. Grant Thornton's hourly billing rates for the Business Advisory Services are as follows:

| Level | Hourly Rate |
|---|---|
| Partner / Managing Director | $955 |
| Director | $590 |
| Manager | $500 |
| Senior Associate | $400 |
| Associate | $270 |

46. Grant Thornton's hourly rates for the Business Advisory Services are subject to change from time to time in the regular course of Grant Thornton's business. Grant Thornton will provide notice to the Debtors, the U.S. Trustee and any official statutory committees in the Debtors' chapter 11 cases of any change in Grant Thornton's hourly rates for the Business Advisory Services. Grant Thornton also will file a notice of any such change in hourly rates with the Court.

14

47. In addition to the hourly billing rates set forth herein, Grant Thornton customarily charges its clients for direct expenses incurred by Grant Thornton in connection with the Business Advisory Services provided herein including, but not limited to, reasonable and customary out-of-pocket expenses for items such as copies, postage, supplies, computer and technology usage, software licensing, research and library databases and similar expense items, as well as the fees and expenses that Grant Thornton's counsel directly bills Grant Thornton in connection with this engagement relating to Grant Thornton's retention and fee applications submitted in the chapter 11 cases.

48. In addition, if Grant Thornton is requested or authorized by the Debtors or Davis Polk, or is required by government regulation, subpoena or other legal process, to produce its documents or personnel as witnesses with respect to the Business Advisory Services, so long as Grant Thornton is not a party in the proceeding in which such information is sought, Grant Thornton customarily charges its clients for its professional time and expenses, as well as the fees and expenses of Grant Thornton's counsel, if any, incurred in responding to such requests.

49. Neither Grant Thornton nor any partner or associate thereof, has received or been promised any compensation for legal services rendered or to be rendered in any capacity in connection with the Debtors' chapter 11 cases, other than as permitted by the Bankruptcy Code. Grant Thornton has agreed not to share compensation received in connection with this case with any other person.

50. Grant Thornton will apply to the Court for allowance of compensation and reimbursement of expenses for all Business Advisory Services performed and expenses incurred for such Business Advisory Services after the Petition Date in accordance with the Fee Guidelines,

15

the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and any applicable orders of the Court.

51. Grant Thornton's rates and policies are consistent with Grant Thornton's normal and customary billing practices for cases of this size and complexity that require the level of scope and services outlined herein.

52. I also believe that Grant Thornton's rates and policies are reasonable in light of (a) industry practice, (b) market rates charged for comparable services both in and out of the chapter 11 context, (c) Grant Thornton's substantial experience with respect to business advisory services, and (d) the nature and scope of work to be performed by Grant Thornton in these chapter 11 cases.

## No Duplication of Services

53. I understand that the Debtors have retained and may retain additional professionals during the term of their engagement and Grant Thornton agrees to work cooperatively with such professionals to avoid any duplication of services.

## Additional Fee Guidelines Disclosures

54. In addition, in accordance and in response to the request for additional information set forth in paragraph D.1 of the Fee Guidelines:

   a. Grant Thornton did not agree to any variations from, or alternatives to, Grant Thornton's customary billing arrangements for this engagement, except with respect to the hourly billing rates for this engagement that Grant Thornton agreed to provide Debtors as set forth herein and in the BAS Agreements.

   b. None of Grant Thornton's professionals included in this engagement varied or will vary their rate based on the geographic location of these chapter 11 bankruptcy cases.

16

c. Grant Thornton will provide such information as the Debtors request or require for them to prepare and submit budget and staffing plans required under the Fee Guidelines.

d. Grant Thornton will use its best efforts to avoid duplicating services rendered by the Debtors' other retained professionals.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.

Executed on this 3rd day of October, 2022.

_____
Raymond Werth