# EXHIBIT 1

FILED: NEW YORK COUNTY CLERK 09/27/2022 04:20 PM
INDEX NO. 653541/2022
NYSCEF DOC. NO. 1
19-23649-shl    Doc 5229-1    Filed 11/09/22    Entered 11/09/22 16:19:18    Exhibit 1-1
RECEIVED NYSCEF: 09/27/2022
Pg 2 of 32

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: COMMERCIAL DIVISION
------------------------------------------------------------------X

BAYONNE, NEW JERSEY
CLIFTON, NEW JERSEY
CLINTON, NEW JERSEY
ELIZABETH, NEW JERSEY
MADISON BOROUGH, NEW JERSEY
PARAMUS, NEW JERSEY
PARSIPPANY-TROY HILLS TOWNSHIP, NEW JERSEY

Plaintiff(s),

-against-

MCKINSEY & COMPANY, INC.,
MCKINSEY HOLDINGS, INC.,
MCKINSEY & COMPANY, INC. UNITED STATES, AND
MCKINSEY & COMPANY, INC. WASHINGTON D.C.
Defendant(s).

------------------------------------------------------------------X

Dated Filed:  September 27, 2022

Index No.: _____

Plaintiff designates New York
County as place of trial

**_SUMMONS_**

The basis of the venue is:
Defendant's Place of Business

**To the above named Defendant:**

*You are hereby summoned* to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's Attorney(s) within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded herein.

Dated: West Islip, New York
        September 27, 2022

David Grossman, Esq.
**TATE, GROSSMAN & KELLY, LLP**
*Attorney(s) for Plaintiff*
1248 Montauk Highway
West Islip, New York 11795
Telephone: (631) 314-4996
Facsimile:  (516) 686-6771

FILED: NEW YORK COUNTY CLERK 09/27/2022 04:20 PM
INDEX NO. 653541/2022
NYSCEF DOC. NO. 1
RECEIVED NYSCEF: 09/27/2022

19-23649-shl    Doc 5229-1    Filed 11/09/22    Entered 11/09/22 16:19:18    Exhibit 1-1
Pg 3 of 32

TO:

McKinsey & Company, Inc.
711 Third Avenue
New York, New York 10017

McKinsey Holdings, Inc.
711 Third Avenue
New York, NY 10017

McKinsey & Company, Inc. United States
711 Third Avenue
New York, New York 10017

McKinsey & Company, Inc. Washington D.C.
711 Third Avenue
New York, New York 10017

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: COMMERCIAL DIVISION
-----------------------------------------------------------------X
BAYONNE, NEW JERSEY
CLIFTON, NEW JERSEY
CLINTON, NEW JERSEY                              Index No.:_____
ELIZABETH, NEW JERSEY
MADISON BOROUGH, NEW JERSEY                      **_VERIFIED_**
PARAMUS, NEW JERSEY                              **_COMPLAINT_**
PARSIPPANY-TROY HILLS TOWNSHIP, NEW JERSEY

                          Plaintiffs,

           - against -

MCKINSEY & COMPANY, INC.,
MCKINSEY HOLDINGS, INC.,
MCKINSEY & COMPANY, INC. UNITED STATES, AND
MCKINSEY & COMPANY, INC. WASHINGTON D.C.

                   Defendants.
-----------------------------------------------------------------X

      The complaint of the Plaintiffs against Defendants McKinsey & Company, Inc., McKinsey

Holdings, Inc., McKinsey & Company, Inc. United States, and McKinsey & Company, Inc.

Washington D.C. (hereinafter "McKinsey" or "Defendants" collectively) for Defendants' role in

creating the opioid crisis throughout the United States, the State of New Jersey and, in

particular, within Plaintiffs' communities, respectfully shows and alleges as follows:

## PARTIES

    1.      Plaintiffs are political subdivisions organized under New Jersey law.

    2.      Plaintiffs sustained economic damage as a result of Defendants' wrongful

conduct alleged herein, including: (1) costs for providing medical care to patients suffering from

opioid-related addiction and injury; (2) costs for providing treatment, counseling, and

rehabilitation services; (3) costs for providing treatment of infants born with opioid-related

medical conditions; (4) increased costs of law enforcement and public safety relating to the

opioid epidemic; (5) and costs associated with providing care for children whose parents suffer

from opioid-related disability or incapacitation. These damages have been suffered, and

continue to be suffered directly, by the Plaintiffs.

3.      Plaintiffs are authorized by law to abate any nuisance and prosecute in any court

of competent jurisdiction any person who creates, continues, contributes to, or suffers such

nuisance to exist and prevent injury and annoyance from such nuisance.

4.      Plaintiffs have standing to recover damages incurred as a result of Defendants'

actions and omissions. Plaintiffs have standing to bring all claims herein.

5.      Defendant McKinsey & Company, Inc. (hereinafter "MNY") is a New York

corporation with its principal place of business at 711 Third Avenue, New York, NY 10017.  It

may be served with process through its registered agent, Corporation Service Company, 80

State Street, Albany, New York 12207.

6.      Defendant McKinsey Holdings, Inc. (hereinafter "MH") is a Delaware corporation

with its principal place of business is located at 711 Third Avenue, New York, NY 10017.  It may

be served with process via its registered agent, Corporation Service Company, 251 Little Falls

Drive, Wilmington, DE 19808.

7.      Defendant McKinsey & Company, Inc. United States (hereinafter "MUS") is a

Delaware corporation with its principal office at 711 Third Avenue, New York, NY 10017.  It may

FILED: NEW YORK COUNTY CLERK 09/27/2022 04:20 PM
INDEX NO. 653541/2022
NYSCEF DOC. NO. 1
19-23649-shl Doc 5229-1 Filed 11/09/22 Entered 11/09/22 16:19:18 Exhibit 1-1
RECEIVED NYSCEF: 09/27/2022
Pg 6 of 32

be served with process through its registered agent, Corporation Service Company, 80 State Street, Albany, New York 12207.

8.      Defendant McKinsey & Company, Inc. Washington D.C. (hereinafter "MDC") is a Delaware corporation with its principal office at 711 Third Avenue, New York, NY 10017. It may be served with process through its registered agent, Corporation Service Company, 80 State Street, Albany, New York 12207.

9.      Upon information and belief, MNY is the parent company of MH, which is itself the parent company of both MUS and MDC.

10.      MNY exercised complete domination of MUS and MDC with respect to the wrongdoing alleged herein, and such domination was used to commit a fraud or wrong against Plaintiffs which resulted in Plaintiffs' injuries.  MUS and MDC are mere shell companies, that have no meaningful separate existence or operations apart from that of MNY.  In committing the wrongs alleged herein MUS, MNY, and MDC conducted their affairs as a single integrated enterprise or, alternatively, as a joint enterprise.

## JURISDICTION AND VENUE

11.      Jurisdiction and venue are proper in this Court pursuant to N.Y. Unif. R. Civ. Cts. § 202.70, N.Y. C.P.L.R. § 301, and  N.Y. C.P.L.R. § 503.

12.      Defendants have engaged in conduct and activities over a long time, systematically, individually, jointly, and severally, in the geographic areas encompassing Plaintiffs' communities that have caused all of the Plaintiffs' damages and all of which form the

bases of the causes of action in this Complaint as against Defendants.

13.     Defendants have committed multiple torts and breaches within the geographic areas of Plaintiffs' communities, repeatedly and systematically.

14.     Defendants, for a long time, repeatedly and systematically, have had substantial contacts and business relationships with the Plaintiffs, some or all of which form the basis of the causes of action in this Complaint as against Defendants.

15.     This Court has personal jurisdiction over Defendants, each of which has committed torts, in part or in whole, within the geographic areas encompassing Plaintiffs' communities, as alleged herein.  Moreover, Defendants have substantial contacts and business dealings directly with the Plaintiffs by virtue of their distribution, dispensing, and sales of prescription opioids.  All causes of action herein relate to Defendants' wrongful actions, conduct, and omissions committed against the Plaintiffs, and the consequences and damages related to said wrongful actions, conduct, and omissions.

### FACTUAL ALLEGATIONS

16.     Beginning in the mid-1990s, opioid manufacturers pursued aggressive sales strategies to increase the sales of their prescription opioids, a plan that resulted in a dramatic rise in opioid prescriptions in New Jersey.  The rise in opioid prescriptions caused an equally devastating rise in opioid abuse, dependence, addiction, and overdose deaths.

17.     Prescription opioids continue to kill hundreds of people across the country every year.  Thousands more suffer from negative health consequences short of death and countless

FILED: NEW YORK COUNTY CLERK 09/27/2022 04:20 PM
NYSCEF DOC. NO. 1
INDEX NO. 653541/2022
RECEIVED NYSCEF: 09/27/2022

19-23649-shl    Doc 5229-1    Filed 11/09/22    Entered 11/09/22 16:19:18    Exhibit 1-1
Pg 8 of 32

others have had their lives ruined by a friend or family member's addiction or death. Every community in New Jersey suffers from the opioid crisis of addiction and death.

18.     McKinsey worked with entities involved in manufacturing and selling opioids and thereby contributed to the opioid crisis.

19.     McKinsey is one of the world's largest consulting companies, working worldwide for corporations and governments across diverse industries. Using to its "best-in-class reputation," McKinsey holds a strong influence and sells the notion that it can take whatever a company or government is doing and make them do it better.

20.     Plaintiffs bring this action against McKinsey for the consulting services it provided to opioid companies in connection with designing the companies' marketing plans and programs that helped cause and contributed to the opioid crisis. McKinsey sold its ideas to OxyContin maker Purdue Pharma, L.P. ("Purdue") for more than fifteen years, from 2004 to 2019, including before and after Purdue's 2007 guilty plea for felony misbranding.

### McKinsey's Agreement with Purdue

21.     With effect as of March 1, 2004, MUS entered into a Master Consulting Agreement (hereinafter the "Agreement") with Purdue Pharma L.P. (hereinafter "PPLP").

22.     PPLP was the successor to The Purdue Frederick Company, Inc. (hereinafter "PFC"), which was a New York corporation headquartered in Connecticut.

23.     At all relevant times PFC and PPLP were members of a pharmaceutical business enterprise (hereinafter "Purdue"). Each member of which was wholly owned directly or

indirectly through family trusts and holding companies, 50% by the family of Mortimer D. Sackler, M.D., and 50% by the family of Raymond R Sackler, M.D. (hereinafter the "Sacklers").

## The Corporate Integrity Agreement

24.    In May of 2007, PFC pleaded guilty to federal charges for misleading regulators, doctors, and the public regarding Purdue's opioid OxyContin. PFC admitted to falsely marketing OxyContin as a less addictive, safer alternative to other pain medications.

25.    Pursuant to its Plea Agreement with the United States, PFC agreed to pay over $600 million, and PPLP entered into a Corporate Integrity Agreement (hereinafter "CIA") with the U.S. Department of Health and Human Services Office of Inspector General.

26.·    The CIA required Purdue to refrain from making any deceptive or misleading claims about OxyContin, to submit regular compliance reports regarding its sales and marketing practices, and to monitor, report, and attempt to prevent inappropriate prescribing practices.

## McKinsey's Role Following the CIA

### *The Sacklers Seek to Divert Money to Themselves*

27.    The Sackler family is among the richest families in the United States. At all times relevant to this complaint, members of the Sackler family controlled Purdue, not merely as the sole owners, but also as members of the board and as executive officers and agents.

28.    Following the guilty plea, the Sacklers sought to insulate themselves from the risk they perceived in the continued operation of the Purdue business of selling opioids. Merely ten days after the announcement of the guilty plea, David Sackler wrote to his father, Richard

FILED: NEW YORK COUNTY CLERK 09/27/2022 04:20 PM
INDEX NO. 653541/2022
NYSCEF DOC. NO. 1
19-23649-shl   Doc 5229-1   Filed 11/09/22   Entered 11/09/22 16:19:18   Exhibit 1-1
RECEIVED NYSCEF: 09/27/2022
Pg 10 of 32

Sackler, and uncle, Jonathan Sackler, that the family now was at risk of facing legal liability for selling OxyContin. Although Jonathan Sacker asserted that there was no basis to sue members of the family, David asserted otherwise, writing, "We will be sued. Read the op-ed stuff in these local papers and ask yourself how long it will take these lawyers to figure out that we might settle with them if they can freeze our assets and threaten us."

29.    On April 18, 2008, Richard Sackler, then the co-chairman of the board along with his uncle, communicated to other family members that Purdue's business of selling OxyContin and other opioids was "a dangerous concentration of risk." One option to address this risk was to sell the company to, or merge the company with, another pharmaceutical manufacturer. The proceeds of such a transaction could then be re-invested in diversified assets, thereby achieving the Sackler's desired insulation from liability for the ongoing opioid business.

30.    Another option included having Purdue borrow money to assure Purdue had adequate funds to continue operating while the Sacklers, as owners, would "distribute more free cash flow" to themselves. This would have the effect of maximizing the amount of money they, as owners, could extract from the business and invest elsewhere.

31.    To pursue either of these options, the Sacklers needed to maximize opioid sales in the short term so as to make Purdue—by then the subject of substantial public scrutiny— appear either as an attractive acquisition target or merger partner to another pharmaceutical manufacturer or as a creditworthy borrower to a lender. In short, the Sacklers planned to engage in a final flurry of opioid pushing to cash themselves out of their pharmaceutical business.

*McKinsey Supplied Purdue with Sales and Marketing Strategies and Remained Intimately Involved in Implementing Those Strategies*

32.     McKinsey touts its model of engaging in "transformational" partnerships with its clients. Rather than giving one-off advice, McKinsey learns each client's business intimately and provides tailored, granular strategies.

33.     Once a client has adopted the strategy recommended, McKinsey assists in implementing that strategy. By the time it was working with Purdue, implementation services were a core component of the overall suite of services that McKinsey provided. Describing McKinsey's approach to implementation, one McKinsey consultant stated, "On some of the most successful engagements I've seen, you can't even tell the difference between a McKinsey team member and one of our clients because we're working that cohesively together." Another McKinsey Senior Implementation Coach described McKinsey's approach by stating, "We're in there interacting with every element of that organization, from the welders or mechanics on the front line, all the way up to the board of directors."

34.     In the broadest of generalities, then, McKinsey's business model, as a provider of strategy and implementation consulting services, is to partner with clients to pursue business objectives identified by McKinsey. Once the objective is identified, the client and McKinsey then engage in concerted action as a seamless and cohesive unit to implement the necessary means to achieve those objectives for the client.

35.     In 2009, McKinsey was tasked with increasing OxyContin sales despite the CIA, which required, among other things, that Purdue comport with FDA requirements and also

included increased review and reporting obligations.

36.    McKinsey provided sales and marketing strategies designed to sell as much OxyContin as possible, at one point in 2010 telling Purdue that the new strategies McKinsey had developed could generate as much as $400 million in additional annual sales. After Purdue accepted McKinsey's advice, McKinsey worked with Purdue to implement the strategies McKinsey had developed.

37.    As a result of McKinsey's advice to, and aiding and abetting of, Purdue, OxyContin sales grew dramatically, and the Sacklers diverted the resulting profits into other holdings that they intended would be beyond the reach of judgment creditors.

38.    In a 2009 report, among other sales strategies, McKinsey advised Purdue sales representatives to push the highest dosages of OxyContin, the most profitable prescription for Purdue, but the most addictive prescription for the patient. To maximize dosages and improve targeting of the coordinated marketing strategy, McKinsey investigated the prescribing habits of individual physicians.

39.    McKinsey shaped Purdue's OxyContin marketing to circumvent the CIA. The CIA imposed restrictions on representations regarding the "withdrawal, drug tolerance, drug addiction, or drug abuse of Purdue's products." To avoid running afoul of this restriction, McKinsey advised Purdue to market OxyContin based on the false and misleading notion that the drug can provide "freedom" and "peace of mind" for its users, and concomitantly reduce stress and isolation.

40.     One Purdue advertisement said, "We sell hope in a bottle," even though both McKinsey and Purdue already understood the addiction problems associated with opioid use and abuse. McKinsey continued to encourage Purdue to tell doctors that OxyContin would give their patients "the best possible chance to live a full and active life," although they knew there was no evidence to support this claim.

41.     McKinsey urged Purdue to train and incentivize its sales representatives to increase sales across the market for opioids, even if it meant sales went to Purdue's competitors. While McKinsey intended this push for higher sales to serve the Sackler family's goal of increasing the marketability of Purdue for potential mergers, it actually worsened the opioid crisis beyond the portion of the crisis directly attributable to sales and use of OxyContin.

### *Project Turbocharge*

42.     The Corporate Integrity Agreement expired in 2012. With this restriction lifted, McKinsey devised additional marketing and sales strategies for Purdue to further increase OxyContin sales.

43.     In the second half of 2013, McKinsey made recommendations to Purdue to increase OxyContin revenue, including "Turbocharging Purdue's Sales Engine."

44.     McKinsey's "Project Turbocharge" recommendations included revising the existing process for targeting high-prescribing physicians with a shift from targeting solely based on prescription decline to considering additional factors. Based on its analysis, McKinsey told Purdue that "[t]here is significant opportunity to slow the decline of OxyContin by calling on more high-value physicians" and that "[t]he revenue upside from sales re-targeting and

FILED: NEW YORK COUNTY CLERK 09/27/2022 04:20 PM   INDEX NO. 653541/2022
NYSCEF DOC. NO. 1    19-23649-shl   Doc 5229-1   Filed 11/09/22   Entered 11/09/22 16:19:18   Exhibit 1-1   RECEIVED NYSCEF: 09/27/2022

Pg 14 of 32

adherence could be up to $250 million."

45.     Also, as part of the Project Turbocharge recommendations, McKinsey determined and advised Purdue that the top half of prescribing physicians "write on average 25 times more scripts per prescriber" than the lower half.  McKinsey advised Purdue that visiting high- prescribing doctors many times per year increased sales.

46.     Despite knowing that the then-recently-expired CIA had required Purdue to refrain from improperly incentivizing OxyContin sales, McKinsey also recommended increasing incentive compensation for incremental OxyContin prescriptions, advising Purdue that "[r]evision to incentive comp could better align reps to Purdue's economics."

47.     At the same time, McKinsey recommended decreasing training by six days a year to allow employees more time to make sales calls.  Meanwhile, McKinsey advised Purdue to exercise closer control over its sales staff to generate more efficient physician targeting.  McKinsey knew that, combined with the strictures of sales quotas and less training for the sales force, bonus/incentive compensation to the sales representatives based on the number of OxyContin prescriptions the representative produced could be a powerful driver of incremental OxyContin sales.

48.     McKinsey also recommended that Purdue circumvent pharmacies entirely with a mail-order program because enforcement by federal regulators was decreasing OxyContin dispensing through Walgreens.

49.     At the board level, McKinsey urged the Sacklers to impose a "revenue growth

goal" on management.

50.     Impressed with McKinsey's work, Richard Sackler emailed Mortimer D.A. Sackler "the discoveries of McKinsey are astonishing," on August 15, 2013.

51.     Eight days later, on August 23, 2013, McKinsey partners met with the Sackler family to pitch Project Turbocharge. Dr. Arnab Ghatak, one of the McKinsey partners leading the Purdue account, recounted the meeting to fellow partner, Martin Elling, in an email exchange, stating, "[T]he room was filled only with family, including the elder statesman, Dr. Raymond [Sackler],. . . . We went through exhibit by exhibit for about 2 hrs.. . . . They were extremely supportive of the findings and our recommendations. . . and wanted to . . . strongly endorse getting going on our recommendations."

52.     Elling, a co-leader of the Purdue account, remarked in the same email correspondence that McKinsey's "findings were crystal clear to" the Sacklers, and that the Sacklers "gave a ringing endorsement of 'moving forward fast.'"

53.     In September, Purdue began to implement Project Turbocharge based on McKinsey's recommendations. In adopting Project Turbocharge, Purdue acknowledged the improper connotations of the name, and re-branded the initiative "Evolve to Excellence."

54.     Evolve to Excellence (hereinafter "E2E") was the theme of Purdue's 2014 National Sales Meeting.

55.     After Purdue adopted McKinsey's recommendations, McKinsey continued to work with Purdue sales and marketing staff, reporting to Purdue executive Russell Gasdia

during Purdue's implementation of McKinsey's recommendations.

56.     In fact, McKinsey and Purdue executives, who together comprised the E2E Executive Oversight Team and Project Management Office jointly oversaw the entire E2E initiative.

57.     The Board informed the Sacklers of the implementation of McKinsey's OxyContin strategy. At the September 13, 2013 Board meeting, the Board discussed with the Sacklers the ongoing implementation of McKinsey's recommendations.

58.     The effect of McKinsey's efforts matched the Sackler's goals. Sales of OxyContin tripled in the years following the 2007 guilty plea, despite the restrictions imposed by the CIA. According to the U.S. Department of Justice, "[f]rom 2010 to 2018, Purdue's profits were almost entirely driven by its success in selling OxyContin."

59.     Thus, while the Sacklers did not sell Purdue or enter into a merger, their goals of increasing sales and extracting wealth from the business were realized.

60.     In 2007, the year of Purdue's guilty plea, net sales of OxyContin totaled approximately $1 billion. The guilty plea did little to stem Purdue's blistering growth rate. In fact, by 2010, because of McKinsey's advice and active assistance to Purdue and the Sacklers, OxyContin sales exceeded $3 billion, a tripling of revenue from OxyContin sales.

61.     With McKinsey's advice and assistance, OxyContin sales reached an all-time peak in 2013, the year McKinsey and Purdue implemented E2E a/k/a Project Turbocharge. This 2013 peak is especially notable given that overall opioid prescriptions had peaked three years earlier.

McKinsey's efforts added a final boost to OxyContin sales before the eventual unraveling, and Purdue's decision, in the end, to cease marketing the drug.

62.    By 2018, with OxyContin sales in their inexorable decline, Purdue announced that it would cease sending sales representatives to healthcare providers to promote OxyContin. The ranks of sales representatives were cut back to the approximate size of Purdue's sales staff prior to the initial launch of OxyContin.

63.    The Sackler's other goal—extracting wealth from Purdue—was also met. The Sackler family has withdrawn over $10 billion from Purdue since 2008, including $1.7 billion in 2009 alone. These distributions were made possible by McKinsey's advice and active assistance and came at the expense of a deepening national opioid crisis and grave harm to Plaintiffs.

***McKinsey Knew About the Dangers of Opioids and Acted to Maximize OxyContin Prescriptions Anyway***

64.    McKinsey has a long history of consulting in the pharmaceutical industry. In addition to its work with Purdue since 2004, McKinsey has performed "opioid-related work" for Johnson & Johnson, Endo International, and Mallinckrodt Pharmaceuticals, each of which manufactured and sold opioids. For instance, a McKinsey PowerPoint presentation prepared for Johnson & Johnson recommended that Johnson & Johnson aggressively target and influence doctors treating back pain in order to increase opioid sales.

65.    Purdue's highly publicized 2007 guilty plea put McKinsey on notice of its client's misconduct. By that time, McKinsey had access to public information indicating that OxyContin and other opioids pose significant risk of addiction and misuse—and that the actions and

FILED: NEW YORK COUNTY CLERK 09/27/2022 04:20 PM
NYSCEF DOC. NO. 1

19-23649-shl    Doc 5229-1    Filed 11/09/22    Entered 11/09/22 16:19:18    Exhibit 1-1
Pg 18 of 32

INDEX NO. 653541/2022
RECEIVED NYSCEF: 09/27/2022

omissions of their several opioid manufacturer clients, including but not limited to Purdue,
were actually contributing to a nationwide opioid epidemic.

66.    As early as 2009, McKinsey was asked to assist Purdue with "countering the
emotional messages from mothers with teenagers that overdosed on OxyContin."

67.    McKinsey also worked with Purdue to counter the understanding of doctors and
patients about the significant risks of OxyContin. McKinsey's presentations to Purdue in 2013
included extensive discussion of doctors' concerns about opioid misuse and side effects. On
September 13, 2013, McKinsey briefed Purdue on the ongoing concerns regarding OxyContin
addiction and diversion among prescribers, noting that "side effects and addiction are
concerns" of prescribers and that "[m]ost prescribers are concerned about abuse, but attempt
to establish measures to protect themselves," and that "diversion, abuse and regulatory
concerns continue to weigh on prescribers." Rather than working to limit these disastrous
effects, McKinsey treated doctors' misgivings as obstacles to be overcome with new messaging.

68.    McKinsey continued to assist Purdue to turbocharge sales long after the severity
of the opioid crisis was well known. On October 23, 2017, the President of the United States
declared the ongoing nationwide opioid epidemic a "public health emergency." Even at this
late hour in the crisis, McKinsey continued to propose solutions to the Sacklers and Purdue to
further boost opioid sales. These solutions were fashioned, in perfect McKinsey parlance, as
"high impact interventions to rapidly address market access challenges."

69.    Less than two months after the public health emergency declaration, McKinsey
proposed these high impact interventions to Purdue and its board. Among them was perhaps

FILED: NEW YORK COUNTY CLERK 09/27/2022 04:20 PM
NYSCEF DOC. NO. 1
INDEX NO. 653541/2022
RECEIVED NYSCEF: 09/27/2022

19-23649-shl   Doc 5229-1   Filed 11/09/22   Entered 11/09/22 16:19:18   Exhibit 1-1
Pg 19 of 32

McKinsey's most audacious gambit of the entire Purdue relationship: paying money—
"rebates"—to health insurers whenever someone overdosed on Purdue's drug or was
diagnosed with opioid use disorder (hereinafter "OUD").

70.     The money would be paid to health insurers for the increased costs of additional
medical services that resulted from the fact that Purdue's medications caused opioid-use
disorder and overdoses in people whose health care costs were the payors' obligation. The
money McKinsey proposed Purdue pay out in these circumstances would not go to the
individuals afflicted or to the families of the dead. Clearly, they were designed to allay the
concerns of insurers and discourage them from restricting access to opioids in the first place.

71.     McKinsey called these payments for future OxyContin overdoses and addictions
"Event-Based Contracts." McKinsey's analysis of "Important considerations when designing an
Event-Based Contract" shows that McKinsey knew precisely how many opioid overdoses/OUD
diagnoses there were each year, that it knew the rate of overdoses and OUD per member of a
health insurance plan, that it projected that rate going forward. Indeed, it actually calculated
the cost to Purdue of these overdose rebates to be in a range of $3-15 million per year.

72.     A former McKinsey consultant described McKinsey's work with Purdue as "the
banality of evil, M.B.A. edition . . . . They knew what was going on. And they found a way to
look past it, through it, around it, so as to answer the only questions they cared about: how to
make the client money, and when the walls closed in, how to protect themselves."

73.     In a 2018 email exchange, two McKinsey senior partners who had participated in
McKinsey's work advising and assisting Purdue—apparently fearing consequences for this

work—discussed deleting or destroying documents related to opioids.

74.     McKinsey's actions as alleged above were committed in knowing, reckless, and wonton disregard for the health and safety of others. Its conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

### Purdue's 2020 Guilty Plea and McKinsey's Recent Statement

75.     In October of 2020, Purdue once again reached an agreement with the U.S. Department of Justice to enter a guilty plea related to its marketing of OxyContin (the "2020 Settlement Agreement").  The agreement includes $8.3 billion in penalties from Purdue and $225 million from the Sackler family.

76.     In the 2020 Settlement Agreement, Purdue pleaded guilty to defrauding health agencies, violating anti-kickback laws, paying illegal kickbacks to doctors, and "using aggressive marketing tactics to convince doctors to unnecessarily prescribe opioids—frivolous prescriptions that experts say helped fuel a drug addiction crisis that has ravaged America for decades."

77.     The 2020 Settlement Agreement includes a provision specifically reserving claims regarding "[a]ny liability of entities other than the [Purdue Bankruptcy] Debtors, including consultants."

78.     In the agreement, Purdue agreed to plead guilty to a dual-object conspiracy to defraud the United States and to violate the Food, Drug and Cosmetic Act, 21 U.S.C. §§ 331,

FILED: NEW YORK COUNTY CLERK 09/27/2022 04:20 PM    INDEX NO. 653541/2022
NYSCEF DOC. NO. 1    19-23649-shl    Doc 5229-1    Filed 11/09/22    Entered 11/09/22 16:19:18    Exhibit 1-1    RECEIVED NYSCEF: 09/27/2022

Pg 21 of 32

353, among other charges, relating to its opioid sales and marketing practices after the 2007

guilty plea. The new plea agreement does not identify Purdue's co-conspirators, and McKinsey

is not identified by name in the agreement. Instead, McKinsey is referred to as the "consulting

company."

79.     Purdue's 2020 guilty plea concerns Covered Conduct (as defined in the plea

agreement) that directly implicates McKinsey in the conspiracy. It is the same conduct

described in this Complaint.

80.     In the agreement, Purdue admits that it adopted the recommendations of the

consulting company (that is, of McKinsey) and that Purdue's E2E program was "overseen by"

the consulting company (that is, McKinsey) in conjunction with some of Purdue's top

executives.

81.     On December 5, 2020, McKinsey issued the following statement regarding its

work with Purdue:

> December 5, 2020-As we look back at our client service during the opioid crisis,
> we recognize that we did not adequately acknowledge the epidemic unfolding in
> our communities or the terrible impact of opioid misuse and addiction on
> millions of families across the country. That is why last year we stopped doing
> any work on opioid-specific business, anywhere in the world.
>
> Our work with Purdue was designed to support the legal prescription and use of
> opioids for patients with legitimate medical needs, and any suggestion that our
> work sought to increase overdoses or misuse and worsen a public health crisis is
> wrong. That said, we recognize that we have a responsibility to take into
> account the broader context and implications of the work that we do. Our work
> for Purdue fell short of that standard.
>
> We have been undertaking a full review of the work in question, including into
> the 2018 email exchange which referenced potential deletion of documents. We

FILED: NEW YORK COUNTY CLERK 09/27/2022 04:20 PM
NYSCEF DOC. NO. 1

INDEX NO. 653541/2022

RECEIVED NYSCEF: 09/27/2022

19-23649-shl    Doc 5229-1    Filed 11/09/22    Entered 11/09/22 16:19:18    Exhibit 1-1
Pg 22 of 32

continue to cooperate fully with the authorities investigating these matters.

82.    In recent weeks, McKinsey has settled opioid-related claims with 49 states, the District of Columbia, and five U.S. territories.

83.    Although McKinsey stated that it has stopped opioid-related work "anywhere in the world," the Sacklers and McKinsey appear to have something else in mind. In August of 2013, when the Sacklers adopted McKinsey's "Project Turbocharge" for Purdue, Tim Reiner, a long-time McKinsey consultant, joined Mundipharma.

84.    Mundipharma is a global network of associated companies operating outside the United States that manufacture and sell opioids, including OxyContin. Like the Purdue companies, the Mundipharma companies were at all relevant times owned and controlled by the Sacklers, and the board members of Mundipharma were the same as those of PPLP. Purdue and the Sacklers commonly referred to the Purdue companies and the Mundipharma companies together as "The Purdue/Mundipharma Group." According to Purdue, "Purdue and a network of independent associated companies (including the Mundipharma and Napp companies) have a presence in more than 30 countries and the collective strength of more than 5000 employees worldwide. This global network has distribution capabilities in all key markets."

85.    Reiner is currently the Sacklers' "Chief Business Officer" at Mundipharma.

86.    As late as 2019, Mundipharma was asserting abroad many of the same misleading claims about opioids that previously led to criminal liability in the United States.

### Joint and Several Liability with Purdue

87.    McKinsey formed a common plan with Purdue to commit the tortious acts alleged herein, and McKinsey actively took part in those acts, or furthered them by cooperation or request, or by lending lend aid or encouragement, or by ratifying and adopting acts done for their common benefit.

88.    McKinsey gave substantial assistance and encouragement to Purdue regarding conduct McKinsey knew to be tortious.

89.    Accordingly, McKinsey is jointly and severally liable for the wrongs committed by Purdue within the scope of their common plan.

## CAUSES OF ACTION

### Count I: Deceptive Acts and Practices Under The New Jersey Consumer Fraud Act

90.    Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if they were set out herein.

91.    The New Jersey Consumer Fraud Act (hereinafter "CFA") prohibits:

The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice . . . .

N.J.S.A. 56:8-2 (2022).

92.    The CFA defines merchandise as including "objects, goods, wares, commodities,

FILED: NEW YORK COUNTY CLERK 09/27/2022 04:20 PM    INDEX NO. 653541/2022
NYSCEF DOC. NO. 1    19-23649-shl    Doc 5229-1    Filed 11/09/22    Entered 11/09/22 16:19:18    Exhibit 1-1    RECEIVED NYSCEF: 09/27/2022

Pg 24 of 32

services or anything else offered directly or indirectly to the public for sale . . . ." N.J.S.A. 56:8-1(c).

93.    In the course of its business, Defendants' unfairly and unconscionably worked with certain of its opioid manufacturing clients to aggressively promote and sell more opioids to more patients for longer periods of time.

94.    Defendants' acts and/or practices are "deceptive or misleading in a material way" and include, but are not limited to:

        a.    misrepresenting the truth about how opioids lead to addiction;

        b.    misrepresenting that opioids improve function;

        c.    misrepresenting that addiction risk can be managed;

        d.    misleading doctors, patients, and payors through the use of misleading terms like "pseudoaddiction;"

        e.    falsely claiming that withdrawal is simply managed;

        f.    misrepresenting that increased doses pose no significant additional risks;

        g.    falsely omitting or minimizing the adverse effects of opioids; and

        h.    overstating the risks of alternative forms of pain treatment.

95.    Such actions constitute unconscionable commercial practices that are prohibited by the N.J.S.A. 56:8-2.

96.    These acts or practices injured consumers in Plaintiffs. Defendants' actions

directly and proximately caused New Jersey's Subdivisions' injuries.

97.      Plaintiffs are entitled to recover their damages caused by Defendants' violation

of the New Jersey Consumer Fraud Act in an amount to be determined at trial.

### Count II: Negligence

98.      Plaintiffs reallege and incorporate by reference each and every allegation

contained in the preceding paragraphs as if they were set out herein.

99.      McKinsey, through its work with Purdue, owed a duty of care to Plaintiffs,

pursuant to which it would not encourage the over-marketing and over-prescribing of a

controlled substance known at the time to be addictive and known at the time to be a threat to

public health.

100.      In violation of this duty, for years McKinsey devised and assisted Purdue with

implementing a sales and marketing campaign, including Project Turbocharge, that would

dramatically increase the amount of OxyContin prescribed and distributed to Plaintiffs'

residents. In the process, McKinsey continually devised misleading claims regarding OxyContin

as part of their efforts to get health care providers to write more and more OxyContin

prescriptions.

101.      As a direct and proximate result of McKinsey's negligent conduct, Plaintiffs have

suffered and will continue to suffer harm.

102.      Plaintiffs are entitled to recover their damages caused by Defendants' negligence

in an amount to be determined at trial, plus attorneys' fees.

### Count III: Negligent Misrepresentation

103.    Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if they were set out herein.

104.    McKinsey, through its work with Purdue, owed a duty of care to Plaintiffs to exercise reasonable care in the marketing of opioids.

105.    McKinsey, in the course of its business with Purdue, failed to exercise reasonable care or competence when obtaining and communicating false information regarding Purdue's opioids that McKinsey knew would be used for the guidance of others in their business transactions, including the healthcare providers who were capable of prescribing Purdue's drugs to Plaintiffs' residents.

106.    McKinsey knew that the false information was material to healthcare providers' decisions to prescribe opioids to patients. McKinsey intended that such statements be relied upon to encourage additional opioid prescriptions.

107.    As a proximate result, McKinsey and its agents have caused Plaintiffs to incur excessive costs related to diagnosis, treatment, and cure of addiction or risk of addiction to opioids, Plaintiffs have borne the massive costs of these illnesses and conditions by having to provide necessary resources for care, treatment facilities, and law enforcement services for Plaintiffs' residents and using Plaintiffs' resources in relation to opioid use and abuse.

108.    McKinsey's acts and omissions imposed an unreasonable risk of harm to others separately and/or combined with the negligent and/or criminal acts of third parties.

109.    Plaintiffs are entitled to recover their damages caused by McKinsey's negligent misrepresentations in an amount to be determined at trial, plus attorneys' fees.

**Count IV: Fraud (Actual and Constructive) and Deceit**

110.    Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if they were set out herein.

111.    McKinsey made and caused to be made false representations to healthcare providers working in Plaintiffs' communities and/or omitted material facts, regarding the risks, efficacy, and medical necessity of opioids, generally, and Purdue's opioids, specifically. McKinsey knew these representations were false, made recklessly without knowledge of the truth, and/or had no reasonable ground for believing such assertions. Specifically, McKinsey knowingly and/or recklessly:

    a.    Downplayed the substantial risks of addiction and other side-effects of opioids generally, and Purdue's opioids specifically, including crafting Purdue's marketing plan to affirmatively state in sales calls and other marketing channels that Purdue's drugs were not as addictive or prone to abuse as they truly are; stating that classic signs of addiction were actually an indication of "pseudoaddiction" requiring additional administration of opioids, and omitting the high risks of addiction actually present;

    b.    Overstated the efficacy of opioids, generally, and Purdue's opioids, specifically, including making false statements regarding the effectiveness of the drugs for treating specific subsets of the patient population (i.e. those with osteoarthritis) and their ability to improve patient function; and

c.   Misrepresented the medical usefulness and necessity of opioids, generally, and Purdue's opioids, specifically, including affirmatively marketing their drugs for off label uses (i.e. osteoarthritis) without solicitation and not in response to questions from healthcare providers.

112.   McKinsey and Purdue's misrepresentations and omissions had a tendency to deceive others, to violate public confidence, and/or injure public interests. McKinsey, having chosen to craft the marketing plan used by Purdue to make representations to healthcare providers regarding their opioids, were under a duty to disclose the whole truth, and not disclose partial and misleading truths.

113.   McKinsey intended healthcare providers throughout the United States to rely upon McKinsey's false statements regarding the risks, efficacy, and medical necessity of opioids generally, and Purdue's opioids specifically, in order to increase the number of opioid prescriptions made by healthcare providers.

114.   Healthcare providers in Plaintiffs' communities did in fact rely on the false representations made in Purdue's marketing plan created by McKinsey and implemented with McKinsey's assistance.

115.   McKinsey acted with knowledge and willful intent, with reckless disregard for the rights of others, and/or intentionally and with malice towards others.

116.   Plaintiffs suffered actual pecuniary loss as a result of McKinsey's fraudulent representations and omissions.

**Count V: Unjust Enrichment**

117.   Plaintiffs reallege and incorporate by reference each and every allegation

FILED: NEW YORK COUNTY CLERK 09/27/2022 04:20 PM
INDEX NO. 653541/2022
NYSCEF DOC. NO. 1
19-23649-shl    Doc 5229-1    Filed 11/09/22    Entered 11/09/22 16:19:18    Exhibit 1-1
RECEIVED NYSCEF: 09/27/2022
Pg 29 of 32

contained in the preceding paragraphs as if they were set out herein.

118.    McKinsey was compensated for its work increasing opioid sales for Purdue.

119.    This compensation for increasing the sales of Purdue's deadly products constitutes money in the possession of McKinsey that, in equity and good conscience, McKinsey ought not be allowed to retain.

## JURY DEMAND

Plaintiffs request a trial by jury on all triable issues.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court enter judgement against Defendants as follows:

A. Awarding Plaintiffs their actual damages for the damages caused by the opioid epidemic, including but not limited to (1) costs for providing medical care, additional therapeutic and prescription drug purchases, and other treatments for patients suffering from opioid-related addiction or disease, including overdoses and deaths (2) costs for providing treatment, counseling and rehabilitation services, and (3) costs for providing treatment of infants born with opioid-related medical conditions.

B. Ordering disgorgement of all money or things of value received by McKinsey from Purdue or the Sacklers;

C. Awarding Plaintiffs punitive damages;

D. Awarding Plaintiffs their reasonable attorneys' fees, all costs and expenses, pre-judgment and post-judgment interest; and

E.  Providing all other and further relief as this Court may deem just and proper.


Respectfully Submitted this 27th day of September, 2022.

Dated: West Islip, New York
        September 27, 2022

                                            Yours, etc.,

                                            **TATE GROSSMAN & KELLY, LLP**



                                            David Grossman, Esq.
                                            Attorneys for Plaintiffs
                                            1248 Montauk Highway
                                            West Islip, New York 11795
                                            Telephone: (631) 314-4996
                                            Facsimile: (516) 686-6771


TO:

McKinsey & Company, Inc.
711 Third Avenue
New York, New York 10017

McKinsey Holdings, Inc.
711 Third Avenue
New York, NY 10017

McKinsey & Company, Inc. United States
711 Third Avenue
New York, New York 10017

McKinsey & Company, Inc. Washington D.C.
711 Third Avenue
New York, New York 10017

FILED: NEW YORK COUNTY CLERK 09/27/2022 04:20 PM
NYSCEF DOC. NO. 1
INDEX NO. 653541/2022
RECEIVED NYSCEF: 09/27/2022

19-23649-shl    Doc 5229-1    Filed 11/09/22    Entered 11/09/22 16:19:18    Exhibit 1-1
Pg 31 of 32

## VERIFICATION

STATE OF NEW YORK )
                )   ss.:
COUNTY OF SUFFOLK )

    I, David Grossman, the undersigned, am an attorney admitted to practice in the courts

of the State of New York say that:

    I am the attorney of record for the Plaintiff. I have read the annexed Summons and

Complaint and know the contents thereof and the same are true to my knowledge, except those

matters therein which are based on information and belief, and as to those matters I believe

them to be true. My belief, as to those matters therein not stated upon knowledge is based on

the following: Investigations which deponent has caused to be made concerning the subject

matter of this Summons and Complaint and from the information, reports, and records in

deponent's file and given deponent by the Plaintiff.

    The reason I make this affirmation instead of Plaintiff is because the said Plaintiff resides

outside the county in which deponent has his office.

Dated:  West Islip, New York
          September 27, 2022

DAVID GROSSMAN, ESQ.

Index No.:

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF NEW YORK: COMMERCIAL DIVISION

-------------------------------------------------------------------X

BAYONNE, NEW JERSEY; CLIFTON, NEW JERSEY

CLINTON, NEW JERSEY; ELIZABETH, NEW JERSEY

MADISON BOROUGH, NEW JERSEY; PARAMUS, NEW

JERSEY; PARSIPPANY-TROY HILLS TOWNSHIP, NEW JERSEY

Plaintiff(s),

   -against-

MCKINSEY & COMPANY, INC., MCKINSEY HOLDINGS, INC.,

MCKINSEY & COMPANY, INC. UNITED STATES, AND

MCKINSEY & COMPANY, INC. WASHINGTON D.C.,

Defendant(s).

-------------------------------------------------------------------X

## SUMMONS AND COMPLAINT

## KELLY, GROSSMAN & KERRIGAN, LLP

1248 Montauk Highway

West Islip, New York 11795

Telephone: (516) 686-6768

Facsimile: (516) 686-6771

*Pursuant to 22 NYCRR 130.1.1, the undersigned, and attorney admitted to practice in the courts of New York State, certifies that, upon information and belief and reasonable inquiry, the contentions contained in the annexed documents are not frivolous.*

*Dated: Tuesday, September 27, 2022*           *Signature:* _____

                                           *Print Name: David Grossman, Esq.*

Service of a copy of the within SUMMONS AND COMPLAINT is hereby admitted

Dated: Tuesday, September 27, 2022          _____

                                         Attorney(s) for Plaintiff

*PLEASE TAKE NOTICE*

    [ ]    *that the within is a (certified) true copy of a        entered in the*

            *Office of the clerk of the within names court on*

    [ ]    *that the       of which the within is a true copy will be presented for*

            *Settlement to the Hon.       , one of the judges of the within names court, on*

Dated: