```
                                                        Page 1
 1   UNITED STATES BANKRUPTCY COURT

 2   SOUTHERN DISTRICT OF NEW YORK

 3   Case No. 19-23649-shl

 4   - - - - - - - - - - - - - - - - - - - - - - - - - x

 5   In the Matter of:

 6

 7   PURDUE PHARMA L.P.,

 8

 9            Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                    United States Bankruptcy Court

13                    300 Quarropas Street, Room 248

14                    White Plains, NY 10601

15

16                    November 16, 2022

17                    11:07 AM

18

19

20

21   B E F O R E :

22   HON SEAN H. LANE

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:   ART
```

```
                                                                  Page 2
1     HEARING re ***PURDUE OMNIBUS***

2

3     HEARING re Doc. #4996 Pro-Se Letter Filed By Carrie L.

4     McGaha Seeking to Participate in Funding Decisions

5

6     HEARING re Doc. #5002 Pro-Se Letter Filed By Carrie L.

7     McGaha Seeking to Participate in Funding Decisions.

8

9     HEARING re Doc. #5226 United States of America's Opposition

10    To The Motions Filed by Claimant Carrie McGaha

11

12    HEARING re Doc. #5227 Debtors' Objection To Motion To

13    Require That Agencies Receiving Funds Generated From This

14    Case Shall Not Be Required to Follow The Executive Order On

15    Advancing Racial Equity And Support For Underserved

16    Communities Through The' Federal Government (EO 13985)

17

18    HEARING re Doc. #5241 Pro-Se Reply Filed By Carrie McGaha

19

20    HEARING re Doc. #5185 Ninth Interim Fee Hearing

21

22    HEARING re Doc. #5136 (Dechert LLP) Application For Interim

23    Professional Compensation / Ninth Interim Fee Application Of

24    Dechert LLP, Special Counsel, Period: 5/1/2022 To

25    8/31/2022, Fee: $896,323.05 Expenses: $1,269.32
```

Page 3

1   HEARING re Doc. #5135 (Arnold & Porter) Application For

2   Interim Professional Compensation / Ninth Application For

3   Interim Professional Compensation For Arnold & Porter Kaye

4   Scholer LLP, Debtor's Attorney, Period: 5/1/2022 To

5   8/31/2022, Fee: $224206.14, : Expenses: $5910.80

6

7   HEARING re Doc. #5150 (King & Spalding LLP) Application For

8   Interim Professional Compensation / Ninth Application For

9   Interim Professional Compensation For King & Spalding LLP,

10  Special Counsel, Period: 4/1/2022 To 8/31/2022, Fee:$

11  1,577,209.96, Expenses: $11,242.48

12

13  HEARING re Doc. #5152 (Davis Polk) Application for Interim

14  Professional Compensation /Ninth Application For Interim

15  Professional Compensation For Davis Polk & Wardwell LLP,

16  Debtor's Attorney, Period: 5/1/2022 To 8/31/2022, Fee:

17  $5,992,845.00, Expenses: $100,555.44

18

19  HEARING re Doe. #5163 (Jones Day) Application For Interim

20  Professional Compensation /Ninth Application For Interim

21  Professional Compensation For Jones Day, Special Counsel,

22  Period: 5/1/2022 To 8/1/2022, Fee: $l,150,485.39, Expenses:

23  $339,454.17

24

25

```
                                                        Page 4
1    HEARING re Doc. #5109 (Ernst & Young) Application For

2    Interim Professional Compensation / Eighth Interim Fee

3    Application Of Ernst & Young LLP, Auditors, Period: 5/1/2022

4    to 8/31/2022, Fee:$67,000.00, Expenses: $0.00

5

6    HEARING re Doe. #5155 (Alix Partners) Application For

7    Interim Professional Compensation /Ninth Interim Fee

8    Application Of Alixpartners, LLP, Financial Advisor, Period:

9    5/1/2022 to 8/31/2022, Fee: $1,583,239.00, Expenses:

10   $315,111.46.

11

12   HEARING re Doc. #5181 (Skadden) Ninth Application For

13   Interim Professional Compensation / Ninth Interim Fee

14   Application Of Skadden, Arps, Slate, Meagher & Flom LLP

15   Debtor's Attorney-Special Counsel, Period: 5/1/2022 To

16   8/31/2022, Fee: $3,642,964.58, Expenses: $260,967.74

17

18   HEARING re Doc. #5122 (PIT Partners LP) Application For

19   Interim Professional Compensation / Ninth Interim Fee

20   Application of PIT Partners LP as Investment Banker to the

21   Debtors, Period: 5/1/2022 To 8/31/2022, Fee: $900,000,

22   Expenses: $0.00

23

24

25
```

Page 5

1    HEARING re Doc. #5130 (Grant Thornton) Application For

2    Interim Professional Compensation / Fourth Interim Fee

3    Application Of Grant Thornton LLP, Consultant, Period:

4    5/1/2022 To 8/31/2022, Fee: $41,101.50, Expenses: $19,200.20

5

6    HEARING re Doe. #5151 (Latham & Watkins) Application For

7    Interim Professional Compensation / Second Interim

8    Application For Latham & Watkins LLP, Special Counsel To The

9    Debtors Period: 5/1/2022 To 8/31/2022, Fee: $69,248.70,

10   Expenses: $689.12

11

12   HEARING re Doc. #5156 (Reed Smith) Application For Interim

13   Professional Compensation / First Application For Interim

14   Professional Compensation For Reed Smith LLP, Special

15   Counsel, Period: 3/1/2022 To 8/31/2022, Fee: $1,662,061.00,

16   Expenses: $8,228.06

17

18   HEARING re Doc. #5177 (Jefferies LLC) Application For

19   Interim Professional Compensation /Ninth Interim Application

20   Of Jefferies LLC, Other Professional, Period: 5/1/2022 To

21   8/31/2022, Fee: $900,000.00, Expenses: $9,669.25

22

23

24

25

```
                                                                  Page 6
 1    HEARING re Doc. #5175 (Cole Schotz) Application For Interim
 2    Professional Compensation /Eighth Interim Fee Application Of
 3    Cole Schotz P.C. As Co-Counsel To The Official Committee Of
 4    Unsecured Creditors, Period: 5/1/2022 To 8/31/2022, Fee:
 5    $487,002.00, Expenses: $1,154.78
 6
 7    HEARING re Doc. #5178 (Province, LLC) Application For
 8    Interim Professional Compensation/Ninth Interim Application
 9    Of Province, LLC, Financial Advisor To The Official
10    Committee Of Unsecured Creditors Period; 5/1/2022 To
11    8/31/2022, Fee: $1,810,785,51, Expenses: $187.80
12
13    HEARING re Doc. #5174 (Akin) Application For Interim
14    Professional Compensation /Ninth Interim Fee Application Of
15    Akin Gump Strauss Hauer & Feld LLP As Counsel To The
16    Official Committee Of Unsecured Creditors Period: 5/1/2022
17    To 8/31/2022, Fee: $2,148,032.50, Expenses: $19,597.14
18
19    HEARING re Doc. #5159 (Otterbourg P.C.) Application For
20    Interim Professional Compensation / Application Of
21    Otterbourg P.C. As Co-Counsel To The Ad Hoc Committee Of
22    Governmental And Other Contingent Claimants Period: 5/1/2022
23    To 8/31/2022, Fee: $49,652.00, Expenses: $0.00
24
25
```

Page 7

1   HEARING re Doc. #5176 (Bedell) Application For Interim

2   Professional Compensation /Eighth Interim Fee Application Of

3   Bedell Cristin Jersey Partnership As Special Foreign

4   Counsel To The Official Committee Of Unsecured Creditors,

5   Period: 5/1/2022 To 8/31/2022, Fee:$ 11,227.50, Expenses: $0

6

7   HEARING re Doc. #5182 (Brown Rudnick) Application For

8   Interim Professional Compensation / Ninth Application for

9   Interim Professional Compensation For Brown Rudnick LLP)

10  Co-Counsel To The Ad Hoc Committee Of Governmental And Other

11  Contingent Liquidation Claimants, Period: 5/1/2022 To

12  8/31/2022, Fee: $131,115.00, Expenses: $3,619.44

13

14  HEARING re Doc. #5161 (FTI Consulting) Application For

15  Interim Professional Compensation / Ninth Interim Fee

16  Application Of FTI Consulting, Inc., Other Professional,

17  Period: 5/1/2022 To 8/31/2022, Fee: $240,216.50, Expenses:

18  $0.00

19

20  HEARING re Doc. #5179 (Kurtzman) Application For Interim

21  Professional Compensation /Ninth Interim Fee Application Of

22  Kurtzman Carson Consultants LLC As Information Agent

23  To The Official Committee Of Unsecured Creditors Period:

24  5/1/2022 To 8/31/2022, Fee:$42,178.39, Expenses: $4,751.69

25

1    HEARING re Doc. #5158 (Gilbert LLP) Application For Interim

2    Professional Compensation / Ninth Interim Application For

3    Allowance Of Compensation For Gilbert LLP As Co-Counsel

4    To The Ad Hoc Committee Of Governmental And Other Contingent

5    Litigation Claimants, Period: 5/1/2022 To 8/31/2022, Fee:

6    $2,001,309.50, Expenses: $12,202.90

7

8    HEARING re Doc. #5180 (Kramer Levin) Application For Interim

9    Professional Compensation / Ninth Interim Application Of

10   Kramer Levin Naftalis & Frankel LLP, As Co-Counsel

11   To The Ad Hoc Committee Of Governmental And Other Contingent

12   Litigation Claimants Period: 5/1/2022 To 8/31/2022, Fee:

13   $599,076.00, Expenses: $263,157.10

14

15   HEARING re Doc. #5164 (Houlihan Lokey) Application For

16   Interim Professional Compensation / Eighth Interim Fee

17   Application Of Houlihan Lokey Capital, Inc., Investment

18   Banker and Co-Financial Advisor To The Ad Hoc Committee,

19   Period: 5/1/2022 To 8/31/2022, Fee: $800,000.00, Expenses:

20   $678.26

21

22   HEARING re Doc. #5184 (Caplin & Drysdale) Application For

23   Interim Professional Compensation / Fourth Interim

24   Application For Interim Professional Compensation For Caplin

25   & Drysdale, Chartered, Special Counsel To The Multi-State

Page 9

1    Governmental Entities Group, Period: 2/1/2022 To 9/30/2022,

2    Fee: $870,355.00, Expenses: $24,464.64

3

4    HEARING re Doc. #5173 (Kleinberg) Application For Interim

5    Professional Compensation / Second Application For Interim

6    Professional Compensation For Kleinberg, Kaplan, Wolff &

7    Cohen, P.C., Creditor's Attorney, Period: 5/1/2022 To

8    8/31/2022, Fee: $350,152.00, Expenses: $132.01

9

10   HEARING re Doc. #5127 (Bielli & Klauder) Application For

11   Interim Professional Compensation'/ Eighth Application For

12   Interim Professional Compensation For Bielli & Klauder, LLC,

13   Counsel To The Fee Examiner, Period: 5/1/2022 To 8/31/2022,

14   Fee: $220,000.00, Expenses: $0.00.

15

16   HEARING re Doc. #5151 Second Application for Interim

17   Professional Compensation / Second Interim Application of

18   Latham & Watkins LLP for Compensation for Services

19   Rendered and Reimbursement of Expenses Incurred as Special

20   Counsel to the Debtors and Debtors In Possession for the

21   Period From May 1, 2022 through August 31, 2022 for Gregory

22   G. Garre, Special Counsel, period: 5/1/2022 to 8/31/2022,

23   fee: $69,248;70, expenses: $689.12.

24

25   Transcribed by:  Sonya Ledanski Hyde

```
                                                    Page 10

 1   A P P E A R A N C E S :

 2

 3   DAVIS POLK WARDWELL LLP

 4        Attorneys for the Debtor

 5        450 Lexington Avenue

 6        New York, NY 10017

 7

 8   BY:  MARSHALL HUEBNER

 9        ESTHER TOWNES

10

11   AKIN GUMP STRAUSS HAUER FELD LLP

12        Attorneys for the Official Committee of Unsecured

13        Creditors

14        One Bryant Park

15        New York, NY 10036

16

17   BY:  ARIK PREIS

18

19   KRAMER LEVIN NAFTAILIS FRANKEL LLP

20        Attorneys for Ad Hoc Committee

21        1177 Avenue of the Americas

22        New York, NY 10036

23

24   BY:  CAROLINE GANGE

25
```

Page 11

1    CAPLIN & DRYSDALE

2         Attorneys for Multi-State Governmental Entities Group

3         One Thomas Circle, NY, Suite 1100

4         Washington, DC 20005

5

6    BY:  KEVIN M. DAVIS

7

8    KLEINBERG, KALPAN, WOLFF & COHEN, P.C.

9         Attorneys for State of Washington

10        500 Fifth Avenue

11        New York, NY 1011

12

13   BY:  MATTHEW J. GOLD

14

15   BIELLI KLAUDER LLC

16        Court-Appointed Fee Examiner

17        1201 N. King Street

18        Wilmington, NY 19801

19

20   BY:  DAVID KLAUDER

21

22

23

24

25

Page 12

```
 1   DEPARTMENT OF JUSTICE

 2        Attorneys for the United States

 3        86 Chambers Street

 4        New York, NY 10007

 5

 6   BY:  DANIELLE J. LEVINE

 7        LAWRENCE FOGELMAN

 8

 9   CARRIE MCGAHA, Pro Se Claimant

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 13

PROCEEDINGS

1

2          THE COURT:  And the agenda for today's hearing has

3     been set forth at Docket Number 5233, which is entitled

4     Agenda for November 16th, 2022 Hearing.

5          And so we'll start by getting appearances.  So

6     first from the Debtors.

7          MR. HUEBNER:  Good morning, Your Honor.  For the

8     record, Marshall Huebner with Davis Polk on behalf of the

9     Debtors.  I'm joined by my colleague, Esther Townes, who

10    will be handling the second matter.

11         THE COURT:  All right.  Good morning.  And on

12    behalf of the Official Committee of Unsecured Creditors?

13         MR. PREIS:  Good morning, Your Honor.  Arik Preis

14    from Akin Gump Strauss Hauer & Feld on behalf of the

15    Official Committee of Unsecured Creditors.

16         THE COURT:  All right.  And on behalf of the Ad

17    Hoc Committee of Government and Other Contingent Litigation

18    Claimants?

19         MS. GANGE:  Good morning, Your Honor.  Caroline

20    Gange from Kramer Levin on behalf of the Ad Hoc Committee.

21         THE COURT:  All right.  Good morning.  On behalf

22    of the Multi-State Governmental Entities Group?

23         MR. DAVIS:  Good morning, Your Honor.  Kevin Davis

24    from Caplin & Drysdale on behalf of the Multi-State

25    Governmental Entities Group.

Page 14

1           THE COURT:  All right, good morning.  On behalf of

2     the nine professionals?

3           MR. GOLD:  Good morning, Your Honor.  Matthew

4     Gold, Kleinberg, Kalpan, Wolff & Cohen, on behalf of the

5     State of Washington and also coordinating with other states

6     in the nine.

7           THE COURT:  All right.  Thank you.  On behalf of

8     the fee examiner?

9           MR. KLAUDER:  Good morning, Your Honor.  Can you

10    hear me okay?

11          THE COURT:  I can hear you just fine.

12          MR. KLAUDER:  David Klauder.  I am the -- excuse

13    me, my voice is a little raspy this morning.  David Klauder,

14    the court-appointed fee examiner.  My counsel as well from

15    our law firm, Tom (indiscernible) is on as well.  Thank you.

16          THE COURT:  All right.  Good morning.  Thank you

17    very much.

18          And at this point, I realize there are a lot of

19    folks who are listening in who may not anticipate speaking

20    at today's hearing.  And so obviously if that changes and

21    people do need to speak, they can make their appearance at

22    that time.  But is there anyone else who wishes to make an

23    appearance at this time?

24          MS. LEVINE:  Good morning, Your Honor.  Danielle

25    Levine from the United States Attorney's Office.

Page 15

1    (indiscernible) New York on behalf of the United States.

2              THE COURT:  All right.  Good morning.  Any other

3    appearances?

4              MR. FOGELMAN:  Good morning, Your Honor.  Larry

5    Fogelman, also on behalf of the United States.

6              THE COURT:  All right.  Good morning.  Other

7    appearances?

8              MS. MCGAHA:  Your Honor, this is Carrie McGaha,

9    pro se claimant.  And I'm just appearing for the motion that

10   I made.  Thank you.

11             THE COURT:  All right.  Thank you.  Good to have

12   you here this morning.  Any other appearances?  All right.

13             So with that, I will turn it over to Debtor's

14   counsel in the first instance to start us off perhaps with a

15   status.  I did receive also the twelfth monitor report I

16   mentioned just in the context of status and reviewed that.

17   That was at Docket 5235.  And I know the agenda sets forth

18   uncontested matters which are fee applications and then Ms.

19   McGaha's contested matter.

20             But with that, Mr. Huebner, take it away, please.

21             MR. HUEBNER:  Sure, Your Honor.  So the way we

22   have normally done these is that I give a general report of

23   where I understand that the examiner is, since we have

24   (indiscernible) the examiner for several years.  And rather

25   than having each professional sort of explain the exact

Page 16

1   resolution and that our -- the fee examiner obviously is

2   here to answer any questions and elaborate further,

3   obviously everyone is here waiting to address any questions

4   or comments that the Court we have.  And then we intended to

5   send in I think on each of the quarterly occasions an

6   omnibus order that lists the actual final amounts after the

7   additional reductions, in many cases agreed to with the fee

8   examiner.  The way it's (indiscernible) just for Your

9   Honor's benefit, since this is the first quarterly hearing

10  on the fee app since Your Honor took over the case, is that

11  the fee examiner actually sends out quite detailed -- at

12  least in our case they are detailed -- questions, concerns,

13  requests for reductions.  We go through them all, we

14  (indiscernible) records, in some cases we provide additional

15  backup and explain how things were incurred on the right.

16  And then in most cases (indiscernible) we have reached a

17  resolution with the fee examiner, me and all the other

18  professionals.  And those are reflected in the order

19  resulting in further savings to the estate, obviously

20  between the many parties for whom the Debtors are paying in

21  addition to themselves, there are a non-trivial number of

22  professionals.  The way it's worked so far I think has been

23  efficient, obviously, it goes without saying.  If Your Honor

24  would like to do it in some other way -- you know, we all

25  sort of work for you, so whatever you would like, we will of

Page 17

1   course accommodate.  But it's been a pretty efficient and

2   streamlined way to handle it so far.

3          THE COURT:  All right.  No, all that sounds fine.

4   I appreciate the update.  That was going to be the first

5   thing I asked you to address, which is to just give me an

6   overview.  And I could piece together a lot of that from

7   looking at the papers that were filed, including the fee

8   examiner pleading and some other papers.  But it's helpful

9   to have that on the record.

10          So let me -- there are a couple things that I

11   appreciate you addressed, and I'm going to lay them out sort

12   of all together because there might be some overlap.  And

13   then obviously appreciate your insights and insights perhaps

14   of the fee examiner.

15          One is since this -- since I've inherited this

16   case and don't have the background with it that you all

17   have, obviously there's always a discussion when you have

18   excessive amount of professionals handling things that are

19   similar but distinct, and the question of overlap.  And

20   maybe a short explanation of sort of what's gone on past

21   this prologue in terms of overlap and how that's been

22   handled in the case.

23          And I guess a second issue to address would be how

24   you handle -- I certainly know that -- and this happens in

25   any of these instances where there are fee examiners and

Page 18

1    there's sort of dialogue back and forth, which is obviously

2    great and efficient and helpful and it leads to the kind of

3    reductions you're talking about -- is how you want to handle

4    that, whether you essentially give me an idea, an overview

5    of the kinds of issues that the fee examiner -- that were

6    the subject of discussion that led to the reductions,

7    whether you do that as a global matter or whether you do

8    that application-by-application, I'm all for whatever you've

9    been doing in the past.

10          Third is -- and again, I apologize for giving it

11   all at once, but again, there's a bit of overlap in some of

12   these issues.  So third would be the question of -- it was

13   mentioned of a holdback, obviously, and how the holdback has

14   been handled in this particular case.  Again, you're getting

15   me educated, so I appreciate that.

16          And those I think are my three main questions.

17   And so I'm happy to let you address them however you think

18   is appropriate, starting with you, Mr. Huebner.

19          MR. HUEBNER:  Sure.  Let me take some of those,

20   and I think obviously Mr. Klauder will jump on sort of his

21   side of the house in particular, certainly on number two and

22   to some extent on number one.  If I can, I'll go in reverse

23   order just because it's as easy as anything.

24          The way the holdback has worked in the case to

25   date is that there was a 20 percent holdback on fees held

Page 19

1   until these quarterly hearings for those periods, at which

2   point, assuming that the Court, as it has been to date, is

3   okay with the further reductions agreed to by the fee

4   examiner, the order is entered and the holdback for the

5   period that's been held is then paid.  Obviously the way the

6   bankruptcy payment system works, everybody still has plenty

7   of skin in the game.  This period, for example, ends on

8   August 31.  And so there's already all of September, all of

9   October, all of November that have yet to be in some cases

10  paid at all.  In some cases not even (indiscernible)

11  obviously in one case (indiscernible) 80 percent.  And then,

12  you know, at some point three or four months from now, there

13  will be a rolling hearing for that formal period.  And so

14  the Court has released on the interim compensation order

15  entered by the Court.  There's a 20 percent holdback until

16  the quarterly hearings, at which point it is released when

17  the Court enters the order.  So that's sort of number three,

18  if that's acceptable to the Court.

19          THE COURT:  Yes, thank you.

20          MR. HUEBNER:  With respect to sort of overlap and

21  (indiscernible) connected, obviously I will not speak to Mr.

22  (indiscernible) conversations of course with other firms,

23  which I have no knowledge of.  But I will speak for a minute

24  about overlap and related issues.

25          You know, this is something that I think that's

Page 20

```
 1   several levels of policing.  You know, the company itself
 2   obviously, frankly, is quite focused on and aware of and
 3   works hard to minimize overlap.  We actually have
 4   coordination calls with the general counsel and deputy
 5   general counsel and the senior leaders of each law firm
 6   about every two weeks, including to make sure that there are
 7   clear divisions of responsibility and that there are not
 8   firms handling similar things.
 9           You know, with respect to this application in
10   particular, for example, I can tell you for a fact I know
11   that in addition to the company being focused on it, and as
12   a fee examiner, as his firm had been in the past, is also
13   focused on it.  And some of the questions were about, you
14   know, if you had Firm X, what was Firm Y doing and please
15   give me sort of detailed comfort that they were not doing
16   the same thing, and each one was sort of in their own lane.
17           One example (indiscernible) for this
18   (indiscernible) is that the most recent entrant I think to
19   the Debtor's legal (indiscernible) was Latham Watkins, which
20   was brought on for a very specific purpose, which is Supreme
21   Court and appellate expertise.  You have a former solicitor
22   general who has argue 3,461 cases before the Supreme Court.
23   They wouldn't even have breakfast unless he tells them it's
24   okay.  You know, was brought in.  Although, frankly, at
25   Davis Polk we do an awful lot of appellate work
```

Page 21

1    (indiscernible) many billions of dollars at issue on the

2    right (indiscernible) really extraordinarily expert and

3    personally experienced in government would help both to

4    assist with the Second Circuit, but really with an eye

5    towards --

6              THE COURT:  And some of the -- I went through the

7    applications for that purpose, and some of them are, you

8    know, pretty clear what lane folks are in.  So, for example,

9    I think it was for the Committee.  They had foreign counsel.

10   All right?  You sort of have a pretty good idea of what that

11   is.  And certainly I did see the appeal as a defined term in

12   the Latham Watkins application.

13             I did see -- and again, I apologize, I'm sure this

14   has all been addressed in the past no doubt.  But just to

15   the education -- getting an education.  There's obviously a

16   lot of intellectual property issues that have come up, and I

17   know there's different counsel involved in different things.

18   I don't know if there's anything in particular you can tell

19   me in terms of trying to understand the lanes that people

20   are operating in.

21             MR. HUEBNER:  Sure.  I can, Your Honor.  I think

22   on that one, really Jones Day is overwhelmingly responsible

23   for the (indiscernible) intellectual property issues.

24   Frankly, I couldn't even name a single lawyer at Jones Day

25   working on this case because I don't think I've ever been on

Page 22

1    a single call with them, and I'm not sure people from Davis

2    Polk have been any more than zero, either.  That's actually

3    quite separate.  This is a large, complicated pharma company

4    that is defending its patents that are worth billions of

5    dollars in many (indiscernible).  Frankly, David Polk

6    (indiscernible) with respect to IP really related

7    exclusively to negotiating IP-related issues with the

8    Sacklers as part of the brand settlement.  But otherwise, we

9    have nothing in the world to do with IP, and I think that

10   the same is true on almost all the Debtor's other primary

11   law firms.  You know, the one exception might be Skadden, in

12   addition to being the Debtor's primary DOJ counsel soup to

13   nuts, is working and has worked on some discrete

14   transactions from a sort of monetization disposition side.

15   Obviously, you know, I personally may have some mild overlap

16   with specialist counsel given that obviously in a form of

17   business, assets obviously IP-driven, as is much of their

18   value.  But that's actually a very good example I think of

19   where there is to my knowledge very, very little overlap.

20   As I said, no disrespect to I'm sure amazing lawyers at

21   Jones Day, I've never been on a single call with them

22   despite being the Debtor's lead counsel for over four-and-a-

23   half years.  So --

24            THE COURT:  My guess is -- and that's all very

25   helpful, and I certainly -- the papers that came through

Page 23

1    that Skadden's primary role is DOJ counsel, but that it has

2    a couple of other specific things where it's jumped in.  But

3    I guess I had asked about intellectual property because I

4    also saw that there's Arnold Porter here as the special

5    counsel and that was described as advising the Debtors on

6    intellectual property disputes and licensing.  And so not

7    being an IP lawyer, you know, you realize you're operating a

8    bit blind on exactly how the division of labor might work,

9    which might be more obvious to somebody with an IP

10   background.

11            MR. HUEBNER:  I'll ask one of those two firms to

12   jump in.  I'm going to take a flyer here from one of the

13   weekly coordination calls.  There may be a specific trial

14   that Arnold Porter is handling for the company against a

15   counterparty, but I could well be misspeaking.  And so since

16   I think to my knowledge Jones Day is the primary counsel and

17   your question is -- but I also see Arnold and Porter.  I

18   could ask someone from Arnold and Porter (indiscernible)

19   video and they'll explain the (indiscernible) overlap that

20   the Judge is asking about, because I think I would probably

21   not be helpful if I kept trying to do it from rather little

22   specific knowledge.

23            THE COURT:  All right, fair enough.

24            MR. GREISS:  Hi, this is Rory Greiss from Arnold

25   and Porter.

Page 24

1                 THE COURT:  Good morning.

2                 MR. GREISS:  Sorry for my informal...

3                 THE COURT:  That's perfectly fine.  Thank you for

4     being here.

5                 MR. GREISS:  Sure.  So mainly the work that we do,

6     which does involve some intellectual property aspects, is

7     transactional work for the client.  So we are involved in

8     licensing arrangements, collaboration agreements, and

9     sometimes we will advise with respect to contractual

10    disputes that come up and advise the client on rights and

11    obligations under various agreements that they've entered

12    into in the past.

13                In addition to that work, we also do some

14    regulatory work for the client, and including on the

15    litigation side.  So hopefully that gives you a good idea of

16    the work that we're doing and that it really does not

17    overlap with much of what the other firms are doing here.

18                THE COURT:  All right.  Thank you very much.  And

19    I would be remiss if I didn't give the fee examiner an

20    opportunity to chime in, as obviously you are having exactly

21    these kinds of conversations on a much more granular, and

22    frankly useful level than the kind of very broad question

23    I'm asking.

24                MR. KLAUDER:  That's correct.  Excuse me.  Yeah.

25    I mean, with respect to Jones Day and Arnold Porter in

Page 25

1    particular, the fee amounts show that Jones Day bills

2    significantly more, so they take on a higher level of the

3    IP.

4           As Mr. Greiss indicated, Arnold & Porter is a more

5    specific issue.  But as it relates, Your Honor, to

6    duplication in general, this is the ninth go-around we've

7    now had with pretty much all these professionals.  You can

8    well imagine when we first got involved in the first couple

9    of rounds, duplication was one of the top items of

10   discussion that went back and forth between my group and the

11   professionals.  So we've always addressed this at the outset

12   between the firms, and really is an issue of sort of how the

13   folks communicate with each other, how they communicate with

14   themselves.

15          What happens -- if you don't mind, I can sort of

16   describe what happens in the interplay between what we do

17   and how the professionals respond.

18          THE COURT:  That would be helpful.  Again, I

19   realize what I'm asking for is a bit of explanation.  While

20   it relates to what's currently on, I'm asking you to

21   essentially do me the favor of giving me a bit of the

22   background that I don't currently have, not having presided

23   over the matter.

24          MR. KLAUDER:  Sure.

25          THE COURT:  And my idea is that sometimes with

Page 26

1    that it's best to do it up front so that I get that

2    education as early as possible rather than have it sort of

3    dog me and then have me sort of continue to ask these kinds

4    of very basic questions in the long term.  So yeah, I would

5    appreciate that.  Kind of an explanation I think would be

6    very helpful.

7         MR. KLAUDER:  Sure.  So when the interim fee apps

8    are filed, we -- you know, we're reviewing -- obviously

9    there are monthly fee apps, but our contact with the

10   professionals occurs at the interim period.  And so when

11   those are filed, we get our comments together and our

12   results together from our review and we put together what's

13   called an interim report, which is essentially a letter that

14   comes from me that sets forth all the issues that we've

15   uncovered with that particular interim fee app.

16        Oftentimes there are sort of detailed spreadsheets

17   that go with the specific topics that we address.  You know,

18   just for Your Honor's edification, we use a software program

19   that is able to synthesize the time records.  You can well

20   imagine the amount of time records that go into any interim

21   fee app in this case are just immense.  So we need some

22   computer help to do the review.  But there are humans that

23   are going through this that are doing the second level and

24   last level review, including myself, who signs off on all

25   interim reports that go out to the professionals.

Page 27

```
 1              We then have a dialogue with each professional and
 2   go through the issues that we phrased.  And ultimately in
 3   every case, it's resulted in a resolution.  That's important
 4   to me because, you know, frankly, I don't feel like -- and
 5   I'm sure Your Honor doesn't feel like fee disputes are the
 6   most efficient and economical disputes to be brought in
 7   front of Your Honor.  If there is to be one, we will bring
 8   it in front of you.  But we have very cooperative
 9   relationships with everyone.
10              You know, when Judge Drain -- you know, we first
11   got in front of Judge Drain, he made it clear to us that he
12   did not want -- unless there were actual disputes that he
13   was going to have to decide, he did not want me and my group
14   to file any reports with the Court.  So, you know, I've done
15   other fee examiner cases.  I oftentimes do a report even if
16   it's on uncontested issues.  But Judge Drain made it clear
17   he did not want that.  And that's the way we've proceeded
18   throughout.  If Your Honor feels differently, we can pivot
19   and create reports --
20              THE COURT:  No, thank you.  I appreciate you
21   flagging that issue.  I certainly have been involved in
22   cases that had fee examiners.  American Airlines obviously
23   was a large case, had a fee examiner.  And each case has its
24   own dynamic.  And I heard from Mr. Huebner that the client
25   is involved, and that was certainly a -- for example, in
```

Page 28

1   American Airlines a very significant part of how fees were

2   looked at, is they had a very engaged client.  And that's

3   fine.  I have no intent to change things, how things have

4   been done unless something is profoundly different than how

5   I normally do it.  And again, there's a range of how things

6   are done in cases.  And so there's no need to change how

7   you've been handling things.

8           Again, I just want to make sure that I get enough

9   information so I can -- it helps me with my review of these

10  things going forward and allows me to sort of exercise an

11  informed discretion as opposed to whistling in the dark, so

12  to speak.  So, yeah, that's fine.

13          Let me ask you what you've done in the past when

14  you've -- essentially as you've been reaching agreements on

15  reductions how you essentially inform the Court of that.  Is

16  it sort of on a top-level?  Do you get into sort of

17  generally during this period for all applications we've

18  sought reductions and received reductions in these areas, or

19  do you do it application-by-application?

20          MR. KLAUDER:  Yes.  So the way we have done it

21  previously is essentially application or professional-by-

22  professional on a total level, not a specific issue level.

23          So I think after this hearing -- and I saw that

24  the Davis Polk group sent a form of the order.  And attached

25  to that order contains a pretty detailed professional-by-

Page 29

1    professional list of what they've asked for in this interim

2    period, what they've agreed to reduce upon our

3    recommendation from a fee and expense standard.  So that's

4    what you -- and that's what would be put before the Court.

5            You know, one other issue or one other factor that

6    we certainly take into account is some pretty significant

7    voluntary reductions that the professionals take, either

8    right off the top for whatever reason, or for specific

9    issues that are set out in the fee applications.  And so

10   that's an important consideration that we always take into

11   account so that professionals are, without even any

12   prompting from our office, are taking some voluntary

13   reductions off the top.  I thought that was important to let

14   Your Honor know about that.  One, that that is happening,

15   and two, that we are taking that into consideration.  It

16   doesn't prevent our review and it doesn't stop the issues

17   that we are raising, but it is a factor we consider.

18            THE COURT:  All right.  Thank you very much.  I

19   appreciate your comments, the comments from counsel for

20   Arnold & Porter, and of course Mr. Huebner's comments as

21   well to just allow me to level set on exactly how things

22   have been done in this case.  Again, very similar to how

23   I've seen it done in other cases.  But again, there's always

24   a few unique things that are done in each case.  That's sort

25   of the way things work and should work.

Page 30

1          So with that, those are -- I appreciate, again,

2     that information.  And with that, I'll turn it back to

3     counsel to tee up anything else on status.  And if not, then

4     to go through the uncontested matters.

5          MR. HUEBNER:  Sure.  And, Your Honor, just to put

6     a tiny bit more meat, and then I think we can move on.  To

7     give you a sense of things, Davis Polk, we take a pretty I

8     think sharp pen to all of our monthly bills before we send

9     them.  Just so you know, we actually wrote off over $296,000

10    before we even file the monthly bills, which in fact

11    materially exceeded the (indiscernible) changes because it's

12    just, you know, we think we (indiscernible) no one would

13    ever raise questions about a single time entry

14    (indiscernible) to make sure that's the case.

15          When you add up just in our case, which is

16    actually a little bit unusually high, but it's fine.  Our

17    initial self-reductions, which were quite material, a

18    conversation we had with the clients about one matter where

19    we actually were comfortable, but we decided in the interest

20    of (indiscernible) just to write off another $60,000.  And

21    then with Mr. Klauder's firm, we actually write off almost

22    seven percent of our time for this fee period voluntarily.

23    So to give you a sense, at least in Davis Polk's case, we

24    cut pretty deep when we think it's justified, sometimes we

25    don't and the numbers look smaller than that.  We look very

Page 31

1    hard at every bill and we (indiscernible) and then we're

2    happy to be very reasonable and appropriate with others.

3            So, Your Honor, with that, unless the Court has

4    further questions, at this point the form of the order does

5    I think clearly reflect in clear form what further

6    reductions that were negotiated.  And I was told early this

7    morning by Mr. Klauder -- I think he may have already said

8    has reached with all of the professionals.  With the

9    Debtors, with the UCC, and for the other creditor groups

10   that we are paying.

11           And so unless the Court has further questions, I

12   think that order is now ready for entry, which would

13   thereafter allow the Debtors to release the holdback for a

14   period that goes back between seven and three months.

15           THE COURT:  All right.  I guess I would just

16   appreciate if the fee examiner could put on the record the

17   reductions that have been agreed upon between the fee

18   examiner and the Applicants.  Just big picture as you like

19   just so I have that on the record.

20           MR. KLAUDER:  And, Your Honor, you're not asking

21   for each professional, right?

22           THE COURT:  No, just the big picture.

23           MR. KLAUDER:  Okay.  Just sort of -- it looks like

24   with expenses, fees and expenses in this go-around,

25   $190,000.

Page 32

1            THE COURT:  All right.  Thank you very much.  All

2    right.  So with that, let me ask if there's any party that

3    wishes to be heard on the interim fee applications that are

4    on for today.  And these are set forth in the agenda that

5    was filed on the docket, and they include the Debtor's

6    professionals, which are listed as A through L.  They

7    include obviously Davis Polk, but also the other counsel

8    we've been talking about.  It includes, but not limited to

9    folks we've already been talking about, Arnold & Porter,

10   Skadden Arps, but also includes other firms.  Dechert LLP,

11   King & Spalding, and Latham & Watkins, Reed Smith, and

12   includes things that aren't law firms, such as Alix Partners

13   LLP.

14            So let me ask if anybody withs to be heard in

15   connection with the applications for Debtor's professionals.

16            All right.  Let the record reflect that there's no

17   response, and I will also make clear that the record reflect

18   I haven't seen any opposition that's been filed in

19   connection with any of these interim applications, and

20   that's why they're listed as uncontested.

21            And I'm going to ask the same question of anybody

22   that wishes to be heard in connection with the interim fee

23   applications of the Official Committee of Unsecured

24   Creditors that are listed as M through R on the agenda,

25   include Jeffries, Cole Schotz, Province Inc., Akin Gump,

Page 33

1    Kurtzman Carson, and (indiscernible).

2            All right.  Once again, don't hear any party

3    withing to be heard, and I didn't see any opposition on the

4    record.  And in the same vein, if anybody wishes to be heard

5    in connection with the interim fee applications of the Ad

6    Hoc Committee of Governmental and Other Contingent

7    Litigation Claimants, those are listed on the agenda as S

8    through X.  They include Brown Rudnick, FTI Consulting,

9    Otterbourg PC, Gilbert LLP, Kramer Levin, and Houlihan

10   Lokey.  Anybody wish to be heard?

11           All right.  Once again, hearing no response, and

12   the Court notes that also it has receive no opposition.

13           And I will ask the same question for the

14   professionals' interim applications that are on for the

15   Multi-State Governmental Entities for the group of nine and

16   for the fee examiner itself.  These are listed on the agenda

17   as letters Y, X, and AA.  Does anybody wish to be heard?

18           All right.  Once again, the Court hears no

19   response and again did not see any opposition that was

20   filed.

21           So given the record before me, I will grant the

22   requested interim fee applications as have been modified by

23   agreements reached between the Applicants and the fee

24   examiner.  And I view them as entirely appropriate as a

25   matter of the facts of the case and applicable law.  And I

Page 34

1    appreciate again the background on the process provided by

2    all those who chimed in this morning.

3            And so with that, I believe that resolve the

4    uncontested matters, that is the uncontested fee

5    applications that are listed on the agenda.

6            So with that, Mr. Huebner, I will turn it back to

7    you.

8            MR. HUEBNER:   Thank you, Your Honor.   That

9    concludes the first matter.   I think there is an irony that

10   Mr. Klauder has to be AA so that he can review literally A

11   through Z.   Another one of the many reasons we all just

12   really hope this case can conclude as swiftly as possible to

13   get money and value and assets out to the hundreds of

14   thousands of victims, governmental and private, who are just

15   waiting for it.   But obviously until we hear from the Second

16   Circuit, none of that is possible.

17           Your Honor, the second matter is a contested

18   matter being handled by my colleague, Esther Townes. It is I

19   believe someone else's motion.   And so (indiscernible) Ms.

20   McGaha would like to go first or if I should durn the podium

21   --

22           THE COURT:   All right.   Yes.

23           MR. HUEBNER:   I will turn off my (indiscernible).

24           THE COURT:   Thank you very much for setting the

25   stage for that.   So I'll sort of help to identify what's on

Page 35

1    and how we should proceed.

2            So, Ms. McGaha filed letters in this case which

3    are construed as motions.  And a motion is anything

4    requesting the Court to take action.  And so on the agenda

5    it's identified as the Pro Se Funding Decision Motion, and

6    it references the letter that was filed by Ms. McGaha

7    seeking to participate in plan funding decisions.  It

8    mentions the letter at Docket 4996, which is dated August

9    2nd of 2022.  And the purpose -- the letter says the purpose

10   of this letter is to request relief from having a department

11   of recovery essentially require compliance with a certain

12   executive order of the government executive order on

13   advancing racial equality and support for underserved

14   communities through the federal government, Executive Order

15   13985.

16           As the agenda reflects, there were two responses

17   to Ms. McGaha's request, and those are filed at Docket 5226

18   and 5227.  5226 is a memorandum of law and opposition to the

19   motion that was filed by the United States Attorney's Office

20   on behalf of the federal government.  And Docket Number 5227

21   was the Debtor's objection to the motion, filed by the law

22   firm of Davis Polk.

23           And then there are listed and the contested matter

24   on the agenda certain related documents such as the notice

25   of hearing and the letter requesting hearing date and things

Page 36

1    of that sort, which are listed as A, B, and C as related

2    documents.

3           And then I think last but not least, which I don't

4    think made it onto the docket, the agenda that I have in

5    front of me, because I think it was filed on November 14th,

6    was the response of Ms. McGaha as a pro se claimant.  That,

7    again, is dated November 14th.  It's a three-page letter

8    with attachments.  And so it's a response to something that

9    the U.S. Attorney's office filed and addresses -- provides

10   her take on their arguments.

11          And then attached to that is docents that are from

12   the Substance Abuse and Mental Health Services

13   Administration Interim Strategic Plan of November of 2022.

14   And this is -- which is essentially that agency's discussion

15   about its mission and its guiding principles across its

16   efforts.  And that goes on for some -- there is a nine-page

17   strategic plan that concludes on Page 9 and then there's a

18   couple of pages of footnote references.  And so I've looked

19   at that as well.

20          So I think that fills out everything that I have

21   received in connection with this particular motion.  And I

22   just want to make it clear what I've received and what I've

23   read so that nobody feels an obligation to repeat everything

24   that they have put in those papers.

25          And so I see a hand raised.  So go ahead, Counsel.

Page 37

1         MR. HUEBNER:  Just one small procedural point.  I

2    see that there are still several dozen people on the phone

3    from various parties, frankly, many of whom are charging the

4    estate.  Sometimes people don't feel comfortable dropping

5    off at the hearing without asking the Court's permission as

6    a courtesy.  At this point, respectfully, I think there

7    should be a very small number of people actually listening

8    to this matter, at least those are that are billing the

9    estate.  I would ask that --

10         THE COURT:  Thank you for flagging that.  Much

11    appreciated.  I have four people on my screen.  I think it's

12    the four people that are -- who are involved in this

13    particular motion.  And so yes, anybody who is here for the

14    interim fee applications or anything else that has been

15    resolved or addressed are more than free to leave.  And I

16    will say that in the future, nobody has to ask.  I

17    appreciate, Mr. Huebner, you mentioning it, because it's

18    important.  And I do appreciate the courtesy that people are

19    extending by not leaving without permission, but you can

20    consider such permission given today and in the future when

21    your matter has been resolved and you don't need to be on

22    going forward.  If, heaven forbid, somebody did do that and

23    had to come back on, we would just take a short break and

24    call that person and ask them to jump back on.  It's fine.

25    I would rather that than have a lot of people on billing the

Page 38

 1   estate that don't need to be here.  So thank you very much.

 2            MR. HUEBNER:  (indiscernible).  So I will go back

 3   on mute now.  Thank you.  I'm sorry.

 4            THE COURT:  All right.  No, all good.

 5            So I just wanted to make sure, having listed

 6   everything that I have, that there's not anything that was

 7   filed connection with this that anybody thinks that I

 8   missed.  And so let me ask that very, very specific

 9   question; is there any pleading that somebody submitted that

10   I didn't identify that I should have?  All right, thank you.

11   That tells me that I have what I'm supposed to have.

12            So, Ms. McGaha, I will hear from you first.  It's

13   your motion.  And that's the way the normal rules are.  I

14   appreciate you being here this morning.  I have read

15   everything that you have submitted, and that's why I wanted

16   to make sure to identify it for the record and walk through

17   it, just so you know.  And I understand your objection to be

18   that you don't want this executive order to play a role in

19   how funding in this case, that it's any funds given to the

20   federal government are handled.  And so I understand that to

21   be your primary focus.

22            And so with that, I will give you a brief

23   opportunity if you wanted to add anything or highlight

24   anything in particular.  Again, you don't need to go through

25   everything that you've submitted, because I have made sure

1    to read everything that I have.  Ms. McGaha?

2              MS. MCGAHA:  Thank you, Your Honor.  Thank you,

3    Your Honor.  I appreciate the time that this is taking, and

4    I don't want to take up any more time than necessary, and so

5    I won't go over everything that I've written.  And I have

6    written submissions in the past when Judge Drain was doing

7    this.  And so I have tried to -- there's lots of information

8    that I shared.  But anyways, as far as this goes, I want to

9    apologize to you and anyone else in the legal profession if

10   this is not being done.  I know it's not being done, you

11   know, the way that you would like or whatever, but I do have

12   issues from all of the drugs that I took, and so it is hard

13   for me to not ramble and to keep things organized.  And I'm

14   just doing the best that I can, because I feel compelled to

15   stand for truth right now.

16              And this equity thing, it sounds really nice, but

17   they are -- I have been in darkness from these drugs.  I

18   have been vulnerable.  I know what it's like to be so lost

19   that you just want help from somebody.  And if they've got

20   mental health workers that are going out there and

21   pretending like changing your sex or that is something that

22   people can do, there's going to be people that will jump at

23   that as some kind of answer to solve their problem.  Because

24   it's not just the drugs, it's the issues underlying that

25   cause people to be so vulnerable to seeking those drugs to

Page 40

1   relieve their pain.

2            And I know through my own experience taking them,

3   you know, everyone has different views.  And I do have a

4   history prior to taking those drugs of working in the

5   healthcare and pharmaceutical field.  And so it gives me

6   kind of a bigger view of all of this.  And I feel like

7   there's so much primary focus on the money and the money

8   that people are making.  I know there's people in these

9   states out here that -- they're making their living in the

10  recovery field and they're all, you know, can't wait to get

11  this money, or whatever.  But they're not thinking about the

12  impact that these policies that are in this executive order

13  is causing.

14            SAMHSA, who is going to be giving all of the

15  guidelines and everything, they're relying on these

16  professionals and the government to lay out things and the

17  government is doing, like I said, in this report or this

18  paper that I wrote.  And I just feel like it's important as

19  a person who was damaged and affected by these drugs, and

20  it's hurt my family, that if the lord gives me something

21  that I need to make a stand for and get it on the record,

22  that this is wrong what is happening, I just have to do it.

23            And I just don't want to take up any more time,

24  but I just had to make my concerns known as someone who I

25  feel like has standing in this issue.  I have receipts for

Page 41

1   all of the drugs I took, and I only am here because the

2   grace and mercy of the lord.  So I just thank you for your

3   time, and I appreciate everyone.

4           THE COURT:  You are quite welcome.  And let me

5   just -- there are times when legal papers and the terms that

6   lawyers use will land with a thud to folks who are maybe not

7   familiar with some of the terminology and can come across in

8   a different way than it's intended, and standing is one of

9   those words.  There's a legal concept of standing, and it's

10  from Supreme Court cases talking about a particular question

11  about who has what rights in what contexts.  But what it's

12  not talking about is who is affected in a circumstance like

13  this, meaning -- the confirmation hearing I think was a

14  reflection of the people who were impacted by these drugs.

15  And I think the reason why that confirmation hearing was

16  extensive and why there have been opportunities for people

17  to be heard in this case is a reflection of all that.

18          So I don't want you to take the word standing in a

19  way that's offensive to your circumstance.  Nobody is --

20  that's not the intent and certainly not what I take from it,

21  either.  And so I think everybody has friends and family who

22  have had issues related to the use of these drugs and their

23  awful personal stories.  So I am very sensitive to that, and

24  I appreciate how difficult it is for you to be here and

25  discuss those.

Page 42

1              And so with that, I'm going to ask -- I'll first

2    start with debtor's counsel.  I have read your response at

3    Docket 5227.  I don't know if there's anything specific you

4    wanted to put on the record today, or if you just wanted to

5    stand on your papers.

6              MS. TOWNES:  Good morning, Your Honor.  Esther

7    Townes on behalf of the Debtors.  Can you hear me clearly?

8              THE COURT:  I can hear you just fine.

9              MS. TOWNES:  Great.  Thank you.  As you noted, the

10   debtors primarily will rest on our papers.  I think I would

11   like to emphasize just that the motion can be denied for at

12   least the two reasons that are laid out in the papers that

13   do not require the Court to delve into the substance of Ms.

14   McGaha's underlying objections to the executive order.  And

15   while we understand that Ms. McGaha has her concerns, as is

16   indicated in our papers, we do not intend to respond to the

17   substance of the issue that Ms. McGaha has raised.  And our

18   determination not to respond shouldn't be seen as adopting

19   or agreeing with her views on what are essentially political

20   issues.

21             Ultimately resolving the motions comes down to

22   (indiscernible) for the bankruptcy court to do.  And there

23   is not, for the reasons we laid out in our papers, namely

24   that from a jurisdictional perspective, the motion is not

25   properly before the Court.  And two, that the issues that

Page 43

1    are raised are not bankruptcy issues that are addressed in

2    the plan.  And so to the extent that relief is sought with

3    respect to policy and otherwise, relief would not be

4    appropriate in this forum.

5             So unless Your Honor has specific questions about

6    our papers, I think we will rest on that and request that

7    the Court deny the motion.

8             THE COURT:  All right.  And let me hear from the

9    United States Attorney's Office if there's anything that you

10   wanted to add beyond what is in your papers.

11            MS. LEVINE:  Good -- it's almost afternoon.  Good

12   morning, Your Honor.  Danielle Levine from the United States

13   Attorney's Office on behalf of the United States.  We will

14   also primarily rest on what's in our papers as well.  I did

15   want to echo the Court though that our use of the word

16   standing was not -- did not have the intent that Ms. McGaha

17   mentioned.  Of course we are extraordinarily sympathetic to

18   the issues she has faced, but her concerns as posited in her

19   motion really do involve a generalized grievance about

20   certain policies embodied by the executive order issued by

21   President Biden, and they are really a political issue as

22   opposed to one that should be addressed by the courts.

23            And unless the Court has any questions, we will

24   rest on our papers.

25            THE COURT:  All right.  I do not.

Page 44

1             So what I would like to do is to just take a ten-

2    minute break, and then I will come back and tell you my

3    views on the matter.  So I will leave all the video and

4    audio on, except I'll mute my microphone.  And I'll be back

5    in about ten minutes.  And I appreciate your patience on

6    that.  Just give me a brief few moments.  Thank you very

7    much.

8             (Recess)

9             THE COURT:  All right.  Good afternoon once again.

10   I want to make sure we have everyone here.  I see Ms.

11   Townes, Ms. Levine, and Ms. McGaha.

12            So I want to address the motion now.  I think that

13   that's appropriate and probably in the best interest of

14   everyone who is here.

15            I'm going to have to deny the motion, Ms. McGaha.

16   The Court doesn't have jurisdiction to grant the relief that

17   you request.  And that's because the plan, that is the

18   funding source behind all of this, is currently on appeal.

19   So said another way, the plan is the foundation of the

20   motion, and the plan is the thing that provides the money to

21   be given to various government entities for the kind of

22   treatment that we're talking about.  And it's those funds

23   and the use of those funds that really is the subject of

24   your motion.

25            But that plan, which was confirmed here, has been

Page 45

1    the subject of appeal and is currently still the subject of

2    appeal.  So it went first to the District Court, who issued

3    a ruling.  And that ruling is now before the Second Circuit.

4    And with that on appeal, that decision about whether the

5    funds are going to be available under the plan for the uses

6    set forth in the plan is still to be decided.  And so that's

7    something that is -- when that happens and an issue like

8    that is on appeal, it divests, meaning it takes the

9    jurisdiction of this Court away on that issue as to whether

10   those funds are going to be spent at all in the manner

11   provided for in the plan.

12          And so we don't know whether money is going to be

13   spent, and if so how and how much until the Second Circuit

14   issues its decision.  And potentially we might not know if

15   the Second Circuit issues a decision, someone appeals it to

16   the Supreme Court, and the Supreme Court takes that case.

17   And so there's actually something called the divestiture

18   doctrine which in its simplest terms provides that the

19   filing of an appeal divests the lower court of its control

20   over an issue and matter that's on appeal.  And courts have

21   held that that legal principle applies to appeals of

22   bankruptcy court orders (indiscernible) confirmation of

23   plan.  And so there are cases that discuss that in detail,

24   including Sabine Oil and Gas Company, 548 B.R. 674, 679

25   (Bankr. S.D.N.Y. 2016) which cites other cases.

Page 46

```
 1              And so in addition, the question about exactly
 2    what the executive order does or doesn't do is problematic
 3    in terms of the relief that you request.  So the executive
 4    order on its face applies to the federal government, that is
 5    it specifically says that it talks about what the federal
 6    government should do or not do to address inequities in
 7    policies and programs, but it does not apply to state and
 8    local governments.  So it wouldn't apply to state and local
 9    governments in how any of them decided to use funds as
10    contemplated by their programs that might be available under
11    the plan.  And in fact, the executive order doesn't even
12    purport to dictate how funds that would be distributed
13    directly to the federal government on an (indiscernible)
14    claim would be used.  So the plan doesn't do that.  And so
15    we don't really know what the concrete consequences of the
16    plan are vis-á-vis that or whether any of those uses would
17    be at all implicated by the executive order.
18              And so there's also -- so there could potentially
19    be specific issues that the Court would be called upon to
20    address, but we don't know what those are.  So we don't
21    actually have a proposed use that invokes the executive
22    order that is -- that would be different than a use without
23    -- absent the executive order.
24              So in addition, the executive order states that
25    it's not intended to and doesn't create any right or
```

Page 47

1   benefit, substantive or procedural, that's enforceable law

2   against any party, against the United States, its agencies

3   or departments.  And there have been cases that -- where

4   there have been similar kinds of executives orders that have

5   found that similar executive orders don't allow for what's

6   called the private right of action, meaning that an

7   individual can sue to enforce the executive order.

8           And so there are cases that talk about that.  For

9   example, Women's Equity Action League v. Cavazos, 906 F.2d

10  742, 750 (D.C. Cir. 1990).  And there are a few other cases

11  that are identified in the Government's brief in Footnote 5

12  of Page 7.

13          And so -- and I guess last but not least is,

14  again, even with the concerns that you have, I'm unaware of

15  anything in the executive order that would actually bear

16  upon or directly impact what a healthcare professional's

17  treatment would be a patient suffering from opioid use

18  disorder would somehow dictate exactly how treatment should

19  be provided.  And again, that somewhat gets into the

20  question of we don't have facts before us that tell us any

21  of that at the moment.  So in light of that, I don't have

22  what's called sort of appropriate case in controversy.

23  And indeed, there is a good argument to be made about

24  whether such a case in controversy would be appropriate to

25  have here in the bankruptcy court or whether it would need

Page 48

1   to be in the district court as a court of more general

2   jurisdiction when challenging something like an executive

3   order.

4           So, again, I can't really sort of fully get my

5   hands around that particular issue because I don't have a

6   particular case in controversy that is of particular use

7   under this particular plan and how it might implicate

8   people's rights that I can sort of sink my teeth into and

9   figure out what that looks like vis-á-vis what a more

10  general challenge would look like.

11          And so in issuing my ruling, Ms. McGaha, I

12  certainly appreciate how painful it is for you, no doubt, to

13  raise these issues, having the personal experience that you

14  have.  It's not easy talking about these issues.  And I

15  appreciate your candor.  Your papers were very well-drafted.

16  I knew exactly what you were arguing.  You did a fine job.

17  But your motion doesn't raise the kind of issue that I can

18  grant the relief that you request.  So again, I appreciate

19  you being here today.  I have read some of your other

20  submissions in the past.  Probably not all of them, because

21  I wasn't involved in the case during its duration.  But

22  obviously this is a very painful case on a personal level

23  for a lot of folks, including yourself.  And I appreciate

24  very much you being here today.

25          So in light of that, my ruling, however, I would

Page 49

1  ask that the Debtor's counsel and the U.S. Attorney's Office

2  coordinate on submitting a proposed order on the motion.

3  And with that, that's my ruling.

4           MS. MCGAHA:  Thank you, Your Honor.  I appreciate

5  it.  And perhaps maybe there are some lawyers that can take

6  up these concerns on behalf of the victims.  So I appreciate

7  your time.  Thank you.

8           THE COURT:  You are more than welcome.  And again,

9  be well.

10          So with that, let me ask if there's anything else

11 on the agenda that needs to be addressed in this case here

12 this morning.  I guess that's really a question to you, Ms.

13 Townes, on behalf of the Debtors.

14          MS. TOWNES:  Nothing further from the Debtors.

15 Thank you.

16          THE COURT:  All right.  Anything else from any

17 other party here this morning?  All right.  With that, the

18 Court is adjourned.  Likely to not see folks until after

19 Thanksgiving.  So in the meantime, I wish everyone the best

20 for Thanksgiving.  Be well and stay healthy and safe and see

21 you in the not too distant future.  Thank you.

22          (Whereupon these proceedings were concluded at

23 12:16 PM)

24

25

Page 50

1                          I N D E X

2

3                           RULINGS

4                                           Page        Line

5   Motion To Require That Agencies Receiving

6   Funds, DENIED                            44          15

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 51

1                        C E R T I F I C A T I O N

2

3         I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  November 17, 2022