James I. McClammy, Attorney
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017


November 21, 2022

Counsel to the Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

---

In re:

Re: PURDUE PHARMA L.P., et al.,

        **Debtors**

**Chapter 11
Case No. 19-23649(SHL)**

**(Jointly Administered)**

---

Response to the Debtors motion objecting motion require that agencies receiving funds generated from this case shall not be required to follow the Executive Oder on advancing . . . equity and supporting for underserved communities through the Federal Government under Executive Order No. 13985.

Specifically, I'm quoting and adopting in part Ms. McGaha, view of the Executive Order 13985 " [t]he Executive Order on Advancing Racial Equality and Support for Underserved Communities Through the Federal Government (EO 13985) is detrimental to the overall health and wellness of vulnerable populations because if forces those who would be in positions to help them to participate in a false belief system, namely the LGBTQ+ agenda".

However, it's not just a cultural shift is unhealthy to the minds of young children, but it's a cover-up to commit fraud on the court, in light of Biven's action

403 U,S, 388 (1971); Judge Codey provided common sense to resolved the federal and state complex criminal matter, see Accardi v. Shaughnessy, 347 U.S. 260 (1954) The Supreme Court requires agencies to follow their promulgated regulation under the Freedom of Information and Privacy Act, my certified request to the United States Department of Justice and the United States Department of Treasury, Secret Service joint criminal investigation with the State of New Jersey, et al., concerning Ms. Suzette Peyton's Apartment in East Orange, New Jersey and other rental properties in the City of Newark, New Jersey

The United States Inspector General never produces any evidence of what I was found guilty of that was taken from Ms. Peyton's bedroom or that was aggregate with receiving stolen property with the Surrogate Court of the State of New Jersey, County of Essex.

This is a Opioid claim against stakeholders and Stockholders of the State of New Jersey, et al.

If the president would have exercise his veto power and congress would have exercise the power vested in them to make laws to benefit the public health, my wife and my son wouldn't have been subjected to the opioid crisis, nor would I have been subject to the political agenda of Hillary D. Clinton's and Michelle R. Obama, (coming on my FaceBook page, false narrative same sex or transgender expressions) unadulterated drivel under the (DOMA) Defense of Marriage Act passed by the 104 United States Congress, signed by President Bill Clinton "One man and One woman".

Be mindful, I have filed a complaint against the East Orange Police Department for taking Miss Peyton's son house keys and inviting United States Department of Justice, et al.

Regards

Ronald Bass, Sr.

CC: U.S. Bankruptcy Court
Southern District of
New York



DEPARTMENT OF HEALTH & HUMAN SERVICES

ADMINISTRATION FOR CHILDREN AND FAMILIES
370 L'Enfant Promenade, S.W.
Washington, D.C. 20447

SEP 17 1992

U.S. Department of Justice
Public Affairs Office
10th & Constitution Avenue, N.W.
Room 1216
Washington, D.C.  20530

Dear Sir:

Enclosed is a letter from Mr. Ronald Bass, Certified Legal
Assistant, of Newark, New Jersey, who has raised questions
pertaining to operations or activities of the police
department of East Orange, New Jersey, under applicable
provisions of the Freedom of Information Act.

Mr. Bass' letter was addressed to the Community Services
Administration, a federal agency which is no longer in
existence.  It was forwarded to the Office of Community
Services, within the Administration for Children and
Families, Department of Health and Human Services, which
does not have cognizance or jurisdiction concerning police
or law enforcement matters.  We are, therefore, forwarding
Mr. Bass' letter to your office for such action as may be
appropriate.

Thank you for your assistance in processing this request for
information.

Sincerely,

Eunice S. Thomas
Director
Office of Community Services

Enclosures:   1. Mr. Bass' letter of inquiry
              2. OCS reply to Mr. Bass

cc:  Mr. Ronald Bass



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

ADMINISTRATION FOR CHILDREN AND FAMILIES
370 L'Enfant Promenade, S.W.
Washington, D.C. 20447

SEP 1 1 1992

Mr. Ronald Bass
Certified Legal Assistant
c/o Miss Cynthia Corbett
22 North 18th Street - 3rd Floor
East Orange, New Jersey 07108

Dear Mr. Bass:

This is in response to your recent letter addressed to the
Community Services Administration, which was received by this
office on May 20, 1992.  Your inquiry was forwarded to us because
the Community Services Administration is no longer in existence.

You raised a number of questions pertaining to operations or
activities of the police department of East Orange, New Jersey,
under provisions of the Freedom of Information Act.  However, we
have no cognizance or jurisdiction concerning police or law
enforcement matters.

For that reason we are transmitting your letter to the Public
Affairs Office, Room 1216, U.S. Department of Justice, 10th &
Constitution Avenue, N.W., Washington, D.C. 20530, and are asking
that office to provide an appropriate response to the questions
which you have raised.

I hope our referral of this matter will assist you in obtaining
the desired information.

Sincerely,

Eunice S. Thomas
Director
Office of Community Services

cc:  Public Affairs Office
     U.S. Department of Justice

**UNITED STATES OF AMERICA**
**MERIT SYSTEMS PROTECTION BOARD**
**NEW YORK REGIONAL OFFICE**

|  |  |
|---|---|
| SUZETTE PEYTON,<br>        Appellant,<br><br>        v.<br><br>DEPARTMENT OF JUSTICE,<br>        Agency. | DOCKET NUMBER<br>NY-0752-94-0001-B-1<br><br>DATE:   April 22, 1994 |

## ORDER

In *Peyton v. Department of Justice*, MSPB Docket No. NY-0752-94-0001-I-1 (Apr. 20, 1994), the Board remanded the appellant's appeal for a determination as to whether continuation of the appellant's indefinite suspension after dismissal of the criminal charges was proper and, if appropriate, any entitlement the appellant may have to an award of back pay. *See id.*, slip op. at 7, citing *White v. U.S. Postal Service*, 58 M.S.P.R. 22, 24 (1993); *Hofmann v. Department of Agriculture*, 31 M.S.P.R. 399, 402 (1986).

The parties are **ORDERED** to file argument and evidence which specifically addresses this issue. Their submissions must be received within twenty days of the date of this Order.

FOR THE BOARD:

_____
Arthur Joseph
Administrative Judge

## CERTIFICATE OF SERVICE

I certify that the attached Document(s) was (were) sent by regular mail, unless otherwise indicated below, this day to each of the following:

### Appellant

Suzette Peyton
67 SO. Munn Avenue
Apt. 8B
East Orange, NJ   07018

### Appellant's Representative(s)

Derrick F. Thomas
AFGE 2nd District
5 Elm Row, Suite 300
New Brunswick, NJ   08901

### Agency's Representative(s)

Brian E. Meyers
Department of Justice
Immigration and Naturalization Service
70 Kimball Avenue, Room 103
S. Burlington, VT   05403-6813

April 22, 1994
_____
(Date)

Carmella Povlosky
Legal Technician

SUPERIOR COURT OF NEW JERSEY
ESSEX COUNTY
CHANCERY DIVISION, FAMILY PART
DOCKET NO. FG-07-92-11
**APP. DIV. NO. A-3353-11T4**

DIVISION OF YOUTH AND          :
FAMILY SERVICES,
                               :
     Plaintiff,
                               :
     vs.
                               :
RONALD BASS,                              TRANSCRIPT
                               :
     Defendant.                          OF
_____:
IN THE MATTER OF THE                   CASE MANAGEMENT
GUARDIANSHIP OF: N.R.B.,       :       CONFERENCE

     A Minor.              :

------------------------------

        Place:  Essex County Courthouse
              212 Washington Street
              Newark, New Jersey 07102

        Date:  May 23, 2011

B E F O R E:

    HONORABLE GARRY J. FURNARI, J.S.C.

TRANSCRIPT ORDERED BY:

    BEATRIX W. SHEAR, Deputy Public Defender, Office
    of Parental Representation, 438 Summit Avenue,
    Fifth Floor, Jersey City, New Jersey 07306

A P P E A R A N C E S:    (Continued)

               Kathleen Price, AD/T 550
               G&L TRANSCRIPTION OF NJ
               40 Evans Place
               Pompton Plains, NJ  07444
               Digitally Recorded/Operator NA

A P P E A R A N C E S:

    MEAGHAN M. GOULDING, ESQ., (Office of the
    Attorney General),
    Attorney for the Plaintiff.

    ROSANNA M. CARDONE, ESQ., Law Guardian.
    Attorney for the Minor.

    SUSAN HERMAN, ESQ.,
    Attorney for Defendant Bass.

    DONALD O. EGBUCHULAM, ESQ.,
    Attorney for Defendant Irby.

Case Management Conference                    52

1          MS. GOULDING:  Judge, in fairness, we --

2          THE COURT:  -- determining -- you can't.

3  You've got to fit into the -- you've got to fit into

4  the guidelines for permanency.  So you can't take --

5  it's not realistic to say that we're going to take

6  seven months.  You need to come out earlier and say

7  the person is not acceptable for whatever reason and

8  let them appeal it, but it's just not due process or

9  anything else to tell somebody well, we need ninety

10 days for this and sixty days for that.

11         Guess what?  If you're in an FG litigation,

12 you've got six months to get to trial.

13         MS. GOULDING:  And, Judge -- January 28th

14 and it's May 23rd --

15         THE COURT:  No, I'm not -- I didn't --

16         MS. GOULDING:  -- and I haven't received any

17 information from them.

18         THE COURT:  Listen, listen, listen, I didn't

19 say to you anything about the past.  I said from the

20 time you get the information.  So it is not

21 acceptable, it's just not an acceptable standard to

22 say if somebody provides all the information in this

23 formal litigation that we may take seven months.  So

24 you should be guided by that.

25         Now, I'm asking you how much time do you

Case Management Conference                    53

1   really need before the next hearing to make your

2   determination.  That doesn't mean your determination

3   can't be at this time we cannot approve this home

4   because of -- these are our serious concerns and they

5   need to be resolved but leaving someone -- and I only

6   say this -- and I'm spending so much time with it is

7   because I've been stuck with this at trial before.

8   Leaving someone in a limbo like -- like the case that

9   we have that I've ended up allowing someone to come in

10  as a -- as another party in the case on a best

11  interest analysis is just wrong.  It's wrong for the

12  system of justice.  It's wrong for the child, it's

13  wrong for everybody.  If they're not making it, deny

14  them.  Give them their chance to appeal within the

15  Division and to get an order so that issue can be

16  resolved before trial.  Don't sit -- don't let --

17  don't hold onto it to decide.

18          And it may be that it's their fault.  It may

19  be that their criminal record caused the problem.

20  Whatever it is, they just need an answer.  They need

21  an answer so that -- so that we're not stuck here and

22  we're getting -- well, we're deciding now because the

23  child is -- leave the child with somebody for six

24  months and then say we decided that it's in the best

25  interest of the child not to be moved from another

1   placement. You know, that's the dilemma that we're

2   facing.

3            MR. EGBUCHULAM:  Thank you, Your Honor.

4            THE COURT:  So I'm going to say this.  I'm

5   going to say that the Division shall knowing full well

6   that there could very well be a reasonable or a reason

7   why it can't be accomplished that if this information

8   is supplied, I'm going to give you four weeks if all

9   the information is supplied that you shall make a

10  decision by the next hearing if the information

11  necessary is provided to the Division at least four

12  weeks prior to that hearing.

13           Now, hopefully, it will be moot because

14  you're already be doing it and you're already decide

15  whether there's drug issues involved with that.  It's

16  2006.  I completely hear where the Division is coming

17  from.  This is not something we want to trample on but

18  we want to make a decision one way or another so that

19  -- so that somebody else can else hear it without --

20  without that issue being adjudicated in the courts.

21  It will be adjudicated administratively within the

22  Division.

23           MR. EGBUCHULAM:  And one more thing, Judge.

24  One other thing was that Ms. Edwards -- I find out

25  what the Division's concerns -- I know the child was

58

<u>CERTIFICATION</u>

I, Kathleen Price, the assigned transcriber, do hereby certify that the foregoing transcript of proceedings in the Essex County Superior Court on May 23, 2011, digitally recorded from 10:29 a.m. to 11:28 a.m., is prepared in full compliance with the current Transcription Format for Judicial Proceedings and is a true and accurate non-compressed transcript of the proceedings, as recorded.

Kathleen Price              AD/T 550              Date
**G&L TRANSCRIPTION OF NJ**



U.S. Department of Justice
**Civil Rights Division**

# The Americans with Disabilities Act and the Opioid Crisis:  Combating Discrimination Against People in Treatment or Recovery

The opioid crisis poses an extraordinary challenge to communities throughout our country.  The Department of Justice (the Department) has responded with a comprehensive approach prioritizing prevention, enforcement, and treatment.  This includes enforcing the Americans with Disabilities Act (ADA), which prohibits discrimination against people in recovery from opioid use disorder (OUD) who are not engaging in illegal drug use, including those who are taking legally-prescribed medication to treat their OUD.  This guidance document provides information about how the ADA can protect individuals with OUD from discrimination—an important part of combating the opioid epidemic across American communities.  While this document focuses on individuals with OUD, the legal principles discussed also apply to individuals with other types of substance use disorders.

### 1) What is the ADA?

The ADA is a federal law that gives civil rights protections to individuals with disabilities in many areas of life.  The ADA guarantees that people with disabilities have the same opportunities as everyone else to enjoy employment opportunities,[1] participate in state and local government programs,[2] and purchase goods and services.[3]  For example, the ADA protects people with disabilities from discrimination by social services agencies; child welfare agencies; courts; prisons and jails; medical facilities, including hospitals, doctors' offices, and skilled nursing facilities; homeless shelters; and schools, colleges, and universities.

### 2) Does an individual in treatment or recovery from opioid use disorder have a disability under the ADA?

Typically, yes, unless the individual is currently engaged in illegal drug use.  *See* Question 5.

The ADA prohibits discrimination on the basis of disability.[4]  The ADA defines disability as (1) a physical or mental impairment that substantially limits one or more major life activities,

U.S. Department of Justice
# Civil Rights Division

including major bodily functions; (2) a record of such an impairment; or (3) being regarded as having such an impairment.[5]

People with OUD typically have a disability because they have a drug addiction that substantially limits one or more of their major life activities. Drug addiction is considered a physical or mental impairment under the ADA.[6] Drug addiction occurs when the repeated use of drugs causes clinically significant impairment, such as health problems and or an inability to meet major responsibilities at work, school, or home.[7] People with OUD may therefore experience a substantial limitation of one or more major life activities, such as caring for oneself, learning, concentrating, thinking, communicating, working, or the operation of major bodily functions, including neurological and brain functions.[8] The ADA also protects individuals who are in recovery, but who would be limited in a major life activity in the absence of treatment and/or services to support recovery.[9]

3) **Does the ADA protect individuals who are taking legally prescribed medication to treat their opioid use disorder?**

Yes, if the individual is not engaged in the illegal use of drugs. Under the ADA, an individual's use of prescribed medication, such as that used to treat OUD, is not an "illegal use of drugs" if the individual uses the medication under the supervision of a licensed health care professional, including primary care or other non-specialty providers.[10] This includes medications for opioid use disorder (MOUD) or medication assisted treatment (MAT). MOUD is the use of one of three medications (methadone, buprenorphine, or naltrexone) approved by the Food and Drug Administration (FDA) for treatment of OUD;[11] MAT refers to treatment of OUD and certain other substance use disorders by combining counseling and behavioral therapies with the use of FDA-approved medications.[12]

> **Example A**
> A skilled nursing facility refuses to admit a patient with OUD because the patient takes doctor-prescribed MOUD, and the facility prohibits any of its patients from taking MOUD. The facility's exclusion of patients based on their OUD would violate the ADA.
>
> **Example B**
> A jail does not allow incoming inmates to continue taking MOUD prescribed before their detention. The jail's blanket policy prohibiting the use of MOUD would violate the ADA.

**U.S. Department of Justice**
# Civil Rights Division

4) **Does the ADA protect individuals with opioid use disorder who currently participate in a drug treatment program?**

Yes. Individuals whose OUD is a disability and who are participating in a supervised rehabilitation or drug treatment program are protected by the ADA if they are not currently engaging in the illegal use of drugs.[13] *See* explanation in Question 5. It is illegal to discriminate against these individuals based on their treatment for OUD.

> **Example C**
> A doctor's office has a blanket policy of denying care to patients receiving treatment for OUD. The office would violate the ADA if it excludes individuals based on their OUD.

> **Example D**
> A town refuses to allow a treatment center for people with OUD to open after residents complained that they did not want "those kind of people" in their area. The town may violate the ADA if its refusal is because of the residents' hostility towards people with OUD.

5) **Does the ADA protect individuals who are currently illegally using opioids?**

Generally, no. With limited exceptions, the ADA does not protect individuals engaged in the current illegal use of drugs if an entity takes action against them because of that illegal drug use.[14] "Current illegal use of drugs" means illegal use of drugs that occurred recently enough to justify a reasonable belief that a person's drug use is current or that continuing use is a real and ongoing problem.[15] Illegal use, however, does not include taking a medication, including an opioid or medication used to treat OUD, under the supervision of a licensed health care professional.[16]

> **Example E**
> A mentoring program requires its volunteers to provide test results showing that they do not engage in the illegal use of drugs. The program dismisses a volunteer who tests positive for opioids for which the volunteer does not have a valid prescription. This does not violate the ADA because the dismissal was based on current illegal drug use.

3



U.S. Department of Justice
# Civil Rights Division

In addition, an individual cannot be denied health services, or services provided in connection with drug rehabilitation, on the basis of that individual's current illegal use of drugs, if the individual is otherwise entitled to such services.[17]  But a drug rehabilitation or treatment program may deny participation to individuals who engage in illegal use of drugs while they are in the program.[18]

**Example F**
A hospital emergency room routinely turns away people experiencing drug overdoses, but admits all other patients who are experiencing emergency health issues.  The hospital would be in violation of the ADA for denying health services to those individuals because of their current illegal drug use, since those individuals would otherwise be entitled to emergency services.

**Example G**
A drug rehabilitation program asks a participant to leave because that participant routinely breaks a rule prohibiting the use of illegal drugs while in the program.  This is not discrimination under the ADA because the program can require participants to abstain from illegal drugs while in the program.

6) **Does the ADA protect individuals with a history of past opioid use disorder, who no longer illegally use drugs?**

Yes.  The ADA protects individuals with a "record of" disability.  As explained above in Question 2, OUD typically qualifies as a disability.  Therefore, individuals with a "record of" having OUD usually will be protected under the ADA.[19]  Individuals would fall into this category if they have a history of, or have been misclassified as having, OUD.[20]

**Example H**
A city terminates an employee based on his disclosure that he completed treatment for a previous addiction to prescription opioids.  The city may be in violation of the ADA for discriminating against the employee based on his record of OUD.

4

**U.S. Department of Justice**

# Civil Rights Division

7) **Does the ADA provide any legal protections for individuals who are regarded as having an opioid use disorder, whether or not they actually have an opioid use disorder?**

Yes. The ADA protects individuals who are "regarded as" having OUD, even if they do not in fact have OUD.[21]

> **Example I**
> An employer mistakenly believes that an employee has OUD simply because that employee uses opioids legally prescribed by her physician to treat pain associated with an injury. The ADA prohibits an employer from firing the employee based on this mistaken belief.

8) **Does the ADA protect individuals from discrimination based on their association with individuals who have opioid use disorder?**

Yes. The ADA protects individuals from discrimination based on their known association or relationship with an individual who has a disability, such as a friend, coworker, or family member. The ADA also protects organizations, such as OUD treatment clinics, from discriminatory enforcement of zoning rules based on the organization's known association with or relationship to individuals with OUD. [22]

9) **Can employers have a drug policy or conduct drug testing for opioids?**

Yes. Employers may adopt or administer reasonable policies or procedures, including drug testing, designed to ensure that individuals are not engaging in the illegal use of drugs.[23] However, some individuals who test positive for an opioid, which may include MOUD, will be able to show that the medication is being taken as prescribed or administered and a licensed health care professional is supervising its use. These individuals may not be denied, or fired from, a job for this legal use of medication, unless they cannot do the job safely and effectively, or are disqualified under another federal law.[24]

10) **What can I do if I believe I have been discriminated against because of my opioid use disorder or treatment for my opioid use disorder?**

Individuals may file a complaint with the Department of Justice if they believe that a public accommodation or a state or local government is discriminating or has discriminated against them because of OUD. Individuals may also bring private lawsuits under the ADA.



U.S. Department of Justice
# Civil Rights Division

Information about filing an ADA complaint with the Department is available at civilrights.justice.gov. More information about the ADA is available by calling the Department's toll-free ADA information line at 800-514-0301 or 800-514-0383 (TTY), or accessing its ADA website at ada.gov.

Complaints about a state or local government's programs, services, or activities relating to the provision of health care and social services can also be filed with the Department of Health and Human Services Office for Civil Rights (HHS OCR). Information about filing an HHS OCR complaint is available at hhs.gov/civil-rights/filing-a-complaint, by email at OCRMail@hhs.gov, by phone at 1-800-368-1019, or at 1-800-537-7697 (TTY).

Complaints about employment discrimination (called "charges") on the basis of disability can be filed with the Equal Employment Opportunity Commission (EEOC). Information about filing an EEOC charge is available at eeoc.gov or 800-669-4000, 800-669-6820 (TTY), or 844-234-5122 (ASL Video Phone). Additional EEOC resources regarding employees and opioid use are available at eeoc.gov/laws/guidance/use-codeine-oxycodone-and-other-opioids-information-employees and eeoc.gov/laws/guidance/how-health-care-providers-can-help-current-and-former-patients-who-have-used-opioids.

Individuals who believe they have been discriminated against under the ADA and would like to file a complaint should file as soon as possible. For instance, there are specific filing deadlines for a charge of employment discrimination, either 180 days or 300 days from the date of the alleged discrimination, depending on the jurisdiction where the charge is filed.

### 11) Where can I find treatment for opioid use disorder?

Information about treatment for opioid use disorder is available at hhs.gov/opioids, findtreatment.gov, samhsa.gov/medication-assisted-treatment/practitioner-program-data/treatment-practitioner-locator, and dpt2.samhsa.gov/treatment.

Date issued: April 5, 2022

---

[1] 42 U.S.C. §§ 12111-12117. The Equal Employment Opportunity Commission (EEOC) and the Department of Justice jointly enforce the ADA's ban on employment discrimination. For more information or to file a complaint of employment discrimination, visit eeoc.gov.

[2] Id. §§ 12131-12134.

U.S. Department of Justice

# Civil Rights Division

[3] *Id.* §§ 12181-12189.

[4] *Id.* §§ 12112, 12132, 12182.

[5] *Id.* § 12102(1)-(2).

[6] 28 C.F.R. §§ 35.108(b)(2), 36.105(b)(2).  Regulations implementing Title I of the ADA define the term "physical or mental impairment" as including "any physiological disorder or condition." 29 C.F.R. § 1630.2(h).

[7] *See* Substance Abuse and Mental Health Services Administration, *Mental Health and Substance Use Disorders*, samhsa.gov/find-help/disorders (last visited Apr. 1, 2022).

[8] 42 U.S.C. § 12102; 28 C.F.R. §§ 35.108(c)(1) (listing examples of major life activities, which include the operation of major bodily functions), 36.105(c)(1) (same).

[9] 28 C.F.R. §§ 35.108(d)(1)(viii), 36.105(d)(1)(viii).

[10] 42 U.S.C. § 12210(d); 28 C.F.R. §§ 35.104, 36.104.

[11] *See* Substance Abuse and Mental Health Services Administration, *TIP 63: Medications for Opioid Use Disorder*, store.samhsa.gov/product/TIP-63-Medications-for-Opioid-Use-Disorder-Full-Document/PEP21-02-01-002 (last visited Apr. 1, 2022); *see also* Health Resources and Services Administration, *Caring for Women with Opioid Use Disorder: A Toolkit for Organization Leaders and Providers*, hrsa.gov/sites/default/files/hrsa/Caring-for-Women-with-Opioid-Disorder.pdf (last visited Apr. 1, 2022).

[12] *See* Substance Abuse and Mental Health Services Administration, *Medication-Assisted Treatment (MAT)*, samhsa.gov/medication-assisted-treatment (last visited Apr. 1, 2022); *see also* Substance Abuse and Mental Health Services Administration, *MAT Medications, Counseling, and Related Conditions*, samhsa.gov/medication-assisted-treatment/medications-counseling-related-conditions (last visited Apr. 1, 2022).

[13] 42 U.S.C. § 12210(b)(2); 28 C.F.R. §§ 35.131(a)(2)(ii), 36.209(a)(2)(ii).

[14] 42 U.S.C. § 12210(a); 28 C.F.R. §§ 35.131(a)(1), 36.209(a)(1).

[15] 28 C.F.R. §§ 35.104, 36.104.

[16] 42 U.S.C. § 12210(d); 28 C.F.R. §§ 35.104, 36.104.

[17] 42 U.S.C. § 12210(c); 28 C.F.R. §§ 35.131(b)(1), 36.209(b)(1).

[18] 28 C.F.R. §§ 35.131(b)(2), 36.209(b)(2).

[19] 42 U.S.C. § 12102(1)(B); 28 C.F.R. §§ 35.108(a)(1)(ii), 36.105(a)(1)(ii).

[20] 42 U.S.C. § 12102(1)(B); 28 C.F.R. §§ 35.108(e), 36.105(e).

[21] 42 U.S.C. § 12102(1)(C); 28 C.F.R. §§ 35.108(a)(1)(iii), 35.108(f), 36.105(a)(1)(iii), 36.105(f); *see also* 42 U.S.C. § 12201(h); 28 C.F.R. §§ 35.130(b)(7)(ii), 36.302(g); 29 C.F.R. § 1630.2(o)(4) (noting that individuals who meet the definition of "disability" solely because they are "regarded as" disabled are not entitled to reasonable modifications or reasonable accommodations under the ADA).

[22] 42 U.S.C. § 12112(b)(4); 42 U.S.C. § 12182(b)(1)(E); 28 C.F.R. §§ 35.130(g), 36.205; 29 C.F.R. § 1630.8.

[23] 42 U.S.C. §§ 12114(b), 12114(d); 29 C.F.R. §§ 1630.3(c), 1630.16(c); *see also* 42 U.S.C. § 12210(b); 28 C.F.R. §§ 35.131(c), 36.209(c) (drug testing by Title II and Title III entities).

[24] *See, e.g.*, 42 U.S.C. § 12111(3); 29 C.F.R. §§ 1630.2(r), 1630.15(b)(2), 1630.15(e).

U.S. Department of Justice
# Civil Rights Division

The Americans with Disabilities Act authorizes the Department of Justice to provide technical assistance to individuals and entities that have rights or responsibilities under the Act.  This document provides informal guidance to assist you in understanding the ADA and the Department's regulations.

The contents of this document do not have the force and effect of law and are not meant to bind the public in any way.  This document is intended to provide clarity to the public regarding existing requirements under the law or Department policies.

SRF 65289

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
James I. McClammy
Eli J. Vonnegut

*Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| **PURDUE PHARMA L.P.,** *et al.,* | **Case No. 19-23649 (SHL)** |
| Debtors.[1] | **(Jointly Administered)** |

**DEBTORS' OBJECTION TO MOTION TO REQUIRE**
**THAT AGENCIES RECEIVING FUNDS GENERATED FROM THIS CASE**
**SHALL NOT BE REQUIRED TO FOLLOW THE EXECUTIVE ORDER ON**
**ADVANCING RACIAL EQUITY AND SUPPORT FOR UNDERSERVED**
**COMMUNITIES THROUGH THE FEDERAL GOVERNMENT (EO 13985)**

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF L.P. (0495), SVC Pharma L.P. (5717), and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

Purdue Pharma L.P. ("**PPLP**") and its affiliates that are debtors and debtors in possession in these proceedings (collectively, the "**Debtors**," the "**Company**," or "**Purdue**") respectfully represent as follows in opposition to the *Motion to Require that Agencies Receiving Funds Generated from this Case Shall Not Be Required to Follow Executive Order on Advancing Racial Equity and Support for Underserved Communities Through the Federal Government (EO 13985)* [Dkt. Nos. 4996, 5002] (the "**Motion**")[2] filed by *pro se* individual Carrie McGaha ("**Ms. McGaha**"):

1.    In the Motion, Ms. McGaha "requests the court to make a ruling that the funds generated from this case, disseminated through the newly formed Department of Recovery, shall not require grantees to abide by Executive Orders which prioritize evolving man-made groups over the needs of individuals needing [r]ecovery [s]ervices or groups rooted in [t]ruth who treat them." (Mot. at 3.)[3]   Specifically, according to Ms. McGaha, "[t]he Executive Order on Advancing Racial Equity and Support for Underserved Communities Through the Federal Government (EO 13985) is detrimental to the overall health and wellness of vulnerable populations because it forces those who would be in positions to help them to participate in a false belief system, namely the LGBTQ+ agenda." (Mot. at 3.)[4]   Thus, although Ms. McGaha believes that "all persons should be treated equally and no one should be discriminated against" (*id.* at 2), Ms. McGaha believes that Executive Order 13985 "impinges upon th[e] basic principles" of "belief in God and [f]reedom of religion" because it is driven by a "cultural shift

---

[2] All references to the "Motion" are to docket number 5002, which is substantially similar to docket number 4996.

[3] Unless otherwise stated, all emphasis is removed.

[4] Executive Order 13985 seeks to "advance[e] equity across the Federal Government . . . for all, including people of color and others who have been historically underserved, marginalized, and adversely affected by persistent poverty and inequality," by directing federal agencies to take certain actions aimed at "recogniz[ing] and work[ing] to redress inequities in their policies and programs that serve as barriers to equal opportunity." *See* Exec. Order No. 13985, 86 Fed. Reg. 7009 (2021).

2

[that] is relatively new in the grand scheme of human history" and should not be "propagated by the government in this manner." (*Id.* at 3.)  Accordingly, Ms. McGaha requests that the Court "make a ruling that agencies receiving funds generated from this Plan shall not prioritize the dissemination of funding to groups based on evolving cultural differences and shall not be required to·follow [Executive Order 13985] or any other executive order not based on the reality of truth." (*Id.* at 4.)  Ms. McGaha further requests that "individual [c]laimants in this case [] be offered the opportunity to effectively participate in state and local policy decisions regarding the dissemination of funding received as a result of this plan." (*Id.* at 4.)

2.    Although the Debtors remain sympathetic to all of those affected by the opioid crisis, including Ms. McGaha and other individual victims and their families, the Debtors must object to the Motion.  The Motion should be denied because (i) the Court does not have jurisdiction to grant the relief sought by the Motion because the Plan[5] is currently on appeal to the Second Circuit; and (ii) even if the Court did have jurisdiction to address Plan issues at this time, it is unclear whether Ms. McGaha's challenges to Executive Order 13985 would fall within the purview of this Court as the Plan does not purport to dictate how any funds are used by the federal government.[6]

3.    *First*, the Court does not have jurisdiction to amend or modify the Plan while it is on appeal.  As an initial matter, although the Motion refers to the distribution of funds pursuant to the Plan through the "newly established Department of Recovery" (*e.g.*, Mot. at 3), no such institution is being established under the Plan.  Ostensibly, "Department of Recovery" is a

---

[5] All references to the "Plan" refer to the *Twelfth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors* (Sept. 2, 2021), Dkt. No. 3726.

[6] For the avoidance of doubt, the Debtors do not intend to respond to the substance of Ms. McGaha's objections to Executive Order 13985, as the Debtors do not believe that it is necessary for the purposes of resolving the issues presented by the Motion.  This should not, however, be taken as agreement with any particular position presented by Ms. McGaha.

reference to the National Opioid Abatement Trust ("**NOAT**"), which the Plan contemplates will, among other things, collect and make distributions to Authorized Recipients, including state and local governments, for Authorized Abatement Purposes, in accordance with the NOAT trust distribution procedures ("**NOAT TDP**").[7] (*See, e.g.*, Plan §§ 4.4, 5.7; *see also* Ex. G, NOAT TDP, Tenth Plan Suppl. (July 15, 2021), Dkt. No. 3232.)  However, to the extent the Motion seeks to modify the NOAT TDP in order to require state and local governments not to comply with Executive Order 13985, the divestiture doctrine precludes the Court from doing so. *See In re Sabine Oil & Gas Corp.*, 548 B.R. 674, 679 (Bankr. S.D.N.Y. 2016) (citing *In re Prudential Lines, Inc.*, 170 B.R. 222, 243 (S.D.N.Y. 1994) ("The divestiture doctrine, in its simplest terms, provides that the filing of an appeal divests the lower court of its control over the issue or matter that is on appeal. Courts have held that the same legal principle applies to appeals of bankruptcy court orders."); *see also* (March 9, 2021 Hr'g Tr. 145:18-24 (Drain, J) (acknowledging that "[the Court] could [not] be asked to amend or modify that Plan . . . given the divestiture doctrine . . . since it would clearly overlap such a motion with a pending appeal of the same Plan except for the amendment.").)

4.    *Second*, even if the Court had jurisdiction to amend the Plan, Executive Order 13985 on its face applies to the federal government.  Specifically, Executive Order 13985 seeks to advance equity by directing the *federal government*, not state and local governments, to "redress inequities in their policies and programs." *See* Exec. Order No. 13985, 86 Fed. Reg. 7009.  In short, it does not appear that Executive Order 13985 will apply to the state and local government abatement programs contemplated to be funded by the Plan.  Moreover, to the extent that the Motion seeks relief with respect to any federal agencies, the Plan does not purport to

---

[7] Capitalized terms used but not defined herein have the meanings ascribed to them in the Plan and the NOAT TDP.

dictate how funds distributed directly to the federal government on account of its claim will be used. (*See, e.g.,* Plan § 4.3; *see also generally* Ltr. from L. Fogelman to the Hon. Robert D. Drain (ret.) (Nov. 30, 2020), Dkt. No. 1942). And, if Ms. McGaha generally is seeking to raise a challenge to Executive Order 13985, this chapter 11 proceeding is not the appropriate forum to do so.

For the reasons set forth above, the Debtors respectfully request that the Court deny the Motion.

Dated:  November 9, 2022
        New York, New York


/s/ James I. McClammy
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
James I. McClammy
Eli J. Vonnegut

*Counsel to the Debtors
and Debtors in Possession*

SHARE



Win McNamee/Getty Images

It was an incredible turnaround: A damning Washington Post and *60 Minutes* report on Sunday. A hint of disappointment by President Donald Trump on Monday. And then, Trump's nominee for drug czar, Rep. Tom Marino (R-PA), **withdrew his name from consideration** on Tuesday.

The cause was Marino's involvement in a law that passed in 2016: the so-called Ensuring Patient Access and Effective Drug Enforcement Act. As the Post and *60 Minutes* explained in **their bombshell report**, the law effectively hindered the Drug Enforcement Administration's (DEA) ability to prosecute opioid distributors and stop dangerous shipments of opioid painkillers — the kind of drugs that sparked America's **opioid epidemic** — right as drug overdose deaths reached yet another peak in the US.

The measure was heavily backed by the drug industry, and Marino, who had received nearly $100,000 in donations from political action committees linked to the industry, was its main sponsor. The bill got through Congress with zero opposition before it was signed by President Barack Obama.

Marino, along with other key sponsors, Rep. Marsha Blackburn (R-TN) and Sen. Orrin Hatch (R-UT), have rightfully gotten a bulk of the blame for the law in the aftermath.

But much of the outrage is missing the fact that it wasn't just Marino, Blackburn, or Hatch but every single elected official at the federal level who deserves at least some of the blame for this law.

Marino, Blackburn, and Hatch were the major sponsors. But the law passed through what's called unanimous consent — a procedure that's used to pass uncontroversial bills in which no votes are recorded but members of the legislative body are given a chance to object. No one in Congress — not a Democrat or a Republican — spoke up.

And, of course, Obama signed the bill into law.

**Everyone shares some of the blame**

Based on my conversations with officials from Congress and the Obama administration this week, the measure slipped through without anyone giving it much thought. Once the DEA signed onto the law, everyone seemed to figure that it was fine. As one former administration official told me, who's going to accuse the DEA, the face of America's punitive war on drugs, of being "soft on crime" and hurting its own mission?

PUBLIC LAW 114-145

S. 483

# One Hundred Fourteenth Congress
## of the
## United States of America

### AT THE SECOND SESSION

*Begun and held at the City of Washington on Monday,
the fourth day of January, two thousand and sixteen*



## An Act

To improve enforcement efforts related to prescription drug diversion and abuse,
and for other purposes.

*Be it enacted by the Senate and House of Representatives of
the United States of America in Congress assembled,*

**SECTION 1. SHORT TITLE.**

This Act may be cited as the "Ensuring Patient Access and
Effective Drug Enforcement Act of 2016".

**SEC. 2. REGISTRATION PROCESS UNDER CONTROLLED SUBSTANCES
ACT.**

(a) DEFINITIONS.—
(1) FACTORS AS MAY BE RELEVANT TO AND CONSISTENT WITH
THE PUBLIC HEALTH AND SAFETY.—Section 303 of the Controlled
Substances Act (21 U.S.C. 823) is amended by adding at the
end the following:

"(j) In this section, the phrase 'factors as may be relevant
to and consistent with the public health and safety' means factors
that are relevant to and consistent with the findings contained
in section 101.".

(2) IMMINENT DANGER TO THE PUBLIC HEALTH OR SAFETY.—
Section 304(d) of the Controlled Substances Act (21 U.S.C.
824(d)) is amended—
(A) by striking "(d) The Attorney General" and
inserting "(d)(1) The Attorney General"; and
(B) by adding at the end the following:

"(2) In this subsection, the phrase 'imminent danger to the
public health or safety' means that, due to the failure of the reg-
istrant to maintain effective controls against diversion or otherwise
comply with the obligations of a registrant under this title or
title III, there is a substantial likelihood of an immediate threat
that death, serious bodily harm, or abuse of a controlled substance
will occur in the absence of an immediate suspension of the registra-
tion.".

(b) OPPORTUNITY TO SUBMIT CORRECTIVE ACTION PLAN PRIOR
TO REVOCATION OR SUSPENSION.—Subsection (c) of section 304 of
the Controlled Substances Act (21 U.S.C. 824) is amended—
(1) by striking the last three sentences;
(2) by striking "(c) Before" and inserting "(c)(1) Before";
and
(3) by adding at the end the following:

"(2) An order to show cause under paragraph (1) shall—
"(A) contain a statement of the basis for the denial, revoca-
tion, or suspension, including specific citations to any laws

S. 483—2

or regulations alleged to be violated by the applicant or reg-
istrant;

"(B) direct the applicant or registrant to appear before
the Attorney General at a time and place stated in the order,
but not less than 30 days after the date of receipt of the
order; and

"(C) notify the applicant or registrant of the opportunity
to submit a corrective action plan on or before the date of
appearance.

"(3) Upon review of any corrective action plan submitted by
an applicant or registrant pursuant to paragraph (2), the Attorney
General shall determine whether denial, revocation, or suspension
proceedings should be discontinued, or deferred for the purposes
of modification, amendment, or clarification to such plan.

"(4) Proceedings to deny, revoke, or suspend shall be conducted
pursuant to this section in accordance with subchapter II of chapter
5 of title 5, United States Code. Such proceedings shall be inde-
pendent of, and not in lieu of, criminal prosecutions or other pro-
ceedings under this title or any other law of the United States.

"(5) The requirements of this subsection shall not apply to
the issuance of an immediate suspension order under subsection
(d).".

SEC. 3. REPORT TO CONGRESS.

(a) IN GENERAL.—Not later than 1 year after the date of enact-
ment of this Act, the Secretary of Health and Human Services,
acting through the Commissioner of Food and Drugs, the Adminis-
trator of the Substance Abuse and Mental Health Services Adminis-
tration, the Director of the Agency for Healthcare Research and
Quality, and the Director of the Centers for Disease Control and
Prevention, in coordination with the Administrator of the Drug
Enforcement Administration and in consultation with the Secretary
of Defense and the Secretary of Veterans Affairs, shall submit
a report to the Committee on the Judiciary of the House of Rep-
resentatives, the Committee on Energy and Commerce of the House
of Representatives, the Committee on the Judiciary of the Senate,
and the Committee on Health, Education, Labor, and Pensions
of the Senate identifying—

(1) obstacles to legitimate patient access to controlled sub-
stances;

(2) issues with diversion of controlled substances;

(3) how collaboration between Federal, State, local, and
tribal law enforcement agencies and the pharmaceutical
industry can benefit patients and prevent diversion and abuse
of controlled substances;

(4) the availability of medical education, training opportuni-
ties, and comprehensive clinical guidance for pain management
and opioid prescribing, and any gaps that should be addressed;

(5) beneficial enhancements to State prescription drug mon-
itoring programs, including enhancements to require com-
prehensive prescriber input and to expand access to the pro-
grams for appropriate authorized users; and

(6) steps to improve reporting requirements so that the
public and Congress have more information regarding prescrip-
tion opioids, such as the volume and formulation of prescription
opioids prescribed annually, the dispensing of such prescription
opioids, and outliers and trends within large data sets.

S. 483—3

(b) CONSULTATION.—The report under subsection (a) shall incorporate feedback and recommendations from the following:
(1) Patient groups.
(2) Pharmacies.
(3) Drug manufacturers.
(4) Common or contract carriers and warehousemen.
(5) Hospitals, physicians, and other health care providers.
(6) State attorneys general.
(7) Federal, State, local, and tribal law enforcement agencies.
(8) Health insurance providers and entities that provide pharmacy benefit management services on behalf of a health insurance provider.
(9) Wholesale drug distributors.
(10) Veterinarians.
(11) Professional medical societies and boards.
(12) State and local public health authorities.
(13) Health services research organizations.

*Speaker of the House of Representatives.*

*Vice President of the United States and*
*President of the Senate.* Pro Tempore

## APPROVED

APR 19 2016

Edgar C. Gentle, III, Esq. Trustee
**MALLINCKRODT OPIOID PERSONAL INJURY TRUST AND NAS PI CLAIMANT**
Post office BOX 36190
Hoover, Alabama 361930

November 8, 2022

### Re: Mallinckrodt Personal Injury Trust NAS Claim form for my son sign by me

Dear Mr. Gentle, Trustee

I am certifying that if former President Obama would have vetoed the Marino's Bill "Opioid epidemic" and members of his administration and the political goals of Hillary D. Clinton trespassing on her husband administration under the criminal investigation of the United States Department of Justice, et al., which resulted in Judge Codey's resolving the federal and state matter and it was further confirmed in the State of Wilmington, Delaware.

Also, if Congress would have been more concern of the health and general welfare of the Americans, I wouldn't be filing claims and being opposed by stockholder/stakeholders of the State of New Jersey conflict of interest.

But we're at the point now crying and trying to wipe up spilt milk that wasn't an accident but out of greed and politics not paying attention and my claims of the State of New Jersey, et al., mealy-mouth excuses by defamation of my character.

My son's medical records during his mom's trimesters.

*Ronald Bass Sr.*

Enclosure

Andrew R. Vara, Trustee
Office of the United States Trustee
844 King Street, Suite 2207
Lockbag 35
Willington, Delaware 19801



PRIME CLERK LLC

July 12, 2021

JUL 1 4 2021
RECEIVED

**In re: Mallinckrodt plc, et al.,**
**Case No. 20-12522(JTD)**
**United States Bankruptcy Court for the District of Delaware**

**Claim Number 49801**

Dear Mr. Vara, Trustee;

I'm in receipt of a notice of the above claim number as creditor under the Mallinckrodt plc, et al., chapter 11 bankruptcy proceeding and restructuring, note that I have provided the Prime Clerk, LLC; United States District Courts and the United States Bankruptcy Courts the names of conglomerate pharmaceuticals companies and health systems that are responsible for my losses

As well the result of being targeted by their public and private **shareholders** of the pharmaceuticals conglomerate of the State of New Jersey Department of Law and Public Safety and Attorney General Office the State of New Jersey ignored **"multiple red flags"** of my opioid addiction that was financed by the State of New Jersey Medicaid Programs.

The State of New Jersey, et al., was aware of my request of the State of New Jersey, et al., insurance policies of New Jersey WEED and SEED Policy the state opioid criminal investigation that Eric Meehan (DAG) of the State of New Jersey Attorney General Office misrepresented material facts and stated it on the record

that my name was involved on some document(s) of the U.S. Department of Justice, U.S. Drug Enforcement Administration, which was resolved before Judge William Martini of the United States District Court in New Jersey.

See attached documents from the United States Department of Justice criminal investigation of the Drug Enforcement Administration; certified response from the United States Department of Justice, DEA; letter I written Judge William Martini, U.S.D.J., and toxicology tests from Muhlenberg Hospital and JFK Medical Center.

The State of New Jersey Public and Private shareholders or bond holders or any other pharmaceutical financial securities offerings, conspired behind the intentional conflict of interest of Gwendolyn O. Austin and the State of New Jersey Chancery Division falsifying drug test and denying me the right to a Daubert motion or defense.

The State of New Jersey, et al., interfered in my custody proceeding by misrepresenting material facts concerning my previous drug addiction due to the prescribed medical necessity of the opiate drugs and the same drugs that they hold shares to on the stock market and other interest of financial securities by investing in the pharmaceutical industries that manufactured, distribution the opioid and its synthetics drugs that effect my health, lifestyle and family members.

**The purpose of the attachments is to stop any federal and states' fraudulent allegations that Mallinckrodt PLC, et al., place reliance upon of me committing opioid crime or counterfeiting medical documents for purchasing opiate drug for the illicit purpose of unlawful distribution for criminal activities**

I'm oppose and against Mallinckrodt, PLC, et al., Chapter 11 restructuring plan, due to the shareholders derivative actions of New Jersey Attorney General Office and the United States Department of Justice, Drug Enforcement Administration, Special Agent in charge at 80 Mulberry Street in Newark, New Jersey **Bivens** violation concerning allegations about the Department of Health and Human Services, members of New Jersey Attorney General Office was employees or

attorneys of the United States Department of Justice in Newark, New Jersey 970 Broad Street, 7th Floor all defendants stock was rolled over into The States of New Jersey 401K retirement and Pension Plans.

As well, those former federal employees or attorneys (positions are unidentified) 401K and Pension Plans was rolled over into the State of New Jersey employees retirement and pension plans that offered several tax benefits.

The unlawful actions of the Superior Court of New Jersey, et al., plausibility of liability in this Bankruptcy proceeding before this court under the above case number and claim number, should be jointly administrated against the State of New Jersey, et al., shareholders and financial advisors and directors insurances policies.

American citizens; Black or people of color can be held accountable just like white people or Caucasian or people out of the Caucasus region generation background, as well as all other ethnicity and the interrelationship with gender.

1. I'm providing a copy of a Book by Russell Brand and pamphlets that points out the struggles of opiate addictions caused by the pharmaceutical industries and their shareholders, also for your understanding of the opioid addiction find Narcotic Anonymous pamphlets.
2. Book by Inger Burnett-Zeigler, PhD "Nobody knows the trouble I've seen' the emotional lives of Black women" because of chapter 7, I chose this particular book because of my son's birth from neonatal absence syndrome of his mother subculture behavior and denial of any social services benefits for prenatal services offered to others by the shareholders.
3. I have provided a book and CD sound recording by Dick Gregory, listen to the full sound CD and read the very informed book.
4. I provided miscellaneous material, photos of my son and daughters, medical record of my son, communications with the shareholders, etc.
5. The United States Department of Justice, Drug Enforcement criminal investigation, which the shareholders of New Jersey employees and

Attorney General Office, "Eric Meehan, "DAG" alleged my name was connected to the DEA criminal investigation.

*The State of New Jersey, et al., should be Jointly Administered in sharing liabilities for financially benefiting from the manufacturing, advertising, distributing opioid and the epidemic and loses it caused me and throughout the State of New Jersey public and private opportunities' to offer a better future for my family.*

*Ronald Bass, Sr.*

**Ronald Bass, Sr.**

**I certify that copy of this complaint in lieu of a letter have been hand delivered to the persons below:**

Prime Clerk, LLC
Grand Central Station
60 East 42nd Street, Suite 1440
P.O. Box 4850
New York, NY 10163-4850