Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 19-23649-shl

4   Adv. Case No. 19-08289-shl

5   - - - - - - - - - - - - - - - - - - - - - - - - - - x

6   In the Matter of:

7

8   PURDUE PHARMA,

9

10          Debtor.

11  - - - - - - - - - - - - - - - - - - - - - - - - - - x

12  PURDUE PHARMA L.P. et al.,

13              Plaintiff,

14          v.

15  COMMONWEALTH OF MASSACHUSETTS, et al.,

16              Defendants.

17  - - - - - - - - - - - - - - - - - - - - - - - - - - x

18              United States Bankruptcy Court

19              300 Quarropas Street, Room 248

20              White Plains, NY 10601

21

22              January 24, 2023

23              11:10 A.M.

24

25

1    B E F O R E :

2    HON SEAN H. LANE

3    U.S. BANKRUPTCY JUDGE

4

5    ECRO:   A. VARGAS

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1      HEARING re Omnibus Hearing

2

3      HEARING re Doc. #5269 Motion to File Late Claim by Richard

4      Paiva

5

6      HEARING re Doc. #5345 Debtors' and the Official Committee of

7      Unsecured Creditors' Joint Response to Motions to File Proof

8      of Claim After Claims Bar Date

9

10     HEARING re Doc. #5283 Notice of Hearing Regarding Late Claim

11     Motion Re:  Richard Paiva

12

13     HEARING re 19-08289-shl Purdue Pharma LP et al. v.

14     Commonwealth of Massachusetts et al. Status and Scheduling

15     Conference Re:  Doc. #2 Motion for Preliminary Injunction

16     (Benjamin S. Kaminetzky)

17

18     HEARING re Status & Scheduling Conference Re:  Doc #400

19     Thirty-First Amended Order Granting Motion for a Preliminary

20     Injunction Signed on 12/5/2022

21

22     HEARING re Status & Scheduling Conference Re:  Doc. #402

23     Opposition to Extension of Preliminary Injunction to Lac La

24     Ronge Indian Band Complaint Filed on Behalf of Lac La Ronge

25     Indian Band (Allen Joseph Underwood II)

1

2   HEARING re Status & Scheduling Conference Re:  Doc. #403

3   Reply in Further Support of Application of the Preliminary

4   Injunction to Plaintiff Lac La Ronge Indian Band

5   (Kaminetzky, Benjamin)

6

7   HEARING re Status & Scheduling Conference Re:  Doc. # 404

8   Declaration of Benjamin S. Kaminetzky in Support of Debtor's

9   Reply in Further Support of Application of the Preliminary

10  Injunction to Plaintiff Lac La Ronge Indian Band (Benjamin

11  S. Kaminetzky)

12

13  HEARING re Status & Scheduling Conference Re:  Doc. #405

14  Motion for Leave to Exceed the Page Limit in Filing Reply in

15  Further Support of Application of the Preliminary Injunction

16  to Plaintiff Lac La Ronge Indian Band (Marc Joseph Tobak)

17

18

19

20

21

22

23

24

25  Transcribed by:  Sonya Ledanski Hyde

Page 5

1    A P P E A R A N C E S :

2

3    DAVIS POLK WARDWELL, LLP

4         Attorneys for the Debtors

5         450 Lexington Avenue

6         New York, NY 10017

7

8    BY:  KATHRYN BENEDICT

9         BENJAMIN KAMINETZKY

10

11   AKIN GUMP STRAUSS HAUER FELD, LLP

12        Attorneys for the Official Committee of Unsecured

13        Creditors

14        One Bryant Park

15        New York, NY 10036

16

17   BY:  ARIK PRIES

18

19   LITE DEPALMA GREENBERG AFANDAOR, LLC

20        Attorneys for Various Canadian Creditors

21        570 Broad Street, Suite 1201

22        Newark, NJ 07102

23

24   BY:  ALLEN J. UNDERWOOD

25

```
 1    ALSO PRESENT:

 2    ROXANA ALEALI

 3    MIKE ATKINSON

 4    JASMINE BALL

 5    BROOKS BARKER

 6    GABRIELLE BECKER

 7    BRIANNA B. BILTER

 8    DAVID E. BLABEY

 9    SARA BRAUNER

10    JULIUS CHEN

11    DANIEL CONNOLY

12    DYLAN CONSLA

13    JABRISKA COTTON

14    KENNETH H. ECKSTEIN

15    LAWRENCE FOGELMAN

16    CAROLAN GANGE

17    MATTHEW J. GOLD

18    IRVE GOLDMAN

19    UDAY GORREPATI

20    ROCHELLE GUITON

21    TAYLOR HARRISON

22    MITCHELL HURLEY

23    ANA LUCIA HURTADO

24    GREGORY JOSEPH

25    WENDY KANE
```

1    MARC KESSELMAN

2    MARA LEVANTHAL

3    JEFFREY A. LIESEMER

4    MICHELE MEISES

5    MAURA KATHLEEN MONAGHAN

6    GEORGE O'CONNOR

7    LESLIE PAPPAS

8    STEVEN D. POHL

9    KATHERINE PORTER

10   RACHAEL RINGER

11   CHRISTOPHER ROBERTSON

12   JEFFREY J. ROSEN

13   JASON RUBINSTEIN

14   ALEC SCHWARTZ

15   PAUL KENAN SCHWARTZBERG

16   J. CHRISTOPHER SHORE

17   JESSICA SIMONELLI

18   MARC F. SKAPOF

19   KATE SOMERS

20   JOSEPH SORKIN

21   MARC JOSEPH TOBAK

22   ELI J. VONNEGUT

23   THEODORE WELLS, JR.

24   FRED WILLUMSEN

25   KAILIA ZAHARIS

1   ALEXANDER LEES

2   ERIC STODOLA

3   GERARD UZZI

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                P R O C E E D I N G S

 2              THE COURT:  Good morning.  This is Judge Sean Lane

 3     in the United States Bankruptcy Court for the Southern

 4     District of New York and we are here this morning for a

 5     hearing in Purdue Pharma LP, a Chapter 11 case that's

 6     jointly administered.  And the matters on for today are set

 7     forth at the -- on an agenda filed -- I'm sorry, did I hear

 8     something from someone?  All right.  The agenda that's filed

 9     at Docket No. 5364.  So we'll start the hearing as we always

10     do with appearances.  So let me find out who is here on

11     behalf of the Debtors.

12              MR. KAMINETZKY:  Good morning, Judge Lane, this is

13     Benjamin Kaminetzky of Davis Polk and Wardwell for the

14     Debtors.  I'm here today with my colleague Kathryn Benedict.

15     Kathryn will be handling the late claims motion which is the

16     first item on the agenda and then I'll be handling the

17     status conference on the Lac La Ronge preliminary injunction

18     matter, which is the second and final item on today's

19     agenda.

20              THE COURT:  All right, thank you.  Let me find out

21     who's here on behalf of the Official Committee of Unsecured

22     Creditors.

23              MR. PREIS:  Good morning.  Arik Preis from Akin

24     Gump Strauss Hauer and Feld on behalf of the Official

25     Committee of Unsecured Creditors.
```

```
 1              THE COURT:  All right, good morning.  And let me

 2    find out who is here on behalf of the folks who filed the

 3    opposition to extending the preliminary injunction, that is

 4    the folks who have filed the lawsuit.  So let me get that

 5    appearance.

 6              MR. UNDERWOOD:  Good morning, Your Honor.  Allen

 7    Underwood of the firm of Lite DePalma Greenberg and Afanador

 8    on behalf of the plaintiffs and creditors, Lac La Ronge

 9    Indian Band.

10              THE COURT:  All right.

11              MR. UNDERWOOD:  Thank you.

12              THE COURT:  Good morning to you.  And let me find

13    out what other folks are here who need to make an

14    appearance.  I recognize that there are always a lot of

15    folks who are on, registered for this, most of whom, who

16    don't make an appearance.  So in the interest of brevity,

17    I'll just throw the appearances open to anyone else who

18    needs to make one.  All right.

19              So with that, I will turn it over to Mr.

20    Kaminetzky to start us off.  You're on mute, Counsel.  It's

21    a challenge of the world we live in.

22              MR. KAMINETZKY:  Can you hear me now?

23              THE COURT:  Yes, I can.

24              MR. KAMINETZKY:  As mentioned, there's only two

25    items on today's agenda.  The first is the late (audio
```

1   drops) motion and for that I'm going to (audio drops) over

2   to my colleague Ms. Kathryn Benedict.

3          THE COURT:  All right, thank you.  Ms. Benedict.

4          MS. BENEDICT:  Hello.  Good morning, Your Honor.

5   This is Kathryn Benedict of Davis Polk and Wardwell LLP on

6   behalf of the Debtors.  Can I be heard clearly?

7          THE COURT:  You can be heard just fine.  Thank you

8   so much.

9          MS. BENEDICT:  Thank you.  As Mr. Kaminetzky

10  mentioned, the first item on the agenda is the late claim

11  motion that was filed by Mr. Richard Paiva, which is at

12  Docket No. 5269.  I don't believe Mr. Paiva is on the Zoom

13  today.

14         THE COURT:  All right, that's probably worth

15  clarifying at this point.  Is Mr. Paiva on our zoom call?

16  All right, let the record reflect that he has not made an

17  appearance and I see that he is, based on looking at Docket

18  5269, there may be a reason for that.  I know he's been

19  incarcerated at the time of submitting that letter November

20  15th of 2022.  So with that, I'll turn it back to you,

21  Counsel.

22         MS. BENEDICT:  Thank you, Your Honor.  I will be

23  brief as the position of the Debtors and the Unsecured

24  Creditors Committee is set out in our joint response, which

25  can be found at Docket No. 5345.  Of course, if the Court

Page 12

1   has any questions after my brief presentation, I'm happy to

2   answer them.

3           After careful consideration of the facts and the

4   Pioneer factors, the Debtors and the Committee believe that

5   Mr. Paiva's late claim motion is substantially similar to

6   three other recent late claim motions on which the Court has

7   previously deferred a ruling in August and October of last

8   year and thus should be treated the same.  The Court's

9   rulings on those previous late claim motions can be found at

10  Dockets 5030 and 5199.

11          In particular, diligence performed by counsel to

12  the Creditors Committee confirmed that Mr. Paiva has been

13  incarcerated in Rhode Island since 2009, well before and

14  after the bar date period, as Mr. Paiva asserted in his

15  motion.  While Mr. Paiva's incarceration is on its own

16  insufficient to justify the filing of a late claim, the

17  Debtors and Creditors Committee believe that deferring a

18  decision on the motion is proper in light of both Mr.

19  Paiva's lengthy incarceration and the recent claim motions

20  that the Court has postponed.

21          Applying the same approach to this late claim

22  motion as was applied to those others recently filed and

23  deferring the motion until the first omnibus hearing that is

24  held at least 21 days after entry of a final order approving

25  the Debtors' modified Chapter 11 plan of reorganization will

Page 13

1    allow the Debtors, the Creditors Committee and the Court to

2    make an informed decision on the motion in the full context

3    of the universe of the late claim motions outstanding at

4    that time.

5           As we've done in the past, the Debtors and

6    Creditors Committee conferred with the Ad Hoc Group of

7    Individual Victims and we understand the PI Group does not

8    oppose postponing the decision on the motion.  So

9    accordingly, we would ask that the Court order -- that the

10   order filed at Docket No. 5345-1 be entered.  And with that,

11   I'm happy to answer any questions the Court might have.

12           THE COURT:  All right, thank you very much for

13   your presentation.  Very helpful.  Let me ask Mr. Preis if

14   there's anything to add from the Committee.

15           MR. PREIS:  Thank you, Your Honor.  No, nothing to

16   add.

17           THE COURT:  Right.  Thank you and an abundance of

18   caution, let me ask if there's anyone else who wishes to be

19   heard on the record as to this particular motion and

20   request.  Let the record reflect there's no one else who is

21   chiming in.  That is not surprising, given the circumstances

22   here.

23           I'm happy to grant the request to enter the

24   proposed order.  As we've discussed in prior hearings, this

25   is a way to try to make sure that folks who are similarly

1    situated are treated in fact in a similar fashion and that

2    that -- given the procedural posture of the case, that this

3    is an approach that makes the most sense.

4            And as did the prior occasions, happy to grant

5    your request for relief to enter the proposed order and

6    allow us to address this in fullness of time in a way that

7    allow us to make the best decision and most fair decision

8    possible.  So your request for the order is granted.  Make

9    sure we have an electronic version of it and I will get it

10   entered.

11           And I think that resolves that particular issue.

12   Thank you very much and it's always nice to see a new face.

13   So I commend the firm for encouraging its young lawyers to

14   literally be heard.  So thank you very much.  Look forward

15   to seeing you again in the future.

16           MS. BENEDICT:  Thank you, Your Honor.  I'll turn

17   the podium over to my colleague, Mr. Kaminetzky.

18           THE COURT:  All right.  Thank you very much.  Mr.

19   Kaminetzky.

20           MR. KAMINETZKY:  Once again, Benjamin Kaminetzky

21   of Davis Polk for the Debtors.  I believe that brings us to

22   the second and final item on the agenda which is the --

23           THE COURT:  All right, and before we get into the

24   merits of it, I just wanted to jump in with an observation

25   because sometimes remembering being on your side of things,

Page 15

1    you're trying to read the tea leaves as to what the Court is

2    doing or not doing.

3          So let me just remove any mystery to the extent

4    there was any.  Particularly in cases if you inherit them

5    and there's a lot of history behind some of these things,

6    which is true here, I will default to having status

7    conferences.  That's my go-to maneuver, frankly, just to

8    make sure that I'm as best informed and that I'm also not

9    wasting anybody's time so that people know, oh, we're just

10   going to talk about, we're not going to argue it.

11         So that sometimes is the most efficient way to

12   handle things.  It sometimes is not, but that's the intent

13   behind it and so I wanted to let people know.  I will also

14   say that I realized something that I hadn't seen, I think,

15   before, when I looked at the application.  And again,

16   there's a history here which I'll get into in a second, is

17   that the 31st amended order states that the Court may

18   determine whether such additional action should be enjoined

19   pursuant this order without further proceedings even, and I

20   don't think I had seen that.

21         So when I saw that, I realized that perhaps I had

22   added another layer process onto this, which we can talk

23   about.  But again, I think my first reaction was to have a

24   status conference to chat with all of you.  But since then,

25   I've gotten a chance to I think wrap my brain around this a

Page 16

1    little bit, in a little more detail.  So with that overly

2    lengthy explanation, I'll turn it back over to Debtors'

3    counsel.

4         MR. KAMINETZKY:  Thank you, Your Honor.  And I

5    believe we read the tea leaves correctly.  What I intend to

6    do, Your Honor, is just give you a -- before we get to the

7    actual, you know, scheduling part of this, I'd very -- I'd

8    like to very briefly recap the history of the preliminary

9    injunction and its role in this case.  I believe that with

10   that context the Court will better understand plaintiffs'

11   role in the case and what plaintiffs' lawsuit is about and

12   what this whole preliminary injunction application is about.

13        I understand, Your Honor, that this is the -- kind

14   of the first contested matter with respect to the

15   preliminary injunction.  So I think this very brief

16   introduction, I think will be help --

17        THE COURT:  Yes, that's fine.  And again, what

18   happens is procedurally you all will have -- I'll get a

19   question that says, how do we handle this, do we want this

20   on for here or whatever.  And I haven't gotten a chance to

21   read the papers yet or fully read the papers yet.  So that's

22   sort of the context for the status conference.  But yeah,

23   please, go ahead.

24        MR. KAMINETZKY:  Okay.  So Your Honor, it's not an

25   exaggeration to say that without the preliminary injunction

Page 17

1      Purdue would have likely liquidated and the parties

2      certainly would not have achieved a settlement that delivers

3      billions and billions of dollars to the American people for

4      opioid abatement and for victim compensation, including,

5      importantly, as much as $6 billion from the Sacklers.

6              On the petition date, the Debtors were defendants

7      in over 2,600 civil actions pending in every conceivable

8      forum, state and federal, including one state that tried to

9      invoke the original jurisdiction of the United States

10     Supreme Court, state administrative tribunals, and

11     everything in between.  As explained by the witnesses put

12     forth in support of our motion for preliminary injunctions,

13     the Debtors were spending over $2 million dollars per week -

14     - per week -- defending these massive amounts of actions.

15             Now in a normal bankruptcy case, as Your Honor

16     well knows, the filing of the petition and the position of

17     the automatic stay would have paused this deluge of

18     litigation, but not here.  Litigation became if anything

19     more frantic and more chaotic with the filing of the cases

20     for two basic reasons.

21             First, hundreds of cases against the Debtors were

22     brought by governmental entities ranging from states,

23     municipalities, tribes, hospital districts, and housing

24     authorities.  Many of these entities asserted that their

25     cases were not subject to the automatic stay under the

Page 18

1    police power exception in 362(b)(4) and thus litigation and

2    the fight among the governmental entities to be the first in

3    the frantic race to the courthouse continued even after the

4    petition date.

5             The second reason is that hundreds of the cases

6    sued the Debtor -- sued the non-Debtor Sacklers.  Indeed, as

7    the bankruptcy filing became more imminent and was widely

8    reported, many people sued only those related parties, only

9    the Sacklers.  But these suits were suits against the

10   Debtors in all but name as they hold -- they sought to hold

11   these related parties, meaning the Sacklers, liable for the

12   alleged misconduct and the damages wrought by the Debtors.

13            Now, this value destructive and chaotic litigation

14   free-for-all ended only when Judge Drain granted the

15   preliminary injunction motion.  The litigation pause that

16   the injunction provided, stopped the legal fee hemorrhaging

17   and more importantly, created the condition that led to the

18   phase one mediation which resulted in a successful

19   consensual allocation of estate recoveries among the private

20   and public creditors and then the phase two and phase three

21   mediations which led to the Sackler settlements in

22   increasing amounts and with increasing creditor support.

23            None of that would have been possible had the

24   Debtors' creditors remain locked in this (indiscernible)

25   struggle to be the first to secure the biggest verdict in

1    the most favorable forum to ensure the largest slice of the

2    pie.  But the importance of the preliminary injunction is

3    not just creating the conditions for a successful case and

4    an unprecedented settlement.  The preliminary injunction

5    also imposes what we call the voluntary injunction and this

6    was quite unprecedented.

7            It was a carefully negotiated set of obligations

8    and restrictions on the Debtors that included the obligation

9    not to employ sales representatives to promote opioids and

10   the obligation not to support advertising that promotes

11   opioids.  This provided the creditors, plaintiffs with

12   greater injunctive relief against the Debtor than they could

13   have secured in their suits subject to the preliminary

14   injunction.

15           The preliminary injunction also requires that the

16   Debtors retain a monitor to oversee and to report to the

17   Court compliance with the voluntary injunction.  And

18   critically, as long as the preliminary injunction remains in

19   place, the Sacklers are bound to a broad anti-secretion

20   order that ensures that they do not transfer assets in a

21   manner that would frustrate any judgment against them.  The

22   current preliminary injunction order runs until 30 days

23   after the Second Circuit rules.

24           Now, with this background -- now, let's just turn

25   for a moment to what's before Your Honor in today's status

Page 20

1    conference.  What you have is the Lac La Ronge objection to

2    the injunction which would let them, and them only, jump

3    ahead of thousands of plaintiffs who filed their lawsuits

4    years ago and allow them and them alone to litigate the

5    Sacklers -- to litigate against the Sacklers.

6          So who are these plaintiffs?  Plaintiffs, just to

7    be clear, is not Canada.  Plaintiff is not a class of all

8    First Nations of Canada.  Plaintiff is a single First

9    Nation, which, according to plaintiff, consists of

10   approximately 11,000 people located in Saskatchewan.  This

11   is important because, as the Court may recall, all of the

12   provinces of Canada, including Saskatchewan, entered into a

13   stipulation in July 2021.  The provinces withdrew their

14   proofs of claims against the Debtors.

15         The Debtors in exchange agreed not to seek an

16   injunction or relief from the Canadian provinces claims that

17   are not based on the conduct of the Debtors.  There is a

18   suggestion in plaintiffs' papers that it has been ignored or

19   excluded.  This is false.  Plaintiff first filed its proof

20   of claim, proof of claim in this case, against the Debtors n

21   July 2020.

22         We heard nothing from plaintiffs until 21 months

23   after the preliminary injunction first issued and about a

24   year after it filed its proof of claim when plaintiff

25   objected to confirmation, which objection Judge Drain

Page 21

1    overruled.

2              We also understand that the plaintiff is subject

3    to a stay in Canada that enjoins it from suing the Sacklers

4    in Canada.  And so plaintiffs sued here down the street in

5    New York Supreme Court, years after everyone else.  Now,

6    what is the plaintiffs' case about?  Plaintiffs' case is not

7    really about Canada or Purdue Canada.  It's all about Purdue

8    meaning the Debtors.

9              Although plaintiff names the Sacklers, its

10   complaint is really about what the Debtors allegedly did

11   wrong in the United States, which plaintiff alleges had

12   consequences in Canada and the Debtors' conduct is the basis

13   for plaintiffs' claims against the Sacklers who allegedly

14   directed, oversaw, or otherwise participated in the Debtors'

15   alleged misconduct.

16             This much is obvious from even a short skim of the

17   complaint.  Plaintiff mentions Purdue meaning the U.S.

18   Debtors in approximately 89 paragraphs of its complaint and

19   plaintiff mentions the United States or one of its states or

20   government in approximately 40 paragraphs.  By contrast,

21   Purdue Canada is only mentioned eight times in seven

22   paragraphs.

23             So let me be clear.  The complaint that was filed

24   in New York Supreme Court by this plaintiff is virtually

25   identical to the complaints against the Sacklers that were

Page 22

1    filed prepetition by many states that Judge Drain enjoined

2    more than three years ago.  And to be clear, the fact that

3    one plaintiff claims against the Sacklers arises under the

4    Canadian Competition Act does not -- does not -- make

5    plaintiffs' complaint any different.

6              Just like plaintiff, the states routinely stated

7    their own -- stated their own unique circumstances,

8    including their own Unfair and Deceptive Trade Practices Act

9    in their lawsuits.  For example, Massachusetts sued the

10   Sacklers for unfair and deceptive acts and practices under

11   Massachusetts law, its own bespoke statutes.  So the fact

12   that this is a suit brought by a single plaintiff in New

13   York Court on a virtually identical foundation to many of

14   the other complaints filed long before and since the

15   petition date, means that there is no need for more briefing

16   and no need for more testimony.

17             The overall legal framework for the preliminary

18   injunction has been exhaustively briefed and does not to be

19   -- appear to be in dispute.  The Debtors and opposing

20   parties filed approximately 300 pages of briefs before Judge

21   Drain, and again extensively briefed the issue in the appeal

22   before Judge McMahon, where Judge McMahon affirmed Judge

23   Drain's imposition of the preliminary injunction.

24             And focusing on plaintiffs, any issue specifically

25   relevant to plaintiffs has also been briefed extensively as

Page 23

1    Your Honor saw.  Plaintiff filed a 29-page brief which

2    covered every topic relevant to the injunction and a number

3    of topics entirely irrelevant to the injunction, including a

4    rehash of its confirmation objections, and we filed a 26

5    page response explaining why the legal and factual record

6    supports enjoining plaintiff from pursuing its newly filed

7    case.

8         So in sum, Your Honor, unless you have any

9    specific issues that you need additional briefing, we simply

10   believe none is necessary.  Now, there was also a suggestion

11   that -- and I'm wrapping up -- that there may be a need for

12   testimony.  And let me say this about that.  In 2019 when we

13   litigated the preliminary injunction, we offered three

14   witnesses in support of the preliminary injunction.

15        It was the Debtors' investment banker who

16   testified about the monetary cost of litigation on the

17   Debtors.  It was the Debtors' financial advisor who

18   testified about the operational burdens of litigation and

19   the Debtors' defense lawyer in the prepetition opioid

20   litigation who testified about the Debtors' post-petition

21   involvement in litigation nominally against the Sacklers.

22        Now, although our preliminary injunction motion

23   was opposed at the time by the attorney generals of 25

24   states and 500 municipalities and tribes, not one of these

25   objectors sought to cross examine any of these witnesses at

Page 24

1    the October 11, 2019 hearing --

2              THE COURT:  Well, let me --

3              MR. KAMINETZKY:  -- and why was --

4              THE COURT:  Let me just interject here just to

5    take something off the table.  I didn't see anything in the

6    back and forth, and Mr. Underwood in his comments can convey

7    his views that suggested that this is a factual issue.

8    Right?  It's this -- I think this is more a question of how

9    does the law apply in these circumstances and in the context

10   of the case.  So I'm not -- I don't see any particular

11   factual issues based on the -- on where we've been and where

12   we currently are.

13             MR. KAMINETZKY:  Okay, I'll stop then, and if Mr.

14   Underwood says otherwise, I can respond.  So let me just sum

15   up then.  This matter is really simple, Your Honor.  All

16   that's needed is a straightforward application of

17   uncontested law to facts that have been long established and

18   consideration of a complaint that is in substance identical

19   or virtually identical to the many other complaints subject

20   to the preliminary injunction.

21             So therefore, we respectfully request that the

22   Court ruled on the papers or set this matter for oral

23   argument as expeditiously as possible, so that we can stop

24   consuming estate resources relitigating issues settled long

25   ago.  Now, I shudder to think about the floodgates that

Page 25

1    could open if the Court indulges this belated and

2    unwarranted attack on the preliminary injunction at this

3    point.  I mean, we have, you know, thousands of complaints

4    that have been enjoined or stayed for three years now, that

5    asserted virtually the same causes of action, and instead

6    we've been focusing on a value maximizing case where

7    significant dollars could go to the American people.  If

8    that gets all blown up --

9              THE COURT:  So the only --

10             MR. KAMINETZKY:  --point.

11             THE COURT:  -- question I had and the only thing

12   I'll -- again, also ask Mr. Underwood this question -- is

13   the procedural posture of the case.  Right?  We're all

14   acutely aware of where that is, which is with the Second

15   Circuit and we're also acutely aware of the fact that no

16   matter what the Second Circuit does, there's a chance that a

17   party may ask for further review and there's a chance that

18   the Supreme Court might take such review.

19             So that's really, I think, the only thing that's

20   changed is the passage of time, given where we are.  And so

21   that would be the one thing, the only thing that I can think

22   of that would be helpful for you to briefly address.

23             MR. KAMINETZKY:  Your Honor, I'd be happy to.

24   Whatever the Supreme Court does -- you know what we hope it

25   does -- it cannot be that the next step is everyone goes

1    back to the original, I guess, fight against all and the

2    original natural everybody 2,600 plus, plus, plus

3    plaintiffs, all running to Court trying to secure their own

4    judgments, trying where -- rather than some sort of

5    consensual deal where the estate is divided up in some sort

6    of consensual and fair manner, that what resumes is, what

7    was the state of play prepetition or even post-petition,

8    whereas literally a race to the courthouse so that folks can

9    secure their own slice of the pie.

10            And Your Honor, I add to that, that the largest

11   creditor in a sense of the Sacklers is the Debtors.  The

12   Debtors have extraordinarily serious claims against the

13   Sacklers, and to allow anyone to jump the line at this point

14   and litigate claims that Judge Drain found are very similar

15   to the Debtors' claims against the Sacklers would also

16   possibly undermine, you know, the settlement and all the

17   progress that has been made.

18            So we're all frustrated by as long as this took,

19   and -- but I should note that there are four factors to the

20   preliminary injunction, none of which is the passage of

21   time.  It's basically as the Court has found and has been

22   confirmed, it's basically whether a successful

23   reorganization is more likely with the preliminary

24   injunction or without the preliminary injunction.  And I

25   must say that really, no matter what the Second Circuit

Page 27

1    does, but we're not -- you know, we're not even there yet.

2           But at this point in time standing here today

3    waiting for the preliminary injunction, it cannot be that

4    the estate would be better off if everyone goes back to

5    fight each other, which would be the -- and also, it would

6    also be quite frankly -- I mean, we could also have the

7    Sacklers walk away from the deal if, you know, if they -- if

8    litigation resumes.  So this is a very dangerous time and

9    we're playing with fire.

10           And -- but Your Honor, the preliminary injunction

11   expires 30 days after the Second Circuit rules.  So, you

12   know, we're going to all have to come back to you when the

13   Second Circuit rules and whether we need a -- on a further

14   injunction or not or something else, we're going to come

15   back to Court and discuss that with Your Honor.  But

16   certainly at this point in time, it's not time to upset the

17   apple cart.  Thank you.

18           THE COURT:  Thank you.  All right, Mr. Underwood,

19   let me hear from you.

20           MR. UNDERWOOD:  Thank you, Your Honor.  I think

21   that, you know, in principle what's important out of the box

22   is to understand that I don't -- we're here for a particular

23   reason and it's a reason that's different than these 2,600

24   plus, plus, plus other creditors.

25           THE COURT:  Well, I -- this do I long to hear.  I

Page 28

1    don't -- I'm not seeing the daylight that you're hinting at,

2    but explain to me what that looks like.

3              MR. UNDERWOOD:  Absolutely, Your Honor.  So in the

4    first case, Lac La Ronge is a Canadian First Nation.

5    They're not a U.S. state.  They're not seeking to enforce

6    U.S. police powers as was the issue previously in the

7    Dunaway case in part.  So that's one distinction.

8              The second distinction, I think that's important

9    is with respect to this notion that yes, Lad La Ronge filed

10   a proof of timely in this bankruptcy case and that proof of

11   claim was undergirded by what was and is a class action

12   complaint up in Canada with respect to all opioid

13   manufacturers. And in fact before the CCAA in Canada, there

14   is stay relief in Canada under that complaint to now name at

15   least the Purdue Canada entities there.  And remember,

16   Purdue Canada is not a Debtor.  It is -- those are not the

17   Debtor entities.

18             THE COURT:  Well, but neither are the Sacklers,

19   right.  So here's my concern, is what has changed.  I

20   understand the passage of time.  Nobody's happy with the

21   passage of time.  You didn't file us a couple of years ago,

22   you filed it now.  But what has changed from the litigation

23   free-for-all that existed before the primary injunction and

24   all of the problems that that brought to the case and

25   frankly, to victims who were all going to have to elbow past

Page 29

1    each other in the race to the courthouse?

2         It seems inconceivable to me that it would be fair

3    or equitable to allow only your clients to go forward as

4    opposed to everyone else.  And so that's -- I don't

5    understand how -- I understand what you want, but I don't

6    understand how it would be all possible to give you what you

7    want without everyone else coming to the courthouse and

8    requesting the same relief, saying that we think we are

9    entitled to move forward.

10         MR. UNDERWOOD:  Your Honor, I think a good portion

11    of the case is not my client's complaint, rather, but just

12    the bankruptcy case generally has been built on this

13    outstanding fear of a parade of horribles.  I -- first of

14    all, preliminarily, one of the things I might suggest is

15    that in fact, you don't see a long line of people here

16    today.  You haven't seen a long line of people --

17         THE COURT:  That's because there's an injunction

18    that's been extended on numerous occasions.  So the word is

19    out, right, there's been an injunction and then there's been

20    an extensive decision by Judge Drain on it and extensive

21    decision by Judge McMahon on it.  So I think it's because

22    people have read that decision and understood the reasons

23    for the injunction and the fact that was upheld on appeal.

24         That's why there's no line.  I mean -- and it's

25    during the original litigation of the request for an

Page 30

1    injunction, in fact, there was a line.  There were a lot of

2    people on the other side of the issue.  And so that's where

3    the line was.  And so I think the fact that there's no line

4    is just a reflection of the fact that people said, well,

5    we've been heard, we haven't prevailed on the issue.  We

6    went and appealed it and we didn't prevail there.  So for

7    better or for worse, this is where we are.

8              MR. UNDERWOOD:  Yes.  And so I think your

9    question, Your Honor, which I was trying to get to address,

10   which is simply that you asked what has changed, what is

11   different.  Well, clearly, I believe that the claims that

12   are asserted by the plaintiff in the New York State

13   complaints are different and we could get into that, but I

14   think I want to answer your primary question first --

15             THE COURT:  Well, tell me --

16             MR. UNDERWOOD:  -- which is --

17             THE COURT:  -- how they're different?  There's a

18   fairly extensive chart in the reply that compares all of

19   your allegations -- well, compares your allegations with

20   allegations and complaints subject to the injunction.  And

21   that's on Page 15, and of course it's discussed throughout

22   the reply as well.  And I think the top level view to dumb

23   it down a little bit, is that the Sacklers are all sued in

24   the context of their role in running the Debtors.

25             And so that's -- and that's how you phrase it and

1    that's how everybody else phrases it, and that's why the

2    Debtors, among many other reasons, the Debtors are involved,

3    as involved as they can be, even if they're not named.  And

4    so you're talking about Purdue's sales strategy being

5    deceptive.  There's countless references to Purdue, the

6    Sackler family overseeing Purdue's strategy and this goes on

7    and on and on.

8             So I appreciate your candor, but what it means is

9    that there's really no attempt to separate this -- these

10   allegations really from the allegations in other cases that

11   then factor the reasons for seeking the injection in the

12   first place.  Again, I understand your frustration with the

13   passage of time.  We are all anxiously awaiting the Second

14   Circuit's decision.  That may or may not be the end of

15   appellate litigation.  It is what it is.  And so we're all

16   waiting for that to happen, but it doesn't change sort of

17   the facts on the ground vis-à-vis the need for the

18   injunction in the first place.

19             MR. UNDERWOOD:  So Your Honor, I think the

20   distinction with regard to the complaint is it has to do

21   with the law under which it arises, meaning our allegations

22   in effect are directly against the Sacklers.  The

23   Competition Act is a -- it's a criminal statute in Canada

24   that has private right of action.  This is a direct cause of

25   action.  It's not property of the estate.  I don't believe

Page 32

 1    the estate could bring it.  The claims that we are bringing

 2    are not subject to indemnity or contribution.  There's a

 3    genuine question here of whether in any way, shape, or form

 4    the Court can actually cross the bridge on related to

 5    jurisdiction.

 6              And I think to the extent that I referenced with

 7    respect to this conference that testimony might be required,

 8    my only reason for asserting that was that there is an

 9    analysis potentially of Canadian law here, what the

10    Competition Act enables and what is the gravamen of these --

11              THE COURT:  So you -- so isn't that true for every

12    state in the union that has its own laws to enforce, as --

13              MR. UNDERWOOD:  Well, I think that --

14              THE COURT:  -- as their own, you know, federalism.

15    Their -- we've got 50 sovereign states as well as one large

16    sovereign capital U, capital S, United States.  I mean,

17    there's 50 sovereigns, so there's 51 here.  And certainly

18    the federal government has -- the settlement was partially

19    possible because the federal government put its claim to the

20    side.  And so there's a lot -- there are a lot of

21    sovereigns.  And so how is it that that your 11,000 people

22    tribe is so markedly different from everyone else?  I'm not

23    seeing it.

24              MR. UNDERWOOD:  Well, I think first of all, that's

25    why we're here.  I think this was an untested question.  As

Page 33

```
1    it stands right now, it suggests that, yes, there is an

2    appellate record here and the estates are where they are.

3    In fact there -- at this point, if there was a 12th

4    confirmed plan, the states would be consenting.  My clients

5    do not.  And so that's --

6              THE COURT:  Well, but that's on appeal.  That

7    that's on appeal.  I don't think that changes.  If the

8    appeal, the existence of the appeal of the confirmation

9    hearing and Judge McMahon's ruling on the confirmation

10   change things, I think you would have all of the folks who

11   originally opposed the injunction back here again.  But they

12   haven't because I don't think there's anything about Judge

13   McMahon's decision that suggests her affirmance of Judge

14   Drain that suggests that an appeal, that confirmation

15   appeal, ongoing process, is going to change -- changes the

16   calculus under these facts and circumstances.

17             MR. UNDERWOOD:  And I guess, Your Honor coming

18   back to your initial question, what has changed in the past

19   three years other than the passage of time; that's a good

20   question and I think it could be addressed in a couple of

21   different ways.  One factor to remember is the fact that

22   these, these Canadians, these Canadian plaintiffs, have been

23   enjoined in Canada from pursuing a non-Debtor entity for

24   those three years.  That has changed now.

25             There's stay relief so that my clients and others
```

Page 34

1    can pursue the non-Debtor entities, but in the meantime, we

2    also have what is an effective side deal, this settlement

3    with the provinces that was engineered by the Sacklers, I

4    gather, and their non-Debtor entities in Canada, and our

5    concern is that that settlement by virtue of the

6    securitization that may be embodied in it will foreclose our

7    ability to recover against Purdue Canada assets which are

8    non-Debtor assets and which, you know, I also add with

9    respect to that it's not entirely clear to me, but my

10   understanding was that Purdue Canada assets were already

11   committed to the reorganization and trust structure in this

12   case before this Court.

13            THE COURT:  But the other side makes the point

14   that while your focus just now is on Canada, that the --

15   looking at the words in your complaint, the focus is on the

16   Sacklers and the Debtors.  It's on Purdue and it's on Purdue

17   U.S. and there's in fact not that many instances where

18   Purdue Canada is mentioned.  It's a focus on what was done

19   here with these Debtors in connection with the Sacklers.

20            And so the focus of the complaint is on that, and

21   I don't -- that's what I'm really having trouble.  And so I

22   don't know that you can re-shift your argument and change

23   the allegations of the complaint for purposes of

24   understanding your requested relief here.

25            MR. UNDERWOOD:  So I think, Your Honor, where the

Page 35

1    distinction was is that this isn't really about -- because

2    it is a very, very complicated Debtor and non-Debtor

3    corporate structure.  This isn't about action.  The

4    complaint that's filed in New York State, it's not about

5    actions that were taken by the Debtor, necessarily.  It's

6    not about actions that were taken by the Canadian non-Debtor

7    entities necessarily.  It is about the direct actions of ten

8    named Sacklers --

9            THE COURT:  But that's not how it's pled in your

10   complaint.  I mean, I just read you some of the instances

11   and the way it's framed in your complaint.  And frankly,

12   again, I said I appreciate your candor because you didn't

13   try to, as they would pejoratively say, put lipstick on a

14   pig and claim it's something else.  I think what you said

15   was, is to frame the allegations accurately, to talk about

16   the Sacklers' actions in connection with the Debtors.

17           And it's that interrelationship that led to the

18   injunction in the first place.  So, again, I don't want to -

19   - I don't want to harangue you here, Counsel.  I just want

20   to make clear what my concerns are and I didn't say this at

21   the beginning, and I should.  Obviously, the arguments about

22   the injunction are separate and apart from any sympathy I

23   have to folks who are plaintiffs who are alleged victims

24   here.  And obviously you take that seriously, I take that

25   seriously, the Debtors take that seriously.

Page 36

1            And so I'm not -- nothing I same should be taken

2       as any -- in any pejorative way to their -- the merits of

3       their claims.  The problem is for, for you, is that sadly

4       they're not alone.  And that there are a lot of folks in

5       exactly the same situation who have pretty much the same

6       claims, albeit under different legal statutes and rights

7       that vary from jurisdiction to jurisdiction.  So what else

8       would you like to, to address?

9            MR. UNDERWOOD:  So I think, Your Honor -- I mean,

10      I think what the crux of this is, is there is a question who

11      out there, who in the world has a direct claim against the

12      Sacklers based upon their own acts whether or not they also

13      were wearing a hat that said, Purdue Pharma U.S. or a hat

14      that said one of their other entities or even perhaps a

15      trust had or certainly even Purdue Canada.

16            The action that is positive is direct as to the

17      acts of a very limited number of people where there is a

18      basis to allege that their acts or statements under the

19      Competition Act directly impacted these plaintiffs in

20      Canada.  That's what's different, and as far as I know, I'm

21      not aware right now of any other plaintiffs or creditors

22      that have come forward with a similar legal or perhaps

23      there's a similar factual basis, but not necessarily as far

24      as I know a similar legal basis.

25            And so that is ultimately, Your Honor, why I'm

Page 37

1    suggesting that if we do have a full and robust hearing on

2    this question, would like the --

3         THE COURT:  Well, listen.  We -- I think we've

4    segued from a status conference to an argument.  And so I

5    think that's pretty clear and one -- I think Mr. Kaminetzky

6    went there.  I wanted to give you a chance to go there.  So

7    I think now is an opportunity to make the legal argument.

8    So again, that's -- I was struck by the fact that the

9    injunction itself allows me to make these rulings even

10   without a hearing, but I'm happy to hear from you.

11        I think it's appropriate and only fair.  But I

12   don't contemplate another hearing now, given that we sort of

13   segued into the oral argument, so -- which is which is where

14   we are.  So what else did you want to address, Counsel?

15        MR. UNDERWOOD:  So I think, you know, the way that

16   I look at this ultimately, you come down to a question of

17   related to jurisdiction.  I think it's perhaps a close call,

18   but I do think that the Court would be best informed if I'm

19   able to provide the Court with a better briefing on Canadian

20   determinations, rulings, and --

21        THE COURT:  Why is there -- why would additional

22   briefing be appropriate?  I'm not sure.  So you filed your

23   opposition to extension consistent with the way it's laid

24   out.  The Debtors filed a reply.  So I was a bit surprised

25   here.  Mr. Kaminetzky discussed additional briefing in the

1   sense that I don't know why that would be appropriate.  You

2   filed a robust brief.  I have it.  We're having argument.

3   That's fine.  That's all appropriate and sensible but I

4   think once I'm done here today, I will consider the matter

5   fully submitted.  I don't think that additional briefing, no

6   one's pointing me to anything where additional briefing is -

7   - again, normally what you have here, as I understand it,

8   the way it worked is that essentially the opening brief here

9   is the opposition to extension.

10          So that is, the Debtors essentially ask to extend.

11   Somebody files an opposition to that motion, which you did.

12   And then the Debtors filed the reply.  So -- and the

13   opposition is extensive.  So I have it.  It's at docket --

14   it's on the docket.  It is -- contains not only your

15   extensive legal brief but also attachments to give me an

16   understanding of what the complaint sets forth.

17          So it's a 29-page brief and then the verified

18   class action complaint and demand for jury trial in the

19   State of New York, and that complaint itself is extensive

20   and is -- trying to get -- some 57-plus pages.  So I have

21   that.  So what else would you like to tell me, Mr.

22   Underwood?

23          MR. UNDERWOOD:  So I think Your Honor, I

24   appreciate your summarization.  If we're talking right now

25   about an actual argument of the matter, this comes down to

Page 39

```
 1    two questions, Your Honor.  Can the Bankruptcy Court extend

 2    this injunction to cover these plaintiffs, and should they?

 3    And I think that's a two part question.  In terms of the

 4    should, I, you know, I indicated in our pleading opposition

 5    filed with the Court -- which is again, on relatively

 6    shortened timeframe that for instance, there is no

 7    entitlement to contribution or indemnity under the Canadian

 8    statute or Canadian law.  And I don't know whether or not,

 9    Your Honor, that actually is going to be part of your

10    decision on this matter, and that's part of the reason why I

11    was glad that we were -- sit down for a conference because

12    if that is, I'm happy to submit briefing on those issues or

13    others, that --

14            THE COURT:  Well, I guess my thought is that there

15    are a number of things addressed in the original injunction

16    and as well as the affirmance of the injunction, and if you

17    look at the framework for it, it's not as narrowly parsed as

18    your -- as you've just framed it, meaning that if it's --

19    there are a number of ways you sort of get at the

20    relationship between the Debtors and the Sacklers here,

21    whether you look at it as a matter of if there are issues

22    decided in a Court of law about the Sacklers' actions as

23    head of various entities, including the Debtors, the effect

24    that will have on the Debtors.

25            You can look at the cost involved in litigation.
```

Page 40

1   So it's not simply just a matter of indemnification

2   necessarily.  There are a whole host of factual

3   underpinnings that were relied on by Judge Drain as well as

4   the District Court in the affirmance.

5           MR. UNDERWOOD:  That's correct, and I think we

6   address some of those facts directly in our directly in our

7   pleading.  I certainly allude to some issues of law that I

8   think might be -- you know, ultimately, I guess Your Honor,

9   the question is really how the decision to extend the

10  injunction arises under Section 105, how the Court, if it

11  chooses to follow that path which is to buttress that

12  decision or on the other hand, you know, not extend the

13  injunction, and I think there's a legal basis.  There's a

14  factual basis at this point in time not to extend the

15  injunction.

16          I don't necessarily foresee that there would be,

17  because factually and legally this is different.  I don't

18  necessarily foresee that there would be a race to the

19  courthouse again by all these parties that are already

20  enjoined.  I think this is a --

21          THE COURT:  Well, but -- so that's just an

22  argument to say Judge, you should grant it to us, and the

23  way you solve the problem with the other parties is just

24  grant it to us.  I don't think the other parties will see it

25  that way.  So -- right?  They will come in and say we have

Page 41

1    our own claims under our own statutes dealing with the

2    Sacklers' actions, and so Mr. Underwood has no right to --

3    he can make whatever arguments he wants, Judge, but it's --

4    for very, very similar reasons, you should grant our request

5    to no longer extend the injunction.

6              And so what it will mean is that before we get

7    through all the levels, before we get a decision on appeal

8    or any further appeal, and before there's any chance to in

9    the aftermath or whatever those decisions are to try to

10   figure out what a bankruptcy solution would look like, we're

11   going to go back to the race to the courthouse, aren't we?

12   How are we going to avoid that?

13             MR. UNDERWOOD:  So Your Honor, I think, you know,

14   one of the issues with respect to the appeal and this

15   application is the fact that yes, my clients are part of the

16   group that is a party to -- they're appellees right now

17   before the Circuit and cross appellants on the

18   categorization issue before the Circuit.

19             But I think what the implication there is, is

20   first of all, we don't know how the Circuit's going to rule

21   but there is a scenario where the circuit and perhaps

22   ultimately the Supreme Court rules favorably with respect to

23   my client.  But my client's in effect alone.  I'm not sure

24   that there might not be a decision that has in effect a

25   carveout for this type of claim established under the

Page 42

1   Competition Act and therefore we're just wasting time.

2           THE COURT: But isn't that -- if that's the kind of

3   carveout that you think might come that would justify you,

4   your client and only your client, to move ahead, isn't that

5   the reason wait for a decision?  I mean, because otherwise

6   you're asking me to make that call and say, I think that

7   your claim is sufficiently distinct, that your client and

8   your client alone among the 2,000-some-odd lawsuits should

9   be allowed to go forward.

10          MR. UNDERWOOD:  I think that is a valid counter

11  argument, Your Honor, but I think that what I'm driving at

12  also is if you look at the parties that remain in the appeal

13  before the circuit, it's effectively real parties in

14  interest, my clients, and the U.S. Trustee's Office and some

15  pro ses.  So I think there's a -- you can read the tea

16  leaves there and sort of say, well, probably all these 2,600

17  others on some level or other are in effect consenting to

18  this 12th amended plan or any treatment that's similar to

19  it.

20          THE COURT:  But the plan is different than the

21  injunction, right?  The injunction makes the plan -- gives

22  us a chance to deal with the plan.  If there's no

23  injunction, there really won't be a plan.  What -- as I

24  understand it, again, to think of it in broad strokes, if

25  you were to explain to somebody who's not a bankruptcy

Page 43

1   lawyer, if you don't have the injunction in this case, it's

2   essentially as if the bankruptcy is dismissed because it's

3   the race to the courthouse.  Everybody sues.  It's self-

4   help.  And it means that not only is there a race to the

5   courthouse, but there's no real chance that whatever

6   claimants get that it will be fair or equitable because it

7   will be decided in as many jurisdictions as there are as to

8   what the claimants in those individual cases should get.

9   And so that's my concern.

10          So I realize, looking at the time, Mr. Underwood,

11   I'll ask you to -- I'll give you another ten minutes or so

12   for anything else you wanted to argue.  Again, I have read

13   your papers and I think I understand your arguments about

14   the jurisdictional issues again, which are addressed in

15   depth in both Judge Drain's decision and in Judge McMahon's

16   decision.

17          MR. UNDERWOOD:  Thank you, Your Honor.  I'll be

18   very brief, nowhere near ten minutes.  I think ultimately,

19   look, the law under which this complaint arises is distinct

20   from any of the other laws that have been addressed by the

21   Dunaway decision or anyone that has pushed it before Judge

22   Drain or the District Court.  I think the actual allegations

23   and the parties to the New York State complaint as filed are

24   different than these other complaints, meaning this is

25   strictly as to a limited number of active Sacklers.

Page 44

1          There is a question of which hat they're wearing

2    when they take certain acts, and my argument, I suppose at

3    heart -- this is the problem with this case -- is that they

4    created a paradigm, the Sacklers, to their own personal

5    benefit that effectively allows them to (audio drops) at

6    different times which hat they're wearing.  They're getting

7    covered for non-Debtor activity from the Debtor in this case

8    and we're trying to think about not only non-Debtor activity

9    from U.S. non-Debtors, corporate entities, but Canadian

10   corporate entity non-Debtors as well.

11          So there's that issue itself of under the Section

12   105(a) necessary and appropriate standard.  I understand

13   where the Court is coming from, that it would appear that it

14   is necessary to continue to enjoin claims in order to

15   protect the aspects of a potential reorganization here.

16          That may be necessary, but then we also reach the

17   question of whether it is appropriate.  The question of

18   whether it is appropriate hinges on whether or not this

19   Court is willing to now and I suppose in the future

20   encourage or enable owners of multinational corporations to

21   structure them in such a way that they can take the benefits

22   of foreign stays in non-main foreign proceedings, take the

23   benefits of the automatic stay in the United States and then

24   extend that to the owners of those corporations, no matter

25   what they've done, without it really being tested.

Page 45

1          THE COURT:  And you started using the language of

2     Chapter 15 here, a non-main case.  I don't think anybody

3     would argue that the bankruptcy here wouldn't be essentially

4     the main proceedings that others might seek to recognize,

5     right.  I think this is, given the Debtor U.S. entities here

6     and the scope of the case, I think it's clearly, we're not -

7     - it's not the tail end of the dog in terms of a

8     restructuring.  But let me ask you, when you talk about

9     appropriate, again -- and I'll just leave you with, it's

10    really the same question, so I apologize to the extent.

11          I'm not trying to be pedantic or anything, but the

12    frustration is -- I understand parties are victims.  They're

13    frustrated with the passage of time and they look to the

14    fact that they have their own self-help opportunities.

15          But again, I don't understand, if -- even

16    regardless of what the Appellate Court decides, there's

17    either an agreement that could potentially -- existing

18    agreement that could be essentially reinstated or there's a

19    deal to be struck under the legal parameters of whatever the

20    decision is, but again, one that would hopefully be fair and

21    equitable to all the folks who are opioid victims here as

22    well as other creditors in their in their stead, that is

23    tribes, municipalities.

24          And so when you talk about appropriate, why isn't

25    that the appropriate result here?  Isn't that -- isn't the

Page 46

1      injunction serving that appropriate purpose, again, thinking

2      about what bankruptcy is supposed to do?

3              MR. UNDERWOOD:   I think that the result may be

4      necessary, but the question of whether it's appropriate, as

5      I was suggesting with regard to the protection of parties

6      who my clients haven't been able to pursue in Canada due to

7      the related, you know, non-main stay up there, is that they

8      haven't been able to necessarily pursue in the U.S. due to

9      the injunction and due to the stay generally, whether the

10     protection that is provided here -- and the complaint is

11     narrow in the sense that it is not a shotgun complaint

12     against every non-Debtor entity.

13             It's not a complaint against every Sackler.  You

14     know, whether those ten folks continue to merit the

15     protections that are afforded by the injunction given that

16     this is at best, I think, a close call with respect to

17     related to jurisdiction, is I think the heart of the matter,

18     Your Honor, and that's in part why I think that our pleading

19     was 29 pages because there is a very complicated factual

20     history here.

21             My clients are not treated in the same way under

22     the proposed and now vacated plan or confirmed and now

23     vacated plan that every other U.S. Tribe was in the state --

24     - on the United States, that is, and then as Canadian First

25     Nation/Tribe.  You know, if -- I think that if that

Page 47

1    treatment had been the same, would we have gone down this

2    path?  Probably not.  But unfortunately, that's the status

3    of this matter generally, and that is why ultimately this

4    complaint was filed in the U.S. and that is ultimately, I

5    think, the question.  If this Court, you know, even if it

6    finds that this is a necessary evil, if you -- those are my

7    words, not the Court's words -- but even if this Court were

8    to find that the extension of this injunction is a necessary

9    evil, there is still the second problem here, which is

10   ultimately is a necessary evil always appropriate.

11          And I'm not sure that on a balancing here, if

12   you're able to narrowly tailor an order that makes very

13   clear that unless you're talking about a complaint that

14   arises under a non-U.S. statute, that does -- you know, that

15   in a regimen that does not permit indemnity and contribution

16   where the claims are direct for individual acts against the

17   plaintiffs.

18          You know, I think that that's probably a list of

19   plaintiffs or creditors of my clients, that's it.  And

20   that's why we're the only party that has really questioned

21   this injunction over the last two or three years.  So

22   ultimately, Your Honor, I think where I am, and I know that

23   the Court has read the briefing and has been engaged in the

24   argument.  I think where I am at is to the extent of the

25   Court wishes any briefing with respect to Canadian law,

Page 48

1    which obviously I cannot necessarily represent, I'd be happy

2    to submit an affidavit with -- from Canadian counsel with

3    supporting case law and statute with respect to these issues

4    that relate to the relatedness of the matter.

5              THE COURT:  All right --

6              MR. UNDERWOOD: And may --

7              THE COURT:  I understand that.  I mean, I am also

8    struck by the fact that while there are obviously Canadian

9    aspects of the complaint, it's a complaint filed here in New

10   York State Supreme Court.  So it's got the Canadian

11   Competition Act, but it's got a public nuisance, and so --

12   and it was filed in New York State.  So if I need that kind

13   of information, I certainly -- chambers will reach out and

14   let you know.

15             MR. UNDERWOOD:  Thank you, Your Honor. I think

16   simply in concluding, I do believe that this is a complaint

17   that is fundamentally different based upon the law and to do

18   to a degree the facts as they relate to the parties from any

19   other complaints that have been asserted.  I do think it is

20   a close call in terms of relatedness and frankly I think it

21   actually falls on the side of not being related to the

22   Debtor as noted in the pleading.  The Debtors have already

23   established, although they have not produced as far as I

24   know, a document bank.

25             They've responded to similar discovery requests

Page 49

```
 1    dozens of times.  I don't see this as being a major drain on

 2    the Debtor.  Its (audio drops) action against the Debtor.

 3    It is an action against the Sacklers.  These are the same

 4    Sacklers that separately and outside of this bankruptcy --

 5              THE COURT:  I got it.  I got that.  I think we've

 6    covered that extensively in the briefing as well as the

 7    argument.  I got that.

 8              MR. UNDERWOOD:  Okay.

 9              THE COURT:  All right --

10              MR. UNDERWOOD:  Thank you.  I appreciate your time

11    greatly.  thank you, Your Honor.

12              THE COURT:  Thank you very much.  So Mr.

13    Kaminetzky, anything briefly?

14              MR. KAMINETZKY:  Yeah, I could --

15              THE COURT:  I've read the papers and I also

16    appreciate everybody's flexibility.  I realize that once we

17    sort of segue to argument, it seemed to be appropriate to

18    have an argument if we're going to do it.  That Zen saying,

19    if you're going to run, run.  If you're walk, walk.  Above

20    all, don't wobble.  So I appreciate your flexibility and

21    segueing to an argument.  I thought that might happen.  And

22    I -- because the argument is helpful, I get a chance to have

23    a colloquy with folks.  And so I appreciate everybody's

24    flexibility to have the argument now.

25              And so with that, Mr. Kaminetzky.
```

1          MR. KAMINETZKY:  I'll be very brief and I'll be

2     responsive, and to the extent Your Honor doesn't need

3     something, I'm happy to move on.

4          Your Honor began by asking my friend Mr. Underwood

5     what's different about your complaint, and the answer is

6     it's not.  They're seeking money from the Sacklers based on

7     Purdue, the Debtors conduct, not based on Purdue Canada's

8     conduct, period, full stop.

9          That's why the filed here in New York.  So it's

10    exactly the same as everyone else who has sued the Sacklers,

11    the hundreds of other parties including states,

12    municipalities, et cetera, et cetera, that are suing the

13    Sacklers based on Purdue, the Debtors' conduct.  And Mr.

14    Underwood also said well, you know, it's different because

15    it's a different statute.  It's a Canadian statute.  It's

16    the Canadian Unfair Competition Statute.

17         As Your Honor noted, there's two causes of action,

18    unfair competition and public nuisance.  Everyone sues for

19    public nuisance.  Everyone sued for unfair competition.

20    Now, let me read to you a quote and I think maybe this just,

21    you know, could put an end to this.  This is a quote from

22    Maryland's brief in front of Judge McMahon on appeal of the

23    preliminary injunction.  Maryland opposed the -- here's what

24    it said.

25         "Here, however" -- this is again, Maryland

Page 51

```
1    speaking -- "the state's direct claims against the Sacklers
2    stand independently of any claims they may have against the
3    Debtors, and it is not necessary to establish the Debtors'
4    liability as a predicate to establishing the Sacklers or
5    other non-Debtors' liability for violation of state unfair
6    and deceptive trade practices statutes."
7            That's a quote from Maryland.  There's a similar
8    quote from Washington.  Every state has their own deceptive
9    trade practices, unfair competition, and they all asserted
10   that they have direct claims against the Sacklers that are
11   not derivative of the Debtors.  I just quoted one.  So it's
12   exactly -- the fact that, you know, this is Canada versus
13   Washington or Maryland, just doesn't matter.  It's exactly
14   the same theory.
15           Mr. Underwood also said that, you know, in terms
16   of what changed, that there was a settlement with the
17   provinces that Purdue Canada settled with the provinces.
18   Mr. Underwood's clients objected to that settlement in
19   Canada.  Their objection was overruled.  They're upset about
20   it.  They wanted to be cut into the Canadian settlement.
21   The Court there decided otherwise and the settlement between
22   the provinces, you know, which is like the governments of
23   Canada and Purdue Canada should stand and they're upset
24   about that, so they came to New York to sue but that's not
25   our issue.
```

Page 52

1              They also -- you know, Mr. Underwood made

2     reference to his jurisdictional arguments and we talked

3     about this in the papers.  They talk about related to

4     jurisdiction arising in, arising under.  It's all a red

5     herring.  All you need is related to jurisdiction for this

6     preliminary injunction.  That's what Judge Drain found.

7     That's what Judge McMahon found.  They found for related to

8     jurisdiction all you need is a conceivable effect on the

9     Debtors.

10             In our irreparable harm section of our brief

11    before Your Honor on this matter, we list seven harms to the

12    Debtors that'll happen if the preliminary injunction is

13    lifted.  The arising in, arising under is completely

14    irrelevant.  That's only relevant if we were asking Your

15    Honor to enter a final order with respect to the underlying

16    claim that's filed in state court.  We're certainly not

17    asking you to do anything like that.

18             All we're doing is to ask you that you -- to apply

19    the -- to extend the preliminary injunction that's in place

20    for all these cases to this case and all you need there is

21    related to jurisdiction, and that issue has been decided by

22    Judge Drain, affirmed by Judge McMahon, based on the any

23    conceivable effect on the estate.

24             They Mr. Underwood then mentioned the indemnity.

25    He said that, you know, they can't give -- that the Canadian

1    statute is unique somehow because it can't give rise to a

2    contribution or indemnity claim.  First, as we explained in

3    argument, 1.A of our reply brief, irreparable harm that

4    plaintiffs' suit will cause the Debtors and their estates

5    goes far beyond possible indemnification claim.

6            And again, I refer Your Honor to the seven harms

7    that we laid out in our brief when talking about the

8    irreparable harm prong.  So it really has nothing to do

9    whether or not there is indemnification, but we do note and

10   as we noted in our brief, that the issue of whether or not

11   there's indemnification under this Canadian Competition Act

12   statute is not a settled issue in Canada.  We quoted you

13   from an Appellate Court of Canada.  I must say we're not

14   expert in Canada law, but some googling showed that -- and

15   we're quoting from a Canadian case -- "that the issue of

16   identification has not been considered by any Court in

17   Canada."

18           So even if you want to go there to

19   indemnification, the question isn't a settled issue in

20   Canada.  And again, based on the conceivable effects test a

21   litigation about indemnification in Canada would certainly -

22   - under this Canadian statute would certainly have a

23   conceivable effect on the estate.

24           Finally, Mr. Underwood like kind of then ended off

25   by talking about their confirmation objection that they

Page 54

1    objected, that they -- that the Canadian First Nations

2    weren't treated the same as domestic Indian tribes or Native

3    American tribes.  That objection was overruled by Judge

4    Drain and it was affirmed by Judge McMahon that there was a

5    basis to -- I mean, it's almost -- what there is a basis to

6    distinguish.  One is domestic tribes and one is Canadian

7    tribes and Judge McMahon confirmed or affirmed that there is

8    a reasonable basis to distinguish between U.S. and Canadian

9    entities.

10          That's all I have in terms of a reply, Your Honor.

11   If you have any questions, I'm happy to answer them, but I'm

12   not going to kind of like re-argue anything --

13          THE COURT:  No, no --

14          MR. KAMINETZKY:  -- because I think Your Honor --

15          THE COURT:  I think I have enough from all the

16   parties.  So my next question is, what I'm going to do is

17   I'll give you a bench ruling.  I'm not going to do it today,

18   but I will do it fairly soon.  Chambers will be in contact

19   to let folks know when that will be.  And I guess the only

20   question I had is in light of that, if there's anything

21   that's supposed to happen in the New York State case that

22   would impose obligations or -- on the estate that would

23   happen in the next week or two that that we should discuss.

24          MR. KAMINETZKY:  Your Honor, if you could direct

25   that to Mr. Underwood or the Sacklers, my belief is that no

Page 55

 1   one's been served yet, but I don't know that to be true

 2   because we're not in that lawsuit.  You know, one of the

 3   parties in that lawsuit.  We'll have to differ on the

 4   question of any deadlines.  But my latest information is

 5   that no service has occurred.

 6            MR. UNDERWOOD:  As of my latest information, Your

 7   Honor, that is correct and frankly, until there's a decision

 8   that extends the injunction, I think the Sacklers could be

 9   served with the complaint.  Now whether or not it's

10   ultimately enjoined is its own issue.

11            THE COURT:  Well, yes and no, because there will

12   be events that will need to take place once people are

13   served in terms of being in a position to respond to the

14   complaint.  And so, my preference would be to have a

15   decision ready to give you, in all of its bells and whistles

16   at one time, fairly promptly and not have to worry about any

17   imposition on anyone and essentially, to stay the New York

18   State litigation until I can get you that prompt decision.

19            If that's not the case, the alternative would be

20   to tell you what my ruling -- to take a short break, tell

21   you what my ruling is going to be, and then give you a more

22   prompt explanation.  I'm trying to avoid having collateral

23   consequences where folks are forced to run into this Court

24   and say, somebody's just been served.  We have -- we found

25   out we have we have ten days to file an answer and they've

Page 56

1    retained a lawyer and we're now being asked -- and so

2    there's a there's a tremendous possibility for having that

3    kind of a fire drill and I'd like to avoid that.

4            I don't know that it helps anybody and given the -

5    - where we are timewise, I don't know that it makes a whole

6    lot of sense to set ourselves up for a fire drill before

7    we're leaving here today.  So I don't know if anybody has

8    any suggestions or thoughts on that.  So I'll start with you

9    Mr. Underwood.

10           MR. UNDERWOOD:  Your Honor, what I would suggest,

11   because I don't want to see a fire -- there've been enough

12   fire drill in this case and certainly the efforts of all

13   parties, I think in the case have at times been on very

14   short notice.  And so what I'm thinking is I can reach out

15   to my co-counsel, the counsel that actually filed the

16   complaint, and find out the time within which they have to

17   serve the complaint under New York State law.  I think it's

18   fairly liberal standard, and I think we could indicate

19   potentially to the Court that we would abstain from service

20   for a week or two, or more, whatever the Court --

21           THE COURT:  Yeah --

22           MR. UNDERWOOD:  -- rather than --

23           THE COURT:  I think two weeks would be more than

24   enough.  I expect to get back to you promptly.  So again,

25   it's just not -- it's just not fair to any of you to have to

Page 57

1    put that on your list of things to do.  And it also seems to

2    send a signal of, like, well we haven't got a decision so

3    we'll do what we can and before -- it's just wrong on

4    several levels, so I'd like to avoid it if we can.

5         And I'm not asking for somebody to hold off for a

6    period of a month or more months.  A week or two would work

7    and then that way nobody has to put that on their list of

8    things to do to monitor, to respond, and just doesn't make a

9    lot of sense to me under the circumstances.  So what I'd

10   ask, Mr. Underwood, if you would do me the favor of reaching

11   out to your co-counsel or your colleague and find out the

12   circumstances and see if they'll put that off for a week or

13   two, just agree that nobody's going to get served.

14        No action needs to be taken in connection with the

15   New York State litigation.  Nothing will move forward.  And

16   I'll get you -- I'll get you a decision promptly.  We'll

17   reach out and schedule something for a bench ruling.

18        MR. UNDERWOOD:  Your Honor, would you like me to

19   reach out to counsel while we're still within this hearing?

20        THE COURT:  Well, no.  So here's what I would do

21   is if you would report back to chambers and to Mr.

22   Kaminetzky and let us know.  If there's no such agreement, I

23   will probably reach out to you all to do something in the

24   next day or two so that -- because I'll, that's -- my hand

25   will be forced and -- well, I shouldn't say that.  I think

1    it will be appropriate at that point for me to do something

2    to avoid muddying things any further.

3              So I would say, reach out to counsel.  Let him

4    know and then reach out to us to let us know here in

5    chambers and then I'll take it from there, and so Chambers

6    will be in contact one way or the other.  The question will

7    be what the timeframe is, depending on what the answer is

8    that you have for us.

9              MR. UNDERWOOD:  Okay.  Thank you, Your Honor.

10             THE COURT:  All right, thank you.  All right, with

11   that, anything further from the Debtors?

12             MR. KAMINETZKY:  No.  No, Your Honor, thank you.

13             THE COURT:  All right.  Mr. Underwood, anything

14   further from you?

15             MR. UNDERWOOD:  No, Your Honor, and I will be back

16   to the Court shortly.

17             THE COURT:  All right.  I appreciate your

18   willingness to do that.  I know, and again, these issues are

19   very important to your clients.  They're very important to

20   all the claimants here.  Totally understand.  We all know as

21   folks who practice in the law that it can be frustrating as

22   folks wait for answers.  And so that's one of the reasons

23   why Hamlet, when talking about the passage of time, talks

24   about the law's delay.  It's one of the slings and arrows of

25   outrageous fortune.  And so I appreciate, counsel's desires

Page 59

1    to zealously advocate on behalf of their clients.  And I

2    also appreciate your willingness to work the confines of

3    this case to try to be as sensible as possible in addressing

4    these issues.  So thank you to everybody.  So I'll wait to

5    hear and in any event will be in touch fairly promptly, and

6    with that, unless there's anything else, I bid you all a

7    very good afternoon.

8              MR. UNDERWOOD:  Thank you, Your Honor.

9              MR. KAMINETZKY:  Thank you.

10             (Whereupon these proceedings were concluded at

11   12:25 PM)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 60

1                                    I N D E X

2

3                                    RULINGS

4                                                    Page      Line

5    Motion to File Late Claim, GRANTED              13        23

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 61

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  January 27, 2023