DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Eli J. Vonnegut
Christopher S. Robertson

*Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | **Chapter 11** |
| **PURDUE PHARMA L.P.,** *et al.*, | **Case No. 19-23649 (SHL)** |
| **Debtors.**[1] | **(Jointly Administered)** |

**DECLARATION OF TERRENCE RONAN IN SUPPORT OF MOTION OF DEBTORS**
**FOR AUTHORIZATION TO ENTER INTO FUNDING AGREEMENT**

      I, Terrence Ronan, being fully sworn, hereby declare that the following is true to the best

of my knowledge, information and belief:

      1.      I am an Executive Vice President and the Chief Financial Officer of Purdue Pharma

L.P. ("PPLP" and, collectively with each of the other above-captioned debtors, the "Debtors," the

"Company" or "Purdue"). I was employed by Purdue as Vice President of Finance on December

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

1, 2021 and became Executive Vice President and Chief Financial Officer on January 1, 2022. I have over 30 years of finance experience in banking as well as corporate positions at the CSuite level. Most recently I served as Executive Vice President and Chief Financial Officer of Atlantic Power Corporation, a publicly traded independent power producer, from 2012 until its sale in 2021. I am familiar with the day-to-day operations, business and financial affairs of the Debtors.

2.        I submit this declaration (this "**Declaration**") in further support of the *Motion of Debtors for Authorization to Enter into Funding Agreement* (the "**Motion**").[2] I am authorized to submit this Declaration on behalf of the Debtors.

3.        Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by other employees of the Company or my opinion based upon experience, knowledge and information concerning the operations of the Debtors and the pharmaceutical industry as a whole.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.

4.        Naloxone is an opioid antagonist "rescue drug" that can counter the effects of an opioid overdose.  According to the Centers for Disease Control and Prevention, over 80,000 lives were lost to opioid overdoses in 2021.[3] Thousands of overdose deaths could be prevented if individuals, families, first responders and communities had greater access to naloxone. [4]

---

[2] Capitalized terms used and not otherwise defined herein have the meanings ascribed to them in the Motion

[3] Centers for Disease Control and Prevention, *U.S. Overdose Deaths in 2021 Increased Half as Much as in 2020 – But Are Still Up 15%* (May 11, 2022), https://www.cdc.gov/nchs/pressroom/nchs_press_releases/2022/202205.htm.

[4] *See* Centers for Disease Control and Prevention, Featured Topics: *Save Lives Now*, https://www.cdc.gov/drugoverdose/featured-topics/save-lives-now.html.

5.     The American Medical Association, [5] the current [6] and prior [7] United States Surgeons General, and both past[8] and current[9] FDA Commissioners have all called for greater access to naloxone.  In August of 2022, the FDA Commissioner Robert Califf introduced the FDA Overdose Prevention Framework – FDA's "vision to undertake impactful, creative actions to prevent drug overdoses and reduce deaths."  Among other priorities, the framework encourages expanding availability and access to overdose reversal products, including naloxone, by supporting accelerated review of products and exploring over-the-counter access.[10]  In November of 2022, the FDA issued a Federal Register notice that included a preliminary assessment that certain naloxone drug products may be approvable as safe and effective for nonprescription use.[11]  This

---

[5] Letter from James L. Madara, MD, Am. Med. Ass'n, to the Hon. Rahul Gupta, MD, Dir., White House Office of Nat'l Drug Control Policy (Feb. 15, 2022), https://searchlf.ama-assn.org/letter/documentDownload?uri=%2Funstructured%2Fbinary%2Fletter%2FLETTERS%2F2022-2-15-Letter-to-Gupta-re-ONDCP-Naloxone.pdf

[6] Press Briefing, *Excerpts from Dr. Gupta's Remarks at Ceremonial Swearing in at the White House* (Nov. 19, 2021), https://www.whitehouse.gov/ondcp/briefing-room/2021/11/19/excerpts-from-dr-guptas-remarks-at-ceremonial-swearing-in-at-the-white-house.

[7] *U.S. Surgeon General's Advisory on Naloxone and Opioid Overdose*, HHS.gov, https://www.hhs.gov/surgeongeneral/reports-and-publications/addiction-and-substance-misuse/advisory-on-naloxone/index.html.

[8] U.S. Food & Drug Admin., FDA Statement, Statement from FDA Commissioner Scott Gottlieb, M.D., on unprecedented new efforts to support development of over-the-counter naloxone to help reduce opioid overdose deaths (Jan. 17, 2019), https://www.fda.gov/news-events/press-announcements/statement-fda-commissioner-scott-gottlieb-md-unprecedented-new-efforts-support-development-over; U.S. Food & Drug Admin., FDA Statement, Statement on continued efforts to increase availability of all forms of naloxone to help reduce opioid overdose deaths (Sept. 20, 2019), https://www.fda.gov/news-events/press-announcements/statement-continued-efforts-increase-availability-all-forms-naloxone-help-reduce-opioid-overdose.

[9] U.S. Food & Drug Admin., *Remarks by FDA Commissioner Robert Califf to the 2022 Rx and Illicit Drug Summit* (Apr. 20, 2022), https://www.fda.gov/news-events/speeches-fda-officials/remarks-fda-commissioner-robert-califf-2022-rx-and-illicit-drug-summit-04202022.

[10] FDA News Release, Robert M. Califf, M.D., Comm'r of Food and Drugs, *FDA's Overdose Prevention Framework Aims to Prevent Drug Overdoses and Reduce Death* (Aug. 30, 2022), https://www.fda.gov/news-events/fda-voices/fdas-overdose-prevention-framework-aims-prevent-drug-overdoses-and-reduce-death..

[11] *E.g.*, FDA News Release, *FDA Announces Preliminary Assessment that Certain Naloxone Products Have the Potential to be Safe and Effective for Over-the-Counter Use* (Nov. 15, 2022), https://www.fda.gov/news-
(….continued)

unprecedented step by the FDA was intended by the agency to "facilitate development and approval of nonprescription naloxone products."[12]  Just this month, the FDA issued a public update on its significant efforts to widen naloxone access.[13]

6.      HRT is a non-stock Maryland tax exempt 501(c)(3) pharmaceutical company founded in 2017 whose mission is to prevent opioid overdose deaths by making easy-to-use, low-cost naloxone available over the counter. HRT's management team has a long and successful history transitioning prescription medications to OTC. Members of the management team have helped develop OTC versions of products such as Nicorette®, Plan B®, Nasacort® Allergy, NicoDerm® CQ®, Prilosec OTC® and Allegra®, among others. Members of the team also have deep expertise in addiction research and substance abuse treatment.

7.      In June of 2020 and again in March of 2022, the Debtors received Court approval to fund HRT's development of its life-saving product (brand name RiVive™), in an aggregate amount of $17.5 million, subject to HRT achieving a series of milestones.[14]  With this support, HRT was able to, among other things, successfully execute a clinical trial showing that RiVive is absorbed as quickly as the FDA reference product, engage a contract manufacturer to produce the product, and complete other stability and reliability studies and reports required for its New Drug Application ("**NDA**"), and submit the NDA for RiVive to the FDA.  The FDA accepted the

---

events/press-announcements/fda-announces-preliminary-assessment-certain-naloxone-products-have-potential-be-safe-and-effective.

[12] *Id.*

[13] Marta Sokolowska, Ph.D., CDER Deputy Ctr. Dir., U.S. Food & Drug Admin., *From Our Perspective, CDER's Continued Efforts to Widen Naloxone Access* (Feb. 2, 2023), https://www.fda.gov/drugs/news-events-human-drugs/our-perspective-cders-continued-efforts-widen-naloxone-access?utm_medium=email&utm_source=govdelivery.

[14] 2020 HRT Order; 2022 HRT Order.

NDA in December of 2022 and granted it Priority Review status, accelerating the FDA review

process from 10 to 6 months.  HRT expects a decision from the FDA regarding the review of the

RiVive NDA by the end of July 2023.[15]  With third-party financial support, HRT believes that

RiVive can be available for distribution and commercial sale in early 2024.

8.    The Debtors believe that RiVive will serve an important role in treating opioid

overdoses for years to come.  There have been significant developments in the OTC naloxone

landscape over the past twelve months.  In December of 2022, Emergent BioSolutions

announced FDA acceptance of a supplemental New Drug Application to switch its prescription

nasal spray product, Narcan®, to over-the-counter status after seven years on the market.  On

February 15th, a joint panel of two FDA advisory committees voted unanimously to recommend

Narcan's approval for over-the-counter status, with committee members forcefully underscoring

the necessity of the treatment's broad availability.[16]  The FDA is expected to issue its decision

with respect to this application by the end of March.[17]  Once OTC Narcan is approved, it is

expected that the existing prescription generic versions will also switch to over the counter.  In

addition, one company, Pocket Naloxone, intends to submit a New Drug Application in the first

---

[15] Timing of FDA approval subject to FDA process and discretion.

[16] Press Release, *Emergent BioSolutions Reports FDA Advisory Committees' Unanimous Vote in Favor of NARCAN® (naloxone HCl) Nasal Spray for Over-the-Counter Use* (Feb. 15, 2023), https://investors.emergentbiosolutions.com/news-releases/news-release-details/emergent-biosolutions-reports-fda-advisory-committees-unanimous; U.S. Food & Drug Admin., *Joint Meeting of the NDAC and the AADPAC*, YouTube (Feb. 15, 2023), https://www.youtube.com/watch?v=QTFU0wHVotM, ("For the sake of the public and saving lives, I believe this medication should be available over the counter to the public as soon as possible.") ("The evidence is compelling that the benefits [of over-the-counter status] clearly outweigh the risks; the urgency [of approval] is paramount.") ("This is a huge public health benefit that is way overdue.").

[17] Press Release, *Emergent BioSolutions Announces U.S. FDA Acceptance and Priority Review of Supplemental New Drug Application for Over-the-Counter NARCAN® (naloxone HCl) Nasal Spray* (Dec. 6, 2022), https://investors.emergentbiosolutions.com/news-releases/news-release-details/emergent-biosolutions-announces-us-fda-acceptance-and-priority.

half of this year for an intranasal swab product, though the path to FDA approval (including

over-the-counter status) is potentially more complex than for nasal spray formulations.

9.      These recent developments should save thousands of lives.  But the availability of

an OTC version of Narcan (and generic equivalents) or a new delivery mechanism should not

obviate the need for RiVive, as RiVive will be differentiated by price, which in turn increases

access to this life-saving drug.  Because HRT is a tax-exempt 501(c)(3) company, it should be

able to offer its product at a lower price than for-profit products, including generics.  The price of

naloxone nasal spray devices remains high: a twin-pack of Narcan retails for approximately

$125, and the price of generic formulations remains approximately 86% that of the branded

product.[18] In addition, HRT intends to prioritize distribution to those that have the greatest

impact on saving lives with naloxone, including harm reduction centers and Departments of

Health.  These organizations are also those that tend to be the most cost-sensitive.

10.     By their motion, the Debtors are seeking approval to enter into and perform under

the 2023 HRT Agreement, pursuant to which the Debtors would provide up to an additional $9

million of funding to enable HRT to prepare for production, marketing and distribution of

RiVive. More specifically, HRT requires additional funding in order to conduct ongoing stability

and reliability studies to support commercial shelf-life, pay certain manufacturing site readiness

fees, purchase intranasal devices and vials, and satisfy third-party service provider, labor, and

marketing and sales development expenses.  The Debtors' commitments would be subject to

HRT satisfying two milestones.  The initial $5 million would be due upon the issuance of

binding purchase orders for the intranasal delivery devices to cover the second half of first-year

---

[18] Wholesale Acquisition Cost quoted by AnalySource®.

product quantities for RiVive, with the remaining $4 million due upon commencement of manufacturing of the RiVive product by HRT's contract manufacturer for subsequent distribution and commercial sale.  Without the Debtors' support, there can be no guarantee when – or if – HRT will be able to bring RiVive to market.  Furthermore, support for OTC naloxone is one of three key initiatives (the "Public Health Initiatives" or "PHI") that the Debtors are pursuing to advance meaningful solutions to the opioid crisis.[19]  The Debtors believe that the Public Health Initiatives will provide billions of dollars of value to the American public.[20]

11.     Since September of 2018, the Debtors have continued to provide modest but vital financial support to HRT in an effort to advance meaningful solutions to the opioid crisis. Purdue made its initial decision to fund HRT, and its later decisions to provide additional funding, after careful evaluation of, among other things, the critical need for OTC naloxone, the close fit between HRT's and Purdue's PHI goals, detailed supporting budgets and development timelines, Purdue's own financial position, and HRT's capabilities and prospects of success.  Before making each additional contribution to HRT, Purdue carefully evaluated HRT's progress toward bringing OTC naloxone to market, and how Purdue's contribution would allow HRT to achieve concrete milestones on the path to that goal.  The Debtors' sophistication in pharmaceutical development also informed their assessment of HRT's funding proposals and the structure of the resulting funding agreements.

---

[19] The other two principal Public Health Initiatives are the development of emergency opioid overdose treatments containing the opioid antagonist nalmefene and the development and distribution of a generic version of Suboxone® tablets, a leading opioid addiction treatment consisting of a combination of buprenorphine and naloxone.  The Debtors obtained FDA approval for a vial form of nalmefene on February 8, 2022, and approval for their generic Suboxone in 2020.

[20] E.g., Press Release, *Purdue Pharma L.P. Files Broadly Supported Plan of Reorganization* (Mar. 16, 2021), https://www.purduepharma.com/news/2021/03/16/purdue-pharma-l-p-files-broadly-supported-plan-of-reorganization/.

12.    The Debtors believe that approval of the Motion will materially advance HRT's efforts to get FDA approved, lower-cost OTC naloxone into the market. As was the case under the Prior HRT Agreements, the amount requested is based on a detailed budget and timeline, and the Debtors' obligation to make future milestone payments under the 2023 HRT Agreement is contingent on HRT achieving appropriate milestones. The Milestone Events and associated Milestone Payments are:

| Milestone Event | Milestone Payment | Expected Milestone Achievement/ Expected Payment Date |
|---|---|---|
| Issuance of binding purchase order to AptarGroup, Inc. for devices to cover second half of first year Product quantities for subsequent distribution and commercial sale. | $5,000,000 | Targeted completion date: March 15, 2023<br><br>Targeted Payment Due Date: April 1, 2023 (Within ten (10) days after HRT delivers a written notice to PPLP that the applicable milestone has been met) |
| Start of manufacturing of Product at Catalent Pharma Solutions, LLC for subsequent distribution and commercial sale. | $4,000,000 | Targeted completion date: June 19, 2023<br><br>Targeted Payment Due Date: July 1, 2023 (Within ten (10) days after HRT delivers a written notice to PPLP that the applicable milestone has been met) |

13.    The timing and amount of the Milestone Payments are structured such that the amount of each Milestone Payment is sufficient only to bridge HRT to the next Milestone Event. HRT does not maintain a sufficient amount of excess cash or a line of credit that could provide a cushion in the event that the Debtors do not or cannot make an anticipated Milestone Payment.

14.    The Debtors remain the only source of funding for HRT to date. The 2023 HRT Agreement and the Prior HRT Agreements require HRT to "use commercially reasonable efforts (taking into account the applicable global and local economic, health/pandemic and market conditions, as well as availability of funding) to obtain funding from third parties . . ."

8

However, despite HRT's ongoing efforts, the Debtors understand that no alternative funding has been made available.

15.     The Debtors believe that a delay in preparation for commercial launch at this time for lack of third-party financial support would only serve to seriously undermine HRT's credibility as a company ready to launch its products, dramatically decrease its fundraising capability, and indefinitely delay access to lower-cost, OTC naloxone for the people who need it most urgently.

16.     The Debtors' Board of Directors approved the Debtors' entry into the 2023 HRT Agreement.

17.     The negotiation of the terms of the Agreement was conducted at arm's length.

18.     Upon the Debtors' careful consideration of the 2023 HRT Agreement, including the benefits and risks attendant thereto, I believe that the relief requested in the Motion is in the best interests of all stakeholders in these Chapter 11 Cases.

Dated:   February 28, 2023
         New York, New York

By:   */s/ Terrence Ronan*
      Terrence Ronan
      Executive Vice President and
      Chief Financial Officer
      Purdue Pharma L.P.

### Appendix I

1. Centers for Disease Control and Prevention, *U.S. Overdose Deaths in 2021 Increased Half as Much as in 2020 – But Are Still Up 15%* (May 11, 2022), https://www.cdc.gov/nchs/pressroom/nchs_press_releases/2022/202205.htm.

2. Centers for Disease Control and Prevention, Featured Topics: Save Lives Now, https://www.cdc.gov/drugoverdose/featured-topics/save-lives-now.html.

3. Letter from James L. Madara, MD, Am. Med. Ass'n, to the Hon. Rahul Gupta, MD, Dir., White House Office of Nat'l Drug Control Policy (Feb. 15, 2022), https://searchlf.ama-assn.org/letter/documentDownload?uri=%2Funstructured%2Fbinary%2Fletter%2FLETTERS%2F2022-2-15-Letter-to-Gupta-re-ONDCP-Naloxone.pdf.

4. Press Briefing, *Excerpts from Dr. Gupta's Remarks at Ceremonial Swearing in at the White House* (Nov. 19, 2021), https://www.whitehouse.gov/ondcp/briefing-room/2021/11/19/excerpts-from-dr-guptas-remarks-at-ceremonial-swearing-in-at-the-white-house.

5. *U.S. Surgeon General's Advisory on Naloxone and Opioid Overdose*, HHS.gov, https://www.hhs.gov/surgeongeneral/reports-and-publications/addiction-and-substance-misuse/advisory-on-naloxone/index.html.

6. U.S. Food & Drug Admin., FDA Statement, Statement from FDA Commissioner Scott Gottlieb, M.D., on unprecedented new efforts to support development of over-the-counter naloxone to help reduce opioid overdose deaths (Jan. 17, 2019), https://www.fda.gov/news-events/press-announcements/statement-fda-commissioner-scott-gottlieb-md-unprecedented-new-efforts-support-development-over.

7. U.S. Food & Drug Admin., FDA Statement, Statement on continued efforts to increase availability of all forms of naloxone to help reduce opioid overdose deaths (Sept. 20, 2019), https://www.fda.gov/news-events/press-announcements/statement-continued-efforts-increase-availability-all-forms-naloxone-help-reduce-opioid-overdose.

8. U.S. Food & Drug Admin., *Remarks by FDA Commissioner Robert Califf to the 2022 Rx and Illicit Drug Summit* (Apr. 20, 2022), https://www.fda.gov/news-events/speeches-fda-officials/remarks-fda-commissioner-robert-califf-2022-rx-and-illicit-drug-summit-04202022.

9. FDA News Release, Robert M. Califf, M.D.,  Comm'r of Food and Drugs, *FDA's Overdose Prevention Framework Aims to Prevent Drug Overdoses and Reduce Death* (Aug. 30, 2022), https://www.fda.gov/news-events/fda-voices/fdas-overdose-prevention-framework-aims-prevent-drug-overdoses-and-reduce-death.

10. FDA News Release, *FDA Announces Preliminary Assessment that Certain Naloxone Products Have the Potential to be Safe and Effective for Over-the-Counter Use* (Nov. 15,

2022), https://www.fda.gov/news-events/press-announcements/fda-announces-preliminary-assessment-certain-naloxone-products-have-potential-be-safe-and-effective.

11. Marta Sokolowska, Ph.D., CDER Deputy Ctr. Dir., U.S. Food & Drug Admin., *From Our Perspective, CDER's Continued Efforts to Widen Naloxone Access* (Feb. 2, 2023), https://www.fda.gov/drugs/news-events-human-drugs/our-perspective-cders-continued-efforts-widen-naloxone-access?utm_medium=email&utm_source=govdelivery.

12. Press Release, *Emergent BioSolutions Reports FDA Advisory Committees' Unanimous Vote in Favor of NARCAN® (naloxone HCl) Nasal Spray for Over-the-Counter Use* (Feb. 15, 2023), https://investors.emergentbiosolutions.com/news-releases/news-release-details/emergent-biosolutions-reports-fda-advisory-committees-unanimous.

13. Press Release, *Emergent BioSolutions Announces U.S. FDA Acceptance and Priority Review of Supplemental New Drug Application for Over-the-Counter NARCAN® (naloxone HCl) Nasal Spray* (Dec. 6, 2022), https://investors.emergentbiosolutions.com/news-releases/news-release-details/emergent-biosolutions-announces-us-fda-acceptance-and-priority.

14. Press Release, *Purdue Pharma L.P. Files Broadly Supported Plan of Reorganization* (Mar. 16, 2021), https://www.purduepharma.com/news/2021/03/16/purdue-pharma-l-p-files-broadly-supported-plan-of-reorganization/.

**Appendix I-1**

 **Centers for Disease Control and Prevention**



National Center for Health Statistics

# U.S. Overdose Deaths In 2021 Increased Half as Much as in 2020 – But Are Still Up 15%

## For Immediate Release: May 11, 2022

**Contact:** CDC, National Center for Health Statistics, Office of Communication (301) 458-4800
**E-mail:** paoquery@cdc.gov

Provisional data from CDC's National Center for Health Statistics indicate there were an estimated 107,622 drug overdose deaths in the United States during 2021, an increase of nearly 15% from the 93,655 deaths estimated in 2020. The 2021 increase was half of what it was a year ago, when overdose deaths rose 30% from 2019 to 2020.

The data is featured in an interactive web data visualization. The 2021 data presented in this visualization are provisional – they are incomplete and subject to change.

The new data show overdose deaths involving opioids increased from an estimated 70,029 in 2020 to 80,816 in 2021. Overdose deaths from synthetic opioids (primarily fentanyl), psychostimulants such as methamphetamine, and cocaine also continued to increase in 2021 compared to 2020.

The biggest percentage increase in overdose deaths in 2021 occurred in Alaska, where deaths were up 75.3%, while overdose deaths in Wyoming did not increase at all in 2021 and deaths in Hawaii declined 1.8% from the same point in 2020. The visualization includes:

- Reported and predicted (estimated) provisional counts of deaths due to drug overdose occurring nationally and in each jurisdiction.
- U.S. map of the percentage changes in provisional drug overdose deaths for the 12-month period ending in December 2021 compared with the 12-month period ending in December 2020, by jurisdiction.
- Reported and predicted provisional counts of drug overdose deaths involving specific drugs or drug classes occurring nationally and in selected jurisdictions.

NCHS releases both reported and predicted provisional drug overdose death counts each month. They represent the numbers of these deaths due to drug overdose occurring in the 12-month periods ending in the month indicated. These counts include all seasons of the year and are insensitive to variations by seasonality. Deaths are reported by the jurisdiction in which the death occurred.

| DRUG TYPE | (DEATHS 2021) | (DEATHS 2020) |
|---|---|---|
| Synthetic Opioids (fentanyl) | 71,238 | 57,834 |
| Psychostimulants (meth) | 32,856 | 24,576 |
| Cocaine | 24,538 | 19,927 |
| Natural/semi-synthetic (prescription) | 13,503 | 13,722 |

Page last reviewed: May 11, 2022

**Appendix I-2**

 Drug Overdose 

Centers for Disease
Control and Prevention

## Drug Overdose

Drug Overdose Home

# Save Lives Now

Overdose Deaths Have Increased During COVID-19

The worsening of the drug overdose epidemic, along with the impact of COVID-19 prevention protocols, such as social distancing and quarantine, makes it more difficult for public health agencies and social services to treat those most at risk of overdose. Urgent actions for innovative strategies within the public health community are required to facilitate continued access to treatment.



## Drug Overdose Deaths Increased During the COVID-19 Pandemic

Preliminary data indicates that the increases in drug overdose deaths appear to have accelerated during the COVID-19 pandemic.

*By the Numbers*

- Preliminary data show that 81,230 overdose deaths occurred in the United States from June 2019 through May 2020, the highest number of overdose deaths ever recorded in a 12-month period.
- Synthetic opioids (likely illicitly manufactured fentanyl) appear to be the primary driver of the increases in overdose deaths.
- Overdose deaths involving cocaine increased by 26.5 percent. These deaths are likely linked to co-use of cocaine with illicitly manufactured fentanyl or heroin.
- Overdose deaths involving psychostimulants, such as methamphetamine, increased by 34.8 percent.

## Preventing overdoses and deaths is critical

Medical and public health professionals, first responders, harm reduction organizations, and other community partners each have a critical role to play in overdose prevention. As the overdose epidemic continues to evolve, expand, and accelerate, the following are critical to preventing overdoses and deaths from overdose:

- Naloxone, which can reverse an opioid overdose, if administered in time
- Early detection of overdose outbreaks in communities
- Early interventions for people who are at highest risk for overdose
- Expand prevention and response activities

### Health Alert Network (HAN) Advisory

CDC issued a HAN advisory to alert public health departments, healthcare professionals, first responders, harm reduction organizations, laboratories, and medical examiners and coroners to:

- Substantial increases in drug overdose deaths across the United States
- A concerning acceleration of the increase in drug overdose deaths

- Changing geographic distribution of overdose deaths involving synthetic opioids
- Significant increases in overdose deaths involving psychostimulants, such as methamphetamine
- Recommendations for communities when responding to the evolving overdose crisis

# Frontline Workers Saving Lives

Preventing overdose deaths starts with getting information about life-saving actions to people who provide services to populations at high risk of overdose.

The need for essential services for those most at risk of overdose and the need to expand prevention and response activities such as:



- Increase the amount of naloxone on hand
- Take steps to reduce the risk of COVID-19 exposure when responding to a suspected drug overdose and administering naloxone  [PDF] 
- Promote treatment engagement through the utilization of peer recovery support specialists in post-overdose outreach and follow-up

Public health departments can:

- Raise awareness about the critical need for bystanders to have naloxone on hand and use it during an overdose  [PDF] 
- Provide messaging to community groups about the changing drug supply and risks for overdose
- Link people who are at risk for overdose with care and track their retention in care programs
- Monitor trends in drugs and overdoses, using local, state, and federal data systems

Healthcare providers can:

- Talk to patients about the changing illicit drug supply and risks for overdose
- Prescribe naloxone to individuals at risk for overdose or those with a history of opioid use disorder (OUD)
- Provide medications for opioid use disorder (MOUD) or treatment for Stimulant (cocaine, methamphetamine) use disorder
- Provide active referral-to-treatment options and recovery support services
- Expand locations in which overdose prevention education and take-home naloxone are provided

Harm reduction organizations can:

- Increase overdose prevention education to people who use drugs, their friends, and others likely to witness or experience an overdose
- Prioritize naloxone distribution to people who use drugs following periods of abstinence and during transitions where opioid tolerance may have waned
- Implement public health-based drug checking services and drug supply surveillance in line with applicable state and local laws
- Partner with public safety and public health to obtain and disseminate the latest information on local drug supply and overdose trends

Expanding Access to Treatment for Substance Use Disorders

## Opioid Use Disorder

During the COVID-19 public health emergency, the Federal Government has made it easier to obtain medications for opioid use disorder (MOUD) through telehealth. Treatment with FDA-approved medications methadone, buprenorphine, or naltrexone are lifesaving and the most effective forms of treatment for opioid use disorder. SAMHSA's Buprenorphine Practitioner Locator can help identify a qualified practitioner who can prescribe buprenorphine.

## Stimulant Use Disorder

There are no FDA-approved medications to treat stimulant use disorders. The most effective treatments for stimulant use disorders are psychosocial therapies. For additional information about treatment strategies, see SAMHSA's Treatment for Stimulant Use Disorders .

SAMHSA's National Helpline is a great resource to share with someone who may have a substance use disorder. Call **1-800-662-HELP (4537)**.

Supporting States and Communities in Prevention

The following activities are in line with CDC commitment to prevent overdose. CDC is committed to preventing overdoses. CDC launched a multiyear cooperative agreement, Overdose Data to Action (OD2A) in 2019 with 66 recipients comprising state, territorial, county, and city health departments. OD2A supports recipients in collecting timely and complete data on drug overdoses and using those data to inform prevention and public health response efforts. Learn more about CDC's response to the opioid overdose epidemic and strategies to prevent drug overdose.

## More Information and Resources

- Save Lives by Safely Managing Chronic Pain – Future of Personal Health
- Alcohol and Substance Use During COVID-19
- CDC Fatal Drug Overdose Health Advisory Network (HAN) Alert
- COVID-19 Questions and Answers: For People Who Use Drugs or Have Substance Use Disorder
- Drug Overdose Epidemic: Putting Data to Action
- Drug Overdose
- Communities Are Leading the Way to Prevent Youth Substance Use
- Evidence-Based Strategies for Preventing Opioid Overdose: What's Working in the United States
- Opioid Overdose Prevention Saves Lives

Last Reviewed: May 11, 2021

**Appendix I-3**

v



**James L. Madara, MD**
CEO, EXECUTIVE VICE PRESIDENT

james.madara@ama-assn.org

February 15, 2022


The Honorable Rahul Gupta, MD
Director
White House Office of National Drug Control Policy
1800 G Street, NW
Washington, DC  20503

Dear Director Gupta:

On behalf of the American Medical Association (AMA) and our physician and medical student members, I am writing to urge your support to help increase the availability of naloxone in the nation's pharmacies and in the community at-large. The AMA greatly appreciates that the Office of National Drug Control Policy (ONDCP) already has made increasing access to naloxone a high priority to save lives from an opioid-related overdose. We believe that additional steps are necessary, however, to ensure this life-saving medication is more widely available. Specifically, the AMA strongly encourages action to remove the prescription status of naloxone to make it more available over the counter (OTC) and for purchase and distribution by harm reduction organizations. We strongly support comments recently made by Department of Health and Human Services (HHS) Secretary Xavier Becerra in December that HHS is considering how to make naloxone available OTC. We offer several suggestions below.

The nation's drug overdose epidemic killed more than 100,000 Americans in the last year, according to the U.S. Centers for Disease Control and Prevention (CDC). The CDC, ONDCP, and many others understand that the dangers of illicitly manufactured fentanyl, combined with increasing polysubstance use, make the epidemic more deadly than ever, particularly during the ongoing COVID-19 pandemic. If not for naloxone, tens of thousands of additional Americans would likely have died, which is why we need to remove all barriers to naloxone. We agree with the CDC that "naloxone saves lives—but only if it's readily available when an overdose occurs." **The AMA urges removing the prescription status of naloxone as an essential step to save lives from opioid-related overdose because it will help make naloxone more readily available to patients everywhere.**

Removing the prescription status of naloxone was addressed by the U.S. Food and Drug Administration (FDA) back in 2017. The Deputy Director in the Division of Nonprescription Drug Products said that the final piece the FDA needed for OTC status for naloxone was an application from manufacturers. **The FDA has taken unprecedented steps to develop a model drug facts label, use instructions, and has evaluated the efficacy of those instructions, clearly stating: "We conclude that the results of this study are acceptable to support use of the tested naloxone DFL in the OTC setting."** As the overdose epidemic has worsened, given the FDA's clear guidance there is no moral, medical, or safety-related reason for these life-saving overdose reversal agents to remain locked under prescription regulations.

The AMA has done everything we can to encourage naloxone manufacturers to take additional actions to increase access to low- or no-cost naloxone. Some manufacturers have provided discounts to states or municipalities for their life-saving products. Some manufacturers have given limited amounts of their products to harm reduction organizations for free. These efforts have helped, but they are not enough. The AMA has tried repeatedly to urge naloxone manufacturers to further reduce costs and take actions more consistent with the needs of the drug overdose epidemic, but manufacturers claim they are doing all they can do. The AMA has encouraged manufacturers to submit the necessary application to make naloxone OTC, but they have consistently declined.

The Honorable Rahul Gupta, MD
February 15, 2022
Page 2

A few months ago, we renewed our call for OTC status to manufacturers, including Emergent BioSolutions and Teva (makers of a nasal spray application), and Hikma Pharmaceuticals (makers of a branded nasal application and generic intramuscular (IM) application). A copy of our letter can be found here. In response, some manufacturers claim naloxone is not safe for OTC status. Others claim that their price discounts are sufficient. Some manufacturers have not responded to the AMA at all. We have tried everything we can, but manufacturers need more than the nation's physicians' encouragement—they need your specific urging and advocacy to remove the prescription status of naloxone. That is what the nature of this epidemic needs, and we are confident that your leadership can help us reach that life-saving result.

In addition to manufacturers' intransigence, there are additional barriers facing patients being able to access naloxone behind the counter. These include the high cost for those without health insurance, hesitance to dispense naloxone to a person at risk of overdose, and "persistent stigma" surrounding naloxone, according to public health researchers. This is despite physicians' increased prescribing of naloxone, support for OTC naloxone from the American Pharmacists Association, and pharmacy chains' public support for standing orders. Other barriers include largely absent prominent pharmacy signage promoting naloxone availability, stigma and time pressures that serve as a barrier for some pharmacists, and lack of public education about standing orders.

It is also important to note that removing prescription status does not mean that health insurance plans have to stop providing coverage for naloxone. Under the Affordable Care Act, OTC aspirin and certain contraceptives are covered by insurance. Coverage for OTC naloxone could be achieved through legislation, if necessary. It would be better, however, if decisions to continue access to affordable naloxone as a covered benefit were made among employers and payers and pharmacy benefit managers. The AMA will continue to advocate for such coverage as part of a comprehensive strategy to broaden access to naloxone. We further urge all federal programs to continue to provide naloxone via Medicare, Medicaid, the Veterans Health Administration, and the Federal Employees Health Benefits Program. The nation needs this combined strategy of providing naloxone through multiple access points.

In addition to all payers continuing to provide naloxone as a covered benefit, the AMA urges all employers to make sure this occurs because we want to ensure that every person who would benefit from naloxone has access to this life-saving medication for themselves, a family member or friend, or a person whom they might encounter in the community. Removing prescription status simply adds access points for those who may not want to use their insurance and/or ask their pharmacist or physician. **At this point in the nation's overdose epidemic, we must remove all potential barriers to naloxone.**

In sum, the AMA asks your support to: (1) take all necessary steps to make naloxone available and remove its prescription status; and (2) continue the ONDCP's efforts to ensure naloxone is available and affordable for all persons regardless of insurance status and to community-based organizations that expand naloxone access in the communities where it is most needed.

Thank you for your consideration. If you have any questions, please contact Sandy Marks in our Federal Affairs unit at sandy.marks@ama-assn.org or 202-789-4585.

Sincerely,

James L. Madara, MD

**<u>Appendix I-4</u>**

NOVEMBER 19, 2021

# Excerpts from Dr. Gupta's Remarks at Ceremonial Swearing in at the White House

**WASHINGTON, D.C.**— Yesterday, Dr. Rahul Gupta attended a ceremonial swearing in at the White House. He is the first-ever physician to serve as Director of the White House Office of National Drug Control Policy (ONDCP). Earlier in the day, Dr. Gupta visited Mary's Center, a community-based treatment center in Washington, D.C. to meet with providers and patients to hear about the center's evidence-based treatment and harm reduction services, including Medication for Opioid Use Disorder (MOUD) and naloxone, and discuss ways the Biden-Harris Administration is working to remove barriers to life-saving treatment for communities across the country.

**Excerpts from Dr. Gupta's remarks during the ceremony at the White House:**

I've been a practicing primary care physician for more than 25 years – I've served in towns as small as 1,900 residents and cities as large as 25 million. I was the Health Commissioner for West Virginia under two governors, and I've seen firsthand the heartbreak of the overdose epidemic. I've learned that an overdose is a cry for help, and for far too many people, that cry goes unanswered.

I've witnessed the challenges that people, providers, and communities face in responding to addiction and overdoses. And at the same time, I've seen how public safety and public health leaders can work together to develop strategies that save lives...and how evidence and data are critical to developing and implementing effective policy.  And I commit to you that during my tenure, the Administration's drug policies will continue to be based on the best evidence and data available to us.

We will continue the work underway to expand access to high-quality, evidence-based prevention, harm reduction, treatment, and recovery supports while also reducing the supply of harmful substances in our communities. Our work will be centered on supporting the people affected by this epidemic – the victims and their families, and those who currently have a substance use disorder and need care.

My focus at the beginning will include four specific areas that align with the Administration's drug policy priorities:

First: Making sure that naloxone is available at every overdose incident... I firmly believe that no one should die of an overdose simply because they didn't have access to naloxone. But sadly, today, that is happening across the country and access to naloxone depends a great deal on your zip code. To help reduce these deadly disparities, yesterday, ONDCP announced a new model law for state policymakers to consider that would ensure all states have consistent policies on naloxone.

Next: Scaling up treatment so our capacity meets the needs of everyone seeking care. Too many people seeking care are not able to access it today, despite the progress we have made in the last decade. We need more providers who are ready to support people with substance use disorder on their path to recovery.

Third: Getting more timely, actionable data to guide our overdose response strategies. Our policies are based on evidence and data, but as we've seen with the COVID pandemic, the timeliness and accuracy of data are critical... I will work closely with our interagency partners to do everything we can to improve this so we can make informed policy decisions that will help us save lives.

And finally: Cracking down on illicit finance... Drug trafficking organizations exploit the finance system to move illicit profits and support their operations. We must prioritize dismantling these financial resources in order to weaken their capabilities and reduce the supply of illicit drugs entering our country.

These elements of the Biden-Harris drug policy priorities are critical to reducing the number of overdose deaths as soon as possible while also strengthening our nation's addiction infrastructure

As the first physician to lead this office, I know that we must build a better addiction infrastructure, centered on individuals, families, and bringing communities together...from public health to law enforcement to faith-based organizations and the private sector, so we can meet people where they are and save lives.

I said earlier that an overdose is a cry for help. The Biden-Harris Administration is working to make sure these cries are heard...and answered.

###

**<u>Appendix I-5</u>**

# HHS.gov
**Office of the Surgeon General**

U.S. Department of Health & Human Services

HHS > Surgeon General Home > Reports and Publications > Addiction and Substance Misuse > U.S. Surgeon General's Advisory on Naloxone and Opioid Overdose

# U.S. Surgeon General's Advisory on Naloxone and Opioid Overdose

*I, Surgeon General of the United States Public Health Service, VADM Jerome Adams, am emphasizing the importance of the overdose-reversing drug naloxone. For patients currently taking high doses of opioids as prescribed for pain, individuals misusing prescription opioids, individuals using illicit opioids such as heroin or fentanyl, health care practitioners, family and friends of people who have an opioid use disorder, and community members who come into contact with people at risk for opioid overdose, **knowing how to use naloxone and keeping it within reach can save a life.***

**BE PREPARED. GET NALOXONE. SAVE A LIFE.**



## The Opioid Epidemic

Over the past 15 years, individuals, families, and communities across our Nation have been tragically affected by the opioid epidemic, with the number of overdose deaths from prescription and illicit opioids doubling from 21,089 in 2010 to 42,249 in 2016.[1] (#ftn1) This steep increase is attributed to the rapid proliferation of illicitly made fentanyl and other highly potent synthetic opioids. These highly potent opioids are being mixed with heroin, sold alone as super-potent heroin, pressed into counterfeit tablets to look like commonly misused prescription opioids or sedatives (e.g., Xanax), and being mixed (often unknowingly) with other illicit drugs like cocaine or methamphetamine. The resulting unpredictability in illegal drug products is dramatically increasing the risk of a fatal overdose. Another contributing factor to the rise in opioid overdose deaths is an increasing number of individuals receiving higher doses of prescription opioids for long-term management of chronic pain. Even when taking their pain medications as prescribed, these patients are at increased risk of accidental overdose as well as drug-alcohol or drug-drug interactions with sedating medications, such as benzodiazepines (anxiety or sleep medications).

## The Overdose-Reversing Drug Naloxone

Naloxone is an opioid antagonist that is used to temporarily reverse the effects of an opioid overdose, namely slowed or stopped breathing. Expanding the awareness and availability of this medication is a key part of the public health response to the opioid epidemic. Naloxone is a safe antidote to a suspected overdose and, when given in time, can save a life. Research shows that when naloxone and overdose education are available to community members, overdose deaths decrease in those communities.[2] (#ftn2)

Therefore, increasing the availability and targeted distribution of naloxone is a critical component of our efforts to reduce opioid-related overdose deaths and, when combined with the availability of effective treatment, to ending the opioid epidemic. In most states, people who are or who know someone at risk for opioid overdose can go to a pharmacy or community-based program, to get trained on naloxone administration, and receive naloxone by "standing order," i.e., without a patient-specific prescription.[3] (#ftn3) The Centers for Disease Control and Prevention advises health care providers to consider offering naloxone to individuals when factors that increase risk for overdose or concurrent benzodiazepine use are present.[4] (#ftn4) Furthermore, most states have laws designed to protect health care professionals for prescribing and dispensing naloxone from civil and criminal liabilities as well as Good Samaritan laws to protect people who administer naloxone or call for help during an opioid overdose emergency.[3] (#ftn3) [5] (#ftn5) Naloxone is increasingly being used by police officers, emergency medical technicians, and non-emergency first responders to reverse opioid overdoses. There are two FDA-approved naloxone products (https://www.fda.gov/Drugs/DrugSafety/PostmarketDrugSafetyInformationforPatientsandProviders/ucm472923.htm) for community use that are available by prescription, but too few community members are aware of the important role they can play to save lives.

If you or someone you know meets any of the following criteria, there is elevated risk for an opioid overdose.

- Misusing prescription opioids (like oxycodone) or using heroin or illicit synthetic opioids (like fentanyl or carfentanil).

- Having an opioid use disorder, especially those completing opioid detoxification or being discharged from treatment that does not include ongoing use of methadone, buprenorphine, or naltrexone.

- Being recently discharged from emergency medical care following an opioid overdose.

- Being recently released from incarceration with a history of opioid misuse or opioid use disorder.

It should be noted that, in addition to the above patient populations, patients taking opioids as prescribed for long-term management of chronic pain, especially those with higher doses of prescription opioids or those taking prescription opioids along with alcohol or other sedating medications, such as benzodiazepines (anxiety or insomnia medications), are also at elevated risk for an overdose.

## Information for Patients and the Public

- **You have an important role to play in addressing this public health crisis.**

- Talk with your doctor or pharmacist about obtaining naloxone.[6] (#ftn6)

- Learn the signs of opioid overdose, like pinpoint pupils, slowed breathing, or loss of consciousness.[7] (#ftn7)

- Get trained to administer naloxone in the case of a suspected emergency.[8] (#ftn8)

- If you have an opioid use disorder, effective treatment is available. Research shows a combination of medication, counseling, and behavioral therapy can help people achieve long-term recovery. Call SAMHSA's National Helpline 1-800-662-HELP (4357) or go to https://www.findtreatment.samhsa.gov/ (https://www.findtreatment.samhsa.gov/)

- **Naloxone may be covered by your insurance or available at low or no cost to you.**[9] (#ftn9)

## Information for Prescribers, Substance Use Disorder Treatment Providers, and Pharmacists

- **You have an important role to play in addressing this public health crisis.**

- Learn how to identify patients at high risk for overdose.[8] (#ftn8)

- Follow the CDC Guideline for Prescribing Opioids for Chronic Pain. (https://www.cdc.gov/mmwr/volumes/65/rr/rr6501e1er.htm)[4] (#ftn4)

- Utilize your state's prescription drug monitoring program (PDMP).

- Find out if your state permits pharmacists to prescribe naloxone independently, or dispense naloxone under a standing order or collaborative practice agreement.

- Prescribe or dispense naloxone to individuals who are at elevated risk for opioid overdose and to their friends and family.

- **Naloxone may be covered by insurance or available at low or no cost to your patients.**[9] (#ftn9)

BE PREPARED. GET NALOXONE. SAVE A LIFE.

References

1. Hedegaard H, Warner M, Miniño AM. Drug overdose deaths in the United States, 1999–2016. NCHS Data Brief, no 294. Hyattsville, MD: National Center for Health Statistics. 2017/ CDC. Wide-ranging online data for epidemiologic research (WONDER). Atlanta, GA: CDC, National Center for Health Statistics; 2016. Available at http://wonder.cdc.gov. (http://wonder.cdc.gov/)

2. Walley AY, Xuan Z, Hackman HH, et al. Opioid overdose rates and implementation of overdose education and nasal naloxone distribution in Massachusetts: interrupted time series analysis. *BMJ (Clinical research ed.).* 2013;346:f174.

3. Prescription Drug Abuse Policy System, Naloxone Overdose Prevention Laws, 2017. Available at www.pdaps.org. (http://www.pdaps.org/)

4. Dowell D, Haegerich TM, Chou R. CDC Guideline for Prescribing Opioids for Chronic Pain - United States, 2016. *MMWR. Recommendations and reports : Morbidity and mortality weekly report. Recommendations and reports.* 2016;65(1):1-49. Available at https://www.cdc.gov/drugoverdose/prescribing/guideline.html. (https://www.cdc.gov/drugoverdose/prescribing/guideline.html)

5. National Association of State Alcohol and Drug Abuse Directors. Single State Agency for substance abuse: Resource to check third party prescription laws and Good Samaritan laws. http://nasadad.org/ssa-web-sites/. (http://nasadad.org/ssa-web-sites/)

6. Prevent & Protect, Frequently Asked Questions about Naloxone, 2018, Available at http://prevent-protect.org/individual-resources/faq-individual/. (http://prevent-protect.org/individual-resources/faq-individual/)

7. Centers for Disease Control and Prevention. Preventing an Opioid Overdose Tip Card, Available at https://www.cdc.gov/drugoverdose/pdf/patients/Preventing-an-Opioid-Overdose-Tip-Carda.pdf. - PDF (https://www.cdc.gov/drugoverdose/pdf/patients/Preventing-an-Opioid-Overdose-Tip-Card-a.pdf)

8. Substance Abuse and Mental Health Services Administration. SAMHSA Opioid Overdose Prevention Toolkit. HHS Publication No. (SMA) 16-4742. Rockville, MD: Substance Abuse and Mental Health Services Administration; 2016. Available at https://store.samhsa.gov/system/files/sma18-4742.pdf - PDF (https://store.samhsa.gov/system/files/sma18-4742.pdf).

9. National Institute on Drug Abuse. Opioid Overdose Reversal with Naloxone (Narcan, Evzio). January 2018, Available at https://www.drugabuse.gov/related-topics/opioid-overdosereversal-naloxone-narcan-evzio. (https://www.drugabuse.gov/related-topics/opioid-overdose-reversal-naloxone-narcan-evzio)

---

**OSG Headquarters**

Office of the Surgeon General
U.S. Department of Health & Human Services
200 Independence Avenue, S.W.
Washington, D.C. 20201
E-mail: surgeongeneral@hhs.gov
Phone: 202-401-7529
Press Requests/Media Inquiries: OSGPress@hhs.gov

**<u>Appendix I-6</u>**

**FDA STATEMENT**

# Statement from FDA Commissioner Scott Gottlieb, M.D., on unprecedented new efforts to support development of over-the-counter naloxone to help reduce opioid overdose deaths

**For Immediate Release:**

January 17, 2019

**Statement From:**

With the number of overdose deaths involving prescription and illicit opioids more than doubling over the last seven years to nearly 48,000 in 2017, it's critical that we continue to address this tragedy from all fronts. This includes new ways to increase availability of naloxone, a drug used to treat opioid overdose.

When someone overdoses on an opioid, the person may lose consciousness and breathing may become shallow or stop. This can rapidly lead to death if there's no medical intervention.

However, if naloxone is administered quickly, it can counter the overdose effects, usually within minutes. While the person administering naloxone should also seek immediate medical attention for the patient, the bottom line is that wider availability of naloxone and quick action to administer it can save lives.

Naloxone is a critical drug to help reduce opioid overdose deaths. Prevention and treatment of opioid overdose is an urgent priority. Increased availability of naloxone for emergency treatment of overdoses is an important step. One potential way to improve access to naloxone is to make it available for over-the-counter (OTC) sale. FDA-approved versions of naloxone currently require a prescription, which may be a barrier for people who aren't under the care of a physician or may be ashamed or even fearful of admitting to issues with substance abuse. Having naloxone widely available, for example as an approved OTC product, is an important public health advance, and a need that we've been working on at the FDA.

Although FDA-approved prescription naloxone formulations have instructions for use in product labeling, they don't have the consumer-friendly Drug Facts label (DFL), which is required for OTC drug products. Before submitting a new drug application or supplement for an OTC drug product, companies must develop a DFL and conduct studies to show that consumers can understand how to use the product without the supervision of a health care professional. Some stakeholders have identified the requirement to perform these studies as a barrier to development of OTC naloxone products.

To encourage drug companies to enter the OTC market and increase access to naloxone, the FDA took an unprecedented step: we developed a model DFL with easy-to-understand pictograms on how to use the drug. We also conducted label comprehension testing to ensure the instructions were simple to follow.

This is the first time the FDA has proactively developed and tested a DFL for a drug to support development of an OTC product. We proactively designed, tested and validated the key labeling requirements necessary to approve an OTC version of naloxone and make it available to patients. One of the key components for OTC availability is now in place. In short, we've crafted model labeling that sponsors can use to obtain approval for OTC naloxone and increase its access. This action was part of our broader commitment to addressing the opioid crisis.

Today, we're announcing the results of our work, including posting two model DFLs (one for use with a nasal spray (/media/119743/download) and one for use with an auto-injector (/media/119744/download)) and the supporting FDA review (/media/119745/download). These efforts should jumpstart the development of OTC naloxone products to promote wider access to this medicine. The model DFL contains the information (except for individual product-specific information) that a consumer needs to administer naloxone safely and effectively.

During this period without a FY19 appropriation for the FDA, we've been focused on making sure that we continue critical aspects of our work, to the extent permitted by law. At this time, for products (such as naloxone) that are covered by a user fee program, our review of existing medical product applications and associated policy development regarding our review are funded by limited carryover user fee balances. We'll continue to update the public on how we're approaching our work during the lapse in appropriations.

Consumer comprehension of the model DFL was iteratively tested by an independent research contractor in a prespecified research design involving over 700 participants across a wide range of potential OTC naloxone users. This included people who use heroin; people who use prescription opioids; family and friends of people who use opioids; adolescents; and the general public. An FDA review team not directly involved in the conduct of the study independently reviewed the study report and determined that the comprehension results were satisfactory. Overall, the study demonstrated that the model DFL was well-understood by consumers and is acceptable for use by manufacturers in support of their OTC naloxone development programs. Using this information, naloxone manufacturers can now focus their efforts on final label comprehension testing of how well consumers understand the product-specific information that hasn't been already tested in the model DFL. I personally urge companies to take notice of this pathway that the FDA has opened for them and come to the Agency with applications as soon as possible.

The model DFL comes in two versions. One is for use with a nasal spray and one for use with an auto-injector. But the product-specific instructions in each version are placeholders that have not been tested by the FDA for comprehension or human factors performance. Sponsors can replace these placeholders with their own product-specific information and test it if necessary. Apart from this product-specific information, the model DFL otherwise contains all the key information needed for an untrained bystander to administer naloxone. In designing the model DFL, the FDA team sought input from multiple stakeholders in the addiction care community, as well as from the FDA internal experts, to streamline the DFL to contain only the most critical information, so that it could be easily understood in an emergency. We're grateful to the hundreds of study participants who helped us see this DFL through their eyes, which enabled us to refine the DFL multiple times until we reached a final version. These research participants enabled these efforts.

This work builds on our ongoing efforts to get this life-saving drug into the hands of those who need it most. In addition to the approval of injectable naloxone for use in a health care setting and both prescription auto-injector and intranasal forms of naloxone, which facilitate use by laypersons, we also released draft guidance to advance development of generic naloxone hydrochloride nasal spray.

Additionally, we also held a two-day advisory committee meeting (/about-fda/page-not-found) last month to solicit input and advice on strategies to increase the availability of naloxone products intended for use in the community. We asked our external advisors from the FDA's Anesthetic and Analgesic Drug Products and the Drug Safety and Risk Management Advisory Committees to consider various options for increasing access to naloxone.

As part of HHS' ongoing efforts to combat the opioid crisis and expand the use of naloxone, in April 2017, the Department announced its 5-Point Strategy (https://www.hhs.gov/opioids/) to Combat the Opioids Crisis. Those efforts include: better addiction prevention, treatment, and recovery services; better data; better pain management; better targeting of overdose reversing drugs; and better research. In April 2018, Surgeon General VADM Jerome Adams issued an advisory (http://wcms.fda.gov/ucm/resources/wcm/3rdparty/fckeditor/editor/[!--$ssExternalLink('UCM629591')--]) encouraging more individuals, including family, friends, and those who are personally at risk for an opioid overdose to carry naloxone. In December 2018, Adm. Brett P. Giroir, MD, Assistant Secretary for Health and the Secretary's Senior Advisor for Opioid Policy, released guidance (http://wcms.fda.gov/ucm/resources/wcm/3rdparty/fckeditor/editor/[!--$ssExternalLink('UCM629592')--]) for health care providers and patients detailing how naloxone can help save lives.

We're taking many steps to improve availability of naloxone products and we're committed to working with other federal, state and local officials; health care providers; patients; and communities across the country to combat the staggering human and economic toll created by

opioid abuse and addiction.

The FDA, an agency within the U.S. Department of Health and Human Services, protects the public health by assuring the safety, effectiveness, and security of human and veterinary drugs, vaccines and other biological products for human use, and medical devices. The agency also is responsible for the safety and security of our nation's food supply, cosmetics, dietary supplements, products that give off electronic radiation, and for regulating tobacco products.

## Related Information

Information about Naloxone (/drugs/postmarket-drug-safety-information-patients-and-providers/information-about-naloxone)

### 

## Inquiries

**Media:**

✉ Sarah Peddicord (mailto:sarah.peddicord@fda.hhs.gov)

📞 301-796-2805

**Consumer:**

📞 888-INFO-FDA

 More Press Announcements (/news-events/newsroom/press-announcements)

**<u>Appendix I-7</u>**

**FDA STATEMENT**

# Statement on continued efforts to increase availability of all forms of naloxone to help reduce opioid overdose deaths

**For Immediate Release:**

September 20, 2019

**Statement From:**

Norman E. "Ned" Sharpless, MD

Acting Commissioner of Food and Drugs - Food and Drug Administration

Addressing opioid overdose continues to be one of the most urgent public health priorities for the U.S. government and making potentially lifesaving treatments more readily available is one of the top ways we can address this crisis. As we observe Prescription Opioid and Heroin Epidemic Awareness Week, a time when we acknowledge the devastating toll the opioid crisis has inflicted on our country, we felt it was essential to clarify important information about naloxone, an emergency opioid overdose reversal treatment. Naloxone is a critical tool for individuals, families, first responders and communities to help reduce opioid overdose deaths.

Access to naloxone, however, continues to be limited in some communities. There are three FDA-approved forms of naloxone – injectable, auto-injector and nasal spray – and all three currently require a prescription, which can be a barrier for people who aren't under the care of a health care provider or who are apprehensive about admitting to issues with substance abuse. However, in response to the crisis, most states and the District of Columbia have passed laws that allow pharmacists to dispense naloxone under a standing order, which takes the place of an individual prescription. Some states also have given pharmacists direct authority to prescribe and sell naloxone to consumers. Still, many pharmacists may be unaware of the standing orders and direct authority in their states or are unwilling to provide all forms of naloxone to consumers without an individual prescription.

There is also a persistent misunderstanding that the FDA-approved labeling for the injectable form of naloxone, the least expensive option, precludes administration outside a health care setting. This has created confusion among public health officials and community-based organizations about whether the injectable form of naloxone can be used as part of their distribution programs. The FDA-approved product labeling for the three forms of naloxone does not exclude dispensing by pharmacies or community distribution programs. All three forms of

naloxone are FDA-approved and may be considered as options for community distribution and use by individuals with or without medical training to stop or reverse the effects of an opioid overdose.

The FDA is working with other federal, state and local officials as well as health care providers, patients and communities across the country to increase availability of all forms of naloxone and combat the toll to communities, individuals and the economy resulting from opioid abuse and addiction. As we continue to confront the opioid crisis, several efforts are underway at the FDA to make naloxone more readily available and accessible.

In April, we approved the first generic naloxone hydrochloride nasal spray (/news-events/press-announcements/statement-fda-commissioner-scott-gottlieb-md-unprecedented-new-efforts-support-development-over), a generic of the brand product, Narcan. The FDA is also granting priority review to all generic applications for products that can be used as emergency treatment of known or suspected opioid overdose. As part of the priority review, sponsors will receive shorter goal dates or standard goal dates with earlier reviewer deadlines; enhanced agency communication with sponsors; and expanded agency engagement, such as pre-submission and mid-cycle meetings.

Making naloxone more widely available in every pharmacy as an approved over-the-counter (OTC) product would also be an important public health advancement – one we have been working on at the FDA. In January, we took an unprecedented step in helping to encourage development of OTC naloxone products (/news-events/press-announcements/statement-fda-commissioner-scott-gottlieb-md-unprecedented-new-efforts-support-development-over). To encourage drug companies to enter the OTC market, the FDA designed, tested and validated the key labeling requirements necessary to approve an OTC version of naloxone. To do this, we developed a model Drug Facts label (DFL) with pictogram instructions so anyone with access to the drug can better understand how to administer it. To ensure the pictograms are easy to understand, we also conducted label comprehension testing with consumers. This was the first time the FDA proactively developed and tested a DFL to support development of an OTC product.

With one of the key components for OTC availability now in place, drug companies can use this information as part of an application to obtain approval for OTC naloxone. We are continuing to work with industry partners who are interested in developing these OTC naloxone products.

The FDA also held a public meeting (/about-fda/page-not-found) in December 2018 on various options for increasing access to naloxone, weighing logistical, social and economic aspects of this important issue. There was overwhelming support from meeting participants to remove barriers to obtaining naloxone, particularly OTC naloxone, and to support community activities that expand its availability. As a result, we are currently exploring more ways to increase the availability of all forms of naloxone, such as working with manufacturers to see if shelf-life

extensions for naloxone products are possible; conducting additional research on naloxone; and considering situations where co-prescribing of naloxone may be appropriate including possible updated product labeling.

The U.S. Department of Health and Human Services has ongoing efforts to fight the opioid crisis and expand the use of naloxone. In April 2017, the department announced a 5-Point Strategy (https://www.hhs.gov/opioids/) to Combat the Opioids Crisis, including better targeting of overdose reversing drugs. In April 2018, Surgeon General VADM Jerome Adams issued an advisory (https://www.hhs.gov/surgeongeneral/priorities/opioids-and-addiction/naloxone-advisory/index.html) encouraging more individuals, including family, friends and those who are personally at risk for an opioid overdose to carry naloxone. In December 2018, Adm. Brett Giroir, M.D., Assistant Secretary for Health and the Secretary's Senior Advisor for Opioid Policy, released guidance (https://www.hhs.gov/opioids/sites/default/files/2018-12/naloxone-coprescribing-guidance.pdf) for health care professionals and patients detailing how naloxone can help save lives

Ultimately, the goal of increasing access to all forms of naloxone is to make this potentially life-saving treatment available to individuals at risk of an overdose – such as those with a history of overdose or substance use disorder – and those in the community most likely to observe an overdose. The FDA remains committed to using its regulatory authority to address this crisis, working with all our partners to expand the availability of all forms of naloxone, and encouraging prescribers and patients to discuss this topic. All together, these efforts have the potential to put a vital tool for combatting opioid overdose in the hands of those who need it most – friends and family of opioid users, as well as first responders and community-based organizations.

The FDA, an agency within the U.S. Department of Health and Human Services, protects the public health by assuring the safety, effectiveness, and security of human and veterinary drugs, vaccines and other biological products for human use, and medical devices. The agency also is responsible for the safety and security of our nation's food supply, cosmetics, dietary supplements, products that give off electronic radiation, and for regulating tobacco products.

### 

---

## Inquiries

**Media:**

✉ Sandy Walsh (mailto:Sandy.Walsh@fda.hhs.gov)

📞 301-796-4669

**Consumer:**

📞 888-INFO-FDA

⊖ More Press Announcements (/news-events/newsroom/press-announcements)

**Appendix I-8**

x

**SPEECH**

# Remarks by FDA Commissioner Robert Califf to the 2022 Rx and Illicit Drug Summit

**APRIL 20, 2022**

**Speech by**

Robert M. Califf, M.D., MACC
Commissioner of Food and Drugs - Food and Drug Administration

*(Remarks as prepared for delivery)*

Good morning.  I'm glad that I can be with you once again for this important meeting.

I want to thank Nancy Hale and Operation UNITE for inviting me, and for continuing your work to make this event a must-attend for those involved in addressing the opioid crisis.

Congressman Rogers, you may not have known the magnitude of the impact of this event when you conceived of it 11 years ago, but you have made a big difference in this difficult and complex problem that has affected so many of us.

When I appeared at this gathering in 2016, during my first stint as FDA Commissioner, I was struck by the enormous breadth of topics addressed during this meeting, as well as by the engagement of such a broad range of stakeholders.  I've had a chance to review this year's agenda and speak with many who are presenting at this meeting, all looking to collaborate and solve problems.  While I can't attend the entire meeting, you can rest assured that I will get updates on what has been discussed and suggested for the future.

But I'm delighted to join this esteemed group again. This annual gathering is an important opportunity to hear your ideas, benefit from your expertise, and explore ways to collaborate.

When I was asked to return to the role of Commissioner, I knew our nation had many weighty public health challenges, including the ongoing COVID-19 pandemic.  I also knew that the opioid crisis that has devastated so many individuals, families, and communities remained and would require my attention.  I've seen first-hand the impact of opioids in my professional life as a physician through my government and academic roles, in my personal experience as a husband, parent, and grandparent, and in my role providing community based clinical care.

Upon leaving the FDA five years ago, for instance, I helped form a non-profit addiction treatment and recovery center in Dayton, Ohio.  As the Chair of that organization's board, I learned a great deal about on-the-ground efforts to prevent misuse and addiction, reduce fatal overdoses, and provide evidence-based treatment and recovery support.  I was humbled and gained tremendous respect for the array of people working together across a community battle this problem.

As you well know, and as is evidenced by the participation in this meeting, dealing with this crisis requires a team in which every team member does his or her part.  And I intend for FDA to do its part, as well as function as an effective team member.

Now that I'm back as commissioner of the FDA, one of my roles in this job is to share with you some of the important work that we've been doing to help respond to this crisis.

I wish I were also in a position to tell you that we have all the answers and that there are one or two things left to do to address this crisis. Unfortunately, I can't tell you that. It's not that we're not working hard, or haven't made headway.

Make no mistake. The FDA is committed to responding to all aspects of this ongoing crisis. And we've made some significant progress.  As you'll hear in a moment, we are taking a fresh look at the things we have done, and we're ready to change our approach if the evidence calls for it.

For instance, we've already made important safety labeling changes for opioids, benzodiazepines, and other medicines in the controlled substances category.  But we're also currently reconsidering our approach to labeling of opioids to make sure it supports the best prescribing practices, given the important expansion of research that informs us in this stage in the crisis.

We've also prioritized ways to work better with clinicians and provider organizations.  We recognize that many people in need have lacked access to proper medications for opioid use disorder, so as a part of this work we've collaborated with our federal partners to increase availability of these important medications. Here again, we're taking a new look at what we need to address in this important area for prescribers.

We've continued to support development of novel non-addictive treatments for pain, including non-opioid analgesics and medical devices.  As someone who has decades of experience in developing new medicines, I am not satisfied that enough progress is being made.  We'll be looking at ways to accelerate progress in this arena through better science and facilitation of clinical development.

These developments are an important part of our overall response to this crisis. But they are nowhere near enough.  We do a disservice to those who have already suffered and those who may become victims if we don't speak frankly about where we've fallen short, what challenges

we currently face, and what is required for us to address the challenges that may still lie ahead.

I know that you have heard from the experts tracking this crisis that we are not where we need to be.  In an era in which good news is emphasized, this is not a popular message.

Because our work is grounded in science and transparency, I firmly believe that if we don't speak honestly and openly, we'll repeat mistakes of the past and not find the answers we need to gain real traction – and possibly even lose ground.

Even so, many have worked hard to develop creative and effective responses to this crisis. Yet, in spite of all of this important work, in some ways we are worse off than we were a decade ago.

According to our colleagues at the CDC, an estimated 106,854 Americans died of a drug overdose between December 2020 and November 2021 – another record high. While the number of prescription opioids dispensed has been steadily declining since 2012, illicit fentanyl and its analogues have become major drivers of overdose deaths.

The diversity of the agenda at this meeting brings home the point that there's no single reason for this crisis, and many of them are not within the FDA's wheelhouse. Certainly, one obvious factor is the isolation and psychological stressors imposed by the COVID-19 pandemic on individuals with substance use disorder. These include disruptions in treatment access, social connections, and other critical supports individuals rely on for recovery.  We know that we will only succeed if we do our part in a manner that takes these changes in the environment into account.

We are also alarmed about the growth in use of other controlled substances, including benzodiazepines and stimulants, particularly methamphetamine, being used in combination with opioids.

I want to specifically acknowledge the increasing resurgence of methamphetamine, driven by the same chemistry capabilities that are causing so much availability of super-potent fentanyl.

In recognition of these complex challenges and the evolving nature of the broadened overdose crisis, we fully support HHS' Overdose Prevention Strategy—a comprehensive framework that we were excited to help develop and now will use to work with others to implement.

HHS has identified four priority areas: primary prevention, harm reduction, evidence-based treatment, and recovery support. We're taking a close look at our own priorities to align with HHS to ensure we're putting forth interventions that will have the most meaningful and greatest impact.

For instance, we're focusing on what we can do to address the frightening increase in illicit synthetic opioids, which are entering the United States illegally and are increasingly available online.

The FDA's Cybercrime Investigation Unit has been working for a number of years to disrupt and dismantle the growing number of dark web marketplaces, vendors, and networks that are manufacturing and selling counterfeit, misbranded, and unapproved drugs.

In one investigation in Massachusetts, for example, a man who called himself "KillWill" distributed counterfeit oxycodone pills that bore markings similar to the Mallinckrodt Pharmaceutical company's oxycodone tablets.  Instead of containing oxycodone hydrochloride, the tablets were made up of heroin and fentanyl.

We're also continuing to collaborate with the DEA to crack down on activities that contribute to potential abuse, misuse, and overdoses.  Just last week, FDA and DEA issued joint warning letters to operators of two websites illegally selling amphetamine drug products marketed as Adderall.  Administrator Milgram and I are focused on this, and will do everything we can to bring to justice those involved in this kind of illegal and dangerous activity.

All of these efforts go hand in hand with our enforcement and interdiction work at international mail facilities.  In fiscal year 2021, FDA reviewed over 96,000 products at international mail facilities that includes nearly 70,000 drug products, including opioids, with 97% destruction rate for those products refused.

One important area of focus involves responding to and preempting the enormous amounts of misinformation out there, particularly on social media.  Many of these cases involve active disinformation efforts.  Everyone in this audience knows that the promotion of long-acting opioids as non-addictive was one of the most damaging misinformation campaigns of our history.

Now we have mail order pills sold as less potent opioids but that are laced with super-potent and much more dangerous fentanyl and methamphetamine.  This growing problem with unreliable information readily available on digital sources is much broader than this crisis, and we frankly need to devise a better strategy to go on the offense rather than a reactive strategy.

The distortions and half-truths that flow from these digital communications undermine public trust in essential scientific work.  But they also pose an enormous risk to public health itself, through their negative influence on individual behaviors.  They can lead people to make poor or misinformed decisions that actually cause physical harm.  And misinformation about science and health care is in fact killing people. It's why we need to develop a comprehensive and effective response to it.

Part of this response requires providing reliable information that is accurate and up to date. For instance, we're focused on using evidence to inform prescribing practices and safe disposal and we support the guidelines under revision by the CDC.

I want to call out my colleagues in the health professions, especially leaders of academic medical centers, professional societies and health systems. We need them to become much more active in training and educating our professionals both about this crisis and their role in countering misinformation.

In addition, while opioid prescriptions continue to drop, multiple studies have confirmed that patients receive more opioid analgesic tablets than needed following surgical procedures. And there are further concerns about these drugs being prescribed to vulnerable populations, such as children and adolescents.

Let me offer an example from personal experience. A close relative, a former nurse, recently had a procedure to treat her severe carpal tunnel syndrome. After her surgery, she was prescribed a month's worth of opioids to help with the anticipated pain. She ended up using exactly one pill and was left with a month's supply of extras. We all know that situations like this have started too many treacherous journeys for family members who now are tempted by the opioids in the medicine cabinet.

Situations like this are why the FDA developed our Remove the Risk campaign, which aims to raise awareness about proper disposal of prescription opioids and decrease unnecessary exposure to opioids. But we recognize that an awareness campaign is not enough.

To this end, I'm pleased to announce that the FDA today issued a potential change to require opioid analgesics used in outpatient settings to be dispensed with prepaid mail-back envelopes and that pharmacists provide patient education on safe disposal of opioids. Mailback envelopes would provide another convenient, safe disposal option for patients. While the FDA has been active in supporting the disposal of unused opioid pills, we believe this new approach could help remove more drugs from the medicine cabinets.

We also want to find a path for adoption of at-home disposal solutions. And we are re-examining the potential utility of blister packaging to stem the problem of accidental ingestion by children and to address the ongoing problem of clinicians prescribing excessive numbers of tablets in some situations.

As I mentioned earlier, we are also re-examining the role of prescriber education, including the need for a unified, national level education program to adequately inform prescribers on managing pain. This would include, but not be limited to the proper use of opioid analgesics, as well as recognition and treatment of substance use disorders.

Here again, we need health systems, academic medical centers and professional organizations to join with us to integrate appropriate prescribing as an active part of clinical quality rather than relying on didactic education.  The dental profession has stepped up over the past year and developed improved educational program—hopefully others will join in.

Education and communication are also a key part of our work to support increased availability and awareness of naloxone products. For instance, we've required drug manufacturers for all opioid pain relievers and medicines to treat opioid use disorder to add recommendations about naloxone to the prescribing information.

We're also continuing our efforts to encourage manufacturers to pursue approval of over-the-counter naloxone products and to bring other similar new products to market.  I'm pleased to see that a bipartisan group of House and Senate members recently urged manufacturers of naloxone to apply for OTC status for their products.  It will require collaboration to ensure that an important policy like this moves forward, since many of the approaches that have been effective for optimizing the use of other medicines don't work for opioids, and market forces don't necessarily reward changes that would help with this crisis.

For many years, the FDA has based decisions on whether to approve drugs, including opioids, on a framework for the assessment of the benefits and risks of a drug.  That approach is the authority Congress mandated for us. When it comes to opioids, we take into account public health factors such as the impact on family and others when reaching the regulatory decision of whether to approve a drug.

Through experience, however, we have learned that even this improvement in our framework isn't suited to address the risks posed by opioids. To be clear, the FDA lacks the statutory authority to require that drug developers seeking approval for the marketing of new opioid products demonstrate that their products offer material safety advantages (such as a reduction in abuse liability or a reduction in respiratory depression) over existing approved opioids.

I am committed to working to address this discontinuity, but, again, it will likely require Congressional action to give us the necessary authority.

We are also giving considerable thought to how evidence on long term effectiveness of opioids can be generated through studies that give us the answers we need while being feasible and ethical.

In closing, let me circle back to a reality I mentioned at the beginning of my remarks – the importance of collaboration among stakeholders.

Strategic and collaborative tactics are clearly evident in this meeting, through the diversity of participant affiliations, the breadth of the meeting agenda, and the zeal with which you approach this work.

There is no single answer, and there is a lot we don't yet know. Working together, driven by a constantly increasing knowledge base about the science of drugs and our response to them and about societal factors that lead to the problems we're addressing at this meeting, we will make a difference.

So, I look forward to sharing in your energy, your commitment, and your teamwork.  Together, we can bring new opportunities and hope to the millions of Americans affected by this crisis.

Thank you.

*(This text was edited for clarification following publication)*

❮ More Speeches by
FDA Officials (/news-events/speeches-fda-officials)

**Appendix I-9**

# FDA's Overdose Prevention Framework Aims to Prevent Drug Overdoses and Reduce Death



*By: Robert M. Califf, M.D., Commissioner of Food and Drugs*

In 2021, a record number of Americans – more than 107,000 (https://www.cdc.gov/nchs/nvss/vsrr/drug-overdose-data.htm) – died from drug overdoses. While the loss of human life alone is staggering, we know that the effects of the drug overdose crisis are even broader, including enormous individual and societal costs (https://www.cdc.gov/mmwr/volumes/70/wr/mm7015a1.htm) as people and families grapple with substance use disorder (SUD). Due to this unfortunate reality, in 2017 the opioid crisis was determined to be a public health emergency, which to this day is still in effect. Today's drug overdose crisis is multifaceted and has evolved beyond prescription opioids. Illicit opioids, largely driven by fentanyl and its analogues, have become key contributors. Other controlled substances, including benzodiazepines and stimulants (particularly methamphetamine), also are being used in combination with opioids.

Recent data from the Substance Abuse and Mental Health Services Administration (SAMHSA) and the Centers for Disease Control and Prevention (CDC) highlight the magnitude and urgency of the issue and the need for attention to equity. By SAMHSA's latest estimates, 18.4 million people suffer from illicit drug use disorders (https://www.samhsa.gov/data/report/2020-nsduh-annual-national-report). In addition, the increase in drug overdose deaths



*Robert M. Califf, M.D.*

([https://www.cdc.gov/mmwr/volumes/71/wr/mm7129e2.htm#T1_down](https://www.cdc.gov/mmwr/volumes/71/wr/mm7129e2.htm#T1_down)), while accelerating in all demographics, is particularly growing among non-Hispanic Black and non-Hispanic American Indian or Alaska Native populations. Rural Americans are also increasingly affected by SUD. Furthermore, effective SUD treatment and holistic intervention centers are less likely to be available in racial and ethnic minority and rural communities.

My resolve to do something has only strengthened over the past several years. I have witnessed first-hand the impact of opioids in my professional life as a physician, through my government and academic roles, in my personal experience, and in my role providing community-based clinical care. Five years ago, I helped form a non-profit addiction treatment and recovery center in Dayton, Ohio. As the chair of that organization's board, I learned a great deal about on-the-ground efforts to prevent misuse, reduce fatal overdoses, and provide evidence-based treatment and recovery support. I gained tremendous respect for the array of people who must work together across a community to battle this problem and achieve better long-term recovery outcomes.

As FDA Commissioner, with renewed opportunity and enhanced resolve, I intend to keep overdose prevention and reduction in SUD and its consequences a key priority throughout my tenure at the FDA. While the FDA's previous strategies have largely focused on opioid use and overdoses, the evolving nature of the overdose crisis calls for both a new approach and honest reflection about what the FDA can do differently moving forward. For example, during my confirmation process, I committed to undertaking a review of our opioid decisions, including labeling. We have initiated this review with the intended goal of understanding what revisions are needed to support appropriate use of opioid analgesics. Our "lessons learned" will actively inform our future approach. I'm optimistic this review will provide us with recommendations to move forward in this multistep process, and we are working expeditiously to address this urgent situation.

# FDA's Overdose Prevention Framework

Today, we are introducing the FDA Overdose Prevention Framework (/drugs/drug-safety-and-availability/food-and-drug-administration-overdose-prevention-framework) – our vision to undertake impactful, creative actions to prevent drug overdoses and reduce deaths. While the four priorities within our framework are overarching, our activities are dynamic to allow us to recalibrate our approach as the overdose crisis continues to evolve. By design, our Framework flows from the U.S. Department of Health and Human Services (HHS) Overdose Prevention Strategy (https://www.hhs.gov/overdose-prevention/) and supports the National Drug Control Strategy (https://www.whitehouse.gov/wp-content/uploads/2022/04/National-Drug-Control-2022Strategy.pdf).

The four priorities within the FDA Overdose Prevention Framework are:

1. Supporting **primary prevention** by eliminating unnecessary initial prescription drug exposure and inappropriate prolonged prescribing.

2. Encouraging **harm reduction** through innovation and education.

3. Advancing development of **evidence-based treatments for substance use disorders**.

4. **Protecting the public from unapproved, diverted, or counterfeit drugs**
   presenting overdose risks.

Below is a snapshot of some of the FDA's activities underneath the Framework, which are a mix of existing activities as well as our exploratory work to test out new strategies that meet the moment. These activities underscore that despite the FDA's focus on this critical issue in the past, previous efforts have not been enough. We need to invest more resources and implement fresh ideas as the crisis evolves. These snapshots also bring into focus the interdependence of the FDA's effort with government and non-government partners to implement strategies that will have impact. It is also evident that the primary basis for preventing overdoses and death is the use of strategies to prevent and reduce the magnitude of SUD, treat it effectively, and sustain long-term recovery.

# Supporting Primary Prevention

Looking forward, we are exploring several strategies to support primary prevention. We are re-examining the role of opioid analgesic prescriber education, including the need for a mandatory unified, national-level education program to adequately inform opioid analgesic prescribers on managing pain. To support our considerations, we have held two Duke-Margolis workshops on Reconsidering Mandatory Opioid Prescriber Education (https://healthpolicy.duke.edu/events/fda-public-workshop-opioid-prescriber-education) ⌕ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) and Identifying Key Competencies for Opioid Prescriber Education (https://healthpolicy.duke.edu/events/margolis-fda-workshop-identifying-key-competencies-opioid-prescriber-education) ⌕ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) in the past year. Prescriber education is not new, and there has been a consistent reduction in the prescription of opioids in the U.S. But we are taking a fresh look at how to make prescriber education more effective and link it to behavioral change in optimizing appropriate prescribing and use of alternative interventions to treat pain. The growing evidence base from the National Institutes of Health's (NIH) HEAL Initiative (https://heal.nih.gov/) and the soon to be updated CDC Clinical Practice Guideline for Prescribing Opioids (https://www.cdc.gov/opioids/guideline-update/index.html) will further inform education efforts.

We are also exploring the need for potential new authorities for opioid approval standards, including whether drug developers seeking approval for the marketing of new opioid analgesics should be required to demonstrate that their products offer material safety advantages over existing approved opioid analgesics. We are considering additional disposal options (/news-events/press-announcements/fda-considers-new-approach-improve-safe-disposal-prescription-opioid-analgesics-decrease-unnecessary), including a potential change that would require opioid analgesics dispensed in outpatient settings to be dispensed with prepaid mail-back envelopes and patient education on safe disposal of opioids. And we intend to publish a

draft guidance for development of non-addictive treatments for chronic pain, following the February 2022 publication of a Draft Guidance: Development of Non-Opioid Analgesics for Acute Pain (/regulatory-information/search-fda-guidance-documents/development-non-opioid-analgesics-acute-pain-draft-guidance-industry). These draft guidances should help stimulate academia and industry to improve the current inadequate pipeline of new interventions.

The FDA continues to view the development of evidence-based guidelines as a high-impact opportunity to support appropriate prescribing practices that will in turn prevent overdoses. In 2020, we awarded our first cooperative agreement (https://www.dental.pitt.edu/fdagrant2020) ⧉ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) to the University of Pittsburgh and the American Dental Association to develop guidelines for the treatment of acute dental pain, and we anticipate publication of adult dental pain guidelines soon. This year, we are supporting the development of two new clinical practice guidelines. One is on the safe tapering of benzodiazepines (https://grants.nih.gov/grants/guide/rfa-files/RFA-FD-22-027.html?utm_medium=email&utm_source=govdelivery), which aims to help address inappropriate prolonged prescribing and was a key gap identified by patients and clinicians in our 2021 Duke-Margolis workshop on the safe use of benzodiazepines (https://healthpolicy.duke.edu/events/safe-use-benzodiazepines-clinical-regulatory-and-public-health-perspectives) ⧉ (http://www.fda.gov/about-fda/website-policies/website-disclaimer). The other is on the management of postoperative pain in obstetric patients (https://grants.nih.gov/grants/guide/rfa-files/RFA-FD-22-028.html?utm_medium=email&utm_source=govdelivery); the FDA-commissioned National Academies of Sciences, Engineering, and Medicine (NASEM) 2020 report on Framing Opioid Prescribing Guidelines (https://nap.nationalacademies.org/catalog/25555/framing-opioid-prescribing-guidelines-for-acute-pain-developing-the-evidence) ⧉ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) identified obstetric surgeries (e.g., cesarean delivery) as a priority area for evidence-based guideline development. Additionally, we continue to collaborate with our federal partners to support other guidelines as appropriate, such as the 2022 CDC Clinical Practice Guideline for Prescribing Opioids.

Throughout my career and during my first stint as Commissioner, I supported the development of FDA guidances and definitive evidence-based documents. These elements can help stimulate other critical constituencies to take actions within their control and I intend to use this approach aggressively as we work together on prevention.

# Encouraging Harm Reduction

To help incorporate a systems approach into considerations about the public health impact of the opioid crisis, the FDA developed a national-level, data-driven, system dynamics model of the opioid crisis (/drugs/information-drug-class/fda-opioid-systems-modeling-effort). This was

partially a response to recommendations from a 2017 NASEM report I commissioned on Pain Management and the Opioid Epidemic (https://nap.nationalacademies.org/catalog/24781/pain-management-and-the-opioid-epidemic-balancing-societal-and-individual) ☑ (http://www.fda.gov/about-fda/website-policies/website-disclaimer). The team has recently published two peer-reviewed articles on the model, Modeling the evolution of the US opioid crisis for national policy development (https://www.pnas.org/doi/10.1073/pnas.2115714119) ☑ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) and Reducing opioid use disorder and overdose deaths in the United States: A dynamic modeling analysis (https://www.science.org/doi/10.1126/sciadv.abm8147) ☑ (http://www.fda.gov/about-fda/website-policies/website-disclaimer). The latter paper described an initial analysis of 11 types of high-level hypothetical strategies, ranging from OUD prevention to harm reduction, and the effects projected by the model that those strategies could have on the opioid crisis. We are actively pursuing multiple strategies identified by the model with a focus on reducing the risk of opioid overdose involving fentanyl use. These include increasing the distribution of naloxone and recent support of two roundtables on community (https://reaganudall.org/sites/default/files/2022-06/FTS_Community Roundtable_Final_Complete 6.30.pdf) ☑ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) and clinical (https://reaganudall.org/sites/default/files/2022-06/FTS_Clinician Roundtable_Final_Complete 6.30.pdf) ☑ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) perspectives on fentanyl drug checking.

Looking forward, the FDA plans to build on our actions to help expand the availability and access to overdose reversal products, including naloxone. Through efforts like our Naloxone Access: Answering Questions public meeting (/drugs/news-events-human-drugs/naloxone-access-answering-questions-03292022), we have heard first-hand from harm reduction groups about the continued challenges in increasing access to naloxone. Despite state naloxone access laws, including standing orders, the prescription status for naloxone continues to pose a barrier to wider access. As such, an over-the-counter (OTC) naloxone switch remains an especially high priority. The FDA continues to encourage and advise industry in the development of OTC naloxone. We are also working with industry to bring novel and generic naloxone products to market. However, the FDA recognizes that the transition from prescription to OTC naloxone status may impact health insurance coverage, and has the potential to create other unintended barriers to access. This is an issue we are actively examining with our federal colleagues.

## Advancing Evidence-Based Treatments for Substance Use Disorders

Through collaboration with other federal agencies, the FDA has contributed to efforts to broaden access to medications for opioid use disorder (MOUD). Simply put, MOUD is a proven intervention to improve outcomes for people with OUD, and recent CDC data indicate that it

continues to be vastly underused, particularly in racial and ethnic minority and rural communities. We supported the development of the Practice Guidelines for the Administration of Buprenorphine for Treating Opioid Use Disorder (https://www.hhs.gov/about/news/2021/04/27/hhs-releases-new-buprenorphine-practice-guidelines-expanding-access-to-treatment-for-opioid-use-disorder.html) that the HHS released in April 2021. These guidelines exempted eligible clinicians from certain federal certification requirements related to training, which were previously cited as a barrier to treating more people with buprenorphine.

We will continue to support development of new interventions and work with implementation partners as the evidence evolves. The potential for digital interventions and other devices to help with reducing SUD and its consequences is profound. Looking forward, we will continue partnering (/about-fda/domestic-mous/mou-225-19-017) with NIH on facilitating medical device innovation for addressing opioid use. We also intend to publish a draft guidance on Clinical Considerations for Medical Device Premarket Submissions Targeting Opioid Use Disorder (/medical-devices/guidance-documents-medical-devices-and-radiation-emitting-products/cdrh-proposed-guidances-fiscal-year-2023-fy2023). Finally, we are looking to build on our October 2021 virtual public workshop on A Practical Research Agenda for Treatment Development for Stimulant Use Disorder (https://reaganudall.org/news-and-events/events/practical-research-agenda-treatment-development-stimulant-use-disorder) ⧉ (http://www.fda.gov/about-fda/website-policies/website-disclaimer), convened by the Reagan-Udall Foundation and held in collaboration with the National Institute on Drug Abuse, and the resulting white paper (https://reaganudall.org/sites/default/files/2022-05/Clinical Trial Design for Stimulant Use Disorder Research.pdf) ⧉ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) by exploring a draft guidance on development of stimulant use disorder treatments.

# Protecting the Public from Unapproved, Diverted, or Counterfeit Drugs

The recent rapid growth of the sale of illicit, chemically synthesized fentanyl, fentanyl analogs, and methamphetamines has raised the need for new approaches. Cracking down on the market for diverted prescription and illegal drugs and securing the supply chain for approved medications, including opioids and other controlled substances, remains a top priority. We will further develop our surveillance, enforcement, and interdiction work targeting illegal, unapproved, counterfeit, and potentially dangerous products at international mail facilities, express courier hubs, and ports of entry across the U.S. We will build on our surveillance, compliance, and enforcement actions, including to address health fraud such as SUD treatment claims. This includes joint interdiction operations with other federal agencies such as Customs and Border Protection.

The FDA has also been aggressively working to address controlled substances illegally sold online, including through high-impact partnerships. For example, in 2020 we completed a pilot process with three major registries and the National Telecommunications and Information Administration to reduce the availability of unapproved opioids offered for sale online. As a result of the pilot, nearly 30 websites illegally offering opioids for sale became inaccessible to the public. The FDA has continued to work with registries to help prevent the illegal sale of opioids, in addition to other controlled substances over the internet. In April 2022, we also partnered with the Drug Enforcement Administration to issue first-of-their-kind joint warning letters (/news-events/press-announcements/fda-and-dea-warn-online-pharmacies-illegally-selling-adderall-consumers) to operators of two websites illegally selling Schedule II stimulants, including amphetamine drug products marketed as Adderall. We recognize the need to accelerate this type of joint effort across federal agencies to deal with this different method of illicit and highly dangerous sale of opioids and methamphetamine.

To conclude, overdose prevention is a complex problem, and no one action or one agency will solve the crisis. However, taken together, these actions by the FDA in partnership with patients, clinicians, harm reduction groups, the U.S. Congress, other governmental agencies, including federal, state, local, territorial and tribal levels—and many other stakeholders—can move us in the right direction. We welcome working with all partners to strengthen our response.

The FDA remains focused on responding to all facets of substance use, misuse, addiction, overdose, and death in the U.S. On my watch, we commit to doing all that we can to respond to this crisis, and reduce SUDs and overdoses—and ultimately achieve and sustain long-term recovery outcomes. And we commit to the American public that our work will remain grounded in science and transparency. We plan to give regular updates on our progress, beginning with an update next month on progress since the NASEM report on Pain Management and the Opioid Epidemic: Balancing Societal and Individual Benefits and Risks of Prescription Opioid Use (https://nap.nationalacademies.org/catalog/24781/pain-management-and-the-opioid-epidemic-balancing-societal-and-individual) ☐ (http://www.fda.gov/about-fda/website-policies/website-disclaimer).


**For more information:**

HHS Overdose Prevention Strategy (https://www.hhs.gov/overdose-prevention/)
National Drug Control Strategy (https://www.whitehouse.gov/wp-content/uploads/2022/04/National-Drug-Control-2022Strategy.pdf)

**<u>Appendix I-10</u>**

**FDA NEWS RELEASE**

# FDA Announces Preliminary Assessment that Certain Naloxone Products Have the Potential to be Safe and Effective for Over-the-Counter Use

*Agency Continues to Encourage Sponsor Applications for Over-the-Counter Naloxone Products*

**For Immediate Release:**

November 15, 2022

Español (https://www.fda.gov/news-events/press-announcements/la-fda-anuncia-una-evaluacion-preliminar-sobre-el-potencial-de-seguridad-y-eficacia-de-ciertos)

Today, the U.S. Food and Drug Administration issued a Federal Register notice, Safety and Effectiveness of Certain Naloxone Hydrochloride Drug Products for Nonprescription Use (https://www.federalregister.gov/public-inspection/2022-24874/safety-and-effectiveness-of-certain-naloxone-hydrochloride-drug-products-for-nonprescription-use), that may help facilitate the development and approval of certain nonprescription naloxone drug products, including through the switch of certain naloxone drug products from prescription status to nonprescription status. Naloxone is a medicine that can help reduce opioid overdose deaths and when administered timely, usually within minutes of the first signs of an opioid overdose, can counter the overdose effects.

**"Today's action supports our efforts to combat the opioid overdose crisis by helping expand access to naloxone," said FDA Commissioner Robert M. Califf, M.D. "The agency will keep overdose prevention and reduction in substance use disorders as a key priority and area of intense strategic focus for action as rapidly as possible."**

The Federal Register notice includes a preliminary assessment that certain naloxone drug products—up to 4 milligrams (mg) nasal spray and up to 2 mg autoinjector for intramuscular (IM) or subcutaneous (SC) use—may be approvable as safe and effective for nonprescription use. This preliminary assessment is intended to facilitate development and approval of nonprescription naloxone products; however, it is not a final determination that certain naloxone drug products are safe and effective for nonprescription use, and it does not mandate an immediately effective switch to nonprescription/over-the-counter (OTC) availability for naloxone.

To make its final determination, the FDA needs additional data, such as product-specific data on the nonprescription user interface design, including packaging and labeling. These data would usually be submitted to the agency in an application for a proposed nonprescription naloxone product.

By issuing this notice, the FDA is making application holders of certain prescription naloxone drug products aware of the preliminary assessment and the possibility that the agency may make a conclusive determination, through approval of a nonprescription naloxone drug product, that such products are safe and effective for use without a prescription.

The notice does not cover all naloxone products, as more data are needed on the safety and efficacy for nonprescription use of higher dose naloxone products and naloxone supplied in other presentations (including vials, ampules or syringes without integrated needles) before a preliminary assessment with respect to those products can be reached. The notice requests comments from the public on whether there is data to support safe and effective nonprescription use of higher dose naloxone products and on potential consequences of a switch from prescription to nonprescription status.

Over the last several years, the FDA has taken a number of steps to improve access to naloxone products. In September, the agency issued an immediately in effect guidance to clarify that certain Drug Supply Chain Security Act requirements do not apply to distribution of naloxone to harm reduction programs during the Opioid Public Health Emergency. Additional efforts include development of a model Drug Facts Label, which is required for OTC drug products, with easy-to-understand pictograms on how to use the drug to encourage manufacturers to pursue approval of OTC naloxone products; requiring drug

manufacturers for all opioid pain relievers and medicines to treat opioid use disorder to add new recommendations about naloxone to their prescribing information; and extending the shelf life of naloxone nasal spray from 24 months to 36 months.

The FDA continues to make progress implementing the new FDA Overdose Prevention Framework (https://www.fda.gov/drugs/drug-safety-and-availability/food-and-drug-administration-overdose-prevention-framework) – our vision to undertake impactful, creative actions to prevent drug overdoses and reduce deaths. The agency remains focused on responding to all facets of substance use, misuse, substance use disorders, overdose, and death in the U.S. through the four priorities of the framework, including: supporting primary prevention by eliminating unnecessary initial prescription drug exposure and inappropriate prolonged prescribing; encouraging harm reduction through innovation and education; advancing development of evidence-based treatments for substance use disorders; and protecting the public from unapproved, diverted, or counterfeit drugs presenting overdose risks.

## Related Information

- FDA Overdose Prevention Framework (https://www.fda.gov/drugs/drug-safety-and-availability/food-and-drug-administration-overdose-prevention-framework)

- Information About Naloxone (https://www.fda.gov/drugs/postmarket-drug-safety-information-patients-and-providers/information-about-naloxone)

- Timeline of Selected FDA Activities and Significant Events Addressing Opioid Misuse and Abuse (https://www.fda.gov/drugs/information-drug-class/timeline-selected-fda-activities-and-significant-events-addressing-opioid-misuse-and-abuse)

### ###

The FDA, an agency within the U.S. Department of Health and Human Services, protects the public health by assuring the safety, effectiveness, and security of human and veterinary drugs, vaccines and other biological products for human use, and medical devices. The agency also is responsible for the safety and security of our nation's food supply, cosmetics, dietary supplements, products that give off electronic radiation, and for regulating tobacco products.

## Inquiries

**Media:**

✉ Lauren-Jei McCarthy (mailto:lauren-jei.mccarthy@fda.hhs.gov)

☎ 240-702-3940

**Consumer:**

☎ 888-INFO-FDA

⊕ More Press Announcements (/news-events/newsroom/press-announcements)

**<u>Appendix I-11</u>**

# From Our Perspective | CDER's Continued Efforts to Widen Naloxone Access

*By: Marta Sokolowska, Ph.D., CDER Deputy Center Director for Substance Use and Behavioral Health*



*Marta Sokolowska, Ph.D.*

The overdose crisis is one of the most devastating public health crises affecting our country. Based on provisional Centers for Disease Control and Prevention data (https://www.cdc.gov/nchs/nvss/vsrr/drug-overdose-data.htm), over 107,000 overdose deaths occurred in the 12-month period ending in August 2022. Furthermore, in 2021, more people aged 15 to 54 died in the United States due to opioid-involved overdose than due to COVID-19.

To address this evolving crisis, FDA announced (/news-events/fda-voices/fdas-overdose-prevention-framework-aims-prevent-drug-overdoses-and-reduce-death) our Overdose Prevention Framework (/drugs/drug-safety-and-availability/food-and-drug-administration-overdose-prevention-framework) – our vision to undertake impactful, creative actions to prevent drug overdoses and reduce deaths – in August 2022. Under the Framework, one of our four priorities is encouraging harm reduction, which includes our efforts to expand access to lifesaving overdose reversal products such as naloxone.

While FDA has prioritized availability of naloxone products (/drugs/postmarket-drug-safety-information-patients-and-providers/information-about-naloxone) for years, we significantly ramped up our efforts to increase naloxone availability in 2022 as we worked to implement the Framework. Below are several key actions we have taken in the last year, as well as some scheduled activities.

### Naloxone Access: Answering Questions Public Meeting

In March 2022, we partnered with the Reagan-Udall Foundation to hold a virtual public meeting (/drugs/news-events-human-drugs/naloxone-access-answering-questions-03292022) to explore effective approaches that could increase naloxone availability. We heard first-hand from harm reduction groups about continued challenges in increasing access to naloxone. This feedback strengthened our resolve to support the lifesaving work of harm reduction programs and continue encouraging drug companies to enter the nonprescription market for naloxone.

### Issuance of Guidance to Help Facilitate Availability of Naloxone

In September 2022, we issued an immediately-in-effect guidance that we hope helps to address some of the obstacles harm reduction programs identified in the March public meeting regarding access to naloxone. The guidance, *Exemption and Exclusion from Certain Requirements of the Drug Supply Chain Security Act (DSCSA) for the Distribution of FDA-Approved Naloxone Products During the Opioid Public Health Emergency (/regulatory-information/search-fda-guidance-documents/exemption-and-exclusion-certain-requirements-drug-supply-chain-security-act-distribution-fda)*, clarifies the scope of the Public Health Emergency exclusion and exemption under the Drug Supply Chain Security Act as they apply to the distribution of FDA-approved naloxone products to harm reduction programs.

We hope this guidance will aid these programs' ability to obtain prescription naloxone directly from drug manufacturers and distributors and expand public availability of this critical medicine.

**Issuance of Nonprescription Naloxone Federal Register Notice**

In November 2022, we issued a Federal Register notice, _Safety and Effectiveness of Certain Naloxone Hydrochloride Drug Products for Nonprescription Use_ (https://www.federalregister.gov/documents/2022/11/16/2022-24874/safety-and-effectiveness-of-certain-naloxone-hydrochloride-drug-products-for-nonprescription-use), announcing FDA's preliminary assessment that certain naloxone drug products may be approvable as safe and effective for nonprescription use. This preliminary assessment is intended to help facilitate development and approval of nonprescription naloxone products. However, this is not a final determination that certain naloxone drug products are safe and effective for nonprescription use, and it doesn't mandate an immediate switch to nonprescription. Rather, by issuing this notice, we sought to make application holders of certain prescription naloxone drug products aware of the preliminary assessment and encourage drug companies to submit an application for a nonprescription naloxone product.

**Harm Reduction Stakeholder Call**

Also in November 2022, we held a stakeholder call (https://content.govdelivery.com/accounts/USFDA/bulletins/335ab22) ⎘ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) to discuss naloxone access. During the meeting, we emphasized support for harm reduction programs' ability to acquire FDA-approved naloxone products, and we acknowledged we have more work to do to expand naloxone access. The Substance Abuse and Mental Health Services Administration also participated in this call, reinforcing our shared commitment to a comprehensive federal response to increase naloxone availability and reduce overdose deaths.

In 2023, the agency is continuing to advise industry and engage stakeholders across the healthcare continuum to explore effective solutions that increase naloxone availability. We are also seeking advice from independent experts to help us make sound decisions based on the available science. Several notable activities and actions are already in the works:

- **Advisory Committees Meetings**
  On February 15th (https://www.federalregister.gov/documents/2023/01/09/2023-00110/joint-meeting-of-the-nonprescription-drugs-advisory-committee-and-the-anesthetic-and-analgesic-drug) and March 20th (https://www.federalregister.gov/documents/2023/01/30/2023-01761/joint-meeting-of-the-nonprescription-drugs-advisory-committee-and-the-anesthetic-and-analgesic-drug), FDA will hold two separate Advisory Committee meetings for two nonprescription

naloxone applications, both of which have been granted priority review. The February 15th meeting will discuss Narcan (naloxone hydrochloride) nasal spray, 4 mg/0.1 mL, submitted by Emergent BioSolutions Inc. The March 20th meeting will discuss RiVive (naloxone hydrochloride) nasal spray, 3 mg/0.1 mL, submitted by Harm Reduction Therapeutics, Inc. FDA hopes to gain expert advice on the adequacy of the data supporting each nonprescription application. These products represent potential first-in-class products in a new therapeutic category for nonprescription drugs.

- **Fatal Overdoses Workshop**
  On March 8th and 9th, we will hold a two-day virtual public meeting, Understanding Fatal Overdoses to Inform Product Development and Public Health Interventions to Manage Overdose, in partnership with the Reagan-Udall Foundation (/drugs/news-events-human-drugs/understanding-fatal-overdoses-inform-product-development-and-public-health-interventions-manage). To support efforts to develop products and approaches to treat overdose and prevent fatalities, speakers and panelists will explore the evolving context surrounding fatal overdoses. Participants will discuss epidemiological trends, drug supply changes, naloxone and other public health interventions to manage overdose, and drug development opportunities.

Ultimately, we recognize naloxone is a critical tool to help reduce opioid-involved overdose deaths during an evolving overdose crisis. We remain committed to using all available evidence and tools at our disposal to equitably improve naloxone access. While we know we have more work to do in collaboration with people who use drugs, harm reduction groups, clinicians, federal partners, and other stakeholders, the actions described above represent our coordinated, proactive, and urgent regulatory approach to improve access to lifesaving naloxone.

**<u>Appendix I-12</u>**

# EMERGENT

## Emergent BioSolutions Reports FDA Advisory Committees' Unanimous Vote in Favor of NARCAN® (naloxone HCl) Nasal Spray for Over-the-Counter Use

February 15, 2023

- If approved by the FDA, NARCAN Nasal Spray will be the first 4 mg naloxone nasal spray switched from prescription status to over-the-counter use

GAITHERSBURG, Md., Feb. 15, 2023 (GLOBE NEWSWIRE) -- Today, Emergent BioSolutions Inc. (NYSE:EBS) announced the U.S. Food and Drug Administration (FDA) Nonprescription Drugs Advisory Committee and the Anesthetic and Analgesic Drug Products Advisory Committee have unanimously voted in favor (a total of 19 votes) that the benefit-risk profile of NARCAN® (naloxone HCl) Nasal Spray is supportive of its use as a nonprescription opioid overdose reversal agent. Emergent presented an overview of its over-the-counter (OTC) development program, the medical need, Human Factors study data and seven years of post-marketing safety data. The FDA is not bound by the committees' guidance but will take its advice into consideration.

"This favorable recommendation marks another important step forward to broaden access to NARCAN Nasal Spray for those who may be at risk of an opioid overdose," said  Paul Williams, SVP and Products Business Head, Emergent BioSolutions. "Today's vote reaffirms our confidence in the safe and effective use of NARCAN in the community setting. We want to thank the participants in the open public hearing who shared their insights and personal experiences informing the need to make NARCAN more readily available over the counter."

According to the United States Centers for Disease Control and Prevention, more than 107,000 Americans lost their lives to a drug overdose in 2021, of which more than 70,000 were a result of using synthetic opioids containing fentanyl.[1] The rise in opioid-related deaths, including the increase associated with use of fentanyl, specifically during the COVID-19 pandemic, has prioritized the need to expand access to opioid overdose reversal treatment.

"Bystanders are present at nearly half of fatal overdoses, yet naloxone is administered in only a small percentage of those cases," [2] said Dr. Joshua Lynch, Clinical Associate Professor of Emergency and Addiction Medicine, University at Buffalo Jacobs School of Medicine and Biomedical Sciences. "The reality is accidental overdoses can happen to anyone, anywhere, at any time, and we can all do our part by being prepared to help like we would in any other emergency. With access to over-the-counter naloxone, we would have a critical opportunity to close this gap and reduce the number of opioid-related deaths."

Emergent was the first company to submit a supplemental New Drug Application for OTC and received Priority Review by the FDA. If approved, NARCAN would be the first 4 mg naloxone nasal spray available OTC in the U.S. The Prescription Drug User Fee Act goal date is March 29, 2023. Emergent will continue to work with policymakers, retailers, advocates and other stakeholders to help ensure policies and solutions are implemented to increase access and awareness of this potentially lifesaving medicine.

**INDICATION AND IMPORTANT SAFETY INFORMATION**

**What is NARCAN Nasal Spray?**

- NARCAN Nasal Spray is a prescription medicine used for the emergency treatment of a known or suspected opioid overdose emergency with signs of breathing problems and severe sleepiness or not being able to respond.

- NARCAN Nasal Spray is to be given right away and does not take the place of emergency medical care. Get emergency medical help right away after giving the first dose of NARCAN Nasal Spray, even if the person wakes up.

NARCAN Nasal Spray is safe and effective in children for known or suspected opioid overdose.

**Who should not use NARCAN Nasal Spray?**

**Do not use NARCAN Nasal Spray** if you are allergic to naloxone hydrochloride or any of the ingredients in NARCAN Nasal Spray.

**What is the most important information I should know about NARCAN Nasal Spray?** NARCAN Nasal Spray is used to temporarily reverse the effects of opioid medicines. The medicine in NARCAN Nasal Spray has no effect in people who are not taking opioid medicines. Always carry NARCAN Nasal Spray with you in case of an opioid overdose.

1. Use NARCAN Nasal Spray right away if you or your caregiver think signs or symptoms of an opioid overdose are present, even if you are not sure, because an opioid overdose can cause severe injury or death. Signs and symptoms of an opioid overdose may include:

   - unusual sleepiness and you are not able to awaken the person with a loud voice or by rubbing firmly on the middle of their chest (sternum)

   - breathing problems including slow or shallow breathing in someone difficult to awaken or who looks like they are not breathing

   - the black circle in the center of the colored part of the eye (pupil) is very small, sometimes called "pinpoint pupils,"

in someone difficult to awaken

2. Family members, caregivers, or other people who may have to use NARCAN Nasal Spray in an opioid overdose should know where NARCAN Nasal Spray is stored and how to give NARCAN Nasal Spray before an opioid overdose happens.

3. **Get emergency medical help right away after giving the first dose of NARCAN Nasal Spray.** Rescue breathing or CPR (cardiopulmonary resuscitation) may be given while waiting for emergency medical help.

4. The signs and symptoms of an opioid overdose can return after NARCAN Nasal Spray is given. If this happens, give another dose after 2 to 3 minutes using a new NARCAN Nasal Spray device and watch the person closely until emergency help is received.

**What should I tell my healthcare provider before using NARCAN Nasal Spray?**

Before using NARCAN Nasal Spray, tell your healthcare provider about all of your medical conditions, including if you:

- have heart problems

- are pregnant or plan to become pregnant. Use of NARCAN Nasal Spray may cause withdrawal symptoms in your unborn baby. Your unborn baby should be examined by a healthcare provider right away after you use NARCAN Nasal Spray.

- are breastfeeding or plan to breastfeed. It is not known if NARCAN Nasal Spray passes into your breast milk.

**Tell your healthcare provider about the medicines you take,** including prescription and over-the-counter medicines, drugs, vitamins, and herbal supplements.

**What are the possible side effects of NARCAN Nasal Spray?**

**NARCAN Nasal Spray may cause serious side effects, including:**

Sudden opioid withdrawal symptoms which can be severe. In someone who has been using opioids regularly, opioid withdrawal symptoms can happen suddenly after receiving NARCAN Nasal Spray and may include:

| | |
|---|---|
| • body aches | • yawning |
| • diarrhea | • nausea or vomiting |
| • increased heart rate | • nervousness |
| • fever | • restlessness or irritability |
| • runny nose | • shivering or trembling |
| • sneezing | • stomach cramping |
| • goose bumps | • weakness |
| • sweating | • increased blood pressure |

Some patients may show aggressive behavior upon abrupt reversal of an opioid overdose.

In infants under 4 weeks old who have been receiving opioids regularly, sudden opioid withdrawal may be life-threatening if not treated the right way. Signs and symptoms include: seizures, crying more than usual, and increased reflexes.

These are not all of the possible side effects of NARCAN Nasal Spray. Call your doctor for medical advice about side effects. You may report side effects to the FDA at 1-800-FDA-1088 or http://www.fda.gov/medwatch.

NNS CON ISI 08/2020

Please see full Prescribing Information.

For additional information on NARCAN® Nasal Spray, please visit www.NARCAN.com.

**About Emergent BioSolutions**

At Emergent, our mission is to protect and enhance life. For over 20 years, we've been at work defending people from things we hope will never happen—so we are prepared just in case they ever do. We provide solutions for complex and urgent public health threats through a portfolio of vaccines and therapeutics that we develop and manufacture for governments and consumers. We also offer a range of integrated contract development and manufacturing services for pharmaceutical and biotechnology customers. To learn more about how we plan to protect or enhance 1 billion lives by 2030, visit our website and follow us on LinkedIn, Twitter, and Instagram.

**Safe Harbor Statement**

This press release includes forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. All statements, other than statements of historical fact, including statements regarding the development of Over-the-Counter NARCAN® (naloxone HCl) Nasal Spray, are forward-looking statements. We generally identify forward-looking statements by using words like "anticipate," "believe," "continue," "could," "estimate," "expect," "forecast," "goal," "intend," "may," "plan," "should," "will," "would," and similar expressions or variations thereof, or the negative thereof, but these terms are not the exclusive means of identifying such statements. Forward-looking statements are based on our current intentions, beliefs and expectations regarding future events. We cannot guarantee that any forward-looking statement will be accurate. Readers should realize that if underlying assumptions prove inaccurate or unknown risks or uncertainties materialize, actual results could differ materially from our

expectations. Readers are, therefore, cautioned not to place undue reliance on any forward-looking statement. Any forward-looking statement speaks only as of the date of this press release, and, except as required by law, we do not undertake to update any forward-looking statement to reflect new information, events or circumstances. There are a number of important factors that could cause the company's actual results to differ materially from those indicated by any forward-looking statements. Readers should consider this cautionary statement, as well as the risk factors identified in our periodic reports filed with the Securities and Exchange Commission, when evaluating our forward-looking statements.

**Emergent BioSolutions Contacts:**

Media:
Matt Hartwig
Senior Director, Media Relations
240-760-0551
mediarelations@ebsi.com

Investors:
Robert G. Burrows
Vice President, Investor Relations
240-631-3280
burrowsr@ebsi.com

[1] Centers for Disease Control and Prevention. (2022, May 11). U.S. overdose deaths in 2021 increased half as much as in 2020 - but are still up 15%. Centers for Disease Control and Prevention. Retrieved November 21, 2022, from https://www.cdc.gov/nchs/pressroom/nchs_press_releases/2022/202205.htm

[2] Mattson CL, et al. Opportunities to Prevent Overdose Deaths Involving Prescription and Illicit Opioids, 11 States, July 2016-June 2017. *MMWR Morb Mortal Wkly Rep.* 2018;67(34):945-951. Published 2018 Aug 31. doi:10.15585/mmwr.mm6734a2



Source: Emergent BioSolutions

**<u>Appendix I-13</u>**

# EMERGENT

## Emergent BioSolutions Announces U.S. FDA Acceptance and Priority Review of Supplemental New Drug Application for Over-the-Counter NARCAN® (naloxone HCl) Nasal Spray

December 6, 2022

- Emergent's supplemental new drug application is the first prescription-to-over-the-counter switch application in history to be granted Priority Review by the FDA.
- NARCAN® (naloxone HCl) Nasal Spray 4 mg, the first intranasal form of naloxone approved by the FDA in 2015, is designed for community use for the treatment of known or suspected opioid overdose.

GAITHERSBURG, Md., Dec. 06, 2022 (GLOBE NEWSWIRE) -- Today, Emergent BioSolutions Inc. (NYSE:EBS) announced that the U.S. Food and Drug Administration (FDA) has accepted for review its supplemental New Drug Application (sNDA) for NARCAN® (naloxone HCl) Nasal Spray, as an over-the-counter (OTC) emergency treatment for known or suspected opioid overdose. The application has been granted Priority Review by the FDA and, if approved, would be the first 4 mg naloxone nasal spray available OTC in the U.S. The Prescription Drug User Fee Act goal date is March 29, 2023.

The opioid epidemic is an ongoing national public health issue and has been exacerbated by the escalating use of synthetic opioids, namely fentanyl. According to the Centers for Disease Control and Prevention, deaths related to synthetic opioids increased nearly 60 percent from 2019 to 2020,[1] and in 2021 alone, more than 71,000 people died from opioids containing fentanyl.[2]

"As a leader in the fight to help combat the opioid epidemic, Emergent is committed to increasing access and awareness of naloxone, and we are taking this step to help address the rising and devastating number of opioid overdoses and fatalities happening across the country," said Robert G. Kramer, president and CEO of Emergent BioSolutions. "We look forward to working with the FDA to advance our application under Priority Review designation and believe in the scientific evidence that supports the efficacy and safety of NARCAN Nasal Spray as an over-the-counter option for opioid overdose reversal."

Emergent's submission to the FDA includes Human Factors studies conducted, as well as more than five years of post-marketing data to demonstrate the safe and effective use of NARCAN. Since its approval in 2015, Emergent has distributed millions of prescription NARCAN devices across the U.S. to national, state, and local government health departments and first responders closest to at-risk populations, including public health clinics, fire departments, and police departments. Accidental overdoses can happen to anyone, anywhere, at any time, and by shifting to OTC status, increased access to NARCAN will help address patient needs as the opioid epidemic continues to evolve.

**INDICATION AND IMPORTANT SAFETY INFORMATION**

**What is NARCAN Nasal Spray?**

- NARCAN Nasal Spray is a prescription medicine used for the emergency treatment of a known or suspected opioid overdose emergency with signs of breathing problems and severe sleepiness or not being able to respond.

- NARCAN Nasal Spray is to be given right away and does not take the place of emergency medical care. Get emergency medical help right away after giving the first dose of NARCAN Nasal Spray, even if the person wakes up.

NARCAN Nasal Spray is safe and effective in children for known or suspected opioid overdose.

**Who should not use NARCAN Nasal Spray?**

**Do not use NARCAN Nasal Spray** if you are allergic to naloxone hydrochloride or any of the ingredients in NARCAN Nasal Spray.

**What is the most important information I should know about NARCAN Nasal Spray?** NARCAN Nasal Spray is used to temporarily reverse the effects of opioid medicines. The medicine in NARCAN Nasal Spray has no effect in people who are not taking opioid medicines. Always carry NARCAN Nasal Spray with you in case of an opioid overdose.

1. Use NARCAN Nasal Spray right away if you or your caregiver think signs or symptoms of an opioid overdose are present, even if you are not sure, because an opioid overdose can cause severe injury or death. Signs and symptoms of an opioid overdose may include:

    - unusual sleepiness and you are not able to awaken the person with a loud voice or by rubbing firmly on the middle of their chest (sternum)

    - breathing problems including slow or shallow breathing in someone difficult to awaken or who looks like they are not breathing

    - the black circle in the center of the colored part of the eye (pupil) is very small, sometimes called "pinpoint pupils," in someone difficult to awaken

2. Family members, caregivers, or other people who may have to use NARCAN Nasal Spray in an opioid overdose should

know where NARCAN Nasal Spray is stored and how to give NARCAN Nasal Spray before an opioid overdose happens.

3. **Get emergency medical help right away after giving the first dose of NARCAN Nasal Spray.** Rescue breathing or CPR (cardiopulmonary resuscitation) may be given while waiting for emergency medical help.

4. The signs and symptoms of an opioid overdose can return after NARCAN Nasal Spray is given. If this happens, give another dose after 2 to 3 minutes using a new NARCAN Nasal Spray device and watch the person closely until emergency help is received.

**What should I tell my healthcare provider before using NARCAN Nasal Spray?**

Before using NARCAN Nasal Spray, tell your healthcare provider about all of your medical conditions, including if you:

- have heart problems

- are pregnant or plan to become pregnant. Use of NARCAN Nasal Spray may cause withdrawal symptoms in your unborn baby. Your unborn baby should be examined by a healthcare provider right away after you use NARCAN Nasal Spray.

- are breastfeeding or plan to breastfeed. It is not known if NARCAN Nasal Spray passes into your breast milk.

**Tell your healthcare provider about the medicines you take**, including prescription and over-the-counter medicines, drugs, vitamins, and herbal supplements.

**What are the possible side effects of NARCAN Nasal Spray?**

**NARCAN Nasal Spray may cause serious side effects, including:**

Sudden opioid withdrawal symptoms which can be severe. In someone who has been using opioids regularly, opioid withdrawal symptoms can happen suddenly after receiving NARCAN Nasal Spray and may include:

- body aches
- diarrhea
- increased heart rate
- fever
- runny nose
- sneezing
- goose bumps
- sweating
- yawning
- nausea or vomiting
- nervousness
- restlessness or irritability
- shivering or trembling
- stomach cramping
- weakness
- increased blood pressure

Some patients may show aggressive behavior upon abrupt reversal of an opioid overdose.

In infants under 4 weeks old who have been receiving opioids regularly, sudden opioid withdrawal may be life-threatening if not treated the right way. Signs and symptoms include: seizures, crying more than usual, and increased reflexes.

These are not all of the possible side effects of NARCAN Nasal Spray. Call your doctor for medical advice about side effects. You may report side effects to the FDA at 1-800-FDA-1088 or http://www.fda.gov/medwatch.

NNS CON ISI 08/2020

Please see full Prescribing Information.

For additional information on NARCAN® Nasal Spray, please visit www.NARCAN.com.

**About Emergent BioSolutions**
At Emergent, our mission is to protect and enhance life. For over 20 years, we've been at work defending people from things we hope will never happen—so we are prepared just in case they ever do. We provide solutions for complex and urgent public health threats through a portfolio of vaccines and therapeutics that we develop and manufacture for governments and consumers. We also offer a range of integrated contract development and manufacturing services for pharmaceutical and biotechnology customers. To learn more about how we plan to protect or enhance 1 billion lives by 2030, visit our website and follow us on LinkedIn, Twitter, and Instagram.

**Safe Harbor Statement**

This press release contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. All statements, other than statements of historical fact, including statements regarding the development of Over-the-Counter NARCAN (naloxone HCl) Nasal Spray, are forward-looking statements. We generally identify forward-looking statements by using words like "anticipate," "believe," "continue," "estimate," "expect," "forecast," "intend," "may," "plan," "should," "will," and similar expressions or variations thereof, or the negative thereof, but these terms are not the exclusive means of identifying such statements. Forward-looking statements are based on our current intentions, beliefs and expectations regarding future events. We cannot guarantee that any forward-looking statement will be accurate. Readers should realize that if underlying assumptions prove inaccurate or unknown risks or uncertainties materialize, actual results could differ materially from our expectations. Readers are, therefore, cautioned not to place undue reliance on any forward-looking statement. Any forward-looking statement speaks only as of the date of this press release, and, except as required by law, we do not undertake to update any forward-looking statement to reflect new information, events or circumstances.

There are a number of important factors that could cause the company's actual results to differ materially from those indicated by any forward-looking statements. Readers should consider this cautionary statement, as well as the risk factors identified in our periodic reports filed with the Securities and Exchange Commission, when evaluating our forward-looking statements.

**Emergent BioSolutions Contacts:**

Media:
Matt Hartwig
Senior Director, Media Relations
240-760-0551
mediarelations@ebsi.com

Investors:
Robert G. Burrows
Vice President, Investor Relations
240-631-3280
burrowsr@ebsi.com

―――――

[1] Centers for Disease Control and Prevention. (2022, February 23). *Fentanyl facts.* Centers for Disease Control and Prevention. Retrieved November 21, 2022, from https://www.cdc.gov/stopoverdose/fentanyl/index.html

[2] Centers for Disease Control and Prevention. (2022, May 11). *U.S. overdose deaths in 2021 increased half as much as in 2020 - but are still up 15%.* Centers for Disease Control and Prevention. Retrieved November 21, 2022, from https://www.cdc.gov/nchs/pressroom/nchs_press_releases/2022/202205.htm



Source: Emergent BioSolutions

**<u>Appendix I-14</u>**



 

# Purdue Pharma L.P. Files Broadly Supported Plan of Reorganization

Mar 16, 2021 | News

- *Plan will create National Opioid Abatement Trust*
- *Plan will make more than $10 billion in value available for opioid abatement programs across the country*
- *100% of Purdue's assets will be transferred to a new company dedicated at its core to addressing the opioid crisis*
- *Plan has broad creditor support*
- *Sacklers to pay $4.275 billion into bankruptcy estate*

STAMFORD, Conn. – March 15, 2021 – Purdue Pharma L.P. today filed a Chapter 11 plan of reorganization (the Plan) and a related disclosure statement in the United States Bankruptcy Court for the Southern District of New York. True to the vision articulated at the outset of the Chapter 11 proceedings, the Plan charts a path for more than $10 billion of value, including 100% of Purdue's assets, to be delivered to claimants and communities across the country affected by the opioid crisis.

"Purdue has delivered a historic plan that can have a profoundly positive impact on public health by directing critically-needed resources to communities and individuals nationwide who have been affected by the opioid crisis," said Steve Miller, chairman of Purdue's Board of Directors. "The company has worked closely with a broad and diverse group of stakeholders to guarantee that billions of dollars will be used exclusively for abatement purposes and not diverted elsewhere."

The company believes there is broad and strong support for the Plan, including many state Attorneys General, the Ad Hoc Committee of Governmental and Other

  

**Plan of Reorganization Highlights**

1. The vast majority of proceeds will be used to abate the opioid crisis; these funds cannot be diverted to other purposes.

2. The Plan will deliver more than $10 billion in value, including providing, at cost, millions of doses of potentially lifesaving opioid addiction treatment and overdose reversal medicines.

3. Purdue will be dissolved. All its assets will be transferred to a new company after emergence from Chapter 11 that will be held to the highest standards of conduct, including a prohibition restricting the promotion of opioid products to healthcare professionals.

4. The new company will ultimately be owned by a new National Opioid Abatement Trust established for the benefit of the American people. State and local governments will neither own, nor operate the new company.

5. The Sacklers will have no involvement in the new company, will end their involvement in pharmaceutical companies worldwide, and have increased their contribution to the global settlement to a total of $4.5 billion.

The Plan is unprecedented in scope and nature. First, it will transfer billions of dollars of value into trusts for the benefit of the American people. Second, it will dissolve Purdue and transfer its operating assets to a newly formed company with the public-minded mission of addressing the opioid crisis. State and local governments will neither own, nor operate the new company.

*Creation of Trusts to Abate the Opioid Crisis Across America*

The single largest recipient of funds under the Plan would be the National Opioid Abatement Trust (NOAT), a newly-formed entity created to satisfy the claims of state and local governments. NOAT would receive billions of dollars, and those funds would be exclusively dedicated to programs designed to abate the opioid crisis.  NOAT and an abatement trust established to satisfy claims asserted by

  

In addition to NOAT and the Tribe Trust, the Plan contemplates the creation of several additional trusts, including:

- The Master Disbursement Trust (MDT), which would make payments to various private trusts
- Several private abatement trusts established to satisfy the claims of treatment providers, third party payors and insurance carriers, as well as legal guardians of children born with neonatal abstinence syndrome. Each would make distributions solely in the form of funding for programs designed to abate the opioid crisis.
- A personal injury trust, which will administer and make distributions on account of personal injury claims.

Each of these trusts established under the Plan will be required to consider the need to ensure that underserved urban and rural areas, as well as minority communities, receive equitable access to the funds.

Funding for the various trusts comes primarily from three sources:

1. An initial cash distribution from the company of more than $500 million immediately upon emergence from bankruptcy.
2. Approximately $1 billion expected to be generated by the assets and the operations of the new post-bankruptcy pharmaceutical company through the end of 2024, for a projected total of approximately $1.5 billion, plus substantial additional recoveries expected from insurance claims.
3. $4.275 billion in cash payments by the Sackler families.

In addition to this cash funding, the company estimates that approximately $4 billion in value could also be provided through the new company's Public Health Initiatives (described in more detail below).

Under the Plan, the Sackler families have agreed to pay $4.275 billion in addition to the $225 million previously paid to the United States to resolve civil claims against Purdue's former shareholders, for a total settlement of $4.5 billion. This amount

  

payments are made ahead of schedule). Additionally, the Sackler families will be required to sell their world-wide pharmaceutical businesses within seven years of the Effective Date, and not engage in the manufacturing or sale of opioid medications going forward.

***Creation of A New Company Dedicated to Addressing the Opioid Crisis***

After confirmation of the Plan, Purdue's assets would be transferred to a newly formed company.

- Purpose – The new company will exist for the purposes of funding trusts dedicated to abating the opioid crisis, developing and distributing medicines to reverse opioid overdoses and treat opioid addiction, and otherwise taking into account long-term public health interests relating to the opioid crisis.
- Responsible Seller of Opioids – The new company would be subject to covenants to ensure that it provides all of its products, including all opioid products, in a safe manner that limits the risk of diversion. The new company will remain subject to a formal commitment to refrain from promoting its opioid products to health care providers. A Monitor will continue to ensure that the new company will comply with all applicable covenants and injunctions. The initial post-emergence Monitor will be the Purdue Monitor in place as of the Effective Date or otherwise selected by the Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants and the Multi-State Governmental Entities Group, with the consent of Purdue and in consultation with the Creditors' Committee.
- Governance – The new company would be overseen by new independent Managers, who will function as the board of directors. The Managers will initially be selected by the Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants and the Multi-State Governmental Entities Group, in consultation with Purdue and the Creditors' Committee, and subject to the Department of Justice's discretionary right to observe the process. The Sacklers will have no role in the selection of the managers or in any other aspect of the new company's governance or operations.






the $2 billion forfeiture that the company would otherwise have to pay to the United States.

- Public Health Initiatives – The new company will oversee the ongoing development and eventual distribution, at or below cost, of three potentially lifesaving medicines**:

1. **Buprenorphine naloxone tablets** – Purdue can manufacture a generic version of buprenorphine and naloxone sublingual tablets CIII, a treatment for opioid dependence. The FDA approved a generic version of buprenorphine and naloxone tablets developed by Rhodes Pharmaceuticals, a subsidiary of Purdue, in 2020. (For full prescribing information, click here; for the medication guide and warnings, click here.)

2. **Over-the-counter (OTC) naloxone nasal spray** – Purdue has been supporting the development of a low-cost, OTC naloxone intranasal spray through collaboration with Harm Reduction Therapeutics that will be sold over-the-counter without need of a prescription or request from a pharmacist, and for a fraction of the cost of the existing naloxone nasal spray therapy, making it easier for more people to afford and access.

3. **Injectable nalmefene** – Purdue is developing injectable nalmefene, an opioid antagonist designed to reverse opioid overdose, in three dosage forms: vial, prefilled syringe and autoinjector. The FDA previously granted Competitive Generic Therapy designation for the vial and prefilled syringe, and Fast Track designation for the autoinjector. Nalmefene may be another treatment option to help address the growing and continuing crisis of opioid overdose deaths, including those due to fentanyl and other synthetic opioids.

"Our teams of scientists are committed to developing and delivering medications and solutions to meaningfully address the opioid crisis," said Dr. Julie Ducharme, vice president, chief scientific officer, and Public Health Initiatives co-lead.  "We have the capability and the passion to make a substantial difference right away, and for years to come."

The full terms of the Plan and the disclosure statement can be viewed here.

  

Court's approval of the disclosure statement, Purdue will distribute the Plan and disclosure statement to voting creditors for their consideration.

"With drug overdoses still at record levels, it is past time to put Purdue's assets to work addressing the crisis," said Steve Miller. "We are confident this plan achieves that critical goal."

\* As specified in the plan, certain provisions remain open for final resolution and the support of the listed parties remains subject to the satisfactory resolution of those issues.

\*\*This information discusses investigational uses of agents in development and are not intended to convey conclusions about efficacy or safety. There is no guarantee that the medications listed in this release will successfully complete development or gain FDA approval.

### 

**About Purdue Pharma L.P.**

Purdue Pharma and its subsidiaries are physician-founded and physician-led companies that develop, manufacture and market medications and consumer health products to meet the evolving needs of healthcare professionals, patients, consumers and caregivers. Purdue Pharma is also committed to driving innovations in patient care while continuing our efforts to address the opioid crisis.

Purdue's subsidiaries include: Adlon Therapeutics L.P., focused on treatment options for Attention-Deficit/Hyperactivity Disorder (ADHD) and related disorders; Avrio Health L.P., a consumer wellness company that provides over-the-counter products to fight infection, promote digestive wellness and provide health supplements; Imbrium Therapeutics L.P., established to develop and commercialize non-opioid pain medications and therapies for select oncology and





development.

For more information, visit www.purduepharma.com.

**Media Contact:**

Michele Sharp

(203) 588-7584

| | Search |

## Recent Posts

FDA Grants Priority Review for Nalmefene Prefilled Syringe for the Treatment of Known or Suspected Opioid Overdos

Prescription Drug Safety Network Reached More Than 22,000 Students with Prescription Drug Safety Digital Education During 2021-22 School Year

Purdue Pharma Introduces Nalmefene HCl Injection, 2mg/2mL (1mg/1mL) in the U.S. for the Treatment of Known or Suspected Overdose with Natural or Synthetic Opioids

Harm Reduction Therapeutics to Receive Additional Funding for the Development of its Over-the-Counter Opioid Overdose Reversal Medication from Purdue Pharma after Bankruptcy Court Approval

Purdue Pharma L.P. to Provide Opportunities for Investigator-Initiated Research to Examine Opioid Overdose Reversal in Emergency Medicine Settings

## Archives

January 2023

November 2022

June 2022

March 2022







September 2021

July 2021

June 2021

March 2021

October 2020

August 2020

June 2020

March 2020

February 2020

September 2019

August 2019

July 2019

June 2019

April 2019

March 2019

February 2019

January 2019

October 2018

September 2018

August 2018

February 2018

January 2018

## Categories







Purdue, as used in this site, refers to Purdue Pharma L.P. and its subsidiaries, which include Avrio Health L.P., Imbrium Therapeutics L.P., Adlon Therapeutics L.P., Greenfield BioVentures L.P., Rhodes Pharmaceuticals L.P., and Purdue Pharmaceuticals L.P.