**Hearing Date and Time: April 25, 2023, at 11:00 a.m. (prevailing Eastern Time)**
**Objection Date and Time: April 18, 2023, at 4:00 p.m. (prevailing Eastern Time)**

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Eli J. Vonnegut
Christopher S. Robertson

*Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | **Chapter 11** |
| **PURDUE PHARMA L.P.,** *et al.*, | **Case No. 19-23649 (SHL)** |
| **Debtors.**[1] | **(Jointly Administered)** |

**NOTICE OF HEARING REGARDING MOTION OF DEBTORS FOR ENTRY OF ORDERS (I)(A) APPROVING BIDDING PROCEDURES FOR SALE OF DEBTORS' AVRIO ASSETS, (B) APPROVING THE DESIGNATION OF ATLANTIS CONSUMER HEALTHCARE INC., A WHOLLY OWNED SUBSIDIARY OF ARCADIA CONSUMER HEALTHCARE INC., AS THE STALKING HORSE BIDDER FOR THE AVRIO ASSETS, (C) AUTHORIZING AND APPROVING ENTRY INTO THE STALKING HORSE ASSET PURCHASE AGREEMENT, (D) APPROVING BID PROTECTIONS, (E) SCHEDULING AUCTION FOR, AND HEARING TO APPROVE, SALE OF DEBTORS' AVRIO ASSETS, (F) APPROVING FORM AND MANNER OF NOTICES OF SALE, AUCTION, AND SALE HEARING, (G) APPROVING ASSUMPTION AND ASSIGNMENT PROCEDURES, AND (H) GRANTING RELATED RELIEF AND**

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014).  The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

**(II)(A) APPROVING SALE OF DEBTORS' AVRIO ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES, (B) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (C) GRANTING RELATED RELIEF**

**PLEASE TAKE NOTICE** that on April 4, 2023, the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") filed the *Motion of Debtors for Entry of Orders (I)(a) Approving Bidding Procedures for Sale of Debtors' Avrio Assets, (b) Approving the Designation of Atlantis Consumer Healthcare Inc., a Wholly-Owned Subsidiary of Arcadia Consumer Healthcare Inc., as the Stalking Horse Bidder for the Avrio Assets, (c) Authorizing and Approving Entry into the Stalking Horse Asset Purchase Agreement, (d) Approving Bid Protections, (e) Scheduling Auction for, and Hearing To Approve, Sale of Debtors' Avrio Assets, (f) Approving Form and Manner of Notices of Sale, Auction, and Sale Hearing, (g) Approving Assumption and Assignment Procedures, and (h) Granting Related Relief and (II)(a) Approving Sale of Debtors' Avrio Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (b) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases, and (c) Granting Related Relief* (the "**Motion**").  A hearing on the Motion will be held on **April 25, 2023, at 11:00 a.m. (prevailing Eastern Time)** (the "**Hearing**") before the Honorable Sean H. Lane, United States Bankruptcy Judge, United States Bankruptcy Court for the Southern District of New York, 300 Quarropas Street, White Plains, New York 10601 (the "**Bankruptcy Court**"), or at such other time as the Bankruptcy Court may determine.

**PLEASE TAKE FURTHER NOTICE** that pursuant to General Order M-543, dated March 20, 2020 (Morris, C.J.) ("**General Order M-543**"), the Hearing shall be conducted **via**

**Zoom for Government**® so long as General Order M-543 is in effect or unless otherwise ordered by the Bankruptcy Court.[2]

PLEASE TAKE FURTHER NOTICE that the Hearing may be continued or adjourned thereafter from time to time without further notice other than an announcement of the adjourned date or dates at the Hearing or a later hearing. The Debtors will file an agenda before the Hearing, which may modify or supplement the motions to be heard at the Hearing.

PLEASE TAKE FURTHER NOTICE that any responses or objections (the "**Objections**") to the Motion shall be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the Southern District of New York, shall be filed with the Bankruptcy Court (a) by attorneys practicing in the Bankruptcy Court, including attorneys admitted *pro hac vice*, electronically in accordance with General Order M-399 (which can be found at www.nysb.uscourts.gov), and (b) by all other parties in interest, on a CD-ROM, in text-searchable portable document format (PDF) (with a hard copy delivered directly to Chambers), in accordance with the customary practices of the Bankruptcy Court and General Order M-399, to the extent applicable, and shall be served in accordance with the *Second Amended Order Establishing Certain Notice, Case Management, and Administrative Procedures* entered on November 18, 2019 [ECF No. 498], so as to be filed and received no later than **April 18, 2023** at **4:00 p.m.** (prevailing Eastern Time) (the "**Objection Deadline**").

PLEASE TAKE FURTHER NOTICE that if no Objections are timely filed and served with respect to the Motion, the Debtors may, on or after the Objection Deadline, submit to the Bankruptcy Court an order substantially in the form of the proposed order annexed to the Motion as Exhibit A thereto, which order may be entered without further notice or opportunity to be heard.

---

[2] A copy of General Order M-543 can be obtained by visiting http://www.nysb.uscourts.gov/news/court-operations-under-exigent-circumstances-created-covid-19.

**PLEASE TAKE FURTHER NOTICE** that objecting parties are required to attend the

Hearing, and failure to appear may result in relief being granted upon default; *provided* that

objecting parties shall attend the Hearing via Zoom for Government so long as General Order

M-543 is in effect or unless otherwise ordered by the Bankruptcy Court.

**PLEASE TAKE FURTHER NOTICE** that copies of the Motion may be obtained free of

charge    by    visiting    the    website    of    Kroll    Restructuring    Administration    at

https://restructuring.ra.kroll.com/purduepharma.  You may also obtain copies of any pleadings by

visiting  the Bankruptcy Court's  website  at  http://www.nysb.uscourts.gov  in  accordance  with

the procedures and fees set forth therein.


Dated:    April 4, 2023
          New York, New York


                        DAVIS POLK & WARDWELL LLP

                        By:   */s/ Eli J. Vonnegut*

                        450 Lexington Avenue
                        New York, New York 10017
                        Telephone: (212) 450-4000
                        Facsimile:  (212) 701-5800
                        Marshall S. Huebner
                        Benjamin S. Kaminetzky
                        Eli J. Vonnegut
                        Christopher S. Robertson
                        Dylan A. Consla

                        *Counsel to the Debtors*
                        *and Debtors in Possession*

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Eli J. Vonnegut
Christopher S. Robertson
Dylan A. Consla

*Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | **Chapter 11** |
| **PURDUE PHARMA L.P.**, *et al.*, | **Case No. 19-23649 (SHL)** |
| **Debtors.[1]** | **(Jointly Administered)** |

**MOTION OF DEBTORS FOR ENTRY OF ORDERS (I)(A) APPROVING BIDDING PROCEDURES FOR SALE OF DEBTORS' AVRIO ASSETS, (B) APPROVING THE DESIGNATION OF ATLANTIS CONSUMER HEALTHCARE INC., A WHOLLY OWNED SUBSIDIARY OF ARCADIA CONSUMER HEALTHCARE INC., AS THE STALKING HORSE BIDDER FOR THE AVRIO ASSETS, (C) AUTHORIZING AND APPROVING ENTRY INTO THE STALKING HORSE ASSET PURCHASE AGREEMENT, (D) APPROVING BID PROTECTIONS, (E) SCHEDULING AUCTION FOR, AND HEARING TO APPROVE, SALE OF DEBTORS' AVRIO ASSETS, (F) APPROVING FORM AND MANNER OF NOTICES OF SALE, AUCTION, AND SALE HEARING, (G) APPROVING ASSUMPTION AND ASSIGNMENT PROCEDURES, AND (H) GRANTING RELATED RELIEF AND (II)(A) APPROVING SALE OF DEBTORS' AVRIO ASSETS FREE AND CLEAR OF LIENS, CLAIMS,**

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

**INTERESTS, AND ENCUMBRANCES, (B) AUTHORIZING ASSUMPTION AND
ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES,
AND (C) GRANTING RELATED RELIEF**

The debtors and debtors in possession (collectively, the "**Debtors**") in the above-captioned chapter 11 cases (the "**Cases**"), hereby file this *Motion of Debtors for Entry of Orders (I)(a) Approving Bidding Procedures for Sale of Debtors' Avrio Assets, (b) Approving the Designation of Atlantis Consumer Healthcare Inc., a Wholly-Owned Subsidiary of Arcadia Consumer Healthcare Inc., as the Stalking Horse Bidder for the Avrio Assets, (c) Authorizing and Approving Entry into the Stalking Horse Asset Purchase Agreement, (d) Approving Bid Protections, (e) Scheduling Auction for, and Hearing To Approve, Sale of Debtors' Avrio Assets, (f) Approving Form and Manner of Notices of Sale, Auction, and Sale Hearing, (g) Approving Assumption and Assignment Procedures, and (h) Granting Related Relief and (II)(a) Approving Sale of Debtors' Avrio Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (b) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases, and (c) Granting Related Relief* (this "**Motion**").  This Motion is supported by (i) the *Declaration of Rafael J. Schnitzler in Support of the Motion of Debtors for Entry of Orders (I)(a) Approving Bidding Procedures for Sale of Debtors' Avrio Assets, (b) Approving the Designation of Atlantis Consumer Healthcare Inc., a Wholly-Owned Subsidiary of Arcadia Consumer Healthcare Inc., as the Stalking Horse Bidder for the Avrio Assets, (c) Authorizing and Approving Entry into the Stalking Horse Asset Purchase Agreement, (d) Approving Bid Protections, (e) Scheduling Auction for, and Hearing To Approve, Sale of Debtors' Avrio Assets, (f) Approving Form and Manner of Notices of Sale, Auction, and Sale Hearing, (g) Approving Assumption and Assignment Procedures, and (h) Granting Related Relief and (II)(a) Approving Sale of Debtors' Avrio Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (b) Authorizing Assumption and*

*Assignment of Executory Contracts and Unexpired Leases, and (c) Granting Related Relief* (the

"**Schnitzler Declaration**"), filed contemporaneously herewith, and (ii) the entire record of the

Cases.  In further support of this Motion, the Debtors respectfully state as follows:

### Relief Requested

1.      By this Motion, pursuant to sections 105(a), 363, 364, 365, 503, and 507 of title 11

of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 6004, 6006, 9007, and 9014 of

the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), rules 2002-1, 6004-1,

6006-1, 9006-1, and 9013-1 of the Local Bankruptcy Rules for the Southern District of New York

(the "**Local Rules**"), and the *Amended Guidelines for the Conduct of Asset Sales, General Order

M-383 of the Court* (the "**Sale Guidelines**"), the Debtors request entry of the following:

a.      an order, substantially in the form attached hereto as **Exhibit A** (the
"**Bidding Procedures Order**"),

   i.      authorizing and approving the bidding procedures, substantially in
   the form attached to the Bidding Procedures Order as **Exhibit 1**
   thereto (the "**Bidding Procedures**"), in connection with the sale of
   the Avrio Assets (as defined herein) (the "**Sale Transaction**");

   ii.     authorizing and approving the Debtors' entry into the Asset
   Purchase Agreement, dated as of April 4, 2023, by and among the
   Debtors, Atlantis Consumer Healthcare Inc. (the "**Stalking Horse
   Bidder**") and Arcadia Consumer Healthcare Inc. ("**Arcadia**"), as
   guarantor, attached hereto as **Exhibit C** (the "**Stalking Horse
   Agreement**");

   iii.    approving certain Bid Protections in favor of the Stalking Horse
   Bidder in connection with the Stalking Horse Agreement and in
   accordance with the terms and conditions set forth in the Bidding
   Procedures;

   iv.     scheduling an auction of the Avrio Assets (the "**Auction**") to be held
   on May 17, 2023 at 10:00 a.m. (prevailing Eastern Time);

   v.      scheduling a hearing (the "**Sale Hearing**") to consider approval of
   the proposed Sale Transaction to be held on May 23, 2023 at 11:00
   a.m. (prevailing Eastern Time);

vi.    authorizing and approving the (A) notice of the sale of the Avrio Assets, the Potential Bidder Deadline, the Bid Deadline, and the Auction and Sale Hearing (each as defined herein), substantially in the form attached to the Bidding Procedures Order (the "**Sale Notice**"), (B) notice to each relevant non-Debtor counterparty (each, a "**Counterparty**") to (i) an executory contract or unexpired lease and (ii) a contract or unexpired lease entered into by the Seller in the ordinary course of business or approved by the Bankruptcy Court, in either case after September 15, 2019, in either case listed on the Potential Assigned Contracts Schedule (as defined below) regarding the Debtors' potential assumption and assignment of such contracts or leases (collectively, the "**Potential Assigned Contracts**") and the amount necessary to cure any defaults thereunder (the "**Cure Costs**"), substantially in the form attached to the Bidding Procedures Order (the "**Potential Assumption and Assignment Notice**");

vii.    authorizing and approving procedures for the assumption and assignment of the Contracts and Leases and the determination of Cure Costs with respect thereto (collectively, the "**Assumption and Assignment Procedures**"); and

viii.    granting related relief.

b.    an order (the "**Sale Order**"), substantially in the form attached hereto as **<u>Exhibit B</u>**, authorizing and approving the following:

i.    the sale of the "Acquired Assets" (as defined in the Stalking Horse Agreement), which consist of substantially all of the assets of the Debtors' consumer health business, which is currently conducted by Avrio Health L.P. (collectively, and solely to the extent expressly set forth and defined as an Acquired Asset in the Stalking Horse Agreement, the "**Avrio Assets**") to Atlantis Consumer Healthcare Inc. ("**Purchaser**") pursuant to the Stalking Horse Agreement, free and clear of all liens, claims, and encumbrances, to the fullest extent permitted by law and except where the Debtors agreed to transfer, and the Purchaser has expressly agreed to permit or assume, certain encumbrances and certain liabilities of the Debtors (solely to the extent expressly set forth and defined in the Agreement, the "**Permitted Post-Closing Encumbrances**" and the "**Assumed Liabilities**");

ii.    the assumption and assignment of the contracts and unexpired leases listed, described or otherwise identified on Schedule 1.1(d)(i) (as such schedule may be amended from time to time pursuant to Section 1.5(c) of the Stalking Horse Agreement) and Schedule 1.1(d)(ii) of the Stalking Horse Agreement (collectively, the

4

"**Assigned Contracts**") in connection with the proposed Sale Transaction; and

iii.    granting related relief.

**Jurisdiction, Venue, and Authority**

2.    The United States Bankruptcy Court for the Southern District of New York (the "**Court**") has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference M-431*, dated January 31, 2012 (Preska, C.J.).

3.    This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2) and, pursuant to Bankruptcy Rule 7008, the Debtors consent to entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

4.    Venue of the Cases and related proceedings is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

**General Background**

5.    On September 15, 2019 (the "**Petition Date**"), each Debtor commenced a voluntary case under chapter 11 of the Bankruptcy Code before the Court.  The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On September 27, 2019, the United States Trustee for the Southern District of New York appointed the official committee of unsecured creditors (the "**Committee**").  No trustee has been appointed in these Cases.

6.    These Cases are being jointly administered pursuant to Bankruptcy Rule 1015(b) and the *Order Directing Joint Administration of Chapter 11 Cases* [D.I. 59] entered by the Court in each of the Cases.

7.     Additional information regarding the Debtors and the events leading up to the Petition Date can be found in the *Debtors' Informational Brief* filed on September 16, 2019 [D.I. 17].

### The Avrio Assets[2]

8.     As described more fully in the Schnitzler Declaration, the Debtors are seeking to sell substantially all of the assets of the Debtors' consumer health business, which is currently conducted by Avrio Health L.P. ("**Avrio**" and such assets, collectively, and as further defined in the Stalking Horse Agreement, the "**Avrio Assets**").

9.     Avrio engages in the marketing, sale, and distribution of four principal and well known over-the-counter ("**OTC**") medications: Betadine® and Betasept® (an antiseptic for use at home and in hospitals, and which is an important defense against topical infections); Colace®, Peri-Colace®, and Colace 2-IN-1® (stool softeners and stool stimulants to treat occasional constipation); Senokot® (a laxative for occasional constipation); and SlowMag® (a magnesium supplement with high-absorption magnesium chloride plus calcium).  OTC medications are FDA-regulated but do not require prescriptions.  Avrio has no role in Purdue's branded or generic prescription medication business and, for the avoidance of doubt, has not and does not manufacture, sell, or distribute opioid pain medications and related products.

10.     The Debtors have determined that conducting a sale of the Avrio Assets in accordance with the Stalking Horse Agreement and the Bidding Procedures is both value maximizing and in the best interests of the Debtors' estates.  Importantly, a sale of the Avrio Assets at this time would maximize the amount of cash in the Debtors' estates available to dedicate to opioid abatement efforts upon effectiveness of a plan of reorganization.

---

[2] The assets and operations described in this section are referred to collectively as the "**Avrio Assets**" herein.

## Marketing and Sale Process

11.     PJT Partners LP ("**PJT**") has been engaged as investment banker to the Debtors since the Petition Date.[3]  PJT has been working with the Debtors' management team and co-advisors to explore strategic alternatives for the Avrio Assets, including conducting the extensive marketing and negotiation process described in more detail below.  After considering a wide range of potential strategic alternatives and extensive discussions with relevant stakeholders, PJT and the Debtors ultimately determined that a sale of the Avrio Assets would maximize the value of these significant non-core, non-opioid assets.

12.     The Debtors and PJT began working on marketing materials to support the sale of the Avrio Assets in the summer of 2022.  In December 2022, PJT began reaching out to a broad universe of potential purchasers that PJT had identified as potentially having the interest and wherewithal to act as a "stalking horse" bidder for the Avrio Assets in connection with a Court-supervised auction process.  Over the course of this initial outreach, PJT contacted a total of over 70 financial and strategic parties.  Several of these parties, including the Stalking Horse Bidder (as defined below), expressed interest in considering a transaction with the Debtors, and each was offered an opportunity to enter into a non-disclosure agreement to continue in the process.  The Debtors executed non-disclosure agreements with 33 of these parties, each of which was granted access to a data room containing limited confidential information regarding the Avrio Assets.  Throughout this initial stage, each prospective purchaser interested in doing so attended diligence calls and meetings with PJT and the Debtors' management team.  Due diligence calls and

---

[3] The *Order Approving Debtors' Employment of PJT Partners LP as Investment Banker Nunc Pro Tunc to the Petition Date* was entered on January 9, 2020 ("**PJT Retention Order**") [D.I. 728].

information were granted to the extent appropriate for this initial stage of the process. The Debtors

and PJT requested that interested parties submit their round one proposals by January 24, 2023.

13.     As described in the Schnitzler Declaration, sixteen interested parties submitted

round-one proposals.   The Debtors and their advisors reviewed and discussed the round one

proposals and elected to invite eight parties into the second round of the process based on numerous

factors, including the economic and other terms of the proposals, the parties' financial wherewithal

to acquire the Avrio Assets, and the parties' perceived level of interest.   The parties invited into

the second round of the process were granted the opportunity to attend a management presentation

with the Debtors' management team and were granted access to a virtual data room that included

additional confidential information regarding the Avrio Assets.   Select parties conducted extensive

due diligence and requested additional specific financial, operational, legal, regulatory, tax and

product information.   Certain parties requested numerous calls and management meetings with the

Debtors' management team and the Debtors' advisors.   The Debtors and PJT requested interested

parties to submit round-two proposals on March 14, 2023.   Three prospective purchasers submitted

round two proposals which included financing commitment letters.   The prospective purchasers

also submitted comments and issues on the Debtors' draft form of Stalking Horse Agreement.

14.     The Debtors and the Debtors' advisors reviewed the round two proposals, engaged

in discussions and concluded to have two potential purchasers submit best and final proposals by

March 19, 2023.  Prior to March 19, 2023, the Debtor's advisors provided the potential purchasers

with key economic and legal feedback on their second-round proposals.  Both potential purchasers

submitted documentation reflecting their best and final proposals and both parties' financial and

legal terms improved materially from their round 2 proposals.  After March 19, one of the potential

purchasers revised its best and final proposal to reflect current business conditions for the Avrio

Assets.  After thoroughly evaluating the final proposals, the Debtors, in the exercise of their business judgment and with the assistance of their advisors, determined that the revised best and final proposal (the "**Stalking Horse Bid**") submitted by the Stalking Horse Bidder offered the most favorable terms available, taken as a whole, including the highest price.  The total purchase price of three hundred ninety-seven million dollars ($397,000,000) (plus the assumption of certain liabilities) consists of three hundred sixty-eight million dollars ($368,000,000) in upfront consideration (the "**Upfront Consideration**") plus up to twenty-nine million dollars ($29,000,000) of contingent consideration (the "**Contingent IP Consideration**") consisting of six million dollars ($6,000,000) upon the transfer of certain intellectual property rights ("**IP**") related to Betadine® and Betasept®, fifteen million dollars ($15,000,000) upon the transfer of certain IP related to Senokot®, and up to eight million dollars ($8,000,000) upon the assignment of an agreement with Alcon Universal Ltd. concerning the Betadine® 5%- Sterile Ophthalmic Prep Solution.

15.     The Stalking Horse Agreement is the product of the extensive marketing efforts of the Debtors and their advisors, which efforts are more fully described above and in the Schnitzler Declaration.  The time periods set forth in the Bidding Procedures are prudent and consistent with both the Debtors' extensive marketing efforts to date and the Debtors' efforts to timely close the Sale Transaction in a manner that maximizes value for the benefit of their estates and stakeholders.

16.     To ensure that the Stalking Horse Bid is in fact the highest or otherwise best offer for the purchase of the Avrio Assets, the Debtors have developed Bidding Procedures to allow interested parties to submit competing bids for the Avrio Assets.  The Stalking Horse Agreement, therefore, sets a floor for value to be obtained in the sale of the Avrio Assets in a competitive bidding process, which will benefit all of the Debtors' stakeholders by providing certainty while

also helping to ensure the highest or otherwise best offer for the Avrio Assets.

17.     The Debtors have carefully evaluated a number of qualitative and quantitative factors in designing a process that they believe will maximize the value of the Avrio Assets and produce maximum recoveries.  This process includes both entry into the Stalking Horse Agreement and approval of the Bidding Procedures, which are designed to (a) promote active bidding from interested parties and (b) elicit the highest or otherwise best offers available for the Avrio Assets for the benefit of stakeholders.

18.     The Debtors, in consultation with their advisors, believe that the process and time periods set forth in the Bidding Procedures are reasonable and will provide parties with sufficient time and information necessary to formulate bids to purchase the Avrio Assets.  In formulating the Bidding Procedures and time periods contained therein, the Debtors balanced the need to provide adequate and appropriate notice to parties in interest and to potential purchasers with the need to efficiently sell the Avrio Assets to maximize realizable value, all while preventing the disclosure of confidential information to competitors that could be damaging to the business going forward. As described above and more fully in the Schnitzler Declaration, the Avrio Assets have been extensively marketed by PJT over approximately four months to a broad group of over 70 potential strategic and financial buyers determined by PJT to be most likely to have interest in and wherewithal to consummate a transaction with Avrio, who have been provided with substantial information regarding the Avrio Assets.

19.     Accordingly, the Debtors believe that approval of the Bidding Procedures, entry into the Stalking Horse Agreement, and the related relief requested in this Motion will maximize the value of the Debtors' estates, allow the Debtors to maximize the amount of funds that would be available to dedicate to opioid abatement upon effectiveness of a plan of reorganization and is

in the best interests of the Debtors' estates and their stakeholders. Therefore, the Debtors respectfully request that the Court grant the relief requested herein.

**The Proposed Sale and Bidding Procedures**

**A.      Summary of Key Terms of the Stalking Horse Bid**

20.      The Stalking Horse Agreement represents a binding bid to purchase the Avrio Assets. By this Motion, the Debtors request authority to provide the Stalking Horse Bidder with customary stalking horse protections that take into consideration, among other things, that the Stalking Horse Bid sets a floor for the purchase price of the Avrio Assets for the benefit of the Debtors' creditors and other parties in interest and that the Stalking Horse Bidder has expended significant resources to date in connection with the sale process and has committed its capital notwithstanding the open auction of the Avrio Assets. In particular, the stalking horse protections consist of (a) the payment of a break-up fee in an amount equal to $11,910,000 (the "**Break-Up Fee**") and (b) reimbursement of up to $3,970,000 for reasonable and documented costs and expenses incurred by the Stalking Horse bidder in connection with the negotiation and execution of, and the carrying out of its obligations under, the Stalking Horse Agreement (other than such costs or expenses that the Stalking Horse Bidder has agreed to pay thereunder) (the "**Expense Reimbursement**" and, together with the Break-Up Fee, the "**Bid Protections**"), the terms and conditions of which are further set forth in the Stalking Horse Agreement.

21.      The Stalking Horse Agreement includes various customary representations, warranties, and covenants by and from the Debtors and the Stalking Horse Bidder. In addition, the Stalking Horse Agreement includes certain conditions to closing of the contemplated Sale Transaction and rights of termination related to the Cases.

11

22.    The pertinent terms of the proposed Stalking Horse Agreement are summarized in the following table.[4]

| Term | Summary Description |
|---|---|
| **Purchase Price** | The aggregate consideration for the Avrio Assets shall be approximately three hundred and ninety-seven million dollars ($397,000,000), which shall consist of the following:<br><br>i. Upfront Consideration: Upfront Consideration in an amount equal to (a) three hundred and sixty-eight million dollars ($368,000,000), *plus* (b) the Net Working Capital Adjustment Amount, *minus* (c) any Excess Cure Amount, *minus* (d) the Adjustment Escrow Amount in cash paid at Closing, by wire transfer of immediately available funds;<br><br>ii. IP Contingent Consideration: As consideration for the Betadine Licensed IP, the Purchaser shall pay to the Seller an amount equal to six million dollars ($6,000,000) (the "**Betadine Contingent Consideration**"), upon the transfer of the Betadine Licensed IP by the Seller to the Purchaser. As consideration for the Senokot Licensed IP by the Seller to the Purchaser, the Purchaser shall pay to the Seller an amount equal to fifteen million dollars ($15,000,000) (the "**Senokot Contingent Consideration**"), upon the transfer of the Senokot Licensed IP by the Seller to the Purchaser. As consideration for the assignment of the Alcon Agreement, the Purchaser shall pay to the Seller an amount equal to the lesser of (i) four (4) times the average Royalty Payment Amount across the three (3) years prior to the Closing Date, (ii) four (4) times the Royalty Payment Amount for the trailing twelve-month period based on the most recent invoice available for the Alcon Agreement as of the Closing Date and (iii) eight million dollars ($8,000,000) (the "**Alcon Contingent Consideration**"), upon the assignment of the Alcon Agreement by the Seller to the Purchaser. Together, the Betadine Contingent Consideration, the Senokot Contingent Consideration, and the Alcon Contingent Consideration shall be referred to herein as the "IP Contingent Consideration." In the event that any one of the three components of the IP Contingent Consideration is not paid when due, such amount shall bear interest from the due date until the date of payment thereof at a per annum rate equal to 2.00%, effective from the date that payment was due, compounded monthly. |
| **Avrio Assets; Transferred Employees** | The Avrio Assets are defined in the APA as the "**Acquired Assets.**" The Avrio Assets include all right, title and interest of the Seller in, to or under all of the following rights, properties and assets (i) Related to the Business wherever situated and whatever the nature, personal (but not real), tangible or intangible and (ii) the following rights, properties and assets (in each case of the foregoing clauses (i) and (ii), other than the Excluded Assets), in each case, |

---

[4] This summary is provided for the convenience of the Court and parties in interest. To the extent that there is any conflict between this summary and the Stalking Horse Agreement, the latter governs in all respects. Capitalized terms used but not otherwise defined in this summary shall have the meanings ascribed to such terms in the Stalking Horse Agreement.

| Term | Summary Description |
|------|--------------------|
|  | as the same shall exist on the Closing Date: (a) all Business Owned Intellectual Property, including all Business Registered Intellectual Property and all Business Data included therein, including (i) rights, priorities and privileges of any kind whatsoever of the Seller accruing under any Business Owned Intellectual Property provided by applicable Law, including, if applicable, by international treaties, multinational Law, compact, treaty, protocol convention or organization, (ii) royalties, fees, income, payments, and other proceeds now or hereafter due or payable with respect to any and all Business Owned Intellectual Property, (iii) injunctive and other legal and equitable relief for past, present, and future infringement, dilution, misappropriation, violation, misuse, breach, or default, with the right but no obligation to sue for such legal and equitable relief and to collect, or otherwise recover, any such damages, and (iv) all rights to file, prosecute and maintain registrations and applications for any Business Owned Intellectual Property; (b) all of the Seller's accounts receivable and other similar rights (whether current or noncurrent) outstanding as of the Closing to the extent arising out of sales of the Products or exclusively related to the Business (other than, for the avoidance of doubt, as set forth in Section 1.2(m) of the Agreement), in each case, whether billed or unbilled, recorded or unrecorded; (c) all credits, claims for refunds, deferred charges and prepaid charges and expenses and other prepaid items (including customer deposits) and all retentions or holdbacks exclusively related to the Business (other than Tax or Tax Refunds); (d) all Assigned Contracts, (e) all Inventory; (f) all equipment, machinery, materials, tools, supplies and other tangible personal property Related to the Business, except for certain IT Assets; (g) to the extent transferable, all Books and Records and Transferred Employee Records, *provided* that the Seller may retain a copy of Books and Records to the extent subject to a litigation hold; (h) to the extent transferable, all Business Permits and pending applications therefor; (i) all goodwill associated with the Business, the Acquired Assets and Assumed Liabilities; (j) all rights. claims, rebates, refunds, causes of action, actions, suits, proceedings, hearings, audits, rights of recovery, rights of setoff, rights of recoupment, rights of reimbursement, rights of indemnity or contribution and similar rights (known and unknown, matured and unmatured, accrued or contingent, regardless of whether such rights are currently exercisable) against any Person, including all warranties, representations, guarantees, indemnities and other contractual claims (express, implied or otherwise) to the extent Related to the Business, the Acquired Assets or the Assumed Liabilities (other than certain excluded causes of action); (k) all Avoidance Actions against certain Designated Parties; (l) certain Tax Refunds; (m) all insurance proceeds or other compensation in respect of loss or damage to the Acquired Assets to the extent occurring on or after the date hereof, and all rights and claims of the Seller to any such insurance proceeds or other compensation not paid by the Closing; and (n) the Seller's Assigned NDC Numbers and Assigned Product Numbers, including the Seller's corresponding five (5)-digit Labeler Code (67618).<br><br>The Purchaser or one of its Affiliates shall make offers of employment to each of the Business Employees employed by the Seller or any of its Affiliates as of the Closing Date (the "**Offer Employees**"). Each individual who accepts the offer of employment pursuant to the provisions of the APA and actually commences employment with the Purchaser or one of its Affiliates as of the Closing Date shall be deemed a "**Transferred Employee**" as of the Closing. |

| Term | Summary Description |
|---|---|
| **Excluded Assets** | The Excluded Assets shall include: (i) except as provided in Section 1.1(m) of the Agreement, all insurance policies and claims or rights thereunder; (ii) all rights to any Tax Refunds, except as expressly provided in Section 1.1(l) of the Agreement; (iii) all partnership interests or other equity interests of the Seller or any Affiliate thereof or any securities convertible into, exchangeable or exercisable for partnership interests or other equity interests of the Seller or any Affiliate thereof; (iv) all Retained Books and Records; (v)(a) any Avoidance Actions against any Person other than any of the Designated Parties, (b) any proceeds of any settlement from and after the date hereof through the Closing of any claims, counterclaims, rights of offset or other causes of action of the Seller against any Person other than any Designated Party and (c) all claims or causes of action of the Seller other than those identified in Section 1.1(j) and Section 1.1(k) of the Agreement; (vi) all rights, claims or causes of action of the Seller arising under this Agreement, the Ancillary Documents or the Confidentiality Agreement or arising under the Seller Confidentiality Agreements (to the extent not assigned to the Purchaser pursuant to Section 6.15 of the Agreement); (vii) all rights, claims or causes of action by or in the right of the Seller against any current or former Affiliate, officer, director, principal, shareholder, member, partner, employee (other than the Transferred Employees) or other representative of the Seller or any Affiliate of any of the foregoing, in each case, only to the extent arising prior to the Closing and Related to the Business, Excluded Assets or Excluded Liabilities; (viii) all Contracts that are not Assigned Contracts, including the Contracts listed or described on Schedule 1.2(h) of the Agreement and including, for the avoidance of doubt, any Shared Contracts; (ix) all Intellectual Property owned by the Seller other than the Business Owned Intellectual Property; (x) all IT Assets other than mobile telephones which are primarily used by the Transferred Employees in the conduct of the Business; (xi) all rights to products in development not Related to the Business (for the avoidance of doubt, this does not include rights to the Product Candidates); (xii) all Permits other than the Business Permits transferable pursuant to Section 1.1(h) of the Agreement and all pending applications therefor; (xiii) all receivables or other assets due from the Seller and its Affiliates, or claims, causes of action, rights of recovery, credits or other adjustments resulting in payments by the applicable Governmental Entity following Closing with respect to Price Calculations, choses in action or setoff of any kind arising before, on or after the Closing Date, in each case that relate to any of the Excluded Assets or the Excluded Liabilities; (xiv) all Cash, including any and all rights of the Seller in and to any restricted cash, security deposits, escrow deposits and cash collateral (including cash collateral given to obtain or maintain letters of credit and cash drawn or paid on letters of credit); (xv) Benefit Plans (including the KERP) and any interests of the Seller in the assets of such Benefit Plans; (xvi)(a) any attorney-client privilege of the Seller or associated with the business and operations of the Seller pertaining to this Agreement and the Ancillary Documents and (b) all emails, correspondences, invoices, recordings and other documents or files, evidencing or reflecting communications between the Seller and the Seller's counsel pertaining to the Seller or associated with the business and operations of the Seller which would be considered privileged attorney-client communications or otherwise be subject to an attorney-client or similar privilege; and (xvii) all assets set forth on Schedule 1.2(q) of the Agreement. |

| Term | Summary Description |
|------|---------------------|
| **Assumed Liabilities** | The Assumed Liabilities shall include: (i) liabilities relating to the ownership, possession or use of the Acquired Assets from and after Closing; (ii) certain Liabilities arising out of the Assigned Contracts, but only to the extent that such Liabilities thereunder are required to be performed after the Closing Date and to the extent such Liabilities do not relate to any failure to perform, improper performance, warranty or other breach, default or violation by the Seller on or prior to the Closing; (iii) all Cure Costs to the extent not paid and discharged by Purchaser prior to or at Closing; (iv) all accounts payable and other trade obligations including accruals for such Liabilities, to the extent Related to the Business or Products; (v) Product Claims; (vi) the employment, termination of employment or service with the Purchaser or any of its Affiliates of any Transferred Employee after the Closing; (vii) the Paid Time Off of Transferred Employees as of the Closing Date; (viii) Periodic Taxes as set forth in the Agreement; (ix) Assumed Liabilities set forth on Schedule 1.3(i) of the Agreement. |
| **Excluded Liabilities** | Notwithstanding anything in the Agreement to the contrary, neither the Purchaser nor any of its Affiliates shall assume the Excluded Liabilities, including: (i) all Indebtedness of the Seller (excluding, for the avoidance of doubt, obligations with respect to, arising out of or relating to the Assigned Contracts); (ii) all Transaction Expenses of the Seller; (iii) all Liabilities for or in respect of Excluded Taxes; (iv) all Liabilities of the Seller and its Affiliates relating to or arising out of (a) any Transferred Employee that arises out of or relates to the period prior to and including the Closing (including with respect to the termination of employment by the Seller and its Affiliates of any Transferred Employee, but not, for the avoidance of doubt, the termination of employment by the Purchaser and its Affiliates of any Transferred Employee following the Closing), (b) any current or former applicant for employment, director, officer, employee, consultant, independent contractor or service provider of the Seller and its Affiliates who is not a Transferred Employee, including any Liabilities for any actual or prospective work relationship or the termination thereof, (c) any director, officer, manager or employee acting in their capacity as a fiduciary of the Seller or its Affiliates, including in respect of any Benefit Plan, (d) the employment practices of the Seller and its Affiliates prior to Closing, and (e) any Liabilities retained by the Seller and its Affiliates set forth in Section 6.10 of the Agreement.; (v) except as otherwise set forth in the Agreement, all Liabilities relating to or at any time arising under or pursuant to any of the Benefit Plans (including the KERP) and any other benefit or compensation plan, program, policy, agreement or arrangement at any time sponsored, maintained, contributed to or required to be contributed to by the Seller or any of its Affiliates or under or with respect to which the Seller or any of its Affiliates has (or has had) any Liabilities; (vi) all fees, charges, expenditures, expenses, costs and other payments incurred or otherwise payable by the Seller or its Affiliates, or for which the Seller or its affiliates is liable, in connection with the administration of the Chapter 11 Cases or the negotiation, execution and consummation of the transactions contemplated by this Agreement or any Ancillary Document (including any preparation for a transaction process, bankruptcy process, any sale process involving other potential buyers or any contemplated public offering or financing), including the fees and expenses of financial advisors, accountants, legal counsel, consultants, brokers and other advisors with respect thereto, whether incurred, accrued or payable on or prior to or after the date hereof or the Closing Date; (vii) all Liabilities or obligations to the extent relating to the |

| Term | Summary Description |
|------|---------------------|
| | ownership, possession or use of the Excluded Assets (other than Liabilities for or in respect of Taxes as described in the Agreement); (viii) all Liabilities relating to or arising out of the Seller's participation in Government Programs and the Seller's Governmental Price Calculations and Reporting with respect to the Products prior to Closing as described in the Agreement; (ix) all Liabilities arising under or relating to Environmental Laws to the extent arising from facts, circumstances or conditions existing or occurring prior to the Closing; and (x) all Liabilities set forth on Schedule 1.4(j) of the Agreement. |
| **Termination** | The Agreement may be terminated: (a) by either the Purchaser or the Seller in the event that the Closing has not occurred on or before the date that is one hundred and sixty (160) days after the date of execution of the Agreement (*provided* that the terminating party is not then in breach as described in the Agreement); (b)(i) at any time by the mutual written agreement of the Purchaser and the Seller, (ii) by the Purchaser if (x) there shall have been a breach of any of the covenants or agreements or any of the representations or warranties set forth in the Agreement on the part of the Seller which breach, either individually or in the aggregate with other breaches by the Seller, would result in, if occurring or continuing on the Closing Date, the failure of the conditions set forth in Sections 7.3(a), 7.3(b) and 7.3(c) of the Agreement or (y) there has been any material breach by the Seller of the Bidding Procedures Order or the Sale Order, in each case which is not cured within ten (10) Business Days following written notice to the Seller thereof (and in any event prior to the Outside Date) or which by its nature or timing cannot be cured within such time period (*provided* that the Purchaser is not then in breach as described in the Agreement), (iii) by the Seller, if (x) there shall have been a breach of any of the covenants or agreements or any of the representations or warranties set forth in the Agreement on the part of the Purchaser which breach, either individually or in the aggregate with other breaches by the Purchaser, would result in, if occurring or continuing on the Closing Date, the failure of the conditions set forth in Section 7.2(a) or Section 7.2(c) of the Agreement, or (y) there has been any material breach by the Purchaser of the Bidding Procedures Order or the Sale Order, in each case which is not cured within ten (10) Business Days following written notice to the Purchaser thereof (and in any event prior to the Outside Date) or which by its nature or timing cannot be cured within such time period (*provided* that the Seller is not then in breach as described in the Agreement); (iv) by the Purchaser, if (x) the Chapter 11 Cases are dismissed or converted to a liquidation proceeding under Chapter 7 of the Bankruptcy Code, (y) a trustee under Chapter 11 of the Bankruptcy Code is appointed in the Chapter 11 Cases, or (z) an examiner is appointed with expanded powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code in the Chapter 11 Cases; (v) by the Purchaser, if the Seller announces its intention to, or files a notice or motion to, pursue or enter into any Superior Proposal (unless the Purchaser is the Alternate Bidder) or other transaction that would make the consummation of the transaction contemplated by this Agreement or the satisfaction of any conditions herein impossible, including, for the avoidance of doubt, a standalone plan of reorganization or liquidation or another sale or recapitalization transaction; (vi) by the Purchaser, if the Bankruptcy Court enters any Order materially inconsistent with the Bidding Procedures Order, the Sale Order or the Acquisition; (vii) by either the Seller or the Purchaser, if a Governmental Entity issues a final, non-appealable ruling or Order permanently prohibiting the transactions contemplated by the |

| Term | Summary Description |
|---|---|
| | Agreement; (viii) by the Purchaser, if any creditor of the Seller obtains a final and unstayed Order of the Bankruptcy Court granting relief from the automatic stay to foreclose on any material portion of the Acquired Assets; (ix) by either the Seller or the Purchaser, if the Purchaser is not the Successful Bidder or the Alternate Bidder at the Auction; (x) by either the Seller or the Purchaser, if (1) the Seller enters into a definitive agreement providing for a Superior Proposal, and the Purchaser is not the Alternate Bidder at the Auction or (2) the Seller enters into a definitive agreement providing for a Superior Proposal, the Purchaser is the Alternate Bidder at the Auction, and the closing of the sale of the Acquired Assets to the Successful Bidder pursuant to such Superior Proposal has occurred; (xi) by either the Seller or the Purchaser, if, after their respective entry, either the Bidding Procedures Order or Sale Order ceases to be in full force and effect; or (xii) by the Seller if the board of directors of Purdue Pharma Inc. determines, in consultation with outside legal counsel, that proceeding with the Closing and consummating the transactions contemplated by the Agreement or failing to terminate the Agreement would be inconsistent with the board of directors of Purdue Pharma Inc.'s fiduciary duties under applicable Law, including to pursue a Superior Transaction. |
| **Bid Protections** | The Bid Protections shall include:<br>i. Break-Up Fee in the amount of eleven million nine hundred and ten thousand dollars ($11,910,000); and<br>ii. Expense Reimbursement in an amount not to exceed three million nine hundred and seventy thousand dollars ($3,970,000). |

## B.    The Bidding Procedures

23.    The Bidding Procedures are designed to promote a competitive and efficient sale process to either confirm that the Stalking Horse Bid is, indeed, the highest or otherwise best offer for the Avrio Assets or to identify one or more alternative bids (if any) that are higher or otherwise better with respect to the sale of the Avrio Assets.  If approved, the Bidding Procedures will allow the Debtors, in consultation with the Committee, the ad hoc committee of governmental and other contingent litigation claimants (the "**Ad Hoc Committe**e"), and the multi-state governmental entities group (the "**MSGE Group**" and, together with the Committee and the Ad Hoc Committee, the "**Consultation Parties**"), to continue to solicit and identify bids from potential buyers that constitute the highest or otherwise best offer for the Avrio Assets on a schedule consistent with the deadlines under the Stalking Horse Agreement, the Bidding Procedures, and the Debtors'

strategy for maximizing value for their stakeholders that will be put to work to address the opioid crisis.

24.    As the Bidding Procedures are attached to the Bidding Procedures Order, they are not herein restated in their entirety.  Certain of the key terms of the Bidding Procedures are highlighted in the chart below.[5]

| MATERIAL TERMS OF THE BIDDING PROCEDURES | |
|---|---|
| **Consultation Rights** | Throughout the sale process, the Debtors and their advisors will regularly and timely consult with the following parties (collectively, the **"Consultation Parties"**): the Committee and its advisors, including Akin Gump Strauss Hauer & Feld LLP, Jefferies LLC, and Province, LLC; the Ad Hoc Committee and its advisors, including Kramer Levin Naftalis & Frankel LLP, FTI Consulting and Houlihan Lokey Capital, Inc.; and the MSGE Group and its advisors, including Caplin & Drysdale, Chartered. |
| | For the avoidance of doubt, unless approved by the Court or otherwise provided in the Bidding Procedures, no amendment or other modification to the Bidding Procedures (including the extension of any deadlines set forth therein) shall be made by the Debtors without the consent of the Consultation Parties. |
| | The Debtors shall not consult with or provide copies of bids regarding any assets to any insider or affiliate of the Debtors pursuant to the terms of the Bidding Procedures if such party has a bid for the Avrio Assets pending, or expressed any interest (written or verbal) in bidding for the Avrio Assets; *provided*, *however*, that if such insider or affiliate of the Debtors chooses not to submit any bid, then such party may receive copies of all bids following expiration of the latest possible Bid Deadline (as such Bid Deadline may be extended under the Bidding Procedures).  Notwithstanding the foregoing, if a member of the Committee submits a Qualified Bid (as defined in the Bidding Procedures), the Committee will maintain its consultation rights as a Consultation Party; *provided* that the Committee shall exclude such member from any discussions or deliberations regarding a transaction involving the applicable Avrio Assets and shall not provide any confidential information regarding the Avrio Assets or a transaction involving the Avrio Assets to the bidding Committee member. |
| **Provisions Governing Qualification of Bidders and Qualified Bids** | **Parts 1 and 2 of the Bidding Procedures set forth the Qualified Bid and Qualified Bidder requirements.** |
| | A party may participate in the bidding process by submitting a bid for the Avrio Assets. |
| | **A.  Indications of Interest.** |

---

[5] To the extent that there is any inconsistency between the terms of the Bidding Procedures and the summary of such terms in this Motion, the terms of the Bidding Procedures shall control.  Capitalized terms used but not otherwise defined in this summary shall have the meanings ascribed to such terms in the Bidding Procedures.

| MATERIAL TERMS OF THE BIDDING PROCEDURES |
|---|

1. <u>Required Information</u>. Interested Parties must deliver the following items to PJT so as to be received no later than 5:00 p.m. (prevailing Eastern Time) on May 2, 2023:

    a.  an executed confidentiality agreement in form and substance satisfactory to the Debtors, *provided* that Interested Parties that executed a confidentiality agreement with the Debtors from and after December 2022 relating to the Sale Transaction and the Avrio Assets and which remains in full force and effect will not be required to execute an additional confidentiality agreement to participate in the bidding process;

    b.  a statement and other factual support demonstrating, to the Debtors' satisfaction, in consultation with the Consultation Parties, that the Interested Party has a *bona fide* interest in purchasing the Avrio Assets;

    c.  a description of the nature and extent of any due diligence the Interested Party wishes to conduct and the date in advance of the Bid Deadline (as defined below) by which such due diligence will be completed; and

    d.  sufficient information, as defined by the Debtors, in consultation with the Consultation Parties, to allow the Debtors, in consultation with the Consultation Parties, to determine that the Interested Party has the financial wherewithal and any required internal corporate, legal, or other authorizations to close the sale transaction, including, but not limited to, current audited financial statements of the Interested Party (or such other form of financial disclosure acceptable to the Debtors in consultation with the Consultation Parties) or, if the Interested Party is an entity formed for the purpose of acquiring the Avrio Assets, (i) current audited financial statements of the equity holder(s) (the "**Sponsor(s)**") of the Interested Party or such other form of financial disclosure acceptable to the Debtors in consultation with the Consultation Parties, (ii) a written commitment acceptable to the Debtors and their advisors, in consultation with the Consultation Parties, that the Sponsor(s) are responsible for the Interested Party's obligations in connection with the Bidding Process, and (iii) copies of any documents evidencing any financing commitments necessary to consummate the transaction.

If the Debtors determine, in consultation with the Consultation Parties, after receipt of the items identified above, that an Interested Party has (i) a *bona fide* interest in purchasing the Avrio Assets, (ii) the financial wherewithal to execute such purchase, and (iii) reasonable due diligence requirements, such Interested Party will be deemed a "**Potential Bidder**" and the Debtors will deliver to such Potential Bidder (a) an electronic copy of the Stalking Horse Agreement and (b) access to the Debtors' confidential electronic data room concerning the Avrio Assets (the "**Data Room**"), which shall include the form of Sale Order attached hereto as **Exhibit B**.

B.  **Due Diligence**.  In addition to Data Room access, the Debtors will provide Potential Bidders with due diligence access and additional information, as may be requested by a Potential Bidder, to the extent that the Debtors determine, in consultation with the Consultation Parties, that such requests are reasonable and appropriate under the circumstances.  The Debtors, with the assistance of PJT, will coordinate all reasonable requests for additional information and due diligence access from Potential Bidders.  Unless otherwise determined by the Debtors, the availability of due diligence to a Potential Bidder will cease if the Potential Bidder does not become a Qualified Bidder or the Bidding Process is terminated.  To the extent any

| MATERIAL TERMS OF THE BIDDING PROCEDURES |
| --- |

written due diligence provided to a Potential Bidder has not previously been uploaded to the Data Room, the Debtors will upload such diligence to the Data Room as soon as reasonably practicable.

**C. Bid Deadline –** May 15, 2023 at 5:00 p.m. (prevailing Eastern Time).

**D. Qualified Bid Requirements.**

1. Required Bid Documents.  A Qualified Bid (other than the Stalking Horse Bid, which has satisfied or is deemed to have satisfied each of the below requirements, and with respect to which the deposit requirements will be governed by the Stalking Horse Agreement) must be accompanied by the following documents:

   a. a letter stating that the bidder's offer is irrevocable until consummation of a transaction involving the Avrio Assets identified in such offer;

   b. a duly authorized and executed asset purchase agreement satisfactory to the Debtors, which purchase agreement must be based on the form of the Stalking Horse Agreement, marked to show any revisions, including, among other things, the purchase price for the Avrio Assets, together with all exhibits and schedules, in each case marked against the Stalking Horse Agreement and any proposed revisions to the proposed form of Sale Order;

   c. written evidence acceptable to the Debtors, in consultation with the Consultation Parties, demonstrating financial wherewithal, operational ability, and corporate authorization to consummate the proposed transaction, including, without limitation, the payment of any contingent or deferred consideration; and

   d. written evidence of a firm commitment for financing to consummate the proposed transaction, or other evidence of ability to consummate the proposed transaction, including, without limitation, the payment of any contingent or deferred consideration, without financing, in either case which is satisfactory to the Debtors, in consultation with the Consultation Parties.

2. Identity of Purchaser.  Full disclosure of the legal identity of the purchaser and related parties participating in the Auction.

3. Avrio Assets; Consideration.

   a. Identification of Avrio Assets to be purchased and the Contracts and Leases to be assumed, and the consideration therefor (the "**Bid Consideration**").

   b. Includes (x) a purchase price payable in cash at Closing in an amount at least equal to $387,880,000, which is the sum of (i) $368,000,000 (*i.e.* the upfront purchase price under the Stalking Horse Agreement); *plus* (ii) the aggregate amount of the Bid Protections; *plus* (iii) $4,000,000 (the consideration in this clause (x), the "**Upfront Consideration**"), and (y) any contingent or deferred consideration;

   c. Clearly states which liabilities of the Debtors will be assumed.

   d. Includes a statement of proposed terms for employees.

   e. Clearly allocates the Bid Consideration among the Avrio Assets and Contracts and Leases to be assumed, and clearly indicates which portion of the Bid Consideration will be paid at Closing and which portion (if any)

| **MATERIAL TERMS OF THE BIDDING PROCEDURES** |
|---|

| | will be deferred or contingent (and, in the event that a portion is deferred or contingent, clearly indicates when such amount would be due and payable). |
|---|---|
| | 4. <u>No Financing/Diligence Contingency</u>.  No condition on the obtainment of financing or on the outcome of unperformed due diligence. |
| | 5. <u>Regulatory Approvals</u>.  Includes a description of all governmental, licensing, regulatory, or other approvals or consents that are required to consummate the proposed transaction (including any antitrust approval related to the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended), together with evidence satisfactory to the Debtors, in consultation with the Consultation Parties, of the ability to obtain such approvals or consents as soon as reasonably practicable, as well as a description of any material contingencies or other conditions that will be imposed upon, or that will otherwise apply to, the obtainment or effectiveness of any such approvals or consents. |
| | 6. <u>Alternate Bidder</u>.  Must expressly state that the bidder agrees to serve as an Alternate Bidder if such bidder's Qualified Bid is selected as the next highest or next best bid after the Successful Bid (as hereinafter defined) with respect to the applicable Avrio Assets. |
| | 7. <u>Good Faith Deposit</u>.  Except with respect to the Stalking Horse Bidder (whose deposit shall be governed by the Stalking Horse Agreement), delivery of a cash deposit by wire transfer to a Deposit Agent in an amount equal to ten percent of the Upfront Consideration. |
| | 8. <u>Authorized Representatives</u>.  A list setting forth the representatives authorized to appear and act for the bidder in connection with the proposed transaction. |
| | 9. <u>No Bid Protections</u>.  Statement that the bidder will not seek any transaction or break-up fee, expense reimbursement, or similar type of payment. |
| | 10. <u>Adequate Assurance</u>.  Evidence supporting the bidder's ability to comply with section 365 of the Bankruptcy Code (to the extent applicable), including the provision of adequate assurance of such bidder's ability to perform under any Contracts and Leases to be assumed by the bidder in connection with the proposed transaction. |
| | 11. <u>Cure Costs</u>.  Indication of whether or not the bidder will assume all cure costs associated with any Contracts and Leases it intends to assume |
| **E.** | **Designation of Qualified Bids; Cure of Non-Qualifying Bids.**  The Debtors shall have the right, in their reasonable business judgment, in a manner consistent with the exercise of their fiduciary duties, and in consultation with the Consultation Parties, to deem a bid a Qualified Bid even if such bid does not conform to one or more of the requirements or does not include one or more of the Required Bid Documents. If the Debtors receive a bid prior to the Bid Deadline that is not a Qualified Bid, the Debtors may provide the bidder with the opportunity to remedy any deficiencies following the Bid Deadline.  If any bid is determined by the Debtors, in consultation with the Consultation Parties, not to be a Qualified Bid, and the applicable bidder fails to remedy such bid in accordance with the Bidding Procedures, the Debtors shall promptly instruct the Deposit Agent to return such bidder's Good Faith Deposit.  Within one day of the Debtors' receipt of any bid for the Avrio Assets, the Debtors shall provide such bid to the Stalking Horse Bidder and the Consultation Parties; *provided* that such bid may be withheld from members of the Committee or redacted to the extent that the Debtors determine, in their reasonable business judgment and in consultation with the advisors to the Committee, that sharing such |

| MATERIAL TERMS OF THE BIDDING PROCEDURES | |
|---|---|
| | bid would be likely to have a negative impact on potential bidding or otherwise be contrary to goal of maximizing value for the Debtors' estates from the sale process. |
| | **F.    Deemed Acknowledgments and Representations**.  Each Qualified Bidder shall be deemed to acknowledge and represent that such bidder: |
| | 1.    had an opportunity to conduct any and all due diligence regarding the Avrio Assets that are the subject of the Auction prior to making any such bid; |
| | 2.    relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the assets in making its bid; and |
| | 3.    did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the Avrio Assets, or the completeness of any information provided in connection therewith, except as expressly stated in the Bidding Procedures or, as to the Stalking Horse Bidder, the Stalking Horse Agreement, or, as to any other Successful Bidder (as defined below), the purchase agreement with such Successful Bidder. |
| **Provisions Providing Bid Protections to Stalking Horse Bidder** | **Part 3 of the Bidding Procedures outlines the terms of the Bid Protections being provided to the Stalking Horse Bidder** |
| | If the Stalking Horse Bidder is not the Successful Bidder, or if the Debtors withdraw the motion prior to the entry of a Sale Order approving the Sale Transaction relating to the Avrio Assets, the Debtors will, in certain circumstances, pay to the Stalking Horse Bidder a Break-Up Fee and the Expense Reimbursement.  The payment of the Break-Up Fee and the Expense Reimbursement will be governed by the provisions of the Stalking Horse Agreement and the Bidding Procedures Order.  The Break-Up Fee is $11,910,000 and the Expense Reimbursement shall not exceed $3,970,000. |
| | Other than any Bid Protections provided to the Stalking Horse Bidder pursuant to the terms of the Stalking Horse Agreement, no bidder or other party shall be entitled to any termination or "break-up" fee, expense reimbursement, or any other bidding protection in connection with the submission of a bid for the Avrio Assets. |
| **Provisions Governing the Auction and Permitting the Modification of Bidding and Auction Procedures** | **Part 4 of the Bidding Procedures sets forth the procedures governing the Auction.** |
| | **A.    Date, Time, and Location.** The Auction shall be conducted at the offices of Skadden, Arps, Slate, Meagher & Flom LLP, One Manhattan West, New York, New York 10001 on May 17, 2023 at 10:00 a.m. (prevailing Eastern Time) or such later time on such day or such other place as the Debtors shall notify all Qualified Bidders (including the Stalking Horse Bidder). |
| | **B.    Participants and Attendees.** |
| | 1.    Attendance will be limited to the representatives or agents (including legal and financial advisors) of (a) the Debtors, (b) any Qualified Bidder that has submitted a Qualified Bid, and (c) the Consultation Parties. |
| | 2.    Each Qualified Bidder must confirm on record that it (a) has not engaged in any collusion with respect to the bidding or the sale of the Avrio Assets, (b) has reviewed, understands, and accepts the Bidding Procedures, (c) has consented to the jurisdiction of the Court, and (d) intends to consummate its Qualified Bid if it is selected as the Successful Bid. |
| | **C.    Auction Procedures.** |

| MATERIAL TERMS OF THE BIDDING PROCEDURES |
|---|

1. <u>Notice of Qualification</u>.  Prior to the Auction, if any, the Debtors will (a) notify each Qualified Bidder that has timely submitted a Qualified Bid that its bid is a Qualified Bid and (b) provide all Qualified Bidders with (i) copies of the Qualified Bid that the Debtors, in consultation with the Consultation Parties, believe is the highest or otherwise best offer (the "**Starting Bid**"), (ii) an explanation of how the Debtors value the Starting Bid, and (iii) a list identifying all of the Qualified Bidders and their respective Qualified Bids.

2. <u>Starting Bid</u>.  The first round of bidding at the Auction shall commence at the Starting Bid.

3. <u>Subsequent Bids</u>. Bidding at the Auction will begin with the Starting Bid and continue, in one or more rounds of bidding in the presence of all parties at the Auction, so long as during each round at least one subsequent bid (a "**Subsequent Bid**") is submitted by a Qualified Bidder that (a) improves upon such Qualified Bidder's immediately prior Qualified Bid and (b) the Debtors determine in consultation with the Consultation Parties that such Subsequent Bid is (i) with respect to the first round, a higher or otherwise better offer than the Starting Bid and (ii) with respect to subsequent rounds, a higher or otherwise better offer than the Leading Bid (as defined below), in each case taking into account other Qualified Bids for other Avrio Assets; *provided, however,* that with respect to each round of bidding, any Qualified Bid or Subsequent Bid must provide consideration at least equal to a minimum overbid of $2,000,000 (the "**Minimum Overbid**").  The Debtors reserve the right, in consultation with the Consultation Parties, to announce reductions or increases in the Minimum Overbid (or in valuing such bids) at any time during the Auction.  For the avoidance of doubt, in any subsequent round of bidding with respect to the Avrio Assets, the Stalking Horse Bidder will be entitled to a "credit" in the amount of the Bid Protections to be counted toward its bid in such round.

4. <u>Minimum Bid Increments</u>. In each subsequent round after the first round, the Debtors, in consultation with the Consultation Parties, may determine appropriate minimum bid increments or requirements for each round of bidding.

5. <u>Highest or Best Offer</u>. After the first round of bidding and between each subsequent round of bidding, as applicable, the Debtors, in consultation with the Consultation Parties, will determine and announce the bid that they believe to be the highest or otherwise best offer (the "**Leading Bid**").  Additional consideration in excess of the amount set forth in the Starting Bid may include cash and/or non-cash consideration and consideration payable at closing and deferred or contingent consideration; *provided, however,* that the value for such non-cash consideration or such deferred or contingent consideration shall be determined by the Debtors in consultation with the Consultation Parties.

6. <u>Recording</u>.  The bidding at the Auction will be transcribed or videotaped.

7. <u>Modification of Bidding and Auction Procedures</u>:  The Debtors, in consultation with the Consultation Parties, may employ and announce at the Auction additional procedural rules for conducting the Auction (*e.g.*, the amount of time allotted to submit Subsequent Bids), *provided, however,* that such rules shall (a) not be inconsistent with the Bankruptcy Code, the Bidding Procedures Order, or any other order of the Court entered in connection herewith and (b) be disclosed to all Qualified Bidders.

| MATERIAL TERMS OF THE BIDDING PROCEDURES | |
|---|---|
| | **Part 5 of the Bidding Procedures sets forth procedures by which the Debtors shall select the Successful Bid and Alternate Bid.** <br><br> A.  **Selection of Successful Bids.**  Prior to the conclusion of the Auction, the Debtors shall, in consultation with the Consultation Parties, (i) review and evaluate each bid made at the Auction on the basis of financial and contractual terms and other factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the sale transaction, (ii) determine and identify the highest or otherwise best offer (the "**Successful Bid**"), (iii) determine and identify the next highest or otherwise best offer (the "**Alternate Bid**"), and (iv) notify all Qualified Bidders participating in the Auction, prior to its adjournment, of (A) the identity of the party or parties that submitted the Successful Bid (the "**Successful Bidder**"), (B) the amount and other material terms of the Successful Bid, (C) the identity of the party or parties that submitted the Alternate Bid (the "**Alternate Bidder**"), and (D) the amount and other material terms of the Alternate Bid. <br><br> Each Qualified Bidder shall agree and be deemed to agree to be the Alternate Bidder if so designated. <br><br> B.  **Execution of Definitive Documentation.**  Absent irregularities in the conduct of the Auction or reasonable and material confusion during the bidding, each as determined by the Court, the Debtors will not consider bids after the Auction has closed. As soon as reasonably practicable after the completion of the Auction, the Successful Bidder and the applicable Debtors shall complete and execute all agreements, instruments, and other documents necessary to consummate the applicable sale or other transaction contemplated by the applicable Successful Bid. Promptly following the selection of the Successful Bid and Alternate Bid, the Debtors shall file a notice of the Successful Bid and Alternate Bid with the Court, together with a proposed Sale Order. |
| **Provisions Regarding Sale Hearing and Closing with Successful Bidder and Alternate Bidder** | **Part 6 of the Bidding Procedures sets forth procedures regarding closing with Successful Bidder or Alternate Bidder.** <br><br> The Sale Hearing shall be held before the Honorable Judge Sean H. Lane, United States Bankruptcy Judge, United States Bankruptcy Court for the Southern District of New York, 300 Quarropas Street, White Plains, New York 10601, on May 23, 2023 at 11:00 a.m. (prevailing Eastern Time)  or such other date and time that the Court may later direct; provided, however, that the Sale Hearing may be adjourned by the Debtors by announcement of the adjournment in open court or on the Court's docket. Pursuant to General Order M-543, dated March 20, 2020 (Morris, C.J.) ("General Order M-543"), the Hearing will be conducted via Zoom for Government® so long as General Order M-543 is in effect or unless otherwise ordered by the Court.  Parties wishing to appear at, or attend, a hearing conducted via Zoom for Government® videoconference are required to register their appearance by 4:00 p.m. (prevailing Eastern Time) the day before such hearing at https://ecf.nysb.uscourts.gov/cgi-bin/nysbAppearances.pl.  At the Sale Hearing, the Debtors will seek the Bankruptcy Court's approval of the Successful Bid and, at the Debtors' election, the Alternate Bid. <br><br> The Debtors' presentation to the Court of the Successful Bid and Alternate Bid will not constitute the Debtors' acceptance of such bid, which acceptance will only occur upon approval of such bid by the Court.  Following the Court's entry of the Sale Order, the Debtors and the Successful Bidder shall proceed to consummate the transaction contemplated by the Successful Bid.  If the Debtors and the Successful Bidder fail to consummate the proposed transaction, then the Debtors shall file a notice with the |

| MATERIAL TERMS OF THE BIDDING PROCEDURES | |
|---|---|
| | Court advising of such failure.  Upon the filing of such notice with the Court, the Alternate Bid will be deemed to be the Successful Bid and the Debtors will be authorized, but not directed, to effectuate the transaction with the Alternate Bidder subject to the terms of the Alternate Bid of such Alternate Bidder without further order of the Court.  If the failure to consummate the transaction contemplated by the Successful Bid is the result of a breach by the Successful Bidder (the "**Breaching Bidder**") of its asset purchase agreement, the Debtors reserve the right to seek all available remedies from such Breaching Bidder, subject to the terms of the applicable asset purchase agreement. |

## C.    Key Dates and Deadlines

25.    Consistent with the Debtors' need to consummate a sale of the Avrio Assets as efficiently as practicable, the Debtors propose the following key dates and deadlines for the sale process, certain of which dates and deadlines may be subject to extension in accordance with the Bidding Procedures:

| | |
|---|---|
| **April 25, 2023 at 11:00 a.m. (prevailing Eastern Time)** | Hearing to consider approval of the Bidding Procedures and entry of the Bidding Procedures Order |
| **April 26, 2023** | Target date for the Debtors to file Potential Assigned Contracts Schedule |
| **May 2, 2023 at 5:00 p.m. (prevailing Eastern Time)** | Potential Bidder deadline |
| **May 12, 2023 at 4:00 p.m. (prevailing Eastern Time)** | Assumption and Assignment Objection Deadline |
| **May 15, 2023 at 5:00 p.m. (prevailing Eastern Time)** | Bid Deadline |
| **May 17, 2023 at 10:00 a.m. (prevailing Eastern Time)** | Auction (if any) to be held at the offices of Skadden, Arps, Slate, Meagher & Flom LLP |
| **On May 17, 2023** | Target date for the Debtors to file with the Court the Notice of Auction Results |
| **May 19, 2023 at 4:00 p.m. (prevailing Eastern Time)** | Deadline to object to the Sale Transaction to the Successful Bidder |
| **May 23, 2023 at 11:00 a.m. (prevailing Eastern Time)** | Hearing to consider approval of the Sale Transaction and entry of the Sale Order |

## D.    Noticing Procedures

26.    The Debtors propose the following "**Noticing Procedures**":

a.    **Sale Notice and Publication.** As soon as reasonably practicable after entry of the Bidding Procedures Order, but not later than three business days after entry of the Bidding Procedures Order, the Debtors shall serve the Sale Notice, the Bidding Procedures Order (including the Bidding Procedures attached to the Bidding Procedures Order) by first class or overnight mail upon the following:  (a) the entities on the Master Service List (as defined in the *Second Amended Order Establishing Certain Notice, Case Management, and Administrative Procedures* entered on November 18, 2019 [D.I. 498] and available on the Debtors' case website at https://restructuring.ra.kroll.com/purduepharma); (b) all Counterparties to Contracts and Leases; (c) the Internal Revenue Service; (d) the Department of Justice; (e) the Food and Drug Administration; (f) the Department of Health and Human Services; (g) any other local, state and federal agencies that have issued licenses or permits to Avrio Health L.P. with respect to the operation and use of the Avrio Assets; (h) all entities known to have expressed an interest to the Debtors in a transaction involving any material portion of the Avrio Assets during the past six (6) months; and (i) any person or entity with a particularized interest in the subject matter of this Motion (collectively, the "**Sale Notice Parties**").  In addition, as soon as reasonably practicable following entry of the Bidding Procedures Order, the Debtors will (i) publish the Sale Notice in the national edition of the *Wall Street Journal* and (ii) serve the Sale Notice via email (or, in instances where no email address is available, via first class mail) on each party that filed a proof of claim against Avrio Health L.P. in these Cases. This publication notice will provide notice of the sale to any other interested parties whose identities are unknown to the Debtors.

b.    **Sale Objections**. Objections to the relief sought in the Sale Order must (a) be in writing, (b) comply with the Bankruptcy Code, Bankruptcy Rules, and Local Rules, (c) state, with specificity, the legal and factual bases thereof, (d) be filed with the Court no later than 4:00 p.m. (prevailing Eastern Time) on May 19, 2023 (the "**Sale Objection Deadline**") and (e) be served on (1) counsel to the Debtors, (A) Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, New York 10017, Attn: Marshall S. Huebner, Eli J. Vonnegut, Christopher S. Robertson, and Dylan A. Consla, and (B) Skadden, Arps, Slate, Meagher & Flom LLP, One Manhattan West, New York, New York 10001, Attn: Marie L. Gibson and A. Caroline M. Frizzo; (2) counsel to the Consultation Parties, consisting of (i) counsel to the Committee: Akin Gump Strauss Hauer & Feld LLP, Bank of America Tower, One Bryant Park, New York, New York 10036, Attn: Arik Preis and Sara L. Brauner; (ii) counsel for the Ad Hoc Committee: Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York 10036, Attn: Kenneth H. Eckstein; and (iii) counsel for the MSGE Group: Caplin & Drysdale, Chartered, 1 Thomas Circle NW Ste 1100, Washington, DC 20005, Attn: Kevin Maclay, (3) counsel to the Stalking Horse Bidder, Kirkland & Ellis LLP, 601 Lexington Ave, New York, New York 10022, Attn: Christopher Marcus, P.C., Constantine N. Skarvelis,

26

P.C., and Jordan E. Elkin; and (4) the U.S. Trustee (collectively, the "**Objection Notice Parties**").

c.   **Notice of Determination of Qualified Bids**. The Debtors, in consultation with the Consultation Parties, will make a determination regarding which bids qualify as a Qualified Bid.  Prior to the Auction, the Debtors will (i) notify each Qualified Bidder that has timely submitted a Qualified Bid that its bid is a Qualified Bid and (ii) provide all Qualified Bidders with (A) a copy of the Starting Bid, (B) an explanation of how the Debtors value the Starting Bid, and (C) a list identifying all of the Qualified Bidders and their respective Qualified Bids.

d.   **Notice of Hearing if Auction Not Held**. If no Qualified Bids for the Avrio Assets are submitted by the Bid Deadline other than the Stalking Horse Bid, the Debtors will cancel the Auction and seek approval of the transactions contemplated in the Stalking Horse Bid or the Qualified Bid which is not the Stalking Horse Bid at the Sale Hearing. If no Auction is to be conducted, the Debtors will file with the Court, serve on the Sale Notice Parties, and cause to be published on the Debtors' case information website located at *https://restructuring.ra.kroll.com/purduepharma* (the "**Case Information Website**") a notice (x) indicating that the Auction for the Avrio Assets has been canceled, (y) indicating that the Stalking Horse Bid is the Successful Bid with respect to the Avrio Assets, and (z) setting forth the date and time of the Sale Hearing.

In no event shall the Consultation Parties have fewer than four days before the Sale Hearing to object to the Successful Bid or to the Stalking Horse Bid, absent consent of the Consultation Parties.

e.   **Notice of Auction Results**.  Promptly following the selection of the Successful Bid and Alternate Bid, the Debtors shall file a notice of the Successful Bid and Alternate Bid (the "**Notice of Auction Results**") with the Court and cause the Notice of Auction Results to be published on the Case Information Website.

27.   The Noticing Procedures constitute adequate and reasonable notice of the key dates and deadlines for the sale process, including, among other things, the Assumption and Assignment Objection Deadline, the Bid Deadline, the Sale Objection Deadline, and the times and locations of the Auction and Sale Hearing.  Accordingly, the Debtors request that the Court find that the Noticing Procedures are adequate and appropriate under the circumstances and comply with the requirements of Bankruptcy Rule 2002 and Local Rule 2002-1.

## Assumption and Assignment Procedures

28.     In connection with the Sale Transaction, the Debtors anticipate that they will

assume and assign to the Successful Bidder (or its designated assignee(s)) all or certain of the

Assigned Contracts and Assigned Leases pursuant to section 365(b) of the Bankruptcy Code.

Accordingly, the Debtors hereby also seek approval of the proposed Assumption and Assignment

Procedures set forth herein, which are designed to, among other things, (a) outline the process by

which the Debtors will serve notice to all Counterparties regarding the potential assumption and

assignment, related Cure Costs, if any, and information regarding the Successful Bidder's adequate

assurance of future performance and (b) establish objection and other relevant deadlines and the

manner for resolving disputes relating to assumption and assignment of the Assigned Contracts

and Assigned Leases.  Specifically, the Assumption and Assignment Procedures are as follows:

a.    **Potential Assigned Contracts Schedule**.  As soon as reasonably practicable following entry of the Bidding Procedures Order, the Debtors shall file with the Court, and cause to be published on the Case Information Website, the Potential Assumption and Assignment Notice and a list of the Potential Assigned Contracts (the "**Potential Assigned Contracts Schedule**") that specifies (i) each of the Contracts and Leases that potentially could be assumed and assigned in connection with the sale of the Avrio Assets, including the name of each Counterparty and (ii) the proposed Cure Cost with respect to each Potential Assigned Contract.

b.    **Potential Assumption and Assignment Notice**.  The Debtors shall, as soon as reasonably practicable after entry of the Bidding Procedures Order (but in any event, so as to provide sufficient notice such that any required responses from any Counterparties are due prior to the scheduled date of the Auction as specified in the Bidding Procedures), serve on each relevant Counterparty the Potential Assumption and Assignment Notice, which shall (i) identify the Potential Assigned Contracts, (ii) list the Debtors' good faith calculation of the Cure Costs with respect to the Potential Assigned Contracts identified on the Potential Assumption and Assignment Notice, (iii) expressly state that assumption or assignment of an Assigned Contract or Assigned Lease is not guaranteed and is subject to Court approval, (iv) prominently display the deadline to file an Assumption and Assignment Objection (as defined herein), and (v) prominently display the date, time, and location of the Sale Hearing.  The Debtors shall serve on all parties requesting notice pursuant to Bankruptcy Rule 2002, via first class mail, a

modified version of the Potential Assumption and Assignment Notice, without the Potential Assigned Contracts Schedule, which will include instructions regarding how to view the Potential Assigned Contracts Schedule on the Case Information Website.

c.  **Assumption and Assignment Objections**.

i.  <u>Objection Deadlines</u>.  Any Counterparty may object to the potential assumption or assignment of its Assigned Contract or Assigned Lease, the Debtors' proposed Cure Costs, if any, or the ability of a Successful Bidder to provide adequate assurance of future performance (an "**Assumption and Assignment Objection**").  All Assumption and Assignment Objections must (A) be in writing, (B) comply with the Bankruptcy Code, Bankruptcy Rules, and Local Rules, (C) state, with specificity, the legal and factual bases thereof, including, if applicable, the Cure Costs the Counterparty believes is required to cure defaults under the relevant Assigned Contract or Assigned Lease, (D) be filed no later than **May 12, 2023 at 4:00 p.m. (prevailing Eastern Time)** (the "**Assumption and Assignment Objection Deadline**"), and (E) be served on the Objection Notice Parties.

ii.  <u>Resolution of Assumption and Assignment Objections</u>.  If a Counterparty files a timely Assumption and Assignment Objection, such objection shall be heard at the Sale Hearing or such later date that the Debtors, in consultation with the Successful Bidder, shall determine in their discretion (in consultation with the Consultation Parties and subject to the Court's calendar).  If such objection has not been resolved prior to the closing of the Sale Transaction (whether by an order of the Court or by agreement with the Counterparty), the Successful Bidder may elect, in its sole and absolute discretion, one of the following options:  (A) treat such Counterparty's contract or lease as property excluded from the Avrio Assets (an "**Excluded Contract**" or "**Excluded Lease**", respectively); or (B) temporarily treat the Potential Assigned Contract as an Excluded Contract or Excluded Lease, as applicable (a "**Designated Agreement**"), proceed to the closing of the Sale Transaction with respect to all other Avrio Assets, and determine whether to treat the Designated Agreement as an Assigned Contract or Assigned Lease, as applicable, or an Excluded Contract or Excluded Lease, as applicable, within ten business days after resolution of such objection (whether by the Court's order or by agreement of the Counterparty, the Debtors, and the Successful Bidder).

iii.  <u>Failure To File Timely Assumption and Assignment Objection</u>. If a Counterparty fails to file with the Court and serve on the Objection

Notice Parties a timely Assumption and Assignment Objection, the Counterparty shall be forever barred from asserting any such objection with regard to the assumption or assignment of its Assigned Contract or Assigned Lease.  Notwithstanding anything to the contrary in the Assigned Contract or Assigned Lease, or any other document, the Cure Costs set forth in the Potential Assumption and Assignment Notice or the Supplemental Assumption and Assignment Notice (as defined herein) shall be controlling and will be the only amount necessary to cure outstanding defaults under the applicable Assigned Contract or Assigned Lease under section 365(b) of the Bankruptcy Code arising out of or related to any events occurring prior to the closing of the Sale Transaction or other applicable date upon which such assumption and assignment will become effective, whether known or unknown, due or to become due, accrued, absolute, contingent, or otherwise, and the Counterparty shall be forever barred from asserting any additional cure or other amounts with respect to such Assigned Contract or Assigned Lease against the Debtors, the Successful Bidder, or the property of any of them.

iv.     <u>Modifications and Additions</u>.   Following the conclusion of the Auction, if any, and the selection of the Successful Bidder, the Debtors reserve the right, in accordance with the Stalking Horse Agreement or as otherwise agreed with the Successful Bidder, at any time before the closing of the Sale Transaction, to modify the previously-stated Cure Costs associated with any Potential Assigned Contract, subject to notice requirements in the Assumption and Assignment Procedures.

v.      In the event that, after the closing of the Sale Transaction, the Debtors or the Successful Bidder identify any contract or lease with respect to the Avrio Assets to which Avrio is a counterparty and that is not a Shared Contract (as defined in the Stalking Horse Agreement), that is not listed on the Potential Assigned Contracts Schedule, and such contract or lease has not been rejected by the Debtors, the Successful Bidder may in its sole and absolute discretion elect by written notice to the Debtors to treat such contract or lease as an Assigned Contract or Assigned Lease, as applicable, and the Debtors shall seek to assume and assign such Assigned Contract or Assigned Lease in accordance with the Bidding Procedures, with all additional Cure Costs related to such Assigned Contracts or Assigned Leases to be paid by the Successful Bidder, in accordance with the terms of the Stalking Horse Agreement.

vi.     In the event that any such contract or lease is added to the Potential Assigned Contracts Schedule, or previously-stated Cure Costs are modified in accordance with the Assumption and Assignment

Procedures, the Debtors will promptly serve a supplemental assumption and assignment notice, by first class mail, on the applicable Counterparty (each, a "Supplemental Assumption and Assignment Notice"). Each Supplemental Assumption and Assignment Notice will include the same information with respect to the applicable Assigned Contract or Assigned Lease as is required to be included in the Potential Assumption and Assignment Notice.

vii.   Any Counterparty listed on a Supplemental Assumption and Assignment Notice whose contract or lease is proposed to be assumed and assigned may object to the proposed assumption or assignment of its Assigned Contract or Assigned Lease, the Debtors' proposed Cure Costs (to the extent modified from the previously-stated amount), or the ability of the Successful Bidder to provide adequate assurance of future performance (a "**Supplemental Assumption and Assignment Objection**"). All Supplemental Assumption and Assignment Objections must (a) be in writing, (b) comply with the Bankruptcy Code, Bankruptcy Rules, and Local Rules, (c) state, with specificity, the legal and factual bases thereof, including, if applicable, the Cure Costs the Counterparty believes is required to cure defaults under the relevant Assigned Contract or Assigned Lease, (d) no later than 14 days from the date of service of such Supplemental Assumption and Assignment Notice, (i) be filed with the Court and (ii) be served on the Objection Notice Parties. Each Supplemental Assumption and Assignment Objection, if any, shall be resolved in the same manner as an Assumption and Assignment Objection.

d.   **Reservation of Rights**.  The inclusion of an Assigned Contract, Assigned Lease, or Cure Costs with respect thereto on a Potential Assumption and Assignment Notice, the Potential Assigned Contracts Schedule, or a Supplemental Assumption and Assignment Notice shall not constitute or be deemed a determination or admission by the Debtors, the Successful Bidder (including the Stalking Horse Bidder), or any other party in interest that such contract or lease is an executory contract or unexpired lease within the meaning of the Bankruptcy Code.  The Debtors reserve all of their rights, claims, and causes of action with respect to each Assigned Contract and Assigned Lease listed on a Potential Assumption and Assignment Notice, Supplemental Assumption and Assignment Notice, and the Potential Assigned Contracts Schedule.  The Debtors' inclusion of any Assigned Contract or Assigned Lease on the Potential Assumption and Assignment Notice, Supplemental Assumption and Assignment Notice, and/or Potential Assigned Contracts Schedule shall not be a guarantee that such Assigned Contract or Assigned Lease ultimately will be assumed or assumed and assigned.  Only those Assigned Contracts and Assigned Leases that are included on a schedule of assumed and assigned contracts attached to a

definitive purchase agreement with the Successful Bidder (including amendments or modifications to such schedules in accordance with such agreement) (the "**Final Assigned Contracts Schedule**"), which will be filed on the docket of these Cases and provided to each Counterparty in accordance with this paragraph 28, will be assumed and assigned to the Successful Bidder.

### Extraordinary Provisions

29.   Section I.D. of the Sale Guidelines provides that the Debtors must conspicuously disclose any "Extraordinary Provisions" in connection with the conduct of certain asset sales.  Out of an abundance of caution, the Debtors disclose that the relief sought herein may include the following Extraordinary Provisions.

| Provision | Summary Description |
|---|---|
| **Sale to Insider** Guideline I.D.1 | The Purchaser is not an "insider," as such term is defined in section 101(31) of the Bankruptcy Code, of any of the Debtors. |
| **Agreements with Management** Guideline I.D.2 | The provisions regarding offers of employment to Offer Employees do not include management or key employees under the Sale Guidelines. |
| **Private Sale/No Competitive Bidding** Guideline I.D.3 | The proposed transaction is not a private sale.  The Bidding Procedures provide for an orderly, uniform, and appropriately competitive process through which interested parties may submit offers to purchase the Avrio Assets. |
| **Deadlines** Guideline I.D.4 | The APA may be terminated by either the Purchase or the Seller in the event that the Closing has not occurred on or before the date that is 160 days after the date of execution of the Agreement.  *See* APA, §8.1(a). |
| **Good-Faith Deposit** Guideline I.D.5 | No Qualified Bidder (including the Stalking Horse Bidder) is excused from submitting a good faith deposit. |
| **Interim Arrangements with Proposed Buyer** Guideline I.D.6 | As soon as reasonably practicable following the date of the Agreement and until the earlier of the Closing Date or valid termination of the Agreement, the Purchaser and Seller shall work together in good faith to agree upon the terms and conditions of a Transition Services Agreement  (the "**TSA**").  *See* APA, §6.22.  The TSA will be consistent with the terms set forth on Exhibit E to the APA. |
| **Use of Proceeds** Guideline I.D.7 | The Agreement does not address the use of proceeds generated from the proposed Sale Transaction. |
| **Tax Exemption** Guideline I.D.8 | The Debtors do not seek to have the Sale of the Purchased Assets declared exempt from taxes under section 1146(a) of the Bankruptcy Code. |
| **Record Retention** Guideline I.D.9 | All Retained Books and Records and all personnel records with respect to current or former employees of the Seller or the Business (including any Business Employees) are Excluded Assets under the APA.  "**Retained Books and Records**" means the company seal, minute books, stock certificates, stock or equity record books, federal, |

| | |
|---|---|
| | state, local or non-U.S. income, franchise or similar Tax Records of the Seller and its Affiliates and any other Tax Records that do not primarily relate to the Acquired Assets, Assumed Liabilities or the Business, work papers and such other books and records as pertain to the organization, qualification to do business, existence or capitalization of the Seller or any Affiliate thereof, books and records that the Seller is required to retain under applicable Law and books and records that relate to an Excluded Asset or an Excluded Liability, and any personnel records with respect to any current or former employees of the Seller and its Affiliates (including any Business Employees).  *See* APA, § 1.2(d) & art. X (def'n of "Retained Books and Records"). |
| **Sale of Avoidance Actions** Guideline I.D.11 | The Acquired Assets include Avoidance Actions against any of the Seller's vendors, suppliers, customers or trade creditors with whom the Purchaser continues to conduct business in regard to the Acquired Assets after the Closing and any of their Affiliates (collectively, the **"Designated Parties"**); provided, however, that it is understood and agreed by the parties that the Purchaser will not pursue or cause to be pursued any Avoidance Actions against any of the Designated Parties other than as a defense (to the extent permitted under applicable Law) against any claim or cause of action raised by such Designated Party.  *See* APA, § 1.1(k). |
| **Requested Findings as to Successor Liability** Guideline I.D.12 | The Debtors seek a finding that (a) the Purchaser is not a "successor" to, a mere continuation of, or alter ego of the Debtors or their estates, and there is no continuity of enterprise or common identity between the Purchaser and the Debtors.  The Purchaser is not holding itself out to the public as a successor to or a continuation of the Debtors or their estates.  The Purchaser is not a successor to any of the Debtors or their estates by reason of any theory of law or equity, and the Sale does not amount to a consolidation, succession, merger, or de facto merger of Purchaser and the Debtors.  Immediately prior to the Closing Date, the Purchaser was not an "insider" or "affiliate" of the Debtors, as those terms are defined in the Bankruptcy Code, and no common identity of incorporators, directors, or controlling stockholders existed between the Debtors and the Purchaser.  The transfer of the Avrio Assets to the Purchaser, and the assumption of the Assumed Liabilities by the Purchaser, except as otherwise explicitly set forth in the Agreement, does not, and will not, subject the Purchaser to any liability whatsoever, with respect to the Debtors or the operation of the Debtors' businesses prior to the Closing (including liabilities based on the Debtors' pre-closing ratings by governmental or quasi-governmental agencies or authorities) or by reason of such transfer, including under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, or any foreign jurisdiction, based, in whole or in part, directly or indirectly, on any, or any theory of, successor, vicarious, antitrust, environmental, revenue, pension, ERISA, tax, labor (including any WARN Act), employment or benefits, de facto merger, business continuation, substantial continuity, alter ego, derivative, transferee, veil piercing, escheat, continuity of enterprise, mere continuation, product line, or products liability or law, or other applicable law, rule, or regulation (including filing requirements under any such law, rule, or regulation), or theory of liability, whether legal, equitable, or otherwise.  *See* Proposed Sale Order ¶¶ O & 35. |
| **Future Conduct** Guideline I.D.13 | N/A |
| **Requested Findings as to Fraudulent Conveyance** Guideline I.D.14 | The Debtors request findings that (a) the consideration provided for the Purchased Assets constitutes reasonably equivalent value and fair consideration and (b) the Agreements were not entered into, and the Debtors and the Purchaser have not entered into the Agreements or proposed to consummate the Transaction, for the purpose of hindering, delaying or defrauding the Debtors' present or future creditors or otherwise |

| | |
|---|---|
| | fraudulently for the purpose of statutory and common-law fraudulent conveyance and fraudulent transfer claims.  *See* Proposed Sale Order ¶¶ Q, 12 & 39. |
| **Sale Free and Clear of Unexpired Leases** Guideline I.D.15 | The Debtors seek to sell the Transferred Assets to the Purchaser free and clear of all Claims and Interests (other than any Permitted Post-Closing Encumbrances and Assumed Liabilities).  *See* APA, § 6.17; Proposed Sale Order ¶ 8. |
| **Relief from Bankruptcy Rule 6004(h)** Guideline I.D.16 | The Debtors seek relief from the fourteen-day stay imposed by Bankruptcy Rule 6004(h) on the grounds set forth below.  *See* Proposed Sale Order ¶¶ BB & 42. |

## Approval of the Relief Requested is Warranted and in the Best Interests of the Debtors and Their Stakeholders

### A.    The Bidding Procedures are Fair and Appropriate and Should Be Approved

30.    The Bidding Procedures are specifically designed to promote what courts have deemed to be the paramount goal of any proposed sale of property of a debtor's estate:  maximizing the value of sale proceeds received by the estate.  *See Official Comm. of Subordinated Bondholders v. Integrated Res. Inc. (In re Integrated Res. Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992) ("It is a well-established principle of bankruptcy law that the objective of bankruptcy rules and the [Debtor's] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate") (quoting *In re Atlanta Packaging Products, Inc.*, 99 B.R. 124, 130 (Bankr. N.D.Ga. 1988)).  As this Court established in the Sale Guidelines "[g]enerally, the Court will entertain a motion for approval . . . of proposed bidding procedures if such procedures are, as a matter of reasonable business judgment, likely to maximize the sale price."  *See also In re Integrated Res., Inc.*, 147 B.R. at 659 (observing that sale procedures "encourage bidding and . . . maximize the value of the debtor's assets"); *In re Fin. News Network, Inc.*, 980 F.2d 165, 166 (2d Cir. 1992) (noting that a bankruptcy court must provide "for an orderly bidding Process" because "absent such a fixed and fair process bidders may decline to participate in the auction").

31.    The Bidding Procedures provide for an orderly, uniform, and appropriately competitive process through which interested parties may submit offers to purchase the Avrio

Assets. The Debtors, with the assistance of their advisors, have structured the Bidding Procedures to promote active bidding by interested parties and to confirm the highest or otherwise best offer available for the Avrio Assets. Additionally, the Bidding Procedures will allow the Debtors to conduct the Auction in a fair and transparent manner that will encourage participation by financially capable bidders with demonstrated ability to consummate a timely Sale Transaction.

32.    Courts in this district have approved procedures similar to the proposed Bidding Procedures in connection with chapter 11 asset sales. *See, e.g.*, *In re Pareteum Corp.*, No. 22-10615 (LGB) (Bankr. S.D.N.Y. May 31, 2022) [D.I. 76]; *In re Greensill Capital Inc.*, No. 21-10561 (MEW) (Bankr. S.D.N.Y. Apr. 6, 2021) [D.I. 37]; *In re Garrett Motion, Inc.*, No. 20-12212 (MEW) (Bankr. S.D.N.Y. Oct. 24, 2020) [D.I. 282]; *In re Hermitage Offshore Services Ltd.*, No. 20-11850 (MG) (Bankr. S.D.N.Y. Sept. 24, 2020) [D.I. 71]; *In re LSC Communications, Inc.*, No. 20-10950 (SHL) (Bankr. S.D.N.Y. June 5, 2020) [D.I. 322]; *In re Barneys New York, Inc.*, No. 19-36300 (CGM) (Bankr. S.D.N.Y. Aug. 22, 2019) [DI. 156]; *In re Hollander Sleep Products, LLC*, No. 19-11608 (MEW) (Bankr. S.D.N.Y. July 3, 2019) [D.I 180]; *In re Sears Holdings Corp.*, No. 18-23538 (RDD) (Bankr. S.D.N.Y. Nov. 16, 2018) [D.I. 775]; *In re Hooper Holmes, Inc.*, No. 18-23302 (RDD) (Bankr. S.D.N.Y. Sept. 20, 2018) [D.I. 119]; *In re Nine West Holdings, Inc.*, No. 18-10947 (SCC) (Bankr. S.D.N.Y. May 7, 2018) [D.I. 223]. Accordingly, the Bidding Procedures should be approved because, under the circumstances, they are reasonable, appropriate, and in the best interests of the Debtors, their estates, and all parties in interest.

**B.    The Selection of the Stalking Horse Bidder and the Bid Protections Have Sound Business Purposes and Should Be Approved**

33.    As noted above, the Stalking Horse Agreement provides for a Break-Up Fee in an amount equal to $11,910,000 to be paid to the Stalking Horse Bidder upon certain termination events in accordance with the Stalking Horse Agreement. In addition, the Stalking Horse

Agreement provides for an Expense Reimbursement of up to $3,970,000 to be paid upon the occurrence of certain events typical and customary for transactions of this kind.  The Debtors believe that the Bid Protections are necessary for the Stalking Horse Bidder to enter into the Stalking Horse Agreement.  In addition, the Debtors believe that the presence of a stalking horse bidder will set a floor for the value of the Avrio Assets and attract other potential buyers to bid for such assets, thereby providing certainty and maximizing the realizable value of the Avrio Assets for the benefit of the Debtors' estates, their creditors, and all other parties in interest.

34.    Approval of the Bid Protections is governed by standards for determining the appropriateness of bid protections in the bankruptcy context.  The appropriateness of such purchaser protections is determined under a business judgment standard.  *Official Comm. of Subordinated Bondholders v. Integrated Res. Inc. (In re Integrated Res. Inc.)*, 147 B.R. 650, 656–57 (S.D.N.Y. 1992) (noting that bid protections, including break-up fee arrangements that have been negotiated by a debtor, are to be reviewed according to the "business judgment" standard, under which such procedures and arrangements are "presumptively valid").  Under this standard, a debtor's decision to provide for a termination fee is proper so long as the following conditions are satisfied: (a) the relationship of the parties who negotiated a termination fee is not tainted by self-dealing or manipulation; (b) the fee does not hamper bidding and (c) the amount of the fee is not unreasonable relative to the proposed purchase price.  *In re Genco Shipping & Trading Ltd.*, 509 B.R. 455, 465 (Bankr. S.D.N.Y. 2014).

35.    Here, the Bid Protections squarely satisfy the *Genco* factors.  First, as demonstrated by the Schnitzler Declaration, the Bid Protections are the product of good faith, arm's length negotiations between the Debtors and the Stalking Horse Bidder.  *See* Schnitzler Decl. ¶ 15.  Further, the Stalking Horse Agreement provisions relating to the Bid Protections (along with other

provisions of the Stalking Horse Agreement) were (a) scrutinized by the Debtors' professionals, (b) reviewed with outside advisors, including the advisors of the Consultation Parties, through the marketing process, and (c) approved by the Debtors' board of directors.  *See* Schnitzler Decl. ¶ 17.

36.    Second, the Debtors believe, based on their business judgment, that the Break-Up Fee and the Expense Reimbursement will allow them to maximize the realizable value of the Avrio Assets without chilling bidding.  The Bid Protections were a material inducement for, and a condition of, the Stalking Horse Bidder's agreement to enter into the Stalking Horse Agreement.[6] Indeed, the Debtors believe that their ability to offer the Bid Protections to the Stalking Horse Bidder is necessary to help ensure an adequate floor for the value of the Avrio Assets and to insist that competing bids be materially higher or otherwise better than the Stalking Horse Bid, thereby providing the upside opportunity that the Debtors could potentially realize a higher or otherwise better offer at any auction for the Avrio Assets which, absent such a bid floor, might otherwise never have been realized—a clear benefit to the Debtors' estates.  *See In re 310 Assocs.*, 346 F.3d 31, 34 (2d Cir. 2003) (citation omitted) ("Break-up fees are sometimes authorized in the bankruptcy auction sale context because they provide an incentive for an initial bidder to serve as a so-called 'stalking horse,' whose initial research, due diligence, and subsequent bid may encourage later bidders."); s*ee also In re Integrated Res., Inc.*, 147 B.R. at 662 (Declaring three proper functions for break-up fees: "(1) to attract or retain a potentially successful bid, (2) to establish a bid standard or minimum for other bidders to follow, or (3) to attract additional bidders.").  Without the Court authorizing the Debtors to offer the Bid Protections, the Debtors might lose the opportunity to obtain the highest or otherwise best offer for the Avrio Assets and

---

[6] Moreover, the Stalking Horse Bidder would not have agreed to act as a stalking horse without the Bid Protections. *See* Schnitzler Decl. ¶ 17.

would certainly lose the downside protection that could be afforded by the existence of a Stalking

Horse Bidder.  Furthermore, without the benefit of the Stalking Horse Bidder, the bids received at

the Auction for the Avrio Assets could be substantially lower than the one offered by the Stalking

Horse Bidder.

37.     Third, and finally, the Break-Up Fee and Expense Reimbursement are reasonable

and appropriate in light of the size, nature, and complexity of the transaction and the efforts that

will necessarily have been expended by the Stalking Horse Bidder.   As set forth in the Schnitzler

Declaration, the Break-Up Fee represents only 3.0% of the Purchase Price to be paid by the

Stalking Horse Bidder.  *See* Schnitzler Decl. ¶ 16.  Additionally, both the Break-Up Fee and the

Expense Reimbursement were negotiated in good faith, and both were necessary to secure the

Stalking Horse Bidder's commitment under the Stalking Horse Agreement.  In sum, the Debtors'

ability to offer the Bid Protections enables them to ensure the sale of the Avrio Assets at a price

they believe to be fair, while, at the same time, providing the Debtors with the potential of

achieving an even greater benefit to the Debtors' estates in the form of a higher or otherwise better

offer for the Avrio Assets.

38.     Courts in this District have approved protections similar to the proposed Break-Up

Fee and Expense Reimbursement as reasonable, and consistent with the type and range of bidding

protections typically approved, and also have granted administrative expense status to break-up

fees that become due under the terms of a stalking horse purchase agreement.  *See, e.g.*, *In re JPA*

*No. 111 Co., Ltd.*, No. 21-12075 (DSJ) (Bankr. S.D.N.Y. Feb. 7, 2022) [D.I. 102] (approving

break-up fee of up to 3.5% of the stalking horse bid and expense reimbursement of up to roughly

.75% of the stalking horse bid); *In re Greensill Capital Inc.*, No. 21-10561 (MEW) (Bankr.

S.D.N.Y. Apr. 6, 2021) [D.I. 37] (approving as a "first priority administrative expense" a break-

up fee of roughly 7% of the cash component of the stalking horse bid and expense reimbursement of up to 2.5% of the cash component of the stalking horse bid); *In re Garrett Motion, Inc.*, No. 20-12212 (MEW) (Bankr. S.D.N.Y. Oct. 24, 2020) [D.I. 282] (approving break-up fee of up to 3% of the stalking horse bid and expense reimbursement of up to 1% of the stalking horse bid); *In re LSC Communications, Inc.*, No. 20-10950 (SHL) (Bankr. S.D.N.Y. June 5, 2020) [D.I. 322] (approving break-up fee of up to 3% of the stalking horse bid and expense reimbursement of up to 1% of the stalking horse bid, subject to a cap of $750,000 in the aggregate for all stalking horse bidders); *In re Barneys New York, Inc.*, No. 19-36300 (CGM) (Bankr. S.D.N.Y. Aug. 22, 2019) [DI. 156] (approving a break-up fee and expense reimbursement that in aggregate do not exceed 3% of the stalking horse bid); *In re Hollander Sleep Products, LLC*, No. 19-11608 (MEW) (Bankr. S.D.N.Y. July 3, 2019) [D.I 180] (same). Accordingly, the Debtors submit that the Bid Protections reflect a sound business purpose, are fair and appropriate under the circumstances, and should be approved. *See* Schnitzler Decl. ¶¶ 23.

## C.    The Proposed Sale Transaction Satisfies the Requirements of Section 363 of the Bankruptcy Code

39.    Section 363(b)(1) of the Bankruptcy Code empowers the Court to authorize a debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). To approve the use of estate property under section 363(b)(1) of the Bankruptcy Code, the Second Circuit requires a debtor to show that the decision to use, sell, or lease assets outside of the ordinary course of business was based on the debtor's sound business judgment in light of "all salient factors" relating to the bankruptcy case. *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983) ("The rule we adopt requires that a judge determining a § 363(b) application expressly find from the evidence presented before him at the hearing a good business reason to grant such an application."); *In re*

*Ionosphere Clubs, Inc*., 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989); *see also In re MF Glob. Inc.*, 467 B.R. 726, 730 (Bankr. S.D.N.Y. 2012) ("Although not specified by section 363, the Second Circuit requires that transactions under section 363 be based on the sound business judgment of the debtor or trustee.").

40.    Courts typically consider the following factors in determining whether a proposed sale satisfies this standard: (a) whether a sound business justification exists for the sale; (b) whether adequate and reasonable notice of the sale was provided to interested parties; (c) whether the sale will produce a fair and reasonable price for the property; and (d) whether the parties have acted in good faith. *See In re MF Glob. Inc.*, 467 B.R. 726, 730 (Bankr. S.D.N.Y. 2012) (citing *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991)).  Where a debtor demonstrates a valid business justification for a decision, it is presumed that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *In re Integrated Res., Inc.*, 147 B.R. at 656.

41.    Moreover, section 105(a) of the Bankruptcy Code confers on a bankruptcy court broad equitable powers to confer relief in alignment with bankruptcy policies.  Pursuant to section 105(a), orders are appropriate where they are essential to the debtor's reorganization efforts and do not pose a burden on the debtor's creditors.  *See U.S. Lines, Inc. v. Am. S.S. Owners Mut. Prof. & Indem. Ass'n (In re U.S. Lines, Inc.)*, 197 F.3d 631, 640 (2d Cir. 1999); *Momentum Mfg. Corp. v. Emp. Creditors Comm. (In re Momentum Mfg. Corp.)*, 25 F.3d 1132, 1136 (2d Cir. 1994) ("It is well settled that bankruptcy courts are courts of equity, empowered to invoke equitable principles to achieve fairness and justice in the reorganization process.").

1.      ***The Debtors Have Demonstrated a Sound Business Justification for the
Potential Sale Transaction***

42.      As set forth above and in the Schnitzler Declaration, a strong business justification

exists for the sale of the Avrio Assets as described herein.  An orderly and expeditious sale of the

Avrio Assets will position the Debtors to distribute hundreds of millions of dollars of additional

cash on the effective date of a plan of reorganization, which will be put to use to help abate the

opioid crisis.  The Debtors believe that the time has come to conduct a sale process for the Avrio

business, as a sale earlier in the Cases likely would have yielded less value and would have resulted

in the sale proceeds remaining in the Debtors' estate for an extended period of time.  Additionally,

the Debtors believe that a consummated Sale Transaction will produce fair and reasonable

purchase prices for the Avrio Assets.  The Stalking Horse Bid is an offer to purchase the Avrio

Assets for a price that the Debtors, with the advice of their advisors, already have determined to

be fair and reasonable.

43.      In addition, the Bidding Procedures were carefully designed to facilitate a flexible,

robust, and competitive bidding process.  The Debtors are poised to capitalize on the progress

made during the process to secure the Stalking Horse Bidder—including PJT's identification of

and outreach to over 70 strategic and financial parties most likely to have interest in and financial

wherewithal to consummate a Sale Transaction with Avrio, the dissemination of confidential

diligence information to 33 of those parties, and multiple rounds of bidding to select the Stalking

Horse Bidder during which the economic and legal terms of the stalking horse bids were

significantly improved—to maximize the value of the Avrio Assets sold at the Auction.  The

Bidding Procedures provide an appropriate framework for the Debtors to review, analyze, and

compare all bids received to determine which bids are in the best interests of the Debtors' estates

and their economic stakeholders.  A Sale Transaction governed by the Bidding Procedures

undoubtedly will serve the important objectives of obtaining a fair and reasonable purchase price for the Avrio Assets, which will inure to the benefit of all parties in interest in the Cases.

44.      Finally, nothing in the Bidding Procedures require the Debtors' board of directors to take any action, or to refrain from taking any action, with respect to the Bidding Procedures, to the extent that the Debtors' board of directors determines, or based on the advice of counsel, that taking such action, or refraining from taking such action, as applicable, is required to comply with applicable law or its fiduciary duties under applicable law.

45.      For the foregoing reasons, the Debtors submit that a strong business justification exists for approving the Sale Transaction and related relief requested herein.

### 2.      *The Noticing Procedures Are Reasonable and Appropriate*

46.      A sale of assets outside of the ordinary course of business requires notice and a hearing and is subject to court approval.  11 U.S.C. § 363(b)(1); *see also In re Roman Cath. Diocese of Rockville Ctr.*, No. 20-12345 (MG), 2022 WL 17543589, at *3 (Bankr. S.D.N.Y. Dec. 9, 2022).  The Noticing Procedures described above are reasonably calculated to provide all of the Debtors' known creditors and all other parties in interest with adequate, timely notice of, among other things, the proposed Sale Transaction, Bidding Procedures, Auction, and Sale Hearing.

### D.      The Successful Bidder Should Be Entitled to the Protections of Section 363(m) of the Bankruptcy Code

47.      Section 363(m) of the Bankruptcy Code protects a good faith purchaser's interest in property purchased from a debtor notwithstanding that the sale conducted under section 363(b) is later reversed or modified on appeal.  Specifically, section 363(m) of the Bankruptcy Code states the following:

> The reversal or modification on appeal of an authorization under [section 363(b) of the Bankruptcy Code] . . . does not affect the validity of a sale . . . to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the

> appeal, unless such authorization and such sale . . . were stayed
> pending appeal.

11 U.S.C. § 363(m).

48.    Section 363(m) of the Bankruptcy Code "affords 'finality to judgments by protecting good faith purchasers, the innocent third parties who rely on the finality of bankruptcy judgments in making their offers and bids.'" *In re Chateaugay Corp.*, No. 92 Civ. 7054 (PKL), 1993 WL 159969, at *3 (S.D.N.Y. May 10, 1993) (quoting *In re Stadium Management Corp.*, 895 F.2d 845, 847 (1st Cir. 1990)). *See also Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal.").

49.    Although the Bankruptcy Code does not define "good faith," most courts have adopted a traditional equitable definition, applying it to a buyer who "purchases the assets for value, in good-faith and without notice of adverse claims." *Licensing by Paolo, Inc. v. Sinatra (In re Gucci)*, 126 F.3d 380, 389 (2d Cir. 1997) (quoting *William v. Kivitz*, 764 F.2d 1019, 1023 (4th Cir. 1985)). Good faith of a purchaser is demonstrated by "the integrity of his conduct during the course of the sale proceedings." *Id.* at 390. Courts in the Second Circuit have held that misconduct that would typically destroy a purchaser's good-faith status involves fraud, collusion or an attempt to control the sale price or take unfair advantage of other bidders. *See Kabro Assocs. of West Islip, LLC v. Colony Hill Assocs. (In re Colony Hill Assocs.)*, 111 F.3d 269, 276 (2d Cir. 1997).

50.    The Debtors submit that the Successful Bidder is or would be a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code. The Debtors and the Stalking Horse Bidder have entered into the Stalking Horse Agreement without collusion, in good faith, and through extensive arm's length negotiations. *See* Schnitzler Decl. ¶¶ 15. Indeed, the

Stalking Horse Bidder and the Debtors have engaged separate counsel and other professional advisors to represent their respective interests in the negotiation of the Stalking Horse Agreement and with respect to the sale process generally. To the best of the Debtors' knowledge, information, and belief, no party has engaged in any conduct that would cause or permit a Sale Transaction, including the Stalking Horse Agreement, to be set aside under section 363(m) of the Bankruptcy Code.

51.    Further, as set forth above, the Bidding Procedures are designed to produce a fair and transparent competitive bidding process. Each Qualified Bidder participating in the Auction must confirm that it has not engaged in any collusion with respect to the bidding or the sale of the Avrio Assets. *See* Bidding Procedures § 4. Any asset purchase agreement with a Successful Bidder executed by the Debtors will be negotiated at arm's length and in good faith. Accordingly, the Debtors seek a finding that any Successful Bidder under the Bidding Procedures is a good faith purchaser and is entitled to the full protections afforded by section 363(m) of the Bankruptcy Code.

52.    Based on the foregoing, the Debtors submit that the Debtors' entry into a Sale Transaction pursuant to the Bidding Procedures is a sound exercise of the Debtors' business judgment and should be approved as a good faith transaction.

**E.    The Avrio Assets Should Be Sold Free and Clear of Liens, Claims, Interests, and Encumbrances Under Section 363(f) of the Bankruptcy Code**

53.    In the interest of attracting the best offers, the Avrio Assets should be sold free and clear of any and all liens, claims, interests, and other encumbrances, in accordance with section 363(f) of the Bankruptcy Code, with any such liens, claims, interests, and encumbrances attaching to the proceeds of the applicable sale. Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests, and encumbrances of an entity other than the estate if any one of the following conditions is satisfied:

a.    applicable non-bankruptcy law permits sale of such property free and clear of such interest;

b.    such entity consents;

c.    such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;

d.    such interest is in bona fide dispute; or

e.    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); *see also In re Celsius Network LLC*, No. 22-10964 (MG), 2022 WL 14193879, at *7 (Bankr. S.D.N.Y. Oct. 24, 2022) ("section 363(f) is written in the disjunctive, authorizing a trustee or debtor-in-possession to sell property of the estate free and clear of all liens 'if any of the five conditions of § 363(f) are met ...'") (quoting *Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988)); *In re Borders Group, Inc.*, 453 B.R. 477, 483 (Bankr. S.D.N.Y. 2011).

54.    Section 363(f) of the Bankruptcy Code is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a); *see also Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.)*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) ("Authority to conduct such sales [free and clear of claims] is within the court's equitable powers when necessary to carry out the provisions of [the Bankruptcy Code].").

55.    The Debtors submit that the sale of the Avrio Assets free and clear of liens, claims, interests, and encumbrances will satisfy one or more of the requirements under section 363(f) of the Bankruptcy Code.  For example, to the extent a party objects to the Sale Transaction on the basis that it holds a prepetition lien or encumbrance on the Avrio Assets, the Debtors believe that

any such party could be compelled to accept a monetary satisfaction of such claims, under section 363(f)(5) of the Bankruptcy Code, or that such lien is in bona fide dispute, under section 363(f)(4) of the Bankruptcy Code.

56.     Moreover, the Debtors have sent or will send the Sale Notice to any purported prepetition lienholders.  If such lienholders do not object to the proposed Sale Transaction, then their consent should be presumed.  Accordingly, the Debtors request that, unless a party asserting a prepetition lien, claim, interest, or encumbrance on the Avrio Assets timely objects to this Motion, such party shall be deemed to have consented to any Sale Transaction approved at the Sale Hearing.  *See Borders Group*, 453 B.R. at 483 ("Under section 363(f)(2), a lienholder who receives notice of a sale but does not object within the prescribed time period is deemed to consent to the proposed sale, and assets thereafter may be sold free and clear of liens."); *In re GSC, Inc.*, 453 B.R. 132, 183 (Bankr. S.D.N.Y. 2011).

57.     The purpose of a sale order purporting to authorize the transfer of assets free and clear of all claims, liens, interests, and encumbrances would be defeated if claimants could thereafter use the transfer as a basis to assert claims against a purchaser arising from a seller's pre-sale conduct.  Moreover, without such assurances, potential bidders may choose not to participate in the Auction or the Stalking Horse Bidder would not have submitted the Stalking Horse Bid, to the detriment of the Debtors' economic stakeholders.  Accordingly, the Debtors request that the Court authorize the sale of the Avrio Assets free and clear of any liens, claims, interests, and encumbrances (with the exception of Permitted Encumbrances and Assumed Liabilities) in accordance with section 363(f) of the Bankruptcy Code, subject to such liens, claims, interests, and encumbrances attaching to the proceeds thereof in the same order of relative priority and with the same validity, force, and effect as prior to such sale.

**F.      The Assumption and Assignment of Executory Contracts and Unexpired Leases
         Should Be Authorized**

58.      Section 365(a) of the Bankruptcy Code provides that a debtor in possession "subject
to the court's approval, may assume or reject any executory contract or unexpired lease of the
debtor."   11 U.S.C. § 365(a).   Courts employ the business judgment standard in determining
whether to approve a debtor's decision to assume or reject an executory contract or unexpired
lease.  *See, e.g.*, *Nostas Assocs. v. Costich (In re Klein Sleep Prods., Inc.)*, 78 F.3d 18, 25 (2d Cir.
1996); *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095,
1099 (2d Cir. 1993).   The "business judgment" test in this context only requires that a debtor
demonstrate that assumption or rejection of an executory contract or unexpired lease benefits the
estate.  *See In re Penn Traffic Co.*, 524 F.3d 373, 383 (2d Cir. 2008).

59.      Any assumption of the Potential Assigned Contracts is an exercise of the Debtors'
sound business judgment because the transfer of such Contracts and Leases is necessary to the
Debtors' ability to obtain the best value for their Avrio Assets.   The assumption and assignment
of Potential Assigned Contracts is a critical component of the Stalking Horse Agreement and the
value of the Avrio Assets.   Given that consummation of the Sale Transaction is critical to the
Debtors' efforts to maximize value for their estates and stakeholders, the Debtors' assumption of
Potential Assigned Contracts is an exercise of sound business judgment and, therefore, should be
approved.

60.      The consummation of any Sale Transaction involving the assignment of a Potential
Assigned Contract will be contingent upon the Debtors' compliance with the applicable
requirements of section 365 of the Bankruptcy Code.   Section 365(b)(1) of the Bankruptcy Code
requires that any outstanding defaults under the Contracts and Leases to be assumed be cured and
that the Debtors provide adequate assurance that such defaults will be promptly cured.   The

Debtors' assumption and assignment of Assigned Contracts will be contingent upon payment of the Cure Costs and effective only upon the closing of the Sale Transaction or any later applicable effective date.  As set forth above, the Debtors propose to file with the Court and serve on each Counterparty a Potential Assumption and Assignment Notice, which will set forth the Debtors' good faith calculations of Cure Costs with respect to each Contract and Lease listed on such Potential Assumption and Assignment Notice.  As a result, Counterparties will have a meaningful opportunity to raise any objections to the proposed assumption of their respective Contracts and Leases in advance of the applicable Sale Hearing.

61.    Pursuant to section 365(f)(2) of the Bankruptcy Code, a debtor may assign an executory contract if "adequate assurance of future performance by the assignee of such contract or lease is provided."  The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes, Inc. v. Azzari* (*In re Carlisle Homes, Inc.*), 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (citation omitted); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean an absolute assurance that debtor will thrive and pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.,* 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) (finding that, "[a]lthough no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").  Among other things, adequate assurance may be provided by evidencing the assignee's financial health and experience in managing the type of enterprise or property assigned.  *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when the prospective assignee of a lease has financial resources, relevant experience, and has

48

expressed willingness to devote sufficient funding to the business to give it a strong likelihood of succeeding).

62.     As set forth above and in the Bidding Procedures, for a bid to qualify as a Qualified Bid, a Potential Bidder must include with its bid information regarding its ability (and the ability of its designated assignee, if applicable) to perform under applicable Potential Assigned Contracts. Each affected Counterparty will have an opportunity to object to the ability of the Successful Bidder (including the Stalking Horse Bidder) to provide adequate assurance as provided in the Bidding Procedures Order.  In addition, the Stalking Horse Bidder submits that it is able to provide adequate assurance of its ability to perform under the applicable Potential Assigned Contracts. Further, the Debtors propose to file with the Court a Potential Assumption and Assignment Notice, which will set forth a list of the Potential Assigned Contracts, in advance of the Sale Hearing.  To the extent necessary, the Debtors will present facts at the Sale Hearing to show the financial wherewithal, willingness, and ability of the Successful Bidder (including the Stalking Horse Bidder) to perform under the Potential Assigned Contracts.

63.     In addition, to facilitate the assumption and assignment of Potential Assigned Contracts, the Debtors further request that the Court find that all anti-assignment provisions contained therein, whether such provisions expressly prohibit or have the effect of restricting or limiting assignment of such Assigned Contract or Assigned Lease, are unenforceable and prohibited pursuant to section 365(f) of the Bankruptcy Code.[7]

---

[7] Section 365(f)(1) of the Bankruptcy Code provides in part that, "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease . . . ."  11 U.S.C. § 365(f)(1).  Section 365(f)(3) of the Bankruptcy Code further provides that, "[n]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee."  11 U.S.C. § 365(f)(3)

## Waiver of Bankruptcy Rules 6004(a), 6004(h), and 6006(d)

64.     To implement successfully the relief sought herein, the Debtors request that the Court find that notice of the Motion is adequate under Bankruptcy Rule 6004(a) under the circumstances.  The Debtors also request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  The Debtors further request that the Court waive the stay imposed by Bankruptcy Rule 6006(d), which provides that an "order authorizing the trustee to assign an executory contract or unexpired lease under section 365(f) is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6006(d).

65.     The proposed Sale Transaction should be consummated as soon as practicable to allow the Debtors to maximize the value of significant non-core assets and the amount of cash in the Debtors' estates available to dedicate to opioid abatement efforts upon effectiveness of a plan of reorganization.  Accordingly, the Debtors request that the Bidding Procedures Order, the Sale Order, and any order authorizing the assumption and assignment of a Potential Assigned Contract in connection with a Sale Transaction be effective immediately upon entry and that the 14-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d) be waived.

## Notice

66.     Notice of this Motion will be provided to (a) the entities on the Master Service List (as defined in the *Second Amended Order Establishing Certain Notice, Case Management, and Administrative Procedures* entered on November 18, 2019 [D.I. 498] and available on the Debtors' case website at *https://restructuring.ra.kroll.com/purduepharm*a);  (b) all Counterparties to Contracts and Leases; (c) the Internal Revenue Service; (d) the Department of Justice; (e) the Food

and Drug Administration; (f) the Department of Health and Human Services; (g) any other local, state and federal agencies that have issued licenses or permits to Avrio Health L.P. with respect to the operation and use of the Avrio Assets; (h) all entities known to have expressed an interest to the Debtors in a transaction involving any material portion of the Avrio Assets during the past six (6) months; and (i) any person or entity with a particularized interest in the subject matter of this Motion (collectively, the "**Notice Parties**").  In addition, as soon as reasonably practicable after filing this Motion, the Debtors will (i) publish the Sale Notice in the national edition of the *Wall Street Journal* and (ii) serve the Sale Notice via email (or, in instances where no email address is available, via first class mail) on each party that filed a proof of claim against Avrio Health L.P. in these Cases, in each case in the form in the form attached hereto.  The Debtors respectfully submit that no further notice is required.

WHEREFORE the Debtors respectfully request that the Court enter the Bidding Procedures Order and, after the Sale Hearing, the Sale Order, granting the relief requested herein and such other and further relief as the Court may deem just and proper.

Dated:   April 4, 2023
         New York, New York

DAVIS POLK & WARDWELL LLP

By:   */s/ Eli J. Vonnegut*
       Eli J. Vonnegut

450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile:  (212) 701-5800
Marshall S. Huebner
Eli J. Vonnegut
Christopher S. Robertson
Dylan A. Consla

*Counsel to the Debtors*
*and Debtors in Possession*