# EXHIBIT C

## Stalking Horse Agreement

EXECUTION VERSION

**ASSET PURCHASE AGREEMENT**

**BY AND AMONG**

**AVRIO HEALTH L.P.,**

**ATLANTIS CONSUMER HEALTHCARE INC.**

**AND**

**as guarantor,**

**ARCADIA CONSUMER HEALTHCARE INC.**

**DATED APRIL 4, 2023**

# TABLE OF CONTENTS

ARTICLE I THE ACQUISITION ............................................................................2

    Section 1.1    Acquired Assets.............................................................................2

    Section 1.2    Excluded Assets ............................................................................4

    Section 1.3    Assumed Liabilities .......................................................................6

    Section 1.4    Excluded Liabilities.......................................................................7

    Section 1.5    Assignment of Assigned Contracts; Transfer of Acquired Assets .............8

    Section 1.6    Consideration ..............................................................................11

    Section 1.7    Good Faith Deposit.......................................................................11

    Section 1.8    Withholding ................................................................................12

ARTICLE II THE CLOSING ...............................................................................13

    Section 2.1    Closing......................................................................................13

    Section 2.2    Closing Statement.........................................................................13

    Section 2.3    Deliveries at the Closing ................................................................13

    Section 2.4    Post-Closing Adjustment ................................................................15

ARTICLE III REPRESENTATIONS AND WARRANTIES OF THE SELLER ......................17

    Section 3.1    Qualification; Organization .............................................................18

    Section 3.2    Authority of the Seller ...................................................................18

    Section 3.3    Consents and Approvals .................................................................18

    Section 3.4    No Violations ..............................................................................19

    Section 3.5    Financial Statements......................................................................19

    Section 3.6    No Undisclosed Liabilities..............................................................19

    Section 3.7    Title to Property ..........................................................................20

    Section 3.8    Absence of Certain Changes ...........................................................20

    Section 3.9    Brokers or Finders .......................................................................20

    Section 3.10    Litigation...................................................................................20

    Section 3.11    Intellectual Property .....................................................................20

    Section 3.12    Material Contracts........................................................................22

    Section 3.13    Compliance with Laws; Permits ......................................................24

    Section 3.14    Employee Benefits Matters.............................................................25

    Section 3.15    Labor Matters .............................................................................26

    Section 3.16    FDA and Healthcare Regulatory Matters ............................................28

i

Section 3.17    Taxes.........................................................................................30

Section 3.18    Insurance ...................................................................................32

Section 3.19    Warranties ...................................................................................32

Section 3.20    No Other Representation; No Reliance ....................................32

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE PURCHASER ............33

Section 4.1    Qualification; Organization .......................................................33

Section 4.2    Authority of the Purchaser.........................................................33

Section 4.3    Consents and Approvals .............................................................34

Section 4.4    No Violations ..............................................................................34

Section 4.5    Compliance with Laws ...............................................................34

Section 4.6    Litigation.....................................................................................34

Section 4.7    Brokers........................................................................................35

Section 4.8    Sufficient Funds .........................................................................35

Section 4.9    No Other Representations; No Reliance......................................35

ARTICLE V REPRESENTATIONS AND WARRANTIES OF THE GUARANTOR .............36

Section 5.1    Qualification; Organization .......................................................36

Section 5.2    Authority of the Guarantor.........................................................36

Section 5.3    Consents and Approvals .............................................................37

Section 5.4    No Violations ..............................................................................37

Section 5.5    Compliance with Laws ...............................................................37

Section 5.6    No Reliance .................................................................................37

ARTICLE VI COVENANTS .........................................................................................38

Section 6.1    Conduct of Business Pending the Closing.................................38

Section 6.2    Access and Information ..............................................................41

Section 6.3    Approvals and Consents; Cooperation; Notification.................43

Section 6.4    Betadine and Senokot Licenses; Deferred Assets ....................45

Section 6.5    Further Assurances .....................................................................46

Section 6.6    Cooperation with Respect to Bankruptcy Court Approvals .....46

Section 6.7    Bankruptcy Court Filings...........................................................47

Section 6.8    Alternate Bidder ........................................................................47

Section 6.9    Communications with Customers and Suppliers .......................47

Section 6.10    Employee Matters.......................................................................47

Section 6.11    Payments Received.....................................................................51

Section 6.12  Use of Names and Marks .................................................................51

Section 6.13  Transition of Assigned Product Numbers................................................51

Section 6.14  Transfer of Regulatory Matters .................................................................52

Section 6.15  Seller Confidentiality Agreements ............................................................52

Section 6.16  Governmental Price Calculations and Reporting Obligations ..................52

Section 6.17  Sale Free and Clear...................................................................................53

Section 6.18  Financing ..................................................................................................54

Section 6.19  Guarantee ..................................................................................................55

Section 6.20  License ......................................................................................................56

Section 6.21  Insurance Cooperation ..............................................................................56

Section 6.22  Transition Services Agreement .................................................................56

Section 6.23  Consultation ..............................................................................................56

ARTICLE VII CONDITIONS PRECEDENT ...................................................................57

Section 7.1   Conditions Precedent to Obligation of the Seller, the Purchaser and the Guarantor..................................................................................................57

Section 7.2   Conditions Precedent to Obligation of the Seller.....................................57

Section 7.3   Conditions Precedent to Obligation of the Purchaser and the Guarantor...................................................................................................58

Section 7.4   Concurrent Delivery .................................................................................58

ARTICLE VIII TERMINATION .........................................................................................59

Section 8.1   Termination ...............................................................................................59

Section 8.2   Effect of Termination ................................................................................60

Section 8.3   Bid Protections ..........................................................................................61

ARTICLE IX GENERAL PROVISIONS............................................................................61

Section 9.1   Tax Matters ................................................................................................61

Section 9.2   Bulk Sales .................................................................................................63

Section 9.3   Survival of Representations, Warranties and Covenants..........................63

Section 9.4   Public Announcements ..............................................................................63

Section 9.5   Notices ......................................................................................................63

Section 9.6   Descriptive Headings; Interpretative Provisions......................................64

Section 9.7   No Strict Construction ..............................................................................65

Section 9.8   Entire Agreement; Assignment .................................................................65

Section 9.9   Governing Law; Submission of Jurisdiction; Waiver of Jury Trial ..........66

Section 9.10    Expenses ....................................................................................66

Section 9.11    Amendment...................................................................................66

Section 9.12    Waiver..........................................................................................66

Section 9.13    Counterparts; Effectiveness .........................................................66

Section 9.14    Severability; Validity; Parties in Interest.....................................66

Section 9.15    Specific Performance....................................................................66

Section 9.16    Time of the Essence......................................................................67

ARTICLE X DEFINITIONS..............................................................................67

## EXHIBITS

Exhibit A              Bidding Procedures Order

Exhibit B              Form of Sublicense Agreement

Exhibit C              Form of Sale Order

Exhibit D              Transition Services Agreement Term Sheet

Exhibit E              Accounting Principles

Exhibit F              Form of Escrow Agreement

Exhibit G              Example Net Working Capital Calculation

## SCHEDULES

Schedule A             Product Candidates

Schedule 1.1(d)(i)     Assigned Executory Contracts

Schedule 1.1(d)(ii)    Post-Petition Contracts

Schedule 1.1(n)        Assigned Product Numbers

Schedule 1.2(h)        Excluded Contracts

Schedule 1.2(q)        Excluded Assets

Schedule 1.3(i)        Assumed Liabilities

Schedule 1.4(j)        Excluded Liabilities

Schedule 1.5(a)        Executory Contracts List

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT**, dated April 4, 2023 (this "<u>Agreement</u>"), is made between (i) Avrio Health L.P., a Delaware limited partnership (the "<u>Seller</u>"), (ii) Atlantis Consumer Healthcare Inc., a Delaware corporation (the "<u>Purchaser</u>") and (iii) Arcadia Consumer Healthcare Inc., a Delaware corporation (the "<u>Guarantor</u>"). Each of the Seller and the Purchaser is referred to individually herein as a "party" and collectively as the "parties." Capitalized terms used herein and not otherwise defined shall have the respective meanings set forth in <u>Article X</u>.

## RECITALS

A.    The Seller is engaged in the business of (a) contracting to manufacture, marketing, distributing and selling the products that are currently marketed and sold under the names (i) Colace, (ii) Senokot, (iii) Betadine (including Betasept) and (iv) SlowMag Mg and (b) developing the Product Candidates (such business, the "<u>Business</u>" and such products and Product Candidates, the "<u>Products</u>").

B.    The Seller and certain of its Affiliates filed voluntary petitions for relief commencing cases (collectively, the "<u>Chapter 11 Cases</u>") under Chapter 11 of Title 11 of the United States Code (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>") on September 15, 2019 (the "<u>Petition Date</u>").

C.    The Purchaser desires to purchase and accept, and the Seller desires to sell, convey, assign, transfer and deliver to the Purchaser, all of the Acquired Assets, and the Purchaser is willing to assume, and the Seller desires to assign and delegate to the Purchaser, all of the Assumed Liabilities, all in the manner and subject to the terms and conditions set forth herein and in accordance with Sections 105, 363 and 365 of the Bankruptcy Code (such sale and purchase of the Acquired Assets and such assignment and assumption of the Assumed Liabilities, the "<u>Acquisition</u>").

D.    The parties acknowledge and agree that the purchase by the Purchaser of the Acquired Assets, and the assumption by the Purchaser of the Assumed Liabilities, are being made at arm's length and in good faith and without intent to hinder, delay or defraud creditors of the Seller or its Affiliates.

E.    Concurrently with the execution and delivery of this Agreement, and as a condition and material inducement to the Seller's execution of this Agreement, the Guarantor has duly executed and delivered the Equity Commitment Letter pursuant to which the Guarantor has received a commitment of investment, subject to the terms and conditions thereof, for the cash amounts set forth therein.

F.    The execution and delivery of this Agreement and the Seller's ability to consummate the transactions set forth in this Agreement are subject to, among other things, the entry of the Bidding Procedures Order and the Sale Order under, inter alia, Sections 363 and 365 of the Bankruptcy Code.

G.     The parties desire to consummate the proposed transaction as promptly as practicable after the Bankruptcy Court enters the Sale Order.

The parties agree as follows:

## ARTICLE I

## THE ACQUISITION

Section 1.1     Acquired Assets.  On the terms and subject to the conditions set forth in this Agreement (including subject to Sections 1.6(b) and 6.4 with respect to the Betadine Licensed IP, the Senokot Licensed IP, the Alcon Agreement and the Separation Assets) and, subject to approval of the Bankruptcy Court, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, at the Closing, the Seller shall sell, assign, transfer, convey and deliver to the Purchaser, and the Purchaser shall purchase and accept from the Seller, all right, title and interest of the Seller in, to or under all of the rights, properties and assets (i) Related to the Business wherever situated and whatever the nature, personal (but not real), tangible or intangible and (ii) the following rights, properties and assets (in each case of the foregoing clauses (i) and (ii), other than the Excluded Assets), in each case, as the same shall exist on the Closing Date (collectively, the "Acquired Assets"):

(a)     all Business Owned Intellectual Property, including all Business Registered Intellectual Property and all Business Data included therein, including, (i) rights, priorities and privileges of any kind whatsoever of the Seller accruing under any Business Owned Intellectual Property provided by applicable Law, including, if applicable, by international treaties, multinational Law, compact, treaty, protocol convention or organization, (ii) royalties, fees, income, payments and other proceeds now or hereafter due or payable with respect to any and all Business Owned Intellectual Property, (iii) injunctive and other legal and equitable relief for past, present and future infringement, dilution, misappropriation, violation, misuse, breach or default, with the right but no obligation to sue for such legal and equitable relief and to collect, or otherwise recover, any such damages, and (iv) all rights to file, prosecute and maintain registrations and applications for any Business Owned Intellectual Property;

(b)     all of the Seller's accounts receivable and other similar rights (whether current or noncurrent) outstanding as of the Closing to the extent arising out of sales of the Products or relating exclusively to the Business (other than, for the avoidance of doubt, as set forth in Section 1.2(m)), in each case, whether billed or unbilled, recorded or unrecorded;

(c)     all credits, claims for refunds, deferred charges and prepaid charges and expenses and other prepaid items (including customer deposits) and all retentions or holdbacks of the Seller or its Affiliates, in each case, to the extent relating exclusively to the Business (other than, for the avoidance of doubt, as set forth in Section 1.2(b)); *provided* that this Section 1.1(c) shall not apply with respect to or in connection with Taxes or Tax Refunds;

(d)     (i) all Contracts listed, described or otherwise identified on Schedule 1.1(d)(i), as such schedule may be amended from time to time pursuant to

2

Section 1.5(c) and (ii) the Post-Petition Contracts listed, described or otherwise identified on Schedule 1.1(d)(ii) (such Contracts, the "Assigned Contracts") and the rights thereunder;

(e)     all raw materials, work-in-process, finished goods, supplies (including clinical drug or supplement supplies), samples, components, packaging materials, parts, consigned goods and the full benefit of all express or implied warranties of such assets and other inventories Related to the Business (pursuant to a contract manufacturing agreement for the Products or otherwise) or Related to the manufacturing or production of the Products, in each case, including inventory in transit to a customer and inventory in transit to any manufacturing or other facility (collectively, "Inventory");

(f)     all equipment, machinery, materials, tools, supplies and other tangible personal property Related to the Business, except as set forth in Section 1.2(j);

(g)     to the extent transferable in compliance with applicable Law, all Books and Records and all Transferred Employee Records; *provided* that the Seller may retain a copy of Books and Records to the extent subject to a litigation hold;

(h)     to the extent transferable in compliance with applicable Law, all Business Permits and all pending applications therefor;

(i)     all goodwill associated with the Business, the Products, the Acquired Assets and the Assumed Liabilities;

(j)     all rights, claims, rebates, refunds, causes of action, actions, suits or proceedings, hearings, audits, rights of recovery, rights of setoff, rights of recoupment, rights of reimbursement, rights of indemnity or contribution and other similar rights (known and unknown, matured and unmatured, accrued or contingent, regardless of whether such rights are currently exercisable) against any Person, including all warranties, representations, guarantees, indemnities and other contractual claims (express, implied or otherwise) to the extent Related to the Business, the Acquired Assets or the Assumed Liabilities (including any claims for past infringement or misappropriation) (excluding, for the avoidance of doubt, all claims or causes of action of the Seller set forth in Sections 1.2(a), 1.2(b), 1.2(e), 1.2(f), 1.2(g), 1.2(h) and 1.2(m)); *provided* that this Section 1.1(j) shall not apply with respect to or in connection with any Taxes or Tax Refunds;

(k)     all avoidance claims or causes of action available to the Seller under Chapter 5 of the Bankruptcy Code (including Sections 544, 545, 547, 548, 549, 550 and 553) or any similar actions under any other applicable Law (collectively, "Avoidance Actions") against any of the Seller's vendors, suppliers, customers or trade creditors with whom the Purchaser continues to conduct business in regard to the Acquired Assets after the Closing and any of their Affiliates (collectively, the "Designated Parties"); *provided, however*, that it is understood and agreed by the parties that the Purchaser will not pursue or cause to be pursued any Avoidance Actions against any of the Designated Parties other than as a defense (to the extent permitted under applicable Law) against any claim or cause of action raised by such Designated Party;

3

(l)     all rights of the Seller to Tax Refunds attributable to (i) Periodic Taxes for which the Purchaser is responsible pursuant to <u>Section 9.1(b)</u> or (ii) Transfer Taxes for which the Purchaser is responsible pursuant to <u>Section 9.1(a)</u>;

(m)     any and all insurance proceeds or other compensation, in respect of loss or damage to any of the Acquired Assets to the extent occurring on or after the date hereof, and all rights and claims of the Seller to any such insurance proceeds or other compensation not paid by the Closing; and

(n)     the Seller's applicable NDC numbers (the "<u>Assigned NDC Numbers</u>") and SKUs on the Products set forth on <u>Schedule 1.1(n)</u> (collectively, the "<u>Assigned Product Numbers</u>"), which include the Seller's corresponding five (5)-digit Labeler Code (67618).

EXCEPT AS SPECIFICALLY AND EXPRESSLY SET FORTH IN <u>ARTICLE III</u>, (I) THE SELLER MAKES NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, RELATING TO THE BUSINESS, THE ACQUIRED ASSETS OR THE ASSUMED LIABILITIES, INCLUDING ANY REPRESENTATION OR WARRANTY AS TO VALUE, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR FOR ORDINARY PURPOSES, OR ANY OTHER MATTER, (II) THE SELLER MAKES NO, AND HEREBY DISCLAIMS ANY, OTHER REPRESENTATION OR WARRANTY REGARDING THE BUSINESS, THE ACQUIRED ASSETS OR THE ASSUMED LIABILITIES AND (III) THE ACQUIRED ASSETS AND THE ASSUMED LIABILITIES ARE CONVEYED ON AN "AS IS, WHERE IS" BASIS AS OF THE CLOSING, AND THE PURCHASER SHALL RELY UPON ITS OWN EXAMINATION THEREOF.  WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, EXCEPT AS SPECIFICALLY AND EXPRESSLY SET FORTH IN <u>ARTICLE III</u>, THE SELLER MAKES NO REPRESENTATION OR WARRANTY REGARDING ANY BUSINESS OTHER THAN THE BUSINESS, ANY ASSETS OTHER THAN THE ACQUIRED ASSETS OR ANY LIABILITIES OTHER THAN THE ASSUMED LIABILITIES, AND NONE SHALL BE IMPLIED AT LAW OR IN EQUITY.

Section 1.2     <u>Excluded Assets</u>.  Notwithstanding anything contained in this Agreement to the contrary, the following shall be retained by, and shall remain the property of the Seller, and in each case, shall be excluded from the Acquired Assets (collectively, the "<u>Excluded Assets</u>"):

(a)     except as provided in <u>Section 1.1(m)</u> above, all insurance policies and claims or rights thereunder;

(b)     all rights to any Tax Refunds, except as expressly provided in <u>Section 1.1(l)</u>;

(c)     all partnership interests or other equity interests of the Seller or any Affiliate thereof or any securities convertible into, exchangeable or exercisable for partnership interests or other equity interests of the Seller or any Affiliate thereof;

(d)     all Retained Books and Records;

(e)     (i) any Avoidance Actions against any Person other than any of the Designated Parties, (ii) any proceeds of any settlement from and after the date hereof through the Closing of any claims, counterclaims, rights of offset or other causes of action of the Seller against any Person other than any Designated Party and (iii) all claims or causes of action of the Seller other than those identified in Section 1.1(j) and Section 1.1(k);

(f)     all rights, claims or causes of action of the Seller arising under this Agreement, the Ancillary Documents or the Confidentiality Agreement or arising under the Seller Confidentiality Agreements (to the extent not assigned to the Purchaser pursuant to Section 6.15);

(g)     all rights, claims or causes of action by or in the right of the Seller against any current or former Affiliate, officer, director, principal, shareholder, member, partner, employee (other than the Transferred Employees) or other representative of the Seller or any Affiliate of any of the foregoing, in each case, only to the extent arising prior to the Closing and related to the Business, Excluded Assets or Excluded Liabilities;

(h)     all Contracts that are not Assigned Contracts, including the Contracts listed or described on Schedule 1.2(h) and including, for the avoidance of doubt, any Shared Contracts (such contracts, the "Excluded Contracts");

(i)     all Intellectual Property owned by the Seller other than the Business Owned Intellectual Property;

(j)     all IT Assets other than mobile telephones which are primarily used by the Transferred Employees in the conduct of the Business;

(k)     all rights to products in development not Related to the Business (for the avoidance of doubt, this Section 1.2(k) does not include rights to the Product Candidates);

(l)     all Permits other than the Business Permits transferable pursuant to Section 1.1(h) and all pending applications therefor;

(m)     all receivables or other assets due from the Seller and its Affiliates, or claims, causes of action, rights of recovery, credits or other adjustments resulting in payments by the applicable Governmental Entity following Closing with respect to Price Calculations, choses in action or setoff of any kind arising before, on or after the Closing Date, in each case, that relate to any of the Excluded Assets or the Excluded Liabilities;

(n)     all Cash, including any and all rights of the Seller in and to any restricted cash, security deposits, escrow deposits and cash collateral (including cash collateral given to obtain or maintain letters of credit and cash drawn or paid on letters of credit);

(o)     all Benefit Plans (including the KERP) and any interests of the Seller in the assets of such Benefit Plans;

(p)     (i) any attorney-client privilege of the Seller or associated with the business and operations of the Seller pertaining to this Agreement and the Ancillary Documents

and (ii) all emails, correspondence, invoices, recordings and other documents or files, evidencing or reflecting communications between the Seller and the Seller's counsel pertaining to the Seller or associated with the business and operations of the Seller which would be considered privileged attorney-client communications or otherwise be subject to an attorney-client or similar privilege; and

> (q)   all assets set forth on Schedule 1.2(q).

Section 1.3   Assumed Liabilities.   On the terms and subject to the conditions set forth in this Agreement, at the Closing, in consideration for the sale, assignment, conveyance, transfer and delivery of the Acquired Assets to the Purchaser, the Purchaser shall assume from the Seller and agree to pay, perform and discharge, when due, in accordance with their respective terms all of the liabilities and obligations (of any nature or kind, and whether based in common law or statute or arising under written Contract or otherwise, known or unknown, fixed or contingent, accrued or unaccrued, liquidated or unliquidated, real or potential) of the Seller arising after the Closing (except as set forth in Section 1.3(g) and Section 1.3(h) below) solely with respect to, arising out of or relating to the following (collectively, the "Assumed Liabilities"):

> (a)   the ownership, possession or use of the Acquired Assets from and after the Closing;

> (b)   other than the Liabilities set forth in Section 1.4, all Liabilities arising out of the Assigned Contracts, but only to the extent that such Liabilities thereunder are required to be performed after the Closing Date and to the extent such Liabilities do not relate to any failure to perform, improper performance, warranty or other breach, default or violation by the Seller on or prior to the Closing;

> (c)   all Cure Costs (to the extent not paid and discharged by the Purchaser prior to or at the Closing);

> (d)   all accounts payable, open purchase orders and other trade obligations, including accruals for such Liabilities, to the extent Related to the Business or the Products;

> (e)   any sale of Products (including all liabilities in respect of (i) customer programs, including claims related to or arising from product warranties, rebates, coupon programs, chargebacks, credits, deductions, group purchasing administrative fees, product returns and expirations; and (ii) associated product shipping costs to such customers) following Closing (collectively, the "Product Claims");

> (f)   the employment, or termination of employment, or service with the Purchaser or any of its Affiliates, of any Transferred Employee after the Closing;

> (g)   the Paid Time Off of the Transferred Employees as of the Closing Date, in accordance with Section 6.10(d);

> (h)   (i) Periodic Taxes for which the Purchaser is responsible pursuant to Section 9.1(b) and (ii) Transfer Taxes for which the Purchaser is responsible pursuant to Section 9.1(a); and

(i)        all Liabilities, if any, set forth on Schedule 1.3(i).

The transactions contemplated by this Agreement shall in no way expand the rights or remedies of any third party against the Purchaser or the Seller as compared to the rights and remedies that such third party would have had against the Seller absent the Chapter 11 Cases had the Purchaser not assumed such Assumed Liabilities.

Section 1.4    Excluded Liabilities.  Notwithstanding anything contained in this Agreement to the contrary, neither the Purchaser nor any of its Affiliates shall assume, be obligated to assume, be deemed to have assumed, or be obliged to pay, perform or otherwise discharge, and the Seller shall be solely and exclusively liable with respect to (and shall pay, perform and discharge), any and all liabilities or obligations (of any nature or kind, and whether based in common law or statute or arising under written Contract or otherwise, known or unknown, fixed or contingent, accrued or unaccrued, liquidated or unliquidated, real or potential) of the Seller and any Affiliate thereof or otherwise related to the Acquired Assets or the Business other than the Assumed Liabilities (such liabilities and obligations other than Assumed Liabilities, the "Excluded Liabilities").  Without limiting the foregoing, the Purchaser does not (nor do any of its Affiliates) assume or agree to pay, perform or otherwise discharge the liabilities or obligations of the Seller or its Affiliates with respect to, arising out of or relating to, the following Excluded Liabilities:

(a)        all Indebtedness of the Seller (excluding, for the avoidance of doubt, obligations with respect to, arising out of or relating to the Assigned Contracts);

(b)        all Transaction Expenses of the Seller;

(c)        all Liabilities for or in respect of Excluded Taxes;

(d)        all Liabilities of the Seller and its Affiliates relating to or arising out of (i) any Transferred Employee that arises out of or relates to the period prior to and including the Closing (including with respect to the termination of employment by the Seller and its Affiliates of any Transferred Employee, but not, for the avoidance of doubt, the termination of employment by the Purchaser and its Affiliates of any Transferred Employee following the Closing), (ii) any current or former applicant for employment, director, officer, employee, consultant, independent contractor or service provider of the Seller and its Affiliates who is not a Transferred Employee, including any Liabilities for any actual or prospective work relationship or the termination thereof, (iii) any director, officer, manager or employee acting in their capacity as a fiduciary of the Seller or its Affiliates, including in respect of any Benefit Plan, (iv) the employment practices of the Seller and its Affiliates prior to Closing, and (v) any Liabilities retained by the Seller and its Affiliates set forth in Section 6.10;

(e)        except as set forth in Section 6.10, all Liabilities relating to or at any time arising under or pursuant to any of the Benefit Plans (including the KERP) and any other benefit or compensation plan, program, policy, agreement or arrangement at any time sponsored, maintained, contributed to or required to be contributed to by the Seller or any of its Affiliates or under or with respect to which the Seller or any of its Affiliates has (or has had) any Liabilities;

(f)      all fees, charges, expenditures, expenses, costs and other payments incurred or otherwise payable by the Seller or its Affiliates, or for which the Seller or its affiliates is liable, in connection with the administration of the Chapter 11 Cases or the negotiation, execution and consummation of the transactions contemplated by this Agreement or any Ancillary Document (including any preparation for a transaction process, bankruptcy process, any sale process involving other potential buyers or any contemplated public offering or financing), including the fees and expenses of financial advisors, accountants, legal counsel, consultants, brokers and other advisors with respect thereto, whether incurred, accrued or payable on or prior to or after the date hereof or the Closing Date;

(g)      all Liabilities or obligations to the extent relating to the ownership, possession or use of the Excluded Assets (other than Liabilities for or in respect of Taxes, which are governed by Section 1.4(c) above);

(h)      all Liabilities relating to or arising out of the Seller's participation in Government Programs and the Seller's Governmental Price Calculations and Reporting with respect to the Products prior to Closing as described in Section 6.16;

(i)      all Liabilities arising under or relating to Environmental Laws to the extent arising from facts, circumstances or conditions existing or occurring prior to the Closing; and

(j)      all Liabilities set forth on Schedule 1.4(j).

Section 1.5      Assignment of Assigned Contracts; Transfer of Acquired Assets.

(a)      Schedule 1.5(a) sets forth a list (the "Executory Contracts List") of all Contracts of the Seller that are subject to assumption or rejection pursuant to Section 365 of the Bankruptcy Code (each, an "Executory Contract"), other than those Contracts set forth or described on Schedule 1.1(d)(ii) and any Shared Contract listed or described on Schedule 1.2(h). The Executory Contracts List sets forth the Seller's good-faith estimate of the amount required to be paid with respect to each Executory Contract to cure all monetary defaults under such Contract to the extent required by Section 365(b) of the Bankruptcy Code and otherwise satisfy all requirements imposed by Section 365(d) of the Bankruptcy Code (the actual amount of such costs, the "Cure Costs").

(b)      To the maximum extent permitted by the Bankruptcy Code and subject to the other provisions of this Section 1.5, on the Closing Date (or promptly upon the designation of an Executory Contract as an Assigned Contract pursuant to Section 1.5(e) if later), the Seller shall assign the Assigned Contracts to the Purchaser pursuant to Section 365 of the Bankruptcy Code and the Sale Order, subject to the provision of adequate assurance by the Purchaser as may be required under Section 365 of the Bankruptcy Code and payment by the Purchaser of the Cure Costs in respect of the Assigned Contracts; *provided* that, to the extent such Cure Costs arose from the Seller's breach of an Assigned Contract during the period between the date hereof and the date that such Assigned Contract is assigned to the Purchaser pursuant hereto (the extent of any such excess, the "Excess Cure Amount"), such Excess Cure Amount shall be deducted from, offset against and shall result in a reduction of the Upfront Consideration.

(c)     At any time prior to three (3) Business Days prior to the Closing Date (the
"Designation Deadline"), the Purchaser will have the right to amend or supplement
Schedules 1.1(d)(i) and 1.2(h) to (i) designate an Executory Contract as an Excluded Contract,
and upon such designation such Executory Contract will constitute an Excluded Contract and
Excluded Asset (and, if applicable, will cease to constitute an Acquired Asset) and (ii) designate
an Executory Contract as an Assigned Contract, and upon such designation such Executory
Contract will constitute an Acquired Asset and Assigned Contract and will be conveyed to the
Purchaser under this Agreement at Closing (and, if applicable, will cease to constitute an
Excluded Asset), so long as (1) such Executory Contract is added to Schedule 1.1(d)(i) prior to
the entry of any Order of the Bankruptcy Court approving the rejection of such Executory
Contract, and (2) the assumption and assignment has been or is approved by the Bankruptcy
Court (including through the Sale Order).  Notwithstanding anything in the foregoing to the
contrary, (i) in no event shall the Purchaser's right to amend or supplement Schedules 1.1(d)(i)
and 1.2(h) allow the Purchaser to designate any Shared Contracts as Assigned Contracts, and
(ii) in the event that, after the Closing Date, the Purchaser identifies any Contract that is not an
Assigned Contract or an Excluded Contract, and such Contract has not been rejected by the
Seller, the Purchaser may, in its sole and absolute discretion, elect by written notice to the Seller
to treat such Contract as an Assigned Contract, and the Seller shall seek to assume and assign
such Assigned Contract to the Purchaser subject to any applicable requirements under the
Bidding Procedures Order or the Sale Order, with all additional Cure Costs related to such
Contracts to be paid by the Purchaser, without regard or counting toward the calculation of the
Excess Cure Amount.

(d)     With the exception of any reductions to the Upfront Consideration as a
result of an Excess Cure Amount, if the Purchaser exercises its rights in Section 1.5(c) above to
designate an Executory Contract as an Assigned Contract or as an Excluded Contract (as the case
may be), then the parties acknowledge and agree that there will be no increase or reduction in the
consideration paid to the Purchaser hereunder as a result of such designation or change in
designation, nor will there be any delay to the Closing, except that the Purchaser shall not be
required to make any payments for Cure Costs for any Excluded Contracts.

(e)     If an Executory Contract that has been identified by the Purchaser as an
Assigned Contract is subject to a cure dispute or other dispute as to the assumption or assignment
of such Executory Contract that has not been resolved to the mutual satisfaction of the Purchaser
and the Seller prior to the Designation Deadline, then the Designation Deadline shall be extended
(but only with respect to such Executory Contract) to no later than the earliest of (A) the date on
which such dispute has been resolved to the mutual satisfaction of the Purchaser and the Seller,
(B) the date on which such Executory Contract is deemed rejected by operation of
Sections 365(d)(4) or 1123(b)(2) of the Bankruptcy Code, as applicable, (C) the date required by
the Bankruptcy Court and set forth in the Bidding Procedures Order or the Sale Order and
(D) the date on which the Purchaser designates such Executory Contract as an Excluded Contract
(unless covered by clause (C)) (the "Extended Contract Period").  If such Executory Contract is
not expressly designated as an Assigned Contract by the Purchaser in writing by the end of such
Extended Contract Period, such Executory Contract shall be automatically deemed an Excluded
Contract.

(f)    Notwithstanding anything in this Agreement to the contrary, to the extent that the sale, transfer, assignment, conveyance or delivery or attempted sale, transfer, assignment, conveyance or delivery to the Purchaser of any asset that would be an Acquired Asset or any claim or right or any benefit arising thereunder or resulting therefrom is prohibited by any applicable Law or would require any consent from any Governmental Entity or any other third party (such asset, claim, right or benefit, a "Restricted Asset") and such consents shall not have been obtained prior to the Closing (after giving effect to the Sale Order and the Bankruptcy Code), the Closing shall proceed without any reduction in the Upfront Consideration (or, subject to Section 1.6(b), the applicable IP Contingent Consideration) without the sale, transfer, assignment, conveyance or delivery of such asset. Then, following the Closing, the Seller shall use its reasonable best efforts and the Purchaser shall cooperate with the Seller to obtain such consent, or seek to remove any applicable prohibition or restriction under applicable Law, as promptly as practicable following the Closing. Pending the receipt of such consent and for so long as such Restricted Asset or the full benefits thereof has not been sold, transferred, conveyed, delivered or assigned to the Purchaser, the parties shall (subject to Sections 1.6(b) and 6.4 with respect to the Betadine Licensed IP, the Senokot Licensed IP, the Alcon Agreement and the Separation Assets), reasonably cooperate with each other to provide the Purchaser with all of the benefits of use of such Restricted Asset, as if such Restricted Asset had been transferred, conveyed or assigned to the Purchaser at the Closing. Once consent for the sale, transfer, assignment, conveyance or delivery of any such Restricted Asset not sold, transferred, assigned, conveyed or delivered at the Closing is obtained, or any restriction or prohibition under applicable Law ceases to exist, the Seller shall promptly (and subject to Sections 1.6(b) and 6.4 with respect to the Betadine Licensed IP, the Senokot Licensed IP, the Alcon Agreement and the Separation Assets) transfer, assign, convey and deliver such Restricted Asset to the Purchaser. To the extent that any such Restricted Asset cannot be transferred or the full benefits or use of any such Restricted Asset cannot be provided to the Purchaser, then as promptly as practicable following the Closing (and subject to Sections 1.6(b) and 6.4 with respect to the Betadine Licensed IP, the Senokot Licensed IP, the Alcon Agreement and the Separation Assets) and subject to any approval of the Bankruptcy Court that may be required, the Purchaser and the Seller shall enter into such arrangements (including subleasing, sublicensing or subcontracting), and subject to any approval of the Bankruptcy Court that may be required pursuant to applicable Law, shall reasonably cooperate with each other, to provide the Purchaser with all of the benefits of use of such Restricted Asset, as if such Restricted Asset had been transferred, conveyed or assigned to the Purchaser at the Closing. Subject to Sections 1.6(b) and 6.4 with respect to the Betadine Licensed IP, the Senokot Licensed IP, the Alcon Agreement and the Separation Assets, the Seller shall hold in trust for, and pay to the Purchaser, promptly upon receipt thereof, all income, proceeds and other monies received by the Seller derived from their use of any asset that would be an Acquired Asset in connection with the arrangements under this Section 1.5(f), and for the avoidance of doubt, no amounts shall be held in trust or paid to the Purchaser in respect of the Alcon Agreement unless and until such Alcon Agreement is assigned to the Purchaser pursuant to Section 6.4(b). The parties agree to treat any asset the benefits of which are transferred pursuant to this Section 1.5(f) as having been sold to the Purchaser for Tax purposes to the extent permitted by Law. The Seller and the Purchaser agree to notify each other promptly in writing if it determines that such treatment (to the extent consistent with the relevant arrangement agreed to by the Seller and the Purchaser pursuant to this Section 1.5(f)) is not permitted for Tax purposes under applicable Law.

Section 1.6    Consideration.

(a)    Upfront Consideration. As partial consideration for the Acquired Assets, the Purchaser shall, in addition to the assumption of the Assumed Liabilities, pay to the Seller at the Closing an aggregate amount equal to, without duplication: (i) three hundred sixty-eight million dollars ($368,000,000), *plus* (ii) the Net Working Capital Adjustment Amount, *minus* (iii) any Excess Cure Amount, *minus* (iv) the Adjustment Escrow Amount (the amount calculated pursuant to this sentence, the "Upfront Consideration"). The Purchaser shall pay (or shall cause one or more of its Affiliates to pay) the Upfront Consideration at the Closing to the Seller, in cash, by wire transfer of immediately available funds to the account or accounts designated in the Closing Statement by the Seller to the Purchaser.

(b)    IP Contingent Consideration. As consideration for the Betadine Licensed IP, the Purchaser shall pay to the Seller an amount equal to six million dollars ($6,000,000) (the "Betadine Contingent Consideration"), upon the transfer of the Betadine Licensed IP by the Seller to the Purchaser. As consideration for the Senokot Licensed IP by the Seller to the Purchaser, the Purchaser shall pay to the Seller an amount equal to fifteen million dollars ($15,000,000) (the "Senokot Contingent Consideration"), upon the transfer of the Senokot Licensed IP by the Seller to the Purchaser. As consideration for the assignment of the Alcon Agreement, the Purchaser shall pay to the Seller an amount equal to the lesser of (i) four (4) times the average Royalty Payment Amount across the three (3) years prior to the Closing Date, (ii) four (4) times the Royalty Payment Amount for the trailing twelve-month period based on the most recent invoice available for the Alcon Agreement as of the Closing Date and (iii) eight million dollars ($8,000,000) (the "Alcon Contingent Consideration"), upon the assignment of the Alcon Agreement by the Seller to the Purchaser. Together, the Betadine Contingent Consideration, the Senokot Contingent Consideration, and the Alcon Contingent Consideration shall be referred to herein as the "IP Contingent Consideration." For the avoidance of doubt, each of the Betadine Contingent Consideration, the Senokot Contingent Consideration and/or the Alcon Contingent Consideration shall be paid by the Purchaser to the Seller (i) at the Closing, if notice of the respective transfer of the Betadine Licensed IP or Senokot Licensed IP or assignment of the Alcon Agreement (as applicable) by the Seller to the Purchaser is provided by the Seller to the Purchaser at least fifteen (15) days prior to the Closing Date or (ii) if the notice of transfer of any of the Betadine Licensed IP, Senokot Licensed IP or assignment of the Alcon Agreement (as applicable) by the Seller to the Purchaser is not provided by the Seller to the Purchaser on or before the day that is fifteen (15) days prior to the Closing Date, then, at the time when such transfer or assignment can be made, the Seller shall notify the Purchaser, the parties shall mutually agree on a date to effectuate such transfer and assignment, and the Purchaser shall make the payment for the applicable IP Contingent Consideration at the time of such transfer or assignment (which shall be no later than fifteen (15) days following such notice), in each case, by wire transfer of immediately available funds to the account or accounts designated in writing by the Seller to the Purchaser. In the event that any one of the three components of the IP Contingent Consideration is not paid when due pursuant to the foregoing clause (ii), such amount shall bear interest from the due date until the date of payment thereof at a per annum rate equal to 2.00%, effective from the date that payment was due, compounded monthly.

Section 1.7    Good Faith Deposit. If the Bankruptcy Court approves this Agreement, then within five (5) Business Days of receipt of such approval: (x) the Purchaser and the Seller

shall execute and deliver the Escrow Agreement and (y) pursuant to the terms of the Escrow Agreement, the Purchaser shall deposit with the Escrow Agent into the Deposit Escrow Account an amount equal to thirty six million eight hundred thousand dollars ($36,800,000) (such amount, the "Deposit Amount") in cash.  The Deposit Amount will be released by the Escrow Agent and delivered to either the Purchaser or the Seller, in accordance with the provisions of this Agreement, the Escrow Agreement and the Bidding Procedures, as follows (and the Purchaser and the Seller will deliver joint written instructions to the Escrow Agent to effect such distributions as and when required hereunder):

(a)     if the Closing occurs, the Deposit Amount (together with any interest thereon) will be delivered to the Seller and applied towards the Upfront Consideration payable by the Purchaser pursuant to Section 1.6(a) and Section 2.3(b)(i)(B);

(b)     if this Agreement is terminated by the Seller pursuant to Section 8.1(b)(iii), the Deposit Amount (together with any interest thereon) will be delivered to the Seller within two (2) Business Days after such termination by wire transfer of immediately available funds to the account designated in writing by the Seller; and

(c)     if this Agreement is terminated by any party for any reason other than by the Seller pursuant to Section 8.1(b)(iii), the Deposit Amount (together with any interest thereon) will be returned to the Purchaser within two (2) Business Days after such termination by wire transfer of immediately available funds to the account or accounts designated in writing by the Purchaser.

The parties acknowledge and agree that the Seller's entitlement to the Deposit Amount under Section 1.7(b) will constitute liquidated damages (and not a penalty) and, if the Seller retains such amount, then notwithstanding anything to the contrary contained herein, but subject to the Seller's right to seek specific performance pursuant to Section 9.15, such Deposit Amount shall be the sole and exclusive remedy available to the Seller and any other Person against the Purchaser, its Subsidiaries, and its Affiliates in connection with this Agreement and the transaction contemplated hereby (including as a result of the failure to consummate the Closing or for a breach or failure to perform hereunder or otherwise) and none of the Purchaser, its Subsidiaries and its Affiliates shall have any further Liability relating to or arising out of this Agreement or the transaction contemplated hereby.

Section 1.8     Withholding.  The Purchaser and the Seller and each of their respective Affiliates and paying agents shall be entitled to deduct and withhold from amounts otherwise payable pursuant to this Agreement any such amounts required to be so deducted and withheld under applicable Law; *provided* that, except with respect to any deduction or withholding in respect of compensatory payments or arising as a result of any failure by the Seller to deliver the certificate described in Section 2.3(a)(iv), the Purchaser and the Seller shall (a) use commercially reasonable efforts to provide the other party with advance written notice of any intended deduction or withholding, which notice shall include a statement of the amounts it intends to deduct or withhold in respect of the making of such payment and the applicable provision of law requiring the Purchaser or the Seller to withhold or deduct, in each case at least ten (10) Business Days prior to the due date for such payment or, if later, promptly after becoming aware thereof, and (b) reasonably cooperate in good faith with the other party to reduce or eliminate any such

amounts that otherwise would be deducted or withheld to the extent permitted by applicable Law.  In the event that any such amounts are so deducted or withheld, such deducted and withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of whom such deduction and withholding was made.

## ARTICLE II

## THE CLOSING

Section 2.1    Closing.  Upon the terms and subject to the conditions hereof, the closing of the sale of the Acquired Assets and the assumption of the Assumed Liabilities contemplated hereby (the "Closing") shall take place remotely via the exchange of electronic documents by electronic mail at 10:00 a.m. local time no later than five (5) Business Days after the conditions set forth in Article VII shall have been satisfied or (if permissible) waived (except for such conditions that, by their nature, are to be satisfied at the Closing, but subject to the satisfaction or (if permissible) waiver thereof at the Closing), or at such time, date and place as the parties hereto may mutually agree (the date of the Closing being herein referred to as the "Closing Date").  For financial, accounting and economic purposes, including risk of loss, and for all other purposes under this Agreement, upon the occurrence of the Closing, the Closing shall be deemed to have occurred at 12:01 a.m., New York City time, on the Closing Date.

Section 2.2    Closing Statement.  On or before the date that is five (5) Business Days prior to the anticipated Closing Date, the Seller shall prepare and deliver to the Purchaser a statement (the "Closing Statement"), prepared in good faith in accordance with the Accounting Principles and setting forth (a) the Estimated Net Working Capital and (b) the resulting calculation of the Estimated Upfront Consideration, together with reasonable supporting detail.

Section 2.3    Deliveries at the Closing.

(a)    At the Closing, the Seller shall deliver, or shall cause to be delivered, to the Purchaser:

(i)    a customary bill of sale transferring the Acquired Assets to the Purchaser, in a form reasonably acceptable to the Purchaser and the Seller (the "Bill of Sale"), duly executed by the Seller;

(ii)    a customary assignment and assumption agreement to be entered into between the Seller and the Purchaser, in a form reasonably acceptable to the Purchaser and the Seller (the "Assignment and Assumption Agreement"), duly executed by the Seller;

(iii)    customary assignments of the Business Registered Intellectual Property, in forms reasonably acceptable to the Purchaser and the Seller (the "Intellectual Property Assignment Agreements"), duly executed by the Seller;

(iv)    a duly executed certificate from the Seller, dated as of the Closing Date and signed by a responsible officer of the Seller under penalties of perjury,

13

establishing that none of the Acquired Assets constitutes a "United States real property interest" within the meaning of Section 897(c)(1) of the Code;

(v)     the certificate described in Section 7.3(d);

(vi)     if required pursuant to Section 5.4(c), the Sublicense Agreement, duly executed by the Seller;

(vii)     the Transition Services Agreement, duly executed by the Seller;

(viii)     to the extent any Encumbrances (other than Permitted Post-Closing Encumbrances and the Assumed Liabilities) on the Acquired Assets are identified prior to the Closing, UCC-3 termination statements or other evidence of discharge of all such Encumbrances on all of the Acquired Assets, in form and substance reasonably satisfactory to the Purchaser; and

(ix)     a copy of the Sale Order as entered by the Bankruptcy Court.

(b)     At the Closing, the Purchaser shall deliver, or shall cause to be delivered, to the Seller:

(i)     (A) an amount equal to the Estimated Upfront Consideration, (B) the Deposit Amount through the release of the Deposit Amount to the Seller from the Deposit Escrow Account in accordance with Section 1.7(a), (C) if notice of the ability to transfer the Betadine Licensed IP shall have been provided by the Seller to the Purchaser at least fifteen (15) days prior to the Closing Date, the Betadine Contingent Consideration, (D) if notice of the ability to transfer the Senokot Licensed IP shall have been provided by the Seller to the Purchaser at least fifteen (15) days prior to the Closing Date, the Senokot Contingent Consideration and (E) if notice of the ability to assign the Alcon Agreement by the Seller to the Purchaser shall have been provided by the Seller to the Purchaser at least fifteen (15) days prior to the Closing Date, the Alcon Contingent Consideration, in each case, by wire transfer of immediately available funds to an account or accounts designated by the Seller;

(ii)     the Bill of Sale, duly executed by the Purchaser;

(iii)     the Assignment and Assumption Agreement, duly executed by the Purchaser;

(iv)     the Intellectual Property Assignment Agreements, duly executed by the Purchaser;

(v)     evidence of the payment of all Cure Costs to the applicable Assigned Contract counterparties;

(vi)     if required pursuant to Section 5.4(c), the Sublicense Agreement, duly executed by the Purchaser;

(vii)   the Transition Services Agreement, duly executed by the Purchaser; and

(viii)   the certificate described in Section 7.2(d).

(c)   At the Closing, the Purchaser shall deliver, or shall cause to be delivered, to the Adjustment Escrow Amount to the Escrow Agent.

(d)   At the Closing, the Seller and the Purchaser shall deliver, or shall cause to be delivered, an executed joint written instruction to release the Deposit Amount from the Deposit Escrow Account in accordance with Section 1.7(a) to the Escrow Agent.

Section 2.4   Post-Closing Adjustment.

(a)   As promptly as practicable following the Closing, and in no event later than ninety (90) days following the Closing Date, the Purchaser shall prepare and deliver to the Seller a statement (the "Post-Closing Statement"), setting forth the Purchaser's good faith calculation of (i) Net Working Capital as of the Benchmark Time (the "Preliminary Net Working Capital") and (ii) the resulting calculation of the Upfront Consideration (such calculation the "Preliminary Upfront Consideration Amount"), together with reasonable supporting detail and documentation. The Post-Closing Statement shall be prepared in accordance with this Agreement, including the Accounting Principles. If the Purchaser fails to deliver the Post-Closing Statement when required pursuant to the foregoing which is not cured within five (5) Business Days following written notice to the Purchaser, then, the Seller may retain (at the Purchaser's sole cost and expense) an independent accounting firm to review the calculation of the Estimated Upfront Consideration and make any adjustments necessary thereto consistent with the provisions of this Section 2.4 and the determination of such accounting firm, absent fraud or manifest error by such accounting firm, shall be conclusive and binding on the parties.

(b)   Upon receipt of the Post-Closing Statement, the Seller shall have sixty (60) days (the "Review Period") to review such Post-Closing Statement and related computations of the Preliminary Net Working Capital and the resulting Preliminary Upfront Consideration Amount. In connection with the review of the Post-Closing Statement, the Purchaser shall reasonably cooperate with and give to the Seller and its Representatives reasonable access to the books and records of the Purchaser, the personnel of the Purchaser, and work papers (subject to the execution of customary access letters, if requested) used in the preparation of the Post-Closing Statement and prepared by or for the Purchaser, in each case, as the Seller or its Representatives may reasonably request. If the Seller accepts such Post-Closing Statement in writing or does not give written notice to the Purchaser setting forth any objection to such Post-Closing Statement (a "Statement of Objections") prior to the expiration of the Review Period, then such Post-Closing Statement shall be final, non-appealable and binding upon the parties, and shall be deemed the Final Closing Statement for purposes of Section 2.4(d). Any Statement of Objections given by the Seller shall specify in reasonable detail each item that the Seller disputes, the amount in dispute and the reasons supporting the Seller's position.

(c)   In the event that the Seller delivers a Statement of Objections during the Review Period, the Purchaser and the Seller shall negotiate in good faith to resolve any such

objection within thirty (30) days following the receipt by the Purchaser of the Statement of Objections (the "Consultation Period"), and any discussions or negotiations related thereto shall be governed by Rule 408 of the Federal Rules of Evidence (as in effect as of the date of this Agreement) and any applicable similar state Law.  If the Seller and the Purchaser are unable to reach an agreement as to any such objection(s) within the Consultation Period, then either party may submit such matter to the dispute resolution group of BDO USA, LLP, or, if such accounting firm is unable or unwilling to serve in such role, another internationally recognized accounting firm mutually acceptable to the Purchaser and the Seller and agreed to in writing (in either case, such accountant, the "Settlement Accountant") for resolution of the remaining disputed matters.  The Settlement Accountant shall act as an expert and not as an arbitrator, and shall only consider those items that are identified on the Statement of Objections as in dispute unless certain items included in the Statement of Objections were otherwise agreed upon during the Consultation Period (such remaining items, the "Disputed Items").  Within five (5) days of the appointment of the Settlement Accountant, the Settlement Accountant shall set a schedule for written submissions, which submissions shall be transmitted simultaneously to the Settlement Accountant and the Purchaser or the Seller, as the case may be.  Unless otherwise directed by the Settlement Accountant, each of the Purchaser and the Seller shall be entitled to provide (i) one (1) single submission to the Settlement Accountant regarding the Disputed Items and (ii) one (1) single written response to the other party's submission.  The Settlement Accountant will have the right to request information and ask questions, but neither the Purchaser nor the Seller shall meet with or discuss the Disputed Items separately with the Settlement Accountant without the other party's prior written consent.  The Settlement Accountant's determination shall be consistent with the definition of Net Working Capital contained herein and the Accounting Principles.  The Seller and the Purchaser shall use their respective commercially reasonable efforts to cause the Settlement Accountant to resolve all disagreements as soon as practicable and in any event within twenty (20) days after the submission of any dispute to the Settlement Accountant.  The Settlement Accountant's determination shall be made solely in accordance with the terms and procedures set forth in this Agreement, including the Accounting Principles, and based solely on the submissions and supporting materials provided by the Purchaser and the Seller in accordance with the terms and procedures set forth in this Agreement (i.e., not on the basis of an independent review).  The Settlement Accountant may not assign a value to any item greater than the greatest value for such item claimed by either party or less than the smallest value for such item claimed by either party.  Absent fraud or manifest error by the Settlement Accountant, the resolution of the dispute by the Settlement Accountant shall be final, binding and non-appealable on the parties hereto.  The costs and expenses of the Settlement Accountant shall be borne by the Purchaser in the proportion that the aggregate dollar amount of the items that are successfully disputed by the Seller (as finally determined by the Settlement Accountant) bears to the aggregate dollar amount of the items submitted to the Settlement Accountant and by the Seller in the proportion that the aggregate dollar amount of the disputed items that are unsuccessfully disputed by the Seller (as finally determined by the Settlement Accountant) bears to the aggregate dollar amount of the items submitted to the Settlement Accountant.

(d)    The Post-Closing Statement (i) that has become final, non-appealable and binding pursuant to the last sentence of Section 2.4(a), the third sentence of Section 2.4(b) or the first sentence of Section 2.4(c) or (ii) as determined by the Settlement Accountant is referred to herein as the "Final Closing Statement" and (A) the Net Working Capital set forth on such Final Closing Statement shall be deemed the final Net Working Capital, and (B) the Upfront

Consideration set forth on such Final Closing Statement shall be deemed the final Upfront Consideration (the "Final Upfront Consideration").

(e)        In the event that the Final Upfront Consideration is greater than the Estimated Upfront Consideration (such excess, the "Final Overage"), then, no later than five (5) Business Days following the determination of the Final Upfront Consideration in accordance with this Section 2.4, (i) the Purchaser and the Seller shall deliver joint written instructions to the Escrow Agent instructing the Escrow Agent to release the Adjustment Escrow Funds to the account or accounts designated by the Seller, and (ii) the Purchaser shall pay to the Seller an amount equal to such Final Overage to the account or accounts designated by the Seller.

(f)        In the event that the Final Upfront Consideration is equal to the Estimated Upfront Consideration, then, no later than five (5) Business Days following the determination of the Final Upfront Consideration, the Purchaser and the Seller shall deliver joint written instructions to the Escrow Agent instructing the Escrow Agent to release the Adjustment Escrow Funds to the account or accounts designated by the Seller.

(g)        In the event that the Estimated Upfront Consideration is greater than the Final Upfront Consideration (such excess, the "Final Underage"), then, no later than five (5) Business Days following the determination of the Final Upfront Consideration in accordance with this Section 2.4, the Purchaser and the Seller shall deliver joint written instructions to the Escrow Agent instructing the Escrow Agent to release an amount equal to the Final Underage from the Adjustment Escrow Account to the account or accounts designated by the Purchaser and (i) if the Final Underage is greater than the Adjustment Escrow Funds, the Seller shall pay to the Purchaser an amount equal to the difference between the Final Underage and the Adjustment Escrow Funds, to the account or accounts designated by the Purchaser, or (ii) if the Final Underage is less than the Adjustment Escrow Funds, the Seller and the Purchaser shall also, as promptly as practicable, deliver a joint written instruction to the Escrow Agent to distribute to the Seller from the Adjustment Escrow Account, an amount equal to the excess of the Adjustment Escrow Funds *minus* the Final Underage Amount to the account or accounts designated by the Seller.

(h)        The parties hereto agree that any adjustment as determined pursuant to this Section 2.4 shall be treated as an adjustment to the consideration paid to acquire the Acquired Assets for Tax purposes, except as otherwise required by Law.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF THE SELLER

Except as disclosed in the disclosure letter delivered by the Seller to the Purchaser simultaneously with the execution of this Agreement (the "Seller Disclosure Letter") (it being understood that any information set forth in one section or subsection of the Seller Disclosure Letter shall be deemed to apply to and qualify the representation and warranty set forth in this Agreement to which it corresponds in number and, whether or not an explicit reference or cross-reference is made, each other representation and warranty set forth in this Article III for which it is reasonably apparent on the face of such disclosure that such disclosure is relevant to such other

section), the Seller represents and warrants to the Purchaser, solely with respect to the Business, the Acquired Assets and the Assumed Liabilities, as follows:

Section 3.1    Qualification; Organization.  The Seller is a legal entity duly organized, validly existing and in good standing under the Laws of the jurisdiction of its formation and has all requisite limited partnership power and authority to own, lease and operate the Acquired Assets and to carry on the Business as presently conducted by it, except where the failure to be in good standing or to have such power an authority would not reasonably be expected to, individually or in the aggregate, have a Material Adverse Effect.  The Seller is qualified to do business and is in good standing (or the equivalent thereof, if applicable, in each case, with respect to the jurisdictions that recognize the concept of good standing or any equivalent thereof) as a foreign entity in each jurisdiction where the ownership, leasing or operation of the Acquired Assets or the conduct of the Business requires such qualification, except where the failure to be so qualified or, where relevant, in good standing would not reasonably be expected to, individually or in the aggregate, have a Material Adverse Effect.

Section 3.2    Authority of the Seller.  The Seller has all requisite limited partnership power and authority to execute and deliver and, subject to the entry and effectiveness of the Bidding Procedures Order and Sale Order, to perform its obligations under this Agreement and each of the Ancillary Documents to which the Seller is or will be a party.  The execution, delivery and performance of this Agreement and such Ancillary Documents by the Seller and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized and approved by all requisite partnership action of the Seller, and no other partnership proceedings (pursuant to applicable Law, the Seller's organizational documents, partnership agreement or otherwise) on the part of the Seller is necessary to authorize the consummation of, and to consummate, the transactions contemplated hereby and thereby.  Subject to the entry and effectiveness of the Bidding Procedures Order and Sale Order, this Agreement and each such Ancillary Document have been duly and validly executed and delivered by the Seller and, assuming the due authorization, execution and delivery of this Agreement and each such Ancillary Document by the Purchaser or its Affiliate, as applicable, constitute a valid and binding agreement of the Seller, enforceable against the Seller in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, fraudulent transfer, moratorium and similar laws affecting creditors' rights generally and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity) (collectively, the "Enforceability Limitations").

Section 3.3    Consents and Approvals.  No consent, waiver, approval, Order, declaration, filing or registration with, or notification to, any Governmental Entity (any of the foregoing, a "Consent") is necessary or required to be made or obtained by the Seller in connection with the execution, delivery and performance of this Agreement and the Ancillary Documents to which the Seller is a party and the consummation of the transactions contemplated hereby and thereby, except as expressly provided in this Agreement or in connection with or compliance with (a) any applicable requirements of the Bankruptcy Code or the Bankruptcy Court, (b) the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act") and (c) for such other Consents which if not obtained or made, would not reasonably be expected to, individually or in the aggregate, have a Material Adverse Effect.

18

Section 3.4    No Violations.  Except as described in Sections 3.3, 4.3 and 5.3, neither the execution, delivery or performance of this Agreement and the Ancillary Documents by the Seller nor the consummation by the Seller of the transactions contemplated hereby or thereby will (a) conflict with or result in any violation or breach of any provisions of the certificate of formation, partnership agreement or other organizational documents of the Seller, (b) with or without notice or lapse of time or both, conflict with or result in any breach or violation of or constitute a default under, or give rise to a right of, or result in, termination, modification, cancellation, first offer, first refusal or acceleration of any obligation or to the loss of a benefit under any Assigned Contract to which the Seller is a party or by or to which any of its properties, rights or assets, or the operations or conduct of the Business, are bound or subject, (c) result in the creation or imposition of any Encumbrance (other than Permitted Pre-Closing Encumbrances) on any Acquired Asset or (d) conflict with or violate any Law applicable to the Seller or the Acquired Assets, or the operations or conduct of the Business, except in the case of clauses (b), (c) and (d), for any conflicts, breaches, violations, defaults, rights or results that would not reasonably be expected to be, individually or in the aggregate, material to the Business and the Acquired Assets taken as a whole.

Section 3.5    Financial Statements.  Section 3.5 of the Seller Disclosure Letter sets forth the unaudited balance sheet of the Seller as of December 31, 2021, and December 31, 2022, and the related statements of operations for the fiscal year then ended (collectively, the "Financial Statements").  Subject to the notes thereto, the Financial Statements were prepared, in all material respects, in conformity with GAAP and present fairly, in all material respects, the financial position of the Seller and its results of operations as of the respective dates and for the respective periods referred to in the Financial Statements.  All accounts receivable recorded in the Financial Statements represent in all material respects valid obligations of Customers arising from bona fide transactions entered into in the ordinary course of business.  The Inventory is free from defects in workmanship and materials, properly stored, merchantable, fit for the purpose for which they were procured or manufactured, and none of which are slow moving, obsolete, damaged or defective, except for the specific and adequate provisions or reserves with respect to slow-moving and obsolete inventory included in the Financial Statements.  The Inventory recorded in the Financial Statements is in good and marketable condition and consists of a quality and quantity usable and saleable in the ordinary course of business, in each case, except as would not reasonably be expected to be, individually or in the aggregate, material to the Business and the Acquired Assets taken as a whole.

Section 3.6    No Undisclosed Liabilities.  There are no liabilities or obligations of the Seller of any kind whatsoever, whether accrued, contingent, absolute, determined, determinable or otherwise, other than (a) liabilities specifically disclosed and adequately provided for in the unaudited balance sheet of the Business as of December 31, 2022, (b) liabilities or obligations incurred in the ordinary course of business consistent with past practice since December 31, 2022 (none of which is a liability for infringement, breach of Contract, breach of warranty, tort, violation of Law or that relates to any cause of action, claim or lawsuit), (c) liabilities arising in connection with the Acquisition or the Chapter 11 Cases or (d) other liabilities that would not be material, individually or in the aggregate, to the Business and the Acquired Assets taken as a whole.

Section 3.7    <u>Title to Property</u>.

(a)    The Seller has good and marketable title to, a valid leasehold or licensed interest in or all rights to use, all of the Acquired Assets.  Upon the entry and effectiveness of the Sale Order, the Seller will have the power and right to sell, assign, transfer, convey and deliver, as the case may be, to the Purchaser the Acquired Assets, and at the Closing, the Seller will sell, assign, transfer, convey and deliver to the Purchaser good title to, or, in the case of personal property leased or licensed by the Seller, a valid leasehold or licensed interest in, the Acquired Assets, that shall be free and clear of all Encumbrances other than Permitted Pre-Closing Encumbrances.

(b)    Except as set forth in <u>Section 3.7(b)</u> of the Seller Disclosure Letter, the Acquired Assets, together with all rights, services and properties provided to the Purchaser or one of its Affiliates under the Ancillary Documents, constitute all of the rights, assets and properties of the Seller that are sufficient for the Purchaser to conduct the Business immediately following the Closing Date in the same manner as the Business is currently conducted by the Seller in all material respects.

Section 3.8    <u>Absence of Certain Changes</u>.  Except to the extent arising out of or relating to the Chapter 11 Cases, this Agreement or the Acquisition, from December 31, 2022, through the date of this Agreement, (a) the Business has been conducted in all material respects in the ordinary course of business consistent with past practice, (b) there has not been any action, event, development, change or effect that if taken or if it were to occur during the period beginning on the date hereof and ending at the Closing, would without the Purchaser's prior written consent, constitute a violation of <u>Section 6.1(b)</u> and (c) there has not been a Material Adverse Effect.

Section 3.9    <u>Brokers or Finders</u>.  Other than PJT Partners LP, the Seller has not employed or engaged any investment banker, broker or finder who is entitled to any brokerage, finder's or other fee or any commission in connection with this Agreement or the transactions contemplated by this Agreement based upon arrangements made by or on behalf of the Seller.

Section 3.10    <u>Litigation</u>.  Except for the Chapter 11 Cases, there are no, and for the past three (3) years there have not been any, material Causes of Action pending or, to the Knowledge of the Seller, threatened against the Acquired Assets or, to the extent involving or related to the Acquisition or the operations or conduct of the Business (including with respect to any Business Employees), against the Seller or, to the Knowledge of the Seller, any of its Affiliates.  There are no Orders of or by a court of competent jurisdiction or other Governmental Entity outstanding against the Seller with respect to the Business or any of the Acquired Assets, except for the Chapter 11 Cases.

Section 3.11    <u>Intellectual Property</u>.

(a)    <u>Section 3.11(a)</u> of the Seller Disclosure Letter sets forth an accurate and complete list, as of the date hereof, of all Registered Intellectual Property that is owned by the Seller or a Seller Affiliate, as applicable, and used, or held for use, exclusively in the Business (the "<u>Business Registered Intellectual Property</u>").  All Business Registered Intellectual Property

is subsisting, valid and to the Knowledge of the Seller, enforceable.  There is no, and since January 1, 2020, there has been no, Cause of Action or notice of any Cause of Action, asserted in writing by any Person, seeking to cancel, limit or challenge the ownership, validity or enforceability of any Business Registered Intellectual Property.

(b)    The Seller or one of the Seller's Affiliates (i) exclusively owns and possesses all right, title and interest in and to all Business Registered Intellectual Property and all other Intellectual Property that is owned or purported to be owned by the Seller or any of its Affiliates and used, or held for use, exclusively in the Business (the "Business Owned Intellectual Property") and (ii) has valid and enforceable license or other rights to use all other Intellectual Property, that is used in or necessary for the operation of the Business as presently conducted (the "Business Intellectual Property"), in the case of clauses (i) and (ii), except as would not be material to the Business and the Acquired Assets taken as a whole.  The Seller or one of its Affiliates owns all Business Owned Intellectual Property, free and clear of any Encumbrances (other than Permitted Pre-Closing Encumbrances).  None of the Business Owned Intellectual Property is, as of the date hereof, subject to any Order adversely affecting or restricting the validity or enforceability thereof, or the Seller's ownership or use thereof.  There are no third parties or other Persons, other than Seller's Affiliates, that own right, title or interest in the BETADINE Brands or the SENOKOT Brands in the United States or its territories.

(c)    Since January 1, 2020, through the date hereof, (i) neither the Business Owned Intellectual Property, nor the conduct of the Business, has infringed, misappropriated, diluted or otherwise violated any Intellectual Property of any other Person in any material respect, and (ii) to the Knowledge of the Seller, no Person has infringed, misappropriated, diluted or otherwise violated any of the Business Owned Intellectual Property in any material respect.  Since January 1, 2020, through the date hereof, neither the Seller nor any of the Seller's Affiliates have sent or received any written claim, notice or demand alleging or asserting any infringement, misappropriation dilution or other violation of the type described in clauses (i) or (ii) of this Section 3.11(c).

(d)    The Seller has, at all times since January 1, 2020, taken commercially reasonable efforts to (i) maintain, enforce and protect all of the Business Owned Intellectual Property, and (ii) maintain and protect the secrecy, confidentiality and value of all material Trade Secrets and other confidential information included in the Business Intellectual Property.  Since January 1, 2020, no material Trade Secrets or confidential Business Intellectual Property have been used by, disclosed to or otherwise discovered by any Third Party or made available to any Person while in the possession or control of the Seller, other than pursuant to a valid, written, and, to the Knowledge of the Seller, enforceable confidentiality agreement, entered into in the ordinary course of business, pursuant to which such Person agrees to protect such confidential information, or in a manner that has not otherwise resulted in the loss of any trade secret rights in any trade secrets included within such Trade Secrets.  All Persons who have contributed to the development of any Business Owned Intellectual Property have executed a valid and enforceable assignment agreement that assigns ownership of all such Intellectual Property to the Seller (or one of the Seller's Affiliates, as applicable), except as would not be material to the Seller's ownership rights therein.

(e)     Except as would not be material to the Business or the Acquired Assets taken as a whole, since January 1, 2020, (i) the Seller or its Affiliates, as applicable, with respect to the Business, and the conduct of the Business are in compliance with, and have been in compliance with, all Data Security Requirements and (ii) neither the Seller, nor any Affiliate thereof, nor any third party processing Business Data on behalf of the Seller for the conduct of the Business, has experienced any Security Breach impacting the Business Data processed by the Business or the Seller, or any Affiliate thereof, in the conduct of the Business.

Section 3.12    Material Contracts.

(a)     Section 3.12(a) of the Seller Disclosure Letter contains a complete and correct list, as of the date of this Agreement, of each Contract described below in this Section 3.12(a) under which the Seller has any current or future rights, responsibilities, obligations or liabilities (in each case, whether contingent or otherwise) in connection with the Business, Business Employees or to which any of the Acquired Assets is subject, other than any confidentiality agreements to which the Seller is a party and any Excluded Contracts (including, for the avoidance of doubt, any Shared Contracts) (all Contracts of the type described in this Section 3.12(a), whether or not set forth on Section 3.12(a) of the Seller Disclosure Letter, being referred to herein as the "Material Contracts"):

(i)     requires expenditures by the Seller involving consideration in excess of two hundred thousand dollars ($200,000) in the previous twelve (12)-month period and in the next twelve (12)-month period, in each case, as measured from the date hereof;

(ii)     provides for payments to be received by the Seller in excess of two hundred thousand dollars ($200,000) in the previous twelve (12)-month period and in the next twelve (12)-month period, in each case, as measured from the date hereof;

(iii)     relates to the incurrence by the Seller of any Indebtedness or any capitalized lease obligations in excess of one hundred thousand dollars ($100,000);

(iv)     relates to the acquisition or disposition outside the ordinary course of business of any assets or any business, or any capital stock or equity interests of any enterprise (whether by merger, sale or purchase of stock, sale or purchase of assets or otherwise) entered into in the past two (2) years from the date hereof, in each case, in excess of one hundred thousand dollars ($100,000);

(v)     relates to the future acquisition or disposition of any material assets or properties (whether by merger, sale or purchase of stock, sale or purchase of assets or otherwise, including any option to acquire, sell, lease or license any material assets or properties of the Business), other than any non-disclosure or similar agreement entered into in connection with the process by which the Seller, any of its Affiliates or any Representatives of the foregoing solicited, discussed or negotiated alternatives to the transaction contemplated by this Agreement prior to the date of this Agreement (including the Acquisition or any other transaction prior to the date of this Agreement);

(vi)    is a material joint venture, profit-sharing, partnership, collaboration, co-promotion, research, development or other similar agreement involving the sharing of profits or expenses (other than subcontracting arrangements entered into in the ordinary course of business);

(vii)    is a lease or sublease of a real property;

(viii)    grants to any Person a right of first refusal, right of first negotiation or any other similar option rights with respect to material rights in any Product;

(ix)    requires the Seller or any of its Subsidiaries to purchase from a third party their total requirements of any products or services;

(x)    is with any Governmental Entity;

(xi)    (A) limits or purports to limit, in any material respect, the freedom of the Business to engage or compete in any line of business or with any Person or in any geographic area, (B) contains exclusivity or "most favored nation" obligations to which the Business is subject in favor of any Person or (C) contains any other provisions restricting or purporting to restrict the ability of the Business to sell, market, distribute, promote, manufacture, develop, commercialize or test or research the Products, directly or indirectly through third parties (in the case of clauses (A), (B) and (C), other than any such restrictions or purported restrictions that have a *de minimis* effect on the Business);

(xii)    is a Contract pursuant to which the Seller receives any material license rights or other rights to use any Business Intellectual Property (other than (A) non-exclusive end user licenses to use commercially available Software and (B) Contracts entered into in the ordinary course of business, in which grants of rights with respect to Intellectual Property are incidental to the third party's performance under such Contract, including clinical trial agreements, contract manufacturing agreements and material transfer agreements);

(xiii)    relates to sales and distribution activities conducted by a third party wholesaler or distributor that are material to the Business and the Acquired Assets taken as a whole;

(xiv)    relates to the ongoing supply or manufacturing of clinical and commercial quantities of any of the Products, the termination of which would reasonably be expected to be material to the Business and the Acquired Assets taken as a whole;

(xv)    relates to any settlement, conciliation or stipulation of any Cause of Action against the Seller by any other Person, other than (A) settlement agreements for cash that do not exceed one hundred thousand dollars ($100,000) individually as to any such Contract entered into since January 1, 2020, or (B) settlements of penalties in the ordinary course of business pursuant to a contract manufacturing agreement ("CMO Agreement"), distribution agreement or other ordinary course agreement for any Product;

(xvi)    any CMO Agreement contemplating the manufacturing and production of any Product currently commercialized by the Seller in the operation of the Business;

(xvii)    any Contract with any Business Employee providing either (A) an annual base compensation in excess of two hundred thousand dollars ($200,000), (B) severance benefits, or (C) change in control benefits;

(xviii)    is a collective bargaining agreement or other Contract with any labor union, works council, other labor organization or employee representative, in each case, to the extent regarding the Business Employees;

(xix)    is a Contract under which the Seller is a licensor or otherwise grants to a third party any rights to use any Business Owned Intellectual Property (other than Intellectual Property licensed on a non-exclusive basis in the ordinary course of business, including pursuant to (A) a clinical trial agreement, (B) a contract manufacturing a CMO Agreement, or (C) a Contract relating to the marketing and distribution of the Products); and

(xx)    provides for indemnification of any officer, director or employee of the Seller or any of its Affiliates other than in the ordinary course of business.

(b)    True and complete copies of each Material Contract, together with all amendments, modifications or supplements thereto, as of the date of this Agreement have been made available to the Purchaser.  As of the date hereof, the Seller has not received any written or to the Knowledge of the Seller, unwritten notice of termination (or intent to terminate) with respect to a Material Contract from any third party to such Material Contract.  No event has occurred which, with the passage of time or the giving of notice, or both, would constitute a default under or a violation of any Material Contract or would cause the acceleration of any obligation of the Seller or the creation of an Encumbrance (other than Permitted Pre-Closing Encumbrances) upon Acquired Assets, except for such events that have not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  To the Knowledge of the Seller, as of the date of this Agreement, no other party to any Material Contract is in breach of or default under the terms of any Material Contract where such breach or default has had or would reasonably be expected to be, individually or in the aggregate, material to the Business and the Acquired Assets taken as a whole.  Each Material Contract is a valid, binding and enforceable obligation of the Seller or its applicable Affiliate that is a party thereto and, to the Knowledge of the Seller, of each other party thereto, and is in full force and effect, subject to the Enforceability Limitations.

Section 3.13    Compliance with Laws; Permits.

(a)    Except as would not be material to the Business and the Acquired Assets taken as a whole (i) the Seller is, and since January 1, 2020, has been, operating the Business in compliance in all material respects with all applicable Laws, (ii) since January 1, 2020, the Seller has not received any written notice from any Governmental Entity or other Person of, or, to the Knowledge of the Seller, been charged with or become subject to, any violation of, or Liability

under, any Laws and (iii) to the Knowledge of the Seller, there has been no release, disposal, sale, marketing or distribution of, contamination by, or exposure of any person to any toxic or hazardous substances, materials or wastes so as to give rise to any Liability for the Seller with respect to the Business or the Acquired Assets under any Environmental Laws.

(b)    Except as would not be material to the Business and the Acquired Assets taken as a whole, the Seller has all Business Permits.  Except as would not be material to the Business and the Acquired Assets taken as a whole, the Seller is not, and since January 1, 2020, has not been, in default or violation of any term, condition or provision of any Business Permit. Except as would not be, individually or in the aggregate, material to the Business and the Acquired Assets taken as a whole, all Business Permits are valid and in full force and effect, subject to the Enforceability Limitations, and, to the Knowledge of the Seller, no condition exists that with notice or lapse of time or both would constitute a default of any term, condition or provision of any such Business Permits to which the Seller is a party.  Since January 1, 2020, the Seller has not received any written notice of any Cause of Action or investigation relating to the revocation, nonrenewal, suspension or modification of any Business Permit, except as would not be material to the Business and the Acquired Assets taken as a whole.

(c)    Since January 1, 2020, the Seller and, to the Knowledge of the Seller, any of its directors, officers, Business Employees and agents have conducted the Business in compliance with all applicable Laws related to anti-bribery, anti-corruption, money laundering, Sanctions, export restrictions and anti-boycott regulations (collectively "Financial Crimes Compliance Laws") in all respects.  Since January 1, 2020, to the Knowledge of the Seller, the Business has not been the subject of any investigations, allegations or disclosures related to Financial Crimes Compliance Laws.  None of the Seller nor, to the Knowledge of the Seller, any of its directors, officers, Business Employees and agents has been since January 1, 2020, or is a Sanctioned Person.

Section 3.14    Employee Benefits Matters.

(a)    Section 3.14(a) of the Seller Disclosure Letter sets forth a complete and correct list of each material Benefit Plan.  The Seller has made available to the Purchaser copies of documents embodying each such Benefit Plan and, for any unwritten Benefit Plan, a summary of the material terms thereof.  The Seller has furnished the Purchaser with the most recent Internal Revenue Service determination or opinion letter issued with respect to each Benefit Plan subject to Section 401(a) of the Code, and, to the Knowledge of the Seller nothing has occurred that could reasonably be expected to cause the loss of or otherwise adversely affect the tax-qualified status of any such Benefit Plan.

(b)    Except as would not reasonably be expected to be, individually or in the aggregate, material to the Business and the Acquired Assets taken as a whole, (i) each Benefit Plan has been established, maintained, funded and administered in accordance with its terms and in compliance with applicable Law, and no event has occurred and no condition exists with respect to any Benefit Plan that would reasonably be expected to subject the Purchaser or any of its Affiliates or the Business to any Tax, fine, lien, penalty or other Liability imposed by ERISA, the Code or any other applicable Law, and (ii) all contributions and payments required to be made by the Seller or any of its Affiliates or any ERISA Affiliate to each Benefit Plan have been

paid when due.  No Business Employee is entitled to post-employment health, life or other welfare benefits, other than as required by applicable Law for which the recipient pays the full cost of coverage.

(c)    Neither the Seller nor any ERISA Affiliate maintains, sponsors, participates in, contributes to, or has an obligation to contribute to, or has, within the three (3) year period prior to the date hereof, maintained, sponsored, participated in, contributed to, or been obligated to contribute to, or otherwise has (or has had) any Liability under or with respect to (i) any "multiemployer plan" (as defined in Section 3(37) of ERISA) ("Multiemployer Plan") or (ii) any "pension plan" (as defined in Section 3(2) of ERISA) that is or was subject to Title IV of ERISA or Section 412 or 430 of the Code.  Neither the Seller nor any ERISA Affiliate has actual or potential withdrawal Liability for any complete or partial withdrawal (as defined in Sections 4203 and 4205 of ERISA) from any Multiemployer Plan.

(d)    Neither the execution and delivery of this Agreement nor the consummation of the Acquisition, whether alone or in combination with any other event, could, directly or indirectly, (i) entitle any Business Employee to severance benefits or any other payment (including unemployment compensation, golden parachute, bonus or benefits) under any Benefit Plan or otherwise; (ii) accelerate the time of payment, vesting or funding of any compensation, benefits or other rights or increase the amount of compensation or benefits due under any Benefit Plan or otherwise to any Business Employee; or (iii) result in an obligation to fund or otherwise set aside assets to secure to any extent any of the obligations under any Benefit Plan for the benefit of any Business Employee.

(e)    Except as would not be material to the Business and the Acquired Assets taken as a whole, with respect to each Business Employee, each Benefit Plan or any other agreement or arrangement that constitutes in any part a nonqualified deferred compensation plan within the meaning of Section 409A of the Code has been operated and maintained in all respects in operational and documentary compliance with Section 409A of the Code and all applicable guidance thereunder.

(f)    The Seller does not have any obligation to gross-up, indemnify or otherwise reimburse any Business Employee for any Tax incurred by such Business Employee, including under Section 409A or 4999 of the Code.

Section 3.15    Labor Matters.

(a)    The Seller has made available to the Purchaser a true and complete list, by employee identification number, of all individuals employed by the Seller or any of its Affiliates exclusively in connection with the Business as of the date of this Agreement, which list shall be updated to include any individuals hired between the date hereof and the Closing by the Seller or any of its Affiliates who are employed exclusively in connection with the Business and hired in accordance with the provisions of this Agreement (all such individuals, the "Business Employees"), identifying as to each their job title, years of service and hire date, current salary or hourly wage rate, status as active/inactive and expected return to work date, employing entity, and primary location of employment (including for Business Employees working remotely).

(b)      The Seller and its Affiliates (in each case with respect to the Business Employees) and the Business are not a party to, or bound by, any collective bargaining agreement or other agreement or bargaining relationship with any labor union, works council, other labor organization or employee representative, and none of the Business Employees are represented by any labor union, works council, other labor organization or employee representative with respect to their employment with the Seller or its Affiliates.  To the Knowledge of the Seller, since January 1, 2020, there have been no activities or proceedings by any individual or group of individuals, including representatives of any labor organizations, works councils or labor unions, to organize any Business Employees or former employees of the Seller or any of its Affiliates who exclusively provided services to the Business.  There is no, and since January 1, 2020, there has been no, pending or, to the Knowledge of the Seller, threatened material labor strike, slowdown, lockout or work stoppage, picketing, handbilling, unfair labor practice charge or other material labor dispute, or material labor arbitration or material labor grievance against or affecting the Seller or its Affiliates (in each case with respect to the Business Employees and former employees who exclusively provided services to the Business) or the Business.

(c)      The Seller and its Affiliates (in each case with respect to the Business Employees and former employees who exclusively provide or provided services to the Business) and the Business (i) are, and since January 1, 2020, have been, in compliance in all material respects with all applicable Laws respecting labor, employment and employment practices, including such Laws regarding terms and conditions of employment, wages and hours (including the classification of independent contractors and exempt and non-exempt employees), occupational safety and health, immigration (including the completion of Forms I-9 for all employees), employment harassment, discrimination or retaliation, whistleblowing, disability rights or benefits, equal opportunity, plant closures and layoffs, employee trainings and notices, workers' compensation, labor relations, employee leave issues, paid time off, COVID-19, affirmative action and unemployment insurance, and (ii) have not since January 1, 2020, incurred any liability or obligation under the WARN Act.

(d)      Except as could not result in material Liability for the Business and the Acquired Assets taken as a whole, (i) the Seller and its Affiliates (in each case with respect to Business Employees and former employees who exclusively provide or provided services to the Business) and the Business have fully and timely paid all wages, salaries, wage premiums, commissions, bonuses, severance and termination payments, fees, expense reimbursements and other compensation that have come due and payable to such Business Employees or former employees under applicable Law, Contract or company policy; and (ii) each individual who is exclusively providing or since January 1, 2020, has exclusively provided services to the Seller and its Affiliates with respect to the Business and is or was classified and treated as an independent contractor, consultant, leased employee, or other non-employee service provider, or as an overtime exempt employee, is and has been properly classified and treated as such for all applicable purposes.

(e)      To the Knowledge of the Seller, within the three (3) year period prior to the date hereof, no Business Employee or former employee who exclusively provided services to the Business is in any material respect in violation of any term of any employment agreement, non-disclosure agreement, common law non-disclosure obligation, fiduciary duty,

noncompetition agreement, non-solicitation agreement, restrictive covenant or other similar obligation: (i) owed to the Seller and its Affiliates with respect to the Business; or (ii) owed to any third party with respect to such person's right to be employed or engaged by the Seller and its Affiliates.

Section 3.16    <u>FDA and Healthcare Regulatory Matters</u>.

(a)    Except as would not be, individually or in the aggregate, material to the Business and the Acquired Assets taken as a whole, (i) the Seller is in compliance with all applicable Health Laws that affect the Business, the Products and the Acquired Assets; (ii) as of the date of this Agreement, the Seller has not received any written or unwritten notice from any Regulatory Authority (A) withdrawing any Regulatory Authorization for any of the Products or (B) alleging any violation of any Health Law with respect to any of the Products; (iii) to the Knowledge of the Seller, there are no Governmental Entity investigations (except routine audits), suits, claims, actions or proceedings pending with respect to any of the Products; (iv) to the Knowledge of the Seller, there is no act, omission, event or circumstance that would reasonably be expected to give rise to or form the basis for any material civil, criminal or administrative action, suit, demand, claim, complaint, hearing, investigation, demand letter, warning letter, untitled letter, proceeding or request for information or any material liability (whether actual or contingent) for failure to comply with Health Laws with respect to any of the Products; and (v) to the Knowledge of the Seller, no director, officer, employee or contractor of the Seller, has made any voluntary self-disclosure to any Governmental Entity regarding any potential material non-compliance with any applicable Health Law with respect to any of the Products.

(b)    Except as would not be, individually or in the aggregate, material to the Business and the Acquired Assets taken as a whole, the Seller holds all Regulatory Authorizations required under any applicable Health Law to research, develop, test, manufacture, handle, label, package, store, supply, promote, distribute, market, commercialize, import and sell the Products and otherwise conduct the Business as presently conducted.  Except as would not, individually or in the aggregate, have a Material Adverse Effect, with respect to such Regulatory Authorizations, (i) all are in full force and effect, (ii) all are in good standing, valid and enforceable, (iii) all applications, modifications, submissions, information, reports, statistics, data and other conclusions utilized as the basis for such Regulatory Authorizations are true, complete and correct in all material respects and (iv) any necessary or required updates, changes, corrections or modifications to such Regulatory Authorizations have been submitted to the applicable Regulatory Authorities.

(c)    To the Knowledge of the Seller, since January 1, 2020, the Products have been researched, developed, tested, manufactured, handled, labeled, packaged, stored, supplied, promoted, distributed, marketed, commercialized, imported and sold by or on behalf of the Seller, in compliance with all applicable Health Laws, in each case, except as would not be material to the Business and the Acquired Assets taken as a whole.

(d)    Except as would not be, individually or in the aggregate, material to the Business and the Acquired Assets taken as a whole, since January 1, 2020, all pre-clinical studies and clinical trials conducted or being conducted with respect to the Products by, or, to the Knowledge of the Seller, on behalf of, the Seller have been and are being conducted in

compliance with the FDA's Good Clinical Practices and Good Laboratory Practices requirements, including regulations under 21 C.F.R. Parts 50, 54, 56, 58 and 312, and applicable guidance documents, as amended from time to time, the Animal Welfare Act (7 U.S.C. § 2131 et seq.), all applicable similar Health Laws in other jurisdictions, all Health Laws relating to protection of human subjects and the required experimental protocols, procedures and controls. Since January 1, 2020, no clinical trial conducted by, or on behalf of, the Seller with respect to the Products has been terminated or suspended by any Regulatory Authority and the Seller has not received any written notifications or other communications from the FDA, any other Regulatory Authority, any institutional review board, ethics committee or safety monitoring committee raising any issues that would reasonably result in a clinical hold or that would otherwise reasonably be expected to delay or materially restrict any clinical studies proposed or currently conducted by, or on behalf of, the Seller with respect to the Products and, to the Knowledge of the Seller, since January 1, 2020, no such action has been threatened against the Seller.

(e)     Neither the Seller, nor, to the Knowledge of the Seller, any Person acting on the Seller's behalf (including a contract manufacturer for the Products) has, with respect to any of the Products, (i) since January 1, 2020, been subject to a Regulatory Authority shutdown or import prohibition or (ii) since January 1, 2020, received any FDA Form 483, or other written Regulatory Authority notice of inspectional observations, "warning letters," "untitled letters" or requests or requirements to make changes to the Products that if not complied with would reasonably be expected to be material to the Business and the Acquired Assets taken as a whole, or similar correspondence or notice from any Regulatory Authority alleging or asserting material non-compliance with any applicable Health Law.

(f)     Neither the Seller, nor, to the Knowledge of the Seller, any of its officers, employees or agents, or, any clinical investigator acting for the Seller has, with respect to any of the Products, (i) made an untrue statement of a material fact or fraudulent statement to any Regulatory Authority, (ii) failed to disclose a material fact required to be disclosed to any Regulatory Authority or (iii) committed an act, made a statement or failed to make a statement, including with respect to any scientific data or information, that, at the time such disclosure was made or failure to disclose occurred, would reasonably be expected to provide a basis for the FDA to invoke its policy respecting "Fraud, Untrue Statements of Material Facts, Bribery, and Illegal Gratuities," set forth in 56 Fed. Reg. 46191 (September 10, 1991), and any amendments thereto, or for any other Regulatory Authority to invoke any similar policy.  Neither the Seller, nor, to the Knowledge of the Seller, any of its officers, employees or agents, or, any clinical investigator acting for the Seller, (i) is or has, with respect to any of the Products, been charged with, served with or received any search warrant, subpoena or civil investigation demand, or been convicted of any criminal offense or engaged in any conduct that has previously caused or would reasonably be expected to result in disqualification or debarment by any Governmental Entity, in each case relating to the delivery of an item or service under any Federal Health Care Program; (ii) has been debarred, excluded or suspended from participation in any Federal Health Care Program; (iii) has had a civil monetary penalty assessed against it, him or her under section 1128 of the Social Security Act; (iv) is currently listed on the General Services Administration published list of parties excluded from federal procurement programs and non-procurement programs; (v) to the Knowledge of the Seller, is the target or subject of any current or potential investigation relating to any Federal Health Care Program-related offense; or (vi) is a

29

party to, or subject to the terms of, any corporate integrity agreement or similar agreement or consent order of any Regulatory Authority.

(g)    Neither the Seller, nor, to the Knowledge of the Seller, any of its officers, employees or agents has submitted any claim for payment, or caused any claim for payment to be submitted, to any government healthcare program related to the Products in material violation of any Laws relating to false claims or fraud, including the Federal False Claim Act, 31 U.S.C. § 3729, or any applicable state false claim or fraud Law.

(h)    To the Knowledge of the Seller, since January 1, 2020, all manufacturing operations relating to the Products conducted on behalf of the Seller have been and are being conducted in compliance with applicable provisions of current Good Manufacturing Practice requirements as set forth in 21 U.S.C. § 351(a)(2)(B), 21 C.F.R. Parts 210 and 211, 21 U.S.C. § 342(g), 21 C.F.R. Part 111 and applicable guidance documents, as amended from time to time, in each case, except as would not have a material effect on the Business and the Acquired Assets taken as a whole. Since January 1, 2020, the Products have not been recalled, suspended, discontinued or subject to any material field notification, field correction, safety alerts or other notice of action relating to an alleged lack of safety, efficacy or regulatory compliance of the Products (a "Safety Notice"), either voluntarily by the Seller or at the request of the FDA or any other Regulatory Authority, nor has the Seller received any written notice from the FDA or any other Regulatory Authority that it has commenced, or threatened to initiate, any action to withdraw approval, place sales or marketing restrictions on or request the recall of, or seek a Safety Notice regarding the Products, or that it has commenced or threatened to initiate any action to enjoin or place restrictions on the production of the Products, in each case, except as would not be material to the Business and the Acquired Assets taken as a whole. In addition, since January 1, 2020, the Seller has filed all material annual and periodic reports, amendments and safety reports required for any Product required to be made to any Regulatory Authority.

(i)    To the Knowledge of the Seller, the Seller's Governmental Price Calculations and Reporting have been complete, accurate and in compliance with applicable Health Laws.

Section 3.17    Taxes.

(a)    The Seller has prepared (or caused to be prepared) and timely filed (taking into account valid extensions of time within which to file) all material Tax Returns required to be filed by it with respect to the Acquired Assets and Assumed Liabilities and paid all material Taxes required to be paid by it with respect to the Acquired Assets and Assumed Liabilities (whether or not shown as due on such Tax Returns), and all such filed Tax Returns (taking into account all amendments thereto) are accurate and complete in all respects.

(b)    No deficiency for any material Taxes with respect to the Acquired Assets or Assumed Liabilities has been proposed or asserted in writing or assessed by any Taxing Authority against the Seller that remains unpaid or unresolved.

(c)    The Seller has not received written notice of any pending or threatened Causes of Action, examinations or proposed adjustments in respect of any material Taxes

imposed on the Seller with respect to the Acquired Assets or Assumed Liabilities, and no such Causes of Action, examinations or proposed adjustments are currently in process.

(d)    There are no Encumbrances for Taxes on any of the Acquired Assets, other than Encumbrances for Taxes not yet due and payable.

(e)    The Seller has not granted any waiver of any statute of limitations that is currently in effect in respect of a material amount of Tax with respect to the Acquired Assets or Assumed Liabilities or entered into any agreement to extend any period of time with respect to the filing of a material Tax Return or an assessment or deficiency for a material amount of Taxes with respect to the Acquired Assets or Assumed Liabilities (other than pursuant to extensions of time to file Tax Returns obtained in the ordinary course of business).

(f)    The Seller has (i) withheld and paid over to the appropriate Taxing Authority all material Taxes required to be so withheld and paid over by it with respect to the Acquired Assets and Assumed Liabilities under applicable Law and (ii) complied with all Tax information reporting requirements imposed on it under applicable Law in all material respects with respect to the Acquired Assets and Assumed Liabilities.

(g)    The Seller is not a party to any Tax allocation or Tax sharing agreement or any other agreement or arrangement relating to the sharing, indemnification or payment of Taxes (other than customary financial or commercial contracts entered into in the ordinary course of business the principal purpose of which is not related to Taxes) with respect to the Acquired Assets or Assumed Liabilities.

(h)    No written claim has been made against the Seller in the prior three years by any Taxing Authority in a jurisdiction where the Seller does not file material Tax Returns that the Seller is or may be required to file material Tax Returns or subject to taxation for a material amount of Taxes with respect to the Acquired Assets or Assumed Liabilities in such jurisdiction that remains unresolved.

(i)    The Seller has not been party to any "listed transaction" within the meaning of Treasury Regulations Section 1.6011-4(b)(2) (or any corresponding or similar provision of state, local or foreign Tax Law) with respect to the Acquired Assets or Assumed Liabilities.

(j)    None of the Acquired Assets are "tax-exempt use property" within the meaning of Section 168(h) of the Code, are "tax-exempt bond financed property" within the meaning of Section 168(g) of the Code, secure any debt the interest of which is tax-exempt under Section 103(a) of the Code or are subject to a "section 467 rental agreement" within the meaning of Section 467 of the Code (or, in each case, any corresponding or similar provision of state, local or foreign Tax Law).

(k)    For U.S. federal income tax purposes, the Seller is classified as a disregarded entity and, to the Knowledge of the Seller, its direct or indirect regarded owner is a "United States person" within the meaning of Section 7701(a)(30) of the Code.  The Purchaser expressly acknowledges and agrees that (i) the Seller is an entity that is disregarded from its owner for U.S. federal and state income tax purposes; (ii) to the Seller's knowledge, the Seller's

indirect owner, Pharmaceutical Research Associates L.P., a Delaware limited partnership ("PRALP"), is treated as the Seller's regarded owner for U.S. federal and state income tax purposes; and (iii) no provision of this Agreement, including the representations and warranties in the foregoing Section 3.17 applies to obligations with respect to Taxes of or Tax matters pertaining to PRALP except as expressly provided (but, for the avoidance of doubt, (A) this clause (iii) shall not otherwise limit or expand the scope of Excluded Taxes and (B) nothing herein shall be construed to limit Purchaser's entitlement to deduct and withhold from amounts otherwise payable pursuant to this Agreement in accordance with Section 1.8).

Section 3.18    Insurance.    Section 3.18 of the Seller Disclosure Letter sets forth a complete and correct list (in all material respects), as of the date hereof, of all material insurance policies and bonds maintained by the Seller or any of its Affiliates with respect to the Business, the Acquired Assets or the Assumed Liabilities.  As of the date hereof, there are no claims pending under any such insurance policy as to which coverage has been questioned, denied or disputed or in respect of which there is an outstanding reservation of rights with respect to the Business, the Acquired Assets or the Assumed Liabilities, in each case, except as would not be material to the Business and the Acquired Assets taken as a whole.

Section 3.19    Warranties.    Other than normal product returns, no claims of any Customer, distributor, Governmental Entity or other Person based upon an alleged defect in any such product are, or since January 1, 2020, through the date hereof have been pending, or to the Knowledge of the Seller, threatened.  Since December 31, 2022, there has not been any product recall, post-sale warning or similar action conducted with respect to any Product manufactured, shipped, delivered or sold by the Seller.  Since January 1, 2020, the Seller has not directly granted to any customer any product warranties, other than standard product warranties described in Section 3.19 of the Seller Disclosure Letter and any required by a Governmental Entity in a Government Program contract.

Section 3.20    No Other Representation; No Reliance.

(a)    Notwithstanding the delivery or disclosure to the Purchaser, any of their Affiliates or any of their respective Representatives of any documentation or other information (including any financial projections or other supplemental data) or anything to the contrary in this Agreement, except for the representations and warranties expressly contained in this Article III (in each case, as qualified by the Seller Disclosure Letter) or in the Ancillary Documents, (i) neither the Seller nor any other Person has made or is making any representation or warranty of any kind or nature, whether express or implied, at Law or in equity, with respect to the accuracy or completeness of any information provided or made available to the Purchaser by or on behalf of the Seller in connection with or related to this Agreement, the transactions contemplated hereby, or the completeness of any information provided in connection therewith and (ii) the Seller (on its own behalf and on behalf of its Affiliates) hereby expressly disclaims any such other representations and warranties.

(b)    Except for the representations and warranties contained in Article III and Article V and in the Ancillary Documents, the Seller acknowledges that it (i) has had an opportunity to conduct any and all due diligence with respect to the Purchaser and the Guarantor in connection with the transactions contemplated hereby, (ii) has relied solely upon their own

independent review, investigation and/or inspection of any documents in connection with the transactions contemplated hereby and (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of Law or otherwise regarding the Purchaser and the Guarantor, or with respect to any other information provided or made available to the Seller in connection with the transactions contemplated hereby, or the completeness of any information provided in connection therewith.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

The Purchaser represents and warrants to the Seller as follows:

Section 4.1    Qualification; Organization.  The Purchaser is a legal entity duly organized, validly existing and in good standing (or the equivalent thereof, if applicable, in each case, with respect to jurisdictions that recognize such concept) under the laws of its jurisdiction of organization and has all requisite corporate or similar power and authority to own, lease and operate its properties and assets and to carry on its business as presently conducted by it, except where the failure to be so in good standing or to have such power and authority would not reasonably be expected to, individually or in the aggregate, prevent or materially impair or materially delay the Acquisition or affect the ability of the Purchaser to perform its obligations under this Agreement or the Ancillary Documents.  The Purchaser is qualified to do business and is in good standing (or the equivalent thereof, if applicable, in each case, with respect to jurisdictions that recognize such concept) as a foreign corporation or other entity in each jurisdiction where the ownership, leasing or operation of its assets or properties or conduct of its business requires such qualification, except where the failure to be so qualified or, where relevant, in good standing, would not reasonably be expected to, individually or in the aggregate, prevent or materially impair or materially delay the Acquisition or affect the ability of the Purchaser to perform its obligations under this Agreement or the Ancillary Documents.

Section 4.2    Authority of the Purchaser.  The Purchaser has all requisite corporate or similar power and authority to execute and deliver (or to cause one or more of its Affiliates to execute and deliver, as applicable) this Agreement and each Ancillary Document to which the Purchaser or such Affiliate of the Purchaser is or will be a party, subject to the Seller obtaining necessary Bankruptcy Court approvals from and after the Petition Date, to carry out the Acquisition and to perform its obligations hereunder and thereunder.  The execution, delivery and performance of this Agreement and such Ancillary Documents by the Purchaser or such Affiliate of the Purchaser and the consummation of the Acquisition and other transactions contemplated hereby and thereby have been duly and validly authorized and approved by all requisite corporate or similar action of the Purchaser, and no other corporate or similar proceedings (pursuant to applicable Law, the Purchaser's organizational documents or otherwise) on the part of the Purchaser is necessary to authorize the consummation of, and to consummate, the transactions contemplated hereby and thereby.  This Agreement and each Ancillary Document to which the Purchaser or such Affiliate of the Purchaser is a party has been duly and validly executed and delivered (subject, from and after the Petition Date, to the approval of the Bankruptcy Court).  Subject to the Seller obtaining necessary Bankruptcy Court approvals from and after the Petition Date, this Agreement and each such Ancillary Document

have been duly and validly executed and delivered by the Purchaser or its Affiliates, as applicable, and, assuming the due authorization, execution and delivery by the Seller, constitute a legal, valid and binding agreement of the Purchaser or its Affiliates, as applicable, enforceable against such Person in accordance with its terms, subject to the Enforceability Limitations.

Section 4.3    Consents and Approvals.  No Consent is necessary or required on the part of (a) the Purchaser in connection with the execution, delivery or performance of this Agreement and any Ancillary Documents to which the Purchaser is a party and the consummation of the Acquisition and the other transactions contemplated hereby and thereby and (b) any applicable Affiliate of the Purchaser in connection with the execution, delivery and performance of any Ancillary Documents to which such Person is a party and the consummation of the transactions contemplated thereby, except in each case of the foregoing clauses (a) and (b), except as expressly provided in this Agreement or in connection with or compliance with any applicable requirements of the Bankruptcy Code or the Bankruptcy Court, the HSR Act or for Consents which if not obtained or made would not reasonably be expected to prevent or materially hinder or materially delay the Acquisition or affect the ability of the Purchaser and any applicable Affiliate to perform its obligations under this Agreement.

Section 4.4    No Violations.  Except as described in Sections 3.3, 4.3 and 5.3, neither the execution, delivery or performance of this Agreement and the Ancillary Documents by the Purchaser or any of its applicable Affiliates, nor the consummation by the Purchaser or any of its applicable Affiliates of the transactions contemplated hereby or thereby will (a) conflict with or result in any violation or breach of any provisions of the certificate of incorporation, bylaws or other organizational documents of any such Person, (b) with or without notice or lapse of time or both, conflict with or result in any breach or violation of or constitute a default under, or give rise to a right of, or result in, termination, modification, cancellation, first offer, first refusal or acceleration of any obligation or to the loss of a benefit under any Contract to which such Person is a party or by or to which any of its properties, rights or assets, or the operations or conduct of its business, are bound or subject or (c) conflict with or violate any Order or Law applicable to such Person or its properties, rights or assets, or the operations or conduct of its business, except in the case of clauses (b) and (c), for any conflicts or violations that would not reasonably be expected to prevent or materially hinder or materially delay the Acquisition or affect the ability of the Purchaser to perform its obligations under this Agreement.

Section 4.5    Compliance with Laws.  The Purchaser is in compliance with and is not in default under or in violation of any Laws applicable to the Purchaser or any of its properties or assets, except where such non-compliance, default or violation has not and would not reasonably be expected to, individually or in the aggregate, materially impair or materially delay the Purchaser's ability to perform its obligations under this Agreement.

Section 4.6    Litigation.  Except as would not, individually or in the aggregate, materially impair or materially delay the Purchaser's ability to perform its obligations under this Agreement, (a) there are no Causes of Action pending or, to the knowledge of the Purchaser, threatened against the Purchaser and (b) the Purchaser has not received written notice of, and to the knowledge of the Purchaser, there are no, Orders of a court of competent jurisdiction outstanding against the Purchaser.

Section 4.7    Brokers.  Other than Centerview Partners, the Purchaser has not employed or engaged any investment banker, broker or finder who is entitled to any brokerage, finder's or other fee or any commission from the Purchaser in connection with this Agreement and the transactions contemplated by this Agreement or any other agreement, document or instrument contemplated hereby based upon arrangements made by or on behalf of the Purchaser or any of its Affiliates.

Section 4.8    Sufficient Funds.  The Purchaser has delivered to the Seller true, correct and complete copies of the Equity Commitment Letter to invest, subject to the terms and conditions therein, cash in the aggregate amount set forth therein (the "Equity Financing").  Assuming (a) the Equity Financing is funded in accordance with the Equity Commitment Letter and (b) the performance by the Seller of its obligations hereunder, as of the date hereof, the net proceeds contemplated by the Equity Commitment Letter will be sufficient to fund the payment by the Purchaser of all obligations pursuant to Section 1.6 and, together with other funds available to the Purchaser, any other amounts required to be paid in connection with the consummation of the transactions contemplated by this Agreement, including all related fees and expenses payable by the Purchaser under this Agreement.  As of the date hereof, the Equity Commitment Letter is in full force and effect and, except as not prohibited by this Agreement, has not been withdrawn or terminated or otherwise amended, restated, replaced, supplemented, modified or waived in any respect, and no such withdrawal, termination, amendment, restatement, replacement, supplement, modification or waiver is contemplated.  As of the date hereof, the Equity Commitment Letter is a legal, valid, binding and enforceable obligation of the Purchaser and, to the knowledge of the Purchaser, the other parties thereto, except as may be limited by the Enforceability Limitations.  There are no side letters or other agreements, arrangements, contracts or understandings relating to the Equity Commitment Letter that could materially delay the availability of, or reasonably be expected to impact the ability to receive, the Equity Financing on the Closing Date.  As of the date hereof, to the knowledge of the Purchaser, no event has occurred which, with or without notice, lapse of time or both, would or would reasonably be expected to constitute a default or breach under the Equity Commitment Letter by any of the parties thereto, under any term or condition of the Equity Commitment Letter.  As of the date hereof, the Purchaser does not have any reason to believe that any of the conditions to the Equity Financing will not be satisfied or that the Equity Financing will not be available to the Purchaser on the Closing Date.  The Equity Commitment Letter contains all of the conditions precedent to the obligations of the parties thereunder to make the Equity Financing available to the Purchaser on the terms therein and, except as set forth in the Equity Commitment Letter, there are no contingencies that would permit the parties thereunder to reduce the total amount of the Equity Financing.  Notwithstanding anything herein to the contrary, the Purchaser is not making any representation or warranty in this Section 4.8 regarding the accuracy of the representations and warranties in Article III or Article V.  It is acknowledged and agreed by the Purchaser that the obligations of the Purchaser under this Agreement are not subject to any conditions regarding the Purchaser's, its Affiliates', or any other Person's ability to obtain financing for the consummation of the transactions contemplated hereby.

Section 4.9    No Other Representations; No Reliance.

(a)    Notwithstanding the delivery or disclosure to the Seller, any of its Affiliates or any of their respective Representatives of any documentation or other information

(including any financial projections or other supplemental data) or anything to the contrary in this Agreement, except for the representations and warranties expressly contained in this Article IV and in the Ancillary Documents, (i) neither the Purchaser nor any other Person has made or is making, and each of the Purchaser and its Affiliates expressly disclaims, any representation or warranty of any kind or nature, whether express or implied, at Law or in equity, with respect to the accuracy or completeness of any information provided or made available to the Seller by or on behalf of the Purchaser in connection with or related to this Agreement, the transactions contemplated hereby, or the completeness of any information provided in connection therewith and (ii) the Purchaser hereby expressly disclaim any such other representations and warranties.

(b)     Except for the representations and warranties contained in Article III and in the Ancillary Documents, the Purchaser acknowledges that it (i) has had an opportunity to conduct any and all due diligence with respect to the Seller and its Affiliates in connection with the transactions contemplated hereby, (ii) has relied solely upon their own independent review, investigation and/or inspection of any documents in connection with the transactions contemplated hereby and (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of Law or otherwise regarding the Seller or its Affiliates, or with respect to any other information provided or made available to the Purchaser in connection with the transactions contemplated hereby, or the completeness of any information provided in connection therewith.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF THE GUARANTOR

The Guarantor represents and warrants to the Seller and the Purchaser as follows:

Section 5.1     Qualification; Organization.  The Guarantor is a legal entity duly organized, validly existing and in good standing (or the equivalent thereof, if applicable, in each case, with respect to jurisdictions that recognize such concept) under the laws of its jurisdiction of organization and has all requisite corporate or similar power and authority to own, lease and operate its properties and assets and to carry on its business as presently conducted by it, except where the failure to be so in good standing or to have such power and authority would not reasonably be expected to, individually or in the aggregate, prevent or materially impair or materially delay the Acquisition or affect the ability of the Guarantor to perform its obligations under this Agreement or the Ancillary Documents.

Section 5.2     Authority of the Guarantor.  The Guarantor has all requisite corporate or similar power and authority to execute and deliver (or to cause one or more of its subsidiaries to execute and deliver, as applicable) this Agreement and each Ancillary Document to which the Guarantor or such subsidiary of the Guarantor is or will be a party and, subject to the Seller obtaining necessary Bankruptcy Court approvals from and after the Petition Date, to carry out the Acquisition and to perform its obligations hereunder and thereunder.  The execution, delivery and performance of this Agreement and such Ancillary Documents by the Guarantor or such subsidiary of the Guarantor and the consummation of the Acquisition and other transactions contemplated hereby and thereby have been duly and validly authorized and approved by all

requisite corporate or similar action of the Guarantor, and no other corporate or similar proceedings (pursuant to applicable Law, the Guarantor's organizational documents or otherwise) on the part of the Guarantor is necessary to authorize the consummation of, and to consummate, the transactions contemplated hereby and thereby.  This Agreement and each Ancillary Document to which the Guarantor or such subsidiary of the Guarantor is a party has been duly and validly executed and delivered (subject, from and after the Petition Date, to the approval of the Bankruptcy Court).  Subject to the Seller obtaining necessary Bankruptcy Court approvals from and after the Petition Date, this Agreement and each such Ancillary Document have been duly and validly executed and delivered by the Guarantor or its subsidiaries, as applicable, and, assuming the due authorization, execution and delivery by the Seller, constitute a legal, valid and binding agreement of the Guarantor or its subsidiaries, as applicable, enforceable against such Person in accordance with its terms, subject to the Enforceability Limitations.

Section 5.3    Consents and Approvals.  No Consent is necessary or required on the part of (a) the Guarantor in connection with the execution, delivery or performance of this Agreement and any Ancillary Documents to which the Guarantor is a party and the consummation of the Acquisition and the other transactions contemplated hereby and thereby and (b) any applicable subsidiary of the Guarantor in connection with the execution, delivery and performance of any Ancillary Documents to which such Person is a party and the consummation of the transactions contemplated thereby, except in each case of the foregoing clauses (a) and (b), except as expressly provided in this Agreement or in connection with or compliance with any applicable requirements of the Bankruptcy Code or the Bankruptcy Court, the HSR Act or for Consents which if not obtained or made would not reasonably be expected to prevent or materially hinder or materially delay the Acquisition or affect the ability of the Guarantor and any applicable subsidiary to perform its obligations under this Agreement.

Section 5.4    No Violations.  Except as described in Sections 3.3, 4.3 and 5.3, neither the execution, delivery or performance of this Agreement and the Ancillary Documents by the Guarantor or any of its applicable subsidiaries, nor the consummation by the Guarantor or any of its applicable subsidiaries of the transactions contemplated hereby or thereby will (a) conflict with or result in any violation or breach of any provisions of the certificate of incorporation, bylaws or other organizational documents of any such Person or (b) conflict with or violate any Order or Law applicable to such Person or its properties, rights or assets, or the operations or conduct of its business, except in the case of clause (b), for any conflicts or violations that would not reasonably be expected to prevent or materially hinder or materially delay the Acquisition or affect the ability of the Guarantor to perform its obligations under this Agreement.

Section 5.5    Compliance with Laws.  The Guarantor is in compliance with and is not in default under or in violation of any Laws applicable to the Guarantor or any of its properties or assets, except where such non-compliance, default or violation has not and would not reasonably be expected to, individually or in the aggregate, materially impair or materially delay the Guarantor's ability to perform its obligations under this Agreement.

Section 5.6    No Reliance.  Except for the representations and warranties contained in Article III and in the Ancillary Documents, the Guarantor acknowledges that it (i) has had an opportunity to conduct any and all due diligence with respect to the Seller and its Affiliates in

connection with the transactions contemplated hereby, (ii) has relied solely upon their own independent review, investigation and/or inspection of any documents in connection with the transactions contemplated hereby and (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of Law or otherwise regarding the Seller or its Affiliates, or with respect to any other information provided or made available to the Guarantor in connection with the transactions contemplated hereby, or the completeness of any information provided in connection therewith.

## ARTICLE VI

## COVENANTS

Section 6.1    <u>Conduct of Business Pending the Closing</u>.

(a)    The Seller covenants and agrees that, from the date hereof and the earlier of the Closing or the date, if any, on which this Agreement is validly terminated pursuant to <u>Article VIII</u>, except (i) as otherwise expressly required by this Agreement, (ii) as required by applicable Law (including the Bankruptcy Code), (iii) as consented to in writing by the Purchaser (which consent shall not be unreasonably withheld, conditioned or delayed), (iv) as required by the Chapter 11 Cases or otherwise required or approved by any Order of the Bankruptcy Court, or (v) as set forth in <u>Section 6.1</u> of the Seller Disclosure Letter, (x) the Business shall be conducted in all material respects in the ordinary course of business consistent with past practice and (y) the Seller shall use its commercially reasonable efforts to preserve the Business and its material business relationships in all material respects; *provided* for avoidance of doubt, that nothing herein shall require the Seller to continue to develop any Product Candidate.

(b)    Without limiting the generality of, and in furtherance of, the foregoing, from the date hereof and the earlier of the Closing or the date, if any, on which this Agreement is validly terminated pursuant to <u>Article VIII</u>, except (v) as otherwise expressly required by this Agreement, (w) as required by applicable Law (including the Bankruptcy Code), (x) as consented to in writing by the Purchaser (which consent shall not be unreasonably withheld, conditioned or delayed), (y) as required by the Chapter 11 Cases or otherwise required or approved by any Order of the Bankruptcy Court or (z) as set forth in <u>Section 6.1</u> of the Seller Disclosure Letter, the Seller shall not, with respect to the Business, the Acquired Assets or the Assumed Liabilities, directly or indirectly:

(i)    incur, create or assume any Encumbrance (other than Permitted Pre-Closing Encumbrances) on any Acquired Asset;

(ii)    other than in the ordinary course of business, and subject to <u>Section 6.16</u> with respect to the Government Program agreements described therein, (A) voluntarily cancel, materially change, materially amend or terminate (other than, for the avoidance of doubt, any expiration in accordance with its terms, any renewals in the ordinary course of business or any changes to or amendments of any purchase orders or statements of work), or waive any material rights under, any Material Contract included

in the Acquired Assets or (B) change or amend the agreement listed at <u>Section 6.1(b)(ii)</u> of the Seller Disclosure Letter;

(iii)    make any material changes with respect to material accounting policies or procedures, except as required by changes in applicable Law or GAAP;

(iv)    other than in the ordinary course of business (including, for the avoidance of doubt, settlements of penalties in the ordinary course of business pursuant to a contract manufacturing agreement, distribution agreement or other ordinary course agreement for any Product), settle or compromise any Cause of Action (A) materially affecting the Business, the Acquired Assets or the Assumed Liabilities or (B) which would impose any monetary obligation on the Purchaser or the Business which is not an Excluded Liability;

(v)    transfer, assign, sell, lease, grant (other than in the ordinary course of business) any exclusive license with respect to, or abandon or permit to lapse, or dispose of, any material Business Intellectual Property, including without limitation, Betadine Licensed IP or Senokot Licensed IP (but excluding any Intellectual Property in or to Business Systems that are not used or held for use exclusively in the conduct of the Business);

(vi)    other than in the ordinary course of business or as required to effectuate or prepare for the consummation of this Agreement or any Ancillary Document, terminate, surrender, withdraw, cancel, transfer, modify or fail to renew any material Business Permit;

(vii)    other than in the ordinary course of business, sell, pledge, dispose of, transfer or authorize the sale, pledge, disposition or transfer of any tangible assets of the Seller (other than Inventory in the ordinary course) that would otherwise be an Acquired Asset;

(viii)    grant any material covenants not to assert or similar rights with respect to any Acquired Assets;

(ix)    fail to use commercially reasonable efforts to maintain, or to renew or replace following their termination, the existing insurance policies relating to the Business, the Acquired Assets and the Assumed Liabilities;

(x)    with respect to the Business Employees, except as required pursuant to the terms of any Benefit Plan set forth on <u>Section 3.14(a)</u> of the Seller Disclosure Letter (as may be amended or modified following the date of this Agreement; *provided* that any such amendment or modification is applicable to all similarly situated employees of the Seller or any of its Affiliates and a copy of which is promptly provided to the Purchaser), pursuant to any Benefit Plan as may be adopted (provided such Benefit Plan is applicable to all similarly situated employees of the Seller or any of its Affiliates) or pursuant to any KERP that may be established by the Seller or any of its Affiliates following the date of this Agreement (provided that such KERP is approved by the Bankruptcy Court and a copy of which is promptly provided to the Purchaser),

(A) increase the compensation or benefits payable or provided to such Business Employee, (B) grant, make or announce any incentive awards (whether cash-based, equity-based, or otherwise), bonus, severance, retention or termination pay, or (C) increase or accelerate or commit to accelerate the funding, payment or vesting of the compensation or benefits provided under any Benefit Plan or any other benefit or compensation plan, agreement, contract, program, policy or arrangement;

(xi)    (A) hire or engage or otherwise enter into any employment or consulting agreement or arrangement with any employee or individual independent contractor who would be a Business Employee (other than to fill vacancies as a result of Business Employee attrition following the date of this Agreement); (B) reassign the duties of a Business Employee such that he or she is no longer a Business Employee; (C) reassign the duties of any other employee of the Seller or any of its Affiliates such that he or she would be a Business Employee other than to fill vacancies as a result of Business Employee attrition following the date of this Agreement to the extent that the compensation and benefits provided are substantially consistent with the compensation and benefits provided to similarly situated employees; or (D) furlough, layoff or terminate (other than for cause) any Business Employee;

(xii)    with respect to the Business Employees, the Business or the Acquired Assets, negotiate, become a party to, establish, adopt, amend, commence participation in or terminate any collective bargaining agreement or other agreement with a labor union, works council, other labor organization or employee representative, or recognize or certify any labor union, works council, other labor organization or employee representative as the bargaining representative for any Business Employees;

(xiii)    revalue any assets or properties of the Seller (including Inventory), except to the extent required by GAAP;

(xiv)    waive or release any noncompetition, non-solicitation, non-disclosure, noninterference, non-disparagement or other restrictive covenant obligation of any Business Employee and former employee who exclusively provided services to the Business;

(xv)    adopt, amend or terminate any Benefit Plan or any benefit or compensation plan, program, policy, agreement or arrangement that would be a Benefit Plan if in effect on the date hereof, in each case, as applied to the Business Employees, except for any adoption, amendment or termination of any Benefit Plan generally applicable to all employees of the Seller and its Affiliates; *provided* that such adoption, amendment or termination does not result in a material increase in compensation or benefits payable by the Purchaser;

(xvi)    increase, accelerate or otherwise engage in any stockpiling, channel stuffing, excess purchasing or excessive sales or discounting activity with respect to inventory, supplies, raw materials or finished Products;

40

(xvii)   make, revoke or change any material Tax election, adopt or change any material Tax accounting method or period, enter into any closing agreement or settlement agreement in respect of material Taxes, settle or compromise any Tax claim or assessment, surrender any right to claim a refund, offset or other reduction in liability of or for material Taxes, consent to any extension or waiver of the limitation period applicable to any claim or assessment with respect to any material Tax matter (other than pursuant to an extension of time to file Tax Returns obtained in the ordinary course of business consistent with past practice), amend any material Tax Return, or fail to pay any material Tax when due and payable (including any estimated Taxes); *provided* that, for the avoidance of doubt, this Section 6.1(b)(xvii) only includes actions directly taken by the Seller; or

(xviii)  authorize or commit, in writing or otherwise, to take any of the foregoing actions; *provided* that, for the avoidance of doubt, this Section 6.1(b)(xviii) only includes actions directly taken by the Seller.

Without in any way limiting any party's rights or obligations under this Agreement, the parties understand and agree that (i) nothing contained in this Agreement shall give the Purchaser, directly or indirectly, the right to control or direct the operations of the Seller, or the Business prior to the Closing and (ii) prior to the Closing, the Seller shall exercise, consistent with and subject to, the terms and conditions of this Agreement, complete control and supervision over the Business and its operations.

(c)      The Purchaser and the Guarantor shall not knowingly take or permit any of their respective Subsidiaries to take any action that is reasonably likely to prevent or materially impede the consummation of the Acquisition.  Without limiting the generality of, and in furtherance of, the foregoing, the Purchaser and the Guarantor shall not, and shall cause their respective Affiliates not to, directly or indirectly (whether by merger, consolidation or otherwise), acquire, purchase, lease or license (or agree to acquire, purchase, lease or license) any business, corporation, partnership, association or other business organization or division or part thereof, or any securities or collection of assets, if doing so would reasonably be expected to (i) impose any material delay in the obtaining of, or materially increase the risk of not obtaining, any consent, approval, authorization or waiver of any Governmental Entity necessary, proper or advisable to consummate the transactions contemplated by this Agreement, (ii) materially increase the risk of any Governmental Entity entering an Order prohibiting the Closing, or (iii) materially increase the risk of not being able to remove any such Order on appeal or otherwise.

Section 6.2    Access and Information.

(a)      Subject to applicable Law, prior to the Closing, the Seller shall afford the Purchaser and its officers, directors, employees, agents, counsel, accountants, investment bankers, financing sources and other authorized Representatives reasonable access, during normal business hours and upon reasonable advance notice, to the Seller's Books and Records and, during such period, the Seller shall furnish as promptly as practicable to the Purchaser all information (financial or otherwise) the Purchaser may reasonably request, in each case, solely to the extent related to the Business, the Acquired Assets or the Assumed Liabilities, for any

purpose related to the consummation of the transactions contemplated by this Agreement; *provided* that no investigation pursuant to this Section 6.2(a) shall affect or be deemed to modify any representation or warranty made by the Seller herein.  Notwithstanding the foregoing, the Seller shall not be required by this Section 6.2(a) to provide the Purchaser and its officers, directors, employees, agents, counsel, accountants, investment bankers, financing sources and other authorized Representatives with access to or to disclose information (i) the disclosure of which would violate applicable Law, (ii) that in the reasonable judgment of the Seller would result in the disclosure of any Trade Secrets of third parties or violate any of its obligations with respect to confidentiality or (iii) the disclosure of which would cause the loss of any attorney-client, attorney work product or other legal privilege; *provided* that, in the event the Seller withholds access to any such information, the Seller will (A) inform the Purchaser that such information has been withheld and (B) use its reasonable best efforts to provide such information in a manner which would not be prohibited or which would not violate applicable Law or cause the loss of any privilege; *provided*, *further*, that the Seller may designate any such information made available to the Purchaser under this Agreement as "outside counsel only" and such information shall be given only to the outside counsel of the Purchaser and may not be shared with the Purchaser or any of its Affiliates or any of their respective Representatives (other than such outside counsel).

(b)  For the avoidance of doubt, information obtained pursuant to Section 6.2(a) shall be subject to the Confidentiality Agreement.  Notwithstanding anything to the contrary in the Confidentiality Agreement, the Confidentiality Agreement shall continue in full force and effect until (x) the Closing or (y) if this Agreement is validly terminated pursuant to Article VIII, the remainder of the term of the Confidentiality Agreement or for twelve (12) months after the date of such termination, whichever is longer.  As of the Closing, (i) the Purchaser's non-use, non-disclosure and return or destruction obligations under the Confidentiality Agreement with respect to the Business, the Acquired Assets or the Assumed Liabilities and the Purchaser's non-solicitation and non-hire obligations with respect to the Transferred Employees shall automatically terminate and (ii) all other provisions of the Confidentiality Agreement shall remain in full force and effect in accordance with their terms.

(c)  From and after the Closing for a period of seven (7) years following the Closing Date (or, if later, the closing of the Chapter 11 Cases), the Purchaser will provide the Seller and its advisors with reasonable access, during normal business hours, at the Seller's sole expense and upon reasonable advance notice, to the Books and Records (for the purpose of examining and copying) relating to the Business, the Acquired Assets or the Assumed Liabilities with respect to periods or occurrences prior to the Closing and reasonable access, during normal business hours, at the Seller's sole expense and upon reasonable advance notice, to employees, officers, advisors, accountants, offices and properties (including for the purpose of better understanding such Books and Records) of the Purchaser, in each case, for purposes relating to the Chapter 11 Cases, requests of any Regulatory Authority, the wind-down of the operations of the Seller and its estates, actions to which the Seller is a party, insurance claims, tax payments, returns or audits, the functions of any trusts established under a Chapter 11 plan of the Seller or any other successor thereof.  Notwithstanding the foregoing, the Purchaser shall not be required by this Section 6.2(c) to provide the Seller and its officers, directors, employees, agents, counsel, accountants, investment bankers, financing sources and other authorized Representatives with access to or to disclose information (i) the disclosure of which would violate applicable Law,

(ii) that in the reasonable judgment of the Purchaser would result in the disclosure of any Trade Secrets of third parties or violate any of its obligations with respect to confidentiality or (iii) the disclosure of which would cause the loss of any attorney-client, attorney work product or other legal privilege; *provided* that, in the event the Purchaser withholds access to any such information, the Purchaser will (A) inform the Seller that such information has been withheld and (B) use its reasonable best efforts to provide such information in a manner which would not be prohibited or which would not violate applicable Law or cause the loss of any privilege. Unless otherwise consented to in writing by the Seller, the Purchaser will not, for a period of seven (7) years following the Closing Date (or, if later, the closing of the Chapter 11 Cases), destroy, alter or otherwise dispose of any of the material Books and Records (other than additional copies thereof) relating to the pre-Closing period without first offering to surrender to the Seller such Books and Records or any portion thereof that the Purchaser may intend to destroy, alter or dispose of.  For purposes of this <u>Section 6.2(c)</u>, references to the "Seller" shall be construed, where applicable, to include any liquidating trust, plan administrator or comparable person or body bearing responsibility for the administration and wind-down of the Seller's operations, estates and Chapter 11 Cases.

(d)     From and after the Closing for a period of seven (7) years following the Closing Date the Seller will provide the Purchaser and its advisors with reasonable access, during normal business hours, upon reasonable advance notice, to any historical Books and Records that are Retained Books and Records.  Unless otherwise consented to in writing by the Purchaser, the Seller will not, for a period of seven (7) years following the Closing Date, destroy, alter or otherwise dispose of any of the material Historical Books and Records (other than additional copies thereof) that are Retained Books and Records without first offering to surrender to the Purchaser such Historical Books and Records or any portion thereof that the Seller may intend to destroy, alter or dispose of.

Section 6.3     <u>Approvals and Consents; Cooperation; Notification</u>.

(a)     Subject to the terms and conditions of this Agreement, each party hereto shall use its reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable under applicable Law to consummate the transactions contemplated hereby as soon as practicable after the date hereof, including (i) preparing and filing or otherwise providing, in consultation with the other parties and as promptly as practicable and advisable after the date hereof, all documentation to effect all necessary applications, notices, petitions, filings and other documents and to obtain as promptly as practicable all waiting period expirations or terminations, consents, clearances, waivers, licenses, orders, registrations, approvals, permits and authorizations necessary or advisable to be obtained from any third party and/or any Governmental Entity in order to consummate the transactions contemplated hereby, and (ii) taking all steps as may be necessary to obtain all such waiting period expirations or terminations, consents, clearances, waivers, licenses, registrations, permits, authorizations, orders and approvals.  In furtherance and not in limitation of the foregoing, each party agrees to (x) make an appropriate filing of a Notification and Report Form pursuant to the HSR Act with respect to the Acquisition as promptly as practicable, and in any event within ten (10) Business Days after the execution of this Agreement, and to supply as promptly as practicable and advisable any additional information and documentary materials that may be requested pursuant to the HSR Act or any other Antitrust Law, and to take all other

actions necessary to cause the expiration or termination of the applicable waiting periods under the HSR Act as soon as practicable and (y) make all other necessary filings as promptly as practicable after the date hereof, and to supply as promptly as practicable and advisable any additional information and documentary materials that may be requested under any Antitrust Laws.  The Purchaser shall have responsibility for the filing fees associated with the HSR Act filings and any other similar filings required under any Antitrust Laws.  In furtherance of the foregoing, the Purchaser shall, and the Seller shall, upon the prior written consent of the Purchaser and subject to any approval of the Bankruptcy Court that may be required, take any and all steps and make any and all undertakings necessary to avoid or eliminate each and every impediment under any Antitrust Laws that may be asserted by any Governmental Entity with respect to the transactions contemplated by this Agreement so as to enable the Closing to occur as soon as reasonably possible, including, without limitation, to: (A) sell, license, assign, transfer, divest, hold separate or otherwise dispose of any assets, business or portion of business of the Seller, the Purchaser or any Subsidiary of any of the foregoing, (B) conduct, restrict, operate, invest or otherwise change the assets, the business or portion of the business of the Seller, the Purchaser or any Subsidiary of any of the foregoing in any manner, (C) impose any restriction, requirement or limitation on the operation of the business or portion of the business of the Seller, the Purchaser or any Subsidiary of any of the foregoing and (D) contest, administratively or in court, any ruling, order or other action of any Governmental Entity or any other Person with respect to the proposed Acquisition.  Notwithstanding the foregoing, in no event shall the Seller or its Affiliates be required to agree to take or enter into any action which is not conditioned upon the Closing.

(b)      Each of the parties hereto shall, in connection with and without limiting the efforts referenced in <u>Section 6.3(a)</u> to obtain all waiting period expirations or terminations, consents, clearances, waivers, licenses, orders, registrations, approvals, permits and authorizations for the Acquisition under the HSR Act or any other Antitrust Law, (i) cooperate in all respects and consult with the other party in connection with any filing or submission and in connection with any investigation or other inquiry, including any proceeding initiated by a private party, including by allowing the other party to have a reasonable opportunity to review in advance and comment on drafts of filings and submissions and reasonably considering in good faith comments of the other party and providing the other party with copies of filings and submissions, (ii) promptly inform the other party of any communication received by such party from, or given by such party to, the Antitrust Division of the Department of Justice (the "<u>DOJ</u>"), the Federal Trade Commission (the "<u>FTC</u>") or any other Governmental Entity, by promptly providing copies to the other party of any such written communications, and of any material communication received or given in connection with any proceeding by a private party, in each case regarding any of the transactions contemplated hereby and (iii) permit the other party to review in advance any communication that it gives to, and consult with each other in advance of any meeting, substantive telephone call or conference with, the DOJ, the FTC or any other Governmental Entity, or, in connection with any proceeding by a private party, with any other Person, and to the extent permitted by the DOJ, the FTC or other applicable Governmental Entity or other Person, give the other party the opportunity to attend and participate in any in-person meetings, substantive telephone calls or conferences with the DOJ, the FTC or other Governmental Entity or other Person; *provided, however*, that materials required to be provided pursuant to the foregoing <u>clauses (i)</u>-<u>(iii)</u> may be redacted (A) to remove references concerning the valuation of any of the parties or any of their respective Subsidiaries, (B) as necessary to

comply with contractual arrangements and (C) as necessary to address reasonable privilege or confidentiality concerns; *provided, further*, that any of the parties may, as each deems advisable and necessary, reasonably designate any competitively sensitive material provided to the other under this Section 6.3(b) as "Outside Counsel Only Material" and materials so designated shall only be provided to each party's outside counsel.

(c)    In connection with and without limiting the foregoing or Section 6.5, the Seller shall give any notices to third parties required under Assigned Contracts, and the Seller shall, subject to any approval of the Bankruptcy Court that may be required, reasonably cooperate with the Purchaser in endeavoring to obtain third-party consents to any Assigned Contracts that cannot be transferred or assigned effectively without the consent of such third parties (after giving effect to the Sale Order and the Bankruptcy Code).

(d)    Notwithstanding the foregoing, the obligations of the parties hereto to obtain any consent, approval or waiver from the Bankruptcy Court shall be governed exclusively by Section 6.6 and Section 6.7.

Section 6.4    Betadine and Senokot Licenses; Deferred Assets.

(a)    Notwithstanding anything contained in this Agreement to the contrary, the Purchaser acknowledges that (i) certain Intellectual Property related to those Products marketed in the United States as of the date hereof under the brands BETADINE and BETASEPT (the "Betadine Licensed IP") and SENOKOT (the "Senokot Licensed IP") are licensed to the Seller by Pharmaceutical Research Associates Inc. ("PRA") pursuant to the Betadine Agreement and the Senokot Agreement, respectively, and (ii) as of the date hereof, PRA is party to that certain Agreement, dated March 5, 1999, with Alcon Universal Limited (as amended from time to time, the "Alcon Agreement"), concerning a Betadine® 5%- Sterile Ophthalmic Prep Solution, to which Alcon Agreement the Seller is not a party.

(b)    In the event that the PRA Separation Agreement and Separation & Coexistence Agreement are entered into at any time following the date hereof, the Seller hereby agrees that it shall promptly sell and assign to the Purchaser all of its right, title and interest in (and, as applicable, the Purchaser agrees it shall assume the Seller's obligations under) (i) the Betadine Licensed IP, upon receipt of the Betadine Contingent Consideration, (ii) the Senokot Licensed IP, upon receipt of the Senokot Contingent Consideration, (iii) subject to obtaining any required third-party consent pursuant to Section 6.3, the Alcon Agreement, upon receipt of the Alcon Contingent Consideration, and (iv) the Separation Assets, in each case, in accordance with this Section 6.4.

(c)    The parties acknowledge and agree that the Betadine Agreement and Senokot Agreement constitute Assigned Contracts hereunder.  Notwithstanding the foregoing, and without limitation to Sections 6.3 and 6.4, in the event that such Contracts may not be assigned to the Purchaser as contemplated hereunder at Closing for any reason, the Seller agrees that it shall sublicense the Betadine Licensed IP and Senokot Licensed IP to the Purchaser upon the Closing and until such time when the PRA Separation Agreement and Separation & Coexistence Agreement are entered into and the Seller is able to make the applicable

assignments to the Purchaser in accordance with <u>Section 6.4(b)</u>, pursuant to the Sublicense Agreement.

(d) As soon as practicable after the date hereof, the Seller shall use its reasonable best efforts to obtain and deliver to the Purchaser consent (in a form reasonably acceptable to the Purchaser and which allows assignment of the applicable license without modification) from PRA to assignment of each of (i) the Amended and Restated License Agreement regarding the Betadine Licensed IP and (ii) the Amended and Restated License Agreement regarding the Senokot Licensed IP, to the Purchaser, with such assignments (if consented to by PRA) to take effect as of the Closing; *provided* that the Seller shall not be obligated to pay any monetary amounts to PRA in connection with obtaining such consent.

Section 6.5    <u>Further Assurances</u>.  In addition to the other provisions of this Agreement, from time to time after the Closing Date, the Seller and the Purchaser shall use reasonable best efforts to execute and deliver such other instruments of conveyance, transfer or assumption, as the case may be, and take such other action as may be reasonably requested by the Purchaser or the Seller, as applicable, to consummate the conveyance and transfer of the Acquired Assets to the Purchaser and the assumption of the Assumed Liabilities by the Purchaser; *provided* that nothing in this <u>Section 6.5</u> shall (a) require the Seller to make any expenditure or incur any obligation on its own or on behalf of the Purchaser (unless funds in the full amount thereof are advanced to the Seller in cash) or (b) prohibit the Seller from ceasing operations or winding up its affairs following the Closing.  If, following the Closing, the Seller, or any successor, receives or becomes aware that it holds or possesses any asset, property or right which constitutes an Acquired Asset, then the Seller shall transfer, and shall cause its Affiliates to transfer, such asset, property or right to the Purchaser and/or, as applicable, one or more designees of the Purchaser as promptly as practicable for no additional consideration, and, until such time that the Seller transfers, or causes to be transferred, such Acquired Asset to the Purchaser in accordance with this <u>Section 6.5</u>, the Seller hereby grants, and shall cause its Affiliates to grant, to the Purchaser and its Affiliates a non-exclusive, royalty-free (except any royalty, license fee or other similar amounts payable to a third party and accrued after the Effective Date), fully paid-up, worldwide, irrevocable, sublicensable and transferable right and license (or sublicense, as the case may be) to the extent such rights would not (i) breach any Contract or (ii) violate any applicable Laws, to fully use, practice and otherwise exploit such Acquired Asset in the conduct of the Business, effective as of the Closing Date.  If, following the Closing, the Purchaser receives or becomes aware that it holds any asset, property or right which constitutes an Excluded Asset, then the Purchaser shall transfer such asset, property or right to the Seller and/or, as applicable, one or more designees of the Seller as promptly as practicable for no additional consideration.  Until such transfer is effective, the Purchaser or the Seller, as applicable, shall (or shall cause its applicable Affiliate to) use reasonable best efforts to preserve the value of, and hold in trust for the use and the benefit of the Purchaser or the Seller, as applicable, such right, property or asset and provide to the Purchaser or the Seller, as applicable, all of the benefits arising from such right, property or asset.

Section 6.6    <u>Cooperation with Respect to Bankruptcy Court Approvals</u>.  The Purchaser shall take such actions as are reasonably requested by the Seller to assist in obtaining entry by the Bankruptcy Court of the Bidding Procedures Order and the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes

of, among other things: (a) demonstrating that the Purchaser is a "good faith" purchaser within the meaning of Section 363(m) of the Bankruptcy Code; and (b) establishing "adequate assurance of future performance" within the meaning of Section 365 of the Bankruptcy Code.

Section 6.7    Bankruptcy Court Filings.  As soon as reasonably practicable following the date of this Agreement, the Seller shall file, or cause to be filed, any motions, pleadings, notices or proposed Orders necessary or advisable in order to receive approval of the Bidding Procedures Order and the Sale Order by the Bankruptcy Court.  The Seller shall consult with the Purchaser concerning the Bidding Procedures Order, the Sale Order and any other Orders of the Bankruptcy Court relating to the transactions contemplated herein, and the bankruptcy proceedings in connection therewith, and, to the extent reasonably practicable, provide the Purchaser with copies of any material applications, pleadings, notices, proposed Orders and other documents to be filed by the Seller in the Chapter 11 Cases that relate in any way to this Agreement, the Acquisition, the Bidding Procedures or the Purchaser at least three (3) Business Days prior to the making of any such filing or submission to the Bankruptcy Court.  From the date hereof until the earlier of (a) the termination of this Agreement in accordance with terms hereof and (b) the Closing Date, the Seller shall continue to pursue the entry of the Bidding Procedures Order and the Sale Order by the Bankruptcy Court.

Section 6.8    Alternate Bidder.  If an Auction is conducted, and the Seller does not choose the Purchaser as the Successful Bidder, but instead chooses the Purchaser as the Alternate Bidder, the Purchaser will be the Alternate Bidder.  If the Purchaser is chosen as the Alternate Bidder, the Purchaser will be required to keep its bid to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be improved upon by the Purchaser prior to or at the Auction) open and irrevocable until the closing of the sale of the Acquired Assets to the Successful Bidder.  If the Superior Proposal with the Successful Bidder is terminated prior to the termination of this Agreement, the Purchaser will be deemed to be the Successful Bidder and will forthwith consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be improved upon by the Purchaser prior to or at the Auction).

Section 6.9    Communications with Customers and Suppliers.  Prior to the Closing or the termination of this Agreement in accordance with Article VIII, the Purchaser shall not, and shall cause its Affiliates and Representatives not to, contact, or engage in any discussions or otherwise communicate with, any Person whom the Purchaser knows (or should reasonably know) to be the Seller's customers, suppliers, licensors, licensees and other Persons whom the Purchaser knows (or should reasonably know) to be a Person with which the Seller has commercial dealings without obtaining the prior written consent of the Seller (other than any such communications in the ordinary course of business of the Purchaser or its Affiliates without reference to the Business, the Acquired Assets, the Assumed Liabilities or the transactions contemplated by this Agreement).

Section 6.10    Employee Matters.

(a)    Effective as of the Closing Date, and contingent upon the occurrence of the Closing, the Purchaser or one of its Affiliates shall make offers of employment to each of the Business Employees employed by the Seller or any of its Affiliates as of the Closing Date (the

"Offer Employees"). Such offers of employment shall be made at least fifteen (15) days prior to the anticipated Closing Date, or within five (5) Business Days of the applicable date of hire with respect to any such individual who becomes a Business Employee within the fifteen (15)-day period prior to the Closing Date. Subject to the provisions of this Section 6.10(a), each offer of employment to an Offer Employee shall initially provide (i) the same or substantially similar position and title held by such Offer Employee as of immediately prior to the Closing, (ii) the same or substantially similar duties, authority and responsibilities performed by such Offer Employee as of immediately prior to the Closing, (iii) a primary work location the same as his or her work location immediately prior to the Closing (or, for Offer Employees whose primary work location is remote or who has a flexible schedule that permits remote working dates, continued ability to work remotely), (iv) a base salary or base wage rate and short- and long-term cash target bonus opportunities in each case no less favorable than as provided to such Offer Employee by the Seller or any of its Affiliates as of immediately prior to the Closing and (v) other employee benefits (but excluding equity or equity-based compensation or incentive based compensation other than as set forth in clause (iv)) that are substantially comparable in the aggregate to those provided to such Offer Employee as of immediately prior to the Closing. The Purchaser shall prepare a form of the offer letter to be sent to the Offer Employees in connection with this Section 6.10(a) and deliver to the Seller within five (5) days prior to the date such offer letters are to be shared with the Offer Employees. The Seller shall be given at least three (3) days to review and comment on the form of the offer letter before such offer letters are shared with the Offer Employees, and the Purchaser shall consider in good faith all comments of the Seller and its counsel in connection therewith. Each individual who accepts the offer of employment pursuant to this Section 6.10(a) and actually commences employment with the Purchaser or one of its Affiliates as of the Closing Date shall be deemed a "Transferred Employee." The Seller shall terminate the employment of the Offer Employees effective as of immediately prior to the Closing. Seller and the Purchaser intend that the transactions contemplated by this Agreement shall not constitute a separation, termination or severance of employment of any Business Employee for purposes of any severance, separation pay or similar plan or policy that provides for separation, termination or severance benefits. Subject to the Purchaser's compliance with this Section 6.10, the Seller and its Affiliates shall be solely responsible for any and all Liabilities relating to such separation, termination or severance benefits in connection with the transactions contemplated hereby.

(b)     On or before the Closing Date, the Seller shall provide a list of the name and site of employment of any and all of its employees who have experienced, or will experience, an employment loss or layoff (as defined by the WARN Act) within ninety (90) days prior to the Closing Date. The Seller shall update this list up to and including the Closing Date. For a period of ninety (90) days after the Closing Date, the Purchaser shall not engage in any conduct which would result in an employment loss or layoff for a sufficient number of employees of the Purchaser which, if aggregated with any such conduct on the part of the Seller prior to the Closing Date, would trigger the WARN Act.

(c)     Except as set forth in this Section 6.10, the Seller and its Affiliates will retain all Liabilities under each Benefit Plan and any other benefit or compensation plan, program, policy, agreement or arrangement at any time sponsored, maintained, contributed to or required to be contributed to by the Seller or any of its Affiliates or under or with respect to which the Seller or any of its Affiliates has (or has had) any Liability, and no assets or Liabilities

of any Benefit Plan will be transferred to the Purchaser or any benefit plan maintained by the Purchaser and no Transferred Employee shall accrue any benefits under any Benefit Plans in respect of service with the Purchaser or any of its Affiliates after the Closing.

(d)    For the period commencing on the Closing Date and continuing through December 31, 2024 (or, if earlier, until the date of termination of employment of the relevant Transferred Employee) (the "Continuation Period"), the Purchaser shall cause one of its Subsidiaries to provide each Transferred Employee with (i) base salary or base wage rates and short- and long-term cash target bonus opportunities that are each no less favorable than those in effect for each such Transferred Employee immediately prior to the Closing and (ii) employee benefits (but excluding equity or equity-based compensation, defined benefit pension, post-employment welfare, change in control, retention and nonqualified deferred compensation) that are substantially comparable in the aggregate to those employee benefits (subject to the same exclusions) provided to such Transferred Employee as of immediately prior to the Closing under the Benefit Plans listed on Section 3.14(a) of the Seller Disclosure Letter.  With respect to each Transferred Employee who is terminated without cause by the Purchaser or one of its Affiliates during the Continuation Period, the Purchaser shall, or shall cause one of its Affiliates to, provide such Transferred Employee with cash severance payments and benefits at a level that is no less than those set forth under the applicable Benefit Plan set forth on Section 6.10(d) of the Seller Disclosure Letter.  On the Closing Date, to the extent permitted by applicable Law and, if required by applicable Law, provided the applicable Transferred Employee consents to the transfer of such individual's Paid Time Off to the Purchaser (or its Affiliates as applicable), the Purchaser shall, or shall cause its Affiliates to, credit all Paid Time Off of each such Transferred Employee, with such Paid Time Off to be used in accordance with the Purchaser's (or its Affiliates') paid time off policies as in effect from time to time.  The Seller shall timely pay or shall cause to be timely paid all amounts due to the Transferred Employees through and including the Closing Date with respect to their employment with, or termination of such employment by, the Seller or its Affiliates, including amounts due as wages, salary, commissions and any amounts set forth on Section 6.10(i) of the Seller Disclosure Letter, as well as any Paid Time Off that is not transferred to the Purchaser or its Affiliates.

(e)    The Purchaser shall, or shall cause one of its Affiliates to, provide to each Transferred Employee full credit for such Transferred Employee's service with the Seller and its Affiliates prior to the Closing for purposes of eligibility to participate, vesting of Section 401(k) contributions, and, with respect to paid time off and severance only, determining the level of benefits (other than defined benefit pension accruals, long-term incentive plans or equity based compensation plans maintained by the Purchaser or one of its Affiliates), under any benefit plan of the Purchaser or its applicable Affiliate in which such Transferred Employee participates on or following the Closing (including severance provided pursuant to Section 6.10(d)) to the same extent and for the same purpose as such service was recognized by the Seller or its Affiliates immediately prior to the Closing under the corresponding Benefit Plan; *provided* that such service shall not be recognized to the extent that such recognition would result in a duplication of compensation, benefits or coverage.  The Purchaser shall cause its applicable Subsidiary, for the plan year that includes the Closing Date, to use commercially reasonable efforts to: (i) waive any limitation on group health and welfare benefit coverage of such Transferred Employees due to pre-existing conditions, waiting periods, active employment requirements and requirements to show evidence of good health under any applicable group health and welfare benefit plan of the

Purchaser or its applicable Subsidiary to the extent such requirements were met or otherwise waived under a corresponding Benefit Plan and (ii) credit each such Transferred Employee with all eligible payments, co-payments and co-insurance paid by such Transferred Employee and credited under any Benefit Plan during the portion of the plan year prior to the Closing Date for the purpose of determining the extent to which any such Transferred Employee has satisfied any applicable deductible and whether such Transferred Employee has reached the out-of-pocket maximum limits under any corresponding benefit plan of the Purchaser or its applicable Subsidiary for the applicable plan year.

(f)     As of or as soon as administratively practicable following the Closing Date, the Purchaser shall allow (or shall cause one of its Affiliates to cover) each Transferred Employee who is a participant in a Benefit Plan that is a tax-qualified defined contribution plan ("Seller 401(k) Plan") to participate under a tax-qualified defined contribution plan established or maintained by the Purchaser or one of its Affiliates ("Purchaser 401(k) Plan"), in accordance with the terms of the Purchaser 401(k) Plan.  Effective not later than sixty (60) days following the Closing Date or as soon as administratively practicable thereafter, the Purchaser shall (or shall cause one of its Affiliates to) to use commercially reasonable efforts to accept eligible rollover distributions (as defined in Section 402(c)(4) of the Code) from Transferred Employees' accounts under the Seller 401(k) Plan to the applicable Purchaser 401(k) Plan, to the extent permitted by the Purchaser 401(k) Plan and elected by the Transferred Employee in accordance with the terms of the Seller 401(k) Plan, with respect to any account balances (including notes for plan loans) distributable in cash within an administratively reasonable time after the Closing Date.

(g)     The Purchaser shall be responsible for all claims for benefits in respect of workers compensation that are based upon Transferred Employees' injuries or illnesses that occur after the Closing.  The Seller or its Affiliates shall be responsible for claims for benefits in respect of workers compensation that are based upon the Transferred Employees' injuries or illnesses that occur on or prior to the Closing.

(h)     Except as required by Law or the terms of any Benefit Plan, effective as of the last day of the month in which the Closing Date occurs, each Transferred Employee shall cease active participation in the health and welfare benefit plans of the Seller and its Affiliates (each a "Seller Welfare Plan") and shall commence participation in the health and welfare benefit plans maintained by the Purchaser or its applicable Affiliate (the "Purchaser Welfare Plans") as soon as administratively practicable thereafter (the "Welfare Commencement Date").  The Seller and its Affiliates shall be responsible for providing benefits in respect of claims incurred under a Seller Welfare Plan by Transferred Employees and their beneficiaries and dependents through the last day of the month in which the Closing occurs.  Benefits in respect of all welfare plan claims incurred by Transferred Employees on or after the Welfare Commencement Date under Purchaser Welfare Plans shall be provided by the Purchaser or is applicable Subsidiary under the applicable Purchaser Welfare Plan.  For purposes of this Section 6.10(h), the following claims shall be deemed to be incurred as follows: (i) life, accidental death and dismemberment and business travel accident insurance benefits, upon the death or accident giving rise to such benefits and (ii) health or medical, dental, vision care and/or prescription drug benefits, upon provision of the applicable services, materials or supplies.  The Seller and its Affiliates shall be solely responsible for any and all Liabilities under

Section 4980B of the Code with respect to all "M&A qualified beneficiaries" as defined in Treasury Regulation Section 54.4980B-9.

(i)     With respect to any Transferred Employee who, as of the Closing Date, was a participant in the KERP, subject to any approval of the Bankruptcy Court that may be required, or is otherwise eligible for retention payments from the Seller or its Affiliates, the Seller or any of its Affiliates shall be responsible for and shall pay any amounts payable under the KERP and any other retention payment to such Transferred Employee to the extent provided by the terms and conditions of the KERP or such other retention program, as applicable.  Any cash amounts to be paid by the Seller to each Transferred Employee in connection with or following the Closing pursuant to the KERP or any other retention arrangement shall be listed on Section 6.10(i) of the Seller Disclosure Letter (as may be updated prior to the Closing) and will be treated as Transaction Expenses.

(j)     Nothing in this Section 6.10 shall constitute or be construed (i) as an establishment, amendment, termination or other modification of any Benefit Plan or any other benefit or compensation plan, program, policy, agreement or arrangement, or a restriction or other limitation on the right of the Purchaser or any of its Affiliates to amend, terminate or otherwise modify any such plans or arrangements, (ii) as a guarantee of employment for any period, or a restriction or other limitation on the right of the Purchaser or any of its Affiliates to terminate the employment or service or the terms and conditions of employment or service of any individual at any time, or (iii) to create any third-party claims, rights or benefits (including any third-party beneficiary claims) in any Person other than the direct parties to this Agreement, including any current or former service provider of the Seller (or any beneficiaries or dependents thereof).

Section 6.11    Payments Received.  The Seller and the Purchaser agree that after the Closing they will hold and will promptly transfer and deliver to the other, from time to time as and when received by them or their respective Affiliates, any cash, checks with appropriate endorsements (using their best efforts not to convert such checks into cash) or other property that they may receive on or after the Closing which properly belongs to the other party hereto or its Affiliates and will account to the other for all such receipts.

Section 6.12    Use of Names and Marks.  The Purchaser and its Affiliates acknowledge and agree that, notwithstanding the transfer of Business Owned Intellectual Property included in the Acquired Assets, (a) the Seller may continue using its current corporate name during the pendency of the Chapter 11 Cases and any additional time during which the Seller winds down its affairs, and (b) the Seller shall be entitled to use and refer to names and marks included in the Acquired Assets in filings with Governmental Entities, solely for factual or historical reference, and in references to such names and marks in historical and Tax records, as permitted by applicable Law.

Section 6.13    Transition of Assigned Product Numbers.

(a)     The Seller hereby transfers to the Purchaser all rights, title, interests and obligations relating to the Assigned Product Numbers, including the Seller's Labeler Code (67618).  The parties intend for Section 1.1(n) to constitute a conveyance of legal title to the

51

Assigned Product Numbers under applicable law, and the provisions of this Section 6.13 shall constitute an assignment of "all commercial rights" with respect to the Products, in each case, as of the Closing Date.

(b)     As promptly as practicable after the Closing Date, the parties shall take all reasonable steps needed to accomplish the transfer of Labeler Code 67618 and the Assigned Product Numbers to the Purchaser, including, without limitation, any required filings with the FDA or other applicable Regulatory Authority and, as applicable, with regard to Customer agreements and Government Program agreements.

Section 6.14   Transfer of Regulatory Matters.  As promptly as practicable after the Closing, the Seller and the Purchaser shall file with the FDA and any other applicable Regulatory Authority the notices and information required pursuant to any applicable regulation or requirement to transfer the Regulatory Authorizations from the Seller to the Purchaser.  The parties also agree to use all commercially reasonable efforts to take any and all other actions required by the FDA and any other applicable Regulatory Authority to effect the transfer of the Regulatory Authorizations from the Seller to the Purchaser.

Section 6.15   Seller Confidentiality Agreements.  Effective at the Closing, the Seller hereby assigns to the Purchaser the rights under the Seller Confidentiality Agreements to enforce the non-use, non-disclosure and return or destruction of "Confidential Information" (as such term is defined in the Seller Confidentiality Agreements) to the extent related to the Business, the Acquired Assets and the Assumed Liabilities and the non-solicitation provisions with respect to the Transferred Employees; *provided* that the Seller retains all other rights and remedies thereunder.

Section 6.16   Governmental Price Calculations and Reporting Obligations.

(a)     Government Program Participation.

(i)     *Compliance with Government Program Requirements*.

(1)     As of the Closing Date, the Purchaser intends to maintain the Seller's existing Medicaid coverage of certain of the Products.  Therefore, on and after the Closing Date, the Purchaser shall comply with the relevant requirements of the Medicaid Drug Rebate Program, the 340B Program, and the VA Federal Supply Schedule Program (collectively, the "Government Programs"), including transfer of the Seller's Government Program contracts to the Purchaser as described further in Section 6.16(b).  The Seller shall bear no responsibility for the Purchaser's failure to comply with any such applicable obligations.

(2)     Following the Closing Date, the Purchaser may elect to voluntarily terminate its participation in the Government Programs at any time, subject to the respective Government Programs' notification and other relevant requirements.

(ii)   *Post-Closing Transition Period.*

(1)   Subject to the terms and conditions of this Agreement, beginning on the Closing Date and continuing until the end of the applicable term as set forth in the Transition Services Agreement, Seller, either directly or indirectly through one or more of its Affiliates or third parties, shall provide to the Purchaser the services described in Exhibit D, pursuant to the terms of the Transition Services Agreement, as amended, supplemented and modified from time to time by mutual written agreement of the parties.

(2)   In addition to this Section 6.16, the Transition Services Agreement shall also set forth each party's financial, legal and operational responsibilities following the Closing Date pertaining to compliance with Governmental Price Calculations and Reporting obligations, processing and payment of associated Payment Claims (including, without limitation, Rebates, Chargebacks, Medicaid Payments, 340B Chargebacks and Rebates, and FSS Chargebacks and IFF), and processing of Product Returns.

(b)   Contract Transfer.  The Seller's Medicaid National Drug Rebate Agreement and 340B Pharmaceutical Pricing Agreement shall automatically assign to the Purchaser on the Closing Date pursuant to the terms of the respective agreements (specifically, those pertaining to the change in ownership of Labeler Code 67618).  The Seller's VA FSS Contract does not automatically assign to the Purchaser upon Closing.  Instead, as soon as reasonably practicable after the Closing Date, the parties shall work together to either novate the Seller's VA FSS Contract to the Purchaser (if the Seller's pending VA FSS Contract proposal is awarded at that time) or recognize the Purchaser as the successor in interest to the Seller's pending VA FSS proposal if no VA FSS Contract has yet been awarded to the Seller.

(c)   Notification of Governmental Inquiry.  The Purchaser shall notify the Seller within ten (10) days of receiving notice of any inspection, investigation or other inquiry by, or other governmental notice or communication from CMS, the U.S. Department of Health and Human Services Office of Inspector General, HRSA, the VA or any other Governmental Entity, relating to any Price Calculations for the Products that is based in whole or in part on data or other information provided by the Seller to the Purchaser.  This obligation extends to any subsequent revisions to such Price Calculations.

Section 6.17   Sale Free and Clear.  The Seller acknowledges and agrees, and the Sale Order shall provide that, except as otherwise provided in Section 1.3, on the Closing Date and concurrently with the Closing, all then existing or thereafter arising obligations, Liabilities and Encumbrances of, against or created by the Seller or its bankruptcy estate, to the fullest extent permitted by Section 363 of the Bankruptcy Code, shall be fully released from and with respect to the Acquired Assets.  On the Closing Date, the Acquired Assets shall be transferred to the Purchaser free and clear of all obligations, Liabilities and Encumbrances, other than Permitted Post-Closing Encumbrances and the Assumed Liabilities to the fullest extent permitted by Section 363 of the Bankruptcy Code and applicable law.

Section 6.18    <u>Financing</u>.

(a)    From the date hereof through the Closing Date, subject to the limitations set forth herein, and unless otherwise agreed by the Purchaser (such agreement not to be unreasonably withheld or delayed), the Seller will use commercially reasonable efforts to cooperate with the Purchaser as reasonably requested by the Purchaser, and at the Purchaser's sole cost and expense, in connection with the Purchaser's arranging and obtaining debt financing for the transactions contemplated by this Agreement (the "<u>Debt Financing</u>").  Such assistance shall include using commercially reasonable efforts to: (i) upon reasonable advance notice, participate in a reasonable number of due diligence sessions with prospective debt financing sources and their Representatives at times to be mutually agreed upon and during normal business hours of the Seller; (ii) reasonably assist (including participating in drafting sessions) with the preparation of customary marketing materials, in each case to the extent such materials relate to information concerning the Seller or the Acquired Assets for rating agency presentations, lender presentations and similar documents customarily required in connection with arranging and marketing the Debt Financing; (iii) furnish the Purchaser with information with respect to the Acquired Assets required and reasonably requested in writing by the sources of the Debt Financing at least ten (10) Business Days prior to the Closing Date under applicable "know your customer" and anti-money laundering rules and regulations; and (iv) reasonably assist the Purchaser with satisfying the conditions precedent set forth in any commitment letter or definitive agreements for the Debt Financing to the extent the satisfaction of such conditions requires the cooperation of or is within the control of the Seller or its Subsidiaries.

(b)    The cooperation requirement in the foregoing <u>Section 6.18(a)</u> shall not require the Seller or its Affiliates to: (i) execute or enter into any agreement (whether or not conditioned on the Closing), (ii) cause any director, officer or employee to incur any personal liability or breach any fiduciary duty, (iii) prepare any financial statements or information that are not reasonably available to it and prepared in the ordinary course of its financial reporting practice (including any projections or pro forma financial information), (iv) require the delivery of any financial statements in a form or subject to a standard different than those provided to the Purchaser on or prior to the date hereof, (v) require delivery of any legal opinions or accountants' cold comfort letters or reliance letters, (vi) pay any commitment or other fee, provide any security or incur any liability or obligation in connection with the Debt Financing or any other financing, (vii) take or permit the taking of any action or provide any information that would or would reasonably be expected to (A) conflict with, result in any violation or breach of, or default (with or without lapse of time, or both) under, its organizational documents, or any applicable Law or its material Contracts, (B) result in a loss of or jeopardize any attorney-client privilege, attorney work product protections or similar protections or (C) result in the disclosure of any trade secrets or similar non-financial proprietary information, violate or conflict with any obligations of the Seller, its Subsidiaries or any other Person with respect to confidentiality, (viii) waive or amend any terms of this Agreement or cause any representation or warranty in this Agreement to be breached or cause any condition to Closing to fail to be satisfied or otherwise cause any breach of this Agreement or (ix) take any action in connection with this <u>Section 6.18</u> that would interfere unreasonably with the business or operations of the Seller or its Subsidiaries.  The Purchaser agrees that in no event shall the Seller or any of its Affiliates be required to execute or deliver any documents in connection with the Debt Financing.

(c)     As a condition to the Seller's obligations pursuant to this <u>Section 6.18</u>, the Purchaser shall promptly, upon request by the Seller, reimburse the Seller for all documented out-of-pocket costs and expenses (including attorney's fees and expenses and disbursements) incurred by the Seller, its Subsidiaries and its and their respective Representatives in connection with the cooperation contemplated by this <u>Section 6.18</u>.  The Purchaser acknowledges and agrees that the Seller, its Subsidiaries and their respective Representatives shall not have any responsibility for, or incur any liability to any Person under, any financing that the Purchaser may raise in connection with the transactions contemplated by this Agreement (including the Debt Financing) or any cooperation provided pursuant to Section 6.18(a), and shall indemnify and hold harmless the Seller, its Subsidiaries and their respective Representatives, from and against any and all losses suffered or incurred by any of them in connection with the Debt Financing or any alternative financing and any information utilized in connection therewith.

(d)     This <u>Section 6.18</u> shall be the only provision in this Agreement setting forth the Seller's obligations to cooperate or provide information or access or take any other action in respect of the Debt Financing.  Notwithstanding anything to the contrary herein, the failure of the Seller, its Subsidiaries or any Representative thereof to comply with this <u>Section 6.18</u> shall not give rise to the failure of a condition precedent set forth in <u>Section 7.3</u> or termination right pursuant to <u>Section 8.1</u>.  In no event shall the receipt or availability of any funds or financing (including, for the avoidance of doubt, the Debt Financing) by the Purchaser or any of its Affiliates or any other financing be a condition to the Purchaser's obligations under this Agreement.  The Purchaser acknowledges and agrees that the obtaining of any Debt Financing or any alternative financing is not a condition to the Closing, and reaffirms its obligation to consummate the transactions contemplated by this Agreement irrespective and independently of the availability of the Debt Financing or any alternative financing thereof.

Section 6.19     <u>Guarantee</u>.

(a)     In order to induce the Purchaser to enter into this Agreement and the Ancillary Documents, the Guarantor hereby absolutely, unconditionally and irrevocably guarantees to the Seller, the due and punctual payment of all of the Purchaser's payment obligations to the Seller required to be paid by the Purchaser under this Agreement, but subject to the terms and conditions herein (the "<u>Guarantee</u>").

(b)     The obligations guaranteed by the Guarantee are collectively referred to herein as the "<u>Guaranteed Obligations</u>."  The liability of the Guarantor under the Guarantee shall, to the fullest extent permitted by applicable Law, be absolute and unconditional, irrespective of: (i) the illegality of the Guarantee; (ii) the enforceability of this <u>Section 6.19</u> against the Purchaser and the Guarantor; (iii) any release or discharge of any obligation of the Purchaser under this Agreement or any Ancillary Document resulting from any insolvency, bankruptcy, reorganization or other similar proceeding affecting the Purchaser; (iv) the existence of any claim, setoff or other right that the Guarantor may have at any time against the Purchaser, whether in connection with any Guaranteed Obligation or otherwise; or (v) any other act or omission relating to the Guarantee that may or might in any manner or to any extent vary the risk of the Guarantor or otherwise operate as a discharge of the Guarantor as a matter of applicable Law or equity.

(c)    The Seller hereby agrees that to the extent the Purchaser makes, or is otherwise is relieved of, its payment obligations under this Agreement, the Guarantor shall be similarly relieved of its corresponding Guaranteed Obligations under this Guarantee solely in respect of such relieved obligations.  The Seller shall not be obligated to file any claim relating to any Guaranteed Obligation in the event that the Purchaser becomes subject to a bankruptcy, reorganization or similar proceeding, and the failure of the Seller to so file shall not affect the Guarantor's obligations hereunder.  The Guarantor irrevocably waives acceptance, presentment, demand, protest and any notice in respect of the Guarantee not provided for herein.  The obligations of the Guarantor under the Guarantee are continuing and will remain in full force and effect until all obligations of the Purchaser under this Agreement have been performed or paid and satisfied in full.  Notwithstanding anything to the contrary herein, none of the Guarantor's obligations under this <u>Section 6.19</u> shall be assignable to any other Person without the prior written consent of the Seller, and any attempted assignment without such consent shall be null and void and of no force and effect.

(d)    Notwithstanding anything to the contrary hereunder, the Guarantor shall have all defenses available to it in respect of payment and performance of the Guaranteed Obligations that the Purchaser has or would have under the terms of this Agreement and the Ancillary Documents.

Section 6.20    <u>License</u>.  Effective upon the occurrence of the Closing, the Seller hereby grants to the Purchaser a perpetual, irrevocable, royalty-free, fully paid-up, freely transferable, sublicensable, non-exclusive license to use and exploit the Licensed Intellectual Property in the United States and its territories in order to conduct the Business substantially as conducted as of Closing or within the twelve (12) months prior, and as such Business may naturally evolve, including, as applicable, in conjunction with the sale and distribution of Products, line extensions and natural evolutions thereof; *provided* that the foregoing license grant shall not include any Intellectual Property made available, or any services provided, under the Transition Services Agreement.

Section 6.21    <u>Insurance Cooperation</u>.  From and after the date hereof, the Seller shall use its reasonable best efforts to cooperate with the Purchaser's efforts to bind insurance policies in connection with the Acquired Assets that are reasonably acceptable to the Purchaser, including by, subject to the provisions of <u>Section 6.2</u>, making available due diligence materials reasonably requested by the Purchaser in connection therewith.

Section 6.22    <u>Transition Services Agreement</u>.  As soon as reasonably practicable following the date hereof and until the earlier of the Closing Date or the valid termination of this Agreement pursuant to <u>Article VIII</u>, the Purchaser and the Seller shall work together in good faith to agree upon the terms and conditions of the Transition Services Agreement, which shall be in customary form and substance and consistent with the terms and conditions set forth in <u>Exhibit D</u> attached hereto.

Section 6.23    <u>Consultation</u>.  From and after the entry of the Sale Order through the Closing Date, the Seller shall use its commercially reasonable efforts to consult with the Purchaser in connection with the matters described in Section 6.23 of the Seller Disclosure Letter.

# ARTICLE VII

## CONDITIONS PRECEDENT

Section 7.1    Conditions Precedent to Obligation of the Seller, the Purchaser and the Guarantor.  The respective obligations of each party hereto to effect the transactions contemplated by this Agreement shall be subject to the satisfaction at or prior to the Closing of the following conditions:

(a)    Approvals.  Any waiting period (and extensions thereof) applicable to the Acquisition under the HSR Act shall have expired or been terminated;

(b)    No Orders.  No Governmental Entity of competent jurisdiction shall have enacted, enforced or entered any Law and no Order shall be in effect on the Closing Date that prohibits the consummation of the Closing; and

(c)    Sale Order.  The Bankruptcy Court shall have entered the Sale Order and such order shall not have been stayed, stayed pending appeal, reversed or vacated as of the Closing Date.

Section 7.2    Conditions Precedent to Obligation of the Seller.  The obligation of the Seller to effect the transactions contemplated by this Agreement shall be subject to the satisfaction or waiver (to the extent permitted by applicable Law) by the Seller at or prior to the Closing of the following conditions:

(a)    Representations and Warranties of the Purchaser. (i) The Purchaser Specified Representations shall be true and correct in all but *de minimis* respects as of the Closing as though made at and as of the Closing Date, and (ii) the representations and warranties of the Purchaser contained in Article IV (other than the Purchaser Specified Representations) shall be true and correct, determined without regard to any qualification as to materiality, as of the Closing Date as though made at and as of the Closing Date, except for such failures to be true and correct as would not, individually or in the aggregate, reasonably be expected to (x) prevent or materially impair or materially delay the Acquisition or transactions contemplated by this Agreement or the Ancillary Documents or (y) affect the ability of the Purchaser to perform its obligations under this Agreement or the Ancillary Documents in any material respect; *provided, however*, that in each of the foregoing clauses (i) and (ii), any representations and warranties that are made as of a particular date or period shall be true and correct (in the manner set forth above), only as of such date or period;

(b)    Representations and Warranties of the Guarantor. (i) The Guarantor Specified Representations shall be true and correct in all but *de minimis* respects as of the Closing as though made at and as of the Closing Date, and (ii) the representations and warranties of the Guarantor contained in Article V (other than the Guarantor Specified Representations) shall be true and correct, determined without regard to any qualification as to materiality, as of the Closing Date as though made at and as of the Closing Date, except for such failures to be true and correct as would not, individually or in the aggregate, reasonably be expected to (x) prevent or materially impair or materially delay the Acquisition or the transactions contemplated by this

57

Agreement or the Ancillary Documents or (y) materially impair the ability of the Guarantor to perform its obligations under this Agreement; *provided, however*, that in each of the foregoing clauses (i) and (ii), any representations and warranties that are made as of a particular date or period shall be true and correct (in the manner set forth above), only as of such date or period;

(c)    Covenants.  The covenants and obligations of the Purchaser to be performed or complied with at or prior to the Closing pursuant to this Agreement shall have been duly performed and complied with in all material respects; and

(d)    Officer's Certificate.  The Purchaser shall have delivered to the Seller a certificate duly executed by an authorized officer of the Purchaser certifying to the effect that the conditions set forth in Section 7.2(a) and Section 7.2(c) have been satisfied.

Section 7.3    Conditions Precedent to Obligation of the Purchaser and the Guarantor. The obligation of the Purchaser and the Guarantor to effect the transactions contemplated by this Agreement shall be subject to the satisfaction or waiver (to the extent permitted by applicable Law) by the Purchaser and the Guarantor at or prior to the Closing of the following conditions:

(a)    Representations and Warranties.  (i) The Seller Fundamental Representations shall be true and correct in all but *de minimis* respects at and as of the Closing Date as though made at and as of the Closing Date, (ii) the representations and warranties of the Seller set forth in Article III (other than the Seller Fundamental Representations and the representations and warranties set forth in Section 3.8(b)) shall be true and correct, determined without regard to any qualification as to materiality or "Material Adverse Effect," at and as of the Closing Date as though made at and as of the Closing Date, except for such failures to be true and correct as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect and (iii) the representations and warranties of the Seller set forth in Section 3.8(b) shall be true and correct at and as of the Closing Date as though made at and as of the Closing Date; *provided, however*, that, in each case of the foregoing clauses (i) through (iii), any representations and warranties that are made as of a particular date or period shall be true and correct (in the manner set forth above), only as of such date or period;

(b)    Covenants.  The covenants and obligations of the Seller to be performed or complied with at or prior to the Closing pursuant to this Agreement shall have been duly performed and complied with in all material respects;

(c)    No MAE.  From the date of this Agreement until the Closing, there shall not have been a Material Adverse Effect; and

(d)    Officer's Certificate.  The Seller shall have delivered to the Purchaser a certificate duly executed by an executive officer of the Seller certifying to the effect that the conditions set forth in Section 7.3(a), Section 7.3(b) and Section 7.3(c) have been satisfied.

Section 7.4    Concurrent Delivery.  It shall be a condition of the Closing that all matters of payment and the execution and delivery of documents, in each case, at Closing by any party to another pursuant to the terms of this Agreement shall be concurrent requirements and that nothing will be complete at the Closing until everything required to be complete at the Closing has been paid, executed and delivered, as the case may be.

## ARTICLE VIII

## TERMINATION

Section 8.1      Termination.

(a)      This Agreement may be terminated by either the Purchaser or the Seller in the event that the Closing has not occurred on or before September 11, 2023, or such later date as may be agreed in writing by the parties in their sole discretion (the "Outside Date"); *provided* that the right to terminate this Agreement pursuant to this Section 8.1(a) shall not be available to any party if such party has failed to materially perform or willfully breached any of its obligations under this Agreement required to be performed by it at or prior to the Closing and such failure to perform or willful breach is the proximate cause for the failure of the Closing to occur on or before the Outside Date.

(b)      This Agreement may also be terminated prior to the Closing:

(i)      at any time by the mutual written agreement of the Purchaser and the Seller;

(ii)      by the Purchaser, if (x) there shall have been a breach of any of the covenants or agreements or any of the representations or warranties set forth in this Agreement on the part of the Seller which breach, either individually or in the aggregate with other breaches by the Seller, would result in, if occurring or continuing on the Closing Date, the failure of the conditions set forth in Section 7.3(a), Section 7.3(b) or Section 7.3(c), as the case may be, or (y) there has been any material breach by the Seller of the Bidding Procedures Order or the Sale Order, in each case which is not cured within ten (10) Business Days following written notice to the Seller thereof (and in any event prior to the Outside Date) or which by its nature or timing cannot be cured within such time period (*provided* that the Purchaser is not then in breach of any of the covenants, agreements, representations or warranties set forth in this Agreement on the part of the Purchaser which such breach would give rise to the failure of any of the conditions specified in Section 7.1 or Section 7.2);

(iii)      by the Seller, if (x) there shall have been a breach of any of the covenants or agreements or any of the representations or warranties set forth in this Agreement on the part of the Purchaser which breach, either individually or in the aggregate with other breaches by the Purchaser, would result in, if occurring or continuing on the Closing Date, the failure of the conditions set forth in Section 7.2(a) or Section 7.2(c), as the case may be, or (y) there has been any material breach by the Purchaser of the Bidding Procedures Order or the Sale Order, in each case which is not cured within ten (10) Business Days following written notice to the Purchaser thereof (and in any event prior to the Outside Date) or which by its nature or timing cannot be cured within such time period (*provided* that the Seller is not then in material breach of any of the covenants, agreements, representations or warranties set forth in this Agreement on the part of the Seller which such breach would give rise to the failure of any of the conditions specified in Section 7.1 or Section 7.3);

(iv)     by the Purchaser, if (x) the Chapter 11 Cases are dismissed or converted to a liquidation proceeding under Chapter 7 of the Bankruptcy Code, (y) a trustee under Chapter 11 of the Bankruptcy Code is appointed in the Chapter 11 Cases, or (z) an examiner is appointed with expanded powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code in the Chapter 11 Cases;

(v)     by the Purchaser, if the Seller announces its intention to, or files a notice or motion to, pursue or enter into any Superior Proposal (unless the Purchaser is the Alternate Bidder) or other transaction that would make the consummation of the transaction contemplated by this Agreement or the satisfaction of any conditions herein impossible, including, for the avoidance of doubt, a standalone plan of reorganization or liquidation or another sale or recapitalization transaction;

(vi)     by the Purchaser, if the Bankruptcy Court enters any Order materially inconsistent with the Bidding Procedures Order, the Sale Order or the Acquisition;

(vii)     by either the Seller or the Purchaser, if a Governmental Entity issues a final, non-appealable ruling or Order permanently prohibiting the transactions contemplated hereby;

(viii)     by the Purchaser, if any creditor of the Seller obtains a final and unstayed Order of the Bankruptcy Court granting relief from the automatic stay to foreclose on any material portion of the Acquired Assets;

(ix)     by either the Seller or the Purchaser, if the Purchaser is not the Successful Bidder or the Alternate Bidder at the Auction;

(x)     by either the Seller or the Purchaser, if (x) the Seller enters into a definitive agreement providing for a Superior Proposal, and the Purchaser is not the Alternate Bidder at the Auction or (y) the Seller enters into a definitive agreement providing for a Superior Proposal, the Purchaser is the Alternate Bidder at the Auction, and the closing of the sale of the Acquired Assets to the Successful Bidder pursuant to such Superior Proposal has occurred;

(xi)     by either the Seller or the Purchaser, if, after their respective entry, either the Bidding Procedures Order or Sale Order ceases to be in full force and effect; or

(xii)     by the Seller if the board of directors of Purdue Pharma Inc. determines, in consultation with outside legal counsel, that proceeding with the Closing and consummating the transactions contemplated hereby or failing to terminate this Agreement would be inconsistent with the board of directors of Purdue Pharma Inc.'s fiduciary duties under applicable Law, including to pursue a Superior Transaction.

Section 8.2    Effect of Termination.  Except as otherwise provided in this Section 8.2, in the event of termination of this Agreement by any party hereto in accordance with Section 8.1, all rights and obligations of the parties under this Agreement shall terminate without any liability of any party to any other parties hereto, except for liability for Fraud or willful and material

breach of this Agreement prior to such termination.  The provisions of this <u>Section 8.2</u>, <u>Section 8.3</u>, <u>Article IX</u> (other than <u>Section 9.2</u> and <u>Section 9.3</u>) and, with respect to any defined terms used in the foregoing Sections or Article, <u>Article X</u> shall expressly survive the termination of this Agreement.  Except as otherwise provided in <u>Section 9.10</u>, (i) if this Agreement is validly terminated under <u>Section 8.1(b)(ii)</u>, <u>Section 8.1(b)(ix)</u>, <u>Section 8.1(b)(x)</u> or <u>Section 8.1(b)(xii)</u>, the Seller will pay to the Purchaser the Break-Up Fee and the Expense Reimbursement, and (ii) if this Agreement is validly terminated under <u>Section 8.1(a)</u> or <u>Section 8.1(b)(iv)</u>, the Seller will pay to the Purchaser the Expense Reimbursement, in each case, within five (5) Business Days of the date of such termination (or, in the case of the Expense Reimbursement, if later, two (2) Business Days after the date on which the Purchaser provides the Seller with reasonable documentation supporting the Purchaser's request for reimbursement of its out-of-pocket costs and expenses hereunder).  The parties acknowledge and agree that in the event of a valid termination of this Agreement, upon the actual payment of the Break-Up Fee and/or the Expense Reimbursement to the Purchaser pursuant to this <u>Section 8.2</u>, such payment shall, notwithstanding anything to the contrary contained herein, be the sole and exclusive remedy of the Purchaser and its Affiliates against the Seller in connection with such termination.

Section 8.3   <u>Bid Protections</u>.  The obligations of the Seller to pay the Break-Up Fee and the Expense Reimbursement shall be entitled to superpriority administrative expense claim status under Section 364(c)(1) of the Bankruptcy Code with priority over any and all administrative expenses of any kind, including those specified under Sections 503(b) and 507(a) of the Bankruptcy Code and shall survive the termination of this Agreement and be payable as set forth in <u>Section 8.2</u> hereof.  The Seller shall seek the approval of the Break-Up Fee and Expense Reimbursement as set forth in this paragraph and this Agreement in the Bidding Procedures Order and Sale Order.

# ARTICLE IX

# GENERAL PROVISIONS

Section 9.1   <u>Tax Matters</u>.

(a)   All sales, use, excise, transfer, documentary, stamp, value added, recordation, license, conveyance and other similar Taxes, if any, imposed on or with respect to the Acquisition ("<u>Transfer Taxes</u>") shall be borne by the Purchaser and shall be paid to the appropriate Taxing Authority promptly when due by the Person having the obligation to pay such Transfer Taxes under applicable Law.  To the extent the Seller is required by applicable Law to pay such Transfer Tax, the Purchaser shall promptly reimburse the Seller in accordance with <u>subsection (c)</u> hereof.  The Seller and the Purchaser shall consult and cooperate on a reasonable basis in preparing and timely filing all Tax Returns with respect to any such Transfer Taxes.  The Purchaser and the Seller shall reasonably cooperate in good faith to reduce or eliminate any Transfer Taxes to the extent permitted by applicable Law.  Notwithstanding anything to the contrary in this Agreement, the parties (i) agree to allocate a portion of the total aggregate Estimated or Final Upfront Consideration among each of the Acquired Assets for purposes of determining whether any Acquired Assets are subject to Transfer Taxes in accordance with <u>Schedule 9.1(a)</u> (to be determined by the Purchaser in good faith in consultation with the Seller, reflecting any reasonable comments the Seller might have following the

determination of the final Net Working Capital as set forth on the Final Closing Statement in accordance with Section 2.4(d) of this Agreement) and (ii) shall not take any Tax reporting position for Transfer Taxes purposes inconsistent with the foregoing unless otherwise required pursuant to a Tax claim or other proceeding initiated by a Taxing Authority with respect thereto.

(b)    For purposes of this Agreement, the Seller and the Purchaser shall apportion the liability for any real and personal property Taxes, intangible property Taxes, ad valorem Taxes, and other similar Taxes ("Periodic Taxes") for Straddle Periods applicable to any Acquired Asset, Assumed Liability or the Business in accordance with this Section 9.1(b).  The Periodic Taxes described in the preceding sentence shall be apportioned between the Seller and the Purchaser as of the Closing Date, with the Purchaser liable for that portion of the Periodic Taxes for a Straddle Period (which portion of such Taxes shall for purposes of this Agreement be deemed attributable to the Post-Closing Tax Period) equal to the Periodic Taxes for such Straddle Period *multiplied by* a fraction, the numerator of which is the number of days remaining in such Straddle Period after the Closing Date, and the denominator of which is the total number of days in such entire Straddle Period.  The Seller shall be liable for that portion of the Periodic Taxes for a Straddle Period for which the Purchaser is not liable under the preceding sentence (which portion of such Taxes shall for purposes of this Agreement be deemed attributable to the Pre-Closing Tax Period).  The party hereto responsible under applicable Law for paying a Tax described in this Section 9.1(b) shall be responsible for administering the payment of such Tax and, if applicable, the party hereto liable for such Tax under this Agreement shall reimburse such other party in accordance with Section 9.1(c).  To the extent the liability for Periodic Taxes for any Straddle Period is not determinable at the time of Closing or such Periodic Taxes are charged in arrears, such Periodic Taxes shall be prorated for such Straddle Period, based on the most recent ascertainable full tax year without adjustment.  For purposes of this Section 9.1(b), the Straddle Period for Periodic Taxes shall be the fiscal period for which such Taxes were assessed by the applicable Tax jurisdiction.

(c)    The Seller, on the one hand, or the Purchaser, on the other hand, as the case may be (the "Reimbursing Party"), shall provide reimbursement for any Tax paid by the other (the "Paying Party"), within ten (10) Business Days following receipt of proof of payment, all or a portion of which is the responsibility of the Reimbursing Party in accordance with the terms of this Agreement (including this Section 9.1).  If either the Seller or the Purchaser receives any Tax Refunds which are the property of the other party under this Agreement, the Seller or the Purchaser, as applicable, shall pay the amount of such Tax Refunds, net of any out-of-pocket Taxes or reasonable third-party costs or expenses incurred in obtaining such Tax Refunds, to the other party within ten (10) Business Days following the receipt thereof.  The parties acknowledge that the Purchaser intends to treat any payment pursuant to this Section 9.1(c) as an adjustment to the consideration paid to acquire the Acquired Assets for Tax purposes, except as otherwise required by Law.

(d)    The parties shall provide each other with such assistance as reasonably may be requested by any of them in connection with (i) the preparation of any Tax Return, (ii) the determination of any liability in respect of Taxes or the right to any Tax Refund or (iii) any audit or other examination by any Taxing Authority, or any judicial or administrative proceeding with respect to any Taxes.

(e)    The Purchaser and the Seller agree to utilize, or cause their respective Affiliates to utilize, the standard procedure set forth in Revenue Procedure 2004-53 with respect to wage reporting.

(f)    The Seller shall use reasonable efforts to deliver a duly executed IRS Form W-9 from its direct or indirect regarded owner for U.S. federal income tax purposes to the Purchaser at the Closing.

Section 9.2    <u>Bulk Sales</u>.  The parties intend that, to the extent permitted under Section 363(f) of the Bankruptcy Code and except as otherwise provided in <u>Section 1.3</u>, the Acquisition shall be free and clear of any obligations, Liabilities and Encumbrances of, against or created by the Seller or its bankruptcy estate, including any liens or claims arising out of any "bulk-transfer" or similar Laws of any jurisdiction that may otherwise be applicable, and the parties shall take such actions as may be reasonably necessary or appropriate to so provide in the Sale Order.  The Purchaser hereby waives compliance with the requirements and provisions of any "bulk-transfer" or similar Laws of any jurisdiction that may otherwise be applicable with respect to the Acquisition.

Section 9.3    <u>Survival of Representations, Warranties and Covenants</u>.  No representations or warranties in this Agreement or in any Ancillary Document shall survive the Closing.  No covenants in this Agreement or in any Ancillary Document shall survive the Closing except to the extent the terms thereof expressly contemplate performance following the Closing.  Notwithstanding anything in this Agreement to the contrary (except as set forth in <u>Section 9.15(b)</u>), nothing in this Agreement shall limit or restrict the rights of any party hereto to maintain or recover any amounts in connection with any action or claim based on Fraud.

Section 9.4    <u>Public Announcements</u>.  Unless otherwise required by applicable Law or by obligations of the Seller or the Purchaser or their respective Affiliates pursuant to any applicable listing agreement with or rules of any securities exchange or in order to enforce a party's rights or remedies under this Agreement, the Seller, on the one hand, and the Purchaser and the Guarantor, on the other hand, shall consult with each other before issuing any other press release or otherwise making any public statement with respect to this Agreement, the transactions contemplated hereby or the activities and operations of the other and shall not issue any such release or make any such statement without the prior written consent of the other (such consent not to be unreasonably withheld, conditioned or delayed); *provided* that the Purchaser and its Affiliates may provide general information regarding this Agreement and the transactions contemplated hereby to their respective existing or prospective limited partners and other investors, in each case, on a confidential and on a need-to-know basis (as determined by the Purchaser in its sole discretion) to the extent customary in connection with their respective or their respective affiliated funds' typical fundraising or reporting activities.

Section 9.5    <u>Notices</u>.  All notices, requests, claims, demands or other communications hereunder shall be deemed to have been duly given and made if in writing and (a) at the time personally delivered if served by personal delivery upon the party hereto for whom it is intended, (b) at the time received if delivered by registered or certified mail (postage prepaid, return receipt requested) or by a national courier service (delivery of which is confirmed), or (c) upon confirmation if sent by facsimile or email; in each case to the Person at the address set forth

below, or such other address as may be designated in writing hereafter, in the same manner, by
such Person:

(a)    if to the Purchaser or the Guarantor, to:

Atlantis Consumer Healthcare Inc.
c/o Arcadia Consumer Healthcare Inc.
440 US Highway 22, Suite 210
Bridgewater, NJ 08807
Attention:    Michael DeBiasi
Email:    mdebiasi@arcadiach.com

with a copy (which shall not constitute notice) to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attention:    Constantine N. Skarvelis, P.C.
    Michael Movsovich, P.C.
    Christopher Marcus, P.C.
Email:    constantine.skarvelis@kirkland.com
    mmovsovich@kirkland.com
    christopher.marcus@kirkland.com

and

(b)    if to the Seller, to:

Purdue Pharma L.P.
201 Tresser Boulevard
Stamford, Connecticut 06901
Email:    marc.kesselman@pharma.com
Attention:    General Counsel

with a copy (which shall not constitute notice) to:

Skadden, Arps, Slate, Meagher & Flom LLP
One Manhattan West
New York, New York 10001
Facsimile:    (917) 777-3207
Email:    marie.gibson@skadden.com
Attention:    Marie L. Gibson

Section 9.6   <u>Descriptive Headings; Interpretative Provisions</u>.  The headings contained
in this Agreement are for reference purposes only and shall not affect in any way the meaning or
interpretation of this Agreement.  The words "hereof," "herein" and "hereunder" and words of
like import used in this Agreement shall refer to this Agreement as a whole and not to any
particular provision of this Agreement.  References to Articles, Sections, Exhibits and Schedules

are to Articles, Sections, Exhibits and Schedules of this Agreement unless otherwise specified. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Exhibit or Schedule but not otherwise defined therein, shall have the meaning as defined in this Agreement.  Any singular term in this Agreement shall be deemed to include the plural, and any plural term the singular.  Where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning.  Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation," whether or not they are in fact followed by those words or words of like import.  The word "or" has the inclusive meaning represented by the phrase "and/or."  Whenever the last day for the exercise of any right or the discharge of any duty under this Agreement falls on other than a Business Day, the party hereto having such right or duty shall have until the next Business Day to exercise such right or discharge such duty.  Unless otherwise indicated, the word "day" shall be interpreted as a calendar day.  References to "dollars" or "$" mean United States dollars, unless otherwise clearly indicated to the contrary.  Any document which is described as being "delivered," "furnished" or "made available" shall be treated as such if copies of such documents have been put in the virtual data room hosted by SS&C Intralinks titled "Project Sequoia" prepared by the Seller or otherwise provided to the Purchaser in electronic or hard copy format, in each case prior to one (1) Business Day prior to the date hereof.  No summary of this Agreement prepared by or on behalf of any party hereto shall affect the meaning or interpretation of this Agreement.

Section 9.7    No Strict Construction.  The Seller, on the one hand, and the Purchaser and the Guarantor, on the other hand, participated jointly in the negotiation and drafting of this Agreement, and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the Seller and the Purchaser and no presumption or burden of proof shall arise favoring or disfavoring any party hereto by virtue of the authorship of any provision of this Agreement.  Without limitation as to the foregoing, no rule of strict construction construing ambiguities against the draftsperson shall be applied against any person with respect to this Agreement.

Section 9.8    Entire Agreement; Assignment.  This Agreement, the Ancillary Documents and the Confidentiality Agreement constitute the entire agreement and supersede all other prior agreements and understandings, both written and oral, among the parties hereto or any of them, with respect to the subject matter hereof and thereof.  Neither this Agreement nor any of the rights, interests or obligations under it may be directly or indirectly assigned, delegated, sublicensed or transferred by any of the parties hereto, in whole or in part, to any other Person by operation of law or otherwise, without the prior written consent of the other parties, and any attempted or purported assignment in violation of this Section 9.8 will be null and void; *provided* that the Purchaser shall have the right, without the prior written consent of the Seller, to assign all or any portion of the Purchaser's rights or obligations under this Agreement (a) to one or more of its Affiliates or (b) as collateral to any lender providing financing to the Purchaser or any of its Subsidiaries or Affiliates; *provided*, *further*, that any such assignment shall not relieve the Purchaser or the Guarantor of their obligations under this Agreement.  Subject to the preceding sentence, this Agreement will be binding upon, inure to the benefit of, and be enforceable by, the parties hereto and their respective successors and permitted assigns and shall not be binding upon, inure to the benefit of, or be enforceable by, any other Person.

Section 9.9    Governing Law; Submission of Jurisdiction; Waiver of Jury Trial.  This
Agreement shall be governed by and construed in accordance with the Laws of the State of New
York without regard to the rules of conflict of Laws of the State of New York or any other
jurisdiction.  Each of the parties hereto irrevocably and unconditionally consents to submit to the
exclusive jurisdiction of the Bankruptcy Court for any claim arising out of or relating to this
Agreement and the transactions contemplated thereby and waives any objection to the laying of
venue of any such action in the Bankruptcy Court.  EACH PARTY HERETO IRREVOCABLY
AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY
IN ANY ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE
TRANSACTIONS CONTEMPLATED HEREBY.

Section 9.10    Expenses.  Except as otherwise expressly provided herein, whether or not
the transactions contemplated by this Agreement are consummated, all costs and expenses
incurred in connection with this Agreement and the transactions contemplated thereby shall be
paid by the party hereto incurring such expenses.

Section 9.11    Amendment.  This Agreement may not be amended except by an
instrument in writing signed by all the parties hereto.

Section 9.12    Waiver.  At any time prior to the Closing, the parties hereto may
(a) extend the time for the performance of any of the obligations or other acts of the other parties
hereto, (b) waive any inaccuracies in the representations and warranties contained herein or in
any document delivered pursuant hereto and (c) waive compliance with any of the agreements or
conditions contained herein.  Any agreement on the part of a party hereto to any such extension
or waiver shall be valid only if set forth in an instrument in writing signed on behalf of such
party.

Section 9.13    Counterparts; Effectiveness.  This Agreement may be executed in two or
more counterparts, each of which shall be deemed to be an original but all of which shall
constitute one and the same agreement, and may be delivered by scanned image or other
electronic means, including files in .pdf or .jpeg, intended to preserve the original graphic or
pictorial appearance of a document.

Section 9.14    Severability; Validity; Parties in Interest.  If any provision of this
Agreement or the application thereof to any Person or circumstance is held invalid or
unenforceable, the remainder of this Agreement and the application of such provision to other
Persons or circumstances, shall not be affected thereby, and to such end, the provisions of this
Agreement are agreed to be severable.  Nothing in this Agreement, express or implied, is
intended to confer upon any Person not a party to this Agreement any rights or remedies of any
nature whatsoever under or by reason of this Agreement.

Section 9.15    Specific Performance.

(a)    The parties recognize that if the Purchaser breaches this Agreement or
refuses to perform under the provisions of this Agreement, monetary damages alone would not
be adequate to compensate the Seller for its injuries.  The Seller shall therefore be entitled, in
addition to any other remedies that may be available, to obtain specific performance of the terms

of this Agreement, without posting bond or other undertaking.  If any Cause of Action is brought by the Seller to enforce this Agreement, the Purchaser shall waive the defense that there is an adequate remedy at Law.

(b)    In the event of any breach prior to the Closing by the Seller of any of the Seller's agreements, covenants, representations or warranties contained herein or in the Bidding Procedures Order or the Sale Order, including any breach that is material or willful, the Purchaser's sole and exclusive remedy shall be to exercise the Purchaser's rights to terminate this Agreement pursuant to Section 8.1(b)(ii), in accordance with the terms of such Section 8.1(b)(ii), and the Purchaser shall not have any further cause of action for damages, specific performance or any other legal or equitable relief against the Seller or any of its former, current or future equityholders, directors, officers, Affiliates, agents or representatives with respect thereto.

Section 9.16    <u>Time of the Essence</u>.  Time shall be of the essence of this Agreement.

## ARTICLE X

## DEFINITIONS

As used herein, the terms below shall have the following meanings:

"<u>340B OPAIS System</u>" means the 340B Office of Pharmacy Affairs Information System, which provides access to covered entity and manufacturer records, user accounts, change requests, recertification and registrations.

"<u>340B Pharmaceutical Pricing Agreement</u>" means the agreement and the accompanying addendum with the Secretary of Health and Human Services which must be signed by pharmaceutical manufacturers in order to participate in the 340B Program.

"<u>340B Program</u>" means the drug pricing program, available to "covered entities," that is administered by the Health Resources and Services Administration pursuant to 42 U.S.C. § 256b.

"<u>Accounting Principles</u>" shall have the meaning set forth on <u>Exhibit E</u>.

"<u>Adjustment Escrow Account</u>" means the account designated by the Escrow Agent for the deposit of the Adjustment Escrow Amount into escrow pursuant to the Escrow Agreement for purposes of the Post-Closing Adjustment contemplated by <u>Section 2.4</u>.

"<u>Adjustment Escrow Amount</u>" means an amount equal to three million dollars ($3,000,000).

"<u>Adjustment Escrow Funds</u>" means the Adjustment Escrow Amount deposited into the Adjustment Escrow Account and any interest thereon.

"<u>Affiliate</u>" of a specified Person means a Person who, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person; *provided* that, "Affiliate" excludes, in the case of the Seller, any Person that is

67

not a debtor in possession in the Chapter 11 Cases; *provided, further*, that in no event shall the Purchaser be considered an Affiliate of any portfolio company affiliated with, or investment fund managed by, Bansk Group LP or any Affiliate thereof (other than Guarantor), nor shall any portfolio company (other than Guarantor) be considered an Affiliate of the Purchaser.

"Agreement" has the meaning set forth in the Preamble and shall include the Exhibits and Schedules annexed hereto or referred to herein.

"Alternate Bidder" will mean the bidder with the next-highest or otherwise second-best bid as determined in accordance with the Bidding Procedures.

"AMP" means the Average Manufacturer Price, as defined at 42 U.S.C. § 1396r-8(k)(1) and 42 C.F.R. § 447.500 et seq.

"Ancillary Documents" means the Bill of Sale, Assignment and Assumption Agreement, Intellectual Property Assignment Agreements, Transition Services Agreement, Sublicense Agreement (if required pursuant to Section 5.4(c)), Escrow Agreement, Equity Commitment Letter and each other agreement, document, certificate or instrument (other than this Agreement) executed and delivered by the parties hereto in connection with the consummation of the transactions contemplated by this Agreement.

"Antitrust Laws" means any applicable supranational, national, federal, state, county, local or foreign antitrust, competition or trade regulation Laws that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade or lessening competition through merger or acquisition, including the HSR Act, the Sherman Act, the Clayton Act and the Federal Trade Commission Act, in each case, as amended, and other similar antitrust, competition or trade regulation Laws of any jurisdiction other than the United States.

"Auction" has the meaning set forth in the Bidding Procedures.

"Base CPI-U" means "Base Consumer Price Index-Urban (CPI-U)." The quarterly CPI-U for non-prescription OTC drugs will equal the CPI-U for the month immediately prior to the quarter being calculated (e.g., if the quarter being calculated is the first quarter of 2018, the quarterly CPI-U will equal the CPI-U for December 2017). Further, in accordance with section 1927(c)(3) of the Social Security Act, for non-prescription OTC drugs with market dates on or before April 1, 2013, the Base CPI-U will equal the CPI-U for September 2014. For non-prescription OTC drugs with market dates after April 1, 2013, the Base CPI-U will equal the CPI-U for the last month of each drug's Base Period AMP quarter.

"Base Period AMP" has the meaning set forth in 42 U.S.C. § 1396r-8(c)(2) and 42 C.F.R. § 447.509(a)(2).

"Benchmark Time" means 11:59 p.m., New York City time, on the day immediately preceding the Closing Date.

"Benefit Plan" means any benefit or compensation plan, program, policy, practice, agreement, Contract, arrangement or other obligation, whether or not in writing and whether or

not funded, in each case, which is sponsored or maintained by, or required to be contributed to, or under or with respect to which any Liability is borne by, the Seller or any of its Affiliates or any ERISA Affiliates in which any Business Employee is eligible to participate or under which any Business Employee is (or may become) entitled to any benefit or compensation or under or with respect to which the Business has any Liability, including, but not limited to, "employee benefit plans" within the meaning of Section 3(3) of ERISA, whether or not subject to ERISA, compensatory, employment, consulting, retention, retirement, severance, separation, termination or change in control agreements or arrangements, relocation, repatriation, expatriation, termination pay, performance awards, bonuses, commissions, incentives, equity or equity-based awards, phantom equity, supplemental retirement, deferred compensation, profit sharing, insurance, medical, welfare, fringe or other benefits, but excluding any such plans established pursuant to statute and administered by a Governmental Entity.

"Best Price" has the meaning set forth in 42 U.S.C. § 1396r-8(c)(1)(C) and 42 C.F.R. § 447.500 et seq.

"Betadine Agreement" means that certain Amended and Restated License Agreement (Betadine®), dated November 29, 2006, between the Seller and PRA.

"Bidding Procedures" means the bidding procedures substantially in the form attached as Exhibit I to the Bidding Procedures Order, as approved by the Bankruptcy Court pursuant to the Bidding Procedures Order, which shall be in form and substance mutually acceptable to each of the Seller and the Purchaser in their reasonable discretion.

"Bidding Procedures Order" means the Order of the Bankruptcy Court, pursuant to Sections 105(a), 363 and 365 of the Bankruptcy Code, that has not been stayed, vacated or stayed pending appeal: (a) authorizing and scheduling the Auction, (b) approving procedures for the submission of Qualified Bids, (c) in the case of any subsequent Qualified Bids, approving the initial Overbid, (d) scheduling a hearing to consider approval of such sale, (e) approving the form and manner of notice of the Auction procedures and Sale Hearing, which Order shall be substantially in the form attached hereto as Exhibit A, (f) approving the Break-Up Fee and (g) approving the Expense Reimbursement, which shall be in form and substance mutually acceptable to each of the Seller and the Purchaser in their reasonable discretion.

"Books and Records" means all documents of, or otherwise in the possession, custody or control of, or used by, the Seller, including all files, instruments, papers, books, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, title policies, lists of past, present and/or prospective customers, supplier lists, regulatory filings, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), data, reports, plans, mailing lists, price lists, marketing and promotional materials, marketing and promotional information and procedures, advertising and promotional materials, equipment records, warranty information, architects agreements, construction contracts, drawings, plans and specifications, records of operations, standard forms of documents, and Tax Records, related books, records and workpapers, manuals of operations or business procedures and other similar procedures (including all discs, tapes and other media-storage data containing such information) and historical financial information (including, on a monthly basis, P&L's,

trial balances, balance sheets, Statements of Cash Flows and balance sheet reconciliations for the period of January 1, 2019, through the Closing Date regarding all brands, SKUs and customers for each such item), in each case, to the extent exclusively related to the Products, the Business, the Acquired Assets or the Assumed Liabilities, excluding any personnel records with respect to any current or former employees of the Business (other than the Transferred Employee Records); *provided* that the foregoing shall not include any Retained Books and Records.

"Break-Up Fee" means a fee payable as set forth in this Agreement in an amount equal to eleven million nine hundred ten thousand dollars ($11,910,000), which upon entry of the Bidding Procedures Order, will constitute a superpriority administrative expense of the Seller in accordance with Section 8.3 hereof.

"Business Data" means all information exclusively related to the Business and all Personal Information owned by, used in or necessary to the operation of the business and processed by or for the Seller or any of its Affiliates through any IT Assets that are owned by or used on behalf of the Seller or any of its Affiliates ("Business Systems") in the conduct of the Business in the United States.

"Business Day" means any day other than Saturday, Sunday and any day that is a legal holiday or a day on which banking institutions in New York, New York, are authorized by Law or other governmental action to close.

"Business Intellectual Property" has the meaning set forth in Section 3.11(b).

"Business Permits" means all Permits that are required for the operation or ownership of the Business or the Acquired Assets, in each case, as conducted or owned and used by the Seller on the Closing Date.

"Calendar Quarter" means any period of three (3) consecutive calendar months ending on March 31, June 30, September 30 or December 31.

"Cash" means all cash and cash equivalents, including checks, commercial paper, treasury bills, certificates of deposit and marketable securities, and any bank accounts and lockbox arrangements of the Seller as of the Closing.

"Cause of Action" means any action, suit, claim, charge, complaint, litigation, audit, inquiry, investigation, proceeding, arbitration, mediation or other dispute by or before any Governmental Entity.

"Chargeback Termination Date" means the fifteenth (15th) calendar day after the Closing Date.

"Chargebacks" means a payment to a wholesaler or distributor (whether reflected as a payment due or a credit issued) reflecting a claim from such wholesaler or distributor for the difference between the applicable Wholesale Acquisition Cost or such wholesaler / distributor's actual purchase price and the applicable contract price to the end customer.

"CMS" means Centers for Medicare & Medicaid Services within the United States Department of Health and Human Services, or any successor organization or agency.

"Code" means the Internal Revenue Code of 1986, as amended.

"Confidentiality Agreement" means the Confidentiality Agreement, between Bansk Group LLC and the Seller, dated December 12, 2022, as may be amended from time to time.

"Consumer Price Index-Urban (CPI-U)" has the meaning set forth in 42 C.F.R. § 447.502.

"Contract" means any agreement, contract, subcontract, settlement agreement, lease, sublease, instrument, permit, concession, franchise, binding understanding, note, option, bond, mortgage, indenture, trust document, loan or credit agreement, license, sublicense, insurance policy or other legally binding commitment or instrument.

"Copyrights" means all copyrights and applications for copyright.

"Customer" means any third-party buyer (individual or entity) or government buyer that, as of the Closing Date, contracts with the Seller with respect to the Products or purchases the Products from the Seller.

"Data Security Requirements" means, collectively, the following to the extent relating to the processing of Personal Information or otherwise relating to privacy, data/cybersecurity or data/cybersecurity breach notification requirements and applicable to the Seller or any of its Affiliates with respect to the conduct of the Business: (i) the Seller's or any of its Affiliates' own rules, policies and procedures (including all website privacy policies), (ii) industry applicable to the industry in which the Business operates, and (iii) Contracts into which the Seller or any of its Affiliates has entered or by which it is otherwise bound.

"Debt Financing Commitment" means a binding financing commitment (including pursuant to a commitment letter) pursuant to which one or more lenders have committed to provide the Purchaser with the Debt Financing, subject to the terms and conditions therein.

"Deposit Escrow Account" means the account designated by the Escrow Agent for the deposit of the Deposit Amount pursuant to the Escrow Agreement and Section 1.7.

"Distributor/End Purchaser Invoice Date" means the date that a wholesaler or distributor sells a Product to an end purchaser Customer, as reflected on Chargeback claims data.

"Encumbrance" means any lien (as defined in Section 101(37) of the Bankruptcy Code), pledge, hypothecation, mortgage, deed of trust, security interest, encumbrance, covenant, charge, claim (as defined in Section 101(5) of the Bankruptcy Code), option, right of first refusal, easement, right of way, encroachment, occupancy right, preemptive right, community property interest, license or restriction of any nature, whether arising prior to or subsequent to the commencement of the Chapter 11 Cases, and whether voluntarily incurred or arising by operation of Law.

"Environmental Laws" means all Laws relating to the protection of the environment or natural resources, pollution or public or worker health or safety.

"Equity Commitment Letter" means that certain commitment letter (together with all annexes, schedules and exhibits (in each case, if any) thereto), duly executed and delivered by Bansk Group LP, a Guernsey limited partnership, Bansk Fund I-A, L.P., a Delaware limited partnership, Bansk Fund I-B, L.P., a Delaware limited partnership and Iaso Co-Invest, LP, a Delaware limited partnership, to the Guarantor, in connection with the execution of this Agreement, to fund certain of the Purchaser's obligations under this Agreement.

"Equity Financing" has the meaning set forth in Section 4.8.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated and rulings issued thereunder.

"ERISA Affiliate" means, with respect to any entity, trade or business, any other entity, trade or business that is (or at any relevant time has been or would be) a member of a group described in Sections 414(b), (c), (m) or (o) of the Code or Section 4001(b)(1) of ERISA that includes the first entity, trade or business, or that is a member of the same "controlled group" as the first entity, trade or business pursuant to Section 4001(a)(14) of ERISA.

"Escrow Agent" means Citibank, N.A.

"Escrow Agreement" means that certain Escrow Agreement (relating to both the Deposit Amount and the Adjustment Escrow Amount), by and among the Seller, the Purchaser and the Escrow Agent, substantially in the form attached hereto as Exhibit F.

"Estimated Net Working Capital" means the Seller's good faith estimate of Net Working Capital as of the Benchmark Time.

"Estimated Net Working Capital Adjustment Amount" means an amount, which may be a positive or negative number, equal to (a) the Estimated Net Working Capital, *minus* (b) the Target Net Working Capital.

"Estimated Upfront Consideration" means an amount equal to (a) three hundred eighty-two million dollars ($382,000,000), *plus* (b) the Estimated Net Working Capital Adjustment Amount, *minus* (c) the Deposit Amount, *minus* (d) any Excess Cure Amount, *minus* (e) the Adjustment Escrow Amount.

"Excluded Taxes" means any Taxes (including (x) any Taxes for which any Person may be liable under applicable Law by virtue of its status as a member of a consolidated, affiliated, combined or unitary Tax group or (y) any Taxes otherwise imposed as transferee or successor, by contract (including any such amount payable pursuant to any tax sharing agreement or other arrangement relating to the sharing, indemnification or payment of such amounts) or otherwise by Law) other than (i) Periodic Taxes for which the Purchaser is responsible pursuant to Section 9.1(b) and (ii) Transfer Taxes for which the Purchaser is responsible pursuant to Section 9.1(a).

"Expense Reimbursement" means an amount equal to the reasonable, documented, out-of-pocket costs and expenses of the Purchaser (including the reasonable, documented expenses of outside counsel, investment bankers, accountants and other advisors, which shall be based on summary invoices, redacted to preserve privileged or confidential information) in connection with or related to negotiating and documenting this Agreement, the Ancillary Documents and the other documents necessary to effect the transactions and agreements contemplated hereby and thereby, and evaluating, analyzing and investigating the Seller and the Acquired Assets, up to a maximum aggregate amount equal to three million nine hundred seventy thousand dollars ($3,970,000), which amount, upon entry of the Bidding Procedures Order, will constitute a superpriority administrative expense of the Seller in the Chapter 11 Cases in accordance with Section 8.3 hereof.

"FDA" means the United States Food and Drug Administration.

"FDCA" means the U.S. Federal Food, Drug and Cosmetic Act of 1938, as amended.

"Fraud" means actual common law fraud under Delaware law by a party hereto to another party hereto in the making of a representation or warranty contained in Article III, Article IV or Article V (or Ancillary Document or certificate delivered in connection with this Agreement) by such party; *provided* that, at the time such representation or warranty was made by such party, (i) such representation or warranty was a false or inaccurate representation of a material fact, (ii) such party had actual knowledge (meaning without imputed or constructive knowledge) that such representation or warranty was false or inaccurate, and (iii) in making such representation or warranty the Person(s) with actual knowledge of the inaccuracy thereof had the intent to deceive such other party or to induce such other party to enter into this Agreement; *provided*, *further*, that such other party reasonably relied on such false or inaccurate representation or warranty.

"FSS" means the Federal Supply Schedule administered by the United States Department of Veterans Affairs.

"GAAP" means United States generally accepted accounting principles.

"Good Clinical Practices" means, with respect to the Seller, standards for clinical trials for pharmaceuticals (including all applicable requirements relating to protection of human subjects), as set forth in the FDCA and applicable regulations promulgated thereunder (including, for example, 21 C.F.R. Parts 50, 54 and 56), as amended from time to time, and such standards of good clinical practice (including all applicable requirements relating to protection of human subjects) as are required by Regulatory Authorities in any other countries in which the Products are sold or intended to be sold, including applicable regulations or guidelines from the International Conference on Harmonization of Technical Requirements for Registration of Pharmaceuticals for Human Use, to the extent such standards are more stringent than those applicable in the United States.

"Good Laboratory Practices" means, with respect to the Seller, standards for pharmaceutical laboratories, as set forth in the FDCA and applicable regulations promulgated thereunder, as amended from time to time, and such standards of good laboratory practices as are

required by Regulatory Authorities in any other countries in which the Products are sold or intended to be sold, including applicable regulations or guidelines from the International Conference on Harmonization of Technical Requirements for Registration of Pharmaceuticals for Human Use, to the extent such standards are more stringent than those applicable in the United States.

"Good Manufacturing Practices" means, with respect to the Seller, standards for the manufacture, processing, packaging, testing, transportation, handling and holding of drug products, and, as applicable, dietary supplements, as set forth in the FDCA and applicable regulations promulgated thereunder including applicable guidance documents, as amended from time to time, and such standards of good manufacturing practices as are required by Regulatory Authorities in any other countries in which the Products are sold or intended to be sold, including applicable regulations or guidelines from the International Conference on Harmonization of Technical Requirements for Registration of Pharmaceuticals for Human Use, to the extent such standards are more stringent than those applicable in the United States.

"Governmental Entity" means (a) any supranational, national, federal, state, county, municipal, local or foreign government or any entity exercising executive, legislative, judicial, regulatory, taxing or administrative functions of or pertaining to government, (b) any public international governmental organization or (c) any agency, division, bureau, department, commission, board, arbitrator, arbitral body (public or private) or other tribunal, branch or other political subdivision of any government, entity or organization described in the foregoing clause (a) or (b) of this definition (including patent and trademark offices and self-regulatory organizations).

"Governmental Price Calculations and Reporting" means all pricing information and reporting with respect to the Product required under the applicable statutes, rules and regulatory guidance relating to Government Programs, as further defined in Section 6.16.

"Guarantor Specified Representations" means the representations and warranties contained in the first sentence of Section 5.1 and Section 5.2.

"Health Laws" means any Law of any Governmental Entity (including multi-country organizations) the purpose of which is to ensure the safety, efficacy and quality of medicines, pharmaceuticals or dietary supplements by regulating the research, development, manufacturing and distribution and sale of these products, including Laws relating to Good Laboratory Practices, Good Clinical Practices, investigational use, licensing, accreditation and certification, establishment registration, product listing, product marketing authorization, manufacturing facilities compliance and approval, Good Manufacturing Practices, labeling, approval, pricing, selling, advertising, promotional practices, safety surveillance, recordkeeping and filing of required reports and their respective counterparts promulgated by Regulatory Authorities in countries outside the United States including (a) the FDCA (21 U.S.C. § 301 et seq.) and the regulations and binding guidance promulgated thereunder, (b) the Federal Trade Commission Act, (15 U.S.C. § 41 et seq.) and the regulations and binding guidance promulgated thereunder, (c) all U.S. federal, state and local healthcare related fraud and abuse Laws, including the U.S. Federal Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)), the civil False Claims Act (31 U.S.C. § 3729 et seq.), the administrative False Claims Law (42 U.S.C. § 1320a-7b(a)), the Anti-

Inducement Law (42 U.S.C. § 1320a-7a(a)(5)), the Civil Monetary Penalties Law (42 U.S.C. §§ 1320a-7a and 1320a-7b), the exclusion Laws (42 U.S.C. § 1320a-7), all criminal laws relating to healthcare fraud and abuse, including 18 U.S.C. §§ 286 and 287, (d) Title XVIII of the Social Security Act, (42 U.S.C. §§ 1395-1395lll) (Medicare), (e) Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396w-5 (Medicaid), (f) 10 U.S.C. § 1071 et seq. (TRICARE), (g) the 340B Program, (h) the Medicaid Drug Rebate Program, and the regulations promulgated pursuant to such statutes, (i) all laws requiring disclosure to the government of payments or other transfers of value to health care providers, (j) all laws governing Governmental Price Calculations and Reporting, and (k) all comparable state Laws and Laws administered by Regulatory Authorities outside of the United States, each of <u>clauses (a)</u> through <u>(j)</u> as may be amended from time to time.

"<u>Health Resources Services Administration</u>" or "<u>HRSA</u>" shall mean the agency responsible for administering the 340B Program.

"<u>IFF</u>" means the Industrial Funding Fee applicable to sales under the FSS agreement, described at 48 C.F.R. § 552.238-74.

"<u>Indebtedness</u>" means, with respect to any Person, (a) all obligations for borrowed money (including the sum of the outstanding principal amount of accrued or unpaid interest on, and other payment obligations including prepayment payments, premiums, breakage costs, fees and other costs, fees or expenses), (b) all obligations evidenced by bonds, debentures, notes or similar instruments, (c) all Indebtedness of others secured by any Encumbrance on owned or acquired property of the reference Person, whether or not the Indebtedness secured thereby has been assumed, (d) all guarantees (direct or indirect) (or any other arrangement having the economic or contractual effect of a guarantee) of Indebtedness of others, (e) all obligations, contingent or otherwise, of such Person as an account party in respect of financial guaranties, letters of credit, letters of guaranty, surety bonds and other similar instruments, (f) all obligations representing the deferred or unpaid purchase price of property, security, business, services and assets, including seller notes, true-up obligations, earn-out payments and other similar payments, whether contingent or otherwise and calculated as the maximum amount payable under or pursuant to such obligation (other than trade payables incurred in the ordinary course of business to the extent included in Net Working Capital), (g) all obligations, contingent or otherwise, in respect of bankers' acceptances, (h) net cash payment obligations of such Person under swaps, options, derivatives and other hedging agreements or arrangements that will be payable upon termination thereof, and (i) all outstanding severance obligations, deferred compensation (to the extent unfunded or underfunded) and unpaid bonuses or commissions, in each case with respect to the Business Employees (*plus* the employer portion of any payroll, social security, unemployment or similar Taxes imposed on such amounts, computed as though all such amounts were payable on the Closing Date).

"<u>Intellectual Property</u>" means all intellectual property rights and proprietary rights of any kind or nature in any jurisdiction of the world including: (a) Patents; (b) Trademarks; (c) Trade Secrets; (d) Copyrights; (e) internet domain names (f) intellectual property rights in Software and data; and (g) all applications for, and registrations of, any of the foregoing.

"IT Assets" means technology devices, computers, Software, servers, networks, workstations, routers, hubs, circuits, switches, data communications lines and all other information technology equipment and all associated documentation.

"KERP" means the Seller's Key Employee Retention Program and all award letters thereunder.

"Knowledge of the Seller" means the actual knowledge of the individuals set forth on Article X of the Seller Disclosure Letter.

"Labeler Code" means the 5-digit labeler code incorporated into the Assigned NDC Numbers.

"Law" means any U.S. or non-U.S. federal, state, provincial or local law, statute, code, ordinance, rule, regulation, Order, stipulation, award or common law requirement.

"Liability" means any debt, loss, liability, claim (including "claim" as defined in the Bankruptcy Code), commitment, undertaking, damage, expense, fine, penalty, cost, royalty or obligation (including those arising out of any action, such as any settlement or compromise thereof or judgment or award therein), of any nature, whether known or unknown, disclosed or undisclosed, express or implied, primary or secondary, direct or indirect, matured or unmatured, fixed, absolute, contingent, accrued or unaccrued, asserted or not asserted, liquidated or unliquidated, and whether due or to become due, and whether in Contract, tort or otherwise.

"Licensed Intellectual Property" means any Intellectual Property (excluding Trademarks and domain names) owned by the Seller or its Affiliates as of the Closing Date that (a) is (or was within the past twelve (12) months) used by the Seller or any of its Affiliates to operate, support and maintain the Business, or (b) that would be infringed, misappropriated, or otherwise violated by the operation of the Business as currently conducted or as conducted in the past twelve (12) months, but, in each case, excluding any Intellectual Property to which access is provided as or in connection with a service under the Transition Services Agreement.  For the avoidance of doubt, "Licensed Intellectual Property" does not include any Intellectual Property that the Seller or any of its Affiliates license from or are otherwise provided access or the right to use in any manner by any third party.

"Material Adverse Effect" means any event, change, effect, condition, state of facts or occurrence which has had or would reasonably be expected to have, individually or when considered together with any other events, changes, effects, conditions, states of facts or occurrences, (a) a material adverse effect on the Business (including the operation or financial condition thereof), the Acquired Assets and the Assumed Liabilities, taken as a whole, or (b) a material adverse effect on the ability of the Seller to consummate the Acquisition or perform its obligations under this Agreement; *provided, however*, that, solely with respect to the foregoing clause (a), no event, change, effect, condition, state of facts or occurrence resulting or arising from the following shall be deemed to constitute a Material Adverse Effect or shall be taken into account when determining whether a Material Adverse Effect exists or has occurred: (i) changes in the United States or foreign economies or global financial, credit, banking, currency or capital markets or conditions in general, including changes in prevailing interest rates, currency

exchange rates, currency fluctuations or price levels or trading volumes in the United States or foreign credit, banking, currency or capital markets, (ii) general changes or developments in business, regulatory or macroeconomic conditions or trends that affect the industries, markets or geographical areas in which the Business operates, (iii) the execution or announcement of this Agreement or any Ancillary Document, the public announcement or the consummation of the Acquisition or the commencement or continuation of the Chapter 11 Cases, including the identity of the Purchaser or the effect of any fact or circumstance relating to the Purchaser or any of its Affiliates or any communication by the Purchaser or any of its Affiliates regarding plans, proposals or projections with respect to the Business, (iv) any action or omission of the Seller or any of its Affiliates which is expressly required by this Agreement or any Ancillary Document or which is taken (or not taken) at the written request of the Purchaser (or because the Purchaser unreasonably withheld, conditioned or delayed its consent), (v) changes in applicable Laws, GAAP or other applicable accounting regulations or principles or the enforcement or interpretation thereof, in each case, occurring after the date hereof, (vi) any global or national political conditions (including any outbreak or escalation of hostilities or war, military action, sabotage or any act of terrorism) or any earthquakes, hurricanes, tropical storms, floods, fires or other natural disaster, act of God, epidemic or pandemic, in each case, whether commenced before or after the date hereof and whether or not pursuant to the declaration of a national emergency, (vii) any failure of the Business to meet any budgets, plans, projections or forecasts (internal or otherwise), it being understood that any underlying facts giving rise or contributing to such failure may be taken into account in determining whether there has been a Material Adverse Effect and (viii) the Excluded Assets or the Excluded Liabilities; *provided, further*, that, with respect to clauses (i), (ii), (v) and (vi), to the extent that such event, change, effect, condition, state of facts or occurrence has a disproportionate effect on the Business (including the operation thereof), the Acquired Assets and the Assumed Liabilities, taken as a whole, as compared to other similarly situated businesses, only the extent of such disproportionate effect shall be considered in determining whether there has been or will be a Material Adverse Effect under the foregoing clause (a).

"Medicaid Drug Rebate Program" or "MDRP" means the rebate program established pursuant to 42 U.S.C. § 1396r-8.

"Medicaid National Drug Rebate Agreement" or "NDRA" means the agreement with the Secretary of Health and Human Services which must be signed by pharmaceutical manufacturers in order to participate in the Medicaid Drug Rebate Program.

"Medicaid Payments" means Payment Claims associated with the Medicaid Drug Rebate Program.

"Medicaid Rebate Obligation Termination Date" means forty-five (45) calendar days after the date of the Closing Date.

"NDC" means the unique, three-segment ten (10)- or eleven (11)-digit National Drug Code, a product identifier consisting of the Labeler Code, product code and package size code, for a pharmaceutical product issued by the FDA pursuant to Section 510 of the FDCA and applicable FDA rules and regulations.

"Net Working Capital" means the result of the following, in each case as reflected in the books and records of the Seller and included in Acquired Assets or Assumed Liabilities (as the case may be) as of the Benchmark Time and calculated in accordance with the Accounting Principles and in the same form and format as Exhibit G: (a) accounts receivable (whether current or noncurrent), *plus* (b) other receivables, *plus* (c) Inventory, *plus* (d) credits, claims for refunds, prepaid expenses and other current assets, *minus* (e) accounts payable and other trade obligations, *minus* (f) all Liabilities or reserves related to Product Claims (whether classified as a contra-asset or liability), *minus* (g) accrued expenses (including accruals for any expenses incurred under open purchase orders); *provided* that, for the avoidance of doubt, Net Working Capital shall exclude any Taxes or Tax Refunds.

"Net Working Capital Adjustment Amount" means an amount, which may be a positive or negative number, equal to (a) the Net Working Capital as of the Benchmark Time *minus* (b) the Target Net Working Capital.

"NFAMP" means the Non-Federal Average Manufacturer Price as defined in 38 U.S.C. § 8126 and the VA Master Agreement.

"Order" means any order, injunction, judgment, decree, ruling, writ, assessment, determination or award of, or entered, issued, made or rendered by, a Governmental Entity, or any settlement agreement entered in connection therewith.

"Paid Time Off" means accrued but unused sick leave and vacation time of the Transferred Employees as of the Closing Date under the Benefit Plans of the Seller or its Affiliates.

"party" and "parties" have the meaning set forth in the Preamble.

"Patents" means patents and patent applications, invention disclosures and rights in respect of utility models or industrial designs, including all related continuations, continuations-in-part, divisionals, reissues, re-examinations, renewals, revisions, supplementary protection certificates, substitutions and extensions thereof.

"Payment Claims" include, without limitation, Rebates, Chargebacks, Medicaid Payments, 340B Chargebacks and Rebates, FSS Chargebacks and IFF, prompt payment discounts, distribution service fees, administrative and/or data fees, price protection claims and other discounts and fees charged by Customers (in all cases, whether reflected as a payment due or a credit or reimbursement issued).

"Permits" means all licenses, permits, franchises, approvals, registrations, listings, authorizations, consents or orders of, or filings with, any Governmental Entity.

"Permitted Post-Closing Encumbrances" means any Encumbrance that is not extinguished by the Sale Order under applicable Law, it being understood that the Sale Order shall extinguish Encumbrances to the maximum extent permissible under applicable Law.

"Permitted Pre-Closing Encumbrances" means, prior to the Closing Date, (i) liens for Taxes not yet due and payable or being contested in good faith by appropriate proceedings and

for which adequate reserves have been established in accordance with GAAP, (ii) statutory liens and rights of setoff of carriers, warehousemen, mechanics, repairmen, workmen, suppliers and materialmen, in each case, incurred in the ordinary course of business (A) for amounts not yet due and payable or that are being contested in good faith by appropriate proceedings, or (B) for amounts as to which payment and enforcement is stayed under the Bankruptcy Code or pursuant to orders of the Bankruptcy Court, (iii) liens securing rental payments under capitalized lease obligations, (iv) rights of setoff or banker's liens upon deposits of cash in favor of banks or other depositary institutions, (v) pledges or deposits under worker's compensation, unemployment insurance and social security Laws to the extent required by applicable Law, (vi) easements, covenants, conditions, restrictions and other similar matters of record affecting title to real or personal property that do not materially impair, individually or in the aggregate, in any material respect, or interfere with the present use or occupancy of the property subject thereto, (vii) restrictions or requirements set forth in any Business Permits, (viii) violations, if any, arising out of the adoption, promulgation, repeal, modification or reinterpretation of any Order or Law which occurs subsequent to the date hereof, (ix) Encumbrances caused by or resulting from the acts or omissions of the Purchaser or any of its Affiliates, employees, officers, directors, agents, contractors, invitees or licensees, (x) Encumbrances arising by operation of Law under Article 2 of any state's Uniform Commercial Code (or successor statute) in favor of a seller of goods or buyer of goods, (xi) Encumbrances extinguished by the Sale Order and (xii) licenses or other grants of rights to use or obligations with respect to Intellectual Property.

"Person" means a natural person, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, Governmental Entity or other entity or organization.

"Personal Information" means any data that identifies, or is reasonably capable of identifying, a particular individual or household, including any data that constitutes personal information, personally-identifiable information or personal data under any Law or privacy policy of the Seller or its Affiliates applicable to the Business.

"Post-Closing Tax Period" means any taxable period or portion thereof beginning after the Closing Date and, in the case of any Straddle Period, the portion of such Straddle Period beginning after the Closing Date.

"Post-Petition Contracts" means Contracts of the Seller entered into by the Seller in the ordinary course of business or approved by the Bankruptcy Court, in either case after September 15, 2019.

"PRA Separation Agreement" means a Termination and Assignment Agreement with PRA under which, among other things, the Betadine Agreement and Senokot Agreement would be terminated, and the Betadine Licensed IP, Senokot Licensed IP and Alcon Agreement would be assigned to the Seller.

"Pre-Closing Tax Period" means any taxable period or portion thereof ending on or before the Closing Date and, in the case of any Straddle Period, the portion of such Straddle Period ending on and including the Closing Date.

"Price Calculations" means with respect to a Product, as applicable on an NDC by NDC basis, such Product's calculated: (a) Medicaid Drug Rebate Program Best Price; (b) Medicaid Drug Rebate Program AMP and AMP-eligible units; (c) Medicaid Unit Rebate Amount ("URA"); (d) 340B Ceiling Price; (e) Nominal Price sales; (f) Customary Prompt Pay Discounts; and (g) IFF.

"Process" means the access, creation, collection, use, storage, maintenance, processing, recording, sharing, distribution, transfer, transmission, receipt, import, export, protection, safeguarding, access, disposal or disclosure or other activity regarding data (whether electronically or in any other form or medium).

"Product Candidates" means those product candidates expressly set forth on Schedule A hereto.

"Purchaser Specified Representations" means the representations and warranties contained in the first sentence of Section 4.1, Section 4.2 and Section 4.7.

"Rebates" means any rebates, price reductions or payments credits issued to Customers, based upon the utilization or sale of the Products, excluding Chargebacks.

"Registered Intellectual Property" means all applications and registrations for Intellectual Property that have been registered with or by, or are the subject of an application before, any Governmental Entity or internet domain name registrar, including the United States Patent and Trademark Office or United States Copyright Office, including issued Patents and Patent applications, registered Trademarks and Trademark applications, registered Copyrights and Copyright applications and internet domain name registrations.

"Regulatory Authority" means any national, regional, state, local or supranational Governmental Entity with responsibility for granting any license, registrations or approvals with respect to the Products or with jurisdiction over the marketing and advertising of the Products, including the FDA, CMS, the VA and the FTC.

"Regulatory Authorizations" means any approvals, clearances, authorizations, registrations, certifications, licenses and permits granted by any Regulatory Authority, including any drug monographs and any equivalent thereof granted by any Regulatory Authority outside of the United States.

"Related to the Business" means primarily related to or used by the Seller or its Affiliates in, or primarily held for use by the Seller or its Affiliates in, the operation or conduct of, the Business or the production or manufacture of the Products.

"Representatives" means, when used with respect to any Person, the directors, officers, employees, consultants, financial advisors, accountants, legal counsel, investment bankers and other agents, advisors and representatives of such Person and its Subsidiaries.

"Retained Books and Records" means (a) the company seal, minute books, stock certificates, stock or equity record books, federal, state, local or non-U.S. income, franchise or similar Tax Records of the Seller and its Affiliates and any other Tax Records that do not

primarily relate to the Acquired Assets, Assumed Liabilities or the Business, work papers and such other books and records as pertain to the organization, qualification to do business, existence or capitalization of the Seller or any Affiliate thereof, books and records that the Seller is required to retain under applicable Law and books and records that relate to an Excluded Asset or an Excluded Liability (including any books and records subject to any attorney-client privilege of the Seller), and any personnel records with respect to any current or former employees of the Seller and its Affiliates (including any Business Employees) that are not Transferred Employee Records and (b) historical Books and Records not necessary to operate the Business as conducted as of immediately prior to the Closing.

"Royalty Payment Amount" means the aggregate amount of royalty payments made or due to be made by the Seller to PRA pursuant to the terms of the Alcon Agreement.

"Sale Hearing" means the hearing conducted by the Bankruptcy Court to approve the transactions contemplated by this Agreement.

"Sale Order" means an Order of the Bankruptcy Court in substantially the form attached hereto as Exhibit C, which shall be in form and substance mutually acceptable to each of the Seller and the Purchaser, and with such changes as the Purchaser and the Seller find reasonably acceptable, that has not been stayed, vacated or stayed pending appeal, authorizing and approving this Agreement and all of the terms and conditions set forth herein and approving and authorizing the Seller to consummate the transactions contemplated hereby pursuant to Sections 105, 363 and 365 of the Bankruptcy Code and providing, among other things, substantially as follows: that (i) the Acquired Assets will be transferred to the Purchaser free and clear of all Encumbrances (other than Permitted Post-Closing Encumbrances) and claims; (ii) the Seller is authorized and empowered to assume and assign the Assigned Contracts to the Purchaser; (iii) the Purchaser has acted in "good faith" within the meaning of Section 363(m) of the Bankruptcy Code; (iv) this Agreement was negotiated, proposed and entered into by the parties without collusion, in good faith and from arm's length bargaining positions; (v) the Purchaser is not a successor of the Seller; and (vi) the Bankruptcy Court will retain jurisdiction to resolve any controversy or claim arising out of or relating to this Agreement, or the breach thereof.

"Sanctioned Person" means any Person that is the target of Sanctions, including by virtue of being (a) listed on any Sanctions-related list of designated or blocked persons; (b) a Governmental Authority of, resident in, or organized under the laws of a country or territory that is the target of comprehensive Sanctions (as of the date of this Agreement, Cuba, Iran, North Korea, Syria and the Crimea region and so-called Donetsk People's Republic and Luhansk People's Republic in Ukraine); or (c) 50% or more owned or controlled by any of the foregoing.

"Sanctions" means trade, economic and financial sanctions Laws, embargoes and restrictive measures, including those administered, enacted or enforced by (a) the United States (including the Department of Treasury, Office of Foreign Assets Control), (b) the European Union and enforced by its member states, (c) the United Nations or (d) His Majesty's Treasury of the United Kingdom.

"<u>Security Breach</u>" means any actual or alleged (i) security breach or unauthorized access or use of any of the Business Systems, (ii) unauthorized access, acquisition, destruction, damage, disclosure, loss, corruption, alteration or use of any Personal Information or sensitive business information included in the Business Data, or (iii) unauthorized interference with system operations or security safeguards of the Business Systems, including any phishing incident or ransomware attack.

"<u>Seller Confidentiality Agreements</u>" means those agreements by and between the Seller, on the one hand, and Persons expressing an interest in acquiring an ownership interest in the Seller or the Business, on the other hand, with respect to the use and confidentiality of information about the Seller and the Business and certain other obligations.

"<u>Seller Fundamental Representations</u>" means the representations and warranties contained in the first sentence of <u>Section 3.1</u>, <u>Section 3.2</u>, <u>Section 3.7(a)</u> and <u>Section 3.9</u>.

"<u>Senokot Agreement</u>" means that certain Amended and Restated License Agreement (Senokot®), dated November 29, 2006, between the Seller and PRA.

"<u>Separation & Coexistence Agreement</u>" means a Separation and Coexistence Agreement with various ex-U.S. entities concerning, among other things, cooperation and coexistence terms in relation to certain Trademarks and domain names related to the Business.

"<u>Separation Assets</u>" means (i) all rights and obligations under the PRA Separation Agreement the Separation & Coexistence Agreement, and (ii) any assets quitclaimed to the Seller under the Separation & Coexistence Agreement, in each case of the foregoing (i) and (ii) to the extent Related to the Business.

"<u>Shared Contracts</u>" means any Contract entered into prior to the Closing to which the Seller or any of its Affiliates is a party that relates to both the Business and another business of the Seller or any of its Affiliates.

"<u>SKU</u>" means a stock-keeping unit maintained by a business in respect of a product or good in which it trades.

"<u>Software</u>" means any and all (a) computer programs and other software, including software implementations of algorithms, models and methodologies, whether in source code, object code or other form; (b) computerized databases and other computerized compilations and collections of data or information; (c) components of and technology supporting the foregoing (e.g., development tools); and (d) all documentation, including user manuals and training documentation, related to any of the foregoing.

"<u>Straddle Period</u>" means a taxable period beginning on or before and ending after the Closing Date.

"<u>Sublicense Agreement</u>" means that form of certain Sublicense Agreement substantially in the form attached hereto as <u>Exhibit B</u>.

"Subsidiary" means with respect to any Person, any corporation, limited liability company, partnership or other organization, whether incorporated or unincorporated, of which (a) at least a majority of the outstanding shares of capital stock of, or partnership interests or other equity interests, having by their terms ordinary voting power to elect a majority of the board of directors or others performing similar functions with respect to such corporation, limited liability company, partnership or other organization is directly or indirectly owned or controlled by such Person or by any one or more of its Subsidiaries, or by such Person and one or more of its Subsidiaries, or (b) with respect to a partnership, such Person or any other Subsidiary of such Person is a general partner of such partnership.

"Successful Bidder" means the bidder with the highest or otherwise best bid as determined in accordance with the Bidding Procedures.

"Superior Proposal" means any bona fide proposal or offer to or from a Person other than the Purchaser or its Representatives with respect to (a) any plan of reorganization or liquidation, proposal, offer, dissolution, winding up, liquidation, reorganization, merger, consolidation, business combination, joint venture, partnership, sale of assets or equity interests or restructuring involving the Acquired Assets, or (b) any other direct or indirect acquisition involving the Acquired Assets, that, in each case, the Seller has determined in its sole business judgment would, if consummated, result in a transaction superior to the transactions contemplated hereunder.  Notwithstanding the foregoing, any Break-Up Fee or Expense Reimbursement under this Agreement will be treated as an administrative expense.

"Target Net Working Capital" means $18,000,000.

"Tax" or "Taxes" means any and all U.S. federal, state, local and non-U.S. taxes, assessments, levies, duties, tariffs, imposts and other similar charges and fees imposed by any Governmental Entity, including income, franchise, windfall or other profits, gross receipts, capital, inventory, accumulated, earnings, intangibles, license, property, sales, use, net worth, capital stock, payroll, employment, social security, workers' compensation, unemployment compensation, excise, withholding, ad valorem, stamp, transfer, documentary, conveyance, recording, value-added, occupation, environmental, disability, real property, personal property, escheat, unclaimed property, registration, alternative or add-on minimum, or estimated taxes, whether disputed or not, and including any interest, penalty, additions to tax and any additional amounts imposed with respect thereto.

"Tax Records" means any Tax Return, and any other books, records and work papers related to Taxes that are in the possession, custody or control of the Seller.

"Tax Refund" means any Tax refund, rebate or credit in lieu thereof with respect to or related to Taxes (including any interest paid or credited with respect thereto).

"Tax Return" means any return, filing, report, questionnaire, information statement, estimate, claim for refund or declaration, including any schedule or attachment thereto or any amendment thereof, filed or required to be filed with any Taxing Authority in connection with the determination, assessment or collection of any Tax, or the administration of any laws,

regulations or administrative requirements relating to any Tax, including consolidated, combined and unitary tax returns.

"Taxing Authority" means any U.S. federal, state, local or non-U.S. Governmental Entity or authority exercising regulatory authority in respect of Taxes or responsible for the imposition of any Tax.

"Trade Secrets" means trade secrets and rights in confidential or proprietary information, inventions, know-how, discoveries, methods, processes, formulae, models, databases, algorithms, designs, specifications, protocols, techniques and methodologies.

"Trademarks" means trademarks, trade names, service marks, trade dress, corporate names, slogans, logos, symbols and other similar designations of source or origin, together with the goodwill associated with or symbolized by any of the foregoing.

"Transaction Expenses" means any fees, costs and expenses incurred or subject to reimbursement by the Business, whether accrued for or not, in each case, in connection with the transactions contemplated by this Agreement and not paid prior to the Closing, including (a) any brokerage fees, commissions, finders' fees or financial advisory fees, in each case, including related costs and expenses, (b) any fees, costs and expenses of counsel, accountants and other advisors or service providers, and (c) any sale, change of control, retention, phantom equity payout or other similar payments, benefits or obligations to any Business Employee, officer, director, individual independent contractor or other individual service provider payable in connection with the execution of this Agreement or consummation of the transactions contemplated by this Agreement (*plus* the employer portion of any payroll, social security, unemployment or similar Taxes imposed on such amounts, computed as though all such amounts were payable on the Closing Date).

"Transferred Employee Records" means copies of the following employment and personnel information with respect to each Transferred Employee, in each case, to the extent permitted by applicable Law to be made available to the Purchaser: salary, wage information, job function/descriptions, KERP amounts, copies of any confidentiality or similar agreements and any other information reasonably requested in writing by the Purchaser that is required in order for the Purchaser to meet its obligations under Section 6.10.

"Transition Services Agreement" means that certain Transition Services Agreement to be entered into by and between the Seller, on the one hand, and the Purchaser, on the other hand, in the form agreed by the parties pursuant to Section 6.22.

"VA" means the United States Department of Veterans Affairs.

"VA Master Agreement" means an agreement between a pharmaceutical manufacturer and the VA to implement the provisions of the Veterans Health Care Act of 1992, 38 U.S.C. § 8126.

"VHCA" means the Veterans Health Care Act of 1992, 38 U.S.C. § 8126.

"WARN Act" means the Worker Adjustment and Retraining Notification Act of 1988, as amended, and any similar state, local or foreign Law relating to plant closings or mass layoffs.

Terms Defined Elsewhere.  The following terms are defined elsewhere in this Agreement, as indicated below:

| Term | Section |
|---|---|
| Acquired Assets | Section 1.1 |
| Acquisition | Recitals |
| Agreement | Preamble |
| Alcon Agreement | Section 6.4(a) |
| Alcon Contingent Consideration | Section 1.6(b) |
| AMP | Article X |
| Assigned Contracts | Section 1.1(d) |
| Assigned NDC Numbers | Section 1.1(n) |
| Assigned Product Numbers | Section 1.1(n) |
| Assignment and Assumption Agreement | Section 2.3(a)(ii) |
| Assumed Liabilities | Section 1.3 |
| Avoidance Actions | Section 1.1(k) |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Betadine Contingent Consideration | Section 1.6(b) |
| Betadine Licensed IP | Section 6.4(a) |
| Bill of Sale | Section 2.3(a)(i) |
| Business | Recitals |
| Business Employees | Section 3.15(a) |
| Business Intellectual Property | Section 3.11(b) |
| Business Owned Intellectual Property | Section 3.11(b) |
| Business Registered Intellectual Property | Section 3.11(a) |
| Chapter 11 Cases | Recitals |
| Closing | Section 2.1 |
| Closing Date | Section 2.1 |
| Closing Statement | Section 2.2 |
| CMO Agreement | Section 3.12(a)(xv) |
| Consent | Section 3.3 |
| Consultation Period | Section 2.4(c) |
| Continuation Period | Section 6.10(d) |
| Cure Costs | Section 1.5(a) |
| Debt Financing | Section 6.18(a) |
| Deposit Amount | Section 1.7 |
| Designated Parties | Section 1.1(k) |
| Designation Deadline | Section 1.5(c) |
| Disputed Items | Section 2.4(c) |
| DOJ | Section 6.3(b) |
| Enforceability Limitations | Section 3.2 |
| Equity Financing | Section 4.8 |

Excess Cure Amount ................................................................Section 1.5(b)
Excluded Assets ....................................................................... Section 1.2
Excluded Contracts .................................................................Section 1.2(h)
Excluded Liabilities ................................................................. Section 1.4
Executory Contract ..................................................................Section 1.5(a)
Executory Contracts List ..........................................................Section 1.5(a)
Extended Contract Period .........................................................Section 1.5(e)
Final Closing Statement ...........................................................Section 2.4(d)
Final Overage..........................................................................Section 2.4(e)
Final Underage.........................................................................Section 2.4(g)
Final Upfront Consideration ......................................................Section 2.4(d)
Financial Crimes Compliance Laws ...........................................Section 3.13(c)
Financial Statements ................................................................ Section 3.5
FTC .......................................................................................Section 6.3(b)
Government Programs................................................Section 6.16(a)(i)(1)
Guarantee...............................................................................Section 6.19(a)
Guaranteed Obligations............................................................Section 6.19(b)
Guarantor................................................................................Preamble
HSR Act ................................................................................. Section 3.3
Intellectual Property Assignment Agreements ................................. Section 2.3(a)(iii)
Inventory................................................................................. Section 1.1(e)
IP Contingent Consideration .....................................................Section 1.6(b)
Material Contracts ................................................................... Section 3.12(a)
Multiemployer Plan..................................................................Section 3.14(c)
Offer Employees .....................................................................Section 6.10(a)
Outside Date ........................................................................... Section 8.1(a)
Paying Party............................................................................Section 9.1(c)
Periodic Taxes.........................................................................Section 9.1(b)
Petition Date ........................................................................... Recitals
Post-Closing Statement ............................................................Section 2.4(a)
PRA ......................................................................................Section 6.4(a)
PRALP .................................................................................Section 3.17(k)
Preliminary Net Working Capital ..............................................Section 2.4(a)
Preliminary Upfront Consideration Amount ................................Section 2.4(a)
Product Claims........................................................................Section 1.3(e)
Products .................................................................................Recitals
Purchaser ...............................................................................Preamble
Purchaser 401(k) Plan .............................................................. Section 6.10(f)
Purchaser Welfare Plans............................................................Section 6.10(h)
Reimbursing Party....................................................................Section 9.1(c)
Restricted Asset ...................................................................... Section 1.5(f)
Review Period .........................................................................Section 2.4(b)
Safety Notice ..........................................................................Section 3.16(h)
Seller .....................................................................................Preamble
Seller 401(k) Plan .................................................................... Section 6.10(f)
Seller Disclosure Letter .............................................................Article III

Seller Welfare Plan ...............................................................................Section 6.10(h)
Senokot Contingent Consideration ........................................................Section 1.6(b)
Senokot Licensed IP..............................................................................Section 6.4(a)
Settlement Accountant ...........................................................................Section 2.4(c)
Statement of Objections .........................................................................Section 2.4(b)
Transfer Taxes .......................................................................................Section 9.1(a)
Transferred Employee ...........................................................................Section 6.10(a)
Upfront Consideration............................................................................Section 1.6(a)
URA .......................................................................................................... Article X
Welfare Commencement Date................................................................Section 6.10(h)

*[Signature Page Follows]*

IN WITNESS WHEREOF, the Seller, the Purchaser and the Guarantor have caused this Agreement to be executed on their behalf as of the date first written above.

**SELLER:**

**Avrio Health L.P.**
By: Purdue Pharma Inc., its general partner

By: *Brianne Weingarten*

Name: Brianne Weingarten
Title: Vice President, Chief Strategic Officer

IN WITNESS WHEREOF, the Seller, the Purchaser and the Guarantor have caused this Agreement to be executed on their behalf as of the date first written above.

**GUARANTOR:**

**ARCADIA CONSUMER HEALTHCARE INC.**

By: _Mike DeBiasi_ _____
    Name: Michael DeBiasi
    Title:  Chief Executive Officer

**PURCHASER:**

**ATLANTIS CONSUMER HEALTHCARE INC.**

By: _Mike DeBiasi_ _____
    Name: Michael DeBiasi
    Title:  Chief Executive Officer