DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Eli J. Vonnegut
Christopher S. Robertson
Dylan A. Consla

*Counsel to the Debtors*
*and Debtors in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| PURDUE PHARMA L.P., *et al.*, | Case No. 19-23649 (SHL) |
| Debtors.[1] | (Jointly Administered) |

**DECLARATION OF RAFAEL J. SCHNITZLER IN SUPPORT OF MOTION OF DEBTORS FOR ENTRY OF ORDERS (I)(A) APPROVING BIDDING PROCEDURES FOR SALE OF DEBTORS' AVRIO ASSETS, (B) APPROVING THE DESIGNATION OF ATLANTIS CONSUMER HEALTHCARE INC., A WHOLLY OWNED SUBSIDIARY OF ARCADIA CONSUMER HEALTHCARE INC., AS THE STALKING HORSE BIDDER FOR THE AVRIO ASSETS, (C) AUTHORIZING AND APPROVING ENTRY INTO THE STALKING HORSE ASSET PURCHASE AGREEMENT, (D) APPROVING BID PROTECTIONS, (E) SCHEDULING AUCTION FOR, AND HEARING TO APPROVE, SALE OF DEBTORS' AVRIO ASSETS, (F) APPROVING FORM AND MANNER OF NOTICES OF SALE, AUCTION, AND SALE HEARING, (G) APPROVING ASSUMPTION AND ASSIGNMENT PROCEDURES, AND (H) GRANTING**

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

**RELATED RELIEF AND (II)(A) APPROVING SALE OF DEBTORS' AVRIO
ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS, AND
ENCUMBRANCES, (B) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF
EXECUTORY CONTRACTS AND UNEXPIRED LEASES,
AND (C) GRANTING RELATED RELIEF**

I, Rafael J. Schnitzler, declare as follows:

1. I am a Managing Director in the Strategic Advisory Group at PJT Partners LP ("**PJT**"), which serves as the investment banker for Purdue Pharma L.P. and certain of its affiliates, as debtors and debtors in possession in the above-captioned cases (collectively, "**Purdue**" or the "**Debtors**"). PJT is an investment banking firm listed on the New York Stock Exchange with its principal offices located at 280 Park Avenue, New York, New York 10017.

2. I submit this declaration (this "**Declaration**") in support of the *Motion of Debtors for Entry of Orders (I)(a) Approving Bidding Procedures for Sale of Debtors' Avrio Assets, (b) Approving the Designation of Atlantis Consumer Healthcare Inc., a Wholly-Owned Subsidiary of Arcadia Consumer Healthcare Inc., as the Stalking Horse Bidder for the Avrio Assets, (c) Authorizing and Approving Entry into the Stalking Horse Asset Purchase Agreement, (d) Approving Bid Protections, (e) Scheduling Auction for, and Hearing To Approve, Sale of Debtors' Avrio Assets, (f) Approving Form and Manner of Notices of Sale, Auction, and Sale Hearing, (g) Approving Assumption and Assignment Procedures, and (h) Granting Related Relief and (II)(a) Approving Sale of Debtors' Avrio Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (b) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases, and*

*(c) Granting Related Relief* (the "**Motion**").[2] In particular, I submit this Declaration as evidence supporting my opinion that the Debtors' sale and marketing process is sufficient to identify potential bidders for the Avrio Assets (as defined below), and that entry into a transaction pursuant to the Bidding Procedures presents the best means to maximize the value of the Debtors' estates.

3. Except as otherwise indicated, all statements in this Declaration are based on my personal knowledge of the Debtors' operations and finances gained throughout PJT's engagement by the Debtors; my discussions with the Debtors' senior management, other members of the PJT team, and the Debtors' other advisors; my involvement in negotiating with counterparties on behalf of the Debtors; my review of relevant documents; the Debtors' records maintained in the ordinary course of their business; and/or my opinion based upon my experience.

4. I am not being specifically compensated for this testimony and PJT is receiving compensation only as part of its engagement letter with the Debtors, which includes, among other things, a transaction fee for a sale of the Debtors' assets.

5. I am over the age of 18 years and authorized to submit this Declaration on behalf of the Debtors. If I were called upon to testify, I could and would competently testify to each of the facts set forth herein based on such personal knowledge, discussions, involvement, review of documents, and/or opinion.

**Background and Qualifications**

---

[2] Capitalized terms used but not defined otherwise herein shall have the meanings ascribed to them in the Motion.

6. I have been an employee at PJT since its spinoff from The Blackstone Group L.P. effective as of October 1, 2015 and, since that time, have focused primarily on mergers and acquisitions in the healthcare and telecommunications industries. Prior to joining PJT, I was a Vice President at Deutsche Bank Securities, Inc. where I worked in the investment bank division from 2011 to 2015.

7. I hold a Bachelor of Arts degree in Economics from University of California Davis and a Master of Business Administration degree with a finance concentration from the Darden School of Business of the University of Virginia.

8. I have 12 years of mergers and acquisitions experience and have served as financial advisor in numerous transactions including asset sales and public and private company mergers and acquisitions. I have been an advisor to the Debtors since 2017. I have been an advisor in connection with the following transactions, among others: the sale of Stemline Therapeutics to Menarini Group, ADMA Biologics' acquisition of Biotest's Therapy Business Unit Assets, the sale of Yahoo's core operating business to Verizon, the sale of Global Tower Partners to American Tower Corporation, RigNet's acquisition of Inmarasat's Energy Broadband Business, the sale of Rhodes Technologies to Noramco, the recapitalization of Phoenix Tower International and the recapitalization of DataBank.

9. To date, PJT has, among other things, engaged in extensive due diligence of the Debtors' business, including their operations, assets, corporate structure, and contractual arrangements to build a foundation for the Debtors' business plan and restructuring strategy. Moreover, PJT has performed diligence on the Debtors' cash flows and liquidity. PJT has played a critical role in arm's-length negotiations between the Debtors and their key stakeholders in furtherance of the Debtors' restructuring efforts. In

addition, PJT has worked closely with the Debtors, AlixPartners, LLP (the Debtors' financial and restructuring advisor), Skadden, Arps, Slate, Meagher & Flom LLP (the Debtors' counsel with respect to the Sale Transaction) and Davis Polk & Wardwell LLP (the Debtors' counsel with respect to the restructuring) on the Sale Transaction described in the Motion and this Declaration.

### The Marketing of the Avrio Assets

10. PJT has been engaged as investment banker to the Debtors since the Petition Date.[3] After considering a wide range of potential strategic alternatives and extensive discussions with relevant stakeholders, the Debtors, in consultation with their advisors, ultimately determined that a sale of the Avrio Assets would maximize the value of these significant non-core, non-opioid assets.

11. The Debtors and PJT began working on marketing materials to support the sale of the Avrio Assets in the summer of 2022. In December 2022, PJT began reaching out to a broad universe of potential purchasers that PJT had identified as potentially having the interest and wherewithal to act as a "stalking horse" bidder for the Avrio Assets in connection with a Court-supervised auction process (the "**Auction**"), including a number of parties that had previously contacted PJT during the course of the Cases to express potential interest in the Avrio Assets. Over the course of this initial outreach, PJT contacted over 70 financial and strategic parties. Several of these parties, including the Stalking Horse Bidder (as defined below), expressed interest in considering a transaction with the Debtors, and each was offered an opportunity to enter into a non-disclosure agreement to

---

[3] The *Order Approving Debtors' Employment of PJT Partners LP as Investment Banker Nunc Pro Tunc to the Petition Date* was entered on January 9, 2020 ("**PJT Retention Order**") [D.I. 728].

continue in the process. The Debtors executed non-disclosure agreements with 33 of these parties, each of which was granted access to a data room containing limited confidential information regarding the Avrio Assets. Throughout this initial stage, each prospective purchaser interested in doing so attended diligence calls and meetings with PJT and the Debtors' management team. Due diligence calls and information were granted to the extent appropriate for this initial stage of the process. The Debtors and PJT requested that interested parties submit their round one proposals by January 24, 2023.

12. Sixteen interested parties submitted round-one proposals. The Debtors and their advisors reviewed and discussed the round one proposals and elected to invite eight parties into the second round of the process based on numerous factors, including the economic and other terms of the proposals, the parties' financial wherewithal to acquire the Avrio Assets, and the parties' perceived level of interest. The parties invited into the second round of the process were granted the opportunity to attend a management presentation with the Debtors' management team and were granted access to a virtual data room that included additional confidential information regarding the Avrio Assets. Select parties conducted extensive due diligence and requested additional specific financial, operational, legal, regulatory, tax and product information. Certain parties requested numerous calls and management meetings with the Debtors' management team and the Debtors' advisors. The Debtors and PJT requested interested parties to submit round-two proposals on March 14, 2023. Three prospective purchasers submitted round two proposals which included financing commitment letters. The prospective purchasers also submitted comments and issues on the Debtors' draft form of Stalking Horse Agreement.

13. The Debtors and the Debtors' advisors reviewed the round two proposals, engaged in discussions and concluded to have two potential purchasers submit best and final proposals by March 19, 2023. Prior to March 19, 2023, the Debtors' advisors provided the potential purchasers with key economic and legal feedback on their second round proposals. Both potential purchasers submitted documentation reflecting their best and final proposals and both parties' financial and legal terms improved materially from their round two proposals. After March 19th, one of the potential purchasers revised its best and final proposal to reflect current business conditions for the Avrio Assets. After thoroughly evaluating the final proposals, the Debtors, in the exercise of their business judgment and with the assistance of their advisors, determined that the revised best and final proposal (the "**Stalking Horse Bid**") submitted by Atlantis Consumer Healthcare Inc. (the "**Stalking Horse Bidder**") offered the most favorable terms available, taken as a whole.

14. Through the Debtors' proposed Court-supervised sale process, the Debtors, with the aid of PJT, will continue to market the Avrio Assets to potential buyers, including, without limitation, those potential buyers approached by PJT and/or that expressed inbound interest earlier in the marketing process, by (a) engaging potential buyers and investors that may have an interest in bidding for the Avrio Assets or a portion thereof, (b) delivering materials to interested parties, and (c) providing access to a data room of confidential information on the Avrio Assets to interested parties. In this way, the Debtors, with the assistance of PJT, intend to maximize the number of participants that may participate as potential bidders at the Auction and, thereby, maximize the value of the Avrio Assets to be achieved through the sale process.

**The Stalking Horse Agreement**

15.     It is my opinion that the Stalking Horse Agreement was negotiated at arm's length and is the product of good faith negotiations, without collusion. I am not aware of any indication of fraud, collusion between the Stalking Horse Bidder and other bidders, or any similar conduct that would taint the sale process. The Stalking Horse Agreement does not contain special treatment for the Debtors' affiliates or insiders. The Stalking Horse Bidder's offer will be subject to higher or otherwise better bids, and thus, ultimately, the Successful Bidder will have submitted the highest or otherwise best bid. Moreover, the Stalking Horse Bidder is able to provide adequate assurance of performance under the Proposed Assigned Contracts as required under section 365 of the Bankruptcy Code.

**The Reasonableness of the Proposed Break-Up Fee and Expense Reimbursement**

16.     The Break-Up Fee and Expense Reimbursement are reasonable and appropriate in light of the size, nature and complexity of the transaction and the efforts that will necessarily have been expended by the Stalking Horse Bidder. First, the Break-Up Fee represents 3.0% of the Purchase Price to be paid by the Stalking Horse Bidder. Additionally, both the Break-Up Fee and the Expense Reimbursement were negotiated in good faith, and both were necessary to secure the Stalking Horse Bidder's commitment under the Stalking Horse Agreement. In sum, the Debtors' ability to offer the Break-Up Fee and Expense Reimbursement enables them to ensure the sale of the Avrio Assets at a price they believe to be fair, while, at the same time, providing them with the opportunity to achieve a higher or otherwise better offer for such assets to the benefit to their estates. Moreover, the payment of the Break-Up Fee and Expense Reimbursement will not diminish the Debtors' estates. The Debtors do not intend to terminate the Stalking Horse

Agreement, if doing so would incur an obligation to pay the Break-Up Fee and Expense Reimbursement, unless the Debtors either (a) accept an alternative bid that provides for consideration that is greater than the consideration offered by the Stalking Horse Bidder by an amount sufficient to pay the Break-Up Fee and Expense Reimbursement or (b) exercise their fiduciary duties to pursue a transaction that otherwise maximizes value for the benefit of the Debtors' stakeholders.

17. In light of these circumstances, the Break-Up Fee and Expense Reimbursement are (a) commensurate to the real and substantial benefits conferred upon the Debtors' estates by the Stalking Horse Bidder, (b) reasonable and appropriate in light of the size and nature of the proposed Sale Transaction and comparable transactions, the commitments that have been made, the condition of the Avrio Assets, and the efforts that have been and will be expended by the Stalking Horse Bidder, and (c) necessary to induce the Stalking Horse Bidder to pursue the Sale Transaction and to continue to be bound by the Stalking Horse Agreement. Further, the Stalking Horse Agreement provisions relating to the Bid Protections (along with other provisions of the Stalking Horse Agreement) were (x) scrutinized by the Debtors' professionals, (y) reviewed with outside advisors through the marketing process, and (z) approved by the Debtors' board of directors.

### The Reasonableness of the Bidding Procedures

18. The proposed Bidding Procedures are designed to maximize the value received for the Avrio Assets by facilitating a competitive bidding process in which all potential bidders are encouraged to participate and submit competing bids within a time frame that will allow the Debtors to efficiently consummate a sale transaction and maximize value for their stakeholders. The Bidding Procedures provide for an orderly,

uniform, and appropriately competitive process through which interested parties may submit offers to purchase the Avrio Assets. The Debtors, with the assistance of their advisors, have structured the Bidding Procedures to promote active bidding by interested parties and to obtain the highest or otherwise best offers for the Avrio Assets. Additionally, the Bidding Procedures will allow the Debtors to conduct the Auction in a fair and transparent manner that will encourage participation by financially capable bidders with demonstrated ability to consummate a timely Sale Transaction.

19.    The proposed Bid Deadline requires bids for the purchase of the Avrio Assets to be delivered no later than 5:00 p.m. (prevailing Eastern Time) on May 15, 2023. The Bid Deadline should provide parties with sufficient time to obtain information and formulate and submit a timely and informed bid to purchase the Avrio Assets, taking into account the time that a number of the most likely interested parties have already invested in due diligence earlier in the process.

20.    As described above, the Avrio Assets were extensively marketed to a broad group of strategic and financial buyers and substantial information regarding the Debtors' businesses has been made available during the marketing process. In particular, many of the approximately 33 interested parties who executed non-disclosure agreements with the Debtors had access to the Debtors' data room for several weeks or more. Accordingly, numerous parties that may have an interest in bidding at the Auction have an existing base of knowledge and familiarity with the Avrio Assets, and in many cases have already conducted significant due diligence that will assist them in formulating potential bids. Given the length and breadth of the Debtors' marketing process, it is my opinion that the

proposed sale process is likely to facilitate the Debtors' ability to achieve a value-maximizing transaction.

21. In addition, potential bidders will have access to a substantial body of information prepared by the Debtors, their advisors and the Debtors' management team, inclusive of historical and projected financial information, operational data, and an extensive data room, including information gathered specifically based upon the due diligence requests of potential buyers.

22. Accordingly, based on the extensive marketing efforts of the Debtors and their advisors, including PJT, and the level of preparedness at the outset of the marketing process, the timeline contained in the Bidding Procedures for the Debtors to further market the Avrio Assets is reasonable.

23. The Bidding Procedures are designed to effect an orderly but expeditious sale of the Avrio Assets, and the terms, conditions, and procedures set forth therein are, taken as a whole, fair and reasonable and are designed to facilitate the Debtors' receiving the highest or otherwise best offer for the Avrio Assets.

24. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:   April 4, 2023
         New York, New York

                                                              By:   */s/ Rafael J. Schnitzler*
                                                                    Rafael J. Schnitzler