**Hearing Date and Time: May 23, 2023 at 11:00 a.m. (prevailing Eastern Time)**
**Objection Date and Time: May 16, 2023 at 4:00 p.m. (prevailing Eastern Time)**

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
James I. McClammy
Eli J. Vonnegut
Darren S. Klein
Dylan A. Consla

*Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | **Chapter 11** |
| **PURDUE PHARMA L.P.,** *et al.*, | **Case No. 19-23649 (SHL)** |
| Debtors.[1] | **(Jointly Administered)** |

### NOTICE OF HEARING ON MOTION OF DEBTORS FOR ENTRY OF AN ORDER AUTHORIZING IMPLEMENTATION OF 2023 KEY EMPLOYEE INCENTIVE PLAN AND 2023 KEY EMPLOYEE RETENTION PLAN

**PLEASE TAKE NOTICE** that on May 2, 2023, the above-captioned debtors and debtors in possession in these proceedings (collectively, the "**Debtors**") filed the *Motion of*

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

*Debtors for Entry of an Order Authorizing Implementation of 2023 Key Employee Incentive Plan and 2023 Key Employee Retention Plan* (the "**Motion**").  A hearing on the Motion will be held on **May 23, 2023 at 11:00 a.m. (prevailing Eastern Time)** (the "**Hearing**") before the Honorable Sean H. Lane, United States Bankruptcy Judge, United States Bankruptcy Court for the Southern District of New York, at the United States Bankruptcy Court for the Southern District of New York, 300 Quarropas Street, White Plains, New York 10601 (the "**Bankruptcy Court**"), or at such other time as the Bankruptcy Court may determine.

PLEASE TAKE FURTHER NOTICE that the Hearing may be continued or adjourned thereafter from time to time without further notice other than an announcement of the adjourned date or dates at the Hearing or a later hearing.  The Debtors will file an agenda before the Hearing, which may modify or supplement the motions to be heard at the Hearing.

PLEASE TAKE FURTHER NOTICE that pursuant to General Order M-543, dated March 20, 2020 (Morris, C.J.) ("**General Order M-543**"), and at the Bankruptcy Court's directive, the Hearing will be conducted **via Zoom for Government®** so long as General Order M-543 is in effect or unless otherwise ordered by the Bankruptcy Court.[2]  Parties wishing to appear at, or attend, an omnibus hearing conducted via Zoom for Government® videoconference are required to register their appearance by 4:00 p.m. (prevailing Eastern Time) the day before such omnibus hearing at https://ecf.nysb.uscourts.gov/cgi-bin/nysbAppearances.pl.

PLEASE TAKE FURTHER NOTICE that any responses or objections (the "**Objections**") to the Motion shall be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the Southern District of New York, shall be filed with the Bankruptcy Court (a) by attorneys practicing in the Bankruptcy Court,

---

[2] A copy of General Order M-543 can be obtained by visiting https://www.nysb.uscourts.gov/news/general-order-m-543-court-operations-under-exigent-circumstances-created-covid-19.

including attorneys admitted *pro hac vice*, electronically in accordance with General Order M-399 (which can be found at https://www.nysb.uscourts.gov/sites/default/files/m399.pdf), and (b) by all other parties in interest, on a CD-ROM, in text-searchable portable document format (PDF) (with a hard copy delivered directly to Chambers), in accordance with the customary practices of the Bankruptcy Court and General Order M-399, to the extent applicable, and shall be served in accordance with the *Second Amended Order Establishing Certain Notice, Case Management, and Administrative Procedures* entered on November 18, 2019 [ECF No. 498], so as to be filed and received no later than **May 16, 2023 at 4:00 p.m. (prevailing Eastern Time)** (the "**Objection Deadline**").

PLEASE TAKE FURTHER NOTICE that any objecting parties are required to attend the Hearing, and failure to appear may result in relief being granted upon default; *provided* that objecting parties shall attend the Hearing via Zoom for Government® so long as General Order M-543 is in effect or unless otherwise ordered by the Bankruptcy Court.

PLEASE TAKE FURTHER NOTICE that if no Objections are timely filed and served with respect to the Motion, the Debtors may, on or after the Objection Deadline, submit to the Bankruptcy Court an order substantially in the form of the proposed order annexed to the Motion, which order may be entered without further notice or opportunity to be heard.

PLEASE TAKE FURTHER NOTICE that copies of the Motion may be obtained free of charge by visiting the website of Kroll Restructuring Administration at https://restructuring.ra.kroll.com/purduepharma.  You may also obtain copies of any pleadings by visiting the Bankruptcy Court's website at https://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

Dated:  May 2, 2023
        New York, New York

DAVIS POLK & WARDWELL LLP

*/s/ Darren S. Klein*

450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
James I. McClammy
Eli J. Vonnegut
Darren S. Klein
Dylan A. Consla

*Counsel to the Debtors*
*and Debtors in Possession*

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
James I. McClammy
Eli J. Vonnegut
Darren S. Klein
Dylan A. Consla

*Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **PURDUE PHARMA L.P.,** *et al.*, | **Case No. 19-23649 (SHL)** |
| **Debtors.**[1] | **(Jointly Administered)** |

**MOTION OF DEBTORS FOR ENTRY OF AN ORDER AUTHORIZING
IMPLEMENTATION OF 2023 KEY EMPLOYEE INCENTIVE
PLAN AND 2023 KEY EMPLOYEE RETENTION PLAN**

The above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**,"

the "**Company**" or "**Purdue**"), by and through their undersigned counsel, hereby submit this

*Motion of Debtors for Entry of an Order Authorizing Implementation of 2023 Key Employee*

*Incentive Plan and 2023 Key Employee Retention Plan* (this "**Motion**"). In support of this Motion,

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

the Debtors rely on the *Declaration of Jesse DelConte in Support of the Motion of Debtors for Entry of an Order Authorizing Implementation of 2023 Key Employee Incentive Plan and 2023 Key Employee Retention Plan* (the "**DelConte Declaration**"), attached hereto as **Exhibit B**, and the *Declaration of Josephine Gartrell in Support of the Motion of Debtors for Entry of an Order Authorizing Implementation of 2023 Key Employee Incentive Plan and 2023 Key Employee Retention Plan* (the "**Gartrell Declaration**"), attached hereto as **Exhibit C**, and respectfully state as follows:

## Preliminary Statement

1.      By this Motion, the Debtors seek approval of their fourth annual key employee incentive plan and key employee retention plan, each effectively a renewal of the longstanding, annual incentive grants that the Debtors utilized for decades prior to the Petition Date.  The Debtors have closely based their proposed key employee incentive plan (the "**2023 KEIP**") and key employee retention plan (the "**2023 KERP**" and, together with the 2023 KEIP, the "**2023 Compensation Plans**") on compensation programs the Court has approved three times—first in 2020, then in 2021, and again in 2022.  The 2023 Compensation Plans hew closely to the design, structure and cost of these predecessor programs and should likewise be found to satisfy the applicable standards for approval.

2.      As discussed in greater detail herein, the 2023 Compensation Plans continue to reflect substantial reductions to the compensation levels of the Company's employees relative to the Company's prepetition practice, with the most substantial percentage reductions borne by KEIP Participants, honoring discounts that were painstakingly negotiated with key creditor constituencies in 2020, and then generally carried forward in each of 2021 and 2022.[2]  In addition,

---

[2] The CEO (defined below) also agreed to certain one-time reductions in 2022 in the interest of facilitating agreement with key creditor constituencies.

the CEO's grants under the 2023 Compensation Plans were consensually reduced by an additional $352,000 following discussions with certain creditor constituencies prior to the filing of this Motion. With this change, the official committee of unsecured creditors (the "**UCC**") and Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants (the "**AHC**") do not object to the relief sought herein.

3.        The 2023 Compensation Plans are necessary to provide the Debtors' employees with appropriate, market-based compensation.  This year, as in the past, the Compensation and Talent Committee (the "**Compensation Committee**") of the Board of Directors of Purdue Pharma Inc. (the "**Board**") and the Debtors' senior management team benefited from the independent guidance and experience of Willis Towers Watson plc ("**WTW**") in designing and developing the 2023 Compensation Plans and in benchmarking this year's programs against what remains a challenging, competitive labor market.  WTW's analysis revealed that the positioning of the compensation of the Debtors' insider and non-insider employees—even with the proposed 2023 Compensation Plans in place—remains within a competitive range of, and in many cases below, the median for their peers in the pharmaceutical industry.  And providing certainty to the Debtors' employees in a timely fashion that they will receive market-based compensation through customary annual compensation grants remains, as it has been in years prior, essential.  As this Court is well aware, the Debtors' employees continue to await resolution of the Debtors' pending appeal before the United States Court of Appeals for the Second Circuit (the "**Second Circuit Appeal**").  In addition, the recent adverse decision of the United States District Court for the District of Delaware with respect to litigation centering on certain patents (the "**Patent Litigation**") that relate to Purdue's innovative abuse deterrent formula for OxyContin®, which is the product of significant research investment, may result in additional challenges with respect to

3

maintaining employee morale even though the Company remains confident in a positive outcome at the United States Court of Appeals for the Federal Circuit. Against that backdrop of uncertainty, employees have been tasked with achieving strong financial results to maximize the value of the Debtors' estates—value that will be distributed to the estates' stakeholders upon emergence. It is essential that the Debtors provide their employees with appropriate, market-based compensation to secure their continued performance and dedication.

4.      The Court has extensively reviewed the Debtors' prior compensation programs and made detailed findings about their necessity and appropriateness. The Court has recognized that these plans are "consistent with industry standards" and "necessary to compensate these employees at market in their industry." Hr'g Tr., 138:1, 142:16–20, Sept. 30, 2020; *see also* Hr'g Tr., 51:4–5, July 29, 2021 (observing that, without a key employee retention plan, "these employees would not be compensated at market"). The Court has also highlighted the importance of providing the Debtors' workforce with market compensation, since the Company's employees are "maintaining the value" of the Debtors' business "and enabling the Debtors . . . to move to a focus on, in large measure, abating the opioid crisis." Hr'g Tr., 54:21–25, July 29, 2021. Indeed, an essential component of the Debtors' proposed chapter 11 plan is that, in addition to the cash held  by the Company and the contributions being made by third parties, the Company itself will be put to continued use in abating the opioid crisis through further cash contributions and supporting medicines to reverse opioid overdoses. So too has the Court acknowledged that the Debtors should have "a proper compensation structure," since "otherwise what they own is going to deteriorate." Hr'g Tr., 113:5–7, Dec. 4, 2019. The 2023 Compensation Plans—like their predecessor programs—represent "a proper exercise of the Debtors' business judgment" to "preserve the value in [their] businesses." Hr'g Tr., 34:5–10, May 18, 2022. They should likewise be approved.

## Relief Requested

5.      By this Motion, and pursuant to sections 363(b) and 503(c)(3) of title 11 of the United States Code (as amended, the "**Bankruptcy Code**"), the Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit A**, authorizing the implementation of the 2023 Compensation Plans.

## Jurisdiction and Venue

6.      The United States Bankruptcy Court for the Southern District of New York (the "**Court**") has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference M-431*, dated January 31, 2012 (Preska, C.J.).  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), the Debtors consent to entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter a final order or judgment consistent with Article III of the United States Constitution.

7.      Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## General Background

8.      On September 15, 2019, the Debtors commenced the above-captioned chapter 11 cases (the "**Chapter 11 Cases**") by filing with the Court voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The United States Trustee for Region 2 appointed the UCC on September 27, 2019.  *See Notice of Appointment of Official Committee of Unsecured Creditors* [ECF No. 131]. No trustee has been appointed in these Chapter 11 Cases.

5

9.     These Chapter 11 Cases are being jointly administered pursuant to Bankruptcy Rule 1015(b) and the *Order Directing Joint Administration of Chapter 11 Cases* [ECF No. 59] entered by the Court in each of the Chapter 11 Cases.

## The Debtors' Historical Compensation Plans

10.     The Debtors' prepetition compensation practices have been described at length in multiple prior motions.[3]  At a high level, for more than thirty years prior to the commencement of these Chapter 11 Cases, the Debtors maintained a performance-based Annual Incentive Plan (the "**AIP**") for the majority of their employees.  The AIP provided annual cash bonuses tied to the achievement of Company and individual performance metrics.  For much of that time, the Debtors also maintained a Long-Term Results Plan (the "**LTRP**" and, together with the AIP, the "**Prepetition Compensation Plans**"), which provided eligible employees with annual grants that would result in cash payouts tied to achievement of corporate objectives measured over a three-year performance period.[4]  Purdue relied on the AIP and LTRP to drive performance and productivity, and as discussed in greater detail in the following section, the Debtors hewed closely

---

[3] *See Mot. of Debtors for Entry of an Order Authorizing (i) Debtors to (a) Pay Pre-Petition Wages, Salaries, Employee Benefits and Other Compensation and (b) Maintain Employee Benefits Programs and Pay Related Administrative Obligations, (ii) Employees and Retirees to Proceed with Outstanding Workers' Compensation Claims and (iii) Financial Institutions to Honor and Process Related Checks and Transfers* [ECF No. 6]; *Mot. of Debtors for Entry of an Order Authorizing Implementation of a Key Employee Incentive Plan and a Key Employee Retention Plan* [ECF No. 1674]; *Mot. of Debtors for Entry of an Order Authorizing Implementation of 2021 Key Employee Incentive Plan and 2021 Key Employee Retention Plan* [ECF No. 3077]; *Mot. of Debtors for Entry of an Order Authorizing Implementation of 2022 Key Employee Incentive Plan and 2022 Key Employee Retention Plan* [ECF No. 4707].

[4] Additional information about the AIP and LTRP can be found in the *Second Suppl. Decl. of Jon Lowne in Supp. of the Mot. of Debtors for Entry of an Order Authorizing (i) Debtors to (a) Pay Pre-Petition Wages, Salaries, Employee Benefits and Other Compensation and (b) Maintain Employee Benefits Programs and Pay Related Administrative Obligations, (ii) Employees and Retirees to Proceed with Outstanding Workers' Compensation Claims and (iii) Financial Institutions to Honor and Process Related Checks and Transfers* [ECF No. 554] (the "**Second Supplemental Lowne Declaration**").

to the structure of their Prepetition Compensation Plans in seeking, and receiving, approval for their compensation programs in 2020, 2021 and 2022.[5]

11.    The Debtors also maintained various retention plans in the ordinary course of business, as needed, to retain their key employees.[6]  In 2018 and 2019 in particular, the Debtors implemented retention plans for certain executive and nonexecutive employees, which were carefully calibrated to incentivize participants to remain employed with the Debtors through the end of 2020.[7]  In December 2019, the Court approved continuation of a prepetition retention plan solely with respect to non-insider employees that provided cash-based awards to approximately 120 such non-insider employees and was structured to retain their services through December 31, 2020.[8]

12.    The Court subsequently approved similar targeted retention programs in 2020, 2021 and 2022.[9]

### Court Approval of Prior Compensation Programs

13.    When the Debtors commenced these Chapter 11 Cases on the Petition Date, they were nearly three-quarters of the way through the performance period for their 2019 AIP, which had historically aligned with the calendar year.  The Debtors also had multiple LTRPs "in flight,"

---

[5] *See, e.g., Decl. of Jon Lowne in Supp. of Mot. of Debtors for Entry of Order Authorizing Implementation of 2021 Key Employee Incentive Plan and 2021 Key Employee Retention Plan* [ECF No. 3077-2] ¶ 4.

[6] *See id.* ¶ 5.

[7] *See id.*

[8] *See Suppl. Final Order Authorizing (i) Debtors to (a) Pay Certain Pre-Petition Wages, Salaries, Employee Benefits and Other Compensation and (b) Maintain Employee Benefits Programs and Pay Related Administrative Obligations, (ii) Employees and Retirees to Proceed with Outstanding Workers' Compensation Claims and (iii) Financial Institutions to Honor and Process Related Checks and Transfers* [ECF No. 629] (the "**2019 AIP and LTRP Order**").

[9] *See Order Authorizing Debtors to Implement Key Employee Retention Plan* [ECF No. 1762]; *Order Authorizing Debtors to Implement 2021 Key Employee Retention Plan* [ECF No. 3571]; *Order Authorizing Debtors to Implement 2022 Key Employee Retention Plan and 2022 Key Employee Incentive Plan* [ECF No. 4862].

given that each year the Debtors would launch a new LTRP, which vested over a three-year performance period.  Unlike many other chapter 11 cases, the Debtors' in-process AIP and LTRP remained viable, because they were not stock-based compensation programs.  Accordingly, the Debtors sought approval to continue honoring their obligations to employees under their in-flight Prepetition Compensation Plans, in order to minimize disruption to the business and retain key employees.  Extensive negotiations with key creditor constituencies ensued, resulting in a substantial reduction in the payments to be made under these programs, and over the course of several hearings, performance under modified versions of these programs was approved.  The reductions addressed important concerns of key stakeholders, including providing for aggregate reductions that exceeded the total amount due under LTRPs with respect to periods before the Debtors ceased marketing opioid medications.  The Debtors' senior-most employees bore a disproportionate share of these reductions for the sake of overall employee retention and morale. In addition, payments to all non-hourly employees, including insiders, were subjected to a modified payment schedule, including an extended clawback period, for both the 2019 AIP and the LTRP awards that would come due in 2020.[10]

14.    The orders approving the programs also included agreed disgorgement and anti-secretion terms.  These orders reserved the Debtors' right to seek disgorgement of amounts paid under the AIP and LTRP in the event any employee was determined by a final order of this Court or other court of competent jurisdiction (a) to have knowingly participated in criminal misconduct in connection with his or her employment with the Debtors, or (b) to have been aware of, and

---

[10] For each insider participant, payments were to be made (i) 50% on April 1, 2020 and (ii) 50% on July 1, 2020, subject to a 25% clawback of the total award upon a resignation prior to September 1, 2020.[10]  For each non-insider, non-hourly employee, 100% of the awards were to be paid on April 1, 2020, with a 50% clawback upon resignation prior to July 1, 2020, and a 25% clawback (without duplication) upon resignation prior to September 1, 2020. *See id.* ¶¶ 66, 69.

failed to report, fraudulent or criminal acts or omissions ((a) and (b) together, the "**Disgorgement Standard**").[11]  A supplemental order further required that the Debtors' chief executive officer in particular not take any action with the intent or effect of frustrating enforcement of any judgment, either of this Court or any other court of competent jurisdiction.[12]  These terms have been included in orders approving the Debtors' subsequent key employee incentive and retention plans in 2020, 2021 and 2022.  And, since 2021, a further safeguard has been included as well: no employee who the Debtors believe, after reasonable inquiry (including inquiry of the Company's advisors), to meet the Disgorgement Standard is eligible to receive payment under a Court-approved compensation program.[13]  Each of these provisions continues to apply to the proposed 2023 Compensation Plans.

15.    The AIP and LTRP were annually-renewed programs, so the Debtors needed to implement new programs each year in order to continue to provide market-level compensation for their employees.  Starting in 2020, the Debtors effectively continued their prepetition AIP, LTRP and targeted retention plan through annually-approved key employee incentive plans and key employee retention plans.  Specifically, the Debtors sought, and received, Court approval for their annual key employee incentive plan and key employee retention plan in each of 2020, 2021 and 2022.

---

[11] *See* 2019 AIP and LTRP Order ¶ 12.

[12] *See Second Suppl. Final Order Authorizing (i) Debtors to (a) Pay Pre-Petition Wages, Salaries, Employee Benefits and Other Compensation and (b) Maintain Employee Benefits Programs and Pay Related Administrative Obligations, (ii) Employees and Retirees to Proceed with Outstanding Workers' Compensation Claims and (iii) Financial Institutions to Honor and Process Related Checks and Transfers* [ECF No. 309]; Supplemental Final Wages Order; *Second Supplemental Final Order Authorizing (i) Debtors to (a) Pay Pre-Petition Wages, Salaries, Employee Benefits and Other Compensation and (b) Maintain Employee Benefits Programs and Pay Related Administrative Obligations, (ii) Employees and Retirees to Proceed with Outstanding Workers' Compensation Claims and (iii) Financial Institutions to Honor and Process Related Checks and Transfers* [ECF No. 783] ¶ 2.

[13] *See, e.g.*, *Order Authorizing Debtors to Implement 2021 Key Employee Retention Plan* [ECF No. 3571] ¶ 9.

16.    In each case, the final, Court-approved programs reflected significant reductions relative to the amounts that would have historically been paid under the corresponding Prepetition Compensation Plan; these reductions were highly negotiated with creditor constituencies. For example, the chart below summarizes reductions to incentive compensation grants to KEIP Participants in the 2020, 2021 and 2022 KEIPs, as well as prepetition incentive compensation programs outstanding on the Petition Date (considering only those KEIP Participants that were employed by the Company throughout in order to allow for meaningful year-over-year comparison):

| Year | Total Awards (at Target) Under Historical Practice | Total Awards (at Target) Under KEIP | Agreed Reductions to Target Awards |
|---|---|---|---|
| 2022 | $7,774,377 | $4,870,092 | ($2,904,285) |
| 2021 | $7,625,177 | $5,220,892 | ($2,404,285) |
| 2020 | $7,480,272 | $5,075,987 | ($2,404,285) |
| Prepetition Programs[14] | N/M | N/M | ($3,687,009) |
| Total | N/M | N/M | ($11,399,864) |

17.    Payments under the annual and long-term components of the Company's 2020, 2021 and 2022 key employee incentive plans were each contingent upon the Debtors' achievement of certain performance metrics pertaining to value creation, innovation and efficiency, and people and culture, which were themselves designed to mirror the Debtors' historical metrics under their Prepetition Compensation Plans. Failure to achieve the performance metrics at a threshold level meant that no payments would be made. While payments under each key employee incentive plan remained subject to similar incentivizing performance metric structure and design structure to the Debtors' prepetition practices, payments to the Debtors' non-insider employees under each key

---

[14] In some cases, only a portion of the applicable prepetition program was still "in flight," making target award amounts a less meaningful metric.

employee retention plan were not subject to performance criteria, so as to give those participants greater certainty about their compensation. Beginning in 2021, the Debtors agreed to formally consult with the UCC, the AHC and the Multi-State Governmental Entities Group (the "**MSGE**") with respect to (a) setting corporate objectives for the calendar year ahead and (b) scoring the Company's performance with respect to the metrics applicable to performance over the course of the year prior.[15] As a result, the proposed corporate objectives with respect to the 2023 Compensation Plans set forth herein already reflect consultation with these creditor constituencies.

18.     The Court has repeatedly recognized that the Debtors' key employee incentive and retention plans essentially replicate a core component of the Debtors' prepetition compensation structure, without which the employees' compensation would fall dramatically below market levels. In authorizing the 2021 key employee retention plan, the Court observed that, without the payments contemplated thereunder, "these employees would not be compensated at market." Hr'g Tr., 51:4−5, July 29, 2021. Last year's program, the Court observed, had been "modified to make it even more retentive and, I think, appropriately fair." Hr'g Tr., 34:3−5, May 18, 2022. With respect to the Debtors' key employee incentive plan, the Court has likewise found that payments were "required by people to be competitive and not go somewhere else," and that the payments were "essentially part of the [executives'] salary." Hr'g Tr., 99:6−10, Sept. 13, 2021.[16] The Court made similar observations when authorizing earlier iterations of the compensation plans as well. *See* Hr'g Tr., 142:16–20, Sept. 30, 2020 (observing with respect to various employee populations that "[t]he record is clear that these payments, in addition to . . . tracking a longstanding practice

---

[15] *See Debtors' Suppl. Omnibus Reply in Supp. of Mot. of Debtors for Entry of an Order Authorizing Implementation of 2021 Key Employee Incentive Plan and 2021 Key Employee Retention Plan* [ECF No. 3744] ¶ 12.

[16] Last year, the Court recognized that the proposed key employee incentive plan remained "consistent" with the programs the Court had approved in years prior. Hr'g Tr., 33:7, May 18, 2022.

of over 30 years, in most cases, albeit reduced from what they were prepetition, [are] necessary to compensate these employees at market in their industry"); Hr'g Tr., 23:8–10, Oct. 28, 2020 ("[T]he revised proposal does place these executives in the middle of industry compensation for people performing jobs like theirs . . . ."); Hr'g Tr., 46:2–8, Nov. 17, 2020 ("[T]he proposed KEIP for these two individuals . . . clearly put[s] their treatment at market for similar pharmaceutical companies even though Purdue obviously is in a bankruptcy case with substantial additional tasks to be performed by these two people.").

**The Proposed 2023 Compensation Plans**

19.     The Debtors now seek approval of their fourth annual key employee incentive plan and key employee retention plan in order to effectively renew, once again, their longstanding annual compensation programs.  The 2023 Compensation Plans, like the longstanding and Court-approved programs on which they are based, are intended to preserve the value of the Debtors' businesses by allowing them to pay market-competitive compensation to motivate the Company's workforce and minimize attrition.   DelConte Decl. ¶ 7.   The resulting package, like its predecessors, includes the following components:

(a)     the 2023 KEIP, described in Section I below, for certain insider employees that, like its predecessor programs, includes (i) an incentive-based, annual award payable in 2024 and (ii) an incentive-based, long-term grant payable in 2024 and subject to clawback through March 2026;[17] and

(b)     the 2023 KERP, described in Section II below, for eligible non-insider employees that, like its predecessor programs, includes (i) an annual retention award payable in 2023 and 2024, (ii) a long-term retention grant payable in 2024 and subject to clawback through March 2026 and (iii) additional targeted retention payments for certain employees.[18]

---

[17] For the avoidance of doubt, the term "**2023 KEIP**" refers to the 2023 KEIP Annual Award and the 2023 KEIP Long-Term Award, collectively.

[18] For the avoidance of doubt, the term "**2023 KERP**" refers to the 2023 KERP Annual Award, the 2023 KERP Long-Term Award and the 2023 Targeted Retention Awards, collectively.

20.    The Compensation Committee and the Debtors' senior management team have again worked closely with WTW, their independent compensation consultant, to benchmark the Debtors' employee compensation against the market.  DelConte Decl. ¶ 10; Gartrell Decl. ¶ 11.

21.    The Debtors' employees are shouldering substantial burdens.  Cumulative attrition has exacerbated the workloads of those employees who remain, all of whom must continue to operate a complex pharmaceutical business in the midst of these protracted Chapter 11 Cases.  DelConte Decl. ¶ 11.  While the senior management team's intense focus on fostering employee well-being and engagement in the face of trying circumstances, combined with providing appropriate compensation under the prior court-approved key employee incentive and retention plans, has held voluntary attrition to manageable levels in recent periods, the Company already maintained lean operations.  The Company also faces a challenging labor market.  Twenty positions have opened at the Company year to date, joining eight positions that opened but were not filled by the end of 2022.  Of these twenty-eight positions, ten remain unfilled, and the eighteen filled positions remained vacant, on average, for more than eight-four days.[19]  DelConte Decl. ¶ 11.

22.    Despite these obstacles, the Debtors' employees must preserve the value of the Debtors' business by continuing to make medicines that benefit patients so that additional value can be generated for opioid abatement, while also delivering on public health initiatives that have the potential to make a meaningful difference and save lives in the context of the opioid crisis.  Departing from the Debtors' established, market-based compensation practices during this critical and delicate juncture—while still awaiting emergence from bankruptcy—could jeopardize the Debtors' ability to maintain their business operations, thereby putting at risk the Debtors' ability

---

[19] Unless otherwise indicated, the employment data referenced in this Motion are current as of April 30, 2023.

to deliver value to their stakeholders.  DelConte Decl. ¶ 37.  Aggregate compensation under the proposed 2023 Compensation Plans remains consistent with the Company's prior Court-approved programs and generally *below* the compensation levels under the Debtors' Prepetition Compensation Plans, as the Debtors continue to honor the reductions that they first painstakingly negotiated in 2020 with their key stakeholders.

## I.    The Proposed 2023 KEIP

A.    Participants

23.    The proposed 2023 KEIP would apply to (i) the Debtors' president and chief executive officer (the "**CEO**"); (ii) the Debtors' new chief financial officer (the "**CFO**") and (iii) the Debtors' executive vice president, general counsel and secretary (the "**General Counsel**") (together with the CEO and CFO, the "**2023 KEIP Participants**").  The 2023 KEIP Participants will not be eligible to participate in the proposed 2023 KERP (including the 2023 Targeted Retention Awards, as defined below), and the purpose of the proposed 2023 KEIP is to incentivize the 2023 KEIP Participants and drive results for the benefit of the estates.  DelConte Decl. ¶ 15.

24.    The CEO and General Counsel were participants in the prior key employee incentive programs.  With respect to the CFO, the Debtors recently reached an agreement with Edward Borkowski to join the Company as CFO on May 8, 2023 and seek authority for Mr. Borkowski to participate in the KEIP on the terms described herein.[20] Mr. Borkowski brings more than 20 years of experience in executive roles for public and private life science companies.  Most recently, he served as Executive Vice President of Therapeutics MD, a women's healthcare

---

[20] In addition, as described by the Debtors' former CFO, Jon Lowne, in prior testimony, it has been the Debtors' long-time practice to offer sign-on bonuses to applicable prospective employees, which are negotiated at arm's length with the prospective employees prior to their employment in order to induce them to accept their offers of employment. *See* Second Suppl. Lowne Decl. ¶ 50.  Mr. Borkowski will receive an aggregate sign-on bonus of $1.2 million, payable over approximately the first 12 to 18 months of his employment.

company, and aided their transition from a development stage company to a commercially focused company. Previously, he was Interim CFO for MiMedx, an industry leader in therapeutic biologics and advanced wound care, where he led the organization through its transition from a wound care company to a bio pharmaceutical company. Prior to MiMedx, he served as CFO to Concordia International, an international specialty pharmaceutical company. Previously, Mr. Borkowski served as CFO at firms including CareFusion and Mylan (where he oversaw the company's growth from less than one billion to more than five billion dollars in revenue). Mr. Borkowski has broad knowledge of the health care industry, with deep experience in corporate finance, treasury, tax, business development, information technology, operations and corporate strategy. He currently serves on the board of directors of FirstWave BioPharma, Inc. as lead independent director.

25.    The expertise, skills and institutional knowledge of the 2023 KEIP Participants is essential to continuing to guide the Debtors through their novel restructuring and maximizing the value of the Debtors' estates. The 2023 KEIP Participants perform essential functions for the Debtors, including providing critical management and legal services, and are responsible for helping determine the Debtors' strategic plan and facilitating the achievement of the Debtors' goals. DelConte Decl. ¶ 14. Their workloads are anticipated to be high, both as a result of the prolongation of these Chapter 11 Cases and cumulative attrition throughout the Company. DelConte Decl. ¶ 14. Moreover, their leadership will be particularly critical this year in supporting employee morale: the Company and its employees continue a prolonged wait for emergence from bankruptcy and face the recent adverse developments in the Patent Litigation. Because the 2023 KEIP Participants continue to make extraordinary efforts to maximize the value of the Debtors' businesses and shepherd the Company through its incredibly complex restructuring, the Compensation Committee, the Board and the Debtors' senior management team believe that

appropriately incentivizing the three 2023 KEIP Participants is necessary to ensure optimal recoveries for all stakeholders.

      B.    <u>Structure</u>

26.    Each 2023 KEIP Participant will receive (i) an annual award (the "**2023 KEIP Annual Award**") and (ii) a long-term incentive compensation grant (the "**2023 KEIP Long-Term Award**"), which are collectively designed to replicate the Debtors' Prepetition Compensation Plans and renew their prior, Court-approved programs, subject to the material reductions discussed above.  DelConte Decl. ¶ 16.  The 2023 KEIP Annual Award and 2023 KEIP Long-Term Award have target values, which are also their maximum values, set forth in **<u>Table 1</u>** below.  Prepetition, annual awards could be paid at up to 150% of target in the event of over-performance, but capping payments at 100% of target was one of the agreed changes during the negotiations that occurred early in these Chapter 11 Cases.[21]  All payments under the 2023 KEIP will be tied to the Debtors' achievement of corporate objectives (as discussed in more detail below, the "**2023 Performance Metrics**") at threshold or target performance levels, as applicable, with straight-line interpolation to be used if actual performance falls between those amounts.  DelConte Decl. ¶ 16.  The 2023 KEIP Participants will not receive any payments under the 2023 KEIP should the Company fail to achieve the 2023 Performance Metrics at the threshold level.  The maximum cost of the 2023 KEIP would be approximately $6.7 million.  DelConte Decl. ¶ 16.

---

[21] *See* Second Suppl. Lowne Decl. ¶ 59.

**TABLE 1**

| 2023 KEIP Participant | Target 2023 KEIP Annual Award | Target 2023 KEIP Long-Term Award | Total Target 2023 KEIP Award |
|---|---|---|---|
| President and Chief Executive Officer | $2,384,700 | $501,111 | $2,885,811 |
| Executive Vice President, Chief Financial Officer | $900,000 | $405,000 | $1,305,000 |
| Executive Vice President, General Counsel and Secretary | $1,910,500 | $557,601 | $2,468,101 |
| **Total** | **$5,195,200** | **$1,463,712** | **$6,658,912** |

27. Subject to achievement of the 2023 Performance Metrics at a threshold level, and subject to each 2023 KEIP Participant's continued employment through the payment date (other than as provided below), the 2023 KEIP Annual Award will be paid on the Company's regular payroll date on or immediately following March 15, 2024. DelConte Decl. ¶ 17. A termination of employment by the Debtors without cause after September 30, 2023 will trigger acceleration at the target value, subject to clawback if performance is later scored below target (such clawback to occur by March 15, 2024). DelConte Decl. ¶ 17. In the event of a termination of employment by the Debtors without cause on or prior to September 30, 2023, no payment will be due.

28. Consistent with Purdue's longstanding compensation practices, each 2023 KEIP Participant will also receive a 2023 KEIP Long-Term Award, which is designed to mimic the economic structure of the LTRP grant that the participant otherwise would have received in 2023.[22]

---

[22] As noted above, the 2023 KEIP Long-Term Award is intended to replicate the Company's prepetition Long-Term Results Plan, which provided for incentive grants that would accrue and be payable over a three-year performance period. In 2021, in connection with seeking stakeholder approval of that year's compensation programs, Purdue agreed to pay its long-term award the following year, with a clawback in place over the course of what would have been a three-year performance period. As they did last year, the Debtors seek once more to replicate this structure and payment timing, with an award payable in 2024 and subject to clawback through the date on which payments would otherwise have been made in 2026.

DelConte Decl. ¶ 18.    In connection with seeking approval of the long-term incentive compensation grant component of the 2020 KEIP, the Debtors agreed to a 52.25% aggregate reduction from historical practice and to subject the award to acceleration upon emergence.  That discount was carried forward for the long-term incentive compensation grant components of the 2021 and 2022 key employee incentive plans while switching to nearer-term payment dates, subject to a clawback through the historical payment date, rather than acceleration upon emergence.  In an effort to try to reach consensus with key creditor constituencies, an additional consensual reduction of the CEO's 2023 KEIP Long-Term Award by a further $352,000 has also been applied this year.  With this change, the UCC and AHC do not object to the relief sought in this Motion.  Such discounts are reflected in the amounts set forth in Table 1 with respect to the CEO and General Counsel, while the newly-hired CFO will be subject to the same 40% reduction that applies to KERP Participants.

29.    This year, as in prior years, payment will be made on the Company's regular payroll date on or immediately following March 15, 2024, subject to clawback if the 2023 KEIP Participant resigns or is terminated for any reason other than by the Debtors without cause prior to March 2026.  As with the 2023 KEIP Annual Award, termination of employment without cause after September 30, 2023 will accelerate the 2023 KEIP Long-Term Award at target, subject to clawback for any amount that would not otherwise have been paid if target performance is not met.  DelConte Decl. ¶ 18.  Payouts will be tied to the same 2023 Performance Metrics that apply to the 2023 KEIP Annual Award and therefore will depend solely on the Company's performance in 2023.[23]  DelConte Decl. ¶ 18.

---

[23] Given that the 2023 KEIP Long-Term Award is paid on an accelerated schedule subject to a clawback through historical payment timing, only 2023 performance will have been determined at the time of payment.  In addition, as it has in each of the prior three performance periods, the Compensation Committee determined that it was in the best

C.    Metrics

30.    Consistent with the Company's longstanding practice of approving performance

metrics early in each calendar year, the Compensation Committee recommended, and the Board

approved, the 2023 Performance Metrics in the first quarter of 2023 with guidance from WTW.

DelConte Decl. ¶ 19; Gartrell Decl. ¶ 19.  The Company consulted with the UCC, AHC and MSGE

regarding the 2023 Performance Metrics.  DelConte Decl. ¶ 19.

31.    The 2023 Performance Metrics are based on the same three strategic pillars that

have long defined the Debtors' corporate objectives: value creation (representing 50% of the 2023

Performance Metrics), innovation and efficiency (40% of the 2023 Performance Metrics), and

people and culture (10% of the 2023 Performance Metrics).  DelConte Decl. ¶ 20.  The 2023

Performance Metrics are the product of the same, rigorous internal process that the Debtors have

long used to identify and strive for corporate priorities, married with input from, and consultation

with, highly-informed and sophisticated members of the Debtors' key creditor constituencies.  The

2023 Performance Metrics, which were recommended by the Compensation Committee and

approved by the full Board following such consultation with key creditor constituencies, are

challenging, require extensive achievement and present a risk of not being met at the threshold

level required for payment.  DelConte Decl. ¶ 20.  Indeed, past performance shows clearly that the

2023 KEIP Participants' diligence and skill will be required to steer the Debtors to even a threshold

score on the 2023 Performance Metrics; in 2021, for instance, following consultation with key

creditor constituencies, the Compensation Committee approved a final score on that year's annual

scorecard of just 86.29%.  DelConte Decl. ¶ 20.  The Company also uses its annual performance

metrics more broadly, as a tool to communicate strategic priorities for the year ahead throughout

---

interest of the Debtors to apply only the 2023 Performance Metrics, rather than performance metrics for a three-year
period, to pay under the 2023 KEIP Long-Term Awards under present circumstances.  DelConte Decl. ¶ 18.

the organization, so the importance of the 2023 Performance Metrics goes far beyond determining the 2023 KEIP Participants' compensation. DelConte Decl. ¶ 20. The 2023 KEIP Participants will be focused on driving the Debtors to meet these goals over the course of the year ahead, and they will need to apply substantial efforts to achieve their targets throughout the rest of this year. DelConte Decl. ¶ 20. The Compensation Committee recommended, and the Board approved, these stretch goals to ensure that the 2023 KEIP has its intended, incentivizing effect.

1.    Value Creation

32.    The value creation strategic pillar measures and rewards the long-term success of the Debtors' business based on certain nonfinancial operational goals, such as meeting certain deadlines with respect to the Company's testing and development of non-opioid products, including overdose treatment products. **Table 2** below sets forth the operational and developmental goals that the Compensation Committee recommended, and the Board approved, as key to the long-term success of the Debtors' business. DelConte Decl. ¶ 21.

**TABLE 2**

| Value Creation Metrics | Target Date | % of Value Creation | % of 2023 Performance Metrics |
|---|---|---|---|
| − Implement Company initiatives to ensure the Company operates efficiently and sustainably so as to maximize net value generated to abate the opioid crisis. | | 50.0% | 25.0% |
| **Public Health Initiatives[24]** | | | |
| − Complete pivotal clinical studies of the Nalmefene auto-injector | End of Q4 2023 | 25.0% | 12.5% |
| − File a New Drug Application ("**NDA**") for the 1.5 mg dose of the Nalmefene auto-injector | End of Q4 2023 | | |

---

[24] All medications referred to in this section are potential treatments for opioid overdose.

| | | | |
|---|---|---|---|
| – Complete 18-month stability testing for the Nalmefene HCl injection pre-filled syringe, and 36-month stability testing for the vial | End of Q3 2023 | | |
| – Provide support to Harm Reduction Therapeutics for the RiVive™ OTC Naloxone NDA, and receive approval of the same | End of Q4 2023 | | |
| **Progressing the Branded Pipeline** | | | |
| – Finalize clinical study protocol for Sunobinop; identify, contract and onboard panel of highly-qualified external subject matter experts and gain their input to help develop and complete a protocol to investigate Sunobinop in Alcohol Use Disorder | End of Q2 2023 | 20.0% | 10.0% |
| – Complete IMB-150 first-in-human cohort in healthy volunteers, including pharmacokinetic and safety analysis | End of Q2 2023 | | |
| – Initiate IMB-150 cohort in patients | End of Q4 2023 | | |
| – Complete QT sub-studies analyses of Tinostamustine and estimate six-month progression-free survival in glioblastoma patients to support a go/no-go decision | End of Q4 2023 | | |
| **Progressing the Generics Pipeline** | | | |
| – Launch Aformoterol and Formoterol inhalation solutions | End of Q3 2023 | 5.0% | 2.5% |
| – File an abbreviated NDA ("**ANDA**") for Prucalopride tablets | End of Q4 2023 | | |
| – Secure approval of the ANDA for the Theophylline extended-release 300 mg tablets | End of Q3 2023 | | |
| **Total** | | **100.0%** | **50.0%** |

DelConte Decl. ¶ 21.

33.     The first metric in the value creation strategic pillar, entitled "[i]mplement Company initiatives to ensure the Company operates efficiently and sustainably so as to maximize net value generated to abate the opioid crisis," was first added in 2022 to address certain priorities raised during the consultation process with the UCC, AHC and MSGE.  This metric continues to be included this year and will consist of three sub-metrics:

(i)     Enter into Asset Purchase Agreement with a "stalking horse bidder" for the sale of substantially all of the assets of Avrio Health in Q2 2023 (1/3rd weighting);

(ii)     (1/3rd weighting);

(iii)    (1/3rd weighting).

2.      Innovation and Efficiency

34.     The innovation and efficiency strategic pillar captures key financial and operational goals, including important business metrics such as operating profit and net sales.  __Table 3__ below sets forth the financial and operational goals that the Compensation Committee, the Board and the Debtors' senior management team have identified as key to the Company's long-term business success.  DelConte Decl. ¶ 24.

**TABLE 3**

| Innovation and Efficiency Metrics[25] | Target | % of Innovation and Efficiency | % of 2023 Performance Metrics |
|---|---|---|---|
| – Consolidated Business Operating Profit Before Non-Recurring and One-Time Charges | $86.0 million | 50.0% | 20.0% |
| – Avrio Consumer Health Business Net Sales | $105.4 million | 10.0% | 4.0% |
| – Rhodes Generics Business Operating Loss | ($24.6 million) | 15.0% | 6.0% |
| – Ensure operational readiness for emergence by (i) transferring business licenses, (ii) making product label changes, (iii) transferring government contracts, (iv) transferring payroll and benefits and (v) transferring intellectual property | | 25.0% | 10.0% |
| **Total** | | **100.0%** | **40.0%** |

### 3.    People and Culture

35.    Finally, nurturing the Debtors' human resources and organizational culture has been, and will remain, critical to keeping the Debtors on the path to emergence and beyond. **Table 4** below sets forth the key people and culture metrics the Debtors' senior management team has identified, and the Board has approved, as essential to enhancing corporate performance and maximizing the value of the Debtors' business.  DelConte Decl. ¶ 25.

**TABLE 4**

| People and Culture Metrics | Target Date | % of People and Culture | % of 2023 Performance Metrics |
|---|---|---|---|
| **Strengthen Colleague Engagement** | | | |
| – Provide timely and transparent employee communications which maintain a full-year average score of 80% or greater on post-event colleague surveys | End of Q4 2023 | 50.0% | 5.0% |
| – Support colleague learning and career growth by enhancing development | End of Q4 2023 | | |

---

[25] In the event of a sale of the Avrio Consumer Health Business during the performance period, performance will be prorated based on performance relative to the Debtors' budget through the last full month prior to such sale.

| | | | |
|---|---|---|---|
| programs for new hires, existing employees and people leaders | | | |
| **Strengthen Our Commitment to Diversity, Equity & Inclusion ("DEI")** | | | |
| – Conduct listening sessions and refresh DEI roadmap | End of Q2 2023 | 50.0% | 5.0% |
| – Progress the three established employee resource groups and support the delivery of at least two all-employee Learning More sessions on DEI-related topics | End of Q4 2023 | | |
| **Total** | | **100.0%** | **10.0%** |

     D.    <u>Commercial Reasonableness</u>

36.    The 2023 KEIP, like those approved by the Court in 2020, 2021 and 2022, is consistent with the Debtors' historical compensation practices (although lower in amount given the continuation of concessions first agreed to in 2020), even as the challenges faced by the 2023 KEIP Participants remain elevated as they continue to navigate these protracted Chapter 11 Cases and work toward emergence. DelConte Decl. ¶ 26. The CEO and CFO's compensation are both below median when compared to executives at peer, non-debtor pharmaceutical companies, while both the CEO and CFO play a vital role in maximizing the value of the Debtors' estates for the benefit of their stakeholders through their stewardship of the Debtors during the many challenges presented by these Chapter 11 Cases. DelConte Decl. ¶ 27; Gartrell Decl. ¶ 34.

37.    As in years past, the General Counsel's compensation remains above-market when compared to general counsel at peer, non-debtor pharmaceutical companies. Gartrell Decl. ¶ 34. But it has long been, and still is, the Debtors' business judgment that they require a general counsel with significantly greater expertise and experience than is typical, particularly in light of the enormous complexities of these Chapter 11 Cases, which are entirely in addition to the usual complex legal issues attendant to running a diversified pharmaceutical business. DelConte Decl. ¶ 28.

38.     The Court has agreed with this exercise of the Debtors' reasonable business judgment in each of the prior three years, and the Debtors urge the Court to do so again now.  As the Court has observed, it is "clear" that the General Counsel's job description "is not comparable to other general counsel in this industry"; that the role "requires more expertise and more work"; and that the General Counsel's compensation "reflects [his] added duties and expertise."  Hr'g Tr., 24:18–25:5, Oct. 28, 2020.  The General Counsel's "role as general counsel is far more complex and difficult than [the] general counsel of a competitor in [the pharmaceutical industry], given the myriad complex issues that, as general counsel, he needs to deal with."  Hr'g Tr., 132:5–14, Sept. 13, 2021.  The Compensation Committee and the Debtors' senior management team continue to believe that the General Counsel's compensation is appropriate and reasonable, given the immense challenges he faces in his role with the Debtors and in light of his past experience and expertise and the other opportunities available to an individual with his qualifications.  DelConte Decl. ¶ 28; Gartrell Decl. ¶ 34.  Accordingly, the Debtors submit that the proposed 2023 KEIP with respect to the General Counsel is reasonable and should be approved.

39.     The proposed 2023 KEIP would continue to provide appropriate incentive compensation to the 2023 KEIP Participants (at levels consistent with the Company's prior, Court-approved programs from 2020, 2021 and 2022 with respect to continuing participants).  The 2023 KEIP, like its predecessor programs, compares reasonably to market compensation levels for the Debtors' peers.  Given the challenging roles and responsibilities of the 2023 KEIP Participants, the complexities that these Chapter 11 Cases continue to present and the substantial efforts that will be required to achieve the 2023 Performance Metrics at even threshold levels, it is abundantly clear that the 2023 KEIP is appropriate and necessary for preserving the value of the Debtors' estates.

II.     **The Proposed 2023 KERP**

A.     <u>Participants</u>

40.     The Debtors seek authorization to implement the 2023 KERP for virtually all employees other than the 2023 KEIP Participants (the "**2023 KERP Participants**").[26]  The 2023 KERP Participants have undertaken significant efforts to maintain the value of the Debtors' business and enable the Debtors' progress toward a successful restructuring.  DelConte Decl. ¶ 29. They have done so in the face of significant stresses, including reduced employee headcount and a very competitive market for talent to replace departing employees.   They have achieved remarkable business results, despite the ongoing overhang of these protracted Chapter 11 Cases and the fiercely competitive industry in which the Debtors operate.  Moreover, the recent adverse results in the Patent Litigation only exacerbate the challenging environment in which the Debtors' employees operate.  The Debtors must provide their employees with market compensation in order to continue to secure their dedicated efforts.  DelConte Decl. ¶ 29.  Approximately 454 employees will participate in the 2023 KERP, of which 16 will be vice president and 438 will be middle management, professional employees and support and technical staff, which include scientific researchers as well as regulatory, compliance, quality and manufacturing personnel.[27]  DelConte Decl. ¶ 29.

41.     The Court here has repeatedly held that the Debtors appropriately distinguish between insiders and non-insiders.  *See* Hr'g Tr., 49:20–24, July 29, 2021 ("It does not appear to

---

[26] A small number of employees either previously did not participate in the AIP or are otherwise ineligible to participate in the 2023 KERP.

[27] In instances where the separation of existing 2023 KERP Participants from the Debtors results in newly hired employees taking on their roles or responsibilities—or if the Debtors hire employees to fill currently vacant, non-insider positions—the 2023 KERP would allow the Debtors to include such newly hired employees as 2023 KERP Participants.

me . . . that any of the debtor's analysis here as to who is within the program and who is without

it is inconsistent with the better recent case law on this issue."); Hr'g Tr., 109:19–24, Dec. 4, 2019

("[T]he company engaged in the proper process to determine whether someone was an insider or

not.  Nothing I've heard today changes that analysis, and I'll rest on my rulings on that point.").

Applying the same criteria that the Debtors previously used to determine insider status in the past

three years, no 2023 KERP Participant is an insider.[28]

>        B.        Payout Structure

42.        Each eligible 2023 KERP Participant will receive (i) an amount equal to the 2023

KERP Participant's target AIP (the "**2023 KERP Annual Award**") and (ii) a long-term incentive

compensation grant payable in 2023 (subject to clawback through March 2026) (the "**2023 KERP**

**Long-Term Award**").  Certain 2023 KERP Participants will receive additional, targeted retention

payments (the "**2023 Targeted Retention Awards**").

43.        The 2023 KERP Annual Award is equal to the target amount of the AIP award that

each participant would historically have received, including modest, ordinary course merit

increases.  The 2023 KERP Annual Award is not subject to performance criteria, in order to

provide the 2023 KERP Participants with greater certainty about their compensation.  This is

expected to help retain 2023 KERP Participants under what remain challenging and uncertain

conditions, as it has in prior years.  DelConte Decl. ¶ 31.

44.        The 2023 KERP Annual Award will be paid, (x) with respect to employees with

titles of vice president, (i) 25% on the Company's regular payroll date on or immediately following

---

[28] The Company categorized an employee as an insider if the employee met any one of the following five criteria.  The employee: (1) is an officer appointed by the Board; (2) holds the title of chief executive officer, chief financial officer, chief operating officer, general counsel or senior vice president; (3) reports to the Board; (4) has authority to make Company-wide or strategic decisions, including critical financial decisions; or (5) is in a position to determine his or her own compensation.  Notably, no insider employee of the Debtors is in a position to determine his or her own compensation, which is the responsibility of the Compensation Committee (and, with respect to the CEO, the Board).

October 1, 2023 and (ii) 75% on the Company's regular payroll date on or immediately following March 15, 2024, and (y) with respect to employees with titles below vice president, (i) 33.3% on the Company's regular payroll date on or immediately following October 1, 2023 and (ii) 66.7% on the Company's regular payroll date on or immediately following March 15, 2024.  DelConte Decl. ¶ 32.  Other than for hourly employees, the first payment of the 2023 KERP Annual Award will be subject to clawback if the 2023 KERP Participant resigns or is terminated for any reason other than by the Debtors without cause prior to March 15, 2024.  DelConte Decl. ¶ 32.  Any outstanding amounts under the 2023 KERP Annual Award will accelerate in the event that a 2023 KERP Participant's employment is terminated by the Debtors without cause after September 30, 2023.[29]  DelConte Decl. ¶ 32.  The total aggregate payment under the 2023 KERP Annual Award is approximately $15.1 million.  DelConte Decl. ¶ 32.

45.    Consistent with past practice, certain 2023 KERP Participants will receive a 2023 KERP Long-Term Award that substantially replicates the long-term grants awarded under the Debtors' prior, Court-approved programs and mimics the economic structure of the LTRP grant that otherwise would have been granted to each eligible 2023 KERP Participant under Purdue's longstanding compensation practices.  DelConte Decl. ¶ 33.  The amount of such grant will equal 60% of the target LTRP grant that otherwise would have been granted, reflecting a 40% discount to past practice negotiated in 2020 and carried forward ever since, subject only to modest, ordinary course annual base salary increases, promotions and other changes to the employee population.

---

[29] The Debtors may waive this October 1 vesting requirement (and the October 1 vesting requirement for the 2023 KERP Long-Term Award, as set forth herein) for any employee of Avrio Health who remains employed with the Company through the closing of the contemplated sale of that business and who, in the Debtors' judgment, cooperates with and facilitates such sale.  Any cessation of employment due solely to the closing of the Avrio Health sale will constitute a termination without cause—even if the affected employee accepts a position at Avrio Health's acquirer—that may give rise, at the Debtors' election, to an acceleration of the applicable 2023 KERP Annual Award and 2023 KERP Long-Term Award.  The aggregate amount of 2023 KERP Annual Awards and 2023 KERP Long-Term Awards that may be affected by this accommodation to the timing of such sale process is less than $750,000. *See* DelConte Decl. ¶ 32.

DelConte Decl. ¶ 33.  The 2023 KERP Long-Term Award will not be subject to performance metrics.  DelConte Decl. ¶ 33.

46.     Payments due under the 2023 KERP Long-Term Awards will be made on the Company's regular payroll date on or immediately following March 15, 2024, subject to clawback if the 2023 KERP Participant resigns or is terminated for any reason other than by the Debtors without cause prior to March 2026.  DelConte Decl. ¶ 34.  This earlier payment timeframe, combined with a clawback through the customary, historical payment date, was put in place to maximize the effect of the award on employee motivation while maintaining its retentive effect. Setting the payment at 60% of the target LTRP award that otherwise would have been granted is also partially on account of this accelerated payment timing.  Outstanding amounts will accelerate in the event of a termination of employment after September 30, 2023 by the Debtors without cause.  DelConte Decl. ¶ 34.  The aggregate total cost of these 2023 KERP Long-Term Awards for all 2023 KERP Participants is approximately $5.7 million.  DelConte Decl. ¶ 34.

47.     In addition, the Debtors have previously used targeted retention awards, including in each year since the commencement of these Chapter 11 Cases, to preserve and maximize the value of the Debtors' estates.  DelConte Decl. ¶ 35.  Although the Debtors have continued to see attrition with these programs in place, the evidence supporting the efficacy of these targeted retention awards is clear: attrition among targeted retention recipients was approximately 4.0% in 2022, compared to approximately 8.4% in the broader Purdue population.  DelConte Decl. ¶ 35. The Debtors therefore seek approval of the 2023 Targeted Retention Awards in an aggregate amount of up to $7,820,000.  The Debtors propose that $1.10 million of such amount consist of supplemental capacity that the Debtors may deploy to respond to changing business conditions, but only after consultation with the UCC, AHC and MSGE, which will provide the Debtors with

necessary flexibility while cabining that flexibility by subjecting any amount spent thereunder to creditor consultation. DelConte Decl. ¶ 35. The Debtors have successfully used such supplemental retention capacity to respond to unique, discrete retention needs in consultation with these creditor constituencies in the past. DelConte Decl. ¶ 35. The 2023 Targeted Retention Awards will renew the Debtors' previous award programs and allow the Debtors to continue their practice of making targeted retention payments to an identified group of key employees.[30] As always, the Debtors will endeavor to use only as much of such capacity as is necessary to retain key employees, with a goal of maximizing the value of the Debtors' estates.

48.    The 2023 Targeted Retention Awards will be paid (a) 25% on the Company's regular payroll date on or immediately following December 30, 2023, (b) 25% on the Company's regular payroll date on or immediately following March 30, 2024 and (c) 50% on the Company's regular payroll date on or immediately following June 30, 2024.[31] DelConte Decl. ¶ 36. The 2023 Targeted Retention Awards are subject to clawback if the recipient resigns or is terminated for any reason other than by the Debtors without cause before September 30, 2024, and outstanding amounts due will accelerate upon a recipient's termination by the Debtors without cause after September 30, 2023. DelConte Decl. ¶ 36.

C.    Commercial Reasonableness

49.    The 2023 KERP is commercially appropriate and reasonable. The challenges of operating in chapter 11 present the 2023 KERP Participants with an ongoing, extraordinary burden. Unless the Debtors provide their workforce with appropriate, market compensation, there is a very

---

[30] The Debtors' management team has identified the employees most likely to require targeted retention payments over the course of this next year. As business needs fluctuate, some variation in the targeted retention population may occur, though in no event will (a) the aggregate dollar amount of the 2023 Targeted Retention Awards exceed $7,820,000 or (b) any insider receive such an award.

[31] Timing with respect to supplemental capacity may be adjusted in response to applicable business conditions. DelConte Decl. ¶ 36.

real risk that employees will depart for other opportunities.  DelConte Decl. ¶ 37.  The prior key

employee retention programs (including clawbacks that extend through early 2023), along with

the senior management team's deep focus on employee well-being and engagement, have held

voluntary resignations to 15 thus far in 2023.  DelConte Decl. ¶ 37.  However, additional defections

among the Debtors' already lean employee base could significantly hamper their operations and

diminish the value to be delivered to the Debtors' stakeholders upon emergence.  Accordingly, the

Company is seeking Court approval to renew its annual compensation programs, so as to continue

providing non-insider employees with much-needed certainty regarding their compensation

arrangements.  DelConte Decl. ¶ 37.  Moreover, the Debtors continue to endure significant hiring

obstacles (in the face of a broadly difficult and competitive market for talent); twenty headcount

positions have opened year to date, joining eight positions that opened but were not filled in 2022.

Ten of these positions remain unfilled, and lateral hiring remains extremely difficult, particularly

as the Debtors continue to operate within the confines of these Chapter 11 Cases.  If not for the

Company's prior annual compensation programs, the Debtors believe that the attrition rate would

have been significantly higher.  DelConte Decl. ¶ 37.  Failure to implement the 2023 KERP could

have a devastating effect on the Debtors' ability to retain the individuals they need to maintain

their business operations and deliver a successful emergence from these Chapter 11 Cases for all

stakeholders.  DelConte Decl. ¶ 37.

50.    The 2023 KERP Annual Award is consistent with the Debtors' historical

compensation practices.  The 2023 KERP Annual Award substantially replicates the Company's

prepetition and Court-approved annual award programs, subject only to modest, ordinary course

annual merit increases.  DelConte Decl. ¶ 38.  Subjecting the first payment to clawback through

March 15, 2024 provides a powerful retentive element and mimics the historical payment timing

of the Company's prepetition AIP.  DelConte Decl. ¶ 38.  Similarly, the 2023 KERP Long-Term

Award substantially replicates the Debtors' longstanding long-term grant program and carries

forward the steep discount to past practice that the Court first approved in 2020 (subject to modest,

ordinary course year-over-year increases).  DelConte Decl. ¶ 38.  Additionally, the Debtors have

identified the 2023 KERP Participants most likely to require 2023 Targeted Retention Awards

through a detailed, thorough process to identify the roles that are most critical to preserving and

maximizing the value of the Debtors' estates.  DelConte Decl. ¶ 38.  The aggregate amount of the

2023 Targeted Retention Awards is consistent with the aggregate amount of prior Court-approved

targeted retention programs, which have proven effective at mitigating attrition among selected

critical employees.  DelConte Decl. ¶ 38.

51.    In sum, the 2023 KERP compensates key employees in line with the Debtors'

market-based historical practices and is critical to retaining the Debtors' employees, who are

needed to preserve the value of the Debtors' estates.

## Basis for Relief Requested

### I.    Section 503(c)(1) of the Bankruptcy Code Does Not Bar the Proposed 2023 Compensation Plans

A.    Section 503(c)(1) Is Not Applicable to the 2023 KEIP Because It Is an Incentive Plan

52.    As the Court has held with respect to all three prior KEIPs approved in these

Chapter 11 Cases, section 503(c)(1) of the Bankruptcy Code does not apply to the 2023 KEIP

because it is designed to incentivize, rather than retain, the 2023 KEIP Participants.  The 2023

KEIP carries forward the terms and the structure of its predecessor programs approved in 2020,

2021 and 2022—all of which the Court held were properly analyzed under section 503(c)(3), and

not section 503(c)(1), of the Bankruptcy Code.  *See* Hr'g Tr., 131:7–20, Sept. 13, 2021 (holding

that that year's key employee incentive plan "is not the type of retentive bonus program that

Congress had in mind in [section] 503(c)(1)")"; Hr'g Tr., 24:14–16, Oct. 28, 2020; *see also* Hr'g

Tr., 32:23–33:24, May 18, 2022.

53.    Section 503(c)(1) of the Bankruptcy Code, with limited exceptions, prohibits a

transfer to an "insider of the debtor for the purpose of inducing such person to remain with the

debtor's business."  This provision, however, does not apply to performance-based incentive plans.

*See In re Hawker Beechcraft, Inc.*, 479 B.R. 308, 313 (Bankr. S.D.N.Y. 2012) ("§ 503(c)(1) does

not prevent a debtor from adopting a plan that rewards insiders for achieving financial or other

targets, rather than for simply remaining in the employment of the debtor, even though the

incentive plan has a retentive effect.").  Under section 503(c)(1), a debtor is required to show, by

a preponderance of evidence, that the key employee incentive plan "is primarily incentivizing and

not primarily retentive."   *In re Residential Capital, LLC*, 478 B.R. 154, 170 (Bankr.

S.D.N.Y. 2012).

54.    A compensation plan that includes "some retentive effect" still passes muster under

section 503(c)(1) where, as here, it is "overall . . . incentivizing in nature." *In re Dana Corp.*, 358

B.R. 567, 571 (Bankr. S.D.N.Y. 2006); *see also Residential Capital*, 478 B.R. at 171 ("When a

plan is designed to motivate employees to achieve specified performance goals, it is primarily

incentivizing, and thus not subject to section 503(c)(1).").  Courts routinely find that compensation

plans are sufficiently incentivizing if they are "tied . . . to the achievement of particular financial

milestones."  *See, e.g.*, *In re Borders Grp., Inc.*, 453 B.R. 459, 471–72 (Bankr. S.D.N.Y. 2011).

When evaluating whether performance goals are sufficiently challenging, courts do not analyze

whether the "targets now appear achievable in hindsight" but rather "review[] a [compensation

plan] that was designed to incentivize work," even if "already partially performed." *In re Aralez Pharm. US Inc.*, No. 18-12425 (MG), 2018 WL 6060356, at *5 (Bankr. S.D.N.Y. Nov. 19, 2018).

55.     Here, the 2023 KEIP primarily incentivizes the 2023 KEIP Participants to achieve performance goals and thus is not prohibited by section 503(c)(1) of the Bankruptcy Code.  As set forth above, both components of the 2023 KEIP are incentive-based: payments under the 2023 KEIP Annual Award and 2023 KEIP Long-Term Award are tied to the Company's achievement of the 2023 Performance Metrics with no amounts payable thereunder unless the Company achieves those metrics at least at the threshold level.  DelConte Decl. ¶ 16.

56.     The 2023 Performance Metrics feature a similar rubric and were set in a similar manner to the performance metrics under the Court-approved programs in 2020, 2021 and 2022, as well as the Company's previous annual corporate objectives.  The 2023 Performance Metrics are ambitious, with threshold targets that were set to be difficult to achieve both individually and when considered in the aggregate when approved by the Compensation Committee.  Success under these metrics will require the 2023 KEIP Participants' diligent and committed efforts.  DelConte Decl. ¶ 20.  The 2023 Performance Metrics are tied to the same high-level categories of goals as were the prior programs, including, among other things, financial metrics, value creation and innovation—all of which shape the long-term health of the Debtors' estates.  Moreover, many of the same headwinds that resulted in challenges in achieving last year's corporate objectives are still present and are only compounded by additional challenges such as the recent adverse decision in the Patent Litigation.  DelConte Decl. ¶ 29.

57.     That the Company has already begun striving to achieve the 2023 Performance Metrics in the short time between when the 2023 Performance Metrics were set and the filing of this Motion renders them no less challenging than when originally designed, which is when their

incentivizing nature is measured. *See Aralez Pharm.*, 2018 WL 6060356, at *5 (authorizing insider compensation plan based on the incentivizing nature of performance goals when originally developed).

58.    Accordingly, the 2023 KEIP should properly be evaluated under section 503(c)(3), rather than section 503(c)(1), of the Bankruptcy Code.

### B.    Section 503(c)(1) Is Not Applicable to the 2023 KERP Because It Does Not Include Insiders

59.    As the Court has held with respect to all three prior KERPs approved in these Chapter 11 Cases, section 503(c)(1) likewise does not bar the 2023 KERP because that plan includes only non-insiders.  Section 503(c)(1) prohibits "a transfer made to . . . an insider of the debtor for the purpose of inducing such person to remain with the debtor's business," but it does not prohibit retention-oriented transfers to non-insiders.  *See In re GT Advanced Techs., Inc.*, No. 14-11916-HJB, 2015 WL 5737181, at *4 (Bankr. D.N.H. Sept. 30, 2015) ("Section 503(c) distinguishes between those employees who are 'insiders' and those who are not . . . . Section 503(c)(3) relaxes those requirements with respect to non-insiders, requiring only that the proposed retention payments be 'justified by the facts and circumstances of the case.'").

60.    The Court here has previously held that the Debtors "engage[] in the proper process to determine whether someone was an insider," Hr'g Tr., 109:19–24, Dec. 4, 2019, and that their analysis is not "inconsistent with the better recent case law on this issue," Hr'g Tr., 49: 20–24, July 29, 2021.  Section 503(c)(1), therefore, does not prohibit the 2023 KERP.

## II.    The Proposed 2023 Compensation Plans Represent a Valid Exercise of the Debtors' Business Judgment Under Section 503(c)(3) of the Bankruptcy Code

61.    Both the 2023 KEIP and the 2023 KERP should be approved under section 503(c)(3) of the Bankruptcy Code because each is essential to the success of the Debtors' restructuring efforts and reflects the sound exercise of the Debtors' business judgment.

62.    Section 503(c)(3) of the Bankruptcy Code prohibits certain transfers "that are outside the ordinary course of business and not justified by the facts and circumstances of the case." "Courts have held that the 'facts and circumstances' language of section 503(c)(3) creates a standard no different than the business judgment standard under section 363(b)." *Borders Grp.*, 453 B.R. at 473; *see also In re Velo Holdings Inc.*, 472 B.R. 201, 212 (Bankr. S.D.N.Y. 2012). A debtor satisfies the business judgment standard if it shows that the proposal "is within the fair and reasonable business judgment of the [d]ebtors and thus within the zone of acceptability." *Dana Corp.*, 358 B.R. at 572.

63.    Courts have described the business judgment standard as "deferential," *In re Alpha Nat. Res., Inc.*, 546 B.R. 348, 356 (Bankr. E.D. Va.), *aff'd sub nom. United Mine Workers of Am. 1974 Pension Plan & Tr. v. Alpha Nat. Res., Inc.*, 553 B.R. 556 (E.D. Va. 2016), and a "more liberal . . . review," *In re Glob. Home Prods., LLC*, 369 B.R. 778, 783 (Bankr. D. Del. 2007). Additionally, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).

64.    In *In re Dana Corp.*, the court distilled six factors (the "***Dana II* Factors**") for determining whether a compensation proposal satisfies the business judgment test:

> (a) Is there a reasonable relationship between the plan proposed and the results to be obtained, i.e., will the key employee stay for as long as it takes for the debtor to reorganize or market its assets, or, in the case of a performance incentive, is the plan calculated to achieve the desired performance?

> (b) Is the cost of the plan reasonable in the context of the debtor's assets, liabilities and earning potential?

> (c) Is the scope of the plan fair and reasonable; does it apply to all employees; does it discriminate unfairly?

(d) Is the plan or proposal consistent with industry standards?

(e) What were the due diligence efforts of the debtor in investigating the need for a plan; analyzing which key employees need to be incentivized; what is available; what is generally applicable in a particular industry?

(f) Did the debtor receive independent counsel in performing due diligence and in creating and authorizing the incentive compensation?

358 B.R. at 576–77 (emphasis omitted).  All six *Dana II* factors weigh in favor of approval of the

Debtors' 2023 Compensation Plans.

65.    *First*, with respect to the 2023 KEIP, the Debtors and their advisors designed the

plan to incentivize the 2023 KEIP Participants to work diligently to ensure that the Debtors will

remain viable and well-positioned to put the value of their estates to use upon emergence.  As

described above, the Debtors carefully developed a well-balanced system of 2023 Performance

Metrics, which are based on the same rubric as the corporate objectives under prior, Court-

approved programs.  Achievement of the 2023 Performance Metrics—which emphasize value

creation, innovation and efficiency, and people and culture—will enable the Debtors to best deliver

value upon emergence for the benefit of all stakeholders and the American public generally.  The

payments under the 2023 KEIP are directly tied to specific and measurable goals within each of

these categories.  There is therefore a clear and reasonable relationship between the 2023 KEIP

and the goals that the Debtors seek to achieve.

66.    Likewise, the Debtors appropriately tailored the 2023 KERP to encourage non-

insider employees to remain in their positions during this critical phase of the bankruptcy process.

The proposed 2023 KERP is substantially similar to the retention plans approved by the Court in

2020, 2021 and 2022, each of which was in turn modeled on the Prepetition Compensation Plans.

The 2023 KERP would provide the market levels of compensation necessary to retain the Debtors'

key employees.  Gartrell Decl. ¶ 38.  Moreover, the Gartrell Declaration confirms that the compensation provided under the 2023 KERP is in line with similarly sized, non-debtor pharmaceutical companies.  Gartrell Decl. ¶ 44.  With a year-to-date annualized voluntary turnover rate of 10.3% and an already lean employee base, the Debtors cannot risk reducing the resources devoted to keeping key employees in their seats through the conclusion of these Chapter 11 Cases. DelConte Decl. ¶ 37.  Each component of the 2023 KERP, including the 2023 Targeted Retention Awards, renews an essential and expiring program that helped mitigate attrition.  A *reduction* in compensation would create a severe risk that the Debtors could experience an increased level of attrition that would be devastating to their business.

67.    *Second*, the 2023 KEIP is reasonable in the context of the Debtors' assets, liabilities and earning potential.  The absolute maximum dollar cost of the 2023 KEIP is approximately $6.7 million, which represents 1.09% of the Debtors' projected 2023 revenue.  Gartrell Decl. ¶ 29.  This cost places the 2023 KEIP in line with market standards for comparably sized companies in bankruptcy; compared to similarly sized companies in chapter 11 proceedings, the 2023 KEIP, as measured by maximum cost, sits close to the median.  Gartrell Decl. ¶ 66.  Moreover, the aggregate cost of compensation for the 2023 KEIP Participants is consistent with the costs of the Debtors' prior, Court-approved programs, which included concessions that were painstakingly negotiated with key creditor constituencies.   WTW's analysis benchmarking the 2023 KEIP's target (maximum) cost to the key employee incentive plans of comparable debtors is summarized in **Table 5** below:

TABLE 5

| Aggregate Cost vs. Comparable Debtors | Purdue 2023 KEIP Annual and Long-Term Awards (Target/Max) | Market 50th Percentile | | Market 75th Percentile | | Market 90th Percentile | |
|---|---|---|---|---|---|---|---|
| | | Target | Max | Target | Max | Target | Max |
| **$000s** | $6,658 | $4,600 | $6,300 | $9,800 | $14,600 | $14,300 | $28,200 |
| **Percentage of Revenue[32]** | 1.09% | 0.42% | 0.61% | 0.76% | 1.24% | 1.12% | 1.68% |

68.     The costs of the 2023 KERP are also reasonable in the context of the Debtors' assets, liabilities and earning potential.  The cost of the 2023 KERP Annual Award plus the 2023 KERP Long-Term Award is approximately $20.8 million, which represents 3.39% of projected 2023 revenue, and the maximum, aggregate cost of the 2023 Targeted Retention Awards is $7,820,000 (comprised of a $6.72 million baseline retention component and $1.10 million of supplemental capacity, as described above), which represents 1.28% of revenue.  Gartrell Decl. ¶ 47.  These aggregate costs are similar to the costs of the equivalent elements of the prior, Court-approved programs and the Debtors' previous compensation arrangements for the same categories of employees.

69.     While the cost-to-revenue ratios for the various components of the 2023 KERP are above market, the facts and circumstances of these Chapter 11 Cases justify the costs.  The Debtors are managing through significant reputational challenges and a uniquely complex restructuring—including a protracted appellate process—all of which have depressed employee morale and made the Debtors' unceasing efforts to retain key employees more challenging.  Cumulative attrition has resulted in high workloads on the remaining employees.  Continuing to mitigate attrition is vital to preserving the value of the Debtors' estates.  In this context, providing

---

[32] For percentage of revenue in all instances, WTW used projected net revenue of $613 million based on the December 8th, 2022 Board-approved budget for 2023.

appropriate compensation, even at larger-than-normal percentages of revenue, is reasonable and beneficial to all stakeholders. The 2023 KERP is also sized in part to make up for comparatively low base salaries relative to market compensation and will result in total direct compensation (as defined in the Gartrell Declaration) that remains competitive with the 50th percentile for relevant groups of 2023 KERP Participants, as shown below.

**TABLE 6**

| Employee Group | No. | Variance to Market TDC (Purdue Target TDC) | | | Variance to Market TDC (Purdue TTDC + Retention) | | | Variance to Market TDC (Purdue Base Only) | | | Memo: Variance to Market TDC Last Year (2022) (Purdue Target TDC) | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | P25 | P50 | P75 | P25 | P50 | P75 | P25 | P50 | P75 | P25 | P50 | P75 |
| Non-Insider (Executive Survey) | 22 | 15% | -12% | -34% | 27% | -3% | -28% | -26% | -43% | -57% | 17% | -10% | -26% |
| Non-Insider (Middle Management and Professional Survey) | 95 | 18% | 3% | -12% | 22% | 6% | -9% | -3% | -16% | -28% | 18% | 1% | -13% |

**TABLE 7**

| Aggregate Cost vs. Comparable Debtors | Purdue 2023 KERP Annual and Long-Term Awards | Market 50th Percentile | Market 75th Percentile | Market 90th Percentile |
|---|---|---|---|---|
| $000s | $20,800 | $10,700 | $24,200 | $33,800 |
| Percentage of Revenue | 3.39% | 0.75% | 1.29% | 1.64% |
| $000s Cost per Person | $45.8 | $48.1 | $59.7 | $91.1 |

**TABLE 8**

| Aggregate Cost vs. Comparable Debtors | Purdue 2023 Targeted Retention Awards | Market 50th Percentile | Market 75th Percentile | Market 90th Percentile |
|---|---|---|---|---|
| $000s | $7,820 | $2,400 | $3,600 | $9,400 |

| Percentage of Revenue | 1.28% | 0.21% | 0.36% | 0.51% |
|---|---|---|---|---|

70.     *Third*, the 2023 KEIP is fair and reasonable and does not discriminate unfairly.  The 2023 KEIP Participants are the same executives, with the addition of Mr. Borkowski, who participated in the Debtors' 2022 KEIP, except in the case of the newly-hired CFO.  Moreover, the process for setting performance metrics, the nature of those performance metrics and the aggregate compensation payable on account of the proposed 2023 KEIP are all similar to those with respect to the compensation programs that the Court previously approved.

71.     The 2023 KERP is also fair and reasonable.  Consistent with past practice, all employees (other than the 2023 KEIP Participants) who would have been eligible to participate in the Debtors' Prepetition Compensation Plans (approximately 454 employees) are 2023 KERP Participants.  DelConte Decl. ¶ 29.  Considering the Debtors' current headcount, retaining the 2023 KERP Participants is critical to the Debtors' ability to survive this restructuring and remain viable in the long term.

72.     *Fourth*, the Debtors engaged WTW, just as they did in connection with the design and development of their prior Court-approved programs, to ensure that both the 2023 KEIP and 2023 KERP are in line with market standards for comparably sized companies in bankruptcy.  As it has done in the past, WTW surveyed recent key employee incentive programs and continuations of broad-based programs and undertook an extensive analysis to identify market standards.  Gartrell Decl. ¶ 3.  WTW also compared the compensation of the 2023 KEIP Participants (assuming approval of the 2023 KEIP) to compensation at similar pharmaceutical companies that participated in its 2022 Pharmaceutical and Health Sciences Executive Compensation Survey Report.

73.    This benchmarking against Purdue's non-debtor peers provides essential insight into the reasonableness of the 2023 KEIP's cost.  Indeed, the Court here has emphasized that compensation of similar executives at peer pharmaceutical companies outside of the chapter 11 context is an important reference point for determining the reasonableness of a key employee incentive plan.  *See* Hr'g Tr., 22:21–25, Oct. 28, 2020 (explaining "that it is important to focus as much, if not more, on whether the plan is consistent with . . . industry specific standards as opposed to bankruptcy case specific standards").  The Debtors—their senior management team and directors, along with their compensation consultants at WTW—continue to be guided by this principle.

74.    The results of this benchmarking analysis are shown in **Table 9** below, along with a comparison against the benchmarks performed last year:

### TABLE 9

| Title | Variance to Market Target TDC | | | | | | | | |
| | Purdue Base + KEIP | | | Purdue Base + KEIP (2022) | | | Purdue (Base Only) | | |
| | P25 | P50 | P75 | P25 | P50 | P75 | P25 | P50 | P75 |
|---|---|---|---|---|---|---|---|---|---|
| **President and CEO** | 139% | -23% | -52% | 174% | -14% | -34% | 21% | -61% | -76% |
| **CFO** | 132% | -15% | -41% | N/A | N/A | N/A | -5% | -65% | -76% |
| **EVP, General Counsel and Secretary** | 345% | 172% | 51% | 382% | 150% | 75% | 117% | 32% | -26% |

75.    The market positioning of each continuing 2023 KEIP Participant's total direct compensation has come down year-over-year, continuing a trend from the last two years prior.  The CEO's compensation has dipped even further below median, notwithstanding his stewardship of the Debtors during these unprecedented Chapter 11 Cases, along with the vital role he has played in maximizing the value of the Debtors' estates for the benefit of their stakeholders.  The CFO's compensation is moderately below median, which similarly demonstrates its appropriateness

considering the essential role he is and is expected to play in maximizing the value of the Debtors'

estate.  And while the General Counsel's compensation continues to exceed the market rate for an

ordinary pharmaceutical company of Purdue's size, so too do his responsibilities.  The General

Counsel's compensation is appropriate given the other opportunities available to him and in light

of his qualifications, which the Debtors continue to believe are necessary for overseeing this

extraordinarily complex legal situation.

76.    Finally, WTW has also verified that the 2023 Performance Metrics are consistent

with typical practices generally, and with practices in the pharmaceutical industry specifically.

Gartrell Decl. ¶ 32.

77.    The Debtors determined that the cost of the 2023 KERP relative to market standards

is justified by the need to maintain manageable levels of employee attrition and because, when

considered in the context of the 2023 KERP Participants' base pay, the 2023 KERP is necessary

to bring the total direct compensation of the 2023 KERP Participants in line with the total direct

compensation provided to similarly situated employees of other pharmaceutical companies.

Gartrell Decl. ¶ 44.  The 2023 KERP Participants' total direct compensation (including the 2023

KERP) remains competitive with the 50th percentile range of the market with respect to both non-

insider executives and middle management, even factoring in retention awards to such employees

that are not included in total direct compensation in the market survey.  Gartrell Decl. ¶ 44.

78.    *Fifth*, as it has in the past, the Compensation Committee engaged in a rigorous

process to develop—and recommend that the full Board approve—the 2023 KEIP and 2023

KERP, including thorough due diligence regarding their proposed terms.  DelConte Decl. ¶ 20;

Gartrell Decl. ¶ 12.  Additionally, the proposed 2023 KEIP and 2023 KERP are both essentially

identical to the compensation programs that the Court approved in each of the last three years.

Those plans, in turn, closely followed the Debtors' Prepetition Compensation Plans, which have "satisfied the independent 'test of time'" and previously withstood the Court's scrutiny. *Glob. Home Prods.*, 369 B.R. at 786 (emphasizing the "nearly identical" nature of the previously used and proposed plans under the business judgment standard); *see also In re Navillus Tile, Inc.*, No. 17-13162 (SHL), Hr'g Tr., 11:18–24, Feb. 28, 2018 (approving payments that were "part of the normal compensation scheme that people have had prior to the bankruptcy" and "reflect[] the normal way that the debtor did business" prepetition, rather than bonuses that were "created through the bankruptcy case").

79.    *Lastly*, the Compensation Committee and the Debtors' senior management team worked closely with WTW to design the 2023 Compensation Plans, including consulting with WTW to assess market position relative to peer non-debtor pharmaceutical companies and comparable chapter 11 debtors. Gartrell Decl. ¶ 11. This rigorous process—all subjected to final approval by the full Board—and thorough consideration of advice from outside experts regarding the 2023 Compensation Plans support the conclusion that their approval represents a reasonable business judgment on the part of the Debtors.

80.    For all of the aforementioned reasons, the Debtors exercised sound business judgment when developing the 2023 KEIP and 2023 KERP and respectfully submit that they satisfy the requirements of section 503(c)(3) of the Bankruptcy Code.

III.    **The Proposed 2023 Compensation Plans Represent a Valid Exercise of the Debtors' Business Judgment Under Section 363(b)(1) of the Bankruptcy Code**

81.    The 2023 Compensation Plans can also be approved under section 363(b)(1) of the Bankruptcy Code, which empowers the Court to authorize a debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate." To approve the use of estate property under section 363(b)(1), the Second Circuit requires a debtor to show that the decision to

use the property outside of the ordinary course of business was based on the debtor's sound business judgment in light of "all salient factors" relating to the bankruptcy case. *Comm. of Equity Sec. Holders v. Lionel Corp.* (*In re Lionel Corp.*), 722 F.2d 1063, 1071 (2d Cir. 1983) ("The rule we adopt requires that a judge determining a § 363(b) application expressly find from the evidence presented before him at the hearing a good business reason to grant such an application."); *In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989); *see also In re MF Glob. Inc.*, 467 B.R. 726, 730 (Bankr. S.D.N.Y. 2012) ("Although not specified by section 363, the Second Circuit requires that transactions under section 363 be based on the sound business judgment of the debtor or trustee.").

82.     As set forth above, the Debtors have shown that the 2023 Compensation Plans represent reasonable exercises of their sound business judgment and are thus permitted under section 363(b)(1) of the Bankruptcy Code.  The 2023 Compensation Plans are essentially identical to predecessor programs approved by the Court, which themselves were consistent with the Debtors' prepetition compensation practices.  The 2023 KEIP and 2023 KERP, like the programs on which they are based, were developed with the assistance of independent experts and with market benchmarks front of mind.  Both the 2023 KEIP and the 2023 KERP are necessary to the Debtors' continuing ability to operate and to preserving the value of the Debtors' estates.  DelConte Decl. ¶ 39.  Without the 2023 Compensation Plans, the Debtors would face serious risk of unsustainable attrition among their key employees—a problem compounded by the Debtors' particular difficulty in attracting new employees and by hiring issues across the pharmaceutical sector more broadly.  DelConte Decl. ¶ 37; Gartrell Decl. ¶ 42.  If allowed to come to pass, this combination would threaten the viability of the Debtors' estates.  The Debtors therefore believe

that it is critical to renew their longstanding compensation practices in the form of these 2023 Compensation Plans.  DelConte Decl. ¶ 39.

### **Notice and No Prior Request**

83.     Notice of this Motion will be provided to (a) the entities on the Master Service List (as defined in the *Second Amended Order Establishing Certain Notice, Case Management, and Administrative Procedures* [ECF No. 498] and available on the Debtors' case website at https://restructuring.ra.kroll.com/purduepharma) and (b) any person or entity with a particularized interest in the subject matter of this Motion (together with the entities on the Master Service List, the "**Notice Parties**").  The Debtors respectfully submit that no further notice is required.

84.     No prior motion for the relief requested herein has been made in this or any other Court.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request that the

Court (i) enter the proposed order authorizing the Debtors to implement the 2023 KEIP and the

2023 KERP and (ii) grant such other and further relief as is just and proper.


Dated: May 2, 2023
     New York, New York

DAVIS POLK & WARDWELL LLP

*/s/ Darren S. Klein*

450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
James I. McClammy
Eli J. Vonnegut
Darren S. Klein
Dylan A. Consla

*Counsel to the Debtors*
*and Debtors in Possession*

**<u>Exhibit A</u>**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| In re: | **Chapter 11** |
| **PURDUE PHARMA L.P.**, *et al.*, | **Case No. 19-23649 (SHL)** |
| **Debtors.**[1] | **(Jointly Administered)** |

## ORDER AUTHORIZING THE DEBTORS TO IMPLEMENT 2023 KEY EMPLOYEE INCENTIVE PLAN AND 2023 KEY EMPLOYEE RETENTION PLAN

Upon the motion (the "**Motion**")[2] of Purdue Pharma L.P. and its affiliates that are debtors and debtors in possession in these cases (collectively, the "**Debtors**") for entry of an order (this "**Order**") approving and authorizing the 2023 KEIP and 2023 KERP, as more fully set forth in the Motion; and upon the DelConte Declaration and the Gartrell Declaration; and the Court having jurisdiction to consider the matters raised in the Motion pursuant to 28 U.S.C. §§ 157(a), (b) and 1334(b) and the *Amended Standing Order of Reference M-431*, dated January 31, 2012 (Preska, C.J.); and consideration of the Motion and the relief requested therein being a core proceeding under 28 U.S.C. § 157(b); and venue being proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided to the

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

[2] Capitalized terms used but otherwise not defined herein will have the meanings set forth in the Motion.

Notice Parties, and it appearing that no other or further notice need be provided; and the Court

having reviewed the Motion and held a hearing to consider the relief requested in the Motion

(the "**Hearing**"); and, after due deliberation, the Court having determined that the legal and factual

bases set forth in the Motion and at the Hearing establish good and sufficient cause for the relief

granted herein; and the Court having determined that the relief requested in the Motion is in the

best interests of the Debtors, their creditors, their estates and all other parties in interest; and all

objections to the Motion, if any, having been withdrawn, resolved or overruled; and upon all of

the proceedings had before the Court and after due deliberation and sufficient cause appearing

therefor;

   **IT IS HEREBY ORDERED THAT**:

   1. Pursuant to sections 363(b)(1) and 503(c)(3) of the Bankruptcy Code, the Motion

is granted as set forth herein.

   2. The 2023 KEIP is approved in its entirety.

   3. The 2023 KERP is approved in its entirety.

   4. The Debtors are authorized, but not directed, to take all actions necessary to

implement the 2023 KEIP on the terms and conditions set forth in the Motion, including making

any payments pursuant to the terms of the 2023 KEIP.

   5. The Debtors are authorized, but not directed, to take all actions necessary to

implement the 2023 KERP on the terms and conditions set forth in the Motion, including making

any payments pursuant to the terms of the 2023 KERP.

   6. Once earned, the Debtors' obligations to pay amounts that become due and owing

under the 2023 KEIP shall constitute administrative expenses pursuant to section 503(b) of the

Bankruptcy Code, thereby entitled to priority payment pursuant to section 507(a)(2) of the Bankruptcy Code.

7.      Once earned, the Debtors' obligations to pay amounts that become due and owing under the 2023 KERP shall constitute administrative expenses pursuant to section 503(b) of the Bankruptcy Code, thereby entitled to priority payment pursuant to section 507(a)(2) of the Bankruptcy Code.

8.      Nothing in this Order nor any action taken by the Debtors in furtherance of the implementation hereof shall be deemed to constitute an assumption or rejection of any executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code, and all of the Debtors' rights with respect to such matters are expressly reserved.

9.      Notwithstanding the relief granted herein and any actions taken hereunder, nothing contained herein shall (a) create, nor is it intended to create, any rights in favor of, or enhance the status of any claim held by, any person or entity or (b) be deemed to convert the priority of any claim from a prepetition claim into an administrative expense claim.

10.     Nothing in this Order nor the Debtors' payment of claims pursuant to this Order shall be construed as or deemed to constitute (a) an agreement or admission by the Debtors as to the validity of any claim against the Debtors on any ground, (b) a grant of third-party beneficiary status or bestowal of any additional rights on any third party, (c) a waiver or impairment of any rights, claims, or defenses of the Debtors' rights to dispute any claim on any ground, (d) a promise by the Debtors to pay any claim, or (e) an implication or admission by the Debtors that such claim is payable pursuant to this Order.

11.     For the avoidance of doubt, to the extent that any 2023 KEIP Participant or 2023 KERP Participant is (a) determined by a final order of this Court or any other court of competent

jurisdiction to have (x) knowingly participated in any criminal misconduct in connection with his or her employment with the Debtors or (y) been aware, other than from public sources, of acts or omissions of others that such participant knew at the time were fraudulent or criminal with respect to the Company's commercial practices in connection with the sale of opioids and failed to report such fraudulent or criminal acts or omissions internally at the Company or to law enforcement authorities at any time during his or her employment with the Company, or (b) believed by the Company based on reasonable inquiry (including inquiry of its attorney and advisors), which inquiry shall be completed prior to any payments being made to the applicable participant, to have met either of the standards in the foregoing clauses (a)(x) or (y), then in either case such participant shall not be eligible to receive any payments approved by this Order. All parties' rights, if any, to seek disgorgement of payments following the entry of any final order referred to in clause (a) of the foregoing sentence are reserved. The CEO shall not take any action with respect to his compensation under the 2023 KEIP with the intent or material effect of frustrating enforcement of any potential judgment of the Court in these Chapter 11 Cases or any other actions pending against him in any other court or jurisdiction with respect to such amounts.

12.     Any Bankruptcy Rule (including, but not limited to, Bankruptcy Rule 6004(h)) or Local Rule that might otherwise delay the effectiveness of this Order is hereby waived, and the terms and conditions of this Order shall be effective and enforceable immediately upon its entry.

13.     The contents of the Motion and the notice procedures set forth therein are good and sufficient notice and satisfy the Bankruptcy Rules and the Local Bankruptcy Rules for the Southern District of New York, and no other or further notice of the Motion or the entry of this Order shall be required.

14.     The Debtors are authorized to take all such actions as are necessary or appropriate to implement the terms of this Order.

15.     The Court shall retain exclusive jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

White Plains, New York
Dated: _____, 2023

_____
THE HONORABLE SEAN H. LANE
UNITED STATES BANKRUPTCY JUDGE

## Exhibit B

**DelConte Declaration**

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
James I. McClammy
Eli J. Vonnegut
Darren S. Klein
Dylan A. Consla

*Counsel to the Debtors
and Debtors in Possession*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **PURDUE PHARMA L.P.,** *et al.*, | **Case No. 19-23649 (SHL)** |
| **Debtors.**[1] | **(Jointly Administered)** |

## DECLARATION OF JESSE DELCONTE IN SUPPORT OF THE MOTION OF DEBTORS FOR ENTRY OF AN ORDER AUTHORIZING IMPLEMENTATION OF 2023 KEY EMPLOYEE INCENTIVE PLAN AND 2023 KEY EMPLOYEE RETENTION PLAN

I, Jesse DelConte, being fully sworn, hereby declare that the following is true to the best of my knowledge, information and belief:

1.      I am a Partner and Managing Director at AlixPartners, LLP ("**AlixPartners**") a corporate advisory and restructuring firm that has its principal office at 909 Third Avenue, Floor

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

30, New York, New York 10022. I specialize in providing leadership to troubled and underperforming companies and advising senior executives, boards of directors, and creditors. I have over 15 years of experience working with distressed companies across numerous industries, including pharmaceuticals, retail/apparel, technology, energy, automotive, industrial and business services, and industrial manufacturing. During this time, I have provided advisory services to debtors, secured creditors, equity holders, and trustees, in out-of-court and in-court scenarios.

2.     Before AlixPartners purchased Zolfo Cooper, LLC ("**Zolfo Cooper**") in 2018, I was employed by Zolfo Cooper, a financial advisory and interim management company that provided restructuring services to companies and their stakeholders, for ten years. During the last three years that I was employed by Zolfo Cooper, I served as a Senior Director. During my time at Zolfo Cooper, I advised numerous companies through successful in-court and out-of-court restructurings. These companies include Sabine Oil & Gas Corp., Avaya Inc., Cenveo Inc., and Fullbeauty Brands. During these engagements I was responsible for critical aspects of the restructuring, including cash flow forecasting, business plan development, lender negotiations, and U.S. Trustee and court reporting requirements. Prior to my time at Zolfo Cooper, I spent approximately five years as an analyst at Seneca Financial Group, Inc., where I provided restructuring advisory services to companies and lenders, as well as litigation support services to various litigants. I received a B.S. in commerce with distinction with concentrations in finance and information technology from the University of Virginia in 2003 and hold the Chartered Financial Analyst designation.

3.     Since March 5, 2019, AlixPartners has been one of the principal advisors to the Debtors' main operating entity, Purdue Pharma L.P. ("**Purdue Pharma**," and together with all Debtors, "**Purdue**" or the "**Debtors**"), and today, to all of the Debtors. As an advisor to the

Debtors, I am actively involved in the Debtors' operations and have been working cooperatively

with PJT Partners and Davis Polk & Wardwell LLP ("**Debtors' Other Restructuring**

**Advisors**," collectively with AlixPartners, "**Debtors' Restructuring Advisors**") to advise the

Debtors on decisions related to the Debtors' business operations and the impacts of the Debtors'

ongoing restructuring activities.

4.      In the four years that my team and I have been working with the Debtors, we have

assisted management and the Debtors' Other Restructuring Advisors on a number of different work

streams. I, and the members of my team, work closely with the Debtors' management, board

members, executive committee members and employees. In the course of my work, I have frequent

conversations with the Debtors' employees, senior management, including Purdue Pharma's chief

executive officer, chief financial officer and general counsel, board members and executive

committee members.  I attend regular meetings with key executives regarding the Debtors'

bankruptcy process and ongoing operations and regularly join board and committee meetings.  As

a result, I am familiar with, among other things, the Debtors operations and budgeting processes.

I have also been deeply involved in the process leading to the approval of key employee incentive

plans and key employee retention plans in prior years, including assisting the company analyzing

such programs at the employee level and negotiating changes to such programs with key creditor

constituencies and regularly joining meetings of the Compensation Committee.  I am playing a

similar role with respect to the proposed programs this year.  I am therefore familiar with the

structure and design process of such programs.

5.      I submit this declaration (this "**Declaration**") in further support of the *Motion of*

*Debtors for Entry of an Order Authorizing Implementation of 2023 Key Employee Incentive Plan*

*and 2023 Key Employee Retention Plan* (the "**Motion**").[2]   I am authorized to submit this Declaration on behalf of the Debtors.

6.      Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by other employees of the Company and WTW, or my opinion based upon experience, knowledge and information concerning the operations of the Debtors.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.

## The Proposed 2023 Compensation Plans

7.      The Debtors now seek approval of their fourth annual key employee incentive plan (the "**2023 KEIP**") and key employee retention plan (the "**2023 KERP**" and, together with the 2023 KEIP, the "**2023 Compensation Plans**").   The 2023 Compensation Plans, like the longstanding and Court-approved programs on which they are based, are intended to preserve the value of the Debtors' businesses by allowing them to pay market-competitive compensation to motivate the Company's workforce and minimize attrition.

8.      The 2023 KEIP, like its predecessor programs, includes an incentive-based, annual award payable in 2024.  The 2023 KEIP also provides for an incentive-based, long-term grant payable in 2024 and subject to clawback through March 2026.

9.      The 2023 KERP, like its predecessor programs, includes an annual retention award payable in 2023 and 2024, a long-term retention grant payable in 2024 and subject to clawback through March 2026, and additional targeted retention payments for certain employees.

---

[2] Capitalized terms used and not otherwise defined herein have the meanings ascribed to them in the Motion.

10.     The Compensation Committee and the Debtors' senior management team have again worked closely with WTW, their independent compensation consultant, to benchmark the Debtors' employee compensation against the market.

11.     The Debtors' employees are shouldering substantial burdens.  Historical attrition has exacerbated the workloads of those employees that remain, all of whom must continue to operate a complex pharmaceutical business in the midst of these protracted Chapter 11 Cases.  The Company maintains lean operations, and in the face of still-present challenges throughout the labor market, the Debtors have struggled to fill open positions.  Indeed, twenty positions have opened at the Company year to date, joining eight positions that opened but were not filled by the end of 2022.  Of these twenty-eight positions, ten remain unfilled, and the eighteen filled positions remained vacant, on average, for more than eighty-four days.[3]

12.     The 2023 Compensation Plans substantially replicate the Company's prior annual programs and remain consistent with the Debtors' historical compensation practices.  I believe that departing from past practice would likely make it much more difficult for the Debtors to retain employees who are necessary to maintain business operations.  I believe also that the 2023 Compensation Plans are reasonably tailored and necessary to realize the Debtors' objective of a successful emergence from chapter 11.

**The Proposed 2023 KEIP**

*The 2023 KEIP Participants*

13.     The proposed 2023 KEIP would apply to (i) the Debtors' president and chief executive officer (the "**CEO**"), (ii) the Debtors' chief financial officer (the "**CFO**") and (iii) the

---

[3] Unless otherwise indicated, the employment data referenced herein are current as of April 30, 2023.

Debtors' executive vice president, general counsel and secretary (the "**General Counsel**" and, together with the CEO and CFO, the "**2023 KEIP Participants**").

14.    The expertise, skills, and institutional knowledge of the 2023 KEIP Participants will be essential to continuing to guide the Debtors through their novel restructuring and maximizing the value of the Debtors' estates.  The 2023 KEIP Participants perform essential functions for the Debtors, including providing critical management and legal services, and are responsible for helping determine the Debtors' strategic plan and facilitating the achievement of the Debtors' goals.  Their workloads are anticipated to be high, both as a result of the prolongation of these Chapter 11 Cases and historical attrition throughout the Company.  Moreover, I believe that their leadership will be particularly critical this year in supporting employee morale: the Company and its employees continue a prolonged wait for emergence from bankruptcy, and, while the Company remains confident in a positive outcome at the United States Court of Appeals for the Federal Circuit, the recent adverse decision of the United States District Court for the District of Delaware with respect to litigation centering on certain patents (the "**Patent Litigation**") that related to Purdue's innovative abuse deterrent formula for OxyContin®, which is the product of significant research investment, may result in additional challenges with respect to maintaining employee morale in the short term.  Because the 2023 KEIP Participants continue to make extraordinary efforts to maximize the value of the Debtors' businesses and shepherd the Company through its restructuring, the Compensation Committee, the Board, and the Debtors' senior management team believe that appropriately incentivizing the three 2023 KEIP Participants is necessary to ensure optimal recoveries for all stakeholders.

15.     None of the 2023 KEIP Participants will be eligible to participate in the proposed 2023 KERP (including the 2023 Targeted Retention Awards, as defined below), and the purpose of the proposed 2023 KEIP is to incentivize the 2023 KEIP Participants.

***The 2023 KEIP Structure***

16.     Each 2023 KEIP Participant will receive (i) an annual award (the "**2023 KEIP Annual Award**") and (ii) a long-term incentive compensation grant (the "**2023 KEIP Long-Term Award**"), which are collectively designed to replicate the Debtors' historical compensation practices and renew their prior, Court-approved programs, subject to the material reductions negotiated in 2020 and carried forward ever since.  The 2023 KEIP Annual Award and 2023 KEIP Long-Term Award have target values, which are also their maximum values, set forth in **Table 1** below.  All payments under the 2023 KEIP will be tied to the Debtors' achievement of corporate objectives (as discussed in more detail below, the "**2023 Performance Metrics**") at threshold or target performance levels, as applicable, with straight-line interpolation to be used if actual performance falls between those amounts.  The 2023 KEIP Participants will not receive any payments under the 2023 KEIP should the Company fail to achieve the 2023 Performance Metrics at the threshold level.  The maximum cost of the 2023 KEIP would be approximately $6.7 million.

**TABLE 1**

| 2023 KEIP Participant | Target 2023 KEIP Annual Award | Target 2023 KEIP Long-Term Award | Total Target 2023 KEIP Award |
|---|---|---|---|
| President and Chief Executive Officer | $2,384,700 | $501,111 | $2,885,811 |
| Chief Financial Officer | $900,000 | $405,000 | $1,305,000 |
| Executive Vice President, General Counsel and Secretary | $1,910,500 | $557,601 | $2,468,101 |

| Total | $5,195,200 | $1,463,712 | $6,658,912 |

17.     Subject to achievement of the 2023 Performance Metrics at a threshold level, and subject to each 2023 KEIP Participant's continued employment through the payment date (other than as provided below), the 2023 KEIP Annual Award will be paid on the Company's regular payroll date on or immediately following March 15, 2024.  A termination of employment by the Debtors without cause after September 30, 2023 will trigger acceleration at the target value, subject to clawback if performance is later scored below target (such clawback to occur by March 15, 2024).  In the event of a termination of employment by the Debtors without cause on or prior to September 30, 2023, no payment will be due.

18.     Consistent with Purdue's longstanding compensation practices, each 2023 KEIP Participant will also receive a 2023 KEIP Long-Term Award, which is designed to mimic the economic structure of the LTRP grant that the participant otherwise would have received in 2023.[4] In connection with seeking approval of the long-term incentive compensation grant component of the 2020 KEIP, the Debtors agreed to a 52.25% aggregate reduction from historical practice and to subject the award to acceleration upon emergence.  That discount was carried forward for the long-term incentive compensation grant components of the 2021 and 2022 KEIPs while switching to nearer-term payment dates, subject to a clawback through the historical payment date, rather than acceleration upon emergence.  In an effort to reach consensus with key creditor constituencies, an additional consensual reduction of the CEO's 2023 KEIP Long-Term Award by a further

---

[4] The 2023 KEIP Long-Term Award is intended to replicate the Company's prepetition Long-Term Results Plan, which provided for incentive grants that would accrue and be payable over a three-year performance period.  In 2021, in connection with seeking stakeholder approval of that year's compensation programs, Purdue agreed to pay its long-term award the following year, with a clawback in place over the course of what would have been a three-year performance period. As they did last year, the Debtors seek once more to replicate this structure and payment timing, with an award payable in 2024 and subject to clawback through the date on which payments would otherwise have been made in 2026.

$352,000 has also been applied this year.  Such discounts are reflected in the amounts set forth in Table 1 with respect to the CEO and General Counsel, while the newly-hired CFO will be subject to the same 40% reduction as KERP Participants.  This year, as in prior years, payment will be made on the Company's regular payroll date on or immediately following March 15, 2024, subject to clawback if the 2023 KEIP Participant resigns or is terminated for any reason other than by the Debtors without cause prior to March 2026.  As with the 2023 KEIP Annual Award, termination of employment without cause after September 30, 2023 will accelerate the 2023 KEIP Long-Term Award at target, subject to clawback for any amount that would not otherwise have been paid if target performance is not met.  Payouts will be tied to the same 2023 Performance Metrics that apply to the 2023 KEIP Annual Award and therefore will depend solely on the Company's performance in 2023.[5]

### The 2023 Performance Metrics

19.    Consistent with the Company's longstanding practice of approving performance metrics early in each calendar year, the Compensation Committee recommended, and the Board approved, the 2023 Performance Metrics in the first quarter of 2023, with guidance from WTW. The Company consulted regarding the 2023 Performance Metrics with the UCC, AHC and MSGE.

20.    The 2023 Performance Metrics are based on the same three strategic pillars that have long defined the Debtors' corporate objectives: value creation (representing 50% of the 2023 Performance Metrics), innovation and efficiency (40% of the 2023 Performance Metrics), and people and culture (10% of the 2023 Performance Metrics).  The 2023 Performance Metrics are

---

[5] Given that the 2023 KEIP Long-Term Award is paid on an accelerated schedule subject to a clawback through historical payment timing, only 2023 performance will have been determined at the time of payment.  In addition, as it has in each of the prior three performance periods, the Compensation Committee determined that it was in the best interest of the Debtors to apply only the 2023 Performance Metrics, rather than performance metrics for a three-year period, to pay under the 2023 KEIP Long-Term Awards, under present circumstances.

ambitious, with threshold targets that were set to be difficult to achieve both individually and in the aggregate when approved by the Compensation Committee, and will continue to require the 2023 KEIP Participants' diligent and committed efforts. The 2023 Performance Metrics were developed using the same rigorous internal process that the Debtors have long used to identify and strive for corporate priorities, married with input from, and consultation with, highly-informed and sophisticated members of the Debtors' key creditor constituencies. The 2023 Performance Metrics, which were recommended by the Compensation Committee and approved by the full Board following such consultation with key creditor constituencies, are challenging, require extensive achievement and present a potential risk of not being met at the threshold level required for payment. Indeed, past performance shows clearly that the 2023 KEIP Participants' diligence and skill will be required to steer the Debtors to even a threshold score on the 2023 Performance Metrics; in 2021, for instance, following consultation with key creditor constituencies, the Compensation Committee approved a final score on that year's annual scorecard of just 86.29%. The Company also uses its annual performance metrics more broadly, as a tool to communicate strategic priorities for the year ahead throughout the organization, so the importance of the 2023 Performance Metrics goes far beyond determining the 2023 KEIP Participants' compensation. The 2023 KEIP Participants will be focused on driving the Debtors to meet these goals over the course of the year ahead, and they will need to apply substantial efforts to achieve their targets throughout the rest of this year. The Compensation Committee recommended, and the Board approved, these stretch goals to ensure that the 2023 KEIP has its intended, incentivizing effect.

21.     The value creation strategic pillar measures and rewards the long-term success of the Debtors' business based on certain nonfinancial operational goals, such as meeting certain deadlines with respect to the Company's testing and development of non-opioid products,

including overdose treatment products.    **Table 2** below sets forth the operational and developmental goals that the Compensation Committee recommended, and the Board approved, as key to the long-term success of the Debtors' business.

### TABLE 2

| Value Creation Metrics | Target Date | % of Value Creation | % of 2023 Performance Metrics |
|---|---|---|---|
| − Implement Company initiatives to ensure the Company operates efficiently and sustainably so as to maximize net value generated to abate the opioid crisis. | | 50.0% | 25.0% |
| **Public Health Initiatives[6]** | | | |
| − Complete pivotal clinical studies of the Nalmefene auto-injector | End of Q4 2023 | 25.0% | 12.5% |
| − File a New Drug Application ("**NDA**") for the 1.5 mg dose of the Nalmefene auto-injector | End of Q4 2023 | | |
| − Complete 18-month stability testing for the Nalmefene HCl injection pre-filled syringe, and 36-month stability testing for the vial | End of Q3 2023 | | |
| − Provide support to Harm Reduction Therapeutics for the RiVive™ OTC Naloxone NDA, and receive approval of the same | End of Q4 2023 | | |

---

[6] All medications referred to in this section are potential treatments for opioid overdose.

| Progressing the Branded Pipeline | | | |
|---|---|---|---|
| − Finalize clinical study protocol for Sunobinop; identify, contract and onboard panel of highly-qualified external subject matter experts and gain their input to help develop and complete a protocol to investigate Sunobinop in Alcohol Use Disorder | End of Q2 2023 | | |
| − Complete IMB-150 first-in-human cohort in healthy volunteers, including pharmacokinetic and safety analysis | End of Q2 2023 | 20.0% | 10.0% |
| − Initiate IMB-150 cohort in patients | End of Q4 2023 | | |
| − Complete QT sub-studies analyses of Tinostamustine and estimate six-month progression-free survival in glioblastoma patients to support a go/no-go decision | End of Q4 2023 | | |
| Progressing the Generics Pipeline | | | |
| − Launch Aformoterol and Formoterol inhalation solutions | End of Q3 2023 | | |
| − File an abbreviated NDA ("**ANDA**") for Prucalopride tablets | End of Q4 2023 | 5.0% | 2.5% |
| − Secure approval of the ANDA for the Theophylline extended-release 300 mg tablets | End of Q3 2023 | | |
| **Total** | | **100.0%** | **50.0%** |

22.      The first metric in the value creation strategic pillar, entitled "[i]mplement Company initiatives to ensure the Company operates efficiently and sustainably so as to maximize net value generated to abate the opioid crisis," was first added in 2022 to address certain priorities raised during the consultation process with the UCC, AHC and MSGE.  This metric continues to be included this year and will consist of three sub-metrics:

(i)    Enter into Asset Purchase Agreement with a "stalking horse bidder" for the sale of substantially all of the assets of Avrio Health in Q2 2023 (1/3rd weighting);

(ii)     (1/3rd weighting);

(iii)    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (1/3rd weighting).

23.    This redacted metric reflects confidential commercial information that consists of specific near-term commercial priorities and opportunities.  Such information is maintained confidentially by the Debtors and has been provided solely to the Board and senior management as well as, subject to the *Third Amended Protective Order* [ECF No. 1935], the creditors that have consultation rights with respect to the 2023 Performance Metrics.  If this information were to be disclosed publicly, I believe that it would likely advantage the Debtors' competitors by providing them with insight into the Debtors' strategic priorities or otherwise negatively impact the Debtors' business.

24.    The innovation and efficiency strategic pillar captures key financial and operational goals, including important business metrics such as operating profit and net sales.  **Table 3** below sets forth the financial and operational goals that the Compensation Committee, the Board and the Debtors' senior management team have identified as key to the Company's long-term business success.

**TABLE 3**

| Innovation and Efficiency Metrics[7] | Target | % of Innovation and Efficiency | % of 2023 Performance Metrics |
|---|---|---|---|
| − Consolidated Business Operating Profit Before Non-Recuring and One-Time Charges | $86.0 million | 50.0% | 20.0% |
| − Avrio Consumer Health Business Net Sales | $105.4 million | 10.0% | 4.0% |
| − Rhodes Generics Business Operating Loss | ($24.6 million) | 15.0% | 6.0% |
| − Ensure operational readiness for emergence by (i) transferring business licenses, (ii) making product label changes, (iii) transferring government contracts, (iv) transferring payroll and benefits and (v) transferring intellectual property | | 25.0% | 10.0% |
| **Total** | | **100.0%** | **40.0%** |

25.    Finally, nurturing the Debtors' human resources and organizational culture has been, and will remain, critical to keeping the Debtors on the path to emergence and beyond. **Table 4** below sets forth the key people and culture metrics the Debtors' senior management team has identified, and the Board has approved, as essential to enhancing corporate performance and maximizing the value of the Debtors' business.

---

[7] In the event of a sale of the Avrio Consumer Health Business during the performance period, performance will be prorated based on performance relative to the Debtors' budget through the last full month prior to such sale.

**TABLE 4**

| People and Culture Metrics | Target Date | % of People and Culture | % of 2023 Performance Metrics |
|---|---|---|---|
| **Strengthen Colleague Engagement** | | | |
| – Provide timely and transparent employee communications which maintain a full-year average score of 80% or greater on post-event colleague surveys | End of Q4 2023 | 50.0% | 5.0% |
| – Support colleague learning and career growth by enhancing development programs for new hires, existing employees and people leaders | End of Q4 2023 | | |
| **Strengthen Our Commitment to Diversity, Equity & Inclusion ("DEI")** | | | |
| – Conduct listening sessions and refresh DEI roadmap | End of Q2 2023 | 50.0% | 5.0% |
| – Progress the three establish employee resource groups and support the delivery of at least two all-employee Learning More sessions on DEI-related topics | End of Q4 2023 | | |
| **Total** | | **100.0%** | **10.0%** |

*Importance of the 2023 KEIP*

26.     The 2023 KEIP, like those approved by the Court in 2020, 2021 and 2022, is consistent with the Debtors' historical compensation practices (although lower in amount given the continuation of concessions first agreed to in 2020), even as the challenges faced by the 2023 KEIP Participants remain elevated as they continue to navigate these protracted Chapter 11 Cases and work toward emergence.

27.     I understand that the CEO and CFO's compensation are both below median when compared to executives at peer, non-debtor pharmaceutical companies, while the CEO plays, and the new CFO is anticipated to also play, a vital role in maximizing the value of the Debtors' estates for the benefit of their stakeholders while stewarding the Debtors through the many ongoing challenges presented by these Chapter 11 Cases.

28.     I also understand that, as in years past, the General Counsel's compensation remains above-market when compared to general counsel at peer, non-debtor pharmaceutical companies.  But I understand it has long been, and still is, the Debtors' business judgment that they require a general counsel with significantly greater expertise and experience than is typical, particularly in light of the enormous complexities of these Chapter 11 Cases, which are entirely in addition to the usual complex legal issues attendant to running a diversified pharmaceutical business.  The Compensation Committee and the Debtors' senior management team continue to believe that the General Counsel's compensation is appropriate and reasonable, given the immense challenges he faces in his role with the Debtors and in light of his past experience and expertise and the other opportunities available to an individual with his qualifications.

### The Proposed 2023 KERP

*The 2023 KERP Participants*

29.     The Debtors seek authorization to implement the 2023 KERP for virtually all employees other than the 2023 KEIP Participants (the "**2023 KERP Participants**").[8]  The 2023 KERP Participants have undertaken significant efforts to maintain the value of the Debtors' business and enable the Debtors' progress toward a successful restructuring.  They have done so in the face of significant stresses, including reduced employee headcount and a very competitive market for talent to replace departing employees.  They have achieved remarkable business results despite the ongoing overhang of these protracted Chapter 11 Cases and fiercely competitive industry in which the Debtors operate.  Moreover, the recent adverse results in the Patent Litigation only exacerbate the challenging environment in which the Debtors' employees operate.  The Debtors must provide their employees with market compensation in order to continue to secure

---

[8] I understand that a small number of employees either do not participate in the AIP or are otherwise ineligible to participate in the 2023 KERP.

their dedicated efforts.  Approximately 454 employees will participate in the 2023 KERP, of which

16 will be vice president and 438 will be middle management, professional employees and support

and technical staff, which include scientific researchers as well as regulatory, compliance, quality

and manufacturing personnel.[9]

*The 2023 KERP Structure*

30.    Each eligible 2023 KERP Participant will receive (i) an amount equal to the 2023

KERP Participant's target AIP (the "**2023 KERP Annual Award**") and (ii) a long-term incentive

compensation grant payable in 2023 (subject to clawback through March 2026) (the "**2023 KERP**

**Long-Term Award**").  Certain 2023 KERP Participants will receive additional, targeted retention

payments (the "**2023 Targeted Retention Awards**").

31.    The 2023 KERP Annual Award is equal to the target amount of the AIP award that

each participant would historically have received, including modest, ordinary course merit

increases.  The 2023 KERP Annual Award is not subject to performance criteria, in order to

provide the 2023 KERP Participants with greater certainty about their compensation.  This is

expected to help retain 2023 KERP Participants under what remain challenging and uncertain

conditions, as it has in prior years.

32.    The 2023 KERP Annual Award will be paid, (x) with respect to employees with

titles of vice president or senior, (i) 25% on the Company's regular payroll date on or immediately

following October 1, 2023 and (ii) 75% on the Company's regular payroll date on or immediately

following March 15, 2024, and (y) with respect to employees with titles below vice president,

(i) 33.3% on the Company's regular payroll date on or immediately following October 1, 2023 and

---

[9] In instances where the separation of existing 2023 KERP Participants from the Debtors results in newly hired employees taking on their roles or responsibilities—or if the Debtors hire employees to fill currently vacant, non-insider positions—the 2023 KERP would allow the Debtors to include such newly hired employees as 2023 KERP Participants.

(ii) 66.7% on the Company's regular payroll date on or immediately following March 15, 2024. Other than for hourly employees, the first payment of the 2023 KERP Annual Award will be subject to clawback if the 2023 KERP Participant resigns or is terminated for any reason other than by the Debtors without cause prior to March 15, 2024. Any outstanding amounts under the 2023 KERP Annual Award will accelerate in the event that a 2023 KERP Participant's employment is terminated by the Debtors without cause after September 30, 2023.[10] The total aggregate payment under the 2023 KERP Annual Award is approximately $15.1 million.

33.    Consistent with past practice, certain 2023 KERP Participants will receive a 2023 KERP Long-Term Award that substantially replicates the long-term grants awarded under the Debtors' prior, Court-approved programs and mimics the economic structure of the LTRP grant that otherwise would have been granted to each eligible 2023 KERP Participant under Purdue's longstanding compensation practices. The amount of such grant will equal 60% of the target LTRP grant that otherwise would have been granted, reflecting a discount to past practice negotiated in 2020 and carried forward ever since, subject only to modest, ordinary course annual base salary increases, promotions and other changes to the employee population. The 2023 KERP Long-Term Award will not be subject to performance metrics.

34.    Payments due under the 2023 KERP Long-Term Awards will be made on the Company's regular payroll date on or immediately following March 15, 2024, subject to clawback

---

[10] I understand that the terms have been tailored with respect to employees of Avrio Health such that the Debtors may waive this October 1 vesting requirement (and the October 1 vesting requirement for the 2023 KERP Long-Term Award, as set forth herein) for any employee of Avrio Health who remains employed with the Company through the closing of the contemplated sale of that business and who, in the Debtors' judgment, cooperates with and facilitates such sale. Any cessation of employment due solely to the closing of the Avrio Health sale will constitute a termination without cause even if the affected employee accepts a position at Avrio Health's acquirer that may give rise, at the Debtors' election, to an acceleration of the applicable 2023 KERP Annual Award and 2023 KERP Long-Term Award. The aggregate amount of the 2023 KERP Annual Awards and 2023 KERP Long-Term Awards that may be affected by this accommodation to the timing of such sales process is less than $750,000.

if the 2023 KERP Participant resigns or is terminated for any reason other than by the Debtors without cause prior to March 2026.   This earlier payment timeframe, combined with a clawback through the customary, historical payment date, was put in place to maximize the effect of the award on employee motivation while maintaining its retentive effect. Setting the payment at 60% of the target LTRP award that otherwise would have been granted is also partially on account of this accelerated payment timing. Outstanding amounts will accelerate in the event of a termination of employment after September 30, 2023 by the Debtors without cause.  The aggregate total cost of these 2023 KERP Long-Term Awards for all 2023 KERP Participants is approximately $5.7 million.

35.      In addition, the Debtors have previously used targeted retention awards, including in each year since the commencement of these Chapter 11 Cases, to preserve and maximize the value of the Debtors' estates.  Though the Debtors have continued to see attrition with these programs in place, the evidence supporting the efficacy of these targeted retention awards is clear: attrition among targeted retention recipients was approximately 4.0% in 2022, compared to approximately 8.3% in the broader Purdue population.  The Debtors therefore seek approval of the 2023 Targeted Retention Awards in an aggregate amount of up to $7,820,000. The Debtors propose that $1.10 million of such amount consist of supplemental capacity that the Debtors may deploy to respond to changing business conditions, but only after consultation with the UCC, AHC and MSGE, which will provide the Debtors with necessary flexibility while cabining that flexibility by subjecting any amount spent thereunder to creditor consultation.  The Debtors have successfully used such supplemental retention capacity to respond to unique, discrete retention needs in consultation with these creditor constituencies in the past. The 2023 Targeted Retention Awards will renew the Debtors' previous award programs and allow the Debtors to continue their

practice of making targeted retention payments to an identified group of key employees.[11]  As always, the Debtors will endeavor to use only as much of such capacity as is necessary to retain key employees, with a goal of maximizing the value of the Debtors' estates.

36.    The 2023 Targeted Retention Awards will be paid (a) 25% on the Company's regular payroll date on or immediately following December 30, 2023, (b) 25% on the Company's regular payroll date on or immediately following March 30, 2024 and (c) 50% on the Company's regular payroll date on or immediately following June 30, 2024.[12]   The 2023 Targeted Retention Awards are subject to clawback if the recipient resigns or is terminated for any reason other than by the Debtors without cause before September 30, 2024, and outstanding amounts due will accelerate upon a recipient's termination by the Debtors without cause after September 30, 2023.

### *Importance of the 2023 KERP*

37.    The 2023 KERP is commercially appropriate and reasonable.  The challenges of operating in chapter 11 present the 2023 KERP Participants with an ongoing, extraordinary burden. Unless the Debtors provide their workforce with appropriate, market compensation, there is a very real risk that employees will depart for other opportunities.  The fifteen resignations thus far in 2023, which represents a year-to-date annualized voluntary turnover rate of 10.3%, continue to pressure an already lean employee base.  Additional defections among the Debtors' workforce could significantly hamper their operations and diminish the value to be delivered to the Debtors' stakeholders upon emergence.  Accordingly, the Company is seeking Court approval to renew its annual compensation programs, so as to continue providing non-insider employees with much-

---

[11] The Debtors' management team has identified the employees most likely to require targeted retention payments over the course of this next year.  As business needs fluctuate, some variation in the targeted retention population may occur, though in no event will (a) the aggregate dollar amount of the 2023 Targeted Retention Awards exceed $7,820,000 or (b) any insider receive such an award.

[12] Timing with respect to supplemental capacity may be adjusted in response to applicable business conditions.

needed certainty regarding their compensation arrangements. Moreover, the Debtors continue to endure significant hiring obstacles (in the face of a broadly difficult and competitive market for talent); twenty headcount positions have opened year to date, joining eight positions that opened but were not filled in 2022. Ten of these positions remain unfilled, and lateral hiring remains extremely difficult, particularly as the Debtors continue to operate within the confines of these Chapter 11 Cases. If not for the Company's prior annual compensation programs, the Debtors believe that the attrition rate would likely have been significantly higher. Failure to implement the 2023 KERP could have a devastating effect on the Debtors' ability to retain the individuals they need to maintain their business operations and deliver a successful emergence from these Chapter 11 Cases for all stakeholders.

38.    The 2023 KERP Annual Award is consistent with the Debtors' historical compensation practices. The 2023 KERP Annual Award substantially replicates the Company's prepetition and Court-approved annual award programs, subject only to modest, ordinary course annual merit increases. Subjecting the first payment to clawback through March 15, 2024, provides a powerful retentive element and mimics the historical payment timing of the Company's prepetition AIP. Similarly, the 2023 KERP Long-Term Award substantially replicates the Debtors' longstanding long-term grant program and carries forward the steep discount to past practice that the Court first approved in 2020 (subject to modest, ordinary course year-over-year increases). Additionally, the Debtors have identified the 2023 KERP Participants most likely to require 2023 Targeted Retention Awards through a detailed, thorough process to identify the roles that are most critical to preserving and maximizing the value of the Debtors' estates. The aggregate amount of the 2023 Targeted Retention Awards is consistent with the aggregate amount of prior Court-

approved targeted retention programs, which have proven effective at mitigating attrition among selected critical employees.

## **Conclusion**

39.    I believe that the 2023 Compensation Plans are crucial to the Debtors' business operations during the pendency of these Chapter 11 Cases, as they will maintain employee morale, dedication, confidence and cooperation and maximize the Debtors' ability to reorganize successfully. These annual programs are necessary to provide Purdue's workforce with market compensation, to motivate employees to achieve demanding corporate objectives, and to ensure that key employees remain in their positions.  Preserving and maximizing the value of these estates by appropriately compensating the Debtors' employees is particularly important at this juncture, as the Debtors prepare to exit chapter 11 and put the Company's assets to work abating the opioid crisis.  Providing appropriate, market compensation to the Debtors' remains as essential now as ever, as the Debtors' employees continue to await the Company's emergence from chapter 11.  I believe that the failure to authorize the 2023 Compensation Plans would likely irreparably impair the Debtors' relationships with employees, adversely impact the Debtors' ability to deliver superior products and services, and needlessly hinder the Debtors' restructuring efforts.

40.    In sum, I believe that the relief requested in the Motion is necessary to avoid irreparable harm to the Debtors and constitutes a critical element in maximizing the value of the Debtors' business.

*[Remainder of Page Intentionally Left Blank]*

41.    I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Executed:   May 2, 2023

By:   */s/ Jesse DelConte*
_____
Jesse DelConte
Partner & Managing Director
AlixPartners, LLP

**Exhibit C**

**Gartrell Declaration**

DAVIS POLK & WARDWELL LLP

450 Lexington Avenue

New York, New York 10017

Telephone: (212) 450-4000

Facsimile: (212) 701-5800

Marshall S. Huebner

James I. McClammy

Eli J. Vonnegut

Darren S. Klein

Dylan A. Consla

*Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **PURDUE PHARMA L.P.,** *et al.*, | **Case No. 19-23649 (SHL)** |
| **Debtors.**[1] | **(Jointly Administered)** |

**DECLARATION OF JOSEPHINE GARTRELL IN SUPPORT OF THE**
**MOTION OF DEBTORS FOR ENTRY OF AN ORDER AUTHORIZING**
**IMPLEMENTATION OF 2023 KEY EMPLOYEE INCENTIVE**
**PLAN AND 2023 KEY EMPLOYEE RETENTION PLAN**

I, Josephine Gartrell, being fully sworn, hereby declare that the following is true to the best

of my knowledge, information and belief:

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

1.      I am a Senior Director at Willis Towers Watson plc ("**WTW**").  Purdue Pharma L.P. and its above-captioned wholly owned direct and indirect subsidiaries (collectively, the "**Debtors**," the "**Company**" or "**Purdue**") engaged WTW to provide compensation consulting services and to serve as advisors to the Compensation and Talent Committee (the "**Compensation Committee**") of the Board of Directors of Purdue Pharma Inc. (the "**Board**").  I am familiar with the structure of the Debtors' pre- and post-petition compensation plans, including the Debtors' proposed 2023 key employee incentive plan (the "**2023 KEIP**") and 2023 key employee retention plan (the "**2023 KERP**" and, together with the 2023 KEIP, the "**2023 Compensation Plans**").

2.      I submit this declaration (this "**Declaration**") on behalf of WTW and in support of the *Motion of Debtors for Entry of an Order Authorizing Implementation of 2023 Key Employee Incentive Plan and 2023 Key Employee Retention Plan* (the "**Motion**").[2]  I am authorized to submit this Declaration on behalf of WTW.

3.      Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my review of the 2023 Compensation Plans and my team's and my research into compensation practices at companies in the pharmaceutical industry and general industry as well as other companies that have recently filed for chapter 11 protection, along with information supplied to me by members of the Debtors' management team and other advisors.  For the reasons described below, it is my opinion that the 2023 KEIP and the 2023 KERP are appropriate and reasonable.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

## Qualifications and Background

### A. Qualifications

4.    I received my Juris Doctor from the University of San Diego School of Law in 1998, graduating *magna cum laude* and Order of the Coif, and my Bachelor of Arts in international business from San Diego State University in 1994.  After working at Gibson, Dunn & Crutcher LLP as an associate in the corporate practice, Pillsbury Winthrop Shaw Pittman LLP as an associate in the executive compensation practice and The Loftin Firm, P.C. as a partner and then of counsel in the corporate practice, I became an executive compensation consultant at the Hay Group LLC in 2014.  I joined WTW in 2016, where I have been continuously employed ever since.

5.    WTW is an international professional services firm that offers a wide variety of services to public and private clients, including expert analysis of executive and management compensation.  WTW designs and delivers solutions that manage risk, optimize benefits, cultivate talent and expand the power of capital to protect and strengthen institutions and individuals.  WTW focuses on two key business segments: Health, Wealth and Career; and Risk and Broking.

6.    My responsibilities at WTW primarily involve advising for-profit companies and not-for-profit organizations, specifically regarding executive compensation.  I routinely assist public and private companies in various industries with compensation philosophy, pay competitiveness issues, incentive plan design and other compensation-related analyses.  I have participated in the development and design of hundreds of management and employee incentive plans for companies in and outside of bankruptcy.

7.    I am highly experienced in executive, management and employee compensation, with over twenty years of experience in the field.  During my tenure at WTW, I have worked closely with a range of companies undergoing a financial restructuring to develop a variety of pre-

3

and post-petition compensation arrangements, including compensation plans and programs for senior executive and nonexecutive employees.  Specifically, I have led or co-led the review and design of key employee incentive plans, key employee retention plans and other similar plans in a number of chapter 11 cases, including *In re Mallinckrodt plc*, Case No: 20-12522 (JTD) (Bankr. D. Del.); *In re PES Holdings, LLC*, Case No. 19-11626 (LSS) (Bankr. D. Del.); *In re Cloud Peak Energy Inc.*, Case No. 19-11047 (CSS) (Bankr. D. Del.); *In re FULLBEAUTY Brands Holdings Corp.*, Case No. 19-22185 (RDD) (Bankr. S.D.N.Y.); *In re Parker Drilling Co.*, Case No. 18-36958 (MI) (Bankr. S.D. Tex.); *In re Aegean Marine Petroleum Network Inc.*, Case No. 18-13374 (MEW) (Bankr. S.D.N.Y.); *In re Westmoreland Coal Co.*, Case No. 18-35672 (DRJ) (Bankr. S.D. Tex.); *In re ATD Corp.*, Case No. 18-12221 (KJC) (Bankr. D. Del.); *In re Claire's Stores, Inc.*, Case No. 18-10584 (MFW) (Bankr. D. Del.); *In re BlockFi Inc.*, Case No. 22-19361 (MBK) (Bankr. D.N.J.); *In re Celsius Network LLC*, Case No. 22-10964 (MG) (Bankr. S.D.N.Y.); *In re David's Bridal, LLC*, Case No 23-13131 (CMG) (Bankr. D.N.J); *In re Tuesday Morning Corporation*, Case No. 23-90001 (Bankr. D. Tex.).

## B.  Background

8.    After the Debtors first retained WTW in 2019, my team and I familiarized ourselves with the Debtors' operations, business goals and pre- and post-petition compensation practices and since that time have become very familiar therewith.  We advised on the design, structure and cost of each of the key employee incentive and retention plans that the Court approved in 2020, 2021 and 2022.  Each year, we also conducted benchmarking analyses to compare (i) the market competitiveness of pay to similar programs at peer pharmaceutical companies and (ii) the cost of

those programs to the cost of similar programs at other chapter 11 debtors.[3]

9.      Prior to commencing these Chapter 11 Cases, Purdue maintained a performance-based Annual Incentive Plan (the "**AIP**") for the majority of their employees. The AIP provided annual cash bonuses tied to the achievement of Company and individual performance metrics. The Company also maintained a performance-based Long-Term Results Plan (the "**LTRP**" and, together with the AIP, the "**Prepetition Compensation Plans**"), which provided eligible employees with annual grants that would result in cash payouts tied to achievement of corporate objectives measured over a three-year performance period. Finally, I understand that, as needed, the Company would utilize targeted retention plans to retain their most critical employees; in 2018 and in 2019, in particular, I understand Purdue implemented retention plans for certain executive and nonexecutive employees which were calibrated to incentivize those employees to remain with the Company through the end of 2020.

10.      In 2020, Purdue replaced the Prepetition Compensation Plans with a key employee incentive plan (the "**2020 KEIP**") and key employee retention plan (the "**2020 KERP**" and, together with the 2020 KEIP, the "**2020 Compensation Plans**"), which closely paralleled the Prepetition Compensation Plans. At a high level, payments under both the annual and the long-term award components of the 2020 KEIP were contingent on the Debtors' achievement of certain performance metrics that likewise substantially replicated the Company's prepetition corporate

---

[3] *See Decl. of Josephine Gartrell in Supp. of Mot. of Debtors for Entry of Order Authorizing Implementation of a Key Employee Incentive Plan and Key Employee Retention Plan* [ECF No. 1674-3]; *Suppl. Decl. of Josephine Gartrell in Supp. of Mot. of Debtors for Entry of Order Authorizing Implementation of a Key Employee Incentive Plan and Key Employee Retention Plan* [ECF No. 1847-2]; *Second Suppl. Decl. of Josephine Gartrell in Supp. of Mot. of Debtors for Entry of Order Authorizing Implementation of a Key Employee Incentive Plan and Key Employee Retention Plan* [ECF No. 1960-2]; *Decl. of Josephine Gartrell in Supp. of Motion of Debtors for Entry of Order Authorizing Implementation of 2021 Key Employee Incentive Plan and 2021 Key Employee Retention Plan* [ECF No. 3077-3]; *Decl. of Josephine Gartrell in Supp. of Motion of Debtors for Entry of Order Authorizing Implementation of 2022 Key Employee Incentive Plan and 2022 Key Employee Retention Plan* [ECF No. 4707-3].

objectives.  Payments under the annual, long-term and targeted retention award components of the

2020 KERP were not subject to those same performance criteria, so as to give participants greater

certainty about their compensation.  The Debtors renewed the 2020 Compensation Plans with

Court approval in 2021 and 2022; the Debtors, in conjunction with WTW and their other advisors,

have designed all of their post-petition key employee incentive and retention plans to substantially

replicate their predecessor, Court-approved programs, as well as the Company's longstanding

historical compensation practices.

11.    This year, the Debtors' proposed 2023 Compensation Plans continue to

substantially replicate their historical and Court-approved compensation programs.  In developing

and evaluating the 2023 Compensation Plans, WTW updated its annual pay benchmarking analysis

by refreshing and analyzing relevant market compensation data, including total direct

compensation offered by companies in WTW's 2022 Pharmaceutical and Health Sciences

Executive Compensation and Middle Management, Professional and Support Surveys. My team

and I provided input and advice on the design, structure and cost of the 2023 KEIP and the 2023

KERP, building upon our input and advice on the design, structure and total cost of the

compensation programs that the Court approved in 2020, 2021 and 2022.  WTW worked closely

with the Compensation Committee, the Debtors' senior management team and other advisors in

connection with this process and leveraged our experience designing programs for similarly

situated companies, both in and outside of chapter 11.  The 2023 Compensation Plans reflect the

input and guidance that my colleagues at WTW and I provided.

12.    Importantly, the 2023 Compensation Plans were subject to oversight, review and

approval by both the Compensation Committee and the full Board.  WTW was involved in and

advised on the design of the 2023 Compensation Plans, and prior to their internal approval by the

6

Debtors, WTW presented its analysis of their appropriateness and reasonableness to senior management and the Compensation Committee.  WTW's primary goal in the course of these interactions was to independently assess whether the 2023 Compensation Plans were appropriate and reasonable in light of its understanding of the specific needs of the Debtors, relevant market data and WTW's experience designing comparable programs for similarly situated companies.

13.    The Debtors continue to work to maximize the value of the Debtors' estates for their stakeholders.  Recognizing the unique facts of these Chapter 11 Cases, and that employee performance continues to play a critical role in achieving a favorable outcome for all parties, the Debtors, in conjunction with WTW and their other advisors, again undertook a collaborative process to design appropriate and reasonable compensation programs for 2023.  The culmination of that work resulted in the 2023 KEIP, which is designed to incentivize the Debtors' CEO, CFO and General Counsel (together, the "**2023 KEIP Participants**") to achieve what the Board has determined to be challenging financial and operational targets, and the 2023 KERP, which is designed to retain all other eligible non-insider employees (the "**2023 KERP Participants**") during the pendency of these Chapter 11 Cases.

## 2023 Key Employee Incentive Plan

### A.  Overview of the 2023 KEIP

14.    The 2023 KEIP is designed to incentivize the 2023 KEIP Participants to achieve the performance metrics (the "**2023 Performance Metrics**") set out in Purdue's annual corporate scorecard (the "**Scorecard**").  The 2023 KEIP establishes a sliding scale of potential award opportunities based on the Debtors' achievement of the 2023 Performance Metrics.  The Debtors must achieve the 2023 Performance Metrics at least at a threshold level (set at 75% of the target) in order for the 2023 KEIP Participants to earn any amounts proposed to be paid thereunder.

Maximum compensation under the 2023 KEIP, as in the prior Court-approved programs, is capped at 100% of target, with straight-line interpolation between 75% and 100% should the Company's performance fall in between threshold and target levels.

15.    Each 2023 KEIP Participant will receive an award comprised of (i) an annual award (the "**2023 KEIP Annual Award**") and (ii) a long-term incentive compensation grant (the "**2023 KEIP Long-Term Award**"), which are collectively designed to replicate the Debtors' Prepetition Compensation Plans and renew their prior, Court-approved programs. The maximum cost of the 2023 KEIP is approximately $6.7 million. The titles of the 2023 KEIP Participants, and their respective proposed award opportunities under the 2023 KEIP, are identified in **Table 1** below.

**TABLE 1**

| 2023 KEIP Participant | Target 2023 KEIP Annual Award | Target 2023 KEIP Long-Term Award | Total Target 2023 KEIP Award |
|---|---|---|---|
| President and Chief Executive Officer | $2,384,700 | $501,111 | $2,885,811 |
| Chief Financial Officer | $900,000 | $405,000 | $1,305,000 |
| Executive Vice President, General Counsel and Secretary | $1,910,500 | $557,601 | $2,468,101 |
| **Total** | $5,195,200 | **$1,463,712** | **$6,658,912** |

16.    Subject to achievement of the 2023 Performance Metrics at a threshold level, and subject to each 2023 KEIP Participant's continued employment through the payment date (other than as provided below), the 2023 KEIP Annual Award will be paid on the Company's regular payroll date on or immediately following March 15, 2024. A termination of employment by the Debtors without cause after September 30, 2023 will trigger acceleration at the target value, subject to clawback if performance is later scored below target (such clawback to occur by March 15,

2024).  In the event of a termination of employment by the Debtors without cause on or prior to September 30, 2023, no payment will be due.

17.    Consistent with Purdue's longstanding compensation practices, each 2023 KEIP Participant will also receive a 2023 KEIP Long-Term Award, which is designed to mimic the economic structure of the LTRP grant that the participant otherwise would have received in 2023. In connection with seeking approval of the long-term incentive compensation grant component of the 2020 KEIP, the Debtors agreed to a 52.25% aggregate reduction from historical practice and to subject the award to acceleration upon emergence.  That discount was carried forward for the long-term incentive compensation grant components of the 2021 and 2022 key employee incentive plans while switching to nearer-term payment dates, subject to a clawback through the historical payment date, rather than acceleration upon emergence.  In an effort to reach consensus with key creditor constituencies, an additional consensual reduction of the CEO's 2023 KEIP Long-Term Award by a further $352,000 has also been applied this year.  Such discounts are reflected in the amounts set forth in Table 1 with respect to the CEO and General Counsel, while the newly-hired CFO will be subject to the same 40% reduction as all other employees.  This year, as in prior years, payment will be made on the Company's regular payroll date on or immediately following March 15, 2024, subject to clawback if the 2023 KEIP Participant resigns or is terminated for any reason other than by the Debtors without cause prior to March 2026.  As with the 2023 KEIP Annual Award, termination of employment without cause after September 30, 2023 will accelerate the 2023 KEIP Long-Term Award at target, subject to clawback for any amount that would not otherwise have been paid if target performance is not met.  Payouts will be tied to the same 2023 Performance Metrics that apply to the 2023 KEIP Annual Award and therefore will depend solely on the Company's performance in 2023.

**B.    Performance Metrics**

18.    The 2023 KEIP is purely incentive based.  Payments under the 2023 KEIP Annual Award and 2023 KEIP Long-Term Award will be conditioned on the 2023 KEIP Participants' ability to meet the 2023 Performance Metrics set out in the Scorecard.  I understand that the Board assessed the Scorecard and believes it properly incentives the 2023 KEIP Participants to work toward a value-maximizing restructuring of the Debtors' estates during this critical stage of these Chapter 11 Cases.

19.    The Compensation Committee recommended, and the Board approved, the 2023 Performance Metrics in the first quarter of 2023, with guidance from WTW and following consultation with the UCC, AHC and MSGE.  The 2023 Performance Metrics rely on the same three strategic pillars that have long defined the Debtors' corporate objectives: (i) value creation (representing 50% of the 2023 Performance Metrics); (ii) innovation and efficiency (40% of the 2023 Performance Metrics); and (iii) people and culture (10% of the 2023 Performance Metrics).

20.    The value creation strategic pillar measures and rewards the long-term success of the Debtors' business based on certain nonfinancial operational goals, such as meeting certain deadlines with respect to the Company's testing and development of non-opioid products, including overdose treatment products.  **Table 2** below sets forth the operational and developmental goals that the Compensation Committee recommended, and the Board approved, as key to the long-term success of the Debtors' business.

**TABLE 2**

| Value Creation Metrics | Target Date | % of Value Creation | % of 2023 Performance Metrics |
|---|---|---|---|
| – Implement Company initiatives to ensure the Company operates efficiently and sustainably so as to maximize net value generated to abate the opioid crisis. | | 50.0% | 25.0% |

10

| Public Health Initiatives[4] | | | |
|---|---|---|---|
| − Complete pivotal clinical studies of the Nalmefene auto-injector | End of Q4 2023 | 25.0% | 12.5% |
| − File a New Drug Application ("NDA") for the 1.5 mg dose of the Nalmefene auto-injector | End of Q4 2023 | | |
| − Complete 18-month stability testing for the Nalmefene HCl injection pre-filled syringe, and 36-month stability testing for the vial | End of Q3 2023 | | |
| − Provide support to Harm Reduction Therapeutics for the RiVive™ OTC Naloxone NDA, and receive approval of the same | End of Q4 2023 | | |
| Progressing the Branded Pipeline | | | |
| − Finalize clinical study protocol for Sunobinop; identify, contract and onboard panel of highly-qualified external subject matter experts and gain their input to help develop and complete a protocol to investigate Sunobinop in Alcohol Use Disorder | End of Q2 2023 | 20.0% | 10.0% |
| − Complete IMB-150 first-in-human cohort in healthy volunteers, including pharmacokinetic and safety analysis | End of Q2 2023 | | |
| − Initiate IMB-150 cohort in patients | End of Q4 2023 | | |
| − Complete QT sub-studies analyses of Tinostamustine and estimate six-month progression-free survival in glioblastoma patients to support a go/no-go decision | End of Q4 2023 | | |
| Progressing the Generics Pipeline | | | |
| − Launch Aformoterol and Formoterol inhalation solutions | End of Q3 2023 | 5.0% | 2.5% |
| − File an abbreviated NDA ("ANDA") for Prucalopride tablets | End of Q4 2023 | | |
| − Secure approval of the ANDA for the Theophylline extended-release 300 mg tablets | End of Q3 2023 | | |
| **Total** | | **100.0%** | **50.0%** |

21.    The innovation and efficiency strategic pillar captures key financial and operational

---

[4] All medications referred to in this section are potential treatments for opioid overdose.

11

goals, including important business metrics such as operating profit and net sales.  **Table 3** below

sets forth the financial and operational goals that the Compensation Committee, the Board and the

Debtors' senior management team have identified as key to the Company's long-term business

success.

**TABLE 3**

| Innovation and Efficiency Metrics | Target | % of Innovation and Efficiency | % of 2023 Performance Metrics |
|---|---|---|---|
| – Consolidated Business Operating Profit | $86.0 million | 50.0% | 20.0% |
| – Avrio Consumer Health Business Net Sales | $105.4 million | 10.0% | 4.0% |
| – Rhodes Generics Business Operating Loss | ($24.6 million) | 15.0% | 6.0% |
| – Ensure operational readiness for emergence by (i) transferring business licenses, (ii) making product label changes, (iii) transferring government contracts, (iv) transferring payroll and benefits and (v) transferring intellectual property | | 25.0% | 10.0% |
| **Total** | | **100.0%** | **40.0%** |

22.      Finally, **Table 4** below sets forth the people and culture metrics that I understand

the Debtors' senior management team has identified, and the Board has approved, as essential to

enhancing corporate performance and maximizing the value of the Debtors' business.

**TABLE 4**

| People and Culture Metrics | Target Date | % of People and Culture | % of 2023 Performance Metrics |
|---|---|---|---|
| **Strengthen Colleague Engagement** | | | |
| – Provide timely and transparent employee communications which maintain a full-year average score of 80% or greater on post-event colleague surveys | End of Q4 2023 | 50.0% | 5.0% |
| – Support colleague learning and career growth by enhancing development programs for new hires, existing employees and people leaders | End of Q4 2023 | | |

12

| Strengthen Our Commitment to Diversity, Equity & Inclusion ("DEI") | | | |
|---|---|---|---|
| − Conduct listening sessions and refresh DEI roadmap | End of Q2 2023 | 50.0% | 5.0% |
| − Progress the three established employee resource groups and support the delivery of at least two all-employee Learning More sessions on DEI-related topics | End of Q4 2023 | | |
| **Total** | | **100.0%** | **10.0%** |

## C.    Evaluation of the 2023 KEIP

23.    In assessing the appropriateness and reasonableness of the 2023 KEIP, I worked with my team to analyze competitive target/max total direct compensation, a standard benchmark that includes base salary, short-term incentives, and long-term incentives ("**Total Direct Compensation**"), for the 2023 KEIP Participants.

24.    As my primary reference point for the competitiveness of Total Direct Compensation of the 2023 KEIP Participants, my team and I analyzed the compensation opportunities of executives at relevant market comparators in the pharmaceutical industry. Specifically, my team and I matched the 2023 KEIP Participants to survey benchmarks at companies in WTW's 2022 Pharmaceutical and Health Sciences Executive Compensation Survey Report, based on our understanding of each 2023 KEIP Participant's job duties and responsibilities within the Debtors' organization.  The result of this analysis, along with a comparison against last year's benchmarking analysis, is shown in **Table 5** below:

TABLE 5

| Title | Variance to Market Target TDC | | | | | | | | |
| | Purdue Base + KEIP | | | Purdue Base + KEIP (2022) | | | Purdue (Base Only) | | |
| | P25 | P50 | P75 | P25 | P50 | P75 | P25 | P50 | P75 |
| President and CEO | 139% | -23% | -52% | 174% | -14% | -34% | 21% | -61% | -76% |
| CFO | 132% | -15% | -41% | N/A | N/A | N/A | -5% | -65% | -76% |
| EVP, General Counsel and Secretary | 345% | 172% | 51% | 382% | 150% | 75% | 117% | 32% | -26% |

25.    As shown above, the market position of the CEO's Total Direct Compensation decreased year-over-year.  Absent Court approval of the 2023 KEIP, the CEO would be materially undercompensated compared to the market median for chief executive officers at similarly sized organizations in the pharmaceutical industry.  Failure to provide the CEO with appropriate, incentivizing, market competitive compensation could significantly undermine the Debtors' ability to motivate that individual to achieve desired business objectives.  The 2023 KEIP is, in part, designed to address some of this shortfall.  In my experience, it would be highly uncommon for any entity with the Debtors' size and scope to fail to provide short- and long-term cash-based incentive opportunities for a relevant compensation period, and the 2023 KEIP is necessary to address compensation during this pay period – just as the Debtors' prior annual programs addressed compensation in 2022 and prior years.

26.    The CFO would also be below the competitive range of market median for chief financial officers at similarly sized organizations in the pharmaceutical industry if the 2023 KEIP were not approved.  Approval of the KEIP, in addition to the CFO's base salary, would bring the CFO's total target annual compensation within competitive range (-15%) of market median target total direct compensation.  This is reasonable market positioning.

27.    As in years past, the General Counsel's compensation under the 2023 KEIP remains

14

above-median when compared to general counsel roles at peer pharmaceutical companies. I understand from discussions with the Debtors and their other advisors, however, that the General Counsel remains critical to the Debtors' operations and the success of these Chapter 11 Cases. The General Counsel's compensation under the 2023 KEIP is similar to his compensation under the prior Court-approved programs and is reasonable in light of my understanding of the importance of his role to the Debtors' successful operation during these Chapter 11 Cases and the Debtors' need of a highly credentialed and qualified general counsel in light of their present circumstances. Moreover, I understand that when the General Counsel accepted his role with the Debtors, he forewent similar opportunities at other companies offering notably higher compensation packages. Accordingly, the General Counsel's compensation—including the 2023 KEIP—is reasonable in light of the aforementioned facts and circumstances as I understand them to be; again, and particularly, the immense challenges he faces in his role with the Debtors and his significant experience and expertise.

28.     To further assess the appropriateness and reasonableness of the design of the 2023 KEIP, I also analyzed 33 comparable examples of key employee incentive plans approved by bankruptcy courts since 2018 for debtors with annual revenues between $250 million and $5 billion. These companies include 24 Hour Fitness Worldwide, Inc.; Aceto Corporation; AcuSport Corporation; Bristow Group Inc.; Brookstone Inc.; California Resources Corp.; Celadon Group, Inc.; Claire's, Inc.; Cloud Peak Energy Inc.; Diamond Offshore Drilling, Inc.; Ditech Holding Corp.; DURA Automotive Systems, LLC.; EXCO Resources, Inc.;  Fairway Group Holdings Corp.; FirstEnergy Solutions Corp.; FTD Companies, Inc.;  Gymboree Group, Inc.; Heritage Home Group LLC.; Intelsat S.A.; LSC Communications, Inc.; Mallinckrodt plc; Neiman Marcus Group LTD LLC; NPC International, Inc.; Payless Inc.; PHI Inc.; Revlon, Inc.; RTW Retailwinds, Inc.;

Speedcast International Limited; Stage Stores, Inc.; Talen Energy Supply, LLC.; Trident Holding Company, LLC.; Valaris plc; and Welded Construction, L.P..

29.     My team and I then benchmarked the proposed target cost (which is also the maximum cost) of the 2023 KEIP against plans at these comparable debtors, expressed in the following two ways: (i) by aggregate amount and (ii) by percentage of revenue.  The results of this analysis can be observed in **Table 6** below:

### TABLE 6

| Aggregate Cost vs. Comparable Debtors | Purdue 2023 KEIP Annual and Long-Term Awards (Target/Max) | Market 50th Percentile | | Market 75th Percentile | | Market 90th Percentile | |
|---|---|---|---|---|---|---|---|
| | | Target | Max | Target | Max | Target | Max |
| **$000s** | $6,658 | $4,600 | $6,300 | $9,800 | $14,600 | $14,300 | $28,200 |
| **Percentage of Revenue** | 1.09% | 0.42% | 0.61% | 0.76% | 1.24% | 1.12% | 1.68% |

30.     In conducting these analyses, I also relied upon my significant consulting experience in the analysis and design of incentive plans generally at other companies.

31.     Based on the results of these benchmarking analyses, and my experience with other incentive compensation arrangements implemented by companies in and outside of chapter 11, I believe that the 2023 KEIP and the 2023 KEIP Participants' potential Total Direct Compensation levels are appropriate in light of competitive market practice for pharmaceutical companies like the Debtors and reasonable in light of the Debtors' current circumstances.  Critically, the absence of short- and long-term incentive opportunities for the 2023 KEIP Participants would significantly undermine the current competitiveness of the Debtors' compensation structure, which in turn could negatively impact the Debtors' ability to motivate current management to achieve desired business objectives.

**D.     Appropriateness and Reasonableness of the 2023 KEIP**

32.     For the aforementioned reasons and based on my experience with incentive-based

compensation programs employed by companies in chapter 11, I believe the design, structure and cost of the 2023 KEIP is appropriate and consistent with market practice, including in the pharmaceutical industry.

33.     The 2023 KEIP Participants continue to manage the Debtors during a time of significant commercial difficulty, including as the Debtors seek to emerge from a prolonged, complex restructuring and in the face of a challenging, competitive labor market.  Indeed, it remains, and it has been in years past, my strong impression and understanding that the Company faces immense challenges that go far beyond even those typically faced by companies in chapter 11.

34.     The 2023 KEIP, like those approved by the Court in 2020, 2021 and 2022, is consistent with the Debtors' historical compensation practices (although lower in amount given the continuation of concessions first agreed to by the Company in 2020).  The CEO and CFO's compensation are both below median when compared to executives at peer, non-debtor pharmaceutical companies.  That the General Counsel would continue to receive above-median compensation under the 2023 KEIP, as he has in the past, does not alter my conclusion that the proposed payments thereunder are reasonable.  The Debtors have determined that it remains appropriate to compensate the General Counsel at a level that recognizes his extraordinary stewardship during these Chapter 11 Cases and incentivizes him to continue to lead the Debtors toward a successful restructuring.  I understand that the Debtors require a general counsel with the highest level of expertise and resilience; a true strategic advisor to the Company's CEO.  It is also my understanding that the General Counsel was an external hire who had been identified as one of the only candidates who could fill the role under the circumstances.

35.     For these reasons, and based on my experience with incentive-based compensation

programs employed by companies in and outside of chapter 11, I believe that the design, structure and cost of the 2023 KEIP are reasonable.

**2023 Key Employee Retention Plan**

**A.  Overview of the 2023 KERP**

36.    The 2023 KERP Participants consist of approximately 454 incentive-eligible employees, of which 16 hold a position of vice president or higher and 438 will be middle management, professional employees and support and technical staff, which include scientific researchers as well as regulatory, compliance, quality and manufacturing personnel.  Neither 2023 KEIP Participant is eligible to participate in the 2023 KERP, and no 2023 KERP Participant is an insider.

37.    Each eligible 2023 KERP Participant will receive (i) an amount equal to the 2023 KERP Participant's target AIP (the "**2023 KERP Annual Award**") and (ii) a long-term incentive compensation grant payable in 2023 (subject to clawback through March 2026) (the "**2023 KERP Long-Term Award**").  Certain 2023 KERP Participants will receive additional, targeted retention payments (the "**2023 Targeted Retention Awards**").

38.    The 2023 KERP Annual Award is equal to the target amount of the AIP award that each participant would historically have received, including modest, ordinary course merit increases.  The 2023 KERP Annual Award is not subject to performance criteria, in order to provide the 2023 KERP Participants with greater certainty about their compensation.  This is expected to help retain 2023 KERP Participants under what remains challenging and uncertain conditions, as I understand it has in prior years.

39.    The 2023 KERP Annual Award will be paid, (x) with respect to employees with titles of vice president or senior, (i) 25% on the Company's regular payroll date on or immediately

18

following October 1, 2023 and (ii) 75% on the Company's regular payroll date on or immediately following March 15, 2024, and (y) with respect to employees with titles below vice president, (i) 33.3% on the Company's regular payroll date on or immediately following October 1, 2023 and (ii) 66.7% on the Company's regular payroll date on or immediately following March 15, 2024. Other than for hourly employees, the first payment of the 2023 KERP Annual Award will be subject to clawback if the 2023 KERP Participant resigns or is terminated for any reason other than by the Debtors without cause prior to March 15, 2024. Any outstanding amounts under the 2023 KERP Annual Award will accelerate in the event that a 2023 KERP Participant's employment is terminated by the Debtors without cause after September 30, 2023.[5] The total aggregate payment under the 2023 KERP Annual Award is approximately $15.1 million.

40.    Consistent with past practice, certain 2023 KERP Participants will receive a 2023 KERP Long-Term Award that substantially replicates the long-term grants awarded under the Debtors' prior, Court-approved programs and mimics the economic structure of the LTRP grant that otherwise would have been granted to each eligible 2023 KERP Participant under Purdue's longstanding compensation practices. The amount of such grant will equal 60% of the target LTRP grant that otherwise would have been granted, reflecting a discount to past practice negotiated in 2020 and carried forward ever since, subject only to modest, ordinary course annual base salary increases, promotions and other changes to the employee population. The 2023 KERP Long-Term Award will not be subject to performance metrics.

---

[5] I understand the Debtors may waive this October 1 vesting requirement (and the October 1 vesting requirement for the 2023 KERP Long-Term Award) for any employee of Avrio Health who remains employed with the Company through the closing of the contemplated sale of that business and who, in the Debtors' judgment, cooperates with and facilitates such sale. Any cessation of employment due solely to the closing of the Avrio Health sale will constitute a termination without cause—even if the affected employee accepts a position at Avrio Health's acquirer—that may give rise, at the Debtors' election, to an acceleration of the applicable 2023 KERP Annual Award and 2023 KERP Long-Term Award.

41.    Payments due under the 2023 KERP Long-Term Awards will be made on the
Company's regular payroll date on or immediately following March 15, 2024, subject to clawback
if the 2023 KERP Participant resigns or is terminated for any reason other than by the Debtors
without cause prior to March 2026.   Outstanding amounts will accelerate in the event of a
termination of employment after September 30, 2023 by the Debtors without cause.   The aggregate
total cost of these 2023 KERP Long-Term Awards for all 2023 KERP Participants is
approximately $5.7 million.

42.    In addition, the Debtors have previously used targeted retention awards, including
in each year since the commencement of these Chapter 11 Cases, to preserve and maximize the
value of the Debtors' estates.   Though the Debtors have continued to see attrition with these
programs in place, I understand that the evidence supporting the efficacy of these targeted retention
awards is clear: attrition among targeted retention recipients in 2022 was approximately 4.0% in
2022, compared to approximately 8.4% in the broader Purdue population.   The Debtors therefore
seek approval of the 2023 Targeted Retention Awards in an aggregate amount of up to $7,820,000.
The Debtors propose that $1.10 million of such amount consist of supplemental capacity that the
Debtors may deploy to respond to changing business conditions, but only after consultation with
the UCC, AHC and MSGE, which will provide the Debtors with, as I understand it, necessary
flexibility while cabining that flexibility by subjecting any amount spent thereunder to creditor
consultation.   I understand that the Debtors have successfully used such supplemental retention
capacity to respond to unique, discrete retention needs, in consultation with these creditor
constituencies in the past.   The 2023 Targeted Retention Awards will renew the Debtors' previous
award programs and allow the Debtors to continue their practice of making targeted retention

payments to an identified group of key employees.[6]

43.    The 2023 Targeted Retention Awards will be paid (a) 25% on the Company's regular payroll date on or immediately following December 30, 2023; (b) 25% on the Company's regular payroll date on or immediately following March 30, 2024; and (c) 50% on the Company's regular payroll date on or immediately following June 30, 2024.[7]  The 2023 Targeted Retention Awards are subject to clawback if the recipient resigns or is terminated for any reason other than by the Debtors without cause before September 30, 2024, and outstanding amounts due will accelerate upon a recipient's termination by the Debtors without cause after September 30, 2023.

44.    In assessing the appropriateness and reasonableness of the 2023 KERP, I worked with my team to analyze the competitiveness of the 2023 KERP Participants' Total Direct Compensation.  Like with the 2023 KEIP, my team and I relied on compensation awarded to non-insider executives and middle management and professionals at Purdue's peer, non-debtor pharmaceutical companies as our primary reference point.  The result of this analysis, along with a comparison against last year's benchmarking analysis, is shown in **Table 7** below:

---

[6] I understand that the Debtors have identified the employees most likely to require targeted retention payments over the course of this next year, though as business needs fluctuate, some variation in the targeted retention population may occur.  I further understand that in no event will (a) the aggregate dollar amount of the 2023 Targeted Retention Awards exceed $7,820,000 or (b) any insider receive such an award.

[7] I understand that timing with respect to supplemental capacity may be adjusted in response to applicable business conditions.

**TABLE 7**

| Employee Group | No. | Variance to Market TDC (Purdue Target TDC) | | | Variance to Market TDC (Purdue TTDC + Retention) | | | Variance to Market TDC (Purdue Base Only) | | | Memo: Variance to Market TDC Last Year (2022) (Purdue Target TDC) | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | P25 | P50 | P75 | P25 | P50 | P75 | P25 | P50 | P75 | P25 | P50 | P75 |
| Non-Insider (Executive Survey) | 22 | 15% | -12% | -34% | 27% | -3% | -28% | -26% | -43% | -57% | 17% | -10% | -26% |
| Non-Insider (Middle Management and Professional Survey) | 95 | 18% | 3% | -12% | 22% | 6% | -9% | -3% | -16% | -28% | 18% | 1% | -13% |

45.     To further assess the appropriateness and reasonableness of the design and cost of the 2023 KERP, I also analyzed 23 comparable examples of bankruptcy court-approved programs since 2018 for debtors with annual revenues between $250 million and $5 billion; these programs may take the form of incentive or retention programs, depending on the company. These companies include 24 Hour Fitness Worldwide, Inc.; ATD Corporation; Bristow Group Inc.; California Resources Corporation; CBL & Associates Properties, Inc.; Cloud Peak Energy Inc.; Core Scientific, Inc.; Covia Holdings Corporation; Diamond Offshore Drilling, Inc.; DURA Automotive Systems, LLC.; Endo International Plc.; EXCO Resources, Inc.; FirstEnergy Solutions Corp.; GTT Communications, Inc.; Hexion Holdings LLC; Intelsat S.A.; LSC Communications, Inc.; Oasis Petroleum Inc.; Seadrill Limited; Speedcast International Limited; Valaris plc; Westmoreland Coal Company; and Whiting Petroleum Corporation.

46.     My team and I then benchmarked the proposed cost of the annual and long-term award components of the 2023 KERP against plans at these comparable debtors, expressed in the following three ways: (i) by aggregate amount, (ii) by percentage of revenue and (iii) by average cost per participant. The results of this analysis can be observed in **Table 8** below:

**TABLE 8**

22

| Aggregate Cost vs. Comparable Debtors | Purdue 2023 KERP Annual and Long-Term Awards | Market 50th Percentile | Market 75th Percentile | Market 90th Percentile |
|---|---|---|---|---|
| **$000s** | $20,800 | $10,700 | $24,200 | $33,800 |
| **Percentage of Revenue** | 3.39% | 0.75% | 1.29% | 1.64% |
| **$000s Cost per Person** | $45.8 | $48.1 | $59.7 | $91.1 |

47.    Finally, to assess the appropriateness and reasonableness of the cost of the 2023 Targeted Retention Awards in particular, my team and I benchmarked the proposed cost of the program against plans at comparable debtors, expressed in the following two ways: (i) by aggregate amount and (ii) by percentage of revenue.  This comparison can be observed in **Table 9** below:

**TABLE 9**

| Aggregate Cost vs. Comparable Debtors | Purdue 2023 Targeted Retention Awards | Market 50th Percentile | Market 75th Percentile | Market 90th Percentile |
|---|---|---|---|---|
| **$000s** | $7,820 | $2,400 | $3,600 | $9,400 |
| **Percentage of Revenue** | 1.28% | 0.21% | 0.36% | 0.51% |

48.    In conducting these analyses, I also relied upon my significant consulting experience in the analysis and design of retention plans.

49.    Based on the results of these benchmarking analyses, my experience with other compensation arrangements implemented by companies in and outside of chapter 11 and my understanding of the Debtors' unique challenges (as represented by the Debtors and their other advisors), I believe that the 2023 KERP —and the 2023 KERP Participants' aggregate Total Direct Compensation levels thereunder—are appropriate and reasonable.

23

**B. Appropriateness and Reasonableness of the 2023 KERP, Including the 2023 Targeted Retention Awards**

50.    Based on my education, experience, and the work I have done in these Chapter 11 Cases and in similar cases, I believe that the design, structure and cost of the 2023 KERP, including the 2023 Targeted Retention Awards, are appropriate and reasonable given the facts and circumstances of these Chapter 11 Cases as I understand them.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: May 2, 2023

*/s/ Josephine Gartrell*

Josephine Gartrell
Senior Director, Executive Compensation and
Board Advisory
Willis Towers Watson plc

25