May 1, 2023


Maria Ecke

Richard Ecke

Andrew Ecke

Peter Sottile

C/o Office of Maria Ecke

8 Glenbrook Drive

West Simsbury, CT 06092

Pro Se

sagitarianm2004@yahoo.com


United States Bankruptcy Court

Southern District of New York

300 Quarropas Street

White Plains, New York 10601


| | |
|---|---|
| MARIA ECKE, | Case |
| Appellant, | No. 19-23649 |
| -against | **JURY TRIAL DEMANDED-** |
| PURDUE PHARMA L.P. | |
| Appellee. | |


**Designation of Items for Record of Appeal for Claim No. 628554 for the Estate of David Jonathan Ecke
and a Motion to Amend Maria Ecke's Claim No.16810**

1.) Why is Davis Polk, the law firm which represents Purdue Pharma, saying that a separate Claim for the
Estate of David Jonathan Ecke, which I did not know that I could start at the same time as my own claim,
that the claim should not be upheld? I am just a layperson of the law. It seems as if my claim is thought
to be too much money by Purdue Pharma's attorneys. Judge Drain kept repeating the amount of my
claim at my appeal, which I truthfully told him, but Purdue's attorneys are getting well over a million a
month. Being a layperson, I did not know that I didn't have to tell Judge Drain the amount of my Claim

1

as I later found out. Is it because the Attorneys are taking all Sackler's and Purdue's money for themselves in monthly increments for their respective firms? **If I can't have a separate Claim for the Estate of David Jonathan Ecke then I need to increase my claim by 5 times the original amount.** Judge Drain clearly states in Case No. 19-23649, Adv. Case No. 19-08289-rdd: "So I will deny the motion's request for leave to file a late claim. That's without prejudice to Ms. Ecke's right to either assert that one of the claims that have already been timely filed encompasses the claim that was filed late or that the claim could be amended, which would require a motion, Ms. Ecke, to encompass that claim on the grounds that the claims as filed basically are consistent with and don't assert a different claim in 628554." Docket No.4703, P.65. Transcript from Hearing Held on April 27, 2022.

ORDERED that the Motions are denied, without prejudice, however, to any party's right to seek leave to amend their proof of claim or assert that claim(s) addressed in claim number 628554 is/are covered by a prior claim submitted by the Movant or another claimant. For the avoidance of doubt, the Court is not, at this time, making any rulings with respect to the appropriateness of any such amendment, and the rights of all parties are reserved in that regard. Dated: April 29, 2022    /s/Robert D. Drain    White Plains, New York THE HONORABLE ROBERT D. DRAIN UNITED STATES BANKRUPTCY JUDGE, Docket 4715, P.2.

2.) "Wherein; No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of LIFE, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

3.) Our family members are deceased and have been deprived of life, dying every day or still struggling with their afflictions as my other son does. He doesn't even have children after 12 years of marriage. Could it be that Purdue Pharma's drugs interfere or interfered with his reproductive system? The families through various organizations have been demanding due process; to no avail.

4.) The bankruptcy proceedings are prohibiting WE THE PEOPLE, the Plaintiffs our due process which is guaranteed by the 14th Amendment of the Constitution. "Due process is the legal requirement the state must respect all legal rights that are owed to one person. Due process balances the power of the law of the land and protects the individual person from it. When a government harms a person without following the exact course of the law, this constitutes a due process violation, which offends the rule of law. " Brief of Opposition to Restructuring of Purdue Pharma L.P., 21-cv8566 by Maria Ecke.

5.) Ever since the Sacklers robbed me of my son, David Jonathan Ecke, I have been depressed, and at any moment I have time lapses. Days go into weeks, weeks go into months, and months go into years with my very bad depression I simply lost track of time which is why I filed David Jonathan Ecke's Claim No. 628554 late along with just being a layperson and not knowing the rules of Bankruptcy, and also had trouble with lawyers and statements that they were prolonging the final claim date. Arik Preis, representing Akin Gump and supposedly representing the Unsecured Creditors Committee for the Purdue and Mallinckrodt Committees sent the Pro Se Individuals paperwork late, especially the paperwork for the voting for Mallinckrodt. My claim has been sent in and the **Estate of David Jonathan Ecke - Claim No.628554** should legally be able to be included. In addition, as Judge Drain ruled on April 27, 2022, in Case No. 19-23649-rdd and Adv. Case No. 19-08289-rdd: Judge Drain clearly states in Case No. 19-23649, Adv. Case No. 19-08289-rdd: "So I will deny the motion's request for leave to file a late claim. That's without prejudice to Ms. Ecke's right to either assert that one of the claims that have

2

already been timely filed encompasses the claim that was filed late or that the claim could be amended, which would require a motion, Ms. Ecke, to encompass that claim on the grounds that the claims as filed basically are consistent with and don't assert a different claim in 628554." Transcript of Hearing April 27, 2022, P.65.

6.) "As a threshold matter, this Court lacks jurisdiction to grant the requested relief because once a notice of appeal is filed, the bankruptcy court is divested of jurisdiction over those matters involved in the appeal. The vacated Plan is at the heart of the appeal—and at the heart of the Term Sheet. Unless and until a higher court remands the matter, this Court has no jurisdiction over how the vacated Plan might be amended." Docket 4484, filed 3/8/22, P.2, U.S. Trustee's Opposition and Reservation of Rights to Debtor's Motion for an Order Authorizing and Approving Settlement Term Sheet.

7.) My family, consisting of the Estate of David Jonathan Ecke, Maria Ecke, Andrew Ecke, Richard Ecke, and Peter Sottile is now being **deprived of DUE PROCESS**. When I wrote the "NOTICE OF APPEAL AND STATEMENT OF ELECTION" on May 13, 2022, which was Docketed on May 20, 2022, by the Law Clerks' Office for the District. On Tuesday, April 11, 2023, Faust explained the process of docketing to me. The same error of omitting the names of Richard Ecke, Andrew Ecke, Peter Sottile occurred when the District Court heard another Appeal of mine which was heard before Judge McMahon on November 30, 2021. In that case, only one name was omitted that of Peter Sottile until it was reinstated on April 5, 2022. It took me that long to add Peter Sottile's name to Case No. 21-CV8566 where it should have been in the first place. The Second Circuit Court of Appeals has omitted Peter Sottile's name also. I don't understand why because the name was added to the case at the United States District Court, Southern District of New York, U.S. Courthouse, 500 Pearl Street, New York, NY 10007 previously. **Are the other members of my family now being denied DUE PROCESS in the same manner?** Why would only my name, Maria Ecke, appear on the Appeal when under "Part 3. Identify the other parties to the appeal." The names of Richard Ecke, Andrew Ecke, and Peter Sottile are clearly listed as Pro Se Appellants in addition to mine. How could this happen twice in a United States District Court? Official Form 417A, Notice of Appeal and Statement of Election.

7.) Both Purdue Pharma L.P. and Mallinckrodt PLC have deprived my son David Jonathan Ecke of his LIFE by addicting him to OxyContin and Oxycodone. Both Purdue Pharma and Mallinckrodt made him a drug-seeking drug addict along with the State of Connecticut and the FDA which approved the drugs. Now Purdue Pharma L.P. and Mallinckrodt P.L.C. are trying to deprive The Estate of David Jonathan Ecke of having a Claim to start "A Star for David", a Foundation which will actually help people, unlike the State of Connecticut and the FDA which allowed Medicaid under the Connecticut Husky D Plan No. 0031741994 to send these drugs to my beloved child even though the drugs were proven to be addictive, yet the State of Connecticut made $26 billion, approximately $300 million over the next 18 years from the information which I and other people provided to the Attorney Generals George Jepson and William Tong. As both Attorney General's staff has told me multiple times "We only sue for the State." yet I and the many unfortunate people who had family members who became addicted or died are going to get a mere pittance for payment for their injuries. Motion to Authorize/Emergency Request for Immediate Injunction and Hearing for Due Process, Production for Evidentiary Documents & Other Relief filed by Ellen Isaacs, 8/17/21, Docket 3582.

3

7.) **"Issue on Appeal"** Did the bankruptcy court err by authorizing the Debtors to advance funds to establish the creditor trusts and other entities required to implement the Debtors' plan and take other related actions, prior to consummation of the plan?" quoted from Chapter 11 Case No. 19-23649 (RDD) (Jointly Administered) APPELLANT, UNITED STATES TRUSTEE'S, STATEMENT OF THE ISSUES AND DESIGNATION OF ITEMS FOR RECORD ON APPEAL OF ADVANCE FUNDING ORDER Docket No. 3843. **Why is the money still being advanced to the Attorneys, States, and all others prior to payment to the actual victims? Why are parts of Purdue Pharma being sold without any compensation to Unsecured Creditors like myself, the Estate of David Jonathan Ecke, Richard Ecke, Andrew Ecke, Peter Sottile, and others? STOP ALL PAYMENTS UNTIL THE TRIAL IS OVER!** Ellen Isaacs, Motion to Authorize Emergency Request for Immediate Injunction and Hearing for Due Process, Production for Evidentiary Documents & Other Relief, Docket 3582.

8.)Two of Connecticut's Attorney Generals, George Jepson, and William Tong's Consumer Advocates have already told me "We only sue for the State." Sandra Arenas, William Tong's Associate Attorney General/Chief of the Division of Constituents and Affairs, and Lorri Adeyemi, George Jepson's previous Associate Attorney General/Chief of the Division of Constituents and Affairs have both told me the same thing "We only sue for the State" more than once. Lorri Adeyemi is now the Head of the Office of the Attorney General's Consumer Protection Department. I, Maria Ecke, have begged for help for my nonprofit mother's groups – Hearts of Hope and Compassionate Friends which have helped me with the mental anguish of losing my firstborn son for free. I know that if my kindhearted son, David Jonathan Ecke were alive he would have helped me with doctor's bills for therapy which I can't now afford. Therefore, I am appealing Judge Drain's decision about my son David Jonathan Ecke's Claim No. 628554 and amending my Claim No. 16810. **I KNOW THAT NOW, ATTORNEY GENERAL WILLIAM TONG HAS STATED THAT HE WILL GIVE SOME OF THE MONEY TO INDIVIDUALS AFTER THIS IS ALL TRIED AND DONE BUT NOW, I SAY – WAY TOO LITTLE TOO LATE!!!** Appellant, United States Trustee's Statement of the Issues and Designation of Items for Record on Appeal of Advance Funding Order, 9/29/21, Docket 3843, 442, 443, 661, 709, 968, 1142, 1309, 2129, 2652, 2921, 2966, 3028, 3057, 3099, 3110, 3111, 3122, 3123, 3124, 3125, 3199, 3235, 3256, 3262, 3277, 3292, 3298, 3299, 3357, 3357, 3368, 3404, 3525, 3582, 3648. All of these are against the Restructuring of Purdue Pharma.

9.) Letter from Michael Julian and Marcia Julian, filed 11/5/19, Docket 442.

10.) Letter from Kimberly Krawczyk, filed 11/7/19, Docket 443.

11.) Letter to Judge Drain from Leona Nuss, and Edwin Moreno, Albert Gonzalez, Brad Nizwantowski, James Wood, Joseph Conti, Deborah O'Brien, Jose Gonzalez, Darin Johnson, Richard O'Connor, Bart Hesson, Daniel Sullivan, Jeff Donahue, John Borgosano, Michael Haley, Hector Lopez, Daniel Moser, Armand Coleman, Pat Clark, Jonathan Owen, Raymond Castillo, Deanna Sharpe, Alejandro Ortiz, Alfred Jones, Paul Violanto, Shannon Lundin, Jennifer Adamson, 19-23649-rdd Doc 661-1 Filed 12/17/19 Entered 12/18/19 13:04:12 The names of the Parties 12-17-19 Pg 1 of 3 Michael Simoett, James Lyons, Luis Aponte, Thomas Cowrolly, Kevin O'Connell, Michael Cain, Edely Tavares Nicole Ubaldi, Sou Fiyane Kardady, Kevin O'Brien, Katie Oleary, Jeane Isles, Cartun Gillespie, Virginia Celata, Quinlan Sallican, Christian Stallworth, Jonathan Lightbody, Joseph Marcangelo Patricia M Maguire, Anthony Hudron, Carol A. Hudson, James A Martin, Amy Schembechler, Susan M. Martin, Lois Sasso, Patricia A. Skinner, Connie Casali, Steve Dombrowski, and Stacey Wipanshi. 19-23649-rdd Doc 661-1 Filed 12/17/19 Entered 12/18/19 13:04:12 The names of the Parties 12-17-19 Pg 2 of 3 19-23649-rdd Do

4

12.) Letter to Judge Drain from Leona Nuss, filed 12/18/19, Docket 709, 12/30/19.

13.) Letter re: Family Member filed by Tim Kramer, filed 3/19/20, Docket 968.

14.) Letter to Judge Drain from Stephen E. Gelfand MD, FACP, FACR, filed 5/12/19, Docket 1142.

15.) Letter to Judge Drain from Dan Schneider, filed 6/29/20, Docket 1309.

16.) Letter to Judge Drain from Keola Maluhia Kekuewe, filed 12/14/20, Docket 2129.

17.) Letter re: reposted letter from Colonel Ralph Olsen MD, filed 4/12/21, Docket 2652.

18.) Pro Se letter from Carrie L. McGaha, filed 5/25/21, Docket 2921.

19.) Pro se letter from Michael Wilford Normile III, filed 6/1/21, Docket 2966.

20.) Pro Se letter from Les Burress, filed 6/15/21, Docket 3028.

21.) Pro Se letter filed by Daniel West on behalf of Brian West, filed 6/23/21, Docket 3057.

22.) Letter re: Legal Mail from Prime Clerk Marked Contraband filed by Thomas Hickey, filed 7/1/21, Docket 3099.

23.) Statement/ Victim Statement from CJ McGaha, filed 7/1/21, Docket 3102.

24.) Pro Se letter from Teresa VomSaal, filed 7/6/21, Docket 3110. "The worst part was finding my son dead on the bathroom floor. There is no pain greater than I can imagine, that even comes close to losing your only child, no matter what age. Especially your only child.....I feel like when I lost him, I lost everything. There is such emptiness since his passing, that I can't put into words."

25.) Pro Se letter from James E. Crawley, filed 7/6/21. Docket 3111.

26.) Statement/Victim Statement from Tamara Graham on Behalf of Michael Parkey, filed 7/8/21, Docket 3122.

27.) Letter re: Disclosure Statement (Settlement) filed by Ruby Romas, filed 7/8/21, Docket 3123.

28.) Statement/Victim Statement filed by Stephanie Lubinski, filed 7/8/21, Docket 3124.

29.) Objection to Debtor's Plan of Reorganization, filed by Kevin X. Singleton, filed 7/8/21, Docket 3125.

30.) Objection to the Plan/Claimants Objection filed by Donald Ernest Allee, filed 7/15/21, Docket 3199.

31.) Objection to Plan (related document(s) 2988) aka Parker's Mom with Hearing to be Held on 8/9/21 at 10 am filed by Mary Butler-Frank, filed 7/16/21, Docket 3235.

32.) Objection of the United States Trustee (William K. Harrington) Pursuant to the Sixth Amended Joint Chapter 11 Plan of Purdue Pharma L.P. and its Affiliated Debtors, filed 7/19/21, Docket 3256.

"The United States Trustee objects to confirmation of the Plan because of two impermissible provisions: (1) the extraordinarily broad release of the Sackler Family and associates at section 10.7(b) from any and all claims related to the opioid crisis held by "all persons," including direct claims of victims against the Sackler Family, which constitutes an impermissible discharge of hundreds (and possibly thousands) of non-debtors; and (2) the payment of up to $500 million in attorneys' fees under section 5.8 without

5

court oversight and approval or the opportunity for parties to object as required by section 503(b)(4) of the Code. The Plan provides that some members of the Sackler Family will "contribute" more than $4.3 billion to fund opioid abatement and compensation trusts established under the Plan. But there is a catch: payment is conditioned on every member of the Sackler Family and associated parties—which total hundreds, if not thousands—receiving a release from all liability from all persons, even if they are not creditors or parties in interest, for the Sackler Family's alleged wrongdoing in concocting and perpetuating for profit one of the most severe public health crises ever experienced in the United States. 3 Although styled as a third-party release, it is nothing less than an illegal, court-ordered discharge of a potentially limitless group of non-debtors."

33.) Objection of Independent Emergency Room Physician, Dr. Michael Masiowski, Individually, and as a Punitive Class Representative for Chapter 11 Plan of Purdue Pharma L.P. and its Affiliated Debtors filed by Paul S. Rothstein on behalf of Paul S. Rothstein, filed 7/19/21, Docket 3262.

34.) Objection to Plan Confirmation filed by James Franklin Ozmet I on behalf of Creighton Bloyd, filed 7/19/21, Docket 3277.

35.) Objection to Consider Confirmation of the Fifth Amended Chapter 11 Plan of Reorganization filed by Joyce Villnave with Hearing to be Held on 8/9/21 at 10 am, filed 7/21/21, Docket 3292.

36.) Objection to Plan and Motion to File Late Ballots filed by Earl Cobb, filed 7/22/21, Docket 3298.

37.) Objection to Plan & Motion to file late ballots filed by Tim Wright with Hearing to be Held on 8/9/21 at 10 am, filed 7/22/21, Docket 3299.

38.) Objection to Restructuring of Purdue Pharma L.P. et al. filed by Maria Ecke, filed 8/2/21, Docket 3357.

39.) Objection to Plan filed by D. Thomas Page with Hearing to be Held on 8/9/21, filed 8/2/21, Docket 3368.

40.) Objection to the Confirmation of the Plan filed on behalf of the Parrish Family Babara Farash, filed 8/5/21, Docket 3404.

41.) Response Reply to Objection and Improperly Submitted Amended Supplemental Objection of Dr. Michael Masiowski, filed

42.) Letter dated August 2, 2021, filed by Scotti Madison. Filed 8/10/21, Docket 3525.

43.) Motion to Authorize/ Emergency Request for Immediate Injunction and Hearing for Due Process, Production for Evidentiary Documents & Other Relief filed by Ellen Isaacs, filed

44.) Objection to Settlement filed by Trudy Duffy, filed 8/24/21, Docket 3648.

45.) Notice of Appeal filed by Maria Ecke, filed 10/4/21, Docket 3878. Appellant, United States Trustee's Statement of the Issues and Designations of Items for Record on Appeal of Advance Funding Order.

46.) DO THE COURTS HAVE NO HEARTS? Are we not citizens of the great United States of America? Why are we considered second-class citizens – in a class by ourselves according to Attorney Arik Preis of Aiken Gump, the law firm that is supposed to help Pro Se litigants and other injured victims? What made

6

us so? In my opinion, this case shows that the wealthy can have the next best thing to a private justice system.  Notice of Appeal filed by Maria Ecke, filed 10/4/21, Docket 3878.

47.) Did Judge Drain err in his decision to require releases? "Judge Drain was quite explicit about the statutory provisions that he believed gave him authority to approve these releases as "necessary or appropriate" to carry out the provisions of the Bankruptcy Code: Sections 105(a), 1123(a)(5) and (b)(6), and 1129, together with "residual authority." In re Purdue Pharma L.P., 2021 WL 4240974, at *43. The question that arises is whether any of the sections other than Section 105(a) confers some substantive right such that a release to enforce that right could be entered pursuant to Section 105(a). **I conclude that they do not.**" Doc 4246 filed 12/22/21 DECISION AND ORDER ON APPEAL by Judge McMahon P120.

48.)"In re Am. Hardwoods, Inc., 885 F.2nd, 621, 626 (9th Cir. 1989) (holding "(s) section 524(e), therefore, limits the court's equitable power under section 105 to order the discharge of the liabilities of nondebtors"); Resorts Int'l, Inc. v. Lowenschuss (In re Lowenschuss), 67 F.3d 1394, 1401 (9th Cir. 1995) (This court has repeatedly held, without exception, that 524(e) precludes bankruptcy courts from discharging the liabilities of non-debtors."); Underhill v. Royal, 769 F.2d, 1426, 1432 (9th Cir. 1985) **("(T)he bankruptcy court has no power to discharge the liabilities of a nondebtor pursuant to the consent of creditors as part of a reorganization plan.").**

49.) Did Judge Drain err in his Finding of Fact, Conclusions of Law and Order Confirming the Twelfth Amended Joint Chapter 11 Plan or Reorganization of Purdue Pharma L.P. and its Affiliated Debtors? Claim payments should be without having to sign a third-party release and claim payments for individuals with losses should be above all else. Docket 3575 Objection to Restructuring of Purdue Pharma L.P. filed by Maria Ecke.

50.) Judge Drain had worked for Purdue when he was young and now, he is working for them again when he retired from the Bankruptcy Court. See letter dated April 14, 2023, "Dear Judge Lane: In compliance with Rule 1.12 of the New York Rules of Professional Conduct, I am writing to advise you that, in April, the Honorable [Ret.] Robert D. Drain will join the Corporate Restructuring Group of Skadden, Arps, Slate, Meagher & Flom LLP and Affiliates (the "Firm") as Of Counsel in the Firm's New York office. Prior to his retirement from the United States Bankruptcy Court for the Southern District of New York, Judge Drain presided over the following matter: In re Purdue Pharma L.P., et al., Case No. 19- 23649 (the "Matter"). The Firm is currently retained pursuant to section 327(e) of the Bankruptcy Code as special counsel to Purdue Pharma L.P. and its affiliated Debtors (collectively, "Purdue") in the Matter (the "Firm Representation" **Is this conflict of interest? <u>Letter to the Honorable Sean H. Lane in compliance with Rule 1.12 of the New York Rules of Professional Conduct</u>  [Docket No. 5551]**

51.) "On May 10, 2007, John Brownlee ("Brownlee"), United States Attorney for the Western District of Virginia, announced the guilty plea of the Purdue Frederick Company, the parent of Purdue Pharma, L.P. ("Purdue"), relating to the misbranding of OxyContin. Brownlee stated,

Even in the face of warnings from health care professionals, the media, and members of its own sales force that OxyContin was being widely abused and causing harm to our citizens, Purdue, under the leadership of its top executives, continued to push a fraudulent marketing campaign that promoted

OxyContin as less addictive, less subject to abuse, and less likely to cause withdrawal. In the process,
scores died as a result of OxyContin abuse and an even greater number of people became addicted to
OxyContin; a drug that Purdue led many to believe was safer, less subject to abuse, and less addictive
than other pain medications on the market.

Along with the guilty plea, Purdue agreed to a Corporate Integrity Agreement with the Office of
Inspector General of the U.S. Department of Health and Human Services ("HHS"). For a period of five
years, ending in 2012, Purdue was obligated to retain an Independent Monitor and submit annual
compliance reports regarding its marketing and sales practices and training of sales representatives vis-
à-vis their interactions with health care providers." quoted from THE CITY OF PEMBROKE PINES,
FLORIDA, Individually and on Behalf of All Others Similarly Situated, in Case No 3:21-cv-04384-CRB.

| Message | |
|---|---|
| From: | David Sackler |
| Sent: | 5/17/2007 11:08:08 PM |
| To: | 'Sackler, Jonathan'    , Sackler, Dr Richard |
| CC: | Ives, Stephen A. |
| Subject: | RE: Idea |
| Attachments: | image001.jpg |

Well I hope you're right, and under logical circumstances I'd agree with you, but we're living in America. This is the land
of the free and the home of the blameless. We will be sued. Read the op-ed stuff in these local papers and ask yourself
how long it will take these lawyers to figure out that we might settle with them if they can freeze our assets and threaten
us.

"The problem was complex. As a result of the 2007 guilty plea, the Sacklers made the strategic
decision to distance the family from Purdue, which was regarded as an increasingly dangerous
"concentration of risk" for Purdue's owners. Ten days after the guilty plea was announced, David
Sackler wrote to his dad, Richard Sackler, and uncle, Jonathan Sackler,describing precisely what that
"risk" was: legal liability for selling OxyContin. In response to Jonathan stating that "there is no basis
to sue 'the family,'" David replied:
Given concern over this "concentration of risk," the two sides of the Sackler familyspent
considerable time and energy debating the best way to achieve distance from Purdue, and
collectively considered a variety of options for doing so."

"The Sackler family has owned and controlled Purdue and its predecessors since 1952. At all
times relevant to this Petition, individual Sackler family members occupied either sixor seven of
the seats on Purdue's board of directors, and at all times held a majority of board seats.To advise
the board of directors of Purdue was to advise the Sackler family. The interests of the Sackler
family and the Purdue board of directors, and Purdue itself, as a privately held company, are all
aligned. Practically, they are indistinguishable.[9] [9] Craig Landau ("Landau"), soon to become CEO of
Purdue, acknowledged in May 2017 that Purdue operated with "the Board of Directors serving as the 'de
facto' CEO." The future CEO of the company, in other words, understood that he would have little
practical power despite his newtitle. The owners ran the business." quoted from THE CITY OF PEMBROKE
PINES, FLORIDA, Individually and on Behalf of All Others Similarly Situated, in Case No 3:21-cv-04384-

CRB.

52.) In the Lawsuit STATE OF CONNECTICUT, Plaintiff, v. PURDUE PHARMA L.P., PURDUE PHARMA INC., THERESA SACKLER, KATHE SACKLER, JONATHAN SACKLER, MORTIMER D.A. SACKLER, BEVERLY SACKLER, DAVID SACKLER, ILENE SACKLER LEFCOURT, FRANK PETER BOER, PAULO COSTA, CECIL PICKETT, RALPH SNYDERMAN, JUDITH LEWENT, JOHN STEWART, MARK TIMNEY, Defendants., CASE NO. X07 HHD-CV-19-6105325-S, SUPERIOR COURT, COMPLEX LITIGATION DOCKET AT HARTFORD, it clearly states on page 4: "A. OPIOIDS, ADDICTION AND DEATH 11. Opioids, which for purposes of this complaint include Purdue opioid products, are dangerous narcotics that can be deadly, causing patients to stop breathing and suffocate. 12. Opioids are highly addictive. Over 70% of those who become opioid dependent begin with prescription pain medications. Americans consume over 90% of the world's pharmaceutical opioids. Patients using opioids for more than a few years can experience severe withdrawal symptoms, including anxiety, insomnia, pain, blurry vision, rapid heartbeat, chills, panic attacks, nausea, vomiting, and tremors. Opioid withdrawal symptoms can last up to one month. The first phase (acute withdrawal) begins about 12 hours after the last opioid use, peaks at around three to five days, and can go up to four weeks. Withdrawal can last so long and be so painful that it is difficult to stop taking opioids. In addition, opioids act on the brain and body in ways that other than withdrawal that create addiction and maintain addiction. 13. Patients who take prescription opioids for longer periods of time or in higher dosages increase their risk of opioid use disorder (addiction), overdose, and death." **THIS IS EXACTLY WHAT HAPPENED TO MY BEAUTIFUL CHILD DAVID JONATHAN ECKE!!!!!!! DOCTOR SHIFREEN PRESCRIBED THE MEDICATION TO MY DEAR SON AND THE STATE OF CONNECTICUT PAID FOR THE MEDICINE THROUGH THE HUSKY D PROGRAM KNOWING THAT THE MEDICINE WAS HARMFUL TO MY SON!!!!!** The State of Connecticut gained $26 billion from that lawsuit approximately $300 million over the next 18 years and an additional amount of 7.5 million to Connecticut from McKinsey. For their role in advertising and turbocharging the opioid epidemic, McKinsey and Company, the consulting giant will pay $573 million, including 7.5 million to Connecticut over the next 5 years. Though this does not have anything to do with my Purdue Pharma appeal, I have tried sending a "MOTION TO INTERVENE" and "ADMINISTRATIVE MOTION FOR PACER FEES" in the Court case 3:21-CV9107 only to be ignored by Judge Charles Breyer. In my opinion, it is a shame the United States Judicial system thinks so poorly of its constituents that it can just ignore the poor working class. **Is this discrimination? Are poor citizens of the great United States of America to be ignored but large corporations and their highly paid lawyers to be awarded in Bankruptcy? In my opinion, this is discrimination to the highest degree!**

53.) Did Judge Drain err in giving the States the majority of the money when in fact it is we the victims who have suffered the most and the States will just waste the money? This is from "Connecticut's Tobacco Windfall: A Billion Dollars Up in Smoke" by Tamara Tragrass, July 2009. , Pages 2 – 3, www.yankeeinstitue.org. "In 1998, Connecticut became one of the 46 beneficiaries of the multi-states:"$246 billion Tobacco Settlement, a deal hammered out in the backrooms between Attorneys Generals and the four major tobacco companies. For Connecticut, the Settlement amounts to between $3.6 and $5 billion over the first twenty-five (25) years of the in – PERPETUITY AGREEMENT. At the time, public health advocates and state Attorney General Richard Blumenthal (now Senator Blumenthal) who represents Connecticut in the lawsuit expected that tobacco prevention and treatment programs would receive much of these funds. **Ten years later Blumenthal was calling the state's handling of the tobacco revenue "a moral and social failure." Key findings of this report."**

Connecticut has received nearly $1.29 billion from the settlement since distributions began in Fiscal year 2000.

Of that, only $23 million, or less than 2% of the total Tobacco Settlement have been used on programs specific to reducing the number of smokers or anti-tobacco efforts.

86% of Tobacco Settlement funds, $1.1 billion, ended up in the General Fund for unrestricted spending.

The Tobacco Health and Trust Fund, set up to fund tobacco prevention, cessation, and health programs, received only $134 million from the Tobacco Settlement over time.

Raids on that Trust Fund by the General Assembly have resulted in just $9.2 million in spending and a projected balance of just $11.1 million.

The terms of the agreement allowed the tobacco companies to shift the cost of the settlement to consumers without fear of losing market share.

Connecticut collected an additional $2 billion in cigarette tax revenue since settlement funds started flowing to the state, bringing the state's total cigarette-related revenue to more than $3 billion during these nine years.

In 2008, smokers paid the state of Connecticut nearly half a billion during these nine years in combined taxes and settlement money.

Despite all the state taxes in from smokers, Connecticut was ranked 51st in the nation by the Campaign for Tobacco-Free Kids in 2008 for failing to spend enough on tobacco prevention. That year Connecticut spent just $1.19 million on tobacco prevention. For comparison, the Centers for Disease Control recommended $43.9 million."

54.) I have asked to be on Connecticut's abatement committee but of course, I have not heard anything from the State. I hope that maybe after this is over, I will hear from the State and be on a committee but I doubt it. I have already begged too many people in the State for help including the Department of Public Health when my son first died and the Attorney General's department. Where were they when my son, himself, who said that he needed acupuncture was fed the vile drugs? He also needed marijuana but it wasn't legal then to ease pain without deadly drugs. David had worked for Garden of Light; a health food store and he had aspirations to be a Biologist and/or an Agronomist like his Great Grandmother who wrote a book on organic gardening in 1930, which I still have. Marshall Huebner, Davis Polk, knows all of my histories since my first tries at writing to Judge Drain, and my letters were not accepted to go on the Docket.

55.) My son was one of the two only Great Grandsons of the Treasurer to the Czar of a free Ukraine. The State prescribed the drugs to him and look what it did to him and my family! Connecticut knew what the drugs did to people in 2007 when Purdue Frederick Company first plead guilty yet my son, David Jonathan Ecke was prescribed even more OxyContin, manufactured by Purdue Pharma, and Oxycodone, manufactured by Mallinckrodt, once again starting in 2010 and the State of Connecticut gave it to him until his death. It killed him on December 17, 2015; nine days after my birthday and nine days before his dad's birthday.

10

56.) The States were not harmed by the death of my son from these deadly, addictive drugs – I, Maria Ecke, Richard Ecke, a disabled Vietnam Veteran father, Andrew Ecke, a traumatized son who found his brother lying in bed gasping for breath from these deadly drugs, Peter Sottile, a good friend of my son's, and of course David, himself, were irrefutably harmed by my poor David Jonathan Ecke's death. Who is to pay for the mental damage that this has caused Andrew Ecke? He has become addicted to drugs also. Now he seems to be OK, but he could relapse with any additional trauma. Who is going to pay for the invitro fertilization that his wife needs so that my genes can carry on? I am an only child of an only child. Richard Ecke has also been mentally harmed by depression by the death of his firstborn son, David Jonathan Ecke.

57) "According to the Sacklers' own expert, the change in distribution pattern drained Purdue's total assets by 75% and Purdue's "solvency cushion" by 82% between 2008 and 2016. (JX-0431, p 77, Fig. 10). Richard Sackler later acknowledged in an email in 2014 that, "in the years when the business was producing massive amounts of cash, the shareholders departed from the practice of our industry peers and took the money out of the business." (JX 1703). In at least one email in 2014, Jonathan Sackler referred to this distributing of cash flow from OxyContin as a "milking" program. (JX-2974)." quoted from 19-23649 rdd - Doc 4246 filed 12/22/21 DECISION AND ORDER ON APPEAL by Judge McMahon, P.40. **Is this yet another "milking program" initiated by the Sacklers and their lawyers to strip the assets from going to the rightful Claimants?**

"The third-party claims at issue neither stem from Purdue's bankruptcy nor can they be resolved in the claims allowance process. Yet those claims are being finally disposed of pursuant to the Plan; they are being released and extinguished, without the claimants' consent and without any payment, and the claimants are being enjoined from prosecuting them." - Doc 4246 filed 12/22/21 DECISION AND ORDER ON APPEAL by Judge McMahon, P.79.

"Lack of Any Statutory Prohibition: Having exhausted the statutory provisions on which Judge Drain relied and finding that none of them confers any substantive right as required by Metromedia, our exercise should be at an end. But it is not. The Debtors argue that the Bankruptcy Court must be statutorily authorized to approve these releases because no provision of the Bankruptcy Code – including but not limited to § 524(e) – expressly prohibits them.

The notion that statutory authority can be inferred from Congressional silence is counterintuitive when, as with the Bankruptcy Code, Congress put together a "comprehensive scheme" designed to target "specific problems with specific solutions." RadLAX Gateway Hotel, 566 U.S. at 645. In this particular case, a number of red flags suggest that Congressional silence (if indeed Congress was silent) was not intended to mean consent.

The first is that silence is inconsistent with comprehensiveness, and the Bankruptcy Code "provides a comprehensive federal system . . . to govern the orderly conduct of debtors' affairs and creditors' rights." E. Equip. & Servs. Corp. v. Factory Point Nat. Bank, Bennington, 236 F.3d 117, 120 (2d Cir. 2001) (emphasis added). "Comprehensive" means "complete, including all elements." Reading elements that do not appear in the text of the Code into the Code is the antithesis of comprehensiveness. Doc 4246 filed 12/22/21 DECISION AND ORDER ON APPEAL by Judge McMahon P127.

**58.) Does the Bankruptcy Court have statutory authority to approve the non-debtor releases? No. The Bankruptcy Code does not authorize a bankruptcy court to order the nonconsensual release of third-**

party claims against non-debtors in connection with the confirmation of a chapter 11 bankruptcy plan. The Confirmation Order fails to identify any provision of the Bankruptcy Code that provides such authority." **Doc 4246 filed 12/22/21 DECISION AND ORDER ON APPEAL by Judge McMahon P73**

"On appeal, Judge Sullivan was not persuaded by appellees' argument that reimbursement for professional fees was 19-23649-rdd Doc 4246 Filed 12/22/21 Entered 12/22/21 11:26:05 Main Document Case 7:21-cv-07532-CM Document 279 Filed 12/16/21 Page 127 of 142 Pg 127 of 142 128 authorized by the Bankruptcy Code simply because nothing in the Bankruptcy Code expressly forbade it. He held that, "no such explicit prohibition is necessary" because the requested reimbursement clearly goes against the purpose of a reorganization – "Reorganization plans exist to pay claims . . . [the] professional fee expenses were all incurred post-petition, and thus cannot be treated as 'claims.'" Id. at 293. He further noted that the federal bankruptcy scheme "cannot remain comprehensive if interested parties and bankruptcy courts in each case are free to tweak the law to fit their preferences." In re Lehman Bros. Holdings Inc., 508 B.R. 283, 294 (S.D.N.Y. 2014) (internal citations omitted). - Doc 4246 filed 12/22/21 DECISION AND ORDER ON APPEAL by Judge McMahon, P.128.

"That would bring about many wonderful things, including especially the funding of desperately needed programs to counter opioid addiction. But just as, "A court's ability to provide finality to a third-party is defined by its jurisdiction, not its good intentions" (Manville III, 517 F.3d at 66), so too its power to grant relief to a non-debtor from nonderivative third party claims "can only be exercised within the confines of the Bankruptcy Code." Norwest Bank Worthington, 485 U.S. at 206. Because the Bankruptcy Code confers no such authority, the order confirming the Plan must be vacated. Because the Advance Order is an adjunct of and follows from the Confirmation Order, it, too, must be vacated.71 - Doc 4246 filed 12/22/21 DECISION AND ORDER ON APPEAL by Judge McMahon, P.137.

### "CONCLUSION"

"For the foregoing reasons, the Bankruptcy Court's Confirmation Order and related Advance Order must be vacated. This decision leaves on the table a number of critically important issues that were briefed and argued on appeal – principal among them, whether the Section 10.7 Shareholder Release can or should be approved on the peculiar facts of this case, assuming all the other legal challenges to their validity were resolved in the Debtors' favor.

But sufficient unto this day. This and the other issues raised by the parties can be addressed – which is to say, if this ruling is reversed.

This constitutes the decision and order of the court. This is a written opinion. Dated: December 16, 2021 by U.S. District Judge Collen McMahon". - Doc 4246 filed 12/22/21 DECISION AND ORDER ON APPEAL by Judge McMahon, P. 142.

1. For Relief and a Stay from **the** Defendants' conduct was reckless. Defendants regularly risk the lives of consumers and users of their product OxyContin with full knowledge of the dangers of its products. Defendants made conscious decisions not to redesign, re-label, warn, or inform the OxyContin unsuspecting public. Defendants' reckless conduct, therefore, warrants an award of punitive damages. As a proximate result of the Defendants' wrongful acts and omissions in placing defective pain pills into the stream of commerce without adequate warnings of the hazardous nature, the Plaintiffs have suffered and continue to suffer severe and permanent

physical and emotional injuries. Plaintiffs have endured pain and suffering, have suffered economic losses (including significant expenses for medical care and treatment), and will continue to incur these expenses in the future. WHEREFORE, Plaintiffs respectfully requests that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper. **Plaintiffs also demand a jury trial on the issues contained herein.**

### DEMAND FOR TRIAL BY JURY AND CONCLUSION

The States have already received money from the Federal Government yet we, Pro Se Litigants, are not able to even bill the Sacklers for our time, our travel, our professional services, and our hurt, empty souls because the United States Bankruptcy Court does not approve us doing so. I need to start my foundation, a "Star for David", in honor of my handsome, kind-hearted, and deceased son David Jonathan Ecke and therefore need a large amount of compensation for compensatory and punitive damages to be awarded by a jury.

1. Defendants' conduct, as described above, was reckless. Defendants regularly risk the lives of the patients.
2. Defendants made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including the Plaintiffs. Defendants' reckless conduct, therefore, warrants an award of punitive damages.
3. As a proximate result of Defendants' wrongful acts and omissions in placing defective OxyContin and Oxycodone into the stream of commerce without adequate warnings of the addiction; Plaintiffs have suffered and continue to suffer severe and permanent physical and emotional injuries.
4. Plaintiffs have endured pain and suffering, have suffered economic losses (including significant expenses for medical care and treatment), and will continue to incur these expenses in the future.
5. WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

### CLAIM TWO
### BREACH OF IMPLIED WARRANTIES (Against All Defendants)

6. Plaintiffs incorporate by reference every allegation outlined in the preceding paragraphs as fully stated herein.

### DEMAND FOR JURY TRIAL

7. At all times relevant to this litigation, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting OxyContin and Oxycodone, which is defective and unreasonably dangerous to consumers, including Plaintiffs,

thereby placing OxyContin and Oxycodone into the stream of commerce. These actions were under the ultimate control and supervision of the Defendants.

8.  Before the time that Plaintiffs were exposed to the use of the aforementioned OxyContin, Defendants impliedly warranted to consumers and those exposed—including Plaintiffs—that OxyContin and Oxycodone were of merchantable quality and safe and fit for the use for which they were intended.

9.  Defendants, however, failed to disclose that OxyContin and Oxycodone have dangerous propensities when used as intended and an increased risk of developing severe injuries, including the Plaintiffs' injuries. Plaintiffs reasonably relied upon the skill, superior knowledge, and judgment of Defendants.

10. Plaintiffs are informed and believe, and based thereon allege, that in committing the acts, alleged herein, each and every managing agent, agent, representative, and/or employee of the Defendants was working within the course and the scope of said agency, representation and/or employment with the knowledge, consent, ratification, and authorization of the Defendants and their directors, officers, and/or managing agents.

11. Plaintiffs are the intended third-party beneficiaries of implied warranties made by Defendants to the purchasers and/or users of their pain, relievers, and as such Plaintiffs are entitled to assert this claim.

12. OxyContin and Oxycodone were expected to reach and did reach consumers and/or users, including Plaintiffs, without substantial change in the condition in which they were manufactured and sold by Defendants.

13. At all times relevant to this litigation, Defendants were aware that consumers and users of their products, including Plaintiffs, would use OxyContin and Oxycodone as marketed by Defendants, which is to say that Plaintiffs were foreseeable users of OxyContin.

14. Defendants intended that OxyContin and Oxycodone be used in the manner in which Plaintiffs were exposed to it and Defendants impliedly warranted each product to be of merchantable quality, safe, and fit for this use, despite the fact that OxyContin and Oxycodone were not adequately tested and/or researched.

15. In reliance upon Defendants' implied warranty, Plaintiffs used or were exposed to OxyContin as instructed and labeled and in a foreseeable manner intended, recommended, promoted, and marketed by Defendants. **DEMAND FOR TRIAL BY JURY**

16. Plaintiffs could not have reasonably discovered or known the risks of serious injury associated with OxyContin.

17. Defendants breached their implied warranty to Plaintiffs in that OxyContin and Oxycodone products were not of merchantable quality, safe, or fit for their intended use, and/or adequately tested. OxyContin has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

18. The harm caused by OxyContin far outweighed its benefit, rendering the product more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

14

19. As a direct and proximate result of Defendants' wrongful acts and omissions Plaintiffs have suffered severe and permanent physical and emotional injuries, including but not limited to addiction and death.

20. Plaintiffs have endured pain and suffering, and have suffered economic loss.

21. Plaintiffs could not have reasonably discovered or known of the risks of serious injury associated with OxyContin Defendants breached their implied warranty to Plaintiffs in that OxyContin products were not of merchantable quality, safe, or fit for their intended use, and/or adequately tested. OxyContin has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein. The harm caused by OxyContin products far outweighed its benefit, rendering OxyContin more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products. As a direct and proximate result of Defendants' wrongful acts and omissions, Plaintiffs have suffered severe and permanent physical and emotional injuries, including but not limited to the. Plaintiffs have endured pain and suffering, have suffered an economic loss (including significant expenses for medical care and treatment), and will continue to incur these expenses in the future. WHEREFORE, Plaintiffs respectfully requests that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

59.) We are considered an administrative claim due to the changes in the confirmation order. I am requesting payment of Claim numbers – 31459 for Richard Ecke, 31450 for Andrew Ecke, 31445 for the Estate of David Jonathan Ecke, 31406 for Peter Sottile, and 31445 for Maria Ecke through the MDT II or Opioid Credit Trusts without a Release.

60.) I oppose the legal shield for the employees which Judge Drain ruled.

## CONCLUSION

61.) I am appealing for Relief and a Stay from **the** Defendants' conduct was reckless. Defendants regularly risk the lives of consumers and users of their product OxyContin with full knowledge of the dangers of its products. Defendants made conscious decisions not to redesign, re-label, warn, or inform the OxyContin unsuspecting public. Defendants' reckless conduct, therefore, warrants an award of punitive damages. As a proximate result of the Defendants' wrongful acts and omissions in placing defective pain pills into the stream of commerce without adequate warnings of the hazardous nature, the Plaintiffs have suffered and continue to suffer severe and permanent physical and emotional injuries. Plaintiffs have endured pain and suffering, have suffered economic losses (including significant expenses for medical care and treatment), and will continue to incur these expenses in the future. WHEREFORE, Plaintiffs respectfully requests that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper. **Plaintiffs also demand a jury trial on the issues contained herein.**

### DEMAND FOR TRIAL BY JURY AND CONCLUSION

15

The States have already received money from the Federal Government yet we, Pro Se Litigants, are not able to even bill the Sacklers for our time, our travel, our professional services, and our hurt, empty souls because the United States Bankruptcy Court does not approve us doing so. I need to start my foundation, a "Star for David", in honor of my handsome, kind-hearted, and deceased son David Jonathan Ecke and therefore need a large amount of compensation for compensatory and punitive damages to be awarded by a jury.

62.) Defendants' conduct, as described above, was reckless. Defendants regularly risk the lives of the patients.

63.) Defendants made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including the Plaintiffs. Defendants' reckless conduct, therefore, warrants an award of punitive damages.

**64.)** As a proximate result of Defendants' wrongful acts and omissions in placing defective OxyContin and Oxycodone into the stream of commerce without adequate warnings of the addiction; Plaintiffs have suffered and continue to suffer severe and permanent physical and emotional injuries.

65.) Plaintiffs have endured pain and suffering, have suffered economic losses (including significant expenses for medical care and treatment), and will continue to incur these expenses in the future.

66.) WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## CLAIM TWO
## BREACH OF IMPLIED WARRANTIES (Against All Defendants)

67.) Plaintiffs incorporate by reference every allegation outlined in the preceding paragraphs as fully stated herein.

## DEMAND FOR JURY TRIAL

68.) At all times relevant to this litigation, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting OxyContin and Oxycodone, which is defective and unreasonably dangerous to consumers, including Plaintiffs, thereby placing OxyContin and Oxycodone into the stream of commerce. These actions were under the ultimate control and supervision of the Defendants.

69.) Before the time that Plaintiffs were exposed to the use of the aforementioned OxyContin, Defendants impliedly warranted to consumers and those exposed—including Plaintiffs—that OxyContin and Oxycodone were of merchantable quality and safe and fit for the use for which they were intended.

70.) Defendants, however, failed to disclose that OxyContin and Oxycodone have dangerous propensities when used as intended and an increased risk of developing severe injuries,

16

including the Plaintiffs' injuries. Plaintiffs reasonably relied upon the skill, superior knowledge, and judgment of Defendants.

71.)Plaintiffs are informed and believe, and based thereon allege, that in committing the acts, alleged herein, each and every managing agent, agent, representative, and/or employee of the Defendants was working within the course and the scope of said agency, representation and/or employment with the knowledge, consent, ratification, and authorization of the Defendants and their directors, officers, and/or managing agents.

72.)Plaintiffs are the intended third-party beneficiaries of implied warranties made by Defendants to the purchasers and/or users of their pain, relievers, and as such Plaintiffs are entitled to assert this claim.

73.)OxyContin and Oxycodone were expected to reach and did reach consumers and/or users, including Plaintiffs, without substantial change in the condition in which they were manufactured and sold by Defendants.

74.)At all times relevant to this litigation, Defendants were aware that consumers and users of their products, including Plaintiffs, would use OxyContin and Oxycodone as marketed by Defendants, which is to say that Plaintiffs were foreseeable users of OxyContin.

75.)Defendants intended that OxyContin and Oxycodone be used in the manner in which Plaintiffs were exposed to it and Defendants impliedly warranted each product to be of merchantable quality, safe, and fit for this use, despite the fact that OxyContin and Oxycodone were not adequately tested and/or researched.

76.)In reliance upon Defendants' implied warranty, Plaintiffs used or were exposed to OxyContin as instructed and labeled and in a foreseeable manner intended, recommended, promoted, and marketed by Defendants. **DEMAND FOR TRIAL BY JURY**

77.)Plaintiffs could not have reasonably discovered or known the risks of serious injury associated with OxyContin.

78.)Defendants breached their implied warranty to Plaintiffs in that OxyContin and Oxycodone products were not of merchantable quality, safe, or fit for their intended use, and/or adequately tested. OxyContin has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

79.)The harm caused by OxyContin far outweighed its benefit, rendering the product more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

80.)As a direct and proximate result of Defendants' wrongful acts and omissions Plaintiffs have suffered severe and permanent physical and emotional injuries, including but not limited to addiction and death.

81.)Plaintiffs have endured pain and suffering, and have suffered economic loss.

82.)Plaintiffs could not have reasonably discovered or known of the risks of serious injury associated with OxyContin Defendants breached their implied warranty to Plaintiffs in that OxyContin products were not of merchantable quality, safe, or fit for their intended use, and/or adequately tested. OxyContin has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein. The harm caused by OxyContin products far outweighed its benefit, rendering OxyContin more dangerous than an ordinary consumer or

user would expect and more dangerous than alternative products. As a direct and proximate result of Defendants' wrongful acts and omissions, Plaintiffs have suffered severe and permanent physical and emotional injuries, including but not limited to the. Plaintiffs have endured pain and suffering, have suffered an economic loss (including significant expenses for medical care and treatment), and will continue to incur these expenses in the future. WHEREFORE, Plaintiffs respectfully requests that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

83.) We are considered an administrative claim due to the changes in the confirmation order. I am requesting payment of Claim numbers – 31459 for Richard Ecke, 31450 for Andrew Ecke, 31445 for the Estate of David Jonathan Ecke, 31406 for Peter Sottile, and 31445 for Maria Ecke through the MDT II or Opioid Credit Trusts without a Release. Please see that this is filed with the proper parties before the deadline of August 15, 2022.

84.) I oppose the legal shield for the employees which Judge Drain ruled.

## CONCLUSION

85.) I am appealing for Relief and a Stay from **the** Defendants' conduct was reckless. Defendants regularly risk the lives of consumers and users of their product OxyContin with full knowledge of the dangers of its products. Defendants made conscious decisions not to redesign, re-label, warn, or inform the OxyContin unsuspecting public. Defendants' reckless conduct, therefore, warrants an award of punitive damages. As a proximate result of the Defendants' wrongful acts and omissions in placing defective pain pills into the stream of commerce without adequate warnings of the hazardous nature, the Plaintiffs have suffered and continue to suffer severe and permanent physical and emotional injuries. Plaintiffs have endured pain and suffering, have suffered economic losses (including significant expenses for medical care and treatment), and will continue to incur these expenses in the future. WHEREFORE, Plaintiffs respectfully requests that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper. **Plaintiffs also demand a jury trial on the issues contained herein.**

86.) I am sending you my deceased son's medical records, autopsy report, and death certificate, can you please seal them from public view?

## DEMAND FOR TRIAL BY JURY AND CONCLUSION

The States have already received money from the Federal Government yet we, Pro Se Litigants, are not able to even bill the Sacklers for our time, our travel, our professional services, and our hurt, empty souls because the United States Bankruptcy Court does not approve us doing so. I need to start my foundation, a "Star for David", in honor of my handsome, kind-hearted, and deceased son David Jonathan Ecke and therefore need a large amount of compensation for compensatory and punitive damages to be awarded by a jury for Claim No. 628554 for the Estate of David Jonathan Ecke and a

18

Motion to Amend Maria Ecke's Claim No.16810 to five times as much. Plaintiffs hereby demand a jury trial so triable in this action.

Respectfully submitted,
/s/ Maria Ecke
Pro Se