Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 19-23649-shl

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    PURDUE PHARMA L.P.,

8

9          Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                   United States Bankruptcy Court

13                   300 Quarropas Street, Room 248

14                   White Plains, NY 10601

15

16                   April 25, 2023

17                   11:12 AM

18

19

20   B E F O R E :

21   HON SEAN H. LANE

22   U.S. BANKRUPTCY JUDGE

23

24   ECRO:  ART

25

1    OMNIBUS HEARING

2

3    Doc. #5560 Notice of Agenda

4

5    HEARING re Doc. #5534 Motion Of Debtors For Entry Of Orders

6    (l)(a) Approving Bidding Procedures for Sale of Debtors

7    Avrio Assets, (b) Approving the Designation of Atlantis

8    Consumer Healthcare Inc., a Wholly Owned Subsidiary Of

9    Arcadia Consumer Healthcare Inc., As The Stalking Horse

10   Bidder For The Avrio Assets, (c) Authorizing And Approving

11   Entry Into The Stalking Horse Asset Purchase Agreement, (d)

12   Approving Bid Protections, (e) Scheduling Auction For, And

13   Hearing To Approve, Sale of Debtors Avrio Assets, (f)

14   Approving Form and Manner of Notices of Sale, Auction, and

15   Sale Hearing, (g) Approving Assumption and Assignment

16   Procedures, And (h) Granting Related Relief And (II)(a)

17   Approving Sale Of Debtors Avrio Assets Free And Clear Of

18   Liens, Claims, Interests, And Encumbrances, (b) Authorizing

19   Assumption And Assignment Of Executory Contracts And

20   Unexpired Leases, And (c) Granting Related Relief)

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

Page 3

1    A P P E A R A N C E S :

2

3    DAVIS POLK WARDWELL, LLP

4         Attorneys for the Debtors

5         450 Lexington Avenue

6         New York, NY 10017

7

8    BY:  CHRISTOPHER ROBERTSON

9

10   KRAMER LEVIN NAFTALIS FRANKEL LLP

11        Attorneys for Ad Hoc Committee

12        1177 Avenue of the Americas

13        New York, NY 10036

14

15   BY:  KENNETH H. ECKSTEIN

16

17   KIRKLAND ELLIS LLP

18        Attorneys for Arcadia Consumer Healthcare Inc. and

19        Atlantis Cons

20        601 Lexington Avenue

21        New York, NY 10022

22

23   BY:  JORDAN ELKIN

24        CHRISTOPHER MARCUS

25

1  KIMBERLY ANN MEYER

2      Pro Se Creditor

3      212 Surrey Drive, Apartment 114

4      Bristol, CT  06010

5

6  BY:  KIMBERLY ANN MEYER

7

8

9  AKIN GUMP STRAUSS HAUER FELD, LLP

10     Attorneys for the Official Committee of Unsecured

11     Creditors

12     One Bryant Park

13     New York, NY 10036

14

15  BY:  ARIK PRIES

16

17  ALSO PRESENT TELEPHONICALLY:

18  ROXANA ALEALI

19  RICHARD ARCHER

20  MICHAEL ATKINSON

21  JASMINE BALL

22  BROOKS BARKER

23  KATHRYN BENEDICT

24  BETH ANN BENTLEY

25  BRIANNA B. BILTER

Page 5

1   DAVID E. BLABEY

2   JOSEPH BRANDT

3   SARA BRAUNDER

4   JULIUS CHEN

5   DANIEL CONNOLLY

6   DYLAN CONSLA

7   JABRISKA COTTON

8   LYNN CROWFOOT

9   JASON DIBATTISTA

10   MARIA ECKE

11   LAWRENCE FOGELMAN

12   CAROLINE GANGE

13   MAGALI GIDDENS

14   MATTHEW J. GOLD

15   UDAY GORREPATI

16   TAYLOR HARRISON

17   MARSHALL SCOTT HUEBNER

18   MITCHELL HURLEY

19   GREGORY JOSEPH

20   BENJAMIN S. KAMINETZKY

21   WENDY KANE

22   JEFF KAPLAN

23   MARC KESSELMAN

24   AYANO KITANO

25   DIETRICH KNAUTH

1    JACQUELYN KNUDSON

2    SHAUN C. LEE

3    ALEXANDER LEES

4    KAREN LEUNG

5    MARA LEVENTHAL

6    JEFFREY A. LIESEMER

7    EDAN LISOVICZ

8    EMILY MACKAY

9    JAMES I. MCCLAMMY

10   MICHELL J. MEISES

11   MAURA KATHLEEN MONAGHAN

12   GEORGE M. O'CONNOR

13   ROBERT ORRAN

14   KATHERINE PORTER

15   JANE A. REDWOOD

16   RENE A. REDWOOD

17   RACHAEL RINGER

18   JEFFREY J. ROSEN

19   JASON RUBINSTEIN

20   CAROLINE SALLS

21   RAFAEL SCHNITZLER

22   ALEC SCWARTZ

23   PAUL KENAN SCHWARTZBERG

24   J. CHRISTOPHER SHORE

25   MARC F. SKAPOF

Page 7

1    JOSEPH SORKIN

2    PETER J. SPROFERA

3    ERIC STODOLA

4    VINCE SULLIVAN

5    MARC JOSEPH TOBAK

6    ALLEN J. UNDERWOOD

7    GERARD UZZI

8    ELI J. VONNEGUT

9    THEODORE WELLS, JR.

10    ROBIN L. ZEPHIER

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 8

P R O C E E D I N G S

1

2          THE COURT:  Good morning.  This is Judge Sean Lane

3     in the United States Bankruptcy Court for the Southern

4     District of New York, and we're here for an 11:00 hearing in

5     Purdue Pharma L.P.  Thank you very much for letting me know

6     I was on mute.  As we all know, in COVID the mute button

7     gets us from time to time, all of us.  So, thank you for

8     your assistance.

9          I do have a copy of the agenda that was filed on

10    the docket for today's hearing, and I thought I would start

11    the hearing, as we always do by getting appearances.  So,

12    let me first get appearances on behalf of the Debtors.

13          MR. ROBERTSON:  Good morning, Your Honor,

14    Christopher Robertson, Davis Polk and Wardwell on behalf of

15    the Debtors.

16          THE COURT:  All right.  And on behalf of The

17    Official Committee of Unsecured Creditors?

18          MR. PREIS:  Good morning, Your Honor, Arik Preis

19    from Akin Gump Strauss Hauer and Feld on behalf of the UCC.

20          THE COURT:  All right, good morning  And on behalf

21    of the Ad Hoc Committee I see Mr. Eckstein here.

22          MR. ECKSTEIN:  Good morning, Your Honor.  Kenneth

23    Eckstein of Kramer Levin on behalf of the Ad Hoc Committee

24    of Governmental and other contingent litigation claimants,

25    thank you.

Page 9

1          THE COURT:  All right.  Good morning.  And I know,

2     as always is the case in this hearing, that there is a very

3     long list of folks who have entered an appearance on Zoom,

4     many of whom have no intentions of speaking and therefore

5     don't necessarily need to enter an official appearance on

6     the transcript by announcing their presence here today.  So,

7     given that fact I'll turn it over to other folks who need to

8     make an appearance.  And so, I do see Mr. Elkin on the

9     screen, so I assume he wants to make an appearance.

10         MR. ELKIN:  Yes, Your Honor, good morning.  Jordan

11    Elkin with Kirkland and Ellis on behalf of Arcadia Consumer

12    Healthcare, Inc., and Atlantis Consumer Healthcare, Inc.,

13    the proposed stalking horse bidder.  And I'm here today with

14    my colleague Christopher Marcus.

15         THE COURT:  All right, good morning.  And I see

16    Kimberly Meyer here as well.  So, let me get that

17    appearance.

18         MS. MEYER:  Yes, Kimberly Meyer here as well.

19    Very interested in hearing what the horse bidder has to say.

20         THE COURT:  All right, good morning.  Any other

21    appearances from any other party?  All right, hearing none.

22    If somebody does need to jump in at some point who hasn't

23    yet made an appearance, obviously you'll do that and enter

24    your appearance at that time.

25         So, with that I'll turn the virtual podium over to

Page 10

1    the Debtors to walk us through the matter that's on for

2    today.

3              MR. ROBERTSON:  Great, thank you, Your Honor.

4    Your Honor, for the record Christopher Robertson, Davis Polk

5    and Wardwell on behalf of the Debtors.  The only item on

6    today's agenda is the Debtor's request to approve bidding

7    procedures for the sale of substantially all of the assets

8    of the Debtor's consumer health business, which is currently

9    conducted by Debtor Avrio Health, LP.

10             This request is unopposed.  We filed a certificate

11   of no objections on Friday the 21st at Docket 5557.  That

12   included a revised form of order and revised bidding

13   procedures reflecting informal comments from The Official

14   Creditors' Committee.  I would note that The Committee also

15   submitted a statement regarding the distribution of proceeds

16   of the sale, which is not an objection to the procedures or

17   to the sale.

18             But I do understand that Mr. Preis and Mr.

19   Eckstein would like to speak briefly on the statement on

20   behalf of the Creditors' Committee and Ad Hoc Committee,

21   respectively, once I've addressed the Court and responded to

22   any questions that Your Honor may have.  I would also note

23   that Mr. Schnitzler from PJT, the Debtor's investment

24   banker, and the Debtor's declarant on this matter, is also

25   on the line if you have questions for him.  Your Honor --

Page 11

```
1              THE COURT:  Oh --

2              MR. ROBERTSON:  I'm sorry, Your Honor.

3              THE COURT:  No, I guess, just first order of

4    business is to admit his declaration in support of the

5    motion requested relief.  Any objection to admitting his

6    declaration in support of the Debtor's motion?  All right,

7    hearing no objection, I'm happy to receive it as evidence in

8    support of the requested relief.

9              So, Mr. Robertson, anything else that you'd like

10   to go through this morning before we hear from the other

11   folks who are selling?

12             MR. ROBERTSON:  No, no thank you, Your Honor.  You

13   know, I'm happy to speak briefly to the timeline of the

14   proposed transaction if that's helpful.  I think it's all in

15   our papers, but you know, kind of very briefly.  PJT here

16   had, you know, really ample time to run a very robust

17   process to select the stalking horse.  You know, this is a,

18   I think, somewhat usual for a Chapter 11 context and that

19   the assets that are being sold here are, you know, the vast

20   of a healthy and profitable business, non-core to the, you

21   know, the bankruptcy estate, but you know significant.

22             And so, PJ&T the freedom to go out to the over 70

23   parties including every party who had trust interest over

24   the course of the case in the assets and run a multi-stage

25   robust process, which we think supports the, you know, the
```

Page 12

```
1    timeline here as does that fact that, you know, we think
2    that any party likely to come into the auction had already
3    been invited into the process previously and should have,
4    you know, access to the data room and kind of be up to speed
5    on the asset.
6           So, I just wanted to, you know, to kind of preview
7    that, you know, for the Court.  And otherwise, we think the
8    procedures are, you know, really pretty typical and
9    customary for transactions of this kind.  You know, I don't
10   propose to walk through the details unless Your Honor has
11   any questions for me.
12          THE COURT:  All right.  And just for any folks who
13   may be listening who aren't familiar with bankruptcy
14   procedures.  A stalking horse is a party who steps forward
15   to make a commitment to purchase assets and to thus set a
16   floor for any auction, which is beneficial for the estate
17   and for creditors to know that you have a buyer, and you
18   know, you have a certain value that you've established.  And
19   so, that stalking horse gets certain protections because
20   they've essentially made a commitment and spent money even
21   though they aren't necessarily guaranteed to be the party
22   that will end up purchasing the asset.
23          So, that's what stalking horse protections are
24   about if you've seen that phrase in the papers or you hear
25   it discussed during today's hearing.  And it is a customary
```

1    thing, and my understanding is the stalking horse

2    protections here include a three percent fee and that is --

3    there's a lot of case law that establishes that as a

4    reasonable figure to use to compensate a stalking horse in

5    circumstances like this.

6              So, anything else, Mr. Robertson, you wanted to

7    say about the stalking horse situation for purposes of the

8    record?

9              MR. ROBERTSON:  No, Your Honor.  I have nothing

10   further.

11             THE COURT:  All right.  So, I thought it -- I'm

12   going to hear, make sure to hear from everybody.  And I

13   thought in terms of order that it made sense probably to

14   hear from The Committee at this point for any statement they

15   wanted to make.

16             MR. PREIS:  Thank you, Your Honor.  Can you hear

17   me all right?

18             THE COURT:  I can hear you just fine, thank you.

19   It's always good to check as I learned self on my -- I

20   learned that myself this morning.  So, yes, I can hear you

21   just fine.

22             MR. PREIS:  Okay.  Good morning, Your Honor.  Arik

23   Preis from Akin Gump Strauss Hauer and Feld on behalf of The

24   Official Committee of Unsecured Creditors.  As Your Honor

25   noted, we filed a statement regarding the bidding procedures

Page 14

1    and the sale in general at Docket Number 5555.  To be clear,

2    it's not an objection and we do thank the Debtors for

3    including us in the process thus far and for taking our

4    comments to the bid procedures.

5              We are sure Your Honor has read our statement and

6    I'm not going to repeat it.  That being said, I do just want

7    to make the following points.  We're now almost 600 days

8    after Judge Drain rendered his decision confirming the Plan.

9    Assuming it would have conservatively taken us six months to

10   effectuate the Plan and to go from confirmation to

11   consummation absent any appeals, we're now more than 400

12   days since much needed funds would have started flowing from

13   Purdue, from the Purdue estate to abate the opioid crisis

14   and compensate victims.

15             In those 400 days, and pursuant to the currently

16   vacated Plan, if we had gone effective more than $1 billion

17   would have already been utilized for these purposes.

18   Instead, we wait while people continue to die from opioid

19   overdose, people continue to suffer from the disease of

20   unnecessary opioid addition, children continue to be born

21   with NAS, and the cost of these crises continue to grow,

22   putting pressure on states, political subdivisions,

23   hospitals, TPPs, and others.

24             For our part, we field between one and five calls

25   a day from victims all asking variations of the same

Page 15

1    question.  What's going on?  Why is the Department of

2    Justice still appealing?  Why did I have to file a proof of

3    claim three years ago if three years later no money would be

4    distributed?  What happens if I can't find my paperwork?

5    And most tragically for a lot of people, what happens if I

6    die before an administrator reviews my claim and determines

7    my distribution?

8            While we can't ask Your Honor to assist us with

9    the Second Circuit, we are presented at this time with the

10   potential for near 400 million in proceeds to come in from

11   the sale of the Avrio assets.  As we mentioned in our

12   pleading, we are pleased with this progress.  And if more

13   proceeds come in, and not taking anything away from the

14   stalking horse bidder, even better for the estate.

15           But our focus at this point is getting these new

16   proceeds out for the purposes that we had envisioned in the

17   Plan, and that the Debtors first announced to everyone more

18   than 1,200 days ago.  We have begin -- begun talking to

19   Debtors about whether there's a structure in which such an

20   outflow would be possible, and we intend on broadening those

21   discussions soon.

22           We're not looking to bore any creditors off, so to

23   speak, and we are open to creative suggestions and

24   solutions.  But the idea this money will come in in the next

25   few months, and absent a decision from the Second Circuit,

Page 16

1    just sitting in the Purdue bank account is very

2    disappointing.  And every party in this case, even I note

3    the Federal Government, notwithstanding its lone wolf status

4    in the pending appeal, should want what's best for the

5    American public and this estate.  Thank you, Your Honor.

6          THE COURT:  All right, thank you very much.  I

7    think, Mr. Preis, it's a very timely speech for those who

8    are listening in and were wondering what is going on and

9    what is the delay.  I think we've done everything we can

10   here in the Bankruptcy Court.  And folks who are

11   participating in the Bankruptcy Court, at this point we are

12   waiting for the appeal process to work out, and that is

13   regrettably something that takes time.  I wish I had, as no

14   doubt you do as well, a better answer for that.  It is the

15   process and certainly as soon as we get any news of any sort

16   from the Second Circuit, we will all make sure collectively

17   that the process and what's going on is as transparent as

18   possible and publicized as possible.  Because just to let

19   people know, the Second Circuit is not necessarily the final

20   word.  There is a potential for any decision by the Second

21   Circuit to be appealed to the Supreme Court, which as some

22   folks may know the Supreme Court does not have to take every

23   case that people request that it take.

24          And so, there is still uncertainty as to the

25   ultimate timing for the ultimate resolution here.  So -- but

Page 17

1      we will make sure, as we've discussed in other context

2      earlier in the case, to schedule a conference very promptly

3      after getting any word of any sort so that we can make sure

4      to disseminate information to all interested parties so that

5      people know.  Even if we don't have great news as to

6      finality of the process, people at least know as best as we

7      can tell them what's going on.  But thank you for your

8      comments.

9              And Mr. Eckstein, I understand that you also had a

10     statement.

11             MR. ECKSTEIN:  I do, Your Honor, thank you very

12     much.  Kenneth Eckstein of Kramer Levin on behalf of the Ad

13     Hoc Committee of Governmental, and other contingent

14     litigation claimants.  I just have two brief points I'd like

15     to make.

16             First, the Ad Hoc Committee is pleased that the

17     Debtor is moving forward at this time with the sale of the

18     Avrio assets and is supportive of the Debtor's efforts to

19     sell the Avrio assets and with the proposed timeline.  In

20     light of the statement that was submitted by the UCC, we

21     simply wanted to make sure that the record was clear that

22     the sale process and the expectation of the stalking horse

23     bidder and the potential third parties are clear and

24     unequivocal.

25             This is an important asset sale and the AHC does

1    look forward to working with the Debtor and the UCC and

2    other key constituencies to ensure the sale process achieves

3    the highest and best price.  We did have some concern at the

4    UCC suggestions that the sale process or potential bids

5    should be tied to distributions of the sale proceeds could

6    create some confusion.  The UCC statement did go so far as

7    to encourage bidders to shape bids that are specifically

8    tied to creditor allocations or distributions, and we were

9    concerned that that might be misleading.  We believe that

10   all parties should focus on maximizing sale proceeds.  And

11   if the Court approves the bid procedures, the objectives of

12   all parties, we believe, should be on identifying the

13   highest and best bidder for the assets.  The matter in which

14   proceeds from the sale are ultimately distributed after the

15   sale closes should not be a factor that the Court is dealing

16   with today or in connection with winning bid.

17          Your Honor, that said, the AHC shares the UCC's

18   frustration with the delay that has been imposed by the

19   appellate process on the ability to effectuate the Plan and

20   to begin distributions that are of much needed funds to

21   abate the opioid crisis and to compensate the victims of the

22   opioid epidemic.  We are hopeful that the Second Circuit

23   will promptly clear the path to effectuate the Plan, or if

24   not, implement an alternative solution to this intractable

25   case.

Page 19

1          Notwithstanding the frustrations with the delay,

2     we cannot lose sight of the prodigious time and effort that

3     all parties have put into constructing an allocation among

4     the multiple creditor constituencies in this case.  That

5     allocation remains fragile and remains an essential part of

6     the Plan which we hope can be implemented in short order.

7          In fact, the AHC and the UCC had incorporated into

8     the allocation agreements specific arrangements with respect

9     to the proceeds from the sale of Avrio which was initially

10    expected to occur post-effective date.  And we would expect

11    that those understandings will remain in place when a Plan

12    is implemented.

13         The AHC remains in active dialog with the UCC and

14    with other parties in this case about options for how this

15    case can be effectuated and we expect those discussions to

16    continue in earnest.  And we hope they'll in fact become

17    increasingly active in the very short order.  Those

18    discussions, however, should not be tied to this sale

19    process involving third party bidders.

20         In conclusion, Your Honor, we would encourage the

21    Court to approve the sale and bidding procedures and allow

22    the parties to deal with the issue of insuring a swift

23    distribution of proceeds through a Plan of Reorganization as

24    promptly as possible.  Thank you.

25         THE COURT:  All right, thank you very much.  I'm

Page 20

```
1    going to hear from Ms. Meyer in one moment but let me just

2    ask if there's any other party that wishes to be heard

3    before I hear from Ms. Meyer.  All right.  Ms. Meyer, I know

4    that you were on the line, I think earlier you said you

5    wanted to hear what people had to say.

6            So, you may or may not have something that you

7    want to say yourself.  If you do, I'm happy to hear it.  But

8    certainly, if you're here to get information and to hear

9    what folks were going to say about the status of the case,

10   in particularly about the sale, obviously you're welcome to

11   be here for that and not say anything, it's up to you.  So,

12   Ms. Meyer, is there anything that you wanted to add?

13           CLERK:  She left.

14           THE COURT:  All right.  She appears to have left

15   the zoom hearing, so I'll take it that she wanted to be here

16   to hear what information people would provide about the sale

17   and about the status of the case, which I think there's been

18   some very helpful information conveyed on that.

19           Any other party have anything else to say in

20   connection with the requested relief today?  All right.

21           I'm happy to grant the motion.  I do note the

22   certificate of no objection.  I do note that it has the

23   support of the constituencies on the line here today.  And

24   my understanding is that today's approval is not about the

25   allocation proceeds, everyone reserves their rights in all
```

1    respects as to how that should work in what is a landscape

2    that may change in ways that we can't predict in the near

3    future.

4            So, the only thing I have is I think I had just a

5    couple of comments on the proposed order, and they all have

6    sort of one theme.  So, looking at the proposed order and I

7    think I'm looking at the black line, I think I'm looking at

8    the -- let me make sure I can identify this properly for you

9    all -- Exhibit B, the comparison order.  So, just for

10   purposes of identifying where I am.  And my comments are

11   really all up -- so, Paragraph 20 through say 28, which are

12   all about timing.  And the idea would be that if there is a

13   assumption and assignment notice there's -- it basically

14   says at this point, the Debtor shall, as reasonably

15   practical after entry of this order, and in no doubt,

16   provide sufficient notice served on each relevant counter

17   party the potential assumption of assignment notice.

18           And then there's an objection deadline in

19   Paragraph 21 that says it's got to be filed by a particular

20   date, which is typical to do if I don't have a date.  I

21   understand -- I understand the changing, the changeable

22   nature of these things, but I did see later on that when

23   you're talking about the supplemental assignment, any

24   supplemental assumption of assignment notice, that you tied

25   the objection date to the notice itself.  And I thought that

Page 22

1    that was one way to address the actual, initial round of any

2    potential assumption of assignment notices to have it run

3    from the date that that notice is filed or provided to the

4    party, Rocco.

5              So, that way we can sort of tweak the objection

6    deadlines in '21 and essentially steal from the order how

7    you handle the supplemental assignment notice, assumption of

8    assignment notice.  So, that was -- I wanted to throw that

9    out there for your consideration.

10             Any thoughts, Counsel?

11             MR. ROBERTSON:  No, Your Honor, that's perfectly

12   acceptable.  We'll have that notice on file and out to all

13   parties tomorrow.  And you're correct that that date as

14   hardwired in the order contemplates filing the notice

15   tomorrow.  Totally happy to make it 14 days after service of

16   that notice.

17             THE COURT:  All right.  And then the other thing,

18   what I've tended to do in garden variety cases is have once

19   somebody gets an assumption of assignment notice and

20   (indiscernible) costs and all that stuff, is to have 30

21   days.  I don't want -- I don't -- that's not magic number,

22   that's been my default.  But I do see that this is going to

23   be served by first-class mail, so 14 days with first-class

24   mail, and maybe I'm scarred thinking of how long mail took

25   during COVID.  But so, there are a couple of ways to address

Page 23

1      that.

2            One is to lengthen the time to say 21 days and use

3      first-class mail.  The other is to say, well, we'll serve it

4      by overnight mail and handle it that way.  So, I -- there's

5      a couple of ways to deal with it and I'm open to your

6      suggestions what way you think is -- makes the most sense

7      for the -- given the case.

8            MR. ROBERTSON:  Sure.  Yeah.  I think looking at

9      the calendar if we add three days that puts the assumption

10     and assignment objection deadline the same day as the bid

11     deadline, which is probably okay, although I think I would

12     prefer to serve by first-class mail and move that up a day

13     or two if we can.

14           THE COURT:  Yeah, that's fine.  I thought you

15     might want to do that.

16           MR. ROBERTSON:  Yeah.

17           THE COURT:  So, that's fine.  So, maybe then

18     you're changing 14 to 17.  Is that what I'm hearing?

19           MR. ROBERTSON:  I think that's right.  And just to

20     kind of (indiscernible), this is a -- it's not a heavy

21     burden on the Debtors to serve by first-class mail.  There

22     aren't that many contract counterparties given, I think, how

23     long we are into the case and just the nature of the

24     business.  So, it's not an issue.

25           THE COURT:  All right.  And the only other thing

Page 24

1    in that connection since its first-class mail, I would just

2    say to the extent that something's put in the language -- to

3    the extent that something is returned as undeliverable, to

4    put in language that say the estate will then take all

5    reasonable efforts to determine the actual proper place for

6    sending such a notice, and then promptly send it.  So, just,

7    you know, just preparing for potential eventualities.

8         So, those are my comments.  As I said, not major

9    issues, but just ones to make sure that that process goes

10   smoothly and consistent with due process.

11        And so, I see Ms. Meyer, you're back on.  I had

12   earlier -- we were talking about the case and then you

13   dropped off.  And I didn't know if you had anything that you

14   wanted to say in connection with the matter that's on for

15   today.  I know you had earlier said that you were here to

16   get some information, to hear what people had to say.  So,

17   you don't have to say anything at all.  But certainly, I

18   wanted to give you the opportunity if there's something that

19   you wanted to say.

20        MS. MEYER:  Thank you very much, Your Honor.  I

21   did want to say that being one of the creditors I had a lot

22   of problems and wanted to go on record specifically with my

23   situation with the pharmaceutical industry, Purdue Pharma

24   specifically.  I am and was on probably over 50 medications

25   prescribed, and no longer take any medications, nothing for

Page 25

1   nothing, including addiction medicine, diabetes medicines,

2   thyroid medicines.  I can go on and on and on.

3           I think we had the opportunity, or I could

4   probably have the opportunity to put a pharmaceutical

5   business out of business, the pharmaceutical industry out of

6   business.  So, I just hope that everybody sees the big

7   picture.  My intentions are for good, and always will be.  I

8   want to work with everybody involved, including Purdue and

9   the pharmaceutical industry because I think they have a

10  really big role to play in our healthcare.  I just hope that

11  we can all come together and find a solution to the problems

12  that are going on with addiction, specifically, and mental

13  healthcare.  Thank you.

14          THE COURT:  All right.  Thank you very much for

15  your comments and I think everybody would agree that that's

16  a -- that is a -- very much a desire we should all have, to

17  have the system work for the best for people's health and

18  wellbeing.  And certainly, I think that's the intent behind

19  the Plan that is currently part of the Second Circuit, and

20  we'll see how those appeals play out.  And you already heard

21  that discussed earlier.  So, thank you very much for your

22  comments.  I wish you all the best.

23          MS. MEYER:  Thank you, Judge.

24          THE COURT:  All right.  So, with that I'm happy to

25  approve the motion, and I'll just wait -- if you could send

Page 26

1    a blackline version of the proposed order, that would be

2    great.  And with that let me ask if there's anything else

3    that we need to address here this morning?

4              MR. ROBERTSON:  Nothing from the Debtors, Your

5    Honor.

6              THE COURT:  All right.  Anything from any other

7    party this morning?  All right.  Hearing nothing, I wish you

8    all a very good day, be well and safe, and see you in the

9    not-too-distant future.  Thank you.

10             MR. ROBERTSON:  Thank you, Your Honor.

11             (Whereupon these proceedings were concluded at

12   11:40 AM)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          **I N D E X**

2

3                              RULINGS

4                                                    Page        Line

5    **Motion Awaiting Blackline Proposed**

6    **Order from the Debtors' Counsel, GRANTED**    26           25

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 28

1                    C E R T I F I C A T I O N

2

3          I, Sonya Ledanski Hyde, certified that the foregoing

4     transcript is a true and accurate record of the proceedings.

5

6

7

8     Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20     Veritext Legal Solutions

21     330 Old Country Road

22     Suite 300

23     Mineola, NY 11501

24

25     Date:  April 28, 2023