AKIN GUMP STRAUSS HAUER & FELD LLP
Arik Preis
Mitchell Hurley
Sara L. Brauner
Theodore James Salwen
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
apreis@akingump.com
mhurley@akingump.com
sbrauner@akingump.com
jsalwen@akingump.com

*Counsel to the Official Committee of Unsecured
Creditors of Purdue Pharma L.P.,* et al.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| PURDUE PHARMA L.P., *et al.*, | : | Case No. 19-23649 (SHL) |
| | : | |
| Debtors.[1] | : | (Jointly Administered) |

---

### STATEMENT OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS IN RESPECT OF THE SALE OF THE AVRIO ASSETS AND THE USE OF THE PROCEEDS THEREFROM

The Official Committee of Unsecured Creditors (the "Official Committee"), appointed in the chapter 11 cases (the "Chapter 11 Cases") of the above-captioned debtors and debtors in possession (collectively, the "Debtors"), by and through its undersigned counsel, hereby submits

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF L.P. (0495), SVC Pharma L.P. (5717) and SVC Pharma Inc. (4014).

this statement (the "Statement") in respect of the current status of the Chapter 11 Cases and, in particular, in respect of the use of proceeds from the proposed sale of the Debtors' "Avrio" business lines.[2]

## STATEMENT

1.  Throughout these Chapter 11 Cases, the Official Committee has taken seriously its role as the only fiduciary for all unsecured creditors—creditors predominantly comprising Opioid Claimants.[3] These Opioid Claimants include both public and private entities, including the federal government, States, political subdivisions, Native American Tribes, public schools, personal injury victims, children born with NAS, hospitals, third party payors and others. The vast majority of these groups are represented on the Official Committee, including through the three public creditor *ex officio* members. Given the breadth of this creditor body, and notwithstanding views expressed by certain public-side creditors throughout the cases, the Official Committee has always endeavored to be as inclusive as possible and take into account often divergent views regarding myriad case issues.

---

[2] *See Motion of Debtors for Entry of Orders (I)(A) Approving Bidding Procedures for Sale of Debtors' Avrio Assets, (B) Approving the Designation of Atlantis Consumer Healthcare Inc., a Wholly Owned Subsidiary of Arcadia Consumer Healthcare Inc., as the Stalking Horse Bidder for the Avrio Assets, (C) Authorizing and Approving Entry Into the Stalking Horse Asset Purchase Agreement, (D) Approving Bid Protections, (E) Scheduling Auction for, and Hearing to Approve, Sale of Debtors' Avrio Assets, (F) Approving Form and Manner of Notices of Sale, Auction, and Sale Hearing, (G) Approving Assumption and Assignment Procedures, and (H) Granting Related Relief and (II)(A) Approving Sale of Debtors' Avrio Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (B) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases, and (C) Granting Related Relief*, dated April 4, 2023 [ECF No. 5532] (the "Motion"). Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

[3] The Official Committee currently comprises the following eight members: (i) The Blue Cross and Blue Shield Association (chair); (ii) CVS Caremark Part D Services L.L.C. and CaremarkPCS Health L.L.C.; (iii) Cheryl Juaire, (iv) Kara Trainor; (v) LTS Lohmann Therapy Systems Corporation; (vi) Pension Benefit Guaranty Corporation; (vii) Walter Lee Salmons; and (viii) West Boca Medical Center, plus three public creditor ex officio members: (a) Cameron County, Texas, on behalf of the Multi-State Governmental Entities Group; (b) the Cheyenne and Arapaho Tribes, on behalf of certain Native American Tribes and Native American-affiliated creditors; and (c) Thornton Township High School District 205, on behalf of certain public school districts. Pension Benefit Guaranty Corporation has abstained from the decision to file this Statement, and takes no position on the issues addressed herein.

2. The Official Committee notes this posture at the outset in an effort to forestall any accusations that this Statement only represents the views or interests of private claimants. Nothing could be further from the truth. This Statement does not reflect a preference for any sub-group of the Official Committee's constituency. Rather, it is part of the Official Committee's efforts to maximize the benefit of estate assets by putting some of the Debtors' value—all of which is intended to flow to creditors—to work now, when it continues to be desperately needed.

3. Prior to the Bid Procedures Hearing, the Official Committee filed a short statement.[4] The premise of the Initial Avrio Statement was straightforward, namely that after more than three and a half years, these Chapter 11 Cases have accomplished little to help the victims of the crisis from which they arose, which is the single worst man made epidemic of our lifetimes and has resulted in a virtually unimaginable volume of litigation against the Debtors and the Sackler Family for their role in allegedly fueling the opioid epidemic. Indeed, ***not a single penny*** of the Debtors' estates or the Sacklers' enormous wealth has been distributed to ***any*** Opioid Claimants—except for $225 million paid by the Sacklers to the Federal Government to settle certain civil claims almost three years ago (it is not without some irony that the federal government, despite being the only beneficiary of these assets to date, is the only party that rose at oral argument before the Second Circuit to oppose a plan of reorganization that would distribute $7 billion to more than six hundred thousand claimants).

4. In the Initial Avrio Statement, the Official Committee also lamented the limited scope of certain nonbankruptcy settlements with certain co-defendants allegedly responsible for the opioid crisis, and in particular the fact that (although net positives for opioid abatement) these settlements of thousands of lawsuits with States and political subdivisions for an aggregate of

---

[4] *Statement of the Official Committee of Unsecured Creditors in Respect of Debtors' Motion To Approve Bidding Procedures for Sale of the Avrio Assets*, dated April 20, 2023 [ECF No. 5555] (the "Initial Avrio Statement").

3

nearly $50 billion, have not resulted—and will never result—in any value being paid as compensation directly to the individuals who were actually injured by opioids. In short, between Purdue's Chapter 11 Cases and the nonbankruptcy settlements, these victims of Opioid Use Disorder, NAS, NOWS and other medical ailments, and the loved ones left behind by those who did not survive these afflictions, have received nothing. And none of the money received by public entities has been paid to other private claimants, such as hospitals, emergency room physicians, or third party payors.

5. The Official Committee noted these circumstances and suggested that the auction for the Debtors' Avrio business—which had been anticipated to take place *well after* Purdue emerged from chapter 11, and the nearly $400 million of gross proceeds it would realize for the Debtors' estates, could be an opportunity to make some sort of distribution to all Opioid Claimants in the Chapter 11 Cases, including victims. Consistent with the Official Committee's view of its role, the Official Committee did not and does not seek to distribute proceeds to Opioid Claimants unfairly or with preference for any constituency. Despite the failure three years ago of the attempt to create an Emergency Relief Fund, the Official Committee thought that other parties might by now be equally sensitive to the causes that militate in favor of distributions. The Official Committee hoped that parties' knowledge of the long and arduous negotiations that resolved a war of all against all through the allocations in the Plan, and their awareness of the unfortunate delay of these cases since then, would render parties open to distributing the Avrio sale proceeds.

6. With that in mind, and since filing the Initial Avrio Statement, the Official Committee engaged in a number of conversations with both the Debtors and the AHC,[5] as well as with other parties in interest, regarding the possible use of the Avrio sale proceeds. The Debtors,

---

[5] The AHC is the Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants.

to their credit, were supportive of distributions to claimants, so long as such distributions carried broad-based support. Indeed, the Debtors, like the Official Committee, are troubled by the fact that the Sacklers' vast fortune and the value of the Debtors' assets remain unable to be distributed to needy claimants, as we all wait for the Second Circuit to rule (and perhaps longer, depending upon the outcome).

7. It is the AHC, on behalf of certain governmental units, that has expressed reservations about making such a payment. Without discussing the specifics of these conversations, the UCC would note the following.

8. First, the UCC is sensitive to concerns about the effect of any distribution on the Second Circuit's decision (or on any requests for rehearing or certiorari, or remand proceedings, in respect thereof). It should be obvious that no one *wants* to give the Second Circuit a reason to rule against a plan supported (at this stage) by 99.9% of the creditors. But it is unfathomable to the Official Committee that making a small distribution of estate proceeds, funded from business activities that have nothing to do with the settlement or the ongoing appeal, would be a reason for the Second Circuit to conclude that nonconsensual third-party releases are forbidden.[6] There is little dispute that if the Second Circuit applies *Metromedia* as binding precedent, this case fits within those criteria better than any case in the history of chapter 11. And the novel statutory interpretation adopted by Judge McMahon should likewise be unaffected by any use of the proceeds of the Avrio sale. Said differently, doing the right thing and distributing money to the

---

[6] At this point, it is clear to all parties in interest that the Debtors' business *as a whole*, much less the Avrio business standing alone, is not the central asset of these Debtors' estates—it is the fate of the claims against the Sacklers on which *all* creditors depend. *See, e.g.*, *Statement of the Official Committee of Unsecured Creditors in Support of Confirmation of the Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors*, dated August 5, 2021 [ECF No. 3459] ¶ 56. That the Avrio proceeds can be used to accomplish some good now does not undercut the necessity of the Sackler resolution to the entirety of the Chapter 11 Cases.

people who were harmed by the opioid crisis cannot affect the matters actually before the Second Circuit.

9.  Second, the Official Committee does not see how any entity could prefer to let money sit unused in a bank account rather than using that money to save lives. Perhaps certain public claimants can afford to wait because they have already obtained close to $50 billion for their opioid abatement programs from settlements with other defendants. But in the announcement of these major victories, the Official Committee is not aware of any public admission by these parties of the following basic truth: that the tens of billions of dollars they have obtained for opioid abatement will not be used to compensate victims, who are left to fend for themselves *in competition with their governments* fighting over the bankruptcy dollars available from Insys, Mallinckrodt, Purdue and Endo. Distributing the proceeds of the Avrio sale would, at least, begin the process of correcting this inequity.

10. It is the Official Committee's hope to continue working with all constituents in an attempt to utilize the Avrio sale proceeds for opioid abatement and victim compensation immediately, not to wait for a Second Circuit ruling before doing anything to ameliorate this staggering epidemic. The Official Committee fully expects to be back in front of the Court in the near term to discuss this issue, unless other events (with luck) overtake its efforts.

[*The remainder of this page has been left blank intentionally.*]

| | |
|---|---|
| Dated: New York, New York<br>May 22, 2023 | AKIN GUMP STRAUSS HAUER & FELD LLP<br><br>By: /s/ *Arik Preis*<br>Arik Preis<br>Mitchell Hurley<br>Sara L. Brauner<br>Theodore James Salwen<br>One Bryant Park<br>New York, New York 10036<br>Tel: (212) 872-1000<br>Fax: (212) 872-1002<br>apreis@akingump.com<br>mhurley@akingump.com<br>sbrauner@akingump.com<br>jsalwen@akingump.com<br><br>*Counsel to the Official Committee of Unsecured Creditors of Purdue Pharma L.P.*, et al. |