Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 19-23649-shl

4    Adv. Case No. 21-07005-shl

5    - - - - - - - - - - - - - - - - - - - - - - - - - - x

6    In the Matter of:

7

8    PURDUE PHARMA L.P..

9

10          Debtor.

11   - - - - - - - - - - - - - - - - - - - - - - - - - - x

12   AVRIO HEALTH LP, et al.,

13          Plaintiffs,

14       v.

15   AIG SPECIALTY INSURANCE COMPANY,

16          Defendants.

17   - - - - - - - - - - - - - - - - - - - - - - - - x

18                  United States Bankruptcy Court

19                  300 Quarropas Street, Room 248

20                  White Plains, NY 10601

21

22                  May 23, 2023

23                  11:14 AM

24

25

1    B E F O R E :

2    HON SEAN H. LANE

3    U.S. BANKRUPTCY JUDGE

4

5    ECRO:    ALIANNA PERSAUD

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1    HEARING re Omnibus Hearing

2

3    HEARING re Doc. #5619 Notice of Agenda

4

5    HEARING re Doc. #5533 (Sale Hearing) Motion to Approve /

6    Motion of Debtors for Entry of Orders (I)(a) Approving

7    Bidding Procedures for Sale of Debtors Avrio Assets, (b)

8    Approving the Designation of Atlantis Consumer Healthcare

9    Inc., a Wholly Owned Subsidiary of Arcadia Consumer

10   Healthcare Inc., as the Stalking Horse Bidder for Avrio

11   Assets, (c) Authorizing and Approving Entry into the

12   Stalking Horse Asset Purchase Agreement, (d) Approving Bid

13   Protections, (e) Scheduling Auction for, and Hearing to

14   Approve, Sale of Debtors Avrio Assets, (f) Approving Form

15   and manner of Notices of Sale, Auction, and Sale Hearing,

16   (g) Approving Assumption and Assignment Procedures, and (h)

17   Granting Related Relief and (II)(a) Approving Sale of

18   Debtors Avrio Assets Free and Clear of Liens, Claims,

19   Interests, and Encumbrances, (b) Authorizing Assumption and

20   Assignment of Executory Contracts and Unexpired Leases, and

21   (c) Granting Related Relief

22

23

24

25

```
1    HEARING re Doc. #5570 (Sale Hearing) Order (I) Approving

2    Bidding Procedures for Sale of Debtors Avrio Assets, (II)

3    Approving the Designation of Atlantis Consumer Healthcare

4    Inc., a Wholly Owned Subsidiary of Arcadia Consumer

5    Healthcare Inc., as the Stalking Horse Bidder for Avrio

6    Assets, (III) Authorizing and Approving Entry into the

7    Stalking Horse Asset Purchase Agreement, (IV) Approving Bid

8    Protections, (V) Scheduling Auction for, and Hearing to

9    Approve, Sale of Debtors Avrio Assets, (VI) Approving Form

10   and Manner of Notices of Sale, Auction, and Sale Hearing,

11   (VII) Approving Assumption and Assignment Procedures, and

12   (VIII) Granting Related Relief with Sale Hearing to be held

13   on 5/23/2023 at 11:00 AM at Videoconference

14   (ZoomGov)(SHL)(Related Doc #5533)

15

16   HEARING re Doc #5578 (Seal KEIP/KERP) Motion to File Under

17   Seal / Motion for Entry of Order Pursuant to 11 U.S.C.

18   105(a), 107(b) and Fed. R. Bankr. P. 9018 Authorizing the

19   Filing of Certain Information Under Seal in Connection with

20   the Motion of Debtors for Entry of an Order Authorizing

21   Implementation of 2023 Key Employee Incentive Plan and 2023

22   Key Employee Retention Plan

23

24

25
```

1    HEARING re Doc #5579 (KEIP/KERP) Motion to Authorize /

2    Motion of Debtors Authorizing Implementation of 2023 Key

3    Employee Incentive Plan and 2023 Key Employee Retention Plan

4

5    HEARING re Adversary Proceeding 21-07005-shl Status

6    Conference

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

Page 6

1    A P P E A R A N C E S :

2

3    REED SMITH LLP

4        Attorneys for the Debtors and Debtors in Possession in

5        Adversarial Proceeding

6        599 Lexington Avenue

7        New York, NY 10022

8

9    BY:  PAUL E. BREENE

10

11   MINTZ

12       Attorneys for Liberty Mutual

13       One Financial Center

14       Boston, MA 02111

15

16   BY:  NICK CRAMB

17

18   WILLKIE FARR GALLAGHER LLP

19       Attorneys for AIG, National Union Fire Insurance, et

20       al.

21       1875 K Street NW

22       Washington, D.C. 20006

23

24   BY:  JOSEPH DAVIS

25

Page 7

```
 1   KRAMER LEVIN NAFTALIS FRANKEL LLP

 2        Attorneys for the Ad Hoc Committee

 3        1177 Avenue of the Americas

 4        New York, NY 10036

 5

 6   BY:  KENNETH H. ECKSTEIN

 7

 8   KIRKLAND ELLIS

 9        Attorneys for Atlantis Consumer

10        601 Lexington Avenue

11        New York, NY 10022

12

13   BY:  JORDAN ELKIN

14

15   GILBERT LLP

16        Attorneys for the Ad Hoc Committee of Governmental

17        Claimants

18        700 Pennsylvania Avenue SE, Suite 400

19        Washington, D.C.

20

21   BY:  RICHARD LEVERIDGE

22

23

24

25
```

1   AKIN GUMP STAUSS HAUER FELD LLP

2        Attorneys for the Official Committee of Unsecured

3        Creditors

4        One Bryant Park

5        New York, NY 10036

6

7   BY:  ARIK PREIS

8

9   COLE SCHOTZ PC

10        Attorneys for the Official Committee of Unsecured

11        Creditors

12        500 Delaware Avenue, Suite 1410

13        Wilmington, DE 19801

14

15   BY:  JUSTIN R. ALBERTO

16

17   DAVIS POLK WARDWELL LLP

18        Attorneys for the Debtors

19        450 Lexington Avenue

20        New York, NY 10017

21

22   BY:  CHRISTOPHER ROBERTSON

23        ELI J. VONNEGUT

24

25

```
 1   UNITED STATES DEPARTMENT OF JUSTICE

 2        Attorneys for the U.S. Trustee

 3        Alexander Hamilton Custom House

 4        One Bowling Green

 5        New York, NY 10004

 6

 7   BY:  PAUL KENAN SCHWARTZBERG

 8

 9   SIMPSON THACHER BARTLETT LLP

10        Attorneys for the Gulf Underwriters St. Paul Fire

11        Marine Insurance Company

12        425 Lexington Avenue

13        New York, NY 10017

14

15   BY:  SARAH PHILLIPS

16

17   ALSO PRESENT:

18   ROXANA ALEALI

19   ALISON R. AMBEAULT

20   MICHAEL ATKINSON

21   JASMINE BALL

22   R. PATRICK P. BEDELL

23   KATHRYN BENEDICT

24   DAVID E. BLABEY

25   SARA BRAUNER
```

1   JULIUS CHEN

2   DANIEL CONNOLLY

3   DYLAN CONSLA

4   ASHLEY V. CRAWFORD

5   JORDAN P. CRISPANO

6   ANTHONY DE LEO

7   GENEVIEVE DISPIRITO

8   ADAM FLEISCHER

9   LAWRENCE FOGELMAN

10  CAROLINE GANGE

11  MAGALI GIDDENS

12  MATTHEW J. GOLD

13  MARSHALL SCOTT HUEBNER

14  MITCHELL HURLEY

15  LINDA IMES

16  GREGORY JOSEPH

17  BENJAMIN S. KAMINETZKY

18  MARC KESSELMAN

19  DARREN S. KLEIN

20  ALEXANDER LEES

21  NICOLE A. LEONARD

22  MARA LEVANTHAL

23  JEFFREY LIESEMER

24  EDAN LISOVICZ

25  CHRISTOPHER MARCUS

1    JAMES I. MCCLAMMY

2    MICHELE J. MEISES

3    KIMBERLY ANN MEYER

4    MAURA KATHLEEN MONAGHAN

5    LYNN H. MURRAY

6    KATHERINE PORTER

7    RACHAEL RINGER

8    JEFFREY J. ROSEN

9    JASON RUBINSTEIN

10   RAFAEL SCHNITZLER

11   DAVID EDWARD SCHOENFELD

12   J. CHRISTOPHER SHORE

13   RICHARD DANIEL SHORE

14   MARC F. SKAPOF

15   COLLEEN P. SORENSEN

16   ERIC STODOLA

17   MARC JOSEPH TOBACK

18   ALLEN J. UNDERWOOD

19   GERARD UZZI

20   MELISSA L. VAN ECK

21   THEODORE WELLS, JR.

22   DENNIS J. WINDSCHEFFEL

23   ROBIN L. ZEPHIER

24   KIM MARRKAND

25   BROOKS BARKER

Page 12

1    BRIANNA B. BILTER

2    JOSEPH BRANDT

3    JABRISKA COTTON

4    LYNN CROWFOOT

5    JASON DIBATTISTA

6    UDAY GORREPATI

7    JACQUELINE HAHN

8    TAYLOR HARRISON

9    JEFF KAPLAN

10   AYANO KITANO

11   DIETRICH KNAUTH

12   DAVID MAYO

13   JAMES J. NANI

14   GEORGE O'CONNOR

15   ROBERT ORREN

16   JASON SCHEIDERER

17   KATE SOMERS

18   MICHAEL SPINELLI

19   PETER J. SPROFERA

20   VINCE SULLIVAN

21   KATY GUINN

22

23

24

25

Page 13

1          P R O C E E D I N G S

2          THE COURT:  Good morning.  This is Judge Sean Lane

3   in the United States Bankruptcy Court for the Southern

4   District of New York.  And we are here for an 11:00 hearing

5   in Purdue Pharma LP, a Chapter 11 case, an omnibus hearing.

6   And there is a notice -- I'm sorry -- well, there is a

7   notice of agenda filed under the docket at Docket Number

8   5619 that provides an agenda for today's matters.  And I

9   believe there also might be an amended agenda.

10          And so we'll start this hearing, as we always do,

11   by getting appearances from folks.  So let me start with the

12   Debtors, find out who is here for the Debtors.

13          All right.  Can folks hear me?  Oh, go ahead.

14          MR. ROBERTSON:  Your Honor, Christopher Robertson

15   of Davis Polk & Wardwell on behalf of the Debtors.

16          THE COURT:  All right.  Good morning.  I don't

17   know if you want to introduce anybody else.  I know there

18   are some declarants.  I don't know if folks are on the line,

19   but I don't know how you want to handle that.  You can wait

20   until we get to those motions as well.  But whatever you

21   prefer, Mr. Robertson.

22          MR. ROBERTSON:  Sure, Your Honor.  My colleague,

23   Jim McClammy, is on the Zoom as well.  He will be handling

24   the KEIP/KERP.  And I see Eli Vonnegut as well on the line.

25   Our declarant for the sale motion is Rafael Jason Schnitzler

Page 14

 1    from PJT.  He is also on the phone and available.

 2              THE COURT:  All right.  Great.  And on behalf of

 3    the Official Committee of Unsecured Creditors?

 4              MR. PREIS:  Good morning, Your Honor.  Arik Preis

 5    from Akin Gump Strauss Hauer Feld on behalf of the Official

 6    Committee of Unsecured Creditors.

 7              THE COURT:  All right.  Good morning.  And on

 8    behalf of the Ad Hoc Committee of governmental folks?

 9              MR. ECKSTEIN:  Your Honor, good morning.  It's

10    Kenneth Eckstein of Kramer Levin on behalf of the Ad Hoc

11    Committee of Governmental Claimants.

12              THE COURT:  All right.  Good morning.  And I know

13    there are always a lot of folks who are on the line, and I

14    could spend all day sort of going through those appearances,

15    but I know a lot of those folks don't anticipate speaking.

16    So at this point, I'll throw it open to get other

17    appearances from other folks who would expect to need to

18    speak at today's hearing.  So let me get those appearances.

19              MR. ALBERTO:  Your Honor, Justin Alberto from Cole

20    Schotz, also on behalf of the Official Committee of

21    Unsecured Creditors.  I would be appearing, if at all,

22    during the status conference in the adversary proceeding

23    later on in the agenda.

24              THE COURT:  All right.  Thank you, good morning.

25    Anyone else?

Page 15

1          MR. BREENE:  Your Honor, Paul Breene from Reed

2     Smith, insurance counsel to the Debtor.  And I will also

3     only be speaking with respect to the adversary proceeding

4     status conference.

5          THE COURT:  All right.  So I imagine there are

6     also I'm sure other insurers who are in the same boat.  So

7     let me get those appearances.

8          MR. LEVERIDGE:  Your Honor, before the insurers

9     start, this is Rick Leverage from Gilbert LLP on behalf of

10    the Ad Hoc Committee of Governmental Claimants.  I will be

11    also participating as necessary in the status conference.

12         THE COURT:  All right.  Good morning.

13         MR. SCHWARTZBERG:  Your Honor, Paul Schwartzberg

14    from the U.S. Trustee's Office.

15         THE COURT:  All right.  Good morning.  Anyone

16    else?

17         MR. ELKIN:  Good morning, Your Honor, Jordan Elkin

18    with Kirkland Ellis on behalf Atlantis Consumer Healthcare

19    Inc., the proposed purchaser of the Debtor's Avrio assets.

20         THE COURT:  All right.  Good morning.

21         MR. DAVIS:  Good morning, Your Honor.  Joseph

22    Davis from Willkie & Gallagher on behalf of National Union

23    Fire Insurance Company of Pittsburgh, Pennsylvania.  And I

24    am also here with Mr. Breene and Mr. Leveridge for the

25    discussion of the adversary.

Page 16

1            THE COURT:  All right.  Good morning.  Anyone

2       else?

3            MR. CRAMB:  Good morning, Your Honor, this is Nick

4       Cramb also appearing here for the status conference on

5       behalf of the Liberty Mutual defendants.  I'm with the Mintz

6       firm.

7            THE COURT:  All right.  And I think there's Mr.

8       Schoenfeld.

9            MR. SCHOENFELD: Yes.  David Schoenfeld for

10      Steadfast and American Guarantee Insurance.  If I speak, it

11      will also be on the status conference only.

12           THE COURT:  All right.  Good morning.  Anyone

13      else?

14           MS. PHILLIPS:  Yes, Your Honor.  Sarah Phillips

15      from Simpson Thatcher & Bartlett representing the insurers,

16      Gulf Underwriters Insurance Company, and St. Paul.  I would

17      also be speaking at the adversary status conference.

18           THE COURT:  All right.  Good morning.  Anyone

19      else?  All right.  Thank you for all the appearances.  If

20      for some reason someone is either having technical problems

21      and needs to chime in later to get an appearance, we'll

22      handle that at that time.  And that's fine.  I thank you for

23      everybody's cooperation in making this a smooth start.

24           So with that, I'll turn it over to the Debtors to

25      walk us through the agenda.  We have a number of things on.

Page 17

1    And I will leave it to you as the best way to proceed in

2    terms of order.

3              MR. ROBERTSON:   Thank you, Your Honor.   For the

4    record, Christopher Robertson, Davis Polk & Wardwell, on

5    behalf of the Debtors.

6              The first item on today's agenda is the Debtor's

7    request to approve the sale of substantially all of the

8    assets of the Debtor's consumer health business to Atlantis

9    Consumer Healthcare.   This matter is unopposed.

10             As Your Honor knows, the Debtor selected Atlantis,

11   which is a wholly-owned subsidiary of Arcadia Consumer

12   Healthcare, as a stalking horse purchaser through an

13   extensive, multi-stage process.   That process was described

14   in the declaration of Rafael Jason Schnitzler that was filed

15   at Docket Number 5534.

16             Your Honor, I believe that Mr. Schnitzler's

17   declaration is in the record as it was entered in the

18   context of the bidding procedures order.

19             THE COURT:   I believe that's correct.

20             MR. ROBERTSON:   Thank you, Your Honor.   So

21   ultimately, no parties submitted bids for the Avrio assets

22   after the bidding procedures were approved, which, frankly,

23   again spreads to the strength of the process that the

24   Debtors conducted to identify and negotiate the stalking

25   horse bid in the first instance.

1          The Debtors filed a notice of cancellation of

2    auction and identified Atlantis as the successful bidder on

3    May 16.  That notice is at Docket Number 5603.

4          Your Honor, as I mentioned at the outset, the sale

5    is unopposed.  We filed a revised form of sale order at

6    Docket 5618 that reflects additions to address informal

7    comments from a few parties.  I would not propose to discuss

8    those changes in any detail unless Your Honor has any

9    questions about those.  The Official Committee of Unsecured

10   Creditors also filed a statement yesterday afternoon at

11   Docket Number 5623.

12         Unless Your Honor has any questions for me, I

13   would propose to turn the podium over to Mr. Preis.  I know

14   he wants to speak briefly to that.  And then I believe that

15   Mr. Eckstein on behalf of the Ad Hoc Committee would also

16   like to speak briefly.

17         Before I do, I would just say, again, that the

18   Debtors are very pleased with the outcome of this process

19   and I believe there's broad consensus amongst all parties

20   here that this transaction is in the best interest of the

21   Debtors and their estates.

22         THE COURT:  All right.  Thank you very much.  Mr.

23   Preis, it sounds like a segue to you on behalf of the

24   Committee.

25         MR. PREIS:  Thank you, Your Honor.  Arik Preis

Page 19

```
 1    from Akin Gump Strauss Hauer & Feld on behalf of the

 2    Official Committee of Unsecured Creditors.  I do want to

 3    echo what Mr. Robertson said.  We are very pleased with the

 4    outcome of the sale.

 5            Your Honor, we filed a short statement yesterday

 6    at Docket Number 5623 in an effort to update the Court on

 7    our efforts to build consensus on making a distribution of

 8    the Avrio sale proceeds in advance of consummation of any

 9    plan given the disappointing delay in these cases.

10            As we set forth in our papers, we've spoken to a

11    number of the case parties, but the main ones by far have

12    been the Debtors and the AHC.

13            As we noted in our papers, the Debtors have been

14    supportive of any reasonable resolution so long as it has

15    broad consensus.

16            Unfortunately, the AHC has expressed concerns and

17    we're therefore not at the point yet where the Debtors feel

18    comfortable filing a motion seeking to distribute the sale

19    proceeds.

20            Without getting into a back and forth and saying

21    anything more than what was in our papers, we remain hopeful

22    that the public entities that formed the AHC will come

23    around in their thinking.

24            Alternatively, we hope that other case parties

25    will join us in trying to convince the Debtors to file a
```

Page 20

```
 1    motion notwithstanding the lack of pre-agreement by the AHC.
 2              I would note that many of us that have been part
 3    of the case since the beginning, about three years ago,
 4    often lament the fact that we were unable to push an
 5    emergency relief fund across the finish line in the winter
 6    of 2019 and beginning of 2020.
 7              There are many of us who think to ourselves if we
 8    had at least been successful on that, we would have had
 9    something we could point to as a financial positive in these
10    cases.  To be certain, there have been other positive
11    developments in the case.  I don't want to say otherwise.
12    But as far as actual dollars being used, it is nothing short
13    of cruel irony that the only money that has left the
14    Sacklers or Purdue since filing date is the $225 million
15    that was paid to the federal government.  And as everyone
16    knows, there were no bankruptcy court-imposed restrictions
17    on what that money could be used for despite our attempts at
18    the time to force the DOJ to at least commit to use it for
19    opioid-related purposes.  We therefore will continue in our
20    efforts, and we hope that the other case parties will join
21    us.  We also of course hope that other events, such as a
22    ruling from the Second Circuit, will overtake us.  However,
23    we really don't want to be in a position many months from
24    now -- I don't think anyone does -- with no progress and
25    wishing we had done everything we could to advance this
```

Page 21

1    alternative.  So we'll press on until then.

2            Unless Your Honor has any questions, that's all.

3            THE COURT:  All right.  Thank you very much.

4            Mr. Eckstein?

5            MR. ECKSTEIN:  Good morning, Your Honor.  Thank

6    you.  Kenneth Eckstein of Kramer Levin on behalf of the Ad

7    Hoc Committee of Government Claimants.  I just would like to

8    make just a few brief comments.

9            First and foremost, the AHC shares the UCC's

10   frustration with a delay in implementing a settlement of

11   this uniquely-challenging case and in making distributions

12   to abate the opioid crisis and to compensate victims.  I

13   think, as all parties know, the AHC and its members have

14   been working for years with multiple parties to put in place

15   a comprehensive settlement that will have the broadest-

16   possible support.  That was actually achieved through the

17   plan that was ultimately approved by Judge Drain.

18           The focus of today's hearing is simply the request

19   to approve the sale of the Avrio business.  Today's motion

20   does not implicate a distribution of Avrio proceeds or of

21   any other debtor assets.  And that's something that will be

22   left for another day.  The AHC believes that it is a

23   favorable time to sell the Avrio business to a third party

24   and supports the relief being sought today.

25           As the Court knows, all parties have been waiting

1    for over a year for a decision from the second circuit on

2    the appeal, and we remain hopeful that we will promptly

3    receive a decision and ideally gain affirmance of the

4    confirmation order.

5            The UCC is correct that the AHC has reservations

6    about making an interim distribution of all the appeals

7    pending.  The AHC does not want to see any steps taken that

8    could potentially impact or in any way destabilize an appeal

9    that has been pending before the Second Circuit for over a

10   year.  The AHC is sensitive about not doing anything to

11   interfere or destabilize the order entered by Judge McMahon

12   to stay any actions to implement the plan of reorganization

13   that was confirmed.  And the AHC is sensitive about the fact

14   that there are other constituencies, including parties that

15   hold administrative claims.  And in particular, the DOJ that

16   holds a $2 billion administrative claim that was handled in

17   a favorable manner through the plan of reorganization.

18           We believe that all of these matters can be

19   navigated successfully, but we believe we have to await a

20   decision from the Second Circuit.  And once we have that

21   decision, we believe the parties will be in the best

22   position to hopefully have this case emerge swiftly from

23   Chapter 11 and to begin the flow of funds to claimants and

24   other constituencies that have been waiting for years.

25           At this point, Your Honor, we support the relief

Page 23

1   being sought by the Debtor and we of course will continue to

2   dialogue with all of the parties about the steps necessary

3   to successfully implement the case.  Thank you.

4           THE COURT:  All right.  Thank you very much.  Let

5   me hear from the purchaser, if the purchaser has anything to

6   add as to the sale motion.

7           MR. VONNEGUT:  Your Honor, if I may be heard

8   briefly.  Eli Vonnegut of Davis Polk on behalf of the

9   Debtors.

10          THE COURT:  Sure.  I was going to circle back to

11  you after I heard from everybody else.  But I'm happy to

12  hear from you now.

13          MR. VONNEGUT:  Thank you, Your Honor.  I just want

14  to briefly respond to Mr. Preis and Mr. Eckstein's comments.

15  Your Honor, the Debtors share the frustration of all parties

16  in this case with the delay of emergency.  The Debtors

17  commenced these proceedings for the purpose of putting the

18  estate assets to good use combatting the opioid crisis and

19  helping those that have bene harmed by opioids.  And it is

20  very difficult that we continue to be unable to do so based

21  on the current status of the appeal related to plan

22  confirmation.

23          We therefore have been engaged in dialogue with

24  the Committee, with the Ad Hoc Committee, attempting to work

25  through whether there is a good way to take some portion of

Page 24

1    the estate's assets and put them to work while we wait for a

2    decision on that appeal.  And we remain openminded.  So if

3    that is to be pursued, I think we share the concern of

4    others that broad consensus will be necessary supporting any

5    step like that.  We share the concerns of the Ad Hoc

6    Committee that there are a number of legal needs that would

7    need to be threaded, ensuring that we don't create any

8    complication for the pending appeal or otherwise destabilize

9    the cases at this juncture.  But as I say, it is a noble

10   goal that the Debtors are open to pursuing, and so we look

11   forward to hopefully ongoing constructive dialogue with our

12   constituents to explore whether there is a path forward that

13   can garner the broad support that we believe it would need.

14           That's all I have to say on that score, Your

15   Honor.

16           THE COURT:  All right.  Thank you very much.

17           MR. VONNEGUT:  Thank you.

18           THE COURT:  Anything from the proposed purchaser?

19           MR. ELKIN:  Your Honor, again, for the record,

20   Jordan Elkin with Kirkland and Ellis on behalf of the

21   proposed purchaser.

22           Your Honor, nothing much to add.  We echo the

23   Debtor's sentiment.  We appreciate their collaboration with

24   us during this process as well as the various committees and

25   other stakeholders who reviewed the various sale documents

Page 25

1    and got us to this point where we're proceeding on a fully-

2    consensual basis.  So happy to answer any questions to the

3    extent Your Honor has any, but otherwise, nothing to add.

4              THE COURT:  All right.  Thank you very much.  Any

5    other party that wishes to be heard on the sale motion?

6              All right.  Hearing no other responses, based on

7    the record before the Court, I'm happy to approve the sale

8    motion.  I find the Debtors have demonstrated a good,

9    sufficient, sound business purpose and justification for

10   entering into this agreement and providing for the sale of

11   the assets to the purchaser.  I find that the Debtors have

12   adequately marketed the assets and conducted the sale

13   process in compliance to the bidding procedures in the

14   bidding procedures order and that approval of the agreement,

15   the sale, and overlay of the transactions are appropriate

16   under the circumstances of these cases and in the best

17   interest of the Debtors or estates of the creditors.  The

18   Court further finds that the purchaser is a good faith

19   purchaser and is entitled to the protections of 363(m).  And

20   I find that the bidding procedures here -- I have already

21   found that they're reasonable and appropriate and have

22   resulted in the highest and best offer and a way to maximize

23   value.

24             And it's probably just worth noting given the

25   circumstances of these cases and it's in the proposed order

Page 26

1    that the purchaser is not a successor or mere continuation

2    or alter ego of the Debtors or the estates.  And for the

3    avoidance of doubt, that that term successor or other

4    liabilities that's included in the sale order, that that

5    also covers the fact that they are not a successor when it

6    comes to any liens, claims, encumbrances, or any interest of

7    any kind relating to the Debtor's opioid-related activities,

8    opioid products, or pending opioid actions.

9            And I guess last but not least, I find that the

10   conditions of Section 363(f) in the Bankruptcy Code have

11   been satisfied and therefore, the Debtors may sell the

12   assets free and clear of interests other than those that are

13   set forth in the deal itself.  That is the post-closing

14   encumbrances and assume liabilities.

15           And so obviously there will be more bells and

16   whistles set forth in the proposed order, that they are set

17   forth in a proposed order that's been submitted and was set

18   forth in the notice of filing the proposed sale order at

19   Docket 5618.  I just wanted to highlight for purposes of

20   making the record.

21           So with that, the sale is approved and we can move

22   on to the next matter on the agenda.

23           MR. ROBERTSON:  Thank you, Your Honor.  I'd just

24   turn the podium over to my colleague, Jim McClammy, to

25   address the KEIP/KERP.

Page 27

1            THE COURT:  All right.  Thank you.  You're on

2     mute, Counsel.  And don't worry, it wouldn't be a remote

3     hearing if somebody didn't get to say that at some point.

4     That's the world in which we live.  And for those who have

5     suffered this problem, I always tell people that they missed

6     -- when I went on mute and started talking, that there was a

7     lot of eloquence there, but that's just -- you know, nobody

8     will never get to hear.  So that's, you know, artistic

9     license for anything that you say that you think was

10    particularly eloquent that was not captured at the hearing.

11           Oh, you're still on mute.  So one other thing you

12    can do, Counsel, is the safe haven for all technical

13    problems in our COVID-related world is to just pick up a

14    phone and dial separately on the phone.  The most important

15    thing is that we can hear you.  I am nothing particularly to

16    look at, so the video is nice, but not necessary.  So I'll

17    give it another minute.  And if not, we can go that route.

18           MR. MCCLAMMY:  Are we off of mute now, Your Honor?

19           THE COURT:  Yes, you are good to go.

20           MR. MCCLAMMY:  Excellent.  Good morning, Your

21    Honor.  For the record, Jim McClammy of Davis Polk &

22    Wardwell on behalf of the Debtors.  And I will be handling

23    matters two and three on the agenda this morning, the motion

24    to seal and the motion for the approval of the KEIP and the

25    KERP.

1          Your Honor, we are pleased to report that no party

2     objects to any of the relief that is up before Your Honor

3     for consideration this morning.  I will note that the U.S.

4     Trustee did file a statement in response to the Debtor's

5     motion that can be found at Docket 5600, noting objections

6     raised by the office in prior years.  But in their words,

7     being cognizant of the Court's prior rulings, not repeating

8     those objections in connection with respect to the pending

9     motion, but reserving their rights.

10          I will also note that, as is our customary

11     practice, the Debtors have consulted with their various

12     constituencies in advance of filing these motions, including

13     the Official Committee of Unsecured Creditors, the Ad Hoc

14     Committee of Governmental and Other Contingent Litigation

15     Claimants, and the Multi-State Governmental Entities Group.

16     And again, Your Honor, there have been no objections.

17          So before proceeding to the substance of the KEIP

18     and the KERP, I would like to just handle a few of the

19     housekeeping items.  As noted at Docket Number -- or at

20     Agenda Item 2, we have filed a motion to seal at Docket

21     5578.  It's really with respect to just a very limited

22     portion of this year's performance metrics which were

23     adopted in consultation with the UCC, the AHC, and the MSGE.

24     No party has objected to the relief that's sought in the

25     sealing motion.  But of course if Your Honor has any

1    questions, we're happy to address those.  Otherwise, I would

2    ask that Your Honor approve of the sealing -- of the

3    portions of the motion and Mr. DelConte's declaration.

4         THE COURT:  All right.  Anybody wish to be heard

5    on the sealing motion?  All right.  Hearing no response, I

6    do note that the sealing no motion does address, as you say,

7    a very discrete and limited portion of the submission and I

8    find that the requested relief here is appropriate, the

9    redacted metrics and the compensation motion or commercial

10   information that if disclosed publicly could be damaging

11   because it could provide competitors with information that

12   could be used against or negatively impact the Debtor's

13   business.  And so I find it satisfies the commercial and

14   confidential requirements for Section 107(b)(1).  And again,

15   I think it's been limited appropriately here.  So for all

16   those reasons, the motion to seal is granted.

17        MR. MCCLAMMY:  Thank you very much, Your Honor.

18   And then before turning to the substance of the KEIP and the

19   KERP motion, I did want to note that we have filed two

20   declarations in support of the motion.  They are found at

21   Exhibit B and C of the motion, which is Docket 5579.

22        The first declaration is from Mr. Jesse DelConte.

23   And again, that is Exhibit B, Pages 58 to 81 of 107 of the

24   motion.  Mr. DelConte is a managing partner or a managing

25   director at AlixPartners and he has acted as a principal

Page 30

1     advisor to the Debtor since March of 2019.

2              In his declaration, Mr. DelConte provides an

3     overview of the 2023 key employee incentive plan, or KEIP,

4     including the structure and the metrics, and the 2023 key

5     employee retention plan, or KERP, including the structure

6     and the importance of the 2023 KERP to the Debtors.

7              Mr. DelConte is present online and available if

8     the Court should have any questions.  My understanding is

9     that there are no parties that wish to ask any questions of

10    Mr. DelConte.  So at this time, I would ask that Mr.

11    DelConte's declaration be accepted into evidence as his

12    direct testimony in support of this motion.

13             THE COURT:  All right.  And why don't you move the

14    other declaration as well and then I'll canvass the virtual

15    room as to any comments from any parties as to both.

16             MR. MCCLAMMY:  Thank you, Your Honor.  Similarly,

17    the Debtors have also filed the declaration of Ms. Josephine

18    Gartrell.  And her declaration can be found as Exhibit C.

19    And that is Pages 82 through 107 of the motion.  And as set

20    out in Ms. Gartrell's declaration, she is a senior director

21    at Willis Towers Watson and has been working on these

22    matters for a number of years and has advised the Debtors in

23    connection with the structure and the evaluation of their

24    KEIP and KERP programs during the course of these -- during

25    the course of these Chapter 11 proceedings.

Page 31

1           Again, Ms. Gartrell is also present and available

2   for questions.  And my understanding is that there were no

3   questions from other parties for Ms. Gartrell at this time,

4   so we would also ask that Ms. Gartrell's declaration be

5   accepted into evidence.

6           THE COURT:  All right.  Thank you very much.  Any

7   party wish to be heard in connection with the request to

8   submit these two declarations?

9           All right.  Hearing no response on the record and

10  seeing no response on the docket, the Court concludes there

11  is no opposition to these declarations, and I'm happy to

12  receive both of them as evidence in support of the KEIP/KERP

13  motion that's at Docket 5579.

14          MR. MCCLAMMY:  Thank you, Your Honor.  With that,

15  I would propose to provide a brief overview of the requested

16  relief here, understanding that is Your Honor's first

17  opportunity to evaluate the KEIP and KERP program that has

18  been presented in similar form on a number of occasions in

19  advance and approved by this Court on those occasions.

20          But as noted in advance of filing the motion, the

21  Debtors have worked diligently to build broad support for

22  their compensation programs.  And as a result, the

23  compensation program sought in the motion already reflect a

24  heavily-negotiated structure to the programs as well as

25  agreed-upon reductions in the amount of the payments

Page 32

1   relative to the proposed compensation programs that were in

2   place at the beginning of the creditor consultation process.

3           With respect to the 2023 compensation plans, they

4   were designed to parallel last year's programs, which of

5   course in turn mirror the 2020 programs and the company's

6   prepetition practices.  The 2022 -- the 2023 KEIP includes

7   the same two elements as its predecessor programs, which is

8   an annual award and a long-term grant.  And consistent with

9   the Debtor's prior programs, all payments under the KEIP

10  will be subject to the Debtor's achievement of rigorous,

11  demanding performance metrics at threshold levels.

12          This year's performance metrics were set out and

13  set using the same process that this Court has consistently

14  found as an appropriate incentivizing corporate targets at

15  the company.

16          As set forth in Mr. DelConte's testimony, the 2023

17  performance metrics are indeed ambitious and difficult to

18  achieve both individually and when considered in the

19  aggregate.  That can be found at Paragraph 20 of Mr.

20  DelConte's declaration.

21          Mr. DelConte also notes that the successful

22  performance of this year's scorecard will again require the

23  2023 KEIP participants' diligent and committed efforts.  And

24  the 2023 metrics present a meaningful risk of not being met

25  at the threshold level of required payment.  Again, at

1   Paragraph 20 of Mr. DelConte's declaration.

2            As noted previously, the proposed compensation

3   programs already include a number of substantial reductions

4   in the compensation relative to prepetition practice and

5   prior to consultation with the creditor constituencies

6   carrying forward the substantial concessions that the

7   debtors first agreed to back in 2020 and have honored since

8   then.  As a result, the compensation programs for the KEIP

9   participants in 2023 are approximately $3.2 million lower in

10  the aggregate than they would have been under the Debtor's

11  historical prepetition practice.  Those reductions consist

12  with respect to the CEO of an aggregate reduction of

13  approximately $1.9 million.  With respect to the general

14  counsel, an aggregate reduction of approximately $1 million,

15  and with respect to the chief financial officer, an

16  aggregate reduction of approximately $0.3 million.  Those

17  numbers that I mentioned also include a $352,000 reduction

18  to the long-term award for the CEO relative to the proposed

19  compensation programs that were initially designed by the

20  company early this year that was subsequently agreed to in

21  negotiations with the key creditor constituencies that I

22  have mentioned.  In part it's as a result of those changes

23  that no party has objected to the proposed KEIP or KERP this

24  year.

25            With respect to the KERP, Your Honor, the

Page 34

1    company's broad base retention program for non-insider

2    employees includes the same three elements as last year's

3    KERP and in similar dollar amounts.  The 2023 KERP annual

4    award has an aggregate payment of approximately $15.1

5    million.  That is lower than the aggregate of approximately

6    $15.6 million that was approved in 2022.

7            With respect to the 2023 KERP long term award, the

8    aggregate payments there are approximately $5.7 million.

9    And again, that amount is very similar to the approximately

10   $5.7 million approved in 2022.

11           The 2023 KERP program also has a targeted

12   retention award with aggregate payments of approximately

13   $7.8 million.  And that amount, again, is very similar to

14   the approximately $7.2 million amount that the Court had

15   authorized just last year.

16           I will note, Your Honor, as set out in our motion,

17   the 2023 compensation plans together are very much necessary

18   to provide the Debtor's employees with appropriate market-

19   based compensation.  It's important that they remain within

20   a competitive range.  And here, the compensation is either

21   in that competitive range, or in many cases below the median

22   of the peers in the pharmaceutical industry.  Providing this

23   certainty to the Debtor's employees in a timely fashion,

24   they will indeed receive market-based compensation through

25   their customary annual compensation grants remains, as it

Page 35

```
 1   has in prior years, essential to moving these cases forward

 2   to the best possible outcome.

 3             With that, Your Honor, I am happy to address any

 4   questions you may have.  Otherwise, for the reasons set

 5   forth in the motion and the accompanying declarations, I

 6   would ask that Your Honor please approve this year's KEIP

 7   and KERP programs.  Thank you.

 8             THE COURT:  All right.  Thank you very much.  I

 9   just had a couple of things that would be helpful to just

10   touch on.  I think for the KEIP, there was a mention that

11   the general counsel, who is also I guess the vice president

12   and the secretary, is above market.  And I know that was

13   discussed in prior hearings as that was also the case, and

14   there was a justification that was provided and that Judge

15   Drain agreed with that talked about the sort of unique role

16   the general counsel is playing here in these challenging

17   cases.  And I just wanted -- is that -- I'm assuming that

18   that's still the case here, that it's in the same factual

19   posture as was before Judge Drain, but I just wanted to make

20   sure there wasn't anything else worth commenting on as to

21   the general counsel for purposes of the KEIP.

22             MR. MCCLAMMY:  Yes, Your Honor.  That definitely

23   remains the case today, as it was.  At the beginning and

24   kind of throughout these cases, it's been the Debtor's

25   business judgement that they really do require a general
```

Page 36

1    counsel with significantly greater experience and expertise

2    than might be typical for this type of a pharmaceutical

3    company.  The sheer complexity of these cases, the vast

4    creditor constituencies, and the various -- you know, very

5    different strategic matters that are required to marshal

6    this case through to its best possible end requires someone

7    that has qualifications that our current general counsel

8    has, which means that our current general counsel is

9    definitely one of the few that are highly sought after and

10   could obtain and has received offers for more.  And we

11   believe it's important that his compensation reflect that in

12   order that he be properly incented and properly compensated

13   here.

14           THE COURT:  All right.  And I assume that's even

15   putting aside the notion that, as the old presidential

16   campaign slogan that you don't want to change horses

17   midstream.  You have somebody who has a background in the

18   extensive issues that have been part of this case and is a

19   good person to continue to be involved in these cases in

20   that capacity.  All right.

21           And again, so a number of my questions are in the

22   same vein, which is that this is what I understand the

23   circumstances have been in prior hearings, and I just wanted

24   to make sure the record is crystal clear.

25           So in terms of distinguishing between insiders and

Page 37

 1   non-insiders, Judge Drain had a number of comments about

 2   that in the past.  And my understanding based on the motion

 3   is the same criteria that he found to be appropriate in

 4   making that determination that was unchallenged I think in

 5   hearings that -- prior hearings is the same criteria that's

 6   being used in this motion.  And in fact if the people are

 7   still here, that they are actually in the same bucket of

 8   insiders, non-insiders as they were before, although I

 9   recognize the group of folks who are subject to this motion

10   are not identical as prior motions because some people have

11   come and gone.

12            MR. MCCLAMMY:  That's absolutely correct, Your

13   Honor.  We've undertaken the same process that we have in

14   the past to confirm the status that people should have as

15   either insiders or as non-insiders.  And that's set forth in

16   Mr. DelConte's declaration at Paragraph 41 and Footnote 28

17   thereto.  But in general, the company is looking at whether

18   or not an officer is appointed by the board holds the title

19   of chief executive officer, chief financial officer, chief

20   operating officer, general counsel, or senior vice

21   president, reports to the board, has authority to make

22   companywide or strategic decisions, including critical

23   financial decisions, or is in a position to determine his or

24   her own compensation.  And I will note that there's no one

25   even within the insider group that's in that fifth category.

Page 38

1    But we've used those categories to delineate between

2    insiders and non-insiders.

3              THE COURT:  All right.  Thank you very much.  And

4    I assume in seeking the relief that you are today that you

5    are relying upon the entire record of the many hearings that

6    occur on these various motions over time.  And so I know

7    there was a hearing December 4th, 2019; September 20th of

8    2020; October 28th, 2020; July 29th, 2021; September 13th,

9    2021; May 189th, 2022. And I risk leaving one out in listing

10   them.  But just to give -- I just want to be clear on the

11   record the amount of extensive conversations, consultations,

12   as well as the sort of evolving nature of the program over

13   time and that, for example, there were three significant

14   changes discussed at the hearing on September 30th of 2020.

15   And so I'm assuming you're relying on the entire record that

16   has been developed thus far in those hearings to -- as the

17   bedrock for your motion today.

18             MR. MCCLAMMY:  Yes, Your Honor.  That's absolutely

19   correct.

20             THE COURT:  All right.  And just to tease out more

21   of those things, the three changes discussed at the hearing

22   in September of 2020 talked about a 40 percent reduction in

23   the actual payables.  That was one change.  Another change

24   was the changing of timing of payments and the clawbacks.

25   And a third had to do with the acceleration of the payments

Page 39

1    rather than have them paid in emergence.  And I just want to

2    understand the status of those three vis-á-vis the current

3    motion.  My understanding is the economics play forward.

4    That is the reductions that occurred over time continue

5    essentially as a general matter and that the other changes

6    do as well.  But I just wanted to confirm that for the

7    record.

8            MR. MCCLAMMY:  Yes, Your Honor.  That is correct.

9    Those changes that were negotiated them form the foundation

10   of what we were presenting to the Court for approval now and

11   have carried through.

12           THE COURT:  All right.  Thank you very much.  All

13   right.  Those are just the comments.  As you see, nothing

14   particularly extravagant or strange.  I just wanted to make

15   sure given the history here that I had my ducks in a row in

16   terms of understanding the state of play and the many

17   hearings that came before me.  I read a number of the

18   transcripts, and so I just wanted to make sure I had all

19   that together.

20           So with that, I don't have any further comments or

21   questions.  And so I thought I would circle the virtual

22   room, perhaps starting with the U.S. Trustee's Office, which

23   did file a response to the motion at Docket 5600.  So, Mr.

24   Schwartzberg?

25           MR. SCHWARTZBERG:  Good morning, Your Honor.

Page 40

1    Other than merely point out our response and the concerns

2    set forth in it, Your Honor, I don't have anything else to

3    add today.

4           THE COURT:  All right.  Thank you very much.  Is

5    there any other party that wishes to be heard in connection

6    with the motion that's on today for KEIP and KERP?  All

7    right.  Hearing nothing.

8           I'm happy to approve the motion, which is based on

9    the entire evidentiary record at this hearing, but also the

10   extensive history, the law of the case as to the prior

11   programs.  And since it is my first foray into it and just

12   given the importance of it, I'll just have some brief

13   comments.

14          So -- and for those of you who have sat through

15   the other KEIP/KERP motions, my comments will be -- I think

16   echo a lot of things you've already heard.

17          So in assessing the motion here, the Court has to

18   first determine whether the employees to be paid are

19   insiders are not.  And that's because of the way Section 503

20   works.  Because in 503(c)(1), Congress precluded the

21   application or approval of a key employee retention plan for

22   insiders.  And so the prior motion and hearing set forth how

23   the debtors determine whether the participants for the KERP

24   were insiders or not under Section 101 subsection 31 of the

25   Bankruptcy Code, applying well-established caselaw.  And

Page 41

1    Judge Drain cited, among other things, the applicable cases

2    of In re Borders Group Inc., 453 B.R. 459, (Bankr. S.D.N.Y.

3    2011) and In re Charles P. Young Company, 145 B.R. 131

4    (Bankr. S.D.N.Y. 1996) and other cases.

5           And so applying the standard that the Debtors have

6    used and that caselaw, the Court finds that none of the

7    participants of the KERP program are insiders.  And

8    therefore, the payments to these individuals under the KERP

9    program have to satisfy the operative test, which is set

10   forth in cases such as In re Residential Capital LLC, 491

11   B.R. 73 (Bankr. S.D.N.Y. 2013).  And that test says that

12   there will be allowed or paid other (indiscernible) or

13   obligations that are outside the ordinary course of business

14   that aren't justified by the facts and circumstances of the

15   case.  And here, I find that these are justified by the

16   facts and circumstances of the case because in Section

17   503(c)(3), Congress clearly preserved the ability to pay

18   more -- to pay to retain key employees who are not insiders.

19          And so given -- for all the reasons that have been

20   discussed at prior hearings and that are clearly set forth

21   in the papers here, I find that the retention program here

22   is appropriate.

23          And I do note in ruling on the KERP here, I note

24   that the U.S. Trustee's Office had previously objected to

25   the plan on two grounds.  And I just want to quickly revisit

Page 42

1    it just to demonstrate that I've thought about these things

2    and I'm not rubberstamping anything.

3            And one was that the employees should have their

4    market-based comprehensive pay reduced substantially because

5    the Debtors hadn't confirmed a plan yet or hadn't made the

6    emergency fund distribution.  And as Judge Drain noted,

7    these employees don't have control over those events.  And

8    he noted that Judge Drain hadn't seen, nor have I, a case

9    where that type of analysis was the relevant metric and

10   somehow would preclude folks from getting these kinds of

11   compensation because these employees are not responsible for

12   negotiating any emergency relief fund that was discussed in

13   prior hearings.  And actually it was mentioned by Mr. Preis

14   earlier.  And they aren't responsible for negotiating a

15   Chapter 11 plan.  And so those same principles apply here

16   today.  We're in a different procedural posture.  The case

17   has moved along in some ways and is in stasis in others.

18   But these employees are not responsible for that particular

19   set of facts.

20           So second, the U.S. Trustee's office had contended

21   that the costs of one of the portions of the KERP as a

22   percentage of the Debtor's revenue was somehow problematic.

23   And that was one of the factors argued in the Dana II

24   analysis by Judge Lifland.  But as Judge Drain noted, and I

25   agree, it's only one of the factors.  And moreover, it's

1    just a cost factor related to the Debtor's revenue as

2    opposed to the assets, liabilities, and other factors listed

3    by Judge Lifland in Dana II.  And Judge Drain found it more

4    relevant as to how the overall proposed compensation relates

5    to the market in the Debtor's industry.  And although

6    slightly less meaningful, how it relates to comparable

7    companies in Chapter 11.

8            And so given analysis of those factors, it's quite

9    easy to see why the KERP here is an appropriate exercise of

10   business judgement.

11           And in reaching a decision on the KERP, Judge

12   Drain also noted that the key parties in interest here have

13   acted responsibly throughout the case and in good faith to

14   maximize value so that value can be distributed to their

15   constituents to abate the opioid crisis.  And I certainly

16   have the same conclusion.

17           So moving along to the KEIP aspect.  The law in

18   the area is fairly straightforward.  Section 503(c)(1),

19   again, Congress effectively barred transfers of obligations

20   incurred for the benefit of insider for the purposes of

21   retaining those folks.  And courts have long recognized that

22   all compensation to some extent causes a first interim

23   (indiscernible) in their employment.  But Section 503(c)(3)

24   also recognizes that other transfers or obligations that are

25   outside the ordinary course of business won't be approved

Page 44

1    unless they're justified by the facts and circumstances of

2    the case.  And where we get to the factors.  A couple of

3    things.

4             One is the justified by the facts and

5    circumstances of the case language.  And the statute sets

6    forth a standard that's essentially the same as the standard

7    under Section 363(b) of the Bankruptcy Code of business

8    judgement.  See In re Velo Holdings Inc., 475 B.R. 201, 212,

9    (Bankr. S.D.N.Y. 2012), and of course In re Dana

10   Corporation, 358 B.R. 567, 576-577 (Bankr. S.D.N.Y. 2006).

11   And in the Dana case that we've already referenced a few

12   times, Judge Lifland observed there were a number of factors

13   that the Court should consider in evaluating the business

14   judgement of making such a determination.  These include is

15   there a reasonable relationship between the plan proposed

16   and the results to be obtained by either the plan calculated

17   to achieve the desired performance.  Because here we're not

18   talking about retention, but we're talking about incentive.

19            The other factors are (indiscernible) the plan

20   reasonable in the context of the Debtor's assets,

21   liabilities, and earning potential, is the scope of the plan

22   reasonable, who does it apply to, and does it unfairly

23   discriminate, is it consistent with industry standards, what

24   are the due diligence efforts of the Debtors investigating

25   the need for a plan, and did the Debtors receive independent

Page 45

1    counsel in performing that due diligence.  Cases often focus

2    on the incentive element of the plan, where the incentives

3    are in fact truly difficult to achieve or are a lay-up, to

4    use the basketball terminology.  And the idea is whether

5    they incentivize employees to work more than beyond the

6    normal job that they would be expected to do.

7              And it's important to note, as Judge Drain did

8    earlier in his analysis, that often in non-bankrupt

9    companies, a significant portion of an executive's

10   compensation comes in the form of stock, which has both

11   risks and rewards.  But in bankruptcy cases, the calculation

12   is different because stock itself is often not appreciating

13   at all or may in fact be worthless.  And so compensation is

14   adjusted in the form of cash.

15             So here I do note that -- and it's probably

16   worthwhile to note that the U.S. Trustee filed its response

17   to the motion, and that response states that, as the Debtors

18   themselves acknowledge, the plans set forth in the 2023

19   compensation motion are essentially identical to the plans

20   contained in the previous motions by the Debtors.  This is

21   true for the KEIP and the KERP.

22             United States Trustee objected to those motions,

23   but was overruled by the Court, and that the United States

24   Trustee have the same concerns with respect to the plan set

25   forth in the 2023 compensation motion that were set forth in

Page 46

1    objections to the 2019 benefit motion, the 2020 compensation

2    motion, the 2021 compensation motion, and statement to the

3    2022 compensation motion.  And they cite ECF 134 or 1708,

4    3137 and 4742.  Being cognizant of the Court's prior

5    rulings, the United States Trustee has chosen not to repeat

6    those objections here.  But it does reserve all rights with

7    respect to the instant motion.

8            So in light of it reserving its rights, I do need

9    to note a couple of things.  One is that the U.S. Trustee

10   doesn't have any objection to the declarations submitted by

11   the Debtors in support of these motions, nor did it have any

12   request to cross-examine any of those individuals. So the

13   facts that those declarations contain support of the motion

14   are undisputed.

15           And also, I would note that while the U.S.

16   Trustee's Office references prior objections going back to

17   2019, as I've already noted, there were some significant

18   changes that have happened along the way as these evolved,

19   including those three significant changes that were

20   discussed in 2020.  One included essentially a 40 percent

21   cut in the amount of money going out the door.  And so I

22   think those are significant.  And so I just want to make it

23   clear that the factual circumstances for these motions have

24   evolved and that it has not remained static.

25           So turning back to this particular motion, the

Page 47

1    KEIP motion, the Court finds that the Bankruptcy Code is

2    satisfied with regard to payments proposed to these

3    executives here.  The proposed compensation motion is

4    reasonable when considering all the factors in the Dana II

5    and other applicable caselaw, and for the reasons set forth

6    in Judge Drain's prior rulings.  Again, there were a lot of

7    changes over time, including the three notable ones in 2020.

8    And with the exception of one executive who is the general

9    counsel who we discussed earlier, the proposed compensation

10   is really at or below market rate.

11         And as to the general counsel, that person -- I

12   think the record is fairly clear was brought in fairly late

13   in the day to help the Debtors manage the enormous amount of

14   litigation that was pending against the per-bankruptcy as

15   well as the tremendous litigation that has occurred between

16   the bankruptcy case.  And Judge Drain found that the general

17   counsel in terms of what that person is doing is really not

18   comparable to other general counsel in the industry because

19   that job requires, has required, and continues to require

20   more expertise and more work.  And the lack of anybody

21   singling out the general counsel situation here I think is a

22   recognition by the stakeholders as to the unique

23   circumstances for the general counsel.

24         So based on the facts and circumstances that I

25   have before me, I agree.  And I don't have any problems with

Page 48

1   the proposed compensation to the general counsel under the

2   KEIP program, either.

3          So I find that the KEIP program, like the KERP

4   program, satisfies all requirements of applicable law, and I

5   think it's appropriate again to look at what's in the

6   industry.  And I also do stress Judge Drain's comments in an

7   earlier hearing that it's important not to talk about these

8   things as bonuses so much as to talk about them as

9   compensation, because that's how folks are compensated in

10  the industry.  So the term bonus is a bit of a misnomer.

11         And so with that, I also will note, as is noted in

12  the papers, that there is caselaw talking about prior plans

13  being used as satisfying the independent test of time.  And

14  I think we're in 2023 program at this point, and so this has

15  been an issue that has been brought before the Court on

16  numerous instances, and I think it has satisfied the

17  independent test of time.

18         So for all those reasons, I'm happy to approve it.

19  I appreciate the record that's been made by the parties here

20  and the effort to get me up to speed so that I had a comfort

21  level in addressing these things here.  And I also

22  appreciate the record that was developed throughout the

23  course of these cases that's very clear and meticulous that

24  allows somebody like myself who is stepping at this point in

25  the case to make an independent and intelligent decision on

Page 49

1      these issues.

2              So with that, I will turn it back to Debtors for

3      anything else we need to address before we turn to the

4      status conference in the adversary proceeding.

5              MR. MCCLAMMY:  Thank you, Your Honor.  And thank

6      you very much for your consideration of what is a hugely

7      important motion both for these cases and the employees at

8      the Debtors.

9              I did want to just clarify one thing for the

10     record with respect to the three changes that had been

11     discussed and that had been negotiated in 2020.  With

12     respect to one of those changes, that is not carried

13     forward.  And that is only with respect to the acceleration

14     of payments upon emergence that had originally been

15     negotiated with the creditor's constituency.  But later

16     negotiations have resulted in a change to that.  That was

17     not a change that's new for this year.  That had also been a

18     change that was noted in 2022.

19             THE COURT:  All right.  Thank you very much.  And

20     just to be crystal clear on the record, just can you make a

21     statement as to the exact timing of those payments and what

22     essentially is the status quo in 2022 that's carrying

23     forward here?

24             MR. MCCLAMMY:  So yes, exactly.  So those payments

25     will match the timing that's set out in the motion without

Page 50

1    the acceleration provision.

2           THE COURT:  All right.  Thank you very much.  All

3    right.  Anything else, Counsel, before we turn to the status

4    conference?

5           MR. MCCLAMMY:  No, Your Honor.  I think with that,

6    we'll turn it over to Mr. Breene from Reed Smith, who will

7    handle the adversary proceeding on behalf of the Debtors.

8    As in the past, I would just note that for the benefit of

9    the -- and protecting and conserving the estate's resources,

10   that to the extent that there are folks on that are not part

11   of the adversary proceeding status conference, if they could

12   please be allowed to excuse themselves or otherwise turn off

13   the clock.

14          THE COURT:  All right.  That's wise, counsel.  And

15   I'm sure Mr. Huebner somewhere can sense a disturbance in

16   the force as you said that.  Because I know that is one of

17   his calling card statements.  So I thank you very much.

18          MR. HUEBNER:  I had already come off mute, Your

19   Honor, in case it wasn't stated.  But Mr. McClammy beat me

20   (indiscernible).  So I appreciate the reference.

21          THE COURT:  All right, great.  All right.  So I

22   did read the letters dealing with the status conference, and

23   I can share a couple of preliminary thoughts and then I'll

24   hear from everybody.

25          So obviously this kind of request, it is not hard

Page 51

1     to understand why it was made.  Right?  The future is

2     something that we're all waiting for decisions.  And

3     certainly there has been talk about whether the Second

4     Circuit's decision will be the final word on things.  We

5     just don't know.  And obviously it's important in all cases

6     to be judicious in spending time and money on things when it

7     makes sense and when it doesn't without anybody giving up

8     any rights.  But bankruptcy courts are well-versed, as are

9     other federal courts, in the ability to pump the brakes and

10    to put things in stasis so that everybody reserves their

11    rights but that you prevent unnecessary cash burn in

12    bankruptcy, which is already a very expensive process.

13          And so the Second Circuit will determine what it

14    thinks the appropriate answer is to the questions that have

15    been posed to it.  As you know, there's very -- there's

16    already extensive decisions by Judge Drain and by Judge

17    McMahon, and it is unknowable what the Second Circuit will

18    do and how it will specifically impact this case.

19          So given that uncertainty, I tend to be

20    sympathetic to a request like this because it's hard to see

21    too much downside, but it's fairly easy to see the potential

22    upside.  And I tend to try to mitigate any downside by

23    having a status conference scheduled so that folks can come

24    in and talk about it.  Nobody is being asked to buy a pig

25    and a poke.  That is to say, well, I'm going to be locked

Page 52

1    into some extended stay without any recourse forever.

2    That's not the intent.  We would all make sure to have a

3    status conference.  But that kind of status conference is

4    not the cash burn, right?  The cash burn is the discovery

5    and the things that happen outside court.  So that's one

6    observation.  That's just my general impression looking at

7    the issue based on the letters that have been submitted.

8         The second observation I can share is obviously if

9    some parties agree to something and think it's a good idea

10   and other parties don't agree, there is a question of, well,

11   how do you figure that out.  The most obvious answer is that

12   somebody files a motion.  But one of the things we're trying

13   to avoid is cash burn.  So that's somewhat paradoxical that

14   that's what that would require.  And that's why I think

15   people submitted a letter to tee up this issue so we could

16   have a conversation.

17        And so being in your shoes, my thought is that you

18   send a letter because you say, oh, we want to get the

19   temperature of the judge as to how the judge generally

20   thinks about these things before we spend any money making

21   that kind of a motion.  But at the same time, it can be a

22   little procedurally awkward if we don't have buy-in from

23   everyone in terms of how we actually get to the requested

24   relief as appropriate.  So that's an open question, but

25   certainly I think it's wise and I appreciate the letters

1    that were submitted in explaining everybody's position and

2    teeing the issue up so at least we can find an efficient way

3    to deal with the question itself.

4              So with that, those are my two observations I

5    wanted to share for what they're worth.  I don't think

6    they're particularly novel or surprising to any of you

7    folks.  And so with that, I'll hear first from the Debtors.

8    Then I'll circle the virtual room.  I recognize that some

9    people may have positions that are aligned.  And so you

10   don't have to repeat what another party may say that you

11   agree with.  But we'll try to do this as efficiently as

12   possible.

13             So let me hear from the Debtors first.

14             MR. BREENE:  Thank you, Your Honor.  Paul Breene,

15   Reed Smith, on behalf of the Debtors.  I'll also be speaking

16   today on behalf of our co-plaintiffs, the Unsecured

17   Creditors' Committee and the Ad Hoc Committee, although

18   after I speak and after they've heard the rest of the

19   conversation, I think that both the UCC and the AHC have

20   their own counsel here, and they may very well wish to chime

21   in if that's all right with the Court.

22             The Court actually in your opening statement and

23   in your reaction to our letter has in many ways stolen the

24   opening of the argument that I intended to make.  I mean, in

25   consultation with our co-plaintiffs, we have made a

Page 54

1    determination that continuing the litigation at this time is

2    not in the best interests of the estate.  And we would

3    submit, Your Honor, that it's not in the best interest of

4    any of the parties in terms of the economies.

5           And basically as estate fiduciaries, we the co-

6    plaintiffs here, are looking to maximize estate assets.  And

7    of course the insurance adversary proceeding is a

8    significant estate asset in our opinion with the potential

9    to bring in excess of a billion dollars into the estate.

10          But in this case, the goal is especially important

11   in terms of maximizing the recoveries since any proceeds

12   that come in are for the opioid abatement through various

13   forms provided under the plan.

14          The second aim of the Debtors is always looking

15   for opportunities to conserve estate assets.  This includes

16   not operating the business -- operating the business

17   efficiently, but also being good stewards for the litigation

18   resources.  The Court has already alluded to the fact that

19   there's been extensive appellate practice with regard to

20   this matter with a confirmed plan in September '21, the

21   vacating of that plan in December of '21, the Second Circuit

22   hearing argument with respect to the vacation of the plan in

23   April of '22 on an emergent basis.  But of course we're

24   still sitting here and waiting for that with the lack of

25   certainty.  And as a result --

1            THE COURT:  Well, let me ask you a specific

2    question, which is I saw in what I looked at that there was

3    essentially I understood that the plans are asking for a

4    stay.  There were some insurance companies that seemed

5    aligned in the way they thinking about it, which is like we

6    shouldn't move forward, but they were seeking a dismissal.

7    My sense is that as a procedural question, while that gulf

8    sounds significant, it really isn't in the sense that you

9    could call it what you want, a dismissal without prejudice

10   with leave to reassert, you could do a number of different

11   things.  I just wanted to make sure I wasn't missing

12   something on that, that there's something more substantive

13   behind that distinction.

14           MR. BREENE:  Your Honor, I agree with you.  I

15   don't think there's any -- again, with a properly drafted

16   stipulation of dismissal -- and that's the rub -- we could

17   in all likelihood get to the same place.  But given the fact

18   that the reason we're here is to save the estate from

19   incurring significant ongoing litigation costs which we

20   don't think are appropriate and necessary at this time, I

21   think spending the next month or so having a bunch of

22   lawyers going through drafts of what has to be included in a

23   very specifically negotiated dismissal is yet another waste

24   of the estate's assets when in fact what we would seek is a

25   stay from Your Honor.

Page 56

1          THE COURT:  The reason why I mention it is because

2     that's one of the services a judge can provide, right?  Is

3     to cut the gordian knot.  And certainly I've been in the

4     position where in a prior life you're negotiating that

5     language very carefully, to have a judge then come in and

6     say I can say that in two sentences and just say it's done.

7     And certainly I would be happy to do that.  The whole idea

8     would be that whatever language, whether you all came up

9     with it or I came up with it, it would preserve everybody's

10    rights.  The idea would not be to put anybody in a worse

11    position.  It would be, whether it's a dismissal, which some

12    folks might favor from their point of view, or stay, which

13    other folks might favor, I don't know that that matters.

14    The idea is as long as it preserves everybody's rights and

15    no one is disadvantaged by it, and I don't think that's hard

16    to do.  And I think, frankly, less is probably more in terms

17    of language when it comes to something like that.  All

18    right.  I think that's where the Plaintiff are.

19          Anything else, Mr. Breene, before I hear from the

20    other folks on the call?

21          MR. BREENE:  I had a few more things that I --

22    first of all, I never even got to the point -- you know,

23    Your Honor, I just wanted to note, this is the first time we

24    in the insurance adversary have been in front of you on

25    anything other than requesting a continual extensions of the

Page 57

1   discovery and the schedules in the case, which I would argue

2   is because of the uncertainty that's in this case.  But I

3   did want -- if the Court were interested in just a

4   background of the case and, you know, what this case is

5   about, unless Your Honor already knows.

6           THE COURT:  Yeah, I do know.  When I was

7   inheriting the docket, there were -- I got to unpack some of

8   the things that I was on the receiving end of.  And so I do

9   have a sense of what the case is about.  So I appreciate the

10  offer, but I think, particularly in light of the purpose of

11  your request, we can probably put a pin in that for another

12  day.  And if we need to get there, that's fine.

13          All right.  With that, let me hear from the folks

14  who are defendants.  I realize there are sort of two camps.

15  One is the camp that is closer to the plaintiffs in terms of

16  they might have a different procedural mechanism for it, but

17  didn't seem to think that pursuing full-blown litigation at

18  this time made a lot of sense.  And then there are folks who

19  say no, we should continue to move forward.  So maybe I'll

20  hear from the first camp first.  That is the folks who are

21  closer to the thinking of the plaintiffs.  So I'm not sure

22  who wants to take the laboring oar on that.

23          MR. CRAMB:  Thank you, Your Honor.  Good

24  afternoon.  This is Nick Cramb from the Mintz firm for the

25  Liberty Mutual defendants.  And you have it right.  We

Page 58

1    largely agree with the plaintiffs that there are

2    uncertainties with respect to the plan and how it could

3    impact insurance that means that the proceedings are not

4    ripe at this time.  And we take the plaintiffs at their word

5    that they are not prepared now to proceed with their claims

6    because of those uncertainties.

7         Where we diverge is that rather than putting a pin

8    in the case and staying it for an indefinite period of time

9    while all of the appeals run their course, we do think that

10   a very simple dismissal without prejudice to refile is the

11   right action.  And we would certainly appreciate Your

12   Honor's assistance in crafting that very simple dismissal.

13        And there are a couple of reasons for that.  The

14   first is that, as Judge Drain found, this insurance case is

15   not a core proceeding.  It was filed a year after the

16   bankruptcy petition, or almost a year after the bankruptcy

17   petition was filed.  Negotiations over the plan did not

18   hinge on insurance recovery.  Confirmation of the plan does

19   not depend in any way on insurance recovery.  And to the

20   extent that there is any recovery --

21        THE COURT:  Well, let me jump in there.  And

22   again, I don't want to prevent anybody from -- affect

23   anybody's procedural or substantive rights, but I recognize

24   we're getting into sort of a substantive legal argument.

25   Right?  So we're talking about Stern v. Marshall,

1    jurisdiction, and all sorts of things where I suspect people

2    have some significant views on.  But I don't know

3    necessarily that I need to get there for purposes of the

4    discussion we're having now, right?  Nobody is asking me to

5    make a decision based on those jurisdictional questions.

6    And my concern is that an extensive speech on that issue by

7    a party will in turn bring extensive speeches by other

8    parties on the same issue.  And while I love a good

9    jurisdictional discussion as much the next guy, I don't know

10   that it's a great use of your time today.  Again, if we have

11   to get there or that becomes a germane issue to decide or to

12   unpack at some point, we'll certainly do that.  But I'm also

13   a little hesitant to get into it in the context of what the

14   ask is here in the sense that I don't want there to be

15   collateral consequences where people are trying to read the

16   tea leaves on what my views are on jurisdiction in sort of a

17   substantive way when we're talking about what we're talking

18   about, which is sort of a procedural question.

19          So, again, I hear you.  I'm not surprised that

20   that would sort of influence your shading on the proper

21   disposition, but I don't know that I want to go down that

22   particular rabbit hole any more than what you flagged at the

23   moment.

24          MR. CRAMB:  Okay.  I think that makes good sense.

25   And I don't think we're asking Your Honor today to make the

1    jurisdictional decision or to tackle that question.  I think

2    the issue for us is prudential ripeness and whether it makes

3    sense within the Court's judgement to decide this case now,

4    which the Plaintiffs say you can't do, or to recognize that

5    it would be more appropriate to decide the case later and --

6            THE COURT:  So let me ask you a question.  Do you

7    have any quibble with the notion that, whether it's a

8    dismissal or a stay, that it really should be done so that

9    it's essentially operates as a standstill where nobody --

10   that the step we would take would not impact anybody's

11   rights, whether it's timing, whether it's any ability to

12   make substantive arguments.  But that's not the intent.

13   It's just to essentially put a pin in things for another

14   day.

15           MR. CRAMB:  That's accurate, Your Honor.

16           THE COURT:  All right.  So I think if that's

17   right, I think -- and I got the sense from Mr. Breene that

18   whether it's a dismissal or a stay, that that probably won't

19   be -- that won't be an issue that stands in the way of

20   parties moving forward if that's where we end up.  All

21   right.

22           Anything else, counsel?

23           MR. CRAMB:  No, Your Honor.  Thank you.

24           THE COURT:  All right.  Thank you very much.

25   Anyone else who finds themselves in a similar mind who wants

Page 61

1    to chime in?  You don't have to.  Maybe you feel like

2    counsel has just covered your issues.  But anyone else who

3    is in that boat?

4           MS. PHILLIPS:  Your Honor, this is Sarah Phillips

5    appearing for the Gulf and St. Paul insurers.  And I won't

6    take up the Court's time and reiterate the arguments, but

7    just wanted to note that we are in the same camp as Liberty

8    Mutual with Mr. Cramb and feel that a voluntary dismissal is

9    the best way to proceed here given the uncertainties the

10   plaintiffs are articulating.

11          THE COURT:  All right.  Thank you very much.

12   Anyone else in that camp?  All right.  And I know there are

13   some other insurers who have a different view about this.

14   And so it makes sense to hear from those folks now.  I don't

15   know if anybody wants to start us off.

16          MR. DAVIS:  Good afternoon, Your Honor.  It's

17   Joseph Davis from Willkie Farr again on behalf of National

18   Union.  And I'm here with my colleague who you can see on

19   the screen, Genevieve DiSpirito.

20          I guess I would like to introduce one concept that

21   hasn't yet really been addressed here, which is that there

22   are -- there's a lot of work yet to be done in this case,

23   and much of that work involves matters that are not affected

24   by the plan and that will simply have to be done if the case

25   is kind of stopped in midstream when the case resumes.

Page 62

```
 1              And our concern about that is kind of the

 2      inefficiency connected with that stop and restart process.

 3      So in our view --

 4              THE COURT:  Well, let me ask you this.  I

 5      understand that as a sort of theoretical matter.  But aren't

 6      there a couple of countervailing concerns and interests on

 7      the other side?  One is that we all know a lot of civil

 8      litigation reaches some sort of resolution.  And litigation

 9      is conducted in that context.  And until we have an answer

10      from a higher court, parties have no context for litigating

11      this dispute,  And, you know, you may litigate it to

12      conclusion, and that's fine.  Everybody has a right to do

13      that.  But you might not.  And I don't know how you would be

14      able to make sort of intelligent decisions without -- in

15      terms of cost benefit and things of that sort.

16              And I guess the other one -- I'll just throw it

17      all out there just at once -- is it's obviously the

18      plaintiff is the one that files the lawsuit.  And if they

19      say, hey, we're really not in a ripe spot to pursue this,

20      the Plaintiff is -- the traditional thing is that plaintiff

21      pushes the action, the defendant does not push the action.

22      And so that's sort of the normal paradigm.  And so if the

23      plaintiff says, jeez, you know, I want to dismiss this

24      without prejudice, I'm preserving my rights to pursue it in

25      the future, you know, it's almost like trying to prosecute a
```

Page 63

1    case without a party who wants to stand up on the opening

2    day of trial.

3              So those are the two countervailing things that I

4    can think of off the top of my head, Mr. Davis.  Any

5    response to those?

6              MR. DAVIS:  Yes, Your Honor, starting with the

7    last point.  I think we didn't come into this hearing in

8    that posture.  We didn't hear the plaintiffs to be offering

9    to dismiss the case voluntarily.  And I think obviously

10   that's something we would have to consider for exactly the

11   reasons you just laid out.  But on the first kind of set of

12   points, you know, without kind of getting into the details

13   of the case, just from a very high level, I would -- kind of

14   the majority of the sort of substantive issues that are at

15   play here are not directly linked to the plan.  And so no

16   matter what plan is put in place or even if there is no plan

17   -- let's hope that doesn't happen.  But these issues are not

18   going to go away really is the message that I want to

19   convey.  And --

20             THE COURT:  But even assuming that's all to be

21   true, the context in which folks will be evaluating those

22   issues will change, right?  Because the big picture will be

23   different and the economics coming down from any decision

24   could be markedly different obviously between Judge Drain's

25   decision and ruling and confirmation of the plan and Judge

Page 64

1    McMahon and a whole host of things in between if you sort of

2    are reading, you know, law review articles and the like.

3          So I understand and I would even for purposes of

4    this argument concede the point.  But I'm just wondering how

5    it's beneficial to sort of go along a bit in the dark on

6    that endgame so you have no context for the day-to-day

7    decisions in the litigation.

8          MR. DAVIS:  I think there is a lot of context,

9    Your Honor.  The litigation is based on events that occurred

10   mostly long ago and claims that were made pre-bankruptcy,

11   claims that caused the bankruptcy.  And just working through

12   the question about whether there is insurance coverage for

13   those claims is kind of a daunting task, and a task that I

14   don't think is going to be substantially enhanced by the

15   context of whatever plan gets put into place.  But I guess -

16   -

17         THE COURT:  Wouldn't the delay, if it's going to

18   harm anyone potentially, it would potentially harm the

19   plaintiffs more in terms of the preservation of evidence,

20   right?  Wouldn't it put them in a harder spot than it would

21   because they have to make a claim and justify the insurance?

22   I don't want to get into the merits of it.

23         MR. DAVIS:  Sure.

24         THE COURT:  But just in terms of preservation of

25   evidence.  If there were I suppose a particularly key

1    witness that there was a need for some sort of preservation

2    of testimony, I suppose you could sort of think about those

3    things as a one-off.  But I guess I'm trying to figure out

4    why this issue would be something that would be particular

5    to the defendants as opposed to really affecting at best all

6    parties equally and perhaps the plaintiffs more than the

7    defendants.

8                MR. DAVIS:  Your Honor, there are issues on which

9    they will bear the burden and there are issues on which the

10   insurers will bear the burden.  So it just really depends.

11               THE COURT:  All right.  That's a fair point.

12               MR. DAVIS:  And, you know, the record in this case

13   literally goes back to 1996 with the introduction of

14   Oxycontin.  And so it is -- those issues of evidence

15   preservation, the age of the witnesses and so forth, they

16   are real issues.

17               I understood one thing that you said to mean that

18   we would not -- whatever the result was, if we ended up with

19   a dismissal or a stay, that we would be checking in

20   periodically with the Court presumably to watch as the clock

21   is ticking whether any of those issues might blossom.  So I

22   do kind of appreciate that.

23               THE COURT:  Yeah.  I think that that's got to be

24   part of -- if this approach goes to fruition, I think it's

25   got to be part of that.  Because I don't want -- although it

Page 66

1    might counsel more for a stay in terms of keeping

2    essentially my supervisory authority, but I understand if

3    the idea is to not prejudice anyone and any party, sometimes

4    the devil is in the details.  So it might be very easy to

5    say but not so easy to do.  And my thought would be having

6    the court available to come on in, send a letter just like

7    what was done today to say, Judge, we have something we want

8    to discuss.  You know, at a certain point the facts on the

9    ground, you all are familiar with those.  I can't even

10   pretend to be anywhere near as familiar with that.  But the

11   idea is just to have -- regular status conferences solve a

12   lot of problems.  And that's the kind of problem that I

13   think it would solve.

14            And it also would be something -- and just to put

15   a little more meat on the bones there, for something like

16   this in other cases I've done something like three or four

17   months.  Again, just so people are not -- you're not buying

18   into something that is open-ended and doesn't have -- and

19   you don't know how it will impact your rights six months,

20   eight months, a year from now.  Nobody should have to guess.

21   And so I would think that that may be something that would

22   allow folks to do this and stay their hand on certain things

23   because they know they could come back.

24            And also, we don't know when a decision is going

25   to come down, and we don't know if there's going to be

Page 67

1    further proceedings, which all factors in.  So if a decision

2    comes down tomorrow and there's no further proceedings,

3    we're in one world.  If a decision comes down in six months

4    and then it goes to the Supreme Court, we're in another

5    world.  And you shouldn't all have to guess as to how that's

6    going to affect your clients' interests.  That's an awfully

7    hard thing to figure out.  So the litigation burn is a

8    significant concern, but it's not the only concern.  I would

9    agree with that.

10            Anything else, Mr. Davis?

11            MR. DAVIS:  No.  I would maybe just circle back

12   around to where I started, which is we didn't come into this

13   hearing, you know, with a proposal from the plaintiffs of

14   voluntary dismissal.  And that's something that I'm sure we

15   would want to discuss with our clients.

16            MR. LEVERIDGE:  Your Honor, this is Rick Loveridge

17   on behalf of --

18            MR. SCHOENFELD:  Your Honor, I had on this same --

19   we are aligned with Mr. Davis, but I have an additional

20   thought.  If I could share that before we move back to the

21   plaintiff's side.

22            THE COURT:  Oh yeah.  No, I think I was just --

23   Mr. Leveridge was just chiming in then.  I'm happy to hear

24   from you right after that, Mr. Schoenfeld.  Hold on.  It's,

25   again, the challenge of the Zoom hearing where you can't

Page 68

1    necessarily hear what everybody is doing.  So let me let Mr.

2    Leveridge finish his comment, and then I'll hear from Mr.

3    Schoenfeld.

4              MR. LEVERIDGE:  Your Honor, Rick Leveridge of

5    Gilbert LLP on behalf of the Ad Hoc Committee.  I am a

6    plaintiff.  So if you want me to wait, I'll be happy to

7    wait.

8              THE COURT:  All right.  All right.

9              MR. LEVERIDGE:  I just wanted to add something.

10             THE COURT:  Thank you for that reminder.

11             MR. LEVERIDGE:  Sure.

12             THE COURT:  So, Mr. Schoenfeld, go ahead, please.

13             MR. SCHOENFELD:  I appreciate Mr. Leveridge's

14   courtesy in this regard.

15             So I represent -- Dave Schoenfeld for the record,

16   Shook, Hardy & Bacon, representing Steadfast Insurance and

17   American Guarantee.

18             I wanted to address or respond beefily to the

19   Court's question about how the parties could resolve issues

20   in this case without knowing the full context of the

21   ultimate plan resolution and how that might impact issues.

22   And I would be happy to go into this in detail.  I don't

23   imagine that the Court wants to hear that, but I would be

24   happy to explain anything I'm about to say in more detail.

25   But let me summarize it at this point by saying that there

Page 69

```
 1    are significant issues.  In fact, let me say that the most

 2    significant issue (indiscernible) I think could properly be

 3    described as essentially binary issues which are not

 4    affected by, for example, the nature of the claims that will

 5    be -- or the character of the claims will be paid under a

 6    plan, however it comes out, or the way that those claims

 7    will be paid.  Those essentially binary issues are almost

 8    entirely or in some cases I would argue entirely independent

 9    of those issues.  And so there are, we believe,

10    opportunities to advance the case perhaps to the --

11              THE COURT:  Well, I understand.  And I heard that

12    from Mr. Davis.  And so, again, I'm not necessarily

13    disagreeing with you that they're distinct intellectual

14    issues.  But as a former litigator, we all assess things not

15    only in their component parts, but in the big picture.  And

16    it just seems somewhat incomplete to me.  And I'm trying to

17    figure out where the balance is.  But that's why I thought

18    the idea of being able to check in on a somewhat regular

19    basis might -- you might be able to get the benefits without

20    any dramatic downside on that front.

21              But can you give me -- and maybe I should have

22    asked Mr. Davis this as well.  But can you give me an

23    example of something specific?  Because I'm hearing the

24    theory.  And I know I said let's not get too deep in the

25    weeds, but it may be unavoidable to get the flavor of this.
```

1           MR. SCHOENFELD:  I would be happy to.  So one

2    primary example is the question of whether or not the

3    policies at issue in this case cover or in fact exclude

4    product completed operations claims, that is claims arising

5    from Purdue's products.  The policies at issue all contain

6    exclusions which would bar any claim arising from Purdue's

7    products.

8           If the insurers are correct that those exclusions

9    would preclude claims -- the opioid claims as they're

10   asserted, there is not really a set of claims out there that

11   might or might not be affected by that ruling and will be

12   introduced into the mix by a plan outcome.

13          THE COURT:  I get that.  But I've had this kind of

14   issue come up before, and I've even have insurance cases

15   where someone said, judge, if you decide this exclusion,

16   we'll settle.  And I decided the exclusion, and there was no

17   settlement.  And it was litigating component parts.  And

18   federal judges tend not to be huge fans of that.  So you

19   don't know until it happens whether the exclusion approach

20   is truly the way to cut the gordian knot or it's just

21   litigation followed by more litigation.

22          So I understand the theory, but again, I have

23   issued rulings on exclusions and -- that were in fact where

24   almost all sides said to me, judge, this is the case

25   cracker, to quote My Cousin Vinny.  And it didn't turn out

Page 71

```
 1    to be.  Even remotely.  And in fact, people didn't bat an

 2    eyelash.  They said, well, now we have some other things we

 3    want to litigate.

 4              So it's hard for me to say that.  Because while it

 5    may be true from your point of view and it may be true

 6    depending on a particular outcome on a particular exclusion

 7    perhaps, but it sort of requires a sort of buy-in and also

 8    it's not quite as certain as it might seem I have found in

 9    prior experience.

10              MR. SCHOENFELD:  I appreciate that, Your Honor.

11    The last point I would make is I also share Mr. Davis's

12    interest in, as I think the Court may have put it, asking

13    anyone here to buy a pig in a poke to come back on a regular

14    basis, you know, hopefully at a relatively short interim,

15    and perhaps revisit some of these issues depending on what's

16    happening with the appeal if the plan confirmation --

17              THE COURT:  All right.  Mr. Leveridge?

18              MR. BREENE:  Your Honor, if I may, Mr. Leveridge

19    has deferred to me for the moment, and then he'll come in

20    just after.

21              THE COURT:  All right.  Let me just warn people, I

22    do have a hard stop about three minutes to one.  I have time

23    this afternoon.  But just in terms of if I'm trying to push

24    the action, that's why.  So I imagine I don't want to wreck

25    your afternoon.  So I'm just trying to make sure I hear from
```

Page 72

1    everybody before we do that.  So, Mr. Breene?

2            MR. BREENE:  Your Honor, just a couple of things

3    very quickly.  First, with regard to discovery, there has

4    been an enormous amount of discovery in this case.  We've

5    produced 15 million documents.  There have been multiple

6    depositions.  And the problem is many, many depositions that

7    the insurance companies are proposing are of Purdue

8    witnesses who have already been deposed in one instance 12

9    times regarding the opioid crisis, in another instance ten

10   times.  Several times.  Seven times for another.

11           Anyway, it is pretty duplicative, and we don't

12   believe that, you know, a stay would be problematic in terms

13   of the discovery and nothing would be lost.

14           THE COURT:  I did understand the state of play

15   that you were getting to expert discovery, which clearly in

16   a case like this would be significant.  But that sort of

17   implied that the traditional fact discovery was at or

18   nearing conclusion.  But obviously --

19           MR. BREENE:  I believe that's right.

20           THE COURT:  Obviously beyond that, I'm not really

21   in a position to draw a more nuanced or intelligent

22   conclusion.

23           MR. BREENE:  And, Your Honor, the only other point

24   I wanted to make is all the points that have been made, and

25   especially Mr. Schoenfeld indicating that, you know, he

1    thought it would be a good idea to come back before Your

2    Honor periodically.  And I think that plaintiffs agree.  And

3    I think that argues very strongly in favor of a stay and not

4    a dismissal.  I think the dismissal introduces significant,

5    frankly unnecessary complications into this when with the

6    stroke of a pen Your Honor can stay this matter and we could

7    set up a schedule to come back before Your Honor as

8    appropriate.

9         THE COURT:  Well, I think it has some benefits and

10   it has some downsides for everybody that people have to work

11   their way through and should probably caucus.  But in terms

12   of keeping a rein on the case and -- and you who have

13   appeared in front of me, I am a fairly active docket

14   manager.  I mention that because different judges have

15   different approaches.  And there's no way in the world that

16   you would know mine if we hadn't had the pleasure of seeing

17   each other in past cases.  But I am a fan of the status

18   conference and I am not a fan of anybody being surprised.

19   And again, if we're doing something that's supposed to

20   preserve everybody's rights, then that's what we should be

21   doing.  So to the extent that's something to throw into the

22   calculus.

23        But my thought would be that probably you all need

24   to think a little bit more amongst yourselves, at least

25   people on different sides of the V, about what course of

Page 74

1    action you think might be appropriate, what you could live

2    with, and if so under what conditions.  And I'm happy,

3    speaking of status conferences, to have another get-together

4    to see if there's any consolidation around one position or

5    two positions just to get sort of everybody's kind of best

6    and final proposal as to what they think should happen and

7    then take it from there.  And if people can't agree, then

8    that will mean that somebody has a right to file a motion.

9    Because in a case like this, obviously I'm not going to cram

10   my views down anybody's throat.  People file a motion and

11   then people will file their papers.

12           But, frankly, for something like this, my thought

13   is that I think there's a way to get there and a way that's

14   fair to everybody involved and that's nimble enough that we

15   can all adjust with the circumstances in the case as they

16   unfold.

17           But again, I recognize I see the tip of the

18   iceberg.  There's a lot of things I don't know and haven't

19   had the pleasure of contemplating that you all have.  So

20   you'll have to work through those and see where you end up.

21   And what I would ask is maybe that parties -- defendants

22   talk, plaintiffs talk, and then groups talk together.  And

23   then you let me know when you want to have a chat.  I'm

24   happy to set a date now just to have something to push

25   against that's three or four weeks out if that works.  But

Page 75

1   I'm open to other suggestions if I don't have a monopoly on

2   wisdom.

3           So today is the 23rd.  I could give you something

4   like June 26th in the morning to touch base and see where we

5   are.  But again, I'm open to other suggestions if people

6   have ideas.

7           MR. LEVERIDGE:  Your Honor, this is Rick Leveridge

8   on behalf of the Ad Hoc Committee.  First of all, June 26th

9   would be find from the standpoint of the Ad Hoc Committee.

10  But one thing I want to note is on the current schedule,

11  there are expert deadlines that come before June 26th.  And

12  so I think at the very least what we would want is some

13  interim stay that would allow the parties to have the

14  conversation that you're suggesting we have and which the Ad

15  Hoc Committee is certainly open to.  But I think perhaps if

16  I could ask the Court to consider having a pause on the

17  schedule now to give the parties an attempt to have this

18  conversation and then come back.

19          THE COURT:  That's not a surprising request, and

20  I'm okay with it.  In the interest of being fair to

21  everybody, I wouldn't want to go out any further than a

22  month for us to get back together.  And then people can come

23  back and say, Judge, you hit the brakes momentarily, but we

24  think you shouldn't do that going forward.

25          Anybody have a problem with June 26th and sort of

1    a momentary pause of deadlines that might be triggered

2    between now and then?

3              MR. DAVIS:  Your Honor, this is Joseph Davis.  We,

4    at least speaking on behalf of National Union, we're fine

5    with that.  And in particular we're fine with that because I

6    don't think we agree that fact discovery is nearing its

7    conclusion.  There's quite a bit left to be done on fact

8    discovery, and we've teen a little bit in limbo talking

9    about a stay now for over a month.  So from our perspective,

10   we're perfectly happy to kind of adjourn the dates and

11   figure out what we do next when we see you on the 26th.

12             THE COURT:  All right.  Anybody else on this

13   question of the 26th and on adjourning dates between now and

14   then?

15             MR. BREENE:  Your Honor, this is  Paul Breene.

16   And I'm sorry to -- I have one commitment on the 26th first

17   thing in the morning.  If we could do it the same time as

18   now or later, I'm fine.

19             THE COURT:  I will be in the middle of what has

20   been promised to be a contested confirmation hearing in a

21   mega case.  So I don't have the afternoon available.  I

22   think I will be -- maybe things will resolve, but I think

23   I'll be hearing opening statements about this time.  So I

24   can play around earlier in the morning if people have a

25   court appearance, if people want to do it at, you know,

Page 77

```
1    8:30, 9:00 before your day starts.  I could also -- I have a

2    trial on the 27th and 28th.  I can also talk to my courtroom

3    deputy and she can circulate a few dates amongst you all and

4    you can choose among them.  So if earlier in the day on the

5    26th doesn't work, then let me do that.  I'll have her

6    circulate some dates to folks.  And I think she has all of

7    your emails.  If she doesn't, she'll send an email to the

8    folks whose email she does have and ask those folks to

9    circulate the dates and times.

10            Anybody else?

11            MR. CRAMB:  Your Honor?

12            THE COURT:  Go ahead.

13            MR. CRAMB:  This is Nick Cramb.  Just a quick

14   clarifying question so that we do not have to come back in

15   the meantime.  But we do have some discovery activates

16   scheduled in the next 30 days.  I think there are two,

17   possibly more depositions that are on the calendar.  And I

18   understand from your explanation just now that we are moving

19   dates, but that we should proceed in the meantime.

20            THE COURT:  Well, the request I got was to adjourn

21   deadlines.  So as to whether a particular event should go

22   ahead or not, which is obviously being done under the

23   context of a deadline but is in itself a deadline, my

24   thought would be to stay out of that conversation with you

25   all because I don't know enough of the details to be
```

1    intelligent and I don't want to have this conversation be

2    weaponized even inadvertently.  So obviously there's a stay

3    or a -- the request that was made was in order to save

4    costs.  And so I imagine you all have a conversation, so I

5    would imagine that I'll adjourn the deadlines, I'll stay the

6    deadlines.  But I would imagine in the aftermath of this

7    conversation, there might be a request made by a party to

8    say you want to go ahead with that deposition, can we

9    adjourn it.  But I'll leave you all to do that.  Because,

10   again, I'm not trying to upset the apple cart between now

11   and when we decide this issue.

12          MR. CRAMB:  Understood.  Thank you.

13          THE COURT:  All right.  Anything from any other

14   party?  All right.  So, Mr. Breene, I'm going to take it the

15   26th doesn't work for you.  We'll circulate some dates and

16   times.  Some of them may be a little earlier, some of them

17   may be a little bit later.  And you'll chat and see where

18   you are.

19          I am going to say that I'm going to so order the

20   record to adjourn discovery deadlines so that nobody needs

21   to paper that in interest of efficiency.  And we will make

22   sure to talk about that at the next conference so that

23   people have no lack of clarity about what -- where things

24   are.  And -- but the deadlines are stayed, any deadline that

25   would otherwise be tripped by this.  And maybe one way to do

Page 79

1    it is to say that we're going to extend the deadlines for

2    however many days it takes from today to the time we get

3    together.  So it's 30 days, all the deadlines will be

4    adjourned 30 days.  So we'll keep sort of the status quo

5    going forward.  So it will follow form with whatever date we

6    get, and we'll take it from there.

7              All right.  With that, anything else from the

8    plaintiffs?

9              UNIDENTIFIED SPEAKER:  No, Your Honor.  Thank you.

10              THE COURT:  All right.  Anything else from any of

11    the defendants?

12              UNIDENTIFIED SPEAKER:  No, Your Honor.  Thank you.

13              THE COURT:  All right.  Thank you very much for

14    people's insight and comments today.  I appreciate it.  And

15    I'll be talking to you soon.  Be well.

16              (Whereupon these proceedings were concluded at

17    1:54 PM)

18

19

20

21

22

23

24

25

Page 80

1                         I N D E X

2

3                         RULINGS

4                                              Page      Line

5   Motion To Seal, GRANTED                    29        16

6   Adjourn Discovery Deadlines                78        19

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 81

1              C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  May 26, 2023