June 8, 2023

Maria Ecke

Estate of David Jonathan Ecke

Richard Ecke

Andrew Ecke

Peter Sottile

C/o Office of Maria Ecke

8 Glenbrook Drive

West Simsbury, CT 06092

sagitarianm2004@yahoo.com

Pro Se

United States Bankruptcy Court

Southern District of New York

300 Quarropas Street

White Plains, New York 10601

| | |
|---|---|
| In re: | Chapter 11 |
| Purdue Pharma L.P. et. all. | Case No. 19-23649 (RDD) |
| Debtors. | Jury Demand |

**BRIEF FOR MYSELF AND ALL OTHER PEOPLE SIMILARLY SITUATED**

1.) **Wherein; No State shall make or enforce any law** which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of **LIFE, liberty,** or **property,** without due **process of law;** nor deny to any person within its jurisdiction the equal protection of the laws.
2.) Our family members are deceased and have been deprived of life, dying every day or still struggling with their afflictions as my other son does. He doesn't even have children after 12 years of marriage. Could it be that Purdue Pharma's drugs interfere or interfered with his reproductive system? The families through various organizations have been demanding due process; to no avail.
3.) The bankruptcy proceedings are prohibiting WE THE PEOPLE, the Plaintiffs our due process which is guaranteed by the 14th Amendment of the Constitution. "Due process is the legal

requirement the state must respect all legal rights that are owed to one person. Due process balances the power of the law of the land and protects the individual person from it. When a government harms a person without following the exact course of the law, this constitutes a due process violation, which offends the rule of law".

4.) "Due process has also been frequently interpreted as limiting laws and legal proceedings so that judges, instead of legislators, may define and guarantee fundamental fairness, justice, and liberty" Everything that continues to go on during this Bankruptcy Plan has been up to discretion. The word discretion is defined in Webster's dictionary as FREEDOM. Our family members are DEAD and NOT FREE and those beloved ones' family members who are left behind full of pain, anguish, grief, and so on are NOT FREE of mental and physical disease due to Trauma inflicted by Purdue Pharma and this "Plan".

5.) Once it was determined that Oxycontin was highly addictive and killing humans the product should have been referred back to the DEA for removal from the public market place and criminal action should have been ensued. The physicians should have been given the notice to put patients on another form of medication that would not kill nearly an entire generation and traumatize a large part of society as a whole. Those of you Lawyers and the Sackler Family, how would you like it if your child looked up at you and said "My heart hurts Mom I think that I am going to die soon." I am sure that your children never had those vile drugs.

6.) Fourteenth Amendment of the US Constitution – "Rights Guaranteed: Privileges and Immunities of Citizenship, Due Process, and Equal Protection. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and the State wherein they reside."

7.) What world do we live in where a corporate giant conglomerate company such as Purdue Pharma can make a product "pain reliever", Oxycontin, and sell it to the public, as we well know they knew it was highly addictive at the onset? After selling it to their unsuspecting customers through their doctors who received buybacks established a drug dealer relationship as if they were selling heroin off the city streets in the back allies. Finally, after way too many people had become addicted to their Pandora Box trick slipped secretively into unsuspected buyers as if it was a harmless candy bar. The public and Government watch-dogs way too late discovered Purdue was lying and knew from the beginning it was highly addictive. To boot Pharma actually came out and said it was the customer's fault for taking too much. They blamed their product on customer use. How dare they!!! How dare they try to turn it back around and blame their poor naïve customers who were told from the beginning and on their label mark it was not addictive. And now we find out that Purdue Pharma is being rewarded for its criminal activity. What if the Marlboro cigarette company killed millions of people with their cancer-causing sticks that they also denied were harmful, all of a sudden, the Government gave them the same bonus deal and a reward for their callousness. Or what if Takata Air Bags were put into millions of cars and were defective and killed many innocent people and were all of a sudden told "Oh, that's too bad but don't worry our government will look after your company and fill your pockets with bonus money and reward you for your criminal engineering skills that were in default. Now back to Purdue Pharma produced a product, lied about its addictiveness, and sold it to many innocent families who are now living a nightmare who have lost their loved ones and their lives are ruined. Now we find out they are going to be compensated and rewarded for their killing of many poor victims. Unbelievable!! Once it was determined that Oxycontin was highly addictive and killing humans the product should have been referred back to the DEA for removal from the public marketplace.

8.) Any agreement that would permit a Bankruptcy that takes away the Plaintiff's rights of due process and permits a corporation and the people who run these Corporations to absolve

themselves from criminal prosecution while humans continue to die is against the Law of the Constitution. Just remember: "Mom, my heart hurts, I think I'm going to die soon." I'll never forget this statement until I die.

9.) It is of record; that Purdue Pharma has taken their wealth and created another pharmaceutical company entitled Mundi Pharmaceuticals so that it can have a continual residual income. Is Purdue Pharma allowed by our government using the Bankruptcy Court to allow Purdue Pharma to walk away with their wealth and away from criminal prosecution?

10.) Being a Layperson and not a Lawyer, I am unaware of the Legal Rules that need to be followed but I know what is morally right. In my Docket 3575, I asked the Honorable Judge Drain for a recount of the ballots via **Rule 3008-1 RECONSIDERATION OF CLAIMS**. This was not ruled upon and completely ignored in my **OBJECTION TO RESTRUCTURING OF PURDUE PHARMA L.P. ET ALL – Docket No. 3575.**

In addition, in **FINDING OF FACT, CONCLUSIONS OF LAW, AND ORDER CONFIRMING THE TWELFTH AMENDED JOINT CHAPTER 11 PLAN OR REORGANIZATION OF PURDUE PHARMA L.P. AND ITS AFFLIATED DEBTORS Docket No. 3878-1** on page 26 in injunction states: "The litigation of the Released Claims and Shareholder Released Claims would have conceivable effects on the res of the Estates. Litigation of such claims could deplete the valve of certain insurance policies, could lead to indemnification and contribution claims against the Estates or Master Distribution Trust (and therefore reduce the value available distribution to the Creditor Trusts) in future litigation of such claims or causes of action. Litigation over a disputed indemnification.

"But in this case, the problems with the collection were the result of what the Sacklers did with the money that they admittedly took out of the corporations between 2008-2016. The assets of family members are held principally in purportedly spendthrift trusts located in the United States and offshore – many of them on the Bailiwick of Jersey – and many of those assets cannot readily be liquidated. As Judge Drain correctly observed, spendthrift trusts can and often do insulate assets from the bankruptcy process. And while generally applicable law governing U.S. trusts allows those trusts to be invaded when they are funded by fraudulent conveyances, there is a substantial question of whether the same is true under Jersey law. Additionally, he noted that many Sackler family members live abroad, raising a barrier to an American court's acquiring personal jurisdiction over them. Although the learned bankruptcy judge did not reach any final conclusion about these complicated issues, he readily drew the conclusion that collectability presented a significant concern, one that was obviated by the settlement. (f)" P.63, Decision and Order on Appeal by Judge McMahon.

**THE SACKLER RELEASES ARE ILLEGAL BECAUSE THEY PURPORT TO OVERRIDE 11 U.S.C. 523(A)(7)**

The Sackler Releases are not permitted by the Bankruptcy Code because non-debtor Sackler individuals cannot receive a broader discharge from governmental penalties claims through Purdue's corporate bankruptcy filing than they could if they filed personal bankruptcy. Metromedia warned that "a non-debtor release is a device that lends itself to abuse…..In form, it is a release; *in effect, it may operate as a bankruptcy discharge arranged without a filing and without safeguards of the Code.*" 416 F.3d at 142 (emphasis added). The Sackler Releases are an abuse of the bankruptcy process they purport to extinguish law-enforced claims for civil penalties against the Sacklers who could never have these claims extinguished even if they filed bankruptcy themselves, in direct contravention of 11 U.S.C. 523(a)(7).

The Sackler Releases are unlawful for at least two independent legal reasons: (1) there is no authority under the Bankruptcy Code for them, and (2) the bankruptcy court lacked adjudicatory and constitutional authority to enter a final order approving them. Either basis requires reversal.

A considerable portion of the appellees' 400 pages of the briefing is devoted to discussing the benefits of the Plan over the hypothetical, "value-destroying" alternative. The issue on appeal, however, is the legality of the nonconsensual Sackler Releases. If those releases are held unlawful, the confirmation order must be reversed, and the case remanded to the bankruptcy court, notwithstanding any sincere "belief (f) that...creditors would be better off" under the Plan. *Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 207 (1988); *accord Czyzewski v. Jevic Holding Corp.,* 137 S. Ct. 973,987 (2017).

Regardless, it is far from clear whether the unfair negotiating leverage that nonconsensual releases create for third parties results in better or more efficient settlements over the alternatives. Here, the specter of the bankruptcy court confirming a plan with sweeping nonconsensual releases empowered the Sacklers to negotiate from a position of strength, unavailable in a true arm's-length negotiation. Implicit in the appellees' discussions of "the alternative" is that global settlement could *never* be reached absent nonconsensual third-party releases. This too is far from clear.

**Wherein; No State shall make or enforce any law** which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of **LIFE, liberty,** or **property**, without due **process of law;** nor deny to any person within its jurisdiction the equal protection of the laws.

### THE SACKLER RELEASES ARE ILLEGAL BECAUSE THEY PURPORT TO OVERRIDE 11 U.S.C. 523(A)(7)

The Sackler Releases are not permitted by the Bankruptcy Code because non-debtor Sackler individuals cannot receive a broader discharge from governmental penalties claims through Purdue's corporate bankruptcy filing than they could if they filed personal bankruptcy. Metromedia warned that "a non-debtor release is a device that lends itself to abuse…..In form, it is a release; *in effect, it may operate as a bankruptcy discharge arranged without a filing and without safeguards of the Code.*" 416 F.3d at 142 (emphasis added*).* The Sackler Releases are an abuse of the bankruptcy process they purport to extinguish law-enforced claims for civil penalties against the Sacklers who could never have these claims extinguished even if they filed bankruptcy themselves, in direct contravention of 11 U.S.C. 523(a)(7).

### THE PLAN'S RELEASE OF THIRD-PARTY CLAIMS IS PRECLUSIVE AS TO THOSE CLAIMS AND THEREFORE CONSTITUTES A "FINAL JUDGEMENT" ON THEM, IMPLICATING THE CONSTITUTIONAL LIMITS OF *STERN V. MARSHALL*

I respectfully disagree with this Court's holding and submit the Supreme Court's decisions in *Travelers Indemnity Co. v. Bailey,*557 U.S. 137 (2009) and *Stoll v. Gottlieb,* 305 U.S. 165 (1938) urge a different result.

### CLAIM ONE

### STRICT LIABILITY – DESIGN DEFECT

### (Against all Defendants)

1.) Plaintiffs incorporate by reference each and every allegation in the preceding paragraphs as if fully stated herein.
2.) Plaintiffs bring this strict liability claim against the Defendants for defective design.

3.) At all times relevant to this litigation, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting OxyContin, which is defective and unreasonably dangerous to the consumers including Plaintiffs thereby placing OxyContin into the stream of commerce. These actions are very triable.

### DEMAND FOR DAMAGES AND FOR JURY TRIAL Rule 9015

4.) Defendants knew of the subject's pain pill's defective and unreasonably dangerous nature but continued to promote and market OxyContin.

### NEGLIGENCE (Against All Defendants)

5.) Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein. Defendants, directly or indirectly, caused OxyContin products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiffs. At all times relevant to this litigation, Defendants had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of OxyContin products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product. **DEMAND FOR JURY TRIAL**

6.) Defendants' OxyContin products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendants were defective in design and formulation in that when they left the hands of the Defendants' manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

7.) At all times relevant to this litigation, Defendants had a duty to exercise reasonable care in the marketing, advertisement, and sale of the OxyContin products. Defendants' duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using OxyContin and appropriate, complete, and accurate warnings concerning the potential addictive effects of OxyContin. At all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known of the hazards and dangers of OxyContin

8.) Accordingly, at all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known that use of OxyContin could cause or be associated with Plaintiffs' injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiffs,

9.) Defendants also knew or, in the exercise of reasonable care, should have known that users and consumers of OxyContin were unaware of the risks and the magnitude of the risks associated with use of OxyContin. **DEMAND FOR JURY TRIAL**

10.) As such, Defendants breached their duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its OxyContin products, in that Defendants manufactured and produced knew or had reason to know of the defects inherent in its products, knew or had reason to know that a user's or consumer's exposure to the products created a

significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries. Despite ability and means to investigate, study, and test products and to provide adequate warnings, Defendants have failed to do so. Indeed, Defendants wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to OxyContin. Defendants' negligence included, but are not limited to: a. Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing OxyContin without thorough and adequate pre- and post-market testing. Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to OxyContin and, consequently, the risk of serious harm associated with human use of and exposure to OxyContin; **DEMAND FOR JURY TRIAL.**

11.) Failing to undertake sufficient studies and conduct necessary tests to determine whether or not OxyContin was safe for use Failing to use reasonable and prudent care in the design, research, manufacture, and development of OxyContin so as to avoid the risk of serious harm; ……
12.) Failing to design and manufacture OxyContin so as to ensure it was at least as safe and effective as other pain relievers on the market.
13.) Failing to provide adequate instructions, guidelines, and safety precautions to those persons using pain relievers. Failing to disclose to Plaintiffs, users/consumers, and the general public that use of OxyContin would lead to death or permanent disability;
14.) Failing to warn Plaintiffs, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative pain relievers available to Plaintiffs and other consumers. Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of OxyContin;
15.) Representing that OxyContin was safe for its intended use when, in fact, Defendants knew or should have known that the products were not safe for their intended purpose; **DEMAND FOR JURY TRIAL**
16.) Declining to make or propose any changes to OxyContin labeling or other promotional materials that would alert the consumers and the general public of the risks of OxyContin. Advertising, marketing, and recommending the use of OxyContin while failing to disclose or warn of the dangers known by Defendants to be associated with or caused by the use of OxyContin; Continuing concealing to disseminate information to its consumers, which indicates or imply that OxyContin is not unsafe for use as a pain reliever; and
17.) Continuing the manufacture and sale of its products with the knowledge that the product was unreasonably unsafe and dangerous.
18.) Defendants knew and/or should have known that it was foreseeable that consumers such as Plaintiffs would suffer injuries as a result of Defendant's failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of OxyContin.
19.) Plaintiffs did not know the nature and extent of the injuries that could result from the intended use of OxyContin Defendants' negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiffs suffered, and will continue to suffer, as described herein;    **DEMAND FOR JURY TRIAL**

20.) Defendants' conduct, as described above, was reckless. Defendants regularly risk the lives of consumers and users of their products, including Plaintiffs, with full knowledge of the dangers of their products

21.) Defendants made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including the Plaintiffs. Defendants' reckless conduct, therefore, warrants an award of punitive damages.

22.) As a proximate result of Defendants' wrongful acts and omissions in placing defective OxyContin into the stream of commerce without adequate warnings of the addiction; Plaintiffs have suffered and continue to suffer severe and permanent physical and emotional injuries.

23.) Plaintiffs have endured pain and suffering, have suffered economic losses (including significant expenses for medical care and treatment) and will continue to incur these expenses in the future.

34.) WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## CLAIM TWO

### BREACH OF IMPLIED WARRANTIES (Against All Defendants)

Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as in fully stated herein. **DEMAND FOR JURY TRIAL**

35.) At all times relevant to this litigation, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting OxyContin, which is defective and unreasonably dangerous to consumers, including Plaintiffs, thereby placing OxyContin into the stream of commerce. These actions were under the ultimate control and supervision of Defendants.

36.) Before the time that Plaintiffs were exposed to the use of the aforementioned OxyContin, Defendants impliedly warranted to consumers and those exposed—including Plaintiffs—that OxyContin were of merchantable quality and safe and fit for the use for which they were intended.

37.) Defendants, however, failed to disclose that OxyContin has dangerous propensities when used as intended and an increased risk of developing severe injuries, including Plaintiffs' injuries. Plaintiffs reasonably relied upon the skill, superior knowledge and judgment of Defendants.

38.) Plaintiffs are informed and believe, and based thereon allege, that in committing the acts, alleged herein, each and every managing agent, agent, representative and/or employee of the Defendants was working within the course and the scope of said agency, representation and/or employment with the knowledge, consent, ratification, and authorization of the Defendants and their directors, officers, and/or managing agents.

39.) Plaintiffs are the intended third-party beneficiaries of implied warranties made by Defendants to the purchasers and/or users of their pain, relievers, and as such Plaintiffs are entitled to assert this claim.

40.) OxyContin was expected to reach and did in fact reach consumers and/or users, including Plaintiffs, without substantial change in the condition in which they were manufactured and sold by Defendants.

41.) At all times relevant to this litigation, Defendants were aware that consumers and users of their products, including Plaintiffs, would use OxyContin as marketed by Defendants, which is to say that Plaintiffs were foreseeable users of OxyContin.

41.) Defendants intended that OxyContin be used in the manner in which Plaintiffs were exposed to it and Defendants impliedly warranted each product to be of merchantable quality, safe, and fit for this use, despite the fact that OxyContin was not adequately tested and/or researched.

42.) In reliance upon Defendants' implied warranty, Plaintiffs used or were exposed to OxyContin as instructed and labeled and in the foreseeable manner intended, recommended, promoted and marketed by Defendants. **DEMAND FOR TRIAL BY JURY**

43.) Plaintiffs could not have reasonably discovered or known of the risks of serious injury associated with OxyContin.

44.) Defendants breached their implied warranty to Plaintiffs in that OxyContin products were not of merchantable quality, safe, or fit for their intended use, and/or adequately tested. OxyContin has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

45.) The harm caused by OxyContin far outweighed its benefit, rendering the product more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

46.) As a direct and proximate result of Defendants' wrongful acts and omissions Plaintiffs have suffered severe and permanent physical and emotional injuries, including but not limited to addiction and death.

47.) Plaintiffs have endured pain and suffering, have suffered economic loss.

48.) Plaintiffs could not have reasonably discovered or known of the risks of serious injury associated with OxyContin Defendants breached their implied warranty to Plaintiffs in that OxyContin products were not of merchantable quality, safe, or fit for their intended use, and/or adequately tested. OxyContin has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein. The harm caused by OxyContin products far outweighed its benefit, rendering OxyContin more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products. As a direct and proximate result of Defendants' wrongful acts and omissions Plaintiffs have suffered severe and permanent physical and emotional injuries, including but not limited to the. Plaintiffs have endured pain and suffering, have suffered economic loss (including significant expenses for medical care and treatment) and will continue to incur these expenses in the future. WHEREFORE, Plaintiffs respectfully requests that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with

interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

49) My claim has been sent in and the **Estate of David Jonathan Ecke - Claim No.628554** should legally be able to be included. In addition, as Judge Drain ruled on April 27, 2022, in Case No. 19-23649-rdd and Adv. Case No. 19-08289-rdd: Judge Drain clearly states in Case No. 19-23649, Adv. Case No. 19-08289-rdd: "So I will deny the motion's request for leave to file a late claim. That's without prejudice to Ms. Ecke's right to either assert that one of the claims that have already been timely filed encompasses the claim that was filed late or that the claim could be amended, which would require a motion, Ms. Ecke, to encompass that claim on the grounds that the claims as filed basically are consistent with and don't assert a different claim in 628554." Transcript of Hearing April 27, 2022, P.65.

50.) Judge Drain had worked for Purdue when he was young and now, he is working for them again when he retired from the Bankruptcy Court. See letter dated April 14, 2023, "Dear Judge Lane: In compliance with Rule 1.12 of the New York Rules of Professional Conduct, I am writing to advise you that, in April, the Honorable [Ret.] Robert D. Drain will join the Corporate Restructuring Group of Skadden, Arps, Slate, Meagher & Flom LLP and Affiliates (the "Firm") as Of Counsel in the Firm's New York office. Prior to his retirement from the United States Bankruptcy Court for the Southern District of New York, Judge Drain presided over the following matter: In re Purdue Pharma L.P., et al., Case No. 19- 23649 (the "Matter"). The Firm is currently retained pursuant to section 327(e) of the Bankruptcy Code as special counsel to Purdue Pharma L.P. and its affiliated Debtors (collectively, "Purdue") in the Matter (the "Firm Representation" **Is this conflict of interest?** <u>**Letter to the Honorable Sean H. Lane in compliance with Rule 1.12 of the New York Rules of Professional Conduct**</u> **[Docket No. 5551**

51.) Why is Davis Polk, the law firm which represents Purdue Pharma, saying that a separate Claim for the Estate of David Jonathan Ecke, which I did not know that I could start at the same time as my own claim, that the claim should not be upheld? I am just a layperson of the law. It seems as if my claim is thought to be too much money by Purdue Pharma's attorneys. Judge Drain kept repeating the amount of my claim at my appeal, which I truthfully told him, but Purdue's attorneys are getting well over a million a month. Being a layperson, I did not know that I didn't have to tell Judge Drain the amount of my Claim as I later found out. Is it because the Attorneys are taking all Sackler's and Purdue's money for themselves in monthly increments for their respective firms? **If I can't have a separate Claim for the Estate of David Jonathan Ecke then I need to increase my claim by 5 times the original amount.** Judge Drain clearly states in Case No. 19-23649, Adv. Case No. 19-08289-rdd: "So I will deny the motion's request for leave to file a late claim. That's without prejudice to Ms. Ecke's right to either assert that one of the claims that have already been timely filed encompasses the claim that was filed late or that the claim could be amended, which would require a motion, Ms. Ecke, to encompass that claim on the grounds that the claims as filed basically are consistent with and don't assert a different claim in 628554." Docket No.4703, P.65. Transcript from Hearing Held on April 27, 2022.

## CONCLUSION

I am appealing for Relief and a Stay from "**FINDING OF FACT, CONCLUSIONS OF LAW, AND ORDER CONFIRMING THE TWELFTH AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF PURDUE PHARMA L.P. AND ITS AFFILIATED DEBTORS.** Defendants' conduct was reckless. Defendants regularly risk the lives of consumers and users of their product OxyContin with full knowledge of the dangers of its

products. Defendants made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public. Defendants' reckless conduct, therefore, warrants an award of punitive damages. As a proximate result of the Defendants' wrongful acts and omissions in placing defective pain pills into the stream of commerce without adequate warnings of the hazardous nature, the Plaintiffs have suffered and continue to suffer severe and permanent physical and emotional injuries. Plaintiffs have endured pain and suffering, have suffered economic losses (including significant expenses for medical care and treatment), and will continue to incur these expenses in the future. WHEREFORE, the Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, my fees, and all such other and further relief as this Court deems just and proper.

Respectfully Submitted,

/s/ Maria Ecke      *Maria Ecke*