**Presentment Date and Time: July 17, 2023, at 10:00 a.m. (prevailing Eastern Time)**
**Objection Date and Time: July 10, 2023, at 4:00 p.m. (prevailing Eastern Time)**

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Eli J. Vonnegut
Christopher S. Robertson

*Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **PURDUE PHARMA L.P.,** *et al.*, | **Case No. 19-23649 (SHL)** |
| **Debtors.**[1] | **(Jointly Administered)** |

**NOTICE OF PRESENTMENT OF DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING ENTRY INTO THE THIRD AMENDMENT TO HEADQUARTERS LEASE AND (II) GRANTING RELATED RELIEF**

**PLEASE TAKE NOTICE** that on June 26, 2023, the above-captioned debtors and

debtors in possession in these proceedings (collectively, the "**Debtors**") filed the *Motion of*

---

[1]  The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Purdue Products L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014).  The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

*Debtors for Entry of an Order (I) Authorizing Entry into the Third Amendment to Headquarters Lease and (II) Granting Related Relief* (the "**Motion**").

**PLEASE TAKE FURTHER NOTICE** that, unless a written objection to the Motion is served and filed with proof of service with the Clerk of the Court, and a courtesy copy is delivered to the undersigned and to the chambers of the Honorable Sean H. Lane, so as to be received by **July 10, 2023 at 4:00 p.m. (prevailing Eastern Time)**, there will not be a hearing to consider such Motion, and an order, substantially in the form attached to the Motion as **Exhibit A** (the "**Proposed Order**"), will be presented to the Honorable Sean H. Lane, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Southern District of New York, 300 Quarropas Street, White Plains, New York 10601 (the "**Bankruptcy Court**"), for approval and signature on **July 17, 2023 at 10:00 a.m. (prevailing Eastern Time)**.

**PLEASE TAKE FURTHER NOTICE** that, if a written objection is timely filed and served with respect to the Motion or the Court so orders, a hearing (the "**Hearing**") will be held to consider the Motion before the Honorable Sean H. Lane, United States Bankruptcy Judge, at the Bankruptcy Court, on a date to be announced.

**PLEASE TAKE FURTHER NOTICE** that objecting parties are required to attend the Hearing and a failure to appear may result in relief being granted upon default.

**PLEASE TAKE FURTHER NOTICE** that copies of the Motion may be obtained free of charge by visiting the website of Kroll Restructuring Administration at https://restructuring.ra.kroll.com/purduepharma.  You may also obtain copies of any pleadings by visiting the Bankruptcy Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

*[Remainder of Page Intentionally Left Blank]*

Dated:    June 26, 2023
          New York, NY

DAVIS POLK & WARDWELL LLP

By:    */s/ Eli J. Vonnegut*
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile:  (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Eli J. Vonnegut
Christopher S. Robertson

*Counsel to the Debtors*
*and Debtors in Possession*

**DAVIS POLK & WARDWELL LLP**
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Eli J. Vonnegut
Christopher S. Robertson

*Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | **Chapter 11** |
| **PURDUE PHARMA L.P.,** *et al.*, | **Case No. 19-23649 (SHL)** |
| Debtors.[1] | **(Jointly Administered)** |

**MOTION OF DEBTORS FOR ENTRY OF AN**
**ORDER (I) AUTHORIZING ENTRY INTO THE THIRD AMENDMENT TO**
**HEADQUARTERS LEASE AND (II) GRANTING RELATED RELIEF**

Purdue Pharma L.P. ("**PPLP**") and its affiliates that are the debtors and debtors in

possession in these proceedings (collectively, the "**Debtors**," the "**Company**" or "**Purdue**"),

hereby file this *Motion of Debtors for Entry of an Order (I) Authorizing Entry into the Third*

*Amendment to Headquarters Lease and (II) Granting Related Relief* (the "**Motion**"). In support

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Purdue Products L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

of this Motion, the Debtors rely on the *Declaration of Edward Borkowski in Support of Motion of Debtors for Entry of an Order (I) Authorizing Entry into the Third Amendment to Headquarters Lease and (II) Granting Related Relief* (the "**Borkowski Declaration**") attached hereto as **Exhibit B** and respectfully state as follows:

## Jurisdiction and Venue

1.      The United States Bankruptcy Court for the Southern District of New York (the "**Court**") has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.).  This is a core proceeding pursuant to 28 U.S.C. § 157(b) and, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), the Debtors consent to entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter a final order or judgment consistent with Article III of the United States Constitution.

2.      Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## General Background

3.      On September 15, 2019 (the "**Petition Date**"), the Debtors each commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101, *et seq.* (as amended or modified, the "**Bankruptcy Code**").  The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On September 27, 2019, the United States Trustee for the Southern District of New York appointed the official committee of unsecured creditors (the "**Creditors' Committee**").  No trustee has been appointed in these chapter 11 cases.

2

4.      Additional information about the Debtors' businesses and the events leading up to the Petition Date can be found in the *Debtors' Informational Brief* filed on September 16, 2019 [Docket No. 17].

### Relief Requested

5.      By this Motion, and pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, the Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit A** (the "**Order**"), authorizing the Debtors to enter into an amendment, substantially in the form attached hereto as **Exhibit C** (the "**Third Amendment to Lease**"), to that certain Lease (as amended by that certain First Amendment to Lease dated as of November 13, 2020 and further amended by that certain Second Amendment to Lease dated as of November 30, 2021, the "**Lease**")[2] dated as of January 31, 2020 between Landlord (defined below) and PPLP to extend the Term for an additional period and modify the Lease in certain other respects.

### The Debtors' Existing Lease

6.      Purdue's corporate headquarters is located at One Stamford Forum, an office building located at 201 Tresser Boulevard, Stamford, CT 06901 (the "**Building**").   Borkowski Decl. ¶ 4.  The Building contains approximately 481,266 rentable square feet.  Borkowski Decl. ¶ 4.  The Building is owned by One Stamford Realty L.P. ("**OSR**"), which is beneficially owned by certain affiliates of the Debtors' existing shareholders.  Borkowski Decl. ¶ 4.  Pursuant to that certain Order (the "**Receivership Order**") of the Superior Court for the Judicial District of Stamford/Norwalk, Connecticut Approving Stipulation for Order Appointing Receiver, dated October 25, 2022 [Docket No. FST-CV22-6058618-S], Ian Lagowitz of Trigild, Inc. was appointed as receiver (solely in such capacity, the "**Receiver**" or the "**Landlord**") to take

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Lease.

possession and control of the Building and exercise all rights and powers under the Receivership Order, including the authority to negotiate and enter into any new contracts in the ordinary course of the business of the Building and to modify existing agreements and contracts in the ordinary course of the business of the Building.  Borkowski Decl. ¶ 4.

7.      The Term of the Lease commenced on January 1, 2021 and will end on December 31, 2023 (except with respect to the data center, which PPLP currently leases on a month-to-month basis), unless it is extended.  Borkowski Decl. ¶ 5.  On February 24, 2020, the Court approved the Debtors' entry into the existing Lease [Docket No. 866].[3]  Pursuant to the Lease, PPLP leases all of floors nine and ten and portions of floors P-1 (including but not limited to a portion of the data center) and P-3 of the Building.  Borkowski Decl. ¶ 5.  The Debtors are current on their obligations under the Lease.  Borkowski Decl. ¶ 5.  The Debtors' office space needs have not changed materially since January 2021, and the space will be sufficient for the Debtors' current footprint.  Borkowski Decl. ¶ 5.

### Entry into the Third Amendment to Lease

8.      With the expiration of the Lease of the Debtors' headquarters office space approaching at year end, the Debtors needed to either secure an extension of the Lease or identify a suitable alternative, negotiate a lease and plan out the new offices, all with sufficient lead time to avoid undue disruption to the Debtors' business.  Borkowski Decl. ¶ 6.  The Debtors carefully considered the available options and ultimately concluded the Third Amendment to Lease presented the best alternative.  Borkowski Decl. ¶ 6.

---

[3] Additional background with respect to the current Lease and prior arrangements with respect to the Debtors' headquarters can be found in the *Motion of Debtors for Entry of an Order (I) Authorizing the Rejection of Commercial Lease, (II) Authorizing Entry into New Headquarters Lease, (III) Authorizing the Assumption of Commercial Leases, and (IV) Granting Related Relief* [Docket No. 796].

9.      The Debtors believe that they have negotiated an attractive extension of the Lease to remain in the Building after the end of this year.  The Third Amendment to Lease is a three-year extension of the Lease with a term commencing on January 1, 2024 and ending on December 31, 2026, except with respect to the data center, which will have a term commencing on the date of the Third Amendment to Lease and expiring on December 31, 2023.  Borkowski Decl. ¶ 7.  The leased premises include the ninth and tenth floors (103,733 square feet in the aggregate) of the Building and portions of the P-1 and P-3 floors, which the Debtors currently occupy.  Borkowski Decl. ¶ 7.  The total rent for the three-year lease is expected to be approximately $10.6 million, which represents a savings of approximately $2.5 million in the first year and approximately $2.1 million in each subsequent year relative to 2023 under the current Lease.  Borkowski Decl. ¶ 7.  The Debtors have confirmed with their real estate broker, CBRE, that the rent per square foot and the calculation of rentable square footage under the Third Amendment to Lease is consistent with the Stamford market.  Borkowski Decl. ¶ 7.

10.      Because the Debtors will remain in the Building, they will not incur any material moving costs or risk disruptions to their operations and their employees' lives.  Borkowski Decl. ¶ 8.  In addition, alternative subleasing options would have included restrictive lease terms, uncertain renewal options and a lack of a direct relationship with the Building owner, any new space would require renovations to fit the Debtors' specific requirements, and many alternatives lack the storage space provided at the Building.  The Debtors took these factors into account in concluding that the Third Amendment to Lease provided a superior alternative to available options to relocate.  Borkowski Decl. ¶ 8.

11.      The negotiation of the terms of the Third Amendment to Lease was conducted at arm's length.  Borkowski Decl. ¶ 9.  Negotiations were conducted with the Receiver.  Borkowski

Decl. ¶ 9.  Because the Third Amendment to Lease is for only three years, which is on the low

end of customary market terms, management will have the opportunity to reevaluate the

Company's location, in light of any changes to the Debtors' needs.  Borkowski Decl. ¶ 9.

Additionally, the Receiver is currently pursuing the sale of the Building.  Borkowski Decl. ¶ 9.

In the event that the sale occurs prior to the execution of the Third Amendment to Lease, the new

owner may not agree to accept the negotiated terms.  Borkowski Decl. ¶ 9.  In light of these

circumstances and the pending expiration of the Lease, the Debtors believe that entry into the

Third Amendment to Lease in an expeditious manner, with a term commencing on January 1,

2024, presents the best available option for the Debtors' business and is in the best interest of the

Debtors and their estates.  Borkowski Decl. ¶ 9.

## Basis for Relief

### Entry into the Third Amendment to Lease is an Appropriate Exercise
### of the Debtors' Business Judgment and Should Be Authorized

12.     Bankruptcy Code section 363(b)(1) empowers the Court to authorize a debtor to

"use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ."

11 U.S.C. § 363(b)(1).  Under applicable case law, in this and other circuits, if a debtor's

proposed use of its assets pursuant to section 363(b) of the Bankruptcy Code represents a

reasonable business judgment on the part of the debtor, such use should be approved.  *See, e.g.,*

*In re MF Global Inc.*, 467 B.R. 726, 730 (Bankr. S.D.N.Y. 2012) ("Although not specified by

section 363, the Second Circuit requires that transactions under section 363 be based on the

sound business judgment of the debtor or trustee."); *Comm. of Equity Sec. Holders v. Lionel*

*Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983) ("The rule we adopt requires that

a judge determining a § 363(b) application expressly find from the evidence presented before

him at the hearing a good business reason to grant such an application."); *Comm. of Asbestos-*

*Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct.").  Although the determination of what constitutes a sufficient business reason depends on the facts and circumstances of each case, a debtor often satisfies the business judgment standard if the actions were undertaken "on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993) (citation omitted).  Moreover, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct."  *In re Johns-Manville Corp.*, 60 B.R. at 616.

13.    Additionally, section 105(a) of the Bankruptcy Code provides that the "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  Pursuant to section 105(a), orders are appropriate where they are essential to the debtor's reorganization efforts and do not pose a burden on the debtor's creditors.  *See U.S. Lines, Inc. v. Am. S.S. Owners Mut. Prof. & Indem. Ass'n (In re U.S. Lines, Inc.)*, 197 F.3d 631, 640 (2d Cir. 1999); *Momentum Mfg. Corp. v. Emp. Creditors Comm. (In re Momentum Mfg. Corp.)*, 25 F.3d 1132, 1136 (2d Cir. 1994) ("It is well settled that bankruptcy courts are courts of equity, empowered to invoke equitable principles to achieve fairness and justice in the reorganization process.").

14.    Entry into the Third Amendment to Lease represents a sound exercise of the Debtors' business judgment.  As described above, the Debtors have carefully evaluated whether

remaining in the Building or relocating to a different location is best for the Company at this time. Borkowski Decl. ¶ 6. The Debtors have made a reasonable business judgment that extending the lease at their current location is the best available alternative, considering both costs and other factors detailed above including the nature and terms of available alternative locations as well as moving costs. As described above, the terms under the Third Amendment to Lease meet the Debtors' business needs and allow them to retain the current office space at a reduced base rent. Borkowski Decl. ¶ 7. Given that the Building may be sold in the future, the Debtors believe that it is in their best interest to execute the Third Amendment to Lease with the current Landlord to mitigate any risk that a future owner may not accept the negotiated terms. Borkowski Decl. ¶ 9. Moreover, the Debtors do not believe that they would benefit from further efforts to identify additional options. Authorizing the Debtors to enter into the Third Amendment to Lease will therefore allow the Debtors to maximize the value of their estates for the benefit of all parties in interest.

15.    In light of the foregoing, the Debtors respectfully request that the Court approve the entry into the Third Amendment to Lease pursuant to sections 105(a) and 363(b) of the Bankruptcy Code.

### **Debtors' Reservation of Rights**

16.    Nothing contained herein or any action taken pursuant to such relief is intended or shall be construed as (a) an admission as to the validity or priority of any claim against the Debtors; (b) a waiver of the Debtors' or any appropriate party in interest's rights to dispute the amount of, basis for or validity of any claim against the Debtors; or (c) a waiver of any claims or causes of action which may exist against any creditor or interest holders or any other party. Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's

order is not intended to be and should not be construed as an admission as to the validity or priority of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

<u>**Waiver of Stay under Bankruptcy Rule 6004(h)**</u>

17.     The Debtors also request that, to the extent applicable to the relief requested in this Motion, the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).   As described above, the relief that the Debtors seek in this Motion is necessary for the Debtors to preserve value for their estates.   Accordingly, the Debtors respectfully request that the Court waive the 14-day stay imposed by Bankruptcy Rule 6004(h), as the nature of the relief sought herein justifies immediate relief.

<u>**Notice**</u>

18.     Notice of this Motion will be provided as to (a) the entities on the Master Service List (as defined in the Case Management Order and available on the Debtors' case website at https://restructuring.ra.kroll.com/purduepharma) and (b) any person or entity with a particularized interest in the subject matter of this motion.  The Debtors respectfully submit that no further notice is required.

<u>**No Prior Request**</u>

19.     The Debtors have not previously sought the relief requested herein from the Court or any other court.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as may be just and proper.

Dated:   June 26, 2023
         New York, NY

                                    DAVIS POLK & WARDWELL LLP

                                    By:  */s/ Eli J. Vonnegut*
                                    DAVIS POLK & WARDWELL LLP
                                    450 Lexington Avenue
                                    New York, New York 10017
                                    Telephone: (212) 450-4000
                                    Facsimile:  (212) 701-5800
                                    Marshall S. Huebner
                                    Benjamin S. Kaminetzky
                                    Eli J. Vonnegut
                                    Christopher S. Robertson

                                    *Counsel to the Debtors*
                                    *and Debtors in Possession*

## Exhibit A

**Proposed Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| **In re:** | **Chapter 11** |
| **PURDUE PHARMA L.P.**, *et al.*, | **Case No. 19-23649 (SHL)** |
| **Debtors.**[1] | **(Jointly Administered)** |

## ORDER (I) AUTHORIZING ENTRY INTO THE THIRD AMENDMENT TO HEADQUARTERS LEASE AND (II) GRANTING RELATED RELIEF

Upon the motion (the "**Motion**")[2] of Purdue Pharma L.P. and its affiliates that are debtors

and debtors in possession in these proceedings (collectively, the "**Debtors**") for entry of an

order, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, authorizing them to enter

into the Third Amendment to Lease, as more fully described in the Motion; and the Court having

jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157

and 1334 and the Amended Standing Order of Reference M-431, dated January 31, 2012

(Preska, C.J.); and consideration of the Motion and the relief requested therein being a core

proceeding under 28 U.S.C. § 157(b); and venue being proper before the Court pursuant to 28

U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided to the

Notice Parties, and it appearing that no other or further notice need be provided; and the Court

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Purdue Products L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

[2] Unless otherwise defined herein, each capitalized term shall have the meaning ascribed to such term in the Motion.

having reviewed the Motion and the Borkowski Declaration; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and the Court having determined that the relief requested is in the best interests of the Debtors, their estates, creditors and all parties in interest; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor;

### IT IS HEREBY ORDERED THAT

1.      The relief requested in the Motion is hereby granted as set forth herein.

2.      Pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, the Debtors are authorized to enter into the Third Amendment to Lease in accordance with its terms without further Court approval, and to enter into any agreements contemplated by the Third Amendment to Lease and to execute, deliver, implement and fully perform any and all obligations, instruments, documents and papers, and to take any and all actions that may be reasonably necessary or appropriate to implement the Third Amendment to Lease.

3.      Nothing in the Motion or this Order shall be deemed to, or constitute an admission as to, the validity or priority of any claim against the Debtors, or constitute an assumption or postpetition reaffirmation of any agreement, plan, practice, program, policy, executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code or a waiver of any rights of the Debtors.

4.      Any Bankruptcy Rule (including, but not limited to, Bankruptcy Rule 6004(h)) or Local Rule that might otherwise delay the effectiveness of this Order is hereby waived, and the terms and conditions of this Order shall be effective immediately and enforceable upon its entry.

5.      The contents of the Motion and the notice procedures set forth therein are good and sufficient notice and satisfy the Bankruptcy Rules and the Local Rules, and no other or further notice of the Motion or the entry of this Order shall be required.

6.      The Debtors are authorized to take all such actions as are necessary or appropriate to implement the relief granted in this Order.

7.      The Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and enforcement of this Order.

White Plains, New York
Dated: _____, 2023

_____
THE HONORABLE SEAN H. LANE
UNITED STATES BANKRUPTCY JUDGE

## Exhibit B

**Borkowski Declaration**

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Eli J. Vonnegut
Christopher S. Robertson

*Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **PURDUE PHARMA L.P.,** *et al.*, | **Case No. 19-23649 (SHL)** |
| **Debtors.**[1] | **(Jointly Administered)** |

**DECLARATION OF EDWARD BORKOWSKI IN SUPPORT OF MOTION OF
DEBTORS FOR ENTRY OF AN ORDER (I) AUTHORIZING ENTRY INTO THE
THIRD AMENDMENT TO HEADQUARTERS LEASE AND (II) GRANTING
<u>RELATED RELIEF</u>**

   I, Edward Borkowski, being fully sworn, hereby declare that the following is true to the

best of my knowledge, information and belief:

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Purdue Products L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF L.P. (0495), SVC Pharma L.P. (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

1.      I am an Executive Vice President and the Chief Financial Officer of Purdue Pharma L.P. ("**PPLP**" and, collectively with each of the other above-captioned debtors, the "**Debtors**," the "**Company**" or "**Purdue**").  I have held this position since May 8, 2023 and have worked in executive roles for public and private life science companies for more than twenty years.  Prior to joining Purdue, I served as Executive Vice President of Therapeutics MD, a women's healthcare company, Interim CFO of MiMedx, a bio pharmaceutical company, and CFO of Concordia International, an international specialty pharmaceutical company.  I also previously served as CFO of two firms, CareFusion and Mylan.  I currently also serve on the board of directors of FirstWave BioPharma, Inc. as lead independent director.  I am a Certified Public Accountant and received a BS in Economics and Political Science from Allegheny College and MBA in Finance and Accounting from Rutgers University.  I am familiar with the day-to-day operations, business and financial affairs of the Debtors.

2.      I submit this declaration (this "**Declaration**") in support of the *Motion of Debtors for Entry of an Order (I) Authorizing Entry into the Third Amendment to Headquarters Lease and (II) Granting Related Relief* (the "**Motion**").[2]  I am authorized to submit this Declaration on behalf of the Debtors.

3.      Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees working under my supervision, or my opinion based upon experience, knowledge and information concerning the operations of the Debtors.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.

---

[2] Capitalized term used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

4.      Purdue's corporate headquarters is located at One Stamford Forum, an office building located at 201 Tresser Boulevard, Stamford, CT 06901 (the "**Building**").  The Building contains approximately 481,266 rentable square feet.  The Building is owned by One Stamford Realty L.P. ("**OSR**"), which is beneficially owned by certain affiliates of the Debtors' existing shareholders.  I understand that, pursuant to that certain Order (the "**Receivership Order**") of the Superior Court for the Judicial District of Stamford/Norwalk, Connecticut Approving Stipulation for Order Appointing Receiver, dated October 25, 2022 [Docket No. FST-CV22-6058618-S], Ian Lagowitz of Trigild, Inc. was appointed as receiver (solely in such capacity, the "**Receiver**" or the "**Landlord**") to take possession and control of the Building and exercise all rights and powers under the Receivership Order, including the authority to negotiate and enter into any new contracts in the ordinary course of the business of the Building and to modify existing agreements and contracts in the ordinary course of the business of the Building.

5.      The Term of the Lease commenced on January 1, 2021 and will end on December 31, 2023 (except with respect to the data center, which PPLP currently leases on a month-to-month basis), unless it is extended.  Pursuant to the Lease, PPLP leases all of floors nine and ten and portions of floors P-1 (including but not limited to a portion of the data center) and P-3 of the Building.  The Debtors are current on their obligations under the Lease.  The Debtors' office space needs have not changed materially since January 2021 and the space will be sufficient for the Debtors' current footprint.

6.      With the expiration of the Lease of the Debtors' headquarters office space approaching at year end, the Debtors needed to either secure an extension of the Lease or identify a suitable alternative, negotiate a lease and plan out the new offices, all with sufficient lead time

to avoid undue disruption to the Debtors' business. The Debtors carefully considered the available options and ultimately concluded the Third Amendment to Lease presented the best alternative.

7.      The Debtors determined that the Third Amendment to Lease represents an attractive extension of the Lease to remain in the Building after the end of this year. The Third Amendment to Lease is a three-year extension of the Lease with a term commencing on January 1, 2024 and ending on December 31, 2026, except with respect to the data center, which will have a term commencing on the date of the Third Amendment to Lease and expiring on December 31, 2023. The leased premises include the ninth and tenth floors (103,733 square feet in the aggregate) of the Building and portions of the P-1 and P-3 floors, which the Debtors currently occupy. The total rent for the three-year lease extension is expected to be approximately $10.6 million, which represents a savings of approximately $2.5 million in the first year and approximately $2.1 million in each subsequent year relative to 2023 under the current Lease. The Debtors have confirmed with their real estate broker, CBRE, that the rent per square foot and the calculation of rentable square footage under the Third Amendment to Lease is consistent with the Stamford market.

8.      By remaining in their current location under the Third Amendment to Lease, the Debtors will not have to incur any moving costs (estimated to range from approximately $160,000 to $340,000 if they were to re-locate) or risk disruptions to their operations and their employees' lives. With the assistance of CBRE, the Debtors considered in detail three potentially available locations in Stamford, CT that met the Debtors' preliminary requirements. In two of the locations, certain areas of the space still needed to be constructed and the third location would have required the Debtors to arrange for significant renovations. In all three locations, the Debtors would have needed to also rent additional storage space to match what they currently have (and require) in their existing Lease; two of the buildings entirely lack adequate storage facilities, while the third

would require an additional build-out to potentially suit the Debtors' needs.  Further, each of these options would have involved a sublease from an existing tenant, which would introduce more restrictive lease terms, uncertain renewal options and a lack of a direct relationship with the building owner.  The Debtors took these factors into account in concluding that the Third Amendment to Lease provides a superior alternative to available options to relocate.

9.      Negotiation of the terms of the Third Amendment to Lease were conducted at arm's length with the Receiver and the Receiver's professional representatives.  Because the Third Amendment to Lease is for only three years, which is on the low end of customary market terms, management will have the opportunity to reevaluate the Company's location in light of any changes to the Debtors' needs in the relatively near term.  Additionally, the Receiver is currently pursuing the sale of the Building.  In the event that the sale occurs prior to the execution of the Third Amendment to Lease, the new owner may not agree to accept the negotiated terms.  In light of these circumstances and the pending expiration of the Lease, the Debtors believe that entry into the Third Amendment to Lease in an expeditious manner, with a term commencing on January 1, 2024, presents the best available option for the Debtors' business and is in the best interest of the Debtors and their estates.

10.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge and belief.

*[Remainder of Page Intentionally Left Blank]*

5

Executed:    June 26, 2023

By:   */s/ Edward Borkowski*
 **Edward Borkowski**
 EVP, Chief Financial Officer

**<u>Exhibit C</u>**

**Third Amendment to Lease**

## THIRD AMENDMENT TO LEASE

THIS THIRD AMENDMENT TO LEASE (this "**Amendment**") is made and entered into as of June 23, 2023 (the "**Agreement Date**"), by and between IAN LAGOWITZ OF TRIGILD, SOLELY IN HIS CAPACITY AS RECEIVER PURSUANT TO THAT CERTAIN ORDER APPROVING STIPULATION FOR ORDER APPOINTING RECEIVER DATED OCTOBER 25, 2022, in the Superior Court for the Judicial District of Stamford/Norwalk, Connecticut in Docket No. FST-CV22-6058618-S (in such capacity, "**Landlord**"), and Purdue Pharma L.P., a Delaware limited partnership ("**Tenant**").

R E C I T A L S :

A.        Landlord and Tenant are parties to that certain Lease dated as of January 31, 2020 (the "**Original Lease**"), as amended by that certain First Amendment to Lease dated as of November 13, 2020 (the "**First Amendment**"), as further amended by that certain Second Amendment to Lease dated as of November 30, 2021 (the "**Second Amendment**"; and together with the Original Lease and the First Amendment, the "**Lease**") pursuant to which Tenant leases from Landlord certain premises (collectively, the "**Premises**") consisting of (i) the entire ninth (9th) floor consisting of approximately 52,600 rentable square feet of space, (ii) the entire tenth (10th) floor consisting of approximately 51,133 rentable square feet of space, (iii) certain Ancillary Space (as defined in the Lease), (iv) certain Storage Space (as defined in the Lease), and (v) certain Data Center West Space (as defined in the Lease) in the building located at One Stamford Forum, Stamford, Connecticut (the "**Building**"), all as more particularly described in the Lease.

B.        The Term (as defined in the Lease) with respect to (i) the Office Premises, the Ancillary Space and the Storage Space is scheduled to expire on December 31, 2023 and (ii) the Data Center West Space expired on December 31, 2022, but has continued on a month to month basis.

C.        Tenant is a debtor in a bankruptcy proceeding pending before the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"), Case No. 19-23649 (the "**Purdue Bankruptcy**"). The Bankruptcy Court authorized Tenant to enter into the Lease.

D.        Landlord and Tenant desire to amend the Lease to (i) extend the Term for an additional period, and (ii) modify the Lease in certain other respects, all on the terms and conditions set forth herein. As provided in Section 12 below, the effectiveness of this Amendment is conditioned upon and subject to approval of the Bankruptcy Court, which Tenant will seek.

A G R E E M E N T :

NOW, THEREFORE, for valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant agree as follows:

1.        Recitals; Capitalized Terms. The recitals set forth herein above are incorporated herein as if restated in their entireties. All capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to them in the Lease.

2.    <u>Amendment of Certain Lease Provisions</u>.  Landlord and Tenant hereby agree that the Lease shall be amended as follows:

(a)    The Term with respect to (i) the Data Center West Space is hereby extended until December 31, 2023 (the "**Data Center West Space Expiration Date**") and (ii) the Premises (other than the Data Center West Space) is hereby extended for an additional period of three (3) years, commencing on January 1, 2024 (the "**Extension Term Commencement Date**") and expiring on December 31, 2026 (the "**New Expiration Date**"), unless sooner terminated as provided in the Lease.  From and after the date hereof, all references in the Lease to the expiration of the Term shall refer to the New Expiration Date, as defined herein.  The extension period described above is herein referred to as the "**Extension Term**."  Tenant's lease of the Premises during the Extension Term shall be on the same terms and conditions as set forth in the Lease, as amended hereby.

(b)    Section 1.01 of the Lease is hereby deleted and amended and restated in its entirety as follows:

"1.01    **Demise.**  (a)    Landlord hereby leases to Tenant and Tenant hereby hires from Landlord, subject to the terms and conditions of this Lease, the entire ninth (9th) floor of the Building consisting of approximately 52,600 rentable square feet, the entire tenth (10th) floor of the Building consisting of approximately 51,133 rentable square feet, the Ancillary Space, the Storage Space and the Data Center West Space.  "**Ancillary Space**" means the portion of the P-3 floor of the Building consisting of approximately 16,650 rentable square feet as shown on the plans of such floor attached hereto as **Exhibit B-1**.  "**Storage Space**" means the portion of the P-1 floor of the Building consisting of approximately 1,042 rentable square feet as shown on the plans of such floor attached hereto as **Exhibit B-2**.  "**Data Center West Space**" means the portion of the P-1 floor of the Building consisting of approximately 2,661 rentable square feet as shown on the plans of such floor attached hereto as **Exhibit B-3**.    The ninth (9th) and tenth (10th) floors of the Building as shown on the plans of such floors attached hereto as **Exhibit B** are collectively called the "**Office Premises**"; the Office Premises, the Ancillary Space, the Storage Space, and the Data Center West Space are collectively called the "**Premises**."

(b)    Landlord and Tenant confirm that (i) the Building is deemed to contain 481,266 rentable square feet, (ii) the Office Premises is deemed to contain 103,733 rentable square feet, (iii) the Ancillary Space is deemed to contain 16,650 rentable square feet, (iv) the Storage Space is deemed to contain 1,042 rentable square feet, and (v) the Data Center West Space is deemed to contain 2,661 rentable square feet, each as set forth on **Exhibit C** attached hereto.  As used in this Lease, the term "**Tenant's Share**" shall mean (i) 25.8%, computed by dividing the sum of the Office Premises, the Ancillary Space, the Storage Space, and the Data Center West Space (i.e., 124,086) by the rentable square footage of the Building (i.e., 481,266) until the Data Center West Expiration Date and thereafter (ii) 25.2%, computed by dividing the sum of the Office Premises, the Ancillary Space and the Storage Space (i.e., 121,425) by the rentable square footage of the Building (i.e.,

2

481,266).  Notwithstanding the foregoing, Landlord and Tenant agree that, for purposes of calculating Fixed Rent for the Office Premises, the Office Premises is deemed to contain 65,000 rentable square feet, as set forth on **Exhibit G** attached hereto.

(c)     The leasing of the Premises by Tenant shall include (i) the right of Tenant to use the plazas, lobbies, corridors, stairways, elevators and other public and common areas of the Building and the Land, as the same may exist from time to time, in common with other tenants in the Building, and (ii) all fixtures, improvements, and betterments owned or leased by Landlord which, at any time during the Term, are attached to or installed in the Premises."

(c)     Section 1.04 of the Lease is hereby deleted and amended and restated in its entirety as follows:

"1.04   **Early Termination by Landlord**.  By provision of written notice given by Landlord to Tenant at any time on or after January 1, 2025, Landlord shall have the right, in Landlord's sole discretion, to accelerate the Expiration Date to a date which is no sooner than twelve (12) months from the date of Landlord's written notice (the "**Accelerated Expiration Date**").  Landlord may set a later Accelerated Expiration Date (provided such date falls on or before December 31, 2026), but not an earlier Accelerated Expiration Date (i.e., less than twelve (12) months from the date of Landlord's notice)."

(d)     The following sentence is hereby added to the end of Section 2.05: Notwithstanding anything to the contrary contained in this Section 2.05, the Prepaid Rent shall be applied to the Fixed Rent for the period commencing on July 1, 2023 through December 31, 2023.

(e)     The following provisions shall be added to the Lease as Section 2.07:

"2.07   **Operating Expense and Tax Escalations**.

(a)   **Escalation Definitions**.  For the purposes of this Section 2.07, the following terms shall have the meanings set forth below.

(i)      "**Assessed Valuation**" shall mean the amount for which the Project is assessed by the Office of the Tax Collector for the City of Stamford, Connecticut for the purpose of calculating all or any portion of the Taxes payable with respect to the Project.

(ii)     "**Base Operating Expenses**" shall mean the Operating Expenses for the Base Operating Year.

(iii)    "**Base Operating Year**" shall mean the calendar year ending December 31, 2024.

(iv)     "**Base Taxes**" shall mean the Taxes payable for the Tax Year commencing July 1, 2022 and ending June 30, 2023.

(v)   **"Operating Expenses"** shall mean all expenses, costs and amounts of every kind and nature which Landlord actually pays or incurs (whether on a cash or accrual basis) during any Operating Year because of or in connection with the ownership, management, maintenance, security, repair, replacement, restoration or operation of the Project, or any portion thereof.  Without limiting the generality of the foregoing, Operating Expenses shall specifically include any and all of the following:  (i) the cost of supplying all utilities (other than the cost of any such utilities supplied to any tenantable or tenant-occupied space in the Project), the cost of operating, repairing, and maintaining the utility, telephone, mechanical, sanitary, storm drainage, and elevator systems, and the cost of maintenance and service contracts in connection therewith; (ii) the cost of licenses, certificates, permits and inspections and the cost of contesting any governmental enactments which may affect Operating Expenses, and the costs incurred in connection with a transportation system management program or similar program; (iii) the cost of all commercially reasonable insurance carried by Landlord in connection with the Project; (iv) the cost of landscaping, relamping, and all supplies, tools, equipment and materials used in the operation, repair and maintenance of the Project, or any portion thereof; (v) costs incurred in connection with the repair, maintenance, or security of the parking areas servicing the Project; (vi) reasonable fees and other costs, including market-based management fees, consulting fees, legal fees and accounting fees, of all contractors and consultants in connection with the management, operation, maintenance and repair of the Project (but excluding any such costs to the extent incurred in the enforcement of any other lease or occupancy agreement at the Project); (vii) payments under any equipment rental agreements; (viii) wages, salaries and other compensation and benefits, including taxes levied thereon, of all persons engaged in the operation, maintenance and security of the Project below the level of property manager for the Project; (ix) costs under any instrument pertaining to the sharing of costs by the Project; (x) operation, repair, maintenance and replacement of all systems and equipment and components thereof of the Project; provided, however, that any capital expenditure shall be amortized with interest at the Prime Rate over its useful life (as shall be reasonably determined consistent with GAAP); (xi) the cost of janitorial (other than the cost of any such janitorial services supplied to any tenantable or tenant-occupied space in the Project), alarm, security and other services, replacement of wall and floor coverings, ceiling tiles and fixtures in common areas, maintenance and replacement of curbs and walkways, repair to roofs and re-roofing; provided, however, that any capital expenditure shall be amortized with interest at the Prime Rate over its useful life (as shall be reasonably determined consistent with GAAP); (xii) amortization (including interest at the Prime Rate on the unamortized cost) of the cost of acquiring personal property used in the maintenance, operation and repair of the Project, or any portion thereof; (xiii) the cost of capital improvements or other costs incurred in connection with the Project that are required under any governmental law or regulation first enacted and enforced following the Commencement Date; provided, however, that any such capital expenditure shall be amortized with interest at the Prime Rate over its useful life (as shall be reasonably determined consistent with GAAP); (xiv) costs, fees, charges or assessments imposed by, or

resulting from, any mandate imposed on Landlord by, any federal, state or local government for fire and police protection, municipal trash removal, community services, or other services which do not constitute Taxes; and (xv) payments under any easement, license, operating agreement, declaration, restrictive covenant, or instrument pertaining to the sharing of costs by the Project (but not any ground or superior lease). Notwithstanding the foregoing, (A) any capital expenditure shall be amortized with interest at the Prime Rate over its useful life (as shall be reasonably determined consistent with GAAP) and (B) the following shall be deducted or excluded (as applicable) from Operating Expenses for purposes of determining Tenant's pro rata share thereof: (1) reserves for future expenses; (2) items for which Landlord receives reimbursement from other sources or is otherwise reimbursed under this Lease, or would have been reimbursed or entitled to reimbursement had Landlord (A) maintained the insurance required by this Lease or by the terms of any mortgage encumbering the Project or part thereof and/or (B) duly and timely submitted for reimbursement from the applicable source; (3) expenses for repairs or maintenance which are covered by warranties, guaranties or service contracts (excluding any mandatory deductible); (4) any payments on mortgages or other indebtedness; ground rents; expenses incurred in leasing or procuring tenants, including, without limitation, expenses incurred to prepare, renovate, repaint, redecorate or perform any other work in any space leased to an existing tenant or prospective tenant of the Building, or enforcing the terms of any lease or other occupancy agreement; (5) advertising expenses; (6) salaries, fringe benefits and other compensation for employees at or above the level of property manager; (7) expenses for repairs and other work occasioned by fire, windstorm or other insured casualties; (8) costs of correcting construction defects; (9) expenses related to environmental matters not caused by Tenant; (10) costs of any fine art installed at the Project; (11) cost to correct any penalty or fine incurred by Landlord due to Landlord's violation of any federal, state, or local law or regulation and any interest or penalties due for late payment by Landlord of any of the Operating Expenses; (12) cost of repairs necessitated by Landlord's gross negligence or willful misconduct; (13) expenses for any item or service not provided to Tenant but exclusively to certain other tenants in the Building; (14) Landlord's general corporate overhead and administrative expenses except if it is solely for the Building; (15) fees paid to affiliates of Landlord to the extent that such fees exceed the customary amount charged for the services provided; (16) Taxes and Excluded Taxes (as such terms are hereinafter defined) and (17) other items not commercially reasonable or not customarily included as operating expenses for similar buildings.

(vi)  **"Operating Statement"** shall mean a statement in reasonable detail setting forth a comparison of the Operating Expenses for an Operating Year with the Base Operating Expenses and the Escalation Rent for the preceding Operating Year pursuant to the provisions of this Section 2.07.

(vii)  **"Operating Year"** shall mean each calendar year subsequent to the Base Operating Year for any part or all of which occurs during the Term.

(viii)   "**Taxes**" shall mean the aggregate amount of real estate taxes and any general or special assessments (exclusive of penalties and interest thereon) imposed upon the Project including, without limitation: (i) assessments made upon or with respect to any "air" and "development" rights now or hereafter appurtenant to or affecting the Project; (ii) any fee, tax, or charge imposed by any governmental authority for any vaults, vault space, or other space within or outside the boundaries of the Project; and (iii) any taxes or assessments levied after the date of this Lease in whole or in part for public benefits to the Project or the Building, including, without limitation, any business improvement district taxes and assessments without taking into account any discount that Landlord may receive by virtue of any early payment of Taxes; provided, that if because of any change in the taxation of real estate, any other tax or assessment, however denominated (including, without limitation, any franchise, income, profit, sales, use, occupancy, gross receipts, or rental tax) is imposed upon Landlord or the owner of the Project or the Building, or the occupancy, rents, or income therefrom, in substitution for any of the foregoing Taxes, such other tax or assessment shall be deemed part of Taxes computed as if Landlord's sole asset were the Project. With respect to any Tax Year, all expenses, including reasonable attorneys' fees and disbursements, experts', and other witnesses' fees, incurred in contesting the validity or amount of any Taxes or in obtaining a refund of Taxes shall be considered as part of the Taxes for such Tax Year. Anything contained herein to the contrary notwithstanding, Taxes shall not be deemed to include: (A) any taxes on Landlord's income; (B) franchise taxes, or corporate or unincorporated business taxes; (C) estate, gift, succession, or inheritance taxes; or (D) any capital gains, mortgage recording, or transfer taxes, or any similar taxes imposed on Landlord, unless such taxes are levied, assessed, or imposed in lieu of or as a substitute for the whole or any part of the taxes, assessments, levies, or impositions which now constitute Taxes (collectively, (A) – (D) are herein referred to as "**Excluded Taxes**").

(xi)   "**Tax Statement**" shall mean a statement in reasonable detail setting forth a comparison of the Taxes for a Tax Year with the Base Taxes.

(x)   "**Tax Year**" shall mean the period July 1 through June 30 (or such other period as hereinafter may be duly adopted by the governmental authority then imposing taxes as its fiscal year for real estate tax purposes), any portion of which occurs during the Term.

(b)   **Payment of Operating Expenses.**

(i)   If the Operating Expenses for any Operating Year shall be greater than the Base Operating Expenses, then Tenant shall pay as additional rent for such Operating Year, Tenant's Share of such increase (the "**Operating Payment**") as hereinafter provided.

(ii)   At any time during or after the Term, Landlord may render to Tenant an Operating Statement or Statements showing:

(A)    A comparison of the Operating Expenses for the Operating Year in question with the Base Operating Expenses; and

(B)    The amount of the Operating Payment resulting from such comparison.

(iii)    Landlord's failure to render an Operating Statement during or with respect to any Operating Year in question shall not prejudice Landlord's right to render an Operating Statement during or with respect to any subsequent Operating Year and shall not eliminate or reduce Tenant's obligation to make payments of the Operating Payment pursuant to this Section 2.07 for such Operating Year.

(iv)    On the first day of the month following the furnishing to Tenant of an Operating Statement, Tenant shall pay to Landlord a sum equal to 1/12th of the Operating Payment shown thereon to be due for the preceding Operating Year multiplied by the number of months (and any fraction thereof) of the Term then elapsed since the commencement of such Operating Year in which such Operating Statement is delivered, less Operating Payments theretofore made by Tenant for such Operating Year and thereafter, commencing with the then current monthly installment of Fixed Rent and continuing monthly thereafter until rendition of the next succeeding Operating Statement, Tenant shall pay on account of the Operating Payment for such Year an amount equal to 1/12th of the Operating Payment shown thereon to be due for the preceding Operating Year. Any Operating Payment shall be collectible by Landlord in the same manner as Fixed Rent.

(v)    As used in this Section 2.07(b):

(A)    "**Tentative Monthly Escalation Charge**" shall mean a sum equal to 1/12th of the product of: (A) Tenant's Share; and (B) the difference between (1) the Base Operating Expenses and (2) Landlord's estimate of Operating Expenses for the Current Year; and

(B)    "**Current Year**" shall mean the Operating Year in which a demand is made upon Tenant for payment of a Tentative Monthly Escalation Charge.

(vi)    At any time in any Operating Year, Landlord, at its option, in lieu of the payments required under Section 2.07(b)(iv) hereof, may demand and collect from Tenant, as additional rent, a sum equal to the Tentative Monthly Escalation Charge multiplied by the number of months in said Operating Year preceding the demand and reduced by the sum of all payments theretofore made under Section 2.07(b)(iv) with respect to said Operating Year, and thereafter, commencing with the month in which the demand is made and continuing thereafter for each month remaining in said Operating Year, the monthly installments of Fixed Rent shall be deemed increased by the Tentative Monthly Escalation Charge. Any amount due to Landlord under this Section 2.07(b)(vi) may be included by Landlord in any Operating Statement rendered to Tenant as provided in Section 2.07(b)(v) hereof.

(vii)    After the end of the Current Year and at any time that Landlord renders an Operating Statement or Statements to Tenant as provided in Section 2.07(b)(v) hereof with respect to the comparison of the Operating Expenses for said Operating Year or Current Year with the Base Operating Expenses, as the case may be, the amounts, if any, collected by Landlord from Tenant under Section 2.07(b)(iv) or Section 2.07(b)(vi) on account of the Operating Payment or the Tentative Monthly Escalation Charge, as the case may be, shall be adjusted, and, if the amount so collected is less than or exceeds the amount actually due under said Operating Statement for the Operating Year, a reconciliation shall be made by Tenant being debited with any Operating Payment shown on such Operating Statement and credited with the amounts, if any, paid by Tenant on account for the Operating Year in question. Tenant shall pay any net debit balance to Landlord within ten (10) days next following rendition by Landlord of an invoice for such net debit balance and any net credit balance shall be applied against the next accruing monthly installments of Fixed Rent.

(c) **Tax Statement.** At any time during or after the Term, Landlord may render to Tenant a Tax Statement or Statements showing: (a) a comparison of the Taxes for the Tax Year with the Base Taxes; and (b) the amount of the Tax Payment (as defined below) resulting from such comparison. On the first day of the month following the furnishing to Tenant of a Tax Statement, Tenant shall pay to Landlord a sum equal to 1/12th of the Tax Payment shown thereon to be due for such Tax Year multiplied by the number of months of the Term then elapsed since the commencement of such Tax Year. Tenant shall continue to pay to Landlord a sum equal to one-twelfth (1/12th) of the Tax Payment shown on such Tax Statement on the first day of each succeeding month until the first day of the month following the month in which Landlord shall deliver to Tenant a new Tax Statement. If Landlord furnishes a Tax Statement for a new Tax Year subsequent to the commencement thereof, promptly after the new Tax Statement is furnished to Tenant, Landlord shall give notice to Tenant stating whether the amount previously paid by Tenant to Landlord for the current Tax Year was greater or less than the installments of the Tax Payment for the current tax year in accordance with the Tax Statement and: (i) if there shall be a deficiency, Tenant shall pay the amount thereof within ten (10) days after demand therefor; or (ii) if there shall have been an overpayment, Landlord shall credit the amount thereof against the next monthly installments of the Fixed Rent payable under this Lease. Tax Payments shall be collectible by Landlord in the same manner as Fixed Rent. Landlord's failure to render a Tax Statement shall not prejudice Landlord's right to render a Tax Statement during or with respect to any subsequent Tax Year and shall not eliminate or reduce Tenant's obligation to make Tax Payments for such Tax Year.

(d) **Payment of Taxes.** If the Taxes payable for any Tax Year shall represent an increase above the Base Taxes, then Tenant shall pay as additional rent for such Tax Year Tenant's Share of such increase (the "**Tax Payment**") as shown on the Tax Statement with respect to such Tax Year in the manner set forth in subsection (c) above. Tenant shall be obliged to pay the Tax Payment regardless of whether Tenant is exempt in whole or part, from the payment of any Taxes by reason of

8

Tenant's diplomatic status or for any other reason whatsoever. The Taxes shall be computed initially on the basis of the Assessed Valuation in effect at the time the Tax Statement is rendered (as the Taxes may have been settled or finally adjudicated prior to such time) regardless of any then pending application, proceeding, or appeal respecting the reduction of any such Assessed Valuation but shall be subject to subsequent adjustment as provided in Section 2.07(e) hereof.

(e)  **Tax Reduction Proceedings.**

(i)      Only Landlord shall be eligible to institute tax reduction or other proceedings to reduce the Assessed Valuation. In the event that, after a Tax Statement has been sent to Tenant, an Assessed Valuation which had been utilized in computing the Taxes for a Tax Year is reduced (as a result of settlement, final determination of legal proceedings, or otherwise), and as a result thereof a refund of Taxes is actually received by or on behalf of Landlord, then, promptly after receipt of such refund, Landlord shall send Tenant a Tax Statement adjusting the Taxes for such Tax Year (taking into account the expenses mentioned in Section 2.07(a)(viii) hereof) and setting forth Tenant's Share of such refund and Tenant shall be entitled to receive such Share, at Landlord's option, either by way of a credit against the Fixed Rent next becoming due after the sending of such Tax Statement or by a refund to the extent no further Fixed Rent is due; provided, however, that Tenant's Share of such refund shall be limited to the portion of the Tax Payment, if any, which Tenant had theretofore paid to Landlord attributable to increases in Taxes for the Tax Year to which the refund is applicable on the basis of the Assessed Valuation before it had been reduced.

(ii)      In the event that, after a Tax Statement has been sent to Tenant, the Assessed Valuation which had been utilized in computing the Base Taxes is reduced (as a result of settlement, final determination, of legal proceedings or otherwise) then, and in such event:

(A)      The Base Taxes shall be retroactively adjusted to reflect such reduction; and

(B)      All retroactive Tax Payments resulting from such retroactive adjustment shall be due and payable when billed by Landlord.

Landlord promptly shall send to Tenant a statement setting forth the basis for such retroactive adjustment and Tax Payments.

(f)  **Prorated Payments.** The expiration or termination of this Lease during any Operating Year or Tax Year shall not affect the rights or obligations of the parties hereto respecting any payments of Operating Payments for such Operating Year and any payments of Tax Payments for such Tax Year, and any Operating Statement relating to such Operating Payment and any Tax Statement relating to such Tax Payment, may be sent to Tenant subsequent to, and all such rights and obligations shall survive, any such expiration or termination. In determining the

amount of the Operating Payment for the Operating Year or the Tax Payment for the Tax Year in which the Term shall expire, the payment of the Operating Payment for such Operating Year or the Tax Payment for the Tax Year shall be prorated based on the number of days of the Term which fall within such Operating Year or Tax Year, as the case may be. Any payments due under such Operating Statement or Tax Statement shall be payable within ten (10) days after such Statement is sent to Tenant.

(g) **Audit Rights**.  For so long as no Event of Default exists and Tenant is not otherwise then in monetary default to which notice, if applicable, has been given, Tenant shall have the right for a period of one hundred twenty (120) days (the "Audit Period") following its receipt of an Operating Statement or a Tax Statement, as the case may be, to examine and copy Landlord's books and records concerning Operating Expenses and Taxes for periods covered by such statement in the offices of the property manager or another location reasonably designated by Landlord. Tenant's audit may be conducted by its employees or its designated accountants, provided that the accountants must be employed on a regular fee for services basis and not on a contingency fee basis.  If, by notice to Landlord given after such examination but during the Audit Period (which notice shall be accompanied by documentation evidencing the results of Tenant's audit to Landlord's reasonable satisfaction), Tenant disputes the amount of Additional Rent shown on any such statement, then Tenant may request that the amount of Additional Rent for the year in question be determined by an audit conducted by a certified public accountant reasonably selected by both parties, provided that if the parties are unable so to agree on an accountant within ten (10) days after receipt of Tenant's notice, then within twenty (20) days after Tenant's notice is given Tenant may submit the dispute for determination by an arbitration conducted by a single arbitrator of the American Arbitration Association ("AAA") in accordance with the AAA's Commercial Arbitration Rules.  The arbitrator shall be selected by the AAA and shall be a certified public accountant with at least ten (10) years of experience in auditing office buildings in the central and lower Fairfield County area.  The cost of the accountant selected by both parties, or the arbitrator, if applicable, shall be borne by Tenant, unless it is finally determined that the Additional Rent due was less than ninety-five percent (95%) of the Additional Rent paid by Tenant on account of Landlord's calculation, in which case the cost shall be borne by Landlord.  Tenant and each person reviewing Landlord's books and records or participating in the arbitration shall agree in a commercially reasonable instrument prepared by Landlord that all information obtained from Landlord's books and records shall be kept confidential and used only for the purpose of determining amounts properly due under this Lease.  If the Additional Rent due is finally determined to be less or more than the Additional Rent paid by Tenant on account of Landlord's calculation, then Landlord shall either promptly refund to Tenant the difference or credit same against rent next due from Tenant or Tenant shall promptly pay to Landlord the difference, as applicable.  Landlord's statements of Additional Rent for Operating Expenses and Taxes shall be conclusive and binding on Tenant unless timely disputed in accordance with the procedures of this Section 2.07(g), in which case such statements shall be conclusive and binding on Tenant

subject to adjustment in accordance with any final determination under the arbitration action contemplated by this Section 2.07(g) or as otherwise agreed in writing by Landlord and Tenant."

(f)      Section 3.01(f) of the Lease is hereby deleted and amended and restated in its entirety as follows:

"(f)  Subject to the reasonable rules and regulations for the use now or hereafter adopted by Landlord in accordance with the provisions of <u>Section 8.02</u>, Tenant shall have the right, at no additional cost, to use up to 208 parking spaces, from time to time.  Except as otherwise expressly provided in this paragraph, such parking spaces shall be provided on an unreserved "first-come, first-served" basis in areas not designated for the exclusive use of other tenants.  The initial parking plan is attached hereto as **<u>Exhibit Q</u>** which reflects 20 reserved spaces for Tenant's exclusive use on Level P-1 (such 20 spaces being a portion of the 208 parking spaces in total allocated to Tenant).  Landlord reserves the right, in Landlord's sole discretion, at any time from time to time upon ten (10) days' prior written notice to Tenant, to relocate 10 of such 20 reserved spaces within the parking garage provided such relocated 10 reserved spaces are in a reasonably comparable location (e.g., within a reasonable distance to an entry way into the Building). "

(g)      Section 3.01(i) of the Lease is hereby deleted and amended and restated in its entirety as follows:

"(i) Exhibit J to the Lease is hereby deleted in its entirety.  Landlord shall provide reasonable security measures for the Project that are commensurate with similar Class A buildings located in Stamford, Connecticut ("**Comparable Buildings**"); provided that Landlord shall have the right to modify such specifications during the Term in Landlord's sole discretion provided such modified specifications continue to be commensurate with Comparable Buildings, and Tenant shall pay Landlord for the actual cost of any additional security services requested by Tenant.  Landlord shall not be liable for any loss or damage resulting from any security breach or failure of the security measures provided, except to the extent caused by Landlord's gross negligence or willful misconduct."

(h)      Section 5.01(b) of the Lease is hereby deleted and amended and restated in its entirety as follows:

"(b) "**Affiliate**" means, as to any designated person or entity, any other person or entity which controls, is controlled by, or is under common control with, such designated person or entity, "Control" (and with correlative meaning, "controlled by" and "under common control with") means ownership or voting control, directly or indirectly, of more than 50% of the voting stock, partnership interests or other beneficial ownership interests of the entity in question. If any person or entity to whom Tenant shall have assigned this Lease or sublet all or any portion of the Premises pursuant to and in accordance with this Section 5.01 shall thereafter cease

to be an Affiliate of Tenant, then no consent of Landlord shall be required for the continuation of such person's or entity's tenancy or subtenancy, as applicable, "Permitted Transferee" means (1) a successor corporation, company, partnership, trust or other person or entity, whether by merger, consolidation or otherwise, or any corporation, company, partnership, trust or other person or entity that purchases or otherwise acquires all or substantially all of Tenant's assets or stock or all or substantially all of the beneficial interests in Tenant and/or (2) a trust (including a public trust) or other person or entity, including KNOA Pharma LLC, that holds all or a material portion of Tenant's assets following the effective date of a plan of reorganization or liquidation in the bankruptcy cases filed on September 15, 2019 by Tenant and certain of its affiliates under chapter 11 title 11 of the United States Code in the Bankruptcy Court for the Southern District of New York, jointly administered under Case No. 19-23649 (RDD), or any other proceeding superseding or related to the foregoing (the "**Pending Bankruptcy Proceeding**")."

(i)　　**Exhibit B** attached to the Lease is hereby deleted and replaced in its entirety with **Exhibit B** attached hereto.

(j)　　**Exhibit B-1** attached to the Lease is hereby deleted and replaced in its entirety with **Exhibit B-1** attached hereto.

(k)　　**Exhibit C** attached to the Lease is hereby deleted and replaced in its entirety with **Exhibit C** attached hereto.

(l)　　**Exhibit G** attached to the Lease is hereby deleted and replaced in its entirety with **Exhibit G** attached hereto.

(m)　　**Exhibit Q** attached to the Lease is hereby deleted and replaced in its entirety with **Exhibit Q** attached hereto.

3.　　"AS-IS" Condition of Premises.　Tenant hereby acknowledges and agrees that Tenant currently occupies the Premises pursuant to the terms of the Lease; therefore, Tenant shall continue to occupy the Premises in its as-is condition as of the date of execution of this Amendment and the commencement of the Extension Term, and Landlord shall have no obligation to make or pay for any alterations, additions, improvements or renovations in or to the Premises. Tenant also acknowledges that neither Landlord nor any agent of Landlord has made any representation or warranty regarding the condition of the Premises or the Building or with respect to the suitability of any of the foregoing for the conduct of Tenant's business.

4.　　Security Deposit.　Within five (5) days from and after the Bankruptcy Court Order Date (as defined in Section 12 below), Tenant shall pay Landlord a security deposit in the amount of Seven Hundred Ninety-Six Thousand Two Hundred Fifty and No/100 Dollars ($796,250.00) (the "**Security Deposit**") as security for the performance of the provisions hereof by Tenant. Landlord shall not be required to keep the Security Deposit separate from its general funds and Tenant shall not be entitled to interest thereon. If Tenant defaults with respect to any provision of the Lease, including, without limitation, the provisions relating to the payment of Rent or the cleaning of the Premises upon the termination of the Lease, or amounts which Landlord may be

entitled to recover pursuant to the terms hereof, beyond the expiration of any applicable notice and/or cure periods, Landlord may, but shall not be required to, use, apply or retain all or any part of the Security Deposit (i) for the payment of any Rent or any other sum in default, (ii) for the payment of any other amount which Landlord may spend or become obligated to spend by reason of Tenant's default hereunder, or (iii) to compensate Landlord for any other loss or damage which Landlord may suffer by reason of Tenant's default hereunder, including, without limitation, costs and reasonable attorneys' fees incurred by Landlord to recover possession of the Premises following a default by Tenant hereunder.  If any portion of the Security Deposit is so used or applied, Tenant shall, within five (5) days after demand therefor, deposit cash with Landlord in an amount sufficient to restore the Security Deposit to the amount required hereunder.  If Tenant shall fully perform every provision of this Lease to be performed by it (including compliance with Section 4.04 concerning the surrender condition of the Premises), the Security Deposit or any balance thereof shall be returned to Tenant (or, at Landlord's option, to the last assignee of Tenant's interest hereunder) within thirty (30) days following the expiration of the Lease Term; provided, however, that Landlord may retain $100,000.00 of the Security Deposit until such time as any amount due from Tenant in accordance with Section 2.07 of the Lease has been determined and paid to Landlord in full.

5.    Signage.  On or before the Extension Term Commencement Date, Tenant shall remove any signage identifying Purdue Pharma from all common areas of the Building and all non-exclusive elevator lobbies within the Building for the remainder of the Term.

6.    Landlord's Right to Relocate.  Landlord shall have the right to relocate Tenant from the Premises to other space located within the Building upon not less than six (6) months' prior written notice (the "**Relocation Notice**") to Tenant given on or after July 1, 2024 (which Relocation Notice shall specify the anticipated date (the "**Anticipated Relocation Date**") of such relocation).  Such space ("**Relocation Space**") shall be mutually acceptable to Landlord and Tenant.  Landlord shall pay all reasonable moving expenses and for improving the Relocation Space (including, without limitation, construction, architectural and engineering costs, wiring, permits, and relocation of Tenant's furniture, fixtures, and equipment) so that the condition thereof (size, utility, painting, carpeting and soundproofing, as applicable) is substantially similar to the Premises.  Tenant shall cooperate with Landlord in all reasonable ways to facilitate any such relocation, which relocation shall occur at such times and on such date(s) as may be reasonably designated by Landlord.  Prior to the date that Tenant is moved to the Relocation Space, Tenant shall remain in the Premises and shall continue to perform all of its obligations under this Lease.  Upon the delivery of possession of the Relocation Space to Tenant, the Relocation Space shall thereupon become the premises leased by Tenant under this Lease (and all references in this Lease to the "**Premises**" shall thereafter refer to the relocated Premises), and the terms of the Lease shall remain in full force and shall thereupon apply to the Relocation Space (including, without limitation, the Term shall expire on the New Expiration Date or the earlier termination of this Lease), except that, (i) if the size of the Relocation Space is smaller than the Premises as they existed immediately before the relocation (as reasonably determined by Landlord), then, effective as of such relocation, Fixed Rent, Tenant's Share and the number of vehicle parking spaces allocated to Tenant under this Lease shall each be adjusted based on the relationship between the number of rentable square feet of the pre-relocation Premises and the number of rentable square feet of the Relocation Space (all as reasonably determined by Landlord) and (ii) if the size of the Relocation Space is larger than the Premises as they existed immediately before the relocation (as

reasonably determined by Landlord), then Fixed Rent, Tenant's Share and the number of vehicle parking spaces allocated to Tenant under this Lease shall not be adjusted. No amendment or other instrument shall be necessary to effectuate a relocation of the Premises pursuant to this Section 6, except that, if requested by Landlord or Tenant, Landlord and Tenant shall execute a commercially reasonable amendment within thirty (30) days after written request therefor. If Tenant fails to relocate within thirty (30) days after the date(s) reasonably designated by Landlord (provided the Relocation Space has been delivered by Landlord to Tenant in the condition required hereby), then any such failure shall constitute an Event of Default by Tenant under this Lease.

7.    SNDA. Landlord represents and warrants to Tenant that, as of the date hereof, there are no Superior Mortgages or Superior Leases encumbering the Premises other than that certain Open-End Fee and Leasehold Mortgage, Assignment of Leases and Rents, and Security Agreement, dated as of June 28, 2016 (the "**Existing Mortgage**"), executed by Original Landlord in favor of Bank of America N.A., which Existing Mortgage was assigned to RSS WFCM2016-BNK1 – CT OSR, LLC, a Connecticut limited liability company, and Wilmington Trust, National Association, as Trustee for Morgan Stanley Bank of America Merrill Lynch Trust 2016-C31, Commercial Mortgage Pass-Through Certificates, Series 2016-C31 (collectively, "**Lender**"). Landlord shall obtain and deliver to Tenant within thirty (30) days from and after the Bankruptcy Court Order Date (as defined in Section 12 below) a subordination, non-disturbance and attornment agreement in the form attached hereto as **Schedule 1** executed by Lender.

8.    Notice Addresses. (a) As of the date hereof, Notices to Landlord shall be sent to the following address:

> Trigild, LLC Receivership
> 24 Church Street
> Montclair, New Jersey 07042
> Attention: Ian V. Lagowitz

(b) As of the date hereof, Notices to Tenant shall be sent to the following address:

> Purdue Pharma L.P.
> One Stamford Forum
> 201 Tresser Boulevard
> Stamford, Connecticut 06901
> Attention: Edward Borkowski, EVP and CFO

With a copy to:    Purdue Pharma L.P.
                   One Stamford Forum
                   201 Tresser Boulevard
                   Stamford, Connecticut 06901
                   Attention: Marc L. Kesselman, EVP, GC and Corporate Secretary

And a copy to:    Wiggin and Dana LLP
                  437 Madison Avenue, 35th Floor
                  New York, New York 10022

Attention: Andrew J. Pal, Esq.

9.      <u>Brokers</u>.  Landlord and Tenant hereby warrant to each other that they have had no dealings with any real estate broker or agent in connection with the negotiation of this Amendment other than Cushman & Wakefield of Connecticut, Inc., on behalf of Landlord, and CBRE, on behalf of Tenant (collectively, the "**Brokers**"), and that they know of no other real estate broker or agent who is entitled to a commission in connection with this Amendment.  Each party agrees to indemnify and defend the other party against and hold the other party harmless from any and all claims, demands, losses, liabilities, lawsuits, judgments, costs and expenses (including without limitation reasonable attorneys' fees) with respect to any leasing commission or equivalent compensation alleged to be owing on account of any dealings with any real estate broker or agent (other than the Brokers) occurring by, through, or under the indemnifying party.  Landlord shall pay any commission or other compensation due and payable to the Brokers in connection with this Amendment pursuant to agreement(s) between Landlord and the Brokers.  The terms of this <u>Section 9</u> shall survive the expiration or earlier termination of the Lease, as amended.

10.     <u>Anti-Terrorism</u>.  Tenant is and will remain in compliance with the requirements of Executive Order No. 13224, 66 Fed Reg. 49079 (September 25, 2001) (the "**Order**") and other similar requirements contained in the rules and regulations of the Office of Foreign Asset Control, Department of the Treasury ("**OFAC**") and in any enabling legislation or other Executive Orders in respect thereof (the Order and such other rules, regulations, legislation, or orders are collectively called the "**Orders**").  Tenant:  (a) is not listed on the Specially Designated Nationals and Blocked Persons List maintained by OFAC pursuant to the Order or on any other list of terrorists or terrorist organizations maintained pursuant to any of the rules and regulations of OFAC or pursuant to any other applicable Orders (such lists are collectively referred to as the "**Lists**"); (b) has not been determined by competent authority to be subject to the prohibitions contained in the Orders; (c) is not and will not become owned or controlled by, nor act for or on behalf of, any person or entity on the Lists or any other person or entity that has been determined by competent authority to be subject to the prohibitions contained in the Orders;  (d) is not knowingly engaged in, and will not knowingly engage in, any dealings or transactions or be otherwise associated with such persons or entities on the Lists or that has been determined by competent authority to be subject to the prohibitions contained in the Orders; and (e) agrees to cooperate with Landlord in providing such additional information and documentation on Tenant's legal or beneficial ownership, policies, procedures and sources of funds as Landlord reasonably deems necessary or prudent solely to enable it to comply with Orders or anti-money laundering laws as now in existence or hereafter amended.  Any breach or violation of this <u>Section 10</u> shall, at Landlord's option, constitute a default by Tenant under the Lease.

11.     <u>No Defaults</u>.  Tenant confirms that to Tenant's actual knowledge, Landlord is not in default under the Lease as of the date hereof, and that it is unaware of any condition or circumstance which, but for the passage of time or delivery of notice, or both, would constitute a default by Landlord under the Lease.  To Tenant's actual knowledge, Tenant has no claims, defenses or set-offs of any kind to the performance of Tenant's obligations under the Lease.  Nothing contained herein shall be deemed to waive any sums due from Tenant to Landlord, or any default or event which, with the passage of time or delivery of notice, or both, would constitute a default by Tenant under the Lease as of the date hereof.

12.    <u>Bankruptcy Court Authorization; Authority</u>.  The Parties acknowledge and agree that this Amendment shall not take effect unless and until the Bankruptcy Court enters an order authorizing Tenant to enter into this Amendment (the date upon which the Bankruptcy Court enters an order authorizing Tenant to enter into this Amendment is herein referred to as the "**Bankruptcy Court Order Date**").  This Amendment shall be automatically void and of no force and effect if the Bankruptcy Court does not issue such an order on or before August 1, 2023.  Tenant hereby represents and warrants that, upon entry of an order from the Bankruptcy Court authorizing Tenant to execute this Amendment, (i) such individual *signing this Amendment on behalf of* Tenant is authorized to execute this Amendment on behalf of Tenant, (ii) such individual possesses the requisite power and authority to bind Tenant to the terms and provisions hereof, and (iii) Tenant has taken all actions necessary to authorize the execution, delivery and performance of this Amendment by Tenant.  Furthermore, Tenant agrees to take any and all necessary action to keep its existence as an entity in good standing throughout the Term of the Lease in the state in which Tenant has been organized as well as to remain qualified to do business within the state in which the Premises is located.

13.    <u>Ratification and Confirmation</u>.  Except as set forth in this Amendment, all of the terms and provisions of the Lease are hereby ratified and confirmed and shall remain unmodified and in full force and effect.  In the event of any conflict between the terms and conditions of the Lease and the terms and conditions of this Amendment, the terms and conditions of this Amendment shall prevail.

14.    <u>No Offer</u>.  Submission of this instrument for examination and signature by Tenant does not constitute an offer to amend the Lease or a reservation of or option to amend the Lease, and this instrument is not effective as a lease amendment or otherwise until executed and delivered by both Landlord and Tenant.

15.    <u>Counterparts; Execution</u>.  This Amendment may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of which counterparts, when taken together, shall be deemed to constitute one and the same instrument.  In addition, the parties hereto consent and agree that this Amendment may be signed and/or transmitted by facsimile, e-mail of a .pdf document or using electronic signature technology (e.g., via DocuSign or similar electronic signature technology), and that such signed electronic record shall be valid and as effective to bind the party so signing as a paper copy bearing such party's handwritten signature.

16.    <u>Amended Notice of Lease</u>.  Upon the request of Tenant, Landlord shall, within thirty (30) days from and after the Bankruptcy Court Order Date, execute, acknowledge and deliver to Tenant an amended notice of lease substantially in the form attached hereto as **Exhibit L**, together with such other instruments as may be reasonably necessary to record such notice. Recording, filing and like charges imposed by any governmental agency to effect such recording shall be paid by Tenant. Upon the expiration or termination of this Lease, Tenant, at Landlord's request, shall execute, acknowledge and deliver to Landlord all necessary instrument(s) in recordable form evidencing a termination of this Lease and sufficient to discharge any notice hereof of record, and Tenant shall pay for all recording, filing and like charges imposed by any governmental agency to effect such recording.

[Signatures to appear on the following page]

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the date first above written.

LANDLORD:

IAN LAGOWITZ OF TRIGILD, solely in his capacity as Receiver pursuant to that certain Order Approving Stipulation for Order Appointing Receiver dated October 25, 2022

By:_____
Name: Ian Lagowitz
Title: Receiver

TENANT:

PURDUE PHARMA L.P.,
a Delaware limited partnership

By:_____
Name: Edward Borkowski
Title: EVP & CFO

[Signature Page to First Amendment to Lease]

## Exhibit B

## OFFICE PREMISES FLOOR PLAN



**EXHIBIT B-1**

**ANCILLARY SPACE FLOOR PLAN**





# EXHIBIT B-2

## STORAGE SPACE FLOOR PLAN



## EXHIBIT B-3

## DATA  CENTER WEST SPACE FLOOR PLAN



**Exhibit C**

**RENTABLE SQUARE FOOTAGE**

| Floor | Rentable Square Footage |
|---|---|
| Storage Space (on P-1) | 1,042 |
| Data Center West Space (on P-1) | 2,661 |
| P-3 | 16,650 |
| 9 | 52,600 |
| 10 | 51,133 |
| TOTAL: | 124,086 |

## Exhibit G

## FIXED RENT

The Fixed Rent for each floor of the Premises demised under this Lease shall be as follows:

With respect to the Office Premises:

| Period | Rentable Square Feet | Rate Per Rentable Square Foot | Annual Fixed Rent | Monthly Fixed Rent |
|---|---|---|---|---|
| January 1, 2024 – December 31, 2024 | 65,000 | $49.00 | $3,185,000.00 | $265,416.67 |
| January 1, 2025 – December 31, 2025 | 65,000 | $50.00 | $3,250,000.00 | $270,833.33 |
| January 1, 2026 – December 31, 2026 | 65,000 | $51.00 | $3,315,000.00 | $276,250.00 |

With respect to the Ancillary Space:

| Period | Rentable Square Feet | Rate Per Rentable Square Foot | Annual Fixed Rent | Monthly Fixed Rent |
|---|---|---|---|---|
| January 1, 2024 – December 31, 2026 | 16,650 | $22.50 | $374,625.00 | $31,218.75 |

With respect to the Data Center West Space:

| Period | Rentable Square Feet | Rate Per Rentable Square Foot | Annual Fixed Rent | Monthly Fixed Rent |
|---|---|---|---|---|
| Agreement Date – December 31, 2023 | 2,661 | $22.50 | $59,872.50 | $4,989.38 |

With respect to the Storage Space:

| Period | Rentable Square Feet | Rate Per Rentable Square Foot | Annual Fixed Rent | Monthly Fixed Rent |
|---|---|---|---|---|
| January 1, 2024 – December 31, 2026 | 1,042 | $22.50 | $23,445.00 | $1,953.75 |

Notwithstanding anything to the contrary contained in this Lease, provided that Tenant shall not be in default of this Lease beyond the expiration of any applicable notice and/or cure periods, Tenant shall not be obligated to pay to Landlord the Monthly Fixed Rent due and payable under this Lease with respect to the entire Premises for the following one (1) month: January 2024.

# EXHIBIT Q

# PARKING PLAN



**<u>Schedule 1</u>**

**<u>FORM OF SNDA</u>**

**PURDUE PHARMA L.P.**
(Tenant)

SUBORDINATION, NON-DISTURBANCE
AND ATTORNMENT AGREEMENT

Dated: _____ ___, 202_

Location:  One Stamford Forum
               201 Tresser Boulevard
               Stamford, Connecticut

County:   Fairfield

**PREPARED BY AND
RECORD AND RETURN TO:**

**POLSINELLI**
**900 West 48th Place, Suite 900**
**Kansas City, MO  64112**
**Attn.:  David A. Goldberg**

## SUBORDINATION, NON DISTURBANCE AND ATTORNMENT AGREEMENT

THIS **SUBORDINATION, NON DISTURBANCE AND ATTORNMENT AGREEMENT** (this "**Agreement**") is made as of the [____] day of [_____], 2023, by and between RSS WFCM2016-BNK1 – CT OSR, LLC , having an address at c/o Rialto Capital Advisors, LLC, 200 S. Biscayne Boulevard, Suite 3550, Miami, Florida 33131, Attention: Niral Shah (together with its affiliates and/or any of its successors and/or assigns, "**Lender**") and PURDUE PHARMA L.P., a Delaware limited partnership, having an address at One Stamford Forum, 201 Tresser Boulevard, Stamford, Connecticut 06901 and its successors and assigns (including KNOA Pharma LLC) ("**Tenant**").

RECITALS:

A.     Lender is the mortgagee pursuant to that certain Open-End Fee and Leasehold Mortgage, Assignment of Leases and Rents, and Security Agreement, dated as of June 28, 2016, as executed by One Stamford Realty L.P., a Delaware limited partnership ("**Landlord**"), in favor of Bank of America, N.A. ("**Original Lender**") that encumbers the property commonly known as 201 Tresser Boulevard, Stamford, Connecticut and legally described in **Exhibit A** attached hereto (the "**Property**," and such Open-End Fee and Leasehold Mortgage, Assignment of Leases and Rents, and Security Agreement being hereinafter referred to as the "**Mortgage**"). The Mortgage secures a loan (the "**Loan**") made pursuant to a Loan Agreement dated June 28, 2016, by and between Landlord, as borrower and Original Lender, as lender (the "**Loan Agreement**") and evidenced by two certain promissory notes, each dated June 28, 2016, in the respective original principal amounts of $71,500,000.00 ("**Note A-1**") and $38,500,000.00 ("**Note A-2**," and Note A-1 and Note A-2 being hereinafter collectively referred to as the "**Note**"). Lender is the current holder of the Note A-1 and the Mortgage, and is authorized to enforce the Note A-2;

B.     Tenant occupies a portion of the Property under and pursuant to the provisions of a certain lease dated January 31, 2020, as amended by that certain First Amendment to Lease dated as of November 13, 2020, as further amended by that certain Second Amendment to Lease dated as of November 30, 2021, as further amended by that certain Third Amendment to Lease dated as of June __, 2023 (collectively, the "**Lease**"); and

C.     Tenant has agreed to subordinate the Lease to the Mortgage and to the lien thereof and Lender has agreed to grant non-disturbance to Tenant under the Lease on the terms and conditions hereinafter set forth.

**AGREEMENT:**

For good and valuable consideration, Tenant and Lender agree as follows:

1)     <u>Subordination</u>.  Tenant agrees that the Lease and all of the terms, covenants and provisions thereof and all rights, remedies and options of Tenant thereunder are and shall at all times continue to be subject and subordinate in all respects to the Mortgage and to the lien thereof and all terms, covenants and conditions set forth in the Mortgage and the Loan Agreement including without limitation all renewals, increases, modifications, spreaders, consolidations,

replacements and extensions thereof and to all sums secured thereby with the same force and effect as if the Mortgage and Loan Agreement had been executed, delivered and (in the case of the Mortgage) recorded prior to the execution and delivery of the Lease.

   2) <u>Non-Disturbance</u>.  Lender agrees that if any action or proceeding is commenced by Lender for the foreclosure of the Mortgage or the sale of the Property, Tenant shall not be named as a party therein unless such joinder shall be required by law, <u>provided</u>, <u>however</u>, such joinder shall not result in the termination of the Lease or disturb the Tenant's possession or use of the premises demised thereunder, and the sale of the Property in any such action or proceeding and the exercise by Lender of any of its other rights under the Note, the Mortgage and the Loan Agreement shall be made subject to all rights of Tenant under the Lease, provided that at the time of the commencement of any such action or proceeding or at the time of any such sale or exercise of any such other rights (a) the Lease shall be in full force and effect, (b) Tenant shall be in possession of the premises demised under the Lease and (c) Tenant shall not be in default under any of the terms, covenants or conditions of the Lease or of this Agreement on Tenant's part to be observed or performed beyond the expiration of any applicable notice or grace periods.

   3) <u>Attornment</u>.  Lender and Tenant agree that upon the conveyance of the Property by reason of the foreclosure of the Mortgage or the acceptance of a deed or assignment in lieu of foreclosure or otherwise, the Lease shall not be terminated or affected thereby (at the option of the transferee of the Property (the "**Transferee**") if the conditions set forth in <u>Section 2</u> above have not been met at the time of such transfer) but shall continue in full force and effect as a direct lease between the Transferee and Tenant upon all of the terms, covenants and conditions set forth in the Lease and in that event, Tenant agrees to attorn to the Transferee and the Transferee shall accept such attornment, <u>provided</u>, <u>however</u>, that the provisions of the Mortgage and the Loan Agreement shall govern with respect to the disposition of any casualty insurance proceeds or condemnation awards and the Transferee shall not be (a) obligated to complete any construction work required to be done by Landlord pursuant to the provisions of the Lease or to reimburse Tenant for any construction work done by Tenant, (b) liable (i) for Landlord's failure to perform any of its obligations under the Lease which have accrued prior to the date on which the Transferee shall become the owner of the Property, or (ii) for any act or omission of Landlord, whether prior to or after such foreclosure or sale, (c) required to make any repairs to the Property or to the premises demised under the Lease required as a result of fire, or other casualty or by reason of condemnation unless the Transferee shall be obligated under the Lease to make such repairs and shall have received sufficient casualty insurance proceeds or condemnation awards to pay for the completion of such repairs, (d) required to make any capital improvements to the Property or to the premises demised under the Lease which Landlord may have agreed to make, but had not completed, or to perform or provide any services not related to possession or quiet enjoyment of the premises demised under the Lease, (e) subject to any offsets, defenses, abatements or counterclaims which shall have accrued to Tenant against Landlord prior to the date upon which the Transferee shall become the owner of the Property, (f) liable for the return of rental security deposits, if any, paid by Tenant to Landlord in accordance with the Lease unless such sums are actually received by the Transferee, (g) bound by any payment of rents, additional rents or other sums which Tenant may

2

have paid more than one (1) month in advance to any prior Landlord unless (i) such sums are actually received by the Transferee or (ii) such prepayment shall have been expressly approved of by the Transferee (the foregoing shall exclude the payment to Lender of the Prepaid Rent (as such term is defined in the Lease) under Section 2.05 of the Lease that has been approved and received by Lender prior to Lender's execution of this Agreement), (h) bound to make any payment to Tenant which was required under the Lease, or otherwise, to be made prior to the time the Transferee succeeded to Landlord's interest, (i) bound by any agreement amending, modifying or terminating the Lease made without the Lender's prior written consent prior to the time the Transferee succeeded to Landlord's interest or (j) bound by any assignment of the Lease or sublease of the Property, or any portion thereof, made prior to the time the Transferee succeeded to Landlord's interest other than if pursuant to the provisions of the Lease.

4)    Notice to Tenant.  After notice is given to Tenant by Lender that the Landlord is in default under the Note and the Mortgage and that the rentals under the Lease should be paid to Lender pursuant to the terms of the assignment of leases and rents executed and delivered by Landlord to Lender in connection therewith, Tenant shall thereafter pay to Lender or as directed by the Lender, all rentals and all other monies due or to become due to Landlord under the Lease and Landlord hereby expressly authorizes Tenant to make such payments to Lender and hereby releases and discharges Tenant from any liability to Landlord on account of any such payments.

5)    Lender's Consent.  Tenant shall not, without obtaining the prior written consent of Lender, (a) enter into any agreement amending, modifying or terminating the Lease, (b) prepay any of the rents, additional rents or other sums due under the Lease for more than one (1) month in advance of the due dates thereof (excluding the Prepaid Rent under Section 2.05 of the Lease as hereinbefore described in Section 3(g) of this Agreement), (c) voluntarily surrender the premises demised under the Lease or terminate the Lease without cause (except as permitted pursuant to the provisions of the Lease) or shorten the term thereof (except as permitted pursuant to the provisions of the Lease), or (d) assign the Lease or sublet the premises demised under the Lease or any part thereof other than pursuant to the provisions of the Lease; and any such amendment, modification, termination, prepayment, voluntary surrender, assignment or subletting, without Lender's prior consent, shall not be binding upon Lender.

6)    Lender to Receive Notices.  Tenant shall provide Lender with copies of all written notices sent to Landlord pursuant to the Lease simultaneously with the transmission of such notices to the Landlord.  Tenant shall notify Lender of any default by Landlord under the Lease which would entitle Tenant to cancel the Lease or to an abatement of the rents, additional rents or other sums payable thereunder, and agrees that, notwithstanding any provisions of the Lease to the contrary, no notice of cancellation thereof or of such an abatement shall be effective unless Lender shall have received notice of default giving rise to such cancellation or abatement and shall have failed within sixty (60) days after receipt of such notice to cure such default, or if such default cannot be cured within sixty (60) days, shall have failed within sixty (60) days after receipt of such notice to commence and thereafter diligently pursue any action necessary to cure such default.

7)      Fee Options.  If the Lease includes any option or right of first offer or right of first refusal contained in the Lease, or otherwise existing, to acquire all or any portion of the Property, or any superior leasehold interest therein (collectively, a "**Fee Option**"), such Fee Option is hereby made and shall hereafter be subject and subordinate in all respects to lien of the Mortgage. Notwithstanding the foregoing, Tenant agrees that any such Fee Option that is a right of first offer or right of first refusal to purchase the Property or any portion thereof shall not apply to any foreclosure and shall not apply to any transfer of the Property by Transferee following such foreclosure.  In consideration of the foregoing, Lender agrees that any such Fee Option shall not be terminated by any foreclosure or conveyance of the Property by Transferee following such foreclosure; rather, any such Fee Option shall remain as an obligation of any party acquiring the Property following the conveyance of the Property by Transferee following such foreclosure. Furthermore, Tenant expressly confirms to Lender that any acquisition of title to all or any portion of the Property pursuant to Tenant's exercise of any Fee Option contained in the Lease shall result in Tenant taking title subject and subordinate in all respects to lien of the Mortgage.

8)      Notices.  All notices or other written communications hereunder shall be deemed to have been properly given (i) upon delivery, if delivered in person, (ii) one (1) Business Day (hereinafter defined) after having been deposited for overnight delivery with any reputable overnight courier service, or (iii) three (3) Business Days after having been deposited in any post office or mail depository regularly maintained by the U.S. Postal Service and sent by registered or certified mail, postage prepaid, return receipt requested, addressed as follows:

If to Tenant:          Purdue Pharma L.P.
                       One Stamford Forum
                       201 Tresser Boulevard
                       Stamford, Connecticut 06901
                       Attention: Edward Borkowski, EVP and CFO

With a copy to:        Purdue Pharma L.P.
                       One Stamford Forum
                       201 Tresser Boulevard
                       Stamford, Connecticut 06901
                       Attention: Marc L. Kesselman, EVP, GC and Corporate Secretary

And a copy to:         Wiggin and Dana LLP
                       437 Madison Avenue, 35th Floor
                       New York, New York 10022
                       Attention: Andrew J. Pal, Esq.

If to Lender:          RSS WFCM2016-BNK1 – CT OSR, LLC c/o Rialto Capital
                       Advisors, LLC
                       200 S. Biscayne Boulevard Suite 3550
                       Miami, Florida 33131

4

Attention: Ms. Niral Shah, Managing Director

With a copy to:    POLSINELLI
900 W. 48th Place, Suite 900
Kansas City, MO 64112
Attention: David A. Goldberg

or addressed as such party may from time to time designate by written notice to the other parties. For purposes of this Section, the term "**Business Day**" shall mean a day on which commercial banks are not authorized or required by law to close in New York, New York.

Either party by notice to the other may designate additional or different addresses for subsequent notices or communications.

9)    <u>Joint and Several Liability</u>.  If Tenant consists of more than one person, the obligations and liabilities of each such person hereunder shall be joint and several. This Agreement shall be binding upon and inure to the benefit of Lender and Tenant and their respective successors and assigns.

10)    <u>Definitions</u>.  The term "**Lender**" as used herein shall include the successors and assigns of Lender and any person, party or entity which shall become the owner of the Property by reason of a foreclosure of the Mortgage or the acceptance of a deed or assignment in lieu of foreclosure or otherwise.  The term "**Landlord**" as used herein shall mean and include the present landlord under the Lease and such landlord's predecessors and successors in interest under the Lease, but shall not mean or include Lender.  The term "**Property**" as used herein shall mean the Property, the improvements now or hereafter located thereon and the estates therein encumbered by the Mortgage.

11)    <u>No Oral Modifications</u>.  This Agreement may not be modified in any manner or terminated except by an instrument in writing executed by the parties hereto.

12)    <u>Governing Law</u>.  This Agreement shall be deemed to be a contract entered into pursuant to the laws of the State where the Property is located and shall in all respects be governed, construed, applied and enforced in accordance with the laws of the State where the Property is located.

13)    <u>Inapplicable Provisions</u>.  If any term, covenant or condition of this Agreement is held to be invalid, illegal or unenforceable in any respect, this Agreement shall be construed without such provision.

14)    <u>Duplicate Originals; Counterparts</u>.  This Agreement may be executed in any number of duplicate originals and each duplicate original shall be deemed to be an original.  This

5

Agreement may be executed in several counterparts, each of which counterparts shall be deemed an original instrument and all of which together shall constitute a single Agreement. The failure of any party hereto to execute this Agreement, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder.

15)    <u>Number and Gender</u>. Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

16)    <u>Transfer of Loan</u>. Lender may sell, transfer and deliver the Note and assign the Mortgage, this Agreement and the other documents executed in connection therewith to one or more investors in the secondary mortgage market ("**Investors**"). In connection with such sale, Lender may retain or assign responsibility for servicing the loan, including the Note, the Mortgage, this Agreement and the other documents executed in connection therewith, or may delegate some or all of such responsibility and/or obligations to a servicer including, but not limited to, any subservicer or master servicer, on behalf of the Investors. All references to Lender herein shall refer to and include any such servicer to the extent applicable.

17)    <u>Further Acts</u>. Tenant will, at the cost of Tenant, and without expense to Lender, do, execute, acknowledge and deliver all and every such further acts and assurances as Lender shall, from time to time, require, for the better assuring and confirming unto Lender the property and rights hereby intended now or hereafter so to be, or for carrying out the intention or facilitating the performance of the terms of this Agreement or for filing, registering or recording this Agreement, or for complying with all applicable laws.

18)    <u>Limitations on Lender's Liability</u>. Tenant acknowledges that Lender is obligated only to Landlord to make the Loan upon the terms and subject to the conditions set forth in the Loan Agreement. In no event shall Lender or any purchaser of the Property at foreclosure sale or any grantee of the Property named in a deed-in-lieu of foreclosure, nor any heir, legal representative, successor, or assignee of Lender or any such purchaser or grantee (collectively the Lender, such purchaser, grantee, heir, legal representative, successor or assignee, the "**Subsequent Landlord**") have any personal liability for the obligations of Landlord under the Lease and should the Subsequent Landlord succeed to the interests of the Landlord under the Lease, Tenant shall look only to the estate and property of any such Subsequent Landlord in the Property for the satisfaction of Tenant's remedies for the collection of a judgment (or other judicial process) requiring the payment of money in the event of any default by any Subsequent Landlord as landlord under the Lease, and no other property or assets of any Subsequent Landlord shall be subject to levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies under or with respect to the Lease; <u>provided</u>, <u>however</u>, that the Tenant may exercise any other right or remedy provided thereby or by law in the event of any failure by Subsequent Landlord to perform any such material obligation.

[NO FURTHER TEXT ON THIS PAGE; SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF**, Lender and Tenant have duly executed this Agreement as of the date first above written.

**LENDER:**          **RSS WFCM2016-BNK1 – CT OSR, LLC**, a Connecticut limited liability company

By:     Rialto Capital Advisors, LLC, a Delaware limited liability company, its Manager

By:     _____
Name:   _____
Title:   Authorized Signatory

*SNDA*

**ACKNOWLEDGMENT**

STATE OF FLORIDA      )

                              ) ss.

COUNTY OF _____ )

       The foregoing instrument was acknowledged before me this _____ day of _____, 2023, by _____, the _____ of Rialto Capital Advisors, LLC, as Manager of **RSS WFCM2016-BNK1 – CT OSR, LLC**. He/She is personally known to me or has produced _____ as identification.

 

_____

Signature of person taking acknowledgment

 

 

_____

Name, typed, printed or stamped

 

 

_____

Title or rank

 

 

_____

Serial number if any

*SNDA*

**TENANT:**

PURDUE PHARMA L.P.,
a Delaware limited partnership

By: _____
Name: _____
Title: _____

## ACKNOWLEDGMENT

STATE OF_____)
                      ) ss.
COUNTY OF _____)

      On this _____ day of _____, 2023, before me, a Notary Public for the State and County aforesaid, to me personally known, who, being by me duly sworn, did say that he/she is the _____ of Purdue Pharma L.P., a Delaware limited partnership, and that said instrument was signed by him/her on behalf of said limited partnership, and said_____ as such _____, acknowledged said instrument to be the free act and deed of said limited liability company.

_____
Signature of person taking acknowledgment

_____
Name, typed, printed or stamped

_____
Title or rank

_____
Serial number if any

*SNDA*

The undersigned accepts and agrees to the provisions of <u>Section 4</u> hereof:

**LANDLORD**:

IAN LAGOWITZ OF TRIGILD, solely in his capacity as Receiver pursuant to that certain Order Approving Stipulation for Order Appointing Receiver dated October 25, 2022

By:_____

Name: Ian Lagowitz

Title: Receiver

## ACKNOWLEDGMENT

STATE OF_____)

) ss.

COUNTY OF _____)

On this _____ day of _____, 2023, before me, a Notary Public for the State and County aforesaid, to me personally known, who, being by me duly sworn, did say that he is Ian Lagowitz of Trigild, solely in his capacity as Receiver pursuant to that certain Order Approving Stipulation for Order Appointing Receiver dated October 25, 2022, and that said instrument was signed by him in such capacity, and is personally known to me or has produced _____ as identification.

_____

Signature of person taking acknowledgment

_____

Name, typed, printed or stamped

_____

Title or rank

_____

Serial number if any

*SNDA*

## EXHIBIT A

## LEGAL DESCRIPTION

TRACT A:

All that certain piece or parcel of land, situated in the City of Stamford, County of Fairfield and State of Connecticut, and being shown and designated as Disposition Parcel 33A on a certain map or plan entitled, "Disposition Map #33A" dated March 10, 1971, prepared by Parsons, Bromfield and Redniss, Registered Surveyors and certified substantially correct, which map or plan is on file in the Office of the Town Clerk of the City of Stamford as Map No. 9079, reference thereto being hereby had, and being more particularly bounded and described as follows:

Beginning at a point in the north line of Beckley Avenue, which the same is intersected by the division line between the premises herein described and land now or formerly of Guta Fischel and Bella Webski, which point is designated on said map as "Point of Beginning"; thence running North 3° 20' 49" East 70.00 feet to a point; thence running North 86° 39' 11" West 0.75 feet to a point; thence running North 3° 20' 49" East 388.092 feet to the south line of Willow Street; thence running along said south line of Willow Street in an east direction along the arc of a curve to the left having a radius of 1516.00 feet 41.203 feet to a point; thence running still along said south line of Willow Street in an east direction on the arc of a curve to the left having a radius of 240.00 feet 73.959 feet to a point; thence running still along said south line of Willow Street in an east direction on the arc of a curve to the right having a radius of 220.00 feet 49.930 feet; thence running still along said south line of Willow Street in an east direction along the arc of a curve to the left having a radius of 1500.00 feet 334.369 feet to the west line of Pacific Street; thence running along the west line of Pacific Street South 7° 26' 50" West 412.628 feet to the north line of North State Street; thence running along said north line of North State Street South 60° 45' 25" West 368.962 feet to a point; thence along in a west direction along the north line of North State Street and along the north line of Beckley Avenue, in part by each, on the arc of a curve to the right having a radius of 223.792 feet 126.540 feet to the point or place of beginning.

TRACT B:

All that certain piece or parcel of land, situated in the City of Stamford, County of Fairfield and State of Connecticut, shown and designated on a certain map or plan entitled,' "Property to be transferred from Urban Redevelopment Commission, City of Stamford, Conn. to abutting property owner, Willow Street Associates, Disposition Parcel No. 33 (B)" certified substantially correct, William D. Sabia, P.E., Stamford, Conn. May 3, 1973, which map or plan is on file in the Office of the Town Clerk of the City of Stamford as Map No. 9357, reference thereto being hereby had, and being more particularly bounded and described as follows:

Beginning at a point on the north side of North State Street where said street is intersected by the division line between the west line of the premises herein described and the east line of other lands now or formerly of Willow Street Associates shown as Disposition Parcel No. 33 (A) on Map No. 9079, which map is on file in the Office of the Stamford Town Clerk; thence running

North 07° 26' 50" East along said Parcel 33 (A), 412.628 feet to the south line of Willow Street; thence running east along the said south line of Willow Street on the arc of a curve to the left having a radius of 1500.00 feet 18.69 feet to a point; thence running South 26° 39' 11" East 66.083 feet to a point; thence running South 07° 51' 40" West 145.389 feet to a point; thence running South 82° 08' 20" East 67.730 feet; thence running South 02° 15' 50" West 142.227 feet to the north line of North State Street; thence running along said north side of North State Street the following three (3) courses and distances: (1) South 68° 07' 18" West 81.411 feet to a point; (2) west along the arc of a curve to the left having a radius of 432.50 feet 55.593 feet to a point; and (3) South 60° 45' 25" West 18.029 feet to the point or place of beginning.

TRACT C:

All that certain piece or parcel of land, situated in the City of Stamford, County of Fairfield and State of Connecticut, and being shown and designated as Disposition Parcel 33C on a certain map or plan entitled, "Property to be conveyed by the Urban Redevelopment Commission, City of Stamford, Conn. to Willow Street Associates and 3d Stamford New Urban Corp.", which map or plan is on file in the Office of the Town Clerk of the City of Stamford as Map No. 9655, reference thereto being hereby had, and being more particularly bounded and described as follows:

Beginning at a point on the north side of North State Street where said street is intersected by the division line between the west line of the premises herein described and the east line of Parcel 33-B as shown on Map No. 9357, which map is on file in the Office of the Stamford Town Clerk; thence running along said division line between the herein described premises and Parcel 33-B the following three (3) courses and distances: (1) North 02° 15' 50" East 142.23 feet to a point; (2) North 82° 08' 20" West 67.73 feet to a point; and (3) North 07° 51' 40" East 145.39 feet to the west line of Parcel 33-D as shown on Map No. 9655, which map is on file in the Office of the Stamford Town Clerk; thence running South 26° 39' 11" East 232.314 feet to a point and South 03° 54' 11" East 61.106 feet to the north line of North State Street; thence running along the north line of North State

Street South 68° 07' 35" West 24.142 feet to a point and South 68° 07' 18" West 47.822 feet to the point or place of beginning.

TRACT D

ALL THAT real property situated in the City of Stamford, County of Fairfield and State of Connecticut, known and designated as Disposition Parcel 33D on a certain map entitled, "Property To Be Conveyed By The Urban Redevelopment Commission, City of Stamford, Connecticut to Willow Street Associates And 3d Stamford New Urban Corp." arid on file in the Stamford Land Records, as Map No. 9655. Said piece or parcel of land is bounded and described as follows:

BEGINNING at a point on the Northerly side of North State Street where said street is intersected by the division line between Lots 33-C and 33-D on Map No. 9655 of the Stamford Land Records.

Running thence North 03°54⁴11' West along said division line 61.106 feet; thence North 26°39'11" West still along said division line and along the division line between said parcel 33-D and parcel 33-B as shown on Map No. 9357 of the Stamford Land Records, 298.394 feet to the Southerly line of Tresser Boulevard, thence Easterly along the Southerly line of Tresser Boulevard the following two (2) courses arid distances:

(1)    Northeasterly along the arc of a curve bearing to the left having a radius of 1500.00 feet a distance of 27.288 feet to a point of reverse curve;

(2)    Northeasterly along the arc of a curve bearing to the right having a radius of 290.00 feet a distance of 68.027 feet to the extreme Westerly end of a curve connecting the Southerly side of Tresser Boulevard with the Westerly side of Canal Street;

thence Southeasterly along the arc of said curve having a radius of 30.00 feet a distance of 43.671 feet to the Westerly side of Canal Street; thence Southerly along the Westerly side of Canal Street and along the arc of a curve bearing to the right having a radius of 140 feet a distance of 42.659 feet; thence South 03°54'11 East still along the Westerly side of Canal Street 285.940 feet to a point;

thence Southwesterly along the arc of a curve bearing to the right having a radius of 20.00 feet a distance of 25.142 feet to a point in the Northerly side of North State Street; thence South 68°07'35' West along the Northerly side of North State Street 1.231 feet to the point or place of beginning.

*SNDA*

**Schedule 2**

**FORM OF AMENDED NOTICE OF LEASE**

AMENDED NOTICE OF LEASE

Notice is hereby given of the following amended Lease:

1.  Name and address of parties:

New Landlord:  IAN LAGOWITZ OF TRIGILD, SOLELY IN HIS CAPACITY AS RECEIVER
PURSUANT TO THAT CERTAIN ORDER APPROVING STIPULATION
FOR ORDER APPOINTING RECEIVER DATED OCTOBER 25, 2022

Tenant:       PURDUE PHARMA L.P.

2.  Said amended Lease was entered into on the ___ day of June, 2023.
3.  The extended term of said amended Lease shall commence on January 1, 2024 and expire on December 31, 2026.
4.  The premises consists of the 9th and 10th floors and a portion of the P-1 and P-3 floors of the Building, as more particularly described in the Lease.
5.  Option to renew: Tenant has no option to renew the Lease.
6.  Option to purchase: Tenant has no option to purchase the Building.
7.  Said Lease is on file at the office of Landlord, One Stamford Forum, 201 Tresser Boulevard, Stamford, Connecticut 06901.

IN WITNESS WHEREOF, the parties have hereunto set their hands and seals this ____ day of June, 2023.

IAN LAGOWITZ OF TRIGILD, solely in his capacity as Receiver pursuant to that certain Order Approving Stipulation for Order Appointing Receiver dated October 25, 2022

By:_____
      Name: Ian Lagowitz
      Title: Receiver

PURDUE PHARMA L.P.

By: _____
      Name:
      Title: