AKIN GUMP STRAUSS HAUER & FELD LLP
Mitchell P. Hurley
Arik Preis
Katherine Porter
Sara L. Brauner
Theodore James Salwen
Erin E. Parlar
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002

COLE SCHOTZ P.C.
Justin R. Alberto
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117

*Counsel to the Official Committee of Unsecured
Creditors of Purdue Pharma L.P., et al.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| In re: | Chapter 11 |
| PURDUE PHARMA L.P., *et al.*, | Case No. 19-23649 (SHL) |
| Debtors.[1] | Jointly Administered |

---

### MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR SOLE STANDING TO COMMENCE AND PROSECUTE ESTATE CAUSES OF ACTION

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF L.P. (0495), SVC Pharma L.P. (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT.................................................................................................1

BACKGROUND ................................................................................................................5

    1.    Dominated by the Sacklers, Purdue Engages in Criminal Conduct in the Marketing and Sale of Opioids, and Is Exposed to Trillions in Liabilities.............5

    2.    Before Relinquishing Control, the Sacklers Secreted Billions of Dollars From Purdue to Family Trusts and Affiliates and Otherwise for Their Own Benefit................................................................................................................6

    3.    Bankruptcy Filing and Anti-Suit Injunction ............................................................8

    4.    Initial Settlement Offer and Official Committee Investigation ..............................9

    5.    Multiple Intra-Creditor and Sackler Mediations Lead to Complex Interlocking Settlements and a Confirmed Plan of Reorganization.....................10

    6.    Settlement Amount Increases During Appeal Process, But Plan Eventually Overturned By Supreme Court .............................................................................12

    7.    The Debtors and the AHC Support Official Committee Standing.........................14

ARGUMENT ..................................................................................................................16

    I.    The Estate Claims Are Colorable.........................................................................17

    II.    Official Committee Standing Is in the Best Interests of the Estates .....................21

    III.    The Official Committee Plans to Coordinate with Informal Creditor Groups in Connection with Prosecuting the Estate Causes of Action .................23

CONCLUSION................................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adelphia Commc'ns Corp. v. Bank of Am., N.A. (In re Adelphia Commc'ns Corp.)*,
   330 B.R. 364 (Bankr. S.D.N.Y. 2005) ...................................................16, 17, 21, 22

*In re Commodore Int'l Ltd.*,
   262 F.3d 96 (2d Cir. 2001)...........................................................................17

*In re Copperfield Invs., LLC*,
   421 B.R. 604 (Bankr. E.D.N.Y. 2010)...........................................................19

*Official Comm. Of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*,
   330 F.3d 548 (3d Cir. 2003)..........................................................................16

*In re Dewey & Leboeuf LLP*,
   2012 WL 5985445 (Bankr. S.D.N.Y. Nov. 29, 2012) ....................................16, 17

*Hobby Ctr. v. Hudson United Bank (In re Am.'s Hobby Ctr.)*,
   223 B.R. 275 (Bankr. S.D.N.Y. 1998) ..........................................................17

*In re On-Site Fuel Service, Inc.*,
   2020 WL 3703004 (Bankr. S.D. Miss. May 8, 2020)..........................................17

*In re Purdue Pharma L.P.*,
   633 B.R. 53 (Bankr. S.D.N.Y. Sept. 17, 2021), *vacated*, 635 B.R. 26
   (S.D.N.Y. Dec. 16, 2021), *rev'd and remanded*, 69 F.4th 45 (2d Cir. May 30,
   2023), *cert. granted*, 144 S. Ct. 44 (Aug. 10, 2023), *rev'd and remanded*,
   *Harrington v. Purdue Pharma L.P.*, 2024 WL 3187799 (U.S. June 27, 2024).......................20

*In re Purdue Pharma, L.P.*,
   635 B.R. 26 (S.D.N.Y. 2021)...............................................................13, 20, 21

*In re Sabine Oil & Gas Corp.*,
   547 B.R. 503 (Bankr. S.D.N.Y. 2016).............................................................21

*Unsecured Creditors Comm. of STN Enters., Inc. v. Noyes (In re STN Enters.)*,
   779 F.2d 901 (2d Cir. 1985)......................................................................16, 17

**Statutes**

11 U.S.C. § 101 *et seq.*...................................................................................1

11 U.S.C. § 105.............................................................................................1, 9

11 U.S.C. § 1103...................................................................................................................1, 16

11 U.S.C. § 1109...................................................................................................................1, 16

The Official Committee of Unsecured Creditors (the "Official Committee") appointed in the chapter 11 cases (the "Chapter 11 Cases") of the above-captioned debtors and debtors in possession (collectively, "Purdue" or the "Debtors"), by and through its undersigned counsel, and with the consent and support of (i) the Debtors and (ii) an ad hoc committee of certain state and local governmental creditors (the "AHC"), hereby submits this motion (the "Motion") for entry of an order, pursuant to §§ 105(a), 1103(c), and 1109(b) of 11 U.S.C. § 101 *et seq.*, in substantially the form attached hereto as **Exhibit A** (the "Proposed Order") granting the Official Committee leave, standing, and authority to commence and prosecute claims and causes of action of the Debtors' estates (the "Estate Claims")[2] set forth in the draft complaint attached hereto as **Exhibit B** (the "Draft Complaint") and any other claim held or that may be asserted by the Debtors estates (i) without the need for further application to or order of the Court provided that the Debtors have, in writing (which may take the form of an email), consented or (ii) as may be authorized by the Court.  In support of this Motion, the Official Committee respectfully states as follows.

## PRELIMINARY STATEMENT

The Official Committee, with the consent and support of the Debtors and the AHC, moves for an order granting sole derivative standing to the Official Committee to commence and prosecute estate claims.

Among other things, the Official Committee seeks authorization to sue Purdue's owners—members of the Sackler family and their trusts and affiliates.  At the Sacklers' direction, Purdue ignited and fueled an opioid firestorm that continues to rage to this day, generating tens of billions of dollars in revenue for Purdue, but at the cost of hundreds of thousands of American lives, and economic harm to the nation measured in the trillions.  To secure their place among America's

---

[2] For the avoidance of doubt, the term Estate Claims as defined in this Motion does not include any claims that name the States or other governmental creditors as defendants.

1

richest families, and to prevent their victims from recovering any of Purdue's ill-gotten gains, the Sacklers caused Purdue to transfer the vast proceeds of Purdue's profligate opioid sales offshore and to family trusts. The Official Committee seeks standing in part to recover those secreted assets so they can be put to use abating the opioid crisis and compensating Purdue's countless public and private victims, rather than continuing to line the Sacklers' pockets and fund their billionaire lifestyles.

Seldom, if ever, has creditor committee standing been more clearly called for than in this case. The value of the Estate Claims that the Official Committee seeks to assert is immense and indisputable. Indeed, the Sacklers have admitted as much themselves, agreeing to pay ***billions of dollars*** to avoid having to defend against those claims. For its part, the Official Committee believes that the Estate Claims actually are worth substantially ***more*** than the Sacklers previously offered in settlement. The Official Committee agreed to support a deal with the Sacklers in the Spring of 2021 only because the Official Committee believed it would speed relief to communities and victims in desperate need of funding.

That was more than three years ago. After appellate delays far greater than Purdue and its creditors reasonably anticipated, that settlement has been vitiated. On June 27, 2024, the Supreme Court held that one of the agreement's foundational terms—a so-called "nonconsensual third-party release"—is not authorized by the Bankruptcy Code. With that decision, the complex, interlocking terms of the parties' deal may unravel, potentially consigning the estates to protracted litigation against the Sacklers. Under the circumstances, creditors must be armed with the ability to commence the Estate Claims.

The Debtors currently have sole standing to assert the Estate Claims. While the Debtors recognize that the Estate Claims (taken as a whole) are immensely valuable, they have determined

that they are not the optimal party to prosecute those claims themselves, and instead support the Official Committee's motion for derivative standing. The Official Committee is the party best prepared to litigate the Estate Claims, and unless its motion is granted, pursuit of the Sacklers and other Defendants for claims worth many billions of dollars will remain purely theoretical. Moreover, absent derivative creditor standing, the Sacklers and their cronies could largely be allowed "off the hook" for their grotesque misconduct in creating and fueling the opioid crisis and for their secretion of billions of dollars from Purdue to Sackler spendthrift trusts and overseas affiliates.

Fortunately, to avoid this nearly unthinkable miscarriage of justice, the Official Committee carries a light burden, particularly considering the support for this motion of the Debtors and the AHC (discussed in more detail below). To obtain derivative standing with a debtor's consent, a creditors committee need only demonstrate that (i) the Estate Claims are colorable, and (ii) prosecuting them would be in the best interests of the bankruptcy estate and beneficial to the fair and efficient resolution of the bankruptcy proceedings. These elements are satisfied easily here.

*First*, there can be no serious doubt that the Estate Claims are colorable, a "low bar" that is satisfied as long as the complaint is not "facially defective." The nearly 200-page Draft Complaint attached to this Motion includes detailed allegations that are more than sufficient to meet this threshold, and that are drawn from reams of documentary and other evidence unearthed in the bankruptcy process, including by the Official Committee's extensive Rule 2004 examination.

Among other things, the Official Committee discovered overwhelming evidence of:

(i)      the micromanagement of Purdue's affairs by the Sacklers and other Defendants, including during the period that Purdue has *twice* admitted that it was engaged in a pattern of criminal wrongdoing spanning three decades in connection with its sale and marketing of OxyContin;

3

(ii)    the vast liability faced by Purdue as a result of its opioid-related misconduct that greatly outstripped its assets and rendered Purdue deeply insolvent for well over a decade (at least) before it filed for bankruptcy; and

(iii)    the panicked attempts by the Sacklers to transfer billions of dollars of ill-gotten gains out of the reach of creditors and into trusts and other entities that they hoped (in vain) would be safe from claims asserted by Purdue's hundreds of thousands of victims.

Even a cursory review of the Official Committee's comprehensive Draft Complaint reveals that, if proven, the Draft Complaint's allegations would support a massive recovery against the Defendants.  And of course, if that were not the case, the Sacklers would not have agreed to pay billions of dollars for a release.

*Second,* it is indisputable that prosecution of the Estate Claims is in the best interests of the estates.  Indeed, the Estate Claims are the most valuable asset of the estates, by a margin of many billions of dollars.  To be sure, the Official Committee previously joined with virtually all other parties-in-interest in seeking to settle the Estate Claims—including by supporting a nonconsensual third-party release for the Sacklers—in an effort to expedite financial relief to communities, organizations, and victims in need.  Unfortunately, that was followed by years of appellate limbo, a period during which the Sacklers and other Defendants paid ***nothing*** for the devastation they visited on countless communities and individuals, while the opioid crisis continued to worsen, and while, presumably, investment gains on unpaid sums continued to pile up for the Sacklers.

Now, a fundamental building block for the parties' settlement has been eliminated by the Supreme Court's recent decision.  Hence, absent a new settlement that will require the parties to agree again, the only path that remains is litigation, and that litigation could be protracted.  Justice for Purdue's victims—already far too long delayed—should not be denied for one additional day

4

longer than is necessary. Standing should be granted to the Official Committee, so that the potentially years-long battle with the Sacklers and other Defendants can begin promptly, and successfully conclude as soon as possible.

## **BACKGROUND**

### 1.    **Dominated by the Sacklers, Purdue Engages in Criminal Conduct in the Marketing and Sale of Opioids, and Is Exposed to Trillions in Liabilities**

The Debtors are pharmaceutical companies that manufacture, sell, or distribute, among other products, extended-release, long-acting opioid pain medication, including their infamous blockbuster drug, Oxycontin. Throughout the relevant period, and to this day, the Debtors have been owned through trusts for the benefit of the Sackler family. But the Sacklers were not merely passive owners. They dominated Purdue's board—which was populated entirely with members of the family and individuals appointed by (and loyal to) the family—and micromanaged the company's business and operations. *See* Draft Compl. ¶¶ 5–6, 123–140. As one close family advisor and Purdue board member put it, members of the Sackler family dominated and controlled Purdue as "executives, management, board and shareholders all-in-one." *Id*. ¶¶ 6, 130.

Purdue now has admitted *twice* to engaging in a pattern of criminal conduct relating to its marketing and sale of opioids over a period spanning three decades, all while under the yoke of the Sacklers. In 2007, Purdue pled guilty to crimes related to misbranding OxyContin, admitting that it had falsely pushed OxyContin as non-addictive since its launch in 1996 and related crimes, for which it paid a then-record penalty in excess of $600 million. *See id.* ¶¶ 4, 157. In 2020, Purdue *again* confessed to criminal misconduct, this time admitting that it conspired with others to aid and abet the dispensing of opioids without a legitimate medical purpose and outside the usual course of professional practice in violation of federal law. Incredibly, Purdue specifically

admitted that its opioid-related criminal misconduct resumed in May 2007—**the same month that Purdue signed its prior criminal confession**—and continued into 2017.  *See id.* ¶¶ 4, 160–65.

Purdue's crime spree was driven by the Sacklers, who relentlessly pressured the company and its advisors to do whatever it took to boost sales and drive up OxyContin proceeds.  *See id.* ¶¶ 5, 123–284.  As detailed in the Draft Complaint, the Sacklers and other Defendants knowingly caused Purdue to engage in improper sales and marketing tactics that deceived prescribers and patients alike.  *See id.* ¶¶ 141–77.  Critically, the Defendants failed utterly to ensure that Purdue met its obligations to maintain effective controls against diversion.  *See id.* ¶¶ 178–226.  Under the Sacklers' direction, OxyContin became a household name, flooding the country with medically unnecessary prescriptions, and generating tens of billions of dollars in revenue for Purdue.

The deluge of OxyContin enriched the Sacklers, but left devastation in its wake.  Purdue's products killed many thousands, with many more suffering opioid use disorder.  For each of those people, a family and community suffer with them.  The economic costs are likewise staggering, and lawsuits against Purdue began to pile up.  Public lawsuits joined pending private actions beginning in 2014.  Purdue eventually was named in thousands of lawsuits relating to its role in igniting and fueling the opioid crisis.  The last Sackler resigned from Purdue's board of directors in 2019.  By then, Purdue had been hopelessly insolvent for many years as a result of its vast accrued opioid liability.  Unable to withstand the crush of litigation, the Debtors filed for bankruptcy on September 15, 2019 (the "<u>Petition Date</u>").  *See id.* ¶¶ 319–39.

2.      **Before Relinquishing Control, the Sacklers Secreted Billions of Dollars From Purdue to Family Trusts and Affiliates and Otherwise for Their Own Benefit**

Causing Purdue to sell vast quantities of OxyContin was not enough for the Sacklers to secure their nearly unimaginable fortune, however.  To guarantee that their family remained ultra-wealthy for generations to come, the Sacklers also had to siphon those funds out of Purdue and

beyond the reach of Purdue's creditors, including the victims of the opioid crisis that Purdue and the Sacklers helped create and fuel. The experience of Purdue's guilty plea in 2007 particularly alarmed the Sacklers, and drove home the danger that opioid-related litigation could swamp Purdue and threaten their wealth. Just a few days after entry of the first guilty plea in 2007, the Sacklers panicked and asked each other, "***We're rich? For how long? Until which suits get through to the family?***" *See id.* ¶¶ 12, 288. A few months later, Peter Boer, a close family advisor and future Purdue director, penned a memorandum advising the Sacklers to "take defensive measures" against Purdue's "uncapped liabilities," including by sending assets overseas. Boer counseled the Sacklers to deprive litigants of a "deep pocket" from which to recover damages inflicted by Purdue. *See id.* ¶¶ 12, 45, 292–93.

Consistent with that advice, the Sacklers drained the proceeds of Purdue's illegal marketing and sale of opioids out of the company at an extraordinary and unprecedented rate. The Sacklers caused Purdue to transfer billions of dollars into an elaborate system of trusts and other Sackler-owned or Sackler-controlled entities (i) in exchange for no value, and (ii) in an effort to defraud Purdue's creditors and frustrate any recovery by the individuals, hospitals, schools, tribes, governments, and others that were left to deal with the consequences of the opioid crisis that the Sacklers helped foment, and that still rages today. Following the 2007 guilty plea, and their receipt of advice to "take defensive measures" against Purdue's creditors, the Sacklers dramatically increased distributions from the Company, ***transferring more than $11.5 billion in cash and property offshore and to spendthrift trusts in less than a decade***. *See id.* ¶¶ 285–317. The non-Sackler officers and other Defendants breached their own fiduciary and other duties in approving the distributions (and through other misconduct) and incurred substantial liability of their own as a result. *See id.* ¶¶ 14–16, 19, 37–39, 45–49, 51–61.

### 3.    Bankruptcy Filing and Anti-Suit Injunction

As noted, the Debtors filed for bankruptcy on September 15, 2019.  The Official Committee was appointed by the U.S. Trustee at the beginning of the Debtors' bankruptcy cases to serve as the statutorily appointed fiduciary for the interests of all unsecured creditors, including public and private opioid claimants, who make up almost the entire creditor body.  As of the Petition Date, the Debtors had more than $1 billion in cash, and no funded debt, but were named in more than 2,600 active lawsuits asserting opioid-related claims.  Some of those lawsuits also named the Sacklers as defendants, and more were likely on the horizon.

In an effort to maximize the Sackler assets available to satisfy any judgment on, or other resolution of, the Estate Claims, the Official Committee supported the Debtors' motion at the beginning of these cases for a preliminary injunction (the "Preliminary Injunction").  *See* [ECF No. 431].  The Preliminary Injunction effectively stayed the commencement or continuation of litigation against the Sacklers, their trusts, and other affiliates.  In addition, the Preliminary Injunction tolled the limitations period for claims (including Estate Claims) against the Sacklers and their trusts and affiliates (among others).  Under a separate stipulation, covered Sackler parties also agreed they would not take "any action with respect to any material amount of his, her, or its property that is located inside or outside the United States with the intent or material effect of frustrating enforcement of any potential judgment" against them (the "Anti-Secretion Agreement").[3]  The injunction has been extended numerous times but will (absent further

---

[3] *See Am. and Restated Case Stip. Among the Debtors, the Official Comm. of Unsecured Creditors and Certain Related Parties* [ECF No. 518] (the "Case Stipulation") ¶ 13.  The Supreme Court's recent elimination of nonconsensual third-party releases changes the landscape of these cases substantially, and greatly enhanced asset preservation measures therefore soon may be required.

extension) terminate on July 29, 2024, and the Anti-Secretion Agreement will terminate 30 days later.[4]

### 4.    Initial Settlement Offer and Official Committee Investigation

At the outset of the cases, the Sacklers proposed a settlement contemplating, among other things, a release of the Estate Claims in exchange for the payment of $3 billion over seven years. In addition to the Sacklers, the initial proposed settlement framework was supported by the AHC.[5] The Official Committee promptly embarked on an extensive informal and formal examination of the Debtors' affairs, including to investigate the extent and value of the Estate Claims against the Sacklers and other Defendants.  Over a period of months, the Official Committee gained access to substantial evidence, including documents that had not been produced previously in any litigation or in connection with a government investigation.  The Official Committee also conducted sixteen depositions, including seven members of the Sackler family,[6] long-serving members of the Debtors' boards of directors,[7] the Debtors' current and past CEOs,[8] a former Vice President and Associate General Counsel at Purdue,[9] Stuart Baker, and other Sackler family advisors.[10]  In addition, the Debtors gave the Official Committee access to millions of pages of documents,

---

[4] The Court entered the Thirty-Fifth Amended Order Pursuant to 11 U.S.C. § 105(a) Granting Motion For A Preliminary Injunction on May 31, 2024. *Purdue Pharma L.P. v. Commw. of Mass. (In re Purdue Pharma L.P.)*, Adv. Proc. No. 19-08289 (Bankr. S.D.N.Y. May 31, 2024) [ECF No. 484].  On June 27, 2024, the Debtors moved the Court for an order extending the Preliminary Injunction so that it is "coterminous" with a mediation period that the Debtors request extend for 60 days from the date of entry of a mediation order.  Debtors' Mem. of Law in Supp. of Mot. to Extend the Prelim. Inj. to Facilitate Mediation, Adv. Proc. No. 19-08289 (Bankr. S.D.N.Y. June 27, 2024) [ECF No. 490] at 1.

[5] *See Debtors' Informational Brief* [ECF No. 17] at 44–45.

[6] Richard Sackler, Mortimer D.A. Sackler, Kathe Sackler, Theresa Sackler, Ilene Sackler-Lefcourt, David Sackler and Marianna Sackler.

[7] Cecil Pickett and F. Peter Boer.

[8] Mark Timney, John Stewart, and Craig Landau.

[9] Robin Abrams.

[10] Stephen Ives and Jonathan White.

including thousands of Debtor-privileged documents.[11] The Official Committee currently is the only creditor representative with access to the Debtor-privileged materials.

### 5.    Multiple Intra-Creditor and Sackler Mediations Lead to Complex Interlocking Settlements and a Confirmed Plan of Reorganization

The Official Committee's investigation uncovered substantial new evidence in support of the Estate Claims.  But rather than immediately seeking standing to prosecute those claims, the Official Committee joined with the Debtors and others in an effort to reach a settlement.  The Official Committee, like the Debtors, believed that a settlement would be more likely to yield near-term relief to communities and victims in need than would protracted litigation.  *See, e.g.*, *Decl. of Michael Atkinson in Supp. of Statement of the Official Comm. of Unsecured Creditors in Supp. of Confirmation of the Sixth Am. Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [ECF No. 3460], Ex. A (the "Official Committee Plan Support Letter") at 20–21.

That process was complicated, however, by the number of informal creditor groups active in the case, and their disparate interests.  In addition to the Official Committee, which represents the interests of the entire unsecured creditor body, other creditors "formed well-represented *ad hoc* committees, including committees of the 48 states and territories that have claims against the Debtors . . . and strong representatives of non-state governmental entities and Native American tribes; personal injury claimants; victims of neonatal abstinence syndrome or their guardians, hospitals, ratepayers and third-party payors, and school districts," among others.[12]  Given the

---

[11] The Official Committee's crime-fraud motion against the Sacklers remains pending.  *Official Comm. of Unsecured Creditors' Mot. to Compel Production of Purportedly Privileged Documents, or for In Camera Review* [ECF No. 1753].

[12] *Modified Bench Ruling on Req. for Confirmation of Eleventh Am. Joint Chapter 11 Plan* [ECF No. 3786] at 68–69.

10

sharply divergent views of these groups concerning, among other things, allocation of estate assets, a value-destructive litigation free-for-all among creditors appeared nearly inevitable.

Hence, early in the cases, the Official Committee, the Debtors and eight public and private creditor groups[13] engaged in mediation (the "Phase I Mediation") to address these complex intercreditor disputes.[14] After more than half a year of negotiation, the Phase I Mediation proved successful, resulting in at least 20 interlocking compromises, and near-complete agreement among the private and public claimant constituencies. The deals allocated a fixed cash distribution over time to each private creditor group, while directing to the public constituencies the potential "upside" from the Debtors' estates—both from the Estate Claims and the Debtors' operating assets. The agreements achieved another important and difficult feat as well. Anxious to avoid mistakes made with the proceeds of the nationwide tobacco settlement, the parties agreed to require that the vast majority of any plan distributions be used ***solely*** for purposes of abating the opioid crisis and compensating personal injury victims.

Funding these distributions and maintaining the complex agreements among creditors required a deal with the Sacklers. A second phase of mediation (the "Phase II Mediation") ensued, and resulted in agreement among the Debtors, the Sacklers, the Official Committee, the MSGE Group, and the AHC. In part as a result of the evidence uncovered through the Official Committee's investigation, the Sacklers agreed to increase their settlement contribution by $1.275

---

[13] The creditor groups formally participating in the Phase I Mediation included (i) the AHC; (ii) the Ad Hoc Group of Non-Consenting States ("NCSG"); (iii) the Multi-State Governmental Entities Group (the "MSGE Group"); (iv) the Ad Hoc Group of Individual Victims (the "PI Group"); (v) certain third-party payors (the "TPPs"); (vi) the Ad Hoc Group of Hospitals (the "Hospital Group"); (vii) the Ad Hoc Committee of NAS Children (the "NAS Group"); and (viii) representatives for a putative class of insurance purchasers (the "Ratepayer Group"). In addition to these formal mediation parties: (i) the United States Department of Justice (the "DOJ") participated as an observer, and (ii) and a group of independent public school districts was granted limited status as a mediation party subject to the mediators' discretion.

[14] *See Debtors' Mot. for Entry of an Order Appointing Mediators* [ECF No. 855]; *Order Appointing Mediators* [ECF No. 895].

billion to a total of $4.275 billion in cash, payable over nine years. Then, as now, the Official

Committee believed that the Estate Claims, if litigated, would result in a judgment against the

Sacklers "far in excess" of the amount they offered to pay in settlement. *See* Official Committee

Plan Support Letter at 20. Nevertheless, the Official Committee supported the proposed new

settlement with the Sacklers as a means of delivering certain, near-term relief for victims and

communities in desperate need of compensation and abatement. *Id*. The Official Committee knew

that the alternative—protracted litigation—would cost countless lives, even if it ultimately

delivered more cash from the Sacklers. *Id*.

But the proposed new settlement was not supported by certain other creditors, including

the NCSG, a group comprising nearly half of the states. The Official Committee supported the

effort to continue working to increase creditor support. On May 7, 2021, Judge Drain ordered a

third round of mediation (the "Phase III Mediation"), which was a partial success. In exchange

for the Sacklers (i) agreeing to increase their cash contribution to $4.325 billion (still over nine

years), and (ii) making significant concessions relating to a public document repository, fifteen of

the twenty-four states in the NCSG group lent their support to the enhanced deal. The settlement

that emerged from the Phase III Mediation was memorialized in a plan of reorganization filed by

the Debtors that was amended numerous times, including on August 31, 2021, which the

Bankruptcy Court confirmed on September 17, 2021, following a nine-day hearing.

### 6. Settlement Amount Increases During Appeal Process, but Plan Eventually Overturned By Supreme Court

All iterations of the settlement required a release and injunction in the Plan precluding the

commencement or continuation (i) of certain kinds of litigation against the Sacklers and identified

trusts and other affiliates, (ii) by any holders of claims, whether or not he, she, or it agreed to the

release and injunction. The Office of the U.S. Trustee, nine states, and a handful of individual

creditors and Canadian municipalities and first nations—out of almost 630,000 claimants—appealed confirmation of the Plan, primarily on the grounds that such so-called "nonconsensual third-party releases" are not authorized by the Bankruptcy Code.  On December 16, 2021, the District Court agreed, and vacated the confirmation order.  *See In re Purdue Pharma, L.P.*, 635 B.R. 26, 118 (S.D.N.Y. 2021).

The Plan supporters appealed to the Second Circuit on January 18, 2022, and expedited appellate briefing ensued.  *See* Notice of Bankruptcy Appeal, *In re Purdue Pharma L.P.*, No. 22-113 (2d Cir. Jan. 18, 2022), [ECF No. 3-1].  In the meantime, a fourth phase of mediation (the "Phase IV Mediation") was convened.  In the course of the Phase IV Mediation, all nine of the states that had previously appealed the confirmation order to the District Court agreed to cease defending their position on appeal to the Second Circuit.  In exchange, the Sacklers agreed to pay at least an additional $1.175 billion towards the settlement—payable over 18 years—bringing the total nominal amount of the Sackler contribution for settlement of the Estate Claims (among others) to no less than $5.5 billion and as much as $6 billion.  On April 29, 2022, the Second Circuit heard the Plan supporters' appeal, and on May 30, 2023—more than one year later—reversed the District Court's decision, holding that nonconsensual third-party releases are authorized by the Bankruptcy Code, provided certain conditions are met.

The U.S. Supreme Court granted the U.S. Trustee's petition for review on August 10, 2023, heard argument on December 4, 2023, and reversed the Second Circuit by order dated June 27, 2024.  *See Harrington v. Purdue Pharma L.P.*, No. 23-124 (U.S. 2024).  The Supreme Court held that "[t]he bankruptcy code does not authorize a release and injunction that, as part of a plan of reorganization under Chapter 11, effectively seek to discharge claims against a nondebtor without

the consent of affected claimants." *Id.* at 1–2. As a result, a cornerstone of the settlement agreement with the Sacklers—and of every prior iteration of that agreement—has been removed.

Nevertheless, in a final effort to avoid potentially protracted litigation, certain parties intend to engage with the Sacklers in an expedited mediation (the "Mediation"). To that end, the Debtors will ask the Court to enter an order (the "Mediation Order") providing for mediation for a period extending 60 days from the date of entry of the Mediation Order. The Debtors also have moved to extend the Preliminary Injunction so that it will continue through the 60-day mediation period. Mot. to Extend the Prelim. Inj., Adv. Proc. No. 19-08289 (Bankr. S.D.N.Y. June 27, 2024) [ECF No. 489].

### 7.    The Debtors and the AHC Support Official Committee Standing

The Official Committee led the investigation of the Estate Claims in the course of the bankruptcy and prepared the detailed Draft Complaint attached to this Motion. On or around April 16, 2024, in anticipation of the Supreme Court's ruling, the Official Committee contacted the Debtors to confirm the Official Committee's long-held understanding that the Debtors do not intend to prosecute the Estate Claims. The Debtors' Special Committee has since confirmed that it believes the Debtors are not the optimal party to prosecute the Estate Claims and has confirmed that the Debtors support the Official Committee's motion for sole standing.[15]

Certain key terms relating to the Debtors' support include the following: Subject to the Court's availability, the hearing on this Motion (the "Standing Hearing") will be scheduled for the date that is fifty-seven (57) days after entry of the Mediation Order.[16] To the extent a risk develops

---

[15] The Pension Benefit Guaranty Corporation, one of the members of the Official Committee, abstains from this filing.

[16] To the extent that (i) the Debtors' motion to extend the litigation stay of the Preliminary Injunction is not granted in the form proposed or as otherwise contemplated by the parties or (ii) any other circumstance arises that could result in the litigation stay of the Preliminary Injunction terminating sooner than any proposed date for a hearing on the Official Committee's Motion, the Official Committee reserves its right to seek an earlier hearing date. Provided that the hearing proceeds on the date that is 57 days after entry of the Mediation Order (subject, of course, to the Court's

at the Standing Hearing that the Motion will not be resolved and/or that the Official Committee will be unable to file its Complaint before the expiration of the litigation stay of the Preliminary Injunction, the Debtors will move (with the Official Committee's support) for any necessary extension of the Preliminary Injunction to obviate such risk. The Standing Hearing only may be moved to a date later than fifty-seven days after entry of the Mediation Order to the extent both the Official Committee and Debtors agree (or, of course, by further Court order).[17]

Separately, the AHC has agreed to provide its unqualified support for the Official Committee's Motion for sole standing (and reports that it has recommended to all of the States that they not oppose the Motion). In return, and importantly, the Official Committee has agreed to provide certain consultation, cooperation, and other rights to the AHC, with the express understanding that the Official Committee shall make all decisions respecting commencement and prosecution of the Estate Claims in the Official Committee's sole discretion. The Official Committee also has agreed to support any motion for intervention the AHC may make in any adversary proceeding asserting the Estate Claims. The AHC has also agreed to provide consultation and cooperation rights to the Official Committee in connection with any AHC intervention, while retaining the right to make all decisions in connection with any such intervention in the AHC's sole discretion. These terms and others are memorialized in detail in an agreement titled "Terms of UCC-AHC Agreement re: Standing and Intervention" as referenced in

---

availability), the Official Committee has agreed with the Debtors' request to set the deadline for any objections to the standing motion for the date that is fifty-one (51) days after this Court enters the Mediation Order (the "Objection Deadline").

[17] In no event shall the Debtors or the UCC request that the Hearing Date occur fewer than three (3) days prior to the expiration of the litigation stay of the Preliminary Injunction or that the Objection Deadline be fewer than nine (9) days before the expiration of the litigation stay of the Preliminary Injunction. For the avoidance of doubt, the Debtors are not, at any time, obligated to act in any manner that the Debtors determine in good faith is inconsistent with their fiduciary duties.

the Proposed Order accompanying this Motion.  The entire agreement of the UCC and AHC is

embodied in the Terms of the UCC-AHC Agreement re: Standing and Intervention.

## ARGUMENT

The provisions of the bankruptcy code imply a right for creditors' committees to sue on

behalf of an estate, with bankruptcy court approval.  *See Unsecured Creditors Comm. of STN*

*Enters., Inc. v. Noyes (In re STN Enters.)*, 779 F.2d 901, 904 (2d Cir. 1985) (holding that 11 U.S.C.

§§ 1103(c)(5) and 1109(b) provide the requisite authority for suits commenced by creditors'

committees).  Indeed, "[t]he practice . . . is a salutary (and many might say essential) element of

the Chapter 11 process," which has been "nearly universally recognized."  *See Adelphia Commc'ns*

*Corp. v. Bank of Am., N.A. (In re Adelphia Commc'ns Corp.)*, 330 B.R. 364, 373 (Bankr. S.D.N.Y.

2005); *see also Official Comm. Of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics*

*Corp. v. Chinery*, 330 F.3d 548, 568 (3d Cir. 2003) (recognizing that a "straightforward

application" of a bankruptcy court's equitable powers allows for a grant of derivative standing

upon creditors' committees to assert causes of action on behalf of, and for the benefit of, the

debtor's estate).

The standard for granting derivative standing to a creditors' committee is not difficult to

meet, and the movant's burden is even lower where, as here, the committee has the debtor's

consent.  Indeed, to grant a motion for so-called *Commodore* standing—where the debtor consents

to the committee bringing suit—the Court need only determine that (1) the committee presents a

colorable claim or claims for relief that on appropriate proof would support a recovery, and (2) the

proposed action is (a) in the best interest of the bankruptcy estate and (b) necessary and beneficial

to the fair and efficient resolution of the bankruptcy proceedings.  *See In re Dewey & Leboeuf LLP,*

2012 WL 5985445, at *5 (Bankr. S.D.N.Y. Nov. 29, 2012) (citing *In re Commodore Int'l Ltd.*, 262 F.3d 96, 100 (2d Cir. 2001) and *Adelphia*, 330 B.R. at 374).

## I.    The Estate Claims Are Colorable

There can be no serious question that the Estate Claims are colorable.  A claim is colorable if it "on appropriate proof would support a recovery."  *STN*, 779 F.2d at 905.  The standard for presenting a "colorable" claim is a "relatively easy one to make," and is satisfied where the proposed litigation will not be a "hopeless fling."  *In re Adelphia*, 330 B.R. at 376, 386; *see also Official Comm. Of Unsecured Creditors of Am.'s Hobby Ctr. v. Hudson United Bank (In re Am.'s Hobby Ctr.)*, 223 B.R. 275, 288 (Bankr. S.D.N.Y. 1998) (standing should be denied for lack of colorability only if claim is "facially defective").

When a court considers whether a colorable claim exists, the court should not conduct a mini-trial.  *Id.* (citing *STN Enters.*, 779 F.2d at 905–06); *see also Adelphia*, 330 B.R. at 369.  A committee seeking standing need not lay bare its complete proof, but rather is required only to describe a facially valid claim, which will be evaluated under a standard "much the same as that undertaken when a defendant moves to dismiss a complaint for failure to state a claim." *Adelphia*, 330 B.R. at 377 (internal citation omitted).  "The required showing that any claims be 'colorable' is a 'relatively easy one to make.'"  *In re Dewey & Leboeuf LLP*, 2012 WL 5985445, at *6 (internal citation omitted).

The allegations contained in the Official Committee's Draft Complaint, which is incorporated by reference into this Motion, easily clear the "low" colorability threshold applicable to this Motion, and warrant granting derivative standing to the Official Committee.[18]  As detailed

---

[18] A party moving for derivative standing in bankruptcy is not required to provide a draft complaint along with its motion, though the Official Committee does so here.  *See In re On-Site Fuel Serv., Inc.*, 2020 WL 3703004, at *2 n.3 (Bankr. S.D. Miss. May 8, 2020) ("For clarity, no bankruptcy rule require[s]" a creditor seeking standing to "attach a copy of the proposed third-party complaint to the Derivative Standing Motion . . .").  If the Official Committee is

in the Draft Complaint, under the domination and control of the Sackler Directors and other defendants, Purdue engaged in a decades-long pattern of criminal misconduct in connection with its marketing and sale of opioids.  Not once, but twice—in 2007, and again in 2020—Purdue expressly admitted that it was guilty of federal crimes over decades under the stewardship of the Sackler Directors and other fiduciary Defendants, and agreed to billions of dollars in resulting fines, forfeitures, and damages.  The conduct of the Sacklers and other proposed Defendants also exposed Purdue to civil damages in nearly unimaginable sums—measured in the ***trillions*** of dollars—that dwarfed Purdue's assets and rendered Purdue insolvent dating to before 2008.

Recognizing that Purdue faced "uncapped liabilities," and consistent with the ***written advice*** provided to them by a close advisor (whom they would soon appoint as a Purdue board member), the Sacklers embarked on a program of fraudulent conveyances unequaled in its scale and audacity.  After Purdue's initial guilty plea in 2007, and fretting—***again, in writing***—about the threat posed to their wealth by "these lawyers," the Sacklers proceeded to cause Purdue to ***fraudulently transfer more than $11.5 billion*** in cash and property off-shore, to their putatively spendthrift trusts, and otherwise for their exclusive benefit.  The Sackler's panicked transfers not only were enormous, they also were vastly larger than past distributions in absolute terms and as a percentage of Purdue's net sales, as illustrated in the chart below[19]:

---

granted standing, the complaint filed by the Official Committee will include exhibits and may add or delete claims or parties to the extent consistent with the relief sought herein.

[19] *See Notice of Filing of Report of the Special Committee* [ECF No. 654], Ex. A.



The nearly 200 pages of allegations in the Draft Complaint detailing the Defendants' extraordinary misconduct and liability are more than sufficient to satisfy the "colorability" standard, which is similar to the standard applied by courts to a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).  *In re Copperfield Invs., LLC*, 421 B.R. 604, 609 (Bankr. E.D.N.Y. 2010).  The Defendants' conduct gives rise to claims for, among other things, intentional and constructive fraudulent conveyance (Counts 1–8), breach of fiduciary duty and aiding and abetting breach of fiduciary duty (Counts 9–11), unjust enrichment (Count 12), constructive trust (Count 13), illegal distributions (Count 14), disallowance and subordination (Counts 15–16), turnover (Count 17), accounting (Counts 18–19), and liability for violations of the Racketeering Influenced and Corrupt Organizations Act (Counts 20–21).  All of these claims would easily survive a motion to dismiss for failure to state a claim.

Indeed, even the Defendant Sacklers tacitly concede that the Estate Claims are at least "colorable."  When these bankruptcy cases first were filed on September 15, 2019, before the Official Committee even had begun its investigation, and before the reams of new evidence

animating the Draft Complaint were discovered, already the Sacklers were prepared to pay *$3 billion* to escape prosecution of, among other things, the Estate Claims.[20]  After, among other things, Purdue's creditors developed and presented substantial additional proof of the Defendants' wrongdoing, including material highlighted in the Official Committee's still-pending motion to compel production of putative Sackler privileged materials based on the crime-fraud exception,[21] the Defendants increased their offer by more than $1 billion, to *$4.325 billion*.  Later, to procure additional creditor support for the settlement after the District Court vacated the Plan, and hopefully increase the odds of success on appeal, the Sacklers agreed to pay no less than *$5.5 billion and as much as $6 billion* to settle.  That claims valued in the billions of dollars—*by the Defendants*—somehow could fail to meet the colorability threshold is of course absurd.[22]

The presiding trial and appellate courts in these cases also concluded that the Estate Claims could be worth many billions of dollars.  Indeed, in his confirmation order, after carefully considering the merits of the estate claims, Judge Drain observed "that in a vacuum the ultimate judgments that could be achieved on the estates' claims . . . *might well be higher than*" $4.325 billion, the amount that the Sacklers had then agreed to contribute.  *In re Purdue Pharma L.P.*, 633 B.R. 53, 93 (Bankr. S.D.N.Y. Sept. 17, 2021) (emphasis added), *vacated*, 635 B.R. 26 (S.D.N.Y. Dec. 16, 2021), *rev'd and remanded*, 69 F.4th 45 (2d Cir. May 30, 2023), *cert. granted*, 144 S. Ct. 44 (Aug. 10, 2023), *rev'd and remanded*, *Harrington v. Purdue Pharma L.P.*, 2024 WL 3187799 (U.S. June 27, 2024).  District Judge McMahon also recognized the "obvious implication" of the evidence presented to the bankruptcy court was that the estates had "potential claims" for "over

_____

[21] The Official Committee's crime-fraud submissions are incorporated herein by reference.  *See Official Comm. of Unsecured Creditors' Mot. to Compel Production of Purportedly Privileged Documents, or for In Camera Review* [ECF No. 1753] and related materials.
[22] The release procured by the Sacklers also would have extinguished so-called "direct" claims of third parties against the Sacklers, in addition to the Estate Claims.

$11 billion" transferred by the Sacklers to themselves or their trusts at a time when they were
closely involved in the operations of Purdue, and aware of the risk of opioid related claims against
Purdue.  *In re Purdue Pharma L.P.*, 635 B.R. at 57.  As in *Adelphia,* the determination that the
Estate Claims are colorable "is, to be blunt about it, an easy one."  *See Adelphia*, 330 B.R. at 384.

## II.    Official Committee Standing Is in the Best Interests of the Estates

There can be no doubt that prosecution of the Estate Claims "would benefit the estate."
*See In re Sabine Oil & Gas Corp.*, 547 B.R. 503, 516 (Bankr. S.D.N.Y. 2016).  The Estate Claims
are the single-most valuable assets of the estates, by a margin of many billions of dollars.  To be
sure, the Official Committee supported the proposed settlement of the Estate Claims in an effort
to guarantee near-term, life-saving funds could begin to flow promptly to victims and abatement
of the opioid crisis that is still ravaging our communities and citizens.  The Supreme Court's recent
decision, however, has unraveled the parties' hard-fought settlement, and eliminated a key piece
of consideration on which it was built—the availability of so-called nonconsensual third-party
releases.  As a consequence, the Official Committee must be in a position to litigate Estate Claims,
either until they yield a judgment, or until the Defendants are convinced to provide terms for
settlement that are acceptable to Purdue's creditors and the Special Committee of Purdue's board
of directors.

In *Adelphia*, as here, the creditors committee carried out an extensive investigation of estate
claims during the course of the bankruptcy and sought derivative standing to assert those claims.
The court recognized that further factual development would be required during the course of any
litigation, and that the defendants likely would assert defenses that would require serious
consideration.  Nevertheless, because the creditors' committee had "put forth an extraordinarily
detailed complaint" alleging facts that, if proven, could result in recovery for "the [Debtors']s

21

estates [of] billions of dollars," it was plain that a grant of derivative standing was warranted. *Adelphia*, 330 B.R. at 377, 383. The "best interests of the estate" were at "the nub of the issue," and strongly influenced the court's decision. *Id.* at 383. There, as here, "the substantial sums to be recovered . . . more than justif[ied] the substantial sums that prosecuting the litigation would cost." *Id.* Hence, as here, denying the committee "standing could result in the waste of one of the estate's most valuable assets" (*id.*), and the determination to grant standing was "an easy one" (*id.* at 383–84).

Standing should be granted to the Official Committee promptly. Justice for the victims of the Defendants already has been too long delayed. The most recent round of lawsuits relating to Purdue's opioid sales and marketing misconduct began to be filed ***more than a decade ago***, and concern misconduct by the Defendants that, in many cases, dates back even farther. Those actions were stayed when the Debtors filed for bankruptcy protection almost ***five years ago***. The need to fund abatement programs and compensate victims of the opioid crisis is immediate and desperate.

As noted, the Official Committee, like others, believed those funds would flow more swiftly from a settlement than from protracted litigation. A settlement ultimately was achieved. But it has now been almost ***three years*** since creditors approved the Plan in which the settlement was memorialized. In that time, not a dime has been paid to the Defendants' victims by the Defendants or Purdue, while the harm stemming from their misconduct only has multiplied. Now that the parties' hard-fought settlement has been overturned on appeal, litigation against the Defendants may be necessary after all, and it could be protracted. The sooner the Official Committee is granted authority to commence that litigation, the sooner compensation can be wrested from the Defendants for their countless victims.

22

A prompt grant of derivative standing to the Official Committee also is important to efforts to ensure that assets in the possession, custody, or control of the Defendants are preserved and available for recovery after a judgment is obtained on the Estate Claims. To induce the Official Committee and the Debtors to negotiate with them during the bankruptcy, the Defendants entered into the Anti-Secretion Agreement, which provided certain restrictions on the use and dissipation of property within their control. The Anti-Secretion Agreement will expire by its terms on August 29, 2024.[23] But that agreement would not provide sufficient protection were it to continue indefinitely. In a litigation context, much stricter limitations and other conditions must be imposed on the property subject to the Estate Claims during the pendency of the litigation. The Official Committee must be granted standing promptly so its complaint is, or soon can be, on file when the Court considers any necessary application for a freezing injunction.[24]

### III. The Official Committee Plans to Coordinate with Informal Creditor Groups in Connection with Prosecuting the Estate Causes of Action

As the only statutory fiduciary available to litigate the Estate Claims, and as the party in the case best prepared to do so, the Official Committee should be granted standing without additional delay. As discussed above, the Official Committee already has reviewed substantial document discovery related to the Estate Claims, taken critical depositions, and prepared a detailed and comprehensive Draft Complaint. That does not mean, however, that the Official Committee intends to prosecute the Estate Claims in isolation. On the contrary, the Official Committee welcomes contributions from, and coordination with, as appropriate, the Debtors' Special

---

[23] If the Debtors' motion to extend the Preliminary Injunction is granted, the anti-secretion period will also be extended.

[24] The Defendants may argue that an asset freezing injunction only can be issued after the Official Committee first files a complaint asserting the Estate Causes of action, a contention the Official Committee does not concede. Nevertheless, it is imperative that the Official Committee's standing motion be granted on a schedule that will allow the Official Committee's Complaint to be available to be filed if and when the Court considers any asset preservation motion.

Committee, individual creditors, and creditor groups in advancing the Estate Claims, to the extent practical and consistent with preserving privileges and the Official Committee's fiduciary duties. Notably, the Official Committee has coordinated seamlessly and successfully with creditors and organized ad hoc creditor groups throughout the Chapter 11 Cases, and the Official Committee's investigation of the Estate Claims, and expects to do so again with respect to prosecution of the Estate Claims.

[*Remainder of page intentionally left blank*]

## CONCLUSION

For the foregoing reasons, the Official Committee respectfully requests that the Court grant

its Motion for sole derivative standing to commence and prosecute estate claims substantially in

the form of the Proposed Order submitted herewith.

Dated: July 8, 2024                         AKIN GUMP STRAUSS HAUER & FELD LLP
   New York, New York

             By:  */s/ Mitchell P. Hurley*
                Mitchell P. Hurley
                Arik Preis
                Katherine Porter
                Sara L. Brauner
                Theodore James Salwen
                Erin E. Parlar
                One Bryant Park
                New York, New York 10036
                Telephone: (212) 872-1000
                Facsimile: (212) 872-1002
                mhurley@akingump.com
                apreis@akingump.com
                kporter@akingump.com
                sbrauner@akingump.com
                jsalwen@akingump.com
                eparlar@akingump.com

             COLE SCHOTZ P.C.

                Justin R. Alberto
                500 Delaware Avenue, Suite 1410
                Wilmington, Delaware 19801
                Telephone: (302) 652-3131
                Facsimile: (302) 652-3117
                jalberto@coleschotz.com

             *Counsel to the Official Committee of*
             *Unsecured Creditors of Purdue Pharma*
             *L.P., et al.*