# Exhibit B

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| PURDUE PHARMA L.P., *et al.*, | Case No. 19-23649 (SHL) |
| Debtors.[1] | Jointly Administered |
| PURDUE PHARMA L.P., *et al.*, by and through THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, | |
| Plaintiffs, | |
| v. | |
| RICHARD S. SACKLER; MORTIMER D.A. SACKLER; GARRETT LYNAM, AS EXECUTOR OF THE ESTATE OF JONATHAN D. SACKLER; FARRER & CO. TRUST CORPORATION LIMITED AND BUTTERFIELD TRUST (GUERNSEY) LIMITED, AS EXECUTORS OF THE ESTATES OF MORTIMER D. SACKLER; RICHARD S. SACKLER, AS EXECUTOR OF THE ESTATE OF RAYMOND R. SACKLER; DAVID A. SACKLER; KATHE A. SACKLER; ILENE SACKLER LEFCOURT; THERESA E. SACKLER; RICHARD S. SACKLER AND DAVID A. SACKLER, AS EXECUTORS OF THE ESTATE OF BEVERLY SACKLER; SAMANTHA SACKLER HUNT; ELLEN S. BOER, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF PETER BOER; JUDITH LEWENT; WILLIAM LOOMIS; CECIL PICKETT; PAULO COSTA; RALPH SNYDERMAN; JACQUES THEURILLAT; ANTHONY RONCALLI; STUART | **COMPLAINT** |

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF L.P. (0495), SVC Pharma L.P. (5717), and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

BAKER; MICHAEL FRIEDMAN; JOHN STEWART;                    )
MARK TIMNEY; PAUL D. GOLDENHEIM; EDWARD                   )
MAHONY; JOHN CROWLEY; ROBIN ABRAMS;                       )
BURT ROSEN; BERT WEINSTEIN; AKE                           )
WIKSTROM; PHARMACEUTICAL RESEARCH                         )
ASSOCIATES L.P. (f/k/a PURDUE HOLDINGS L.P.);             )
PLP ASSOCIATES HOLDINGS, INC.; PLP                        )
ASSOCIATES HOLDINGS, L.P.; BR HOLDINGS                    )
ASSOCIATES L.P.; RECIPIENT SACKLER TRUSTS                 )
BY THEIR TRUSTEES AS IDENTIFIED ON                        )
EXHIBITS B, E, AND F; RECIPIENT SACKLER                   )
BENEFICIARIES IDENTIFIED ON EXHIBITS C, E,                )
AND F; RECIPIENTS AND/OR BENEFICIARIES OF                 )
CASH TRANSFERS IDENTIFIED ON EXHIBIT E, F,                )
AND G; RECIPIENTS AND/OR BENEFICIARIES OF                 )
TAX DISTRIBUTIONS IDENTIFIED ON EXHIBITS                  )
B, C, E, AND F; RECIPIENTS AND/OR                         )
BENEFICIARIES OF NON-CASH TRANSFERS                       )
IDENTIFIED ON EXHIBIT H; THE SACKLER                      )
TRUSTS, BY THEIR TRUSTEES, AS IDENTIFIED ON               )
EXHIBIT I; AND DOES 1-5000,                               )
                                                          )
     Defendants.                 )
                                                          )
                                                          )
                                                          )

# TABLE OF CONTENTS

Page

**NATURE OF THE ACTION** ............................................................................ **1**

**DEMAND FOR TRIAL BY JURY** .................................................................... **11**

**JURISDICTION AND VENUE** ......................................................................... **11**

**THE PARTIES** ................................................................................................... **12**

 I.  **Plaintiffs** ......................................................................................... **12**

 II.  **Defendants and Other Related Parties** ....................................... **14**

   A. Director Defendants .............................................................. 14

   B. Officer Defendants ................................................................ 23

   C. Trust Defendants ................................................................... 28

   D. Recipient Sackler Beneficiaries ........................................... 39

   E. Additional Sackler Related Entities ..................................... 39

   F. Doe Defendants ..................................................................... 41

 III.  **Personal Jurisdiction** .................................................................... **41**

   A. Certain Side A Sackler Directors (Theresa Sackler, Mortimer Sackler Jr., and Mortimer Sackler Sr.), Certain Recipient Sackler Beneficiaries, Non-Sackler Director Theurillat, and Non-Sackler Officer and MNP/MNC Director Wikstrom ................................. 42

   B. Trustees of the Purportedly Non-U.S. Recipient Sackler Trusts ............... 45

**FACTS** ................................................................................................................ **52**

 IV.  **The Sacklers' Domination of Purdue** .......................................... **52**

   A. At All Relevant Times, the Sacklers Owned Purdue and Exercised Complete Control Over Its Board and Affairs ........................... 52

   B. The Sackler Directors Were Particularly Domineering When It Came to Purdue's Aggressive Marketing Activities ................................. 60

 V.  **At the Sacklers' Direction, Purdue Launched OxyContin and Undertook an Aggressive—and Criminal—Marketing Scheme** ................... **63**

 VI.  **Following the Pre-2008 DOJ/State Resolutions, Purdue Implemented a New Round of Criminal and Misleading Marketing Tactics to Boost Sales of Opioids, Culminating in Yet Another Guilty Plea with the DOJ in 2020** ............................................................................................. **72**

   A. Purdue Knowingly Employed Improper Sales and Marketing Tactics That Resulted in Staggering Numbers of Medically Unnecessary Prescriptions ........................................................... 75

   B. The Sackler Directors Failed to Ensure That Purdue Met Its Legal Obligations to Maintain Effective Controls against Diversion ................. 80

**VII.    Purdue Desperately Attempted to "Turbocharge" Sales after Reformulation Made Some Methods of Abuse—Crushing or Dissolving OxyContin—More Challenging ......................................101**

    A.    Seeking to Extend Their Monopoly, the Sacklers Reformulated OxyContin and Successfully Lobbied to Have the Original Formula Declared Unsafe ...........................................................101

    B.    After Reformulation Made Some Forms of Abuse More Challenging, the Sacklers Berated Management to Fill the Sales Gap by Any Means Necessary ..............................................102

    C.    Purdue and the Sackler Directors Actively Sought to Deflect and Conceal Their Misconduct ........................................120

**VIII.    The Sacklers Realized that Litigation Could Threaten Their Wealth and Undertook "Defensive Measures" to Transfer Billions of Dollars Out of the Debtors to Try to Place Them Out of the Reach of the Debtors' Creditors.........................................................124**

    A.    The Sacklers Knew That Litigation Could Wipe Out Their Wealth ........124

    B.    Close Family Advisor and Future Purdue Director, Peter Boer, Authored a Memorandum Recommending that the Family Transfer Assets from Purdue to Evade Tort Creditors ...........................127

    C.    The Sacklers Implemented a Scheme to Transfer Assets Out of Purdue to Prevent Them from Falling into the Hands of Creditors .........128

**IX.    Throughout the Relevant Period, the Debtors Were Insolvent Due to Crushing Accrued and Accruing Opioid Liability .........................................130**

    A.    Balance-Sheet Insolvency ........................................................140

    B.    Purdue Also Was Insolvent Based on Its Inadequate Capitalization and Inability to Pay Debts as They Came Due .........................144

**X.    The Debtors' Bankruptcy Filings .......................................................147**

**CAUSES OF ACTION.............................................................................148**

**COUNT 1  INTENTIONAL FRAUDULENT TRANSFER, AVOIDANCE, AND RECOVERY OF THE FRAUDULENT CASH TRANSFERS AGAINST THE RECIPIENT SACKLER TRUSTS, RECIPIENT SACKLER BENEFICIARIES, AND CERTAIN OTHER II-WAY ENTITIES ........................148**

**COUNT 2  CONSTRUCTIVE FRAUDULENT TRANSFER, AVOIDANCE, AND RECOVERY OF THE FRAUDULENT CASH TRANSFERS AGAINST THE RECIPIENT SACKLER TRUSTS, RECIPIENT SACKLER BENEFICIARIES, AND CERTAIN OTHER II-WAY ENTITIES ........................151**

**COUNT 3  INTENTIONAL FRAUDULENT TRANSFER, AVOIDANCE, AND RECOVERY OF THE FRAUDULENT NON-CASH TRANSFERS AND OBLIGATIONS AGAINST THE RECIPIENT SACKLER BENEFICIARIES, THE RECIPIENT SACKLER TRUSTS, THE INDIVIDUAL SACKLERS AND SACKLER TRUSTS IDENTIFIED ON EXHIBIT I, AND CERTAIN OTHER II-WAY ENTITIES .......................155**

**COUNT 4  CONSTRUCTIVE FRAUDULENT TRANSFER, AVOIDANCE, AND RECOVERY OF THE FRAUDULENT NON-CASH TRANSFERS AND OBLIGATIONS AGAINST THE RECIPIENT SACKLER BENEFICIARIES, THE RECIPIENT SACKLER TRUSTS, THE INDIVIDUAL SACKLERS AND SACKLER TRUSTS IDENTIFIED ON EXHIBIT I, AND CERTAIN OTHER II-WAY ENTITIES ...................................159**

**COUNT 5  INTENTIONAL FRAUDULENT TRANSFER OF THE PURPORTED INDEMNITY OBLIGATIONS AGAINST THE SACKLER DIRECTORS, THE NON-SACKLER DIRECTORS, THE NON-SACKLER OFFICERS, AND THE RECIPIENT SACKLER TRUSTS ...........................162**

**COUNT 6  CONSTRUCTIVE FRAUDULENT TRANSFER OF THE PURPORTED INDEMNITY OBLIGATIONS AGAINST THE SACKLER DIRECTORS, THE NON-SACKLER DIRECTORS, THE NON-SACKLER OFFICERS, AND THE RECIPIENT SACKLER TRUSTS ...............163**

**COUNT 7  INTENTIONAL FRAUDULENT TRANSFER OF THE PURPORTED FIDUCIARY DUTY WAIVER AGAINST PPI ...................165**

**COUNT 8  CONSTRUCTIVE FRAUDULENT TRANSFER OF THE PURPORTED FIDUCIARY DUTY WAIVER AGAINST PPI ..................166**

**COUNT 9  BREACH OF FIDUCIARY DUTY AGAINST PPLP'S FIDUCIARIES (THE SACKLER DIRECTORS, NON-SACKLER DIRECTORS, AND NON-SACKLER OFFICERS) ...................................168**

**COUNT 10  BREACH OF FIDUCIARY DUTY AGAINST PPI'S FIDUCIARIES (THE SACKLER DIRECTORS, NON-SACKLER DIRECTORS, AND NON-SACKLER OFFICERS) ...................................170**

**COUNT 11  AIDING AND ABETTING BREACH OF FIDUCIARY DUTY AGAINST THE MNP/MNC DIRECTORS ...................172**

**COUNT 12  UNJUST ENRICHMENT AGAINST ALL DEFENDANTS ...........................174**

**COUNT 13  CONSTRUCTIVE TRUST...................................177**

**COUNT 14  ILLEGAL DISTRIBUTIONS AGAINST PRA LP ...................178**

**COUNT 15  DISALLOWANCE OF CLAIMS ASSERTED BY FRAUDULENT TRANSFER DEFENDANTS...................................179**

**COUNT 16  EQUITABLE SUBORDINATION AND DISALLOWANCE OF ALL CLAIMS BY DEFENDANTS...................................180**

**COUNT 17  TURNOVER OF THE FRAUDULENT CASH TRANSFERS AND THE FRAUDULENT NON-CASH TRANSFERS AGAINST THE OTHER II-WAY ENTITIES, RECIPIENT SACKLER BENEFICIARIES, AND RECIPIENT SACKLER TRUSTS...................................181**

**COUNT 18  TURNOVER AND ACCOUNTING OF DOCUMENTS RELATED TO THE FRAUDULENT CASH TRANSFERS AND THE FRAUDULENT**

**NON-CASH TRANSFERS AGAINST THE SACKLERS AND THEIR AFFILIATES**.................................................................................**182**

**COUNT 19  ACCOUNTING OF PROFITS AGAINST THE SACKLERS AND THEIR AFFILIATES** .....................................................**183**

**COUNT 20  RACKETEERING INFLUENCED CORRUPT ORGANIZATIONS ACT ("RICO") AGAINST THE SACKLER RICO DEFENDANTS UNDER 18 U.S.C. § 1962(C)**...............................................**184**

**COUNT 21  RACKETEERING INFLUENCED CORRUPT ORGANIZATIONS ACT ("RICO-CONSPIRACY") AGAINST THE RICO CONSPIRACY DEFENDANTS UNDER 18 U.S.C. § 1962(D)**...............................**189**

**RESERVATION OF RIGHTS** ...............................................................**190**

**PRAYER FOR RELIEF** .........................................................................**190**

Purdue Pharma L.P. ("PPLP"), Purdue Pharma Inc. ("PPI"), Purdue Transdermal Technologies L.P., Purdue Pharma Manufacturing L.P., Purdue Pharmaceuticals L.P., Imbrium Therapeutics L.P., Adlon Therapeutics L.P., Greenfield BioVentures L.P., Seven Seas Hill Corp., Ophir Green Corp., Purdue Pharma of Puerto Rico, Avrio Health L.P., Purdue Pharmaceutical Products L.P., Purdue Neuroscience Company, Nayatt Cove Lifescience Inc., Button Land L.P., Rhodes Associates L.P., Paul Land Inc., Quidnick Land L.P., Rhodes Pharmaceuticals L.P., Rhodes Technologies, UDF L.P., SVC Pharma L.P., and SVC Pharma Inc. (collectively, the "Debtors," "Purdue," or "Plaintiffs"),[2] by and through the Official Committee of Unsecured Creditors of Purdue Pharma L.P., *et al.* (the "Official Committee") appointed in these chapter 11 cases, respectfully allege as follows:

## NATURE OF THE ACTION

1.      This is an action against members of the Sackler family and other Defendants for their roles in (i) igniting and fueling the opioid inferno that continues to rage across the country, destroying families and claiming hundreds of American lives every day, and (ii) fraudulently transferring the vast spoils reaped from the crisis by Purdue to trusts and offshore entities owned by, or for the benefit of, the Sacklers.  Through this action, the Official Committee seeks, among other things, to recover the more than $11.5 billion in cash and other property that the Sacklers caused Purdue to fraudulently transfer to themselves, or for their benefit, so that money can be put to use abating the opioid crisis and compensating the Defendants' victims, rather than continuing to line the Sacklers' pockets and fund their billionaire lifestyles.

2.      It is now beyond any serious dispute that the opioid epidemic is among the worst ever human-made public health crises.  Since 1999, ***more than 800,000*** people have died from an

---

[2] A glossary of all defined terms used in this Complaint is attached hereto as Exhibit K.

opioid overdose, and countless other lives have been destroyed by opioid addiction.  Through their control of Purdue, the Sacklers, with the aid and support of other Defendants, are responsible for much of that death and devastation.  Under the Sacklers' yoke, Purdue's sales of its blockbuster drug OxyContin, aggressive and deceptive marketing of opioid products, failure to take steps required by law to address diversion of its products, and other breaches of duty set the opioid epidemic ablaze and stoked it for decades.[3]

3.      When Purdue launched OxyContin in 1996, at the Sacklers' direction, Purdue spread the lie that its opioids were safe, not addictive, and appropriate for a wide range of new patients and pain symptoms.  Purdue also improperly paid doctors to promote its products, targeted doctors with abnormally high histories of prescribing opioids, secretly sponsored front groups that falsely portrayed opioids as safe, and advocated for prescribing higher doses of opioids and for longer periods of time.  In the infamous words of then-member of the board of directors, Richard Sackler, Purdue sought to conjure a "blizzard" of opioid prescriptions that would be "deep, dense, and white."  The Sacklers' scheme succeeded, leading predictably to a rapid surge in medically unnecessary opioid prescriptions and the widespread diversion and abuse of the drug.  Almost immediately after the launch of Oxycontin, the first wave of the opioid epidemic was underway, ravaging communities across the nation, and destroying countless lives and families.

4.      Purdue has now *twice* confessed that the opioid marketing and sales practices that Purdue adopted and carried out under the domination and control of the Sacklers constituted federal crimes.  In 2007, Purdue admitted that it falsely pushed OxyContin as non-addictive since its launch in 1996 and pled guilty to misbranding and related crimes for which it paid a record $600 million penalty.  In 2020, Purdue *again* confessed to criminal misconduct, this time admitting

---

[3] An organizational chart of the Debtors and their organizational structure is attached hereto as Exhibit D.

that it conspired with others to aid and abet the dispensing of opioids without a legitimate medical

purpose and outside the usual course of professional practice in violation of federal law.  For these

crimes, Purdue agreed to the imposition of a criminal fine in the amount of $3.544 billion, ***plus***

entry of a forfeiture judgment in the amount of $2 billion, ***plus*** allowance of a $2.8 billion claim

in these chapter 11 cases to resolve civil liability asserted by the U.S. Department of Justice

("DOJ").   Moreover, Purdue specifically admitted that the latest opioid-related criminal

misconduct (to which it confessed) dates back at least to ***May 2007—the very same month and***

***year that Purdue last pled guilty to criminal marketing of opioids***—and continued into 2017.

5.    Purdue's decades-long crime sprees and other misconduct were carried out at the

direction of the Sacklers, with the aid and support of other Defendants.  For close to 70 years,

Purdue—originally known as Purdue Frederick Company ("Purdue Frederick")—has been

beneficially owned by the Sacklers and micromanaged by members of that family.   The

descendants of Mortimer D. Sackler and Raymond Sackler, respectively, own the company

through family trusts.[4]  The two branches of the family—which sometimes refer to themselves as

"Side A" (the Mortimer side) and "Side B" (the Raymond side)—share ownership of Purdue to

this day, and at all relevant times completely dominated and controlled the company.  At various

times, Purdue had a handful of so-called "outside" directors appointed to the board of directors of

the general partner PPI (the "Board") by the Sacklers, but according to the Sacklers themselves,

they were "dominated by" the family, acting as mere "soldiers" who could be "march[ed] . . . into

a meeting" and relied on to carry out the family's wishes.

6.    The Sacklers were neither passive owners nor typical directors; they disregarded

normal corporate practices and acted effectively as "executives, management, board and

---

[4] The Sackler family tree is attached hereto as Exhibit J.

shareholders all-in-one" (in the words of one of their closest advisors), dictating all material company activities.  The Sacklers exercised such complete control that a leading expert on corporate law concluded that "there is little to distinguish the control the Sacklers exercised over Purdue from the control that the godfather held over his Mafia family."

7.      When they dreamed up OxyContin in the mid-1990s, the Sacklers saw the drug as a way to launch the family's wealth into the stratosphere, and were willing to stop at nothing to achieve that end.  Among other things, the Sacklers relentlessly pressured company personnel, including its vast sales force, to do whatever it took to drive-up OxyContin sales.  The Sacklers closely tracked data regarding sales and marketing of OxyContin, demanded that management increase sales targets and meet unreasonable goals, went on sales calls to physician offices, engaged with junior marketing personnel over the objection of management, contravened or countermanded executive directions, and gave "trivial" and even "insulting" orders to junior personnel.  The Sacklers demanded that the company market OxyContin aggressively (and, as Purdue has now twice admitted, ***criminally***), including by targeting so-called "high value" prescribers based not on their specialty or practice—which did not factor into the sales plan—but solely on the fact that those prescribers wrote exponentially more OxyContin prescriptions than other prescribers.  Under the Sacklers' direction, OxyContin became a household name, and Purdue achieved tens of billions of dollars in sales.

8.      All the while, the Sacklers were callously aware of OxyContin's addictive nature and potential for abuse.  Oxycodone—the active ingredient in OxyContin—is far more powerful than morphine.  But the Sacklers sought deliberately to foster a contrary impression among health care providers to encourage them to write prescriptions for OxyContin that they otherwise would not.  The Sacklers also knew that OxyContin was being diverted and abused at an astonishing

rate—even as they cheered the ballooning sales numbers.  Indeed, in as early as 2006, Purdue estimated that as much as 18.1%—or *$1.8 billion*—of OxyContin sales revenue between 1996 and 2005 were "attributable to OxyContin abuse" and as much as *25% of all OxyContin kilograms were being abused*.  A similar McKinsey analysis provided to Purdue concluded that, in 2007, *38% of OxyContin users were dependent and/or abused the drug*.

9.       Despite their keen awareness of the abuse, dependence, and overdose profiles of OxyContin, the Sacklers sought relentlessly to expand sales of the drug to new markets, and to vulnerable groups.  Incredibly, this included pressuring the company to seek "pediatric indications on oxycontin tablets."   When a senior Purdue executive and medical doctor pushed back, questioning whether promoting the use by children of powerful opioids would be "desirable, appropriate or feasible," Richard Sackler impatiently reminded the executive that being able to sell OxyContin for consumption by children was a "critically important piece of business," and scolded the executive for being "unclear on this point."  As a Sackler once quipped, "█████████ ███████████" to "████████████████████."  And the Sacklers had nothing but scorn and contempt for the victims of their misconduct.  For example, shortly after Purdue's first guilty plea in 2007, one Sackler mocked concern about how those addicted to their product might react if the tablets were uncrushable, riffing pitilessly that "abusers" might "dissolve it in battery acid and pour it into their ears," or "[m]aybe they'll take an ice pick and stab a hole in their sternums and plunge the tablets into their hearts."  In this way, the Sacklers flooded communities with their addictive drugs, reaped enormous profits from those sales, and mocked and vilified those who became addicted.

10.     At the same time that they were seeking to "turbocharge" OxyContin sales, the Sacklers also failed to ensure Purdue's compliance with its anti-diversion duties under the

Controlled Substances Act (the "CSA") and corresponding Drug Enforcement Administration ("DEA") regulations, which obligated  Purdue to maintain effective controls against the diversion of its opioid products into illegal drug markets, including by maintaining a suspicious order monitoring ("SOM") system and an Abuse and Diversion Detection Program (the "ADD Program").  Purdue, however, failed to maintain an effective SOM system or ADD Program.

11.    To the contrary, it blatantly targeted prescribers who, based on their aberrant prescribing practices, were (or should have been) identified as likely sources of suspicious orders and medical unnecessary prescriptions.  Moreover, although Purdue's ADD Program identified and instructed sales representatives not to conduct sales calls with and promote OxyContin to prescribers on its "no call" list (referred to internally as "Region Zero"), Purdue continued to profit from selling opioids based on the profligate prescriptions written by these suspicious prescribers. In derogation of its anti-diversion obligations, Purdue failed to report Region Zero prescribers to the proper law enforcement authorities, instead allowing them to continue to operate and drive revenue into Purdue's coffers (and ultimately into the Sacklers' trusts and offshore entities). Remarkably, Purdue authorized its sales personnel and other employees to petition to **remove** prescribers from the ADD Program's Region Zero list.  In 2012 alone, 180 doctors with suspicious prescribing patterns were removed from the list and allowed to be contacted by sales representatives.  All of this ensured that Purdue's sales of Oxycontin skyrocketed, and earnings soared.

12.    But that was not enough for the Sacklers.  To guarantee their family remained ultra-wealthy for generations to come, the Sacklers also had to siphon those profits out of the Debtors, and (they hoped) beyond the reach of Purdue's creditors, including the individual and governmental victims of the opioid crisis that Purdue and the Sacklers helped create and fuel.

Indeed, the Sacklers' efforts to move assets out of Purdue and away from its creditors are at the heart of this Complaint.  The experience of Purdue's guilty plea in 2007 particularly alarmed the Sacklers and drove home the danger that opioid-related litigation could swamp Purdue and threaten their wealth.  Just a few days after entry of the first guilty plea in 2007, the Sacklers panicked and asked each other, "***We're rich?  For how long?  Until which suits get through to the family?***"  A few months later, Peter Boer, a close family advisor and soon-to-be Purdue director, advised the Sacklers to "take defensive measures" against Purdue's "uncapped liabilities," including by sending assets overseas.  Boer counseled the Sacklers to deprive litigants of a "deep pocket" from which to recover damages inflicted by Purdue.

13.    Consistent with that advice, the Sacklers spent the next decade siphoning off the proceeds of their illegal marketing and sale of opioids from Purdue just as Boer and others had counseled.  The Sacklers transferred billions into an elaborate system of trusts and offshore entities in a manner designed to defraud the Debtors and the Debtors' creditors and frustrate any effort at recovery by the individuals and governments that have been devastated by Purdue's crimes.  The family hoped they had created "layers and layers that would have to be penetrated" before litigation could threaten the "vast fortune" the family had built.  Immediately following the 2007 guilty plea, the Sacklers dramatically increased distributions from the company, transferring more than $11.5 billion in cash and property offshore and to spendthrift trusts in less than a decade.  As illustrated by the following table, the transfers were unprecedented.

**Purdue Cash Distributions to or for the benefit of the Sacklers as a Percentage of Net Sales ($MM)**

14.    The Debtors' non-Sackler fiduciaries were complicit in the efforts to turbocharge sales, boost profits, and siphon profits of OxyContin to the Sacklers.  As noted, the non-Sackler directors occupied a minority position on the Board and acted essentially as puppets for the Sacklers, providing no independent oversight or guardrails.  John Stewart and Mark Timney, in their respective tenures as CEO, and Ed Mahony as CFO, consistently prioritized loyalty to the Sacklers over loyalty to Purdue (and its creditors) and participated in years of wrongdoing by the company, including its transfer of billions of dollars in assets to or for the benefit the Sacklers.  Former CEO Friedman and Chief Medical Officer Paul Goldenheim pled guilty to criminal charges for their roles in Purdue's marketing of opioids.  As part of the Debtors' legal and/or compliance teams, Defendants Crowley, Abrams, Rosen, and Weinstein failed to ensure Purdue's compliance with applicable laws and regulations.

15.    Ake Wikstrom served as an advisor to the Board and, together with the Sacklers and certain non-Sackler directors, served as an executive and board member of non-Debtor Sackler-owned entities formed to oversee and control worldwide operations, including by directing

the transfers of Purdue assets to or for the benefit of the Sacklers. Finally, Stuart Baker was the individual who was perhaps most trusted by the Sacklers and most central to the scheme, outside of the family. Baker was an attorney who provided legal advice and occupied hundreds of executive and advisory positions across many Sackler entities, served as trustee, or trustee director, for dozens of trusts identified on Exhibit A (the "Sackler Trusts") and acted as effective chairman of the Board, among other positions. Embedded throughout the global enterprise, Baker was able to assist the Sacklers with every step along the way—"turbocharging" opioid sales, "milking" the company (a phrase coined by Mortimer Sackler Jr.), and then transferring Purdue's profits to trusts in an effort to prevent opioid litigants from reaching those assets.

16.    This scheme, which enriched the Sacklers and the fiduciaries of Purdue who enabled it, left devastation in its wake. Hundreds of thousands have died from an opioid overdose, and millions more struggle with addiction. In 2022 alone, an estimated 5.6 million people suffered from substance use disorders related to prescription opioids. For each of those people, a family and a community suffer with them. The economic costs are likewise staggering. The Centers for Disease Control and Prevention estimates that the total "economic burden" of opioid abuse, dependence, and overdose in the United States, which includes the costs of healthcare, lost productivity, addiction treatment, and criminal justice involvement, was more than $1 trillion in 2017 alone. A bipartisan congressional report released in February 2022 confirmed that $1 trillion annual estimate. Indeed, governmental entities, including states, territories, municipalities, and tribes, have asserted damages in the trillions of dollars.

17.    As the Sacklers feared, the litigation onslaught did not end with the 2007 DOJ plea agreement. Among other things, the Sacklers feared that states and other litigants would pursue Purdue the way they pursued tobacco companies a decade before. They were right to worry.

Public lawsuits against Purdue joined pending private actions beginning in 2014, and by 2017, Purdue had been named in thousands of lawsuits that sought to hold the company accountable for its role in the opioid epidemic.  Hopelessly insolvent for many years as a result of their vast accrued opioid liability, and unable to withstand the crush of litigation, the Debtors filed for bankruptcy in September 2019.

18.    The Debtors' creditors comprise the victims of the company's conduct: the individuals who lost their lives to addiction and overdose; the families of those individuals; the children born with neonatal abstinence syndrome or neonatal opioid withdrawal syndrome; the hospitals who have lost and will continue to lose billions caring for sick and addicted populations; the insurers that help pay for the healthcare and treatment of those impacted by opioids; the states, municipalities, and tribes that have been saddled with enormous costs required to address and abate the opioid crisis; the schools that allocate resources to educate special needs children impacted by the crisis; and others with claims arising out of Purdue's marketing and sale of opioids.  Together, their claims against Purdue total trillions of dollars.

19.    Based on the extraordinary misconduct of the Sacklers and other Defendants, this Complaint alleges claims for intentional and constructive fraudulent conveyance, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, unjust enrichment, illegal distributions, equitable subordination and disallowance, turnover, accounting, and violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO").  On behalf of Purdue's creditors, the Official Committee seeks, among other things, to hold the Sacklers accountable for the staggering harm they have caused, and to recover the billions in cash and other assets that the Sacklers intentionally funneled from the Debtors to defraud the Debtors' creditors, as well as to recover damages from the Defendants related to their myriad breaches of fiduciary and other

duties.  This Complaint also seeks an award of pre- and post-judgment interest, disgorgement and recovery of the Debtors' property, disgorgement and recovery of all of the Defendants' ill-gotten gains of every kind and description (including any appreciation or other gains of any kind on fraudulent distributions wrongfully held by the Sacklers, in some cases for well over a decade), treble damages (on RICO claims), attorneys' fees, costs, and other appropriate relief.

## DEMAND FOR TRIAL BY JURY

20.    Plaintiffs request that all claims and damages contained in and requested by this Complaint be resolved at trial by jury.

## JURISDICTION AND VENUE

21.    This Court has subject-matter jurisdiction over this adversary proceeding under 28 U.S.C. §§ 157 and 1334 and the Standing Order of the United States District Court for the Southern District of New York (the "Southern District of New York") referring to the Bankruptcy Judges of the Southern District of New York all cases and proceedings arising under title 11 of the United States Code (the "Bankruptcy Code").

22.    This adversary proceeding constitutes a "core" proceeding as defined in 28 U.S.C. § 157(b)(2)(A).  In the event that this or any other appropriate Court finds any part of this adversary proceeding to be "non-core," Plaintiffs consent to the entry of final orders and judgments by the Bankruptcy Court, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure.  However, Plaintiffs reserve their right to withdraw their consent if Defendants do not consent to a trial by jury in this Court.

23.    This adversary proceeding is commenced pursuant to Sections 105(a) and 541, *et seq.* of the Bankruptcy Code; the general equity powers of the Bankruptcy Code; the general common law; and pursuant to Federal Rules of Bankruptcy Procedure 6009, 7001, and 7008 to recover money and property of the estate.

24.     Venue in the Southern District of New York is and was proper under 28 U.S.C. §§ 1408 and 1409 because this adversary proceeding arises under and in connection with cases commenced under the Bankruptcy Code.

## THE PARTIES

### I.    Plaintiffs

25.     Plaintiffs are the Debtors, by and through the Official Committee, which was appointed by the Office of the United States Trustee under 11 U.S.C. § 1102(a) on September 27, 2019 to represent the interests of all of the Debtors' unsecured creditors.  The Official Committee is composed of the following eight members: (1) The Blue Cross and Blue Shield Association (chair); (2) CVS Caremark Part D Services L.L.C. and CaremarkPCS Health L.L.C.; (3) Cheryl Juaire; (4) Kara Trainor; (5) LTS Lohmann Therapy Systems Corporation; (6) Pension Benefit Guaranty Corporation; (7) Walter Lee Salmons; and (8) West Boca Medical Center.  The Official Committee also has three *ex officio* members: (i) Cameron County, Texas, on behalf of the Multi-State Governmental Entities Group; (ii) the Cheyenne and Arapaho Tribes, on behalf of certain Native American tribes and Native American-affiliated creditors; and (iii) Thornton Township High School District 205, on behalf of certain public school districts.

26.     The Debtors are branded and generic prescription pharmaceutical businesses that are ultimately owned, and at all relevant times were controlled, by the Sackler family.  The Debtors' main businesses revolve around the manufacture and sale of opioids, although their product portfolio includes other products.  The Debtors' principal product is OxyContin, a time-release oxycodone tablet.  Oxycodone is a synthetic opioid that is more potent than morphine.  The vast majority of Purdue's $34 billion in revenues between 1996 and 2019 derived from sales of OxyContin.  Other Sackler-owned entities involved in the sale of opioids internationally include more than 100 entities located outside of the United States that are often referred to by the Sacklers

as "independent associated companies" (the "IACs") as well as various other non-Debtor entities

owned jointly by Side A and Side B of the Sackler family that the Sacklers do not characterize as

IACs (the "Other II-Way Entities").

27.    Debtor PPLP is and was a limited partnership organized under the laws of Delaware

with its headquarters and principal place of business in Stamford, Connecticut.  At all relevant

times, PPLP was managed and controlled by its non-equity holding general partner, PPI.  While

Purdue's corporate structure has evolved over time, currently, and throughout the relevant period,

PPLP, with 22 wholly owned Debtor subsidiaries in the United States and the British Virgin

Islands, has functioned as the operational heart and center of the Debtors.  PPLP was first jointly

held by 1446 Withholding Partnership L.P. and PPI until December 31, 2008, and then jointly held

by PLP Associates Holdings, L.P. ("PLP LP") (a non-Debtor Delaware limited partnership), PLP

Associates Holdings, Inc. ("PLP Inc.") (a non-Debtor New York corporation), and PPI.  From

April 30, 2010 onward, PPLP was wholly owned by Purdue Holdings L.P. (which changed its

name to Pharmaceutical Research Associates L.P. ("PRA LP") on July 24, 2018) and treated as a

disregarded entity for U.S. federal income tax purposes.  At no point has PPLP been treated as a

corporation for U.S. federal income tax purposes.

28.    At all relevant times, Debtor PPI (PPLP's general partner) was incorporated in New

York, with its headquarters and principal place of business in Stamford, Connecticut.  At all

relevant times, the Board controlled and directed PPLP and, thus, the activities of each of the

Purdue subsidiaries.

29.    Debtors Rhodes Pharmaceuticals L.P. and Rhodes Technologies (collectively,

"Rhodes") are a Delaware limited partnership and a Delaware general partnership, respectively.

Rhodes is the Debtors' generic prescription pharmaceutical business and sells generic versions of

opioid pain relievers as well as a variety of other generic prescription medications.  Prior to 2008, Rhodes Technologies was a subsidiary of PPLP.  On January 1, 2008, PPLP distributed its interest in Rhodes Technologies' parent company, Coventry Technologies, L.P., to PLP LP—an Other II-Way Entity ultimately owned by the Sacklers.  As a result of the 2008 transaction, Rhodes Technologies came under common ownership with Rhodes Pharmaceuticals L.P., a subsidiary of Coventry Technologies, L.P., that was created contemporaneously with the 2008 transaction. From January 2008 to May 2019, Rhodes was nominally managed by its own board of directors (of Sackler loyalists), although it was at all times owned and actually managed and controlled by the Sackler family.  In May 2019, the Sacklers contributed Rhodes back to Purdue, and Rhodes once again became a wholly owned subsidiary of PPLP, at which point it became managed indirectly by the Board.

30.     The remaining Debtor entities, identified in footnote 1, are wholly owned subsidiaries of PPLP and, thus, ultimately directed and managed by the Board.  These entities each played a role in the development, production, marketing, and/or sale of the Debtors' opioid products.  Over time, some of these entities had nominal boards, but in every case, those boards comprised solely one or two Sackler appointees who carried out the bidding of the Sackler family and the Sackler-dominated Board.

## II.    Defendants and Other Related Parties

### A.    Director Defendants

#### 1.    The Side A Director Defendants

31.     Mortimer D. Sackler ("Mortimer Sackler Sr."), the patriarch of "Side A" of the Sackler family, died on March 24, 2010.  Defendants Farrer & Co. Trust Corporation Limited and Butterfield Trust (Guernsey) Limited are executors of the Estates of Mortimer D. Sackler, which are estates consisting of all interests and assets owned by Mortimer Sackler Sr. as of his death.

Mortimer Sackler Sr. acquired Purdue Frederick with his brothers Arthur and Raymond R. Sackler

in 1952.[5]  Mortimer Sackler Sr. served on the Board from October 2, 1990 until his death in 2010.

Mortimer Sackler Sr. also served on the board (the "MNP Board") of the entity that controlled the

global Sackler enterprise, MNP Consulting Limited ("MNP"), from the formation of MNP in or

around 1996 until his death.  Mortimer Sackler Sr. also served as a director for at least 11 IACs,

including Napp Pharmaceutical Holdings Ltd. █████████████████████████████████████

████████████████████████████████████.  Mortimer Sackler Sr.

attended medical school and was a licensed psychiatrist.

      32.    Defendant Theresa E. Sackler ("Theresa Sackler") is Mortimer Sackler Sr.'s widow

and was his third wife.  She was a member of the Board from 1993 through 2018, a member of the

MNP Board from its formation until February 19, 2019, and a member of the board (the "MNC

Board") of MN Consulting LLC ("MNC") from January 17, 2019 until April 15, 2019.[6]  MNC

replaced the role previously occupied by MNP in connection with management of the global

Sackler enterprise.  She also served as a director for at least five IACs, including Napp

Pharmaceutical Group Limited and Napp Pharmaceutical Holdings Ltd.  Upon information and

belief, she currently resides in the United Kingdom and resided in New York, at least part-time,

through 2019.

      33.    Defendant Kathe A. Sackler ("Kathe Sackler") is Mortimer Sackler Sr.'s daughter

from his first wife, Muriel.  Kathe Sackler was a member of the Board from 1990 through 2018

and a member of the MNP Board from its formation until February 5, 2019.  She also served as a

---

[5] █████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████
[6] ███████████████████████████████████████████████████████████████
███████████████████████████████████

director for at least five IACs, including Napp Pharmaceutical Group Limited and Napp
Pharmaceutical Holdings Ltd, and ████████████████████████████.  She
graduated from the New York University School of Medicine and is trained in medicine.  She
resides in Connecticut.

34.    Defendant Ilene Sackler Lefcourt ("Ilene Sackler") is another daughter of Mortimer
Sackler Sr. from his first wife, Muriel.  Ilene Sackler was a member of the Board between 1990
and 2018 and a member of the MNP Board from its formation until September 18, 2018.  Ilene
Sackler served as a director for at least four IACs, including Napp Pharmaceutical Group Limited
and Napp Pharmaceutical Holdings Ltd.  She resides in New York.

35.    Defendant Mortimer D.A. Sackler ("Mortimer Sackler Jr.") is the son of Mortimer
Sackler Sr. from Mortimer Sackler Sr.'s second wife, Gertraud Wimmer.  Mortimer Sackler Jr.
was a member of the Board from 1993 through 2019, a member of the MNP Board from its
formation until April 1, 2019, and a member of the MNC Board from January 17, 2019 to, upon
information and belief, the present.  Mortimer Sackler Jr. also served as a director for at least five
IACs, including Napp Pharmaceutical Group Limited and Napp Pharmaceutical Holdings Ltd.
Upon information and belief, he resides in Switzerland and maintains a business office in New
York.

36.    Defendant Samantha Sackler Hunt ("Samantha Sackler") is the daughter of
Mortimer Sackler Sr. and Gertraud Wimmer.  Samantha Sackler served on the Board from January
15, 1993 to March 8, 2003, on the MNP Board at various times between its formation and October
17, 2017, and as a director for at least six IACs, including Napp Pharmaceutical Group Limited
and ████████████████.  Upon information and belief, she resides in New York.

37.    Defendant Judith Lewent ("Lewent") was appointed to the Board by the Side A

Sacklers, where she served from March 2009 to December 2014.  Lewent served as a director on

the Board throughout the period in which most of the transfers from the Debtors for the Sacklers'

benefit occurred.  Lewent approved every distribution for the Sacklers made by the Debtors during

her Board tenure, and never voted against a distribution for the Sacklers.  Lewent also was on

Purdue's Compensation Committee, which set compensation for executives in the sales and

marketing departments.  Upon information and belief, Lewent resides in New Jersey.

38.    Defendant Cecil Pickett ("Pickett") was another Side A appointee.  Pickett has been

a director of PPI since January 2010 and served as a director of MNP from January 2010 until

August 2018.  Pickett served as a director on the Board throughout the period in which most of the

transfers from the Debtors for the Sacklers' benefit occurred.  Pickett approved every distribution

for the Sacklers made by the Debtors during his Board tenure, and never voted against a

distribution for the Sacklers.  Upon information and belief, Pickett resides in New Jersey.

39.    Defendant Jacques Theurillat ("Theurillat") was a director of PPI from February

2016 until April 2019 and a director of MNP from February 2016 until October 2018 and has been

the Chairman of the MNC Board since its formation.  Theurillat is a "Class A" director appointed

to all three boards by the Side A Sacklers.  Theurillat served as a director on the Board throughout

the period in which most of the transfers from the Debtors for the Sacklers' benefit occurred.

Theurillat approved every distribution for the Sacklers made by the Debtors during his Board

tenure, and never voted against a distribution for the Sacklers.  Upon information and belief,

Theurillat currently resides in Italy.

### 2.    The Side B Director Defendants

40.    Raymond R. Sackler ("Raymond Sackler"), the patriarch of "Side B" of the Sackler

family, died on July 17, 2017.  Defendant Richard S. Sackler ("Richard Sackler"), Raymond

Sackler's son, is named as a defendant both in his individual capacity, as noted *infra*, and in his

capacity as executor of the Estate of Raymond R. Sackler, which is an estate consisting of all

interests and assets owned by Raymond Sackler as of his death.  Raymond Sackler was a physician

and, as alleged above, acquired Purdue Frederick with his brothers Mortimer Sackler Sr. and

Arthur in 1952.  Raymond Sackler served on the Board (beginning October 2, 1990, including as

co-Chairman until 2007) and on the MNP Board from its formation until his death in 2017.

Raymond Sackler also served as a director for a number of IACs, ███████████████

and Napp Pharmaceutical Group Limited, ████████████ and 2017, respectively.  He was

co-CEO of PPI at the time of OxyContin's launch in 1996 and held that position until 2003.  He

helped devise Purdue's business plan to preserve profit streams for the Sacklers, was involved in

various operational details of Purdue's business, helped develop abuse-deterrent OxyContin

formulations, consulted on high-level strategic decisions, and influenced various initiatives and

programs and Purdue's support for various third parties that promoted Purdue's interests.

Raymond Sackler, his descendants, their spouses, and their affiliates are sometimes referred to by

the Sacklers, and in this Complaint, as the "Side B Sacklers."

41.    Beverly Sackler ("Beverly Sackler"), Raymond Sackler's widow, died on October

14, 2019.  Defendants Richard Sackler and David A. Sackler ("David Sackler") are named as

defendants both in their individual capacities, as noted *infra*, and in their capacities as executors

of the Estate of Beverly Sackler, which is an estate consisting of all interests and assets owned by

Beverly Sackler as of her death.  In life, Beverly Sackler was deeply involved in the Debtors and

the Sacklers' worldwide enterprise.  Beverly Sackler was a member of the Board from January 15,

1993 until October 17, 2017, and a member of the MNP Board from 1996 until October 17, 2017.

Beverly Sackler also served as a director for at least three IACs, including Napp Pharmaceutical

Group Limited and Napp Pharmaceutical Holdings Ltd.  Until her death in 2019, she resided in Connecticut.  Upon information and belief, the Estate of Beverly Sackler that was not devised under the terms of her will is now property of the Beverly Sackler Revocable Trust.

42.    Defendant Richard Sackler is the son of Raymond Sackler and Beverly Sackler.  He became a member of the Board in 1990 and its co-chair in 2003, which position he retained until he left the Board in 2018.  Richard Sackler also served on the MNP Board from its formation until October 1, 2018.  He also was PPLP's head of research and development from at least 1990 through 1999, its president from 1999 through 2003, and served in other executive roles throughout the business.  Richard Sackler also served as a director for at least five IACs, including Napp Pharmaceutical Group Limited and Napp Pharmaceutical Holdings Ltd.  He currently holds active licenses to practice medicine in New York and Connecticut.  He resides in Florida.

43.    Jonathan D. Sackler ("Jonathan Sackler"), another son of Raymond Sackler and Beverly Sackler, and brother to Richard Sackler, died on June 30, 2020.  Defendant Garrett Lynam is the executor of the Estate of Jonathan D. Sackler, which is an estate consisting of all interests and assets owned by Jonathan Sackler as of his death.  Jonathan Sackler was a member of the Board from 1990 through 2018 and a member of the MNP Board from its formation until September 20, 2018.  Jonathan Sackler also served as a director for at least six IACs, including Napp Pharmaceutical Group Limited and Napp Pharmaceutical Holdings Ltd, ████████████  ████████████████████  He resided in Connecticut.

44.    Defendant David Sackler is the son of Richard Sackler and the grandson of Raymond Sackler.  David Sackler was a member of the Board from 2012 through 2018, a member of the MNP Board from July 19, 2012 until April 1, 2019, and a member of the MNC Board from January 2019 to, upon information and belief, the present.  David Sackler also served as a director

for at least four IACs, including Napp Pharmaceutical Group Limited and Napp Pharmaceutical

Holdings Ltd.  Upon information and belief, he resides in New York.

45.    Defendant Ellen S. Boer is the personal representative of the Estate of Peter Boer.

Peter Boer ("Boer") was a close advisor to the Sacklers and director of the Debtors.  The Estate of

Peter Boer is an estate consisting of all interests and assets owned by Boer as of his death on or

about October 3, 2022.  Boer was a director of the Board from April 2008 until his death, including

for more than three years after Purdue filed for bankruptcy.  Boer served as a director of MNP

from April 2008 until August 2018.  Boer was a "Class B" director who was appointed to both

boards by the Side B Sacklers.  He also served as a director of Rhodes.  Shortly before the Side B

Sacklers appointed Boer to the boards, in 2007, Boer wrote a memorandum to certain Sacklers

warning them about Purdue's "uncapped liabilities" and recommending that the family take

"defensive measures" that would make the Sacklers "less attractive to litigants," including by

sending assets "overseas."  Boer was a director of the boards throughout the period in which most

of the transfers from the Debtors for the Sacklers' benefit occurred.  Boer approved every

distribution for the Sacklers made by the Debtors during his Board tenure, and never voted against

a distribution for the Sacklers.

46.    Defendant Paulo Costa ("Costa") was a director of the Board from April 2012 until

January 2018, a director of MNP from April 25, 2012 until April 1, 2019, and a director of MNC

from its formation until September 30, 2019.  Costa was a "Class B" director appointed to all three

boards by the Side B Sacklers.  Costa served as a director on the Board throughout the period in

which most of the transfers from the Debtors for the Sacklers' benefit occurred.  Costa approved

every distribution for the Sacklers made by the Debtors during his Board tenure, and never voted

against a distribution for the Sacklers.  Upon information and belief, Costa resides in Connecticut.

47.    Defendant William Loomis ("Loomis") was appointed to the Board by the Side B Sacklers, where he served from May 2008 to July 2008.  During Loomis' brief service as a director on the Board, he approved several transfers from the Debtors for the Sacklers' benefit, and never voted against a distribution for the Sacklers.  When Loomis resigned from the Board after only a few months, he explained that "he did not realize when he accepted" a position on the Board "that the Boards of Directors were more in the nature of operating committees rather than a more traditional Board of Directors," and that accordingly the "time commitment" Purdue expected "was much greater than he anticipated."  Upon information and belief, Loomis currently resides in California.

48.    Defendant Ralph Snyderman ("Snyderman") was a director of the Board from August 2012 to October 2017 and a director of MNP from August 1, 2012 until October 30, 2017.  Snyderman was a "Class B" director appointed to both boards by the Side B Sacklers.  Snyderman served as a director on the Board throughout the period in which most of the transfers from the Debtors for the Sacklers' benefit occurred.  During the time Snyderman served as a director, Snyderman approved every distribution for the Sacklers made by the Debtors, and never voted against a distribution for the Sacklers.  Upon information and belief, Snyderman resides in North Carolina.

49.    Defendant Anthony Roncalli ("Roncalli") was a partner at the law firm Norton Rose Fulbright ("Norton Rose") and a long-time advisor of the Sacklers and Purdue, along with Baker.  Roncalli was appointed to the Board by the Side B Sacklers on December 1, 2018, and remains a Board member to this day.  As a member of the Board, Roncalli was a member of the Strategic Issues Committee (formerly named the Special Committee on Strategic Issues), from its creation on May 14, 2019 until it was dissolved on October 17, 2019.  The Strategic Issues

Committee was authorized to (i) review and make recommendations to the Board regarding any

corporate structure alternatives, restructuring activities of the company, and potential settlements;

(ii) if requested by the Board, supervise and assist in the development and implementation of a

restructuring; and (iii) from time to time, evaluate and make recommendations to the Board

regarding the continuation or dissolution of the committee depending on the legal and financial

circumstances of the company. ███████████████████

███████████████████████████████████

███████    For years, Roncalli also was involved in preparing materials for and attending Board

meetings, even before joining the Board.  Such Board materials covered, *inter alia*, sales of

OxyContin, Purdue's SOM systems and chargeback data to monitor suspicious orders, and opioid

abuse and overdose.  Roncalli also was involved in IAC matters and discussions regarding the

global enterprise, including the deployment of OxyContin license agreements across various IACs.

He was aware of Purdue's work to explore growth opportunities for OxyContin and was involved

with or otherwise aware of the billions of dollars in distributions that the Board authorized out of

the Debtors.  In addition to his significant work with and for Purdue, Roncalli has also long served

as a trustee of a number of Sackler Trusts and was involved in various Sackler Trust matters over

the years and, upon information and belief, remains an officer of numerous private trust companies

that serve as trustees of Sacker Trusts.  Upon information and belief, Roncalli currently resides in

Florida.

50.    Collectively, Mortimer Sackler Sr., Theresa Sackler, Kathe Sackler, Ilene Sackler,

Mortimer Sackler Jr., Samantha Sackler, Raymond Sackler, Beverly Sackler, Richard Sackler,

Jonathan Sackler, and David Sackler are referred to as the "Sackler Directors."  Pickett, Theurillat,

Boer, Lewent, Costa, Loomis, Snyderman, and Roncalli are referred to as the "Non-Sackler

Directors."  Collectively, Mortimer Sackler Sr., Theresa Sackler, Kathe Sackler, Ilene Sackler, Mortimer Sackler Jr., Samantha Sackler, Pickett, Theurillat, Raymond Sackler, Beverly Sackler, Richard Sackler, Jonathan Sackler, David Sackler, Boer, Costa, Snyderman, and Wikstrom (defined below) are referred to as the "MNP/MNC Directors" in their capacities as directors of MNP and/or MNC.

### B.   Officer Defendants

51.    Defendant Stuart Baker ("Baker") was a partner at the law firm Norton Rose (and its predecessor Chadbourne & Parke LLP ("Chadbourne")) and a long-time advisor to Purdue, the Sacklers, and various Sackler entities.  But he was much more than just an attorney for the family. The degree of Baker's involvement in Purdue and the Sacklers' affairs cannot be overstated.  Over the decades, Baker held more than 100 executive titles at various Purdue entities and the IACs, sat on dozens of company boards, served as trustee, or a trustee director, for dozens of the Sackler Trusts, and was described as the "de facto chairman" of the Debtors.  With respect to just the Debtors, specifically, Baker was (i) Executive Vice President, Counsel to the Board and Secretary of PPLP, (ii) Executive Vice President, Counsel to the Board and Secretary of PPI, (iii) Executive Vice President, Counsel to the Board and Secretary of Avrio Health L.P., (iv) Director, Vice President and Secretary of Nayatt Cove Life Science Inc., (v) Vice President and Secretary of Purdue Pharma Manufacturing L.P., (vi) Vice President and Assistant Secretary of Purdue Pharma of Puerto Rico, (vii) Executive Vice President, Counsel to the Board and Secretary of Purdue Pharmaceutical Products L.P., (viii) Executive Vice President, Counsel to the Board and Secretary of Purdue Pharmaceuticals L.P., (ix) Executive Vice President, Counsel to the Board and Secretary of Purdue Transdermal Technologies L.P., (x) Director, Vice President and Assistant Secretary of Ophir Green Corp., (xi) Director, Vice President and Assistant Secretary of Seven Seas Hill Corp., (xii) Director, Vice President and Assistant Secretary of Paul Land Inc., (xiii) Vice President and

Assistant Secretary of Rhodes Pharmaceuticals L.P., (xiv) Secretary of Rhodes Technologies, (xv)

Vice President and Assistant Secretary of SVC Pharma Inc., and (xvi) Vice President and Assistant

Secretary of SVC Pharma L.P.  Baker annually submitted to Purdue a compensation memo in

which he described in detail the work he had performed relating to virtually every aspect of the

Sackler family's global enterprise, including Purdue.  Baker was involved in every aspect of the

Sacklers' relentless drive to enrich the family through the sale of opioids and siphon that ill-gotten

wealth out of reach from the Debtors' creditors.  Baker received $28 million from Purdue through

direct compensation from 2008 to 2018 in addition to the renumeration he received indirectly

through his network of relationships (including through IACs and Norton Rose).  Upon

information and belief, Baker currently resides in New York.

52.    Defendant Michael Friedman ("Friedman") joined Purdue Frederick in 1985 as

Vice President and Assistant to the President and Chairman.  He held various positions at Purdue

Frederick, including Vice President and Chief Operating Officer from 1999 to 2003 and CEO from

2003 to 2006.  In May 2007, Friedman, together with two other top executives—General Counsel

Howard Udell and former Chief Medical Officer Paul Goldenheim—entered into a criminal plea

agreement and settlement with the U.S. Department of Justice (the "2007 DOJ Criminal Plea and

Settlement") and pled guilty to criminal misdemeanor charges of misbranding OxyContin in their

leadership roles at Purdue.  Upon information and belief, Friedman currently resides in Florida.

53.    Defendant John Stewart ("Stewart") served as President and CEO of PPI and PPLP

from 2008 to December 2013.  In that role, he was the chief executive during the period when the

Debtors transferred more than $7 billion in cash for the Sacklers and the IACs.  Stewart received

millions of dollars in compensation from the Debtors.  Stewart also participated with the Sacklers

in expanding Purdue's national sales force for the sale and marketing of Purdue's opioids and

promoting sales of OxyContin.  Prior to his roles with Purdue, Stewart served as President and

CEO of Purdue Pharma Canada, an IAC, from 1991 to 2008.[7]  Prior to his selection by the Sacklers

as CEO of PPI and PPLP, Stewart was identified in a memorandum titled "CEO Considerations"

prepared for Richard Sackler by Boer as an attractive prospect for chief executive because of his

demonstrated "loyalt[y]" to the Sacklers.  In a deposition taken by the Official Committee and the

Office of the Attorney General for the State of Massachusetts, Stewart refused to answer any

questions about his official Purdue activities and instead invoked his Fifth Amendment right

against self-incrimination in response to a broad range of questions.  Upon information and belief,

Stewart currently resides in Florida.

54.    Defendant Mark Timney ("Timney") served as CEO of PPI and PPLP after Stewart,

from January 2014 to June 2017.  As CEO, Timney participated with the Sacklers in Purdue's

operations, including the sales and marketing of opioids, and prepared updates and information for

the Board.  Timney served as CEO at the time most of the remaining cash distributions from the

Debtors for the Sacklers, as well as very significant non-cash transfers to Sackler-owned entities,

were made.  Timney received millions of dollars in compensation from the Debtors.  Like Stewart,

during a deposition taken by the Official Committee and the Office of the Attorney General for

the State of Massachusetts, Timney refused to answer any questions about his official Purdue

activities and instead invoked his Fifth Amendment right against self-incrimination in response to

a broad range of questions.  Upon information and belief, Timney resides in Connecticut.

55.    Defendant Paul D. Goldenheim ("Goldenheim") was Chief Medical Officer of

Purdue Frederick from 2003 to 2004.  Before that, Goldenheim was a Medical Director of Purdue

Frederick and held several other titles after joining Purdue Frederick in 1985.  Goldenheim left

---

[7] Interestingly, this is the same career trajectory as the current CEO of PPLP, Craig Landau, who the Sacklers named as CEO in 2017.

Purdue Frederick in 2004 and subsequently pled guilty to criminal misdemeanor charges of misbranding OxyContin in connection with the 2007 DOJ Criminal Plea and Settlement. Upon information and belief, Goldenheim currently resides in Maine.

56.    Defendant Edward Mahony ("Mahony") was Executive Vice President and CFO of PPLP from 1999 until 2015. Following his tenure as CFO of PPLP, Mahony became the Executive Vice President of Due Diligence and Integration at PPLP. Before and during his tenure as CFO of PPLP, Mahony also served as CFO of Purdue Frederick. ████████████████████ ████████████████████████████████████████████████████. Mahony was PPLP's CFO when the Debtors transferred billions of dollars of cash and other assets for the Sacklers and the IACs. Despite knowing and publicly acknowledging that Purdue's opioid business gave rise to massive and potentially enterprise-crippling liabilities, Mahony spent years demonstrating his loyalty to the Sacklers (rather than Purdue) by implementing recommendations of the Board to distribute significant portions of Purdue's assets to or for the benefit of the Sacklers. Mahony resides in Connecticut, and at least as of January 2023, continued to hold titles at about 40 Sackler-owned non-Debtor entities.

57.    Defendant John Crowley ("Crowley") was Executive Director of CSA Compliance at PPLP from 2003 to 2012. In this role, Crowley was responsible for overseeing Purdue's compliance obligations with the CSA and corresponding DEA regulations. Crowley also served on the Order Monitoring System Committee (the "OMS Committee"), which was meant to oversee Purdue's SOM operations. During Crowley's tenure as Executive Director of CSA Compliance and as a member of the OMS Committee, Purdue completed many suspicious orders despite clear evidence of diversion and failed to report suspicious orders and pharmacies to law enforcement

authorities in violation of the CSA and corresponding DEA regulations.  Upon information and

belief, Crowley currently resides in Georgia.

58.    Defendant Robin Abrams ("<u>Abrams</u>") was Vice President and Associate General

Counsel of PPLP from 2002 to 2016.  In this role, Abrams was responsible for overseeing Purdue's

SOM operations and ADD program.  Abrams also served on the OMS Committee.  During

Abrams's tenure as Associate General Counsel and as a member of the OMS Committee, Purdue

completed many suspicious orders despite clear evidence of diversion and failed to report

suspicious orders and pharmacies to law enforcement authorities in violation of the CSA and

corresponding DEA regulations.  Upon information and belief, Abrams currently resides in New

York.

59.    Defendant Burt Rosen ("<u>Rosen</u>") was the Debtors' Vice President of Government

Affairs until April 2020.  In this role, Rosen was responsible for federal lobbying on behalf of the

Debtors.  Additionally, Rosen played a key role in orchestrating the Debtors' collaboration with

"<u>Key Opinion Leaders</u>" and third-party organizations to disseminate misinformation concerning

the risks of opioid use and to combat legislative, regulatory, and educational measures to limit

opioid prescriptions and mitigate the opioid crisis.  Upon information and belief, Rosen currently

resides in Georgia.

60.    Defendant Bert Weinstein ("<u>Weinstein</u>") was the Debtors' Vice President of Ethics

& Compliance.  In this role, Weinstein was responsible for overseeing the Debtors' compliance

with applicable laws and regulations and reported to and interacted with members of the Board

concerning these issues.  Upon information and belief, Weinstein currently resides in California.

61.    Defendant Ake Wikstrom ("<u>Wikstrom</u>") held various roles across the Purdue

enterprise.  Although it is unclear if he ever had a formal executive title at any of the Debtors,

Wikstrom was officially a member of the Board's Agenda Committee and its Talent Development and Compensation Committee, was an "advisor" to the full Board, and attended Board meetings, received updates from executives about Purdue's budgets and sales projections, and otherwise provided strategic advice and direction to the Sacklers with respect to the Debtors' affairs. Wikstrom was copied on Baker's daily circulation of media coverage about the Sacklers and the opioid crisis. In addition to his involvement with the Debtors, Wikstrom also was heavily involved in overseeing the IACs. Among other things, Wikstrom was President of Mundipharma Europe, was a member of the MNP Board from October 17, 2018 until April 1, 2019, and a member of the MNC Board from January 17, 2019 to, upon information and belief, the present. Wikstrom regularly informed the Board of developments impacting various IACs and was involved with the preparation of sales projections and OxyContin licensing matters. He also made presentations about the IACs at formal meetings of the extended Sackler family about the family's opioid business (i.e., Beneficiaries Meetings, discussed below). Richard Sackler considered Wikstrom one of the "top people from the business" worthy of being invited to his daughter's wedding in 2015. Upon information and belief, Wikstrom currently resides in the United Kingdom.

62.     Collectively, Baker, Friedman, Stewart, Timney, Goldenheim, Mahony, Crowley, Abrams, Rosen, and Weinstein are referred to as the "Non-Sackler Officers." To the extent Wikstrom was a fiduciary of the Debtors, he is included as a Non-Sackler Officer.

### C.     Trust Defendants

#### 1.     The Side A Trust Defendants

63.     The "Side A Trusts" are, collectively, the more than 130 trusts that benefit some combination of Mortimer Sackler Sr.'s widow, Theresa Sackler, and his descendants (and in a few instances, the spouses of his descendants), as well as certain family charitable organizations. Mortimer Sackler Sr.'s surviving children are: Ilene Sackler and Kathe Sackler, from his marriage

to Muriel Sackler; Samantha Sackler and Mortimer Sackler Jr., from his marriage to Gertraud

(Gerri) Wimmer; and Marissa T. Sackler, Sophia Sackler Dalrymple ("Sophia Sackler"), and

Michael D. Sackler ("Michael Sackler"), from his marriage to Theresa Sackler. Theresa Sackler

and the children of Mortimer Sackler Sr. are Recipient Sackler Beneficiaries, as defined herein.

Additional Side A Recipient Sackler Beneficiaries include adult children and minor grandchildren

of Ilene Sackler and the spouse and adult children of Kathe Sackler. The presently identified

Recipient Sackler Beneficiaries are set forth on Exhibit C.

64.     Defendant "Beacon Trust," by its trustee Heatheridge Trust Company Limited, is a

trust purportedly governed by the laws of Jersey, Channel Islands ("Jersey") as to validity and

construction and administered under the laws of Jersey for the benefit of the Side A Sackler family.

Beacon Trust owns a 100% interest as a limited partner in Beacon Company ("Beacon"), a

Delaware limited partnership which in turn indirectly owns approximately 50% of PPLP. Beacon

Trust also owns, directly and through Beacon, interests in certain IACs. Mortimer Sackler Sr.

established Beacon Trust for the benefit of his descendants and for the additional benefit (after his

death) of Theresa Sackler and certain family charitable organizations. Beacon Trust purports to

be an irrevocable, discretionary, spendthrift trust, which by its nature is designed to attempt to

protect trust assets from claims of creditors of the settlor and beneficiaries. The Sacklers caused

cash and property worth billions of dollars to be fraudulently transferred by the Debtors to or for

the benefit of Beacon Trust. Side A Trusts that have received presently identifiable fraudulent

transfers of Debtor property are identified on Exhibits B and E (together, the "Side A Trust

Defendants"). Other trusts benefitting Side A family members likely received transfers yet to be

disclosed.

65.    During Mortimer Sackler Sr.'s lifetime, over a dozen additional Side A Trusts were established, including some that hold interests in specific IACs.  One of these trusts, Defendant "Hercules Trust," by its trustee Millborne Trust Company Limited, also holds a 100% interest in Banela Corporation, which holds a 50% interest in PLP Inc. and PPI, which together hold a 0.4939% interest in PRA LP, and thus, indirectly, in PPLP.  Each of these trusts purports to be an irrevocable, discretionary, spendthrift trust for the collective benefit of Mortimer Sackler Sr.'s descendants, Theresa Sackler, and, in some cases, charities.  All purport to be governed by Jersey law as to validity and construction and administered by Jersey private trust companies.

66.    Also during Mortimer Sackler Sr.'s lifetime, various purported irrevocable, discretionary, spendthrift trusts were created for the collective benefit of (i) Mortimer Sackler Sr.'s descendants and Theresa Sackler, (ii) Mortimer Sackler Sr.'s non-U.S. descendants and Theresa Sackler, (iii) subsets of Mortimer Sackler Sr.'s U.S. descendants, (iv) Theresa Sackler and her descendants, and (v) individual children of Mortimer Sackler Sr. and their descendants.  Almost all these trusts purport to be governed by Jersey law and administered by Jersey private trust companies.  Several of these trusts are Recipient Sackler Trust Defendants, having received distributions from Beacon Trust after Mortimer Sackler Sr.'s death in 2010.

67.    Prior to 2008, distributions originating from PPLP and transferred to Beacon Trust and/or Beacon Trust's beneficiaries were relatively limited.  But all that changed after Purdue's first guilty plea.  Starting in 2008, Beacon Trust began receiving substantial cash distributions traceable to PPLP and making corresponding cash distributions to its beneficiaries.  For instance, in the two-year period from 2008 to 2009, Beacon Trust made outright distributions totaling approximately $118.8 million to each child of Mortimer Sackler Sr. (or to the child and descendants of the child, collectively), for a total of approximately $831.6 million.  After Beacon

Trust began making these massive distributions, Side A Sacklers began eagerly awaiting (and demanding) the quarterly distributions from PPLP, which inevitably and immediately resulted in quarterly distributions from Beacon Trust. The family members who received such distributions are among the Defendant Recipient Sackler Beneficiaries.

68.    After Mortimer Sackler Sr.'s death, Beacon Trust changed the structure (although not the cadence) of distributions. From early 2010 and through 2017, Beacon Trust generally began making distributions to other family trusts established for the beneficiaries, rather than making distributions to the family members outright. More than 50 new trusts were created by declaration of the trustees and received distributions from Beacon Trust, which as before were made on a quarterly basis and timed to coincide with distributions traceable from PPLP to Beacon Trust. All such trusts are among the Recipient Sackler Trust Defendants. The trusts generally purport to be irrevocable, discretionary, spendthrift trusts for the primary benefit of, variously, (i) Theresa Sackler, (ii) a child of Mortimer Sackler Sr., (iii) a spouse of a child of Mortimer Sackler Sr., or (iv) one or more descendants of a child of Mortimer Sackler Sr. The trusts for the benefit of U.S. family members are generally administered in the United States by U.S. trustees, but more than half purport to be governed by Jersey law. The trusts for the benefit of non-U.S. family members, as described *infra*, generally purport to be governed by Jersey law and administered by Jersey private trust companies.

69.    The Side A Trusts are all administered by individual trustees and private trust companies that are populated with a small number of the Sacklers' intimate insiders. This cabal of trustees and trustee directors managed the affairs of more than 100 trusts for the Side A Sacklers, many purporting to be governed by Jersey law. No bank or other third-party entity independent of the Sacklers and their cronies ever has acted as a trustee of a Side A Trust. Altogether, ten

private trust companies act as nominal trustees of the various Side A Trusts.  But, upon information and belief, all ten private companies used the same small pool of close Sackler cronies as trustee directors during the period that substantial cash and non-cash transfers were distributed out of the Debtors.  As described *infra* Section III.B and on Exhibits A and B, the individuals who served both as trustees and trustee directors for the private trust companies included members of the Side A Sacklers' inner circle, such as Leslie Schreyer, Jonathan White, Jörg Fischer, and, of course, the ubiquitous Baker.

### 2.  The Side B Trust Defendants

70.    At least 80 trusts are believed to benefit some combination of Raymond Sackler's wife, Beverly Sackler, his descendants, and, in a few instances, spouses of his descendants (collectively, the "Side B Trusts").  Raymond Sackler died in July 2017, and Beverly Sackler died in October 2019.  They had two children, Richard Sackler and Jonathan Sackler.  Jonathan Sackler died in June 2020.  Richard Sackler has three adult children, including David Sackler, all of whom are presently identified as Recipient Sackler Beneficiaries on Exhibit C.  Jonathan Sackler had three adult children, two of whom are presently identified as Recipient Sackler Beneficiaries on Exhibit C.

71.    Defendant 74A Trust U/A 11/5/74 f/b/o Beverly Sackler (the "74A Trust"), by its trustees Richard Sackler and Cedar Cliff Fiduciary Management Inc., is a trust governed by New York law as to validity and construction and administered under Wyoming law for the benefit of the Side B Sackler family.  The 74A Trust indirectly owns approximately 50% of the Debtors, as illustrated on Exhibit D, through its ownership of its 98% limited partner interest in Rosebay Medical Company L.P. ("Rosebay"),[8] which, like Beacon on Side A, indirectly owns

---

[8] The other 2% of Rosebay is owned indirectly in equal parts by the 1A Trust and 2A Trust, as described below.

approximately 50% of PPLP.  Through Rosebay, the 74A Trust also indirectly owns interests in

certain IACs.  The Sacklers caused Debtor cash and property worth billions to be fraudulently

transferred to or for the benefit of the 74A Trust.  Side B Trusts that have received presently

identifiable fraudulent transfers of Debtor property are identified on Exhibits B and E (together,

the "Side B Trust Defendants").  Other trusts benefitting Side B family members likely received

transfers yet to be disclosed.  The Side A Trust Defendants and the Side B Trust Defendants are

sometimes referred to herein as the "Recipient Sackler Trusts."

72.    The 74A Trust was created by Raymond Sackler in 1974 and is held for the benefit

of Beverly Sackler and the descendants of Raymond Sackler.[9]  Beverly Sackler, Richard Sackler,

and Jonathan Sackler were the original trustees of the 74A Trust; Richard Sackler and Jonathan

Sackler were the sole trustees of the 74A Trust from June 2004 through December 2019, during

which time they exercised complete control over the 74A Trust.  On December 31, 2019, Jonathan

Sackler resigned in favor of Cedar Cliff Fiduciary Management Inc., a Wyoming private trust

company owned by a special purpose family trust.  Like Beacon Trust on Side A, the 74A Trust is

purportedly an irrevocable, discretionary, spendthrift trust that is structured to attempt to prevent

creditors of the settlor and beneficiaries from reaching trust assets.

73.    Commencing in 2002, the trustees of the 74A Trust periodically divided the trust

into separate trusts and transferred certain assets to the newly created trusts.  For instance, in 2002,

the 74A Trust was divided in two: the 74A Trust and the new Trust B U/A 11/4/74 f/b/o Beverly

Sackler with identical terms and beneficiaries.  Substantially all assets of the 74A Trust, other than

its interest in Rosebay, were transferred to the new trust.  Then, in 2004, the 74A Trust again was

---

[9] The governing trust agreement provides that upon Beverly Sackler's death, the 74A Trust is to be divided into
separate trusts for the respective benefit of Richard Sackler and his descendants and of Jonathan Sackler and his
descendants.  Because Beverly Sackler's death occurred after the commencement of the bankruptcy proceeding, this
division has not been implemented.

divided in two: the 74A Trust and the new 1974 Irrevocable Investment Trust (the "Investment
Trust"), by its trustee North Bay Trust Company, Inc., with identical terms and beneficiaries.
Substantially all assets of the 74A Trust other than its interest in Rosebay were transferred to the
Investment Trust.

74.     In 2015, ███████████████████████████████████,
Richard Sackler and Jonathan Sackler, as trustees of the 74A Trust, divided the 74A Trust yet
again, this time into three trusts: the 74A Trust and two more new trusts.  Specifically, the 74A
Trust was divided into (i) the 74A Trust, (ii) Defendant 1974 Irrevocable Trust f/b/o BS and RSS
("74-AR Trust"), by its trustee Crystal Fiduciary Company LLC, and (iii) Defendant 1974
Irrevocable Trust f/b/o BS and JDS ("74-AJ Trust"), by its trustee MCM Fiduciary Management
LLC.  The terms of the two newly created trusts were identical to those of the 74A Trust, but the
beneficiaries were different.  In addition to Beverly Sackler, the beneficiaries of the 74-AR Trust
are Richard Sackler and his descendants, while the beneficiaries of the 74-AJ Trust are Jonathan
Sackler and his descendants.  The trustees then transferred substantially all of the assets of the 74A
Trust, other than its interest in Rosebay, to the 74-AR Trust and the 74-AJ Trust, in roughly equal
shares.

75.     In other words, following the 2015 transactions, the Side B Sacklers' indirect
ownership of Purdue remained with the 74A Trust, while most other 74A Trust assets were divided
among the newly created trusts.  Richard Sackler and Jonathan Sackler were the initial trustees of
the two new trusts.  In 2017, they were succeeded (i) as trustees of the 74 AR Trust by Defendant
Crystal Fiduciary Company LLC, a Wyoming private trust company owned by a family trust for
the benefit of Richard Sackler's descendants, and (ii) as trustees of the 74 AJ Trust by Defendant
MCM Fiduciary Management LLC, a private trust company formed in Wyoming that is owned by

a family trust for the benefit of Jonathan Sackler's descendants.  The 74-AR Trust and the 74-AJ

Trust purportedly are governed by New York law as to validity and construction but are now

administered under Wyoming law.

76.    In 2019, Defendant "AR Irrevocable Trust," by its trustee Crystal Fiduciary

Company LLC, a new purportedly irrevocable, discretionary, spendthrift trust for the benefit of

Beverly Sackler, Richard Sackler, and descendants of Richard Sackler, was established by

declaration of its trustee, Crystal Fiduciary Company LLC, one of Richard Sackler's family's

private trust companies.  Also in 2019, Defendant "AJ Irrevocable Trust," by its trustee Cornice

Fiduciary Management LLC, a new purportedly irrevocable, discretionary, spendthrift trust for the

benefit of Beverly Sackler, Jonathan Sackler, and descendants of Jonathan Sackler, was established

by declaration of its trustee, Cornice Fiduciary Management LLC, one of Jonathan Sackler's

family's private trust companies.  The AR Irrevocable Trust and the AJ Irrevocable Trust

purportedly are governed by New York law as to validity and construction but are administered

under Wyoming law.  Shortly after the new trusts were formed, the trustee of the 74-AR Trust

transferred (or "decanted," to use the term preferred by the Sacklers) substantially all of the assets

of the 74-AR Trust to the AR Irrevocable Trust, and the Trustee of the 74-AJ Trust transferred

substantially all of the assets of the 74-AJ Trust to the AJ Irrevocable Trust.  Currently, a

substantial portion of the Side B net asset value traceable to distributions from PPLP resides in the

AR Irrevocable Trust and the AJ Irrevocable Trust.

77.    Notably, in connection with the 2019 transactions, ████████████ and

the AJ Irrevocable Trust each executed a "Receipt, Refunding and Guarantee Agreement."

Pursuant to these agreements, each trust agreed to satisfy any valid and enforceable right to

payment held by a creditor against the trust from which its assets were transferred.  Furthermore,

the agreements empower creditors of the 74-AR Trust and the 74-AJ Trust to enforce the guarantees directly against the AR Irrevocable Trust and the AJ Irrevocable Trust, respectively.

78.    Defendants Raymond R. Sackler Trust 1 dtd 12/23/89 (the "1A Trust"), by its trustee Data LLC, and Raymond R. Sackler Trust 2 dtd 12/23/89 (the "2A Trust"), by its trustee Cornice Fiduciary Management LLC, are purportedly irrevocable, discretionary, spendthrift trusts created and funded by Raymond Sackler in 1989.  The beneficiaries of the 1A Trust are the descendants of Richard Sackler, and the beneficiaries of the 2A Trust are the descendants of Jonathan Sackler.  Each trust, indirectly through Rosebay Medical Company Inc. ("Rosebay Inc."), owns a 1% interest in Rosebay, which, as discussed above, indirectly owns the Side B interest in Purdue.  The 1A Trust and the 2A Trust also own a significant portion of the Side B interests in IACs (including IACs owned through Rosebay).  Significant assets were transferred from the 74A Trust into the 1A Trust and the 2A Trust through purported "loans," as set forth in Exhibit G.  Leslie Schreyer was the sole trustee of the 1A Trust and the 2A Trust for the period June 24, 2002 through November 20, 2018.  Both the 1A Trust and the 2A Trust purportedly are governed by New York law as to validity and construction but are now administered in Wyoming by separate Wyoming private trust companies owned by family trusts.

79.    Defendants Raymond R. Sackler Trust 1B dtd 12/23/89 (the "1B Trust"), by its trustee Data LLC, and Raymond R. Sackler Trust 2B dtd 12/23/89 (the "2B Trust"), by its trustee Cornice Fiduciary Management LLC, were created in 2003 by division from the 1A Trust and the 2A Trust, respectively.  The 1B Trust and the 2B Trust together own four limited liability companies that collectively function like Banela Corporation on Side A, in that they hold interests in PLP Inc. and PPI, which hold indirect interests in PPLP.

80.    Additional Side B Trusts include (i) trusts, some of which own interests in IACs, that Raymond and Beverly Sackler created or funded for each of their six grandchildren; (ii) trusts Richard Sackler and Jonathan Sackler created to hold interests in IACs; (iii) trusts Richard Sackler and Jonathan Sackler created to hold residential real property; and (iv) special purpose trusts Richard Sackler and Jonathan Sackler created to own their private trust companies.

81.    Richard Sackler and Jonathan Sackler, as trustees of the 74A Trust, authorized massive transfers of funds from the 74A Trust to the 1A Trust and the 2A Trust and, to a lesser extent, the Investment Trust, which they characterized as "loans."  As illustrated on Exhibit G, from 2008 until the division of the 74A Trust in May 2015, the 74A Trust transferred (characterized by the Sacklers as "loans") a total $1.35 billion to the 1A Trust and 2A Trust and ███████████████████████████████.  In November 2013, the 1A Trust and the 2A Trust transferred (characterized by the Sacklers as a "sale") investments to the 74A Trust in exchange for cash.  In December 2013, the 1A Trust and 2A Trust then transferred $300 million to the 74A Trust, which they characterized as a "loan repayment."  Prior to this, between 2008 and July 2013, the 1A Trust and 2A Trust transferred an additional $118 million of cash to the 74A Trust which they also characterized as loan repayments.

82.    As discussed above, in May 2015, the 74A Trust transferred its non-pharma assets in roughly equal shares to newly formed 74-AR Trust and 74-AJ Trust.  The 74-AR Trust received from the 74A Trust approximately $770 million in assets, plus "notes" payable by the 1A Trust in the amount of approximately $465 million.  The 74-AJ Trust likewise received from the 74A Trust approximately $740 million in assets, plus "notes" payable by the 2A Trust in the amount of approximately $465 million.  Immediately following the division, the 74A Trust was left with approximately $39 million in cash, plus its ownership of Rosebay (and thus, indirectly, PPLP).

83.     In August 2015, the 1A Trust and 2A Trust transferred to the 74-AR Trust and the 74-AJ Trust approximately $702 million of assets as purported "repayment" on principal of the "notes" receivable that had been transferred from the 74A Trust to the 74-AR Trust and the 74-AJ Trust.  The assets transferred by the 1A Trust and 2A Trust in 2015 originally were acquired by those trusts using funds transferred to them by the 74A Trust (transfers that the Sacklers characterized as "loans").  The funds so transferred by the 74A Trust originally were received by it through a series of transfers originating at PPLP.

84.     In addition, cash transfers were made by the 1A Trust and the 2A Trust between 2015 and 2018 to the 74-AR Trust and the 74-AJ Trust, respectively, totaling $257 million.  Following the division of the 74A Trust, from 2016 to 2018, the 74-AR Trust and the 74-AJ Trust transferred (characterized as "loans") $26.85 million and $11.85 million to the 1A Trust and the 2A Trust, respectively.  Each of the putative "loans" was made at significantly below-market interest rates, and the Sacklers' designation of these transfers as "loans" appears to have had no purpose other than to seek to further hinder, delay, and defraud PPLP's creditors.

85.     Like the Side A Trusts, the Side B Trusts have long been managed by a small cabal of Sackler loyalists.  The Side B Sacklers never have appointed any professional third-party banks, public trust companies, or other entities independent of the Sacklers and their cronies to serve as trustees of the Side B Trusts.  Prior to 2017, most of the trustees were either Side B family members or long-time, trusted family advisors such as Leslie Schreyer, Jeffrey Robins, Stephen Ives, Roncalli and, of course, Baker.  Between 2017 and 2019, most of the individual trustees were succeeded by member-managed Wyoming private trust companies owned by other Side B Trusts. In many cases, one or more of the Side B family members or family advisors who previously

### D.    Recipient Sackler Beneficiaries

86.    The "Recipient Sackler Beneficiaries" are the individuals who received distributions from Recipient Sackler Trusts that are traceable to PPLP.  The Recipient Sackler Beneficiaries whose identities are presently known to the Official Committee are identified on Exhibit C attached hereto.

### E.    Additional Sackler Related Entities

87.    In addition to the Debtors and the Sackler Trusts, the Sacklers also created a sprawling network of IACs and Other II-Way Entities in the United States and abroad that were generally connected to Purdue or otherwise involved in expanding the sale of opioids.  Like Purdue, the IACs and Other II-Way Entities are directly or indirectly owned and controlled by the Sacklers.

88.    Defendant PRA LP, a non-Debtor Delaware limited partnership (formerly known as Purdue Holdings L.P.), is an Other II-Way Entity that is the initial transferee for many of the fraudulent transfers identified in Exhibit E.  PRA LP is and has been the sole limited partner and 100% equity holder of PPLP since April 30, 2010.  PRA LP, in turn, is ultimately 99.5061% owned by Beacon and Rosebay, which separately are owned by various trusts for the benefit of Side A and Side B, respectively.  The remaining 0.4939% interest in PRA is held by PPI and non-Debtor PLP Inc., a New York corporation.  PPI and PLP Inc. also are ultimately owned by trusts for the benefit of the Sackler families.

89.    Defendant PLP LP, a non-Debtor Delaware limited partnership, is an Other II-Way Entity that is the initial transferee of many of the fraudulent transfers identified in Exhibit E.  PLP LP is wholly owned by BR Holdings Associates L.P. ("BR Holdings"), which ultimately is owned by trusts for the benefit of the Sackler families.

90.    Defendant PLP Inc., a non-Debtor New York corporation, is an Other II-Way that is the initial transferee of many of the fraudulent transfers identified in Exhibit E. PLP Inc. owns a 0.2464% interest in PRA LP and ultimately is owned by trusts for the benefit of the Sackler families.

91.    Defendant BR Holdings, a non-Debtor Delaware limited partnership, is an Other II-Way Entity that is the initial transferee of many of the fraudulent transfers identified in Exhibit E. BR Holdings has a 100% equity interest in PLP LP and is wholly owned by Beacon and Rosebay, which separately are owned by various trusts for the benefit of Side A and Side B, respectively.

92.    The non-party IACs are owned and/or controlled by the Sacklers through the Sackler Trusts. Many of the IACs engage in the marketing and sale of opioids in foreign markets. Certain Other II-Way Entities transferred to the IACs significant amounts of cash that had been transferred to them by PPLP for the benefit of the Sackler Trusts (and thus, for the benefit of the Sacklers), moving assets offshore in an effort to put them out of the reach of the Debtors' creditors.

93.    In addition, the Sacklers also caused Purdue to transfer significant value for the benefit of the Sackler Trusts that own IACs (and thus, for the benefit of the Sacklers) by causing certain IACs to exploit the Debtors' intellectual property rights at dramatically below-market royalty rates. This scheme transferred significant value out of the Debtors and for the benefit of the Sackler Trusts (and, thereby, the Sacklers). The individual Sacklers and Sackler Trusts for whose benefit this was done, and who were unjustly enriched thereby, are set forth on Exhibit I.

94.    The global enterprise was overseen and controlled by the Sacklers, including through MNP until 2019 and then through MNC (as successor to MNP) from 2019 until the present. According to Mortimer Sackler Jr., the MNP Board acted as the "global CEO and CFO"

of the Sackler family enterprise.  At all times, the Sacklers owned MNP through various trusts and dominated and controlled the MNP Board, as they did the PPI Board.  Through the MNP Board, the Sacklers issued so-called "recommendations" to the boards of PPI, the IACs, and the Other II-Way Entities.  These recommendations included instructions for transfers of the Debtors' assets designed to hinder, delay, and defraud the Debtors' creditors.  The Sacklers continue to control the IACs and Other II-Way Entities through MNC through the present day.

### F. Doe Defendants

95.     Does 1-5000 (collectively, the "Doe Defendants") are natural persons or juridical entities, other than those Defendants who are named parties listed in the caption hereof, as supplemented by the information contained in the Exhibits appended hereto and incorporated by reference herein.  Each Doe Defendant's identity presently is unknown to Plaintiffs and may be a necessary or proper party to this action.

## III.  Personal Jurisdiction

96.     The majority of the Defendants named in this Complaint are domiciled in the United States or are entities organized with their principal place of business or place of organization or administration in the United States and, thus, are subject to the general personal jurisdiction of the Court.  Included in this category are all Side B Sackler Director, Trust, and Beneficiary Recipient Defendants, the majority of Side A Sackler Director, Trust, and Beneficiary Recipient Defendants, all Non-Sackler Directors (other than Theurillat), all Non-Sackler Officers (other than Wikstrom), and all Other II-Way Entity Defendants.

97.     In addition, each of the Defendants has purposefully availed himself, herself, or itself of the privilege of conducting activities within the forum, and is subject to this Court's personal jurisdiction, including to the extent he, she, or it participated in the Debtors' chapter 11 proceedings and/or bargained for and/or accepted benefits and obligations in connection with the

Debtors' plan of reorganization, and the settlements, releases, and injunctions entered and/or contemplated therein or otherwise in connection with these proceedings, and/or pursuant to the consents to jurisdiction included in documents relating to the Debtors' chapter 11 proceedings.

98.    Certain Defendants purport to reside primarily abroad or claim to be organized abroad. Those Defendants also are subject to this Court's jurisdiction, including for the reasons set forth in the preceding paragraph. In addition, the jurisdictionally relevant contacts described below provide a separate and independent basis for jurisdiction with respect to the putatively foreign Defendants.

A.    **Certain Side A Sackler Directors (Theresa Sackler, Mortimer Sackler Jr., and Mortimer Sackler Sr.), Certain Recipient Sackler Beneficiaries, Non-Sackler Director Theurillat, and Non-Sackler Officer and MNP/MNC Director Wikstrom**

99.    Certain Side A Sackler Directors—Theresa Sackler, Mortimer Sackler Jr., and Mortimer Sackler Sr. (prior to his death in 2010)—purportedly are or were domiciled abroad but, at all relevant times, conducted Purdue business in, and maintained continuous and systematic contacts with, the United States. Theresa Sackler was a member of the Board from 1993 through 2018 and a member of the MNP (a Delaware entity) Board from its formation in or around 1996 until February 19, 2019. Mortimer Sackler Jr. was a member of the Board from 1993 through 2019 and a member of the MNP Board from its formation until April 1, 2019. Mortimer Sackler Sr. was a member of the Board from October 2, 1990 until his death in 2010, and a member of the MNP Board from MNP's formation in or around 1996 until his death. Similarly, Non-Sackler Director Theurillat a member of the Board from February 2016 until April 2019, a member of the MNP Board from February 2016 until October 2018 and has been Chairman of the MNC Board since its formation in January 2019. Non-Sackler Officer Wikstrom served as an advisor to the

Board and also was a member of the MNP Board from October 17, 2018, until April 1, 2019, and

a member of the MNC Board from January 17, 2019 to, upon information and belief, the present.

100.    Board meetings were held frequently and always in the United States.  Indeed,

Purdue directors were contractually required to devote approximately 70 to 100 days per year to

Board duties, including attending meetings.  As members of the Board, Theresa Sackler, Mortimer

Sackler Jr., Mortimer Sackler Sr., and Theurillat travelled to the United States regularly to attend

Board meetings and engage in other activities related to Purdue in person.  Wikstrom served as an

advisor to the Board and a member of the Board's Agenda Committee and Talent Development

and Compensation Committee, and often attended Board meetings.

101.    As described *infra*, the Sackler Directors took part in micromanaging Purdue's

management and employees as part of their drive to increase sales, with Mortimer Sackler Jr. being

one of the worst offenders.  The Sackler Directors, the Non-Sackler Directors including Theurillat,

and the MNP/MNC Directors, including Wikstrom, routinely interacted with Purdue personnel

and advisors located in the United States by email, telephone, and other methods, including with

respect to the events giving rise to the claims asserted in this Complaint.

102.    Side A's so-called "Family Council," which, according to its charter, was

established in 2003 to facilitate interactions amongst the family members and with the family

trustees and protectors regarding trust matters, regularly held meetings in the United States.[10]  All

adult Side A family members, including but not limited to Theresa Sackler, Mortimer Sackler Jr.,

and Mortimer Sackler Sr., were invited to and often attended Family Council meetings in the

United States.  The Family Council also established Family Committees, including the four initial

committees: Philanthropy, Pharmaceutical Business, Trust and Legal, and Investment and Finance.

---

[10] A "protector" is an individual or entity appointed to oversee the actions of the trustee(s) of a trust. The specific
powers and duties of the protector are set forth in the governing trust instrument.

Theresa Sackler, Mortimer Sackler Sr., and Mortimer Sackler Jr. each served on various Family

Committees and, as such, attended meetings in the United States and regularly corresponded with

family members, advisors, and Purdue personnel in the United States, including regarding trust

matters.

103.    Moreover, Mortimer Sackler Jr. was domiciled in the United States at least until

October 2017 and, upon information and belief, is a U.S. citizen.  Mortimer Sackler Jr. also

maintains a New York business office and owns a private investment entity, Stillwater LLC, which

is a Delaware limited liability company.  Mortimer Sackler Jr. also has served on the board of

governors for the New York Academy of Sciences, as a trustee of Intelligence Squared U.S., as

Vice President and Treasurer of the Mortimer D. Sackler Foundation (New York), a member of

the Board of Directors of the Solomon R. Guggenheim Foundation, and Commissioner of the

Vitality Institute (New York). ███████████████████████

█████████████████████████████████████

█████████████████████████████████████

████████████████████████████████.

104.    Certain of the Side A Recipient Sackler Beneficiaries identified on Exhibit C—

Theresa Sackler, Mortimer Sackler Jr., Samantha Sackler, Sophia Sackler, and Michael Sackler—

purportedly reside abroad but nonetheless are subject to personal jurisdiction in the United States.

Several served as directors of the Debtors, travelled to the United States, and directed Debtor

business.  In addition, at least annually, the beneficiaries of the various Side A Trusts attended

meetings in-person in the United States.  The purpose of these beneficiary meetings was to provide

information about the business to adult trust beneficiaries and owners of the business who did not

follow the business on a regular basis.  In addition, all transfers at issue in this Complaint are transfers of U.S. property from U.S. Debtors.

105.    Finally, all Sackler Directors and Recipient Sackler Beneficiaries, including those purportedly living abroad, purposely availed themselves of this Court's jurisdiction when they sought to benefit from Purdue's bankruptcy proceedings.  As David Sackler explained at the confirmation hearing, the Sacklers sought to negotiate a plan of reorganization "sufficient to get [their own] goals accomplished,"[11] including by seeking to obtain releases from liability.  Other Sacklers filed proofs of claim in the bankruptcy, and/or were party to the shareholder settlement agreement that they hoped would release them and their trusts and affiliated entities from liability for good.    Having for years availed themselves of the protection of this Court, the Sacklers and other Defendants cannot deny its power over them now that the Supreme Court has decided an issue of law in a manner that does not suit them.

**B.    Trustees of the Purportedly Non-U.S. Recipient Sackler Trusts**

106.    The relevant trust Defendants included in this Complaint are also subject to personal jurisdiction in the United States.  All Side B Trusts are organized under U.S. law or administered in the United States, with U.S.-based trustees, and are therefore undeniably subject to this Court's jurisdiction.  Out of the 68 Side A Sackler Trusts identified as Defendants on Exhibits B and I, 32 such trusts are also organized under U.S. law and/or have a U.S.-based trustee and are similarly subject to this Court's jurisdiction.

107.    The remaining 36 Side A Sackler Trusts identified as Defendants on Exhibits B and I are purportedly governed by the laws of Jersey, and/or are administered in Jersey (the "Jersey

---

[11] *See also Harrington v. Purdue Pharma L.P.*, No. 23-124, 2024 WL 3187799 (June 27, 2024) (citing *In re Purdue Pharma L.P.*, No. 19-23649 (Bankr. Ct. S.D.N.Y., Aug. 18, 2021) ("Members of the Sackler family saw in [Purdue's Chapter 11 bankruptcy filing] an opportunity 'to get [their own] goals accomplished.'").

Sackler Trust Defendants"). Despite Side A's transparent attempt to escape justice in the United States by transferring billions of dollars originating from Purdue to the Beacon Trust and other Sackler Trusts purportedly organized under Jersey law, each of the Sackler Trust Defendants, including the Jersey Sackler Trust Defendants, is subject to this Court's jurisdiction.

108.    Although there are numerous Jersey Sackler Trust Defendants, there are only a handful of trustees for such trusts—all of which are private companies run by the same familiar small cadre of Sackler insiders, and all of which have regular and systematic contacts with the United States and Purdue. Each of the Jersey Sackler Trust Defendants identified on Exhibits B and I has as its trustee one of the following private trust companies managed by loyal advisors to the Side A Sacklers: Heatheridge Trust Company Limited ("Heatheridge") is the trustee of Beacon Trust;[12] Chelsea Trust Company Limited ("Chelsea") is the trustee for 26 of the Jersey Sackler Trust Defendants; Millborne Trust Company Limited ("Millborne") is the trustee for three of the Jersey Sackler Trust Defendants; Hillside Trust Company Limited ("Hillside") is the trustee for three of the Jersey Sackler Trust Defendants; Hagen Trust Company Limited ("Hagen") is the trustee for Fidinc Trust; and Sandiway Trust Company Limited ("Sandiway" and, together with Heatheridge, Chelsea, Millborne, Hillside, and Hagen, the "Corporate Trustees") is the trustee for Tom & Kelly Trust.

109.    Through, among other things, the Corporate Trustees' directors and other personnel appointed by individual trusts, many of whom are U.S. residents and citizens in the Sacklers' inner circle, the Corporate Trustees regularly and systematically conducted trust business in the United

---

[12] ████████████████████████████████████████████████

States, including with respect to the Debtors' fraudulent transfers that are the subject of this Complaint.

1. <u>U.S. Contacts of Corporate Trustee Board Members, Trust Protectors, and Special Trustees</u>

110.    At all relevant times, each of the Corporate Trustees for the Jersey Sackler Trust Defendants operated through a board of directors.  Upon information and belief, at all relevant times, the boards of each of the Corporate Trustees were identical and comprised the following U.S. and purported non-U.S. directors (the "trustee directors" of the Corporate Trustees):

1.    Leslie Schreyer (U.S. citizen and resident);

2.    Kerry Sulkowicz (U.S. citizen and resident), who became a trustee director in 2018;[13]

3.    Baker (U.S. citizen and resident)—resigned as trustee director in 2018;

4.    Charles Lubar (U.S. citizen)—retired as trustee director in 2014;

5.    Jonathan White (alleged Jersey resident);

6.    Jörg Fischer (alleged Switzerland resident); and

7.    Christopher Mitchell (alleged U.K. resident)—upon information and belief, served through 2016.

111.    This same group of individuals acted as directors, not only of the Corporate Trustees of the Jersey Sackler Trust Defendants, but also of every other private trust company that was a trustee of the remaining Jersey Sackler Trust Defendants, and of every other U.S. private trust company that was a trustee of the Side A Trusts identified on Exhibit A.  Baker and Leslie Schreyer also currently serve, and have served at all relevant times, as individual trustees for a number of trusts organized and administered under U.S. law.

---

[13]

112.    Throughout the relevant period, ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████.[14]  Upon information and belief, the Corporate Trustees—through

their trustee directors—had numerous additional U.S. contacts, including regular email, telephone,

and other communications concerning trust affairs with directors located in the United States.

113.    Certain decisions of the Corporate Trustees required the consent of the applicable

Recipient Sackler Trust's "protectors."  Upon information and belief, obtaining such consents

required contacts with the United States.  The trust protectors of various Jersey Sackler Trust

Defendants during the relevant period included U.S. residents Peter Ward and Leslie Schreyer.

114.    Decisions of the trustee directors of Heatheridge, as Corporate Trustee of Beacon

Trust, regarding distributions to trust beneficiaries also required the consent of a majority of the

"special trustees."  Upon information and belief, obtaining such consents required contacts with

the United States.  The special trustees during the relevant period included U.S. residents Peter

Ward and Leslie Schreyer, as well as U.S. citizen Charles Lubar.

115.    In addition, throughout the relevant period, each of the Corporate Trustees was

advised by U.S.-based legal counsel—Norton Rose (and its predecessor Chadbourne).  ████████

████████████████████████████████████████████████████████

---

[14] ████████████████████████████████████████████████████

████████████████████████████████████████████████

2. <u>U.S. Contacts of the Corporate Trustee Directors and Trust Protectors That Served on the Family Council's Trustee Investment Committee</u>

116.    The trustee directors of the Corporate Trustees and the trust protectors and special trustees of the various Sackler Trusts, also served on various committees of the Family Council. From 2012 to 2016, the majority of such committee meetings were held in the United States. Committee members, including purported non-U.S. trustee directors, trust protectors, and special trustees, often attended these meetings in-person.

117.    Notably, the Family Council established the Trustee Investment Committee to consider and propose retention of asset managers and oversee asset allocation and investment portfolios on behalf of the majority of the Side A Trusts, including the Jersey Sackler Trust Defendants.  The Trustee Investment Committee initially comprised trustee directors Leslie Schreyer, Jörg Fischer, Charles Lubar, and Jonathan White.  The Trustee Investment Committee met multiple times a year in the United States, and the trustee directors attended those meetings as trust representatives.

118.

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████.  Upon information and belief, ██████████  ██████  and

various other investment managers and advisors to the Corporate Trustees had U.S. personnel,

recommended to the Corporate Trustees investments in U.S. funds and securities, and otherwise

maintained myriad contacts with U.S. banks, brokers, and other custodians on behalf of the

Corporate Trustees.  ████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████

3.  <u>U.S. Contacts of the Corporate Trustee Directors, Trust Protectors, and Special
Trustees That Were Part of the Trustee and Advisor Group</u>

119.    The trustee directors of each Corporate Trustee and the trust protectors and special

trustees of the Jersey Sackler Trust Defendants, together with the trustees, trustee directors, trust

protectors, and special trustees of nearly all other Side A Trusts identified at Exhibit A, comprised

the "<u>Trustee and Advisor Group</u>."[15]  The Trustee and Advisor Group thus included U.S. residents

(Baker, Leslie Schreyer, Jeffrey Robins, Peter Ward, and Kerry Sulkowicz) as well as purported

non-U.S. residents (Jonathan White, Jörg Fischer, Christopher B. Mitchell, Hermance Schaepman,

and Charles Lubar).[16]  The members of the Trustee and Advisor Group worked together to manage

nearly all Side A Trusts, including the Jersey Sackler Trust Defendants.

---

[15] The Sacklers and members of the Trustee and Advisor Group also referred to the Trustee and Advisor Group as the
"Trustee/Advisor Group," the "Trustee/Protector Group," the "Trustee/Advisors," and the "advisors."

[16] Charles Lubar, Leslie Schreyer, Peter Ward, Christopher Mitchell, and Hermance Schaepman (each acting
personally or through a corporate alter ego) served in various combinations as trust "protectors" of many Side A
Trusts.

120.    The Trustee and Advisor Group, including the trustee directors of the Corporate Trustees and the trust protectors and special trustees of the various Jersey Sackler Trust Defendants, met twice annually, and at least one of these annual meetings occurred in the United States.  Trust business regularly was conducted at these in-person meetings in the United States. For example, at a September 2013 meeting of the Trustee and Advisor Group in Wyoming, the members of the Trustee and Advisor Group discussed on behalf of all Side A Trusts various trust matters, including but not limited to trust advisors, professional fees, investment managing, cash flow funds, and succession planning for trustee directors and trust protectors.

121.    Moreover, upon information and belief, the Trustee and Advisor Group met at least twice annually with Side A's Family Council, and at least one of these annual meetings occurred in-person in the United States. ███████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████ Indeed, at those annual meetings, the trustee directors and trust protectors—including those who claim to live abroad—presented in the United States to the Family Council on matters of trust business, including trust investments, anticipated distributions for the year ahead, and general administration.  Upon information and belief, at those annual meetings, trustee directors and trust protectors generally discussed trust matters related to all Side A Trusts, including the Jersey Sackler Trust Defendants. For example, trustee director Jörg Fischer typically traveled to New York to present at Family Council meetings regarding the financial position of the trusts and the anticipated distributions for the upcoming year.  Baker typically presented on business issues, including updates on the

business operations of Purdue.  Significantly, litigation risk also was discussed at Family Council meetings.

122.    Through the foregoing contacts, the Jersey Sackler Trust Defendants maintained extensive contacts with the United States, including business related to monitoring the business of the Debtors, the receipt of Debtor distributions, and utilizing the funds distributed from the Debtors, among other significant contacts.  Like the other Defendants, all of the Jersey Sackler Trust Defendants are subject to the personal jurisdiction of this Court.

## **FACTS**

### IV.    **The Sacklers' Domination of Purdue**

#### A.    **At All Relevant Times, the Sacklers Owned Purdue and Exercised Complete Control Over Its Board and Affairs**

123.    The Sacklers purchased Purdue Frederick in 1952.  At that time, the company was not yet engaged in the sale of opioids.  Since the Sackler brothers purchased the company, Purdue has, at all times, been owned, directed, and controlled by members of the Sackler family.  Throughout the period relevant to this Complaint, the two sides of the Sackler family—Mortimer D. Sackler and his descendants (i.e., Side A) and Raymond Sackler and his descendants (i.e., Side B)—shared equal ownership of the company and equal rights to control the decisions of the company.[17]

124.    From 1990 until January 16, 2019, members of the Sackler family served on the Board, which controlled and directed the business activities of all of Purdue.  Throughout that

---

[17] Three brothers, Arthur, Mortimer Sackler Sr., and Raymond Sackler, purchased the company together.  Arthur died in 1987.  Soon after his death, and before the launch of OxyContin, Arthur's estate sold his one-third interest in Purdue to Mortimer Sackler Sr. and Raymond Sackler.  Since that time, ownership of Purdue has been split equally between the two brothers and their respective families.

time, the Sacklers were either the sole directors or the majority of directors on the Board, as set

forth in the chart below:



125.    The various Sackler Directors served on the Board for the following periods of

time:

| Sackler Director | Years Served as Purdue Director (rounded to nearest year) | Years on the Purdue Board |
|---|---|---|
| Jonathan Sackler | 28 years | 1990–2018 |
| Ilene Sackler | 28 years | 1990–2018 |
| Kathe Sackler | 28 years | 1990–2018 |
| Richard Sackler | 28 years | 1990–2018 |
| Raymond Sackler | 27 years | 1990–2017 |
| Mortimer Sackler Jr. | 26 years | 1993–2019 |
| Theresa Sackler | 26 years | 1993–2018 |
| Beverly Sackler | 25 years | 1993–2017 |
| Mortimer Sackler Sr. | 19 years | 1990–2010 |
| Samantha Sackler | 10 years | 1993–2003 |
| David Sackler | 6 years | 2012–2018 |

126.    Multiple Sackler Directors held various Board positions.   Specifically, Richard

Sackler was Co-Chairman of the Board from March 6, 2003 through June 30, 2007; Raymond

Sackler was Co-Chairman of the Board from January 1, 2004 through June 30, 2007, and Co-

Chairman of Purdue Frederick from March 6, 2003 through December 31, 2003; and Mortimer

Sackler Sr. was Chairman of Purdue from January 1, 2002 through November 2, 2003, Co-

Chairman from January 1, 2004 through June 30, 2007, and Co-Chairman of Purdue Frederick

from November 3, 2003 through December 31, 2003.  In addition to their board positions, multiple

Sacklers also held executive positions at Purdue for several years.[18]

127.    Until 2007, there either were no board members or only one board member who

was not also a member of the Sackler family.  After Purdue pled guilty to federal crimes and settled

various investigations by state governments concerning its marketing and sale of opioids in 2007,

the Sacklers began to add a handful of non-Sackler members to the Board to create the appearance

of some independent oversight.  These Non-Sackler Directors included the following individuals:

(1) Boer (Side B Director from April 2008 to 2022); (2) Loomis (Side B Director from May 2008

to July 2008); (3) Lewent (Side A Director from March 2009 to December 2014); (4) Pickett (Side

A Director from January 2010 to the present); (5) Costa (Side B Director from April 2012 to

January 2018); (6) Snyderman (Side B Director from August 2012 to October 2017); (7) Theurillat

(Side A Director from February 2016 to June 2018); and (8) Roncalli (Side B Director from

---

[18] Specifically, Richard Sackler was President of PPI from January 1, 2002, through March 5, 2003, and he described himself in a resume as COO from January 1, 1986, to December 1999; Mortimer Sackler Jr. was Vice President of PPI from January 1, 2002 through April 23, 2003; Raymond Sackler was President and Co-CEO of PPI from January 1, 2002 through March 5, 2003; Mortimer Sackler Sr. was Co-CEO of PPI from January 1, 2002 through November 2, 2003; Jonathan Sackler was Senior Vice President from January 1, 2002 through June 30, 2007; Kathe Sackler was Senior Vice President from January 1, 2002 through June 30, 2007; and Ilene Sackler was a Vice President from January 1, 2002 through December 31, 2002.  Even when they dropped these nominal officer titles, the change was entirely superficial.  In reality, the Sacklers continued micromanaging the business at all relevant times.

December 2018 to present).  The Non-Sackler Directors never held a majority position on the Board and never had the ability to veto a decision approved by the Sackler Directors.

128.    These Non-Sackler Directors, moreover, were not remotely independent from the Sacklers.  To the Sackler Directors, non-family members of the Board were "soldiers" who could be "march[ed] . . . into a meeting" and relied on to "follow the lead of the family member[s] in the room."  Indeed, upon information and belief, in the hundreds of votes that came before them during their respective Board tenures, the Non-Sackler Directors voted with the Sacklers *every single time*. ███████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████.  Notably, in the words of Mortimer Sackler Jr., the Non-Sackler Directors "consistently said, and correctly so," that distributions were "a shareholder issue and not one [the Non-Sackler Directors] have or are comfortable expressing a view on."  Thus, the Non-Sackler Directors provided no independent oversight and merely rubber-stamped the Sackler Directors' decisions, in particular with respect to the billions of dollars of distributions the Sacklers took from Purdue over the decade preceding the bankruptcy filing.

129.    Likewise, the Sacklers handpicked Purdue's chief executives based on their perceived readiness to prioritize loyalty to the Sackler family over loyalty to Purdue.  Just before he was appointed to the Board, Boer wrote in a 2008 memorandum to Richard Sackler, titled "CEO Considerations," that "Top Purdue management must be aligned to this reality" that "the most certain way for the owners to diversify their risk is to distribute more free cash flow [to themselves] so they can purchase diversifying assets."  Boer continued, "People who will shift their loyalties rapidly under stress and temptation can become a liability from the owners' viewpoint.  My opinion is that JHS [Stewart] is very (favorably) strong in this dimension."  Unsurprisingly, Stewart was

selected by the Sacklers to serve as Purdue's CEO shortly after Boer's memo was written, and he served in that capacity until December 2013.

130.    The Sackler-dominated and controlled Board took an unusually active role in directing the business of Purdue.  Unlike a normal company board, which typically meets to review periodic financial results and to address other significant strategic decisions, the directors of the Board devoted approximately *70 to 100 days* per year to their duties, including attending meetings, which typically took an entire day.[19]  According to former Board member Boer, the patriarchs Raymond and Mortimer Sackler Sr. ran the company as "executives, management, board and shareholders all-in-one," and their progeny inherited and continued this practice.  As noted above, Loomis resigned from the Board in 2008 after less than three months for exactly this reason. Loomis explained to Baker—Purdue's "de facto Chairman"—that Loomis did not realize when he agreed to join the Board that it was not a "traditional Board of Directors," but instead was "more in the nature of an operating committee[]," and therefore demanded a "time commitment [that] was much greater than he anticipated."  When Baker relayed this information to the Sacklers, he noted that the "hands on style of the Boards of Directors is really nothing new," but reminded them of his many previous warnings that the practice could result in "personal liability" for Board members.

131.    The Sackler Directors routinely decided matters that are left to management in a typical company, requested detailed information from management, and demanded that executives make themselves available for numerous meetings that were far outside the bounds of typical corporate practices, even of closely held companies.  As Baker explained to Defendant Wikstrom, "the ever present reason for meetings of the Boards of Directors being loaded with lots of agenda

---

[19] Defendant Pickett, a director since April 2008, noted that "obviously" 70 to 100 days "is a lot of days compared to what I served on public company boards."

items is the Boards of Directors wanting to be deeply involved in the business and unwilling to delegate authority over many matters that would be left to management of a public company." Likewise, Board member Pickett acknowledged that the Sackler Directors routinely and inappropriately "g[o]t in the weeds" of Purdue's affairs and, in particular, got "very granular on" Purdue's "sales and marketing."

132.   The Sackler Directors' overbearing practices were so abnormal that, in 2017, management identified the fact that "the Board of Directors serve[s] as the 'de facto' CEO" as one of the most pressing issues facing the company.   Consultants brought in from McKinsey & Company ("McKinsey") similarly observed that "the Board gets involved in too many decisions that it shouldn't" and noted that the Sacklers "viewed all employees like the guys who 'trim the hedges' – employees should do exactly what's asked of them and not say too much."   As a result, they observed that "Purdue employees are good 'servitors' who are fearful of speaking up in decision making processes," and who fall in line and carry out the Sacklers' bidding.   Another consultant noted that "[d]ecision-making at Purdue is an 'utter failure'" and cited as a primary reason for this failure the chronic "interference by the Board" which was "involved in all levels of decision-making on a weekly basis."

133.   The problem of the Sackler Directors meddling in the details of the business was so extreme that the Sacklers themselves acknowledged that "the role of the board and that of the management [at Purdue] is blurred compared with the distinctions made by other major corporations," and recognized that the lack of a "conventional division between board and management roles" was due in part to "the [Board's] majority of family Board Members."   In 2015, Baker, on behalf of the Board, went so far as to actually draft a resolution that would have limited the Sackler Directors' contact with managers in an effort to stop family members from

"bombarding execs with . . . ideas and trying to influence them." That resolution appears to have failed, however, and the Sackler Directors' abnormal and disruptive method of running the Board and Purdue's business continued.

134.   Through the Petition Date,[20] the Sackler Directors involved themselves in the details of the business and dominated and harassed their employees to a truly unusual and problematic extent. Defendant Friedman, one of Purdue's former CEOs, complained that the Sackler Directors' practice of directing and overseeing employees' work was "disruptive to operations, impairing effectiveness, and negatively impacting morale" and "undermine[d] [his] authority as the leader of [their] organization and ma[de] it more difficult for [him] to perform [his] duties." Friedman had raised these concerns many times, but the Sackler Directors never changed.[21] Later, Friedman again complained that "Board members continue to engage my subordinates in lengthy conversations and chains of correspondence . . . that amount to substantial direction. . . . [S]ome of these directions have been trivial and insulting." Employees complained that Jonathan Sackler was one of the members of the family who was guilty of continuously interacting with subordinates in a way that undermined management, yet even Jonathan Sackler recognized that "the practice of individual family members, without formal responsibility or

---

[20] While the Sacklers purportedly ceased involvement with the business shortly before the Petition Date, members of the Sackler family attended a Beneficiaries Call on December 12, 2019—nearly three months after the Petition Date—where management provided the beneficiaries with a business and financial update as well as a litigation update. Incredibly, the meeting also was attended by the Special Committee of the Board, nominally appointed to, among other things, investigate the Debtors' potential claims against the Sackler family.

[21] For instance, in November 2004, Defendant Friedman wrote to Richard Sackler, "Your practice of communicating with people and not copying the chain of command is a real problem for me. I would appreciate it if you would always follow the chain of command. At least copy the chain, especially in a time of down sizing and turmoil. . . . I am more concerned with your and Jon's continuing practice of interacting with subordinates in the organization, which undermines management. However, there is no need to continue this debate. You know how I feel and will do what you wish." Again, in 2007, when Richard Sackler met directly with a sales and marketing director to discuss sales forecasts, bypassing his superior, Defendant Friedman informed Richard Sackler: "I think your involvement at this level of detail and calling [Purdue's Vice President of Marketing] to your office for a review, without notifying me is wrong. . . . *I will not debate this with you. I have no reason to expend any energy on getting you to act properly because I don't believe you will change*."

REDACTED

accountability, floating into situations and asserting themselves with executives" "frustrated both families and our executives."

135.   In March 2007, Jonathan Sackler explained the issue to Richard Sackler in colorful terms, telling him that his practice of assigning projects directly to Purdue employees without consulting their supervisors was basically "Yanking people around from the middle of the organization AND making a big fucking to-do about it is just fucking with [management].  Why is this so mysterious to you?"  Richard replied, "I can't see it.  Sorry, I'm blind to it."  Jonathan stated, "Richard, you've been told the same thing 2000 fucking times.  Wake up."  Richard insisted, "I don't see what is wrong.  Sorry I can't agree with you."  Jonathan replied, "It's like someone walking into your house and saying, 'I don't plan to take much.  I'll just have a glass of water, take a piss and watch a little TV.  It won't really put you out.'  Here's the deal – these people don't report to you.  Their time belongs to [management].  You are poaching.  Which would be OK if the commitment is truly modest, the occasions rare, and you were a little discrete about it."

136.   The Sackler Directors eventually dropped their formal executive titles to give the appearance that they no longer were in management, but they never stopped acting as executives and micromanaging the business of the company.  As a result, at all relevant times, the Sackler Directors exercised complete control over every aspect of Purdue's day-to-day business, from decisions at the board level about strategic business directions and major transactions, to those decisions more appropriate for an executive, such as setting sales targets, establishing marketing initiatives, and even minor details about product pricing.  ██████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████

137.    The Sackler Directors replicated these practices in their roles as directors on the MNP Board, which Mortimer Sackler Jr. once described as the "global CEO and CFO" of the Sackler-owned entities. ██████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████ Thus, using the Board and the MNP Board, the Sacklers controlled the operations of their entire global network of companies and orchestrated the various fraudulent transfers described in this Complaint.

**B.     The Sackler Directors Were Particularly Domineering When It Came to Purdue's Aggressive Marketing Activities**

138.    Though each of the Sackler Directors took part in micromanaging Purdue's management and employees as part of their drive to increase OxyContin sales, Richard Sackler and Mortimer Sackler Jr. were particularly aggressive.  In 1999, just four years after Purdue began to market and sell OxyContin, Richard Sackler wrote in an email, "You won't believe how committed I am to make [sic] OxyContin a huge success.  It is almost that I dedicated my live [sic] to it."  This practice continued throughout Richard's tenure on the Board.

139.    Indeed, both Richard and Mortimer Sackler Jr. regularly requested and analyzed sales forecasts prepared by Purdue personnel, disregarded or countermanded sales goals established by management to demand higher sales targets, and intervened with Purdue's nominal

executive team to drive increased OxyContin sales to boost Purdue's cash flows and allow for

more distributions out of the company and into the Recipient Sackler Trusts:

- For example, on March 8, 2008, Russell Gasdia, Purdue's head of sales, informed then-CEO Stewart of a conversation he had with Richard Sackler regarding Purdue's sales forecast, writing, "John, I know it is tricky, but Dr. Richard has to back off somewhat. He is pulling people in all directions, creating a lot of extra work and increasing pressure and stress. I will draft a response but he is not realistic in his expectations and it is very difficult to get him to understand."

- Either the message did not make it to Richard, or he disregarded it. The following day, on March 9, 2008, Richard engaged with Purdue's sales team in painstaking detail in an effort to prove that the team's sales forecast was too low. Richard instructed the team to revise their spreadsheets, remarking, after the changes, that "this looks very different and much more encouraging, doesn't it?" and expressing his "excite[ment]" to dig into the data." After removing Richard from the chain, one of the marketing managers advised his subordinates on how to "defend[] the forecast" if "you wind up talking to Dr. Richard today without me."

- But Richard preferred his own views to that of his marketing team. In a report to the Board the following day, Richard wrote that after a deep dive into "the preliminary sales forecast for 2008," he could "happily report that the 2008 forecast and sales plan [prepared by management] is almost certainly overly conservative, by which I mean it significantly understates what we may reasonably expect to be achieved in 2008." Richard concluded by recommending that the Board "have Mortimer Jr. and I work with John Stewart to re-forecast the year and also the 5 year plan for OxyContin tablets," and to create "a new and higher sales plan."

- In January 2010, numerous members of Purdue's marketing team lamented receiving "more data requests from Dr. Richard . . . that will take a lot of time and not add much value," complaining that "we're getting carried away with weekly data," and querying, "[w]hat questions are we trying to answer?" Gasdia forwarded the complaints to Stewart asking for his "help with this? It seems like every week we get one off requests from Dr. Richard and now even Dr Raymond for reports tailored to their needs, which take time and effort away from other priorities. We are not even sure of the value provided once complete." After Stewart provided some advice on how to handle the Sacklers' requests, he added, "You are not alone in receiving requests for extraordinary analyses and reports."

- In February 2011, after Gasdia provided information to the Board regarding sales of Butrans (another opioid) compared to forecasts at Richard's request, Richard responded, "I had hoped for better results." A couple weeks later,

Richard Sackler asked members of management, "What do I have to do to get a weekly report on Butrans sales without having to ask for it?" The following week, after Gasdia provided the weekly sales report that Richard requested, Richard asked Gasdia individually, "What else more can we do to energize the sales and grow at a faster rate?" Less than a week later, in response to another weekly sales report regarding Butrans sales, Richard inquired with Gasdia about the performance of a specific salesperson located in Palm Beach.

- In June 2011, Richard even joined sales representatives on physician sales calls in order to help the Sackler Directors "get a sense of" what "impacts prescribing behavior" and gain "a more detailed analysis of 'where' the prescription uptake is great, and where it is poor," including "which district, which region, which types of prescribers, which types of practices etc." affected prescribing behavior—even though in private, Purdue management was wary of the "potential compliance risk" that this posed. As discussed below, Purdue's policy of targeting abnormally high-volume OxyContin prescribers for intensive marketing—enthusiastically endorsed by the Sackler Directors—is at the heart of the criminal conduct to which Purdue confessed, and closely related to the Sackler civil settlement they reached with the DOJ in 2020.

- In February 2012, Mortimer Sackler Jr. intervened on the timing of Purdue's annual sales meeting, arguing that Purdue should "not plan the national sales meeting" after "the winter break as it extends the period of time since the doctor[s] last saw our rep." As a result, Mortimer Sackler Jr. was accused by lower-level sales managers of "micromanagement beyond belief."

- That same month, Richard continued to press management regarding Butrans sales. After Gasdia circulated his weekly report on Butrans sales, Richard replied that he was "not convinced by this data." Richard's email was forwarded by Defendant Weinstein, Vice President of Corporate Compliance, to other members of management "to provide a little feel for the level of scrutiny and skepticism(?) of Dr. Richard regarding sales data."

- In March 2012, after Richard was provided with a report regarding sales of Butrans, Richard remarked, "This is bad," and asked a marketing executive to make edits to the report. Gasdia forwarded the email to Stewart, writing, "This is taking a lot of David's energy, almost every day. . . . It isn't constructive to spend too much time on this as opposed to expending energy within my department of identifying the problem, developing the solutions and gaining implementation. Anything you can do to reduce the direct contact of Richard into the organization is appreciated."

- In 2013, Baker reported that during "a recent conversation with Dr. Richard, he outlined what he would tell [incoming CEO] Mark [Timney] he had to do to do [sic] with the US business in the short run," despite Baker imploring Richard "to leave the new executive to consider and make recommendations to the board without prior direction."

- In June 2014, after Richard posed questions to then-CEO Timney and Saeed Motahari, a new sales executive, aimed at boosting sales of Butrans, Timney cautioned that it was "a little early" to be pushing Motahari since he was "only 2 weeks into the role." Seemingly disregarding Timney's words of caution, Richard responded, "I'm looking for the difficult task of changing the trajectory very significantly. What can be done that gives a relaunch a chance?"

140.    The Sackler Directors' micromanaging of management's affairs to drive sales got so meddlesome that, in 2015, MNP's Governance Committee actually drafted a resolution in an attempt to circumscribe the behavior. After Mortimer Sackler Jr. told Theresa Sackler that he did not agree with the language of the proposed recommendation, Theresa responded, "the original idea is from Jon, who wants to stop Richard bombarding execs with his ideas and trying to influence them." In addition, as noted, all of the Sackler Directors played a role in micromanaging. As such, one of the other reasons for the proposed recommendation was "to prevent Kathe wasting hours of their time for no reason." Ultimately, the Governance Committee was unable to overcome the opposition; its recommendation was not adopted by the Board (which was dominated by the Sacklers themselves); and the Sacklers' micromanagement of Purdue continued at all relevant times.

## V.    At the Sacklers' Direction, Purdue Launched OxyContin and Undertook an Aggressive—and Criminal—Marketing Scheme

141.    Purdue entered the opioid market in the 1980s when it acquired a Scottish drug producer that had developed a sustained-release technology suitable for morphine, which Purdue branded as MS Contin. "Contin" is short for "continuous" and is meant to reflect the allegedly steady release of medication over time permitted by the technology. MS Contin was marketed primarily for cancer and end-of-life pain.

142.    In 1996, Purdue launched "OxyContin"—a tablet in a time-release formula similar to MS Contin but using the opioid oxycodone as its active ingredient. Designed to release oxycodone into the user's bloodstream over 12 hours, a single OxyContin pill contains far more

oxycodone than otherwise comparable, so-called "immediate-release" prescription opioids.  As such, OxyContin had enormous potential for abuse.  Moreover, in its original formulation, OxyContin easily could be crushed or dissolved in water to cause the release of all 12 hours' worth of opioids at once, producing an intense high and a greatly increased risk of overdose and addiction from even a single use.  Notably, however, oral abuse was always the most common way OxyContin was misused, both before and after Purdue's introduction in 2013 of a formula designed to make OxyContin more resistant to tampering.

143.    The Sackler Directors knew that expanding the potential patient pool for OxyContin meant higher cash flows for Purdue and, in turn, more money for the Sackler family.  Even though oxycodone is substantially more powerful than morphine (the active ingredient in MS Contin), the Sacklers sought to ensure that OxyContin would not be limited like MS Contin to treating cancer and end-of-life pain.  To that end, the Sackler Directors caused the company to engage in an unlawful marketing campaign designed to mislead medical professionals and patients.  Among other things, Purdue hired an army of sales representatives to make the false claim that OxyContin could be prescribed safely in high doses for a broad variety of pain ailments, could improve patients' quality of life, could provide 12 continuous hours of pain relief, and had a lower addiction risk than other opioids.  These sales representatives made hundreds of thousands of calls to prescribers annually and more than 7.2 million calls over the relevant period.

144.    The Debtors were well aware that they were misleading prescribers to achieve higher sales.  Richard Sackler and then-CEO Friedman congratulated one another that their misinformation campaign had succeeded in instilling the mistaken view "held by many physicians, that oxycodone is weaker than morphine."  Indeed, they crowed that Purdue had "been successful beyond our expectations in the non-malignant pain market" because doctors and patients

mistakenly considered OxyContin to be "less threatening."  Purdue's claims about OxyContin

misled doctors, prescribers, physician assistants, patients, and others and greatly expanded the

prescription and use of non-medically necessary opioid products, which, in turn, led to rampant

abuse and diversion.

145.    Beginning with the initial launch of OxyContin, the Sackler Directors made

decisions calibrated to limit the potential exposure of their misrepresentations regarding the abuse-

potential of OxyContin.   For example, the Sackler Directors deliberately limited Purdue's

marketing efforts to states that lacked certain regulations aimed at reducing medically unnecessary

prescriptions of controlled substances like opioids.  In 1997, Jonathan Sackler wrote, "I recently

learned that in NY a doc wants to prescribe certain narcotic meds to a patient with a history (or

believed to have a history?) of drug abuse, the doc must write out and file a special form with the

state.  I am wondering if this is a noticeable hassle . . . ."  This was a reference to policies

("Triplicate Prescription Programs") some states ("Triplicate States") had at the time, which

required doctors who were prescribing Schedule II controlled substances (such as OxyContin) to

use special state-issued prescription forms and keep one copy for their records while giving two

copies to the pharmacy dispensing the controlled substance.  The pharmacy would then keep one

copy for its own records and send the third copy to the state drug-monitoring agency, which used

the forms to monitor and investigate prescribing irregularities and diversion.

146.    Following up on Jonathan's query, Purdue conducted several focus groups with

doctors in Triplicate and Non-Triplicate States to analyze the potential impact of these Triplicate

Prescription Programs on OxyContin sales.  Purdue found that doctors in Triplicate States were

much less willing to prescribe Schedule II drugs such as OxyContin due to the logistical burden

of complying with the Triplicate Prescription Program requirements and concerns about extra

government oversight of prescribing behavior. Purdue's OxyContin launch plan concluded that, while "there seems to be a definite opportunity for OxyContin as a medication for treatment of severe non-cancer pain among doctors in non-triplicate states," Triplicate Prescription Programs "create a barrier when positioning OxyContin" in Triplicate States. Hence, "the absolute number of prescriptions [physicians in Triplicate States] would write each year is very small, and probably would not be sufficient to justify any separate marketing effort." The plan recommended that OxyContin "should only be positioned to physicians in non-triplicate states."

147.   Purdue's initial marketing efforts heeded that recommendation. Consequently, OxyContin prescribing was more than twice as high in Non-Triplicate States than in Triplicate States in the years immediately following OxyContin's launch. Non-Triplicate States also experienced much higher rates of OxyContin abuse and, upon information and belief, even higher volumes of non-medically appropriate OxyContin prescriptions than Triplicate States due to Purdue's marketing efforts. Triplicate Prescription Programs were discontinued soon after OxyContin's launch, as they were largely replaced by electronic prescription monitoring systems. However, the initial deterrence effect these programs had on the marketing of OxyContin in Triplicate States had long-lasting impacts on the prescribing and dispensation of OxyContin and resulting opioid deaths in those states.

148.   A working paper published by the National Bureau of Economic Research found that, had Non-Triplicate States implemented Triplicate Prescription Programs when OxyContin was first launched, they would have had an average of 36% fewer drug overdose deaths and 44% fewer opioid overdose deaths between 1996 and 2017. The study further found that the additional exposure to OxyContin's launch and marketing for Non-Triplicate States led to 4.49 more deaths per 100,000, which is equivalent to 65% of the national growth in overdose death rates since 1996.

Based on these results, the study concluded exposure to OxyContin "may explain a large share of the growth in drug overdose deaths since the mid-1990s." In other words, the Sackler Directors' decision to concentrate Purdue's initial marketing efforts of OxyContin in Non-Triplicate States played a direct role in accelerating the country's opioid epidemic.

149.    Purdue also distributed pamphlets, promotional videos, and other "educational materials" making misleading statements to scores of physicians across the country. In one such pamphlet, *Providing Relief, Preventing Abuse: A Reference Guide to Controlled Substance Prescribing Practices*, Purdue stated that addiction "is not caused by drugs." In another pamphlet, *Resource Guide for People with Pain*, Purdue stated that, when properly prescribed and taken as directed, opioids do not lead to addiction or cause a "high." In fact, privately, the Sacklers were well aware of the abuse potential of Purdue's opioid products. A member of the Sackler family once callously joked that "███████████████████" to "███████████████████ ███."

150.    In addition to its direct marketing efforts, Purdue paid prominent physicians known as Key Opinion Leaders and ostensibly "independent" third-party organizations to promote misinformation about the benefits and safety of OxyContin and ran a shadow campaign through unbranded websites to achieve the same objectives. For example, Purdue paid Dr. Lynn Webster, who has been described as a leading proponent of the debunked concept of "pseudoaddiction" (the concept that drug-seeking behavior by a patient should be viewed as a sign that pain is undertreated, and more drugs are needed, rather than an indication of addiction) more than $1.4 million to promote Purdue's opioid products. During a portion of his time as a Key Opinion Leader, Dr. Webster was under investigation by the DEA for overprescribing pain medication, which led to the death of more than 20 of Dr. Webster's former patients. The DEA raided his

clinic in 2010.  In addition, Purdue created a website called *Partners Against Pain* to promote

OxyContin pain treatment and persuade patients to "overcome" their "concerns about addiction."

The website presented testimonials as personal stories of OxyContin patients who had overcome

debilitating pain, but the testimonials were in fact written by Purdue consultants who were paid by

Purdue to promote OxyContin.  In 2000, it was explained to the Board that "one of the biggest

barriers to building an interactive community through Partners Against Pain" was that "Purdue

entering into some of the chat rooms where OxyContin uses and abuses are discussed . . . it would

remove the learned intermediary defense, which [Purdue] depend[s] on to limit liability."  It was

suggested, as a workaround, that Purdue sponsor a chat room hosted by some of Purdue's top

Speakers' Bureau experts because, "[s]ince none of them work for Purdue, that might be a vehicle

to provide medical advice to patients without risking product liability suits."  Purdue paid the

doctors in its Speakers' Bureau and offered all-expenses-paid trips to deliver presentations about

the merits of OxyContin.

151.    As another example, Purdue exercised significant control over the non-profit

American Pain Foundation, a patient advocacy organization that disseminated misinformation

concerning the risks of opioid use and lobbied against legislative initiatives aimed at limiting

opioid prescriptions.  The American Pain Foundation depended entirely on incoming grants from

(and was controlled by) drug companies like Purdue, which paid the American Pain Foundation

more than $3.6 million and was their second-largest donor.  As early as 2001, Purdue informed

them that the grant money was part of Purdue's effort to "strategically align its investments in

nonprofit organizations that share [its] business interests," which made clear that Purdue's

continued funding of the American Pain Foundation depended upon their continued role in

complementing Purdue's own marketing efforts.  The American Pain Foundation also assisted

with the design and promotion of the *Partners Against Pain* website and, in 2010, reported to Purdue that it had reached more than 38.9 million people "with key messages about pain and overcoming barriers to treatment through print, television, radio, and online placements as a part of **Purdue's local market media outreach grant**."

152.    Additionally, the American Pain Foundation established the Pain Care Forum in 2004 with the stated goal of "promot[ing] and support[ing] taking collaborative action regarding federal pain policy issues."   In fact, the Pain Care Forum successfully frustrated legislative, regulatory, and educational measures aimed at mitigating the opioid crisis.   It was effectively run by Defendant Rosen, Purdue's in-house lobbyist, who once emailed Jonathan Sackler to boast that the Pain Care Forum was "one of [Purdue's] best achievements."

153.    Purdue also exercised control over the American Academy of Pain Medicine, which Purdue paid more than $2 million, and the American Pain Society, which Purdue paid more than $3 million.   Each of these entities actively worked on the Sacklers' behalf to increase opioid prescribing.   Among other things, these entities pushed the narrative that the "public health problem represented by misuse of prescription opioids is miniscule in comparison with that of untreated and unrelenting pain."

154.    As intended, Purdue's marketing strategy succeeded and prescriptions for OxyContin skyrocketed.   Between its launch in 1996 and 2001, OxyContin brought in $3.5 billion in revenue for Purdue and almost immediately accounted for 90% of the company's sales.   Sales of opioids nationwide likewise skyrocketed, increasing from slightly more than $1 billion in 1996 to nearly $4 billion in 2001.   Prescription opioid use per adult in this country rose from an average of 16 pills per year in 1992 to approximately 55 pills per year in 2011.   Measured another way, the

increase in morphine milligram equivalents ("MMEs") rose from 134 MMEs per person in 1992 to 790 MMEs per person in 2011.  MMEs are values that represent the potency of an opioid dose.

155.     This national deluge of OxyContin resulting from Purdue's illegal marketing practices led to countless medically inappropriate and unnecessary prescriptions, which in turn created quick and terrible consequences.  Shortly after Purdue launched OxyContin and began pushing the lie that opioids were safe for the general population, the opioid epidemic had begun. The Centers for Disease Control and Prevention specifically identifies the cause of the first wave of the opioid epidemic as "increased prescribing of opioids in the 1990s."  As a result of its misconduct, Purdue was named as a defendant in numerous personal injury lawsuits, including putative class actions and mass tort actions.  The federal government and many states also launched investigations into Purdue's unlawful marketing practices.

156.     The government investigations culminated in a series of settlements in 2007 in which Purdue admitted to criminal misconduct.  In May 2007, Purdue Frederick and its top three executives—CEO Friedman, General Counsel Howard Udell, and former Chief Medical Officer Goldenheim—entered into the 2007 DOJ Criminal Plea and Settlement and pled guilty to criminal misdemeanor charges of misbranding OxyContin.  In entering the agreement, the DOJ noted, among other things, that (i) Purdue had falsely marketed OxyContin as a "miracle drug—a low risk drug that could provide long acting pain relief but was less addictive and less subject to abuse"; (ii) OxyContin had become "the new pain medication of choice for many doctors and patients" due to Purdue's "aggressive marketing campaign"; (iii) sales for OxyContin had "skyrocketed— making billions for Purdue and millions for its top executives"; (iv) "Purdue's claims that OxyContin was less addictive and less subject to abuse and diversion were false—and Purdue

knew its claims were false"; and (v) "OxyContin is nothing more than pure oxycodone—a habit forming narcotic derived from the opium poppy."

157.    In connection with its plea agreement, Purdue specifically admitted to criminal misbranding of OxyContin by making false and misleading statements for use in distribution and sale of the drug.  Among other things, Purdue admitted that, "with intent to defraud or mislead," it falsely claimed that OxyContin was "less addictive, less subject to abuse and diversion and less likely to cause tolerance and withdrawal than other pain medications."  Purdue paid a settlement of $600 million—at the time, the largest a pharmaceutical company had ever paid—consisting of criminal and civil penalties, fines, and forfeitures, and its three executives paid an additional $34.5 million (which was reimbursed by Purdue).  In connection with the 2007 DOJ Criminal Plea and Settlement, Purdue admitted that it had illegally promoted OxyContin and trained sales representatives to misrepresent the risks of OxyContin.  As the plea agreement plainly stated, "Purdue is pleading guilty as described above because Purdue is in fact guilty."

158.    Purdue also entered into agreements with multiple state governments in connection with the 2007 DOJ Criminal Plea and Settlement.  First, a number of states entered into settlement agreements with Purdue Frederick resolving certain Medicaid-related claims for $59.4 million (collectively, the "Medicaid Settlements").[22]  Separately, Purdue entered into consent judgments with 26 states[23] and the District of Columbia concerning their Medicaid programs or, in some cases, investigations of claims arising under their respective consumer protection laws during the

---

[22] Specifically, 50 states and the District of Columbia had brought actions against Purdue Frederick to exclude it from their respective Medicaid programs based on Purdue Frederick's deceptive marketing of OxyContin.

[23] Arizona; Arkansas; California; Connecticut; Washington D.C.; Idaho; Illinois; Kentucky; Louisiana; Maine; Maryland; Massachusetts; Montana; Nebraska; Nevada; New Mexico; North Carolina: Ohio; Oregon; Pennsylvania; South Carolina; Tennessee; Texas; Vermont; Virginia; Washington; and Wisconsin.

covered period (from 1995 to 2005) (together with the Medicaid Settlements, the "State Released Claims").

159.    None of these settlements released any other state claims against Purdue or claims arising in any other periods.  Significantly, notwithstanding these settlements with the DOJ and the states (collectively, the "Pre-2008 DOJ/State Resolutions"), Purdue remained vulnerable to (i) public nuisance and other claims, of every kind and description, belonging to states, municipalities other political subdivisions, and Native American Tribes, regardless of when those claims accrued; (ii) all other claims belonging to states not included within the definition of State Released Claims, and all other claims of municipalities and other political subdivisions and Native American Tribes, regardless of when those claims accrued; (iii) claims of every kind and description belonging to private persons and entities regardless of when those claims accrued; and (iv) claims belonging to state and federal governments of every kind and description to the extent arising from conduct that occurred on or after 2005 or 2007, respectively.  Purdue also was hit with a second "wave" of civil litigation in late 2007.  In short, despite the Pre-2008 DOJ/State Resolutions, Purdue was not out of the woods, and the Sacklers knew it.

## VI.    Following the Pre-2008 DOJ/State Resolutions, Purdue Implemented a New Round of Criminal and Misleading Marketing Tactics to Boost Sales of Opioids, Culminating in Yet Another Guilty Plea with the DOJ in 2020

160.    Unfortunately, the Pre-2008 DOJ/State Resolutions did not put an end to Purdue's and the Sacklers' criminal misconduct.  On the contrary, Purdue later admitted that its crime spree resumed in May 2007, the same month it entered into its last guilty plea.  The Sackler Directors and Purdue redoubled their efforts to increase OxyContin sales through means that Purdue has since expressly admitted (again) were criminal and resulted in the dispensing of vast amounts of OxyContin without a legitimate medical purpose.

161.    In 2007, the Sacklers perceived at least two major challenges to maintaining and enhancing their wealth.   First, they knew that profits and other assets held at Purdue were vulnerable to U.S. opioid litigants and "plaintiffs' lawyers," which threatened their wealth. Second, the patent for OxyContin was set to expire in 2013, and with it, the Sacklers' ability to extract massive profits from branded sales of Purdue's flagship drug.   Alarmed, the Sackler Directors began considering ways to effectively extend OxyContin's exclusivity and retained outside consultants to help "turbocharge" OxyContin sales.   The Sacklers knew that their window to "milk" their cash cow product was closing and were intent on maximizing sale proceeds by any means necessary.   Much of Purdue's conduct in "turbocharging" sales of OxyContin from 2007 to 2017 was illegal, as it now admits.

162.    In October 2020, Purdue pled guilty to multiple felonies arising from its aggressive marketing and sale of opioids, activities designed and driven by members of the Sackler family. Under the plea agreement (the "2020 Purdue-DOJ Plea Agreement"), Purdue admitted to a three-count felony information and agreed to a criminal fine of $3.544 billion and an additional $2 billion in criminal forfeitures.   Purdue admitted it was guilty of engaging in a (1) conspiracy to defraud the United States and to violate the Federal Food, Drug, and Cosmetic Act, including by continuing to market opioids to healthcare providers ("HCPs") despite having information showing that such HCPs were prescribing opioids without a legitimate medical purpose; (2) conspiracy to violate the Federal Anti-Kickback Statute through improper payments to HCPs; and (3) conspiracy to violate the Federal Anti-Kickback Statute related to Purdue's payments to Practice Fusion Inc. ("Practice Fusion"), a cloud-based electronic health records organization.

163.    The 2020 Purdue-DOJ Plea Agreement set forth the following counts to which Purdue stipulated and agreed:

- "Purdue *knowingly* and *intentionally* conspired and agreed with others to defraud the DEA by impeding its lawful governmental functions and rights by: *failing to maintain effective controls against diversion* in that, with respect to more than one hundred HCPs, including ten of the HCPs the United States has identified for Purdue in the course of plea negotiations, *Purdue*, *inter alia*, *failed to*: (1) *report* and provide complete and accurate information to DEA about HCPs after the *HCPs* were *flagged by internal anti-diversion programs*, in situations in which the Company possessed sufficient information that should have led to a report; and (2) *cease detailing HCPs* after receiving information suggesting that those HCPs *were prescribing opioid products without a legitimate medical purpose and outside the usual course of professional practice*, in situations in which Purdue possessed sufficient information that a decision should have been made to cease detailing. Moreover, Purdue knowingly and intentionally conspired and agreed with others to impede the lawful function of the DEA by *failing to account for potential downstream diversion of its products* in reporting sales numbers to DEA as part of its quota requests." [24]

- "Purdue *knowingly and intentionally* conspired and agreed with others to aid and abet HCPs' dispensing, without a legitimate medical purpose and outside the usual course of professional practice (and thus without a valid prescription), prescription drugs held for sale after shipment in interstate commerce, thereby rendering the dispensed drugs misbranded in violation of the Federal Food, Drug, and Cosmetic Act."

- Purdue "*knowingly* and *willfully* offer[ed] payments in the form of *speakers fees and other payments* (*e.g.*, travel, lodging, consulting fees) to two HCPs with at least one purpose to induce those HCPs to write more prescriptions of Purdue opioid products, for which payment was made in whole or in part under a Federal healthcare program."

- Certain "remuneration paid by Purdue to *Practice Fusion* was done in return for Practice Fusion including in its [electronic health records] platform" *an alert to prompt HCPs to conduct pain assessments in order to influence prescriptions of Purdue's opioid products*, "portions of which were paid for by federal health care programs, in violation of the Anti-Kickback Statute. . . . Purdue and Practice Fusion's agreement was a conspiracy to violate the Anti-Kickback Statute."

164.    Also in October 2020, Purdue and the Sacklers entered into separate settlement agreements with the DOJ resolving certain civil claims against them based on their misconduct in

---

[24] "Detailing" involved making repeated sales calls and visits to doctors' offices and pharmacies, disseminating marketing materials, and providing meals for HCPs, among other practices.

connection with their marketing and sale of opioids following the Pre-2008 DOJ/State Resolutions. Purdue agreed to a civil settlement in the amount of $2.8 billion to resolve its civil liability under the False Claims Act (the "2020 Purdue-DOJ Settlement Agreement," and together with the 2020 Purdue-DOJ Plea Agreement and the 2020 Sackler-DOJ Settlement Agreement (defined below), the "2020 DOJ Agreements").  When combined with the $3.544 billion criminal fine, and $2 billion in criminal forfeitures, Purdue admitted liability in connection with the 2020 DOJ Agreements of ***more than $8 billion***—the largest amount ever levied against a pharmaceutical manufacturer in the United States.  For their part, the Sacklers agreed (through the "2020 Sackler-DOJ Settlement Agreement") to pay another $225 million in respect of False Claims Act claims against Richard Sackler, David Sackler, Mortimer Sackler Jr., Kathe Sackler, and the Estate of Jonathan Sackler (collectively referred to as the "Named Sacklers").

165.    As the DOJ concluded, the Board, and the Sackler Directors in particular, orchestrated, implemented, and micromanaged an aggressive marketing scheme that, among other things, targeted high "decile" HCPs and pharmacies that dispensed opioids at an alarmingly high rate, and at the same time failed to satisfy its anti-diversion and suspicious order monitoring (previously defined as "SOM") obligations under federal law.

### A.    Purdue Knowingly Employed Improper Sales and Marketing Tactics That Resulted in Staggering Numbers of Medically Unnecessary Prescriptions

1.    Purdue Continued to Detail Suspicious HCPs and Pharmacies and Provide "Speaker Fees" to High-Prescribing HCPs, All of Which Caused Them to Prescribe and Dispense More of Purdue's Opioids than Medically Necessary

166.    Under the Controlled Substances Act (previously defined as the "CSA"), opioid manufacturers such as Purdue are required to monitor, flag, and report any suspected abuse and diversion of their opioid products.  Rather than flag suspected abuse and diversion of its opioid products to the DEA as required, Purdue continued to make sales calls on, or "detail," a significant

number of prescribers whom it suspected were involved in the abuse and diversion of its products. Following the 2007 DOJ Criminal Plea and Settlement, Purdue representatives continued to detail suspicious HCPs with the goal of promoting Purdue's opioid products.

167.    Purdue and the Sackler Directors knew that detailing was the single most important driver of OxyContin sales.  For example, in October 2010, at a presentation to Purdue's sales supervisors, a Purdue executive explained:  "As I have stated several times, we know increases in the prescriber call average will have the single largest impact of anything you can do to increase prescriptions of Purdue products with our core and super core prescribers."  The Sackler Directors were well aware of the connection between detailing and prescriptions as well.  Sackler Directors routinely received return-on-investment analyses showing that Purdue's detailing materially increased OxyContin prescribing.

168.    Purdue also implemented a savings card program where sales representatives provided HCPs with savings cards to defray the costs of Purdue opioid prescriptions.  Pursuant to this program, doctors would give savings cards to their patients to help them save money on prescription costs for Purdue products, including OxyContin.  This program was a key component of Purdue's strategy for keeping patients on OxyContin longer.  Purdue's internal analyses consistently showed that patients who redeemed savings cards stayed on OxyContin longer, and that the use of savings cards led more physicians to prescribe OxyContin.

169.    Thus, increased use of opioid savings cards meant greater profits for Purdue. Indeed, Purdue's sales representatives urged prescribers in states that banned the use of savings cards to instruct their patients to redeem them in out-of-state pharmacies.  This led, for example, to prescriptions that were written by doctors in Massachusetts for more than 40,000 pills being filled in neighboring states like New Hampshire.  The Board and the Non-Sackler Officer

Defendants played key roles in overseeing, approving, monitoring, and implementing this key initiative, and were aware that Purdue aggressively encouraged prescribers to use opioid savings cards through direct mail and email, sales visits, and other promotional efforts.

170. Purdue also organized speaker programs in which Purdue "recruited and paid HCPs to educate other HCPs about Purdue opioid products." It is illegal for a drug manufacturer to sponsor speaker programs where, among other things, the program involves kickbacks or otherwise incentivizes fraud and abuse, such as payments made to induce the speaker to write additional prescriptions. In the 2020 Purdue-DOJ Plea Agreement, Purdue specifically admitted that it offered payments in the form of speaker fees and other payments to HCPs "with at least one purpose to induce those HCPs to write more prescriptions of Purdue opioid products."

171. Among numerous examples of such conduct, Purdue paid one of the highest-volume OxyContin prescribers in the United States $160,000 between 2013 and May 2018. Purdue employees understood that this prescriber was "by far, the biggest OxyContin writer in the district," was "probably also one of the biggest OxyContin writers in the country," and was "very important" to the company's success. Purdue employees took seriously this prescriber's indication that if he stopped receiving speaking assignments from Purdue, "the love may be lost." Purdue also paid the highest-volume OxyContin prescriber in Medicare approximately $475,000 between 2013 and January 2017 to deliver speeches and advice even though he was "not a strong speaker or presenter" and "attendees couldn't follow him." This speaker engaged in "heavy prescribing, particularly in large doses for long periods of time." Purdue likewise paid more than $110,000 to another high-volume prescriber who threatened that he would "re-evaluate the use of [Purdue's] products" if Purdue did not give him more speaking assignments.

172.    In 2015, a sales representative sent an anonymous letter to then-CEO Timney and Raymond Sackler explaining her experience pushing sales for Purdue: "Yesterday, [Purdue's head of sales], [a sales manager] and the [regional managers] were laid off.  Two were retained because they had the highest Hysingla sales . . . .  [Purdue's head of sales, a sales manager, and the regional managers] are the ones that remind us daily about the [corporate integrity agreement] and the importance of integrity when selling Purdue products.  So why would you just let them all go? . . . .  What is the new culture?  As far as I can see it's all numbers - how many calls can I make, get anyone/everyone to write our opioid products, to hell with compliance, integrity, pride in the difference we make in people's lives."  Yet, still nothing changed.

### 2. By Targeting High-Decile Prescribers, Purdue Turned Its Professed Anti-Diversion Strategy on Its Head

173.    Purdue's Abuse and Diversion Detection Program (previously defined as the "ADD Program") was meant to be in place from 2002 through 2018 and should have provided Purdue the ability to identify prescribers engaged in abuse and diversion.  For much of that time, the ADD Program was governed by Purdue's Standard Operating Procedure ("SOP") 1.7.1, which was supposed to minimize improper prescribing of opioids by requiring Purdue personnel to report any HCP engaged in certain kinds of suspicious activity, including when an HCP was engaged "in an atypical pattern of prescribing."[25]  These "ADD Reports" were meant to be reviewed by more senior Purdue personnel to consider whether such HCPs were enabling the diversion of opioids.  Among other things, Purdue was to consider whether such HCPs should be placed on the so-called Region Zero (i.e., "do not call") list.

---

[25] Purdue drafted and implemented "standard operating procedures," or "SOPs," to provide guidance to its employees on various topics.  One SOP, titled "Order Management System," addressed Purdue's procedures related to its SOM program.  SOP 1.7.1, titled "Abuse and Diversion Detection," addressed Purdue's ADD Program.

174.    Incredibly, however, Purdue instead used one of the primary "red flags" under its SOP 1.7.1 as a cornerstone of its strategy to drive opioid sales.  Under the Sackler Directors' close watch and guidance, Purdue deliberately identified HCPs who prescribed vastly more OxyContin than typical HCPs and required Purdue's sales force to target and focus on these "high value" HCPs to encourage them to write even more prescriptions.  Purdue tracked average monthly prescriptions by HCPs, which it ranked by "deciles."[26]  The HCPs who wrote the most OxyContin prescriptions were ranked in decile 10, and the HCPs who wrote the fewest such prescriptions in decile 1.  Opioid dispensation rates increased from one decile to another, and dramatically increased for HCPs appearing in the "high" deciles 7 through 10.  Indeed, prescriptions written by HCPs in the higher deciles were multiples of the average HCP.  In one report, for example, the 358 HCPs in decile 10 wrote as many OxyContin prescriptions as the 99,825 HCPs in decile 1 and wrote exponentially more prescriptions than did all HCPs on average.

175.    Notably, Purdue paid no attention to HCP specialty and made no effort to determine *why* the prescribing practices of HCPs in decile 10 were so wildly out of step with those of a typical HCP.  Instead, Purdue simply identified the highest decile prescribers as the prime targets for their sales force.  In June 2010, for example, Purdue executives discussed instructing sales representatives to "build their target list with a focus on highest prescribers across all three categories (Tier 1), then fill in target list with the next highest potential and keep in front of OER [opioid extended-release] high prescribers."  They estimated that "the top three deciles drive closer to 80% of all Rxs."  In this way, Purdue turned its own SOM system (described in detail *infra*) on

---

[26] Purdue organized HCPs across 10 different "deciles," with each decile accounting for 10% of total OxyContin prescription "value" to Purdue.  Decile 10 captured the HCPs with the most OxyContin "Rx value."  The decile system revealed the disproportionate value that Purdue obtained from a high concentration of a small number of HCPs with high "value" OxyContin prescribing practices.

its head, electing to target suspicious (and likely diversion-prone) prescribers instead of flagging them for review, or reporting them to law enforcement authorities.

176.    Purdue also discovered that high-decile prescribers were the most responsive to detailing.   A July 2012 Purdue PowerPoint, "OxyContin Marketing Mix Modeling Result," included a chart showing a clear correlation between deciles and the impact of detailing.   Extreme high-volume prescribers (deciles 7 and above) were the most responsive to detailing—with deciles 9 and 10 (the very highest of the high-volume prescribers) demonstrating the greatest responsiveness to Purdue's marketing, including the distribution of opioid savings cards.   Purdue also knew that *not* detailing these high-volume prescribers would lead to a decline in prescriptions. On September 16, 2011, a Purdue executive stated that OxyContin prescriptions for high-volume prescribers decreased between 23% and 28% without detailing—a significant decline.   On July 12, 2012, Russell Gasdia, Purdue's head of sales, and Defendant Mahony, Purdue's then-CFO, attended a meeting that discussed how "OxyContin base sales will most likely erode with time when marketing programs are removed" and that incremental prescription lift was 32% after detailing by Purdue sales representatives.

177.    The Board was well aware of the Company's improper detailing strategy and its impact on OxyContin sales.   In October 2012, Mahony emailed the Board a "Sales & Marketing" presentation that highlighted why Purdue focused on targeting high-decile prescribers: "OxyContin is still promotionally sensitive to sales calls.   For every $1 spent on a decile 7-10 HCP, an[] average of $3.70 is returned."

### B.    The Sackler Directors Failed to Ensure That Purdue Met Its Legal Obligations to Maintain Effective Controls against Diversion

178.    As it directed Purdue's fraudulent marketing campaign, the Board failed to ensure that Purdue met its legal obligation to prevent the diversion of its opioid products into illegal drug

markets.  As a result, from the introduction of OxyContin to the present day, including the period beginning immediately after the Pre-2008 DOJ/State Resolutions, millions of OxyContin pills have been diverted into illegal channels where they fueled a crisis of abuse of, and addiction to, *illegally* dispensed opioids, compounding the crisis of abuse and addiction in patients using *legally* dispensed opioids.

179.    With the Sackler-dominated Board at the helm, Purdue violated its duties under the CSA and corresponding DEA regulations—as Purdue has since expressly admitted.  These duties required Purdue to maintain effective controls against the diversion of its opioid products into illegal drug markets, including by maintaining a SOM system able to (i) identify wholesaler and pharmacy orders that indicated a risk of diversion due to some irregularity in size, frequency, or pattern—so-called "suspicious orders"—and (ii) report suspicious orders to the DEA when they were identified.  Purdue failed to maintain such controls—and, indeed, actually encouraged suspicious orders in order to increase sales of its opioid products.

180.    Although Purdue maintained certain SOM systems and an ADD Program, these programs utterly failed to prevent diversion of Purdue's opioid products and fell far short of Purdue's legal obligations, as described in the following sections.  Among other shortcomings, Purdue's SOM systems suffered from fatal design flaws—which Purdue and the Board were aware of—that prevented the company from adequately identifying and reporting suspicious orders.  In addition, Purdue's Order Monitoring System Committee (previously defined as the "OMS Committee")—which was nominally responsible for Purdue's SOM operations for more than eight years between March 2009 and September 2017, and which included Defendants Abrams and Crowley as key members—failed to report numerous suspicious orders to the DEA despite clear evidence of diversion.

181.    Moreover, the ADD Program failed to report countless diversion-prone prescribers to authorities and, in many cases, the company permitted and even encouraged sales representatives to continue promoting opioid products to these prescribers.  For these and many other reasons discussed below, Purdue knowingly failed to comply with its duties under the CSA and corresponding DEA regulations.  Despite the critical importance of its compliance obligations, the Board failed to monitor, or even inquire into, Purdue's SOM measures or the ADD Program appropriately, let alone take reasonable steps to ensure they were being implemented effectively.  As a result, throughout the relevant period, Purdue faced staggering liability in the form of civil penalties, fines, and tort liabilities.

1.    Purdue's Anti-Diversion and SOM Duties under the CSA and Corresponding DEA Regulations

182.    The CSA (21 U.S.C. § 801, *et seq.*) regulates the manufacturing, distribution, and use of substances that may have a detrimental effect on public health and welfare.  Under 21 U.S.C. § 841(a)(1), it is illegal to manufacture a controlled substance except where an individual or entity is expressly authorized to "possess, manufacture, distribute, or dispense [controlled] substances . . . in conformity with the other provisions" of the CSA.  This express authority comes in the form of DEA licensure and is required for doctors, pharmacists, manufacturers, distributors, and other practitioners to prescribe or otherwise handle prescription controlled substances, including opioids.  As a manufacturer of opioids, Purdue was required to be a DEA registrant.

183.    Under 21 U.S.C. § 823(b)(1), DEA registrants have a general duty to maintain "effective control[s] against the diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels."  In other words, DEA registrants must act to prevent the diversion of controlled substances into illegal drug markets.  Additionally, under 21 C.F.R. § 1301.74(b), DEA registrants have a specific duty to "design and operate a system to

disclose . . . suspicious orders of controlled substances" and "inform the Field Division Office of the [DEA] in [the relevant area] of suspicious orders when discovered."

184.    As defined in 21 C.F.R. § 1301.74(b), "Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency." Under 21 U.S.C. § 842(c)(B)(ii), each violation "related to the reporting of suspicious orders for opioids" or "failing to maintain effective controls against diversion of opioids" is subject to a civil penalty of as much as $100,000.  Under 21 U.S.C. § 842(c)(D), each violation "that relates to the reporting of suspicious orders for opioids" or "failing to maintain effective controls against diversion of opioids" is subject to a criminal fine of as much as $500,000.

185.    On September 27, 2006, the DEA issued the first (the "2006 SOM Letter") of a series of general guidance letters (the "SOM Letters") explaining that the reporting requirement set forth in 21 C.F.R. § 1301.74(b) is "in addition to, and not in lieu of, the general requirement under [the CSA] that a [DEA registrant] maintain effective controls against diversion."  This has been widely interpreted—critically, by the DEA itself—as requiring opioid manufacturers to monitor not only their own customers—i.e., the wholesalers that purchase products directly from the manufacturers—but also *their customers' customers*—i.e., the pharmacies and retailers that purchase the manufacturers' products from the wholesalers—to inhibit the so-called "downstream distribution" of opioids.  Indeed, the 2006 SOM Letter sets forth a list of 10 questions for a manufacturer or distributor to pose to a pharmacy in order "to determine whether a suspicious order is indicative of diversion of controlled substances to other than legitimate medical channels."

186.    Thus, under the CSA and corresponding DEA regulations, Purdue had legal obligations not only to report suspicious orders, but also to ensure that it maintained systems capable of *preventing actual diversion* of its drugs.  Purdue understood this very well.  The

company's standing operating procedure titled GC-SOP-0007 (Order Management System) mirrored the language of C.F.R. § 1301, 74(b) and the guidance set forth in the 2006 SOM Letter, explaining, "As a DEA registrant, Purdue is charged with maintaining effective controls against diversion of controlled substances into other than legitimate medical, scientific, and industrial channels," and "recognizes that pertinent regulations require that registrants inform the local DEA Field Division Office of suspicious orders *when discovered* by the registrant (21 CFR § 1301.74(b))."

187.    Purdue also well understood its legal duties to monitor wholesalers *and* pharmacies to ensure that it was not shipping orders that could be diverted downstream.  Pursuant to GC-SOP-0007, Purdue recognized that its regulatory obligations "include[d] reasonable efforts to 'know our customers' as well as aiding in the efforts of our distributors to ensure that they take reasonable steps to 'know their customers.'"

188.    The 2006 SOM Letter also made clear that the reporting duty set forth under 21 C.F.R. § 1301.74(b) is *individual*, not *joint*, and so a manufacturer may not decline to report a suspicious order to the DEA simply because it expects that a wholesaler will do so.  Again, Purdue's GC-SOP-0007 memorialized this obligation, stating, "We recognize as a manufacturer and distributor we may not simply rely on the fact that the person placing the order is a DEA registrant and fail to scrutinize what may be suspicious circumstances.  Rather we must exercise due care in confirming the legitimacy of all orders prior to filling."  Despite understanding its individual reporting obligation, Purdue routinely failed to report suspicious orders made by pharmacies, supposedly because Purdue expected that wholesalers would do so instead.  Each time Purdue deferred to wholesalers in this way, it violated its obligation under 21 C.F.R. § 1301.74(b) to report suspicious orders "when discovered."

189.    The 2006 SOM Letter also identifies "circumstances that might be indicative of diversion" and instructs DEA registrants not to rely on any single factor or subset of factors when evaluating orders but instead to "consider the totality of the circumstances when evaluating an order for controlled substances, just as DEA will do when determining whether the filling of an order is consistent with the public interest within the meaning of 21 U.S.C. § 823(e)." As described in further detail in the section that follows, Purdue did not abide by this guidance, as its OMS relied on rigid algorithms to detect possible suspicious orders for review and follow-up, and failed to consider the "totality of the circumstances" when evaluating orders.

190.    The DEA issued another guidance letter on December 27, 2007 (the "2007 SOM Letter"), after the Pre-2008 DOJ/State Resolutions, that further explained its interpretation of 21 U.S.C. § 823(b)(1) and 21 C.F.R. § 1301.74(b). As the 2007 SOM Letter states, DEA registrants must "inform the local DEA Division Office of suspicious orders *when discovered*," and so periodic reports of completed transactions involving suspicious orders are inadequate. As noted above and explained in detail below, Purdue violated this requirement whenever it deferred to wholesalers to report suspicious pharmacy orders. Moreover, Purdue arguably failed to satisfy this reporting requirement *by definition* because its practice was to investigate orders that were flagged as suspicious and then, only after failing to eliminate the suspicion, report to the DEA.

191.    The 2007 SOM Letter also discusses the definition of "suspicious order" stated in 21 C.F.R. § 1301.74(b) and clarifies the practical significance of that definition. As the 2007 SOM Letter states, the elements of a "suspicious order" set forth in 21 C.F.R. § 1301.74(b)—"orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency"—are "disjunctive" and "not all inclusive." Thus, "if an order deviates substantially from a normal pattern, the size of the order does not matter and the order should be reported as

suspicious." Similarly, the size of an order alone, whether or not it deviates from a normal pattern, is "enough to trigger the responsibility to report the order as suspicious." For these reasons, the 2007 SOM Letter warns DEA registrants not to rely on "rigid formulas to define whether an order is suspicious" due to the risk that such formulas may fail "to detect suspicious orders."

192. Purdue's SOM operations violated the plain meaning of 21 U.S.C. § 823(b)(1) and 21 C.F.R. § 1301.74(b) and flouted the explicit guidance provided by the DEA in the SOM Letters. Among other things, Purdue's SOM systems relied on rigid algorithms that were divorced from the DEA's definition of "suspicious order," failed to report suspicious orders and suspicious activity generally when discovered, unlawfully relied on wholesalers to report suspicious orders in violation of Purdue's individual obligations to report such orders, and failed to fulfill Purdue's legal obligation to prevent diversion.

## 2. Purdue's SOM Systems

193. In essence, Purdue maintained two largely parallel SOM systems. One of these systems monitored wholesaler orders (the "Wholesaler SOM"), while the other monitored pharmacy orders (the "Pharmacy SOM"). The procedures of each system, and the various iterations of each, were established under a specific SOP or a collection of SOPs.

194. An outside consultant with expertise in CSA compliance conducted an audit of Purdue's SOM systems in 2016 (the "SOM Audit"). The compliance consultant criticized Purdue's wholesaler and pharmacy SOM systems. Based on its findings, the compliance consultant recommended that Purdue overhaul these systems substantially to enable Purdue to comply with its duties under 21 U.S.C. § 823(b)(1) and 21 C.F.R. § 1301.74(b). "At a high level," the SOM Audit "found that the firm's SOM activities are at times poorly organized, fragmented and difficult to understand."

195.    The SOM Audit found that Purdue's Wholesaler SOM was deficient.  Among other things, Purdue's SOP 7.7, which was published to monitor suspicious wholesaler orders, charged Customer Service Representatives ("CSRs") with identifying suspicious orders from wholesalers in the first instance.  This created an inherent conflict of interest, because CSRs were compensated based on the volume of opioids that they sold,[27] and therefore CSRs' primary function and concern was to *fill* orders—not to investigate and, if necessary, stop suspicious orders, as required under SOP 7.7.  In addition, CSRs lacked sufficient training to discharge their SOM responsibilities adequately and were provided with stale empirical data that prevented them from identifying suspicious orders until "well after the shipment."

196.    Even when a CSR could manage to identify a suspicious order, the order would then have to undergo several additional levels of review before it was finally recognized by Purdue as a "suspicious order" for purposes of 21 C.F.R. § 1301.74(b) and reported to the DEA, and thus was not reported *when discovered*.  The teams that were tasked with monitoring and reviewing suspicious orders were woefully understaffed, as evidenced by the fact that Purdue tasked only *three* employees with reviewing possible suspicious orders made by Purdue's three largest wholesalers—Cardinal, McKesson, and AmerisourceBergen.  Remarkably, Purdue did not maintain a SOM system to monitor orders for generic opioid products manufactured and distributed by Rhodes, Purdue's affiliate.  Indeed, at the time of the SOM Audit, Purdue staff reported to the compliance consultant that there was "no electronic analysis of orders" submitted to Rhodes, that staff "perform[ed] manual calculations . . . to look for suspicious orders," and that "no [Rhodes] order has ever been reported to the DEA."

---

[27] Purdue's CSRs earned bonuses in the hundreds of thousands of dollars depending on the volume of prescriptions they generated.  In 2001, for example, Purdue paid a total of $40 million in bonuses to CSRs.  Sales memos informed CSRs, "Your priority is to Sell, Sell, Sell OxyContin," and instructed CSRs to target particularly vulnerable patient populations: "Finally, continue to highlight the advantages of OxyContin, specifically for use in the elderly."

197.    In addition, the SOM Audit found that Purdue's Wholesaler SOM was deficient because it relied on rigid computer algorithms to identify possible suspicious orders in the first instance.  Specifically, these algorithms were largely based on order volume and would flag an order for follow-up if it was either 33% or 50% over the wholesaler's average.  The SOM Audit found that these rigid thresholds were "arbitrary in nature," "penalize[d] all small wholesalers" that submitted orders in lower quantities than the big three wholesalers, were "not appropriate given Purdue's disparate customer base," and did "not provide Purdue with the ability to track the deviation from normal ordering trends."  Moreover, the algorithm did not track either a change in order frequency or any significant deviation from normal patterns even though these "two specific factors [were] identified in the regulatory definition of a suspicious order."  Thus, by definition, Purdue's Wholesaler SOM was not equipped to flag categories of "suspicious orders" explicitly set forth in 21 C.F.R. § 1301.74(b).  As a result, Purdue's Wholesaler SOM system was woefully insufficient to meet Purdue's legal obligations under the CSA.

198.    The SOM Audit identified similar shortcomings in Purdue's Pharmacy SOM.  GC-SOP-0007 established an OMS Committee to oversee Purdue's SOM operations and empowered the OMS Committee to decide when to report pharmacies or pharmacy orders to the DEA as suspicious.  However, the OMS Committee (including Defendants Crowley, Purdue's Executive Director of CSA Compliance and a member of the OMS Committee, and Abrams) routinely deferred to wholesalers to make this decision.  This practice was deficient for several reasons.  First, Purdue failed to satisfy its *individual* affirmative duty to report suspicious orders to the DEA itself rather than rely on other DEA registrants to do so.  Purdue's unlawful deference was particularly egregious because Purdue knew that many of its wholesalers themselves lacked

adequate order monitoring systems or otherwise could not be trusted to provide complete and accurate information about their customers' (i.e., pharmacies') orders.[28]

199.    Second, Purdue failed to report pharmacies to the DEA *when suspicious orders were discovered*, which is an express requirement under 21 C.F.R. § 13.01.74(b) and was reiterated explicitly in the SOM Letters.  Instead, Purdue allowed the pharmacies to go unreported while waiting to confer with the pharmacy's wholesaler.  Third, multiple wholesalers did not enter into any Fee for Service Agreements ("FFSAs")[29] with Purdue, which meant that Purdue did not have access to "chargeback data" necessary for it to evaluate pharmacy orders submitted to those wholesalers.  With respect to pharmacies that were customers of wholesalers without FFSAs, by definition, Purdue lacked the information necessary to monitor their orders in clear violation of Purdue's SOM duties under 21 C.F.R. § 1301.74(b).

200.    Moreover, Purdue knew that wholesalers and pharmacies were financially incentivized to ensure that the gusher of opioid sales continued unabated and should not be relied on to provide complete and accurate suspicious order reporting.  Indeed, Purdue actively and knowingly worked with these wholesalers and pharmacies to maximize sales of Purdue's opioid products.  As examples, Purdue worked with CVS, Walgreens, and Rite Aid to exaggerate the benefits of OxyContin, downplay its risks, and train pharmacists (using Purdue-designed continuing education programs) to ignore red flags for diversion and abuse.

---

[28] For example, as early as August 2010, Purdue understood that Miami-Luken, one of its wholesalers, had issues maintaining an effective SOM system.  As another example, in 2012, Purdue learned about the DEA's efforts to suspend the distribution license of a Cardinal distribution facility in Florida because Cardinal had failed to monitor its customers' opioid orders effectively.  As another example, in 2012, Crowley emailed other OMS Committee members about the West Virginia Attorney General's lawsuit "against 14 wholesalers (virtually all Rhodes and/or Purdue customers) faulting them for supplying pain medications," suggesting that the OMS Committee knew these wholesalers' SOM systems could not be relied on for Purdue's own SOM operations.

[29] FFSAs were agreements pursuant to which Purdue paid its wholesalers to provide it with "chargeback data," which was data that traced the sale and distribution of Purdue's products from wholesalers to pharmacies.

201.    In addition, even when the OMS Committee met periodically to discuss reports concerning distributors and pharmacies whose orders or other behavior indicated a risk of diversion ("OMS Reports"), the OMS Committee failed to ensure that Purdue satisfied its duty to report suspicious pharmacy activity to the DEA.  For example, in one case, a wholesaler customer of Purdue alerted the OMS Committee that it had observed suspicious activity by one of its pharmacy customers in Indianapolis: Marwood Low Cost Pharmacy.  Still, the OMS Committee declined to report the pharmacy to the DEA and, in fact, recommended that Purdue's sales representative be allowed to continue calling on the pharmacy.  Months later, the same wholesaler informed the OMS Committee that it had stopped selling to Marwood Low Cost Pharmacy because it had reason to believe the pharmacy was engaging in criminal activity, including manipulating prescriptions.  And still, the OMS Committee appears not to have reported the pharmacy to the DEA as required by federal regulations.

202.    Furthermore, in numerous cases, while the OMS Committee waited to confer with a wholesaler about reporting a pharmacy to the DEA, the OMS Committee recommended that sales representatives continue promoting opioids to the pharmacy.  As an example, a June 7, 2012 OMS Report concerning Food City Pharmacy in Knoxville, Tennessee recommended that the pharmacy "should be referred to DEA" because of the large size of its orders of 80 mg OxyContin (more than double the state average and nearly triple the national average)[30] and observations by a Purdue sales representative and the wholesaler that indicated a risk of diversion.  Despite these findings, the OMS Report stated that Defendant Crowley should contact the wholesaler prior to any referral to DEA and that the pharmacy's "sales representative may continue to call" (i.e., conduct sales visits) in the meantime.

---

[30] The 80 mg tablet is one of the most potent dosage units and popular among people who are addicted to OxyContin.

203.    Finally, even though Purdue was responsible for implementing and overseeing SOM systems for Rhodes given Rhodes' manufacture of generic opioids, the SOM Audit found that  (i) Rhodes's orders were monitored for suspicious activity manually, which "could be considered arbitrary[,]" (ii) Rhodes does not conduct "any SOM activity relating to 'downstream distribution'" and therefore did not comply with its obligation to monitor and report suspicious orders placed by pharmacies, and (iii) "no [Rhodes] order ha[d] ever been reported" to the DEA.

204.    Despite Purdue's well-known statutory and regulatory obligations to maintain an effective SOM program, the Board appears to have taken no steps to oversee or establish oversight controls regarding Purdue's SOM systems, let alone any steps to address the manifest failures of these systems.

### 3. Purdue's ADD Program

205.    Purdue established its ADD Program in 2002.  As stated in SOP 1.7.1, the ADD Program was supposed to "ensure that Purdue's interactions with Prescribers or Pharmacists that reveal observations or circumstances that suggest potential concerns generate appropriate review and follow up," and "preclude promotion of Purdue's opioid products in circumstances where there is a concern about potential abuse or diversion."  The ADD Program failed to achieve these objectives.

206.    The ADD Program purported to require "all members of Purdue's field sales organization, medical science liaisons, and other Purdue employees and contract or third party representatives" to report prescribers and pharmacies suspected of diversion to Purdue's law department "promptly, ideally within 48 hours of when the Reporter learns of a circumstance or makes an observation that may be indicative of potential abuse or diversion."[31]  As laid out in SOP

---

[31] According to SOP 1.7.1, suspicious pharmacies were within the province of the ADD Program.  In practice, however, the ADD Program appears to have focused predominantly (if not exclusively) on prescribers.

1.7.1, "red flags" that would trigger an obligation to file a report with Purdue's law department included, *inter alia*, excessive numbers of patients, short patient visits, patients paying HCPs for opioids with cash, unexplained changes in prescribing behavior, patients overdosing, and reports of suspicious activity from pharmacists or law enforcement, among others.

207.    

If the answer was "no," the HCP was required to be placed in "Region Zero"—the "no call" list containing prescribers Purdue suspected of intentionally or recklessly prescribing controlled substances to drug dealers and abusers or otherwise facilitating diversion. In addition, the HCP was required to be reported to appropriate medical, regulatory, or law enforcement authorities (including the DEA) consistent with the ADD Program's parameters and Purdue's regulatory obligations under the CSA.[32] Purdue's Associate General Counsel from 2002 to 2016, Defendant Abrams, once described the law department's decision-making process as "essentially a judgment call," but did not explain exactly how the law department arrived at its decisions.

208.    Despite the opacity of the decision-making process, it is clear that Purdue and its law department prioritized Purdue's sales performance at the expense of the ADD Program's stated objectives. Even though the ADD Program regularly surfaced alarming information suggesting that prescribers were likely sources of diversion, the law department continued to allow sales representatives to promote Purdue opioid products to these prescribers rather than place them on the Region Zero list and report them to the DEA and other relevant authorities, as required. Indeed, in some instances where Purdue identified particular "high value" doctors, managers ordered

---

[32] As explained previously, 21 C.F.R. § 1301.74(b) requires a manufacturer to inform the DEA's Field Division Office "in his area of suspicious orders when discovered by the registrant."

representatives to keep promoting opioids to these doctors *even after* these representatives warned their supervisors that the doctors were involved in diversion and abuse.  Below are several illustrative (though far from exhaustive) examples.

209.    ***Frank Li***.  Li owned and operated a network of clinics in Washington state collectively called the "Seattle Pain Center."  Approximately 60 Seattle Pain Center patients died of opioid overdoses between 2010 and 2015, yet in this same period, Purdue twice actually decided to *continue* promoting opioid products to Li despite numerous ADD Reports indicating that Li and his Seattle Pain Center were sources of diversion.  On February 4, 2010, a sales representative submitted an ADD Report after learning from Li's registered nurse practitioner that his patients regularly were approached to sell their prescriptions.  Subsequently, sales representatives submitted numerous reports stating that Li's clinics served unusually large numbers of patients and that Li prescribed notably large amounts and high doses.  Despite these reports, the law department twice instructed sales representatives to continue promoting opioid products to Li.  Purdue only stopped promoting opioid products to Li in July 2016—*after learning that Li's medical license had already been suspended*.

210.    There are many other examples where Purdue *should have* placed prescribers on the Region Zero list but did not do so or did so long after it became clear that the prescribers were at risk of being identified as sources of diversion.  Indeed, many of the high-value prescribers to whom Purdue promoted its opioids were engaged in deeply troubling prescribing practices.  As one example, a sales representative frequently called on Dr. Chris Cristensen, a Montana doctor who ultimately was sentenced to 10 years in prison for improper opioid prescribing that led to several overdose deaths and who was not placed on the Region Zero list until *after* Purdue became aware that his clinic had been raided by the DEA.  In another instance in 2012, Purdue staff became

aware that a doctor's license had been suspended and office raided in connection with the doctor's prescriptions of controlled substances but did not place the prescriber on the Region Zero list until two weeks later.  And in yet another case in 2014, Purdue sales representatives were told by Purdue's law department they could resume calling on an Oregon prescriber who previously had been on the Region Zero list even though the prescriber was on probation with, and being monitored by, the Oregon Medical Board.

211.    Additionally, in some cases, even if Purdue's sales representatives ceased sales calls to a specific doctor on the Region Zero list, Purdue continued to promote its opioids to medical practices that included Region Zero doctors.  As one example, in March 2015, Purdue employees learned that certain doctors in a practice who were ***not*** on the Region Zero list were leaving their practice, and that their patients likely would be taken over by doctors who ***were*** on the Region Zero list.  Rather than take steps to reduce this practice's ability to prescribe opioids, the sales representative wondered if Purdue could get "special exceptions" for this "extream [sic] situation" because "otherwise we will be crushed even though patients will be remaining on our products just being written by region zero clinicians (as they have not lost their prescribing ability)."  Another employee, even after acknowledging that the medical practice potentially facilitated diversion and had been "shut down by CVS," agreed that "you cannot lose 3 key prescribers . . . without replacing."  The employees eventually decided to "discuss offline," leading one employee to write "offline, foreshadowing . . . overwhelming."

212.    In other situations, the law department would place a prescriber on the Region Zero list but fail to report them to the DEA even after receiving numerous reports about suspected diversion.

213.   ***Dr. Delbert Whetstone*** is one example.  Whetstone was another Washington state prescriber about whom Purdue's sales force submitted numerous ADD Reports because it was "obvious that something was seriously wrong."  On April 20, 2007, a sales representative submitted an ADD Report noting that he had discovered that Whetstone maintained a strict "cash for services" policy; Whetstone's malpractice insurance premiums had "skyrocketed"; and Whetstone kept a safe in his office.  On January 23, 2008, the sales representative submitted two additional ADD Reports after learning that someone had forged Whetstone's signature on a prescription pad; there was a security camera in the reception area of Whetstone's office; and Whetstone did not require patient urinalysis.  On November 5, 2008, the sales representative submitted yet another ADD Report stating that a pharmacist had begun refusing to fill prescriptions made by Whetstone because Whetstone's patients typically were young, appeared not to be in pain, and paid for high-dose prescriptions in cash.  Yet, despite these numerous red flags—some of which are identified specifically as indications of diversion in SOP 1.7.1—it was not until December 15, 2008 (i.e., after more than a year and a half) that Purdue's law department finally instructed the sales force to "cease calling" on Whetstone and placed him on the Region Zero list.

214.   Throughout 2010, sales representatives continued to report Whetstone's suspicious activity to the law department based on information they learned in their conversations with pharmacists about Whetstone's prescribing practices, and the law department continued to fail to act.

- On March 13, 2010, a pharmacist "expressed concern over the number" and high doses of "OxyContin prescriptions coming from Dr. Whetstone.

- On March 16, 2010, a pharmacist stated that Whetstone was "having numerous cash pay patients taking the upper doses three and four times a day."

- On March 17, 2010, a pharmacy surveillance camera captured patients of Whetstone selling prescription opioids inside the pharmacy and in its parking lot.

- On June 11, 2010, a pharmacist stated that the "majority of the OxyContin prescriptions he sees are from Dr. Whetstone" and expressed skepticism about whether the patients were "legitimate and appropriate."

- On August 3, 2010, a Purdue sales representative reported that Whetstone had instructed his patients not to visit pharmacies that questioned prescriptions made by him.

- On September 27, 2010, a Purdue sales representative reported that Whetstone had been "writing a separate prescription for OxyContin so his patients [could] shop around to get the old [non-tamper resistant] formulation."

215.   In a March 15, 2010 email, a Purdue sales force manager stated that he had reported Whetstone many times and kept the law department apprised of Whetstone's suspicious prescribing activity and concluded, "Something more needs to be done." But Purdue did not report Whetstone to the authorities until April 2011—***after he already had been arrested and more than two years after placing him on the Region Zero list***. Ultimately, Whetstone pled guilty to criminal drug distribution.

216.   ***Ebrahim Sajedi***. Sajedi was a California prescriber who admitted to sales representatives that he was actively diverting OxyContin into illegal drug markets. On November 7, 2009, a sales representative submitted an ADD Report noting that Sajedi had acknowledged it was his practice to "prescribe[] OxyContin to patients who requested prescriptions for OxyContin" and that "in his opinion the prescriptions helped his patients in hard economic times because they could take on[e] tablet and sell another." Sajedi also told the sales representative that his patients "only want [80-milligram] OxyContin" and that patients were not seeking this dosage to treat pain but for "social economic" reasons. In a memorandum regarding this ADD Report and Sajedi's practice, Purdue's law department noted that data available to Purdue reflected a significant increase in Sajedi's prescriptions of 80-milligram OxyContin, which appeared to corroborate Sajedi's own admission that he was prescribing to drug dealers.

217.    Accordingly, on January 15, 2010, the law department recommended that Purdue's sales representatives "cease calling on Dr. Sajedi" given, among other things, Sajedi's high volume of 80-milligram OxyContin prescriptions, the large percentage of prescriptions paid for in cash, and Sajedi's remarks implying he was prescribing OxyContin for non-medical reasons.  Incredibly, however, the law department decided ***not*** to report Sajedi to the DEA because Purdue had "not uncovered concrete evidence of any wrongdoing."  And it was not until August 2012—more than two years after Purdue had knowledge of his misconduct that it failed to report—that the Medical Board of California brought a disciplinary action against Sajedi.

218.    ***Mumtaz Ali***.  Ali was a California prescriber about whom three separate Purdue sales representatives submitted an ADD Report in June 2009.  Each of these reports described facts indicating diversion, including that (i) a pharmacist reported receiving from Ali, in a single month, 20 prescriptions for 80-milligram OxyContin in quantities of 200–300 tablets, accompanied by prescriptions for other controlled substances; (ii) Ali wrote prescriptions for 80-milligram OxyContin to patients "who traveled from out of town to see him"; and (iii) Ali's statement in response to questions regarding these circumstances was that "perhaps he needed to screen his patients more carefully."  In its memorandum addressing these ADD Reports, Purdue's law department noted that data available to Purdue reflected a significant increase in Ali's prescriptions for opioids.  In view of these facts, Purdue's law department recommended that "sales representatives should cease calling on Dr. Ali," but because "at least one pharmacist stated that she was reporting Dr. Ali to the DEA or the California Board of Pharmacy, no referral to regulatory authorities is recommended at this time."  This was a direct violation of Purdue's independent anti-diversion obligations under the CSA.

219.    *Gail Krivan*.  Krivan was a Nevada prescriber whom the law department decided to place on the Region Zero list because, among other reasons, Krivan would "immediately put every patient on the highest dose of narcotics she can, whether it's OxyContin or another product"; prescribed a single patient 80-milligram OxyContin tablets at a dosage of five times per day; and allowed assistants to prescribe opioids even though the assistants lacked the requisite authority to do so.  Despite all of this, Purdue decided **not** to report Krivan to the DEA and other appropriate authorities, deciding instead that sales representatives should "encourage those pharmacists who have concerns about Dr. Krivan's prescribing pattern to speak with her about proper dosing or report their concerns to the appropriate regulatory authorities."

220.    There are many more examples of Purdue placing a prescriber on the Region Zero list for improper prescribing but deciding not to report the prescriber to the DEA or other authorities.  For instance, in response to an information request from the Medical Board of California, Purdue represented that it placed more than 110 California doctors on the Region Zero list through September 2013, in many cases for improper prescribing.  Yet, Purdue's response to the Medical Board of California indicates that **no more than 20** of these prescribers were actually reported by Purdue to the DEA or other authorities.

221.    Purdue's own employees acknowledged the failure of Purdue's law department to administer the ADD Program effectively.  For example, in March 2013, sales representatives learned that a prescriber named Christopher Huntington had committed suicide after losing his license for improper prescribing of opioids, including OxyContin.  Purdue began investigating Huntington in 2011 after sales representatives informed the law department about his suspicious prescribing practices.  But the law department decided not to designate Huntington as a Region Zero prescriber or report him to the DEA or other authorities.  After learning that Huntington

finally had lost his license, sales representatives deflected blame from themselves and criticized the law department for not taking action.  As one sales representative wrote, the law department had "goofed and missed this . . . NOT us.  When an HCP is reported to legal and he then has his license taken away . . . it should NOT impact the rep in any way.  Legal missed something."

222.   As part of its drive toward selling as many opioids as possible, Purdue adopted a cavalier attitude toward important regulatory limits designed to crack down on improper prescribing.  For example, in 2013, a sales representative complained to her supervisor that she was having issues with a pharmacist being unable to purchase more OxyContin because of a DEA SOP that placed limits on the amount of oxycodone a pharmacy can purchase based on the pharmacy's previous buying patterns.   Her supervisor responded by congratulating the representative on selling such high amounts of opioids and instructed the representative that when "customer (prescribers)" express concern about pharmacies being unable to supply OxyContin due to exceeding the DEA limit, representatives should tell the prescriber that their patient "will simply need to fill the RX at another store."

223.   Despite having information on physicians' prescribing behavior, the law department not only failed to report prescribers suspected of diversion and abuse to the appropriate authorities but also continued to allow Purdue to promote to them.  The Board did nothing to address the law department's shortcomings.  For example, at the July 2010 Board meeting, the Board asked staff about opioid sales and revenue generated by doctors on the Region Zero list and was assured that prescription information existed at the doctor level (indeed, prescription level), and that data was then shared with the Board.  The Board also was given a list of the specific problem prescribers by name, along with the exact number of prescriptions and dollars of revenue each prescriber's practice provided to Purdue.  Despite possessing this wealth of knowledge of

suspected abuse and diversion, the Board did not halt the promotion of Purdue's products to these problematic prescribers and failed to ensure the prescribers were reported to the DEA. Nor did they ensure proper response by management.

224.   The Board knew that Region Zero prescribers accounted for a meaningful portion of Purdue's proceeds from OxyContin. For example, in March 2011, staff told the Board that if Region Zero doctors stopped prescribing opioids, Purdue would lose almost **10%** of its sales. By failing to report Region Zero prescribers to authorities, the Sackler-dominated Board ensured that revenue generated by such suspect prescribers would continue to flow, and that the Sacklers would continue to profit from their non-medically necessary prescriptions.

225.   Unsurprisingly, a number of Region Zero prescribers ultimately lost their licenses or were criminally convicted for improper opioid prescribing. By then, Purdue and the Sacklers had collected a vast amount of money from their dangerous prescriptions and poured medically unnecessary opioids into communities around the country. Notably, presumably aware that top prescribers could face liability, Mortimer Sackler Jr. suggested in 2005 that Purdue lobby Congress to shield doctors from liability when prescribing opioids in order to "eliminate doctors needing to play Russian roulette each time they write a prescription for an opioid."

226.   Despite Purdue's well-known anti-diversion obligations, including and in addition to the obligations arising from the Pre-2008 DOJ/State Resolutions, the Sackler and Non-Sackler Directors, and the Non-Sackler Officers, took insufficient steps to oversee or establish oversight controls regarding the ADD Program, let alone to address its manifest failures. The Board's failure to take steps to ensure adequate oversight of the ADD Program is especially remarkable given how assiduously they monitored Region Zero sales data and other activity indicating diversion of Purdue's opioid products.

## VII.    Purdue Desperately Attempted to "Turbocharge" Sales after Reformulation Made Some Methods of Abuse—Crushing or Dissolving OxyContin—More Challenging

### A.    Seeking to Extend Their Monopoly, the Sacklers Reformulated OxyContin and Successfully Lobbied to Have the Original Formula Declared Unsafe

227.    With the patent on OxyContin expiring in 2013, Purdue and the Sackler Directors spent years coming up with ideas for new products or new formulations of OxyContin in order to preserve Purdue's exclusive OxyContin revenue stream.  They reaped the fruits of their labor in April 2010, when Purdue received approval from the U.S. Food and Drug Administration (the "FDA") to begin marketing a reformulated, purportedly abuse-deterrent version of OxyContin ("ADF OxyContin").  ADF OxyContin was more difficult to crush or dissolve for purposes of snorting or injecting.  As the FDA warned, however, the reformulation was "not completely tamper-resistant."  Moreover, "the product can still be misused or abused and result in overdose by simply administering or ingesting larger than recommended oral doses."  The Sacklers remained callously indifferent towards the FDA's concerns of ongoing abuse, even with the new formulation.  For example, in May 2008, Jonathan Sackler "joked" about possible ways "abusers" would react to ADF OxyContin, suggesting that "[m]aybe they'll dissolve it in battery acid and pour it into their ears," or "[m]aybe they'll take an ice pick and stab a hole in their sternums and plunge the tablets into their hearts."

228.    Incredibly, to extend their monopoly, the Sackler Directors and Purdue then campaigned to have the original formula for OxyContin deemed unsafe.  That's right: despite having aggressively marketed OxyContin in its original form in the United States for 15 years, and despite continuing to sell OxyContin in its original form in foreign markets, Purdue petitioned the FDA to refuse to accept generic versions of the original formulation because it was too dangerous to be sold in the United States.  In April 2013, Purdue's shameless about-face paid off, with the FDA deciding to withdraw the original formulation from the market "for reasons of safety."  In a

presentation to the Sacklers, Defendant Stewart credited a "company-wide, sustained effort" that "[a]voided what would, in all likelihood, have been a 'patent cliff' event."[33] ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

**B.    After Reformulation Made Some Forms of Abuse More Challenging, the Sacklers Berated Management to Fill the Sales Gap by Any Means Necessary**

229.    Following the introduction of the new formulation, Purdue immediately began to see a substantial drop in original-formula OxyContin sales.  In December 2010, Purdue management informed the Board that the total weekly kilograms dispensed of branded OxyContin declined from August to November 2010, and that the Region Zero prescribers accounted "for much of the [prescription] decline at the regional level."  In a June 2011 presentation, Defendant Mahony, Purdue's then-CFO, informed the Board that "[s]ince the transition, 40 and 80mg tablet prescriptions have decreased significantly.  The 10mg and 20mg tablet prescriptions initially increased, but given their lower value not enough to offset the higher strength decline."  The presentation included a revised forecast of projected OxyContin sales for 2011 of $2.8 billion, down from $3.9 billion.  OxyContin sales dropped from $2.31 billion in 2009 to $2.26 billion in 2010, then to $2.1 billion in 2011, and continued to decline thereafter.

230.    Purdue studied the post-reformulation decline in OxyContin sales and determined that the decline was largely attributable to a reduction in prescriptions written for individuals who abused OxyContin by crushing, and then snorting or injecting the drug.  Purdue also conducted post-marketing studies of ADF OxyContin, which showed that the decline in OxyContin

---

[33] A "patent cliff" is a term given to the sharp decline of a profit stream once a patent expires and a patent holder loses exclusivity.  The result is that competitors would have been able to market versions of OxyContin, which would cut into Purdue's profits and market dominance.

prescriptions was most pronounced among high-volume opioid prescribers and 40 mg and 80 mg

tablets, Purdue's highest and most profitable dosages that were most popular among those who

used the drug for non-medical purposes. ████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████.

231.    If the Sacklers and Purdue had reformulated OxyContin with the goal of reducing

diversion, they would have greeted the sales drop as a positive sign because it meant fewer

medically unnecessary prescriptions were being written.  But the motivation of the Sacklers and

Purdue for introducing ADF OxyContin was to extend their exclusivity over the drug despite the

looming expiration of their patent on the original formulation.  Hence, though anticipated, the sales

decline was anything but welcome to the Sacklers and Purdue, and they sought desperately to

replace the lost medically unnecessary prescriptions.

### 1.    The Sacklers Pressed for More Aggressive Sales Targets and Tactics

232.    The Sackler Directors were laser focused on increasing sales despite the imminent

launch of ADF OxyContin (approved for sale in April 2010).  On January 25, 2010, Richard

Sackler emailed the other members of the Board regarding the importance of OxyContin sales,

reminding them that "the most important driver of our sales growth or decline is the performance

of all the oxycodone extended-release forms in the market (called OER); this is comprised of

OxyContin tablets plus all the generics in the space."

233.    The Sackler Directors pressured executives to meet aggressive OxyContin sales

goals, despite knowing that ADF OxyContin would naturally result in a sales decline.  The 2010

budget prepared by Purdue management pegged OxyContin prescription growth at 3%.  Richard

Sackler found this number unacceptable.  He believed that 3% growth was too low and would

"lead to an OxyContin[] tablets forecast that is almost the same as our sales in 2009."  Then-CEO

Stewart informed Richard that more significant growth was unrealistic:  "I know that you have

been advocating for an increase in the top line, but in looking at the recent OER prescription growth

trends and knowing the overall dynamics of the market OxyContin competes in – I just can't see

a way of the prescription growth tracking to a level substantially higher than the 3% on which this

budget is based."  Stewart warned Richard that the higher target Richard wanted would "be

interpreted as an imposition as opposed to an action that will stimulate the type of business building

behaviors we want to encourage."

234.    Richard was not satisfied with Stewart's response.  He replied, "I'm disappointed

and don't agree with you.  This is a matter that the Board will have to take up and give you a settled

direction."  Later that month, on January 25, 2010, Richard emailed the Board to discuss his

concerns with the OxyContin growth target.  Richard thought management's target was "unduly

conservative" and would not lead to the "best results" for the year.  While management wanted to

target 3% growth, Richard was convinced that growth of up to 12% was reasonable.  Richard was

not alone among the Sacklers.  That same day, Mortimer Sackler Jr. followed up with Theresa

Sackler regarding Richard's email, stating, "we should push management to agree to a higher

target."

235.    Although the Sackler Directors understood that the decline in OxyContin sales

beginning in 2010 was attributable to reduced diversion due to the reformulation, they nevertheless

continued to insist that Purdue work to recapture the lost medically unnecessary sales.  In April

2012, Richard Sackler emailed Russell Gasdia, Purdue's head of sales, writing, "We should . . .

discuss the sudden decline in [OxyContin] sales in the past year or two.  What are we doing to

identify corrective actions?"  The following day, Purdue's Vice President of Sales forwarded

Richard Sackler's email to Purdue's CEO, among others, stating, "I am surprised that Dr. Richard

is asking this . . . Since the decline is related to reformulation I'm not sure how to proceed with him."

236.    Meanwhile, Mortimer Sackler Jr. blamed the declining sales on a failure of leadership.  On July 17, 2012, he emailed Board members to discuss a "search asap for a new CEO."  He also suggested that they consider "replacing the head of sales and marketing."  In October 2013, Mortimer Sackler Jr. requested additional data concerning the downward trend in sales by dosage, including a chart that "show[s] the breakdown of OxyContin market share by strength against competitors.  I would like to understand more the recent dynamics of the market and where the patients are shifting to that we are losing."  Later that same day, responses to his questions explained that the loss of sales was due to "the recent dynamics of the market," the pressures of increased government regulation, and "fewer patients titrating to the higher strengths from the lower ones."[34]  Ultimately, Mortimer Sackler Jr. exclaimed that it "*[s]eems like the organization has just fully given up*" and that the Sackler Directors "*would be better off laying everyone off and milking the business than doing this!*"

### 2.  Purdue Engaged McKinsey to "Turbocharge" OxyContin Sales

237.    In 2013, hoping to make up for lost black market sales following the introduction of ADF OxyContin, Purdue hired McKinsey to help "turbocharge" sales.   McKinsey has since agreed to pay hundreds of millions of dollars in settlements and is now under criminal investigation by the DOJ as a result of its involvement in the opioid crisis, including its work for Purdue.

238.    Purdue had a long history with McKinsey.  It was first retained by Purdue in 2004 to provide consulting services, including analyses focused on assessing the abuse potential of OxyContin, and adverse reports resulting from the use of OxyContin.  For example, in February

---

[34] With titration, the medication initially is prescribed at a low dose and the prescription is raised (i.e., "titrated up") until the maximum effective dose is achieved.

2009, McKinsey drafted a PowerPoint for Purdue entitled "Evaluating Abuse Potential: Risk Mitigation in Developing Products for Pain Management," and one of its core findings was that OxyContin was a "perfect storm" for abuse potential.

239.    In June 2009, McKinsey drafted a PowerPoint regarding "[p]hysician survey results," which found that opioids were "the leading source of abuse and diversion issues for physicians."   Less than two weeks later, McKinsey presented a strategy to Purdue called "OxyContin: Driving Growth Through Stronger Brand Loyalty," which analyzed drivers of prescription decline and sensitivity to detailing and used that prescriber-level detail to devise ways that Purdue could increase brand loyalty to OxyContin, even though its prior analyses had shown the drug was one of the opioids of "greatest concern."

240.    McKinsey continued to develop strategies focused on increasing OxyContin prescriptions throughout 2009.  Among other things, McKinsey recommended convincing doctors that opioids provide "freedom" and "peace of mind" and give patients "the best possible chance to live a full and active life."  At a Purdue Steering Committee meeting, McKinsey recommended that Purdue use "messages and tactics" that would increase sales among "loyalist prescribers and 'fence sitters.'"

241.    When Purdue's sales of OxyContin began to decline following the introduction of ADF OxyContin, the Sacklers again engaged McKinsey to help.  On or around May 25, 2013, Richard Sackler had a call with a senior executive from McKinsey and, three days later, Purdue entered into another contract with McKinsey to "conduct a rapid assessment of the underlying drivers of current OxyContin performance, identify key opportunities to increase near-term OxyContin performance, and build plans to capture priority opportunities."

242.     McKinsey acknowledged that the introduction of ADF OxyContin reduced sales, and that "this downshift primarily reflects **reduced demand among abusers** for the new abuse-resistant formulation."  McKinsey also highlighted the "intense scrutiny" faced by "[t]he retail channel, both pharmacies and distributors," as an impediment to opioid sales.  McKinsey explained that "[t]here are reports of wholesalers stopping shipments entirely to an increasing number of pharmacies," that "[m]any wholesalers are also imposing hard quantity limits on orders based on prior purchase levels," and that "[p]harmacy chains are implementing guidelines for which patients can fill opioid prescriptions."  McKinsey identified these policies to address mass opioid abuse as obstacles that Purdue and the Sackler Directors would need to overcome in their desire to boost sales of OxyContin.  McKinsey concluded that, "despite strong trends that may be making the opioid marketplace challenging for the foreseeable future," its findings indicated that "there [was] significant opportunity to improve OxyContin performance" and that "OxyContin remain[ed] quite promotionally sensitive."  McKinsey encouraged Purdue to "aggressively seize these opportunities and begin action immediately."

243.     Despite clear indications of abuse and diversion, McKinsey recommended that Purdue take actions to "Turbocharge Purdue's Sales Engine" by focusing sales efforts on the higher decile and, thus, higher profit-generating HCPs.  This turbocharging focused on what McKinsey saw as a "significant opportunity to improve sales through better targeting." Specifically, McKinsey opined that "better targeting" of HCPs could result in greater than $100 million in sales "upside," noting that "the average prescriber in decile 5-10 writes 25 times as many OxyContin scripts as prescribers in decile 0-4"—even though the HCPs in deciles 5-10 comprised less than 7% of all prescribers nationwide—and recommending "shift[ing] calls to higher potential prescribers."

244.    In August 2013, McKinsey's progress on evaluating growth opportunities for OxyContin was discussed with the Board, including certain Sackler Directors.  The presentation noted that the analysis would include an examination of "[r]elatively more sudden declines in: [t]ablets per prescription and [p]rescriptions for 40mg & 80mg strengths" and "[p]rescriber segmentation and targeting."  Later that same day, Richard Sackler emailed Mortimer Sackler Jr.: "The 'discoveries' of McKinsey are astonishing."  Richard Sackler subsequently arranged for a face-to-face meeting for the Board.

245.    On August 23, 2013, certain of the Sackler Directors met with McKinsey and examined its "unvarnished" findings and recommendations.  Following the meeting, one of McKinsey's partners that led the meeting memorialized in an email, "[T]he room was filled with only family, including the elder statesman Dr. Raymond [Sackler] . . . We went through exhibit by exhibit for about 2 hrs . . . They were extremely supportive of the findings and our recommendations . . . and wanted to strongly endorse getting going on our recommendations." Another McKinsey partner remarked that their "findings were crystal clear" to the Sacklers "and [the Sacklers] gave a ringing endorsement of 'moving forward fast.'"

   3.   Purdue Implemented McKinsey's "Evolve to Excellence" Program to Target High Volume Prescribers

246.    Purdue implemented McKinsey's recommendations through a program called "Evolve to Excellence" ("E2E").  The core focus of the E2E program was developing mechanisms to target the highest-volume prescribers, including through increased call frequency and minimized sales representative discretion in choosing which prescribers to target.  E2E placed a "heavy emphasis on target physicians" and tied sales representative incentive plans to their adherence to the plan's sales structure.  McKinsey also recommended that Purdue refresh its

marketing message around titration to higher, more lucrative dosages and undertake strategies to ensure prescriptions would be filled.

247.    In July 2013, the Board met to discuss the first report on sales tactics that McKinsey had prepared for them called *Identifying Granular Growth Opportunities for OxyContin: First Board Update*.  McKinsey confirmed that Purdue's sales visits generated opioid prescriptions. They recommended that the Board demand more sales visits from sales representatives and increase each representative's annual quota for in-person sales visits from 1,400 to 1,700. McKinsey also advised the Board to control the sales representatives' target lists more closely, focusing on doctors who prescribed the most opioids and therefore yielded the largest sales.  To facilitate this recommendation, McKinsey asked the Board to obtain "prescriber level milligram dosing data" so they could analyze the doses prescribed by individual doctors.

248.    In an August addendum to the July report, McKinsey recommended that "Purdue make[] a clear go/no go decision to 'Turbocharge the Sales Engine.'"  In September 2013, McKinsey provided two final reports in connection with its "OxyContin Growth Project." McKinsey's "OxyContin growth opportunities Phase I Final Report: Diagnostic" proposed measures to address decreasing OxyContin prescriptions.  It found that "increased [sales] calls have a significant impact on OxyContin" prescriptions, provided an overview of effective sales programs including "dinner programs," and estimated that "revenue upside from sales re-targeting and adherence could be up to $235M."  McKinsey's "OxyContin growth opportunities Phase II Final Report: Recommendations" made a variety of recommendations, including hiring more sales representatives to hit target goals, examining their compensation structure, and turbocharging the sales force.

249.    McKinsey further advised Purdue to train its sales representatives to "emphasiz[e] the broad range of doses," which would have the intended effect of increasing the sales of the highest (and most profitable) doses of OxyContin.  Indeed, evidence indicates that the 80-milligram pill of OxyContin—the highest dosage strength—was the most popular and profitable in illicit sales of the product.  Of course, higher dosage strength, particularly for longer periods of use, also contributes to and accelerates opioid dependency, addiction, and abuse.  Purdue implemented McKinsey's suggestions by adopting the marketing slogan, "Individualize the Dose," and initiating the S.T.A.R.T. (Supplement, Titrate, Adjust, Reassess, Tailor) initiative, which was meant to focus sales conversations with HCPs on titrating patients to higher dosages.  The goal of the program was to discourage patients' discontinuation of OxyContin due to a perceived lack of pain relief by encouraging HCPs to increase the OxyContin dosage, or "titrate up."  In other words, Purdue trained its sales representatives to "[o]vercome . . . objection[s]" from HCPs whose patients complained that they still felt pain by encouraging the HCPs to "titrate up" to higher dosages.

250.    Specifically, sales representatives were trained to pivot from legitimate concerns about addiction voiced by HCPs to statements about "dependence" and opioid "tolerance."  In fact, when asked about the safety of high dosages, representatives were instructed to respond that OxyContin "does not have a ceiling dose."  On their sales calls, sales representatives also were trained to discuss initiating opioid naïve patients (i.e., patients not already taking opioids) on opioid therapy and switching patients from immediate release opioids to ADF OxyContin.

251.    The Board received a presentation on E2E's implementation at the September 12, 2013 Board meeting.  The implementation of the E2E program was overseen by McKinsey and some of Purdue's top executives through the creation of the E2E Executive Oversight Team and Project Management Office and was an immediate success.  In December 2013, a Purdue executive

told the Board that "[t]he E2E sales force focus/effectiveness initiatives [that] are being implemented starting October 2013 through April 2014 are already showing positive results."  By April 2014, Purdue's CFO Mahony was able to report to the Board that "[t]he E2E effort has resulted in significant improvement" in sales of opioids.

252.    McKinsey urged Purdue to double down on sales practices that Purdue had already established to increase prescriptions from high-value, high-volume opioid prescribers.  Then-CEO Timney explained to the Board in a May 2014 memorandum titled "Rebuilding Purdue to Compete, Win & Grow," that Purdue shifted to a "tiered" structure for sales calls, targeting the highest volume prescribers at 24 sales calls per year.  As a Purdue executive emphasized during a national sales meeting: "[T]he single core objective of E2E . . . is to make sure that we're making calls on the highest potential customers with the right frequency to maximize prescribing potential."  As part of that initiative, Purdue made sure to reward sales representatives for "[c]alling on the right physicians with the right frequency" via a sales bonus.  Identifying "the right physicians" depended solely on the physician's opioid prescribing volume, not his or her area of medical specialty.

253.    A 2014 budget presentation to the Board explicitly referencing Purdue's work with McKinsey reflected that the extreme high-volume prescribers Purdue was targeting through E2E were the most sensitive to Purdue's marketing.  The presentation noted: "Increased calls with decile 8-10 prescribers have a significant impact on OxyContin TRx growth"—an over 39% increase as compared to a decline of approximately 17% among HCPs receiving fewer calls.  Astonishingly, on average, more prescriptions were written by the high-decile HCPs whom Purdue targeted through E2E than even Region Zero doctors—i.e., doctors on Purdue's "do not call" list due to suspected overprescribing and diversion.

254.    The Sackler Directors and the Non-Sackler Directors were well aware of these initiatives.  Not only did the Sacklers meet personally with McKinsey to learn about their "astonishing" findings, but the Board also received budget presentations reviewing E2E's implementation and discussed ensuring E2E's funding at Board meetings.  The Board approved of the program, which was aimed at increasing sales of OxyContin by any means available, despite the addiction and abuse issues resulting from OxyContin use.  They did this despite the fact that they knew, or should have known, that E2E's core strategies relied on generating still more prescriptions from aberrantly high-volume prescribers, notwithstanding the additional diversion that surely would follow.

### 4. Purdue Should Have Considered High Decile Prescribers for Inclusion on the Region Zero List, but Instead Focused on Driving Them to Still More Prescriptions

255.    Purdue knew, or should have known, that the high decile prescribers it was targeting actually should have been considered for inclusion on the Region Zero list.  Certainly, the numbers of prescriptions written by these HCPs indicated they were as problematic, or worse, than those on the Region Zero list.  For example, in August 2013, the Board received a study reporting that, on average, Region Zero doctors wrote *61.1* OxyContin prescriptions per month (a "comparator" group averaged just 9 prescriptions per month).  In October 2013, the Board learned that HCPs in the top three deciles—the ones specifically targeted by Purdue for more sales calls—wrote *more* prescriptions on average than the Region Zero doctors.  Decile seven HCPs averaged *67.8* prescriptions, while decile ten HCPs prescribed a whopping *246.6* OxyContin prescriptions per month, more than four times the earlier Region Zero average, and 27 times the August "comparator group."  The same document reported that (1) the top decile—composed of just 358 prescribers— wrote as many OxyContin prescriptions as the bottom 99,825 HCPs combined, and (2) fully half of all OxyContin prescriptions were written by just 5.2% of HCPs—those in deciles 5-10.

256.    The prescribing patterns of high-decile prescribers after ADF OxyContin was introduced also were similar to Region Zero doctors.  Purdue learned that much of the fall off in following the introduction of ADF OxyContin was due to Region Zero doctors writing fewer prescriptions, presumably because their customers disproportionately had been crushing or dissolving the original formular of OxyContin for abuse.  Prescriptions from high decile prescribers exhibited the same pattern.   For example, a report supplied to the Sackler Directors and other Board members in August 2013 indicated that "[t]wo thirds of th[e] decline [in OxyContin sales] comes from prescribers in [the highest prescribing] deciles 5-10."  This is another reason Purdue should have investigated high decile prescribers for inclusion on the Region Zero list, rather than targeting them for more sales.

257.    While one avenue of abuse declined following the introduction of ADF OxyContin, others skyrocketed, and Purdue's own studies indicated that such abuse and diversion was concentrated among patients of high-volume prescribers.  On October 25, 2011, the Board received a study that found that there was a "[d]ecline in 80 mg prescriptions, esp[ecially] among [Region Zero] doctors," and "[s]hifts in routes of abuse, especially injecting and snorting."  Notably, the study indicated that the percentage of abusers who reported abusing OxyContin orally *increased* from 52% to 75% following the introduction of ADF OxyContin.  Abuse via snorting or injection also continued, albeit at lower rates.  The same Board materials indicated that a comparatively "small number of prescribers contribute to a large proportion of potential diversions of opioids from legal to illegal channels," and "there were doctors in the [Purdue] datebase [sic] who were prescribing painkillers 'for what appears to be the wrong reasons.'"

258.    Yet, neither Purdue nor McKinsey did anything to determine why their high-value HCPs were writing so many prescriptions, despite McKinsey's previous studies demonstrating a

strong correlation between aberrant numbers of OxyContin prescriptions and abuse and diversion of opioids.  They did not, for example, seek to identify the medical specialties of the high prescribing HCPs.  Rather, Purdue, the Sackler Directors, and McKinsey identified a variable that should have been a "red flag" under Purdue's ADD Program—HCPs with aberrant prescribing practices—and used it instead as a basis for trying to get those HCPs to write even more OxyContin prescriptions.

5.   Purdue Detailed the Pharmacies of Region Zero HCPs to Cause More Medically Unnecessary Prescriptions to Be Filled

259.   In 2013, McKinsey identified pharmacist scrutiny as a hurdle to sales and told the Board: "Access to OxyContin for some patients has become quite challenging in specific local markets.  This is due to a combination of factors including: regulations, DEA initiatives, [Physicians for Responsible Opioid Prescribing], wholesaler initiatives and local pharmacist perceptions. . . .  While the wholesaler issues are quite visible and real, we believe the daily decisions being made at local pharmacies, while less publicly visible, are in fact creating far greater access issues."

260.   On November 18, 2013, Purdue received a presentation from a vendor that identified the top 20 OxyContin prescribers whose OxyContin prescriptions had declined as a result of a pharmacy's "good faith dispensing" policy designed to hinder the dispensing of medically unnecessary prescriptions.  In 2014, a Purdue regional manager similarly wrote that "[t]he retail pharmacist is an integral part of our business.  As the old adage in pharmaceutical sales goes, 'The pharmacist isn't likely to generate business, but they sure can kill it.'"

261.   To ensure that prescriptions from extreme high-volume prescribers would be filled, Purdue engaged in a variety of strategies, including instructing its sales representatives to detail pharmacies to fill "red flag" prescriptions.  For example, Purdue sales representatives also

encouraged pharmacists to "reach out to a [p]rescriber to recommend that a patient be switched from immediate release oxycodone to OxyContin." These pharmacy calls, at times, effectively functioned to bypass safeguards such as the Region Zero list, which forbade Purdue's sales force from contacting certain prescribers directly. In a similar vein, Purdue also trained its sales force to call on pharmacies that dispensed a "high volume of opioid scripts" and were near a "[l]arge pain practice."

262.    Despite possessing data showing which pharmacies were filling prescriptions from Region Zero prescribers, Purdue knowingly continued to market to pharmacies that filled the prescriptions of Region Zero HCPs. For example, in or around 2010, Purdue's OMS Committee reviewed a Florida pharmacy based on a report from a district manager that the pharmacy was "filling primarily from 1.7.1 physicians," which referred to prescribers reported for displaying indicia of abuse and diversion. The report stated that the Florida pharmacy's "parking lot is filled with cars with license plates from other states including Kentucky. They are ordering and filling prescriptions for primarily OxyContin 80mg. . . . [the sales representative] asked the pharmacist if he had any concerns about filling prescriptions from [the 1.7.1] physicians, and the Pharmacist (owner) stated that he was not going to question what a physician writes for his/her patient."

263.    Despite Purdue's knowledge of the red flags indicating the pharmacy was engaged in abuse and diversion, the OMS Committee voted to "continue to monitor" the pharmacy and allowed the sales representatives to continue to call on the pharmacy for the ***next five years***.

      6.   <u>To Circumvent Safeguards against the Dispensation of Suspicious Prescriptions, the Sackler Directors Caused Purdue to Enter Into Distribution Agreements with Specialty Pharmacies to Fill OxyContin Prescriptions That Traditional Pharmacies Had Rejected</u>

264.    In its *Identifying Granular Growth Opportunities for OxyContin: First Board Update*, McKinsey informed the Board that part of the reason for declining OxyContin sales was

that "both pharmacies and distributors" were "under intense scrutiny and direct risk," causing a "clear disruption impacting patients." In particular, McKinsey noted a "range of obstacles" to patients' access to OxyContin, including "entire pharmacies being shut off by distributors, pharmacies themselves imposing tablet limits, decreases in channel inventory leading to greater stockouts, and pharmacies choosing to not stock OxyContin." To address this issue, McKinsey proposed creating an "alternative model for how patients receive OxyContin" that would "bypass retail, likely through a third party vendor who would provide [ ] direct distribution to patients."

265. In response, in August 2013, Mortimer Sackler Jr. emailed Baker and then-CEO Stewart soliciting ideas for a new distribution system "to help relieve this problem of product access" and asking whether they were pursuing the strategy proposed by McKinsey "or an alternate." Mortimer Sackler Jr. shared his own vision for a new distribution system in which Purdue "would directly ship" patients OxyContin prescriptions "after using an independent service to verify the legitimacy of their prescriptions." Stewart responded that Purdue was "considering/evaluating many options," including "shipping directly to pharmacies who can't get supply from their regular wholesalers" and finding a way "to provide guidance to patients who call [Purdue] with respect to their personal problem in filling a prescription." To this, Mortimer Sackler Jr. responded, copying additional members of Purdue's management **and** the entire MNP Board, "I do think there may be an opportunity here for us to set up a complimentary [sic] business to handle this for Purdue as well as other controlled drug manufacturers."

266. Responding to Mortimer Sackler Jr., Richard Sackler claimed to have had the same idea and expressed it to Stewart. In turn, Stewart confirmed Mortimer Sackler Jr.'s interest in exploring an "alternative distribution process for all or essentially all opioid formulations" that would "supply pharmacies, clinics and perhaps also patients (eg mail order)," and possibly even

hospitals. Mortimer Sackler Jr. responded, "To be clear, I was thinking about selling to pharmacies," and noted his belief that "McKinsey was talking about our fulfilling [prescriptions] to the consumer."

267.    Not long after these exchanges—and as explained in an update about the implementation of E2E prepared by members of Purdue's management—Purdue proceeded to develop "multiple tactics to address [distribution] issues," including "alternative [supply] channels." By October 2013, Purdue approached at least six potential partners for its alternative distribution strategies, but all of them rejected Purdue's offer because they were "not comfortable with mail fulfillment" and were concerned with the "risk associated with dispensing OxyContin" under Purdue's proposed distribution models. Despite these setbacks, Purdue continued to explore alternative distribution strategies and, in October 2013, members of Purdue's management updated the Board on the status of these strategies: "What is Purdue Considering? Includes exploring opportunity to distribute directly; exploring existing channels (Specialty pharmacies, independent pharmacy networks)."

268.    Purdue eventually realized its goal of establishing "alternative distribution" channels. In 2015, Purdue entered into distribution agreements with three specialty pharmacies, which proceeded to fill numerous prescriptions that (1) had been rejected by traditional retail pharmacies based on indications of diversion; (2) were for uses that were unsafe, ineffective, and medically unnecessary; and (3) were often diverted into illegal drug markets. Indeed, the findings of Purdue's own ADD Program show that many of these prescriptions were medically unnecessary. In particular, the specialty pharmacies filled Medicare prescriptions for Purdue opioids written by approximately 100 prescribers, ***nearly one-fourth of whom were referred to the ADD Program on suspicion of diverting opioids into illegal markets.*** Between 2015 and

2018, Purdue paid these specialty pharmacies more than $100,000 in kickbacks to fill prescriptions that other traditional pharmacies had rejected.

269.    When prescribers and patients experienced difficulty filling prescriptions for Purdue's opioid products, including OxyContin, Purdue's sales representatives and employees in its Medical Affairs department referred them to the specialty pharmacies with which Purdue had contracted.

7.    Purdue Paid Practice Fusion to Design an Online Pain Platform to Increase Purdue's Extended-Release Opioid Sales

270.    As Practice Fusion and Purdue each has admitted in separate criminal plea agreements, they conspired together to drive medically unnecessary sales of opioids. Practice Fusion is a web-based electronic health record company that provided electronic health record services to tens of thousands of HCPs in the United States, and its software was used during millions of patient encounters each month. Practice Fusion received payments from pharmaceutical companies in exchange for creating a clinical decision support ("CDS") alert in its electronic health records program. The CDS would generate treatment recommendations using the patient information entered into the system by HCPs.

271.    Beginning in or around spring 2014, Purdue discussed paying Practice Fusion to implement a "Pain CDS." The Pain CDS would prompt doctors to focus on assessing and treating a patient's pain systems and suggesting treatments, including the prescription of extended-release opioid medications such as Purdue's products.

272.    The Pain CDS was presented as a neutral medical standard, but Purdue's primary objective was increasing ERO sales. As a Purdue executive wrote on May 4, 2014, regarding a potential deal with Practice Fusion, "[t]he key is understanding how it grows or protects [prescriptions]." A Purdue presentation from March 2016 similarly noted that the primary goal of

the collaboration with Practice Fusion was "to increase Rx [prescriptions] for Purdue's medications," and a Practice Fusion employee remarked in May 2016, "I keep hearing the client revert back to 'Rx lift' as the primary objective of the program[.]"

273.   On March 23, 2015, a Practice Fusion employee emailed colleagues in preparation for an upcoming meeting at Purdue and described the opportunity to sell the CDS program to Purdue. The Practice Fusion employee explained that Purdue "has communicated that the average dosage of OxyContin is declining," and that "[p]roviders are hesitant about using high dosages to combat pain." The Practice Fusion employee further explained that, "[a]s a result, Purdue is toying with the idea of using Pain Assessment tools with the provider at every visit and before every [prescription]."

274.   In a September 2015 presentation to Purdue's marketing personnel, Practice Fusion touted that the Pain CDS would increase Purdue's prescriptions of OxyContin, Butrans, and Hysingla by delivering "clinical patient-centric provider messages" targeted at HCPs with "opioid naïve patients with chronic pain"—meaning patients who had not been prescribed opioids recently and/or were not receiving opioids on a regular basis—and with patients currently receiving immediate release oxycodone and hydrocodone.

275.   Purdue participated in the design of the Pain CDS alert. It approved the types of patients the Pain CDS would target and what guidance the alert would provide to HCPs. The Pain CDS was presented to HCPs as a neutral medical standard, but it was deliberately designed to increase sales of Purdue products. In addition, the Pain CDS directly violated medically accepted standards, CDC guidelines, and FDA-approved labels for Purdue's EROs.

276.   From 2015 to 2016, Purdue spent approximately $1 million working with Practice Fusion "to add reminder[s] for healthcare professionals prescribing opioid medications to conduct

interim pain assessments." Purdue now admits that "[t]he remuneration [it] paid . . . to Practice Fusion was done in return for Practice Fusion including in its [electronic health record] platform a CDS with one of its purposes to increase Purdue's ERO sales, portions of which were paid for by federal health care programs, in violation of the Anti-Kickback Statute."

277. The CDS alerts were live on Practice Fusion's platform from at least on or about July 6, 2016 to the spring of 2019, and more than 230 million alerts were generated during that period. HCPs who received the Pain CDS alerts prescribed extended-release opioid prescriptions such as Purdue's ERO products at a higher rate than those that did not.

278. Even within Purdue, there were concerns about the propriety of the Practice Fusion project. On July 21, 2017, the head of Purdue's Medical Affairs Strategic Research department, wrote Gail Cawkwell, then Chief Medical Officer, expressing "significant discomfort about the Practice Fusion Project." As she noted, there had been "an explicit (in writing) goal at the beginning of increasing opioid scripts," which put Purdue in "a precarious position." They were right—Practice Fusion's Pain CDS directly contributed to an increase in unnecessary opioid prescriptions and the steadily mounting opioid liability that Purdue faced. Indeed, in January 2020, Practice Fusion executed a deferred prosecution agreement with the DOJ in which it admitted to conspiring with Purdue to drive medically unnecessary opioid prescriptions and paid $145 million in fines.

## C. Purdue and the Sackler Directors Actively Sought to Deflect and Conceal Their Misconduct

279. All the while Purdue knowingly engaged in aggressive mismarketing of its dangerous drugs, Purdue and the Sackler Directors promoted the false idea that opioid abuse and addiction was the result of the moral failings of the victims of drug addiction.

- In May 2008, Purdue personnel sent the Board a proposal of "KEY MESSAGES THAT WORK"—one of which Richard Sackler had long

subscribed to: Deflect blame from Purdue's addictive drugs by stigmatizing people who become addicted.  The tag line the staff proposed did just that: "It's not addiction, it's abuse.  It's about personal responsibility."

- In 2010, Dr. Portenoy—a doctor who "led the charge for mass prescribing of opioids in the US, and was then paid by Purdue Pharma to help drive sales of OxyContin"—said on *Good Morning America* that "[a]ddiction, when treating pain, is distinctly uncommon" and "most doctors can feel very assured that that person is not going to become addicted.  Dr. Portenoy later admitted in an interview that he "gave innumerable lectures in the late 1980s and '90s about addiction that weren't true" because the primary goal was to "destigmatize" opioids.  In an interview with the Wall Street Journal he said: "Did I teach about pain management, specifically about opioid therapy, in a way that reflects misinformation?  Well, . . . I guess I did."

- In September 2011, CEO Stewart gave a speech in Connecticut titled *Providing Relief, Preventing Abuse*, which deceptively blamed addiction, overdose, and death on "abuse"—deploying Richard Sackler's time-worn strategy to "hammer on the abusers in every way possible"—to draw attention away from how dangerous Purdue opioids were for everyone.[35]

- On October 4, 2018, after reviewing an article suggesting that low-income people are more prone to opioid abuse because they cannot afford alternative care or surgery, Mortimer Sackler Jr. continued his victim-blaming, asking, "Is that the reason or is it because lower income households are more prone to drug abuse (to escape the difficulties of their lives) and hence seek out opioid prescriptions as a means of getting high and so their prescriptions are not legitimate pain prescriptions?"

280.    After Purdue and the Sacklers spent years deflecting blame from Purdue's addictive drugs by stigmatizing people who became addicted, the Business Development Committee led by Kathe Sackler sought to further profit from the "market" of individuals addicted to opioids, rationalizing that "[a]ddiction treatment is a good fit and next natural step for Purdue," because "[p]ain treatment and addiction are naturally linked" and there is a "[l]arge, unmet need for vulnerable, underserved and stigmatized patient population."  In 2014, the Business Development team, led by Kathe Sackler, pitched "Project Tango"—a plan to expand across "the pain and

---

[35] Stewart gave another *Providing Relief, Preventing Abuse* speech in March 2012, making the same misleading statements as before: that pain is undertreated and that patients are to blame for addiction, overdose, and death because of "abuse."

addiction spectrum" to become an "end-to-end pain provider" by treating addiction with Suboxone. Purdue illustrated this marketing strategy internally with a picture of a funnel guiding patients down the funnel from pain treatment to opioid addiction treatment.

281.    But while they were publicly blaming victims, privately, the Sackler Directors and Purdue were doing everything they could to make sure that their fingerprints were not on written evidence of Purdue's criminal conduct. Purdue's internal documents from before and after 2007 are filled with examples of Purdue leadership, including the Sackler Directors, discouraging written communications about topics that could raise potential liability issues for Purdue. For example:

- In 2001, a regional manager sent his sales representatives a reminder of the types of information that is "okay to communicate" but "should never ever go on e-mail." Instead, he advised that negative comments "should be placed on voicemail or typed in a hard copy memo and sent via U.S. mail or fax, so there is no permanent electronic record." The manager told his team to "[i]magine if each of these messages was displayed on an overhead projector in a court of law accusing Purdue of unethical or inappropriate marketing."

- Purdue's strictest policy against written communications prohibited sales representatives from recording details about their sales pitches to doctors in emails. The Board knew about and approved this policy, and staff assured the Board that the policy was enforced. Purdue instructed its sales representatives to avoid using words like "Meal ticket" or "I pushed her to write more OxyContin" in their call notes – "Work to remove this language from you[r] written and oral communications!" Its training presentations also advised sales representatives to "not include adverse events" – defined as "any undesirable event . . . associated with the use of a drug" – "in your call notes." Purdue required that sales representatives discuss opioids only in face-to-face oral conversations to avoid generating discoverable evidence of its misconduct. As the top sales and marketing executive in the company, Russell Gasdia personally enforced the rule. When Gasdia learned that a sales representative had sent a doctor emails about Purdue opioids, he ordered: "Fire her now! We can't afford this."

- This, of course, was consistent with Gasdia's email playbook. For example, when staff emailed Russell Gasdia a detailed report of illegal OxyContin trafficking, he responded: "These should not be on email." When the Northeast Regional Manager emailed Gasdia about the arrest of a profitable "core physician" in Massachusetts, Gasdia ordered: "Discontinue use of email on this

subject." When sales staff emailed each other about how to "push" doctors to prescribe more opioids, Gasdia instructed: "Please take this off line. I would prefer a face to face discussion on this."

- 

- In 2014, Purdue abolished the issuance of detailed Quarterly Reports that had created a paper trail of targets for sales visits and been emailed among the Board and staff, as a result of a subpoena that the City of Chicago served on Purdue in 2013 seeking internal documents about Purdue's marketing of opioids. The subpoena provoked a flurry of activity, including discussion among the Board. Purdue fought the subpoena, and eventually it was withdrawn. But as a result of this incident, from 2014 and onward, the Board decided to limit many of Purdue's official Board reports to numbers and graphs and relayed other information orally only.

- Throughout 2018, Josephine Martin, Purdue's Senior Vice President of Corporate Affairs and Communications, was the center of several email exchanges concerning public affairs issues. Martin frequently ended electronic conversations and insisted on continuing them offline, for example, writing: "Happy to discuss offline." After such messages, the electronic communications usually ended.

282. 

283. The Sacklers' ability to conceal their wrongdoing was augmented by the fact that Purdue is, and at all relevant times was, a privately held corporation, meaning that it was not subject to reporting or disclosure obligations imposed on public companies by the U.S. Securities

and Exchange Commission and other state and federal regulators.  Purdue also had no shareholders outside of the Sackler family and therefore was able to avoid disclosure of most information beyond family members and a close-knit circle of advisors.  From the beginning, the Sacklers apparently appreciated this.  For instance, in 1995, Baker advised Richard Sackler: "since we are private, we haven't a fair disclosure requirement, and can choose and select what we want to publish."  Richard commented that the lack of a disclosure requirement was a "definite advantage of our private status."

284.    Ultimately, despite their best efforts at concealing their misconduct, the Sackler Directors and Purdue became subject to an onslaught of claims and litigation for their significant role in creating and fueling the opioid crisis.

## VIII.   **The Sacklers Realized that Litigation Could Threaten Their Wealth and Undertook "Defensive Measures" to Transfer Billions of Dollars Out of the Debtors to Try to Place Them Out of the Reach of the Debtors' Creditors**

### A.    **The Sacklers Knew That Litigation Could Wipe Out Their Wealth**

285.    The experience of the Pre-2008 DOJ/State Resolutions, and the investigations leading up to them, alarmed the Sacklers.  They realized that as long as much of their wealth remained at Purdue, it was at risk due to Purdue's overwhelming opioid-related liabilities.  As they negotiated settlements to resolve the governments' claims in 2006 and 2007, the Sacklers and their close advisors worried that Purdue would remain permanently at risk of government prosecution and other litigation due to its continued manufacture and marketing of opioids, despite those settlements.  The Sacklers predicted that Purdue would ultimately become embroiled in the same kind of crushing litigation that beset the tobacco and asbestos industries.  Their primary concern was that litigation against Purdue could threaten the family's enormous wealth.

286.    In late 2006 and in 2007, as Purdue negotiated an agreement in principle with the DOJ personnel in the Western District of Virginia (the "WDVA") and finalized the Pre-2008

DOJ/State Resolutions, the Sackler Directors clearly understood and feared that the litigation risk overhanging the company remained massive and crushing. In October 2006, the Sacklers reached an "agreement in principle" with the federal government—with terms that were materially identical to those provided in the final agreement—to pay $634 million in settlement of opioid-related claims. About a month later, Jonathan Sackler wrote to others in the family about the "pharma issues" the family faced, including his worry that the pharmaceutical industry had become "enshrined as a permanent whipping boy for . . . [the] trial bar." He recognized that "Getting caught in the crossfire of the 'war on drugs' is obviously a huge risk" that the company faced.

287. Likewise, in March 2007, Jonathan Sackler emailed Richard, Kathe, and Mortimer Sackler Jr. that, "as WDVA empties our coffers," "[t]here are a number of risks" that "we're not really braced for," including "[t]he emergence of numerous new lawsuits." In another email, Jonathan noted several "ongoing risks created by WDVA," including that, "if there's a future perception that Purdue has screwed up on compliance, *we could get murdered*." Jonathan also explained that there was "an uncertain contingent liabilities picture" with "zero margin for error." On May 13, 2007—only three days after Purdue had entered into the 2007 DOJ Criminal Plea and Settlement—Richard Sackler wrote an email stating that the "equating of marketing OxyContin with 'drug pushing' is . . . very threatening . . . . Frankly, I don't know what to do. I'm not confident that this is something that will blow over. My sense is that it may get a lot worse in the coming weeks."

288. Most acutely, the Sacklers realized that potential opioid litigation threatened to wipe out the family's wealth. On May 17, 2007—just a week after the 2007 DOJ Criminal Plea and Settlement had been filed—David Sackler emailed Richard and Jonathan:

> "[W]hat do you think is going on in all of these courtrooms right now? *We're rich? For how long?* Until which suits get through to

the family? . . .  My thought is to lever up where we can, and try to generate some additional income.  We may all need it. . . . [I]t's better to have leverage now while we can get it than thinking it will be there for us when we get sued."

\* \* \*

[W]e're living in America.  This is the land of the free and the home of the blameless.  ***We will be sued***.  Read the op ed stuff in these local papers and ***ask yourself how long it will take these lawyers to figure out that we might settle with them if they can freeze our assets and threaten us***.

289.    These exchanges continued into early 2008, when Mortimer Sackler Jr. exchanged emails with Richard Sackler concerning the creation of what they called a "suspense account" in case a family member is "sued as a consequence of his/her actions in the company or related to a company product."  As Richard Sackler wrote, "At this moment, no family member is being sued. But I've been told by [Associate General Counsel, Richard Silbert] that I will be so and probably soon."  Mortimer replied, "[m]akes sense to me," but emphasized that the account "should only be triggerable [sic] ***if Purdue fails to meet its indemnification obligations***."  In that event, Mortimer wrote in a later email, "any family member who has been sued directly . . . [but] no longer being covered by Purdue" could activate the suspense account "up to a maximum of $50 million." Significantly, that $50 million would be ***on top of*** the depletion of Purdue's assets because it "can't get triggered unless Purdue is unable to meet its obligations under its indemnification agreements." Clearly, the Sacklers feared that opioid victims would seek to recover from the Sacklers ***after*** depleting Purdue's assets entirely.

290.    Later, in January 2011, David Sackler—the self-proclaimed "cynic"—wrote to Richard Sackler: "I believe having a second passport could be very valuable if things start to unravel.  It's unlikely the US would choose to seize foreign money immediately.  While we would have US citizenship, having another passport might buy us time we need to protect ourselves."

291.    Just a few days after the 2007 DOJ Criminal Plea and Settlement, Baker arranged a meeting between the Sacklers and a bankruptcy partner at Chadbourne.  The Sacklers' concern about Purdue's latent, but enormous, liability relating to its opioid sales and marketing misconduct is the obvious explanation for their interest in bankruptcy advice since, at the time, Purdue had little or no funded debt and no other material contingent liabilities, and continued to generate substantial free cash from opioid sales.  The Sacklers soon embarked on a deliberate plan to hinder or delay the Debtors' creditors by transferring vast sums from the Debtors to family trusts and wholly owned foreign entities.

### B.    Close Family Advisor and Future Purdue Director, Peter Boer, Authored a Memorandum Recommending that the Family Transfer Assets from Purdue to Evade Tort Creditors

292.    The Sacklers also listened to close family advisor Boer about how to shield themselves from Purdue's massive liability risk.  Boer prepared a memo, dated July 24, 2007— barely two months after the 2007 DOJ Criminal Plea and Settlement—addressed to "the family's desire to separate themselves from the unpleasantness and unfairness of the past few years" (the "Boer Memo").  In his memo, Boer warned the Sackler Directors about the "uncapped nature" of Purdue's opioid liabilities and sketched out a scheme for secreting Purdue's assets from the reach of creditors.

293.    Touting his experience as an executive at W.R. Grace, another entity that declared bankruptcy in the face of massive tort liability, Boer cautioned that "perceptions of deep pockets hugely affect litigants' strategy."  "For the family," Boer advised, "it may be that overseas assets with limited transparency and jurisdictional shielding from U.S. judgments will be less attractive to litigants than domestic assets.  Obviously, this factor depends on how the ownership is structured, and I presume the family has taken most of the appropriate defensive measures."  In April 2008, the Sackler Directors rewarded Boer by making him a member of the Board.  In his

role as member of the Board, Boer—together with the Sackler Directors and certain other Non-Sackler Directors—would go on to authorize many of the transfers of value out of Purdue to or for the benefit of the Sackler family.

### C.    The Sacklers Implemented a Scheme to Transfer Assets Out of Purdue to Prevent Them from Falling into the Hands of Creditors

294.    As Mortimer Sackler Jr. explained in a February 2008 email to Side B's Richard Sackler, "Fundamentally we don't want to stay in this business anymore (given the horrible risks, outlooks, difficulties, etc.) and I think the majority of your family feels the same way."  He went on to muse that a sale could "once and for all eliminate the great risks we have and continue to take and secure our families' current and future financial security."

295.    The Sacklers soon recognized, however, that selling the company would not be easy (and would not fetch the rich price the Sacklers wanted) due to Purdue's significant liability overhang.  As David Sackler noted, Purdue's "future liabilities" stood in the way of any potential transaction because they threatened to "decimate" any prospective merger partner's stock price. Hence, the Sacklers instead focused on transferring cash and other value out of Purdue, just as Boer had recommended.  Indeed, during the 10 years following the 2007 DOJ Criminal Plea and Settlement (and the Boer Memo), *the Sacklers transferred more than $10 billion in cash out of Purdue, as well as more than $1.5 billion more in non-cash assets, all to themselves and their trusts and entities, or otherwise for the family's ultimate benefit*.

296.    Certain Sacklers argued that these disproportionate distributions should be made precisely because of the litigation risk faced by Purdue based on its sale of OxyContin.  As Mortimer Sackler Jr. stated, "Pharma has always been a risky business but in the last decade between our own R&D failures, *heavy U.S. sales dependence on OxyContin and all the legal issues around it*, the general national and international demonization of Pharma companies and

the worsening payor and regulatory environment makes us feel ***it is especially prudent to take money out of the business to diversify our holdings***."

               1.   <u>Fraudulent Cash Transfers</u>

297.    At the Sacklers' direction, the Debtors transferred more than $10 billion in cash to or for the benefit of the Sacklers, their trusts, and their affiliated entities between 2008 and 2017 (collectively, the "<u>Fraudulent Cash Transfers</u>"), which included (i) more than $4 billion in cash partner distributions; (ii) close to $5 billion that the Sacklers claim was used, directly or indirectly, to satisfy their personal tax liability, or to serve as a deposit with respect to, or advance against, such tax liability; and (iii) more than $1 billion in cash distributions that were transferred to certain Other II-Way Entities, and then subsequently transferred to certain of the Sacklers' offshore entities, the IACs.

298.    These transfers substantially depleted Purdue's assets, which were already dwarfed by Purdue's mounting opioid liability.  Indeed, the cash distributions were exponentially larger than prior-year distributions, both in absolute terms and as a percentage of Purdue's net sales and free cash flow.





299.    After the Sacklers were rattled by the Debtors' first guilty plea in 2007, the Board
went from distributing less than 15% of Purdue's revenue to distributing as much as 70% of its
revenue.  Similarly telling, the Board approved distributions of approximately 39% of Purdue's
free cash flow in 2006, yet approved distributions of more than 167% of free cash flow in 2007
and in the 90% range for the next decade.  Cumulatively, the cash distributions amounted to **_nearly_**
**_eight times_** the $1.32 billion in total value that the Sackler Directors distributed to themselves in
the 13 years between 1995, the year before OxyContin was first approved, and 2008.

300.    The Sacklers readily acknowledged the distributions were made solely for the
benefit of the family.  Richard Sackler acknowledged in an email in 2014 that, "in the years when
the business was producing massive amounts of cash, the shareholders departed from the practice
of our industry peers and took the money out of the business."  For his part, Jonathan Sackler
referred to this distribution of free cash flow out of Purdue as a "milking" program.

301.    The Board also pushed executives to squeeze as much money out of Purdue as
possible, with the express aim of preventing large payouts in litigation.



In November 2014, Baker emailed then-CEO
Timney and Mahony that the Sacklers had decided to distribute $125 million more for the year.
Mahony noted that this put pressure on the company's financing options, but Baker confirmed that
the money had to come out of Purdue and its affiliated IACs.  All the while, as these individuals
acquiesced to the Sacklers' demands for distributions, they were aware of Purdue's mounting
liabilities.

302.    The Sackler Directors made all relevant decisions related to these transfers and
voted on approving the transfers while they served on the Board.  The Non-Sackler Directors

followed the Sacklers' desires and voted to approve every distribution the Sacklers requested. They provided no oversight—to the contrary, the Non-Sackler Directors "consistently said" that distributions were a "shareholder [i.e., Sackler] issue and not one they have or are comfortable expressing a view on." As such, upon information and belief, the cash and non-cash transfers from the Debtors described herein and detailed in Exhibits E through H were unanimously approved by the Sackler Directors and Non-Sackler Directors then sitting on the Board when presented with each such transfer, with such approval typically being made within a few days to at most a few weeks prior to each transfer being made.

303. Of the Fraudulent Cash Transfers that were distributed between 2008 and 2017, more than $4 billion were extracted from Purdue in the form of cash partner distributions. The details of these transfers are set forth on Exhibit E.

304. The Sacklers understood and intended to use the trust structure to attempt to shield those assets from the Debtors' creditors. Richard Sackler summed up the purpose of the trusts in a letter to his children in 2015, stating that they use "Trustees *as a liability shield* - if there is a personal or business litigation and a huge judgment is leveled, you have the freedom of going bankrupt without having to draw into these trusts. This is useful to keep as much in the trusts as you can for liability's sake." Kathe Sackler, in an October 4, 2001 email to Mortimer Sackler Sr., similarly described the trusts of which descendants of Mortimer Sackler Sr. are beneficiaries (the "Mortimer-Side Trusts") as "layers and layers that would have to be penetrated" before litigation could threaten the "vast fortune" the family had built. Tellingly, Purdue's former CEOs, Stewart and Timney, both invoked their Fifth Amendment rights and refused to answer any questions about whether these distributions were made in order to try to avoid the exposure associated with

Purdue's future opioid liability, and whether the transfers were made with the intent to hinder future creditors.[36]

305.



306.    The Fraudulent Cash Transfers also included close to $5 billion that purportedly were distributed in order to satisfy the Sacklers' personal tax liability on account of their (or their entities') direct or indirect ownership of Purdue (the "Tax Distributions").  Those funds were generally distributed out of PPLP in four different ways: (i) via payment or deposit directly from PPLP to the relevant taxing authorities; (ii) from PPLP to Other II-Way Entities and subsequently transferred by the Other II-Way Entities to the relevant taxing authority; (iii) from PPLP to Other

---

[36] In the addendum to the DOJ's civil settlement with the Sacklers, the DOJ asserted that "from 2008 to 2018, the Board approved billions in transfers of funds out of the Debtors as cash distributions of profits into Sackler holding companies and trusts.  Certain of these distributions and transfers were made with the intent to hinder future creditors."

II-Way Entities, which subsequently transferred the cash to Beacon and Rosebay and on to the Sacklers or the Sackler Trusts with the apparent intention that such transfers subsequently be made to the relevant taxing authorities; and/or (iv) from PPLP directly to or for the benefit of the Sacklers or the Sackler Trusts with the apparent intention that such transfers subsequently be made to the relevant taxing authorities.  In every circumstance, these transfers were made to or for the benefit of the Sacklers and/or their tax-paying trusts to cover their personal or their trusts' tax liabilities—not Purdue's own tax liability.[37]

307.    Commencing on April 30, 2010,[38] PPLP was treated as a "disregarded entity" (a "DRE") for U.S. federal income tax purposes.  Having DRE status meant that PPLP was effectively ignored for purposes of determining U.S. federal income tax liabilities and was not itself treated as a substantive federal income taxpayer or a withholding agent.  During the times it was a DRE, PPLP could not, as a matter of law, bear any U.S. federal income tax liability and had no obligation to make the Tax Distributions—nor did it receive any benefit in return for making them.  The actual tax or withholding liability in respect of which the Tax Distributions were made resides with the Sacklers directly, with their trusts, or with non-Purdue investment vehicles controlled or owned by the Sacklers.

---

[37] ████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████

[38] Prior to April 30, 2010, PPLP was treated as a domestic partnership for U.S. federal income tax purposes, a form of entity that also is not itself treated as a substantive income taxpayer.  Similar to the U.S. Internal Revenue Code's treatment of a DRE, a partnership is not itself treated as a substantive income taxpayer.

308.    Finally, more than $1 billion of the Fraudulent Cash Transfers was distributed from PPLP to the Other II-Way Entities, which subsequently transferred cash to the Sacklers' various offshore entities, the IACs.  These transfers were made at a time when the Debtors were hopelessly insolvent and were designed to make it more difficult for Purdue's creditors to reach the value transferred.

309.    A full list of all cash transfers that Plaintiffs seek to recover as fraudulent transfers on behalf of the Debtors, including the amount of each transfer, the payer and payee of each transfer, and/or the entity for whose benefit the transfer was made, is listed in Exhibits E and F attached hereto.

2.    Fraudulent Non-Cash Transfers

310.    Over the same time period the Board approved the Fraudulent Cash Transfers, and again at the Sacklers' direction, it also approved substantial distributions of other, non-cash property out of the Debtors for less than reasonably equivalent value.  The value of these non-cash transfers totaled more than $1.5 billion and included at least the following transfers (collectively, the "Fraudulent Non-Cash Transfers"):

- stock of Infinity Pharmaceuticals, Inc. from PPLP to PLP LP (and then from PLP LP to BR Holdings and then to Beacon and Rosebay) in November 2008, worth approximately $45 million based on the price Purdue paid for the stock, or conservatively, no less than approximately $21 million based on the stock's fair market value at the time of the transfer in November 2008; the Debtors did not receive any consideration in return for this transfer;

- equity of Millsaw Realty L.P. ("Millsaw") from PPLP to PLP LP (and then from PLP LP to BR Holdings and then to Beacon and Rosebay, each of which received 50% of the equity of Millsaw) in January 2009, valued at approximately $30 million based on cash distributions made in that amount by Millsaw to Beacon and Rosebay in 2010; the Debtors did not receive any consideration in return for this transfer;

- stock and warrants of Infinity Pharmaceuticals, Inc. from PPLP to PLP LP (and then from PLP LP to BR Holdings and then to Beacon and Rosebay) in January 2009; Purdue paid approximately $30 million for the stock, which was worth

no less than approximately $12 million at the time of the transfer; the Debtors did not receive any consideration in return for this transfer;

- stock and warrants of Novelos Therapeutics, Inc. from PPLP to PLP LP (and then from PLP LP to BR Holdings and then to Beacon and Rosebay) in March 2009, valued at approximately $10 million based on the price Purdue paid for the stock; the Debtors did not receive any consideration in return for this transfer;

- stock of Novelos Therapeutics, Inc. from PPLP to PLP LP (and then from PLP LP to BR Holdings and then to Beacon and Rosebay) in August 2009, valued at approximately $13.1 million based on fair market value; the Debtors did not receive any consideration in return for this transfer;

- stock of Kolltan Pharmaceuticals from PPLP to PLP LP (and then from PLP LP to BR Holdings and then to Beacon and Rosebay) in September 2009, valued at approximately $13 million; the Debtors did not receive any consideration in return for this transfer;

- equity of New Suffolk Holdings LLP from PPLP to PRA LP in April 2010, valued at approximately $32.8 million based on book value; the Debtors did not receive any consideration in return for this transfer;

- equity of Lucien Holdings S.àr.l. from PPLP to PRA LP in April 2010, valued at approximately $200 million based on the cash investments that PPLP made to Lucien Holdings S.àr.l. when it was a subsidiary of PPLP from 2008 to April 2010 and the debt repayments made by PPLP on Lucien's behalf during the same period, and PPLP's interest in debt obligations owed to PPLP by Lucien and Lucien's Luxembourg subsidiaries in the principal amount of approximately $245 million as of the transfer date; the Debtors did not receive any consideration in return for this transfer;

- 90% equity ownership of RSJ Company LP from PPLP to PRA LP in April 2010; the Debtors did not receive any consideration in return for this transfer;

- stock of Infinity Pharmaceuticals, Inc. from PPLP to PRA LP (and then from PRA LP to BR Holdings and then to Beacon and Rosebay) in April 2013, worth approximately $230 million based on fair market value at the time of the transfer; the Debtors did not receive any consideration in return for this transfer;

- stock of Kolltan Pharmaceuticals from PPLP to PRA LP (and then from PRA LP to BR Holdings and then to Beacon and Rosebay) in March 2014, valued at approximately $2.1 million based on book value; the Debtors did not receive any consideration in return for this transfer;

- transfer of original formulation OxyContin IP rights from PPLP to PRA LP in January 2017 estimated to be worth between $250 million and close to $585

million based on fair market value at the time of the transfer; the Debtors did
not receive any consideration in return for this transfer;

- purported loans of approximately $312.6 million from PPLP to PRA LP that
were issued at below-market interest rates generally equal to the blended annual
rate as published by the IRS of approximately 1%-2% annually, drastically
below a market interest rate; PRA LP paid far less in interest to Purdue from
2017 to 2019 for receipt of the loans than it would have paid if it had been
subject to a market rate of interest; and

- licenses to exploit original formulation OxyContin and ADF OxyContin by or
for the benefit of the various IACs and/or their owners in exchange for below-
market royalty rates (the "Fraudulent IP Transfers") which were generally set
at 13%-15% pre-loss of exclusivity ("LOE") and 7% post-LOE, drastically
below a market rate that allowed IACs and/or their owners to exploit Purdue's
IP for substantially inadequate consideration, and thereby transfer value away
from the Debtors and to the IACs and/or their owners; between 2008 and the
Petition Date, the owners of intellectual property rights in original formulation
OxyContin and ADF OxyContin received substantially less in royalties in
connection with exploitation of OxyContin by IACs than they would have
received under license agreements setting royalty rates at fair market value.

311.    The Debtors did not receive reasonably equivalent consideration for any of the
Fraudulent Non-Cash Transfers.  And just as the Fraudulent Cash Transfers unanimously were
approved by the Sackler Directors and Non-Sackler Directors sitting on the Board at the time of
each transfer, so too were the Fraudulent Non-Cash Transfers.

### 3.    Purported Indemnity Obligations

312.    Even before the Pre-2008 DOJ/State Resolutions, the Sackler Directors had begun
taking measures to reduce or eliminate any personal liability they might face as a consequence of
their conduct.  At a November 19, 2004 meeting of the Board, the Sackler Directors and certain
Non-Sackler Directors passed a resolution to require PPLP to indemnify directors and officers of
various Purdue entities (the "Indemnitees") and assume maximum liability for expenses and
damages incurred in connection with the Indemnitees' service to Purdue (the "D&O Indemnity
Obligation").  According to the terms of the D&O Indemnity Obligation, PPLP must indemnify
and assume liability "to the fullest extent allowed by applicable law . . . even if such

indemnification is not specifically authorized by [PPLP's] Limited Partnership Agreement, or the Certificate of Incorporation and Bylaws of [PPI]." The D&O Indemnity Obligation carves out, and does not require indemnification in, scenarios where a final court judgment establishes that an Indemnitee's conduct was in bad faith or criminally unlawful.

313. Following the Pre-2008 DOJ/State Resolutions, the Sackler Directors made sure to reinforce and further ratify the D&O Indemnity Obligation. The Amendments to By-Laws of PPI, effective April 18, 2008, state that PPI "shall indemnify any person made, or threatened to be made, a party to any action or proceeding, whether civil or criminal, by reason of the fact that s/he, or his testator or intestate, is or was a director or officer of [PPI] . . . to the fullest extent permitted by law." PPLP's Third Amended and Restated Limited Partnership Agreement, dated as of March 7, 2018, states that, "To the fullest extent permitted by applicable law, [PPLP] shall and does hereby agree to be bound by the indemnification provisions . . . adopted by [PPI] on November 19, 2004 on behalf of [PPLP.]" And PPLP's Fifth Amended and Restated Limited Partnership Agreement, dated as of June 20, 2019, states that PPLP "shall, to the fullest extent allowed by applicable law . . . indemnify and hold harmless each Indemnitee . . . from and against any and all expenses . . . , amounts paid or incurred in satisfaction of or as part of settlements, judgments, fines, penalties, liabilities and similar or related items incurred or suffered or threatened to be incurred or suffered as a result of or in connection with" any civil, criminal, or other action.

314. Subsequently, in 2014, after the City of Chicago brought suit for Purdue's continued opioid misconduct, the Board voted to indemnify the trustees of Sackler Trusts that own Purdue against any "settlements, judgments, fines, liabilities or similar" in connection with "the City of Chicago litigation matter or in any" other civil or criminal proceeding "involving Purdue Pharma L.P. and/or any of the other U.S. independent associated companies" (the "Trustee

Indemnity Obligation"), presumably in recognition of the fact the trustees shared risk on account of the mounting opioid liability and siphoning of wealth from Purdue.

315.    The D&O Indemnity Obligation, the Trustee Indemnity Obligation, and any other purported obligations of Purdue to indemnify, reimburse, or otherwise pay the Sackler Directors, other Defendants, and other parties for liabilities and expenses incurred in connection with their service to Purdue are collectively referred to as the "Purported Indemnity Obligations."  PPI, PPLP, and Purdue Pharmaceutical Products, L.P. incurred the Purported Indemnity Obligations without receiving any reasonably equivalent consideration in exchange, and with the intent to hinder, delay, or defraud the Debtors' creditors.

4.    Purported Elimination of Fiduciary Duties to PPLP

316.    On March 7, 2018, PPLP executed a Third Amended and Restated Limited Partnership Agreement (the "2018 LPA").  The 2018 LPA includes *for the first time* section 12(b), which purports to eliminate certain fiduciary duties of PPI (and, therefore, the Sackler Directors, the Non-Sackler Directors, and the Non-Sackler Officers as officers of PPI) to PPLP (the "Purported Fiduciary Duty Waiver").  In particular, section 12(b) provides that:

> *The General Partner [i.e., PPI] shall not have any duties (including fiduciary duties) to any Limited Partner or the Partnership [i.e., PPLP], and any duties or implied duties (including fiduciary duties) of a General Partner to the Partnership or to any Limited Partner that would otherwise apply at law or in equity are hereby eliminated to the fullest extent permitted under any applicable law*.  Notwithstanding anything to the contrary in [the 2018 LPA], to the fullest extent permitted by applicable law, and without limiting the foregoing, the General Partner shall be entitled to consider only such interests and factors it desires with respect to any action for which it is entitled to grant or deny approval, including its own interests, and shall have no duty or obligation to give any consideration to any interests or factors affecting the Partnership, the Limited Partners or any other person.

(emphasis added).

317.    Neither PPI nor any of its or PPLP's fiduciaries provided any consideration in exchange for the Purported Fiduciary Duty Waiver, which PPLP granted while insolvent and with the intent to hinder the ability of creditors to hold PPI, the Sackler Directors, the Non-Sackler Directors, and the Non-Sackler Officers accountable for their breaches of fiduciary duty following March 2018.  Notably, extensive litigation arising out of the opioid crisis was already pending at the time that PPLP executed the 2018 LPA.

## IX.    Throughout the Relevant Period, the Debtors Were Insolvent Due to Crushing Accrued and Accruing Opioid Liability

318.    The Debtors were insolvent at all relevant times under each of the three familiar financial condition tests.  Any reasonable approach to valuing Purdue's crushing opioid liabilities shows that its liabilities greatly exceeded its assets, by many multiples, and rendered Purdue deeply insolvent.

### A.    Balance-Sheet Insolvency

319.    Throughout the entire period that the Board authorized distributions out of Purdue, including the Fraudulent Cash Transfers and the Fraudulent Non-Cash Transfers, Purdue was subject to staggering opioid-related liabilities.

320.    To be sure, Purdue entered into settlements in 2007 with federal agencies and certain states relating to Purdue's role in the opioid crisis.  But the settlements released Purdue only for certain types of claims arising from conduct during the period 1995 to 2005 (in the case of the 25 states and Washington D.C. that signed consent judgments as part of the Pre-2008 DOJ/State Resolutions) and to 2007 (in the case of the federal government).  The settlements did **not** absolve Purdue from all opioid-related liability.  Among other things, Purdue remained subject to liability to every political subdivision and Native American Tribe in the country, with pre- and post-2007 claims that have been alleged to exceed $1.1 trillion.  And the states themselves retained

nuisance and other types of claims of enormous value. Likewise, the claims of virtually every private plaintiff, other than the comparatively small number of personal injury victims who settled separately, were unaffected by the Pre-2008 DOJ/State Resolutions, and by themselves were enough to render the Debtors insolvent by 2007.

321.   Purdue's opioid liabilities can be estimated using a variety of approaches, and all lead inevitably to the conclusion that Purdue was deeply insolvent at all relevant times. For example, Purdue commissioned a report in 2008 regarding the "Economic Costs of Nonmedical Use of Prescription Opioids" (the "Hansen Study"), which determined that OxyContin caused at least 1,533 deaths and $7.2 billion in damages in 2006 alone. Purdue employees actively collaborated with the study's authors on the scope and methodology for measuring economic damages and were provided with a pre-publication finalized version of the report on December 18, 2008. Purdue further referenced the study in its 2012 reformulated OxyContin messaging plan as evidence of the "significant monetary burden" that opioid abuse and dependence imposes on society. Additionally, Richard Sackler received an email summarizing the conclusions of the study on December 24, 2010, which was then published in a medical journal in Spring 2011.

322.    Extrapolating the Hansen Study's results to 1999 through 2017, and adjusting for the Pre-2008 DOJ/State Resolutions and Purdue's share of liabilities, suggests Purdue's OxyContin-related liabilities vastly outstripped the value of the Debtors' assets at all times relevant to this Complaint.



**Est. Purdue Fair Value of Assets v. Est. Opioid Liabilities based on Hansen Study**
*($BB)*

323.    The extent of the harm caused by Purdue is so enormous that it is difficult to quantify in dollars, and the Official Committee does not concede that the Hansen study commissioned by Purdue reflects the full scope of Purdue's liability.  No matter how it is assessed, however, the economic cost of the harm caused by the Debtors is extraordinary.  For instance, in connection with the 2020 Purdue-DOJ Plea Agreement, Purdue admitted that its conduct (spanning the years from 2007 to 2017) exposed the company to at least $8 billion in claims to the DOJ alone.  Other creditor claims are likewise enormous.  States, municipalities, and tribes have asserted trillions of dollars in additional claims arising out of Purdue's role in the opioid crisis.  Since 2007, more than 300,000 people have died from an opioid overdose, and an estimated average of over 1.8 million people suffered from substance use disorders related to prescription opioids each year,

each of whom may have a viable claim against Purdue.  Indeed, claims filed in the Debtors' chapter 11 cases assert **trillions of dollars** in damages.[39]

324.    Studies, including studies commissioned by Purdue such as the Hansen Study, likewise measure damage from the opioid crisis in the many billions or trillions of dollars.  Both the CDC and a bipartisan congressional report released in February 2022 estimate that the economic burden from the opioid epidemic is over $1 trillion **annually**.

325.    Another study found that opioid painkiller abuse in the United States caused at least $55 billion in total societal costs in 2007 **alone**.  The study was circulated to many people at Purdue, including Defendants Stewart, Mahony, Weinstein, Abrams (Associate General Counsel), and Baker, as well as Craig Landau, Stephen Seid, Paul Coplan (Head of Epidemiology, Risk Management and Abuse Deterrence Research), Mark Geraci (Chief Security Officer), and others.  Given the number and titles of individuals who received the study at Purdue, it is likely that the study's findings (if not the study itself) were reported to the Board (or at least some of its members).  Beyond demonstrating an undeniable awareness that OxyContin was being diverted and abused, the study also indicates that the degree to which OxyContin was being abused was knowable and quantifiable since the drug's commercialization in 1996.

326.    By at least 2008, Purdue's liabilities vastly outstripped the fair value of its assets given the sheer magnitude of its unliquidated opioid-related liability.  The massive liabilities rendered Purdue deeply insolvent on a balance sheet basis during the relevant period.

---

[39] Excluding a single claim asserting $100 trillion in damages.  This totals the claims that asserted a precise claim amount, which comprises approximately 10% of the claims that were filed.  When calculating the vast size of Purdue's opioid-related liabilities over time, it is not limited to just known and pending litigation that was filed against the Debtors.  These liabilities also included unasserted but to-be-filed litigation claims that had accrued by 2007—held by creditors that had not yet commenced litigation against Purdue but nonetheless had a right to payment for Purdue's misconduct—and continued to accrue thereafter as a result of new and additional harms caused by Purdue's opioid products.

**B.    Purdue Also Was Insolvent Based on Its Inadequate Capitalization and Inability to Pay Debts as They Came Due**

1.    Adequate Capitalization Test

327.    Given the sheer magnitude of its accruing opioid-related liabilities, Purdue also did not have sufficient capitalization or liquidity to continue as a going-concern. By any metric (current ratio, quick ratio, current liabilities to net worth, current liabilities to inventory, total liabilities to net worth, and fixed assets to net worth), Purdue did not have sufficient capital to operate its business in the ordinary course given its accrued, accruing, and inevitable liabilities.

2.    Ability to Pay

328.    Finally, at all relevant times, Purdue was not able to pay its liabilities as they would come due in light of its accruing opioid liabilities. At its peak in 2009, Purdue's cash flow from operations was $1.73 billion. Even that amount was utterly insufficient to satisfy even the lowest realistic estimate of opioid-related liabilities facing Purdue, which, as noted above, were at least $26 billion by 2008 and greater thereafter.

329.    Purdue was well aware that it was incurring debts beyond its ability to pay as they became due. Indeed, Purdue even calculated how much of its OxyContin revenues were "attributable to OxyContin abuse[.]" **In 2006, for example, Purdue's then-Director of Risk Management & Health Policy estimated that as much as 18.1%—$1.8 *billion*—of OxyContin sales revenue between 1996 and 2005 were "attributable to OxyContin abuse" and as much as "25% of all OxyContin kilograms are abused[.]"** A similar analysis conducted by McKinsey in 2009 concluded that 38% of OxyContin users in 2007 were dependent on the drug, including 97% of patients that started using OxyContin in the past year.

330.    The Sackler Directors openly discussed their expectation that litigation liability would continue to hang over the company after the Pre-2008 DOJ/State Resolutions and

throughout the time that the Fraudulent Cash Transfers and Fraudulent Non-Cash Transfers were approved and executed.  Indeed, as discussed above, in early 2008, Mortimer Sackler Jr. exchanged emails with Richard Sackler expressly discussing the creation of a "suspense account" because of their expectation that a family member would be "sued as a consequence of his/her actions in the company or related to a company product."  Richard's email specifically contemplated the possibility that Purdue would be unable to satisfy its opioid-related liabilities.

331.   An April 2012 slide deck titled "OxyContin Market Events"—which Richard Sackler requested and approved—reflects that the first OxyContin product liability suit was filed against Purdue in April 2001, and Purdue entered into the first "mass settlement" of product liability claims in December 2006.  The slide deck noted that the second "wave" of civil litigation against Purdue began with a filing in August 2007—*after* the 2007 DOJ Criminal Plea and Settlement—and Purdue began settling those cases in May 2009.

332.   Again, in February 2014, Defendant Mahony, Purdue's Executive Vice President, Chief Financial Officer, and Treasurer of Purdue, testified affirmatively that an adverse judgment of only $1 billion "would have an immediate, crippling, and irreparable effect on Purdue" and would require immediate layoffs and the fire sale of important capital assets.

333.   In their depositions, both of Purdue's former CEOs Stewart and Timney invoked their Fifth Amendment right against self-incrimination and refused to answer any questions about whether the liability associated with Purdue's opioid products caused the company to be insolvent.

334.   The Board was well aware of the mounting liabilities and risk of personal and criminal liability, as it received regular compliance reports with information about government scrutiny of the pharmaceutical industry and actions against Purdue's industry peers.  For example, in a July 2010 presentation titled "Corporate Compliance Quarterly Report to Board of Directors

2Q10," Purdue's Chief Compliance Officer, Defendant Bert Weinstein, warned the Board that "Congress, regulators and prosecutors don't think [corporate integrity agreements] and settlement payments are deterring bad acts and are looking for solutions to repeat offenders. Over the past year, the drumbeat for prosecution of individuals has grown very loud."

335.    In January 2013, in a presentation titled "4Q 2012 Compliance Report to the Board of Directors," Bert Weinstein explained that government agencies "continue to focus" on the pharmaceutical industry, that the value of settlements entered into by pharmaceutical companies was on the rise, that several of the settlements entered into in 2012 had criminal components, mainly for off-label promotion, and that the government had begun focusing on individual actors, making "incarceration more likely." Similarly, in May 2014, a presentation titled "Quarterly Compliance Report to Board of Directors 1Q 2014" reported that "Government pharma fraud and abuse prosecutions continue apace, with aggressive plaintiffs' bar supplementing limited government resources." As the report highlighted, as of 2013, federal and state governments had already recovered $8 billion from pharmaceutical companies.

336.    The Sackler Directors were made aware of Purdue's mounting liabilities not just through compliance reports but through other sources as well. ████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████

337.    At the same time, the Sacklers were well aware of the growing number of individuals harmed by their products and the likely liability arising from that harm given the increasing reporting on the opioid crisis.[40] The economic significance and litigation overhang was

---

[40] By way of example, (i) on October 8, 2010, Kathe Sackler received a "Purdue News Summary" linking several articles concerning opioid investigations and arrests and an article titled Police: Painkiller Becoming Teen Drug of

not lost on the Sacklers, even if they were willing to overlook the human toll.  For example, in 2012, Jonathan Sackler circulated an article to the Board and certain senior executives about the rise of overdose deaths involving prescription medications.  He warned, "We should assume this will remain an important issue (and an opportunity for grandstanding) by politicians, regulators, the media and potentially trial lawyers."

## X.    The Debtors' Bankruptcy Filings

338.    By 2017, the crush of litigation that the Sackler Directors feared had reached a crescendo.  Over the ensuing months, the Debtors obtained bankruptcy counsel, and by early 2019, all the Sackler Directors had resigned from the Board (although certain Sacklers remained on the MNP/MNC Board and continued to direct the business of the IACs until 2020).

339.    On September 16, 2019, the Debtors filed for bankruptcy protection under chapter 11 of the Bankruptcy Code.

340.    On July 29, 2020, the Estate of Beverly Sackler, the Estate of Jonathan Sackler, the Estate of Raymond Sackler, Ilene Sackler, Kathe Sackler, David Sackler, Mortimer Sackler Jr., Richard Sackler, and Theresa Sackler each individually filed proofs of claim against each of the Debtors (the "Sackler Proofs of Claim").  Each Sackler Proof of Claim asserts its respective claimant's right to all payments and other amounts to which they allegedly are entitled under the Purported Indemnity Obligations.

---

Choice; (ii) on October 8, 2011, David Sackler received a Google Alert linking an article about a man who became addicted to OxyContin, turned to heroin, and ultimately died of a heroin overdose; (iii) on February 29, 2012, Theresa Sackler received a "Purdue News Summary" linking 29 articles concerning "Diversion and Abuse," including articles titled "Legal Prescriptions for Opioids Can Lead to Addiction" and "Woman Convicted of OxyCodone Trafficking"; (iv) on November 1, 2013, Richard Sackler received a Google Alert linking an article about a high school student who died of an OxyContin overdose; (v) on June 18, 2014, Jonathan Sackler received a "Purdue News Summary" linking 57 articles about "Diversion and Abuse," including an article titled "Prescription Pain Killer Deaths Outnumber Heroin, Cocaine Overdoses"; (vi) on April 18, 2015, Mortimer Sackler Jr. received a Google Alert linking an article titled "Why Supposedly Abuse-Proof Pills Won't Stop Opioid Overdose Deaths"; (vii) on July 10, 2016, Raul Damas emailed the Sacklers linking an L.A. Times article about a fraudulent pain clinic that Purdue itself had investigated and determined to be corrupt but chose not to terminate its supply to said pain clinic or contact government authorities.

## CAUSES OF ACTION

### Count 1

### Intentional Fraudulent Transfer, Avoidance, and Recovery of the Fraudulent Cash Transfers Against the Recipient Sackler Trusts, Recipient Sackler Beneficiaries, and Certain Other II-Way Entities

341.    Plaintiffs, by and through the Official Committee, repeat and reallege each and every allegation stated in the entirety of this Complaint as though fully set forth herein.

342.    Since at least 2007, the Debtors transferred billions in cash out of the Debtors (previously defined as the "Fraudulent Cash Transfers").  The Fraudulent Cash Transfers include transfers made to certain Other II-Way Entities, which then transferred billions in cash to Recipient Sackler Trusts and/or other Sackler entities, and transfers made on account of the tax obligations of certain Sackler entities.[41]  Details of the disclosed Fraudulent Cash Transfers are set forth on Exhibit E.  Certain additional details concerning the subsequent transfers related to Recipient Sackler Trusts, transfers related to Recipient Sackler Beneficiaries, and federal tax distributions made for the benefit of Side A are set forth on Exhibits B, C, and F, respectively.  To the extent any additional transfers were made but not disclosed during the relevant period, they also are fraudulent transfers and should be avoided as such.

343.    Every single one of the entities involved in the Fraudulent Cash Transfers is ultimately owned and controlled by, and/or created for the benefit of, various Sackler Directors and Recipient Sackler Beneficiaries.  While certain transfers (and subsequent transfers) to certain Recipient Sackler Trusts have not yet been disclosed, upon information and belief, the Sacklers' wealth ultimately originates from the Debtors and the network of IACs that received benefits from the Debtors.

---

[41] This Complaint asserts claims to avoid tax distributions solely against the entities for whose benefit the transfers were made as identified on Exhibits E and F.

344.    The Debtors effected the Fraudulent Cash Transfers in order to hinder, delay, and defraud creditors.  Each of the Fraudulent Cash Transfers was authorized by the Board controlled by the Sackler Directors.  The Sackler Directors actively sought to ensure the Debtors' assets would not be available to pay the accruing liability and extracted all of the Debtors' value for themselves.  To protect Purdue's ill-gotten proceeds from future litigation creditors, the Sackler Directors caused Purdue to make the Fraudulent Cash Transfers to impede future litigation creditors' ability to recover the transferred cash to satisfy judgments against the Debtors.  The natural consequence of authorizing the Fraudulent Cash Transfers was to hinder, delay, and defraud the Debtors' creditors.

345.    As a result of the Fraudulent Cash Transfers, the Debtors and the Debtors' creditors have been harmed.

346.    Sections 544(b), 550, and 1107(a) of the Bankruptcy Code provide for the avoidance, for the benefit of the estates, of any transfer of the Debtors' property or of the Debtors' interest in property that is avoidable under applicable non-bankruptcy law by any creditor holding an unsecured, allowable claim.  Here, numerous creditors of the Debtors held allowed or allowable claims under applicable law and, therefore, could avoid the Fraudulent Cash Transfers as actual fraudulent transfers under applicable non-bankruptcy law.  These creditors include the United States, 48 states (including the States of New Jersey, Connecticut, and Hawaii), municipalities, tribes, public schools, hospitals, third-party payors and health insurance carriers, trade creditors, and thousands of individual victims of Purdue's conduct, including, but not limited to, children who were born with NAS as a result of having been exposed to Purdue's opioids during pregnancy, and individuals injured by direct exposure to Purdue's opioids.  None of these claimants could have discovered either the Fraudulent Cash Transfers or their fraudulent nature.

347.    The Fraudulent Cash Transfers from the Debtors should be avoided as actual fraudulent transfers under sections 544(b) and 550 of the Bankruptcy Code and other applicable law, and the Other II-Way Entities, the Recipient Sackler Beneficiaries, and the Recipient Sackler Trusts, as appropriate, should be ordered to return the Fraudulent Cash Transfers, or, in the alternative, judgment should be entered against, as appropriate, the Other II-Way Entities, the Recipient Sackler Beneficiaries, and the Recipient Sackler Trusts for the value of the Fraudulent Cash Transfers.

348.    In addition, the Fraudulent Cash Transfers were effectuated through and to dozens of entities and trusts owned or controlled by the Sacklers, and therefore reflect accounts of a complicated character.  Thus, Plaintiffs, by and through the Official Committee, require a complete and comprehensive accounting of the Fraudulent Cash Transfers in order to ascertain the amounts and locations of profits fraudulently transferred out of the Debtors.

349.    Furthermore, the Other II-Way Entities, the Recipient Sackler Beneficiaries, and the Recipient Sackler Trusts were unjustly enriched in connection with the Fraudulent Cash Transfers.  Thus, Plaintiffs are entitled to a constructive trust over the Fraudulent Cash Transfers and their proceeds, including, without limitation, any and all appreciation of the Fraudulent Cash Transfers, any additional property acquired using the Fraudulent Cash Transfers, and any appreciation of the subsequently acquired property.

350.    For these reasons, Plaintiffs, by and through the Official Committee, are entitled to: (1) a judgment (a) avoiding each of the Fraudulent Cash Transfers from the Debtors, including but not limited to those transfers set forth on Exhibit E, and recovering the Fraudulent Cash Transfers, or, in the alternative, the value of same, as appropriate, from the Other II-Way Entities, the Recipient Sackler Beneficiaries, and the Recipient Sackler Trusts, (b) imposing a constructive

trust over the Fraudulent Cash Transfers and their proceeds, including, without limitation, any and all appreciation of and additional property acquired using same, and (c) providing for recovery to Plaintiffs of the avoided Fraudulent Cash Transfers; and (2) an order directing the Other II-Way Entities, the Recipient Sackler Beneficiaries, and the Recipient Sackler Trusts to provide a complete and comprehensive accounting of the Fraudulent Cash Transfers.

## Count 2

### Constructive Fraudulent Transfer, Avoidance, and Recovery of the Fraudulent Cash Transfers Against the Recipient Sackler Trusts, Recipient Sackler Beneficiaries, and Certain Other II-Way Entities

351.    Plaintiffs, by and through the Official Committee, repeat and reallege each and every allegation stated in the entirety of this Complaint as though fully set forth herein.

352.    Since at least 2007, the Debtors transferred billions in cash out of the Debtors.  The Fraudulent Cash Transfers include transfers made to certain Other II-Way Entities, which then transferred billions in cash to Recipient Sackler Trusts and/or other Sackler entities, and transfers made on account of the tax obligations of certain Sackler entities.[42]  Details of the disclosed Fraudulent Cash Transfers are included on Exhibit E.  Certain additional details concerning the subsequent transfers related to Recipient Sackler Trusts, transfers related to Recipient Sackler Beneficiaries, and federal tax distributions made for the benefit of Side A are set forth on Exhibits B, C, and F, respectively.  To the extent any additional transfers were made but not disclosed during the relevant period, they also are fraudulent transfers and should be avoided as such.

353.    Every single one of the entities involved in the Fraudulent Cash Transfers is ultimately owned and controlled by, and/or created for the benefit of, various Sackler Directors and Recipient Sackler Beneficiaries.  While certain transfers (and subsequent transfers) to certain

---

[42] This Complaint asserts claims to avoid tax distributions solely against the entities for whose benefit the transfers were made as identified on Exhibits E and F.

Recipient Sackler Trusts have not yet been disclosed, upon information and belief, the Sacklers' wealth ultimately originates from the Debtors and the network of IACs that received benefits from the Debtors.

354.    The Fraudulent Cash Transfers were authorized by the Board controlled by the Sackler Directors.

355.    The Debtors received no consideration in exchange for the Fraudulent Cash Transfers.

356.    Certain of the Fraudulent Cash Transfers constituted distributions from the Debtors of purported profit for which the Debtors received nothing in return.  Certain of the Fraudulent Cash Transfers were transferred to Other II-Way Entities and then to other Sackler entities, for which the Debtors received nothing in return.

357.    Certain of the Fraudulent Cash Transfers were transferred to taxing authorities or to Other II-Way Entities or to certain Sackler Trusts, which then transferred those amounts to taxing authorities.  In every circumstance, these transfers were made to or for the benefit of the Sacklers and their tax-paying trusts in order to cover their personal or their trusts' tax liabilities. The details of the Sacklers and Sackler Trusts for whose benefit these transfers were made are included at Exhibits B, C, E, and F.

358.    Throughout the period in which the Fraudulent Cash Transfers were made, the Debtors were subject to many billions or trillions of dollars in liability, arising out of Purdue's unlawful operations of its opioid business and contributions to the opioid epidemic.  This liability dwarfed the Debtors' assets.  Accordingly, when the Fraudulent Cash Transfers were made, the Debtors (i) were insolvent, (ii) had unreasonably small capital, and (iii) intended to incur or believed they would incur debts or liabilities beyond their ability to repay as they came due.

359.    As a result of the Fraudulent Cash Transfers, the Debtors and the Debtors' creditors have been harmed.

360.    Sections 544(b), 550, and 1107(a) of the Bankruptcy Code provide for the avoidance, for the benefit of the estates, of any transfer of the Debtors' property or of the Debtors' interest in property that is avoidable under applicable non-bankruptcy law by any creditor holding an unsecured, allowable claim.  Here, numerous creditors of the Debtors held allowed or allowable claims under applicable law and, therefore, could avoid the Fraudulent Cash Transfers as constructive fraudulent transfers under applicable non-bankruptcy law.  These creditors include the United States, 48 states (including the States of New Jersey, Connecticut, and Hawaii), municipalities, tribes, public schools, hospitals, third-party payors and health insurance carriers, trade creditors, and thousands of individual victims of Purdue's conduct, including, but not limited to, children who were born with NAS as a result of having been exposed to Purdue's opioids during pregnancy, and individuals injured by direct exposure to Purdue's opioids.  None of these claimants could have discovered either the Fraudulent Cash Transfers or their fraudulent nature.

361.    The Fraudulent Cash Transfers from the Debtors should be avoided as constructive fraudulent transfers under sections 544(b) and 550 of the Bankruptcy Code and other applicable law, and the Other II-Way Entities, the Recipient Sackler Beneficiaries, and the Recipient Sackler Trusts, as appropriate, should be ordered to return the Fraudulent Cash Transfers, or, in the alternative, judgment should be entered against, as appropriate, the Other II-Way Entities, the Recipient Sackler Beneficiaries, and the Recipient Sackler Trusts for the value of the Fraudulent Cash Transfers.

362.    In addition, the Fraudulent Cash Transfers were effectuated through and to dozens of entities and trusts owned or controlled by the Sacklers, and therefore reflect accounts of a

complicated character.  Thus, Plaintiffs, by and through the Official Committee, require a complete and comprehensive accounting of the Fraudulent Cash Transfers in order to ascertain the amounts and locations of profits fraudulently transferred out of the Debtors.

363.    Furthermore, the Other II-Way Entities, the Recipient Sackler Beneficiaries, and the Recipient Sackler Trusts were unjustly enriched in connection with the Fraudulent Cash Transfers.  Thus, Plaintiffs are entitled to a constructive trust over the Fraudulent Cash Transfers and their proceeds, including, without limitation, any and all appreciation of the Fraudulent Cash Transfers, any additional property acquired using the Fraudulent Cash Transfers, and any appreciation of the subsequently acquired property.

364.    For these reasons, Plaintiffs, by and through the Official Committee, are entitled to: (1) a judgment (a) avoiding each of the Fraudulent Cash Transfers from the Debtors, including but not limited to the Fraudulent Cash Transfers set forth on Exhibit E, and recovering the Fraudulent Cash Transfers, or, in the alternative, the value of same, as appropriate, from the Other II-Way Entities, the Recipient Sackler Beneficiaries, and the Recipient Sackler Trusts, (b) imposing a constructive trust over the Fraudulent Cash Transfers and their proceeds, including, without limitation, any and all appreciation of and additional property acquired using same, and (c) providing for recovery to Plaintiffs of the avoided Fraudulent Cash Transfers; and (2) an order directing the Other II-Way Entities, the Recipient Sackler Beneficiaries, and the Recipient Sackler Trusts to provide a complete and comprehensive accounting of the Fraudulent Cash Transfers.

**Count 3**

**Intentional Fraudulent Transfer, Avoidance, and Recovery of the Fraudulent Non-Cash Transfers and Obligations Against the Recipient Sackler Beneficiaries, the Recipient Sackler Trusts, the Individual Sacklers and Sackler Trusts Identified on Exhibit I, and Certain Other II-Way Entities**

365.    Plaintiffs, by and through the Official Committee, repeat and reallege each and every allegation stated in the entirety of this Complaint as though fully set forth herein.

366.    Since at least 2007, the Debtors have transferred away Debtor property comprising billions in non-cash assets (valued at the time of the transfer), including those non-cash assets transferred since 2008 worth at least $1.5 billion at the time of the transfers (previously defined as the "Fraudulent Non-Cash Transfers").  Certain details of the Fraudulent Non-Cash Transfers made since 2008 that have been disclosed by the Debtors and other parties are included on Exhibit H.  To the extent any additional transfers were made but not disclosed during the relevant period, they also are fraudulent transfers and should be avoided as such.

367.    As set forth on Exhibit H, the Debtors made transfers to or for the benefit of the Recipient Sackler Beneficiaries, the Recipient Sackler Trusts, the individual Sacklers and Sackler Trusts identified on Exhibit I, and certain Other II-Way Entities.  Both the Sackler Directors and the Recipient Sackler Beneficiaries were owners of the entities involved in the transfers, and beneficiaries of the recipient trusts.

368.    Specifically, the Fraudulent Non-Cash Transfers detailed on Exhibit H comprise (i) approximately $21 million to $45 million in stock of Infinity Pharmaceuticals, Inc. from the Debtors in November 2008; (ii) 50% of the equity in Millsaw from the Debtors, valued at approximately $30 million, in January 2009; (iii) approximately $12 million to $30 million in stock of Infinity Pharmaceuticals, Inc. from the Debtors in February 2009; (iv) approximately $23.1 million in stock of Novelos Therapeutics, Inc. from the Debtors in March 2009 and August 2009;

(v) approximately $13 million in stock of Kolltan Pharmaceuticals from the Debtors in September 2009; (vi) approximately $32.8 million in equity of New Suffolk Holdings LLP from the Debtors in April 2010; (vii) 90% of the equity in RSJ Company LP from the Debtors in April 2010; (viii) approximately $200 million in equity of Lucien Holdings S.àr.l. from the Debtors in April 2010 as well as PPLP's interest in debt obligations owed to PPLP by Lucien and Lucien's Luxembourg subsidiaries in the principal amount of approximately $245 million; (ix) approximately $230 million in stock of Infinity Pharmaceuticals, Inc. from the Debtors in April 2013; (x) approximately $2.1 million in stock of Kolltan Pharmaceuticals from the Debtors in March 2014; (xi) approximately $250 million to $535 million in non-ADF OxyContin IP rights from the Debtors in 2017; (xii) loans of approximately $312.6 million from the Debtors to PRA LP that were issued at a below-market blended IRS interest rate of approximately 1–2% annually that allowed PRA LP to underpay the Debtors by approximately $24 million in interest payments; and (xi) intellectual property rights from the Debtors for the benefit of certain individual Sacklers and Sackler Trusts identified on Exhibit I that own certain IACs (as previously defined, the "Fraudulent IP Transfers") in exchange for dramatically below-market royalty rates that allowed exploitation of the Debtors' IP from 2008 to the Petition Date.

369.    The Debtors effected the Fraudulent Non-Cash Transfers in order to hinder, delay, and defraud creditors.  Each of the Fraudulent Non-Cash Transfers was authorized by the Board controlled by the Sackler Directors.  The Sackler Directors actively sought to ensure the Debtors' assets would not be available to pay the accruing liability and extracted all of the Debtors' value for themselves.  To protect Purdue's ill-gotten proceeds from future litigation creditors, the Sackler Directors caused Purdue to make the Fraudulent Non-Cash Transfers to impede future litigation creditors' ability to recover the transferred non-cash assets to satisfy judgments against Purdue.

The natural consequence of authorizing the Fraudulent Non-Cash Transfers was to hinder, delay, and defraud the Debtors' creditors.

370.    As a result of the Fraudulent Non-Cash Transfers, the Debtors and the Debtors' creditors have been harmed.

371.    Sections 544(b), 550, and 1107(a) of the Bankruptcy Code, provide for the avoidance, for the benefit of the estates, of any transfer of the Debtors' property or of the Debtors' interest in property that is avoidable under applicable non-bankruptcy law by any creditor holding an unsecured, allowable claim.  Here, numerous creditors of the Debtors held allowed or allowable claims under applicable law and, therefore, could avoid the Fraudulent Non-Cash Transfers as actual fraudulent transfers under applicable non-bankruptcy law.  These creditors include the United States, 48 states (including the States of New Jersey, Connecticut, and Hawaii), municipalities, tribes, public schools, hospitals, third-party payors and health insurance carriers, trade creditors, and thousands of individual victims of Purdue's conduct, including, but not limited to, children who were born with NAS as a result of having been exposed to Purdue's opioids during pregnancy, and individuals injured by direct exposure to Purdue's opioids.  None of these claimants could have discovered either the Fraudulent Non-Cash Transfers or their fraudulent nature.

372.    The Fraudulent Non-Cash Transfers from the Debtors should be avoided as actual fraudulent transfers under sections 544(b) and 550 of the Bankruptcy Code and other applicable law, and the Recipient Sackler Beneficiaries, the Recipient Sackler Trusts, the individual Sacklers and Sackler Trusts identified on Exhibit I, and certain Other II-Way Entities, as appropriate, should be ordered to return the Fraudulent Non-Cash Transfers, or, in the alternative, judgment should be entered against, as appropriate, the Recipient Sackler Beneficiaries, the Recipient Sackler Trusts,

the individual Sacklers and Sackler Trusts identified on Exhibit I, and certain Other II-Way Entities

for the value of the Fraudulent Non-Cash Transfers.

373.    In addition, the Fraudulent Non-Cash Transfers were effectuated through and to dozens of entities and trusts owned or controlled by the Sacklers, and therefore reflect accounts of a complicated character.  Thus, Plaintiffs, by and through the Official Committee, require a complete and comprehensive accounting of the Fraudulent Non-Cash Transfers in order to ascertain the amounts and locations of profits fraudulently transferred out of the Debtors.

374.    Furthermore, the Recipient Sackler Beneficiaries, the Recipient Sackler Trusts, the individual Sacklers and Sackler Trusts identified on Exhibit I, and certain Other II-Way Entities were unjustly enriched in connection with the Fraudulent Non-Cash Transfers.  Thus, Plaintiffs are entitled to a constructive trust over the Fraudulent Non-Cash Transfers and their proceeds, including, without limitation, any and all appreciation of the Fraudulent Non-Cash Transfers, any additional property acquired using the Fraudulent Non-Cash Transfers, and any appreciation of the subsequently acquired property.

375.    For these reasons, Plaintiffs, by and through the Official Committee, are entitled to: (1) a judgment (a) avoiding each of the Fraudulent Non-Cash Transfers from the Debtors and recovering the Fraudulent Non-Cash Transfers, or, in the alternative, the value of same, as appropriate, from the Recipient Sackler Beneficiaries, the Recipient Sackler Trusts, the individual Sacklers and Sackler Trusts identified on Exhibit I, and certain Other II-Way Entities, (b) imposing a constructive trust over the Fraudulent Non-Cash Transfers and their proceeds, including, without limitation, any all appreciation of and additional property acquired using same, (c) providing for recovery to Plaintiffs of the avoided Fraudulent Non-Cash Transfers; and (2) an order directing the Recipient Sackler Beneficiaries, the Recipient Sackler Trusts, the individual Sacklers and

Sackler Trusts identified on Exhibit I, and certain Other II-Way Entities to provide a complete and comprehensive accounting of the Fraudulent Non-Cash Transfers.

## Count 4

### Constructive Fraudulent Transfer, Avoidance, and Recovery of the Fraudulent Non-Cash Transfers and Obligations Against the Recipient Sackler Beneficiaries, the Recipient Sackler Trusts, the Individual Sacklers and Sackler Trusts Identified on Exhibit I, and Certain Other II-Way Entities

376.   Plaintiffs, by and through the Official Committee, repeat and reallege each and every allegation stated in the entirety of this Complaint as though fully set forth herein.

377.   Since at least 2007, the Debtors have transferred away Debtor property comprising billions in non-cash assets (valued at the time of the transfer), including the more than $1.5 billion in Fraudulent Non-Cash Transfers.

378.   As set forth on Exhibit H, the Debtors made transfers to or for the benefit of the Recipient Sackler Beneficiaries, the Recipient Sackler Trusts, the individual Sacklers and Sackler Trusts identified on Exhibit I, and certain Other II-Way Entities.  Both the Sackler Directors and the Recipient Sackler Beneficiaries were owners of the entities involved in the transfers, and beneficiaries of the recipient trusts.

379.   The Debtors did not receive any consideration, or received inadequate consideration, in return for the Fraudulent Non-Cash Transfers.

380.   Throughout the period in which the Fraudulent Non-Cash Transfers were made, the Debtors were subject to hundreds of billions (if not trillions) of dollars in liability, arising out of Purdue's unlawful operations of its opioid business and contributions to the opioid epidemic.  This liability dwarfed the Debtors' assets.  Accordingly, when the Fraudulent Non-Cash Transfers were made, the Debtors (i) were insolvent, (ii) had unreasonably small capital, and (iii) intended to incur or believed they would incur debts or liabilities beyond their ability to repay as they came due.

381.    As a result of the Fraudulent Non-Cash Transfers, the Debtors and the Debtors'
creditors have been harmed.

382.    Sections 544(b), 550, and 1107(a) of the Bankruptcy Code provide for the
avoidance, for the benefit of the estates, of any transfer of the Debtors' property or of the Debtors'
interest in property that is avoidable under applicable non-bankruptcy law by any creditor holding
an unsecured, allowable claim.  Here, numerous creditors of the Debtors held allowed or allowable
claims under applicable law and, therefore, could avoid the Fraudulent Non-Cash Transfers as
constructive fraudulent transfers under applicable non-bankruptcy law.  These creditors include
the United States, 48 states (including the States of New Jersey, Connecticut, and Hawaii),
municipalities, tribes, public schools, hospitals, third-party payors and health insurance carriers,
trade creditors, and thousands of individual victims of Purdue's conduct, including, but not limited
to, children who were born with NAS as a result of having been exposed to Purdue's opioids during
pregnancy, and individuals injured by direct exposure to Purdue's opioids.  None of these
claimants could have discovered either the Fraudulent Non-Cash Transfers or their fraudulent
nature.

383.    The Fraudulent Non-Cash Transfers from the Debtors should be avoided as
constructive fraudulent transfers under sections 544(b) and 550 of the Bankruptcy Code and other
applicable law, and Recipient Sackler Beneficiaries, the Recipient Sackler Trusts, the individual
Sacklers and Sackler Trusts identified on Exhibit I, and certain Other II-Way Entities, as
appropriate, should be ordered to return the Fraudulent Non-Cash Transfers, or, in the alternative,
judgment should be entered against, as appropriate, Recipient Sackler Beneficiaries, the Recipient
Sackler Trusts, the individual Sacklers and Sackler Trusts identified on Exhibit I, and certain Other
II-Way Entities, for the value of the Fraudulent Non-Cash Transfers.

384.    In addition, the Fraudulent Non-Cash Transfers were effectuated through and to dozens of entities and trusts owned or controlled by the Sacklers, and therefore reflect accounts of a complicated character.  Thus, Plaintiffs, by and through the Official Committee, require a complete and comprehensive accounting of the Fraudulent Non-Cash Transfers in order to ascertain the amounts and locations of profits fraudulently transferred out of the Debtors.

385.    Furthermore, the Recipient Sackler Beneficiaries, the Recipient Sackler Trusts, the individual Sacklers and Sackler Trusts identified on Exhibit I, and certain Other II-Way Entities were unjustly enriched in connection with the Fraudulent Non-Cash Transfers.  Thus, Plaintiffs are entitled to a constructive trust over the Fraudulent Non-Cash Transfers and their proceeds, including, without limitation, any and all appreciation of the Fraudulent Non-Cash Transfers, any additional property acquired using the Fraudulent Non-Cash Transfers, and any appreciation of the subsequently acquired property.

386.    For these reasons, Plaintiffs, by and through the Official Committee, are entitled to: (1) a judgment (a) avoiding each of the Fraudulent Non-Cash Transfers from the Debtors and recovering the Fraudulent Non-Cash Transfers, or, in the alternative, the value of same, as appropriate, from the Recipient Sackler Beneficiaries, the Recipient Sackler Trusts, the individual Sacklers and Sackler Trusts identified on Exhibit I, and certain Other II-Way Entities, (b) imposing a constructive trust over the Fraudulent Non-Cash Transfers and their proceeds, including, without limitation, any all appreciation of and additional property acquired using same, (c) providing for recovery to Plaintiffs of the avoided Fraudulent Non-Cash Transfers; and (2) an order directing the Recipient Sackler Beneficiaries, the Recipient Sackler Trusts, the individual Sacklers and Sackler Trusts identified on Exhibit I, and certain Other II-Way Entities to provide a complete and comprehensive accounting of the Fraudulent Non-Cash Transfers.

## Count 5

### Intentional Fraudulent Transfer of the Purported Indemnity Obligations Against the Sackler Directors, the Non-Sackler Directors, the Non-Sackler Officers, and the Recipient Sackler Trusts

387.    Plaintiffs, by and through the Official Committee, repeat and reallege each and every allegation stated in the entirety of this Complaint as though fully set forth herein.

388.    Through the Purported Indemnity Obligations, Purdue incurred obligations to or for the benefit of the Sackler Directors, the Non-Sackler Directors, the Non-Sackler Officers, and the Recipient Sackler Trusts.

389.    Purdue incurred the Purported Indemnity Obligations with actual intent to hinder, delay, or defraud creditors.  At each time the Purported Indemnity Obligations were approved or ratified, Purdue faced significant liability for unlawfully operating its opioid business and contributing to the opioid epidemic.  The Sackler Directors caused Purdue to incur the Purported Indemnity Obligations to reduce or eliminate the cost of personal liability they knew they and others would face as a consequence of their conduct as directors and officers of Purdue.  The natural consequence of authorizing the incurrence of the Purported Indemnity Obligations was to hinder, delay, and defraud the Debtors' creditors.

390.    As a result of the Purported Indemnity Obligations, the Debtors and the Debtors' creditors have been harmed.

391.    Under section 548(a)(1)(B) of the Bankruptcy Code, any transfer of an interest in property and any obligation incurred by Purdue with the actual intent to hinder, delay, or defraud creditors may be avoided for the benefit of the estates.

392.    Sections 544(b), 550, and 1107(a) of the Bankruptcy Code provide for the avoidance, for the benefit of the estates, of any transfer of the Debtors' property or of the Debtors' interest in property that is avoidable under applicable non-bankruptcy law by any creditor holding

an unsecured, allowable claim.  Here, numerous creditors of the Debtors held allowed or allowable claims under applicable law and, therefore, could avoid the Purported Indemnity Obligations as actual fraudulent transfers under applicable non-bankruptcy law.  These creditors include the United States, 48 states (including the States of New Jersey, Connecticut, and Hawaii), municipalities, tribes, and thousands of individual victims of Purdue's conduct, including, but not limited to, children who were born with NAS as a result of having been exposed to Purdue's opioids during pregnancy, and individuals injured by direct exposure to Purdue's opioids.  None of these claimants could have discovered either the Purported Indemnity Obligations or their fraudulent nature.

393.    The Purported Indemnity Obligations should be avoided as actual fraudulent transfers under sections 544(b), 548, and 550 of the Bankruptcy Code and other applicable law.

394.    For these reasons, Plaintiffs, by and through the Official Committee, are entitled to a judgment that the Purported Indemnity Obligations are avoidable as actual fraudulent transfers and, for this reason, void and unenforceable.

## Count 6

### Constructive Fraudulent Transfer of the Purported Indemnity Obligations Against the Sackler Directors, the Non-Sackler Directors, the Non-Sackler Officers, and the Recipient Sackler Trusts

395.    Plaintiffs, by and through the Official Committee, repeat and reallege each and every allegation stated in the entirety of this Complaint as though fully set forth herein.

396.    Through the Purported Indemnity Obligations, Purdue incurred obligations to or for the benefit of the Sackler Directors, the Non-Sackler Directors, the Non-Sackler Officers, and the Recipient Sackler Trusts.

397.    Throughout the period in which the Purported Indemnity Obligations were incurred, the Debtors were subject to hundreds of billions (if not trillions) of dollars in liability,

arising out of Purdue's unlawful operations of its opioid business and contributions to the opioid epidemic. This liability dwarfed the Debtors' assets. Accordingly, the Purported Indemnity Obligations were incurred when the Debtors (i) were insolvent, (ii) had unreasonably small capital, or (iii) intended to incur or believed they would incur debts or liabilities beyond their ability to repay as they came due.

398.    Under section 548(a)(1)(B) of the Bankruptcy Code, the Debtors may avoid any transfer of an interest in property and any obligation incurred by the Debtors for which they (1) received less than a reasonably equivalent value in exchange for such transfer or obligation and (2) were insolvent on the date of the transfer or obligation or became insolvent as a result of the transfer or obligation, were left with unreasonably small capital or intended to incur, or believed they would incur debts or liabilities beyond their ability to repay as such debts or liabilities came due.

399.    Sections 544(b), 550, and 1107(a) of the Bankruptcy Code provide for the avoidance, for the benefit of the estates, of any transfer of the Debtors' property or of the Debtors' interest in property that is avoidable under applicable non-bankruptcy law by any creditor holding an unsecured, allowable claim. Here, numerous creditors of the Debtors held allowed or allowable claims under applicable law and, therefore, could avoid the Purported Indemnity Obligations as constructive fraudulent transfers under applicable non-bankruptcy law. These creditors include the United States, 48 states (including the States of New Jersey, Connecticut, and Hawaii), municipalities, tribes, and thousands of individual victims of Purdue's conduct, including, but not limited to, children who were born with NAS as a result of having been exposed to Purdue's opioids during pregnancy, and individuals injured by direct exposure to Purdue's opioids. None

of these claimants could have discovered either the Purported Indemnity Obligations or their fraudulent nature.

400.    The Purported Indemnity Obligations should be avoided as constructive fraudulent transfers under sections 544(b), 548, and 550 of the Bankruptcy Code and other applicable law.

401.    For these reasons, Plaintiffs, by and through the Official Committee, are entitled to a judgment that the Purported Indemnity Obligations are avoidable as constructive fraudulent transfers and, for this reason, void and unenforceable.

## Count 7

## Intentional Fraudulent Transfer of the Purported Fiduciary Duty Waiver Against PPI

402.    Plaintiffs, by and through the Official Committee, repeat and reallege each and every allegation stated in the entirety of this Complaint as through fully set forth herein.

403.    Through the Purported Fiduciary Duty Waiver, PPLP purported to eliminate certain fiduciary duties owed by PPI to PPLP.

404.    PPLP executed the 2018 LPA (including the Purported Fiduciary Duty Waiver) with actual intent to hinder or delay creditors.  At the time PPLP executed the 2018 LPA (including the Purported Fiduciary Duty Waiver), Purdue faced significant liability for unlawfully operating its opioid business and contributing to the opioid epidemic.  PPLP executed the 2018 LPA (including the Purported Fiduciary Duty Waiver) in an attempt to eliminate the liability PPI and its fiduciaries (including the Sackler Directors, the Non-Sackler Directors, and the Non-Sackler Officers) would face as a consequence of their conduct as the general partner, and as fiduciaries of the general partner, of PPLP.  The natural consequence of the Purported Fiduciary Duty Waiver is to hinder, delay, and defraud the Debtors' creditors.

405.    As a result of the Purported Fiduciary Duty Waiver, the Debtors and the Debtors' creditors have been harmed.

406.    Under section 548(a)(1)(B) of the Bankruptcy Code, any transfer of an interest in property and any obligation incurred by Purdue with the actual intent to hinder, delay, or defraud creditors may be avoided for the benefit of the estates.

407.    Sections 544(b), 550, and 1107(a) of the Bankruptcy Code provide for the avoidance, for the benefit of the estates, of any transfer of the Debtors' property or of the Debtors' interest in property that is avoidable under applicable non-bankruptcy law by any creditor holding an unsecured, allowable claim.  Here, numerous creditors of the Debtors held allowed or allowable claims under applicable law and, therefore, could avoid the Purported Fiduciary Duty Waiver as actual fraudulent transfers under applicable non-bankruptcy law.  These creditors include the United States, 48 states (including the States of New Jersey, Connecticut, and Hawaii), municipalities, tribes, and thousands of individual victims of Purdue's conduct, including, but not limited to, children who were born with NAS as a result of having been exposed to Purdue's opioids during pregnancy, and individuals injured by direct exposure to Purdue's opioids.  None of these claimants could have discovered either the Purported Fiduciary Duty Waiver or its fraudulent nature.

408.    The Purported Fiduciary Duty Waiver should be avoided as an actual fraudulent transfer under sections 544(b), 548, and 550 of the Bankruptcy Code and other applicable law.

409.    For these reasons, Plaintiffs, by and through the Official Committee, are entitled to a judgment that the Purported Fiduciary Duty Waiver is avoidable as an actual fraudulent transfer and, for this reason, void and unenforceable.

## Count 8

## Constructive Fraudulent Transfer of the Purported Fiduciary Duty Waiver Against PPI

410.    Plaintiffs, by and through the Official Committee, repeat and reallege each and every allegation stated in the entirety of this Complaint as though fully set forth herein.

411.   Through the Purported Fiduciary Duty Waiver, PPLP purported to eliminate certain fiduciary duties owed by PPI (including the Sackler Directors, the Non-Sackler Directors, and the Non-Sackler Officers as officers of PPI) to PPLP.

412.   At the time PPLP executed the 2018 LPA (including the Purported Fiduciary Duty Waiver), the Debtors were subject to hundreds of billions (if not trillions) of dollars in liability, arising out of Purdue's unlawful operations of its opioid business and contributions to the opioid epidemic.  This liability dwarfed the Debtors' assets.  Accordingly, the Purported Fiduciary Duty Waiver was incurred when the Debtors (i) were insolvent, (ii) had unreasonably small capital, or (iii) intended to incur or believed they would incur debts or liabilities beyond their ability to repay as they came due.

413.   Under section 548(a)(1)(B) of the Bankruptcy Code, the Debtors may avoid any transfer of an interest in property and any obligation incurred by the Debtors for which they (i) received less than a reasonably equivalent value in exchange for such transfer or obligation and (ii) were insolvent on the date of the transfer or obligation or became insolvent as a result of the transfer or obligation, were left with unreasonably small capital or intended to incur, or believed they would incur debts or liabilities beyond their ability to repay as such debts or liabilities came due.

414.   Sections 544(b), 550, and 1107(a) of the Bankruptcy Code provide for the avoidance, for the benefit of the estates, of any transfer of the Debtors' property or of the Debtors' interest in property that is avoidable under applicable non-bankruptcy law by any creditor holding an unsecured, allowable claim.  Here, numerous creditors of the Debtors held allowed or allowable claims under applicable law and, therefore, could avoid the Purported Indemnity Obligations as constructive fraudulent transfers under applicable non-bankruptcy law.  These creditors include

the United States, 48 states (including the States of New Jersey, Connecticut, and Hawaii), municipalities, tribes, and thousands of individual victims of Purdue's conduct, including, but not limited to, children who were born with NAS as a result of having been exposed to Purdue's opioids during pregnancy, and individuals injured by direct exposure to Purdue's opioids.  None of these claimants could have discovered either the Purported Fiduciary Duty Waiver or its fraudulent nature.

415.   The Purported Fiduciary Duty Waiver should be avoided as a constructive fraudulent transfer under sections 544(b), 548, and 550 of the Bankruptcy Code and other applicable law.

416.   For these reasons, Plaintiffs, by and through the Official Committee, are entitled to a judgment that the Purported Fiduciary Duty Waiver is avoidable as a constructive fraudulent transfer and, for this reason, void and unenforceable.

## Count 9

## Breach of Fiduciary Duty Against PPLP's Fiduciaries (the Sackler Directors, Non-Sackler Directors, and Non-Sackler Officers)

417.   Plaintiff, PPLP, by and through the Official Committee, repeats and realleges each and every allegation stated in the entirety of this Complaint as though fully set forth herein.

418.   As officers of PPLP, the Sackler Directors, Non-Sackler Directors, and Non-Sackler Officers owed fiduciary duties of loyalty, care, and good faith to PPLP.

419.   In addition, PPI, as general partner of PPLP, owed fiduciary duties of loyalty, care and good faith to PPLP.[43]   As directors of PPI, the Sackler Directors and Non-Sackler Directors

---

[43] PPLP's Amended and Restated Limited Partnership Agreement dated January 2, 1997 was in effect from the date of its execution until March 7, 2018, when PPLP executed the 2018 LPA and purported to eliminate the general partner's fiduciary duties.  Notwithstanding this Purported Fiduciary Duty Waiver, which Plaintiffs seek to avoid as an intentional fraudulent transfer at Count 7, much of the conduct underlying the breaches of fiduciary duty alleged herein took place prior to the execution of the 2018 LPA.

owed the fiduciary duty of loyalty to PPLP to the same extent as their fiduciary duty of loyalty

owed to PPI.

420.    Among other things, the Sackler Directors, the Non-Sackler Directors, and the Non-

Sackler Officers breached their duties to PPLP by:

- Causing (or failing to prevent) Purdue's unlawful sales and marketing practices, which involved mismarketing OxyContin and other opioid products, exaggerating their benefits, and downplaying their risks, thus causing widespread addiction, harm, and death and exposing PPLP to billions of dollars of liability as a result;

- Failing to ensure that PPLP satisfied its duties under federal law to maintain effective controls against the diversion of controlled substances into illegal markets, including by failing to implement an effective SOM system;

- Failing to conduct adequate inspections of the limited controls that were in place to monitor and ensure Purdue's compliance with applicable law;

- Prioritizing profitability over compliance with applicable law;

- Causing (or failing to prevent) PPLP's distribution of billions of dollars of value in the form of self-dealing cash and non-cash transfers from PPLP and (i) into trusts that were established for the benefit of the Sacklers and (ii) into other entities owned and controlled by the Sacklers despite knowing that significant legal liability was accruing against the Debtors; and

- Causing the Debtors to take actions to protect the Sacklers to the detriment of the estates, including by taking actions to harm the estate causes of action and failing to maximize benefits to the estate.

421.    PPLP has been damaged substantially as a direct and proximate result of the

breaches of fiduciary duty by the Non-Sackler Officers of PPLP and the Sackler Directors and

Non-Sackler Directors of PPI.

422.    For these reasons, Plaintiff, PPLP, by and through the Official Committee,

respectfully requests that the Court enter an order (1)(a) for restitution or disgorgement, directing

the Non-Sackler Officers, Sackler Directors, and Non-Sackler Directors to restore to the Debtors

assets they unjustly received at the Debtors' expense as a result of their self-dealing breaches of

fiduciary duty to PPLP, including but not limited to the Fraudulent Cash Transfers and the Fraudulent Non-Cash Transfers that were fraudulently transferred out of PPLP to and/or for the benefit of the Sacklers and their trusts and affiliates, or, in the alternative, judgment against each of the Non-Sackler Officers, Sackler Directors, and Non-Sackler Directors in an amount to be determined at trial, including but not limited to the amount of harm incurred by PPLP as a result of the Fraudulent Cash Transfers and the Fraudulent Non-Cash Transfers that were fraudulently transferred out of PPLP to and/or for the benefit of the Sacklers and their trusts and affiliates, and (b) imposing a constructive trust over the Fraudulent Cash Transfers and the Fraudulent Non-Cash Transfers and their proceeds, including, without limitation, any and all appreciation of and additional property acquired using same; and (2) directing the Sackler Directors, Non-Sackler Directors, and Non-Sackler Officers to provide a complete and comprehensive accounting of the cash and non-cash assets they unjustly received at the Debtors' expense as a result of their breaches of fiduciary duty to PPLP.

## Count 10

### Breach of Fiduciary Duty Against PPI's Fiduciaries (the Sackler Directors, Non-Sackler Directors, and Non-Sackler Officers)

423.    Plaintiff, PPI, by and through the Official Committee, repeats and realleges each and every allegation stated in the entirety of this Complaint as though fully set forth herein.

424.    As officers and directors of PPI, the Sackler Directors, Non-Sackler Directors, and Non-Sackler Officers owed fiduciary duties of care, loyalty, and good faith to PPI.

425.    Among other things, the Sackler Directors, Non-Sackler Directors, and Non-Sackler Officers breached their duties to PPI by:

- Causing (or failing to prevent) Purdue's unlawful sales and marketing practices, which involved mismarketing OxyContin and other opioid products, exaggerating their benefits, and downplaying their risks, thus causing

widespread addiction, harm, and death and exposing PPI to billions of dollars of liability as a result;

- Failing to ensure that PPI satisfied its duties under federal law to maintain effective controls against the diversion of controlled substances into illegal markets, including by failing to implement an effective SOM system;

- Failing to conduct adequate inspections of the limited controls that were in place to monitor and ensure Purdue's compliance with applicable law;

- Prioritizing profitability over compliance with applicable law;

- Causing (or failing to prevent) PPLP's distribution of billions of dollars of value in the form of self-dealing cash and non-cash transfers from PPLP and (i) into trusts that were established for the benefit of the Sacklers and (ii) into other entities owned and controlled by the Sacklers despite knowing that significant legal liability was accruing against Purdue; and

- Causing the Debtors to take actions to protect the Sacklers to the detriment of the estates, including by taking actions to harm the estate causes of action and failing to maximize benefits to the estate.

426.    PPI has been damaged substantially as a direct and proximate result of the breaches of fiduciary duty by the Sackler Directors, Non-Sackler Directors, and Non-Sackler Officers.

427.    For these reasons, Plaintiff, PPI, by and through the Official Committee, respectfully requests that the Court enter an order (1)(a) for restitution or disgorgement, directing the Sackler Directors, Non-Sackler Directors, and Non-Sackler Officers to restore to the Debtors assets they unjustly received at the Debtors' expense as a result of their breaches of fiduciary duty to PPI, including but not limited to the Fraudulent Cash Transfers and the Fraudulent Non-Cash Transfers that were fraudulently transferred out of PPLP to and/or for the benefit of the Sacklers and their trusts and affiliates, or, in the alternative, judgment against each of the Sackler Directors, Non-Sackler Directors, and Non-Sackler Officers in an amount to be determined at trial, including but not limited to the amount of harm incurred by PPI as a result of the Fraudulent Cash Transfers and the Fraudulent Non-Cash Transfers that were fraudulently transferred out of PPLP to and/or for the benefit of the Sacklers and their trusts and affiliates, and (b) imposing a constructive trust

over the Fraudulent Cash Transfers and the Fraudulent Non-Cash Transfers and their proceeds,

including, without limitation, any and all appreciation of and additional property acquired using

same; and (2) directing the Sackler Directors, Non-Sackler Directors, and Non-Sackler Officers to

provide a complete and comprehensive accounting of the cash and non-cash assets they unjustly

received at the Debtors' expense as a result of their breaches of fiduciary duty to PPI.

### **Count 11**

### **Aiding and Abetting Breach of Fiduciary Duty Against the MNP/MNC Directors**

428.    Plaintiffs, by and through the Official Committee, repeat and reallege each and

every allegation stated in the entirety of this Complaint as though fully set forth herein.

429.    The Sackler Directors, Non-Sackler Directors, and Non-Sackler Officers owed

fiduciary duties to PPLP and PPI and breached their duties to PPLP and PPI.

430.    The MNP/MNC Directors, in their capacities as such (or as directors or officers of

other IACs or Other II-Way Entities), aided and abetted the breaches of fiduciary duty by the

Debtors' fiduciaries.  To the extent that Wikstrom was not a fiduciary of the Debtors, he likewise

aided and abetted the breaches of fiduciary duty by the Debtors' fiduciaries in his role as an

"advisor" to the Board.  Among other things, as directors of MNP and/or MNC, the MNP/MNC

Directors set policies and agendas for the Sacklers' worldwide enterprise that were detrimental to

the Debtors, including but not limited to:

- Failing to prevent or properly oversee Purdue's unlawful sales and marketing
  practices, which involved mismarketing OxyContin and other opioid products,
  exaggerating their benefits, and downplaying their risks, thus causing
  widespread addiction, harm, and death and exposing PPI to billions of dollars
  of liability as a result;

- Failing to ensure that the Debtors satisfied their duties under federal law to
  maintain effective controls against the diversion of controlled substances into
  illegal markets, including by failing to implement an effective SOM system;

- Failing to conduct adequate inspections of the limited controls that were in place to monitor and ensure Purdue's compliance with applicable law;

- Prioritizing profitability over compliance with applicable law;

- Causing (or failing to prevent) PPLP's distribution of billions of dollars of value in the form of self-dealing cash and non-cash transfers from PPLP and (i) into trusts that were established for the benefit of the Sacklers and (ii) into other entities owned and controlled by the Sacklers despite knowing that significant legal liability was accruing against Purdue; and

- Causing the Debtors to take actions to protect the Sacklers to the detriment of the estates, including by taking actions to harm the estate causes of action and failing to maximize benefits to the estate.

431.    PPLP and PPI have been damaged substantially as a direct and proximate result of the breaches of fiduciary duty by the Sackler Directors, the Non-Sackler Directors, and the Non-Sackler Officers.

432.    For these reasons, Plaintiffs PPLP and PPI, by and through the Official Committee, respectfully request that the Court enter an order (1)(a) for restitution or disgorgement, directing the MNP/MNC Directors to restore to the Debtors assets they unjustly received at the Debtors' expense as a result of their breaches of fiduciary duty to PPLP and PPI, including but not limited to the Fraudulent Cash Transfers and the Fraudulent Non-Cash Transfers that were fraudulently transferred out of PPLP to and/or for the benefit of the Sacklers and their trusts and affiliates, or, in the alternative, judgment against the MNP/MNC Directors in an amount to be determined at trial, including but not limited to the amount of harm incurred by PPLP and PPI as a result of the Fraudulent Cash Transfers and the Fraudulent Non-Cash Transfers that were fraudulently transferred out of PPLP to and/or for the benefit of the Sacklers and their trusts and affiliates, and (b) imposing a constructive trust over the Fraudulent Cash Transfers and the Fraudulent Non-Cash Transfers and their proceeds, including, without limitation, any and all appreciation of and additional property acquired using same; and (2) directing the MNP/MNC Directors to provide a

complete and comprehensive accounting of the cash and non-cash assets they unjustly received at

the Debtors' expense as a result of their aiding and abetting the Sackler Directors, the Non-Sackler

Directors, and the Non-Sackler Officers in breaching their fiduciary duties to PPLP and PPI.

## Count 12

## Unjust Enrichment Against All Defendants

433.    Plaintiffs, by and through the Official Committee, repeat and reallege each and

every allegation stated in the entirety of this Complaint as though fully set forth herein.

434.    Without justification, each of the Defendants has received a benefit through the

reception and retention of cash, credit, and other things of value that rightly belong to PPLP and

its creditors, including but not limited to the Fraudulent Cash Transfers set forth on Exhibit E and

the Fraudulent Non-Cash Transfers set forth on Exhibit H, including but not limited to their

exploitation of IP rights and loans from the Debtors for dramatically insufficient consideration.

435.    In addition, upon information and belief, the Sacklers' wealth ultimately originates

from the Debtors and the network of IACs that received benefits from the Debtors.  As such, non-

IAC assets held in Recipient Sackler Trusts ultimately are traceable to transfers from PPLP,

including pre-2008 and other transfers (and subsequent transfers) that have not yet been disclosed.

The Recipient Sackler Trusts were unjustly enriched by the Sacklers' scheme of transferring value

out of the Debtors and into their network of trusts.  All of the non-IAC assets held in the Recipient

Sackler Trusts are the product of that unjust enrichment.

436.    These benefits inured to the benefit of each of the Defendants at the expense of

PPLP and its creditors.  Specifically, these individuals and entities were enriched by wrongful acts

and omissions through their wrongful receipt of payments and distributions made by PPLP through

the Petition Date.

437.    Retention of these proceeds by each of the Defendants would be inequitable, unjust, and against good conscience under all the circumstances alleged herein.

438.    The Sackler Directors unjustly enriched themselves by abusing their control over PPLP to direct and facilitate numerous self-dealing fraudulent transfers to themselves, to other entities they own and control, and to trusts that were established for their benefit.  The remaining Defendants were unjustly enriched by the Sackler Directors' misconduct and breaches of fiduciary duty.

439.    Plaintiffs, by and through the Official Committee, seek restitution and recovery of all benefits from all of the Defendants unjustly received from PPLP and its creditors, and an order of this Court disgorging all payments, transfers, credit, profits, proceeds, fees, benefits, incentives, and any other things of value obtained by these individuals and entities as a result of their wrongful conduct and breaches of fiduciary duty.

440.    In the alternative, Plaintiffs, by and through the Official Committee, seek the imposition of a constructive trust over assets held by each of the Defendants that were fraudulently transferred out of the Debtors.  As explained in Counts 1 through 4, *supra*, Plaintiffs, by and through the Official Committee, are seeking to avoid and recover cash and non-cash transfers that were wrongfully and fraudulently transferred out of the Debtors in breach of the Sackler Directors', Non-Sackler Directors', and Non-Sackler Officers' fiduciary duties to Purdue.  Defendants would be unjustly enriched if permitted to retain these cash and non-cash assets.  Thus, Plaintiffs, by and through the Official Committee, are entitled to a constructive trust over (i) all cash and non-cash assets held by the Defendants that were fraudulently transferred out of the Debtors, or otherwise wrongfully paid by the Debtors to the Defendants in the form of monetary compensation or other things of value, and (ii) any and all appreciation of the cash and non-cash assets, any additional

property acquired using the cash and non-cash assets, and any appreciation of the subsequently acquired property.

441.    In the further alternative, Plaintiffs, by and through the Official Committee, seek the imposition of an equitable lien over all assets held in Recipient Sackler Trusts that (1) received cash and non-cash assets traceable to the Debtors and (2) commingled said assets with other assets obtained from other sources, resulting in one, indistinguishable mass of assets held in said trusts (the "Commingled Recipient Sackler Trusts").   As the source of cash and non-cash assets fraudulently transferred by the Sackler Directors, Plaintiffs, by and through the Official Committee, are entitled to an equitable lien over assets held by the Commingled Recipient Sackler Trusts and a pro rata allocation of assets from commingled funds held in these trusts.

442.    For these reasons, Plaintiffs, by and through the Official Committee, respectfully request entry of an order by this Court: (1) against the Defendants directing that they disgorge all payments, transfers, credit, profits, proceeds, fees, benefits, incentives, and any other things of value that they received from the Debtors as a result of their wrongful conduct and breaches of fiduciary duty; or, in the alternative, (2) imposing a constructive trust over (i) all cash and non-cash assets held by the Defendants that were fraudulently transferred out of the Debtors or otherwise wrongfully paid by the Debtors to the Defendants in the form of monetary compensation or other things of value, and (ii) any and all appreciation of the cash and non-cash assets, any additional property acquired using the cash and non-cash assets, and any appreciation of the subsequently acquired property; or, in the further alternative, and (3) imposing an equitable lien over all assets held in Commingled Recipient Sackler Trusts.

**Count 13**

**Constructive Trust**

443.    Plaintiffs, by and through the Official Committee, repeat and reallege each and every allegation stated in the entirety of this Complaint as though fully set forth herein.

444.    The Debtors, on the one hand, and the Sackler Directors, Non-Sackler Directors, and Non-Sackler Officers, on the other hand, had a fiduciary relationship, as the Sackler Directors, Non-Sackler Directors, and Non-Sackler Officers owed fiduciary duties to the Debtors.

445.    The Defendants had a confidential and/or special relationship with the Debtors given that the Debtors were a privately held corporation owned and controlled by the Sacklers with no public disclosure or reporting requirements.

446.    Without justification, the Defendants abused their fiduciary and/or confidential and/or special relationships with the Debtors by retaining cash, credit, and other things of value that rightly belong to the Debtors and the Debtors' creditors, including but not limited to the Fraudulent Cash Transfers set forth on Exhibit E and the Fraudulent Non-Cash Transfers set forth on Exhibit H, including but not limited to their exploitation of IP rights and loans from the Debtors for dramatically insufficient consideration.  These individuals and entities were enriched by their wrongful acts and omissions through the wrongful receipt of payments and distributions made by the Debtors up through the Petition Date, enrichment which directly caused harm to the Debtors. Retention of these proceeds by the Defendants violates fundamental principles of justice, equity, and good conscience.

447.    The Sackler Directors unjustly enriched themselves by abusing their control over Purdue to direct and facilitate numerous self-dealing fraudulent transfers to themselves, to other entities they own and control, and to trusts that were established for their benefit.  The remaining Defendants were unjustly enriched by or in connection with the Sackler Directors' misconduct and

breaches of fiduciary duty, including through the receipt of fraudulently transferred cash and non-cash assets and monetary compensation and other things of value.

448.    The fraudulent transfers authorized out of the Debtors by the Sackler Directors that are held currently by the Other II-Way Entities, the Recipient Sackler Beneficiaries, and the Recipient Sackler Trusts, constituted unconscionable and inequitable conduct.

449.    As a result, Plaintiffs, by and through the Official Committee, are entitled to the imposition of a constructive trust on the assets that were fraudulently transferred out of the Debtors and are in the possession of the Other II-Way Entities, the Recipient Sackler Beneficiaries, and the Recipient Sackler Trusts.

## Count 14

## Illegal Distributions Against PRA LP

450.    Plaintiffs, by and through the Official Committee, repeat and reallege each and every allegation stated in the entirety of this Complaint as though fully set forth herein.

451.    As the limited partner of PPLP, PRA LP received billions in non-tax cash distributions from PPLP.

452.    At the time each cash distribution was made, after giving effect to each distribution, PPLP's total liabilities exceeded the fair value of its assets, and PPLP was insolvent or rendered insolvent by the Fraudulent Cash Transfers.  In addition, PRA LP, which was ultimately owned by the Sackler Trusts, knew that PPLP was insolvent or rendered insolvent by these cash distributions.

453.    Plaintiffs, by and through the Official Committee, seek recovery from PRA LP in the full amount of cash distributions it received from PPLP as illegal distributions obtained in contravention of section 17-607 of DRULPA.

## Count 15

### Disallowance of Claims Asserted by Fraudulent Transfer Defendants

454.     Plaintiffs, by and through the Official Committee, repeat and reallege each and every allegation stated in the entirety of this Complaint as though fully set forth herein.

455.     As stated in Counts 1 through 4, the Fraudulent Cash Transfers and the Fraudulent Non-Cash Transfers are avoidable (1) as actual fraudulent transfers because the Debtors incurred them with the actual intent to hinder, delay, or defraud the Debtors' creditors, to the detriment of these creditors; and/or (2) constructive fraudulent transfers because the Debtors (i) made them for no consideration, without fair consideration, or for less than reasonably equivalent value, and (ii) at a time when the Debtors were insolvent, had unreasonably small capital, or intended to incur or believed they would incur debts or liabilities beyond their ability to repay as they came due, all as a result of the Debtors' impending, immense litigation liability for unlawfully operating its opioid business and contributing to the opioid epidemic.

456.     As stated herein, the Debtors made the Fraudulent Cash Transfers and the Fraudulent Non-Cash Transfers to or for the benefit of the Other II-Way Entities, Recipient Sackler Beneficiaries, and Recipient Sackler Trusts.

457.     The Other II-Way Entities, Recipient Sackler Beneficiaries, and Recipient Sackler Trusts have not returned to the Debtors' estates the property transferred (or the value of the property transferred) in the Fraudulent Cash Transfers and the Fraudulent Non-Cash Transfers.

458.     Under section 502(d) of the Bankruptcy Code, any and all claims assertable by or on behalf of the Other II-Way Entities, Recipient Sackler Beneficiaries, and Recipient Sackler Trusts against the Debtors' estates, other than those previously allowed by the Court, must be disallowed until such time as the Other II-Way Entities, Recipient Sackler Beneficiaries, and

Recipient Sackler Trusts return to the Debtors' estates the value of the property transferred in the Fraudulent Cash Transfers and the Fraudulent Non-Cash Transfers.

## Count 16

### Equitable Subordination and Disallowance of All Claims by Defendants

459.    Plaintiffs, by and through the Official Committee, repeat and reallege each and every allegation stated in the entirety of this Complaint as though fully set forth herein.

460.    By engaging in grossly inequitable conduct, each of the Defendants named in this Complaint abused their position of trust and otherwise violated duties owed to the Debtors and creditors of the Debtors.  The Sackler Directors' misconduct, including breaches of fiduciary duties, enriched the Sacklers at the expense of all the Debtors and their creditors.  The Non-Sackler Directors and Non-Sackler Officers likewise breached their fiduciary duties to the Debtors and thereby enriched themselves and the Sacklers at the expense of all the Debtors and their creditors.  The remaining named Defendants knowingly aided and abetted or otherwise facilitated these breaches of fiduciary duties at the expense of the Debtors and their creditors.

461.    As stated throughout this Complaint, the inequitable conduct of the Defendants resulted in injury to the Debtors and their unsecured creditors and conferred unjust benefits on the Defendants.  As a result, any claims assertable against any Debtor by or on behalf of any Defendant, including but not limited to claims arising from the Purported Indemnity Obligations, should be equitably subordinated to the claims of all other unsecured creditors or equitably disallowed in their entirety.  Equitable subordination and disallowance of such claims is consistent with the provisions of the Bankruptcy Code.

## Count 17

### Turnover of the Fraudulent Cash Transfers and the Fraudulent Non-Cash Transfers Against the Other II-Way Entities, Recipient Sackler Beneficiaries, and Recipient Sackler Trusts

462.   Plaintiffs, by and through the Official Committee, repeat and reallege each and every allegation stated in the entirety of this Complaint as though fully set forth herein.

463.   Section 541(a) of the Bankruptcy Code defines "property of the estate" to include, among other things, "all legal or equitable interests of the debtor in property as of the commencement of the case," "wherever located and by whomever held."  11 U.S.C. § 541(a)(1).

464.   Section 542(a) of the Bankruptcy Code provides that "an entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title . . . shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate."  11 U.S.C. § 542(a).

465.   Section 542(b) of the Bankruptcy Code provides that "an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the trustee."  11 U.S.C. § 542(b).

466.   The cash and non-cash assets that are the subject of the Fraudulent Cash Transfers and the Fraudulent Non-Cash Transfers are property of the Debtors' estates as defined in section 541(a) of the Bankruptcy Code presently in the possession, custody, or control of the Defendants listed in this Count 21 which may be used, sold, or leased by the Debtors under section 363 of the Bankruptcy Code and are valuable and beneficial to the Debtors' estates.

467.   Pursuant to section 542(b) of the Bankruptcy Code, the Fraudulent Cash Transfers and the Fraudulent Non-Cash Transfers are debts owed to the Debtors and are "matured, payable on demand, or payable on order."  As such, they must be turned over to the Debtors.

468.     The Defendants listed in this Count 21 have no legal or contractual basis that permits them to hold or setoff these cash and non-cash assets.

469.     As a result of the foregoing, the Debtors are entitled to the immediate turnover of the Fraudulent Cash Transfers and the Fraudulent Non-Cash Transfers pursuant to section 542 of the Bankruptcy Code, or, in the alternative, recovery of an equivalent judgment for the value of the property of the Debtors' estates.

## Count 18

### Turnover and Accounting of Documents Related to the Fraudulent Cash Transfers and the Fraudulent Non-Cash Transfers Against the Sacklers and Their Affiliates

470.     Plaintiffs, by and through the Official Committee, repeat and reallege each and every allegation stated in the entirety of this Complaint as though fully set forth herein.

471.     Pursuant to section 542(e) of the Bankruptcy Code, "the court may order an attorney, accountant, or other person that holds recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs, to turn over or disclose such recorded information to the trustee."  11 U.S.C. § 542(e).

472.     The Sackler Directors, the Non-Sackler Directors, the Recipient Sackler Beneficiaries, the Recipient Sackler Trusts, certain Other II-Way Entities, Beacon, and Rosebay are in possession of and hold recorded information, including books, documents, records, and/or papers relating to the Debtors' property and/or financial affairs.  Among other things, these Defendants are in the possession of information concerning the amount and location of the Fraudulent Cash Transfers and the Fraudulent Non-Cash Transfers wrongfully transferred out of the Debtors.

473.     The Debtors are entitled to turnover from these Defendants and their attorneys, accountants, professionals, and other persons of such recorded information, including books,

documents, records, and papers, pursuant to 11 U.S.C. § 542(e). The Debtors seek an order requiring these Defendants and their attorneys, accountants, professionals, and other persons to turnover this information without further delay, and an award of damages, costs, and attorneys' fees in the event any defendant willfully refuses to do so.

474.    Based on the uncertainty associated with valuing and locating the cash and non-cash transfers that are the subject of the Fraudulent Cash Transfers and the Fraudulent Non-Cash Transfers, Plaintiffs, by and through the Official Committee, contend that an accounting should be performed pursuant to 11 U.S.C. § 542(e) to determine (i) the value and location of the Debtors' cash and non-cash assets in the possession, custody, or control of the various Defendants listed in this Count 18, and (ii) whether some or all of such assets should be turned over to the Debtors.

## Count 19

### Accounting of Profits Against the Sacklers and Their Affiliates

475.    Plaintiffs, by and through the Official Committee, repeat and reallege each and every allegation stated in the entirety of this Complaint as though fully set forth herein.

476.    At all relevant times, the Debtors were owned and controlled by the Sacklers, and therefore the Debtors' viability as a business relied upon the Sackler Directors' proper stewardship of the company consistent with their fiduciary duties.

477.    The assessment of Plaintiffs' claims for actual and constructive fraudulent transfer of the Fraudulent Cash Transfers and the Fraudulent Non-Cash Transfers, the tracing of these transfers out of the Debtors and through several dozens of entities and trusts to the ultimate transferee Defendants, and the discovery of the amounts and deployment of profits received by the ultimate transferees (including their use in acquiring or investing in additional assets), require this court to consider and adjudicate issues relating to accounts of a complicated character.

478.    Absent enforcement of this obligation of accounting of profits, the Debtors have no adequate remedy at law.

479.    Plaintiffs, by and through the Official Committee, are excused from making a demand for accounting of profits against the Sackler Directors, the Recipient Sackler Beneficiaries, and the Recipient Sackler Trusts.  As set forth in this Complaint, the Sackler Directors breached their fiduciary duties to Purdue by, *inter alia*, fraudulently transferring billions in cash and non-cash assets out of the Debtors and into various entities and trusts that the Sacklers owned or were the beneficiaries of, and thereby mismanaged the Debtors' assets.  An accounting of the fraudulent transfers is necessary to provide Plaintiffs the relief requested herein.

480.    Accordingly, the Sackler Directors, the Recipient Sackler Beneficiaries, and the Recipient Sackler Trusts are obligated to provide a complete accounting to Plaintiffs, by and through the Official Committee, of all profits they have received from the Debtors, including but not limited to the Fraudulent Cash Transfers and the Fraudulent Non-Cash Transfers, including any interest earned or accrued thereupon, the proceeds of any and all such transfers, any assets purchased by profits they received, the locations of the various assets, and all activities in which the Sackler Directors, the Recipient Sackler Beneficiaries, and the Recipient Sackler Trusts engaged in connection with their possession, custody, and control of the cash and non-cash transfers that were effectuated out of the Debtors.

## Count 20

## Racketeering Influenced Corrupt Organizations Act ("RICO") Against the Sackler RICO Defendants Under 18 U.S.C. § 1962(c)

481.    Plaintiffs, by and through the Official Committee, repeat and reallege each and every allegation stated in the entirety of this Complaint as though fully set forth herein.

482.    Defendants Richard Sackler, Mortimer Sackler Jr., Estate of Jonathan Sackler,
Estates of Mortimer Sackler Sr., Estate of Raymond Sackler, David Sackler, Kathe Sackler, Ilene
Sackler, Theresa Sackler, Estate of Beverly Sackler, and Samantha Sackler (the "Sackler RICO
Defendants") are each a "person" capable of holding legal or beneficial interest in property within
the meaning of 18 U.S.C. § 1962(c) and 18 U.S.C. § 1961(3).

483.    The Sackler RICO Defendants each violated 18 U.S.C. § 1962(c) by their
respective acts, described in the prior paragraphs and as further described below.

484.    The Sackler RICO Defendants each had the specific intent to violate 18 U.S.C. §
1962(c) and to commit each underlying predicate act alleged below.

485.    The Sackler RICO Defendants each committed at least two predicate acts of
racketeering, as more specifically alleged below.  The acts of racketeering were not isolated; rather,
they were related in that they had the same or similar purpose and result, participants, victims, or
method of commission.  Further, the acts of racketeering have been continuous, spanning the
period from at least 2008 to 2017.

**The RICO Enterprise**

486.    PPI is a corporation.  PPI is therefore an "enterprise" within the meaning of 18
U.S.C. § 1961(4).

487.    Alternatively, PPI, PPLP, MNP, and MNC, collectively, form an association-in-
fact enterprise engaged in and affecting interstate and foreign commerce for a common and
continuing purpose of managing and operating Purdue and the IACs.

488.    Alternatively, the Sackler RICO Defendants, together with PPI, PPLP, MNP, and
MNC, and their known and unknown co-conspirators form an association-in-fact enterprise
engaged in and affecting interstate and foreign commerce for a common and continuing purpose

of formulating and implementing a common scheme to defraud Debtors' creditors through a pattern of actual fraudulent transfers for the Recipient Sackler Trusts' and/or Recipient Sackler Beneficiaries' personal enrichment.  Such common purpose came into existence on or around 2008, when the Sackler RICO Defendants began to implement a scheme to defraud Debtors' creditors by authorizing transfers out of PPLP to PRA LP and others for the benefit of the Sacklers.

489.    Whether conceptualized in the manner described in the three prior paragraphs, there existed during the Relevant Period one or more enterprises within the meaning of 18 U.S.C. § 1964(4) (the "RICO Enterprise").

490.    At all relevant times, the Sackler RICO Defendants each were employed by or associated with the RICO Enterprise, and each conducted or participated, directly or indirectly, in the conduct of the RICO Enterprise's affairs through a pattern of racketeering activity.

491.    The RICO Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which the Sackler RICO Defendants engage.

492.    The RICO Enterprise constitutes an "enterprise" within the meaning of 18 U.S.C. § 1961(4), and it was or is engaged in, and its activities affected, interstate and foreign commerce.

493.    The repeated and continuous violations of federal criminal law alleged in this Complaint constitute a "pattern of racketeering activity" in violation of RICO, 18 U.S.C. § 1961, *et seq*.

494.    The Sackler RICO Defendants are central and controlling figures in the RICO Enterprise and have directed others to take actions necessary to accomplish the overall aims of the RICO Enterprise.

**The Pattern of Racketeering Activity**

495.    The Sackler RICO Defendants conducted or participated, directly or indirectly, in the conduct of the RICO Enterprise's affairs through a pattern of racketeering activity, as defined by 18 U.S.C. § 1961(1) and (5), consisting of multiple acts of racketeering that are interrelated, not isolated, and perpetrated for the same or similar purposes by the same persons (the "RICO Pattern").

**Predicate Acts: Wire Fraud, Violations of 18 U.S.C. § 1343**

496.    The RICO Pattern included numerous acts of wire fraud in violation of 18 U.S.C. § 1343.

497.    The Sackler RICO Defendants voluntarily and intentionally devised and participated in one or more criminal schemes to perpetrate actual fraudulent transfers of PPLP's assets during the Relevant Period, including without limitation, the Fraudulent Cash Transfers and the Fraudulent Non-Cash Transfers described in this Complaint.

498.    In furtherance of such scheme or schemes, the Sackler RICO Defendants willfully and knowingly transmitted, or caused to be transmitted, by means of wire communications in interstate or foreign commerce, writings, signs, signals, pictures, and sounds.

499.    The use of interstate and international wires to perpetrate these actual fraudulent transfers and to connect this international racketeering conspiracy was foreseeable.

500.    Accordingly, the Sackler RICO Defendants committed numerous violations of wire fraud in violation of 18 U.S.C. § 1343.

501.    The Sackler RICO Defendants' violations of 18 U.S.C. §1343 directly and proximately caused injury to PPLP's business and property by unjustifiably and irrevocably depleting PPLP's assets in the amount of such transfers.

## Continuity of Conduct

502.     The Sackler RICO Defendants' violations of law as set forth herein, each of which directly and proximately injured PPLP, constituted a continuous course of conduct in the United States beginning in 2008 and continuing at least through 2017, which was intended to obtain economic gain through fraud, deceit, and other improper and unlawful means.  Therefore, the violations were a part of pattern of racketeering activity under 18 U.S.C. §§ 1961(1) and (5).

## The RICO Pattern Caused Injury to PPLP

503.     PPLP has been injured in its business or property as a direct result and proximate result of the Sackler RICO Defendants' violations, described above, of 18 U.S.C. § 1962(c), including any injury by reason of the predicate acts constituting the RICO Pattern.

504.     The Sackler RICO Defendants' violations of federal law in furtherance of their scheme or schemes to loot PPLP's assets through a series of actual fraudulent transfers resulted in PPLP's assets being unjustifiably and irrevocably depleted in the amount of the applicable actual fraudulent transfers.

## Plaintiffs' Entitlement to Treble Damages

505.     As a result of the violations of 18 U.S.C. § 1962(c) by the Sackler RICO Defendants, PPLP has suffered substantial damages in an amount to be proven at trial.

506.     Under 11 U.S.C. §§ 101, 1103 and 1109, Plaintiffs have standing to bring all claims alleged in this Complaint on behalf of each of the Debtors' chapter 11 estates.

507.     Under 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover treble PPLP's general and special compensatory damages, plus interest, costs, and attorneys' fees caused by reason of Defendants' violations of 18 U.S.C. § 1962(c).

## Count 21

## Racketeering Influenced Corrupt Organizations Act ("RICO-Conspiracy") Against the RICO Conspiracy Defendants Under 18 U.S.C. § 1962(d)

508.    Plaintiffs, by and through the Official Committee, repeat and reallege each and every allegation stated in the entirety of this Complaint as though fully set forth herein.

509.    Since at least 2008, each of the Sackler RICO Defendants, together with those Non-Sackler Directors who approved the transfers—Boer, Judith Lewent, Loomis, Pickett, Paulo Costa, Snyderman, and Theurillat (collectively, the "Non-Sackler RICO Defendants"); Baker who recommended and facilitated the approval of the transactions in his role as "de facto chairman" of the Board and as a close advisor to the family and Purdue enterprise, and who also served as a trustee and trustee director for dozens of Sackler Trusts, and, thus, facilitated the trusts' receipt of the transfers; Roncalli who served as a long-time advisor to the Debtors, with Baker, before serving as a member of the Board, and who also served as a trustee of a number of Sackler Trusts and/or an officer of various private trust companies that served as trustees, and, thus, facilitated the trusts' receipt of the transfers; Mahony, Stewart, and Timney, each of whom facilitated the transactions; the Recipient Sackler Trusts, by their trustees; and others known and unknown, being persons employed by and associated with the RICO Enterprise (collectively, the "RICO Conspiracy Defendants"), have unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together and with others to violate 18 U.S.C. § 1962(c), as described above, in violation of 18 U.S.C. § 1962(d).

510.    The RICO Conspiracy Defendants knew that they were engaged in a conspiracy to commit the predicate acts and knew that the predicate acts were part of such racketeering activity, and the participation and agreement of each of them was necessary to allow the

commission of this pattern of racketeering activity. This conduct constitutes a conspiracy to violate 18 U.S.C.§ 1962(c), in violation of 18 U.S.C. § 1962(d).

511.    The RICO Conspiracy Defendants agreed to conduct or participate in, directly or indirectly, the conduct, management, or operation of the RICO Enterprise's affairs through a pattern of racketeering activity, including but not limited to the acts of racketeering set forth above in Count 19 of this Complaint.

512.    As part of the conspiracy, each RICO Conspiracy Defendant, and/or acting through certain of their agents, and representatives, or co-conspirators, committed at least two predicate acts of racketeering in the conduct of the RICO Enterprise's affairs.

513.    As a direct and proximate result of the RICO Conspiracy Defendants' conspiracy, the pattern of racketeering activity through which they conducted or participated in the conduct of the affairs of the RICO Enterprise, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), PPLP has been injured in its business and property.

514.    Under 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover treble PPLP's general and special compensatory damages, plus interest, costs, and attorneys' fees incurred by reason of the RICO Conspiracy Defendants' violations of 18 U.S.C. § 1962(d).

## RESERVATION OF RIGHTS

515.    Plaintiffs, by and through the Official Committee, reserve the right, to the extent permitted under the Bankruptcy Code, the Federal Rules of Civil or Bankruptcy Procedure, or by agreement, to assert any claims relating to the subject matter of this action or otherwise relating to the Debtors and their estates against any third party.

## PRAYER FOR RELIEF

WHEREFORE, by reason of the foregoing, Plaintiffs respectfully request that this Court enter judgment against Defendants as follows:

- awarding Plaintiffs damages in an amount to be determined at trial;

- avoiding each of the Fraudulent Cash Transfers, the Fraudulent Non-Cash Transfers, the Purported Indemnity Obligations, and the Purported Fiduciary Duty Waiver as intentionally and/or constructively fraudulent under applicable law;

- recovering each of the Fraudulent Cash Transfers and the Fraudulent Non-Cash Transfers, or, in the alternative, the value of the same, from the Defendants as appropriate consistent with Exhibits E through I;

- directing the turnover of each of the Fraudulent Cash Transfers and the Fraudulent Non-Cash Transfers;

- ordering an accounting of profits received by various transferees by virtue of their receipt of the Fraudulent Cash Transfers and the Fraudulent Non-Cash Transfers;

- awarding Plaintiffs their attorneys' fees, costs, and other expenses incurred in this action;

- awarding Plaintiffs treble their general and special compensatory damages in connection with Plaintiffs' RICO claims;

- awarding Plaintiffs pre- and post-judgment interest at the maximum rate permitted by law; and

- awarding Plaintiffs such other and further relief as the Court deems just and proper.


Dated: [ ], 2024
      New York, New York

AKIN GUMP STRAUSS HAUER & FELD LLP

By: /s/ [Draft]
Mitchell P. Hurley
Arik Preis
Katherine Porter
Sara L. Brauner
Erin E. Parlar
Theodore James Salwen
Jillian R. Kulikowski
Patrick J. Glackin
One Bryant Park
New York, NY 10036

Telephone: (212) 872-1000
Facsimile: (212) 872-1002
mhurley@akingump.com
apreis@akingump.com
kporter@akingump.com
sbrauner@akingump.com
eparlar@akingump.com
jsalwen@akingump.com
jkulikowski@akingump.com
pglackin@akingump.com

Ashley Vinson Crawford
Danielle C. Ginty (*pro hac vice forthcoming*)
Hilda Kajbaf (*pro hac vice forthcoming*)
100 Pine Street, Suite 3200
San Francisco, CA 94111
Telephone: (415) 765-9500
Fax: (415) 765-9501
avcrawford@akingump.com
dginty@akingump.com
hkajbaf@akingump.com

Elizabeth D. Scott
Karen Yang
2300 N. Field Street, Suite 1800
Dallas, TX 75201
Telephone: (214) 969-2800
Fax: (214) 969-4343
edscott@akingump.com
kyang@akingump.com

COLE SCHOTZ P.C.

Justin R. Alberto
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117
jalberto@coleschotz.com

Donald A. Ottaunick
Court Plaza North
25 Main Street
Hackensack, NJ 07601

Telephone: (201) 489-3000
Facsimile: (201) 489-1536
dottaunick@coleschotz.com

Anthony De Leo
1325 Avenue of the Americas
19th Floor
New York, NY 10019
Telephone: (212) 752-8000
Facsimile: (212) 752-8393

*Counsel to the Official Committee of Unsecured Creditors of Purdue Pharma L.P., et al.*