Hearing Date: September 23, 2024 at 2:00 p.m. (Prevailing Eastern Time)
Objection Deadline: September 20, 2024 at 3:00 p.m. (Prevailing Eastern Time)
Reply Deadline: September 22, 2024 at 4:00 p.m. (Prevailing Eastern Time)

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
James I. McClammy
Marc J. Tobak
Joshua N. Shinbrot

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br>**PURDUE PHARMA L.P.**, *et al.*,<br>　　　　Debtors.[1] | Chapter 11<br>Case No. 19-23649 (SHL)<br>(Jointly Administered) |
| **PURDUE PHARMA L.P.**, *et al.*,<br>　　　　Plaintiffs,<br>　　v.<br>**COMMONWEALTH OF MASSACHUSETTS**, *et al.*,<br>　　　　Defendants. | Adv. Pro. No. 19-08289 (SHL) |

**REPLY MEMORANDUM IN FURTHER SUPPORT OF MOTION TO (I) EXTEND THE MEDIATION; (II) EXTEND THE PRELIMINARY INJUNCTION AND ASSOCIATED DEADLINES INCLUDING TOLLING; AND (III) EXTEND THE SCHEDULE FOR THE STANDING MOTION**

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Purdue Products L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717), and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

**PRELIMINARY STATEMENT**[2]

Lifting the preliminary injunction now would threaten to unravel the substantial progress made to date in the Mediation.[3] The Mediators, who have authorized the Debtors to inform the Court that the parties have made substantial progress thus far, and key creditor constituencies, including the State AG Negotiating Committee, the Multi-State Governmental Entities Group (the "**MSGE**"), the Official Committee of Unsecured Creditors (the "**UCC**"), and the Ad Hoc Committee of Governmental and other Contingent Litigation Claimants (the "**AHC**"), all either support or do not object to the relief requested in the Debtors' Extension Motion.[4] This Court's extensive legal and factual findings regarding the necessity of the Preliminary Injunction, which are rooted in a robust evidentiary record, strongly support granting the relief requested.

Against the recommendation of the Mediators stand four objectors[5], who misread and mischaracterize the small number of cases they cite in support of their flawed arguments and ignore the Court's prior legal rulings and factual findings. Indeed, this Court has already repeatedly rejected many of the recycled arguments of the Objecting Parties.

---

[2] ECF numbers reference docket entries in this adversary proceeding unless otherwise noted.

[3] All capitalized terms used but not defined herein have the meanings ascribed to them in the Debtors' *Memorandum of Law in Support of Motion to (I) Extend the Mediation; (II) Extend the Preliminary Injunction and Associated Deadlines Including Tolling; and (III) Extend Schedule for the Standing Motion* ("**Opening Brief**") [ECF No. 538].

[4] The Debtors misunderstood the position of the Plaintiffs' Executive Committee (the "**PEC**") with respect to the Limited Extension, and incorrectly characterized such position in the Opening Brief as support for the relief requested in the Extension Motion. The PEC's position is laid out in its Statement [ECF No. 549]. The Debtors apologize for this inadvertent mischaracterization.

[5] The four objecting parties (the "**Objecting Parties**") are Nassau County [ECF No. 543] ("**Nassau Objection**"); the State of Washington [ECF No. 544] ("**Washington Objection**"); the State of Maryland [ECF No. 545] ("**Maryland Objection**"); and the State of Rhode Island ("**Rhode Island Objection**") [ECF No. 548]. Contrary to Washington's assertion, the volume of creditor objections received is lower than it was for the last extension request, which received six total objections. (Washington Objection at 5.)

2

Unable to seriously contest this Court's authority to enter the Preliminary Injunction, the Objecting Parties ignore the extensive evidentiary record in these cases and assert—in conclusory fashion and without citation to any evidence—that the requested injunction is no longer warranted. Nassau County, Maryland, and Rhode Island argue that the litigation should go forward because it is necessary to create leverage to get to a deal with the Sacklers, ignoring the strong history of successful mediation in these cases <u>with the protection of the Preliminary Injunction in place</u> that resulted in billions of dollars in settlements to facilitate a value-maximizing plan of reorganization for the benefit of the Debtors' creditors, while admitting that even with the injunction lifted immediately they would not be materially closer to a judgment against the Sacklers in the next 35 days.

Washington contends that the Court should lift the Preliminary Injunction because the mountain of evidence that forms the basis for this Court's issuance and extensions of the Preliminary Injunction is now "stale." Washington cynically attempts to transform mediation confidentiality from a shield into a sword by arguing that the very confidentiality of the Mediation precludes the Court from acknowledging the views of the Mediators' and vast majority of parties in interest in these cases regarding progress and the need for a bit more time. When this Court issued the Preliminary Injunction, it found based on thousands of pages of evidence and testimony at a full-day hearing with witnesses subject to cross examination, that the Debtors were drowning under a veritable tsunami of litigation. The Preliminary Injunction, this Court found, was necessary to protect the Debtors' prospects of a successful reorganization. That finding has been affirmed time and again by this Court, and on appeal before Judge McMahon. Where, as here, the Debtors' prospects of reorganization remain viable, nothing in the law requires this Court to periodically experiment on the Debtors by opening the floodgates

whenever an objector makes a conclusory assertion that the overwhelming evidence supporting the injunction has inexplicably become "stale."

All four of the Preliminary Injunction factors continue to be satisfied as to the Limited Extension. Substantial progress in Mediation and broad support for or non-objection to the extension demonstrates that the Debtors' prospects of reorganization are greater with the injunction in place. The Debtors would suffer irreparable harm if hundreds or thousands of lawsuits are permitted to resume, many of which would litigate the same conduct that forms the basis for the Estates' claims against the Sacklers. That harm greatly outweighs any incremental harm to the Objecting Parties from 35 days of delay. And the public interest weighs strongly in favor of a short delay to potentially preserve billions of dollars in value for states, municipalities, Tribes, hospitals, and victims of the opioid epidemic who may well receive nothing absent a settlement. The Court should overrule the objections and extend the Preliminary Injunction.

## ARGUMENT

### I. The Preliminary Injunction Factors Continue to Weigh Strongly in Favor of the Debtors' Requested Extension

The Objecting Parties' do not rebut the Debtors' clear showing that each of the four factors supporting the Limited Extension is satisfied here. *See* Opening Brief at 3-5. The Mediators—who are best situated to assess the impact of the Mediation on the Debtors' likelihood of successful reorganization—believe that the Debtors and their major creditor constituents are making substantial progress. *Id.* at 1, 3; *see also* Sept. 5, 2024 Hr'g Tr. 61:7-15 [ECF No. 534] (crediting the support of the Mediators because they "have their pulse on the mediation and are really in the best position to know what works and what doesn't work"). Mediation is "clearly the best course of action" at this point in these cases, and the Preliminary Injunction is "critical to the parties' mediation efforts." Sept. 5, 2024 Hr'g Tr. 56:1-9 [ECF No.

4

534]. With the continued support or non-objection of key creditor constituencies, the Debtors now request a slightly longer extension in light of the progress made, to avoid expending critical Estate resources and distracting key Mediation Parties from the indispensable work at hand of negotiating a broadly consensual plan of reorganization.

      **A.    The Debtors Have Demonstrated Reasonable Prospects of a Successful Reorganization**

The Debtors have demonstrated reasonable prospects of a successful reorganization based on the progress made in Mediation to date. As an initial matter, this Court has found—as recently as September 5, 2024—that "[t]he history of these Chapter 11 cases . . . provide[s] strong evidence of the Debtors' prospects for success coming out of the mediation." Sept. 5, 2024 Hr'g Tr. 60:1-4 [ECF No. 534]. The progress made in Mediation since September 5 further demonstrates the prospect of a successful reorganization.

It is true that the Debtors are not at liberty to report in detail on developments in the Mediation. Contrary to Washington's effort to cast mediation confidentiality in a sinister light, (Washington Objection at 5), such confidentiality is both provided by an order of this Court, and an "important feature of the mediation . . . process[]" protected by Second Circuit law. *In re Teligent, Inc.*, 640 F.3d 53, 57 (2d. Cir. 2011). What the Debtors can note, however, is the support of the Mediators for the extension and the following: when the Debtors, supported by many other parties, requested that the Court extend the Preliminary Injunction to cover a 60-day mediation period, numerous parties made it clear that they would support no further injunction and seek to restart litigation against the Sacklers if the Mediation failed. (Statement in Response to Debtors' Motion to Extend the Preliminary Injunction at 2 [ECF No. 493]); July 9, 2024 Hr'g Tr. 43:9-16 [ECF No. 511] (the Official Committee representing that "if mediation does not result in a resolution satisfactory to the creditors," "all of the various creditors" will restart

5

litigation). Those parties—with a front-row seat to Mediation—today support or, as explained in the Statement filed by the State of New York and other Members of the Attorneys General Negotiating Committee, "do not oppose the requested relief." (Statement in Response to Debtors' Motion to Extend the Preliminary Injunction at 2 [ECF No. 547].) That, too, is ample evidence from which to infer that substantial progress continues to be made and that the Debtors' reorganization is at least reasonably likely to succeed.[6] *See In re Purdue Pharms. L.P.* ("*Dunaway*"), 619 B.R. 38, 58 (S.D.N.Y. 2020) (finding that "debtors need not present proof of the uncertain in order to demonstrate a reasonable likelihood of a successful reorganization") (internal quotation and citation omitted).

Similarly, this Court should again reject certain Objecting Parties' attempts to tie the Preliminary Injunction to nonconsensual third-party releases. The purpose and validity of the Preliminary Injunction—and the likelihood of the Debtors' successful reorganization—have <u>never</u> depended on the availability of nonconsensual third-party releases. *See* Oct. 11, 2019 Hr'g Tr. 264:20-265:1 [ECF No. 108] ("I am far from approving any sort of permanent injunction and release with respect to third parties in this case. In fact, the purposes -- one of the main purposes of the preliminary injunction is to enable the parties to analyze whether they would support such a plan."); Dec. 29, 2021 Hr'g Tr. 16:10-19 [ECF No. 315] (extending injunction following Judge McMahon's decision vacating confirmation to avoid a "haphazard, disorganized race to the

---

[6] Notably, the objections of Washington, Maryland, and Rhode Island do not contest the Mediators' assessment that there has been substantial progress in the Mediation. Only Nassau Country asserts that there has been "no showing of progress made in mediation," which it cannot possibly know if its statement that it has "not been invited to participate in the ongoing mediation" is true. (Nassau County Objection at 3, 7.) And Nassau County's assertion that the Debtors' "spent most of those eighteen days [the most recent extension] negotiating a second request for an extension" is plainly false and mischaracterizes the Debtors' brief, which speaks for itself. (Nassau County Objection at 10.)

6

courthouse" which would "deal a fatal blow to the Debtors' progress towards reorganization"). This Court has already found that "[w]hile the Supreme Court's decision precludes consummation of a plan of reorganization that contains non-consensual third-party releases, it does not preclude a successful reorganization in these cases." July 9, 2024 Hr'g Tr. 91:13-16 [ECF No. 511]. Against the backdrop of the Supreme Court's decision, the parties have made substantial progress in the Mediation, and "the Debtors are substantially more likely to reorganize with the injunction in place." *Dunaway*, 619 B.R. at 59 (internal citation and quotation marks omitted). The purpose of the Preliminary Injunction is <u>not</u> to bridge to the imposition of nonconsensual releases; it is to give the parties space and time to negotiate a broadly consensual a plan of reorganization consistent with the law. Should that effort fail, the objectors (and all creditors) will be free to pursue their litigation against the Sacklers. But they should not be permitted to derail the settlement effort while it is still underway and with the parties making substantial progress.

### B. The Estates and Their Creditors Would be Irreparably Harmed if the Preliminary Injunction Were Lifted Now

This Court has repeatedly found, based upon extensive evidence, that allowing prosecution of the claims subject to the Preliminary Injunction, including claims against the Debtors' Related Parties such as the Sacklers, (i) threatens to undermine the Mediation; (ii) threatens to irreparably injure the value of the Estates' most valuable assets—claims against the Sacklers; and (iii) would burden the Estates with monetary and non-monetary costs. Bereft of any evidence to the contrary, certain Objecting Parties assert that the evidence supporting the injunction is "stale"—without identifying a single factual finding or piece of evidence in support of the injunction that it actually believes is no longer true. (Washington Objection at 4.) In

reality, the evidence before the Court relates to events that are <u>ongoing</u>—i.e., the Mediation—and that predate the Petition Date.

### 1. *Lifting the Injunction Threatens to Upend the Mediation*

Continuation of the Mediation offers the Estates' best chance at maximizing the value delivered for abatement and victim compensation and the speed and efficiency with which that value is delivered. Allowing litigation to restart during this critical phase of Mediation would delay—or destroy—the prospects of a maximally consensual resolution through Mediation. For one, litigation will divert the parties' efforts from Mediation to litigation, as this Court has found on July 9 and September 5. July 9, 2024 Hr'g Tr. 93:11-16 [ECF No. 511]; Sept. 5, 2024 Hr'g Tr. 60:24-61:3 [ECF No. 534]. In addition, developments in such litigation could alter the complex balance regarding the allocation of value among <u>creditors</u>, greatly frustrating Mediation efforts that must not only reach settlements with the Sacklers but also secure agreement among the broadest possible coalition of the Debtors' creditors. The Objecting Parties have offered no answer to any of these basic facts, other than the breezy assertion that perhaps the Mediation would not collapse, and that risk should be taken. (Rhode Island Objection at 6; Nassau Objection at 10.) But the Debtors—and vast majority of parties in interest—are not willing to gamble with such a disastrous outcome given the current facts and circumstances.

### 2. *Lifting the Injunction Threatens to Irreparably Injure the Value of the Estates' Most Valuable Assets*

Lifting the injunction would also put at risk the Estate claims against the Sacklers, recognized by this Court over and over as the Estates' most valuable assets. *See* July 9, 2024 Hr'g Tr. 93:14-16 [ECF No. 511] ("And in fact resuming litigation would threaten the estate's most valuable asset; that is the estate's claims against the Sacklers"); Feb. 1, 2023 Hr'g Tr. 31:2 [ECF No. 409] (identifying the claims against the Sacklers as the "most valuable asset" of the

8

Estates); *In re Purdue Pharma L.P.*, 633 B.R. 53, 109 (Bankr. S.D.N.Y. Sept. 17, 2021) (the Estate claims "probably would have the best chance of material success among all of the claims against the shareholder released parties."). This Court has found, time and again, that because creditor claims against the Sacklers are premised on the same conduct that underlies the Estates' claims, the Sacklers would "raise the same defenses" to creditor's claims "as they would to the estate's [claims]." July 9, 2024 Hr'g Tr. 93:20-21 [ECF No. 511]. That would make whichever case proceeds first into a test case for valuable Estate claims, and would mean that a legal or factual ruling in favor of the Sacklers on almost any issue could materially diminish the value of Estate claims. While Washington argues that "the short time frame of the requested extension renders vacuous any fear that any judgments of significance will be handed down in time," (Washington Objection at 9), that entirely misses the point. Litigation developments that could diminish the value of the Estates' claims can occur long before any judgment, such as on a ruling on a motion to dismiss. To guard against this risk, the Estates would need to launch their own costly parallel litigation of the Estates' claims. The Court should not lift the Preliminary Injunction and permit whichever of the thousands of claimants outruns the rest of the litigation pack to jeopardize a potentially multi-billion dollar settlement while progress continues in Mediation.

      **3.**  *Lifting the Injunction Will Burden the Estates with Monetary and Non-Monetary Costs*

    Finally, litigating claims against the Sacklers will greatly burden the Estates, draining value that should be reserved for opioid abatement and victim compensation to fund ballooning litigation costs. To take one example, Rhode Island asserts that it wants to pursue a claim against the Sacklers which alleges "that the Sacklers exercised complete control over Purdue's Board of Directors and its misconduct that fueled the epidemic." (Rhode Island Objection at 4.)

According to Rhode Island, pursuing this claim "will not irreparably harm *Purdue* or the mediation." (*Id.* at 6.) But its objection concedes that its claims against the Sacklers depend upon demonstrating alleged misconduct of the Debtors, which means the Debtors will be at the very core of disputed legal and factual issues in prosecution of Rhode Island's claim against the Sacklers. Thus, as the Debtors demonstrated through a detailed chart submitted in support of their initial motion to extend the Preliminary Injunction, Rhode Island's complaint "asserted against the Sackler defendants all the same allegations that it asserted against Purdue." (Declaration of Hayden A. Coleman in Supp. Debtors' Motion for Preliminary Injunction ("Coleman Decl.") ¶ 22 [ECF No. 61].) Moreover, the evidence of monetary and non-monetary harm to the Debtors in support of the Preliminary Injunction included costs related to demands from states like Rhode Island, which "moved to compel a deposition of a Purdue corporate representative on topics that had already been subject to depositions in the MDL." (*Id.* ¶ 36.) Rhode Island argued that "[e]ven if the States' requested deposition was duplicative of deposition testimony in another case by other plaintiffs (which it is not), that is not a reason to restrain the State from seeking discovery in this case." (*Id.* (internal quotation, citation, and emphasis omitted.) Nothing in Rhode Island's objection indicates that its position, including that it is entitled to duplicative, costly, and distracting discovery from the Debtors has changed.

Washington, which unlike many other states and governmental entities had not yet filed a prepetition lawsuit against the Sacklers, argues it "looks forward to doing so promptly after the injunction lifts." (Washington Objection at 2.) But nothing in Washington's objection indicates that it will refrain from seeking discovery of the Debtors in support of the overlapping claims it intends to assert against the Sacklers. As with Rhode Island, the evidence that the Debtors offered in support of the Preliminary Injunction clearly showed that "just after this Court rules,

10

Washington could immediately resume a flood of depositions and motion practice if this Court does not grant a preliminary injunction." (Coleman Decl. ¶ 39.) Those deposition requests included nine former Purdue employees, and corporate representative testimony for Purdue. (*Id.* ¶¶ 50-52.) In addition, in the month leading up to Purdue's bankruptcy filing, Washington served Purdue with substantial written discovery. (*Id.* ¶ 55.) Extensive evidence of such burdens is what formed the basis for the preliminary injunction. Oct. 11, 2019 Hr'g Tr. 256:6-12 [ECF No. 87]. The Debtors' experience before the issuance of the Preliminary Injunction vividly demonstrates the burden that resuming litigation would impose.

Washington's assertion that discovery burdens and indemnification obligations constitute insufficient harm to justify the Preliminary Injunction is flatly contradicted by the law of this case. (Washington Objection at 5-9.) Judge McMahon concluded that the possibility of an indemnification obligation, paired with the Debtors' litigation expenses, was sufficient to justify imposition of the Preliminary Injunction. *Dunaway*, 619 B.R. at 59. That holding was not appealed and is still binding law.[7]

---

[7] Washington's case law in support of its argument that "discovery costs are an insufficient basis for an injunction" is completely inapposite. (Washington Objection at 6-7, 9); *see also In re Parlement Techs., Inc.*, 661 B.R. 722, 730 (Bankr. D. Del. 2024*)* (denying extension of preliminary injunction to non-debtor defendants in a single lawsuit on grounds that discovery costs "will not *in a typical case* be a basis for granting a third-party injunction" (emphasis added)); *Matter of Davis*, 691 F.2d 176, 177-78 (3d Cir. 1982) (finding litigation burdens of single criminal prosecution against individual Chapter 7 debtors did not constitute irreparable harm); *Quarrato v. Madison Global LLC*, 2023 WL 7212173, at *2 (S.D.N.Y. Nov. 2, 2023) (merely noting that "in situations where third-party discovery of a debtor could burden the bankruptcy proceeding, courts have generally placed the onus on the debtor to seek injunctive relief"). In contrast, courts have found that burdensome litigation and discovery costs justified enjoining non-debtor actions in complex chapter 11cases. *See, e.g.*, *In re Philadelphia Newspapers, LLC*, 423 B.R. 98, 106 (E.D. Pa. 2010) (affirming extension of preliminary injunction to non-debtor suit because "the Debtors would be forced to spend time, money, and effort with respect to each pending suit" and because "[t]his case, a large and complex Chapter 11 with many employees being sued, presents the unusual circumstance of a Debtor needing the time and space of a [section] 105 injunction extended to non-debtor employees"); *In re Johns-*

11

Washington's reliance on *In re Parlement Techs., Inc.*, 661 B.R. 722 (Bankr. D. Del. 2024) is unavailing. At the September 5, 2024 hearing this Court agreed with the *Parlement* court's conclusion that "a preliminary injunction may still be granted if the Court concludes that (a) providing the debtor's management a breathing spell from the distraction of other litigation is necessary to permit the debtor to focus on the reorganization of its business or (b) because it believes the parties may ultimately be able to negotiate a plan that includes a consensual resolution of the claims against the non-debtors," and found that the facts of this case clearly fall into bucket (a). *Parlement*, 661 B.R. at 724; Sept. 5, 2024 Hr'g Tr. 65:13-66:3 [ECF No. 534] (applying *Parlement*'s standard and holding "the preliminary injunction [] here, I think it's pretty clear, that it satisfies the requirements"). That finding is supported by the evidentiary record. By way of example, a single deposition of the former chief financial officer of Purdue Pharma "lasted approximately a full day and required approximately 30 hours of [the CFO's] time to prepare." (Declaration of Jesse DelConte in Support of Debtors' Motion for Preliminary Injunction ("DelConte Decl.") ¶¶ 10, 12 [ECF No. 5] (detailing burdens on Debtors associated with written discovery demands)); Oct. 11, 2019 Hr'g Tr. 167:3-10 [ECF No. 87] (rejecting the non-consenting States' argument that the Debtors relied only on risk of collateral estoppel, rather than the substantial evidentiary record of massive and sustained burdens on the Estates).

The Debtors can ill afford such a distraction now, facing significant employee attrition over the past five years and continuing challenges with attracting new personnel. *See* Motion of Debtors for Entry of an Order Authorizing Implementation of 2024 Key Employee Incentive

---

*Manville Corp.*, 40 B.R. 219, 224 (S.D.N.Y. 1984) (upholding stay and noting that "to permit discovery to proceed in this instance would open the door to additional requests . . . in literally thousands of other pending asbestos-related cases . . . [and] [t]he cumulative effect of this on the reorganization can well be understood").

Plan and 2024 Key Employee Retention Plan at Ex. B ¶ 11, *In re Purdue Pharma LLP*, No. 19-23649-SHL (Mar. 27, 2024) [ECF No. 6279].  Essentially, "cumulative attrition during earlier periods of these Chapter 11 Cases left the remaining employees with high workloads" where "the remaining employees must continue to operate a complex pharmaceutical business in the midst of these protracted Chapter 11 Cases." *Id.* at ¶ 18 (citing DelConte Decl. ¶ 11.)  Such a distraction now, when the Debtors have fewer employees carrying greater responsibilities, would undoubtedly jeopardize the Mediation and any attempt to negotiate a consensual resolution of these chapter 11 cases.

      **C.    The Balance of the Harms and the Public Interest Weigh Strongly in Favor of the Debtors' Modest Request**

Achieving a value-maximizing resolution to these cases through Mediation is in the public interest, as well as in the best interests of the Estates and its creditors, which include States, Native American Tribes, thousands of municipalities, school districts, hospitals, and victims.  Confoundingly, most of the Objecting Parties appear to agree that mediation provides the best path forward for achieving a broadly consensual plan of reorganization.  (*See* Washington Objection at 2; Maryland Objection at 1; Rhode Island Objection at 1.)  Casting aside this Court's extensive findings, the Objecting Parties baldly assert that the resumption of the value-destructive prepetition litigation chaos would not impact the Mediation. *See Dunaway*, 619 B.R. at 59-60.  That position is untenable, and the Court should reject it yet again.  *See* July 9, 2024 Hr'g Tr. 92:1-2 [ECF No. 511] (holding that "the breathing room provided by the requested injunction is critical to the parties' mediation efforts").

Against the tangible harms that the Debtors would suffer if the Court were to lift the injunction now, the Objecting Parties offer only baseless insinuations.  Certain Objecting Parties assert that litigation "will aid rather than frustrate Purdue's reorganization."  (Maryland

13

Objection at 3; *see* Rhode Island Objection at 5; Nassau County Objection at 10.)  That assertion is entirely without evidence and contrary to the history of mediation in these cases, which has succeeded <u>with</u> the protections of the Preliminary Injunction in place.  Maryland and Rhode Island's assertion that their cases or only the States' cases could go forward without irreparably harming the Debtors, (Maryland Objection at 3; Rhode Island Objection at 5), is mystifying and directly contrary to this Court's prior finding, affirmed on an appeal pursued by five district attorneys in Tennessee that there is no reason "their lawsuit[s] should be treated differently from every other lawsuit that is subject to the injunction" because there is "nothing fundamentally different" about Maryland and Rhode Island's actions "to distinguish [them] from the thousands of other stayed proceedings." *Dunaway*, 619 B.R. at 60.  Doing so "would soon engulf the Debtors' and the Bankruptcy Court in appeals challenging the injunction's application to similar claims," including by thousands of municipalities.  *Id*; *see* Oct. 11, 2019 Hr'g Tr. at 255:17-256:5 [ECF No. 87] (finding that "continued pursuit of litigation, even if only to establish liability . . . would materially and adversely affect the Debtors' Chapter 11 process and estates . . . because it appears likely to me that separate and apart from the mere cost of continuing that specific litigation . . . there would be an inevitable, I believe, desire by multiple other governmental entities to vindicate the same principles that the State of Washington would seek to vindicate in that litigation").  Nassau County's objection is but one example.  (Nassau Objection at 11 (arguing that the "continued stay of the proceedings would . . . undermin[e] Nassau County's rightful ability to enforce its lawful police and regulatory power").)

Maryland, Washington, and Rhode Island's insinuation that the Preliminary Injunction curbs their criminal investigative powers similarly reflects a misunderstanding of the operation of the Preliminary Injunction.  The Preliminary Injunction has <u>never</u> enjoined any criminal claim

14

that any governmental entity has pursued and the injunction only applies to bar the commencement or continuation of actions "alleging substantially similar facts or causes of action as those alleged in actions" subject to the injunction. Thirty-Seventh Amended Order Pursuant to 11 U.S.C. § 105(a) Granting Motion for a Preliminary Injunction at 13 [ECF No. 533].

Nassau County's claim that the Sacklers are using Mediation to "delay and hide assets" (Nassau Objection at 11) evinces a profound misunderstanding of the Preliminary Injunction, through which the Estates' representatives secured critical anti-secretion provisions explicitly <u>preventing</u> the Sacklers from hiding assets.[8] Rhode Island's accusation that the Limited Extension's purpose is to "protect[] the Sacklers" (Rhode Island Objection at 2) ignores the primary purpose of the Preliminary Injunction: protecting and preserving the <u>Estates'</u> claims <u>against</u> the Sacklers. *See* July 9, 2024 Hr'g Tr. 93:14-16 [ECF No. 511] ("[R]esuming litigation would threaten the estate's most valuable asset; that is the estate's claims against the Sacklers.").

In short, the Objecting Parties identify no compelling harm that will result from a 35-day extension of the Preliminary Injunction, and fail to rebut the Debtors' showing of the harms to the Estates that would result. Because all four of the preliminary injunction factors are met, this Court should grant the Limited Extension.

---

[8] The Preliminary Injunction extends the provisions of the Amended and Restated Case Stipulation Among the Debtors, the Official Committee of Unsecured Creditors and Certain Related Parties, *In re: Purdue Pharma, L.P. et al.*, Case No. 19-23649 (RDD) (Nov. 20, 2019) [ECF No. 518] ("**UCC Stipulation**"), including the provision prohibiting any Sackler or related trust from taking "any action with respect to any material amount of his, her, or its property that is located inside or outside the United States with the intent or material effect of frustrating enforcement of any potential judgment of this Court in these chapter 11 cases or any other actions pending against them in any other court or jurisdiction." (UCC Stipulation ¶ 13.); Thirty-Seventh Amended Order Pursuant to 11 U.S.C. § 105(a) Granting Motion for a Preliminary Injunction at 14 [ECF No. 533].

**II.   This Court Should Once Again Reject the Objecting Parties' Recycled Arguments**

The remainder of the Objecting Parties' arguments have already been conclusively rejected by this Court and should be overruled again now.[9]

*First,* this Court's "related to" jurisdiction to temporarily enjoin non-debtor claims against third parties is clear and undisturbed. July 9, 2024 Hr'g Tr. 90:3-11 [ECF No. 511]. Bankruptcy courts have subject matter jurisdiction under 28 U.S.C. § 1334 extending to third-party claims that "might have any conceivable effect on the bankrupt estate." *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 339-40 (2d Cir. 2018) (quoting *Parmalat Capital Fin. Ltd. v. Bank of Am. Corp.*, 639 F.3d 572, 579 (2d Cir. 2011)); *Celotex Corp. v. Edwards*, 514 U.S. 300, 308 n.6 (1995) (bankruptcy courts' jurisdiction extends to any claim that "could conceivably have any effect on the estate being administered in bankruptcy" (emphasis and internal citation omitted)). That jurisdiction encompasses "suits between third parties," as this Court, the District Court, and the Second Circuit have all confirmed. *SPV Osus*, 882 F.3d at 340 (quoting *Celotex*, 514 U.S. at 307 n.5); *In Re Purdue Pharma L.P.*, 69 F.4th 45, 71-72 (2d Cir. 2023); *In re Purdue Pharma, L.P.*, 635 B.R. 26, 83 (S.D.N.Y. 2021); *Dunaway*, 619 B.R., at 48; Modified Bench Ruling at 105-111, *In re Purdue Pharma L.P., et al.*, No. 19-23649-RDD (Bankr. S.D.N.Y. Sept. 17, 2021) [ECF No. 3786]. The Objecting Parties do not offer any contrary authority or reasoning that would bring into question this binding law.

*Second,* it is settled law that Section 105(a) of the Bankruptcy Code authorizes courts to temporarily enjoin claims against nondebtors upon a showing of the four preliminary injunction

---

[9] Four paragraphs of the Nassau Objection's thirteen-paragraph argument section are lifted word for word, and multiple other paragraphs show only a few words changed, from its prior objection, which was argued and overruled by this Court on September 5, 2024. *See* Sept. 5, 2024 Hr'g Tr. 63:11-12, 63:19-66:5 (overruling objections and reiterating the Court's prior ruling that Supreme Court's decision did not affect the availability of the Preliminary Injunction).

16

factors. Sept. 5, 2024 Hr'g Tr. 58:8-17 [ECF No. 534] (detailing the Court's statutory authority under section 105(a) to issue the preliminary injunction); July 9, 2024 Hr'g Tr. 96:2-6 [ECF No. 511]; *See Erti v. Paine Webber Jackson & Curtis, Inc.*, 765 F.2d 343, 348 (2d Cir. 1985); *see also MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 93 (2d Cir. 1988) (holding that Section 105(a) provides "[a]dditional authority" to enjoin lawsuits "that might impede the reorganization process"); *In re Bernard L. Madoff Inv. Sec., LLC*, 512 F. App'x 18, 19-20 (2d Cir. 2013) ("Section 105(a) is to be 'construed liberally to enjoin suits that might impede the reorganization process'" (quoting *MacArthur Co.*, 837 F.2d at 93)). Indeed, Nassau County concedes as much. (*See* Nassau Objection at 7-8 ("Section 105(a) is employed to enjoin creditors' lawsuits against third parties where the injunction plays an important part in the debtor's reorganization plan or where the action to be enjoined 'will have an immediate adverse economic consequence for the debtor's estate.'") (quoting *In re Bernard L. Madoff Inv. Sec., LLC*, 512 F. App'x at 20) (internal quotation marks omitted).) And the out-of-circuit case Maryland relies on is entirely inapposite to a court's authority under section 105(a). (*See* Maryland Objection at 1-2 (citing *Int'l Petroleum Prod. & Additives Co., Inc. v. Black Gold S.A.R.L.*, No. 22-15109, 2024 WL 4195335, at *10 (9th Cir. Sept. 16, 2024).)[10]

*Third*, the Supreme Court's decision in *Harrington* neither addressed nor affected the authority of a bankruptcy court to temporarily enjoin claims against nondebtors under Section

---

[10] The portion of the case Maryland cites stands for nothing more than the obvious proposition that the automatic stay under Section 362 does not apply to protect non-debtors. *See id.* In reaching that conclusion, the Ninth Circuit acknowledged that some courts have exercised a power to "extend the automatic stay" to cover non-debtors, "rooted in the bankruptcy court's injunctive powers under section 105 of the Bankruptcy Code," but since "the bankruptcy court was not asked to answer these questions in the first instance, this case is not in the correct procedural posture for us to decide" the issue. *Id.* at *11 (internal quotation and citation omitted).

17

105(a) of the Code. Sept. 5, 2024 Hr'g Tr. 63:19-23 [ECF No. 534] ("I do note that there has been some discussion about whether the Supreme Court's decision precludes granting this kind of a requested injunction. I have already made a ruling in July that it does not."); July 9, 2024 Hr'g Tr. 95:5-15 [ECF No. 511] (explaining that the third-party releases prohibited by the Supreme Court are "legally distinct" from a preliminary injunction of claims against a non-debtor third party). As this Court noted on September 5, 2024, this is consistent with the analysis of other courts that have considered injunctions under section 105(a) since the Supreme Court decision. *In re Coast to Coast Leasing, LLC*, 661 B.R. 621, 624 (Bankr. N.D. Ill. 2024) (holding the *Purdue* decision did not preclude 105(a) injunction of creditor claims against non-debtor third parties); *Parlement*, 661 B.R. at 724 ("The Court concludes that *Purdue Pharma* does not preclude the entry of [] a preliminary injunction" against non-debtor third parties); *Onyx Site Servs., LLC v. Caterpillar Fin. Servs. Corp. (In re Onyx Site Servs., LLC)*, 2024 WL 4132150, at *2 (Bankr. M.D. Fla. Aug. 22, 2024) (granting 105(a) preliminary injunction of claims against non-debtor principal of the debtor). This Court should not entertain the Objecting Parties' halfhearted efforts to relitigate an issue has been twice fully briefed, argued, and decided.

*Finally*, the automatic stay in section 362 of the Code, and the exceptions thereto, are "irrelevant" to the relief requested herein.[11] *Dunaway*, 619 B.R. at 57 (holding "the police powers exception is irrelevant" to courts' powers to issue a preliminary injunction pursuant to section 105(a)); Sept. 5, 2024 Hr'g Tr. 58:5-8 [ECF No. 534] ("In addition to the protections of [section] 362 . . . Section 105 has been used to enjoin actions [] that were brought by non-debtors – against non-debtors"). Legislative history and precedent make clear that section 105(a)

---

[11] Though the matter is not before the Court on the present Motion, the Debtors do not concede that any claims would fall under an exception to section 362.

18

provides separate authority to enjoin actions which could impact the *res*. Indeed, this was Congress's expressed intent when enacting the Code: "[b]y excepting an act or action from the automatic stay, the [Bankruptcy Code] simply requires that the [debtor] move the court into action, rather than requiring the stayed party to request relief from the stay." *See* H.R. Rep. No. 95-595, at 342 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6298. Thus, "[t]he effect of [the exceptions in section 362(b)] is not to make the action immune from injunction. The court has ample other powers to stay actions not covered by the automatic stay. Section 105 . . . grants the power to issue [such an injunction]." *Id.* It is therefore unsurprising that courts routinely employ section 105(a) to temporarily enjoin civil actions that would otherwise be excepted from the ambit of the automatic stay. *E.g.*, *Erti*, 765 F.2d at 348 (holding that "the Bankruptcy Court has authority under section 105 broader than the automatic stay provisions of section 362 and may use its equitable powers to assure the orderly conduct of the reorganization proceedings.") The Objecting Parties offer no argument as to why this Court should depart from well-established precedent. (*See* Nassau Objection at 11.)

19

**CONCLUSION**

For the foregoing reasons, and for the reasons set forth in prior pleadings in support of the Preliminary Injunction, the Debtors respectfully request that this Court overrule the objections, and enter the Limited Extension as set forth herein.

Dated: September 22, 2024
New York, New York

By: */s/ Marshall S. Huebner*
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
James I. McClammy
Marc J. Tobak
Joshua N. Shinbrot

*Counsel to the Debtors
and Debtors in Possession*