AKIN GUMP STRAUSS HAUER & FELD LLP
Mitchell P. Hurley
Arik Preis
Katherine Porter
Sara L. Brauner
Theodore James Salwen
Erin E. Parlar
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002

COLE SCHOTZ P.C.
Justin R. Alberto
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117

*Counsel to the Official Committee of Unsecured
Creditors of Purdue Pharma L.P.,* et al.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| In re: | Chapter 11 |
| PURDUE PHARMA L.P., *et al.*, | Case No. 19-23649 (SHL) |
| Debtors.[1] | Jointly Administered |

---

**OFFICIAL COMMITTEE'S OMNIBUS REPLY**
**TO STANDING MOTION OBJECTIONS AND SACKLER STATEMENTS**

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF L.P. (0495), SVC Pharma L.P. (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

## **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT..............................................................................................1

ARGUMENT ........................................................................................................................3

I.    THE SOLE OBJECTION TO THE STANDING MOTION— SUBMITTED BY
      THE CMFN—SHOULD BE OVERRULED..................................................................3

      A.    Decades of Circuit Court Precedent Authorize Derivative Standing for
            Creditors.................................................................................................................3

      B.    Delaware State Law Does Not Limit Bankruptcy Derivative Standing .................4

      C.    The Debtors' Support Is Sufficient to Trigger *Commodore* ...................................7

      D.    The Official Committee Easily Satisfies the *Commodore* Standard........................8

      E.    The Official Committee Is Coordinating with Creditor Groups.............................9

      F.    No Trustee Has Been Requested, or Should be Appointed....................................10

II.   THE SACKLERS DO NOT OBJECT TO THE STANDING MOTION AND
      THEIR EXTENSIVE SUBMISSIONS SHOULD BE DISREGARDED.........................11

CONCLUSION...................................................................................................................15

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Adams v. Marwil (In re Bayou Group, LLC)*,
564 F.3d 541 (2d Cir. 2009)...................................................................................11

*In re AmeriFirst Fin., Inc.*,
No. 23-11240 (TMH), 2024 WL 3841582 (Bankr. D. Del. Aug. 14, 2024).............................4

*In re Citadel Watford City Disposal Partners, L.P.*,
603 B.R. 897 (Bankr. D. Del. 2019) .........................................................................5

*In re Commodore Intern. Ltd.*,
262 F.3d 96 (2d Cir. 2001)................................................................................4, 7, 8

*Glinka v. Murad (In re Housecraft Inds. USA, Inc.)*,
310 F.3d 64 (2d Cir. 2002)..................................................................................4

*In re HH Liquidation, LLC*,
590 B.R. 211 (Bankr. D. Del. 2018) ......................................................................4, 5

*In re North Star Contracting Corp.*,
128 B.R. 66 (Bankr. S.D.N.Y. 1991) .....................................................................11

*In re Pack Liquidating, LLC*,
658 B.R. 305 (Bankr. D. Del. 2024) ....................................................................5, 6, 7

*In re PennySaver USA Publ'g, LLC*,
587 B.R. 445 (Bankr. D. Del. 2018) ......................................................................4, 5

*In re STN Enters.*,
779 F.2d 901 (2d Cir. 1985)............................................................................4, 6, 7, 9

**Statutes**

11 U.S.C. § 101............................................................................................10

11 U.S.C. § 1102..........................................................................................10

29 U.S.C. §§ 1301-1461 ..................................................................................10

29 U.S.C. §§ 1321, 1322, 1361 .........................................................................10

**Other Authorities**

Fed. R. Bankr. P. 7016....................................................................................13

Fed. R. Bankr. P. 7026....................................................................................13

Fed. R. Civ. P. 16............................................................................................................13

Fed. R. Civ. P. 26............................................................................................................13

## PRELIMINARY STATEMENT

The Official Committee's motion for sole standing,[2] which enjoys the support of the

Debtors and tens of thousands of Purdue's creditors,[3] should be granted.[4]  As explained in the

Standing Motion, the requirements for granting derivative standing under well-established Second

Circuit precedent are easily met here.  The Estate Claims are manifestly colorable, and indeed,

represent the most valuable asset of the Debtors' estates, by far.  If the preliminary injunction is

not extended, there can be no serious doubt that prosecution of the Estate Claims is in the estates'

best interests.[5]

Indeed, so clear are the merits of the Standing Motion that there is just one substantive

objection for the Court to consider—the filing submitted by the CMFN.[6]  While Maryland also

---

[2] Capitalized terms used but not defined herein have the meanings ascribed to them in the *Amended Motion of the Official Committee of Unsecured Creditors for Sole Standing to Commence and Prosecute Estate Causes of Action* [ECF No. 6685] (the "Standing Motion") and in the complaint attached as Exhibit B (the "Draft Complaint").

[3] Of the approximately 630,000 claimants in these Cases, two objections and one joinder representing 8 claimants (0.01%) were filed.

[4] *Debtors' Statement in Support of the Motion of the Official Committee of Unsecured Creditors for Sole Standing to Commence and Prosecute Estate Causes of Action* [ECF No. 6525] (the "Debtors' Statement"); *Ad Hoc Committee's Statement in Support of the Official Committee of Unsecured Creditors' Standing Motion* [ECF No. 6531]; *Statement of the Ad Hoc Group of Individual Victims in Support of the Amended Motion of the Official Committee of Unsecured Creditors for Sole Standing to Commence and Prosecute Estate Causes of Action* [ECF No. 6863]; *The Multi-State Governmental Entities Group's Statement in Support of the Amended Motion of the Official Committee of Unsecured Creditors for Sole Standing to Commence and Prosecute Estate Causes of Action* [ECF No. 6704].

[5] As a result of discussions with numerous parties, the hearing to approve the Standing Motion has been adjourned a number of times.  In light of the current facts and circumstances of these Cases, and in order to avoid timing issues resulting from the interplay of extensions of the preliminary injunction (if any) in the future and the briefing for and hearing to approve the Standing Motion, the Committee and various parties have agreed that the time has come to have the hearing to approve the Standing Motion on October 29, 2024.

[6] *Opposition of the Certain Canadian Municipal and First Nations Creditors Including Toronto to the Motion of the Official Committee of Unsecured Creditors for Sole Standing to Commence and Prosecute Estate Causes of Action* [ECF No. 6701] (the "CMFN Opposition").  In addition, one creditor filed a response styled as an objection, but does not appear to oppose the relief requested.  *Objection, to the Official Committee of Unsecured Creditors Motion for Sole Standing to Litigate by Individual Pro Se Claimant, Carrie L McGaha, a Woman Personally Injured by Prescription Opiates* [ECF No. 6700] (acknowledging that "it makes sense to have the people already familiar with the case litigating it.").  The CMFN's objection was joined by the County of Nassau.  *County of Nassau's Joinder and Limited Objection to the Official Committee of Unsecured Creditors' Motion for Sole Standing to Commence and Prosecute Estate Causes of Action* [ECF No. 6703] (the "Nassau Joinder").  The state of New York, where Nassau County is located, does not object to the Standing Motion, and neither does any other state or any other U.S. political subdivision other than Nassau County.

1

originally objected, it has agreed to enter into a cooperation agreement with the Official

Committee, and now supports the Standing Motion.  The only other parties to submit a response

of any kind are the Sacklers, but they do not object to the Standing Motion, or oppose the relief it

seeks.[7]  Instead, they submit extensive "statements" concerning these cases—more than 90 pages

in total—in which they contend, incredibly, that the Estate Claims (which the Sacklers previously

agreed to pay at least $5.5 billion to settle) are "utterly meritless."  The Sacklers also try to rewrite

the well-documented history of their misconduct, including their domination and control of Purdue

while it engaged in a decades-long pattern of criminal conduct in the sale of opioids (to which

Purdue has twice pled guilty), and attempt to direct blame elsewhere for the opioid crisis they

helped ignite and fuel, the vast proceeds of which continue to fund their lavish, billionaire

lifestyles.  The Sacklers' tired denials and finger pointing, while no doubt appalling to their many

victims, are irrelevant to the Standing Motion (which, again, they do not oppose), and can largely

be disregarded.

That leaves only the CMFN's objection, which is dispensed with easily.  The CMFN ignore

or mischaracterize the support provided for the Standing Motion by the Debtors (and

representatives of thousands of Purdue creditors), misstates the standard applicable to the motion,

and flirts with arguing that the Court should overrule decades of Circuit and District Court

authority by holding that derivative standing is *never* permissible.  Mainly, however, the CMFN

rely on an obvious misreading of several older Delaware bankruptcy cases to argue that Delaware

law somehow prevents the Court from granting the Standing Motion.  In fact, the reasoning and

conclusions of the cases cited by the CMFN have never been adopted by any court in this District,

---

[7] *Statement of the Raymond Sackler Family in Response to the Unsecured Creditors Committee's Motion for Standing to Pursue Estate Claims* [ECF No. 6791] (the "Side B Statement"); *Statement of Beacon Company in Response to the Motion of the Official Committee of Unsecured Creditors for Sole Standing to Commence and Prosecute Estate Causes of Action* [ECF No. 6793] (the "Side A Statement").

have been roundly rejected by subsequent Delaware holdings, and would not justify denying the

Standing Motion if they controlled (and they do not).  The CMFN objection should be overruled.

As the Debtors expressly recognize, the Official Committee is the only party prepared to

prosecute the enormously valuable Estate Claims for the benefit of all of Purdue's creditors, and

without competing claims of its own.  Nevertheless, the Official Committee intends to work closely

with its constituents, including through cooperation agreements with the state AHC (an ad hoc

committee of certain state and local governmental creditors), the MSGE Group (representing

thousands of municipalities and other public entities), the PI Group (an ad hoc group counting

thousands of individual victims among its members) and now the state of Maryland, all of whom

support granting the Standing Motion, while retaining sole authority to direct the litigation. To be

sure, the parties remain engaged in mediation in an effort to resolve the Estate Claims through

settlement, and the Official Committee has long expressed its preference for a near-term,

negotiated resolution over the prospect of time-consuming and expensive litigation.  But if that

process does not soon yield settlement terms from the Sacklers that are acceptable to the Official

Committee and its constituents, the Official Committee must be in a position to proceed with the

Estate Claims without further delay.  The Official Committee respectfully submits that its Standing

Motion should be granted.

**ARGUMENT**

I.      **THE SOLE OBJECTION TO THE STANDING MOTION—
        SUBMITTED BY THE CMFN—SHOULD BE OVERRULED**

   A.    **Decades of Circuit Court Precedent Authorize
          Derivative Standing for Creditors**

The CMFN spill substantial ink suggesting that the Second Circuit's rulings approving

derivative grants of standing may no longer be good law, but ultimately pulls back.  The CMFN at

first note that it "object[s] to the idea of creditor derivative standing in bankruptcy," but then concede "that circuit precedent permits the practice." CMFN Opp. ⚌ 20, n.7.

And indeed it does, and has for decades. In *STN*, decided nearly 40 years ago, the Second Circuit first recognized that a committee may obtain derivative standing to bring an adversary suit in the context of a bankruptcy proceeding. *In re STN Enters.*, 779 F.2d 901, 904 (2d Cir. 1985). Later, in *Commodore*, the Second Circuit held that a committee may obtain derivative standing, with the debtor's consent and the bankruptcy court's approval, so long as the court finds that the suit is in the estate's best interest and is necessary and beneficial to the fair resolution of the bankruptcy proceedings. *In re Commodore Intern. Ltd.*, 262 F.3d 96, 100 (2d Cir. 2001). Finally, in *Housecraft*, the Second Circuit held that a committee may sue as a co-plaintiff with the debtor on behalf of the estate when the requirements for standing have been met. *Glinka v. Murad (In re Housecraft Inds. USA, Inc.)*, 310 F.3d 64, 70–72 (2d Cir. 2002). No intervening Supreme Court decision even remotely questions the continuing availability of derivative standing for creditors under these precedents. Notably, derivative standing has been granted as recently as this summer (post-*Harrington*). *See, e.g.*, *In re AmeriFirst Fin., Inc.*, No. 23-11240 (TMH), 2024 WL 3841582, at *4, *17 (Bankr. D. Del. Aug. 14, 2024) (citing *STN* and granting committee derivative standing to prosecute fraudulent transfer, preference, and equitable subordination claims).

**B.      Delaware State Law Does Not Limit Bankruptcy Derivative Standing**

According to the CMFN, the Court cannot grant derivative standing to the Official Committee to commence the Estate Claims because it is prevented from doing so by Delaware law. The CMFN's entire argument hangs on their reading of a few stale decisions that construed Delaware's limited partnership and limited liability company statutes and found that, in those cases, a creditors' committee or chapter 7 trustee lacked standing to assert breach of fiduciary duty claims. CMFN Opp. ⚌ 26 (citing *In re Citadel Watford City Disposal Partners, L.P.*, 603 B.R. 897

4

(Bankr. D. Del. 2019); *In re PennySaver USA Publ'g, LLC*, 587 B.R. 445 (Bankr. D. Del. 2018);

*In re HH Liquidation, LLC*, 590 B.R. 211 (Bankr. D. Del. 2018)).

Even if those decisions were controlling, and they are not, they would not justify denying

the Standing Motion.  Those decisions relate ***only*** to Delaware law breach of fiduciary duty claims.

*See Citadel*, 603 B.R. at 903–05; *PennySaver*, 587 B.R. at 467; *HH Liquidation*, 590 B.R. at 283–

85.  Of the twenty-two claims alleged in the Official Committee's Draft Complaint, just one (Count

10) asserts a breach of fiduciary duty claim on behalf of a Delaware limited partnership.  The

remaining twenty-one counts assert claims for fraudulent transfer, preference, breach of fiduciary

on behalf of a New York corporation,[8] racketeering, and other claims.  In other words, the Official

Committee's motion would have to be granted as to virtually all of the Estate Claims alleged in

the Draft Complaint even if the CMFN's argument otherwise were persuasive (and it is not).[9]

Moreover, all of the cases cited by the CMFN have been rejected by courts in this district,

and by all subsequent bankruptcy decisions in the district of Delaware.  *See In re Pack Liquidating,*

*LLC*, 658 B.R. 305, 332–33 (Bankr. D. Del. 2024) (rejecting each of the three decisions relied on

by the CMFN as inconsistent with controlling precedent which holds that "the Bankruptcy Code

rather than state law [is] the source of authority for granting committee standing.")[10]; *In re The*

*McClatchy Company*, Case No. 20-10418 (MEW) (Bankr. S.D.N.Y. July 8, 2020), July 6, 2020

Hr'g Tr. at 30:11–25 [ECF No. 641] (declining to follow "cases holding as a matter of Delaware

limited liability company law [that] a creditor of an LLC is not permitted to make derivative

---

[8] PPI is a New York corporation.

[9] Judge Sontchi recognized as much expressly in *Pennysaver*.  *See* 587 B.R. at 468 (granting standing to committee to assert derivatively Delaware LLC's fraudulent conveyance claims, regardless of any purported limit relating to Delaware LLC breach of fiduciary duty claims).

[10] In *Pack Liquidating*, the United States Bankruptcy Court for the District of Delaware ("Delaware Bankruptcy Court") specifically discussed and rejected, one by one, each of the three decisions relied on by the CMFN for their incompatibility with Third Circuit precedent providing that "the Bankruptcy Code rather than state law [is] the source of authority for granting committee standing."  658 B.R. at 319.

claims" because derivative standing would be granted under "federal bankruptcy law, not state law").[11]

Both this Court, and the *Pack Liquidating* decision from the Delaware Bankruptcy Court, have ruled that "the Bankruptcy Code rather than state law [is] the source of authority for granting committee standing" and, therefore, "that authority [to grant derivative standing] is not affected by acts of a state legislature to limit the availability of state-law derivative actions." *In re Pack Liquidating, LLC*, 658 B.R. at 318–19; *McClatchy* at 30:17–31:13 (recognizing that "a bankruptcy court's powers to grant [derivative] standing to a committee as an estate fiduciary, [is] a matter of federal bankruptcy law").[12] As such, Delaware law ***does not*** preclude an order granting derivative standing to a creditors' committee. *See Pack Liquidating*, 658 B.R. at 324 ("[T]he restrictions on derivative actions imposed by the Delaware Limited Liability Company Act . . . have no bearing on a bankruptcy court's ability to authorize a committee to bring an estate cause of action."); *McClatchy* at 31:11–13 ("This motion is a matter of federal bankruptcy law that is governed by *STN* and other decisions, not by Delaware state law."). The CMFN are simply incorrect when they argue that the Official Committee cannot assert derivative claims on behalf of the Debtors' estates.

The CMFN's related preemption argument also fails. According to the CMFN, even if derivative standing derives from the Bankruptcy Code, it would not preempt Delaware law. CMFN Opp. ₽₽ 27–32. Once again, however, the CMFN fail to acknowledge (let alone address) case law that has reached the exact opposite conclusion. *In re Pack Liquidating*, 658 B.R. at 324 (holding that if Delaware law "sought to restrict the authority of a bankruptcy court to authorize [derivative

---

[11] The CMFN accuse the Official Committee of seeking to "lead this Court to error". CMFN Opp. ₽ 9. But the CMFN failed to cite cases that are directly on-point and squarely reject the law they presented to this Court.

[12] In support of these rulings, both this Court and the Delaware Bankruptcy Court cited *Unsecured Creditors Comm. of STN Enters., Inc. v. Noyes (In re STN Enters.)*, 779 F.2d 901, 904 (2d Cir. 1985) for its holding that the authority to grant derivative standing derives specifically from the Bankruptcy Code.

standing], such an effort would be unsuccessful because it would conflict with the Bankruptcy Code and thus be preempted.").

### C.     The Debtors' Support Is Sufficient to Trigger *Commodore*

In *Commodore*, the Second Circuit identified a particularly light burden for creditors seeking derivative standing to assert estate claims with the support of the debtors. *See In re Commodore Int'l*, 262 F.3d at 100.  Indeed, a debtor arguably can transfer standing to a committee by stipulation.  *See, e.g.*, Debtors' Stmt at 5.  The CMFN contend, however, that the Debtors' support for the Standing Motion somehow is insufficient to trigger *Commodore* review.  Not so.

The Debtors submitted a separate filing in support of the Standing Motion, expressly agreeing "with the Official Committee . . .  that sole standing to prosecute the claims set forth in the draft complaint … (that was shared with the Debtors prior to the filing of the Standing Motion) … should be granted to the [Official Committee]." *Id*. at 3.  As the Debtors explain, "the [Official Committee] is the only other party in these chapter 11 cases with a fiduciary duty to all unsecured creditors, and the only party empowered by statue." *Id*. at 4.  Hence, the Official Committee is "the only party other than the Debtors that does not have its own third-party claims that may present interests conflicting with the goal of maximizing recoveries on the Estate Claims." *Id*. According to the Debtors, derivative standing is particularly called for here because the Official Committee "has worked assiduously … alongside the Debtors to conduct an exhaustive investigation into the Estate Claims" for over five years. *Id.*  To that end, the Official Committee "reviewed many millions of pages of documents produced in discovery and led depositions of the Sacklers and other key witnesses which helped the estates propose" a plan "that would have delivered $5.5-6 billion in value and other non-monetary concessions from the Sacklers." *Id*. at 5. In the Debtors' words, granting sole standing to the Official Committee "is clearly warranted." *Id*.

Nevertheless, the CMFN contend that the Debtors have not made their support for this motion adequately clear to justify a grant of derivative standing to the Official Committee. According to the CMFN, the Debtors' consent under *Commodore* must be conveyed in "a complete, irrevocable written assignment of all of the Debtors in Possession's rights without reservation." CMFN Opp. ¶ 39. But a motion for derivative standing does not seek to transfer ***ownership*** of estate claims from the debtors to the moving party. Rather, as the label implies, a motion for derivative standing merely seeks permission for a party other than the debtor or trustee to stand in their shoes and prosecute estate claims ***for the benefit of the estates***. The claims themselves remain property of the estates, at least until such time as they are transferred or otherwise disposed of through a plan or other resolution of the bankruptcy cases or adversary proceeding. Notably, just like the Official Committee here, the committee in *Commodore* received "consent" to pursue *the debtors'* claims, not an assignment of those claims. *See In re Commodore Int'l*, 262 F.3d at 98. Nothing more is required to trigger *Commodore* review.

**D.      The Official Committee Easily Satisfies the *Commodore* Standard**

Under *Commodore,* a standing motion should be granted where (i) the debtor consents, and (ii) derivative standing is in the best interest of the bankruptcy estate and necessary and beneficial to the fair and efficient resolution of the bankruptcy proceedings. *See In re Commodore Int'l.*, 262 F.3d at 100. Courts typically ask whether the claims at issue are "colorable," in determining whether a grant of standing is in the best interests of the estates.

The CMFN do not dispute that the Estate Claims are colorable. Instead, the CMFN argue that the Standing Motion should be denied because it does not allege that "the Debtors in Possession have unreasonably and unjustifiably failed and refused to pursue the avoidance causes of action." CMFN Obj. ¶ 40. That is the standard applicable under *STN*, not *Commodore*. Indeed, the standard identified by the CMFN would make no sense where, as here, the debtor has consented

8

to the movant bringing estate claims in the debtor's place.  As explained in the Official Committee's opening brief, there can be no serious dispute that assertion of the Estate Claims—the estates' most valuable assets by far—is in the best interests of the estates if the mediation does not produce a settlement.

### E.      The Official Committee Is Coordinating with Creditor Groups

The Official Committee has cooperated with creditor groups throughout the Chapter 11 Cases[13] and has committed to continue to coordinate with the AHC, the MSGE Group, the PI Group and, most recently, Maryland in connection with the prosecution of the Estate Claims.  Each of those parties—representing thousands of creditors and millions of American citizens—supports the Standing Motion.  The CMFN apparently misapprehends the Official Committee's commitment to coordinate with these creditors and groups, however.  CMFN Opp. ¶ 65.  The Official Committee has agreed to coordinate, support, and consult, but "with the express understanding that the Official Committee shall make all decisions respecting commencement and prosecution of the Estate Claims in the Official Committee's sole discretion." *E.g.,* Standing Mot. at 15.  The Official Committee has not granted (and could not unilaterally grant) any party intervention or settlement rights, and if a settlement ever is agreed, it will be subject to approval by the Bankruptcy Court in accordance with the Bankruptcy Code and all applicable rules.

Finally, it bears noting that the Official Committee includes a voting governmental entity as a member.  The Pension Benefit Guaranty Corporation ("PBGC") is the United States federal agency and wholly owned United States government corporation, that administers the defined benefit pension plan termination insurance program under Title IV of Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§ 1301-1461.  PBGC guarantees

---

[13] *See, e.g.*, *Notice of Filing of Amended Stipulation and Agreed Order Among the Official Committee and Other Parties in Interest Regarding Discovery and the Sharing of Information in the Chapter 11 Cases* [ECF No. 1440].

the payment of certain pension benefits upon the termination of a single-employer pension plan covered by Title IV of ERISA.  When an underfunded pension plan terminates, PBGC typically becomes the statutory trustee of the plan and supplements any assets remaining in the pension plan with PBGC's insurance funds to ensure that participants and beneficiaries receive their pension benefits up to statutory limits established by Title IV.  *See* 29 U.S.C. §§ 1321, 1322, 1361.  When a pension plan sponsor is in bankruptcy, PBGC typically files a claim for a pension plan's unfunded benefit liabilities, which are due if a pension plan terminates.  In addition, PBGC files claims for ERISA Title IV premiums due to PBGC and for unpaid minimum funding contributions owed to the pension plan, which are due regardless of whether the pension plan terminates.  PBGC uses premiums paid by pension plan sponsors, and any recoveries from such bankruptcy claims, *inter alia*, to maintain its insurance fund to ensure that participants and beneficiaries of terminated pension plans will continue to receive their benefits, subject to certain statutory limitations.

As "a guarantor of a pension benefit payable by or on behalf of a debtor," PBGC is a "person" eligible for committee membership.  11 U.S.C. §§ 101(41)(B), 1102(b).  PBGC has served as a committee member on over 150 unsecured creditors' committees in bankruptcy cases across the United States.  PBGC fulfills its role as committee member in this case as it has done in all other cases, with the utmost diligence and care as a fiduciary.  This includes voting in the best interest of all unsecured creditors.

### F.      No Trustee Has Been Requested, or Should be Appointed

Building off their incorrect interpretations about derivative standing under Delaware law, the CMFN suggest that perhaps a trustee should be appointed to pursue the Estate Claims.  CMFN Opp. at ¶¶ 7-8.  Notably, the CMFN have not actually moved for appointment of a trustee—a prerequisite to that relief—presumably because the CMFN undertand that such a motion would not succeed.

The Official Committee has conducted an investigation and marshalled extensive facts to set forth claims in a detailed, 200-page complaint, that it is ready to prosecute ***immediately***. It is imperative that litigation commence without delay because key tolling agreements are set to expire.[14] The litigation will be complex and include pursuit of claims in the United States and overseas.[15] Appointing a trustee would introduce substantial delay and impose on the estates the substantial unnecessary costs associated with bringing that trustee, and potentially another group of professionals, up to speed.

Under the circumstances presented here, if the CMFN moved for a trustee (and they did not), they could never meet the "very high" standard to justify that relief. *E.g.*, *Adams v. Marwil (In re Bayou Group, LLC)*, 564 F.3d 541, 546–47 (2d Cir. 2009) (rejecting appointment of trustee because movant provided no reason to doubt the debtor in possession's "competence to manage. . . [the] bankruptcy proceedings"); *In re North Star Contracting Corp.*, 128 B.R. 66, 70 (Bankr. S.D.N.Y. 1991) (rejecting appointment of a trustee because "the costs of a trustee will only burden this estate with additional administrative expenses and will not be in the best interests of creditors").

## II.    THE SACKLERS DO NOT OBJECT TO THE STANDING MOTION AND THEIR EXTENSIVE SUBMISSIONS SHOULD BE DISREGARDED

Together, the two sides of the Sackler family submitted "statements" totaling more than 90 pages that supposedly relate to the Official Committee's Standing Motion. But neither Side A nor Side B actually objects to the Standing Motion or opposes the relief that the Official Committee seeks. *See* Side A Stmt at 1 ("Side A does not take a position" on the motion); Side B Stmt at 1,

---

[14] *E.g.*, *Thirty-Eighth Amended Order Pursuant to 11 U.S.C. § 105(a) Granting Motion for a Preliminary Injunction* [Adv. Pro. No. 19-08289 (RDD) [ECF No. 537]]; *Stipulation Order Tolling Shareholder Released Claims* [ECF No. 6812].

[15] *See Motion of the Official Committee of Unsecured Creditors for a Letter of Request to the Royal Court of Jersey* [ECF No. 6689].

2, n.4 ("Side B takes no position on the Motion" and "is not objecting to the relief sought by the motion."). The Sacklers characterize their statements as "responses" to the Standing Motion, but that is true only in the loosest sense of the word. They do not grapple with the Official Committee's arguments in support of the Standing Motion, or contest that the prevailing standards for the Standing Motion have been met, or (as noted) argue the Standing Motion should not be granted.[16]

Instead, the Sacklers have issued what amounts to a 90-page press release, in which they claim (yet again) that they are blameless for Purdue's decades of admitted criminal misconduct while under the family's yoke, and describe the Estate Claims—***which they previously agreed to pay billions to settle***—as "utterly meritless." *See* Side A Stmt *passim;* Side B Stmt at 1. In addition to being manifestly incredible, the Sacklers' contentions are irrelevant to the motion before the Court, as even they admit, and should be disregarded. Only the Sacklers' scheduling and case management contentions, and their misstatements concerning Purdue's 2020 criminal plea agreement, warrant a brief response now.

*First*, the Sacklers threaten to "object to, and litigate, all Proofs of Claim asserting Purdue's tort liability," and argue that their objections—if and when they ever are filed—must be resolved before the Estate Claims can proceed. Side B Stmt at 1.[17] In addition to being misguided, the Sacklers' scheduling and case-management contentions are premature. If the Official Committee, with this Court's authorization, commences an adversary proceeding, the Court will set the date for an initial pretrial conference "in the summons." S.D.N.Y. LBR 7016-2. Under Federal Rule of Civil Procedure 26, the parties must confer concerning scheduling and other matters "as soon as practicable—and in any event at least 21 days before" the date of that initial conference. As

---

[16] No other defendant has filed a response to the Standing Motion.

[17] The Sacklers do not suggest that this is a basis to deny standing, only to defer prosecution. Side B Stmt at 2.

part of their Rule 26 conference, the parties must prepare and submit to the Court a report, including concerning scheduling matters. Fed. R. Civ. P. 26(f)(2); Fed. R. Bankr. P. 7026. "After receiving the parties' report under Rule 26(f)," and after conferring with the parties, the Court will issue a scheduling order that will address, among other things, timing and case management issues. Fed. R. Civ. P. 16(c)(2) (identifying various scheduling and other matters to be considered at pretrial conference); 16(b)(1) (requiring issuance of a scheduling order); Fed. R. Bankr. P. 7016 (incorporating Fed. R. Civ. P. 16 by reference). In other words, the Sacklers will have ample opportunity to make whatever arguments they wish to make about scheduling **after** the Official Committee files its complaint, and in compliance with the rules. That time, however, is not now.

*Second*, and contrary to the Sacklers' claims, the Official Committee fairly and accurately described Purdue's criminal guilty plea in 2020. It is undisputed that Purdue admitted in 2020 to engaging in the criminal sale of opioids for a period spanning decades, all while Purdue's Board was entirely dominated and controlled by the Sackler family and their designees. It also is undisputed that Purdue admitted in its 2020 plea agreement that its crime spree continued in May 2007, the same month that Purdue last confessed to federal crimes in the sale of opioids, dating back to 1995 again, all while Purdue's board was dominated and controlled by the Sackler family. The Sacklers now claim falsely that the Official Committee mischaracterized aspects of Purdue's guilty plea in its Draft Complaint.

Significantly, the party that actually signed the plea agreement—Purdue—supports the Official Committee's motion, and takes no issue with the Official Committee's description of Purdue's conduct. Nor could it. The Official Committee alleges that "Purdue confessed" to "criminal conduct" relating to Purdue's sale of opioids. Draft Complaint ¶ 143 (sixth bulleted paragraph). That is of course undeniably true. Purdue admitted that it (i) "knowingly and

intentionally conspired and agreed with others to aid and abet [Health Care Professionals] dispensing [opioids], without a legitimate medical purpose and outside the usual course of professional practice," and (ii) "failed to . . . cease detailing [Health Care Professionals] after receiving information suggesting that those [Health Care Professionals] were prescribing opioid products without a legitimate medical purpose and outside the usual course of professional practice."[18]

The Official Committee believes that Purdue carried out these crimes in part "by targeting abnormally high-volume OxyContin prescribers for intensive marketing" (marketing to health care providers is sometimes referred to as "detailing"), which resulted in, among other things, opioids being prescribed "without a legitimate medical purpose." Indeed, the Official Committee believes, and therefore alleged, that such conduct is "at the heart" of the crimes that Purdue admits committing. The Official Committee did not, however, allege that Purdue stipulated to that connection in the plea agreement. But merely because Purdue did not admit to certain facts in the plea agreement does not make them untrue. The Official Committee believes that the evidence will demonstrate clearly that Purdue's targeting of doctors with suspicious prescribing practices— and other efforts to "turbocharge" OxyContin sales—in fact resulted in substantial illicit prescriptions of OxyContin, just as the Official Committee alleges in the Draft Complaint. *See also* Draft Compl. ¶ 165.

It is worth noting, moreover, that the Sacklers had a chance months ago to identify any aspect of the Official Committee's draft complaint that they believe to be inaccurate, but chose not to do so. After the Official Committee filed its standing motion and proposed complaint on July 8, 2024, the Sacklers were quoted in a number of prominent publications claiming that the Official

---

[18] *Motion of Debtors Pursuant to 11 U.S.C. § 105 and Fed. R. Bankr. P. 9019 Authorizing and Approving Settlements Between the Debtors and the United States* [ECF N. 1828], Ex B (Plea Agreement), Schedule A.

Committee's filings were "riddled with factual errors."[19]  On August 7, 2024, the Official

Committee wrote the Sacklers about those reports, advising that it "stands by [the] allegations" in

the Draft Complaint, "which it believes are entirely accurate." Nevertheless, the Official

Committee expressly "invite[d the Sacklers] to identify specifically any factual errors" they

"contend are included in the Official Committee's filing so that we can consider [their] position in

good faith." *See* Letter from M. Hurley to counsel for the Sacklers and their affiliates, dated Aug.

7, 2024 (relevant portions of which are attached hereto as Exhibit A).  The Sacklers never

responded to the Official Committee's letter, or otherwise ever identified the supposed plea

agreement "misrepresentations" of which they now breathlessly complain.

## CONCLUSION

For the foregoing reasons, the Official Committee respectfully requests that the Court

overrule the objection, and grant its Standing Motion for sole derivative standing to commence

and prosecute estate claims.  The Official Committee respectfully requests that the Court enter the

Proposed Order attached hereto as Exhibit B, which reflect additional terms recently agreed to

with the PI Group and Maryland.[20]

---

[19] *See, e.g.*, Jan Hoffman, *States and Creditors for Purdue Pharma Threaten Sacklers With Gush of Lawsuits,* N.Y. TIMES, (July 9, 2024) ("Two branches of the Sackler families responded in a statement: 'Their filing is riddled with factual errors' . . . ."); Dietrich Knauth, *Purdue Creditors Seek Approval to Sue Sackler Family Members,* REUTERS, (July 8, 2024) ("A spokesperson for the Sackler family members said the committee's court filing was 'riddled with factual errors'").

[20] The revised proposed order is attached hereto as Exhibit B.  A redline of the revised proposed order against the original proposed order is attached hereto as Exhibit C.

Dated: October 24, 2024
New York, New York

AKIN GUMP STRAUSS HAUER & FELD LLP

By: */s/ Mitchell Hurley*_____
    Mitchell P. Hurley
    Arik Preis
    Katherine Porter
    Sara L. Brauner
    Theodore James Salwen
    Erin E. Parlar
    One Bryant Park
    New York, New York 10036
    Telephone: (212) 872-1000
    Facsimile: (212) 872-1002
    mhurley@akingump.com
    apreis@akingump.com
    kporter@akingump.com
    sbrauner@akingump.com
    jsalwen@akingump.com
    eparlar@akingump.com

COLE SCHOTZ P.C.

    Justin R. Alberto
    500 Delaware Avenue, Suite 1410
    Wilmington, Delaware 19801
    Telephone: (302) 652-3131
    Facsimile: (302) 652-3117
    jalberto@coleschotz.com

*Counsel to the Official Committee of Unsecured*
*Creditors of Purdue Pharma L.P.,* et al.