**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------x

In re:                                              Chapter 11

PURDUE PHARMA L.P., *et al.*,                       Case No. 19-23649 (SHL)

                      Debtors.                (Jointly Administered)

------------------------------------------------------------------x

## MEMORANDUM OF DECISION

**A P P E A R A N C E S :**

**AKIN GUMP STRAUSS HAUER & FELD LLP**
*Counsel for the Official Committee of Unsecured Creditors of Purdue Pharma L.P., et al.*
One Bryant Park
New York, New York 10036
By:    Mitchell P. Hurley, Esq.
           Arik Preis, Esq.
           Katherine Porter, Esq.
           Sara L. Brauner, Esq.
           Theodore James Salwen, Esq.
           Erin E. Parlar, Esq.

**COLE SCHOTZ P.C.**
*Counsel for the Official Committee of Unsecured Creditors of Purdue Pharma L.P., et al.*
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
By:    Justin R. Alberto, Esq.

**DAVIS POLK & WARDWELL LLP**
*Counsel for the Debtors, Purdue Pharma L.P., et al.*
450 Lexington Avenue
New York, New York 10017
By:    Marshall S. Huebner, Esq.
           Benjamin S. Kaminetzky, Esq.
           James I. McClammy, Esq.
           Marc J. Tobak, Esq.
           Eric M. Kim, Esq.
           Joshua N. Shinbrot, Esq.

**LITE DEPALMA GREENBERG & AFANADOR, LLC**
*Counsel for Certain Canadian Municipal and First Nations Creditors*
570 Broad Street, Suite 1201
Newark, New Jersey 07102
By:     Allen J. Underwood II, Esq.

**ANTHONY G. BROWN, ATTORNEY GENERAL OF MARYLAND**
*Counsel to the State of Maryland*
Office of the Attorney General
200 St. Paul Place
Baltimore, Maryland 21202
By:     Brian T. Edmunds, Esq.
        Sarah A. Zadrozny, Esq.

**NAPOLI SHKOLNIK**
*Counsel to the County of Nassau, New York*
1302 Avenida Ponce de Leon
Santurce, Puerto Rico 00907
By:     Hunter J. Shkolnik, Esq.

-and-

400 Broadhollow Road
Melville, New York 11747
By:     Brett S. Bustamante, Esq.

**KRAMER LEVIN NAFTALIS & FRANKEL LLP**
*Counsel to the Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants*
1177 Avenue of the Americas
New York, New York 10036
By:     Kenneth H. Eckstein, Esq.
        Rachael Ringer, Esq.
        David E. Blabey Jr., Esq.

**GILBERT LLP**
*Counsel to the Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants*
700 Pennsylvania Avenue, SE
Washington, D.C. 20003
By:     Kami E. Quinn, Esq.

**BROWN RUDNICK LLP**
*Counsel to the Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants*
7 Times Square
New York, New York 10036
By:     David J. Molton, Esq.
        Gerard Cicero, Esq.

**OTTERBOURG P.C.**
*Counsel to the Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants*
230 Park Avenue
New York, New York 10169
By:    Melanie L. Cyganowski, Esq.
       Jennifer S. Feeney, Esq.

**CAPLIN & DRYSDALE, CHARTERED**
*Counsel to the Multi-State Governmental Entities Group*
1200 New Hampshire Ave. NW, 8th Floor
Washington, D.C. 20036
By:    Kevin C. Maclay, Esq.
       James P. Wehner, Esq.
       Jeffrey A. Liesemer, Esq.
       Todd E. Phillips, Esq.
       Serafina Concannon, Esq.

**WHITE & CASE LLP**
*Counsel to the Ad Hoc Group of Individual Victims of Purdue Pharma L.P., et al.*
Southeast Financial Center, Suite 4900
200 South Biscayne Boulevard
Miami, Florida 33131
By:    Thomas E. Lauria, Esq.

-and-

1221 Avenue of the Americas
New York, New York 10020
By:    J. Christopher Shore, Esq.
       Michele J. Meises, Esq.

**ASK LLP**
*Counsel to the Ad Hoc Group of Individual Victims of Purdue Pharma L.P., et al.*
60 East 42nd Street, 46th Floor
New York, New York 10165
By:    Edward E. Neiger, Esq.
       Jennifer A. Christian, Esq.

**DEBEVOISE & PLIMPTON LLP**
*Counsel to Beacon Company*
66 Hudson Boulevard East
New York, New York 10001
By:    Jasmine Ball, Esq.
       Maura Kathleen Monaghan, Esq.
       Jeffrey J. Rosen, Esq.

**MILBANK LLP**
*Counsel to the Raymond Sackler Family*
55 Hudson Yards
New York, New York 10001
By:    Dennis F. Dunne, Esq.
       Alexander B. Lees, Esq.

**GHU ASSOCIATES LLC**
*Counsel to the Raymond Sackler Family*
One Liberty Plaza
165 Broadway, 23rd Floor
New York, New York 10006
By:    Gerard H. Uzzi, Esq.

**JOSEPH HAGE AARONSON LLC**
*Counsel to the Raymond Sackler Family*
800 Third Avenue, 30th Floor
New York, New York 10022
By:    Gregory P. Joseph, Esq.
       Mara Leventhal, Esq.
       Christopher J. Stanley, Esq.
       Eric K. Stodola, Esq.

**CARRIE L. MCGAHA**
*Pro Se*

**SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court is the request of the Official Committee of Unsecured Creditors

appointed in these cases (the "Committee") for standing to commence and prosecute estate

causes of action. *See Amended Motion of the Official Committee of Unsecured Creditors for*

*Sole Standing to Commence and Prosecute Estate Causes of Action* [ECF No. 6685][1] (the

"Standing Motion"). The Standing Motion is supported by Purdue Pharma L.P. and its affiliated

debtors (collectively, the "Debtors" or "Purdue"), the Ad Hoc Committee of Governmental and

Other Contingent Litigation Claimants (the "AHC"), the Ad Hoc Group of Individual Victims

---

[1]    Unless otherwise indicated, references in this Memorandum of Decision to docket entries on the Case
Management/Electronic Case Files ("ECF") system are to Case No. 19-23649.

(the "PI Group"), and the Multi-State Governmental Entities Group (the "MSGE Group").  *See Debtors' Statement in Support of the Motion of the Official Committee of Unsecured Creditors for Sole Standing to Commence and Prosecute Estate Causes of Action* [ECF No. 6525] (the "Debtors' Statement in Support"); *Ad Hoc Committee's Statement in Support of the Official Committee of Unsecured Creditors' Standing Motion* [ECF No. 6531] (the "AHC Statement in Support"); *The Multi-State Governmental Entities Group's Statement in Support of the Amended Motion of the Official Committee of Unsecured Creditors for Sole Standing to Commence and Prosecute Estate Causes of Action* [ECF No. 6704] (the "MSGE Group Statement in Support"); *Statement of the Ad Hoc Group of Individual Victims in Support of the Amended Motion of the Official Committee of Unsecured Creditors for Sole Standing to Commence and Prosecute Estate Causes of Action* [ECF No. 6863] (the "PI Group Statement in Support").

An opposition to the Standing Motion has been filed by certain Canadian Municipal and First Nations Creditors (the "CMFN"), with a joinder to that opposition filed by the County of Nassau, New York ("Nassau County").[2]  *See Opposition of the Certain Canadian Municipal and First Nations Creditors Including Toronto to the Motion of the Official Committee of Unsecured Creditors for Sole Standing to Commence and Prosecute Estate Causes of Action* [ECF No. 6701] (the "CMFN Opposition"); *County of Nassau's Joinder and Limited Objection to the Official Committee of Unsecured Creditors' Motion for Sole Standing to Commence and Prosecute Estate Causes of Action* [ECF No. 6703] (the "Nassau County Joinder").[3]  While not

---

[2]      An objection filed by the State of Maryland has been withdrawn.  *See The State of Maryland's Objection to the Official Committee of Unsecured Creditors' Amended Motion for Sole Standing to Commence and Prosecute Estate Causes of Action* [ECF No. 6851] (the "Maryland Objection"); *Withdrawal of the State of Maryland's Objection to the Official Committee of Unsecured Creditors' Amended Motion for Sole Standing to Commence and Prosecute Estate Causes of Action* [ECF No. 6890].

[3]      Additionally, an objection was filed by *pro se* creditor Carrie McGaha.  *See Objection, To the Official Committee of Unsecured Creditors Motion for Sole Standing to Litigate By Individual Pro Se Claimant, Carrie L McGaha, a Woman Personally Injured by Prescription Opiates* [ECF No. 6700].  While styled as an objection to the Standing Motion, it does not present argument to oppose the Committee's requested relief.  Rather, her pleading

opposing the relief requested in the Standing Motion, statements challenging the merits of the

underlying estate causes of action have been filed by the Raymond Sackler family and the

Beacon Company.  *See Statement of the Raymond Sackler Family in Response to the Unsecured*

*Creditors Committee's Motion for Standing to Pursue Estate Claims* [ECF No. 6791] (the

"Raymond Sackler Family Statement"); *Statement of Beacon Company in Response to the*

*Motion of the Official Committee of Unsecured Creditors for Sole Standing to Commence and*

*Prosecute Estate Causes of Action* [ECF No. 6793] (the "Beacon Company Statement").

The Debtors currently have sole standing to pursue estate claims and causes of action.

The Standing Motion requests that the Court grant the Committee standing under Sections

105(a), 1103(c) and 1109(b) of the Bankruptcy Code to commence and prosecute claims and

causes of action of the Debtors' estates.  *See* Standing Motion at 1, 3.  Most notably, the

Committee seeks authorization, among other things, to sue members of the Sackler family and

their trusts and affiliates for actions they took with respect to the Debtors, including to recover

assets that that the Committee states the Sacklers caused Purdue to transfer offshore and to

family trusts.  *See id.* at 2.  Attached as an exhibit to the Standing Motion is a draft complaint

---

acknowledges that "it makes sense to have the people already familiar with the case litigating it, if it comes to that, but if they are going to continue to ignore valid concerns like mine." *Id.* at 5.  Instead of objecting, she raises concerns about "necessary changes to the [pain management] System . . . to improve prevention efforts." *Id.* at 1. These are the same concerns that Ms. McGaha has raised previously in these cases on several occasions.  *See, e.g., Objection to the Motion to Approve the Settlement Term Sheet* [ECF No. 4489]; *Motion to Require that Agencies Receiving Funds Generated From this Case Shall Not Be Required to Follow the Executive Order on Advancing Racial Equity and Support for Underserved Communities Through the Federal Government (EO13985)* [ECF No. 4996]; *Response to Objections in Regard to Motions Set Forth By Pro Se Claimant Carrie McGaha Regarding Executive Order 13985* [ECF No. 5241]; *Letter to Judge Lane, Re: Motion to Amend/Correct Objections and Plead the Court to Address Concerns Based on Personal Life Experience of Taking Prescription Opiates* [ECF No. 5581]; *Statement in Support of the Supreme Court Taking Up this Case for Review From Individual Pro Se Claimant, Carrie L. McGaha* [ECF No. 6101]; *Statement by Individual, Personal Injury Claimant, Carrie L. McGaha, to the Court, the US Trustee, the Supreme Court, Lawyers Representing the Debtors and Those Claiming to Represent the Victims in This Case* [ECF No. 6101]; *Request by Individual, Personal Injury Claimant, Carrie L. McGaha, to the District Court, the US Trustee, the Appeals Court, and Anyone Else Involved in Litigating this Case to Allow Her, to Appear and Participate in the Hearing Dated July 9, 2024, and any Other Mediation or Meetings Which Will Affect the Decisions in This Case* [ECF No. 6520]; *Statement in Support of the Motion to Extend Mediation* [ECF No. 6666].  As Ms. McGaha's comments are not directed to the requested relief here, the Court will not discuss her pleading in this decision.

(the "Draft Complaint") that comprises the causes of action the Committee intends to pursue, but the Committee also seeks standing to pursue any other claim held or that may be asserted by the Debtors' estates. *See id.*; *see also* Standing Motion, Ex. B. The Committee asserts that the value of the estate claims in question reaches into the billions of dollars. *See* Standing Motion at 2-3.

The CMFN objectors oppose the Standing Motion on the grounds that standing here is prohibited by controlling Delaware state law, notwithstanding longstanding Second Circuit precedent that permits the grant of standing to official committees. The CMFN also argues that the Committee has not met the requirements in this jurisdiction for standing. For the following reasons, the Court grants the Standing Motion and overrules the objections.

## BACKGROUND

Today's motion requires a brief description of the proceedings in these bankruptcy cases, which are more thoroughly discussed in prior decisions. *See In re Purdue Pharma, L.P.*, 635 B.R. 26 (S.D.N.Y. 2021), *rev'd and remanded sub nom.*, 69 F.4th 45 (2d Cir. 2023), *rev'd and remanded sub nom. Harrington v. Purdue Pharma L. P.*, 144 S. Ct. 2071 (2024). Prior to the filing of these bankruptcy cases, the Debtors were pharmaceutical companies that manufactured, sold, and distributed—among other products—opioid pain medication, including the drug Oxycontin. *See* Standing Motion at 5. Throughout the relevant period, the Debtors have been owned through trusts for the benefit of the Sackler family. *See id.* The Debtors' board of directors was also populated entirely by members of the Sackler family or individuals appointed by them. *See id.*

In September 2019, the Debtors filed for relief under Chapter 11 of the Bankruptcy Code. *See* Standing Motion at 8. As of the date of their bankruptcy filing, the Debtors had more than $1 billion in cash, and no funded debt, but were named in more than 2,600 active lawsuits

asserting opioid-related claims. *Id.* Some of those suits also named the Sacklers as defendants, with more lawsuits likely to follow in the future. *See id.* The Committee was appointed by the Office of the United States Trustee (the "UST") at the beginning of the Debtors' cases to serve as the statutorily appointed fiduciary for the interests of all unsecured creditors, including the public and private opioid claimants that make up almost the entirety of the creditor body. *Id.*

In an attempt to maximize the Sackler assets available to satisfy any judgment or other resolution of the estate claims, the Debtors—with the support of the Committee—filed a motion at the beginning of these cases for a preliminary injunction (the "Preliminary Injunction"); the grant of the requested Preliminary Injunction effectively stayed the commencement or continuation of litigation against the Sacklers, their trusts, and other affiliates. *See id.* at 8-9; *see also Amended and Restated Case Stipulation Among the Debtors, the Official Committee of Unsecured Creditors and Certain Related Parties* [ECF No. 518] (the "Case Stipulation"). The Preliminary Injunction also tolled the limitations period for claims, including the estate claims, against the Sacklers and their trusts and affiliates. *See* Standing Motion at 9. Through a separate stipulation, the covered Sackler parties also agreed that they would not take "any action with respect to any material amount of his, her, or its property that is located inside or outside the United States with the intent or material effect of frustrating enforcement of any potential judgment" against them. Case Stipulation ¶ 13.

At the outset of the Debtors' cases, the Sacklers proposed a settlement that contemplated, among other things, a release of the estate claims against them in exchange for a payment of $3 billion by the Sacklers over a period of seven years. *See* Standing Motion at 9. Both the Committee and the Debtors believed that reaching a global settlement would be more likely to yield near-term relief to the communities and creditors impacted by opioids than would engaging

8

in protracted litigation. *See id.* at 10; *see, e.g.*, *Declaration of Michael Atkinson in Support of Statement of the Official Committee of Unsecured Creditors in Support of Confirmation of the Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* at 20-21 [ECF No. 3460], Ex. A (the "Official Committee Plan Support Letter").  But settlement discussions were complicated by the large number of informal creditor groups active in the cases and these parties' disparate interests. *See* Standing Motion at 11.  In addition to the Committee, which has fiduciary duties to represent the interests of the entire unsecured creditor body, other creditors "formed well-represented *ad hoc* committees, including committees of the 48 states and territories that have claims against the Debtors . . . and strong representatives of non-state governmental entities and Native American tribes; personal injury claimants; victims of neonatal abstinence syndrome or their guardians, hospitals, ratepayers and third-party payors, and school districts," among others. *Id*. (citing *Modified Bench Ruling on Request for Confirmation of Eleventh Amended Joint Chapter 11 Plan* at 68–69 [ECF No. 3786]).  As the various creditor groups held sharply divergent views concerning allocation of estate assets and other issues, a value-destructive litigation fight among creditors appeared inevitable. *See* Standing Motion at 11.

To avoid this result, the Debtors, the Committee, and eight public and private creditor groups engaged in mediation to address the complex intercreditor disputes that existed in the case.[4]  *See id.*  The first phase of mediation continued for over half a year, and successfully culminated in a series of at least 20 interlocking compromises, with almost total agreement

---

[4]        These groups included (i) the AHC; (ii) the Ad Hoc Group of Non-Consenting States (the "NCSG"); (iii) the MSGE Group; (iv) the PI Group; (v) certain third-party payors; (vi) the Ad Hoc Group of Hospitals; (vii) the Ad Hoc Committee of NAS Children; and (viii) representatives for a putative class of insurance purchasers. *See* Standing Motion at 11 n.15.  In addition to these formal mediation parties, the United States Department of Justice participated as an observer, and a group of independent public school districts was granted limited status as a mediation party subject to the mediators' discretion. *See id.*

among the private and public claimant constituencies.  *See id.*  These agreements allocated a
fixed cash distribution over time to each private creditor group, while directing to the public
constituents any potential "upside" from the Debtors' estates, from both the Debtors' estate
claims and their operating assets.  *See id.*  The parties also agreed to require the majority of any
plan distributions be used solely for purposes of abating the opioid crisis and compensate
persona injury victims.  *See id.* at 11-12.

As the funding of these distributions required reaching an agreement with the Sacklers, a
second phase of mediation took place.  *See id.* at 12.  This resulted in an agreement among the
Debtors, the Sacklers, the Committee, the MSGE Group, and the AHC, with the Sacklers
agreeing to increase their settlement contribution by $1.275 billion, for a total of $4.275 billion
in cash, payable over nine years.  *See id.*  While the Committee believed that the estate claims
were well in excess of this amount, the Committee supported the settlement as a means to deliver
definite and near-term relief for victims and communities, believing that the alternative of
protracted litigation would cost lives, even if it did result in additional compensation from the
Sacklers.  *See id.* (citing Official Committee Plan Support Letter at 20).

This settlement, however, was not supported by certain other creditors, including the
NCSG, which comprised nearly half of the states.  *See* Standing Motion at 12.  To address this
situation, a third round of mediation was approved by the Court in May 2021, which resulted in
an agreement that the Sacklers would increase their cash contribution to $4.325 billion over nine
years and would make significant concessions relating to a public document repository.  *See id.*
In response, 15 of the 24 states in the NCSG group supported the new enhanced deal.  *See id.*
This version of the settlement was subsequently memorialized in a plan of reorganization filed
by the Debtors (the "Plan"), which was confirmed in September 2021.  *See id.* at 12-13.

All iterations of the settlement, including the version in the Debtors' Plan, required a release and injunction that precluded the commencement or continuation (i) of certain types of litigation against the Sacklers and their identified trusts and other affiliates, (ii) by any holders of claims, whether or not the claimant had agreed to the release and injunction. *See* Standing Motion at 13. Of the 630,000 claimants involved in the Debtors' cases a small number objected. The UST, nine states, and a handful of individual creditors and Canadian municipalities and first nations appealed confirmation of the Plan, primarily on the grounds that these "nonconsensual third-party releases" in the Plan for the benefit of the Sacklers were not authorized by the Bankruptcy Code. *See id.* In December 2021, the District Court for the Southern District of New York ruled in favor of the appellants and vacated the confirmation order. *See id.* (citing *In re Purdue Pharma, L.P.*, 635 B.R. 26, 118 (S.D.N.Y. 2021)). In January 2022, the District Court decision was appealed to the Court of Appeals for the Second Circuit. *See id.* (citing *Notice of Bankruptcy Appeal*, *In re Purdue Pharma L.P.* (2d Cir. Jan. 18, 2022) [Case No. 22-113, ECF No. 3-1]).

While this appeal was pending, a fourth phase of mediation occurred and resulted in all nine states that had previously appealed the confirmation order agreeing upon a new deal, which included the cessation of their appeal. *See* Standing Motion at 13. In exchange, the Sacklers agreed to pay at least an additional $1.175 billion towards the settlement—payable over 18 years—bringing the total nominal amount of the Sackler contribution for settlement of the estate and other claims to not less than $5.5 billion, and possibly as much as $6 billion. *See id.* In May 2023, the Second Circuit reversed the District Court's decision and held that nonconsensual third-party releases were authorized by the Bankruptcy Code under certain circumstances and were appropriate here. *See id.* at 13-14.

In August 2023, the U.S. Supreme Court granted the UST's petition for review. *See id.* at 14. In late June 2024, the Supreme Court issued a decision reversing the Second Circuit. *See Harrington v. Purdue Pharma L.P.*, 144 S. Ct. 2071 (2024). The Supreme Court held that "[t]he [B]ankruptcy [C]ode does not authorize a release and injunction that, as part of a plan of reorganization under Chapter 11, effectively seek to discharge claims against a nondebtor without the consent of affected claimants." *Id.* at 2074. As a result, a cornerstone of the settlement agreement with the Sacklers was eliminated.

In a final effort to avoid protracted litigation, various parties are once again engaged with the Sacklers in mediation (the "Mediation") to determine if a new settlement can be reached that complies with the Supreme Court's decision. To that end, the Court approved an order providing for mediation for an initial period of sixty days, which period has been extended and is currently set to expire on December 2, 2024. *See Third Amended Order Appointing the Honorable Shelley C. Chapman (Ret.) and Eric D. Green as Co-Mediators and Establishing Terms and Conditions of Mediation* [ECF No. 6906]. The Court also approved a corresponding request to extend the Preliminary Injunction so that it will continue throughout the Mediation, with the Preliminary Injunction set to expire on December 2, 2024. *See Thirty-Ninth Amended Order Pursuant to 11 U.S.C. § 105(a) Granting Motion for a Preliminary Injunction* [Adv. Proceeding No. 19-08289, ECF No. 583]. Against this backdrop, the Committee filed this motion to provide a pathway forward if a settlement is not reached during Mediation and litigation of the estate's claims against the Sacklers is necessary.

## DISCUSSION

### A. Legal Standard

The Bankruptcy Code does not expressly provide committees or individual creditors with authorization to sue on behalf of a debtor's estate. *See Adelphia Communications Corp. v. Bank of America (In re Adelphia Communications Corp.)*, 330 BR. 364, 372 (Bankr. S.D.N.Y. 2005). But for over forty years, it has been well established in this jurisdiction that the Bankruptcy Code provides an implied right for a creditors' committee to do so. *See, e.g., Unsecured Creditors Committee of STN Enterprises, Inc. v. Noyes (In re STN Enterprises)*, 779 F.2d 901 (2d Cir. 1985); *Commodore Int'l Ltd. v. Gould (In re Commodore Int'l Ltd.)*, 262 F.3d 96 (2d Cir. 2001); *Glinka v. Murad (In re Housecraft Indus. USA, Inc.)*, 310 F.3d 64 (2d Cir. 2002). Indeed, "the practice of authorizing the prosecution of actions on behalf of an estate by committees, and even by individual creditors . . . is . . . nearly universally recognized." *See In re Adelphia*, 330 B.R. at 373 (citing *Official Committee of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re Cybergenics Corp.),* 330 F.3d 548, 560-566 (3d Cir. 2003) (*en banc* ), *cert. dismissed,* 540 U.S. 1002 (2003)).[5]

The sources of this authority are much discussed in these decisions. As they explain, Section 1109(b) of the Bankruptcy Code provides, in relevant part, that a committee "may raise

---

[5]      *See also Louisiana World Exposition v. Federal Insurance Co.,* 858 F.2d 233 (5th Cir. 1988), *reh'g denied,* 864 F.2d 1147 (5th Cir. 1989); *Canadian Pacific Forest Products Ltd. v. J.D. Irving, Ltd. (In re The Gibson Group, Inc.),* 66 F.3d 1436 (6th Cir. 1995); *Fogel v. Zell,* 221 F.3d 955 (7th Cir. 2000); *Avalanche Maritime, Ltd. v. Parekh (In re Parmetex, Inc.),* 199 F.3d 1029 (9th Cir. 1999); *Jefferson County Board of County Commissioners v. Voinovich (In re The V. Companies),* 292 B.R. 290 (6th Cir. BAP 2003); *ReGen Capital III, Inc. v. Official Committee of Unsecured Creditors (In re Trism, Inc.),* 282 B.R. 662 (8th Cir. BAP 2002); *Liberty Mutual Insurance Co. v. Official Unsecured Creditors' Committee of Spaulding Composites Co. (In re Spaulding Composites Co., Inc.),* 207 B.R. 899 (9th Cir. BAP 1997); *see also* 5 COLLIER ON BANKRUPTCY ¶ 547.11[6] (Matthew Bender 16th ed. 2024) (noting that "most lower courts today recognize the concept of derivative standing and will permit a creditors' committee or other party in interest to initiate and prosecute a preference or other avoidance action on behalf of the estate"); *but see United Phosphorus, Ltd. v. Fox (In re Fox),* 305 B.R. 912 (10th Cir. BAP 2004) (holding that a plain reading of the Bankruptcy Code does not provide authority for a bankruptcy court to grant standing to sue to any party other than a trustee or debtor in possession).

13

and may appear and be heard on any issue" in a debtor's chapter 11 case. 11 U.S.C. § 1109(b). And under Section 1103(c)(2), a committee may "investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business . . . and any other matter relevant to the case or to the formulation of a plan." 11 U.S.C. § 1103(c)(2). Additionally, Section 1103(c)(5) allows a committee to "perform such other services as are in the interest of those represented." 11 U.S.C. § 1103(c)(5). Beginning with *STN Enterprises*, the Court of Appeals for the Second Circuit has recognized that Sections 1103(c)(5) and 1109(b) of the Bankruptcy Code together "imply a qualified right for creditors' committees to initiate suit with the approval of the bankruptcy court" on behalf of the bankruptcy estate. *In re STN Enterprises,* 779 F.2d at 904. The Second Circuit found such relief is appropriate where the committee presented "a colorable claim or claims for relief that on appropriate proof would support a recovery. . . ." *Id.* at 905. Under the *STN* standard, the trustee or debtor in possession must have unjustifiably failed to bring suit or abused its discretion in choosing not to sue. *See id.* at 904. Under *STN*, a bankruptcy court also should conduct a cost/benefit analysis to examine whether conferring such standing is likely to benefit the estate and determine "whether it would be preferable to appoint a trustee in lieu of the creditors' committee to bring suit (bearing in mind any fees imposed on the estate by such an appointment, the wishes of the parties, and other relevant factors) and the terms relative to attorneys' fees on which suit might be brought." *Id.* at 905. But the Second Circuit made clear that the bankruptcy court is not required to undertake a mini-trial on these issues and instead need only "assure itself that there is a sufficient likelihood of success to justify the anticipated delay and expense to the bankruptcy estate that the initiation and continuation of litigation will likely produce." *Id.* at 905-06.

14

The Second Circuit subsequently expanded on these standing principles in the

*Commodore* case, which recognized committee standing to pursue estate claims in situations

where the debtor—while not prosecuting the litigation—consented to their prosecution by a

committee.  *See In re Commodore*, 262 F.3d at 99-100.  In circumstances where the debtor

consents to the committee bringing suit, the bankruptcy court under *Commodore* must also find

that the suit by the committee "is (a) in the best interest of the bankruptcy estate, and (b) is

'necessary and beneficial' to the fair and efficient resolution of the bankruptcy proceedings." *Id.*

at 100.  The Second Circuit noted that such an approach "permits a reasoned and practicable

division of labor between the creditors' committee and the debtor in possession or trustee, while

also providing bankruptcy courts with significant authority both to manage the litigation and to

check any potential for abuse by the parties." *Id.*[6]

### B.  <u>The Committee Has Met the *Commodore* Standard</u>

Relying to the Second Circuit holding in *Commodore*, the Committee seeks sole standing

and authority—with the Debtor's consent—to commence and prosecute the claims and causes of

action of the Debtors' estates as set forth in the Draft Complaint, as well as any other claim held

or that may be asserted by the Debtors.  *See* Standing Motion at 1.  The Court finds that the

Committee has met the requirements for standing under *Commodore* and grants it standing to

pursue the estates' causes of action.

### 1.  Debtor's Consent

The Debtors explicitly "agree with the Official Committee . . . that sole standing to

prosecute the claims set forth in the [D]raft [C]omplaint . . . should be granted to the

---

[6]     The Second Circuit again explored the principles of *STN* standing in the *Housecraft* decision, permitting a
bankruptcy court to confer standing on a committee to sue as a co-plaintiff with the debtor on behalf of the estate so
long as the requirements of *Commodore* are satisfied.  *See In re Housecraft Industries*, 310 F.3d at 70-71.  Neither
the Committee nor the Debtor seek to have the Debtors proceed as co-plaintiff here.

[Committee]" and that granting the Committee standing to pursue estate claims "is clearly warranted."  Debtors' Statement in Support at 3, 5.  The Debtors note that they "have determined, after careful consideration, that they are not the most appropriate entity to pursue litigation of the [estate causes of action]."  *Id.* at 3.  They explain that "the [Committee] is the only other party in these [C]hapter 11 cases with a fiduciary duty to all unsecured creditors, and the only party empowered by statue."  *Id*. at 4.  As a result, the Debtors contend that the Committee is "the only party other than the Debtors that does not have its own third-party claims that may present interests conflicting with the goal of maximizing recoveries on the Estate Claims."  *Id*.  The Debtors also believe that derivative standing is appropriate here because the Committee "has worked assiduously . . . alongside the Debtors to conduct an exhaustive investigation into the Estate Claims."  *Id.*  Indeed, the other major constituencies in the case have reached a similar conclusion as the Debtors, with the Standing Motion enjoying wide support from the AHC, the MSGE Group, and the PI Group.  *See generally* AHC Statement in Support; MSGE Group Statement in Support; PI Group Statement in Support.

In its opposition, the CMFN raises several points that seem directed to the consent issue. As a threshold matter, the CMFN appears to misunderstand what the Committee seeks to accomplish through the Standing Motion.  *See* CMFN Opposition ¶¶ 37, 39 (arguing that Debtor's reservation of rights does not constitute "consent" and thus the Standing Motion "is not premised upon a complete, irrevocable written assignment of all of the Debtors in Possession's rights without reservation. . . .").  When seeking derivative standing, a moving party is not requesting the transfer of *ownership* in the estate claims from the debtors to the movant.  Instead, the request seeks permission for a party other than the debtor or trustee to stand in their shoes and prosecute estate claims *for the benefit of the estates*.  The claims themselves remain estate

property, until such time as they are disposed of through a plan, an adversary proceeding, or some other resolution in these bankruptcy cases.

The CMFN also suggests in conclusive fashion that the Committee is required to allege that "the Debtors in Possession have unreasonably and unjustifiably failed and refused to pursue the avoidance causes of action." CMFN Opposition ¶ 40. But no such requirement is present in *Commodore*, which is the case upon which the Committee relies here. Indeed, such a requirement would be illogical where the Debtors have consented to the Committee bringing estate claims in the Debtors' place. The CMFN also complains about a reservation in the Debtors' Statement in Support that "[t]he Debtors' agreement with the [Committee] shall not be construed as an agreement, and the Debtors will not otherwise be obligated, to act in any manner that the Debtors determine in good faith is inconsistent with their fiduciary duties." CMFN Opposition ¶ 37 (quoting Debtors' Statement in Support at 4). But the Court finds no issue with this language, which is standard in a variety of circumstances in a bankruptcy proceeding, given that a debtor cannot and should not be compelled to act in a way that conflicts with its fiduciary duties. And such language does not mean that the Committee is receiving anything less than full consent from the Debtors to pursue the estate's causes of action.

**2. Best Interest of the Estates and Necessary and Beneficial to the Bankruptcy Proceeding**

The second prong of the *Commadore* test examines whether granting standing to the Committee is in the best interest of the bankruptcy estates and is "necessary and beneficial" to the fair and efficient resolution of the bankruptcy proceedings. There is no doubt that prosecuting the estate claims meets this standard in the circumstances of these cases. Both the Debtors and the Committee—the two parties with fiduciary duties to all creditors—assert that the estate claims are the most valuable asset of the Debtors' estates, estimating the claims to be

valued in the billions of dollars. *See* Standing Motion at 2-3; Debtors' Statement in Support at 3. No objecting party disputes this. As the most valuable estate asset then, pursuit of these estate claims by the Committee is central to the estate's goal of obtaining the funds necessary to compensate the creditors that have suffered so greatly from the opioid crisis. As creditors here have waited years to receive a recovery, granting the Committee permission now to prosecute is a critical step to move the cases forward to conclusion.

The CMFN seems to suggest that the Committee is not the appropriate party to pursue these estate claims, speculating that the Committee's request for standing may merely be a vehicle to achieve a "quick and dirty" settlement with the Sacklers. CMFN Opposition ¶¶ 9-10. But the Court strongly rejects this contention. While the Committee previously supported settlement of the estate claims with the Sacklers, this history does not make the Committee an improper party to now pursue the estate claims or somehow make the Committee's request for standing nefarious. Indeed, the CMFN's position makes little sense. The prior settlement was supported by virtually all parties-in-interest—including the Committee—as an appropriate way to expedite financial relief to the communities, organizations, and individuals in need of assistance due to the opioid crisis. Consistent with this prior consensus, a vast cross-section of creditors in these cases now support the Standing Motion, including the AHC (an ad hoc committee of certain state and local governmental creditors), the MSGE Group (a group representing thousands of municipalities and other public entities), and the PI Group (an ad hoc group counting thousands of individual victims among its members). *See generally* AHC Statement in Support; PI Group Statement in Support; MSGE Group Statement in Support. In this same spirit, the Committee has entered into cooperation agreements with the AHC, the PI Group, the MSGE Group, and the State of Maryland. The CMFN somehow misinterprets the

Committee's willingness to coordinate and cooperate with these groups, referring to it as "buddy standing" for those groups and suggesting that such cooperation constitutes a *sub rosa* plan. CMFN Opposition ¶¶ 65-70.  But once again, the CMFN has nothing to support such an outlandish contention.  There is no relief requested in this procedural motion that dictates the contents of a plan.  Indeed, these bankruptcy cases are nowhere close to confirming a plan, making it difficult to even understand the CMFN's *sub rosa* argument.  The argument about "buddy standing" fares no better.  While the Committee has agreed to "coordinate, support and consult" with its various constituents, that agreement is "with the express understanding that the Official Committee shall make all decisions respecting commencement and prosecution of the Estate Claims in the Official Committee's sole discretion." *Official Committee's Omnibus Reply to Standing Motion Objections and Sackler Statements* at 9 [ECF No. 6881]; Standing Motion at 15.  As the Committee notes, moreover, it cannot unilaterally grant parties intervention or settlement rights and any hypothetical settlement that were reached would be subject to approval by this Court in accordance with the Bankruptcy Code and applicable rules.  Of course, any interested party would have the ability to object to any settlement reached in the future.

The CMFN argues that a Chapter 11 trustee would be in the best position to pursue estate claims.  But the CMFN has not acted consistently with its professed belief.  Despite the fact that the Committee filed its Standing Motion months ago, *see* Standing Motion (filed July 8, 2024), the CMFN has not filed a motion to seek the appointment of a Chapter 11 trustee in these cases. In any event, the Court finds that the Committee is clearly in a better position to pursue the estate claims than a Chapter 11 trustee.  To put it plainly, the Committee has already put in the work and is ready to prosecute the claims immediately.  At the outset of the Debtors' cases, the Committee began an extensive examination of the Debtors' affairs, including an investigation of

the extent and value of the estate claims against the Sacklers and other potential defendants.  *See*

Standing Motion at 9.  Over a period of months, the Official Committee gained access to

evidence and documents not previously produced in litigation or in connection with government

investigations.  *See id.* at 9-10.  As part of its investigatory efforts, the Committee has conducted

sixteen depositions, which include seven members of the Sackler family, members of the

Debtors' boards of directors, the Debtors' current and past CEOs, a former Vice President and

Associate General Counsel at Purdue, and other Sackler family advisors.  *See id.* at 10.  The

Debtors have also provided the Committee with access to millions of pages of documents,

including thousands of Debtor-privileged documents, and the Committee is the only creditor

representative that currently has access to the Debtor-privileged materials.  *See id.*; *see also*

Debtors' Statement in Support at 5 (noting that the Committee "reviewed many millions of pages

of documents produced in discovery and led depositions of the Sacklers and other key witnesses

which helped the estates propose" a plan "that would have delivered $5.5-6 billion in value and

other non-monetary concessions from the Sacklers.").  The Committee's detailed and lengthy

Draft Complaint is the culmination of its extensive efforts.

By contrast, any newly appointed Chapter 11 trustee would be starting from scratch.

Such a trustee would need many months—and huge amounts of costly professional time—just to

catch up to where the Committee already is.  At oral argument, counsel to the CMFN suggested

that a Chapter 11 trustee would simply be able to read any reports prepared by the Committee

and be fully up to speed in a few weeks.  But there is little basis in reality for this suggestion,

which runs counter to this Court's lived experience.  Hundreds of millions of dollars in legal fees

have already been billed by counsel retained in these cases; to add an unnecessary layer of

expense in the form of a Chapter 11 trustee and accompanying counsel would simply be

unconscionable.  *See In re Pack Liquidating*, 658 B.R. 305, 320 (Bankr. D. Del. 2024) (noting that the Third Circuit agreed with the sentiment that "requiring a bankruptcy court to appoint a Chapter 11 trustee rather than granting a committee derivative standing would amount to replacing a scalpel of derivative suit with a chainsaw.") (internal citations and quotations omitted); *see also In re North Star Contracting Corp.*, 128 B.R. 66, 70 (Bankr. S.D.N.Y. 1991) (rejecting appointment of a trustee because "the costs of a trustee will only burden this estate with additional administrative expenses and will not be in the best interests of creditors"); *Adams v. Marwil (In re Bayou Group, LLC)*, 564 F.3d 541, 546–47 (2d Cir. 2009) (rejecting appointment of trustee because movant provided no reason to doubt the debtor in possession's "competence to manage . . . [the] bankruptcy proceedings").  Too much time has passed to squander additional time in having a Chapter 11 trustee and new counsel now step into these cases for such a critical task.  Given the extensive appellate litigation after the prior settlement, these creditors have had to wait for years to reach this point.  Absent a new settlement being reached soon in the ongoing Mediation, the best path forward is litigating the estate's claims against the Sacklers, which the Committee is ready to do right now.

The Court's conclusion is supported by the *Adelphia* case.  Like the circumstances here, the creditors' committee in *Adelphia* had conducted an extensive investigation of estate claims during the course of the bankruptcy and sought derivative standing to assert those claims.  *See In re Adelphia*, 330 B.R. at 369-70, 377.  The court in *Adelphia* ultimately concluded that the creditors' committee had "put forth an extraordinarily detailed complaint" alleging facts that, if proven, could result in recovery for the debtors' estates of billions of dollars which clearly justified the grant of derivative standing to the committee.  *In re Adelphia*, 330 B.R. at 377, 383. The court found that "the substantial sums to be recovered . . . more than justif[ied] the

substantial sums that prosecuting the litigation would cost." *Id.* at 383.  It went on to note that

denying the committee "standing could result in the waste of one of the estate's most valuable

assets" and the determination to grant standing was "an easy one." *Id.* at 383–84.

At the hearing on this motion, the CMFN suggested that a Chapter 11 trustee would not

have the same problems with statutes of limitations that would be faced by the Committee.  But

the CMFN failed to provide much specificity on the statutes of limitation or the timing that was

involved.  In any event, the Committee is merely stepping into the shoes of the Debtors and

would have the same rights and obligations that the Debtors would have if they were litigating

these causes of action.

### 3.  Causes of Action Are Colorable

The Court finds that the estate causes of action are colorable, a required showing that is

relatively easy to make here.  *See In re Adelphia*, 330 B.R. at 376.  "[T]he court must engage in

an inquiry that is much the same as that undertaken when a defendant moves to dismiss a

complaint for failure to state a claim," and "authorization should be denied only if the claims are

facially defective. . . ." *Id.* (internal citations and quotations omitted).  "[C]ourts have observed

that, consistent with the common meaning of 'colorable,' the claims to be asserted should be

'plausible' or 'not without some merit.'" *In re Sabine Oil & Gas Corp.*, 547 B.R. 503, 516

(Bankr. S.D.N.Y. 2016) (quoting *In re Adelphia*, 330 B.R. at 376).  Standing has been denied for

requests to pursue "'apparently meritless claim[s]' or claims so flawed and 'not subject to cure'

that estate funds 'ought not be squandered through continued litigation' of such claims." *In re

Sabine*, 547 B.R. at 516 (quoting *Official Committee of Unsecured Creditors of America's

Hobby Ctr. v.  Hudson United Bank (In re America's Hobby Ctr.),* 223 B.R. 275, 288 (Bankr.

S.D.N.Y. 1998)).  The Draft Complaint attached to the Standing Motion includes detailed

allegations that the Court finds easily satisfies this threshold, based on the documents and other
evidence unearthed during the bankruptcy process, including through the Committee's Rule 2004
examination.  Indeed, no objecting party challenges that the claims to be asserted are colorable.[7]
Given the lack of argument by any objecting party as to the colorability of these claims, the
Court will refrain from a detailed analysis here of each of the causes of action.  Suffice it to say,
the Draft Complaint alleges colorable claims based on the defendants' involvement in Purdue's
marketing and sale of opioids, including Purdue's expressions of culpability as to its conduct and
alleged extensive transfer of Purdue assets.

The CMFN also argues that if the Court grants the Committee standing to pursue estate
claims, any order entered "must make clear that the recipient of the rights does not have standing
to pursue direct creditor claims which are not derivative of Estate claims, including the CMFN
claims."  CMFN Opposition ¶ 55.  But the Committee is being granted the right to bring those
claims that belong to the estate, no more and no less.  It is premature to address how these estate
claims may—or may not—impact any claims that the CMFN may seek to bring on its own
behalf.  Indeed, counsel to the Committee noted at the hearing that the proposed order has been
revised to add a new paragraph making clear any grant of derivative standing for the Committee
to pursue estate claims does not change the status quo in this respect.  *See* Standing Motion, Ex.
A ¶ 5.

---

[7]        The only parties that speak to that subject are the Beacon Company and the Raymond Sackler family,
whose pleadings convey their view that they are blameless for any alleged misconduct in connection with Purdue.
Of course, the merits of such claims are for another day.  The lengthy statements filed by the Beacon Company and
the Raymond Sackler family merely highlight the legal and factual complexities of the claims asserted in the Draft
Complaint.  *See generally* Beacon Company Statement (totaling 74 pages in length); Raymond Sackler Family
Statement (totaling 19 pages in length).  After reviewing both the Draft Complaint and these statements, the Court
finds that the statements do not undermine the colorability of the claims at issue and instead demonstrate the
complexity of the relevant factual record.

## C. **The CMFN's Objection Based on State Law**

In addition to its arguments about the *Commadore* standard, the CMFN objects to the

grant of standing to the Committee on the grounds that Delaware law bars such a result.  More

specifically, the CMFN argues that Delaware law does not permit a creditor of a Delaware

limited partnership to sue on behalf of the limited partnership unless the creditor is a partner or

assignee.[8]  In making this argument, the CMFN cites to the Delaware Limited Partnership Act

(the "L.P. Act"), which provides that "[i]n a derivative action, the plaintiff must be a partner or an

assignee of a partnership interest at the time of bringing the action."  6 Del. C. §17-1002.  The

CMFN also relies on three cases from the Delaware Bankruptcy Court to support its position that

Delaware law bars standing here for the Committee.  *See* CMFN Opposition ¶ 26 (citing *Citadel

Watford City Disposal Partners, L.P. v. Citadel Energy Partners, LLC (In re Citadel Watford City

Disposal Partners, L.P.)*, 603 B.R. 897, 903–05 (Bankr. D. Del. 2019); *PennySaver USA

Publishing, LLC v. OpenGate Capital Group (In re PennySaver USA Publishing, LLC)*, 587 B.R.

445, 467 (Bankr. D. Del. 2018); *HH Liquidation, LLC v. Comvest Group Holdings, LLC (In re

HH Liquidation, LLC)*, 590 B.R. 211, 284–85 (Bankr. D. Del. 2018)).

The Court disagrees.  The CMFN's position has been explicitly rejected by this Court.  In

*The McClatchy Company*, Judge Wiles rejected the argument that the grant of derivative standing

to an official committee of unsecured creditors was governed by Delaware law.  *See In re The

McClatchy Company,* Case No. 20-10418 (MEW) (Bankr. S.D.N.Y. July 8, 2020), July 6, 2020

Hr'g Tr. at 30:11–25 [ECF No. 641].  In rejecting the notion that state law governed this

---

[8]    Fifteen of the twenty-four Purdue subsidiaries are alleged to be Delaware limited partnerships: Purdue
Pharma L.P., Purdue Transdermal Technologies L.P., Purdue Pharma Manufacturing L.P., Purdue Pharmaceuticals
L.P., Imbrium Therapeutics L.P., Adlon Therapeutics L.P., Greenfield BioVentures L.P., Avrio Health L.P., Purdue
Pharmaceutical Products L.P., Button Land L.P., Rhodes Associates L.P., Quidnick Land L.P., Rhodes
Pharmaceuticals L.P., UDF LP, and SVC Pharma LP.  *See* CMFN Opposition ¶¶ 21–26.

question, the *McClatchy* decision observed that the creditors committee was not seeking

permission to bring a derivative claim under Delaware law—or any state law—but rather seeking

authority under federal bankruptcy law to pursue claims belonging to bankruptcy estate. *Id*. The

court further explained that "[v]arious authorities in this [C]ircuit, and otherwise, have

recognized a bankruptcy court's powers to grant such standing to a committee as an estate

fiduciary as a matter of federal bankruptcy law." *Id*. at 31:1-4. In sum, the court concluded that

the Bankruptcy Code and the bankruptcy court itself "determine who may speak for the estate in

[a] bankruptcy case." *Id*. at 31:7–9.

This conclusion is consistent with the most recent decision from the Delaware

Bankruptcy Court on this topic, which specifically rejects the CMFN's position here. *See In re*

*Pack Liquidating, LLC*, 658 B.R. 305, 319 (Bankr. D. Del. 2024). In *Pack Liquidating*, the court

explained that derivative actions are born from state law as a procedural tool to address the issue

of an entity's management refusing to pursue certain legal claims and, in such scenario,

derivative standing is provided by state law. *Id*. at 315. Separate and apart from such standing

under state law, however, the court in *Pack Liquidating* recognized that a bankruptcy court has

authority to grant derivative standing to a creditors committee under the Bankruptcy Code. *Id*.

at 318. In reaching its conclusion, the *Pack Liquidating* court relied upon the Third Circuit's *en*

*banc* decision in *Cybergenics*, which held that the Bankruptcy Code provides the implicit

authority for creditor committee derivative standing. *See id*. (citing *Official Comm. of*

*Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548

(3d Cir. 2003) (*en banc*), *cert. dismissed,* 540 U.S. 1002 (2003)). Much like the Second Circuit,

the Third Circuit in *Cybergenics* held that various sections of the Bankruptcy Code—including

Sections 1109(b) and 1103(c)(5)—provide the implicit authority needed to grant derivative

standing to a creditors committee. *Cybergenics*, 330 F.3d at 560–66.  The court in *Pack Liquidating* noted that the Third Circuit had recognized a "'compelling' pre-Code practice in which bankruptcy courts [had] regularly authorized creditors to bring suit on behalf of a bankruptcy estate when a trustee refused to do so." *In re Pack Liquidating*, 658 B.R. at 321 (noting that the Bankruptcy Code preserved the bankruptcy court's equitable authority under pre-Code practice to grant derivative standing).  The *Pack Liquidating* court further noted that other courts had also concluded that the bankruptcy courts had authority to grant derivative standing. *Id*. at 322-23 (citing *In re Commodore*, 262 F.3d at 96-98; *In re The Gibson Group*, 66 F.3d 1436 (6th Cir. 1995); *Louisiana World Exposition v. Federal Ins. Co.*, 858 F.2d 233 (5th Cir. 1988); *Fogell v. Zell*, 221 F.3d 955 (7th Cir. 2000); and *The McClatchy Company*, Hr'g Tr. at 30, No. 20-10418 (Bankr. S.D.N.Y. July 6, 2020)).  The court observed that, "[t]o the extent any of the court of appeals that have addressed committee standing even refer to state law, they have rejected arguments that a federal bankruptcy court's authority to grant standing should depend on what state law provides." *In re Pack Liquidating*, 658 B.R. at 323.  Finally, the *Pack Liquidating* court concluded that, even to the extent that Delaware state law sought to restrict standing permitted under federal law, such state law would be preempted by the Bankruptcy Code. *Id*. at 324.  Notably, the CMFN's opposition fails to address, much less distinguish, the persuasive analyses in the *McClatchy Company* and *Pack Liquidation* cases, both of which are directly on point here.

## CONCLUSION

For the reasons stated above, the Standing Motion is granted.  The Committee should settle an order on two (2) days' notice.  The proposed order must be submitted by filing a notice of the proposed order on the Case Management/Electronic Case Filing docket, with a copy of the

proposed order attached as an exhibit to the notice.  A copy of the notice and proposed order

shall also be served upon both the CMFN and Nassau County.

Dated:  White Plains, New York
        November 18, 2024


                                    */s/ Sean H. Lane*
                                    UNITED STATES BANKRUPTCY JUDGE