**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re:* | *Chapter 11* |
| *PURDUE PHARMA L.P., et al.,* | *Case No. 19-23649 (SHL)* |
| *Debtors.[1]* | *(Jointly Administered)* |

### THIRTEENTH AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF PURDUE PHARMA L.P. AND ITS AFFILIATED DEBTORS

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Eli J. Vonnegut
Christopher S. Robertson
Joshua Y. Sturm
Abraham Bane

Counsel to the Debtors
and Debtors in Possession

Dated: May 16, 2025
New York, New York

> THIS DRAFT OF THE PLAN REMAINS SUBJECT TO CONTINUING NEGOTIATIONS WITH ALL PARTIES IN INTEREST AND THE FINAL VERSION MAY CONTAIN MATERIAL DIFFERENCES. FOR THE AVOIDANCE OF DOUBT, NO PARTY HAS CONSENTED TO THIS VERSION AS THE FINAL FORM, AND ALL PARTIES RESERVE THEIR RESPECTIVE RIGHTS WITH RESPECT TO THIS DOCUMENT AND ANY RELATED DOCUMENTS. THE DEBTORS SHALL FILE A REDLINE VERSION WITH THE BANKRUPTCY COURT CONCURRENTLY WITH THE FILING OF ANY AMENDED OR MODIFIED VERSION OF THIS PLAN.

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Purdue Products L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

**Table of Contents**

| | | |
|---|---|---|
| ARTICLE I | DEFINITIONS AND INTERPRETATION. | 1 |
| 1.1 | Definitions | 1 |
| 1.2 | Interpretation; Application of Definitions; Rules of Construction | 52 |
| 1.3 | Reference to Monetary Figures. | 52 |
| 1.4 | Controlling Document. | 52 |
| 1.5 | Consent Rights. | 53 |
| ARTICLE II | ADMINISTRATIVE CLAIMS, PROFESSIONAL FEE CLAIMS, PRIORITY TAX CLAIMS AND DOJ FORFEITURE JUDGMENT CLAIM | 53 |
| 2.1 | Administrative Claims. | 53 |
| 2.2 | Priority Tax Claims. | 54 |
| 2.3 | DOJ Forfeiture Judgment Claim. | 55 |
| ARTICLE III | CLASSIFICATION OF CLAIMS AND INTERESTS. | 55 |
| 3.1 | Classification in General. | 55 |
| 3.2 | Summary of Classification of Claims and Interests. | 55 |
| 3.3 | Voting Classes; Presumed Acceptance by Non-Voting Classes. | 56 |
| 3.4 | Voting; Presumptions; Solicitation. | 56 |
| 3.5 | Cramdown. | 57 |
| 3.6 | No Waiver. | 57 |
| ARTICLE IV | TREATMENT OF CLAIMS AND INTERESTS. | 57 |
| 4.1 | Secured Claims (Class 1). | 57 |
| 4.2 | Other Priority Claims (Class 2). | 58 |
| 4.3 | Federal Government Unsecured Claims (Class 3). | 58 |
| 4.4 | Non-Federal Domestic Governmental Claims (Class 4). | 58 |
| 4.5 | Tribe Claims (Class 5). | 59 |
| 4.6 | Public School Claims (Class 6). | 59 |
| 4.7 | Hospital Claims (Class 7). | 60 |
| 4.8 | Third-Party Payor Claims (Class 8). | 60 |
| 4.9 | ER Physician Claims (Class 9). | 61 |
| 4.10 | PI Claims (Classes 10(a) and 10(b)). | 61 |
| 4.11 | Avrio General Unsecured Claims (Class 11(a)) | 63 |
| 4.12 | Adlon General Unsecured Claims (Class 11(b)). | 63 |
| 4.13 | Other General Unsecured Claims (Class 11(c)). | 64 |
| 4.14 | Intercompany Claims (Class 12). | 64 |
| 4.15 | Shareholder Claims (Class 13). | 64 |

4.16    Co-Defendant Claims (Class 14). ..................................................................... 65

4.17    Other Subordinated Claims (Class 15). ............................................................. 65

4.18    PPLP Interests (Class 16). ................................................................................ 65

4.19    PPI Interests (Class 17). ................................................................................... 66

4.20    Intercompany Interests (Class 18). ................................................................... 66

4.21    Debtors' Rights with Respect to Unimpaired Claims. ...................................... 66

ARTICLE V       MEANS FOR IMPLEMENTATION. .................................................... 67

5.1     Restructuring Transactions .............................................................................. 67

5.2     Plan Settlements ............................................................................................... 67

5.3     The Plan Administration Trust .......................................................................... 77

5.4     NewCo ............................................................................................................... 81

5.5     Foundation ....................................................................................................... 83

5.6     Master Disbursement Trust .............................................................................. 84

5.7     Special Operating Reserve; Released Claims Reserves ................................... 92

5.8     Creditor Trusts ................................................................................................. 96

5.9     Attorneys' Fees and Costs ................................................................................ 100

5.10    Transferability of Distribution Rights .............................................................. 105

5.11    Insurance Neutrality ......................................................................................... 105

5.12    Transfer of Books and Records; Cooperation; Privilege ................................. 105

5.13    Public Document Repository ............................................................................ 107

5.14    Effective Date Cash; Surplus Reserved Cash .................................................. 120

5.15    Corporate Action .............................................................................................. 121

5.16    Cancellation of Notes, Interests, Instruments, Certificates and Other Documents ........ 122

5.17    Closing of Chapter 11 Cases ........................................................................... 122

ARTICLE VI      DISTRIBUTIONS. ................................................................................ 123

6.1     Distributions Generally .................................................................................... 123

6.2     Distributions on the Effective Date .................................................................. 123

6.3     Date of Distributions ........................................................................................ 123

6.4     Disbursing Agent .............................................................................................. 123

6.5     Rights and Powers of Disbursing Agent .......................................................... 123

6.6     Expenses of Disbursement Agent ..................................................................... 124

6.7     Delivery of Distributions .................................................................................. 124

6.8     Undeliverable and Unclaimed Distributions .................................................... 124

6.9     Distribution Record Date ................................................................................. 124

6.10    Manner of Payment under Plan ........................................................................ 124

ii

| | | |
|---|---|---|
| 6.11 | Minimum Cash Distributions | 124 |
| 6.12 | Setoffs and Recoupment | 125 |
| 6.13 | Claims Paid or Payable by Third Parties | 125 |
| 6.14 | Distributions after Effective Date | 125 |
| 6.15 | No Postpetition Interest and Penalties on Claims | 125 |
| 6.16 | Allocation of Distributions between Principal and Interest | 125 |
| 6.17 | No Constructive Receipt | 125 |
| 6.18 | No Distribution in Excess of Amount of Allowed Claim | 126 |
| 6.19 | Satisfaction of Claims | 126 |
| 6.20 | Withholding and Reporting Requirements | 126 |
| 6.21 | Post-Confirmation Claims | 127 |
| ARTICLE VII | PROCEDURES FOR NON-PARTICIPATING CHANNELED CLAIMS AND OTHER DISPUTED CLAIMS | 127 |
| 7.1 | Procedures for Non-Participating Channeled Claims and other Disputed Claims Generally | 127 |
| 7.2 | Non-Participating Claims Reserves; PAT Disputed Claims Reserves | 127 |
| 7.3 | Claim Objections | 130 |
| 7.4 | No Distribution Pending Allowance | 131 |
| 7.5 | Estimation of Claims | 132 |
| 7.6 | Resolution of Claims | 132 |
| 7.7 | Distribution After Allowance | 132 |
| 7.8 | Disallowance of Non-Participating Channeled Claims and Other Disputed Claims | 133 |
| 7.9 | Allowance of Non-Participating Channeled Claims | 134 |
| 7.10 | Claims Resolution Procedures Cumulative | 135 |
| 7.11 | No Postpetition Interest or Penalties on Non-Participating Channeled Claims and other Disputed Claims | 135 |
| 7.12 | Shareholder Rights Regarding Settlement and Estimation of Claims | 135 |
| ARTICLE VIII | EXECUTORY CONTRACTS AND UNEXPIRED LEASES. | 136 |
| 8.1 | Assumption and Rejection of Executory Contracts and Unexpired Leases | 136 |
| 8.2 | Determination of Contract Disputes and Deemed Consent | 137 |
| 8.3 | Payments Related to Assumption of Contracts and Leases | 138 |
| 8.4 | Co-Defendant Contracts | 138 |
| 8.5 | Rejection Claims | 139 |
| 8.6 | Compensation and Benefit Plans | 139 |
| 8.7 | Purdue Pension Plan | 139 |
| 8.8 | Insurance Policies | 140 |

| | | |
|---|---|---|
| 8.9 | Reservation of Rights | 142 |
| ARTICLE IX | CONDITIONS PRECEDENT TO THE OCCURRENCE OF THE EFFECTIVE DATE. | 142 |
| 9.1 | Conditions Precedent to Effective Date | 142 |
| 9.2 | Waiver of Conditions Precedent | 144 |
| 9.3 | Frustration of Conditions Precedent. | 145 |
| ARTICLE X | EFFECT OF CONFIRMATION. | 145 |
| 10.1 | Binding Effect | 145 |
| 10.2 | Discharge of Claims against and Interests in the Debtors | 145 |
| 10.3 | Pre-Confirmation Injunctions, Stays, Stipulations and Discovery Orders | 145 |
| 10.4 | Injunction against Interference with Plan | 147 |
| 10.5 | Plan Injunction | 147 |
| 10.6 | Releases | 148 |
| 10.7 | Shareholder Releases | 151 |
| 10.8 | Channeling Injunction | 157 |
| 10.9 | Tolling of Shareholder Released Claims; Violations of Shareholder Releases and Channeling Injunction | 159 |
| 10.10 | MDT Insurer Injunction | 160 |
| 10.11 | Settling MDT Insurer Injunction | 161 |
| 10.12 | Exculpation | 162 |
| 10.13 | Injunction Related to Releases and Exculpation | 163 |
| 10.14 | Subordinated Claims | 163 |
| 10.15 | Preservation of Causes of Action and Reservation of Rights | 163 |
| 10.16 | Ipso Facto and Similar Provisions Ineffective | 164 |
| 10.17 | No Successor Liability | 164 |
| 10.18 | Co-Defendant Defensive Rights | 164 |
| 10.19 | Reinstatement of Certain Shareholder Released Claims | 165 |
| 10.20 | Special Provisions for United States | 165 |
| ARTICLE XI | RETENTION OF JURISDICTION. | 168 |
| 11.1 | Retention of Jurisdiction | 168 |
| ARTICLE XII | MISCELLANEOUS PROVISIONS. | 172 |
| 12.1 | Exemption from Certain Transfer Taxes | 172 |
| 12.2 | Dates of Actions to Implement Plan | 172 |
| 12.3 | Amendments | 172 |
| 12.4 | Revocation or Withdrawal of Plan | 173 |

12.5    Payment of Statutory Fees ................................................................................................ 173

12.6    Severability ....................................................................................................................... 173

12.7    Governing Law .................................................................................................................. 174

12.8    Immediate Binding Effect.................................................................................................. 174

12.9    Successors and Assigns ..................................................................................................... 174

12.10   Entire Agreement .............................................................................................................. 175

12.11   Computing Time ................................................................................................................ 175

12.12   Exhibits to Plan ................................................................................................................. 175

12.13   Notices .............................................................................................................................. 175

12.14   Dissolution of the Creditors' Committee ......................................................................... 175

12.15   Reservation of Rights........................................................................................................ 176

Each of Purdue Pharma L.P., Purdue Pharma Inc., Purdue Transdermal Technologies L.P., Purdue Pharma Manufacturing L.P., Purdue Pharmaceuticals L.P., Imbrium Therapeutics L.P., Adlon Therapeutics L.P., Greenfield BioVentures L.P., Seven Seas Hill Corp., Ophir Green Corp., Purdue Pharma of Puerto Rico, Purdue Products L.P. (f/k/a Avrio Health L.P.), Purdue Pharmaceutical Products L.P., Purdue Neuroscience Company, Nayatt Cove Lifescience Inc., Button Land L.P., Rhodes Associates L.P., Paul Land Inc., Quidnick Land L.P., Rhodes Pharmaceuticals L.P., Rhodes Technologies, UDF LP, SVC Pharma LP and SVC Pharma Inc. (each, a "***Debtor***" and, collectively, the "***Debtors***" or "***Purdue***") proposes the following thirteenth amended joint chapter 11 plan of reorganization pursuant to section 1121(a) of the Bankruptcy Code. Capitalized terms used herein shall have the meanings set forth in <u>Section 1.1</u> below.

## ARTICLE I    DEFINITIONS AND INTERPRETATION.

### 1.1    *Definitions*.

The following terms shall have the respective meanings specified below:

"***Access Materials***" has the meaning set forth in <u>Section 5.13(f)(i)</u> of the Plan.

"***Act***" has the meaning set forth in <u>Section 5.2(f)(i)(D)</u> of the Plan.

"***Ad Hoc Committee***" means the ad hoc committee of governmental and other contingent litigation claimants identified in the *Verified Statement Pursuant to Bankruptcy Rule 2019* [D.I. 279], as may be amended from time to time.

"***Ad Hoc Group of Hospitals***" means the Ad Hoc Group of Hospitals identified in the *Second Amended Verified Statement of the Ad Hoc Group of Hospitals Pursuant to Bankruptcy Rule 2019* [D.I. 1536].

"***Ad Hoc Group of Individual Victims***" means the Ad Hoc Group of Individual Victims of Purdue Pharma L.P. identified in the *Second Amended Verified Statement of the Ad Hoc Group of Individual Victims of Purdue Pharma L.P., et al., Pursuant to Bankruptcy Rule 2019* [D.I. 3939], as may be amended from time to time.

"***Adlon General Unsecured Claim***" means any Claim against Adlon Therapeutics L.P. that is not an Administrative Claim, a Priority Claim, a Secured Claim, a Federal Government Unsecured Claim, a Channeled Claim, a Co-Defendant Claim, an Other Subordinated Claim, an Intercompany Claim or a Shareholder Claim.

"***Administrative Claim***" means any Claim against any Debtor for costs and expenses of administration of the Chapter 11 Cases pursuant to section 327, 328, 330, 365, 503(b), 507(a)(2) or 507(b) of the Bankruptcy Code, including (i) the actual and necessary costs and expenses incurred on or after the Petition Date and through the Effective Date of preserving the Estates and operating the Debtors' business, (ii) any Professional Fee Claim, (iii) any fee or charge assessed against the Estates pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code, (iv) any Allowed Claim that is to be treated as an Administrative Claim pursuant to a Final Order of the Bankruptcy Court under section 546(c)(2) of the Bankruptcy Code, (v) once Allowed in accordance with <u>Section 2.3(a)</u> of the Plan, the DOJ Forfeiture Judgment Claim and (vi) any Allowed Cure Claim.

"***Aggregate LG Cost Cap***" has the meaning set forth in <u>Section 5.9(a)(i)</u> of the Plan.

"***Aggregate State Expenses Cap***" has the meaning set forth in <u>Section 5.9(b)</u> of the Plan.

"***AHC Reimbursement Agreement Assumption Order***" means the *Order Authorizing the Debtors to Assume the Reimbursement Agreement and Pay the Fees and Expenses of the Ad Hoc Committee's Professionals* [D.I. 553], as amended or supplemented by the Bankruptcy Court pursuant to D.I. 1617 and D.I. 2190.

"***Allowed***" means (i) any Claim held by a Settling Creditor (whose distribution, if any, shall be subject to and determined in accordance with the Plan and any applicable Creditor Trust Documents), (ii) with respect to any Claim held by a Non-Settling Creditor, such Claim that has been allowed in accordance with the Plan or a Final Order (whose distribution, if any, shall be subject to and determined in accordance with the Plan and any applicable Creditor Trust Documents), (iii) with respect to any Adlon General Unsecured Claim or Avrio General Unsecured Claim, such Claim that is Scheduled as not disputed, contingent or unliquidated, and for which no Proof of Claim or Interest, as applicable, has been timely filed, and (iv) with respect to any Claim (other than a Channeled Claim) against a Debtor, such Claim (A) that is allowed pursuant to the Plan or a Final Order, (B) as to which no objection has been timely filed and that is evidenced by a Proof of Claim timely filed by the applicable Bar Date or that is not required to be evidenced by a filed Proof of Claim under the Plan, the Bankruptcy Code or a Final Order or (C) the amount of which has been agreed, compromised, settled or otherwise resolved pursuant to the authority of the Debtors or the Plan Administration Trustee, as applicable. Except as otherwise specified in the Plan or any Final Order, the amount of an Allowed Claim shall not include interest or other charges on such Claim on and after the Petition Date. No Claim of any Person subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Person pays in full the amount for which it is liable to the applicable Debtor or the Plan Administration Trustee as provided in section 502(d). Correlative terms such as "Allow" and "Allowance" have correlative meanings. For the avoidance of doubt, any Channeled Claim that is Allowed under the Plan shall still be subject to, and shall only receive a distribution pursuant to, the applicable Creditor Trust Documents.

"***Asset***" means, with respect to a Person, all of the right, title and interest of such Person in and to property of whatever type or nature, including real, personal, mixed, intellectual, tangible and intangible property, which, for avoidance of doubt, includes insurance policies and any rights, claims or potential claims with respect thereto.

"***Assumed Liabilities***" means the liabilities of the Debtors assumed by NewCo as expressly set forth in the NewCo Transfer Agreement.

"***Assumption Notice***" means a notice of the assumption or assumption and assignment and any proposed Cure Amount provided to counterparties to executory contracts and unexpired leases pursuant to the Solicitation Procedures Order.

"***Avrio General Unsecured Claim***" means any Claim against Purdue Products L.P. (f/k/a Avrio Health L.P.) that is not an Administrative Claim, a Priority Claim, a Secured Claim, a Federal Government Unsecured Claim, a Channeled Claim, a Co-Defendant Claim, an Other Subordinated Claim, an Intercompany Claim or a Shareholder Claim. "***Bankruptcy Code***" means title 11 of the United States Code, as applicable to the Chapter 11 Cases.

"***Bankruptcy Court***" means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Chapter 11 Cases and, to the extent any reference made under section 157 of title 28 of the United States Code is withdrawn or the Bankruptcy Court is determined not to have authority to enter a Final Order on an issue, the United States District Court for the Southern District of New York.

"***Bankruptcy Rules***" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Cases, and any local rules of the Bankruptcy Court.

"***Bar Date***" means, as applicable, the General Bar Date or any other date established by the Bankruptcy Court as the deadline by which Proofs of Claim or requests for payment of Administrative Claims must be filed.

"***Bar Date Order***" means, collectively, (i) the *Order Establishing (I) Deadlines for Filing Proofs of Claims and Procedures Relating Thereto, (II) Approving the Proof of Claim Forms, and (III) Approving the Form and Manner of Notice Thereof* [D.I. 800] and (ii) the *Order (I) Extending the General Bar Date for a Limited Period and (II) Approving the Form and Manner of Notice Thereof* [D.I. 1221].

"***Benefit Plan***" means any "employee benefit plan" as defined in section 3(3) of ERISA, compensation, employment, consulting, severance, retention or similar plan, agreement, arrangement, program or policy, or other plan, agreement, arrangement, program or policy providing for compensation, bonuses or other forms of incentive compensation, including the Key Employee Plans, vacation benefits, insurance, medical, dental, vision, prescription or fringe benefits, life insurance, perquisites, disability or sick leave benefits or employee assistance program, in each case, that is sponsored, maintained or administered or entered into by the Debtors for the benefit of their respective employees or non-employee directors.

["***Breaching Shareholder Family Group***" means a Shareholder Family Group that is in Specified Breach (as defined in the Master Shareholder Settlement Agreement).]

"***Business Day***" means any day other than a Saturday, a Sunday or any other day which is a federal holiday.

"***Canadian Patient Claim Settlement Stipulation***" means the *Amended and Restated Stipulation and Order Permitting the Filing of a Class Proof of Claim Solely for Administrative Convenience in Order to Effectuate a Potential Settlement in Respect of Certain Canadian Patient Litigation* [D.I. 1515].

"***Canadian Patient Settlement Agreement***" means the "Patient Settlement Agreement" as defined in the Canadian Patient Claim Settlement Stipulation.

"***Canadian Patient Settlement Trust***" means the "Settlement Trust" as defined in the Canadian Patient Claim Settlement Stipulation.

"***Case Stipulation***" means the *Amended and Restated Case Stipulation Among the Debtors, the Official Committee of Unsecured Creditors and Certain Related Parties* [D.I. 518], including any predecessors thereto.

"***Cash***" means all legal tender of the United States of America.

"***Cause of Action***" means any Claim, action, class action, claim, cross-claim, counterclaim, third-party claim, cause of action, controversy, dispute, demand, right, Lien, indemnity, contribution, rights of subrogation, reimbursement, guaranty, suit, obligation, liability, debt, damage, judgment, loss, cost, attorneys' fees and expenses, account, defense, remedy, offset, power, privilege, license or franchise, in each case, of any kind, character or nature whatsoever, asserted or unasserted, accrued or unaccrued, known or unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or

unliquidated, disputed or undisputed, foreseen or unforeseen, direct or indirect, choate or inchoate, secured or unsecured, allowable or disallowable, Allowed or Disallowed, assertible directly or derivatively (including, without limitation, under alter-ego theories), in rem, quasi in rem, in personam or otherwise, whether arising before, on or after the Petition Date, arising under federal or state statutory or common law, or any other applicable international, foreign or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, in contract or in tort, at law, in equity or pursuant to any other theory or principle of law, including fraud, negligence, gross negligence, recklessness, reckless disregard, deliberate ignorance, public or private nuisance, breach of fiduciary duty, avoidance, willful misconduct, veil piercing, alter ego, unjust enrichment, disgorgement, restitution, contribution, indemnification, rights of subrogation and joint liability, regardless of where in the world accrued or arising.  For the avoidance of doubt, "Cause of Action" expressly includes (i) any Cause of Action held by a natural person who is not yet born or who has not yet attained majority as of the Petition Date or as of the Effective Date, (ii) any right of setoff, counterclaim or recoupment and any Cause of Action for breach of contract or for breach of duty imposed by law or in equity, (iii) the right to object to or otherwise contest Claims or Interests, (iv) any Cause of Action pursuant to section 362 of the Bankruptcy Code or chapter 5 of the Bankruptcy Code, (v) any claim or defense, including fraud, mistake, duress and usury and any other defense set forth in section 558 of the Bankruptcy Code, and (vi) any claim under any state or foreign law, including for the recovery of any fraudulent transfer or similar theory.

"*Channeled Claims*" means, collectively, all Non-Federal Domestic Governmental Channeled Claims, Tribe Channeled Claims, Public School Channeled Claims, Hospital Channeled Claims, Third-Party Payor Channeled Claims, ER Physician Channeled Claims, and PI Channeled Claims.

"*Channeling Injunction*" means the channeling injunction issued pursuant to Section 10.8 of the Plan.

"*Chapter 11 Cases*" means the cases under chapter 11 of the Bankruptcy Code commenced by the Debtors on or after the Petition Date (and not otherwise dismissed), currently pending in the Bankruptcy Court that are jointly administered in the case styled *In re Purdue Pharma L.P.*, Case No. 19-23649 (SHL).

"*Civil Settlement Agreement*" means that certain civil settlement agreement attached as Exhibit C to the DOJ 9019 Motion, as approved and modified by the DOJ 9019 Order, by and among Purdue Pharma L.P. and the United States, acting through the United States Department of Justice, Civil Division, Commercial Litigation Branch, the United States Attorney's Office for the District of New Jersey, the United States Attorney's Office for the District of Vermont, and on behalf of the Office of Inspector General of the United States Department of Health and Human Services, the Defense Health Agency, acting on behalf of the TRICARE Program, 10 U.S.C. §§ 1071-1110b, and the Office of Personnel Management.

"*Claim*" has the meaning set forth in section 101(5) of the Bankruptcy Code. For the avoidance of doubt, unless otherwise indicated herein, "Claim" shall not be limited to Claims against the Debtors or to Claims for which a Proof of Claim was submitted.

"*Claim-Over*" means a Cause of Action asserted by a Non-Released Party against a Shareholder Released Party or a Released Party on the basis of contribution, indemnity, or other claim-over on any theory relating to a Non-Party Covered Conduct Claim asserted by a Releasing Party.

"*Claims Reserves*" means, collectively, (i) PAT Disputed Claims Reserves, and (ii) Creditor Trust Non-Participating Claims Reserves.

"*Class*" means any group of Claims or Interests classified under this Plan pursuant to section 1122(a) of the Bankruptcy Code.

"***Class 4 Non-Participating Claims Reserves***" means the Creditor Trust Non-Participating Claims Reserves established in respect of Non-Participating Non-Federal Domestic Governmental Channeled Claims.

"***Class 4 Released Claims Reserve***" means the Released Claims Reserve established in respect of Non-Participating Non-Federal Domestic Governmental Channeled Claims.

"***Class 5 Non-Participating Claims Reserves***" means the Creditor Trust Non-Participating Claims Reserves established in respect of Non-Participating Tribe Claims.

"***Class 5 Released Claims Reserve***" means the Released Claims Reserve established in respect of Non-Participating Tribe Claims.

"***Class 6 Non-Participating Claims Reserve***" means the Creditor Trust Non-Participating Claims Reserve established in respect of Non-Participating Public School Claims.

"***Class 6 Released Claims Reserve***" means the Released Claims Reserve established in respect of Non-Participating Public School Claims.

"***Class 7 Non-Participating Claims Reserve***" means the Creditor Trust Non-Participating Claims Reserve established in respect of Non-Participating Hospital Claims.

"***Class 7 Released Claims Reserve***" means the Released Claims Reserve established in respect of Non-Participating Hospital Claims.

"***Class 8 Non-Participating Claims Reserve***" means the Creditor Trust Non-Participating Claims Reserve established in respect of Non-Participating Third-Party Payor Claims.

"***Class 8 Released Claims Reserve***" means the Released Claims Reserve established in respect of Non-Participating Third-Party Payor Claims.

"***Class 9 Non-Participating Claims Reserve***" means the Creditor Trust Non-Participating Claims Reserve established in respect of Non-Participating ER Physician Claims.

"***Class 9 Released Claims Reserve***" means the Released Claims Reserve established in respect of Non-Participating ER Physician Claims.

"***Class 10(a) Non-Participating Claims Reserve***" means the Creditor Trust Non-Participating Claims Reserve established in respect of Non-Participating NAS PI Claims.

"***Class 10(a) Released Claims Reserve***" means the Released Claims Reserve established in respect of Non-Participating NAS PI Claims.

"***Class 10(b) Non-Participating Claims Reserves***" means the Creditor Trust Non-Participating Claims Reserves established in respect of Non-Participating Non-NAS PI Claims.

"***Class 10(b) Released Claims Reserve***" means the Released Claims Reserve established in respect of Non-Participating Non-NAS PI Claims.

"***Class Action Escrow Accounts***" has the meaning set forth in <u>Section 5.2(e)(i)</u> of the Plan.

"***Co-Defendant***" means any co-defendant in a Pending Opioid Action commenced as of the Effective Date, in each case, other than (x) the Debtors and their current and former officers, directors, authorized agents and employees and (y) the Shareholder Released Parties.

"***Co-Defendant Action***" means any Pending Opioid Action and any previous, pending, or future litigation or dispute that alleges substantially similar facts or causes of action as those alleged in the Pending Opioid Actions and that concerns conduct occurring before the Effective Date.

"***Co-Defendant Claim***" means any Claim, other than a Claim held by an Insurance Company, that (i) either (A) is or could be asserted against any Debtor, including without limitation any Claim that would otherwise be a Cure Claim or (B) seeks to recover from any property of any Debtor or its Estate, including any MDT Insurance Policy, (ii) is for or based upon or arises from contribution, indemnification, reimbursement, setoff or recoupment or any other similar claim or Cause of Action, and (iii) seeks to recover, directly or indirectly, any costs, losses, damages, fees, expenses or any other amounts whatsoever, actually or potentially imposed upon the Holder of such Claim, in each case relating to or arising from any actual or potential litigation or dispute, whether accrued or unaccrued, asserted or unasserted, existing or hereinafter arising, based on or relating to, or in any manner arising from, in whole or in part, Opioid-Related Activities or otherwise relating to opioids (including, without limitation, any such Claims asserted by any manufacturer, distributor, pharmacy, pharmacy-benefit manager, group purchasing organization or physician or other contract counterparty or business partner of any Debtor), in each case that is not a Shareholder Claim or a Claim held by any current or former director, officer, employee or agent of the Debtors. For the avoidance of doubt, a Co-Defendant Claim shall not include any Co-Defendant Surviving Pre-Effective Date Claim. Notwithstanding anything to the contrary outside of this definition in the Plan, any Claim that satisfies the definition of a Co-Defendant Claim shall be a Co-Defendant Claim notwithstanding that such Claim would otherwise satisfy the definition of another type of Claim. For the avoidance of doubt, Co-Defendant Claim includes a Claim that is held by an insurance company in its capacity as subrogee of a Holder of a Co-Defendant Claim.

"***Co-Defendant Defensive Rights***" means any and all direct, or indirect, protections, immunities, objections, assertions, Causes of Action and, in each case, of any kind, character or nature, whether legal, equitable or contractual, contingent or non-contingent, liquidated or unliquidated, disputed or undisputed, including, without limitation, all rights, remedies, defenses, assertions and Claims against liability, rights to setoff, offset, recoupment, counter-claims, cross-claims, rights to allocation or apportionment of fault and judgment reduction, apportionment of damages, any other defenses, affirmative defenses or judgment reduction mechanisms or rights similar to the foregoing, and any steps necessary to assert the foregoing, in each case, solely to reduce the liability, judgment, obligation or fault of the applicable Holder of a Co-Defendant Claim to any Person that asserts any Cause of Action against such Holder of any Co-Defendant Claim based in whole or in part on Opioid-Related Activities. Co-Defendant Defensive Rights (i) may be used to offset, set-off, recoup, allocate or apportion fault, liability or damages, or seek judgment reduction or otherwise defend against any Cause of Action brought by any Person against the Holder of any Co-Defendant Claim based in whole or in part on Opioid-Related Activities and (ii) shall in no case be used to seek or obtain any affirmative monetary recovery from any Protected Party or any Asset of any Protected Party (including from any Purdue Insurance Policy or any other insurance policy of a Protected Party) on account of any Released Claim or Shareholder Released Claim.

"***Co-Defendant Surviving Pre-Effective Date Claim***" means any Cause of Action held by a Co-Defendant that (i) arose in the ordinary course of business, (ii) is not related to a Co-Defendant Action, and (iii) concerns conduct occurring before the Effective Date.

"***Common Benefit Escrow***" means the fund to be established as set forth in <u>Section 5.9(a)</u> of the Plan.

"***Common Benefit Fund***" means a common benefit fund established by order of, and administered by, the MDL Court.

"***Confirmation Date***" means the date on which the Bankruptcy Court enters the Confirmation Order.

"***Confirmation Hearing***" means the hearing to be held by the Bankruptcy Court regarding confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

"***Confirmation Order***" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code and approving the Plan Settlement, which shall be in form and substance acceptable to the Debtors and reasonably acceptable to the Creditors' Committee and the Governmental Consent Parties.

"***Contract Dispute***" means an unresolved objection regarding assumption or assumption and assignment, Cure Amount, "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) or other issues related to assumption or assumption and assignment of an executory contract or unexpired lease.

"***Covered Conduct***" means any actual or alleged act, failure to act, negligence, statement, error, omission, breach of any duty, conduct, event, transaction, agreement, misstatement, misleading statement, or other activity of any kind whatsoever from the beginning of time through the Effective Date (and any past, present, or future consequence of any such act, failure to act, negligence, statement, error, omission, breach of duty, conduct, event, transaction, agreement, misstatement, misleading statement, or other activity) relating in any way to (1) compounding, counseling or documentation relating to any Product or class of Products; (2) the discovery, development, manufacture, packaging, repackaging, marketing, promotion, advertising, labeling, recall, withdrawal, distribution, delivery, monitoring, reporting, supply, sale, prescribing, dispensing, physical security, warehousing, use or abuse of, or operating procedures relating to, any Product, or any system, plan, policy or advocacy relating to any Product or class of Products, including, but not limited to, any unbranded promotion, marketing, programs, or campaigns relating to any Product or class of Products; (3) the characteristics, properties, risks, or benefits of any Product; (4) the reporting, disclosure, non-reporting or nondisclosure to federal, state or other regulators of orders placed with any Shareholder Released Parties or physicians or pharmacists identified by any Shareholder Released Party as potentially engaging in suspicious or problematic conduct; or (5) diversion control programs or suspicious order monitoring.

"***Creditor Trust***" means (i) with respect to Non-Federal Domestic Governmental Channeled Claims, the Governmental Remediation Trust, (ii) with respect to Tribe Channeled Claims, the Tribe Trust, (iii) with respect to Hospital Channeled Claims, the Hospital Trust, (iv) with respect to ER Physician Channeled Claims, the ERP Trust, (v) with respect to Public School Channeled Claims, the Public School Trust, (vi) with respect to Third-Party Payor Channeled Claims, the TPP Trust, and (vii) with respect to PI Channeled Claims, the PI Trust.

"***Creditor Trust Advance Amount***" means, with respect to each Creditor Trust, a reduction in Distributions equal to amounts advanced to such Creditor Trust prior to the Effective Date pursuant to the Creditor Trust Establishment Order.

"***Creditor Trust Establishment Order***" means the *Order (I) Authorizing the Debtors to Fund Establishment of the Creditor Trusts, the Master Disbursement Trust and Topco, (II) Directing Prime Clerk LLC to Release Certain Protected Information, and (III) Granting Other Related Relief* [D.I. 3773].

"***Creditor Trust Non-Participating Claims Reserves***" means the (i) Creditor Trust Non-PRA Non-Participating Claims Reserves, (ii) Creditor Trust PRA Non-Participating Claims Reserves and (iii) other segregated accounts established pursuant to Section 7.2 of this Plan for each of Classes 6 through 10(a), in each case held and administered on and after the Effective Date by the applicable Creditor Trust of such Class. Each other Creditor Trust Non-Participating Claims Reserve in subclause (iii) herein shall be funded with Distributions in accordance with Sections 7.2(c) and (d) of this Plan.

"***Creditor Trust Non-PRA Non-Participating Claims Reserves***" means segregated accounts established pursuant to Section 7.2 of this Plan for each of Classes 4, 5 and 10(b), in each case held and administered on and after the Effective Date by the applicable Creditor Trust of such Class. Each Creditor Trust Non-Participating Claims Reserve shall be funded with Non-PRA Estate Distributions in accordance with Sections 7.2(c) and (d) of this Plan, as applicable.

"***Creditor Trust PRA Non-Participating Claims Reserves***" means segregated accounts established pursuant to Section 7.2 of this Plan for each of Classes 4, 5 and 10(b), in each case held and administered on and after the Effective Date by the applicable Creditor Trust of such Class. Each Creditor Trust PRA Non-Participating Claims Reserve shall be funded with PRA Estate Distributions in accordance with Sections 7.2(c) and (d) of this Plan, as applicable.[2]

"***Creditor Trust Documents***" means, collectively, the Governmental Remediation Trust Documents, the Tribe Trust Documents, the Public School Trust Documents, the Hospital Trust Documents, the ERP Trust Documents, the TPP Trust Documents and the PI Trust Documents.

"***Creditor Trust Operating Expenses***" means, with respect to each Creditor Trust, any and all costs, expenses, fees, taxes, disbursements, debts or obligations incurred from the operation and administration of such Creditor Trust, including in connection with the reconciliation and administration of the Channeled Claims channeled to such Creditor Trust, working capital and all compensation, costs and fees of the Creditor Trustees of such Creditor Trust and any professionals retained by such Creditor Trustees.

"***Creditor Trust Operating Reserves***" means the reserves to be established to pay the Creditor Trust Operating Expenses of the respective Creditor Trusts, as and to the extent set forth in the Creditor Trust Documents. The Creditor Trust Operating Reserves shall be (i) funded with Cash and cash equivalents held by the respective Creditor Trusts in accordance with the respective Creditor Trust Documents and (ii) held by the respective Creditor Trusts in a segregated account and administered by the respective Creditor Trustees.

"***Creditor Trust Overseer(s)***" means, with respect to each Creditor Trust, the Person(s) responsible for the administration of such Creditor Trust or advisory or oversight committee member(s), as applicable, for such Creditor Trust, in each case, appointed in accordance with Section 5.8(c) of the Plan and the Creditor Trust Documents for such Creditor Trust.

"***Creditor Trust TDPs***" means, collectively or as applicable, the Governmental Remediation Trust Documents, the Tribe TDP, the Hospital TDP, the Public School TDP, the ERP TDP, the TPP TDP, and the PI TDP.

---

[2] [**NTD**: Tax treatment of Special Operating Reserve, the Credit Trust PRA Non-Participating Claims Reserves, and the Released Claims Reserves is subject to ongoing discussion, and remains subject to agreement by the Governmental Consent Parties, the Creditors' Committee, the Debtors and the Sackler Parties' Representative]

"**_Creditor Trustee(s)_**" means each trustee of a Creditor Trust or, collectively, the trustees of the Creditor Trusts, in each case, appointed in accordance with Section 5.8(c) of the Plan, including the Governmental Remediation Trust Trustees.

"**_Creditors' Committee_**" means the statutory committee of unsecured creditors appointed by the U.S. Trustee on September 27, 2019 pursuant to section 1102(a)(1) of the Bankruptcy Code.

"**_Cure Amount_**" means the payment of Cash or the distribution of other property (as the parties may agree or the Bankruptcy Court may order) as necessary to (i) cure a monetary default by the Debtors in accordance with the terms of an executory contract or unexpired lease of the Debtors, and (ii) permit the Debtors to assume such executory contract or unexpired lease under section 365(a) of the Bankruptcy Code.

"**_Cure Claim_**" means a Claim for a Cure Amount in connection with the assumption or assumption and assignment of an executory contract or unexpired lease under section 365(a) of the Bankruptcy Code.

"**_Cutoff Date_**" has the meaning set forth in Section 5.13(i)(i) of the Plan.

"**_D&O Insurance Policies_**" means all directors and officers/executive liability insurance policies (including extension of coverage of any policy beyond the end of the policy period) issued to or providing insurance coverage at any time to any of the Debtors' directors, officers, managers or authorized agents, in their respective capacities as such, for alleged Wrongful Acts (as defined in such policies) or similar triggering acts, and all agreements, documents or instruments relating thereto.

"**_Debtor(s)_**" has the meaning set forth in the introductory paragraph of the Plan.

"**_Defense Counsel_**" has the meaning set forth in Section 5.13(s)(v) of the Plan.

"**_Definitive Documents_**" has the meaning set forth in the Master Shareholder Settlement Agreement.

"**_Designated Shareholder Released Parties_**" has the meaning set forth in the Master Shareholder Settlement Agreement.

"**_Direct Claims Shareholder Settlements_**" means the Governmental Entity Shareholder Direct Settlement, the Tribal Shareholder Direct Settlement, the Public School District Shareholder Direct Settlement, the Third-Party Payor Shareholder Direct Settlement, the ER Physician Shareholder Direct Settlement, the Hospital Shareholder Direct Settlement, the PI Shareholder Direct Settlements and any other settlements that contemplate releases similar to the foregoing that are entered into by and among the Shareholder Payment Parties and Holders of Claims, if applicable.

"**_Direct Claims Shareholder Settlement Agreements_**" means, collectively, the (i) Governmental Entity Shareholder Direct Settlement Agreement, (ii) Tribal Shareholder Direct Settlement Agreement, (iii) ER Physician Shareholder Direct Settlement Agreement, (iv) Hospital Shareholder Direct Settlement Agreement, and (v) Public School District Shareholder Direct Settlement Agreement.

"**_Direct Claim Settlement Retained Payment Amounts_**" shall mean:

(a)     with respect to each Direct Claims Shareholder Settlement other than the Third-Party Payor Shareholder Direct Settlement and the PI Shareholder Direct Settlements and at the

relevant time, (i) the maximum amounts payable pursuant to the applicable Direct Claims Shareholder Settlement Agreement *less* (ii) amounts actually paid pursuant to the applicable Direct Claims Shareholder Settlement Agreement, in each case as set forth in the applicable Direct Claims Shareholder Settlement Agreement;

(b)    with respect to the Third-Party Payor Shareholder Direct Settlement, the TPP Direct Claim Settlement Retained Payment Amount; and

(c)    with respect to the PI Shareholder Direct Settlements, the NAS PI Direct Claim Settlement Retained Payment Amount and Non-NAS PI Direct Claim Settlement Retained Payment Amount.

"***Direct Settlement Eligible NAS PI Claims***" means NAS PI Claims held by Holders that timely filed Proofs of Claim that either (i) satisfy the requirements of the NAS PI TDP, including by such Holders having (a) submitted their NAS PI Trust Claim Form (as defined in the PI and TPP Claims Procedures Order) by the deadline set forth in the PI and TPP Claims Procedures Order, and (b) in the determination of the PI Claims Administrator (as defined in the PI and TPP Claims Procedures Order), provided sufficient information substantiating their asserted NAS PI Claims, or (ii) are Allowed pursuant to a Final Order on or prior to the Effective Date.

"***Direct Settlement Eligible Non-NAS PI Claims***" means Non-NAS PI Claims held by Holders that timely filed Proofs of Claim that either (i) satisfy the requirements of the Non-NAS PI TDP, including by such Holders having (a) submitted their Non-NAS PI Trust Claim Form (as defined in the PI and TPP Claims Procedures Order) by the deadline set forth in the PI and TPP Claims Procedures Order, and (b) in the determination of the PI Claims Administrator (as defined in the PI and TPP Claims Procedures Order), provided sufficient information substantiating their asserted Non-NAS PI Claims, or (ii) are Allowed pursuant to a Final Order on or prior to the Effective Date.

"***Direct Settlement Eligible TPP Claims***" means Third-Party Payor Claims held by Holders that timely filed or were included in timely filed Proofs of Claim, and any amendments thereto. "***Disallowed***" means (i) with respect to a Channeled Claim, or any portion thereof, such Channeled Claim that has been disallowed by a Final Order or pursuant to a settlement, and (ii) with respect to any Claim against a Debtor (other than a Channeled Claim), such Claim, or any portion thereof, that (A) has been disallowed under this Plan, by a Final Order or pursuant to a settlement, (B) is Scheduled at zero dollars ($0) or as contingent, disputed or unliquidated and as to which a Bar Date has been established but no Proof of Claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court, including the Bar Date, or otherwise deemed timely filed under applicable law, or (C) is not Scheduled and as to which a Bar Date has been established but no Proof of Claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely filed under applicable law. Correlative terms such as "Disallow", and "Disallowance" have correlative meanings.

"***Disallowed Claim Distribution***" shall have the meaning set forth in Section 7.8 of this Plan.

"***Disbursing Agent***" means any Person in its capacity as disbursing agent under Article VI of the Plan, including the Plan Administration Trustee acting in such a capacity to make Distributions in respect of Allowed Claims, other than Channeled Claims, pursuant to the Plan.

"***Disclosure Program Budget***" has the meaning set forth in Section 5.13(e) of the Plan.

"***Disclosure Statement***" means the disclosure statement for this Plan, as may be amended or supplemented from time to time, prepared and distributed in accordance with sections 1125, 1126(b) and 1145 of the Bankruptcy Code, Bankruptcy Rules 3016 and 3018 and other applicable law, and all exhibits, appendices, schedules, supplements, modifications, amendments, annexes and attachments to such disclosure statement.

"***Disposition Event***" has the meaning set forth in <u>Section 5.4(d)(ii)</u> of the Plan.

"***Disputed***" means, with respect to a Claim against a Debtor, a Claim that is not yet Allowed or Disallowed, regardless of whether such Claim is the subject of an objection.

"***Disputed Cure Claim***" means the amount that a counterparty to a Contract Dispute alleges must be paid in order for an executory contract or unexpired lease to be assumed or assumed and assigned as provided under the Plan.

"***Disputed Cure Claims Reserve***" means a reserve established to pay the aggregate amount of Disputed Cure Claims or such lower amount as ordered by the Bankruptcy Court or agreed to by the parties to the applicable executory contract or unexpired lease. The Disputed Cure Claims Reserve shall be (i) funded on the Effective Date with Effective Date Cash in an amount determined by the Debtors and reasonably acceptable to the Creditors' Committee and the Governmental Consent Parties and (ii) held by the Plan Administration Trust in a segregated account and administered by the Plan Administration Trustee on and after the Effective Date in a manner consistent with the Master Shareholder Settlement Agreement.

"***Disputed Other General Unsecured Claims Reserve***" means the PAT Disputed Claims Reserve established on account of Disputed Other General Unsecured Claims.

"***Distribution***" means any initial or periodic payment or transfer of consideration in respect of Allowed Claims or Channeled Claims made under this Plan (including any amounts funded under any Direct Shareholder Settlement Agreement); *provided* that all Distributions to Holders in respect of Channeled Claims shall be exclusively from the applicable Creditor Trust in accordance with the applicable Creditor Trust Documents.

"***Distribution Record Date***" means the record date for purposes of making Distributions under the Plan on account of Allowed Claims, which date shall be the Effective Date.

"***DOB***" means the volunteer disclosure oversight board created in accordance with <u>Section 5.13(c)</u> of the Plan.

"***DOJ***" means the United States Department of Justice.

"***DOJ 9019 Motion***" means the *Motion of Debtors Pursuant to 11 U.S.C. § 105 and Fed. R. Bankr. P. 9019 Authorizing and Approving Settlements Between the Debtor and the United States* [D.I. 1828].

"***DOJ 9019 Order***" means the *Order Pursuant to 11 U.S.C. § 105 and Fed. R. Bankr. P. 9019 Authorizing and Approving Settlements Between the Debtors and the United States* [D.I. 2004].

"***DOJ Civil Claim***" means the "Civil Claim" as defined in the DOJ 9019 Order in the amount of $2.8 billion.

"***DOJ Conviction Judgment Date***" means the date on which the United States District Court for the District of New Jersey enters a judgment of conviction pursuant to the Plea Agreement and the DOJ 9019 Order.

"***DOJ Criminal Fine Claim***" means the "Criminal Fine Claim" as defined in the DOJ 9019 Order in the amount of $3.544 billion.

"***DOJ Forfeiture Judgment Claim***" means the "Forfeiture Judgment" as defined in the DOJ 9019 Order in the amount of $2 billion.

"***DOJ Forfeiture Judgment Credit***" means the amount of value distributed or otherwise conferred by the Debtors in respect of Non-Federal Domestic Governmental Claims and Tribe Claims, which shall be credited against the DOJ Forfeiture Judgment Claim pursuant to the Plan and the Plea Agreement, it being understood and agreed that (i) the amount so credited shall not exceed $1.775 billion, and (ii) the Confirmation Order shall include a finding that the amount of value distributed or otherwise conferred by the Debtors in respect of Non-Federal Domestic Governmental Claims and Tribe Claims exceeds $1.775 billion.

"***DOJ Forfeiture Payment***" means a payment of $225 million in Cash by PPLP to the United States Marshals in accordance with the Plan, the Plea Agreement and the DOJ 9019 Order.

"***DOJ Repository Obligation***" has the meaning set forth in Section 5.13(b) of the Plan.

"***DOJ Resolution***" means the Plea Agreement and the Civil Settlement Agreement, including the settlements contemplated therein and the other terms and conditions thereof.

"***DOJ Unsecured Claims***" means the DOJ Civil Claim and the DOJ Criminal Fine Claim.

["***Domestic Governmental Entity***" means the United States or any State, county, municipality, Tribe, or other Governmental Unit within the United States, or an officer of any of the foregoing in his or her official capacity, but, for the avoidance of doubt, not including (a) any Non-Federal Acute Care Hospitals, (b) any elementary, middle, or secondary public school district in the United States, (c) California health districts acting as Third-Party Payors that filed Third-Party Payor Proofs of Claim in such capacity by the Bar Date established by the Bar Date Order, or (d) any hospitals listed on Exhibit [A] of the Hospital Shareholder Direct Settlement Agreement].

"***Effective Date***" means the date selected by the Debtors for the consummation of the Plan, or as soon thereafter as reasonably practicable.

"***Effective Date Cash***" means, collectively all Cash and cash equivalents of the Debtors (including all amounts paid on the Effective Date directly to, or pursuant to direction from, the MDT under the Shareholder Settlement Agreements) on the Effective Date prior to the making of any payments by the Debtors or the MDT, as applicable, in accordance with the Restructuring Transactions, excluding any Cash and cash equivalents (i) in the form of security deposits, (ii) that collateralize any obligations of the Debtors or (iii) that are otherwise subject to any legal, contractual or other restriction on the ability to freely transfer such Cash or cash equivalents.

"***EMTALA***" means the Emergency Medical Treatment & Labor Act, 42 U.S.C. § 1395dd.

"***Entity***" has the meaning set forth in section 101(15) of the Bankruptcy Code.

"***ER Physician***" means an emergency room physician, in its capacity as such.

"***ER Physician Channeled Claim***" means (i) any ER Physician Claim or (ii) any Claim held by an ER Physician that is released pursuant to the ER Physician Shareholder Direct Settlement Agreement. ER Physician Channeled Claims shall be channeled to the ERP Trust in accordance with the Plan and Master TDP.

"***ER Physician Claims***" means any Claim against any Debtor that is held by an ER Physician, provided that such Claim arose when such ER Physician's billing and revenue collection were entirely separate from the billing and revenue collection practices of the medical facility at which such ER Physician practiced, and such ER Physician was not employed by such medical facility.

"***ER Physician Shareholder Direct Settlement***" means the settlement set forth in the ER Physician Shareholder Direct Settlement Agreement.

"***ER Physician Shareholder Direct Settlement Agreement***" means the settlement agreement which shall be filed by the Debtors with the Plan Supplement.

"***ERISA***" means the Employee Retirement Income Security Act of 1974, as amended. 29 U.S.C. §§ 1301-1461.

"***ERP TDP***" means the trust distribution procedures to be implemented by the ERP Trust setting forth the procedures for Distributions from the ERP Trust, the terms of which shall be consistent with Articles I through XII of the Plan and otherwise acceptable to the Debtors and the ERP Trustee and reasonably acceptable to the Creditors' Committee and the Governmental Consent Parties, and which shall be filed by the Debtors with the Plan Supplement.

"***ERP Trust***" means the trust to be established in accordance with Section 5.8 of the Plan to (i) assume all liability for the ER Physician Channeled Claims, (ii) collect the Initial ERP Trust Distribution and additional payments due under the MDT ERP Claim in accordance with the Private Entity Settlements and the ERP Trust Documents, (iii) administer ER Physician Channeled Claims, (iv) hold and administer the Class 9 Non-Participating Claims Reserve on and after the Effective Date, (v) hold the Class 9 Released Claims Reserve on and after the Effective Date and (vi) make Distributions in accordance with the ERP TDP.

"***ERP Trust Agreement***" means the trust agreement establishing and delineating the terms and conditions for the creation and operation of the ERP Trust, the terms of which shall be consistent with Articles I through XII of the Plan and otherwise acceptable to the Debtors and the ERP Trustee and reasonably acceptable to the Creditors' Committee and the Governmental Consent Parties, and which shall be filed by the Debtors with the Plan Supplement.

"***ERP Trust Documents***" means the ERP Trust Agreement and the ERP TDP.

"***ERP Trustee***" means Dr. Michael Masiowski, or such successor(s) as may be appointed pursuant to the terms of the ERP Trust Documents.

"***Estate(s)***" means, individually or collectively, the estate or estates of the Debtors created under section 541 of the Bankruptcy Code.

"***Estate Causes of Action***" means, in each case whether or not asserted, any and all Causes of Action that any Debtor or its Estate may have, hold, or control, or be entitled to assert, or that any Person may be entitled to assert, currently or in the future, by, through, under, or on behalf of any Debtor or its Estate, and each of their respective successors or assigns, including, without limitation, any and all Causes of Action that: (i) were included in the proposed complaint filed by the Creditors' Committee [D.I. 6685-

2]; (ii) seek to avoid or recover any transfer of property or value by any Debtor or its Estate, or to avoid any obligation incurred by any Debtor or its Estate, including on a theory of fraudulent transfer, fraudulent conveyance, preference, turnover, unjust enrichment, constructive trust, or conversion; (iii) arise from an injury suffered by a Debtor, including Causes of Action arising from a breach of fiduciary duty, mismanagement, corporate waste, or similar theories arising out of a Person's ownership, management, oversight, operation, status, tenure, conduct, omission, liability, action, or inaction at any time as a stockholder, affiliate, owner, partner, member, manager, director, officer, employee, servant, agent, representative, attorney, creditor, successor, assign, or other relationship with a Debtor or any of its predecessors; (iv) arise from disregarding the separateness of any Debtor or its Estate or imputing the liability of any Debtor or its Estate to another Person, including on a theory of successor liability, vicarious liability, respondeat superior, alter ego, veil piercing, agency, control person liability, or joint venture; (v) arise from a common injury that (a) could be asserted by creditors of a Debtor or its Estate or (b) arises from a breach of duty owed to a Debtor or its Estate; (vi) are property of any Debtor or its Estate or can be asserted, settled, or released by any Debtor or its Estate under the Bankruptcy Code or other applicable law; or (vii) are other derivative claims duplicative of any of the foregoing. Estate Causes of Action shall not include any Cause of Action arising from a breach by a non-Debtor of a legally cognizable duty or statutory prohibition – including not to engage personally in fraud, misrepresentation, or misconduct that causes a nuisance, in each case under consumer protection laws and like regulatory laws or statutes (such as UDAP laws) or the common law – which duty or statutory obligation is owed by such non-Debtor directly to the Person asserting such Cause of Action (or to the citizenry on whose behalf such Person is charged to act), where the injury caused by such breach is particular to the Person asserting such Cause of Action (or the citizenry on whose behalf such Person is charged to act) and is not an injury common to creditors of the Debtor or its Estate.

"*Estate Distributions*" means, with respect to the Distributions to each Class, all Distributions other than such Class's Shareholder Direct Settlement Portion. For the avoidance of doubt, any amounts received by the Governmental Remediation Trust or the Tribe Trust from the IAC Sale Bonus Payment shall constitute Estate Distributions.

"*Estate Releases*" means the releases provided for in <u>Section 10.6</u> of the Plan.

"*Estate Surviving Pre-Effective Date Claim*" means any Estate Cause of Action against a Co-Defendant that (i) arose in the ordinary course of business, (ii) is not related to a Co-Defendant Action, and (iii) concerns conduct occurring before the Effective Date.

"*Excluded Assets*" means (i) all Effective Date Cash other than the Initial NewCo Cash and (ii) any other Assets of the Debtors excluded from the transfer to NewCo pursuant to the NewCo Transfer Agreement, including without limitation all MDT Transferred Assets and all PAT Assets.

"*Excluded Claim*" means (i) any criminal action or criminal proceeding arising under a criminal provision of any statute instituted (A) by a Domestic Governmental Entity that has authority to bring such a criminal action or criminal proceeding, and (B) to adjudicate a person's guilt or to set a convicted person's punishment; (ii) any Cause of Action against a non-Debtor Person by any federal, state or local authority with respect to taxes (other than tax laws targeting Covered Conduct ) imposed on such non-Debtor Person; (iii) any Estate Cause of Action or any Cause of Action held by a Releasing Party against an Excluded Party; (iv) any Cause of Action against any Person to the extent based on the actual conduct of such Person after the Effective Date; (v) any Cause of Action against persons or entities who are not Released Parties or Shareholder Released Parties; or (vi) any claim arising under the Plan for enforcement of the Plan.

"*Excluded Insurance Policies*" means (i) the Isosceles Insurance Ltd. policy number PPLP-01/2019, (ii) the Purdue Insurance Policies agreed by the Debtors, the Creditors' Committee and the

Governmental Consent Parties, which shall be identified in the MDT Agreement, and (iii) any rights or obligations under any Purdue Insurance Policy to the extent, but only to the extent, that such rights or obligations pertain solely to coverage for workers' compensation liability. For the avoidance of doubt, clause (i) of this definition does not negate or limit the scope of the definition of MDT Insurance Collateral. For the avoidance of further doubt, if a Purdue Insurance Policy both (x) does or may afford the Debtors rights, benefits, indemnity, insurance coverage or defense costs with respect to any Cause of Action against the Debtors arising out of, on account of, or in connection with Opioid-Related Activities or for which the Debtors have insurance rights arising out of or in connection with Opioid-Related Activities and (y) is subject to clause (ii) or (iii) of this definition, such Purdue Insurance Policy is only an Excluded Insurance Policy to the extent it is subject to clause (ii) or (iii) of this definition, and all provisions herein concerning the MDT Insurance Policies apply to that Purdue Insurance Policy.

"***Excluded Party***" means (i) each Person identified on the Schedule of Excluded Parties and (ii) each Co-Defendant; *provided* that no Settling Co-Defendant and none of their respective Related Parties (except to the extent any such Related Party is identified by name on the Schedule of Excluded Parties filed on August 23, 2021) shall be an Excluded Party.

"***Excluded Privileged Materials***" means the Privileged documents, books and records prepared in connection with or related to any Purdue Legal Matter.

"***Exculpated Parties***" means, collectively, (i) the Debtors, (ii) the Creditors' Committee and its members, solely in their capacities as such, (iii) the Plan Administration Trustee, (iv) the MDT Trustees and the MDT Advisory Council Representatives, (v) the Creditor Trustees, (vi) the Supporting Claimants, each solely in their capacities as such, (vii) the DOB members, and (viii) with respect to each of the Persons in the foregoing clauses (i) through (vii), each of their Related Parties; *provided*, *however*, that no Excluded Party or Shareholder Released Party (other than current and former directors, officers and employees of the Debtors that are not Excluded Parties or Sackler Family Members) shall be an Exculpated Party in any capacity or respect.

"***FDA***" means the United States Food and Drug Administration.

"***Federal Government Unsecured Claims***" means the DOJ Unsecured Claims and the Other Federal Agency Claims.

"***Final Order***" means an order or judgment of the Bankruptcy Court, as entered on the docket in any Chapter 11 Case, or of any other court of competent jurisdiction (i) that has not been reversed, stayed, modified or amended, and (ii) (A) as to which the time to appeal, seek certiorari or move for a new trial, re-argument or rehearing has expired according to applicable law and no appeal or petition for certiorari or other proceedings for a new trial, re-argument or rehearing has been timely taken or (B) as to which any appeal that has been taken or any petition for certiorari that has been or may be timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, re-argument or rehearing shall have been denied, resulted in no modification of such order or has otherwise been dismissed with prejudice.

"***First Reversion Date***" shall have the meaning ascribed to such term in the Master Shareholder Settlement Agreement.

"***Foundation***" means a newly formed New York non-stock corporation treated as a corporation for U.S. federal income tax purposes to be created in accordance with Section 5.5 of the Plan to receive and hold the NewCo Interest and collect the Foundation Distributable Cash in accordance with the Plan and the Foundation Bylaws and is intended to be an exempt organization for U.S. federal income tax purposes.

"***Foundation Distributable Cash***" means an amount of NewCo Distributable Cash to be distributed from NewCo directly to the Foundation in respect of the NewCo Interest in any year equal to the lesser of (x) 5% of NewCo Distributable Cash and (y) $5 million.

"***Foundation Bylaws***" means the agreement establishing and delineating the terms and conditions for the creation and operation of the Foundation, the terms of which shall be consistent with Articles I through XII of the Plan and otherwise acceptable to the DOJ and the Governmental Consent Parties and reasonably acceptable to the Debtors, and which shall be filed by the Debtors with the Plan Supplement.

"***Foundation Trustees***" means the trustees of the Foundation appointed in accordance with Section 5.5(b) of the Plan. "***General Bar Date***" means July 30, 2020.

"***Governmental Consent Parties***" means (i) the States AG Negotiating Group, (ii) the Ad Hoc Committee, and (iii) the MSGE Group.

"***Governmental Entity Shareholder Direct Settlement***" means the settlement set forth in the Governmental Entity Shareholder Direct Settlement Agreement.

"***Governmental Entity Shareholder Direct Settlement Agreement***" means the agreement substantially in the form of Exhibit [●] attached to the Plan.

"***Governmental NewCo Distributable Cash***" means all NewCo Distributable Cash other than Foundation Distributable Cash.

"***Governmental Remediation Trust***" means the Delaware trust to be established in accordance with Section 5.8 of the Plan and the Governmental Remediation Trust Documents and administered by the Governmental Remediation Trust Administrator, which shall receive and distribute all distributions on account of the Allowed Non-Federal Domestic Governmental Channeled Claims pursuant to the Governmental Remediation Trust Documents.

"***Governmental Remediation Trust Administrator***" means the Person appointed pursuant to the Governmental Entity Shareholder Direct Settlement Agreement to serve as the "Directing Administrator."

"***Governmental Remediation Trust Agreement***" means the trust agreement establishing and delineating the terms and conditions for the creation and operation of the Governmental Remediation Trust, the terms of which shall be consistent with the Plan and acceptable to the Governmental Consent Parties, in consultation with the Debtors and the Creditors' Committee, and which shall be filed by the Debtors with the Plan Supplement. "***Governmental Remediation Trust Delaware Trustee***" means the Person appointed pursuant to the Governmental Remediation Trust Agreement to serve as the "Delaware Trustee."

"***Governmental Remediation Trust Directed Trustee***" means the Person appointed pursuant to the Governmental Entity Shareholder Direct Settlement Agreement to serve as the "Directed Trustee."

"***Governmental Remediation Trust Documents***" means the Governmental Entity Shareholder Direct Settlement Agreement and the Governmental Remediation Trust Agreement.

"***Governmental Remediation Trust Trustees***" means the Governmental Remediation Trust Administrator, the Governmental Remediation Trust Delaware Trustee, and the Governmental Remediation Trust Directed Trustee.

"***Governmental Unit***" has the meaning set forth in section 101(27) of the Bankruptcy Code.

"***Holder***" means a Person holding a Claim, a Channeled Claim, a Cause of Action or an Interest, as applicable. For the avoidance of doubt, "Holder" shall not be limited to Persons Holding Claims against the Debtors or Persons that submitted timely Proofs of Claim.

"***Hospital***" means any acute care hospital subject to EMTALA which hospital is not a Domestic Governmental Entity or a Physician.

"***Hospital Districts***" shall correspond to Special Districts categorized by the U.S. Census Bureau under the function name "Hospital."

"***Hospital Attorney Fee Fund***" means the fund to be established as set forth in Section 5.9(d) of the Plan.

"***Hospital Channeled Claim***" means (i) any Hospital Claim or (ii) any Claim held by a Hospital that is released pursuant to the Hospital Shareholder Direct Settlement Agreement. Hospital Channeled Claims shall be channeled to the Hospital Trust in accordance with the Plan and Master TDP.

"***Hospital Claim***" means any Claim against any Debtor that is held by a Hospital, other than as set forth below. For the avoidance of doubt, (a) Proofs of Claim filed by (i) Physicians or (ii) Domestic Governmental Entities shall not be Hospital Claims, and (b) Hospital Claims shall include all Proofs of Claim filed by Hospitals.

"***Hospital Shareholder Direct Settlement***" means the settlement set forth in the Hospital Shareholder Direct Settlement Agreement.

"***Hospital Shareholder Direct Settlement Agreement***" means the settlement agreement which shall be filed by the Debtors with the Plan Supplement.

"***Hospital TDP***" means the trust distribution procedures to be implemented by the Hospital Trust setting forth the procedures for Distributions from the Hospital Trust, the terms of which shall be consistent with Articles I through XII of the Plan and otherwise acceptable to the Debtors and the Ad Hoc Group of Hospitals and reasonably acceptable to the Creditors' Committee and the Governmental Consent Parties, and which shall be filed by the Debtors with the Plan Supplement.

"***Hospital Trust***" means a trust to be established in accordance with Section 5.8 of the Plan to (i) assume all liability for the Hospital Channeled Claims, (ii) hold the MDT Hospital Claim and collect the Initial Hospital Trust Distribution and additional payments due under the MDT Hospital Claim in accordance with the Private Entity Settlements and the Hospital Trust Documents, (iii) administer Hospital Channeled Claims, (iv) hold and administer the Class 7 Non-Participating Claims Reserve on and after the Effective Date, (v) hold the Class 7 Released Claims Reserve on and after the Effective Date and (vi) make Distributions in accordance with the Hospital TDP.

"***Hospital Trust Agreement***" means the trust agreement establishing and delineating the terms and conditions for the creation and operation of the Hospital Trust, the terms of which shall be consistent with Articles I through XII of the Plan and otherwise acceptable to the Debtors and the Ad Hoc

Group of Hospitals and reasonably acceptable to the Creditors' Committee and the Governmental Consent Parties, and which shall be filed by the Debtors with the Plan Supplement.

"*Hospital Trust Documents*" means the Hospital Trust Agreement and the Hospital TDP.

"*Host Institutions*" has the meaning set forth in <u>Section 5.13(b)</u> of the Plan.

"*IAC Sale Bonus Payment*" has the set forth in the Master Shareholder Settlement Agreement.

"*Impaired*" means, with respect to any Claim, Interest or Class of Claims or Interests, "impaired" within the meaning of such term in section 1124 of the Bankruptcy Code.

"*Initial ERP Trust Distribution*" means the payment of $5,811,440 of Effective Date Cash to the ERP Trust on the later of (i) the Effective Date and (ii) consummation of the ER Physician Shareholder Direct Settlement, *less* (i) the SOR Holdback in the amount of $141,440 and (ii) any applicable Direct Claim Settlement Retained Payment Amount.

"*Initial Federal Government Distribution*" means the payment of $25 million of Effective Date Cash to the United States on the Effective Date on account of the Federal Government Unsecured Claims.

"*Initial Hospital Trust Distribution*" means the payment of $263,507,000 of Effective Date Cash to the Hospital Trust on the later of (i) the Effective Date and (ii) consummation of the Hospital Shareholder Direct Settlement, *less* (i) the SOR Holdback in the amount of $2,697,000, (ii) any applicable Direct Claim Settlement Retained Payment Amount, and (iii) any applicable Creditor Trust Advance Amount.

"*Initial Governmental Remediation Trust Distribution*" means the payment to the Governmental Remediation Trust on the Effective Date of all Effective Date Cash remaining after the satisfaction of all amounts described in <u>Section 5.14(a)</u> of the Plan, the Initial Tribe Trust Distribution and the SOR Holdback.

"*Initial LG Costs Funding Date*" has the meaning set forth in <u>Section 5.9(a)(i)</u> of the Plan.

"*Initial NAS PI Distribution*" means the payment of Effective Date Cash to the PI Trust on the Effective Date equal to the sum of (a) $48,215,000[3] and (b) $65,851,710, *less* (i) the SOR Holdback in the amount of $1,814,710 (ii) any NAS PI Direct Claim Settlement Retained Payment Amount, (iii) any amounts advanced to the NAS Monitoring Trust (as defined in the Creditor Trust Establishment Order) pursuant to the Creditor Trust Establishment Order, and (iv) 13.98% of (A) any amounts paid by the Debtors to the PI Claims Administrator (as defined in the PI and TPP Claims Procedures Order) as of the Effective Date, and (B) any applicable Creditor Trust Advance Amount with respect to the PI Trust.

"*Initial Non-NAS PI Distribution*" means the payment of Effective Date Cash to the PI Trust on the Effective Date in the amount of $701,785,000 *less* (i) the SOR Holdback in the amount of $9,357,000, (ii) any Non-NAS PI Direct Claim Settlement Retained Payment Amount, and (iii) 86.02% of (A) any amounts paid by the Debtors to the PI Claims Administrator (as defined in the PI and TPP Claims

---

[3] $48,215,000 is the sum of (i) 6.43% of $700,000,000 of the Initial PI Trust Distribution Amount, up to an aggregate $45 million in accordance with the definition of "NAS PI Portion" in the Twelfth Amended Plan, and (ii) 6.43% of the $50,000,000 remaining Initial PI Trust Distribution Amount

Procedures Order) as of the Effective Date, and (B) any applicable Creditor Trust Advance Amount with respect to the PI Trust.

"***Initial NewCo Cash***" means $135 million of Effective Date Cash to be transferred to NewCo on the Effective Date.

"***Initial PI Trust Distribution***" means the Initial NAS PI Distribution and the Initial Non-NAS Distribution.

"***Initial PI Trust Distribution Amount***" means $750,000,000.

"***Initial Private Creditor Trust Distributions***" means, collectively, the Initial Hospital Trust Distribution, the Initial TPP Trust Distribution, the Initial ERP Trust Distribution and the Initial PI Trust Distribution.

"***Initial Public Creditor Trust Distributions***" means, collectively, the Initial Governmental Remediation Trust Distribution and the Initial Tribe Trust Distribution.

"***Initial Public Schools Distribution***" means a payment of Effective Date Cash to the Public School Trust (a) in the amount of $25.5 million, *less* the applicable Direct Claim Settlement Retained Payment Amount, on the later of (i) the Effective Date and (ii) consummation of the Public School District Shareholder Direct Settlement, which amount will be used by the Public School Trust (i) to fund educational supports to abate the effects of the opioid crisis and (ii) for the required payments to the Common Benefit Escrow and in respect of attorneys' fees of the Public School District Claimants in accordance with Section 5.9(a) and (h) of the Plan, and (b) for reimbursement of costs and expenses incurred in connection with the Public Schools' Opt-Out Class Action Settlement notices in an additional amount not to exceed $75,000.[4]

"***Initial TPP Trust Distribution***" means the payment of $394,929,850 of Effective Date Cash to the TPP Trust on the Effective Date *less* (i) any amounts paid by the Debtors to the TPP Claims Administrator (as defined in the PI and TPP Claims Procedures Order) as of the Effective Date, (ii) the SOR Holdback in the amount of $5,989,850, (iii) the TPP Direct Claim Settlement Retained Payment Amount, if any, and (iv) any applicable Creditor Trust Advance Amount.

"***Initial Tribe Trust Distribution***" means the payment on the Effective Date of (i) 3.3% of the Maximum Governmental Direct Settlement Amount payable on the Effective Date, and (ii) 3.3% of all Effective Date Cash attributable to Estate Distributions remaining after the satisfaction of all amounts described in Section 5.14(a) of the Plan, *less* the SOR Holdback.

"***Insurance Companies***" means, collectively, all Persons that issued any Purdue Insurance Policy, any third-party administrator, claims handling agent or any parent, Subsidiary, affiliate, successor, predecessor or assign of any of the foregoing, solely in such Insurance Company's capacity with respect to a Purdue Insurance Policy.

"***Intercompany Claim***" means any Claim against any Debtor that is held by another Debtor or an affiliate of a Debtor.

"***Intercompany Interest***" means any Interest in any Debtor that is held by another Debtor.

---

[4] [**NTD**: Public Schools' SOR holdback subject to ongoing discussions]

"*Interest*" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in a Person, including any shares, common stock or units, preferred stock or units, or other instrument evidencing any fixed or contingent equity or ownership interest in a Person, including any option, warrant or other right, contractual or otherwise, to acquire any such interest in such Person, whether or not transferable and whether fully vested or vesting in the future.

"*Interim Compensation Order*" means the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Retained Professionals* [D.I. 529].

"*IRC*" means the Internal Revenue Code of 1986, as amended (including any successor statute).

"*IRS*" means the Internal Revenue Service.

"*Key Employee Plans*" means, collectively, the Key Employee Retention Plans and Key Employee Incentive Plans approved by the Bankruptcy Court pursuant to the *Order Authorizing the Debtors to Implement a Key Employee Retention Plan* [D.I. 1762], the *Order Authorizing the Debtors to Implement a Key Employee Incentive Plan* [D.I. 1861], the *Supplemental Order Authorizing the Debtors to Implement a Key Employee Incentive Plan* [D.I. 2002], the *Order Authorizing the Debtors to Implement 2021 Key Employee Retention Plan* [D.I. 3571], the *Order Authorizing the Debtors to Implement 2021 Key Employee Incentive Plan* [D.I. 3770], the *Order Authorizing the Debtors to Implement 2022 Key Employee Retention Plan and 2022 Key Employee Incentive Plan* [D.I. 4862], the *Supplemental Order Authorizing the Debtors to Implement 2022 Key Employee Incentive Plan* [D.I. 4924], the *Order Authorizing the Debtors to Implement 2023 Key Employee Incentive Plan and 2023 Key Employee Retention Plan* [D.I. 5646], the *Order Authorizing the Debtors to Implement 2024 Key Employee Incentive Plan and 2024 Key Employee Retention Plan* [D.I. 6322], and any similar compensation programs approved by other order of the Bankruptcy Court, in each case, as may be supplemented from time to time by further order of the Bankruptcy Court.

"*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

"*Liquidating Debtors*" means, collectively, all Debtors that are not Transferred Debtors, on and after the Effective Date.

"*Local Government Costs and Expenses Fund*" means the fund to be established as set forth in Section 5.9(a) of the Plan.

"*LRP Agreement*" means the agreement establishing lien resolution procedures with respect to certain claims held by LRP Participating TPPs against Holders of PI Claims and Distributions payable to Holders of PI Claims, the terms of which shall be consistent with Articles I through XII of the Plan and otherwise acceptable to the Debtors, the Ad Hoc Group of Individual Victims and the Third-Party Payor Group and reasonably acceptable to the Creditors' Committee and the Governmental Consent Parties, and which shall be filed by the Debtors with the Plan Supplement (it being understood and agreed that the form of LRP Agreement filed on May 26, 2021 is acceptable to such parties).

"*LRP Participating TPP*" means any Holder of a Third-Party Payor Claim that becomes a party to the LRP Agreement in accordance with the terms thereof.

"*Master Disbursement Trust*" means the trust established in accordance with Section 5.6 of the Plan to, among other things, (i) hold and administer the MDT Transferred Assets and the Special Operating Reserve, (ii) serve as administrative agent with respect to Released Claims Reserves, (iii) make payments in satisfaction of the MDT Claims in accordance with the Plan and the Private Entity Settlements

and (iv) make Public Creditor Trust Distributions in respect of the MDT Interests from MDT Distributable Value in accordance with the Plan and the Public Entity Settlements.

"***Master Shareholder Settlement Agreement***" means the settlement agreement substantially in the form of Exhibit [●] attached to the Plan, including all exhibits, schedules, annexes and supplements and appendices thereto.

"***Master TDP***" means the master trust distribution procedures to be implemented by the Master Disbursement Trust setting forth the procedures for the administration of Channeled Claims by the Master Disbursement Trust, which shall be filed by the Debtors with the Plan Supplement, and the terms of which shall be consistent with Articles I through XII of the Plan and otherwise reasonably acceptable to (i) the Debtors, (ii) the Creditors' Committee, (iii) the Governmental Consent Parties and (iv) solely with respect to any provisions regarding the channeling of Channeled Claims to (A) the Tribe Trust, the Native American Tribe Group, (B) the Hospital Trust, the Ad Hoc Group of Hospitals, (C), the ERP Trust, the ERP Trustee, (D) TPP Trust, the Third-Party Payor Group, (E) the Public School Trust, the Public School District Claimants, and (F) the PI Trust, the Ad Hoc Group of Individual Victims and the NAS Committee.

"***Material Litigation***" shall have the meaning ascribed to such term in the Master Shareholder Settlement Agreement.

"***Maximum Governmental Direct Settlement Amount***" means, for any given SSA Payment Date, the sum of the amounts of such SSA Payment Date in clause (a) and (b) of the definition of Shareholder Direct Settlement Portion, subject to any Shareholder Prepayments, but not subject to any Direct Claim Settlement Retained Payment Amounts.

"***Maximum NAS PI Shareholder Direct Settlement Amount***" has the meaning set forth in the definition "Shareholder Direct Settlement Portion" and shall be payable by the Shareholder Payment Parties in full (without retaining any NAS PI Direct Claim Settlement Retained Payment Amount) in the event that all Holders of Direct Settlement Eligible NAS PI Claims are Settling Creditors.

"***Maximum Non-NAS PI Shareholder Direct Settlement Amount***" has the meaning set forth in the definition "Shareholder Direct Settlement Portion" and shall be payable by the Shareholder Payment Parties in full (without retaining any Non-NAS PI Direct Claim Settlement Retained Payment Amount) in the event that all Holders of Direct Settlement Eligible Non-NAS PI Claims are Settling Creditors.

"***Maximum TPP Shareholder Direct Settlement Amount***" has the meaning set forth in the definition "Shareholder Direct Settlement Portion" and shall be payable by the Shareholder Payment Parties in full (without retaining any TPP Direct Claim Settlement Retained Payment Amount) in the event that all Holders of Direct Settlement Eligible TPP Claims are Settling Creditors.

"***MDL Court***" means the United States District Court for the Northern District of Ohio, Eastern Division, presiding over the MDL Proceeding.

"***MDL Plaintiffs' Executive Committee***" means the sixteen-member committee appointed by the MDL Court in the MDL Proceeding.

"***MDL Proceeding***" means *In re National Prescription Opiate Litigation*, Case No. 17-md-02804, MDL No. 2804.

"***MDT Advisory Council***" means the advisory council established in accordance with Section 5.6(e) of the Plan and the MDT Agreement, to which the Master Disbursement Trust shall [regularly

report] with respect to the operations and activities of the Master Disbursement Trust and the handling of all payments and Distributions made from the Master Disbursement Trust, all as provided for in greater detail in the MDT Agreement.

"*MDT Advisory Council Representative*" has the meaning set forth in Section 5.6(e) of the Plan.

"*MDT Agreement*" means the trust agreement establishing and delineating the terms and conditions for the creation and operation of the Master Disbursement Trust, the terms of which shall be consistent with Articles I through XII of the Plan and otherwise reasonably acceptable to the Debtors, the Creditors' Committee and the Governmental Consent Parties, and which shall be filed by the Debtors with the Plan Supplement.

"*MDT Beneficiaries*" means, subject to Section 5.6(f)(iv), each of (i) the Public Creditor Trusts, (ii) the Hospital Trust, (iii) the ERP Trust, (iv) the Public School Trust, (v) the PI Trust, (vi) the TPP Trust, and (vii) the United States.

"*MDT Causes of Action*" means any and all Retained Causes of Action (i) against Excluded Parties (other than Co-Defendants) or relating to and necessary to enforce Retained Causes of Action against Excluded Parties (other than Co-Defendants), (ii) relating to and necessary to enforce the MDT Insurance Rights, (iii) relating to and necessary to enforce the MDT Shareholder Rights, including without limitation, but subject to the terms of, the Master Shareholder Settlement Agreement or (iv) against any other Person that is not a Co-Defendant or an ongoing commercial counterparty of NewCo or any of its Subsidiaries, to the extent such Retained Causes of Action are not otherwise transferred to the Plan Administration Trust or the Creditor Trusts. For the avoidance of doubt, "MDT Causes of Action" shall include all entitlements, proceeds, payments and benefits of the Debtors to any of the foregoing.

"*MDT Claims*" means, collectively, the MDT Private Claims, the MDT Public School Districts Claim and the MDT Federal Government Claim.

"*MDT Distributable Value*" means all Cash and cash equivalents held by the Master Disbursement Trust, as of the relevant date of determination, after application of Cash to satisfy the amounts contemplated by Section 5.2(g)(i), (ii), (iii), and (iv) of the Plan in the MDT Priority Waterfall.

"*MDT Distribution Date*" means (i) each Scheduled MDT Distribution Date, (ii) the date that is ten (10) Business Days after the receipt by the Master Disbursement Trust of any Shareholder Prepayment, (iii) the date that is ten (10) Business Days after the receipt by the Master Disbursement Trust of any reversion amounts pursuant to Section 5.7 of the Plan, (iv) the date that is ten (10) Business Days after the receipt by the Master Disbursement Trust of any IAC Sale Bonus Payments under Section [2.06] of the Master Shareholder Settlement Agreement, and (v) each other date on which the MDT Trustees seek to make a distribution to the Public School Trust or Public Creditor Trust Distribution, acting in accordance with their fiduciary duties to the Creditor Trusts as beneficiaries of the Master Disbursement Trust, solely in accordance with Section 5.6(f) of the Plan.

"*MDT Documents*" means the MDT Agreement and the Master TDP.

"*MDT ERP Claim*" means the beneficial interest in the Master Disbursement Trust granted to the ERP Trust pursuant to the Private Entity Settlements, which interest shall entitle the ERP Trust to the reversion rights from the Special Operating Reserve as set forth in the Plan, the Master Shareholder Settlement Agreement, and the ER Physician Shareholder Direct Settlement Agreement, as applicable.

"***MDT Federal Government Claim***" means the beneficial interest in the Master Disbursement Trust granted to the United States pursuant to Section 4.3(b) of the Plan.

"***MDT Governmental Remediation Trust Interest***" means the beneficial interest in the Master Disbursement Trust granted to the Governmental Remediation Trust pursuant to the Public Entity Settlements and the Plan, which interest shall entitle the Governmental Remediation Trust to (i) its share of distributions of MDT Distributable Value in accordance with Section 5.2(f)(i)(A) of the Plan and the MDT Priority Waterfall and (ii) the reversion rights from the Special Operating Reserve as set forth in the Plan, the Master Shareholder Settlement Agreement, and the Governmental Entity Shareholder Direct Settlement Agreement, as applicable.

"***MDT Hospital Claim***" means the beneficial interest in the Master Disbursement Trust granted to the Hospital Trust pursuant to the Private Entity Settlements, which interest shall entitle the Hospital Trust to the reversion rights from the Special Operating Reserve as set forth in the Plan, the Master Shareholder Settlement Agreement, and the Hospital Shareholder Direct Settlement Agreement, as applicable.

"***MDT Insurance Collateral***" means (i) the Purdue Insurance Collateral in respect of the Purdue Insurance Policies agreed by the Debtors, the Creditors' Committee and the Governmental Consent Parties, which shall be identified in the MDT Agreement, and (ii) the Purdue Insurance Collateral in respect of the Isosceles Insurance Ltd. policy number PPLP-01/2019.

"***MDT Insurance Policies***" means all Purdue Insurance Policies that do or may afford the Debtors rights, benefits, indemnity, insurance coverage or defense costs with respect to any Cause of Action against the Debtors arising out of, on account of, or in connection with Opioid-Related Activities or for which the Debtors have or may have insurance rights arising out of or in connection with Opioid-Related Activities, including, but not limited to (i) all Purdue Insurance Policies listed in Exhibit A to the *Complaint for Declaratory Relief*, Adv. Pro. No. 21-07005 (RDD) [D.I. 1], (ii) all D&O Insurance Policies and (iii) any additional Purdue Insurance Policies agreed by the Debtors and the Governmental Consent Parties, which shall be identified in the MDT Agreement, but excluding in each case the Excluded Insurance Policies.

"***MDT Insurance Proceeds***" means the Cash proceeds obtained through the pursuit of the MDT Insurance Rights, including but not limited to the Cash proceeds in respect of any MDT Insurance Settlement, whether received before, on or after the Effective Date.

"***MDT Insurance Rights***" means the Purdue Insurance Rights in respect of the MDT Insurance Policies and the MDT Insurance Collateral, which Purdue Insurance Rights shall be transferred by the Debtors to the Master Disbursement Trust on the Effective Date. Notwithstanding anything to the contrary herein, (i) the MDT Insurance Rights with respect to the MDT Insurance Collateral for Isosceles Insurance Ltd. policy number PPLP-01/2019 shall be limited to the right to receive any such MDT Insurance Collateral remaining after the expiration of the policy period and any extension of the reporting period under such policy, (ii) the MDT Insurance Rights shall not include any right to interfere in any manner with the rights of the insureds under Isosceles Insurance Ltd. policy number PPLP-01/2019 prior to the expiration of the policy period and any extension of coverage under such policy and the resolution of all claims asserted thereunder and (iii) any persons who have unresolved claims under the Isosceles Insurance Ltd. policy number PPLP-01/2019 at the expiration of the policy period, including any extension, shall cooperate with and provide consent to the Master Disbursement Trust to resolve those claims in connection with the MDT Insurance Collateral after the expiration of the policy period, including any extension.

"***MDT Insurance Settlement***" means each settlement agreement concerning the MDT Insurance Rights that (i) the Debtors and an MDT Insurer have entered into pursuant to the Purdue Insurance Stipulation on or before the Effective Date or (ii) the Master Disbursement Trust and an MDT Insurer have entered into after the Effective Date; *provided* that, in the case of both clauses (i) and (ii), the settlement agreement is approved by the Bankruptcy Court.

"***MDT Insurer***" means an Insurance Company that has issued, is responsible for, or has liability to pay under any MDT Insurance Policy or MDT Insurance Collateral, and each of its affiliates, predecessors in interest, and agents, solely in its capacity as such and solely with respect to such MDT Insurance Policy or MDT Insurance Collateral.

"***MDT Insurer Injunction***" means the injunction issued pursuant to Section 10.10 of the Plan.

"***MDT Interests***" means, collectively, the MDT Governmental Remediation Trust Interest and the MDT Tribe Interest.

"***MDT Operating Expenses***" means any and all costs, expenses, fees, taxes, disbursements, debts or obligations incurred from the operation and administration of the Master Disbursement Trust, including in connection with the prosecution or settlement of MDT Causes of Action, working capital, all compensation, costs and fees of the MDT Trustees and the MDT Advisory Council Representatives and any professionals retained by the Master Disbursement Trust, but excluding any amounts to be paid in respect of the MDT Claims or the MDT Interests.

"***MDT Operating Reserve***" means a reserve to be established to pay any and all MDT Operating Expenses. The MDT Operating Reserve shall be (i) funded on the Effective Date with Effective Date Cash in an amount determined by the Debtors and the Governmental Consent Parties with the consent (not to be unreasonably withheld, delayed or conditioned) of the Creditors' Committee, and thereafter with Cash held or received by the Master Disbursement Trust in accordance with the MDT Agreement as determined by the MDT Trustees; *provided*, *however*, that payments received by the Master Disbursement Trust on account of the Governmental Entity Shareholder Direct Settlement shall be immediately transferred to the Governmental Remediation Trust and shall not be used to fund a Replenishment Transfer or the MDT Operating Reserve, and shall not be used to pay the MDT Claims, and (ii) held by the Master Disbursement Trust in a segregated account and administered by the MDT Trustees on and after the Effective Date.

"***MDT PI Claim***" means the beneficial interest in the Master Disbursement Trust granted to the PI Trust pursuant to the Private Entity Settlements, which interest shall entitle the PI Trust to (i) the payments of the amounts set forth in Section 5.2(e)(ii) of the Plan which, for the avoidance of doubt, shall be allocated only to the Non-NAS PI Portion, and (ii) the reversion rights from the Special Operating Reserve as set forth in the Plan and the Master Shareholder Settlement Agreement.

"***MDT Priority Waterfall***" means the priority waterfall applicable to the Master Disbursement Trust set forth in Section 5.2(g) of the Plan.

"***MDT Private Claims***" means, collectively, the MDT Hospital Claim, the MDT ERP Claim, the MDT TPP Claim and the MDT PI Claim.

"***MDT Public School Districts Claim***" means the beneficial interest in the Master Disbursement Trust granted to the Public School Trust pursuant to the Private Entity Settlements, which interest shall entitle the Public School Trust to the payments of the amounts set forth in the second sentence of Section 5.2(f)(ii).

"***MDT Shareholder Insurance Rights***" means any and all rights, titles, privileges, interests, claims, demands or entitlements of the Shareholder Released Parties to any proceeds, payments, benefits, Causes of Action, choses in action, defense or indemnity arising under, or attributable to, any and all MDT Insurance Policies and MDT Insurance Collateral, now existing or hereafter arising, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, disputed or undisputed, fixed or contingent. For the avoidance of doubt and without in any way limiting the foregoing, "MDT Shareholder Insurance Rights" include (i) any rights of the Shareholder Released Parties to proceeds of MDT Insurance Policies, and MDT Insurance Collateral and (ii) the right to enforce any Insurance Company's obligation to the Shareholder Released Parties under any MDT Insurance Policies and MDT Insurance Collateral. Solely in connection with the term MDT Shareholder Insurance Rights, the MDT Insurance Collateral excludes the Purdue Insurance Collateral in respect of the Isosceles Insurance Ltd. policy number PPLP-01/2019 (for all other purposes the MDT Insurance Collateral includes such Purdue Insurance Collateral).

"***MDT Shareholder Rights***" means, subject in all respects to the Shareholder Settlements (including the Shareholder Releases and the Channeling Injunction) (i) any and all rights, titles, privileges, interests, claims, demands and entitlements of the Debtors arising under, or attributable to, any Causes of Action or choses in action against, or proceeds, payments, benefits or indemnities from, Shareholder Release Snapback Parties, including without limitation to the extent arising under, or attributable to, the Master Shareholder Settlement Agreement and any related security agreements, documents, agreements or instruments, in each case whether now existing or hereafter arising, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, disputed or undisputed, fixed or contingent and (ii) the MDT Shareholder Insurance Rights.

"***MDT TPP Claim***" means the beneficial interest in the Master Disbursement Trust granted to the TPP Trust pursuant to the Private Entity Settlements, which interest shall entitle the TPP Trust to the reversion rights from the Special Operating Reserve as set forth in the Plan and the Master Shareholder Settlement Agreement.

"***MDT Transferred Assets***" means all right, title and interest of the Debtors (or, solely with respect to the MDT Shareholder Insurance Rights, of the Shareholder Released Parties) arising under, or attributable to, (i) the MDT Operating Reserve, (ii) the MDT Causes of Action, (iii) the MDT Insurance Rights, (iv) the MDT Shareholder Rights, (v) any other Excluded Assets identified in the MDT Agreement and (vi) any Surplus Reserve Cash to be distributed to the Master Disbursement Trust, upon the identification thereof by the Plan Administration Trustee or the dissolution of the Plan Administration Trust, in accordance with Section 5.14(c) of the Plan. For the avoidance of doubt, "MDT Transferred Assets" shall not include any Causes of Action against any Released Party.

"***MDT Tribe Interest***" means the beneficial interest in the Master Disbursement Trust granted to the Tribe Trust under the Plan pursuant to the Public Entity Settlements, which interest shall entitle the Tribe Trust to its share of distributions of MDT Distributable Value in accordance with Section 5.2(f)(i)(A) of the Plan and the MDT Priority Waterfall and the reversion rights from the Special Operating Reserve as set forth in the Plan, the Master Shareholder Settlement Agreement, and the Tribal Shareholder Direct Settlement Agreement, as applicable.

"***MDT Trustees***" means the trustees of the Master Disbursement Trust appointed in accordance with Section 5.6(d) of the Plan.

"***Mediation***" means the mediation authorized by the Bankruptcy Court and described in the Mediation Orders.

"***Mediation Orders***" means the following orders of the Bankruptcy Court: *Order Appointing Mediators* [D.I. 895]; *Order Expanding Scope of Mediation* [D.I. 1756]; *Order Establishing the*

*Terms and Conditions of Mediation Before the Honorable Shelley C. Chapman* [D.I. 2879]; *Order Establishing the Terms and Conditions of Mediation Before the Honorable Shelley C. Chapman* [D.I. 4261]; *Order Extending Termination Date Under the Terms and Conditions of Mediation Before the Honorable Shelley C. Chapman* [D.I. 4286]; *Order Further Extending Termination Date Under the Terms and Conditions of Mediation Before the Honorable Shelley C. Chapman* [D.I. 4319]; *Third Order Extending Termination Date Under the Terms and Conditions of Mediation Before the Honorable Shelley C. Chapman* [D.I. 4339]; *Third [SIC] Order Extending Termination Date Under the Terms and Conditions of Mediation Before the Honorable Shelley C. Chapman* [D.I. 4370]; *Order Expanding the Scope of Mediation Before the Honorable Shelley C. Chapman* [D.I. 4609]; *Order Appointing the Honorable Shelley C. Chapman (Ret.) and Eric D. Green as Co-Mediators and Establishing Terms and Conditions Of Mediation* [D.I. 6537]; *Amended Order Appointing the Honorable Shelley C. Chapman (Ret.) and Eric D. Green as Co-Mediators and Establishing Terms and Conditions Of Mediation* [D.I. 6682]; *Second Amended Order Appointing the Honorable Shelley C. Chapman (Ret.) and Eric D. Green as Co-Mediators and Establishing Terms and Conditions Of Mediation* [D.I. 6749]; *Third Amended Order Appointing the Honorable Shelley C. Chapman (Ret.) and Eric D. Green as Co-Mediators and Establishing Terms and Conditions Of Mediation* [D.I. 6906]; *Fourth Amended Order Appointing the Honorable Shelley C. Chapman (Ret.) and Eric D. Green as Co-Mediators and Establishing Terms and Conditions Of Mediation* [D.I. 6980]; *and Fifth Amended Order Appointing the Honorable Shelley C. Chapman (Ret.) and Eric D. Green as Co-Mediators and Establishing Terms and Conditions Of Mediation* [D.I. 7058].

"***Medicaid Program***" has the meaning set forth in <u>Section 10.20(d)</u> of the Plan.

"***Minimum Required Settlement Payment***" means, with respect to an SSA Payment Date, the minimum amount payable by the Shareholder Payment Parties under the [Shareholder Settlement Agreements] on such SSA Payment Date.

"***MSGE Fee Allocation Agreement***" means the agreement entered into on October 9, 2020, by and between the MSGE Group and the MDL Plaintiffs' Executive Committee, which is attached hereto as <u>Exhibit A</u>.

"***MSGE Group***" means the Multi-State Governmental Entities Group identified in the *Second Amended Verified Statement of the Multi-State Governmental Entities Group Pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure* [D.I. 1794], as amended from time to time; *provided, however,* that, notwithstanding anything herein to the contrary, the MSGE Group shall be a "Governmental Consent Party" and shall have the same consent rights, appointment or selection rights, and any other rights or obligations afforded to the Ad Hoc Committee, such rights not to be reduced or modified without the written consent of the MSGE Group. The foregoing shall not give the MSGE Group any independent or individual rights to make any unilateral decisions, including to appoint or select any trustees, managers, directors, or officers under the Plan. Notwithstanding anything herein to the contrary, the sole remedy of the MSGE Group in respect of its rights hereunder shall be the termination of the Term Sheet (as defined in the MSGE Group Reimbursement Motion) by written notice and withdrawal of the MSGE Group's support of the Plan.

"***MSGE Group Reimbursement Motion***" means the *Debtors' Motion to Enter into Term Sheet with and Pay Certain Fees and Expenses of the Multi-State Governmental Entities Group* [D.I. 2580].

"***MSGE Group Reimbursement Order***" means the *Order Authorizing the Debtors to Enter into Term Sheet with and Pay Certain Fees and Expenses of the Multi-State Governmental Entities Group* [D.I. 2695].

"***NAS Child***" means a natural person who has been diagnosed by a licensed medical provider with a medical, physical, cognitive or emotional condition resulting from such natural person's

intrauterine exposure to opioids or opioid replacement or treatment medication, including but not limited to the condition known as neonatal abstinence syndrome.

"*NAS Committee*" means the Ad Hoc Committee of NAS Children identified in the *First Amended Verified Statement of the Ad Hoc Committee of NAS Children Pursuant to Bankruptcy Rule 2019* [D.I. 1582].

"*NAS PI Channeled Claim*" means (i) any NAS PI Claim or (ii) any Released Claim or Shareholder Released Claim that is held by a Holder of an NAS PI Claim for alleged opioid-related personal injury to an NAS Child or that is a similar opioid-related Cause of Action asserted by or on behalf of an NAS Child, in each case, that arose prior to the Petition Date (in the case of Third-Party Released Claims, solely to the extent that such Holder of an NAS PI Claim is a Settling Creditor), that is not a Third-Party Payor Channeled Claim or a Hospital Channeled Claim, or held by a Domestic Governmental Entity. NAS PI Channeled Claims shall be channeled to the PI Trust in accordance with the Plan and Master TDP.

"*NAS PI Claim*" means any Claim against any Debtor that is for alleged opioid-related personal injury to an NAS Child or similar opioid-related Cause of Action against any Debtor asserted by or on behalf of an NAS Child, including, for the avoidance of doubt, Claims held on account of an NAS Child and that relate to medical monitoring support, educational support, vocational support, familial support or similar related relief, in each case, that arose prior to the Petition Date, and that is not a Third-Party Payor Claim or a Hospital Claim, or held by a Domestic Governmental Entity.

"*NAS PI Direct Claim Settlement Retained Payment Amount*" means the portion of the Maximum NAS PI Shareholder Direct Settlement Amount allocable to Holders of Direct Settlement Eligible NAS PI Claims that are Non-Settling Creditors (if any) that would have otherwise been distributed to such Holders pursuant to the NAS PI TDP had they been Settling Creditors, and which amount shall be retained by the Shareholder Payment Parties.

"*NAS PI Portion*" means (i) the Initial NAS PI Distribution, and (ii) 16.2438% of amounts distributed to the PI Trust on account of the MDT PI Claim other than the PI Trust Obligation, each of which is gross of applicable PI Trust Deductions and Holdbacks.

"*NAS PI TDP*" means the trust distribution procedures to be implemented by the PI Trust with respect to NAS PI Channeled Claims, the terms of which shall be consistent with Articles I through XII of the Plan and otherwise acceptable to the Debtors and the NAS Committee and reasonably acceptable to the Ad Hoc Group of Individual Victims, the Creditors' Committee and the Governmental Consent Parties, and which shall be filed by the Debtors with the Plan Supplement.

"*Native American Tribe Group*" means the group consisting of the Muscogee (Creek) Nation, a member of the Ad Hoc Committee, the Cheyenne & Arapaho Tribes, an ex officio member of the Creditors' Committee, and other Tribes represented by various counsel from the Tribal Leadership Committee and the MDL Plaintiffs' Executive Committee.

"*NewCo*" means a newly formed Delaware limited liability company to be created in accordance with Section 5.4 of the Plan to directly or indirectly receive the NewCo Transferred Assets and operate such NewCo Transferred Assets in accordance with the NewCo Operating Agreement, the NewCo Governance Covenants and the NewCo Operating Injunction.

"*NewCo Distributable Cash*" means, as of the end of any calendar year, all unrestricted Cash and cash equivalents held by NewCo and NewCo's Subsidiaries (as reflected, or as would be reflected on a consolidated balance sheet of NewCo and NewCo's Subsidiaries as of such date in accordance with GAAP) in excess of the amount determined by the NewCo Managers in their discretion to be appropriate

to reserve to pay NewCo's incurred and forecasted costs, expenses, fees, taxes, disbursements, debts or obligations, including without limitation operating expenses, research and development expenses, and Public Health Initiative expenditures.

"***NewCo Governance Covenants***" means the provisions contained in the Confirmation Order that will bind NewCo, and any successor owner of NewCo's opioid business, to covenants to ensure that NewCo (i) provides all of its products, including all opioid products, in a safe manner that limits the risk of diversion, (ii) complies with its obligations under the Public Entity Settlements and the Private Entity Settlements, (iii) pursues and implements Public Health Initiatives, and (iv) otherwise operates in accordance with NewCo's purpose and takes into account long-term public health interests relating to the opioid crisis and responsible and transparent practices in management of a pharmaceutical business, which covenants shall be acceptable to the DOJ and the Governmental Consent Parties and reasonably acceptable to the Debtors; *provided* that the covenants in respect of the foregoing clause (ii) shall be acceptable to the DOJ and reasonably acceptable to the Debtors, the Creditors' Committee and the Governmental Consent Parties.

"***NewCo Interest***" means the sole limited liability company interest in NewCo, which shall be held by the Foundation as of the Effective Date pursuant to the Public Entity Settlements, representing 100% of the economic and voting Interests in NewCo.

"***NewCo Managers***" means the members of the board of managers of NewCo appointed in accordance with Section 5.4(d) of the Plan.

"***NewCo Monitor***" means the monitor appointed in accordance with Section 5.4(h) of the Plan to review NewCo's compliance with the NewCo Operating Injunction.

"***NewCo Operating Agreement***" means the limited liability company agreement of NewCo, the terms of which shall be consistent with Articles I through XII of the Plan and otherwise acceptable to the DOJ and the Governmental Consent Parties and reasonably acceptable to the Debtors, and which shall be filed by the Debtors with the Plan Supplement.

"***NewCo Operating Injunction***" means a voluntary injunction to be contained in the Confirmation Order that will bind NewCo, and any successor owner of NewCo's opioid business, to injunctive relief substantially similar to the voluntary injunction set forth in Appendix I to the Preliminary Injunction, with any such changes to such voluntary injunction as may be agreed by the Debtors and the Governmental Consent Parties based upon good-faith discussions and in furtherance of NewCo's purpose as set forth in Section 5.4(b) of the Plan.

"***NewCo Transfer Agreement***" means one or more agreements transferring the NewCo Transferred Assets, and all documents and information of the Debtors related thereto, from the Debtors to NewCo or one of its Subsidiaries (or the transfer of the Transferred Debtors to NewCo or one of its Subsidiaries and the re-vesting of the NewCo Transferred Assets held by such Transferred Debtors in such Transferred Debtors), the terms of which shall be consistent with Articles I through XII of the Plan and otherwise acceptable to the Debtors, the DOJ and the Governmental Consent Parties, and which shall be filed by the Debtors with the Plan Supplement.

"***NewCo Transferred Assets***" means (i) the Initial NewCo Cash and (ii) all non-Cash Assets of the Debtors on the Effective Date (prior to giving effect to the Restructuring Transactions) other than the Excluded Assets. For the avoidance of doubt, all Retained Causes of Action against Co-Defendants and ongoing commercial counterparties of NewCo and any Estate Surviving Pre-Effective Date Claims shall be NewCo Transferred Assets.

"***Non-Federal Acute Care Hospital***" means and includes (i) all non-federal acute care hospitals as defined by the Centers for Medicare & Medicaid Services, and (ii) all non-federal hospitals and hospital districts that are required by law to provide inpatient acute care and/or fund the provision of inpatient acute care.

"***Non-Federal Domestic Governmental Channeled Claim***" means (i) any Non-Federal Domestic Governmental Claim or (ii) any Claim held by a Domestic Governmental Entity that is released pursuant to the Governmental Entity Shareholder Direct Settlement, other than the United States or a Tribe. Non-Federal Domestic Governmental Channeled Claims shall be channeled to the Governmental Remediation Trust in accordance with the Plan and Governmental Remediation Trust Documents.

"***Non-Federal Domestic Governmental Claim***" means any Claim against any Debtor that is held by a Domestic Governmental Entity other than the United States or a Tribe (including any Claim based on the subrogation rights of the Holder thereof that is not an Other Subordinated Claim), and that is not a Priority Tax Claim.

"***Non-NAS PI Channeled Claim***" means (i) any Non-NAS PI Claim or (ii) any Released Claim or Shareholder Released Claim that is held by a Holder of a Non-NAS PI Claim that is for alleged opioid-related personal injury or that is a similar opioid-related Cause of Action, in each case, that arose prior to the Petition Date (in the case of Third-Party Released Claims, solely to the extent that such Holder of a Non-NAS PI Claim is a Settling Creditor), that is not an NAS PI Channeled Claim, a Third-Party Payor Channeled Claim, or a Hospital Channeled Claim, or held by a Domestic Governmental Entity. Non-NAS PI Channeled Claims shall be channeled to the PI Trust in accordance with the Plan and Master TDP.

"***Non-NAS PI Claim***" means any Claim against any Debtor that is for alleged opioid-related personal injury or other similar opioid-related Cause of Action against any Debtor, in each case, that arose prior to the Petition Date, and that is not an NAS PI Claim, a Third-Party Payor Claim, or a Hospital Claim, or held by a Domestic Governmental Entity.

"***Non-NAS PI Direct Claim Settlement Retained Payment Amount***" means the portion of the Maximum Non-NAS PI Shareholder Direct Settlement Amount allocable to Holders of Direct Settlement Eligible Non-NAS PI Claims that are Non-Settling Creditors (if any) that would have otherwise been distributed to such Holders pursuant to the Non-NAS PI TDP had they been Settling Creditors, and which amount shall be retained by the Shareholder Payment Parties.

"***Non-NAS PI Portion***" means (i) the Initial Non-NAS PI Distribution, (ii) 83.7652% of amounts distributed to the PI Trust on account of the MDT PI Claim other than the PI Trust Obligation, and (iii) the PI Trust Obligation distributed to the PI Trust on account of the MDT Claim, which amount is gross of applicable PI Trust Deductions and Holdbacks.

"***Non-NAS PI TDP***" means the trust distribution procedures to be implemented by the PI Trust with respect to Non-NAS PI Channeled Claims, the terms of which shall be consistent with <u>Articles I</u> through <u>XII</u> of the Plan and otherwise acceptable to the Debtors and the Ad Hoc Group of Individual Victims and reasonably acceptable to the Creditors' Committee and the Governmental Consent Parties, and which shall be filed by the Debtors with the Plan Supplement.

"***Non-Opioid Excluded Claim***" means a Cause of Action by a Person that is not a Debtor, an Estate, the Master Disbursement Trust, a Creditor Trust, the Plan Administration Trust or any successor of any of the foregoing against a Shareholder Released Party to the extent such Cause of Action (i) does not arise from or relate to Opioid-Related Activities, Pending Opioid Actions or opioid use or misuse or the consequences thereof; (ii) is not based upon and does not arise from the same allegations, facts or evidence as any Pending Opioid Action; (iii) does not allege (expressly or impliedly) any liability of such

Shareholder Released Party that is derivative of any liability of any Debtor or any of their Estates, including, but not limited to, by making allegations (expressly or impliedly) that such Shareholder Released Party is directly or indirectly liable for the conduct of or a Cause of Action against a Debtor by reason of such Shareholder Released Party's (A) direct or indirect ownership of an Interest in a Debtor, a past or present affiliate of a Debtor, or a predecessor in interest of a Debtor; (B) involvement in the management of a Debtor or a predecessor in interest of a Debtor, or service as an officer, director or employee of a Debtor or a related party; or (C) involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition, of the Debtor or a related party, including but not limited to involvement in providing financing (debt or equity), or advice to an entity involved in such a transaction, or acquiring or selling a financial interest in an entity as part of such a transaction; and (iv) has been authorized to proceed by the Bankruptcy Court in accordance with Section 11.1(f) of the Plan. As used in this definition of Non-Opioid Excluded Claim, the term "related party" has the same meaning as in 11 U.S.C. § 524(g)(4)(A)(iii).

"**Non-Participating**" with respect to Channeled Claim(s) means any Channeled Claim(s) held by a Non-Settling Creditor.

"**Non-Participating Channeled Claims**" means any Channeled Claim held by a Non-Settling Creditor as of the Effective Date, in each case, until such Channeled Claim is either: (i) Allowed in accordance with Sections 7.6 or 7.9 of the Plan, or (ii) Disallowed by Final Order.

"**Non-Party Covered Conduct Claim**" means a Cause of Action against any Non-Released Party involving, arising out of, or related to Covered Conduct (or conduct that would be Covered Conduct if engaged in by a Shareholder Released Party).

"**Non-Party Settlement**" means a settlement by any Releasing Party that settles any Non-Party Covered Conduct Claim and includes a release of any Non-Released Party.

"**Non-PRA Estate Distributions**" means all Estate Distributions that are not PRA Estate Distributions.

"**Non-Released Party**" means any Person or Entity that is not a Released Party or Shareholder Released Party.

"*Non-Settling Creditor*" means any Holder of a Claim (other than any Holder of a Claim in Classes 11(a), 11(b) and 11(c) that is not an Other GUC Litigation Claim) that is (i) evidenced by a Proof of Claim timely filed by the applicable Bar Date, or (ii) not required to be evidenced by a filed Proof of Claim under the Plan, the Bankruptcy Code or a Final Order, in each case, that does not consent to the Shareholder Direct Claims Releases pursuant to the Shareholder Release Consent Mechanism applicable to the applicable Class of such Claims. For avoidance of doubt, and notwithstanding the foregoing, Non-Settling Creditors will include (i) Non-Settling States, (ii) Non-Settling Subdivisions, and (iii) Subdivisions that are not Participating Subdivisions.

"**Non-Settling States**" means States that are Non-Settling Creditors.

"**Non-Settling States Holdback Distributions**" means both the (i) the PRA Estate Distributions and (ii) Non-PRA Estate Distributions that would have otherwise been distributed to any Non-Settling States as Estate Distributions had they been Settling States, [in accordance with the Governmental Remediation Trust Agreement]."**Non-Settling Subdivisions**" means Subdivisions that have timely filed a Proof of Claim against the Debtors and that are not Participating Subdivisions.

"***Non-Settling Subdivisions Holdback Distributions***" means both the (i) PRA Estate Distributions and (ii) Non-PRA Estate Distributions that would have been distributed to such Non-Settling Subdivisions as Estate Distributions had they been Participating Subdivisions [in accordance with the Governmental Remediation Trust Agreement].

"***Notice of Shareholder Release Snapback***" means a notice filed with the Bankruptcy Court by the Master Disbursement Trust pursuant to the Master Shareholder Settlement Agreements providing notice that a Shareholder Family Group is in Specified Breach (as defined in the Shareholder Settlement Agreements) and the Master Disbursement Trust has elected to enforce the Shareholder Release Remedy pursuant to the terms of the Master Shareholder Settlement Agreement and identifying the Breaching Shareholder Family Group and the Designated Shareholder Released Parties subject to such Shareholder Release Remedy.

"***Oklahoma Litigating Political Subdivisions***" means subdivisions located in Oklahoma that are listed in Exhibit [●] attached to the Plan.

"***Omnibus Claims Objection Order***" has the meaning set forth in Section 7.3(f) of the Plan.

"***Opioid-Related Activities***" means the development, production, manufacture, licensing, labeling, marketing, advertising, promotion, distribution or sale of opioid Products or the use or receipt of any proceeds therefrom, or the use or misuse of opioids, including opioids that are not Products, or any act or failure to act in connection with laws or regulations related to any opioid.

"***Opt-In Settling Creditor***" means any Holder of Claims that consents to the Third-Party Releases through electing to opt-in to the Third-Party Releases on its applicable ballot.

"***Opt-Out Class Action Settlements***" means the (i) Public School District Shareholder Direct Settlement, (ii) Hospital Shareholder Direct Settlement, and (iii) ER Physician Shareholder Direct Settlement.

"***Other Federal Agency Claim***" means any Claim filed by the United States Department of Health and Human Services, the United States Department of Veterans Affairs, the Indian Health Service and the Centers for Medicare & Medicaid Services, set forth in Proof of Claim Nos. 138509, 137406, 137782 and 138522, respectively.

"***Other General Unsecured Claim***" means any Claim against any Debtor that is not an Administrative Claim, a Priority Claim, a Secured Claim, a Federal Government Unsecured Claim, a Channeled Claim, a Co-Defendant Claim, an Other Subordinated Claim, an Avrio General Unsecured Claim, an Adlon General Unsecured Claim, an Intercompany Claim or a Shareholder Claim.

"***Other General Unsecured Claim Cash***" means $15 million of Effective Date Cash to be used to make Distributions to Holders of Allowed Other General Unsecured Claims.

"***Other GUC Litigation Claims***" means Disputed Other General Unsecured Claims arising from or related to Covered Conduct.

"***Other Priority Claim***" means any Claim against any Debtor that is entitled to priority of payment as specified in section 507(a) of the Bankruptcy Code and is not an Administrative Claim or a Priority Tax Claim.

"***Other Subordinated Claim***" means any Claim against any Debtor that is subject to subordination under section 509(c) or 510 of the Bankruptcy Code or other applicable law, and that is not

31

a Co-Defendant Claim or a Shareholder Claim. Notwithstanding anything to the contrary outside of this definition in the Plan, any Claim that satisfies the definition of an Other Subordinated Claim shall be an Other Subordinated Claim notwithstanding that such Claim would otherwise satisfy the definition of another type of Claim.

"***Participating Subdivision***" means any Subdivision located in a Settling State, in Oklahoma, or any Subdivision located in a Non-Settling State that subsequently becomes a Settling State, in each case where the Subdivision has executed a joinder to the Governmental Entity Shareholder Direct Settlement and thereby provided the Shareholder Direct Claims Releases.

"***PAT Agreement***" means the trust agreement establishing and delineating the terms and conditions for the creation and operation of the Plan Administration Trust, as it may be amended from time to time, the terms of which shall be consistent with Articles I through XII of the Plan and otherwise acceptable to the Debtors and the Governmental Consent Parties and reasonably acceptable to the Creditors' Committee, and which shall be filed by the Debtors with the Plan Supplement.

"***PAT Assets***" means (i) the PAT Reserves, (ii) the PAT Distribution Accounts, (iii) the Retained Causes of Action relating solely to, and only to the extent necessary for, the administration of Claims against the Debtors (other than Channeled Claims), the enforcement of the Plan Administration Trust's rights and the other responsibilities of the Plan Administration Trust, *provided* that no Retained Causes of Action against Excluded Parties shall constitute PAT Assets, except as necessary to object to and resolve any Disputed Claims held by an Excluded Party, (iv) the Excluded Privileged Materials and (v) any other Excluded Assets that are not MDT Transferred Assets.

"***PAT Disputed Claims Reserves***" means the reserves to be established on account of Disputed Avrio General Unsecured Claims, Disputed Adlon General Unsecured Claims and Disputed Other General Unsecured Claims (which may be a single or collective reserve for one or more Classes of Claims). The PAT Disputed Claims Reserves shall be (i) funded on the Effective Date with Effective Date Cash in an amount determined by the Debtors and reasonably acceptable to the Creditors' Committee and the Governmental Consent Parties and, solely with respect to amounts funded on account of Disputed Other GUC Litigation Claims, the Sackler Parties' Representative; and (ii) held by the Plan Administration Trust and administered by the Plan Administration Trustee on and after the Effective Date.

"***PAT Distribution Account***" means one or more accounts to be established to make Distributions in respect of Allowed Avrio General Unsecured Claims, Allowed Adlon General Unsecured Claims and Allowed Other General Unsecured Claims (which may be a single or collective account for one or more Classes of Claims). The PAT Distribution Account shall be (i) funded on the Effective Date in accordance with Section 5.14(a) of the Plan in an amount necessary to make Distributions in respect of such Claims to the extent Allowed as of the Effective Date and periodically funded thereafter in accordance with Section 7.7 of the Plan and (ii) held by the Plan Administration Trust and administered by the Plan Administration Trustee.

"***PAT Distribution Date***" means any date upon which a Distribution is made by the Plan Administration Trustee.

"***PAT Released Claims Reserve***" means the Released Claims Reserve established in respect of Other GUC Litigation Claims.

"***PAT Reserves***" means, collectively, the Wind-Up Reserve, the PAT Disputed Claims Reserves, the Disputed Cure Claims Reserve and the Priority Claims Reserve.

"***Patient Settlement Payment***" has the meaning set forth in Section 4.10(d) of the Plan.

"***Payment Remedy***" has the meaning set forth in <u>Section 5.6(f)(i)</u> of the Plan.

"***PBGC***" means the Pension Benefit Guaranty Corporation, a wholly owned United States government corporation, and an agency of the United States created by ERISA.

"***Pending Opioid Actions***" means the judicial, administrative or other actions or proceedings or Causes of Actions that were or could have been commenced before the commencement of the Chapter 11 Cases and that are identified in the charts annexed as Appendix II and Appendix III to the Preliminary Injunction, as well as any other pending actions against any of the Debtors, Released Parties or Shareholder Released Parties alleging substantially similar facts or Causes of Action as those alleged in the actions identified in those appendices.

"***Person***" means an individual (including, without limitation, in his or her capacity as a trustee, protector or executor), corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust or trustee, protector, executor, estate, unincorporated organization, Governmental Unit, Tribe or other Entity.

"***Petition Date***" means September 15, 2019.

"***Petitioner***" has the meaning set forth in <u>Section 5.13(s)(vi)</u> of the Plan.

"***Physician***" means a physician or physician practice group, which shall include, without limitation, ER Physicians

"***PI and TPP Claims Procedures Order***" means the *Order (I) Appointing PI and TPP Claims Administrators; (II) Authorizing the Establishment of Claims Deadlines and Claims Objection Procedures; and (III) Granting Related Relief* [D.I. 7382]

"***PI Channeled Claim***" means any NAS PI Channeled Claim or Non-NAS PI Channeled Claim.

"***PI Claim***" means any NAS PI Claim or Non-NAS PI Claim.

"***PI Shareholder Direct Settlements***" means the agreements by the Holders of PI Claims to provide, pursuant to the applicable Shareholder Release Consent Mechanism, the Third-Party Releases and be subject to the injunctions set forth in <u>Sections 10.6(b)</u> and 10.7(b) of the Plan in exchange for the consideration contemplated in the Plan and the Master Shareholder Settlement Agreement.

"***PI TDP***" means, collectively or as applicable, (i) with respect to NAS PI Channeled Claims, the NAS PI TDP and (ii) with respect to Non-NAS PI Channeled Claims, the Non-NAS PI TDP.

"***PI Trust***" means the trust to be established in accordance with <u>Section 5.8</u> of the Plan to (i) assume all liability for the PI Channeled Claims, (ii) hold the MDT PI Claim, collect the Initial PI Trust Distribution and any payments due under the MDT PI Claim in accordance with the Plan, the Private Entity Settlements and the PI Trust Documents, (iii) administer PI Channeled Claims, (iv) make Distributions on account of Allowed PI Channeled Claims in accordance with the PI Trust Documents, (v) hold and administer the Class 10(a) Non-Participating Claims Reserve and the Class 10(b) Non-Participating Claims Reserves on and after the Effective Date, (vi) fund the TPP LRP Escrow Account and make payments therefrom to LRP Participating TPPs, in each case, in accordance with and subject to the terms of the LRP Agreement and (vii) carry out such other matters as are set forth in the PI Trust Documents.

"***PI Trust Agreement***" means the trust agreement establishing and delineating the terms and conditions for the creation and operation of the PI Trust, the terms of which shall be consistent with Articles I through XII of the Plan and otherwise acceptable to the Debtors and the Ad Hoc Group of Individual Victims and reasonably acceptable to the Creditors' Committee and the Governmental Consent Parties, and which shall be filed by the Debtors with the Plan Supplement.

"***PI Trust Deductions and Holdbacks***" means, collectively or as applicable, the following deductions and holdbacks from Distributions from the PI Trust pursuant to the PI Trust Documents: (i) the deduction of Creditor Trust Operating Expenses of the PI Trust, as required under and subject to the terms of the PI TDP and the PI Trust Agreement, (ii) the holdback of amounts in the TPP LRP Escrow Account and payments therefrom to LRP Participating TPPs, in each case, as required under and subject to the terms of the LRP Agreement, [(iii) the deduction of amounts prepaid to the United States under the United States-PI Claimant Medical Expense Claim Settlement,] (iv) the deduction of amounts on account of compensation, costs and fees of professionals that represented or advised (a) the Ad Hoc Group of Individual Victims in the event a Final Order is not entered granting a request for the allowance of reasonable and documented fees and expenses incurred by the Ad Hoc Group of Individual Victims under section 503(b) of the Bankruptcy Code; *provided* that, if a Final Order is entered granting such request in an amount less than the amount requested, then the deduction of the difference between the amount approved by such Final Order and the amount requested and (b) the NAS Committee in connection with the Chapter 11 Cases, in each case as and to the extent provided in the PI Trust Agreement and subject to Section 5.9(g) of the Plan, and (v) the common benefit assessment required under Section 5.9(c) of the Plan and, where applicable, the fees and costs of a Holder's individual attorney(s), which deduction shall be made by such attorney(s) and reduced by the common benefit assessment in accordance with Section 5.9(c).

"***PI Trust Documents***"means the PI Trust Agreement, the PI TDP and the LRP Agreement, including all exhibits thereto."***PI Trust NAS Fund***" means a fund established by the PI Trust to make Distributions on account of Allowed NAS PI Channeled Claims and funded with the NAS PI Portion.

"***PI Trust Non-NAS Fund***" means a fund established by the PI Trust to make Distributions on account of Allowed Non-NAS PI Channeled Claims and funded with the Non-NAS PI Portion.

"***PI Trust Obligation***" has the meaning set forth in Section 5.2(e)(ii) of the Plan.

"***PI Trustee***" means the Creditor Trustee of the PI Trust.

"***Plan***" means this joint chapter 11 plan of reorganization for the Debtors, including all appendices, exhibits, schedules and supplements hereto (including the Plan Supplement), as it may be altered, amended or modified from time to time in accordance with the Bankruptcy Code, the Bankruptcy Rules and the terms hereof.

"***Plan Administration Trust***" means the trust to be created in accordance with Section 5.3 of the Plan to administer and make Distributions in respect of Claims against the Debtors (other than Channeled Claims and Federal Government Unsecured Claims) and administer the Plan.

"***Plan Administration Trustee***" means the trustee of the Plan Administration Trust appointed in accordance with Section 5.3(c) of the Plan.

"***Plan Documents***" means, collectively, the Plan and all documents to be executed, delivered, assumed or performed in connection with the Restructuring Transaction and the occurrence of the Effective Date, including the documents to be included in the Plan Supplement.

"***Plan Injunction***" means the injunctions issued pursuant to Section 10.5 of the Plan.

"*Plan Settlement*" means the settlement of certain Claims and controversies described in Section 5.2 of the Plan, and as further described and explained in the Disclosure Statement.

"*Plan Supplement*" means the supplement or supplements to the Plan containing certain documents relevant to the implementation of the Plan, which shall include the MDT Documents, the NewCo Transfer Agreement, the NewCo Operating Agreement, the Foundation Bylaws, the Governmental Remediation Trust Documents, the PAT Agreement, the PI Trust Documents (including the LRP Agreement), the Hospital Trust Documents, the ERP Trust Documents, the TPP Trust Documents, Public School Trust Documents, the Tribe Trust Documents, the identity of the MDT Trustees, the identity of the MDT Advisory Council Representatives, the identity of the NewCo Managers, the identity of the Foundation Trustees, the identity of the Plan Administration Trustee and PPLP Liquidator, the identity of the Creditor Trustees, identity of the Governmental Remediation Trust Trustees, the Schedule of Rejected Contracts, the Schedule of Retained Causes of Action, the Schedule of Excluded Parties, the Master Shareholder Settlement Agreement, and the Restructuring Steps Memorandum.

"*Plea Agreement*" means that certain proposed plea agreement attached as Exhibit B to the DOJ 9019 Motion, as approved by the DOJ 9019 Order, by and among (i) Purdue Pharma L.P. and (ii) the United States, acting through the United States Attorney's Office for the District of New Jersey, the United States Attorney's Office for the District of Vermont, and the United States Department of Justice, Civil Division, Consumer Protection Branch.

"*PPI Interest*" means any Interest in Purdue Pharma Inc., whether held directly or indirectly, that existed immediately before the Effective Date.

"*PPLP*" means Purdue Pharma L.P.

"*PPLP Dissolution Date*" means the date on which the PPLP Liquidator dissolves PPLP in accordance with Section 5.15(d) of the Plan.

"*PPLP Interest*" means any Interest in PPLP, whether held directly or indirectly, that existed immediately before the Effective Date.

"*PPLP Liquidator*" means the person appointed in accordance with Section 5.15(c) of the Plan, who will be the same individual appointed as the Plan Administration Trustee.

"*PRA L.P.*" means Pharmaceutical Research Associates L.P.

"*PRA Estate Distributions*" means [the portion of the Estate Distributions for each Class that is attributable to amounts received from the PRA L.P. and/or from Effective Date Cash.]

"*Preliminary Injunction*" means the *Seventeenth Amended Order Pursuant to 11 U.S.C. § 105(a) Granting Motion for a Preliminary Injunction*, Adv. Pro. No. 19-08289 (RDD) [D.I. 254], as amended from time to time.

"*Prepayment Date*" shall have the meaning ascribed to such term in the Master Shareholder Settlement Agreement.

"*Prepetition Oklahoma Settlement*" has the meaning set forth in Section 5.2(f)(i)(D) of the Plan.

"*Priority Claim*" means any Priority Tax Claim or Other Priority Claim.

"***Priority Claims Reserve***" means a reserve to be established to pay Allowed Administrative Claims (other than Professional Fee Claims, which shall be paid from the Professional Fee Escrow Account in accordance with Section 2.1(b) of the Plan, and the DOJ Forfeiture Judgment Claim, which shall be paid in accordance with Section 2.3 of the Plan), Allowed Secured Claims and Allowed Priority Claims. The Priority Claims Reserve shall be (i) funded on the Effective Date with Cash and cash equivalents of the Debtors in an amount determined by the Debtors and reasonably acceptable to the Governmental Consent Parties, in consultation with the Creditors' Committee, and (ii) held by the Plan Administration Trust in a segregated account and administered by the Plan Administration Trustee on and after the Effective Date.

"***Priority Tax Claim***" means any Claim against any Debtor that is held by a Governmental Unit and of the kind entitled to priority in payment under sections 502(i) and 507(a)(8) of the Bankruptcy Code.

"***Private Claimants' Priority Reversion***" means, on any date of determination, an amount equal to $19.8 million *less* the total Litigation Costs (as defined in the Master Shareholder Settlement Agreement) paid from the Special Operating Reserve for claims pursued by any Non-Settling Creditors in their respective Class as of such date.

"***Private Creditor Trusts***" means the Hospital Trust, the ERP Trust, the TPP Trust, and the PI Trust.

"***Private Entity Settlements***" means the settlement of Hospital Channeled Claims, Third-Party Payor Channeled Claims, the ER Physician Channeled Claims and PI Channeled Claims provided for under the Plan, as set forth in Section 5.2(e) of the Plan.

"***Privilege***" means any attorney-client privilege, work-product protection, joint defense or common interest privilege or other privilege or protection of immunity (i) held by any or all of the Debtors or their Estates, (ii) held by the board of directors (or similar body) or any special committee of the board of directors (or similar body) of any of the Debtors or (iii) attaching to any documents, communications, or thing (whether written or oral), including, but not limited to, electronic information relating to any Purdue Insurance Rights or Estate Causes of Action. Correlative terms such as "Privileged" have correlative meanings. [Documents or information that are or have been subject to a clawback request by Debtors in the Purdue Legal Matters are Privileged.][5]

"***Pro Rata Share***" means, with respect to an Allowed Other General Unsecured Claim, the proportion that such Allowed Claim bears to the aggregate amount of Allowed Other General Unsecured Claims and Disputed Other General Unsecured Claims.

"***Products***" means any and all products developed, designed, manufactured, marketed or sold, in research or development, or supported by, the Debtors, whether work in progress or in final form, whether used for medicinal or non-medicinal purposes, and whether natural, synthetic, or semi-synthetic, or any finished pharmaceutical product made from or with such product, including, but not limited to (a) any such products that are: (i) an opioid or opiate, as well as any product containing any such substance; or (ii) benzodiazepine, carisoprodol, or gabapentin; or (iii) a combination or "cocktail" of chemical substances prescribed, sold, bought, or dispensed to be used together that includes opioids or opiates and (b) any such product consisting of or containing buprenorphine, codeine, fentanyl, hydrocodone, hydromorphone, meperidine, methadone, morphine, oxycodone, oxymorphone, tapentadol, tramadol, opium, heroin,

---

[5] [**NTD**: Subject to ongoing review]

carfentanil, diazepam, estazolam, quazepam, alprazolam, clonazepam, oxazepam, flurazepam, triozolam, temazepam, midazolam, carisoprodol, gabapentin, or any variant of these substances or any similar substance.

"**Professional Fee Claim**" means a Claim for services or costs incurred in connection with such services, on or after the Petition Date and on or prior to the Effective Date, in each case by Professional Persons that remains unpaid as of the Effective Date, less any existing amounts held as a fee advance, retainer, or as security by a Professional Person that such Professional Person is authorized to use to satisfy Allowed Professional Fee Claims pursuant to the Interim Compensation Order or an order of the Bankruptcy Court authorizing the retention of such Professional Person (other than a reasonable retainer to cover post-Effective Date work); *provided* that, notwithstanding the foregoing, (i) the Professional Fee Claims of the Professional Persons retained by the Ad Hoc Committee shall be subject to the terms of the AHC Reimbursement Agreement Assumption Order and shall also include fees and expenses incurred prior to the Petition Date as and to the extent set forth in the AHC Reimbursement Agreement Assumption Order, and (ii) the Professional Fees Claims of the Professional Persons retained by the MSGE Group shall be subject to the terms of the MSGE Group Reimbursement Order.

"**Professional Fee Escrow Account**" means an account funded by the Debtors in Cash on or before the Effective Date to satisfy Allowed Professional Fee Claims in accordance with Section 2.1(b) of the Plan.

"**Professional Person**" means (i) any Person retained by order of the Bankruptcy Court in connection with these Chapter 11 Cases pursuant to section 327, 328, 330, 331, 503(b) or 1103 of the Bankruptcy Code, excluding any ordinary course professional retained pursuant to an order of the Bankruptcy Court, (ii) each of the professionals for the Ad Hoc Committee, as and to the extent authorized by the AHC Reimbursement Agreement Assumption Order, and (iii) each of the professionals for the MSGE Group, as and to the extent authorized by the MSGE Group Reimbursement Order.

"**Proof of Claim**" means a proof of Claim against any of the Debtors filed in the Chapter 11 Cases in accordance with section 501 of the Bankruptcy Code.

"**Protected Information**" has the meaning set forth in Section 5.13(o)(i) of the Plan.

"**Protected Parties**" means, collectively, (i) the Debtors, (ii) each of the Debtors' Related Parties, (iii) NewCo, (iv) the Foundation, (v) the Plan Administration Trust, (vi) the Master Disbursement Trust, except, solely to the extent provided in the Master TDP and the Governmental Remediation Trust Documents, with respect to the Channeled Claims channeled to the Master Disbursement Trust, (vii) each Creditor Trust, except, solely to the extent provided in the applicable Creditor Trust TDP, with respect to the Channeled Claims channeled to such Creditor Trust and (viii) the Shareholder Released Parties, subject to Section 10.8(c) of the Plan with respect to the Shareholder Release Snapback Parties.

"**Protective Order**" means the *Third Amended Protective Order*, 19-23649 (RDD) [D.I. 1935], as amended.

"**Public Creditor Trust Distributions**" means any and all payments, transfers and distributions from or on behalf of the Debtors or the Master Disbursement Trust to either of the Public Creditor Trusts, including without limitation the Initial Public Creditor Trust Distributions and all distributions of MDT Distributable Value received by a Public Creditor Trust.

"**Public Creditor Trusts**" means Governmental Remediation Trust and the Tribe Trust.

"***Public Document Repository***" means the public document repository to be established as set forth in Section 5.13 of the Plan.

"***Public Entity Allocation***" means the allocations of Public Creditor Trust Distributions between Governmental Remediation Trust and the Tribe Trust as set forth in Section 5.2(f)(i)(B) of the Plan.

"***Public Entity Settlements***" means the settlement of Non-Federal Domestic Governmental Channeled Claims, Tribe Channeled Claims and Public School Channeled Claims provided for under the Plan, as set forth in Section 5.2(f) of the Plan.

"***Public Health Initiatives***" means the development and distribution of medicines to treat opioid addiction and reverse opioid overdoses.

"***Public School Channeled Claim***" means (i) any Public School Claim or (ii) any Claim held by a Public School District that is released pursuant to the Public School District Shareholder Direct Settlement Agreement. Public School Channeled Claims shall be channeled to the Public School Trust in accordance with the Plan and Master TDP.

"***Public School Claims***" means any Claim against any Debtor that is held by a Public School District, in its capacity as such.

"***Public School District***" means an elementary, middle, or secondary public school district in the United States, in its capacity as such, that (i) has filed one or more Proofs of Claim; (ii) has a student population greater than 5,000 students; or (iii) has filed cases against the opioid industry in MDL 2804 McKinsey or other courts.

"***Public School District Claimants***" means the public school districts identified in the (i) *Verified Statement of Binder & Schwartz LLP Under Federal Rule of Bankruptcy Procedure 2019* [D.I. 2707] and (ii) *Verified Statement of Hughes Socol Piers Resnick & Dym, Ltd. and Cocounsel under Federal Rule of Bankruptcy Procedure 2019* [D.I. 2304], each as may be amended from time to time.

"***Public School District Shareholder Direct Settlement***" means the settlement set forth in the Public School District Shareholder Direct Settlement Agreement.

"***Public School District Shareholder Direct Settlement Agreement***" means the settlement agreement which shall be filed by the Debtors with the Plan Supplement.

"***Public School TDP***" means the trust distribution procedures to be implemented by the Public School Trust setting forth the procedures for distributions from the Public School Trust, the terms of which shall be consistent with Articles I through XII of the Plan and otherwise acceptable to the Debtors and the Public School District Claimants and reasonably acceptable to the Creditors' Committee and the Governmental Consent Parties, and which shall be filed by the Debtors with the Plan Supplement.

"***Public School Trust***" means a trust called the Public Schools' Special Education Initiative Trust which shall, on the terms described in the Public School Trust Agreement and in accordance with Section 5.8 of the Plan (i) assume all liability for the Public School Channeled Claims, (ii) hold the MDT Public School District Claim and collect the Initial Public Schools Distribution and additional payments due under the MDT Public School District Claim in accordance with the Public Entity Settlements and the Public School Trust Documents, (iii) administer Public School Channeled Claims, (iv) hold and administer the Class 6 Non-Participating Claims Reserve on and after the Effective Date, (v) hold the Class 6 Released

Claims Reserve on and after the Effective Date and (vi) make Distributions in accordance with the Public School TDP.

"**Public School Trust Agreement**" means the trust agreement establishing and delineating the terms and conditions for the creation and operation of the Public School Trust, the terms of which shall be consistent with Articles I through XII of the Plan and otherwise acceptable to the Debtors and the Public School District Claimants and reasonably acceptable to the Creditors' Committee and the Governmental Consent Parties, and which shall be filed by the Debtors with the Plan Supplement.

"**Public School Trust Documents**" means the Public School Trust Agreement and the Public School TDP.

"**Purdue**" has the meaning set forth in the introductory paragraph of this Plan.

"**Purdue Insurance Collateral**" means any collateral the Debtors have provided or set aside to secure obligations under any Purdue Insurance Policy.

"**Purdue Insurance Policies**" means any primary, umbrella, excess, fronting or other insurance policy, whether known or unknown, issued to or that provides or may provide coverage or benefits at any time to any of the Debtors or under which any of the Debtors have sought or may seek coverage or benefits, including, without limitation, any such policy for directors' and officers' liability, general liability, product liability, property, workers' compensation or fiduciary liability, or any other coverage, and all agreements, documents or instruments relating thereto including, without limitation, any agreement with a third-party administrator for claims handling, risk control or related services, that (i) were issued prior to the Effective Date and (ii) cover periods that are, in whole or in part, prior to the Effective Date. For the avoidance of doubt, Purdue Insurance Policies shall not include any insurance policy that was issued exclusively to and that exclusively benefits and exclusively provides coverage to Persons who are neither Debtors nor predecessors of a Debtor nor current or former officers, directors or shareholders of any of the Debtors.

"**Purdue Insurance Rights**" means any and all rights, titles, privileges, interests, claims, demands or entitlements of the Debtors to any proceeds, payments, benefits, Causes of Action, choses in action, defense or indemnity arising under, or attributable to, any and all Purdue Insurance Policies or Purdue Insurance Collateral, now existing or hereafter arising, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, disputed or undisputed, fixed or contingent. For the avoidance of doubt, "Purdue Insurance Rights" include any rights of the Debtors to proceeds of Purdue Insurance Policies and Purdue Insurance Collateral.

"**Purdue Insurance Stipulation**" means the *Stipulation and Agreed Order Granting Joint Standing to Prosecute Claims and Causes of Action Related to the Debtors' Insurance Coverage to (1) the Official Committee of Unsecured Creditors and (2) the Ad Hoc Committee of Government and Other Contingent Litigation Claimants* [D.I. 2305].

"**Purdue Legal Matter**" means (i) these Chapter 11 Cases, the Plan or the Restructuring Transactions, (ii) the Pending Opioid Actions, (iii) any other ongoing or completed action or proceeding, whether commenced by a Governmental Unit or any other Person, or government investigation, in each case, relating generally to the same or similar subject matter of the actions and proceedings subject to the Preliminary Injunction, (iv) any ongoing or completed action or investigation by the DOJ, including any cooperation obligation arising out of any such action or investigation or (v) any mediation or settlement related to the same or similar subject matter of any of the foregoing.

"***Purdue Monitor***" means the monitor retained pursuant to the voluntary injunction set forth in Appendix I to the Preliminary Injunction.

"***Purdue Oklahoma Subdivision Fund***" means the fund designated for the Oklahoma subdivisions in the State of Oklahoma's pre-petition settlement with the Debtors and certain of the Sackler Parties and/or their Related Parties.

"***Purdue Pension Plan***" means the Purdue Pharma L.P. Pension Plan, a single-employer defined benefit pension plan covered by Title IV of ERISA.

"***Ratepayer Mediation Participants***" means the proposed representatives of classes of privately insured parties who are plaintiffs and proposed class representatives identified in the Amended Verified Statement of Stevens & Lee, P.C. Pursuant to Bankruptcy Rule 2019 [D.I. 333].

"***Ratepayer Mediation Participants Stipulation***" means a stipulation to be entered into among the Debtors, the Ratepayer Mediation Participants and the Sackler Parties pursuant to which (i) the Ratepayer Mediation Participants will agree to (a) withdraw all proofs of claim filed by the Ratepayer Mediation Participants and (b) not to prosecute further litigation on grounds similar to those represented by such proofs of claim against the Shareholder Released Parties; (ii) the Ratepayer Mediation Participants agree to support this Plan; and (iii) the Ratepayer Mediation Participants will receive $1.4 million in professional fees for services rendered in connection with the Chapter 11 Cases.

"***Reciprocal Releasee***" means each of the following: (i) the Debtors and their Estates and (ii) each Party granting the Third-Party Releases pursuant to the applicable Shareholder Release Consent Mechanism.

"***Reinstated***" means, with respect to any Claim against or Interest in a Debtor, that such Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

"***Related Parties***" means, with respect to a Person, (i) such Person's predecessors, successors, assigns, Subsidiaries, affiliates, managed accounts or funds, past, present and future officers, board members, directors, principals, agents, servants, independent contractors, co-promoters, third-party sales representatives, medical liaisons, members, partners (general or limited), managers, employees, subcontractors, agents, advisory board members, financial advisors, attorneys and legal representatives, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals and advisors, trusts (including trusts established for the benefit of such Person), trustees, protectors, beneficiaries, direct or indirect owners and/or equityholders, parents, transferees, heirs, executors, estates, nominees, administrators, and legatees, in each case in their respective capacities as such; (ii) the Related Parties of each of the foregoing, in each case in their respective capacities as such; and (iii) solely with respect to the Settling Co-Defendants, any insurer of any Settling Co-Defendant solely in its capacity as such (and specifically excluding certain insurers of the Debtors that have issued, are responsible for, or have liability on account of insurance rights arising out of or in connection with Opioid-Related Activities, solely in such insurers capacities as such). For the avoidance of doubt, the citizens and residents of a State shall not be deemed to be Related Parties of such State solely as a result of being citizens or residents of such State; provided, however, that notwithstanding the foregoing, in no event shall an Excluded Party be a Related Party.

"***Relativity Database***" has the meaning set forth in <u>Section 5.13(g)</u> of the Plan.

"***Released Claims***" means any Causes of Action released pursuant to <u>Section 10.6(a)</u> and <u>(b)</u> of the Plan.

"*Released Claims Reserves*" means separate interest-bearing escrow accounts established on the Effective Date by each Creditor Trust and the Plan Administration Trust, with the Master Disbursement Trust serving as administrative agent in relation thereto, to hold amounts released from the Creditor Trust Non-Participating Claims Reserves (other than the Creditor Trust Non-PRA Non-Participating Claims Reserves) and the Disputed Other General Unsecured Claims Reserve pursuant to Section 7.8 of this Plan upon the disallowance of Non-Participating Channeled Claims and Disputed Other GUC Litigation Claims.

"*Released Parties*" means, collectively, (i) the Debtors, (ii) each of the Debtors' Related Parties, solely in their respective capacities as such, and (iii) solely for purposes of the releases by the Debtors in Section 10.6(a) of the Plan, (A) the Supporting Claimants, the Creditors' Committee and the Creditors' Committee's members and each of their respective professionals, in each case solely in their respective capacities as such and (B) the Settling Co-Defendants and each of their Related Parties, in each case solely in their respective capacities as such; *provided*, *however*, that, notwithstanding the foregoing or anything herein to the contrary, no Excluded Party or Shareholder Release Snapback Party shall be a Released Party in any capacity or respect. For purposes of this definition of "Released Parties," the phrase "solely in their respective capacities as such" means, with respect to a Person, solely to the extent a claim against such Person (x) arises from such Person's conduct or actions taken in such capacity, or from such Person's identified capacity in relation to another specified Released Party and not, in either case, from such Person's conduct or actions independent of such capacity, and (y) to the extent such Person's liability depends on or derives from the liability of such other Released Party, such claim would be released if asserted against such other Released Party.

"*Releases*" means the releases provided for in Sections 10.6 and 10.7 of the Plan.

"*Releasing Parties*" means, collectively, (i) the Supporting Claimants, solely in their respective capacities as such, (ii) the Opt-In Settling Creditors, (iii) the Settling Co-Defendants and (iv) with respect to each of the Persons in the foregoing clauses (i) through (iii), each of their Related Parties, to the extent the applicable Releasing Party has the authority under applicable law to grant such release on their behalf, in each case, other than any Shareholder Released Party.

"*Replenishment Transfer*" means a transfer by the Master Disbursement Trust to the Special Operating Reserve pursuant to the terms of the Master Shareholder Settlement Agreement.

"*Reserved MDT Insurance Policies*" means (i) policy number B0509FINMR 1600558 and policy number B0509FINMR 1600559 and (ii) any MDT Insurance Policy that is not listed by policy number in Schedule 2 to the MDT Agreement.

"*Restructuring Steps Memorandum*" means the summary of transaction steps to complete the Restructuring Transactions, which shall be consistent with Articles I through XII of the Plan and otherwise acceptable to the Debtors and reasonably acceptable to the Creditors' Committee and the Governmental Consent Parties, and which shall be included in the Plan Supplement.

"*Restructuring Transactions*" means one or more transactions to occur on or before the Effective Date or as soon as reasonably practicable thereafter, that may be necessary or appropriate to effect any transaction described in, approved by, contemplated by or necessary to effectuate this Plan, including (i) the creation of NewCo and the direct or indirect transfer thereto and vesting therein (or in a Subsidiary of NewCo) of the NewCo Transferred Assets free and clear of Claims, Interests and liabilities in accordance with the NewCo Transfer Agreement, (ii) the creation of the Foundation and the issuance of the NewCo Interest to the Foundation, (iii) the creation of the Master Disbursement Trust and the transfer thereto and vesting therein of the MDT Transferred Assets, (iv) the creation of the Plan Administration Trust and the vesting therein of the PAT Assets, (v) the creation of Governmental Remediation Trust and the Tribe Trust

41

and the consummation of the Public Entity Settlements, consisting of the payment of the Initial Public Creditor Trust Distributions and the issuance of the MDT Interests, (vi) the consummation of the Public School District Shareholder Direct Settlement, consisting of the payment of the Initial Public Schools Distribution and the issuance of the MDT Public School District Claims, (vii) the creation of the Private Creditor Trusts and the consummation of the Private Entity Settlements, consisting of the payment of the Initial Private Creditor Trust Distributions and the issuance of the MDT Private Claims, (viii) the creation and funding of the Priority Claims Reserve and the PAT Distribution Account to make Distributions in respect of Allowed Claims (other than Channeled Claims), (ix) entry into the Shareholder Settlements in exchange for, among other things, the contribution of funds to the Master Disbursement Trust and/or the Governmental Remediation Trust, as applicable, pursuant to the Shareholder Settlement Agreement, (x) the Releases, injunctions and exculpations set forth herein and in the Confirmation Order and (xi) the transactions set forth in the Restructuring Steps Memorandum.

"***Retained Causes of Action***" means all Estate Causes of Action that are not expressly settled or released under the Plan on or prior to the Effective Date, and which shall include all Causes of Action against Excluded Parties and the Causes of Action set forth on the Schedule of Retained Causes of Action. Any and all Estate Causes of Action against any Settling Co-Defendant (other than any Estate Causes of Action against any Settling Co-Defendant expressly preserved against such Settling Co-Defendants in Section 10.6 of the Plan) are not Retained Causes of Action and are released under the Plan.

"***Retained Shareholder Insurance Claim***" has the meaning set forth in Section 5.6(j) of the Plan.

"***Sackler Family Members***" means (i) Raymond R. Sackler and Mortimer D. Sackler, (ii) all Persons who are descendants of either Raymond R. Sackler or Mortimer D. Sackler, (iii) all current and former spouses of any individual identified in the foregoing clause (i) or (ii), and (iv) the estate of any individual identified in the foregoing clause (i), (ii) or (iii).

"***Sackler Parties' Representative***" has the meaning set forth in the Master Shareholder Settlement Agreement.

"***Sackler Party***" has the meaning set forth in the Master Shareholder Settlement Agreement.

"***Schedule of Excluded Parties***" means the schedule of Excluded Parties filed by the Debtors with the Plan Supplement, which shall include only Persons agreed to by the Debtors and the Governmental Consent Parties, in consultation with the Creditors' Committee.

"***Schedule of Rejected Contracts***" means the schedule of all executory contracts and unexpired leases to be rejected by the Debtors, if any, filed by the Debtors with the Plan Supplement, which shall be in form and substance acceptable to the Debtors and reasonably acceptable to the Governmental Consent Parties, in consultation with the Creditors' Committee.

"***Schedule of Retained Causes of Action***" means the schedule of Retained Causes of Action filed by the Debtors with the Plan Supplement, which shall be in form and substance acceptable to the Debtors and the Governmental Consent Parties and reasonably acceptable to the Creditors' Committee.

"***Scheduled***" means, with respect to any Claim against the Debtors, the status, priority, and amount, if any, of such Claim as set forth in the Schedules.

"*Scheduled MDT Distribution Date*" means (i) the date that is the Effective Date and (ii) with respect to each subsequent Scheduled MDT Distribution Date, the date that is the first Business Day of the month in which each anniversary of the Effective Date occurs thereafter.

"*Schedules*" means the schedules of assets and liabilities, statements of financial affairs, lists of Holders of Claims and Interests and all amendments or supplements thereto filed by the Debtors with the Bankruptcy Court to the extent such filing is not waived pursuant to an order of the Bankruptcy Court.

"*Second Public Schools Distribution*" has the meaning set forth in Section 5.2(f)(ii) of the Plan.

"*Secured Claim*" means any Claim against any Debtor to the extent such Claim is (i) secured by a valid, perfected and non-avoidable Lien on property of a Debtor's Estate, the amount of which is equal to or less than the value of such property (A) as set forth in this Plan, (B) as agreed to by the Holder of such Claim and the Debtors, or (C) as determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code or (ii) subject to any setoff right of the Holder of such Claim under section 553 of the Bankruptcy Code. "Secured Claim" does not include any Claim that meets the definition of "Priority Tax Claim."

"*Securities Act*" means the Securities Act of 1933, as amended.

"*Separation Agreement*" means the agreements entered into in accordance with the Master Shareholder Settlement Agreement to govern continuing business relationships and claims among the Debtors, NewCo and any entities owned directly or indirectly by the Shareholder Payment Parties, Sackler Family Members or trusts established by or for the benefit of the Sackler Family Members, which shall be on terms reasonably acceptable to the Governmental Consent Parties and the Creditors' Committee.

"*Sequestered Materials*" has the meaning set forth in Section 5.13(i) of the Plan.

"*Sequestration Date*" has the meaning set forth in Section 5.13(k) of the Plan.

"*Settled Canadian Patient Claims*" means the "Settled Patient Claims" as defined in the Canadian Patient Claim Settlement Stipulation.

"*Settling Co-Defendant*" means (i) any Person that is a signatory to the *Joint Objection of Certain Distributors, Manufacturers, and Pharmacies to the Sixth Amended Joint Chapter 11 Plan of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 3306] and/or (ii) any Co-Defendant that objected, formally or informally, or reserved rights with respect to the assumption and assignment of any contract pursuant to the Plan.

"*Settling Creditor*" means any Holder of a Channeled Claim that consents to the Third-Party Releases or otherwise provides a release under a Shareholder Settlement Agreement pursuant to the applicable Shareholder Release Consent Mechanism.

"*Settling MDT Insurer*" means an Insurance Company that has entered into an MDT Insurance Settlement, solely in its capacity as such and solely with respect to any MDT Insurance Policy released in such MDT Insurance Settlement.

"*Settling MDT Insurer Injunction*" means the injunction issued pursuant to Section 10.11 of the Plan.

"***Settling States***" means States that are Settling Creditors.

"***Settling States MDT Trustees***" has the meaning set forth in <u>Section 5.6(d)</u> of the Plan.

"***Shareholder Claim***" means any Claim against any Debtor or that seeks to recover from any property of any Debtor or its Estate, including from any MDT Insurance Policy, in each case, that is held by a Shareholder Released Party (other than any current or former director, officer or employee of the Debtors that is not a Sackler Family Member). Notwithstanding anything to the contrary outside of this definition in the Plan, any Claim that satisfies the definition of a Shareholder Claim shall be a Shareholder Claim notwithstanding that such Claim would otherwise satisfy the definition of another type of Claim.

"***Shareholder Direct Claims Releases***" means (i) the releases provided for in <u>Section 10.7(b)</u> of the Plan, or (ii) any and all releases, waivers, or disclaimers of liability, standstill agreements, or other similar terms contained in the Direct Claims Shareholder Settlement Agreements.

"***Shareholder Direct Settlement Portion***" means the portion of the aggregate Distribution to each Class of Channeled Claim funded with amounts received from the Shareholder Payment Parties on account of the Direct Claims Shareholder Settlements, which, subject to any Direct Claim Settlement Retained Payment Amounts:

(a)        with respect to Non-Federal Domestic Governmental Channeled Claims, shall be an aggregate amount of $[3,485,264,791.64], consisting of $450,819,227.34 of the Initial Governmental Remediation Trust Distribution, and the following amounts received by the Governmental Remediation Trust on each of the following Scheduled MDT Distribution Dates from amounts paid by the Shareholder Payment Parties to the Master Disbursement Trust on the SSA Payment Date corresponding to such Scheduled MDT Distribution Date: (i) $276,239,448.81 on the second Scheduled MDT Distribution Date, (ii) $324,589,448.81 on the third Scheduled MDT Distribution Date, (iii) $268,342,500.00 on the fourth Scheduled MDT Distribution Date, (iv) $166,465,020.83 on the fifth Scheduled MDT Distribution Date, (v) $116,664,520.83 on the sixth Scheduled MDT Distribution Date, (vi) $122,627,687.50 on the seventh Scheduled MDT Distribution Date, (vii) $122,627,687.50 on the eighth Scheduled MDT Distribution Date, (viii) $122,627,687.50 on the ninth Scheduled MDT Distribution Date, (ix) $152,604,687.50 on the tenth Scheduled MDT Distribution Date, (x) $152,604,687.50 on the eleventh Scheduled MDT Distribution Date, (xi) $152,604,687.50 on the twelfth Scheduled MDT Distribution Date, (xii) $152,604,687.50 on the thirteenth Scheduled MDT Distribution Date, (xiii) $301,280,937.50 on the fourteenth Scheduled MDT Distribution Date, (xiv) $301,280,937.50 on the fifteenth Scheduled MDT Distribution Date, and (xv) $301,280,937.50 on the sixteenth Scheduled MDT Distribution Date;

(b)        with respect to Tribe Channeled Claims, shall be an aggregate amount of $[118,938,715.74], consisting of $15,384,730.61 of the Initial Tribe Trust Distribution, and the following amounts received by the Tribe Trust on each of the following Scheduled MDT Distribution Dates from amounts paid by the Shareholder Payment Parties to the Master Disbursement Trust on the Settlement Payment Date corresponding to such Scheduled MDT Distribution Date: (i) $9,426,992.57 on the second Scheduled MDT Distribution Date, (ii) $11,076,992.57 on the third Scheduled MDT Distribution Date, (iii) $9,157,500.00 on the fourth Scheduled MDT Distribution Date, (iv) $5,680,812.50 on the fifth Scheduled MDT Distribution Date, (v) $3,981,312.50 on the sixth Scheduled MDT Distribution Date, (vi) $4,184,812.50 on the seventh Scheduled MDT Distribution Date, (vii) $4,184,812.50 on the eighth Scheduled MDT Distribution Date, (viii) $4,184,812.50 on the ninth Scheduled MDT Distribution Date, (ix) $5,207,812.50 on the tenth Scheduled MDT Distribution Date, (x) $5,207,812.50 on the eleventh Scheduled MDT Distribution Date, (xi) $5,207,812.50 on the twelfth Scheduled MDT Distribution Date, (xii) $5,207,812.50 on the thirteenth Scheduled MDT Distribution Date, (xiii) $10,281,562.50 on the fourteenth Scheduled MDT Distribution Date, (xiv) $10,281,562.50 on the fifteenth Scheduled MDT Distribution Date, and (xv) $10,281,562.50 on the sixteenth Scheduled MDT Distribution Date;

(c)　　　with respect to Hospital Channeled Claims, shall be $[174,215,320.82];

(d)　　　with respect to Public School Channeled Claims, shall be an aggregate amount of $[26,776,216.55], consisting of (i) $16,859,099.31 of the Initial Public Schools Distribution, (ii) $4,958,558.62 of the Second Public Schools Distribution, and (iii) $4,958,558.62 of the Third Public Schools Distribution;

(e)　　　with respect to Third-Party Payor Channeled Claims, shall be $[261,104,374.91] (such amount, the "**Maximum TPP Shareholder Direct Settlement Amount**");

(f)　　　with respect to ER Physician Channeled Claims, shall be $[3,842,182.12]; and

(g)　　　with respect to NAS PI Channeled Claims, shall be $[25,138,065.25] (such amount, the "**Maximum NAS PI Shareholder Direct Settlement Amount**").

(h)　　　with respect to Non-NAS PI Channeled Claims, shall be $[153,178,666.30] (such amount, the "**Maximum Non-NAS PI Shareholder Direct Settlement Amount**").

In the event of any Shareholder Prepayment, the Shareholder Direct Settlement Portion otherwise applicable to Distributions to the Governmental Remediation Trust and Tribe Trust on the Scheduled MDT Distribution Date corresponding to the Target Payment Date of such prepayment shall be applied to Distributions made to the Governmental Remediation Trust and Tribe Trust on the MDT Distribution Date corresponding to such Prepayment Date with amounts received from the Shareholder Payment Parties on account of such prepayment, and such Shareholder Direct Settlement Portion shall be reduced using the discount rate calculation applicable to such Shareholder Prepayment pursuant to the terms of the Master Shareholder Settlement Agreement. In the event of any that any Shareholder Payment Group fails to pay when due any portion of the Payment Date Obligation owed by such Shareholder Payment Group pursuant to the terms of the Master Shareholder Settlement Agreement, the Shareholder Direct Settlement Portion for the Scheduled MDT Distribution Date corresponding to such Payment Date Obligations shall be reduced pro rata based on the amount of such non-payment.

"*Shareholder Estate Claim Releases*"　means releases provided for in Section 10.7(a) of the Plan.

"*Shareholder Estate Settlement Distribution*" means Estate Distributions to Holders of Channeled Claims solely on account of funds provided by the Sackler Parties on account of the Sackler Parties' settlement with the Estates as set forth in the Master Shareholder Settlement Agreement.

"*Shareholder Family Group*" has the meaning ascribed to the term "Family Group" in the Master Shareholder Settlement Agreement.

"*Shareholder Payment Group*" has the meaning ascribed to the term "Payment Group" in the Master Shareholder Settlement Agreement.

"*Shareholder Payment Party*" means, as applicable, the Shareholder Released Parties that are parties to the Master Shareholder Settlement Agreement or the applicable Direct Claims Shareholder Settlement Agreement.

"*Shareholder Prepayment*" means any payment of all or any portion of a Minimum Required Settlement Payment to the Master Disbursement Trust prior to the scheduled SSA Payment Date

for such Minimum Required Settlement Payment as set forth in the Master Shareholder Settlement Agreement.

"**Shareholder Release Consent Mechanism**" means the applicable mechanism for each Holder of a Claim to consent to the Third-Party Releases or otherwise be bound by a release under a Shareholder Settlement Agreement which are exclusively: (i) with respect to Holders of Non-Federal Domestic Governmental Claims, executing a joinder to the Governmental Entity Shareholder Direct Settlement Agreement or otherwise participating in the Governmental Entity Shareholder Direct Settlement Agreement in accordance with the terms thereof, (ii) with respect to Holders of Public School Claims, participating in the Public School District Shareholder Direct Settlement, (iii) with respect to Holders of Tribe Claims, executing a joinder to the Tribal Shareholder Direct Settlement Agreement, (iv) with respect to Holders of Hospital Claims, participating in the Hospital Shareholder Direct Settlement, (v) with respect to Holders of Third-Party Payor Claims, through electing to opt-in to the Third-Party Releases on its applicable ballot, (vi) with respect to Holders of ER Physician Claims, participating in the ER Physician Shareholder Direct Settlement; and (vii) with respect to Holders of PI Claims, through electing to opt-in to the Third-Party Releases on its applicable ballot.

"**Shareholder Release Remedy**" has the meaning ascribed to the term "Release Remedy" in the Master Shareholder Settlement Agreement.

"**Shareholder Release Snapback Parties**" means, collectively, the Designated Shareholder Released Parties and all members of any Shareholder Family Group.

"**Shareholder Released Claims**" means any Causes of Action released pursuant to Section 10.7(a) and (b) of the Plan, as applicable.

"**Shareholder Released Direct Claims**" means any Causes of Action released pursuant to Section 10.7(b) of the Plan.

"**Shareholder Released Estate Claims**" means any Causes of Action released pursuant to Section 10.7(a) of the Plan.

"**Shareholder Released Parties**" means, collectively, (i) the Shareholder Payment Parties; (ii) the Designated Shareholder Released Parties and the Persons identified on Exhibit [X] to the Master Shareholder Settlement Agreement; (iii) all Persons directly or indirectly owning an equity interest in any Debtor on the date on which such Debtor commenced its Chapter 11 Case; (iv) Sackler Family Members; (v) all trusts for the benefit of any of the Persons identified in the foregoing clause (iv) and the past, present and future trustees (including, without limitation, officers, directors and employees of any such trustees that are corporate or limited liability company trustees and members and managers of trustees that are limited liability company trustees), protectors and beneficiaries thereof, solely in their respective capacities as such; (vi) all Persons (other than the Debtors) to which property or funds of the Persons identified in any of the foregoing clauses (i) through (v) have been or are directly or indirectly transferred (including for charitable or philanthropic purposes), solely in such Persons' capacities as transferees and solely to the extent of any property or funds transferred to them; and (vii) with respect to each Person in the foregoing clauses (i) through (v), such Person's (A) predecessors, successors, permitted assigns, subsidiaries (other than the Debtors), controlled affiliates, spouses, heirs, executors, estates and nominees, in each case solely in their respective capacities as such, (B) current and former officers and directors, principals, members and employees, in each case, solely in their respective capacities as such, (C) financial advisors, attorneys (including, without limitation, attorneys retained by any director, in his or her capacity as such), accountants, investment bankers (including, without limitation, investment bankers retained by any director, in his or her capacity as such), consultants, experts and other professionals, in each case, solely in their respective capacities as such, and (D) property possessed or owned at any time or the proceeds

46

therefrom; *provided* that notwithstanding anything to the contrary herein, the Debtors and the Excluded Parties identified on the Schedule of Excluded Parties shall not be Shareholder Released Parties. For purposes of this definition of "Shareholder Released Parties," the phrase "solely in their respective capacities as such" means, with respect to a Person, solely to the extent a claim against such Person (x) arises from such Person's conduct or actions taken in such capacity, or from such Person's identified capacity in relation to another specified Shareholder Released Party and not, in either case, from such Person's conduct or actions independent of such capacity, and (y) to the extent such Person's liability depends on or derives from the liability of such other Shareholder Released Party, such claim would be released if asserted against such other Shareholder Released Party. For the avoidance of doubt, any Person that fits within multiple categories above shall be a Shareholder Released Party in all such categories and failure to include any Person that fits within any category above on Exhibit [X] to the Master Shareholder Settlement Agreement shall not mean that such Person is not a Shareholder Released Party.

"***Shareholder Releases***" means the releases provided for in Section 10.7 of the Plan.

"***Shareholder Settlement Agreements***" means, collectively, the Master Shareholder Settlement Agreement and all Direct Claims Shareholder Settlement Agreements.

"***Shareholder Settlement Amount***" means the aggregate amount of up to $7 billion provided for in settlement of all Shareholder Settlement Released Claims in the Shareholder Settlement Agreements, collectively, which shall be paid by the Shareholder Payment Parties on the dates and pursuant to the terms set forth in the Shareholder Settlement Agreements.

"***Shareholder Settlement Released Claims***" means the Shareholder Released Estate Claims, the Third-Party Released Claims, and the Causes of Action release under the applicable Direct Claims Shareholder Settlement Agreements.

"***Shareholder Settlement Releases***" means the Shareholder Estate Claim Releases, the Third-Party Releases, and any and all releases, waivers, or disclaimers of liability, standstill agreements, or other similar terms contained in the applicable Direct Claims Shareholder Settlement Agreements or pursuant to the Direct Claims Shareholder Settlements.

"***Shareholder Settlements***" means the settlements, including the Direct Claims Shareholder Settlements, reflected in the Plan, the Plan Supplement, the Confirmation Order, the Master Shareholder Settlement Agreement, and the Direct Claims Shareholder Settlement Agreements providing for, among other things, the Shareholder Settlement Releases and the Channeling Injunction in exchange for, among other things, the payments to be made by the Shareholder Payment Parties to the Master Disbursement Trust for the benefit of the Debtors, their Estates, and the Settling Creditors.

"***Solicitation Procedures Order***" means the order entered by the Bankruptcy Court approving (i) the adequacy of information in the Disclosure Statement, (ii) solicitation and voting procedures, (iii) forms of ballots, notices and notice procedures in connection therewith and (iv) certain dates with respect thereto [D.I. 2988].

"***SOR Holdback***" has the meaning set forth in Section 5.7(a)(i) of the Plan.

"***Special Master***" means the Disclosure Oversight Special Master appointed in accordance with Section 5.13(s) of the Plan.

"***Special Operating Reserve***" means a separate interest-bearing escrow account established by the Master Disbursement Trust on or before the Effective Date, subject to the terms set forth in the Master Shareholder Settlement Agreement.

"**SSA Payment Date**" means each "Payment Date" as defined in, and as subject to adjustment pursuant to the terms of, the Master Shareholder Settlement Agreement.

"**State**" means except for Oklahoma, all 50 states of the United States of America and the District of Columbia, American Samoa, Guam, Northern Mariana Islands, Puerto Rico, and U.S. Virgin Islands.

"**State Expenses Fund**" means the fund to be established as set forth in Section 5.9(b) of the Plan.

"**States AG Negotiating Group**" means the negotiating committee of State Attorneys General formed pursuant to the *Amended Order Appointing the Honorable Shelley C. Chapman (Ret.) and Eric D. Green as Co-Mediators and Establishing Terms and Conditions Of Mediation* [D.I. 6682].

"**Subdivision**" has the meaning set forth in the Master Shareholder Settlement Agreement.

"**Subdivision Allocation**" means, with respect to a Subdivision, the allocation applicable to such Subdivision as calculated based on the Subdivision Allocation Percentage.

"**Subdivision Allocation Percentage**" shall have the meaning ascribed to such term in the Governmental Entity Shareholder Direct Settlement.

"**Subdivisions in Non-Settling States**" has the meaning set forth in Section 5.2(f)(i)(C) of the Plan.

"**Subject MDT Assets**" has the meaning set forth in Section 5.2(e)(ii) of the Plan.

"**Subsidiary**" has the meaning set forth in Section 10.9(a) of the Plan.

"**Subsidiaries**" means, with respect to a Person, all direct and indirect subsidiaries of such Person.

"**Supporting Claimants**" means (i) the Ad Hoc Committee, (ii) the MSGE Group, (iii) the Native American Tribes Group, (iv) the Ad Hoc Group of Individual Victims, (v) the Ad Hoc Group of Hospitals, (vi) the Third-Party Payor Group, (vii) the NAS Committee, (viii) the Public School District Claimants, and (ix) with respect to each of the foregoing clauses (i) through (viii), the respective members thereof, solely in their respective capacities as such.

"**Surplus Reserve Cash**" means any surplus Cash or cash equivalents in any of the PAT Reserves in excess of what is estimated to be necessary to satisfy the obligations for which such amounts were reserved, in each case, as determined by the Plan Administration Trustee in accordance with Section 5.14(c) of the Plan.

"**Suspension Event**" shall have the meaning ascribed to such term in the Master Shareholder Settlement Agreement.

"**Target Payment Date**" shall have the meaning ascribed to such term in the Master Shareholder Settlement Agreement.

"**Third-Party Payor**" means a private health insurer, an employer-sponsored health plan, a union health and welfare fund or any other provider of healthcare benefits, including any third-party administrator or agent on behalf thereof, in each case in its capacity as such, that is not a Domestic Governmental Entity; *provided*, *however*, that California health districts acting as third-party payors that

filed Third-Party Payor Proofs of Claim in such capacity by the Bar Date established by the Bar Date Order shall be included in this definition of "Third-Party Payor."

"***Third-Party Payor Channeled Claim***" means any (i) Third-Party Payor Claim or (ii) Released Claim or Shareholder Released Claim that is held by a Third-Party Payor (in the case of Third Party Released Claims, solely to the extent that such Third-Party Payor is a Settling Creditor) that is not a Domestic Governmental Entity. Third-Party Payor Channeled Claims shall be channeled to the TPP Trust in accordance with the Plan and the Master TDP.

"***Third-Party Payor Claim***" means any Claim against any Debtor that is held by a Third-Party Payor (including any Claim based on the subrogation rights of the Holder thereof that is not an Other Subordinated Claim) that is not a Domestic Governmental Entity; *provided* that Claims in respect of self-funded government plans that were and are asserted through private Third-Party Payors shall be included in this definition of "Third-Party Payor Claims." For the avoidance of doubt, (i) Federal Government Unsecured Claims are not Third-Party Payor Claims, and (ii) claims of Third-Party Payors against Holders of PI Claims or Distributions payable to Holders of PI Claims are not claims against any Debtor and therefore are not included in this definition of "Third-Party Payor Claims."

"***Third-Party Payor Group***" means the group of certain Holders of Third-Party Payor Claims consisting of (i) the Holders of Third-Party Payor Claims represented by the Third-Party Payer participants in the Mediation listed in Exhibit A of the *Mediators' Report* [D.I. 1716] and (ii) one representative from United Healthcare for its Medicare, Medicaid, and fully insured commercial plans and one representative from the Ad Hoc Group of Self-Funded Plans identified in the *Verified Statement of the Ad Hoc Group of Self-Funded Health Plans Pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure* [D.I. 1243].

"***Third-Party Payor Shareholder Direct Settlement***" means the settlement among the Shareholder Payment Parties and Holders of Third-Party Payor Claims that agree to provide the Third-Party Releases and be subject to the injunctions set forth in Sections 10.6(b) and 10.7(b) of the Plan in exchange for the consideration contemplated in the Plan and Master Shareholder Settlement Agreement.

"***Third-Party Released Claims***" means any Causes of Action released pursuant to Sections 10.6(b) and 10.7(b) of the Plan, as applicable.

"***Third-Party Releases***" means the releases provided for in Sections 10.6(b) and 10.7(b) of the Plan.

"***Third Public Schools Distribution***" has the meaning set forth in Section 5.2(f)(ii) of the Plan.

"***Total Direct Settlement Amount***" has the meaning set forth in the Governmental Entity Shareholder Direct Settlement Agreement.

"***TPP Direct Claim Settlement Retained Payment Amount***" means the portion of the Maximum TPP Shareholder Direct Settlement Amount allocable to Holders of Direct Settlement Eligible TPP Claims that are Non-Settling Creditors (if any) pursuant to the TPP TDP, and which amount shall be retained by the Shareholder Payment Parties.

"***TPP LRP Escrow Account***" means an escrow account to be established, maintained and administered by the Creditor Trustee for the PI Trust and into which the Creditor Trustee for the PI Trust shall deposit a portion of the funds received by the PI Trust pursuant to the Plan, in accordance with and subject to the terms of the LRP Agreement.

"***TPP TDP***" means the trust distribution procedures to be implemented by the TPP Trust setting forth the procedures for Distributions from the TPP Trust, the terms of which shall be consistent with Articles I through XII of the Plan and otherwise acceptable to the Debtors and the Third-Party Payor Group and reasonably acceptable to the Creditors' Committee and the Governmental Consent Parties, and which shall be filed by the Debtors with the Plan Supplement.

"***TPP Trust***" means a trust to be established in accordance with Section 5.8 of the Plan to (i) assume all liability for the Third-Party Payor Channeled Claims, (ii) hold the MDT TPP Claim and collect the Initial TPP Trust Distribution and additional payments due under the MDT TPP Claim in accordance with the Private Entity Settlements and the TPP Trust Documents, (iii) administer Third-Party Payor Channeled Claims, (iv) hold and administer the Class 8 Non-Participating Claims Reserve on and after the Effective Date, (v) hold the Class 8 Released Claims Reserve on and after the Effective Date, (vi) make Distributions in accordance with the TPP Trust Documents, and (vii) carry out such other matters as are set forth in the TPP TDP.

"***TPP Trust Agreement***" means the trust agreement establishing and delineating the terms and conditions for the creation and operation of the TPP Trust, the terms of which shall be consistent with Articles I through XII of the Plan and otherwise acceptable to the Debtors and the Third-Party Payor Group and reasonably acceptable to the Creditors' Committee and the Governmental Consent Parties, and which shall be filed by the Debtors with the Plan Supplement.

"***TPP Trust Documents***" means the TPP Trust Agreement and the TPP TDP.

"***Transferred Debtor***" means a Debtor that is acquired directly or indirectly by NewCo pursuant to the NewCo Transfer Agreement. For the avoidance of doubt, PPLP shall not be a Transferred Debtor.

"***Treasury Regulations***" means the regulations promulgated from time to time under the IRC.

"***Tribal Shareholder Direct Settlement***" means the settlement set forth in the Tribal Shareholder Direct Settlement Agreement.

"***Tribal Shareholder Direct Settlement Agreement***" means the settlement agreement which shall be filed by the Debtors with the Plan Supplement.

"***Tribe***" means any American Indian or Alaska Native Tribe, band, nation, pueblo, village or community, that the U.S. Secretary of the Interior acknowledges as an Indian Tribe, as provided in the Federally Recognized Tribe List Act of 1994, 25 U.S.C. § 5130, and as periodically listed by the U.S. Secretary of the Interior in the Federal Register pursuant to 25 U.S.C. § 5131; and any "Tribal Organization" as provided in the Indian Self-Determination and Education Assistance Act of 1975, as amended, 25 U.S.C. § 5304(l).

"***Tribe Channeled Claim***" means (i) any Tribe Claim or (ii) any Claim held by a Tribe that is released pursuant to the Tribal Shareholder Direct Settlement Agreement. Tribe Channeled Claims shall be channeled to the Tribe Trust in accordance with the Plan and Master TDP.

"***Tribe Claim***" means any Claim against any Debtor that is held by a Tribe (including any Claim based on the subrogation rights of a Tribe that is not an Other Subordinated Claim), in its capacity as such. For the avoidance of doubt, claims of Tribes against Holders of PI Claims or Distributions payable to Holders of PI Claims, to the extent such claims exist, are not claims against any Debtor and therefore are not included in this definition of "Tribe Claims."

50

"***Tribe TDP***" means the trust distribution procedures to be implemented by the Tribe Trust setting forth the procedures for Distributions from the Tribe Trust, the terms of which shall be consistent with Articles I through XII of the Plan and otherwise acceptable to the Debtors and the Native American Tribe Group and reasonably acceptable to the Creditors' Committee and the Governmental Consent Parties, and which shall be filed by the Debtors with the Plan Supplement.

"***Tribe Trust***" means one or more trusts, limited liability companies or other Persons to be established in accordance with Section 5.8 of the Plan to (i) assume all liability for the Tribe Channeled Claims, (ii) hold the MDT Tribe Interest and collect the Initial Tribe Trust Distribution and the other Public Creditor Trust Distributions received in accordance with the Public Entity Settlements, (iii) administer Tribe Channeled Claims, (iv) hold and administer the Class 5 Non-Participating Claims Reserves on and after the Effective Date, (v) hold the Class 5 Released Claims Reserve on and after the Effective Date and (vi) make Distributions in accordance with the Tribe TDP.

"***Tribe Trust Agreement***" means the trust agreement and any limited liability company agreement or similar governing document establishing and delineating the terms and conditions for the creation and operation of the Tribe Trust, the terms of which shall be consistent with Articles I through XII of the Plan and otherwise acceptable to the Debtors and the Native American Tribe Group and reasonably acceptable to the Creditors' Committee and the Governmental Consent Parties, and which shall be filed by the Debtors with the Plan Supplement.

"***Tribe Trust Documents***" means the Tribe Trust Agreement and the Tribe TDP.

"***Twelfth Amended Plan***" means the *Twelfth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 3726].

"***U.S. Trustee***" means the United States Trustee for Region 2.

"***Unimpaired***" means, with respect to any Claim, Interest, or Class of Claims or Interests, not "impaired" within the meaning of such term in section 1124 of the Bankruptcy Code.

"***United States***" means the United States of America, its agencies, departments or agents.

["***United States-PI Claimant Medical Expense Claim***" means any healthcare-related claim, Cause of Action or Lien (including a subrogation claim or reimbursement claim), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, choate or inchoate, (i) against a Holder of a PI Claim or the recoveries of a Holder of a PI Claim pursuant to the PI TDP or under the Plan, (ii) held by any of the following federal governmental agencies or federal health insurance programs: the United States Department of Health and Human Services, on its own behalf and on behalf of its component agencies, which are the Centers for Medicare & Medicaid Services and the Indian Health Service on behalf of its federally-operated programs; the TRICARE Program; and the United States Department of Veterans Affairs, and (iii) on account of opioid injury-related conditional payments made by such programs or agencies to, on behalf of, or in respect of, such Holders of PI Claims. [The United States-PI Claimant Medical Expense Claim Settlement does not apply to any claims brought by programs operated by tribes or tribal organizations under the Indian Self-Determination and Education Assistance Act, 25 U.S.C. §§ 5301–5423, or programs operated by urban Indian organizations that have a grant or contract with the Indian Health Service under the Indian Health Care Improvement Act, 25 U.S.C. §§ 1601–1685.]

["***United States-PI Claimant Medical Expense Claim Releases***" means the releases provided for in Section 5.2(i)(ii) of the Plan.]

["***United States-PI Claimant Medical Expense Claim Settlement***" means the settlement provided for in Section 5.2(i) of the Plan.]

"***Voting Deadline***" means the last day for Holders of Claims and Interests entitled to vote on the Plan to cast their votes to accept or reject the Plan as may be set by the Bankruptcy Court.

"***Voting Representative***" means a Firm representing Holders of Claims in any of the Master Ballot Classes who has returned a properly completed Solicitation Directive (as such terms are defined in the Solicitation Procedures Order).

"***Wind-Up Reserve***" means a reserve to be established to pay any and all costs, expenses, fees, taxes, debts, or obligations incurred from the operation and administration of the Debtors' Estates after the Effective Date (including professional fees and expenses). The Wind-Up Reserve shall be (i) funded with Effective Date Cash in an amount determined by the Debtors but not to exceed $10 million, or such greater amount subject to the consent (not to be unreasonably withheld) of the NewCo Managers and the MDT Trustees; *provided* further that if the NewCo Managers or the MDT Trustees withhold such consent, the Plan Administration Trustee shall have the right to seek relief from the Bankruptcy Court, which shall be granted upon the Bankruptcy Court's determination that such budgeted expenditures are appropriate and otherwise within the scope for which the Wind-Up Reserve was established pursuant to the Plan; and (ii) held by the Plan Administration Trust in a segregated account and administered by the Plan Administration Trustee on and after the Effective Date.

## 1.2    *Interpretation; Application of Definitions; Rules of Construction*.

Unless otherwise specified, all section or exhibit references in the Plan are to the respective section in, or exhibit to, this Plan, as the same may be amended, waived, or modified from time to time in accordance with the terms hereof. The words "herein," "hereof," or "hereunder," and other words of similar import refer to this Plan as a whole and not to any particular section, subsection, or clause contained therein and have the same meaning as "in the Plan," "of the Plan," and "under the Plan," respectively. The words "includes" and "including" are not limiting. The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof. For purposes herein: (a) in the appropriate context, each term, whether stated in the singular or plural, shall include both the singular and plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the reference document shall be substantially in that form or substantially on those terms and conditions; (c) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (d) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

## 1.3    *Reference to Monetary Figures.*

All references in this Plan to monetary figures shall refer to the legal tender of the United States of America unless otherwise expressly provided.

## 1.4    *Controlling Document.*

(a)    **Plan Supplements**. In the event of an inconsistency between Articles I through XII of the Plan and the Plan Supplement, the terms of Articles I through XII of the Plan shall control, except that in the event of an inconsistency between Articles I through XII of the Plan and the Master Shareholder Settlement Agreement (or any agreements ancillary to the Master Shareholder

Settlement Agreement (other than any Direct Claims Shareholder Settlement Agreement)), the Master Shareholder Settlement Agreement (or such ancillary agreement) shall control.

(b) **Direct Claims Shareholder Settlement Agreements**. In the event of an inconsistency between Articles I through XII of the Plan and any Direct Claims Shareholder Settlement Agreement (or any agreement ancillary to such Direct Claims Shareholder Settlement Agreement (other than the Master Shareholder Settlement Agreement)), (i) the terms of Articles I through XII of the Plan shall control with respect to any matter affecting, or a dispute involving, a party that is not a Party to or otherwise bound by the applicable Direct Claims Shareholder Settlement Agreement, and (ii) such Direct Claims Shareholder Settlement Agreement (or such ancillary agreement) shall control with respect to all other matters. No Direct Claims Shareholder Settlement Agreement may be enforced against any Person not party to or otherwise bound by such Direct Claims Shareholder Settlement Agreement; *provided*, that in no event will any Direct Claims Shareholder Settlement Agreement (or any agreement ancillary to such Direct Claims Shareholder Settlement Agreement) release or otherwise impact any Released Claim or Shareholder Released Claim of a type contemplated under the Plan pursuant to the applicable Shareholder Release Consent Mechanism to be governed by any other Direct Claims Shareholder Settlement Agreement or the Plan.

(c) **Other Documents**. Subject to Section 1.4(a) and 1.4(b), in the event of an inconsistency between this Plan and any other instrument or document created or executed pursuant to this Plan, or between this Plan and the Disclosure Statement, this Plan shall control.

(d) **Plan and Confirmation Order**. The provisions of this Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effectuate the purposes of each; *provided*, *however*, that, if there is determined to be any inconsistency between any provision of this Plan and any provision of the Confirmation Order that cannot be reconciled, then, the provisions of the Confirmation Order shall govern, and any such provisions of the Confirmation Order shall be deemed a modification of this Plan solely to the extent of such inconsistency.

(e) **Determinations**. The determination of whether there is any inconsistency between any of the documents referred to in the foregoing Sections 1.4(a)-(d) will be made by the Bankruptcy Court in all instances.

## 1.5 Consent Rights.

For the avoidance of doubt and notwithstanding anything herein to the contrary, nothing in this Plan shall in any way eliminate, impair, or limit any consent or similar rights provided in favor of the Sackler Parties' Representative or any Shareholder Released Party in the Master Shareholder Settlement Agreement or any Shareholder Direct Settlement Agreement, including any such rights in respect of Definitive Documents (notwithstanding whether any such rights are provided in favor of the Sackler Parties' Representative or any Shareholder Released Party in this Plan).

## ARTICLE II    ADMINISTRATIVE CLAIMS, PROFESSIONAL FEE CLAIMS, PRIORITY TAX CLAIMS AND DOJ FORFEITURE JUDGMENT CLAIM.

### 2.1 *Administrative Claims.*

(a) **Generally**. Except as provided for herein or in any order of the Bankruptcy Court, and subject to section 503(b)(1)(D) of the Bankruptcy Code, Holders of Administrative Claims (other than Professional Fee Claims and the DOJ Forfeiture Judgment Claim) must file and serve on the Debtors requests for the payment of such Administrative Claims not already Allowed by a Final Order. Any Holder of an Administrative Claim that is required to, but does not, file and serve a request for payment

of such Administrative Claim pursuant to the procedures specified in the Confirmation Order shall be forever barred, estopped and enjoined from asserting such Claims against the Debtors, the Liquidating Debtors, the Transferred Debtors, the Plan Administration Trust or their respective Assets or properties, and such Claims shall be deemed discharged as of the Effective Date. An Administrative Claim, with respect to which a request for payment has been properly and timely filed pursuant to this Section 2.1(a), shall become an Allowed Administrative Claim if no objection to such request is filed by the Debtors or the Plan Administration Trustee with the Bankruptcy Court on or before the date that is one hundred twenty (120) days after the Effective Date, or such later date as may be fixed by the Bankruptcy Court. If an objection is timely filed, such Administrative Claim shall become an Allowed Administrative Claim only to the extent Allowed by Final Order or such Claim is settled, compromised or otherwise resolved pursuant to Section 7.6 of the Plan. Except to the extent a Holder of an Allowed Administrative Claim and the Debtor against which such Claim is asserted agree to different treatment, each Holder of an Allowed Administrative Claim (other than a Professional Fee Claim or the DOJ Forfeiture Judgment Claim) shall receive, on account of such Allowed Claim, Cash in an amount equal to the Allowed amount of such Claim from the Priority Claims Reserve within thirty (30) days following the later to occur of (i) the Effective Date and (ii) the date on which such Administrative Claim shall become an Allowed Claim; *provided* that any Administrative Claim that is an Assumed Liability shall be paid by NewCo in the ordinary course of business.

(b)    **Professional Fee Claims**. All Professional Persons seeking awards by the Bankruptcy Court for compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under (x) section 327, 328, 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), 503(b)(5) or 1103 of the Bankruptcy Code, (y) with respect to the Ad Hoc Committee, the AHC Reimbursement Agreement Assumption Order, or (z) with respect to the MSGE Group, the MSGE Group Reimbursement Order, shall (i) file, on or before the date that is forty-five (45) days after the Effective Date, or as soon as reasonably practicable thereafter, their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred and (ii) be paid in full in Cash, (A) *first*, from any existing amounts held by a Professional Person as a fee advance, retainer, or security that such Professional Person is authorized to use to satisfy Allowed Professional Fee Claims pursuant to the Interim Compensation Order or the order of the Bankruptcy Court authorizing the retention of such Professional Person (other than a reasonable retainer to cover post-Effective Date work), and (B) *second*, from the Professional Fee Escrow Account, in such aggregate amounts as are Allowed by the Bankruptcy Court or authorized to be paid in accordance with the order(s) relating to or allowing any such Professional Fee Claim. On or prior to the Effective Date, the Debtors shall establish the Professional Fee Escrow Account and, on the Effective Date, fund the Professional Fee Escrow Account with Cash such that the total amount held in the Professional Fee Escrow Account is equal to the sum of each Professional Person's good-faith estimates of its Professional Fee Claims. The procedures for filing objections to Professional Persons' applications for final allowance of compensation for services rendered and expenses incurred shall be set forth in the Confirmation Order.

## 2.2    _Priority Tax Claims_.

Except to the extent a Holder of an Allowed Priority Tax Claim and the Debtor against which such Claim is asserted agree to different treatment, on the Effective Date or as soon as reasonably practicable thereafter, each Holder of an Allowed Priority Tax Claim shall receive, on account of such Allowed Priority Tax Claim, either Cash in an amount equal to the Allowed amount of such Claim from the Priority Claims Reserve or such other treatment as may satisfy section 1129(a)(9) of the Bankruptcy Code.

2.3     _DOJ Forfeiture Judgment Claim._

(a)     Allowance: Pursuant to the Plea Agreement and the DOJ 9019 Order, the DOJ Forfeiture Judgment Claim shall be Allowed in the amount of $2.0 billion on the later of (i) the DOJ Conviction Judgment Date and (ii) the entry by the Bankruptcy Court of the Confirmation Order.

(b)     Treatment: In full and final satisfaction, settlement, release and discharge of the DOJ Forfeiture Judgment Claim, the Debtors shall make the DOJ Forfeiture Payment within three (3) Business Days following the DOJ Conviction Judgment Date, which DOJ Forfeiture Payment, in combination with the DOJ Forfeiture Judgment Credit, shall satisfy and discharge the DOJ Forfeiture Judgment Claim in full.

## ARTICLE III  CLASSIFICATION OF CLAIMS AND INTERESTS.

3.1     _Classification in General._

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation and Distributions under this Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or Interest is classified in a particular Class for the purpose of receiving Distributions pursuant to this Plan only to the extent such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent any portion of the Claim or Interest qualifies within the description of such other Classes; _provided_ that, to the extent any Claim satisfies the definition of a Shareholder Claim, a Co-Defendant Claim or an Other Subordinated Claim, such Claim shall be classified as such, notwithstanding that such Claim may satisfy the definition of another type of Claim. A Claim or Interest is also classified in a particular Class for the purpose of receiving Distributions hereunder only to the extent such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been satisfied, released or otherwise settled prior to the Effective Date. In no event shall any Holder of an Allowed Claim be entitled to receive payments under this Plan that, in the aggregate, exceed the Allowed amount of such Holder's Claim.

3.2     _Summary of Classification of Claims and Interests._

The following table designates the Classes of Claims against and Interests in the Debtors and specifies which Classes are (a) Impaired or Unimpaired under this Plan, (b) entitled to vote to accept or reject this Plan in accordance with section 1126 of the Bankruptcy Code or presumed to accept or deemed to reject this Plan:

| Class | Type of Claim or Interest | Impairment | Entitled to Vote |
|-------|---------------------------|------------|------------------|
| Class 1 | Secured Claims | Unimpaired | No (Presumed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | No (Presumed to Accept) |
| Class 3 | Federal Government Unsecured Claims | Impaired | Yes |
| Class 4 | Non-Federal Domestic Governmental Claims | Impaired | Yes |
| Class 5 | Tribe Claims | Impaired | Yes |
| Class 6 | Public School Claims | Impaired | Yes |
| Class 7 | Hospital Claims | Impaired | Yes |

| Class 8 | Third-Party Payor Claims | Impaired | Yes |
|---|---|---|---|
| Class 9 | ER Physician Claims | Impaired | Yes |
| Class 10(a) | NAS PI Claims | Impaired | Yes |
| Class 10(b) | Non-NAS PI Claims | Impaired | Yes |
| Class 11(a) | Avrio General Unsecured Claims | Unimpaired | No (Presumed to Accept) |
| Class 11(b) | Adlon General Unsecured Claims | Unimpaired | No (Presumed to Accept) |
| Class 11(c) | Other General Unsecured Claims | Impaired | Yes |
| Class 12 | Intercompany Claims | Unimpaired or Impaired | No (Presumed to Accept or Deemed to Reject) |
| Class 13 | Shareholder Claims | Impaired | No (Deemed to Reject) |
| Class 14 | Co-Defendant Claims | Impaired | No (Deemed to Reject) |
| Class 15 | Other Subordinated Claims | Impaired | No (Deemed to Reject) |
| Class 16 | PPLP Interests | Impaired | No (Deemed to Reject) |
| Class 17 | PPI Interests | Impaired | No (Deemed to Reject) |
| Class 18 | Intercompany Interests | Unimpaired or Impaired | No (Presumed to Accept or Deemed to Reject) |

### 3.3 *Voting Classes; Presumed Acceptance by Non-Voting Classes.*

With respect to each Debtor, if a Class contains Claims eligible to vote and no Holder of Claims eligible to vote in such Class votes to accept or reject this Plan by the Voting Deadline, this Plan shall be presumed accepted by the Holders of Claims in such Class.

### 3.4 *Voting; Presumptions; Solicitation.*

(a) **Acceptance by Certain Impaired Classes**. Only Holders of Claims in Classes 3, 4, 5, 6, 7, 8, 9, 10(a), 10(b) and 11(c) are entitled to vote to accept or reject this Plan. An Impaired Class of Claims shall have accepted this Plan if (i) the Holders, including Holders acting through a Voting Representative, of at least two-thirds (2/3) in amount of Claims actually voting in such Class have voted to accept this Plan and (ii) the Holders, including Holders acting through a Voting Representative, of more than one-half (1/2) in number of Claims actually voting in such Class have voted to accept this Plan. Holders of Claims in Classes 3, 4, 5, 6, 7, 8, 9, 10(a), 10(b) and 11(c) (or, if applicable, the Voting Representatives of such Holders) shall receive ballots containing detailed voting instructions. For the avoidance of doubt, pursuant to and except as otherwise provided in the Solicitation Procedures Order, each Claim in Classes 4, 5, 6, 7, 8, 9, 10(a) and 10(b) shall be accorded one (1) vote and valued at one dollar ($1.00) for voting purposes only, and not for purposes of Allowance or distribution, such that each of Classes 4, 5, 6, 7, 8, 9, 10(a) and 10(b) shall be deemed to have accepted this Plan if the Holders, including Holders acting through a Voting Representative, of at least two-third (2/3) in number of Claims actually voting in such Class have voted to accept the Plan.

(b)     **Deemed Acceptance by Unimpaired Classes**. Holders of Claims in Classes 1, 2, 11(a) and 11(b) are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Accordingly, such Holders are not entitled to vote to accept or reject this Plan.

(c)     **Deemed Rejection by Certain Impaired Classes**. Holders of Claims and Interests in Classes 13, 14, 15, 16, and 17 are deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code. Accordingly, such Holders are not entitled to vote to accept or reject this Plan.

(d)     **Deemed Acceptance or Rejection by Certain Classes**. Holders of Interests in Classes 12 and 18 are either conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code or are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Accordingly, such Holders are not entitled to vote to accept or reject the Plan.

(e)     **Individual Creditor Voting Rights**. Notwithstanding anything to the contrary in this Plan, the voting rights of Holders of Claims in any Class shall be governed in all respects by the Solicitation Procedures Order, including without limitation with respect to the amount of such Claims for voting purposes.

### 3.5     *Cramdown.*

If any Class of Claims is deemed to reject this Plan or is entitled to vote on this Plan and does not vote to accept this Plan, the Debtors may (a) seek confirmation of this Plan under section 1129(b) of the Bankruptcy Code and/or (b) amend or modify this Plan in accordance with the terms hereof and the Bankruptcy Code. If a controversy arises as to whether any Claim or Interest, or any Class of Claims or Interests, is Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

### 3.6     *No Waiver.*

Nothing contained in this Plan shall be construed to waive a Debtor's or other Person's right to object on any basis to any Claim.

## ARTICLE IV   TREATMENT OF CLAIMS AND INTERESTS.

### 4.1     *Secured Claims (Class 1).*

(a)     Treatment: Except to the extent a Holder of an Allowed Secured Claim and the Debtor against which such Claim is asserted agree to different treatment, on the Effective Date, or as soon as reasonably practicable thereafter, each Holder of an Allowed Secured Claim shall receive, on account of such Allowed Claim, (i) payment in full in Cash from the Priority Claims Reserve in accordance with section 506(a) of the Bankruptcy Code, (ii) Reinstatement of such Allowed Claim pursuant to section 1124 of the Bankruptcy Code or (iii) such other treatment as may be necessary to render such Claim Unimpaired.

(b)     Impairment and Voting: Secured Claims are Unimpaired. Holders of Secured Claims are conclusively presumed to accept this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Secured Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Secured Claims.

### 4.2    *Other Priority Claims (Class 2).*

(a)    <u>Treatment</u>: Except to the extent a Holder of an Allowed Other Priority Claim and the Debtor against which such Claim is asserted agree to different treatment, on the Effective Date, or as soon as reasonably practicable thereafter, each Holder of an Allowed Other Priority Claim shall receive, on account of such Allowed Claim, (i) payment in full in Cash from the Priority Claims Reserve or (ii) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

(b)    <u>Impairment and Voting</u>: Other Priority Claims are Unimpaired. Holders of Other Priority Claims are conclusively presumed to accept this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Other Priority Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Other Priority Claims.

### 4.3    *Federal Government Unsecured Claims (Class 3).*

(a)    <u>Allowance of the DOJ Civil Claim and DOJ Criminal Fine Claim</u>: Pursuant to the DOJ 9019 Order, the DOJ Civil Claim is Allowed in the amount of $2.8 billion. The DOJ Criminal Fine Claim shall be Allowed in the amount of $3.544 billion on the later of (i) the DOJ Conviction Judgment Date and (ii) the entry by the Bankruptcy Court of the Confirmation Order.

(b)    <u>Treatment</u>: On the Effective Date, in full and final satisfaction, settlement and release of the Allowed Federal Government Unsecured Claims, the United States shall receive (i) the Initial Federal Government Distribution and (ii) the MDT Federal Government Claim. The MDT Federal Government Claim shall be payable by the Master Disbursement Trust in the following installments: (x) $10 million on the second Scheduled MDT Distribution Date, (y) $10 million on the third Scheduled MDT Distribution Date and (z) $5 million on the fourth Scheduled MDT Distribution Date. The Initial Federal Government Distribution and the amounts paid to the United States on account of the MDT Federal Government Claim shall be deemed applied 60% to the DOJ Unsecured Claims and 40% to the Other Federal Agency Claims.

(c)    <u>Impairment and Voting</u>: The Federal Government Unsecured Claims are Impaired. Holders of Federal Government Unsecured Claims are entitled to vote to accept or reject the Plan.

### 4.4    *Non-Federal Domestic Governmental Claims (Class 4).*

(a)    <u>Treatment</u>: On the Effective Date, in full and final satisfaction, settlement and release of the Debtors' obligations in respect of Non-Federal Domestic Governmental Claims, the Governmental Remediation Trust shall receive (i) the Initial Governmental Remediation Trust Distribution, (ii) the MDT Governmental Remediation Trust Interest and (iii) the right to receive 96.7% of the Governmental NewCo Distributable Cash pursuant to Section 5.4(e) of the Plan.

(b)    <u>Channeling</u>: As of the Effective Date, in accordance with the Plan and the Master TDP, any and all liability of the Debtors and the other Protected Parties for any and all Non-Federal Domestic Governmental Channeled Claims shall automatically, and without further act, deed or court order, be channeled exclusively to and assumed by the Governmental Remediation Trust and shall be exclusively satisfied by payments from the Governmental Remediation Trust. Each Non-Federal Domestic Governmental Channeled Claim shall be asserted exclusively against the Governmental Remediation Trust and resolved solely in accordance with the terms, provisions and procedures of the Governmental Remediation Trust Agreement. The sole recourse of any Person on account of any Non-Federal Domestic Governmental Channeled Claim, whether or not the Holder thereof participated in the Chapter 11 Cases and whether or not such Holder filed a Proof of Claim in the Chapter 11 Cases, shall be to the Governmental Remediation Trust as and to the extent provided in the Governmental Remediation Trust Agreement.

Subject to Section 10.8(c), Holders of Non-Federal Domestic Governmental Channeled Claims are enjoined from asserting against any Debtor or other Protected Party any Channeled Claim, and may not proceed in any manner against any Debtor or other Protected Party on account of any Channeled Claim in any forum whatsoever, including any state, federal or non-U.S. court or administrative or arbitral forum, and are required to pursue Non-Federal Domestic Governmental Channeled Claims exclusively against the Governmental Remediation Trust.

(c)    Impairment and Voting: Non-Federal Domestic Governmental Claims are Impaired. Holders of Non-Federal Domestic Governmental Claims are entitled to vote to accept or reject the Plan.

### 4.5    *Tribe Claims (Class 5).*

(a)    Treatment: On the Effective Date, in full and final satisfaction, settlement and release of the Debtors' obligations in respect of Tribe Claims, the Tribe Trust shall receive (i) the Initial Tribe Trust Distribution, (ii) the MDT Tribe Interest and (iii) the right to receive 3.3% of the Governmental NewCo Distributable Cash pursuant to Section 5.4(e) of the Plan.

(b)    Channeling: As of the Effective Date, in accordance with the Plan and the Master TDP, any and all liability of the Debtors and the other Protected Parties for any and all Tribe Channeled Claims shall automatically, and without further act, deed or court order, be channeled exclusively to and assumed by the Tribe Trust and shall be exclusively satisfied by payments from the Tribe Trust. Each Tribe Channeled Claim shall be asserted exclusively against the Tribe Trust and resolved solely in accordance with the terms, provisions and procedures of the Tribe TDP. The sole recourse of any Person on account of any Tribe Channeled Claim, whether or not the Holder thereof participated in the Chapter 11 Cases and whether or not such Holder filed a Proof of Claim in the Chapter 11 Cases, shall be to the Tribe Trust as and to the extent provided in the Tribe TDP. Subject to Section 10.8(c), Holders of Tribe Channeled Claims are enjoined from asserting against any Debtor or other Protected Party any Channeled Claim, and may not proceed in any manner against any Debtor or other Protected Party on account of any Channeled Claim in any forum whatsoever, including any state, federal or non-U.S. court or administrative or arbitral forum, and are required to pursue Tribe Channeled Claims exclusively against the Tribe Trust, solely as and to the extent provided in the Tribe TDP.

(c)    Impairment and Voting: Tribe Claims are Impaired. Holders of Tribe Claims are entitled to vote to accept or reject the Plan.

### 4.6    *Public School Claims (Class 6).*

(a)    Treatment: On the Effective Date, in full and final satisfaction, settlement and release of the Debtors' obligations in respect of Public School Claims, the Public School Trust shall receive (i) the Initial Public Schools Distribution and (ii) the MDT Public School Districts Claim; *provided* that if, as of the Effective Date, the Public School District Shareholder Direct Settlement has not been consummated, the Shareholder Direct Settlement Portion of the Initial Public Schools Distribution will be deposited into a third-party interest bearing escrow in accordance with the Master Shareholder Settlement Agreement on the Effective Date and distributed in accordance with Section 5.2(e)(i) of the Plan.

(b)    Channeling: As of the Effective Date, in accordance with the Plan and the Master TDP, any and all liability of the Debtors and the other Protected Parties for any and all Public School Channeled Claims shall automatically, and without further act, deed or court order, be channeled exclusively to and assumed by the Public School Trust and shall be exclusively satisfied by payments from the Public School Trust. Each Public School Channeled Claim shall be asserted exclusively against the Public School Trust and resolved solely in accordance with the terms, provisions and procedures of the

Public School TDP. The sole recourse of any Person on account of any Public School Channeled Claim, whether or not the Holder thereof participated in the Chapter 11 Cases and whether or not such Holder filed a Proof of Claim in the Chapter 11 Cases, shall be to the Public School Trust as and to the extent provided in the Public School TDP. Subject to Section 10.8(c), Holders of Public School Channeled Claims are enjoined from asserting against any Debtor or other Protected Party any Channeled Claim, and may not proceed in any manner against any Debtor or other Protected Party on account of any Channeled Claim in any forum whatsoever, including any state, federal or non-U.S. court or administrative or arbitral forum, and are required to pursue Public School Channeled Claims exclusively against the Public School Trust, solely as and to the extent provided in the Public School TDP.

(c)    Impairment and Voting: Public School Claims are Impaired. Holders of Public School Claims are entitled to vote to accept or reject the Plan.

### 4.7    *Hospital Claims (Class 7).*

(a)    Treatment: On the Effective Date, in full and final satisfaction, settlement and release of the Debtors' obligations in respect of Hospital Claims, the Hospital Trust shall receive (i) the Initial Hospital Trust Distribution and (ii) the MDT Hospital Claim; *provided* that if, as of the Effective Date, the Hospital Shareholder Direct Settlement has not been consummated, the Shareholder Direct Settlement Portion of the Shareholder Direct Settlement Portion of the Initial Hospital Trust Distribution will be deposited into a third-party interest bearing escrow in accordance with the Master Shareholder Settlement Agreement on the Effective Date and distributed in accordance with Section 5.2(e)(i) of the Plan.

(b)    Channeling: As of the Effective Date, in accordance with the Plan and the Master TDP, any and all liability of the Debtors and the other Protected Parties for any and all Hospital Channeled Claims shall automatically, and without further act, deed or court order, be channeled exclusively to and assumed by the Hospital Trust and shall be exclusively satisfied by payments from the Hospital Trust. Each Hospital Channeled Claim shall be asserted exclusively against the Hospital Trust and resolved solely in accordance with the terms, provisions and procedures of the Hospital TDP. The sole recourse of any Person on account of any Hospital Channeled Claim, whether or not the Holder thereof participated in the Chapter 11 Cases and whether or not such Holder filed a Proof of Claim in the Chapter 11 Cases, shall be to the Hospital Trust as and to the extent provided in the Hospital TDP. Subject to Section 10.8(c), Holders of Hospital Channeled Claims are enjoined from asserting against any Debtor or other Protected Party any Channeled Claim, and may not proceed in any manner against any Debtor or other Protected Party on account of any Channeled Claim in any forum whatsoever, including any state, federal or non-U.S. court or administrative or arbitral forum, and are required to pursue Hospital Channeled Claims exclusively against the Hospital Trust, solely as and to the extent provided in the Hospital TDP.

(c)    Impairment and Voting: Hospital Claims are Impaired. Holders of Hospital Claims are entitled to vote to accept or reject the Plan.

### 4.8    *Third-Party Payor Claims (Class 8).*

(a)    Treatment: On the Effective Date, in full and final satisfaction, settlement and release of the Debtors' obligations in respect of Third-Party Payor Claims, the TPP Trust shall receive (i) the Initial TPP Trust Distribution and (ii) the MDT TPP Claim. For the avoidance of doubt, any payments from the TPP LRP Escrow Account to which LRP Participating TPPs may be entitled under the LRP Agreement shall not be subject to this Section 4.8.

(b)    Channeling: As of the Effective Date, in accordance with the Plan and the Master TDP, any and all liability of the Debtors and the other Protected Parties for any and all Third-Party

Payor Channeled Claims shall automatically, and without further act, deed or court order, be channeled exclusively to and assumed by the TPP Trust and shall be exclusively satisfied by payments from the TPP Trust. Each Third-Party Payor Channeled Claim shall be asserted exclusively against the TPP Trust and resolved solely in accordance with the terms, provisions and procedures of the TPP TDP. The sole recourse of any Person on account of any Third-Party Payor Channeled Claim, whether or not the Holder thereof participated in the Chapter 11 Cases and whether or not such Holder filed a Proof of Claim in the Chapter 11 Cases, shall be to the TPP Trust as and to the extent provided in the TPP TDP. Subject to <u>Section 10.8(c)</u>, Holders of Third-Party Payor Channeled Claims are enjoined from asserting against any Debtor or other Protected Party any Channeled Claim, and may not proceed in any manner against any Debtor or other Protected Party on account of any Channeled Claim in any forum whatsoever, including any state, federal or non-U.S. court or administrative or arbitral forum, and are required to pursue Third-Party Payor Channeled Claims exclusively against the TPP Trust, solely as and to the extent provided in the TPP TDP.

(c)     <u>Impairment and Voting</u>: Third-Party Payor Claims are Impaired. Holders of Third-Party Payor Claims are entitled to vote to accept or reject the Plan.

**4.9     *<u>ER Physician Claims (Class 9).</u>***

(a)     <u>Treatment</u>: On the Effective Date, in full and final satisfaction, settlement and release of the Debtors' obligations in respect of ER Physician Claims, the ERP Trust shall receive (i) the Initial ERP Trust Distribution and (ii) the MDT ERP Claim; *provided* that if, as of the Effective Date, the ER Physician Shareholder Direct Settlement has not been consummated, the Initial ERP Trust Distribution will be deposited into a third-party interest bearing escrow in accordance with the Master Shareholder Settlement Agreement on the Effective Date and distributed in accordance with <u>Section 5.2(e)(i)</u> of the Plan.

(b)     <u>Channeling</u>: As of the Effective Date, in accordance with the Plan and the Master TDP, any and all liability of the Debtors and the other Protected Parties for any and all ER Physician Channeled Claims shall automatically, and without further act, deed or court order, be channeled exclusively to and assumed by the ERP Trust and shall be exclusively satisfied by payments from the ERP Trust. Each ER Physician Channeled Claim shall be asserted exclusively against the ERP Trust and resolved solely in accordance with the terms, provisions and procedures of the ERP TDP. The sole recourse of any Person on account of any ER Physician Channeled Claim, whether or not the Holder thereof participated in the Chapter 11 Cases and whether or not such Holder filed a Proof of Claim in the Chapter 11 Cases, shall be to the ERP Trust as and to the extent provided in the ERP TDP. Subject to <u>Section 10.8(c)</u>, Holders of ER Physician Channeled Claims are enjoined from asserting against any Debtor or other Protected Party any ER Physician Channeled Claim, and may not proceed in any manner against any Debtor or other Protected Party on account of any ER Physician Channeled Claim in any forum whatsoever, including any state, federal or non-U.S. court or administrative or arbitral forum, and are required to pursue ER Physician Channeled Claims exclusively against the ERP Trust, solely as and to the extent provided in the ERP TDP.

(c)     <u>Impairment and Voting</u>: ER Physician Claims are Impaired. Holders of ER Physician Claims are entitled to vote to accept or reject the Plan.

**4.10     *<u>PI Claims (Classes 10(a) and 10(b)).</u>***

(a)     <u>PI Trust</u>: On the Effective Date, in full and final satisfaction, settlement and release of the Debtors' obligations in respect of PI Claims, the PI Trust shall receive, subject to <u>Section 5.2(i)</u> of the Plan, (i) the Initial PI Trust Distribution and (ii) the MDT PI Claim.

(b)     <u>NAS PI Claims (Class 10(a))</u>:

(i)      <u>Treatment</u>: The PI Trust shall deposit the NAS PI Portion into the PI Trust NAS Fund in periodic installments as funds are received by the PI Trust. Distributions in respect of NAS PI Channeled Claims shall be exclusively in the form of Distributions from the PI Trust NAS Fund to Holders of Allowed NAS PI Channeled Claims, in accordance with the NAS PI TDP, and shall be subject to the PI Trust Deductions and Holdbacks.

(ii)      <u>Channeling</u>: As of the Effective Date, in accordance with the Plan and the Master TDP, any and all liability of the Debtors and the other Protected Parties for any and all NAS PI Channeled Claims shall automatically, and without further act, deed or court order, be channeled exclusively to and assumed by the PI Trust and shall be exclusively satisfied by payments from the PI Trust. Each NAS PI Channeled Claim shall be asserted exclusively against the PI Trust and resolved solely in accordance with the terms, provisions and procedures of the NAS PI TDP. The sole recourse of any Person on account of any NAS PI Channeled Claim, whether or not the Holder thereof participated in the Chapter 11 Cases and whether or not such Holder filed a Proof of Claim in the Chapter 11 Cases, shall be to the PI Trust NAS Fund as and to the extent provided in the NAS PI TDP. Subject to <u>Section 10.8(c)</u>, Holders of NAS PI Channeled Claims are enjoined from asserting against any Debtor or other Protected Party any Channeled Claim, and may not proceed in any manner against any Debtor or other Protected Party on account of any Channeled Claim in any forum whatsoever, including any state, federal or non-U.S. court or administrative or arbitral forum, and are required to pursue NAS PI Channeled Claims exclusively against the PI Trust, solely as and to the extent provided in the NAS PI TDP.

(iii)      <u>Impairment and Voting</u>: NAS PI Claims are Impaired. Holders of NAS PI Claims are entitled to vote to accept or reject the Plan.

(c)      <u>Non-NAS PI Claims (Class 10(b))</u>.<u>Treatment</u>: The PI Trust shall deposit the Non-NAS PI Portion into the PI Trust Non-NAS Fund in periodic installments as funds are received by the PI Trust. Distributions in respect of Non-NAS PI Channeled Claims shall be exclusively in the form of Distributions from the PI Trust Non-NAS Fund to Holders of Allowed Non-NAS PI Channeled Claims, in accordance with the Non-NAS PI TDP, and shall be subject to the PI Trust Deductions and Holdbacks.

(ii)      <u>Channeling</u>: As of the Effective Date, in accordance with the Plan and the Master TDP, any and all liability of the Debtors and the other Protected Parties for any and all Non-NAS PI Channeled Claims shall automatically, and without further act, deed or court order, be channeled exclusively to and assumed by the PI Trust and shall be exclusively satisfied by payments from the PI Trust. Each Non-NAS PI Channeled Claim shall be asserted exclusively against the PI Trust and resolved solely in accordance with the terms, provisions and procedures of the Non-NAS PI TDP. The sole recourse of any Person on account of any Non-NAS PI Channeled Claim, whether or not the Holder thereof participated

in the Chapter 11 Cases and whether or not such Holder filed a Proof of Claim in the Chapter 11 Cases, shall be to the PI Trust Non-NAS Fund as and to the extent provided in the Non-NAS PI TDP. Subject to Section 10.8(c) of the Plan, Holders of Non-NAS PI Channeled Claims are enjoined from asserting against any Debtor or other Protected Party any Channeled Claim, and may not proceed in any manner against any Debtor or other Protected Party on account of any Channeled Claim in any forum whatsoever, including any state, federal or non-U.S. court or administrative or arbitral forum, and are required to pursue Non-NAS PI Channeled Claims exclusively against the PI Trust, solely as and to the extent provided in the Non-NAS PI TDP.

(iii)   Impairment and Voting: Non-NAS PI Claims are Impaired. Holders of Non-NAS PI Claims are entitled to vote to accept or reject the Plan.

(d)   Canadian Patient Settlement. Pursuant to the Canadian Patient Claim Settlement Stipulation, (i) no Holder of a Settled Canadian Patient Claim that filed a Proof of Claim shall receive a recovery in respect of such Settled Canadian Patient Claim from any source other than the Patient Settlement Payment (as defined in the Canadian Patient Claim Settlement Stipulation) made from the Canadian Patient Settlement Trust and (ii) in order to receive a recovery in respect of any other Claim for which a Proof of Claim was filed by a Holder of a Settled Canadian Patient Claim, such Holder shall have the burden of proving that such Proof of Claim is not in respect of a Settled Canadian Patient Claim that was released and discharged pursuant to the Canadian Patient Claim Settlement Stipulation and such Holder has not received any recovery from the Canadian Patient Settlement Trust on account of such Claim. No Distributions shall be made on account of any Claims that may constitute Settled Canadian Patient Claims unless and until (x) the Saskatchewan Court of Queen's Bench approves the Canadian Patient Settlement Agreement and all funds in the Canadian Patient Settlement Trust have been distributed to Holders of Settled Canadian Patient Claims in accordance with the Canadian Patient Settlement Agreement or (y) the Saskatchewan Court of Queen's Bench denies the Canadian Patient Settlement Agreement. For the avoidance of doubt, nothing in Article X of the Plan shall affect the validity or enforceability of the Canadian Patient Settlement Agreement.

### 4.11   *Avrio General Unsecured Claims (Class 11(a))*.

(a)   Treatment: Except to the extent a Holder of an Allowed Avrio General Unsecured Claim and Avrio Health L.P. agree to different treatment, on the Effective Date, or as soon as reasonably practicable thereafter, each Holder of an Allowed Avrio General Unsecured Claim shall receive, on account of such Allowed Claim, including interest, payment in full in Cash.

(b)   Impairment and Voting: Avrio General Unsecured Claims are Unimpaired. Holders of Avrio General Unsecured Claims are conclusively presumed to accept this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Avrio General Unsecured Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited.

### 4.12   *Adlon General Unsecured Claims (Class 11(b))*.

(a)   Treatment: Except to the extent a Holder of an Allowed Adlon General Unsecured Claim and Adlon Therapeutics L.P. agree to different treatment, on the Effective Date, or as soon as reasonably practicable thereafter, each Holder of an Allowed Adlon General Unsecured Claim shall receive, on account of such Allowed Claim, including interest, payment in full in Cash.

(b)      Impairment and Voting: Adlon General Unsecured Claims are Unimpaired. Holders of Adlon General Unsecured Claims are conclusively presumed to accept this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Adlon General Unsecured Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited.

### 4.13    *Other General Unsecured Claims (Class 11(c)).*

(a)      Treatment: All Other General Unsecured Claims are Disputed. Except to the extent a Holder of an Allowed Other General Unsecured Claim and the Debtor against which such Claim is asserted agree to different treatment, after the Effective Date upon the Allowance of such Claim in accordance with Article VII of the Plan, each Holder of an Allowed Other General Unsecured Claim shall receive, on account of such Allowed Claim, such Holder's Pro Rata Share of the Other General Unsecured Claim Cash, up to payment in full of such Allowed Claim.

(b)      Impairment and Voting: Other General Unsecured Claims are Impaired. Holders of Other General Unsecured Claims are entitled to vote to accept or reject the Plan.

### 4.14    *Intercompany Claims (Class 12).*

(a)      Treatment: Except as otherwise provided in the NewCo Transfer Agreement or the Restructuring Steps Memorandum, on or after the Effective Date, Intercompany Claims shall be (x) in the case of Intercompany Claims held by a Liquidating Debtor against another Liquidating Debtor, at the discretion of the Debtors (or the Plan Administration Trustee, as applicable), (y) in the case of Intercompany Claims held by a Transferred Debtor against another Transferred Debtor, at the discretion of NewCo and (z) otherwise, at the discretion of the Debtors (or the Plan Administration Trustee, as applicable) with the consent (not to be unreasonably withheld, conditioned or delayed) of the Governmental Consent Parties:

(i)      Reinstated; or

(ii)     Compromised and settled or canceled and extinguished with no distribution on account thereof.

(b)      Impairment and Voting: Intercompany Claims are either Unimpaired or Impaired with no distribution on account thereof. Holders of Intercompany Claims are either conclusively presumed to accept this Plan pursuant to section 1126(f) of the Bankruptcy Code or deemed to reject this Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Intercompany Claims.

### 4.15    *Shareholder Claims (Class 13).*

(a)      Treatment: Holders of Shareholder Claims shall not receive or retain any property on account of such Claims. As of the Effective Date, in accordance with the terms of and except as otherwise expressly provided in the Shareholder Settlements, all Shareholder Claims shall automatically, and without further act, deed or court order, be deemed to have been released without any distribution on account thereof, and such Claims shall be of no further force or effect.

(b)      Impairment and Voting: Shareholder Claims are Impaired. Holders of Shareholder Claims are deemed to reject this Plan pursuant to section 1126(g) of the Bankruptcy Code.

Therefore, Holders of Shareholder Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Shareholder Claims.[6]

### 4.16    *Co-Defendant Claims (Class 14).*

(a)    Treatment: In full and final satisfaction and release of each Co-Defendant Claim, the Holder thereof shall (i) not receive or retain any property on account of such Co-Defendant Claim and not have any recourse to any Debtor or any Assets of any Debtor, any Estate or any Assets of any Estate, or any other Protected Party or any Assets of any Protected Party and (ii) retain its Co-Defendant Defensive Rights, which may be exercised solely in accordance with Section 10.18. As of the Effective Date, Co-Defendant Claims shall be deemed expunged, released and extinguished without further action by or order of the Bankruptcy Court, and shall be of no further force or effect. Notwithstanding the release, satisfaction, expungement and extinguishment of Co-Defendant Claims, a Co-Defendant retains its Co-Defendant Defensive Rights, which includes the ability to recover from Persons that are not Protected Parties or from any insurance policies that are not Purdue Insurance Policies or other insurance policies of Protected Parties.

(b)    Impairment and Voting: Co-Defendant Claims are Impaired. Holders of Co-Defendant Claims are deemed to reject this Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Co-Defendant Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Co-Defendant Claims.

### 4.17    *Other Subordinated Claims (Class 15).*

(a)    Treatment: Other Subordinated Claims are subordinated pursuant to the Plan and section 509(c) and/or 510 of the Bankruptcy Code and/or other applicable law. Holders of Other Subordinated Claims shall not receive or retain any property under this Plan on account of such Claims. As of the Effective Date, Other Subordinated Claims shall be deemed expunged, released and extinguished without further action by or order of the Bankruptcy Court, and shall be of no further force or effect.

(b)    Impairment and Voting: Other Subordinated Claims are Impaired. Holders of Other Subordinated Claims are deemed to reject this Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Other Subordinated Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Other Subordinated Claims.

### 4.18    *PPLP Interests (Class 16).*

(a)    Treatment: In accordance with the terms of the Shareholder Settlement Agreements, Holders of PPLP Interests shall relinquish such Interests and shall not receive or retain any property under the Plan on account of such Interests. As of the PPLP Dissolution Date, all PPLP Interests shall be deemed surrendered, canceled and/or redeemed without further action by or order of the Bankruptcy Court, and shall be of no further force or effect.

(b)    Impairment and Voting: PPLP Interests are Impaired. Holders of PPLP Interests are deemed to reject this Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore,

---

[6] Although Holders of Shareholder Claims are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code, the Shareholder Payment Parties, in all capacities (including as Holders of Claims), have agreed to support the Plan pursuant to the Master Shareholder Settlement Agreement.

Holders of PPLP Interests are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such PPLP Interests.

### 4.19    *PPI Interests (Class 17).*

(a)    Treatment: In accordance with the terms of the Shareholder Settlement Agreements, Holders of PPI Interests shall relinquish such Interests and shall not receive or retain any property under this Plan on account of such Interests. As of the Effective Date, PPI Interests shall be deemed surrendered, canceled and/or redeemed without further action by or order of the Bankruptcy Court, and shall be of no further force or effect.

(b)    Impairment and Voting: PPI Interests are Impaired. Holders of PPI Interests are deemed to reject this Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of PPI Interests are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such PPI Interests.

### 4.20    *Intercompany Interests (Class 18).*

(a)    Treatment: Except as otherwise provided in the NewCo Transfer Agreement or the Restructuring Steps Memorandum, on the Effective Date, Intercompany Interests shall be:

(i)    with respect to Intercompany Interests in any Transferred Debtor held by PPLP, Reinstated and transferred to NewCo (or one of its Subsidiaries) in accordance with the NewCo Transfer Agreement;

(ii)    with respect to Intercompany Interests in any Transferred Debtor held by another Transferred Debtor, Reinstated or otherwise treated in accordance with the NewCo Transfer Agreement; and

(iii)    with respect to Intercompany Interests in any Debtor that is not a Transferred Debtor, Reinstated solely for administrative convenience until canceled when such Debtor is dissolved or merged out of existence by the Plan Administration Trustee.

(b)    Impairment and Voting: Intercompany Interests are either Unimpaired or Impaired with no distribution on account thereof. Holders of Intercompany Interests are either conclusively presumed to accept this Plan pursuant to section 1126(f) of the Bankruptcy Code or deemed to reject this Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Intercompany Interests.

### 4.21    *Debtors' Rights with Respect to Unimpaired Claims.*

Except as otherwise provided in this Plan, nothing under the Plan shall affect the rights of the Debtors with respect to an Unimpaired Claim, including all rights with respect to legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

## ARTICLE V    MEANS FOR IMPLEMENTATION.

### 5.1    *Restructuring Transactions*.

On or before the Effective Date or as soon as reasonably practicable thereafter, the Debtors may take all actions consistent with this Plan as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by or necessary to effectuate the Restructuring Transactions under and in connection with this Plan, including (a) the execution and delivery of all appropriate agreements or other documents of merger, consolidation, sale, restructuring, conversion, disposition, transfer, dissolution or liquidation containing terms that are consistent with the Plan; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any Asset, property, interest, right, liability, debt or obligation on terms consistent with the Plan; (c) the filing of appropriate certificates or articles of organization, limited partnership, incorporation, reincorporation, merger, consolidation, conversion or dissolution pursuant to applicable law; (d) the execution, delivery, filing, recordation and issuance of any other documents, instruments or agreements in connection with the Restructuring Transactions; and (e) any transactions described in the Restructuring Steps Memorandum.

### 5.2    *Plan Settlements*.

(a)    As further described in the Disclosure Statement, the provisions of this Plan (including the provisions contained in Section 5.9 of the Plan and the release and injunctive provisions contained in Article X of the Plan), the Shareholder Settlements and the other Plan Documents constitute a good faith compromise and settlement of Claims and controversies among the Debtors, the Supporting Claimants, the Settling Creditors, the Shareholder Payment Parties, certain other participants in the Mediation and other parties in interest reached in connection with the Mediation and otherwise, which such compromise and settlement is necessary and integral to the Plan and the Plan Documents and the success of these Chapter 11 Cases. The Debtors, the Supporting Claimants, the Settling Creditors and the Shareholder Payment Parties believe the treatment provided in respect of Claims against and Interests in the Debtors and the treatment of competing Classes of Claims is fair and appropriate only when combined with the distribution scheme, including without limitation all Distributions to be made under the Plan, and the release, injunction and all other provisions contained in the Plan, all of which are material aspects of the Plan and the terms of the Shareholder Settlements. More than 614,000 Proofs of Claim alleging liability arising out of or in connection with Opioid-Related Activities were filed against the Debtors by the General Bar Date. Approximately 10% of the submitted Proofs of Claim allege a specific amount of liability. The aggregate alleged liability associated with these Proofs of Claim is more than $40 trillion (exclusive of one personal injury claim that asserted $100 trillion in alleged liability). Approximately 90% of Claims alleging liability arising out of or in connection with Opioid-Related Activities do not allege a specific amount of liability. The Debtors believe that any reasonable estimate, projection or valuation of their total liability and obligation to pay for Claims asserted against them, if they had the ability to pay those Claims outside of these Chapter 11 Cases, exceeds by many multiples the total value of all assets of their Estates, including but not limited to contributions from third parties and the full face value of all of Purdue's insurance. The Debtors have structured the Plan on the basis of this understanding, and the Confirmation Order shall include a finding consistent with this understanding.

(b)    The Plan, including the explanation set forth in the Disclosure Statement, and the Plan Documents shall be deemed a motion to approve the Plan Settlements, including the Shareholder Settlements, and the good faith full and final comprehensive compromise and settlement of all of the Claims, Interests and controversies described in the foregoing Section 5.2(a) pursuant to Bankruptcy Rule 9019, and entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Plan Settlements under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a

finding by the Bankruptcy Court that the Plan Settlements are fair, equitable, reasonable and in the best interests of the Debtors and their Estates.

(c)    The Plan, the Plan Settlement, the Plan Documents (including the Creditor Trust Documents), the Shareholder Settlements and the Confirmation Order constitute a good faith full and final comprehensive compromise and settlement of all Claims, Interests and controversies described in the Plan based upon the unique circumstances of these Chapter 11 Cases (such as the total distributable value available, the unique facts and circumstances relating to these Debtors and the need for an accelerated resolution without additional avoidable litigation) such that (i) none of the foregoing documents (including the provisions contained in Section 5.9 of the Plan), nor any materials used in furtherance of Plan confirmation (including, but not limited to, the Disclosure Statement, and any notes related to, and drafts of, such documents and materials), may be offered into evidence, deemed an admission, used as precedent or used by any party or Person in any context whatsoever beyond the purposes of this Plan, in any other litigation or proceeding, except as necessary, and as admissible in such context, to enforce their terms and to evidence the terms of the Plan and the Plan Documents before the Bankruptcy Court or any other court of competent jurisdiction and (ii) any obligation by any party, in furtherance of such compromise and settlement, to not exercise rights that might be otherwise available to such party shall be understood to be an obligation solely in connection with this specific compromise and settlement and to be inapplicable in the absence of such compromise and settlement. The Plan, the Plan Settlement, the Plan Documents and the Confirmation Order will be binding as to the matters and issues described therein, but will not be binding with respect to similar matters or issues that might arise in any other litigation or proceeding in which none of the Debtors or any other Protected Party is a party; *provided* that such litigation or proceeding is not to enforce or evidence the terms of the Plan, the Plan Settlement, the Plan Documents, the Shareholder Settlements or the Confirmation Order. Any Person's support of, or position or action taken in connection with, this Plan, the Plan Settlement, the Plan Documents, the Shareholder Settlements and the Confirmation Order may differ from such Person's position or testimony in any other litigation or proceeding not in connection with these Chapter 11 Cases. Further, and, as all parties to the Mediation agreed, this Plan Settlement is not intended to serve as an example for, or represent the parties' respective positions or views concerning, any other chapter 11 cases relating to opioids, nor shall it be used as precedent by any Person or party in any other such chapter 11 cases or in any other proceeding, situation or litigation.

(d)    The "allocation" of dollars between the Shareholder Direct Settlement Portion of any Distribution and the Estate Distributions is part of an overall compromise and settlement under Bankruptcy Rule 9019 between the Mediation Parties, including the Debtors, the Creditors' Committee, the Shareholder Payment Parties, and all creditors and creditor groups that are Mediation Parties, and upon confirmation of this Plan will be deemed to be a settlement between the Debtors, the Creditors' Committee, the Supporting Claimants and the Shareholder Payment Parties in which, among other things, the Shareholder Payment Parties are providing up to $6.5 billion in consideration over 15 years. The "allocation" is intended by the Shareholder Payment Parties and the other Mediation Parties to, among other things, facilitate the distribution of proceeds for opioid abatement, victim compensation, and other permitted uses under the Plan, and otherwise. All such parties, including but not limited to the Shareholder Payment Parties, Sackler Parties, the Debtors, the Ad Hoc Committee and the States AG Negotiating Group, including each member of such groups, has agreed that neither the settlement amount nor the "allocation" (including any allocation between the Shareholder Payment Party of payment responsibility) reflects any concession or agreement by any party as to the strength, validity, merits, collectability, amount, or otherwise of the Shareholder Released Estate Claims or of the Shareholder Released Direct Claims or any defenses to the Shareholder Released Estate Claims or the Shareholder Released Direct Claims, and if for whatever reason the agreement in principle is not consummated, neither the settlement amount nor the "allocation" shall be cited or used by the Debtors, the Creditors' Committee, the Supporting Claimants or the Shareholder Payment Parties (or the Released Parties) – or any party to the Shareholder Settlements or any other Mediation Party – for any purpose whatsoever in any pleading or

proceeding wherever or whenever.  Further, no party to the compromise and settlement will be bound by this Plan or the agreement set forth in this provision (other than as set forth in this Section 5.2(d)) with regard to what it may state in a pleading, court hearing, proceeding, or otherwise about the strength, validity, merits, collectability, amount, or otherwise of the Shareholder Released Estate Claims or of the Shareholder Released Direct Claims, or any defenses thereto, including, without limitation, in any pleading filed in connection with the Shareholder Settlements and this Plan. This paragraph shall be binding forever upon all parties from the earlier of (i) the time that this agreement in principle is reached and (ii) the time that this Section 5.2(d) is made publicly available (on the Bankruptcy Court docket or otherwise), regardless of whether a settlement including that represented in the Plan is consummated, and shall be specifically enforceable by the Bankruptcy Court (with no cap on damages that may be awarded).[7] This Section 5.2(d) is non-severable from the overall compromise and settlement, and is an integral part of the Plan. This Section 5.2(d) is specifically subject to Federal Rule of Evidence 408 and analogous state provisions barring the use of settlement offers and communications to prove the validity or amount of disputed claim.[8]

(e)    **Private Entity Settlements**.

(i)    On the Effective Date, the Private Creditor Trusts shall receive their respective Initial Private Creditor Trust Distributions and their respective MDT Private Claims; *provided* that with respect to Private Creditor Trusts that are the subject of Opt-Out Class Action Settlements, if, as of the Effective Date, the applicable Opt-Out Class Action Settlement has not been consummated, the Shareholder Direct Settlement Portion of the Initial Private Creditor Trust Distribution  (exclusive of amounts that would constitute Direct Claim Settlement Retained Payment Amounts under the applicable Opt-Out Class Action Settlement, to the extent known) for such Private Creditor Trust shall be placed by the Master Disbursement Trust into a third-party interest bearing escrow in accordance with the Master Shareholder Settlement Agreement (the "**Class Action Escrow Accounts**"). If any such Opt-Out Class Action Settlement is consummated on or prior to the ten (10) month anniversary of the Effective Date, amounts held in the applicable Class Action Escrow Account shall be distributed to the corresponding Private Creditor Trust, other than the applicable Direct Claim Settlement Retained Payment Amounts, if any, which shall be released to the Shareholder Payment Parties. If any Opt-Out Class Action Settlement is not consummated by the (10) month anniversary of the Effective Date, amounts held in the applicable Class Action Escrow Account shall be promptly released to the Shareholder Payment Parties. If such Opt-Out Class Action Settlement is consummated after such release from the Class Action Escrow Account to the Shareholder Payment Parties, each Shareholder Payment Party shall pay to the Master Disbursement Trust such amounts due and payable by it within ten (10) Business Days of delivery to such Shareholder Payment

---

[7] This sentence shall not apply to the States.

[8] While all parties understand that the Plan is not enforceable until confirmation, all Mediation Parties have agreed to be bound by this provision as of March 18, 2025.

Party of notice of such Opt-Out Class Action Settlement having been consummated, pending final payment from the Shareholder Released Parties, and the applicable Private Creditor Trust shall receive the Shareholder Direct Settlement Portion of the applicable Initial Private Creditor Trust Distribution from the Master Disbursement Trust, which shall only be funded from amounts received by it from the Shareholder Payment Parties in accordance with the amounts set forth in the Plan and the applicable Direct Claims Shareholder Settlement Agreement.

(ii)　Notwithstanding anything to the contrary in the Master Shareholder Settlement Agreement or the Governmental Entity Shareholder Direct Settlement Agreement, the Master Disbursement Trust shall have an obligation under this Plan to distribute to the PI Trust, on account of the MDT PI Claim, (A) on a first priority basis, the first $50 million of proceeds, payments, and benefits (including, but not limited to, the MDT Insurance Proceeds) of (I) any MDT Causes of Action (other than those Retained Causes of Action relating to or necessary to enforce the MDT Shareholder Rights) and (II) the MDT Insurance Rights (assets described in clauses (I) and (II), collectively, the "**Subject MDT Assets**"), and (B) in the absence of payment in full of such $50 million prior to the second anniversary of the Effective Date from proceeds, payments, and benefits of the Subject MDT Assets, the remaining unpaid amount thereof (which may be the entire amount) in full in cash on the first Scheduled MDT Distribution Date following such second anniversary of the Effective Date from MDT Transferred Assets or the proceeds thereof other than the Subject MDT Assets on a priority basis in accordance with Section 5.2(g) hereof (the payment obligations described in clauses (A) and  (B), the "**PI Trust Obligation**").[9]

(iii)　Until such time as the PI Trust Obligation has been satisfied in full in accordance with Section 5.2 of the Plan

(A)　the Master Disbursement Trust shall not (I) permit a Lien or other encumbrance to attach to the Subject MDT Assets or (II) incur any Claim (including any Channeled Claim) or otherwise grant any right of payment in respect of the Subject MDT Assets, in each case, senior to the PI Trust Obligation;

(B)　the Master Disbursement Trust shall afford the PI Trustee (or its designated representative) with periodic reporting

---

[9] For the avoidance of doubt, to the extent the PI Trust Obligation has not been paid in full by the second anniversary of the Effective Date in accordance with this Section 5.2(e) of the Plan, the priority of the PI Trust Obligation shall only be second to the funding of the Replenishment Transfer with Cash and cash equivalents that are Shareholder Estate Settlement Distributions, but not, for the avoidance of doubt, second with respect to application of the Total Direct Settlement Amount under the Governmental Entity Shareholder Direct Settlement Agreement.

as contemplated by <u>Section 5.6(f)(v)</u> of the Plan and subject to <u>Section 5.6(f)(iv)</u>;

(C) none of the protections with respect to the PI Trust Obligation in this <u>Section 5.2(e)</u> of the Plan nor the priority afforded to the PI Trust Obligation in <u>Section 5.2(g)</u> of the Plan shall be modified or eliminated from the MDT Agreement, the Master Shareholder Settlement Agreement, or the Governmental Entity Shareholder Direct Settlement Agreement, solely to the extent applicable, without the written consent of the PI Trustee; and

(D) the PI Trustee reserves all legal and equitable rights under the Plan, the Confirmation Order, and federal and common law with respect to the PI Trust Obligation.

(iv) The Master Disbursement Trust shall reserve amounts from the Total Direct Settlement Amount under the Governmental Entity Shareholder Direct Settlement Agreement, as needed, to satisfy the PI Trust Obligation, solely to the extent the PI Trust Obligation has not been paid in full by the [first Scheduled MDT Distribution Date following] second anniversary of the Effective Date in accordance with this <u>Section 5.2(e)</u> of the Plan.

(v) In the event the PI Trust Obligation is not satisfied in full by the [first Scheduled MDT Distribution Date following] second anniversary of the Effective Date in accordance with <u>Section 5.2</u> of the Plan, the PI Trustee shall be entitled to seek enforcement of the PI Trust Obligation by motion to enforce the Plan filed with the Bankruptcy Court, which shall be heard on an expedited basis subject to the Bankruptcy Court's availability, and the PI Trustee may seek legal and/or equitable remedies available under applicable law, including, but not limited to, specific performance, disgorgement, and/or damages against any successor of the Debtors or their Estates, including the Master Disbursement Trust.

(f) **Non-Federal Public Entity Settlements**.

(i) On the Effective Date, the Governmental Remediation Trust and the Tribe Trust shall receive their respective Initial Public Creditor Trust Distributions, and the Governmental Remediation Trust and the Tribe Trust shall receive their respective MDT Interests. The MDT Interests shall entitle the Governmental Remediation Trust and the Tribe Trust to the payments from the Master Disbursement Trust and other benefits set forth below.

(A) Subject to <u>Section 5.2(g)</u>, on each MDT Distribution Date, the Master Disbursement Trust shall make Public Creditor Trust Distributions from all MDT Distributable Value in accordance with <u>Section 5.2(f)(i)(B)</u> of the Plan.

(B)     All Public Creditor Trust Distributions to the Governmental Remediation Trust and/or the Tribe Trust shall be allocated between the Governmental Remediation Trust and the Tribe Trust as follows, in each case, as calculated before accounting for any amounts payable pursuant to Section 5.9 of this Plan: (I) with respect to the Estate Distributions, (X) 96.7% to the Governmental Remediation Trust and (Y) 3.3% to the Tribe Trust; and (II) with respect to the Shareholder Direct Settlement Portion, (X) 96.7% of the Maximum Governmental Direct Settlement Amount on the payment dates indicated therein to the Governmental Remediation Trust, subject to, and payable in accordance with, the terms of the Governmental Entity Shareholder Direct Settlement Agreement, and (Y) 3.3% of the Maximum Governmental Direct Settlement Amount on the payment dates indicated therein to the Tribe Trust, subject to, and payable in accordance with, the terms of the Tribe Trust Agreement.

(C)     All Public Creditor Trust Distributions to the Governmental Remediation Trust shall be further allocated between States and Subdivisions in accordance with the Governmental Remediation Trust Documents. The allocation of the applicable Shareholder Direct Settlement Portion to Subdivisions who become Initial Participating Subdivisions may be higher than Later Joining Subdivisions (each as defined in and as more fully described in the Governmental Entity Shareholder Direct Settlement Agreement). Subdivisions located in Oklahoma shall be entitled to participate in the Governmental Entity Shareholder Direct Settlement as though Oklahoma was a Settling State. Subdivisions in Non-Settling States and Subdivisions which previously litigated and resolved their claims against the Debtors and/or Shareholder Released Parties shall not be eligible to be Participating Subdivisions [unless and until, in the case of the Subdivisions located in Non-Settling States, a Subdivision's corresponding State becomes a Settling State]. For the avoidance of doubt, each Non-Settling Subdivision shall be entitled to receive Estate Distributions pursuant to Section 7.7 of the Plan upon Allowance of its Claim in accordance with Sections 7.6 or 7.9 of the Plan.

(D)     Oklahoma Litigating Political Subdivisions will receive Oklahoma's allocation, which allocation amount has already been reduced by $12.5 million that the State of Oklahoma set aside in accordance with the Oklahoma Political Subdivisions Opioid Abatement Grants Act (the "Act") for distribution to Oklahoma subdivisions

72

pursuant to Oklahoma's settlement with the Shareholder Released Parties and the Debtors (the "**Prepetition Oklahoma Settlement**"). The Oklahoma subdivision allocation is set forth in Exhibit [●] of the Plan and will be administered as agreed between the State of Oklahoma and the Oklahoma Litigating Political Subdivisions. Any release requirements contained in the Prepetition Oklahoma Settlement that are a condition for a Subdivision to participate in the Purdue Oklahoma Subdivision Fund shall be waived by the Debtors and Shareholder Payment Parties such that the Oklahoma Litigating Political Subdivisions may participate in both the Purdue Oklahoma Subdivision Fund and receive distributions from the Governmental Remediation Trust. The Debtors and Shareholder Payment Parties also waive any requirement in the Prepetition Oklahoma Settlement that funds not distributed by the Purdue Oklahoma Subdivision Fund within a certain amount of time will revert to the Foundation or the National Center for Addiction Studies and Treatment established pursuant to the Prepetition Oklahoma Settlement, and acknowledge that the entire Purdue Oklahoma Subdivision Fund shall be distributed to Oklahoma subdivisions. Oklahoma's allocation shall be paid from the Governmental Remediation Trust to a settlement fund established for the benefit of the Oklahoma Litigating Political Subdivisions. Distributions from such settlement fund to the Oklahoma Litigating Political Subdivisions shall be made in accordance with the ratios set forth in Exhibit [●] of the Plan. The Oklahoma Litigating Political Subdivisions shall either hire an administrator for the funds from the Remediation Trust Account or receive the funds directly from the Governmental Remediation Trust. The administrator may be reasonably compensated by the Governmental Remediation Trust to perform its administrative function, but not to exceed 5% of the money distributed to Oklahoma Litigating Political Subdivisions by the Governmental Remediation Trust.

(ii)    On the Effective Date, the Public School Trust shall receive the Initial Public Schools Distribution and the MDT Public School Districts Claim. On account of the MDT Public School Districts Claim, the Master Disbursement Trust shall pay to the Public School Trust: (i) $7.5 million on the first anniversary of the Effective Date (the "*Second Public Schools Distribution*"), and (ii) $7.5 million on the second anniversary of the Effective Date (the "*Third Public Schools Distribution*").

(g)    **MDT Priority Waterfall**. On each MDT Distribution Date, all Cash and cash equivalents of the Master Disbursement Trust shall be applied as follows: (i) *first*, to fund any Replenishment Transfer solely to the extent such Cash and cash equivalents are Shareholder Estate

73

Settlement Distributions; (ii) *second*, to fund the PI Trust Obligation in accordance with Section 5.2(e)(ii) of the Plan; (iii) *third*, to fund the MDT Operating Reserve in an amount determined by the MDT Trustees; (iv) *fourth*, to the extent there are outstanding amounts then due on account of the MDT Claims, to pay the MDT Claims; (v) *fifth*, to reimburse the applicable Public Creditor Trust for any Shareholder Direct Settlement Portion previously applied in respect of adjustments implemented in accordance with Section 5.2(e)(iv) and (vi) *sixth*, as Public Creditor Trust Distributions in respect of the MDT Interests; *provided*, *however*, that, except to the extent expressly set forth in Exhibit M to the Governmental Entity Shareholder Direct Settlement Agreement, payments received by the Master Disbursement Trust: (A) on account of the Governmental Entity Shareholder Direct Settlement shall be immediately transferred to the Governmental Remediation Trust and (B) on account of the Tribal Shareholder Direct Settlement Agreement shall be immediately transferred to the Tribe Trust, and the amounts in (A) and (B) shall not be used to fund a Replenishment Transfer to fund the MDT Operating Reserve or pay the MDT Claims.

(h)     **Shareholder Settlements**. On or before the Effective Date, the Debtors, the Shareholder Payment Parties and the Settling Creditors shall enter into the Shareholder Settlement Agreements. Pursuant to the Public Entity Settlements, the Private Entity Settlements, the Shareholder Settlement Agreements and the Plan, in exchange for among other things, the Shareholder Settlement Releases and the Channeling Injunction, as set forth in Sections 10.6, 10.7 and 10.8 of the Plan, and the other agreements set forth in the Shareholder Settlement Agreements, (i) the Shareholder Payment Parties shall pay the applicable Shareholder Settlement Amount on the dates and pursuant to the terms set forth in the applicable Shareholder Settlement Agreements, (ii) the Shareholder Claims shall be deemed released on the Effective Date pursuant to Section 4.15 of the Plan, (iii) the MDT Shareholder Insurance Rights shall be transferred to the Master Disbursement Trust in accordance with Section 5.6(j) of the Plan, (iv) the Shareholder Payment Parties have agreed to support the Plan and (v) the Shareholder Payment Parties have provided the other agreements and consideration set forth in the applicable Shareholder Settlement Agreement, in each case, as more fully set forth in, and subject to the terms and conditions of, the Shareholder Settlement Agreement. The Master Disbursement Trust shall distribute all proceeds of the MDT Shareholder Rights, including each applicable Shareholder Settlement Amount, in accordance with the Plan, including Section 5.2(e)–(g) of the Plan.

(i)     **[Potential United States-PI Claimant Medical Expense Claim Settlement**. The United States-PI Claimant Medical Expense Claim Settlement is as follows:

(i)     On the Effective Date of the Plan, the PI Trust shall be deemed, without further action of the Bankruptcy Court or the PI Trust, to have irrevocably assigned to the United States the PI Trust's right to receive $26 million from the Master Disbursement Trust, which amount shall be paid by the Debtors or the Master Disbursement Trust, as applicable, to the United States in installments equal to 3.7143% of any amounts received and retained by the PI Trust under the Plan in the form of the Initial PI Trust Distribution and distributions made on account of the MDT PI Claim, and on the same distribution schedule as such distributions are received and retained by the PI Trust, until the United States has received payments aggregating to $26 million. For the avoidance of doubt, in no event shall (A) the stated amount of the Initial PI Trust Distribution or the stated amount of the MDT PI Claim be altered in a manner that would reduce the aggregate amount to be paid to the United States pursuant to this Section 5.2(i)(i) of the Plan, (B) the aggregate amount paid to the United States pursuant to this Section 5.2(i)(i) of the Plan exceed $26 million, or (C) the United

74

States' claim against the Master Disbursement Trust arising from the assignment described in this Section 5.2(i)(i) of the Plan be released until the United States has received payments thereof aggregating to $26 million. Should the PI Trust obtain recoveries under the Plan from a source other than the Master Disbursement Trust as a result of litigation following and resulting from either a modification of the MDT Insurer Injunction pursuant to Section 10.10 of the Plan or election by the Master Disbursement Trust of a Shareholder Release Remedy, the PI Trust shall pay over 3.7143% of any such recoveries to the United States until the United States shall have received payments aggregating to $26 million pursuant to the United States-PI Claimant Medical Expense Claim Settlement. The United States shall have the right to enforce the obligations set forth in this Section 5.2(i)(i) of the Plan notwithstanding the United States-PI Claimant Medical Expense Claim Releases.

(ii)    Notwithstanding Section 10.19 of the Plan, as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the PI Trust, each Holder of a PI Claim and, in respect of each of the PI Trust and each Holder of a PI Claim, its respective agents, representatives, heirs, successors and assigns, in their respective capacities as such, shall, without any further action by the Bankruptcy Court, be conclusively, absolutely, unconditionally, irrevocably, fully, finally, forever and permanently released by each Holder of a United States-PI Claimant Medical Expense Claim of all United States-PI Claimant Medical Expense Claims and all Causes of Action based on or relating to, or in any manner arising from, in whole or in part, the United States-PI Claimant Medical Expense Claim Settlement (other than a Cause of Action to enforce the United States-PI Claimant Medical Expense Claim Settlement, including, but not limited to, the release set forth in Section 5.2 (i)(iii) of the Plan) that each Holder of a United States-PI Claimant Medical Expense Claim has asserted or could assert on its own behalf or on behalf of another Person or party, notwithstanding section 1542 of the California Civil Code or any law of any jurisdiction that is similar, comparable or equivalent thereto (which shall conclusively be deemed waived), against the PI Trust, a Holder of a PI Claim, Distributions to Holders of PI Claims pursuant to the PI TDP or under the Plan and, in respect of each of the PI Trust and each Holder of a PI Claim, its respective agents, representatives, heirs, successors and assigns, in their respective capacities as such; *provided*, *however*, that, if a Holder of a PI Claim commences a legal action against a Holder of a United States-PI Claimant Medical Expense Claim challenging all or any portion of the United States-PI Claimant Medical Expense Claim Settlement, then, from and after the commencement of such legal action, the United States-PI Claimant Medical Expense Claim Release shall be *void ab initio* solely with respect to such Holder of a PI Claim, and the heirs, successors and assigns of such Holder of a PI Claim,

in their capacities as such, and not with respect to any other Person or party, including, but not limited to, the PI Trust, counsel to such Holder of a PI Claim and, in respect of each of the PI Trust and such counsel, its respective agents, representatives, heirs, successors and assigns, in their respective capacities as such; *provided further* that no such legal action against a Holder of a United States-PI Claimant Medical Expense Claim shall impair or reduce the amount that the United States shall receive pursuant to Section 5.2(i)(i). Nothing in this Section 5.2(i)(ii) creates any rights of a Holder of a PI Claim to sue the United States or any of its agencies, including a Holder of a United States-PI Claimant Medical Expense Claim, and the United States and its agencies reserve all rights and defenses in that regard; and nothing in this paragraph is or shall be deemed a waiver of any applicable sovereign immunity with respect to any legal action against the United States or any of its agencies challenging all or any portion of the United States-PI Claimant Medical Expense Claim Settlement brought by a Holder of a PI Claim or the heirs, successors or assigns of such Holder of a PI Claim, in their capacities as such.

(iii)    As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, each Holder of a United States-PI Claimant Medical Expense Claim shall, without any further action by the Bankruptcy Court, be conclusively, absolutely, unconditionally, irrevocably, fully, finally, forever and permanently released by the PI Trust and its agents, representatives, successors and assigns, in their respective capacities as such, of all Causes of Action based on or relating to, or in any manner arising from, in whole or in part, the United States-PI Claimant Medical Expense Claim Settlement (other than a Cause of Action to enforce the United States-PI Claimant Medical Expense Claim Settlement, including, but not limited to, any United States-PI Claimant Medical Expense Claim Release) that the PI Trust has asserted or could assert on its own behalf or on behalf of another Person or party, notwithstanding section 1542 of the California Civil Code or any law of any jurisdiction that is similar, comparable or equivalent thereto (which shall conclusively be deemed waived), against a Holder of a United States-PI Claimant Medical Expense Claim and, in respect of each Holder of a United States-PI Claimant Medical Expense Claim, its respective agents, representatives, successors and assigns, in their respective capacities as such.

(iv)    The payments made to the United States pursuant to Section 5.2(i)(i) of the Plan are a prepayment by the PI Trust of amounts that would otherwise be payable by certain Holders of PI Claims to Holders of United States-PI Claimant Medical Expense Claims upon receipt by such Holders of PI Claims of Distributions pursuant to the PI TDP and under the Plan. Such prepayment shall be borne equitably by such Holders of PI Claims in the form of a

reduction in the Distributions otherwise payable to such Holders of PI Claims pursuant to the PI TDP.

(v)     The United States Department of Defense, Defense Health Agency (in respect of the TRICARE Program) submits to the jurisdiction of the Bankruptcy Court for purposes of the United States-PI Claimant Medical Expense Claim Settlement, including, but not limited to, the United States-PI Claimant Medical Expense Claim Releases.

(vi)    The United States Department of Health and Human Services, on its own behalf and on behalf of its component agencies, which are the Centers for Medicare & Medicaid Services and the Indian Health Service on behalf of its federally-operated programs; the United States Department of Defense, Defense Health Agency (in respect of the TRICARE Program); and the United States Department of Veterans Affairs submit to the exclusive jurisdiction of the Bankruptcy Court for purposes of any proceeding in respect of the interpretation or enforcement of the United States-PI Claimant Medical Expense Claim Settlement, including, but not limited to, the United States-PI Claimant Medical Expense Claim Releases.][10]

(j)     **Individual Settlement Agreements**: Each of the Settling States, Participating Subdivisions, the Master Disbursement Trust, and the Debtors shall not enter into any side letter or separate agreement with any Sackler Family Member that grants more favorable terms or benefits, when taken as a whole, to such Sackler Family Member's Shareholder Family Group than those set forth in the Plan and the Shareholder Settlement Agreements.

### 5.3     *The Plan Administration Trust*.

(a)     **Establishment and Purpose of Plan Administration Trust**. On or before the Effective Date, the Debtors shall take all necessary steps to form the Plan Administration Trust in accordance with the Plan and the PAT Agreement. The Plan Administration Trust shall be established for the purposes described in this Plan and any others more fully described in the PAT Agreement, shall have no objective to continue or engage in the conduct of trade or business and shall be subject to the jurisdiction of the Bankruptcy Court. The Plan Administration Trust shall, in each case in accordance with the Plan and the PAT Agreement:

(i)     hold, manage, sell and invest the PAT Assets for the benefit of Holders of Allowed Claims (other than Channeled Claims and Federal Government Unsecured Claims);

---

[10] [**NTD**: Section 5.2(i) reflects terms that were agreed to in 2021 in connection with the 12th Amended Plan among PI claimants and the federal government.  The parties do not currently have an agreement on any of these issues.  If an agreement is reached, it will be reflected in subsequent versions of the Plan and Disclosure Statement.  There can be no assurances that any such agreement will be reached.  If no agreement is reached, the federal government reserves its rights to seek recoveries from appropriate parties (including PI claimants and/or their attorneys) under the Medicare Secondary Payer Act, 42 USC §§ 1395y(b), section 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2007 (Pub. L. 110-173), or the Federal Medical Care Recovery Act, 42 U.S.C. §§ 2651-2653; and other parties (including the PI claimants and their attorneys) reserve all rights and defenses to such claims and any attempts by the federal government to recover on such claims.]

(ii)     administer, process, resolve and liquidate Claims (other than Channeled Claims and Federal Government Unsecured Claims), including through the prosecution and resolution of objections to Disputed Avrio General Unsecured Claims, Disputed Adlon General Unsecured Claims or Disputed Other General Unsecured Claims;

(iii)     hold and maintain the PAT Reserves and the PAT Distribution Account and maintain the Professional Fee Escrow Account and the account described in <u>Section 5.3(e)</u> of the Plan; and

(iv)     make Distributions to Holders of Allowed Claims (other than Channeled Claims and Federal Government Unsecured Claims) and other payments from the Plan Administration Trust, the Professional Fee Escrow Account and the account described in <u>Section 5.3(e)</u> of the Plan.

(b)     **Vesting of the PAT Assets in the Plan Administration Trust**. The Plan Administration Trust shall consist of the PAT Assets. On the Effective Date, the PAT Assets shall vest in the Plan Administration Trust, free and clear of all Claims, Interests, Liens, other encumbrances and liabilities of any kind.

(c)     **Appointment and Role of the Plan Administration Trustee**. The Plan Administration Trustee shall be an existing employee of the Debtors selected by the Debtors in their sole discretion or another individual selected by the Debtors with the consent of the Creditors' Committee and the Governmental Consent Parties (which consent shall not be unreasonably withheld, conditioned or delayed). The identity and compensation of the Plan Administration Trustee shall be disclosed in the Plan Supplement. The appointment of the Plan Administration Trustee shall be approved in the Confirmation Order, and such appointment shall be effective as of the Effective Date. In accordance with the PAT Agreement, the Plan Administration Trustee shall serve in such capacity through the earlier of (x) the date that the Plan Administration Trust is dissolved in accordance with the PAT Agreement and (y) the date the Plan Administration Trustee resigns, is terminated or is otherwise unable to serve for any reason. In furtherance of and consistent with the purpose of the Plan Administration Trust and the Plan, the Plan Administration Trustee shall:

(i)     have the power and authority to perform all functions on behalf of the Plan Administration Trust;

(ii)     undertake all administrative responsibilities as are provided in the Plan and the PAT Agreement, including filing the final monthly operating report (for the month in which the Effective Date occurs) and all subsequent quarterly operating reports and administering the closure of the Chapter 11 Cases, which reports shall be delivered to the Master Disbursement Trust;

(iii)     be responsible for all decisions and duties with respect to the Plan Administration Trust and the PAT Assets; and

(iv)     take such other actions as the Plan Administration Trust determines to be necessary or desirable to carry out the purposes of the Plan.

(d)        **Funding of the Wind-Up Reserve; Costs and Expenses of the Plan Administration Trust**. On the Effective Date, the Debtors shall establish and fund the Wind-Up Reserve, which shall vest in the Plan Administration Trust and be held and maintained by the Plan Administration Trustee. In the event of any shortfall of funding in the Wind-Up Reserve, NewCo shall be obligated to satisfy any such deficiency, subject to the consent (not to be unreasonably withheld) of the NewCo Managers and the MDT Trustees (which obligation shall be assumed by NewCo and any successor to NewCo's business). The costs and expenses of the Plan Administration Trust, including the compensation, fees and expenses of the Plan Administration Trustee and its retained professionals, shall be paid out of the Wind-Up Reserve. The Plan Administration Trustee shall be entitled to reasonable compensation, in an amount to be determined by the Debtors, subject to the consent (not to be unreasonably withheld, conditioned or delayed) of the Creditors' Committee and the Governmental Consent Parties, and to retain and reasonably compensate counsel and other professionals, including any professional who represented parties in interest, including the Debtors, in the Chapter 11 Cases, to assist in its duties as Plan Administration Trustee on such terms as the Plan Administration Trustee deems appropriate without Bankruptcy Court approval, subject to the provisions of the PAT Agreement.

(e)        **[Attorneys' Fees and Expenses of Directors, Officers, Employees and Agents**. The Plan Administration Trust will promptly advance or reimburse as and when incurred the reasonable actual attorneys' fees and related expenses incurred by any current or former director, officer, employee or authorized agent of the Debtors (other than any Sackler Family Member) after the Effective Date and before the sixth (6th) anniversary of the Effective Date in connection with such individual's cooperation with, or in connection with the defense of such individual with respect to, any investigation, prosecution and/or litigation involving conduct relating to the Debtors or the Debtors' business or property or any defense of the Releases or the Channeling Injunction. On or before the Effective Date, the Debtors will establish and fund a segregated account in the amount of $[●] million, which shall be held and maintained by the Plan Administration Trustee to fund the foregoing advancement and reimbursement obligations. If, at any time, the balance in such segregated account is less than $[●] million, NewCo (or, at any time after a sale of all or substantially all Assets of or Interests in NewCo, the Master Disbursement Trust) shall replenish such account so that amounts in the account are not less than $[●] million, provided that (x) the aggregate amount deposited into the segregated account may not exceed $[●] million, and (y) on the sixth (6th) anniversary of the Effective Date, any funds remaining in the segregated account will be released to the Master Disbursement Trust and NewCo's and the Master Disbursement Trust's funding obligations with respect to such account will cease. Notwithstanding the foregoing, the Plan Administration Trust will not advance or reimburse any such amounts incurred by any individual who (i) does not provide an appropriate undertaking consistent with the undertakings required for indemnification during the pendency of the Chapter 11 Cases, (ii) has at any time prior to the Effective Date refused or does at any time after the Effective Date refuse to testify based on a claim of privilege against self-incrimination in any proceeding relating to the Debtors or the Debtors' business or property, or (iii) is at any time indicted for a felony relating to the Debtors or the Debtors' business or property (*provided*, *however*, that if such individual is found to be not guilty of such felony, then expenses shall be promptly reimbursed).][11]

(f)        **Institution and Maintenance of Legal and Other Proceedings**. As of the date upon which the Plan Administration Trust is established, the Plan Administration Trust shall be empowered to initiate, prosecute, defend and resolve all legal actions and other proceedings related to any Asset, liability or responsibility of the Plan Administration Trust. Such legal actions and other proceedings shall be limited solely to those required for the purposes of reconciling, administering and defending against Claims (other than Channeled Claims) and the other responsibilities of the Plan Administration Trust. The Plan Administration Trust shall be empowered to initiate, prosecute, defend and resolve all such actions in

---

[11] [**NTD**: Subject to ongoing review]

the name of the Debtors or their Estates, in each case if deemed necessary or appropriate by the Plan Administration Trustee. The Plan Administration Trust shall be responsible for the payment of all damages, awards, judgments, settlements, expenses, costs, fees and other charges incurred subsequent to the date upon which the Plan Administration Trust is established arising from, or associated with, any legal action or other proceeding brought pursuant to the foregoing. For the avoidance of doubt, the Plan Administration Trust, pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and applicable state corporate law, is appointed as the successor-in-interest to, and representative of, the Debtors and their Estates for the retention, enforcement, settlement or adjustment of Claims against the Debtors (other than the Channeled Claims). For the further avoidance of doubt, neither the Plan Administration Trust nor the Plan Administration Trustee shall be vested with the rights to pursue any MDT Insurance Rights or MDT Insurance Collateral.

(g)     **U.S. Federal Income Tax Matters Relating to Plan Administration Trust**. The Plan Administration Trust is intended to be treated as a trust described in IRC sections 661 through 664 and the regulations promulgated thereunder (a "complex trust"). The Plan Administration Trustee shall file (or cause to be filed) such statements, returns, or disclosures relating to the Plan Administration Trust as are required by any Governmental Unit, including IRS Form 1041, IRS Form 1041-ES, and IRS Schedule K-1. The Plan Administration Trustee shall be responsible for payment, out of the PAT Assets, of any taxes imposed on the Plan Administration Trust or the PAT Assets, including, without limitation, estimated and annual U.S. federal income taxes. The Plan Administration Trustee may request an expedited determination of taxes of the Plan Administration Trust under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Plan Administration Trust for all taxable periods through the dissolution of the Plan Administration Trust. Nothing in this Section 5.3(g) shall be deemed to determine, expand or contract the jurisdiction of the Bankruptcy Court under section 505 of the Bankruptcy Code.

(h)     **Dissolution, Release of Reserves and Residual Value**. The Plan Administration Trust shall be dissolved and the Plan Administration Trustee shall be discharged from its duties with respect to the Plan Administration Trust upon completion of its duties as set forth in the Plan and satisfaction of the purposes of the Plan Administration Trust as set forth in the Plan and the PAT Agreement, which, for the avoidance of doubt, shall be no earlier than the later of (i) the PPLP Dissolution Date and (ii) the date on which (A) all Disputed Claims (other than Non-Participating Channeled Claims) have been resolved, (B) all PAT Assets have been liquidated and (C) all Distributions and other payments required to be made by the Plan Administration Trustee under the Plan and the PAT Agreement have been made, unless dissolution on an earlier date is authorized pursuant to a Final Order of the Bankruptcy Court. Any Cash or cash equivalents in the Plan Administration Trust remaining upon dissolution of the Plan Administration Trust, including any Surplus Reserve Cash remaining in the PAT Reserves, shall be distributed in accordance with Section 5.14(c) of the Plan.

(i)     **Exculpation and Indemnification of the Plan Administration Trustee**. To the maximum extent permitted by applicable law, the Plan Administration Trustee shall not have or incur any liability for actions taken or omitted in its capacity as the Plan Administration Trustee, or on behalf of the Plan Administration Trust, except those acts found by Final Order to be arising out of its willful misconduct, bad faith, gross negligence or fraud, and shall be entitled to indemnification, advancement and reimbursement for reasonable fees and expenses in defending any and all of its actions or inactions in its capacity as the Plan Administration Trustee, or on behalf of the Plan Administration Trust, and for any other liabilities, losses, damages, claims, costs and expenses arising out of or due to the implementation or administration of the Plan or the PAT Agreement, in each case, except for any actions or inactions found by Final Order to be arising out of its willful misconduct, bad faith, gross negligence or fraud. Any valid indemnification claim of the Plan Administration Trustee shall be satisfied from the Wind-Up Reserve.

5.4   _NewCo_.[12]

(a)   **Establishment and Ownership of NewCo**. On or before the Effective Date, NewCo and any Subsidiaries of NewCo shall be formed in accordance with the Plan and the NewCo Operating Agreement. Upon completion of the Restructuring Transactions, the Foundation shall hold the NewCo Interest, representing 100% of the voting and economic Interests in NewCo.

(b)   **Purpose of NewCo**. From and after the Effective Date, NewCo shall operate the NewCo Transferred Assets in accordance with the terms of the NewCo Operating Agreement, and subject to the NewCo Operating Injunction and the NewCo Governance Covenants set forth in the Confirmation Order. NewCo shall be operated in a responsible and sustainable manner, balancing (i) the interests of its stakeholders to fund and provide abatement of the opioid crisis, (ii) effective deployment of its assets to address the opioid crisis and (iii) the interests of those materially affected by its conduct. In connection with any action of NewCo, all elements of NewCo's purpose as set forth in this Section 5.4(b) shall be taken into account, and NewCo shall not be required (and the NewCo Managers shall not be required to cause NewCo) to maximize NewCo's or NewCo's subsidiaries' sales or profits.

(c)   **Vesting of the NewCo Transferred Assets in NewCo**. On or prior to the Effective Date, pursuant to the Plan and in accordance with the NewCo Transfer Agreement, the NewCo Transferred Assets, including the Initial NewCo Cash, shall be transferred to and vest in NewCo or one or more Subsidiaries of NewCo, in each case free and clear of all Claims, Interests, Liens, other encumbrances and liabilities of any kind; _provided_ that NewCo shall comply with its obligations under the Plan, including NewCo's obligation to distribute directly to the Governmental Remediation Trust, the Tribe Trust and the Foundation the NewCo Distributable Cash in accordance with the Plan and to satisfy any deficiency of funding in the Wind-Up Reserve subject to the consent (not to be unreasonably withheld) of the NewCo Managers and the MDT Trustees (which obligation shall be assumed by NewCo and any successor to NewCo's business) and NewCo shall assume the Assumed Liabilities. Except as described in the foregoing sentence, NewCo shall have no liability for, and the NewCo Transferred Assets shall vest in NewCo free and clear of, any prepetition and postpetition Causes of Action of any kind, in each case that have been or could have been asserted against the Debtors, their Estates or their property (including, but not limited to, Claims based on successor liability) based on any acts or omissions prior to the Effective Date.

(d)   **NewCo Managers**.

(i)   <u>Appointment</u>. The board of managers of NewCo will consist of [5] NewCo Managers, each with experience in one or more of the following areas: pharmaceuticals, public policy (including public health policy), law enforcement, ethics and compliance, finance, audit, general business and/or corporate governance issues. The initial NewCo Managers shall be disinterested and independent, and shall be selected by the Settling States with the consent (not to be unreasonably withheld) of the Ad Hoc Committee and in consultation with the Debtors and the Creditors' Committee, and pursuant to a selection process that is reasonably acceptable to the Debtors; _provided_ that the DOJ shall have the right, in its discretion, to observe such selection process. The identity of the initial NewCo Managers shall be included in the Plan Supplement. The appointment of the initial NewCo Managers shall be approved

---

[12] [**NTD**: Section remains subject to ongoing discussion]

in the Confirmation Order, and such appointment shall be effective as of the Effective Date.

(ii)     Responsibilities. The NewCo Managers shall, among other things, (A) determine appropriate expenditure levels for commercial operations and the Public Health Initiatives of NewCo, and (B) make all decisions with respect to NewCo operations (including, for the avoidance of doubt, to effectuate a Disposition Event (as defined in the NewCo Operating Agreement)), taking into account the public interest and NewCo's purpose; *provided*, in each of clauses (A) and (B) above, any such actions of the NewCo Managers shall be subject to oversight by the Foundation.

(e)     **NewCo Distributable Cash**. On an annual basis following the Effective Date, NewCo shall distribute (i) 96.7% of the Governmental NewCo Distributable Cash directly to the Governmental Remediation Trust, (ii) 3.3% of the Governmental NewCo Distributable Cash directly to the Tribe Trust and (iii) the Foundation Distributable Cash directly to the Foundation. [The obligation to pay the Governmental NewCo Distributable Cash in accordance with this Section 5.4(e) shall be otherwise documented in an agreement to be negotiated between NewCo and the Governmental Remediation Trust.][13]

(f)     **NewCo Insurance**. On or prior to the Effective Date, the Debtors shall fund an upfront premium payment from Effective Date Cash to purchase insurance required and appropriate for the business needs of NewCo, including liability and other insurance for NewCo, including, without limitation, product liability insurance and directors' and officers' liability insurance for the NewCo Managers, officers and other authorized agents, in an amount and on terms acceptable to the Debtors and the Governmental Consent Parties.

(g)     **NewCo Operating Injunction and NewCo Governance Covenants**. The Confirmation Order will provide for the issuance of the NewCo Operating Injunction and the NewCo Governance Covenants. Any purchaser of NewCo's opioid business shall remain subject to the NewCo Operating Injunction and the NewCo Governance Covenants.

(h)     **NewCo Monitor**. The Confirmation Order will provide for the appointment of the NewCo Monitor. The initial NewCo Monitor shall be the Purdue Monitor in place as of the Effective Date or otherwise selected by the Governmental Consent Parties with the consent of the Debtors, and in consultation with the Creditors' Committee. The identity of the NewCo Monitor shall be disclosed in the Plan Supplement. The NewCo Monitor shall be responsible for reviewing NewCo's compliance with the NewCo Operating Injunction. NewCo and its professionals and representatives, including the NewCo Managers, shall cooperate and reasonably respond to requests by the NewCo Monitor in the performance of its responsibilities, including reasonable requests for access to relevant books and records of NewCo. In furtherance of the responsibilities of the NewCo Monitor, the NewCo Monitor shall be authorized to seek relief from the Bankruptcy Court to the extent necessary to carry out its obligations hereunder. The NewCo Monitor shall prepare and publish [quarterly][14] reports regarding the matters for which the NewCo Monitor is responsible, including NewCo's compliance with the NewCo Operating Injunction. All compensation, costs and fees of the NewCo Monitor and any professionals retained by the NewCo Monitor shall be paid by NewCo.

---

[13] [**NTD**: Subject to discussion]

[14] [**NTD:** Subject to ongoing review]

(i)    **U.S. Federal Income Tax Matters Relating to NewCo**. The NewCo Managers shall cause NewCo to make a timely election to be treated as a corporation for U.S. federal income tax purposes effective as of the date immediately succeeding the Effective Date by the deadline for making such election. NewCo shall be responsible for filing all tax returns of NewCo and the payment, out of the Assets of NewCo, of any taxes due by or imposed on NewCo or NewCo Transferred Assets, including, without limitation, estimated and annual U.S. federal income taxes.

(j)    **Exculpation and Indemnification of the NewCo Managers**. To the maximum extent permitted by applicable law, no NewCo Manager shall have or incur any liability for actions taken or omitted in his or her capacity as a NewCo Manager, or on behalf of NewCo, except those acts found by Final Order to be arising out of his or her willful misconduct, bad faith or fraud, and shall be entitled to indemnification, advancement and reimbursement for reasonable fees and expenses in defending any and all actions or inactions in his or her capacity as a NewCo Manager, or on behalf of NewCo, except for any actions or inactions found by Final Order to be arising out of his or her willful misconduct, bad faith or fraud. Any valid indemnification claim of any NewCo Manager shall be satisfied by NewCo.

**5.5**    *Foundation*.

(a)    **Establishment and Ownership of the Foundation**. On or before the Effective Date, the Foundation shall be formed in accordance with the terms of the Plan and the Foundation Bylaws.

(b)    **Appointment of the Foundation Trustees**. The board of trustees of the Foundation will consist of [3] Foundation Trustees, each of whom shall be disinterested and independent, provided that one (but no more than one) Creditor Trustee of the [Master Disbursement Trust] may serve as a Foundation Trustee; provided further that any action taken by such individual in his or her capacity as Foundation Trustee shall not be subject to the fiduciary duties of such individual in his or her capacity as a Creditor Trustee of the Master Disbursement Trust."[15] The initial Foundation Trustees shall be selected by the Settling States with the consent (not to be unreasonably withheld) of the Ad Hoc Committee and in consultation with the Debtors and the Creditors' Committee, and pursuant to a selection process that is reasonably acceptable to the Debtors; *provided* that the DOJ shall have the right, in its discretion, to observe such selection process. The identity of the initial Foundation Trustees shall be included in the Plan Supplement. The appointment of the initial Foundation Trustees shall be approved in the Confirmation Order, and such appointment shall be effective as of the Effective Date.

(c)    **Foundation D&O Insurance and Indemnification**. On or prior to the Effective Date, the Debtors shall fund an upfront premium payment from Effective Date Cash to purchase directors' and officers' liability insurance for the Foundation Trustees in an amount and on terms acceptable to the Debtors and the Governmental Consent Parties.

(d)    **U.S. Federal Income Tax Matters Relating to the Foundation**. The Foundation Trustees shall cause the Foundation to (A) be formed as a non-stock corporation and (B) be organized as a corporation that is intended to be treated as an exempt organization for U.S. federal and applicable state and local income tax purposes. Neither the Foundation nor any Foundation Trustee shall make an election for the Foundation to be classified as other than a corporation pursuant to Treasury Regulations section 301.7701-3.

---

[15] [**NTD**: Subject to ongoing discussion]

(e)     **Exculpation and Indemnification of the Foundation Trustees**. To the maximum extent permitted by applicable law, no Foundation Trustee shall have or incur any liability for actions taken or omitted in his or her capacity as a Foundation Trustee, or on behalf of NewCo, except those acts found by Final Order to be arising out of his or her willful misconduct, bad faith or fraud, and shall be entitled to indemnification, advancement and reimbursement for reasonable fees and expenses in defending any and all actions or inactions in his or her capacity as a Foundation Trustee, or on behalf of NewCo, except for any actions or inactions found by Final Order to be arising out of his or her willful misconduct, bad faith or fraud. Any valid indemnification claim of any Foundation Trustee shall be satisfied by the Foundation.

**5.6**    *Master Disbursement Trust*.

(a)     **Establishment and Purpose of the Master Disbursement Trust**. On or before the Effective Date, the Debtors shall take all necessary steps to establish the Master Disbursement Trust in accordance with the Plan and the MDT Agreement. The Master Disbursement Trust shall be established for the purposes described in this Plan and any other purposes more fully described in the MDT Agreement and shall be subject to the jurisdiction of the Bankruptcy Court. The Master Disbursement Trust shall, in each case in accordance with the Plan and the MDT Agreement:

(i)     hold, manage, sell, invest and distribute the MDT Transferred Assets for the benefit of the MDT Beneficiaries in accordance with the Private Entity Settlements and the Public Entity Settlements;

(ii)     enforce, pursue, prosecute, compromise and/or settle the MDT Causes of Action, the MDT Insurance Rights and the MDT Shareholder Rights, including monitoring and enforcing the Shareholder Settlement Agreements;

(iii)     make payments in satisfaction of the MDT Claims;

(iv)     make Public Creditor Trust Distributions from MDT Distributable Value;

(v)     administer the Special Operating Reserve; and

(vi)     serve as administrative agent with respect to the Released Claims Reserves.

(b)     **Vesting of the MDT Transferred Assets in the Master Disbursement Trust**. The corpus of the Master Disbursement Trust shall consist of the MDT Transferred Assets. On the Effective Date, pursuant to the Plan and in accordance with the MDT Agreement, the MDT Transferred Assets shall be irrevocably transferred to and vest in the Master Disbursement Trust free and clear of all Claims, Interests, Liens, other encumbrances and liabilities of any kind; *provided* that, to the extent certain Assets comprising the MDT Transferred Assets are not known or identified as of the Effective Date, such Assets shall automatically, and without further act or deed, be transferred to and vest in the Master Disbursement Trust upon the discovery or identification thereof, including, with respect to the Surplus Reserve Cash, in accordance with Section 5.14(c) of the Plan. The Master Disbursement Trust shall have no liability for any prepetition or postpetition Causes of Action of any kind, in each case that have been or could have been asserted against the Debtors, their Estates or their property (including, but not limited to, Claims based on successor liability) based on any acts or omissions prior to the Effective Date, except as expressly set forth in the Plan and the MDT Agreement; *provided* that the Master Disbursement Trust will

assume the Channeled Claims solely for the purpose of effectuating the Master TDP in accordance with Section 5.6(g) of the Plan and issue the MDT Claims and MDT Interests in accordance with the Public Entity Settlements and the Private Entity Settlements. From and after the Effective Date, all proceeds of the MDT Transferred Assets, including, without limitation, amounts paid by Insurance Companies under the MDT Insurance Policies and amounts paid under the Master Shareholder Settlement Agreement, shall be paid to the Master Disbursement Trust to be applied in accordance with the MDT Priority Waterfall and the MDT Agreement.

(c)    **Funding of the Master Disbursement Trust**. The Master Disbursement Trust shall be funded with the proceeds of the MDT Transferred Assets.

(d)    **Appointment and Role of the MDT Trustees**. The board of trustees of the Master Disbursement Trust will consist of [three (3)] MDT Trustees with relevant experience. The MDT Trustees shall be disinterested and independent. At least one (1) initial MDT Trustee shall be selected by the Settling States that have attorneys general from the Democratic Party, and at least one (1) initial MDT Trustee shall be selected by the Settling States that have attorneys general from the Republican Party, and such MDT Trustees shall select the third MDT Trustee (the "**Settling States MDT Trustees**"); *provided* that notwithstanding the above, in each case, each MDT Trustee shall be appointed with the consent of the Ad Hoc Committee in consultation with the MSGE Group and the Debtors, and the DOJ shall have the right, in its discretion, to observe such selection process. The identity of the initial MDT Trustees shall be disclosed in the Plan Supplement. The appointment of the initial MDT Trustees shall be approved in the Confirmation Order, and such appointment shall be effective as of the Effective Date. Each Settling States MDT Trustee may be removed and replaced at any time by the unanimous vote of the MDT Advisory Council Representatives from the same political party as such Settling States that selected such Settling States MDT Trustee. In furtherance of and consistent with the purpose of the Master Disbursement Trust and the Plan, the MDT Trustees shall:

(i)    have the power and authority to perform all functions on behalf of the Master Disbursement Trust;

(ii)    have the power and authority to perform all functions necessary to operate the Master Disbursement Trust, including, but not limited to, hiring employees or financial, tax, legal, or other necessary professionals to achieve the Master Disbursement Trust's operations and purposes;

(iii)    be responsible for all decisions and duties with respect to the Master Disbursement Trust and the MDT Transferred Assets; and

(iv)    in all circumstances and at all times, act in a fiduciary capacity for the benefit and in the best interests of the MDT Beneficiaries, in furtherance of the purpose of the Master Disbursement Trust, and in accordance with the Plan, including Section 5.6(f) of the Plan, and the MDT Agreement.

(e)    **Appointment and Role of the MDT Advisory Council**. There shall be an MDT Advisory Council established under the MDT Agreement that will consist of a total of [seven (7)] representatives (the "***MDT Advisory Council Representatives***," and each an "***MDT Advisory Council Representative***"), selected in the following manner: (i) two (2) representatives shall be selected by the representatives of Settling States that have a state attorney general from the Democratic Party; (ii) two (2) representatives shall be selected by the representatives of Settling States that have a state attorney general from the Republican Party, and (iii) these four (4) MDT Advisory Council Representatives shall select the

fifth MDT Advisory Council Representative. In addition, one (1) MDT Advisory Council Representative shall be selected by the MDL Plaintiffs' Executive Committee and one (1) MDT Advisory Council Representative shall be selected by the MSGE Group. Notwithstanding anything in the foregoing to the contrary, in each case, [each MDT Advisory Council Representative shall be appointed with the consent of the Ad Hoc Committee]. The Master Disbursement Trust shall regularly report to the MDT Advisory Council with respect to the operations and activities of the Master Disbursement Trust and the handling of all payments and Distributions made from the Master Disbursement Trust to the extent set forth in the MDT Agreement.

(f)     **Obligations of the MDT Trustees**. The MDT Trustees shall take into account the interests of, and owe fiduciary duties to, each of the MDT Beneficiaries in making all decisions on behalf of the Master Disbursement Trust. In furtherance thereof:

(i)     in the event of a Specified Breach (as defined in the Master Shareholder Settlement Agreement), the MDT Trustees will take into account the remaining rights of the Holders of MDT Claims as well as the interests of the Holders of MDT Interests in formulating and exercising appropriate remedies as they relate to the Shareholder Payment Parties and the Shareholder Release Snapback Parties, but shall in all events, to the extent there are obligations remaining to the Private Creditor Trusts upon such default, seek to utilize all other available sources of assets (including by first utilizing commercially reasonable efforts to pursue a Payment Remedy (as defined in the Master Shareholder Settlement Agreement) before electing to pursue a Shareholder Release Remedy) to pay all outstanding amounts owed to the Holders of MDT Claims then-due or to be paid in the future from amounts due from such Breaching Shareholder Family Group until such outstanding amounts have been paid in full;

(ii)    the Master Disbursement Trust shall provide no less than ten (10) Business Days' advance written notice (unless urgent circumstances require less notice) to each MDT Beneficiary of any material action proposed to be taken in respect of the MDT Shareholder Rights, including any exercise of remedies under the Shareholder Settlement Agreements or the commencement or settlement of any litigation against any Shareholder Payment Party or Shareholder Release Snapback Party;

(iii)   to the extent there are any disputes raised by any MDT Beneficiary regarding the operation of the Master Disbursement Trust or the actions of the MDT Trustees (including, without limitation, any action related to the MDT Shareholder Rights), (A) any MDT Beneficiary shall have the right to seek resolution by the Bankruptcy Court of such a dispute, including seeking to enjoin any disputed action by the Master Disbursement Trust, and all MDT Trustees and MDT Beneficiaries shall have the right to be heard with regard to any such dispute, including by filing objections, declarations, statements in support or other pleadings (including with supporting evidence) or providing witness testimony at any hearing and (B) the Bankruptcy Court shall have

exclusive jurisdiction to hear and resolve any such disputes, and shall be authorized to order appropriate relief (subject to the provisions of this Section 5.6(f)) and make a determination in an expedited manner, and in all events, shall make such a decision within thirty (30) days from the request for relief;

(iv)    upon the payment in full in Cash of any MDT Claim, the holder of such MDT Claim shall immediately cease to be an MDT Beneficiary for all purposes under the MDT Agreement, and the MDT Trustees shall have no further fiduciary duties to such holder, and such holder shall have no further rights to commence or participate in any action relating to the operations of the Master Disbursement Trust or the actions of the MDT Trustees;

(v)    the Master Disbursement Trust shall (A) provide reasonable reporting to each of the other Creditor Trusts that hold MDT Claims regarding the MDT Trustees' activities at least every four (4) months (both cumulatively and in the period just ended), including with regard to the MDT Shareholder Rights (or any reporting received), any insurance proceeds, assets (including the value thereof), expenditures, distributions and forward-looking projections (subject to appropriate limitations to be agreed by the Debtors, the Governmental Consent Parties and the Creditors' Committee), (B) make themselves reasonably available in addition to holding at least one (1) call every four (4) months for the other Creditor Trustees to answer questions of such other Creditor Trustees relating to the Master Disbursement Trust's activities, (C) provide each Private Creditor Trust with quarterly reporting regarding Litigation Costs (as defined in the Master Shareholder Settlement Agreement) and other items relating to litigation claims pertaining to such Private Creditor Trusts' applicable Creditor category as well as all other Creditor categories, and (D) provide the PI Trust with the information, consultation rights and notice as required pursuant to Section 5.2(e) of the Plan. Notwithstanding anything in the foregoing to the contrary, the Master Disbursement Trust shall not be required to provide any reporting to any Creditor Trust to which the Master Disbursement Trust's duties cease pursuant to Section 5.6(f)(iv).

(vi)    the MDT Trustees shall be obligated to comply with the terms of the Plan, including this Section 5.6(f), and the MDT Agreement; and

(vii)    in the event of any inconsistency between the terms of this Section 5.6(f) and any other provision of this Plan or the MDT Agreement, the terms of this Section 5.6(f) shall govern unless the MDT Trustees and the Creditor Trustees for each of the Creditor Trusts mutually agree.

(g)    **Assumption of Channeled Claims and Master TDP**. As of the Effective Date, any and all liability of the Debtors and the other Protected Parties for any and all Channeled Claims

shall automatically, and without further act, deed or court order, be channeled to and assumed by the Master Disbursement Trust solely for the purpose of effectuating the Master TDP, pursuant to which each Channeled Claim shall either be automatically channeled to and assumed exclusively by a Creditor Trust or otherwise Disallowed and released in full. All Channeled Claims channeled to a Creditor Trust in accordance with the Master TDP shall be administered and resolved solely pursuant to, and solely to the extent provided in, the applicable Creditor Trust TDP for such Creditor Trust. Distributions, in accordance with the applicable Creditor Trust TDP, from the Creditor Trust to which a Channeled Claim is channeled, in accordance with the Master TDP, shall be the sole source of recovery, if any, in respect of such Channeled Claim, and the Holder of such Channeled Claim shall have no other or further recourse to the Protected Parties, including the Master Disbursement Trust. All Channeled Claims that are Disallowed and released and not channeled to a Creditor Trust in accordance with the Master TDP shall have no recourse to any Protected Party, including the Master Disbursement Trust. For the avoidance of doubt, in no event shall any Channeled Claim have any recourse to the Assets of the Master Disbursement Trust. In furtherance of the foregoing, the Master Disbursement Trust, subject to and only to the extent provided in the MDT Documents, shall have all defenses, cross-claims, offsets and recoupments regarding the Channeled Claims that the Debtors, the Released Parties and the Shareholder Released Parties, as applicable, have, or would have had, under applicable law, but solely to the extent consistent with the MDT Documents and the Plan; *provided* that, subject to <u>Section 10.8(c)</u>, no such Claims, defenses or rights may be asserted against any Protected Party; and *provided*, *further*, that all such defenses, cross-claims, offsets and recoupments regarding any Channeled Claim that is channeled to a Creditor Trust in accordance with the Master TDP shall be transferred to such Creditor Trust with such Channeled Claim, at which point, the Master Disbursement Trust shall no longer have such defenses, cross-claims, offsets and recoupments regarding such Channeled Claim. For the avoidance of doubt, nothing in this <u>Section 5.6(g)</u> shall limit or affect the transfer of the MDT Insurance Rights.

(h) **MDT Operating Expenses**. On the Effective Date, the Debtors shall establish and fund the MDT Operating Reserve, which shall vest in the Master Disbursement Trust in accordance with <u>Section 5.6(b)</u> of the Plan and be held and maintained by the MDT Trustees. Periodically, until the dissolution of the Master Disbursement Trust, the MDT Trustees will replenish the MDT Operating Reserve from Cash held or received by the Master Disbursement Trust to the extent deemed necessary by the MDT Trustees to satisfy and pay estimated future MDT Operating Expenses; *provided*, *however*, that subject only to <u>Section 5.2(g)</u> of this Plan, payments received by the Master Disbursement Trust on account of the Governmental Entity Shareholder Direct Settlement shall be immediately transferred to the Governmental Remediation Trust and shall not be used to fund a Replenishment Transfer or the MDT Operating Reserve, and shall not be used to pay the MDT Claims. The MDT Trustees shall create and maintain an annual budget of MDT Operating Expenses, which shall be reviewed by the MDT Beneficiaries and reasonably acceptable to the MDT Beneficiaries. All MDT Operating Expenses shall be satisfied and paid from the MDT Operating Reserve. The MDT Trustees shall be entitled to reasonable compensation and to retain and reasonably compensate counsel and other professionals to assist in the duties of the Master Disbursement Trust on such terms as the MDT Trustees deem appropriate without Bankruptcy Court approval, subject to the provisions of the MDT Agreement. The initial compensation of the MDT Trustees shall be reasonably acceptable to the Debtors and the Governmental Consent Parties, and thereafter shall be subject to the annual budgets prepared by the MDT Trustees.

(i) **Transfer of the MDT Insurance Rights**. In furtherance of the transfer of the MDT Transferred Assets to the Master Disbursement Trust and in accordance with the MDT Agreement, on the Effective Date, the Debtors shall irrevocably transfer, grant and assign to the Master Disbursement Trust, and the Master Disbursement Trust shall receive and accept, any and all of the MDT Causes of Action and MDT Insurance Rights. To the extent any Insurance Company would be obligated in respect of any MDT Insurance Policy to pay any Channeled Claim on behalf of one or more of the Debtors, the Debtors shall transfer and assign to the Master Disbursement Trust the right to enforce such Insurance

Company's obligation. The foregoing transfer shall be (i) free and clear of all encumbrances and Causes of Action of any nature whatsoever, (ii) made to the maximum extent possible under applicable law, (iii) absolute and without requirement of any further action by the Debtors, the Liquidating Debtors, the Plan Administration Trust, the Master Disbursement Trust, the Bankruptcy Court or any other Person, and (iv) governed by, and construed in accordance with, the Bankruptcy Code and the other applicable laws governing the applicable MDT Insurance Policies. Notwithstanding the foregoing, the Master Disbursement Trust shall become and remain liable in full for and shall satisfy, to the extent required under applicable law, any prospective premiums, deductibles, self-insured retentions and any other amounts or obligations arising in any way out of the receipt of payment from an Insurance Company in respect of the MDT Insurance Rights; *provided* that, for the avoidance of doubt, the Master Disbursement Trust will not be required to pay premiums or any other amounts for Purdue Insurance Policies that are not MDT Insurance Policies. The transfer of the MDT Insurance Rights contemplated in this <u>Section 5.6(i)</u> is not an assignment of any insurance policy itself. The Confirmation Order shall contain findings reasonably acceptable to the Creditors' Committee and the Governmental Consent Parties related to or necessary to preserve all MDT Insurance Rights.

(j)     **Transfer of MDT Shareholder Insurance Rights**. On the Effective Date, in consideration of the Shareholder Releases, the Shareholder Released Parties shall irrevocably transfer, grant, and assign to the Master Disbursement Trust, and the Master Disbursement Trust shall receive and accept, any and all MDT Shareholder Insurance Rights. Each Shareholder Released Party shall be deemed to have irrevocably transferred, granted, and assigned to the Master Disbursement Trust any and all MDT Shareholder Insurance Rights without further action and without further consideration to such Shareholder Released Party. Pursuant to the Plan, the foregoing transfer shall be (i) free and clear of all encumbrances and Causes of Action of any nature whatsoever, (ii) made to the maximum extent possible under applicable law, (iii) absolute and without requirement of any further action by the Shareholder Released Parties, the Debtors, the Liquidating Debtors, the Plan Administration Trust, the Master Disbursement Trust, the Bankruptcy Court or any other Person, and (iv) governed by, and construed in accordance with, the Bankruptcy Code and the other applicable laws governing the MDT Shareholder Insurance Rights. The transfer of the MDT Shareholder Insurance Rights is not an assignment of any insurance policy itself. For the avoidance of doubt, the transfer of the MDT Shareholder Insurance Rights is in addition to the other obligations of the Shareholder Released Parties set forth herein. The Shareholder Released Parties will make best efforts to provide the Master Disbursement Trust access to information and copies of documents that are reasonably necessary to preserve, secure, or obtain the benefit of the MDT Shareholder Insurance Rights, and will comply in all respects with the Plan to preserve, secure, or obtain the benefit of the MDT Shareholder Insurance Rights, including but not limited to the obligations set forth in <u>Section 8.8(b)</u>. The Confirmation Order shall contain findings reasonably acceptable to the Creditors' Committee and the Governmental Consent Parties related to or necessary to preserve all MDT Shareholder Insurance Rights. Notwithstanding the foregoing in this paragraph, to the extent that (y) a Shareholder Released Party has, prior to the Effective Date, provided notice of a Claim under a Reserved MDT Insurance Policy under which a Shareholder Released Party is covered and (z) such Claim is not one for which such Shareholder Released Party receives the benefit of the Shareholder Releases (a "***Retained Shareholder Insurance Claim***"), such Shareholder Released Party shall not be deemed to have irrevocably transferred, granted, and assigned to the Master Disbursement Trust the Retained Shareholder Insurance Claim, and such Shareholder Released Party shall be entitled to pursue any such Retained Shareholder Insurance Claim prior to and after the Effective Date; *provided* that, notwithstanding the foregoing, with respect to the Retained Shareholder Insurance Claims, each Shareholder Released Party, in consideration of the Shareholder Releases, (A) will confer and fully cooperate with the Master Disbursement Trust in connection with the settlement of all claims or rights under such MDT Insurance Policy, including the Retained Shareholder Insurance Claims, and including but not limited to as set forth in <u>Section 8.8(b)(i)</u> of the Plan, and (B) in the event the Master Disbursement Trust has obtained settlement terms that it deems acceptable in its sole discretion, and such settlement terms include a settlement of any Retained Shareholder

Insurance Claim, each Shareholder Released Party with rights under such Retained Shareholder Insurance Claim shall be deemed to consent to the release of any claims or rights held by such Shareholder Released Party against and under such MDT Insurance Policy, with the same effect as if such Shareholder Released Party had executed such settlement agreement, and without further consideration to such Shareholder Released Party from the insurance settlement proceeds or otherwise in respect of such settlement. After the Effective Date, no Shareholder Released Party shall be entitled to submit a claim under any MDT Insurance Policy (with the exception of a current or former director, officer, manager, authorized agent or employee that is not a Sackler Family Member, but solely to the extent such individual has a right to submit a claim after the Effective Date pursuant to Section 8.8(b)(ii) of the Plan).

(k)     **Shareholder Insurance Release**. On the Effective Date, in consideration of the Shareholder Releases, all Sackler Family Members shall irrevocably, fully and forever release and discharge any obligation to indemnify and/or to defend the Sackler Family Members under the Isosceles Insurance Ltd. policy number PPLP-01/2019 for any Claim or loss of any type or nature whatsoever, whether known or unknown. The Sackler Family Members hereby surrender all rights, interest in and Claim to any benefit under the Isosceles Insurance Ltd. policy number PPLP-01/2019, and acknowledge that (i) all rights, interest in and Claim to any benefit they may have under the Isosceles Insurance Ltd. policy number PPLP-01/2019 are fully terminated on the Effective Date; and (ii) after the Effective Date, the Sackler Family Members will not receive and cannot claim any further benefits under the Isosceles Insurance Ltd. policy number PPLP-01/2019 for any time period and shall have no rights whatsoever under or relating to the Isosceles Insurance Ltd. policy number PPLP-01/2019.

(l)     **Institution and Maintenance of Legal and Other Proceedings**. As of the date upon which the Master Disbursement Trust is established, the Master Disbursement Trust shall be empowered to initiate, prosecute, defend and resolve all legal actions and other proceedings related to any Asset, liability or responsibility of the Master Disbursement Trust, including in respect of the MDT Causes of Action, the MDT Insurance Rights and the MDT Shareholder Rights. Such legal actions and other proceedings shall be limited solely to those required for the purposes of satisfying the responsibilities of the Master Disbursement Trust, including in respect of the MDT Causes of Action, the MDT Insurance Rights and the MDT Shareholder Rights. The Master Disbursement Trust shall be empowered to initiate, prosecute, defend and resolve all such actions in the name of the Debtors or their Estates, in each case if deemed necessary or appropriate by the MDT Trustees. The Master Disbursement Trust shall be responsible for the payment of all damages, awards, judgments, settlements, expenses, costs, fees and other charges incurred subsequent to the date upon which the Master Disbursement Trust is established arising from, or associated with, any legal action or other proceeding brought pursuant to the foregoing.

(m)     **U.S. Federal Income Tax Matters Relating to the Master Disbursement Trust**. The Master Disbursement Trust is intended to be treated, and shall be reported, as a "qualified settlement fund," and the receipt of (i) any MDT Transferred Assets (and any other amounts received by the Master Disbursement Trust pursuant to the Plan) that are treated as amounts transferred to the Master Disbursement Trust for purposes of Treasury Regulations section 1.468B-2(b)(1)  and (ii) the proceeds received in respect of any MDT Transferred Assets (and any other amounts received by the Master Disbursement Trust pursuant to the Plan) that are not described in clause (i) above (including, without limitation, proceeds received in respect of the MDT Shareholder Rights) by the Master Disbursement Trust are intended to be treated as amounts transferred by, or on behalf of, a "transferor" to a "qualified settlement fund," within the meaning of Treasury Regulations sections 1.468B-1 and 1.468B-2 for U.S. federal income tax purposes and shall be treated consistently for state and local tax purposes, to the extent applicable. All parties (including, without limitation, the Shareholder Payment Parties, Holders of Claims against or Interests in the Debtors, the Related Parties of such Holders, the Debtors, the Creditor Trusts, the Creditor Trustees, the Foundation, the MDT Trustees and the Master Disbursement Trust) shall report consistently with the foregoing for all applicable tax reporting purposes. An MDT Trustee shall be the "administrator,"

within the meaning of Treasury Regulations section 1.468B-2(k)(3), of the Master Disbursement Trust. The administrator of the Master Disbursement Trust shall be responsible for filing all tax returns required to be filed by or on behalf of the Master Disbursement Trust and the payment, out of the Assets of the Master Disbursement Trust, of any taxes due by or imposed on the Master Disbursement Trust. The MDT Trustees may request an expedited determination under section 505(b) of the Bankruptcy Code for all tax returns filed by or on behalf of the Master Disbursement Trust for all taxable periods through the dissolution of the Master Disbursement Trust. Nothing in this <u>Section 5.6(m)</u> shall be deemed to determine, expand or contract the jurisdiction of the Bankruptcy Court under section 505 of the Bankruptcy Code.

(n)        **Distributions from the Master Disbursement Trust Free and Clear**. All Distributions made by the Master Disbursement Trust to the MDT Beneficiaries shall be made on no less than ten (10) Business Days' notice to all MDT Beneficiaries, and thereafter shall become the property of such MDT Beneficiary, free and clear of all Claims, Liens or other recourse or encumbrances, and shall not be subject to attachment, disgorgement or recoupment by any Person. Such distributions to each Creditor Trust shall become the property of such Creditor Trust, and shall be used for the administration (including the payment of Creditor Trust Operating Expenses) of such Creditor Trust, to make Distributions on account of Channeled Claims channeled to such Creditor Trust in accordance with the applicable Creditor Trust TDP and for such other purposes as may be specifically set forth in the applicable Creditor Trust Documents; *provided* that such ten (10) Business Days' notice period shall not be required for the Initial Private Creditor Trust Distributions, Initial Public Creditor Trust Distributions or the Initial Public Schools Distribution.

(o)        **Dissolution, Release of Reserves and Residual Value**. The Master Disbursement Trust shall be dissolved and the MDT Trustees shall be discharged from their respective duties with respect to the Master Disbursement Trust upon completion of their duties as set forth in this Plan and the MDT Agreement, which, for the avoidance of doubt, shall be no earlier than the date on which (i) all Assets held by the Master Disbursement Trust, including the MDT Transferred Assets, have been liquidated and (ii) all payments and other distributions required to be made from the Master Disbursement Trust under the Plan and the MDT Agreement have been made, including payment in full in Cash of all MDT Claims, unless dissolution on an earlier date is authorized pursuant to a Final Order of the Bankruptcy Court. Upon dissolution of the Master Disbursement Trust, any Cash remaining in the MDT Operating Reserve or otherwise held by the Master Disbursement Trust shall be distributed in accordance with the MDT Priority Waterfall and the MDT Agreement; *provided* that, in the event the Master Disbursement Trust is dissolved prior to the payment in full in Cash of all MDT Claims, all outstanding amounts under such MDT Claims shall be deemed due and payable for purposes of the distribution of such remaining Cash pursuant to the MDT Priority Waterfall. Subject to the foregoing sentences, the Master Disbursement Trust shall be dissolved at such time as the MDT Trustees determine that the administration of any remaining assets of the Master Disbursement Trust is not likely to yield sufficient additional proceeds to justify further pursuit.

(p)        **Exculpation and Indemnification of the MDT Trustee and the MDT Advisory Council Representatives**. To the maximum extent permitted by applicable law, each of the MDT Trustees and MDT Advisory Council Representatives shall not have or incur any liability for actions taken or omitted in his or her capacity as an MDT Trustee or MDT Advisory Council Representative, or on behalf of the Master Disbursement Trust, except those acts found by Final Order to be arising out of his or her willful misconduct, bad faith, gross negligence or fraud, and shall be entitled to indemnification, advancement and reimbursement for reasonable fees and expenses in defending any and all of his or her actions or inactions in his or her capacity as an MDT Trustee or MDT Advisory Council Representative, or on behalf of the Master Disbursement Trust, and for any other liabilities, losses, damages, claims, costs and expenses arising out of or due to the implementation or administration of the Plan or the MDT Agreement, in each case, except for any actions or inactions found by Final Order to be arising out of his or her willful

misconduct, bad faith, gross negligence or fraud. Any valid indemnification claim of the MDT Trustees or the MDT Advisory Council Representatives shall be satisfied from the MDT Operating Reserve.

5.7    *Special Operating Reserve; Released Claims Reserves*.

(a)    **Establishment of Special Operating Reserve and Released Claims Reserves**.

(i)    On or before the Effective Date, the Debtors shall establish the Special Operating Reserve which shall vest in the Master Disbursement Trust in accordance with Section 5.6(b) of the Plan and be held and maintained by the Master Disbursement Trust. The Special Operating Reserve shall be funded initially in the aggregate amount of $200 million by withholding, in each case from Shareholder Estate Settlement Distributions, (a) $20 million from the Initial Private Creditor Trust Distributions and (b) $180 million from the Initial Public Creditor Trust Distributions (the "***SOR Holdback***")[; *provided*, *however*, that neither the Initial Public Schools Distribution, nor any additional payments due under the MDT Public School District Claim, shall be subject to the SOR Holdback]. [16] The Master Disbursement Trust, as administrative agent, shall facilitate the releases from the Special Operating Reserve accordance with terms and consent procedures set forth in [Exhibit N] to the Master Shareholder Settlement Agreement.

(ii)    On the Effective Date, each Creditor Trust and the Plan Administration Trust shall establish the Released Claims Reserves and, once amounts are funded from the corresponding Creditor Trust PRA Non-Participating Claims Reserves or the Disputed Other General Unsecured Claims Reserve in accordance with Section 7.8(b) or Section 7.8(c), as applicable, be otherwise held and maintained by such Creditor Trust or the PAT, in each case, with the Master Disbursement Trust serving as administrative agent with respect thereto. The Master Disbursement Trust, as administrative agent, shall facilitate the releases from the Released Claims Reserves in accordance with terms and consent procedures set forth in [Exhibit N] to the Master Shareholder Settlement Agreement.

(b)    **Reversion of Special Operating Reserve and Released Claims Reserves**. Subject in all respects to the Master Shareholder Settlement Agreement, on the First Reversion Date, (A) one third (1/3) of the balance of each of the Special Operating Reserve and each Released Claims Reserves will be released to the Master Disbursement Trust, the applicable Creditor Trust or PAT, respectively, after completion of all requirements set forth in the Master Shareholder Settlement Agreement and (B) Replenishment Transfers shall cease.

---

[16] [**NTD**: Public Schools' SOR Holdback subject to ongoing discussions.]

(i)    Unless and until Material Litigation is commenced or continued prior to any of the times set forth below against any Shareholder Released Party after the First Reversion Date, then:

    (A)    Upon the first anniversary of the First Reversion Date, if and only if no Material Litigation is or has been pending for the prior thirty (30) days, fifty percent (50%) of each of the remaining balance of the Released Claims Reserves and Special Operating Reserves will be released to the applicable Creditor Trust, the Plan Administration Trust or the Master Disbursement Trust, respectively;

    (B)    Upon the second anniversary of the First Reversion Date, if and only if no Material Litigation is or has been pending for the prior thirty (30) days, fifty percent (50%) of each of the remaining balance of the Released Claims Reserves will be released to the applicable Creditor Trust, the Plan Administration Trust or the Master Disbursement Trust, respectively; and

    (C)    Thereafter, upon the date when no litigation is or has been pending for the prior thirty (30) days, the remaining balance of each of the Released Claims Reserves and Special Operating Reserve will be released to the applicable Creditor Trust, the Plan Administration Trust or the Master Disbursement Trust, respectively.

(ii)    Upon a Suspension Event:

    (A)    All releases from the Released Claims Reserves and Special Operating Reserve described in Section 5.7(b)(i) of the Plan shall cease; and

    (B)    If the Material Litigation is of the type referenced in clause (1)(a) of the definition of "Material Litigation" in the Master Shareholder Settlement Agreement (i.e., any litigation by a Material Litigant against Shareholder Released Parties regarding Covered Conduct) or clause (2) thereof (500 or more separate lawsuits (i.e., not aggregated and not in a class) pending against Shareholder Released Parties concerning Covered Conduct being pursued by non-Material Litigants), the Master Disbursement Trust shall resume Replenishment Transfers pursuant to Section 5.7(b)(i) of the Plan.

    (C)    Following a Suspension Event, a new First Reversion Date shall occur on the next date when no Material Litigation is or has been pending for thirty (30) days. The Sackler Parties' Representative shall report the occurrence of a new First Reversion Date to the Master Disbursement Trust in accordance with Section 7(b)(v)(B) of Exhibit N the Master Shareholder

Settlement Agreement. On such new First Reversion Date or as soon as reasonably practicable thereafter, Replenishment Transfers shall cease and one third (1/3) of the balance of each of the Special Operating Reserve and Released Claims Reserves will be released to the Master Disbursement Trust, the applicable Creditor Trust and/or Plan Administration Trust, respectively, in accordance with Section 5.7(b)(iii) of the Plan, after completion of all requirements set forth in <u>Exhibit N</u> to the Master Shareholder Settlement Agreement.

Thereafter:

(D)     Upon the first anniversary of the First Reversion Date, if and only if no Material Litigation is or has been pending for the prior thirty (30) days, one half (1/2) of the remaining balance of each of the Special Operating Reserve will be released to the Master Disbursement Trust and Released Claims Reserves will be released to the applicable Creditor Trust or Plan Administration Trust, as applicable; and

(E)     Upon the second anniversary of the First Reversion Date, if and only if no Material Litigation is or has been pending for the prior thirty (30) days, one half (1/2) of the remaining balance of each of the Special Operating Reserve will be released to the Master Disbursement Trust and Released Claims Reserves will be released to the applicable Creditor Trust or Plan Administration Trust, as applicable.

(F)     Thereafter, upon the date when no litigation against any of the Shareholder Released Parties with respect to Covered Conduct is or has been pending for the prior thirty (30) days, the remaining balance of each of the Special Operating Reserve will be released to the Master Disbursement Trust and Released Claims Reserves will be released to the applicable Creditor Trust or Plan Administration Trust, as applicable;

*provided*, that if money remains in the Released Claims Reserves or the Special Operating Reserve after the twelfth (12th) SSA Payment Date, then:

(G)     All remaining funds in the Released Claims Reserves will be released to the applicable Creditor Trust or Plan Administration Trust, as applicable, no later than thirty (30) days after the first date that no Material Litigation against any of the Shareholder Released Parties with respect to Covered Conduct is pending.

(H)    All but $25 million of the remaining funds in the Special Operating Reserve will be released to the Master Disbursement Trust for the benefit of the applicable Creditor Trust(s) no later than six (6) months after the first date that no Material Litigation against any of the Shareholder Released Parties with respect to Covered Conduct is pending; and all funds remaining in the Special Operating Reserve from the $25 million described in clause (H) of this proviso will be released to the Master Disbursement Trust for distribution to the Creditor Trusts pursuant to Section 5.7(b)(iii) no later than six (6) months after the first date that no litigation against any of the Shareholder Released Parties with respect to Covered Conduct is pending

(iii)    Master Disbursement Trust shall first allocate all reversion funds received from the Special Operating Reserve to the Private Creditor Trusts in proportion to their respective SOR Holdback until they have received a cumulative amount of such reversion funds equal to the Private Claimants' Priority Reversion.

(iv)    If by the ninth (9th) SSA Payment Date the Master Disbursement Trust has not made allocations to the Private Creditor Trusts pursuant to Section 5.7(b)(iii) of the Plan in an amount equal to the Private Claimants' Priority Reversion, then the Special Operating Reserve shall release funds to the Master Disbursement Trust for distribution to the Private Creditor Trusts on the ninth (9th) SSA Payment Date in an amount equal to the shortfall. Upon a release from the Special Operating Reserve to the Master Disbursement Trust pursuant to Sections 5.7(b)(i)(C) or 5.7(b)(ii)(C)5.7(b)(ii)(F) of the Plan, the Master Disbursement Trust will allocate $200,000 immediately prior to such release to the Private Creditor Trusts.

(c)    **[U.S. Federal Income Tax Matters Relating to the Special Operating Reserve and Released Claims Reserves**. The Special Operating Reserve and each of the Released Claims Reserves is intended to be treated and shall be reported as a qualified settlement fund for U.S. federal income tax purposes. Pursuant to the Master Shareholder Settlement Agreement, PRA L.P. will timely elect to treat the Special Operating Reserve and each of the Released Claims Reserves as a "grantor trust" pursuant to Section 1.468B-1(k) of the Treasury Regulations, for U.S. federal income tax purposes and, to the extent permitted under applicable law, for state and local tax purposes, for which PRA L.P. is the sole grantor, owner and transferor, and will not revoke such election. All parties (including the Shareholder Payment Parties, the Debtors, the Foundation, the Plan Administration Trustee, each applicable Creditor Trustee, and Holders of Non-Participating Claims and other Disputed Claims) shall be required to report for tax purposes in a manner consistent with the foregoing. PRA L.P. shall be responsible for payment of any taxes imposed on or collected from the Special Operating Reserve, any of the Released Claims Reserves or the assets or income of any of the foregoing.]

**5.8**    *Creditor Trusts*.

(a)    **Establishment and Purpose of the Creditor Trusts**. The Confirmation Order shall endorse and direct the establishment of the Creditor Trusts on or prior to the Effective Date in accordance with the terms of the respective Creditor Trust Documents. The Creditor Trusts shall be independent from the Holders of Claims against the Debtors and shall be subject to the exclusive jurisdiction of the Bankruptcy Court (other than as specifically set forth in the Creditor Trust Documents). The Creditor Trusts shall be established for the purposes described in this Plan and any other purposes more fully described in the Creditor Trust Documents. Each Creditor Trust shall, in each case, in accordance with the Plan, the Confirmation Order and the applicable Creditor Trust Documents:

     (i)    hold, manage and invest all funds and other Assets received by such Creditor Trust from the Debtors and the Master Disbursement Trust, as applicable (including, with respect to the Public Creditor Trusts, the MDT Interests), in each case, for the benefit of the beneficiaries of such Creditor Trust;

     (ii)    hold and maintain the Creditor Trust Operating Reserve of such Creditor Trust;

     (iii)    administer, process, resolve and liquidate Channeled Claims, including Non-Participating Channeled Claims, applicable to such Creditor Trust, in each case as provided in the applicable Creditor Trust Documents;

     (iv)    establish and administer the applicable Creditor Trust Non-Participating Claims Reserve;

     (v)    establish and administer the applicable Released Claims Reserves; and

     (vi)    exercise rights over any proposed use of funds in the applicable Released Claims Reserve held in such Creditor Trust to the extent set forth in Exhibit N to the Master Shareholder Settlement Agreement.

(b)    **Role of the Creditor Trustees**. In furtherance of and consistent with the purposes of the Creditor Trusts and the Plan, the Creditor Trustees shall have the power and authority to perform all functions on behalf of the respective Creditor Trusts, subject to the Creditor Trust Documents for such Creditor Trusts. The Creditor Trustees shall undertake all administrative responsibilities as are provided in the Plan and the applicable Creditor Trust Documents. The Creditor Trustees shall be responsible for all decisions and duties with respect to the respective Creditor Trusts, subject to the Creditor Trust Documents for such Creditor Trusts. In all circumstances, each Creditor Trustee shall be independent and disinterested and, in its capacity as a Creditor Trustee, shall act in the best interests of the beneficiaries of such Creditor Trust, in furtherance of the purpose of such Creditor Trust and in accordance with this Plan and the applicable Creditor Trust Documents. In accordance with the Creditor Trust Documents, each Creditor Trustee shall serve in such capacity through the earlier of (x) the date that the applicable Creditor Trust is dissolved in accordance with the applicable Creditor Trust Documents and (y) the date such Creditor Trustee resigns, is terminated or is otherwise unable to serve for any reason.

(c)    **Appointment of the Creditor Trustees and Creditor Trust Overseers**. In furtherance of and consistent with the purposes of the Creditor Trusts and the Plan, the Creditor Trust

Documents for each of the Creditor Trusts shall provide for the appointment of the Creditor Trustees and, if applicable, Creditor Trust Overseers for each of the Creditor Trusts. The identity of the initial Creditor Trustees and the initial Creditor Trust Overseers shall be as disclosed in the Plan Supplement as of the date hereof, or shall otherwise be:

(i)     with respect to the Governmental Remediation Trust, selected in accordance with the terms of the Governmental Remediation Trust Documents;

(ii)    with respect to the Tribe Trust, selected by the Native American Tribe Group with the consent of the Debtors (which consent shall not be unreasonably withheld, delayed or denied); and

(iii)   with respect to each of the following Private Creditor Trusts, selected as follows: (A) with respect to the TPP Trust, by the Third-Party Payor Group, (B) with respect to the Hospital Trust, by the Ad Hoc Group of Hospitals, (C) with respect to the ERP Trust, by the ERP Trustee (and, for the avoidance of doubt, the Creditor Trustee and/or Creditor Trust Overseer for the ERP Trust may be the ERP Trustee), (D) with respect to the Public School Trust, by the Public School District Claimants and (E) with respect to the PI Trust, by the Ad Hoc Group of Individual Victims.

(d)     **PI Trust Distributions**. The PI Trust shall, in accordance with the Plan, the Confirmation Order and the PI Trust Documents, make Distributions on account of Allowed PI Channeled Claims to Holders of such Allowed PI Channeled Claims, subject to the PI Trust Deductions and Holdbacks. The PI Trust shall establish the PI Trust NAS Fund and the PI Trust Non-NAS Fund, and shall deposit (i) the NAS PI Portion into the PI Trust NAS Fund and (ii) the Non-NAS PI Portion into the PI Trust Non-NAS Fund, in each case, periodically as funds are received by the PI Trust. The PI Trust shall make Distributions on account of Allowed NAS PI Channeled Claims solely from the PI Trust NAS Fund in accordance with the NAS PI TDP, and shall make Distributions on account of Allowed Non-NAS PI Channeled Claims solely from the PI Trust Non-NAS Fund in accordance with the Non-NAS PI TDP, in each case, subject to the PI Trust Deductions and Holdbacks.

(e)     **Rights of the Creditor Trustee for the TPP Trust under the LRP Agreement**. Pursuant to and in accordance with the LRP Agreement, the Creditor Trustee for the TPP Trust shall have the right (i) to inquire periodically with the Creditor Trustee for the PI Trust, the claims administrator appointed in respect of the PI Trust and the escrow agent for the TPP LRP Escrow Account as to whether the TPP LRP Escrow Account has been properly funded and payments therefrom are being made to the LRP Participating TPPs as required under the LRP Agreement, and to request evidence of the same, and (ii) to seek entry of an order by the Bankruptcy Court enforcing the LRP Agreement, including the obligations to provide such information and evidence, in the event the Creditor Trustee for the TPP Trust reasonably believes that the TPP LRP Escrow Account has not been properly funded as required by the LRP Agreement, payments have not been made to LRP Participating TPPs as required by the LRP Agreement, and/or any of the Creditor Trustee for the PI Trust, the claims administrator appointed in respect of the PI Trust and the escrow agent for the TPP LRP Escrow Account is not responding to reasonable requests by the Creditor Trustee for the TPP Trust for such information and evidence.

(f)     **Assumption of Obligations and Liabilities**. In furtherance of the purposes of the Plan and the Creditor Trusts, pursuant to the Master TDP and subject to the applicable Creditor Trust Documents, each Creditor Trust shall (i) expressly assume sole and exclusive responsibility

and liability for (A) the Channeled Claims channeled to such Creditor Trust in accordance with the Master TDP and (B) all Creditor Trust Operating Expenses of such Creditor Trust and (ii) have (A) the rights provided to such Creditor Trust in accordance with the Private Entity Settlements and Public Entity Settlements and (B) all defenses, cross-claims, offsets and recoupments regarding such Channeled Claims that the Debtors, the Released Parties and the Shareholder Released Parties, as applicable, have, or would have had, under applicable law, but solely to the extent consistent with the applicable Creditor Trust Documents and this Plan; *provided* that no such Claims, defenses or rights may be asserted against any Protected Party.

(g)     **Administration of Channeled Claims and Creditor Trust TDPs**. Pursuant to the Master TDP, (i) all Non-Federal Domestic Governmental Channeled Claims will be administered by the Governmental Remediation Trust and resolved in accordance with, and to the extent provided in, the Governmental Remediation Trust Documents, (ii) all Tribe Channeled Claims will be administered by the Tribe Trust and resolved in accordance with, and to the extent provided in, the Tribe TDP, (iii) all Third-Party Payor Channeled Claims will be administered by the TPP Trust and resolved in accordance with, and to the extent provided in, the TPP TDP, (iv) all Hospital Channeled Claims will be administered by the Hospital Trust and resolved in accordance with, and to the extent provided in, the Hospital TDP, (v) all Public School Channeled Claims will be administered by the Public School Trust and resolved in accordance with, and to the extent provided in, the Public School TDP, (vi) all ER Physician Channeled Claims will be administered by the ERP Trust and resolved in accordance with, and to the extent provided in, the ERP TDP, and (vii) all PI Channeled Claims will be administered by the PI Trust and resolved in accordance with, and to the extent provided in, the PI TDP. Each of the Creditor Trusts shall be funded in accordance with the Public Entity Settlements and the Private Entity Settlements, as applicable. The Creditor Trust shall, in accordance with, and to the extent provided in, the applicable Creditor Trust Documents and/or the Creditor Trust TDPs, (y) determine the eligibility, amount and Allowance (if applicable) of such Channeled Claims; and (z) make all determinations with respect to Distributions to be made by the respective Creditor Trusts. The foregoing determinations by the Creditor Trusts shall be final and binding, and shall not be subject to any challenge or review of any kind, by any court or other Person, except as set forth in the Creditor Trust TDPs. Distributions by the Creditor Trusts shall be the sole source of recovery, if any, in respect of Channeled Claims, and Holders of Channeled Claims shall have no other or further recourse to the Protected Parties; *provided* that the foregoing shall not diminish, or otherwise alter, the rights of LRP Participating TPPs under the LRP Agreement or the rights of non-LRP Participating TPPs at law.

(h)     **Trust Reporting Obligations**. Each of the Plan Administration Trust and the Creditor Trusts shall be required to provide (i) any periodic forwarding, not more frequently than every three months, of applicable bank statements with respect to the Released Claims Reserves and Claims Reserves, or, (ii) solely at the applicable trustee's election, such other reporting as provides the Master Disbursement Trust with substantially similar relevant information as appears in such bank statements, in each case, which the applicable trustee may redact (or cause to be redacted) to exclude information that it considers not reasonably necessary for the Master Disbursement Trust to provide information with respect to the Released Claims Reserves and Claims Reserves

(i)     **Institution and Maintenance of Legal and Other Proceedings**. As of the date upon which each Creditor Trust is established, such Creditor Trust shall be empowered to initiate, prosecute, defend and resolve all legal actions and other proceedings related to any Asset, liability or responsibility of such Creditor Trust. Such legal actions and other proceedings shall be limited solely to those required for purposes of reconciling, administering or defending against the Channeled Claims channeled to such Creditor Trust and for enforcing the rights of such Creditor Trust under the Plan and the Plan Documents (including the rights of the Creditor Trustee for the TPP Trust specifically enumerated in the LRP Agreement). Each Creditor Trust shall be empowered to initiate, prosecute, defend and resolve all

such actions in the name of the Debtors or their Estates, in each case if deemed necessary by the applicable Creditor Trustee to fulfill the purposes for which such Creditor Trust was created. Each Creditor Trust shall be responsible for the payment of all damages, awards, judgments, settlements, expenses, costs, fees and other charges incurred subsequent to the date upon which such Creditor Trust is established arising from, or associated with, any legal action or other proceeding brought pursuant to the foregoing. For the avoidance of doubt, each Creditor Trust, pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and applicable state corporate law, is appointed as the successor-in-interest to, and representative of, the Debtors and their Estates for the retention, enforcement, settlement or adjustment of the applicable Channeled Claims channeled to such Creditor Trust.

(j)        **Creditor Trust Operating Expenses**. The Creditor Trustees shall be entitled to reasonable compensation and to retain and reasonably compensate counsel and other professionals to assist in their duties without Bankruptcy Court approval, subject to the provisions of the applicable Creditor Trust Documents. Creditor Trust Operating Expenses of each Creditor Trust shall be satisfied and paid from such Creditor Trust's Creditor Trust Operating Reserve in accordance with the applicable Creditor Trust Documents. Periodically, until the dissolution of a Creditor Trust, the applicable Creditor Trustee will replenish the Creditor Trust Operating Reserve from Cash held or received by such Creditor Trust to the extent deemed necessary by such Creditor Trustee to satisfy and pay estimated future Creditor Trust Operating Expenses in accordance with the Creditor Trust Documents.

(k)        **U.S. Federal Income Tax Matters Relating to the Creditor Trusts**. Each Creditor Trust (other than any Tribe Trust entity that is formed as a legal entity other than a trust) is intended to be treated, and shall be reported, as a "qualified settlement fund," and the Initial Private Creditor Trust Distributions, distributions on account of the MDT Private Claims, Public Creditor Trust Distributions, Initial Public Schools Distribution, distributions on account of the MDT Public School Districts Claim, the right to receive Governmental Remediation Trust and Tribe Trust NewCo Distributable Cash, and any other amounts received pursuant to the Plan, as applicable, made to such Creditor Trust are intended to be treated as amounts transferred by, or on behalf of, a "transferor" to a "qualified settlement fund," within the meaning of Treasury Regulations sections 1.468B-1 and 1.468B-2 for U.S. federal income tax purposes and shall be treated consistently for state and local tax purposes to the extent applicable. All parties (including, without limitation, the Shareholder Payment Parties, Holders of Claims against or Interests in the Debtors, the Related Parties of such Holders, the Debtors, the Creditor Trusts, the Creditor Trustees, the Foundation, the MDT Trustees and the Master Disbursement Trust) will be required to report consistently with the foregoing for all applicable tax reporting purposes. A Creditor Trustee from each relevant Creditor Trust shall be the "administrator" within the meaning of Treasury Regulations section 1.468B-2(k)(3) of the applicable Creditor Trust. The administrator of each such Creditor Trust shall be responsible for filing all tax returns required to be filed by or on behalf of the applicable Creditor Trust and the payment, out of the assets of such Creditor Trust, of any taxes due by or imposed on such Creditor Trust. Each Creditor Trustee may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all tax returns filed by or on behalf of the applicable Creditor Trust for all taxable periods through the dissolution of such Creditor Trust. Nothing in this Section 5.8(k) shall be deemed to determine, expand or contract the jurisdiction of the Bankruptcy Court under section 505 of the Bankruptcy Code.

(l)        **Exculpation and Indemnification of the Creditor Trustees and the Creditor Trust Overseers**. To the maximum extent permitted by applicable law, each of the Creditor Trustees and Creditor Trust Overseers shall not have or incur any liability for actions taken or omitted in his or her capacity as a Creditor Trustee or Creditor Trust Overseer, or on behalf of the applicable Creditor Trust, except those acts found by Final Order to be arising out of his or her willful misconduct, bad faith, gross negligence or fraud, and shall be entitled to indemnification, advancement and reimbursement for reasonable fees and expenses in defending any and all of his or her actions or inactions in his or her capacity

as a Creditor Trustee or Creditor Trust Overseer, or on behalf of the applicable Creditor Trusts, and for any other liabilities, losses, damages, claims, costs and expenses arising out of or due to the implementation or administration of the Plan or the applicable Creditor Trust Documents, in each case, except for any actions or inactions found by Final Order to be arising out of his or her willful misconduct, bad faith, gross negligence or fraud. Any valid indemnification claim of any of the Creditor Trustees or Creditor Trust Overseers shall be satisfied from the respective Creditor Trusts.

(m)    **Dissolution of the Creditor Trusts**. Each Creditor Trust shall be dissolved and the applicable Creditor Trustee shall be discharged from its duties with respect to such Creditor Trust upon completion of its duties and the satisfaction of the purposes of the Creditor Trust as set forth in this Plan and the applicable Creditor Trust Documents.

### 5.9    *Attorneys' Fees and Costs*.[17]

(a)    **Local Government Costs and Expenses**. On the Effective Date, the Local Government Costs and Expenses Fund shall be established for the payment of certain attorneys' fees and costs of Holders of Non-Federal Domestic Governmental Channeled Claims (other than States) subject to the terms set forth herein, other than amounts paid pursuant to the AHC Reimbursement Agreement Assumption Order, the MSGE Group Reimbursement Order or any other Order of the Bankruptcy Court.

(i)    The Local Government Costs and Expenses Fund shall be funded beginning on the second MDT Distribution Date (the "**Initial LG Costs Funding Date**") and continuing on each Scheduled MDT Distribution Date thereafter, from periodic distributions in an amount equal to [8.5]% of the Distributions made on account of Non-Federal Domestic Governmental Channeled Claims, excluding (A) any Distributions relating to MDT Insurance Proceeds, and (B) any amounts distributed on account of such Non-Federal Domestic Governmental Channeled Claims on the Effective Date, but including any Distributions on account of amounts payable under the Governmental Entity Shareholder Direct Settlement (other than such Distributions on the Effective Date); *provided* that the amount to be distributed to the Local Government Costs and Expenses Fund shall not exceed $[370] million in the aggregate (the "**Aggregate LG Cost Cap**"); provided, further that amounts funded pursuant to this section 5.9(a) shall be allocated and applied solely in accordance with Exhibit R to the Governmental Entity Shareholder Direct Settlement for the benefit of counsel to Subdivisions constituting Prior Litigating Subdivisions (as defined in the Governmental Entity Shareholder Direct Settlement Agreement) as of the Petition Date, in each case, as follows: (i) $4 million annually for a maximum of five (5) years (plus [4.25%] of any Distribution constituting a Settlement Prepayment (as defined under the Master Shareholder Settlement Agreement)), to the "Cost Fund," as defined in Exhibit R, established in the MDL Proceeding, not to exceed $20 million in the aggregate, and (ii) for any additional amounts (A) [40%] to the "Contingency Fee Fund," as defined in

---

[17] [**NTD**: Section 5.9 under discussion by relevant parties]

Exhibit R, established in the MDL Proceeding (which fund is to be managed by the fee panel appointed in connection with the MDL Proceeding), not to exceed $140 million, and (iii) [60%] to the "Common Benefit [Fee] Fund," as defined in Exhibit R, established in the MDL Proceeding, not to exceed $210 million in the aggregate; provided further, as consideration for the settlement between holders of certain public and private Claims regarding Special Operating Reserves, timing of payment and allocation matters, the Local Government Costs and Expenses Fund shall also be funded with, and allocated solely in accordance with Exhibit R, Distributions made on account of Non-Federal Domestic Governmental Channeled Claims (as qualified in this Section 5.9(a)(i) above) in an amount equal to [8.5]% of (i) the incremental $80 million of Initial Private Creditor Trust Distributions (provided that funding of the Local Government Costs and Expenses Fund with respect to such distributions shall not be made until the Initial LG Costs Funding Date); and (ii) up to $20 million of amounts payable in respect of (A) the Private Claimants' Priority Reversion and (B) the other amounts contemplated to be paid under [Section 5.05(e)] of the Master Shareholder Settlement Agreement, in each case, that become payable to the Private Creditor Trusts in accordance with the Master Shareholder Settlement Agreement, which amounts shall be subject in each case to the Aggregate LG Cost Cap;

(ii)  In addition to the amounts described in subsection (i) above, the Local Government Costs and Expenses Fund shall be funded, and allocated solely in accordance with Exhibit R, on or after the Initial LG Costs Funding Date with an additional amount equal to 12.4% of the MDT Insurance Proceeds which amounts, if any, shall be deposited into an account designated by the MDL Plaintiffs' Executive Committee for the benefit of the "Common Benefit [Fee] Fund" established in the MDL Proceeding, and as described in Exhibit R, and shall be incremental to, and not otherwise count against, the Aggregate LG Cost Cap; provided, for the avoidance of doubt, such funded amounts shall not be considered "Distributions" for the purpose of subsection (i) above; provided, further, such amounts shall be subject, to the prior payment in full of the MDT PI Claim pursuant to and in accordance with Section 5.2(e)(ii).

(iii)  Payments from the Local Government Costs and Expenses Fund shall be [administered in accordance with Exhibit R to the Governmental Entity Shareholder Direct Settlement and be][18] the exclusive means of payment from the Creditor Trusts for costs and expenses (including attorneys' fees) of any Holder of a Non-Federal Domestic Governmental Channeled Claim (other than a

---

[18] [**NTD:** Exhibit R remains under negotiation among the parties, and all parties rights with respect to the terms of Exhibit R and any related plan terms are expressly reserved.]

State) or any attorney therefor, other than (i) amounts paid or to be paid from the Creditor Trusts in accordance with existing agreements, contracts or statutes setting forth the allocation and uses of abatement funds or backstop fee arrangements between States and their Subdivisions; and (ii) amounts paid in accordance with the order of the MDL Court establishing the Common Benefit Fund; provided, however, nothing in this section 5.9(a)(iii) [or Exhibit R to the Governmental Entity Shareholder Direct Settlement] shall override the payment obligations contemplated by <u>Section 5.9(a)(i)</u>.

(iv)     [Except as otherwise agreed in writing by the MSGE Group and the MDL Plaintiffs' Executive Committee, the MSGE Fee Allocation Agreement shall be and remain fully enforceable and shall apply to the Local Government Costs and Expenses Fund]; provided that the costs associated with the arbitration process contemplated under the MSGE Fee Allocation Agreement shall not be paid by the Debtors, their Estates or any Creditor Trust.

(b)      **State Costs and Expenses**. On the Effective Date, the State Expenses Fund shall be established for the payment of expenses (including attorneys' fees) of the States (including any ad hoc group thereof), other than amounts already paid, or any amounts paid or payable under the AHC Reimbursement Agreement Assumption Order, the MSGE Group Reimbursement Order or any other Order of the Bankruptcy Court; provided that the State Expenses Fund shall be funded beginning on the second MDT Distribution Date and continuing on each Scheduled MDT Distribution Date thereafter. The State Expenses Fund shall be funded from periodic distributions in an amount equal to [4.5]% of the Distributions made on account of Non-Federal Domestic Governmental Channeled Claims, excluding any amounts distributed on account of such Non-Federal Domestic Governmental Channeled Claims on the Effective Date, but including (a) any Distributions on account of amounts payable under the Governmental Entity Shareholder Direct Settlement (other than such Distributions on the Effective Date), and (b) any Distributions relating to MDT Insurance Proceeds; *provided* that such amount shall not exceed $[200][19] million in the aggregate (the "**Aggregate State Expenses Cap**").

For the avoidance of doubt, in no event shall any of the provisions of Section 5.9(a) or (b), [Exhibit R to the Governmental Entity Shareholder Direct Settlement] [or any order of the MDL Court (including the order establishing the Common Benefit Fund)] have any effect on the Distributions made to Holders of Claims in Classes [____] (or the rights of any of their attorneys to receive payment) other than the recognition of the priority of section 5.2(e)(ii) in such provisions.[20]

(c)      **Common Benefit Fund Assessments**. On the Effective Date, the following assessments shall be made to the account directed in Exhibit [●], which is the Common Benefit Fund established by the MDL Court (the "**Common Benefit Fund**"): (i) 5% of each Distribution made by the Private Creditor Trusts, and (i) 5% of the Initial Public Schools' Special Education Initiative Contribution. Assessments from the Private Creditor Trusts shall be paid [on periodic schedules for each Private Creditor Trust acceptable to the Governmental Consent Parties, the Ad Hoc Group of Hospitals, the

---

[19] [**NTD**: Amount subject to ongoing review]

[20] For the avoidance of doubt, no order of the MDL Court establishing the Common Benefit Fund will have any effect on any Private Claimant or its counsel, nor will the MDL Court have jurisdiction to interpret, decide, hear disputes, or enforce any provision of or regarding this Plan or the Confirmation Order [[or any of the agreements or documents related thereto]].

Third-Party Payor Group, the NAS Committee and the Ad Hoc Group of Individual Victims,] as applicable. The assessments payable by the Public School Trust shall be deducted from and paid at the time of the fee award described in Section 5.9(h)(ii). All assessments of 5% of each Distribution made by the Private Creditor Trusts shall be transferred to and distributed in accordance with the order of the MDL Court establishing the Common Benefit Fund. To the extent a Holder of a Hospital Channeled Claim, a Third-Party Payor Channeled Claim, an NAS PI Channeled Claim or a Non-NAS PI Channeled Claim (or any ad hoc group consisting of Holders of any of the foregoing) has retained counsel through a contingency fee arrangement, any contingency fees owed to such contingency counsel payable from Distributions under the Plan shall be reduced by the full amount payable under this Section 5.9(a).[21] However, the applicable Holder and its counsel, in their sole discretion, may agree that an amount up to but not exceeding 40% of the amount payable under this Section 5.9(a) may be applied to the reimbursement of actual costs and expenses incurred by such Holder's counsel, in which case such agreed cost-reimbursement amount shall not reduce the contingency fee amounts payable to such counsel.

(d)    **Hospital Costs and Expenses**. On the Effective Date, the Hospital Attorney Fee Fund shall be established for the payment of attorneys' fees and costs of the Ad Hoc Group of Hospitals with respect to Hospital Channeled Claims. The Hospital Attorney Fee Fund shall be funded with (i) 20% of each Distribution made to the Hospital Trust less (ii) the amount of such Distributions payable to the Common Benefit Escrow and the Common Benefit Fund under Section 5.9(a). The Hospital Attorney Fee Fund shall be administered by the Hospital Trust on terms acceptable to the Ad Hoc Group of Hospitals.

(e)    **Ratepayer Costs and Expenses**. In the event that the Ratepayer Mediation Participants Stipulation has been entered into on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter, the attorneys' fees of the Ratepayer Mediation Participants shall be paid from Effective Date Cash in an amount not to exceed $1.4 million.

(f)    **ERP Costs and Expenses**. The ERP Trust shall pay or reimburse, as applicable, the compensation, costs and expenses of professionals that represented or advised the ERP Trustee in connection with the Chapter 11 Cases, to the extent provided for in the ERP Trust Documents.

(g)    **PI Claimant Costs and Expenses**.

(i)    Debtors shall pay the reasonable and documented fees and expenses of the Ad Hoc Group of Individual Victims subject to the entry of a Final Order granting the Ad Hoc Group of Individual Victims' request for allowance of such fees and expenses under section 503(b) of the Bankruptcy Code, which request shall be supported by the Debtors and the Creditors' Committee and considered at the Confirmation Hearing. In the event such a Final Order is (i) not entered or (ii) entered allowing fees and expenses in an amount less than reasonable and documented fees and expenses requested, then (A) the PI Trustee shall pay or reimburse, as applicable, the reasonable and documented fees and expenses of professionals that represented or advised the Ad Hoc Group of Individual Victims in connection with the Chapter 11

---

[21] For the avoidance of doubt, any amount payable to counsel to the Ad Hoc Group of Individual Victims or the Ad Hoc Group of NAS Children on an hourly basis (including incremental amounts in consideration of deferring payment of hourly fees) shall not constitute a "contingency fee," and the agreement in respect thereof shall not constitute a "contingency fee arrangement," in each case for purposes of Section 5.9 of the Plan.

Cases, as and to the extent provided in the PI Trust Agreement and subject to Bankruptcy Court approval of such fees and expenses as provided in the Confirmation Order and (B) such fees and expenses paid or reimbursed, as applicable, by the PI Trust shall be deducted from Distributions from the PI Trust Non-NAS Fund to Holders of Allowed Non-NAS PI Channeled Claims pursuant to the PI Trust Documents.

(ii)     The PI Trustee shall pay or reimburse, as applicable, the reasonable and documented fees and expenses of professionals that represented or advised the NAS Committee in connection with the Chapter 11 Cases, as and to the extent provided in the PI Trust Agreement and subject to Bankruptcy Court approval of such fees and expenses as provided in the Confirmation Order. Such compensation, costs and fees paid or reimbursed, as applicable, by the PI Trust shall be deducted from Distributions from the PI Trust NAS Fund to Holders of Allowed NAS PI Channeled Claims and pursuant to the PI Trust Documents. Nothing in this Section 5.9 shall impair or otherwise affect any fee contract that is not a contingency fee contract between the Ad Hoc Group of Individual Victims and its professionals, or between the NAS Committee and its professionals.

(h)     **Public Schools' Costs and Expenses**. From the Initial Public Schools Distribution, the Public School Trust shall:

(i)     dedicate an amount of $500,000 for payment or reimbursement, as applicable, of the out-of-pocket litigation expenses, such as for special bankruptcy counsel and expert fees and expenses, of professionals that represented or advised the Public School District Claimants to be computed based upon reasonable hourly rates and costs incurred, and not to include any premium to reasonable hourly rates, and subject to Bankruptcy Court approval of such litigation expenses as provided in the Confirmation Order; and

(ii)     pay or reimburse, as applicable, the reasonable attorneys' fees and litigation costs of the Public School District Claimants' putative class counsel in an amount determined by mediator Ken Feinberg (which amount is not to exceed such class counsel's contractual contingency fee of 25% of the Initial Public Schools Distribution) subject to Bankruptcy Court approval of such litigation expenses as provided in the Confirmation Order, *less* the amount payable to the Common Benefit Escrow under Section 5.9(c).

(i)     **No Impairment of Contingency Fee Contracts; No Further Assessment**. Except as expressly set forth in this Section 5.9, nothing in the Plan shall impair or otherwise affect any contingency fee contract between any Holder of a Claim (or any ad hoc group of Holders of Claims) and such Holder's (or ad hoc group's) counsel. In this regard, the payment of the assessments described in this Section 5.9 shall be the only payment that such Holders (or their counsel) shall ever have to make to the Common Benefit Fund with respect to amounts distributed under this Plan, and amounts

104

distributed pursuant to the Plan to such Holders or payments to attorneys in respect thereof shall not be subject to any further or other common benefit or similar assessments.

### 5.10    *Transferability of Distribution Rights*.

Any right to receive a Distribution or other payment from the Plan Administration Trust (including any PAT Distribution Account or PAT Reserve), a Creditor Trust or the Master Disbursement Trust shall not be evidenced by any certificate, security, receipt or in any other form or manner whatsoever, except on the books and records of the Plan Administration Trust (as maintained by the Plan Administration Trustee), the applicable Creditor Trust (as maintained by the applicable Creditor Trustees) or the Master Disbursement Trust (as maintained by the MDT Trustees), as applicable. Further, any right to receive a Distribution or other payment from the Plan Administration Trust (including any PAT Distribution Account or PAT Reserve), a Creditor Trust or the Master Disbursement Trust shall be nontransferable and nonassignable except by will, intestate, succession or operation of law or as otherwise provided in the Plan, the applicable Creditor Trust Documents, Governmental Entity Shareholder Direct Settlement Agreement or the MDT Agreement. Any rights to receive a Distribution or other payment from the Plan Administration Trust (including any PAT Distribution Account or PAT Reserve), a Creditor Trust or the Master Disbursement Trust shall not constitute "securities" and shall not be registered pursuant to the Securities Act. If it is determined that such rights constitute "securities," the exemption provisions of section 1145(a)(1) of the Bankruptcy Code would be satisfied and such securities would be exempt from registration.

### 5.11    *Insurance Neutrality*.

Nothing in the Plan, the Plan Documents or the Confirmation Order shall alter, supplement, change, decrease or modify the terms (including conditions, limitations and/or exclusions) of the Purdue Insurance Policies, including the MDT Insurance Policies; *provided* that, notwithstanding anything in the foregoing to the contrary, the enforceability and applicability of the terms (including conditions, limitations and/or exclusions) of the Purdue Insurance Policies, including the MDT Insurance Policies, and thus the rights or obligations of any of the Insurance Companies, the Debtors and the applicable post-Effective Date Entities, including the Master Disbursement Trust, arising out of or under any Purdue Insurance Policy, including any MDT Insurance Policy, whether before or after the Effective Date, are subject to the Bankruptcy Code and applicable law (including any actions or obligations of the Debtors thereunder), the terms of the Plan and the Plan Documents, the Confirmation Order (including the findings contained therein or issued in conjunction therewith, including but not limited to any findings pursuant to Sections 5.2 and 5.6(i) of the Plan) and, to the extent the Insurance Companies have or had adequate notice from any source, any other ruling made or order entered by the Bankruptcy Court whether prior to or after the Confirmation Date. For the avoidance of doubt, nothing contained in the Plan, the Plan Documents or the Confirmation Order shall operate to require any Insurance Company to pay under any Purdue Insurance Policy the liability of any Person that was not an insured prior to the Petition Date.

### 5.12    *Transfer of Books and Records; Cooperation; Privilege*.

(a)    **Transfer of Books and Records to NewCo and the Plan Administration Trust**. Except with respect to Excluded Assets, all documents, books and records of the Debtors shall be transferred and assigned to NewCo on or prior to the Effective Date pursuant to the NewCo Transfer Agreement; *provided* that, from and after the date of such transfer, the Plan Administration Trustee shall have the right to retain copies of all transferred documents, books and records and NewCo shall permit the Plan Administration Trustee and its counsel and representatives to have full access to such transferred documents, books and records. All documents, books and records of the Debtors that are Excluded Assets shall be transferred and assigned to the Plan Administration Trust; *provided* that, except for the Excluded Privileged Materials, NewCo shall receive copies of all documents, books and records of the Debtors that

105

are Excluded Assets. Any documents transferred under this <u>Section 5.12(a)</u> that are documents that were produced to the Debtors by Shareholder Released Parties in connection with Purdue Legal Matters shall continue to remain subject to the terms of the Protective Order and any order of the Bankruptcy Court or provision of this Plan affording confidentiality protections to such documents, unless such documents are included in the Public Document Repository in accordance with the Plan and the Master Shareholder Settlement Agreement.

(b)     **Cooperation with the Master Disbursement Trust and the Creditor Trusts**. On the Effective Date or as soon as reasonably practicable thereafter, the Debtors shall transfer and assign, or cause to be transferred and assigned, (i) to the MDT Trustees, (A) copies of all MDT Insurance Policies, (B) information and copies of documents, including books and records of the Debtors that reasonably relate to (I) any Claims previously noticed, tendered or submitted or paid by any Insurance Company under the MDT Insurance Policies and (II) any MDT Causes of Action, and (C) other information and copies of all other documents, including books and records of the Debtors that are reasonably necessary to preserve, secure or obtain the benefit of the MDT Insurance Rights, pursue the MDT Causes of Action or liquidate any other MDT Transferred Assets and (ii) to each Creditor Trust, a copy of the Proofs of Claims for Channeled Claims channeled to such Creditor Trust. Subject to <u>Section 5.12(c)</u> of the Plan, the materials to be provided pursuant to this <u>Section 5.12(b)</u> include those in the possession of the Debtors' current and former insurance coverage counsel. On and after the Effective Date, the Plan Administration Trustee and NewCo may maintain their respective documents, books and records in accordance with their respective document retention policies set forth in the PAT Agreement and the NewCo Operating Agreement, respectively. Prior to the Effective Date, the Debtors shall use reasonable best efforts to provide the Creditors' Committee and the Governmental Consent Parties reasonable access to current employees and professionals of the Debtors (including insurance brokers) with knowledge concerning the information and documents to be provided to the Master Disbursement Trust under this <u>Section 5.12(b)</u>, and, after the Effective Date, NewCo shall use best efforts to provide the Master Disbursement Trust reasonable access to employees and professionals of NewCo with knowledge concerning such information and documents and to facilitate access to former employees and professionals of the Debtors (including insurance brokers). The Plan Administration Trustee and NewCo shall respond to reasonable requests of (x) the MDT Trustees for information and documents related to the MDT Insurance Rights, the MDT Causes of Action or otherwise, in each case to the extent reasonably necessary for the administration of the Master Disbursement Trust, and (y) each Creditor Trustee for information and documents relating to the applicable Channeled Claims or otherwise, in each case to the extent reasonably necessary for the administration of the applicable Creditor Trust. In the event of any dispute between the MDT Trustees and NewCo regarding the delivery of information or documents requested pursuant to clause (x) of the foregoing sentence, the MDT Trustees shall have the right to request intervention by the Foundation Trustees to resolve any such dispute.

(c)     **Privilege**. The transfer or assignment of information and copies of documents, including books and records, in accordance with this <u>Section 5.12,</u> shall not result in the destruction or waiver of any applicable Privileges. On the Effective Date, all Privileges in connection with the information or documents transferred in accordance with this <u>Section 5.12</u> shall be transferred to, and vest exclusively in, NewCo, the MDT Trustees, the Plan Administration Trustee and the Creditor Trustees in accordance herewith. Further, with respect to the transfer of Privileges to the MDT Trustees and the Creditor Trustees, such Privileges shall (i) be transferred to such MDT Trustees and Creditor Trustees for the purpose of enabling such Persons to perform their respective duties as set forth in the Plan or in the MDT Agreement or the applicable Creditor Trust Documents and for no other reason, (ii) vest solely in the MDT Trustees and the Creditor Trustees and not in the Master Disbursement Trust or the Creditor Trusts, or any other committee or subcomponent of the Master Disbursement Trust or the Creditor Trusts, or any other Person (including counsel and other professionals) who is (or has been engaged by, represents or has represented) any Holder of a Claim against or Interest in the Debtors or any Person that alleges or may allege a Claim, directly or indirectly, relating to or arising out of the Debtors' Products or operations and

(iii) be preserved and not waived as a result of such transfer. For the avoidance of doubt, any such transfer shall have no effect on any right, Claim or Privilege of any Person other than the Debtors. No information subject to a Privilege shall be disclosed or communicated by the MDT Trustees or the Creditor Trustees (x) to any Person not entitled to receive such information, including for the avoidance of doubt any Person (including counsel and other professionals) who is (or has been engaged by, represents or has represented) any Holder of a Claim against or Interest in the Debtors or any Person that alleges or may allege a Claim, directly or indirectly, relating to or arising out of the Debtors' Products or operations or (y) for any reason or in any manner other than as necessary for such Persons to perform their respective duties as set forth in the Plan or in the MDT Documents or the applicable Creditor Trust Documents. Notwithstanding the foregoing, nothing herein shall preclude the MDT Trustees from providing information or documents received pursuant to this Section 5.12 to any Insurance Company as necessary to preserve, secure or obtain the benefit of the MDT Insurance Rights.

**5.13**    ***Public Document Repository***.

(a)    **Summary**. The document disclosure program provided in this Plan will lead to the public disclosure of the most significant documents about Purdue, the Sackler family and the opioid crisis, including video depositions and millions of documents that Purdue produced in investigations and litigation over the past two decades. In addition, it will lead to the public disclosure of millions of documents not previously available to the public, including documents not previously produced in any investigation or litigation and certain privileged documents from the years when Purdue developed and promoted OxyContin, as identified below. The document disclosure program and Public Document Repository will be conducted in a way to maximize public confidence and public access and will set a new standard for transparency.

(b)    **DOJ Repository Obligation**. The Debtors bear sole responsibility for complying with the DOJ document repository obligation set forth in the Plea Agreement ("***DOJ Repository Obligation***"), and the DOJ Repository Obligation is not modified by this Plan. Similarly, the Debtors' satisfaction of the DOJ Repository Obligation shall not diminish the additional commitment to disclosure provided by this Plan. Instead, the public shall receive the full benefit of both, and the Public Document Repository shall contain the full set of documents that the Debtors have agreed to host under the DOJ Repository Obligation.

(c)    **Disclosure Oversight Board**. As described further below, the disclosure program provided in this Plan shall be overseen by the DOB created on the Confirmation Date, consisting of up to four (4) representatives appointed by each of the Ad Hoc Committee, the Creditors' Committee, the States AG Negotiating Group and the MSGE Group and one (1) representative appointed by the Native American Tribe Group. No current or former director, officer, employee or attorney of the Debtors shall serve on the DOB or oversee the disclosure program.

(d)    **Purdue Legal Matters**. As described further below, important material for the disclosure program is contained in documents that the Debtors preserved, collected, logged and produced in connection with investigations and litigation about Purdue's opioid business. Many non-privileged documents were produced in those matters, and many privileged documents were identified and logged. This Section 5.13 provides for the disclosure of many documents from the Purdue Legal Matters, which is a broad set of investigations and litigation defined in the Plan.

(e)    **Disclosure Program Budget**. As described further below, the disclosure program is designed to avoid unnecessary expense, including by employing an unpaid volunteer oversight board and by using negotiated agreements to avoid the need for litigation. The disclosure program shall be funded in an aggregate amount of $39 million, which shall be paid in the following installments: (i) $2 million on the Effective Date, (ii) $10 million on the second Scheduled MDT Distribution Date,

107

(iii) $10 million on the third Scheduled MDT Distribution Date, (iv) $8.5 million on the fourth Scheduled MDT Distribution Date and (v) $8.5 million on the fifth Scheduled MDT Distribution Date (collectively, the "***Disclosure Program Budget***"). The Disclosure Program Budget shall be spent at the direction of the DOB. In addition, as provided in the Plan, Domestic Governmental Entities may elect (but are not required) to direct portions of their distributions to the Public Document Repository under terms provided in the Plan. Moreover, the DOB shall be permitted, but not required, to coordinate its work on this disclosure program with the work of state Attorneys General on related disclosures in the opioid industry, in a manner that reduces the costs and increases the benefits of this disclosure program. Finally, to make efficient use of the knowledge and expertise of the Debtors and their professionals, the Plan provides for significant materials to be collected by the Effective Date, or as soon as reasonably practicable thereafter, as described further below. For the avoidance of doubt, the Public Document Repository shall not be owned, held, administered or operated by the DOB, the Master Disbursement Trust or any Creditor Trust; the role of the DOB is to develop and oversee a temporary program to set up the appropriate Public Document Repository and achieve the goals of the disclosure program.

(f)    **Access Materials**.

(i)    Subject to the Protected Information review, as described in Section 5.13(o) of the Plan, the Debtors, the Plan Administration Trust, or any entity or law firm designated by the Debtors or the Plan Administration Trust to assist in that review, shall provide the DOB access to a set of non-privileged materials for the purpose of accomplishing the Public Document Repository (collectively, the "***Access Materials***") on a rolling basis following the Effective Date. These Access Materials shall include:

(A)    all transcripts and audio or video recordings of depositions taken in the Purdue Legal Matters, together with the exhibits to those depositions;

(B)    all documents produced by the Debtors in the Purdue Legal Matters (which comprise more than thirteen million documents and more than one hundred million pages);

(C)    the non-privileged documents from the Relativity Database (as defined below) (which are estimated to comprise more than twenty million additional documents beyond those produced in the Purdue Legal Matters);

(D)    all privilege logs regarding documents withheld by the Debtors in the Purdue Legal Matters; and

(E)    documents obtained during the Chapter 11 Cases by the NAS Committee regarding clinical and pre-clinical studies conducted by the Debtors or other companies associated with the Sackler Family Members.

(ii)    The Debtors, the Plan Administration Trust, or any entity or law firm designated by the Debtors or the Plan Administration Trust, will use their best efforts to complete the review of Protected Information and production of the Access Materials no later than 12 months after the Effective Date. Following entry of the

Confirmation Order, the Debtors shall pay Wiggin and Dana LLP $5 million as a retainer on account of Wiggin and Dana LLP's fees and expenses in connection with the review of Protected Information as contemplated pursuant to Section 5.13(o) of the Plan. Upon its completion of such review, Wiggin and Dana LLP shall refund any unused portion of the $5 million to the Master Disbursement Trust concurrent with the final release of Access Materials to the DOB.

(iii)    All documents containing information that is redacted as described in Section 5.13(o) of the Plan, and not included in the Access Materials provided to the DOB, will be provided to the Plan Administration Trust. The Plan Administration Trust will retain these materials for the period described in Section 5.13(aa).

(g)    **Debtors' Relativity Database**. In the course of the Purdue Legal Matters, the Debtors collected a significant set of documents that are stored in a Relativity database (the "***Relativity Database***"). This collection includes files from more than two hundred custodians who played important roles at Purdue, including every Sackler Family Member who sat on the board or worked at the company. It also includes non-custodial documents, such as collections from electronic drives and paper archives. The custodial and non-custodial documents collected for the Relativity Database are from files that Purdue has preserved pursuant to broad document preservation policies in place for over twenty years, including from an email archive containing emails dating to the 1990s. Pursuant to the terms provided in this Section 5.13, materials from the Relativity Database created before February 2018 will be available for the disclosure program as described in this Section 5.13.

(h)    **Additional Collections**. On or before the Effective Date, the DOB will identify to the Debtors the additional custodians whose documents should be collected, to the extent possible, from the email archive and other preserved files, and the Debtors will load those files into the Relativity Database for inclusion as Access Materials or Sequestered Materials, as applicable.

(i)    **Sequestered Materials**. On the Effective Date, or as soon as reasonably practicable thereafter, the Debtors shall provide the Plan Administration Trust with certain Privileged documents, described below, collected by the Debtors during the course of the Purdue Legal Matters and stored in the Relativity Database ("***Sequestered Materials***"), to be preserved for access by the DOB. The provision of the Sequestered Materials to the Plan Administration Trust shall not constitute a waiver of any applicable privileges, and, for clarity, no waiver of any applicable Privilege shall occur prior to the Sequestration Date (as defined below). The Sequestered Materials are estimated to include hundreds of thousands of documents. To leverage efficiencies, the Debtors' current document review teams with experience reviewing Purdue's documents for privilege will screen and review, as necessary, all documents currently in the Relativity Database for Privilege, attorney work product, confidentiality, the Health Insurance Portability and Accountability Act or similar state or federal statute and critical business information before turning over documents as Access Materials or as Sequestered Materials. The DOB will aid the Debtors' document review team in setting parameters and search terms to effectuate accurate screening and review. The DOB may, confidentially and subject to privilege, request and be provided with information, and, as necessary, an appropriate, expert-aided statistically valid sampling of the relevant documents or other methodologies to aid in the foregoing review under an appropriate protective order and non-waiver agreement.

(i)    Subject to the Sequestration Date, the Debtors agree to waive attorney client and work product privilege over documents created

109

before May 1, 2014 ("***Cutoff Date***") that fall within the following categories:

(A)     Marketing materials, promotional materials and sales strategies. This will include, for example, legal advice on: marketing and promotional materials as part of the medical, regulatory, legal review process and other reviews of statements in promotional and marketing materials to ensure consistency with a product's labeling and legal requirements; sales training materials (such as how to instruct the sales team on what they can and cannot say about the products); review of all call notes and whether statements on sales calls were appropriate; call planning; and sales bulletins. For the avoidance of doubt, "sales strategies" in this paragraph includes documents related to (I) medical liaisons, (II) continuing medical education, (III) the evolve to excellence program, (IV) Purdue's interactions with medical advocacy groups, and (V) legal advice regarding the performance, selection, retention, management and compensation of personnel in sales and marketing;

(B)     Materials reflecting legal advice on submissions to the FDA and compliance with FDA regulations. This will include, for example, advice on the decision to reformulate OxyContin, advice on interactions and communications with FDA and advice on FDA requirements;

(C)     Legal advice regarding distributions to or for the benefit of the Sackler Family Members;

(D)     Legal advice regarding the organization or function of the board of directors;

(E)     Legal advice regarding grants, gifts and other payments with respect to naming rights of Purdue and its shareholders;

(F)     Legal advice regarding the performance, selection, retention, management and compensation of the CEO of Purdue Pharma;

(G)     Legal advice regarding Purdue's interactions with state licensing boards and the federation of state medical boards;

(H)     Legal advice regarding Purdue's interactions with key opinion leaders, advisory boards and treatment guidance;

(I)     Legal advice regarding advocacy before the United States Congress or a state legislative branch with respect to (i)

110

any opioid product sold by Purdue, including OxyContin, or (ii) any public policies regarding the availability and accessibility of opioid products;

(J)     Employment records and files created before the Cutoff Date pertaining to employment terminations or disciplinary actions related to opioid sales and marketing, including documents created before the Cutoff Date pertaining to internal investigations of personnel related to marketing of opioids, in all cases subject to applicable federal and state privacy and similar laws with respect to employees and with any redactions necessary to comply therewith; and

(K)     To the extent provided during the time period while the corporate integrity agreement was in effect, legal advice regarding compliance with the corporate integrity agreement entered into between Purdue and the DOJ Office of the Inspector General of the U.S. Department of Health and Human Services;

(L)     Legal advice regarding compliance with the consent judgments entered into between Purdue, the Debtors and the State Attorneys General and other state representatives in 2007;

(M)     Legal advice to Purdue's public relations department regarding the promotion, sales, or distribution of Purdue's opioid products, including but not limited to their safety, efficacy, addictive properties, or availability of opioid products; and

(N)     Legal advice to Purdue's compliance department regarding the organizational structure of the compliance department, including its processes for implementing order monitoring systems, suspicious order monitoring programs, and abuse deterrence and detection programs.

(ii)     Subject to the Sequestration Date, below, the Debtors agree to waive attorney client and work product privilege over the following categories of documents:

(A)     Documents reflecting law department reviews of, and decisions regarding, health care providers and pharmacies pursuant to Purdue's abuse and diversion detection, order monitoring system and suspicious order monitoring programs, which will have been or will be provided to the DOJ under a June 2019 non-waiver agreement;

(B)     Documents created before February 2018 reflecting legal review, analysis and advice with respect to advice received from McKinsey & Company, Publicis Groupe

<div style="margin-left:2em;">
S.A., Publicis Health, LLC, Razorfish Health, Publicis Health Media, LLC, Publicis Touchpoint Solutions, Inc., or Verilogue, Inc. related to the sale and marketing of opioids; and
</div>

(C)     Documents created before June 30, 2017 reflecting legal review, analysis and advice with respect to Practice Fusion.

(iii)     To the extent documents subject to any of the foregoing waivers were previously logged on a privilege log in a Purdue Legal Matter, the Debtors shall provide the DOB with amended privilege logs that indicate the entries being produced pursuant to these waivers. For the avoidance of doubt, Privileged communications (during the applicable time periods set forth in Section 5.13(i)(i) and (ii)) about interactions with the media with respect to subject matters that are otherwise waived herein are included in such waivers.

(iv)     Nothing herein shall waive any third-party privilege or other rights, whether arising from a joint defense agreement, common interest privilege or otherwise, to which any document described in Section 5.13(i)(i) and (ii) is subject and which the Debtors do not have authority to waive. The Debtors will provide the DOB with privilege logs reflecting documents subject to such third-party privileges and rights that are identified in the course of identifying and compiling the Sequestered Materials. No documents subject to such third-party privileges and rights shall be included in the Public Document Repository, absent appropriate resolution of such third parties' rights and privileges. Further, no waiver of Privilege described herein shall be construed as subject matter waiver. Subject to the foregoing, the Debtors, and the Creditors' Committee, and the Governmental Consent Parties shall work together in good faith to ensure that all documents consistent with the Sequestered Material categories shall be available to the DOB for potential inclusion in the Public Document Repository in accordance with this Section 5.13.

(j)     **Protection of the Privilege**. For the avoidance of doubt, the Debtors do not waive any Privilege and do not agree to provide as Sequestered Materials for the Public Document Repository any Privileged documents or communications not otherwise identified in Section 5.13(i)(i) and (ii). Such Privileged documents and communications not otherwise identified in Section 5.13(i)(i) and (ii) shall be removed from the Relativity Database and separately preserved, and shall not be eligible for the Public Document Repository at any time. All Privileged documents removed from the Relativity Database, and not included in the Sequestered Materials described above, will be provided to the Plan Administration Trust, separately from the Sequestered Materials. The Plan Administration Trust will retain these materials for the period described in Section 5.13(aa). For clarity, except for the Sequestered Materials identified in Section 5.13(i)(i) and (ii), the Debtors shall not intentionally provide the Master Disbursement Trust or the DOB with access to any documents or content of documents that are Privileged. In the event that the Debtors inadvertently provide the Master Disbursement Trust or the DOB with access to Privileged documents except for those documents identified in Section 5.13(i)(i) and (ii), that inadvertent provision

shall not operate as a waiver of the Privilege, and, upon discovery, the DOB and/or the Master Disbursement Trust, as applicable, must promptly take steps to return the documents to the Plan Administration Trust or destroy such documents.

(k)     **Sequestration Date**. On the date that is the earlier of (i) six years after the Effective Date and (ii) the date no Material Litigation is or has been pending for the prior six months, including the pendency of any appeals, the Plan Administration Trust shall deliver the Sequestered Materials to the Host Institution (the "***Sequestration Date***"). Those materials shall be made available for assessment by the DOB and disclosure in the Public Document Repository, subject to the other provisions of this Section 5.13.

(l)     **Responsibilities of the DOB**. The DOB shall be responsible for:

(i)     accomplishing prompt, broad, permanent, public disclosure of millions of the Debtors' documents via the Public Document Repository in accordance with this Section 5.13 to allow the public to examine the Debtors' role in the opioid crisis;

(ii)     engaging with survivors, advocates, journalists, scholars, policymakers and others to ensure that the disclosure program serves the public;

(iii)     directing the use of the Disclosure Program Budget;

(iv)     maintaining protections for Protected Information, as described below;

(v)     establishing procedures for resolution of challenges to the redaction or disclosure of information, as described below;

(vi)     overseeing the Host Institution's implementation of the disclosure program;

(vii)     coordinating, as appropriate, the disclosure of documents from other producing parties or non-parties in opioid cases whose confidential information is included in the Access Materials, including by discussing inclusion of Access Materials containing such third-party confidential information;

(viii)     ensuring the long-term sustainability and success of the disclosure program; and

(ix)     retaining and overseeing staff, counsel, or such other resources as are necessary and appropriate to accomplish the DOB's responsibilities under this Section 5.13.

(m)     **Host Institutions**. The host institution(s) shall be selected by the Governmental Consent Parties and the Creditors' Committee (the "***Host Institutions***"). The Host Institution will be responsible for hosting and maintaining the Public Document Repository in perpetuity, including but not limited to: maintaining control and security over documents in the Public Document Repository; providing an accessible user interface; and providing clear and transparent explanations of its procedures to the public. Subject to restrictions and oversight imposed by the DOB, the Host Institution may employ

appropriate resources to accomplish its responsibilities, including but not limited to the use of permanent university employees, temporary employees, contractors and vendor services. Commensurate with the large responsibilities assigned to the Host Institution, and subject to the decisions and oversight of the DOB and the requirements of this Plan, much of the Disclosure Program Budget may be directed to the Host Institution to fund the accomplishment of its responsibilities. As soon as practicable, the Debtors shall meet with the Host Institutions to agree upon the processes to be used by the Debtors to prepare the documents for delivery to DOB, including, for example, protocols, methodologies and technical specifications.

(n)    **Prompt Disclosure**. In keeping with the importance of the matter, the DOB shall dedicate its best efforts to ensure prompt disclosure and shall seek to ensure that the public receives substantial disclosure at least every calendar quarter. The DOB shall prioritize prompt disclosure of the transcripts and audio and video recordings of depositions taken in the Purdue Legal Matters, together with the exhibits to those depositions. The Debtors will prioritize prompt production of the documents that Debtors have agreed to host pursuant to the DOJ Repository Obligation for immediate inclusion in the Public Document Repository for the sake of efficiency and cost savings.

(o)    **Redaction of Protected Information**.

(i)    The Debtors, the Plan Administration Trust, a successor entity to the Plan Administration Trust, or any entity or law firm designated by the Debtors or the Plan Administration Trust, shall implement appropriate procedures to protect the following information ("***Protected Information***") by redacting Protected Information in documents before they are provided to the DOB or disclosed to the public in the Public Document Repository and by promptly catching and correcting errors if Protected Information is disclosed. Protected Information is (i) any information protected from disclosure by the Health Insurance Portability and Accountability Act or similar state or federal statute; (ii) Social Security or tax identification numbers; (iii) personal financial account numbers; (iv) passport numbers and drivers' license numbers; (v) home addresses, personal email addresses, residential addresses, and personal phone numbers, including mobile phone numbers; (vi) information subject to confidentiality or trade secret rights of third parties that Debtors are without authority to abrogate; (vii) information subject to current Trade Secrets protection; (viii) information regarding individuals that is of a purely personal nature and does not pertain to the Debtors' opioid business or related practices; and (ix) other personally identifiable information otherwise protected by law. For the avoidance of doubt, Protected Information that should be redacted in a written document shall also be redacted in audio or video, such as deposition recordings.

(ii)    The Plan Administration Trust must provide to the DOB a redaction log identifying the basis for the redaction with sufficient detail to allow assessment of the redaction's merits. The States AG Negotiating Group and Debtors will discuss and agree upon a robust audit process sufficient for the DOB to verify the Debtors' redactions are consistent with the final Plan, and the DOB's designee(s) and/or any auditors designated by the DOB will be

114

given access to unredacted documents for this purpose subject to confidential safeguards to be agreed upon.

(iii)    The Debtors and the Plan Administration Trust will prioritize the review of certain documents and custodians at the DOB's request.

(iv)    **Trade Secret**. A 'trade secret' is information, including a formula, pattern, compilation, program, device, method, technique or process, that (i) derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure and use; and (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. Information reflecting opioid sales or promotional strategies, tactics, targeting, or data, or internal communications regarding sales or promotion of opioids will not be considered subject to trade secret protection unless the information is or contains specifically enumerated categories of Debtors' Information subject to trade secret protection set forth in Section 5.13(o)(v) of the Plan, and then only such information will be redacted.

(v)    **Debtors' Information Subject to Current Trade Secrets Protection**. The following Debtor documents will be subject to trade secret protection: (i) documents that contain Debtors' trade secrets regarding (a) ANDA/NDA information that is not publicly available or is redacted in FDA filings, including development reports, batch records, and inspections, provided the redacted information contains trade secrets, and (b) Debtors' proprietary models, including the Rebate Return Model and the License & Supply Analysis Model; and (ii) documents dated less than ten (10) years before the disclosure that contain Debtors' trade secrets regarding: (a) Internal Cost of Goods Sold (COGS), including elements and calculations used to calculate COGS such as raw material sourcing, pricing, internal overhead, and capacity allocations, (b) Return on Rebate Model Data Output, and (c) License & Supply Analysis Model Data Output, including COGS, demand data, and gross-to-net information. Only the information subject to trade secrets protection will be redacted. Information reflecting opioid sales or promotional strategies, tactics, targeting, or data, or internal communications related to sales or promotion of opioids will not be considered subject to trade secret protection unless the information is or contains the narrow categories in this section, and then only the information subject to current trade secrets protection will be redacted.

(p)    **Limits on Redaction**. There shall be no redaction of: (i) names of the Debtors' directors, officers, employees, agents, attorneys or consultants or of prescribers or of officials or employees of a government agency, or (ii) email addresses at the "pharma.com" or "purduepharma.com" domain.

(q)    **Notice to Third Parties**. Debtors shall provide notice to third parties, consistent with such third-party agreements, whose trade secrets or confidential information may appear in documents which are to be provided to the DOB.

(r)    **Inadvertent Release of Privileged or Protected Information**. Notwithstanding anything else in the Plan, the Public Document Repository shall not contain or disclose any documents or content of documents that are Privileged, except for those documents identified in <u>Section 5.13(i)(i)</u> and <u>(ii)</u> above that are eligible for the Public Document Repository, or any Protected Information. Inadvertent disclosure of Privileged documents in the Public Document Repository does not operate as a waiver of Privilege, and, upon discovery, any Privileged documents shall be promptly removed from the Public Document Repository. The DOB will establish a procedure that permits any party or member of the public to identify or challenge the disclosure of any potentially Protected Information placed in the Public Document Repository. The DOB will cause any document identified through this process to be immediately removed from the Public Document Repository pending review. Any disagreements regarding whether such material is Protected Information shall be resolved by the Special Master.

(s)    **Special Master**.

(i)    Shortly after the Confirmation Date, the Debtors shall file an appropriate motion asking the Bankruptcy Court or the United States District Court for the Southern District of New York to select and appoint a disclosure oversight Special Master. The Special Master's qualifications shall include former service as a judicial officer, whether as a state or federal judge, and no current or former director, officer, employee or attorney of the Debtors, the Sackler Family Members, the Creditors' Committee, or the Governmental Consent Parties shall be eligible to be appointed as the Special Master, counsel or staff working under the Special Master, *provided* that prior work for a Governmental Consent Party that was completed prior to 2015 shall not preclude the appointment of a Special Master. The Special Master will adjudicate all privilege and related disputes. The Special Master's reasonable hourly fees and expenses shall be paid out of the Disclosure Program Budget except as the Special Master orders otherwise upon finding that a party advanced an argument that was frivolous, harassing or in bad faith.

(ii)    <u>Selection of Special Master</u>. The selection of the Special Master shall be made by the Bankruptcy Court; *provided* that the Bankruptcy Court may consider a recommendation made jointly by the Debtors, the Sackler Family Members, the Creditors Committee, and the Governmental Consent Parties. For the purposes of determining if there is to be a joint recommendation, five (5) Business Days after the Confirmation Date, the parties ((x) the Debtors, (y) the Creditors' Committee, the Governmental Consent Parties and (z) the Sackler Family Members) each shall exchange a list of up to five (5) names as recommendations for the role of Special Master. The Debtors thereafter shall make a motion to the Bankruptcy Court to select a Special Master. If there are names in common on the exchanged lists, the Debtors' motion shall be limited to any name or names that are common to all such

116

parties' lists. If there is no name common to each of the three lists, the Debtors' motion will ask the Bankruptcy Court, in its discretion, to select a Special Master.

(iii)    <u>Disclosure Challenges</u>: To the extent that the DOB seeks to (A) challenge the Debtors' assertion of Privilege with respect to any documents withheld or redacted from production in the Purdue Legal Matters, or excluded by the Debtors from the Access Materials, or (B) disclose any Protected Information in the Public Document Repository, such efforts shall be subject to review by the Special Master, who shall have final say regarding whether (y) the DOB should be provided with such materials, and (z) such materials shall be protected from public disclosure.

(iv)    <u>Timing of Challenges</u>: All challenges to the redaction or withholding of documents from the Public Document Repository, including with regard to the Privilege and to Protected Information, including challenges brought by either the DOB or members of the public, shall be brought within the later of (A) one (1) year of the Effective Date and (B) one (1) year from when the document or information at issue is first withheld from the Public Document Repository by redaction or logging.

(v)     <u>Counsel for Challenges</u>: On or shortly after the Effective Date, the Debtors, the Governmental Consent Parties, and the Creditors' Committee shall agree to appoint a law firm to defend Privilege and Protected Information assertions against challenges ("***Defense Counsel***"); *provided, however*, that if the Debtors, the Governmental Consent Parties, and the Creditors' Committee are unable to reach an agreement regarding the identity of Defense Counsel, the Bankruptcy Court shall appoint the Defense Counsel. Third parties shall represent themselves before the Special Master and shall bear their own costs.

(vi)    <u>Procedure for Challenges</u>: Any party seeking to initiate a challenge to the Privilege or Protected Information designation of a document or information in a document or any other challenge to the inclusion or exclusion of documents in the Public Document Repository (the "***Petitioner***") must first, as a condition precedent to any such challenge, meet and confer with the relevant defense counsel by serving a written statement of the specific material being disputed and the reasons for disputing each such material. If the meet and confer does not resolve the dispute, then the Petitioner shall submit a brief to the Special Master arguing why each individual document at issue should not be considered Privileged or Protected Information or should otherwise be included or excluded. Once a challenge has been submitted, the Special Master shall set a briefing schedule, permitting defense counsel no fewer than twenty-one (21) days to respond to the challenge, which may include in camera submissions in response. At the discretion of the Special Master, the briefing schedule may

117

also include supplemental submissions, oral argument or other procedures the Special Master deems necessary to reach a determination. The Special Master shall then evaluate and decide the challenge based upon existing legal precedent of federal law within the U.S. Court of Appeals for the Second Circuit, and shall be empowered to determine whether such materials are subject to a valid claim of Privilege or otherwise constitute Protected Information or should have otherwise been included or excluded, but shall not be empowered to waive any Privilege ever asserted by the Debtors with respect to the Purdue Legal Matters or with respect to the Access Materials or the Sequestered Materials. If the Petitioner does not prevail, then the Special Master shall have the discretion to shift to the Petitioner some or all of the reasonable legal expense of Defense Counsel, whose reasonable fees and expenses shall otherwise be paid for by the Disclosure Program Budget. If the Special Master determines that the challenge was frivolous, harassing, needlessly increasing costs or expenses, or otherwise brought for an improper purpose, then the Special Master shall shift to the Petitioner some or all of the reasonable legal expense of Defense Counsel. For avoidance of doubt, any materials determined by the Special Master to be Privileged or to contain Protected Information shall not be included in the Public Document Repository.

(vii)    Pending resolution of a challenge asserting a document was improperly disclosed, the Host Institution shall remove or redact each identified, challenged document.

(t)    **Materials Produced by Shareholder Released Parties**. The Public Document Repository shall include all Sackler Family Members' documents that were produced in the Chapter 11 Cases and that relate to the manufacturing, sale or marketing of opioids in the United States, the Debtors' alleged role or liability in connection with the opioid crisis or the regulatory approval of any opioid product sold in the United States by the Debtors, but subject to appropriate exclusions for documents covered by the attorney-client and work product privileges and certain confidential information (including exclusions for information and documents related to the finances, financing activities, taxes and tax filings, investments and third party business and advisory relationships of the Shareholder Released Parties).

(i)    The Special Master appointed in accordance with Section 5.13(s) shall resolve disputes regarding whether certain documents or information is required to be included in the document repository by the Sackler Family Members.

(ii)    The Sackler Family Members shall have the right to claw back documents that they were entitled to exclude in accordance with this provision but inadvertently produced to the Public Document Repository, and such inadvertent production shall not operate as a waiver of rights. The Special Master shall resolve any disputes between Sackler Family Members, the Governmental Consent Parties, and the DOB concerning the exercise of clawback rights.

(iii)    For the avoidance of doubt, "Sackler Family Members' documents" refer only to documents in the Sackler Family Members' possession, custody or control. Section 5.13(t) does not refer to documents including or involving Sackler Family Members that are in the Debtors' possession, custody or control.

(u)    **Release of Confidentiality Rights by Parties Receiving Releases**. With regard to the disclosure of information in the Public Document Repository as authorized by this Section 5.13, the protections provided to Released Parties and Shareholder Released Parties shall be limited to the protections provided by this Plan. To the extent that Released Parties and Shareholder Released Parties possess rights to confidentiality beyond those provided this Plan (for example, a contractual confidentiality provision) or the Direct Claims Shareholder Settlement Agreements, those rights are waived to facilitate this disclosure program in exchange for the benefit of the releases provided to the Released Parties and Shareholder Released Parties by the Plan.

(v)    **DOJ Settlement Communications**. Communications between the Debtors and DOJ regarding settlement or cooperation between 2015 and the final, non-appealable conclusion of *U.S. v. Purdue Pharma L.P.*, Case 2:20-cr-01028-MCA (D.N.J.) shall be protected from disclosure to the Master Disbursement Trust and the DOB and shall not be included in the Public Document Repository, nor shall any internal Debtor documents reflecting such communications or the strategy for such communications. The Debtors shall implement this exclusion when creating the set of Sequestered Materials.

(w)    **Documents Produced By Certain Financial Institutions**. The disclosure program shall not include the documents produced by financial institutions pursuant to the examination authorized by the Bankruptcy Court at D.I. 1143. For the avoidance of doubt, if the same information also appears in a second source that is subject to disclosure (e.g., a deposition exhibit), then the information in that second source is subject to disclosure.

(x)    **Active Vendor Contracts**. The Public Document Repository shall not disclose the NewCo's active vendor contracts or expired contracts that would reveal the sum and substance of active contracts.

(y)    **Exculpation and Indemnification of DOB members and Host Institution**. To the maximum extent permitted by applicable law, the DOB members, whenever appointed, and the Host Institution shall not have or incur any liability for actions taken or omitted in his or her capacity as a DOB member, or on behalf of the DOB, except those acts found to be arising out of his or her willful misconduct, bad faith, gross negligence or fraud, and shall be entitled to indemnification, advancement and reimbursement for reasonable fees and expenses in defending any and all of his or her actions or inactions in his or her capacity as a DOB member, except for any actions or inactions found to be arising out of his or her willful misconduct, bad faith, gross negligence or fraud. Any valid indemnification claim of any of the DOB members shall be satisfied from the Disclosure Program Budget.

(z)    **Reports**. On each of the first five anniversaries of the Effective Date, the DOB shall publish a public report describing the activities of the disclosure program, the use of any funds expended, and any funds committed for future use.

(aa)    **Wind Down**. In or after one year following the Sequestration Date, the DOB shall wind itself down. If appropriate to facilitate the long-term success of the Public Document Repository, the DOB may arrange for another long-lived institution, such as one or more Attorneys General Offices, to interact with the Host Institution after the DOB is wound down (e.g., by receiving reports). Upon the wind down of the DOB, (i) the Host Institution shall be responsible for the permanent maintenance of

the Public Document Repository; *provided* that, for avoidance of doubt, the access to the Access Materials and the Sequestered Materials granted to the DOB herein shall not be transferred to any successor institution other than the Host Institution and (ii) any Access Materials or Sequestered Materials in the possession of the DOB but not included in the Public Document Repository, for any reason, shall be, at NewCo's election, delivered to NewCo or destroyed or, if all or substantially all of the Assets of or Interests in NewCo have been sold, destroyed or delivered to Defense Counsel. Within ninety (90) days of the announcement of the dissolution of the Plan Administration Trust, the Plan Administration Trust shall use commercially reasonable efforts to return Privileged and Protected Information materials to Defense Counsel who shall retain the materials in a segregated client file.

(bb)    **Master Disbursement Trust**. For the avoidance of doubt, nothing in this Section 5.13 limits the rights of the Master Disbursement Trust, subject to and in accordance with Section 5.12 of the Plan, to access or use Privileged documents, including Excluded Privileged Materials, in connection with any potential or actual Causes of Action, including, among other things, any potential or actual Causes of Action contemplated by or that may result from, the Shareholder Settlement Agreement, including, without limitation, with respect to a Cause of Action against a Shareholder Release Snapback Party upon the filing of a Notice of Shareholder Release Snapback.

### 5.14    *Effective Date Cash; Surplus Reserved Cash*.

(a)    **Effective Date Fixed Payments**. On the Effective Date, Effective Date Cash shall be used to fund (i) the Professional Fee Escrow Account in an amount necessary to satisfy Professional Fee Claims in accordance with Section 2.1(b) of the Plan, (ii) the Priority Claims Reserve in an amount necessary to satisfy estimated Allowed Administrative Claims (other than Professional Fee Claims and the DOJ Forfeiture Judgment Claim), Allowed Secured Claims and Allowed Priority Claims, (iii) the Claims Reserves in accordance with Section 7.2 of the Plan, (iv) the Disputed Cure Claims Reserve in accordance with Section 8.2(d) of the Plan, (v) the Wind-Up Reserve in accordance with Section 5.3(d) of the Plan, (vi) the MDT Operating Reserve in accordance with Section 5.6(f) of the Plan, (vii) the Special Operating Reserve in accordance with Section 5.7(a) of the Plan, (viii) the Initial NewCo Cash in accordance with Section 5.4(c) of the Plan, (ix) the applicable PAT Distribution Account in the amounts necessary to make Distributions required in accordance with Article IV of the Plan in respect of Allowed Adlon General Unsecured Claims, Allowed Avrio General Unsecured Claims, and Allowed Other General Unsecured Claims, each to the extent Allowed as of the Effective Date, (x) the Initial Private Creditor Trust Distributions, (xi) the Initial Federal Government Distribution, (xii) the Initial Public Schools Distribution, (xiii) amounts required to establish the Public Document Repository in accordance with Section 5.13 of the Plan, (xiv) the upfront insurance premium payments and other amounts in accordance with Sections 5.3(e), 5.4(f) and 5.5(c) of the Plan and (xv) any other amounts required to be paid on the Effective Date pursuant to the Plan. No later than five (5) Business Days prior to the Effective Date, the Debtors shall provide notice to the Creditors' Committee and the Governmental Consent Parties of the then-current estimated amount of Effective Date Cash and all amounts described in this Section 5.14(a), and shall promptly notify the Creditors' Committee and the Governmental Consent Parties of any changes to such estimations prior to the Effective Date. Any objection by the Creditors' Committee or the Governmental Consent Parties with respect to the Debtors' proposed amount of funding of any PAT Reserve shall be resolved by the Bankruptcy Court.

(b)    **Initial Governmental Remediation Trust Distribution**. On the Effective Date, all Effective Date Cash remaining after the satisfaction of all amounts described in the foregoing paragraph (a) [and the Initial Tribe Trust Distribution] and subject to the SOR Holdback shall be used to make the Initial Governmental Remediation Trust Distribution.

(c)    **Surplus Reserved Cash**. Prior to the dissolution of the Plan Administration Trust, the Plan Administration Trustee shall determine, on each six (6)-month anniversary of the Effective Date, whether the amounts available in any PAT Reserve exceed the amounts necessary to satisfy the purpose for which such reserves were established. If the Plan Administration Trustee determines that a surplus exists in any PAT Reserve as of the date of such determination, such Surplus Reserve Cash shall be (i) *first*, used to satisfy any funding deficiency in any other PAT Reserve and (ii) *second*, with respect to any amounts not used to satisfy any such funding deficiency in another PAT Reserve, transferred to the Master Disbursement Trust in accordance with the MDT Agreement. All Cash and cash equivalents of the Plan Administration Trust remaining upon the dissolution of the Plan Administration Trust, including any remaining Surplus Reserve Cash in the PAT Reserves, shall be transferred to the Master Disbursement Trust in accordance with the MDT Agreement.

### 5.15    *Corporate Action*.

(a)    **Dissolution of Boards of the Debtors**. As of the Effective Date, the respective boards of directors and managers, as applicable, of each of the Debtors shall be terminated and dissolved and the members of each of the boards of directors and managers, as applicable, of the Debtors shall be deemed to have resigned.

(b)    **Continued Existence of the Liquidating Debtors**. Each of the Debtors, other than the Transferred Debtors, shall continue to exist as a Liquidating Debtor after the Effective Date in accordance with the laws of the state under which such Debtor was formed and pursuant to its certificate of incorporation, bylaws, articles of formation, operating agreement, and other organizational documents, as applicable, in effect prior to the Effective Date, except to the extent such organizational documents are amended under the Plan, for the limited purposes of liquidating all of the Assets of such Debtor's Estate and making distributions in accordance with the Plan. From and after the Effective Date, except as set forth herein, the Liquidating Debtors (i) for all purposes shall be deemed to have withdrawn their business operations from any state in which the Liquidating Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, (ii) shall be deemed to have canceled pursuant to the Plan all PPI Interests and, as of the PPLP Dissolution Date, all PPLP Interests, and (iii) shall not be liable in any manner to any taxing authority for franchise, business, license or similar taxes accruing on or after the Effective Date.

(c)    **Appointment of the PPLP Liquidator as the Sole Representative for the Liquidating Debtors**. On the Effective Date, the PPLP Liquidator shall be appointed as the sole director and sole officer of the Liquidating Debtors, and shall succeed to the powers of the Liquidating Debtors' general partners, directors and officers. From and after the Effective Date, the PPLP Liquidator shall be the sole representative of, and shall act for, the Liquidating Debtors and administer the winding up and dissolution of the Liquidating Debtors. The PPLP Liquidator shall act for the Liquidating Debtors in the same fiduciary capacity as applicable to a board of directors and officers, subject to the provisions hereof (and all certificates of formation, partnership agreements, operating agreements, membership agreements and related documents are deemed amended by the Plan to permit and authorize the same). Any fees and expenses incurred by the PPLP Liquidator shall be paid by the Plan Administration Trustee from the Wind-Up Reserve.

(d)    **Merger; Dissolution; Consolidation of the Liquidating Debtors**. On or after the date(s) upon which the Plan Administration Trust is established, the Liquidating Debtors or the PPLP Liquidator may, subject to the terms of the Plan, cause any or all of the Liquidating Debtors to be merged into one or more of the Liquidating Debtors, dissolved or otherwise consolidated and engage in any other transaction in furtherance of the Plan. Notwithstanding the foregoing, upon the dissolution of each

Liquidating Debtor by the PPLP Liquidator after the completion of the acts required of such Liquidating Debtor pursuant to this Plan, such Liquidating Debtor shall be deemed dissolved for all purposes without the necessity for any other or further actions to be taken by or on behalf of such Liquidating Debtor; *provided*, *however*, that each Liquidating Debtor or the PPLP Liquidator, as applicable, shall file with the office of the Secretary of State, or other appropriate office for the state of its organization, a certificate of cancellation or dissolution.

(e)      **Charter and Bylaws**. To the extent necessary or appropriate, the charters, by-laws and other organizational documents of the Debtors shall be amended, or amended and restated as necessary, in a manner consistent with section 1123(a)(6) of the Bankruptcy Code, if applicable, and the terms of this Plan.

(f)      **No Further Action**. Each of the matters provided for under the Plan involving the corporate structure of the Debtors or the Plan Administration Trust, or corporate action to be taken by or required of the Debtors, shall, as of the Effective Date, be deemed to have occurred (unless contemplated hereunder to occur before or after the Effective Date) and be effective as provided herein, and shall be authorized and approved in all respects without any requirement of further action by any Person, including, but not limited to, the Plan Administration Trustee, the PPLP Liquidator, Holders of Claims against or Interests in the Debtors or directors or officers of the Debtors.

(g)      **Effectuating Documents**. Prior to or after the Effective Date, any appropriate officer of the Debtors or the PPLP Liquidator, as applicable, shall be authorized to execute, deliver, file or record such contracts, instruments, releases, indentures and other agreements or documents, and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

(h)      **Exculpation and Indemnification of the PPLP Liquidator**. To the maximum extent permitted by applicable law, the PPLP Liquidator shall not have or incur any liability for actions taken or omitted in its capacity as the PPLP Liquidator, except those acts found by Final Order to be arising out of its willful misconduct, bad faith, gross negligence, or fraud, and shall be entitled to indemnification, advancement and reimbursement for reasonable fees and expenses in defending any and all of its actions or inactions in its capacity as the PPLP Liquidator, except for any actions or inactions found by Final Order to be arising out of its willful misconduct, bad faith, gross negligence or fraud. Any valid indemnification claim of the PPLP Liquidator shall be satisfied from the Wind-Up Reserve.

### 5.16    *Cancellation of Notes, Interests, Instruments, Certificates and Other Documents*.

Except as otherwise provided herein, on and after the Effective Date, all PPLP Interests and PPI Interests and all notes, instruments, certificates, agreements, indentures, mortgages, security documents and other documents evidencing Claims against or Interests in the Debtors or obligations of the Debtors or the Liquidating Debtors, as applicable, thereunder or in any way related to the foregoing shall be deemed canceled, satisfied in full and of no further force or effect without any need for further action or approval of the Bankruptcy Court.

### 5.17    *Closing of Chapter 11 Cases*.

After a Debtor's Estate has been fully administered, the Plan Administration Trustee shall seek authority from the Bankruptcy Court to close the applicable Chapter 11 Case in accordance with the Bankruptcy Code and Bankruptcy Rules.

## ARTICLE VI  DISTRIBUTIONS.

### 6.1    *Distributions Generally*.

Except as otherwise provided in the Plan or the PAT Agreement, all Distributions in respect of Allowed Claims, other than Channeled Claims, shall be made by the Disbursing Agent, or such other Persons designated by the Plan, in accordance with the terms of the Plan, including this Article VI. Except with respect to Sections 6.17, 6.20, and 6.21 of the Plan, this Article VI shall not apply to Channeled Claims.

### 6.2    *Distributions on the Effective Date*.

On the Effective Date or as soon as reasonably practicable thereafter, the Disbursing Agent shall make Distributions (a) from the Priority Claims Reserve in respect of Allowed Administrative Claims, Allowed Secured Claims and Allowed Priority Claims, each in an amount and to the extent Allowed as of the Effective Date, and (b) from the PAT Distribution Account in respect of Allowed Avrio General Unsecured Claims and Allowed Adlon General Unsecured Claims, each in an amount required in accordance with this Article VI of the Plan and solely to the extent Allowed as of the Effective Date.

### 6.3    *Date of Distributions*.

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

### 6.4    *Disbursing Agent*.

The Disbursing Agent shall be deemed to hold all property to be distributed under this Plan in trust for the Persons entitled to receive the same. The Disbursing Agent shall not hold an economic or beneficial interest in the property to be distributed under this Plan. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties.

### 6.5    *Rights and Powers of Disbursing Agent*.

The Disbursing Agent shall be empowered to (a) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Plan, (b) make all Distributions contemplated by the Plan, (c) employ professionals to represent it with respect to its responsibilities and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

The Disbursing Agent shall only be required to act and make Distributions in accordance with the terms of the Plan and the PAT Agreement, and shall have no (x) liability for actions taken in accordance with the Plan and the PAT Agreement or in reliance upon information provided to it in accordance with the Plan or (y) obligation or liability in respect of any Channeled Claims or for Distributions under the Plan to any party who does not hold an Allowed Claim administered by the Plan Administration Trust at the time of Distribution or who does not otherwise comply with the terms of the Plan; *provided*, *however*, that the foregoing shall not affect the liability that otherwise would result from any such act or omission to the extent such act or omission is determined by a Final Order to have constituted willful misconduct, gross negligence, intentional fraud or criminal conduct of any such Person.

**6.6** **_Expenses of Disbursement Agent_**.

Any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date shall be paid in Cash by the Plan Administration Trustee from the Wind-Up Reserve.

**6.7** **_Delivery of Distributions_**.

Subject to Bankruptcy Rule 9010, the Disbursing Agent shall make all Distributions to any Holder of an Allowed Claim at the address of such Holder (a) as set forth on the Schedules filed with the Bankruptcy Court or (b) on the books and records of the Debtors or their agents, unless the Disbursing Agent has been notified in writing of a change of address, including, without limitation, by filing of a Proof of Claim by such Holder that contains an address for such Holder that is different than the address of such Holder as set forth in the Schedules or on such books and records of the Debtors.

**6.8** **_Undeliverable and Unclaimed Distributions_**.

In the event that any Distribution to any Holder of an Allowed Claim is returned as undeliverable, no Distribution to such Holder shall be made unless and until the Disbursing Agent has been notified of the then-current address of such Holder, at which time or as soon as reasonably practicable thereafter such Distribution shall be made to such Holder without interest; _provided_, _however_, that all Distributions made by the Disbursing Agent that are unclaimed for a period of six (6) months after the Distribution thereof shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and shall revest in the Plan Administration Trust, and any entitlement of any Holder of any Claims to such Distributions shall be extinguished and forever barred.

**6.9** **_Distribution Record Date_**.

As of the close of business on the Distribution Record Date, the Claims register shall be closed. The Disbursing Agent shall have no obligation to recognize any transfer of any such Claims occurring after the close of business on the Distribution Record Date and shall instead be entitled to recognize and deal, for all purposes under the Plan, with only those Holders of record as of the close of business on the Distribution Record Date.

**6.10** **_Manner of Payment under Plan_**.

At the option of the Disbursing Agent, any Cash payment to be made pursuant to the Plan may be made by a check or wire transfer or as otherwise required or provided in the PAT Agreement.

**6.11** **_Minimum Cash Distributions_**.

The Disbursing Agent shall not be required to make any Distributions of Cash in an amount less than $100, or such lower amount as determined by the Disbursing Agent in accordance with the PAT Agreement, to any Holder of an Allowed Claim; _provided_, _however_, that if any Distribution is not made pursuant to this <u>Section 6.11</u>, such Distribution shall be added to any subsequent Distribution to be made on behalf of such Holder's Allowed Claims. The Disbursing Agent shall not be required to make any final Distribution of Cash in an amount less than $25 to any Holder of an Allowed Claim. If the amount of any final Distribution to any Holder of Allowed Claims would be $25 or less, then such Distribution shall be made available for Distribution to all Holders of Allowed Claims in the same Class receiving final Distributions of at least $25.

**6.12**    ***Setoffs and Recoupment***.

Subject to Section 2.1 and Sections 10.5 through 10.13 of the Plan, the Disbursing Agent may, but shall not be required to, set off against or recoup from any Claim against the Debtors, and from any payments to be made pursuant to the Plan with respect to such Claim, any Claims of any nature whatsoever (to the extent permitted by applicable law) that the Debtors or the Plan Administration Trust, as applicable, may have against the Holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Plan Administration Trust of any such Claim it may have against such Holder.

**6.13**    ***Claims Paid or Payable by Third Parties***.

The Plan Administration Trustee shall reduce in full a Claim against the Debtors, and such Claim shall be Disallowed without a Claims objection having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from any Person that is not a Debtor. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim against the Debtors receives a Distribution on account of such Claim and receives payment from a Person that is not a Debtor on account of such Claim, such Holder shall, within fourteen (14) days of receipt thereof, repay or return the Distribution to the Plan Administration Trust to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such Distribution under the Plan. The failure of such Holder to timely repay or return such Distribution shall result in the Holder owing the Debtors annualized interest at the federal judgment rate on such amount owed for each Business Day after the fourteen (14)-day grace period specified above until the amount is repaid.

**6.14**    ***Distributions after Effective Date***.

Distributions made after the Effective Date to Holders of Non-Participating Channeled Claims and other Disputed Claims that are not Allowed Claims as of the Effective Date, but which later become Allowed Claims, shall be deemed to have been made on the Effective Date (except for U.S. federal income tax purposes).

**6.15**    ***No Postpetition Interest and Penalties on Claims***.

Unless otherwise provided for in the Plan or the Confirmation Order or required by the Bankruptcy Code, no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date or to penalties on any Claim. Any such interest or penalty component of any such Claims, if Allowed, shall be paid only in accordance with section 726(b) of the Bankruptcy Code.

**6.16**    ***Allocation of Distributions between Principal and Interest***.

To the extent that any Allowed Claim is based upon any obligation or instrument that is treated for U.S. federal income tax purposes as indebtedness of any Debtor or any other Person and is entitled to accrued but unpaid interest thereon, it is intended, subject to applicable law, that such Distribution shall be allocated first to the principal amount of the Allowed Claim (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Allowed Claim, to accrued but unpaid interest.

**6.17**    ***No Constructive Receipt***.

No Holder of Claims shall be treated as receiving a Distribution for U.S. federal income tax purposes except to the extent such Holder is entitled to receive such Distribution directly under

the Plan (or such Distribution is made in satisfaction of an obligation of such Holder). All parties (including, without limitation, Holders of Claims against or Interests in the Debtors, the Related Parties of such Holders, the Debtors, the Master Disbursement Trust, the MDT Trustees and the Creditor Trusts) shall report consistently with the foregoing for U.S. federal income tax purposes.

### 6.18    *No Distribution in Excess of Amount of Allowed Claim*.

Notwithstanding anything to the contrary in this Plan, no Holder of an Allowed Claim shall receive, on account of such Allowed Claim, Distributions in excess of the Allowed amount of such Claim when combined with amounts received by such Holder from other sources.

### 6.19    *Satisfaction of Claims*.

Unless otherwise provided herein, the Distributions and deliveries to be made on account of Allowed Claims under this Plan shall, in the aggregate, be in complete and final satisfaction, settlement and discharge of, and exchange for, such Allowed Claims. The Distributions and deliveries to be made on account of Claims under this Plan shall additionally be in consideration of the release and discharge of any and all Released Claims and Shareholder Released Claims related to or arising from such Claims.

### 6.20    *Withholding and Reporting Requirements*.

(a)    **Withholding Rights**. In connection with the Plan, and all instruments or Interests issued in connection therewith and in consideration thereof, any party issuing any instrument or Interest or making any Distribution described in the Plan shall comply with all applicable withholding and reporting requirements imposed by any U.S. federal, state or local or foreign taxing authority, and all Distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements to the extent required under applicable law. In the case of a non-Cash Distribution that is subject to withholding, the distributing party may withhold a portion of such distributed property equal in value to the tax to the extent required to be withheld, and either (i) sell such withheld property to generate Cash necessary to pay over the withholding tax (or reimburse the distributing party for any advance payment of the withholding tax), or (ii) pay the withholding tax using its own funds and retain such withheld property. Any amounts withheld pursuant to this Section 6.20(a) and properly remitted to the applicable Governmental Unit shall be deemed to have been distributed to, and received by, the applicable recipient for all purposes of the Plan. In the event that any Person issues any instrument or Interest or makes any non-Cash Distribution pursuant to the Plan that is subject to withholding tax and such issuing or distributing party has not sold such withheld property to generate Cash to pay the withholding tax, or paid the withholding tax using its own funds and retained such withheld property as described above, such issuing or distributing party has the right, but not the obligation, to not make a Distribution until such Holder has made arrangements reasonably satisfactory to such issuing or disbursing party for payment of any such tax obligations, after which such issuing or disbursing party shall return to such Holder the portion of the property previously withheld.

(b)    **Forms**. Any party entitled to receive any Cash or other property under the Plan shall, upon request, deliver to the Disbursing Agent, the Master Disbursement Trust, the applicable Creditor Trust, NewCo, the Foundation or such other Person designated by the Plan Administration Trustee (which Person shall subsequently deliver to the Disbursing Agent any applicable IRS Form W-8 or Form W-9 or other forms or documents received), as applicable, a properly executed IRS Form W-9 or Form W-8, as applicable, and any other forms or documents reasonably requested by such party, to reduce or eliminate any withholding required by any U.S. federal, state, local or foreign taxing authority. Except as otherwise provided in the Creditor Trust Documents, as applicable, if any such request is made by such party in accordance with the foregoing, and the Holder fails to comply before the date that is three hundred

sixty-five (365) calendar days after the request is made, the amount of such Distribution shall irrevocably revert to the Plan Administration Trust, the Master Disbursement Trust, the applicable Creditor Trust, NewCo or the Foundation, as applicable, and any Claim with respect to such Distribution shall be discharged and forever barred from assertion against such party or its property.

(c)    **Tax Liability**. Notwithstanding <u>Section 6.20(a)</u>, each Holder of a Claim or other Person that receives or is to receive a Distribution pursuant to this Plan shall have the sole and exclusive responsibility for the satisfaction and payment (to the extent not withheld from such Distribution pursuant to <u>Section 6.20(a)</u> of the Plan) of any tax obligations imposed on such Holder by any Governmental Unit, including income, withholding and other tax obligations, on account of such Distribution.

### 6.21    *Post-Confirmation Claims*.

Except as otherwise provided in the applicable Creditor Trust TDP, in the event a Person seeks payment at any time on account of a Channeled Claim as to which no Proof of Claim was filed before the Bar Date and/or for which no motion seeking leave or order granting leave to file a late Proof of Claim was filed or entered before the Confirmation Date, or as to which no Proof of Claim was required to be filed, such Person shall not be entitled to any payment or distribution on account of such Channeled Claim unless such Channeled Claim is held by a Settling Creditor. If such Channeled Claim is held by a Settling Creditor, such Person shall be entitled to seek to recover on such Channeled Claim solely from the Creditor Trust to which such Channeled Claim is or was channeled pursuant to the Master TDP, as determined by the Bankruptcy Court, and any such recovery shall be solely in accordance with and to the extent provided in the Creditor Trust TDP for such Creditor Trust. After the Effective Date, in addition to the Person seeking to assert such Channeled Claim and any Person against which such Channeled Claim is purportedly asserted, only the MDT Trustees, the Creditor Trustees and NewCo shall have standing to participate in any action before the Bankruptcy Court [(or, in the event that such actions are heard before another tribunal, before such tribunal)] in respect of the foregoing. For the avoidance of doubt, nothing in this paragraph is intended or shall be construed to enlarge, amend or modify the provisions of the Bar Date Order, nor is anything in this paragraph intended to derogate from, modify or amend the terms and conditions of any Creditor Trust TDP or the Master TDP or the rights of any MDT Trustee, Creditor Trustee or claims administrator for any Creditor Trust.

## ARTICLE VII    PROCEDURES FOR NON-PARTICIPATING CHANNELED CLAIMS AND OTHER DISPUTED CLAIMS.

### 7.1    *Procedures for Non-Participating Channeled Claims and other Disputed Claims Generally*.

Except as otherwise provided in the Plan, the PAT Agreement, or the Creditor Trust Documents, all Claims against the Debtors that are Non-Participating Channeled Claims or otherwise Disputed as of the Effective Date shall be subject to the claims resolution procedures set forth in the Plan, including this <u>Article VII</u>. Any Distributions on account of Non-Participating Channeled Claims or other Disputed Claims shall be reserved pending the completion of the Claims resolution process in this <u>Article VII</u>.

### 7.2    *Non-Participating Claims Reserves; PAT Disputed Claims Reserves*.

(a)    **Establishment**. On the Effective Date, or as soon as reasonably practicable thereafter, the Plan Administration Trustee and each applicable Creditor Trustee shall, consistent with and subject to section 1123(a)(4) of the Bankruptcy Code, with respect to each applicable

Class of Claims against the Debtors, establish the PAT Disputed Claims Reserves or the applicable Non-Participating Claims Reserve(s) for such Class.

(b) **Funding of PAT Disputed Claims Reserves**. The PAT Disputed Claims Reserves shall be (i) funded on the Effective Date with Effective Date Cash in an amount determined by the Debtors and reasonably acceptable to the Creditors' Committee, the Governmental Consent Parties and, solely with respect to amounts funded on account of Disputed Other General Unsecured Claims, the Sackler Parties' Representative. Following establishment of the PAT Disputed Claims Reserves, the Plan Administration Trustee shall administer the applicable PAT Disputed Claims Reserve, in each case taking into account any changes in the projected distributions to Holders of the applicable Disputed Claims.

(c) **Funding of Creditor Trust Non-Participating Claims Reserves**. With respect to the Creditor Trust Non-Participating Claims Reserves other than the Class 4 Non-Participating Claims Reserves, (i) each Creditor Trust PRA Non-Participating Claims Reserve will be funded on the Effective Date, and from time to time on or after the Effective Date, by the PRA Estate Distributions to which the Holders of the Non-Participating Channeled Claims in such Class would be entitled should their Claims be Allowed Claims pursuant to the applicable Creditor Trust TDP, and (ii) each Creditor Trust Non-Participating Claims Reserve (other than any Creditor Trust PRA Non-Participating Claims Reserve) will be funded from time to time after the Effective Date, in an amount equal to the Non-PRA Estate Distributions to which the Holders of the Non-Participating Channeled Claims in such Class would be entitled should their Claims be Allowed Claims pursuant to the applicable Creditor Trust TDP, in each case as determined by the applicable Creditor Trustee and reasonably acceptable to the Debtors, the Creditors' Committee, the Governmental Consent Parties [and the Sackler Parties' Representative], and (i) with respect to the Class 5 Non-Participating Claims Reserves, the Native American Tribe Group, (ii) with respect to the Class 6 Non-Participating Claims Reserve, the Public School District Claimants, (iii) with respect to the Class 7 Non-Participating Claims Reserve, the Ad Hoc Group of Hospitals, (iv) with respect to the Class 8 Non-Participating Claims Reserve, the Third-Party Payor Group, (v) with respect to the Class 9 Non-Participating Claims Reserve, the ERP Trustee, (vi) with respect to the Class 10(a) Non-Participating Claims Reserve, the NAS Committee, and (vii) with respect to the Class 10(b) Non-Participating Claims Reserves, the Ad Hoc Group of Individual Victims.

(d) **Funding of Class 4 Non-Participating Claims Reserves**. The Class 4 PRA Non-Participating Claims Reserve and Class 4 Non-PRA Non-Participating Claims Reserve shall be funded by the Governmental Remediation Trust with the Non-Settling States Holdback Distributions and the Non-Settling Subdivisions Holdback Distributions as Distributions are made by the Master Disbursement Trust to the Governmental Remediation Trust, in each case, in accordance with the following requirements;

(i) In the event that a State is a Non-Settling State on the Effective Date, then such State and each Subdivision of such State that has filed a Proof of Claim will be deemed to hold a Non-Participating Channeled Claim, and (A) a Non-Settling States Holdback Distribution on account of such State and each such Subdivision, that is a PRA Estate Distribution shall be deposited in the Class 4 Creditor Trust PRA Non-Participating Claims Reserve and (B) a Non-Settling States Holdback Distribution on account of such State and each such Subdivision, that is a Non-PRA Estate Distribution shall be deposited in the Class 4 Creditor Trust Non-PRA Non-Participating Claims Reserve. The Non-Settling States Holdback Distribution for the benefit of such Non-Settling State shall be equal to such State's share of Estate Distributions based

on the interstate allocation as further described in Governmental Remediation Trust Documents. Any Non-Settling State's share shall be subdivided generally in accordance with the default state-subdivision allocation set forth in the Governmental Entity Shareholder Direct Settlement Agreement as if there was no applicable state-subdivision agreement. The portion of a Non-Settling State's share allocated to its Subdivisions who filed Proofs of Claim shall be further subdivided based on the applicable subdivision metrics developed by the MDL Plaintiffs' Executive Committee.

(ii)     Subject to <u>Section 7.2(d)(iii)</u>, in the event that a State is a Settling State, but one or more of its Subdivisions that filed Proofs of Claim are not Participating Subdivisions, then the amount of the total PRA Estate Distributions and Non-PRA Estate Distributions allocated to such State shall be reduced by an amount equal to the share that a Non-Settling Subdivision would have received under (A) the intrastate allocation agreement that exists between that Settling State and its Subdivisions (if an intrastate allocation agreement exists), (B) the intrastate allocation statute (if an intrastate allocation statute exists), or (C) the default state-subdivision allocation set forth in the Governmental Entity Shareholder Direct Settlement Agreement (if no intrastate allocation agreement or statute exists), with the Non-Settling Subdivision's share calculated based on the applicable subdivision metrics developed by the MDL Plaintiffs' Executive Committee, with the amounts of such reductions deposited, (X) in the case of PRA Estate Distributions, in the Class 4 PRA Non-Participating Claims Reserve and (Y) in the case of Non-PRA Estate Distributions, in the Class 4 Non-PRA Non-Participating Claims Reserve. Non-Settling Subdivisions that have filed Proofs of Claim and whose Claims are or may be Allowed may be entitled to different allocations of Estate Distributions upon such Subdivision becoming a Participating Subdivision.

(iii)    In the event a Non-Settling Subdivision is located in a Settling State that has a statutory bar against such Non-Settling Subdivision pursuing a Released Claim, such Creditor Trust shall not be required to reserve any amount on account of the Non-Participating Non-Federal Domestic Governmental Claim held by such Non-Settling Subdivision.

(iv)     The Class 4 PRA Non-Participating Claims Reserve shall be funded over time from each PRA Estate Distribution and the Class 4 Non-PRA Non-Participating Claims Reserve shall be funded over time from each Non-PRA Estate Distribution, in each case, on account of each such Class 4 Non-Participating Channeled Claim, as applicable, including such amount(s) payable on account of Attorneys' Fees under <u>Section 5.9</u> of this Plan.

(e)    **U.S. Federal Income Tax Matters Relating to the Creditor Trust Non-PRA Non-Participating Claims Reserves**. [Each Creditor Trust Non-PRA Non-Participating Claims Reserve is intended to be treated and shall be reported as an account of the corresponding Creditor Trust, and not as an entity separate from the corresponding Creditor Trust, for U.S. federal income tax purposes, and shall be treated consistently for state and local tax purposes, to the extent applicable. All parties (including the Shareholder Payment Parties, the Debtors, the Foundation, the Plan Administration Trustee, each applicable Creditor Trustee, and Holders of Non-Participating Claims and other Disputed Claims) shall be required to report for tax purposes in a manner consistent with the foregoing. Each applicable Creditor Trustee shall each be responsible for payment, out of the assets of the applicable Creditor Trust Non-PRA Non-Participating Claims Reserve, of any taxes imposed on the applicable Creditor Trust Non-PRA Non-Participating Claims Reserve or its assets.][22]

(f)    **U.S. Federal Income Tax Matters Relating to the Creditor Trust PRA Non-Participating Claims Reserve**. [Each Creditor Trust PRA Non-Participating Claims Reserve is intended to be treated and shall be reported as a qualified settlement fund for U.S. federal income tax purposes. Pursuant to the Master Shareholder Settlement Agreement, PRA L.P. will timely elect to treat each Creditor Trust PRA Non-Participating Claims Reserve as a "grantor trust" pursuant to Section 1.468B-1(k) of the Treasury Regulations, for U.S. federal income tax purposes and, to the extent permitted under applicable law, for state and local tax purposes, for which PRA L.P. is the sole grantor, owner and transferor, and will not revoke such election. All parties (including the Shareholder Payment Parties, the Debtors, the Foundation, the Plan Administration Trustee, each applicable Creditor Trustee, and Holders of Non-Participating Claims and other Disputed Claims) shall be required to report for tax purposes in a manner consistent with the foregoing. PRA L.P. shall be responsible for payment of any taxes imposed on or collected from a Creditor Trust PRA Non-Participating Claims Reserve or its assets or income.][23]

### 7.3    *Claim Objections*.

(a)    **Prior to Effective Date**. Prior to the Effective Date, objections to Claims against the Debtors may be interposed and prosecuted by the Debtors and any other party in interest, including, for the avoidance of doubt, any Shareholder Released Party; *provided*, that no Shareholder Released Party shall interpose any objection to a Claim held by a Settling Creditor.

(b)    **PAT Disputed Claims Reserves**. On or after the Effective Date, except as otherwise provided in the Plan or the PAT Agreement, objections to Avrio General Unsecured Claims, Adlon General Unsecured Claims, and Other General Unsecured Claims against the Debtors may be interposed and prosecuted only by the Plan Administration Trustee, provided that with respect to Disputed Other GUC Litigation Claims, such objections may be interposed and prosecuted by any other party in interest, including, for the avoidance of doubt, any Shareholder Released Party. Any objections to Avrio General Unsecured Claims, Adlon General Unsecured Claims, and [Other General Unsecured Claims][24] shall be served on the applicable Holders of such Claims and filed with the Bankruptcy Court (A) on or before one hundred eighty (180) days following the later of (i) the Effective Date and (ii) the date that a Proof of Claim is filed or amended or a Claim is otherwise asserted or amended in writing by or on behalf of the Holder of such Claim or (B) on such later date as may be fixed by the Bankruptcy Court (including upon request by a party in interest, including, for the avoidance of doubt, any Shareholder Released Party).

---

[22] [**NTD**: Subject to continuing tax review]

[23] [**NTD**: Subject to continuing tax review.

[24] [**NTD**: Subject to ongoing discussion]

(c)        **Objections to Non-Participating Channeled Claims**. On or after the Effective Date, except as otherwise provided in the Plan or the applicable Creditor Trust Documents, objections to Non-Participating Channeled Claims may be interposed and prosecuted by the Master Disbursement Trust and any other party in interest, including, for the avoidance of doubt, the applicable Creditor Trustee or any Shareholder Released Party, and the Bankruptcy Court shall retain exclusive jurisdiction to the greatest extent permitted by applicable law to hear and determine such objections.

(d)        **Proceedings on Objections to Creditor Trust Channeled Claims other than in Class 4**. In connection with any objection to a Non-Participating Channeled Claim other than a Non-Participating Channeled Claim in Class 4, any judgment entered (i) as to the validity of such Claim shall constitute a binding determination that such Claim is either Allowed or Disallowed; and (ii) as to the amount of such Claim shall not be binding for purposes of Distribution, which shall instead be determined in accordance with Section 7.7(b) of this Plan and the applicable Creditor Trust Documents. The Bankruptcy Court (or any other court of competent jurisdiction in connection with such an objection) may, at its discretion, decline to enter any judgment as to the amount of a Non-Participating Channeled Claim.

(e)        **Proceedings on Objections to Creditor Trust Channeled Claims in Class 4**. In connection with any objection to a Non-Participating Channeled Claim in Class 4, any judgment entered (i) as to the validity of such Claim shall constitute a binding determination that such claim is either Allowed or Disallowed; and (ii) shall not determine the amount of such Claim for purposes of Distribution, which shall instead be determined in accordance with Section 7.7(c) of this Plan. The Bankruptcy Court (or any other court of competent jurisdiction in connection with such an objection) may, at its discretion, decline to enter any judgment as to the amount of a Non-Participating Channeled Claim.

(f)        **Omnibus Objections to Non-Participating Channeled Claims**. On or after the Effective Date, notwithstanding anything to the contrary in Bankruptcy Rule 3007, any party in interest, including, for the avoidance of doubt, the Creditor Trustee for the applicable Creditor Trust or any Shareholder Released Party, may object to more than one Non-Participating Channeled Claim consistent with the *Omnibus Claims Objection Procedures Approved in the Bankruptcy Court's Corrected Order Approving (I) Omnibus Claims Objection Procedures, (II) Omnibus Claims Settlement Procedures and (III) Omnibus Claims Hearing Procedures* [D.I. 2878] (the "**Omnibus Claims Objection Order**") as if (solely for purposes of such procedures) such party in interest were the Debtors. Any such omnibus objection shall be governed by the Omnibus Claims Hearing Procedures set forth in the Omnibus Claims Objection Order.

(g)        **Joint Hearings on Common Issues of Law or Fact**. To the extent that multiple pending objections to Non-Participating Channeled Claims in the same Class (including when brought as an omnibus objection pursuant to Section 7.3(f) of this Plan) raise common issues of law or fact, including for the avoidance of doubt issues of fact as to the Debtors' or other parties' alleged conduct, the Bankruptcy Court may, to the extent practicable and consistent with applicable law, schedule joint hearings in respect of such common issues, including joint evidentiary hearings as to issues of fact. For the avoidance of doubt, this Section 7.3(g) shall apply notwithstanding differences in the law governing Non-Participating Channeled Claims to which this Section applies.

### 7.4    *No Distribution Pending Allowance*.

Except as otherwise expressly provided in the Plan or the PAT Agreement, if any portion of any Claim in any Class in this Plan, including any Avrio General Unsecured Claims, Adlon General Unsecured Claims, or Other General Unsecured Claims is Disputed or Non-Participating, no payment or Distribution provided under the Plan shall be made on account of such Claim unless and until such Disputed Claim or Non-Participating Claim becomes an Allowed Claim.

7.5    *Estimation of Claims*.

Subject in all respects to Section 7.12 of the Plan, the Debtors (before the Effective Date), and the Plan Administration Trustee (on or after the Effective Date), or any party in interest (including, for the avoidance of doubt, any Shareholder Released Party) may, at any time, request that the Bankruptcy Court estimate, pursuant to section 502(c) of the Bankruptcy Code, any Disputed Avrio General Unsecured Claims, Disputed Adlon General Unsecured Claims or Disputed Other General Unsecured Claims that the Bankruptcy Court has jurisdiction to estimate in accordance with the Bankruptcy Code or other applicable law, regardless of whether an objection was previously filed with the Bankruptcy Court with respect to such Claim, or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim at any time during litigation concerning any objection to any such Claim, including during the pendency of any appeal relating to any such objection. If the Bankruptcy Court estimates such a Disputed Claim, such estimated amount shall constitute either the Allowed amount of such Claim, the amount used to determine the PAT Disputed Claims Reserves or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If such estimated amount constitutes a maximum limitation on such Claim, the Plan Administration Trustee or any party in interest (including, for the avoidance of doubt, any Shareholder Released Party) may elect to pursue any supplemental proceeding to object to any ultimate Distribution on account of such Claim.

7.6    *Resolution of Claims*.

Subject in all respects to Section 7.12 of the Plan, and except as expressly provided in the Plan, the PAT Agreement, the applicable Creditor Trust Documents, or any order entered by the Bankruptcy Court before the Effective Date, including the Confirmation Order, the MDT Trustees, the Plan Administration Trustee and each applicable Creditor Trustee shall have and retain any and all rights and defenses held by the Debtors with respect to any Claim against the Debtors as of the Petition Date, and, subject in all respects to Section 7.12 of the Plan, shall have the authority to compromise, settle, otherwise resolve or withdraw any objections to such Claims and to compromise, settle or otherwise resolve any Non-Participating Channeled Claims and other Disputed Claims without approval of the Bankruptcy Court; *provided*, *however*, that no Non-Participating Channeled Claim or other Disputed Claim may be resolved as contemplated in this Section 7.6 without the consent of the corresponding Creditor Trustee or Plan Administration Trustee, as applicable. Subject to the applicable Creditor Trust Documents, if the Master Disbursement Trust, the Plan Administration Trustee or the applicable Creditor Trustee, as applicable, and a Holder of a Non-Participating Channeled Claim or other Disputed Claim are unable to reach a settlement on the Non-Participating Channeled Claim or other Disputed Claim within [●] of the Effective Date, such Non-Participating Channeled Claim or other Disputed Claim shall be submitted to the Bankruptcy Court for resolution consistent with this Article VII of the Plan. For the avoidance of doubt, nothing in this Section 7.6 shall (i) alter the processes for determining Distributions to the Holders of Allowed Channeled Claims set forth in this Plan, any order of the Bankruptcy Court, and the applicable Creditor Trust Documents or (ii) limit the rights and obligations of the Creditor Trustees in connection with such processes.

7.7    *Distribution After Allowance*.

(a)    **PAT Disputed Claims Reserves**. In accordance with the PAT Agreement, on the first PAT Distribution Date following the date on which a Disputed Avrio General Unsecured Claim, Disputed Adlon General Unsecured Claim or Disputed Other General Unsecured Claim becomes an Allowed Claim, the Disbursing Agent shall remit to the respective PAT Distribution Account, for Distribution to the Holder of such Allowed Claim, the Cash or cash equivalents retained in the applicable PAT Disputed Claims Reserve in an amount equal to any amount that would have been distributed to the Holder of such Claim from the Effective Date through and including the PAT Distribution Date if such

Claim had been Allowed as of the Effective Date, net of any costs and expenses, including taxes (if any), of or related to the applicable PAT Disputed Claims Reserve. Each Holder of a Disputed Avrio General Unsecured Claim, Disputed Adlon General Unsecured Claim and Disputed Other General Unsecured Claim that ultimately becomes an Allowed Claim shall have recourse only to the undistributed Cash held in the applicable PAT Disputed Claims Reserve for satisfaction of such Holders' Allowed Claim and shall have no recourse against any Protected Party or any Assets previously distributed on account of any Allowed Claim. No distribution from a PAT Disputed Claims Reserve or otherwise shall be made on account of any Disputed Claim unless such Disputed Claim is Allowed by a Final Order.

(b)    **Creditor Trust Non-Participating Claims Reserves**. With respect to the Creditor Trust Non-Participating Claims Reserves other than the Class 4 Non-Participating Claims Reserves, in accordance with the applicable Creditor Trust Documents, following the date on which a Non-Participating Channeled Claim becomes an Allowed Claim, each applicable Creditor Trust shall distribute to the Holder of such Allowed Claim the Cash or cash equivalents retained in the applicable Creditor Trust Non-Participating Claims Reserve(s) in an amount equal to any Estate Distribution amount that would have been distributed to the Holder of such Claim from the Effective Date through and including the applicable distribution date if such Claim had been Allowed as of the Effective Date pursuant to the applicable Creditor Trust TDP, net of any costs and expenses, including taxes (if any), of or related to the applicable Non-Participating Claims Reserve, and shall be entitled to receive its pro rata share of Estate Distributions as a Holder of an Allowed Claim in its applicable Class if and when such distribution is made, pursuant to the applicable Creditor Trust TDP. For the avoidance of doubt, nothing herein shall entitle the Holder of a Non-Participating Claim, regardless of Allowance, to any share of the Shareholder Direct Settlement Portion. Each Holder of a Non-Participating Channeled Claim that ultimately becomes an Allowed Claim shall have no recourse against any Protected Party or any Assets previously distributed on account of any Allowed Claim.

(c)    **Class 4 Non-Participating Claims Reserve**. Upon the Allowance of a Non-Participating Channeled Claim in Class 4, (i) the Governmental Remediation Trust shall distribute from the Class 4 Non-Participating Claims Reserves to the holder of such Allowed Claim an amount equal to the Estate Distribution the Holder of such Claim would have received if such Claim was an Allowed Class 4 Claim on the Effective Date, less (A) any costs, expenses, and fees (including taxes, if any) of or related to the Class 4 Non-Participating Claims Reserves and (B) any costs, expenses, and fees incurred by the Governmental Remediation Trust, the Master Disbursement Trust, the Debtors, or any Released Party (to the extent not already claimed or paid to or on behalf of any Released Party out of the Direct Claim Settlement Retained Payment Amounts or the Special Operating Reserve) arising out of, in relation to, or in connection with litigating or in any way resolving any objection to that Class 4 Claim, and (ii) the Holders of such Claim shall be entitled to receive further Estate Distributions pursuant to Article VI of the Plan.

**7.8**    *Disallowance of Non-Participating Channeled Claims and Other Disputed Claims*.

(a)    **PAT Disputed Claims Reserves**.

(i)    Upon Disallowance of a Disputed Avrio General Unsecured Claim, Disputed Adlon General Unsecured Claim or Disputed Other General Unsecured Claim other than Disputed Other GUC Litigation Claims, in whole or in part, the Plan Administration Trustee shall (i) first, reallocate all amounts reserved for distribution on account of such Disallowed Claim or the Disallowed portion thereof (the "***Disallowed Claim Distribution***") to Holders of then Allowed and Disputed Claims

in the applicable Class and (ii) second, distribute the Disallowed Claim Distribution that has been so reallocated to each Holder of an Allowed Claim in such Class and allocate to the PAT Disputed Claims Reserve for such Class, pro rata, in accordance with clause (i) of this sentence.

(ii)    Upon Disallowance of a Disputed Other GUC Litigation Claim, any amounts held on account of such Disputed Other GUC Litigation Claim shall be transferred by the Plan Administration Trustee to the PAT Released Claims Reserve and any future distribution that would have been made to the Disputed Other General Unsecured Claims Reserve on account of such Disputed Other GUC Litigation Claim shall be funded directly to the PAT Released Claims Reserve.

(b)    **Creditor Trust Non-Participating Claims Reserves**. Upon Disallowance of a Non-Participating Channeled Claim other than with respect to any Non-Participating Channeled Claims in Class 4: (i) any amounts held in the applicable Creditor Trust PRA Non-Participating Claims Reserve on account of such Non-Participating Channeled Claim shall be transferred by the applicable Creditor Trustee from the applicable Creditor Trust PRA Non-Participating Claims Reserve directly to the corresponding Released Claims Reserve and any future Distribution that would have been funded to the applicable Creditor Trust PRA Non-Participating Claims Reserve on account of such Non-Participating Channeled Claim shall be funded directly to the applicable Released Claims Reserve, and (ii) any amounts held in the applicable Creditor Trust Non-Participating Claims Reserve (other than any Creditor Trust PRA Non-Participating Claims Reserve) on account of such Non-Participating Channeled Claim shall be released to the applicable Creditor Trust for distribution pursuant to the applicable Creditor Trust Documents.

(c)    **Class 4 Non-Participating Claims Reserve**. In the event a Non-Participating Channeled Claim in Class 4 is Disallowed: (i) the amount reserved on account of such Claim in the Class 4 PRA Non-Participating Claims Reserve shall be released to the corresponding Released Claims Reserve, and any future Distribution that would have been funded to the Class 4 PRA Non-Participating Claims Reserve on account of such Non-Participating Non-Federal Domestic Governmental Channeled Claim shall be funded directly to the Released Claim Reserve established in the Governmental Remediation Trust, and (ii) the amount reserved on account of such Claim in the Class 4 Non-PRA Non-Participating Claims Reserve shall be released to the applicable Governmental Remediation Trust for distribution pursuant to the Governmental Remediation Trust Documents.

(d)    **Released Claims Reserves**. All amounts funded to the Released Claims Reserves in accordance with this Section 7.8 shall be administered in accordance with the terms of Article 5 and Exhibit N of the Master Shareholder Settlement Agreement.

### 7.9    *Allowance of Non-Participating Channeled Claims*.

(a)    If no objection is affirmatively raised to the Allowance of a Non-Participating Channeled Claim (other than a Non-Participating Channeled Claim in Classes 10(a) or 10(b)) within two (2) years of the Effective Date, such claim shall be deemed Allowed and the holder thereof shall be entitled to the Estate Distribution allocated to such Channeled Claim under the applicable TDP. If no objection is affirmatively raised to the Allowance of a Non-Participating Channeled Claim in Classes 10(a)

134

or 10(b) within [one (1) year]<sup>25</sup> of the Effective Date, such claim shall be deemed Allowed and the holder thereof shall be entitled to the Estate Distribution allocated to such Channeled Claim under the applicable TDP. Notwithstanding the foregoing, (i) any Allowance pursuant to this <u>Section 7.9(a)</u> of the Plan shall not constitute a determination as to the merits of such Non-Participating Channeled Claim and shall not be used as a basis to assert the merits of such Non-Participating Channeled Claim in any forum, and (ii) any Non-Participating Channeled Claim that is Allowed (pursuant to this <u>Section 7.9</u> or otherwise) shall still be subject to, and shall only receive a distribution pursuant to, the applicable TDP.

(b)     For the purposes of Allowance of any Non-Participating Channeled Claim that is not otherwise Disallowed in accordance with the Plan, such Channeled Claim shall be deemed an Allowed Claim (i) pursuant to a settlement or other resolution in accordance with <u>Section 7.6</u> of the Plan, (ii) pursuant to <u>Section 7.9(a)</u> of the Plan, or (iii) upon entry of a Final Order finding that such Holder has a valid, compensable Channeled Claim, regardless of the allowed amount of such Channeled Claim (and, for the avoidance of doubt, such Holder shall not be required to litigate the allowed amount of its Allowed Claim). Other than as expressly contemplated by the applicable trust distribution procedures, any judgment entered as to the amount of a Non-Participating Channeled Claim shall not be binding for purposes of Distribution, which shall instead be determined in accordance with <u>Sections 7.7(b)</u> and <u>(c)</u> of this Plan. The Bankruptcy Court (or any other court of competent jurisdiction in connection with such an objection) may, at its discretion, decline to enter any judgment as to the amount of a Non-Participating Channeled Claim.

### 7.10   *Claims Resolution Procedures Cumulative*.

All of the objection, estimation, settlement and resolution procedures set forth in this Plan with respect to Claims against the Debtors are intended to be cumulative and not exclusive of one another. Claims against the Debtors may be established and subsequently settled, compromised, withdrawn or resolved in accordance with this Plan by any mechanism approved by the Bankruptcy Court.

### 7.11   *No Postpetition Interest or Penalties on Non-Participating Channeled Claims and other Disputed Claims*.

Unless otherwise specifically provided for in the Plan or the Confirmation Order or required by applicable bankruptcy law, no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date or to any penalties on any Claim. Interest and penalties shall not accrue or be paid upon any Non-Participating Channeled Claim or other Disputed Claim with respect to the period from the Effective Date to the date a Distribution is made thereon, or on and after such Non-Participating Channeled Claim or other Disputed Claim becomes an Allowed Claim.

### 7.12   *Shareholder Rights Regarding Settlement and Estimation of Claims*.

[In consideration of certain compromises made under the Shareholder Settlements, notwithstanding anything to the contrary contained in the Plan, the Confirmation Order, or the other Plan Documents, neither the Debtors, the reorganized Debtors, the Estates, the Plan Administration Trust, the Plan Administration Trustee, any of the Creditor Trusts, any of the Creditor Trustees, nor any representative or successor of any of the foregoing shall be permitted to settle or seek to estimate any Non-Participating Channeled Claim or other Disputed Claim absent the express written consent of the Sackler Parties' Representative, not to be unreasonably withheld, solely to the extent that such settlement or estimation of any such Non-Participating Channeled Claim or other Disputed Claim could be reasonably expected to adversely impact any Shareholder Released Party's defense against or resolution of any claims or Causes

---

<sup>25</sup> [**NTD**: Subject to ongoing discussion]

of Action asserted or potentially asserted against any Shareholder Released Party [for Covered Conduct] that would have been released pursuant to the Shareholder Direct Claims Release had the Persons asserting or potentially asserting such claims or Causes of Action been Settling Creditors (including because admissions of fact or showings of evidentiary support requisite to effectuation of such settlement or estimation could adversely impact the legal defenses of any Shareholder Released Party); *provided* that no such consent shall be required to the extent that (a) such settlement or estimation of such Non-Participating Channeled Claim or other Disputed Claim is sought in an amount not exceeding $[●], (b) such settlement or estimation of such Non-Participating Channeled Claim or other Disputed Claim would include no non-monetary conditions on the part of any Debtor, any reorganized Debtor, any Estate, the Plan Administration Trust, the Plan Administration Trustee, any Creditor Trust, any Creditor Trustee, or any representative or successor of any of the foregoing, and (c) the total aggregate amount of Non-Participating Channeled Claims or other Disputed Claims or formerly Non-Participating Channeled Claims or other Disputed Claims that have been settled or estimated do not exceed $[●]. Whether or not the Debtors, the reorganized Debtors, the Estates, the Plan Administration Trust, the Plan Administration Trustee, any of the Creditor Trusts, any of the Creditor Trustees, or any representative or successor of any of the foregoing settles or estimates (or seeks to settle or estimate) any Non-Participating Channeled Claim or other Disputed Claim, in no event shall any Shareholder Released Parties be considered the privies of any of the foregoing for purposes of preclusion principles or otherwise.][26]

## ARTICLE VIII        EXECUTORY CONTRACTS AND UNEXPIRED LEASES.

### 8.1    *Assumption and Rejection of Executory Contracts and Unexpired Leases*.

(a)    As of and subject to the occurrence of the Effective Date, all executory contracts and unexpired leases to which any Debtor is a party, subject to the terms of <u>Section 8.4</u>, shall be deemed assumed by the applicable Debtor and, except with respect to any contract or lease held by a Transferred Debtor, assigned to NewCo or its designee, except for any executory contract or unexpired lease that (i) has previously been assumed or rejected pursuant to a Final Order of the Bankruptcy Court, (ii) is specifically identified on the Schedule of Rejected Contracts, (iii) is the subject of a separate assumption or rejection motion filed by the Debtors under section 365 of the Bankruptcy Code pending on the Confirmation Date, (iv) is the subject of a pending Contract Dispute or (v) is being otherwise treated pursuant to the Plan. The Debtors reserve the right to modify the treatment of any particular executory contract or unexpired lease pursuant to this Plan [with the reasonable consent to the Governmental Consent Parties]. Furthermore, notwithstanding anything to the contrary in the Plan, the Debtors may alter, amend, modify or supplement the Schedule of Rejected Contracts and assume, assume and assign or reject executory contracts and unexpired leases at any time prior to the Effective Date or, with respect to any executory contract or unexpired lease subject to a Contract Dispute that is resolved after the Effective Date, within thirty (30) days following entry of a Final Order of the Bankruptcy Court resolving such Contract Dispute.

(b)    Subject to the occurrence of the Effective Date, the payment of any applicable Cure Amount and the resolution of any Contract Dispute, the entry of the Confirmation Order shall constitute approval of the rejections, assumptions and assumptions and assignments provided for in this Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Unless otherwise indicated herein or provided in a separate order of the Bankruptcy Court, rejections, assumptions and assumptions and assignments of executory contracts and unexpired leases pursuant to the Solicitation Procedures Order and this Plan are effective as of the Effective Date. Each executory contract and unexpired lease assumed pursuant to this Plan or by order of the Bankruptcy Court shall vest in and be fully enforceable by the

---

[26] [**NTD**: Subject to ongoing discussion]

applicable Debtor or NewCo, in each case in accordance with its terms, except as modified by the provisions of this Plan, any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law.

(c)    Unless otherwise provided herein (including Section 8.4 of the Plan) or by separate order of the Bankruptcy Court, each executory contract or unexpired lease that is assumed or assumed and assigned shall include any and all modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument or other document is listed in an Assumption Notice.

(d)    Except as otherwise expressly set forth on an Assumption Notice, any contracts, engagement letters, retention agreements, and similar arrangements, in each case between the Debtors and any attorneys, accountants, financial advisors, investment bankers or similar professionals, representatives or advisors, shall not be treated under the Plan as executory contracts subject to assumption, assumption and assignment, or rejection. Counterparties to any such contracts, engagement letters, retention agreements and similar arrangements were required to file Proofs of Claim by the General Bar Date, and any Allowed Claims relating thereto shall be treated as Other General Unsecured Claims or Co-Defendant Claims, as applicable.

**8.2    _Determination of Contract Disputes and Deemed Consent_.**

(a)    The Debtors shall serve Assumption Notices in accordance with the Solicitation Procedures Order. If a counterparty to an executory contract or unexpired lease receives an Assumption Notice, but such executory contract or unexpired lease is not listed therein, the proposed Cure Amount for such executory contract or unexpired lease shall be deemed to be zero dollars ($0).

(b)    Any counterparty to an executory contract or unexpired lease shall have the time prescribed in the Solicitation Procedures Order to object to (i) the Cure Amount identified on the Assumption Notice, (ii) adequate assurance of future performance by the applicable Debtor, NewCo or its assignee (within the meaning of section 365 of the Bankruptcy Code) and (iii) any other matter pertaining to assumption or assumption and assignment of such executory contract or unexpired lease on the terms set forth in the Plan and such Assumption Notice.

(c)    To the extent a Contract Dispute is asserted in an objection filed in accordance with the procedures set forth in the Assumption Notice, such Contract Dispute shall be heard by the Bankruptcy Court at the Confirmation Hearing. Following resolution of a Contract Dispute by Final Order of the Bankruptcy Court, the applicable executory contract or unexpired lease shall be deemed assumed or assumed and assigned effective as of the Effective Date, subject to the Debtors' right to reject such executory contract or unexpired lease at any time prior to the Effective Date or, if any Contract Dispute is resolved after the Effective Date, within thirty (30) days following entry of such Final Order of the Bankruptcy Court resolving the applicable Contract Dispute.

(d)    To the extent a Contract Dispute has not been resolved prior to the Effective Date, the Debtors shall establish the Disputed Cure Claims Reserve. Any amounts in the Disputed Cure Claims Reserve remaining after the resolution of all Disputed Cure Claims and the payment of all Cure Amounts with respect to Allowed Cure Claims for contracts and leases to be assumed or assumed and assigned shall be applied in accordance with Section 5.14(c) of the Plan.

(e)    To the extent an objection is not timely filed and properly served on the Debtors with respect to a Contract Dispute, then the counterparty to the applicable contract or lease shall be deemed to have assented to (i) the Cure Amount proposed by the Debtors and (ii) the assumption or

assumption and assignment of such contract or lease on the terms set forth in the Plan and the Assumption Notice, notwithstanding any provision of the applicable contract or lease that (A) prohibits, restricts or conditions the transfer or assignment of such contract or lease or (B) terminates or permits the termination of such contract or lease as a result of any direct or indirect transfer or assignment of the rights of the Debtors under such contract or lease or a change in the ownership or control as contemplated by the Plan, and shall forever be barred and enjoined from asserting such objection against the Debtors or terminating or modifying such contract or lease on account of transactions contemplated by the Plan.

(f)    With respect to payment of any Cure Amounts or resolution of Contract Disputes, none of the Debtors, the Plan Administration Trustee, NewCo or any Transferred Debtor shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable executory contract or unexpired lease, even if such non-Debtor party has sold, assigned or otherwise transferred its Cure Claim.

### 8.3    *Payments Related to Assumption of Contracts and Leases*.

(a)    Subject to resolution of any Contract Dispute, any Cure Claim shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by the Plan Administration Trust from the Priority Claims Reserve or the Disputed Cure Claims Reserve, as applicable, or NewCo in the ordinary course of business upon assumption thereof.

(b)    Assumption or assumption and assignment of any executory contract or unexpired lease pursuant to the Plan, or otherwise, shall result in the full release and satisfaction of any Claims or defaults, subject to satisfaction of the Cure Amount, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time before the effective date of assumption or assumption and assignment. Any Proofs of Claim filed with respect to an executory contract or unexpired lease that has been assumed shall be deemed Disallowed and expunged, without further notice, or action, order or approval of the Bankruptcy Court or any other Person.

### 8.4    *Co-Defendant Contracts*.

Except as otherwise provided in the Plan or agreed by any counterparty and the Debtors (with the consent (not to be unreasonably withheld, conditioned or delayed) of the Governmental Consent Parties, and after consultation with the Creditors' Committee), the assumption of any contract or lease under the Plan shall (a) release any Causes of Action on account of any and all terms or provisions of such contract or lease solely to the extent such terms or provisions create an obligation of any party thereto (or any assignee thereof), or give rise to a right in favor of any non-Debtor under any MDT Insurance Policy or any other insurance policy of any Protected Party, for the indemnification or reimbursement of any Person for costs, losses, damages, fees, expenses or any other amounts whatsoever relating to or arising from any actual or potential opioid-related litigation or dispute, whether accrued or unaccrued, asserted or unasserted, existing or hereinafter arising, based on or relating to, or in any manner arising from, in whole or in part, Opioid-Related Activities or other conduct occurring prior to the Effective Date; and (b) constitute a release by each party of each other counterparty (and any assignee thereof or successor thereto) and by each non-Debtor party of all Insurance Companies, in each case, from any and all Causes of Action and other rights of recovery arising under or relating to such indemnification and reimbursement rights to the extent relating to any conduct occurring prior to the Effective Date, and an agreement by each non-Debtor counterparty to release any and all Co-Defendant Claims held by such party and to channel, in accordance with the Channeling Injunction, all Channeled Claims arising under or relating to such contract, including any such Claims that might otherwise be elevated to administrative status through assumption of such contract or lease. On the Effective Date, (x) all Co-Defendant Claims arising under or related to any such assumed or assumed and assigned contract or lease shall be released and discharged with no

138

consideration on account thereof, and all Proofs of Claim in respect thereof shall be deemed expunged, without further notice, or action, order or approval of the Bankruptcy Court or any other Person and (y) all Channeled Claims arising under or related to any such assumed or assumed and assigned contract or lease shall be channeled in accordance with the Channeling Injunction. For the avoidance of doubt, unless otherwise agreed by the counterparty to any assumed or assumed and assigned contract or lease, the foregoing shall not release or otherwise modify any term or provision of such contract or lease to the extent of any indemnification or reimbursement rights (i) accruing after the Effective Date for conduct occurring after the Effective Date, (ii) for any amounts, if any, due to a Co-Defendant as a result of the New York Opioid Stewardship Act (2018 N.Y. Sess. Laws, ch. 57, pt. NN 7 (codified at N.Y. Pub. Health Law § 3323 and N.Y. State Fin. Law § 97-aaaaa)) or (iii) for any Co-Defendant Surviving Pre-Effective Date Claim. Notwithstanding the release, satisfaction, expungement and extinguishment of Co-Defendant Claims, a Co-Defendant retains its Co-Defendant Defensive Rights, which include the ability to recover from Persons that are not Protected Parties or from any insurance policies that are not Purdue Insurance Policies or other insurance policies of Protected Parties. The counterparty to such contract or lease and all other applicable Persons shall be bound by the terms set forth in this <u>Section 8.4</u>.

      8.5        <u>*Rejection Claims*</u>.

      In the event that the rejection of an executory contract or unexpired lease by any of the Debtors herein results in damages to the other party or parties to such contract or lease, any Claim for such damages shall be forever barred and shall not be enforceable against the Debtors or their Estates, properties or interests in property, unless a Proof of Claim is filed with the Bankruptcy Court and served upon the Debtors no later than thirty (30) days after the entry of the order of the Bankruptcy Court (including the Confirmation Order) authorizing the rejection of such executory contract or unexpired lease. Any such Claim shall be classified in accordance with the classification of Claims set forth in <u>Article III</u> of the Plan, including that any such Claims that constitute Co-Defendant Claims shall be classified as such. The Confirmation Order shall constitute the Bankruptcy Court's authorization of the rejection of all the leases and contracts identified in the Schedule of Rejected Contracts.

      8.6        <u>*Compensation and Benefit Plans*</u>.

      Except with respect to any Benefit Plans for which the Debtors have received approval of the Bankruptcy Court to reject or terminate on or before the Effective Date or that are subject to a pending motion to reject or terminate as of the Confirmation Hearing, all Benefit Plans shall be deemed to be, and shall be treated as, executory contracts under this Plan pursuant to sections 365 and 1123 of the Bankruptcy Code and shall be assumed by applicable Debtors and, unless held by a Transferred Debtor, assigned to NewCo (or one of its Subsidiaries).

      8.7        <u>*Purdue Pension Plan*</u>.

      The Purdue Pension Plan has approximately 3,200 participants. PPLP is the contributing sponsor of the Purdue Pension Plan. The Debtors that are members of the contributing sponsor's controlled-group within the meaning of 29 U.S.C. §§ 1301(a)(13), (14) are jointly and severally liable with respect to the Purdue Pension Plan. Further, any non-debtor members of the contributing sponsor's controlled-group are also jointly and severally liable with respect to the Purdue Pension Plan.

      [On or prior to the Effective Date, the Debtors shall have commenced a standard termination of the Purdue Pension Plan pursuant to 29 U.S.C. § 1341 and any standard termination costs,

other liabilities, or obligations remaining thereunder as of the Effective Date shall be assumed and payable by NewCo.][27]

NewCo or its wholly owned subsidiary will assume the Purdue Pension Plan to the extent the standard termination and PBGC audit, pursuant to 29 U.S.C. § 1303, has not been completed for the Purdue Pension Plan prior to the Effective Date. Specifically, upon the Effective Date, NewCo or its wholly owned subsidiary shall be deemed to have assumed the Purdue Pension Plan (to the extent the standard termination and PBGC audit has not been completed prior to the Effective Date) and all liabilities and assets thereunder and shall comply with all applicable statutory provisions of ERISA and the IRC, including, but not limited to, satisfying the minimum funding standards pursuant to 26 U.S.C. §§ 412, 430, and 29 U.S.C. §§1082, 1083; paying the PBGC premiums in accordance with 29 U.S.C. §§ 1306 and 1307; administering the Purdue Pension Plan in accordance with its terms and the provisions of ERISA and the IRC, and completing the standard termination under 29 U.S.C. § 1341 (and NewCo reserves all rights thereunder.

Notwithstanding any provision in the Plan to the contrary, no provision contained in the Plan, the Confirmation Order, the Bankruptcy Code (including section 1141 thereof), or any other document filed in the Debtors' bankruptcy cases shall be construed as discharging, releasing, exculpating or relieving any Person (other than the Liquidating Debtors) from any fiduciary duties or liabilities under Title I of ERISA with respect to the Purdue Pension Plan. PBGC and the Purdue Pension Plan shall not be enjoined or precluded from enforcing such fiduciary duties or liabilities under Title I of ERISA as a result of any of the provisions of the Plan, the Confirmation Order, the Bankruptcy Code or any other document filed in the Debtors' bankruptcy cases. The PBGC and the Debtors agree that all Proofs of Claim filed by the PBGC shall be deemed to be withdrawn, with prejudice, as of the Effective Date.

### 8.8    *Insurance Policies*.

Notwithstanding anything to the contrary in the Plan, the Plan Documents, the Disclosure Statement or the Confirmation Order:

(a)    nothing in the Plan, the Plan Documents, the Disclosure Statement or the Confirmation Order shall terminate or otherwise reduce the coverage under any D&O Insurance Policy with respect to conduct occurring on or prior to the Effective Date, and, after the Effective Date, all directors, officers, managers, authorized agents and employees of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any applicable D&O Insurance Policy for the full term of such policy, including but not limited to any extension of coverage after the end of such policy period if an extended reporting period has been purchased, in accordance with the terms thereof, subject to (i) any release or assignment of rights by certain Shareholder Released Parties pursuant to the Shareholder Settlements and (ii) with respect to D&O Insurance Policies that are MDT Insurance Policies, the provisions of paragraph (b) of this Section 8.8;

(b)    after the Effective Date, in consideration of the Estate Releases and Shareholder Releases in favor of each Released Party and Shareholder Released Party that is an individual insured under any MDT Insurance Policy:

(i)    each such Released Party or Shareholder Released Party (A) will fully cooperate with the Master Disbursement Trust in connection with the settlement of claims or rights under such MDT Insurance

---

[27] [**NTD**: Subject to ongoing review]

Policy, including but not limited to as set forth in this Section 8.8(b)(i), and (B) shall be deemed to consent to the release of any claims or rights held by such Released Party or Shareholder Released Party against and under such MDT Insurance Policy in the event that the Master Disbursement Trust has otherwise obtained settlement terms that it deems acceptable in its sole discretion with the same effect as if such Released Party or Shareholder Released Party had executed such settlement agreement, and without further consideration to such Released Party or Shareholder Released Party from the insurance settlement proceeds or otherwise in respect of such settlement;

(ii)     no such Released Party or Shareholder Released Party (other than a Sackler Family Member) that was a director, officer, manager, authorized agent or employee of the Debtors who served in such capacity at any time prior to the Petition Date shall be entitled to submit a claim under any MDT Insurance Policy for anything other than reimbursement of attorneys' fees and related expenses incurred in connection with such individual's cooperation with, or in connection with the defense of such individual with respect to, any investigation, prosecution and/or litigation involving conduct relating to the Debtors or the Debtors' business or property or any defense of the Releases or the Channeling Injunction; and

(iii)    no such Shareholder Released Party (other than a current or former director, officer, manager, authorized agent or employee that is not a Sackler Family Member, each of whom is subject to the foregoing paragraph (ii) of this Section 8.8(b)) shall be entitled to submit a claim under any MDT Insurance Policy other than in accordance with the Shareholder Settlements;

(c)     on and after the Effective Date, all Purdue Insurance Policies (other than the MDT Insurance Policies) shall be deemed to be, and shall be treated as, executory contracts under the Plan, and shall be assumed pursuant to sections 105 and 365 of the Bankruptcy Code by the applicable Debtor, and such Purdue Insurance Policies shall vest, and/or the Purdue Insurance Rights (other than the MDT Insurance Rights) associated therewith shall vest, as applicable, in NewCo, the applicable Transferred Debtor or the Plan Administration Trust, as applicable, in accordance with the NewCo Transfer Agreement and the PAT Agreement and continue in full force and effect in accordance with their respective terms such that the applicable recipients of the Purdue Insurance Policies (other than the MDT Insurance Policies) and the Purdue Insurance Rights (other than the MDT Insurance Rights) shall become and remain liable in full for and shall satisfy, to the extent required under applicable law, any prospective premiums, deductibles, self-insured retentions and any other amounts or obligations arising in any way out of the receipt of payment from an Insurance Company in respect of the Purdue Insurance Policies (other than the MDT Insurance Policies); and

(d)     solely with respect to Purdue Insurance Policies that are not MDT Insurance Policies, the automatic stay of section 362(a) of the Bankruptcy Code and the injunctions set forth in the Plan, if and to the extent applicable, shall be deemed lifted without further order of this Bankruptcy Court, solely to permit (i) claimants with valid workers' compensation claims or direct action claims against Insurance Companies under applicable non-bankruptcy law to proceed with their claims; and (ii) Insurance Companies to administer, handle, defend, settle and/or pay, in the ordinary course of business

141

and without further order of this Bankruptcy Court, (A) workers' compensation claims, (B) claims where a claimant asserts a direct claim against an Insurance Company under applicable non-bankruptcy law, or an order has been entered by this Bankruptcy Court granting a claimant relief from the automatic stay or the injunctions set forth in the Plan to proceed with its claim, and (C) all costs in relation to each of the foregoing.

**8.9** **_Reservation of Rights_**.

(a)    Neither the exclusion nor the inclusion by the Debtors of any contract or lease on any exhibit, schedule or other annex to this Plan or in the Plan Supplement, nor anything contained in this Plan, shall constitute an admission by the Debtors that any such contract or lease is or is not an executory contract or unexpired lease or that the Debtors have any liability thereunder.

(b)    Except as explicitly provided in this Plan, nothing herein shall waive, excuse, limit, diminish or otherwise alter any of the Estate Causes of Action under any executory or non-executory contract or unexpired lease.

(c)    Nothing in this Plan shall increase, augment or add to any of the duties, obligations, responsibilities or liabilities of the Debtors under any executory or non-executory contract or unexpired or expired lease, including the Purdue Insurance Policies.

(d)    If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of its assumption under this Plan, the Debtors shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

# ARTICLE IX CONDITIONS PRECEDENT TO THE OCCURRENCE OF THE EFFECTIVE DATE.

**9.1** **_Conditions Precedent to Effective Date_**.

The Effective Date shall not occur unless all of the following conditions precedent have been satisfied:

(a)    the Confirmation Order shall have been entered by the Bankruptcy Court, and shall not be subject to any stay and shall not have been modified or vacated on appeal;

(b)    the Plan Documents shall have been approved of or accepted by all applicable Persons in accordance with the respective consent rights under this Plan, and shall have been filed, executed and delivered, as applicable, and the conditions precedent contained therein shall have been satisfied or waived in accordance with the terms thereof, except with respect to such conditions that by their terms shall be satisfied substantially simultaneously with or after consummation of the Plan;

(c)    the DOJ Resolution (including, for the avoidance of doubt, the entry of a judgment of conviction in strict accordance with the Plea Agreement and the payment in full of the DOJ Forfeiture Payment) shall have been consummated or will be consummated substantially simultaneously with consummation of the Plan;

(d)    the NewCo Operating Agreement shall have been executed and shall be in compliance with the DOJ Resolution, the NewCo Transferred Assets shall have vested in NewCo (or one or more of its Subsidiaries) in accordance with the NewCo Transfer Agreement and the NewCo Managers shall have been appointed;

(e)        the MDT Agreement shall have been executed, the MDT Transferred Assets shall have vested, or will vest simultaneously with the consummation of the Plan, in the Master Disbursement Trust in accordance therewith and the MDT Trustees shall have been appointed;

(f)        the Creditor Trust Documents shall have been executed and the Creditor Trustees shall have been appointed;

(g)        the Public Entity Settlements other than the Public School District Shareholder Direct Settlement shall have been consummated or will be consummated substantially simultaneously with consummation of the Plan, including (i) the payment in full of the Initial Public Creditor Trust Distributions and (ii) the issuance of the MDT Interests to the Public Creditor Trusts;

(h)        the Foundation Bylaws shall have been adopted, the Foundation Trustees shall have been appointed and the NewCo Interest shall have been issued, or will be issued simultaneously with consummation of the Plan, to the Foundation;

(i)        the Private Entity Settlements other than the Opt-Out Class Action Settlements shall have been consummated or will be consummated substantially simultaneously with consummation of the Plan, including: (i) with respect to the Creditor Trusts that are not the subject of Opt-Out Class Actions, the payment in full of the Initial Private Creditor Trust Distributions to such Creditor Trusts,(ii) the issuance of the MDT Claims (in the case of Creditor Trusts that are the subject of Opt-Out Class Actions, to the extent that the applicable Opt-Out Class Action Settlement has been consummated) and (iii) the execution of any Plan Documents required to be executed in connection with the foregoing;

(j)        with respect to the Creditor Trusts that are the subject of Opt-Out Class Actions, payment in full of the Initial Private Creditor Trust Distributions to such Creditor Trusts, or, to the extent that the applicable Opt-Out Class Action Settlement has not been consummated, the placement of the Shareholder Direct Settlement Portion of the Initial Private Creditor Trust Distributions for such Creditor Trusts into the applicable Class Action Escrow Account;

(k)        each Shareholder Settlement Agreement other than the Opt-Out Class Action Settlements shall have been executed and all amounts required to be paid thereunder on the Effective Date shall have been received, and all of the conditions precedent to the effectiveness of each Shareholder Settlement Agreement other than the Opt-Out Class Action Settlements shall have been satisfied or waived in accordance with the terms of such Shareholder Settlement Agreement;

(l)        the Ratepayer Mediation Participants Stipulation shall have been approved by a Final Order of the Bankruptcy Court;

(m)        the PAT Agreement shall have been executed, the PAT Assets shall have vested, or will vest simultaneously with the consummation of the Plan, in the Plan Administration Trust in accordance therewith and the Plan Administration Trustee shall have been appointed;

(n)        each of the PAT Reserves, the Claims Reserves, the Professional Fee Escrow Account, the Special Operating Reserve and the PAT Distribution Accounts shall have been fully funded, or will be funded simultaneously with the consummation of the Plan, and each of the other payments and Distributions of Effective Date Cash described in Section 5.14(a) and (b) of the Plan shall have been made or will be made substantially simultaneously with consummation of the Plan;

(o)        the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings and documents that are necessary to implement and effectuate the Plan;

(p)      all Professional Fee Claims shall have been paid in full or amounts sufficient to pay such Claims after the Effective Date shall have been placed in the Professional Fee Escrow Account, or shall be otherwise contained in a professional fee retainer, pending approval by the Bankruptcy Court;

(q)      the Debtors shall have implemented the Restructuring Transactions, or shall implement the Restructuring Transactions simultaneously with the consummation of the Plan, in a manner consistent in all material respects with this Plan;

(r)      the Bankruptcy Court shall have confirmed that the Bankruptcy Code authorizes the transfer and vesting of the MDT Transferred Assets, notwithstanding any terms of the Purdue Insurance Policies or provisions of non-bankruptcy law that any Insurance Company may otherwise argue prohibits such transfer and vesting;

(s)      the DOB shall have been appointed in accordance with Section 5.13(c) of the Plan;

(t)      all Liens granted as contemplated by the Plan and any documents included in the Plan Supplement shall have been approved by the Bankruptcy Court;

(u)      the Debtors shall have Effective Date Cash sufficient to pay the effective date fixed payments as provided in Section 5.14(a) of this Plan in full in cash; and

(v)      all other actions, documents and agreements necessary to implement and effectuate the Plan shall have been effected or executed.

**9.2**      *Waiver of Conditions Precedent*.

Each of the conditions precedent to the occurrence of the Effective Date (other than the condition precedent set forth in Section 9.1(i) of the Plan) may be waived by the Debtors; *provided* that (a) with respect to any condition precedent, the waiver of which would materially and adversely affect the entitlements of any Class of Claims (or any Creditor Trust to which such Claims shall be channeled) represented by any of the Supporting Claimants, the waiver of such condition precedent shall also require the consent (not to be unreasonably withheld, conditioned or delayed) of the applicable Supporting Claimants representing such materially and adversely affected Class of Claims, it being understood that the waiver of the condition precedent set forth in Section 9.1(i) materially and adversely affects the Class of Claims and the Creditor Trust entitled to the applicable Initial Private Creditor Trust Distribution and/or MDT Claim, (b) the waiver of the conditions precedent set forth in Section 9.1(a), (b) (solely with respect to any Plan Document over which the Creditors' Committee has a consent right set forth in the Plan), (e), (f), (i), (j), (k), (l), (m), (n), (p) (solely with respect to Professional Fee Claims by Professional Persons retained by the Creditors' Committee), (q), (r), (s), and (u) of the Plan shall also require the consent of the Creditors' Committee (which consent shall not be unreasonably withheld, delayed or conditioned), (c) the waiver of the conditions precedent set forth in Section 9.1(a), (b) (solely with respect to any Plan Document over which the Governmental Consent Parties have a consent right set forth in the Plan), (d), (e), (f), (g), (i), (n),(q), (r), (s), and (u) of the Plan shall also require the consent of the Governmental Consent Parties (which consent shall not be unreasonably withheld, delayed or conditioned) and (d) the waiver of the conditions precedent set forth in Section 9.1(a), (b) (solely with respect to any Plan Document over which the Sackler Parties' Representative has a consent right set forth in the Master Shareholder Settlement Agreement), (e), (g), (i), (j), (k), (m), (n), and (q) of the Plan shall also require the consent of the Sackler Parties' Representative (which consent shall not be unreasonably withheld, delayed or conditioned).

**9.3**     *Frustration of Conditions Precedent*.

Notwithstanding anything to the contrary herein, if the failure to satisfy any condition precedent to the Effective Date set forth in Section 9.1 was primarily caused by the action of any party (or such party's failure to act), then (i) such party's consent shall not be required for the Debtors' waiver of such condition and (ii) such party shall not be entitled to prevent or delay the Effective Date by asserting that such condition has not been satisfied.

## ARTICLE X    EFFECT OF CONFIRMATION.

**10.1**     *Binding Effect*.

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, and subject to the occurrence of the Effective Date, on and after the entry of the Confirmation Order, the provisions of this Plan and the Plan Documents shall bind every Holder of a Claim against or Interest in any Debtor and every Holder of a Channeled Claim and inure to the benefit of, and be binding on, any such Holder's respective successors and assigns, regardless of whether any Claim or Interest of such Holder is Impaired under this Plan or whether such Holder has accepted this Plan.

**10.2**     *Discharge of Claims against and Interests in the Debtors*.

Upon the Effective Date and in consideration of the Distributions to be made under this Plan, except as otherwise provided in the Plan or in the Confirmation Order, each Holder (as well as any trustee or agent on behalf of such Holder) of a Claim or Interest and any successor, assign and affiliate of such Holder shall be deemed to have forever waived, released and discharged the Debtors (other than the Liquidating Debtors), to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights and liabilities that arose prior to the Effective Date. Except as otherwise provided in this Plan, upon the Effective Date, all such Holders of Claims against or Interests in the Debtors, and their successors, assigns and affiliates, shall be forever precluded and enjoined, pursuant to sections 105, 524 and 1141 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against, or terminated Interest in, any Debtor. Pursuant to section 1141(d)(3) of the Bankruptcy Code, confirmation of the Plan will not discharge the Liquidating Debtors; *provided* that, upon confirmation of the Plan and the occurrence of the Effective Date, Holders of Claims against and Interests in the Debtors may not seek or receive any payment or other Distribution from, or seek recourse against, the Debtors or their Estates [or, to the extent set forth in the Plan, any other Protected Party], except as expressly provided in the Plan. The Co-Defendant Defensive Rights shall not be waived, released or discharged and all Co-Defendant Defensive Rights are preserved, as provided in Section 10.18 of the Plan.

**10.3**     *Pre-Confirmation Injunctions, Stays, Stipulations and Discovery Orders*.

(a)     Unless otherwise provided in this Plan, all injunctions and stays arising under or entered during the Chapter 11 Cases, whether under section 105 or 362 of the Bankruptcy Code or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

(b)     Notwithstanding the foregoing paragraph (a) of this Section 10.3, on the Effective Date, without further action by or order of the Bankruptcy Court:

(i)     any and all obligations of the Shareholder Released Parties arising under the Case Stipulation shall terminate and the Case Stipulation shall be withdrawn, vacated and superseded by the Confirmation Order solely with respect to paragraphs 15, 17, 19,

22 and 25 of the Case Stipulation, and solely as such paragraphs apply to any Shareholder Released Party; *provided* that, for the avoidance of doubt, the terms of such paragraphs shall continue in full force and effect with respect to all other parties (if applicable), and all other provisions of the Case Stipulation shall remain in full force and effect, in each case, unless otherwise provided by the Plan;

(ii)    any and all obligations of any Shareholder Released Party arising under paragraph I of the voluntary injunction set forth in Appendix I to the Preliminary Injunction (and any predecessors or successors of the Preliminary Injunction) shall terminate, and the Preliminary Injunction shall be withdrawn, vacated and superseded by the Confirmation Order solely with respect to paragraph I of the voluntary injunction set forth in Appendix I; *provided* that, for the avoidance of doubt, all other provisions of the Preliminary Injunction shall remain in full force and effect, unless otherwise provided by the Plan; and

(iii)    any and all obligations of any Person arising under any subpoenas issued pursuant to any of *Order Pursuant to Federal Rules of Bankruptcy Procedure 2004 and 9016 Authorizing Examination of Third Parties* [D.I. 992] (as amended by the *Amended Order Pursuant to Federal Rules of Bankruptcy Procedure 2004 and 9016 Authorizing Examination of Third Parties* [D.I. 1008]), the *Order Pursuant to Rules 2004 and 9016 of the Federal Rules of Bankruptcy Procedure Authorizing Examinations of Certain Financial Institutions* [D.I. 1143], the *Order Pursuant to Federal Rules of Bankruptcy Procedure 2004 and 9016 Authorizing Examinations of and Document Production by Third Parties* [D.I. 1340] and the *Order Pursuant to Federal Rules of Bankruptcy Procedure 2004 and 9016 Authorizing Examination of Certain Former Debtor Executives, Separately Represented Debtor Personnel, and Norton Rose Fulbright Pursuant to Federal Rules of Bankruptcy Procedure 2004 and 9006* [D.I. 1788] shall terminate.

(c)    Any and all information shared or produced by any Shareholder Released Party pursuant to the agreements or orders referenced in the foregoing paragraph (b) of this Section 10.3, including any such information also shared with Persons not party to the Case Stipulation, shall remain subject to the confidentiality terms under which it was shared, including any information that was designated under the Protective Order (or confidentiality agreement that was superseded by the Protective Order), which such information shall remain confidential under the terms of the Protective Order unless such information, materials or documents are included in the Public Document Repository in accordance with the Plan and the Master Shareholder Settlement Agreement. Names or other identifying information of investments or specific third-party counterparties or advisors with whom or with which a Shareholder Released Party has or had a third-party investment, advisory or business relationship that was disclosed in documents or information produced by a Shareholder Released Party and designated Outside Professional Eyes Only Information under the Protective Order shall retain such designation and be protected accordingly.

(d)       Except as provided in the PI TDP, nothing in this Plan shall either (i) excuse any Person from compliance with any legislative, judicial or administrative subpoena, any civil investigative demand or any request for information made in the course of a government investigation; or (ii) limit any right of any Person with respect to compliance with any legislative, judicial or administrative subpoena, any civil investigative demand or any request for information made in the course of a government investigation.

### 10.4    _Injunction against Interference with Plan_.

Subject to Section 12.4 of the Plan, upon entry of the Confirmation Order, all Holders of Claims or Interests in the Debtors, Holders of Channeled Claims, Releasing Parties, Released Parties, Shareholder Released Parties and other parties in interests shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan and the Plan Documents. This Section 10.4 shall be included in the Confirmation Order.

### 10.5    _Plan Injunction_.

(a)       Except as otherwise provided in this Plan or in the Confirmation Order, as of the entry of the Confirmation Order but subject to the occurrence of the Effective Date, all Persons who have held, hold or may hold Claims against or Interests in the Debtors are, with respect to any such Claim or Interest, permanently enjoined after the entry of the Confirmation Order from: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting, directly or indirectly, a Debtor or an Estate or the property of any of the foregoing, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this clause (i) or any property of any such transferee or successor; (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting or otherwise recovering in any manner or by any means, whether directly or indirectly, any judgment, award, decree or order against a Debtor or an Estate or its property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this clause (a) or any property of any such transferee or successor; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against a Debtor or an Estate or any of its property, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons mentioned in this clause (iii) or any property of any such transferee or successor; (iv) acting or proceeding in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of this Plan; and (v) commencing or continuing, in any manner or in any place, any action that does not comply, or is inconsistent, with the provisions of this Plan; _provided, however_, that nothing contained herein shall preclude such Persons who have held, hold or may hold Claims against or Interests in a Debtor or an Estate from exercising their rights, or obtaining benefits, pursuant to, and consistent with, the terms of this Plan and the Plan Documents.

(b)       All Persons, including all governmental, tax and regulatory authorities, lenders, trade creditors, dealers, customers, employees, litigation claimants and other creditors holding Claims, Liens, Interests, charges, encumbrances and other interests of any kind or nature whatsoever, including rights or Claims based on any successor or transferee liability, against or in a Debtor, the NewCo Transferred Assets, the MDT Transferred Assets or the PAT Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or noncontingent, known or unknown), arising under or out of, in connection with, or in any way relating to the Debtors, the NewCo Transferred Assets, the MDT Transferred Assets, the PAT Assets, the operation of the NewCo Transferred Assets prior to the Effective Date or the Restructuring Transactions are forever barred, estopped and permanently enjoined from asserting against the Released Parties, their respective successors and assigns, their property, the NewCo

147

Transferred Assets, the MDT Transferred Assets or the PAT Assets, any Released Claim or any other Cause of Action the assertion of which does not comply with or is inconsistent with the provisions of this Plan, including, without limitation, by: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting, directly or indirectly, a Released Party, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this clause (i) or any property of any such transferee or successor; (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting or otherwise recovering in any manner or by any means, whether directly or indirectly, any judgment, award, decree or order against a Released Party, or any direct or indirect transferee of any property of, or direct or indirect successor-in-interest to, any of the foregoing Persons mentioned in this clause (ii) or any property of any such transferee or successor; (iii) creating, perfecting or otherwise enforcing any encumbrance of any kind or asserting any Released Claims in any manner, directly or indirectly, against a Released Party or any of its property, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons mentioned in this clause (iii) or any property of any such transferee or successor; (iv) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of this Plan; and (v) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of this Plan.

      **10.6**    *Releases*.

      (a)      Releases by Debtors.

**As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties before and during the Chapter 11 Cases to facilitate the reorganization of the Debtors and the implementation of the Restructuring Transactions, and except as otherwise explicitly provided in the Plan or in the Confirmation Order, the Released Parties shall be conclusively, absolutely, unconditionally, irrevocably, fully, finally, forever and permanently released by the Debtors and their Estates from any and all Causes of Action, including any derivative claims asserted or assertible by or on behalf of any Debtor or any of their Estates and including any claims that any Debtor or any of their Estates, or that any other Person or party claiming under or through any Debtor or any of their Estates, would have presently or in the future been legally entitled to assert in its own right (whether individually or collectively) or on behalf of any Debtor or any of their Estates or any other Person, notwithstanding section 1542 of the California Civil Code or any law of any jurisdiction that is similar, comparable or equivalent thereto (which shall conclusively be deemed waived), whether existing or hereinafter arising, in each case, based on or relating to, or in any manner arising from, in whole or in part, (i) the Debtors, as such Entities existed prior to or after the Petition Date (including the Debtors' Opioid-Related Activities, manufacture, marketing and sale of Products, interaction with regulators concerning Opioid-Related Activities or Products, and involvement in the subject matter of the Pending Opioid Actions, and the past, present or future use or misuse of any opioid by a Releasing Party), (ii) the Estates or (iii) the Chapter 11 Cases. The Debtors, the Plan Administration Trust, the Master Disbursement Trust, the Creditor Trusts, NewCo, the Foundation and any other newly-formed Persons that shall be continuing the Debtors' businesses after the Effective Date shall be bound, to the same extent the Debtors are bound, by the Releases set forth in this <u>Section 10.6(a)</u>.**

**Notwithstanding anything herein to the contrary, (x) nothing in the Plan shall release any Excluded Claim and (y) nothing in this <u>Section 10.6(a)</u> shall (A) release any contractual Estate Cause of Action or any Estate Cause of Action that is commercial in nature and, in each case, unrelated to either the Chapter 11 Cases or the subject matter of the Pending Opioid Actions;**

*provided* that, with respect to the Settling Co-Defendants, only Estate Surviving Pre-Effective Date Claims shall be retained and not released, (B) release any Estate Cause of Action against a Holder of a Claim against a Debtor, to the extent such Estate Cause of Action is necessary for the administration and resolution of such Claim solely in accordance with the Plan, *provided*, *however*, that the foregoing shall not apply to any Holder of a Co-Defendant Claim solely with respect to such Co-Defendant Claim, (C) be construed to impair in any way the Effective Date or post-Effective Date rights and obligations of any Person under the Plan, the Plan Documents, the Confirmation Order or the Restructuring Transactions, including the Shareholder Settlement Agreements, or (D) release any Claim or right to disgorge, recoup or recover compensation under the orders authorizing the Key Employee Plans or the orders with respect to the *Motion of Debtors for Entry of an Order Authorizing (I) Debtors to (A) Pay Pre-Petition Wages, Salaries, Employee Benefits and Other Compensation and (B) Maintain Employee Benefits Programs and Pay Related Administrative Obligations, (II) Employees and Retirees to Proceed with Outstanding Workers' Compensation Claims and (III) Financial Institutions to Honor and Process Related Checks and Transfers* **[D.I. 6].**

(b)    Releases by Releasing Parties.

As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties before and during the Chapter 11 Cases to facilitate the reorganization of the Debtors and the implementation of the Restructuring Transactions, and except as otherwise explicitly provided in the Plan or in the Confirmation Order, the Released Parties shall be conclusively, absolutely, unconditionally, irrevocably, fully, finally, forever and permanently released by the Releasing Parties from any and all Causes of Action, including, without limitation, any Estate Cause of Action and any claims that any Releasing Party, or that any other Person or party claiming under or through any Releasing Party, would have presently or in the future been legally entitled to assert in its own right (whether individually or collectively) or on behalf of any Releasing Party or any other Person, notwithstanding section 1542 of the California Civil Code or any law of any jurisdiction that is similar, comparable or equivalent thereto (which shall conclusively be deemed waived), whether existing or hereinafter arising, in each case, (A) directly or indirectly based on, arising out of, or in any way relating to or concerning, in whole or in part, (i) the Debtors, as such Entities existed prior to or after the Petition Date, and their Affiliates, (ii) the Estates, (iii) the Chapter 11 Cases, or (iv) Covered Conduct and (B) as to which any conduct, omission or liability of any Debtor or any Estate is the legal cause or is otherwise a legally relevant factor.

Without limiting the foregoing: (A) the foregoing releases include any Cause of Action of a Releasing Party that has been or may be asserted against any Released Party, by such Releasing Party (whether or not such party has brought such action or proceeding) in any federal, state, or local action or proceeding (whether judicial, arbitral, or administrative) (x) directly or indirectly based on, arising out of, or in any way relating to or concerning, in whole or in part, (I) the Debtors, as such Entities existed prior to or after the Petition Date, and their Affiliates, (II) the Estates, (III) the Chapter 11 Cases, or (IV) Covered Conduct and (y) as to which any conduct, omission or liability of any Debtor or any Estate is the legal cause or is otherwise a legally relevant factor; and (B) the parties intend that these releases (including the term "Released Claims") be broad and interpreted so as to give the Released Parties the broadest possible release of any liability relating in any way to the Released Claims.

For the avoidance of doubt and notwithstanding anything to the contrary in this Plan or the Confirmation Order, the releases set forth in this <u>Section 10.6(b)</u>, and all referenced to "Releasing Parties" as used herein, shall not apply to (i) Holders of Claims who do not opt-in to the releases through their applicable ballots, (ii) Holders of Claims whose releases will be governed

solely and exclusively by a Direct Claims Shareholder Settlement Agreement and (iii) Holders of Non-Federal Domestic Governmental Claims, whose releases shall be governed solely and exclusively by the Governmental Entity Shareholder Direct Settlement Agreement.[28] For the avoidance of doubt and notwithstanding anything to the contrary in this Plan, none of the releases, injunctions, or other terms contained in the Plan or the Confirmation Order shall expand, limit, alter, or otherwise affect any releases, waivers, or disclaimers of liability or other terms contained in any of the Direct Claims Shareholder Settlement Agreements.

[To the extent that, on or after the Effective Date, any Releasing Party negotiates and enters into a Non-Party Settlement, including in any bankruptcy case or through any plan of reorganization (whether individually or as a class of creditors), the Releasing Party will include (or in the case of a Non-Party Settlement made in connection with a bankruptcy case, will cause the debtor to include), unless prohibited from doing so under applicable law, in the Non-Party Settlement a prohibition on contribution or indemnity of any kind against the Released Parties substantially equivalent to that required from the Shareholder Released Parties in Section 10.7(b)(iii)(A) of the Plan, or a release from such Non-Released Party in favor of the Released Parties (in a form equivalent to this Section 10.6(b)) of any Claim-Over. Each Releasing Party acknowledges and agrees that it shall take reasonable steps to enforce such agreement related to indemnification and contribution, and any other agreement related to indemnification and contribution from a prior opioid settlement, in each case as applicable, for the benefit of the and the Released Parties.][29]

Notwithstanding anything herein to the contrary, (x) nothing in the Plan shall release any Excluded Claim; (y) Co-Defendants shall not be Released Parties for purposes of this Section 10.6(b); and (z) nothing in this Section 10.6(b) shall (A) release any Non-Opioid Excluded Claims, (B) release any Estate Cause of Action against a Holder of a Claim against a Debtor, to the extent such Estate Cause of Action is necessary for the administration and resolution of such Claim solely in accordance with the Plan, *provided*, *however*, that the foregoing shall not apply to any Holder of a Co-Defendant Claim solely with respect to such Co-Defendant Claim, or (C) be construed to impair in any way the Effective Date or post-Effective Date rights and obligations of any Person under the Plan, the Plan Documents, the Confirmation Order or the Restructuring Transactions, including the Shareholder Settlement Agreements.

Notwithstanding anything herein to the contrary, but subject to the MDT Insurer Injunction and the Settling MDT Insurer Injunction, the Debtors shall not be released from liability for any Claim (other than any Co-Defendant Claim) that is or may be covered by any Purdue Insurance Policy; *provided* that recovery for any such Claim, including by way of settlement or judgment, shall be limited to the available proceeds of such Purdue Insurance Policy (and any extra-contractual liability of the Insurance Companies with respect to the Purdue Insurance Policies), and no Person or party shall execute, garnish or otherwise attempt to collect any such recovery from any assets other than the available proceeds of the Purdue Insurance Policies. The Debtors shall be released automatically from a Claim described in this paragraph upon the earlier of (x) the abandonment of such Claim and (y) such a release being given as part of a settlement or resolution

---

[28] **The Direct Claims Shareholder Settlement Agreements, including the Governmental Entity Shareholder Direct Settlement Agreement, remain subject to ongoing negotiations. The releases in the Direct Claims Shareholder Settlement Agreements, including the Governmental Entity Shareholder Direct Settlement Agreement, may differ from those provided for in this Section 10.6(b). The rights of all parties to the Direct Claims Shareholder Settlement Agreements, including the Governmental Entity Shareholder Direct Settlement Agreement, are fully reserved.**

[29] [**NTD**: Subject to continuing discussion]

of such Claim, and shall be released automatically from all Claims described in this paragraph upon the exhaustion of the available proceeds of the Purdue Insurance Policies (notwithstanding the nonoccurrence of either event described in the foregoing clauses (x) and (y)).

(c)    Releases by Debtors of Holders of Claims.

As of the Effective Date, all Holders of Channeled Claims (excluding, in all respects, any Excluded Party, Shareholder Release Snapback Party or MDT Insurer) are hereby released by the Debtors and their Estates from any and all Causes of Action for any Claim in connection with, or arising out of, (i) the administration of the Chapter 11 Cases; the negotiation and pursuit of the Restructuring Transactions, the Plan, the Master Disbursement Trust, the Creditor Trusts (including the trust distribution procedures and the other Creditor Trust Documents) and the solicitation of votes with respect to, and confirmation of, the Plan; the funding of the Plan; the occurrence of the Effective Date; the administration of the Plan and the property to be distributed under the Plan; and the wind-up and dissolution of the Liquidating Debtors and the transactions in furtherance of any of the foregoing or (ii) such Holder's participation in the Pending Opioid Actions. The Debtors, the Plan Administration Trust, the Master Disbursement Trust, the Creditor Trusts, NewCo, the Foundation and any other newly-formed Persons that shall be continuing the Debtors' businesses after the Effective Date shall be bound, to the same extent the Debtors are bound, by the Releases set forth in this <u>Section 10.6(c)</u>.

As of the Effective Date, all Holders of PI Channeled Claims (excluding, in all respects, any Excluded Party, Shareholder Release Snapback Party or MDT Insurer) are hereby released by the Debtors and their Estates from any and all Causes of Action for any Claim in connection with, or arising out of, (i) the Debtors, as such Entities existed prior to or after the Petition Date (including the Debtors' Opioid-Related Activities, manufacture, marketing and sale of Products, interaction with regulators concerning Opioid-Related Activities or Products, and involvement in the subject matter of the Pending Opioid Actions, and the past, present or future use or misuse of any opioid by a Releasing Party), (ii) the Estates or (iii) the Chapter 11 Cases, including, in each case, without limitation, any act, conduct, omission, event, transaction, occurrence, injury, damage, or continuing condition in any way relating to the foregoing.

Notwithstanding anything herein to the contrary, (x) nothing in the Plan shall release any Excluded Claim and (y) nothing in this <u>Section 10.6(c)</u> shall (A) release any contractual Estate Cause of Action or any Estate Cause of Action that is commercial in nature and, in each case, unrelated to either the Chapter 11 Cases or the subject matter of the Pending Opioid Actions, *provided* that, with respect to the Settling Co-Defendants, only Estate Surviving Pre-Effective Date Claims shall be retained and not released, (B) release any Estate Cause of Action against a Holder of a Claim against a Debtor, to the extent such Estate Cause of Action is necessary for the administration and resolution of such Claim solely in accordance with the Plan, *provided*, *however*, that the foregoing shall not apply to any Holder of a Co-Defendant Claim solely with respect to such Co-Defendant Claim, (C) release any claim or right arising in the ordinary course of the Debtors' or NewCo's business, including, without limitation, any such claim with respect to taxes or (D) be construed to impair in any way the Effective Date or post-Effective Date rights and obligations of any Person under the Plan, the Plan Documents, the Confirmation Order or the Restructuring Transactions, including the Shareholder Settlement Agreements.

10.7    *<u>Shareholder Releases</u>*.

(a)    Releases by Debtors.

As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, and except as otherwise explicitly provided in the Plan or in the Confirmation Order, the Shareholder Released Parties shall be conclusively, absolutely, unconditionally, irrevocably, fully, finally, forever and permanently released, subject to clause (z) of the last paragraph of this Section 10.7(a), by the Debtors and their Estates from any and all Causes of Action, including any Estate Causes of Action asserted or assertible by or on behalf of any Debtor or any of their Estates and including any claims that any Debtor or any of their Estates, or that any other Person or party claiming under or through any Debtor or any of their Estates, would have presently or in the future been legally entitled to assert in its own right (whether individually or collectively) or on behalf of any Debtor or any of their Estates or any other Person, notwithstanding section 1542 of the California Civil Code or any law of any jurisdiction that is similar, comparable or equivalent thereto (which shall conclusively be deemed waived), whether existing or hereinafter arising, in each case, based on or relating to, or in any manner arising from, in whole or in part, (i) the Debtors, as such Entities existed prior to or after the Petition Date (including the Debtors' Opioid-Related Activities, manufacture, marketing and sale of Products, interaction with regulators concerning Opioid-Related Activities or Products, and involvement in the subject matter of the Pending Opioid Actions, and the past, present or future use or misuse of any opioid by a Releasing Party), (ii) the Estates or (iii) the Chapter 11 Cases. The Debtors, the Plan Administration Trust, the Master Disbursement Trust, the Creditor Trusts, NewCo, the Foundation and any other newly-formed Persons that shall be continuing the Debtors' businesses after the Effective Date shall be bound, to the same extent the Debtors are bound, by the Shareholder Releases set forth in this Section 10.7(a).

Notwithstanding anything herein to the contrary, (x) nothing in the Plan shall release any Excluded Claim; (y) nothing in this Section 10.7(a) shall be construed to impair in any way the Effective Date or post-Effective Date rights and obligations of any Person under the Plan, the Plan Documents, the Confirmation Order or the Restructuring Transactions, including the Shareholder Settlement Agreements and the Separation Agreements; and (z) upon the filing of a Notice of Shareholder Release Snapback, (A) the Shareholder Releases set forth in this Section 10.7(a) shall be entirely null and void, revoked and invalidated, as of the Effective Date, with respect to all members of the Breaching Shareholder Family Group and the Designated Shareholder Released Parties, (B) the *status quo ante* shall be restored in all respects for the Debtors and the Master Disbursement Trust with respect to the members of the Breaching Shareholder Family Group and the Designated Shareholder Released Parties, and (C) the Master Disbursement Trust shall be deemed to have received and accepted all of the rights with respect to any member of the Breaching Shareholder Family Group and the Designated Shareholder Released Parties, in each case, that the Debtors and their Estates had prior to the Effective Date and that the Master Disbursement Trust would have pursuant to the transfer of the MDT Shareholder Rights to the Master Disbursement Trust if the Shareholder Releases of this Section 10.7(a) had never been granted, which rights the Debtors and their Estates shall be deemed to have irrevocably transferred, granted and assigned to the Master Disbursement Trust; *provided* that, for the avoidance of doubt, notwithstanding the nullification, voiding, revocation and invalidation pursuant to the foregoing clause (A), the Shareholder Releases shall continue in effect for, and shall be fully enforceable by and for the benefit of, all other Shareholder Released Parties other than the Breaching Shareholder Family Group and the Designated Shareholder Released Parties.

(b)      Releases by Releasing Parties.

(i) **As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, and except as otherwise explicitly provided in the Plan or in the Confirmation Order, the Shareholder Released Parties shall be conclusively, absolutely, unconditionally, irrevocably, fully, finally, forever and permanently released, subject to clause (y) of the last paragraph of this Section 10.7(b) of the Plan, by the Releasing Parties from any and all Causes of Action, including, without limitation, any Estate Cause of Action and any claims that any Releasing Party, or that any other Person or party claiming under or through any Releasing Party, would have presently or in the future been legally entitled to assert in its own right (whether individually or collectively) or on behalf of any Releasing Party or any other Person, notwithstanding section 1542 of the California Civil Code or any law of any jurisdiction that is similar, comparable or equivalent thereto (which shall conclusively be deemed waived), whether existing or hereinafter arising, in each case, (A) directly or indirectly based on, arising out of, or in any way relating to or concerning, in whole or in part, (i) the Debtors, as such Entities existed prior to or after the Petition Date, and their Affiliates, (ii) the Estates, (iii) the Chapter 11 Cases, or (iv) Covered Conduct and (B) as to which any conduct, omission or liability of any Debtor or any Estate is the legal cause or is otherwise a legally relevant factor.**

**Without limiting the foregoing: (A) the foregoing releases include any Cause of Action of a Releasing Party that has been or may be asserted against any Shareholder Released Party, by such Releasing Party (whether or not such party has brought such action or proceeding) in any federal, state, or local action or proceeding (whether judicial, arbitral, or administrative) (x) directly or indirectly based on, arising out of, or in any way relating to or concerning, in whole or in part, (I) the Debtors, as such Entities existed prior to or after the Petition Date, and their Affiliates, (II) the Estates, (III) the Chapter 11 Cases, or (IV) Covered Conduct and (y) as to which any conduct, omission or liability of any Debtor or any Estate is the legal cause or is otherwise a legally relevant factor; and (B) the parties intend that these releases (including the term "Shareholder Released Claims") be broad and interpreted so as to give the Shareholder Released Parties the broadest possible release of any liability relating in any way to the Shareholder Released Claims.**

**For the avoidance of doubt and notwithstanding anything to the contrary in this Plan or the Confirmation Order, the releases set forth in this <u>Section 10.7(b)</u>, and all referenced to "Releasing Parties" as used herein, shall not apply to (i) Holders of Claims who do not opt-in to the releases through their applicable ballots, (ii) Holders of Claims whose releases will be governed solely and exclusively by a Direct Claims Shareholder Settlement Agreement and (iii) Holders of Non-Federal Domestic Governmental Claims, whose releases shall be governed solely and exclusively by the Governmental Entity Shareholder Direct Settlement Agreement.[30] For the avoidance of doubt and notwithstanding anything to the contrary in this Plan, none of the releases, injunctions, or other terms contained in the Plan or the Confirmation Order shall expand, limit, alter, or otherwise affect any releases, waivers, or disclaimers of liability or other terms contained in any of the Direct Claims Shareholder Settlement Agreements.**

---

[30] **The Direct Claims Shareholder Settlement Agreements, including the Governmental Entity Shareholder Direct Settlement Agreement, remain subject to ongoing negotiations. The releases in the Direct Claims Shareholder Settlement Agreements, including the Governmental Entity Shareholder Direct Settlement Agreement, may differ from those provided for in this Section 10.7. The rights of all parties to the Direct Claims Shareholder Settlement Agreements, including the Governmental Entity Shareholder Direct Settlement Agreement, are fully reserved.**

(ii) [In addition to granting the foregoing release, any Releasing Party represented by counsel agrees not to waive any conflict of interest that may arise for any such counsel by virtue of the clients of such counsel participating in any Shareholder Settlement.][31]

[(iii) (A) No Shareholder Released Party shall seek to recover for amounts paid under Master Shareholder Settlement Agreement and the Plan based on indemnification, contribution, or any other theory from a manufacturer, pharmacy, hospital, pharmacy benefit manager, health insurer, third-party vendor, trade association, distributor, health care practitioner; *provided* that a Shareholder Released Party shall be relieved of this prohibition with respect to any entity that asserts a Claim-Over against it.

(B) To the extent that, on or after the Effective Date, any Releasing Party negotiates and enters into a Non-Party Settlement, including in any bankruptcy case or through any plan of reorganization (whether individually or as a class of creditors), the Releasing Party will include (or in the case of a Non-Party Settlement made in connection with a bankruptcy case, will cause the debtor to include), unless prohibited from doing so under applicable law, in the Non-Party Settlement a prohibition on contribution or indemnity of any kind against the Shareholder Released Parties substantially equivalent to that required from the Shareholder Released Parties in Section 10.7(b)(iii)(A) of the Plan, or a release from such Non-Released Party in favor of the Shareholder Released Parties (in a form equivalent to this Section 10.7(b)) of any Claim-Over. Each Releasing Party acknowledges and agrees that it shall take reasonable steps to enforce such agreement related to indemnification and contribution, and any other agreement related to indemnification and contribution from a prior opioid settlement, in each case as applicable, for the benefit of the Shareholder Released Parties.

(C) In the event that any Releasing Party obtains a judgment with respect to Non-Party Covered Conduct against a Non-Released Party that does not contain a prohibition like that described in Section 10.7(b)(iii)(B) or any Releasing Party files a Non-Party Covered Conduct Claim against a Non-Released Party in bankruptcy or a Releasing Party is prevented for any reason from obtaining a prohibition/release in a Non-Party Settlement as provided in Section 10.7(b)(iii)(B), and such Non-Released Party asserts a Claim-Over against a Shareholder Released Party, the Shareholder Released Party shall be relieved of the prohibition in Section 10.7(b)(iii)(B) with respect to that Non-Released Party and that Releasing Party and the Sackler Parties' Representative shall take the following actions to ensure that the Shareholder Released Parties do not pay more with respect to Covered Conduct to Releasing Parties or to Non-Released Parties than the amounts owed under the Plan and the Master Shareholder Settlement Agreement by Shareholder Payment Groups:

(I)    The Sackler Parties' Representative shall notify that Releasing Party of the Claim-Over within sixty (60) calendar days of when it becomes aware of the assertion of the Claim-Over or sixty (60) calendar days of the Effective Date, whichever is later;

(II)    The Sackler Parties' Representative and that Releasing Party shall meet and confer concerning the means to hold Shareholder Released Parties harmless and ensure that they are not required to pay more with respect to Covered Conduct than the amounts owed by the Shareholder Payment Groups under Plan and the Master Shareholder Settlement Agreement;

---

[31] [**NTD**: Subject to ongoing discussions]

**(III)** That Releasing Party and the Sackler Parties' Representative shall take steps sufficient and permissible under the law of the state of the Releasing Party to hold Shareholder Released Parties harmless from the Claim-Over and ensure Shareholder Released Parties are not required to pay more with respect to Covered Conduct than the amounts owed by the Shareholder Payment Groups under Plan and the Master Shareholder Settlement Agreement. Such steps may include, where permissible:

Filing of motions to dismiss or such other appropriate motion by the Sackler Parties' Representative or Shareholder Released Parties and supported by that Releasing Party, in response to any claim filed in litigation or arbitration;

**(1)** Reduction of that Releasing Party's Claim and any judgment it has obtained or may obtain against such Non-Released Party by whatever amount or percentage is necessary to extinguish such Claim-Over under applicable law, up to the amount that Releasing Party has obtained, may obtain, or has authority to control from such Non-Released Party;

**(2)** Placement into escrow of funds paid by the Non-Released Parties such that those funds are available to satisfy the Claim-Over;

**(3)** Return of monies paid by Shareholder Payment Groups to that Releasing Party under Plan and the Master Shareholder Settlement Agreement to permit satisfaction of a judgment against or settlement with the Non-Released Party to satisfy the Claim-Over;

**(4)** Payment of monies to Shareholder Released Parties by that Releasing Party to ensure they are held harmless from such Claim-Over, up to the amount that Releasing Party has obtained, may obtain, or has authority to control from such Non-Released Party;

**(5)** Credits to Shareholder Payment Groups under this Plan and the Master Shareholder Settlement Agreement to reduce the overall amounts to be paid under Plan and the Master Shareholder Settlement Agreement such that they are held harmless from the Claim-Over; and

**(6)** Such other actions as that Releasing Party and Shareholder Payment Parties, the Sackler Parties' Representative may devise to hold Shareholder Released Parties harmless from the Claim-Over.

**(IV)** The actions taken pursuant to paragraph (III) must, in combination, ensure that Shareholder Payment Groups are not required to pay more with respect to Covered Conduct than the amounts owed by them to such Releasing Party under the Plan and the Master Shareholder Settlement Agreement.

(D)    To the extent that the Claim-Over is based on a contractual indemnity, the obligations under Section 10.7(b)(iii)(C) shall extend solely to a Non-Party Covered Conduct Claim against a clinic, hospital or other purchaser, distributor or dispenser of Products, a manufacturer that sold Products, a consultant, and/or a pharmacy benefit manager or other third-party payor. The Sackler Parties' Representative shall notify the Settling States, to the extent permitted by applicable law, in the event that any of these types of Non- Released Party asserts a Claim-Over arising out of contractual indemnity against it.][32]

(iv) Notwithstanding anything herein to the contrary, (x) nothing in this Section 10.7(b) shall (A) release any Excluded Claims or (B) be construed to impair in any way the rights and obligations of any Person under the Plan, the Plan Documents, the Confirmation Order or the Restructuring Transactions, including the Shareholder Settlement Agreements and (y) upon the filing of a Notice of Shareholder Release Snapback, (A) the Shareholder Releases set forth in this Section 10.7(b) shall be entirely null and void, revoked and invalidated, as of the Effective Date, with respect to all members of the Breaching Shareholder Family Group and the Designated Shareholder Released Parties and (B) the status quo ante shall be restored in all respects for the Releasing Parties with respect to the members of the Breaching Shareholder Family Group and the Designated Shareholder Released Parties; provided that, for the avoidance of doubt, notwithstanding the nullification, voiding, revocation and invalidation pursuant to the foregoing clause (A), the Shareholder Releases shall continue in effect for, and shall be fully enforceable by and for the benefit of, all other Shareholder Released Parties other than the Breaching Shareholder Family Group and the Designated Shareholder Released Parties.

(c)    Releases by Shareholder Released Parties.

As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, and except as otherwise explicitly provided in the Plan or in the Confirmation Order, the Reciprocal Releasees shall be conclusively, absolutely, unconditionally, irrevocably, fully, finally, forever and permanently released, subject to clause (z) of the last paragraph of this Section 10.7(c), by the Shareholder Released Parties from any and all Causes of Action, including any derivative claims asserted or assertible by or on behalf of the Debtors or their Estates and including any claims that any Shareholder Released Party, or that any other Person or party claiming under or through any Shareholder Released Party, would have presently or in the future been legally entitled to assert in its own right (whether individually or collectively) or on behalf of any Shareholder Released Party or any other Person, notwithstanding section 1542 of the California Civil Code or any law of any jurisdiction that is similar, comparable or equivalent thereto (which shall conclusively be deemed waived), whether existing or hereinafter arising, in each case, based on or relating to, or in any manner arising from, in whole or in part, (i) the Debtors, as such Entities existed prior to or after the Petition Date (including the Debtors' Opioid-Related Activities, manufacture, marketing and sale of Products, interaction with regulators concerning Opioid-Related Activities or Products, and involvement in the subject matter of the Pending Opioid Actions, and the past, present or future use or misuse of any opioid by a Releasing Party), (ii) the Estates or (iii) the Chapter 11 Cases.

Notwithstanding anything herein to the contrary, (x) nothing in the Plan shall release any Excluded Claim; (y) nothing in this Section 10.7(c) shall be construed to impair in any way the Effective Date or post-Effective Date rights and obligations of any Person under the Plan, the Plan Documents, the Confirmation Order or the Restructuring Transactions, including the Shareholder Settlement Agreements, and the Separation Agreement, and including the rights of any

---

[32] [**NTD**: Subject to ongoing discussion]

Shareholder Released Party that is a current or former director, officer or employee of the Debtors but is not a Sackler Family Member relating to plan treatment of any Claims held by such party; and (z) upon the filing of a Notice of Shareholder Release Snapback and the commencement or continuation of any action or proceeding against a member of a Breaching Shareholder Family Group or a Designated Shareholder Released Party by any Reciprocal Releasee, (A) the releases set forth in this <u>Section 10.7(c)</u> of any Reciprocal Releasee that has commenced or continued any such action shall be entirely null and void, revoked and invalidated, as of the Effective Date, with respect to the members of the Breaching Shareholder Family Group and the Designated Shareholder Released Parties and (B) the *status quo ante* shall be restored in all respects for the members of the Breaching Shareholder Family Group and the Designated Shareholder Released Parties with respect to any Reciprocal Releasee that has commenced or continued any such litigation; *provided* that, for the avoidance of doubt, notwithstanding the nullification, voiding, revocation and invalidation pursuant to the foregoing clause (A), the releases set forth in this <u>Section 10.7(c)</u> shall continue in effect for, and shall be fully enforceable by and for the benefit of, all other Reciprocal Releasees, and shall be binding on, and enforceable against, all other Shareholder Released Parties, including any members of the Breaching Shareholder Family Group with respect to any Reciprocal Releasee that has not commenced any such litigation.

      **10.8**    ***Channeling Injunction***.

      In order to supplement the injunctive effect of the Plan Injunction, the Estate Releases and the Shareholder Releases set forth in <u>Sections 10.5</u>, <u>10.6</u> and <u>10.7</u> of the Plan, the Confirmation Order shall provide for the following permanent injunction to take effect as of the Effective Date:

      (a)    <u>Terms</u>. In order to preserve and promote the settlements contemplated by and provided for in the Plan and to supplement, where necessary, the injunctive effect of the Plan Injunction, the Estate Releases and the Shareholder Releases described in <u>Sections 10.5</u>, <u>10.6</u> and <u>10.7</u> of the Plan, and pursuant to the exercise of the equitable jurisdiction and power of the Bankruptcy Court under section 105(a) of the Bankruptcy Code, all Persons that have held or asserted, that hold or assert or that may in the future hold or assert any Channeled Claim shall be permanently and forever stayed, restrained and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering or receiving payments, satisfaction, recovery or judgment of any form from or against any Protected Party with respect to any Channeled Claim, including:

      (i)    commencing, conducting or continuing, in any manner, whether directly or indirectly, any suit, action or other proceeding, in each case, of any kind, character or nature, in any forum in any jurisdiction with respect to any Channeled Claims, against or affecting any Protected Party, or any property or interests in property of any Protected Party with respect to any Channeled Claims;

      (ii)    enforcing, levying, attaching, collecting or otherwise recovering, by any means or in any manner, either directly or indirectly, any judgment, award, decree or other order against any Protected Party or against the property of any Protected Party with respect to any Channeled Claims;

      (iii)    creating, perfecting or enforcing, by any means or in any manner, whether directly or indirectly, any Lien of any kind against any

Protected Party or the property of any Protected Party with respect to any Channeled Claims;

(iv)    asserting or accomplishing any setoff, right of subrogation, indemnity, contribution or recoupment of any kind, whether directly or indirectly, in respect of any obligation due to any Protected Party or against the property of any Protected Party with respect to any Channeled Claims; and

(v)    taking any act, by any means or in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan Documents, with respect to any Channeled Claims.

(b)    <u>Reservations</u>. Notwithstanding anything to the contrary in this <u>Section 10.8</u> or the Confirmation Order, this Channeling Injunction shall not stay, restrain, bar or enjoin:

(i)    the rights of Holders of Channeled Claims to the treatment afforded them under the Plan and the Plan Documents, including the rights of Holders of Channeled Claims to assert such Channeled Claims solely in accordance with <u>Section 6.21</u> of the Plan, the Master TDP and the Creditor Trust TDPs, in each case whether or not there are funds to make Distributions in respect of such Channeled Claims and whether or not such rights entitle such Holders to any Distributions;

(ii)    the rights of Persons to assert any claim, debt, litigation or liability for payment of Creditor Trust Operating Expenses solely against the applicable Creditor Trust;

(iii)    the rights of Persons to assert any claim, debt or litigation against any Excluded Party;

(iv)    the rights of the Master Disbursement Trust to pursue and enforce the MDT Shareholder Rights, the MDT Insurance Rights and the MDT Causes of Action;

(v)    the rights of the parties to the LRP Agreement to enforce the terms thereof in accordance with the Plan;

(vi)    the Creditor Trusts from enforcing their respective rights against the Master Disbursement Trust under the Plan and the MDT Documents; or

(vii)    the Master Disbursement Trust and the Plan Administration Trust from enforcing its rights against NewCo under the Plan.

(c)    **Notice of Shareholder Release Snapback**. Upon the filing of a Notice of Shareholder Release Snapback, the Channeling Injunction shall terminate, be rescinded and have no application, without further order of the Bankruptcy Court, to any suit, action or other proceeding, in each case, of any kind, character or nature, brought against any member of the Breaching Shareholder Family Group and any Designated Shareholder Released Party; *provided*, *however*, that the extension of time

provided by Section 10.9(a) of the Plan shall continue in effect in accordance with its terms; *provided further* that, for the avoidance of doubt, notwithstanding the termination and rescission pursuant to this Section 10.8(c), the Channeling Injunction shall continue in effect for, and shall be fully enforceable by and for the benefit of, all other Protected Parties, including all other Shareholder Released Parties, other than the Breaching Shareholder Family Group and the Designated Shareholder Released Parties; and *provided further* that, in the event of the filing of a Notice of Shareholder Release Snapback, any determination made in the claims resolution process in accordance with Section 7.6 of this Plan will not be binding against any party.

(d) **Modifications**. Except as expressly set forth in paragraph (c) of this Section 10.8, there can be no modification, dissolution or termination of the Channeling Injunction, which shall be a permanent injunction.

(e) **Non-Limitation of Channeling Injunction**. Except as expressly set forth in paragraphs (b) and (c) of this Section 10.8, nothing in the Plan, the MDT Documents or the Creditor Trust Documents shall be construed in any way to limit the scope, enforceability or effectiveness of the Channeling Injunction issued in connection with the Plan.

(f) **Bankruptcy Rule 3016 Compliance**. The Debtors' compliance with the requirements of Bankruptcy Rule 3016 shall not constitute an admission that the Plan provides for an injunction against conduct not otherwise enjoined under the Bankruptcy Code.

**10.9** ***Tolling of Shareholder Released Claims; Violations of Shareholder Releases and Channeling Injunction***.

(a) **Tolling of Shareholder Released Claims**. If applicable law, an order in any proceeding or an agreement fixes a period for commencing or continuing an action or proceeding based on a Shareholder Released Claim and such Shareholder Released Claim is released pursuant to the Shareholder Releases or such action or proceeding is enjoined by the Channeling Injunction, then such period does not expire with respect to such Shareholder Released Claim with respect to the Master Disbursement Trust (or the MDT Trustees) or the Releasing Parties until the latest of (i) the end of such period; (ii) with respect to the applicable Shareholder Family Group and any Designated Shareholder Released Party, two hundred twenty-five (225) days after the filing of a Notice of Shareholder Release Snapback with respect to such Shareholder Family Group; (iii) with respect to the applicable Shareholder Family Group and any Designated Shareholder Released Party, when such Shareholder Family Group fulfills its payment obligations under the Shareholder Settlement Agreements; and (iv) with respect to the applicable Shareholder Released Party that is a Subsidiary (as defined in the Master Shareholder Settlement Agreement) of a Shareholder Payment Party, two hundred twenty-five (225) days after the reinstatement of any Estate Cause of Action against such Shareholder Released Party pursuant to Section 10.19 of the Plan.

(b) **Violations of Shareholder Releases and Channeling Injunction**. In the event that any Person takes any action that a Shareholder Released Party believes violates the Shareholder Releases or Channeling Injunction as it applies to any Shareholder Released Party, such Shareholder Released Party shall be entitled to make an emergency application to the Bankruptcy Court for relief, and may proceed by contested matter rather than by adversary proceeding. The Bankruptcy Court shall have jurisdiction and authority to enter final orders in connection with any dispute over whether an action violates the Shareholder Releases or Channeling Injunction. Upon determining that a violation of the Shareholder Releases or Channeling Injunction has occurred, the Bankruptcy Court, in its discretion, may award any appropriate relief against such violating Person, including, but not limited to, (i) disgorgement from the violating Person of any funds, assets or other value received, directly or indirectly, pursuant to the Plan or Plan Documents (including fees and expenses paid pursuant to the Plan or Plan Documents on account of legal or other advisory services rendered to or for the benefit of the violating Person); (ii) the termination

of any rights of the violating Person to receive any funds, assets or other value pursuant to the Plan or Plan Documents; (iii) the reduction of any payments owed by any Shareholder Released Parties under the Shareholder Settlement Agreements to the violating Person in an amount equal to the amount of disgorgement ordered from, or the reduction of future payments ordered to be made to, or on account of, the violating Person (subject to the right of the violating Person to request that any amounts actually disgorged from such violating Person offset any reduction of future payments ordered to be made to, or on account of, such violating Person); (iv) an admonition, reprimand or censure of, or citation of contempt by, the violating Person and its counsel; (v) a fine or penalty paid into the Bankruptcy Court; (vi) a bond or other security in an amount equal to any financial obligation ordered by the Bankruptcy Court in respect of the violation; (vii) an appropriate sanction on any attorney or law firm responsible for the violation; (viii) injunctive relief to prevent future violations by the Person or its counsel; and (ix) attorney and other professional fees incurred by any Shareholder Released Party arising from the violation. The provision of any one form of relief shall not preclude the provision of any other form of relief.

### 10.10    *MDT Insurer Injunction*.

(a)    **Terms**. In accordance with section 105(a) of the Bankruptcy Code, upon the occurrence of the Effective Date, all Persons that have held or asserted, that hold or assert or that may in the future hold or assert any Claim based on, arising under or attributable to an MDT Insurance Policy shall be, and hereby are, permanently stayed, restrained and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering or receiving payment or recovery on account of any such Claim based on, arising under or attributable to an MDT Insurance Policy from or against any MDT Insurer, including:

(i)    commencing, conducting or continuing, in any manner, any action or other proceeding of any kind (including an arbitration or other form of alternate dispute resolution) against any MDT Insurer, or against the property of any MDT Insurer, on account of any Claim based on, arising under or attributable to an MDT Insurance Policy;

(ii)    enforcing, attaching, levying, collecting or otherwise recovering, by any manner or means, any judgment, award, decree or other order against any MDT Insurer, or against the property of any MDT Insurer, on account of any Claim based on, arising under or attributable to an MDT Insurance Policy;

(iii)    creating, perfecting or enforcing in any manner any Lien of any kind against any MDT Insurer, or against the property of any MDT Insurer, on account of any Claim based on, arising under or attributable to an MDT Insurance Policy;

(iv)    asserting or accomplishing any setoff, right of subrogation, indemnity, contribution or recoupment of any kind, whether directly or indirectly, against any obligation due to any MDT Insurer, or against the property of any MDT Insurer, on account of any Claim based on, arising under or attributable to an MDT Insurance Policy; and

(v)    taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan

applicable to any Claim based on, arising under or attributable to an MDT Insurance Policy.

(b)    **Reservations**. The provisions of this MDT Insurer Injunction shall not preclude the Master Disbursement Trust from pursuing any Claim based on, arising under or attributable to an MDT Insurance Policy, or any other claim that may exist under any MDT Insurance Policy against any MDT Insurer, or enjoin the rights of the Master Disbursement Trust to prosecute any action based on or arising from the MDT Insurance Policies or the rights of the Master Disbursement Trust to assert any claim, debt, obligation, cause of action or liability for payment against an MDT Insurer based on or arising from the MDT Insurance Policies. The provisions of this MDT Insurer Injunction are not issued for the benefit of any MDT Insurer, and no such insurer is a third-party beneficiary of this MDT Insurer Injunction. This MDT Insurer Injunction shall not enjoin, impair or affect (i) any claims between or among MDT Insurers that are not Settling MDT Insurers; (ii) the rights of current and former directors, officers, employees and authorized agents of the Debtors that are not Sackler Family Members that are preserved under the Plan; or (iii) the terms of the Master Shareholder Settlement Agreement with respect to the MDT Shareholder Insurance Rights. For the avoidance of doubt, with respect to a Person that purports to be insured under any MDT Insurance Policy, the MDT Insurer Injunction shall enjoin only derivative claims and rights. Nothing in this Plan shall determine whether any Claim or right under any MDT Insurance Policy is either derivative or direct, or otherwise would be disallowed or subordinated under the Bankruptcy Code, which determination shall be made, as necessary, to the extent such Claim or right is not otherwise released under this Plan, in accordance with applicable law.

(c)    **Modifications**. To the extent the MDT Trustees make a good faith determination that some or all of the MDT Insurance Proceeds are substantially unrecoverable by the Master Disbursement Trust, the Master Disbursement Trust shall have the sole and exclusive authority at any time, upon written notice to any affected MDT Insurer, to terminate, reduce or limit the scope of this MDT Insurer Injunction with respect to any MDT Insurer; *provided* that any termination, reduction, or limitation of the MDT Insurer Injunction (A) shall apply in the same manner to all beneficiaries of the Creditor Trusts that are MDT Beneficiaries and (B) shall comply with any procedures set forth in the MDT Agreement.

(d)    **Non-Limitation of MDT Insurer Injunction**. Except as set forth in paragraphs (b) and (c) of this Section 10.10, nothing in the Plan, the MDT Documents or the Creditor Trust Documents shall be construed in any way to limit the scope, enforceability or effectiveness of the MDT Insurer Injunction issued in connection with the Plan.

**10.11    *Settling MDT Insurer Injunction***.

(a)    Terms. In accordance with section 105(a) of the Bankruptcy Code, upon the occurrence of the Effective Date, all Persons that have held or asserted, that hold or assert or that may in the future hold or assert any Claim based on, arising under or attributable to an MDT Insurance Policy shall be, and hereby are, permanently stayed, restrained and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering or receiving payment or recovery on account of any such Claim based on, arising under or attributable to an MDT Insurance Policy from or against any Settling MDT Insurer, solely to the extent that such Settling MDT Insurer has been released from such Claim under such MDT Insurance Policy pursuant to an MDT Insurance Settlement, including:

(i)    commencing, conducting or continuing in any manner any action or other proceeding of any kind (including an arbitration or other form of alternate dispute resolution) against any such Settling MDT Insurer, or against the property of such Settling MDT Insurer, on account of such Claim based on, arising under or attributable to such MDT Insurance Policy;

(ii)     enforcing, attaching, levying, collecting or otherwise recovering, by any manner or means, any judgment, award, decree or other order against any such Settling MDT Insurer, or against the property of such Settling MDT Insurer, on account of such Claim based on, arising under or attributable to such MDT Insurance Policy;

(iii)    creating, perfecting or enforcing in any manner any Lien of any kind against any such Settling MDT Insurer, or against the property of such Settling MDT Insurer, on account of such Claim based on, arising under or attributable to such MDT Insurance Policy;

(iv)     asserting or accomplishing any setoff, right of subrogation, indemnity, contribution or recoupment of any kind, whether directly or indirectly, against any obligation due to any such Settling MDT Insurer, or against the property of such Settling MDT Insurer, on account of such Claim based on, arising under or attributable to such MDT Insurance Policy; and

(v)      taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan applicable to such Claim based on, arising under or attributable to such MDT Insurance Policy.

(b)      **Reduction of Insurance Judgments.** Any right, Claim or cause of action that an Insurance Company may have been entitled to assert against any Settling MDT Insurer but for the Settling MDT Insurer Injunction, if any such right, Claim or cause of action exists under applicable non-bankruptcy law, shall become a right, Claim or cause of action solely as a setoff claim against the Master Disbursement Trust and not against or in the name of the Settling MDT Insurer in question. Any such right, Claim or cause of action to which an Insurance Company may be entitled shall be solely in the form of a setoff against any recovery of the Master Disbursement Trust from that Insurance Company, and under no circumstances shall that Insurance Company receive an affirmative recovery of funds from the Master Disbursement Trust or any Settling MDT Insurer for such right, Claim or cause of action. In determining the amount of any setoff, the Master Disbursement Trust may assert any legal or equitable rights the Settling MDT Insurer would have had with respect to any right, Claim or cause of action.

(c)      **Modifications**. There can be no modification, dissolution or termination of the Settling MDT Insurer Injunction, which shall be a permanent injunction.

(d)      **Non-Limitation of Settling MDT Insurer Injunction**. Except as set forth in paragraphs (b) and (c) of this Section 10.11, nothing in the Plan, the MDT Documents or the Creditor Trust Documents shall be construed in any way to limit the scope, enforceability or effectiveness of the Settling MDT Insurer Injunction issued in connection with the Plan.

### 10.12  *Exculpation*.

To the maximum extent permitted by applicable law, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from: any Cause of Action for any Claim in connection with, or arising out of, the administration of the Chapter 11 Cases; the negotiation and pursuit of the Disclosure Statement (including any information provided, or statements made, in the Disclosure Statement or omitted therefrom), the Restructuring Transactions, the Plan, the Master

162

Disbursement Trust (including the Master TDP and the MDT Agreement), the Creditor Trusts (including the Creditor Trust TDPs and the other Creditor Trust Documents) and the solicitation of votes for, and confirmation of, the Plan; the funding of the Plan; the occurrence of the Effective Date; the administration of the Plan and the property to be distributed under the Plan; and the wind-up and dissolution of the Liquidating Debtors and the transactions in furtherance of any of the foregoing, in each case other than Causes of Action arising out of, or related to, any act or omission of an Exculpated Party that is a criminal act or constitutes fraud, gross negligence or willful misconduct. This exculpation shall be in addition to, and not in limitation of, all other Releases, indemnities, exculpations and any other applicable law or rules protecting such Exculpated Parties from liability. For the avoidance of doubt, this <u>Section 10.12</u> shall not exculpate or release any Exculpated Party with respect to any act or omission of such Exculpated Party prior to the Effective Date that is later found to be a criminal act or to constitute fraud, gross negligence or willful misconduct, including findings after the Effective Date. Notwithstanding anything herein to the contrary, nothing in the Plan shall release any Causes of Action that may be asserted against any Excluded Party.

### 10.13 <u>*Injunction Related to Releases and Exculpation*</u>.

To the maximum extent permitted under applicable law, the Confirmation Order shall permanently enjoin the commencement or prosecution by any Person, whether directly, derivatively or otherwise, of any Causes of Action released pursuant to this Plan, including, without limitation, the Causes of Action released or exculpated in this Plan and with respect to any Claims, Interests, Liens, other encumbrances or liabilities that are subject to <u>Sections 5.3(b)</u>, <u>5.4(c)</u> or <u>5.6(b)</u> of the Plan (but, for the avoidance of doubt, excluding any Excluded Claims).

### 10.14 <u>*Subordinated Claims*</u>.

The allowance, classification and treatment of all Claims and Interests and the respective Distributions and treatments in respect thereof under this Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, sections 509(c), 510(a), 510(b) or 510(c) of the Bankruptcy Code or otherwise. Pursuant to sections 509(c) and 510 of the Bankruptcy Code or otherwise, the Debtors reserve the right to reclassify any Allowed Claim or Allowed Interest in accordance with any contractual, legal or equitable subordination relating thereto.

### 10.15 <u>*Preservation of Causes of Action and Reservation of Rights*</u>.

As of the Effective Date, (a) the Master Disbursement Trust shall have the right to prosecute any and all MDT Causes of Action, (b) the Plan Administration Trust shall have the right to prosecute any and all Retained Causes of Action relating to and necessary for the administration of Claims against the Debtors (other than Channeled Claims) or the other responsibilities of the Plan Administration Trustee in accordance with the PAT Agreement, (c) each Creditor Trust shall have the right to prosecute any and all Retained Causes of Action relating to and necessary for the administration of the applicable Channeled Claims in accordance with the applicable Creditor Trust TDP and (d) NewCo shall have the right to prosecute any and all Retained Causes of Action constituting NewCo Transferred Assets. Pursuant to section 1123(b) of the Bankruptcy Code, except as expressly provided in <u>Sections 10.5</u> through <u>10.13</u> of the Plan, nothing contained in this Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any Causes of Action that the Debtors had immediately before the Effective Date on behalf of the Estates or of themselves in accordance with any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including but not limited to any actions specifically enumerated in the Schedule of Retained Causes of Action. Subject to <u>Sections 10.5</u> through <u>10.13</u> of the Plan, all such Causes of Action shall be transferred to the Master Disbursement Trust, the Plan Administration Trust, the

applicable Creditor Trust or NewCo, as applicable, which shall have, retain, reserve and be entitled to assert all such Causes of Action in accordance with the Plan as fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and equitable rights with respect to any Claim or Interest may be asserted after the Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

### 10.16    *Ipso Facto and Similar Provisions Ineffective*.

Any term of any policy, contract or other obligation applicable to a Debtor shall be void and of no further force or effect with respect to any Debtor to the extent such policy, contract, or other obligation is conditioned on, creates an obligation of any Debtor as a result of, or gives rise to a right of any Person based on any of the following: (a) the insolvency or financial condition of a Debtor; (b) the commencement of the Chapter 11 Cases; (c) the confirmation or consummation of this Plan, including any change of control that shall occur as a result of such consummation; or (d) the Restructuring Transactions.

### 10.17    *No Successor Liability*.

Except as otherwise expressly provided in this Plan and the Confirmation Order, each of NewCo, the Foundation, the Master Disbursement Trust, the Plan Administration Trust and the Creditor Trusts (a) is not, and shall not be deemed to assume, agree to perform, pay or otherwise have any responsibilities for any liabilities or obligations of the Debtors or any other Person relating to or arising out of the operations or the Assets of the Debtors on or prior to the Effective Date, (b) is not, and shall not be, a successor to the Debtors by reason of any theory of law or equity or responsible for the knowledge or conduct of any Debtor prior to the Effective Date and (c) shall not have any successor or transferee liability of any kind or character.

### 10.18    *Co-Defendant Defensive Rights*.

Except as provided in the MDT Insurer Injunction, the Settling MDT Insurer Injunction or clause (ii) of the penultimate sentence of this Section 10.18, notwithstanding anything to the contrary in this Article X or in the Plan as it currently exists or as it might be further amended, the Confirmation Order or any order entered in connection with the Plan (or the Plan as amended) (or any such order, as amended, modified or supplemented), or any supplement to the Plan (or the Plan as amended), nothing contained in the Plan or any of the foregoing documents or orders (including, without limitation, the classification, treatment, allowance, disallowance, release, bar, injunction, Channeling Injunction or any other provision of the Plan or the Plan as amended with respect to, impacting, affecting, modifying, limiting, subordinating, impairing, in any respect, a Co-Defendant Claim), will release, bar, enjoin, impair, alter, modify, amend, limit, prohibit, restrict, reduce, improve or enhance any Co-Defendant Defensive Rights of any Holder of a Co-Defendant Claim or Excluded Party as such rights exist or might in the future exist under applicable non-bankruptcy law. Nothing in the Plan, any of the Plan Documents or in the Confirmation Order shall preclude, operate to or have the effect of, impairing any Holder of a Co-Defendant Claim or Excluded Party from asserting in any proceeding any and all Co-Defendant Defensive Rights that it has or may have under applicable law. Nothing in the Plan, any of the Plan Documents or the Confirmation Order shall be deemed to waive any Co-Defendant Defensive Rights, and nothing in the Chapter 11 Cases, the Plan, any of the Plan Documents or the Confirmation Order may be used as evidence of any determination regarding any Co-Defendant Defensive Rights, and under no circumstances shall any Person be permitted to assert issue preclusion or claim preclusion, waiver, estoppel or consent in response to the assertion of any Co-Defendant Defensive Rights. This Section 10.18 shall be included in the Confirmation Order. Co-Defendant Defensive Rights (i) may be used to offset, set-off, recoup, allocate or apportion fault, liability, or damages, or seek judgment reduction or otherwise defend against any Cause of Action brought by any Person against the Holder of any Co-Defendant Claim or the Excluded Party based in whole or in part on Opioid-Related Activities and (ii) shall in no case be used to seek or obtain any affirmative monetary recovery from any Protected Party or any Asset of any Protected Party (including

from any Purdue Insurance Policy or any other insurance policy of a Protected Party) on account of any Released Claim or Shareholder Released Claim. The foregoing does not constitute a release of any Co-Defendant's Class 14 Claim or any other Excluded Party's Class 11(c) Claim.

### 10.19 _Reinstatement of Certain Shareholder Released Claims_.

As set forth in the Shareholder Settlement Agreements, if any Shareholder Released Party that is a Subsidiary (as defined in the Master Shareholder Settlement Agreement) of a Shareholder Payment Party voluntarily or involuntarily becomes subject to an insolvency, bankruptcy, reorganization, winding-up, administration, dissolution, composition or similar proceeding, upon election by notice from the Sackler Parties' Representative, with the consent of the Master Disbursement Trust, any Estate Causes of Action against such Shareholder Released Party that were previously held by the Debtors and that were released pursuant to Section 10.7(a) of the Plan shall be reinstated in full (and the Shareholder Release provided under Section 10.7(a) of the Plan shall be deemed null and void with respect thereto, and the Channeling Injunction shall terminate, be rescinded and have no application with respect thereto) and the Master Disbursement Trust, in its sole discretion and upon receipt of an advance for fees and expenses provided by the Shareholder Released Parties in an amount determined by the Master Disbursement Trust in its sole discretion (which advance shall be repaid to the extent not used), shall utilize commercially reasonable efforts to maximize the value of any such Estate Causes of Action in such insolvency or liquidation proceeding, and any recovery shall be treated in accordance with the terms as set forth in the Shareholder Settlement Agreements.

### 10.20 _Special Provisions for United States_.

(a)     As to the United States, notwithstanding anything contained in the Plan or Confirmation Order to the contrary [(except Section 5.2(i) of the Plan and in respect of the United States-PI Claimant Medical Expense Claim Settlement]), including but not limited to this Article X, nothing in the Plan or Confirmation Order [(except Section 5.2(i) of the Plan and in respect of the United States-PI Claimant Medical Expense Claim Settlement)] shall:

(i)     limit or expand the scope of discharge, release or injunction permitted to debtors under the Bankruptcy Code. The discharge, release, and injunction provisions contained in the Plan and Confirmation Order are not intended and shall not be construed to bar the United States from, subsequent to the Confirmation Order, pursuing any police or regulatory action, or any criminal action;

(ii)     discharge, release, exculpate, impair or otherwise preclude: (A) any liability to the United States that is not a "claim" within the meaning of section 101(5) of the Bankruptcy Code; (B) any Claim of the United States arising on or after the Effective Date; (C) any liability of the Debtors under police or regulatory statutes or regulations to the United States as the owner, lessor, lessee or operator of property that such Entity owns, operates or leases after the Effective Date; or (D) any liability to the United States, including but not limited to any liabilities arising under the IRC, the environmental laws, the criminal laws, the civil laws or common law, of any Person, including any Released Parties, Shareholder Released Parties or any Exculpated Parties, in each case, other than the Debtors; _provided_, _however_, that the foregoing shall not (x) limit the scope of discharge granted to the Debtors under sections 524 and 1141 of the Bankruptcy Code,

165

(y) diminish the scope of any exculpation to which any Person is entitled under section 1125(e) of the Bankruptcy Code or (z) change the treatment of the DOJ Forfeiture Judgment Claim pursuant to Section 2.3 of the Plan or the treatment of the Federal Government Unsecured Claims pursuant to Section 4.3 of the Plan;

(iii)    enjoin or otherwise bar the United States from asserting or enforcing, outside the Bankruptcy Court, any liability described in the preceding clause (ii); *provided*, *however*, that the non-bankruptcy rights and defenses of all Persons with respect to (A) – (D) in clause (ii) are likewise fully preserved;

(iv)    affect any valid right of setoff or recoupment of the United States against any of the Debtors; *provided*, *however*, that the rights and defenses of the Debtors with respect thereto are fully preserved (other than any rights or defenses based on language in the Plan or the Confirmation Order that may extinguish setoff or recoupment rights);

(v)    divest any court, commission or tribunal of jurisdiction to determine whether any liabilities asserted by the United States are discharged or otherwise barred by this Confirmation Order, the Plan or the Bankruptcy Code; *provided*, *however*, that the Bankruptcy Court shall retain jurisdiction as set forth in and pursuant to the terms of the Plan to the extent permitted by law; or

(vi)    be deemed to (A) determine the tax liability of any Person, including but not limited to the Debtors, (B) have determined the federal tax treatment of any item, distribution or Entity, including the federal tax consequences of the Plan or Confirmation Order, or (C) expressly expand or diminish the jurisdiction of the Bankruptcy Court to make determinations as to federal tax liability and federal tax treatment under the Bankruptcy Code and 28 U.S.C. §§ 157, 1334.

For the avoidance of doubt, the Channeling Injunction set forth in Section 10.8 of the Plan does not apply to the rights and causes of action protected by this Section 10.20.

(b)    Notwithstanding anything to the contrary herein, nothing in the Plan, the Confirmation Order, the Shareholder Settlement Agreements or any other document filed in connection with the Plan shall release claims held by the United States of America against the Shareholder Released Parties; *provided* that, for the avoidance of doubt, nothing in the Plan, Confirmation Order, the Shareholder Settlement Agreements or any other document filed in connection with the Plan shall limit the releases contained in the Settlement Agreement between the United States of America and Purdue Pharma L.P., executed on October 21, 2020, or the Settlement Agreement between the United States of America and Dr. Richard Sackler, David Sackler, Mortimer D.A. Sackler, Kathe Sackler, and the Estate of Jonathan Sackler, executed on October 21, 2020.

(c)        Several of the Debtors are parties to the various following agreements with the Secretary of the Department of Health and Human Services under which the Debtors owe rebates to third parties:

(i)        The Medicare Coverage Gap Discount Program Agreement is established under 42 U.S.C. §§ 1395w-l14A, 1395w-153 and is required should manufacturers wish to have coverage for their products under Medicare Part D. Under the Medicare Coverage Gap Discount Program Agreement, manufacturers agree to reimburse Medicare Part D plan sponsors for certain Coverage Gap discounts the plans provide to Medicare beneficiaries in the Part D coverage gap. The Centers for Medicare & Medicaid Services require that a new entity that seeks to assume a Medicare Coverage Gap Discount Program Agreement enter into a novation agreement with the Centers for Medicare & Medicaid Services with respect to the transfer of such agreement. The Debtors that have entered into Medicare Coverage Gap Discount Program Agreements with the Secretary are: Purdue Pharma L.P. (P1180) and Rhodes Pharmaceuticals L.P. (P1281);

(ii)        The Medicaid Drug Rebate Program, established under section 1927 of the Social Security Act, requires manufacturers to enter into National Drug Rebate Agreements with the Secretary for the coverage and payment of a manufacturer's covered outpatient drugs. Under the Medicaid Drug Rebate Program, if a manufacturer has entered into and has in effect a National Drug Rebate Agreement, Medicaid covers and pays for all of the drugs of that manufacturer dispensed and paid for under the state plan, and in return manufacturers pay applicable rebates to the states. The Debtors that have National Drug Rebate Agreements and the labeler codes associated with the National Drug Rebate Agreements are as follows: Rhodes Pharmaceuticals L.P. (42858), Purdue Pharma L.P. (59011), and Adlon Therapeutics L.P. (72912);

(iii)        Manufacturers with National Drug Rebate Agreements must also comply with the Drug Pricing Program under section 340B of the Public Health Service Act, 42 U.S.C. § 256b, and have Pharmaceutical Pricing Agreements with the Secretary of the Department of Health and Human Services. Under the Pharmaceutical Pricing Agreements, manufacturers agree to charge a price for covered outpatient drugs that will not exceed the average manufacturer price decreased by a rebate percentage. The Debtors that have Pharmaceutical Pricing Agreements and the labeler codes associated with such agreements are as follows: Rhodes Pharmaceuticals L.P. (42858), Purdue Pharma L.P. (59011), and Adlon Therapeutics L.P. (72912); and

(iv)        The Medicare Coverage Gap Discount Program Agreements, the Medicaid National Drug Rebate Agreements and the Pharmaceutical Pricing Agreements identified above provide that,

167

in the event of a transfer of ownership, such agreements are automatically assigned to the new owner and all terms and conditions of such agreements remain in effect as to the new owner. Accordingly, notwithstanding anything contained in the Plan or the Confirmation Order which may be to the contrary, the Debtors shall assume such agreements pursuant to section 365 of the Bankruptcy Code, and upon the Effective Date, the Medicare Coverage Gap Discount Program Agreements, the Medicaid National Drug Rebate Agreements and the Pharmaceutical Pricing Agreements identified above shall be assigned to NewCo. NewCo, as the new owner, will assume the obligations of the Debtors who are parties under such agreements from and after the Effective Date, and to fully perform all the duties and responsibilities that exist under such agreements in accordance with their terms, including the payment of discounts owed to Part D Plan sponsors or payment of rebates owed to states and wholesalers for quarters prior to the Effective Date. For the avoidance of doubt, NewCo shall be liable for any outstanding rebates or discounts owed to third parties (and any applicable interest thereon) arising prior to the Effective Date, as well as any penalties associated with noncompliance by the Debtors with the Medicare Coverage Gap Discount Program Agreements, the Medicaid National Drug Rebate Agreements and the Pharmaceutical Pricing Agreements identified above prior to the Effective Date.

(d)    Notwithstanding anything to the contrary herein, nothing in the Plan, the Confirmation Order, the Shareholder Settlement Agreements or any other document filed in connection with the Plan shall bind the United States in any application of statutory, or associated regulatory, authority grounded in Title 19 of the Social Security Act, 42 U.S.C. § 1396-1 et seq. (the "*Medicaid Program*") or in section 1115 of Title 11 of the Social Security Act. The United States is neither enjoined nor in any way prejudiced in seeking recovery of any funds owed to the United States under the Medicaid Program.

## ARTICLE XI  RETENTION OF JURISDICTION.

### 11.1    *Retention of Jurisdiction*.

(a)    The Bankruptcy Court shall retain exclusive jurisdiction of all matters arising under, arising out of or related to the Chapter 11 Cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

(i)    to hear and determine applications for the assumption or rejection of executory contracts and unexpired leases and any Disputed Cure Claims or Disputed Claims in respect of rejection damages resulting therefrom;

(ii)    to hear and determine any motions, adversary proceedings, applications, contested matters and other litigated matters pending on, or commenced after, entry of the Confirmation Order;

(iii)    to hear and resolve any disputes arising from or related to (A) any orders of the Bankruptcy Court still in effect granting relief under

Bankruptcy Rule 2004 or (B) any protective orders entered by the Bankruptcy Court in connection with the foregoing (including the Protective Order);

(iv)    to ensure that Distributions to Holders of Allowed Claims are accomplished as provided in this Plan and the Confirmation Order;

(v)    to consider Claims or the allowance, classification, priority, compromise, estimation or payment of any Claim, including any Administrative Claim or, solely to the extent provided in the Master TDP and/or the applicable Creditor Trust TDP, any Channeled Claim;

(vi)    to enter, implement or enforce such orders as may be appropriate in the event that the Confirmation Order is, for any reason, stayed, reversed, revoked, modified or vacated;

(vii)    to issue and enforce injunctions, enter and implement other orders and take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation or enforcement of this Plan, the Confirmation Order or any other order of the Bankruptcy Court;

(viii)    to hear and determine any application to modify this Plan in accordance with section 1127 of the Bankruptcy Code to remedy any defect or omission or reconcile any inconsistency in this Plan, the Disclosure Statement or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(ix)    to hear and determine all Professional Fee Claims;

(x)    to resolve disputes concerning any reserves with respect to Non-Participating Channeled Claims and other Disputed Claims or the administration thereof;

(xi)    to hear and determine disputes arising in connection with the interpretation, implementation or enforcement of this Plan, the Confirmation Order, any transactions or payments in furtherance of the Plan or the Confirmation Order or any agreement, instrument or other document governing, or related to, any of the foregoing, including the Plan Documents;

(xii)    to take any action and issue such orders, including any such action or orders as may be necessary after entry of the Confirmation Order or the occurrence of the Effective Date, as may be necessary to construe, enforce, implement, execute and consummate this Plan, including any release (including, but not limited to, the United States-PI Claimant Medical Expense Claim Releases), exculpation or injunction provisions set forth in this Plan, or to

maintain the integrity of this Plan following the occurrence of the Effective Date;

(xiii)   to hear and determine any other matters related to the Chapter 11 Cases and not inconsistent with the Bankruptcy Code or title 28 of the United States Code;

(xiv)   to hear, determine and resolve disputes arising in connection with the interpretation, implementation or enforcement of the Plan or Confirmation Order;

(xv)   to resolve any disputes concerning whether a Person had sufficient notice of the Chapter 11 Cases, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, any Bar Date established in the Chapter 11 Cases or any deadline for responding or objecting to a Cure Amount, in each case, for the purpose of determining whether a Claim or Interest is discharged hereunder or for any other purpose;

(xvi)   to hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Shareholder Settlement Agreements, the Public Entity Settlements and the Private Entity Settlements;

(xvii)   to hear and determine disputes arising in connection with the MDT Claims or operations of the Master Disbursement Trust or the actions of the MDT Trustees;

(xviii)   to hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Creditor Trust Documents, and to hear and determine disputes concerning violations of the Confirmation Order or the use of funds from the Creditor Trusts in a manner inconsistent with the applicable Creditor Trust Documents; *provided* that, with respect to the Governmental Remediation Trust and the Tribe Trust, such jurisdiction shall be concurrent and not exclusive to the extent set forth in the Governmental Remediation Trust Documents and the Tribe Trust Documents, respectively, as in effect on the Effective Date;

(xix)   to hear and resolve any disputes arising from or related to (A) Liens, collateral, or other forms of credit protections that are granted or otherwise effected pursuant to the Shareholder Settlement Agreements, the Public Entity Settlements and the Private Entity Settlements, or (B) any other attempt by any Person to seek orders of attachment, Liens, or collateral involving any Assets, in full or in part, of the Shareholder Released Parties;

(xx)   to determine such other matters, and for such other purposes, as may be provided in the Confirmation Order;

(xxi)     to hear and determine all matters relating to the Plan Settlements, to the extent permitted under applicable law; and

(xxii)    to enter a final decree closing each of the Chapter 11 Cases.

(b)      The Bankruptcy Court shall retain concurrent, rather than exclusive, jurisdiction of all matters arising under, arising out of or related to the Chapter 11 Cases and the Plan to, among other things, hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including the expedited determination of taxes under section 505(b) of the Bankruptcy Code), and to hear and resolve or recommend resolution of disputes related to the MDT Insurance Rights.

(c)      Notwithstanding anything in this Article XI to the contrary, the resolution of Channeled Claims against the Debtors and the forum in which such resolution shall be determined shall be governed by, and in accordance with, Section 6.21 of the Plan, the Master TDP and the Creditor Trust TDPs, if applicable.

(d)      By consenting to the treatment provided by this Plan or otherwise supporting the Plan, no State or Tribe shall be construed to have waived any claim of Sovereign Immunity that it may have in any other action or proceeding, including any action or proceeding occurring after the Effective Date.

(e)      Nothing in this Article XI shall be construed to alter the jurisdiction of a court in which an Opt-Out Class Action is pending or was adjudicated in respect of such Opt-Out Class Action.

(f)      As of the earlier of the Effective Date or the expiration of the Preliminary Injunction, all Persons are permanently enjoined from commencing, conducting, or continuing, directly or indirectly, any litigation or prosecution of an Estate Cause of Action (including in any proceeding in a judicial, arbitral, administrative, or other forum). Any Person seeking to commence, conduct, or continue litigation or prosecution of a Cause of Action against a Shareholder Released Party or a Released Party may, but is not required to, seek a prior determination in the Bankruptcy Court that a Cause of Action is not an Estate Cause of Action. If any Person commences, conducts or continues litigation or prosecution of such Cause of Action without a prior determination by the Bankruptcy Court, the Person against which such Cause of Action was asserted, and the Master Disbursement Trust or NewCo, shall be entitled to make an emergency application to the Bankruptcy Court for a determination that such Cause of Action is an Estate Cause of Action and that the injunction in this Section 11.1(f) has been violated. In either event, the determination whether or not a Cause of Action is an Estate Cause of Action shall be based on an appropriate evidentiary record, and the only Persons with standing to be heard shall be: (i) the Person seeking to bring such Cause of Action; (ii) the Person or entity against which such Cause of Action would be or has been brought; or (iii) the Debtors, the Creditors' Committee, the PAT, each Governmental Consent Party, the Master Disbursement Trust or NewCo. Upon determining that a violation of the injunction has occurred, damages may be awarded in the amount of attorneys' fees and other litigation costs and expenses incurred by the Person against which the Estate Cause of Action was brought or who is otherwise seeking to enforce the injunction, including in connection with litigation or prosecution of the Estate Cause of Action and in connection with enforcing the injunction in this Section 11.1(f) subject to the discretion of the Bankruptcy Court. Without limiting the foregoing, the Bankruptcy Court, in its discretion, also may award any additional appropriate relief against a violating Person and may award any sanctions against any other Person engaging in otherwise sanctionable conduct in connection with the enforcement of the injunction in this Section 11.1(f).

## ARTICLE XII MISCELLANEOUS PROVISIONS.

### 12.1 *Exemption from Certain Transfer Taxes*.

To the maximum extent permitted pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property under the Plan pursuant to (a) the issuance, distribution, transfer or exchange of any debt, equity security or other interest in the Debtors, (b) the Restructuring Transactions, (c) the creation, modification, consolidation, termination, refinancing and/or recording of any mortgage, deed of trust or other security interest, or the securing of additional indebtedness by such or other means, or (d) the making, assignment, recording or surrender of any lease or sublease, or the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, including any deeds, bills of sale or other assignments or instruments of transfer, or assignments executed in connection with any disposition of Assets contemplated by the Plan (including transfers of Assets to and by the Debtors, the Plan Administration Trust, NewCo, the Foundation, the Master Disbursement Trust and the Creditor Trusts) shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles tax, transfer tax (including real estate transfer tax), mortgage tax or mortgage recording tax, sales or use tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee or other similar tax or governmental assessment, and the appropriate federal, state, provincial or local government officials or agents shall forego collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### 12.2 *Dates of Actions to Implement Plan*.

In the event that any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day but shall be deemed to have been completed as of the required date.

### 12.3 *Amendments*.

(a) **Plan Modifications**. This Plan may be amended, modified or supplemented by the Debtors in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as otherwise ordered by the Bankruptcy Court; *provided* that (i) any such amendment, modification or supplement shall be reasonably acceptable to the Governmental Consent Parties; *provided further* that any such amendment, modification or supplement that expands the scope of the Releases or modifies any provision relating to the MDT Insurance Policies (including the scope thereof) or the transfer of the MDT Insurance Rights shall be acceptable to the Governmental Consent Parties, (ii) any such amendment, modification or supplement shall be reasonably acceptable to the Creditors' Committee to the extent that it (A) relates to the MDT Insurance Rights, (B) modifies Section 5.9 of the Plan as it relates to payment of the attorneys' fees and costs of Holders of Hospital Claims, Third-Party Payor Claims, or PI Claims, the Ad Hoc Group of Individual Victims, the Ratepayer Mediation Participants or the NAS Committee, (C) modifies the Creditors' Committee's consent rights under the Plan, (D) expands the scope of the Releases or (E) materially and adversely affects the treatment of Holders of Hospital Claims, Third-Party Payor Claims, PI Claims, ER Physician Claims or Other General Unsecured Claims (it being understood that (x) any reduction in the amount of any Initial Private Creditor Trust Distribution, the PI Trust Obligation or any Private Creditor Trust's MDT Claim, (y) any elimination of any consent rights in favor of such Holders or (z) any modification to Section 5.2, 5.6 or 5.7 of the Plan to the extent such modification relates to the Master Disbursement Trust or a Private Creditor Trust shall constitute such a material and adverse effect), and (iii) any such amendment, modification or supplement shall be acceptable to the Sackler Parties' Representative with respect to the Specified Shareholder Provisions and, to the extent set forth in

the Master Shareholder Settlement Agreement, reasonably acceptable to the Sackler Parties' Representative with respect to modification of terms relating to the rights, obligations, or interests of the Shareholder Released Parties; *provided* that solely with respect to the Creditor Trust Documents, such consent shall only apply to the extent set forth in the Master Shareholder Settlement Agreement. In addition, after the Confirmation Date, as long as such action does not materially and adversely affect the treatment of Holders of Allowed Claims pursuant to this Plan, the Debtors may remedy any defect or omission or reconcile any inconsistencies in this Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes or effects of this Plan, and any Holder of a Claim or Interest that has accepted this Plan shall be deemed to have accepted this Plan as amended, modified or supplemented.

(b)    **Certain Technical Amendments**. Prior to the Effective Date, the Debtors may make appropriate technical adjustments and modifications to this Plan without further order or approval of the Bankruptcy Court; *provided*, *however*, that such technical adjustments and modifications do not adversely affect in a material way the treatment of Holders of Claims and Interests under this Plan.

### 12.4    *Revocation or Withdrawal of Plan*.

The Debtors reserve the right to revoke or withdraw this Plan prior to the Effective Date as to any or all of the Debtors; *provided* that each Debtor shall be entitled to revoke this Plan only in full and not in part. If, with respect to a Debtor, this Plan has been revoked or withdrawn prior to the Effective Date, or if confirmation or the occurrence of the Effective Date as to such Debtor does not occur on the Effective Date, then, with respect to such Debtor: (a) this Plan and the Plan Documents shall be null and void in all respects; (b) any settlement or compromise embodied in this Plan (including the fixing or limiting to an amount any Claim or Interest or Class of Claims or Interests), assumption or rejection of executory contracts and unexpired leases effected by this Plan and any document or agreement executed pursuant to this Plan (including the Plan Documents) shall be deemed null and void; and (c) nothing contained in this Plan shall (i) constitute a waiver or release of any Claim or by or against, or any Interest in, such Debtor or any other Person, (ii) prejudice in any manner the rights of such Debtor or any other Person, or (iii) constitute an admission of any sort by any Debtor or any other Person; *provided* that any provisions under the Shareholder Settlement Agreements that are expressly contemplated to survive revocation or reversal of the Plan shall survive.

### 12.5    *Payment of Statutory Fees*.

All fees payable under section 1930 of chapter 123 of title 28 of the United States Code shall be paid on or before the Effective Date by the Debtors. After the Effective Date, the Plan Administration Trust shall assume liability for and shall pay, or cause to be paid, any and all quarterly fees owed to the U.S. Trustee when due in accordance with applicable law, and shall continue to file, or cause to be filed, with the Bankruptcy Court quarterly reports to show the calculation of such fees for the Debtors' Estates. Each of the Debtors shall remain obligated to pay quarterly fees to the U.S. Trustee until such Debtor's Chapter 11 Case is closed, dismissed or converted to a case under chapter 7 of the Bankruptcy Code.

### 12.6    *Severability*.

(a)    Notwithstanding anything else contained in the Plan, (i) the Plan provisions effectuating the Releases provided by the Debtors, their Estates, and the Releasing Parties and the Channeling Injunction (A) are integrated with and integral to all other provisions of the Master Shareholder Settlement Agreement, the Plan and the Plan Documents, (B) are not and shall not be severable from the remainder of the Master Shareholder Settlement Agreement, the Plan or the Plan Documents and (C) shall not be excised or modified other than in accordance with the Plan and the Master Shareholder Settlement Agreement and (ii) if the Plan provisions effectuating the Releases provided by the Debtors,

their Estates, and the Releasing Parties and the Channeling Injunction are deemed null, void, illegal or unenforceable, then the terms, provisions, covenants and restrictions of the Master Shareholder Settlement Agreement and the Plan shall be void and shall not remain in force or effect, except as specifically and expressly stated otherwise in the Master Shareholder Settlement Agreement or the Plan, or as specifically and expressly agreed in writing by all parties to the Master Shareholder Settlement Agreement.

(b)    If, prior to entry of the Confirmation Order, any term or provision of this Plan that is not related to the Master Shareholder Settlement Agreement or the Releases provided by the Debtors, their Estates, and the Releasing Parties and the Channeling Injunction is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation by the Bankruptcy Court, the remainder of the terms and provisions of this Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with this <u>Section 12.6</u>, is valid and enforceable pursuant to its terms.

(c)    The impact of any modification, reversal, or vacatur of the Confirmation Order, the Plan, or the Shareholder Settlements following the Effective Date will be governed by the Master Shareholder Settlement Agreement.[33]

### 12.7    *Governing Law*.

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent that a Plan Document provides otherwise, the rights, duties and obligations arising under this Plan and the Plan Documents shall be governed by, and construed and enforced in accordance with, the internal laws of the State of New York, without giving effect to the principles of conflicts of laws thereof (other than section 5-1401 and section 5-1402 of the New York General Obligations Law).

### 12.8    *Immediate Binding Effect*.

Subject only to Bankruptcy Rules 3020(e), 6004(h) and 7062, as applicable, upon the occurrence of the Effective Date, the terms of this Plan and the Plan Documents shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the other Protected Parties, all Holders of Claims against or Interests in the Debtors, all Holders of Channeled Claims, all Releasing Parties and each of their respective successors and assigns.

### 12.9    *Successors and Assigns*.

The rights, benefits and obligations of any Person named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or permitted assign, if any, of each such Person.

---

[33] [**NTD**: Inclusion of plan provisions concerning the effectiveness of the settlement agreements under certain appellate outcomes as set forth in Section 2.04 the Master Shareholder Settlement Agreement are subject to ongoing discussion.]

### 12.10    *Entire Agreement*.

On the Effective Date, this Plan, the Plan Supplement and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings and representations concerning such documents, all of which have become merged and integrated into this Plan.

### 12.11    *Computing Time*.

In computing any period of time prescribed or permitted by this Plan, unless otherwise set forth in this Plan or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

### 12.12    *Exhibits to Plan*.

All exhibits, schedules, supplements and appendices to this Plan (including the Plan Supplement) are incorporated into and are part of this Plan as if set forth in full herein.

### 12.13    *Notices*.

All notices, requests and demands to or upon the Debtors shall be in writing (including by facsimile transmission) and, unless otherwise provided herein, shall be deemed to have been duly given or made only when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

> DAVIS POLK & WARDWELL LLP
> 450 Lexington Avenue
> New York, New York 10017
> Attn: Marshall S. Huebner, Benjamin S. Kaminetzky, Eli J. Vonnegut,
> Christopher S. Robertson, Joshua Y. Sturm and Abraham Bane.
>
> *Counsel to the Debtors*
> *and Debtors in Possession*

After the occurrence of the Effective Date, the Plan Administration Trustee shall have authority to send a notice to Entities providing that, to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entities must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002; *provided*, *however*, that the U.S. Trustee need not file such a renewed request and shall continue to receive documents without any further action being necessary. After the occurrence of the Effective Date, the Debtors and the Plan Administration Trustee are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to the U.S. Trustee and those Entities that have filed such renewed requests.

### 12.14    *Dissolution of the Creditors' Committee*.

On the Effective Date, the Creditors' Committee will dissolve; *provided*, *however*, that following the Effective Date, the Creditors' Committee shall continue in existence and have standing and a right to be heard for the following limited purposes: (a) applications, and any relief related thereto, for compensation by Professional Persons and requests for allowance of fees and/or expenses under section 503(b) of the Bankruptcy Code, (b) any appeals of, or related to, the Confirmation Order or (c) any other appeal to which the Creditors' Committee is a party. Upon the dissolution of the Creditors' Committee, the Creditors' Committee, each of its members (including each officer, director, employee or

agent thereof) and its respective Professional Persons will cease to have any duty, obligation or responsibility arising from, or related to, the Chapter 11 Cases and shall be released and discharged from all rights and duties from, or related to, the Chapter 11 Cases.

      **12.15** *__Reservation of Rights__*.

      Except as otherwise provided herein, this Plan shall be of no force or effect unless the Bankruptcy Court enters the Confirmation Order. None of the filing of this Plan, any statement or provisions of this Plan or the taking of any action by the Debtors with respect to this Plan shall be, or deemed to be, an admission or waiver of any rights of the Debtors with respect to any Claim or Interest prior to the Effective Date.


Dated: [●], 2025
By: */s/ [●]*
Name: [●]
Title: Authorized Signatory

**PURDUE PHARMA L.P.**
**PURDUE PHARMA INC.**
**PURDUE TRANSDERMAL TECHNOLOGIES L.P.**
**PURDUE PHARMA MANUFACTURING L.P.**
**PURDUE PHARMACEUTICALS L.P.**
**IMBRIUM THERAPEUTICS L.P.**
**ADLON THERAPEUTICS L.P.**
**GREENFIELD BIOVENTURES L.P.**
**SEVEN SEAS HILL CORP.**
**OPHIR GREEN CORP.**
**PURDUE PHARMA OF PUERTO RICO**
**PURDUE PRODUCTS L.P.**
**PURDUE PHARMACEUTICAL PRODUCTS L.P.**
**PURDUE NEUROSCIENCE COMPANY**
**NAYATT COVE LIFESCIENCE INC.**
**BUTTON LAND L.P.**
**RHODES ASSOCIATES L.P.**
**PAUL LAND INC.**
**QUIDNICK LAND L.P.**
**RHODES PHARMACEUTICALS L.P.**
**RHODES TECHNOLOGIES**
**UDF LP**
**SVC PHARMA LP**
**SVC PHARMA INC.**

## EXHIBIT A

**MSGE Fee Allocation Agreement**