**Hearing Date and Time: September 4, 2025, at 11:00 a.m. (prevailing Eastern Time)**
**Objection Date and Time: August 28, 2025, at 4:00 p.m. (prevailing Eastern Time)**

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
James I. McClammy
Eli J. Vonnegut
Darren S. Klein

*Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | **Chapter 11** |
| **PURDUE PHARMA L.P.,** *et al.*, | **Case No. 19-23649 (SHL)** |
| **Debtors.**[1] | **(Jointly Administered)** |

### NOTICE OF HEARING REGARDING DEBTORS' MOTION FOR ENTRY OF AN ORDER AUTHORIZING IMPLEMENTATION OF 2025 KEY EMPLOYEE INCENTIVE PLAN AND 2025 KEY EMPLOYEE RETENTION PLAN

    **PLEASE TAKE NOTICE** that on August 14, 2025, the above-captioned debtors and

debtors in possession (collectively, the "**Debtors**") filed the *Motion of Debtors for Entry of an*

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Purdue Products L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

*Order Authorizing Implementation of 2025 Key Employee Incentive Plan and 2025 Key Employee Retention Plan* (the "**Motion**").

**PLEASE TAKE FURTHER NOTICE** that a hearing on the Motion will be held on **September 4, 2025, at 11:00 a.m. (prevailing Eastern Time)** (the "**Hearing**") before the Honorable Sean H. Lane, United States Bankruptcy Judge, United States Bankruptcy Court for the Southern District of New York, 300 Quarropas Street, White Plains, New York 10601 (the "**Bankruptcy Court**"); *provided that* such Hearing shall be conducted **via Zoom for Government®** unless otherwise ordered by the Bankruptcy Court.

**PLEASE TAKE FURTHER NOTICE** that parties wishing to participate in the Hearing are required to register their appearance by **4:00 p.m. (Prevailing Eastern Time) the day before the Hearing** at https://ecf.nysb.uscourts.gov/cgi-bin/nysbAppearances.pl.

**PLEASE TAKE FURTHER NOTICE** that the Hearing may be continued or adjourned thereafter from time to time without further notice other than an announcement of the adjourned date or dates at the Hearing or a later hearing. The Debtors will file an agenda before the Hearing, which may modify or supplement the motions to be heard at the Hearing.

**PLEASE TAKE FURTHER NOTICE** that any responses or objections (the "**Objections**") to the Motion shall be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the Southern District of New York, shall be filed with the Bankruptcy Court (a) by attorneys practicing in the Bankruptcy Court, including attorneys admitted *pro hac vice*, electronically in accordance with Local Bankruptcy Rule 5005-2 (which can be found at www.nysb.uscourts.gov), and (b) by all other parties in interest, on a CD or other electronic media, in text-searchable portable document format (PDF) (with a hard copy delivered directly to Chambers), in accordance with the customary practices of the Bankruptcy Court and

Local Bankruptcy Rule 5005-2, to the extent applicable, and shall be served in accordance with the *Second Amended Order Establishing Certain Notice, Case Management, and Administrative Procedures* entered on November 18, 2019 [ECF No. 498], so as to be filed and received no later than **August 28, 2025** at **4:00 p.m.** (prevailing Eastern Time) (the "**Objection Deadline**").

**PLEASE TAKE FURTHER NOTICE** that if no Objections are timely filed and served with respect to the Motion, the Debtors may, on or after the Objection Deadline, submit to the Bankruptcy Court an order substantially in the form of the proposed order annexed to the Motion, which order may be entered without further notice or opportunity to be heard.

**PLEASE TAKE FURTHER NOTICE** that objecting parties are required to attend the Hearing, and failure to appear may result in relief being granted upon default; *provided that* objecting parties shall attend the Hearing **via Zoom for Government**® unless otherwise ordered by the Bankruptcy Court.

**PLEASE TAKE FURTHER NOTICE** that copies of the Motion may be obtained free of charge by visiting the website of Kroll Restructuring Administration at https://restructuring.ra.kroll.com/purduepharma.  You may also obtain copies of any pleadings by visiting the Bankruptcy Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

Dated:    August 14, 2025
          New York, New York

                              DAVIS POLK & WARDWELL LLP

                              By:    */s/ Darren S. Klein*                      

                              450 Lexington Avenue
                              New York, New York 10017
                              Telephone: (212) 450-4000
                              Facsimile:     (212) 701-5800
                              Marshall S. Huebner
                              James I. McClammy
                              Eli J. Vonnegut
                              Darren S. Klein

                              *Counsel to the Debtors*
                              *and Debtors in Possession*

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
James I. McClammy
Eli J. Vonnegut
Darren S. Klein

*Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **PURDUE PHARMA L.P.,** *et al.*, | **Case No. 19-23649 (SHL)** |
| **Debtors.**[1] | **(Jointly Administered)** |

## MOTION OF DEBTORS FOR ENTRY OF AN ORDER AUTHORIZING IMPLEMENTATION OF 2025 KEY EMPLOYEE INCENTIVE PLAN AND 2025 KEY EMPLOYEE RETENTION PLAN

The above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**,"

the "**Company**" or "**Purdue**"), by and through their undersigned counsel, hereby submit this

*Motion of Debtors for Entry of an Order Authorizing Implementation of 2025 Key Employee*

*Incentive Plan and 2025 Key Employee Retention Plan* (this "**Motion**"). In support of this Motion,

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Purdue Products L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

the Debtors rely on the *Declaration of Jesse DelConte in Support of the Motion of Debtors for Entry of an Order Authorizing Implementation of 2025 Key Employee Incentive Plan and 2025 Key Employee Retention Plan* (the "**DelConte Declaration**"), attached hereto as **Exhibit B**, and the *Declaration of Josephine Gartrell in Support of the Motion of Debtors for Entry of an Order Authorizing Implementation of 2025 Key Employee Incentive Plan and 2025 Key Employee Retention Plan* (the "**Gartrell Declaration**"), attached hereto as **Exhibit C**, and respectfully state as follows:

### Preliminary Statement

1.      By this Motion, the Debtors seek approval of their sixth annual key employee incentive plan and key employee retention plan, each effectively a renewal of the longstanding, annual incentive grants that the Debtors utilized for decades prior to the Petition Date. The Debtors have closely based their proposed key employee incentive plan (the "**2025 KEIP**") and key employee retention plan (the "**2025 KERP**" and, together with the 2025 KEIP, the "**2025 Compensation Plans**") on compensation programs the Court has approved five times—first in 2020, then again in 2021, 2022, 2023, and 2024. The 2025 Compensation Plans hew closely to the design, structure and cost of these approved predecessor programs and should likewise be found to satisfy the applicable standards for approval.

2.      As discussed in greater detail herein, the 2025 Compensation Plans continue to reflect substantial reductions to the compensation levels of the Company's employees relative to the Company's prepetition practice, with the most substantial percentage reductions borne by KEIP Participants, re-implementing concessions that were painstakingly negotiated with key creditor constituencies in 2020, and then generally carried forward in each of 2021, 2022, 2023, and 2024. As in past years, the Debtors also consulted with the official committee of unsecured

2

creditors (the "**UCC**"), the Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants (the "**AHC**") and the Multi-State Governmental Entities Group (the "**MSGE**") with respect to the 2025 Compensation Plans.  As a result, the proposed corporate objectives with respect to the 2025 Compensation Plans set forth herein already reflect the Debtors' consultation with these creditor constituencies. In fact, recognizing that this Motion would likely not be heard until the summer, the Debtors proactively socialized the 2025 corporate scorecard earlier in the year so that it would represent full-year performance objectives. The Debtors remain in ongoing dialogue with the UCC, AHC, and MSGE regarding a limited and discrete number of open issues, none of which relate to the corporate objectives.

3.     The 2025 Compensation Plans are necessary to provide the Debtors' employees with appropriate, market-based compensation.  This year, as in the past, the Compensation and Talent Committee (the "**Compensation Committee**") of the Board of Directors of Purdue Pharma Inc. (the "**Board**") and the Debtors' senior management team benefited from the independent guidance and experience of Willis Towers Watson plc ("**WTW**") in designing and developing the 2025 Compensation Plans and in benchmarking this year's programs against what remains a challenging, competitive labor market.  WTW's analysis revealed that the positioning of the compensation of the Debtors' insider and non-insider employees once the 2025 Compensation Plans are put in place would remain within a competitive range of, and, with respect to non-insider employees, in many cases below, the median for their peers in the pharmaceutical industry.  And providing certainty to the Debtors' employees in a timely fashion that they will receive market-based compensation through customary annual compensation grants remains, as it has been in years prior, essential. Following the Supreme Court's decision in *Harrington v. Purdue Pharma L.P.*, 144 S. Ct. 2071, 2077 (2024), various parties in interest returned to mediation, and after many

3

months of intensive effort, those mediation discussions culminated in the settlements reflected in the *Thirteenth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors* [ECF No. 7306] (the "**Plan**") and described in the accompanying *Disclosure Statement for Thirteenth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors* [ECF No. 7307]. The Debtors are now actively focused on advancing toward plan confirmation and as part of these efforts, employees have been tasked with delivering strong financial performance to maximize the value of the Debtors' estates—value that will ultimately be distributed to stakeholders. To ensure the continued commitment and performance needed to meet these objectives, it remains critical that the Debtors provide appropriate, market-based compensation for their employees.

4.      The Court has extensively reviewed the Debtors' prior compensation programs and made detailed findings about their necessity and appropriateness. The Court has recognized that the compensation plans "reflect a sound exercise of the Debtor's business judgment." Hr'g Tr., 14: 18–19, April 17, 2024; *see also* Hr'g Tr., 43:9–10, 48:3–17, May 5, 2023 (finding the compensation plans "satisf[y] all requirements of applicable law" and have "satisfied the independent test of time."); Hr'g Tr., 138:1, 142:16–20, Sept. 30, 2020 (recognizing that these compensation plans are "consistent with industry standards" and "necessary to compensate these employees at market in their industry"); Hr'g Tr., 51:4–5, July 29, 2021 (observing that, without a key employee retention plan, "these employees would not be compensated at market"). The Court has also highlighted the importance of providing the Debtors' workforce with market compensation, since the Company's employees are "maintaining the value" of the Debtors' business "and enabling the Debtors . . . to move to a focus on, in large measure, abating the opioid crisis." Hr'g Tr., 54:21–25, July 29, 2021. Now that the Disclosure Statement has been approved

and solicitation of the Plan has commenced, it is even more critical that the Debtors' stability not

be jeopardized in the period leading up to confirmation of the Plan and emergence. Since the

Petition Date, the Debtors' workforce has substantially increased the Debtors' cash position,

enhancing the value available for distribution to creditors, all while responsibly manufacturing

critical medicines with a solid track record of compliance. And, an essential component of the

proposed Plan is that the Company will be put to continued use in abating the opioid crisis,

including through the low-cost provision of medicines to reverse opioid overdoses.  The Court has

also acknowledged that the Debtors should have "a proper compensation structure," since

"otherwise what they own is going to deteriorate."  Hr'g Tr., 113:5–7, Dec. 4, 2019.  The 2025

Compensation Plans—like their predecessor programs— are "essential to the success of the

Debtor's restructuring efforts."  Hr'g Tr., 14: 17–18, April 17, 2024.  They should likewise be

approved.

**Relief Requested**

5.      By this Motion, and pursuant to sections 363(b) and 503(c)(3) of title 11 of the

United States Code (as amended, the "**Bankruptcy Code**"), the Debtors seek entry of an order,

substantially in the form attached hereto as **Exhibit A**, authorizing the implementation of the 2025

Compensation Plans.

**Jurisdiction and Venue**

6.      The United States Bankruptcy Court for the Southern District of New York

(the "**Court**") has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and

the *Amended Standing Order of Reference M-431*, dated January 31, 2012 (Preska, C.J.).  This is

a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and, pursuant to Rule 7008 of the Federal

Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), the Debtors consent to entry of a final

5

order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter a final order or judgment consistent with Article III of the United States Constitution.

7.      Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### General Background

8.      On September 15, 2019, the Debtors commenced the above-captioned chapter 11 cases (the "**Chapter 11 Cases**") by filing with the Court voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The United States Trustee for Region 2 appointed the UCC on September 27, 2019.  *See Notice of Appointment of Official Committee of Unsecured Creditors* [ECF No. 131]. No trustee has been appointed in these Chapter 11 Cases.

9.      These Chapter 11 Cases are being jointly administered pursuant to Bankruptcy Rule 1015(b) and the *Order Directing Joint Administration of Chapter 11 Cases* [ECF No. 59] entered by the Court in each of the Chapter 11 Cases.

### The Debtors' Historical Compensation Plans

10.     The Debtors' prepetition compensation practices have been described at length in multiple prior motions.[2]  At a high level, for more than thirty years prior to the commencement of

---

[2] *See Mot. of Debtors for Entry of an Order Authorizing (i) Debtors to (a) Pay Pre-Petition Wages, Salaries, Employee Benefits and Other Compensation and (b) Maintain Employee Benefits Programs and Pay Related Administrative Obligations, (ii) Employees and Retirees to Proceed with Outstanding Workers' Compensation Claims and (iii) Financial Institutions to Honor and Process Related Checks and Transfers* [ECF No. 6]; *Mot. of Debtors for Entry of an Order Authorizing Implementation of a Key Employee Incentive Plan and a Key Employee Retention Plan* [ECF No. 1674]; *Mot. of Debtors for Entry of an Order Authorizing Implementation of 2021 Key Employee Incentive Plan and 2021 Key Employee Retention Plan* [ECF No. 3077]; *Mot. of Debtors for Entry of an Order Authorizing Implementation of 2022 Key Employee Incentive Plan and 2022 Key Employee Retention Plan* [ECF No. 4707]; *Mot. of Debtors for Entry of an Order Authorizing Implementation of 2023 Key Employee Incentive Plan and 2023 Key Employee Retention Plan* [ECF No. 5579]; *Mot. of Debtors for Entry of an Order Authorizing Implementation of 2024 Key Employee Incentive Plan and 2024 Key Employee Retention Plan* [ECF No. 6279] (the "**2024 KEIP KERP Motion**").

these Chapter 11 Cases, the Debtors maintained a performance-based Annual Incentive Plan (the "**AIP**") for the majority of their employees.  The AIP provided annual cash bonuses tied to the achievement of Company and individual performance metrics.  For much of that time, the Debtors also maintained a Long-Term Results Plan (the "**LTRP**" and, together with the AIP, the "**Prepetition Compensation Plans**"), which provided eligible employees with annual grants that would result in cash payouts tied to achievement of corporate objectives measured over a three-year performance period.[3]  Purdue relied on the AIP and LTRP to drive performance and productivity, and as discussed in greater detail in the following section, the Debtors hewed closely to the structure of their Prepetition Compensation Plans in seeking, and receiving, approval for their compensation programs in 2020, 2021, 2022, 2023, and 2024.[4]

11.     The Debtors also maintained various retention plans in the ordinary course of business, as needed, to retain their key employees.[5]  In 2018 and 2019 in particular, the Debtors implemented retention plans for certain executive and nonexecutive employees, which were carefully calibrated to incentivize participants to remain employed with the Debtors through the end of 2020.[6]  In December 2019, the Court approved continuation of a prepetition retention plan solely with respect to non-insider employees that provided cash-based awards to approximately

---

[3] Additional information about the AIP and LTRP can be found in the *Second Suppl. Decl. of Jon Lowne in Supp. of the Mot. of Debtors for Entry of an Order Authorizing (i) Debtors to (a) Pay Pre-Petition Wages, Salaries, Employee Benefits and Other Compensation and (b) Maintain Employee Benefits Programs and Pay Related Administrative Obligations, (ii) Employees and Retirees to Proceed with Outstanding Workers' Compensation Claims and (iii) Financial Institutions to Honor and Process Related Checks and Transfers* [ECF No. 554] (the "**Second Supplemental Lowne Declaration**").

[4] *See, e.g., Decl. of Jon Lowne in Supp. of Mot. of Debtors for Entry of Order Authorizing Implementation of 2021 Key Employee Incentive Plan and 2021 Key Employee Retention Plan* [ECF No. 3077-2] ¶ 4.

[5] *See id.* ¶ 5.

[6] *See id.*

120 such non-insider employees and was structured to retain their services through December 31, 2020.[7] The Court subsequently approved similar targeted retention programs in 2020 through 2024.[8]

### Court Approval of Prior Compensation Programs

12.     The Debtors' key employee incentive plan (the "**2020 KEIP**") and key employee retention plan (the "**2020 KERP**" and, together with the 2020 KEIP, the "**2020 Compensation Plans**") closely tracked the Debtors' Prepetition Compensation Plans, the continuation of which was approved by this Court with certain consensual modifications over the course of multiple hearings in late 2019 through early 2020.[9] In each of 2021, 2022, 2023, and 2024, the Debtors sought authority to implement a key employee incentive plan and key employee retention plan that was designed to parallel the 2020 Compensation Plans, and this Court approved each of these programs in 2021, 2022, 2023, and 2024.[10]

---

[7] *See Suppl. Final Order Authorizing (i) Debtors to (a) Pay Certain Pre-Petition Wages, Salaries, Employee Benefits and Other Compensation and (b) Maintain Employee Benefits Programs and Pay Related Administrative Obligations, (ii) Employees and Retirees to Proceed with Outstanding Workers' Compensation Claims and (iii) Financial Institutions to Honor and Process Related Checks and Transfers* [ECF No. 629] (the "**2019 AIP and LTRP Order**").

[8] *See Order Authorizing Debtors to Implement Key Employee Retention Plan* [ECF No. 1762]; *Order Authorizing Debtors to Implement 2021 Key Employee Retention Plan* [ECF No. 3571]; *Order Authorizing Debtors to Implement 2022 Key Employee Retention Plan and 2022 Key Employee Incentive Plan* [ECF No. 4862]; *Order Authorizing the Debtors to Implement 2023 Key Employee Incentive Plan and 2023 Key Employee Retention Plan* [ECF No. 5646]; *Order Authorizing Debtors to Implement 2024 Key Employee Incentive Retention Plan and 2024 Key Employee Retention Plan* [ECF No. 6322].

[9] *See Final Order Authorizing (i) Debtors to (a) Pay Pre-Petition Wages, Salaries, Employee Benefits and Other Compensation and (b) Maintain Employee Benefits Programs and Pay Related Administrative Obligations, (ii) Employees and Retirees to Proceed with Outstanding Workers' Compensation Claims and (iii) Financial Institutions to Honor and Process Related Checks and Transfers* [ECF No. 309]; Supplemental Final Wages Order; *Second Supplemental Final Order Authorizing (i) Debtors to (a) Pay Pre-Petition Wages, Salaries, Employee Benefits and Other Compensation and (b) Maintain Employee Benefits Programs and Pay Related Administrative Obligations, (ii) Employees and Retirees to Proceed with Outstanding Workers' Compensation Claims and (iii) Financial Institutions to Honor and Process Related Checks and Transfers* [ECF No. 783].

[10] *See Order Authorizing Debtors to Implement Key Employee Retention Plan* [ECF No. 1762]; *Order Authorizing Debtors to Implement 2021 Key Employee Retention Plan* [ECF No. 3571]; *Order Authorizing Debtors to Implement 2021 Key Employee Incentive Plan* [ECF No. 3770]; *Order Authorizing Debtors to Implement 2022 Key Employee Retention Plan and 2022 Key Employee Incentive Plan* [ECF No. 4862]; *Order Authorizing the Debtors to Implement 2023 Key Employee Incentive Plan and 2023 Key Employee Retention Plan* [ECF No. 5646]; *Order Authorizing*

13.    Payments under the annual and long-term components of the Company's 2020 through 2024 key employee incentive plans were each contingent upon the Debtors' achievement of certain performance metrics pertaining to Value Creation, Innovation and Efficiency, and People and Culture, which were themselves designed to mirror the Debtors' historical metrics under their Prepetition Compensation Plans.  Failure to achieve the performance metrics at a threshold level meant that no payments would be made.  While payments under each key employee incentive plan remained subject to similar incentivizing performance metric structure and design structure to the Debtors' prepetition practices, payments to the Debtors' non-insider employees under each key employee retention plan were not subject to performance criteria, so as to give those participants greater certainty about their compensation.

14.    Beginning in 2021, the Debtors agreed to formally consult with the UCC, AHC and MSGE with respect to (a) setting corporate objectives for the calendar year ahead and (b) scoring the Company's performance with respect to the metrics applicable to performance over the course of the year prior. [11]    As a result, the proposed corporate objectives with respect to the 2025 Compensation Plans set forth herein already reflect the Debtors' consultation with these creditor constituencies, and the Debtors remain in ongoing dialogue with the UCC, AHC and MSGE with respect to a limited and discrete number of issues regarding the 2025 Compensation Plans. In fact, recognizing that this Motion was unlikely to be heard until the summer, the Debtors proactively socialized the 2025 corporate scorecard earlier in the year so that it would represent full-year performance objectives.

---

*Debtors to Implement 2024 Key Employee Incentive Retention Plan and 2024 Key Employee Retention Plan* [ECF No. 6322].

[11] *See Debtors' Suppl. Omnibus Reply in Supp. of Mot. of Debtors for Entry of an Order Authorizing Implementation of 2021 Key Employee Incentive Plan and 2021 Key Employee Retention Plan* [ECF No. 3744].

15.    The Court has repeatedly recognized that the Debtors' key employee incentive plans and retention plans essentially replicate a core component of the Debtors' prepetition compensation structure, without which the employees' compensation would fall dramatically below market levels.  In authorizing the key employee retention plan, the Court observed in 2021 that, without the payments contemplated thereunder, "these employees would not be compensated at market."  Hr'g Tr., 51:4−5, July 29, 2021.  In 2022, the Court observed that the program had been "modified to make it even more retentive and, I think, appropriately fair."  Hr'g Tr., 34:3−5, May 18, 2022.  In authorizing the 2023 key employee retention plan, the Court observed that "the key parties in interest here have acted responsibly throughout the case and in good faith to maximize value so that value can be distributed to their constituents to abate the opioid crisis."  Hr'g Tr., 43: 12−16, May 5, 2023.  The Court further noted in authorizing the 2024 key employee retention plan that "the Debtors tailored the 2024 KERP to encourage non-insider employees to remain in their positions during what is a critical phase of the bankruptcy process." Hr'g Tr.,15: 5−8, April 17, 2024.  With respect to the Debtors' key employee incentive plan, the Court has likewise found that payments were "required by people to be competitive and not go somewhere else," and that the payments were "essentially part of the [executives'] salary." Hr'g Tr., 99:6−10, Sept. 13, 2021.[12]  The Court made similar observations when authorizing earlier iterations of the compensation plans as well.  *See* Hr'g Tr., 142:16–20, Sept. 30, 2020 (observing with respect to various employee populations that "[t]he record is clear that these payments, in addition to . . . tracking a longstanding practice of over 30 years, in most cases, albeit reduced from what they were prepetition, [are] necessary to compensate these employees at market in their industry"); Hr'g

---

[12] In 2022, 2023, and 2024, the Court recognized that the proposed key employee incentive plan remained "consistent" or "essentially identical" with the programs the Court had approved in years prior.  *See* Hr'g Tr., 33:7, May 18, 2022; Hr'g Tr., 45:15−21, May 23, 2023; Hr'g Tr., 12:13–17, April 17, 2024.

Tr., 23:8–10, Oct. 28, 2020 ("[T]he revised proposal does place these executives in the middle of

industry compensation for people performing jobs like theirs . . . ."); Hr'g Tr., 46:2–8, Nov. 17,

2020 ("[T]he proposed KEIP for these two individuals . . . clearly put[s] their treatment at market

for similar pharmaceutical companies even though Purdue obviously is in a bankruptcy case with

substantial additional tasks to be performed by these two people.").

### The Proposed 2025 Compensation Plans

16.     The Debtors now seek approval of their sixth annual key employee incentive plan

and key employee retention plan in order to effectively renew, once again, their longstanding

annual compensation programs.[13]  The 2025 Compensation Plans, like the longstanding and Court-

approved programs on which they are based, are intended to preserve the value of the Debtors'

businesses by allowing them to pay market-competitive compensation to motivate the Company's

workforce and minimize attrition.     DelConte Decl. ¶ 7.    The resulting package, like its

predecessors, includes the following components:

(a)     the 2025 KEIP, described in Section I below, for certain insider employees that,
        like its predecessor programs, includes (i) an incentive-based, annual award
        payable in March 2026 and (ii) an incentive-based, long-term grant payable in
        March 2026 and subject to clawback through March 2028; and

(b)     the 2025 KERP, described in Section II below, for eligible non-insider employees
        that, like its predecessor programs, includes (i) an annual retention award payable
        in October 2025 (subject to clawback through March 2026 for eligible salaried

---

[13] The orders approving past compensation programs also included agreed disgorgement and anti-secretion terms.
These orders reserved the Debtors' right to seek disgorgement of amounts paid under the AIP and LTRP in the event
any employee was determined by a final order of this Court or other court of competent jurisdiction (a) to have
knowingly participated in criminal misconduct in connection with his or her employment with the Debtors, or (b) to
have been aware of, and failed to report, fraudulent or criminal acts or omissions ((a) and (b) together, the
"**Disgorgement Standard**").    A supplemental order further required that the Debtors' chief executive officer in
particular not take any action with the intent or effect of frustrating enforcement of any judgment, either of this Court
or any other court of competent jurisdiction.    These terms have been included in orders approving the Debtors'
subsequent key employee incentive and retention plans in 2020, 2021, 2022, 2023, and 2024.  And, since 2021, a
further safeguard has been included as well: no employee whom the Debtors believe, after reasonable inquiry
(including inquiry of the Company's advisors), to meet the Disgorgement Standard is eligible to receive payment
under a Court-approved compensation program.   Each of these provisions continues to apply to the proposed 2025
Compensation Plans.

employees) and March 2026, (ii) a long-term retention grant payable in March 2026 and subject to clawback through March 2028 to salaried employees and (iii) additional targeted retention payments for certain employees.[14]

17.    The Compensation Committee and the Debtors' senior management team have again worked closely with WTW, their independent compensation consultant, to benchmark the Debtors' employee compensation against the market.  DelConte Decl. ¶ 10; Gartrell Decl. ¶ 11.

18.    The Debtors' employees continue to shoulder substantial burdens.  The senior management team's intense focus on fostering employee well-being and engagement in the face of trying circumstances, combined with providing appropriate compensation under the prior court-approved key employee incentive and retention plans, has continued to hold voluntary attrition to manageable levels in recent periods.  However, cumulative attrition during these Chapter 11 Cases has left the Company's remaining employees with high workloads, particularly given that the Company had already maintained lean operations prepetition. Moreover, the remaining employees must continue to operate a complex pharmaceutical business in the midst of these protracted Chapter 11 Cases.  DelConte Decl. ¶ 11.  The Company also faces a challenging labor market. Seventeen positions have opened at the Company year to date, joining three positions that opened but were not filled by the end of 2024.  Of the twenty total positions, eleven remain unfilled.  The nine filled positions remained vacant, on average, for 68 days.[15]  DelConte Decl. ¶ 11.

19.    Despite these obstacles, the Debtors' employees must preserve the value of the Debtors' business by continuing to make medicines that benefit patients so that additional value can be generated for opioid abatement, while also delivering on public health initiatives that have the potential to make a meaningful difference and save lives in the context of the opioid crisis.

---

[14] For the avoidance of doubt, the term "**2025 KERP**" refers to the 2025 KERP Annual Award, the 2025 KERP Long-Term Award and the 2025 Targeted Retention Awards, collectively.

[15] Unless otherwise indicated, the employment data referenced in this Motion are current as of June 30, 2025.

Departing from the Debtors' established, market-based compensation practices while the Company progresses toward plan confirmation and emergence from bankruptcy could jeopardize the Debtors' ability to maintain their business operations, thereby putting at risk the Debtors' ability to deliver value to their stakeholders.  DelConte Decl. ¶ 38.  Aggregate compensation under the proposed 2025 Compensation Plans remains consistent with the Company's prior Court-approved programs and generally *below* the compensation levels under the Debtors' Prepetition Compensation Plans, as the Debtors continue to honor the reductions that they first negotiated in 2020 with their key stakeholders.

## I.    The Proposed 2025 KEIP

### A.    Participants

20.    The proposed 2025 KEIP would apply to (i) the Debtors' President and Chief Executive Officer (the "**CEO**"); (ii) the Debtors' newly promoted Executive Vice President and Chief Financial Officer (the "**CFO**"); and (iii) the Debtors' recently promoted Chief Legal Officer, Executive Vice President, Strategy and Corporate Affairs (the "**CLO**") (together with the CEO and CFO, the "**2025 KEIP Participants**"). The 2025 KEIP Participants will not be eligible to participate in the proposed 2025 KERP (including the 2025 Targeted Retention Awards, as defined below), and the purpose of the proposed 2025 KEIP is to incentivize the 2025 KEIP Participants and drive results for the benefit of the Debtors' estates.  DelConte Decl. ¶ 15.

21.    The CEO and CLO (who was then, general counsel) were KEIP participants in the Debtors' 2024 Compensation Program. As has been the case throughout these Chapter 11 Cases, the CEO continues to play a pivotal role in maximizing the value of the Debtors' estates for the benefit of all stakeholders and remains critical to the Debtors' ability to achieve the 2025 Performance Metrics (as defined below).  His leadership throughout the complex and evolving

challenges of the Chapter 11 Cases, combined with rising business uncertainty, regulatory pressures, macroeconomic headwinds, and employee retention risks, has been, and remains, essential to maintaining the Debtors' stability and driving their progress toward a successful emergence.

22.     With respect to the CFO, the Debtors recently promoted Mr. Darragh to the position of CFO, effective as of July 14, 2025 and therefore seek authority for Mr. Darragh to participate in the KEIP on the terms described herein. Mr. Darragh first served as the Debtors' Head of Finance, Financial Planning and Analysis, and Treasurer, after which he served for approximately two years as the Debtors' Vice President, Finance and Treasurer. Prior to joining the Debtors, he held senior finance positions at several biotechnology and medical device companies, including CFO roles at Eleison Pharmaceuticals, Inc. and Starton Therapeutics, Inc.

23.     With respect to the CLO, the Debtors recently promoted Mr. Kesselman to the newly created position of Chief Legal Officer and Executive Vice President, Strategy & Corporate Affairs, effective as of June 2, 2025. Mr. Kesselman has served for six years as the Debtors' General Counsel. In addition to his current responsibilities over Law, Government Affairs, Corporate Security, and Compliance, Mr. Kesselman has, in connection with the promotion, assumed oversight of the Debtors' Human Resources, Communications, Corporate Social Responsibility, Business Development and Strategy functions.

24.     The expertise, skills and institutional knowledge of the 2025 KEIP Participants are essential to running a complex business that safely manufactures critical Class II medicines while continuing to guide the Debtors through their challenging and novel restructuring and maximizing the value of the Debtors' estates. The 2025 KEIP Participants perform essential functions for the Debtors, including providing critical management and legal services, and are responsible for

helping determine the Debtors' strategic plan and facilitating the achievement of the Debtors' goals. DelConte Decl. ¶ 14. Their workloads are anticipated to continue to be high, both as a result of the prolongation and complexity of these Chapter 11 Cases and cumulative attrition throughout the Company. DelConte Decl. ¶ 14. Because the 2025 KEIP Participants continue to make extraordinary efforts to maximize the value of the Debtors' businesses and shepherd the Company through its incredibly complex restructuring, the Compensation Committee and the Board believe that appropriately incentivizing the three 2025 KEIP Participants is necessary to ensure optimal recoveries for all stakeholders.

B.    Structure

25.    Each 2025 KEIP Participant will receive (i) an annual award (the "**2025 KEIP Annual Award**") and (ii) a long-term incentive compensation grant (the "**2025 KEIP Long-Term Award**"), which are collectively designed to replicate the Debtors' Prepetition Compensation Plans and renew their prior, Court-approved programs, subject to the material reductions discussed above. DelConte Decl. ¶ 16. The 2025 KEIP Annual Award and 2025 KEIP Long-Term Award have target values, which are also their maximum values, set forth in **Table 1** below. Prepetition, annual awards could be paid at up to 150% of target in the event of over-performance, but capping payments at 100% of target was one of the agreed changes during the negotiations that occurred early in these Chapter 11 Cases.[16] All payments under the 2025 KEIP will be tied to the Debtors' achievement of corporate objectives (as discussed in more detail below, the "**2025 Performance Metrics**") at threshold or target performance levels, as applicable, with straight-line interpolation to be used if actual performance falls between those amounts. DelConte Decl. ¶ 16. The 2025 KEIP Participants will not receive any payments under the 2025 KEIP should the Company fail to

---

[16] *See* Second Suppl. Lowne Decl. ¶ 59.

achieve the 2025 Performance Metrics at the threshold level. The maximum cost of the 2025 KEIP would be approximately $6.71 million. DelConte Decl. ¶ 16.

### TABLE 1

| 2025 KEIP Participant | Target 2025 KEIP Annual Award | Target 2025 KEIP Long-Term Award | Total Target 2025 KEIP Award |
|---|---|---|---|
| President and Chief Executive Officer | $2,612,300 | $566,318 | $3,178,618 |
| Chief Legal Officer Executive Vice President, Strategy and Corporate Affairs | $2,089,000 | $600,218 | $2,689,218 |
| Executive Vice President and Chief Financial Officer | $600,000 | $240,000 | $840,000 |
| **Total** | **$5,301,300** | **$1,406,536** | **$6,707,836** |

26.     Subject to achievement of the 2025 Performance Metrics at a threshold level, and subject to each 2025 KEIP Participant's continued employment through the payment date (other than as provided below), the 2025 KEIP Annual Award will be paid on the Company's regular payroll date on or immediately following March 13, 2026. DelConte Decl. ¶ 17. A termination of employment by the Debtors without cause after September 30, 2025 will trigger acceleration at the target value, subject to clawback if performance is later scored below target (such clawback to occur by March 13, 2026). DelConte Decl. ¶ 17. In the event of a termination of employment by the Debtors without cause on or prior to September 30, 2025, no payment will be due.

27.     Consistent with Purdue's longstanding compensation practices, each 2025 KEIP Participant will also receive a 2025 KEIP Long-Term Award, which is designed to mimic the

economic structure of the LTRP grant that the participant otherwise would have received in 2025.[17]

DelConte Decl. ¶ 18.    In connection with seeking approval of the long-term incentive compensation grant component of the 2020 KEIP, the Debtors agreed to a 52.25% aggregate reduction from historical practice and to subject the award to acceleration upon emergence.    That discount was carried forward for the long-term incentive compensation grant components of the 2021, 2022, (and, with respect to the CEO and CLO) 2023, and 2024 key employee incentive plans while switching to nearer-term payment dates, subject to a clawback through the historical payment date, rather than acceleration upon emergence.    Similar to 2023 and 2024, in an effort to try to reach consensus with key creditor constituencies, an additional consensual reduction of the CEO's 2025 KEIP Long-Term Award by a further $352,000 has also been applied this year. Such discounts are reflected in the amounts set forth in **Table 1** (above) with respect to the CEO and CLO, as applicable, while the CFO will be subject to the same 40% reduction as all other employees, consistent with the 40% reduction approved last year for the Debtors' former CFO.

28.    As in prior years, payment for the 2025 KEIP Long-Term Award will be made on the Company's regular payroll date on or immediately following March 13, 2026, subject to clawback if the 2025 KEIP Participant resigns or is terminated for any reason other than by the Debtors without cause prior to March 2028.    As with the 2025 KEIP Annual Award, termination of employment without cause after September 30, 2025, will accelerate the 2025 KEIP Long-Term Award at target, subject to clawback by March 13, 2026, for any amount that would not otherwise

---

[17] As noted above, the 2025 KEIP Long-Term Award is intended to replicate the Company's prepetition Long-Term Results Plan, which provided for incentive grants that would accrue and be payable over a three-year performance period.    In 2021, in connection with seeking stakeholder approval of that year's compensation programs, Purdue agreed to pay its long-term award the following year, with a clawback in place over the course of what would have been a three-year performance period.    As they did in previous years, the Debtors seek once more to replicate this structure and payment timing, with an award payable in 2026 and subject to clawback through the date on which payments would otherwise have been made in 2028.

have been paid if target performance is not met.  DelConte Decl. ¶ 18.  Payouts will be tied to the same 2025 Performance Metrics that apply to the 2025 KEIP Annual Award and therefore will depend solely on the Company's performance in 2025.[18]  DelConte Decl. ¶ 18.

C.    Metrics

29.    Consistent with the Company's longstanding practice of approving performance metrics early in each calendar year, the Compensation Committee recommended, and the Board approved, the 2025 Performance Metrics in the second quarter of 2025 with guidance from WTW.  DelConte Decl. ¶ 19; Gartrell Decl. ¶ 19.   The Company consulted with the UCC, AHC and MSGE regarding the 2025 Performance Metrics.  DelConte Decl. ¶ 19.

30.    The 2025 Performance Metrics are based on the same three strategic pillars that have long defined the Debtors' corporate objectives: Value Creation (representing 50% of the 2025 Performance Metrics), Innovation and Efficiency (40% of the 2025 Performance Metrics), and People and Culture (10% of the 2025 Performance Metrics).  DelConte Decl. ¶ 19.   The 2025 Performance Metrics are the product of the same rigorous internal process that the Debtors have long used to identify and strive for corporate priorities, married with input from, and consultation with, highly-informed and sophisticated members of the Debtors' key creditor constituencies. The 2025 Performance Metrics, which were recommended by the Compensation Committee and approved by the full Board following such consultation with key creditor constituencies, are challenging, require extensive achievement and present a risk of not being met at the threshold level required for payment.  DelConte Decl. ¶ 20.  Indeed, past performance shows clearly that the

---

[18] Given that the 2025 KEIP Long-Term Award is paid on an accelerated schedule subject to a clawback through historical payment timing, only 2025 performance will have been determined at the time of payment.  In addition, as it has in each of the prior three performance periods, the Compensation Committee determined that it was in the best interest of the Debtors to apply only the 2025 Performance Metrics, rather than performance metrics for a three-year period, to pay under the 2025 KEIP Long-Term Awards under present circumstances.  DelConte Decl. ¶ 18.

2025 KEIP Participants' diligence and skill will be required to steer the Debtors to even a threshold score on the 2025 Performance Metrics; in 2021, for instance, following consultation with key creditor constituencies, the Compensation Committee approved a final score on that year's annual scorecard of just 86.29%, and in the two subsequent years—2022 and 2023—the scores came in slightly below 100%. DelConte Decl. ¶ 20.  The Company also uses its annual performance metrics more broadly, as a tool to communicate strategic priorities for the year ahead throughout the organization, so the importance of the 2025 Performance Metrics goes far beyond determining the 2025 KEIP Participants' compensation.  DelConte Decl. ¶ 20.  The 2025 KEIP Participants will be focused on driving the Debtors to meet these goals over the course of 2025, and they will need to apply continued substantial efforts to achieve their targets throughout the rest of the year. DelConte Decl. ¶ 20.  The Compensation Committee recommended, and the Board approved, these stretch goals to ensure that the 2025 KEIP has its intended, incentivizing effect.

### 1.     Value Creation

31.     The Value Creation strategic pillar measures and rewards the long-term success of the Debtors' business based on certain nonfinancial operational goals, such as meeting certain deadlines with respect to the Company's research and development of non-opioid products, including overdose treatment products.  **Table 2** below sets forth the operational and developmental goals that the Compensation Committee recommended, and the Board approved, as key to the long-term success of the Debtors' business.  DelConte Decl. ¶ 21.

19

**TABLE 2**

| Value Creation Metrics | Target Date | % of Value Creation | % of 2025 Performance Metrics |
|---|---|---|---|
| − Implement Company initiatives to ensure the Company operates efficiently and sustainably so as to maximize net value generated to abate the opioid crisis. | | 60.0% | 30.0% |
| **Public Health Initiatives[19]** | | | |
| − Improve access to MOUD (Medications for Opioid Use Disorder) for incarcerated individuals with opioid use disorder by supplying and facilitating the distribution of 50% more low-cost generic buprenorphine/naloxone tablets than under the 2024 program's amount of 1.7M | End of Q4 2025 | 20.0% | 10.0% |
| − Complete process validation batch manufacturing by the end of Q3, and make Zurnai 1.5 mg available to order by end of Q4 | End of Q3 2025; End of Q4 2025 | | |
| − In connection with nalmefene postmarketing, submit final toxicology reports and draft clinical study protocol to FDA | End of Q3 2025 | | |
| **Progressing the Branded Pipeline** | | | |
| − Complete database lock of Sunobinop IC/BPS by end of Q2 and achieve top line results by end of Q3 | End of Q2 2025; End of Q3 2025 | 15.0% | 7.5% |
| − Complete enrollment in the Phase 2 craving sub-study of Sunobinop AUD | End of Q4 2025 | | |
| − File two regulatory submissions of Tinostamustine GBM, including supporting data and information with the FDA by end of Q3; Orphan Drug Designation Request and the glioblastoma IND | End of Q3 2025 | | |

---

[19] All medications referred to in this section are potential treatments for opioid overdose.

| Value Creation Metrics | Target Date | % of Value Creation | % of 2025 Performance Metrics |
|---|---|---|---|
| **Progressing the Generics Pipeline** | | | |
| – ████████████████████ | End of Q3 2025 | | |
| – ██████████████<br>████████████████<br>██████████████<br>██████ | End of Q2 2025;<br>End of Q4 2025 | 5.0% | 2.5% |
| – █████████████<br>███████████████<br>███████████████<br>████ | End of Q2 2025 | | |
| **Total** | | **100.0%** | **50.0%** |

DelConte Decl. ¶ 21.

32.     The first metric in the Value Creation strategic pillar, entitled "[i]mplement Company initiatives to ensure the Company operates efficiently and sustainably so as to maximize net value generated to abate the opioid crisis," was first added in 2022 to address certain priorities raised during the consultation process with the UCC, AHC and MSGE. This metric continues to be included this year and will consist of three sub-metrics:



(iii)    ██████████████████████████████████████

(1/4th weighting).

### 2.    Innovation and Efficiency

33.    The innovation and efficiency strategic pillar captures key financial and operational goals, including important business metrics such as operating profit and net sales.  **Table 3** below sets forth the financial and operational goals that the Compensation Committee, the Board and the Debtors' senior management team have identified as key to the Company's long-term business success.  DelConte Decl. ¶ 24.

**TABLE 3**

| Innovation and Efficiency Metrics | Target | % of Innovation and Efficiency | % of 2025 Performance Metrics |
|---|---|---|---|
| – Consolidated Continuing Operations Business Profit Before Non-Recurring and One-Time Charges | $219.9 million | 50.0% | 20.0% |
| – Rhodes Generics Business Profit Before Non-Recurring and One-Time Charges | $26.8 million | 25.0% | 10.0% |
| – Ensure operational readiness for emergence by (i) transferring business licenses, (ii) making product label changes, (iii) transferring government contracts, (iv) transferring payroll and benefits and (v) transferring intellectual property. Take all necessary pre-emergence actions within a specific time period and implement such initiatives, including, but not limited to, ensuring that all company SOPs are current. | | 25.0% | 10.0% |
| **Total** | | **100.0%** | **40.0%** |

DelConte Decl. ¶ 24.

### 3.    People and Culture

34.    Finally, nurturing the Debtors' human resources and organizational culture has been, and will remain, critical to keeping the Debtors on the path to emergence and beyond.  **Table 4** below sets forth the key people and culture metrics the Debtors' senior management team

has identified, and the Board has approved, as essential to enhancing corporate performance and maximizing the value of the Debtors' business.  DelConte Decl. ¶ 25.

**TABLE 4**

| People and Culture Metrics | Target Date | % of People and Culture | % of 2025 Performance Metrics |
|---|---|---|---|
| – Provide timely and transparent employee communications which maintain a full-year average score of 80% or greater on post-event colleague surveys | End of Q4 2025 | 33.3% | 3.3% |
| – Support colleague engagement through culture and change initiatives focused on career and leadership development, employee recognition and belonging | End of Q4 2025 | 33.3% | 3.3% |
| **Continue Ongoing Commitment to Fostering a Sense of Belonging** | | | |
| – Sponsor two company-wide Learning More, training events, or educational networking events | End of Q4 2025 | 33.3% | 3.3% |
| – Issue a minimum of seven company-wide communications and four articles in the CEO Quarterly meet-up | End of Q4 2025 | | |
| **Total** | | **100.0%** | **10.0%** |

**D.    Commercial Reasonableness**

35.    The 2025 KEIP, like those KEIPs approved by the Court in 2020 through 2024, is consistent with the Debtors' historical compensation practices (although lower in amount given the continuation of concessions first agreed to in 2020), even as the challenges faced by the 2025 KEIP Participants remain elevated as they continue to navigate these protracted Chapter 11 Cases and work toward emergence.  DelConte Decl. ¶ 26.  The CEO's compensation is 24% below market median when compared to executives at non-debtor pharmaceutical companies in the most relevant industry survey, while the CEO plays a vital role in maximizing the value of the Debtors' estates for the benefit of their stakeholders through his stewardship of the Debtors during the many challenges presented by these Chapter 11 Cases.  DelConte Decl. ¶ 27; Gartrell Decl. ¶ 33.

23

36.     The CFO's compensation is 44% below market median when compared to executives at non debtor pharmaceutical companies in the most relevant industry survey. Gartrell Decl. ¶ 26. This initial pay positioning is reasonable due to the CFO's recent promotion. It aligns with the common practice of targeting new executives' total compensation below median with an emphasis on shifting to median once supported by tenure, expertise and performance in the new role. Gartrell Decl. ¶ 26.

37.     As in years past, the CLO's compensation remains above-market when compared to chief legal officers and general counsel roles at peer, non-debtor pharmaceutical companies. Gartrell Decl. ¶ 33. But it has long been, and still is, the Debtors' business judgment that they require a chief legal officer with significantly greater expertise and experience than is typical, particularly in light of the (i) enormous complexities of these Chapter 11 Cases, which are entirely in addition to the usual complex legal issues attendant to running a diversified pharmaceutical business and (ii) the CLO's expanded job responsibilities, which now also include overseeing the Debtors' Human Resources, Communications, Corporate Social Responsibility, Business Development and Strategy functions. DelConte Decl. ¶ 29.

38.     The Court has agreed with this exercise of the Debtors' reasonable business judgment in each of the prior five years, and the Debtors urge the Court to do so again now. As the Court has observed, it is "clear" that the CLO's job description (in his prior capacity as general counsel) "is not comparable to other general counsel in this industry"; that the role "requires more expertise and more work"; and that the CLO's compensation "reflects [his] added duties and expertise." Hr'g Tr., 24:18–25:5, Oct. 28, 2020. The CLO's role "is far more complex and difficult than [the] general counsel of a competitor in [the pharmaceutical industry], given the myriad complex issues that, as general counsel, he needs to deal with." Hr'g Tr., 132:5–14, Sept.

13, 2021.  In 2023, the Court observed that the CLO "has a background in the extensive issues that have been part of this case and is a good person to continue to be involved in these cases in that capacity." Hr'g Tr., 36:17−20, 47:21−23, May 23, 2023.  The Compensation Committee continues to believe that the CLO's compensation is appropriate and reasonable, given the immense challenges he faces in his role with the Debtors and in light of his past experience and expertise, as well as the other opportunities available to an individual with his qualifications. DelConte Decl. ¶ 29; Gartrell Decl. ¶ 33.  Accordingly, the Debtors submit that the proposed 2025 KEIP with respect to the CLO is reasonable and should be approved.

39.     The proposed 2025 KEIP would continue to provide appropriate incentive compensation to the 2025 KEIP Participants (at levels consistent with the Company's prior, Court-approved programs from 2020 through 2024 with respect to continuing participants).  The 2025 KEIP, like its predecessor programs, compares reasonably to market compensation levels for the Debtors' non-debtor peers in the pharmaceutical industry.  Given the challenging roles and responsibilities of the 2025 KEIP Participants, the complexities that these Chapter 11 Cases continue to present and the substantial efforts that will be required to achieve the 2025 Performance Metrics at even threshold levels, it is abundantly clear that the 2025 KEIP is appropriate and necessary for preserving the value of the Debtors' estates.

## II.     The Proposed 2025 KERP

### A.     Participants

40.     The Debtors seek authorization to implement the 2025 KERP for virtually all employees other than the 2025 KEIP Participants (the "**2025 KERP Participants**").[20]  The 2025

---

[20] A small number of employees either previously did not participate in the AIP or are otherwise ineligible to participate in the 2025 KERP.

KERP Participants have undertaken significant efforts to maintain the value of the Debtors' business and enable the Debtors' progress toward a successful restructuring. DelConte Decl. ¶ 30. They have done so in the face of significant stresses, including reduced employee headcount and a very competitive market for talent to replace departing employees. They have achieved remarkable business results, despite the ongoing overhang of these protracted Chapter 11 Cases and the fiercely competitive industry in which the Debtors operate. The Debtors must provide their employees with market compensation in order to continue to secure their dedicated efforts. DelConte Decl. ¶ 30. Approximately 427 employees will participate in the 2025 KERP, of which 13 are vice presidents and 414 are middle management, professional employees and support and technical staff, which includes scientific researchers as well as regulatory, compliance, quality and manufacturing personnel.[21] DelConte Decl. ¶ 30.

41.    This Court has repeatedly held that the Debtors appropriately distinguish between insiders and non-insiders. *See* Hr'g Tr., 49:20–24, July 29, 2021 ("It does not appear to me . . . that any of the debtor's analysis here as to who is within the program and who is without it is inconsistent with the better recent case law on this issue."); Hr'g Tr., 109:19–24, Dec. 4, 2019 ("[T]he company engaged in the proper process to determine whether someone was an insider or not. Nothing I've heard today changes that analysis, and I'll rest on my rulings on that point."); *see also* Hr'g Tr., 36:25−37:6; 41:5−7, May 23, 2023 ("So in terms of distinguishing between insiders and non-insiders, … the same criteria that [Judge Drain] found to be appropriate in making that determination that was unchallenged [in prior hearings] is the same criteria that's being used

---

[21] In instances where the separation of existing 2025 KERP Participants from the Debtors results in newly hired employees taking on their roles or responsibilities—or if the Debtors hire employees to fill currently vacant, non-insider positions—the 2025 KERP would allow the Debtors to include such newly hired employees as 2025 KERP Participants.

in this motion… [a]nd so applying the standard that the Debtors have used and that caselaw, the Court finds that none of the participants of the KERP program are insiders"); Hr'g Tr., 14: 11–16, April 17, 2024 ("[T]he Court had previously held that the Debtor's engaged in the process to determine whether someone as an insider… and in fact the Court concluded that the Debtors' analysis was consistent with the better recent case law on the issue.").

42.     Applying the same criteria the Debtors have applied over the past five years to determine insider status[22]—updated to reflect that the Debtors' most senior legal officer now holds the title of 'Chief Legal Officer'—none of the 2025 KERP Participants qualifies as an insider.[23]

B.     Payout Structure

43.     Each eligible 2025 KERP Participant will receive (i) an amount equal to the 2025 KERP Participant's target AIP (the "**2025 KERP Annual Award**") and (ii) a long-term incentive compensation grant payable in March 2026 (subject to clawback through March 2028) (the "**2025 KERP Long-Term Award**").  Certain 2025 KERP Participants will receive additional, targeted retention payments (the "**2025 Targeted Retention Awards**").

44.     The 2025 KERP Annual Award is equal to the target amount of the AIP award that each participant would historically have received, and accounts for modest, ordinary course merit increases and/or base salary increases due to promotions or job responsibility changes.  The 2025 KERP Annual Award is not subject to performance criteria, in order to provide the 2025 KERP

---

[22] *See, e.g., Suppl. Decl. of Jon Lowne in Supp. of the Mot. of Debtors for Entry of an Order Authorizing (I) Debtors to (A) Pay Prepetition Wages, Salaries, Employee Benefits and Other Compensation and (B) Maintain Employee Benefits Programs and Pay Related Administrative Obligations, (II) Employees and Retirees to Proceed with Outstanding Workers' Compensation Claims and (III) Financial Institutions to Honor and Process Related Checks and Transfers* ¶ 9 [ECF 236]; 2024 KEIP KERP Motion ¶ 38, n.23.

[23] The Company categorized an employee as an insider if the employee met any one of the following five criteria.  The employee: (1) is an officer appointed by the Board; (2) holds the title of chief executive officer, chief financial officer, chief operating officer, chief legal officer or senior vice president; (3) reports to the Board; (4) has authority to make Company-wide or strategic decisions, including critical financial decisions; or (5) is in a position to determine his or her own compensation.  Notably, no insider employee of the Debtors is in a position to determine his or her own compensation, which is the responsibility of the Compensation Committee (and, with respect to the CEO, the Board).

Participants with greater certainty about their compensation.  This is expected to help retain 2025

KERP Participants under what remain challenging and uncertain conditions, as it has in prior years.

DelConte Decl. ¶ 32.

45.     The 2025 KERP Annual Award will be paid, (x) with respect to employees with

titles of vice president, (i) 25% on the Company's regular payroll date on or immediately following

October 24, 2025 and (ii) 75% on the Company's regular payroll date on or immediately following

March 13, 2026, and (y) with respect to employees with titles below vice president, (i) 33.3% on

the Company's regular payroll date on or immediately following October 24, 2025 and (ii) 66.7%

on the Company's regular payroll date on or immediately following March 13, 2026.

DelConte Decl. ¶ 33.   Other than for hourly employees, the first payment of the 2025 KERP

Annual Award will be subject to clawback if the applicable 2025 KERP Participant resigns or is

terminated for any reason other than by the Debtors without cause prior to March 13, 2026.

DelConte Decl. ¶ 33.   Any outstanding amounts under the 2025 KERP Annual Award will

accelerate in the event that a 2025 KERP Participant's employment is terminated by the Debtors

without cause after September 30, 2025.  DelConte Decl. ¶ 34.  The total aggregate payment under

the 2025 KERP Annual Award is approximately $14.02 million.  DelConte Decl. ¶ 33.

46.     Consistent with past practice, certain 2025 KERP Participants will receive a 2025

KERP Long-Term Award that substantially replicates the long-term grants awarded under the

Debtors' prior, Court-approved programs and mimics the economic structure of the LTRP grant

that otherwise would have been granted to each eligible 2025 KERP Participant under Purdue's

longstanding compensation practices.  DelConte Decl. ¶ 34.  The amount of such grant will equal

60% of the target LTRP grant that otherwise would have been granted, continuing to reflect a 40%

discount similar to past practice that was negotiated in 2020 and carried forward ever since, subject

only to modest, ordinary course annual base salary increases, and/or base salary increases due to promotions or job responsibility changes. DelConte Decl. ¶ 34. The 2025 KERP Long-Term Award will not be subject to performance metrics. DelConte Decl. ¶ 34.

47.    Payments due under the 2025 KERP Long-Term Awards will be made on the Company's regular payroll date on or immediately following March 13, 2026, subject to clawback if the 2025 KERP Participant resigns or is terminated for any reason other than by the Debtors without cause prior to March 2028. DelConte Decl. ¶ 35. This earlier payment timeframe, combined with a clawback through the customary, historical payment date, was put in place to maximize the effect of the award on employee motivation while maintaining its retentive effect. Setting the payment at 60% of the target LTRP award that otherwise would have been granted is also partially on account of this accelerated payment timing. Outstanding amounts will accelerate in the event of a termination of employment after September 30, 2025 by the Debtors without cause. DelConte Decl. ¶ 35. The aggregate total cost of these 2025 KERP Long-Term Awards for all 2025 KERP Participants is approximately $5.41 million. DelConte Decl. ¶ 35.

48.    In addition, the Debtors have previously used targeted retention awards, including in each year since the commencement of these Chapter 11 Cases, to preserve and maximize the value of the Debtors' estates. DelConte Decl. ¶ 36. Although the Debtors have continued to experience attrition with these programs in place, the evidence supporting the efficacy of these targeted retention awards is clear: as of June 30, 2025, there have been only two voluntary departures among the 2024 targeted retention program participants, demonstrating a 2.0% attrition rate for targeted retention participants compared to approximately 4.0% in the broader Purdue population. DelConte Decl. ¶ 36. The Debtors seek approval of the 2025 Targeted Retention Awards in an aggregate amount of up to $8,100,000. The Debtors propose that $580,000 of such

amount consist of supplemental capacity that the Debtors may deploy to respond to changing business conditions, after consultation with the UCC, AHC and MSGE, which will provide the Debtors with necessary flexibility while containing that flexibility by subjecting any amount spent thereunder to creditor consultation.  DelConte Decl. ¶ 36.  The Debtors have successfully used, or had the ability to use, such supplemental retention capacity to respond to unique, discrete retention needs in consultation with these creditor constituencies in the past.  DelConte Decl. ¶ 36.  The 2025 Targeted Retention Awards will renew the Debtors' previous award programs and allow the Debtors to continue their practice of making targeted retention payments to an identified group of key employees.[24]  As always, the Debtors will endeavor to use only as much of such capacity as is necessary to retain key employees, with a goal of maximizing the value of the Debtors' estates.

49.    The 2025 Targeted Retention Awards will be paid (a) 25% on the Company's regular payroll date on or immediately following December 30, 2025, (b) 25% on the earlier of the Company's date of emergence from bankruptcy or Company's regular payroll date on or immediately following March 30, 2026, and (c) 50% on the earlier of the Company's date of emergence from bankruptcy or Company's regular payroll date on or immediately following June 30, 2026.[25]  DelConte Decl. ¶ 37.  The 2025 Targeted Retention Awards are subject to clawback if the recipient resigns or is terminated for any reason other than by the Debtors without cause before September 30, 2026, and outstanding amounts due will accelerate upon a recipient's termination by the Debtors without cause after September 30, 2025.  DelConte Decl. ¶ 37.

---

[24] The Debtors' management team has identified the employees most likely to require targeted retention payments over the course of this next year.  As business needs fluctuate, some variation in the targeted retention population may occur, though in no event will (a) the aggregate dollar amount of the 2025 Targeted Retention Awards exceed $8,100,000 or (b) any insider receive such an award.

[25] Timing with respect to supplemental capacity may be adjusted in response to applicable business conditions. DelConte Decl. ¶ 38.

C.      Commercial Reasonableness

50.      The 2025 KERP is commercially appropriate and reasonable.  The challenges of operating in chapter 11 present the 2025 KERP Participants with an ongoing, extraordinary burden. Unless the Debtors provide their workforce with appropriate, market compensation, there is a very real risk that employees will depart for other opportunities.  DelConte Decl. ¶ 38. The prior key employee retention programs (including clawbacks that extend through early 2025), along with the senior management team's deep focus on employee well-being and engagement, have held voluntary resignations to 4.0% thus far in 2025.  DelConte Decl. ¶ 38.  However, additional defections among the Debtors' already lean employee base could significantly hamper their operations and diminish the value to be delivered to the Debtors' stakeholders upon emergence. Accordingly, the Company is seeking Court approval to renew its annual compensation programs, so as to continue providing non-insider employees with much-needed certainty regarding their compensation arrangements.  DelConte Decl. ¶ 38.  Moreover, the Debtors continue to endure significant hiring obstacles (in the face of a broadly difficult and competitive market for talent); seventeen headcount positions have opened year to date, joining three positions that opened but were not filled in 2024.  Eleven of these positions remain unfilled, and lateral hiring remains extremely difficult, particularly as the Debtors continue to operate within the confines of these Chapter 11 Cases.  If not for the Company's prior annual compensation programs, the Debtors believe that the attrition rate would have been significantly higher.  DelConte Decl. ¶ 39.  Failure to implement the 2025 KERP could have a devastating effect on the Debtors' ability to retain the individuals they need to maintain their business operations and deliver a successful emergence from these Chapter 11 Cases for all stakeholders.  DelConte Decl. ¶ 39.

51.    The 2025 KERP Annual Award is consistent with the Debtors' historical compensation practices.  The 2025 KERP Annual Award substantially replicates the Company's prepetition and Court-approved annual award programs, subject only to modest, ordinary course annual merit increases.  DelConte Decl. ¶ 39.  Subjecting the first payment to clawback through March 13, 2026 provides a powerful retentive element and mimics the historical payment timing of the Company's prepetition AIP.  DelConte Decl. ¶ 39.  Similarly, the 2025 KERP Long-Term Award substantially replicates the Debtors' longstanding long-term grant program and carries forward the steep discount to past practice that the Court first approved in 2020 (subject to modest, ordinary course year-over-year increases).  DelConte Decl. ¶ 39.  Additionally, the Debtors have preliminarily identified the 2025 KERP Participants most likely to require 2025 Targeted Retention Awards through a detailed, thorough process to identify the roles that are most critical to preserving and maximizing the value of the Debtors' estates.  DelConte Decl. ¶ 39.  The aggregate amount of the 2025 Targeted Retention Awards is consistent with the aggregate amount of prior Court-approved targeted retention programs, which have proven effective at mitigating attrition among selected critical employees.  DelConte Decl. ¶ 39.

52.    In sum, the 2025 KERP compensates key employees in line with the Debtors' market-based historical practices and is critical to retaining the Debtors' employees, who are needed to preserve the value of the Debtors' estates.

### Basis for Relief Requested

I.    **Section 503(c)(1) of the Bankruptcy Code Does Not Bar the Proposed 2025 Compensation Plans**

A.    Section 503(c)(1) Is Not Applicable to the 2025 KEIP Because It Is an Incentive Plan

53.    As the Court has held with respect to all five prior KEIPs approved in these Chapter 11 Cases, section 503(c)(1) of the Bankruptcy Code does not apply to the 2025 KEIP because it is

designed to incentivize, rather than retain, the 2025 KEIP Participants.  The 2025 KEIP carries

forward the terms and the structure of its predecessor programs approved in 2020, 2021, 2022,

2023, and 2024 — all of which the Court held were properly analyzed under section 503(c)(3), and

not section 503(c)(1), of the Bankruptcy Code.  *See* Hr'g Tr., 131:7–20, Sept. 13, 2021 (holding

that that year's key employee incentive plan "is not the type of retentive bonus program that

Congress had in mind in [section] 503(c)(1)"); Hr'g Tr., 24:14–16, Oct. 28, 2020; *see also* Hr'g

Tr., 32:23–33:24, May 18, 2022; HR'g Tr., 43:17–50:1, May 5, 2023; Hr'g Tr., 13:10–13, April

17, 2024.

54.    Section 503(c)(1) of the Bankruptcy Code, with limited exceptions, prohibits a

transfer to an "insider of the debtor for the purpose of inducing such person to remain with the

debtor's business."  This provision, however, does not apply to performance-based incentive plans.

*See In re Hawker Beechcraft, Inc.*, 479 B.R. 308, 313 (Bankr. S.D.N.Y. 2012) ("§ 503(c)(1) does

not prevent a debtor from adopting a plan that rewards insiders for achieving financial or other

targets, rather than for simply remaining in the employment of the debtor, even though the

incentive plan has a retentive effect.").  Under section 503(c)(1), a debtor is required to show, by

a preponderance of evidence, that the key employee incentive plan "is primarily incentivizing and

not primarily retentive."  *In re Residential Capital, LLC*, 478 B.R. 154, 170 (Bankr.

S.D.N.Y. 2012).

55.    A compensation plan that includes "some retentive effect" still passes muster under

section 503(c)(1) where, as here, it is "overall . . . incentivizing in nature."  *In re Dana Corp.*, 358

B.R. 567, 571 (Bankr. S.D.N.Y. 2006); *see also Residential Capital*, 478 B.R. at 171 ("When a

plan is designed to motivate employees to achieve specified performance goals, it is primarily

incentivizing, and thus not subject to section 503(c)(1).").  Courts routinely find that compensation

plans are sufficiently incentivizing if they are "tied . . . to the achievement of particular financial milestones." *See, e.g.*, *In re Borders Grp., Inc.*, 453 B.R. 459, 471–72 (Bankr. S.D.N.Y. 2011). When evaluating whether performance goals are sufficiently challenging, courts do not analyze whether the "targets now appear achievable in hindsight" but rather "review[] a [compensation plan] that was designed to incentivize work," even if "already partially performed." *In re Aralez Pharm. US Inc.*, No. 18-12425 (MG), 2018 WL 6060356, at \*5 (Bankr. S.D.N.Y. Nov. 19, 2018).

56.     Here, the 2025 KEIP primarily incentivizes the 2025 KEIP Participants to achieve performance goals and thus is not prohibited by section 503(c)(1) of the Bankruptcy Code. As set forth above, both components of the 2025 KEIP are incentive-based: payments under the 2025 KEIP Annual Award and 2025 KEIP Long-Term Award are tied to the Company's achievement of the 2025 Performance Metrics with no amounts payable thereunder unless the Company achieves those metrics at least at the threshold level. DelConte Decl. ¶ 16.

57.     The 2025 Performance Metrics feature a similar rubric and were set in a similar manner to the performance metrics under the Court-approved programs in 2020 through 2024, as well as the Company's previous annual corporate objectives. The 2025 Performance Metrics are ambitious, with threshold targets that were set to be difficult to achieve both individually and when considered in the aggregate when approved by the Compensation Committee. Success under these metrics will require the 2025 KEIP Participants' diligent and committed efforts. DelConte Decl. ¶ 20. The 2025 Performance Metrics are tied to the same high-level categories of goals as were the prior programs, including, among other things, financial metrics, Value Creation and Innovation—all of which shape the long-term health of the Debtors' estates. Moreover, many of the same headwinds that resulted in challenges in achieving last year's corporate objectives are still present. DelConte Decl. ¶ 31.

58.     That the Company has already begun striving to achieve the 2025 Performance

Metrics in the time between when the 2025 Performance Metrics were set and the filing of this

Motion renders them no less challenging than when originally designed, which is when their

incentivizing nature is measured.  *See Aralez Pharm.*, 2018 WL 6060356, at *5 (authorizing insider

compensation plan based on the incentivizing nature of performance goals when originally

developed).

59.     Accordingly, the 2025 KEIP should properly be evaluated under section 503(c)(3),

rather than section 503(c)(1), of the Bankruptcy Code.

B.      Section 503(c)(1) Is Not Applicable to the 2025 KERP Because It Does Not
        Include Insiders

60.     As the Court has held with respect to all five prior KERPs approved in these

Chapter 11 Cases, section 503(c)(1) likewise does not bar the 2025 KERP because that plan

includes only non-insiders.  Section 503(c)(1) prohibits "a transfer made to . . . an insider of the

debtor for the purpose of inducing such person to remain with the debtor's business," but it does

not prohibit retention-oriented transfers to non-insiders.  *See In re GT Advanced Techs., Inc.*, No.

14-11916-HJB, 2015 WL 5737181, at *4 (Bankr. D.N.H. Sept. 30, 2015) ("Section 503(c)

distinguishes between those employees who are 'insiders' and those who are not . . . . Section

503(c)(3) relaxes those requirements with respect to non-insiders, requiring only that the proposed

retention payments be 'justified by the facts and circumstances of the case.'").

61.     The Court here has previously held that the Debtors "engage[] in the proper process

to determine whether someone was an insider," Hr'g Tr., 109:19–24, Dec. 4, 2019, and that their

analysis is not "inconsistent with the better recent case law on this issue," Hr'g Tr., 49: 20–24,

July 29, 2021.  Section 503(c)(1), therefore, does not prohibit the 2023 KERP.

## II.    The Proposed 2025 Compensation Plans Represent a Valid Exercise of the Debtors' Business Judgment Under Section 503(c)(3) of the Bankruptcy Code

62.    Both the 2025 KEIP and the 2025 KERP should be approved under section 503(c)(3) of the Bankruptcy Code because each is essential to the success of the Debtors' restructuring efforts and reflects the sound exercise of the Debtors' business judgment.

63.    Section 503(c)(3) of the Bankruptcy Code prohibits certain transfers "that are outside the ordinary course of business and not justified by the facts and circumstances of the case." "Courts have held that the 'facts and circumstances' language of section 503(c)(3) creates a standard no different than the business judgment standard under section 363(b)." *Borders Grp.*, 453 B.R. at 473; *see also In re Velo Holdings Inc.*, 472 B.R. 201, 212 (Bankr. S.D.N.Y. 2012). A debtor satisfies the business judgment standard if it shows that the proposal "is within the fair and reasonable business judgment of the [d]ebtors and thus within the zone of acceptability." *Dana Corp.*, 358 B.R. at 572.

64.    Courts have described the business judgment standard as "deferential," *In re Alpha Nat. Res., Inc.*, 546 B.R. 348, 356 (Bankr. E.D. Va.), *aff'd sub nom. United Mine Workers of Am. 1974 Pension Plan & Tr. v. Alpha Nat. Res., Inc*., 553 B.R. 556 (E.D. Va. 2016), and a "more liberal . . . review," *In re Glob. Home Prods., LLC*, 369 B.R. 778, 783 (Bankr. D. Del. 2007). Additionally, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).

65.    In *In re Dana Corp.*, the court distilled six factors (the "***Dana II* Factors**") for determining whether a compensation proposal satisfies the business judgment test:

(a)    Is there a reasonable relationship between the plan proposed and the results to be obtained, i.e., will the key employee stay for as long as it takes for the debtor to

36

reorganize or market its assets, or, in the case of a performance incentive, is the plan calculated to achieve the desired performance?

(b) Is the cost of the plan reasonable in the context of the debtor's assets, liabilities and earning potential?

(c) Is the scope of the plan fair and reasonable; does it apply to all employees; does it discriminate unfairly?

(d) Is the plan or proposal consistent with industry standards?

(e) What were the due diligence efforts of the debtor in investigating the need for a plan; analyzing which key employees need to be incentivized; what is available; what is generally applicable in a particular industry?

(f) Did the debtor receive independent counsel in performing due diligence and in creating and authorizing the incentive compensation?

358 B.R. at 576–77 (emphasis omitted).  All six *Dana II* Factors weigh in favor of approval of the Debtors' 2025 Compensation Plans.

66.     *First*, with respect to the 2025 KEIP, the Debtors and their advisors designed the plan to incentivize the 2025 KEIP Participants to work diligently to ensure that the Debtors will remain viable and well-positioned to put the value of their estates to use upon emergence.  As described above, the Debtors carefully developed a well-balanced system of 2025 Performance Metrics, which are based on the same rubric as the corporate objectives under prior, Court-approved programs.  Achievement of the 2025 Performance Metrics—which emphasize Value Creation, Innovation and Efficiency, and People and Culture—will enable the Debtors to best deliver value upon emergence for the benefit of all stakeholders and the American public generally. The payments under the 2025 KEIP are directly tied to specific and measurable goals within each of these categories.  There is therefore a clear and reasonable relationship between the 2025 KEIP and the goals that the Debtors seek to achieve.

37

67.     Likewise, the Debtors appropriately tailored the 2025 KERP to encourage non-insider employees to remain in their positions during this critical phase of the bankruptcy process. The proposed 2025 KERP is substantially similar to the retention plans approved by the Court in 2020 through 2024, each of which was in turn modeled on the Prepetition Compensation Plans. The 2025 KERP would provide the market levels of compensation necessary to retain the Debtors' key employees.   Gartrell Decl. ¶ 37.   Moreover, the Gartrell Declaration confirms that the compensation provided under the 2025 KERP is in line with similarly sized, non-debtor pharmaceutical companies.   Gartrell Decl. ¶ 43.   With a year-to-date annualized voluntary turnover rate of 4.0% and an already lean employee base, the Debtors cannot risk reducing the resources devoted to keeping key employees in their positions through the conclusion of these Chapter 11 Cases.  DelConte Decl. ¶ 39.  Each component of the 2025 KERP, including the 2025 Targeted Retention Awards, renews an essential and expiring program that helped mitigate attrition.  A *reduction* in compensation would create a severe risk that the Debtors could experience an increased level of attrition that would be devastating to their business.

68.     *Second*, the 2025 KEIP is reasonable in the context of the Debtors' assets, liabilities and earning potential.  The absolute maximum dollar cost of the 2025 KEIP is approximately $6.71 million, which represents 1.19% of the Debtors' projected 2025 revenue.  Gartrell Decl. ¶ 29.  This cost places the 2025 KEIP in line with market standards for comparably sized companies in bankruptcy; compared to similarly sized companies in chapter 11 proceedings, the 2025 KEIP, as measured by maximum absolute dollar cost, is positioned between the market 50th and 75th percentiles.  Gartrell Decl. ¶ 31.  Moreover, the aggregate cost of compensation for the 2025 KEIP Participants is consistent with the costs of the Debtors' prior, Court-approved programs, which included concessions that were painstakingly negotiated with key creditor constituencies.  WTW's

analysis benchmarking the 2025 KEIP's target (maximum) cost to the key employee incentive plans of comparable debtors is summarized in **Table 5** below:

**TABLE 5**

| Aggregate Cost vs. Comparable Debtors | Purdue 2025 KEIP Annual and Long-Term Awards (Target/Max) | Market 50th Percentile | | Market 75th Percentile | | Market 90th Percentile | |
|---|---|---|---|---|---|---|---|
| | | Target | Max | Target | Max | Target | Max |
| **$000s** | $6,708 | $3,800 | $5,100 | $9,700 | $14,600 | $14,300 | $27,300 |
| **Percentage of Revenue[26]** | 1.19% | 0.47% | 0.61% | 0.72% | 1.01% | 1.09% | 1.65% |

69.    The costs of the 2025 KERP are also reasonable in the context of the Debtors' assets, liabilities and earning potential.  The cost of the 2025 KERP Annual Award plus the 2025 KERP Long-Term Award is approximately $19.4 million, which represents 3.46% of projected 2025 revenue, and the maximum, aggregate cost of the 2025 Targeted Retention Awards is $8.10 million (comprised of a $7.52 million baseline retention component and $580,000 of supplemental capacity, as described above), which represents 1.44% of revenue.  Gartrell Decl. ¶ 46. Moreover, as detailed in the Debtors' most recent Monthly Operating Report, the company has a current cash balance of approximately $1.7 billion. These aggregate costs and ratios are similar to the costs of the equivalent elements of the prior, Court-approved programs and the Debtors' previous compensation arrangements for the same categories of employees.

70.    While the cost-to-revenue ratios for the various components of the 2025 KEIP and 2025 KERP are above market, the facts and circumstances of these Chapter 11 Cases justify the costs.  The Debtors continue to manage through significant reputational challenges and a uniquely

---

[26] For percentage of revenue in all instances, WTW used projected net revenue of $562 million based on the Board-approved budget for 2025.

complex restructuring, all of which have depressed employee morale and made the Debtors' unceasing efforts to retain key employees more challenging. Cumulative attrition has resulted in high workloads on the remaining employees. Continuing to mitigate attrition is vital to preserving the value of the Debtors' estates. In this context, providing appropriate compensation, even at larger-than-normal percentages of revenue, is reasonable and beneficial to all stakeholders. As with the KEIP discussed above, although the target KERP award as a percentage of revenue is now above the 90th percentile due to the Debtors' decline in revenues since the commencement of these Chapter 11 Cases, the absence or decrease of incentive opportunities for the 2025 KERP Participants would significantly undermine the Debtors' ability to provide competitive compensation to the non-insider population. Gartrell Decl. ¶ 45. The 2025 KERP will result in total direct compensation (as defined in the Gartrell Declaration) that remains competitive with the 50th percentile for relevant groups of 2025 KERP Participants, as shown below.

**TABLE 6**

| Employee Group | No. | Variance to Market TDC (Purdue Target TDC; Base +KERP) | | | Variance to Market TDC (Purdue Target TDC + Targeted Retention) | | | Variance to Market TDC (Purdue Base Only) | | | Memo: Variance to Market TDC Last Year (2024) (Purdue Target TDC) | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | P25 | P50 | P75 | P25 | P50 | P75 | P25 | P50 | P75 | P25 | P50 | P75 |
| Non-Insider (Executive Survey) | 38 | 17% | -11% | -30% | 37% | 4% | -19% | -25% | -42% | -54% | 18% | -11% | -31% |
| Non-Insider (Middle Management and Professional Survey) | 283 | 6% | -7% | -20% | 8% | -6% | -19% | -7% | -19% | -30% | 4% | -10% | -21% |

**TABLE 7**

| Aggregate Cost vs. Comparable Debtors | Purdue 2025 KERP Annual and Long-Term Awards | Market 50th Percentile | Market 75th Percentile | Market 90th Percentile |
|---|---|---|---|---|
| **$000s** | $19,425 | $8,900 | $24,100 | $36,300 |
| **Percentage of Revenue** | 3.46% | 0.76% | 1.38% | 1.93% |
| **$000s Cost per Person** | $45.5 | $37.3 | $50.4 | $75.7 |

**TABLE 8**

| Aggregate Cost vs. Comparable Debtors | Purdue 2025 Targeted Retention Awards | Market 50th Percentile | Market 75th Percentile | Market 90th Percentile |
|---|---|---|---|---|
| **$000s** | $8,100 | $2,400 | $3,600 | $8,500 |
| **Percentage of Revenue** | 1.44 % | 0.24% | 0.43% | 0.74% |

71.     *Third*, the 2025 KEIP is fair and reasonable and does not discriminate unfairly.  The 2025 KEIP Participants (except for the newly promoted CFO) participated in the Debtors' 2024 KEIP and the process for setting performance metrics and the nature of those performance metrics are similar to those with respect to the compensation programs that the Court previously approved.

72.     The 2025 KERP is also fair and reasonable.  Consistent with past practice, all employees (other than the 2025 KEIP Participants) who would have been eligible to participate in the Debtors' Prepetition Compensation Plans (approximately 427 employees) are 2025 KERP Participants.  DelConte Decl. ¶ 31.  Considering the Debtors' current headcount, retaining the 2025 KERP Participants is critical to the Debtors' ability to survive this restructuring and remain viable in the long term.

73.     *Fourth*, the Debtors engaged WTW, just as they did in connection with the design and development of their prior Court-approved programs, to ensure that both the 2025 KEIP and 2025 KERP are in line with market standards for comparably sized companies in bankruptcy.  As it has done in the past, WTW assessed recent key employee incentive programs and continuations of broad-based programs and undertook an extensive analysis to identify market standards. Gartrell Decl. ¶ 3.   WTW also compared the compensation of the 2025 KEIP Participants (assuming approval of the 2025 KEIP) to compensation at similar pharmaceutical companies that participated in its 2024 BioPharma and Life Sciences Executive Compensation Survey Report.

74.     This benchmarking against Purdue's non-debtor peers provides essential insight into the reasonableness of the 2025 KEIP's cost.  Indeed, the Court here has emphasized that compensation of similar executives at peer pharmaceutical companies outside of the chapter 11 context is an important reference point for determining the reasonableness of a key employee incentive plan.  *See* Hr'g Tr., 22:21–25, Oct. 28, 2020 (explaining "that it is important to focus as much, if not more, on whether the plan is consistent with . . . industry specific standards as opposed to bankruptcy case specific standards").   The Debtors—their senior management team and directors, along with their compensation consultants at WTW—continue to be guided by this principle.

75.     The results of this benchmarking analysis are shown in **Table 9** below, along with a comparison against the benchmarks performed last year:

TABLE 9

| Title | Variance to Market Target TDC | | | | | | | | |
| | Purdue Base + KEIP | | | Purdue Base + KEIP (2024) | | | Purdue (Base Only) | | |
| | P25 | P50 | P75 | P25 | P50 | P75 | P25 | P50 | P75 |
| President and CEO | 214% | -24% | -34% | 162% | -12% | -38% | 58% | -62% | -67% |
| EVP, CLO, Strategy and Corporate Affairs | 308% | 144% | 61% | 236% | 147% | 48% | 97% | 18% | -22% |
| EVP and CFO | 61% | -44% | -54% | -- | -- | -- | -22% | -73% | -77% |
| *Former CFO* | -- | -- | -- | 104% | -5% | -26% | -- | -- | -- |

76.     The market positioning of each continuing 2025 KEIP Participant's total direct compensation remains reasonable.  The CEO's compensation remains at the lower end of the competitive range of market below median, notwithstanding his stewardship of the Debtors during these unprecedented Chapter 11 Cases, along with the vital role he has played in maximizing the value of the Debtors' estates for the benefit of their stakeholders.  The CFO's compensation is below the competitive range of market median direct total compensation. And while the CLO's compensation continues to exceed the market rate for an ordinary pharmaceutical company of Purdue's size, so too do his responsibilities.  The CLO's compensation is appropriate given the other opportunities available to him and in light of his recent promotion and incremental responsibilities, as well as his qualifications, which the Debtors continue to believe are necessary for overseeing this extraordinarily complex legal situation.

77.     Finally, WTW has also verified that the 2025 Performance Metrics are consistent with typical practices generally, and with practices in the pharmaceutical industry specifically. Gartrell Decl. ¶ 32.

78.     The Debtors determined that the cost of the 2025 KERP relative to market standards is justified by the need to maintain manageable levels of employee attrition and because, when

considered in the context of the 2025 KERP Participants' base pay, the 2025 KERP is necessary to bring the total direct compensation of the 2025 KERP Participants in line with the total direct compensation provided to similarly situated employees of other pharmaceutical companies. Gartrell Decl. ¶ 45.  The 2025 KERP Participants' total direct compensation (including the 2025 KERP) remains competitive with the 50th percentile range of the market with respect to both non-insider executives and middle management.  Gartrell Decl. ¶ 45.

79.    *Fifth*, as it has in the past, the Compensation Committee engaged in a rigorous process to develop—and recommend that the full Board approve—the 2025 KEIP and 2025 KERP, including thorough due diligence regarding their proposed terms.  DelConte Decl. ¶ 20; Gartrell Decl. ¶ 12.  Additionally, the proposed 2025 KEIP and 2025 KERP are both essentially identical to the compensation programs that the Court approved in each of the last five years. Those plans, in turn, closely followed the Debtors' Prepetition Compensation Plans, which have "satisfied the independent 'test of time'" and previously withstood the Court's scrutiny.  *Glob. Home Prods.*, 369 B.R. at 786 (emphasizing the "nearly identical" nature of the previously used and proposed plans under the business judgment standard); *see also In re Navillus Tile, Inc.*, No. 17-13162 (SHL), Hr'g Tr., 11:18–24, Feb. 28, 2018 (approving payments that were "part of the normal compensation scheme that people have had prior to the bankruptcy" and "reflect[] the normal way that the debtor did business" prepetition, rather than bonuses that were "created through the bankruptcy case").  In authorizing the 2023 programs, the Court found that "this has been an issue that has been brought before the Court on numerous instances, and I think it has satisfied the independent test of time."  Hr'g Tr., 48:14–17, May 5, 2023.  Similarly, in authorizing the 2024 programs, the court found that "the proposed 2024 KEIP and KERP are both essentially

identical to the compensation programs that were approved in the last four years."  Hr'g Tr., 15:23–25, April 17, 2024.

80.    *Lastly*, the Compensation Committee and the Debtors' senior management team worked closely with WTW to design the 2025 Compensation Plans, including consulting with WTW to assess market positioning relative to peer non-debtor pharmaceutical companies and comparable chapter 11 debtors.  Gartrell Decl. ¶ 11.  This rigorous process—all subjected to final approval by the full Board—and thorough consideration of advice from outside experts regarding the 2025 Compensation Plans support the conclusion that their approval represents a reasonable business judgment on the part of the Debtors.

81.    For all of the aforementioned reasons, the Debtors exercised sound business judgment when developing the 2025 KEIP and 2025 KERP, and respectfully submit that they satisfy the requirements of section 503(c)(3) of the Bankruptcy Code.

### III.    The Proposed 2025 Compensation Plans Represent a Valid Exercise of the Debtors' Business Judgment Under Section 363(b)(1) of the Bankruptcy Code

82.    The 2025 Compensation Plans can also be approved under section 363(b)(1) of the Bankruptcy Code, which empowers the Court to authorize a debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate."  To approve the use of estate property under section 363(b)(1), the Second Circuit requires a debtor to show that the decision to use the property outside of the ordinary course of business was based on the debtor's sound business judgment in light of "all salient factors" relating to the bankruptcy case.  *Comm. of Equity Sec. Holders v. Lionel Corp.* (*In re Lionel Corp.*), 722 F.2d 1063, 1071 (2d Cir. 1983) ("The rule we adopt requires that a judge determining a § 363(b) application expressly find from the evidence presented before him at the hearing a good business reason to grant such an application."); *In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989); *see also In re MF Glob. Inc.*,

467 B.R. 726, 730 (Bankr. S.D.N.Y. 2012) ("Although not specified by section 363, the Second Circuit requires that transactions under section 363 be based on the sound business judgment of the debtor or trustee.").

83.     As set forth above, the Debtors have shown that the 2025 Compensation Plans represent reasonable exercises of their sound business judgment and are thus permitted under section 363(b)(1) of the Bankruptcy Code.  The 2025 Compensation Plans are essentially identical to predecessor programs approved by the Court, which themselves were consistent with the Debtors' prepetition compensation practices.  The 2025 KEIP and 2025 KERP, like the programs on which they are based, were developed with the assistance of independent experts and with market benchmarks front of mind.  Both the 2025 KEIP and the 2025 KERP are necessary to the Debtors' continuing ability to operate and to preserving the value of the Debtors' estates. DelConte Decl. ¶ 40.  Without the 2025 Compensation Plans, the Debtors would face serious risk of unsustainable attrition among their key employees—a problem compounded by the Debtors' particular difficulty in attracting new employees and by hiring issues across the pharmaceutical sector more broadly.  DelConte Decl. ¶ 39; Gartrell Decl. ¶ 41.  If allowed to come to pass, this combination would threaten the viability of the Debtors' estates.  The Debtors therefore believe that it is critical to renew their longstanding compensation practices in the form of these 2025 Compensation Plans.  DelConte Decl. ¶ 40.

### Notice and No Prior Request

84.     Notice of this Motion will be provided to (a) the entities on the Master Service List (as defined in the *Second Amended Order Establishing Certain Notice, Case Management, and Administrative Procedures* [ECF No. 498] and available on the Debtors' case website at https://restructuring.ra.kroll.com/purduepharma) and (b) any person or entity with a particularized

interest in the subject matter of this Motion (together with the entities on the Master Service List,

the "**Notice Parties**").  The Debtors respectfully submit that no further notice is required.

85.     No prior motion for the relief requested herein has been made in this or any other

Court.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request that the

Court (i) enter the proposed order authorizing the Debtors to implement the 2025 KEIP and the

2025 KERP and (ii) grant such other and further relief as is just and proper.

Dated: August 14, 2025
      New York, New York

DAVIS POLK & WARDWELL LLP

*/s/ Darren S. Klein*
_____

450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
James I. McClammy
Eli J. Vonnegut
Darren S. Klein

*Counsel to the Debtors*
*and Debtors in Possession*

**<u>Exhibit A</u>**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | **Chapter 11** |
| **PURDUE PHARMA L.P.,** *et al.*, | **Case No. 19-23649 (SHL)** |
| **Debtors.**[1] | **(Jointly Administered)** |

## ORDER AUTHORIZING THE DEBTORS TO IMPLEMENT 2025 KEY EMPLOYEE INCENTIVE PLAN AND 2025 KEY EMPLOYEE RETENTION PLAN

Upon the motion (the "**Motion**")[2] of Purdue Pharma L.P. and its affiliates that are debtors

and debtors in possession in these cases (collectively, the "**Debtors**") for entry of an order

(this "**Order**") approving and authorizing the 2025 KEIP and 2025 KERP, as more fully set forth

in the Motion; and upon the DelConte Declaration and the Gartrell Declaration; and the Court

having jurisdiction to consider the matters raised in the Motion pursuant to 28 U.S.C. §§ 157(a),

(b) and 1334(b) and the *Amended Standing Order of Reference M-431*, dated January 31, 2012

(Preska, C.J.); and consideration of the Motion and the relief requested therein being a core

proceeding under 28 U.S.C. § 157(b); and venue being proper before the Court pursuant to 28

U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided to the

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Purdue Products L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

[2] Capitalized terms used but otherwise not defined herein will have the meanings set forth in the Motion.

Notice Parties, and it appearing that no other or further notice need be provided; and the Court having reviewed the Motion and held a hearing to consider the relief requested in the Motion (the "**Hearing**"); and, after due deliberation, the Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish good and sufficient cause for the relief granted herein; and the Court having determined that the relief requested in the Motion is in the best interests of the Debtors, their creditors, their estates and all other parties in interest; and all objections to the Motion, if any, having been withdrawn, resolved or overruled; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor;

**IT IS HEREBY ORDERED THAT**:

1. Pursuant to sections 363(b)(1) and 503(c)(3) of the Bankruptcy Code, the Motion is granted as set forth herein.

2. The 2025 KEIP is approved in its entirety.

3. The 2025 KERP is approved in its entirety.

4. The Debtors are authorized, but not directed, to take all actions necessary to implement the 2025 KEIP on the terms and conditions set forth in the Motion, including making any payments pursuant to the terms of the 2025 KEIP.

5. The Debtors are authorized, but not directed, to take all actions necessary to implement the 2025 KERP on the terms and conditions set forth in the Motion, including making any payments pursuant to the terms of the 2025 KERP.

6. Once earned, the Debtors' obligations to pay amounts that become due and owing under the 2025 KEIP shall constitute administrative expenses pursuant to section 503(b) of the

Bankruptcy Code, thereby entitled to priority payment pursuant to section 507(a)(2) of the Bankruptcy Code.

7.        Once earned, the Debtors' obligations to pay amounts that become due and owing under the 2025 KERP shall constitute administrative expenses pursuant to section 503(b) of the Bankruptcy Code, thereby entitled to priority payment pursuant to section 507(a)(2) of the Bankruptcy Code.

8.        Nothing in this Order nor any action taken by the Debtors in furtherance of the implementation hereof shall be deemed to constitute an assumption or rejection of any executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code, and all of the Debtors' rights with respect to such matters are expressly reserved.

9.        Notwithstanding the relief granted herein and any actions taken hereunder, nothing contained herein shall (a) create, nor is it intended to create, any rights in favor of, or enhance the status of any claim held by, any person or entity or (b) be deemed to convert the priority of any claim from a prepetition claim into an administrative expense claim.

10.       Nothing in this Order nor the Debtors' payment of claims pursuant to this Order shall be construed as or deemed to constitute (a) an agreement or admission by the Debtors as to the validity of any claim against the Debtors on any ground, (b) a grant of third-party beneficiary status or bestowal of any additional rights on any third party, (c) a waiver or impairment of any rights, claims, or defenses of the Debtors' rights to dispute any claim on any ground, (d) a promise by the Debtors to pay any claim, or (e) an implication or admission by the Debtors that such claim is payable pursuant to this Order.

11.       For the avoidance of doubt, to the extent that any 2025 KEIP Participant or 2025 KERP Participant is (a) determined by a final order of this Court or any other court of competent

jurisdiction to have (x) knowingly participated in any criminal misconduct in connection with his or her employment with the Debtors or (y) been aware, other than from public sources, of acts or omissions of others that such participant knew at the time were fraudulent or criminal with respect to the Company's commercial practices in connection with the sale of opioids and failed to report such fraudulent or criminal acts or omissions internally at the Company or to law enforcement authorities at any time during his or her employment with the Company, or (b) believed by the Company based on reasonable inquiry (including inquiry of its attorney and advisors), which inquiry shall be completed prior to any payments being made to the applicable participant, to have met either of the standards in the foregoing clauses (a)(x) or (y), then in either case such participant shall not be eligible to receive any payments approved by this Order. All parties' rights, if any, to seek disgorgement of payments following the entry of any final order referred to in clause (a) of the foregoing sentence are reserved. The CEO shall not take any action with respect to his compensation under the 2025 KEIP with the intent or material effect of frustrating enforcement of any potential judgment of the Court in these Chapter 11 Cases or any other actions pending against him in any other court or jurisdiction with respect to such amounts.

12.     Any Bankruptcy Rule (including, but not limited to, Bankruptcy Rule 6004(h)) or Local Rule that might otherwise delay the effectiveness of this Order is hereby waived, and the terms and conditions of this Order shall be effective and enforceable immediately upon its entry.

13.     The contents of the Motion and the notice procedures set forth therein are good and sufficient notice and satisfy the Bankruptcy Rules and the Local Bankruptcy Rules for the Southern District of New York, and no other or further notice of the Motion or the entry of this Order shall be required.

14.     The Debtors are authorized to take all such actions as are necessary or appropriate to implement the terms of this Order.

15.     The Court shall retain exclusive jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

White Plains, New York
Dated: _____, 2025

_____
THE HONORABLE SEAN H. LANE
UNITED STATES BANKRUPTCY JUDGE

**<u>Exhibit B</u>**

**DelConte Declaration**

.S.DAVIS POLK & WARDWELL LLP

450 Lexington Avenue

New York, New York 10017

Telephone: (212) 450-4000

Facsimile: (212) 701-5800

Marshall S. Huebner

James I. McClammy

Eli J. Vonnegut

Darren S. Klein

*Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | **Chapter 11** |
| **PURDUE PHARMA L.P., *et al.*,** | **Case No. 19-23649 (SHL)** |
| **Debtors.**[1] | **(Jointly Administered)** |

## DECLARATION OF JESSE DELCONTE IN SUPPORT OF THE MOTION OF DEBTORS FOR ENTRY OF AN ORDER AUTHORIZING IMPLEMENTATION OF 2025 KEY EMPLOYEE INCENTIVE PLAN AND 2025 KEY EMPLOYEE RETENTION PLAN

I, Jesse DelConte, being fully sworn, hereby declare that the following is true to the best

of my knowledge, information and belief:

1.        I have held the position of Partner and Managing Director at AlixPartners, LLP

("**AlixPartners**") a corporate advisory and restructuring firm that has its principal office at 909

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Purdue Products L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014).  The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

Third Avenue, Floor 30, New York, New York 10022, since January 2021. I also served as a

Director at AlixPartners from 2018 to 2020. Prior to AlixPartners purchasing Zolfo Cooper, LLC

("**Zolfo Cooper**") in 2018, I was employed by Zolfo Cooper, a financial advisory and interim

management company that provided restructuring services to companies and their stakeholders,

for ten years.  During the last three years that I was employed by Zolfo Cooper, I served as a Senior

Director.  During this time, I advised numerous companies through successful in-court and out-of-

court restructurings, where I was responsible for all aspects of the restructuring, including cash

flow forecasting, business plan development, lender negotiations, the liquidation analysis and U.S.

trustee and other reporting requirements.  Prior to Zolfo Cooper, I spent approximately five years

as an analyst at Seneca Financial Group, Inc., where I provided restructuring advisory services to

companies, lenders, and trustees as well as litigation support services to various litigants.

2.    Since 2003, I have served as an advisor in the transformation, turnaround, and

restructuring of numerous stagnant or underperforming companies, advising management teams,

boards of directors, equity sponsors, and creditor constituents across numerous industries,

including life sciences, airlines, retail/apparel, technology, energy, automotive, industrial and

business services, and industrial manufacturing.  During the course of my career, I have been

involved in representing companies and constituents in numerous large and complex restructurings

in which I served a lead role, including, but not limited to, NanoString Technologies, Inc., Case

No. 24-10160 (CTG) (Bankr. D. Del. 2024); Clovis Oncology, Inc., Case No. 22-11292 (JKS)

(Bankr. D. Del. 2022); GOL Linhas Aereas Inteligentes S.A., Case No. 24-10118 (MG) (Bankr.

S.D.N.Y. 2024); FullBeauty Brands Holdings Corp., Case No. 19-22185 (RDD) (Bankr. S.D.N.Y.

2019); Aearo Technologies LLC, Case No. 22-02890-JJC-11 (Bankr. S.D. Ind. 2022); and Endo

International plc, Case No. 22-22549 (Bankr. S.D.N.Y. 2022). I received a B.S. with Distinction,

Commerce from the University of Virginia in 2003 and hold the Chartered Financial Analyst designation.

3.      Since March 5, 2019, AlixPartners has been one of the principal advisors to the Debtors' main operating entity, Purdue Pharma L.P. ("**Purdue Pharma**," and together with all Debtors, "**Purdue**" or the "**Debtors**"), and today, to all of the Debtors. As an advisor to the Debtors, I am actively involved in the Debtors' operations and have been working collaboratively with PJT Partners and Davis Polk & Wardwell LLP ("**Debtors' Other Restructuring Advisors**," collectively with AlixPartners, "**Debtors' Restructuring Advisors**") to advise the Debtors on decisions related to the Debtors' business operations and the impacts of the Debtors' ongoing restructuring activities.

4.      In the six years that my team and I have been working with the Debtors, we have assisted management and the Debtors' Other Restructuring Advisors on a number of different work streams. I, and the members of my team, work closely with the Debtors' management, board members, executive committee members and employees. In the course of my work, I have frequent conversations with the Debtors' employees, senior management, including Purdue Pharma's chief executive officer, chief financial officer and chief legal officer, board members and executive committee members.  I attend regular meetings with key executives regarding the Debtors' bankruptcy process and ongoing operations and regularly join board and committee meetings.  As a result, I am familiar with, among other things, the Debtors operations and budgeting processes. I have also been deeply involved in the process leading to the approval of key employee incentive plans and key employee retention plans in prior years, including assisting the company analyzing such programs at the employee level and negotiating changes to such programs with key creditor constituencies and regularly joining meetings of the Compensation Committee.  I am playing a

similar role with respect to the proposed programs this year.  I am therefore familiar with the structure and design process of such programs.

5.       I submit this declaration (this "**Declaration**") in further support of the *Motion of Debtors for Entry of an Order Authorizing Implementation of 2025 Key Employee Incentive Plan and 2025 Key Employee Retention Plan* (the "**Motion**"). [2]  I am authorized to submit this Declaration on behalf of the Debtors.

6.       Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by other employees of the Company and WTW, or my opinion based upon experience, knowledge and information concerning the operations of the Debtors.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.

## The Proposed 2025 Compensation Plans

7.       The Debtors now seek approval of their sixth annual key employee incentive plan (the "**2025 KEIP**") and key employee retention plan (the "**2025 KERP**" and, together with the 2025 KEIP, the "**2025 Compensation Plans**").   The 2025 Compensation Plans, like the longstanding and Court-approved programs on which they are based, are intended to preserve the value of the Debtors' businesses by allowing them to pay market-competitive compensation to motivate the Company's workforce and minimize attrition.

8.       The 2025 KEIP, like its predecessor programs, includes an incentive-based, annual award payable in 2026.  The 2025 KEIP also provides for an incentive-based, long-term grant payable in 2026 and subject to clawback through March 2028.

---

[2] Capitalized terms used and not otherwise defined herein have the meanings ascribed to them in the Motion.

9.      The 2025 KERP, like its predecessor programs, includes an annual retention award payable in 2025 (subject to clawback through March 2026 for eligible salaried employees) and 2026, a long-term retention grant payable in 2026 and subject to clawback through March 2028 for eligible salaried employees, and additional targeted retention payments for certain employees.

10.     The Compensation Committee and the Debtors' senior management team have again worked closely with WTW, their independent compensation consultant, to benchmark the Debtors' employee compensation against the market.

11.     The Debtors' employees are shouldering substantial burdens.  Historical attrition has exacerbated the workloads of those employees that remain, all of whom must continue to operate a complex pharmaceutical business in the midst of these protracted Chapter 11 Cases.  The Company maintains lean operations, and in the face of still-present challenges throughout the labor market, the Debtors have struggled to timely fill open positions.  Indeed, 17 positions have opened at the Company year to date, joining 3 open positions that were not filled by the end of 2024. Of the 20 total positions, 11 remain unfilled.  The 9 filled positions remained vacant, on average, for 68 days.[3]

12.     The 2025 Compensation Plans substantially replicate the Company's prior annual programs and remain consistent with the Debtors' historical compensation practices.  I believe that departing from past practice would likely make it much more difficult for the Debtors to retain employees who are necessary to maintain business operations.  I also believe that the 2025 Compensation Plans are reasonably tailored and necessary to realize the Debtors' objective of a successful emergence from chapter 11.

---

[3] Unless otherwise indicated, the employment data referenced herein are current as of June 30, 2025.

## The Proposed 2025 KEIP

### *The 2025 KEIP Participants*

13.     The proposed 2025 KEIP would apply to (i) the Debtors' President and Chief Executive Officer (the "**CEO**"); (ii) the Debtors' newly promoted Executive Vice President and Chief Financial Officer (the "**CFO**"); and (iii) the Debtors' recently promoted Chief Legal Officer, Executive Vice President, Strategy and Corporate Affairs (the "**CLO**") (together with the CEO and CFO, the "**2025 KEIP Participants**").

14.     The expertise, skills, and institutional knowledge of the 2025 KEIP Participants will be essential to continuing to guide the Debtors through their novel restructuring and maximizing the value of the Debtors' estates.  The 2025 KEIP Participants perform essential functions for the Debtors, including providing critical management and legal services, and are responsible for helping determine the Debtors' strategic plan and facilitating the achievement of the Debtors' goals.  Their workloads are anticipated to be high, both as a result of the prolongation of these Chapter 11 Cases and historical attrition throughout the Company.  Moreover, I believe that their leadership will be particularly critical this year in supporting employee morale. Because the 2025 KEIP Participants continue to make extraordinary efforts to maximize the value of the Debtors' businesses and shepherd the Company through its restructuring, the Compensation Committee, and the Board believe that appropriately incentivizing the three 2025 KEIP Participants is necessary to ensure optimal recoveries for all stakeholders.

15.     None of the 2025 KEIP Participants will be eligible to participate in the proposed 2025 KERP (including the 2025 Targeted Retention Awards, as defined below), and the purpose of the proposed 2025 KEIP is to incentivize the 2025 KEIP Participants.

*The 2025 KEIP Structure*

16.    Each 2025 KEIP Participant will receive (i) an annual award (the "**2025 KEIP Annual Award**") and (ii) a long-term incentive compensation grant (the "**2025 KEIP Long-Term Award**"), which are collectively designed to replicate the Debtors' historical compensation practices and renew their prior, Court-approved programs, subject to the material reductions negotiated in 2020 and carried forward ever since.  The 2025 KEIP Annual Award and 2025 KEIP Long-Term Award have target values, which are also their maximum values, set forth in **Table 1** below.  All payments under the 2025 KEIP will be tied to the Debtors' achievement of corporate objectives (as discussed in more detail below, the "**2025 Performance Metrics**") at threshold or target performance levels, as applicable, with straight-line interpolation to be used if actual performance falls between those amounts.  The 2025 KEIP Participants will not receive any payments under the 2025 KEIP should the Company fail to achieve the 2025 Performance Metrics at the threshold level.  The maximum cost of the 2025 KEIP would be approximately $6.71 million.

**TABLE 1**

| 2025 KEIP Participant | Target 2025 KEIP Annual Award | Target 2025 KEIP Long-Term Award | Total Target 2025 KEIP Award |
|---|---|---|---|
| **President and Chief Executive Officer** | $2,612,300 | $566,318 | $3,178,618 |
| **Chief Legal Officer Executive Vice President, Strategy and Corporate Affairs** | $2,089,000 | $600,218 | $2,689,218 |
| **Executive Vice President and Chief Financial Officer** | $600,000 | $240,000 | $840,000 |
| **Total** | **$5,301,300** | **$1,406,536** | **$6,707,836** |

17.     Subject to achievement of the 2025 Performance Metrics at a threshold level, and subject to each 2025 KEIP Participant's continued employment through the payment date (other than as provided below), the 2025 KEIP Annual Award will be paid on the Company's regular payroll date on or immediately following March 13, 2026.  A termination of employment by the Debtors without cause after September 30, 2025 will trigger acceleration at the target value, subject to clawback if performance is later scored below target (such clawback to occur by March 13, 2026).  In the event of a termination of employment by the Debtors without cause on or prior to September 30, 2025, no payment will be due.

18.     Consistent with Purdue's longstanding compensation practices, each 2025 KEIP Participant will also receive a 2025 KEIP Long-Term Award, which is designed to mimic the economic structure of the LTRP grant that the participant otherwise would have received in 2025.[4] In connection with seeking approval of the long-term incentive compensation grant component of the 2020 KEIP, the Debtors agreed to a 52.25% aggregate reduction from historical practice and to subject the award to acceleration upon emergence.  That discount was carried forward for the long-term incentive compensation grant components of the 2021, 2022 (and, with respect to the CEO and CLO), 2023, and 2024 KEIPs while switching to nearer-term payment dates, subject to a clawback through the historical payment date, rather than acceleration upon emergence. Similar to 2023 and 2024, in an effort to reach consensus with key creditor constituencies, an additional consensual reduction of the CEO's 2025 KEIP Long-Term Award by a further $352,000 has also

---

[4] The 2025 KEIP Long-Term Award is intended to replicate the Company's prepetition Long-Term Results Plan, which provided for incentive grants that would accrue and be payable over a three-year performance period.  In 2021, in connection with seeking stakeholder approval of that year's compensation programs, Purdue agreed to pay its long-term award the following year, with a clawback in place over the course of what would have been a three-year performance period.  As they did in previous years, the Debtors seek once more to replicate this structure and payment timing, with an award payable in 2026 and subject to clawback through the date on which payments would otherwise have been made in 2028.

been applied this year. Such discounts are reflected in the amounts set forth in **Table 1** (above) with respect to the CEO and CLO, as applicable, while the CFO will be subject to the same 40% reduction as all other employees, consistent with the 40% reduction approved last year for the former CFO. As in prior years, payment for the 2025 KEIP Long-Term Award will be made on the Company's regular payroll date on or immediately following March 13, 2026, subject to clawback if the 2025 KEIP Participant resigns or is terminated for any reason other than by the Debtors without cause prior to March 2028. As with the 2025 KEIP Annual Award, termination of employment without cause after September 30, 2025 will accelerate the 2025 KEIP Long-Term Award at target, subject to clawback by March 13, 2026, for any amount that would not otherwise have been paid if target performance is not met. Payouts will be tied to the same 2025 Performance Metrics that apply to the 2025 KEIP Annual Award and therefore will depend solely on the Company's performance in 2025.[5]

### The 2025 Performance Metrics

19.    Consistent with the Company's longstanding practice of approving performance metrics early in each calendar year, the Compensation Committee recommended, and the Board approved, the 2025 Performance Metrics in the first quarter of 2025, with guidance from WTW. The Company consulted with the UCC, AHC and MSGE regarding the 2025 Performance Metrics.

20.    The 2025 Performance Metrics are based on the same three strategic pillars that have long defined the Debtors' corporate objectives: Value Creation (representing 50% of the 2025 Performance Metrics), Innovation and Efficiency (40% of the 2025 Performance Metrics), and

---

[5] Given that the 2023 KEIP Long-Term Award is paid on an accelerated schedule subject to a clawback through historical payment timing, only 2023 performance will have been determined at the time of payment. In addition, as it has in each of the prior three performance periods, the Compensation Committee determined that it was in the best interest of the Debtors to apply only the 2023 Performance Metrics, rather than performance metrics for a three-year period, to pay under the 2023 KEIP Long-Term Awards, under present circumstances.

People and Culture (10% of the 2025 Performance Metrics). The 2025 Performance Metrics are ambitious, with threshold targets that were set to be difficult to achieve both individually and in the aggregate when approved by the Compensation Committee, and will continue to require the 2025 KEIP Participants' diligent and committed efforts.  The 2025 Performance Metrics were developed using the same rigorous internal process that the Debtors have long used to identify and strive for corporate priorities, married with input from, and consultation with, highly-informed and sophisticated members of the Debtors' key creditor constituencies.  The 2025 Performance Metrics, which were recommended by the Compensation Committee and approved by the full Board following such consultation with key creditor constituencies, are challenging, require extensive achievement and present a potential risk of not being met at the threshold level required for payment.  Indeed, past performance shows clearly that the 2025 KEIP Participants' diligence and skill will be required to steer the Debtors to even a threshold score on the 2025 Performance Metrics; in 2021, for instance, following consultation with key creditor constituencies, the Compensation Committee approved a final score on that year's annual scorecard of just 86.29%, and in the two subsequent years—2022 and 2023—the scores came in slightly below 100%. The Company also uses its annual performance metrics more broadly, as a tool to communicate strategic priorities for the year ahead throughout the organization, so the importance of the 2025 Performance Metrics goes far beyond determining the 2025 KEIP Participants' compensation.  The 2025 KEIP Participants will be focused on driving the Debtors to meet these goals over the course of the year ahead, and they will need to apply substantial efforts to achieve their targets throughout the rest of this year.  The Compensation Committee recommended, and the Board approved, these stretch goals to ensure that the 2025 KEIP has its intended, incentivizing effect.

21.     The Value Creation strategic pillar measures and rewards the long-term success of the Debtors' business based on certain nonfinancial operational goals, such as meeting certain deadlines with respect to the Company's research and development of non-opioid products, including overdose treatment products.    **Table 2** below sets forth the operational and developmental goals that the Compensation Committee recommended, and the Board approved, as key to the long-term success of the Debtors' business.

### TABLE 2

| Value Creation Metrics | Target Date | % of Value Creation | % of 2025 Performance Metrics |
|---|---|---|---|
| − Implement Company initiatives to ensure the Company operates efficiently and sustainably so as to maximize net value generated to abate the opioid crisis. | | 60.0% | 30.0% |
| Public Health Initiatives[6] | | | |
| − Improve access to MOUD (Medications for Opioid Use Disorder) for incarcerated individuals with opioid use disorder by supplying and facilitating the distribution of 50% more low-cost generic buprenorphine/naloxone tablets than under the 2024 program's amount of 1.7M | End of Q4 2025 | 20.0% | 10.0% |
| − Complete process validation batch manufacturing by the end of Q3, and make Zurnai 1.5 mg available to order by end of Q4 | End of Q3 2025; End of Q4 2025 | | |
| − In connection with nalmefene postmarketing requirements, submit final toxicology reports and draft clinical study protocol to FDA | End of Q3 2025 | | |
| Progressing the Branded Pipeline | | | |
| − Complete database lock of Sunobinop IC/BPS by end of Q2 and achieve top line results by end of Q3 | End of Q2 2025; End of Q3 2025 | 15.0% | 7.5% |
| − Complete enrollment in the Phase 2 craving sub-study of Sunobinop AUD | End of Q4 2025 | | |
| − File two regulatory submissions of Tinostamustine GBM, including supporting | End of Q3 2025 | | |

---

[6] All medications referred to in this section are potential treatments for opioid overdose.

| Value Creation Metrics | Target Date | % of Value Creation | % of 2025 Performance Metrics |
|---|---|---|---|
| data and information with the FDA by end of Q3; Orphan Drug Designation Request and the glioblastoma IND | | | |
| Progressing the Generics Pipeline | | | |
| − ██████████████████ | End of Q3 2025 | | |
| − ███████████<br>██████████████<br>██████████████<br>████████ | End of Q2 2025;<br>End of Q4 2025 | 5.0% | 2.5% |
| − ████████████<br>██████████████<br>██████████████<br>█████ | End of Q2 2025 | | |
| **Total** | | **100.0%** | **50.0%** |

22.     The first metric in the Value Creation strategic pillar, entitled "[i]mplement Company initiatives to ensure the Company operates efficiently and sustainably so as to maximize net value generated to abate the opioid crisis," was first added in 2022 to address certain priorities raised during the consultation process with the UCC, AHC and MSGE.  This metric continues to be included this year and will consist of three sub-metrics:



(i)     ██████████████████████████
        ██████████████████████████████
        ██████████████ (1/2 weighting);

(ii)    ██████████████████████████████
        ██████████████████████████████
        ████████████████ (1/4th weighting);

(iii)  ███████████████████████████████

(1/4th weighting).

23.    This redacted metric—as well as the redacted sub-metrics in the "Progressing the Generics Pipeline" category—reflects confidential commercial information that consists of specific near-term commercial priorities and opportunities.  Such information is maintained confidentially by the Debtors and has been provided solely to the Board and senior management as well as, subject to the *Third Amended Protective Order* [ECF No. 1935], the creditors that have consultation rights with respect to the 2025 Performance Metrics.  If this information were to be disclosed publicly, I believe that it would likely advantage the Debtors' competitors by providing them with insight into the Debtors' strategic priorities or otherwise negatively impact the Debtors' business.

24.    The Innovation and Efficiency strategic pillar captures key financial and operational goals, including important business metrics such as operating profit and net sales. **Table 3** below sets forth the financial and operational goals that the Compensation Committee, the Board and the Debtors' senior management team have identified as key to the Company's long-term business success.

## TABLE 3

| Innovation and Efficiency Metrics | Target | % of Innovation and Efficiency | % of 2025 Performance Metrics |
|---|---|---|---|
| − Consolidated Continuing Operations Business Profit Before Non-Recurring and One-Time Charges | $219.9 million | 50.0% | 20.0% |
| − Rhodes Generics Business Profit Before Non-Recurring and One-Time Charges | $26.8 million | 25.0% | 10.0% |
| − Ensure operational readiness for emergence by (i) transferring business licenses, (ii) making product label changes, (iii) transferring government contracts, (iv) transferring payroll and | | 25.0% | 10.0% |

| | | |
|---|---|---|
| benefits and (v) transferring intellectual property. Take all necessary pre-emergence actions within a specific time period and implement such initiatives, including, but not limited to ensuring that all company SOPs are current. | | |
| **Total** | **100.0%** | **40.0%** |

25.     Finally, nurturing the Debtors' human resources and organizational culture has been, and will remain, critical to keeping the Debtors on the path to emergence and beyond. **Table 4** below sets forth the key People and Culture metrics the Debtors' senior management team has identified, and the Board has approved, as essential to enhancing corporate performance and maximizing the value of the Debtors' business.

### TABLE 4

| People and Culture Metrics | Target Date | % of People and Culture | % of 2025 Performance Metrics |
|---|---|---|---|
| – Provide timely and transparent employee communications which maintain a full-year average score of 80% or greater on post-event colleague surveys | End of Q4 2025 | 33.3% | 3.3% |
| – Support colleague engagement through culture and change initiatives focused on career and leadership development, employee recognition and belonging | End of Q4 2025 | 33.3% | 3.3% |
| Continue Ongoing Commitment to Fostering a Sense of Belonging | | | |
| – Sponsor two company-wide Learning More, training events, or educational networking events | End of Q4 2025 | 33.3% | 3.3% |
| – Issue a minimum of seven company-wide communications and four articles in the CEO Quarterly meet-up | End of Q4 2025 | | |
| **Total** | | **100.0%** | **10.0%** |

***Importance of the 2025 KEIP***

26.     The 2025 KEIP, like those approved by the Court in 2020 through 2024, is consistent with the Debtors' historical compensation practices (although lower in amount given the continuation of concessions first agreed to in 2020), even as the challenges faced by the 2025

KEIP Participants remain elevated as they continue to navigate these protracted Chapter 11 Cases and work toward emergence.

27.    I understand that the CEO's compensation is 24% below market median when compared to executives at non-debtor pharmaceutical companies in the most relevant industry survey, while the CEO plays a vital role in maximizing the value of the Debtors' estates for the benefit of their stakeholders while stewarding the Debtors through the many ongoing challenges presented by these Chapter 11 Cases.

28.    I also understand that the CFO's compensation is 44% below market median when compared to executives at non debtor pharmaceutical companies in the most relevant industry survey.

29.    I also understand that, as in years past, the CLO's compensation remains above-market when compared to chief legal officers and general counsel at peer, non-debtor pharmaceutical companies.  But I understand it has long been, and still is, the Debtors' business judgment that they require a chief legal officer with significantly greater expertise and experience than is typical, particularly in light of the (i) enormous complexities of these Chapter 11 Cases, which are entirely in addition to the usual complex legal issues attendant to running a diversified pharmaceutical business and (ii) the CLO's expanded job responsibilities, which now also include overseeing the Debtor's Human Resources, Communications, Corporate Social Responsibility, and Business Development and Strategy departments.  The Compensation Committee and the Debtors' senior management team continue to believe that the CLO's compensation is appropriate and reasonable, given the immense challenges he faces in his role with the Debtors and in light of his past experience and expertise and the other opportunities available to an individual with his qualifications.

## **The Proposed 2025 KERP**

### *The 2025 KERP Participants*

30.     The Debtors seek authorization to implement the 2025 KERP for virtually all employees other than the 2025 KEIP Participants (the "**2025 KERP Participants**").[7]  The 2025 KERP Participants have undertaken significant efforts to maintain the value of the Debtors' business and enable the Debtors' progress toward a successful restructuring.  They have done so in the face of significant stresses, including reduced employee headcount and a very competitive market for talent to replace departing employees.  They have achieved remarkable business results despite the ongoing overhang of these protracted Chapter 11 Cases and fiercely competitive industry in which the Debtors operate.  The Debtors must provide their employees with market compensation in order to continue to secure their dedicated efforts.  Approximately 427 employees will participate in the 2025 KERP, of which 13 are vice presidents and 414 are middle management, professional employees and support and technical staff, which includes scientific researchers as well as regulatory, compliance, quality and manufacturing personnel.[8]

### *The 2025 KERP Structure*

31.     Each eligible 2025 KERP Participant will receive (i) an amount equal to the 2025 KERP Participant's target AIP (the "**2025 KERP Annual Award**") and (ii) a long-term incentive compensation grant payable in March 2026 (subject to clawback through March 2028) (the "**2025 KERP Long-Term Award**").  Certain 2025 KERP Participants will receive additional, targeted retention payments (the "**2025 Targeted Retention Awards**").

---

[7] I understand that a small number of employees either previously did not participate in the AIP or are otherwise ineligible to participate in the 2025 KERP.

[8] In instances where the separation of existing 2025 KERP Participants from the Debtors results in newly hired employees taking on their roles or responsibilities—or if the Debtors hire employees to fill currently vacant, non-insider positions—the 2025 KERP would allow the Debtors to include such newly hired employees as 2025 KERP Participants.

32.    The 2025 KERP Annual Award is equal to the target amount of the AIP award that each participant would historically have received, including modest, ordinary course merit increases.  The 2025 KERP Annual Award is not subject to performance criteria, in order to provide the 2025 KERP Participants with greater certainty about their compensation.  This is expected to help retain 2025 KERP Participants under what remain challenging and uncertain conditions, as it has in prior years.

33.    The 2025 KERP Annual Award will be paid, (x) with respect to employees with titles of vice president or senior, (i) 25% on the Company's regular payroll date on or immediately following October 24, 2025 and (ii) 75% on the Company's regular payroll date on or immediately following March 13, 2026, and (y) with respect to employees with titles below vice president, (i) 33% on the Company's regular payroll date on or immediately following October 24, 2025 and (ii) 67% on the Company's regular payroll date on or immediately following March 13, 2026. Other than for hourly employees, the first payment of the 2025 KERP Annual Award will be subject to clawback if the applicable 2025 KERP Participant resigns or is terminated for any reason other than by the Debtors without cause prior to March 13, 2026.  Any outstanding amounts under the 2025 KERP Annual Award will accelerate in the event that a 2025 KERP Participant's employment is terminated by the Debtors without cause after September 30, 2025.  The total aggregate payment under the 2025 KERP Annual Award is approximately $14.02 million.

34.    Consistent with past practice, certain 2025 KERP Participants will receive a 2025 KERP Long-Term Award that substantially replicates the long-term grants awarded under the Debtors' prior, Court-approved programs and mimics the economic structure of the LTRP grant that otherwise would have been granted to each eligible 2025 KERP Participant under Purdue's longstanding compensation practices.  The amount of such grant will equal 60% of the target LTRP

grant that otherwise would have been granted, reflecting a discount similar to past practice that was negotiated in 2020 and carried forward ever since, subject only to modest, ordinary course annual base salary increases, and/or base salary increases due to promotions or job responsibility changes.  The 2025 KERP Long-Term Award will not be subject to performance metrics.

35.    Payments due under the 2025 KERP Long-Term Awards will be made on the Company's regular payroll date on or immediately following March 13, 2026, subject to clawback if the 2025 KERP Participant resigns or is terminated for any reason other than by the Debtors without cause prior to March 2028.   This earlier payment timeframe, combined with a clawback through the customary, historical payment date, was put in place to maximize the effect of the award on employee motivation while maintaining its retentive effect. Setting the payment at 60% of the target LTRP award that otherwise would have been granted is also partially on account of this accelerated payment timing. Outstanding amounts will accelerate in the event of a termination of employment after September 30, 2025 by the Debtors without cause.  The aggregate total cost of these 2025 KERP Long-Term Awards for all 2025 KERP Participants is approximately $5.41 million.

36.    In addition, the Debtors have previously used targeted retention awards, including in each year since the commencement of these Chapter 11 Cases, to preserve and maximize the value of the Debtors' estates.  Though the Debtors have continued to experience attrition with these programs in place, the evidence supporting the efficacy of these targeted retention awards is clear:  as of June 30, 2025, there have been only two voluntary departures among the 2024 targeted retention program participants, demonstrating a 2.0% attrition rate for targeted retention participants compared to approximately 4.0% in the broader Purdue population.  The Debtors seek approval of the 2025 Targeted Retention Awards in an aggregate amount of up to $8,100,000. The

Debtors propose that $580,000 of such amount consist of supplemental capacity that the Debtors may deploy to respond to changing business conditions, after consultation with the UCC, AHC and MSGE, which will provide the Debtors with necessary flexibility while containing that flexibility by subjecting any amount spent thereunder to creditor consultation.  The Debtors have successfully used, or had the ability to use, such supplemental retention capacity to respond to unique, discrete retention needs in consultation with these creditor constituencies in the past. The 2025 Targeted Retention Awards will renew the Debtors' previous award programs and allow the Debtors to continue their practice of making targeted retention payments to an identified group of key employees.[9]  As always, the Debtors will endeavor to use only as much of such capacity as is necessary to retain key employees, with a goal of maximizing the value of the Debtors' estates.

37.    The 2025 Targeted Retention Awards will be paid (a) 25% on the Company's regular payroll date on or immediately following December 30, 2025, (b) 25% on the earlier of the Company's date of emergency from bankruptcy or Company's regular payroll date on or immediately following March 30, 2026 and (c) 50% on the earlier of the Company's date of emergence from bankruptcy or Company's regular payroll date on or immediately following June 30, 2026.[10]   The 2025 Targeted Retention Awards are subject to clawback if the recipient resigns or is terminated for any reason other than by the Debtors without cause before September 30, 2026, and outstanding amounts due will accelerate upon a recipient's termination by the Debtors without cause after September 30, 2025.

---

[9] The Debtors' management team has identified the employees most likely to require targeted retention payments over the course of this next year.  As business needs fluctuate, some variation in the targeted retention population may occur, though in no event will (a) the aggregate dollar amount of the 2025 Targeted Retention Awards exceed $8,1000,000 or (b) any insider receive such an award.

[10] Timing with respect to supplemental capacity may be adjusted in response to applicable business conditions.

*Importance of the 2025 KERP*

38.    The 2025 KERP is commercially appropriate and reasonable.  The challenges of operating in chapter 11 present the 2025 KERP Participants with an ongoing, extraordinary burden. Unless the Debtors provide their workforce with appropriate, market compensation, there is a very real risk that employees will depart for other opportunities. Additional defections among the Debtors' workforce could significantly hamper their operations and diminish the value to be delivered to the Debtors' stakeholders.  Accordingly, the Company is seeking Court approval to renew its annual compensation programs, so as to continue providing non-insider employees with much-needed certainty regarding their compensation arrangements.   Moreover, the Debtors continue to endure significant hiring obstacles (in the face of a broadly difficult and competitive market for talent); 20 headcount positions have opened year to date, joining 3 positions that opened but were not filled in 2024.  Eleven (11) of these positions remain unfilled, and lateral hiring remains extremely difficult, particularly as the Debtors continue to operate within the confines of these Chapter 11 Cases.  If not for the Company's prior annual compensation programs, the Debtors believe that the attrition rate would likely have been significantly higher.  Failure to implement the 2025 KERP could have a devastating effect on the Debtors' ability to retain the individuals they need to maintain their business operations and deliver a successful emergence from these Chapter 11 Cases for all stakeholders.

39.    The 2025 KERP Annual Award is consistent with the Debtors' historical compensation practices.  The 2025 KERP Annual Award substantially replicates the Company's prepetition and Court-approved annual award programs, subject only to modest, ordinary course annual merit increases.  Subjecting the first payment to clawback through March 13, 2026, provides a powerful retentive element and mimics the historical payment timing of the Company's

prepetition AIP. Similarly, the 2025 KERP Long-Term Award substantially replicates the Debtors' longstanding long-term grant program and carries forward the steep discount to past practice that the Court first approved in 2020 (subject to modest, ordinary course year-over-year increases). Additionally, the Debtors have preliminarily identified the 2025 KERP Participants most likely to require 2025 Targeted Retention Awards through a detailed, thorough process to identify the roles that are most critical to preserving and maximizing the value of the Debtors' estates. The aggregate amount of the 2025 Targeted Retention Awards is consistent with the aggregate amount of prior Court-approved targeted retention programs, which have proven effective at mitigating attrition among selected critical employees.

## Conclusion

40.     I believe that the 2025 Compensation Plans are crucial to the Debtors' business operations during the pendency of these Chapter 11 Cases, as they will maintain employee morale, dedication, confidence and cooperation and maximize the Debtors' ability to reorganize successfully. These annual programs are necessary to provide Purdue's workforce with market compensation, to motivate employees to achieve demanding corporate objectives, and to ensure that key employees remain in their positions. Preserving and maximizing the value of these estates by appropriately compensating the Debtors' employees is particularly important at this juncture, as the Debtors prepare to exit chapter 11 and put the Company's assets to work abating the opioid crisis. Providing appropriate, market compensation to the Debtors' employees remains as essential now as ever, as the Debtors' employees continue to await the Company's emergence from chapter 11. I believe that the failure to authorize the 2025 Compensation Plans would likely irreparably impair the Debtors' relationships with employees, adversely impact the Debtors' ability to deliver superior products and services, and needlessly hinder the Debtors' restructuring efforts.

41.    In sum, I believe that the relief requested in the Motion is necessary to avoid irreparable harm to the Debtor, and constitutes a critical element in maximizing the value of the Debtors' business.

[*Remainder of Page Intentionally Left Blank*]

42.      I declare under penalty of perjury that, to the best of my knowledge and after

reasonable inquiry, the foregoing is true and correct.

Executed:    August 14, 2025


By:    */s/ Jesse DelConte*
                Jesse DelConte
                Partner & Managing Director
                AlixPartners, LLP

**<u>Exhibit C</u>**

**Gartrell Declaration**

DAVIS POLK & WARDWELL LLP

450 Lexington Avenue

New York, New York 10017

Telephone: (212) 450-4000

Facsimile: (212) 701-5800

Marshall S. Huebner

James I. McClammy

Eli J. Vonnegut

Darren S. Klein

*Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **PURDUE PHARMA L.P.**, *et al.*, | **Case No. 19-23649 (SHL)** |
| **Debtors.**[1] | **(Jointly Administered)** |

**DECLARATION OF JOSEPHINE GARTRELL IN SUPPORT OF THE
MOTION OF DEBTORS FOR ENTRY OF AN ORDER AUTHORIZING
IMPLEMENTATION OF 2025 KEY EMPLOYEE INCENTIVE
PLAN AND 2025 KEY EMPLOYEE RETENTION PLAN**

       I, Josephine Gartrell, being fully sworn, hereby declare that the following is true to the best

of my knowledge, information and belief:

       1.      I am a Managing Director at Willis Towers Watson plc ("**WTW**").  Purdue Pharma

L.P. and its above-captioned wholly owned direct and indirect subsidiaries (collectively,

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Purdue Products L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014).  The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

the "**Debtors**," the "**Company**" or "**Purdue**") engaged WTW to provide compensation consulting services and to serve as advisors to the Compensation and Talent Committee (the "**Compensation Committee**") of the Board of Directors of Purdue Pharma Inc. (the "**Board**").  I am familiar with the structure of the Debtors' pre- and post-petition compensation plans, including the Debtors' proposed 2025 key employee incentive plan (the "**2025 KEIP**") and 2025 key employee retention plan (the "**2025 KERP**" and, together with the 2025 KEIP, the "**2025 Compensation Plans**").

2.      I submit this declaration (this "**Declaration**") on behalf of WTW and in support of the *Motion of Debtors for Entry of an Order Authorizing Implementation of 2025 Key Employee Incentive Plan and 2025 Key Employee Retention Plan* (the "**Motion**").[2]  I am authorized to submit this Declaration on behalf of WTW.

3.      Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my review of the 2025 Compensation Plans and my team's and my research into compensation practices at companies in the pharmaceutical industry and general industry as well as other companies that have recently filed for chapter 11 protection, along with information supplied to me by members of the Debtors' management team and other advisors.  For the reasons described below, it is my opinion that the 2025 KEIP and the 2025 KERP are appropriate and reasonable.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

## Qualifications and Background

### A. Qualifications

4.       I received my Juris Doctor from the University of San Diego School of Law in 1998, graduating *magna cum laude* and Order of the Coif, and my Bachelor of Arts in international business from San Diego State University in 1994.  After working at Gibson, Dunn & Crutcher LLP as an associate in the corporate practice, Pillsbury Winthrop Shaw Pittman LLP as an associate in the executive compensation practice and The Loftin Firm, P.C. as a partner and then of counsel in the corporate practice, I became an executive compensation consultant at the Hay Group LLC in 2014.  I joined WTW in 2016, where I have been continuously employed ever since.

5.       WTW is an international professional services firm that offers a wide variety of services to public and private clients, including expert analysis of executive and management compensation.  WTW designs and delivers solutions that manage risk, optimize benefits, cultivate talent and expand the power of capital to protect and strengthen institutions and individuals.  WTW focuses on two key business segments: Health, Wealth and Career; and Risk and Broking.

6.       My responsibilities at WTW primarily involve advising for-profit companies and not-for-profit organizations, specifically regarding executive compensation.  I routinely assist public and private companies in various industries with compensation philosophy, pay competitiveness issues, incentive plan design and other compensation-related analyses.  I have participated in the development and design of hundreds of management and employee incentive plans for companies in and outside of bankruptcy.

7.       I am highly experienced in executive, management and employee compensation, with over twenty years of experience in the field.  During my tenure at WTW, I have worked closely with a range of companies undergoing a financial restructuring to develop a variety of pre-

3

and post-petition compensation arrangements, including compensation plans and programs for senior executive and nonexecutive employees. Specifically, I have led or co-led the review and design of key employee incentive plans, key employee retention plans and other similar plans in a number of chapter 11 cases, including *In re Mallinckrodt plc*, Case No: 20-12522 (JTD) (Bankr. D. Del.); *In re PES Holdings, LLC*, Case No. 19-11626 (LSS) (Bankr. D. Del.); *In re Cloud Peak Energy Inc.*, Case No. 19-11047 (CSS) (Bankr. D. Del.); *In re FULLBEAUTY Brands Holdings Corp.*, Case No. 19-22185 (RDD) (Bankr. S.D.N.Y.); *In re Parker Drilling Co.*, Case No. 18-36958 (MI) (Bankr. S.D. Tex.); *In re Aegean Marine Petroleum Network Inc.*, Case No. 18-13374 (MEW) (Bankr. S.D.N.Y.); *In re Westmoreland Coal Co.*, Case No. 18-35672 (DRJ) (Bankr. S.D. Tex.); *In re ATD Corp.*, Case No. 18-12221 (KJC) (Bankr. D. Del.); *In re Claire's Stores, Inc.*, Case No. 18-10584 (MFW) (Bankr. D. Del.); *In re BlockFi Inc.*, Case No. 22-19361 (MBK) (Bankr. D.N.J.); *In re Celsius Network LLC*, Case No. 22-10964 (MG) (Bankr. S.D.N.Y.); *In re David's Bridal, LLC*, Case No 23-13131 (CMG) (Bankr. D.N.J); *In re Tuesday Morning Corporation*, Case No. 23-90001 (Bankr. D. Tex.).

**B. Background**

8.    After the Debtors first retained WTW in 2019, my team and I familiarized ourselves with the Debtors' operations, business goals and pre- and post-petition compensation practices and since that time have become very familiar therewith. We advised on the design, structure and cost of each of the key employee incentive and retention plans that the Court approved in 2020 through 2024. Each year, we also conducted benchmarking analyses to compare (i) the market competitiveness of pay to similar programs at peer pharmaceutical companies and (ii) the cost of

those programs to the cost of similar programs at other chapter 11 debtors.[3]

9.       Prior to commencing these Chapter 11 Cases, Purdue maintained a performance-based Annual Incentive Plan (the "**AIP**") for the majority of their employees.  The AIP provided annual cash bonuses tied to the achievement of Company and individual performance metrics.  The Company also maintained a performance-based Long-Term Results Plan (the "**LTRP**" and, together with the AIP, the "**Prepetition Compensation Plans**"), which provided eligible employees with annual grants that would result in cash payouts tied to achievement of corporate objectives measured over a three-year performance period.  Finally, I understand that, as needed, the Company would utilize targeted retention plans to retain their most critical employees; in 2018 and in 2019, in particular, I understand Purdue implemented retention plans for certain executive and nonexecutive employees which were calibrated to incentivize those employees to remain with the Company through the end of 2020.

10.      In 2020, Purdue replaced the Prepetition Compensation Plans with a key employee incentive plan (the "**2020 KEIP**") and key employee retention plan (the "**2020 KERP**" and, together with the 2020 KEIP, the "**2020 Compensation Plans**"), which closely paralleled the Prepetition Compensation Plans.  At a high level, payments under both the annual and the long-term award components of the 2020 KEIP were contingent on the Debtors' achievement of certain performance metrics that likewise substantially replicated the Company's prepetition corporate

---

[3] *See Decl. of Josephine Gartrell in Supp. of Mot. of Debtors for Entry of Order Authorizing Implementation of a Key Employee Incentive Plan and Key Employee Retention Plan* [ECF No. 1674-3]; *Suppl. Decl. of Josephine Gartrell in Supp. of Mot. of Debtors for Entry of Order Authorizing Implementation of a Key Employee Incentive Plan and Key Employee Retention Plan* [ECF No. 1847-2]; *Second Suppl. Decl. of Josephine Gartrell in Supp. of Mot. of Debtors for Entry of Order Authorizing Implementation of a Key Employee Incentive Plan and Key Employee Retention Plan* [ECF No. 1960-2]; *Decl. of Josephine Gartrell in Supp. of Motion of Debtors for Entry of Order Authorizing Implementation of 2021 Key Employee Incentive Plan and 2021 Key Employee Retention Plan* [ECF No. 3077-3]; *Decl. of Josephine Gartrell in Supp. of Motion of Debtors for Entry of Order Authorizing Implementation of 2022 Key Employee Incentive Plan and 2022 Key Employee Retention Plan* [ECF No. 4707-3]; *Decl. of Josephine Gartrell in Supp. of Motion of Debtors for Entry of Order Authorizing Implementation of 2023 Key Employee Incentive Plan and 2023 Key Employee Retention Plan* [ECF No. 5579 Ex. C].

objectives.  Payments under the annual, long-term and targeted retention award components of the 2020 KERP were not subject to those same performance criteria, so as to give participants greater certainty about their compensation.  The Debtors renewed the 2020 Compensation Plans with Court approval in 2021 through 2024; the Debtors, in conjunction with WTW and their other advisors, have designed all of their post-petition key employee incentive and retention plans to substantially replicate their predecessor, Court-approved programs, as well as the Company's longstanding historical compensation practices.

11.    This year, the Debtors' proposed 2025 Compensation Plans continue to substantially replicate their historical and Court-approved compensation programs.  In developing and evaluating the 2025 Compensation Plans, WTW updated its annual pay benchmarking analysis by refreshing and analyzing relevant market compensation data, including total direct compensation offered by companies in WTW's 2024 BioPharma and Life Sciences Executive and Middle Management, Professional, and Support Surveys. My team and I provided input and advice on the design, structure and cost of the 2025 KEIP and the 2025 KERP, building upon our input and advice on the design, structure and total cost of the compensation programs that the Court approved in 2020 through 2024.  WTW worked closely with the Compensation Committee, the Debtors' senior management team and other advisors in connection with this process and leveraged our experience designing programs for similarly situated companies, both in and outside of chapter 11.  The 2025 Compensation Plans reflect the input and guidance that my colleagues at WTW and I provided.

12.    Importantly, the 2025 Compensation Plans were subject to oversight, review and approval by both the Compensation Committee and the full Board.  WTW was involved in and advised on the design of the 2025 Compensation Plans, and prior to their internal approval by the

6

Debtors, WTW presented its analysis of their appropriateness and reasonableness to senior management and the Compensation Committee. WTW's primary goal in the course of these interactions was to independently assess whether the 2025 Compensation Plans were appropriate and reasonable in light of its understanding of the specific needs of the Debtors, relevant market data and WTW's experience designing comparable programs for similarly situated companies.

13.     The Debtors continue to work to maximize the value of the Debtors' estates for their stakeholders. Recognizing the unique facts of these Chapter 11 Cases, and that employee performance continues to play a critical role in achieving a favorable outcome for all parties, the Debtors, in conjunction with WTW and their other advisors, again undertook a collaborative process to design appropriate and reasonable compensation programs for 2025. The culmination of that work resulted in the 2025 KEIP, which is designed to incentivize the Debtors' CEO, newly promoted CFO, and recently promoted CLO (together, the "**2025 KEIP Participants**") to achieve what the Board has determined to be challenging financial and operational targets, and the 2025 KERP, which is designed to retain all other eligible non-insider employees (the "**2025 KERP Participants**") during the pendency of these Chapter 11 Cases.

### 2025 Key Employee Incentive Plan

**A. Overview of the 2025 KEIP**

14.     The 2025 KEIP is designed to incentivize the 2025 KEIP Participants to achieve the performance metrics (the "**2025 Performance Metrics**") set out in Purdue's annual corporate scorecard (the "**Scorecard**"). The 2025 KEIP establishes a sliding scale of potential award opportunities based on the Debtors' achievement of the 2025 Performance Metrics. The Debtors must achieve the 2025 Performance Metrics at least at a threshold level (payout at this level is set at 75% of the target) in order for the 2025 KEIP Participants to earn any amounts proposed to be

paid thereunder. Maximum compensation under the 2025 KEIP, as in the prior Court-approved programs, is capped at 100% of target, with straight-line interpolation for performance associated with payout levels between 75% and 100% should the Company's performance fall in between threshold and target levels.

15.    Each 2025 KEIP Participant will receive an award comprised of (i) an annual award (the "**2025 KEIP Annual Award**") and (ii) a long-term incentive compensation grant (the "**2025 KEIP Long-Term Award**"), which are collectively designed to replicate the Debtors' Prepetition Compensation Plans and renew their prior, Court-approved programs. The maximum cost of the 2025 KEIP is approximately $6.71 million. The titles of the 2025 KEIP Participants, and their respective proposed award opportunities under the 2025 KEIP, are identified in **Table 1** below.

**TABLE 1**

| 2025 KEIP Participant | Target 2025 KEIP Annual Award | Target 2025 KEIP Long-Term Award | Total Target 2025 KEIP Award |
|---|---|---|---|
| President and Chief Executive Officer | $2,612,300 | $566,318 | $3,178,618 |
| Chief Legal Officer Executive Vice President, Strategy and Corporate Affairs | $2,089,000 | $600,218 | $2,689,218 |
| Executive Vice President and Chief Financial Officer | $600,000 | $240,000 | $840,000 |
| **Total** | **$5,301,300** | **$1,406,536** | **$6,707,836** |

16.    Subject to achievement of the 2025 Performance Metrics at a threshold level, and subject to each 2025 KEIP Participant's continued employment through the payment date (other than as provided below), the 2025 KEIP Annual Award will be paid on the Company's regular payroll date on or immediately following March 13, 2026. A termination of employment by the

Debtors without cause after September 30, 2025 will trigger acceleration at the target value, subject to clawback if performance is later scored below target (such clawback to occur by March 13, 2026). In the event of a termination of employment by the Debtors without cause on or prior to September 30, 2025, no payment will be due.

17.    Consistent with Purdue's longstanding compensation practices, each 2025 KEIP Participant will also receive a 2025 KEIP Long-Term Award, which is designed to mimic the economic structure of the LTRP grant that the participant otherwise would have received in 2025. In connection with seeking approval of the long-term incentive compensation grant component of the 2020 KEIP, the Debtors agreed to a 52.25% aggregate reduction from historical practice and to subject the award to acceleration upon emergence. That discount was carried forward for the long-term incentive compensation grant components of the 2021, 2022 (and, with respect to the CEO and CLO), 2023, and 2024 key employee incentive plans while switching to nearer-term payment dates, subject to a clawback through the historical payment date, rather than acceleration upon emergence. Similar to 2023 and 2024, in an effort to reach consensus with key creditor constituencies, an additional consensual reduction of the CEO's 2025 KEIP Long-Term Award by a further $352,000 has also been applied this year. Such discounts are reflected in the amounts set forth in **Table 1** (above) with respect to the CEO and CLO, as applicable, while the CFO will be subject to the same 40% reduction as all other employees, consistent with the 40% reduction approved last year for the former CFO. As in prior years, payment for the 2025 KEIP Long-Term Award will be made on the Company's regular payroll date on or immediately following March 13, 2026, subject to clawback if the 2025 KEIP Participant resigns or is terminated for any reason other than by the Debtors without cause prior to March 2028. As with the 2025 KEIP Annual Award, termination of employment without cause after September 30, 2025 will accelerate the

9

2025 KEIP Long-Term Award at target, subject to clawback for any amount that would not otherwise have been paid if target performance is not met. Payouts will be tied to the same 2025 Performance Metrics that apply to the 2025 KEIP Annual Award and therefore will depend solely on the Company's performance in 2025.

**B.      Performance Metrics**

18.      The 2025 KEIP is purely incentive based. Payments under the 2025 KEIP Annual Award and 2025 KEIP Long-Term Award will be conditioned on the 2025 KEIP Participants' ability to meet the 2025 Performance Metrics set out in the Scorecard. I understand that the Board assessed the Scorecard and believes it properly incentivizes the 2025 KEIP Participants to work toward a value-maximizing restructuring of the Debtors' estates during this critical stage of these Chapter 11 Cases.

19.      The Compensation Committee recommended, and the Board approved, the 2025 Performance Metrics in the first quarter of 2025, with guidance from WTW. The Company consulted with the UCC, AHC and MSGE regarding the 2025 Performance Metrics. The 2025 Performance Metrics rely on the same three strategic pillars that have long defined the Debtors' corporate objectives: (i) Value Creation (representing 50% of the 2025 Performance Metrics); (ii) Innovation and Efficiency (40% of the 2025 Performance Metrics); and (iii) People and Culture (10% of the 2025 Performance Metrics).

20.      The Value Creation strategic pillar measures and rewards the long-term success of the Debtors' business based on certain nonfinancial operational goals, such as meeting certain deadlines with respect to the Company's research and development of non-opioid products, including overdose treatment products. **Table 2** below sets forth the operational and developmental goals that the Compensation Committee recommended, and the Board approved,

as key to the long-term success of the Debtors' business.

### TABLE 2

| Value Creation Metrics | Target Date | % of Value Creation | % of 2025 Performance Metrics |
|---|---|---|---|
| − Implement Company initiatives to ensure the Company operates efficiently and sustainably so as to maximize net value generated to abate the opioid crisis. | | 60.0% | 30.0% |
| Public Health Initiatives[4] | | | |
| − Improve access to MOUD (Medications for Opioid Use Disorder) for incarcerated individuals with opioid use disorder by supplying and facilitating the distribution of 50% more low-cost generic buprenorphine/naloxone tablets than under the 2024 program's amount of 1.7M | End of Q4 2025 | 20.0% | 10.0% |
| − Complete process validation batch manufacturing by the end of Q3, and make Zurnai 1.5 mg available to order by end of Q4 | End of Q3 2025; End of Q4 2025 | | |
| − Submit final toxicology reports and draft clinical study protocol to FDA | End of Q3 2025 | | |
| Progressing the Branded Pipeline | | | |
| − Complete database lock of Sunobinop IC/BPS by end of Q2 and achieve top line results by end of Q3 | End of Q2 2025; End of Q3 2025 | 15.0% | 7.5% |
| − Complete enrollment in the Phase 2 craving sub-study of Sunobinop AUD | End of Q4 2025 | | |
| − File two regulatory submissions of Tinostamustine GBM, including supporting data and information with the FDA by end of Q3; Orphan Drug Designation Request and the glioblastoma IND | End of Q3 2025 | | |
| Progressing the Generics Pipeline | | | |
| − ██████████████ | End of Q3 2025 | 5.0% | 2.5% |
| − ██████████████ | End of Q2 2025; End of Q4 2025 | | |

---

[4] All medications referred to in this section are potential treatments for opioid overdose.

| Value Creation Metrics | Target Date | % of Value Creation | % of 2025 Performance Metrics |
|---|---|---|---|
| ██████████████ <br> – ███████████ <br> ██████████ <br> ████████████ <br> ███ | End of Q2 2025 | | |
| **Total** | | **100.0%** | **50.0%** |

21.     The Innovation and Efficiency strategic pillar captures key financial and operational goals, including important business metrics such as operating profit and net sales. **Table 3** below sets forth the financial and operational goals that the Compensation Committee, the Board and the Debtors' senior management team have identified as key to the Company's long-term business success.

### TABLE 3

| Innovation and Efficiency Metrics | Target | % of Innovation and Efficiency | % of 2025 Performance Metrics |
|---|---|---|---|
| – Consolidated Continuing Operations Business Profit Before Non-Recurring and One-Time Charges | $219.9 million | 50.0% | 20.0% |
| – Rhodes Generics Business Profit Before Non-Recurring and One-Time Charges | $26.8 million | 25.0% | 10.0% |
| – Ensure operational readiness for emergence by (i) transferring business licenses, (ii) making product label changes, (iii) transferring government contracts, (iv) transferring payroll and benefits and (v) transferring intellectual property. Take all necessary pre-emergence actions within a specific time period and implement such initiatives, including, but not limited to, ensuring that all company SOPs are current. | | 25.0% | 10.0% |
| **Total** | | **100.0%** | **40.0%** |

22.     Finally, **Table 4** below sets forth the People and Culture metrics that I understand the Debtors' senior management team has identified, and the Board has approved, as essential to enhancing corporate performance and maximizing the value of the Debtors' business.

12

**TABLE 4**

| People and Culture Metrics | Target Date | % of People and Culture | % of 2025 Performance Metrics |
|---|---|---|---|
| − Provide timely and transparent employee communications which maintain a full-year average score of 80% or greater on post-event colleague surveys | End of Q4 2025 | 33.3% | 3.3% |
| − Support colleague engagement through culture and change initiatives focused on career and leadership development, employee recognition and belonging | End of Q4 2025 | 33.3% | 3.3% |
| Continue Ongoing Commitment to Fostering a Sense of Belonging | | | |
| − Sponsor two company-wide Learning More, training events, or educational networking events | End of Q4 2025 | 33.3% | 3.3% |
| − Issue a minimum of seven company-wide communications and four articles in the CEO Quarterly meet-up | End of Q4 2025 | | |
| **Total** | | **100.0%** | **10.0%** |

## C.    Evaluation of the 2025 KEIP

23.    In assessing the appropriateness and reasonableness of the 2025 KEIP, I worked with my team to analyze competitive target/max total direct compensation, a standard benchmark that includes base salary, short-term incentives, and long-term incentives ("**Total Direct Compensation**"), for the 2025 KEIP Participants.

24.    As my primary reference point for the competitiveness of Total Direct Compensation of the 2025 KEIP Participants, my team and I analyzed the compensation opportunities of executives at relevant market comparators in the pharmaceutical industry. Specifically, my team and I matched the 2025 KEIP Participants to survey benchmarks at companies in WTW's 2024 BioPharma and Life Sciences Executive Compensation Survey Report, based on our understanding of each 2025 KEIP Participant's job duties and responsibilities within the Debtors' organization. The result of this analysis, along with a comparison against last

13

year's benchmarking analysis, is shown in **Table 5** below:

TABLE 5

| Title | Variance to Market Target TDC | | | | | | | | |
| | Purdue Base + KEIP | | | Purdue Base + KEIP (2024) | | | Purdue (Base Only) | | |
| | P25 | P50 | P75 | P25 | P50 | P75 | P25 | P50 | P75 |
|---|---|---|---|---|---|---|---|---|---|
| **President and CEO** | 214% | -24% | -34% | 162% | -12% | -38% | 58% | -62% | -67% |
| **EVP, CLO, Strategy and Corporate Affairs** | 308% | 144% | 61% | 236% | 147% | 48% | 97% | 18% | -22% |
| **EVP and CFO** | 61% | -44% | -54% | -- | -- | -- | -22% | -73% | -77% |
| *Former CFO* | -- | -- | -- | 104% | -5% | -26% | -- | -- | -- |

25.     As shown above, the market position of the CEO's Total Direct Compensation without Court approval of the 2025 KEIP would be significantly behind market median for chief executive officers at similarly sized organizations in the pharmaceutical industry.  Approval of the 2025 KEIP, in addition to the CEO's base salary, would bring the CEO's total target direct compensation to the lower end of the competitive range (-24%) of market median target total direct compensation, which is reasonable market positioning.   Failure to provide the CEO with appropriate, incentivizing, market competitive compensation could significantly undermine the Debtors' ability to motivate that individual to achieve desired business objectives.  The 2025 KEIP is, in part, designed to address some of this shortfall.  In my experience, it would be highly uncommon for any entity with the Debtors' size and scope to fail to provide short- and long-term cash-based incentive opportunities for the relevant compensation period, and the 2025 KEIP is necessary to address compensation during this pay period – just as the Debtors' prior annual programs addressed compensation in 2024 and prior years.

26.     The CFO would be below the competitive range of market median for chief financial officers at similarly sized organizations in the pharmaceutical industry if the 2025 KEIP were not approved.  Approval of the 2025 KEIP, in addition to the CFO's base salary, would bring

14

the CFO's total direct annual compensation below competitive range (-44%) of market median target total direct compensation. This initial pay positioning is reasonable due to the CFO's recent promotion. It aligns with the common practice of targeting new executives' total compensation below median with an emphasis on shifting to median once supported by tenure, expertise and performance in the new role.

27.     As in years past, the CLO's compensation under the 2025 KEIP remains above median when compared to chief legal officer and general counsel roles at peer pharmaceutical companies.  I understand from discussions with the Debtors and their other advisors, however, that the CLO remains critical to the Debtors' operations and the success of these Chapter 11 Cases. The CLO's compensation under the 2025 KEIP is similar to his compensation under the prior Court-approved programs and is reasonable in light of my understanding of the importance of his role to the Debtors' successful operation during these Chapter 11 Cases and the Debtors' need of a highly credentialed and qualified CLO in light of their present circumstances. Moreover, I understand that the CLO's expanded job responsibilities now also include overseeing the Debtor's Human Resources, Communications, Corporate Social Responsibility, and Business Development and Strategy departments.  Accordingly, the CLO's compensation—including the 2025 KEIP—is reasonable in light of the aforementioned facts and circumstances as I understand them to be; again, and particularly, the immense challenges he faces in his role with the Debtors and his significant experience and expertise.

28.     To further assess the appropriateness and reasonableness of the design of the 2025 KEIP, I also analyzed 41 comparable examples of key employee incentive plans approved by bankruptcy courts since 2019 for debtors with annual revenues between $200 million and $5 billion.  These companies include 24 Hour Fitness Worldwide, Inc.; Aceto Corporation; Agway

15

Farm & Home Supply, LLC; Amyris Inc.; Basic Energy Services, Inc.; Benson Hill, Inc.; Bristow Group Inc.; California Resources Corp.; Celadon Group, Inc.; Cloud Peak Energy Inc.; Conn's Inc.,; Diamond Offshore Drilling, Inc.; Ditech Holding Corp.; DURA Automotive Systems, LLC.; Ebix, Inc.; Exactech, Inc..;  Fairway Group Holdings Corp.; FTD Companies, Inc.; Genesis Care Pty Limited;  Gymboree Group, Inc.; Intelsat S.A.; LSC Communications, Inc.; Mallinckrodt plc; Neiman Marcus Group LTD LLC; Nova Wildcat Shur-Line Holdings, Inc.; NPC International, Inc.; Payless Inc.; PHI Inc.; Ravn Air Group, Inc.; Revlon, Inc.; RTW Retailwinds, Inc.; Speedcast International Limited; Stage Stores, Inc.; Talen Energy Supply, LLC.; TOMS King (Ohio) LLC; Trident Holding Company, LLC.; True Religion Apparel, Inc.; Tuesday Morning Corporation; Valaris plc; Vision Group Holdings, LLC; and Williams Industrial Services Group Inc.

29.     My team and I then benchmarked the proposed target cost (which is also the maximum cost) of the 2025 KEIP against plans at these comparable debtors, expressed in the following two ways: (i) by aggregate amount and (ii) by percentage of revenue.  The results of this analysis can be observed in **Table 6** below:

**TABLE 6**

| Aggregate Cost vs. Comparable Debtors | Purdue 2025 KEIP Annual and Long-Term Awards (Target/Max) | Market 50th Percentile | | Market 75th Percentile | | Market 90th Percentile | |
|---|---|---|---|---|---|---|---|
| | | Target | Max | Target | Max | Target | Max |
| **$000s** | $6,708 | $3,800 | $5,100 | $9,700 | $14,600 | $14,300 | $27,300 |
| **Percentage of Revenue[5]** | 1.19% | 0.47% | 0.61% | 0.72% | 1.01% | 1.09% | 1.65% |

30.     In conducting these analyses, I also relied upon my significant consulting experience in the analysis and design of incentive plans generally at other companies.

---

[5] For percentage of revenue in all instances, WTW used projected net revenue of $562 million based on the Board-approved budget for 2025.

31.     Based on the results of these benchmarking analyses, and my experience with other incentive compensation arrangements implemented by companies in and outside of chapter 11, I believe that the 2025 KEIP and the 2025 KEIP Participants' potential Total Direct Compensation levels are appropriate in light of competitive market practice for pharmaceutical companies like the Debtors and reasonable in light of the Debtors' current circumstances.  The target KEIP award as a dollar value is positioned between the market 50th and 75th percentiles.  Critically, the absence or decrease of short- and long-term incentive opportunities for the 2025 KEIP Participants would significantly undermine the current competitiveness of the Debtors' compensation structure, particularly compared to their past pay experiences, which in turn could negatively impact the Debtors' ability to motivate current management to achieve desired business objectives.

**D.      Appropriateness and Reasonableness of the 2025 KEIP**

32.     The 2025 KEIP Participants continue to manage the Debtors during a time of significant commercial difficulty, including as the Debtors seek to emerge from a prolonged, complex restructuring and in the face of a challenging, competitive labor market.  Indeed, it remains, and it has been in years past, my strong impression and understanding that the Company faces immense challenges that go far beyond even those typically faced by companies in chapter 11.

33.     The 2025 KEIP, like those approved by the Court in 2020 through 2024, is consistent with the Debtors' historical compensation practices (although lower in amount given the continuation of concessions first agreed to by the Company in 2020).  The CEO and CFO's compensation are 24% and 44%, respectively, below market median when compared to executives at non-debtor pharmaceutical companies in the most relevant industry survey.  That the CLO would receive above-median compensation under the 2025 KEIP, as the general counsel has in the

past, does not alter my conclusion that the proposed payments thereunder are reasonable. The Debtors have determined that it remains appropriate to compensate the CLO at a level that recognizes his extraordinary stewardship during these Chapter 11 Cases and incentivizes him to continue to lead the Debtors toward a successful restructuring. I understand that the Debtors require a CLO with the highest level of expertise and resilience; a true strategic advisor to the Company's CEO.

34.     For these reasons, and based on my experience with incentive-based compensation programs employed by companies in and outside of chapter 11, I believe that the design, structure and cost of the 2025 KEIP are reasonable.

### 2025 Key Employee Retention Plan

**A. Overview of the 2025 KERP**

35.     The 2025 KERP Participants consist of approximately 427 incentive-eligible employees, of which 13 hold a position of vice president or higher and 414 are middle management, professional employees and support and technical staff, which includes scientific researchers as well as regulatory, compliance, quality and manufacturing personnel. None of the 2025 KEIP Participants are eligible to participate in the 2025 KERP, and no 2025 KERP Participant is an insider.

36.     Each eligible 2025 KERP Participant will receive (i) an amount equal to the 2025 KERP Participant's target AIP (the "**2025 KERP Annual Award**") and (ii) a long-term incentive compensation grant payable in March 2026 (subject to clawback for eligible salaried employees through March 2028) (the "**2025 KERP Long-Term Award**"). Certain 2025 KERP Participants will receive additional, targeted retention payments (the "**2025 Targeted Retention Awards**").

37.     The 2025 KERP Annual Award is equal to the target amount of the AIP award that

each participant would historically have received, including market-rate, ordinary course merit increases to base salaries which impact KERP values. The 2025 KERP Annual Award is not subject to performance criteria, in order to provide the 2025 KERP Participants with greater certainty about their compensation. This is expected to help retain 2025 KERP Participants under what remain challenging and uncertain conditions, as I understand it has in prior years.

38.    The 2025 KERP Annual Award will be paid, (x) with respect to employees with titles of vice president or senior, (i) 25% on the Company's regular payroll date on or immediately following October 24, 2025 and (ii) 75% on the Company's regular payroll date on or immediately following March 13, 2026, and (y) with respect to employees with titles below vice president, (i) 33.3% on the Company's regular payroll date on or immediately following October 24, 2025 and (ii) 66.7% on the Company's regular payroll date on or immediately following March 13, 2026. Other than for hourly employees, the first payment of the 2025 KERP Annual Award will be subject to clawback if the 2025 KERP Participant resigns or is terminated for any reason other than by the Debtors without cause prior to March 13, 2026. Any outstanding amounts under the 2025 KERP Annual Award will accelerate in the event that a 2025 KERP Participant's employment is terminated by the Debtors without cause after September 30, 2025. The total aggregate payment under the 2025 KERP Annual Award is approximately $14.02 million.

39.    Consistent with past practice, certain 2025 KERP Participants will receive a 2025 KERP Long-Term Award that substantially replicates the long-term grants awarded under the Debtors' prior, Court-approved programs and mimics the economic structure of the LTRP grant that otherwise would have been granted to each eligible 2025 KERP Participant under Purdue's longstanding compensation practices. The amount of such grant will equal 60% of the target LTRP grant that otherwise would have been granted, reflecting a discount similar to past practice that

19

was negotiated in 2020 and carried forward ever since, subject only to modest, ordinary course annual base salary increases, and/or base salary increases due to promotions or job responsibility changes. The 2025 KERP Long-Term Award will not be subject to performance metrics.

40.     Payments due under the 2025 KERP Long-Term Awards will be made on the Company's regular payroll date on or immediately following March 13, 2026, subject to clawback if the 2025 KERP Participant resigns or is terminated for any reason other than by the Debtors without cause prior to March 2028. Outstanding amounts will accelerate in the event of a termination of employment after September 30, 2025 by the Debtors without cause. The aggregate total cost of these 2025 KERP Long-Term Awards for all 2025 KERP Participants is approximately $5.41 million.

41.     In addition, the Debtors have previously used targeted retention awards, including in each year since the commencement of these Chapter 11 Cases, to preserve and maximize the value of the Debtors' estates. Though the Debtors have continued to experience attrition with these programs in place, I understand that the evidence supporting the efficacy of these targeted retention awards is clear: as of June 30, 2025, there have been only two voluntary departures among the 2024 targeted retention program participants, demonstrating a 2.0% attrition rate for targeted retention participants compared to approximately 4.0% in the broader Purdue population. The Debtors seek approval of the 2025 Targeted Retention Awards in an aggregate amount of up to $8,100,000. The Debtors propose that $580,000 of such amount consist of supplemental capacity that the Debtors may deploy to respond to changing business conditions, after consultation with the UCC, AHC and MSGE, which will provide the Debtors with, as I understand it, necessary flexibility while containing that flexibility by subjecting any amount spent thereunder to creditor consultation. I understand that the Debtors have successfully used, or had the ability to

20

use, such supplemental retention capacity to respond to unique, discrete retention needs, in consultation with these creditor constituencies in the past. The 2025 Targeted Retention Awards will renew the Debtors' previous award programs and allow the Debtors to continue their practice of making targeted retention payments to an identified group of key employees.[6]

42.    The 2025 Targeted Retention Awards will be paid (a) 25% on the Company's regular payroll date on or immediately following December 30, 2025, (b) 25% on the earlier of the Company's date of emergence from bankruptcy or Company's regular payroll date on or immediately following March 30, 2026 and (c) 50% on the earlier of the Company's date of emergence from bankruptcy or Company's regular payroll date on or immediately following June 30, 2026.[7] The 2025 Targeted Retention Awards are subject to clawback if the recipient resigns or is terminated for any reason other than by the Debtors without cause before September 30, 2026, and outstanding amounts due will accelerate upon a recipient's termination by the Debtors without cause after September 30, 2025.

43.    In assessing the appropriateness and reasonableness of the 2025 KERP, I worked with my team to analyze the competitiveness of the 2025 KERP Participants' Total Direct Compensation. Like with the 2025 KEIP, my team and I relied on compensation awarded to non-insider executives and middle management and professionals at non-debtor pharmaceutical companies in the most relevant industry survey as our primary reference point. The result of this analysis, along with a comparison against last year's benchmarking analysis, is shown in **Table 7**

---

[6] I understand that the Debtors have preliminarily identified the employees most likely to require targeted retention payments over the course of the upcoming year, though as business needs fluctuate, some variation in the targeted retention population may occur. I further understand that in no event will (a) the aggregate dollar amount of the 2025 Targeted Retention Awards exceed $8,100,000 or (b) any insider receive such an award.

[7] My understanding is that timing with respect to supplemental capacity may be adjusted in response to applicable business conditions.

below:

**TABLE 7** [8]

| Employee Group | No. | Variance to Market TDC (Purdue Target TDC; Base +KERP) | | | Variance to Market TDC (Purdue Target TDC + Targeted Retention) | | | Variance to Market TDC (Purdue Base Only) | | | Memo: Variance to Market TDC Last Year (2024) (Purdue Target TDC) | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | P25 | P50 | P75 | P25 | P50 | P75 | P25 | P50 | P75 | P25 | P50 | P75 |
| Non-Insider (Executive Survey) | 38 | 17% | -11% | -30% | 37% | 4% | -19% | -25% | -42% | -54% | 18% | -11% | -31% |
| Non-Insider (Middle Management and Professional Survey) | 283 | 6% | -7% | -20% | 8% | -6% | -19% | -7% | -19% | -30% | 4% | -10% | -21% |

44.     To further assess the appropriateness and reasonableness of the design and cost of the 2025 KERP, I also analyzed 28 comparable examples of bankruptcy court-approved programs since 2019 for debtors with annual revenues between $200 million and $5 billion; these programs may take the form of incentive or retention programs, depending on the company.  These companies include 24 Hour Fitness Worldwide, Inc.; Avianca Holdings S.A.; Bristow Group Inc.; California Resources Corporation; CBL & Associates Properties, Inc.; Cloud Peak Energy Inc.; Core Scientific, Inc.; Covia Holdings Corporation; Cyxtera Technologies, Inc.; Diamond Offshore Drilling, Inc.; DURA Automotive Systems, LLC.; Endo International Plc.;  Genesis Care Pty Limited; Gol Linhas Aéreas Inteligentes S.A.; GTT Communications, Inc.; Hexion Holdings LLC; Intelsat S.A.;  LSC Communications, Inc.;  Mallinckrodt plc; Oasis Petroleum Inc.; Party City Holdco Inc.; Proterra, Inc.; Seadrill Limited; Serta Simmons Bedding, LLC; SmileDirectClub, Inc.; Speedcast International Limited;  Valaris plc;  and Whiting Petroleum Corporation.

---

[8] Represents 2024 constant sample, which is smaller than the full non-Insider population under the proposed Compensation Programs.

45.     My team and I benchmarked the proposed cost of the annual and long-term award components of the 2025 KERP against plans at these comparable debtors, expressed in the following three ways: (i) by aggregate amount, (ii) by percentage of revenue and (iii) by average cost per participant.  The aggregate KERP award as a dollar value are positioned between the market 50th and 75th percentiles, but due to the Debtors' decline in revenues since the commencement of these Chapter 11 Cases, the 2025 KERP award as a percentage of revenue is now above the 90th percentile.  In my experience, when companies seek stability in their non-insider employee population in the face of declining revenues, compensation is not necessarily reduced commensurate with revenue decline.  Critically, the absence or decrease of incentive opportunities for the 2025 KERP Participants would significantly undermine the Debtors' ability to provide competitive compensation to the non-insider population.  The results of this analysis can be observed in **Table 8** below:

**TABLE 8**

| Aggregate Cost vs. Comparable Debtors | Purdue 2025 KERP Annual and Long-Term Awards | Market 50th Percentile | Market 75th Percentile | Market 90th Percentile |
|---|---|---|---|---|
| **$000s** | $19,425 | $8,900 | $24,100 | $36,300 |
| **Percentage of Revenue** | 3.46% | 0.76% | 1.38% | 1.93% |
| **$000s Cost per Person** | $45.5 | $37.3 | $50.4 | $75.7 |

46.     Finally, to assess the appropriateness and reasonableness of the cost of the 2025 Targeted Retention Awards in particular, my team and I benchmarked the proposed cost of the program against plans at comparable debtors, expressed in the following two ways: (i) by aggregate amount and (ii) by percentage of revenue.  This comparison can be observed in **Table 9** below:

23

**TABLE 9**

| Aggregate Cost vs. Comparable Debtors | Purdue 2025 Targeted Retention Awards | Market 50th Percentile | Market 75th Percentile | Market 90th Percentile |
|---|---|---|---|---|
| **$000s** | $8,100 | $2,400 | $3,600 | $8,500 |
| **Percentage of Revenue** | 1.44 % | 0.24% | 0.43% | 0.74% |

47.    In conducting these analyses, I also relied upon my significant consulting experience in the analysis and design of retention plans.

48.    Based on the results of these benchmarking analyses, my experience with other compensation arrangements implemented by companies in and outside of chapter 11 and my understanding of the Debtors' unique challenges (as represented by the Debtors and their other advisors), I believe that the 2025 KERP—and the 2025 KERP Participants' aggregate Total Direct Compensation levels thereunder—are appropriate and reasonable.

**B. Appropriateness and Reasonableness of the 2025 KERP, Including the 2025 Targeted Retention Awards**

49.    Based on my education, experience, and the work I have done in these Chapter 11 Cases and in similar cases, I believe that the design, structure and cost of the 2025 KERP, including the 2025 Targeted Retention Awards, are appropriate and reasonable given the facts and circumstances of these Chapter 11 Cases as I understand them.

24

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: August 14, 2025

*/s/ Josephine Gartrell*
Josephine Gartrell
Managing Director, Executive Compensation
and Board Advisory
Willis Towers Watson plc

25