DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Eli J. Vonnegut
James I. McClammy
Marc J. Tobak
Joshua N. Shinbrot

*Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| **PURDUE PHARMA L.P.,** *et al.,* | Case No. 19-23649 (SHL) |
| Debtors.[1] | (Jointly Administered) |

**DEBTORS' MEMORANDUM OF LAW IN SUPPORT OF CONFIRMATION OF
DEBTORS' FOURTEENTH AMENDED JOINT CHAPTER 11 PLAN OF
REORGANIZATION OF PURDUE PHARMA L.P. AND ITS DEBTOR AFFILIATES
AND OMNIBUS REPLY TO OBJECTIONS THERETO**

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Purdue Products L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717), and SVC Pharma Inc. (4014).  The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

## TABLE OF CONTENTS

PAGE

PRELIMINARY STATEMENT ................................................................................. 1

JURISDICTION, VENUE, AND CORE PROCEEDING ...................................... 5

SUMMARY OF THE PLAN ...................................................................................... 5

BACKGROUND ............................................................................................................ 11

I.    Prepetition Litigation Against the Debtors and Related Parties ...................................... 11

II.   Commencement of Chapter 11 Cases and Investigatory Efforts ...................................... 14

    A.  2019 Initial Settlement Framework ...............................................................14

    B.  Investigations by the Special Committee of the Debtors' Board of Directors ............15

    C.  Information Sharing, Discovery, and the UCC's Investigation and Prosecution of Estate Claims ........................................................................17

    D.  The DOJ Resolution.....................................................................................22

III.  Mediation Efforts and Post-Confirmation Appeals ............................................ 23

    A.  Mediation Efforts Leading to the Twelfth Amended Plan...........................................23

    B.  Confirmation of the Twelfth Amended Plan .................................................25

    C.  Appellate Litigation and Supreme Court Decision.....................................................26

    D.  Renewed Mediation and Improved Shareholder Settlement Agreement.....................28

IV.   Solicitation of the Revised Plan and Voting ............................................ 33

ARGUMENT.................................................................................................................. 35

I.    The Court Has Subject Matter Jurisdiction to Approve the Plan.....................................35

II.   The Settlements Embodied in the Plan Are Fair and Equitable and Should Be Approved................................................................................................................ 37

    A.  The Standard for Approval of Settlements in Bankruptcy...........................................41

    B.  The Plan Settlement Is Reasonable and in the Best Interests of the Estates and Should Be Approved..................................................................................44

        1.  The First *Iridium* Factor Weighs Strongly in Favor of Approval Because the Plan Settlement Delivers Enormous Benefits and Avoids Value-Destructive, Protracted, and Uncertain Litigation................................................46

            (i)   The Benefits of the Plan Settlement ................................................46

            (ii)  The Likelihood of Successful Litigation .....................................49

        2.  The Second *Iridium* Factor Weighs Strongly in Favor of Approval Because Litigating the Resolved Claims Would Involve Enormous Complexity, Cost, and Delay, as Well as Substantial Difficulties with Collectability.......................73

3.   The Third and Fourth *Iridium* Factors Weigh in Favor of Approval Because the Plan Settlement Is in the Paramount Interest of Creditors and Has Overwhelming Support From Parties-in-Interest ...................................... 77

4.   The Fifth and Seventh *Iridium* Factors Weigh Strongly in Favor of Approval Because the Plan Settlement Is the Product of Years of Arm's-Length Bargaining Among the Parties by Highly Experienced Counsel .......................... 78

5.   The Sixth *Iridium* Factor Supports Approval Because the Releases Are Reasonable Under the Circumstances of These Chapter 11 Cases and Necessary to Ensuring a Value-Maximizing Plan ................................ 80

C.   The Remainder of the Plan Settlement Is Reasonable and in the Best Interests of the Estates and Should Be Approved .................................... 81

III. The Plan Satisfies Each Requirement for Confirmation Under the Bankruptcy Code ..... 84

A.   The Plan Complies with the Applicable Provisions of the Bankruptcy Code (11 U.S.C § 1129(a)(1)) .................................... 84

1.   The Plan Satisfies the Classification Requirements of Section 1122 ................... 85

2.   The Plan Satisfies the Mandatory Plan Requirements of Section 1123(a) ........... 88

3.   The Plan Complies with the Discretionary Provisions of Section 1123(b) of the Bankruptcy Code .................................... 92

(i)   The Plan is Consistent with Sections 1123(b)(1)-(3) of the Bankruptcy Code .................................... 93

(ii)   The Plan's Additional Provisions Are Not Inconsistent with the Bankruptcy Code in Satisfaction of Section 1123(b)(6) .............................. 96

(iii)  The Third-Party Releases Are Appropriate .................................... 96

(iv)   The Plan Injunction and Channeling Injunction .............................. 98

(v)   The MDT Insurer Injunctions .................................... 100

(vi)   Exculpation .................................... 101

B.   The Debtors Have Complied with the Applicable Provisions of the Bankruptcy Code (11 U.S.C. § 1129(a)(2)) .................................... 104

1.   The Debtors Have Complied with the Disclosure and Solicitation Requirements of Section 1125 .................................... 105

2.   The Debtors Have Complied with the Plan Acceptance Requirements of 11 U.S.C. § 1126 .................................... 106

3.   Modifications to the Plan Were Permissible Under 11 U.S.C. § 1127 ............... 106

C.   The Plan Has Been Proposed in Good Faith and Not by Any Means Forbidden by Law (11 U.S.C. § 1129(a)(3)) .................................... 107

D.   The Plan Provides for Required Bankruptcy Court Approval of Certain Administrative Payments (11 U.S.C. § 1129(a)(4)) .................................... 110

E.   The Debtors Have Complied with Applicable Governance Disclosure Requirements (11 U.S.C. § 1129(a)(5)) .................................... 110

ii

F.   The Plan is in the Best Interests of Creditors (11 U.S.C. § 1129(a)(7)) ....................111

G.   Acceptance by Impaired Classes (11 U.S.C. § 1129(a)(8)) ........................................117

H.   The Plan Complies with Statutorily Mandated Treatment of Administrative and Priority Tax Claims (11 U.S.C. § 1129(a)(9)) ...........................................................118

I.   At Least One Impaired Class of Claims Has Accepted the Plan (11 U.S.C. § 1129(a)(10)) ..................................................................................................................119

J.   The Plan is Feasible in Compliance with the Bankruptcy Code (11 U.S.C. § 1129(a)(11)) ..................................................................................................................119

   1.   The Plan's Distribution Framework and Post-Emergence Structure Are Feasible ...........................................................................................................120

K.   The Plan Provides for the Payment of All Fees as Required Under 28 U.S.C. § 1930 (11 U.S.C. § 1129(a)(12)) ..............................................................................121

L.   Inapplicable Provisions ...........................................................................................122

M.   Section 1129(b) is Satisfied as to Classes Deemed to Reject ....................................123

   1.   The Plan Satisfies Cramdown Requirements for Classes 12, 13, 14, 15, 16, 17, and 18 (11 U.S.C. § 1129(b)(2)(B) and (C))...................................................123

N.   The Principal Purpose of the Plan is Not Avoidance of Taxes in Compliance with Section 1129(d)........................................................................................................126

IV. The Additional Objections Should Be Rejected ............................................................ 126

A.   Releases Provided by the Settling Creditors Are Not Coercive ...............................127

B.   Dismissing the Bankruptcy Cases at the Confirmation Hearing Would be Disastrous for Creditors and Contrary to Law ...........................................................128

C.   Payment in Full is not Required for Confirmation ....................................................130

D.   The Plan's Distribution Scheme is not Inequitable....................................................131

E.   The Debtors' Debts may be Discharged ....................................................................133

F.   The Plan Does Not Impermissibly Discharge Sackler Parties...................................134

G.   Nothing in the Plan Exculpates Any Party from Criminal Liability.........................134

H.   Creditors Should Not be Permitted to Individually Pursue Estate Causes of Action...................................................................................................................134

I.   Individual Adjudication of Proofs of Claim is Inappropriate at this Time ...............135

J.   No Party In Interest Has Been Denied Due Process .................................................136

CONCLUSION.................................................................................................................... 137

## TABLE OF AUTHORITIES

---

### CASES

PAGE(S)

*In re 1031 Tax Grp., LLC*,
439 B.R. 84 (Bankr. S.D.N.Y. 2010) .............................................................. 69-70

*In re 305 E. 61st St. Grp. LLC*,
2022 WL 16749111 (Bankr. S.D.N.Y. Nov. 7, 2022) .................................... 42-43

*AAA Advantage Carting & Demolition Serv., LLC v. Capone*,
301 A.3d 1111, *cert. denied,* 304 A.3d 442 (Conn. App. Ct. 2023)........................ 70

*In re Adelphia Commc'ns Corp.*,
285 B.R. 580 (Bankr. S.D.N.Y. 2002) ................................................................ 101

*In re Adelphia Commc'ns Corp.*,
327 B.R. 143 (Bankr. S.D.N.Y. 2005) .................................................................. 42

*In re Adelphia Commc'ns Corp.*,
368 B.R. 140 (Bankr. S.D.N.Y. 2007) ...................................... 44, 95-96, 112, 118

*Advanced Fin. Servs. v. Associated Appraisal Servs.*,
830 A.2d 240 (Conn. App. Ct. 2003) .................................................................. 70

*Aetna Cas. & Sur. Co. v. Clerk, U.S. Bankr. Court (In re Chateaugay Corp.)*,
89 F.3d 942 (2d Cir. 1996) ................................................................................. 85

*AHW Inv. P'ship, MFS, Inc. v. Citigroup Inc.*,
661 F. App'x 2 (2d Cir. 2016) ............................................................................ 57

*Alarmax Distribs. v. New Canaan Alarm Co.*,
2013 WL 3613890 (Conn. Super. Ct. June 19, 2013) ......................................... 70

*All Am. Tel. Co., Inc. v. AT&T Corp.*,
328 F. Supp. 3d 342 (S.D.N.Y. 2018) ................................................................ 71

*In re Allstate Ins. Co.*,
613 N.E.2d 936 (N.Y. 1993) ............................................................................... 57

*In re AMR Corp.*,
502 B.R. 23 (Bankr. S.D.N.Y. 2013) ............................................................. 42, 79

*ASARCO LLC v. Americas Mining Corp.*,
396 B.R. 278 (S.D. Tex. 2008) ........................................................................... 66

*In re Avianca Holdings S.A.*,
    632 B.R. 124 (Bankr. S.D.N.Y. 2021) .................................................................. 98

*In re Babcock & Wilcox Co.*,
    274 B.R. 230 (Bankr. E.D. La. 2002) .............................................................. 63-64

*Ballou v. Law Offices Howard Lee Schiff, P.C.*,
    39 A.3d 1075 (Conn. 2012) ................................................................................ 70

*In re Bayou Grp., LLC*,
    439 B.R. 284 (S.D.N.Y. 2010) ........................................................................... 59

*In re Best Prods. Co., Inc.*,
    168 B.R. 35 (Bankr. S.D.N.Y. 1994) ....................................................... 36, 44, 74

*Bos. Post Rd. Ltd. P'ship v. FDIC (In re Bos. Post Rd. Ltd. P'ship)*,
    21 F.3d 477 (2d Cir. 1994) ................................................................................ 85

*In re Breitburn Energy Partners LP*,
    582 B.R. 321 (Bankr. S.D.N.Y. 2018) ................................................................ 89

*Briarpatch Ltd., L.P. v. Phx. Pictures, Inc.*,
    373 F.3d 296 (2d Cir. 2004) .............................................................................. 72

*In re Briscoe Enters., Ltd. II*,
    994 F.2d 1160 (5th Cir. 1993) ......................................................................... 119

*Celotex Corp. v. Edwards*,
    514 U.S. 300 (1995) .......................................................................................... 35

*Chapman Lumber, Inc. v. Tager*,
    288 Conn. 69 (2008) .......................................................................................... 70

*In re Charter Commc'ns*,
    419 B.R. 221 (Bankr. S.D.N.Y. 2009) .................................................. 95, 111, 124

*In re Chassix Holdings, Inc.*,
    533 B.R. 64 (Bankr. S.D.N.Y. 2015) .............................................................. 81, 98

*In re Chateaugay Corp.*,
    104 B.R. 622 (S.D.N.Y. 1989) .................................................................... 135-136

*In re Chemtura Corp.*,
    439 B.R. 561 (Bankr. S.D.N.Y. 2010) ..................................................... 41-42, 108

*City of New Haven v. Purdue Pharm., L.P.*,
    2019 WL 423990 (Conn. Super. Ct. Jan. 8, 2019) ............................................. 63

*Clean Air Car Serv. & Parking Branch Three, LLC v. Operr Plaza, LLC*,
    2025 WL 1181698 (E.D.N.Y. Apr. 23, 2025) .................................................... 129

*Commonwealth v. Purdue Pharm. L.P.*,
2019 WL 6497887 (Mass. Super. Ct. Nov. 4, 2019) ............................................................. 63

*In re CVAH, Inc.*,
570 B.R. 816 (Bankr. D. Idaho 2017) ................................................................................. 56

*In re Dana Corp.*,
412 B.R. 53 (S.D.N.Y. 2008) ............................................................................................. 89

*In re Dark Horse Tavern*,
189 B.R. 576 (Bankr. N.D.N.Y. 1995) ............................................................................. 128

*In re DBSD N. Am., Inc.*,
419 B.R. 179 (Bankr. S.D.N.Y. 2009), *aff'd in part, rev'd in part on other grounds*,
627 F.3d 496 (2d Cir. 2010) ......................................................................................... 95-96

*Deutsche Bank AG, London Branch v. Metromedia Fiber Network, Inc. (In re Metromedia
Fiber Network, Inc.)*,
416 F.3d 136 (2d Cir. 2005) .............................................................................................. 97

*In re Dewey & LeBoeuf LLP*,
478 B.R. 627 (Bankr. S.D.N.Y. 2012) ................................................................................. 44

*In re Direct Access Partners, LLC*,
602 B.R. 495 (Bankr. S.D.N.Y. 2019) ................................................................................. 65

*In re Ditech Holding Corp.*,
606 B.R. 544 (Bankr. S.D.N.Y. 2019) ............................................................................... 105

*Drenis v. Haligiannis*,
452 F. Supp. 2d 418 (S.D.N.Y. 2006) ................................................................................. 57

*In re Drexel Burnham Lambert Grp., Inc.*,
134 B.R. 499 (Bankr. S.D.N.Y. 1991) ................................................................................. 43

*In re Drexel Burnham Lambert Grp., Inc.*,
138 B.R. 723 (Bankr. S.D.N.Y. 1992) ............................................................... 85-86, 110, 118

*In re Drexel Burnham Lambert Grp., Inc.*,
140 B.R. 347 (S.D.N.Y. 1992) ......................................................................................... 124

*In re Eddington Thread Mfg. Co.*,
181 B.R. 826 (Bankr. E.D. Pa. 1995) ......................................................................... 119-120

*In re FAH Liquidating Corp.*,
572 B.R. 117 (Bankr. D. Del. 2017) ................................................................................... 54

*In re Finley*,
130 F.3d 52 (2d Cir. 1997) ............................................................................................... 77

*In re Genco Shipping & Trading Ltd.*,
513 B.R. 233 (Bankr. S.D.N.Y. 2014) ................................................................. 124

*In re Genesis Glob. Holdco, LLC*,
660 B.R. 439 (Bankr. S.D.N.Y. 2024) ................................................................. 103

*In re Genesis Glob. Holdco, LLC*,
2023 WL 6543250 (Bankr. S.D.N.Y. Oct. 6, 2023) ....................................... 42, 79

*In re G-I Holdings, Inc.*,
313 B.R. 612 (Bankr. D.N.J. 2004) ...................................................................... 56

*In re Glob. Safety Textiles Holdings LLC*,
2009 WL 6825278 (Bankr. D. Del. Nov. 30, 2009) ......................................... 107

*In re GOL Linhas Aéreas Inteligentes S.A.*,
672 B.R. 129 (Bankr. S.D.N.Y. 2025) ........................................... 37, 99-100, 103

*In re Haemmerle*,
529 B.R. 17 (Bankr. E.D.N.Y. 2015) ................................................................. 143

*In re Kelton Motors, Inc.*,
130 B.R. 170(Bankr. D. Vt. 1991) ....................................................................... 65

*Harrington v. Purdue Pharm. L.P.*,
603 U.S. 204 (2024) .................................................................... 5, 28, 97, 101

*Hawaii v. Makaaa*,
43 Haw. 237 (1959) ............................................................................................. 56

*HBE Leasing Corp. v. Frank*,
48 F.3d 623 (2d Cir. 1995) .................................................................................. 66

*In re Hessco Indus., Inc.*,
295 B.R. 372 (2003) ............................................................................................ 75

*In re Hibbard Brown & Co., Inc.*,
217 B.R. 41 (Bankr. S.D.N.Y. 1998) .................................................................. 43

*In re Ionosphere Clubs*,
156 B.R. 414 (S.D.N.Y. 1993) ............................................................................ 43

*In re Johns-Manville Corp.*,
68 B.R. 618 (Bankr. S.D.N.Y. 1986) ................................................................ 139

*In re Joint E. & S. Dist. Asbestos Litig.*,
982 F.2d 721 (2d Cir. 1992), *op. modified on rehearing*, 993 F.2d 7 (2d Cir. 1993) ............ 89

*In re Just Plumbing & Heating Supply, Inc.*,
2011 WL 4962993 (Bankr. S.D.N.Y. Oct. 18, 2011) ....................................... 128

*In re JVJ Pharm. Inc.*,
618 B.R. 408 (Bankr. S.D.N.Y. 2020), *rev'd on other grounds*,
2021 WL 3038763 (S.D.N.Y. July 19, 2021) .......................................................... 57

*Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.)*,
843 F.2d 636 (2d Cir. 1988) ........................................................ 85, 108, 112, 119

*Kim v. Ji Sung Yoo*,
311 F. Supp. 3d 598 (S.D.N.Y. 2018) .................................................................. 59

*In re Kirwan Offices S.a.r.l.*,
592 B.R. 489 (S.D.N.Y. 2018), *aff'd sub nom. In re Kirwan Offs. S.a.R.L.*, 792 F. App'x 99
(2d Cir. 2019) ..................................................................................................... 36

*In re Klaynberg*,
2023 WL 5426748 (Bankr. S.D.N.Y. Aug. 21, 2023) ................................... 103, 131

*Knox v. Countrywide Bank*,
4 F. Supp. 3d 499 (E.D.N.Y. 2014) ................................................................... 127

*In re LATAM Airlines Grp. S.A.*,
2022 WL 2206829 (Bankr. S.D.N.Y. June 18, 2022) ............................... 97, 108-09

*In re Leslie Fay Cos.*,
207 B.R. 764 (Bankr. S.D.N.Y. 1997) ............................................................... 112

*In re Lester*,
616 B.R. 549 (Bankr. D. Or. 2020) ..................................................................... 65

*Lippe v. Bairnco Corp.*,
99 F. App'x 274 (2d Cir. 2004) .......................................................................... 60

*In re LXEng, LLCP*,
607 B.R. 67 (Bankr. D. Conn. 2019) .............................................................. 59, 65

*Lyman Commerce Sols., Inc. v. Lung*,
2013 WL 4734898 (S.D.N.Y. Aug. 30, 2013) ...................................................... 57

*Macarthur Co. v. Johns-Manville Corp.*,
837 F.2d 89 (2d Cir. 1988) .............................................................................. 101

*In re Mallinckrodt Public Ltd. Co.*,
2024 WL 206682 (Bankr. D. Del. Jan. 18, 2024) ................................................. 56

*Marchand v. Barnhill*,
212 A.3d 805 (Del. 2019) .................................................................................. 73

*Maryland v. Purdue Pharm. L.P. (In re Purdue Pharm. L.P.)*,
2024 WL 4894349 (S.D.N.Y. Nov. 26, 2024) ...................................................... 37

*In re Mastro*,
    465 B.R. 576 (Bankr. W.D. Wash. 2011) .............................................................. 74

*McAlary v. Cash Cloud Inc.*,
    2025 WL 2206176 (D. Nev. Aug. 4, 2025) .......................................................... 103

*In re Medaglia*,
    52 F.3d 451 (2d Cir. 1995) ................................................................................. 136

*In re MBM Ent., LLC*,
    531 B.R. 363 (Bankr. S.D.N.Y. 2015) ................................................................ 129

*Motorola, Inc. v. Off. Comm. of Unsecured Creditors (In re Iridium Operating LLC)*,
    478 F.3d 452 (2d Cir. 2007) ......................................................................... *passim*

*In re Motors Liquidation Co.*,
    555 B.R. 355 (Bankr. S.D.N.Y. 2016) .................................................................. 41

*In re Moyer Grp., Inc.*,
    586 B.R. 401 (Bankr. S.D.N.Y. 2018) .................................................................. 72

*In re MSR Hotels & Resorts, Inc.*,
    2013 WL 5716897 (Bankr. S.D.N.Y. Oct. 1, 2013) ........................................... 129

*In re Murray Energy Holdings Co.*,
    665 B.R. 347 (Bankr. S.D. Ohio 2024) ........................................................... 81, 98

*Newman v. Stein*,
    464 F.2d 689 (2d Cir. 1972) ................................................................................ 42

*In re Newman Cos.*,
    140 B.R. 495 (Bankr. E.D. Wis. 1992) ................................................................ 75

*In re NII Holdings*,
    536 B.R. 61 (Bankr. S.D.N.Y. 2015) ...................................................... 43, 44, 95

*N.Y. Life Ins. Co. v. Singh*,
    2016 WL 11395019 (E.D.N.Y. Jan. 12, 2016) ................................................... 127

*In re Odebrecht Engenharia e Construção S.A. – Em Recuperação Jud.*,
    669 B.R. 457 (Bankr. S.D.N.Y. 2025) ................................................................ 103

*In re Operations NY LLC*,
    490 B.R. 84 (Bankr. S.D.N.Y. 2013) ................................................................... 72

*Paniccia v. Success Vill. Apts., Inc.*,
    215 Conn. App. 705 (2022) ................................................................................ 70

*Parmalat Cap. Fin. Ltd. v. Bank of Am. Corp.*,
    639 F.3d 572 (2d Cir. 2011) ............................................................................... 36

*In re Patrician St. Joseph Partners Ltd. P'ship*,
  169 B.R. 669 (D. Ariz. 1994) ........................................................... 120

*In re PG&E Corp.*,
  617 B.R. 671 (Bankr. N.D. Cal. 2020) ................................. 81

*In re Phillips*,
  379 B.R. 765 (Bankr. N.D. Ill. 2007) ................................... 75

*Pritchard v. Pritchard*,
  2004 WL 1052680 (Conn. Super. Ct. Apr. 26, 2004) ........................ 56

*Protective Comm. for Indep. S'holders of TMT Trailer Ferry v. Anderson*,
  390 U.S. 414 (1968) ........................................................... 42

*In re Purdue Pharm. L.P.*,
  633 B.R. 53 (Bankr. S.D.N.Y. 2021) ............................... *passim*

*In re Purdue Pharm., L.P.*,
  635 B.R. 26 (S.D.N.Y. 2021) ........................................... 11, 27

*In re Purdue Pharm. L.P.*,
  69 F.4th 45 (2d Cir. 2023) ............................................. 27

*In re Quigley Co.*,
  377 B.R. 110 (Bankr. S.D.N.Y. 2007) ........................... 85, 86

*In re Quigley Co.*,
  676 F.3d 45 (2d Cir. 2012) ............................................. 36

*Resolution Tr. Corp. v. Best Prods. Co.  (In re Best Prods. Co.)*,
  177 B.R. 791 (S.D.N.Y. 1995) ......................................... 42

*In re Roman Cath. Diocese of Rockville Ctr.*,
  No. 20-12345 (MG), 2023 WL 4833307 (Bankr. S.D.N.Y. July 18, 2023) ........ 129

*In re Sabine Oil & Gas Corp.*,
  555 B.R. 180 (Bankr. S.D.N.Y. 2016) ........................... *passim*

*Sears, Roebuck & Co. v. Bd. of Tax Review*,
  699 A.2d 81 (Conn. 1997) ............................................. 70

*In re SGK Ventures, LLC*,
  521 B.R. 842 (Bankr. N.D. Ill. 2014) ............................... 68

*In re Smallhold, Inc.*,
  665 B.R. 704 (Bankr. D. Del. 2024) ............................... 81, 102, 127

*In re Spirit Airlines, Inc.*,
  668 B.R. 689 (Bankr. S.D.N.Y. 2025) ........................... 36, 37, 97

*SPV Osus, Ltd. v. UBS AG*,
    882 F.3d 333 (2d Cir. 2018) ................................................ 36

*St. Paul Fire & Marine Ins. Co. v. Pepsico, Inc.*,
    884 F.2d 688 (2d Cir. 1989) ................................................ 135

*State v. Purdue Pharm. L.P.*,
    2019 WL 3991963 (R.I. Super. Ct. Aug. 16, 2019) ................................................ 63

*State Dep't of Env't Prot. v. Caldeira*,
    794 A.2d 156 (N.J. 2002) ................................................ 56

*State ex rel. Stenehjem v. Purdue Pharm., L.P.*,
    2019 WL 2245743 (N.D. Dist. Ct. May 10, 2019) ................................................ 63

*In re Stearns Holdings, LLC*,
    607 B.R. 781 (Bankr. S.D.N.Y. 2019) ................................................ 103, 104

*In re SunEdison, Inc.*,
    575 B.R. 220 (Bankr. S.D.N.Y. 2017) ................................................ 132

*In re TC Liquidations LLC*,
    463 B.R. 257 (Bankr. E.D.N.Y. 2011) ................................................ 68-69, 72

*In re Texaco, Inc.*,
    84 B.R. 893 (Bankr. S.D.N.Y. 1988) ................................................ 42

*In re Texaco, Inc.*,
    505 F. App'x 77 (2d Cir. 2012) ................................................ 60

*In re Thelen LLP*,
    736 F.3d 213 (2d Cir. 2013) ................................................ 57

*In re Tommy's Fort Worth, LLC*,
    2025 WL 2092193 (Bankr. N.D. Tex. July 24, 2025) ................................................ 100

*In re Trinsum Grp., Inc.*,
    460 B.R. 379 (Bankr. S.D.N.Y. 2011) ................................................ 57

*In re Tronox Inc.*,
    429 B.R. 73 (Bankr. S.D.N.Y. 2010) ................................................ 54

*In re Tronox Inc.*,
    503 B.R. 239 (Bankr. S.D.N.Y. 2013) ................................................ 55, 60, 63, 64

*In re Tronox Inc.*,
    855 F.3d 84 (2d Cir. 2017) ................................................ 13

*In re Universal Rehearsal Partners, Ltd.*,
    2023 WL 2816684 (Bankr. N.D. Tex. Apr. 5, 2023) ................................................ 100

*In re Voyager Holdings, Inc.*,
    649 B.R. 111 (Bankr. S.D.N.Y. 2023) ............................................................ 81, 98

*In re Wash. Mut., Inc.*,
    442 B.R. 314 (Bankr. D. Del. 2011) ....................................................................... 81

*Weisfelner v. Blavatnik  (In re Lyondell Chem. Co.)*,
    567 B.R. 55 (Bankr. S.D.N.Y. 2017) ..................................................................... 74

*In re Weiss Multi-Strategy Advisers LLC*,
    2024 WL 2767893 (Bankr. S.D.N.Y. May 29, 2024) ........................................ 130

*West v. WorldCom, Inc.*,
    2007 WL 3407060 (S.D.N.Y. Nov. 14, 2007) ...................................................... 60

*In re WorldCom, Inc.*,
    2003 WL 23861928 (Bankr. S.D.N.Y. Oct. 31, 2003) ................................ 106, 110, 120, 124

*In re WorldCom, Inc.*,
    347 B.R. 123 (Bankr. S.D.N.Y. 2006) ................................................................... 44

*W.R. Berkley Corp. v. Classic Carts, Inc.*,
    2015 WL 4965884 (Conn. Super. Ct. July 23, 2015) ........................................... 70

*In re W.R. Grace & Co.*,
    281 B.R. 852 (Bankr. D. Del. 2002) ........................................................... 60, 62, 64

*In re W.R. Grace & Co.*,
    729 F.3d 311 (3d Cir. 2013) ........................................................................... 89, 90

*In re Wyly*,
    2019 WL 2590035 (Bankr. N.D. Tex. June 22, 2019) .......................................... 81

*In re Zambrano Corp.*,
    478 B.R. 670 (Bankr. W.D. Pa. 2012) ................................................................... 65

## STATUTES & RULES

11 U.S.C. § 101(32) ....................................................................................................... 59

11 U.S.C. § 109 ............................................................................................................... 5

11 U.S.C. § 502 ........................................................................................................... 143

11 U.S.C. § 502(a) ......................................................................................................... 90

11 U.S.C. § 503(b) ....................................................................................................... 118

11 U.S.C. § 507(a) ....................................................................................................... 118

11 U.S.C. § 523(a) ....................................................................................................... 140

11 U.S.C. § 544(b) ................................................................................................. *passim*

11 U.S.C. § 548 ................................................................................................ *passim*

11 U.S.C. § 550(a) ................................................................................................ 74, 77

11 U.S.C. § 727 ................................................................................................ 140

11 U.S.C. § 1114 ................................................................................................ 130

11 U.S.C. § 1122 ................................................................................ 84, 85, 86, 88, 107

11 U.S.C. § 1112(b) ................................................................................ 135, 136, 137

11 U.S.C. § 1121(a) ................................................................................................ 5

11 U.S.C. § 1122(a) ................................................................................................ 85

11 U.S.C. § 1123 ................................................................................ 42, 84, 85, 107

11 U.S.C. § 1123(a) ................................................................................................ *passim*

11 U.S.C. § 1123(b) ................................................................................................ *passim*

11 U.S.C. § 1124 ................................................................................................ 88, 89

11 U.S.C. § 1125 ................................................................................................ 105, 107

11 U.S.C. § 1125(b) ................................................................................................ 105, 106

11 U.S.C. § 1126 ................................................................................................ 105, 106

11 U.S.C. § 1126(c) ................................................................................................ 106, 117

11 U.S.C. § 1126(f) ................................................................................................ 117

11 U.S.C. § 1126(g) ................................................................................................ 117

11 U.S.C. § 1127 ................................................................................................ 107

11 U.S.C. § 1128 ................................................................................................ 117

11 U.S.C. § 1129 ................................................................................ 1, 5, 84, 144

11 U.S.C. § 1129(a) ................................................................................................ *passim*

11 U.S.C. § 1129(b) ................................................................................ 118, 130, 131, 132, 133

11 U.S.C. § 1129(d) ................................................................................................ 133

11 U.S.C. § 1141(d) ................................................................................................ 140

28 U.S.C. § 157(b) ................................................................................................ 5

28 U.S.C. § 524(c) ................................................................................................ 49

28 U.S.C. § 1334 ................................................................................................ 5, 141

28 U.S.C. § 1334(b) ................................................................................................ 35

28 U.S.C. § 1408 ................................................................................................ 5

28 U.S.C. § 1409 ................................................................................................ 5

28 U.S.C. § 3304 ................................................................................................ 55

28 U.S.C. § 3304(a) ................................................................................................ 59, 68

28 U.S.C. § 3304(b) ................................................................................................ 58, 65

28 U.S.C. § 3306 ................................................................................................................. 55, 57

2019 N.Y. Sess. Laws Ch. 580 (McKinney) ......................................................................... 55

Conn. Gen. Stat. § 37-3a(a) ................................................................................................. 70

Conn. Gen. Stat. § 52-552c .................................................................................................. 59

Conn. Gen. Stat. § 52-552e(a) .......................................................................................... 52, 58

Conn. Gen. Stat. § 52-552f(a) ....................................................................................... 53, 59, 68

Conn. Gen. Stat. § 52-552j ................................................................................................ 55, 57

Del. Code Ann. tit. 6§ 1302 (West) ..................................................................................... 59

Del. Code Ann. tit. 6 § 1304 (West) ................................................................................. 52, 58

Del. Code Ann. tit. 6 § 1305 (West) ................................................................................. 53, 59

Del. Code Ann. tit. 6, § 1309 ............................................................................................ 55, 57

Fed. R. Bankr. Pro 3007 ...................................................................................................... 143

Fed. R. Bankr. P. 3019 ........................................................................................................ 109

Fed. R. Bankr. P. 3019(a) .................................................................................................... 107

Fed. R. Bankr. P. 9019 ....................................................................... 23, 38, 41-42, 49, 61

N.J. Stat. Ann. § 2A:14-1.2 (West) ...................................................................................... 56

N.Y. C.P.L.R. 213(1) .......................................................................................................... 55, 57

N.Y. Debt. & Cred. Law § 271 (McKinney 2025) ................................................................ 59

N.Y. Debt. & Cred. Law § 273 (McKinney 2025) ............................................................. 53, 55

N.Y. Debt. & Cred. Law § 274 (McKinney 2025) ................................................................ 59

N.Y. Debt. & Cred. Law § 275 (McKinney 2025) ................................................................ 58

N.Y. Debt. & Cred. Law § 276 (McKinney 2025) ................................................................ 53

Uniform Fraudulent Transfer Act § 4(a)(1) ........................................................................ 65

OTHER AUTHORITIES

1 Collier on Bankruptcy P 3.01 (16th ed. 2025) ................................................................ 36

4 Collier on Bankruptcy § 507.02 (16th ed. 2011) ........................................................... 138

7 Collier on Bankruptcy ¶ 1122.03[3] (16th ed. 2021) ..................................................... 86

7 Collier on Bankruptcy ¶ 1112.05 (16th ed. 2025) ......................................................... 137

7 Collier on Bankruptcy ¶ 1129 (16th ed. 2025) .............................................................. 131

H.R. Rep. No. 95-595, at 412 (1977), *as reprinted in* 1978 U.S.C.C.A.N. 5963 ............... 85, 105

Press Release, CardinalHealth, Distributors Announce Proposed Opioid Settlement Agreement
(July 21, 2021),
    https://newsroom.cardinalhealth.com/2021-07-21- Distributors-Announce-Proposed-
    Opioid-Settlement-Agreement ...................................................................................... 64

Restatement (Second) of Contracts § 175 (1981) ...................................................................... 135

S. Rep. No. 95-989, at 126 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5787 ............................ 85

## PRELIMINARY STATEMENT

1.      Purdue's Plan should be confirmed.  The Plan fulfills the promise that the Debtors

made on the first day of these cases:  to dedicate the entirety of the Debtors' value to opioid

abatement and victim compensation.  The Plan—which delivers $6.5 to $7 billion from the

Debtors' former shareholders—is supported by more than 99% of voting creditors, and by every

major organized creditor constituency.[1]  And, most importantly for the matter before the Court,

the Plan satisfies every applicable requirement of the Bankruptcy Code, provides for only

consensual releases as the Supreme Court mandated, and implements settlements that are

manifestly fair, equitable, and in the best interests of the Estates.  After more than six years of

sustained effort by so many, it is now time to bring these cases to their conclusion, and begin the

long-awaited distributions of value for abatement and compensation.

2.      Purdue Pharma L.P. and its affiliated debtors in the above-captioned Chapter 11

Cases (collectively, the "**Debtors**" or "**Purdue**") respectfully submit this memorandum of law in

support of confirmation ("**Confirmation**") of the *Fourteenth Amended Joint Chapter 11 Plan of*

*Reorganization of Purdue Pharma L.P. and its Affiliated Debtors* [Dkt. No. 7911] (as modified,

amended or supplemented from time to time, the "**Plan**") pursuant to section 1129 of title 11 of

the United States Code ("**Bankruptcy Code**") and in response to the objections (the

"**Objections**," and the parties who filed objections, the "**Objectors**").[2]

---

[1] The support of the AHC and States AG Negotiating Committee is subject to acceptable resolution
of certain currently open collateral, credit support, and MSA points.

[2] All capitalized terms not defined herein shall have the meaning ascribed to such terms in the
Plan.  (*See* Plan § 1.1.)  Docket numbers refer to Case No. 19-23649 (SHL) (Bankr. S.D.N.Y.)
unless otherwise specified.  The represented Objectors are (i) National Union Fire Insurance
Company of Pittsburgh, Pa., Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance
Company, Liberty Insurance Corporation; Swiss Re Corporate Solutions Elite Insurance
Corporation, formerly known as North American Elite Insurance Company, Aspen American
Insurance Company, The Travelers Indemnity Company, Gulf Underwriters Insurance Company,

3.     The Plan reflects remarkable consensus.  No represented opioid claimant opposes

confirmation of the plan.  Not one.  Not one state, tribe, municipality, or represented individual

victim is pressing an objection to confirmation.  This exceeds even the historic level of support

achieved in 2021, and is truly remarkable given this case's four-year odyssey through the federal

appellate process.  Indeed, and much like its predecessor, this plan is very much the creditors'

---

and St. Paul Fire and Marine Insurance Company (collectively, "**Certain Insurers**") [Dkt. No. 7895]; (ii) Navigators Specialty Insurance Company ("**Navigators**"), American Guarantee and Liability Insurance Company ("**AGLIC**"), Steadfast Insurance Company ("**Steadfast**"), and XL Insurance America, Inc. ("**XL**") [Dkt. No. 7897]; and (iii) Old Republic Insurance Company and its affiliates ("**ORIC**") [Dkt. No. 7937].  Johnson & Johnson filed a reservation of rights that does not object to confirmation of the Plan [Dkt. No. 7951].

An objection was also submitted by the Mayor and City Council of Baltimore ("**Baltimore**") [Dkt. No. 7955], which has since been resolved pending the Court's approval of a stipulation submitted by the parties [Dkt. No. 8134].  The Travelers Indemnity Company ("**Travelers**") on its own behalf and on behalf of its wholly owned subsidiaries Gulf Underwriters Insurance Company ("**Gulf**") and St. Paul Fire and Marine Insurance Company ("**St. Paul**") filed an objection [Dkt. No. 7896], which has also been resolved pending revisions that will be made to the Plan prior to the Confirmation Hearing.

Certain individual *pro se* creditors also objected: (i) Pamala Bartz Halaschak [Dkt. No. 7530] ("**Halaschak**"); (ii) Amanda Morales [Dkt. Nos. 6245, 7206, 7299, 7355, 7456, 7818, 7819, 7940] (the "**Morales Objections**"); (iii) Rosemary Walker [Dkt. Nos. 7246, 7678, 7723, 7771, 7855, 7863, 7885, 8086, 8087, 8098, 8099, 8108, 8113, 8115] (the "**Walker Objections**"); (iv) Maria Ecke [Dkt. Nos. 7289, 7645, 7849, 7915, 7961, 8064, 8096, 8097, 8131] (the "**Ecke Objections**"); Laureen Ferrante [Dkt. Nos. 7420, 7604] (the "**Ferrante Objections**"); Carrie L. McGaha [Dkt. Nos. 7432, 7522, 7676, 7683, 7724, 7737] (the "**McGaha Objections**"); (v) Joseph Kenney ("**Kenney**") [Dkt. No. 7535]; (vi) Diane Pike ("**Pike**") [Dkt. No. 7536]; (vii) Bradley W. Kennedy ("**Kennedy**") [Dkt. No. 7596]; (viii) Vitaly Pinkusov [Dkt. Nos. 7597, 7755] (the "**Pinkusov Objections**"); (ix) Charles Moore [Dkt Nos. 7660, 7661] (the "**Moore Objections**"); (x) the Estate of Jane A. Redwood [Dkt. Nos. 7865, 7943, 7944, 7945, 7946, 7947, 7997, 8078, 8132] (the "**Redwood Objections**"); (xii) Mary S. Jannotta ("**Jannotta**") [Dkt. 7909]; (xiii) Ellen Isaacs [Dkt Nos. 7972, 8084, 8085, 8088, 8089] (the "**Isaacs Objections**"); (xiv) James Harry Rand [Dkt. No. 7367] (the "**Rand Objection**"); (xv) Tammey Clark [Dkt. No. 7519] (the "**Clark Objection**"); (xvi) Jacqueline Torres Herrera [Dkt. No. 7919] (the "**Herrera Objection**") and (xvii) Laurie Danielle Pitts-Tillman ("**Pitts-Tillman**") [via email].  A number of pro se individuals have additionally requested relief that does not bear on the confirmability of the Plan.  Those filings will be addressed separately and in due course. (*See* Dkt. Nos. 7643, 7694, 7792, 7825, 7886 (the "**Pending Late Claims Motions**"); Dkt. Nos. 7759, 7121, 7715, 7923, 7843 (the "**Requests for Follow-Up**").

plan.  Arrayed against the unanimous support of organized creditor constituencies in these cases
are a handful of objections by *pro se* creditors, and limited, technical objections to certain Plan
language advanced by certain of the Debtors' insurers.

4.    Although the level of support for the Plan is remarkable, it is no accident.  When
the Supreme Court fundamentally altered the legal predicates underpinning the prior plan, the
Debtors and key stakeholders worked over the course of the past year and several months to
develop a new plan that would not only maintain the many benefits of its predecessor, but would
build upon it and deliver only consensual releases of the Sackler Parties (as defined herein).
Now, the Debtors and their creditors are on the cusp of achieving that aim.  The Plan provides at
least $7.4 billion in recoveries for the Debtors' creditors, is supported by over 99 percent of
voting creditors, and satisfies every requirement of the Bankruptcy Code.

5.    If confirmed, the Plan will result in the orderly resolution of these exceedingly
complex chapter 11 cases.  Like its 2021 predecessor, this Plan provides for billions of dollars to
states, municipalities, and other creditor groups for opioid abatement efforts.  It also provides
hundreds of millions of distributable dollars for qualified personal injury victims.  Desperately
needed abatement funding will be used for the treatment and prevention of opioid use disorder,
and will meaningfully support community-led efforts to reduce overdose deaths and other tragic
opioid-related harms.

6.    On the Effective Date, Purdue will cease to exist and the Debtors' businesses will
be transferred to a new company managed by individuals initially selected by participating states.
This new company, Knoa Pharma, will be dedicated to abating the opioid crisis and its core
Purpose will include continuing its Public Health Initiatives related to developing and
distributing opioid overdose reversal and addiction treatment medications.  The opioids business

will remain  subject to strict conduct restrictions—including a prohibition against the promotion

of opioids—under to the supervision of a Monitor.  <u>One hundred percent</u> of the value distributed

under the Plan will benefit the American people and the trusts under the Plan—with no value

flowing to the Debtors' former shareholders.

7.      At the heart of the Plan are several interrelated settlement structures.  First, the

Plan contains the core settlements between and among public and private creditors developed in

2020 and 2021.  Second, the Plan contemplates two distinct but interlocking settlements with

third parties:  (i) a settlement of the Debtors' claims against certain former shareholders, officers

and directors; and (ii) optional settlements by creditors of their direct claims against the Sackler

Parties.  Settlement of the Estates' claims will resolve the Debtors' claims against the Sackler

Parties arising out of the Debtors' production, marketing, and sale of opioid medications, and

allocate the proceeds of the settlement to the Debtors' creditors.  The Official Committee of

Unsecured Creditors (the "**UCC**"), which was given sole standing to prosecute the Estates'

causes of action against the Sackler Parties, supports the Plan and these settlements.  The

settlements incorporated into the Plan are without question adequate, satisfy the *Iridium* factors,

and serve the best interests of the Debtors' creditor body.

8.      Likewise, other than the Debtors' insurers that object to certain Plan language on

technical grounds, no party seriously contends that the Plan fails to satisfy any requirement of the

Bankruptcy Code or other governing law.  The *pro se* objectors, for their part, largely raise issues

specific to the merits of their individual claims, which will be addressed through the claims

allowance process, or present arguments that, while passionate and undoubtedly well-

intentioned, lack foundation in facts or governing law.

9.       More than six years after the Debtors filed for chapter 11 protection, in excess of 99% of voting creditors agree that this Plan—which will dedicate billions of dollars that are urgently needed to combat the opioid crisis and compensate victims—is the right path forward for the Debtors and their Estates.  Extensive mediation has allowed the Debtors and key stakeholders to build this overwhelming consent around a plan that contains only consensual releases and that otherwise satisfies all applicable elements of section 1129 and complies with all applicable sections of the Bankruptcy Code, Bankruptcy Rules, and non-bankruptcy law.  For all of these reasons, and those more fully set forth below, the Debtors respectfully submit that the Plan should be confirmed.

## JURISDICTION, VENUE, AND CORE PROCEEDING

10.       The United States Bankruptcy Court for the Southern District of New York (the "**Court**") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.).  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The Debtors are eligible debtors under section 109 of the Bankruptcy Code and are proper plan proponents under section 1121(a) of the Bankruptcy Code.  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## SUMMARY OF THE PLAN

11.       The Plan—built in large part upon the structure and mechanics of its confirmed predecessor—effects a global resolution of all claims against the Debtors, and is the best available path to a value-maximizing resolution of these chapter 11 cases.  Under the Plan, billions of dollars will flow into trusts established for the benefit of the Debtors' creditors, the majority of which will go towards compensating victims and remediating the opioid crisis.  Consistent with the Supreme Court's decision in *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204 (2024) (the "**Supreme Court Decision**"), creditors are afforded the option to voluntarily

participate in consensual settlements of their direct claims against the Sackler Parties and other
related parties in exchange for enhanced recoveries.  For Personal Injury claimants, the Third-
Party Payor claimants, Supporting Claimants, and Settling Co-Defendants (as defined in the
Plan), the voluntary third-party releases are implemented through the Plan and creditors may
elect to grant the release by providing affirmative consent.  With respect to other claimants who
are afforded the opportunity to grant release as part of the Plan settlements, those third-party
releases will be implemented through separate pathways.[3]

12.    The core components of the Plan include the following:

13.    *First*, the overwhelming majority of Purdue's current value, including the billions
of dollars in proceeds secured by the Estates through settlement of the Estate Causes of Action
(as defined below) under the Master Shareholder Settlement Agreement, will be transferred to
nine trusts for the benefit of the Debtors' public and private creditors.  (*See* November 3, 2025
Declaration of Jesse DelConte ("**DelConte Plan Decl.**") ¶¶ 4-5.)  These trusts will include a
Master Disbursement Trust ("**MDT**"), two Public Creditor Trusts (the Governmental
Remediation Trust and Tribe Trust), the Public School Trust, four Private Creditor Trusts (the PI
Trust, Healthcare Provider Trust, TPP Trust, and ERP Trust), and a Plan Administration Trust
("**PAT**").  (*See* DelConte Plan Decl. ¶ 5.)

- **The Master Disbursement Trust ("MDT")**. The MDT will (i) make distributions to the
  Creditor Trusts established for the benefit of various groups of the Debtors' creditors; (ii)
  hold and administer the MDT Transferred Assets and Special Operating Reserve; and (iii)
  serve as administrative agent with respect to Released Claims Reserves.  Each of the Creditor
  Trusts and the United States will hold an initial beneficial interest in the MDT until payment
  in full of such MDT Claims has been made. (*See* Plan § 5.6(a).)

- **The Governmental Remediation Trust**. The Governmental Remediation Trust will make
  distributions on account of channeled claims held by non-federal domestic governmental

---

[3] *See infra* ¶ 15 (discussing applicable Shareholder Release Consent Mechanisms).

entities such as states, territories, and municipalities. ("**Non-Federal Domestic Governmental Entities**"). (*See* Plan §§ 1.1, 5.8.)

- **The Tribe Trust**. The Tribe Trust, made up of one or more trusts, will make distributions on account of channeled claims held by Tribes, as defined in the Plan. (*See* Plan §§ 1.1, 5.8.)

- **The TPP Trust**. The TPP Trust will make distributions on account of channeled claims held by private health insurers, employer-sponsored health plans, union health and welfare funds, and other providers of healthcare benefits (including third-party administrators or agents of such providers) ("**Third-Party Payors**" or "**TPPs**"). (*See* Plan §§ 1.1, 5.8.)

- **The Healthcare Provider Trust.** The Healthcare Provider Trust will make distributions on account of channeled claims held by any provider of healthcare treatment services or social services ("**Hospitals**"). (*See* Plan §§ 1.1, 5.8.)

- **The Emergency Room Physician Trust ("ERP Trust")**. The ERP Trust will make distributions on account of channeled claims held by certain ER Physician claimants. (*See* Plan §§ 1.1, 5.8.)

- **The PI Trust.** The PI Trust will make distributions on account of channeled claims for alleged opioid-related personal injury to an NAS Child ("**NAS PI Claims**") or to persons that are not NAS Children ("**Non-NAS PI Claims**"). (*See* Plan §§ 1.1, 5.8.)

- **The Public School Trust.** The Public School Trust will make distributions on account of channeled claims held by Public School District claimants. The Public School Trust is also a grant-making trust aimed to help public school districts recover from and develop responses to educate students harmed by the opioid crisis. (*See* Plan §§ 1.1, 5.8.)

- **The Plan Administration Trust ("PAT")**. The PAT will manage and oversee the winding up of the Debtors' Estates after the date on which the plan becomes effective (the "**Effective Date**"), and the resolution of claims that are not channeled to any of the MDT, the Governmental Remediation Trust, the Tribe Trust, the Hospital Trust, the ERP Trust, the TPP Trust, the PI trust, or the Public School Trust.[4]

14. The Private Creditor Trusts and Public School Trust are estimated to receive in excess of $1.5 billion in value under the Plan, approximately $865.8 million of which will be used to compensate personal injury claimants. (*See* DelConte Plan Decl. ¶¶ 21, 23, 25, 27, 29.) Residual funds remaining after payment of the fixed amounts required to be distributed under the

---

[4] The Governmental Remediation Trust and the Tribe Trust are referred to as the "Public Creditor Trusts." The PI Trust, the Healthcare Provider Trust, the TPP Trust, the ERP Trust, and the Public School Trust are collectively referred to as the "Private Creditor Trusts."

Plan, including to the Private Creditor Trusts, the Public School Trust, the Plan Administration

Trust and in satisfaction of obligations under the DOJ Resolution, will go to the Public Creditor

Trusts—that is, the Tribe Trust and Governmental Remediation Trust.  (*See id.* ¶ 31.)  In order to

facilitate the resolution of claims contemplated under the Plan, the Plan provides for an

injunction that will channel claims against the Debtors to the Creditor Trusts as provided for

under the Plan and applicable trust distribution procedures ("**TDPs**").  (Plan § 10.8; JX-3335

(Second Plan Supplement, Ex. A); JX-3469 (Non-NAS Trust Distribution Procedures) JX-3470

(NAS Trust Distribution Procedures).)

15.    Consistent with the Supreme Court Decision, the Plan contains only *consensual*

third-party releases of direct creditor claims against the Sackler Parties and other nondebtor

parties.  Each class of creditors is provided one of the following Shareholder Release Consent

Mechanisms (*see* Plan § 1.1) through which they may *consensually* release any direct claims:

(i) releases from the States, Tribes, and certain other non-federal public entities (Classes 4 and 5)

will be sought through standalone Direct Claims Settlement Agreements entered into among

those claimants and the Sackler Parties; (ii) releases from Public School Districts (Class 6),

Hospitals (Class 7), and ER Physicians (Class 9) will be sought through Opt-Out Class Actions

(*see* Plan §§ 1.1, 5.2(e)(i)); and (iii) releases from Third-Party Payors (Class 8) and PI Claimants

(Class 10) will be sought through opt-in check boxes on the applicable form of Ballot or other

forms of affirmative consent, triggering releases governed by Sections 10.6(b) and 10.7(b) of the

Plan (*See* Plan §§ 1.1, 10.6(b), 10.7(b)).[5]

---

[5] For the avoidance of doubt, the terms of any Direct Settlement Agreements (including the Opt-Out Class Actions), and any releases provided therein, are not governed by the Plan and may differ from those governed by the releases in Sections 10.6(b) and 10.7(b) of the Plan.  (*See, e.g.*, Plan § 10.7(b) n.18.)  Indeed, as the Plan explicitly notes, Sections 10.6(b) and 10.7(b)'s releases

16.    *Second*, the Plan delivers on a commitment first made at the outset[6] of these chapter 11 cases:  the creation of a public document repository that will make more than 100 million pages of material available for public review.  (*See* Plan § 5.13; DelConte Plan Decl. ¶ 32.)  More specifically, the Plan requires the creation of a publicly accessible, online document repository hosted by an academic institution or library that will include documents from more than 13 million documents (consisting of more than 100 million pages) produced to litigants in these chapter 11 cases, an additional approximately thirty million documents collected during the Purdue Legal Matters, and certain categories of documents currently subject to attorney-client privilege.  (*Id.*)  Documents in the repository will include:  (a) documents from the Debtors' email system from present and former officers and senior current and former employees in marketing, sales, R&D, legal, compliance, and regulatory; (b) documents that the Sackler Parties sent or received on the Debtors' email system; (c) documents that reflect clinical and pre-clinical research regarding opioids, including research related to safety and effectiveness of opioids; (d) minutes and documents presented to the board of directors; (e) marketing and sales plans for opioid medications; (f) sales call notes; (g) standard operating procedures; (h) suspicious order monitoring data and documents; and (i) reports of concern and files pertaining to prescribers.

---

"shall not apply to . . . Holders of Claims whose releases will be governed solely and exclusively by a Direct Claims Shareholder Settlement Agreement."  (Plan §§ 10.6(b), 10.7(b)(i).)

[6] The Debtors first introduced the idea of creating a public document repository at the October 11, 2019 Preliminary Injunction Hearing, have repeatedly reaffirmed their commitment to creating a public document repository, and incorporated such a document repository in their previously-confirmed Twelfth Amended Plan.  (*See* Oct. 11, 2019 Hr'g Tr. 66:17-18, 67:5-20, Adv Pro. No. 19-08289 [Dkt. No. 87]; Nov. 6, 2019 Hr'g Tr. 30:19-31:19, Adv Pro. No. 19-08289 [Dkt. No. 119]; June 3, 2020 Hr'g Tr. 20:18-21:8 [Dkt. No. 3329]; July 23, 2020 Hr'g Tr. 48:12-18 [Dkt. No. 1549]; Oct. 28, 2020 Hr'g Tr. 30:20-22 [Dkt. No. 2024]; Nov. 17, 2020 Hr'g Tr. 96:6-24 [Dkt. No. 2073]; Jan. 24, 2025 Hr'g Tr. 14:5-8, Adv Pro. No. 19-08289 [Dkt. No. 658]; June 18, 2025 Hr'g Tr. 30:20-31:12, Adv Pro. No. 19-08289 [Dkt. No. 702].)

(*Id.*)  The document repository will also include all transcripts and audio and video recordings of depositions taken in connection with Purdue-related litigation and investigations; other non-privileged documents collected in the course of such litigation and investigations; privilege logs regarding documents withheld by the Debtors in Purdue-related litigation and investigations; and documents obtained during these chapter 11 cases by the Ad Hoc Committee of NAS Children regarding clinical studies conducted by the Debtors and other companies associated with the Sackler Parties.  (*Id.*)  The repository will also contain certain privileged documents for which the Debtors have agreed to waive privilege, including many relating to marketing, regulatory submissions, distributions to the Sackler Parties, and the organization and function of the board of directors.  (*See id.*; Plan § 5.13.)  The Plan will ensure that scholars and the public will have access to this unprecedented disclosure of materials.

17.    *Third*, on or prior to the Effective Date, Purdue's current business operating assets will be transferred to Knoa Pharma ("**Knoa**" or "**NewCo**").  (*See* Plan § 5.4(a); DelConte Plan Decl. ¶¶ 4, 7.)  No federal, state, or local governmental entity will own the equity of Knoa. Instead, Knoa will be a private company uniquely and historically governed by a charter requiring that Knoa deploy its assets to address the opioid crisis.  (*See* DelConte Plan Decl. ¶ 7; JX-3610 (Knoa Operating Agreement) § 2.3.)  Knoa will be required to operate in a responsible and sustainable manner, and will be subject to the same laws and regulations as any other pharmaceutical company.  (*See id.*)  Moreover, Knoa will be subject to an operating injunction that will bind the company, as well as any successor owner of Knoa's opioid business to certain restrictions on the marketing of opioid products.  (*See* DelConte Plan Decl. ¶ 10; Plan § 5.4(g); JX-3610 (Knoa Operating Agreement) at 4, § 11.4.)  Finally, under the terms of the Master

Shareholder Settlement Agreement, the Sackler parties will be subject to restrictions on

participation in the opioid business.  (JX-3535 (First Plan Supplement, Ex. A) § 8.8.)

## **BACKGROUND**

## I.    **Prepetition Litigation Against the Debtors and Related Parties**

18.    The Debtors operate pharmaceutical companies that manufacture, among other

things, FDA-approved, abuse-deterrent opioid medications, including OxyContin® Tablets

("**OxyContin**").  (*See* DelConte Plan Decl. ¶ 33); *In re Purdue Pharma L.P.*, 633 B.R. 53, 58

(Bankr. S.D.N.Y. 2021) ("**MBR**").  Purdue Pharma L.P. ("**PPLP**") is a limited partnership that is

managed and operated by its general partner, Purdue Pharma Inc. ("**PPI**"), and is governed by

PPI's Board of Directors.  PPLP and its 22 wholly owned operating and non-operating

subsidiaries are ultimately owned by various trusts for the benefit of the Sackler Parties.

19.    Before initiating these chapter 11 cases, certain of the Debtors, including PPLP,

faced more than 2,600 civil actions in dozens of courts and other fora around the country arising

out of the marketing and sale of OxyContin and other opioid pain medications (the "**Pending**

**Actions**").  (*See* DelConte Plan Decl. ¶ 37); MBR at 90 n.5.[7]  Approximately 2,200 of the

Pending Actions have been consolidated in a multidistrict litigation pending in the United States

District Court for the Northern District of Ohio ("**Ohio MDL**"), although there are also hundreds

of stayed actions pending against the Debtors and their related parties in state and territorial

---

[7] Throughout this brief, the Debtors will cite in parallel to the evidence that will be adduced at
the Confirmation Hearing and, where applicable, to the Court's 2021 Modified Bench Ruling
confirming the Twelfth Amended Plan.  Although the 2021 confirmation order has been vacated,
the appeals from that order were decided on legal grounds—as the District Court observed "no
one has challenged any of Judge Drain's findings of fact."  *In re Purdue Pharma, L.P.*, 635 B.R.
26, 82 n.54 (S.D.N.Y. 2021).  The unchallenged findings of this Court in 2021 thus remain a
persuasive reason why analogous conclusions should be drawn from the equivalent testimonial
and documentary evidence to be presented at the Confirmation Hearing.

courts all around the country.[8]  *See* Transfer Order, *In re Nat'l Prescription Opiate Litig.*, No. 17-MD-2804, at 3 (N.D. Ohio Dec. 12, 2017) [Dkt. No. 1].  Hundreds of the Pending Actions were commenced by governmental entities.  *See* Forty-Sixth Amended Order Pursuant to 11 U.S.C. § 105(a) Granting Motion for a Preliminary Injunction at App. II, *Purdue Pharma L.P. v. Commonwealth of Mass.*, Adv. Pro. No. 19-08289 [Dkt. No. 701] (listing governmental actions against the Debtors).  The Pending Actions assert substantially overlapping and similar allegations and claims:  The plaintiffs generally allege that the Debtors acted improperly in the marketing and sale of opioid medications and seek monetary damages based on public nuisance, consumer protection laws, unjust enrichment, false claims acts, and similar claims.[9]  Although some of the plaintiffs also sought injunctive relief against the Debtors, requests for such relief were ancillary to the monetary claims in the Pending Actions—which all allege misconduct that is now many years in the past.[10]

---

[8] (*See, e.g.*, JX-0783 (Complaint, filed in *State of Oregon v. Richard S. Sackler* (19-44161, Cir. Ct. Or.), dated October 10, 2019); JX-0798 (Tribal Plaintiffs' Short Form for Supplementing Compl. and Am. Defendants and Jury Demand, Doc. 2, filed in *In re National Prescription Opiate Litigation, rel. Eastern Shoshone Tribe v. Purdue Pharma L.P.* (MDL No. 2804 (19-45412), N.D. Ohio), dated August 12, 2019); JX-0948 (Complaint, filed in *State of Vermont v. Purdue Pharma L.P.* (757-9-18, Super. Ct. Vt.), dated October 31, 2018).)

[9] *See, e.g.*, Transfer Order, *In re Nat'l Prescription Opiate Litig.*, No. 17-MD-2804, at 3 (J.P.M.L. Dec. 12, 2017), Dkt. No. 1 (centralizing complaints where "[p]laintiffs variously bring claims for violation of RICO statutes, consumer protection laws, state analogues to the Controlled Substances Act, as well as common law claims such as public nuisance, negligence, negligent misrepresentation, fraud and unjust enrichment" raising "common factual questions about, *inter alia*, the manufacturing and distributor defendants' knowledge of and conduct regarding the alleged diversion of these prescription opiates, as well as the manufacturers' alleged improper marketing of such drugs").

[10] These requests for injunctive relief were obviated by the pre-petition actions taken by the company in 2018 as well as the unprecedented voluntary injunction that the Debtors asked the Court to impose upon them in connection with the preliminary injunction entered early in these chapter 11 cases—a voluntary injunction which among other things, prohibits Purdue from the promotion of opioid medications and has been overseen during the pendency of these chapter 11 cases by two highly respected monitors.  (*See* Compl. ¶ 7, *Purdue Pharma L.P. v.*

20.     Prepetition litigation was not confined to the Debtors.  Many lawsuits also named Purdue's related parties as defendants, including but not limited to many of the Sackler Parties. (*See, e.g.*, JX-0783 (complaint filed in 2019 naming Sackler Parties as defendants); JX-0798 (same).)  The rush to name these parties as defendants became increasingly frenzied as rumors of the Debtors' impending bankruptcy swirled in the spring and summer of 2019.  (*See, e.g.*, JX-0798 (Tribal Plaintiffs' Short Form for Supplementing Compl. and Am. Defendants and Jury Demand, *In re Nat'l Prescription Opiate Litig., rel. Eastern Shoshone Tribe v. Purdue Pharma L.P.*, No. 2804 (N.D. Ohio, August 12, 2019) [Dkt. No. 2]; JX-0840 (Second Am. Compl., filed in *State of Connecticut v. Purdue Pharma L.P.*, X07 HHD-CV-19-6105325-S (Conn. Super. Ct., July 1, 2019)).)  Indeed, in the week leading up to or after Purdue's filing of these chapter 11 cases, six states sued Sackler Party defendants in substantially similar, but separate actions without naming Purdue.  (*See, e.g.*, JX-0783 (Compl., *State of Oregon v. Richard S. Sackler*, No. 19-44161 (Or. Cir. Ct. Oct. 10, 2019)).)

21.     In addition to the Pending Actions, the Debtors also had been subject to investigation by multiple components of the United States Department of Justice ("**DOJ**") since at least June 2016.  *See* Mot. Authorizing and Approving Settlements Between the Debtors and the United States at ¶ 16 [Dkt. No. 1828].  Specifically, beginning in the summer of 2016, certain United States Attorney's Offices and components of the DOJ served subpoenas and other requests for documents and information on PPLP related to topics including but not limited to PPLP's opioid medications, including OxyContin, the Debtors' suspicious order monitoring

---

*Commonwealth of Mass.*, Adv. Pro. No. 19-08289  [Dkt. No. 1].)  That voluntary injunction is still in place.  *See* Forty-Sixth Amended Order Pursuant to 11 U.S.C. § 105(a) Granting Motion for a Preliminary Injunction, *Purdue Pharma L.P. v. Commonwealth of Mass.*, Adv. Pro. No. 19-08289 [Dkt. No. 701].

programs, payments to professionals, marketing practices, and other matters. (*Id.*) The Debtors produced more than 9 million documents in connection with these investigations. (*Id.* at ¶ 17.)

22.    It ultimately became clear that case-by-case litigation on the scale faced by the Debtors was untenable and would result in the financial and operational destruction of the Debtors. Not only did the Pending Actions incentivize many inequitable races to the courthouse where various plaintiffs attempted to leapfrog one another to be the first to judgment, but they also forced Purdue to spend millions of dollars <u>per week</u> in legal and professional costs directly related to defending the Pending Actions. (Feb. 1, 2023 Hr'g Tr. 29:3-5 [Dkt No. 409] ("[B]efore bankruptcy, the debtors were spending $2 million per week in connection [with defending] opioid actions against the debtors and their related parties.").) It was equally clear that bankruptcy was the only forum available that could halt the immense destruction of value associated with continued litigation of the Pending Actions and productively orient the parties toward a value-maximizing and equitable global resolution of the litigation.

## II.    Commencement of Chapter 11 Cases and Investigatory Efforts

### A.    2019 Initial Settlement Framework

23.    On September 15, 2019 (the "**Petition Date**"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. *See* Chapter 11 Voluntary Petition [Dkt. No. 1]. Shortly before the Petition Date, and after over a year of intense, hard-fought negotiations, the Debtors, Debtors' shareholders, and a critical mass of plaintiff constituencies reached an agreement in principle on a framework for a global resolution of litigation in connection with Purdue's marketing, manufacturing, and sale of opioid medications (the "**Initial Settlement Framework**"). (November 3, 2025 Declaration of John S. Dubel Decl. ("**Dubel Decl.**") ¶ 37.) The Initial Settlement Framework had, broadly speaking, three core pillars pursuant to which Purdue's shareholders would: (i) relinquish their equity interests in the

14

Debtors; (ii) engage in a sale process for their ex-U.S. pharmaceutical businesses; and (iii) make

a multi-billion-dollar payment over time to the Debtors' estates.  The Initial Settlement

Framework was the product of diligent negotiations by and among the Debtors, plaintiff

constituencies—representing no fewer than 23 state attorneys general and analogous officials

from five U.S. territories, and co-lead counsel in the Ohio MDL—and the Sackler Parties.[11]

24.    The Initial Settlement Framework was a starting place to work towards a broadly

supported, value-maximizing resolution of the Debtors' bankruptcy.  (Dubel Decl. ¶ 37.)  This

framework was a launching point for further negotiations regarding the shape and contours of an

ultimate resolution with the Sackler Parties.  (*See, e.g.*, Sept. 17, 2019 Hr'g Tr. 19:12-13 [Dkt.

No. 324]; *see also* Mar. 18, 2020 Hr'g Tr. 31:15-18, *Purdue Pharma L.P. v. Commonwealth of

Mass.*, Adv. Pro. No. 19-08289 [Dkt. No. 165] ("[T]here's still a lot of work they've required in

this case to determine whether parties support the settlement framework."); Mar. 24, 2021 Hr'g

Tr. 28:18-23 [Dkt. No. 2608] ("[T]he Debtors, the AHC, the UCC, the MSG on the one hand,

and the Sackler Parties on the other, are productively and seriously engaged virtually seven days

a week and around the clock working to attempt to bring to fruition the settlement.").)  The

proposed framework only developed into a confirmable plan after unprecedent amounts of

diligence, investigation, and mediation.

**B.    Investigations by the Special Committee of the Debtors' Board of Directors**

25.    During the course of these bankruptcy cases, the Special Committee of the

Debtors' Board of Directors (the "**Special Committee**") undertook a comprehensive

---

[11] The Initial Settlement Framework was later memorialized in an unsigned term sheet among the
Ad Hoc Committee, the Debtors, and Shareholders Parties.  (*See* Notice of Filing of Term Sheet,
Ex. A (Term Sheet) [Dkt. No. 257].)

investigation of claims that the Debtors might have against the Sackler Parties and associated entities.

26.     The Special Committee was formed in May 2019 and vested with exclusive authority over all transactions between Purdue and the Sackler Parties.  (*See* Dubel Decl. ¶ 8.)  In September 2019, the Special Committee was provided with the additional (and exclusive) authority over the prosecution, defense, and settlement of any causes of action that the Debtors might assert against their shareholders and the Sackler Parties and their affiliates in bankruptcy. (*See* Dubel Decl. ¶¶ 10-11.)

27.     The Special Committee is comprised of four respected and experienced restructuring and pharmaceutical professionals, none of whom had any prior connection to the Sackler Parties.  (*See* Dubel Decl. ¶¶ 13-16.)  To further safeguard the independence of the Special Committee, early in these chapter 11 cases, the Debtors put into place a prophylactic governance measure whereby PPI's shareholders granted PPI's General Counsel an irrevocable proxy to exercise certain shareholder rights, including the right to appoint and remove the Chairman of the Board and the At-Large Directors, all of whom serve on the Special Committee. (*See* Dubel Decl. ¶ 12.)  As the DOJ-selected and Court-appointed independent examiner in these cases determined, the Special Committee "acted independently" in performing its work and "was not controlled or influenced, or subjected to attempted control or influence, by the Sackler Parties."  (JX-0873 (Examiner's Report) at 3-4.)

28.     The Special Committee's investigation began in Spring of 2019 and continued for the next 22 months.  (*See* Dubel Decl. ¶ 17.)  The investigation involved, among other things, an exhaustive review of allegations made in lawsuits by the states and in the news media; identification of potential legal claims that might be brought against the Sackler Parties and

associated entities; an analysis of key legal issues; the collection and review of hundreds of thousands of documents; forensic analyses of transfers to or for the benefit of the Sackler Parties, including all cash and non-cash transfers (ultimately turned into two reports that were published on the docket); expert analysis of the Debtors' solvency; and material collaboration on all of the foregoing with the UCC.  (*See* Dubel Decl. ¶¶ 21-36.)  The Special Committee met no fewer than 56 times between May 2019 and March 2021, during which meetings it received many reports, briefings and updates from its counsel and advisors at Davis Polk, Alix Partners, Bates White, and others.  (*See* Dubel Decl. ¶¶ 19-20.)  Additional details regarding the Special Committee's investigation can be found in the accompanying declaration of John Dubel, who chaired that committee, as well as in the Disclosure Statement.

**C.    Information Sharing, Discovery, and the UCC's Investigation and Prosecution of Estate Claims**

29.    At the outset of these cases, and in furtherance of the Debtors' commitment to provide unprecedented amounts of information to key stakeholders, the Debtors produced what this Court described as an "almost unfathomable" record to creditors to investigate potential claims and to consider whether to support the Initial Settlement Framework—an effort that was substantially completed in late 2020.  MBR at 86.

30.    By way of example, in the first month of these cases, the Debtors, the UCC, and the Sackler Parties reached an agreement whereby the Debtors and the Sackler Parties would provide certain diligence materials to the UCC and others ("**UCC Stipulation**").  (*See* Case Stipulation among the Debtors, the Official Committee of Unsecured Creditors and Certain Related Parties ¶¶ 7, 17 [Dkt. No. 291].)[12]  The Debtors began producing materials pursuant to

---

[12] The obligations of the Shareholder Parties were expanded and amended on November 5, 2019 (*see* Amended and Restated Case Stipulation among the Debtors, the Official Committee of Unsecured Creditors and Certain Related Parties ¶ 17 [Dkt. No. 431-1]), and the Court endorsed

the UCC Stipulation almost immediately.  The UCC Stipulation also secured for the UCC and

the Debtors important commitments from the Sackler Parties, including but not limited to a

provision barring certain Sackler Parties from taking any action with respect to their property

with the intent or material effect of frustrating any judgment that might be obtained against them

(UCC Stipulation ¶ 13), as well as commitments to provide material amounts of information and

presentations on the value, location, and format of their assets (*Id.* ¶ 17).

31.    Over the next year and a half, the Debtors produced a staggering amount of

material—over 90 million pages—to estate stakeholders on a wide variety of issues, including

materials going to both estate claims and underlying opioid liability claims.  (*See* DelConte Plan

Decl. ¶ 32); MBR at 86.  This discovery included, among other things, all documents produced

by the Debtors in the federal multi-district litigation pending in the Ohio MDL and in similar

non-MDL civil litigations; millions of pages of documents produced to the DOJ in connection

with its investigation of the Debtors; millions of additional pages of materials that the Debtors

collected from over 50 custodians, including from additional Sackler family custodians and

directors for time periods going back as much as 25 years; as well as reams of additional

historical analysis and diligence to enable the parties to assess the economics of the Initial

Settlement Framework.

32.    The UCC also conducted its own searching and independent investigation into

potential claims against the Sackler Parties.  (*See* JX-3519 (UCC Amended Standing Motion) at

9-10; JX-0873 (Examiner's Report) at 5; JX-2869 (UCC Plan Support Letter).)  In pursuit of its

investigation, the UCC, often in conjunction with then non-consenting States, vigorously pursued

---

the stipulation on November 20, 2019 (*see* Amended and Restated Case Stipulation among the
Debtors, the Official Committee of Unsecured Creditors and Certain Related Parties [Dkt. No.
518]).

discovery and due diligence in these cases, including directly from the Sackler Parties and their

associated entities and financial institutions.  (JX-3519 (UCC Amended Standing Motion) at 10

(identifying that the UCC "conducted sixteen depositions, including seven members of the

Sackler family, long-serving members of the Debtors' boards of directors, the Debtors' current

and past CEOs," Stuart Baker (former Vice President and Associate General Counsel at Purdue),

and other Sackler family advisors)); MBR at 87 (describing the UCC's "extensive analysis of

potential estate claims").  For example, the UCC moved for, and secured, an order authorizing

Rule 2004 discovery of certain individual Sackler Parties.  (*See* Order Pursuant to Federal Rules

of Bankruptcy Procedure 2004 and 9016 Authorizing Examination of Third Parties [Dkt. No.

992].)  Certain then non-consenting States and the UCC also secured Rule 2004 discovery of

certain of the Sackler's financial institutions.  (*See* Order Pursuant to Rules 2004 and 9016 of the

Federal Rules of Bankruptcy Procedure Authorizing Examinations of Certain Financial

Institutions [Dkt. No. 1143].)  The UCC moved to compel the production of privileged

documents from the Debtors, which resulted in an agreement under which the Debtors shared

over 16,000 of the Debtors' privileged documents with the UCC on a common interest basis

(including communications with the Sackler Parties), all of which go to the heart of the

investigation of possible claims against the Sackler Parties.  (*See* Stipulation of Settlement and

Agreed Order Regarding Official Committee's Motions to Compel and Debtors' Motion for

Protective Order [Dkt. No. 1955]; JX-3519 (UCC Amended Standing Motion) at 10.)  The UCC

and the then non-consenting States took 16 depositions of the Sackler Parties, current and former

Board members, current employees of the Debtors, and other parties; analyzed millions of

documents; evaluated the legal merits of potential claims against the Sackler Parties, including

intentional and constructive fraudulent transfer, breach of fiduciary duty, and direct claims

arising out of the Sackler Parties' involvement in the Debtors' prepetition marketing of opioids; and performed due diligence on the proposed resolution contemplated by the Initial Settlement Framework.[13]  The UCC's investigation was independent and comprehensive.  (*See,* JX-2869 (UCC Plan Support Letter).)

33.    The scope of material provided in these cases was historic, and included significant discovery of overseas persons and non-parties, much of which would likely have been difficult, if not impossible, to obtain in civil litigation.  As this Court previously observed, "more information has been provided with respect to this [P]lan and more specifically with respect to the elements of a settlement with the Sacklers than [the Court] ha[d] ever seen, and . . . [perhaps] ha[s] ever been provided in any [c]hapter 11 case."  (Mar. 24, 2021 Hr'g Tr. 56:5-9 [Dkt. No. 2608]; *see also* MBR at 85-86 (describing the discovery as "the most extensive discovery process that not only I have seen after practicing bankruptcy law since 1984 and being on the bench since 2002, but I believe any court in bankruptcy has ever seen").)  These historic discovery and diligence efforts equally inform and support confirmation of the current Plan and approval of the corresponding settlement agreements.

34.    As a result of the aforementioned efforts, on September 6, 2024, with the consent of the Debtors and the AHC, the UCC moved for an order granting it sole standing to commence and prosecute the Estate Causes of Action (the "**UCC Standing Motion**").[14]  (Dkt. No. 6685; *see*

---

[13] *See, e.g.*, JX-2869 (UCC Plan Support Letter); Official Committee of Unsecured Creditors' Motion to Compel Production of Purportedly Privileged Documents, or for In Camera Review, Based on Failure of the Sacklers and the Debtors to Demonstrate Documents Identified on Logs Are Privileged [Dkt. No. 1752]; Official Committee of Unsecured Creditors' Motion to Compel Production of Purportedly Privileged Documents, or for In Camera Review, Based on Good Cause, Crime Fraud, and at Issue Exceptions to Claims of Privilege [Dkt. No. 1753].

[14] The UCC Standing Motion is a revised version of the UCC's July 8, 2024 motion seeking the same relief.  (*See* Dkt. No. 6523.)

*also* Dubel Decl. ¶ 57 (describing the Special Committee's "lengthy consideration" of the UCC

Standing Motion and its ultimate determination to consent to standing, conditioned on the

Debtors retaining the power to settle such claims).)  The UCC appended to its Motion a 203-

page, 22-count complaint (the "**UCC Complaint**") against 55 named defendants, including

certain of the Debtors' former directors and officers including the Sackler Parties, 218 Sackler

trusts, individual beneficiaries of those trusts, and other Sackler-related entities.  (Dkt. No. 6685-

2.)  The UCC Complaint, which was the product of the UCC's extensive investigation, asserted

claims for, among other things, intentional and constructive fraudulent conveyance (Counts 1-8),

preferential transfers (Count 9), breach of fiduciary duty and aiding and abetting breach of

fiduciary duty (Counts 10-12), unjust enrichment (Count 13), constructive trust (Count 14),

illegal distributions (Count 15), disallowance and subordination (Counts 16-17), accounting

(Counts 18-19), alter ego (Count 20), and liability for violations of the Racketeering Influenced

and Corrupt Organizations Act (Counts 21-22).  (Dkt. No. 6685 at 19.)

35.    On November 18, 2024, the Court issued a written decision granting the UCC's

Standing Motion.  (*See* Memorandum of Decision [Dkt. No. 6931].)  In so doing, the Court

found that the UCC's "detailed and lengthy Draft Complaint [was] the culmination of its

extensive efforts" following "an extensive examination of the Debtors' affairs, including an

investigation of the extent and value of the estate claims against the Sacklers and other potential

defendants." (*Id.* at 19-20.)  The Court further found that the UCC Complaint alleged colorable

claims against the Debtors' related parties based on their involvement in the Debtors' marketing

and sale of opioids, a conclusion that was not challenged by any of the objecting parties.  (*Id.* at

22-23.)  On December 2, 2024, the Court entered an order granting the UCC sole standing to

commence and prosecute Estate Causes of Action.  (*See* Order Granting the Official Committee

of Unsecured Creditors of Purdue Pharma L.P., et al. Sole Standing to Commence and Prosecute
Estate Causes of Action [Dkt. No. 6979].)[15]

36.     The UCC—in addition to every other major creditor constituency—supports the
Shareholder Settlements, which resolves (rather than litigates) the Estate Causes of Action.

**D.     The DOJ Resolution**

37.     On November 18, 2020, the Bankruptcy Court approved PPLP entering into (i) a
plea agreement (the "**Plea Agreement**") by and among PPLP and the United States, and (ii) a
civil settlement agreement by and between PPLP and the United States ("**Civil Settlement**" and,
together with the Plea Agreement, the "**DOJ Resolution**") to fully resolve the United States'
civil and criminal investigations into the Debtors' past practices related to the production, sale,
marketing, and distribution of opioid products.  (*See* [Dkt. No. 2004].)  On November 24, 2020,
in accordance with the terms of the DOJ Resolution (*see* JX-2094 (Plea Agreement); JX-2095
(Civil Settlement)), PPLP pled guilty in the United States District Court for the District of New
Jersey to an information charging it with three felony offenses:  one count charging a dual-object
conspiracy to defraud the United States and to violate the Food, Drug, and Cosmetic Act, and
two counts charging conspiracy to violate the Federal Anti-Kickback Statute.

38.     Pursuant to the Plea Agreement, among other things, the Debtors and the United
States agreed to a criminal forfeiture judgment in the amount of $2 billion (the "**Forfeiture
Judgment**") that will be entered after confirmation of the Plan and upon the New Jersey District
Court's acceptance of the Plea Agreement, and will be deemed to have the status of an allowed

---

[15] Notwithstanding the UCC's sole standing to <u>prosecute</u> Estate causes of action, the Debtors
retain the right to <u>settle</u> Estate causes of action.  (*See* Order Granting the Official Committee of
Unsecured Creditors of Purdue Pharma L.P., et al. Sole Standing to Commence and Prosecute
Estate Causes of Action at ¶ 11 [Dkt. No. 6979].)

superpriority administrative expense claim against PPLP.[16]  Critically for the success of these

chapter 11 cases, the United States further agreed to provide a credit offsetting the Forfeiture

Judgment (the "**Forfeiture Judgment Credit**") of up to $1.775 billion for value distributed or

otherwise conferred by PPLP under the Plan in respect of claims asserted by state, tribal, or local

government entities if the Plan provided for the establishment of a public benefit company (or

entity with a similar mission) and certain other terms and conditions as described in more detail

in the Plea Agreement.  (*See* Dubel Decl. ¶¶ 58, 68.)  The Forfeiture Judgment Credit was

singularly effective at incentivizing all of the other creditors—who faced the real possibility of

receiving nothing in the absence of the DOJ settlement and credit—to craft and join a settlement

that maximizes the value dedicated to abatement purposes.  (*Id.*)  The current Plan contemplates

that the Debtors will be able to utilize the full amount of the Forfeiture Judgment Credit

following satisfaction of two requirements: (i) distribution of the value of the Forfeiture

Judgment Credit from the Debtors' Estates to the Governmental Remediation Trust and the Tribe

Trust; and (ii) transfer of the Debtors' businesses to Knoa.

## III.    Mediation Efforts and Post-Confirmation Appeals

### A.    Mediation Efforts Leading to the Twelfth Amended Plan

39.    Prior to confirmation of the *Twelfth Amended Joint Chapter 11 Plan of

Reorganization of Purdue Pharma L.P. and its Affiliated Debtors* ("**Twelfth Amended Plan**"),

the Debtors and various core creditor constituencies participated in three phases of mediation to

resolve various intercreditor disputes and certain potential causes of action against the Sackler

---

[16] Order Pursuant to 11 U.S.C. § 105 and Fed. R. Bankr. P. 9019 Authorizing and Approving
Settlement Between the Debtors and the United States [Dkt. No. 2004] ¶ 3.

Parties.  (*See* Dubel Decl. ¶ 38); JX-1637 (Phase One Mediators' Report); JX-1638 (Phase Two

Mediators' Report); JX-1639 (Phase Three Mediators' Report).)

40.    In February 2020, the Debtors filed a motion seeking appointment of the

Honorable Layn Phillips and Mr. Kenneth Feinberg as co-mediators to conduct mediation

amongst the Debtors, UCC, and various ad hoc committees and groups in these cases (the "**Pre-**

**Confirmation Mediation**").  (*See* Dubel Decl. ¶ 38; Debtors' Motion for Entry of an Order

Appointing Mediators [Dkt. No. 855].)  The Court thereafter approved the Debtors' motion (*see*

Order Appointing Mediators [Dkt. No. 895]), and the Pre-Confirmation Mediation proceeded

with the various parties outlined in greater detail in the Disclosure Statement.  The initial

objective of the Pre-Confirmation Mediation was to mediate disputes among the Non-Federal

Public Claimants and Private Claimants as to the allocation of value or proceeds available from

the Debtors' Estates, including, without limitation, from any settlements, to such claimants, in

each case on an aggregate basis as among them.  (Dubel Decl. ¶ 38.)

41.    In September 2020, the Court entered an order expanding the scope of the Pre-

Confirmation Mediation to allow the mediators to resolve certain open issues identified in the

Phase One Mediators' Report and mediate the Estates' causes of action and any potential claims

or causes of action held by any Non-Federal Public Claimants against the Sackler Parties.  (*See*

Dubel Decl. ¶ 38; Order Expanding Scope of Mediation [Dkt. No. 1756].)  These efforts resulted

in a settlement between five out of six of the mediating parties, wherein the Sackler Parties

aggregate contribution increased from $3 billion over seven years under the Initial Settlement

Framework to $4.275 billion over nine years.  (*See* JX-1638 (Phase Two Mediators' Report) at

9.)  And in May 2021, the Court appointed the Honorable Shelley C. Chapman to preside over

further mediation between certain then non-consenting States and the Sackler Parties with

respect to disagreements over the terms of a then-existing shareholder settlement agreement. (*See* Dubel Decl. ¶ 51; Order Appointing the Honorable Shelley C. Chapman as Mediator [Dkt. No. 2820].)  These negotiations resulted in fifteen additional states signing on to an enhanced shareholder settlement agreement.  (Dubel Decl. ¶ 52.)

### B.    Confirmation of the Twelfth Amended Plan

42.    Starting on August 12, 2021, the Court—then under the stewardship of the Honorable Robert D. Drain—presided over a confirmation hearing for confirmation of the Twelfth Amended Plan.  Even at that time, the Twelfth Amended Plan was backed by an extraordinarily broad consensus and opposed only by a handful of States, several *pro se* claimants, and the U.S. Trustee.  While these objecting parties raised several issues in opposition to confirmation of the Twelfth Amended Plan, chief among them was a challenge to the legality of the nonconsensual third-party releases contained in that plan.

43.    The August 2021 confirmation hearing was an extraordinarily robust exercise that produced an extensive trial record.  The hearing took place over the course of six full days of trial, during which the Court received testimony from 41 fact and expert witnesses.  The proponents and supporters of the Twelfth Amended Plan introduced 35 of those witnesses.  In addition, the Court accepted over 2,800 exhibits into evidence.  While confirmation was fiercely contested, and featured more than two days of oral argument, the parties opposing confirmation for the most part declined to dispute the critical elements of the plan supporters' factual case.  They declined to ask a <u>single</u> cross-exam question of nine of the plan proponents' witnesses.  And cross-exam of the remaining witnesses focused not on the testimony presented about the Plan and its benefits—or the consequences of abandoning the Plan—but instead focused on the underlying merits of the Pending Actions.

44.    Following the confirmation trial, the Court overruled the various pending
objections and confirmed the Twelfth Amended Plan in a six-hour, comprehensive bench ruling
that was later reduced to a written decision, the Modified Bench Ruling, spanning more than 150
pages.  *See generally* MBR.  Judge Drain's extensive factual findings and holdings were deeply
rooted in the robust factual record; indeed, the Court observed that settlements reached by the
parties were preceded by the "most extensive discovery process" that the Court had ever seen.
(MBR at 85-86.)  Among other things, Judge Drain found that the then-existing shareholder
settlement was fair, reasonable, and in the best interests of the Estates.  The Court also found
that, absent the Twelfth Amended Plan and settlement structure, creditors would likely face
serious obstacles trying to recover from the Sackler Parties—who are "not a simple group of a
few defendants"—and, even if judgments were obtained against the Sackler Parties, creditors
would face significant "problems" in trying to collect on those judgments given that much of the
Sackler Parties' assets are held in spendthrift trusts, many of which were in hard-to-reach
jurisdictions.  (MBR at 88, 93.)

45.    Analyzing the *Iridium* factors, Judge Drain observed that the then-existing
settlement negotiated by the creditors—which provided for a smaller aggregate contribution
from the Sackler Parties for a more global resolution of the potential claims against them than
under the current Plan—was negotiated at arms' length, was the product of a staggering level of
transparency, had garnered overwhelming support, evaded the great risks of piecemeal litigation
and judgment collection, and was the alternative to an otherwise likely liquidation of the Debtors
with no recovery for unsecured creditors.  (MBR at 85-91.)

C.    **Appellate Litigation and Supreme Court Decision**

46.    The Court ultimately confirmed the Debtors' Twelfth Amended Plan in
September 2021, which included the *nonconsensual* release of certain fundamentally overlapping

26

creditor claims against certain of the Debtors' Related Parties.  (*See* Findings of Fact, Conclusions of Law, and Order Confirming the Twelfth Amended Plan ("**2021 Confirmation Order**") [Dkt. No. 3787].)  For approximately three years following confirmation, the Debtors, creditor constituencies, the U.S. Trustee, and other interested parties engaged in multiple levels of appeals to litigate, primarily, whether the Bankruptcy Code authorized the nonconsensual third-party releases under the Twelfth Amended Plan.  (*See generally* Dubel Decl. ¶¶ 48-56.)

47.     In December 2021, approximately three months after the Twelfth Amended Plan was confirmed, the United States District Court for the Southern District of New York vacated the Confirmation Order, holding that the Bankruptcy Code did not authorize the nonconsensual third-party releases in the Twelfth Amended Plan.  *See In re Purdue Pharma, L.P.*, 635 B.R. 26 (S.D.N.Y. 2021); (Dubel Decl. ¶ 50).  At the same time, the District Court rejected other challenges to the Bankruptcy Court's subject matter jurisdiction to approve the release of claims against nondebtors and the Twelfth Amended Plan's classification and treatment of certain unsecured creditors.  *Id.* at 83-89, 115-17.  Thereafter, the Debtors and others appealed the District Court's decision to the United States Court of Appeals for the Second Circuit.  (Dubel Decl. ¶ 51.)  On May 30, 2023, the Court of Appeals reversed the District Court and affirmed the Bankruptcy Court's Confirmation Order.  *See In re Purdue Pharma L.P.*, 69 F.4th 45 (2d Cir. 2023); (Dubel Decl. ¶ 54).  In relevant part, the Second Circuit likewise upheld the Bankruptcy Court and District Court's rejection of challenges to jurisdiction and the classification and treatment of certain unsecured creditors.  *Id.* at 71-72, 84.

48.     Despite virtually every single economically interested party having agreed to support the Twelfth Amended Plan, the United States Trustee sought, and was granted, certiorari before the United States Supreme Court.  On June 27, 2024, the Supreme Court (5 – 4) reversed

the Second Circuit's decision and held that the Bankruptcy Code does not authorize the

nonconsensual release of claims of a nondebtor against another nondebtor in a plan of

reorganization—as then provided by section 10.7 of the Twelfth Amended Plan—and remanded

the case for further proceedings consistent with its opinion. *See generally Harrington*, 603 U.S.

204; (Dubel Decl. ¶¶ 54, 56). The Supreme Court Decision neither addressed nor adjudicated

any other bases upon which the Second Circuit affirmed the Confirmation Order. And regarding

the achievement of such "rare" levels of consensus, Supreme Court Justice Brett Kavanaugh

(joined in dissent by Chief Justice John Roberts, Justice Elena Kagan, and Justice Sonia

Sotomayor) described Purdue's Twelfth Amended Plan as "a shining example of the bankruptcy

system at work." *Harrington*, 603 U.S. at 228 (Kavanaugh, J., dissenting).

### D. Renewed Mediation and Improved Shareholder Settlement Agreement

49. The very same day that the Supreme Court Decision was issued, the Debtors

sought permission from the Court to engage in further mediation with their major creditor

constituencies to explore whether it would be possible to preserve any portion of the web of

complex inter- and intra-creditor settlements that undergirded the Twelfth Amended Plan, and to

do so in a manner that was consistent with the Supreme Court's directive (the "**2024-25**

**Mediation**"). (Dubel Decl. ¶ 57.) On July 10, 2024, the Court entered an order appointing The

Honorable Shelley C. Chapman (Ret.) and Professor. Eric D. Green as co-mediators to facilitate

these negotiations. (*See* Order Appointing the Honorable Shelley C. Chapman (Ret.) and Eric D.

Green as Co-Mediators and Establishing Terms and Conditions of Mediation [Dkt. No. 6537] (as

amended and extended, the "**Mediation Order**").) The Debtors, UCC, Ad Hoc Committee,

MSGE, "Covered Parties" (consisting of the Initial Covered Sackler Persons and the Additional

Covered Sackler Persons),[17] Ad Hoc Group of Hospitals, NAS Committee, Ad Hoc Group of

Individual Victims, Third-Party Payor Group, Public School District Claimants, Ratepayer

Mediation Participants, and one or more negotiating committee(s) of State Attorneys General

were all active participants in the 2024-25 Mediation.

50.     Prior to the Supreme Court Decision, at a time when the Second Circuit

recognized the viability of nonconsensual third-party releases, the facts and circumstances

existing at that time foreclosed any Plan without the form of nonconsensual third-party releases

contemplated by the Twelfth Amended Plan.  (*See* Dubel Decl. ¶ 47.)  Following the Supreme

Court's decision, however, and in response to the changed legal landscape, the parties developed

a new settlement structure after thousands of hours of mediation sessions and summits over the

course of eight months.  (*See* Dubel Decl. ¶ 60.)  This new settlement structure achieves a

resolution that is even *more* broadly supported than the one achieved in the Twelfth Amended

Plan.  Since the new settlement structure includes only *consensual* third-party releases, it is

entirely consistent with the Supreme Court Decision.  This new value-maximizing Plan is

expected to deliver approximately $7.4 billion of distributable cash over fifteen years (as well as

myriad other benefits) to claimants and communities across the country affected by the opioid

crisis.

51.     The new settlement structure—which includes a number of separate yet

interrelated settlements (collectively, the "**Shareholder Settlements**")—implements a

comprehensive resolution of (i) the Debtors' claims (the "**Estate Causes of Action**") against the

Shareholder Released Parties (the "**Estate Claims Settlement**"); and (ii) claims held by Settling

---

[17] These terms are defined in the *Amended and Restated Case Stipulation Among the Debtors, the Official Committee of Unsecured Creditors and Certain Related Parties*, [Dkt. No. 518].

Creditors[18] against the Shareholder Released Parties and Released Parties (the "**Direct Claims Settlements**"). (*See* Dubel Decl. ¶ 69.) These two components together comprise the Shareholder Settlements. Only certain of the Shareholder Settlements—specifically, settlement of the Third-Party Payor and PI Claims against Shareholder Released Parties and Released Parties, and the Estate Claims Settlement—are effectuated through the Plan. The remaining Shareholder Settlements are effectuated through private agreements between certain Settling Creditors and the Sackler Parties.

52.     Pursuant to the Master Shareholder Settlement Agreement, the Sackler Parties are to contribute up to $7 billion—$500 million of which is contingent upon a sale of the IACs in excess of a certain value. (*See* Dubel Decl. ¶¶ 60, 67.) The $7 billion will be allocated between the Estate Claims Settlement (receiving one-third, or approximately $2.17 billion) and the Direct Claims Settlements (receiving two-thirds, or approximately $4.33 billion). Settling Creditors will receive separate distributions on account of both the Estate Claims Settlement and the Direct Claims Settlement. By contrast, Non-Settling Creditors will be eligible to receive a distribution from the Estate Claim Settlement if and when their claim is allowed, but will not receive a payment flowing from the Direct Claims Settlement (as they will have chosen to retain their direct claims against the Shareholder Released Parties in lieu of settling). (*See generally* DelConte Plan Decl. ¶¶ 18-31.)

---

[18] A "Settling Creditor" is "any Holder of a Channeled Claim that consents to the Third-Party Releases or otherwise provides a release under a Shareholder Settlement Agreement pursuant to the applicable Shareholder Release Consent Mechanism." (Plan § 1.1) A "Non-Settling Creditor" is "any Holder of a Claim [with exceptions] . . . that does not consent to the Shareholder Direct Claims Releases pursuant to the Shareholder Release Consent Mechanism applicable to the applicable Class of such Claims." (*Id.*)

53.     The ultimate consequence of the Shareholder Settlements is that billions of dollars will flow into trusts established for the benefit of, among others, States, Subdivisions (as defined in the Master Shareholder Settlement Agreement), healthcare providers, Public School Districts, ER Physicians, and qualified personal injury claimants.  (*See* DelConte Plan Decl. ¶¶ 21, 23, 25, 27, 29.)  In addition to the up to $7 billion provided by the Sackler Parties, the aforementioned creditor trusts will be further funded by approximately $900 million to be paid out of the Debtors' Estates on the Effective Date, with the cumulative effect of providing up to approximately $7.9 billion in cash to creditors over time (plus any recoveries from insurance and other litigation claims transferred to the MDT).

54.     This settlement framework not only provides enormous distributable value to the Debtors' creditors, but also provides a number of critical ancillary benefits: (i) it avoids the possibility of immensely destructive inter-creditor litigation concerning allocation; (ii) it avoids the potential unwinding of the DOJ Resolution and the destruction of value and loss to creditor recoveries that would result from the Debtors' inability to satisfy the terms of the $1.775 billion forfeiture judgment credit, potentially leading the United States to consume the entire value of the Debtors through its $2 billion superpriority claim; and (iii) it largely avoids costly, value-destructive litigation against the Sackler Parties by the Debtors and their creditors, and sidesteps the uncertainty and delay attendant in obtaining potential recoveries through litigation across jurisdictions.  (*See* Dubel Decl. ¶¶ 67-69.)

55.     While the Shareholder Settlement was built on the structure of the agreements reached in the Twelfth Amended Plan, there are key differences between the two plan structures, including:

- **Consensual releases**: In contrast to section 10.7 of the Twelfth Amended Plan, the proposed Plan provides certain classes of creditors with a Shareholder Release Consent Mechanism (*see* Plan § 1.1) through which they may *consensually* release any direct claims.

- **Greater contribution of aggregate funds**: Whereas the Twelfth Amended Plan provided for up to $6 billion in aggregate payments by the Sackler Parties to creditors, the proposed Plan provides up to $7 billion in aggregate payments by the Sackler Parties.

- **Settlements implemented outside the Plan**: The Twelfth Amended Plan endeavored to provide a global resolution of claims against the Debtors and the Sackler Parties. By contrast, this Plan incorporates the settlement of direct claims held by creditors in certain creditor classes (*i.e.* classes 8, 10(a), and 10(b)), but it is also built in conjunction with several other carefully negotiated settlements of creditor direct claims, which are conditioned on, but independent of, confirmation of the Plan.

56.    The Special Committee played an active role throughout the 2024-25 Mediation and in the approval of the Master Shareholder Settlement Agreement. (*See* Dubel Decl. ¶ 58.) During the negotiations, counsel and financial advisors to the Debtors provided the Special Committee regular updates via email, telephone, and in-person and virtual meetings on the status of negotiations and the various proposals and counterproposals circulated by the Mediation Parties. (*Id.* at ¶¶ 58-59.) During this period, the Special Committee met no fewer than 13 times to discuss the Debtors' position on matters implicated by the mediation. Ultimately, in March 2025, after being provided drafts of the Plan, Disclosure Statement, and other key documents, the

Special Committee approved the Shareholder Settlement Term Sheet which set forth the terms of the Shareholder Settlements. (*Id.* at ¶ 62.) The full Board of Directors subsequently approved the remaining components of the settlement structure, authorized filing of the Plan and Disclosure Statement, and approved entry into the Master Shareholder Settlement Agreement. (Dubel Decl. ¶ 62.)

## IV.    Solicitation of the Revised Plan and Voting

57.    On March 18, 2025, the Debtors filed the Thirteenth Amended Plan and corresponding Disclosure Statement, which, among other things, incorporated the term of the Settlement Agreements [Dkt Nos. 7306, 7307]. Thereafter, the Debtors filed several revised versions of the Thirteenth Amended Plan and Disclosure Statement to reflect ongoing negotiations and conforming updates [Dkt. No. 7445, 7446, 7508, 7509, 7588, 7589]. Following the hearings held on June 18, 2025, and June 20, 2025, the Court entered the Order approving the Disclosure Statement. (*See* Order Approving Disclosure Statement [Dkt. No. 7615] ("**Disclosure Statement Order**").)[19] Pursuant to the Solicitation and Voting Procedures approved by the Court [Disclosure Statement Order, Ex. 1], the Debtors' Solicitation Agent, Kroll Restructuring Administration LLC ("**Kroll**"), mailed a solicitation package to each holder

---

[19] On July 1, 2025, the Debtors filed amended versions of the Plan and Disclosure Statement [Dkt. Nos. 7636, 7637] to be included in the solicitation packages. In addition, the Debtors also filed a series of Plan Supplements beginning on June 17, 2025 that contained drafts of certain documents relevant to the Plan's implementation, such as the Master Shareholder Settlement Agreement, the various trust agreements and trust distribution procedures. (*See* JX-3335 (Second Plan Supplement, Ex. A).) On June 17, 2025 and September 19, 2025, the Debtors also filed (for informational purposes and not as part of the Plan Supplement) drafts of the various Direct Shareholder Settlement Agreements [Dkt. Nos. 7592, 7878]. On September 26, 2025, the Debtors filed the Fourteenth Amended Joint Chapter 11 Plan of Reorganization [Dkt. No. 7911], which incorporated additional detail and terms relating to the Shareholder Settlements achieved with certain organized creditor groups, including the Public School District Claimants and the Hospital Group Claimants, as well as other minor changes.

of Claims in the Voting Classes by July 11, 2025.  (*See generally* Affidavit of Service of

Solicitation Materials [Dkt. No. 7987]; Johnson Decl. ¶ 4.)  The solicitation packages included

(i) a notice of the Confirmation Hearing; (ii) the applicable Ballot; (iii) a cover letter from the

Debtors urging creditors to vote to accept the Plan and a cover letter from the UCC

recommending acceptance of the Plan; (iv) the Solicitation and Voting Procedures; and (v) a

flash drive containing the Disclosure Statement Order, the Disclosure Statement, and the Plan.

(*See* Disclosure Statement Order, Ex. 1 at 2.)

58.    After the distribution of the solicitation packages, voting commenced.  Eligible

creditors voted on the Plan by completing and submitting a ballot, or in some cases, having an

attorney do so on their behalf, such that it was received prior to the applicable voting deadline.

(*See* Disclosure Statement Order, Ex. 1 at 2.)  After September 30, 2025 at 4:00 p.m., prevailing

Eastern Time, when the last of the applicable voting deadlines had passed, Kroll tabulated the

timely and valid ballots in accordance with the Solicitation and Voting Procedures.  (*See* Johnson

Decl. ¶ 10.)

59.    The voting results once again confirm a historic level of consensus among

creditors in support of the Plan.  Overall, across all classes of voting creditors, more than 99% of

the ballots cast and more than 99% of the amount of total voting dollars voted to accept the Plan.

(*See* Johnson Decl., Ex. A.)  This overwhelming consensus even exceeds the historic consensus

reached in connection with confirmation of the Twelfth Amended Plan.  Each and every Class of

creditors that voted has overwhelmingly voted to accept the Plan, as reflected in the following

table.  (*Id.*)

**Purdue Pharma L.P.,** *et al.*
**Exhibit A - Preliminary Tabulation**

| Class | Class Description | Number Accepting % | Number Rejecting % | Amount Accepting % | Amount Rejecting % | Class Voting Result |
|-------|-----------------|--------------------|--------------------|--------------------|--------------------|---------------------|
| 3 | Federal Government Unsecured Claims | No valid Ballot submitted by a holder entitled to vote in the class | | | | Deemed to Accept[1] |
| 4 | Non-Federal Domestic Governmental Claims | 3,229 | 8 | $3,229.00 | $8.00 | Accept |
| | | 99.75% | 0.25% | 99.75% | 0.25% | |
| 5 | Tribe Claims | 59 | 10 | $59.00 | $10.00 | Accept |
| | | 85.51% | 14.49% | 85.51% | 14.49% | |
| 6 | Public School Claims | 173 | 1 | $173.00 | $1.00 | Accept |
| | | 99.43% | 0.57% | 99.43% | 0.57% | |
| 7 | Healthcare Provider Claims | 604 | 1 | $604.00 | $1.00 | Accept |
| | | 99.83% | 0.17% | 99.83% | 0.17% | |
| 8 | Third-Party Payor Claims | 19,278 | 1 | $19,278.00 | $1.00 | Accept |
| | | 99.99% | 0.01% | 99.99% | 0.01% | |
| 9 | ER Physician Claims | 1 | 0 | $1.00 | $0.00 | Accept |
| | | 100% | 0% | 100% | 0% | |
| 10(a) | NAS PI Claims | 3,325 | 4 | $3,325.00 | $4.00 | Accept |
| | | 99.88% | 0.12% | 99.88% | 0.12% | |
| 10(b) | Non-NAS PI Claims | 54,354 | 218 | $54,354.00 | $218.00 | Accept |
| | | 99.60% | 0.40% | 99.60% | 0.40% | |
| 11(c) | Other General Unsecured Claims | 95 | 2 | $8,400,087.11 | $751.00 | Accept |
| | | 97.94% | 2.06% | 99.99% | 0.01% | |

[1] It is Kroll's understanding that Section 3.3 of the Plan provides: "With respect to each Debtor, if a Class contains Claims eligible to vote and no Holder of Claims eligible to vote in such Class votes to accept or reject this Plan by the Voting Deadline, this Plan shall be presumed accepted by the Holders of Claims in such Class."

## ARGUMENT

### I.    The Court Has Subject Matter Jurisdiction to Approve the Plan

60.    This Court's "core" jurisdiction extends to all civil proceedings "arising under," "arising in" or "related to" cases under title 11.  *See* 28 U.S.C. § 1334(b).  The Supreme Court has instructed that the jurisdictional grants of section 1334 be construed "broadly" as "Congress intended to grant comprehensive jurisdiction to the bankruptcy courts so that they might deal efficiently and expeditiously with *all matters* connected with the bankruptcy estate."  *Celotex Corp. v. Edwards*, 514 U.S. 300, 308 (1995) (emphasis added) (citation omitted).  While Congress did not specifically delineate the scope of bankruptcy courts' jurisdiction, the Supreme Court has held that "its choice of words suggests a grant of some breadth" indicating it intended for "related to" jurisdiction to encompass any action that "could conceivably have any effect on the estate being administered in bankruptcy."  *Id.* at 308, 308 n.6 (citation omitted).

61.     Consistent with the teachings of *Celotex*, the Second Circuit Court of Appeals has held that bankruptcy courts have jurisdiction over any proceeding that "might have any conceivable effect on the bankrupt estate." *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 339-40 (2d Cir. 2018) (holding "related to" jurisdiction is "fairly capacious" and reaches "suits between third parties which have an effect on the bankruptcy estate") (citation omitted); *see also Parmalat Cap. Fin. Ltd. v. Bank of Am. Corp.*, 639 F.3d 572, 579 (2d Cir. 2011) (holding state law action to recover assets of a foreign debtor fell within bankruptcy court's "related to" jurisdiction); *In re Quigley Co., Inc.*, 676 F.3d 45, 53 (2d Cir. 2012) (bankruptcy jurisdiction is appropriate over "third-party non-debtor claims that directly affect the res of the bankruptcy estate.") (citation omitted).

62.     Confirmation of a plan of reorganization falls comfortably within the Court's subject matter jurisdiction. *See* 1 Collier on Bankruptcy P 3.01 (16th 2025) (explaining that matters "arising under" title 11 include "confirmation of a plan under chapters 9, 11, 12 or 13"); *In re Kirwan Offs. S.a.r.l.*, 592 B.R. 489, 505 (S.D.N.Y. 2018) (holding "a proposed plan of reorganization [is] a proceeding that is clearly at the core of bankruptcy law" (citation omitted)), *aff'd sub nom. In re Kirwan Offs. S.a.R.L.*, 792 F. App'x 99 (2d Cir. 2019); *In re Best Prods. Co., Inc.*, 168 B.R. 35, 64 (Bankr. S.D.N.Y. 1994). No party disputes that the Court has jurisdiction to confirm the Plan.

63.     The settlements contemplated under the Plan also fall comfortably within the Court's "capacious" subject matter jurisdiction. *SPV Osus*, 882 F.3d at 340. And numerous courts, including this one, have concluded that, following the Supreme Court Decision, the relevant test for "related to" jurisdiction remains whether an action has any conceivable effect on the *res*. *See In re Spirit Airlines, Inc.*, 668 B.R. 689, 715 (Bankr. S.D.N.Y. 2025) (confirming

plan with consensual releases and holding the Court had jurisdiction to do so where releases affected the *res* of the estate); *In re GOL Linhas Aéreas Inteligentes S.A.*, 672 B.R. 129, 171 (Bankr. S.D.N.Y. 2025) (confirming plan with consensual releases and holding court had jurisdiction to do so where debtors had "demonstrated that the third-party releases are an essential component of the Plan," and thus "directly affect the *res* of the Debtors' estates."); *Maryland v. Purdue Pharma L.P. (In re Purdue Pharma L.P.)* 2024 WL 4894349, at \*7 (S.D.N.Y. Nov. 26, 2024) (affirming this Court's holding that the Supreme Court Decision "left unchanged" bankruptcy courts' subject matter jurisdiction, "which is about as broad as it can possibly be" and encompasses any claim that could impact the *res*).

64.    Here, the claims subject to settlement under the Plan plainly impact the *res* of the estates.  As in *Spirit*, the Shareholder Settlements "forms the foundation of the reorganization accomplished by the Plan and [] provides the basis for the robust recovery of the affected creditors."  *In re Spirit*, 668 B.R. at 715.  Without settlement of the Estate Causes of Action and the Direct Claims Settlement, the economics of the Plan would be fundamentally altered, and the $6.5 to $7 billion provided as consideration for, in part, the consensual releases in the Plan would be jeopardized.  Absent the funding from the Direct Claims Settlement, the economics of the Plan would not support the intercreditor settlements, including regarding allocation, and the carefully negotiated resolution would collapse.  Under such circumstances, it cannot be seriously disputed that resolution of these claims could have a "conceivable effect" on the *res*, thereby satisfying the standard for "related to" jurisdiction.

## II.    The Settlements Embodied in the Plan Are Fair and Equitable and Should Be Approved

65.    As discussed below, the Plan incorporates a number of interrelated settlements, including, but not limited to: (i) the Shareholder Settlement Agreement; (ii) the Public Entity

Settlements; (iv) the Private Entity Settlements; (v) the Public Entity Allocation; (vi) other intra-creditor allocations; and (vii) certain fee arrangements.

66.     The Shareholder Settlements themselves are a global resolution of claims and controversies against the Debtors and a comprehensive, consensual resolution of claims against the Sackler Parties arising out of the Debtors' production, marketing, and sale of opioid medications. This value-maximizing settlement is the product of years of diligent investigations, several rounds of mediation, and hard-fought negotiations, and will result in up to $7 billion contributed by the Sackler Parties being provided to public and private creditor trusts, including approximately $865.8 million for distribution to qualified personal injury claimants. Remarkably, this fiercely negotiated settlement has the support of every key creditor group in these chapter 11 cases.

67.     As discussed above, only certain elements of the Shareholder Settlements—the Estate Claims Settlement and the settlement of direct claims held by Personal Injury Claimants and Third-Party Payors—are directly implemented by the Plan. *See supra* ¶ 51. As such, it is only those portions of the Shareholder Settlements, together with the additional compromises contained in the Plan (together, the "**Plan Settlement**"), for which approval is sought under the Bankruptcy Code and Bankruptcy Rule 9019.[20] However, the remaining components of the Shareholder Settlements—the Direct Claims Settlement Agreements—are interrelated with the Plan Settlement. In combination with the Direct Claims Settlements under the Plan for the Personal Injury and Third-Party Payor Claimants, they provide approximately $4.33 billion in

---

[20] Likewise, only those releases of direct claims held by Settling Creditors that are governed by Section 106.(b) and 10.7(b) of the Plan (as opposed to those releases governed by the Direct Claims Shareholder Settlement Agreements) are before the Court for approval.

value that will flow directly from the Sackler Parties to the Settling Creditors.[21]  Thus, the

Debtors have weighed—and the Court too should weigh—the total benefits of the

comprehensive resolution provided by the Shareholder Settlements when evaluating whether to

approve the Estate Claims Settlement.  Billions of dollars of value and non-monetary measures

of great importance are provided under those settlements.  That consideration, and the broad Plan

support that the settlements have yielded, is of primary relevance when assessing whether the

Plan Settlement is reasonable and in the best interests of the Debtors' creditors.  The allocation

of value from the Shareholder Settlements between Estate and direct claims is the product of

careful negotiation and intense mediation among the Debtors creditors.

68.    The Plan Settlement also embodies two additional sets of compromises—the

Public Entity Settlements and Private Entity Settlements—that were incorporated, in similar

form, in the Twelfth Amended Plan and further refined during the 2024-25 Mediation.  As

described further in Section 5.2(f) of the Plan, the Public Entity Settlements would resolve all

claims by non-federal domestic governmental entities (States, cities, counties, towns, and other

local governmental entities, as well as the Tribes) against the Debtors by channeling such claims

to the Governmental Remediation Trust and Tribe Trust.  The Public Entity Settlements also

resolve, through the Public Entity Allocation, the question of how the Estates' value should be

distributed <u>among</u> governmental entities (*e.g.*, by providing the interstate allocation formula, a

---

[21] This includes:  (i) for the Non-Federal Domestic Governmental Channeled Claims, an aggregate amount of $3,485,264,791.64; (ii) for the Tribe Channeled Claims, an aggregate amount of $118,938,715.74; (iii) for the Healthcare Provider Channeled Claims, an aggregate amount of $174,215,320.82; (iv) for the Public School Channeled Claims, an aggregate amount of $26,776,216.55; (v) for the Third-Party Payor Channeled Claims, the amount of $261,104,374.91; (vi) for the ER Physician Channeled Claims, the amount of $3,842,182.12; (vii) for the NAS PI Channeled Claims, the amount of $25,138,065.25; and (viii) for the Non-NAS PI Channeled Claims, the amount of $153,178,666.30 (together, the "**Shareholder Direct Settlement Portion**").  (*See* Plan § 1.1.)

mechanism for determining intrastate distributions in the absence of an agreement between a state and its localities, and the value to be provided to the Tribes, as memorialized in the relevant trust distribution procedures).

69.     The Private Entity Settlements, as discussed in Section 5.2(e) of the Plan, consist of a series of agreements that resolve the contingent litigation claims of various non-governmental creditors against the Debtors by channeling those claims to the private creditor trusts in exchange for fixed cash contributions to those trusts (totaling over $1.5 billion).  This includes at least $865.8 million in cash for distribution to qualified personal injury claimants. (*See* DelConte Plan Decl. ¶¶ 21, 23, 25, 27, 29.)  The Private Entity Settlements thereby collectively resolve all private entity claims against the Debtors.[22]

70.     Finally, agreements regarding certain fee arrangements, as reflected in Section 5.9 of the Plan, were an integral and necessary part of reaching an agreement concerning overall allocation of the Debtors' Estates and thus are an integral part of the Plan's resolutions.  (*See, e.g.*, JX-2766 (Mediator's Report) ¶ 26 ("Finally, in my experience, reaching agreement pertaining to contingency fees and common benefit assessments is often an integral and necessary part of reaching an agreement concerning overall allocation.  This situation is no different."); JX-3340 (Co-Mediators' Fifth Interim Status Report) Ex. A ¶ 5 ("Similar to the other national opioid settlements, the [Governmental Entity Shareholder Direct Settlement

---

[22] The Plan also implements an additional settlement regarding the United States' medical expense claim whereby the United States will be granted an assignment of rights to receive $26 million from the MDT (the "**United States-PI Claimant Medical Expense Claim Settlement**"). This settlement resolves claims or liens held by various federal healthcare programs against PI Claimants or their recoveries under the Plan on the basis of amounts that those healthcare programs previously paid to, or on behalf of, those claimants for opioid-related injuries.  (*See* Plan § 5.2(i).)

Agreement] will include requirements for the use of funds received and provisions for certain State and Subdivision attorney fees.").)

71.     The Plan Settlement is undoubtedly in the best interests of the Estates and their stakeholders.  The interlocking agreements constitute a comprehensive compromise of claims and disputes that will avoid a litigation melee in which hundreds of thousands of creditors race to the courthouse.  It will conserve value that would otherwise be destroyed through complex and time-consuming estate and inter-creditor litigation, including litigation on the issues of claim allowance, distribution, and treatment of claims that would surely consume a significant portion, if not effectively all, of the value of the Debtors' Estates.  The Private Entity and Public Entity Settlements are also critical building blocks to the Shareholder Settlements, without which there could be no value-maximizing resolution as contemplated by the Plan.  Each of the settlements before the Court should be approved.

**A.     The Standard for Approval of Settlements in Bankruptcy**

72.     It is axiomatic that "settlements or compromises are favored in bankruptcy and, in fact, encouraged."  *In re Chemtura Corp.*, 439 B.R. 561, 595 (Bankr. S.D.N.Y. 2010).  That is because settlements "minimize costly litigation and further parties' interests in expediting the administration of the bankruptcy estate."  *In re Motors Liquidation Co.*, 555 B.R. 355, 364-65 (Bankr. S.D.N.Y. 2016).

73.     Section 1123(b) of the Bankruptcy Code provides that a chapter 11 plan may include a settlement of any claim belonging to the estates and "any other appropriate provision not inconsistent with the applicable provisions of [the Bankruptcy Code]."  11 U.S.C. § 1123(b)(3)(A), (b)(6).  In the Second Circuit, courts evaluate settlements included as part of a chapter 11 plan of reorganization under the same standards applied under Federal Rule of

Bankruptcy Procedure 9019 ("**Rule 9019**")[23]:  they assess whether the settlement is "fair,

equitable, and in the best interests of the estate."  *In re Genesis Glob. Holdco, LLC*, 2023 WL

6543250, at *5 (Bankr. S.D.N.Y. Oct. 6, 2023) (SHL); *see also In re Chemtura Corp.*, 439 B.R.

at 608 (approving settlement under Rule 9019 framework as part of plan of reorganization); *In re

AMR Corp.*, 502 B.R. 23, 42-43 (Bankr. S.D.N.Y. 2013) (SHL); *see also Protective Comm. for

Indep. S'holders of TMT Trailer Ferry v. Anderson*, 390 U.S. 414, 424 (1968) (holding that in

plan confirmation context, courts must "determine that a proposed compromise forming part of a

reorganization plan is fair and equitable").

74.    To be approved under the "fair and equitable" standard, the settlement need not be

the best compromise that the Debtors could have possibly obtained.  Courts will instead approve

a settlement so long as it does not "fall[] below the lowest point in the range of reasonableness."

*In re Adelphia Commc'ns Corp.*, 327 B.R. 143, 159 (Bankr. S.D.N.Y. 2005) (citation omitted);

*see also In re AMR Corp.*, 502 B.R. at 43.  That standard "recognizes the uncertainties of law

and fact in any particular case and the concomitant risks and costs necessarily inherent in taking

any litigation to completion."  *In re Sabine Oil & Gas Corp.*, 555 B.R. at 257 (quoting *Newman

v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972)).  The ultimate determination as to whether the

proposed settlement falls within the range of reasonableness is firmly committed to the discretion

of the bankruptcy court.  *In re Sabine Oil & Gas Corp.*, 555 B.R. at 256-57 ("The decision to

approve a particular settlement lies within the sound discretion of the bankruptcy court."); *In re

---

[23] *See, e.g.*, *In re Sabine Oil & Gas Corp.*, 555 B.R. 180, 256 (Bankr. S.D.N.Y. 2016) ("Courts
analyze settlements under section 1123 by applying the same standard applied under Bankruptcy
Rule 9019 . . . ."); *Resolution Trust Corp. v. Best Prods. Co. Inc. (In re Best Prods. Co., Inc.)*,
177 B.R. 791, 794 n.4 (S.D.N.Y. 1995) (evaluating a settlement included in a plan pursuant to
section 1123(b)(3) using the same standards applied under Rule 9019); *In re Texaco Inc.*, 84
B.R. 893, 901-02 (Bankr. S.D.N.Y. 1988) (evaluating a settlement of non-estate claims included
in a plan pursuant to section 1123(b)(3) using the standards applied under Rule 9019).

*305 E. 61st St. Grp. LLC*, 2022 WL 16749111, at *2 (Bankr. S.D.N.Y. Nov. 7, 2022) (SHL); *In re Drexel Burnham Lambert Grp., Inc.*, 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991) ("A decision to either accept or reject a compromise and settlement is within the sound discretion of the Court . . . ."). Courts should exercise this discretion "in light of the general public policy favoring settlements." *In re Hibbard Brown & Co., Inc.*, 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998).

75.    Courts in the Second Circuit look to seven factors—the so-called "*Iridium* factors"—to determine whether a settlement is fair, equitable, and in the best interests of the estates. These factors are:  (1) "the balance between the litigation's possibility of success and the settlement's future benefits"; (2) "the likelihood of complex and protracted litigation, with its attendant expense, inconveniences, and delay, including the difficulty in collecting on the judgment"; (3) "the paramount interest of the creditors"; (4) "whether other parties in interest support the proposed settlement"; (5) the "competency and experience of counsel supporting, and the experience and knowledge of the bankruptcy court judge reviewing, the settlement"; (6) the "nature and breadth of releases to be obtained by officers and directors"; and (7) "the extent to which the settlement is the product of arm's length bargaining." *Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 462 (2d Cir. 2007) (internal quotations and alterations omitted). When assessing a global settlement of claims, courts evaluate whether the settlement is "in its entirety appropriate for the [] estate." *In re Ionosphere Clubs*, 156 B.R. 414, 430 (S.D.N.Y. 1993) (emphasis added).

76.    In weighing the *Iridium* factors, courts do not undertake a full-blown "'mini-trial' of the facts or the merits underlying the dispute." *In re NII Holdings, Inc.*, 536 B.R. 61, 65 (Bankr. S.D.N.Y. 2015) (citation omitted). Nor should they. "[L]ittle would be saved by the

settlement process if bankruptcy courts could approve settlements only after an exhaustive investigation and determination of the underlying claims." *In re Best Prods. Co., Inc.*, 168 B.R. at 51. Courts instead "canvass the issues [to] see whether the settlement falls below the lowest point in the range of reasonableness." *In re Adelphia Commc'ns Corp.*, 368 B.R. at 225 (quoting *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983)). Moreover, although a court must make its own "considered and independent judgment" as to the reasonableness of the settlement, the court "may rely on the opinions of the debtor, the parties to the settlement, and professionals in evaluating the necessary facts, and it should factor in the debtor's exercise of its business judgment in recommending the settlement." *In re NII Holdings*, 536 B.R. at 99 (citing *In re Dewey & LeBoeuf LLP*, 478 B.R. 627, 641 (Bankr. S.D.N.Y. 2012)); *see also In re Best Prod. Co., Inc.*, 168 B.R. at 50 ("[T]he court may credit and consider the opinion of counsel that the settlement is fair and equitable."). Finally, "[w]hile the bankruptcy court may consider the objections lodged by parties in interest, such objections are not controlling." *In re WorldCom, Inc.*, 347 B.R. 123, 137 (Bankr. S.D.N.Y. 2006).

77. Here, the *Iridium* factors weigh overwhelmingly in favor of approval of the Plan Settlement. The reasonableness of each constitutive part of the Plan Settlement is demonstrated below.

### B. The Plan Settlement Is Reasonable and in the Best Interests of the Estates and Should Be Approved

78. The Plan Settlement is more than reasonable and is plainly in the best interests of the Estates. It forms the core of the Debtors' highly negotiated plan of reorganization, and closely tracks (and provides greater value) than the shareholder agreement approved in connection with the confirmed Twelfth Amended Plan, while abiding by the parameters of the Supreme Court Decision.

79.     The Debtors believe that the Estates have meritorious claims against certain of the Debtors' shareholders, including under applicable fraudulent transfer law. The UCC has articulated its view of these claims in a 203-page, 22-count draft complaint. There can be no question that the Debtors (through the Special Committee), UCC, and various creditor constituencies have vigorously and thoroughly investigated the breadth of claims that can be pursued against the Sackler Parties and their related entities. *See* MBR at 86 (finding discovery in these cases "produced . . . an almost unfathomable record that nevertheless teams of lawyers for the creditor groups have pored through to find anything suggesting a claim against the shareholder released parties").

80.     Litigation of those claims, however, would take years and success is not assured. All litigation has inherent risk and uncertainty. Those risks are amplified here in light of the novel nature and sheer number of complicated legal and factual issues; the commitment of the Sackler Parties, as well as trusts established by or for the benefit of the Sackler Parties and other Sackler-related entities (the "**Sackler Entities**"), to litigate vigorously absent a settlement; and the possibility of substantial obstacles to collection on any resulting judgment—all of which make the Debtors' (or anyone's) ability to recover in excess of the value of the Shareholder Settlement Amount uncertain. The Plan Settlement mitigates these significant risks and avoids the need for complex, highly value-destructive, and potentially decades-long legal proceedings in multiple jurisdictions.

81.     Moreover, as described above, the Plan Settlement is the product of years of hotly contested, arm's-length negotiations among various plaintiffs' constituencies, and enjoys nearly universal support. Indeed, this is underscored by the UCC's support of the Plan Settlement, notwithstanding its ability to otherwise prosecute the UCC Complaint.

1. **The First *Iridium* Factor Weighs Strongly in Favor of Approval Because the Plan Settlement Delivers Enormous Benefits and Avoids Value-Destructive, Protracted, and Uncertain Litigation**

82.     The first *Iridium* factor—the balance between the litigation's possibility of success and the settlement's future benefits—weighs in favor of approval of the Plan Settlement.

### (i)    The Benefits of the Plan Settlement

83.     The benefits of the Plan Settlement are myriad and substantial.  If approved, the Plan Settlement would, among other things:  (i) guarantee at least $6.5 billion being contributed by the Sackler Parties for the benefit of the Debtors' creditors, including a resolution of the Estates' claims for approximately $2.17 billion; (ii) ensure that the Debtors can satisfy their obligations under the Private Entity Settlements, thereby avoiding value destructive intercreditor litigation on issues of allocation; (iii) secure the benefits of the DOJ Resolution and avoid the possible destruction of the entirety of the Debtors' estates through forfeiture and other remedies uniquely available to the DOJ; (iv) avoid the costly, value-destructive litigation that would be required to pursue the Sackler Parties on any Estate Causes of Action; and (v) avoid the uncertainty and delay attendant in obtaining and collecting on a potential judgment through litigation.

### (a)    The Settlement Payments

84.     Funds from the Shareholder Settlement Amount will be deposited into trusts established for the benefit of States and localities and other non-governmental claimants, including the Tribes and public schools.  (*See* DelConte Plan Decl. ¶ 18; *see also* Plan §§ 5.2, 5.6, 5.8.)  The Plan will also establish and fund a trust that will make distributions to qualified personal injury claimants, including children with a history of NAS and their guardians, ensuring that monies also flow directly to individual victims of the opioid crisis.  (*See* DelConte Plan Decl. ¶ 29; *see also* Plan §§ 4.10, 5.8(d).)  Accordingly, the Plan Settlement, along with the other

direct settlements under the Shareholder Settlements, provide enormous financial value to the

Estates for the benefit of the Debtors' creditors.  (*See, e.g.*, DelConte Plan Decl. ¶¶ 18-30.)  In

addition to the value that this broad resolution will confer upon the direct recipients of funds, the

agreements among creditors to use the overwhelming majority of the funds to remediate the

opioid crisis will confer value far beyond the direct recipients of those funds.  (JX-3330 (Expert

Report of Gautam Gowrisankaran ("**Gowrisankaran Report**"))[24] ¶ 8 ("[T]he abatement

programs funded by the Healthcare Provider, Public School, and ERP Trusts will confer value to

entities beyond those receiving the funds, including other non-governmental claimants as well as

governmental claimants such as state, local, and tribal governments.").)

### (b)    Satisfaction of the Settlement Obligations

85.    The Plan Settlement also ensures that the Debtors are able to satisfy their

obligations under the Private Entity Settlements reached in these cases.  (*See* Dubel Decl. ¶ 68

(concluding that one of the many benefits of the settlement is that "financial contributions of the

Shareholder Settlement would allow the Debtors to . . . satisfy their obligations under the Private

Entity Settlements").)  Without the Shareholder Settlement Amount, however, there is

considerable risk that the Debtors would be unable to meet their obligations under the Private

Entity Settlements.  (*See* Dubel Decl. ¶ 69.)  This, in turn, would have potentially devastating

consequences.  Absent the Private Entity Settlements, the various Private Claimant groups would

very likely dispute the claims of the of the Non-Federal Public Claimants, the United States, and

other Private Claimants, and each group would be compelled to respond in kind. (*See* Dubel

Decl. ¶ 69.)  The result would be a web of complex, protracted and extremely costly inter-

---

[24] Contemporaneously with this Confirmation Brief, the Debtors have filed the Declaration of
Gautam Gowrisankaran, incorporating the Gowrisankaran Report as Dr. Gowrisankaran's
confirmation testimony.

creditor litigation.  Indeed, this was emblematic of the overall reality that a comprehensive

resolution of claims against the Sackler Parties unlocked value that would greatly improve the

prospects of a value-maximizing intercreditor settlement.

### (c)    Securing the Benefits of the DOJ Resolution

86.    In addition to ensuring the preservation of the Private Entity Settlements, the Plan

Settlement enables the Debtors to secure the full benefits of the DOJ Resolution and the

Forfeiture Judgment Credit.  (*See id.*; JX-2094 (Plea Agreement) at 9-10.)  Without the

Shareholder Settlement Amount, there is a considerable risk that the Debtors would lack

adequate funds to satisfy the Private Entity Settlements, discussed above, and would thus fail to

make the quantum of distributions for the benefit of the States, Tribes and local government

entities necessary to qualify for the full Forfeiture Judgment Credit.  In this scenario, the Debtors

could be obligated to pay the entire $2 billion Forfeiture Judgment to the DOJ, thereby wiping

out a significant portion of the Debtors' Estates that could otherwise be distributed to the

Debtors' unsecured creditors for, among other things, remediation of the opioid crisis.  (*See* JX-

3328 (Expert Report of Jesse DelConte ("**DelConte Report**"))[25] ¶ 9 ("[N]o net liquidation

proceeds would be distributed to holders of contingent liability claims . . . in significant part

because the $2 billion DOJ Forfeiture Judgment Claim would absorb nearly all of the net

liquidation proceeds.").)

87.    Moreover, if the Private Entity Settlements collapse, there would be no assurance

that the Debtors could confirm a plan that satisfies the terms of the DOJ Resolution, including

providing for the emergence of a public benefit company (or other entity with a similar mission).

---

[25] Contemporaneously with this Confirmation Brief, the Debtors have filed the Declaration of
Jesse DelConte, incorporating the DelConte Report as a portion of Mr. DelConte's confirmation
testimony.

(Order Pursuant to 11 U.S.C. § 105 and Fed. R. Bankr. P. 9019 Authorizing and Approving Settlements Between the Debtors and the United States [Dkt. No. 2004] ¶ 6.)  If the Plan does not satisfy the terms of the DOJ Resolution, exercise of rescission rights under the DOJ Resolution would return the parties to the status quo ex ante, in which case the DOJ would pursue billions of dollars in additional fines and forfeiture that could exceed and potentially consume the entire value of the Debtors' Estates.  (*See id.*)  Any funds paid to the United States in satisfaction of these claims could not be distributed to other creditors, and it is the Debtors' understanding that any forfeiture payments could not be specifically designated for opioid abatement efforts. *See* 28 U.S.C. § 524(c) (providing that funds paid into the DOJ Assets Forfeiture Fund shall be available to the Attorney General only for payments towards certain enumerated uses, such as law enforcement operational expenses, awards for information or assistance, and expenses relating to the seizure and forfeiture program).

### (d)      Avoidance of Value-Destructive Litigation

88.      Finally, the Plan Settlement provides the critical benefit of avoiding years of massive professional fees that would be incurred in the absence of a near-global resolution of the Debtors' and the Sackler Parties' liability.  For example, the Debtors could continue to incur the very significant expenses of remaining in bankruptcy for an additional period of unknown length as they expend significant Estate resources to litigate the Estate claims against the Sackler Parties or negotiate and confirm a plan that transfers such claims to a trust.  (Dubel Decl. ¶ 69.)  Such fees would total many hundreds of millions of dollars.

### (ii)      The Likelihood of Successful Litigation

89.      In contrast to the benefits and certainty that the Plan Settlement provides the Debtors' Estates and creditors, litigation against the Sackler Parties carries a number of attendant risks.  In the absence of the Plan Settlement, the UCC would pursue the Estate Causes of Action

49

under the Bankruptcy Code and/or applicable state or federal law.  Foremost among these are

claims for fraudulent transfer of assets, but the UCC would seek to recover under a variety of

other legal theories.  The breadth and far-reaching nature of these claims is reflected in the UCC

Complaint's 22 counts asserted against more than 50 individual defendants and over 200

Sackler-related entities.  (*See generally* UCC Complaint.)  Such claims, however, would likely

face varying prospects of success on the merits, a wide range of potential recoveries, and

significant collection risk, as discussed further below.  *See* MBR at 93 ("I do not believe that

recoveries on such judgments would be higher after taking into account the catastrophic effect on

recoveries that would result from pursuing those claims and unravelling the plan's intricate

settlements. . . . [T]here is also the serious issue of problems that would be faced in collection

that the plan settlements materially reduce.").

Fraudulent Transfer

90.    From 2008 to 2019, PPLP distributed approximately $10.4 billion in total net cash

distributions for the benefit of the Sackler parties and Sackler Entities ("**Cash Transfers**").  (*See*

JX-3327 (Expert Report of Richard A. Collura ("**Collura Report**"), Ex. A)[26] ¶ 12; JX-3327

(Collura Report, Ex. A, Appendix A) at 11.)  Of the $10.4 billion in total net cash distributions,

approximately $4.7 billion were made for the purposes of funding tax payments by the Sackler

parties or Sackler Entities ("**Tax Distributions**").  (JX-3327 (Collura Report, Ex. A, Appendix

A) at 11.)  In addition, between 2008 and 2019, the Debtors also made non-cash distributions for

the benefit of the Sackler parties and entered into commercial transactions between the Debtors

and Sackler Entities, such as supply agreements, service agreements and license-and-royalty

---

[26] Contemporaneously with this Confirmation Brief, the Debtors have filed the Declaration of
Richard A. Collura, incorporating the Collura Report as Mr. Collura's confirmation testimony.

arrangements, whereby the Sackler parties may have benefitted from above-market or below-market terms of exchange that were not reasonable. (*See* JX-3332 (Expert Report of Mark F. Rule, CPA ("**Rule Report**"), Ex. A) ¶¶ 7-11.)[27]  Non-cash transfers and excess benefits based on non-market terms may, using the high end of the range of estimates generated by the Debtors' advisors, total in excess of an additional $1.4 billion in value to or for the benefit of the Sackler parties from 2008 through 2019 ("**Non-Cash Transfers**," and with the Cash Transfers, "**Transfers**").  (See JX-3332 (Rule Report, Ex. A) ¶¶ 7-11; JX-3332 (Rule Report, Ex. A, Appendix A) at 12-20; JX-3329 (Expert Report of David W. DeRamus, PhD ("**DeRamus Report**"), Ex. A) ¶ 33 n.15.)[28]  For ease of reference, the Cash Transfers[29] and Non-Cash Transfers[30] (again, using the highest estimates) from 2008 through 2017 are depicted in terms of millions of dollars on a year-by-year basis in the following graph:

---

[27] Contemporaneously with this Confirmation Brief, the Debtors have filed the Declaration of Mark F. Rule, CPA, incorporating the Rule Report as Mr. Rule's confirmation testimony.

[28] Contemporaneously with this Confirmation Brief, the Debtors have filed the Declaration of David W. DeRamus, PhD, incorporating the DeRamus Report as Dr. DeRamus' confirmation testimony.

[29] A s shown in Figure 1, Cash Transfers other than Tax Distributions consist of two categories: (1) cash distributions that flowed from PPLP through a series of parent entities to trusts held for the benefit of the members of the Sackler parties ("**US Partner Cash Distributions**"); and (2) distributions from PPLP that were earmarked as funding for ex-US IACs and flowed through PPLP's parent entities to the ex-US IACs ("**Ex-US IAC Distributions**").

[30] The total Non-Cash Transfers of approximately $1.4 billion between 2008 and 2019 include an additional $12 million that occurred in 2018 and $6 million that occurred in 2019 prior to the Petition Date.  (*See* JX-3329 (DeRamus Report, Ex. A) ¶ 33 & n.15.)



**Figure 1**

91.    The Bankruptcy Code provides two statutory avenues for pursuing fraudulent transfer claims.  The Estates could proceed with direct fraudulent transfer claims under 11 U.S.C. § 548 or fraudulent transfer claims arising under state or other federal law pursuant to 11 U.S.C. § 544(b).  Section 544(b) enables the Debtors to "step into the shoes" of any unsecured creditor and to pursue a fraudulent transfer claim that creditor may have for the benefit of the Estates.  In either case, the Estates could seek to claw back the Transfers under essentially one of two theories.  The first, intentional fraudulent transfer, requires proof that the Transfers were made "with actual intent to hinder, delay, or defraud" present or future creditors.  *See, e.g.*, 11 U.S.C. § 548(a)(1)(A); *accord* Conn. Gen. Stat. § 52-552e(a); Del. Code Ann. tit. 6, § 1304 (West); N.Y. Debt. & Cred. Law § 276 (McKinney 2024).  The second, constructive fraudulent transfer, is proven by showing that the Debtors (1) "received less than a reasonably equivalent value" in exchange for the Transfers, and (2) "w[ere] insolvent on the date that such transfer was made . . . , or became insolvent as a result of such transfer."  *See, e.g.*, 11 U.S.C. § 548(a)(1)(B);

*accord* Conn. Gen. Stat. § 52-552f(a); Del. Code Ann. tit. 6, § 1305 (West); N.Y. Debt. & Cred. Law § 273 (McKinney 2024).

92.     Indeed, the UCC Complaint asserts multiple claims for both intentional and constructive fraudulent transfer against more than 120 defendants, including the Sackler Parties, their related entities, and other non-Sackler parties.  (*See* UCC Complaint at ¶¶ 346-421.)  Each of these potential pathways to recovery presents some degree of legal risk, and the amount of Transfers that the Estates could successfully recover through litigation is ultimately uncertain. *First*, as a threshold matter, it is possible that a court will determine, under the applicable statute of limitations, that certain Transfers—potentially those prior to 2015 or 2013—occurred too long ago, such that the Estates would be barred from seeking to recover them.  *Second*, it is not clear that a court would determine that PPLP, the entity from which distributions were made, was insolvent at the time of each of the Transfers.  *Third*, the Estates may not be able to establish that some or all of the Transfers were made with the intent to hinder, delay, or defraud creditors. *Fourth*, the Estates may not be able to recover all or a material portion of the Tax Distributions (the distributions made for the purposes of funding tax payments by the Sackler parties or Sackler Entities) under applicable fraudulent transfer law.  And *fifth*, even if the Estates' claims succeeded in part, the amount of pre-judgment interest that may be recovered is uncertain, which would likely materially impact the amount of any ultimate recovery.  Each of these points is explored in more detail below.

Statute of Limitations

93.     As an initial matter, the applicable statutes of limitations may curtail the amount the Estates could recover in litigation against the Sackler parties.  Under section 548 of the Bankruptcy Code, under which the UCC Complaint seeks relief, the Estates can recover fraudulent transfers within a two-year lookback period beginning on the "date of the filing of the

petition." 11 U.S.C. § 548(a)(1); (*see also* UCC Complaint ¶ 398). These chapter 11 cases commenced in 2019, placing the beginning of section 548's lookback period in 2017. But because cash distributions from the Debtors had largely ceased by 2017 (*see* JX-3327 (Collura Report, Ex. A, Appendix A) at 11), this lookback period would likely substantially limit any amount the Debtors could recover under section 548.

94.    Therefore, the Estates would also pursue, as the UCC Complaint does, claims under section 544(b) because these claims benefit from a longer lookback period. But here, too, it is possible that the applicable limitations period would circumscribe recovery. As an initial matter, section 544(b) enables a debtor-in-possession to "borrow" state fraudulent transfer law or other "applicable" non-bankruptcy laws and use them in the bankruptcy context to avoid prepetition transfers. Courts typically impute all aspects of that law to the section 544(b) avoidance proceeding, including the statute of limitations. *See, e.g.*, *In re Tronox, Inc.*, 429 B.R. 73, 98 (Bankr. S.D.N.Y. 2010) (applying Oklahoma's statute of limitations and relevant exceptions); *In re FAH Liquidating Corp.*, 572 B.R. 117, 130 (Bankr. D. Del. 2017) (applying German fraudulent transfer law's two-year lookback period). For the purposes of section 544(b), the sources of "applicable law" that most often supply the basis for creditor claims are state fraudulent transfer statutes, which are generally based on one of three model statutes: the Uniform Fraudulent Transfer Act ("**UFTA**"), the Uniform Fraudulent Conveyance Act ("**UFCA**"), and the Uniform Voidable Transactions Act ("**UVTA**").

95.    Here, potentially relevant jurisdictions include Connecticut (the location of PPI's headquarters); Delaware (the state under whose laws PPLP is organized); and New York (the state in which PPI is incorporated). (See JX-0872 (PPLP's Fifth Am. and Restated Limited Partnership Agreement) ¶ 25; JX-2077 (PPI's certificate of incorporation); Dubel Decl. ¶ 1.)

The UFTA, as adopted by Connecticut and Delaware, provides for a four-year statute of repose, Conn. Gen. Stat. § 52-552j; Del. Code Ann. tit. 6, § 1309, while the UFCA, as adopted by New York, has a six-year statute of limitations, N.Y. C.P.L.R. § 213(1).[31]

96.    The Estates could also seek to stand in the shoes of the United States, which can assert claims under the Federal Debt Collection Procedures Act ("**FDCPA**").  *See, e.g.*, *In re Tronox Inc.*, 503 B.R. 239, 274-75 (Bankr. S.D.N.Y. 2013) (noting that under section 544(b), the Debtors may step into the shoes of any creditor, including whichever creditor whose claim gives rise to the longest lookback period, sometimes referred to as the "triggering" creditor).  The FDCPA is a federal version of the Uniform Fraudulent Transfer Law and applies in cases involving a debt to the United States, a federal corporation, or an agency, department, or other entity of the United States, and it provides for a six-year statute of limitations.  *See* 28 U.S.C. §§ 3304, 3306.  Under the FDCPA, the Estates would have an argument that notwithstanding the choice-of-law analysis, a six-year statute of limitations should apply.  *See In re Tronox Inc.*, 503 B.R. at 273-75 (holding the FDCPA's six-year lookback period applied because the trustee could step into the federal government's shoes pursuant to section 544(b)).

97.    To extend the lookback period even further, the Estates would argue that by stepping into the shoes of a government creditor under section 544(b), they could benefit from statutory provisions or common law doctrine that provide individual states, as sovereigns, longer or unlimited statutes of limitation.  For example, Hawaii and New Jersey, both contingent creditors in these cases, enjoy an unlimited or ten-year statute of limitations, respectively, in bringing fraudulent transfer actions.  *See Hawaii v. Makaaa,* 43 Haw. 237, 239-40 (1959); *see*

---

[31] In December 2019, New York adopted the UVTA to replace the UFCA.  However, the UVTA, as enacted by the New York legislature, does not apply retroactively to claims that arose before April 2020.  *See* 2019 N.Y. Sess. Laws Ch. 580 (McKinney).

*also* N.J. Stat. Ann. § 2A:14-1.2 (West); *see State Dept. of Env't Protection v. Caldeira,* 794 A.2d 156, 159 (N.J. 2002); (*see also* UCC Complaint ¶ 375 (asserting in connection with seeking relief under section 544(b) that "numerous creditors of the Debtors held allowed or allowable claims under applicable law and, therefore, could avoid the Fraudulent Non-Cash Transfers . . . includ[ing] 48 states (including the States of New Jersey, Connecticut, and Hawaii)")).  In addition, under the common law doctrine of *nullum tempus occurrit regi*, or "no time runs against the king," sovereign entities can bring actions to enforce a public right that would otherwise be barred by the statute of limitations, unless the statute of limitations expressly states otherwise.  *See, e.g.*, *In re CVAH, Inc.*, 570 B.R. 816, 834 (Bankr. D. Idaho 2017).  For example, in Connecticut, the limitations period for such actions is potentially unlimited.  *See Pritchard v. Pritchard*, 2004 WL 1052680, at *2 (Conn. Super. Ct. Apr. 26, 2004).

98.    Any attempt by the Estates to extend the lookback period would be vigorously contested by the Sackler parties, and success is not assured.  The Sackler parties would likely observe that some federal bankruptcy courts have held that a plaintiff proceeding under section 544(b) may step into the shoes of a state government creditor and avail itself of an extended lookback period, which was ten years in that case.  *See In re G-I Holdings, Inc.*, 313 B.R. 612, 636 (Bankr. D.N.J. 2004); *see In re Mallinckrodt PLC*, 2024 WL 206682, at *37 (Bankr. D. Del. Jan. 18, 2024).  The Sackler parties would likely contend that such a result is inappropriate here and that Connecticut law and its four-year statute of limitations should apply, because Connecticut is where the transfers of funds from Purdue were planned, authorized, and executed.[32]

---

[32] Where, as here, more than one jurisdiction is involved, a majority of courts apply the choice-of-law principles of the forum state to determine which jurisdiction's law governs the fraudulent transfer claim.  *See, e.g.*, *In re JVJ Pharm. Inc.*, 618 B.R. 408, 417 (Bankr. S.D.N.Y. 2020),

99.     In the event that the applicable lookback period is determined to be four or six years, the Transfers that would be recoverable would be significantly limited.  For example, a four-year statute of limitations would place the beginning of the lookback period in 2015, while a six-year statute of limitations would place the beginning of lookback period in 2013.  *See* Conn. Gen. Stat. § 52-552j; Del. Code Ann. tit. 6, § 1309; N.Y. C.P.L.R. § 213(1); 28 U.S.C. § 3306. Either date would put many of the Transfers at issue out of reach.  Over 60% of the Transfers— approximately $7.6 billion—occurred before 2013, and more than 80%—or over $9.7 billion— occurred before 2015.  (See JX-3327 (Collura Report, Ex. A, Appendix A) at 11; JX-3332 (Rule Report, Ex. A) ¶¶ 7-11; JX-3332 (Rule Report, Ex. A, Appendix A) at 12-20; JX-3329 (DeRamus Report, Ex. A) ¶ 33 n.15.)  The Transfers that would likely be put out of reach in either scenario are set forth in the graph below.  Indeed, a six- or four-year lookback period would likely limit the amount of recoverable Transfers to roughly $4.1 billion, or $2.0 billion, respectively, as shown in the graph below:

---

*rev'd on other grounds*, 2021 WL 3038763 (S.D.N.Y. July 19, 2021); *In re Trinsum Grp., Inc.*, 460 B.R. 379, 389 (Bankr. S.D.N.Y. 2011).  Thus, even if the UCC Complaint's section 544(b) claims were prosecuted in this Court, New York choice-of-law principles would apply.  *See In re Thelen LLP*, 736 F.3d 213, 219 (2d Cir. 2013).  Under those principles, the first step would be for the court to determine whether an actual conflict exists between the laws of the relevant jurisdictions; if not, the law of the forum state applies.  *See In re Allstate Ins. Co.*, 613 N.E.2d 936, 937 (N.Y. 1993).  Courts have concluded that an actual conflict exists between the UFTA, as adopted by Connecticut and Delaware, and the UFCA, as adopted by New York, making a choice-of-law analysis necessary.  *See, e.g., Lyman Commerce Sols., Inc. v. Lung*, 2013 WL 4734898, at *4 (S.D.N.Y. Aug. 30, 2013); *Drenis v. Haligiannis*, 452 F. Supp. 2d 418, 426-27 (S.D.N.Y. 2006).  The court would thus conduct an interest analysis to give effect to the law of the jurisdiction with the greatest interest in the litigation, *see In re Thelen LLP*, 736 F.3d at 219 (explaining that for "fraudulent conveyance" claims, "[t]he relevant analytical approach . . . is the interest analysis"), which would be the jurisdiction where the allegedly wrongful conduct occurred, *see AHW Inv. P'ship, MFS, Inc. v. Citigroup Inc.*, 661 F. App'x 2, 5 (2d Cir. 2016).



**Figure 2**

Evidence of Insolvency

100.    In addition to the potential limitations on recoveries imposed by applicable

statutes of limitations, the Estates' constructive fraudulent transfer claims would also face

uncertainty as to whether they could establish insolvency at the time of each Transfer.

101.    To succeed on a constructive fraudulent transfer claim under bankruptcy and

applicable state or federal law, the Estates would generally have to establish that (1) the Debtors

received less than reasonably equivalent value in exchange for each Transfer and (2) the Debtors

were insolvent at the time of such transfer.[33]  *See* 11 U.S.C. § 548(a)(1)(B); 28 U.S.C. §

---

[33] A transfer may also be constructively fraudulent under applicable law if it was made for less
than reasonably equivalent value and the debtor was in some other fragile financial condition at
the time besides insolvency, such as (i) operating with unreasonably small capital or
(ii) intending to incur, or believing it would incur, debts beyond the debtor's ability to pay.  *See,
e.g.,* 11 U.S.C. § 548(a)(1)(B)(ii)(II)-(III); 28 U.S.C. § 3304(b)(1)(B); Conn. Gen. Stat. § 52-
552e(a); Del. Code Ann. tit. 6, § 1304 (West); N.Y. Debt. & Cred. Law § 275 (McKinney 2019).
Such alternative bases were asserted by the UCC.  (*See* UCC Complaint ¶¶ 332-42.)  In response
to such claims, the Sackler parties would likely raise many of the defenses discussed below,
including, for example, that PPLP had substantial enterprise value for much of the time period at
issue and the extent of any future opioid-related liabilities was not foreseeable at the time.  (*See*

3304(a)(1); Conn. Gen. Stat. § 52-552f(a); Del. Code Ann. tit. 6, § 1305 (West); N.Y. Debt. & Cred. Law § 274 (McKinney 2025).  With respect to insolvency, courts typically apply a "balance sheet" test to determine insolvency, under which a debtor is deemed "insolvent when the sum of its debts exceeds the sum of its assets." *See, e.g.*, 11 U.S.C. § 101(32) (Bankruptcy Code definition); 28 U.S.C. § 3304(a)(1)(A), (b)(1)(B) (FDCPA); Conn. Gen. Stat. § 52-552c (Conn. law); Del. Code Ann. tit. 6, § 1302 (West) (Del. law); N.Y. Debt. & Cred. Law § 271 (McKinney 2025) (N.Y. law).  At all times before the Petition Date, however, the Sackler parties would contend that PPLP's balance sheet as presented in its audited financial statements indicated that the value of its assets exceeded that of its liabilities.  (*See* JX-0431 (Chakraborty Report) ¶¶ 33, 84-87 (concluding that from 2008 to 2016, PPLP's operating assets and excess cash exceeded its balance sheet liabilities); *see, e.g.*, JX-1784 (2010 audited combined financial statements); JX-1788 (2011); JX-1792 (2012); JX-1794 (2013); JX-1795 (2014); JX-1797 (2015); JX-1802  (2016); JX-1804 (2017).)

102.    Courts, however, may consider unliquidated litigation claims when evaluating a debtor's liabilities for purposes of a claim of constructive fraudulent transfer.  *See, e.g.*, *In re Bayou Grp., LLC*, 439 B.R. 284, 334-37 (S.D.N.Y. 2010) (applying Bankruptcy Code); *In re LXEng LLC*, 607 B.R. 67, 90-91, 96-98 (Bankr. D. Conn. 2019) (applying the Connecticut UFTA and Bankruptcy Code).  Moreover, even claims that were not asserted at the time of the Transfer may nonetheless be considered a liability in this context if the Court determined that the claim had "accrued" and would be timely as of the date of the transfer.  *See, e.g.*, *In re Tronox, Inc.*, 503 B.R. at 314-15 (including unasserted tort claims in debtor's liabilities); *In re W.R.*

---

JX-0431 (Chakraborty Report) ¶¶ 32, 164-180 (concluding that PPLP had adequate capital and did not incur debts beyond its ability to pay during 2008-2016).)

*Grace & Co.*, 281 B.R. 852, 864, 867 (Bankr. D. Del. 2002) (same).  Whether a claim had

accrued and could be timely filed can vary depending on the type of claim, the governing law,

the facts regarding the parties' conduct, the nature of the relief sought and the nature of the harm.

*See, e.g.*, *In re Texaco, Inc.*, 505 F. App'x 77, 80 (2d Cir. 2012); *West v. Worldcom, Inc.*, 2007

WL 3407060, at *3 (S.D.N.Y. Nov. 14, 2007); *Lippe v. Bairnco Corp.*, 99 F. App'x 274, 282 (2d

Cir. 2004); *Kim v. Ji Sung Yoo*, 311 F. Supp. 3d 598, 616-17 (S.D.N.Y. 2018).  In determining a

debtor's liability for accrued but unasserted claims, courts have taken varying approaches that

have included, among others, considering the likelihood that the plaintiff would succeed, the

foreseeability of future litigation of the claims, or evidence as to the value of such claims through

adjudications or settlements.  *See, e.g.*, *In re W.R. Grace & Co.*, 281 B.R. at 864, 867 (adopting a

probabilistic approach to value asbestos tort claims because they "are routinely analyzed and

their value estimated by experts on the basis of epidemiology and statistics"); *In re Tronox Inc.*,

503 B.R. at 314 (accepting an expert valuation that estimated tort claims based on the population

of potential victims, their propensity to sue, and the historical defense costs for those claims).  A

court evaluating whether the Debtors were insolvent as of the date of a particular Transfer would

accordingly assess whether, as of that time, the Debtors' liabilities for accrued claims (even if

unasserted) exceeded the value of their assets.

103.    To maximize the number of Transfers that might be clawed back, the Estates

would seek to establish that PPLP was insolvent at the earliest possible date prior to the Petition

Date based on unasserted but accrued tort and criminal liability.  The Estates would argue that as

of the Petition Date, approximately 2,600 lawsuits were pending against the Debtors.  (*See*

DelConte Plan Decl. ¶ 37; UCC Complaint ¶ 17 (asserting that Purdue was "[h]opelessly

insolvent for many years as a result of their vast accrued opioid litigation" given that "by 2017,

Purdue had been named in thousands of lawsuits").)  The Estates would point to the fact that these claims seek recoveries on behalf of cities, counties, and states, and could result in very significant judgments.  (*See, e.g.*, Compl. at 78-79, *State of Oregon v. Purdue Pharma L.P.*, No. 18CV40526 (Or. Cir. Ct. Nov. 13, 2018) (seeking, among other things, $25,000 and $250,000 for each violation of various Oregon statutes); First Am. Compl. at 54, *State of California v. Purdue Pharma L.P.*, No. 19STCV19045 (Cal. Sup. Ct. Oct. 2, 2019) (seeking, among other things, penalties of $2,500 per each violation of various California statutes and an order requiring defendants "to abate the public nuisance that exists within the State of California").)  In the aggregate, the asserted amount of the proofs of claim in the bankruptcy total in the tens of trillions of dollars (*see* Johnson Decl. ¶ 7), would easily bankrupt the Company many times over.

104.    In addition, the Estates would contend that the total value of the claims asserted by the United States and resolved by the DOJ Resolution (totaling approximately $8.3 billion) rendered the Debtors insolvent at some earlier point, as it allegedly arose out of PPLP's conduct between 2008 and 2017.  (*See* Order Pursuant to 11 U.S.C. § 105 and Fed. R. Bankr. P. 9019 Authorizing and Approving Settlements Between the Debtors and the United States [Dkt. No. 2004] ¶¶ 3-6; *see also* JX-2094 (Plea Agreement) Ex. B at 3-4; JX-2095 (Civil Settlement) at 3-4).)  Indeed, the UCC Complaint makes this very claim.  (*See* UCC Complaint ¶ 328 ("Purdue admitted that its conduct (spanning the years from 2007 to 2017) exposed the company to at least $8 billion in claims to the DOJ alone").)  Ultimately, however, it is uncertain as to whether a court or factfinder would determine that the Debtors were insolvent on the date of each Transfer.

105.    First, the thousands of opioid litigation claims against the Debtors are asserted under the laws of myriad jurisdictions and by a variety of plaintiffs, including private citizens, business organizations, and state, Tribal, and local governments.  (*See, e.g.*, JX-0840 (complaint

by State of Connecticut); JX-0814 (complaint by Dr. Michael Masiowski); JX-0837 (complaint

by Tribal health organization); JX-0789 (complaint by City of Seattle).)  These claims also assert

a variety of legal theories, including product liability, wrongful death, negligence, fraud,

fraudulent concealment, unjust enrichment, public nuisance, and claims under state consumer

protection and controlled substances laws.  (*See, e.g.*, JX-0840 (alleging fraudulent transfer and

violations of Connecticut consumer protection statute); JX-0814 (alleging RICO violations,

negligence, and common-law fraud); JX-0837 (alleging, among other things, public nuisance,

unjust enrichment, violations of Alaska consumer protection statute, and strict products liability);

JX-0789 (alleging, among other things, nuisance, violations of Washington consumer protection

statute and Washington Criminal Profiteering Act, and civil conspiracy).)  The Sackler parties

would likely highlight this variation and the practical and legal complications of analyzing these

claims, and argue that there is no clear date on which unliquidated, opioid-related claims against

the Debtors accrued.  The Sackler parties contend that between 2008 and 2015, there were

relatively few tort claims asserted against the Debtors, and exceedingly few governmental

claims.  (See JX-0431 (Chakraborty Report) ¶¶ 97-98, 100-101 (reviewing litigation and

concluding that newly filed opioid litigations by non-individuals were "small in number and is in

direct contrast to the sharp uptick in the Pending Actions that began in 2017").)

106.    Moreover, the Sackler parties likely would argue that many of the claims rest on

novel theories of liability and lack the types of historical data that courts have previously relied

upon to estimate the likely value of unliquidated tort claims.  *Cf. W.R. Grace*, 281 B.R. at 864

(relying on historical data regarding asbestos claims); *In re Babcock & Wilcox Co.*, 274 B.R.

230, 243, 246-47, 254 (Bankr. E.D. La. 2002) (same); *In re Tronox*, 503 B.R. at 314 (relying on

historical data regarding chemical-exposure claims).  Indeed, the litigation history against PPLP

is highly variable.  Some cases have been dismissed as legally defective on the pleadings.  *See, e.g.*, *State ex rel. Stenehjem v. Purdue Pharma, L.P.*, 2019 WL 2245743 (N.D. Dist. Ct. May 10, 2019); *City of New Haven v. Purdue Pharma, L.P.*, 2019 WL 423990 (Conn. Super. Ct. Jan. 8, 2019).  In other cases, courts have held that the complaints stated a valid claim for relief, and many such cases were being litigated at the time these chapter 11 cases were initiated.  *See, e.g.*, *Commonwealth v. Purdue Pharma L.P.*, 2019 WL 6497887 (Mass. Super. Ct. Nov. 4, 2019); *State v. Purdue Pharma L.P.*, 2019 WL 3991963 (R.I. Super. Ct. Aug. 16, 2019).

107.    The value of the unliquidated opioid-related claims would also arguably have to be offset against the Debtors' enterprise value.  The Sackler parties point out that enterprise value was consistently in the billions of dollars throughout the entire time period during which the transfers at issue were made.  (See JX-0431 (Chakraborty Report) ¶¶ 56-75 (calculating PPLP's enterprise value as ranging from $1.9 billion to $9.5 billion between 2008 and 2016); JX-0443 (Chakraborty Report, Ex. 12) (same).)  Meanwhile, over that same time period, the company's annual accrued settlement and legal expenses on account of opioid-related claims were nearly always under $200 million. (JX-0447 (Chakraborty Report, Ex. 16).)

108.    Finally, the Sackler parties assert that based on the novelty of the claims, as well as evidence of how they were evaluated at the time, the scale of any resulting liability was not foreseeable until at least 2017.  (See JX-0431 (Chakraborty Report) ¶¶ 88-93 (concluding based on litigation trends, contemporaneous financial disclosures by PPLP, and contemporaneous assessments of PPLP's creditworthiness "that during the 2008-16 Period, the risk of a substantial increase in the number of Pending Actions was not reasonably foreseeable.").)  While the Estates would counter that foreseeability occurred earlier, precipitating conflicting expert opinions, courts have taken varying views on whether foreseeability is even relevant to this inquiry.

*Compare In re W.R. Grace*, 281 B.R. at 852; *In re Tronox, Inc.*, 503 B.R. 239 (Bankr. S.D.N.Y. 2013), *with In re Babcock & Wilcox Co.*, 274 B.R. 230 (Bankr. E.D. La. 2002).

109.    To be sure, these assertions and counterarguments by the Sackler parties would not pass without a fusillade of answers from the Estates and creditors.  In addition to the DOJ Resolution, the Estates could point to other recent judgments and settlements against other opioid manufacturers and distributors, as hindsight evidence of the value of the claims.  *See* Final Judgment, *Oklahoma v. Johnson & Johnson*, No. CJ-2017-816 (Okla. Dist. Ct. Nov. 15, 2019), Dkt. No. 1202 (awarding $465 million in opioid-related public nuisance claim against Johnson & Johnson); *see also* Press Release, CardinalHealth, Distributors Announce Proposed Opioid Settlement Agreement (July 21, 2021), https://newsroom.cardinalhealth.com/2021-07-21-Distributors-Announce-Proposed-Opioid-Settlement-Agreement (announcing $21 billion settlement between opioid distributors and state attorneys general).  The Estates would cite to courts that have accepted the use of hindsight data in assessing the size of contingent liabilities at earlier points in time.  *See, e.g.*, *W.R. Grace*, 281 B.R. at 867; *In re Tronox*, 503 B.R. at 297-303. However, the Sackler parties would point to cases that have rejected the use of hindsight evidence in estimating the value of contingent liabilities, *see, e.g.*, *In re Babcock & Wilcox Co.*, 274 B.R. at 254, 262 (opting to use contemporaneous estimates of a company's liability so long as they were made "in good faith, and did not purposefully underestimate liability"), as well as to judgments and settlements that could undermine the significance of these other cases.

110.    Ultimately, while the Estates would present compelling arguments regarding insolvency, there is uncertainty as to the quantum of distributions the Estates could recover on the Debtors' claims.

<u>Evidence of Actual Intent to Defraud</u>

111.    Under bankruptcy and state fraudulent transfer law, a transfer is generally

considered intentionally fraudulent if it is entered into "with actual intent to hinder, delay or

defraud" creditors.  11 U.S.C. § 548(a)(1)(A); UFTA § 4(a)(1); 28 U.S.C § 3304(b)(1)(A).

Although the UCC has pled strong intentional fraudulent transfer claims, such claims are not free

from risk.

112.    As an initial matter, the applicable burden of proof for proving fraudulent intent is

on the Debtors.  With respect to intentional fraudulent transfer claims under section 548, most

courts have held that a debtor-in-possession must prove fraudulent intent by a preponderance of

the evidence.  *See, e.g.*, *In re Direct Access Partners*, 602 B.R. 495, 540 (Bankr. S.D.N.Y. 2019);

*In re Zambrano Corp.*, 478 B.R. 670, 690 (Bankr. W.D. Pa. 2012); *but see In re Kelton Motors,*

*Inc.*, 130 B.R. 170, 179 (Bankr. D. Vt. 1991) ("[T]his Court holds that Trustee must prove all

elements under § 548(a)(1) by the clear and convincing evidentiary standard.").  But the Estates'

ability to recover under section 548 might be limited due to the relatively short two-year

lookback period, as discussed above.  *See supra* ¶ 93.  For intentional fraudulent transfer claims

asserted under section 544(b), the burden of proof is determined by the "applicable law," and

both the Connecticut UFTA and the FDCPA require proving fraudulent intent by clear and

convincing evidence—a more demanding standard than preponderance of the evidence.  *See,*

*e.g.*, *In re LXEng LLC*, 607 B.R. at 89 (noting that under Connecticut law, a plaintiff must "prove

a constructive or actual fraud by clear and convincing evidence"); *In re Lester*, 616 B.R. 549,

561- 62 (Bankr. D. Or. 2020) (applying FDCPA's clear and convincing burden of proof in

section 544(b) action where FDCPA was applicable law); *accord HBE Leasing Corp. v. Frank*,

48 F.3d 623, 639 (2d Cir. 1995) ("Actual fraudulent intent must be proven by clear and

convincing evidence" under New York law).  *But see ASARCO LLC v. Americas Mining Corp.*,

396 B.R. 278, 368-69 (S.D. Tex. 2008) (concluding that under Delaware law, a plaintiff "must

prove its actual-intent fraudulent transfer claim by a preponderance of the evidence").

113.    It is uncertain whether the Estates could ultimately convince a fact finder that

every one of the Transfers was made with fraudulent intent.  To be sure, the extensive discovery

record in these cases includes documents that the Estates would use to argue that, as early as

2007, individual members of the Sackler parties and members of the Board believed that PPLP

faced substantial legal risks related to its sale and marketing of opioid products.  Indeed, the

UCC has already laid out some of the documentary evidence to that effect in past motion practice

in these cases and in the UCC Complaint.  (*See* Official Committee of Unsecured Creditors'

Motion to Compel Production of Purportedly Privileged Documents, or for In Camera Review,

Based on Good Cause, Crime Fraud, and At Issue Waiver Exceptions to Claims of Privilege

[Dkt. No. 2157] ("Exceptions Motion") ¶¶ 16-35; *see, e.g.*, Hurley Decl. [Dkt. No. 2161], Exs.

62, 67, 68; UCC Complaint ¶ 285 ("Purdue's internal documents from before and after 2007 are

filled with examples of Purdue leadership, including the Sackler Directors, discouraging written

communications about topics that could raise potential liability issues for Purdue.").)  The

Estates would also point to record evidence reflecting concerns, at various times, about the

concentration of the Sackler parties' wealth in the Debtors, including in respect of legal risks to

the business, and discussions about diversifying that wealth, such as by distributing PPLP's

assets.  (*See, e.g.*, Exceptions Motion ¶¶ 22-25; Hurley Decl. [Dkt. No. 2161], Exs. 67, 69, 70;

UCC Complaint ¶¶ 289-314.)

114.    The Sackler parties, however, have contended that there are also

contemporaneous indications throughout the period from 2007 through 2017 that certain

individual members of the Sackler parties and members of the Board did not consider those legal

risks to present a threat of insolvency, but instead considered them to be manageable, just as the

Debtors had managed their liability exposures to the federal government, 26 states, and the

District of Columbia in settling claims with those entities in May 2007 for approximately $650

million. (*See, e.g.*, Objection of Mortimer Sackler Initial Covered Sackler Persons to Exceptions

Motion [Dkt. No. 2171] ¶¶ 14-27, 29-34.)  And although the Estates could point to a large

increase in the amount of cash distributions beginning in 2008, shortly after PPLP's large federal

and state government settlements, the Sackler parties have argued that increase coincided with a

significant increase in PPLP's revenues, profits, and cash position.  (*See, e.g.*, *id.* ¶¶ 14-27; JX-

0439 (Chakraborty Report, Ex. 8).)  The Sackler parties would also point to documents that they

would argue demonstrate both that members of the Sackler parties occasionally chose to reinvest

in the business rather than take additional cash distributions, and that certain transfers and off-

market intercompany dealings were made based on long-term business planning or long-running

business practices.  (*See, e.g.*, Objection of Mortimer Sackler Initial Covered Sackler Persons to

Exceptions Motion [Dkt. No. 2171] ¶ 15.)

115.    The foregoing does not reflect the full record of materials that would be available

to the Estates, but it demonstrates that the Estates would face at least a modicum of uncertainty

in establishing, based on a fact-intensive inquiry, that PPLP made each transfer with the intent to

hinder, delay, or defraud creditors, or significantly, that the Debtors would necessarily succeed in

establishing a right to recover amounts on such a claim in excess of the present value of up to

$7.4 billion, the amount contemplated under the Shareholder Settlement Agreement.

<u>Tax Distributions</u>

116.    Separate and apart from the foregoing, the Estates also face uncertainty as to

whether they could recover some or all of the $4.7 billion in Tax Distributions made between

2008 through 2017—a significant portion of the total distributions during this period.  (*See* JX-

3327 (Collura Report, Ex. A, Appendix A) at 11; UCC Complaint, Ex. E.)  More specifically, since its formation, PPLP has been treated as a "pass-through" entity for U.S. federal income tax purposes, making it not subject to U.S. federal income tax.  (*See* JX-0425 (Blouin Report) ¶¶ 18-23, 29-30.)  PPLP's taxable income was instead "passed through to," and was reportable by, its shareholders. (*See id.*)  Pursuant to agreements between certain of the Debtors' shareholders, the Debtors distributed amounts equal to the income tax liability of the highest tax rate of any shareholder, which amounted to approximately $4.7 billion between 2008 and 2017.  (*See id.* ¶¶ 46-50; JX-3327 (Collura Report, Ex. A, Appendix A) at 11.)  To avoid those tax distributions as constructive fraudulent transfers, the Estates would have to establish not only that PPLP was insolvent at the time—which is itself subject to the difficulties described above—but also that the Debtors received less than reasonably equivalent value in exchange for each transfer.  *See* 11 U.S.C. § 548(a)(1)(B); 28 U.S.C. § 3304(a)(1); Conn. Gen. Stat. § 52-552f(a).

117.    The Estates would argue, as the UCC Complaint does, that the Debtors received less than reasonably equivalent value for the Tax Distributions because those distributions were made for the benefit of the Sackler parties without any corresponding benefit to PPLP, a position which has support in the case law.  (*See* UCC Complaint ¶ 310 ("In every circumstance, these [Tax Distributions] were made to or for the benefit of the Sackler Parties and/or their tax-paying trusts to cover their personal or their trusts' tax liabilities—not Purdue's own tax liability.")); *see also In re TC Liquidations LLC*, 463 B.R. 257, 265-267, 271 (Bankr. E.D.N.Y. 2011) (setting aside tax distributions from "S" corporation to shareholders as constructively fraudulent because the shareholders "were personally liable for the taxes" and there was "no shown consideration provided to [the "S" corporation] for these payments"); *In re SGK Ventures, LLC*, 521 B.R. 842, 846, 859 (N.D. Ill. 2014) (setting aside tax distributions from pass-through entity to its

shareholders as constructively fraudulent because even if the entity had a contractual obligation
to make those transfers, "fulfilling the commitment would not produce any benefit" to the
entity).

118.    The Sackler parties, on the other hand, would likely contend that the tax
distributions were made so that PPLP itself could receive the benefit of being structured as a
limited partnership, thus avoiding any entity-level tax obligations, a position which has been
embraced by some courts.  Moreover, the Sackler parties would likely contest any assessment of
PPLP's tax liabilities, including through submission of expert testimony.  (*See, e.g.*, JX-0425
(Blouin Report) ¶¶ 55-71 (concluding that PPLP's tax distributions were comparable to the tax
liabilities it would have faced as a taxpayer and that PPLP received reasonable benefit in
return).)  If the UCC were to litigate these claims, they would need to introduce competing
expert opinions.  At bottom, the "battle of the experts" that would likely ensue and the lack of
uniformity in the case law—including the fact that there is no controlling authority in the Second
Circuit—create at least some uncertainty as to whether the Estates would prevail in establishing
that some or all of the Tax Distributions were not for "reasonably equivalent value."

Prejudgment Interest

119.    The amount of any recovery by the Estates on the fraudulent transfer claims
would also depend significantly on how much prejudgment interest, if any, a court were to
award.  Although the Estates could likely secure an award of prejudgment interest, *see, e.g.*, *In re
1031 Tax Grp., LLC*, 439 B.R. 84, 87 (Bankr. S.D.N.Y. 2010) (holding that in a fraudulent
transfer action, "absent a sound reason to deny prejudgment interest, such interest should be
awarded"), the amount of any such prejudgment interest would be uncertain, because that
amount depends on two factors, both of which are discretionary.

120.    First, the court must determine the rate of any prejudgment interest, which in turn depends on the source of applicable law underlying the fraudulent transfer claims.  Federal and Connecticut law, for example, both generally leave the applicable prejudgment interest rate to the court's discretion.  *See 1031 Tax Grp.*, 439 B.R. at 88; *Ballou v. Law Offices Howard Lee Schiff, P.C.*, 39 A.3d 1075, 1084 (Conn. 2012); *Sears Roebuck & Co. v. Bd. of Tax Review of Town of W. Hartford*, 699 A.2d 81, 90 (Conn. 1997) ("A trial court . . . has broad discretion to award interest.").  And these courts have applied a variety of interest rates, including the municipal bond rate, Treasury rate, and constant maturity Treasury rate.  A Connecticut statute caps prejudgment interest at an annual rate of 10%, Conn. Gen. Stat. § 37-3a(a), and Connecticut courts have often applied the maximum statutory rate, *see, e.g.*, *Chapman Lumber, Inc. v. Tager*, 288 Conn. 69, 73 n.2, 102 n.36 (2008); *Adv. Fin. Servs., Inc. v. Assoc. Appraisal Servs., Inc.*, 830 A.2d 240, 248-49 (Conn. App. Ct. 2003).  More recently, however, and in light of historically low prevailing market rates, Connecticut courts have awarded rates of 4-10%.  *See, e.g.*, *Paniccia v. Success Vill. Apartments, Inc.*, 215 Conn. App. 705, 712 (2022) (affirming superior court's award of interest 5% on back wages); *AAA Advantage Carting & Demolition Serv., LLC v. Capone*, 301 A.3d 1111, 1136, *cert. denied,* 304 A.3d 442 (Conn. App. Ct. 2023) (affirming superior court's award of 10% interest on conversion damages); *W.R. Berkley Corp. v. Classic Carts, Inc.*, 2015 WL 4965884, at *17 (Conn. Sup. Ct. July 23, 2015) (choosing 6% due to "prevailing (low) interest rates"); *Alarmax Distribs., Inc. v. New Canaan Alarm Co.*, 2013 WL 3613890, at *3 (Conn. Sup. Ct. June 19, 2013) (choosing 4%).  In light of the considerable variability in potentially applicable interest rates, it is far from certain which one would apply to the Estate claims, and the application of a lower rate of interest would likely materially affect the amount of any judgment.

121.    And this is in addition to the second factor that could materially affect any award of prejudgment interest—the date at which that interest began accruing—which is also discretionary.  *See All Am. Tel. Co., Inc. v. AT&T Corp.*, 328 F. Supp. 3d 342, 371 (S.D.N.Y. 2018) ("District courts . . . exercise discretion in determining the rate of prejudgment interest as well as the date on which interest accrues.").

122.    In sum, given these uncertainties, it is far from assured that the Estates would recover a significant, much less the full, amount of any fraudulent transfer judgments— assuming, of course, that they successfully obtained those judgments.  And it would likely take years to attempt to do so, at extraordinary cost.

### Breach of Fiduciary Duty and Unjust Enrichment Claims

123.    The Estates would also pursue other types of claims that do not sound in fraudulent transfer, such as claims for unjust enrichment and breach of fiduciary duty.  Recovery on these claims likely shares some of the same risks as the Estates' fraudulent transfer claims.[34]

124.    For example, with respect to potential unjust enrichment claims, the Estates would not have to prove an actual intent to defraud, nor would they have to demonstrate that PPLP was insolvent at the time of the transfers.  *See In re Operations NY LLC*, 490 B.R. 84, 100

---

[34] Indeed, the UCC Complaint asserts two counts of breach of fiduciary duty (Counts 10 & 11) and one count of unjust enrichment (Count 13).  (*See* UCC Complaint ¶¶ 431-41, 447-56.) While not discussed at length herein, in addition to these claims and the fraudulent transfer claims discussed *supra*, the UCC Complaint also asserts claims for avoidance of preference (Count 9), aiding and abetting breach of fiduciary duty (Count 12), constructive trust (Count 14), illegal distributions (Count 15), disallowance of claims (Count 16), equitable subordination (Count 17), turnover and account of documents (Count 18), accounting of profits (Count 19), alter ego liability (Count 20), liability under the Racketeering Influenced Corrupt Organizations Act ("**RICO**") (Count 21), and liability for RICO conspiracy (Count 22).  (*See* UCC Complaint ¶¶ 422-30, 442-46, 457-542.)  Like those claims for fraudulent transfer, breach of fiduciary duty, and unjust enrichment discussed herein, the UCC's remaining claims similarly face challenges to establishing liability, determining the value of any judgment, and collection efforts.

(Bankr. S.D.N.Y. 2013).  But they would have to demonstrate that assets transferred could have been used to satisfy creditors and that equity and good conscience require returning the transfers for the benefit of all creditors.  *See Briarpatch Ltd., L.P v. Phoenix Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir. 2004); *In re Moyer Grp., Inc.*, 586 B.R. 401, 408 (Bankr. S.D.N.Y. 2018).  And any such showing would likely be based on the same set of facts as the Debtors' fraudulent transfer claims, and thus subject to the same evidentiary challenges and uncertainties described above. *See, e.g.*, *In re Operations NY LLC*, 490 B.R. at 99-100 (acknowledging that "fraudulent transfer and unjust enrichment claims overlap" and may be "view[ed] as substitutes for each other"). Moreover, even if these Estates could succeed on an unjust enrichment claim, the Sackler parties would point out that the Estates could not seek double recovery under both unjust enrichment and fraudulent transfer theories.  *See, e.g.*, *In re TC Liquidations*, 463 B.R. at 280 (holding that tax dividends violated both fraudulent conveyance statutes and unjust enrichment theory, but refusing to award "duplication in damages").

125.    Similarly, claims that Board members breached their fiduciary duties because transfers made out of PPLP for the benefit of members of the Sackler parties constituted self-dealing would require proof of many of the same factual predicates as the Estates' fraudulent transfer claims.  The Sackler parties therefore would likely make the same evidentiary and legal arguments as they would in response to the Estates' arguments that PPLP was insolvent or that transfers were made with fraudulent intent, as described above.  The Sackler parties would also point out that only entities can be pursued for breach of fiduciary duty, rather than the recipients of fraudulently transferred funds.  This could materially limit recoveries on these claims.

126.    Moreover, claims that members of the Board breached their fiduciary duties by failing to exercise good-faith oversight of PPLP's operations and ensure it had a system of

internal controls in place—known as *Caremark* claims—are also subject to uncertainties. *See Marchand v. Barnhill*, 212 A.3d 805, 809 (Del. 2019). Various Sackler parties would likely respond to these claims by asserting various defenses, including that Board members regularly received updates from management and external advisors regarding PPLP's compliance program during the relevant time period. (See JX-0470 (Hamermesh Report) ¶¶ 10, 25-30.)

> **2.    The Second *Iridium* Factor Weighs Strongly in Favor of Approval Because Litigating the Resolved Claims Would Involve Enormous Complexity, Cost, and Delay, as Well as Substantial Difficulties with Collectability**

127.    Irrespective of the chances of success on the claims resolved by the Plan Settlement, collecting any judgments the Debtors obtain would be a complex, costly, and potentially decades-long process. As detailed above, the claims of the Debtors would require adjudication of myriad complex matters, including the interpretation of a veritable mountain of evidence spanning over two decades, questions of choice of law, and numerous issues that would likely be litigated through expert testimony, such as PPLP solvency. *See supra* § II.B.1(ii). The documentary record in these chapter 11 cases alone constitutes nearly 100 million pages of discovery and diligence. And the Sackler Parties are certain to contest liability on the claims vigorously and for as long as it takes to prevail or to exhaust all possible appeals. (*See* Statement of the Raymond Sackler Family and Beacon Company in Support of the Debtors' Motion for a Preliminary Injunction at 12-14, *Purdue Pharma L.P. v. Commonwealth of Mass.*, Adv. Pro. No. 19-08289 (RDD) (Oct. 8, 2019) [Dkt. No. 63]; JX-1807 (Dec. 6, 2019 presentation by Mortimer Sackler family on potential defenses).)

128.    The road to litigating these claims to any form of final judgment would be a long one. Indeed, litigating the Debtors' fraudulent transfer claims through to final judgment and the exhaustion of any appeals could take years, if not a decade or longer. *See, e.g.*, *Weisfelner v.*

*Blavatnik (In re Lyondell Chemical Co.)*, 567 B.R. 55, 67-68 (Bankr. S.D.N.Y. 2017) (reviewing

procedural history from January 2008 bankruptcy filing to April 2017 post-trial opinion).

Meanwhile, such protracted litigation would further delay the transfer of significant value to the

Debtors' creditors.

129.    Not only would litigation span many years, it is also likely to be enormously

expensive, thus further eroding value that could be preserved for use starting on the Effective

Date.  Courts often recognize that the high costs of chapter 11 fraudulent transfer litigation

justify settlement.  *See, e.g., In re Best Prod. Co., Inc.*, 168 B.R. at 60 (approving settlement of

preference action and finding that litigation would have been expensive and "protracted,

including very extensive discovery, motion practice, and, in all likelihood, interlocutory appeals

before the case were ever tried").

130.    Moreover, even after success on any or all of the Estates' claims, Plaintiffs would

likely face obstacles in collecting on any resulting judgments.  Under the Bankruptcy Code,

fraudulent transfer claimants can recover both from the transferees, as well as the parties for

whose benefit a transfer is made, even if those intended beneficiaries never received the transfer.

*See* 11 U.S.C. § 550(a).  Trusts that receive fraudulent transfers generally qualify as transferees

from which a fraudulent transfer claimant may recover.  *See, e.g., In re Mastro*, 465 B.R. 576,

617 (Bankr. W.D. Wash. 2011) (holding that a co-trustee exercised sufficient dominion over

trust assets to qualify as an initial transferee); *In re Newman Cos.*, 140 B.R. 495, 498-99 (Bankr.

E.D. Wis. 1992) (holding that a trustee possessed "dominion over the money or other asset, [and]

the right to put money to one's own purposes").  Moreover, the beneficiaries of a trust qualify as

parties "for whose benefit" transfers to the trust are made.  *See In re Hessco Indus., Inc.*, 295

B.R. 372, 378 (9th Cir. B.A.P. 2003) (affirming bankruptcy court decision holding income

beneficiaries of a trust liable as individuals for whose benefit fraudulent transfers into the trust's

accounts were made); *In re Phillips*, 379 B.R. 765, 786-87 (Bankr. N.D. Ill. 2007) (holding that

transfer to pay off mortgage held by trust was "for the benefit" of trust's sole beneficiary because

the mortgage payoff resulted in a "dollar for dollar increase" in the beneficiary's equity position

in the trust).  Importantly, this means that, through a fraudulent transfer claim, a claimant may

recover from a spendthrift trust that was a transferee or an intended beneficiary of fraudulently

transferred funds, even if such trust would otherwise be considered "judgment proof" with

respect to other types of claims, as discussed further below.  That aspect is critical here, as a

substantial portion of the Sackler Parties' assets are held in various trusts.

131.    There are obstacles to litigating, enforcing, and collecting against the Sackler

Parties that create uncertainty with respect to the sums that may ultimately be recoverable.  For

one, although the Sackler Parties are often characterized as a monolithic entity, they are, in fact,

dozens of individuals spread out around the globe over a number of independent family units and

ranging in ages from young to elderly.  *See* MBR at 88 ("The Sacklers are not a simple group of

a few defendants" but rather "are a large family divided into two sides . . . with eight pods or

groups of family members within those divisions that have their own unique sources and

holdings of wealth.").  The majority have never served on the Board or been employed by the

Debtors.  Moreover, these efforts would be complicated by the fact that much of the wealth of

the Sackler Parties is concentrated in dozens of trusts created for their benefit, and several of

those trusts pre-date the invention of OxyContin.  *See* MBR at 88 (finding that the Sackler

Parties' assets are "widely scattered and primarily held . . . in purportedly spendthrift offshore

trusts . . . spendthrift U.S. trusts, and/or [ ] by people who themselves live outside of the

territorial jurisdiction of the United States").  As described in the Jersey law expert report

submitted by the Mortimer Sackler family, the trustees of these Jersey law trusts[35] are likely to attempt to rely on a number of legal doctrines and procedural devices to extend litigation (including, potentially, those that might even require *de novo* litigation[36] on claims underlying the judgments if successfully asserted) and delay or frustrate enforcement of the Debtors' judgments.  (*See* JX-0409 (Cushing Report) ¶ 13.)  In addition, the UCC's attempts to recover from the Raymond Sackler family's assets held in trusts in the United States may also encounter practical difficulties (although to a lesser degree than direct claimants would).  These difficulties could include needing to litigate recovery actions against individuals,[37] each of the 46 Raymond Sackler family trusts, and possibly each of the certain foreign independent associated companies in which those trusts hold interests (the "**IACs**").[38]

---

[35] Under Jersey law, the Sackler Parties would contend, "a trust does not itself have legal personality," and therefore "[a]ny proceedings relating to the assets of the Jersey Trusts would, accordingly, need to be brought against the trustees." (JX-0409 (Cushing Report) ¶ 8.)

[36] In the event that the Debtors are "unable to establish that, as a matter of Jersey law, the US court giving any judgment sought to be enforced had jurisdiction over the Trustees, then" the Sackler Parties contend it would be necessary "to re-litigate the claims in full before the Jersey court, with all of the cost, uncertainty and delay which this would produce."  (JX-0409 (Cushing Report) ¶ 11.2.)

[37] Plaintiffs have asserted claims against four specified individuals in the Raymond Sackler family: Richard Sackler, Jonathan Sackler, David Sackler, and the Estate of Beverly Sackler. (*See* JX-3615 (Martin Report (Raymond Sackler Family), Ex. F) at 23.)  Richard Sackler's non-trust net assets total $139.2 million excluding IACs and $192.5 million including IACs.  (*Id.* at 28.)  Jonathan Sackler's non-trust net assets total $74.1 million excluding IACs and $126.6 million including IACs.  (*See id.* at 42.)  David Sackler's non-trust net assets have negative value, with no assets attributable to the IACs.  (*See id.* at 55.)  Beverly Sackler's non-trust net assets total $6.0 million, with no assets attributable to the IACs.  (*See id.* at 58.)  Thus, the total non-trust net assets of the four Sackler individuals against whom Plaintiffs have asserted claims amount to $219.3 million excluding IACs and $319.1 million including IACs.

[38] The Debtors would assert that they could recover value distributed to the IACs, in particular, from the members of the Raymond Sackler family and their trusts, as parties for whose benefit the transfers were made.  (*See* 11 U.S.C. § 550(a)(1).)  The Raymond Sackler family would likely argue, however, that the Debtors could recover such assets only from those IACs themselves, because the family members and trusts did not receive or obtain those funds and are

132.    For all these reasons, the second *Iridium* factor weighs heavily in favor of settlement.

### 3.    The Third and Fourth *Iridium* Factors Weigh in Favor of Approval Because the Plan Settlement Is in the Paramount Interest of Creditors and Has Overwhelming Support From Parties-in-Interest

133.    The Plan Settlement unquestionably satisfies *Iridium* factors three and four.  First, parties-in-interest overwhelmingly support the Plan Settlement.  Every major creditor constituency in these chapter 11 cases endorses the Plan Settlement and recognizes its importance as a core pillar of the Plan.  These groups include the AHC, the UCC, the MSGE, the Native American Tribes Group, the Ad Hoc Group of Individual Victims, the Ad Hoc Group of Hospitals, the Third-Party Payor Group, the Ratepayer Mediation Participants, the Ad Hoc Committee of NAS Children, and the Public School District Claimants.  Moreover, all of the States now support or do not object to the Plan and the Plan Settlement.  *See* MBR at 87 (finding support by these groups and even fewer than all of the States satisfied these two *Iridium* factors notwithstanding an objection from the U.S. Trustee).  Further, the voting report also establishes the overwhelming support among creditors more broadly for the Plan, and thus, for the Plan Settlement.  (*See* Johnson Decl., Ex. A.)  This is a remarkable state of affairs given that numerous states and other creditors spent years in vigorous opposition.

134.    This extraordinary creditor support is perhaps the most convincing evidence that the Plan Settlement reflects the best available resolution for all parties-in-interest and is in "the paramount interests of the creditors."  *Iridium*, 478 F.3d at 462.  As discussed above, the

---

not transferees with respect to those funds, *see In re Finley*, 130 F.3d 52, 57 (2d Cir. 1997) ("[T]he minimum requirement of status as a 'transferee' is dominion over the money or other asset[.]"), potentially further complicating the Debtors' ability to recover Raymond Sackler family assets.

settlement confers substantial benefits on creditors, primarily by facilitating the transfer of

billions of dollars in value in respect of their claims.  The Plan Settlement avoids the uncertainty

and value-destruction that would ensue were the Debtors and creditors to instead litigate their

claims.  *See In re Sabine Oil & Gas Corp.*, 555 B.R. at 307-08 (concluding that the third *Iridium*

factor weighed in favor of approval because "[l]itigation of any or all of [the settled claims]

likely would harm creditors by extending the length of the Debtors' restructuring and eroding the

Debtors' enterprise value as liquidity is allocated . . . to litigation and related administrative

costs").  The value of this settlement is firmly evidenced by the overwhelming number of

eligible, voting creditors, including personal injury claimants, who, when given the choice to

settle their nondebtor claims in lieu of litigating them, chose to do so by affirmatively opting in

to the Plan's Third-Party Releases.  Accordingly, the fourth *Iridium* factor also weighs strongly

in favor of approving the settlement.  *See Iridium*, 478 F.3d at 462.

>   **4.    The Fifth and Seventh *Iridium* Factors Weigh Strongly in Favor of Approval Because the Plan Settlement Is the Product of Years of Arm's-Length Bargaining Among the Parties by Highly Experienced Counsel**

135.    As noted above, the Plan Settlement was negotiated by, and has garnered

overwhelming support from, every major creditor constituency in these Chapter 11 Cases.  As

was the case during the prior confirmation proceedings, these constituencies include duly elected

and appointed officials from States, municipalities, and Tribes, and were represented by skilled

and experienced bankruptcy practitioners, including (i) Akin Gump Strauss Hauer & Feld LLP;

(ii) Herbert Smith Freehills Kramer LLP; (iii) Brown Rudnick LLP; (iv) Caplin & Drysdale,

Chartered; (v) Gilbert LLP; and (vi) Davis Polk & Wardwell LLP.  *See* MBR at 86-87 (finding

counsel and advisors to the Debtors, Special Committee, UCC, and other constituencies "on the

other side of the table from the Sacklers" were experienced, capable, and "every match for the

Sacklers' own able counsel"). The Debtors also received guidance on the underlying tort and insurance issues from Dechert LLP and Reed Smith LLP respectively. And these proceedings were presided over by this Court, which has comprehensive experience reviewing settlements in complex bankruptcy proceedings such as these. *See, e.g.*, *In re Genesis Glob. Holdco, LLC*, 2023 WL 6543250, at *1 (Bankr. S.D.N.Y. Oct. 6, 2023) (Lane, J.) (holding *Iridium* factors were satisfied for complex settlement between two debtor entities); *In re AMR Corp.*, 502 B.R. at 45 (approving settlement between Department of Justice and Debtors in antitrust action). Thus, there can be no dispute that the fifth *Iridium* factor—the "competency and experience of counsel" supporting the Plan Settlement, and "the experience and knowledge of the bankruptcy court judge" reviewing the settlement—supports approval. *See Iridium*, 478 F.3d at 462.

136.    Likewise, it is beyond cavil that the seventh *Iridium* factor—whether the settlement is the result of arm's-length bargaining—is satisfied. (*See* Dubel Decl. ¶¶ 32-46, 57-63.) As the Court found in confirming the Twelfth Amended Plan, the settlement with the Sackler Parties "was clearly and unmistakably the product of arm's-length bargaining" predicated on "the most extensive discovery process that not only [the Court] ha[s] seen . . . but [ ] any court in bankruptcy has ever seen." MBR at 85-86. The Plan Settlement—largely built upon the settlements confirmed in connection with the Twelfth Amended Plan—was the product of delicate and thoughtful mediation and negotiation by the constituencies mentioned above. (*See* Dubel Decl. ¶¶ 57-68.) This settlement was reached notwithstanding *two* Estate fiduciaries undertaking extensive and searching investigations into possible claims—and the UCC filing a 22-count complaint—against the Sackler Parties and their associated entities. *See* MBR at 86 ("The record is unrefuted regarding the incredible extent of discovery taken not only by the . . . Special Committee . . . but also the [UCC]"); *supra* Background § II.C; (JX-0873 (Examiner's

Report) at 30 (noting that "it is abundantly clear the Official Committee conducted a highly motivated, independent evaluation of potential claims in connection with the negotiation and consideration of the Plan and the Shareholder Settlement contained therein").)

137.    And the current Plan Settlement is the result of nearly sixteen months of *additional* non-stop mediation, built upon foundational progress made during years of negotiations and successive rounds of mediation in 2020, 2021, and 2022.  This history and the fact that the original 2020-21 settlements and current settlements were all mediated proposals more than amply satisfies this *Iridium* factor.

> **5.    The Sixth *Iridium* Factor Supports Approval Because the Releases Are Reasonable Under the Circumstances of These Chapter 11 Cases and Necessary to Ensuring a Value-Maximizing Plan**

138.    Finally, the sixth *Iridium* factor—the "nature and breadth of releases to be obtained by officers and directors"—further supports approval of the Plan Settlement.  *See Iridium*, 478 F.3d at 462.  Unlike the third-party releases contained in the Twelfth Amended Plan, the Plan and Plan Settlement provide for fully consensual releases (of the Sackler Parties, as well as the Sackler Entities and other entities for conduct related to Purdue) that apply only for those creditors who opt into the settlement and voluntarily release their claims.[39]  In the

---

[39] For the avoidance of doubt, the Court's authority to confirm a plan of reorganization containing *consensual*, opt-in third-party releases survives the Supreme Court Decision.  *See, e.g.*, *In the Matter of 2U, Inc., et al.*, No. 24-11279, Hr'g Tr. 35:15-16; 28:2-14; 32:12-20; 38:2-8 (Bankr. S.D.N.Y. Sept. 6, 2024) [Dkt. No. 175] (confirming Debtors' prepackaged plan which included an opt-in mechanic, holding that "there is authority that voting in favor of a plan is [] consent" and "I don't think that there's any question that [people who voted for the plan is] a form of consent" where "people [] signed a ballot form that said, in the clearest possible terms, this is what the consequence is of your vote"); *In the Matter of Acorda Therapeutics, Inc., et al.*, No. 24-22284, Hr'g Tr. 101:5-103:4 (Bankr. S.D.N.Y. Aug. 7, 2024) [Dkt. No. 449] (finding "an affirmative manifestation of consent" where "parties who voted in favor of the plan are bound by third-party releases set forth in the plan" when ballot "explicitly said in large letters … that a vote in favor of the plan will bind the party voting yes to the nondebtor release as set forth in the plan.  It was made plain as day."); *In re Murray Energy Holdings Co.*, 665 B.R. 347, 358 (Bankr. S.D. Ohio 2024) (finding that third-party release was consensual where "all parties to be bound

aftermath of the Supreme Court Decision (*see supra* n.39), those releases are critical to preserving the highly negotiated Plan Settlement, unlocking the immense benefits of the Plan, and avoiding the pitfalls of potentially interminable, value-destructive fraudulent transfer litigation that would result in the absence of a settlement.  Indeed, it is only because of the scope of the consensual releases that the Debtors are capable of implementing a value-maximizing reorganization for the various creditor constituencies.  At bottom, these releases are what the Sackler Parties are paying up to $7.0 billion to obtain.

## C.    The Remainder of the Plan Settlement Is Reasonable and in the Best Interests of the Estates and Should Be Approved

139.    The remaining settlements contained in the Plan are likewise in the best interests of the Estates and comfortably pass muster under the *Iridium* factors—including for many of the same reasons demonstrated above.

140.    The Public and Private Entity Settlements, for example, provide substantial benefits to the Estates because they enable the orderly, equitable, and consensual distribution of

---

by the [] Release either (i) voted to accept the Plan or (ii) affirmatively agreed to be a Releasing Party").

Indeed, the Court's authority to approve opt-in third-party releases also long predates the Supreme Court Decision.  *See, e.g.*, *In re Chassix Holdings, Inc.*, 533 B.R. 64, 80 (Bankr. S.D.N.Y. 2015) (confirming plan where creditors who voted to reject the plan could also opt-in to the third-party release, and noting "[a] clearer form of 'consent' can hardly be imagined"); *In re Voyager Holdings, Inc.*, 649 B.R. 111, 130 (Bankr. S.D.N.Y. 2023) (rejecting objections to third-party releases where "the plan here provides that no creditor or shareholder has released any claims belonging to that person or entity unless that person has affirmatively done so by executing the 'opt-in' release form"); *In re Wash. Mut., Inc.*, 442 B.R. 314, 355 (Bankr. D. Del. 2011) (holding that "any third party release is effective only with respect to those who affirmatively consent to it . . ."); *In re Wyly*, 2019 WL 2590035, at *6 (Bankr. N.D. Tex. June 22, 2019) (confirming a plan where the claim holder ballots had a third-party release opt-in, holding "[t]he Third-Party Releases are fully consensual because they are only given by those parties who affirmatively opted-in to such releases"); *In re PG&E Corp.*, 617 B.R. 671, 683 (Bankr. N.D. Cal. 2020) (finding proposed third-party release appropriate where "it requires the non-debtor parties to affirmatively opt-in to a release of their claims").

the value of the Debtors' Estates among the Non-Federal Public Claimants and the Private

Claimants.  Among other things, they ensure substantial recoveries to public and private

creditors alike (*e.g.*, over $865.8 million in cash to be distributed to qualified personal injury

victims by the PI Trust).  (*See* DelConte Plan Decl. ¶ 29.)  Moreover, these settlements avoid

years of potentially catastrophic inter-creditor litigation.  Over 183,000[40] contingent opioid-

related proofs of claim were filed in these chapter 11 cases, alleging in excess of $40 trillion.

(*See* Johnson Decl. at 5-6 & n.6.)  In other words, there is no scenario in which the Debtors'

assets would be sufficient to pay the full value of their contingent opioid liability to creditors.

Accordingly, in the absence of a consensual resolution, the public and private claimants would

almost certainly seek to disallow or subordinate each other's claims and the claims of the United

States, and Debtors, as Estate fiduciaries, would also be forced to test the validity of each of the

claims filed in the chapter 11 cases in an attempt to protect rightful creditors.  That multi-year

litigation quagmire would be devastating to the reorganization and benefit no one.  Not only

would such litigation be incredibly costly and protracted, it would also create significant

uncertainty as to whether Debtors could distribute sufficient value to public creditors to take

advantage of the  DOJ Forfeiture Judgment Credit.  *See supra* Background § II.D.  The Public

and Private Entity Settlements, by contrast, ensure that Debtors will be able to distribute billions

for the benefit of their creditors and take full advantage of the $1.775 billion DOJ Forfeiture

Judgment Credit.

---

[40] Kroll had originally received over 615,000 timely filed proofs of claim.  (Johnson Decl. ¶ 7.)
Over 471,000 of those proofs of claim belonged to Third-Party Payors.  However, Kroll
determined that over 181,000 of those Third-Party Payor Claims were superseded by amended
Claims or duplicative of other Claims, and that over 266,000 were withdrawn by claimants who
determined they did not have Claims.  (Johnson Decl. at 6 n.6.)  This reduced the total number of
Third-Party Payor Claims to just over 24,000.  (*Id.*)

141.    Moreover, as part of the global resolution of these chapter 11 cases, Section 5.9 of the Plan provides for the creation of several funds to pay attorneys' fees and costs of creditors' counsel.  This fee mechanism is an integral component of the Plan Settlement because it enables the compensation of creditors' counsel in a case where many creditors have chosen to dedicate their distributions towards opioid abatement efforts.

142.    By contrast, there is no benefit to foregoing the resolution contemplated by the Plan Settlement and choosing instead to litigate the fraught issue of claim allowance of hundreds of thousands of claims.  *See Iridium*, 478 F.3d at 462 (explaining that a settlement's benefits must be weighed against "the litigation's possibility of success").  Indeed, the only result would be to force the Debtors and their many creditor constituencies—parties who collectively have invested many tens of thousands of hours to resolve the complex issues of allocation and claim treatment—to litigate those questions anew.  And to what end?  Such litigation would be protracted and costly, would result in inequitable recoveries dictated by races to the courthouse, and would lead to the destruction of an immense portion of Debtors' Estates—all of which should be preserved for the benefit of Debtors' creditors.  (*See* Oct. 11, 2019 Hr'g Tr. 256:13-18, *Purdue Pharma L.P. v. Commonwealth of Mass.*, Adv. Pro. No. 19-08289 (RDD) [Dkt. No. 87] ("The Debtors have already committed . . . to turn over to their creditor body all of their assets which is an extraordinary commitment, to say the least.").)[41]

143.    Finally, the Public and Private Entity Settlements are the result of hard-fought, arm's-length negotiations among the Debtors' creditors (all of whom are represented by competent and sophisticated counsel).  Indeed, the Debtors' public and private creditors engaged

---

[41] For substantially similar reasons, the United States-PI Claimant Medical Expense Claim Settlement should be approved.

in numerous, vigorous rounds of mediation before several of the most respected mediators in the country, and engaged in even further negotiation thereafter, on numerous critical issues related to allocation and distribution, all of which culminated in the Public and Private Entity Settlements. (*See* Dubel Decl. ¶¶ 37-46, 57-63.)  This factor, too, further supports approval of the remainder of the Plan Settlement.  *See Iridium*, 478 F.3d at 462.

### III.    The Plan Satisfies Each Requirement for Confirmation Under the Bankruptcy Code

144.    To confirm the Plan, the Court must find that the Debtors have satisfied the provisions of section 1129 of the Bankruptcy Code by a preponderance of the evidence.  *See In re Sabine Oil & Gas Corp.*, 555 B.R. at 310.  As set forth below, the Plan satisfies all applicable elements of section 1129 and otherwise complies with all applicable sections of the Bankruptcy Code, Bankruptcy Rules, and non-bankruptcy law.  Accordingly, the Plan should be confirmed.

#### A.    The Plan Complies with the Applicable Provisions of the Bankruptcy Code (11 U.S.C § 1129(a)(1))

145.    Section 1129(a)(1) of the Bankruptcy Code requires that a plan of reorganization comply with all applicable provisions of the Bankruptcy Code.  The legislative history to this provision provides that its principal purpose is to ensure compliance with the requirements of section 1122 and 1123 of the Bankruptcy Code, which govern the classification of claims and interests and the contents of the Plan, respectively.  *See Kane v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*), 843 F.2d 636, 648-49 (2d Cir. 1988) (quoting H.R. Rep. No. 95-595, at 412 (1977), *as reprinted in* 1978 U.S.C.C.A.N. 5963; S. Rep. No. 95-989, at 126 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5787, at 5912); *see also In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992).  The Plan complies with sections 1122 and 1123 in all respects.

### 1.     The Plan Satisfies the Classification Requirements of Section 1122

146.     Section 1122(a) of the Bankruptcy Code provides that "a plan may place a claim

or an interest in a particular class only if such claim or interest is substantially similar to the other

claims or interests of such class." 11 U.S.C. § 1122(a).  "[C]lassification is constrained by two

straight-forward rules:  Dissimilar claims may not be classified together; similar claims may be

classified separately only for a legitimate reason." *In re Quigley Co., Inc.*, 377 B.R. 110, 116

(Bankr. S.D.N.Y. 2007) (quoting *Aetna Cas. & Sur. Co. v. Clerk, U.S. Bankr. Court (In re*

*Chateaugay Corp.)*, 89 F.3d 942, 949 (2d Cir. 1996)).  Plan proponents have significant

flexibility under this standard to place similar claims into different classes as long as there is a

rational basis for doing so. *See In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. at 757 ("A

plan proponent is afforded significant flexibility in classifying claims under § 1122(a) if there is

a reasonable basis for the classification scheme and if all claims within a particular class are

substantially similar."); *Bos. Post Rd. Ltd. P'ship v. FDIC (In re Bos. Post Rd. Ltd. P'ship)*, 21

F.3d 477, 483 (2d Cir. 1994) (recognizing similar claims may be separately classified unless sole

purpose is to engineer assenting impaired class).

147.     The Plan's classification scheme comfortably satisfies the requirements of section

1122.  Under the Plan, Claims and Interests are classified into 21 Classes based on, among other

things, their legal rights to the Debtors' property, their priority, and their relative treatment as

agreed to by the relevant holders of those claims pursuant to the Plan Settlement.  (*See* Plan

§ 3.2.)  For example, the Plan appropriately classifies certain claims asserting domestic opioid

litigation liability together—including those filed by States and local government entities in

Class 4—because these opioid litigation claims are all unsecured claims for damages arising out

of the Debtors' manufacture, marketing, and sale of opioid medications in the United States. *See*

*In re Quigley Co., Inc.*, 377 B.R. at 116 (quoting *In re Drexel Burnham Lambert Grp.*, 138 B.R.

at 757) (holding that because those claims have "substantially similar rights to the *[D]ebtors'*

*assets*," they are "similar" for the purposes of section 1122 and are properly classified together

(emphasis in original)); *see also* 7 Collier on Bankruptcy ¶ 1122.03[3] (16th ed. 2021) (noting

that courts look at "the nature of the claim and the relationship of the claim to property of the

debtor").  The same is true for the other claims classified together by the Plan, as each of those

classes also has substantially similar rights to the Debtors' assets.  Claims of adults on account of

"alleged opioid-related personal injury" are classified together, regardless of the alleged

mechanism of injury or nature of damages, because such claims have the same legal nature and

relationship to the property of the estates.[42]  (*See* Plan Art. IV (explaining treatment of claims

and interests).)

148.    There is also a reasonable basis for the Plan's classification of similar opioid

litigation claims into separate classes.  That classification framework, which arranges opioid

litigation claims into nine classes (Classes 3 through 10(b)), is the outgrowth of the very first

phase of mediation in these chapter 11 cases, and a similar classification framework was

previously confirmed as part of the Twelfth Amended Plan.  Phase One of mediation resulted in

agreements with respect to allocation of the Debtors' assets among the Debtors' public and

private creditors as well as agreements with respect to the treatment of those claims under the

Plan.  (*See* JX-1637 (Phase One Mediators' Report) ¶¶ 3-7); *see also supra* Background § III.A.

---

[42] At least two *pro se* objectors oppose the Plan's classification scheme on the ground that the
mechanism of personal injury underlying their claim (*e.g.*, a drug interaction) or the nature of
damages they seek (*e.g.*, economic damages, as opposed to pain and suffering) meaningfully
distinguish their claims from other Non-NAS PI Claims.  (*See, e.g.*, Morales Obj. [Dkt. No. 7355
at 8-11]; Redwod Obj. [Dkt. Nos. 7865; 7944; 7945; 7947; 7997; 8078].)  These distinctions are
of no moment because they do not meaningfully alter the priority or legal bases of these
claims.  Moreover, any attempt to divide the creditor body so minutely would result in an
unworkably complex classification scheme.

Consistent with the results of that mediation, as did its predecessor, the Plan classifies these
proofs of claim according to the agreed-upon treatment and channeling, including channeling to
respective Creditor Trusts that will either fund abatement programs across the United States or
make cash distributions to creditors pursuant to trust distribution procedures.[43]  (*See* Plan §§ 4.3-
4.10.)  This is more than ample justification for classifying those opioid litigation claims
separately, and it is consistent with numerous mass tort and other large-cale chapter 11 plans
involving multi-trust distribution frameworks.  *See, e.g.*, *In re Sabine Oil & Gas Corp.*, 555 B.R.
at 310-11 (plan proponents must only show a rational or reasonable business, factual, and/or
legal basis to justify separate classification of similar claims); *see also* (Twelfth Amended Plan,
§§ 4.3-4.10); Confirmed Plan of Reorganization, *In re PG&E Corp.*, No. 19-30088 (Bankr. N.D.
Cal. June 20, 2020) [Dkt. No. 8053] (classifying separately unsecured creditors whose recoveries
were to come from different trusts); Confirmed Second Am. Plan of Reorganization, *In re Insys
Therapeutics, Inc.*, No. 19-11292 (Bankr. D. Del. Jan. 16, 2020) [Dkt. No. 1115] (same);
Confirmed Fifth Am. Plan of Reorganization, *In re TK Holdings Inc.*, No. 17-11375 (Bankr. D.
Del. Feb. 21, 2018) [Dkt. No. 2120] (same); Confirmed Second Am. Plan of Reorganization, *In
re Motors Liquidation Co.*, No. 09-50026 (Bankr. S.D.N.Y. Mar. 29, 2011) [Dkt. No. 994]
(same).

---

[43] The Secured Claims (Class 1) and Other Priority Claims (Class 2) involve creditors that have
not asserted opioid litigation claims and are not the focus of any of the objections.  Both the NAS
PI Claims (Class 10(a)) and Non-NAS PI Claims (Class 10(b)) will be channeled to the PI Trust.

### 2.   The Plan Satisfies the Mandatory Plan Requirements of Section 1123(a)

149.   Section 1123(a) of the Bankruptcy Code sets forth seven mandatory requirements that every chapter 11 plan must meet.  *See* 11 U.S.C. § 1123(a)(1)-(7).  The Plan meets each of these requirements.

### (i)   Specification of Classes, Impairment, and Treatment

150.   Sections 1123(a)(1), (2), and (3) of the Bankruptcy Code require a plan to designate classes of claims or interests subject to section 1122, specify the classes of claims and interests that are not impaired, and specify the treatment of such claims and interests under the plan that are impaired, respectively.  Here, the Plan satisfies each of these provisions.

151.   *First*, as discussed above, the Plan designates all Claims and Interests into 21 classes or sub-classes (*see* Plan, Art. III), in accordance with section 1122 (*see supra* § III.A.1). *Second*, the Plan specifies that Class 1 (Secured Claims), Class 2 (Other Priority Claims), Class 11(a) (Avrio General Unsecured Claims), Class 11(b) (Adlon General Unsecured Claims), Class 12 (Intercompany Claims), and Class 18 (Intercompany Interests) are unimpaired or potentially unimpaired Classes under the Plan, within the meaning of section 1124 of the Bankruptcy Code. (*See* Plan Art. IV.)  And *third*, the Plan specifies that Class 3 (Federal Government Unsecured Claims), Class 4 (Non-Federal Domestic Governmental Claims), Class 5 (Tribe Claims), Class 6 (Public School Claims), Class 7 (Healthcare Provider Claims), Class 8 (Third-Party Payor Claims), Class 9 (ER Physician Claims), Class 10(a) (NAS PI Claims), Class 10(b) (Non-NAS PI Claims), Class 11(c) (Other General Unsecured Claims), Class 12 (Intercompany Claims), Class 13 (Shareholder Claims), Class 14 (Co-Defendant Claims), Class 15 (Other Subordinated Claims), Class 16 (PPLP Interests), Class 17 (PPI Interests), and Class 18 (Intercompany Interests) are impaired or potentially impaired under the Plan, within the meaning of section

1124 of the Bankruptcy Code.  (*See* Plan Art. IV.)  And the Plan specifies the treatment of each

of these Classes, thereby satisfying section 1123(a)(3) of the Bankruptcy Code.  (*See id.*)

### (ii)    Same Treatment

152.    Section 1123(a)(4) requires that a plan "provide the same treatment for each claim

or interest of a particular class, unless the holder of a particular claim or interest agrees to a less

favorable treatment of such particular claim or interest."  11 U.S.C. § 1123(a)(4).  This "same

treatment" standard only "requires equality of *treatment*, not equality of *result*."  *In re Breitburn

Energy Partners LP*, 582 B.R. 321, 358 (Bankr. S.D.N.Y. 2018) (emphasis added); *see In re

Joint E. & S. Dist. Asbestos Litig.*, 982 F.2d 721, 749 (2d Cir. 1992) ("Without question, the

'same treatment' standard of section 1123(a)(4) does not require that all claimants within a class

receive the same amount of money."), *op. modified on rehearing*, 993 F.2d 7 (2d Cir. 1993).  In

practice, the "key inquiry under § 1123(a)(4) is not whether all of the claimants in a class obtain

the same thing, but whether they have the same opportunity" to recover.  *In re Dana Corp.*, 412

B.R. 53, 62 (S.D.N.Y. 2008); *In re W.R. Grace & Co.*, 729 F.3d 311, 327 (3d Cir. 2013) ("What

matters, then, is not that claimants recover the same amount but that they have equal opportunity

to recover on their claims.").

153.    The Plan satisfies section 1123(a)(4) of the Bankruptcy Code because each class

of claims or interests under the Plan receives the same opportunity to recover as every other

Claim or Interest in such class.  For example, Classes 4 through 10(b) consist of different classes

of opioid litigation claims.  (*See* Plan §§ 4.4-4.10.)  Each of these classes of opioid litigation

claims will be channeled to separate Creditor Trusts, where the claims in each such class will

receive distributions in accordance with the applicable trust distribution procedures.  (*See id.*)

With the exception of distinguishing between Participating and Non-Participating Channeled

Claims, as discussed below, each of those trust distribution procedures applies equally to the

claims within each respective class and affords each claimant with an equal opportunity to test their claims against the same set of criteria.

154.    The treatment of Non-Participating Channeled Claims under the Plan does not otherwise violate Section 1123(a)(4).  Courts have recognized that "differences in the timing of distributions and other procedural variations that have a legitimate basis do not generally violate § 1123(a)(4) unless they produce a substantive difference in a claimant's opportunity to recover." *In re W.R. Grace & Co.*, 729 F.3d at 329  (finding section 1123(a)(4) was not violated where TDPs "impose[d] additional restrictions on indirect claims" such as requiring "that, in order to have a presumptively valid claim, an indirect claimant must secure a release of liability against the trust from the direct claimant"; the Circuit opined that this treatment was not improper because "the release provision does not limit a claimant's opportunity for recovery, as indirect claimants who are unable to obtain a release can still pursue their claims through the individual review process").  Here, to the extent any Non-Participating Channeled Claim is deemed Allowed, its later opportunity to recover will not be diminished.  Otherwise, no claimant is *entitled* to have their claim allowed without being subject to challenge by the Debtors or any other party in interest.  *See* 11 U.S.C. § 502(a) ("A claim or interest . . . is deemed allowed, unless a party in interest . . . objects.").

155.    For the aforementioned reasons, the provisions of the Plan, including their treatment of Non-Participating Channeled Claims, satisfy the requirements of section 1123(a)(4) of the Bankruptcy Code.

### (iii)    Adequate Means for Implementation

156.    Section 1123(a)(5) of the Bankruptcy Code requires that a plan provide "adequate means" for its implementation.  The Plan, Plan Supplements, and terms of the Confirmation Order provide for adequate and proper means of implementation, including, but not limited to:

- Authorization and approval of the various Plan Settlements (Plan § 5.2);

- Establishment of the Plan Administration Trust, including the vesting of the PAT Assets in the PAT and the appointment of the Plan Administration Trustee (Plan § 5.3);

- Establishment of Knoa, including the vesting of the Knoa Transferred Assets in Knoa and the appointment of the Knoa Managers and the establishment of the Foundation, including the appointment of the Foundation Trustees (Plan §§ 5.4, 5.5);

- Establishment of the Master Disbursement Trust, including the vesting of the MDT Transferred Assets in the Master Disbursement Trust and the appointment of the MDT Trustees and MDT Advisory Council (Plan § 5.6);

- Establishment of the Special Operating Reserve and Release Claims Reserves (Plan § 5.7);

- Establishment of the Creditor Trusts, including the appointment of the Creditor Trustees and the Creditor Trust Overseers (Plan § 5.8);

- Establishment of the Public Document Repository (Plan § 5.13);

- Authorization for the Debtors to make certain payments on the Effective Date described in Section 5.14 of the Plan (Plan § 6.2);

- Cancellation of existing securities and agreements (Plan § 5.16); and

- Authorization for the Debtors to take all actions consistent with the Plan that may be necessary or appropriate to effect any transaction described in, approved by, contemplated by or necessary to effectuate the Restructuring Transactions under and in connection with the Plan (Plan § 5.1).

Accordingly, the Plan provides ample means for implementation, as required by section 1123(a)(5).

### (iv)    Non-Voting Stock

157.    Section 1123(a)(6) requires that the Debtors' corporate documents prohibit the issuance of non-voting equity securities.  Here, the Knoa Operating Agreement prohibits the issuance of non-voting securities to the extent prohibited by section 1123(a)(6) of the Bankruptcy Code.  (Plan § 5.15(e); JX-3610 (Knoa Operating Agreement) § 2.7.)  Accordingly, the Plan satisfies the requirements of section 1123(a)(6).

### (v)      Selection of Officers and Directors

158.      Section 1123(a)(7) of the Bankruptcy Code requires that the Plan contain

provisions consistent with the interests of creditors and with public policy with respect to the

manner of selection of any officer, director, trustee, or any other successor thereto.

159.      Here, section 1123(a)(7) is satisfied because the Plan describes a method of

selection of directors and officers for the post-emergence debtors that is consistent with the

interests of creditors and public policy.  The Plan describes an organizational structure for Knoa

whereby the board of managers will consist of five disinterested and independent NewCo

Managers, each with experience in one or more of the following areas relevant to the post-

emergence Debtors' business:  pharmaceuticals, public policy (including public health policy),

law enforcement, ethics and compliance, finance, audit, general business and/or corporate

governance issues.  (Plan § 5.4(d)(i).)  The Plan further provides that the Settling States, with the

consent of the AHC and in consultation with the Debtors and UCC, and pursuant to a selection

process that is reasonably acceptable to the Debtors, will select the initial NewCo Managers.

(*Id.*)  This is provided that the DOJ shall have the right, in its discretion, to observe the selection

process.[44]  (*Id.*)

### 3.      The Plan Complies with the Discretionary Provisions of Section 1123(b) of the Bankruptcy Code

160.      Section 1123(b) of the Bankruptcy Code sets forth various discretionary

provisions that may be incorporated into a chapter 11 plan.  Under this provision, a plan may

among other things:  (a) impair or leave unimpaired any class of claims or interests; (b) provide

---

[44] Section 1123(a)(8) does not apply to these chapter 11 cases because none of the Debtors are individuals.  *See* 11 U.S.C. § 1123(a)(8) (applicable "in a case in which the debtor is an individual").

for the assumption or rejection of executory contracts and unexpired leases; and (c) provide for the settlement or adjustment of any claim or interest belonging to the debtor or the estates.  *See* 11 U.S.C. § 1123(b)(1)-(3).  In addition, section 1123(b)(6) states that a plan of reorganization may "include any other appropriate provision not inconsistent with the applicable provisions of [title 11]."  *See* 11 U.S.C. § 1123(b)(6).

> **(i)      The Plan is Consistent with Sections 1123(b)(1)-(3) of the Bankruptcy Code**

161.     The Plan's provisions are consistent with sections 1123(b)(1), (b)(2), and (b)(3).

162.     *First*, section 1123(b)(1) provides that a plan may impair or leave unimpaired any class of claims.  Consistent with this provision, the Plan provides that (i) Classes 1, 2, 11(a), 11(b), 12, and 18 are unimpaired or potentially unimpaired, and (ii) Classes 3, 4, 5, 6, 7, 8, 9, 10(a), 10(b), 11(c), 12, 13, 14, 15, 16, 17, and 18 are impaired or potentially impaired under the Plan.

163.     *Second*, section 1123(b)(2) states that a plan may provide for the assumption and rejection of executory contracts and unexpired leases.  In accordance with this provision, Article VIII of the Plan provides that all executory contracts and unexpired leases to which any Debtor is a party, as amended pursuant to Section 8.4 of the Plan, shall be deemed assumed by the applicable Debtor and, except with respect to any contract or lease held by a Transferred Debtor, assigned to Knoa or its designee, with additional exceptions as described in the Plan.  (Plan §§ 8.1, 8.4.)

164.     *Third*, section 1123(b)(3)(A) states that a plan may provide for the settlement or adjustment of any claim belonging to the debtor or the estate.  Here, consistent with that provision, the Plan provides for a series of settlements, including settlements of claims or interests belonging to the Debtors (the Plan Settlement).  The settlements are fair and reasonable

and in the best interests of the estates, as demonstrated in Section II(B), *supra*.  Moreover, section 1123(b)(3)(B) states that a plan may provide for the retention and enforcement by the debtor of any claim or interest belonging to the debtors.  Consistent with this provision, the Plan provides for the retention and enforcement of certain claims by the Debtors' successors in interest, including, as of the Effective Date: (i) the Master Disbursement Trust shall have the right to prosecute any and all MDT Causes of Action (Plan § 5.6(a)(ii)); (ii) the Plan Administration Trust shall have the right to prosecute any and all Retained Causes of Action relating to and necessary for the administration of Claims against the Debtors (other than Channeled Claims) or the other responsibilities of the Plan Administration Trustee in accordance with the PAT Agreement (Plan § 10.15); (iii) each Creditor Trust shall have the right to prosecute any and all Retained Causes of Action relating to and necessary for the administration of the applicable Channeled Claims in accordance with the applicable Creditor Trust TDP (*id.*); and (iv) Knoa shall have the right to prosecute any and all Retained Causes of Action constituting Knoa Transferred Assets (*id.*).  These provisions are consistent with applicable law and not inconsistent with the Bankruptcy Code, and therefore should be approved.

165.    Sections 10.6(a) and 10.7(a) of the Plan provide for releases by the Debtors (the "**Debtor Release**") of claims and causes of action, including among other things, those claims against the Released Parties[45] and, in connection with the Shareholder Settlements, the Shareholder Released Parties, other than those retained under the Plan.

---

[45] "Released Parties" means, collectively, (i) the Debtors, (ii) each of the Debtors' Related Parties solely in their respective capacities as such, and (iii) solely for purposes of the releases by the Debtors in Section 10.6(a) of the Plan, (A) the Supporting Claimants, the Creditors' Committee and the Creditors' Committee's members and each of their respective professionals, in each case solely in their respective capacities as such and (B) the Settling Co-Defendants and each of their Related Parties, in each case solely in their respective capacities as such; provided, however, that, notwithstanding the foregoing or anything in the Plan to the contrary, no Excluded

166.    It is well settled that "[d]ebtors have considerable leeway in issuing releases of any claims the Debtors themselves own." *In re Adelphia Commc'ns Corp.*, 368 B.R. at 263 n. 289.  The Bankruptcy Code itself states that a plan of reorganization may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."  11 U.S.C. § 1123(b)(3)(A).  For that reason, the Debtors have authority to, under section 1123(b)(3)(A), release estate causes of action as consideration for concessions made by their various stakeholders pursuant to the Plan.  *See, e.g.*, *In re Charter Commc'ns*, 419 B.R. 221, 257 (Bankr. S.D.N.Y. 2009) ("Debtors are authorized to settle or release their claims in a chapter 11 plan.").  The inquiry therefore is whether the releases are in the "best interests of the estate" or that granting the releases is a valid exercise of the debtor's business judgment.  *See In re DBSD N. Am., Inc.*, 419 B.R. 179, 217 (Bankr. S.D.N.Y. 2009) ("The releases and discharges of claims and causes of action by the Debtors, pursuant to section 1123(b)(3)(A), of the Bankruptcy Code represent a valid exercise of the Debtors' business judgment, and are fair, reasonable and in the best interests of the estate."), *aff'd in part, rev'd in part on other grounds*, 627 F.3d 496 (2d Cir. 2010).  Under this standard, the "court should instead canvass the [settled] issues [to] see whether the settlement falls below the lowest point in the range of reasonableness."  *In re NII Holdings Inc.*, 536 B.R. at 100 (quoting *In re Adelphia Commc'ns Corp.*, 368 B.R. at 225).

---

Party or Shareholder Release Snapback Party shall be a Released Party in any capacity or respect.  (Plan § 1.1.)

For the avoidance of doubt, the phrase "solely in their respective capacities as such" in subsections (ii) and (iii) means, with respect to a Person, solely to the extent a claim against such Person (x) arises from such Person's conduct or actions taken in such capacity, or from such Person's identified capacity in relation to another specified Released Party and not, in either case, from such Person's conduct or actions independent of such capacity, and (y) to the extent such Person's liability depends on or derives from the liability of such other Released Party, such claim would be released if asserted against such other Released Party.  (*Id.*)

167.    Here, as demonstrated above, the resolutions contemplated by the Plan Settlement are fair and reasonable, and in the best interests of the Estates.  *See supra* § II(B).  The Debtors have determined that their Estates are best served by settling the claims against the Released Parties and in connection with the Shareholder Settlements.  (*See* Dubel Decl. ¶¶ 65-70.)  In short, absent the Debtor Release, the Sackler Parties would not contribute up to $7 billion in cash contributions to the Debtors and their creditors, and the Estates would be forced to pursue the Sackler parties in uncertain litigation that would likely take years or longer before realizing any recovery.  *See supra* § II(B).  At the same time, the Debtor Release is subject to a snapback provision that, with respect to certain Shareholder Released Parties, will restore the parties to the *ex ante* status quo in the event that, among other things, the Sackler Parties fail to make payments outlined under the Plan, which adequately protects the Estates' interests.  Accordingly, the Debtor Release is appropriate and not inconsistent with the Bankruptcy Code.

### (ii)    The Plan's Additional Provisions Are Not Inconsistent with the Bankruptcy Code in Satisfaction of Section 1123(b)(6)

168.    Section 1123(b)(6) provides that a Plan may include "any other appropriate provision not inconsistent with the applicable provisions of this title."  11 U.S.C. § 1123(b)(6).  Here, in accordance with § 1123(b)(6), the Plan's other provisions are appropriate and consistent with the applicable provisions of the Bankruptcy Code and other applicable law.

### (iii)    The Third-Party Releases Are Appropriate

169.    Sections 10.6(b) and 10.7(b) of the Plan provide for consensual nondebtor third-party releases by the Releasing Parties of certain direct and derivative claims and causes of action against the Released Parties and Shareholder Released (the "**Third-Party Releases**").  (Plan §§ 10.6(b), 10.7(b).)  Consistent with the Supreme Court Decision's mandate, the Plan provides that the Third-Party Releases "shall not apply to [] Holders of Claims who do not opt-in

to the releases through their applicable ballots" (other than the Supporting Claimants and Settling

Co-Defendants, who otherwise affirmatively consent to the releases).[46] (*Id.*)  In other words,

under the Plan, no nondebtor party is compelled to release their direct claims against the

Released Parties or the Shareholder Released Parties absent consent to do so.  As this Court has

recognized, the viability of consensual third-party releases—such as the Third-Party Releases—

in a chapter 11 plan of reorganization survive the Supreme Court Decision.  *See Harrington*, 603

U.S. at 226 ("Nothing in what we have said should be construed to call into question *consensual*

third-party releases offered in connection with a bankruptcy reorganization plan."); *In re Spirit*

*Airlines, Inc.*, 668 B.R. at 701 (finding same).  There is otherwise overwhelming support in the

Second Circuit for the permissibility of consensual nondebtor releases.  *See, e.g.*, *supra* at note

38; *In re Spirit Airlines, Inc.*, 668 B.R. at 702-03 (collecting cases); *Deutsche Bank AG v.*

*Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136, 142 (2d

Cir. 2005) ("Nondebtor releases may also be tolerated if the affected creditors consent."); *In re*

*LATAM Airlines Grp. S.A.*, 2022 WL 2206829, at *45 (Bankr. S.D.N.Y. June 18, 2022) ("It is

well settled that, as a general proposition, creditors may consent to third-party releases."); *In re*

*Avianca Holdings S.A.*, 632 B.R. 124, 133 (Bankr. S.D.N.Y. 2021) ("If third-party releases are

consensual . . . 'courts generally approve them unless they are truly overreaching on their face'"

(internal citation omitted)).

---

[46] For the avoidance of doubt, the Third-Party Releases also do not apply to (i) Holders of Claims whose releases of the Released Parties "will be governed solely and exclusively by a Direct Claims Shareholder Settlement Agreement"; and (ii) Holders of Non-Federal Domestic Governmental Claims, "whose releases shall be governed solely and exclusively by the Governmental Entity Shareholder Direct Settlement Agreement."  (Plan §§ 10.6(b), 10.7(b).) Creditors voluntarily participating in these settlements will be providing releases of their nondebtor claims outside of the Plan.

170.    Indeed, the Third-Party Releases provided for under the Plan utilize an opt-in

mechanism, meaning "[a] clearer form of 'consent' can hardly be imagined." *In re Chassix*

*Holdings, Inc.*, 533 B.R. at 80; *see also In re Acorda Therapeutics, Inc., et al.*, No. 24-22284,

Hr'g Tr. 101:5-103:4 (Bankr. S.D.N.Y. Aug. 7, 2024) [Dkt. No. 449] (finding "an affirmative

manifestation of consent" where "parties who voted in favor of the plan are bound by third-party

releases set forth in the plan" when ballot "explicitly said in large letters … that a vote in favor

of the plan will bind the party voting yes to the nondebtor release as set forth in the plan.  It was

made plain as day."); *In re Murray Energy Holdings Co.*, 665 B.R. at 358 (finding that third-

party release was consensual where "all parties to be bound by the [] Release either (i) voted to

accept the Plan or (ii) affirmatively agreed to be a Releasing Party"); *In re Voyager Holdings,*

*Inc.*, 649 B.R. at 130 (rejecting objections to third-party releases where "the plan here provides

that no creditor or shareholder has released any claims belonging to that person or entity unless

that person has affirmatively done so by executing the 'opt-in' release form").  Accordingly, the

Third-Party Releases should be approved.

### (iv)    The Plan Injunction and Channeling Injunction

171.    The Plan generally enjoins all persons or entities that have held, hold or may hold

any Claims or Interests in the Debtors from commencing or continuing any suit, action or other

proceeding related to such Claims or Interests against the Debtors, the Estates, or their successors

(the "**Plan Injunction**").  (*See* Plan § 10.5(a)-(b).)  In addition, in aid of the Plan's channeling of

Claims to the Creditor Trusts, the Plan provides all Persons that have held or asserted, that hold

or assert, or may in the future hold or assert, any Channeled Claims shall be enjoined from taking

any action on such claim against any Protected Party[47] (the "**Channeling Injunction**").[48]  (Plan

§ 10.8.)

172.    The Plan Injunction and Channeling Injunction are consistent with the Bankruptcy

Code, and the Supreme Court Decision, and should be approved.  At the outset, injunctions are a

key component of implementing releases included in a plan of reorganization.  *See, e.g.*, *In re*

*GOL Linhas Aéreas Inteligentes S.A.*, 672 B.R. at 172 (finding, post-Supreme Court Decision,

that "[a] long line of precedent in this district supports the issuance of an injunction to enforce

the third-party releases" in a plan of reorganization).

---

[47] For the avoidance of doubt, neither the Plan Injunction nor the Channeling Injunction constitutes a nonconsensual third-party release.  As described by its plain terms, the Plan Injunction operates to enjoin persons or entities from pursuing claims against the Debtors—not against nondebtor parties—meaning it is not a third-party release in any form.  (*See* Plan § 10.5.)  The Channeling Injunction only operates to enjoin the continued or future prosecution of Channeled Claims.  (*See* Plan § 10.8(a) ("[A]ll persons that have held or asserted, that hold or assert or that may in the future hold or assert any Channeled Claims shall be permanently and forever . . . enjoined from taking any action . . . with respect to any Channeled Claim.").)  Under the Plan, "Channeled Claims" are limited only to those claims that are (i) held against the Debtors, or (ii) held against a nondebtor and consensually released through an applicable Shareholder Release Consent Mechanism, such as through a Shareholder Direct Settlement Agreement or by opting in to the Plan's Third-Party Releases.  (*See* Plan § 1.1.)  Accordingly, no Channeled Claims enjoined by the Channeling Injunction against a nondebtor are released without consent.

[48] "Protected Parties" means, collectively, (i) the Debtors, (ii) each of the Debtors' Related Parties, (iii) NewCo, (iv) the Foundation, (v) the Plan Administration Trust, (vi) the Master Disbursement Trust, except solely to the extent provided in the Master TDP and the Governmental Remediation Trust Documents, with respect to the Channeled Claims channeled to the Master Disbursement Trust, (vii) each Creditor Trust, except, solely to the extent provided in the applicable Creditor Trust TDP, with respect to the Channeled Claims channeled to such Creditor Trust, and (viii) the Shareholder Released Parties, subject to Section 10.8(c) of the Plan with respect to the Shareholder Release Snapback Parties.  (Plan § 1.1.)

"Channeled Claims" means, collectively, all Non-Federal Domestic Governmental Channeled Claims, Tribe Channeled Claims, Public School Channeled Claims, Healthcare Provider Channeled Claims, Third-Party Payor Channeled Claims, ER Physician Channeled Claims, and PI Channeled Claims.  (Plan § 1.1.)

173.    And further, because the Plan contains only consensual nondebtor releases, the

Plan Injunction and Channeling Injunction will not have the effect of releasing any creditor's

claim absent consent.  Accordingly, injunctions of this type customarily and appropriately

accompany releases included in a plan.  *See, e.g.*, *In re GOL Linhas Aéreas Inteligentes S.A.*, 672

B.R. at 172; *In re Tommy's Fort Worth, LLC*, 2025 WL 2092193, at *71 (Bankr. N.D. Tex. July

24, 2025) ("The Plan Injunctions have been specifically tailored to provide for the

implementation of . . . the release provisions that are included in the Plan.  It is an appropriate

corollary basis for relief to provide for the Plan injunctions to effectuate the releases that are

granted, and that's within the power of the Court under Section 105(a)[.]");  *In re Universal

Rehearsal Partners, Ltd.*, 2023 WL 2816684, at *5 (finding plan injunction "is a key component

of the Plan necessary to implement the Releases and Exculpation," that the "Plan's Releases and

Exculpation would lose their impact" without it, and that the injunction "is permissible under [] §

1123(b)").  Here, the Plan Injunction and Channeling Injunction are necessary to enforce the

Releases, Third-Party Releases (as discussed above), and Exculpation (as discussed below), and

are narrowly tailored to that purpose.  Accordingly, the Plan Injunction and Channeling

Injunction should be approved.

### (v)    The MDT Insurer Injunctions

174.    The Debtors' insurance policies which are being transferred to the Master

Disbursement Trust under the Plan ("**MDT Insurance Policies**") are a meaningful source of

value for the contemplated creditor distributions.  In furtherance of this goal, the Plan generally

enjoins all persons other than the Master Disbursement Trust that have held or asserted, that hold

or assert, or that may in the future hold or assert any Claims based on, arising under or

attributable to any of the MDT Insurance Policies[49] from attempting to collect or recover on

account of such Claim from or against any MDT Insurer as set forth in Section 10.10(b) and (c)

of the Plan (the "**MDT Insurer Injunction**" and the "**Settling MDT Insurer Injunction**").

(*See* Plan §§ 10.10 and 10.11.)

175.    A debtor's insurance policies are property of the estate, subject to the bankruptcy

court's jurisdiction.  *See, e.g.*, *MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 91-93 (2d

Cir. 1988) ("Having properly exercised jurisdiction over the insurance proceeds, the Bankruptcy

Court had the authority to approve the settlements and to channel claims arising under the

policies to the proceeds of the settlement."); *In re Adelphia Commc'ns Corp.*, 285 B.R. 580, 590

(Bankr. S.D.N.Y. 2002) ("The parties do not dispute, understandably, that insurance policies are

property of the estate.").  The MDT Insurer Injunction and the Settling MDT Insurer Injunction

are necessary to preserve the value of the MDT Insurance Policies for the benefit of the holders

of claims channeled to the Creditor Trusts.  Accordingly, the MDT Insurer Injunction and

Settling MDT Insurer Injunction should be approved.

### (vi)    Exculpation

176.    The Plan provides for a customary exculpation of negligence-based claims in

connection with, or arising out of, the administration of the chapter 11 cases ("**Exculpation**").[50]

---

[49] "MDT Insurance Policies" is defined, in part, as "all Purdue Insurance Policies that do or may afford the Debtors rights, benefits, indemnity, insurance coverage or defense costs with respect to any Cause of Action against the Debtors arising out of, on account of, or in connection with Opioid-Related Activities or for which the Debtors have or may have insurance rights arising out of or in connection with Opioid-Related Activities[.]"  (Plan § 1.1.)

[50] Exculpated conduct includes: "the administration of the Chapter 11 Cases; the negotiation and pursuit of the Disclosure Statement (including any information provided, or statements made, in the Disclosure Statement or omitted therefrom), the Restructuring Transactions, the Plan, the Master Disbursement Trust (including the Master TDP and the MDT Agreement), the Creditor Trusts (including the Creditor Trust TDPs and the other Creditor Trust Documents) and the solicitation of votes for, and confirmation of, the Plan; the funding of the Plan; the occurrence of

(*See* Plan § 10.12.)  The Exculpated Parties are (i) the Debtors, (ii) the Creditors' Committee and its members, solely in their capacities as such, (iii) the Plan Administration Trustee, (iv) the MDT Trustees and the MDT Advisory Council Representatives, (v) the Creditor Trustees, (vi) the Supporting Claimants, each solely in their capacities as such, (vii) the Disclosure Oversight Board members, and (viii) with respect to each of the Persons in the foregoing clauses (i) through (vii), each of their Related Parties.  (Plan § 1.1.)

177.    Importantly, the Exculpation expressly <u>excludes</u> from its scope any claim against an Exculpated Party arising out of any criminal act or from fraud, gross negligence, or willful misconduct.  (Plan § 10.12.)  Moreover, the Exculpated Parties do not include any Excluded Parties or Shareholder Released Parties other than current and former directors, officers, and employees of the Debtors that are not members of the Sackler Parties.  (Plan § 1.1.)

178.    The Exculpation (which no Objector challenges) is appropriate under Second Circuit law and should be approved.  Both before and after the Supreme Court Decision, courts in this Circuit, and elsewhere,[51] have recognized their authority to approve plans containing exculpation provisions covering both estate fiduciaries and parties that are not estate fiduciaries. *See, e.g.*, *In re Odebrecht Engenharia e Construção S.A. – Em Recuperação Jud.*, 669 B.R. 457,

---

the Effective Date; the administration of the Plan and the property to be distributed under the Plan; and the wind-up and dissolution of the Liquidating Debtors and the transactions in furtherance of any of the foregoing, in each case other than Causes of Action arising out of, or related to, any act or omission of an Exculpated Party that is a criminal act or constitutes fraud, gross negligence or willful misconduct."  (Plan § 10.12.)

[51] *See, e.g.*, *McAlary v. Cash Cloud Inc.*, 2025 WL 2206176, at *5 (D. Nev. Aug. 4, 2025) (finding the Supreme Court Decision "does not apply" to exculpation provisions because exculpation "does not extend the benefits of a Chapter 11 discharge to nondebtors[,]" which the Supreme Court Decision foreclosed, but "rather, it exculpates participants in the Plan approval process for actions relating to that process"); *In re Smallhold, Inc.*, 665 B.R. 704, 725 (Bankr. D. Del. 2024) (finding that "[n]othing in *Purdue Pharma* can be read to call into question the kind of exculpation approved by the Third Circuit").

471 (Bankr. S.D.N.Y. 2025) ("In the Chapter 11 context, at least in this district, non-estate

fiduciaries are entitled to exculpation when they have been actively involved in the bankruptcy

proceeding and made significant contributions to its success, and when the exculpation applies to

court-supervised and -approved transactions."); *In re GOL Linhas Aéreas Inteligentes S.A.*, 672

B.R. at 142, 173 (confirming plan containing similar and unopposed plan exculpation); *In re

Genesis Glob. Holdco, LLC*, 660 B.R. 439, 528 (Bankr. S.D.N.Y. 2024) ("It is well established

in this district that, under the proper circumstances, exculpation is not limited to estate

fiduciaries."). Thus, in evaluating the Exculpation, the Court should assess factors such as

whether the plan was proposed in good faith, whether the provision is integral to the plan, and

whether the provision is necessary for plan negotiation. *See, e.g.*, *In re Stearns Holdings, LLC*,

607 B.R. 781, 790-91 (Bankr. S.D.N.Y. 2019) (approving exculpation of estate fiduciaries and

non-estate fiduciaries for negligence based conduct in connection with the chapter 11 cases

because exculpation was "essential to the promotion of good-faith plan negotiations that might

not otherwise have occurred had the negotiating parties faced the risk of future collateral attacks

from other parties"); *In re Klaynberg*, 2023 WL 5426748, at *17 (Bankr. S.D.N.Y. Aug. 22,

2023) (recognizing appropriateness of exculpating parties, including prepetition lenders, who

"contribute substantial consideration to the reorganization" (quoting *In re Residential Capital,

LLC*, No. 12-12020 (Bankr. S.D.N.Y. Dec. 11, 2013) [Dkt. No. 6066, ¶ 291]) (citation

modified)).

179.     The Exculpation is a key component of the Plan because the protection it affords

was essential to the promotion of good faith negotiations and the many resolutions embodied in

the Plan. These chapter 11 cases arose from a multi-party mass tort litigation involving

numerous plaintiffs' constituencies, the Debtors, and related parties. Liability is alleged to be in

the <u>tens of trillions</u> of dollars.  Against this backdrop, the Exculpated Parties needed to be able to

negotiate without fear that their cooperation, or even participation, might expose them to

litigation.  And the record of these chapter 11 cases is clear that the Exculpated Parties did in fact

participate in good faith (and to extraordinary effect).[52]  For similar reasons, the Exculpation as

to the MDT Trustees, Plan Administration Trustee, and Credit Trustees is necessary because it

ensures that those parties can take all steps necessary, free from the fear of strike suits, to enable

an orderly wind down of the Debtors and the administration of the value-maximizing creditor

trusts established under the Plan.  Because the Exculpation is narrowly tailored to these purposes,

and because it contains carve-outs for gross negligence, willful misconduct, fraud, or criminal

conduct, it is entirely consistent with provisions routinely approved by this Court, and should be

approved here.  *See, e.g.*, *In re Stearns Holdings, LLC*, 607 B.R. at 790-91.

> **B.  The Debtors Have Complied with the Applicable Provisions of the
> Bankruptcy Code (11 U.S.C. § 1129(a)(2))**

180.  Section 1129(a)(2) of the Bankruptcy Code requires that plan proponents comply

with all applicable provisions of the Code, including "the disclosure and solicitation

requirements under sections 1125 and 1126 of the Bankruptcy Code."  *In re Ditech Holding

Corp.*, 606 B.R. 544, 578 (Bankr. S.D.N.Y. 2019) (citing H.R. Rep. No. 95-595, at 412 (1977));

11 U.S.C. § 1129(a)(2).  Here, the Debtors have complied with all applicable provisions of the

Bankruptcy Code, including sections 1125 and 1126.

---

[52] (*See* JX-1637 (Phase One Mediators' Report); JX-1638 (Phase Two Mediators' Report); JX-1639 (Phase Three Mediators' Report); JX-3340 (Co-Mediators' First Interim Status Report) at Ex. E; JX-3340 (Co-Mediators' Second Interim Status Report) at Ex. D; JX-3340 (Co-Mediators' Third Interim Status Report) at Ex. C; JX-3340 (Co-Mediators' Fourth Interim Status Report) at Ex. B; JX-3340 (Co-Mediators' Fifth Interim Status Report) at Ex. A; JX-3340 (Co-Mediators' Sixth Interim Status Report).)

### 1.   The Debtors Have Complied with the Disclosure and Solicitation Requirements of Section 1125

181.   Section 1125 of the Bankruptcy Code prohibits the Debtors from soliciting acceptances or rejections of the Plan "unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement, approved after notice and a hearing, by the court as containing adequate information."  11 U.S.C. § 1125(b).

182.   The Debtors have satisfied section 1125—a conclusion no Objector challenges. On June 20, 2025, before votes were solicited on the Plan, the Court entered an order approving the Disclosure Statement as containing adequate information and approving the procedure for soliciting and tabulating the votes.  (*See* Disclosure Statement Order, [Dkt. No. 7615].)  After the Court's approval of the Disclosure Statement, on or before July 11, 2025, the Debtors complied with the solicitation materials requirement by mailing solicitation packages to holders of Claims in the Voting Classes.  (*See generally* Aff. of Service of Solicitation Materials, [Dkt. No. 7987].) This mailing included: (i) a notice of the Confirmation Hearing; (ii) the applicable Ballot; (iii) a cover letter from the Debtors urging creditors to vote to accept the Plan and a cover letter from the UCC recommending acceptance of the Plan; (iv) the Solicitation and Voting Procedures; and (v) a flash drive containing the Disclosure Statement Order, the Disclosure Statement, and the Plan.  (Disclosure Statement Order, Ex. 1 at 2; Johnson Decl. ¶¶ 4-10.)

183.   Moreover, in compliance with section 1125(b), the Debtors did not solicit acceptances of the Plan from Non-Voting Classes.  Instead, for holders of Claims and Interests in the Non-Voting Classes, the Debtors provided solicitation packages with the Confirmation Hearing Notice and the applicable Notice of Non-Voting Status.  (*See* Disclosure Statement Order, Ex. 1 at 2; Johnson Decl. ¶ 3.)

105

### 2.     The Debtors Have Complied with the Plan Acceptance Requirements of 11 U.S.C. § 1126

184.    Section 1126 of the Bankruptcy Code outlines the requirements for acceptance of the Plan.  11 U.S.C. § 1126.  Under section 1126, only holders of allowed claims in impaired classes of claims or equity interests that will receive or retain property under a plan on account of such claims of equity interests may vote to accept or reject such plan.  11 U.S.C. § 1126.  A class of claims has accepted the Plan if at least two-thirds in amount or more than one-half in number of holders of allowed claims votes to accept the Plan.  11 U.S.C. § 1126(c).  Holders of claims in impaired classes that "are not otherwise deemed to reject the Plan" have been "conclusively presumed to have accepted the Plan."  *In re Worldcom, Inc.*, 2003 WL 23861928, at *50 (Bankr. S.D.N.Y. Oct. 31, 2003).

185.    The requirements of section 1126 have been satisfied.  As set forth in Exhibit 1 to the Disclosure Statement Order (the "**Solicitation and Voting Procedures**"), the voting deadline was September 30, 2025 at 4:00 p.m., prevailing Eastern Time.  As discussed above, the voting results confirm a historic level of consensus among creditors in support of the Plan—even exceeding the consensus previously reached in connection with the Twelfth Amended Plan.  Overall, across all classes of voting creditors, <u>more than 99%</u> of the ballots cast and <u>more than 99%</u> of the amount of total voting dollars voted to accept the Plan.  (*See* Johnson Decl., Ex. A.)  Each and every class of creditors that voted has overwhelmingly voted to accept the Plan.

### 3.     Modifications to the Plan Were Permissible Under 11 U.S.C. § 1127

186.    Section 1127(a) of the Bankruptcy Code provides that a plan proponent may modify its plan at any time before confirmation so long as such modified plan meets the requirements of sections 1122 and 1123 of the Bankruptcy Code.  *See* 11 U.S.C. § 1127(a).  Bankruptcy Rule 3019 provides that modifications after a plan has been accepted will be deemed

accepted by all creditors who previously accepted the plan, if the court finds that the proposed modifications do not adversely change the treatment of the claim of any creditor.  *See* Fed. R. Bankr. P. 3019(a).  Courts interpreting Bankruptcy Rule 3019 have held that a proposed modification to a previously accepted plan will be deemed accepted if such modification is not material or does not adversely affect the way creditors and stakeholders are treated.  *See, e.g.*, *In re Glob. Safety Textiles Holdings LLC*, 2009 WL 6825278, at *4 (Bankr. D. Del. Nov. 30, 2009).

187.    On September 26, 2025, four days before the Voting Deadline, the Debtors filed a modified version of the Plan [Dkt. No. 7911] that memorializes agreements in principle described in the Disclosure Statement and timely-filed Plan Supplements, makes technical clarifications, and resolves certain formal and informal comments to the Plan by parties in interest.  Any further modification of the Plan will implement revisions of a similar nature.  The Plan, as modified, complies with sections 1122 and 1123 of the Bankruptcy Code as set forth *supra*, and the Debtors have complied with section 1125 of the Bankruptcy Code.  Accordingly, the requirements of section 1127 have been satisfied.  Bankruptcy Rule 3019 is satisfied because the Plan's modifications do not "adversely change the treatment" of the claim of any creditor or the interest of any equity security holder who has not accepted in writing the modification.  Fed. R. Bankr. P. 3019(a).  The Debtors submit that no additional solicitation or disclosure is required on account of the modifications; and that such modifications should be deemed accepted by all creditors that previously accepted the Plan.

C.    **The Plan Has Been Proposed in Good Faith and Not by Any Means Forbidden by Law (11 U.S.C. § 1129(a)(3))**

188.    Section 1129(a)(3) requires that a plan have been both "proposed in good faith and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3).  "Whether a reorganization plan has been proposed in good faith must be viewed in the totality of the circumstances," and

the requirement "speaks more to the process of plan development than to the content of the plan." *In re Chemtura Corp.*, 439 B.R. 561, 608 (Bankr. S.D.N.Y. 2010).  The central inquiry is whether "the plan was proposed with honesty and good intentions and with a basis for expecting that a reorganization can be effected." *Johns-Manville*, 843 F.2d at 649 (citation modified). "The bankruptcy judge is in the best position to assess the good faith of the parties' proposals." *Chemtura Corp.*, 439 B.R. at 608.

189.    The record is abundantly clear that the Plan here has been proposed in good faith. On the first day of these Chapter 11 Cases, the Debtors committed to work with their creditors and other stakeholders to develop a proposed plan that establishes a public benefit company (or an entity with a similar mission) and dedicates billions of dollars to local governments for abatement purposes.  (*See* Oct. 10, 2019 Hr'g Tr. 15:3-9 [Dkt. No. 325].)  The proposed Plan is the fulfillment of those promises.  The Debtors and parties in interest, including the Debtors' major organized creditor constituencies, have engaged in numerous rounds of mediation under the auspices of court-appointed mediators, whose credentials and neutrality in these cases have never been seriously questioned.  Throughout mediation, the court-appointed mediators reported that the Mediation Parties worked "tirelessly, constructively, and in good faith[.]"  (JX-3340 (Co-Mediators' First Interim Status Report) at Ex. E [Dkt. No. 6917]); *cf. LATAM*, 2022 WL 2206829, at *40 (creditor "failed to demonstrate that the Debtors engaged in 'vote buying' or that the Plan otherwise was filed in bad faith" as the Debtors "engaged in good faith, arm's-length negotiations overseen by the Mediator").

190.    Insofar as a handful of *Pro Se* Objectors contend that the Plan is being proposed in bad faith, such contentions are unsupported by the record.[53]  As the Court has explained, the mediation was "what one might call a plan mediation. . . not a mediation of individual claims." Feb. 25, 2025 Hr'g Tr. at 97:1-15 [Dkt. No. 7285].  Individual claims are addressed through the claims allowance process described in the Plan.  (*See generally* Plan Art. IV.)  The Plan enjoys unprecedented support *because* it emerged from a highly negotiated process under the guidance of multiple, preeminent court-appointed mediators.  Importantly, it is supported by the UCC, which was appointed by the United States Trustee to serve as the fiduciary to all unsecured creditors.  It is supported both by creditors who have elected to settle *and* by creditors who have elected to pursue direct claims against the Sackler Parties.

191.    Nor is there any purchase to Ms. Jannotta's assertion that Knoa will not be a public benefit company or similar entity.  To the contrary, under the Plan Knoa *must* be a public benefit company or an entity with a similar mission, consistent with the Debtors' settlement with the DOJ.  (*See* Plan at § 5.4(b) (providing that the purpose of Knoa will be to "address the opioid crisis' and to "fund and provide abatement of the opioid crisis").)  And finally, while the Debtors are sympathetic to creditors' frustrations with the time it took to reach a global resolution, the record is clear that such time was necessary and warranted, and that the Debtors have consistently sought to resolve these cases as expeditiously as possible.  *See, e.g.*, Co-Mediators' Sixth Interim Status Report [Dkt. No. 7323] (reporting that the Mediation Parties were working

---

[53] The *Pro Se* Objectors advance a number of theories as to why the Plan is not proposed in good faith (and request various forms of relief including claw back of professional fees), including that individuals could not participate directly in the mediation process (*see* McGaha Obj. [Dkt. No. 7432] at 2; McGaha Obj. [Dkt. No. 7522] at 1); that Knoa "will not actually benefit the public" (Jannotta Obj. [Dkt. No. 7909] at § 1); and that the amount of time it took to achieve the Plan settlements was "excessive" (Moore Obj. [Dkt. No. 7661] at 1).

"diligently" to achieve settlements and made "great strides" toward completion of documentation of the "complex agreements in principle" between and among the Mediation Parties).)

### D.    The Plan Provides for Required Bankruptcy Court Approval of Certain Administrative Payments (11 U.S.C. § 1129(a)(4))

192.    Section 1129(a)(4) of the Bankruptcy Code requires that certain professional fees and expenses paid by the plan proponent, the debtor, or a person issuing securities or acquiring property under the Plan, be subject to approval of the bankruptcy court as reasonable.  11 U.S.C. § 1129(a)(4).  Courts have construed section 1129(a)(4) "to require that all payments of professional fees that are made from estate assets be subject to review and approval" by the Court for reasonableness.  *In re Worldcom, Inc.*, 2003 WL 23861928, at *54; *see, e.g.*, *In re Drexel Burnham Lambert Grp.*, 138 B.R. at 760.  Here, all payments made or to be made by the Debtors for services or for costs and expenses in connection with or incident to these chapter 11 cases have been approved by, or are subject to the approval of the Court as reasonable.  Section 1129(a)(4) is therefore satisfied.

### E.    The Debtors Have Complied with Applicable Governance Disclosure Requirements (11 U.S.C. § 1129(a)(5))

193.    Section 1129(a)(5) requires the plan proponent to disclose the "identity and affiliations of the proposed officers and directors of the reorganized debtors."  11 U.S.C. § 1129(a)(5).  The Plan must also disclose "that the appointment or continuance of such officers and directors [is] consistent with the interests of creditors and equity security holders and with public policy."  *In re Worldcom, Inc.*, 2003 WL 23861928, at *54 (citing 11 U.S.C. § 1129(a)(5)).  The Plan complies with section 1129(a)(5).  (Plan § 5.4.)  Section 5.4 provides that Knoa will consist of five managers, each with experience in one or more enumerated industries and practices.  (Plan § 5.4(d).)  Knoa's initial managers "shall be disinterested and independent, and shall be selected by the Settling States with the consent (not to be unreasonably withheld) of

the Ad Hoc Committee and in consultation with the Debtors and the Creditors' Committee. . ."
(*Id.*)  Confirmation of the Plan will also provide for the appointment of a monitor who will
ensure Knoa's compliance with the Operating Injunction and will publish quarterly reports on
New Co's operations and compliance with the injunction.  (Plan § 5.4(h).)

194.    The Debtors understand that the Settling States are considering candidates for the
foregoing positions, and that such candidates will be appointed in accordance with the Plan and
applicable governance and trust documents.  To the extent the identity of any NewCo Manager is
known prior to the commencement of the confirmation hearing, the Debtors will make all
necessary disclosures.  This is sufficient to satisfy the Debtors' burden under section 1129(a)(5).
*See In re Charter Commc'ns, Inc.*, 419 B.R. 221, 260 n.30 (Bankr. S.D.N.Y. 2009) ("Although
section 1129(a)(5) requires the plan to identify all directors of the reorganized entity, that
provision is satisfied by the Debtors' disclosure at this time of the identities of known
directors.").

F.    **The Plan is in the Best Interests of Creditors (11 U.S.C. § 1129(a)(7))**

195.    The Plan is manifestly in the best interests of creditors.  Put simply, under the
Plan, creditors will receive billions of dollars of consideration, whereas in a liquidation under
chapter 7 of the Bankruptcy Code, creditors will likely receive <u>nothing</u> on account of their claims
against the Debtors.

196.    Section 1129(a)(7) requires that, with respect to each impaired class of claims or
interests, each individual holder of a claim or interest has either accepted the plan or will receive
or retain property having a present value, as of the effective date of the plan, of not less than the
value such holder would so receive if the debtor were liquidated under chapter 7 of the
Bankruptcy Code at that time.  11 U.S.C. § 1129(a)(7); *Johns-Manville Corp.*, 843 F.2d at 649.
This standard, commonly referred to as the "best interests of creditors" test, is satisfied so long as

the estimated recoveries for a debtors' creditors in a hypothetical chapter 7 liquidation would be less than or equal to the estimated recoveries under the debtors' plan of reorganization for a holder of an impaired claim that votes to reject the plan.[54]  *In re Adelphia Commc'ns Corp.*, 368 B.R. at 252 ("[T]he court must measure what is to be received by rejecting creditors in the impaired classes under the plan against what would be received by them in the event of liquidation under chapter 7," factoring in, among other things, "the probable costs incident to such liquidation."); *In re Leslie Fay Cos., Inc.*, 207 B.R. 764, 787 (Bankr. S.D.N.Y. 1997) ("[T]he court must find that each dissenting creditor will receive or retain value that is not less than the amount he or she would receive if the debtor were liquidated." (citation modified)).

197.    The question is not close:  the Plan certainly provides creditors no less than they would receive in a hypothetical chapter 7 liquidation.  (*See* JX-3328 (DelConte Report) ¶ 8.)  A detailed and unchallenged Liquidation Analysis sets forth the estimated recoveries for each class of impaired creditors in a hypothetical chapter 7 liquidation scenario.  (*See* JX-3328 (DelConte Report) ¶ 10; (JX-3333 (Disclosure Statement), app. C at Ex. 1 (same)); *see also* MBR at 90 (crediting DelConte's liquidation analysis and holding it satisfied the "best interests" analysis under section 1129(a)(7)).  Jesse DelConte, a Managing Director of AlixPartners and financial advisor to the Debtors prepared and supervised the preparation of the Liquidation Analysis.  (*See* JX-3328 (DelConte Report) ¶¶ 3, 5, 11-13.) Mr. DelConte has extensive experience in this area, having advised companies for over 20 years across various industries in restructuring, including

---

[54] Because the Plan does not provide for nonconsensual releases of claims against third parties, there is no need to balance the recoveries nonconsenting creditors could receive on account of such claims under the Plan against litigation recoveries against the Sacklers, as some parties contended in 2021.  *See* MBR at 110-11; (Debtors' Memorandum of Law in Support of Confirmation of Debtors' Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Debtor Affiliates and Omnibus Reply to Objections Thereto [Dkt. No. 3461].)

with respect to liquidation analyses.  (See *id.* ¶¶ 3-4.)  Not a single objector has proffered a

competing expert or submitted a report contesting Mr. DelConte's analysis.  No objector has

engaged with his analysis at even the most superficial level.  Parties undoubtedly had the

opportunity to do so as his analysis was first published over four months ago in the Debtors'

Disclosure Statement.  (JX-3333 (Disclosure Statement) app. C.)

198.    Mr. DelConte concludes that "estimated recoveries for all creditor groups under

the Plan are no less than, and in many cases significantly greater than, the estimated recoveries

for creditor groups in a hypothetical chapter 7 liquidation."  (*See* JX-3328 (DelConte Report) ¶

8.)  Liquidation of the Debtors' assets would result in proceeds available for distribution to

creditors ranging from $623.1 million to $3,414.5 million (in a high-case scenario, which may

very well not materialize)—compared with over $7 billion under the Plan.  (*Id.*)  Because of the

DOJ Forfeiture Judgment Claim, there would be <u>no</u> net liquidation proceeds available to

creditors in all but the potential high scenario.  (*See* JX-3328 (DelConte Report) ¶ 9.)  And even

in a high scenario, "for every dollar of asserted claims there would be about twenty eight ten-

thousandths of a cent (.000028) of distributable value."  (*Id.*)

199.    The projected recoveries under the Plan as compared to under a hypothetical

liquidation analysis are as follows:

| Class | Type of Claim or Interest | Impairment | Aggregate Treatment Under the Plan | Aggregate Treatment Under Chapter 7 (Mid-Case) |
|-------|---------------------------|------------|-----------------------------------|------------------------------------------------|
| Class 1 | Secured Claims | Unimpaired | Unimpaired | Unimpaired |
| Class 2 | Other Priority Claims | Unimpaired | Unimpaired | Approximately $30.5 thousand (or approximately 0.7% recovery) |

| Class | Type of Claim or Interest | Impairment | Aggregate Treatment Under the Plan | Aggregate Treatment Under Chapter 7 (Mid-Case) |
|---|---|---|---|---|
| Class 3 | Federal Government Unsecured Claims | Impaired | The United States shall receive (i) the Initial Federal Government Distribution and (ii) the MDT Federal Government Claim, which collectively total $50 million in payment obligations. | $0 |
| Class 4 | Non-Federal Domestic Governmental Claims | Impaired | The Governmental Remediation Trust shall receive approximately $5.1 billion. | $0 |
| Class 5 | Tribe Claims | Impaired | The Tribe Trust shall receive approximately $176 million. | $0 |
| Class 6 | Public School Claims | Impaired | The Public School Trust shall receive approximately $40.6 million. | $0 |
| Class 7 | Healthcare Provider Claims | Impaired | The Healthcare Provider Trust shall receive approximately $263.5 million. | $0 |
| Class 8 | Third-Party Payor Claims | Impaired | The TPP Trust shall receive approximately $394.9 million. | $0 |
| Class 9 | ER Physician Claims | Impaired | The ERP Trust shall receive approximately $5.8 million. | $0 |
| Class 10(a) | NAS PI Claims | Impaired | The PI Trust NAS Fund shall receive approximately $114.1 million. | $0 |
| Class 10(b) | Non-NAS PI Claims | Impaired | The PI Trust Non-NAS Fund shall receive approximately $751.8 million. | $0 |

| Class | Type of Claim or Interest | Impairment | Aggregate Treatment Under the Plan | Aggregate Treatment Under Chapter 7 (Mid-Case) |
|---|---|---|---|---|
| Class 11(a) | Avrio General Unsecured Claims | Unimpaired | Unimpaired | Approximately $2.6 million (or approximately 5.8%) |
| Class 11(b) | Adlon General Unsecured Claims | Unimpaired | Unimpaired | $0 |
| Class 11(c) | Other General Unsecured Claims | Impaired | $15 million in aggregate Other General Unsecured Claim Cash. | Approximately $43.1 million of which approximately $1.7 million would be available for other general unsecured claims and the remaining $41.4 million would be available for the PBGC termination claim.[55] |
| Class 12 | Intercompany Claims | Unimpaired or Impaired | Reinstated, settled, or extinguished | $0 |
| Class 13 | Shareholder Claims | Impaired | Released | $0 |
| Class 14 | Co-Defendant Claims | Impaired | Disallowed | Disallowed |
| Class 15 | Other Subordinated Claims | Impaired | $0 | $0 |
| Class 16 | PPLP Interests | Impaired | Released | $0 |

---

[55] In total, approximately $45.7 million would be available for the PBGC termination claim and general unsecured claims. Of this amount, $42.8 million would go towards recovery of the PBGC termination claim ($1.4 million under Class 11(a) and $41.4 million under Class 11(c)) and approximately $2.9 million would be available for other general unsecured claims ($1.2 million under Class 11(a) and $1.7 million under Class 11(c)).

| Class | Type of Claim or Interest | Impairment | Aggregate Treatment Under the Plan | Aggregate Treatment Under Chapter 7 (Mid-Case) |
|-------|---------------------------|------------|-------------------------------------|------------------------------------------------|
| Class 17 | PPI Interests | Impaired | Released | $0 |
| Class 18 | Intercompany Interests | Unimpaired or Impaired | Reinstated, settled, or extinguished | $0 |

200.    As the above chart illustrates, a liquidation scenario would result in nothing left for distribution to personal injury claimants, states, tribes, or municipalities in all but one of the scenarios tested.  (*See* JX-3328 (DelConte Report) ¶ 10.)  And even in the high scenario, recoveries would be de minimis—ten-thousandths of a cent on the dollar.  Accounting for the $2 billion DOJ Forfeiture Judgment Claim, only $1.1 billion would remain to be distributed to creditors in the best case scenario.  (*See* JX-3328 (DelConte Report) ¶ 9.)  That amount would be absolutely dwarfed by the face amount of contingent liability claims. (*Id.*)  More than 614,000 proofs of claim were filed, and even though only 10% of those claims asserted a specific amount of liability, the total asserted liability totals approximately $41 trillion (excluding one personal injury claim that asserted liability of $100 trillion).  (*See* JX-3328 (DelConte Report) ¶ 15.)

201.    Moreover, liquidation proceedings would be costly and would deplete the Debtors' assets even further.  Mr. DelConte estimates that the costs associated with liquidation would "be between $617.6 million and $1,682.7 million, with a midpoint of $1,086.6 million." (*See* JX-3328 (DelConte Report) ¶ 16.)

202.    The contrast between a hypothetical chapter 7 liquidation and the Plan could not be more stark:  at least an estimated $7.4 billion dollars of cash in creditor recoveries plus significant additional non-monetary benefits under the Plan, versus, at most, roughly $3.4 billion, $2 billion of which would satisfy the DOJ Forfeiture Judgment Claim.  (*See* JX-3328 (DelConte

116

Report) ¶ 16.)  Put differently, the Plan provides over three times greater estimated recovery to

creditors under even the most optimistic liquidation scenario.  Unsurprisingly, no party has

disputed Mr. DelConte's conclusion that "it is not reasonable to conclude that any creditor group

would be better off pursuing a chapter 7 liquidation."  (*See* JX-3328 (DelConte Report) ¶ 17.)

### G.    Acceptance by Impaired Classes (11 U.S.C. § 1129(a)(8))

203.    Section 1129(a)(8) of the Bankruptcy Code requires that each class of impaired

claims or interests must accept the plan.  Under section 1126(c) of the Bankruptcy Code, a class

of claims accepts a plan if holders of at least two-thirds in amount and more than one half in

number of the allowed claims in that class have accepted the plan.  A class that is not impaired

under a plan is presumed to have accepted, while a class is deemed to reject a plan if the plan

provides that holders of claims or interest within that class do not "receive or retain any property

under the plan on account of such claims or interests."  *See* 11 U.S.C. §§ 1126(f), (g).

204.    Here, the holders of Claims in Class 1 (Secured Claims), Class 2 (Other Priority

Claims), Class 11(a) (Avrio General Unsecured Claims), Class 11(b) (Adlon General Unsecured

Claims), Class 12 (Intercompany Claims), and Class 18 (Intercompany Interests) are unimpaired

or potentially unimpaired, and pursuant to section 1126(f) of the Bankruptcy Code, are

conclusively presumed to have accepted the Plan; thus, meeting the requirements of section

1128(a)(8) of the Bankruptcy Code.  (*See* Plan §§ 4.1, 4.2, 4.11, 4.12, 4.14, 4.20.)

205.    Moreover, at least one voting Impaired Class of claims at each Debtor entity

affirmatively voted to accept the Plan.  (*See* Plan §§ 3.2, art. IV; Johnson Decl., Ex. A.)

206.    None of the holders of Federal Governmental Unsecured Claims (Class 3) eligible

to vote in that Class have voted to accept or reject the Plan.  (*See* Johnson Decl., Ex. A n.1.)

Accordingly, the Plan shall be presumed accepted by the holders of Claims in that Class.  (*See*

Plan § 3.3); *see also In re Adelphia Commc'ns Corp.*, 368 B.R. at 259-63 (holding that a voting

class in which a creditor does not vote to accept or reject the plan is deemed to accept the plan).

207.    Finally, although Class 12 (Intercompany Claims), Class 13 (Shareholder

Claims), Class 14 (Co-Defendant Claims), Class 15 (Other Subordinated Claims), Class 16

(PPLP Interests), Class 17 (PPI Interests), and Class 18 (Intercompany Interests) are deemed

rejecting Classes for purposes of section 1129(a)(8) of the Bankruptcy Code, the Plan is

confirmable pursuant to section 1129(b) of the Bankruptcy Code notwithstanding such rejection.

(*See infra*, Section III.A.1.)

### H.    The Plan Complies with Statutorily Mandated Treatment of Administrative and Priority Tax Claims (11 U.S.C. § 1129(a)(9))

208.    Section 1129(a)(9) of the Bankruptcy Code requires that certain priority claims be

paid in full on the Effective Date of a plan and that the holders of certain other priority claims

receive deferred cash payments.  In particular, holders of claims of a kind specified in section

507(a)(2) of the Bankruptcy Code—administrative expenses allowed under section 503(b) of the

Bankruptcy Code—must receive on the Effective Date cash equal to the allowed amount of such

claims. 11 U.S.C. § 1129(a)(9)(A).  Each holder of a claim of a kind specified in section

507(a)(1) or (4)-(7) of the Bankruptcy Code—generally wage, employee benefit, and deposit

claims entitled to priority—also must receive deferred cash payments of a value, as of the

effective date of the plan, equal to the allowed amount of such claim (if such class has accepted

the plan), or cash of a value equal to the allowed amount of such claim on the effective date of

the plan (if such class has not accepted the plan). 11 U.S.C. § 1129(a)(9)(B); *see also In re*

*Drexel Burnham Lambert Grp.*, 138 B.R. at 761.  Finally, the holder of a claim of a kind

specified in section 507(a)(8) of the Bankruptcy Code—*i.e.*, priority tax claims—must receive

cash.  11 U.S.C. § 1129(a)(9)(C).

209.    The Debtors have satisfied the requirements of section 1129(a)(9) because Article

II of the Plan provides that all Allowed Administrative Claims, Priority Tax Claims, and Other

Priority Claims will either be paid in cash in full on the Effective Date, or will receive other

treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

**I.    At Least One Impaired Class of Claims Has Accepted the Plan (11 U.S.C. § 1129(a)(10))**

210.    Section 1129(a)(10) of the Bankruptcy Code provides that, if a class of claims is

impaired under the plan, at least one impaired class of claims must accept the plan, excluding

acceptance by any insider.  11 U.S.C. § 1129(a)(10).  The Debtors have satisfied this requirement

because at least one impaired Class of Claims voted to accept the Plan at each Debtor entity.

(*See* Johnson Decl., Ex. A.)

**J.    The Plan is Feasible in Compliance with the Bankruptcy Code (11 U.S.C. § 1129(a)(11))**

211.    Section 1129(a)(11) of the Bankruptcy Code requires that a court determine that a

plan is feasible to be confirmed.  Specifically, the Court must find that "[c]onfirmation of the

plan is not likely to be followed by the liquidation, or the need for further financial

reorganization, of the debtor or any successor to the debtor under the plan, unless such

liquidation or reorganization is proposed in the plan."  11 U.S.C. § 1129(a)(11).

212.    To satisfy the requirements of 1129(a)(11), success need not be a certainty.  *See*

*Johns-Manville*, 843 F.2d at 649. Rather, a debtor must demonstrate a "reasonable assurance"

that consummation of the plan will not likely result in a further need for financial reorganization

of the post-emergence debtors.  *See id.* ("[T]he feasibility standard is whether the plan offers a

reasonable assurance of success.  Success need not be guaranteed.") (citation omitted); *see also*

*In re Briscoe Enters., Ltd., II*, 994 F.2d 1160, 1166 (5th Cir. 1993) ("Only a reasonable assurance

of commercial viability is required.") (citation omitted); *In re Eddington Thread Mfg. Co.*, 181

B.R. 826, 833 (Bankr. E.D. Pa. 1995) (finding a plan satisfies the feasibility requirement "so long as there is a reasonable prospect for success and a reasonable assurance that the proponents can comply with the terms of the plan") (citation omitted); *In re Patrician St. Joseph Partners Ltd. P'ship*, 169 B.R. 669, 674 (Bankr. D. Ariz. 1994) ("A plan meets this feasibility standard if the plan offers a reasonable prospect of success and is workable.") (citation omitted).  In evaluating feasibility, courts have identified, among other probative factors, whether the debtor will have the ability to meet its requirements for capital expenditures.  *See, e.g., WorldCom*, 2003 WL 23861928, at *58.

> 1.    **The Plan's Distribution Framework and Post-Emergence Structure Are Feasible**

213.    As the evidence will demonstrate at the Confirmation Hearing, the post emergence Debtors will be able to meet their obligations under the Plan, and these chapter 11 cases are unlikely to be followed by a liquidation or further reorganization except as provided for in the Plan.  With assistance from Purdue management, the Debtors' financial advisors developed a financial model to reflect the Debtors' anticipated financial condition post-emergence should the Plan be confirmed.  (*See* DelConte Plan Decl. ¶¶ 44-45.)  The financial model includes, among other things, post-emergence cash flow projections and an assessment that such cash flows will be sufficient for Knoa to satisfy distributions called for under the Plan. (*Id.* ¶¶ 45-46.)  Appendix D of the Debtors' Disclosure Statement was prepared using the projections in that financial model.  (*See id.*)  Notably, the accuracy of the Debtors' cash flow projections reflected in Appendix D of the Disclosure Statement is uncontested.

214.    As reflected in the Debtors' projected cash flows, the up to $6.5 billion in contributions under the Master Shareholder Settlement Agreement combined with the Debtors' current assets and projected cash generation by Knoa will enable the post-emergence Debtors to

meet their annual obligations under the Plan, including their obligations to the Department of

Justice, the Public Creditor Trusts, and the MDT.  (*See* DelConte Decl. ¶ 47.)

215.    In addition, as no party has credibly disputed, the trust distribution procedures

("**TDPs**") contemplated under the Plan will allow for efficient and effective distributions to the

Debtors' creditors.  In particular, and as reflected in the uncontroverted expert report of Deborah

Greenspan, the PI TDPs "employ procedures and terms that are consistent with best practices

and follow the general types of distribution procedures approved and implemented successfully

in multiple settlements and bankruptcy trusts involving large numbers of claims."  (JX-3621

(Amended Expert Report of Deborah E. Greenspan ("**Am. Greenspan Report**")) at 8 ("The PI

[TDPs] for both NAS and Non-NAS PI Claims provide a reasonable option for claimants.").)[56]

216.    Therefore, the Plan satisfies the requirements of Section 1129(a)(11) of the

Bankruptcy Code.

**K.    The Plan Provides for the Payment of All Fees as Required Under 28 U.S.C. § 1930 (11 U.S.C. § 1129(a)(12))**

217.    Section 1129(a)(12) requires that the plan provides for the payment of all fees to

the U.S. Trustee, among others, on the effective date.  11 U.S.C. § 1129(a)(12).  Here, after the

Effective Date, the Plan Administration Trust shall assume liability for and shall pay, or cause to

be paid, any and all quarterly fees owed to the U.S. Trustee when due in accordance with

applicable law, and shall continue to file, or cause to be filed, with the Bankruptcy Court

quarterly reports to show the calculation of such fees for the Debtors' Estates.  (Plan § 12.5.)

Each of the Debtors shall remain obligated to pay quarterly fees to the U.S. Trustee until such

---

[56] Contemporaneously with this Confirmation Brief, the Debtors have filed the Declaration of Deborah E. Greenspan, incorporating the Amended Greenspan Report as Ms. Greenspan's confirmation testimony.

Debtor's chapter 11 case is closed, dismissed or converted to a case under chapter 7 of the Bankruptcy Code. (*Id.*) The Plan thereby satisfies section 1129(a)(12) of the Bankruptcy Code.

### L.    Inapplicable Provisions

218.    The remainder of requirements of section 1129(a) of the Bankruptcy Code not addressed above are inapplicable to these chapter 11 cases.

219.    Section 1129(a)(6) of the Bankruptcy Code permits confirmation of a plan of reorganization only if any regulatory commission that will have jurisdiction over the debtor after confirmation has approved any rate change provided for in the Plan. Section 1129(a)(6) is inapplicable here because the Plan does not provide for any rate change over which a governmental regulatory commission has jurisdiction.

220.    Section 1129(a)(13) of the Bankruptcy Code requires that retiree benefits are paid post-confirmation at any levels established in accordance with section 1114 of the Bankruptcy Code. The Debtors, however, do not maintain retirement plans or other benefits obligations, so section 1129(a)(13) of the Bankruptcy Code is inapplicable to the Plan.

221.    Section 1129(a)(15) imposes requirements on debtors who are individuals. 11 U.S.C. § 1129(a)(15). Here, none of the Debtors are individuals and, accordingly, section 1129(a)(15) of the Bankruptcy Code is inapplicable to the Plan.

222.    Section 1129(a)(16) imposes requirements on non-business entities. 11 U.S.C. § 1129(a)(16). None of the Debtor entities is a non-business entity and, accordingly, section 1129(a)(16) of the Bankruptcy Code is inapplicable to the Plan.

**M.      Section 1129(b) is Satisfied as to Classes Deemed to Reject**

       **1.      The Plan Satisfies Cramdown Requirements for Classes 12, 13, 14, 15, 16, 17, and 18 (11 U.S.C. § 1129(b)(2)(B) and (C))**

223.      Section 1129(b) of the Bankruptcy Code provides that, if all applicable requirements of section 1129(a) are met other than section 1129(a)(8), a plan may be confirmed so long as the requirements set forth in section 1129(b) are satisfied as to each rejecting class. *See* 11 U.S.C. § 1129(b)(1).  To confirm a plan that has not been accepted by all impaired classes (thereby failing to satisfy section 1129(a)(8)), the plan proponent must show that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the non-accepting impaired classes. *Id.*  Here, Class 13 (Shareholder Claims), Class 14 (Co-Defendant Claims), Class 15 (Other Subordinated Claims), Class 16 (PPLP Interests) Class 17 (PPI Interests), and, to the extent that they are not reinstated and do not otherwise receive any distributions under the Plan, Class 12 (Intercompany Claims) and Class 18 (Intercompany Interests), are deemed to reject the Plan. (Plan § 3.2.)  For the reasons detailed below, the Debtors respectfully submit that the Plan satisfies section 1129(b) of the Bankruptcy Code's cramdown requirements with respect to such Classes.

      **(a)      The Plan Does Not Unfairly Discriminate with Respect to Classes 12, 13, 14, 15, 16, 17, and 18**

224.      The Bankruptcy Code does not provide a standard for determining when "unfair discrimination" exists.  *See generally* 7 Collier on Bankruptcy ¶ 1129.03 (16th Ed. 2025) ("Courts have struggled to give the unfair discrimination test an objective standard."); *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986), *aff'd sub nom. In re Johns-Manville Corp.*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd sub nom. Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988) ("The language and legislative history of the statute provides little guidance in applying the 'unfair discrimination' standard of § 1129(b)(1).")

225.    Generally speaking, courts in the Second Circuit will engage in a fact-intensive

inquiry under which a court will only find unfair discrimination where "similarly situated classes

are treated differently without a reasonable basis for the disparate treatment." *In re Genco*

*Shipping & Trading Ltd.*, 513 B.R. 233, 241 (Bankr. S.D.N.Y. 2014) (quoting *Worldcom,* 2003

WL 23861928, at \*59); *see also In re Drexel Burnham Lambert Grp., Inc.*, 140 B.R. 347, 349-

350 (S.D.N.Y. 1992) (holding that where each class "possess[ed] different legal rights,"

disparate treatment was rational); *Sabine*, 555 B.R. at 316 (finding that where holders of "similar

legal rights" received materially similar treatment under the Plan, there was no unfair

discrimination).

226.    A threshold inquiry is whether the dissenting class is equally situated to the class

allegedly receiving more favorable treatment.  *See, e.g.*, *Charter Commc'ns*, 419 B.R. at 264,

268 (rejecting creditor class's unfair discrimination objection because the two classes at issue

had "disparate legal rights and payment expectations"); *see also Sabine*, 555 B.R. at 316

(holding plan did not unfairly discriminate where "holders of claims with similar legal rights will

not be receiving materially different treatment under the Plan"); *Drexel Burnham Lambert Grp.,*

140 B.R. at 350 (holding plan did not unfairly discriminate where creditor classes were

differently situated).  Only if the two classes are similarly situated in terms of their claims, rights,

and interests, will a court proceed to the second inquiry:  whether disparate treatment is fair

within the context of the plan of reorganization.  *Cf. Charter Commc'ns*, 419 B.R. at 267 n.41

(noting that even if the disparately treated creditor classes were similarly situated, discrimination

would have been justified based on the classes' distinct rights to reimbursement).

227.    Here, the Plan does not discriminate unfairly with respect to any rejecting Class.

As described above, Claims in the Impaired rejecting Classes—Class 13 (Shareholder Claims),

Class 14 (Co-Defendant Claims), Class 15 (Other Subordinated Claims), Class 16 (PPLP

Interests) and Class 17 (PPI Interests), and, to the extent that they are not reinstated and do not

otherwise receive any distributions under the Plan, Class 12 (Intercompany Claims) and Class 18

(Intercompany Interests)—are specifically classified in such manner because of, among other

things, the differences in the legal nature and/or propriety of the underlying obligation.  None of

the holders of claims and interests in such classes are receiving dissimilar treatment from any

other similarly situated claims.  Accordingly, the Debtors respectfully submit that the Plan

satisfies section 1129(b)(1) of the Bankruptcy Code.

> **(b)    The Plan is Fair and Equitable with Respect to Classes
> 12, 13, 14, and 15 (Section 1129(b)(2)(B)(ii))**

228.    Section 1129(b)(2)(B)(ii) of the Bankruptcy Code provides, among other things,

that a plan is fair and equitable with respect to a class of impaired unsecured claims if, under the

plan, no holder of any junior claim or interest will receive or retain property under the plan on

account of such junior claim or interest.  *See* 11 U.S.C. § 1129(b)(2)(B)(ii).  This standard is

clearly satisfied as no holder of a Claim or interest junior to Claims in Class 13 (Shareholder

Claims), Class 14 (Co-Defendant Claims), Class 15 (Other Subordinated Claims), or, to the

extent that they are not reinstated and do not otherwise receive any distributions under the Plan,

Class 12 (Intercompany Claims), will receive or retain any property or distribution under the

Plan.  Accordingly, the Plan is "fair and equitable" with respect to such Classes.

> **(c)    The Plan is Fair and Equitable with Respect to Classes
> 16, 17 and 18 (Section 1129(b)(2)(C))**

229.    Section 1129(b)(2)(C) of the Bankruptcy Code provides, among other things, that

a plan is fair and equitable with respect to a class of interests if the holder of any interest that is

junior to the interests of such class will not receive or retain under the plan on account of such

junior interest any property.  11 U.S.C. § 1129(b)(2)(C)(ii).  Under the Plan, no holder of an

interest junior to Interests in Class 16 (PPLP Interests), Class 17 (PPI Interests), or, to the extent

that they are not reinstated and do not otherwise receive any distributions under the Plan, Class

18 (Intercompany Interests), will receive or retain any property or distribution under the Plan.

Accordingly, the Plan is "fair and equitable" with respect to such Classes.

### N.    The Principal Purpose of the Plan is Not Avoidance of Taxes in Compliance with Section 1129(d)

230.    Section 1129(d) of the Bankruptcy Code states "the court may not confirm a plan

if the principal purpose of the plan is the avoidance of taxes or the avoidance of the application

of section 5 of the Securities Act of 1933." The purpose of the Plan is not to avoid taxes or the

application of section 5 of the Securities Act of 1933.

### IV.    The Additional Objections Should Be Rejected

231.    Certain *pro se* claimants (the "**Pro Se Objectors**")[57] advance a number of

additional confirmation-related objections, each of which is without merit. While many of these

objections are addressed affirmatively above, the Debtors also address certain of Objectors'

specific arguments here for the sake of completeness.

---

[57] The *Pro Se* Objectors are: (i) Pamala Bartz Halaschak [Dkt. No. 7530] ("**Halaschak**"); (ii) Amanda Morales [Dkt. Nos. 6245, 7206, 7299, 7355, 7456, 7818, 7819, 7940] (the "**Morales Objections**"); (iii) Rosemary Walker [Dkt. Nos. 7246, 7678, 7723, 7771, 7855, 7863, 7885, 8086, 8087, 8098, 8099, 8108, 8113, 8115] (the "**Walker Objections**"); (iv) Maria Ecke [Dkt. Nos. 7289, 7645, 7849, 7915, 7961, 8064, 8096, 8097, 8131] (the "**Ecke Objections**"); Laureen Ferrante [Dkt. Nos. 7420, 7604] (the "**Ferrante Objections**"); Carrie L. McGaha [Dkt. Nos. 7432, 7522, 7676, 7683, 7724, 7737] (the "**McGaha Objections**"); (v) Joseph Kenney ("**Kenney**") [Dkt. No. 7535]; (vi) Diane Pike ("**Pike**") [Dkt. No. 7536]; (vii) Bradley W. Kennedy ("**Kennedy**") [Dkt. No. 7596]; (viii) Vitaly Pinkusov [Dkt. Nos. 7597, 7755] (the "**Pinkusov Objections**"); (ix) Charles Moore [Dkt Nos. 7660, 7661] (the "**Moore Objections**"); (x) the Estate of Jane A. Redwood [Dkt. Nos. 7865, 7943, 7944, 7945, 7946, 7947, 7997, 8078, 8132] (the "**Redwood Objections**"); (xii) Mary S. Jannotta ("**Jannotta**") [Dkt. 7909]; (xiii) Ellen Isaacs [Dkt Nos. 7972, 8084, 8085, 8088, 8089] (the "**Isaacs Objections**"); (xiv) James Harry Rand [Dkt. No. 7367] (the "**Rand Objection**"); (xv) Tammey Clark [Dkt. No. 7519] (the "**Clark Objection**"); (xvi) Jacqueline Torres Herrera [Dkt. No. 7919] (the "**Herrera Objection**") and (xvii) Laurie Danielle Pitts-Tillman ("**Pitts-Tillman**") [via email].

## A.    Releases Provided by the Settling Creditors Are Not Coercive

232.    Insofar as any *Pro Se* Objector contends that the Plan coerces them into releasing their direct claims against the Sackler Parties, that claim is misguided and misunderstands the Plan's mechanics.  (*See, e.g.*, Jannotta Obj. [Dkt. No. 7909] § 2 (asserting that "victims are compelled to forfeit their rights to pursue the Sacklers" under a "coercive structure").)  As discussed *supra*, no PI Claimant is required to release their direct claims against any nondebtor party—the Third-Party Releases are entirely consensual.  *See supra* ¶ 15.  Indeed, any PI Claimant who chooses to release their claims against the Shareholder Released Parties or Released Parties can only do so by affirmatively opting in to such releases on their voting Ballot. (*Id.*); *see also In re Smallhold, Inc.*, 665 B.R. 704, 717 (Bankr. D. Del. 2024) (finding "no risk of coercion" where "the ballot provided a simple mechanism by which these creditors could opt out").  A decision not to opt in to the Third-Party Releases does not prevent any PI Claimant from voting in favor of the Plan or receiving their distribution in connection with resolution of the Estate Causes of Action.  Thus, there is no evidence that the Third-Party Releases are coercive.[58]

---

[58] And to the extent that any *Pro Se* Objectors have declined to opt in to the Third-Party Releases, they cannot contend that they were coerced into releasing their direct claims for the simple fact that they did not do so.  *See, e.g.*, Restatement (Second) of Contracts § 175(1) (1981) (stating duress is present where the victim is "induced by an improper threat by the other party that leaves the victim *no reasonable alternative*" (emphasis added)); *Knox v. Countrywide Bank*, 4 F. Supp. 3d 499, 513, 515 (E.D.N.Y. 2014) (finding, under New York law, that duress and other defenses cannot be asserted as affirmative claims); *N.Y. Life Ins. Co. v. Singh*, 2016 WL 11395019, at *3 (E.D.N.Y. Jan. 12, 2016) ("Singh fails to offer any persuasive contrary holdings in support of her position that her proposed duress [and other defense-based] claims are cognizable.").

**B.      Dismissing the Bankruptcy Cases at the Confirmation Hearing Would be Disastrous for Creditors and Contrary to Law**

233.     The belated requests from Ms. Isaacs and Ms. Ecke that the Court dismiss the bankruptcy proceedings because of the harms wrought by the opioid crisis should be rejected. (*Contra* Isaacs Obj. [Dkt. No. 7972] at 1, 5; [Dkt. No. 8085] at 1-2; Ecke Obj. [Dkt. Nos. 8096, 8097, 8131].)  There is no ground to dismiss these bankruptcy cases, and dismissing them at this stage would result in a catastrophic destruction of value and be counterproductive to efforts to abate the opioid crisis.

234.     Section 1112(b) of the Bankruptcy Code dictates that a chapter 11 case may be dismissed only upon a showing (i) of cause to dismiss (as defined by statute), and (ii) that dismissal is in the best interests of both the estate and its creditors.  *See* 11 U.S.C. § 1112(b)(1); *see also In re Just Plumbing & Heating Supply, Inc.*, 2011 WL 4962993, at *2 (Bankr. S.D.N.Y. Oct. 18, 2011) ("Bankruptcy Code § 1112(b) permits a court to dismiss a chapter 11 case . . . 'for cause' as long as it is 'in the best interests of creditors and the estate'").  Neither prong is satisfied here.

235.     Cause to dismiss simply does not exist here.  The Bankruptcy Code sets forth a non-exhaustive list of acts that may constitute cause for dismissal, which include, *inter alia*, gross mismanagement of the estate, failure to comply with a court order, and termination of a confirmed plan.  11 U.S.C. § 1112(b)(4).  Dismissal of a chapter 11 case is a "harsh[]" and "drastic measure," and the movant bears the burden of showing that such relief is warranted.  *In re Dark Horse Tavern*, 189 B.R. 576, 580 (Bankr. N.D.N.Y. 1995).  Neither Ms. Isaacs nor Ms. Ecke have met that burden here.  The crux of Ms. Isaacs' argument appears to be that a variety of actors, including the DOJ, state attorneys general, McKinsey & Company, Judge Drain, and the Debtors themselves have not adequately responded to the opioid crisis.  But even if Ms. Isaacs

had demonstrated that were true of any of these parties (she has not) and even if these alleged

policy failures were within the power of the Debtors and the Court to address (they are not), that

would not provide a cause for dismissal of these cases.

236.    Dismissal of a chapter 11 case for bad faith is warranted only where the debtors

"had an intent to abuse the judicial process, and the purpose of the reorganization process."

*Clean Air Car Serv. & Parking Branch Three, LLC v. Operr Plaza*, LLC, 2025 WL 1181698, at

*4-6 (E.D.N.Y. Apr. 23, 2025) (affirming denial of motion to dismiss chapter 11 case where

there was no evidence debtor intended to "abuse the judicial process").  Where, as here, the

Debtors entered bankruptcy in order to effectuate an orderly reorganization, that is sufficient to

rebut any accusation of bad faith or abuse of judicial process.  *See In re MSR Hotels & Resorts,*

*Inc.*, 2013 WL 5716897, at *1 (Bankr. S.D.N.Y. Oct. 1, 2013) (SHL) (holding no showing of

"cause" under 11 U.S.C. § 1112(b) where history of "protracted and contentious litigation" made

bankruptcy necessary for debtor to sell assets free of litigation); *In re MBM Ent., LLC*, 531 B.R.

363, 408 (Bankr. S.D.N.Y. 2015) (denying motion to dismiss where chapter 11 filings served the

"legitimate purpose of holding foreclosure suits at bay until [creditors'] claims could be

resolved").  Nor does Ms. Isaacs' assertion that the Debtors will not rehabilitate have any basis in

the law or facts.  To the contrary, the Debtors are on the cusp of enacting a broadly supported

plan of reorganization.  *See In re Roman Catholic Diocese of Rockville Ctr.*, 2023 WL 4833307,

at *3 (Bankr. S.D.N.Y. July 18, 2023) (denying motion to dismiss chapter 11 case where movant

"failed to show that there is an absence of a reasonable likelihood of [the debtor's] rehabilitation

within a reasonable period of time").  The procedural posture in which Ms. Isaacs' motion arises

should be all but dispositive: far from abusing the chapter 11 process, the Debtors are on the eve

of an orderly and broadly consensual reorganization that will yield far greater recoveries to

creditors than an alternative hypothetical liquidation—precisely the outcome the Bankruptcy Code was designed to yield.

237.    But even if Ms. Isaacs or Ms. Ecke succeeded in showing bad faith, the Court would still need to engage in a "fact intensive" assessment of whether termination of the bankruptcy case would be in the best interests of the creditors.  7 Collier on Bankruptcy ¶ 1112.05 (16th ed. 2025); *see also In re Weiss Multi-Strategy Advisers LLC*, 2024 WL 2767893, at *12 (Bankr. S.D.N.Y. May 29, 2024) ("[C]ourts apply a 'fact and circumstances' test in determining whether dismissal or conversion is in the best interests of creditors and the estate" (internal citation omitted)).  And the Code explicitly provides that "[t]he court may not . . . dismiss a case under this chapter if . . . dismissing the case is not in the best interests of creditors and the estate." 11 U.S.C. § 1112(b)(2) (emphasis added).  As demonstrated at length *supra*, dismissing these cases would destroy billions of dollars of value for creditors, and would realistically result in individual creditors such as Ms. Isaacs and Ms. Ecke receiving nothing. (Dubel Decl. ¶ 40; *see also* JX-3330 (Gowrisankaran Report) ¶ 8.)  Billions of dollars of opioid abatement funds would be delayed or never materialize, and the company's Public Health Initiatives would not save lives.  That result is plainly unwarranted and Ms. Isaacs' Objection should be rejected.

### C.    Payment in Full is not Required for Confirmation

238.    Contrary to the assertion of certain objectors, there is nothing in the Bankruptcy Code to suggest that a plan of reorganization must provide for payment in full of creditors' allowed claims.  *See* 4 Collier on Bankruptcy § 507.02 (16th ed. 2011) ("Many bankruptcy cases do not generate sufficient proceeds to pay in full all claims entitled to payment in the case.  It becomes necessary, therefore, to allocate the insufficient proceeds among the holders of claims in some manner."); (*contra* Bartz-Halaschak Obj. [Dkt. No. 7530] (objecting to Purdue "being

allowed to go bankrupt" and not adequately compensating individual creditors).)  Nor did the

Supreme Court Decision impose any such requirement.  (*Contra* McGaha Obj. [Dkt. No. 7432]

at 2.)

239.    Here, a plan of reorganization that would provide for payment in full is simply not

possible, where nearly two-hundred thousand contingent opioid-related proofs of claim were

filed in the bankruptcy, alleging in excess of $40 trillion in aggregate damages.  (*See* Johnson

Decl. at 5-6 & n.6.)  And contrary to Ms. Morales' baseless assertion that the Debtors have not

"adequately explained the deficiency of assets to meet the Debtors' liability to the creditors," the

Liquidation Analysis amply demonstrates that the Debtors' assets, even in a high case scenario,

would be *tens of trillions* of dollars short of the amount required to pay creditors' asserted claims

in full.  That shortfall significantly exceeds the total amount of U.S. dollars in existence.  (*See*

JX-3328 (DelConte Report) ¶¶ 15-16); *see* also Federal Reserve Economic Data, Release H.6,

Table 1 (estimating M2 money stock at approximately $22.2 trillion).

### D.    The Plan's Distribution Scheme is not Inequitable

240.    Ms. Jannotta argues that the Plan's distribution scheme is inequitable because

governmental entities are not required to prove individualized harm, while personal injury

victims must do so, and are also subject to limited recoveries from a capped trust.  (Jannotta Obj.

[Dkt. No. 7909] at § 3; *see also* Ferrante Obj. [Dkt. No. 7604] (objecting to states' distribution

under the plan).)  As explained above, however, the Bankruptcy Code permits a plan to provide

different treatment for differently situated creditor classes.  *See In re Klaynberg*, 2023 WL

5426748, at *16 (a plan does not unfairly discriminate between creditor classes where "(i) the

classes are comprised of dissimilar claims or interests, or (ii) taking into account the particular

facts and circumstances of the case, there is a reasonable basis for such disparate treatment"

(internal citations omitted)); *In re Sabine Oil & Gas Corp.*, 555 B.R. at 316 (where holders of

"similar legal rights" received materially similar treatment under the Plan, there was no unfair discrimination); *In re Johns-Manville Corp.*, 68 B.R. at 636 (explaining that unfair discrimination means segregation of similar claims into separate, disparately treated classes); *In re SunEdison, Inc.*, 575 B.R. 220, 226 (Bankr. S.D.N.Y. 2017) (explaining that "the unfair discrimination test assures fair treatment among classes of the same priority level"). Here, Classes 10(a) and 10(b), which apply to personal injury claimants, are differently situated from Classes 3 and 4 (governmental entities) because of, among other things, the difference in the nature of claims held by governmental entities and personal injury claimants, which are natural persons. Further, in contrast to PI Claimants, who will receive cash distributions on account of their Allowed Claims, Class 3 and 4 claimants will be receiving funds for opioid abatement and remediation efforts—which themselves are intended to address the opioid crisis and confer value to other parties beyond those claimants receiving the funds. (*See* JX-3330 (Gowrisankaran Report) ¶ 8 ("[T]he abatement programs funded by the Healthcare Provider, Public School, and ERP Trusts will confer value to entities beyond those receiving the funds, including other non-governmental claimants as well as governmental claimants such as state, local, and tribal governments.").)[59]

241.    Moreover, the debtors note that the Trust Distribution Procedures for the Personal Injury Trust were designed by representatives of the Ad Hoc Group of Individual Victims. (*See*

---

[59] One claimant, Mr. Redwood, objects to the Non-NAS PI TDP's treatment of economic damages asserted by personal injury claimants. (Redwood Obj. [Dkt. No. 7946] at 1; [Dkt. No. 8132] at 3-5. His opposition to this feature of the Non-NAS PI TDP poses no obstacle to confirmation of the Plan, as over 99% of personal injury claimants have voted in favor of the Plan and the Plan satisfies the "best interests" test of section 1129(a)(7). Moreover, as Ms. Greenspan opines, a compensation program for economic damages would "require extensive documentation, individualized analysis, and would generate substantial administrative costs—thereby depleting the funds and causing delay in compensation." (JX-3621 (Am. Greenspan Report) at 35 n.33.)

Plan § 1.1 (defining "NAS PI TDP" as "trust distribution procedures to be implemented by the PI

Trust with respect to NAS PI Channeled Claims, the terms of which shall be . . . reasonably

acceptable to the Ad Hoc Group of Individual Victims"); *id.* (providing same definition in

connection with the "Non-NAS PI TDP").)  Per the uncontested report of Deborah Greenspan,

such procedures "provide a fair and reasonable process and incorporate fair, reasonable and

appropriate criteria for evaluating NAS PI Claims and Non-NAS PI Claims, for determining

award value, and for assuring consistent treatment of claims as appropriate."  (*See* JX-3621 (Am.

Greenspan Report) at 10.)

   **E.**   **The Debtors' Debts may be Discharged**

  242.  A number of individual creditors assert, in various manners, that the Debtors are

not entitled to a discharge for fraud-related conduct.  (*See, e.g.*, Morales [Dkt. Nos. 7818, 7819];

McGaha [Dkt. Nos. 7432, 7451].)  These objections are predicated on a misunderstanding of the

applicability of section 523(a) of the Code.  That section prohibits the discharge of certain debts

obtained through actual fraud for "*an individual debtor*"—not, as is the case here, for corporate

debtors.[60]  *See* 11 U.S.C. § 523(a).  Ms. Morales' invocation of section 727 of the Code is

likewise inapplicable here because that provision applies to Chapter 7 bankruptcies, and this is a

Chapter 11 bankruptcy.  (*See* Morales Obj. [Dkt. No. 7818] at 8-9.)

---

[60] Section 1141(d)(6) applies the section 523(a)(2) exception to discharge to debtors that are corporations only with respect to such debts "owed to a domestic governmental unit, or owed to a person as the result of an action filed under subchapter III of chapter 37 of title 31 or any similar State statute."  11 U.S.C. § 1141(d)(6).  Ms. Morales is not a "domestic governmental unit" or a *qui tam* relator.

### F.     The Plan Does Not Impermissibly Discharge Sackler Parties

243.     The Sackler Parties do not receive a discharge under the Plan.  (*Contra* Morales Obj. [Dkt. No. 7818] at 9.)  To the contrary, any creditor may elect to litigate against the Sackler Parties for their pre-petition conduct, as explained *supra*.

### G.     Nothing in the Plan Exculpates Any Party from Criminal Liability

244.     Many of the Pro Se Objectors appear to be under the misapprehension that the Plan could or should impose criminal liability on certain parties.  (*See, e.g.*, Ferrante Obj. [Dkt. No. 7420] at 1 ("[T]he Sackler family should be before a criminal court no matter how much money they agree to give up"); Ellen Isaacs Obj. [Dkt. No. 7972] at 1-2, 5 (requesting arrest of the Sackler Parties); Pinkusov Obj. [Dkt. No. 7597] at 1 ("I believe that there should be a criminal prosecution of all individuals who have been involved in the deceitful marketing of OxyContin."); Amanda Morales Obj. [Dkt. No. 7818] at 12 (noting that the Sackler Parties have avoided criminal liability); Carrie McGaha [Dkt. No. 7432] at 5 (detailing alleged harms caused by the Sackler Parties).)

245.     To be very clear, nothing in the Plan affects the criminal liability of any party. Nor could it.  This Court's subject matter jurisdiction includes "*civil* proceedings arising under title 11, or arising in or related to cases under title 11."  *See* 28 U.S.C. § 1334 (emphasis added). Criminal prosecutions are out outside the scope of a bankruptcy court's powers.

### H.     Creditors Should Not be Permitted to Individually Pursue Estate Causes of Action

246.     Ms. Morales—whose many requests for individual adjudication of her claims have been repeatedly rejected by the Court as inappropriate, *see, e.g.*, Memorandum of Decision and Order [Dkt. No. 7941]—appears to object to the Plan on the basis that it should allow for creditors to pierce the corporate veil and "hold shareholders . . . responsible."  (Morales Obj.

[Dkt. No. 7940] at 11.)  That argument should be denied because any generalized claim for piercing the corporate veil belongs exclusively to the Debtors, and such claims are presently proposed for settlement by the Estates, for the benefit of the Debtors' thousands upon thousands of creditors, not just Ms. Morales.  *See* MBR at 92 ("[C]laims based on alter ego, piercing the corporate veil, and breach of fiduciary duty/failure to supervise theories would appear to stem from allegations against Sackler family members that they caused harm to the creditor body generally, or to the Debtors, in exercising their control of the Debtors and, therefore, would belong to the Debtors' estates rather than to individual creditors.").

247.    Claims predicated on theories of indirect liability, including veil piercing and alter-ego claims, are classically derivative and thus exclusively the property of the estate.  *See, e.g.*, *In re Tronox Inc.*, 855 F.3d 84, 88-89 (2d Cir. 2017) (holding "indirect alter-ego and veil-piercing theories" were "generalized 'derivative' claims that fall within the property of the bankruptcy estate").  Because a claim for piercing the corporate veil "could be equally asserted . . . by any creditor of the [] debtors" the claims are properly pursued by the estates' representative. *Id.* at 94.  Here, the Debtors' indirect liability claims against the Sackler Parties are to be settled for the benefit of the Debtors' creditors.  Ms. Morales cannot circumvent the bankruptcy process and seek to commandeer the estates' claims for her exclusive and personal benefit. *See St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 705 (2d Cir. 1989) (alter ego claim that was "already being litigated by the bankruptcy trustee and by the unsecured creditors' committee" could not be separately pursued "outside of the bankruptcy proceeding").

### I.    Individual Adjudication of Proofs of Claim is Inappropriate at this Time

248.    Many *pro se* litigants have also requested relief unrelated to confirmation of the Plan, including requests for leave to file late proofs of claim, or to have the merits of their underlying claims against the Debtors adjudicated.  As the Court recently explained, "[i]n

bankruptcy, there is a specific process for handling and satisfying claims." (Memorandum of

Decision and Order at 11 [Dkt. No. 7941] (citing Fed. R. Bankr. Pro. 3007; 11 U.S.C. § 502; *In*

*re Chateaugay Corp.*, 104 B.R. 622, 624–25 (S.D.N.Y. 1989)).) That process is "crucial,"

particularly in a case of this size and complexity, where over 614,000 individual proofs of claim

were filed against the Debtors. *Id.* Under these processes, individual claims cannot be

substantively litigated at confirmation, nor can the Court order direct payment of claimants'

claims, as some individuals request. The Debtors are deeply sympathetic to the time, stress, and

uncertainty that are the natural byproduct of these proceedings and the long appellate process.

To that end, the Debtors and their major creditor constituencies, including the UCC, have

worked tirelessly to reorganize as expeditiously as possible, and in a manner that will yield the

greatest potential recoveries to creditors. If the Plan is confirmed, the time for individual claims

adjudication will follow in short order. For now, the Debtors respectfully submit that none of

these individual requests have any bearing on the confirmability of the Plan, which is plainly

warranted.

**J.      No Party In Interest Has Been Denied Due Process**

249.    To the extent any *Pro Se* Objectors assert that the Plan or these proceedings have

denied them adequate due process, such a contention is without merit. (*See, e.g.*, Ecke Obj. [Dkt.

No. 8097] at 1 (asserting she is "being denied due constitutional due process"); Walker Obj.

[Dkt. No. 8099] at 1 (asserting a "denial of claimants due process rights against the Sacklers &

Purdue Pharma").) The bedrock of due process is notice and the opportunity to be heard. *See,*

*e.g.*, *In re Medaglia*, 52 F.3d 451, 455 (2d Cir. 1995) ("The means to that end is 'notice

reasonably calculated, under all the circumstances, to apprise interest parties of the pendency of

the action'"); *In re Haemmerle*, 529 B.R. 17, 23 (Bankr. E.D.N.Y. 2015). Here, in addition to a

historically robust noticing program (*see supra* ¶ 219), adequate notice is made evident by the

objections filed in this very case.  In addition, the Court has provided all interested parties, including these specific *pro se* individuals, countless opportunities to be heard throughout these proceedings.[61]  These *pro se* litigants will also have an opportunity to be heard yet again at the Confirmation Hearing.  And insofar as the *pro se* litigants' due process challenges are predicated on the treatment of their claims against the Debtors or the Shareholder Released Parties, (i) due process does not require that litigants be able to litigate their claims against the Debtors to judgment, and (ii) the Plan does not release these claimants' third-party claims absent their express consent.  *See supra* ¶ 15.

## CONCLUSION

For the reasons set forth herein, the Plan satisfies fully all applicable requirements of the Bankruptcy Code.  The Debtors respectfully request that the Court confirm the Plan pursuant to section 1129 of the Bankruptcy Code.

---

[61] *See, e.g.*, June 20, 2025 Hr'g Tr. at 37:10-41:22 [Dkt. No. 7623] (addressing Rosemary Walker's first amendment argument regarding contacting the court and argument against attorneys' fees, advising that Ms. Walker can file anything on docket and that other arguments will come up for a confirmation hearing where "[e]veryone reserves their rights to be heard on the confirmation of the plan and the substance of the plan at that time"); June 18, 2025 Hr'g Tr. at 135:18-136:14 [Dkt. No. 7635] (addressing Maria Ecke's objection to disclosure statement, stating, "I'm certainly happy to give you a brief opportunity to address that"); May 22, 2025 Hr'g Tr. at 57:10-59:17 [Dkt. No. 7488] (addressing Maria Ecke's objection to an extension of the preliminary injunction and advising that members of the UCC are available to help unsecured creditors with questions); March 28, 2025 Hr'g Tr. at 51:5-52:22 [Dkt. No. 7369] (addressing Maria Ecke's objection to mediation and advising that "[t]he mediation is not designed to be with every individual Claimant, because that's an impossibility [and] we've discussed this before").

Dated:  November 3, 2025
        New York, New York

                        DAVIS POLK & WARDWELL LLP

                        By:  */s/ Benjamin S. Kaminetzky*

                        450 Lexington Avenue
                        New York, New York 10017
                        Telephone: (212) 450-4000
                        Facsimile:  (212) 701-5800
                        Marshall S. Huebner
                        Benjamin S. Kaminetzky
                        Eli J. Vonnegut
                        James I. McClammy
                        Marc J. Tobak
                        Joshua N. Shinbrot

                        *Counsel to the Debtors*
                        *and Debtors in Possession*