DAVIS POLK & WARDWELL LLP

450 Lexington Avenue

New York, New York 10017

Telephone: (212) 450-4000

Facsimile: (212) 701-5800

Marshall S. Huebner

Benjamin S. Kaminetzky

Eli J. Vonnegut

Christopher S. Robertson

Joshua Y. Sturm

Abraham Bane

*Counsel to the Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| **PURDUE PHARMA L.P.**, *et al.*, | Case No. 19-23649 (SHL) |
| Debtors.[1] | (Jointly Administered) |

**NOTICE OF FILING OF FOURTH REVISED [DEBTORS' PROPOSED] FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER CONFIRMING THE EIGHTEENTH AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF PURDUE PHARMA L.P. AND ITS AFFILIATED DEBTORS**

**PLEASE TAKE NOTICE** that, on November 3, 2025, the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") filed the *Fifteenth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 8168] (the "**Fifteenth Amended Plan**").

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Purdue Products L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

**PLEASE TAKE FURTHER NOTICE** that, on November 3, 2025, the Debtors filed the *[Debtors' Proposed] Findings of Fact, Conclusions of Law, and Order Confirming the Fifteenth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 8175] (the "**Original Proposed Order**").

**PLEASE TAKE FURTHER NOTICE** that, on November 7, 2025, the Debtors filed the *Sixteenth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 8199] (the "**Sixteenth Amended Plan**").

**PLEASE TAKE FURTHER NOTICE** that, on November 11, 2025, the Debtors filed a revised *[Debtors' Proposed] Findings of Fact, Conclusions of Law, and Order Confirming the Sixteenth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 8214] (the "**First Revised Proposed Order**").

**PLEASE TAKE FURTHER NOTICE** that, on November 11, 2025, the Debtors filed a further revised *[Debtors' Proposed] Findings of Fact, Conclusions of Law, and Order Confirming the Sixteenth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* (the "**Second Revised Proposed Order**").

**PLEASE TAKE FURTHER NOTICE** that, on November 13, 2025, the Debtors filed the *Seventeenth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 8230] (the "**Seventeenth Amended Plan**").

**PLEASE TAKE FURTHER NOTICE** that, on November 13, 2025, the Debtors filed a further revised *[Debtors' Proposed] Findings of Fact, Conclusions of Law, and Order Confirming the Seventeenth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 8232] (the "**Third Revised Proposed Order**").

**PLEASE TAKE FURTHER NOTICE** that, contemporaneously herewith, the Debtors have filed the *Eighteenth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* (the "**Eighteenth Amended Plan**").

**PLEASE TAKE FURTHER NOTICE** that, the Debtors hereby file a further revised *[Debtors' Proposed] Findings of Fact, Conclusions of Law, and Order Confirming the Eighteenth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* (the "**Fourth Revised Proposed Order**"). The Third Revised Proposed Order is attached hereto as **Exhibit A**. Included in **Exhibit A** attached hereto are Exhibit B (NewCo Operating Injunction) and a revised version of Exhibit C (NewCo Governance Covenants) to the Fourth Revised Proposed Order.

**PLEASE TAKE FURTHER NOTICE** that, a blackline of the Fourth Revised Proposed Order reflecting changes from the Third Revised Proposed Order is attached hereto as **Exhibit B-1**. A blackline of the revised version of Exhibit C (NewCo Governance Covenants) to the Fourth Revised Proposed Order reflecting changes from the version filed with the Second Revised Proposed Order is attached hereto as **Exhibit B-2**.

**PLEASE TAKE FURTHER NOTICE** that a copy of the Fourth Revised Proposed Order, the Seventeenth Amended Plan, and all related papers may be obtained free of charge by visiting the website of Kroll Restructuring Administration LLC at https://restructuring.ra.kroll.com/purduepharma/. You may also obtain copies of any pleadings by visiting the Bankruptcy Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

**PLEASE TAKE FURTHER NOTICE** that, to the extent the Debtors make further revisions to the Fourth Revised Proposed Order, including to Exhibit B (NewCo Operating

Injunction) and Exhibit C (NewCo Governance Covenants) thereto, the Debtors will present further blacklined copies of such revised documents to the Bankruptcy Court.

Dated:  November 14, 2025
        New York, New York

DAVIS POLK & WARDWELL LLP

/s/ *Eli J. Vonnegut*
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Eli J. Vonnegut
Christopher S. Robertson
Joshua Y. Sturm
Abraham Bane

*Counsel to the Debtors*
*and Debtors in Possession*

## EXHIBIT A

**Fourth Revised Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | **Chapter 11** |
| **PURDUE PHARMA L.P.,** *et al.*, | **Case No. 19-23649 (SHL)** |
| **Debtors.**[1] | **Jointly Administered** |

**[DEBTORS' PROPOSED] FINDINGS OF FACT, CONCLUSIONS OF LAW,**
**AND ORDER CONFIRMING THE EIGHTEENTH AMENDED**
**JOINT CHAPTER 11 PLAN OF REORGANIZATION OF**
**PURDUE PHARMA L.P. AND ITS AFFILIATED DEBTORS**

The Debtors[2] having filed (i) the *Thirteenth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors* [D.I. 7638] (including all appendices, exhibits, schedules, and supplements thereto, and as altered, amended, supplemented, or otherwise modified from time to time in accordance therewith, including pursuant to the *Fourteenth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors* [D.I. 7911], the *Fifteenth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors* [D.I. 8168], the *Sixteenth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors* [D.I. 8199], the *Seventeenth Amended Joint Chapter 11 Plan of Reorganization of*

---

[1]  The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Purdue Products L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

[2]  Capitalized terms used but not otherwise or immediately defined herein (this "**Order**") shall have the meanings ascribed to such terms elsewhere herein, in the Disclosure Statement, the Plan, the Confirmation Brief, or the Confirmation Protocols Order, as applicable. The rules of interpretation set forth in Section 1.2 of the Plan shall apply hereto.

*Purdue Pharma L.P. and its Affiliated Debtors* [D.I. 8230], and the *Eighteenth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors* [D.I. 8233], the "**Plan**") (attached hereto as **Exhibit A**) and (ii) the *Disclosure Statement for the Thirteenth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P.* [D.I. 7638] (including all appendices, exhibits, schedules, and supplements thereto, and as altered, amended, supplemented, or otherwise modified from time to time in accordance therewith, the "**Disclosure Statement**"), each of which is incorporated herein by reference; and upon the *Debtors' Motion for Order Establishing Confirmation Schedule and Protocols* [D.I. 7512] (the "**Confirmation Protocols Motion**") and the *Order Granting Debtors' Motion for Order Establishing Confirmation Schedule and Protocols* [D.I. 7614] (as modified through various extensions filed on the docket in the Chapter 11 Cases, the "**Confirmation Protocols Order**"); and the Bankruptcy Court having considered the responses and objections to Confirmation (as defined herein) of the Plan (collectively, the "**Confirmation Objections**"), the *Debtors' Memorandum of Law in Support of Confirmation of the Fifteenth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors* [D.I. 8164] (the "**Confirmation Brief**"), and the Statements in Support[3]; and the Bankruptcy Court having jurisdiction to consider the relief granted herein pursuant to 28 U.S.C. § 1334 and the *Amended*

---

[3] The "**Statements in Support**" means, collectively, and together with any declarations, exhibits and/or reports filed in connection therewith, (i) *Beacon Company's Statement in Support of Confirmation of the Fourteenth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors* [D.I. 8150], (ii) *The Ad Hoc Group of Individual Victims' Statement in Support of Confirmation of the Debtors' Joint Chapter 11 Plan of Reorganization and Limited Reply to Certain Plan Objections* [D.I. 8151], (iii) *Statement of the Raymond Sackler Family in Support of Confirmation of Debtors' Fourteenth Amended Plan of Reorganization and in Reply to Plan Objections* [D.I. 8152], (iv) *The Multi-State Governmental Entities Group's Statement in Support of the Fourteenth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors* [D.I. 8153], (v) *Debtors' Omnibus Response to Insurers' Objections to Confirmation of the Debtors' Joint Chapter 11 Plan of Reorganization* [D.I. 8156], (vi) *Statement of the Official Committee of Unsecured Creditors in Support of Confirmation of the Fourteenth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors* [D.I. 8165], and (vii) *Ad Hoc Committee's Reply to Plan Objections* [D.I. 8172].

*Standing Order of Reference M-431*, dated January 31, 2012 (Preska, C.J.); and the Bankruptcy Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157; and the Bankruptcy Court having found that it may enter a final order consistent with Article III of the United States Constitution; and the Bankruptcy Court having found that venue of the Chapter 11 Cases and related proceedings is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the relief requested having been provided to the parties listed in the *Affidavit of Service of Solicitation Materials* [D.I. 7987], such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and the Bankruptcy Court having reviewed and considered Confirmation of the Plan; and the Bankruptcy Court having reviewed or otherwise taken judicial notice of the entire record of the Chapter 11 Cases (including the Confirmation Hearing, written and oral testimony of witnesses offered at the Confirmation Hearing, and any and all exhibits admitted into evidence during the Confirmation Hearing) (collectively, the "**Record**"); and the Bankruptcy Court having held a hearing to consider the Record, including the written and oral testimony of all witnesses, any and all exhibits admitted into evidence, and, ultimately, the relief granted herein (the "**Confirmation Hearing**"); and the Bankruptcy Court having determined that the Confirmation Hearing was conducted in accordance with all requirements of due process and applicable State and federal law; and the Bankruptcy Court having determined that the legal and factual bases set forth in the Record establish just cause for the relief granted herein; and all objections and reservations of rights filed or asserted in connection with the relief granted herein, if any, having been withdrawn, resolved, or overruled with prejudice; and upon all of the proceedings had before the Bankruptcy Court; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY FOUND, ORDERED, ADJUDGED, AND DETERMINED THAT:**

1.      <u>Confirmation</u>.  The facts and legal arguments set forth in the Record, including the evidence and argument at the Confirmation Hearing, demonstrate that the requirements for entry of a Confirmation Order by the Bankruptcy Court on the docket of the Chapter 11 Cases ("**Confirmation**") of the Plan have been satisfied.  Further, each witness who testified (by declaration or otherwise) at or in connection with the Confirmation Hearing in support of the Plan was credible, reliable, and qualified to testify as to the topics addressed in his or her testimony.  Therefore, the Debtors, as proponents of the Plan, have met their burden of proving the satisfaction of the requirements for Confirmation of the Plan set forth in section 1129 of the Bankruptcy Code by a preponderance of the evidence, which is the applicable standard.  All requirements under the Bankruptcy Code for the Confirmation of the Plan have been satisfied. Accordingly, the Plan, in its entirety, is **CONFIRMED** pursuant to section 1129 of the Bankruptcy Code.  Each of the terms and conditions of the Plan and the Plan Documents (and any amendments, modifications, and supplements thereto) are integral parts of the Plan.  The failure to specifically describe or include herein any particular provision of the Plan or any Plan Document, each of which is incorporated by reference herein, shall not diminish or impair the effectiveness of such provision, it being the intent of the Bankruptcy Court that the Plan (including each Plan Document to the extent incorporated therein) is confirmed in its entirety. All of the transactions contemplated by the Plan are hereby approved.  The Plan complies with all applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules. Once finalized and executed, the Plan and Plan Documents shall, as applicable, constitute legal, valid, binding, and authorized obligations of the applicable Debtors and the parties thereto, enforceable in accordance with their terms and the terms of the Plan and this Order.

2.      <u>Objections</u>.  All objections (including the Confirmation Objections), responses, statements, reservations of rights, and comments in opposition to Confirmation of the Plan, to the extent not withdrawn with prejudice in their entirety, waived, settled, or resolved prior to the Confirmation Hearing, or otherwise resolved on the Record of the Confirmation Hearing or herein, are hereby overruled with prejudice.  The Record of the Confirmation Hearing is hereby closed.

3.      <u>Solicitation</u>.  As described in the Confirmation Protocols Order, and as evidenced by the affidavits at D.I. 7987 and 7992, service of the Solicitation Packages was adequate and sufficient under the circumstances of the Chapter 11 Cases, and adequate and sufficient notice of the Confirmation Hearing and other requirements, deadlines, hearings, and matters described in the Confirmation Protocols Order (a) was timely and properly provided in compliance with the Confirmation Protocols Order and, to the extent applicable, with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules and (b) provided due process, including an opportunity to appear and to be heard, to all parties in interest.  Accordingly, no other or further notice or service of the Solicitation Packages or the Confirmation Hearing is or shall be required.  All parties have had a fair opportunity to litigate all issues (including those raised by the Confirmation Objections), and the Confirmation Objections have been fully and fairly litigated. All parties in interest, including, without limitation, the Debtors' insurers, had notice of the Purdue bankruptcy proceedings and an opportunity to participate in them and were on notice that Debtors' opioid-related liabilities were being mediated, negotiated, and resolved.

4.      <u>Good Faith</u>.  The Plan is the product of the good faith process through which the Debtors have conducted the Chapter 11 Cases and reflects extensive, good faith, arm's-length negotiations among the Debtors, the Creditors' Committee, each of the Supporting Claimants,

and their respective professionals, including in court-ordered, arm's-length good faith Mediation, which occurred in multiple phases from 2020 through 2025 as directed in the Mediation Orders entered in these Chapter 11 Cases. The Plan Documents are the product of good faith efforts of the Debtors and applicable non-Debtor parties who negotiated the agreements reflected in the Plan Documents and assisted in the drafting of the Plan Documents. The Plan itself and the process leading to its formulation provide independent evidence of the Debtors' good faith, serve the public interest, and assure fair treatment of Holders of Claims. Consistent with the overriding purpose of the Bankruptcy Code, the Chapter 11 Cases were filed and the Plan was proposed with the legitimate and honest purpose of maximizing the value of the Debtors' Estates and providing for the opportunity for fair and reasonable distributions to creditors. Accordingly, the Plan is fair, reasonable, and consistent with sections 1122, 1123, and 1129 of the Bankruptcy Code. Based on the foregoing, as well as the facts and record of the Chapter 11 Cases, including, but not limited to, the Record, the Plan has been proposed in good faith and not by any means forbidden by law, thereby satisfying section 1129(a)(3) of the Bankruptcy Code.

5.    No Disparate Treatment. The Plan provides for the same treatment for each Claim or Interest in each respective Class unless the Holder of a particular Claim or Interest has agreed to less favorable treatment on account of such Claim or Interest, thereby satisfying section 1123(a)(4) of the Bankruptcy Code.

6.    Plan Modifications. Any modifications to the Plan since the commencement of solicitation and prior to the entry of this Order comply with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Confirmation Protocols Order, and Section 12.3 of the Plan. Such modifications constitute immaterial modifications or do not adversely affect or change the treatment of any Claims or Interests. Notice of these

modifications by filing revised documents was adequate and appropriate under the facts and circumstances of the Chapter 11 Cases. Pursuant to Bankruptcy Rule 3019, the modifications do not require either (a) any additional disclosure under section 1125 of the Bankruptcy Code or the resolicitation of votes under section 1126 of the Bankruptcy Code or (b) that the Holders of Claims be afforded an opportunity to (i) change previously cast acceptances or rejections of the Plan or (ii) withdraw previously submitted elections to opt-in to the Third-Party Releases through the applicable ballots. Accordingly, the Plan is properly before the Bankruptcy Court, and all votes cast with respect to the Plan and elections to opt in to the Third-Party Releases prior to any such modifications shall be binding and shall apply with respect to the Plan. The Plan may not be further modified except in accordance with Section 12.3 of the Plan. The Debtors are authorized, prior to the Effective Date, to make modifications to the Plan as and to the extent provided under Section 12.3 of the Plan.

7.    Plan Supplement.    The contents, filing, and notice of the Plan Supplement [D.I. 7591, 7877, 8094, 8171, 8201] (and any subsequent amendments, modifications, and supplements thereto filed with the Bankruptcy Court) are proper and in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Confirmation Protocols Order, and other applicable laws, and no other or further notice is or shall be required. All documents included in the Plan Supplement are integral to, part of, and incorporated by reference into the Plan. Subject to the terms of the Plan and the Direct Claims Shareholder Settlement Agreements, and the consent rights of the parties thereunder, the Debtors may amend, update, supplement, or otherwise modify the Plan Supplement at any time before the Effective Date or in accordance with the Plan and the Direct Claims Shareholder Settlement Agreements, as applicable. All parties were provided due, adequate, and sufficient notice of the Plan

Supplement, and the filing of any further supplements thereto will provide due, adequate, and sufficient notice thereof.

8.      <u>Plan Classification</u>.   The categories listed in <u>Article III</u> of the Plan properly classify, and identify as Impaired or Unimpaired, the Claims against, and Interests in, each of the Debtors, pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code, for all purposes, including voting, Confirmation of the Plan, and distributions pursuant to the Plan, and shall be controlling for all purposes under the Plan.

9.      <u>Effectiveness of All Actions</u>.   Except as set forth in the Plan or this Order, all actions authorized to be taken pursuant to this Order or the Plan may be taken and shall be effective when taken on, prior to, or after the Effective Date pursuant to the Plan and this Order, as applicable, without further notice to, or action, order, or approval of, the Bankruptcy Court.

10.     <u>Compromise and Settlement of Claims, Interests, and Controversies</u>.  Pursuant to the Bankruptcy Code, including section 1123 of the Bankruptcy Code, and Bankruptcy Rule 9019, the Debtors have authority to propose and negotiate the Plan Settlements, including resolution of their opioid-related liabilities and, with approval of the Bankruptcy Court, enter into the Plan Settlements, including the resolution of their opioid-related liabilities through the Plan and the resolution of any potential objections to the Allowance of Settling Creditors' Claims.  The Plan Settlements, including the settlements reached between the Debtors and the opioid-related claimants, as embodied in the Plan, are fair, equitable, reasonable and in the best interests of the Debtors and their Estates, and the Holders of Claims and Interests, and were entered into in good faith based on arm's-length negotiations.  The treatment provided in respect of Claims against and Interests in the Debtors, the treatment of competing Classes of Claims and the various intercreditor allocation agreements and settlements, including the settlement of

potential objections to the Allowance of Settling Creditors' Claims, are fair, equitable, and reasonable when combined with the distribution scheme, including without limitation all Distributions to be made under the Plan, and the release, injunction and all other provisions contained in the Plan, all of which are material aspects of the Plan and the terms of the Shareholder Settlements.  Such negotiation, settlement, and resolution of liabilities shall not operate to excuse any insurer from its obligations under any insurance policy, notwithstanding any terms of such insurance policy (including any consent-to-settle or pay-first provisions) or provisions of non-bankruptcy law.  The Plan Settlements are necessary and integral to the Plan and the Plan Documents and the success of the Chapter 11 Cases.  Any reasonable estimate, projection, or valuation of their total liability and obligation to pay for Claims asserted against the Debtors, if the Debtors had the ability to pay those Claims and that liability outside of the Chapter 11 Cases, exceeds by many multiples the total value of all assets of the Debtors' Estates, including but not limited to the value of the Debtors' business, contributions from third parties and the full face value of all of Purdue's insurance.  The provisions of the Plan and the other Plan Documents constitute a good faith compromise and settlement of Claims and controversies among the Debtors, the Supporting Claimants, the Settling Creditors, the Shareholder Payment Parties, certain other participants in the multiple phases of court-ordered Mediation and other parties in interest reached in connection with that Mediation and otherwise; *provided*, that the Plan Settlements are not intended to serve as an example for, or represent the parties' respective positions or views concerning, any other chapter 11 cases relating to opioids, nor shall any Person or party use them as precedent in any other such chapter 11 cases or in any other proceeding, situation or litigation.  The Debtors are hereby authorized and directed to enter into the Plan Settlements under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019.

11.     <u>Master Shareholder Settlement Agreement</u>.

(a)     The Master Shareholder Settlement Agreement, the Definitive Documents (as defined in the Master Shareholder Settlement Agreement) and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Debtors or the Master Disbursement Trust, as applicable, in connection therewith, are hereby approved.

(b)     All Liens granted as contemplated by the Plan, the Master Shareholder Settlement Agreement, the Plan Supplement, and the Collateral Documents (as defined in the Master Shareholder Settlement Agreement), as applicable, are hereby approved.

(c)     Subject to the terms and conditions of the Master Shareholder Settlement Agreement, Purdue Pharma Inc. shall surrender, cancel and/or redeem its de minimis interests in Pharmaceutical Research Associates L.P.

(d)     Each Family Member (as defined in the Master Shareholder Settlement Agreement) and each party to the Master Shareholder Settlement Agreement, the Collateral Documents, and the other Definitive Documents (each as defined in the Master Shareholder Settlement Agreement) shall comply in good faith with the applicable terms of such agreements to which they are a party.  Each provision of the Master Shareholder Settlement Agreement, the Collateral Documents, and the other Definitive Documents shall have the full force and effect of a binding Court order as of the Agreement Effective Date (as defined in the Master Shareholder Settlement Agreement); *provided*, *however*, that nothing in this paragraph shall confer, or be deemed to confer, any rights, benefits, or enforcement authority upon any Person for which any such rights, benefits, or enforcement authority do not arise under the terms of the Master Shareholder Settlement Agreement, the Collateral Documents, or the other Definitive Documents (any such Person, a "**Non-Enforcing Party**"); *provided*, nothing in the foregoing proviso shall limit or be deemed to limit any such rights, benefits, or enforcement authority that the Master Disbursement Trust, Creditor Trusts or Settling Creditors  may have under the terms of the Master Shareholder Settlement Agreement, the Collateral Documents, or the other Definitive Documents. The Plan and this Order shall be binding upon each of the Shareholder Released Parties.

(e)     Pursuant to the Master Shareholder Settlement Agreement, each party to the Master Shareholder Settlement Agreement will (i) submit to the jurisdiction of the Bankruptcy Court solely for the purposes of enforcing the Master Shareholder Settlement Agreement, (ii) consent to the authority of the Bankruptcy Court to enter Final Orders or judgments relating to the enforcement of the Master Shareholder Settlement Agreement, and (iii) waive and not advance any argument that any Proceeding (as defined in the Master Shareholder Settlement Agreement) arising under, related to, or in connection with the Master Shareholder Settlement Agreement is or must be adjudicated as an adversary proceeding governed by Part VII of the Federal Rules of Bankruptcy Procedure or that the Bankruptcy Court is an improper or inconvenient forum or venue. For the avoidance of doubt, the

foregoing shall not apply in connection with litigation brought by any Non-Enforcing Party.

(f)     Each Family Member shall not seek, request, or permit any new naming rights for the "Sackler" name with respect to charitable or similar donations to organizations (irrespective of when such funds were donated or from what source) until the later to occur of (1) the date on which the remaining unpaid Payment Obligations of the Payment Groups that such Family Member is a member have been reduced to zero (accounting, in the case of an A-Side Payment Group, for the maximum amount the A-Side Payment Group may be liable for hereunder) and (2) the first date on which the IAC Payment Parties of such Payment Groups are no longer the owners or holders of any interest in any IAC (other than Retained Interests permitted by Section 3.01(b) of the Master Shareholder Settlement Agreement); *provided* that at such time Family Member and its associated Payment Parties and Payment Group are in compliance with their obligations under Section 8.08 of the Master Shareholder Settlement Agreement). For the avoidance of doubt, nothing herein shall prohibit (x) any Payment Party or Family Member from making any charitable or similar donations or (y) the publication of the name of any Payment Party or Family Member making a charitable or similar donation in connection with such donation, provided such publication is not pursuant to a naming right.[4]

(g)     Each Family Member and Payment Party shall, upon occurrence of the Plan Effective Date, allow any institution or organization in the United States that has provided naming rights to such Family Member, Payment Party, the associated Payment Group or associated Payment Parties to remove the "Sackler" name from any applicable (i) physical facilities and (ii) academic, medical, and cultural programs, scholarships, endowments, and the like, subject to the following conditions: (A) such institution or organization shall provide the respective Payment Party or Family Member with forty-five (45) calendar days' confidential notice of its intention to remove the "Sackler" name; (B) if such institution or organization in its discretion determines that an announcement or other disclosure regarding the removal of the "Sackler" name is necessary, such announcement or disclosure shall include a statement that indicates that such removal is pursuant to an agreement reached in mediation in the Bankruptcy Cases; and (C) any statements issued by such institution or organization in connection with or substantially concurrent with such removal shall not disparage any Payment Party or Family Member, *provided* that nothing in this clause (C) shall restrict any academic or similar work at such institution or organization. For the avoidance of doubt, the removal rights provided herein shall not limit any rights that any applicable institution or organization otherwise may have irrespective of the Master Shareholder Settlement Agreement or this Confirmation Order.

---

[4] For the avoidance of doubt, capitalized terms used in paragraphs 11(e), 11(f), 11(g) and 11(h) of this Order shall have the meanings ascribed to such terms in the Master Shareholder Settlement Agreement.

(h)     The IAC Payment Parties shall use their commercially reasonable best efforts to sell or cause to be sold to one or more unaffiliated third parties, through any transaction, series of related transactions or separate transactions, all or substantially all of their respective direct and/or indirect Equity Interests in the IACs (excluding Purdue Canada) and/or their assets (excluding Purdue Canada) on the terms and conditions set forth in the Master Shareholder Settlement Agreement.

(i)     The Sackler Parties shall participate in the Public Document Repository on the terms and conditions set forth in the Plan.

(j)     Any and all periods for commencing or continuing any Tolled Claim (as defined in the Master Shareholder Settlement Agreement), whether fixed by statute, agreement, order, or otherwise, shall not expire until the Payment Obligations are paid in full and no Shareholder Released Party or any other signatory thereto shall assert otherwise (including through defenses (x) of statute of limitations, statute of repose, laches or inadequate tolling, or (y) that any release granted to any other Shareholder Released Party, but not made void pursuant to the terms of Section 9.02(a)(ii)(B) of the Master Shareholder Settlement Agreement has the effect of precluding such claim against such Shareholder Released Party or other signatory thereto, but excluding any defense of inadequate tolling only to the extent it could have been raised on and as of the Petition Date) in the litigation of any such Tolled Claim. For the avoidance of doubt, the Shareholder Released Claims shall include potential claims against subsequent transferees of fraudulent conveyances that occurred prior to the Settlement Effective Date, regardless of when such subsequent transfer of the funds or proceeds occurred (including transfers made after the Settlement Effective Date), and as such these claims are included in the Tolled Claims. For the avoidance of doubt, the foregoing extension of time periods shall not apply in connection with litigation brought by any Non-Enforcing Party.

12.     <u>Establishment and Purpose of the Trusts</u>.  Each of the Plan Administration Trust, the Master Disbursement Trust and the Creditor Trusts (other than any Tribe Trust entity that is formed as a legal entity other than a trust) shall be, or has been, established or designated as a trust under applicable state law for the purposes described in the Plan and the applicable Plan Documents, and shall be funded as and to the extent provided for in the Plan.  For the avoidance of doubt, the PI Trust is a continuation of the "qualified settlement fund" (within the meaning of section 1.468B-1, et seq. of the Treasury Regulations promulgated under section 468B of the Internal Revenue Code) established in accordance with the Creditor Trust Establishment Order.

Each of the Master Disbursement Trust and the Creditor Trusts (other than any Tribe Trust entity that is formed as a legal entity other than a trust) has been or is being established or designated to resolve or satisfy Claims that have resulted or may result from an event (or related series of events) that has occurred and that has given rise to Claims asserting liability arising out of a tort, breach of contract or violation of law.

13.    <u>Scope of Discharge</u>.  Except as expressly provided in this Order or the Plan, the discharge or release of the Debtors through the Plan will not operate to relieve any other entity, including Insurance Companies, of their obligation, if any, to pay the Debtors' opioid-related liabilities, without regard to (i) whether the Debtors would be able to pay such liabilities in the first instance outside of bankruptcy, and (ii) whether the Debtors or a post-bankruptcy trust can or do pay those liabilities in full, in both instances notwithstanding any terms of the Purdue Insurance Policies or provisions of non-bankruptcy law.

14.    <u>Attorneys' Fees and Expenses</u>.  Except as otherwise provided in the Plan or order of the Bankruptcy Court, Professionals that are required to seek payment or reimbursement under <u>Section 5.9(h)</u> or <u>(i)</u> of the Plan of their compensation, costs and/or fees shall file with the Bankruptcy Court an application for approval of such compensation, costs and/or fees as "reasonable" under section 1129(a)(4) of the Bankruptcy Code not later than ninety (90) days following the Effective Date, with respect to compensation, costs and/or fees incurred during the period through and including the Effective Date.  Such applications shall not be deemed an application for reasonable compensation for actual, necessary services by such professionals or reimbursement for actual, necessary expenses to be paid from the Estates (except as otherwise provided in the Plan or order of the Bankruptcy Court), and neither section 330 of the Bankruptcy Code nor any of the Bankruptcy Rules, guidelines from the office of the U.S.

Trustee, or other rules or guidelines applicable to fee applications shall apply. Each such application shall set forth the amount of compensation, costs and/or fees sought, provide a narrative basis for such compensation, costs and/or fees, and attach, as applicable, supporting documentation. A single application may cover one or more professionals that represented or advised an ad hoc group. Each such application shall be set for hearing on not less than fourteen (14) days' notice and served upon counsel to the Debtors, counsel to the Creditors' Committee, and the U.S. Trustee. If no objection is filed by any of such parties by the date that is three (3) days prior to such hearing, the Bankruptcy Court may enter an order approving such application without a hearing. With respect to applications filed by lead bankruptcy counsel to the Ad Hoc Group of Individual Victims under Section 5.9(h)(i) of the Plan, the Debtors and the Creditors' Committee have agreed and acknowledged that they shall not file any objections to, and shall support, such applications. With respect to applications filed by other professionals of the Ad Hoc Group of Individual Victims under Section 5.9(h)(i) of the Plan and professionals that represented or advised the NAS Committee under Section 5.9(h)(ii) of the Plan, the Supporting Claimants have agreed and acknowledged that they shall not file any objections to such applications, and the Debtors and the Creditors' Committee have agreed to support such applications. Any such application made is without prejudice to any applications by the Ad Hoc Group of Individual Victims, the NAS Committee, the Public School District Claimants or professionals that represented or advised any of the foregoing for allowance and payment of compensation, costs or fees under section 503(b) of the Bankruptcy Code. In addition, on the Effective Date, or as soon as reasonably practicable thereafter, the attorneys' fees and expenses of the State of Washington incurred through and including June 6, 2025 shall be paid from Effective Date Cash in an amount not to exceed $1,464,411.01, *provided*, that such payments

shall be subject to paragraph 4 of the *Order Pursuant to 11 U.S.C. §§ 105 and 363(b) Authorizing and Approving Settlement Term Sheet* [D.I. 4503], including, for the avoidance of doubt, compliance with all procedures governing the authorization and payment of professional fees and expenses of the Debtors and the Creditors' Committee as set forth in the Interim Compensation Order, *mutatis mutandis.* In addition, on the Effective Date, or as soon as reasonably practicable thereafter, the fees and expenses of Pullman & Comley, LLC incurred through and including June 6, 2025 shall be paid from Effective Date Cash in an amount not to exceed $6,500.00, *provided*, that such payments shall be subject to paragraph 4 of the *Order Pursuant to 11 U.S.C. §§ 105 and 363(b) Authorizing and Approving Settlement Term Sheet* [D.I. 4503], including, for the avoidance of doubt, compliance with all procedures governing the authorization and payment of professional fees and expenses of the Debtors and the Creditors' Committee as set forth in the Interim Compensation Order, *mutatis mutandi*s.

15. <u>U.S. Federal Income Tax Matters.</u>

(a) The Master Disbursement Trust shall be structured to qualify as a "qualified settlement fund," and the receipt of (i) any MDT Transferred Assets (and any other amounts received by the Master Disbursement Trust pursuant to the Plan) that are treated as amounts transferred to the Master Disbursement Trust for purposes of Treasury Regulations section 1.468B-2(b)(1) and (ii) the proceeds received in respect of any MDT Transferred Assets (and any other amounts received by the Master Disbursement Trust pursuant to the Plan) that are not described in clause (i) above (including, without limitation, proceeds received in respect of the MDT Shareholder Rights) by the Master Disbursement Trust shall be treated as amounts transferred by, or on behalf of, a "transferor" to a "qualified settlement fund," within the meaning of Treasury Regulations section 1.468B-1 for U.S. federal income tax purposes and shall be treated consistently for state and local tax purposes, to the extent applicable.

(b) Each of the Grantor Trust Escrow Accounts (as defined in Exhibit Z of the Master Shareholder Settlement Agreement) shall be structured to qualify as a separate "qualified settlement fund" within the meaning of Treasury Regulations section 1.468B-1 for U.S. federal income tax purposes and shall be treated consistently for state and local tax purposes, to the extent applicable. PRA L.P. or the applicable Shareholder Payment Party shall timely elect pursuant to Treasury Regulations Section 1.468B-1(k) (and any applicable state and local income tax

purposes), to treat each such Grantor Trust Escrow Account as a "grantor trust," all of which is owned, for federal and applicable state and local income tax purposes only, by PRA L.P. or the applicable Shareholder Payment Party. PRA L.P. or the applicable Shareholder Payment Party shall maintain such election and shall not revoke such election without the prior written consent of the Involved Party (as defined in Exhibit Z of the Master Settlement Agreement).

(c)     The Special Operating Reserve and each of the Released Claims Reserves shall each be structured to qualify as a separate "qualified settlement fund" within the meaning of Treasury Regulations section 1.468B-1 for U.S. federal income tax purposes and shall be treated consistently for state and local tax purposes, to the extent applicable. PRA L.P. shall timely elect pursuant to Treasury Regulations Section 1.468B-1(k) (and any applicable state and local income tax purposes), to treat the Special Operating Reserve and each of the Released Claims Reserves as a "grantor trust," all of which is owned, for federal and applicable state and local income tax purposes only, by PRA L.P. PRA L.P. shall maintain such election and shall not revoke such election without the prior written consent of the Master Disbursement Trust and/or the applicable Creditor Trusts.

(d)     Each Creditor Trust (other than any Tribe Trust entity that is formed as a legal entity other than a trust) and each Sub-Qualified Settlement Fund has been or shall be structured to qualify as a separate "qualified settlement fund," and the Initial Private Creditor Trust Distributions, distributions on account of the MDT Private Claims, Public Creditor Trust Distributions, Initial Public Schools Distribution, distributions on account of the MDT Public School Districts Claim, the right to receive Governmental NewCo Distributable Cash, distributions from the PI Trust to a Sub-Qualified Settlement Fund and any other amounts received pursuant to the Plan, as applicable, made to the applicable Creditor Trust or Sub-Qualified Settlement Fund shall be treated as amounts transferred by, or on behalf of, a "transferor" to a "qualified settlement fund," within the meaning of Treasury Regulations section 1.468B-1 for U.S. federal income tax purposes and shall be treated consistently for state and local tax purposes to the extent applicable. The following funds shall be designated as Sub-Qualified Settlement Funds: CLD Purdue BK Qualified Settlement Fund; D. Miller Purdue Qualified Settlement Fund; AT and ASK PRD Qualified Settlement Fund; Hilliard Purdue Qualified Settlement Fund; and Laborde Earles Purdue Qualified Settlement Fund.

(e)     Each Creditor Trust PRA Non-Participating Claims Reserve and each Select Private Creditor Trust Non-Participating Claims Reserve shall be structured to qualify as a separate "qualified settlement fund" within the meaning of Treasury Regulations section 1.468B-1 for U.S. federal income tax purposes and shall be treated consistently for state and local tax purposes, to the extent applicable. PRA L.P. shall timely elect, pursuant to Treasury Regulations Section 1.468B-1(k) (and any applicable state and local income tax purposes), to treat each Creditor Trust PRA Non-Participating Claims Reserve and each Select Private Creditor Trust Non-Participating Claims Reserve as a "grantor trust," all of which is owned, for

federal and applicable state and local income tax purposes only, by PRA L.P. PRA L.P. shall maintain such elections and shall not revoke any of such elections without the prior written consent of the Master Disbursement Trust and the applicable Creditor Trust(s).

16.    <u>Appointment of Managers, Trustees, Etc.</u>    The appointment and, where applicable, the manner of appointment of the MDT Trustees, the MDT Advisory Council Representatives, the NewCo Managers, the NewCo Monitor, the Foundation Trustees, the Plan Administration Trustee, the PPLP Liquidator, the Creditor Trustees, and the Creditor Trust Overseers in accordance with <u>Article V</u> of the Plan, and the exculpation thereof pursuant to <u>Article V</u> of the Plan, is hereby approved.

17.    <u>Release of Liens</u>.  Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan or this Order, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date in accordance with the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, discharged, and compromised, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors or the Liquidating Debtors, as applicable, and all rights, titles, and interests of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall revert to the Liquidating Debtors and their successors and assigns.  The Liquidating Debtors are authorized to file any necessary or desirable documents to evidence such release in the name of the party secured by such pre-Effective Date mortgages, deeds of trust, Liens, pledges, or other security interests.

18.    <u>Executory Contracts and Unexpired Leases</u>.  Entry of this Order shall constitute approval of all amendments, assumptions, assumptions and assignments, and rejections of Executory Contracts and Unexpired Leases provided for under the Plan pursuant to section 365 of the Bankruptcy Code.  Amendments, assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date without the need for any further action or consents that may otherwise be required under applicable non-bankruptcy law.  Any motions to assume, assume and assign, or reject any Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order of the Bankruptcy Court on or after the Effective Date, entry of which shall result in such assumption, assumption and assignment, or rejection becoming effective without need for any further action that may otherwise be required under applicable non-bankruptcy law.

19.    <u>Injunction, Exculpation, Release, Indemnification, Discharge, Settlement, and Compromise</u>.

(a)    The Bankruptcy Court has jurisdiction under 28 U.S.C. § 1334, and authority under 28 U.S.C. § 157, to approve the injunctions, exculpations, releases, indemnifications, discharges, settlements, and compromises set forth in the Plan (including, but not limited to, <u>Sections 10.5</u>, <u>10.6</u>, <u>10.7</u>, <u>10.8</u>, <u>10.10</u>, <u>10.11</u>, <u>10.12</u>, and <u>10.13</u> of the Plan).  Sections 105(a), 1123(b)(3), and 1123(b)(6) of the Bankruptcy Code and Bankruptcy Rule 9019 permit issuance of the injunctions and approval of the exculpations, releases, indemnifications, discharges, settlements, and compromises set forth in the Plan.

(b)    The injunctions, releases, and exculpations set forth in <u>Article X</u> of the Plan, including the Debtor Releases (as defined below), the Third-Party Releases, and the Channeling Injunction, were adequately disclosed and explained in the Disclosure Statement, on the Ballots, and in the Plan.

(c)    The releases by the Debtors and their Estates pursuant to <u>Sections 10.6</u> and <u>10.7</u> of the Plan (the "**Debtor Releases**") represent a valid exercise of the Debtors' business judgment.  For the reasons set forth in the Disclosure Statement and the Confirmation Brief and based on the evidence proffered or adduced at the Confirmation Hearing, the Debtor Releases are (i) an integral and necessary part

of the Plan, (ii) a good faith settlement and compromise of the claims and Causes of Action released, (iii) given in exchange for good and valuable consideration, (iv) appropriately tailored to the facts and circumstances of the Chapter 11 Cases, and (v) given after due notice and opportunity for objection.  The Debtor Releases shall constitute a bar to the Debtors, the Liquidating Debtors, the Transferred Debtors, the Estates, the Plan Administration Trust, the Master Disbursement Trust, the Creditor Trusts, NewCo, any other newly formed Persons that shall be continuing the Debtors' businesses after the Effective Date, or any party purporting to claim through any of the foregoing, from asserting any Released Claim or Shareholder Released Claim released pursuant to Sections 10.6 and 10.7 of the Plan, except as otherwise set forth in the Plan.  The Debtor Releases were negotiated by sophisticated parties represented by able counsel and financial advisors and are the result of an arm's-length negotiation process, including through the Mediation.  The Debtors' pursuit of any Released Claims or Shareholder Released Claims against the Released Parties or the Shareholder Released Parties (but not, for the avoidance of doubt, against any Excluded Party, Shareholder Release Snapback Party or MDT Insurer) would not be in the interests of the Estates' various constituencies because the benefits to the Estates obtained in exchange for granting the releases, including the benefit to the Estate's creditors by virtue of the various intercreditor allocation agreements and settlements reached in Mediation, likely outweigh any potential benefit from pursuing such claims considering the costs and uncertainty involved therein, and the fact that all of the intercreditor allocation agreements and settlements reached in Mediation were conditioned upon the Shareholder Settlement Agreements.  In light of, among other things, the concessions and contributions provided to the Debtors' Estates and the critical nature of the Debtor Releases to the Plan, the Debtor Releases are fair and reasonable, in the best interests of the Estates and their creditors, and appropriate.

(d)     The non-Debtor releases set forth in Sections 10.6 and 10.7 of the Plan (the "**Third-Party Releases**") are appropriate.   The Third-Party Releases are consensual and therefore compliant with *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204 (2024).  The Releasing Parties each provided consent to the Third-Party Releases. The Third-Party Releases are binding on the Releasing Parties, *provided* that such binding effect shall not modify or expand the scope or terms of such Third-Party Releases, which shall in all respects be as set forth in the Plan and Shareholder Settlement Agreements. The Record of the Confirmation Hearing demonstrates the following:

(i)     The consideration under the Master Shareholder Settlement Agreement described in the Disclosure Statement, including up to $7 billion in cash, constitutes a substantial contribution to the Estates and the Debtors' creditors.  The consideration under the Master Shareholder Settlement Agreement includes payments totaling up to $7 billion over fifteen years.  Such payments exceed the value of the Debtors as a going concern.  Such

payments also allow the Debtors to make the payments required under the DOJ Resolution and the Plan Settlements.

(ii)    The Released Claims and Shareholder Released Claims directly impact the Debtors' reorganization.  The appropriate resolution of these claims has been the subject of significant discovery, litigation and mediation in these cases by sophisticated parties from multiple creditor constituencies that were represented by able counsel and financial advisors.

(e)    The injunction provisions set forth in <u>Article X</u> of the Plan, including, without limitation, the Channeling Injunction:  (i) are essential to the Plan; (ii) are necessary to preserve and enforce the discharge and releases set forth in <u>Sections 10.2</u>, <u>10.6</u>, and <u>10.7</u> of the Plan, the exculpation provisions in <u>Section 10.12</u> of the Plan, and the compromises and settlements implemented under the Plan; (iii) are appropriately tailored to achieve that purpose; (iv) are within the jurisdiction of this Court under 28 U.S.C. §§ 1334(a), 1334(b), and 1334(d); (v) are an essential means of implementing the Plan pursuant to section 1123(a)(5) and (b)(6) of the Bankruptcy Code; (vi) are an integral element of the transactions incorporated into the Plan; (vii) confer material benefits on, and are in the best interests of, the Debtors and their Estates, creditors, and other stakeholders; (viii) are critical to the overall objectives of the Plan; and (ix) are consistent with sections 105, 524(e), 1123, and 1129 of the Bankruptcy Code, other provisions of the Bankruptcy Code, and other applicable law.  The injunction provisions set forth in <u>Article X</u> of the Plan, including, without limitation, the Channeling Injunction, were adequately disclosed and explained on the relevant Ballots, in the Disclosure Statement, and in the Plan.  The record of the Confirmation Hearing and the Chapter 11 Cases is sufficient to support the injunction provisions set forth in <u>Article X</u> of the Plan.

(f)    The Released Parties and Exculpated Parties have performed a meaningful role in, and significantly and tangibly contributed to, the Chapter 11 Cases and their resolution, have participated in the Chapter 11 Cases and the Debtors' restructuring in good faith, and have acted in compliance with all provisions of the Bankruptcy Code, including in connection with the negotiation, preparation, and pursuit of Confirmation of the Plan and compromises implemented therein.  Specifically, each of the Released Parties and Exculpated Parties that owed fiduciary duties to the Debtors and their Estates fulfilled such fiduciary duties at all times.

(g)    The Debtors and their management, directors, employees, professionals, attorneys, and advisors (in each case, other than any Excluded Party), have worked diligently (both before and after the Petition Date) in connection with the Debtors' restructuring efforts, by preparing the Chapter 11 Cases, negotiating, formulating, and seeking and obtaining Court approval, as applicable and among other things, of the Restructuring Transactions, the Direct Claims Shareholder Settlement Agreements, the Disclosure Statement, and the Plan.  Throughout the Chapter 11 Cases, the Debtors have fulfilled any fiduciary duties or obligations

owed to the Estates and protected the interests of all the Debtors' constituents. The Debtors and the Released Parties have acted, and will enter into the documents to which they are contemplated to become parties to effectuate the Plan (including the Plan Supplement and Plan Documents), in good faith and are hereby deemed to continue to act in good faith if they (i) proceed to consummate the Plan and the Restructuring Transactions in accordance with the terms thereof and (ii) take the actions authorized or directed by this Order that are consistent with the Plan and Plan Documents. The Debtors fairly and reasonably negotiated the transactions contemplated by the Plan in good faith and at arm's length, and the resulting terms are in the best interests of the Debtors and the Estates.

(h)     The non-Debtor Released Parties and non-Debtor Exculpated Parties assisted the Debtors with negotiating and developing the Plan and the transactions and settlements contemplated thereby, or have agreed to forgo certain rights, make certain concessions, or incur certain obligations to permit recoveries for the Estates' creditors set forth in the Plan which might not otherwise have been achievable.

(i)     Accordingly, and based on the Record before the Bankruptcy Court, each of the injunction, exculpation, release, indemnification, discharge, settlement, and compromise provisions set forth in the Plan (including, but not limited to, Sections 10.5, 10.6, 10.7, 10.8, 10.10, 10.11, 10.12, and 10.13 of the Plan) are (i) the product of extensive good-faith and arm's length negotiations, (ii) fair, equitable, reasonable, and appropriate under the circumstances, (iii) confers a material benefit on, and is in the best interests of, the Debtors, their Estates, and their creditors, (iv) essential, integral, and non-severable components of the Plan, consummation, and resolution of the Chapter 11 Cases, (v) appropriately and narrowly tailored, (vi) supported by good and valuable consideration (including the Released Parties' contributions to facilitate the resolution of the Chapter 11 Cases and implementation of the Plan), (vii) granted after due notice and opportunity for hearing, (viii) consistent with the Bankruptcy Code and applicable law, (ix) intended to promote finality and prevent parties from circumventing or attempting to circumvent the Plan, (x) supported by the Debtors and their key stakeholders, (xi) constitute good-faith compromises and settlements of the matters covered thereby, (xii) with respect to the Third-Party Releases, consensual, (xiii) with respect to the injunction provisions, necessary to preserve and enforce the Plan's discharge, release, and exculpation provisions, and (xiv) are the result of a fair and valid exercise of the Debtors' business judgment.

20.     Term of Injunctions and Case Stipulation.

(a)     Unless otherwise provided in the Plan, all injunctions and stays arising under or entered during the Chapter 11 Cases, whether under section 105 or 362 of the Bankruptcy Code or otherwise, and in existence on the Confirmation Date, including but not limited to the Preliminary Injunction, shall remain in full force

and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

(b)     Notwithstanding the foregoing paragraph 20(a), on the Effective Date, without further action by or order of the Bankruptcy Court:

(i)     any and all obligations of the Shareholder Released Parties arising under the Case Stipulation shall terminate and the Case Stipulation shall be superseded by this Order solely with respect to paragraphs 15, 17, 19, 22 and 25 of the Case Stipulation, and solely as such paragraphs apply to any Shareholder Released Party; *provided* that, for the avoidance of doubt, the terms of such paragraphs shall continue in full force and effect with respect to all other parties (if applicable), and all other provisions of the Case Stipulation shall remain in full force and effect, in each case, unless otherwise provided by the Plan;

(ii)     any and all obligations of any Shareholder Released Party arising under paragraph I of the Voluntary Injunction set forth in Appendix I to the Preliminary Injunction (and any predecessors or successors of the Preliminary Injunction) shall terminate, and the Preliminary Injunction shall be withdrawn, vacated and superseded by this Order solely with respect to paragraph I of the Voluntary Injunction set forth in Appendix I; *provided* that, for the avoidance of doubt, all other provisions of the Preliminary Injunction shall remain in full force and effect, unless otherwise provided by the Plan; and

(iii)     any and all obligations of any Person arising under any subpoenas issued pursuant to any of *Order Pursuant to Federal Rules of Bankruptcy Procedure 2004 and 9016 Authorizing Examination of Third Parties* [D.I. 992] (as amended by the *Amended Order Pursuant to Federal Rules of Bankruptcy Procedure 2004 and 9016 Authorizing Examination of Third Parties* [D.I. 1008]), the *Order Pursuant to Rules 2004 and 9016 of the Federal Rules of Bankruptcy Procedure Authorizing Examinations of Certain Financial Institutions* [D.I. 1143], the *Order Pursuant to Federal Rules of Bankruptcy Procedure 2004 and 9016 Authorizing Examinations of and Document Production by Third Parties* [D.I. 1340] and the *Order Pursuant to Federal Rules of Bankruptcy Procedure 2004 and 9016 Authorizing Examination of Certain Former Debtor Executives, Separately Represented Debtor Personnel, and Norton Rose Fulbright Pursuant to Federal Rules of Bankruptcy Procedure 2004 and 9006* [D.I. 1788] shall terminate.

(c)     Any and all information shared or produced by any Shareholder Released Party pursuant to the agreements or orders referenced in the foregoing paragraph 20(b), including any such information also shared with Persons not party to the Case Stipulation shall remain subject to the confidentiality terms under which it was shared, including any information that was designated under the Protective Order

(or confidentiality agreement that was superseded by the Protective Order), which such information shall remain confidential under the terms of the Protective Order unless such information, materials or documents are included in the Public Document Repository in accordance with the Plan and the Master Shareholder Settlement Agreement.  Names or other identifying information of investments or specific third-party counterparties or advisors with whom or with which a Shareholder Released Party has or had a third-party investment, advisory or business relationship that was disclosed in documents or information produced by a Shareholder Released Party and designated Outside Professional Eyes Only Information under the Protective Order shall retain such designation and be protected accordingly. Notwithstanding the foregoing, the Creditors' Committee may provide to the Master Disbursement Trust any documents and information that it received from any party, including any Shareholder Released Party, through discovery during these Chapter 11 Cases, and such disclosure to the Master Disbursement Trust shall not be deemed to violate the Protective Order or any other confidentiality or non-disclosure agreement that may have governed the production of such documents and information to the Creditors' Committee in the first instance (provided that, for the avoidance of doubt, the terms of such Protective Order or confidentiality or non-disclosure agreements shall permit the prosecution, by the Master Disbursement Trust, of any MDT Causes of Action, and otherwise shall continue otherwise continue to govern the use and retention of such documents and information in all respects, regardless of whether the Master Disbursement Trust is a party to or otherwise subject to such Protective Order or confidentiality or non-disclosure agreements).

(d)     Except as provided in the PI Trust Documents, nothing in the Plan shall either (i) excuse any Person from compliance with any legislative, judicial or administrative subpoena, any civil investigative demand or any request for information made in the course of a government investigation; or (ii) limit any right of any Person with respect to compliance with any legislative, judicial or administrative subpoena, any civil investigative demand or any request for information made in the course of a government investigation.

21.     <u>Injunction Against Interference with Plan</u>.  Subject to <u>Section 12.4</u> of the Plan, upon entry of the Confirmation Order, all Holders of Claims against or Interests in the Debtors, Holders of Channeled Claims, Releasing Parties, Released Parties, Shareholder Released Parties and other parties in interest shall be enjoined from taking any actions directly or indirectly to interfere with the implementation or consummation of the Plan and the Plan Documents.

22.     <u>Plan Injunction</u>.

(a)     Except as otherwise provided in the Plan or in this Order, as of the entry of this Order but subject to the occurrence of the Effective Date, all Persons who have

held, hold or may hold Claims against or Interests in the Debtors are, with respect to any such Claim or Interest, permanently enjoined after the entry of this Order from: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting, directly or indirectly, a Debtor or an Estate or the property of any of the foregoing, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this clause (i) or any property of any such transferee or successor; (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting or otherwise recovering in any manner or by any means, whether directly or indirectly, any judgment, award, decree or order against a Debtor or an Estate or its property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this clause (a) or any property of any such transferee or successor; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against a Debtor or an Estate or any of its property, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons mentioned in this clause (iii) or any property of any such transferee or successor; (iv) acting or proceeding in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan; and (v) commencing or continuing, in any manner or in any place, any action that does not comply, or is inconsistent, with the provisions of the Plan; *provided*, *however*, that nothing contained herein shall preclude such Persons who have held, hold or may hold Claims against or Interests in a Debtor or an Estate from exercising their rights, or obtaining benefits, pursuant to, and consistent with, the terms of the Plan and the Plan Documents.

(b)     All Persons, including all governmental, tax and regulatory authorities, lenders, trade creditors, dealers, customers, employees, litigation claimants and other creditors holding Claims, Liens, Interests, charges, encumbrances and other interests of any kind or nature whatsoever, including rights or Claims based on any successor or transferee liability, against or in a Debtor, the NewCo Transferred Assets, the MDT Transferred Assets or the PAT Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or noncontingent, known or unknown), arising under or out of, in connection with, or in any way relating to the Debtors, the NewCo Transferred Assets, the MDT Transferred Assets, the PAT Assets, the operation of the NewCo Transferred Assets prior to the Effective Date or the Restructuring Transactions are forever barred, estopped and permanently enjoined from asserting against the Released Parties, their respective successors and assigns, their property, the NewCo Transferred Assets, the MDT Transferred Assets or the PAT Assets, any Released Claim or any other Cause of Action the assertion of which does not comply with or is inconsistent with the provisions of the Plan, including, without limitation, by: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or

-24-

affecting, directly or indirectly, a Released Party, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this clause (i) or any property of any such transferee or successor; (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting or otherwise recovering in any manner or by any means, whether directly or indirectly, any judgment, award, decree or order against a Released Party, or any direct or indirect transferee of any property of, or direct or indirect successor-in-interest to, any of the foregoing Persons mentioned in this clause (ii) or any property of any such transferee or successor; (iii) creating, perfecting or otherwise enforcing any encumbrance of any kind or asserting any Released Claims in any manner, directly or indirectly, against a Released Party or any of its property, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons mentioned in this clause (iii) or any property of any such transferee or successor; (iv) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan; and (v) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan.

23.    <u>Channeling Injunction</u>.

(a)    As of the Effective Date, in order to preserve and promote the settlements contemplated by and provided for in the Plan and to supplement, where necessary, the injunctive effect of the Plan Injunction, the Estate Releases and the Shareholder Releases described in <u>Sections 10.5</u>, <u>10.6</u> and <u>10.7</u> of the Plan, and pursuant to the exercise of the equitable jurisdiction and power of the Bankruptcy Court under section 105(a) of the Bankruptcy Code, all Persons that have held or asserted, that hold or assert or that may in the future hold or assert any Channeled Claim shall be permanently and forever stayed, restrained and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering or receiving payments, satisfaction, recovery or judgment of any form from or against any Protected Party with respect to any Channeled Claim, including:

(i)    commencing, conducting or continuing, in any manner, whether directly or indirectly, any suit, action or other proceeding, in each case, of any kind, character or nature, in any forum in any jurisdiction with respect to any Channeled Claims, against or affecting any Protected Party, or any property or interests in property of any Protected Party with respect to any Channeled Claims;

(ii)    enforcing, levying, attaching, collecting or otherwise recovering, by any means or in any manner, either directly or indirectly, any judgment, award, decree or other order against any Protected Party or against the property of any Protected Party with respect to any Channeled Claims;

(iii)    creating, perfecting or enforcing, by any means or in any manner, whether directly or indirectly, any Lien of any kind against any Protected Party or the property of any Protected Party with respect to any Channeled Claims;

(iv)    asserting or accomplishing any setoff, right of subrogation, indemnity, contribution or recoupment of any kind, whether directly or indirectly, in respect of any obligation due to any Protected Party or against the property of any Protected Party with respect to any Channeled Claims; and

(v)    taking any act, by any means or in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan Documents, with respect to any Channeled Claims.

(b)    Notwithstanding anything to the contrary in <u>Section 10.8</u> of the Plan or this Order, this Channeling Injunction shall not stay, restrain, bar or enjoin:

(i)    the rights of Holders of Channeled Claims to the treatment afforded them under the Plan and the Plan Documents, including the rights of Holders of Channeled Claims to assert such Channeled Claims solely in accordance with <u>Section 6.21</u> of the Plan, the Master TDP and the Creditor Trust TDPs, in each case whether or not there are funds to make Distributions in respect of such Channeled Claims and whether or not such rights entitle such Holders to any Distributions;

(ii)    the rights of Persons to assert any claim, debt, litigation or liability for payment of Creditor Trust Operating Expenses solely against the applicable Creditor Trust;

(iii)    the rights of Persons to assert any claim, debt or litigation against any Excluded Party;

(iv)    the rights of the Master Disbursement Trust to pursue and enforce the MDT Shareholder Rights, the MDT Insurance Rights and the MDT Causes of Action or any other rights afforded to the Master Disbursement Trust pursuant to the Plan, the Plan Documents, the Master Shareholder Settlement Agreement and/or the Direct Shareholder Settlement Agreements;

(v)    the rights of the parties to the LRP Agreement to enforce the terms thereof in accordance with the Plan;

(vi)    the Creditor Trusts from enforcing their respective rights against the Master Disbursement Trust under the Plan, the Master Shareholder Settlement Agreement and the MDT Documents;

(vii)    the Creditor Trusts from enforcing their respective rights against the Payment Parties under the Plan or the Master Shareholder Settlement Agreement; or

(viii)   the Master Disbursement Trust and the Plan Administration Trust from enforcing their rights against NewCo under the Plan.

(c)    Upon the filing of a Notice of Shareholder Release Snapback, the Channeling Injunction shall terminate, be rescinded and have no application, without further order of the Bankruptcy Court, to any suit, action or other proceeding, in each case, of any kind, character or nature, brought against any member of the Breaching Shareholder Family Group and any Designated Shareholder Released Party by the Master Disbursement Trust (or if such claims cannot be assigned to the Master Disbursement Trust, by a Releasing Party for the benefit of the Master Disbursement Trust); *provided*, *however*, that the extension of time provided by Section 10.9(a) of the Plan shall continue in effect in accordance with its terms; *provided further* that, for the avoidance of doubt, notwithstanding the termination and rescission pursuant to Section 10.8(c) of the Plan, the Channeling Injunction shall continue in effect for, and shall be fully enforceable by and for the benefit of, all other Protected Parties, including all other Shareholder Released Parties, other than the Breaching Shareholder Family Group and the Designated Shareholder Released Parties; and *provided further* that, in the event of the filing of a Notice of Shareholder Release Snapback, any determination made in the claims resolution process in accordance with Section 7.6 of the Plan will not be binding against any party.

(d)    Except as expressly set forth in Section 10.8(c) of the Plan, there can be no modification, dissolution or termination of the Channeling Injunction, which shall be a permanent injunction.

(e)    Except as expressly set forth in Sections 10.8(b) and 10.8(c) of the Plan, nothing in the Plan, the MDT Documents or the Creditor Trust Documents shall be construed in any way to limit the scope, enforceability or effectiveness of the Channeling Injunction issued in connection with the Plan.

(f)    The Debtors' compliance with the requirements of Bankruptcy Rule 3016 shall not constitute an admission that the Plan provides for an injunction against conduct not otherwise enjoined under the Bankruptcy Code.

24.    Tolling of Shareholder Released Claims; Violations of Shareholder Releases and Channeling Injunction.

(a)    Any and all periods for commencing or continuing any Tolled Claim (as defined in the Master Shareholder Settlement Agreement), whether fixed by statute, agreement, order, or otherwise, shall not expire until the latest of (i) the end of such period; (ii) with respect to the applicable Shareholder Family Group and any

Designated Shareholder Released Party, two hundred twenty-five (225) days after the filing of a Notice of Shareholder Release Snapback with respect to such Shareholder Family Group; (iii) with respect to the applicable Shareholder Family Group and any Designated Shareholder Released Party, when such Shareholder Family Group fulfills its payment obligations under the Shareholder Settlement Agreements; and (iv) with respect to the applicable Shareholder Released Party that is a Subsidiary (as defined in the Master Shareholder Settlement Agreement) of a Shareholder Payment Party, two hundred twenty-five (225) days after the reinstatement of any Estate Cause of Action against such Shareholder Released Party pursuant to Section 10.19 of the Plan.  No Shareholder Released Party or any other signatory to the Master Shareholder Settlement Agreement shall assert otherwise (including through defenses of (x) statute of limitations, statute of repose, laches or inadequate tolling, or (y) that any release granted to any other Shareholder Released Party, but not made void pursuant to the terms of Section 9.02(a)(ii)(B) of the Master Shareholder Settlement Agreement has the effect of precluding such claim against such Shareholder Released Party or other signatory hereto), but excluding any defense of inadequate tolling only to the extent it could have been raised on and as of the Petition Date)) in the litigation of any such Tolled Claim. Each party to the Master Shareholder Settlement Agreement and each Shareholder Released Party consents to the jurisdiction of the Bankruptcy Court to finally determine any disputes arising out of, related to, or in connection with the construction or interpretation of these tolling provisions, including without limitation any issues related to any period for commencing or continuing any Tolled Claim under section 9.02(ii)(B) of the Master Shareholder Settlement Agreement. For the avoidance of doubt, the foregoing extension of time periods shall not apply in connection with litigation brought by any Non-Enforcing Party.

(b)     In the event that any Person takes any action that a Shareholder Released Party believes violates the Shareholder Releases or Channeling Injunction as it applies to any Shareholder Released Party, such Shareholder Released Party shall be entitled to make an emergency application to the Bankruptcy Court for relief, and may proceed by contested matter rather than by adversary proceeding.  The Bankruptcy Court shall have jurisdiction and authority to enter final orders in connection with any dispute over whether an action violates the Shareholder Releases or Channeling Injunction.  Upon determining that a violation of the Shareholder Releases or Channeling Injunction has occurred, the Bankruptcy Court, in its discretion, may award any appropriate relief against such violating Person, including, but not limited to, (i) disgorgement from the violating Person of any funds, assets or other value received, directly or indirectly, pursuant to the Plan or Plan Documents (including fees and expenses paid pursuant to the Plan or Plan Documents on account of legal or other advisory services rendered to or for the benefit of the violating Person); (ii) the termination of any rights of the violating Person to receive any funds, assets or other value pursuant to the Plan or Plan Documents; (iii) the reduction of any payments owed by any Shareholder Released Parties under the Shareholder Settlement Agreements to the violating Person in an amount equal to the amount of disgorgement ordered from, or the reduction of future payments ordered to be made to, or on account of, the

violating Person (subject to the right of the violating Person to request that any amounts actually disgorged from such violating Person offset any reduction of future payments ordered to be made to, or on account of, such violating Person); (iv) an admonition, reprimand or censure of, or citation of contempt by, the violating Person and its counsel; (v) a fine or penalty paid into the Bankruptcy Court; (vi) a bond or other security in an amount equal to any financial obligation ordered by the Bankruptcy Court in respect of the violation; (vii) an appropriate sanction on any attorney or law firm responsible for the violation; (viii) injunctive relief to prevent future violations by the Person or its counsel; and (ix) attorney and other professional fees incurred by any Shareholder Released Party arising from the violation.  The provision of any one form of relief shall not preclude the provision of any other form of relief.

25.    <u>MDT Insurer Injunction</u>.

(a)    In accordance with section 105(a) of the Bankruptcy Code, upon the occurrence of the Effective Date, all Persons that have held or asserted, that hold or assert or that may in the future hold or assert any Claim based on, arising under or attributable to an MDT Insurance Policy shall be, and hereby are, permanently stayed, restrained and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering or receiving payment or recovery on account of any such Claim based on, arising under or attributable to an MDT Insurance Policy from or against any MDT Insurer, including:

   (i)    commencing, conducting or continuing, in any manner, any action or other proceeding of any kind (including an arbitration or other form of alternate dispute resolution) against any MDT Insurer, or against the property of any MDT Insurer, on account of any Claim based on, arising under or attributable to an MDT Insurance Policy;

   (ii)    enforcing, attaching, levying, collecting or otherwise recovering, by any manner or means, any judgment, award, decree or other order against any MDT Insurer, or against the property of any MDT Insurer, on account of any Claim based on, arising under or attributable to an MDT Insurance Policy;

   (iii)    creating, perfecting or enforcing in any manner any Lien of any kind against any MDT Insurer, or against the property of any MDT Insurer, on account of any Claim based on, arising under or attributable to an MDT Insurance Policy;

   (iv)    asserting or accomplishing any setoff, right of subrogation, indemnity, contribution or recoupment of any kind, whether directly or indirectly, against any obligation due to any MDT Insurer, or against the property of any MDT Insurer, on account of any Claim based on, arising under or attributable to an MDT Insurance Policy; and

(v)    taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan applicable to any Claim based on, arising under or attributable to an MDT Insurance Policy.

(b)    The provisions of this MDT Insurer Injunction shall not preclude the Master Disbursement Trust from pursuing any Claim based on, arising under or attributable to an MDT Insurance Policy, or any other claim that may exist under any MDT Insurance Policy against any MDT Insurer, or enjoin the rights of the Master Disbursement Trust to prosecute any action based on or arising from the MDT Insurance Policies or the rights of the Master Disbursement Trust to assert any claim, debt, obligation, cause of action or liability for payment against an MDT Insurer based on or arising from the MDT Insurance Policies.  The provisions of this MDT Insurer Injunction are not issued for the benefit of any MDT Insurer, and no such insurer is a third-party beneficiary of this MDT Insurer Injunction.  This MDT Insurer Injunction shall not enjoin, impair or affect (i) any claims between or among MDT Insurers that are not Settling MDT Insurers; (ii) the rights of current and former directors, officers, employees and authorized agents of the Debtors that are not Sackler Family Members that are preserved under the Plan; or (iii) the terms of the Master Shareholder Settlement Agreement with respect to the MDT Shareholder Insurance Rights. For the avoidance of doubt, with respect to a Person that purports to be insured under any MDT Insurance Policy, the MDT Insurer Injunction shall enjoin only derivative claims and rights. Nothing in this Order or the Plan shall determine whether any Claim or right under any MDT Insurance Policy is either derivative or direct, or otherwise would be disallowed or subordinated under the Bankruptcy Code, which determination shall be made, as necessary, to the extent such Claim or right is not otherwise released under this Plan, in accordance with applicable law. For the avoidance of doubt, the MDT Insurer Injunction shall not enjoin or release Settling Co-Defendant's Direct Insurance Interests, if any, in any MDT Insurance Policies or Purdue Insurance Policies, and Section 8.4 of the Plan controls over any contrary terms or provisions of this Order

(c)    To the extent the MDT Trustees make a good faith determination that some or all of the MDT Insurance Proceeds are substantially unrecoverable by the Master Disbursement Trust, the Master Disbursement Trust shall have the sole and exclusive authority at any time, upon written notice to any affected MDT Insurer, to terminate, reduce or limit the scope of this MDT Insurer Injunction with respect to any MDT Insurer; *provided* that any termination, reduction, or limitation of the MDT Insurer Injunction (A) shall apply in the same manner to all beneficiaries of the Creditor Trusts that are MDT Beneficiaries and (B) shall comply with any procedures set forth in the MDT Agreement.

(d)    Except as set forth in subparagraphs (b) and (c) of this paragraph 25, nothing in the Plan, the MDT Documents or the Creditor Trust Documents shall be construed in any way to limit the scope, enforceability or effectiveness of the MDT Insurer Injunction issued in connection with the Plan.

26.    Settling MDT Insurer Injunction.

(a)    In accordance with section 105(a) of the Bankruptcy Code, upon the occurrence of the Effective Date, all Persons that have held or asserted, that hold or assert or that may in the future hold or assert any Claim based on, arising under or

attributable to an MDT Insurance Policy shall be, and hereby are, permanently stayed, restrained and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering or receiving payment or recovery on account of any such Claim based on, arising under or attributable to an MDT Insurance Policy from or against any Settling MDT Insurer, solely to the extent that such Settling MDT Insurer has been released from such Claim under such MDT Insurance Policy pursuant to an MDT Insurance Settlement, including:

    (i)    commencing, conducting or continuing in any manner any action or other proceeding of any kind (including an arbitration or other form of alternate dispute resolution) against any such Settling MDT Insurer, or against the property of such Settling MDT Insurer, on account of such Claim based on, arising under or attributable to such MDT Insurance Policy;

    (ii)    enforcing, attaching, levying, collecting or otherwise recovering, by any manner or means, any judgment, award, decree or other order against any such Settling MDT Insurer, or against the property of such Settling MDT Insurer, on account of such Claim based on, arising under or attributable to such MDT Insurance Policy;

    (iii)    creating, perfecting or enforcing in any manner any Lien of any kind against any such Settling MDT Insurer, or against the property of such Settling MDT Insurer, on account of such Claim based on, arising under or attributable to such MDT Insurance Policy;

    (iv)    asserting or accomplishing any setoff, right of subrogation, indemnity, contribution or recoupment of any kind, whether directly or indirectly, against any obligation due to any such Settling MDT Insurer, or against the property of such Settling MDT Insurer, on account of such Claim based on, arising under or attributable to such MDT Insurance Policy; and

    (v)    taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan applicable to such Claim based on, arising under or attributable to such MDT Insurance Policy.

(b)    Any right, Claim or cause of action that an Insurance Company may have been entitled to assert against any Settling MDT Insurer but for the Settling MDT Insurer Injunction, if any such right, Claim or cause of action exists under applicable non-bankruptcy law, shall become a right, Claim or cause of action solely as a setoff claim against the Master Disbursement Trust and not against or in the name of the Settling MDT Insurer in question. Any such right, Claim or cause of action to which an Insurance Company may be entitled shall be solely in the form of a setoff against any recovery of the Master Disbursement Trust from that Insurance Company, and under no circumstances shall that Insurance Company receive an affirmative recovery of funds from the Master Disbursement Trust or any Settling MDT Insurer for such right, Claim or cause of action. In determining the amount of any setoff, the Master Disbursement Trust may assert any legal or equitable rights the Settling MDT Insurer would have had with respect to any right,

Claim or cause of action. For the avoidance of doubt, the Settling MDT Insurer Injunction shall not enjoin or release Settling Co-Defendant's Direct Insurance Interests, if any, in any MDT Insurance Policies or Purdue Insurance Policies, and <u>Section 8.4</u> of the Plan controls over any contrary terms or provisions of this Order.

(c)    There can be no modification, dissolution or termination of the Settling MDT Insurer Injunction, which shall be a permanent injunction.

(d)    Except as set forth in subparagraphs (b) and (c) of this paragraph 26, nothing in the Plan, the MDT Documents or the Creditor Trust Documents shall be construed in any way to limit the scope, enforceability or effectiveness of the Settling MDT Insurer Injunction issued in connection with the Plan.

27.    <u>Co-Defendant Defensive Rights</u>.    Except as provided in the MDT Insurer Injunction, the Settling MDT Insurer Injunction or clause (ii) of the penultimate sentence of <u>Section 10.18</u> of the Plan, notwithstanding anything to the contrary in <u>Article X</u> of the Plan or in the Plan as it currently exists or as it might be further amended, this Order or any order entered in connection with the Plan (or the Plan as amended) (or any such order, as amended, modified or supplemented), or any supplement to the Plan (or the Plan as amended), nothing contained in the Plan or any of the foregoing documents or orders (including, without limitation, the classification, treatment, allowance, disallowance, release, bar, injunction, Channeling Injunction or any other provision of the Plan or the Plan as amended with respect to, impacting, affecting, modifying, limiting, subordinating, impairing, in any respect, a Co-Defendant Claim), will release, bar, enjoin, impair, alter, modify, amend, limit, prohibit, restrict, reduce, improve or enhance any Co-Defendant Defensive Rights of any Holder of a Co-Defendant Claim or Excluded Party as such rights exist or might in the future exist under applicable non-bankruptcy law.  Nothing in the Plan, any of the Plan Documents or in this Order shall preclude, operate to or have the effect of, impairing any Holder of a Co-Defendant Claim or Excluded Party from asserting in any proceeding any and all Co-Defendant Defensive Rights that it has or may have under applicable law.  Nothing in the Plan, any of the Plan Documents or this Order shall be

deemed to waive any Co-Defendant Defensive Rights, and nothing in the Chapter 11 Cases, the

Plan, any of the Plan Documents or this Order may be used as evidence of any determination

regarding any Co-Defendant Defensive Rights, and under no circumstances shall any Person be

permitted to assert issue preclusion or claim preclusion, waiver, estoppel or consent in response

to the assertion of any Co-Defendant Defensive Rights.  Co-Defendant Defensive Rights (i) may

be used to offset, set-off, recoup, allocate or apportion fault, liability, or damages, or seek

judgment reduction or otherwise defend against any Cause of Action brought by any Person

against the Holder of any Co-Defendant Claim or the Excluded Party based in whole or in part

on Opioid-Related Activities and (ii) subject to Section 8.4 of the Plan, shall in no case be used

to seek or obtain any affirmative monetary recovery from any Protected Party or any Asset of any

Protected Party (including from any Purdue Insurance Policy or any other insurance policy of a

Protected Party) on account of any Released Claim or Shareholder Released Claim.   The

foregoing does not constitute a release of any Co-Defendant's Class 14 Claim or any other

Excluded Party's Class 11(c) Claim.

28.    Injunction Related to Releases and Exculpation.   To the maximum extent

permitted under applicable law, this Order shall permanently enjoin the commencement or

prosecution by any Person, whether directly, derivatively or otherwise, of any Causes of Action

released pursuant to the Plan, including, without limitation, the Causes of Action released or

exculpated in the Plan and with respect to any Claims, Interests, Liens, other encumbrances or

liabilities that are subject to Sections 5.3(b), 5.4(c) or 5.6(b) of the Plan (but, for the avoidance of

doubt, excluding any Excluded Claims).

29.    Operating Injunction and Governance Covenants.    The NewCo Operating

Injunction set forth in **Exhibit B** hereto and the NewCo Governance Covenants set forth in

**Exhibit C** hereto shall bind NewCo and any successor owner of NewCo's opioid business to the extent set forth therein.

30.    <u>DOJ Forfeiture Judgment Credit</u>.  The aggregate amount of value distributed or otherwise conferred by the Debtors in respect of Non-Federal Domestic Governmental Claims and Tribe Claims under the Plan exceeds $1.775 billion.

31.    <u>Timney and Stewart Stipulation</u>.  The *Stipulation in Connection with the Debtors' Chapter 11 Plan of Reorganization* [D.I. 7948] between the Debtors, Mark Timney, a former officer of Purdue, and John H. Stewart, a former officer of Purdue, and acknowledged and agreed to by the Creditors' Committee, the Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants and the Multi-State Governmental Entities Group, was entered into as of October 6, 2025, and is hereby approved and so ordered.

32.    <u>Baltimore Stipulation</u>.  The *Stipulation Resolving the Objection of the Mayor & City Council of Baltimore to the Debtors' Chapter 11 Plan of Reorganization* [D.I. 8134] between the Debtors, Mayor & City Council of Baltimore, and acknowledged and agreed to by the Creditors' Committee, the Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants, The Raymond Sackler Family and Beacon Company (the "**Baltimore Stipulation**"), was entered into as of November 3, 2025, and is hereby approved and so ordered. Any objection to the Allowance of the Baltimore Proof of Claim (as defined in the Baltimore Stipulation) filed by any party shall be held in abeyance and shall not be adjudicated or advanced during the Standstill Period (as defined in the Baltimore Stipulation).

33.    <u>Shareholder Settlement Document Undertakings</u>.

(a)    **Settlement Stipulation Acknowledgment**.  The rights and obligations set forth in the *Settlement Stipulation Dismissing Proceedings Without Prejudice* [D.I. 7713, Exhibit A] (the "**Settlement Stipulation**"), of Richard S. Sackler and Lin Gao (together, the "**RSS Parties**") and the Litigation Parties defined thereunder

remain in full force and effect including the acknowledgments and agreement contained therein that they will not directly or indirectly (i) interfere, now or at any time in the future, with any Trustees' (as defined in the Settlement Stipulation), Shareholder Payment Parties' or the B-Side Payment Group 1's ability to consummate, implement, and perform under the Plan and Shareholder Settlement Agreements; (ii) take (or fail to take) any action that interferes with, delays, frustrates, or impairs the ability of any party to enter into or satisfy its obligations under the Plan or the Shareholder Settlement Agreements, or that would undermine the validity or enforceability of the Plan or the Shareholder Settlement Agreements (including, without limitation, by exercising or purporting to exercise a power of appointment over property held by a Shareholder Payment Party that is in a trust in a manner that interferes with, adversely affects, or undermines the Plan or the Shareholder Settlement Agreements); and (iii) assist or conspire with any other person to take any such action.

**Nothing herein shall modify or limit the rights of any party under the Settlement Stipulation**.  This Order is intended, among other things, to implement the obligations set forth in the Settlement Stipulation and shall not extend, broaden, or limit any rights, defenses, claims, or positions of the any of the Parties to the Settlement Stipulation in the pending litigation that is the subject of the Settlement Stipulation.  Nothing herein shall modify or limit the rights of any party under the Settlement Stipulation, nor shall any provision herein be construed to affect any party's rights in the Settlement Stipulation or in the pending litigation that is the subject of the Settlement Stipulation.

(b)      **Compliance with the Settlement, Stipulation and Plan**.  In furtherance of the Plan and the Shareholder Settlement Agreements, each of the RSS Parties and the other members of the B-1 Payment Group are hereby directed to comply with the foregoing.

(c)      **Finalization of Certain Documents by Certain Sackler Payment Parties by December 19, 2025**.  All relevant parties, including each Sackler Payment Party that is subject thereto, the Creditors' Committee, the Debtors, the Ad Hoc Committee and the States AG Negotiating Group, are further directed and ordered to negotiate in good faith to finalize by no later than December 19, 2025, Annex E and Annex F, which shall be consistent with (x) the applicable term sheets set forth on Exhibits A-32 and A-33 to the *Notice of Filing of Fifth Plan Supplement Pursuant to the Fifteenth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 8201] and (y) the Settlement Stipulation, as applicable, and, in each case, shall otherwise be in form and substance reasonably acceptable to a supermajority of Sackler Payment Parties subject thereto.

(d)      **Finalization of All Documents by January 30, 2026**.  It is further directed and ordered that all other remaining documentation necessary or appropriate to implement the Plan and Shareholder Settlement Agreements and the transactions contemplated thereby, including, without limitation, the remaining exhibits, annexes, collateral documents and ancillary documents to the Shareholder Settlement Agreements, shall be finalized no later than January 30, 2026.

(e)    **Negotiation and Execution by Richard S. Sackler of Certain Documents by December 19, 2025**.  In addition, and without limiting the foregoing, Richard S. Sackler is directed and ordered to: (I)   negotiate in good faith and finalize Annex G to the Master Shareholder Settlement Agreement, and (II) complete and irrevocably execute each of the following documents (collectively, the "**Specified Settlement Documents**") once such documents have been agreed to by a supermajority of the Sackler Payment Parties that are party thereto, and deliver the Specified Settlement Documents to the Debtors, the Creditors' Committee, the Ad Hoc Committee, and the State AG Negotiating Committee as soon as reasonably practicable, and in any event no later than December 19, 2025, or such later date as such documents have been finalized (the "**Specified Settlement Document Deadline**"): (A) the Master Shareholder Settlement Agreement; and (B) each of the following exhibits and annexes to the Master Shareholder Settlement Agreement: (i) Exhibit Y (Confessions of Judgment); (ii) Exhibit P-2 (Form of Further Assurances Undertaking of an Assuring Party with respect to the JDS Estate or a Trust that is part of the B-Side Payment Group); and (iii) the applicable pledge and security agreements contemplated by Annex E and Annex G.  All executed Specified Settlement Documents shall be held in escrow by the Debtors and released automatically on the Effective Date of the Plan without any further action by the RSS Parties.

(f)    **Further Assurances by the RSS Parties**.  In addition, and without limiting the foregoing, the RSS Parties are further directed and ordered to timely execute, deliver, and perform all other documentation necessary or appropriate to effectuate the Plan and the Shareholder Settlement Agreements (including but not limited to documentation in connection with any Permitted Trust Restructurings as contemplated by Exhibits A-32 and A-33).

(g)    **Further Assurances by the B-1 Payment Group Parties other than the RSS Parties**. In addition, and without limiting the foregoing, the B-1 Payment Group Parties other than the RSS Parties are further directed and ordered to timely execute, deliver, and perform all other documentation necessary or appropriate to effectuate the Plan and the Shareholder Settlement Agreements (including but not limited to documentation in connection with any Permitted Trust Restructurings as contemplated by Exhibits A-32 and A-33).

(h)    **December 12 Status Conference**.  A status conference shall be held before the Bankruptcy Court on December 12, 2025, at which Richard S. Sackler, Richard S. Sackler's counsel, trustees of other members of the B1 Payment Group and counsel for such trustees shall appear before the Bankruptcy Court to report on, and demonstrate compliance with, the obligations and provisions set forth herein.

(i)    **Compelling Performance**.  The Bankruptcy Court, pursuant to sections 105(a) and 1142(b) of the Bankruptcy Code, may compel compliance with this Order, including but not limited to appointing an independent representative or other fiduciary with full authority to act on behalf of Richard S. Sackler in any and all capacities in which he is required to act (whether individually, as trustee, or in any other fiduciary capacity), to execute, deliver, or otherwise effectuate any documents required with respect to the payment obligations of the B-1 Payment Group Parties, including Richard S. Sackler.

(j)    **Bankruptcy Court Jurisdiction/Sanctions**.  The Bankruptcy Court shall retain exclusive jurisdiction of all matters arising under, arising out of, or related to the obligations set

forth herein, including to resolve any dispute or failure of performance by Richard S. Sackler or any other party, and to impose sanctions, including, without limitation, findings of contempt, monetary sanctions, or such other relief as the Bankruptcy Court determines appropriate for any failure to negotiate in good faith or otherwise comply with any obligation set forth herein.

34.    <u>Retention of Jurisdiction</u>.    Except as provided in <u>Section 11.1</u> of the Plan, notwithstanding the entry of this Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction of all matters arising under, arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for the purposes set forth in <u>Section 11.1</u> of the Plan.  The Court shall retain concurrent, rather than exclusive, jurisdiction of all matters set forth in Section 11.1(b) of the Plan.  Consistent with <u>Section 11.1(f)</u> of the Plan, and as of the earlier of the Effective Date or the expiration of the Preliminary Injunction, all Persons are permanently enjoined from commencing, conducting, or continuing, directly or indirectly, any litigation or prosecution of an Estate Cause of Action; *provided*, *however*, that nothing in this paragraph shall preclude NewCo, the Plan Administration Trust, each Creditor Trust or the Master Disbursement Trust from pursuing any Retained Cause of Action vested in or transferred to such entity pursuant to the Plan.  Subject to Sections 10.5 through 10.13 of the Plan, all such Retained Causes of Action shall be transferred to the Master Disbursement Trust, the Plan Administration Trust, the applicable Creditor Trust or NewCo, as applicable, which shall have, retain, reserve and be entitled to assert all such Retained Causes of Action in accordance with the Plan as fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and equitable rights with respect to any Claim or Interest may be asserted after the Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

35.    Any Person seeking to commence, conduct, or continue litigation or prosecution of a Cause of Action against a Shareholder Released Party or a Released Party may, but is not

required to, seek a prior determination in the Bankruptcy Court that a Cause of Action is not an Estate Cause of Action.    If any Person commences, conducts or continues litigation or prosecution of such Cause of Action without a prior determination by the Bankruptcy Court, the Person against which such Cause of Action was asserted, and the Master Disbursement Trust or NewCo, shall be entitled to make an emergency application to the Bankruptcy Court for a determination that such Cause of Action is an Estate Cause of Action and therefore in violation of <u>Section 11.1(f)</u> of the Plan.

36.    <u>Evidentiary Stipulation</u>.    In the event there is litigation against a Shareholder Released Party as a result of a Notice of Shareholder Release Snapback, as defined in the Plan, no party (a "**Non-Prejudiced Party**," which term shall include any party as a result of the Plan), shall be prejudiced in any way in connection with such snapback litigation by its decision to (i) limit or forgo the presentation of evidence (or forgo cross examination of any witness) or (ii) forgo or not participate in any argument regarding such evidence during oral argument, in each case in connection with the Confirmation of the Plan (including at the Confirmation Hearing).    If Plan Confirmation is reversed on appeal, no Non-Prejudiced Party shall be prejudiced in any way in connection with any future proceeding based on its decision to (i) limit or forgo the presentation of evidence (or forgo cross examination of any witness) or (ii) forgo or not participate in any argument regarding such evidence during oral argument, in each case in connection with the Confirmation of the Plan (including at the Confirmation Hearing).    Nothing that occurs at the Confirmation Hearing (or related thereto) shall constitute or be deemed agreement or disagreement in any future proceeding or snapback litigation by any Non-Prejudiced Party with any position taken or evidence offered or argument made (at oral argument) by any other party at the Confirmation Hearing, *provided* that nothing herein shall

operate to limit or reduce the binding nature of the Plan, this Order, and any related findings on any party. For the avoidance of doubt, all parties agree and acknowledge that the Debtors, the Creditors' Committee, the Master Disbursement Trust, any Holder of a Channeled Claim that is not objecting to the Plan, and any Shareholder Released Party subject to snapback litigation is intended to be a "Non-Prejudiced Party."

37.    <u>Timing of Opt-In Release Elections</u>.  Notwithstanding anything to the contrary in the Solicitation Procedures Order, no election to opt-in to the Third-Party Releases by means of a Ballot shall be required to be treated by the Solicitation Agent as valid unless such election is received by the Solicitation Agent no later than March 1, 2026.

38.    <u>No Precedent</u>.  The "allocation" of dollars between the Shareholder Direct Settlement Portion of any Distribution and the Estate Distributions is part of an overall compromise and settlement under Bankruptcy Rule 9019 between the Mediation Parties, including the Debtors, the Creditors' Committee, the Shareholder Payment Parties, and all creditors and creditor groups that are Mediation Parties, and upon confirmation of this Plan will be deemed to be a settlement between the Debtors, the Creditors' Committee, the Supporting Claimants and the Shareholder Payment Parties in which, among other things, the Shareholder Payment Parties are providing up to $6.5 billion in consideration over 15 years. The "allocation" is intended by the Shareholder Payment Parties and the other Mediation Parties to, among other things, facilitate the distribution of proceeds for opioid abatement, victim compensation, and other permitted uses under the Plan, and otherwise.  Neither the settlement amount nor the "allocation" (including any allocation between the Shareholder Payment Party of payment responsibility) reflects any concession or agreement by any party as to the strength, validity, merits, collectability, amount, or otherwise of the Shareholder Released Estate Claims or of the

Shareholder Released Direct Claims or any defenses to the Shareholder Released Estate Claims

or the Shareholder Released Direct Claims, and if for whatever reason the agreement in principle

is not consummated, neither the settlement amount nor the "allocation" shall be cited or used by

the Debtors, the Creditors' Committee, the Supporting Claimants or the Shareholder Payment

Parties (or the Released Parties) – or any party to the Shareholder Settlements or any other

Mediation Party – for any purpose whatsoever in any pleading or proceeding wherever or

whenever. Further, no party to the compromise and settlement will be bound by this Plan or the

agreement set forth in this provision (other than as set forth Section 5.2(d) of the Plan) with

regard to what it may state in a pleading, court hearing, proceeding, or otherwise about the

strength, validity, merits, collectability, amount, or otherwise of the Shareholder Released Estate

Claims or of the Shareholder Released Direct Claims, or any defenses thereto, including, without

limitation, in any pleading filed in connection with the Shareholder Settlements and this Plan.

This paragraph shall be binding forever upon all parties from the time that this Order becomes

effective, regardless of whether a settlement including that represented in the Plan is

consummated and shall be specifically enforceable by the Bankruptcy Court (with no cap on

damages that may be awarded).   This paragraph is specifically subject to Federal Rule of

Evidence 408 and analogous state provisions barring the use of settlement offers and

communications to prove the validity or amount of disputed claims.

39.    Successors and Assigns.   The rights, benefits and obligations of any Person

named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir,

executor, administrator, successor or permitted assign, if any, of each such Person.

40.    Further Assurances.  PRA, L.P., each Family Member (as defined in the Master

Shareholder Settlement Agreement), the Debtors, the Holders of Claims and Channeled Claims

receiving Distributions under the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan, the Settlement Agreements and the agreements and instruments contemplated therein (including, without limitation, the Collateral Documents (as defined in the Master Shareholder Settlement Agreement)), including, without limitation, to cause the satisfaction of all conditions to effectiveness of the Plan, the Settlement Agreements and such documents and instruments (including, without limitation, the effectiveness of such document and agreements generally, the effectiveness of any releases granted thereunder and the effectiveness of any obligations to make payments thereunder) and to comply with their respective obligations pursuant to, the Plan, the Settlement Agreements and such documents and instruments.

41.    <u>Notice of Confirmation Date and Effective Date</u>.  The Claims and Solicitation Agent may serve notice of the entry of this Order on (a) all Holders of Claims and (b) those other parties on whom the Plan, Disclosure Statement, and related documents were served.  Such service constitutes good and sufficient notice pursuant to Bankruptcy Rules 2002(f)(7) and 3020(c).  On the Effective Date, or as soon thereafter as is reasonably practicable, the Debtors shall file with the Bankruptcy Court a "Notice of Effective Date" (the "**Notice of Effective Date**") and shall mail or cause to be mailed by first-class mail to Holders of Claims or Interests a copy of the Notice of Effective Date; *provided*, *however*, that the Debtors shall not be required to transmit the Notice of Effective Date to Holders of Claims or Interests in Classes 12 and 18 or to any Holders of Claims or Interest for which applicable Solicitation Materials were returned to the Debtors' Claims and Solicitation Agent as undeliverable.  Upon the Effective Date, the Plan

shall be deemed substantially consummated as to each Debtor, consistent with the definition of "substantial consummation" in section 1101(2) of the Bankruptcy Code.

42.     <u>Administrative Claims Bar Date</u>.  All requests for payment of Administrative Claims, other than Professional Fee Claims, that accrued on or before the Effective Date must be filed with the Claims and Solicitation Agent and served on counsel for the Debtors and Liquidating Debtors, counsel for the Creditors' Committee, the Plan Administration Trustee and the PPLP Liquidator by (a) 30 days after notice of the Confirmation Date is served with respect to Claims that arose before the Confirmation Date and (b) 30 days after notice of the Effective Date is served with respect to Claims that arose on or after the Confirmation Date (the "**Administrative Claim Bar Date**").  Any requests for payment of Administrative Claims pursuant to <u>Article II</u> of the Plan that are not properly filed and served by the Administrative Claim Bar Date shall be disallowed automatically without the need for any objection from the Debtors or any action by the Bankruptcy Court.

43.     <u>Shareholder Stipulation</u>.  Notwithstanding anything to the contrary herein, nothing in this Order, in the Plan or in any Plan Document shall impair the effectiveness of the Stipulation attached to the *Notice of Filing of Stipulation Concerning Shareholder Settlement Agreements* [D.I. 7713].

44.     <u>Bailiwick of Jersey</u>.  Upon the dissolution of the Creditors' Committee pursuant to Section 12.14 of the Plan, the Master Disbursement Trust shall succeed to the Creditors' Committee in all respects for purposes of the *Order Granting the Official Committee of Unsecured Creditors' Motion for a Letter of Request to the Royal Court of Jersey* [D.I. 6944] in connection with all claims assigned or otherwise transferred under the Plan to the Master Disbursement Trust, and the Bankruptcy Court's requests on behalf of the Creditors' Committee

and its professionals shall be deemed to apply, *mutatis mutandis*, to the Master Disbursement

Trust.

45.    <u>Westchester Fire Insurance Company</u>.

(a)    Notwithstanding anything to the contrary in the Plan Documents, the Disclosure Statement, or this Order, or any agreements or documents relating to the foregoing, including, without limitation, any transition agreements and trust agreements, nothing in the Plan Documents shall in any way prime, discharge, impair, modify, subordinate or affect the rights of Westchester Fire Insurance Company and/or its past, present or future U.S.-based affiliated sureties (each as surety in its role as an issuer of bonds, individually and collectively referred to herein as "**Westchester**" or "**Surety**") as to:

(i)    any indemnity or collateral obligations or agreements relating to bonds or related instruments issued and/or executed by Surety and assumed by the Debtors and/or NewCo (each such bond or related instrument, a "**Bond**", and, collectively, the "**Bonds**");

(ii)    any collateral or letter of credit related to any Bond; or

(iii)    any indemnity agreement related to any of the Bonds (collectively, the "**Indemnity Agreements**"), which include, without limitation, the General Agreement of Indemnity dated December 13, 2016 and the General Agreement of Indemnity dated August 2, 2017 which are hereby assumed and assigned to NewCo.

(b)    Notwithstanding any provision in the Plan Documents to the contrary, including, without limitation, the third-party releases in the Plan,

(i)    any and all collateral, including cash collateral and letters of credit, held by Surety and/or on Surety's behalf in connection with the Bonds shall be retained by Surety and/or on Surety's behalf to secure the obligations of the Debtors and/or NewCo under such Bonds;

(ii)    Surety has no obligation to issue or execute any new bond or related indemnity agreement on behalf of any entity, and Surety has no obligation to extend, modify and/or increase the amount of any Bond or related indemnity agreement;

(iii)    any rights, remedies and/or defenses Surety may now or in the future have with respect to the Bonds are preserved;

(iv)    any current or future setoff, recoupment rights, lien rights, trust fund claims of Surety or any party to whose rights the Surety has or may be

subrogated, and/or any existing or future subrogation or other common law rights of the Surety are preserved;

(v) it shall not be necessary for Surety to file an administrative proof of claim, file a request for payment, and/or file a fee application to protect any of its claims related to the Indemnity Agreements and Bonds;

(vi) Section 6.13 and Section 6.18 of the Plan shall not have the effect of disallowing Surety's claims related to the Bonds and Indemnity Agreements and/or the claims that Surety may assert via subrogation, and Section 7.5 of the Plan shall not apply to such claims; and

(vii) Surety shall have access to any and all books and records held by the Debtors and/or NewCo relating to the Bonds and Indemnity Agreements and Surety shall receive no less than thirty (30) days written notice by the entity holding such books and records prior to destruction or abandonment of any such books and records. Without limitation to any other rights of the Surety, if a claim or claims is or are asserted against any Bonds and/or related instruments, then the Surety shall be granted access to, and may make copies of, any books and records related to such Bonds upon Surety's request.

46.   Old Republic.   In connection with the Debtors' products/completed operations liability insurance policy (policy number MWZZ 314344) and the commercial general liability policy (policy number MWZZ 315036), subsequent renewals of those policies, and any related agreements (collectively, the "**ORIC Policies**")  with Old Republic Insurance Company ("**ORIC**"), the ORIC Policies are Purdue Insurance Policies that are not MDT Insurance Policies and NewCo shall assume all the Debtors' obligations to ORIC under the ORIC Policies.  All collateral held by ORIC posted by the Debtors, whether posted before or after the Petition Date, secures all obligations of NewCo to ORIC under the ORIC Policies no matter when they arise, pursuant to the terms of the ORIC Policies.  Any reimbursement obligations and any other obligations that arise pre-petition or post-petition under any ORIC Policy (regardless of whether all or any part of such obligations are liquidated, due or paid before or after confirmation of a chapter 11 plan or conversion of one or more of the Debtors' chapter 11 cases to chapter 7) shall

be assumed by NewCo.  The Debtors' rights against all collateral held by ORIC, in whatever

form, shall be governed by the terms of the ORIC Policies.

47.    <u>Motions Relating to Late Claims</u>.  Any hearing on a motion to deem a proof of

claim timely filed shall be scheduled no earlier than 120 days after the entry of this Order.

48.    <u>Final Order</u>.  This Order is a final order and the period in which an appeal must be

filed shall commence upon the entry hereof.

49.    <u>Binding Effect</u>.  Pursuant to Bankruptcy Rules 3020(e), 6004(h), and 7062, this

Order shall be stayed until the expiration of 14 days after the entry of this Order.  Unless stayed

by this Court or another court under Bankruptcy Rule 8007 or otherwise, (i) notwithstanding any

Bankruptcy Rules, nonbankruptcy law, or otherwise, this Order shall be immediately effective

and enforceable after the expiration of 14 days after the entry of this Order and (ii) except as

otherwise provided in section 1141(d)(3) of the Bankruptcy Code, and subject to the occurrence

of the Effective Date, the provisions of the Plan, the Plan Documents, and this Order shall bind

the Debtors, the other Protected Parties, all Releasing Parties, all Holders of Claims against or

Interests in any Debtors, all Holders of Channeled Claims, all parties to executory contracts and

unexpired leases with any of the Debtors, and all other parties in interest in the Chapter 11

Cases, including the Debtors' insurers, and each of their respective heirs, executors,

administrators, estates, successors and assigns.

50.    <u>Conflicts with This Order</u>.  The provisions of the Plan and this Order shall be

construed in a manner consistent with each other so as to effect the purpose of each; *provided,*

*however*, that if there is determined to be any inconsistency between any terms and provisions of

this Order and any terms and provisions of the Plan or any other Plan Document that cannot be

so reconciled, then solely to the extent of such inconsistency, (a) with respect to Sections 8.4 and

10.20 of the Plan, the Plan shall govern, and (b) with respect any other terms and provisions of the Plan or any other Plan Document, the provisions of this Order shall govern, and any provision of this Order shall be deemed a modification of the Plan or such other document and shall control and take precedence.

51.     <u>Findings of Fact and Conclusions of Law</u>.  The findings and conclusions set forth herein and in the Record constitute the Bankruptcy Court's findings of fact and conclusions of law pursuant to rule 52 of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rules 7052 and 9014.  To the extent that any of the following findings of fact constitute conclusions of law, and to the extent that any of the following conclusions of law constitute findings of fact, they are adopted as such.  Any requirement under the Bankruptcy Rules that the Bankruptcy Court state its conclusions of law separate from its findings of fact is hereby waived.

52.     <u>Headings</u>.  The headings contained within this Order are used for the convenience of the parties and shall not alter or affect the meaning of the text of this Order.


Dated:     _____, 2025
           White Plains, New York

                                        _____
                                        HONORABLE SEAN H. LANE
                                        UNITED STATES BANKRUPTCY JUDGE

## Exhibit A

**Plan of Reorganization**

## **Exhibit B**

**NewCo Operating Injunction**

**DEBTORS/NEWCO OPERATING INJUNCTION**

## I.    DEFINITIONS

A.    "Bankruptcy Court" or "Court" shall mean the court presiding over the chapter 11 proceedings *In re Purdue Pharma L.P. et al.*, Case No. 19-23649 (SHL) (Bankr. S.D.N.Y.).

B.    "CDC Guideline Recommendations" shall mean the 12 enumerated Recommendations published by the U.S. Centers for Disease Control and Prevention (CDC) for the prescribing of opioid pain medication for patients 18 and older in primary care settings as part of its 2016 Guideline for Prescribing Opioids for Chronic Pain (CDC Guidelines), as updated or amended by the CDC.

C.    "Chapter 11 Plan of Reorganization" or "Plan of Reorganization" or "Plan" shall mean the *Fourteenth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors*, filed on September 26, 2025 [D.I. 7911], as the same may be amended, modified, or supplemented from time to time.

D.    "Company" shall mean the Debtors as defined in these chapter 11 proceedings *In re Purdue Pharma L.P. et al.*, Case No. 19-23649 (SHL) (S.D.N.Y.).   Following the Effective Date, "Company" shall mean "NewCo," a newly formed Delaware limited liability company to be created in accordance with Section 5.4 of the Plan to directly or indirectly receive the NewCo Transferred Assets and operate such NewCo Transferred Assets in accordance with the NewCo Operating Agreement, the NewCo Governance Covenants and the NewCo Operating Injunction.

E.    "Confirmation Order" shall mean the order of the Bankruptcy Court (or other court of competent jurisdiction) confirming the Chapter 11 Plan.

F.    "Downstream Customer Data" shall mean transaction information that the Company collects relating to the Company's direct customers' sales to downstream customers, including but not limited to chargeback data tied to the Company providing certain discounts, "867 data," and IQVIA data.

G.    "Effective Date" means the date on which the Plan of Reorganization becomes effective.

H.    "Governance Covenants" shall have the meaning set forth in the NewCo Operating Agreement.

I.    "Health Care Provider" shall mean any U.S.-based physician or other health care practitioner who is licensed to provide health care services or to prescribe pharmaceutical products and any medical facility, medical practice, hospital, clinic or pharmacy.

J.    "Including but not limited to," when followed by a list or examples, shall mean that list or examples are illustrative instances only and shall not be read to be restrictive.

K.    "In-Kind Support" shall mean payment or assistance in the form of goods, commodities, services, or anything else of value.

L.    "Lobby" shall mean to engage in "lobbying activities" or "lobbying contacts" under the federal lobbying disclosure act, 2 U.S.C. § 1602 *et seq.*, and any analogous state or local provisions governing the person or entity being lobbied in that particular state or locality. As used in this injunction, "Lobby" includes Lobbying directly or indirectly, through grantees or Third Parties.

M.    "NewCo Disposition Event" shall have the meaning assigned to the term "Disposition Event" as set forth in the NewCo Operating Agreement.

N.    "NewCo Operating Agreement" shall have the meaning set forth in the Plan of Reorganization.

O.    "Opioid(s)" shall mean all natural, semi-synthetic, or synthetic chemicals that interact with opioid receptors and act like opium. For the avoidance of doubt, the term Opioid shall not include the opioid antagonists naloxone and nalmefene.

P.    "Opioid Product(s)" shall mean all current and future medications containing Opioids approved by the U.S. Food & Drug Administration (FDA) and listed by the Drug Enforcement Administration (DEA) as Schedule II, III, or IV drugs pursuant to the federal Controlled Substances Act, including but not limited to codeine, fentanyl, hydrocodone, hydromorphone, meperidine, morphine, oxycodone, oxymorphone, tapentadol, and tramadol.

Q.    "OUD" shall mean opioid use disorder defined in the *Diagnostic and* Statistical *Manual of Mental Disorders, Fifth Edition (DSM–5)*, as updated or amended.

R.    "PHI Product(s)" shall have the meaning set forth in the NewCo Operating Agreement, which for the avoidance of doubt includes, buprenorphine-naloxone combination tablets, over-the-counter naloxone nasal spray, injectable nalmefene, and any other medicines as determined by NewCo's Board provided that such medicines must be approved by the FDA for treatment of opioid addiction and/or reversing opioid overdoses, but for purposes of this injunction does not include methadone and generic versions of Subutex® sublingual buprenorphine tablets.

S.    "Promote," "Promoting," and "Promotion" shall mean dissemination of information or other practices intended or that could be reasonably anticipated to influence prescribing practices in a manner that increases sales, prescriptions, or the utilization of prescription products.

T.    "Qualified Researcher" shall mean any researcher holding a faculty appointment or research position at an institution of higher education, a research organization, a nonprofit organization, or a government agency.

U.    "Section" shall mean, unless the context requires otherwise, a Section of this injunction.

V.    "Shareholder Released Parties" shall mean the Estate of Beverly Sackler, David A. Sackler, Ilene Sackler, the Estate of Jonathan D. Sackler, Kathe Sackler, Mortimer D.A. Sackler, Richard S. Sackler, Theresa Sackler, any trusts of which any of the foregoing are beneficiaries, and the trustees thereof (solely in their capacities as such), each Shareholder Party and each other entity or person that directly or indirectly owns equity in, or has voting control over, any of the Debtors, and in the event of the death of a Shareholder Released Party who is a natural person, other than a natural person who is a Shareholder Released Party solely in the capacity as a trustee, the estate of such person.

W.    "State Monitor Committee" shall mean a bipartisan, volunteer committee comprising representatives from 5-7 States.

X.    "Suspicious Order" shall have the same meaning as provided by the Controlled Substances Act, 21 U.S.C. §§ 801-904, and the regulations promulgated thereunder, final DEA administrative decisions that are published in the Federal Register, and analogous state laws and regulations.

Y.    "Third Party" shall mean any person or entity other than the Company or a government entity.

Z.    "Treatment of Pain" means the provision of therapeutic modalities to alleviate or reduce pain. "Treatment of Pain" does not include (i) the provision of therapeutic modalities to treat a disease or condition that is something other than pain but for which a side effect or impact of the treatment of such disease or condition is a reduction in pain caused by such disease or condition, or (ii) Tinostamustine or Sunobinop.

## II.    SCOPE AND ENFORCEMENT

A.    This injunction shall apply to and be binding on NewCo on the Effective Date; and on any transferee or successor to, or subsequent operator of, all or any portion of NewCo's Opioid business (a "Transferee/Successor") as set forth below.

B.    The Debtors and NewCo consent to the entry of a final judgment or consent order, substantially in the form of this injunction, imposing all of the provisions of this injunction in each state and territorial court on the Debtors, NewCo and any Transferee/Successor, at any time after the Effective Date (the "Consent Judgment"), as well as to the jurisdiction of those state and territorial courts with respect to a Consent Judgment. A Consent Judgment shall apply to and be binding on NewCo after the Effective Date; and on any Transferee/Successor.

C.    Until this injunction is effective, the Voluntary Injunction initially entered on November 6, 2019 in *Purdue Pharma L.P. v. Massachusetts*, Adv. Pro. No. 19-08289 (Bankr. S.D.N.Y) as Exhibit 1 to the Second Amended Order Pursuant to 11 U.S.C. § 105(a) Granting Motion for a Preliminary Injunction and re-entered thereafter, shall remain in full force and effect on the Company and NewCo.

D.    Without limiting the foregoing:

3

1.  NewCo shall be required to obtain the consent of any Transferee/Successor to be bound by this injunction and to submit to the jurisdiction of this Court and each state and territorial court for enforcement of the terms of this injunction as a condition to a transfer of all or any portion of NewCo's Opioid business.

2.  Nothing in this injunction applies to the operation of a Transferee/Successor's pre-existing Opioid business. Any Transferee/Successor shall be subject only to Sections III.A-C and III.E-H.

3.  Nothing requires that this injunction be enforced exclusively in this Court or limits the jurisdiction of any state or territorial court to enforce the terms of this injunction.

## III.    INJUNCTIVE RELIEF

### A.    Ban on Promotion

1.  The Company shall not engage in the Promotion of Opioids or Opioid Products, including but not limited to, by:

    a.  Employing or contracting with sales representatives or other persons to Promote Opioids or Opioid Products to Health Care Providers or patients.

    b.  Using speakers, key opinion leaders, thought leaders, lecturers, and/or speaking events for Promotion of Opioids or Opioid Products.

    c.  Sponsoring, or otherwise providing financial support or In-Kind Support to medical education programs that include references to Opioids or Opioid Products.

    d.  Creating, sponsoring, operating, controlling, or otherwise providing financial support or In-Kind Support to any website, network, and/or social or other media account for the Promotion of Opioids or Opioid Products.

    e.  Creating, sponsoring, distributing, or otherwise providing financial support or In-Kind Support for materials Promoting Opioids or Opioid Products, including but not limited to brochures, newsletters, pamphlets, journals, books, and guides.

    f.  Creating, sponsoring, or otherwise providing financial support or In-Kind Support for advertisements that Promote Opioids or Opioid Products, including but not limited to internet advertisements or similar content, and providing hyperlinks or otherwise directing internet traffic to advertisements.

    g.  Engaging in Internet search engine optimization or other techniques designed to Promote Opioids or Opioid Products, including by improving

4

rankings or making content appear among the top results in an Internet search or otherwise be more visible or more accessible to the public on the Internet.

h.      Utilizing electronic health records software or other digital health platforms to create alerts, workflows, or disseminate information known or reasonably expected to increase utilization of Opioids or Opioid Products.

2.      Notwithstanding Sections III.A.1 and III.C, the Company may:

a.      Maintain corporate websites.

b.      Maintain a website for any Opioid Product that contains principally the following content: the FDA-approved package insert, medication guide, and labeling, and a statement directing patients or caregivers to speak with a licensed Health Care Provider; Risk Evaluation and Mitigation Strategy (REMS) materials; and contact information to report an adverse event or product complaint.

c.      Provide information or support the provision of information as expressly required by law, settlement, court order or any state or federal government agency, including providing all information necessary in order for the Company to comply with its regulatory obligations pursuant to the Federal Food, Drug, and Cosmetic Act or the Controlled Substances Act, and/or provide information about legal proceedings involving the Company.

d.      Engage and compensate Health Care Providers or other Third Parties to assist the Company in responding to, preparing for and participating in any of the following activities held by any state or federal government or state or federal agencies or regulators, including the FDA: advisory committees, working groups, meetings and or/hearings.

e.      Provide the following by mail, electronic mail, on or though the Company's corporate or product websites or through other electronic or digital methods: FDA-approved package insert, medication guide, approved labeling for Opioid Products, REMS materials or other prescribing information for Opioid Products that are published by a state or federal government agency.  State materials may be provided only within the applicable state.

f.      Provide scientific and/or medical information in response to an unsolicited request by a Health Care Provider concerning Opioid Products consistent with the  recommendations set forth in the FDA's Draft Guidance for Industry, *Responding to Unsolicited Requests for Off-Label Information About Prescription Drugs and Medical Devices* (Dec. 2011, as updated or amended by the FDA) and Guidance for Industry, *Good Reprint Practices for the Distribution of Medical Journal Articles and Medical or Scientific*

5

*Reference Publications on Unapproved New Uses of Approved Drugs and Approved or Cleared Medical Devices* (Jan. 2009, as updated or amended by the FDA). Such responses should be handled by medical or scientific personnel at the Company who are independent from the sales or marketing departments.

g.    Provide a response to any unsolicited question or request from a patient or caregiver, directing the patient or caregiver to the FDA-approved labeling and to the extent that the question cannot be answered solely by reference to a specific provision of the FDA-approved labeling, providing a response that is truthful, balanced, non-misleading and fully consistent with the FDA-approved labeling or recommending the patient or caregiver speak with a licensed Health Care Provider without naming any specific provider or healthcare institution; or directing the patient or caregiver to speak with their insurance carrier regarding coverage of an Opioid Product.

h.    Provide information to a payor, formulary committee, distributor, or other similar entity with knowledge and expertise in the area of health care economics concerning the cost or availability of a Company Opioid Product, including the costs compared to the cost of an Opioid Product manufactured or distributed by another company.  Such information may include information about the stocking of the Opioid Product as described in the FDA-approved labeling; tier status; applicable prescribing guidelines that are consistent with the FDA-approved labeling; step-edits for Opioid Products; restrictions; and/or prior authorization status concerning an Opioid Product.  Provided further that information provided pursuant to this subparagraph shall also be posted on the website permitted by Section III.A.2.b, except for information that is commercially sensitive or otherwise confidential, which instead shall be provided to the Monitor and the State Monitor Committee.

i.    Sponsor or provide financial support or In-Kind Support for an accredited or approved continuing medical education program required by either an FDA-approved REMS program or other federal or state law or regulation in accordance with applicable requirements, settlement with a governmental entity, or court order, through an independent Third Party, which shall be responsible for the continuing medical education program's content without the participation of the Company.

j.    Provide rebates, discounts, fees and other customary pricing adjustments to DEA-registered customers and contracting intermediaries, such as Buying Groups, Group Purchasing Organizations, Managed Care Plans and Pharmacy Benefit Managers, except as prohibited by Section III.E.

k.    Promote PHI Products, and provide information about, discuss, or comment on, issues regarding mechanisms for preventing opioid abuse

6

and misuse, including the prevention, education and treatment of opioid overdose.  Except that the Company shall not:

> (i)  Employ or contract with sales representatives to detail PHI Products (i.e., through direct interaction, whether in-person or virtual, with individual prescribing or dispensing health care professionals or their staffs) who are compensated based on sales or volume of PHI Products. The Company will document interactions related to PHI Products between Company sales representatives and health care professionals or their staffs and will retain documents and information relating to those communications; and/or

> (ii) In addition to Section III.A.2.k.i, with regard to PHI Products that are Opioid Products indicated for the treatment of substance abuse disorders, employ or contract with sales representatives to detail such PHI Products (i.e., through direct interaction, whether in-person or virtual, with individual prescribing or dispensing health care professionals or their staffs).  Nothing in this Section III.A.2.k.ii shall be construed to prohibit personal contact between non-sales representatives of the Company and health care professionals or their staffs regarding PHI Products that are Opioids. The Company will document interactions regarding PHI Products that are Opioids between Company non-sales representatives and health care professionals or their staffs and will retain documents and information relating to those communications.

> (iii)  Any and all documents and information relating to communications related to the activities described in Subsections (i) and (ii) of this Section III.A.2.k shall be provided to the Monitor at his request for his review.

> (iv) Nothing in this section shall be construed to permit the Promotion of methadone or generic versions of Subutex® sublingual buprenorphine tablets except pursuant to Sections III.A.2.a-j.

3.    The Company shall not engage in the following specific Promotional activity relating to any products for the treatment of Opioid-induced side effects except as permitted by Section III.A.2.k, above:

> a.    Employing or contracting with sales representatives or other persons to Promote products for the treatment of Opioid-induced side effects to Health Care Providers or patients.

7

b.   Using speakers, key opinion leaders, thought leaders, lecturers, and/or speaking events for Promotion of products for the treatment of Opioid-induced side effects.

c.   Sponsoring, or otherwise providing financial support or In-Kind Support to medical education programs relating to products for the treatment of Opioid-induced side effects except as required by REMs, court orders or settlements.

d.   Creating, sponsoring, or otherwise providing financial support or In-Kind Support for advertisements that Promote products for the treatment of Opioid-induced side effects, including but not limited to internet advertisements or similar content, and providing hyperlinks or otherwise directing internet traffic to advertisements.

e.   Engaging in any other Promotion of products for the treatment of Opioid-induced side effects in a manner that encourages the utilization of Opioids or Opioid Products or normalizes the use of Opioids or Opioid Products for chronic pain.

f.   Utilizing electronic health records software or other digital health platforms to create alerts, workflows, or disseminate information known or reasonably expected to increase utilization of Opioids or Opioid Products.

4.   Treatment of Pain

a.   The Company shall not, either through the Company or through Third Parties, engage in Promotion of the Treatment of Pain in a manner that directly or indirectly encourages the use of Opioids or Opioid Products.

b.   The Company shall not, either through the Company or through Third Parties, Promote the concept that pain is undertreated in a manner that directly or indirectly encourages the use of Opioids or Opioid Products.

5.   To the extent that the Company engages in conduct permitted by Section III.A.2, the Company shall do so in a manner that is:

a.   Consistent with the CDC Guideline Recommendations, as applicable.

b.   Truthful, not misleading, accurate, and not deceptive.

6.   For the avoidance of doubt, nothing in this injunction shall be construed or used to prohibit the Company from taking legal or factual positions in litigation, bankruptcy proceedings, investigations, regulatory actions, or other legal or administrative proceedings  or prohibit or limit the Company's right to make public statements or respond to media reports or inquiries relating to any

litigation, bankruptcy proceedings, investigations, regulatory actions, or other legal, administrative, or legislative proceedings.

**B.** **No Reward or Discipline Based on Volume of Opioid Sales**

1.  The Company shall not provide financial or non-financial incentives to its employees or discipline its employees based upon sales volume or sales quotas for Opioid Products.

2.  The Company shall not offer or pay any remuneration (including any kickback, bribe, or rebate) directly or through a Third Party, to or from any person in return for the prescribing, sale, use or distribution of an Opioid Product. For the avoidance of doubt, this subparagraph shall not prohibit the provision of rebates and/or chargebacks to the extent permitted by Section III.A.2.j.

3.  The Company's compensation policies and procedures shall be designed to ensure compliance with this injunction and other legal requirements.

**C.** **Ban on Funding/Grants to Third Parties**

Except with respect to PHI Products:

1.  The Company shall not directly or indirectly provide financial support or In-Kind Support to any Third Party for the purpose of Promoting Opioids, Opioid Products, the Treatment of Pain, or products intended to treat Opioid-related side effects, including educational programs or websites that Promote Opioids, Opioids Products, the Treatment of Pain, or products intended to treat Opioid-related side effects, but excluding financial support otherwise allowed by this injunction, including REMS, settlements, and court orders or as required by a federal or state agency.

2.  The Company shall not operate, control, create, sponsor, provide financial support or In-Kind Support to any medical society or patient advocacy group relating to any Opioids, Opioid Products, the Treatment of Pain, or products intended to treat Opioid-related side effects, except with regard to REMS or to comply with settlements, court orders, or federal or state law.

3.  The Company shall not provide links to any Third-Party website or materials or otherwise distribute materials created by a Third Party relating to any Opioids, Opioid Products, the Treatment of Pain, or products intended to treat Opioid-related side effects.

4.  The Company shall not use or pay any Third Party to engage in any activity that the Company itself would be prohibited from engaging in pursuant to the injunction.

5.  The Company shall not enter into any contract or agreement with any person or entity or otherwise attempt to influence any person or entity in such a manner that

has the purpose or likely effect of limiting the dissemination of information regarding the risks and side effects of using Opioids.

6.      The Company shall not compensate or provide In-Kind Support to Health Care Providers or organizations to advocate for formulary access or treatment guideline changes that would have the effect of increasing access to any Opioid Product by third-party payors, *i.e.*, any entity, other than an individual, that pays or reimburses for the dispensing of prescription medicines, including but not limited to managed care organizations and pharmacy benefit managers. For the avoidance of doubt, nothing herein shall prohibit the Company from compensating Third Parties for engaging in conduct otherwise permitted under this injunction

7.      No current director, officer, or management-level employee of the Company may serve as a director, board member, employee, agent, or officer of any entity that engages in Promotion relating to Opioids, Opioid Products, the Treatment of Pain, or products intended to treat Opioid-related side effects except insofar as such service would be consistent with Section III.A.2. or III.A.4, or except for services relating to (i) the treatment of OUD, (ii) the prevention, education or treatment of opioid abuse, addiction or overdose, including medication-assisted treatment for opioid addiction and/or (iii) rescue medication for opioid overdose.

8.      The Company shall play no role in appointing persons to the board, or hiring persons to the staff, of any entity that principally engages in Promotion relating to any Opioids, Opioid Products, the Treatment of Pain, or products intended to treat Opioid-related side effects except as otherwise permissible under Section III.A.4.

9.      The Company shall ensure that any employee serving on the board of any organization that engages in lobbying or educating state and federal officials on policies and regulations, the impact of which would be to more easily enable or Promote the use of Opioids or Opioid Products, recuse himself/herself from any board discussion or decisions relating to Opioids, including any determinations the organization may make related to lobbying efforts with respect to opioids. Further, the Company shall ensure that any such employees will refrain from participation in any working group of such organization that focus on the Promotion of Opioids or Opioid Products or which focus on issues that would otherwise not be permitted under this injunction.

10.     For the avoidance of doubt, nothing in Section III.C shall be construed or used to prohibit the Company from providing financial or In-Kind Support to:

a.      medical societies and patient advocate groups, who are principally involved in issues relating to (i) the treatment of OUD; (ii) the prevention, education, and treatment of opioid abuse, addiction, or overdose, including medication-assisted treatment for opioid addiction; and/or (iii) rescue medications for opioid overdose.

10

    b.    universities, medical institutions, or hospitals, for the purpose of addressing, or providing education on, issues relating to (i) the treatment of OUD; (ii) the prevention, education, and treatment of opioid abuse, addiction, or overdose, including medication-assisted treatment for opioid addiction; and/or (iii) rescue medications for opioid overdose.

**D.      Lobbying Restrictions**

1.      The Company shall not Lobby for or against the enactment of any federal, state or local legislation or promulgation of any rule or regulation that:

    a.    Encourages or requires Health Care Providers to prescribe Opioids or sanctions Health Care Providers for failing to prescribe Opioids or failing to treat pain with Opioids;

    b.    Would have the effect of limiting access to any non-Opioid alternative pain treatments;

    c.    Pertains to the prohibitions against misbranding or adulteration in the Federal Food, Drug, and Cosmetic Act; or

    d.    Pertains to the classification of any Opioid or Opioid Product as a scheduled drug under the Controlled Substances Act.

2.      The Company shall not directly, or by employing or controlling a Third Party, Lobby against the enactment of any federal, state or local legislation or promulgation of any rule or regulation that supports:

    a.    The use of non-pharmacologic therapy and/or non-Opioid pharmacologic therapy to treat chronic pain over or instead of Opioid therapy, including but not limited to Third Party payment or reimbursement for such therapies;

    b.    The use and/or prescription of immediate release Opioids instead of extended release Opioids when Opioid therapy is initiated, including but not limited to Third Party reimbursement or payment for such prescriptions;

    c.    The prescribing of the lowest effective dose of an Opioid, including but not limited to Third Party reimbursement or payment for such prescription;

    d.    The limitation of initial prescriptions of Opioids to treat acute pain;

    e.    The prescribing and other means of distribution of naloxone to minimize the risk of overdose, including but not limited to Third Party reimbursement or payment for naloxone;

f.      The use of urine testing before starting Opioid therapy and annual urine testing when Opioids are prescribed, including but not limited to Third Party reimbursement or payment for such testing;

g.      Evidence-based treatment (such as using medication-assisted treatment with buprenorphine or methadone in combination with behavioral therapies) for Opioid Use Disorder, including but not limited to third party reimbursement or payment for such treatment; or

h.      The implementation or use of Opioid drug disposal systems that have proven efficacy for the Company's Opioid Products.

i.      The Company shall not directly, or indirectly by employing or controlling a Third Party, Lobby against the enactment of any federal, state or local legislation or promulgation of any rule or regulation limiting the operation or use of prescription drug monitoring programs ("PDMPs"), including, but not limited to, provisions requiring Health Care Providers to review PDMPs when Opioid therapy is initiated and with every prescription thereafter.

j.      The Company shall not establish any Political Action Committees or make campaign contributions to candidates for political office at any time prior to the NewCo Disposition Event.

3.      Provided, however, that nothing in Section III.D of this injunction limits the Company from:

a.      Challenging the enforcement of, or suing to stop the enactment of, or for declaratory or injunctive relief with respect to any legislation, rules or regulations;

b.      Responding to a statute, rule, regulation, or order requiring such communication;

c.      Appearing before a federal or state legislative or administrative body, committee, or subcommittee as a result of a mandatory order, or subpoena commanding that person to testify;

d.      Responding, in a manner consistent with this injunction, to an unsolicited request for the input on the passage of legislation or the promulgation of any rule or regulation when such request is submitted in writing specifically to the Company from a government entity directly involved in the passage of that legislation or promulgation of that rule or regulation;

e.      Responding to unsolicited requests from the DEA, the FDA, or any other Federal or state agency and/or participating in FDA or other agency panels at the request of the agency;

f.      Communicating with governmental officials regarding access to, availability of, procurement of, or use of PHI Products.

g.      Monitoring any pending or proposed legislation, rule or regulation relating to its business, including directly or indirectly through grantees or Third Parties.

4.      The Company shall not Lobby by affirmatively advocating either for or against the enactment of any federal, state, or local legislation or promulgation of any rule or regulation or the appointment of any individual to public office, unless NewCo's Board shall have determined that the request comports with the Company's Purpose (as defined in the NewCo Operating Agreement).  If NewCo's Board so determines, then the Company shall provide advance notice to the Monitor of its intention to Lobby on the issue.  The Monitor shall then have the sole and absolute discretion to direct that the activity not take place if the Monitor exercises such discretion and determines that the request approved by the NewCo Board (a) is expressly prohibited by the terms of this injunction, or (b) does not reasonably comport with the Company's Purpose (as defined in the NewCo Operating Agreement).  Nothing in Section III.D.4 shall permit advocacy that is otherwise prohibited under Section III.D.

5.       The Company shall require all of its officers, employees, and agents engaged in conduct described in Section III.D to certify annually in writing or by appropriate electronic means to the Company that they are aware of and will fully comply with the provisions of this injunction with respect to Lobbying on behalf of the Company.

6.      On a quarterly basis, NewCo will report its Lobbying activities to the Monitor and the Board. The requirements of Section III.D shall remain in effect until the NewCo Disposition Event.

**E.      Ban on Prescription Savings Cards**

1.      The Company shall not directly or through a Third Party offer prescription savings cards or coupons for its Opioid Products (other than PHI Products) except to existing, commercially insured, non-cash paying patients.  Nothing in this paragraph shall prohibit the Company from utilizing unsolicited electronic point-of-dispense programs for the benefit of commercially-insured, non-cash paying patients.

2.      The Company shall not directly or indirectly assist patients, Health Care Providers, or pharmacies regarding the claims and/or prior authorization process required for third-party payors to approve claims involving any Opioid Product.

**F.      Monitoring and Reporting of Direct and Downstream Customers**

1.      The Company shall operate an effective monitoring and reporting system in compliance with 21 C.F.R. § 1301.71(a), 21 C.F.R. §1301.74(b), 21 U.S.C. §

823(d) and Section 3292 of the SUPPORT for Patients and Communities Act and final DEA administrative decisions that are published in the Federal Register.

2.    The monitoring and reporting system shall include processes and procedures pertaining to Opioid Products that:

a.    Utilize all reasonably available information and conduct appropriate due diligence to identify a Suspicious Order of an Opioid Product by a direct customer, including, but not limited to, utilizing appropriate algorithms to identify orders of unusual size, unusual frequency and/or that deviate from a normal pattern.

b.    Review all Suspicious Orders to determine whether circumstances warrant permitting a Suspicious Order to be cleared for shipment. As part of this review, the Company shall conduct appropriate due diligence including, but not limited to, collecting additional information and documentation from direct customers that explain whether the order is legitimate, and conducting a site visit if warranted. No Suspicious Order may be cleared absent adequate, documented justification.

c.    In addition to the review above, each month the Company shall make a selection of previously cleared orders for further review. Such additional review will include, but not be limited to gathering information pertaining to the legitimacy of the customer's orders and investigating whether there are indicators that a direct or downstream customer poses a risk of diversion. The Company shall document its review and findings.

d.    Require all direct customers to annually complete a Wholesaler Due Diligence Questionnaire ("Questionnaire"), utilize all information that the Company receives through such Questionnaire, and require any direct customer that provides incomplete, unsigned, or unresponsive responses, or fails to provide referenced accompanying information to correct the deficiency. The Company will conduct site visits to corroborate the information obtained from its customers. Once the Questionnaire review process is complete, any Questionnaire that is incomplete, unsigned or unresolved shall result in denial of clearance for shipment.

e.    Utilize all reasonably available Downstream Customer Data to identify whether a downstream customer poses a material risk of diversion of an Opioid Product, including, but not limited to: a monthly review of Downstream Customer Data; review of Downstream Customer Data to identify downstream customers that consistently have a large volume of chargebacks meriting further investigation; the establishment of objective methods for identifying chargeback units that merit further review; and the review of chargeback reports to identify downstream customers that have higher chargebacks on a repeat basis. If chargeback data reveals suspicious indicia (e.g. the number or frequency of chargebacks), the

14

Company shall investigate further. To the extent the inquiry does not resolve the concern, the Company shall report the identity of the downstream customer to DEA and to the relevant direct customers.

f.     Utilize all reasonably available information that the Company receives that indicates an unreasonable risk of a direct customer's or a downstream customer's diversion activity or potential for diversion activity, including reports by the Company's employees, customers, Health Care Providers, law enforcement, state, tribal, or federal agencies, or the media.

g.     Upon request (unless otherwise required by law), report to any requesting State Attorney General or State controlled substances regulatory agency or Department of Justice component any direct customer or downstream customer in such requesting State Attorney General's or agency's State identified as part of the monitoring required by Sections III.F.2(a)-(f), and any customer relationship in such State terminated by the Company relating to diversion or potential for diversion. DEA will be notified of all Suspicious Orders. Additionally, rejected order information will be shared with DEA in compliance with governing statutes and regulations. These reports shall include the following information, to the extent known to the Company:

   i.     The identity of the downstream customer and the direct customer(s) engaged in the controlled substance transaction(s), to include each registrant's name, address, business type, and DEA registration number.

   ii.    The dates of reported distribution of controlled substances by direct customers to the downstream customer during the relevant time period.

   iii.   The drug name, drug family or NDC and dosage amounts reportedly distributed.

   iv.    The transaction or order number of the reported distribution.

   v.     A brief narrative providing a description of the circumstances leading to the Company's suspicion that there is a risk of diversion.

h.     The Company will retain record copies of documentation associated with Sections III.F.2(a)-(g), and make such documentation available to any federal, state, or local law enforcement agency upon request.

3.     The Company shall not provide to any direct customer an Opioid Product to fill an order identified as a Suspicious Order unless the Company investigates and finds that the identified order is not suspicious. The Company may not find an identified order is not suspicious solely based on a threshold review. Where the

Company has reviewed an order identified as a Suspicious Order and determined that the identified order is not suspicious, the Company must document the basis for its determination, and provide such documentation to the Monitor. The Company will retain record copies of documents provided to the Monitor, and make such documentation available to any federal, state, or local law enforcement agency upon request.

4.      The Company shall promptly notify the DEA of findings by the Monitor related to the Company's suspicious order monitoring program.

5.      The Company shall employ sufficient staff so that the suspicious order monitoring can be robust, the review of customer provided Questionnaires can be thorough, and the documentation of all decisions related to Suspicious Orders can be thorough and complete.

6.      Upon request, the Company shall provide full cooperation and assistance to any federal, state or local law enforcement investigations of potential diversion or suspicious circumstances involving Opioid Products, including criminal law enforcement agencies, drug control agencies, professional licensing boards, and Attorney General's offices. For the avoidance of doubt, the Company must provide full cooperation to DEA and any component of the Department of Justice.

7.      The Company will refrain from providing an Opioid Product (other than a PHI Product) directly to a retail pharmacy location or Health Care Provider or otherwise engaging in activity that requires it to be registered as a distributor under the Controlled Substances Act. Nothing in this provision, however, prevents the Company from acting as a distributor of PHI Products consistent with applicable law.

**G.      General Terms**

1.      To the extent that a provision in this injunction conflicts with federal or relevant state law or regulation, the requirements of the law or regulation will prevail. To the extent that any provision in the injunction is in conflict with federal or relevant state law such that the Company cannot comply with both the statute or regulation and a provision of this injunction, the Company may comply with such statute or regulation. To the extent that the Company makes any such determination, it will disclose the conflict and its determination to the affected State Attorney(s) General, the Director, Consumer Protection Branch, Department of Justice, and the Monitor as soon as reasonably practicable and in advance of any change to the Company's policies or practices.

2.      The Company shall not make any written or oral statement about Opioids, Opioid Products or PHI Products that is unfair, false, misleading or deceptive, or unconscionable.

16

3. The Company shall not represent that Opioids, Opioid Products or PHI Products have approvals, characteristics, uses, benefits, or qualities that they do not have or are inconsistent with the products' FDA-approved labeling.

4. For the avoidance of doubt, nothing in this injunction is intended to or shall be construed to prohibit the Company in any way whatsoever from taking legal or factual positions with regard to its Opioid Product(s) in defense of litigation or other legal proceedings or investigations.

5. Upon the request of any State Attorney General or federal component, the Company shall provide the requesting State Attorney General or federal component with the following, within 30 days of the request:

   a. Notification as to whether the Company has received any litigation or civil or criminal law enforcement subpoenas or Civil Investigative Demands relating to the Company's Opioid Product(s), as well as the identity of the state or federal component(s) that issued any such subpoenas or Civil Investigative Demands.

   b. Copies of warning or untitled letters issued by the FDA regarding the Company's Opioid Product(s) and all non-confidential correspondence between the Company and the FDA related to such letters.

6. Whenever possible, each provision of this injunction shall be interpreted in such manner as to be effective and valid under applicable law and regulation, but if any provision of this injunction is held to be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of this injunction.

## H. Compliance with All Laws and Regulations Relating to the Sale, Promotion, and Distribution of Any Opioid Product

1. The Company shall comply with all laws and regulations that relate to the sale, Promotion, distribution, and disposal of any Opioid Product or PHI Product including but not limited to:

   a. State controlled substances acts.

   b. The Federal Controlled Substance Act and any regulation promulgated thereunder.

   c. The Federal Food, Drug and Cosmetic Act, or any regulation promulgated thereunder.

   d. Federal health care offenses, as defined in 18 U.S.C. § 24.

   e. State consumer protection and unfair trade practices acts.

> f.  State laws and regulations related to prescribing, distribution and disposal of Opioid Products.
>
> g.  Bribery, Foreign Corrupt Practices Act, Anti-Kickback, and Stark laws and regulations.

## I.  Compliance Deadlines

1.  As of 90 days after the Effective Date, the Company must be in full compliance with the provisions included in this injunction.

## J.  Training

1.  The Company shall provide regular training, at least once per year, to relevant employees on their obligations imposed by this injunction.  The Company shall provide training to any new employees at the time of their onboarding.

## IV.  CLINICAL DATA TRANSPARENCY

## A.  Data to Be Shared

1.  The Company shall share the following clinical data to the extent and in a manner permitted by applicable law and contracts, including data privacy laws, informed consent forms and clinical trial protocols through a third-party data archive that conforms to the requirements defined below to increase the transparency of its clinical research.

> a.  The Company shall make available all clinical data and/or information it possesses in electronic form that can be located following a reasonably diligent search, regarding OxyContin® Tablets, Butrans® Transdermal System and Hysingla® Tablets previously disclosed to the FDA.
>
> b.  The Company shall make available all previously unreleased, clinical data it possesses in electronic form that can be located following a reasonably diligent search, regarding OxyContin® Tablets, Butrans® Transdermal System and Hysingla® Tablets, for both approved and unapproved indications, including:
>
>> i.  Full analyzable data set(s) (including individual participant-level data de-identified by an independent biostatistician);
>>
>> ii.  The clinical study report(s) redacted for commercial or personal identifying information;
>>
>> iii.  The full protocol(s) (including the initial version, final version, and all amendments); and

18

iv.  Full statistical analysis plan(s) (including all amendments and documentation for additional work processes) and analytic code.

## B. Third-Party Data Archive

1. The Company shall share the clinical data and information described in Section IV.A.1 via a third-party data archive that makes clinical data available to Qualified Researchers with a bona fide scientific research proposal.

2. The Company shall begin sharing information identifying the clinical data and information described in Section IV.A.1.a and b with the vendor no later than 30 days following entry of the Confirmation Order and shall complete that process of identifying the clinical data and information described in Section IV.A.1.a and b no later than 90 days following entry of the Confirmation Order.

3. The data archive shall have a panel of reviewers with independent review authority to determine whether the researchers are qualified, whether a research application seeks data for bona fide scientific research, and whether a research proposal is complete.

4. The panel may exclude research proposals with a commercial interest.

## C. Non-Interference

1. The Company shall not interfere with decisions made by the staff or reviewers associated with the third-party data archive.

2. Unless expressly stated herein, the Company shall have no communications directly or indirectly with a Qualified Researcher, including with regard to the data added to the third-party archive.

## D. Data Use Agreement

1. Any data sharing agreement with a Qualified Researcher who receives shared data via the third-party data archive shall contain contact information for the Company's pharmacovigilance staff. Every agreement shall require the lead qualified researcher to inform the Company's pharmacovigilance staff within 24 hours of any determination that research findings could detrimentally impact the risk-benefit assessment regarding the product. The Company's pharmacovigilance staff shall take all necessary and appropriate steps upon receipt of such safety information, including but not limited to notifying regulatory authorities or the public. The lead Qualified Researcher may also inform regulatory authorities of the safety signal impacting the risk-benefit assessment as well as provide reasonable notice to the Company.

## E. Cost

1.    The Company shall bear all costs for making data and/or information until the NewCo Disposition Event.

## V.    DISPUTE RESOLUTION

A.    For the purposes of resolving disputes with respect to compliance with this injunction, should any State Attorney General or federal agency have reason to believe that the Company has violated a provision of this injunction subsequent to the Effective Date, then such Attorney General or federal agency shall notify the Company in writing of the specific objection, identify with particularity the provisions of this injunction that the practice appears to violate, and give the Company 30 days to respond to the notification.

B.    Upon 30 days of receipt of written notice from such State Attorney General or federal agency, the Company shall provide a written response, containing either a statement explaining why the Company believes it is in compliance with this injunction or a detailed explanation of how the alleged violation occurred and a statement explaining how and when the Company intends to remedy or has remedied the alleged violation.

C.    Such State Attorney General may not take any action concerning the alleged violation of this injunction during the 30-day response period.  Nothing shall prevent such State Attorney General from agreeing in writing to provide the Company with additional time beyond the 30 days to respond to the notice.  However, such State Attorney General may take any action, including, but not limited to legal action to enforce compliance with the [Confirmation Order/consent judgment specified by Section II.B], without delay if such State Attorney General believes that, because of the specific practice, a threat to the health or safety of the public requires immediate action.

D.    Such State Attorney General may bring an action against the Company to enforce the terms of the [Confirmation Order/consent judgment specified by Section II.B], but only after providing the Company an opportunity to respond to the notification as described above or within any other period as agreed to by the Company and such State Attorney General.

E.    Nothing in this injunction shall be interpreted to limit any State Attorney General's Civil Investigative Demand ("CID") or investigative subpoena authority and any federal agency's subpoena or investigative authority, to the extent such authority exists under applicable state or federal law.  The Company agrees to comply with such CID, subpoenas, or other demands or requests issued pursuant to such authority.

F.    Nothing herein shall be construed to exonerate any failure to comply with any provision of this injunction after the Effective Date, or to compromise the authority of any State Attorney General to take action for any failure to comply with this injunction.

## VI.    INDEPENDENT MONITOR

**A.    Monitor Selection and Engagement**

1.      The Company shall engage a Monitor to review its compliance with this injunction.

2.      Steven Bullock, the Monitor approved by the Bankruptcy Court on March 1, 2021, to oversee compliance with the Voluntary Injunction, shall continue to serve as Monitor with respect to this injunction after the Effective Date.

3.      If a new Monitor must be appointed due to the Monitor resigning or otherwise becoming unable to perform the specified tasks, the Foundation shall select a new Monitor, who must be approved by the State Monitor Committee which approval shall not be unreasonably withheld and approved by the Court.  The selected Monitor approved by the State Monitor Committee may serve while Court approval is pending.

4.      The Monitor may employ or retain personnel who have appropriate qualifications related to the pharmaceutical industry and the laws governing the manufacture, marketing and sale of pharmaceuticals and controlled substances and the applicable requirements of federal and state law. The Monitor may also retain the services of additional third-parties to the extent that additional expertise is required for the engagement.  The Monitor may consult with and seek input from the Company and the State Monitor Committee prior to finalizing the retentions described in this paragraph. The Company shall pay the Monitor, and any personnel or third parties employed or retained by the Monitor, their reasonable fees and expenses for services under this injunction.

## B.    Term

1.      The Company shall retain a Monitor until the NewCo Disposition Event(s).

2.      As required under Section II.A, any person or entity that acquires some or all of the Company's Opioid Products, including through the NewCo Disposition Event, shall retain the Monitor for at least one (1) year after the effective date of the transaction.

## C.    Monitor's Scope of Work

1.      The Monitor shall review the Company's ongoing compliance with the requirements of this injunction, except for Section III.H.

2.      The Monitor will report his or her findings as provided in Section VI.F.

3.      In the event that in the course of reviewing the Company's compliance with the requirements of this injunction the Monitor becomes aware of action or conduct by the Company that the Monitor believes may pose a threat to the health or safety of the public or otherwise requires prompt action, the Monitor may in his or her sole discretion, notify the Company and the States of such action or conduct without following the procedures provided in Section VI.F below.

4. Within thirty (30) calendar days after the Effective Date, the State Monitor Committee and the Company shall confer with the Monitor on a work plan and contract. In the event a new Monitor is appointed within thirty (30) days prior to the Effective Date, the State Monitor Committee and the Company shall have sixty (60) days from the Effective Date to confer with the Monitor on a work plan and contract. The work plan shall set forth the substance of the Monitor's review and the manner in which the Monitor will carry out his or her review of the Company's compliance with this injunction, including the general scope of information that the Monitor will seek to review. The Monitor shall have final authority to determine the content and substance of the work plan. The Monitor may select the period of time covered by the work plan, not to exceed one year. Any work plan and contract in place before the Effective Date may continue to be used upon agreement of the State Monitor Committee, the Company, and the Monitor

5. At least annually, and more frequently if appropriate, the Company and the State Monitor Committee will meet in person or virtually to discuss the monitorship and any suggestions, comments, or improvements the Company may wish to discuss with or propose to the State Monitor Committee, unless the Company and the State Monitor Committee believe such a meeting is unnecessary.

## D. Monitor Access to Information

1. In connection with its review of the Company's compliance with this injunction, the Monitor shall be vested with broad discretion to review the Company's operations, including access to documents and the right to interview employees, as the Monitor determines is reasonably necessary to fulfill its duties under this injunction, with reasonable notice to the Company and without unreasonable interference in the Company's or its employees' ability to perform day-to-day operations. The Monitor shall have all powers reasonable and necessary to efficiently and effectively discharge its responsibilities subject to appropriate confidentiality. The Monitor, and each of his employees or consultants, shall enter into a confidentiality agreement, the terms of which will be consistent with the confidentiality restrictions imposed by the Bankruptcy Court in the Third Amended Protective Order (Doc. 1935, Nov. 12, 2020).

2. The Company's Chief Legal Officer or their designee shall serve as the primary point of contact for the Monitor to facilitate the Monitor's reasonable access to documents, materials, or employees necessary to review for compliance with this injunction. The Monitor shall have unfettered access to the Chief Compliance Officer. The Monitor shall make a good faith effort to leverage the Company's existing compliance mechanisms when reviewing the Company's compliance with this injunction. The Monitor shall communicate any request for documents, materials, or access to employees to the Chief Legal Officer or their designee, but, subject to the terms hereof, is not prohibited from speaking with any other current or former employees of the Company.

3.    The Company shall not intimidate, harass, threaten, or penalize any employee or former employee for his or her cooperation with or assistance to the Monitor.

4.    If at any time the Monitor reasonably believes that there is undue delay, resistance, interference, limitation, or denial of access to any records or to any employee deemed necessary by the Monitor to implement or review compliance by the Company with this injunction, the Monitor may meet and confer with the Company's Chief Legal Officer or their designee. If the Monitor cannot resolve such limitation or denial, it shall be immediately reported to the Board of NewCo. If the issue remains unresolved after consultation with the Board of NewCo, the Monitor shall report the issue to the State Monitor Committee.

**E.    Access to Monitor**

1.    There shall be no limitation on the ability of the Monitor to communicate at any time with States and the United States, including any agency or component of the United States, regarding the Company's conduct.

**F.    Monitor Reports**

1.    Observations and Recommendations

a.    If the Monitor notes any areas for potential improvement regarding the Company's compliance with this injunction during the course of his or her reviews, the Monitor shall include any such recommendations in the Final Report described below.

b.    Collectively, any such questions, concerns or recommendations will be referred to as "Observations and Recommendations."

2.    Draft and Final Reports

a.    For purposes of the reporting described below, the Monitor's work will be divided into three-month periods for at least the first two reports, and the Monitor shall issue reports no later than every six months thereafter ("Reporting Periods").

b.    After the close of a Reporting Period and/or at any other time deemed reasonably necessary by the Monitor, the Monitor shall separately provide the Company and the State Monitor Committee with draft reports identifying and detailing any Observations and Recommendations and Potential Violations and the bases therefore (the "Draft Report"). Potential Violations shall mean the Company's failure to comply with the provisions of this injunction, as reasonably determined by the Monitor. The Company shall have the right to cure any Potential Violation, in accordance with the below provisions. The Draft Report will also contain

detailed descriptions of any Observations and Recommendations for Improvement.

c. Within seven (7) calendar days of its receipt of the Draft Report, the Company will provide comments to the Draft Report. The Company may also:

  i. Respond to each Potential Violation, including, where appropriate, explaining why no violation occurred, or describing any corrective action taken (or to be taken) as a result of the findings made by the Monitor, including, where appropriate, providing documentation supporting a relevant decision or additional context explaining the Potential Violation and why it occurred.

  ii. Respond to each Observation and Recommendation for Improvement.

d. After receipt of the Company's comments and responses and the State Monitor Committee's comments, if any, the Monitor will provide a final report (the "Final Report") simultaneously to the State Monitor Committee and the Company.

e. The Final Report shall set forth:

  i. The Monitor's evaluation of the Company's compliance with this injunction and the factual basis for the Monitor's conclusions, including whether a Potential Violation has occurred and an explanation of the nature of the Potential Violation.

  ii. The Monitor's conclusion as to whether the Company has cured any Potential Violations.

  iii. The Final Report shall include a listing of the Observations and Recommendations for Improvement made by the Monitor and responses of the Company. Recommendations shall not be deemed to be incorporated into the terms of this injunction.

  iv. The Monitor shall create a public version of each Final Report. The public version of each Final Report shall exclude all information that the Monitor determines, in consultation with the Company, to be trade secret or otherwise commercially sensitive and shall be posted on the Company's website.

## VII.   SHAREHOLDER RELEASED PARTIES

A.    The Shareholder Released Parties shall not take any action that would interfere with the Company's compliance with its obligations under this injunction.

## **Exhibit C**

### **NewCo Governance Covenants**

## NEWCO GOVERNANCE COVENANTS

These Governance Covenants will bind NewCo (the "**Company**") and the Company's Subsidiaries to operating requirements and controls that ensure that the Company and the Company's Subsidiaries (i) develop, manufacture, distribute and sell all of their products, including all opioid products, in a safe and secure manner that limits the risk of diversion, (ii) comply with their respective obligations under the Public Entity Settlements and the Private Entity Settlements, (iii) pursue and implement Public Health Initiatives, (iv) comply with the Operating Injunction and (v) otherwise operate in accordance with the Company's Purpose and take into account long-term public health interests relating to the opioid crisis and responsible, transparent and sustainable practices in the management of a pharmaceutical business.

| Category | Covenant |
|---|---|
| Governance | **Purpose and Principles**<br><br>• In accordance with Section 2.3(a) of the Limited Liability Company Operating Agreement of the Company (the "**Operating Agreement**"), the purpose of the Company shall be to, directly and/or through the Company's Subsidiaries, operate the Company Transferred Assets and any other assets of the Company or any of its Subsidiaries (i) in accordance with the terms of the Agreement, the Plan and the Confirmation Order, (ii) subject to the Operating Injunction and these Governance Covenants, and (iii) in a responsible and sustainable manner balancing: (x) the best interests of its stakeholders (including the direct and indirect holders of Interests in the Member), to fund and provide abatement of the opioid crisis, (y) effective deployment of the Company's and the Company's Subsidiaries' Assets to address the opioid crisis, and (z) the best interests of third parties materially affected by the Company's and the Company's Subsidiaries' conduct (collectively, the "**Company's Purpose**").<br><br>• In accordance with Section 2.3(b) of the Operating Agreement, the Company shall not be required (and the Board shall not be required to cause the Company) to maximize the Company's or the Company's Subsidiaries' sales or profits, but rather shall take all elements of the Company's Purpose into account.<br><br>**Effectuation of the Company's Purpose**<br><br>• In accordance with Section 2.3 of the Operating Agreement, the Company shall, and shall cause the Company's Subsidiaries to, conduct their respective business in a manner that complies with the Operating Injunction and these Governance Covenants in order to ensure that each of the Company and the Company's Subsidiaries, (i) develops, manufactures, distributes and sells all of its products, including all opioid products, in a safe and secure manner that limits the risk of diversion, (ii) complies with its obligations under the Public Entity Settlements and the Private Entity Settlements, (iii) pursues and implements Public Health Initiatives, and (iv) otherwise operates in accordance with the Company's Purpose and takes into account long-term public health interests relating to the national opioid crisis and responsible practices in the management of a pharmaceutical business. |

- The Company shall integrate the Company's Purpose into material business activities and systems by:
  - providing relevant employees with at least annual training on the Purpose, the Injunction and these Governance Covenants. The Company shall provide appropriate, relevant training to new employees at the time of their onboarding.
  - incorporating, under the oversight of the Board, to the extent relevant, the Company's Purpose, the Injunction and these Governance Covenants into the Company's controls, performance management programs, management and leadership oversight, and executive compensation schemes.
  - vesting the appropriate committee of the Company Board with the responsibility for oversight of policy-setting and monitoring with respect to the Company fulfilling its Purpose; compensating and managing its workforce; maintaining legal compliance and otherwise fulfilling its obligations under these Governance Covenants.
  - authorizing the Board and Board committees with the ability and the funding to retain external subject matter experts who may provide insight, recommendations and review of the Company's strategic plans and programs for implementing these Covenants.
  - subject to the Company's obligation to distribute Distribution and Trust Payments in accordance with Section 6.5(a) of the Operating Agreement, using reasonable efforts to ensure, in consultation with the Board, that the amount of unrestricted cash and cash equivalents held by the Company and the Company's Subsidiaries, as reflected on the consolidated balance sheet of the Company and the Company's Subsidiaries, is adequate for purposes of ensuring the Company's ability to comply with its obligation to fund Operating Expenses consistent with the Company's Purpose and these Governance Covenants.
  - taking, as determined by the Company Board, steps as needed to ensure that these Governance Covenants are integrated into the Company's strategic plans, management controls and day to day operations.

- The Company will maintain programs and controls reasonably designed to manage risk and protect and strengthen its resilience and capacity to anticipate and manage business threats and disruptions. This shall include plans and programs relating to: (i) business continuity, (ii) crisis management; (iii) physical security; (iv) emergency management and response; and (v) IT disaster recovery. The Board (or an authorized committee thereof) shall review Purdue's Business Continuity Plan and may decide to have it apply to the Company or whether another business continuity plan should be adopted in a manner consistent with the Company's Purpose. The Board (or an authorized committee thereof) will

2

| | review its business continuity plan from time to time and amend it if appropriate, in a manner consistent with the Company's Purpose. |
|---|---|

**Transparency & Reporting**

- The Board shall cause the Company to prepare (i) in accordance with Section 8.3(c) of the Operating Agreement, semi-annual public benefit reports to be published publicly, which shall describe the effectuation of the Company's Purpose and the public benefits being achieved consistent with the Company's Purpose ("**Public Benefit Reports**"), and (ii) in accordance with Section 8.3(b) of the Operating Agreement semi-annual financial and operating reports to be delivered to the Foundation.

- The Board shall cause the Company to, from time to time, solicit and consider feedback from those stakeholders that the Board determines to be appropriate, in identifying material threats, opportunities, megatrends and material topics to the company to inform the Public Benefit Reports.

| **Access to Medicine - Public Health Initiatives** | **PHI Funding and Implementation**<br><br>- Subject to the parameters set forth in Section 6.2 of the Operating Agreement and consistent with the Company's Purpose, the Board will determine appropriate expenditure levels for the Public Health Initiatives. |
|---|---|
| **Product Diversion and Security** | - The Company will maintain product security and diversion controls reasonably designed to ensure that the Company's Products are sold and distributed in a manner that is safe, compliant and minimizes the risk of diversion and that is otherwise compliant with:<br><br>    o The Operating Injunction.<br>    o applicable Drug Enforcement Administration regulations.<br>    o relevant Standard Operating Procedures for Purdue Pharma L.P. and Associated US Companies including, without limitation, those governing the receipt, destruction, procurement, and handling of controlled substances, provided that such procedures may be reviewed and amended from time to time by the Board (or an authorized committee thereof).<br><br>- The Company shall operate a robust supply chain security program. The Board (or an authorized committee thereof) shall review Purdue's current applicable policies and program and decide whether to have them apply to the Company, or whether another program should be implemented, consistent with the Operating Injunction after taking into account the Company's Purpose. The Board (or an authorized committee thereof) will review the supply chain security program from time to time and amend the |

| | program if appropriate, in a manner consistent with the Company's Purpose. |
|---|---|
| **Compliance and Ethics** | **Compliance and Regulatory Programs**<br><br>The Company will implement a comprehensive internal compliance management and assurance program that:<br><br>  o  is designed to ensure adherence to the Operating Injunction and these Governance Covenants in accordance with Section 6.7 of the Operating Agreement.<br>  o  is designed to ensure compliance with all applicable laws and regulations.<br>  o  is consistent with: (i) the Office of Inspector General Compliance Program Guidance for Pharmaceutical Manufacturers; (ii) the US Department of Justice Guidance on the Evaluation of Corporate Compliance Programs; and (iii) the PhRMA Code on Interactions with Healthcare Professionals.<br>  o  is reasonably designed to mitigate compliance risks applicable to a pharmaceutical business including, without limitation, those relating to: bribery and corruption; conflicts of interest; physical and product security; bioethics; clinical trial transparency and patient safety; provided that such Code of Ethics and policies may be reviewed and amended from time to time by the Board (or an authorized committee thereof) in a manner consistent with the Company's Purpose, and implemented through a Code of Ethics and the adoption of procedures, standards and other controls. |
| **Environmental, Health, & Safety** | **Environmental, Workplace Health & Safety**<br><br>• The Company will maintain environment, workplace health and safety policies, programs and controls that:<br><br>  o  are reasonably likely to ensure compliance with applicable laws and regulations.<br>  o  are reasonably designed to minimize any adverse impacts on the environment associated with the Company's operations or products, whether in use or at the end of their useful life.<br>  o  are reasonably designed to educate and enable Company employees and contractors to work in a safe, healthy and environmentally responsible manner.<br>  o  reflect and embed leadership commitment to maintaining a safe, "zero injury" workplace.<br>  o  are reasonably designed to proactively identify and manage workplace hazards to employees and third parties.<br>  o  are reasonably designed to embed a culture of safety and wellbeing throughout the Company.<br>  o  are reasonably designed to continuously improve performance. |

4

| | |
|---|---|
| | o   enable the Company to transparently communicate performance to stakeholders through the Public Benefit Reports. |
| **Oversight** | • On an annual basis, the CEO of the Company shall certify, solely in his or her capacity as an officer of the Company, that, after reasonable inquiry and based on his or her knowledge, the Company is in material compliance with these Covenants. The certification shall be provided to the Board, the State Monitor Committee (as defined in the Operating Injunction) and upon request, any State Attorney General. <br><br> • In accordance with the Operating Agreement, under the oversight of the Board, the Company and its representatives shall cooperate with, and reasonably respond to requests for assistance by, the Monitor in the performance of the Monitor's duties and responsibilities as provided for in the Plan, the Confirmation Order and the Operating Injunction, including by responding to reasonable requests for access to relevant books and records of the Company and the Company's Subsidiaries. The reasonable compensation of, and costs and expenses incurred by, the Monitor in connection with its duties and responsibilities, including the fees and expenses of professionals retained by the Monitor shall be paid by the Company. <br><br> • The Company will not amend the Operating Agreement, including by merger, consolidation, division or otherwise, (i) in any manner that is inconsistent with the Plan or the Confirmation Order without (I) an order of the Bankruptcy Court approving such modification, and (II) to the extent such proposed amendment adversely affects the Governmental Remediation Trust or the Tribe Trust, the unanimous consent of the trustees of the Governmental Remediation Trust or the Tribe Trust, as applicable. The Company will give the Monitor 7 business days' written notice of any amendment to the Operating Agreement and will reasonably consider comments of the Monitor solely to the extent that the contemplated amendment would or would potentially alter, undermine or limit or interfere with the effectiveness or the implementation of the Operating Injunction. The Monitor shall promptly deliver such notice to the State Monitor Committee (as defined in the Operating Injunction). |
| **Successors** | • Any successor owner (whether through one transaction or a series of related transactions) of the Opioid Business, shall be obligated to comply with the provisions of these Governance Covenants that are specifically enumerated under the category "Product Diversion and Security" and the matters described in clauses (i) and (iv) of Section 2.3(c) of the Operating Agreement; provided (x) that the obligations of any successor to comply with the Operating Injunction shall be as set forth in the Operating Injunction and (y) as long as a successor maintains internal standard operating procedures similar to the Standard Operating Procedures for Purdue Pharma L.P. and Associated US Companies, as may be amended |

| | from time to time by the Board, as appropriate and reasonable for such successor, taking into account such successor's size and resources, such successor shall not be obligated to adopt the Company's standard operating procedures. |
| --- | --- |

## **<u>EXHIBIT B-1</u>**

**Blackline of Fourth Revised Proposed Order against Third Revised Proposed Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | **Chapter 11** |
| **PURDUE PHARMA L.P.**, *et al.*, | **Case No. 19-23649 (SHL)** |
| Debtors.[1] | **Jointly Administered** |

**[DEBTORS' PROPOSED] FINDINGS OF FACT, CONCLUSIONS OF LAW,
AND ORDER CONFIRMING THE ~~SEVENTEENTH~~EIGHTEENTH AMENDED
JOINT CHAPTER 11 PLAN OF REORGANIZATION OF
PURDUE PHARMA L.P. AND ITS AFFILIATED DEBTORS**

The Debtors[2] having filed (i) the *Thirteenth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors* [D.I. 7638] (including all appendices, exhibits, schedules, and supplements thereto, and as altered, amended, supplemented, or otherwise modified from time to time in accordance therewith, including pursuant to the *Fourteenth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors* [D.I. 7911], the *Fifteenth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors* [D.I. 8168], the *Sixteenth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors* [D.I. 8199], ~~and~~ the *Seventeenth Amended Joint Chapter 11 Plan of Reorganization of*

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Purdue Products L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

[2] Capitalized terms used but not otherwise or immediately defined herein (this "**Order**") shall have the meanings ascribed to such terms elsewhere herein, in the Disclosure Statement, the Plan, the Confirmation Brief, or the Confirmation Protocols Order, as applicable. The rules of interpretation set forth in <u>Section 1.2</u> of the Plan shall apply hereto.

*Purdue Pharma L.P. and its Affiliated Debtors* [D.I. 8230], and the *Eighteenth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors* [D.I. 8233], the "**Plan**") (attached hereto as **Exhibit A**) and (ii) the *Disclosure Statement for the Thirteenth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P.* [D.I. 7638] (including all appendices, exhibits, schedules, and supplements thereto, and as altered, amended, supplemented, or otherwise modified from time to time in accordance therewith, the "**Disclosure Statement**"), each of which is incorporated herein by reference; and upon the *Debtors' Motion for Order Establishing Confirmation Schedule and Protocols* [D.I. 7512] (the "**Confirmation Protocols Motion**") and the *Order Granting Debtors' Motion for Order Establishing Confirmation Schedule and Protocols* [D.I. 7614] (as modified through various extensions filed on the docket in the Chapter 11 Cases, the "**Confirmation Protocols Order**"); and the Bankruptcy Court having considered the responses and objections to Confirmation (as defined herein) of the Plan (collectively, the "**Confirmation Objections**"), the *Debtors' Memorandum of Law in Support of Confirmation of the Fifteenth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors* [D.I. 8164] (the "**Confirmation Brief**"), and the Statements in Support[3]; and the Bankruptcy Court having jurisdiction to consider the relief granted herein pursuant to 28 U.S.C. § 1334 and the *Amended*

---

[3] The "**Statements in Support**" means, collectively, and together with any declarations, exhibits and/or reports filed in connection therewith, (i) *Beacon Company's Statement in Support of Confirmation of the Fourteenth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors* [D.I. 8150], (ii) *The Ad Hoc Group of Individual Victims' Statement in Support of Confirmation of the Debtors' Joint Chapter 11 Plan of Reorganization and Limited Reply to Certain Plan Objections* [D.I. 8151], (iii) *Statement of the Raymond Sackler Family in Support of Confirmation of Debtors' Fourteenth Amended Plan of Reorganization and in Reply to Plan Objections* [D.I. 8152], (iv) *The Multi-State Governmental Entities Group's Statement in Support of the Fourteenth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors* [D.I. 8153], (v) *Debtors' Omnibus Response to Insurers' Objections to Confirmation of the Debtors' Joint Chapter 11 Plan of Reorganization* [D.I. 8156], (vi) *Statement of the Official Committee of Unsecured Creditors in Support of Confirmation of the Fourteenth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors* [D.I. 8165], and (vii) *Ad Hoc Committee's Reply to Plan Objections* [D.I. 8172].

*Standing Order of Reference M-431*, dated January 31, 2012 (Preska, C.J.); and the Bankruptcy Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157; and the Bankruptcy Court having found that it may enter a final order consistent with Article III of the United States Constitution; and the Bankruptcy Court having found that venue of the Chapter 11 Cases and related proceedings is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the relief requested having been provided to the parties listed in the *Affidavit of Service of Solicitation Materials* [D.I. 7987], such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and the Bankruptcy Court having reviewed and considered Confirmation of the Plan; and the Bankruptcy Court having reviewed or otherwise taken judicial notice of the entire record of the Chapter 11 Cases (including the Confirmation Hearing, written and oral testimony of witnesses offered at the Confirmation Hearing, and any and all exhibits admitted into evidence during the Confirmation Hearing) (collectively, the "**Record**"); and the Bankruptcy Court having held a hearing to consider the Record, including the written and oral testimony of all witnesses, any and all exhibits admitted into evidence, and, ultimately, the relief granted herein (the "**Confirmation Hearing**"); and the Bankruptcy Court having determined that the Confirmation Hearing was conducted in accordance with all requirements of due process and applicable State and federal law; and the Bankruptcy Court having determined that the legal and factual bases set forth in the Record establish just cause for the relief granted herein; and all objections and reservations of rights filed or asserted in connection with the relief granted herein, if any, having been withdrawn, resolved, or overruled with prejudice; and upon all of the proceedings had before the Bankruptcy Court; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY FOUND, ORDERED, ADJUDGED, AND DETERMINED THAT:**

1.      <u>Confirmation</u>.  The facts and legal arguments set forth in the Record, including the evidence and argument at the Confirmation Hearing, demonstrate that the requirements for entry of a Confirmation Order by the Bankruptcy Court on the docket of the Chapter 11 Cases ("**Confirmation**") of the Plan have been satisfied.  Further, each witness who testified (by declaration or otherwise) at or in connection with the Confirmation Hearing in support of the Plan was credible, reliable, and qualified to testify as to the topics addressed in his or her testimony.  Therefore, the Debtors, as proponents of the Plan, have met their burden of proving the satisfaction of the requirements for Confirmation of the Plan set forth in section 1129 of the Bankruptcy Code by a preponderance of the evidence, which is the applicable standard.  All requirements under the Bankruptcy Code for the Confirmation of the Plan have been satisfied. Accordingly, the Plan, in its entirety, is **CONFIRMED** pursuant to section 1129 of the Bankruptcy Code.  Each of the terms and conditions of the Plan and the Plan Documents (and any amendments, modifications, and supplements thereto) are integral parts of the Plan.  The failure to specifically describe or include herein any particular provision of the Plan or any Plan Document, each of which is incorporated by reference herein, shall not diminish or impair the effectiveness of such provision, it being the intent of the Bankruptcy Court that the Plan (including each Plan Document to the extent incorporated therein) is confirmed in its entirety. All of the transactions contemplated by the Plan are hereby approved.  The Plan complies with all applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules. Once finalized and executed, the Plan and Plan Documents shall, as applicable, constitute legal, valid, binding, and authorized obligations of the applicable Debtors and the parties thereto, enforceable in accordance with their terms and the terms of the Plan and this Order.

2.      <u>Objections</u>.  All objections (including the Confirmation Objections), responses, statements, reservations of rights, and comments in opposition to Confirmation of the Plan, to the extent not withdrawn with prejudice in their entirety, waived, settled, or resolved prior to the Confirmation Hearing, or otherwise resolved on the Record of the Confirmation Hearing or herein, are hereby overruled with prejudice.  The Record of the Confirmation Hearing is hereby closed.

3.      <u>Solicitation</u>.  As described in the Confirmation Protocols Order, and as evidenced by the affidavits at D.I. 7987 and 7992, service of the Solicitation Packages was adequate and sufficient under the circumstances of the Chapter 11 Cases, and adequate and sufficient notice of the Confirmation Hearing and other requirements, deadlines, hearings, and matters described in the Confirmation Protocols Order (a) was timely and properly provided in compliance with the Confirmation Protocols Order and, to the extent applicable, with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules and (b) provided due process, including an opportunity to appear and to be heard, to all parties in interest.  Accordingly, no other or further notice or service of the Solicitation Packages or the Confirmation Hearing is or shall be required.  All parties have had a fair opportunity to litigate all issues (including those raised by the Confirmation Objections), and the Confirmation Objections have been fully and fairly litigated. All parties in interest, including, without limitation, the Debtors' insurers, had notice of the Purdue bankruptcy proceedings and an opportunity to participate in them and were on notice that Debtors' opioid-related liabilities were being mediated, negotiated, and resolved.

4.      <u>Good Faith</u>.  The Plan is the product of the good faith process through which the Debtors have conducted the Chapter 11 Cases and reflects extensive, good faith, arm's-length negotiations among the Debtors, the Creditors' Committee, each of the Supporting Claimants,

and their respective professionals, including in court-ordered, arm's-length good faith Mediation, which occurred in multiple phases from 2020 through 2025 as directed in the Mediation Orders entered in these Chapter 11 Cases. The Plan Documents are the product of good faith efforts of the Debtors and applicable non-Debtor parties who negotiated the agreements reflected in the Plan Documents and assisted in the drafting of the Plan Documents. The Plan itself and the process leading to its formulation provide independent evidence of the Debtors' good faith, serve the public interest, and assure fair treatment of Holders of Claims. Consistent with the overriding purpose of the Bankruptcy Code, the Chapter 11 Cases were filed and the Plan was proposed with the legitimate and honest purpose of maximizing the value of the Debtors' Estates and providing for the opportunity for fair and reasonable distributions to creditors. Accordingly, the Plan is fair, reasonable, and consistent with sections 1122, 1123, and 1129 of the Bankruptcy Code. Based on the foregoing, as well as the facts and record of the Chapter 11 Cases, including, but not limited to, the Record, the Plan has been proposed in good faith and not by any means forbidden by law, thereby satisfying section 1129(a)(3) of the Bankruptcy Code.

5. <u>No Disparate Treatment</u>. The Plan provides for the same treatment for each Claim or Interest in each respective Class unless the Holder of a particular Claim or Interest has agreed to less favorable treatment on account of such Claim or Interest, thereby satisfying section 1123(a)(4) of the Bankruptcy Code.

6. <u>Plan Modifications</u>. Any modifications to the Plan since the commencement of solicitation and prior to the entry of this Order comply with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Confirmation Protocols Order, and <u>Section 12.3</u> of the Plan. Such modifications constitute immaterial modifications or do not adversely affect or change the treatment of any Claims or Interests. Notice of these

modifications by filing revised documents was adequate and appropriate under the facts and circumstances of the Chapter 11 Cases.  Pursuant to Bankruptcy Rule 3019, the modifications do not require either (a) any additional disclosure under section 1125 of the Bankruptcy Code or the resolicitation of votes under section 1126 of the Bankruptcy Code or (b) that the Holders of Claims be afforded an opportunity to (i) change previously cast acceptances or rejections of the Plan or (ii) withdraw previously submitted elections to opt-in to the Third-Party Releases through the applicable ballots.  Accordingly, the Plan is properly before the Bankruptcy Court, and all votes cast with respect to the Plan and elections to opt in to the Third-Party Releases prior to any such modifications shall be binding and shall apply with respect to the Plan.  The Plan may not be further modified except in accordance with Section 12.3 of the Plan.  The Debtors are authorized, prior to the Effective Date, to make modifications to the Plan as and to the extent provided under Section 12.3 of the Plan.

7.    Plan Supplement.    The contents, filing, and notice of the Plan Supplement [D.I. 7591, 7877, 8094, 8171, 8201] (and any subsequent amendments, modifications, and supplements thereto filed with the Bankruptcy Court) are proper and in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Confirmation Protocols Order, and other applicable laws, and no other or further notice is or shall be required.  All documents included in the Plan Supplement are integral to, part of, and incorporated by reference into the Plan.  Subject to the terms of the Plan and the Direct Claims Shareholder Settlement Agreements, and the consent rights of the parties thereunder, the Debtors may amend, update, supplement, or otherwise modify the Plan Supplement at any time before the Effective Date or in accordance with the Plan and the Direct Claims Shareholder Settlement Agreements, as applicable.  All parties were provided due, adequate, and sufficient notice of the Plan

Supplement, and the filing of any further supplements thereto will provide due, adequate, and sufficient notice thereof.

8. _Plan Classification_. The categories listed in _Article III_ of the Plan properly classify, and identify as Impaired or Unimpaired, the Claims against, and Interests in, each of the Debtors, pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code, for all purposes, including voting, Confirmation of the Plan, and distributions pursuant to the Plan, and shall be controlling for all purposes under the Plan.

9. _Effectiveness of All Actions_. Except as set forth in the Plan or this Order, all actions authorized to be taken pursuant to this Order or the Plan may be taken and shall be effective when taken on, prior to, or after the Effective Date pursuant to the Plan and this Order, as applicable, without further notice to, or action, order, or approval of, the Bankruptcy Court.

10. _Compromise and Settlement of Claims, Interests, and Controversies_. Pursuant to the Bankruptcy Code, including section 1123 of the Bankruptcy Code, and Bankruptcy Rule 9019, the Debtors have authority to propose and negotiate the Plan Settlements, including resolution of their opioid-related liabilities and, with approval of the Bankruptcy Court, enter into the Plan Settlements, including the resolution of their opioid-related liabilities through the Plan and the resolution of any potential objections to the Allowance of Settling Creditors' Claims. The Plan Settlements, including the settlements reached between the Debtors and the opioid-related claimants, as embodied in the Plan, are fair, equitable, reasonable and in the best interests of the Debtors and their Estates, and the Holders of Claims and Interests, and were entered into in good faith based on arm's-length negotiations. The treatment provided in respect of Claims against and Interests in the Debtors, the treatment of competing Classes of Claims and the various intercreditor allocation agreements and settlements, including the settlement of

potential objections to the Allowance of Settling Creditors' Claims, are fair, equitable, and reasonable when combined with the distribution scheme, including without limitation all Distributions to be made under the Plan, and the release, injunction and all other provisions contained in the Plan, all of which are material aspects of the Plan and the terms of the Shareholder Settlements.  Such negotiation, settlement, and resolution of liabilities shall not operate to excuse any insurer from its obligations under any insurance policy, notwithstanding any terms of such insurance policy (including any consent-to-settle or pay-first provisions) or provisions of non-bankruptcy law.  The Plan Settlements are necessary and integral to the Plan and the Plan Documents and the success of the Chapter 11 Cases.  Any reasonable estimate, projection, or valuation of their total liability and obligation to pay for Claims asserted against the Debtors, if the Debtors had the ability to pay those Claims and that liability outside of the Chapter 11 Cases, exceeds by many multiples the total value of all assets of the Debtors' Estates, including but not limited to the value of the Debtors' business, contributions from third parties and the full face value of all of Purdue's insurance.  The provisions of the Plan and the other Plan Documents constitute a good faith compromise and settlement of Claims and controversies among the Debtors, the Supporting Claimants, the Settling Creditors, the Shareholder Payment Parties, certain other participants in the multiple phases of court-ordered Mediation and other parties in interest reached in connection with that Mediation and otherwise; *provided*, that the Plan Settlements are not intended to serve as an example for, or represent the parties' respective positions or views concerning, any other chapter 11 cases relating to opioids, nor shall any Person or party use them as precedent in any other such chapter 11 cases or in any other proceeding, situation or litigation.  The Debtors are hereby authorized and directed to enter into the Plan Settlements under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019.

11. <u>Master Shareholder Settlement Agreement</u>.

(a) The Master Shareholder Settlement Agreement, the Definitive Documents (as defined in the Master Shareholder Settlement Agreement) and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Debtors or the Master Disbursement Trust, as applicable, in connection therewith, are hereby approved.

(b) All Liens granted as contemplated by the Plan, the Master Shareholder Settlement Agreement, the Plan Supplement, and the Collateral Documents (as defined in the Master Shareholder Settlement Agreement), as applicable, are hereby approved.

(c) Subject to the terms and conditions of the Master Shareholder Settlement Agreement, Purdue Pharma Inc. shall surrender, cancel and/or redeem its de minimis interests in Pharmaceutical Research Associates L.P.

(d) Each Family Member (as defined in the Master Shareholder Settlement Agreement) and each party to the Master Shareholder Settlement Agreement, the Collateral Documents, and the other Definitive Documents (each as defined in the Master Shareholder Settlement Agreement) shall comply in good faith with the applicable terms of such agreements to which they are a party. Each provision of the Master Shareholder Settlement Agreement, the Collateral Documents, and the other Definitive Documents shall have the full force and effect of a binding Court order as of the Agreement Effective Date (as defined in the Master Shareholder Settlement Agreement); *provided*, *however*, that nothing in this paragraph shall confer, or be deemed to confer, any rights, benefits, or enforcement authority upon any Person for which any such rights, benefits, or enforcement authority do not arise under the terms of the Master Shareholder Settlement Agreement, the Collateral Documents, or the other Definitive Documents (any such Person, a "**Non-Enforcing Party**"); *provided*, nothing in the foregoing proviso shall limit or be deemed to limit any such rights, benefits, or enforcement authority that  the Master Disbursement Trust, Creditor Trusts or Settling Creditors  may have under the terms of the Master Shareholder Settlement Agreement, the Collateral Documents, or the other Definitive Documents. The Plan and this Order shall be binding upon each of the Shareholder Released Parties.

(e) Pursuant to the Master Shareholder Settlement Agreement, each party to the Master Shareholder Settlement Agreement will (i) submit to the jurisdiction of the Bankruptcy Court solely for the purposes of enforcing the Master Shareholder Settlement Agreement, (ii) consent to the authority of the Bankruptcy Court to enter Final Orders or judgments relating to the enforcement of the Master Shareholder Settlement Agreement, and (iii) waive and not advance any argument that any Proceeding (as defined in the Master Shareholder Settlement Agreement) arising under, related to, or in connection with the Master Shareholder Settlement Agreement is or must be adjudicated

as an adversary proceeding governed by Part VII of the Federal Rules of Bankruptcy Procedure or that the Bankruptcy Court is an improper or inconvenient forum or venue. For the avoidance of doubt, the foregoing shall not apply in connection with litigation brought by any Non-Enforcing Party.

(f)  Each Family Member shall not seek, request, or permit any new naming rights for the "Sackler" name with respect to charitable or similar donations to organizations (irrespective of when such funds were donated or from what source) until the later to occur of (1) the date on which the remaining unpaid Payment Obligations of the Payment Groups that such Family Member is a member have been reduced to zero (accounting, in the case of an A-Side Payment Group, for the maximum amount the A-Side Payment Group may be liable for hereunder) and (2) the first date on which the IAC Payment Parties of such Payment Groups are no longer the owners or holders of any interest in any IAC (other than Retained Interests permitted by Section 3.01(b) of the Master Shareholder Settlement Agreement); *provided* that at such time Family Member and its associated Payment Parties and Payment Group are in compliance with their obligations under Section 8.08 of the Master Shareholder Settlement Agreement).   For the avoidance of doubt, nothing herein shall prohibit (x) any Payment Party or Family Member from making any charitable or similar donations or (y) the publication of the name of any Payment Party or Family Member making a charitable or similar donation in connection with such donation, provided such publication is not pursuant to a naming right.[4]

(g)  Each Family Member and Payment Party shall, upon occurrence of the Plan Effective Date, allow any institution or organization in the United States that has provided naming rights to such Family Member, Payment Party, the associated Payment Group or associated Payment Parties to remove the "Sackler" name from any applicable (i) physical facilities and (ii) academic, medical, and cultural programs, scholarships, endowments, and the like, subject to the following conditions: (A) such institution or organization shall provide the respective Payment Party or Family Member with forty-five (45) calendar days' confidential notice of its intention to remove the "Sackler" name; (B) if such institution or organization in its discretion determines that an announcement or other disclosure regarding the removal of the "Sackler" name is necessary, such announcement or disclosure shall include a statement that indicates that such removal is pursuant to an agreement reached in mediation in the Bankruptcy Cases; and (C) any statements issued by such institution or organization in connection with or substantially concurrent with such removal shall not disparage any Payment Party or Family Member, *provided* that nothing in this clause (C) shall restrict any academic or similar work at such institution or organization. For the avoidance of doubt, the

---

[4] For the avoidance of doubt, capitalized terms used in paragraphs 11(e), 11(f), 11(g) and 11(h) of this Order shall have the meanings ascribed to such terms in the Master Shareholder Settlement Agreement.

removal rights provided herein shall not limit any rights that any applicable institution or organization otherwise may have irrespective of the Master Shareholder Settlement Agreement or this Confirmation Order.

(h) The IAC Payment Parties shall use their commercially reasonable best efforts to sell or cause to be sold to one or more unaffiliated third parties, through any transaction, series of related transactions or separate transactions, all or substantially all of their respective direct and/or indirect Equity Interests in the IACs (excluding Purdue Canada) and/or their assets (excluding Purdue Canada) on the terms and conditions set forth in the Master Shareholder Settlement Agreement.

(i) The Sackler Parties shall participate in the Public Document Repository on the terms and conditions set forth in the Plan.

(j) Any and all periods for commencing or continuing any Tolled Claim (as defined in the Master Shareholder Settlement Agreement), whether fixed by statute, agreement, order, or otherwise, shall not expire until the Payment Obligations are paid in full and no Shareholder Released Party or any other signatory thereto shall assert otherwise (including through defenses (x) of statute of limitations, statute of repose, laches or inadequate tolling, or (y) that any release granted to any other Shareholder Released Party, but not made void pursuant to the terms of Section 9.02(a)(ii)(B) of the Master Shareholder Settlement Agreement has the effect of precluding such claim against such Shareholder Released Party or other signatory thereto, but excluding any defense of inadequate tolling only to the extent it could have been raised on and as of the Petition Date) in the litigation of any such Tolled Claim. For the avoidance of doubt, the Shareholder Released Claims shall include potential claims against subsequent transferees of fraudulent conveyances that occurred prior to the Settlement Effective Date, regardless of when such subsequent transfer of the funds or proceeds occurred (including transfers made after the Settlement Effective Date), and as such these claims are included in the Tolled Claims. For the avoidance of doubt, the foregoing extension of time periods shall not apply in connection with litigation brought by any Non-Enforcing Party.

12.  <u>Establishment and Purpose of the Trusts</u>.  Each of the Plan Administration Trust, the Master Disbursement Trust and the Creditor Trusts (other than any Tribe Trust entity that is formed as a legal entity other than a trust) shall be, or has been, established or designated as a trust under applicable state law for the purposes described in the Plan and the applicable Plan Documents, and shall be funded as and to the extent provided for in the Plan.  For the avoidance

of doubt, the PI Trust is a continuation of the "qualified settlement fund" (within the meaning of section 1.468B-1, et seq. of the Treasury Regulations promulgated under section 468B of the Internal Revenue Code) established in accordance with the Creditor Trust Establishment Order. Each of the Master Disbursement Trust and the Creditor Trusts (other than any Tribe Trust entity that is formed as a legal entity other than a trust) has been or is being established or designated to resolve or satisfy Claims that have resulted or may result from an event (or related series of events) that has occurred and that has given rise to Claims asserting liability arising out of a tort, breach of contract or violation of law.

13.    <u>Scope of Discharge</u>.  Except as expressly provided in this Order or the Plan, the discharge or release of the Debtors through the Plan will not operate to relieve any other entity, including Insurance Companies, of their obligation, if any, to pay the Debtors' opioid-related liabilities, without regard to (i) whether the Debtors would be able to pay such liabilities in the first instance outside of bankruptcy, and (ii) whether the Debtors or a post-bankruptcy trust can or do pay those liabilities in full, in both instances notwithstanding any terms of the Purdue Insurance Policies or provisions of non-bankruptcy law.

14.    <u>Attorneys' Fees and Expenses</u>.  Except as otherwise provided in the Plan or order of the Bankruptcy Court, Professionals that are required to seek payment or reimbursement under <u>Section 5.9(h)</u> or <u>(i)</u> of the Plan of their compensation, costs and/or fees shall file with the Bankruptcy Court an application for approval of such compensation, costs and/or fees as "reasonable" under section 1129(a)(4) of the Bankruptcy Code not later than ninety (90) days following the Effective Date, with respect to compensation, costs and/or fees incurred during the period through and including the Effective Date.  Such applications shall not be deemed an application for reasonable compensation for actual, necessary services by such professionals or

reimbursement for actual, necessary expenses to be paid from the Estates (except as otherwise provided in the Plan or order of the Bankruptcy Court), and neither section 330 of the Bankruptcy Code nor any of the Bankruptcy Rules, guidelines from the office of the U.S. Trustee, or other rules or guidelines applicable to fee applications shall apply. Each such application shall set forth the amount of compensation, costs and/or fees sought, provide a narrative basis for such compensation, costs and/or fees, and attach, as applicable, supporting documentation. A single application may cover one or more professionals that represented or advised an ad hoc group. Each such application shall be set for hearing on not less than fourteen (14) days' notice and served upon counsel to the Debtors, counsel to the Creditors' Committee, and the U.S. Trustee. If no objection is filed by any of such parties by the date that is three (3) days prior to such hearing, the Bankruptcy Court may enter an order approving such application without a hearing. With respect to applications filed by lead bankruptcy counsel to the Ad Hoc Group of Individual Victims under Section 5.9(h)(i) of the Plan, the Debtors and the Creditors' Committee have agreed and acknowledged that they shall not file any objections to, and shall support, such applications. With respect to applications filed by other professionals of the Ad Hoc Group of Individual Victims under Section 5.9(h)(i) of the Plan and professionals that represented or advised the NAS Committee under Section 5.9(h)(ii) of the Plan, the Supporting Claimants have agreed and acknowledged that they shall not file any objections to such applications, and the Debtors and the Creditors' Committee have agreed to support such applications. Any such application made is without prejudice to any applications by the Ad Hoc Group of Individual Victims, the NAS Committee, the Public School District Claimants or professionals that represented or advised any of the foregoing for allowance and payment of compensation, costs or fees under section 503(b) of the Bankruptcy Code. In addition, on the

Effective Date, or as soon as reasonably practicable thereafter, the attorneys' fees and expenses

of the State of Washington incurred through and including June 6, 2025 shall be paid from

Effective Date Cash in an amount not to exceed $1,464,411.01, *provided*, that such payments

shall be subject to paragraph 4 of the *Order Pursuant to 11 U.S.C. §§ 105 and 363(b)*

*Authorizing and Approving Settlement Term Sheet* [D.I. 4503], including, for the avoidance of

doubt, compliance with all procedures governing the authorization and payment of professional

fees and expenses of the Debtors and the Creditors' Committee as set forth in the Interim

Compensation Order, *mutatis mutandis*.   In addition, on the Effective Date, or as soon as

reasonably practicable thereafter, the fees and expenses of Pullman & Comley, LLC incurred

through and including June 6, 2025 shall be paid from Effective Date Cash in an amount not to

exceed $6,500.00, *provided*, that such payments shall be subject to paragraph 4 of the *Order*

*Pursuant to 11 U.S.C. §§ 105 and 363(b) Authorizing and Approving Settlement Term Sheet*

[D.I. 4503], including, for the avoidance of doubt, compliance with all procedures governing the

authorization and payment of professional fees and expenses of the Debtors and the Creditors'

Committee as set forth in the Interim Compensation Order, *mutatis mutandi*s.

15.    <u>U.S. Federal Income Tax Matters</u>.

(a)    The Master Disbursement Trust shall be structured to qualify as a "qualified
settlement fund," and the receipt of (i) any MDT Transferred Assets (and any
other amounts received by the Master Disbursement Trust pursuant to the Plan)
that are treated as amounts transferred to the Master Disbursement Trust for
purposes of Treasury Regulations section 1.468B-2(b)(1) and (ii) the proceeds
received in respect of any MDT Transferred Assets (and any other amounts
received by the Master Disbursement Trust pursuant to the Plan) that are not
described in clause (i) above (including, without limitation, proceeds received in
respect of the MDT Shareholder Rights) by the Master Disbursement Trust shall
be treated as amounts transferred by, or on behalf of, a "transferor" to a "qualified
settlement fund," within the meaning of Treasury Regulations section 1.468B-1
for U.S. federal income tax purposes and shall be treated consistently for state and
local tax purposes, to the extent applicable.

(b) Each of the Grantor Trust Escrow Accounts (as defined in Exhibit Z of the Master Shareholder Settlement Agreement) shall be structured to qualify as a separate "qualified settlement fund" within the meaning of Treasury Regulations section 1.468B-1 for U.S. federal income tax purposes and shall be treated consistently for state and local tax purposes, to the extent applicable. PRA L.P. or the applicable Shareholder Payment Party shall timely elect pursuant to Treasury Regulations Section 1.468B-1(k) (and any applicable state and local income tax purposes), to treat each such Grantor Trust Escrow Account as a "grantor trust," all of which is owned, for federal and applicable state and local income tax purposes only, by PRA L.P. or the applicable Shareholder Payment Party. PRA L.P. or the applicable Shareholder Payment Party shall maintain such election and shall not revoke such election without the prior written consent of the Involved Party (as defined in Exhibit Z of the Master Settlement Agreement).

(c) The Special Operating Reserve and each of the Released Claims Reserves shall each be structured to qualify as a separate "qualified settlement fund" within the meaning of Treasury Regulations section 1.468B-1 for U.S. federal income tax purposes and shall be treated consistently for state and local tax purposes, to the extent applicable. PRA L.P. shall timely elect pursuant to Treasury Regulations Section 1.468B-1(k) (and any applicable state and local income tax purposes), to treat the Special Operating Reserve and each of the Released Claims Reserves as a "grantor trust," all of which is owned, for federal and applicable state and local income tax purposes only, by PRA L.P. PRA L.P. shall maintain such election and shall not revoke such election without the prior written consent of the Master Disbursement Trust and/or the applicable Creditor Trusts.

(d) Each Creditor Trust (other than any Tribe Trust entity that is formed as a legal entity other than a trust) and each Sub-Qualified Settlement Fund has been or shall be structured to qualify as a separate "qualified settlement fund," and the Initial Private Creditor Trust Distributions, distributions on account of the MDT Private Claims, Public Creditor Trust Distributions, Initial Public Schools Distribution, distributions on account of the MDT Public School Districts Claim, the right to receive Governmental NewCo Distributable Cash, distributions from the PI Trust to a Sub-Qualified Settlement Fund and any other amounts received pursuant to the Plan, as applicable, made to the applicable Creditor Trust or Sub-Qualified Settlement Fund shall be treated as amounts transferred by, or on behalf of, a "transferor" to a "qualified settlement fund," within the meaning of Treasury Regulations section 1.468B-1 for U.S. federal income tax purposes and shall be treated consistently for state and local tax purposes to the extent applicable. The following funds shall be designated as Sub-Qualified Settlement Funds: CLD Purdue BK Qualified Settlement Fund; D. Miller Purdue Qualified Settlement Fund; AT and ASK PRD Qualified Settlement Fund; Hilliard Purdue

Qualified Settlement Fund; and Laborde Earles Purdue Qualified Settlement Fund.

(e) Each Creditor Trust PRA Non-Participating Claims Reserve and each Select Private Creditor Trust Non-Participating Claims Reserve shall be structured to qualify as a separate "qualified settlement fund" within the meaning of Treasury Regulations section 1.468B-1 for U.S. federal income tax purposes and shall be treated consistently for state and local tax purposes, to the extent applicable. PRA L.P. shall timely elect, pursuant to Treasury Regulations Section 1.468B-1(k) (and any applicable state and local income tax purposes), to treat each Creditor Trust PRA Non-Participating Claims Reserve and each Select Private Creditor Trust Non-Participating Claims Reserve as a "grantor trust," all of which is owned, for federal and applicable state and local income tax purposes only, by PRA L.P. PRA L.P. shall maintain such elections and shall not revoke any of such elections without the prior written consent of the Master Disbursement Trust and the applicable Creditor Trust(s).

16.    <u>Appointment of Managers, Trustees, Etc.</u>    The appointment and, where applicable, the manner of appointment of the MDT Trustees, the MDT Advisory Council Representatives, the NewCo Managers, the NewCo Monitor, the Foundation Trustees, the Plan Administration Trustee, the PPLP Liquidator, the Creditor Trustees, and the Creditor Trust Overseers in accordance with <u>Article V</u> of the Plan, and the exculpation thereof pursuant to <u>Article V</u> of the Plan, is hereby approved.

17.    <u>Release of Liens</u>.  Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan or this Order, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date in accordance with the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, discharged, and compromised, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors or the Liquidating Debtors, as applicable, and all rights, titles, and interests of any Holder of such

mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall revert to the Liquidating Debtors and their successors and assigns.  The Liquidating Debtors are authorized to file any necessary or desirable documents to evidence such release in the name of the party secured by such pre-Effective Date mortgages, deeds of trust, Liens, pledges, or other security interests.

18.    <u>Executory Contracts and Unexpired Leases</u>.  Entry of this Order shall constitute approval of all amendments, assumptions, assumptions and assignments, and rejections of Executory Contracts and Unexpired Leases provided for under the Plan pursuant to section 365 of the Bankruptcy Code.  Amendments, assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date without the need for any further action or consents that may otherwise be required under applicable non-bankruptcy law.  Any motions to assume, assume and assign, or reject any Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order of the Bankruptcy Court on or after the Effective Date, entry of which shall result in such assumption, assumption and assignment, or rejection becoming effective without need for any further action that may otherwise be required under applicable non-bankruptcy law.

19.    <u>Injunction, Exculpation, Release, Indemnification, Discharge, Settlement, and Compromise</u>.

(a)    The Bankruptcy Court has jurisdiction under 28 U.S.C. § 1334, and authority under 28 U.S.C. § 157, to approve the injunctions, exculpations, releases, indemnifications, discharges, settlements, and compromises set forth in the Plan (including, but not limited to, <u>Sections 10.5</u>, <u>10.6</u>, <u>10.7</u>, <u>10.8</u>, <u>10.10</u>, <u>10.11</u>, <u>10.12</u>, and <u>10.13</u> of the Plan).  Sections 105(a), 1123(b)(3), and 1123(b)(6) of the Bankruptcy Code and Bankruptcy Rule 9019 permit issuance of the injunctions and approval of the exculpations, releases, indemnifications, discharges, settlements, and compromises set forth in the Plan.

-18-

(b)   The injunctions, releases, and exculpations set forth in <u>Article X</u> of the Plan, including the Debtor Releases (as defined below), the Third-Party Releases, and the Channeling Injunction, were adequately disclosed and explained in the Disclosure Statement, on the Ballots, and in the Plan.

(c)   The releases by the Debtors and their Estates pursuant to <u>Sections 10.6</u> and <u>10.7</u> of the Plan (the "**Debtor Releases**") represent a valid exercise of the Debtors' business judgment.   For the reasons set forth in the Disclosure Statement and the Confirmation Brief and based on the evidence proffered or adduced at the Confirmation Hearing, the Debtor Releases are (i) an integral and necessary part of the Plan, (ii) a good faith settlement and compromise of the claims and Causes of Action released, (iii) given in exchange for good and valuable consideration, (iv) appropriately tailored to the facts and circumstances of the Chapter 11 Cases, and (v) given after due notice and opportunity for objection.   The Debtor Releases shall constitute a bar to the Debtors, the Liquidating Debtors, the Transferred Debtors, the Estates, the Plan Administration Trust, the Master Disbursement Trust, the Creditor Trusts, NewCo, any other newly formed Persons that shall be continuing the Debtors' businesses after the Effective Date, or any party purporting to claim through any of the foregoing, from asserting any Released Claim or Shareholder Released Claim released pursuant to <u>Sections 10.6</u> and <u>10.7</u> of the Plan, except as otherwise set forth in the Plan.   The Debtor Releases were negotiated by sophisticated parties represented by able counsel and financial advisors and are the result of an arm's-length negotiation process, including through the Mediation.   The Debtors' pursuit of any Released Claims or Shareholder Released Claims against the Released Parties or the Shareholder Released Parties (but not, for the avoidance of doubt, against any Excluded Party, Shareholder Release Snapback Party or MDT Insurer) would not be in the interests of the Estates' various constituencies because the benefits to the Estates obtained in exchange for granting the releases, including the benefit to the Estate's creditors by virtue of the various intercreditor allocation agreements and settlements reached in Mediation, likely outweigh any potential benefit from pursuing such claims considering the costs and uncertainty involved therein, and the fact that all of the intercreditor allocation agreements and settlements reached in Mediation were conditioned upon the Shareholder Settlement Agreements.   In light of, among other things, the concessions and contributions provided to the Debtors' Estates and the critical nature of the Debtor Releases to the Plan, the Debtor Releases are fair and reasonable, in the best interests of the Estates and their creditors, and appropriate.

(d)   The non-Debtor releases set forth in <u>Sections 10.6</u> and <u>10.7</u> of the Plan (the "**Third-Party Releases**") are appropriate.   The Third-Party Releases are consensual and therefore compliant with *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204 (2024).   The Releasing Parties each provided consent to the Third-Party Releases. The Third-Party Releases are binding on the Releasing Parties, *provided* that such binding effect shall not modify or expand the scope

or terms of such Third-Party Releases, which shall in all respects be as set forth in the Plan and Shareholder Settlement Agreements. The Record of the Confirmation Hearing demonstrates the following:

(i)     The consideration under the Master Shareholder Settlement Agreement described in the Disclosure Statement, including up to $7 billion in cash, constitutes a substantial contribution to the Estates and the Debtors' creditors.  The consideration under the Master Shareholder Settlement Agreement includes payments totaling up to $7 billion over fifteen years. Such payments exceed the value of the Debtors as a going concern.  Such payments also allow the Debtors to make the payments required under the DOJ Resolution and the Plan Settlements.

(ii)    The Released Claims and Shareholder Released Claims directly impact the Debtors' reorganization.  The appropriate resolution of these claims has been the subject of significant discovery, litigation and mediation in these cases by sophisticated parties from multiple creditor constituencies that were represented by able counsel and financial advisors.

(e) The injunction provisions set forth in Article X of the Plan, including, without limitation, the Channeling Injunction:  (i) are essential to the Plan; (ii) are necessary to preserve and enforce the discharge and releases set forth in Sections 10.2, 10.6, and 10.7 of the Plan, the exculpation provisions in Section 10.12 of the Plan, and the compromises and settlements implemented under the Plan; (iii) are appropriately tailored to achieve that purpose; (iv) are within the jurisdiction of this Court under 28 U.S.C. §§ 1334(a), 1334(b), and 1334(d); (v) are an essential means of implementing the Plan pursuant to section 1123(a)(5) and (b)(6) of the Bankruptcy Code; (vi) are an integral element of the transactions incorporated into the Plan; (vii) confer material benefits on, and are in the best interests of, the Debtors and their Estates, creditors, and other stakeholders; (viii) are critical to the overall objectives of the Plan; and (ix) are consistent with sections 105, 524(e), 1123, and 1129 of the Bankruptcy Code, other provisions of the Bankruptcy Code, and other applicable law.  The injunction provisions set forth in Article X of the Plan, including, without limitation, the Channeling Injunction, were adequately disclosed and explained on the relevant Ballots, in the Disclosure Statement, and in the Plan.  The record of the Confirmation Hearing and the Chapter 11 Cases is sufficient to support the injunction provisions set forth in Article X of the Plan.

(f) The Released Parties and Exculpated Parties have performed a meaningful role in, and significantly and tangibly contributed to, the Chapter 11 Cases and their resolution, have participated in the Chapter 11 Cases and the Debtors' restructuring in good faith, and have acted in compliance with all provisions of the Bankruptcy Code, including in connection with the negotiation, preparation, and pursuit of Confirmation of the Plan and compromises implemented therein.  Specifically, each of the Released Parties and

Exculpated Parties that owed fiduciary duties to the Debtors and their Estates fulfilled such fiduciary duties at all times.

(g) The Debtors and their management, directors, employees, professionals, attorneys, and advisors (in each case, other than any Excluded Party), have worked diligently (both before and after the Petition Date) in connection with the Debtors' restructuring efforts, by preparing the Chapter 11 Cases, negotiating, formulating, and seeking and obtaining Court approval, as applicable and among other things, of the Restructuring Transactions, the Direct Claims Shareholder Settlement Agreements, the Disclosure Statement, and the Plan. Throughout the Chapter 11 Cases, the Debtors have fulfilled any fiduciary duties or obligations owed to the Estates and protected the interests of all the Debtors' constituents. The Debtors and the Released Parties have acted, and will enter into the documents to which they are contemplated to become parties to effectuate the Plan (including the Plan Supplement and Plan Documents), in good faith and are hereby deemed to continue to act in good faith if they (i) proceed to consummate the Plan and the Restructuring Transactions in accordance with the terms thereof and (ii) take the actions authorized or directed by this Order that are consistent with the Plan and Plan Documents. The Debtors fairly and reasonably negotiated the transactions contemplated by the Plan in good faith and at arm's length, and the resulting terms are in the best interests of the Debtors and the Estates.

(h) The non-Debtor Released Parties and non-Debtor Exculpated Parties assisted the Debtors with negotiating and developing the Plan and the transactions and settlements contemplated thereby, or have agreed to forgo certain rights, make certain concessions, or incur certain obligations to permit recoveries for the Estates' creditors set forth in the Plan which might not otherwise have been achievable.

(i) Accordingly, and based on the Record before the Bankruptcy Court, each of the injunction, exculpation, release, indemnification, discharge, settlement, and compromise provisions set forth in the Plan (including, but not limited to, Sections 10.5, 10.6, 10.7, 10.8, 10.10, 10.11, 10.12, and 10.13 of the Plan) are (i) the product of extensive good-faith and arm's length negotiations, (ii) fair, equitable, reasonable, and appropriate under the circumstances, (iii) confers a material benefit on, and is in the best interests of, the Debtors, their Estates, and their creditors, (iv) essential, integral, and non-severable components of the Plan, consummation, and resolution of the Chapter 11 Cases, (v) appropriately and narrowly tailored, (vi) supported by good and valuable consideration (including the Released Parties' contributions to facilitate the resolution of the Chapter 11 Cases and implementation of the Plan), (vii) granted after due notice and opportunity for hearing, (viii) consistent with the Bankruptcy Code and applicable law, (ix) intended to promote finality and prevent parties from circumventing or attempting to circumvent the Plan, (x) supported by the Debtors and their key stakeholders, (xi) constitute good-faith compromises and settlements of the matters covered thereby, (xii) with

respect to the Third-Party Releases, consensual, (xiii) with respect to the injunction provisions, necessary to preserve and enforce the Plan's discharge, release, and exculpation provisions, and (xiv) are the result of a fair and valid exercise of the Debtors' business judgment.

20.   <u>Term of Injunctions and Case Stipulation</u>.

(a)   Unless otherwise provided in the Plan, all injunctions and stays arising under or entered during the Chapter 11 Cases, whether under section 105 or 362 of the Bankruptcy Code or otherwise, and in existence on the Confirmation Date, including but not limited to the Preliminary Injunction, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

(b) Notwithstanding the foregoing paragraph 20(a), on the Effective Date, without further action by or order of the Bankruptcy Court:

(i)   any and all obligations of the Shareholder Released Parties arising under the Case Stipulation shall terminate and the Case Stipulation shall be superseded by this Order solely with respect to paragraphs 15, 17, 19, 22 and 25 of the Case Stipulation, and solely as such paragraphs apply to any Shareholder Released Party; *provided* that, for the avoidance of doubt, the terms of such paragraphs shall continue in full force and effect with respect to all other parties (if applicable), and all other provisions of the Case Stipulation shall remain in full force and effect, in each case, unless otherwise provided by the Plan;

(ii)   any and all obligations of any Shareholder Released Party arising under paragraph I of the Voluntary Injunction set forth in Appendix I to the Preliminary Injunction (and any predecessors or successors of the Preliminary Injunction) shall terminate, and the Preliminary Injunction shall be withdrawn, vacated and superseded by this Order solely with respect to paragraph I of the Voluntary Injunction set forth in Appendix I; *provided* that, for the avoidance of doubt, all other provisions of the Preliminary Injunction shall remain in full force and effect, unless otherwise provided by the Plan; and

(iii)   any and all obligations of any Person arising under any subpoenas issued pursuant to any of *Order Pursuant to Federal Rules of Bankruptcy Procedure 2004 and 9016 Authorizing Examination of Third Parties* [D.I. 992] (as amended by the *Amended Order Pursuant to Federal Rules of Bankruptcy Procedure 2004 and 9016 Authorizing Examination of Third Parties* [D.I. 1008]), the *Order Pursuant to Rules 2004 and 9016 of the Federal Rules of Bankruptcy Procedure Authorizing Examinations of Certain Financial Institutions* [D.I. 1143], the *Order Pursuant to Federal Rules of Bankruptcy Procedure 2004 and 9016 Authorizing Examinations of and Document Production by Third Parties* [D.I. 1340] and the *Order*

*Pursuant to Federal Rules of Bankruptcy Procedure 2004 and 9016 Authorizing Examination of Certain Former Debtor Executives, Separately Represented Debtor Personnel, and Norton Rose Fulbright Pursuant to Federal Rules of Bankruptcy Procedure 2004 and 9006* [D.I. 1788] shall terminate.

(c)   Any and all information shared or produced by any Shareholder Released Party pursuant to the agreements or orders referenced in the foregoing paragraph 20(b), including any such information also shared with Persons not party to the Case Stipulation shall remain subject to the confidentiality terms under which it was shared, including any information that was designated under the Protective Order (or confidentiality agreement that was superseded by the Protective Order), which such information shall remain confidential under the terms of the Protective Order unless such information, materials or documents are included in the Public Document Repository in accordance with the Plan and the Master Shareholder Settlement Agreement.  Names or other identifying information of investments or specific third-party counterparties or advisors with whom or with which a Shareholder Released Party has or had a third-party investment, advisory or business relationship that was disclosed in documents or information produced by a Shareholder Released Party and designated Outside Professional Eyes Only Information under the Protective Order shall retain such designation and be protected accordingly. Notwithstanding the foregoing, the Creditors' Committee may provide to the Master Disbursement Trust any documents and information that it received from any party, including any Shareholder Released Party, through discovery during these Chapter 11 Cases, and such disclosure to the Master Disbursement Trust shall not be deemed to violate the Protective Order or any other confidentiality or non-disclosure agreement that may have governed the production of such documents and information to the Creditors' Committee in the first instance (provided that, for the avoidance of doubt, the terms of such Protective Order or confidentiality or non-disclosure agreements shall permit the prosecution, by the Master Disbursement Trust, of any MDT Causes of Action, and otherwise shall continue otherwise continue to govern the use and retention of such documents and information in all respects, regardless of whether the Master Disbursement Trust is a party to or otherwise subject to such Protective Order or confidentiality or non-disclosure agreements).

(d)   Except as provided in the PI Trust Documents, nothing in the Plan shall either (i) excuse any Person from compliance with any legislative, judicial or administrative subpoena, any civil investigative demand or any request for information made in the course of a government investigation; or (ii) limit any right of any Person with respect to compliance with any legislative, judicial or administrative subpoena, any civil investigative demand or any request for information made in the course of a government investigation.

21.     <u>Injunction Against Interference with Plan</u>.  Subject to <u>Section 12.4</u> of the Plan, upon entry of the Confirmation Order, all Holders of Claims against or Interests in the Debtors, Holders of Channeled Claims, Releasing Parties, Released Parties, Shareholder Released Parties and other parties in interest shall be enjoined from taking any actions directly or indirectly to interfere with the implementation or consummation of the Plan and the Plan Documents.

22.     <u>Plan Injunction</u>.

(a)     Except as otherwise provided in the Plan or in this Order, as of the entry of this Order but subject to the occurrence of the Effective Date, all Persons who have held, hold or may hold Claims against or Interests in the Debtors are, with respect to any such Claim or Interest, permanently enjoined after the entry of this Order from: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting, directly or indirectly, a Debtor or an Estate or the property of any of the foregoing, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this clause (i) or any property of any such transferee or successor; (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting or otherwise recovering in any manner or by any means, whether directly or indirectly, any judgment, award, decree or order against a Debtor or an Estate or its property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this clause (a) or any property of any such transferee or successor; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against a Debtor or an Estate or any of its property, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons mentioned in this clause (iii) or any property of any such transferee or successor; (iv) acting or proceeding in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan; and (v) commencing or continuing, in any manner or in any place, any action that does not comply, or is inconsistent, with the provisions of the Plan; *provided*, *however*, that nothing contained herein shall preclude such Persons who have held, hold or may hold Claims against or Interests in a Debtor or an Estate from exercising their rights, or obtaining benefits, pursuant to, and consistent with, the terms of the Plan and the Plan Documents.

(b)     All Persons, including all governmental, tax and regulatory authorities, lenders, trade creditors, dealers, customers, employees, litigation claimants and other creditors holding Claims, Liens, Interests, charges, encumbrances and other interests of any kind or nature whatsoever, including rights or Claims based on any successor or transferee liability, against or in a Debtor,

the NewCo Transferred Assets, the MDT Transferred Assets or the PAT Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or noncontingent, known or unknown), arising under or out of, in connection with, or in any way relating to the Debtors, the NewCo Transferred Assets, the MDT Transferred Assets, the PAT Assets, the operation of the NewCo Transferred Assets prior to the Effective Date or the Restructuring Transactions are forever barred, estopped and permanently enjoined from asserting against the Released Parties, their respective successors and assigns, their property, the NewCo Transferred Assets, the MDT Transferred Assets or the PAT Assets, any Released Claim or other Cause of Action the assertion of which does not comply with or is inconsistent with the provisions of the Plan, including, without limitation, by: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting, directly or indirectly, a Released Party, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this clause (i) or any property of any such transferee or successor; (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting or otherwise recovering in any manner or by any means, whether directly or indirectly, any judgment, award, decree or order against a Released Party, or any direct or indirect transferee of any property of, or direct or indirect successor-in-interest to, any of the foregoing Persons mentioned in this clause (ii) or any property of any such transferee or successor; (iii) creating, perfecting or otherwise enforcing any encumbrance of any kind or asserting any Released Claims in any manner, directly or indirectly, against a Released Party or any of its property, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons mentioned in this clause (iii) or any property of any such transferee or successor; (iv) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan; and (v) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan.

23.    <u>Channeling Injunction</u>.

(a)    As of the Effective Date, in order to preserve and promote the settlements contemplated by and provided for in the Plan and to supplement, where necessary, the injunctive effect of the Plan Injunction, the Estate Releases and the Shareholder Releases described in <u>Sections 10.5</u>, <u>10.6</u> and <u>10.7</u> of the Plan, and pursuant to the exercise of the equitable jurisdiction and power of the Bankruptcy Court under section 105(a) of the Bankruptcy Code, all Persons that have held or asserted, that hold or assert or that may in the future hold or assert any Channeled Claim shall be permanently and forever stayed, restrained and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering or

receiving payments, satisfaction, recovery or judgment of any form from or against any Protected Party with respect to any Channeled Claim, including:

(i)  commencing, conducting or continuing, in any manner, whether directly or indirectly, any suit, action or other proceeding, in each case, of any kind, character or nature, in any forum in any jurisdiction with respect to any Channeled Claims, against or affecting any Protected Party, or any property or interests in property of any Protected Party with respect to any Channeled Claims;

(ii)  enforcing, levying, attaching, collecting or otherwise recovering, by any means or in any manner, either directly or indirectly, any judgment, award, decree or other order against any Protected Party or against the property of any Protected Party with respect to any Channeled Claims;

(iii)  creating, perfecting or enforcing, by any means or in any manner, whether directly or indirectly, any Lien of any kind against any Protected Party or the property of any Protected Party with respect to any Channeled Claims;

(iv)  asserting or accomplishing any setoff, right of subrogation, indemnity, contribution or recoupment of any kind, whether directly or indirectly, in respect of any obligation due to any Protected Party or against the property of any Protected Party with respect to any Channeled Claims; and

(v)  taking any act, by any means or in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan Documents, with respect to any Channeled Claims.

(b)  Notwithstanding anything to the contrary in Section 10.8 of the Plan or this Order, this Channeling Injunction shall not stay, restrain, bar or enjoin:

(i)  the rights of Holders of Channeled Claims to the treatment afforded them under the Plan and the Plan Documents, including the rights of Holders of Channeled Claims to assert such Channeled Claims solely in accordance with Section 6.21 of the Plan, the Master TDP and the Creditor Trust TDPs, in each case whether or not there are funds to make Distributions in respect of such Channeled Claims and whether or not such rights entitle such Holders to any Distributions;

(ii)  the rights of Persons to assert any claim, debt, litigation or liability for payment of Creditor Trust Operating Expenses solely against the applicable Creditor Trust;

(iii)  the rights of Persons to assert any claim, debt or litigation against any Excluded Party;

(iv)  the rights of the Master Disbursement Trust to pursue and enforce the MDT Shareholder Rights, the MDT Insurance Rights and the MDT

Causes of Action or any other rights afforded to the Master Disbursement Trust pursuant to the Plan, the Plan Documents, the Master Shareholder Settlement Agreement and/or the Direct Shareholder Settlement Agreements;

(v) the rights of the parties to the LRP Agreement to enforce the terms thereof in accordance with the Plan;

(vi) the Creditor Trusts from enforcing their respective rights against the Master Disbursement Trust under the Plan, the Master Shareholder Settlement Agreement and the MDT Documents;

(vii) the Creditor Trusts from enforcing their respective rights against the Payment Parties under the Plan or the Master Shareholder Settlement Agreement; or

(viii) the Master Disbursement Trust and the Plan Administration Trust from enforcing their rights against NewCo under the Plan.

(c) Upon the filing of a Notice of Shareholder Release Snapback, the Channeling Injunction shall terminate, be rescinded and have no application, without further order of the Bankruptcy Court, to any suit, action or other proceeding, in each case, of any kind, character or nature, brought against any member of the Breaching Shareholder Family Group and any Designated Shareholder Released Party by the Master Disbursement Trust (or if such claims cannot be assigned to the Master Disbursement Trust, by a Releasing Party for the benefit of the Master Disbursement Trust); *provided*, *however*, that the extension of time provided by Section 10.9(a) of the Plan shall continue in effect in accordance with its terms; *provided further* that, for the avoidance of doubt, notwithstanding the termination and rescission pursuant to Section 10.8(c) of the Plan, the Channeling Injunction shall continue in effect for, and shall be fully enforceable by and for the benefit of, all other Protected Parties, including all other Shareholder Released Parties, other than the Breaching Shareholder Family Group and the Designated Shareholder Released Parties; and *provided further* that, in the event of the filing of a Notice of Shareholder Release Snapback, any determination made in the claims resolution process in accordance with Section 7.6 of the Plan will not be binding against any party.

(d) Except as expressly set forth in Section 10.8(c) of the Plan, there can be no modification, dissolution or termination of the Channeling Injunction, which shall be a permanent injunction.

(e) Except as expressly set forth in Sections 10.8(b) and 10.8(c) of the Plan, nothing in the Plan, the MDT Documents or the Creditor Trust Documents shall be construed in any way to limit the scope, enforceability or effectiveness of the Channeling Injunction issued in connection with the Plan.

(f) The Debtors' compliance with the requirements of Bankruptcy Rule 3016 shall not constitute an admission that the Plan provides for an injunction against conduct not otherwise enjoined under the Bankruptcy Code.

24.    <u>Tolling of Shareholder Released Claims; Violations of Shareholder Releases and Channeling Injunction</u>.

(a)    Any and all periods for commencing or continuing any Tolled Claim (as defined in the Master Shareholder Settlement Agreement), whether fixed by statute, agreement, order, or otherwise, shall not expire until the latest of (i) the end of such period; (ii) with respect to the applicable Shareholder Family Group and any Designated Shareholder Released Party, two hundred twenty-five (225) days after the filing of a Notice of Shareholder Release Snapback with respect to such Shareholder Family Group; (iii) with respect to the applicable Shareholder Family Group and any Designated Shareholder Released Party, when such Shareholder Family Group fulfills its payment obligations under the Shareholder Settlement Agreements; and (iv) with respect to the applicable Shareholder Released Party that is a Subsidiary (as defined in the Master Shareholder Settlement Agreement) of a Shareholder Payment Party, two hundred twenty-five (225) days after the reinstatement of any Estate Cause of Action against such Shareholder Released Party pursuant to Section 10.19 of the Plan.  No Shareholder Released Party or any other signatory to the Master Shareholder Settlement Agreement shall assert otherwise (including through defenses of (x) statute of limitations, statute of repose, laches or inadequate tolling, or (y) that any release granted to any other Shareholder Released Party, but not made void pursuant to the terms of Section 9.02(a)(ii)(B) of the Master Shareholder Settlement Agreement has the effect of precluding such claim against such Shareholder Released Party or other signatory hereto), but excluding any defense of inadequate tolling only to the extent it could have been raised on and as of the Petition Date)) in the litigation of any such Tolled Claim. Each party to the Master Shareholder Settlement Agreement and each Shareholder Released Party consents to the jurisdiction of the Bankruptcy Court to finally determine any disputes arising out of, related to, or in connection with the construction or interpretation of these tolling provisions, including without limitation any issues related to any period for commencing or continuing any Tolled Claim under section 9.02(ii)(B) of the Master Shareholder Settlement Agreement. For the avoidance of doubt, the foregoing extension of time periods shall not apply in connection with litigation brought by any Non-Enforcing Party.

(b)    In the event that any Person takes any action that a Shareholder Released Party believes violates the Shareholder Releases or Channeling Injunction as it applies to any Shareholder Released Party, such Shareholder Released Party shall be entitled to make an emergency application to the Bankruptcy Court for relief, and may proceed by contested matter rather than by adversary proceeding.  The Bankruptcy Court shall have jurisdiction and authority to enter final orders in connection with any dispute over whether an action violates the Shareholder Releases or Channeling Injunction.  Upon

determining that a violation of the Shareholder Releases or Channeling Injunction has occurred, the Bankruptcy Court, in its discretion, may award any appropriate relief against such violating Person, including, but not limited to, (i) disgorgement from the violating Person of any funds, assets or other value received, directly or indirectly, pursuant to the Plan or Plan Documents (including fees and expenses paid pursuant to the Plan or Plan Documents on account of legal or other advisory services rendered to or for the benefit of the violating Person); (ii) the termination of any rights of the violating Person to receive any funds, assets or other value pursuant to the Plan or Plan Documents; (iii) the reduction of any payments owed by any Shareholder Released Parties under the Shareholder Settlement Agreements to the violating Person in an amount equal to the amount of disgorgement ordered from, or the reduction of future payments ordered to be made to, or on account of, the violating Person (subject to the right of the violating Person to request that any amounts actually disgorged from such violating Person offset any reduction of future payments ordered to be made to, or on account of, such violating Person); (iv) an admonition, reprimand or censure of, or citation of contempt by, the violating Person and its counsel; (v) a fine or penalty paid into the Bankruptcy Court; (vi) a bond or other security in an amount equal to any financial obligation ordered by the Bankruptcy Court in respect of the violation; (vii) an appropriate sanction on any attorney or law firm responsible for the violation; (viii) injunctive relief to prevent future violations by the Person or its counsel; and (ix) attorney and other professional fees incurred by any Shareholder Released Party arising from the violation.  The provision of any one form of relief shall not preclude the provision of any other form of relief.

25.    <u>MDT Insurer Injunction</u>.

(a)    In accordance with section 105(a) of the Bankruptcy Code, upon the occurrence of the Effective Date, all Persons that have held or asserted, that hold or assert or that may in the future hold or assert any Claim based on, arising under or attributable to an MDT Insurance Policy shall be, and hereby are, permanently stayed, restrained and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering or receiving payment or recovery on account of any such Claim based on, arising under or attributable to an MDT Insurance Policy from or against any MDT Insurer, including:

(i)    commencing, conducting or continuing, in any manner, any action or other proceeding of any kind (including an arbitration or other form of alternate dispute resolution) against any MDT Insurer, or against the property of any MDT Insurer, on account of any Claim based on, arising under or attributable to an MDT Insurance Policy;

(ii)    enforcing, attaching, levying, collecting or otherwise recovering, by any manner or means, any judgment, award, decree or other order against any MDT Insurer, or against the property of any MDT Insurer, on account of

any Claim based on, arising under or attributable to an MDT Insurance Policy;

(iii) creating, perfecting or enforcing in any manner any Lien of any kind against any MDT Insurer, or against the property of any MDT Insurer, on account of any Claim based on, arising under or attributable to an MDT Insurance Policy;

(iv) asserting or accomplishing any setoff, right of subrogation, indemnity, contribution or recoupment of any kind, whether directly or indirectly, against any obligation due to any MDT Insurer, or against the property of any MDT Insurer, on account of any Claim based on, arising under or attributable to an MDT Insurance Policy; and

(v) taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan applicable to any Claim based on, arising under or attributable to an MDT Insurance Policy.

(b) The provisions of this MDT Insurer Injunction shall not preclude the Master Disbursement Trust from pursuing any Claim based on, arising under or attributable to an MDT Insurance Policy, or any other claim that may exist under any MDT Insurance Policy against any MDT Insurer, or enjoin the rights of the Master Disbursement Trust to prosecute any action based on or arising from the MDT Insurance Policies or the rights of the Master Disbursement Trust to assert any claim, debt, obligation, cause of action or liability for payment against an MDT Insurer based on or arising from the MDT Insurance Policies.  The provisions of this MDT Insurer Injunction are not issued for the benefit of any MDT Insurer, and no such insurer is a third-party beneficiary of this MDT Insurer Injunction.  This MDT Insurer Injunction shall not enjoin, impair or affect (i) any claims between or among MDT Insurers that are not Settling MDT Insurers; (ii) the rights of current and former directors, officers, employees and authorized agents of the Debtors that are not Sackler Family Members that are preserved under the Plan; or (iii) the terms of the Master Shareholder Settlement Agreement with respect to the MDT Shareholder Insurance Rights. For the avoidance of doubt, with respect to a Person that purports to be insured under any MDT Insurance Policy, the MDT Insurer Injunction shall enjoin only derivative claims and rights. Nothing in this Order or the Plan shall determine whether any Claim or right under any MDT Insurance Policy is either derivative or direct, or otherwise would be disallowed or subordinated under the Bankruptcy Code, which determination shall be made, as necessary, to the extent such Claim or right is not otherwise released under this Plan, in accordance with applicable law. For the avoidance of doubt, the MDT Insurer Injunction shall not enjoin or release Settling Co-Defendant's Direct Insurance Interests, if any, in any MDT Insurance Policies or Purdue Insurance Policies, and Section 8.4 of the Plan controls over any contrary terms or provisions of this Order

(c) To the extent the MDT Trustees make a good faith determination that some or all of the MDT Insurance Proceeds are substantially unrecoverable by the Master Disbursement Trust, the Master Disbursement Trust shall have the sole and exclusive authority at any time, upon written notice to any affected MDT Insurer, to terminate, reduce or limit the scope of this MDT Insurer Injunction with respect to any MDT Insurer; *provided* that any termination, reduction, or limitation of the MDT Insurer Injunction (A) shall apply in the same manner to all beneficiaries of the Creditor Trusts that are MDT Beneficiaries and (B) shall comply with any procedures set forth in the MDT Agreement.

(d) Except as set forth in subparagraphs (b) and (c) of this paragraph 25, nothing in the Plan, the MDT Documents or the Creditor Trust Documents shall be construed in any way to limit the scope, enforceability or effectiveness of the MDT Insurer Injunction issued in connection with the Plan.

26.    <u>Settling MDT Insurer Injunction</u>.

(a)    In accordance with section 105(a) of the Bankruptcy Code, upon the occurrence of the Effective Date, all Persons that have held or asserted, that hold or assert or that may in the future hold or assert any Claim based on, arising under or attributable to an MDT Insurance Policy shall be, and hereby are, permanently stayed, restrained and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering or receiving payment or recovery on account of any such Claim based on, arising under or attributable to an MDT Insurance Policy from or against any Settling MDT Insurer, solely to the extent that such Settling MDT Insurer has been released from such Claim under such MDT Insurance Policy pursuant to an MDT Insurance Settlement, including:

(i)    commencing, conducting or continuing in any manner any action or other proceeding of any kind (including an arbitration or other form of alternate dispute resolution) against any such Settling MDT Insurer, or against the property of such Settling MDT Insurer, on account of such Claim based on, arising under or attributable to such MDT Insurance Policy;

(ii)    enforcing, attaching, levying, collecting or otherwise recovering, by any manner or means, any judgment, award, decree or other order against any such Settling MDT Insurer, or against the property of such Settling MDT Insurer, on account of such Claim based on, arising under or attributable to such MDT Insurance Policy;

(iii)    creating, perfecting or enforcing in any manner any Lien of any kind against any such Settling MDT Insurer, or against the property of such Settling MDT Insurer, on account of such Claim based on, arising under or attributable to such MDT Insurance Policy;

(iv)    asserting or accomplishing any setoff, right of subrogation, indemnity, contribution or recoupment of any kind, whether directly or indirectly, against any obligation due to any such Settling MDT Insurer, or against the property of such Settling MDT Insurer, on account of such Claim based on, arising under or attributable to such MDT Insurance Policy; and

(v)    taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan applicable to such Claim based on, arising under or attributable to such MDT Insurance Policy.

(b) Any right, Claim or cause of action that an Insurance Company may have been entitled to assert against any Settling MDT Insurer but for the Settling MDT Insurer Injunction, if any such right, Claim or cause of action exists under applicable non-bankruptcy law, shall become a right, Claim or cause of action solely as a setoff claim against the Master Disbursement Trust and not against or in the name of the Settling MDT Insurer in question.  Any such right, Claim or cause of action to which an Insurance Company may be entitled shall be solely in the form of a setoff against any recovery of the Master Disbursement Trust from that Insurance Company, and under no circumstances shall that Insurance Company receive an affirmative recovery of funds from the Master Disbursement Trust or any Settling MDT Insurer for such right, Claim or cause of action.  In determining the amount of any setoff, the Master Disbursement Trust may assert any legal or equitable rights the Settling MDT Insurer would have had with respect to any right, Claim or cause of action. For the avoidance of doubt, the Settling MDT Insurer Injunction shall not enjoin or release Settling Co-Defendant's Direct Insurance Interests, if any, in any MDT Insurance Policies or Purdue Insurance Policies, and Section 8.4 of the Plan controls over any contrary terms or provisions of this Order.

(c) There can be no modification, dissolution or termination of the Settling MDT Insurer Injunction, which shall be a permanent injunction.

(d) Except as set forth in subparagraphs (b) and (c) of this paragraph 26, nothing in the Plan, the MDT Documents or the Creditor Trust Documents shall be construed in any way to limit the scope, enforceability or effectiveness of the Settling MDT Insurer Injunction issued in connection with the Plan.

27.    Co-Defendant Defensive Rights.    Except as provided in the MDT Insurer Injunction, the Settling MDT Insurer Injunction or clause (ii) of the penultimate sentence of Section 10.18 of the Plan, notwithstanding anything to the contrary in Article X of the Plan or in the Plan as it currently exists or as it might be further amended, this Order or any order entered in

connection with the Plan (or the Plan as amended) (or any such order, as amended, modified or supplemented), or any supplement to the Plan (or the Plan as amended), nothing contained in the Plan or any of the foregoing documents or orders (including, without limitation, the classification, treatment, allowance, disallowance, release, bar, injunction, Channeling Injunction or any other provision of the Plan or the Plan as amended with respect to, impacting, affecting, modifying, limiting, subordinating, impairing, in any respect, a Co-Defendant Claim), will release, bar, enjoin, impair, alter, modify, amend, limit, prohibit, restrict, reduce, improve or enhance any Co-Defendant Defensive Rights of any Holder of a Co-Defendant Claim or Excluded Party as such rights exist or might in the future exist under applicable non-bankruptcy law. Nothing in the Plan, any of the Plan Documents or in this Order shall preclude, operate to or have the effect of, impairing any Holder of a Co-Defendant Claim or Excluded Party from asserting in any proceeding any and all Co-Defendant Defensive Rights that it has or may have under applicable law. Nothing in the Plan, any of the Plan Documents or this Order shall be deemed to waive any Co-Defendant Defensive Rights, and nothing in the Chapter 11 Cases, the Plan, any of the Plan Documents or this Order may be used as evidence of any determination regarding any Co-Defendant Defensive Rights, and under no circumstances shall any Person be permitted to assert issue preclusion or claim preclusion, waiver, estoppel or consent in response to the assertion of any Co-Defendant Defensive Rights. Co-Defendant Defensive Rights (i) may be used to offset, set-off, recoup, allocate or apportion fault, liability, or damages, or seek judgment reduction or otherwise defend against any Cause of Action brought by any Person against the Holder of any Co-Defendant Claim or the Excluded Party based in whole or in part on Opioid-Related Activities and (ii) subject to Section 8.4 of the Plan, shall in no case be used to seek or obtain any affirmative monetary recovery from any Protected Party or any Asset of any

Protected Party (including from any Purdue Insurance Policy or any other insurance policy of a Protected Party) on account of any Released Claim or Shareholder Released Claim. The foregoing does not constitute a release of any Co-Defendant's Class 14 Claim or any other Excluded Party's Class 11(c) Claim.

28.    <u>Injunction Related to Releases and Exculpation</u>.    To the maximum extent permitted under applicable law, this Order shall permanently enjoin the commencement or prosecution by any Person, whether directly, derivatively or otherwise, of any Causes of Action released pursuant to the Plan, including, without limitation, the Causes of Action released or exculpated in the Plan and with respect to any Claims, Interests, Liens, other encumbrances or liabilities that are subject to <u>Sections 5.3(b)</u>, <u>5.4(c)</u> or <u>5.6(b)</u> of the Plan (but, for the avoidance of doubt, excluding any Excluded Claims).

29.    <u>Operating Injunction and Governance Covenants</u>.    The NewCo Operating Injunction set forth in **Exhibit B** hereto and the NewCo Governance Covenants set forth in **Exhibit C** hereto shall bind NewCo and any successor owner of NewCo's opioid business to the extent set forth therein.

30.    <u>DOJ Forfeiture Judgment Credit</u>.    The aggregate amount of value distributed or otherwise conferred by the Debtors in respect of Non-Federal Domestic Governmental Claims and Tribe Claims under the Plan exceeds $1.775 billion.

31.    <u>Timney and Stewart Stipulation</u>.    The *Stipulation in Connection with the Debtors' Chapter 11 Plan of Reorganization* [D.I. 7948] between the Debtors, Mark Timney, a former officer of Purdue, and John H. Stewart, a former officer of Purdue, and acknowledged and agreed to by the Creditors' Committee, the Ad Hoc Committee of Governmental and Other Contingent

Litigation Claimants and the Multi-State Governmental Entities Group, was entered into as of October 6, 2025, and is hereby approved and so ordered.

32.    <u>Baltimore Stipulation</u>.  The *Stipulation Resolving the Objection of the Mayor & City Council of Baltimore to the Debtors' Chapter 11 Plan of Reorganization* [D.I. 8134] between the Debtors, Mayor & City Council of Baltimore, and acknowledged and agreed to by the Creditors' Committee, the Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants, The Raymond Sackler Family and Beacon Company (the "**Baltimore Stipulation**"), was entered into as of November 3, 2025, and is hereby approved and so ordered. Any objection to the Allowance of the Baltimore Proof of Claim (as defined in the Baltimore Stipulation) filed by any party shall be held in abeyance and shall not be adjudicated or advanced during the Standstill Period (as defined in the Baltimore Stipulation).

33.    <u>Shareholder Settlement Document Undertakings</u>.

(a)    **Settlement Stipulation Acknowledgment**.  The rights and obligations set forth in the *Settlement Stipulation Dismissing Proceedings Without Prejudice* [D.I. 7713, Exhibit A] (the "**Settlement Stipulation**"), of Richard S. Sackler and Lin Gao (together, the "**RSS Parties**") and the Litigation Parties defined thereunder remain in full force and effect including the acknowledgments and agreement contained therein that they will not directly or indirectly (i) interfere, now or at any time in the future, with any Trustees' (as defined in the Settlement Stipulation), Shareholder Payment Parties' or the B-Side Payment Group 1's ability to consummate, implement, and perform under the Plan and Shareholder Settlement Agreements; (ii) take (or fail to take) any action that interferes with, delays, frustrates, or impairs the ability of any party to enter into or satisfy its obligations under the Plan or the Shareholder Settlement Agreements, or that would undermine the validity or enforceability of the Plan or the Shareholder Settlement Agreements (including, without limitation, by exercising or purporting to exercise a power of appointment over property held by a Shareholder Payment Party that is in a trust in a manner that interferes with, adversely affects, or undermines the Plan or the Shareholder Settlement Agreements); and (iii) assist or conspire with any other person to take any such action.

**Nothing herein shall modify or limit the rights of any party under the Settlement Stipulation**.  This Order is intended, among other things, to implement the obligations set forth in the Settlement Stipulation and shall not extend, broaden, or limit any rights, defenses, claims, or positions of the any of

the Parties to the Settlement Stipulation in the pending litigation that is the subject of the Settlement Stipulation. Nothing herein shall modify or limit the rights of any party under the Settlement Stipulation, nor shall any provision herein be construed to affect any party's rights in the Settlement Stipulation or in the pending litigation that is the subject of the Settlement Stipulation.

(b) **Compliance with the Settlement, Stipulation and Plan**. In furtherance of the Plan and the Shareholder Settlement Agreements, each of the RSS Parties and the other members of the B-1 Payment Group are hereby directed to comply with the foregoing.

(c) **Finalization of Certain Documents by Certain Sackler Payment Parties by December 19, 2025**. All relevant parties, including each Sackler Payment Party that is subject thereto, the Creditors' Committee, the Debtors, the Ad Hoc Committee and the States AG Negotiating Group, are further directed and ordered to negotiate in good faith to finalize by no later than December 19, 2025, Annex E and Annex F, which shall be consistent with (x) the applicable term sheets set forth on Exhibits A-32 and A-33 to the *Notice of Filing of Fifth Plan Supplement Pursuant to the Fifteenth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 8201] and (y) the Settlement Stipulation, as applicable, and, in each case, shall otherwise be in form and substance reasonably acceptable to a supermajority of Sackler Payment Parties subject thereto.

(d) **Finalization of All Documents by January 30, 2026**. It is further directed and ordered that all other remaining documentation necessary or appropriate to implement the Plan and Shareholder Settlement Agreements and the transactions contemplated thereby, including, without limitation, the remaining exhibits, annexes, collateral documents and ancillary documents to the Shareholder Settlement Agreements, shall be finalized no later than January 30, 2026.

(e) **Negotiation and Execution by Richard S. Sackler of Certain Documents by December 19, 2025**. In addition, and without limiting the foregoing, Richard S. Sackler is directed and ordered to: (I) negotiate in good faith and finalize Annex G to the Master Shareholder Settlement Agreement, and (II) complete and irrevocably execute each of the following documents (collectively, the "**Specified Settlement Documents**") once such documents have been agreed to by a supermajority of the Sackler Payment Parties that are party thereto, and deliver the Specified Settlement Documents to the Debtors, the Creditors' Committee, the Ad Hoc Committee, and the State AG Negotiating Committee as soon as reasonably practicable, and in any event no later than December 19, 2025, or such later date as such documents have been finalized (the "**Specified Settlement Document Deadline**"): (A) the Master Shareholder Settlement Agreement; and (B) each of the following exhibits and annexes to the Master Shareholder Settlement Agreement: (i) Exhibit Y (Confessions of Judgment); (ii) Exhibit P-2 (Form of Further Assurances

-36-

Undertaking of an Assuring Party with respect to the JDS Estate or a Trust that is part of the B-Side Payment Group); and (iii) the applicable pledge and security agreements contemplated by <u>Annex E</u> and <u>Annex G</u>. All executed Specified Settlement Documents shall be held in escrow by the Debtors and released automatically on the Effective Date of the Plan without any further action by the RSS Parties.

(f) **Further Assurances by the RSS Parties**. In addition, and without limiting the foregoing, the RSS Parties are further directed and ordered to timely execute, deliver, and perform all other documentation necessary or appropriate to effectuate the Plan and the Shareholder Settlement Agreements (including but not limited to documentation in connection with any Permitted Trust Restructurings as contemplated by <u>Exhibits A-32</u> and <u>A-33</u>).

(g) **Further Assurances by the B-1 Payment Group Parties other than the RSS Parties**. In addition, and without limiting the foregoing, the B-1 Payment Group Parties other than the RSS Parties are further directed and ordered to timely execute, deliver, and perform all other documentation necessary or appropriate to effectuate the Plan and the Shareholder Settlement Agreements (including but not limited to documentation in connection with any Permitted Trust Restructurings as contemplated by <u>Exhibits A-32</u> and <u>A-33</u>).

(h) **December 12 Status Conference**. A status conference shall be held before the Bankruptcy Court on December 12, 2025, at which Richard S. Sackler, Richard S. Sackler's counsel, trustees of other members of the B1 Payment Group and counsel for such trustees shall appear before the Bankruptcy Court to report on, and demonstrate compliance with, the obligations and provisions set forth herein.

(i) **Compelling Performance**. The Bankruptcy Court, pursuant to sections 105(a) and 1142(b) of the Bankruptcy Code, may compel compliance with this Order, including but not limited to appointing an independent representative or other fiduciary with full authority to act on behalf of Richard S. Sackler in any and all capacities in which he is required to act (whether individually, as trustee, or in any other fiduciary capacity), to execute, deliver, or otherwise effectuate any documents required with respect to the payment obligations of the B-1 Payment Group Parties, including Richard S. Sackler.

(j) **Bankruptcy Court Jurisdiction/Sanctions**. The Bankruptcy Court shall retain exclusive jurisdiction of all matters arising under, arising out of, or related to the obligations set forth herein, including to resolve any dispute or failure of performance by Richard S. Sackler or any other party, and to impose sanctions, including, without limitation, findings of contempt, monetary sanctions, or such other relief as the Bankruptcy Court determines appropriate

for any failure to negotiate in good faith or otherwise comply with any obligation set forth herein.

34.    <u>Retention of Jurisdiction</u>.    Except as provided in <u>Section 11.1</u> of the Plan, notwithstanding the entry of this Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction of all matters arising under, arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for the purposes set forth in <u>Section 11.1</u> of the Plan.    The Court shall retain concurrent, rather than exclusive, jurisdiction of all matters set forth in Section 11.1(b) of the Plan.    Consistent with <u>Section 11.1(f)</u> of the Plan, and as of the earlier of the Effective Date or the expiration of the Preliminary Injunction, all Persons are permanently enjoined from commencing, conducting, or continuing, directly or indirectly, any litigation or prosecution of an Estate Cause of Action; *provided*, *however*, that nothing in this paragraph shall preclude NewCo, the Plan Administration Trust, each Creditor Trust or the Master Disbursement Trust from pursuing any Retained Cause of Action vested in or transferred to such entity pursuant to the Plan.    Subject to Sections 10.5 through 10.13 of the Plan, all such Retained Causes of Action shall be transferred to the Master Disbursement Trust, the Plan Administration Trust, the applicable Creditor Trust or NewCo, as applicable, which shall have, retain, reserve and be entitled to assert all such Retained Causes of Action in accordance with the Plan as fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and equitable rights with respect to any Claim or Interest may be asserted after the Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

35.    Any Person seeking to commence, conduct, or continue litigation or prosecution of a Cause of Action against a Shareholder Released Party or a Released Party may, but is not required to, seek a prior determination in the Bankruptcy Court that a Cause of Action is not an

Estate Cause of Action.    If any Person commences, conducts or continues litigation or prosecution of such Cause of Action without a prior determination by the Bankruptcy Court, the Person against which such Cause of Action was asserted, and the Master Disbursement Trust or NewCo, shall be entitled to make an emergency application to the Bankruptcy Court for a determination that such Cause of Action is an Estate Cause of Action and therefore in violation of Section 11.1(f) of the Plan.

36.    Evidentiary Stipulation.    In the event there is litigation against a Shareholder Released Party as a result of a Notice of Shareholder Release Snapback, as defined in the Plan, no party (a "**Non-Prejudiced Party**," which term shall include any party as a result of the Plan), shall be prejudiced in any way in connection with such snapback litigation by its decision to (i) limit or forgo the presentation of evidence (or forgo cross examination of any witness) or (ii) forgo or not participate in any argument regarding such evidence during oral argument, in each case in connection with the Confirmation of the Plan (including at the Confirmation Hearing).    If Plan Confirmation is reversed on appeal, no Non-Prejudiced Party shall be prejudiced in any way in connection with any future proceeding based on its decision to (i) limit or forgo the presentation of evidence (or forgo cross examination of any witness) or (ii) forgo or not participate in any argument regarding such evidence during oral argument, in each case in connection with the Confirmation of the Plan (including at the Confirmation Hearing).    Nothing that occurs at the Confirmation Hearing (or related thereto) shall constitute or be deemed agreement or disagreement in any future proceeding or snapback litigation by any Non-Prejudiced Party with any position taken or evidence offered or argument made (at oral argument) by any other party at the Confirmation Hearing, *provided* that nothing herein shall operate to limit or reduce the binding nature of the Plan, this Order, and any related findings on

any party.  For the avoidance of doubt, all parties agree and acknowledge that the Debtors, the Creditors' Committee, the Master Disbursement Trust, any Holder of a Channeled Claim that is not objecting to the Plan, and any Shareholder Released Party subject to snapback litigation is intended to be a "Non-Prejudiced Party."

37.    <u>Timing of Opt-In Release Elections</u>.  Notwithstanding anything to the contrary in the Solicitation Procedures Order, no election to opt-in to the Third-Party Releases by means of a Ballot shall be required to be treated by the Solicitation Agent as valid unless such election is received by the Solicitation Agent no later than ~~thirty (30) days prior to the Effective Date~~<u>March 1, 2026</u>.

38.    <u>No Precedent</u>.    The "allocation" of dollars between the Shareholder Direct Settlement Portion of any Distribution and the Estate Distributions is part of an overall compromise and settlement under Bankruptcy Rule 9019 between the Mediation Parties, including the Debtors, the Creditors' Committee, the Shareholder Payment Parties, and all creditors and creditor groups that are Mediation Parties, and upon confirmation of this Plan will be deemed to be a settlement between the Debtors, the Creditors' Committee, the Supporting Claimants and the Shareholder Payment Parties in which, among other things, the Shareholder Payment Parties are providing up to $6.5 billion in consideration over 15 years. The "allocation" is intended by the Shareholder Payment Parties and the other Mediation Parties to, among other things, facilitate the distribution of proceeds for opioid abatement, victim compensation, and other permitted uses under the Plan, and otherwise.  Neither the settlement amount nor the "allocation" (including any allocation between the Shareholder Payment Party of payment responsibility) reflects any concession or agreement by any party as to the strength, validity, merits, collectability, amount, or otherwise of the Shareholder Released Estate Claims or of the

Shareholder Released Direct Claims or any defenses to the Shareholder Released Estate Claims

or the Shareholder Released Direct Claims, and if for whatever reason the agreement in principle

is not consummated, neither the settlement amount nor the "allocation" shall be cited or used by

the Debtors, the Creditors' Committee, the Supporting Claimants or the Shareholder Payment

Parties (or the Released Parties) – or any party to the Shareholder Settlements or any other

Mediation Party – for any purpose whatsoever in any pleading or proceeding wherever or

whenever. Further, no party to the compromise and settlement will be bound by this Plan or the

agreement set forth in this provision (other than as set forth Section 5.2(d) of the Plan) with

regard to what it may state in a pleading, court hearing, proceeding, or otherwise about the

strength, validity, merits, collectability, amount, or otherwise of the Shareholder Released Estate

Claims or of the Shareholder Released Direct Claims, or any defenses thereto, including, without

limitation, in any pleading filed in connection with the Shareholder Settlements and this Plan.

This paragraph shall be binding forever upon all parties from the time that this Order becomes

effective, regardless of whether a settlement including that represented in the Plan is

consummated and shall be specifically enforceable by the Bankruptcy Court (with no cap on

damages that may be awarded).   This paragraph is specifically subject to Federal Rule of

Evidence 408 and analogous state provisions barring the use of settlement offers and

communications to prove the validity or amount of disputed claims.

     39.    Successors and Assigns.   The rights, benefits and obligations of any Person

named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir,

executor, administrator, successor or permitted assign, if any, of each such Person.

     40.    Further Assurances.  PRA, L.P., each Family Member (as defined in the Master

Shareholder Settlement Agreement), the Debtors, the Holders of Claims and Channeled Claims

receiving Distributions under the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan, the Settlement Agreements and the agreements and instruments contemplated therein (including, without limitation, the Collateral Documents (as defined in the Master Shareholder Settlement Agreement)), including, without limitation, to cause the satisfaction of all conditions to effectiveness of the Plan, the Settlement Agreements and such documents and instruments (including, without limitation, the effectiveness of such document and agreements generally, the effectiveness of any releases granted thereunder and the effectiveness of any obligations to make payments thereunder) and to comply with their respective obligations pursuant to, the Plan, the Settlement Agreements and such documents and instruments.

41.    <u>Notice of Confirmation Date and Effective Date</u>.  The Claims and Solicitation Agent may serve notice of the entry of this Order on (a) all Holders of Claims and (b) those other parties on whom the Plan, Disclosure Statement, and related documents were served.  Such service constitutes good and sufficient notice pursuant to Bankruptcy Rules 2002(f)(7) and 3020(c).  On the Effective Date, or as soon thereafter as is reasonably practicable, the Debtors shall file with the Bankruptcy Court a "Notice of Effective Date" (the "**Notice of Effective Date**") and shall mail or cause to be mailed by first-class mail to Holders of Claims or Interests a copy of the Notice of Effective Date; *provided*, *however*, that the Debtors shall not be required to transmit the Notice of Effective Date to Holders of Claims or Interests in Classes 12 and 18 or to any Holders of Claims or Interest for which applicable Solicitation Materials were returned to the Debtors' Claims and Solicitation Agent as undeliverable.  Upon the Effective Date, the Plan

shall be deemed substantially consummated as to each Debtor, consistent with the definition of "substantial consummation" in section 1101(2) of the Bankruptcy Code.

42.      <u>Administrative Claims Bar Date</u>.   All requests for payment of Administrative Claims, other than Professional Fee Claims, that accrued on or before the Effective Date must be filed with the Claims and Solicitation Agent and served on counsel for the Debtors and Liquidating Debtors, counsel for the Creditors' Committee, the Plan Administration Trustee and the PPLP Liquidator by (a) 30 days after notice of the Confirmation Date is served with respect to Claims that arose before the Confirmation Date and (b) 30 days after notice of the Effective Date is served with respect to Claims that arose on or after the Confirmation Date (the "**Administrative Claim Bar Date**").   Any requests for payment of Administrative Claims pursuant to <u>Article II</u> of the Plan that are not properly filed and served by the Administrative Claim Bar Date shall be disallowed automatically without the need for any objection from the Debtors or any action by the Bankruptcy Court.

43.      <u>Shareholder Stipulation</u>.   Notwithstanding anything to the contrary herein, nothing in this Order, in the Plan or in any Plan Document shall impair the effectiveness of the Stipulation attached to the *Notice of Filing of Stipulation Concerning Shareholder Settlement Agreements* [D.I. 7713].

44.      <u>Bailiwick of Jersey</u>.   Upon the dissolution of the Creditors' Committee pursuant to Section 12.14 of the Plan, the Master Disbursement Trust shall succeed to the Creditors' Committee in all respects for purposes of the *Order Granting the Official Committee of Unsecured Creditors' Motion for a Letter of Request to the Royal Court of Jersey* [D.I. 6944] in connection with all claims assigned or otherwise transferred under the Plan to the Master Disbursement Trust, and the Bankruptcy Court's requests on behalf of the Creditors' Committee

and its professionals shall be deemed to apply, *mutatis mutandis*, to the Master Disbursement Trust.

45.   <u>Westchester Fire Insurance Company</u>.

(a)   Notwithstanding anything to the contrary in the Plan Documents, the Disclosure Statement, or this Order, or any agreements or documents relating to the foregoing, including, without limitation, any transition agreements and trust agreements, nothing in the Plan Documents shall in any way prime, discharge, impair, modify, subordinate or affect the rights of Westchester Fire Insurance Company and/or its past, present or future U.S.-based affiliated sureties (each as surety in its role as an issuer of bonds, individually and collectively referred to herein as "**Westchester**" or "**Surety**") as to:

(i)   any indemnity or collateral obligations or agreements relating to bonds or related instruments issued and/or executed by Surety and assumed by the Debtors and/or NewCo (each such bond or related instrument, a "**Bond**", and, collectively, the "**Bonds**");

(ii)   any collateral or letter of credit related to any Bond; or

(iii)   any indemnity agreement related to any of the Bonds (collectively, the "**Indemnity Agreements**"), which include, without limitation, the General Agreement of Indemnity dated December 13, 2016 and the General Agreement of Indemnity dated August 2, 2017 which are hereby assumed and assigned to NewCo.

(b)   Notwithstanding any provision in the Plan Documents to the contrary, including, without limitation, the third-party releases in the Plan,

(i)   any and all collateral, including cash collateral and letters of credit, held by Surety and/or on Surety's behalf in connection with the Bonds shall be retained by Surety and/or on Surety's behalf to secure the obligations of the Debtors and/or NewCo under such Bonds;

(ii)   Surety has no obligation to issue or execute any new bond or related indemnity agreement on behalf of any entity, and Surety has no obligation to extend, modify and/or increase the amount of any Bond or related indemnity agreement;

(iii)   any rights, remedies and/or defenses Surety may now or in the future have with respect to the Bonds are preserved;

(iv)   any current or future setoff, recoupment rights, lien rights, trust fund claims of Surety or any party to whose rights the Surety has or may be

subrogated, and/or any existing or future subrogation or other common law rights of the Surety are preserved;

(v)     it shall not be necessary for Surety to file an administrative proof of claim, file a request for payment, and/or file a fee application to protect any of its claims related to the Indemnity Agreements and Bonds;

(vi)    Section 6.13 and Section 6.18 of the Plan shall not have the effect of disallowing Surety's claims related to the Bonds and Indemnity Agreements and/or the claims that Surety may assert via subrogation, and Section 7.5 of the Plan shall not apply to such claims; and

(vii)   Surety shall have access to any and all books and records held by the Debtors and/or NewCo relating to the Bonds and Indemnity Agreements and Surety shall receive no less than thirty (30) days written notice by the entity holding such books and records prior to destruction or abandonment of any such books and records. Without limitation to any other rights of the Surety, if a claim or claims is or are asserted against any Bonds and/or related instruments, then the Surety shall be granted access to, and may make copies of, any books and records related to such Bonds upon Surety's request.

46.    Old Republic.  In connection with the Debtors' products/completed operations liability insurance policy (policy number MWZZ 314344) and the commercial general liability policy (policy number MWZZ 315036), subsequent renewals of those policies, and any related agreements (collectively, the "**ORIC Policies**")  with Old Republic Insurance Company ("**ORIC**"), the ORIC Policies are Purdue Insurance Policies that are not MDT Insurance Policies and NewCo shall assume all the Debtors' obligations to ORIC under the ORIC Policies.  All collateral held by ORIC posted by the Debtors, whether posted before or after the Petition Date, secures all obligations of NewCo to ORIC under the ORIC Policies no matter when they arise, pursuant to the terms of the ORIC Policies.  Any reimbursement obligations and any other obligations that arise pre-petition or post-petition under any ORIC Policy (regardless of whether all or any part of such obligations are liquidated, due or paid before or after confirmation of a chapter 11 plan or conversion of one or more of the Debtors' chapter 11 cases to chapter 7) shall

be assumed by NewCo.  The Debtors' rights against all collateral held by ORIC, in whatever form, shall be governed by the terms of the ORIC Policies.

47.    <u>Motions Relating to Late Claims</u>.  Any hearing on a motion to deem a proof of claim timely filed shall be scheduled no earlier than 120 days after the entry of this Order.

48.    <u>Final Order</u>.  This Order is a final order and the period in which an appeal must be filed shall commence upon the entry hereof.

49.    <u>Binding Effect</u>.  Pursuant to Bankruptcy Rules 3020(e), 6004(h), and 7062, this Order shall be stayed until the expiration of 14 days after the entry of this Order.  Unless stayed by this Court or another court under Bankruptcy Rule 8007 or otherwise, (i) notwithstanding any Bankruptcy Rules, nonbankruptcy law, or otherwise, this Order shall be immediately effective and enforceable after the expiration of 14 days after the entry of this Order and (ii) except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, and subject to the occurrence of the Effective Date, the provisions of the Plan, the Plan Documents, and this Order shall bind the Debtors, the other Protected Parties, all Releasing Parties, all Holders of Claims against or Interests in any Debtors, all Holders of Channeled Claims, all parties to executory contracts and unexpired leases with any of the Debtors, and all other parties in interest in the Chapter 11 Cases, including the Debtors' insurers, and each of their respective heirs, executors, administrators, estates, successors and assigns.

50.    <u>Conflicts with This Order</u>.  The provisions of the Plan and this Order shall be construed in a manner consistent with each other so as to effect the purpose of each; *provided, however*, that if there is determined to be any inconsistency between any terms and provisions of this Order and any terms and provisions of the Plan or any other Plan Document that cannot be so reconciled, then solely to the extent of such inconsistency, (a) with respect to Sections 8.4 and

10.20 of the Plan, the Plan shall govern, and (b) with respect any other terms and provisions of the Plan or any other Plan Document, the provisions of this Order shall govern, and any provision of this Order shall be deemed a modification of the Plan or such other document and shall control and take precedence.

51.    <u>Findings of Fact and Conclusions of Law</u>.  The findings and conclusions set forth herein and in the Record constitute the Bankruptcy Court's findings of fact and conclusions of law pursuant to rule 52 of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rules 7052 and 9014.  To the extent that any of the following findings of fact constitute conclusions of law, and to the extent that any of the following conclusions of law constitute findings of fact, they are adopted as such.  Any requirement under the Bankruptcy Rules that the Bankruptcy Court state its conclusions of law separate from its findings of fact is hereby waived.

52.    <u>Headings</u>.  The headings contained within this Order are used for the convenience of the parties and shall not alter or affect the meaning of the text of this Order.


Dated:    _____, 2025
            White Plains, New York

                                          _____
                                          HONORABLE SEAN H. LANE
                                          UNITED STATES BANKRUPTCY JUDGE

## Exhibit A

**Plan of Reorganization**

**Exhibit B**

**NewCo Operating Injunction**

## **Exhibit C**

**NewCo Governance Covenants**

## **EXHIBIT B-2**

**Blackline of Exhibit C to the Fourth Revised Proposed Order against the version filed with the Second Revised Proposed Order**

## DEBTORS/NEWCO OPERATING INJUNCTION

## I.    DEFINITIONS

A.    "Bankruptcy Court" or "Court" shall mean the court presiding over the chapter 11 proceedings *In re Purdue Pharma L.P. et al.*, Case No. 19-23649 (SHL) (Bankr. S.D.N.Y.).

B.    "CDC Guideline Recommendations" shall mean the 12 enumerated Recommendations published by the U.S. Centers for Disease Control and Prevention (CDC) for the prescribing of opioid pain medication for patients 18 and older in primary care settings as part of its 2016 Guideline for Prescribing Opioids for Chronic Pain (CDC Guidelines), as updated or amended by the CDC.

C.    "Chapter 11 Plan of Reorganization" or "Plan of Reorganization" or "Plan" shall mean the *Fourteenth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors*, filed on September 26, 2025 [D.I. 7911], as the same may be amended, modified, or supplemented from time to time.

D.    "Company" shall mean the Debtors as defined in these chapter 11 proceedings *In re Purdue Pharma L.P. et al.*, Case No. 19-23649 (SHL) (S.D.N.Y.).    Following the Effective Date, "Company" shall mean "NewCo," a newly formed Delaware limited liability company to be created in accordance with Section 5.4 of the Plan to directly or indirectly receive the NewCo Transferred Assets and operate such NewCo Transferred Assets in accordance with the NewCo Operating Agreement, the NewCo Governance Covenants and the NewCo Operating Injunction.

E.    "Confirmation Order" shall mean the order of the Bankruptcy Court (or other court of competent jurisdiction) confirming the Chapter 11 Plan.

F.    "Downstream Customer Data" shall mean transaction information that the Company collects relating to the Company's direct customers' sales to downstream customers, including but not limited to chargeback data tied to the Company providing certain discounts, "867 data," and IQVIA data.

G.    "Effective Date" means the date on which the Plan of Reorganization becomes effective.

H.    "Governance Covenants" shall have the meaning set forth in the NewCo Operating Agreement.

I.    "Health Care Provider" shall mean any U.S.-based physician or other health care practitioner who is licensed to provide health care services or to prescribe pharmaceutical products and any medical facility, medical practice, hospital, clinic or pharmacy.

J.    "Including but not limited to," when followed by a list or examples, shall mean that list or examples are illustrative instances only and shall not be read to be restrictive.

K.    "In-Kind Support" shall mean payment or assistance in the form of goods, commodities, services, or anything else of value.

L.    "Lobby" shall mean to engage in "lobbying activities" or "lobbying contacts" under the federal lobbying disclosure act, 2 U.S.C. § 1602 *et seq*., and any analogous state or local provisions governing the person or entity being lobbied in that particular state or locality. As used in this injunction, "Lobby" includes Lobbying directly or indirectly, through grantees or Third Parties.

M.    "NewCo Disposition Event" shall have the meaning assigned to the term "Disposition Event" as set forth in the NewCo Operating Agreement.

N.    "NewCo Operating Agreement" shall have the meaning set forth in the Plan of Reorganization.

O.    "Opioid(s)" shall mean all natural, semi-synthetic, or synthetic chemicals that interact with opioid receptors and act like opium. For the avoidance of doubt, the term Opioid shall not include the opioid antagonists naloxone and nalmefene.

P.    "Opioid Product(s)" shall mean all current and future medications containing Opioids approved by the U.S. Food & Drug Administration (FDA) and listed by the Drug Enforcement Administration (DEA) as Schedule II, III, or IV drugs pursuant to the federal Controlled Substances Act, including but not limited to codeine, fentanyl, hydrocodone, hydromorphone, meperidine, morphine, oxycodone, oxymorphone, tapentadol, and tramadol.

Q.    "OUD" shall mean opioid use disorder defined in the *Diagnostic and* Statistical *Manual of Mental Disorders, Fifth Edition (DSM–5)*, as updated or amended.

R.    "PHI Product(s)" shall have the meaning set forth in the NewCo Operating Agreement, which for the avoidance of doubt includes, buprenorphine-naloxone combination tablets, over-the-counter naloxone nasal spray, injectable nalmefene, and any other medicines as determined by NewCo's Board provided that such medicines must be approved by the FDA for treatment of opioid addiction and/or reversing opioid overdoses, but for purposes of this injunction does not include methadone and generic versions of Subutex® sublingual buprenorphine tablets.

S.    "Promote," "Promoting," and "Promotion" shall mean dissemination of information or other practices intended or that could be reasonably anticipated to influence prescribing practices in a manner that increases sales, prescriptions, or the utilization of prescription products.

T.    "Qualified Researcher" shall mean any researcher holding a faculty appointment or research position at an institution of higher education, a research organization, a nonprofit organization, or a government agency.

U.    "Section" shall mean, unless the context requires otherwise, a Section of this injunction.

V.     "Shareholder Released Parties" shall mean the Estate of Beverly Sackler, David A. Sackler, Ilene Sackler, the Estate of Jonathan D. Sackler, Kathe Sackler, Mortimer D.A. Sackler, Richard S. Sackler, Theresa Sackler, any trusts of which any of the foregoing are beneficiaries, and the trustees thereof (solely in their capacities as such), each Shareholder Party and each other entity or person that directly or indirectly owns equity in, or has voting control over, any of the Debtors, and in the event of the death of a Shareholder Released Party who is a natural person, other than a natural person who is a Shareholder Released Party solely in the capacity as a trustee, the estate of such person.

W.     "State Monitor Committee" shall mean a bipartisan, volunteer committee comprising representatives from 5-7 States.

X.     "Suspicious Order" shall have the same meaning as provided by the Controlled Substances Act, 21 U.S.C. §§ 801-904, and the regulations promulgated thereunder, final DEA administrative decisions that are published in the Federal Register, and analogous state laws and regulations.

Y.     "Third Party" shall mean any person or entity other than the Company or a government entity.

Z.     "Treatment of Pain" ~~shall mean [means~~ the provision of ~~pharmaceutical products whose primary purpose is~~therapeutic modalities to alleviate or reduce pain~~, which for the avoidance of doubt shall not include~~. "Treatment of Pain" does not include (i) the provision of therapeutic modalities to treat a disease or condition that is something other than pain but for which a side effect or impact of the treatment of such disease or condition is a reduction in pain caused by such disease or condition, or (ii) Tinostamustine or Sunobinop~~].~~

## II.    SCOPE AND ENFORCEMENT

A.     This injunction shall apply to and be binding on NewCo on the Effective Date; and on any transferee or successor to, or subsequent operator of, all or any portion of NewCo's Opioid business (a "Transferee/Successor") as set forth below.

B.     The Debtors and NewCo consent to the entry of a final judgment or consent order, substantially in the form of this injunction, imposing all of the provisions of this injunction in each state and territorial court on the Debtors, NewCo and any Transferee/Successor, at any time after the Effective Date (the "Consent Judgment"), as well as to the jurisdiction of those state and territorial courts with respect to a Consent Judgment. A Consent Judgment shall apply to and be binding on NewCo after the Effective Date; and on any Transferee/Successor.

C.     Until this injunction is effective, the Voluntary Injunction initially entered on November 6, 2019 in *Purdue Pharma L.P. v. Massachusetts*, Adv. Pro. No. 19-08289 (Bankr. S.D.N.Y) as Exhibit 1 to the Second Amended Order Pursuant to 11 U.S.C. § 105(a) Granting Motion for a Preliminary Injunction and re-entered thereafter, shall remain in full force and effect on the Company and NewCo.

D.    Without limiting the foregoing:

1.    NewCo shall be required to obtain the consent of any Transferee/Successor to be bound by this injunction and to submit to the jurisdiction of this Court and each state and territorial court for enforcement of the terms of this injunction as a condition to a transfer of all or any portion of NewCo's Opioid business.

2.    Nothing in this injunction applies to the operation of a Transferee/Successor's pre-existing Opioid business. Any Transferee/Successor shall be subject only to Sections III.A-C and III.E-H.

3.    Nothing requires that this injunction be enforced exclusively in this Court or limits the jurisdiction of any state or territorial court to enforce the terms of this injunction.

### III.    INJUNCTIVE RELIEF

**A.    Ban on Promotion**

1.    The Company shall not engage in the Promotion of Opioids or Opioid Products, including but not limited to, by:

a.    Employing or contracting with sales representatives or other persons to Promote Opioids or Opioid Products to Health Care Providers or patients.

b.    Using speakers, key opinion leaders, thought leaders, lecturers, and/or speaking events for Promotion of Opioids or Opioid Products.

c.    Sponsoring, or otherwise providing financial support or In-Kind Support to medical education programs that include references to Opioids or Opioid Products.

d.    Creating, sponsoring, operating, controlling, or otherwise providing financial support or In-Kind Support to any website, network, and/or social or other media account for the Promotion of Opioids or Opioid Products.

e.    Creating, sponsoring, distributing, or otherwise providing financial support or In-Kind Support for materials Promoting Opioids or Opioid Products, including but not limited to brochures, newsletters, pamphlets, journals, books, and guides.

f.    Creating, sponsoring, or otherwise providing financial support or In-Kind Support for advertisements that Promote Opioids or Opioid Products, including but not limited to internet advertisements or similar content, and providing hyperlinks or otherwise directing internet traffic to advertisements.

4

g.   Engaging in Internet search engine optimization or other techniques designed to Promote Opioids or Opioid Products, including by improving rankings or making content appear among the top results in an Internet search or otherwise be more visible or more accessible to the public on the Internet.

h.   Utilizing electronic health records software or other digital health platforms to create alerts, workflows, or disseminate information known or reasonably expected to increase utilization of Opioids or Opioid Products.

2.   Notwithstanding Sections III.A.1 and III.C, the Company may:

a.   Maintain corporate websites.

b.   Maintain a website for any Opioid Product that contains principally the following content: the FDA-approved package insert, medication guide, and labeling, and a statement directing patients or caregivers to speak with a licensed Health Care Provider; Risk Evaluation and Mitigation Strategy (REMS) materials; and contact information to report an adverse event or product complaint.

c.   Provide information or support the provision of information as expressly required by law, settlement, court order or any state or federal government agency, including providing all information necessary in order for the Company to comply with its regulatory obligations pursuant to the Federal Food, Drug, and Cosmetic Act or the Controlled Substances Act, and/or provide information about legal proceedings involving the Company.

d.   Engage and compensate Health Care Providers or other Third Parties to assist the Company in responding to, preparing for and participating in any of the following activities held by any state or federal government or state or federal agencies or regulators, including the FDA: advisory committees, working groups, meetings and or/hearings.

e.   Provide the following by mail, electronic mail, on or though the Company's corporate or product websites or through other electronic or digital methods: FDA-approved package insert, medication guide, approved labeling for Opioid Products, REMS materials or other prescribing information for Opioid Products that are published by a state or federal government agency.   State materials may be provided only within the applicable state.

f.   Provide scientific and/or medical information in response to an unsolicited request by a Health Care Provider concerning Opioid Products consistent with the  recommendations set forth in the FDA's Draft Guidance for Industry, *Responding to Unsolicited Requests for Off-Label Information About Prescription Drugs and Medical Devices* (Dec. 2011, as updated or

amended by the FDA) and Guidance for Industry, *Good Reprint Practices for the Distribution of Medical Journal Articles and Medical or Scientific Reference Publications on Unapproved New Uses of Approved Drugs and Approved or Cleared Medical Devices* (Jan. 2009, as updated or amended by the FDA). Such responses should be handled by medical or scientific personnel at the Company who are independent from the sales or marketing departments.

g.    Provide a response to any unsolicited question or request from a patient or caregiver, directing the patient or caregiver to the FDA-approved labeling and to the extent that the question cannot be answered solely by reference to a specific provision of the FDA-approved labeling, providing a response that is truthful, balanced, non-misleading and fully consistent with the FDA-approved labeling or recommending the patient or caregiver speak with a licensed Health Care Provider without naming any specific provider or healthcare institution; or directing the patient or caregiver to speak with their insurance carrier regarding coverage of an Opioid Product.

h.    Provide information to a payor, formulary committee, distributor, or other similar entity with knowledge and expertise in the area of health care economics concerning the cost or availability of a Company Opioid Product, including the costs compared to the cost of an Opioid Product manufactured or distributed by another company.  Such information may include information about the stocking of the Opioid Product as described in the FDA-approved labeling; tier status; applicable prescribing guidelines that are consistent with the FDA-approved labeling; step-edits for Opioid Products; restrictions; and/or prior authorization status concerning an Opioid Product.  Provided further that information provided pursuant to this subparagraph shall also be posted on the website permitted by Section III.A.2.b, except for information that is commercially sensitive or otherwise confidential, which instead shall be provided to the Monitor and the State Monitor Committee.

i.    Sponsor or provide financial support or In-Kind Support for an accredited or approved continuing medical education program required by either an FDA-approved REMS program or other federal or state law or regulation in accordance with applicable requirements, settlement with a governmental entity, or court order, through an independent Third Party, which shall be responsible for the continuing medical education program's content without the participation of the Company.

j.    Provide rebates, discounts, fees and other customary pricing adjustments to DEA-registered customers and contracting intermediaries, such as Buying Groups, Group Purchasing Organizations, Managed Care Plans and Pharmacy Benefit Managers, except as prohibited by Section III.E.

k.  Promote PHI Products, and provide information about, discuss, or comment on, issues regarding mechanisms for preventing opioid abuse and misuse, including the prevention, education and treatment of opioid overdose.  Except that the Company shall not:

(i)  Employ or contract with sales representatives to detail PHI Products (i.e., through direct interaction, whether in-person or virtual, with individual prescribing or dispensing health care professionals or their staffs) who are compensated based on sales or volume of PHI Products. The Company will document interactions related to PHI Products between Company sales representatives and health care professionals or their staffs and will retain documents and information relating to those communications; and/or

(ii) In addition to Section III.A.2.k.i, with regard to PHI Products that are Opioid Products indicated for the treatment of substance abuse disorders, employ or contract with sales representatives to detail such PHI Products (i.e., through direct interaction, whether in-person or virtual, with individual prescribing or dispensing health care professionals or their staffs).  Nothing in this Section III.A.2.k.ii shall be construed to prohibit personal contact between non-sales representatives of the Company and health care professionals or their staffs regarding PHI Products that are Opioids. The Company will document interactions regarding PHI Products that are Opioids between Company non-sales representatives and health care professionals or their staffs and will retain documents and information relating to those communications.

(iii)  Any and all documents and information relating to communications related to the activities described in Subsections (i) and (ii) of this Section III.A.2.k shall be provided to the Monitor at his request for his review.

(iv)  Nothing in this section shall be construed to permit the Promotion of methadone or generic versions of Subutex® sublingual buprenorphine tablets except pursuant to Sections III.A.2.a-j.

3.  The Company shall not engage in the following specific Promotional activity relating to any products for the treatment of Opioid-induced side effects except as permitted by Section III.A.2.k, above:

a. Employing or contracting with sales representatives or other persons to Promote products for the treatment of Opioid-induced side effects to Health Care Providers or patients.

b. Using speakers, key opinion leaders, thought leaders, lecturers, and/or speaking events for Promotion of products for the treatment of Opioid-induced side effects.

c. Sponsoring, or otherwise providing financial support or In-Kind Support to medical education programs relating to products for the treatment of Opioid-induced side effects except as required by REMs, court orders or settlements.

d. Creating, sponsoring, or otherwise providing financial support or In-Kind Support for advertisements that Promote products for the treatment of Opioid-induced side effects, including but not limited to internet advertisements or similar content, and providing hyperlinks or otherwise directing internet traffic to advertisements.

e. Engaging in any other Promotion of products for the treatment of Opioid-induced side effects in a manner that encourages the utilization of Opioids or Opioid Products or normalizes the use of Opioids or Opioid Products for chronic pain.

f. Utilizing electronic health records software or other digital health platforms to create alerts, workflows, or disseminate information known or reasonably expected to increase utilization of Opioids or Opioid Products.

4. Treatment of Pain

a. The Company shall not, either through the Company or through Third Parties, engage in Promotion of the Treatment of Pain in a manner that directly or indirectly encourages the use of Opioids or Opioid Products.

b. The Company shall not, either through the Company or through Third Parties, Promote the concept that pain is undertreated in a manner that directly or indirectly encourages the use of Opioids or Opioid Products.

5. To the extent that the Company engages in conduct permitted by Section III.A.2, the Company shall do so in a manner that is:

a. Consistent with the CDC Guideline Recommendations, as applicable.

b. Truthful, not misleading, accurate, and not deceptive.

6. For the avoidance of doubt, nothing in this injunction shall be construed or used to prohibit the Company from taking legal or factual positions in litigation,

bankruptcy proceedings, investigations, regulatory actions, or other legal or administrative proceedings or prohibit or limit the Company's right to make public statements or respond to media reports or inquiries relating to any litigation, bankruptcy proceedings, investigations, regulatory actions, or other legal, administrative, or legislative proceedings.

**B.    No Reward or Discipline Based on Volume of Opioid Sales**

1.    The Company shall not provide financial or non-financial incentives to its employees or discipline its employees based upon sales volume or sales quotas for Opioid Products.

2.    The Company shall not offer or pay any remuneration (including any kickback, bribe, or rebate) directly or through a Third Party, to or from any person in return for the prescribing, sale, use or distribution of an Opioid Product.  For the avoidance of doubt, this subparagraph shall not prohibit the provision of rebates and/or chargebacks to the extent permitted by Section III.A.2.j.

3.    The Company's compensation policies and procedures shall be designed to ensure compliance with this injunction and other legal requirements.

**C.    Ban on Funding/Grants to Third Parties**

Except with respect to PHI Products:

1.    The Company shall not directly or indirectly provide financial support or In-Kind Support to any Third Party for the purpose of  Promoting Opioids, Opioid Products, the Treatment of Pain, or products intended to treat Opioid-related side effects, including educational programs or websites that Promote Opioids, Opioids Products, the Treatment of Pain, or products intended to treat Opioid-related side effects, but excluding financial support otherwise allowed by this injunction, including REMS, settlements, and court orders or as required by a federal or state agency.

2.    The Company shall not operate, control, create, sponsor, provide financial support or In-Kind Support to any medical society or patient advocacy group relating to any Opioids, Opioid Products, the Treatment of Pain, or products intended to treat Opioid-related side effects, except with regard to REMS or to comply with settlements, court orders, or federal or state law.

3.    The Company shall not provide links to any Third-Party website or materials or otherwise distribute materials created by a Third Party relating to any Opioids, Opioid Products, the Treatment of Pain, or products intended to treat Opioid-related side effects.

4.      The Company shall not use or pay any Third Party to engage in any activity that the Company itself would be prohibited from engaging in pursuant to the injunction.

5.      The Company shall not enter into any contract or agreement with any person or entity or otherwise attempt to influence any person or entity in such a manner that has the purpose or likely effect of limiting the dissemination of information regarding the risks and side effects of using Opioids.

6.      The Company shall not compensate or provide In-Kind Support to Health Care Providers or organizations to advocate for formulary access or treatment guideline changes that would have the effect of increasing access to any Opioid Product by third-party payors, *i.e.*, any entity, other than an individual, that pays or reimburses for the dispensing of prescription medicines, including but not limited to managed care organizations and pharmacy benefit managers. For the avoidance of doubt, nothing herein shall prohibit the Company from compensating Third Parties for engaging in conduct otherwise permitted under this injunction

7.      No current director, officer, or management-level employee of the Company may serve as a director, board member, employee, agent, or officer of any entity that engages in Promotion relating to Opioids, Opioid Products, the Treatment of Pain, or products intended to treat Opioid-related side effects except insofar as such service would be consistent with Section III.A.2. or III.A.4, or except for services relating to (i) the treatment of OUD, (ii) the prevention, education or treatment of opioid abuse, addiction or overdose, including medication-assisted treatment for opioid addiction and/or (iii) rescue medication for opioid overdose.

8.      The Company shall play no role in appointing persons to the board, or hiring persons to the staff, of any entity that principally engages in Promotion relating to any Opioids, Opioid Products, the Treatment of Pain, or products intended to treat Opioid-related side effects except as otherwise permissible under Section III.A.4.

9.      The Company shall ensure that any employee serving on the board of any organization that engages in lobbying or educating state and federal officials on policies and regulations, the impact of which would be to more easily enable or Promote the use of Opioids or Opioid Products, recuse himself/herself from any board discussion or decisions relating to Opioids, including any determinations the organization may make related to lobbying efforts with respect to opioids. Further, the Company shall ensure that any such employees will refrain from participation in any working group of such organization that focus on the Promotion of Opioids or Opioid Products or which focus on issues that would otherwise not be permitted under this injunction.

10.     For the avoidance of doubt, nothing in Section III.C shall be construed or used to prohibit the Company from providing financial or In-Kind Support to:

a.      medical societies and patient advocate groups, who are principally involved in issues relating to (i) the treatment of OUD; (ii) the prevention, education, and treatment of opioid abuse, addiction, or overdose, including medication-assisted treatment for opioid addiction; and/or (iii) rescue medications for opioid overdose.

b.      universities, medical institutions, or hospitals, for the purpose of addressing, or providing education on, issues relating to (i) the treatment of OUD; (ii) the prevention, education, and treatment of opioid abuse, addiction, or overdose, including medication-assisted treatment for opioid addiction; and/or (iii) rescue medications for opioid overdose.

## D.    Lobbying Restrictions

1.    The Company shall not Lobby for or against the enactment of any federal, state or local legislation or promulgation of any rule or regulation that:

a.      Encourages or requires Health Care Providers to prescribe Opioids or sanctions Health Care Providers for failing to prescribe Opioids or failing to treat pain with Opioids;

b.      Would have the effect of limiting access to any non-Opioid alternative pain treatments;

c.      Pertains to the prohibitions against misbranding or adulteration in the Federal Food, Drug, and Cosmetic Act; or

d.      Pertains to the classification of any Opioid or Opioid Product as a scheduled drug under the Controlled Substances Act.

2.    The Company shall not directly, or by employing or controlling a Third Party, Lobby against the enactment of any federal, state or local legislation or promulgation of any rule or regulation that supports:

a.      The use of non-pharmacologic therapy and/or non-Opioid pharmacologic therapy to treat chronic pain over or instead of Opioid therapy, including but not limited to Third Party payment or reimbursement for such therapies;

b.      The use and/or prescription of immediate release Opioids instead of extended release Opioids when Opioid therapy is initiated, including but not limited to Third Party reimbursement or payment for such prescriptions;

c.      The prescribing of the lowest effective dose of an Opioid, including but not limited to Third Party reimbursement or payment for such prescription;

11

d.      The limitation of initial prescriptions of Opioids to treat acute pain;

e.      The prescribing and other means of distribution of naloxone to minimize the risk of overdose, including but not limited to Third Party reimbursement or payment for naloxone;

f.      The use of urine testing before starting Opioid therapy and annual urine testing when Opioids are prescribed, including but not limited to Third Party reimbursement or payment for such testing;

g.      Evidence-based treatment (such as using medication-assisted treatment with buprenorphine or methadone in combination with behavioral therapies) for Opioid Use Disorder, including but not limited to third party reimbursement or payment for such treatment; or

h.      The implementation or use of Opioid drug disposal systems that have proven efficacy for the Company's Opioid Products.

i.      The Company shall not directly, or indirectly by employing or controlling a Third Party, Lobby against the enactment of any federal, state or local legislation or promulgation of any rule or regulation limiting the operation or use of prescription drug monitoring programs ("PDMPs"), including, but not limited to, provisions requiring Health Care Providers to review PDMPs when Opioid therapy is initiated and with every prescription thereafter.

j.      The Company shall not establish any Political Action Committees or make campaign contributions to candidates for political office at any time prior to the NewCo Disposition Event.

3.      Provided, however, that nothing in Section III.D of this injunction limits the Company from:

a.      Challenging the enforcement of, or suing to stop the enactment of, or for declaratory or injunctive relief with respect to any legislation, rules or regulations;

b.      Responding to a statute, rule, regulation, or order requiring such communication;

c.      Appearing before a federal or state legislative or administrative body, committee, or subcommittee as a result of a mandatory order, or subpoena commanding that person to testify;

d.      Responding, in a manner consistent with this injunction, to an unsolicited request for the input on the passage of legislation or the promulgation of any rule or regulation when such request is submitted in writing

specifically to the Company from a government entity directly involved in the passage of that legislation or promulgation of that rule or regulation;

e.   Responding to unsolicited requests from the DEA, the FDA, or any other Federal or state agency and/or participating in FDA or other agency panels at the request of the agency;

f.   Communicating with governmental officials regarding access to, availability of, procurement of, or use of PHI Products.

g.   Monitoring any pending or proposed legislation, rule or regulation relating to its business, including directly or indirectly through grantees or Third Parties.

4.   The Company shall not Lobby by affirmatively advocating either for or against the enactment of any federal, state, or local legislation or promulgation of any rule or regulation or the appointment of any individual to public office, unless NewCo's Board shall have determined that the request comports with the Company's Purpose (as defined in the NewCo Operating Agreement).   If NewCo's Board so determines, then the Company shall provide advance notice to the Monitor of its intention to Lobby on the issue.   The Monitor shall then have the sole and absolute discretion to direct that the activity not take place if the Monitor exercises such discretion and determines that the request approved by the NewCo Board (a) is expressly prohibited by the terms of this injunction, or (b) does not reasonably comport with the Company's Purpose (as defined in the NewCo Operating Agreement).   Nothing in Section III.D.4 shall permit advocacy that is otherwise prohibited under Section III.D.

5.   The Company shall require all of its officers, employees, and agents engaged in conduct described in Section III.D to certify annually in writing or by appropriate electronic means to the Company that they are aware of and will fully comply with the provisions of this injunction with respect to Lobbying on behalf of the Company.

6.   On a quarterly basis, NewCo will report its Lobbying activities to the Monitor and the Board. The requirements of Section III.D shall remain in effect until the NewCo Disposition Event.

## E.   Ban on Prescription Savings Cards

1.   The Company shall not directly or through a Third Party offer prescription savings cards or coupons for its Opioid Products (other than PHI Products) except to existing, commercially insured, non-cash paying patients.   Nothing in this paragraph shall prohibit the Company from utilizing unsolicited electronic point-of-dispense programs for the benefit of commercially-insured, non-cash paying patients.

2.    The Company shall not directly or indirectly assist patients, Health Care Providers, or pharmacies regarding the claims and/or prior authorization process required for third-party payors to approve claims involving any Opioid Product.

**F.    Monitoring and Reporting of Direct and Downstream Customers**

1.    The Company shall operate an effective monitoring and reporting system in compliance with 21 C.F.R. § 1301.71(a), 21 C.F.R. §1301.74(b), 21 U.S.C. § 823(d) and Section 3292 of the SUPPORT for Patients and Communities Act and final DEA administrative decisions that are published in the Federal Register.

2.    The monitoring and reporting system shall include processes and procedures pertaining to Opioid Products that:

a.    Utilize all reasonably available information and conduct appropriate due diligence to identify a Suspicious Order of an Opioid Product by a direct customer, including, but not limited to, utilizing appropriate algorithms to identify orders of unusual size, unusual frequency and/or that deviate from a normal pattern.

b.    Review all Suspicious Orders to determine whether circumstances warrant permitting a Suspicious Order to be cleared for shipment. As part of this review, the Company shall conduct appropriate due diligence including, but not limited to, collecting additional information and documentation from direct customers that explain whether the order is legitimate, and conducting a site visit if warranted. No Suspicious Order may be cleared absent adequate, documented justification.

c.    In addition to the review above, each month the Company shall make a selection of previously cleared orders for further review. Such additional review will include, but not be limited to gathering information pertaining to the legitimacy of the customer's orders and investigating whether there are indicators that a direct or downstream customer poses a risk of diversion. The Company shall document its review and findings.

d.    Require all direct customers to annually complete a Wholesaler Due Diligence Questionnaire ("Questionnaire"), utilize all information that the Company receives through such Questionnaire, and require any direct customer that provides incomplete, unsigned, or unresponsive responses, or fails to provide referenced accompanying information to correct the deficiency. The Company will conduct site visits to corroborate the information obtained from its customers. Once the Questionnaire review process is complete, any Questionnaire that is incomplete, unsigned or unresolved shall result in denial of clearance for shipment.

e.    Utilize all reasonably available Downstream Customer Data to identify whether a downstream customer poses a material risk of diversion of an Opioid Product, including, but not limited to: a monthly review of

14

Downstream Customer Data; review of Downstream Customer Data to identify downstream customers that consistently have a large volume of chargebacks meriting further investigation; the establishment of objective methods for identifying chargeback units that merit further review; and the review of chargeback reports to identify downstream customers that have higher chargebacks on a repeat basis.   If chargeback data reveals suspicious indicia (e.g. the number or frequency of chargebacks), the Company shall investigate further.   To the extent the inquiry does not resolve the concern, the Company shall report the identity of the downstream customer to DEA and to the relevant direct customers.

f.   Utilize all reasonably available information that the Company receives that indicates an unreasonable risk of a direct customer's or a downstream customer's diversion activity or potential for diversion activity, including reports by the Company's employees, customers, Health Care Providers, law enforcement, state, tribal, or federal agencies, or the media.

g.   Upon request (unless otherwise required by law), report to any requesting State Attorney General or State controlled substances regulatory agency or Department of Justice component any direct customer or downstream customer in such requesting State Attorney General's or agency's State identified as part of the monitoring required by Sections III.F.2(a)-(f), and any customer relationship in such State terminated by the Company relating to diversion or potential for diversion.  DEA will be notified of all Suspicious Orders.  Additionally, rejected order information will be shared with DEA in compliance with governing statutes and regulations.  These reports shall include the following information, to the extent known to the Company:

   i.   The identity of the downstream customer and the direct customer(s) engaged in the controlled substance transaction(s), to include each registrant's name, address, business type, and DEA registration number.

   ii.   The dates of reported distribution of controlled substances by direct customers to the downstream customer during the relevant time period.

   iii.   The drug name, drug family or NDC and dosage amounts reportedly distributed.

   iv.   The transaction or order number of the reported distribution.

   v.   A brief narrative providing a description of the circumstances leading to the Company's suspicion that there is a risk of diversion.

15

    h.    The Company will retain record copies of documentation associated with Sections III.F.2(a)-(g), and make such documentation available to any federal, state, or local law enforcement agency upon request.

3.    The Company shall not provide to any direct customer an Opioid Product to fill an order identified as a Suspicious Order unless the Company investigates and finds that the identified order is not suspicious.  The Company may not find an identified order is not suspicious solely based on a threshold review.  Where the Company has reviewed an order identified as a Suspicious Order and determined that the identified order is not suspicious, the Company must document the basis for its determination, and provide such documentation to the Monitor.  The Company will retain record copies of documents provided to the Monitor, and make such documentation available to any federal, state, or local law enforcement agency upon request.

4.    The Company shall promptly notify the DEA of findings by the Monitor related to the Company's suspicious order monitoring program.

5.    The Company shall employ sufficient staff so that the suspicious order monitoring can be robust, the review of customer provided Questionnaires can be thorough, and the documentation of all decisions related to Suspicious Orders can be thorough and complete.

6.    Upon request, the Company shall provide full cooperation and assistance to any federal, state or local law enforcement investigations of potential diversion or suspicious circumstances involving Opioid Products, including criminal law enforcement agencies, drug control agencies, professional licensing boards, and Attorney General's offices.  For the avoidance of doubt, the Company must provide full cooperation to DEA and any component of the Department of Justice.

7.    The Company will refrain from providing an Opioid Product (other than a PHI Product) directly to a retail pharmacy location or Health Care Provider or otherwise engaging in activity that requires it to be registered as a distributor under the Controlled Substances Act.  Nothing in this provision, however, prevents the Company from acting as a distributor of PHI Products consistent with applicable law.

**G.    General Terms**

1.    To the extent that a provision in this injunction conflicts with federal or relevant state law or regulation, the requirements of the law or regulation will prevail.  To the extent that any provision in the injunction is in conflict with federal or relevant state law such that the Company cannot comply with both the statute or regulation and a provision of this injunction, the Company may comply with such statute or regulation.   To the extent that the Company makes any such determination, it will disclose the conflict and its determination to the affected State Attorney(s) General, the Director, Consumer Protection Branch, Department

of Justice, and the Monitor as soon as reasonably practicable and in advance of any change to the Company's policies or practices.

2. The Company shall not make any written or oral statement about Opioids, Opioid Products or PHI Products that is unfair, false, misleading or deceptive, or unconscionable.

3. The Company shall not represent that Opioids, Opioid Products or PHI Products have approvals, characteristics, uses, benefits, or qualities that they do not have or are inconsistent with the products' FDA-approved labeling.

4. For the avoidance of doubt, nothing in this injunction is intended to or shall be construed to prohibit the Company in any way whatsoever from taking legal or factual positions with regard to its Opioid Product(s) in defense of litigation or other legal proceedings or investigations.

5. Upon the request of any State Attorney General or federal component, the Company shall provide the requesting State Attorney General or federal component with the following, within 30 days of the request:

   a. Notification as to whether the Company has received any litigation or civil or criminal law enforcement subpoenas or Civil Investigative Demands relating to the Company's Opioid Product(s), as well as the identity of the state or federal component(s) that issued any such subpoenas or Civil Investigative Demands.

   b. Copies of warning or untitled letters issued by the FDA regarding the Company's Opioid Product(s) and all non-confidential correspondence between the Company and the FDA related to such letters.

6. Whenever possible, each provision of this injunction shall be interpreted in such manner as to be effective and valid under applicable law and regulation, but if any provision of this injunction is held to be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of this injunction.

**H. Compliance with All Laws and Regulations Relating to the Sale, Promotion, and Distribution of Any Opioid Product**

1. The Company shall comply with all laws and regulations that relate to the sale, Promotion, distribution, and disposal of any Opioid Product or PHI Product including but not limited to:

   a. State controlled substances acts.

   b. The Federal Controlled Substance Act and any regulation promulgated thereunder.

     c.      The Federal Food, Drug and Cosmetic Act, or any regulation promulgated thereunder.

     d.      Federal health care offenses, as defined in 18 U.S.C. § 24.

     e.      State consumer protection and unfair trade practices acts.

     f.      State laws and regulations related to prescribing, distribution and disposal of Opioid Products.

     g.      Bribery, Foreign Corrupt Practices Act, Anti-Kickback, and Stark laws and regulations.

**I.    Compliance Deadlines**

1.     As of 90 days after the Effective Date, the Company must be in full compliance with the provisions included in this injunction.

**J.    Training**

1.     The Company shall provide regular training, at least once per year, to relevant employees on their obligations imposed by this injunction.  The Company shall provide training to any new employees at the time of their onboarding.

## IV.    CLINICAL DATA TRANSPARENCY

**A.    Data to Be Shared**

1.     The Company shall share the following clinical data to the extent and in a manner permitted by applicable law and contracts, including data privacy laws, informed consent forms and clinical trial protocols through a third-party data archive that conforms to the requirements defined below to increase the transparency of its clinical research.

     a.      The Company shall make available all clinical data and/or information it possesses in electronic form that can be located following a reasonably diligent search, regarding OxyContin® Tablets, Butrans® Transdermal System and Hysingla® Tablets previously disclosed to the FDA.

     b.      The Company shall make available all previously unreleased, clinical data it possesses in electronic form that can be located following a reasonably diligent search, regarding OxyContin® Tablets, Butrans® Transdermal System and Hysingla® Tablets, for both approved and unapproved indications, including:

        i.      Full analyzable data set(s) (including individual participant-level data de-identified by an independent biostatistician);

ii.     The clinical study report(s) redacted for commercial or personal identifying information;

iii.    The full protocol(s) (including the initial version, final version, and all amendments); and

iv.     Full statistical analysis plan(s) (including all amendments and documentation for additional work processes) and analytic code.

**B.     Third-Party Data Archive**

1.    The Company shall share the clinical data and information described in Section IV.A.1 via a third-party data archive that makes clinical data available to Qualified Researchers with a bona fide scientific research proposal.

2.    The Company shall begin sharing information identifying the clinical data and information described in Section IV.A.1.a and b with the vendor no later than 30 days following entry of the Confirmation Order and shall complete that process of identifying the clinical data and information described in Section IV.A.1.a and b no later than 90 days following entry of the Confirmation Order.

3.    The data archive shall have a panel of reviewers with independent review authority to determine whether the researchers are qualified, whether a research application seeks data for bona fide scientific research, and whether a research proposal is complete.

4.    The panel may exclude research proposals with a commercial interest.

**C.     Non-Interference**

1.    The Company shall not interfere with decisions made by the staff or reviewers associated with the third-party data archive.

2.    Unless expressly stated herein, the Company shall have no communications directly or indirectly with a Qualified Researcher, including with regard to the data added to the third-party archive.

**D.     Data Use Agreement**

1.    Any data sharing agreement with a Qualified Researcher who receives shared data via the third-party data archive shall contain contact information for the Company's pharmacovigilance staff.  Every agreement shall require the lead qualified researcher to inform the Company's pharmacovigilance staff within 24 hours of any determination that research findings could detrimentally impact the risk-benefit assessment regarding the product.    The Company's pharmacovigilance staff shall take all necessary and appropriate steps upon receipt of such safety information, including but not limited to notifying regulatory authorities or the public.  The lead Qualified Researcher may also

inform regulatory authorities of the safety signal impacting the risk-benefit assessment as well as provide reasonable notice to the Company.

**E.    Cost**

1.    The Company shall bear all costs for making data and/or information until the NewCo Disposition Event.

## V.    DISPUTE RESOLUTION

A.    For the purposes of resolving disputes with respect to compliance with this injunction, should any State Attorney General or federal agency have reason to believe that the Company has violated a provision of this injunction subsequent to the Effective Date, then such Attorney General or federal agency shall notify the Company in writing of the specific objection, identify with particularity the provisions of this injunction that the practice appears to violate, and give the Company 30 days to respond to the notification.

B.    Upon 30 days of receipt of written notice from such State Attorney General or federal agency, the Company shall provide a written response, containing either a statement explaining why the Company believes it is in compliance with this injunction or a detailed explanation of how the alleged violation occurred and a statement explaining how and when the Company intends to remedy or has remedied the alleged violation.

C.    Such State Attorney General may not take any action concerning the alleged violation of this injunction during the 30-day response period.  Nothing shall prevent such State Attorney General from agreeing in writing to provide the Company with additional time beyond the 30 days to respond to the notice.  However, such State Attorney General may take any action, including, but not limited to legal action to enforce compliance with the [Confirmation Order/consent judgment specified by Section II.B], without delay if such State Attorney General believes that, because of the specific practice, a threat to the health or safety of the public requires immediate action.

D.    Such State Attorney General may bring an action against the Company to enforce the terms of the [Confirmation Order/consent judgment specified by Section II.B], but only after providing the Company an opportunity to respond to the notification as described above or within any other period as agreed to by the Company and such State Attorney General.

E.    Nothing in this injunction shall be interpreted to limit any State Attorney General's Civil Investigative Demand ("CID") or investigative subpoena authority and any federal agency's subpoena or investigative authority, to the extent such authority exists under applicable state or federal law.  The Company agrees to comply with such CID, subpoenas, or other demands or requests issued pursuant to such authority.

F.    Nothing herein shall be construed to exonerate any failure to comply with any provision of this injunction after the Effective Date, or to compromise the authority of any State Attorney General to take action for any failure to comply with this injunction.

## VI.    INDEPENDENT MONITOR

**A.    Monitor Selection and Engagement**

1.    The Company shall engage a Monitor to review its compliance with this injunction.

2.    Steven Bullock, the Monitor approved by the Bankruptcy Court on March 1, 2021, to oversee compliance with the Voluntary Injunction, shall continue to serve as Monitor with respect to this injunction after the Effective Date.

3.    If a new Monitor must be appointed due to the Monitor resigning or otherwise becoming unable to perform the specified tasks, the Foundation shall select a new Monitor, who must be approved by the State Monitor Committee which approval shall not be unreasonably withheld and approved by the Court.   The selected Monitor approved by the State Monitor Committee may serve while Court approval is pending.

4.    The Monitor may employ or retain personnel who have appropriate qualifications related to the pharmaceutical industry and the laws governing the manufacture, marketing and sale of pharmaceuticals and controlled substances and the applicable requirements of federal and state law. The Monitor may also retain the services of additional third-parties to the extent that additional expertise is required for the engagement.   The Monitor may consult with and seek input from the Company and the State Monitor Committee prior to finalizing the retentions described in this paragraph. The Company shall pay the Monitor, and any personnel or third parties employed or retained by the Monitor, their reasonable fees and expenses for services under this injunction.

**B.    Term**

1.    The Company shall retain a Monitor until the NewCo Disposition Event(s).

2.    As required under Section II.A, any person or entity that acquires some or all of the Company's Opioid Products, including through the NewCo Disposition Event, shall retain the Monitor for at least one (1) year after the effective date of the transaction.

**C.    Monitor's Scope of Work**

1.    The Monitor shall review the Company's ongoing compliance with the requirements of this injunction, except for Section III.H.

2.    The Monitor will report his or her findings as provided in Section VI.F.

3.    In the event that in the course of reviewing the Company's compliance with the requirements of this injunction the Monitor becomes aware of action or conduct by the Company that the Monitor believes may pose a threat to the health or

safety of the public or otherwise requires prompt action, the Monitor may in his or her sole discretion, notify the Company and the States of such action or conduct without following the procedures provided in Section VI.F below.

4. Within thirty (30) calendar days after the Effective Date, the State Monitor Committee and the Company shall confer with the Monitor on a work plan and contract. In the event a new Monitor is appointed within thirty (30) days prior to the Effective Date, the State Monitor Committee and the Company shall have sixty (60) days from the Effective Date to confer with the Monitor on a work plan and contract. The work plan shall set forth the substance of the Monitor's review and the manner in which the Monitor will carry out his or her review of the Company's compliance with this injunction, including the general scope of information that the Monitor will seek to review. The Monitor shall have final authority to determine the content and substance of the work plan. The Monitor may select the period of time covered by the work plan, not to exceed one year. Any work plan and contract in place before the Effective Date may continue to be used upon agreement of the State Monitor Committee, the Company, and the Monitor

5. At least annually, and more frequently if appropriate, the Company and the State Monitor Committee will meet in person or virtually to discuss the monitorship and any suggestions, comments, or improvements the Company may wish to discuss with or propose to the State Monitor Committee, unless the Company and the State Monitor Committee believe such a meeting is unnecessary.

## D.  Monitor Access to Information

1. In connection with its review of the Company's compliance with this injunction, the Monitor shall be vested with broad discretion to review the Company's operations, including access to documents and the right to interview employees, as the Monitor determines is reasonably necessary to fulfill its duties under this injunction, with reasonable notice to the Company and without unreasonable interference in the Company's or its employees' ability to perform day-to-day operations. The Monitor shall have all powers reasonable and necessary to efficiently and effectively discharge its responsibilities subject to appropriate confidentiality. The Monitor, and each of his employees or consultants, shall enter into a confidentiality agreement, the terms of which will be consistent with the confidentiality restrictions imposed by the Bankruptcy Court in the Third Amended Protective Order (Doc. 1935, Nov. 12, 2020).

2. The Company's Chief Legal Officer or their designee shall serve as the primary point of contact for the Monitor to facilitate the Monitor's reasonable access to documents, materials, or employees necessary to review for compliance with this injunction.  The Monitor shall have unfettered access to the Chief Compliance Officer.  The Monitor shall make a good faith effort to leverage the Company's existing compliance mechanisms when reviewing the Company's compliance with this injunction.  The Monitor shall communicate any request for documents,

materials, or access to employees to the Chief Legal Officer or their designee, but, subject to the terms hereof, is not prohibited from speaking with any other current or former employees of the Company.

3.    The Company shall not intimidate, harass, threaten, or penalize any employee or former employee for his or her cooperation with or assistance to the Monitor.

4.    If at any time the Monitor reasonably believes that there is undue delay, resistance, interference, limitation, or denial of access to any records or to any employee deemed necessary by the Monitor to implement or review compliance by the Company with this injunction, the Monitor may meet and confer with the Company's Chief Legal Officer or their designee.  If the Monitor cannot resolve such limitation or denial, it shall be immediately reported to the Board of NewCo. If the issue remains unresolved after consultation with the Board of NewCo, the Monitor shall report the issue to the State Monitor Committee.

**E.    Access to Monitor**

1.    There shall be no limitation on the ability of the Monitor to communicate at any time with States and the United States, including any agency or component of the United States, regarding the Company's conduct.

**F.    Monitor Reports**

1.    Observations and Recommendations

   a.    If the Monitor notes any areas for potential improvement regarding the Company's compliance with this injunction during the course of his or her reviews, the Monitor shall include any such recommendations in the Final Report described below.

   b.    Collectively, any such questions, concerns or recommendations will be referred to as "Observations and Recommendations."

2.    Draft and Final Reports

   a.    For purposes of the reporting described below, the Monitor's work will be divided into three-month periods for at least the first two reports, and the Monitor shall issue reports no later than every six months thereafter ("Reporting Periods").

   b.    After the close of a Reporting Period and/or at any other time deemed reasonably necessary by the Monitor, the Monitor shall separately provide the Company and the State Monitor Committee with draft reports identifying and detailing any Observations and Recommendations and Potential Violations and the bases therefore (the "Draft Report"). Potential Violations shall mean the Company's failure to comply with the provisions of this injunction, as reasonably determined by the Monitor.

23

The Company shall have the right to cure any Potential Violation, in accordance with the below provisions. The Draft Report will also contain detailed descriptions of any Observations and Recommendations for Improvement.

c.  Within seven (7) calendar days of its receipt of the Draft Report, the Company will provide comments to the Draft Report. The Company may also:

  i.  Respond to each Potential Violation, including, where appropriate, explaining why no violation occurred, or describing any corrective action taken (or to be taken) as a result of the findings made by the Monitor, including, where appropriate, providing documentation supporting a relevant decision or additional context explaining the Potential Violation and why it occurred.

  ii.  Respond to each Observation and Recommendation for Improvement.

d.  After receipt of the Company's comments and responses and the State Monitor Committee's comments, if any, the Monitor will provide a final report (the "Final Report") simultaneously to the State Monitor Committee and the Company.

e.  The Final Report shall set forth:

  i.  The Monitor's evaluation of the Company's compliance with this injunction and the factual basis for the Monitor's conclusions, including whether a Potential Violation has occurred and an explanation of the nature of the Potential Violation.

  ii.  The Monitor's conclusion as to whether the Company has cured any Potential Violations.

  iii.  The Final Report shall include a listing of the Observations and Recommendations for Improvement made by the Monitor and responses of the Company. Recommendations shall not be deemed to be incorporated into the terms of this injunction.

  iv.  The Monitor shall create a public version of each Final Report. The public version of each Final Report shall exclude all information that the Monitor determines, in consultation with the Company, to be trade secret or otherwise commercially sensitive and shall be posted on the Company's website.

## VII.    SHAREHOLDER RELEASED PARTIES

A.    The Shareholder Released Parties shall not take any action that would interfere with the Company's compliance with its obligations under this injunction.