**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>**PURDUE PHARMA L.P.**, *et al.*,<br><br>Debtors.[1] | **Chapter 11**<br><br>**Case No. 19-23649 (SHL)**<br><br>**Jointly Administered** |

**FINDINGS OF FACT, CONCLUSIONS OF LAW,
AND ORDER CONFIRMING THE EIGHTEENTH AMENDED
JOINT CHAPTER 11 PLAN OF REORGANIZATION OF
PURDUE PHARMA L.P. AND ITS AFFILIATED DEBTORS**

The Debtors[2] having filed (i) the *Thirteenth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors* [D.I. 7638] (including all appendices, exhibits, schedules, and supplements thereto, and as altered, amended, supplemented, or otherwise modified from time to time in accordance therewith, including pursuant to the *Fourteenth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors* [D.I. 7911], the *Fifteenth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors* [D.I. 8168], the *Sixteenth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors* [D.I. 8199], the *Seventeenth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its*

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Purdue Products L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

[2] Capitalized terms used but not otherwise or immediately defined herein (this "**Order**") shall have the meanings ascribed to such terms elsewhere herein, in the Disclosure Statement, the Plan, the Confirmation Brief, or the Confirmation Protocols Order, as applicable. The rules of interpretation set forth in <u>Section 1.2</u> of the Plan shall apply hereto.

*Affiliated Debtors* [D.I. 8230], and the *Eighteenth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors* [D.I. 8233], the "**Plan**") (attached hereto as **Exhibit A**) and (ii) the *Disclosure Statement for the Thirteenth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P.* [D.I. 7638] (including all appendices, exhibits, schedules, and supplements thereto, and as altered, amended, supplemented, or otherwise modified from time to time in accordance therewith, the "**Disclosure Statement**"), each of which is incorporated herein by reference; and upon the *Debtors' Motion for Order Establishing Confirmation Schedule and Protocols* [D.I. 7512] (the "**Confirmation Protocols Motion**") and the *Order Granting Debtors' Motion for Order Establishing Confirmation Schedule and Protocols* [D.I. 7614] (as modified through various extensions filed on the docket in the Chapter 11 Cases, the "**Confirmation Protocols Order**"); and the Bankruptcy Court having considered the responses and objections to Confirmation (as defined herein) of the Plan (collectively, the "**Confirmation Objections**"), the *Debtors' Memorandum of Law in Support of Confirmation of the Fifteenth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors* [D.I. 8164] (the "**Confirmation Brief**"), and the Statements in Support[3]; and the Bankruptcy Court having jurisdiction to consider the relief granted herein pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference M-431*, dated January 31, 2012 (Preska,

---

[3] The "**Statements in Support**" means, collectively, and together with any declarations, exhibits and/or reports filed in connection therewith, (i) *Beacon Company's Statement in Support of Confirmation of the Fourteenth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors* [D.I. 8150], (ii) *The Ad Hoc Group of Individual Victims' Statement in Support of Confirmation of the Debtors' Joint Chapter 11 Plan of Reorganization and Limited Reply to Certain Plan Objections* [D.I. 8151], (iii) *Statement of the Raymond Sackler Family in Support of Confirmation of Debtors' Fourteenth Amended Plan of Reorganization and in Reply to Plan Objections* [D.I. 8152], (iv) *The Multi-State Governmental Entities Group's Statement in Support of the Fourteenth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors* [D.I. 8153], (v) *Debtors' Omnibus Response to Insurers' Objections to Confirmation of the Debtors' Joint Chapter 11 Plan of Reorganization* [D.I. 8156], (vi) *Statement of the Official Committee of Unsecured Creditors in Support of Confirmation of the Fourteenth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors* [D.I. 8165], and (vii) *Ad Hoc Committee's Reply to Plan Objections* [D.I. 8172].

C.J.); and the Bankruptcy Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157; and the Bankruptcy Court having found that it may enter a final order consistent with Article III of the United States Constitution; and the Bankruptcy Court having found that venue of the Chapter 11 Cases and related proceedings is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the relief requested having been provided to the parties listed in the *Affidavit of Service of Solicitation Materials* [D.I. 7987], such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and the Bankruptcy Court having reviewed and considered Confirmation of the Plan; and the Bankruptcy Court having reviewed or otherwise taken judicial notice of the entire record of the Chapter 11 Cases (including the Confirmation Hearing, written and oral testimony of witnesses offered at the Confirmation Hearing, and any and all exhibits admitted into evidence during the Confirmation Hearing) (collectively, the "**Record**"); and the Bankruptcy Court having held a hearing to consider the Record, including the written and oral testimony of all witnesses, any and all exhibits admitted into evidence, and, ultimately, the relief granted herein (the "**Confirmation Hearing**"); and the Bankruptcy Court having determined that the Confirmation Hearing was conducted in accordance with all requirements of due process and applicable State and federal law; and the Bankruptcy Court having determined that the legal and factual bases set forth in the Record establish just cause for the relief granted herein; and all objections and reservations of rights filed or asserted in connection with the relief granted herein, if any, having been withdrawn, resolved, or overruled with prejudice; and upon all of the proceedings had before the Bankruptcy Court; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY FOUND, ORDERED, ADJUDGED, AND DETERMINED THAT:**

1.      <u>Confirmation</u>.  The facts and legal arguments set forth in the Record, including the evidence and argument at the Confirmation Hearing, demonstrate that the requirements for entry of a Confirmation Order by the Bankruptcy Court on the docket of the Chapter 11 Cases ("**Confirmation**") of the Plan have been satisfied.  Further, each witness who testified (by declaration or otherwise) at or in connection with the Confirmation Hearing in support of the Plan was credible, reliable, and qualified to testify as to the topics addressed in his or her testimony. Therefore, the Debtors, as proponents of the Plan, have met their burden of proving the satisfaction of the requirements for Confirmation of the Plan set forth in section 1129 of the Bankruptcy Code by a preponderance of the evidence, which is the applicable standard.  All requirements under the Bankruptcy Code for the Confirmation of the Plan have been satisfied.  Accordingly, the Plan, in its entirety, is **CONFIRMED** pursuant to section 1129 of the Bankruptcy Code.  Each of the terms and conditions of the Plan and the Plan Documents (and any amendments, modifications, and supplements thereto) are integral parts of the Plan.  The failure to specifically describe or include herein any particular provision of the Plan or any Plan Document, each of which is incorporated by reference herein, shall not diminish or impair the effectiveness of such provision, it being the intent of the Bankruptcy Court that the Plan (including each Plan Document to the extent incorporated therein) is confirmed in its entirety.  All of the transactions contemplated by the Plan are hereby approved.  The Plan complies with all applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.  Once finalized and executed, the Plan and Plan Documents shall, as applicable, constitute legal, valid, binding, and authorized obligations of the

applicable Debtors and the parties thereto, enforceable in accordance with their terms and the terms of the Plan and this Order.

2.    <u>Objections</u>.  All objections (including the Confirmation Objections), responses, statements, reservations of rights, and comments in opposition to Confirmation of the Plan, to the extent not withdrawn with prejudice in their entirety, waived, settled, or resolved prior to the Confirmation Hearing, or otherwise resolved on the Record of the Confirmation Hearing or herein, are hereby overruled with prejudice.  The Record of the Confirmation Hearing is hereby closed.

3.    <u>Solicitation</u>.  As described in the Confirmation Protocols Order, and as evidenced by the affidavits at D.I. 7987 and 7992, service of the Solicitation Packages was adequate and sufficient under the circumstances of the Chapter 11 Cases, and adequate and sufficient notice of the Confirmation Hearing and other requirements, deadlines, hearings, and matters described in the Confirmation Protocols Order (a) was timely and properly provided in compliance with the Confirmation Protocols Order and, to the extent applicable, with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules and (b) provided due process, including an opportunity to appear and to be heard, to all parties in interest.  Accordingly, no other or further notice or service of the Solicitation Packages or the Confirmation Hearing is or shall be required.  All parties have had a fair opportunity to litigate all issues (including those raised by the Confirmation Objections), and the Confirmation Objections have been fully and fairly litigated.  All parties in interest, including, without limitation, the Debtors' insurers, had notice of the Purdue bankruptcy proceedings and an opportunity to participate in them and were on notice that Debtors' opioid-related liabilities were being mediated, negotiated, and resolved.

4.    <u>Good Faith</u>.  The Plan is the product of the good faith process through which the Debtors have conducted the Chapter 11 Cases and reflects extensive, good faith, arm's-length

negotiations among the Debtors, the Creditors' Committee, each of the Supporting Claimants, and their respective professionals, including in court-ordered, arm's-length good faith Mediation, which occurred in multiple phases from 2020 through 2025 as directed in the Mediation Orders entered in these Chapter 11 Cases.  The Plan Documents are the product of good faith efforts of the Debtors and applicable non-Debtor parties who negotiated the agreements reflected in the Plan Documents and assisted in the drafting of the Plan Documents.  The Plan itself and the process leading to its formulation provide independent evidence of the Debtors' good faith, serve the public interest, and assure fair treatment of Holders of Claims.  Consistent with the overriding purpose of the Bankruptcy Code, the Chapter 11 Cases were filed and the Plan was proposed with the legitimate and honest purpose of maximizing the value of the Debtors' Estates and providing for the opportunity for fair and reasonable distributions to creditors.  Accordingly, the Plan is fair, reasonable, and consistent with sections 1122, 1123, and 1129 of the Bankruptcy Code.  Based on the foregoing, as well as the facts and record of the Chapter 11 Cases, including, but not limited to, the Record, the Plan has been proposed in good faith and not by any means forbidden by law, thereby satisfying section 1129(a)(3) of the Bankruptcy Code.

5.      <u>No Disparate Treatment</u>.  The Plan provides for the same treatment for each Claim or Interest in each respective Class unless the Holder of a particular Claim or Interest has agreed to less favorable treatment on account of such Claim or Interest, thereby satisfying section 1123(a)(4) of the Bankruptcy Code.

6.      <u>Plan Modifications</u>.  Any modifications to the Plan since the commencement of solicitation and prior to the entry of this Order comply with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Confirmation Protocols Order, and <u>Section 12.3</u> of the Plan.  Such modifications constitute immaterial modifications or do not

adversely affect or change the treatment of any Claims or Interests.  Notice of these modifications

by filing revised documents was adequate and appropriate under the facts and circumstances of

the Chapter 11 Cases.  Pursuant to Bankruptcy Rule 3019, the modifications do not require either

(a) any additional disclosure under section 1125 of the Bankruptcy Code or the resolicitation of

votes under section 1126 of the Bankruptcy Code or (b) that the Holders of Claims be afforded an

opportunity to (i) change previously cast acceptances or rejections of the Plan or (ii) withdraw

previously submitted elections to opt-in to the Third-Party Releases through the applicable ballots.

Accordingly, the Plan is properly before the Bankruptcy Court, and all votes cast with respect to

the Plan and elections to opt in to the Third-Party Releases prior to any such modifications shall

be binding and shall apply with respect to the Plan.  The Plan may not be further modified except

in accordance with Section 12.3 of the Plan.  The Debtors are authorized, prior to the Effective

Date, to make modifications to the Plan as and to the extent provided under Section 12.3 of the

Plan.

7.    Plan Supplement.    The contents, filing, and notice of the Plan Supplement

[D.I. 7591, 7877, 8094, 8171, 8201] (and any subsequent amendments, modifications, and

supplements thereto filed with the Bankruptcy Court) are proper and in accordance with the

Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Confirmation Protocols Order, and

other applicable laws, and no other or further notice is or shall be required.  All documents included

in the Plan Supplement are integral to, part of, and incorporated by reference into the Plan.  Subject

to the terms of the Plan and the Direct Claims Shareholder Settlement Agreements, and the consent

rights of the parties thereunder, the Debtors may amend, update, supplement, or otherwise modify

the Plan Supplement at any time before the Effective Date or in accordance with the Plan and the

Direct Claims Shareholder Settlement Agreements, as applicable.  All parties were provided due,

adequate, and sufficient notice of the Plan Supplement, and the filing of any further supplements thereto will provide due, adequate, and sufficient notice thereof.

8.     <u>Plan Classification</u>.  The categories listed in <u>Article III</u> of the Plan properly classify, and identify as Impaired or Unimpaired, the Claims against, and Interests in, each of the Debtors, pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code, for all purposes, including voting, Confirmation of the Plan, and distributions pursuant to the Plan, and shall be controlling for all purposes under the Plan.

9.     <u>Effectiveness of All Actions</u>.  Except as set forth in the Plan or this Order, all actions authorized to be taken pursuant to this Order or the Plan may be taken and shall be effective when taken on, prior to, or after the Effective Date pursuant to the Plan and this Order, as applicable, without further notice to, or action, order, or approval of, the Bankruptcy Court.

10.    <u>Compromise and Settlement of Claims, Interests, and Controversies</u>.  Pursuant to the Bankruptcy Code, including section 1123 of the Bankruptcy Code, and Bankruptcy Rule 9019, the Debtors have authority to propose and negotiate the Plan Settlements, including resolution of their opioid-related liabilities and, with approval of the Bankruptcy Court, enter into the Plan Settlements, including the resolution of their opioid-related liabilities through the Plan and the resolution of any potential objections to the Allowance of Settling Creditors' Claims.  The Plan Settlements, including the settlements reached between the Debtors and the opioid-related claimants, as embodied in the Plan, are fair, equitable, reasonable and in the best interests of the Debtors and their Estates, and the Holders of Claims and Interests, and were entered into in good faith based on arm's-length negotiations.  The treatment provided in respect of Claims against and Interests in the Debtors, the treatment of competing Classes of Claims and the various intercreditor allocation agreements and settlements, including the settlement of potential objections to the

Allowance of Settling Creditors' Claims, are fair, equitable, and reasonable when combined with the distribution scheme, including without limitation all Distributions to be made under the Plan, and the release, injunction and all other provisions contained in the Plan, all of which are material aspects of the Plan and the terms of the Shareholder Settlements. Such negotiation, settlement, and resolution of liabilities shall not operate to excuse any insurer from its obligations under any insurance policy, notwithstanding any terms of such insurance policy (including any consent-to-settle or pay-first provisions) or provisions of non-bankruptcy law. The Plan Settlements are necessary and integral to the Plan and the Plan Documents and the success of the Chapter 11 Cases. Any reasonable estimate, projection, or valuation of their total liability and obligation to pay for Claims asserted against the Debtors, if the Debtors had the ability to pay those Claims and that liability outside of the Chapter 11 Cases, exceeds by many multiples the total value of all assets of the Debtors' Estates, including but not limited to the value of the Debtors' business, contributions from third parties and the full face value of all of Purdue's insurance. The provisions of the Plan and the other Plan Documents constitute a good faith compromise and settlement of Claims and controversies among the Debtors, the Supporting Claimants, the Settling Creditors, the Shareholder Payment Parties, certain other participants in the multiple phases of court-ordered Mediation and other parties in interest reached in connection with that Mediation and otherwise; *provided*, that the Plan Settlements are not intended to serve as an example for, or represent the parties' respective positions or views concerning, any other chapter 11 cases relating to opioids, nor shall any Person or party use them as precedent in any other such chapter 11 cases or in any other proceeding, situation or litigation. The Debtors are hereby authorized and directed to enter into the Plan Settlements under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019.

11.    <u>Master Shareholder Settlement Agreement.</u>

(a)     The Master Shareholder Settlement Agreement, the Definitive Documents (as defined in the Master Shareholder Settlement Agreement) and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Debtors or the Master Disbursement Trust, as applicable, in connection therewith, are hereby approved.

(b)     All Liens granted as contemplated by the Plan, the Master Shareholder Settlement Agreement, the Plan Supplement, and the Collateral Documents (as defined in the Master Shareholder Settlement Agreement), as applicable, are hereby approved.

(c)     Subject to the terms and conditions of the Master Shareholder Settlement Agreement, Purdue Pharma Inc. shall surrender, cancel and/or redeem its de minimis interests in Pharmaceutical Research Associates L.P.

(d)     Each Family Member (as defined in the Master Shareholder Settlement Agreement) and each party to the Master Shareholder Settlement Agreement, the Collateral Documents, and the other Definitive Documents (each as defined in the Master Shareholder Settlement Agreement) shall comply in good faith with the applicable terms of such agreements to which they are a party.  Each provision of the Master Shareholder Settlement Agreement, the Collateral Documents, and the other Definitive Documents shall have the full force and effect of a binding Court order as of the Agreement Effective Date (as defined in the Master Shareholder Settlement Agreement); *provided*, *however*, that nothing in this paragraph shall confer, or be deemed to confer, any rights, benefits, or enforcement authority upon any Person for which any such rights, benefits, or enforcement authority do not arise under the terms of the Master Shareholder Settlement Agreement, the Collateral Documents, or the other Definitive Documents (any such Person, a "**Non-Enforcing Party**"); *provided*, nothing in the foregoing proviso shall limit or be deemed to limit any such rights, benefits, or enforcement authority that  the Master Disbursement Trust, Creditor Trusts or Settling Creditors  may have under the terms of the Master Shareholder Settlement Agreement, the Collateral Documents, or the other Definitive Documents. The Plan and this Order shall be binding upon each of the Shareholder Released Parties.

(e)     Pursuant to the Master Shareholder Settlement Agreement, each party to the Master Shareholder Settlement Agreement will (i) submit to the jurisdiction of the Bankruptcy Court solely for the purposes of enforcing the Master Shareholder Settlement Agreement, (ii) consent to the authority of the Bankruptcy Court to enter Final Orders or judgments relating to the enforcement of the Master Shareholder Settlement Agreement, and (iii) waive and not advance any argument that any Proceeding (as defined in the Master Shareholder Settlement Agreement) arising under, related to, or in connection with the Master Shareholder Settlement Agreement is or must be adjudicated as an adversary proceeding governed by Part VII of the Federal Rules of Bankruptcy Procedure or that the Bankruptcy Court is an improper or inconvenient forum or venue. For the avoidance of doubt, the foregoing shall not apply in connection with litigation brought by any Non-Enforcing Party.

(f)     Each Family Member shall not seek, request, or permit any new naming rights for the "Sackler" name with respect to charitable or similar donations to organizations (irrespective of when such funds were donated or from what source) until the later to occur of (1) the date on which the remaining unpaid Payment Obligations of the Payment Groups that such Family Member is a member have been reduced to zero (accounting, in the case of an A-Side Payment Group, for the maximum amount the A-Side Payment Group may be liable for hereunder) and (2) the first date on which the IAC Payment Parties of such Payment Groups are no longer the owners or holders of any interest in any IAC (other than Retained Interests permitted by Section 3.01(b) of the Master Shareholder Settlement Agreement); *provided* that at such time Family Member and its associated Payment Parties and Payment Group are in compliance with their obligations under Section 8.08 of the Master Shareholder Settlement Agreement). For the avoidance of doubt, nothing herein shall prohibit (x) any Payment Party or Family Member from making any charitable or similar donations or (y) the publication of the name of any Payment Party or Family Member making a charitable or similar donation in connection with such donation, provided such publication is not pursuant to a naming right.[4]

(g)     Each Family Member and Payment Party shall, upon occurrence of the Plan Effective Date, allow any institution or organization in the United States that has provided naming rights to such Family Member, Payment Party, the associated Payment Group or associated Payment Parties to remove the "Sackler" name from any applicable (i) physical facilities and (ii) academic, medical, and cultural programs, scholarships, endowments, and the like, subject to the following conditions: (A) such institution or organization shall provide the respective Payment Party or Family Member with forty-five (45) calendar days' confidential notice of its intention to remove the "Sackler" name; (B) if such institution or organization in its discretion determines that an announcement or other disclosure regarding the removal of the "Sackler" name is necessary, such announcement or disclosure shall include a statement that indicates that such removal is pursuant to an agreement reached in mediation in the Bankruptcy Cases; and (C) any statements issued by such institution or organization in connection with or substantially concurrent with such removal shall not disparage any Payment Party or Family Member, *provided* that nothing in this clause (C) shall restrict any academic or similar work at such institution or organization. For the avoidance of doubt, the removal rights provided herein shall not limit any rights that any applicable institution or organization otherwise may have irrespective of the Master Shareholder Settlement Agreement or this Confirmation Order.

(h)     The IAC Payment Parties shall use their commercially reasonable best efforts to sell or cause to be sold to one or more unaffiliated third parties, through any transaction, series of related transactions or separate transactions, all or substantially all of their respective direct and/or indirect Equity Interests in the

---

[4] For the avoidance of doubt, capitalized terms used in paragraphs 11(e), 11(f), 11(g) and 11(h) of this Order shall have the meanings ascribed to such terms in the Master Shareholder Settlement Agreement.

IACs (excluding Purdue Canada) and/or their assets (excluding Purdue Canada) on the terms and conditions set forth in the Master Shareholder Settlement Agreement.

(i)     The Sackler Parties shall participate in the Public Document Repository on the terms and conditions set forth in the Plan.

(j)     Any and all periods for commencing or continuing any Tolled Claim (as defined in the Master Shareholder Settlement Agreement), whether fixed by statute, agreement, order, or otherwise, shall not expire until the Payment Obligations are paid in full and no Shareholder Released Party or any other signatory thereto shall assert otherwise (including through defenses (x) of statute of limitations, statute of repose, laches or inadequate tolling, or (y) that any release granted to any other Shareholder Released Party, but not made void pursuant to the terms of Section 9.02(a)(ii)(B) of the Master Shareholder Settlement Agreement has the effect of precluding such claim against such Shareholder Released Party or other signatory thereto, but excluding any defense of inadequate tolling only to the extent it could have been raised on and as of the Petition Date) in the litigation of any such Tolled Claim. For the avoidance of doubt, the Shareholder Released Claims shall include potential claims against subsequent transferees of fraudulent conveyances that occurred prior to the Settlement Effective Date, regardless of when such subsequent transfer of the funds or proceeds occurred (including transfers made after the Settlement Effective Date), and as such these claims are included in the Tolled Claims. For the avoidance of doubt, the foregoing extension of time periods shall not apply in connection with litigation brought by any Non-Enforcing Party.

12.     <u>Establishment and Purpose of the Trusts</u>.  Each of the Plan Administration Trust, the Master Disbursement Trust and the Creditor Trusts (other than any Tribe Trust entity that is formed as a legal entity other than a trust) shall be, or has been, established or designated as a trust under applicable state law for the purposes described in the Plan and the applicable Plan Documents, and shall be funded as and to the extent provided for in the Plan.  For the avoidance of doubt, the PI Trust is a continuation of the "qualified settlement fund" (within the meaning of section 1.468B-1, et seq. of the Treasury Regulations promulgated under section 468B of the Internal Revenue Code) established in accordance with the Creditor Trust Establishment Order. Each of the Master Disbursement Trust and the Creditor Trusts (other than any Tribe Trust entity that is formed as a legal entity other than a trust) has been or is being established or designated to resolve or satisfy Claims that have resulted or may result from an event (or related series of events)

that has occurred and that has given rise to Claims asserting liability arising out of a tort, breach of contract or violation of law.

13.    <u>Scope of Discharge</u>.  Except as expressly provided in this Order or the Plan, the discharge or release of the Debtors through the Plan will not operate to relieve any other entity, including Insurance Companies, of their obligation, if any, to pay the Debtors' opioid-related liabilities, without regard to (i) whether the Debtors would be able to pay such liabilities in the first instance outside of bankruptcy, and (ii) whether the Debtors or a post-bankruptcy trust can or do pay those liabilities in full, in both instances notwithstanding any terms of the Purdue Insurance Policies or provisions of non-bankruptcy law.

14.    <u>Attorneys' Fees and Expenses</u>.  Except as otherwise provided in the Plan or order of the Bankruptcy Court, Professionals that are required to seek payment or reimbursement under <u>Section 5.9(h)</u> or <u>(i)</u> of the Plan of their compensation, costs and/or fees shall file with the Bankruptcy Court an application for approval of such compensation, costs and/or fees as "reasonable" under section 1129(a)(4) of the Bankruptcy Code not later than ninety (90) days following the Effective Date, with respect to compensation, costs and/or fees incurred during the period through and including the Effective Date.  Such applications shall not be deemed an application for reasonable compensation for actual, necessary services by such professionals or reimbursement for actual, necessary expenses to be paid from the Estates (except as otherwise provided in the Plan or order of the Bankruptcy Court), and neither section 330 of the Bankruptcy Code nor any of the Bankruptcy Rules, guidelines from the office of the U.S. Trustee, or other rules or guidelines applicable to fee applications shall apply.  Each such application shall set forth the amount of compensation, costs and/or fees sought, provide a narrative basis for such compensation, costs and/or fees, and attach, as applicable, supporting documentation.  A single

application may cover one or more professionals that represented or advised an ad hoc group.  Each such application shall be set for hearing on not less than fourteen (14) days' notice and served upon counsel to the Debtors, counsel to the Creditors' Committee, and the U.S. Trustee.  If no objection is filed by any of such parties by the date that is three (3) days prior to such hearing, the Bankruptcy Court may enter an order approving such application without a hearing.  With respect to applications filed by lead bankruptcy counsel to the Ad Hoc Group of Individual Victims under Section 5.9(h)(i) of the Plan, the Debtors and the Creditors' Committee have agreed and acknowledged that they shall not file any objections to, and shall support, such applications. With respect to applications filed by other professionals of the Ad Hoc Group of Individual Victims under Section 5.9(h)(i) of the Plan and professionals that represented or advised the NAS Committee under Section 5.9(h)(ii) of the Plan, the Supporting Claimants have agreed and acknowledged that they shall not file any objections to such applications, and the Debtors and the Creditors' Committee have agreed to support such applications.  Any such application made is without prejudice to any applications by the Ad Hoc Group of Individual Victims, the NAS Committee, the Public School District Claimants or professionals that represented or advised any of the foregoing for allowance and payment of compensation, costs or fees under section 503(b) of the Bankruptcy Code.  In addition, on the Effective Date, or as soon as reasonably practicable thereafter, the attorneys' fees and expenses of the State of Washington incurred through and including June 6, 2025 shall be paid from Effective Date Cash in an amount not to exceed $1,464,411.01, *provided*, that such payments shall be subject to paragraph 4 of the *Order Pursuant to 11 U.S.C. §§ 105 and 363(b) Authorizing and Approving Settlement Term Sheet* [D.I. 4503], including, for the avoidance of doubt, compliance with all procedures governing the authorization and payment of professional fees and expenses of the Debtors and the Creditors' Committee as set

forth in the Interim Compensation Order, *mutatis mutandis*.  In addition, on the Effective Date, or

as soon as reasonably practicable thereafter, the fees and expenses of Pullman & Comley, LLC

incurred through and including June 6, 2025 shall be paid from Effective Date Cash in an amount

not to exceed $6,500.00, *provided*, that such payments shall be subject to paragraph 4 of the *Order*

*Pursuant to 11 U.S.C. §§ 105 and 363(b) Authorizing and Approving Settlement Term Sheet*

[D.I. 4503], including, for the avoidance of doubt, compliance with all procedures governing the

authorization and payment of professional fees and expenses of the Debtors and the Creditors'

Committee as set forth in the Interim Compensation Order, *mutatis mutandi*s.

15.    <u>U.S. Federal Income Tax Matters.</u>

(a)    The Master Disbursement Trust shall be structured to qualify as a "qualified settlement fund," and the receipt of (i) any MDT Transferred Assets (and any other amounts received by the Master Disbursement Trust pursuant to the Plan) that are treated as amounts transferred to the Master Disbursement Trust for purposes of Treasury Regulations section 1.468B-2(b)(1) and (ii) the proceeds received in respect of any MDT Transferred Assets (and any other amounts received by the Master Disbursement Trust pursuant to the Plan) that are not described in clause (i) above (including, without limitation, proceeds received in respect of the MDT Shareholder Rights) by the Master Disbursement Trust shall be treated as amounts transferred by, or on behalf of, a "transferor" to a "qualified settlement fund," within the meaning of Treasury Regulations section 1.468B-1 for U.S. federal income tax purposes and shall be treated consistently for state and local tax purposes, to the extent applicable.

(b)    Each of the Grantor Trust Escrow Accounts (as defined in Exhibit Z of the Master Shareholder Settlement Agreement) shall be structured to qualify as a separate "qualified settlement fund" within the meaning of Treasury Regulations section 1.468B-1 for U.S. federal income tax purposes and shall be treated consistently for state and local tax purposes, to the extent applicable. PRA L.P. or the applicable Shareholder Payment Party shall timely elect pursuant to Treasury Regulations Section 1.468B-1(k) (and any applicable state and local income tax purposes), to treat each such Grantor Trust Escrow Account as a "grantor trust," all of which is owned, for federal and applicable state and local income tax purposes only, by PRA L.P. or the applicable Shareholder Payment Party. PRA L.P. or the applicable Shareholder Payment Party shall maintain such election and shall not revoke such election without the prior written consent of the Involved Party (as defined in Exhibit Z of the Master Settlement Agreement).

(c)     The Special Operating Reserve and each of the Released Claims Reserves shall each be structured to qualify as a separate "qualified settlement fund" within the meaning of Treasury Regulations section 1.468B-1 for U.S. federal income tax purposes and shall be treated consistently for state and local tax purposes, to the extent applicable. PRA L.P. shall timely elect pursuant to Treasury Regulations Section 1.468B-1(k) (and any applicable state and local income tax purposes), to treat the Special Operating Reserve and each of the Released Claims Reserves as a "grantor trust," all of which is owned, for federal and applicable state and local income tax purposes only, by PRA L.P. PRA L.P. shall maintain such election and shall not revoke such election without the prior written consent of the Master Disbursement Trust and/or the applicable Creditor Trusts.

(d)     Each Creditor Trust (other than any Tribe Trust entity that is formed as a legal entity other than a trust) and each Sub-Qualified Settlement Fund has been or shall be structured to qualify as a separate "qualified settlement fund," and the Initial Private Creditor Trust Distributions, distributions on account of the MDT Private Claims, Public Creditor Trust Distributions, Initial Public Schools Distribution, distributions on account of the MDT Public School Districts Claim, the right to receive Governmental NewCo Distributable Cash, distributions from the PI Trust to a Sub-Qualified Settlement Fund and any other amounts received pursuant to the Plan, as applicable, made to the applicable Creditor Trust or Sub-Qualified Settlement Fund shall be treated as amounts transferred by, or on behalf of, a "transferor" to a "qualified settlement fund," within the meaning of Treasury Regulations section 1.468B-1 for U.S. federal income tax purposes and shall be treated consistently for state and local tax purposes to the extent applicable. The following funds shall be designated as Sub-Qualified Settlement Funds: CLD Purdue BK Qualified Settlement Fund; D. Miller Purdue Qualified Settlement Fund; AT and ASK PRD Qualified Settlement Fund; Hilliard Purdue Qualified Settlement Fund; and Laborde Earles Purdue Qualified Settlement Fund.

(e)     Each Creditor Trust PRA Non-Participating Claims Reserve and each Select Private Creditor Trust Non-Participating Claims Reserve shall be structured to qualify as a separate "qualified settlement fund" within the meaning of Treasury Regulations section 1.468B-1 for U.S. federal income tax purposes and shall be treated consistently for state and local tax purposes, to the extent applicable. PRA L.P. shall timely elect, pursuant to Treasury Regulations Section 1.468B-1(k) (and any applicable state and local income tax purposes), to treat each Creditor Trust PRA Non-Participating Claims Reserve and each Select Private Creditor Trust Non-Participating Claims Reserve as a "grantor trust," all of which is owned, for federal and applicable state and local income tax purposes only, by PRA L.P. PRA L.P. shall maintain such elections and shall not revoke any of such elections without the prior written consent of the Master Disbursement Trust and the applicable Creditor Trust(s).

16.     <u>Appointment of Managers, Trustees, Etc.</u>  The appointment and, where applicable, the manner of appointment of the MDT Trustees, the MDT Advisory Council Representatives, the

NewCo Managers, the NewCo Monitor, the Foundation Trustees, the Plan Administration Trustee, the PPLP Liquidator, the Creditor Trustees, and the Creditor Trust Overseers in accordance with Article V of the Plan, and the exculpation thereof pursuant to Article V of the Plan, is hereby approved.

17.    Release of Liens.  Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan or this Order, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date in accordance with the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, discharged, and compromised, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors or the Liquidating Debtors, as applicable, and all rights, titles, and interests of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall revert to the Liquidating Debtors and their successors and assigns.  The Liquidating Debtors are authorized to file any necessary or desirable documents to evidence such release in the name of the party secured by such pre-Effective Date mortgages, deeds of trust, Liens, pledges, or other security interests.

18.    Executory Contracts and Unexpired Leases.  Entry of this Order shall constitute approval of all amendments, assumptions, assumptions and assignments, and rejections of Executory Contracts and Unexpired Leases provided for under the Plan pursuant to section 365 of the Bankruptcy Code.  Entry of this Order shall also constitute approval of all Cure Amounts as set forth in the filed Assumption Notice [D.I. 7950] (as well as any amended Assumption Notice

that may be filed after entry of this Order), as well as any agreed setoffs, whether prepetition or postpetition, as set forth in such Assumption Notice. Amendments, assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date without the need for any further action or consents that may otherwise be required under applicable non-bankruptcy law. Any motions to assume, assume and assign, or reject any Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order of the Bankruptcy Court on or after the Effective Date, entry of which shall result in such assumption, assumption and assignment, or rejection becoming effective without need for any further action that may otherwise be required under applicable non-bankruptcy law.

     19.    <u>Injunction, Exculpation, Release, Indemnification, Discharge, Settlement, and Compromise</u>.

    (a)    The Bankruptcy Court has jurisdiction under 28 U.S.C. § 1334, and authority under 28 U.S.C. § 157, to approve the injunctions, exculpations, releases, indemnifications, discharges, settlements, and compromises set forth in the Plan (including, but not limited to, <u>Sections 10.5</u>, <u>10.6</u>, <u>10.7</u>, <u>10.8</u>, <u>10.10</u>, <u>10.11</u>, <u>10.12</u>, and <u>10.13</u> of the Plan). Sections 105(a), 1123(b)(3), and 1123(b)(6) of the Bankruptcy Code and Bankruptcy Rule 9019 permit issuance of the injunctions and approval of the exculpations, releases, indemnifications, discharges, settlements, and compromises set forth in the Plan.

    (b)    The injunctions, releases, and exculpations set forth in <u>Article X</u> of the Plan, including the Debtor Releases (as defined below), the Third-Party Releases, and the Channeling Injunction, were adequately disclosed and explained in the Disclosure Statement, on the Ballots, and in the Plan.

    (c)    The releases by the Debtors and their Estates pursuant to <u>Sections 10.6</u> and <u>10.7</u> of the Plan (the "**Debtor Releases**") represent a valid exercise of the Debtors' business judgment. For the reasons set forth in the Disclosure Statement and the Confirmation Brief and based on the evidence proffered or adduced at the Confirmation Hearing, the Debtor Releases are (i) an integral and necessary part of the Plan, (ii) a good faith settlement and compromise of the claims and Causes of Action released, (iii) given in exchange for good and valuable consideration, (iv) appropriately tailored to the facts and circumstances of the Chapter 11 Cases, and (v) given after due notice and opportunity for objection. The Debtor Releases shall

constitute a bar to the Debtors, the Liquidating Debtors, the Transferred Debtors, the Estates, the Plan Administration Trust, the Master Disbursement Trust, the Creditor Trusts, NewCo, any other newly formed Persons that shall be continuing the Debtors' businesses after the Effective Date, or any party purporting to claim through any of the foregoing, from asserting any Released Claim or Shareholder Released Claim released pursuant to Sections 10.6 and 10.7 of the Plan, except as otherwise set forth in the Plan.  The Debtor Releases were negotiated by sophisticated parties represented by able counsel and financial advisors and are the result of an arm's-length negotiation process, including through the Mediation.  The Debtors' pursuit of any Released Claims or Shareholder Released Claims against the Released Parties or the Shareholder Released Parties (but not, for the avoidance of doubt, against any Excluded Party, Shareholder Release Snapback Party or MDT Insurer) would not be in the interests of the Estates' various constituencies because the benefits to the Estates obtained in exchange for granting the releases, including the benefit to the Estate's creditors by virtue of the various intercreditor allocation agreements and settlements reached in Mediation, likely outweigh any potential benefit from pursuing such claims considering the costs and uncertainty involved therein, and the fact that all of the intercreditor allocation agreements and settlements reached in Mediation were conditioned upon the Shareholder Settlement Agreements.  In light of, among other things, the concessions and contributions provided to the Debtors' Estates and the critical nature of the Debtor Releases to the Plan, the Debtor Releases are fair and reasonable, in the best interests of the Estates and their creditors, and appropriate.

(d)     The non-Debtor releases set forth in Sections 10.6 and 10.7 of the Plan (the "**Third-Party Releases**") are appropriate.  The Third-Party Releases are consensual and therefore compliant with *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204 (2024). The Releasing Parties each provided consent to the Third-Party Releases. The Third-Party Releases are binding on the Releasing Parties, *provided* that such binding effect shall not modify or expand the scope or terms of such Third-Party Releases, which shall in all respects be as set forth in the Plan and Shareholder Settlement Agreements. The Record of the Confirmation Hearing demonstrates the following:

(i)     The consideration under the Master Shareholder Settlement Agreement described in the Disclosure Statement, including up to $7 billion in cash, constitutes a substantial contribution to the Estates and the Debtors' creditors.  The consideration under the Master Shareholder Settlement Agreement includes payments totaling up to $7 billion over fifteen years.  Such payments exceed the value of the Debtors as a going concern.  Such payments also allow the Debtors to make the payments required under the DOJ Resolution and the Plan Settlements.

(ii)     The Released Claims and Shareholder Released Claims directly impact the Debtors' reorganization.  The appropriate resolution of these claims has been the subject of significant discovery, litigation and mediation in these

cases by sophisticated parties from multiple creditor constituencies that were represented by able counsel and financial advisors.

(e)     The injunction provisions set forth in <u>Article X</u> of the Plan, including, without limitation, the Channeling Injunction: (i) are essential to the Plan; (ii) are necessary to preserve and enforce the discharge and releases set forth in <u>Sections 10.2, 10.6,</u> and <u>10.7</u> of the Plan, the exculpation provisions in <u>Section 10.12</u> of the Plan, and the compromises and settlements implemented under the Plan; (iii) are appropriately tailored to achieve that purpose; (iv) are within the jurisdiction of this Court under 28 U.S.C. §§ 1334(a), 1334(b), and 1334(d); (v) are an essential means of implementing the Plan pursuant to section 1123(a)(5) and (b)(6) of the Bankruptcy Code; (vi) are an integral element of the transactions incorporated into the Plan; (vii) confer material benefits on, and are in the best interests of, the Debtors and their Estates, creditors, and other stakeholders; (viii) are critical to the overall objectives of the Plan; and (ix) are consistent with sections 105, 524(e), 1123, and 1129 of the Bankruptcy Code, other provisions of the Bankruptcy Code, and other applicable law.   The injunction provisions set forth in <u>Article X</u> of the Plan, including, without limitation, the Channeling Injunction, were adequately disclosed and explained on the relevant Ballots, in the Disclosure Statement, and in the Plan.   The record of the Confirmation Hearing and the Chapter 11 Cases is sufficient to support the injunction provisions set forth in <u>Article X</u> of the Plan.

(f)     The Released Parties and Exculpated Parties have performed a meaningful role in, and significantly and tangibly contributed to, the Chapter 11 Cases and their resolution, have participated in the Chapter 11 Cases and the Debtors' restructuring in good faith, and have acted in compliance with all provisions of the Bankruptcy Code, including in connection with the negotiation, preparation, and pursuit of Confirmation of the Plan and compromises implemented therein.   Specifically, each of the Released Parties and Exculpated Parties that owed fiduciary duties to the Debtors and their Estates fulfilled such fiduciary duties at all times.

(g)     The Debtors and their management, directors, employees, professionals, attorneys, and advisors (in each case, other than any Excluded Party), have worked diligently (both before and after the Petition Date) in connection with the Debtors' restructuring efforts, by preparing the Chapter 11 Cases, negotiating, formulating, and seeking and obtaining Court approval, as applicable and among other things, of the Restructuring Transactions, the Direct Claims Shareholder Settlement Agreements, the Disclosure Statement, and the Plan.   Throughout the Chapter 11 Cases, the Debtors have fulfilled any fiduciary duties or obligations owed to the Estates and protected the interests of all the Debtors' constituents.   The Debtors and the Released Parties have acted, and will enter into the documents to which they are contemplated to become parties to effectuate the Plan (including the Plan Supplement and Plan Documents), in good faith and are hereby deemed to continue to act in good faith if they (i) proceed to consummate the Plan and the Restructuring Transactions in accordance with the terms thereof and (ii) take the actions authorized or directed by this Order that are consistent with the Plan and Plan Documents.   The Debtors fairly and reasonably negotiated the transactions

contemplated by the Plan in good faith and at arm's length, and the resulting terms are in the best interests of the Debtors and the Estates.

(h)   The non-Debtor Released Parties and non-Debtor Exculpated Parties assisted the Debtors with negotiating and developing the Plan and the transactions and settlements contemplated thereby, or have agreed to forgo certain rights, make certain concessions, or incur certain obligations to permit recoveries for the Estates' creditors set forth in the Plan which might not otherwise have been achievable.

(i)    Accordingly, and based on the Record before the Bankruptcy Court, each of the injunction, exculpation, release, indemnification, discharge, settlement, and compromise provisions set forth in the Plan (including, but not limited to, Sections 10.5, 10.6, 10.7, 10.8, 10.10, 10.11, 10.12, and 10.13 of the Plan) are (i) the product of extensive good-faith and arm's length negotiations, (ii) fair, equitable, reasonable, and appropriate under the circumstances, (iii) confers a material benefit on, and is in the best interests of, the Debtors, their Estates, and their creditors, (iv) essential, integral, and non-severable components of the Plan, consummation, and resolution of the Chapter 11 Cases, (v) appropriately and narrowly tailored, (vi) supported by good and valuable consideration (including the Released Parties' contributions to facilitate the resolution of the Chapter 11 Cases and implementation of the Plan), (vii) granted after due notice and opportunity for hearing, (viii) consistent with the Bankruptcy Code and applicable law, (ix) intended to promote finality and prevent parties from circumventing or attempting to circumvent the Plan, (x) supported by the Debtors and their key stakeholders, (xi) constitute good-faith compromises and settlements of the matters covered thereby, (xii) with respect to the Third-Party Releases, consensual, (xiii) with respect to the injunction provisions, necessary to preserve and enforce the Plan's discharge, release, and exculpation provisions, and (xiv) are the result of a fair and valid exercise of the Debtors' business judgment.

20.   Term of Injunctions and Case Stipulation.

(a)   Unless otherwise provided in the Plan, all injunctions and stays arising under or entered during the Chapter 11 Cases, whether under section 105 or 362 of the Bankruptcy Code or otherwise, and in existence on the Confirmation Date, including but not limited to the Preliminary Injunction, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

(b)   Notwithstanding the foregoing paragraph 20(a), on the Effective Date, without further action by or order of the Bankruptcy Court:

(i)    any and all obligations of the Shareholder Released Parties arising under the Case Stipulation shall terminate and the Case Stipulation shall be superseded by this Order solely with respect to paragraphs 15, 17, 19, 22 and 25 of the Case Stipulation, and solely as such paragraphs apply to any Shareholder Released Party; *provided* that, for the avoidance of doubt, the

terms of such paragraphs shall continue in full force and effect with respect to all other parties (if applicable), and all other provisions of the Case Stipulation shall remain in full force and effect, in each case, unless otherwise provided by the Plan;

(ii) any and all obligations of any Shareholder Released Party arising under paragraph I of the Voluntary Injunction set forth in Appendix I to the Preliminary Injunction (and any predecessors or successors of the Preliminary Injunction) shall terminate, and the Preliminary Injunction shall be withdrawn, vacated and superseded by this Order solely with respect to paragraph I of the Voluntary Injunction set forth in Appendix I; *provided* that, for the avoidance of doubt, all other provisions of the Preliminary Injunction shall remain in full force and effect, unless otherwise provided by the Plan; and

(iii) any and all obligations of any Person arising under any subpoenas issued pursuant to any of *Order Pursuant to Federal Rules of Bankruptcy Procedure 2004 and 9016 Authorizing Examination of Third Parties* [D.I. 992] (as amended by the *Amended Order Pursuant to Federal Rules of Bankruptcy Procedure 2004 and 9016 Authorizing Examination of Third Parties* [D.I. 1008]), the *Order Pursuant to Rules 2004 and 9016 of the Federal Rules of Bankruptcy Procedure Authorizing Examinations of Certain Financial Institutions* [D.I. 1143], the *Order Pursuant to Federal Rules of Bankruptcy Procedure 2004 and 9016 Authorizing Examinations of and Document Production by Third Parties* [D.I. 1340] and the *Order Pursuant to Federal Rules of Bankruptcy Procedure 2004 and 9016 Authorizing Examination of Certain Former Debtor Executives, Separately Represented Debtor Personnel, and Norton Rose Fulbright Pursuant to Federal Rules of Bankruptcy Procedure 2004 and 9006* [D.I. 1788] shall terminate.

(c) Any and all information shared or produced by any Shareholder Released Party pursuant to the agreements or orders referenced in the foregoing paragraph 20(b), including any such information also shared with Persons not party to the Case Stipulation shall remain subject to the confidentiality terms under which it was shared, including any information that was designated under the Protective Order (or confidentiality agreement that was superseded by the Protective Order), which such information shall remain confidential under the terms of the Protective Order unless such information, materials or documents are included in the Public Document Repository in accordance with the Plan and the Master Shareholder Settlement Agreement. Names or other identifying information of investments or specific third-party counterparties or advisors with whom or with which a Shareholder Released Party has or had a third-party investment, advisory or business relationship that was disclosed in documents or information produced by a Shareholder Released Party and designated Outside Professional Eyes Only Information under the Protective Order shall retain such designation and be protected accordingly. Notwithstanding the foregoing, the Creditors' Committee

may provide to the Master Disbursement Trust any documents and information that it received from any party, including any Shareholder Released Party, through discovery during these Chapter 11 Cases, and such disclosure to the Master Disbursement Trust shall not be deemed to violate the Protective Order or any other confidentiality or non-disclosure agreement that may have governed the production of such documents and information to the Creditors' Committee in the first instance (provided that, for the avoidance of doubt, the terms of such Protective Order or confidentiality or non-disclosure agreements shall permit the prosecution, by the Master Disbursement Trust, of any MDT Causes of Action, and otherwise shall continue otherwise continue to govern the use and retention of such documents and information in all respects, regardless of whether the Master Disbursement Trust is a party to or otherwise subject to such Protective Order or confidentiality or non-disclosure agreements).

(d)     Except as provided in the PI Trust Documents, nothing in the Plan shall either (i) excuse any Person from compliance with any legislative, judicial or administrative subpoena, any civil investigative demand or any request for information made in the course of a government investigation; or (ii) limit any right of any Person with respect to compliance with any legislative, judicial or administrative subpoena, any civil investigative demand or any request for information made in the course of a government investigation.

21.     <u>Injunction Against Interference with Plan</u>.  Subject to <u>Section 12.4</u> of the Plan, upon entry of the Confirmation Order, all Holders of Claims against or Interests in the Debtors, Holders of Channeled Claims, Releasing Parties, Released Parties, Shareholder Released Parties and other parties in interest shall be enjoined from taking any actions directly or indirectly to interfere with the implementation or consummation of the Plan and the Plan Documents.

22.     <u>Plan Injunction</u>.

(a)     Except as otherwise provided in the Plan or in this Order, as of the entry of this Order but subject to the occurrence of the Effective Date, all Persons who have held, hold or may hold Claims against or Interests in the Debtors are, with respect to any such Claim or Interest, permanently enjoined after the entry of this Order from: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting, directly or indirectly, a Debtor or an Estate or the property of any of the foregoing, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this clause (i) or any property of any such transferee or successor; (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting or otherwise recovering in any manner or by any means, whether directly or indirectly, any judgment, award,

decree or order against a Debtor or an Estate or its property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this clause (a) or any property of any such transferee or successor; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against a Debtor or an Estate or any of its property, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons mentioned in this clause (iii) or any property of any such transferee or successor; (iv) acting or proceeding in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan; and (v) commencing or continuing, in any manner or in any place, any action that does not comply, or is inconsistent, with the provisions of the Plan; *provided*, *however*, that nothing contained herein shall preclude such Persons who have held, hold or may hold Claims against or Interests in a Debtor or an Estate from exercising their rights, or obtaining benefits, pursuant to, and consistent with, the terms of the Plan and the Plan Documents.

(b)    All Persons, including all governmental, tax and regulatory authorities, lenders, trade creditors, dealers, customers, employees, litigation claimants and other creditors holding Claims, Liens, Interests, charges, encumbrances and other interests of any kind or nature whatsoever, including rights or Claims based on any successor or transferee liability, against or in a Debtor, the NewCo Transferred Assets, the MDT Transferred Assets or the PAT Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or noncontingent, known or unknown), arising under or out of, in connection with, or in any way relating to the Debtors, the NewCo Transferred Assets, the MDT Transferred Assets, the PAT Assets, the operation of the NewCo Transferred Assets prior to the Effective Date or the Restructuring Transactions are forever barred, estopped and permanently enjoined from asserting against the Released Parties, their respective successors and assigns, their property, the NewCo Transferred Assets, the MDT Transferred Assets or the PAT Assets, any Released Claim or any other Cause of Action the assertion of which does not comply with or is inconsistent with the provisions of the Plan, including, without limitation, by: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting, directly or indirectly, a Released Party, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this clause (i) or any property of any such transferee or successor; (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting or otherwise recovering in any manner or by any means, whether directly or indirectly, any judgment, award, decree or order against a Released Party, or any direct or indirect transferee of any property of, or direct or indirect successor-in-interest to, any of the foregoing Persons mentioned in this clause (ii) or any property of any such transferee or successor; (iii) creating, perfecting or otherwise enforcing any encumbrance of any kind or asserting any Released Claims in any manner, directly or indirectly, against a Released Party or any of its property, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons mentioned in this clause (iii)

or any property of any such transferee or successor; (iv) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan; and (v) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan.

23.    <u>Channeling Injunction</u>.

(a)    As of the Effective Date, in order to preserve and promote the settlements contemplated by and provided for in the Plan and to supplement, where necessary, the injunctive effect of the Plan Injunction, the Estate Releases and the Shareholder Releases described in <u>Sections 10.5</u>, <u>10.6</u> and <u>10.7</u> of the Plan, and pursuant to the exercise of the equitable jurisdiction and power of the Bankruptcy Court under section 105(a) of the Bankruptcy Code, all Persons that have held or asserted, that hold or assert or that may in the future hold or assert any Channeled Claim shall be permanently and forever stayed, restrained and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering or receiving payments, satisfaction, recovery or judgment of any form from or against any Protected Party with respect to any Channeled Claim, including:

(i)    commencing, conducting or continuing, in any manner, whether directly or indirectly, any suit, action or other proceeding, in each case, of any kind, character or nature, in any forum in any jurisdiction with respect to any Channeled Claims, against or affecting any Protected Party, or any property or interests in property of any Protected Party with respect to any Channeled Claims;

(ii)    enforcing, levying, attaching, collecting or otherwise recovering, by any means or in any manner, either directly or indirectly, any judgment, award, decree or other order against any Protected Party or against the property of any Protected Party with respect to any Channeled Claims;

(iii)    creating, perfecting or enforcing, by any means or in any manner, whether directly or indirectly, any Lien of any kind against any Protected Party or the property of any Protected Party with respect to any Channeled Claims;

(iv)    asserting or accomplishing any setoff, right of subrogation, indemnity, contribution or recoupment of any kind, whether directly or indirectly, in respect of any obligation due to any Protected Party or against the property of any Protected Party with respect to any Channeled Claims; and

(v)    taking any act, by any means or in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan Documents, with respect to any Channeled Claims.

(b)    Notwithstanding anything to the contrary in <u>Section 10.8</u> of the Plan or this Order, this Channeling Injunction shall not stay, restrain, bar or enjoin:

(i) the rights of Holders of Channeled Claims to the treatment afforded them under the Plan and the Plan Documents, including the rights of Holders of Channeled Claims to assert such Channeled Claims solely in accordance with Section 6.21 of the Plan, the Master TDP and the Creditor Trust TDPs, in each case whether or not there are funds to make Distributions in respect of such Channeled Claims and whether or not such rights entitle such Holders to any Distributions;

(ii) the rights of Persons to assert any claim, debt, litigation or liability for payment of Creditor Trust Operating Expenses solely against the applicable Creditor Trust;

(iii) the rights of Persons to assert any claim, debt or litigation against any Excluded Party;

(iv) the rights of the Master Disbursement Trust to pursue and enforce the MDT Shareholder Rights, the MDT Insurance Rights and the MDT Causes of Action or any other rights afforded to the Master Disbursement Trust pursuant to the Plan, the Plan Documents, the Master Shareholder Settlement Agreement and/or the Direct Shareholder Settlement Agreements;

(v) the rights of the parties to the LRP Agreement to enforce the terms thereof in accordance with the Plan;

(vi) the Creditor Trusts from enforcing their respective rights against the Master Disbursement Trust under the Plan, the Master Shareholder Settlement Agreement and the MDT Documents;

(vii) the Creditor Trusts from enforcing their respective rights against the Payment Parties under the Plan or the Master Shareholder Settlement Agreement; or

(viii) the Master Disbursement Trust and the Plan Administration Trust from enforcing their rights against NewCo under the Plan.

(c) Upon the filing of a Notice of Shareholder Release Snapback, the Channeling Injunction shall terminate, be rescinded and have no application, without further order of the Bankruptcy Court, to any suit, action or other proceeding, in each case, of any kind, character or nature, brought against any member of the Breaching Shareholder Family Group and any Designated Shareholder Released Party by the Master Disbursement Trust (or if such claims cannot be assigned to the Master Disbursement Trust, by a Releasing Party for the benefit of the Master Disbursement Trust); *provided*, *however*, that the extension of time provided by Section 10.9(a) of the Plan shall continue in effect in accordance with its terms; *provided further* that, for the avoidance of doubt, notwithstanding the termination and rescission pursuant to Section 10.8(c) of the Plan, the Channeling Injunction shall continue in effect for, and shall be fully enforceable by and for the benefit of,

all other Protected Parties, including all other Shareholder Released Parties, other than the Breaching Shareholder Family Group and the Designated Shareholder Released Parties; and *provided further* that, in the event of the filing of a Notice of Shareholder Release Snapback, any determination made in the claims resolution process in accordance with Section 7.6 of the Plan will not be binding against any party.

(d)     Except as expressly set forth in <u>Section 10.8(c)</u> of the Plan, there can be no modification, dissolution or termination of the Channeling Injunction, which shall be a permanent injunction.

(e)     Except as expressly set forth in <u>Sections 10.8(b)</u> and <u>10.8(c)</u> of the Plan, nothing in the Plan, the MDT Documents or the Creditor Trust Documents shall be construed in any way to limit the scope, enforceability or effectiveness of the Channeling Injunction issued in connection with the Plan.

(f)     The Debtors' compliance with the requirements of Bankruptcy Rule 3016 shall not constitute an admission that the Plan provides for an injunction against conduct not otherwise enjoined under the Bankruptcy Code.

24.     <u>Tolling of Shareholder Released Claims; Violations of Shareholder Releases and Channeling Injunction</u>.

(a)     Any and all periods for commencing or continuing any Tolled Claim (as defined in the Master Shareholder Settlement Agreement), whether fixed by statute, agreement, order, or otherwise, shall not expire until the latest of (i) the end of such period; (ii) with respect to the applicable Shareholder Family Group and any Designated Shareholder Released Party, two hundred twenty-five (225) days after the filing of a Notice of Shareholder Release Snapback with respect to such Shareholder Family Group; (iii) with respect to the applicable Shareholder Family Group and any Designated Shareholder Released Party, when such Shareholder Family Group fulfills its payment obligations under the Shareholder Settlement Agreements; and (iv) with respect to the applicable Shareholder Released Party that is a Subsidiary (as defined in the Master Shareholder Settlement Agreement) of a Shareholder Payment Party, two hundred twenty-five (225) days after the reinstatement of any Estate Cause of Action against such Shareholder Released Party pursuant to Section 10.19 of the Plan.  No Shareholder Released Party or any other signatory to the Master Shareholder Settlement Agreement shall assert otherwise (including through defenses of (x) statute of limitations, statute of repose, laches or inadequate tolling, or (y) that any release granted to any other Shareholder Released Party, but not made void pursuant to the terms of Section 9.02(a)(ii)(B) of the Master Shareholder Settlement Agreement has the effect of precluding such claim against such Shareholder Released Party or other signatory hereto), but excluding any defense of inadequate tolling only to the extent it could have been raised on and as of the Petition Date)) in the litigation of any such Tolled Claim. Each party to the Master Shareholder Settlement Agreement and each Shareholder

Released Party consents to the jurisdiction of the Bankruptcy Court to finally determine any disputes arising out of, related to, or in connection with the construction or interpretation of these tolling provisions, including without limitation any issues related to any period for commencing or continuing any Tolled Claim under section 9.02(ii)(B) of the Master Shareholder Settlement Agreement. For the avoidance of doubt, the foregoing extension of time periods shall not apply in connection with litigation brought by any Non-Enforcing Party.

(b)     In the event that any Person takes any action that a Shareholder Released Party believes violates the Shareholder Releases or Channeling Injunction as it applies to any Shareholder Released Party, such Shareholder Released Party shall be entitled to make an emergency application to the Bankruptcy Court for relief, and may proceed by contested matter rather than by adversary proceeding.  The Bankruptcy Court shall have jurisdiction and authority to enter final orders in connection with any dispute over whether an action violates the Shareholder Releases or Channeling Injunction.  Upon determining that a violation of the Shareholder Releases or Channeling Injunction has occurred, the Bankruptcy Court, in its discretion, may award any appropriate relief against such violating Person, including, but not limited to, (i) disgorgement from the violating Person of any funds, assets or other value received, directly or indirectly, pursuant to the Plan or Plan Documents (including fees and expenses paid pursuant to the Plan or Plan Documents on account of legal or other advisory services rendered to or for the benefit of the violating Person); (ii) the termination of any rights of the violating Person to receive any funds, assets or other value pursuant to the Plan or Plan Documents; (iii) the reduction of any payments owed by any Shareholder Released Parties under the Shareholder Settlement Agreements to the violating Person in an amount equal to the amount of disgorgement ordered from, or the reduction of future payments ordered to be made to, or on account of, the violating Person (subject to the right of the violating Person to request that any amounts actually disgorged from such violating Person offset any reduction of future payments ordered to be made to, or on account of, such violating Person); (iv) an admonition, reprimand or censure of, or citation of contempt by, the violating Person and its counsel; (v) a fine or penalty paid into the Bankruptcy Court; (vi) a bond or other security in an amount equal to any financial obligation ordered by the Bankruptcy Court in respect of the violation; (vii) an appropriate sanction on any attorney or law firm responsible for the violation; (viii) injunctive relief to prevent future violations by the Person or its counsel; and (ix) attorney and other professional fees incurred by any Shareholder Released Party arising from the violation.  The provision of any one form of relief shall not preclude the provision of any other form of relief.

25.     <u>MDT Insurer Injunction</u>.

(a)     In accordance with section 105(a) of the Bankruptcy Code, upon the occurrence of the Effective Date, all Persons that have held or asserted, that hold or assert or that may in the future hold or assert any Claim based on, arising under or attributable to an MDT Insurance Policy shall be, and hereby are, permanently stayed, restrained and enjoined from taking any action for the purpose of directly or indirectly

collecting, recovering or receiving payment or recovery on account of any such Claim based on, arising under or attributable to an MDT Insurance Policy from or against any MDT Insurer, including:

(i) commencing, conducting or continuing, in any manner, any action or other proceeding of any kind (including an arbitration or other form of alternate dispute resolution) against any MDT Insurer, or against the property of any MDT Insurer, on account of any Claim based on, arising under or attributable to an MDT Insurance Policy;

(ii) enforcing, attaching, levying, collecting or otherwise recovering, by any manner or means, any judgment, award, decree or other order against any MDT Insurer, or against the property of any MDT Insurer, on account of any Claim based on, arising under or attributable to an MDT Insurance Policy;

(iii) creating, perfecting or enforcing in any manner any Lien of any kind against any MDT Insurer, or against the property of any MDT Insurer, on account of any Claim based on, arising under or attributable to an MDT Insurance Policy;

(iv) asserting or accomplishing any setoff, right of subrogation, indemnity, contribution or recoupment of any kind, whether directly or indirectly, against any obligation due to any MDT Insurer, or against the property of any MDT Insurer, on account of any Claim based on, arising under or attributable to an MDT Insurance Policy; and

(v) taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan applicable to any Claim based on, arising under or attributable to an MDT Insurance Policy.

(b) The provisions of this MDT Insurer Injunction shall not preclude the Master Disbursement Trust from pursuing any Claim based on, arising under or attributable to an MDT Insurance Policy, or any other claim that may exist under any MDT Insurance Policy against any MDT Insurer, or enjoin the rights of the Master Disbursement Trust to prosecute any action based on or arising from the MDT Insurance Policies or the rights of the Master Disbursement Trust to assert any claim, debt, obligation, cause of action or liability for payment against an MDT Insurer based on or arising from the MDT Insurance Policies. The provisions of this MDT Insurer Injunction are not issued for the benefit of any MDT Insurer, and no such insurer is a third-party beneficiary of this MDT Insurer Injunction. This MDT Insurer Injunction shall not enjoin, impair or affect (i) any claims between or among MDT Insurers that are not Settling MDT Insurers; (ii) the rights of current and former directors, officers, employees and authorized agents of the Debtors that are not Sackler Family Members that are preserved under the Plan; or (iii) the terms of the Master Shareholder Settlement Agreement with respect to the MDT Shareholder Insurance Rights. For the avoidance of doubt, with respect to a Person

that purports to be insured under any MDT Insurance Policy, the MDT Insurer Injunction shall enjoin only derivative claims and rights. Nothing in this Order or the Plan shall determine whether any Claim or right under any MDT Insurance Policy is either derivative or direct, or otherwise would be disallowed or subordinated under the Bankruptcy Code, which determination shall be made, as necessary, to the extent such Claim or right is not otherwise released under this Plan, in accordance with applicable law. For the avoidance of doubt, the MDT Insurer Injunction shall not enjoin or release Settling Co-Defendant's Direct Insurance Interests, if any, in any MDT Insurance Policies or Purdue Insurance Policies, and <u>Section 8.4</u> of the Plan controls over any contrary terms or provisions of this Order

(c)   To the extent the MDT Trustees make a good faith determination that some or all of the MDT Insurance Proceeds are substantially unrecoverable by the Master Disbursement Trust, the Master Disbursement Trust shall have the sole and exclusive authority at any time, upon written notice to any affected MDT Insurer, to terminate, reduce or limit the scope of this MDT Insurer Injunction with respect to any MDT Insurer; *provided* that any termination, reduction, or limitation of the MDT Insurer Injunction (A) shall apply in the same manner to all beneficiaries of the Creditor Trusts that are MDT Beneficiaries and (B) shall comply with any procedures set forth in the MDT Agreement.

(d)   Except as set forth in subparagraphs (b) and (c) of this paragraph 25, nothing in the Plan, the MDT Documents or the Creditor Trust Documents shall be construed in any way to limit the scope, enforceability or effectiveness of the MDT Insurer Injunction issued in connection with the Plan.

26.   <u>Settling MDT Insurer Injunction</u>.

(a)   In accordance with section 105(a) of the Bankruptcy Code, upon the occurrence of the Effective Date, all Persons that have held or asserted, that hold or assert or that may in the future hold or assert any Claim based on, arising under or attributable to an MDT Insurance Policy shall be, and hereby are, permanently stayed, restrained and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering or receiving payment or recovery on account of any such Claim based on, arising under or attributable to an MDT Insurance Policy from or against any Settling MDT Insurer, solely to the extent that such Settling MDT Insurer has been released from such Claim under such MDT Insurance Policy pursuant to an MDT Insurance Settlement, including:

(i)   commencing, conducting or continuing in any manner any action or other proceeding of any kind (including an arbitration or other form of alternate dispute resolution) against any such Settling MDT Insurer, or against the property of such Settling MDT Insurer, on account of such Claim based on, arising under or attributable to such MDT Insurance Policy;

(ii)   enforcing, attaching, levying, collecting or otherwise recovering, by any manner or means, any judgment, award, decree or other order against any such Settling MDT Insurer, or against the property of such Settling MDT Insurer, on account of such Claim based on, arising under or attributable to such MDT Insurance Policy;

(iii)   creating, perfecting or enforcing in any manner any Lien of any kind against any such Settling MDT Insurer, or against the property of such Settling MDT Insurer, on account of such Claim based on, arising under or attributable to such MDT Insurance Policy;

(iv)   asserting or accomplishing any setoff, right of subrogation, indemnity, contribution or recoupment of any kind, whether directly or indirectly, against any obligation due to any such Settling MDT Insurer, or against the property of such Settling MDT Insurer, on account of such Claim based on, arising under or attributable to such MDT Insurance Policy; and

(v)   taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan applicable to such Claim based on, arising under or attributable to such MDT Insurance Policy.

(b)   Any right, Claim or cause of action that an Insurance Company may have been entitled to assert against any Settling MDT Insurer but for the Settling MDT Insurer Injunction, if any such right, Claim or cause of action exists under applicable non-bankruptcy law, shall become a right, Claim or cause of action solely as a setoff claim against the Master Disbursement Trust and not against or in the name of the Settling MDT Insurer in question.  Any such right, Claim or cause of action to which an Insurance Company may be entitled shall be solely in the form of a setoff against any recovery of the Master Disbursement Trust from that Insurance Company, and under no circumstances shall that Insurance Company receive an affirmative recovery of funds from the Master Disbursement Trust or any Settling MDT Insurer for such right, Claim or cause of action.  In determining the amount of any setoff, the Master Disbursement Trust may assert any legal or equitable rights the Settling MDT Insurer would have had with respect to any right, Claim or cause of action. For the avoidance of doubt, the Settling MDT Insurer Injunction shall not enjoin or release Settling Co-Defendant's Direct Insurance Interests, if any, in any MDT Insurance Policies or Purdue Insurance Policies, and Section 8.4 of the Plan controls over any contrary terms or provisions of this Order.

(c)   There can be no modification, dissolution or termination of the Settling MDT Insurer Injunction, which shall be a permanent injunction.

(d)   Except as set forth in subparagraphs (b) and (c) of this paragraph 26, nothing in the Plan, the MDT Documents or the Creditor Trust Documents shall be construed in any way to limit the scope, enforceability or effectiveness of the Settling MDT Insurer Injunction issued in connection with the Plan.

27.    <u>Co-Defendant Defensive Rights</u>.    Except as provided in the MDT Insurer

Injunction, the Settling MDT Insurer Injunction or clause (ii) of the penultimate sentence of

<u>Section 10.18</u> of the Plan, notwithstanding anything to the contrary in <u>Article X</u> of the Plan or in

the Plan as it currently exists or as it might be further amended, this Order or any order entered in

connection with the Plan (or the Plan as amended) (or any such order, as amended, modified or

supplemented), or any supplement to the Plan (or the Plan as amended), nothing contained in the

Plan or any of the foregoing documents or orders (including, without limitation, the classification,

treatment, allowance, disallowance, release, bar, injunction, Channeling Injunction or any other

provision of the Plan or the Plan as amended with respect to, impacting, affecting, modifying,

limiting, subordinating, impairing, in any respect, a Co-Defendant Claim), will release, bar, enjoin,

impair, alter, modify, amend, limit, prohibit, restrict, reduce, improve or enhance any Co-

Defendant Defensive Rights of any Holder of a Co-Defendant Claim or Excluded Party as such

rights exist or might in the future exist under applicable non-bankruptcy law.    Nothing in the Plan,

any of the Plan Documents or in this Order shall preclude, operate to or have the effect of,

impairing any Holder of a Co-Defendant Claim or Excluded Party from asserting in any

proceeding any and all Co-Defendant Defensive Rights that it has or may have under applicable

law.    Nothing in the Plan, any of the Plan Documents or this Order shall be deemed to waive any

Co-Defendant Defensive Rights, and nothing in the Chapter 11 Cases, the Plan, any of the Plan

Documents or this Order may be used as evidence of any determination regarding any Co-

Defendant Defensive Rights, and under no circumstances shall any Person be permitted to assert

issue preclusion or claim preclusion, waiver, estoppel or consent in response to the assertion of

any Co-Defendant Defensive Rights.    Co-Defendant Defensive Rights (i) may be used to offset,

set-off, recoup, allocate or apportion fault, liability, or damages, or seek judgment reduction or

otherwise defend against any Cause of Action brought by any Person against the Holder of any Co-Defendant Claim or the Excluded Party based in whole or in part on Opioid-Related Activities and (ii) subject to <u>Section 8.4</u> of the Plan, shall in no case be used to seek or obtain any affirmative monetary recovery from any Protected Party or any Asset of any Protected Party (including from any Purdue Insurance Policy or any other insurance policy of a Protected Party) on account of any Released Claim or Shareholder Released Claim.  The foregoing does not constitute a release of any Co-Defendant's Class 14 Claim or any other Excluded Party's Class 11(c) Claim.

28.     <u>Injunction Related to Releases and Exculpation</u>.  To the maximum extent permitted under applicable law, this Order shall permanently enjoin the commencement or prosecution by any Person, whether directly, derivatively or otherwise, of any Causes of Action released pursuant to the Plan, including, without limitation, the Causes of Action released or exculpated in the Plan and with respect to any Claims, Interests, Liens, other encumbrances or liabilities that are subject to <u>Sections 5.3(b)</u>, <u>5.4(c)</u> or <u>5.6(b)</u> of the Plan (but, for the avoidance of doubt, excluding any Excluded Claims).

29.     <u>Operating Injunction and Governance Covenants</u>.   The NewCo Operating Injunction set forth in **Exhibit B** hereto and the NewCo Governance Covenants set forth in **Exhibit C** hereto shall bind NewCo and any successor owner of NewCo's opioid business to the extent set forth therein.

30.     <u>DOJ Forfeiture Judgment Credit</u>.  The aggregate amount of value distributed or otherwise conferred by the Debtors in respect of Non-Federal Domestic Governmental Claims and Tribe Claims under the Plan exceeds $1.775 billion.

31.     <u>Timney and Stewart Stipulation</u>.  The *Stipulation in Connection with the Debtors' Chapter 11 Plan of Reorganization* [D.I. 7948] between the Debtors, Mark Timney, a former

officer of Purdue, and John H. Stewart, a former officer of Purdue, and acknowledged and agreed to by the Creditors' Committee, the Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants and the Multi-State Governmental Entities Group, was entered into as of October 6, 2025, and is hereby approved and so ordered.

32.     <u>Baltimore Stipulation</u>.  The *Stipulation Resolving the Objection of the Mayor & City Council of Baltimore to the Debtors' Chapter 11 Plan of Reorganization* [D.I. 8134] between the Debtors, Mayor & City Council of Baltimore, and acknowledged and agreed to by the Creditors' Committee, the Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants, The Raymond Sackler Family and Beacon Company (the "**Baltimore Stipulation**"), was entered into as of November 3, 2025, and is hereby approved and so ordered.  Any objection to the Allowance of the Baltimore Proof of Claim (as defined in the Baltimore Stipulation) filed by any party shall be held in abeyance and shall not be adjudicated or advanced during the Standstill Period (as defined in the Baltimore Stipulation).

33.     <u>Shareholder Settlement Document Undertakings</u>.

(a)     **Settlement Stipulation Acknowledgment**.  The rights and obligations set forth in the *Settlement Stipulation Dismissing Proceedings Without Prejudice* [D.I. 7713, Exhibit A] (the "**Settlement Stipulation**"), of Richard S. Sackler and Lin Gao (together, the "**RSS Parties**") and the Litigation Parties defined thereunder remain in full force and effect including the acknowledgments and agreement contained therein that they will not directly or indirectly (i) interfere, now or at any time in the future, with any Trustees' (as defined in the Settlement Stipulation), Shareholder Payment Parties' or the B-Side Payment Group 1's ability to consummate, implement, and perform under the Plan and Shareholder Settlement Agreements; (ii) take (or fail to take) any action that interferes with, delays, frustrates, or impairs the ability of any party to enter into or satisfy its obligations under the Plan or the Shareholder Settlement Agreements, or that would undermine the validity or enforceability of the Plan or the Shareholder Settlement Agreements (including, without limitation, by exercising or purporting to exercise a power of appointment over property held by a Shareholder Payment Party that is in a trust in a manner that interferes with, adversely affects, or undermines the Plan or the Shareholder Settlement Agreements); and (iii) assist or conspire with any other person to take any such action.

**Nothing herein shall modify or limit the rights of any party under the Settlement Stipulation**. This Order is intended, among other things, to implement the obligations set forth in the Settlement Stipulation and shall not extend, broaden, or limit any rights, defenses, claims, or positions of the any of the Parties to the Settlement Stipulation in the pending litigation that is the subject of the Settlement Stipulation. Nothing herein shall modify or limit the rights of any party under the Settlement Stipulation, nor shall any provision herein be construed to affect any party's rights in the Settlement Stipulation or in the pending litigation that is the subject of the Settlement Stipulation.

(b)    **Compliance with the Settlement, Stipulation and Plan**.  In furtherance of the Plan and the Shareholder Settlement Agreements, each of the RSS Parties and the other members of the B-1 Payment Group are hereby directed to comply with the foregoing.

(c)    **Finalization of Certain Documents by Certain Sackler Payment Parties by December 19, 2025**.  All relevant parties, including each Sackler Payment Party that is subject thereto, the Creditors' Committee, the Debtors, the Ad Hoc Committee and the States AG Negotiating Group, are further directed and ordered to negotiate in good faith to finalize by no later than December 19, 2025, Annex E and Annex F, which shall be consistent with (x) the applicable term sheets set forth on Exhibits A-32 and A-33 to the *Notice of Filing of Fifth Plan Supplement Pursuant to the Fifteenth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 8201] and (y) the Settlement Stipulation, as applicable, and, in each case, shall otherwise be in form and substance reasonably acceptable to a supermajority of Sackler Payment Parties subject thereto.

(d)    **Finalization of All Documents by January 30, 2026**.  It is further directed and ordered that all other remaining documentation necessary or appropriate to implement the Plan and Shareholder Settlement Agreements and the transactions contemplated thereby, including, without limitation, the remaining exhibits, annexes, collateral documents and ancillary documents to the Shareholder Settlement Agreements, shall be finalized no later than January 30, 2026.

(e)    **Negotiation and Execution by Richard S. Sackler of Certain Documents by December 19, 2025**.  In addition, and without limiting the foregoing, Richard S. Sackler is directed and ordered to: (I) negotiate in good faith and finalize Annex G to the Master Shareholder Settlement Agreement, and (II) complete and irrevocably execute each of the following documents (collectively, the "**Specified Settlement Documents**") once such documents have been agreed to by a supermajority of the Sackler Payment Parties that are party thereto, and deliver the Specified Settlement Documents to the Debtors, the Creditors' Committee, the Ad Hoc Committee, and the State AG Negotiating Committee as soon as reasonably practicable, and in any event no later than December 19, 2025, or such later date as such documents have been finalized (the "**Specified Settlement Document Deadline**"): (A) the Master Shareholder Settlement Agreement; and (B) each of the following exhibits and

annexes to the Master Shareholder Settlement Agreement: (i) <u>Exhibit Y</u> (Confessions of Judgment); (ii) <u>Exhibit P-2</u> (Form of Further Assurances Undertaking of an Assuring Party with respect to the JDS Estate or a Trust that is part of the B-Side Payment Group); and (iii) the applicable pledge and security agreements contemplated by <u>Annex E</u> and <u>Annex G</u>.  All executed Specified Settlement Documents shall be held in escrow by the Debtors and released automatically on the Effective Date of the Plan without any further action by the RSS Parties.

(f)    **<u>Further Assurances by the RSS Parties</u>**.  In addition, and without limiting the foregoing, the RSS Parties are further directed and ordered to timely execute, deliver, and perform all other documentation necessary or appropriate to effectuate the Plan and the Shareholder Settlement Agreements (including but not limited to documentation in connection with any Permitted Trust Restructurings as contemplated by <u>Exhibits A-32</u> and <u>A-33</u>).

(g)    **<u>Further Assurances by the B-1 Payment Group Parties other than the RSS Parties</u>**.  In addition, and without limiting the foregoing, the B-1 Payment Group Parties other than the RSS Parties are further directed and ordered to timely execute, deliver, and perform all other documentation necessary or appropriate to effectuate the Plan and the Shareholder Settlement Agreements (including but not limited to documentation in connection with any Permitted Trust Restructurings as contemplated by <u>Exhibits A-32</u> and <u>A-33</u>).

(h)    **<u>December 12 Status Conference</u>**.  A status conference shall be held before the Bankruptcy Court on December 12, 2025, at which Richard S. Sackler, Richard S. Sackler's counsel, trustees of other members of the B1 Payment Group and counsel for such trustees shall appear before the Bankruptcy Court to report on, and demonstrate compliance with, the obligations and provisions set forth herein.

(i)    **<u>Compelling Performance</u>**. The Bankruptcy Court, pursuant to sections 105(a) and 1142(b) of the Bankruptcy Code, may compel compliance with this Order, including but not limited to appointing an independent representative or other fiduciary with full authority to act on behalf of Richard S. Sackler in any and all capacities in which he is required to act (whether individually, as trustee, or in any other fiduciary capacity), to execute, deliver, or otherwise effectuate any documents required with respect to the payment obligations of the B-1 Payment Group Parties, including Richard S. Sackler.

(j)    **<u>Bankruptcy Court Jurisdiction/Sanctions</u>**.  The Bankruptcy Court shall retain exclusive jurisdiction of all matters arising under, arising out of, or related to the obligations set forth herein, including to resolve any dispute or failure of performance by Richard S. Sackler or any other party, and to impose sanctions, including, without limitation, findings of contempt, monetary sanctions, or such other relief as the Bankruptcy Court determines appropriate for any failure to negotiate in good faith or otherwise comply with any obligation set forth herein.

34.    <u>Retention of Jurisdiction</u>.    Except as provided in <u>Section 11.1</u> of the Plan, notwithstanding the entry of this Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction of all matters arising under, arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for the purposes set forth in <u>Section 11.1</u> of the Plan.  The Court shall retain concurrent, rather than exclusive, jurisdiction of all matters set forth in Section 11.1(b) of the Plan.  Consistent with <u>Section 11.1(f)</u> of the Plan, and as of the earlier of the Effective Date or the expiration of the Preliminary Injunction, all Persons are permanently enjoined from commencing, conducting, or continuing, directly or indirectly, any litigation or prosecution of an Estate Cause of Action; *provided*, *however*, that nothing in this paragraph shall preclude NewCo, the Plan Administration Trust, each Creditor Trust or the Master Disbursement Trust from pursuing any Retained Cause of Action vested in or transferred to such entity pursuant to the Plan.  Subject to Sections 10.5 through 10.13 of the Plan, all such Retained Causes of Action shall be transferred to the Master Disbursement Trust, the Plan Administration Trust, the applicable Creditor Trust or NewCo, as applicable, which shall have, retain, reserve and be entitled to assert all such Retained Causes of Action in accordance with the Plan as fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and equitable rights with respect to any Claim or Interest may be asserted after the Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

35.    Any Person seeking to commence, conduct, or continue litigation or prosecution of a Cause of Action against a Shareholder Released Party or a Released Party may, but is not required to, seek a prior determination in the Bankruptcy Court that a Cause of Action is not an Estate Cause of Action.  If any Person commences, conducts or continues litigation or prosecution of such Cause

of Action without a prior determination by the Bankruptcy Court, the Person against which such Cause of Action was asserted, and the Master Disbursement Trust or NewCo, shall be entitled to make an emergency application to the Bankruptcy Court for a determination that such Cause of Action is an Estate Cause of Action and therefore in violation of <u>Section 11.1(f)</u> of the Plan.

36.    <u>Evidentiary Stipulation</u>.    In the event there is litigation against a Shareholder Released Party as a result of a Notice of Shareholder Release Snapback, as defined in the Plan, no party (a "**Non-Prejudiced Party**," which term shall include any party as a result of the Plan), shall be prejudiced in any way in connection with such snapback litigation by its decision to (i) limit or forgo the presentation of evidence (or forgo cross examination of any witness) or (ii) forgo or not participate in any argument regarding such evidence during oral argument, in each case in connection with the Confirmation of the Plan (including at the Confirmation Hearing).    If Plan Confirmation is reversed on appeal, no Non-Prejudiced Party shall be prejudiced in any way in connection with any future proceeding based on its decision to (i) limit or forgo the presentation of evidence (or forgo cross examination of any witness) or (ii) forgo or not participate in any argument regarding such evidence during oral argument, in each case in connection with the Confirmation of the Plan (including at the Confirmation Hearing).    Nothing that occurs at the Confirmation Hearing (or related thereto) shall constitute or be deemed agreement or disagreement in any future proceeding or snapback litigation by any Non-Prejudiced Party with any position taken or evidence offered or argument made (at oral argument) by any other party at the Confirmation Hearing, *provided* that nothing herein shall operate to limit or reduce the binding nature of the Plan, this Order, and any related findings on any party.    For the avoidance of doubt, all parties agree and acknowledge that the Debtors, the Creditors' Committee, the Master Disbursement Trust, any Holder of a Channeled Claim that is not objecting to the Plan, and any

Shareholder Released Party subject to snapback litigation is intended to be a "Non-Prejudiced Party."

37.    <u>Timing of Opt-In Release Elections</u>.    Notwithstanding anything to the contrary in the Solicitation Procedures Order, no election to opt-in to the Third-Party Releases by means of a Ballot shall be required to be treated by the Solicitation Agent as valid unless such election is received by the Solicitation Agent no later than March 1, 2026.

38.    <u>No Precedent</u>.    The "allocation" of dollars between the Shareholder Direct Settlement Portion of any Distribution and the Estate Distributions is part of an overall compromise and settlement under Bankruptcy Rule 9019 between the Mediation Parties, including the Debtors, the Creditors' Committee, the Shareholder Payment Parties, and all creditors and creditor groups that are Mediation Parties, and upon confirmation of this Plan will be deemed to be a settlement between the Debtors, the Creditors' Committee, the Supporting Claimants and the Shareholder Payment Parties in which, among other things, the Shareholder Payment Parties are providing up to $6.5 billion in consideration over 15 years. The "allocation" is intended by the Shareholder Payment Parties and the other Mediation Parties to, among other things, facilitate the distribution of proceeds for opioid abatement, victim compensation, and other permitted uses under the Plan, and otherwise.  Neither the settlement amount nor the "allocation" (including any allocation between the Shareholder Payment Party of payment responsibility) reflects any concession or agreement by any party as to the strength, validity, merits, collectability, amount, or otherwise of the Shareholder Released Estate Claims or of the Shareholder Released Direct Claims or any defenses to the Shareholder Released Estate Claims or the Shareholder Released Direct Claims, and if for whatever reason the agreement in principle is not consummated, neither the settlement amount nor the "allocation" shall be cited or used by the Debtors, the Creditors'

Committee, the Supporting Claimants or the Shareholder Payment Parties (or the Released Parties) – or any party to the Shareholder Settlements or any other Mediation Party – for any purpose whatsoever in any pleading or proceeding wherever or whenever. Further, no party to the compromise and settlement will be bound by this Plan or the agreement set forth in this provision (other than as set forth Section 5.2(d) of the Plan) with regard to what it may state in a pleading, court hearing, proceeding, or otherwise about the strength, validity, merits, collectability, amount, or otherwise of the Shareholder Released Estate Claims or of the Shareholder Released Direct Claims, or any defenses thereto, including, without limitation, in any pleading filed in connection with the Shareholder Settlements and this Plan. This paragraph shall be binding forever upon all parties from the time that this Order becomes effective, regardless of whether a settlement including that represented in the Plan is consummated and shall be specifically enforceable by the Bankruptcy Court (with no cap on damages that may be awarded).  This paragraph is specifically subject to Federal Rule of Evidence 408 and analogous state provisions barring the use of settlement offers and communications to prove the validity or amount of disputed claims.

39.    Successors and Assigns.  The rights, benefits and obligations of any Person named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or permitted assign, if any, of each such Person.

40.    Further Assurances.  PRA, L.P., each Family Member (as defined in the Master Shareholder Settlement Agreement), the Debtors, the Holders of Claims and Channeled Claims receiving Distributions under the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan, the Settlement Agreements and the agreements and instruments contemplated therein (including, without

limitation, the Collateral Documents (as defined in the Master Shareholder Settlement Agreement)), including, without limitation, to cause the satisfaction of all conditions to effectiveness of the Plan, the Settlement Agreements and such documents and instruments (including, without limitation, the effectiveness of such document and agreements generally, the effectiveness of any releases granted thereunder and the effectiveness of any obligations to make payments thereunder) and to comply with their respective obligations pursuant to, the Plan, the Settlement Agreements and such documents and instruments.

41.    Notice of Confirmation Date and Effective Date.    The Claims and Solicitation Agent may serve notice of the entry of this Order on (a) all Holders of Claims and (b) those other parties on whom the Plan, Disclosure Statement, and related documents were served.    Such service constitutes good and sufficient notice pursuant to Bankruptcy Rules 2002(f)(7) and 3020(c).    On the Effective Date, or as soon thereafter as is reasonably practicable, the Debtors shall file with the Bankruptcy Court a "Notice of Effective Date" (the "**Notice of Effective Date**") and shall mail or cause to be mailed by first-class mail to Holders of Claims or Interests a copy of the Notice of Effective Date; *provided*, *however*, that the Debtors shall not be required to transmit the Notice of Effective Date to Holders of Claims or Interests in Classes 12 and 18 or to any Holders of Claims or Interest for which applicable Solicitation Materials were returned to the Debtors' Claims and Solicitation Agent as undeliverable.    Upon the Effective Date, the Plan shall be deemed substantially consummated as to each Debtor, consistent with the definition of "substantial consummation" in section 1101(2) of the Bankruptcy Code.

42.    Administrative Claims Bar Date.    All requests for payment of Administrative Claims, other than Professional Fee Claims, that accrued on or before the Effective Date must be filed with the Claims and Solicitation Agent and served on counsel for the Debtors and Liquidating

Debtors, counsel for the Creditors' Committee, the Plan Administration Trustee and the PPLP Liquidator by (a) 30 days after notice of the Confirmation Date is served with respect to Claims that arose before the Confirmation Date and (b) 30 days after notice of the Effective Date is served with respect to Claims that arose on or after the Confirmation Date (the "**Administrative Claim Bar Date**").  Any requests for payment of Administrative Claims pursuant to Article II of the Plan that are not properly filed and served by the Administrative Claim Bar Date shall be disallowed automatically without the need for any objection from the Debtors or any action by the Bankruptcy Court.

43.    Shareholder Stipulation.  Notwithstanding anything to the contrary herein, nothing in this Order, in the Plan or in any Plan Document shall impair the effectiveness of the Stipulation attached to the *Notice of Filing of Stipulation Concerning Shareholder Settlement Agreements* [D.I. 7713].

44.    Bailiwick of Jersey.  Upon the dissolution of the Creditors' Committee pursuant to Section 12.14 of the Plan, the Master Disbursement Trust shall succeed to the Creditors' Committee in all respects for purposes of the *Order Granting the Official Committee of Unsecured Creditors' Motion for a Letter of Request to the Royal Court of Jersey* [D.I. 6944] in connection with all claims assigned or otherwise transferred under the Plan to the Master Disbursement Trust, and the Bankruptcy Court's requests on behalf of the Creditors' Committee and its professionals shall be deemed to apply, *mutatis mutandis*, to the Master Disbursement Trust.

45.    Westchester Fire Insurance Company.

(a)    Notwithstanding anything to the contrary in the Plan Documents, the Disclosure Statement, or this Order, or any agreements or documents relating to the foregoing, including, without limitation, any transition agreements and trust agreements, nothing in the Plan Documents shall in any way prime, discharge, impair, modify, subordinate or affect the rights of Westchester Fire Insurance Company and/or its past, present or future U.S.-based affiliated sureties (each as surety in its role as an

issuer of bonds, individually and collectively referred to herein as "**Westchester**" or "**Surety**") as to:

    (i)    any indemnity or collateral obligations or agreements relating to bonds or related instruments issued and/or executed by Surety and assumed by the Debtors and/or NewCo (each such bond or related instrument, a "**Bond**", and, collectively, the "**Bonds**");

    (ii)    any collateral or letter of credit related to any Bond; or

    (iii)    any indemnity agreement related to any of the Bonds (collectively, the "**Indemnity Agreements**"), which include, without limitation, the General Agreement of Indemnity dated December 13, 2016 and the General Agreement of Indemnity dated August 2, 2017 which are hereby assumed and assigned to NewCo.

  (b)    Notwithstanding any provision in the Plan Documents to the contrary, including, without limitation, the third-party releases in the Plan,

    (i)    any and all collateral, including cash collateral and letters of credit, held by Surety and/or on Surety's behalf in connection with the Bonds shall be retained by Surety and/or on Surety's behalf to secure the obligations of the Debtors and/or NewCo under such Bonds;

    (ii)    Surety has no obligation to issue or execute any new bond or related indemnity agreement on behalf of any entity, and Surety has no obligation to extend, modify and/or increase the amount of any Bond or related indemnity agreement;

    (iii)    any rights, remedies and/or defenses Surety may now or in the future have with respect to the Bonds are preserved;

    (iv)    any current or future setoff, recoupment rights, lien rights, trust fund claims of Surety or any party to whose rights the Surety has or may be subrogated, and/or any existing or future subrogation or other common law rights of the Surety are preserved;

    (v)    it shall not be necessary for Surety to file an administrative proof of claim, file a request for payment, and/or file a fee application to protect any of its claims related to the Indemnity Agreements and Bonds;

    (vi)    Section 6.13 and Section 6.18 of the Plan shall not have the effect of disallowing Surety's claims related to the Bonds and Indemnity Agreements and/or the claims that Surety may assert via subrogation, and Section 7.5 of the Plan shall not apply to such claims; and

    (vii)    Surety shall have access to any and all books and records held by the Debtors and/or NewCo relating to the Bonds and Indemnity Agreements

and Surety shall receive no less than thirty (30) days written notice by the entity holding such books and records prior to destruction or abandonment of any such books and records. Without limitation to any other rights of the Surety, if a claim or claims is or are asserted against any Bonds and/or related instruments, then the Surety shall be granted access to, and may make copies of, any books and records related to such Bonds upon Surety's request.

46.    <u>Old Republic</u>.  In connection with the Debtors' products/completed operations liability insurance policy (policy number MWZZ 314344) and the commercial general liability policy (policy number MWZZ 315036), subsequent renewals of those policies, and any related agreements (collectively, the "**ORIC Policies**")  with Old Republic Insurance Company ("**ORIC**"), the ORIC Policies are Purdue Insurance Policies that are not MDT Insurance Policies and NewCo shall assume all the Debtors' obligations to ORIC under the ORIC Policies.  All collateral held by ORIC posted by the Debtors, whether posted before or after the Petition Date, secures all obligations of NewCo to ORIC under the ORIC Policies no matter when they arise, pursuant to the terms of the ORIC Policies.  Any reimbursement obligations and any other obligations that arise pre-petition or post-petition under any ORIC Policy (regardless of whether all or any part of such obligations are liquidated, due or paid before or after confirmation of a chapter 11 plan or conversion of one or more of the Debtors' chapter 11 cases to chapter 7) shall be assumed by NewCo.  The Debtors' rights against all collateral held by ORIC, in whatever form, shall be governed by the terms of the ORIC Policies.

47.    <u>Motions Relating to Late Claims</u>.  Any hearing on a motion to deem a proof of claim timely filed shall be scheduled no earlier than 120 days after the entry of this Order.

48.    <u>Final Order</u>.  This Order is a final order and the period in which an appeal must be filed shall commence upon the entry hereof.

49.    <u>Binding Effect</u>.  Pursuant to Bankruptcy Rules 3020(e), 6004(h), and 7062, this Order shall be stayed until the expiration of 14 days after the entry of this Order.  Unless stayed

by this Court or another court under Bankruptcy Rule 8007 or otherwise, (i) notwithstanding any Bankruptcy Rules, nonbankruptcy law, or otherwise, this Order shall be immediately effective and enforceable after the expiration of 14 days after the entry of this Order and (ii) except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, and subject to the occurrence of the Effective Date, the provisions of the Plan, the Plan Documents, and this Order shall bind the Debtors, the other Protected Parties, all Releasing Parties, all Holders of Claims against or Interests in any Debtors, all Holders of Channeled Claims, all parties to executory contracts and unexpired leases with any of the Debtors, and all other parties in interest in the Chapter 11 Cases, including the Debtors' insurers, and each of their respective heirs, executors, administrators, estates, successors and assigns.

50.    <u>Conflicts with This Order</u>.  The provisions of the Plan and this Order shall be construed in a manner consistent with each other so as to effect the purpose of each; *provided, however*, that if there is determined to be any inconsistency between any terms and provisions of this Order and any terms and provisions of the Plan or any other Plan Document that cannot be so reconciled, then solely to the extent of such inconsistency, (a) with respect to Sections 8.4 and 10.20 of the Plan, the Plan shall govern, and (b) with respect any other terms and provisions of the Plan or any other Plan Document, the provisions of this Order shall govern, and any provision of this Order shall be deemed a modification of the Plan or such other document and shall control and take precedence.

51.    <u>Findings of Fact and Conclusions of Law</u>.  The findings and conclusions set forth herein and in the Record constitute the Bankruptcy Court's findings of fact and conclusions of law pursuant to rule 52 of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rules 7052 and 9014.  To the extent that any of the following findings of fact constitute

conclusions of law, and to the extent that any of the following conclusions of law constitute findings of fact, they are adopted as such.  Any requirement under the Bankruptcy Rules that the Bankruptcy Court state its conclusions of law separate from its findings of fact is hereby waived.

52.    <u>Headings</u>.  The headings contained within this Order are used for the convenience of the parties and shall not alter or affect the meaning of the text of this Order.

Dated:     November 18, 2025
             White Plains, New York

_/s/ Sean H. Lane_____
HONORABLE SEAN H. LANE
UNITED STATES BANKRUPTCY JUDGE

## Exhibit A

**Plan of Reorganization**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| **PURDUE PHARMA L.P., et al.,** | Case No. 19-23649 (SHL) |
| Debtors.[1] | (Jointly Administered) |

## EIGHTEENTH AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF PURDUE PHARMA L.P. AND ITS AFFILIATED DEBTORS

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Eli J. Vonnegut
Christopher S. Robertson
Joshua Y. Sturm
Abraham Bane

Counsel to the Debtors
and Debtors in Possession

Dated: November 14, 2025
New York, New York

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Purdue Products L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

**Table of Contents**

ARTICLE I          DEFINITIONS AND INTERPRETATION. .................................................. 1

    1.1    Definitions ......................................................................................................... 1

    1.2    Interpretation; Application of Definitions; Rules of Construction ................... 55

    1.3    Reference to Monetary Figures. ....................................................................... 56

    1.4    Controlling Document. ..................................................................................... 56

    1.5    Consent Rights. ................................................................................................ 57

ARTICLE II         ADMINISTRATIVE CLAIMS, PROFESSIONAL FEE CLAIMS, PRIORITY
                    TAX CLAIMS AND DOJ FORFEITURE JUDGMENT CLAIM. ........................... 57

    2.1    Administrative Claims. ..................................................................................... 57

    2.2    Priority Tax Claims. ......................................................................................... 58

    2.3    DOJ Forfeiture Judgment Claim. ..................................................................... 58

ARTICLE III        CLASSIFICATION OF CLAIMS AND INTERESTS. ............................................ 58

    3.1    Classification in General. .................................................................................. 58

    3.2    Summary of Classification of Claims and Interests. ......................................... 59

    3.3    Voting Classes; Presumed Acceptance by Non-Voting Classes. ...................... 60

    3.4    Voting; Presumptions; Solicitation. .................................................................. 60

    3.5    Cramdown. ........................................................................................................ 60

    3.6    No Waiver. ........................................................................................................ 61

ARTICLE IV        TREATMENT OF CLAIMS AND INTERESTS. ................................................ 61

    4.1    Secured Claims (Class 1). ................................................................................. 61

    4.2    Other Priority Claims (Class 2). ....................................................................... 61

    4.3    Federal Government Unsecured Claims (Class 3). ............................................ 61

    4.4    Non-Federal Domestic Governmental Claims (Class 4). .................................. 62

    4.5    Tribe Claims (Class 5). ..................................................................................... 62

    4.6    Public School Claims (Class 6). ....................................................................... 63

    4.7    Healthcare Provider Claims (Class 7). ............................................................. 63

    4.8    Third-Party Payor Claims (Class 8). ................................................................ 64

    4.9    ER Physician Claims (Class 9). ........................................................................ 64

    4.10   PI Claims (Classes 10(a) and 10(b)). ............................................................... 65

    4.11   Avrio General Unsecured Claims (Class 11(a)) ............................................... 67

    4.12   Adlon General Unsecured Claims (Class 11(b)). .............................................. 67

    4.13   Other General Unsecured Claims (Class 11(c)). ............................................... 67

    4.14   Intercompany Claims (Class 12). ..................................................................... 68

    4.15   Shareholder Claims (Class 13) ......................................................................... 68

4.16    Co-Defendant Claims (Class 14). ................................................................. 68

4.17    Other Subordinated Claims (Class 15). ....................................................... 69

4.18    PPLP Interests (Class 16). ........................................................................... 69

4.19    PPI Interests (Class 17). ............................................................................... 69

4.20    Intercompany Interests (Class 18). .............................................................. 69

4.21    Debtors' Rights with Respect to Unimpaired Claims. ................................. 70

ARTICLE V        MEANS FOR IMPLEMENTATION. ............................................................ 70

5.1     Restructuring Transactions .......................................................................... 70

5.2     Plan Settlements ........................................................................................... 70

5.3     The Plan Administration Trust ..................................................................... 88

5.4     NewCo .......................................................................................................... 92

5.5     Foundation .................................................................................................... 95

5.6     Master Disbursement Trust .......................................................................... 96

5.7     Special Operating Reserve; Released Claims Reserves ............................. 104

5.8     Creditor Trusts ........................................................................................... 108

5.9     Attorneys' Fees and Costs .......................................................................... 114

5.10    Transferability of Distribution Rights ........................................................ 121

5.11    Insurance Neutrality ................................................................................... 121

5.12    Transfer of Books and Records; Cooperation; Privilege ........................... 121

5.13    Public Document Repository ...................................................................... 123

5.14    Effective Date Cash; Surplus Reserved Cash ............................................ 136

5.15    Corporate Action ........................................................................................ 137

5.16    Cancellation of Notes, Interests, Instruments, Certificates and Other Documents ........ 138

5.17    Closing of Chapter 11 Cases ...................................................................... 138

ARTICLE VI       DISTRIBUTIONS. ....................................................................................... 138

6.1     Distributions Generally .............................................................................. 138

6.2     Distributions on the Effective Date ............................................................ 139

6.3     Date of Distributions .................................................................................. 139

6.4     Disbursing Agent ........................................................................................ 139

6.5     Rights and Powers of Disbursing Agent .................................................... 139

6.6     Expenses of Disbursement Agent ............................................................... 139

6.7     Delivery of Distributions ............................................................................ 140

6.8     Undeliverable and Unclaimed Distributions .............................................. 140

6.9     Distribution Record Date ............................................................................ 140

6.10    Manner of Payment under Plan ................................................................... 140

6.11    Minimum Cash Distributions ........................................................................ 140

6.12    Setoffs and Recoupment ............................................................................. 140

6.13    Claims Paid or Payable by Third Parties .................................................... 141

6.14    Distributions after Effective Date .............................................................. 141

6.15    No Postpetition Interest and Penalties on Claims ...................................... 141

6.16    Allocation of Distributions between Principal and Interest ........................ 141

6.17    No Constructive Receipt ............................................................................. 141

6.18    No Distribution in Excess of Amount of Allowed Claim ............................ 142

6.19    Satisfaction of Claims ................................................................................. 142

6.20    Withholding and Reporting Requirements .................................................. 142

6.21    Post-Confirmation Claims .......................................................................... 143

ARTICLE VII        PROCEDURES FOR NON-PARTICIPATING CHANNELED CLAIMS AND
              OTHER DISPUTED CLAIMS .................................................................... 143

7.1     Procedures for Non-Participating Channeled Claims and other Disputed Claims
        Generally .................................................................................................... 143

7.2     Non-Participating Claims Reserves; PAT Disputed Claims Reserves ........... 143

7.3     Claim Objections ........................................................................................ 146

7.4     No Distribution Pending Allowance ........................................................... 148

7.5     Estimation of Claims .................................................................................. 148

7.6     Resolution of Claims .................................................................................. 148

7.7     Distribution After Allowance ..................................................................... 149

7.8     Disallowance of Non-Participating Channeled Claims and Other Disputed Claims ...... 150

7.9     Allowance of Non-Participating Channeled Claims .................................... 150

7.10    Claims Resolution Procedures Cumulative ................................................. 151

7.11    No Postpetition Interest or Penalties on Non-Participating Channeled Claims and
        other Disputed Claims ................................................................................ 151

7.12    Shareholder Rights Regarding Settlement and Estimation of Claims .......... 151

ARTICLE VIII       EXECUTORY CONTRACTS AND UNEXPIRED LEASES. ............... 152

8.1     Assumption and Rejection of Executory Contracts and Unexpired Leases ... 152

8.2     Determination of Contract Disputes and Deemed Consent ......................... 153

8.3     Payments Related to Assumption of Contracts and Leases ......................... 154

8.4     Co-Defendant Contracts ............................................................................. 154

8.5     Rejection Claims ........................................................................................ 155

8.6     Compensation and Benefit Plans ................................................................ 155

8.7     Purdue Pension Plan ................................................................................... 155

8.8     Insurance Policies ...................................................................................... 156

8.9     Reservation of Rights................................................................................................ 158

ARTICLE IX     CONDITIONS PRECEDENT TO THE OCCURRENCE OF THE EFFECTIVE
DATE. ...................................................................................................................... 158

9.1     Conditions Precedent to Effective Date ................................................................. 158

9.2     Waiver of Conditions Precedent ........................................................................... 160

9.3     Frustration of Conditions Precedent. ..................................................................... 161

ARTICLE X     EFFECT OF CONFIRMATION. .......................................................................... 161

10.1     Binding Effect........................................................................................................ 161

10.2     Discharge of Claims against and Interests in the Debtors ..................................... 161

10.3     Pre-Confirmation Injunctions, Stays, Stipulations and Discovery Orders..................... 161

10.4     Injunction against Interference with Plan .............................................................. 163

10.5     Plan Injunction ...................................................................................................... 163

10.6     Releases ................................................................................................................. 164

10.7     Shareholder Releases ............................................................................................ 168

10.8     Channeling Injunction........................................................................................... 180

10.9     Tolling of Shareholder Released Claims; Violations of Shareholder Releases and
Channeling Injunction........................................................................................... 182

10.10     MDT Insurer Injunction ........................................................................................ 183

10.11     Settling MDT Insurer Injunction .......................................................................... 184

10.12     Exculpation ............................................................................................................ 186

10.13     Injunction Related to Releases and Exculpation................................................... 186

10.14     Subordinated Claims.............................................................................................. 186

10.15     Preservation of Causes of Action and Reservation of Rights ............................... 186

10.16     Ipso Facto and Similar Provisions Ineffective ..................................................... 187

10.17     No Successor Liability ........................................................................................... 187

10.18     Co-Defendant Defensive Rights ........................................................................... 187

10.19     Reinstatement of Certain Shareholder Released Claims................................. 188

10.20     Special Provisions for United States...................................................................... 188

ARTICLE XI     RETENTION OF JURISDICTION........................................................................ 192

11.1     Retention of Jurisdiction ....................................................................................... 192

ARTICLE XII     MISCELLANEOUS PROVISIONS. ..................................................................... 195

12.1     Exemption from Certain Transfer Taxes .............................................................. 195

12.2     Dates of Actions to Implement Plan ..................................................................... 195

12.3     Amendments .......................................................................................................... 196

12.4     Revocation or Withdrawal of Plan........................................................................ 196

12.5      Payment of Statutory Fees ........................................................................................ 197

12.6      Severability .............................................................................................................. 197

12.7      Governing Law ......................................................................................................... 197

12.8      Immediate Binding Effect.......................................................................................... 198

12.9      Successors and Assigns ............................................................................................ 198

12.10    Entire Agreement ...................................................................................................... 198

12.11    Computing Time ....................................................................................................... 198

12.12    Exhibits to Plan ........................................................................................................ 198

12.13    Notices ..................................................................................................................... 198

12.14    Dissolution of the Creditors' Committee ...................................................................... 199

12.15    Reservation of Rights................................................................................................ 199

Each of Purdue Pharma L.P., Purdue Pharma Inc., Purdue Transdermal Technologies L.P., Purdue Pharma Manufacturing L.P., Purdue Pharmaceuticals L.P., Imbrium Therapeutics L.P., Adlon Therapeutics L.P., Greenfield BioVentures L.P., Seven Seas Hill Corp., Ophir Green Corp., Purdue Pharma of Puerto Rico, Purdue Products L.P. (f/k/a Avrio Health L.P.), Purdue Pharmaceutical Products L.P., Purdue Neuroscience Company, Nayatt Cove Lifescience Inc., Button Land L.P., Rhodes Associates L.P., Paul Land Inc., Quidnick Land L.P., Rhodes Pharmaceuticals L.P., Rhodes Technologies, UDF LP, SVC Pharma LP and SVC Pharma Inc. (each, a "*Debtor*" and, collectively, the "*Debtors*" or "*Purdue*") proposes the following thirteenth amended joint chapter 11 plan of reorganization pursuant to section 1121(a) of the Bankruptcy Code. Capitalized terms used herein shall have the meanings set forth in Section 1.1 below.

## ARTICLE I   DEFINITIONS AND INTERPRETATION.

### 1.1   *Definitions*.

The following terms shall have the respective meanings specified below:

"*Access Materials*" has the meaning set forth in Section 5.13(f)(i) of the Plan.

"*Act*" has the meaning set forth in Section 5.2(f)(i)(D) of the Plan.

"*Ad Hoc Committee*" means the ad hoc committee of governmental and other contingent litigation claimants identified in the *Verified Statement Pursuant to Bankruptcy Rule 2019* [D.I. 279], as may be amended from time to time.

"*Ad Hoc Group of Hospitals*" means the Ad Hoc Group of Hospitals identified in the *Second Amended Verified Statement of the Ad Hoc Group of Hospitals Pursuant to Bankruptcy Rule 2019* [D.I. 1536].

"*Ad Hoc Group of Individual Victims*" means the Ad Hoc Group of Individual Victims of Purdue Pharma L.P. identified in the *Second Amended Verified Statement of the Ad Hoc Group of Individual Victims of Purdue Pharma L.P., et al., Pursuant to Bankruptcy Rule 2019* [D.I. 3939], as may be amended from time to time.

"*Adlon General Unsecured Claim*" means any Claim against Adlon Therapeutics L.P. that is not an Administrative Claim, a Priority Claim, a Secured Claim, a Federal Government Unsecured Claim, a Channeled Claim, a Co-Defendant Claim, an Other Subordinated Claim, an Intercompany Claim or a Shareholder Claim.

"*Administrative Claim*" means any Claim against any Debtor for costs and expenses of administration of the Chapter 11 Cases pursuant to section 327, 328, 330, 365, 503(b), 507(a)(2) or 507(b) of the Bankruptcy Code, including (i) the actual and necessary costs and expenses incurred on or after the Petition Date and through the Effective Date of preserving the Estates and operating the Debtors' business, (ii) any Professional Fee Claim, (iii) any fee or charge assessed against the Estates pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code, (iv) any Allowed Claim that is to be treated as an Administrative Claim pursuant to a Final Order of the Bankruptcy Court under section 546(c)(2) of the Bankruptcy Code, (v) once Allowed in accordance with Section 2.3(a) of the Plan, the DOJ Forfeiture Judgment Claim and (vi) any Allowed Cure Claim.

"*Aggregate LG Cost Cap*" has the meaning set forth in Section 5.9(a)(i) of the Plan.

"*Aggregate State Expenses Cap*" has the meaning set forth in Section 5.9(b) of the Plan.

"***AHC Reimbursement Agreement Assumption Order***" means the *Order Authorizing the Debtors to Assume the Reimbursement Agreement and Pay the Fees and Expenses of the Ad Hoc Committee's Professionals* [D.I. 553], as amended or supplemented by the Bankruptcy Court pursuant to D.I. 1617 and D.I. 2190.

"***Allowed***" means (i) any Claim held by a Settling Creditor or a Non-Hospital Healthcare Provider Claim (in each case, whose distribution, if any, shall be subject to and determined in accordance with the Plan and any applicable Creditor Trust Documents), (ii) with respect to any Claim held by a Non-Settling Creditor, such Claim that has been allowed in accordance with the Plan or a Final Order (whose distribution, if any, shall be subject to and determined in accordance with the Plan and any applicable Creditor Trust Documents), (iii) with respect to any Adlon General Unsecured Claim or Avrio General Unsecured Claim, such Claim that is Scheduled as not disputed, contingent or unliquidated, and for which no Proof of Claim or Interest, as applicable, has been timely filed, and (iv) with respect to any Claim (other than a Channeled Claim) against a Debtor, such Claim (A) that is allowed pursuant to the Plan or a Final Order, (B) as to which no objection has been timely filed and that is evidenced by a Proof of Claim timely filed by the applicable Bar Date or that is not required to be evidenced by a filed Proof of Claim under the Plan, the Bankruptcy Code or a Final Order or (C) the amount of which has been agreed, compromised, settled or otherwise resolved pursuant to the authority of the Debtors or the Plan Administration Trustee, as applicable. Except as otherwise specified in the Plan or any Final Order, the amount of an Allowed Claim shall not include interest or other charges on such Claim on and after the Petition Date. No Claim of any Person subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Person pays in full the amount for which it is liable to the applicable Debtor or the Plan Administration Trustee as provided in section 502(d). Correlative terms such as "Allow" and "Allowance" have correlative meanings. For the avoidance of doubt, any Channeled Claim that is Allowed under the Plan shall still be subject to, and shall only receive a distribution pursuant to, the applicable Creditor Trust Documents.

"***Asset***" means, with respect to a Person, all of the right, title and interest of such Person in and to property of whatever type or nature, including real, personal, mixed, intellectual, tangible and intangible property, which, for avoidance of doubt, includes insurance policies and any rights, claims or potential claims with respect thereto.

"***Assumed Liabilities***" means the liabilities of the Debtors assumed by NewCo as expressly set forth in the NewCo Transfer Agreement.

"***Assumption Notice***" means a notice of the assumption or assumption and assignment and any proposed Cure Amount provided to counterparties to executory contracts and unexpired leases pursuant to the Solicitation Procedures Order.

"***Avrio General Unsecured Claim***" means any Claim against Purdue Products L.P. (f/k/a Avrio Health L.P.) that is not an Administrative Claim, a Priority Claim, a Secured Claim, a Federal Government Unsecured Claim, a Channeled Claim, a Co-Defendant Claim, an Other Subordinated Claim, an Intercompany Claim or a Shareholder Claim. "***Bankruptcy Code***" means title 11 of the United States Code, as applicable to the Chapter 11 Cases.

"***Bankruptcy Court***" means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Chapter 11 Cases and, to the extent any reference made under section 157 of title 28 of the United States Code is withdrawn or the Bankruptcy Court is determined not to have authority to enter a Final Order on an issue, the United States District Court for the Southern District of New York.

"***Bankruptcy Rules***" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Cases, and any local rules of the Bankruptcy Court.

"***Bar Date***" means, as applicable, the General Bar Date or any other date established by the Bankruptcy Court as the deadline by which Proofs of Claim or requests for payment of Administrative Claims must be filed.

"***Bar Date Order***" means, collectively, (i) the *Order Establishing (I) Deadlines for Filing Proofs of Claims and Procedures Relating Thereto, (II) Approving the Proof of Claim Forms, and (III) Approving the Form and Manner of Notice Thereof* [D.I. 800] and (ii) the *Order (I) Extending the General Bar Date for a Limited Period and (II) Approving the Form and Manner of Notice Thereof* [D.I. 1221].

"***Benefit Plan***" means any "employee benefit plan" as defined in section 3(3) of ERISA, compensation, employment, consulting, severance, retention or similar plan, agreement, arrangement, program or policy, or other plan, agreement, arrangement, program or policy providing for compensation, bonuses or other forms of incentive compensation, including the Key Employee Plans, vacation benefits, insurance, medical, dental, vision, prescription or fringe benefits, life insurance, perquisites, disability or sick leave benefits or employee assistance program, in each case, that is sponsored, maintained or administered or entered into by the Debtors for the benefit of their respective employees or non-employee directors.

"***Board Consulting Advisor***" means an advisor to identify, evaluate, and recommend candidates for Foundation Trustees, NewCo Managers, and management roles at NewCo on behalf of the Settling States, and, after the Effective Date, to be retained by NewCo, the Foundation, and/or the Master Disbursement Trust to provide such and other consulting services.

"***Breaching Shareholder Family Group***" means a Shareholder Family Group that is in Specified Breach (as defined in the Master Shareholder Settlement Agreement).

"***Business Day***" means any day other than a Saturday, a Sunday or any other day which is a federal holiday.

"***Canadian Patient Claim Settlement Stipulation***" means the *Amended and Restated Stipulation and Order Permitting the Filing of a Class Proof of Claim Solely for Administrative Convenience in Order to Effectuate a Potential Settlement in Respect of Certain Canadian Patient Litigation* [D.I. 1515].

"***Canadian Patient Settlement Agreement***" means the "Patient Settlement Agreement" as defined in the Canadian Patient Claim Settlement Stipulation.

"***Canadian Patient Settlement Trust***" means the "Settlement Trust" as defined in the Canadian Patient Claim Settlement Stipulation.

"***Case Stipulation***" means the *Amended and Restated Case Stipulation Among the Debtors, the Official Committee of Unsecured Creditors and Certain Related Parties* [D.I. 518], including any predecessors thereto.

"***Cash***" means all legal tender of the United States of America.

"**Cause of Action**" means any Claim, action, class action, claim, cross-claim, counterclaim, third-party claim, cause of action, controversy, dispute, demand, right, Lien, indemnity, contribution, rights of subrogation, reimbursement, guaranty, suit, obligation, liability, debt, damage, judgment, loss, cost, attorneys' fees and expenses, account, defense, remedy, offset, power, privilege, license or franchise, in each case, of any kind, character or nature whatsoever, asserted or unasserted, accrued or unaccrued, known or unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, foreseen or unforeseen, direct or indirect, choate or inchoate, secured or unsecured, allowable or disallowable, Allowed or Disallowed, assertible directly or derivatively (including, without limitation, under alter-ego theories), in rem, quasi in rem, in personam or otherwise, whether arising before, on or after the Petition Date, arising under federal or state statutory or common law, or any other applicable international, foreign or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, in contract or in tort, at law, in equity or pursuant to any other theory or principle of law, including fraud, negligence, gross negligence, recklessness, reckless disregard, deliberate ignorance, public or private nuisance, breach of fiduciary duty, avoidance, willful misconduct, veil piercing, alter ego, unjust enrichment, disgorgement, restitution, contribution, indemnification, rights of subrogation and joint liability, regardless of where in the world accrued or arising.  For the avoidance of doubt, "Cause of Action" expressly includes (i) any Cause of Action held by a natural person who is not yet born or who has not yet attained majority as of the Petition Date or as of the Effective Date, (ii) any right of setoff, counterclaim or recoupment and any Cause of Action for breach of contract or for breach of duty imposed by law or in equity, (iii) the right to object to or otherwise contest Claims or Interests, (iv) any Cause of Action pursuant to section 362 of the Bankruptcy Code or chapter 5 of the Bankruptcy Code, (v) any claim or defense, including fraud, mistake, duress and usury and any other defense set forth in section 558 of the Bankruptcy Code, and (vi) any claim under any state or foreign law, including for the recovery of any fraudulent transfer or similar theory.

"**Channeled Claims**" means, collectively, all Non-Federal Domestic Governmental Channeled Claims, Tribe Channeled Claims, Public School Channeled Claims, Healthcare Provider Channeled Claims, Third-Party Payor Channeled Claims, ER Physician Channeled Claims, and PI Channeled Claims.

"**Channeling Injunction**" means the channeling injunction issued pursuant to <u>Section 10.8</u> of the Plan.

"**Chapter 11 Cases**" means the cases under chapter 11 of the Bankruptcy Code commenced by the Debtors on or after the Petition Date (and not otherwise dismissed), currently pending in the Bankruptcy Court that are jointly administered in the case styled *In re Purdue Pharma L.P.*, Case No. 19-23649 (SHL).

"**Civil Settlement Agreement**" means that certain civil settlement agreement attached as Exhibit C to the DOJ 9019 Motion, as approved and modified by the DOJ 9019 Order, by and among Purdue Pharma L.P. and the United States, acting through the United States Department of Justice, Civil Division, Commercial Litigation Branch, the United States Attorney's Office for the District of New Jersey, the United States Attorney's Office for the District of Vermont, and on behalf of the Office of Inspector General of the United States Department of Health and Human Services, the Defense Health Agency, acting on behalf of the TRICARE Program, 10 U.S.C. §§ 1071-1110b, and the Office of Personnel Management.

"**Claim**" has the meaning set forth in section 101(5) of the Bankruptcy Code. For the avoidance of doubt, unless otherwise indicated herein, "Claim" shall not be limited to Claims against the Debtors or to Claims for which a Proof of Claim was submitted.

"***Claim-Over***" means a Cause of Action asserted by a Non-Released Party against a Shareholder Released Party or a Released Party on the basis of contribution, indemnity, or other claim-over on any theory relating to a Non-Party Covered Conduct Claim asserted by a Releasing Party.

"***Claims Reserves***" means, collectively, (i) PAT Disputed Claims Reserves, and (ii) Creditor Trust Non-Participating Claims Reserves.

"***Class***" means any group of Claims or Interests classified under this Plan pursuant to section 1122(a) of the Bankruptcy Code.

"***Class 4 Non-Participating Claims Reserves***" means the Creditor Trust Non-Participating Claims Reserves established in respect of Non-Participating Non-Federal Domestic Governmental Channeled Claims.

"***Class 4 Released Claims Reserve***" means the Released Claims Reserve established in respect of Non-Participating Non-Federal Domestic Governmental Channeled Claims.

"***Class 4 Non-PRA Non-Participating Claims Reserve***" means the Creditor Trust Non-PRA Non-Participating Claims Reserve held and administered by the Governmental Remediation Trust.

"***Class 4 PRA Non-Participating Claims Reserve***" means the Creditor Trust PRA Non-Participating Claims Reserve held and administered by the Governmental Remediation Trust.

"***Class 5 Non-Participating Claims Reserves***" means the Creditor Trust Non-Participating Claims Reserves established in respect of Non-Participating Tribe Claims.

"***Class 5 Released Claims Reserve***" means the Released Claims Reserve established in respect of Non-Participating Tribe Claims.

"***Class 6 Non-Participating Claims Reserve***" means the Creditor Trust Non-Participating Claims Reserve established in respect of Non-Participating Public School Claims.

"***Class 6 Released Claims Reserve***" means the Released Claims Reserve established in respect of Non-Participating Public School Claims.

"***Class 7 Non-Participating Claims Reserve***" means the Creditor Trust Non-Participating Claims Reserve established in respect of Non-Participating Healthcare Provider Claims.

"***Class 7 Released Claims Reserve***" means the Released Claims Reserve established in respect of Non-Participating Healthcare Provider Claims.

"***Class 8 Non-Participating Claims Reserve***" means the Creditor Trust Non-Participating Claims Reserve established in respect of Non-Participating Third-Party Payor Claims.

"***Class 8 Released Claims Reserve***" means the Released Claims Reserve established in respect of Non-Participating Third-Party Payor Claims.

"***Class 9 Non-Participating Claims Reserve***" means the Creditor Trust Non-Participating Claims Reserve established in respect of Non-Participating ER Physician Claims.

"***Class 9 Released Claims Reserve***" means the Released Claims Reserve established in respect of Non-Participating ER Physician Claims.

"***Class 10(a) Non-Participating Claims Reserve***" means the Creditor Trust Non-Participating Claims Reserve established in respect of Non-Participating NAS PI Claims.

"***Class 10(a) Released Claims Reserve***" means the Released Claims Reserve established in respect of Non-Participating NAS PI Claims.

"***Class 10(b) Non-Participating Claims Reserves***" means the Creditor Trust Non-Participating Claims Reserves established in respect of Non-Participating Non-NAS PI Claims.

"***Class 10(b) Released Claims Reserve***" means the Released Claims Reserve established in respect of Non-Participating Non-NAS PI Claims.

"***Class Action Escrow Accounts***" has the meaning set forth in <u>Section 5.2(e)(ii)</u> of the Plan.

"***Co-Defendant***" means any co-defendant in a Pending Opioid Action commenced as of the Effective Date, in each case, other than (x) the Debtors and their current and former officers, directors, authorized agents and employees and (y) the Shareholder Released Parties.

"***Co-Defendant Action***" means any Pending Opioid Action and any previous, pending, or future litigation or dispute that alleges substantially similar facts or causes of action as those alleged in the Pending Opioid Actions and that concerns conduct occurring before the Effective Date.

"***Co-Defendant Claim***" means any Claim, other than a Claim held by an Insurance Company, that (i) either (A) is or could be asserted against any Debtor, including without limitation any Claim that would otherwise be a Cure Claim or (B) seeks to recover from any property of any Debtor or its Estate, including any MDT Insurance Policy, (ii) is for or based upon or arises from contribution, indemnification, reimbursement, setoff or recoupment or any other similar claim or Cause of Action, and (iii) seeks to recover, directly or indirectly, any costs, losses, damages, fees, expenses or any other amounts whatsoever, actually or potentially imposed upon the Holder of such Claim, in each case relating to or arising from any actual or potential litigation or dispute, whether accrued or unaccrued, asserted or unasserted, existing or hereinafter arising, based on or relating to, or in any manner arising from, in whole or in part, Opioid-Related Activities or otherwise relating to opioids (including, without limitation, any such Claims asserted by any manufacturer, distributor, pharmacy, pharmacy-benefit manager, group purchasing organization or physician or other contract counterparty or business partner of any Debtor), in each case that is not a Shareholder Claim or a Claim held by any current or former director, officer, employee or agent of the Debtors. For the avoidance of doubt, a Co-Defendant Claim shall not include any Co-Defendant Surviving Pre-Effective Date Claim. Notwithstanding anything to the contrary outside of this definition in the Plan, any Claim that satisfies the definition of a Co-Defendant Claim shall be a Co-Defendant Claim notwithstanding that such Claim would otherwise satisfy the definition of another type of Claim. For the avoidance of doubt, Co-Defendant Claim includes a Claim that is held by an insurance company in its capacity as subrogee of a Holder of a Co-Defendant Claim.

"***Co-Defendant Defensive Rights***" means any and all direct, or indirect, protections, immunities, objections, assertions, Causes of Action and, in each case, of any kind, character or nature, whether legal, equitable or contractual, contingent or non-contingent, liquidated or unliquidated, disputed or undisputed, including, without limitation, all rights, remedies, defenses, assertions and Claims against liability, rights to setoff, offset, recoupment, counter-claims, cross-claims, rights to allocation or apportionment of fault and judgment reduction, apportionment of damages, any other defenses, affirmative defenses or judgment reduction mechanisms or rights similar to the foregoing, and any steps necessary to assert the foregoing, in each case, solely to reduce the liability, judgment, obligation or fault of the applicable Holder of a Co-Defendant Claim to any Person that asserts any Cause of Action against such Holder of any Co-Defendant Claim based in whole or in part on Opioid-Related Activities. Co-Defendant

Defensive Rights (i) may be used to offset, set-off, recoup, allocate or apportion fault, liability or damages, or seek judgment reduction or otherwise defend against any Cause of Action brought by any Person against the Holder of any Co-Defendant Claim based in whole or in part on Opioid-Related Activities and (ii) shall in no case be used to seek or obtain any affirmative monetary recovery from any Protected Party or any Asset of any Protected Party (including from any Purdue Insurance Policy or any other insurance policy of a Protected Party) on account of any Released Claim or Shareholder Released Claim.

"***Co-Defendant Surviving Pre-Effective Date Claim***" means any Cause of Action held by a Co-Defendant that (i) arose in the ordinary course of business, (ii) is not related to a Co-Defendant Action, and (iii) concerns conduct occurring before the Effective Date.

"***Common Benefit Fund***" has the meaning set forth in Section 5.9(d) of the Plan.

"***Confirmation Date***" means the date on which the Bankruptcy Court enters the Confirmation Order.

"***Confirmation Hearing***" means the hearing to be held by the Bankruptcy Court regarding confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

"***Confirmation Order***" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code and approving the Plan Settlement, which shall be in form and substance acceptable to the Debtors, and reasonably acceptable to the Creditors' Committee and the Governmental Consent Parties.

"***Contract Dispute***" means an unresolved objection regarding assumption or assumption and assignment, Cure Amount, "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) or other issues related to assumption or assumption and assignment of an executory contract or unexpired lease.

"***Covered Conduct***" means any actual or alleged act, failure to act, negligence, statement, error, omission, breach of any duty, conduct, event, transaction, agreement, misstatement, misleading statement, or other activity of any kind whatsoever from the beginning of time through the Effective Date (and any past, present, or future consequence of any such act, failure to act, negligence, statement, error, omission, breach of duty, conduct, event, transaction, agreement, misstatement, misleading statement, or other activity) relating in any way to (1) compounding, counseling or documentation relating to any Product or class of Products; (2) the discovery, development, manufacture, packaging, repackaging, marketing, promotion, advertising, labeling, recall, withdrawal, distribution, delivery, monitoring, reporting, supply, sale, prescribing, dispensing, physical security, warehousing, use or abuse of, or operating procedures relating to, any Product, or any system, plan, policy or advocacy relating to any Product or class of Products, including, but not limited to, any unbranded promotion, marketing, programs, or campaigns relating to any Product or class of Products; (3) the characteristics, properties, risks, or benefits of any Product; (4) the reporting, disclosure, non-reporting or nondisclosure to federal, state or other regulators of orders placed with any Shareholder Released Parties or physicians or pharmacists identified by any Shareholder Released Party as potentially engaging in suspicious or problematic conduct; or (5) diversion control programs or suspicious order monitoring.

"***Creditor Trust***" means (i) with respect to Non-Federal Domestic Governmental Channeled Claims, the Governmental Remediation Trust, (ii) with respect to Tribe Channeled Claims, the Tribe Trust, (iii) with respect to Healthcare Provider Channeled Claims, the Healthcare Provider Trust, (iv) with respect to ER Physician Channeled Claims, the ERP Trust, (v) with respect to Public School Channeled Claims, the Public School Trust, (vi) with respect to Third-Party Payor Channeled Claims, the TPP Trust, and (vii) with respect to PI Channeled Claims, the PI Trust.

"***Creditor Trust Advance Amount***" means, with respect to each Creditor Trust, a reduction in Distributions equal to amounts advanced to such Creditor Trust prior to the Effective Date pursuant to the Creditor Trust Establishment Order.

"***Creditor Trust Establishment Order***" means the *Order (I) Authorizing the Debtors to Fund Establishment of the Creditor Trusts, the Master Disbursement Trust and Topco, (II) Directing Prime Clerk LLC to Release Certain Protected Information, and (III) Granting Other Related Relief* [D.I. 3773].

"***Creditor Trust Non-Participating Claims Reserves***" means the (i) Creditor Trust Non-PRA Non-Participating Claims Reserves, (ii) Creditor Trust PRA Non-Participating Claims Reserves and (iii) Select Private Creditor Trust Non-Participating Claims Reserves. "***Creditor Trust Non-PRA Non-Participating Claims Reserves***" means segregated accounts established pursuant to Section 7.2 of this Plan for each of Classes 4, 5 and 10(b), in each case held and administered on and after the Effective Date by the applicable Creditor Trust of such Class. Each Creditor Trust Non-PRA Non-Participating Claims Reserve shall be funded with Non-PRA Estate Distributions in accordance with Sections 7.2(c) and (d) of this Plan, as applicable.

"***Creditor Trust PRA Non-Participating Claims Reserves***" means segregated accounts established pursuant to Section 7.2 of this Plan for each of Classes 4, 5 and 10(b), in each case held and administered on and after the Effective Date by the applicable Creditor Trust of such Class. Each Creditor Trust PRA Non-Participating Claims Reserve shall be funded with PRA Estate Distributions in accordance with Sections 7.2(c) and (d) of this Plan, as applicable.

"***Creditor Trust Documents***"  means, collectively, the Governmental Remediation Trust Documents, the Tribe Trust Documents, the Public School Trust Documents, the Healthcare Provider Trust Documents, the ERP Trust Documents, the TPP Trust Documents and the PI Trust Documents.

"***Creditor Trust Operating Expenses***" means, with respect to each Creditor Trust, any and all costs, expenses, fees, taxes, disbursements, debts or obligations incurred from the operation and administration of such Creditor Trust, including in connection with the reconciliation and administration of the Channeled Claims channeled to such Creditor Trust, working capital and all compensation, costs and fees of the Creditor Trustees of such Creditor Trust and any professionals retained by such Creditor Trustees.

"***Creditor Trust Operating Reserves***" means the reserves to be established to pay the Creditor Trust Operating Expenses of the respective Creditor Trusts, as and to the extent set forth in the Creditor Trust Documents. The Creditor Trust Operating Reserves shall be (i) funded with Cash and cash equivalents held by the respective Creditor Trusts in accordance with the respective Creditor Trust Documents and (ii) held by the respective Creditor Trusts in a segregated account and administered by the respective Creditor Trustees.

"***Creditor Trust Overseer(s)***" means, with respect to each Creditor Trust, the Person(s) responsible for the administration of such Creditor Trust or advisory or oversight committee member(s), as applicable, for such Creditor Trust, in each case, appointed in accordance with Section 5.8(c) of the Plan and the Creditor Trust Documents for such Creditor Trust.

"***Creditor Trust TDPs***" means, collectively or as applicable, the Governmental Remediation Trust Documents, the Tribe TDP, the Healthcare Provider TDP, the Public School TDP, the ERP TDP, the TPP TDP, and the PI TDP.

"***Creditor Trustee(s)***" means each trustee of a Creditor Trust or, collectively, the trustees of the Creditor Trusts, in each case, appointed in accordance with Section 5.8(c) of the Plan, including the Governmental Remediation Trust Trustees.

"***Creditors' Committee***" means the statutory committee of unsecured creditors appointed by the U.S. Trustee on September 27, 2019 pursuant to section 1102(a)(1) of the Bankruptcy Code.

"***Cure Amount***" means the payment of Cash or the distribution of other property (as the parties may agree or the Bankruptcy Court may order) as necessary to (i) cure a monetary default by the Debtors in accordance with the terms of an executory contract or unexpired lease of the Debtors, and (ii) permit the Debtors to assume such executory contract or unexpired lease under section 365(a) of the Bankruptcy Code.

"***Cure Claim***" means a Claim for a Cure Amount in connection with the assumption or assumption and assignment of an executory contract or unexpired lease under section 365(a) of the Bankruptcy Code.

"***Cutoff Date***" has the meaning set forth in Section 5.13(i)(i) of the Plan.

"***D&O Insurance Policies***" means all directors and officers/executive liability insurance policies (including extension of coverage of any policy beyond the end of the policy period) issued to or providing insurance coverage at any time to any of the Debtors' directors, officers, managers or authorized agents, in their respective capacities as such, for alleged Wrongful Acts (as defined in such policies) or similar triggering acts, and all agreements, documents or instruments relating thereto.

"***Debtor(s)***" has the meaning set forth in the introductory paragraph of the Plan.

"***Debtor Party***" means any Debtor, Estate, transferee of any Cause of Action held at any time by any Debtor or Estate, or any Person prosecuting any such Cause of Action on behalf of any Debtor or Estate.

"***Defense Counsel***" has the meaning set forth in Section 5.13(s)(v) of the Plan.

"***Definitive Documents***" has the meaning set forth in the Master Shareholder Settlement Agreement.

"***Designated Shareholder Released Parties***" has the meaning set forth in the Master Shareholder Settlement Agreement.

"***Direct Claims Shareholder Settlements***" means the Governmental Entity Shareholder Direct Settlement, the Tribal Shareholder Direct Settlement, the Public School District Shareholder Direct Settlement, the Third-Party Payor Shareholder Direct Settlement, the ER Physician Shareholder Direct Settlement, the Hospital Shareholder Direct Settlement, the PI Shareholder Direct Settlements and any other settlements that contemplate releases similar to the foregoing that are entered into by and among the Shareholder Payment Parties and Holders of Claims, if applicable.

"***Direct Claims Shareholder Settlement Agreements***" means, collectively, the (i) Governmental Entity Shareholder Direct Settlement Agreement, (ii) Tribal Shareholder Direct Settlement Agreement, (iii) ER Physician Shareholder Direct Settlement Agreement, (iv) Hospital Shareholder Direct Settlement Agreement, and (v) Public School District Shareholder Direct Settlement Agreement.

"***Direct Claim Settlement Retained Payment Amounts***" shall mean:

(a)    with respect to each Direct Claims Shareholder Settlement other than the Third-Party Payor Shareholder Direct Settlement and the PI Shareholder Direct Settlements and at the relevant time, (i) the maximum amounts payable pursuant to the applicable Direct Claims Shareholder Settlement Agreement *less* (ii) amounts actually paid pursuant to the applicable Direct Claims Shareholder Settlement Agreement, in each case as set forth in the applicable Direct Claims Shareholder Settlement Agreement;

(b)    with respect to the Third-Party Payor Shareholder Direct Settlement, the TPP Direct Claim Settlement Retained Payment Amount; and

(c)    with respect to the PI Shareholder Direct Settlements, the NAS PI Direct Claim Settlement Retained Payment Amount and Non-NAS PI Direct Claim Settlement Retained Payment Amount.

"***Direct Settlement Eligible NAS PI Claims***" means NAS PI Claims held by Holders that timely filed Proofs of Claim that either (i) satisfy the requirements of the NAS PI TDP, including by such Holders having (a) submitted their NAS PI Trust Claim Form (as defined in the PI and TPP Claims Procedures Order) by the deadline set forth in the PI and TPP Claims Procedures Order, and (b) in the determination of the PI Claims Administrator (as defined in the PI and TPP Claims Procedures Order), provided sufficient information substantiating their asserted NAS PI Claims, or (ii) are Allowed pursuant to a Final Order on or prior to the Effective Date.

"***Direct Settlement Eligible Non-NAS PI Claims***" means Non-NAS PI Claims held by Holders that timely filed Proofs of Claim that either (i) satisfy the requirements of the Non-NAS PI TDP, including by such Holders having (a) submitted their Non-NAS PI Trust Claim Form (as defined in the PI and TPP Claims Procedures Order) by the deadline set forth in the PI and TPP Claims Procedures Order, and (b) in the determination of the PI Claims Administrator (as defined in the PI and TPP Claims Procedures Order), provided sufficient information substantiating their asserted Non-NAS PI Claims, or (ii) are Allowed pursuant to a Final Order on or prior to the Effective Date.

"***Direct Settlement Eligible TPP Claims***" means Third-Party Payor Claims held by Holders that timely filed or were included in timely filed Proofs of Claim, and any amendments thereto. "***Disallowed***" means (i) with respect to a Channeled Claim, or any portion thereof, such Channeled Claim that has been disallowed by a Final Order or pursuant to a settlement, and (ii) with respect to any Claim against a Debtor (other than a Channeled Claim), such Claim, or any portion thereof, that (A) has been disallowed under this Plan, by a Final Order or pursuant to a settlement, (B) is Scheduled at zero dollars ($0) or as contingent, disputed or unliquidated and as to which a Bar Date has been established but no Proof of Claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court, including the Bar Date Order, or otherwise deemed timely filed under applicable law, or (C) is not Scheduled and as to which a Bar Date has been established but no Proof of Claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely filed under applicable law. Correlative terms such as "Disallow", and "Disallowance" have correlative meanings.

"***Disallowed Claim Distribution***" shall have the meaning set forth in Section 7.8 of this Plan.

"***Disbursing Agent***" means any Person in its capacity as disbursing agent under <u>Article VI</u> of the Plan, including the Plan Administration Trustee acting in such a capacity to make Distributions in respect of Allowed Claims, other than Channeled Claims, pursuant to the Plan.

"***Disclosure Program Budget***" has the meaning set forth in <u>Section 5.13(e)</u> of the Plan.

"***Disclosure Statement***" means the disclosure statement for this Plan, as may be amended or supplemented from time to time, prepared and distributed in accordance with sections 1125, 1126(b) and 1145 of the Bankruptcy Code, Bankruptcy Rules 3016 and 3018 and other applicable law, and all exhibits, appendices, schedules, supplements, modifications, amendments, annexes and attachments to such disclosure statement.

"***Disposition Event***" has the meaning set forth in <u>Section 5.4(d)(ii)</u> of the Plan.

"***Disputed***" means, with respect to a Claim against a Debtor, a Claim that is not yet Allowed or Disallowed, regardless of whether such Claim is the subject of an objection.

"***Disputed Cure Claim***" means the amount that a counterparty to a Contract Dispute alleges must be paid in order for an executory contract or unexpired lease to be assumed or assumed and assigned as provided under the Plan.

"***Disputed Cure Claims Reserve***" means a reserve established to pay the aggregate amount of Disputed Cure Claims or such lower amount as ordered by the Bankruptcy Court or agreed to by the parties to the applicable executory contract or unexpired lease. The Disputed Cure Claims Reserve shall be (i) funded on the Effective Date with Effective Date Cash in an amount determined by the Debtors, and reasonably acceptable to the Creditors' Committee and the Governmental Consent Parties and (ii) held by the Plan Administration Trust in a segregated account and administered by the Plan Administration Trustee on and after the Effective Date in a manner consistent with the Master Shareholder Settlement Agreement.

"***Distribution***" means any initial or periodic payment or transfer of consideration in respect of Allowed Claims or Channeled Claims made under this Plan (including any amounts funded under any Direct Claims Shareholder Settlement Agreement); *provided* that all Distributions to Holders in respect of Channeled Claims shall be exclusively from the applicable Creditor Trust or Sub-Qualified Settlement Fund in accordance with the applicable Creditor Trust Documents.

"***Distribution Record Date***" means the record date for purposes of making Distributions under the Plan on account of Allowed Claims, which date shall be the Effective Date.

"***DOB***" means the volunteer disclosure oversight board created in accordance with <u>Section 5.13(c)</u> of the Plan.

"***DOJ***" means the United States Department of Justice.

"***DOJ 9019 Motion***" means the *Motion of Debtors Pursuant to 11 U.S.C. § 105 and Fed. R. Bankr. P. 9019 Authorizing and Approving Settlements Between the Debtor and the United States* [D.I. 1828].

"***DOJ 9019 Order***" means the *Order Pursuant to 11 U.S.C. § 105 and Fed. R. Bankr. P. 9019 Authorizing and Approving Settlements Between the Debtors and the United States* [D.I. 2004].

"***DOJ Civil Claim***" means the "Civil Claim" as defined in the DOJ 9019 Order in the amount of $2.8 billion.

"***DOJ Conviction Judgment Date***" means the date on which the United States District Court for the District of New Jersey enters a judgment of conviction pursuant to the Plea Agreement and the DOJ 9019 Order.

"***DOJ Criminal Fine Claim***" means the "Criminal Fine Claim" as defined in the DOJ 9019 Order in the amount of $3.544 billion.

"***DOJ Forfeiture Judgment Claim***" means the "Forfeiture Judgment" as defined in the DOJ 9019 Order in the amount of $2 billion.

"***DOJ Forfeiture Judgment Credit***" means the amount of value distributed or otherwise conferred by the Debtors in respect of Non-Federal Domestic Governmental Claims and Tribe Claims, which shall be credited against the DOJ Forfeiture Judgment Claim pursuant to the Plan and the Plea Agreement, it being understood and agreed that (i) the amount so credited shall not exceed $1.775 billion, and (ii) the Confirmation Order shall include a finding that the amount of value distributed or otherwise conferred by the Debtors in respect of Non-Federal Domestic Governmental Claims and Tribe Claims exceeds $1.775 billion.

"***DOJ Forfeiture Payment***" means a payment of $225 million in Cash by PPLP to the United States Marshals in accordance with the Plan, the Plea Agreement and the DOJ 9019 Order.

"***DOJ Repository Obligation***" has the meaning set forth in Section 5.13(b) of the Plan.

"***DOJ Resolution***" means the Plea Agreement and the Civil Settlement Agreement, including the settlements contemplated therein and the other terms and conditions thereof.

"***DOJ Unsecured Claims***" means the DOJ Civil Claim and the DOJ Criminal Fine Claim.

"***Domestic Governmental Entity***" means the United States or any State, county, municipality, Tribe, or other Governmental Unit within the United States, or an officer of any of the foregoing in his or her official capacity. For the avoidance of doubt, Domestic Governmental Entity shall include the organizations listed on Exhibit B of the Plan but shall not include (a) any Non-Federal Acute Care Hospitals, (b) any elementary, middle, or secondary public school district in the United States, (c) California health districts acting as Third-Party Payors that filed Third-Party Payor Proofs of Claim in such capacity by the Bar Date established by the Bar Date Order, or (d) any hospitals listed on Exhibit A of the Plan.

"***Effective Date***" means the date selected by the Debtors for the consummation of the Plan, or as soon thereafter as reasonably practicable.

"***Effective Date Cash***" means, collectively all Cash and cash equivalents of the Debtors (including all amounts paid on the Effective Date directly to, or pursuant to direction from, the MDT under the Shareholder Settlement Agreements) on the Effective Date prior to the making of any payments by the Debtors or the MDT, as applicable, in accordance with the Restructuring Transactions, excluding any Cash and cash equivalents (i) in the form of security deposits, (ii) that collateralize any obligations of the Debtors or (iii) that are otherwise subject to any legal, contractual or other restriction on the ability to freely transfer such Cash or cash equivalents.

"***EMTALA***" means the Emergency Medical Treatment & Labor Act, 42 U.S.C. § 1395dd.

"***Entity***" has the meaning set forth in section 101(15) of the Bankruptcy Code.

"*ER Physician*" means an emergency room physician, in its capacity as such.

"*ER Physician Channeled Claim*" means (i) any ER Physician Claim or (ii) any Claim held by an ER Physician that is released pursuant to the ER Physician Shareholder Direct Settlement Agreement. ER Physician Channeled Claims shall be channeled to the ERP Trust in accordance with the Plan and Master TDP.

"*ER Physician Claims*" means any Claim against any Debtor that is held by an ER Physician, provided that such Claim arose when such ER Physician's billing and revenue collection were entirely separate from the billing and revenue collection practices of the medical facility at which such ER Physician practiced, and such ER Physician was not employed by such medical facility.

"*ER Physician Shareholder Direct Settlement*" means the settlement set forth in the ER Physician Shareholder Direct Settlement Agreement.

"*ER Physician Shareholder Direct Settlement Agreement*" means the settlement agreement substantially in the form attached as Exhibit D to the *Notice of Filing of Certain Direct Claims Shareholder Settlement Agreements* [D.I. 7878].

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended. 29 U.S.C. §§ 1301-1461.

"*ERP TDP*" means the trust distribution procedures to be implemented by the ERP Trust setting forth the procedures for Distributions from the ERP Trust, the terms of which shall be consistent with Articles I through XII of the Plan and otherwise acceptable to the Debtors and the ERP Trustee, and reasonably acceptable to the Creditors' Committee and the Governmental Consent Parties, and which shall be filed by the Debtors with the Plan Supplement.

"*ERP Trust*" means the trust to be established in accordance with Section 5.8 of the Plan to (i) assume all liability for the ER Physician Channeled Claims, (ii) collect the Initial ERP Trust Distribution and additional payments due under the MDT ERP Claim in accordance with the Private Entity Settlements and the ERP Trust Documents, (iii) administer ER Physician Channeled Claims, (iv) hold and administer the Class 9 Non-Participating Claims Reserve on and after the Effective Date, (v) hold the Class 9 Released Claims Reserve on and after the Effective Date and (vi) make Distributions in accordance with the ERP TDP.

"*ERP Trust Agreement*" means the trust agreement establishing and delineating the terms and conditions for the creation and operation of the ERP Trust, the terms of which shall be consistent with Articles I through XII of the Plan and otherwise acceptable to the Debtors and the ERP Trustee, and reasonably acceptable to the Creditors' Committee and the Governmental Consent Parties, and which shall be filed by the Debtors with the Plan Supplement.

"*ERP Trust Documents*" means the ERP Trust Agreement and the ERP TDP.

"*ERP Trustee*" means Dr. Michael Masiowski, or such successor(s) as may be appointed pursuant to the terms of the ERP Trust Documents.

"*Estate(s)*" means, individually or collectively, the estate or estates of the Debtors created under section 541 of the Bankruptcy Code.

"*Estate Causes of Action*" means, in each case whether or not asserted, any and all Causes of Action that any Debtor or its Estate may have, hold, or control, or be entitled to assert, or that any Person

may be entitled to assert, currently or in the future, by, through, under, or on behalf of any Debtor or its Estate, and each of their respective successors or assigns, including, without limitation, any and all Causes of Action that: (i) were included in the proposed complaint filed by the Creditors' Committee [D.I. 6685-2]; (ii) seek to avoid or recover any transfer of property or value by any Debtor or its Estate, or to avoid any obligation incurred by any Debtor or its Estate, including on a theory of fraudulent transfer, fraudulent conveyance, preference, turnover, unjust enrichment, constructive trust, or conversion; (iii) arise from an injury suffered by a Debtor, including Causes of Action arising from a breach of fiduciary duty, mismanagement, corporate waste, or similar theories arising out of a Person's ownership, management, oversight, operation, status, tenure, conduct, omission, liability, action, or inaction at any time as a stockholder, affiliate, owner, partner, member, manager, director, officer, employee, servant, agent, representative, attorney, creditor, successor, assign, or other relationship with a Debtor or any of its predecessors; (iv) arise from disregarding the separateness of any Debtor or its Estate or imputing the liability of any Debtor or its Estate to another Person, including on a theory of successor liability, vicarious liability, respondeat superior, alter ego, veil piercing, agency, control person liability, or joint venture; (v) arise from a common injury that (a) could be asserted by creditors of a Debtor or its Estate or (b) arises from a breach of duty owed to a Debtor or its Estate; (vi) are property of any Debtor or its Estate or can be asserted, settled, or released by any Debtor or its Estate under the Bankruptcy Code or other applicable law; or (vii) are other derivative claims duplicative of any of the foregoing. Estate Causes of Action shall not include any Cause of Action arising from a breach by a non-Debtor of a legally cognizable duty or statutory prohibition – including not to engage personally in fraud, misrepresentation, or misconduct that causes a nuisance, in each case under consumer protection laws and like regulatory laws or statutes (such as UDAP laws) or the common law – which duty or statutory obligation is owed by such non-Debtor directly to the Person asserting such Cause of Action (or to the citizenry on whose behalf such Person is charged to act), where the injury caused by such breach is particular to the Person asserting such Cause of Action (or the citizenry on whose behalf such Person is charged to act) and is not an injury common to creditors of the Debtor or its Estate.

"***Estate Distributions***" means, with respect to the Distributions to each Class, all Distributions other than such Class's Shareholder Direct Settlement Portion. For the avoidance of doubt, any amounts received by the Governmental Remediation Trust or the Tribe Trust from the IAC Sale Bonus Payment shall constitute Estate Distributions.

"***Estate Releases***" means the releases provided for in Section 10.6 of the Plan.

"***Estate Surviving Pre-Effective Date Claim***" means any Estate Cause of Action against a Co-Defendant that (i) arose in the ordinary course of business, (ii) is not related to a Co-Defendant Action, and (iii) concerns conduct occurring before the Effective Date.

"***Estimated Retained Payment Amount***" has the meaning set forth in Section 5.2(e)(i) herein.

"***Excluded Assets***" means (i) all Effective Date Cash other than the Initial NewCo Cash and (ii) any other Assets of the Debtors excluded from the transfer to NewCo pursuant to the NewCo Transfer Agreement, including without limitation all MDT Transferred Assets and all PAT Assets.

"***Excluded Claim***" means (i) any criminal action or criminal proceeding arising under a criminal provision of any statute instituted (A) by a Domestic Governmental Entity that has authority to bring such a criminal action or criminal proceeding, and (B) to adjudicate a person's guilt or to set a convicted person's punishment; (ii) any Cause of Action against a non-Debtor Person by any federal, state or local authority with respect to taxes (other than tax laws targeting Covered Conduct ) imposed on such non-Debtor Person; (iii) any Estate Cause of Action or any Cause of Action held by a Releasing Party

against an Excluded Party; (iv) any Cause of Action against any Person to the extent based on the actual conduct of such Person after the Effective Date; (v) any Cause of Action against persons or entities who are not Released Parties or Shareholder Released Parties; (vi) any claim arising under the Plan for enforcement of the Plan; or (vii) any Cause of Action (including, without limitation, any such Cause of Action held by holders of Settled Canadian Patient Claims or by other Canadians) against any non-Debtor Person (including, without limitation, Purdue Pharma, a Canadian limited partnership, Purdue Pharma Inc., a Canadian corporation and/or Purdue Frederick Inc., a Canadian corporation (collectively, "**_Purdue Canada_**") or any other Shareholder Released Party) that (x) arises out of or relates to the conduct of any corporations, companies, partnerships and other entities formed under the laws of Canada or its provinces affiliated or associated with any of the Debtors, including, without limitation, Purdue Canada; (y) is not based upon any conduct of the Debtors, including any Opioid-Related Activities of the Debtors; and (z) in respect of which, a Canadian court has not granted an order precluding the Holder of such Cause of Action from recovering any portion of damages, costs or interest that corresponds to the liability of the non-Debtor Person released by this Plan (*provided* that, notwithstanding anything to the contrary in this subclause (vii), nothing in this subclause (vii) shall limit the scope (in terms of both liability released and parties released) of the release provided by the Debtors and their Estates in favor of the Settling Co-Defendants pursuant to <u>Section 10.6(a)</u> of the Plan). For greater certainty, with respect to the foregoing clause (vii), to the extent a Cause of Action is asserted in Canada against a Shareholder Released Party and/or former director or officer of a Debtor, the knowledge of that Person regarding the Opioid-Related Activities of the Debtors may be asserted against that Person and form part of the Cause of Action in Canada, and any such assertion shall be without prejudice to all defenses of the applicable Shareholder Released Party or former officer or director to such assertion.

"**_Excluded Insurance Policies_**" means (i) the Isosceles Insurance Ltd. policy number PPLP-01/2019, (ii) the Purdue Insurance Policies agreed by the Debtors, the Creditors' Committee and the Governmental Consent Parties, which shall be identified in the MDT Agreement, and (iii) any rights or obligations under any Purdue Insurance Policy to the extent, but only to the extent, that such rights or obligations pertain solely to coverage for workers' compensation liability. For the avoidance of doubt, clause (i) of this definition does not negate or limit the scope of the definition of MDT Insurance Collateral. For the avoidance of further doubt, if a Purdue Insurance Policy both (x) does or may afford the Debtors rights, benefits, indemnity, insurance coverage or defense costs with respect to any Cause of Action against the Debtors arising out of, on account of, or in connection with Opioid-Related Activities or for which the Debtors have insurance rights arising out of or in connection with Opioid-Related Activities and (y) is subject to clause (ii) or (iii) of this definition, such Purdue Insurance Policy is only an Excluded Insurance Policy to the extent it is subject to clause (ii) or (iii) of this definition, and all provisions herein concerning the MDT Insurance Policies apply to that Purdue Insurance Policy.

"**_Excluded Party_**" means (i) each Person identified on the Schedule of Excluded Parties and (ii) each Co-Defendant; *provided* that (x) subject to the terms of the Settling Executive Stipulation, the Settling Executives shall not be Excluded Parties and (y) no Settling Co-Defendant and none of their respective Related Parties (except to the extent any such Related Party is identified by name on the Schedule of Excluded Parties filed on August 23, 2021) shall be an Excluded Party.

"**_Excluded Privileged Materials_**" means the Privileged documents, books and records prepared in connection with or related to any Purdue Legal Matter.

"**_Exculpated Parties_**" means, collectively, (i) the Debtors, (ii) the Creditors' Committee and its members, solely in their capacities as such, (iii) the Plan Administration Trustee, (iv) the MDT Trustees and the MDT Advisory Council Representatives, (v) the Creditor Trustees, (vi) the Supporting Claimants, each solely in their capacities as such, (vii) the DOB members, (viii) the Board Consulting Advisor, and (ix) with respect to each of the Persons in the foregoing clauses (i) through (viii), each of their

Related Parties; *provided*, *however*, that no Excluded Party or Shareholder Released Party (other than current and former directors, officers and employees of the Debtors that are not Excluded Parties or Sackler Family Members) shall be an Exculpated Party in any capacity or respect.

"***FDA***" means the United States Food and Drug Administration.

"***Federal Government Unsecured Claims***" means the DOJ Unsecured Claims and the Other Federal Agency Claims.

"***Final Claims Determination***" means, with respect to Class 8 (Third-Party Payor Claims), Class 10(a) (NAS PI Claims), or Class 10(b) (Non-NAS PI Claims), the final liquidation and determination of all Claims in such Class (pursuant to a Final Order or the applicable Creditor Trust Documents), such that the PI/TPP Trustee knows the final payment amount for each Third-Party Payor Claim, NAS PI Claim, or Non-NAS PI Claim, as applicable, pursuant to the applicable Creditor Trust Documents.

"***Final Direct Settlement Payments***" has the meaning set forth in Section 5.2(e)(i) herein.

"***Final Order***" means an order or judgment of the Bankruptcy Court, as entered on the docket in any Chapter 11 Case, or of any other court of competent jurisdiction (i) that has not been reversed, stayed, modified or amended, and (ii) (A) as to which the time to appeal, seek certiorari or move for a new trial, re-argument or rehearing has expired according to applicable law and no appeal or petition for certiorari or other proceedings for a new trial, re-argument or rehearing has been timely taken or (B) as to which any appeal that has been taken or any petition for certiorari that has been or may be timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, re-argument or rehearing shall have been denied, resulted in no modification of such order or has otherwise been dismissed with prejudice.

"***Final Shareholder Direct Settlement Amount***" has, for a given Shareholder Payment Group and PI/TPP Class, the meaning set forth in Section 5.2(e)(i) herein.

"***First Reversion Date***" shall have the meaning ascribed to such term in the Master Shareholder Settlement Agreement.

"***Foundation***" means a newly formed New York corporation to be created in accordance with Section 5.5 of the Plan to receive and hold the NewCo Interest and collect the Foundation Distributable Cash in accordance with the Plan and the Foundation Bylaws and that is intended to be an exempt organization under IRC section 501(c)(4) for U.S. federal income tax purposes.

"***Foundation Distributable Cash***" means an amount of NewCo Distributable Cash to be distributed from NewCo directly to the Foundation in respect of the NewCo Interest in any year equal to the lesser of (x) 5% of NewCo Distributable Cash and (y) $5 million.

"***Foundation Bylaws***" means the agreement establishing and delineating the terms and conditions for the creation and operation of the Foundation, the terms of which shall be consistent with Articles I through XII of the Plan and otherwise acceptable to the DOJ and the Governmental Consent Parties and reasonably acceptable to the Debtors, and which shall be filed by the Debtors with the Plan Supplement.

"***Foundation Trustees***" means the trustees of the Foundation appointed in accordance with Section 5.5(b) of the Plan.

"**GBM AGILE Motion**" means the *Motion to Authorize to Enter into and Perform Under Clinical Trial Collaboration and Supply Agreement* [D.I. 7762].

"**General Bar Date**" means July 30, 2020.

"**Governmental Consent Parties**" means (i) the States AG Negotiating Group, (ii) the Ad Hoc Committee, and (iii) the MSGE Group.

"**Governmental Entity Shareholder Direct Settlement**" means the settlement set forth in the Governmental Entity Shareholder Direct Settlement Agreement.

"**Governmental Entity Shareholder Direct Settlement Agreement**" means the settlement agreement substantially in the form attached as <u>Exhibit A</u> to the *Notice of Filing of Governmental Entity Shareholder Direct Settlement Agreement* [D.I. 7592].

"**Governmental NewCo Distributable Cash**" means all NewCo Distributable Cash other than Foundation Distributable Cash.

"**Governmental Remediation Trust**" means the Delaware trust to be established in accordance with <u>Section 5.8</u> of the Plan and the Governmental Remediation Trust Documents and administered by the Governmental Remediation Trust Administrator, which shall receive and distribute all distributions on account of the Allowed Non-Federal Domestic Governmental Channeled Claims pursuant to the Governmental Remediation Trust Documents.

"**Governmental Remediation Trust Administrator**" means the Person appointed pursuant to the Governmental Entity Shareholder Direct Settlement Agreement to serve as the "Directing Administrator."

"**Governmental Remediation Trust Agreement**" means the trust agreement establishing and delineating the terms and conditions for the creation and operation of the Governmental Remediation Trust, the terms of which shall be consistent with the Plan and acceptable to the Governmental Consent Parties, in consultation with the Debtors and the Creditors' Committee, and which shall be filed by the Debtors with the Plan Supplement. "**Governmental Remediation Trust Delaware Trustee**" means the Person appointed pursuant to the Governmental Remediation Trust Agreement to serve as the "Delaware Trustee."

"**Governmental Remediation Trust Directed Trustee**" means the Person appointed pursuant to the Governmental Entity Shareholder Direct Settlement Agreement to serve as the "Directed Trustee."

"**Governmental Remediation Trust Documents**" means the Governmental Entity Shareholder Direct Settlement Agreement and the Governmental Remediation Trust Agreement.

"**Governmental Remediation Trust Trustees**" means the Governmental Remediation Trust Administrator, the Governmental Remediation Trust Delaware Trustee, and the Governmental Remediation Trust Directed Trustee.

"**Governmental Unit**" has the meaning set forth in section 101(27) of the Bankruptcy Code.

"**_Grantor Trust Retained Payment Escrow Arrangement_**" means a "Grantor Trust Arrangement" (as defined in the Master Shareholder Settlement Agreement) established for the purposes set forth in Section 5.2(e)(i).

"**_Grantor Trust Escrow Agent_**" means the third party or parties responsible for administering the Grantor Trust Retained Payment Escrow Arrangements in accordance with Section 5.2(e)(i) and Exhibit Z to the Master Shareholder Settlement Agreement, which agent shall be reasonably acceptable to the trustee of the applicable Creditor Trust and the Sackler Parties' Representative.

"**_Grantor Trust Release Date_**" has the meaning set forth in Section 5.2(e)(i) herein.

"**_Healthcare Provider Channeled Claim_**" means (i) any Healthcare Provider Claim or (ii) any Claim held by a Hospital that is released pursuant to the Hospital Shareholder Direct Settlement Agreement. Healthcare Provider Channeled Claims shall be channeled to the Healthcare Provider Trust in accordance with the Plan and Master TDP.

"**_Healthcare Provider Claim_**" means any Claim against any Debtor that is held by (a) a Hospital or (b) a non-Hospital provider of healthcare treatment services or any social services, in its capacity as such, in each case, other than as set forth below.  For the avoidance of doubt, (i) Proofs of Claim filed by ER Physicians or Domestic Governmental Entities shall not be Healthcare Provider Claims, and (ii) Healthcare Provider Claims shall include the Proofs of Claim listed on Exhibits A and C of the Plan, but not, for the avoidance of doubt, the Proofs of Claim listed on Exhibit B of the Plan.[2]

"**_Healthcare Provider TDP_**" means the trust distribution procedures to be implemented by the Healthcare Provider Trust setting forth the procedures for Distributions from the Healthcare Provider Trust, the terms of which shall be consistent with Articles I through XII of the Plan and otherwise acceptable to the Debtors and the Ad Hoc Group of Hospitals, and reasonably acceptable to the Creditors' Committee and the Governmental Consent Parties, and which shall be filed by the Debtors with the Plan Supplement.

"**_Healthcare Provider Trust_**" means a trust to be established in accordance with Section 5.8 of the Plan to (i) assume all liability for the Healthcare Provider Channeled Claims, (ii) hold the MDT Healthcare Provider Claim and collect the Initial Healthcare Provider Trust Distribution and additional payments due under the MDT Healthcare Provider Claim in accordance with the Private Entity Settlements and the Healthcare Provider Trust Documents, (iii) administer Healthcare Provider Channeled Claims, (iv) hold and administer the Class 7 Non-Participating Claims Reserve on and after the Effective Date, (v) hold the Class 7 Released Claims Reserve on and after the Effective Date and (vi) make Distributions in accordance with the Healthcare Provider TDP.

"**_Healthcare Provider Trust Agreement_**" means the trust agreement establishing and delineating the terms and conditions for the creation and operation of the Healthcare Provider Trust, the terms of which shall be consistent with Articles I through XII of the Plan and otherwise acceptable to the Debtors and the Ad Hoc Group of Hospitals, and reasonably acceptable to the Creditors' Committee and the Governmental Consent Parties, and which shall be filed by the Debtors with the Plan Supplement.

---

[2] For the avoidance of doubt, only Hospitals shall be eligible to receive distributions from the Hospital Shareholder Direct Settlement, and the Hospital Shareholder Direct Settlement will include trust distribution procedures that will govern the distribution to Hospitals of proceeds from the Hospital Shareholder Direct Settlement.  All members of Class 7 shall be eligible to receive Estate Distributions (Class 7's share of the Estate Settlement and any other Estate proceeds distributed to Class 7) allocable to Class 7, and the Hospital Trust TDP shall govern distribution of such Estate Distributions.

"*Healthcare Provider Trust Documents*" means the Healthcare Provider Trust Agreement and the Healthcare Provider TDP.

"*Hospital Shareholder Direct Settlement*" means the settlement set forth in the Hospital Shareholder Direct Settlement Agreement.

"*Hospital Shareholder Direct Settlement Agreement*" means the settlement agreement substantially in the form attached as Exhibit C to the *Notice of Filing of Certain Direct Claims Shareholder Settlement Agreements* [D.I. 7878].

"*Holder*" means a Person holding a Claim, a Channeled Claim, a Cause of Action or an Interest, as applicable. For the avoidance of doubt, "Holder" shall not be limited to Persons Holding Claims against the Debtors or Persons that submitted timely Proofs of Claim.

"*Holdback Increment*" means, with respect to a PI/TPP Class, a percentage determined in accordance with Section 5.2(e)(i).

"*Holdback Percentage*" means, with respect to a PI/TPP Class, a percentage equal to 100% plus the Holdback Increment.

"*Hospital*" means any acute care hospital subject to EMTALA which hospital is not a Domestic Governmental Entity or a Physician. For the avoidance of doubt, none of the organizations listed on Exhibit B of the Plan shall be Hospitals.

"*Hospital Attorney Fee Fund*" means the fund to be established as set forth in Section 5.9(e) of the Plan.

"*Hospital Districts*" shall correspond to Special Districts categorized by the U.S. Census Bureau under the function name "Hospital."

"*Host Institutions*" has the meaning set forth in Section 5.13(b) of the Plan.

"*IAC Sale Bonus Payment*" has the set forth in the Master Shareholder Settlement Agreement.

"*Impaired*" means, with respect to any Claim, Interest or Class of Claims or Interests, "impaired" within the meaning of such term in section 1124 of the Bankruptcy Code.

"*Initial ERP Trust Distribution*" means the payment of $5,811,015 of Effective Date Cash to the ERP Trust, *less* (i) the SOR Holdback in the amount of $141,015 and (ii) any applicable Direct Claim Settlement Retained Payment Amount.

"*Initial Federal Government Distribution*" means the payment of $25 million of Effective Date Cash to the United States on the Effective Date on account of the Federal Government Unsecured Claims.

"*Initial Healthcare Provider Trust Distribution*" means the payment of $263,498,910 of Effective Date Cash to the Healthcare Provider Trust, *less* (i) the SOR Holdback in the amount of $2,688,910, (ii) any applicable Direct Claim Settlement Retained Payment Amount, and (iii) any applicable Creditor Trust Advance Amount.

"*Initial Governmental Remediation Trust Distribution*" means the payment to the Governmental Remediation Trust on the Effective Date of (i) 96.7% of the Maximum Governmental Direct

Settlement Amount, as may be adjusted in accordance with the Governmental Entity Shareholder Direct Settlement Agreement, payable on the Effective Date, and (ii) 96.7% of all Effective Date Cash remaining after the satisfaction of all amounts described in Section 5.14(a) of the Plan.

"*Initial LG Costs Funding Date*" has the meaning set forth in Section 5.9(a)(i) of the Plan.

"*Initial NAS PI Distribution*" means the payment of Effective Date Cash to the PI Trust on the Effective Date equal to the sum of (a) $48,213,070[3] and (b) $65,848,195, *less* (i) the SOR Holdback in the amount of $1,809,265 (ii) any NAS PI Direct Claim Settlement Retained Payment Amount, (iii) any amounts advanced to the NAS Monitoring Trust (as defined in the Creditor Trust Establishment Order) pursuant to the Creditor Trust Establishment Order, and (iv) 13.98% of (A) any amounts paid by the Debtors to the PI Claims Administrator (as defined in the PI and TPP Claims Procedures Order) and its professionals as of the Effective Date, and (B) any applicable Creditor Trust Advance Amount with respect to the PI Trust. For the avoidance of doubt, any and all payments made by the Debtors of the reasonable and documented fees and expenses of the Ad Hod Group of Individual Victims pursuant to a Final Order granting the Ad Hoc Group of Individual Victims' request for allowance of such fees and expenses under section 503(b) of the Bankruptcy Code in accordance with Section 5.9(h) of the Plan shall not be considered payments of the PI Claims Administrator's professionals and shall not be deducted from the payment of Effective Date Cash to the PI Trust.

"*Initial Non-NAS PI Distribution*" means the payment of Effective Date Cash to the PI Trust on the Effective Date in the amount of $701,756,930 *less* (i) the SOR Holdback in the amount of $9,328,930, (ii) any Non-NAS PI Direct Claim Settlement Retained Payment Amount, and (iii) 86.02% of (A) any amounts paid by the Debtors to the PI Claims Administrator (as defined in the PI and TPP Claims Procedures Order) and its professionals as of the Effective Date, and (B) any applicable Creditor Trust Advance Amount with respect to the PI Trust. For the avoidance of doubt, any and all payments made by the Debtors of the reasonable and documented fees and expenses of the Ad Hod Group of Individual Victims pursuant to a Final Order granting the Ad Hoc Group of Individual Victims' request for allowance of such fees and expenses under section 503(b) of the Bankruptcy Code in accordance with Section 5.9(h) of the Plan shall not be considered payments of the PI Claims Administrator's professionals and shall not be deducted from the payment of Effective Date Cash to the PI Trust.

"*Initial NewCo Cash*" means $135 million of Effective Date Cash to be transferred to NewCo on the Effective Date.

"*Initial PI Trust Distribution*" means the Initial NAS PI Distribution and the Initial Non-NAS PI Distribution.

"*Initial PI Trust Distribution Amount*" means $749,970,000.

"*Initial Private Creditor Trust Distributions*" means, collectively, the Initial Healthcare Provider Trust Distribution, the Initial TPP Trust Distribution, the Initial ERP Trust Distribution and the Initial PI Trust Distribution.

"*Initial Public Creditor Trust Distributions*" means, collectively, the Initial Governmental Remediation Trust Distribution and the Initial Tribe Trust Distribution.

---

[3] $48,213,070 is the sum of (i) 6.43% of $700,000,000 of the Initial PI Trust Distribution Amount, up to an aggregate $45 million in accordance with the definition of "NAS PI Portion" in the Twelfth Amended Plan, and (ii) 6.43% of the $49,970,000 remaining Initial PI Trust Distribution Amount.

"***Initial Public Schools Distribution***" means a payment of Effective Date Cash to benefit the Public School Trust (a) in the amount of $25,560,000 million, *less* (i) the applicable Direct Claim Settlement Retained Payment Amount, and (ii) the SOR Holdback in the amount of $60,000 which amount will be used (i) to fund educational supports to abate the effects of the opioid crisis and (ii) for the required payments to the Common Benefit Fund and in respect of attorneys' fees and expenses of the Public School District Claimants in accordance with Section 5.9(d) and (i) of the Plan, and (b) for reimbursement of costs and expenses incurred in connection with the Public Schools' Opt-Out Class Action Settlement notices in an additional amount not to exceed $75,000.

"***Initial Shareholder Direct Settlement Amount***" means, for a given PI/TPP Class and Shareholder Payment Group, an amount equal to (x) the Shareholder Payment Group's PG Pro Rata Share of the Maximum Shareholder Direct Settlement Amount for such Class *minus* (y) the Shareholder Payment Group's Retained Payment Reserve applicable to such Class.

"***Initial TPP Trust Distribution***" means the payment of $394,911,880 of Effective Date Cash to the TPP Trust on the Effective Date *less* (i) any amounts paid by the Debtors to the TPP Claims Administrator (as defined in the PI and TPP Claims Procedures Order) and its professionals as of the Effective Date, (ii) the SOR Holdback in the amount of $5,971,880, (iii) the TPP Direct Claim Settlement Retained Payment Amount, if any, and (iv) any applicable Creditor Trust Advance Amount.

"***Initial Tribe Trust Distribution***" means the payment on the Effective Date of (i) 3.3% of the Maximum Governmental Direct Settlement Amount payable on the Effective Date, and (ii) 3.3% of all Effective Date Cash remaining after the satisfaction of all amounts described in Section 5.14(a) of the Plan.

"***Insurance Companies***" means, collectively, all Persons that issued any Purdue Insurance Policy, any third-party administrator, claims handling agent or any parent, Subsidiary, affiliate, successor, predecessor or assign of any of the foregoing, solely in such Insurance Company's capacity with respect to a Purdue Insurance Policy.

"***Intercompany Claim***" means any Claim against any Debtor that is held by another Debtor or an affiliate of a Debtor.

"***Intercompany Interest***" means any Interest in any Debtor that is held by another Debtor.

"***Interest***" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in a Person, including any shares, common stock or units, preferred stock or units, or other instrument evidencing any fixed or contingent equity or ownership interest in a Person, including any option, warrant or other right, contractual or otherwise, to acquire any such interest in such Person, whether or not transferable and whether fully vested or vesting in the future.

"***Interim Compensation Order***" means the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Retained Professionals* [D.I. 529].

"***IRC***" means the Internal Revenue Code of 1986, as amended (including any successor statute).

"***IRS***" means the Internal Revenue Service.

"***Key Employee Plans***" means, collectively, the Key Employee Retention Plans and Key Employee Incentive Plans approved by the Bankruptcy Court pursuant to the *Order Authorizing the Debtors to Implement a Key Employee Retention Plan* [D.I. 1762], the *Order Authorizing the Debtors to Implement a Key Employee Incentive Plan* [D.I. 1861], the *Supplemental Order Authorizing the Debtors to Implement*

*a Key Employee Incentive Plan* [D.I. 2002], the *Order Authorizing the Debtors to Implement 2021 Key Employee Retention Plan* [D.I. 3571], the *Order Authorizing the Debtors to Implement 2021 Key Employee Incentive Plan* [D.I. 3770], the *Order Authorizing the Debtors to Implement 2022 Key Employee Retention Plan and 2022 Key Employee Incentive Plan* [D.I. 4862], the *Supplemental Order Authorizing the Debtors to Implement 2022 Key Employee Incentive Plan* [D.I. 4924], the *Order Authorizing the Debtors to Implement 2023 Key Employee Incentive Plan and 2023 Key Employee Retention Plan* [D.I. 5646], the *Order Authorizing the Debtors to Implement 2024 Key Employee Incentive Plan and 2024 Key Employee Retention Plan* [D.I. 6322], the *Order Authorizing the Debtors to Implement 2025 Key Employee Incentive Plan and 2025 Key Employee Retention Plan* [D.I. 7830], and any similar compensation programs approved by other order of the Bankruptcy Court, in each case, as may be supplemented from time to time by further order of the Bankruptcy Court.

"***Kroll***" means Kroll Restructuring Administration LLC

"***Lien***" has the meaning set forth in section 101(37) of the Bankruptcy Code.

"***Liquidating Debtors***" means, collectively, all Debtors that are not Transferred Debtors, on and after the Effective Date.

"***Local Government Fee Fund***" means the fund to be established as set forth in Section 5.9(a) of the Plan.

"***LRP Agreement***" means the agreement establishing lien resolution procedures with respect to certain claims held by LRP Participating TPPs against Holders of PI Claims and Distributions payable to Holders of PI Claims, the terms of which shall be consistent with Articles I through XII of the Plan and otherwise acceptable to the Debtors, the Ad Hoc Group of Individual Victims and the Third-Party Payor Group, and reasonably acceptable to the Creditors' Committee and the Governmental Consent Parties, and which shall be filed by the Debtors with the Plan Supplement (it being understood and agreed that the form of LRP Agreement filed on May 26, 2021 is acceptable to such parties).

"***LRP Participating TPP***" means any Holder of a Third-Party Payor Claim that becomes a party to the LRP Agreement in accordance with the terms thereof.

"***Master Disbursement Trust***" means the trust established in accordance with Section 5.6 of the Plan to, among other things, (i) hold and administer the MDT Transferred Assets and the Special Operating Reserve, (ii) serve as administrative agent with respect to Released Claims Reserves, (iii) make payments in satisfaction of the MDT Claims in accordance with the Plan, the Private Entity Settlements and, with respect to the MDT Public School Districts Claim, the Public Entity Settlements and (iv) make Public Creditor Trust Distributions in respect of the MDT Interests from MDT Distributable Value in accordance with the Plan and the Public Entity Settlements.

"***Master Shareholder Settlement Agreement***" means the settlement agreement substantially in the form attached as Exhibit A to the *Notice of Filing of Plan Supplement Pursuant to the Thirteenth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors* [D.I. 7591], including all exhibits, schedules, annexes and supplements and appendices thereto.

"***Master TDP***" means the master trust distribution procedures to be implemented by the Master Disbursement Trust setting forth the procedures for the administration of Channeled Claims by the Master Disbursement Trust, which shall be filed by the Debtors with the Plan Supplement, and the terms of which shall be consistent with Articles I through XII of the Plan and otherwise reasonably acceptable to (i) the Debtors, (ii) the Creditors' Committee, (iii) the Governmental Consent Parties and (iv) solely with respect to any provisions regarding the channeling of Channeled Claims to (A) the Tribe Trust, the Native

American Tribe Group, (B) the Healthcare Provider Trust, the Ad Hoc Group of Hospitals, (C), the ERP Trust, the ERP Trustee, (D) TPP Trust, the Third-Party Payor Group, (E) the Public School Trust, the Public School District Claimants, and (F) the PI Trust, the Ad Hoc Group of Individual Victims and the NAS Committee.

"*Material Litigation*" shall have the meaning ascribed to such term in the Master Shareholder Settlement Agreement.

"*Maximum Governmental Direct Settlement Amount*" means, for any given SSA Payment Date, the sum of the amounts of such SSA Payment Date in clause (a) and (b) of the definition of Shareholder Direct Settlement Portion, subject to any Shareholder Prepayments, but not subject to any Direct Claim Settlement Retained Payment Amounts.

"*Maximum NAS PI Shareholder Direct Settlement Amount*" has the meaning set forth in the definition "Shareholder Direct Settlement Portion" and shall be payable by the Shareholder Payment Parties in full (without retaining any NAS PI Direct Claim Settlement Retained Payment Amount) in the event that all Holders of Direct Settlement Eligible NAS PI Claims are Settling Creditors.

"*Maximum Non-NAS PI Shareholder Direct Settlement Amount*" has the meaning set forth in the definition "Shareholder Direct Settlement Portion" and shall be payable by the Shareholder Payment Parties in full (without retaining any Non-NAS PI Direct Claim Settlement Retained Payment Amount) in the event that all Holders of Direct Settlement Eligible Non-NAS PI Claims are Settling Creditors.

"*Maximum TPP Shareholder Direct Settlement Amount*" has the meaning set forth in the definition "Shareholder Direct Settlement Portion" and shall be payable by the Shareholder Payment Parties in full (without retaining any TPP Direct Claim Settlement Retained Payment Amount) in the event that all Holders of Direct Settlement Eligible TPP Claims are Settling Creditors.

"*Maximum Shareholder Direct Settlement Amount*" means, for a given PI/TPP Class, the Maximum NAS PI Shareholder Direct Settlement Amount, the Maximum Non-NAS PI Shareholder Direct Settlement Amount and Maximum TPP Shareholder Direct Settlement Amount, as applicable.

"*MDL Court*" means the United States District Court for the Northern District of Ohio, Eastern Division, presiding over the MDL Proceeding.

"*MDL Plaintiffs' Executive Committee*" means the sixteen-member committee appointed by the MDL Court in the MDL Proceeding.

"*MDL Proceeding*" means *In re National Prescription Opiate Litigation*, Case No. 17-md-02804, MDL No. 2804.

"*MDT Advisory Council*" means the advisory council established in accordance with Section 5.6(e) of the Plan and the MDT Agreement, to which the Master Disbursement Trust shall regularly report with respect to the operations and activities of the Master Disbursement Trust and the handling of all payments and Distributions made from the Master Disbursement Trust, all as provided for in greater detail in the MDT Agreement.

"*MDT Advisory Council Representative*" has the meaning set forth in Section 5.6(e) of the Plan.

"***MDT Agreement***" means the trust agreement establishing and delineating the terms and conditions for the creation and operation of the Master Disbursement Trust, the terms of which shall be consistent with Articles I through XII of the Plan and otherwise reasonably acceptable to the Debtors, the Creditors' Committee and the Governmental Consent Parties, and which shall be filed by the Debtors with the Plan Supplement.

"***MDT Beneficiaries***" means, subject to Section 5.6(f)(iv), each of (i) the Public Creditor Trusts, (ii) the Healthcare Provider Trust, (iii) the ERP Trust, (iv) the Public School Trust, (v) the PI Trust, (vi) the TPP Trust, and (vii) the United States.

"***MDT Causes of Action***" means any and all Retained Causes of Action (i) against Excluded Parties (other than Co-Defendants not listed on the Schedule of Excluded Parties) or relating to and necessary to enforce Retained Causes of Action against Excluded Parties (other than Co-Defendants not listed on the Schedule of Excluded Parties), (ii) relating to and necessary to enforce the MDT Insurance Rights, (iii) relating to and necessary to enforce the MDT Shareholder Rights, including without limitation, but subject to the terms of, the Master Shareholder Settlement Agreement or (iv) against any other Person that is not a Co-Defendant or an ongoing commercial counterparty of NewCo or any of its Subsidiaries, to the extent such Retained Causes of Action are not otherwise transferred to the Plan Administration Trust or the Creditor Trusts. For the avoidance of doubt, "MDT Causes of Action" shall include all entitlements, proceeds, payments and benefits of the Debtors to any of the foregoing. For the further avoidance of doubt, all Retained Causes of Action against McKinsey & Company and all other parties listed on the Schedule of Excluded Parties shall constitute "MDT Causes of Action."

"***MDT Claims***" means, collectively, the MDT Private Claims, the MDT Public School Districts Claim and the MDT Federal Government Claim.

"***MDT Distributable Value***" means all Cash and cash equivalents held by the Master Disbursement Trust, as of the relevant date of determination, after application of Cash to satisfy the amounts contemplated by Section 5.2(g)(i), (ii), (iii), and (iv) of the Plan in the MDT Priority Waterfall.

"***MDT Distribution Date***" means (i) each Scheduled MDT Distribution Date, (ii) a date determined by the MDT Trustees that is promptly after the receipt by the Master Disbursement Trust of (x) any Shareholder Prepayment, (y) any reversion amounts pursuant to Section 5.7 of the Plan, and (z) any IAC Sale Bonus Payments under Section 2.06 of the Master Shareholder Settlement Agreement, which such date shall be no later than thirty (30) days after the receipt by the Master Disbursement Trust of the applicable funds, and (iii) each other date on which the MDT Trustees seek to make a distribution to the Public School Trust or Public Creditor Trust Distribution, acting in accordance with their fiduciary duties to the Creditor Trusts as beneficiaries of the Master Disbursement Trust, solely in accordance with Section 5.6(f) of the Plan.

"***MDT Documents***" means the MDT Agreement and the Master TDP.

"***MDT ERP Claim***" means the beneficial interest in the Master Disbursement Trust granted to the ERP Trust pursuant to the Private Entity Settlements, which interest shall entitle the ERP Trust to the reversion rights from the Special Operating Reserve set forth in the Plan, the Master Shareholder Settlement Agreement, and the ER Physician Shareholder Direct Settlement Agreement, as applicable.

"***MDT Federal Government Claim***" means the beneficial interest in the Master Disbursement Trust granted to the United States pursuant to Section 4.3(b) of the Plan.

"***MDT Governmental Remediation Trust Interest***" means the beneficial interest in the Master Disbursement Trust granted to the Governmental Remediation Trust pursuant to the Public Entity

Settlements and the Plan, which interest shall entitle the Governmental Remediation Trust to (i) its share of distributions of MDT Distributable Value in accordance with Section 5.2(f)(i)(A) of the Plan and the MDT Priority Waterfall and (ii) the reversion rights from the Special Operating Reserve set forth in the Plan, the Master Shareholder Settlement Agreement, and the Governmental Entity Shareholder Direct Settlement Agreement, as applicable.

"***MDT Healthcare Provider Claim***" means the beneficial interest in the Master Disbursement Trust granted to the Healthcare Provider Trust pursuant to the Private Entity Settlements, which interest shall entitle the Healthcare Provider Trust to the reversion rights from the Special Operating Reserve set forth in the Plan, the Master Shareholder Settlement Agreement, and the Hospital Shareholder Direct Settlement Agreement, as applicable.

"***MDT Insurance Collateral***" means (i) the Purdue Insurance Collateral in respect of the Purdue Insurance Policies agreed by the Debtors, the Creditors' Committee and the Governmental Consent Parties, which shall be identified in the MDT Agreement, and (ii) the Purdue Insurance Collateral in respect of the Isosceles Insurance Ltd. policy number PPLP-01/2019.

"***MDT Insurance Policies***" means all Purdue Insurance Policies that do or may afford the Debtors rights, benefits, indemnity, insurance coverage or defense costs with respect to any Cause of Action against the Debtors arising out of, on account of, or in connection with Opioid-Related Activities or for which the Debtors have or may have insurance rights arising out of or in connection with Opioid-Related Activities, including, but not limited to (i) all Purdue Insurance Policies listed in Exhibit A to the *Complaint for Declaratory Relief*, Adv. Pro. No. 21-07005 (RDD) [D.I. 1], (ii) all D&O Insurance Policies and (iii) any additional Purdue Insurance Policies agreed by the Debtors and the Governmental Consent Parties, which shall be identified in the MDT Agreement, but excluding in each case the Excluded Insurance Policies.

"***MDT Insurance Proceeds***" means the Cash proceeds obtained through the pursuit of the MDT Insurance Rights, including but not limited to the Cash proceeds in respect of any MDT Insurance Settlement, whether received before, on or after the Effective Date.

"***MDT Insurance Rights***" means the Purdue Insurance Rights in respect of the MDT Insurance Policies and the MDT Insurance Collateral, which Purdue Insurance Rights shall be transferred by the Debtors to the Master Disbursement Trust on the Effective Date. Notwithstanding anything to the contrary herein, (i) the MDT Insurance Rights with respect to the MDT Insurance Collateral for Isosceles Insurance Ltd. policy number PPLP-01/2019 shall be limited to the right to receive any such MDT Insurance Collateral remaining after the expiration of the policy period and any extension of the reporting period under such policy, (ii) the MDT Insurance Rights shall not include any right to interfere in any manner with the rights of the insureds under Isosceles Insurance Ltd. policy number PPLP-01/2019 prior to the expiration of the policy period and any extension of coverage under such policy and the resolution of all claims asserted thereunder and (iii) any persons who have unresolved claims under the Isosceles Insurance Ltd. policy number PPLP-01/2019 at the expiration of the policy period, including any extension, shall cooperate with and provide consent to the Master Disbursement Trust to resolve those claims in connection with the MDT Insurance Collateral after the expiration of the policy period, including any extension.

"***MDT Insurance Settlement***" means each settlement agreement concerning the MDT Insurance Rights that (i) the Debtors and an MDT Insurer have entered into pursuant to the Purdue Insurance Stipulation on or before the Effective Date or (ii) the Master Disbursement Trust and an MDT Insurer have entered into after the Effective Date; *provided* that, in the case of both clauses (i) and (ii), the settlement agreement is approved by the Bankruptcy Court.

"***MDT Insurer***" means an Insurance Company that has issued, is responsible for, or has liability to pay under any MDT Insurance Policy or MDT Insurance Collateral, and each of its affiliates, predecessors in interest, and agents, solely in its capacity as such and solely with respect to such MDT Insurance Policy or MDT Insurance Collateral.

"***MDT Insurer Injunction***" means the injunction issued pursuant to Section 10.10 of the Plan.

"***MDT Interests***" means, collectively, the MDT Governmental Remediation Trust Interest and the MDT Tribe Interest.

"***MDT Operating Expenses***" means any and all costs, expenses, fees, taxes, disbursements, debts or obligations incurred from the operation and administration of the Master Disbursement Trust, including in connection with the prosecution or settlement of MDT Causes of Action, working capital, all compensation, costs and fees of the MDT Trustees and the MDT Advisory Council Representatives and any professionals retained by the Master Disbursement Trust, but excluding any amounts to be paid in respect of the MDT Claims or the MDT Interests.

"***MDT Operating Reserve***" means a reserve to be established to pay any and all MDT Operating Expenses. The MDT Operating Reserve shall be (i) funded on the Effective Date with Effective Date Cash in an amount determined by the Debtors and the Governmental Consent Parties with the consent (not to be unreasonably withheld, delayed or conditioned) of the Creditors' Committee, and thereafter with Cash held or received by the Master Disbursement Trust in accordance with the MDT Agreement as determined by the MDT Trustees; *provided*, *however*, that, except to the extent expressly set forth in Exhibit M to the Governmental Entity Shareholder Direct Settlement Agreement, payments received by the Master Disbursement Trust: (A) on account of the Governmental Entity Shareholder Direct Settlement shall be immediately transferred to the Governmental Remediation Trust and (B) on account of the Tribal Shareholder Direct Settlement Agreement shall be immediately transferred to the Tribe Trust, and the amounts in (A) and (B) shall not be used to fund a Replenishment Transfer, to fund the MDT Operating Reserve, or to pay the MDT Claims, and (ii) held by the Master Disbursement Trust in a segregated account and administered by the MDT Trustees on and after the Effective Date.

"***MDT PI Claim***" means the beneficial interest in the Master Disbursement Trust granted to the PI Trust pursuant to the Private Entity Settlements, which interest shall entitle the PI Trust to (i) the payments of the amounts set forth in Section 5.2(e)(iv) of the Plan which, for the avoidance of doubt, shall be allocated only to the Non-NAS PI Portion, and (ii) the reversion rights from the Special Operating Reserve set forth in the Plan and the Master Shareholder Settlement Agreement.

"***MDT Priority Waterfall***" means the priority waterfall applicable to the Master Disbursement Trust set forth in Section 5.2(g) of the Plan.

"***MDT Private Claims***" means, collectively, the MDT Healthcare Provider Claim, the MDT ERP Claim, the MDT TPP Claim and the MDT PI Claim.

"***MDT Public School Districts Claim***" means the beneficial interest in the Master Disbursement Trust granted to the Public School Trust, which interest shall entitle the Public School Trust to (i) the reversion rights from the Special Operating Reserve set forth in the Plan and the Master Shareholder Settlement Agreement, and (ii) payments to its benefit in the amounts set forth in the second sentence of Section 5.2(f)(ii).

"***MDT Shareholder Insurance Rights***" means any and all rights, titles, privileges, interests, claims, demands or entitlements of the Shareholder Released Parties to any proceeds, payments,

benefits, Causes of Action, choses in action, defense or indemnity arising under, or attributable to, any and all MDT Insurance Policies and MDT Insurance Collateral, now existing or hereafter arising, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, disputed or undisputed, fixed or contingent. For the avoidance of doubt and without in any way limiting the foregoing, "MDT Shareholder Insurance Rights" include (i) any rights of the Shareholder Released Parties to proceeds of MDT Insurance Policies, and MDT Insurance Collateral and (ii) the right to enforce any Insurance Company's obligation to the Shareholder Released Parties under any MDT Insurance Policies and MDT Insurance Collateral. Solely in connection with the term MDT Insurance Rights, the MDT Insurance Collateral excludes the Purdue Insurance Collateral in respect of the Isosceles Insurance Ltd. policy number PPLP-01/2019 (for all other purposes the MDT Insurance Collateral includes such Purdue Insurance Collateral).

"**MDT Shareholder Rights**" means, subject in all respects to the Shareholder Settlements (including the Shareholder Releases and the Channeling Injunction) (i) any and all rights, titles, privileges, interests, claims, demands and entitlements of the Debtors arising under, or attributable to, any Causes of Action or choses in action against, or proceeds, payments, benefits or indemnities from, Shareholder Release Snapback Parties, including without limitation to the extent arising under, or attributable to, the Master Shareholder Settlement Agreement and any related security agreements, documents, agreements or instruments, in each case whether now existing or hereafter arising, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, disputed or undisputed, fixed or contingent and (ii) the MDT Shareholder Insurance Rights.

"**MDT TPP Claim**" means the beneficial interest in the Master Disbursement Trust granted to the TPP Trust pursuant to the Private Entity Settlements, which interest shall entitle the TPP Trust to the reversion rights from the Special Operating Reserve set forth in the Plan and the Master Shareholder Settlement Agreement.

"**MDT Transferred Assets**" means all right, title and interest of the Debtors (or, solely with respect to the MDT Shareholder Insurance Rights, of the Shareholder Released Parties) arising under, or attributable to, (i) the MDT Operating Reserve, (ii) the MDT Causes of Action, (iii) the MDT Insurance Rights, (iv) the MDT Shareholder Rights, (v) any other Excluded Assets identified in the MDT Agreement and (vi) any Surplus Reserve Cash to be distributed to the Master Disbursement Trust, upon the identification thereof by the Plan Administration Trustee or the dissolution of the Plan Administration Trust, in accordance with Section 5.14(b) of the Plan. For the avoidance of doubt, "MDT Transferred Assets" shall not include any Causes of Action against any Released Party.

"**MDT Tribe Interest**" means the beneficial interest in the Master Disbursement Trust granted to the Tribe Trust under the Plan pursuant to the Public Entity Settlements, which interest shall entitle the Tribe Trust to its share of distributions of MDT Distributable Value in accordance with Section 5.2(f)(i)(A) of the Plan and the MDT Priority Waterfall and the reversion rights from the Special Operating Reserve set forth in the Plan, the Master Shareholder Settlement Agreement, and the Tribal Shareholder Direct Settlement Agreement, as applicable.

"**MDT Trustees**" means the trustees of the Master Disbursement Trust appointed in accordance with Section 5.6(d) of the Plan.

"**Mediation**" means the mediation authorized by the Bankruptcy Court and described in the Mediation Orders.

"**Mediation Orders**" means the following orders of the Bankruptcy Court: *Order Appointing Mediators* [D.I. 895]; *Order Expanding Scope of Mediation* [D.I. 1756]; *Order Establishing the Terms and Conditions of Mediation Before the Honorable Shelley C. Chapman* [D.I. 2879]; *Order Establishing the Terms and Conditions of Mediation Before the Honorable Shelley C. Chapman*

[D.I. 4261]*; Order Extending Termination Date Under the Terms and Conditions of Mediation Before the Honorable Shelley C. Chapman* [D.I. 4286]*; Order Further Extending Termination Date Under the Terms and Conditions of Mediation Before the Honorable Shelley C. Chapman* [D.I. 4319]*; Third Order Extending Termination Date Under the Terms and Conditions of Mediation Before the Honorable Shelley C. Chapman* [D.I. 4339]*; Third [SIC] Order Extending Termination Date Under the Terms and Conditions of Mediation Before the Honorable Shelley C. Chapman* [D.I. 4370]*; Order Expanding the Scope of Mediation Before the Honorable Shelley C. Chapman* [D.I. 4609]*; Order Appointing the Honorable Shelley C. Chapman (Ret.) and Eric D. Green as Co-Mediators and Establishing Terms and Conditions Of Mediation* [D.I. 6537]*; Amended Order Appointing the Honorable Shelley C. Chapman (Ret.) and Eric D. Green as Co-Mediators and Establishing Terms and Conditions Of Mediation* [D.I. 6682]*; Second Amended Order Appointing the Honorable Shelley C. Chapman (Ret.) and Eric D. Green as Co-Mediators and Establishing Terms and Conditions Of Mediation* [D.I. 6749]*; Third Amended Order Appointing the Honorable Shelley C. Chapman (Ret.) and Eric D. Green as Co-Mediators and Establishing Terms and Conditions Of Mediation* [D.I. 6906]*; Fourth Amended Order Appointing the Honorable Shelley C. Chapman (Ret.) and Eric D. Green as Co-Mediators and Establishing Terms and Conditions Of Mediation* [D.I. 6980]*; Fifth Amended Order Appointing the Honorable Shelley C. Chapman (Ret.) and Eric D. Green as Co-Mediators and Establishing Terms and Conditions Of Mediation* [D.I. 7058]*; Sixth Amended Order Appointing the Honorable Shelley C. Chapman (Ret.) and Eric D. Green as Co-Mediators and Establishing Terms and Conditions Of Mediation* [D.I. 7140]*; Seventh Amended Order Appointing the Honorable Shelley C. Chapman (Ret.) and Eric D. Green as Co-Mediators and Establishing Terms and Conditions Of Mediation* [D.I. 7273]*; Eighth Amended Order Appointing the Honorable Shelley C. Chapman (Ret.) and Eric D. Green as Co-Mediators and Establishing Terms and Conditions Of Mediation* [D.I. 7343]*; Ninth Amended Order Appointing the Honorable Shelley C. Chapman (Ret.) and Eric D. Green as Co-Mediators and Establishing Terms and Conditions Of Mediation* [D.I. 7481]; and *Tenth Amended Order Appointing the Honorable Shelley C. Chapman (Ret.) and Eric D. Green as Co-Mediators and Establishing Terms and Conditions Of Mediation* [D.I. 7600].

"***Medicaid Program***" has the meaning set forth in <u>Section 10.20(d)</u> of the Plan.

"***Minimum Required Settlement Payment***" means, with respect to an SSA Payment Date, the minimum amount payable by the Shareholder Payment Parties under the Shareholder Settlement Agreements on such SSA Payment Date.

"***MSGE Fee Allocation Agreement***" means the agreement entered into on October 9, 2020, by and between the MSGE Group and the MDL Plaintiffs' Executive Committee, which is attached hereto as <u>Exhibit D</u> of the Plan.

"***MSGE Group***" means the Multi-State Governmental Entities Group identified in the *Second Amended Verified Statement of the Multi-State Governmental Entities Group Pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure* [D.I. 1794], as amended from time to time; *provided, however*, that, notwithstanding anything herein to the contrary, the MSGE Group shall be a "Governmental Consent Party" and shall have the same consent rights, appointment or selection rights, and any other rights or obligations afforded to the Ad Hoc Committee, such rights not to be reduced or modified without the written consent of the MSGE Group. The foregoing shall not give the MSGE Group any independent or individual rights to make any unilateral decisions, including to appoint or select any trustees, managers, directors, or officers under the Plan. Notwithstanding anything herein to the contrary, the sole remedy of the MSGE Group in respect of its rights hereunder shall be the termination of the Term Sheet (as defined in the MSGE Group Reimbursement Motion) by written notice and withdrawal of the MSGE Group's support of the Plan.

"***MSGE Group Reimbursement Motion***" means the *Debtors' Motion to Enter into Term Sheet with and Pay Certain Fees and Expenses of the Multi-State Governmental Entities Group* [D.I. 2580].

"***MSGE Group Reimbursement Order***" means the *Order Authorizing the Debtors to Enter into Term Sheet with and Pay Certain Fees and Expenses of the Multi-State Governmental Entities Group* [D.I. 2695].

"***NAS Child***" means a natural person who has been diagnosed by a licensed medical provider with a medical, physical, cognitive or emotional condition resulting from such natural person's intrauterine exposure to opioids or opioid replacement or treatment medication, including but not limited to the condition known as neonatal abstinence syndrome.

"***NAS Committee***" means the Ad Hoc Committee of NAS Children identified in the *First Amended Verified Statement of the Ad Hoc Committee of NAS Children Pursuant to Bankruptcy Rule 2019* [D.I. 1582].

"***NAS Medical Expense Claim Settlement Reserve Amount***" means $835,900 from amounts received by the PI Trust from the Initial NAS PI Distribution.

"***NAS PI Channeled Claim***" means (i) any NAS PI Claim or (ii) any Released Claim or Shareholder Released Claim that is held by a Holder of an NAS PI Claim for alleged opioid-related personal injury to an NAS Child or that is a similar opioid-related Cause of Action asserted by or on behalf of an NAS Child, in each case, that arose prior to the Petition Date (in the case of Third-Party Released Claims, solely to the extent that such Holder of an NAS PI Claim is a Settling Creditor), that is not a Third-Party Payor Channeled Claim or a Healthcare Provider Channeled Claim, or held by a Domestic Governmental Entity. NAS PI Channeled Claims shall be channeled to the PI Trust in accordance with the Plan and Master TDP.

"***NAS PI Claim***" means any Claim against any Debtor that is for alleged opioid-related personal injury to an NAS Child or similar opioid-related Cause of Action against any Debtor asserted by or on behalf of an NAS Child, including, for the avoidance of doubt, Claims held on account of an NAS Child and that relate to medical monitoring support, educational support, vocational support, familial support or similar related relief, in each case, that arose prior to the Petition Date, and that is not a Third-Party Payor Claim or a Healthcare Provider Claim, or held by a Domestic Governmental Entity.

"***NAS PI Direct Claim Settlement Retained Payment Amount***" means the portion of the Maximum NAS PI Shareholder Direct Settlement Amount allocable to Holders of Direct Settlement Eligible NAS PI Claims that are Non-Settling Creditors (if any) that would have otherwise been distributed to such Holders pursuant to the NAS PI TDP had they been Settling Creditors, and which amount shall be retained by the Shareholder Payment Parties.

"***NAS PI Portion***" means (i) the Initial NAS PI Distribution, and (ii) 16.2438% of amounts distributed to the PI Trust on account of the MDT PI Claim other than the PI Trust Obligation.

"***NAS PI TDP***" means the trust distribution procedures to be implemented by the PI Trust with respect to NAS PI Channeled Claims, the terms of which shall be consistent with Articles I through XII of the Plan and otherwise acceptable to the Debtors and the NAS Committee, and reasonably acceptable to the Ad Hoc Group of Individual Victims, the Creditors' Committee and the Governmental Consent Parties, and which shall be filed by the Debtors with the Plan Supplement.

"***Native American Tribe Group***" means the group consisting of the Muscogee (Creek) Nation, a member of the Ad Hoc Committee, the Cheyenne & Arapaho Tribes, an ex officio member of the

Creditors' Committee, and other Tribes represented by various counsel from the Tribal Leadership Committee and the MDL Plaintiffs' Executive Committee.

"*NewCo*" means a newly formed Delaware limited liability company to be created in accordance with Section 5.4 of the Plan to directly or indirectly receive the NewCo Transferred Assets and operate such NewCo Transferred Assets in accordance with the NewCo Operating Agreement, the NewCo Governance Covenants and the NewCo Operating Injunction.

"*NewCo Distributable Cash*" means (i) as of the end of any calendar year, all unrestricted Cash and cash equivalents held by NewCo and NewCo's Subsidiaries (as reflected, or as would be reflected on a consolidated balance sheet of NewCo and NewCo's Subsidiaries as of such date in accordance with GAAP) in excess of the amount determined by the NewCo Managers in their discretion to be appropriate to reserve to pay NewCo's incurred and forecasted costs, expenses, fees, taxes, disbursements, debts or obligations, including without limitation operating expenses, research and development expenses, and Public Health Initiative expenditures and (ii) the Unutilized Tino Trial Amount.

"*NewCo Governance Covenants*" means the provisions contained in the Confirmation Order that will bind NewCo, and any successor owner of NewCo's opioid business, to covenants to ensure that NewCo (i) provides all of its products, including all opioid products, in a safe manner that limits the risk of diversion, (ii) complies with its obligations under the Public Entity Settlements and the Private Entity Settlements, (iii) pursues and implements Public Health Initiatives, and (iv) otherwise operates in accordance with NewCo's purpose and takes into account long-term public health interests relating to the opioid crisis and responsible and transparent practices in management of a pharmaceutical business, which covenants shall be acceptable to the DOJ and the Governmental Consent Parties and reasonably acceptable to the Debtors; *provided* that the covenants in respect of the foregoing clause (ii) shall be acceptable to the DOJ and reasonably acceptable to the Debtors, the Creditors' Committee and the Governmental Consent Parties.

"*NewCo Interest*" means the sole limited liability company interest in NewCo, which shall be held by the Foundation as of the Effective Date pursuant to the Public Entity Settlements, representing 100% of the voting Interests in NewCo.

"*NewCo Managers*" means the members of the board of managers of NewCo appointed in accordance with Section 5.4(d) of the Plan.

"*NewCo Monitor*" means the monitor appointed in accordance with Section 5.4(h) of the Plan to review NewCo's compliance with the NewCo Operating Injunction.

"*NewCo Operating Agreement*" means the limited liability company agreement of NewCo, the terms of which shall be consistent with Articles I through XII of the Plan and otherwise acceptable to the DOJ and the Governmental Consent Parties and reasonably acceptable to the Debtors, and which shall be filed by the Debtors with the Plan Supplement.

"*NewCo Operating Injunction*" means a voluntary injunction to be contained in the Confirmation Order that will bind NewCo, and any successor owner of NewCo's opioid business, to injunctive relief substantially similar to the voluntary injunction set forth in Appendix I to the Preliminary Injunction, with any such changes to such voluntary injunction as may be agreed by the Debtors and the Governmental Consent Parties based upon good-faith discussions and in furtherance of NewCo's purpose as set forth in Section 5.4(b) of the Plan.

"*NewCo Transfer Agreement*" means one or more agreements transferring the NewCo Transferred Assets, and all documents and information of the Debtors related thereto, from the Debtors to

NewCo or one of its Subsidiaries (or the transfer of the Transferred Debtors to NewCo or one of its Subsidiaries and the re-vesting of the NewCo Transferred Assets held by such Transferred Debtors in such Transferred Debtors), the terms of which shall be consistent with Articles I through XII of the Plan and otherwise acceptable to the Debtors, the DOJ and the Governmental Consent Parties, and which shall be filed by the Debtors with the Plan Supplement.

"***NewCo Transferred Assets***" means (i) the Initial NewCo Cash and (ii) all non-Cash Assets of the Debtors on the Effective Date (prior to giving effect to the Restructuring Transactions) other than the Excluded Assets. For the avoidance of doubt, all Retained Causes of Action against Co-Defendants not listed on the Schedule of Excluded Parties and ongoing commercial counterparties of NewCo and any Estate Surviving Pre-Effective Date Claims shall be NewCo Transferred Assets.

"***Non-Federal Acute Care Hospital***" means and includes (i) all non-federal acute care hospitals as defined by the Centers for Medicare & Medicaid Services, and (ii) all non-federal hospitals and hospital districts that are required by law to provide inpatient acute care and/or fund the provision of inpatient acute care.

"***Non-Federal Domestic Governmental Channeled Claim***" means (i) any Non-Federal Domestic Governmental Claim or (ii) any Claim held by a Domestic Governmental Entity that is released pursuant to the Governmental Entity Shareholder Direct Settlement, other than the United States or a Tribe. Non-Federal Domestic Governmental Channeled Claims shall be channeled to the Governmental Remediation Trust in accordance with the Plan and Governmental Remediation Trust Documents.

"***Non-Federal Domestic Governmental Claim***" means any Claim against any Debtor that is held by a Domestic Governmental Entity other than the United States or a Tribe (including any Claim based on the subrogation rights of the Holder thereof that is not an Other Subordinated Claim), and that is not a Priority Tax Claim.

"***Non-Hospital Healthcare Provider Claim***" means any Healthcare Provider Claim, for which a Proof of Claim was timely filed by the applicable Bar Date, that is held by a non-Hospital provider of healthcare treatment services or any social services, in its capacity as such.

"***Non-NAS PI Channeled Claim***" means (i) any Non-NAS PI Claim or (ii) any Released Claim or Shareholder Released Claim that is held by a Holder of a Non-NAS PI Claim that is for alleged opioid-related personal injury or that is a similar opioid-related Cause of Action, in each case, that arose prior to the Petition Date (in the case of Third-Party Released Claims, solely to the extent that such Holder of a Non-NAS PI Claim is a Settling Creditor), that is not an NAS PI Channeled Claim, a Third-Party Payor Channeled Claim, or a Healthcare Provider Channeled Claim, or held by a Domestic Governmental Entity. Non-NAS PI Channeled Claims shall be channeled to the PI Trust in accordance with the Plan and Master TDP.

"***Non-NAS PI Claim***" means any Claim against any Debtor that is for alleged opioid-related personal injury or other similar opioid-related Cause of Action against any Debtor, in each case, that arose prior to the Petition Date, and that is not an NAS PI Claim, a Third-Party Payor Claim, or a Healthcare Provider Claim, or held by a Domestic Governmental Entity.

"***Non-NAS PI Direct Claim Settlement Retained Payment Amount***" means the portion of the Maximum Non-NAS PI Shareholder Direct Settlement Amount allocable to Holders of Direct Settlement Eligible Non-NAS PI Claims that are Non-Settling Creditors (if any) that would have otherwise been distributed to such Holders pursuant to the Non-NAS PI TDP had they been Settling Creditors, and which amount shall be retained by the Shareholder Payment Parties.

"***Non-NAS PI Portion***" means (i) the Initial Non-NAS PI Distribution, (ii) 83.7562% of amounts distributed to the PI Trust on account of the MDT PI Claim other than the PI Trust Obligation, and (iii) the PI Trust Obligation distributed to the PI Trust on account of the MDT Claim.

"***Non-NAS PI TDP***" means the trust distribution procedures to be implemented by the PI Trust with respect to Non-NAS PI Channeled Claims, the terms of which shall be consistent with Articles I through XII of the Plan and otherwise acceptable to the Debtors and the Ad Hoc Group of Individual Victims, and reasonably acceptable to the Creditors' Committee and the Governmental Consent Parties, and which shall be filed by the Debtors with the Plan Supplement.

"***Non-Opioid Excluded Claim***" means a Cause of Action by a Person that is not a Debtor, an Estate, the Master Disbursement Trust, a Creditor Trust, the Plan Administration Trust or any successor of any of the foregoing against a Shareholder Released Party to the extent such Cause of Action (i) does not arise from or relate to Opioid-Related Activities, Pending Opioid Actions or opioid use or misuse or the consequences thereof; (ii) is not based upon and does not arise from the same allegations, facts or evidence as any Pending Opioid Action; (iii) does not allege (expressly or impliedly) any liability of such Shareholder Released Party that is derivative of any liability of any Debtor or any of their Estates, including, but not limited to, by making allegations (expressly or impliedly) that such Shareholder Released Party is directly or indirectly liable for the conduct of or a Cause of Action against a Debtor by reason of such Shareholder Released Party's (A) direct or indirect ownership of an Interest in a Debtor, a past or present affiliate of a Debtor, or a predecessor in interest of a Debtor; (B) involvement in the management of a Debtor or a predecessor in interest of a Debtor, or service as an officer, director or employee of a Debtor or a related party; or (C) involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition, of the Debtor or a related party, including but not limited to involvement in providing financing (debt or equity), or advice to an entity involved in such a transaction, or acquiring or selling a financial interest in an entity as part of such a transaction; and (iv) has been authorized to proceed by the Bankruptcy Court in accordance with Section 11.1(f) of the Plan. As used in this definition of Non-Opioid Excluded Claim, the term "related party" has the same meaning as in 11 U.S.C. § 524(g)(4)(A)(iii).

"***Non-Participating***" with respect to Channeled Claim(s) means any Channeled Claim(s) held by a Non-Settling Creditor.

"***Non-Participating Channeled Claims***" means any Channeled Claim held by a Non-Settling Creditor as of the Effective Date, in each case, until such Channeled Claim is either: (i) Allowed in accordance with Sections 7.6 or 7.9 of the Plan, or (ii) Disallowed by Final Order.

"***Non-Party Covered Conduct Claim***" means a Cause of Action against any Non-Released Party involving, arising out of, or related to Covered Conduct (or conduct that would be Covered Conduct if engaged in by a Shareholder Released Party).

"***Non-Party Settlement***" means a settlement by any Releasing Party that settles any Non-Party Covered Conduct Claim and includes a release of any Non-Released Party.

"***Non-PRA Estate Distributions***" means all Estate Distributions that are not PRA Estate Distributions.

"***Non-Released Party***" means any Person or Entity that is not a Released Party or Shareholder Released Party.

"*Non-Settling Creditor*" means any Holder of a Claim (other than any Holder of a Claim in Classes 11(a), 11(b) and 11(c) that is not an Other GUC Litigation Claim) that is (i) evidenced by a Proof

of Claim timely filed by the applicable Bar Date, or (ii) not required to be evidenced by a filed Proof of Claim under the Plan, the Bankruptcy Code or a Final Order, in each case, that does not consent to the Shareholder Direct Claims Releases pursuant to the Shareholder Release Consent Mechanism applicable to the applicable Class of such Claims. For avoidance of doubt, and notwithstanding the foregoing, Non-Settling Creditors will include (i) Non-Settling States, (ii) Non-Settling Subdivisions, and (iii) Subdivisions that are not Participating Subdivisions.

"***Non-Settling States***"  means States that are Non-Settling Creditors.

"***Non-Settling States Holdback Distributions***" means both the (i) the PRA Estate Distributions and (ii) Non-PRA Estate Distributions that would have otherwise been distributed to any Non-Settling States as Estate Distributions had they been Settling States, in accordance with the Governmental Remediation Trust Agreement."***Non-Settling Subdivisions***"  means Subdivisions that have timely filed a Proof of Claim against the Debtors and that are not Participating Subdivisions.

"***Non-Settling Subdivisions Holdback Distributions***" means both the (i) the PRA Estate Distributions and (ii) Non-PRA Estate Distributions that would have been distributed to such Non-Settling Subdivisions that filed a Proof of Claim as Estate Distributions had they been Participating Subdivisions in accordance with the Governmental Remediation Trust Agreement.

"***Notice of Shareholder Release Snapback***" means a notice filed with the Bankruptcy Court by the Master Disbursement Trust pursuant to the Master Shareholder Settlement Agreements providing notice that a Shareholder Family Group is in Specified Breach (as defined in the Shareholder Settlement Agreements) and the Master Disbursement Trust has elected to enforce the Shareholder Release Remedy pursuant to the terms of the Master Shareholder Settlement Agreement and identifying the Breaching Shareholder Family Group and the Designated Shareholder Released Parties subject to such Shareholder Release Remedy.

"***Oklahoma Litigating Political Subdivisions***" means subdivisions located in Oklahoma that are listed in Exhibit E the Plan.

"***Omnibus Claims Objection Order***" has the meaning set forth in Section 7.3(f) of the Plan.

"***Opioid-Related Activities***" means the development, production, manufacture, licensing, labeling, marketing, advertising, promotion, distribution or sale of opioid Products or the use or receipt of any proceeds therefrom, or the use or misuse of opioids, including opioids that are not Products, or any act or failure to act in connection with laws or regulations related to any opioid.

"***Opt-In Settling Creditor***" means any Holder of Claims that consents to the Third-Party Releases through electing to opt-in to the Third-Party Releases on its applicable ballot.

"***Opt-Out Class Action Settlements***" means the (i) Public School District Shareholder Direct Settlement, (ii) Hospital Shareholder Direct Settlement, and (iii) ER Physician Shareholder Direct Settlement.

"***Other Federal Agency Claim***" means any Claim filed by the United States Department of Health and Human Services, the United States Department of Veterans Affairs, the Indian Health Service and the Centers for Medicare & Medicaid Services, set forth in Proof of Claim Nos. 138509, 137406, 137782 and 138522, respectively.

"***Other General Unsecured Claim***" means any Claim against any Debtor that is not an Administrative Claim, a Priority Claim, a Secured Claim, a Federal Government Unsecured Claim, a

Channeled Claim, a Co-Defendant Claim, an Other Subordinated Claim, an Avrio General Unsecured Claim, an Adlon General Unsecured Claim, an Intercompany Claim or a Shareholder Claim.

"***Other General Unsecured Claim Cash***" means $15 million of Effective Date Cash to be used to make Distributions to Holders of Allowed Other General Unsecured Claims.

"***Other GUC Litigation Claims***" means Disputed Other General Unsecured Claims arising from or related to Covered Conduct.

"***Other Priority Claim***" means any Claim against any Debtor that is entitled to priority of payment as specified in section 507(a) of the Bankruptcy Code and is not an Administrative Claim or a Priority Tax Claim.

"***Other Subordinated Claim***" means any Claim against any Debtor that is subject to subordination under section 509(c) or 510 of the Bankruptcy Code or other applicable law, and that is not a Co-Defendant Claim or a Shareholder Claim. Notwithstanding anything to the contrary outside of this definition in the Plan, any Claim that satisfies the definition of an Other Subordinated Claim shall be an Other Subordinated Claim notwithstanding that such Claim would otherwise satisfy the definition of another type of Claim.

"***Participating Subdivision***" means any Subdivision located in a Settling State, in Oklahoma, or any Subdivision located in a Non-Settling State that subsequently becomes a Settling State, in each case where the Subdivision has executed a joinder to the Governmental Entity Shareholder Direct Settlement and thereby provided the Shareholder Direct Claims Releases.

"***PAT Agreement***" means the trust agreement establishing and delineating the terms and conditions for the creation and operation of the Plan Administration Trust, as it may be amended from time to time, the terms of which shall be consistent with Articles I through XII of the Plan and otherwise acceptable to the Debtors and the Governmental Consent Parties, and reasonably acceptable to the Creditors' Committee, and which shall be filed by the Debtors with the Plan Supplement.

"***PAT Assets***" means (i) the PAT Reserves, (ii) the PAT Distribution Accounts, (iii) the Retained Causes of Action relating solely to, and only to the extent necessary for, the administration of Claims against the Debtors (other than Channeled Claims), the enforcement of the Plan Administration Trust's rights and the other responsibilities of the Plan Administration Trust, *provided* that no Retained Causes of Action against Excluded Parties shall constitute PAT Assets, except as necessary to object to and resolve any Disputed Claims held by an Excluded Party, (iv) the Excluded Privileged Materials and (v) any other Excluded Assets that are not MDT Transferred Assets.

"***PAT Disputed Claims Reserves***" means the reserves to be established on account of Disputed Avrio General Unsecured Claims, Disputed Adlon General Unsecured Claims and Disputed Other General Unsecured Claims (which may be a single or collective reserve for one or more Classes of Claims). The PAT Disputed Claims Reserves shall be (i) funded on the Effective Date with Effective Date Cash in an amount determined by the Debtors, and reasonably acceptable to the Creditors' Committee and the Governmental Consent Parties; and (ii) held by the Plan Administration Trust and administered by the Plan Administration Trustee on and after the Effective Date.

"***PAT Distribution Account***" means one or more accounts to be established to make Distributions in respect of Allowed Avrio General Unsecured Claims, Allowed Adlon General Unsecured Claims and Allowed Other General Unsecured Claims (which may be a single or collective account for one or more Classes of Claims). The PAT Distribution Account shall be (i) funded on the Effective Date in accordance with Section 5.14(a) of the Plan in an amount necessary to make Distributions in respect of such

Claims to the extent Allowed as of the Effective Date and periodically funded thereafter in accordance with Section 7.7 of the Plan and (ii) held by the Plan Administration Trust and administered by the Plan Administration Trustee.

"***PAT Distribution Date***" means any date upon which a Distribution is made by the Plan Administration Trustee.

"***PAT Reserves***" means, collectively, the Wind-Up Reserve, the PAT Disputed Claims Reserves, the Disputed Cure Claims Reserve and the Priority Claims Reserve.

"***Patient Settlement Payment***" has the meaning set forth in Section 4.10(d) of the Plan.

"***Payment Remedy***" has the meaning set forth in Section 5.6(f)(i) of the Plan.

"***PBGC***" means the Pension Benefit Guaranty Corporation, a wholly owned United States government corporation, and an agency of the United States created by ERISA.

"***Pending Opioid Actions***" means the judicial, administrative or other actions or proceedings or Causes of Actions that were or could have been commenced before the commencement of the Chapter 11 Cases and that are identified in the charts annexed as Appendix II and Appendix III to the Preliminary Injunction, as well as any other pending actions against any of the Debtors, Released Parties or Shareholder Released Parties alleging substantially similar facts or Causes of Action as those alleged in the actions identified in those appendices.

"***Person***" means an individual (including, without limitation, in his or her capacity as a trustee, protector or executor), corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust or trustee, protector, executor, estate, unincorporated organization, Governmental Unit, Tribe or other Entity.

"***Petition Date***" means September 15, 2019.

"***Petitioner***" has the meaning set forth in Section 5.13(s)(vi) of the Plan.

"***Physician***" means a physician or physician practice group, which shall include, without limitation, ER Physicians.

"***PI and TPP Claims Procedures Order***" means the *Order (I) Appointing PI and TPP Claims Administrators; (II) Authorizing the Establishment of Claims Deadlines and Claims Objection Procedures; and (III) Granting Related Relief* [D.I. 7382].

"***PI Channeled Claim***" means any NAS PI Channeled Claim or Non-NAS PI Channeled Claim.

"***PI Claim***" means any NAS PI Claim or Non-NAS PI Claim.

"***PI Shareholder Direct Settlements***" means the agreements by the Holders of PI Claims to provide, pursuant to the applicable Shareholder Release Consent Mechanism, the Third-Party Releases and be subject to the injunctions set forth in Sections 10.6(b) and 10.7(b) of the Plan in exchange for the consideration contemplated in the Plan and the Master Shareholder Settlement Agreement.

"***PI TDP***" means, collectively or as applicable, (i) with respect to NAS PI Channeled Claims, the NAS PI TDP and (ii) with respect to Non-NAS PI Channeled Claims, the Non-NAS PI TDP.

"*PI Trust*" means the trust to be established in accordance with Section 5.8 of the Plan to (i) assume all liability for the PI Channeled Claims, (ii) hold the MDT PI Claim, collect the Initial PI Trust Distribution and any payments due under the MDT PI Claim in accordance with the Plan, the Private Entity Settlements and the PI Trust Documents, (iii) administer PI Channeled Claims, (iv) make Distributions on account of Allowed PI Channeled Claims in accordance with the PI Trust Documents, (v) hold and administer the Class 10(a) Non-Participating Claims Reserve and the Class 10(b) Non-Participating Claims Reserves on and after the Effective Date, (vi) fund the TPP LRP Escrow Account and make payments therefrom to LRP Participating TPPs, in each case, in accordance with and subject to the terms of the LRP Agreement and (vii) carry out such other matters as are set forth in the PI Trust Documents.

"*PI Trust Agreement*" means the trust agreement establishing and delineating the terms and conditions for the creation and operation of the PI Trust, the terms of which shall be consistent with Articles I through XII of the Plan and otherwise acceptable to the Debtors and the Ad Hoc Group of Individual Victims, and reasonably acceptable to the Creditors' Committee and the Governmental Consent Parties, and which shall be filed by the Debtors with the Plan Supplement.

"*PI Trust Deductions and Holdbacks*" means, collectively or as applicable, the following deductions and holdbacks from Distributions from the PI Trust as required under and subject to the terms of the PI Trust Documents: (i) the deduction of Creditor Trust Operating Expenses of the PI Trust, as required under and subject to the terms of the PI TDP and the PI Trust Agreement, (ii) the holdback of amounts in the TPP LRP Escrow Account and payments therefrom to LRP Participating TPPs, in each case, as required under and subject to the terms of the LRP Agreement, (iii) the deduction of amounts prepaid to the United States under the United States-PI Claimant Medical Expense Claim Settlement, (iv) the deduction of amounts on account of compensation, costs and fees of professionals that represented or advised (a) the Ad Hoc Group of Individual Victims in the event a Final Order is not entered granting a request for the allowance of reasonable and documented fees and expenses incurred by the Ad Hoc Group of Individual Victims under section 503(b) of the Bankruptcy Code; provided that, if a Final Order is entered granting such request in an amount less than the amount requested, then the deduction of the difference between the amount approved by such Final Order and the amount requested and (b) the NAS Committee in connection with the Chapter 11 Cases, in each case as and to the extent provided in the PI TDP and the PI Trust Agreement and subject to Section 5.9(h) of the Plan, and (v) the common benefit assessment required under Section 5.9(d) of the Plan and, where applicable, the fees and costs of a Holder's individual attorney(s), which deduction shall be made by such attorney(s) and reduced by the common benefit assessment in accordance with Section 5.9(d), as and to the extent provided in the PI TDP.

"*PI Trust Documents*"means the PI Trust Agreement, the PI TDP and the LRP Agreement, including all exhibits thereto."*PI Trust NAS Fund*" means a fund established by the PI Trust to make Distributions on account of Allowed NAS PI Channeled Claims and funded with the NAS PI Portion.

"*PI Trust Non-NAS Fund*" means a fund established by the PI Trust to make Distributions on account of Allowed Non-NAS PI Channeled Claims and funded with the Non-NAS PI Portion.

"*PI Trust Obligation*" has the meaning set forth in Section 5.2(e)(iv) of the Plan.

"*PI Trustee*" means the Creditor Trustee of the PI Trust.

*PI/TPP Classes*" means, as applicable, Class 8 (Third-Party Payor Claims), Class 10(a) (NAS PI Claims), or Class 10(b) (Non-NAS PI Claims).

"*PI/TPP Trust*" means, as applicable, the TPP Trust or the PI Trust.

"***PI/TPP Trustee***" means, as applicable, the Creditor Trustee for the TPP Trust or the PI Trust.

"***PG Pro Rata Share***"  means, with respect to a given Shareholder Payment Group, the share represented by:

(a)      With respect to the Third-Party Payor Shareholder Direct Settlement for Class 8 (Third-Party Payor Claims), (i) the portion of the Maximum TPP Shareholder Direct Settlement Amount assigned to such Shareholder Payment Group (if any) pursuant to Exhibit M-2 of the Master Shareholder Settlement Agreement divided by (ii) the Maximum TPP Shareholder Direct Settlement Amount.

(b)      With respect to the PI Shareholder Direct Settlement for Class 10(a) (NAS PI Claims), (i) the portion of the Maximum NAS PI Shareholder Direct Settlement Amount assigned to such Shareholder Payment Group (if any) pursuant to Exhibit M-2 of the Master Shareholder Settlement Agreement divided by (ii) the Maximum NAS PI Shareholder Direct Settlement Amount.

(c)      With respect to the PI Shareholder Direct Settlement for Class 10(b) (Non-NAS PI Claims), (i) the portion of the Maximum Non-NAS PI Shareholder Direct Settlement Amount assigned to such Shareholder Payment Group (if any) pursuant to Exhibit M-2 of the Master Shareholder Settlement Agreement divided by (ii) the Maximum Non-NAS PI Shareholder Direct Settlement Amount.

"***Plan***" means this joint chapter 11 plan of reorganization for the Debtors, including all appendices, exhibits, schedules and supplements hereto (including the Plan Supplement), as it may be altered, amended or modified from time to time in accordance with the Bankruptcy Code, the Bankruptcy Rules and the terms hereof.

"***Plan Administration Trust***" means the trust to be created in accordance with <u>Section 5.3</u> of the Plan to administer and make Distributions in respect of Claims against the Debtors (other than Channeled Claims and Federal Government Unsecured Claims) and administer the Plan.

"***Plan Administration Trustee***" means the trustee of the Plan Administration Trust appointed in accordance with <u>Section 5.3(c)</u> of the Plan.

"***Plan Documents***" means, collectively, the Plan and all documents to be executed, delivered, assumed or performed in connection with the Restructuring Transaction and the occurrence of the Effective Date, including the documents to be included in the Plan Supplement.

"***Plan Injunction***" means the injunctions issued pursuant to <u>Section 10.5</u> of the Plan.

"***Plan Settlement***" means the settlement of certain Claims and controversies described in <u>Section 5.2</u> of the Plan, and as further described and explained in the Disclosure Statement.

"***Plan Supplement***" means the supplement or supplements to the Plan containing certain documents relevant to the implementation of the Plan, which shall include the MDT Documents, the NewCo Transfer Agreement, the NewCo Operating Agreement, the Foundation Bylaws, the Governmental Remediation Trust Documents, the PAT Agreement, the PI Trust Documents (including the LRP Agreement), the Healthcare Provider Trust Documents, the ERP Trust Documents, the TPP Trust Documents, Public School Trust Documents, the Tribe Trust Documents, the identity of the MDT Trustees, the identity of the MDT Advisory Council Representatives, the identity of the NewCo Managers, the identity of the Foundation Trustees, the identity of the Plan Administration Trustee and PPLP Liquidator, the identity of the Creditor Trustees, identity of the Governmental Remediation Trust Trustees, the Schedule

of Rejected Contracts, the Schedule of Retained Causes of Action, the Schedule of Excluded Parties, the Master Shareholder Settlement Agreement, and the Restructuring Steps Memorandum.

"*Plea Agreement*" means that certain proposed plea agreement attached as Exhibit B to the DOJ 9019 Motion, as approved by the DOJ 9019 Order, by and among (i) Purdue Pharma L.P. and (ii) the United States, acting through the United States Attorney's Office for the District of New Jersey, the United States Attorney's Office for the District of Vermont, and the United States Department of Justice, Civil Division, Consumer Protection Branch.

"*PPI Interest*" means any Interest in Purdue Pharma Inc., whether held directly or indirectly, that existed immediately before the Effective Date.

"*PPLP*" means Purdue Pharma L.P.

"*PPLP Dissolution Date*" means the date on which the PPLP Liquidator dissolves PPLP in accordance with Section 5.15(d) of the Plan.

"*PPLP Interest*" means any Interest in PPLP, whether held directly or indirectly, that existed immediately before the Effective Date.

"*PPLP Liquidator*" means the person appointed in accordance with Section 5.15(c) of the Plan, who will be the same individual appointed as the Plan Administration Trustee.

"*PRA L.P.*" means Pharmaceutical Research Associates L.P.

"*PRA Estate Distributions*" means the portion of the Estate Distributions for each Class that is attributable to amounts received from PRA L.P. and/or from Effective Date Cash.

"*Preliminary Injunction*" means the *Seventeenth Amended Order Pursuant to 11 U.S.C. § 105(a) Granting Motion for a Preliminary Injunction*, Adv. Pro. No. 19-08289 (RDD) [D.I. 254], as amended from time to time.

"*Prepayment Date*" shall have the meaning ascribed to such term in the Master Shareholder Settlement Agreement.

"*Prepetition Oklahoma Settlement*" has the meaning set forth in Section 5.2(f)(i)(D) of the Plan.

"*Priority Claim*" means any Priority Tax Claim or Other Priority Claim.

"*Priority Claims Reserve*" means a reserve to be established to pay Allowed Administrative Claims (other than Professional Fee Claims, which shall be paid from the Professional Fee Escrow Account in accordance with Section 2.1(b) of the Plan, and the DOJ Forfeiture Judgment Claim, which shall be paid in accordance with Section 2.3 of the Plan), Allowed Secured Claims and Allowed Priority Claims. The Priority Claims Reserve shall be (i) funded on the Effective Date with Cash and cash equivalents of the Debtors in an amount determined by the Debtors and reasonably acceptable to the Governmental Consent Parties, in consultation with the Creditors' Committee, and (ii) held by the Plan Administration Trust in a segregated account and administered by the Plan Administration Trustee on and after the Effective Date.

"*Priority Tax Claim*" means any Claim against any Debtor that is held by a Governmental Unit and of the kind entitled to priority in payment under sections 502(i) and 507(a)(8) of the Bankruptcy Code.

"***Private Claimants' Priority Reversion***" means, on any date of determination, an amount equal to $19.8 million *less* the total Litigation Costs (as defined in the Master Shareholder Settlement Agreement) paid from the Special Operating Reserve for claims pursued by any Non-Settling Creditors in their respective Class as of such date.

"***Private Creditor Trusts***" means the Healthcare Provider Trust, the ERP Trust, the TPP Trust, and the PI Trust.

"***Private Entity Settlements***" means the settlement of Healthcare Provider Channeled Claims, Third-Party Payor Channeled Claims, the ER Physician Channeled Claims and PI Channeled Claims provided for under the Plan, as set forth in Section 5.2(e) of the Plan.

"***Privilege***" means any attorney-client privilege, work-product protection, joint defense or common interest privilege or other privilege or protection of immunity (i) held by any or all of the Debtors or their Estates, (ii) held by the board of directors (or similar body) or any special committee of the board of directors (or similar body) of any of the Debtors or (iii) attaching to any documents, communications, or thing (whether written or oral), including, but not limited to, electronic information relating to any Purdue Insurance Rights or Estate Causes of Action. Correlative terms such as "Privileged" have correlative meanings. Documents or information that are or have been subject to a clawback request by Debtors in the Purdue Legal Matters are Privileged.

"***Pro Rata Share***" means, with respect to an Allowed Other General Unsecured Claim, the proportion that such Allowed Claim bears to the aggregate amount of Allowed Other General Unsecured Claims and Disputed Other General Unsecured Claims.

"***Products***" means any and all products developed, designed, manufactured, marketed or sold, in research or development, or supported by, the Debtors, whether work in progress or in final form, whether used for medicinal or non-medicinal purposes, and whether natural, synthetic, or semi-synthetic, or any finished pharmaceutical product made from or with such product, including, but not limited to (a) any such products that are: (i) an opioid or opiate, as well as any product containing any such substance; or (ii) benzodiazepine, carisoprodol, or gabapentin; or (iii) a combination or "cocktail" of chemical substances prescribed, sold, bought, or dispensed to be used together that includes opioids or opiates and (b) any such product consisting of or containing buprenorphine, codeine, fentanyl, hydrocodone, hydromorphone, meperidine, methadone, morphine, oxycodone, oxymorphone, tapentadol, tramadol, opium, heroin, carfentanil, diazepam, estazolam, quazepam, alprazolam, clonazepam, oxazepam, flurazepam, triozolam, temazepam, midazolam, carisoprodol, gabapentin, or any variant of these substances or any similar substance.

"***Professional Fee Claim***" means a Claim for services or costs incurred in connection with such services, on or after the Petition Date and on or prior to the Effective Date, in each case by Professional Persons that remains unpaid as of the Effective Date, less any existing amounts held as a fee advance, retainer, or as security by a Professional Person that such Professional Person is authorized to use to satisfy Allowed Professional Fee Claims pursuant to the Interim Compensation Order or an order of the Bankruptcy Court authorizing the retention of such Professional Person (other than a reasonable retainer to cover post-Effective Date work); *provided* that, notwithstanding the foregoing, (i) the Professional Fee Claims of the Professional Persons retained by the Ad Hoc Committee shall be subject to the terms of the AHC Reimbursement Agreement Assumption Order and shall also include fees and expenses incurred prior to the Petition Date as and to the extent set forth in the AHC Reimbursement Agreement Assumption Order, and (ii) the Professional Fees Claims of the Professional Persons retained by the MSGE Group shall be subject to the terms of the MSGE Group Reimbursement Order.

"***Professional Fee Escrow Account***" means an account funded by the Debtors in Cash on or before the Effective Date to satisfy Allowed Professional Fee Claims in accordance with Section 2.1(b) of the Plan.

"***Professional Person***" means (i) any Person retained by order of the Bankruptcy Court in connection with these Chapter 11 Cases pursuant to section 327, 328, 330, 331, 503(b) or 1103 of the Bankruptcy Code, excluding any ordinary course professional retained pursuant to an order of the Bankruptcy Court, (ii) each of the professionals for the Ad Hoc Committee, as and to the extent authorized by the AHC Reimbursement Agreement Assumption Order, and (iii) each of the professionals for the MSGE Group, as and to the extent authorized by the MSGE Group Reimbursement Order.

"***Proof of Claim***" means a proof of Claim against any of the Debtors filed in the Chapter 11 Cases in accordance with section 501 of the Bankruptcy Code.

"***Protected Information***" has the meaning set forth in Section 5.13(o)(i) of the Plan.

"***Protected Parties***" means, collectively, (i) the Debtors, (ii) each of the Debtors' Related Parties, (iii) NewCo, (iv) the Foundation, (v) the Plan Administration Trust, (vi) the Master Disbursement Trust, except, solely to the extent provided in the Master TDP and the Governmental Remediation Trust Documents, with respect to the Channeled Claims channeled to the Master Disbursement Trust, (vii) each Creditor Trust, except, solely to the extent provided in the applicable Creditor Trust TDP, with respect to the Channeled Claims channeled to such Creditor Trust and (viii) the Shareholder Released Parties, subject to Section 10.8(c) of the Plan with respect to the Shareholder Release Snapback Parties.

"***Protective Order***" means the *Third Amended Protective Order*, 19-23649 (RDD) [D.I. 1935], as amended.

"***Public Creditor Trust Distributions***" means any and all payments, transfers and distributions from or on behalf of the Debtors or the Master Disbursement Trust to either of the Public Creditor Trusts, including without limitation the Initial Public Creditor Trust Distributions and all distributions of MDT Distributable Value received by a Public Creditor Trust.

"***Public Creditor Trusts***" means Governmental Remediation Trust and the Tribe Trust.

"***Public Document Repository***" means the public document repository to be established as set forth in Section 5.13 of the Plan.

"***Public Entity Allocation***" means the allocations of Public Creditor Trust Distributions between Governmental Remediation Trust and the Tribe Trust as set forth in Section 5.2(f)(i)(B) of the Plan.

"***Public Entity Settlements***" means the settlement of Non-Federal Domestic Governmental Channeled Claims, Tribe Channeled Claims and Public School Channeled Claims provided for under the Plan, as set forth in Section 5.2(f) of the Plan.

"***Public Health Initiatives***" means the development and distribution of medicines to treat opioid addiction and reverse opioid overdoses.

"***Public School Channeled Claim***" means (i) any Public School Claim or (ii) any Claim held by a Public School District that is released pursuant to the Public School District Shareholder Direct Settlement Agreement. Public School Channeled Claims shall be channeled to the Public School Trust in accordance with the Plan and Master TDP.

"***Public School Claims***" means any Claim against any Debtor that is held by a Public School District, in its capacity as such.

"***Public School District***" means an elementary, middle, or secondary public school district in the United States, in its capacity as such, that (i) has filed one or more Proofs of Claim; (ii) has a student population greater than 5,000 students; or (iii) has filed cases against the opioid industry in MDL 2804 McKinsey or other courts.

"***Public School District Claimants***" means the public school districts identified in the (i) *Verified Statement of Binder & Schwartz LLP Under Federal Rule of Bankruptcy Procedure 2019* [D.I. 2707] and (ii) *Verified Statement of Hughes Socol Piers Resnick & Dym, Ltd. and Cocounsel under Federal Rule of Bankruptcy Procedure 2019* [D.I. 2304], each as may be amended from time to time.

"***Public School District Shareholder Direct Settlement***" means the settlement set forth in the Public School District Shareholder Direct Settlement Agreement.

"***Public School District Shareholder Direct Settlement Agreement***" means the settlement agreement substantially in the form attached as Exhibit B to the *Notice of Filing of Certain Direct Claims Shareholder Settlement Agreements* [D.I. 7878].

"***Public School TDP***" means the trust distribution procedures to be implemented by the Public School Trust setting forth the procedures for distributions from the Public School Trust, the terms of which shall be consistent with Articles I through XII of the Plan and otherwise acceptable to the Debtors and the Public School District Claimants, and reasonably acceptable to the Creditors' Committee and the Governmental Consent Parties, and which shall be filed by the Debtors with the Plan Supplement.

"***Public School Trust***" means a trust called the Public Schools' Special Education Initiative Trust which shall, on the terms described in the Public School Trust Agreement and in accordance with Section 5.8 of the Plan (i) assume all liability for the Public School Channeled Claims, (ii) hold the MDT Public School District Claim and collect the Initial Public Schools Distribution and additional payments due under the MDT Public School District Claim in accordance with the Public Entity Settlements and the Public School Trust Documents (after deduction of any required payments to the Common Benefit Fund and/or in respect of attorneys' fees and expenses of the Public School District Claimants in accordance with Section 5.9(d) and (i) of the Plan), (iii) administer Public School Channeled Claims, (iv) hold and administer the Class 6 Non-Participating Claims Reserve on and after the Effective Date, (v) hold the Class 6 Released Claims Reserve on and after the Effective Date and (vi) make Distributions in accordance with the Public School TDP.

"***Public School Trust Agreement***" means the trust agreement establishing and delineating the terms and conditions for the creation and operation of the Public School Trust, the terms of which shall be consistent with Articles I through XII of the Plan and otherwise acceptable to the Debtors and the Public School District Claimants, and reasonably acceptable to the Creditors' Committee and the Governmental Consent Parties, and which shall be filed by the Debtors with the Plan Supplement.

"***Public School Trust Documents***" means the Public School Trust Agreement and the Public School TDP.

"***Purdue***" has the meaning set forth in the introductory paragraph of this Plan.

"***Purdue Arm***" has the meaning set forth in the GBM AGILE Motion.

"***Purdue Insurance Collateral***" means any collateral the Debtors have provided or set aside to secure obligations under any Purdue Insurance Policy.

"***Purdue Insurance Policies***" means any primary, umbrella, excess, fronting or other insurance policy, whether known or unknown, issued to or that provides or may provide coverage or benefits at any time to any of the Debtors or under which any of the Debtors have sought or may seek coverage or benefits, including, without limitation, any such policy for directors' and officers' liability, general liability, product liability, property, workers' compensation or fiduciary liability, or any other coverage, and all agreements, documents or instruments relating thereto including, without limitation, any agreement with a third-party administrator for claims handling, risk control or related services, that (i) were issued prior to the Effective Date and (ii) cover periods that are, in whole or in part, prior to the Effective Date. For the avoidance of doubt, Purdue Insurance Policies shall not include any insurance policy that was issued exclusively to and that exclusively benefits and exclusively provides coverage to Persons who are neither Debtors nor predecessors of a Debtor nor current or former officers, directors or shareholders of any of the Debtors.

"***Purdue Insurance Rights***" means any and all rights, titles, privileges, interests, claims, demands or entitlements of the Debtors to any proceeds, payments, benefits, Causes of Action, choses in action, defense or indemnity arising under, or attributable to, any and all Purdue Insurance Policies or Purdue Insurance Collateral, now existing or hereafter arising, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, disputed or undisputed, fixed or contingent. For the avoidance of doubt, "Purdue Insurance Rights" include any rights of the Debtors to proceeds of Purdue Insurance Policies and Purdue Insurance Collateral.

"***Purdue Insurance Stipulation***" means the *Stipulation and Agreed Order Granting Joint Standing to Prosecute Claims and Causes of Action Related to the Debtors' Insurance Coverage to (1) the Official Committee of Unsecured Creditors and (2) the Ad Hoc Committee of Government and Other Contingent Litigation Claimants* [D.I. 2305].

"***Purdue Legal Matter***" means (i) these Chapter 11 Cases, the Plan or the Restructuring Transactions, (ii) the Pending Opioid Actions, (iii) any other ongoing or completed action or proceeding, whether commenced by a Governmental Unit or any other Person, or government investigation, in each case, relating generally to the same or similar subject matter of the actions and proceedings subject to the Preliminary Injunction, (iv) any ongoing or completed action or investigation by the DOJ, including any cooperation obligation arising out of any such action or investigation or (v) any mediation or settlement related to the same or similar subject matter of any of the foregoing.

"***Purdue Monitor***" means the monitor retained pursuant to the voluntary injunction set forth in Appendix I to the Preliminary Injunction.

"***Purdue Oklahoma Subdivision Fund***" means the fund designated for the Oklahoma subdivisions in the State of Oklahoma's pre-petition settlement with the Debtors and certain of the Sackler Parties and/or their Related Parties.

"***Purdue Pension Plan***" means the Purdue Pharma L.P. Pension Plan, a single-employer defined benefit pension plan covered by Title IV of ERISA.

"***Ratepayer Mediation Participants***" means the proposed representatives of classes of privately insured parties who are plaintiffs and proposed class representatives identified in the Amended Verified Statement of Stevens & Lee, P.C. Pursuant to Bankruptcy Rule 2019 [D.I. 333].

"***Ratepayer Mediation Participants Stipulation***" means a stipulation to be entered into among the Debtors, the Ratepayer Mediation Participants and the Sackler Parties pursuant to which (i) the Ratepayer Mediation Participants will agree to (a) withdraw all proofs of claim filed by the Ratepayer Mediation Participants and (b) not to prosecute further litigation on grounds similar to those represented by such proofs of claim against the Shareholder Released Parties; (ii) the Ratepayer Mediation Participants agree to support this Plan; and (iii) the Ratepayer Mediation Participants will receive $1.4 million in professional fees for services rendered in connection with the Chapter 11 Cases.

"***Reciprocal Releasee***" means each of the following: (i) the Debtors and their Estates, (ii) each Party granting the Third-Party Releases pursuant to the applicable Shareholder Release Consent Mechanism, and (iii) each Releasing Party.

"***Reinstated***" means, with respect to any Claim against or Interest in a Debtor, that such Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

"***Related Parties***" means, with respect to a Person, (i) such Person's predecessors, successors, assigns, Subsidiaries, affiliates, managed accounts or funds, past, present and future officers, board members, directors, principals, agents, servants, independent contractors, co-promoters, third-party sales representatives, medical liaisons, members, partners (general or limited), managers, employees, subcontractors, advisory board members, financial advisors, attorneys and legal representatives, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals and advisors, trusts (including trusts established for the benefit of such Person), trustees, protectors, beneficiaries, direct or indirect owners and/or equityholders, parents, transferees, heirs, executors, estates, nominees, administrators, and legatees, in each case in their respective capacities as such; (ii) the Related Parties of each of the foregoing, in each case in their respective capacities as such; and (iii) solely with respect to the Settling Co-Defendants, any insurer of any Settling Co-Defendant solely in its capacity as such (and specifically excluding certain insurers of the Debtors that have issued, are responsible for, or have liability on account of insurance rights arising out of or in connection with Opioid-Related Activities, solely in such insurers capacities as such). For the avoidance of doubt, the citizens and residents of a State shall not be deemed to be Related Parties of such State solely as a result of being citizens or residents of such State; *provided*, *however*, that notwithstanding the foregoing, in no event shall an Excluded Party be a Related Party.

"***Relativity Database***" has the meaning set forth in <u>Section 5.13(g)</u> of the Plan.

"***Released Claims***" means any Causes of Action released pursuant to <u>Section 10.6(a)</u> and <u>(b)</u> of the Plan.

"***Released Claims Reserves***" means separate interest-bearing escrow accounts established on the Effective Date by each Creditor Trust, with the Master Disbursement Trust serving as administrative agent in relation thereto, to hold amounts released from the Creditor Trust PRA Non-Participating Claims Reserves and the Select Private Creditor Trust Non-Participating Claims Reserves pursuant to <u>Section 7.8</u> of this Plan upon the disallowance of Non-Participating Channeled Claims.

"***Released Parties***" means, collectively, (i) the Debtors, (ii) each of the Debtors' Related Parties, solely in their respective capacities as such, and (iii) solely for purposes of the releases by the Debtors in <u>Section 10.6(a)</u> of the Plan, (A) the Supporting Claimants, the Creditors' Committee and the Creditors' Committee's members and each of their respective professionals, in each case solely in their respective capacities as such and (B) the Settling Co-Defendants and each of their Related Parties, in each case solely in their respective capacities as such; *provided*, *however*, that, notwithstanding the foregoing or anything herein to the contrary, no Excluded Party or Shareholder Release Snapback Party shall be a Released Party in any capacity or respect. For purposes of this definition of "Released Parties," the phrase

43

"solely in their respective capacities as such" means, with respect to a Person, solely to the extent a claim against such Person (x) arises from such Person's conduct or actions taken in such capacity, or from such Person's identified capacity in relation to another specified Released Party and not, in either case, from such Person's conduct or actions independent of such capacity, and (y) to the extent such Person's liability depends on or derives from the liability of such other Released Party, such claim would be released if asserted against such other Released Party.

"***Releases***" means the releases provided for in <u>Sections 10.6</u> and <u>10.7</u> of the Plan.

"***Releasing Parties***" means, collectively, (i) the Supporting Claimants, solely in their respective capacities as such, (ii) the Opt-In Settling Creditors, (iii) the Settling Co-Defendants and (iv) with respect to each of the Persons in the foregoing clauses (i) through (iii), each of their Related Parties, to the extent the applicable Releasing Party has the authority under applicable law to grant such release on its behalf, in each case, other than any Shareholder Released Party.

"***Replenishment Transfer***" means a transfer by the Master Disbursement Trust to the Special Operating Reserve pursuant to the terms of the Master Shareholder Settlement Agreement.

"***Reserved MDT Insurance Policies***" means (i) policy number B0509FINMR 1600558 and policy number B0509FINMR 1600559 and (ii) any MDT Insurance Policy that is not listed by policy number in Schedule 2 to the MDT Agreement.

"***Restructuring Steps Memorandum***" means the summary of transaction steps to complete the Restructuring Transactions, which shall be consistent with <u>Articles I</u> through <u>XII</u> of the Plan and otherwise acceptable to the Debtors, and reasonably acceptable to the Creditors' Committee and the Governmental Consent Parties, and which shall be included in the Plan Supplement.

"***Restructuring Transactions***" means one or more transactions to occur on or before the Effective Date or as soon as reasonably practicable thereafter, that may be necessary or appropriate to effect any transaction described in, approved by, contemplated by or necessary to effectuate this Plan, including (i) the creation of NewCo and the direct or indirect transfer thereto and vesting therein (or in a Subsidiary of NewCo) of the NewCo Transferred Assets free and clear of Claims, Interests and liabilities in accordance with the NewCo Transfer Agreement, (ii) the creation of the Foundation and the issuance of the NewCo Interest to the Foundation, (iii) the creation of the Master Disbursement Trust and the transfer thereto and vesting therein of the MDT Transferred Assets, (iv) the creation of the Plan Administration Trust and the vesting therein of the PAT Assets, (v) the creation of Governmental Remediation Trust and the Tribe Trust and the consummation of the Public Entity Settlements, consisting of the payment of the Initial Public Creditor Trust Distributions and the issuance of the MDT Interests, (vi) the consummation of the Public School District Shareholder Direct Settlement, consisting of the payment of the Initial Public Schools Distribution and the issuance of the MDT Public School District Claims, (vii) the creation of the Private Creditor Trusts and the consummation of the Private Entity Settlements, consisting of the payment of the Initial Private Creditor Trust Distributions and the issuance of the MDT Private Claims, (viii) the creation and funding of the Priority Claims Reserve and the PAT Distribution Account to make Distributions in respect of Allowed Claims (other than Channeled Claims), (ix) entry into the Shareholder Settlements in exchange for, among other things, the contribution of funds to the Master Disbursement Trust and/or the Governmental Remediation Trust, as applicable, pursuant to the Shareholder Settlement Agreement, (x) the Releases, injunctions and exculpations set forth herein and in the Confirmation Order and (xi) the transactions set forth in the Restructuring Steps Memorandum.

"***Retained Causes of Action***" means all Estate Causes of Action that are not expressly settled or released under the Plan on or prior to the Effective Date, and which shall include all Causes of Action against Excluded Parties and the Causes of Action set forth on the Schedule of Retained Causes of

Action. Any and all Estate Causes of Action against any Settling Co-Defendant (other than any Estate Causes of Action against any Settling Co-Defendant expressly preserved against such Settling Co-Defendants in <u>Section 10.6</u> of the Plan) are not Retained Causes of Action and are released under the Plan.

"***Retained Shareholder Insurance Claim***" has the meaning set forth in <u>Section 5.6(j)</u> of the Plan.

"***Retained Payment Reserves***" has the meaning set forth in <u>Section 5.2(e)(i)</u> herein.

"***Sackler Family Members***" means (i) Raymond R. Sackler and Mortimer D. Sackler, (ii) all Persons who are descendants of either Raymond R. Sackler or Mortimer D. Sackler, (iii) all current and former spouses of any individual identified in the foregoing clause (i) or (ii), and (iv) the estate of any individual identified in the foregoing clause (i), (ii) or (iii).

"***Sackler Parties' Representative***" has the meaning set forth in the Master Shareholder Settlement Agreement.

"***Sackler Party***" has the meaning set forth in the Master Shareholder Settlement Agreement.

"***Schedule of Excluded Parties***" means the schedule of Excluded Parties filed by the Debtors with the Plan Supplement, which shall include only Persons agreed to by the Debtors and the Governmental Consent Parties, in consultation with the Creditors' Committee.

"***Schedule of Rejected Contracts***" means the schedule of all executory contracts and unexpired leases to be rejected by the Debtors, if any, filed by the Debtors with the Plan Supplement, which shall be in form and substance acceptable to the Debtors and reasonably acceptable to the Governmental Consent Parties, in consultation with the Creditors' Committee.

"***Schedule of Retained Causes of Action***" means the schedule of Retained Causes of Action filed by the Debtors with the Plan Supplement, which shall be in form and substance acceptable to the Debtors and the Governmental Consent Parties, and reasonably acceptable to the Creditors' Committee.

"***Scheduled***" means, with respect to any Claim against the Debtors, the status, priority, and amount, if any, of such Claim as set forth in the Schedules.

"***Scheduled MDT Distribution Date***" means (i) the Effective Date and (ii) other than the SSA Payment Date occurring on the Effective Date, the date that is thirty (30) calendar days after each SSA Payment Date.

"***Schedules***" means the schedules of assets and liabilities, statements of financial affairs, lists of Holders of Claims and Interests and all amendments or supplements thereto filed by the Debtors with the Bankruptcy Court to the extent such filing is not waived pursuant to an order of the Bankruptcy Court.

"***Second Public Schools Distribution***" has the meaning set forth in <u>Section 5.2(f)(ii)</u> of the Plan.

"***Secured Claim***" means any Claim against any Debtor to the extent such Claim is (i) secured by a valid, perfected and non-avoidable Lien on property of a Debtor's Estate, the amount of which is equal to or less than the value of such property (A) as set forth in this Plan, (B) as agreed to by the Holder of such Claim and the Debtors, or (C) as determined by a Final Order in accordance with

section 506(a) of the Bankruptcy Code or (ii) subject to any setoff right of the Holder of such Claim under section 553 of the Bankruptcy Code. "Secured Claim" does not include any Claim that meets the definition of "Priority Tax Claim."

"*Securities Act*" means the Securities Act of 1933, as amended.

"*Select Private Creditor Trust Non-Participating Claims Reserves*" means segregated accounts established pursuant to Section 7.2 of this Plan for each of Classes 6 through 10(a), in each case held and administered on and after the Effective Date by the applicable Creditor Trust of such Class. Each Select Private Creditor Trust Non-Participating Claims Reserve shall be funded with Distributions in accordance with Sections 7.2(c) and (d) of this Plan.

"*Separation Agreement*" means the agreements entered into in accordance with the Master Shareholder Settlement Agreement to govern continuing business relationships and claims among the Debtors, NewCo and any entities owned directly or indirectly by the Shareholder Payment Parties, Sackler Family Members or trusts established by or for the benefit of the Sackler Family Members, which shall be on terms reasonably acceptable to the Governmental Consent Parties and the Creditors' Committee.

"*Sequestered Materials*" has the meaning set forth in Section 5.13(i) of the Plan.

"*Sequestration Date*" has the meaning set forth in Section 5.13(k) of the Plan.

"*Settled Canadian Patient Claims*" means the "Settled Patient Claims" as defined in the Canadian Patient Claim Settlement Stipulation.

"*Settling Co-Defendant*" means (i) any Person that is a signatory to the *Joint Objection of Certain Distributors, Manufacturers, and Pharmacies to the Sixth Amended Joint Chapter 11 Plan of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 3306] and/or (ii) any Co-Defendant that objected, formally or informally, or reserved rights with respect to the assumption and assignment of any contract pursuant to the Plan.

"*Settling Co-Defendant Direct Insurance Interests*" has the meaning set forth in Section 8.4 of the Plan.

"*Settling Creditor*" means any Holder of a Channeled Claim that consents to the Third-Party Releases or otherwise provides a release under a Shareholder Settlement Agreement pursuant to the applicable Shareholder Release Consent Mechanism.

"*Settling Executive Stipulation*" means the Stipulation in Connection with the Debtors' Chapter 11 Plan of Reorganization [D.I. 7948].

"*Settling Executives*" means Mark Timney and John H. Stewart, each a former executive of Purdue.

"*Settling MDT Insurer*" means an Insurance Company that has entered into an MDT Insurance Settlement, solely in its capacity as such and solely with respect to any MDT Insurance Policy released in such MDT Insurance Settlement.

"*Settling MDT Insurer Injunction*" means the injunction issued pursuant to Section 10.11 of the Plan.

"*Settling States*" means States that are Settling Creditors.

"**_Settling States MDT Trustees_**" has the meaning set forth in <u>Section 5.6(d)</u> of the Plan.

"**_Shareholder Claim_**" means any Claim against any Debtor or that seeks to recover from any property of any Debtor or its Estate, including from any MDT Insurance Policy, in each case, that is held by a Shareholder Released Party (other than any current or former director, officer or employee of the Debtors that is not a Sackler Family Member). Notwithstanding anything to the contrary outside of this definition in the Plan, any Claim that satisfies the definition of a Shareholder Claim shall be a Shareholder Claim notwithstanding that such Claim would otherwise satisfy the definition of another type of Claim.

"**_Shareholder Direct Claims Releases_**" means (i) the releases provided for in <u>Section 10.7(b)</u> of the Plan, or (ii) any and all releases, waivers, or disclaimers of liability, standstill agreements, or other similar terms contained in the Direct Claims Shareholder Settlement Agreements.

"**_Shareholder Direct Settlement Portion_**" means the portion of the aggregate Distribution to each Class of Channeled Claim funded with amounts received from the Shareholder Payment Parties on account of the Direct Claims Shareholder Settlements, which, subject to any Direct Claim Settlement Retained Payment Amounts (to the extent applicable):

(a)     with respect to Non-Federal Domestic Governmental Channeled Claims, shall be an aggregate amount of $3,485,264,791.64, consisting of $450,819,227.34 of the Initial Governmental Remediation Trust Distribution, and the following amounts received by the Governmental Remediation Trust on each of the following Scheduled MDT Distribution Dates from amounts paid by the Shareholder Payment Parties to the Master Disbursement Trust on the SSA Payment Date corresponding to such Scheduled MDT Distribution Date: (i) $276,239,448.81 on the second Scheduled MDT Distribution Date, (ii) $324,589,448.81 on the third Scheduled MDT Distribution Date, (iii) $268,342,500.00 on the fourth Scheduled MDT Distribution Date, (iv) $166,465,020.83 on the fifth Scheduled MDT Distribution Date, (v) $116,664,520.83 on the sixth Scheduled MDT Distribution Date, (vi) $122,627,687.50 on the seventh Scheduled MDT Distribution Date, (vii) $122,627,687.50 on the eighth Scheduled MDT Distribution Date, (viii) $122,627,687.50 on the ninth Scheduled MDT Distribution Date, (ix) $152,604,687.50 on the tenth Scheduled MDT Distribution Date, (x) $152,604,687.50 on the eleventh Scheduled MDT Distribution Date, (xi) $152,604,687.50 on the twelfth Scheduled MDT Distribution Date, (xii) $152,604,687.50 on the thirteenth Scheduled MDT Distribution Date, (xiii) $301,280,937.50 on the fourteenth Scheduled MDT Distribution Date, (xiv) $301,280,937.50 on the fifteenth Scheduled MDT Distribution Date, and (xv) $301,280,937.50 on the sixteenth Scheduled MDT Distribution Date;

(b)     with respect to Tribe Channeled Claims, shall be an aggregate amount of $118,938,715.74, consisting of $15,384,730.61 of the Initial Tribe Trust Distribution, and the following amounts received by the Tribe Trust on each of the following Scheduled MDT Distribution Dates from amounts paid by the Shareholder Payment Parties to the Master Disbursement Trust on the SSA Payment Date corresponding to such Scheduled MDT Distribution Date: (i) $9,426,992.57 on the second Scheduled MDT Distribution Date, (ii) $11,076,992.57 on the third Scheduled MDT Distribution Date, (iii) $9,157,500.00 on the fourth Scheduled MDT Distribution Date, (iv) $5,680,812.50 on the fifth Scheduled MDT Distribution Date, (v) $3,981,312.50 on the sixth Scheduled MDT Distribution Date, (vi) $4,184,812.50 on the seventh Scheduled MDT Distribution Date, (vii) $4,184,812.50 on the eighth Scheduled MDT Distribution Date, (viii) $4,184,812.50 on the ninth Scheduled MDT Distribution Date, (ix) $5,207,812.50 on the tenth Scheduled MDT Distribution Date, (x) $5,207,812.50 on the eleventh Scheduled MDT Distribution Date, (xi) $5,207,812.50 on the twelfth Scheduled MDT Distribution Date, (xii) $5,207,812.50 on the thirteenth Scheduled MDT Distribution Date, (xiii) $10,281,562.50 on the fourteenth Scheduled MDT Distribution Date, (xiv) $10,281,562.50 on the fifteenth Scheduled MDT Distribution Date, and (xv) $10,281,562.50 on the sixteenth Scheduled MDT Distribution Date;

(c)      with respect to Healthcare Provider Channeled Claims, shall be $174,215,320.82, which amount, for the avoidance of doubt, will only be available to Hospitals that are Holders of Healthcare Provider Claims and that are granting the Third-Party Releases pursuant to the Hospital Shareholder Direct Settlement.

(d)      with respect to Public School Channeled Claims, shall be an aggregate amount of $26,776,216.55, consisting of (i) $16,859,099.31 of the Initial Public Schools Distribution, (ii) $4,958,558.62 of the Second Public Schools Distribution, and (iii) $4,958,558.62 of the Third Public Schools Distribution;

(e)      with respect to Third-Party Payor Channeled Claims, shall be $261,104,374.91 (such amount, the "**Maximum TPP Shareholder Direct Settlement Amount**");

(f)      with respect to ER Physician Channeled Claims, shall be $3,842,182.12; and

(g)      with respect to NAS PI Channeled Claims, shall be $25,138,065.25 (such amount, the "**Maximum NAS PI Shareholder Direct Settlement Amount**").

(h)      with respect to Non-NAS PI Channeled Claims, shall be $153,178,666.30 (such amount, the "**Maximum Non-NAS PI Shareholder Direct Settlement Amount**").

In the event of any Shareholder Prepayment, the Shareholder Direct Settlement Portion otherwise applicable to Distributions to the Governmental Remediation Trust and Tribe Trust on the Scheduled MDT Distribution Date corresponding to the Target Payment Date of such prepayment shall be applied to Distributions made to the Governmental Remediation Trust and Tribe Trust on the MDT Distribution Date corresponding to such Prepayment Date with amounts received from the Shareholder Payment Parties on account of such prepayment, and such Shareholder Direct Settlement Portion shall be reduced using the discount rate calculation applicable to such Shareholder Prepayment pursuant to the terms of the Master Shareholder Settlement Agreement. In the event of any that any Shareholder Payment Group fails to pay when due any portion of the Payment Date Obligation owed by such Shareholder Payment Group pursuant to the terms of the Master Shareholder Settlement Agreement, the Shareholder Direct Settlement Portion for the Scheduled MDT Distribution Date corresponding to such Payment Date Obligations shall be reduced pro rata based on the amount of such non-payment.

"*Shareholder Estate Claim Releases*"  means releases provided for in <u>Section 10.7(a)</u> of the Plan.

"*Shareholder Estate Settlement Distribution*" means Estate Distributions to Holders of Channeled Claims solely on account of funds provided by the Sackler Parties on account of the Sackler Parties' settlement with the Estates as set forth in the Master Shareholder Settlement Agreement.

"*Shareholder Family Group*" has the meaning ascribed to the term "Family Group" in the Master Shareholder Settlement Agreement.

"*Shareholder Payment Group*" has the meaning ascribed to the term "Payment Group" in the Master Shareholder Settlement Agreement.

"*Shareholder Payment Party*" means, as applicable, the Shareholder Released Parties that are parties to the Master Shareholder Settlement Agreement or the applicable Direct Claims Shareholder Settlement Agreement.

"***Shareholder Prepayment***" means any payment of all or any portion of a Minimum Required Settlement Payment to the Master Disbursement Trust prior to the scheduled SSA Payment Date for such Minimum Required Settlement Payment as set forth in the Master Shareholder Settlement Agreement.

"***Shareholder Release Consent Mechanism***" means the applicable mechanism for each Holder of a Claim to consent to the Third-Party Releases or otherwise be bound by a release under a Shareholder Settlement Agreement which are exclusively: (i) with respect to Holders of Non-Federal Domestic Governmental Claims, executing a joinder to the Governmental Entity Shareholder Direct Settlement Agreement or otherwise participating in the Governmental Entity Shareholder Direct Settlement Agreement in accordance with the terms thereof, (ii) with respect to Holders of Public School Claims, participating in the Public School District Shareholder Direct Settlement, (iii) with respect to Holders of Tribe Claims, executing a joinder to the Tribal Shareholder Direct Settlement Agreement, (iv) with respect to Hospitals that are Healthcare Provider Claims, participating in the Hospital Shareholder Direct Settlement, (v) with respect to Holders of Third-Party Payor Claims, through electing to opt-in to the Third-Party Releases on its applicable ballot, (vi) with respect to Holders of ER Physician Claims, participating in the ER Physician Shareholder Direct Settlement; and (vii) with respect to Holders of PI Claims, through electing to opt-in to the Third-Party Releases on its applicable ballot.

"***Shareholder Release Remedy***" has the meaning ascribed to the term "Release Remedy" in the Master Shareholder Settlement Agreement.

"***Shareholder Release Snapback Parties***" means, collectively, the Designated Shareholder Released Parties and all members of any Shareholder Family Group.

"***Shareholder Released Claims***" means any Causes of Action released pursuant to Section 10.7(a) and (b) of the Plan, as applicable.

"***Shareholder Released Direct Claims***" means any Causes of Action released pursuant to Section 10.7(b) of the Plan.

"***Shareholder Released Estate Claims***" means any Causes of Action released pursuant to Section 10.7(a) of the Plan.

"***Shareholder Released Parties***" means, collectively, (i) the Shareholder Payment Parties; (ii) the Designated Shareholder Released Parties and the Persons identified on Exhibit X to the Master Shareholder Settlement Agreement; (iii) all Persons directly or indirectly owning an equity interest in any Debtor on the date on which such Debtor commenced its Chapter 11 Case; (iv) Sackler Family Members; (v) all trusts for the benefit of any of the Persons identified in the foregoing clause (iv) and the past, present and future trustees (including, without limitation, officers, directors and employees of any such trustees that are corporate or limited liability company trustees and members and managers of trustees that are limited liability company trustees), protectors and beneficiaries thereof, solely in their respective capacities as such; (vi) all Persons (other than the Debtors) to which property or funds of the Persons identified in any of the foregoing clauses (i) through (v) have been or are directly or indirectly transferred (including for charitable or philanthropic purposes), solely in such Persons' capacities as transferees and solely to the extent of any property or funds transferred to them; and (vii) with respect to each Person in the foregoing clauses (i) through (v), such Person's (A) predecessors, successors, permitted assigns, subsidiaries (other than the Debtors), controlled affiliates, spouses, heirs, executors, estates and nominees, in each case solely in their respective capacities as such, (B) current and former officers and directors, principals, members and employees, in each case, solely in their respective capacities as such, (C) financial advisors, attorneys (including, without limitation, attorneys retained by any director, in his or her capacity as such), accountants, investment bankers (including, without limitation, investment bankers retained by any

director, in his or her capacity as such), consultants, experts and other professionals, in each case, solely in their respective capacities as such, and (D) property possessed or owned at any time or the proceeds therefrom; *provided* that notwithstanding anything to the contrary herein, the Debtors and the Excluded Parties identified on the Schedule of Excluded Parties shall not be Shareholder Released Parties. For purposes of this definition of "Shareholder Released Parties," the phrase "solely in their respective capacities as such" means, with respect to a Person, solely to the extent a claim against such Person (x) arises from such Person's conduct or actions taken in such capacity, or from such Person's identified capacity in relation to another specified Shareholder Released Party and not, in either case, from such Person's conduct or actions independent of such capacity, and (y) to the extent such Person's liability depends on or derives from the liability of such other Shareholder Released Party, such claim would be released if asserted against such other Shareholder Released Party. For the avoidance of doubt, any Person that fits within multiple categories above shall be a Shareholder Released Party in all such categories and failure to include any Person that fits within any category above on Exhibit X to the Master Shareholder Settlement Agreement shall not mean that such Person is not a Shareholder Released Party.

"***Shareholder Releases***" means the releases provided for in Section 10.7 of the Plan.

"***Shareholder Settlement Agreements***" means, collectively, the Master Shareholder Settlement Agreement and all Direct Claims Shareholder Settlement Agreements.

"***Shareholder Settlement Amount***" means the aggregate amount of up to $7 billion provided for in settlement of all Shareholder Settlement Released Claims in the Shareholder Settlement Agreements, collectively, which shall be paid by the Shareholder Payment Parties on the dates and pursuant to the terms set forth in the Shareholder Settlement Agreements.

"***Shareholder Settlement Released Claims***" means the Shareholder Released Estate Claims, the Third-Party Released Claims, and the Causes of Action released under the applicable Direct Claims Shareholder Settlement Agreements.

"***Shareholder Settlement Releases***" means the Shareholder Estate Claim Releases, the Third-Party Releases, and any and all releases, waivers, or disclaimers of liability, standstill agreements, or other similar terms contained in the applicable Direct Claims Shareholder Settlement Agreements or pursuant to the Direct Claims Shareholder Settlements.

"***Shareholder Settlements***" means the settlements, including the Direct Claims Shareholder Settlements, reflected in the Plan, the Plan Supplement, the Confirmation Order, the Master Shareholder Settlement Agreement, and the Direct Claims Shareholder Settlement Agreements providing for, among other things, the Shareholder Settlement Releases and the Channeling Injunction in exchange for, among other things, the payments to be made by the Shareholder Payment Parties to the Master Disbursement Trust for the benefit of the Debtors, their Estates, and the Settling Creditors.

"***Solicitation Procedures Order***" means the order entered by the Bankruptcy Court approving (i) the adequacy of information in the Disclosure Statement, (ii) solicitation and voting procedures, (iii) forms of ballots, notices and notice procedures in connection therewith and (iv) certain dates with respect thereto [D.I. 2988].

"***SOR Holdback***" has the meaning set forth in Section 5.7(a)(i) of the Plan.

"***Special Master***" means the Disclosure Oversight Special Master appointed in accordance with Section 5.13(s) of the Plan.

"***Special Operating Reserve***" means a separate interest-bearing escrow account established by the Master Disbursement Trust on or before the Effective Date, subject to the terms set forth in the Master Shareholder Settlement Agreement.

"***Specified Settling Co-Defendant***" means any Settling Co-Defendants that opts to participate in Section 10.7(d) of the Plan by written notice to be filed on the Bankruptcy Court docket on or before November 28, 2025.

"***SSA Payment Date***" means each "Payment Date" as defined in, and as subject to adjustment pursuant to the terms of, the Master Shareholder Settlement Agreement.

"***State***" means except for Oklahoma, all 50 states of the United States of America and the District of Columbia, American Samoa, Guam, Northern Mariana Islands, Puerto Rico, and U.S. Virgin Islands.

"***State Expenses Fund***" means the fund to be established as set forth in Section 5.9(b) of the Plan.

"***States AG Negotiating Group***" means the negotiating committee of State Attorneys General formed pursuant to the *Amended Order Appointing the Honorable Shelley C. Chapman (Ret.) and Eric D. Green as Co-Mediators and Establishing Terms and Conditions Of Mediation* [D.I. 6682].

"***Subdivision***" has the meaning set forth in the Master Shareholder Settlement Agreement.

"***Subdivision Allocation***" means, with respect to a Subdivision, the allocation applicable to such Subdivision as calculated based on the Subdivision Allocation Percentage.

"***Subdivision Allocation Percentage***" shall have the meaning ascribed to such term in the Governmental Entity Shareholder Direct Settlement.

"***Subdivisions in Non-Settling States***" has the meaning set forth in Section 5.2(f)(i)(C) of the Plan.

"***Subject MDT Assets***" has the meaning set forth in Section 5.2(e)(iv) of the Plan.

"***Subsidiary***" has the meaning set forth in Section 10.9(a) of the Plan.

"***Subsidiaries***" means, with respect to a Person, all direct and indirect subsidiaries of such Person.

"***Sub-Qualified Settlement Fund***" means any fund, account or trust intended to be treated as a "qualified settlement fund" (within the meaning of Treasury Regulations section 1.468B-1 for U.S. federal income tax purposes) and expressly established as a Sub-Qualified Settlement Fund (i) by the Bankruptcy Court in the Confirmation Order or (ii) in a separate order by the Bankruptcy Court after the Confirmation Date, but, in each case, only if such fund is authorized to receive payments solely from the PI Trust pursuant to such order.

"***Supporting Claimants***" means (i) the Ad Hoc Committee, (ii) the MSGE Group, (iii) the Native American Tribes Group, (iv) the Ad Hoc Group of Individual Victims, (v) the Ad Hoc Group of Hospitals, (vi) the Third-Party Payor Group, (vii) the NAS Committee, (viii) the Public School District Claimants, and (ix) with respect to each of the foregoing clauses (i) through (viii), the respective members thereof, solely in their respective capacities as such.

51

"***Surplus Reserve Cash***" means any surplus Cash or cash equivalents in any of the PAT Reserves in excess of what is estimated to be necessary to satisfy the obligations for which such amounts were reserved, in each case, as determined by the Plan Administration Trustee in accordance with Section 5.14(b) of the Plan.

"***Suspension Event***" shall have the meaning ascribed to such term in the Master Shareholder Settlement Agreement.

"***Target Payment Date***" shall have the meaning ascribed to such term in the Master Shareholder Settlement Agreement.

"***Third-Party Payor***" means a private health insurer, an employer-sponsored health plan, a union health and welfare fund or any other provider of healthcare benefits, including any third-party administrator or agent on behalf thereof, in each case in its capacity as such, that is not a Domestic Governmental Entity; *provided*, *however*, that California health districts acting as third-party payors that filed Third-Party Payor Proofs of Claim in such capacity by the Bar Date established by the Bar Date Order shall be included in this definition of "Third-Party Payor."

"***Third-Party Payor Channeled Claim***" means any (i) Third-Party Payor Claim or (ii) Released Claim or Shareholder Released Claim that is held by a Third-Party Payor (in the case of Third-Party Released Claims, solely to the extent that such Third-Party Payor is a Settling Creditor) that is not a Domestic Governmental Entity. Third-Party Payor Channeled Claims shall be channeled to the TPP Trust in accordance with the Plan and the Master TDP.

"***Third-Party Payor Claim***" means any Claim against any Debtor that is held by a Third-Party Payor (including any Claim based on the subrogation rights of the Holder thereof that is not an Other Subordinated Claim) that is not a Domestic Governmental Entity; *provided* that Claims in respect of self-funded government plans that were and are asserted through private Third-Party Payors shall be included in this definition of "Third-Party Payor Claims." For the avoidance of doubt, (i) Federal Government Unsecured Claims are not Third-Party Payor Claims, and (ii) claims of Third-Party Payors against Holders of PI Claims or Distributions payable to Holders of PI Claims are not claims against any Debtor and therefore are not included in this definition of "Third-Party Payor Claims."

"***Third-Party Payor Group***" means the group of certain Holders of Third-Party Payor Claims consisting of (i) the Holders of Third-Party Payor Claims represented by the Third-Party Payor participants in the Mediation listed in Exhibit A of the *Mediators' Report* [D.I. 1716] and (ii) one representative from United Healthcare for its Medicare, Medicaid, and fully insured commercial plans and one representative from the Ad Hoc Group of Self-Funded Plans identified in the *Verified Statement of the Ad Hoc Group of Self-Funded Health Plans Pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure* [D.I. 1243].

"***Third-Party Payor Shareholder Direct Settlement***" means the settlement among the Shareholder Payment Parties and Holders of Third-Party Payor Claims that agree to provide the Third-Party Releases and be subject to the injunctions set forth in Sections 10.6(b) and 10.7(b) of the Plan in exchange for the consideration contemplated in the Plan and Master Shareholder Settlement Agreement.

"***Third-Party Released Claims***" means any Causes of Action released pursuant to Sections 10.6(b) and 10.7(b) of the Plan, as applicable.

"***Third-Party Releases***" means the releases provided for in Sections 10.6(b) and 10.7(b) of the Plan.

"***Third Public Schools Distribution***" has the meaning set forth in <u>Section 5.2(f)(ii)</u> of the Plan.

"***Tino Trial Maximum Amount***" means $49.9 million to fund the Purdue Arm in accordance with the Clinical Trial Collaboration and Supply Agreement, filed as Exhibit B to the GBM AGILE Motion.

"***Total Direct Settlement Amount***" has the meaning set forth in the Governmental Entity Shareholder Direct Settlement Agreement.

"***TPP Direct Claim Settlement Retained Payment Amount***" means the portion of the Maximum TPP Shareholder Direct Settlement Amount allocable to Holders of Direct Settlement Eligible TPP Claims that are Non-Settling Creditors (if any) pursuant to the TPP TDP, and which amount shall be retained by the Shareholder Payment Parties.

"***TPP LRP Escrow Account***" means an escrow account to be established, maintained and administered by the Creditor Trustee for the PI Trust and into which the Creditor Trustee for the PI Trust shall deposit a portion of the funds received by the PI Trust pursuant to the Plan, in accordance with and subject to the terms of the LRP Agreement.

"***TPP TDP***" means the trust distribution procedures to be implemented by the TPP Trust setting forth the procedures for Distributions from the TPP Trust, the terms of which shall be consistent with <u>Articles I</u> through <u>XII</u> of the Plan and otherwise acceptable to the Debtors and the Third-Party Payor Group, and reasonably acceptable to the Creditors' Committee and the Governmental Consent Parties, and which shall be filed by the Debtors with the Plan Supplement.

"***TPP Trust***" means a trust to be established in accordance with <u>Section 5.8</u> of the Plan to (i) assume all liability for the Third-Party Payor Channeled Claims, (ii) hold the MDT TPP Claim and collect the Initial TPP Trust Distribution and additional payments due under the MDT TPP Claim in accordance with the Private Entity Settlements and the TPP Trust Documents, (iii) administer Third-Party Payor Channeled Claims, (iv) hold and administer the Class 8 Non-Participating Claims Reserve on and after the Effective Date, (v) hold the Class 8 Released Claims Reserve on and after the Effective Date, (vi) make Distributions in accordance with the TPP Trust Documents, and (vii) carry out such other matters as are set forth in the TPP TDP.

"***TPP Trust Agreement***" means the trust agreement establishing and delineating the terms and conditions for the creation and operation of the TPP Trust, the terms of which shall be consistent with <u>Articles I</u> through <u>XII</u> of the Plan and otherwise acceptable to the Debtors and the Third-Party Payor Group, and reasonably acceptable to the Creditors' Committee and the Governmental Consent Parties, and which shall be filed by the Debtors with the Plan Supplement.

"***TPP Trust Documents***" means the TPP Trust Agreement and the TPP TDP.

"***Transferred Debtor***" means a Debtor that is acquired directly or indirectly by NewCo pursuant to the NewCo Transfer Agreement. For the avoidance of doubt, PPLP shall not be a Transferred Debtor.

"***Treasury Regulations***" means the regulations promulgated from time to time under the IRC.

"***Tribal Shareholder Direct Settlement***" means the settlement set forth in the Tribal Shareholder Direct Settlement Agreement.

"***Tribal Shareholder Direct Settlement Agreement***" means the settlement agreement substantially in the form attached as Exhibit A to the *Notice of Filing of Certain Direct Claims Shareholder Settlement Agreements* [D.I. 7878].

"***Tribe***" means any American Indian or Alaska Native Tribe, band, nation, pueblo, village or community, that the U.S. Secretary of the Interior acknowledges as an Indian Tribe, as provided in the Federally Recognized Tribe List Act of 1994, 25 U.S.C. § 5130, and as periodically listed by the U.S. Secretary of the Interior in the Federal Register pursuant to 25 U.S.C. § 5131; and any "Tribal Organization" as provided in the Indian Self-Determination and Education Assistance Act of 1975, as amended, 25 U.S.C. § 5304(l).

"***Tribe Attorney Fee Fund***" means the fund to be established as set forth in Section 5.9(c) of the Plan.

"***Tribe Channeled Claim***" means (i) any Tribe Claim or (ii) any Claim held by a Tribe that is released pursuant to the Tribal Shareholder Direct Settlement Agreement. Tribe Channeled Claims shall be channeled to the Tribe Trust in accordance with the Plan and Master TDP.

"***Tribe Claim***" means any Claim against any Debtor that is held by a Tribe (including any Claim based on the subrogation rights of a Tribe that is not an Other Subordinated Claim), in its capacity as such. For the avoidance of doubt, claims of Tribes against Holders of PI Claims or Distributions payable to Holders of PI Claims, to the extent such claims exist, are not claims against any Debtor and therefore are not included in this definition of "Tribe Claims."

"***Tribe TDP***" means the trust distribution procedures to be implemented by the Tribe Trust setting forth the procedures for Distributions from the Tribe Trust, the terms of which shall be consistent with Articles I through XII of the Plan and otherwise acceptable to the Debtors and the Native American Tribe Group, and reasonably acceptable to the Creditors' Committee and the Governmental Consent Parties, and which shall be filed by the Debtors with the Plan Supplement.

"***Tribe Trust***" means one or more trusts, limited liability companies or other Persons to be established in accordance with Section 5.8 of the Plan to (i) assume all liability for the Tribe Channeled Claims, (ii) hold the MDT Tribe Interest and collect the Initial Tribe Trust Distribution and the other Public Creditor Trust Distributions received in accordance with the Public Entity Settlements, (iii) administer Tribe Channeled Claims, (iv) hold and administer the Class 5 Non-Participating Claims Reserves on and after the Effective Date, (v) hold the Class 5 Released Claims Reserve on and after the Effective Date and (vi) make Distributions in accordance with the Tribe TDP.

"***Tribe Trust Agreement***" means the trust agreement and any limited liability company agreement or similar governing document establishing and delineating the terms and conditions for the creation and operation of the Tribe Trust, the terms of which shall be consistent with Articles I through XII of the Plan and otherwise acceptable to the Debtors and the Native American Tribe Group, and reasonably acceptable to the Creditors' Committee and the Governmental Consent Parties, and which shall be filed by the Debtors with the Plan Supplement.

"***Tribe Trust Documents***" means the Tribe Trust Agreement and the Tribe TDP.

"***Twelfth Amended Plan***" means the *Twelfth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 3726].

"***U.S. Trustee***" means the United States Trustee for Region 2.

"***Unimpaired***" means, with respect to any Claim, Interest, or Class of Claims or Interests, not "impaired" within the meaning of such term in section 1124 of the Bankruptcy Code.

"***United States***" means the United States of America, its agencies, departments or agents.

"***United States-PI Claimant Medical Expense Claim***" means any healthcare-related claim, Cause of Action or Lien (including a subrogation claim or reimbursement claim), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, choate or inchoate, (i) against a Holder of a PI Claim or the recoveries of a Holder of a PI Claim pursuant to the PI TDP or under the Plan, (ii) held by any of the following federal governmental agencies or federal health insurance programs: the United States Department of Health and Human Services, on its own behalf and on behalf of its component agencies, which are the Centers for Medicare & Medicaid Services and the Indian Health Service on behalf of its federally-operated programs; the TRICARE Program; and the United States Department of Veterans Affairs, and (iii) on account of opioid injury-related conditional payments made by such programs or agencies to, on behalf of, or in respect of, such Holders of PI Claims. The United States-PI Claimant Medical Expense Claim Settlement does not apply to any claims brought by programs operated by tribes or tribal organizations under the Indian Self-Determination and Education Assistance Act, 25 U.S.C. §§ 5301–5423, or programs operated by urban Indian organizations that have a grant or contract with the Indian Health Service under the Indian Health Care Improvement Act, 25 U.S.C. §§ 1601–1685.

"***United States-PI Claimant Medical Expense Claim Releases***" means the releases provided for in <u>Section 5.2(i)(ii)</u> of the Plan.

"***United States-PI Claimant Medical Expense Claim Settlement***" means the settlement provided for in <u>Section 5.2(i)</u> of the Plan.

"***Voting Deadline***" means the last day for Holders of Claims and Interests entitled to vote on the Plan to cast their votes to accept or reject the Plan as may be set by the Bankruptcy Court.

"***Voting Representative***" means a Firm representing Holders of Claims in any of the Master Ballot Classes who has returned a properly completed Solicitation Directive (as such terms are defined in the Solicitation Procedures Order).

"***Wind-Up Reserve***" means a reserve to be established to pay any and all costs, expenses, fees, taxes, debts, or obligations incurred from the operation and administration of the Debtors' Estates after the Effective Date (including professional fees and expenses). The Wind-Up Reserve shall be (i) funded with Effective Date Cash in an amount determined by the Debtors but not to exceed $10 million, or such greater amount subject to the consent (not to be unreasonably withheld) of the NewCo Managers and the MDT Trustees; *provided* further that if the NewCo Managers or the MDT Trustees withhold such consent, the Plan Administration Trustee shall have the right to seek relief from the Bankruptcy Court, which shall be granted upon the Bankruptcy Court's determination that such budgeted expenditures are appropriate and otherwise within the scope for which the Wind-Up Reserve was established pursuant to the Plan; and (ii) held by the Plan Administration Trust in a segregated account and administered by the Plan Administration Trustee on and after the Effective Date.

### 1.2    <u>*Interpretation; Application of Definitions; Rules of Construction*</u>.

Unless otherwise specified, all section or exhibit references in the Plan are to the respective section in, or exhibit to, this Plan, as the same may be amended, waived, or modified from time to time in accordance with the terms hereof. The words "herein," "hereof," or "hereunder," and other words of similar import refer to this Plan as a whole and not to any particular section, subsection, or clause

contained therein and have the same meaning as "in the Plan," "of the Plan," and "under the Plan," respectively. The words "includes" and "including" are not limiting. The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof. For purposes herein: (a) in the appropriate context, each term, whether stated in the singular or plural, shall include both the singular and plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the reference document shall be substantially in that form or substantially on those terms and conditions; (c) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (d) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

**1.3**      *<u>Reference to Monetary Figures.</u>*

All references in this Plan to monetary figures shall refer to the legal tender of the United States of America unless otherwise expressly provided.

**1.4**      *<u>Controlling Document.</u>*

(a)      **Plan Supplements**. In the event of an inconsistency between <u>Articles I</u> through <u>XII</u> of the Plan and the Plan Supplement, the terms of <u>Articles I</u> through <u>XII</u> of the Plan shall control, except that in the event of an inconsistency between <u>Articles I</u> through <u>XII</u> of the Plan and the Master Shareholder Settlement Agreement (or any agreements ancillary to the Master Shareholder Settlement Agreement (other than any Direct Claims Shareholder Settlement Agreement)), the Master Shareholder Settlement Agreement (or such ancillary agreement) shall control.

(b)      **Direct Claims Shareholder Settlement Agreements**. In the event of an inconsistency between Articles I through XII of the Plan and any Direct Claims Shareholder Settlement Agreement (or any agreement ancillary to such Direct Claims Shareholder Settlement Agreement (other than the Master Shareholder Settlement Agreement)), (i) the terms of Articles I through XII of the Plan shall control with respect to any matter affecting, or a dispute involving, a party that is not a Party to or otherwise bound by the applicable Direct Claims Shareholder Settlement Agreement, and (ii) such Direct Claims Shareholder Settlement Agreement (or such ancillary agreement) shall control with respect to all other matters. No Direct Claims Shareholder Settlement Agreement may be enforced against any Person not party to or otherwise bound by such Direct Claims Shareholder Settlement Agreement; *provided*, that in no event will any Direct Claims Shareholder Settlement Agreement (or any agreement ancillary to such Direct Claims Shareholder Settlement Agreement) release or otherwise impact any Released Claim or Shareholder Released Claim of a type contemplated under the Plan pursuant to the applicable Shareholder Release Consent Mechanism to be governed by any other Direct Claims Shareholder Settlement Agreement or the Plan.

(c)      **Other Documents**. Subject to Section 1.4(a) and 1.4(b), in the event of an inconsistency between this Plan and any other instrument or document created or executed pursuant to this Plan, or between this Plan and the Disclosure Statement, this Plan shall control.

(d)      **Plan and Confirmation Order**. The provisions of this Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effectuate the purposes of each; *provided*, *however*, that, if there is determined to be any inconsistency between any provision of this Plan and any provision of the Confirmation Order that cannot be reconciled, then, the provisions of the Confirmation Order shall govern, and any such provisions of the Confirmation Order shall be deemed a modification of this Plan solely to the extent of such inconsistency.

(e)     **Determinations**. The determination of whether there is any inconsistency between any of the documents referred to in the foregoing Sections 1.4(a)-(d) will be made by the Bankruptcy Court in all instances.

### 1.5     Consent Rights.

For the avoidance of doubt and notwithstanding anything herein to the contrary, nothing in this Plan shall in any way eliminate, impair, or limit any consent or similar rights provided in favor of the Sackler Parties' Representative or any Shareholder Released Party in the Master Shareholder Settlement Agreement or any Shareholder Direct Settlement Agreement, including any such rights in respect of Definitive Documents (notwithstanding whether any such rights are provided in favor of the Sackler Parties' Representative or any Shareholder Released Party in this Plan).

## ARTICLE II    ADMINISTRATIVE CLAIMS, PROFESSIONAL FEE CLAIMS, PRIORITY TAX CLAIMS AND DOJ FORFEITURE JUDGMENT CLAIM.

### 2.1     *Administrative Claims.*

(a)     **Generally**. Except as provided for herein or in any order of the Bankruptcy Court, and subject to section 503(b)(1)(D) of the Bankruptcy Code, Holders of Administrative Claims (other than Professional Fee Claims and the DOJ Forfeiture Judgment Claim) must file and serve on the Debtors requests for the payment of such Administrative Claims not already Allowed by a Final Order. Any Holder of an Administrative Claim that is required to, but does not, file and serve a request for payment of such Administrative Claim pursuant to the procedures specified in the Confirmation Order shall be forever barred, estopped and enjoined from asserting such Claims against the Debtors, the Liquidating Debtors, the Transferred Debtors, the Plan Administration Trust or their respective Assets or properties, and such Claims shall be deemed discharged as of the Effective Date. An Administrative Claim, with respect to which a request for payment has been properly and timely filed pursuant to this Section 2.1(a), shall become an Allowed Administrative Claim if no objection to such request is filed by the Debtors or the Plan Administration Trustee with the Bankruptcy Court on or before the date that is one hundred twenty (120) days after the Effective Date, or such later date as may be fixed by the Bankruptcy Court. If an objection is timely filed, such Administrative Claim shall become an Allowed Administrative Claim only to the extent Allowed by Final Order or such Claim is settled, compromised or otherwise resolved pursuant to Section 7.6 of the Plan. Except to the extent a Holder of an Allowed Administrative Claim and the Debtor against which such Claim is asserted agree to different treatment, each Holder of an Allowed Administrative Claim (other than a Professional Fee Claim or the DOJ Forfeiture Judgment Claim) shall receive, on account of such Allowed Claim, Cash in an amount equal to the Allowed amount of such Claim from the Priority Claims Reserve within thirty (30) days following the later to occur of (i) the Effective Date and (ii) the date on which such Administrative Claim shall become an Allowed Claim; *provided* that any Administrative Claim that is an Assumed Liability shall be paid by NewCo in the ordinary course of business.

(b)     **Professional Fee Claims**. All Professional Persons seeking awards by the Bankruptcy Court for compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under (x) section 327, 328, 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), 503(b)(5) or 1103 of the Bankruptcy Code, (y) with respect to the Ad Hoc Committee, the AHC Reimbursement Agreement Assumption Order, or (z) with respect to the MSGE Group, the MSGE Group Reimbursement Order, shall (i) file, on or before the date that is forty-five (45) days after the Effective Date, or as soon as reasonably practicable thereafter, their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred and (ii) be paid in full in Cash, (A) *first*, from any existing amounts held by a Professional Person as a fee advance, retainer, or security that such Professional Person is authorized to use to satisfy Allowed Professional Fee Claims pursuant to

the Interim Compensation Order or the order of the Bankruptcy Court authorizing the retention of such Professional Person (other than a reasonable retainer to cover post-Effective Date work), and (B) *second*, from the Professional Fee Escrow Account, in such aggregate amounts as are Allowed by the Bankruptcy Court or authorized to be paid in accordance with the order(s) relating to or allowing any such Professional Fee Claim. On or prior to the Effective Date, the Debtors shall establish the Professional Fee Escrow Account and, on the Effective Date, fund the Professional Fee Escrow Account with Cash such that the total amount held in the Professional Fee Escrow Account is equal to the sum of each Professional Person's good-faith estimates of its Professional Fee Claims. The procedures for filing objections to Professional Persons' applications for final allowance of compensation for services rendered and expenses incurred shall be set forth in the Confirmation Order. For the avoidance of doubt, Professional Persons shall be authorized to apply any fee advance, retainer, or security to satisfy any Secured Claims held by such Professional Person.

2.2    *Priority Tax Claims.*

Except to the extent a Holder of an Allowed Priority Tax Claim and the Debtor against which such Claim is asserted agree to different treatment, on the Effective Date or as soon as reasonably practicable thereafter, each Holder of an Allowed Priority Tax Claim shall receive, on account of such Allowed Priority Tax Claim, either Cash in an amount equal to the Allowed amount of such Claim from the Priority Claims Reserve or such other treatment as may satisfy section 1129(a)(9) of the Bankruptcy Code.

2.3    *DOJ Forfeiture Judgment Claim.*

(a)    Allowance: Pursuant to the Plea Agreement and the DOJ 9019 Order, the DOJ Forfeiture Judgment Claim shall be Allowed in the amount of $2.0 billion on the later of (i) the DOJ Conviction Judgment Date and (ii) the entry by the Bankruptcy Court of the Confirmation Order.

(b)    Treatment: In full and final satisfaction, settlement, release and discharge of the DOJ Forfeiture Judgment Claim, the Debtors shall make the DOJ Forfeiture Payment within three (3) Business Days following the DOJ Conviction Judgment Date, which DOJ Forfeiture Payment, in combination with the DOJ Forfeiture Judgment Credit, shall satisfy and discharge the DOJ Forfeiture Judgment Claim in full.

## ARTICLE III  CLASSIFICATION OF CLAIMS AND INTERESTS.

3.1    *Classification in General.*

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation and Distributions under this Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or Interest is classified in a particular Class for the purpose of receiving Distributions pursuant to this Plan only to the extent such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent any portion of the Claim or Interest qualifies within the description of such other Classes; *provided* that, to the extent any Claim satisfies the definition of a Shareholder Claim, a Co-Defendant Claim or an Other Subordinated Claim, such Claim shall be classified as such, notwithstanding that such Claim may satisfy the definition of another type of Claim. A Claim or Interest is also classified in a particular Class for the purpose of receiving Distributions hereunder only to the extent such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been satisfied, released or otherwise settled prior to the Effective Date. In no event shall any Holder of an Allowed Claim be entitled to receive payments under this Plan that, in the aggregate, exceed the Allowed amount of such Holder's Claim.

### 3.2    *Summary of Classification of Claims and Interests.*

The following table designates the Classes of Claims against and Interests in the Debtors and specifies which Classes are (a) Impaired or Unimpaired under this Plan, (b) entitled to vote to accept or reject this Plan in accordance with section 1126 of the Bankruptcy Code or presumed to accept or deemed to reject this Plan:

| Class | Type of Claim or Interest | Impairment | Entitled to Vote |
|---|---|---|---|
| Class 1 | Secured Claims | Unimpaired | No (Presumed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | No (Presumed to Accept) |
| Class 3 | Federal Government Unsecured Claims | Impaired | Yes |
| Class 4 | Non-Federal Domestic Governmental Claims | Impaired | Yes |
| Class 5 | Tribe Claims | Impaired | Yes |
| Class 6 | Public School Claims | Impaired | Yes |
| Class 7 | Healthcare Provider Claims | Impaired | Yes |
| Class 8 | Third-Party Payor Claims | Impaired | Yes |
| Class 9 | ER Physician Claims | Impaired | Yes |
| Class 10(a) | NAS PI Claims | Impaired | Yes |
| Class 10(b) | Non-NAS PI Claims | Impaired | Yes |
| Class 11(a) | Avrio General Unsecured Claims | Unimpaired | No (Presumed to Accept) |
| Class 11(b) | Adlon General Unsecured Claims | Unimpaired | No (Presumed to Accept) |
| Class 11(c) | Other General Unsecured Claims | Impaired | Yes |
| Class 12 | Intercompany Claims | Unimpaired or Impaired | No (Presumed to Accept or Deemed to Reject) |
| Class 13 | Shareholder Claims | Impaired | No (Deemed to Reject) |
| Class 14 | Co-Defendant Claims | Impaired | No (Deemed to Reject) |
| Class 15 | Other Subordinated Claims | Impaired | No (Deemed to Reject) |
| Class 16 | PPLP Interests | Impaired | No (Deemed to Reject) |
| Class 17 | PPI Interests | Impaired | No (Deemed to Reject) |
| Class 18 | Intercompany Interests | Unimpaired or Impaired | No (Presumed to Accept or Deemed to Reject) |

### 3.3 *Voting Classes; Presumed Acceptance by Non-Voting Classes.*

With respect to each Debtor, if a Class contains Claims eligible to vote and no Holder of Claims eligible to vote in such Class votes to accept or reject this Plan by the Voting Deadline, this Plan shall be presumed accepted by the Holders of Claims in such Class.

### 3.4 *Voting; Presumptions; Solicitation.*

(a)     **Acceptance by Certain Impaired Classes**. Only Holders of Claims in Classes 3, 4, 5, 6, 7, 8, 9, 10(a), 10(b) and 11(c) are entitled to vote to accept or reject this Plan. An Impaired Class of Claims shall have accepted this Plan if (i) the Holders, including Holders acting through a Voting Representative, of at least two-thirds (2/3) in amount of Claims actually voting in such Class have voted to accept this Plan and (ii) the Holders, including Holders acting through a Voting Representative, of more than one-half (1/2) in number of Claims actually voting in such Class have voted to accept this Plan. Holders of Claims in Classes 3, 4, 5, 6, 7, 8, 9, 10(a), 10(b) and 11(c) (or, if applicable, the Voting Representatives of such Holders) shall receive ballots containing detailed voting instructions. For the avoidance of doubt, pursuant to and except as otherwise provided in the Solicitation Procedures Order, each Claim in Classes 4, 5, 6, 7, 8, 9, 10(a) and 10(b) shall be accorded one (1) vote and valued at one dollar ($1.00) for voting purposes only, and not for purposes of Allowance or distribution, such that each of Classes 4, 5, 6, 7, 8, 9, 10(a) and 10(b) shall be deemed to have accepted this Plan if the Holders, including Holders acting through a Voting Representative, of at least two-third (2/3) in number of Claims actually voting in such Class have voted to accept the Plan.

(b)     **Deemed Acceptance by Unimpaired Classes**. Holders of Claims in Classes 1, 2, 11(a) and 11(b) are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Accordingly, such Holders are not entitled to vote to accept or reject this Plan.

(c)     **Deemed Rejection by Certain Impaired Classes**. Holders of Claims and Interests in Classes 13, 14, 15, 16, and 17 are deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code. Accordingly, such Holders are not entitled to vote to accept or reject this Plan.

(d)     **Deemed Acceptance or Rejection by Certain Classes**. Holders of Interests in Classes 12 and 18 are either conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code or are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Accordingly, such Holders are not entitled to vote to accept or reject the Plan.

(e)     **Individual Creditor Voting Rights**. Notwithstanding anything to the contrary in this Plan, the voting rights of Holders of Claims in any Class shall be governed in all respects by the Solicitation Procedures Order, including without limitation with respect to the amount of such Claims for voting purposes.

### 3.5 *Cramdown.*

If any Class of Claims is deemed to reject this Plan or is entitled to vote on this Plan and does not vote to accept this Plan, the Debtors may (a) seek confirmation of this Plan under section 1129(b) of the Bankruptcy Code and/or (b) amend or modify this Plan in accordance with the terms hereof and the Bankruptcy Code. If a controversy arises as to whether any Claim or Interest, or any Class of Claims or Interests, is Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

### 3.6    *No Waiver.*

Nothing contained in this Plan shall be construed to waive a Debtor's or other Person's right to object on any basis to any Claim.

## ARTICLE IV   TREATMENT OF CLAIMS AND INTERESTS.

### 4.1    *Secured Claims (Class 1).*

(a)    <u>Treatment</u>: Except to the extent a Holder of an Allowed Secured Claim and the Debtor against which such Claim is asserted agree to different treatment, on the Effective Date, or as soon as reasonably practicable thereafter, each Holder of an Allowed Secured Claim shall receive, on account of such Allowed Claim, (i) payment in full in Cash from the Priority Claims Reserve in accordance with section 506(a) of the Bankruptcy Code, (ii) Reinstatement of such Allowed Claim pursuant to section 1124 of the Bankruptcy Code or (iii) such other treatment as may be necessary to render such Claim Unimpaired.

(b)    <u>Impairment and Voting</u>: Secured Claims are Unimpaired. Holders of Secured Claims are conclusively presumed to accept this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Secured Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Secured Claims.

### 4.2    *Other Priority Claims (Class 2).*

(a)    <u>Treatment</u>: Except to the extent a Holder of an Allowed Other Priority Claim and the Debtor against which such Claim is asserted agree to different treatment, on the Effective Date, or as soon as reasonably practicable thereafter, each Holder of an Allowed Other Priority Claim shall receive, on account of such Allowed Claim, (i) payment in full in Cash from the Priority Claims Reserve or (ii) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

(b)    <u>Impairment and Voting</u>: Other Priority Claims are Unimpaired. Holders of Other Priority Claims are conclusively presumed to accept this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Other Priority Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Other Priority Claims.

### 4.3    *Federal Government Unsecured Claims (Class 3).*

(a)    <u>Allowance of the DOJ Civil Claim and DOJ Criminal Fine Claim</u>: Pursuant to the DOJ 9019 Order, the DOJ Civil Claim is Allowed in the amount of $2.8 billion. The DOJ Criminal Fine Claim shall be Allowed in the amount of $3.544 billion on the later of (i) the DOJ Conviction Judgment Date and (ii) the entry by the Bankruptcy Court of the Confirmation Order.

(b)    <u>Treatment</u>: On the Effective Date, in full and final satisfaction, settlement and release of the Allowed Federal Government Unsecured Claims, the United States shall receive (i) the Initial Federal Government Distribution and (ii) the MDT Federal Government Claim. The MDT Federal Government Claim shall be payable by the Master Disbursement Trust in the following installments: (x) $10 million on the second Scheduled MDT Distribution Date, (y) $10 million on the third Scheduled MDT Distribution Date and (z) $5 million on the fourth Scheduled MDT Distribution Date. The Initial Federal Government Distribution and the amounts paid to the United States on account of the MDT Federal Government Claim shall be deemed applied 60% to the DOJ Unsecured Claims and 40% to the Other Federal Agency Claims.

(c)     Impairment and Voting: The Federal Government Unsecured Claims are Impaired. Holders of Federal Government Unsecured Claims are entitled to vote to accept or reject the Plan.

### 4.4     *Non-Federal Domestic Governmental Claims (Class 4).*

(a)     Treatment: On the Effective Date, in full and final satisfaction, settlement and release of the Debtors' obligations in respect of Non-Federal Domestic Governmental Claims, the Governmental Remediation Trust shall receive (i) the Initial Governmental Remediation Trust Distribution, (ii) the MDT Governmental Remediation Trust Interest and (iii) the right to receive 96.7% of the Governmental NewCo Distributable Cash pursuant to Section 5.4(e) of the Plan.

(b)     Channeling: As of the Effective Date, in accordance with the Plan and the Master TDP, any and all liability of the Debtors and the other Protected Parties for any and all Non-Federal Domestic Governmental Channeled Claims shall automatically, and without further act, deed or court order, be channeled exclusively to and assumed by the Governmental Remediation Trust and shall be exclusively satisfied by payments from the Governmental Remediation Trust. Each Non-Federal Domestic Governmental Channeled Claim shall be asserted exclusively against the Governmental Remediation Trust and resolved solely in accordance with the terms, provisions and procedures of the Governmental Remediation Trust Agreement. The sole recourse of any Person on account of any Non-Federal Domestic Governmental Channeled Claim, whether or not the Holder thereof participated in the Chapter 11 Cases and whether or not such Holder filed a Proof of Claim in the Chapter 11 Cases, shall be to the Governmental Remediation Trust as and to the extent provided in the Governmental Remediation Trust Agreement. Subject to Section 10.8(c), Holders of Non-Federal Domestic Governmental Channeled Claims are enjoined from asserting against any Debtor or other Protected Party any Channeled Claim, and may not proceed in any manner against any Debtor or other Protected Party on account of any Channeled Claim in any forum whatsoever, including any state, federal or non-U.S. court or administrative or arbitral forum, and are required to pursue Non-Federal Domestic Governmental Channeled Claims exclusively against the Governmental Remediation Trust.

(c)     Impairment and Voting: Non-Federal Domestic Governmental Claims are Impaired. Holders of Non-Federal Domestic Governmental Claims are entitled to vote to accept or reject the Plan.

### 4.5     *Tribe Claims (Class 5).*

(a)     Treatment: On the Effective Date, in full and final satisfaction, settlement and release of the Debtors' obligations in respect of Tribe Claims, the Tribe Trust shall receive (i) the Initial Tribe Trust Distribution, (ii) the MDT Tribe Interest and (iii) the right to receive 3.3% of the Governmental NewCo Distributable Cash pursuant to Section 5.4(e) of the Plan.

(b)     Channeling: As of the Effective Date, in accordance with the Plan and the Master TDP, any and all liability of the Debtors and the other Protected Parties for any and all Tribe Channeled Claims shall automatically, and without further act, deed or court order, be channeled exclusively to and assumed by the Tribe Trust and shall be exclusively satisfied by payments from the Tribe Trust. Each Tribe Channeled Claim shall be asserted exclusively against the Tribe Trust and resolved solely in accordance with the terms, provisions and procedures of the Tribe TDP. The sole recourse of any Person on account of any Tribe Channeled Claim, whether or not the Holder thereof participated in the Chapter 11 Cases and whether or not such Holder filed a Proof of Claim in the Chapter 11 Cases, shall be to the Tribe Trust as and to the extent provided in the Tribe TDP. Subject to Section 10.8(c), Holders of Tribe Channeled Claims are enjoined from asserting against any Debtor or other Protected Party any Channeled Claim, and may not proceed in any manner against any Debtor or other Protected Party on account of any Channeled Claim in any forum whatsoever, including any state, federal or non-U.S. court or administrative or arbitral

forum, and are required to pursue Tribe Channeled Claims exclusively against the Tribe Trust, solely as and to the extent provided in the Tribe TDP.

(c)    Impairment and Voting: Tribe Claims are Impaired. Holders of Tribe Claims are entitled to vote to accept or reject the Plan.

### 4.6    *Public School Claims (Class 6).*

(a)    Treatment: On the Effective Date, in full and final satisfaction, settlement and release of the Debtors' obligations in respect of Public School Claims, the Public School Trust shall receive (i) the Initial Public Schools Distribution (less any required payments to the Common Benefit Fund and/or in respect of attorneys' fees and expenses of the Public School District Claimants in accordance with Section 5.9(d) and (i) of the Plan) and (ii) the MDT Public School Districts Claim; *provided* that if, as of the Effective Date, the Public School District Shareholder Direct Settlement has not been consummated, the Shareholder Direct Settlement Portion of the Initial Public Schools Distribution will be deposited into a third-party interest bearing escrow in accordance with the Master Shareholder Settlement Agreement on the Effective Date and distributed in accordance with Section 5.2(e)(ii) of the Plan.

(b)    Channeling: As of the Effective Date, in accordance with the Plan and the Master TDP, any and all liability of the Debtors and the other Protected Parties for any and all Public School Channeled Claims shall automatically, and without further act, deed or court order, be channeled exclusively to and assumed by the Public School Trust and shall be exclusively satisfied by payments from the Public School Trust. Each Public School Channeled Claim shall be asserted exclusively against the Public School Trust and resolved solely in accordance with the terms, provisions and procedures of the Public School TDP. The sole recourse of any Person on account of any Public School Channeled Claim, whether or not the Holder thereof participated in the Chapter 11 Cases and whether or not such Holder filed a Proof of Claim in the Chapter 11 Cases, shall be to the Public School Trust as and to the extent provided in the Public School TDP. Subject to Section 10.8(c), Holders of Public School Channeled Claims are enjoined from asserting against any Debtor or other Protected Party any Channeled Claim, and may not proceed in any manner against any Debtor or other Protected Party on account of any Channeled Claim in any forum whatsoever, including any state, federal or non-U.S. court or administrative or arbitral forum, and are required to pursue Public School Channeled Claims exclusively against the Public School Trust, solely as and to the extent provided in the Public School TDP.

(c)    Impairment and Voting: Public School Claims are Impaired. Holders of Public School Claims are entitled to vote to accept or reject the Plan.

### 4.7    *Healthcare Provider Claims (Class 7).*

(a)    Treatment: On the Effective Date, in full and final satisfaction, settlement and release of the Debtors' obligations in respect of Healthcare Provider Claims, the Healthcare Provider Trust shall receive (i) the Initial Healthcare Provider Trust Distribution and (ii) the MDT Healthcare Provider Claim; *provided* that if, as of the Effective Date, the Hospital Shareholder Direct Settlement has not been consummated, the Shareholder Direct Settlement Portion of the Initial Healthcare Provider Trust Distribution will be deposited into a third-party interest bearing escrow in accordance with the Master Shareholder Settlement Agreement on the Effective Date and distributed in accordance with Section 5.2(e)(ii) of the Plan.

(b)    Channeling: As of the Effective Date, in accordance with the Plan and the Master TDP, any and all liability of the Debtors and the other Protected Parties for any and all Healthcare Provider Channeled Claims shall automatically, and without further act, deed or court order, be channeled exclusively to and assumed by the Healthcare Provider Trust and shall be exclusively satisfied by payments

from the Healthcare Provider Trust. Each Healthcare Provider Channeled Claim shall be asserted exclusively against the Healthcare Provider Trust and resolved solely in accordance with the terms, provisions and procedures of the Healthcare Provider TDP. The sole recourse of any Person on account of any Healthcare Provider Channeled Claim, whether or not the Holder thereof participated in the Chapter 11 Cases and whether or not such Holder filed a Proof of Claim in the Chapter 11 Cases, shall be to the Healthcare Provider Trust as and to the extent provided in the Healthcare Provider TDP. Subject to Section 10.8(c), Holders of Healthcare Provider Channeled Claims are enjoined from asserting against any Debtor or other Protected Party any Channeled Claim, and may not proceed in any manner against any Debtor or other Protected Party on account of any Channeled Claim in any forum whatsoever, including any state, federal or non-U.S. court or administrative or arbitral forum, and are required to pursue Healthcare Provider Channeled Claims exclusively against the Healthcare Provider Trust, solely as and to the extent provided in the Healthcare Provider TDP.

(c)    Impairment and Voting: Healthcare Provider Claims are Impaired. Healthcare Provider of Healthcare Provider Claims are entitled to vote to accept or reject the Plan.

### 4.8    _Third-Party Payor Claims (Class 8)._

(a)    Treatment: On the Effective Date, in full and final satisfaction, settlement and release of the Debtors' obligations in respect of Third-Party Payor Claims, the TPP Trust shall receive (i) the Initial TPP Trust Distribution and (ii) the MDT TPP Claim; _provided_ that if, as of the Effective Date, a Final Claims Determination with respect to Third-Party Payor Claims has not occurred, the Shareholder Direct Settlement Portion of the Initial TPP Trust Distribution shall be paid in accordance with Section 5.2(e)(i) of the Plan. For the avoidance of doubt, any payments from the TPP LRP Escrow Account to which LRP Participating TPPs may be entitled under the LRP Agreement shall not be subject to this Section 4.8.

(b)    Channeling: As of the Effective Date, in accordance with the Plan and the Master TDP, any and all liability of the Debtors and the other Protected Parties for any and all Third-Party Payor Channeled Claims shall automatically, and without further act, deed or court order, be channeled exclusively to and assumed by the TPP Trust and shall be exclusively satisfied by payments from the TPP Trust. Each Third-Party Payor Channeled Claim shall be asserted exclusively against the TPP Trust and resolved solely in accordance with the terms, provisions and procedures of the TPP TDP. The sole recourse of any Person on account of any Third-Party Payor Channeled Claim, whether or not the Holder thereof participated in the Chapter 11 Cases and whether or not such Holder filed a Proof of Claim in the Chapter 11 Cases, shall be to the TPP Trust as and to the extent provided in the TPP TDP. Subject to Section 10.8(c), Holders of Third-Party Payor Channeled Claims are enjoined from asserting against any Debtor or other Protected Party any Channeled Claim, and may not proceed in any manner against any Debtor or other Protected Party on account of any Channeled Claim in any forum whatsoever, including any state, federal or non-U.S. court or administrative or arbitral forum, and are required to pursue Third-Party Payor Channeled Claims exclusively against the TPP Trust, solely as and to the extent provided in the TPP TDP.

(c)    Impairment and Voting: Third-Party Payor Claims are Impaired. Holders of Third-Party Payor Claims are entitled to vote to accept or reject the Plan.

### 4.9    _ER Physician Claims (Class 9)._

(a)    Treatment: On the Effective Date, in full and final satisfaction, settlement and release of the Debtors' obligations in respect of ER Physician Claims, the ERP Trust shall receive (i) the Initial ERP Trust Distribution and (ii) the MDT ERP Claim; _provided_ that if, as of the Effective Date, the ER Physician Shareholder Direct Settlement has not been consummated, the Initial ERP Trust Distribution will be deposited into a third-party interest bearing escrow in accordance with the Master

64

Shareholder Settlement Agreement on the Effective Date and distributed in accordance with Section 5.2(e)(ii) of the Plan.

(b)        Channeling: As of the Effective Date, in accordance with the Plan and the Master TDP, any and all liability of the Debtors and the other Protected Parties for any and all ER Physician Channeled Claims shall automatically, and without further act, deed or court order, be channeled exclusively to and assumed by the ERP Trust and shall be exclusively satisfied by payments from the ERP Trust. Each ER Physician Channeled Claim shall be asserted exclusively against the ERP Trust and resolved solely in accordance with the terms, provisions and procedures of the ERP TDP. The sole recourse of any Person on account of any ER Physician Channeled Claim, whether or not the Holder thereof participated in the Chapter 11 Cases and whether or not such Holder filed a Proof of Claim in the Chapter 11 Cases, shall be to the ERP Trust as and to the extent provided in the ERP TDP. Subject to Section 10.8(c), Holders of ER Physician Channeled Claims are enjoined from asserting against any Debtor or other Protected Party any ER Physician Channeled Claim, and may not proceed in any manner against any Debtor or other Protected Party on account of any ER Physician Channeled Claim in any forum whatsoever, including any state, federal or non-U.S. court or administrative or arbitral forum, and are required to pursue ER Physician Channeled Claims exclusively against the ERP Trust, solely as and to the extent provided in the ERP TDP.

(c)        Impairment and Voting: ER Physician Claims are Impaired. Holders of ER Physician Claims are entitled to vote to accept or reject the Plan.

### 4.10    *PI Claims (Classes 10(a) and 10(b))*.

(a)        PI Trust: On the Effective Date, in full and final satisfaction, settlement and release of the Debtors' obligations in respect of PI Claims, the PI Trust shall receive, subject to Section 5.2(i) of the Plan, (i) the Initial PI Trust Distribution and (ii) the MDT PI Claim; *provided* that if, as of the Effective Date, a Final Claims Determination with respect to NAS PI Claims or Non-NAS PI Claims has not occurred, the Shareholder Direct Settlement Portion of the Initial NAS PI Distribution or Initial Non-NAS PI Distribution, as applicable, shall be paid in accordance with Section 5.2(e)(i) of the Plan.

(b)        NAS PI Claims (Class 10(a)):

(i)        Treatment: The PI Trust shall deposit the NAS PI Portion into the PI Trust NAS Fund in periodic installments as funds are received by the PI Trust. Distributions in respect of NAS PI Channeled Claims shall be exclusively in the form of Distributions from the PI Trust NAS Fund or a Sub-Qualified Settlement Fund to Holders of Allowed NAS PI Channeled Claims, in accordance with the NAS PI TDP, and shall be subject to the PI Trust Deductions and Holdbacks.

(ii)       Channeling: As of the Effective Date, in accordance with the Plan and the Master TDP, any and all liability of the Debtors and the other Protected Parties for any and all NAS PI Channeled Claims shall automatically, and without further act, deed or court order, be channeled exclusively to and assumed by the PI Trust and shall be exclusively satisfied by payments from the PI Trust. Each NAS PI Channeled Claim shall be asserted exclusively against the PI Trust and resolved solely in accordance with the terms, provisions and procedures of the NAS PI TDP. The sole recourse of any Person on account of any NAS PI Channeled Claim, whether or

65

not the Holder thereof participated in the Chapter 11 Cases and whether or not such Holder filed a Proof of Claim in the Chapter 11 Cases, shall be to the PI Trust NAS Fund as and to the extent provided in the NAS PI TDP. Subject to <u>Section 10.8(c)</u>, Holders of NAS PI Channeled Claims are enjoined from asserting against any Debtor or other Protected Party any Channeled Claim, and may not proceed in any manner against any Debtor or other Protected Party on account of any Channeled Claim in any forum whatsoever, including any state, federal or non-U.S. court or administrative or arbitral forum, and are required to pursue NAS PI Channeled Claims exclusively against the PI Trust, solely as and to the extent provided in the NAS PI TDP.

    (iii) <u>Impairment and Voting</u>: NAS PI Claims are Impaired. Holders of NAS PI Claims are entitled to vote to accept or reject the Plan.

   (c) <u>Non-NAS PI Claims (Class 10(b))</u>.<u>Treatment</u>: The PI Trust shall deposit the Non-NAS PI Portion into the PI Trust Non-NAS Fund in periodic installments as funds are received by the PI Trust. Distributions in respect of Non-NAS PI Channeled Claims shall be exclusively in the form of Distributions from the PI Trust Non-NAS Fund or Sub-Qualified Settlement Fund to Holders of Allowed Non-NAS PI Channeled Claims, in accordance with the Non-NAS PI TDP, and shall be subject to the PI Trust Deductions and Holdbacks.

    (ii) <u>Channeling</u>: As of the Effective Date, in accordance with the Plan and the Master TDP, any and all liability of the Debtors and the other Protected Parties for any and all Non-NAS PI Channeled Claims shall automatically, and without further act, deed or court order, be channeled exclusively to and assumed by the PI Trust and shall be exclusively satisfied by payments from the PI Trust. Each Non-NAS PI Channeled Claim shall be asserted exclusively against the PI Trust and resolved solely in accordance with the terms, provisions and procedures of the Non-NAS PI TDP. The sole recourse of any Person on account of any Non-NAS PI Channeled Claim, whether or not the Holder thereof participated in the Chapter 11 Cases and whether or not such Holder filed a Proof of Claim in the Chapter 11 Cases, shall be to the PI Trust Non-NAS Fund as and to the extent provided in the Non-NAS PI TDP. Subject to <u>Section 10.8(c)</u> of the Plan, Holders of Non-NAS PI Channeled Claims are enjoined from asserting against any Debtor or other Protected Party any Channeled Claim, and may not proceed in any manner against any Debtor or other Protected Party on account of any Channeled Claim in any forum whatsoever, including any state, federal or non-U.S. court or administrative or arbitral forum, and are required to pursue Non-NAS PI Channeled Claims exclusively against the PI Trust, solely as and to the extent provided in the Non-NAS PI TDP.

    (iii) <u>Impairment and Voting</u>: Non-NAS PI Claims are Impaired. Holders of Non-NAS PI Claims are entitled to vote to accept or reject the Plan.

(d)     Canadian Patient Settlement. Pursuant to the Canadian Patient Claim Settlement Stipulation, (i) no Holder of a Settled Canadian Patient Claim that filed a Proof of Claim shall receive a recovery in respect of such Settled Canadian Patient Claim from any source other than the Patient Settlement Payment (as defined in the Canadian Patient Claim Settlement Stipulation) made from the Canadian Patient Settlement Trust and (ii) in order to receive a recovery in respect of any other Claim for which a Proof of Claim was filed by a Holder of a Settled Canadian Patient Claim, such Holder shall have the burden of proving that such Proof of Claim is not in respect of a Settled Canadian Patient Claim that was released and discharged pursuant to the Canadian Patient Claim Settlement Stipulation and such Holder has not received any recovery from the Canadian Patient Settlement Trust on account of such Claim. No Distributions shall be made on account of any Claims that may constitute Settled Canadian Patient Claims unless and until (x) the Saskatchewan Court of Queen's Bench approves the Canadian Patient Settlement Agreement and all funds in the Canadian Patient Settlement Trust have been distributed to Holders of Settled Canadian Patient Claims in accordance with the Canadian Patient Settlement Agreement or (y) the Saskatchewan Court of Queen's Bench denies the Canadian Patient Settlement Agreement. For the avoidance of doubt, nothing in Article X of the Plan shall affect the validity or enforceability of the Canadian Patient Settlement Agreement.

### 4.11   *Avrio General Unsecured Claims (Class 11(a))*.

(a)     Treatment: Except to the extent a Holder of an Allowed Avrio General Unsecured Claim and Avrio Health L.P. agree to different treatment, on the Effective Date, or as soon as reasonably practicable thereafter, each Holder of an Allowed Avrio General Unsecured Claim shall receive, on account of such Allowed Claim, including interest, payment in full in Cash.

(b)     Impairment and Voting: Avrio General Unsecured Claims are Unimpaired. Holders of Avrio General Unsecured Claims are conclusively presumed to accept this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Avrio General Unsecured Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited.

### 4.12   *Adlon General Unsecured Claims (Class 11(b))*.

(a)     Treatment: Except to the extent a Holder of an Allowed Adlon General Unsecured Claim and Adlon Therapeutics L.P. agree to different treatment, on the Effective Date, or as soon as reasonably practicable thereafter, each Holder of an Allowed Adlon General Unsecured Claim shall receive, on account of such Allowed Claim, including interest, payment in full in Cash.

(b)     Impairment and Voting: Adlon General Unsecured Claims are Unimpaired. Holders of Adlon General Unsecured Claims are conclusively presumed to accept this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Adlon General Unsecured Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited.

### 4.13   *Other General Unsecured Claims (Class 11(c))*.

(a)     Treatment: All Other General Unsecured Claims are Disputed. Except to the extent a Holder of an Allowed Other General Unsecured Claim and the Debtor against which such Claim is asserted agree to different treatment, after the Effective Date upon the Allowance of such Claim in accordance with Article VII of the Plan, each Holder of an Allowed Other General Unsecured Claim shall receive, on account of such Allowed Claim, such Holder's Pro Rata Share of the Other General Unsecured Claim Cash, up to payment in full of such Allowed Claim.

(b)     Impairment and Voting: Other General Unsecured Claims are Impaired. Holders of Other General Unsecured Claims are entitled to vote to accept or reject the Plan.

19-23649-shl    Doc 8263    Filed 11/18/25    Entered 11/18/25 20:20:55    Main Document
Pg 121 of 325

### 4.14    *Intercompany Claims (Class 12).*

(a)    <u>Treatment</u>: Except as otherwise provided in the NewCo Transfer Agreement or the Restructuring Steps Memorandum, on or after the Effective Date, Intercompany Claims shall be (x) in the case of Intercompany Claims held by a Liquidating Debtor against another Liquidating Debtor, at the discretion of the Debtors (or the Plan Administration Trustee, as applicable), (y) in the case of Intercompany Claims held by a Transferred Debtor against another Transferred Debtor, at the discretion of NewCo and (z) otherwise, at the discretion of the Debtors (or the Plan Administration Trustee, as applicable) with the consent (not to be unreasonably withheld, conditioned or delayed) of the Governmental Consent Parties:

(i)    Reinstated; or

(ii)    Compromised and settled or canceled and extinguished with no distribution on account thereof.

(b)    <u>Impairment and Voting</u>: Intercompany Claims are either Unimpaired or Impaired with no distribution on account thereof. Holders of Intercompany Claims are either conclusively presumed to accept this Plan pursuant to section 1126(f) of the Bankruptcy Code or deemed to reject this Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Intercompany Claims.

### 4.15    *Shareholder Claims (Class 13).*

(a)    <u>Treatment</u>: Holders of Shareholder Claims shall not receive or retain any property on account of such Claims. As of the Effective Date, in accordance with the terms of and except as otherwise expressly provided in the Shareholder Settlements, all Shareholder Claims shall automatically, and without further act, deed or court order, be deemed to have been released without any distribution on account thereof, and such Claims shall be of no further force or effect.

(b)    <u>Impairment and Voting</u>: Shareholder Claims are Impaired. Holders of Shareholder Claims are deemed to reject this Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Shareholder Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Shareholder Claims.[4]

### 4.16    *Co-Defendant Claims (Class 14).*

(a)    <u>Treatment</u>: In full and final satisfaction and release of each Co-Defendant Claim, the Holder thereof shall (i) not receive or retain any property on account of such Co-Defendant Claim and not have any recourse to any Debtor or any Assets of any Debtor, or any Estate or any Assets of any Estate and (ii) retain its Co-Defendant Defensive Rights, which may be exercised solely in accordance with <u>Section 10.18</u>. As of the Effective Date, Co-Defendant Claims shall be deemed expunged, released and extinguished without further action by or order of the Bankruptcy Court, and shall be of no further force or effect. Notwithstanding the release, satisfaction, expungement and extinguishment of Co-Defendant Claims, a Co-Defendant retains its Co-Defendant Defensive Rights.

---

[4] Although Holders of Shareholder Claims are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code, the Shareholder Payment Parties, in all capacities (including as Holders of Claims), have agreed to support the Plan pursuant to the Master Shareholder Settlement Agreement.

(b)    <u>Impairment and Voting</u>: Co-Defendant Claims are Impaired. Holders of Co-Defendant Claims are deemed to reject this Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Co-Defendant Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Co-Defendant Claims.

### 4.17    *Other Subordinated Claims (Class 15)*.

(a)    <u>Treatment</u>: Other Subordinated Claims are subordinated pursuant to the Plan and section 509(c) and/or 510 of the Bankruptcy Code and/or other applicable law. Holders of Other Subordinated Claims shall not receive or retain any property under this Plan on account of such Claims. As of the Effective Date, Other Subordinated Claims shall be deemed expunged, released and extinguished without further action by or order of the Bankruptcy Court, and shall be of no further force or effect.

(b)    <u>Impairment and Voting</u>: Other Subordinated Claims are Impaired. Holders of Other Subordinated Claims are deemed to reject this Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Other Subordinated Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Other Subordinated Claims.

### 4.18    *PPLP Interests (Class 16)*.

(a)    <u>Treatment</u>: In accordance with the terms of the Shareholder Settlement Agreements, Holders of PPLP Interests shall relinquish such Interests and shall not receive or retain any property under the Plan on account of such Interests. As of the PPLP Dissolution Date, all PPLP Interests shall be deemed surrendered, canceled and/or redeemed without further action by or order of the Bankruptcy Court, and shall be of no further force or effect.

(b)    <u>Impairment and Voting</u>: PPLP Interests are Impaired. Holders of PPLP Interests are deemed to reject this Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of PPLP Interests are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such PPLP Interests.

### 4.19    *PPI Interests (Class 17)*.

(a)    <u>Treatment</u>: In accordance with the terms of the Shareholder Settlement Agreements, Holders of PPI Interests shall relinquish such Interests and shall not receive or retain any property under this Plan on account of such Interests. As of the Effective Date, PPI Interests shall be deemed surrendered, canceled and/or redeemed without further action by or order of the Bankruptcy Court, and shall be of no further force or effect.

(b)    <u>Impairment and Voting</u>: PPI Interests are Impaired. Holders of PPI Interests are deemed to reject this Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of PPI Interests are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such PPI Interests.

### 4.20    *Intercompany Interests (Class 18)*.

(a)    <u>Treatment</u>: Except as otherwise provided in the NewCo Transfer Agreement or the Restructuring Steps Memorandum, on the Effective Date, Intercompany Interests shall be:

(i)        with respect to Intercompany Interests in any Transferred Debtor held by PPLP, Reinstated and transferred to NewCo (or one of its Subsidiaries) in accordance with the NewCo Transfer Agreement;

(ii)       with respect to Intercompany Interests in any Transferred Debtor held by another Transferred Debtor, Reinstated or otherwise treated in accordance with the NewCo Transfer Agreement; and

(iii)      with respect to Intercompany Interests in any Debtor that is not a Transferred Debtor, Reinstated solely for administrative convenience until canceled when such Debtor is dissolved or merged out of existence by the Plan Administration Trustee.

(b)        <u>Impairment and Voting</u>: Intercompany Interests are either Unimpaired or Impaired with no distribution on account thereof. Holders of Intercompany Interests are either conclusively presumed to accept this Plan pursuant to section 1126(f) of the Bankruptcy Code or deemed to reject this Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Intercompany Interests.

### 4.21    *Debtors' Rights with Respect to Unimpaired Claims.*

Except as otherwise provided in this Plan, nothing under the Plan shall affect the rights of the Debtors with respect to an Unimpaired Claim, including all rights with respect to legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

## ARTICLE V    MEANS FOR IMPLEMENTATION.

### 5.1    *Restructuring Transactions*.

On or before the Effective Date or as soon as reasonably practicable thereafter, the Debtors may take all actions consistent with this Plan as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by or necessary to effectuate the Restructuring Transactions under and in connection with this Plan, including (a) the execution and delivery of all appropriate agreements or other documents of merger, consolidation, sale, restructuring, conversion, disposition, transfer, dissolution or liquidation containing terms that are consistent with the Plan; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any Asset, property, interest, right, liability, debt or obligation on terms consistent with the Plan; (c) the filing of appropriate certificates or articles of organization, limited partnership, incorporation, reincorporation, merger, consolidation, conversion or dissolution pursuant to applicable law; (d) the execution, delivery, filing, recordation and issuance of any other documents, instruments or agreements in connection with the Restructuring Transactions; and (e) any transactions described in the Restructuring Steps Memorandum.

### 5.2    *Plan Settlements*.

(a)        As further described in the Disclosure Statement, the provisions of this Plan (including the provisions contained in <u>Section 5.9</u> of the Plan and the release and injunctive provisions contained in <u>Article X</u> of the Plan), the Shareholder Settlements and the other Plan Documents constitute a good faith compromise and settlement of Claims and controversies among the Debtors, the Supporting Claimants, the Settling Creditors, the Shareholder Payment Parties, certain other participants in the Mediation and other parties in interest reached in connection with the Mediation and otherwise, which such compromise and settlement is necessary and integral to the Plan and the Plan Documents and the success

of these Chapter 11 Cases. The Debtors, the Supporting Claimants, the Settling Creditors and the Shareholder Payment Parties believe the treatment provided in respect of Claims against and Interests in the Debtors and the treatment of competing Classes of Claims is fair and appropriate only when combined with the distribution scheme, including without limitation all Distributions to be made under the Plan, and the release, injunction and all other provisions contained in the Plan, all of which are material aspects of the Plan and the terms of the Shareholder Settlements. More than 614,000 Proofs of Claim alleging liability arising out of or in connection with Opioid-Related Activities were filed against the Debtors by the General Bar Date. Approximately 10% of the submitted Proofs of Claim allege a specific amount of liability. The aggregate alleged liability associated with these Proofs of Claim is more than $40 trillion (exclusive of one personal injury claim that asserted $100 trillion in alleged liability). Approximately 90% of Claims alleging liability arising out of or in connection with Opioid-Related Activities do not allege a specific amount of liability. The Debtors believe that any reasonable estimate, projection or valuation of their total liability and obligation to pay for Claims asserted against them, if they had the ability to pay those Claims outside of these Chapter 11 Cases, exceeds by many multiples the total value of all assets of their Estates, including but not limited to contributions from third parties and the full face value of all of Purdue's insurance. The Debtors have structured the Plan on the basis of this understanding, and the Confirmation Order shall include a finding consistent with this understanding.

(b)    The Plan, including the explanation set forth in the Disclosure Statement, and the Plan Documents shall be deemed a motion to approve the Plan Settlements, including the Shareholder Settlements, and the good faith full and final comprehensive compromise and settlement of all of the Claims, Interests and controversies described in the foregoing Section 5.2(a) pursuant to Bankruptcy Rule 9019, and entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Plan Settlements under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that the Plan Settlements are fair, equitable, reasonable and in the best interests of the Debtors and their Estates.

(c)    The Plan, the Plan Settlement, the Plan Documents (including the Creditor Trust Documents), the Shareholder Settlements and the Confirmation Order constitute a good faith full and final comprehensive compromise and settlement of all Claims, Interests and controversies described in the Plan based upon the unique circumstances of these Chapter 11 Cases (such as the total distributable value available, the unique facts and circumstances relating to these Debtors and the need for an accelerated resolution without additional avoidable litigation) such that (i) none of the foregoing documents (including the provisions contained in Section 5.9 of the Plan), nor any materials used in furtherance of Plan confirmation (including, but not limited to, the Disclosure Statement, and any notes related to, and drafts of, such documents and materials), may be offered into evidence, deemed an admission, used as precedent or used by any party or Person in any context whatsoever beyond the purposes of this Plan, in any other litigation or proceeding, except as necessary, and as admissible in such context, to enforce their terms and to evidence the terms of the Plan and the Plan Documents before the Bankruptcy Court or any other court of competent jurisdiction and (ii) any obligation by any party, in furtherance of such compromise and settlement, to not exercise rights that might be otherwise available to such party shall be understood to be an obligation solely in connection with this specific compromise and settlement and to be inapplicable in the absence of such compromise and settlement. The Plan, the Plan Settlement, the Plan Documents and the Confirmation Order will be binding as to the matters and issues described therein, but will not be binding with respect to similar matters or issues that might arise in any other litigation or proceeding in which none of the Debtors or any other Protected Party is a party; *provided* that such litigation or proceeding is not to enforce or evidence the terms of the Plan, the Plan Settlement, the Plan Documents, the Shareholder Settlements or the Confirmation Order. Any Person's support of, or position or action taken in connection with, this Plan, the Plan Settlement, the Plan Documents, the Shareholder Settlements and the Confirmation Order may differ from such Person's position or testimony in any other litigation or proceeding not in connection with these Chapter 11 Cases. Further, and, as all parties to the Mediation agreed, this Plan

Settlement is not intended to serve as an example for, or represent the parties' respective positions or views concerning, any other chapter 11 cases relating to opioids, nor shall it be used as precedent by any Person or party in any other such chapter 11 cases or in any other proceeding, situation or litigation.

(d)     The "allocation" of dollars between the Shareholder Direct Settlement Portion of any Distribution and the Estate Distributions is part of an overall compromise and settlement under Bankruptcy Rule 9019 between the Mediation Parties, including the Debtors, the Creditors' Committee, the Shareholder Payment Parties, and all creditors and creditor groups that are Mediation Parties, and upon confirmation of this Plan will be deemed to be a settlement between the Debtors, the Creditors' Committee, the Supporting Claimants and the Shareholder Payment Parties in which, among other things, the Shareholder Payment Parties are providing up to $6.5 billion in consideration over 15 years.[5] The "allocation" is intended by the Shareholder Payment Parties and the other Mediation Parties to, among other things, facilitate the distribution of proceeds for opioid abatement, victim compensation, and other permitted uses under the Plan, and otherwise. All such parties, including but not limited to the Shareholder Payment Parties, Sackler Parties, the Debtors, the Ad Hoc Committee and the States AG Negotiating Group, including each member of such groups, has agreed that neither the settlement amount nor the "allocation" (including any allocation between the Shareholder Payment Party of payment responsibility) reflects any concession or agreement by any party as to the strength, validity, merits, collectability, amount, or otherwise of the Shareholder Released Estate Claims or of the Shareholder Released Direct Claims or any defenses to the Shareholder Released Estate Claims or the Shareholder Released Direct Claims, and if for whatever reason the agreement in principle is not consummated, neither the settlement amount nor the "allocation" shall be cited or used by the Debtors, the Creditors' Committee, the Supporting Claimants or the Shareholder Payment Parties (or the Released Parties) – or any party to the Shareholder Settlements or any other Mediation Party – for any purpose whatsoever in any pleading or proceeding wherever or whenever. Further, no party to the compromise and settlement will be bound by this Plan or the agreement set forth in this provision (other than as set forth in this Section 5.2(d)) with regard to what it may state in a pleading, court hearing, proceeding, or otherwise about the strength, validity, merits, collectability, amount, or otherwise of the Shareholder Released Estate Claims or of the Shareholder Released Direct Claims, or any defenses thereto, including, without limitation, in any pleading filed in connection with the Shareholder Settlements and this Plan. This paragraph shall be binding forever upon all parties from the earlier of (i) the time that this agreement in principle is reached and (ii) the time that this Section 5.2(d) is made publicly available (on the Bankruptcy Court docket or otherwise), regardless of whether a settlement including that represented in the Plan is consummated, and shall be specifically enforceable by the Bankruptcy Court (with no cap on damages that may be awarded).[6] This Section 5.2(d) is non-severable from the overall compromise and settlement, and is an integral part of the Plan. This Section 5.2(d) is specifically subject to Federal Rule of Evidence 408 and analogous state provisions barring the use of settlement offers and communications to prove the validity or amount of disputed claim.[7]

---

[5] In accordance with Section 2.01(g) of the Master Shareholder Settlement Agreement (and as more fully described therein), A-Side Payment Group 8's $345 million payment obligation shall be prepaid in an amount equal to $225,677,259.42, unless pre-paid on the Effective Date in the amount of $218 million, representing the agreed-upon present value on the Effective Date. If A-Side Payment Group 8 elects to defer payment of up to $35 million on the Effective Date, A-Side Payment Group 8 shall pay the MDT up to $17.5 million due on each of the fifth and sixth payment dates plus 4.5% interest (i.e. which would aggregate to $225,677,259.42), and the other A-Side Payment Groups' shall pay up to $35 million on the Effective Date and their payment obligations on the fifth and sixth payment dates shall be reciprocally reduced.

[6] This sentence shall not apply to the States.

[7] While all parties understand that the Plan is not enforceable until confirmation, all Mediation Parties have agreed to be bound by this provision as of March 18, 2025.

(e)    **Private Entity Settlements**. On the Effective Date, the Private Creditor Trusts shall receive their respective Initial Private Creditor Trust Distributions and their respective MDT Private Claims, in each case, subject to the following Sections 5.2(e)(i)(A) and 5.2(e)(ii):

(i)    **Direct Claim Settlement Retained Payment Amount Grantor Trust Arrangements.**

(A)    **Final Shareholder Direct Settlement Amounts**: Subject to the Master Shareholder Settlement Agreement and this Plan, for a given PI/TPP Class, each Shareholder Payment Group shall pay its PG Pro Rata Share of (x) the applicable Maximum Shareholder Direct Settlement Amount for such PI/TPP Class, *less* (y) the applicable Direct Claim Settlement Retained Payment Amount for such PI/TPP Class (such amount for the applicable PI/TPP Class and Shareholder Payment Group, the applicable Shareholder Payment Group's "**Final Shareholder Direct Settlement Amount**" for that PI/TPP Class), which amount shall be distributed to the TPP Trust and the PI Trust, as applicable, in accordance with the procedures set forth in this Section 5.2(e)(i)(A). Each Shareholder Payment Group's Final Shareholder Direct Settlement Amount is determined separately for each PI/TPP Class and is payable solely for the benefit of the PI/TPP Class to which such Final Shareholder Direct Settlement Amount relates).

Each Shareholder Payment Group's share of the Maximum TPP Shareholder Direct Settlement Amount, the Maximum NAS PI Shareholder Direct Settlement Amount, and the Maximum Non-NAS PI Shareholder Direct Settlement Amount (*i.e.*, assuming no Direct Settlement Retained Payment Amount for such PI/TPP Class) is limited to the amounts set forth under that Shareholder Payment Group's name in Exhibit M-2 of the Master Shareholder Settlement Agreement. Payment when due by or on behalf of a Shareholder Payment Group of its Final Shareholder Direct Settlement Amount for a given PI/TPP Class shall satisfy in full all of such Shareholder Payment Group's payment obligations with respect to that PI/TPP Class. The obligation of each Shareholder Payment Group to pay its Final Shareholder Direct Settlement Amount for a given PI/TPP Class shall be on a several and not joint basis as among the Shareholder Payment Groups (but shall be joint and several to the extent set forth in the Master Shareholder Settlement Agreement, as among Shareholder Payment Parties within each Shareholder Payment Group) and is otherwise limited in the manner contemplated by the Master Shareholder Settlement Agreement.

(B)    **Retained Payment Calculations and Procedures**: For each PI/TPP Class for which a Final Claims Determination occurs prior to the Effective Date, each Shareholder Payment Group shall, on the Effective Date, pay an amount equal to such Shareholder Payment Group's Final Shareholder Direct Settlement Amount for such PI/TPP Class to the TPP Trust and the PI Trust, as applicable, subject to and in accordance with the Master Shareholder Settlement Agreement and this Plan. For each PI/TPP Class for which a Final Claims Determination does not occur prior to the Effective Date:

(I) The applicable PI/TPP Trustee shall (x) propose a Holdback Increment for each PI/TPP Class (a "**Proposed Holdback Increment**"), and (y) estimate the TPP Direct Claim Settlement Retained Payment Amount, the NAS PI Direct Claim Settlement Retained Payment Amount, or the Non-NAS PI Direct Claim Settlement Retained Payment Amount (the "**Estimated Retained Payment Amount**"), which shall be reasonably based on available information; *provided* that, (i) the methodology used by the applicable PI/TPP Trustee to determine the Estimated Retained Payment Amount (a "**Proposed Methodology**") and the Proposed Holdback Increment shall be disclosed by such PI/TPP Trustee to the Sackler Parties' Representative at least 45 days prior to the Effective Date (the "**Disclosure Date**") and reasonably acceptable to the Sackler Parties' Representative and; (ii) such PI/TPP Trustee's Proposed Methodology and Proposed Holdback Increment shall be deemed reasonably acceptable to the Sackler Parties' Representative unless the Sackler Parties' Representative provides written notice to the PI/TPP Trustee within 10 days of the Disclosure Date that the Sackler Parties' Representative requests additional reasonable information or explanation regarding, or otherwise disagrees with, the Proposed Methodology and/or the Proposed Holdback Increment (and the reasons for such disagreement), (iii) in the event of any such notice, the PI/TPP Trustee shall work reasonably and in good faith with the Sackler Parties' Representative to provide such additional information or explanation, or to resolve such disagreement; (iv) if the Sackler Parties' Representative, which shall work diligently and in good faith to evaluate the Proposed Methodology and the Proposed Holdback Increment and to engage with the applicable PI/TPP Trustee to resolve any such disagreement, has not determined that the Proposed Methodology and/or the Proposed Holdback Increment is reasonably acceptable within 15 days of the Effective Date, then the Sackler Parties' Representative shall be entitled to seek a hearing before the Bankruptcy Court in advance of the Effective

74

Date on shortened notice for a determination as to whether the Proposed Methodology and the Proposed Holdback Increment is reasonable, and the PI/TPP Trustee shall not object to the occurrence of such hearing on shortened notice; and (v) (x) if the Bankruptcy Court makes a final determination with respect to the Proposed Methodology or the Proposed Holdback Increment prior to the Effective Date, such determination shall be binding on all parties, solely for purposes of calculating the Estimated Retained Payment Amount and the Retained Payment Reserve, or (y) if the Sackler Parties' Representative does not request such hearing, or if the Bankruptcy Court does not make a final determination with respect to the Proposed Methodology or the Proposed Holdback Increment prior to the Effective Date for any reason, then the Proposed Methodology and the Proposed Holdback Increment put forward by the PI/TPP Trustee shall be used for the Estimated Retained Payment Amount and the Retained Payment Reserve.

(II) On the Effective Date, each Shareholder Payment Group shall, for each PI/TPP Class, pay: (i) to the applicable Grantor Trust Arrangement(s), an amount equal to its PG Pro Rata Share of the Holdback Percentage of the Estimated Retained Payment Amount for that PI/TPP Class (such amount paid by such Shareholder Payment Group to the applicable Grantor Trust Arrangement(s) with respect to such PI/TPP Class constituting such Payment Group's "**Retained Payment Reserve**" for that PI/TPP Class), subject to and in accordance with the Master Shareholder Settlement Agreement; and (ii) to the PI/TPP Trust, as applicable, such Shareholder Payment Group's Initial Shareholder Direct Settlement Amount applicable to such PI/TPP Class.

(III) The Retained Payment Reserves for a given PI/TPP Class shall remain in the applicable Grantor Trust Arrangement(s) and shall be governed by Exhibit Z to the Master Shareholder Settlement Agreement and the Master Shareholder Settlement Agreement until a Final Claims Determination occurs for that PI/TPP Class, as applicable. For the avoidance of doubt, (i) Taxes arising out of such Grantor Trust Arrangement shall be paid in accordance with Section 2.03(g) of Exhibit Z to the Master Shareholder Settlement Agreement, (ii) associated tax distributions shall be payable in accordance with Section 3.02(b) of Exhibit Z to the Master Shareholder Settlement Agreement, and (iii) in connection with the final release from the applicable Retained Payment Reserve, the applicable PI/TPP Trust shall be entitled to all after-tax interest earned on the funds released to such PI/TPP Trust.

75

(IV) Once a Final Claims Determination occurs for such PI/TPP Class: (a) as soon as reasonably practicable, the applicable PI/TPP Trustee, in cooperation with the Sackler Parties' Representative, shall calculate the finalized Direct Claim Settlement Retained Payment Amount for that PI/TPP Class; (b) within ten (10) Business Days after the applicable PI/TPP Trustee finalizes such Direct Claim Settlement Retained Payment Amount, or as soon as reasonably practicable thereafter (the "**Grantor Trust Release Date**"), amounts from each Shareholder Payment Group's Retained Payment Reserve for such PI/TPP Class shall be distributed to the PI/TPP Trust, as applicable, determined by the equation set forth in clauses (1)–(2) below for such Shareholder Payment Group (the "**Final Direct Settlement Payments**"): (1) (x) such Shareholder Payment Group's Final Shareholder Direct Settlement Amount for such PI/TPP Class *minus* (y) the Shareholder Payment Group's Initial Shareholder Direct Settlement Amount actually paid to the applicable PI/TPP Trust in accordance with (B)(ii) above, *plus* (2) the aggregate interest earned on such Retained Payment Reserve and neither disbursed to pay associated taxes or otherwise swept pursuant to the Master Shareholder Settlement Agreement (including pursuant to Exhibit N or Exhibit Z) from the Effective Date to the Grantor Trust Release Date.

(V) If a Shareholder Payment Group's Retained Payment Reserve for a given PI/TPP Class consists of more than one Grantor Trust Arrangement, then such Shareholder Payment Group shall decide which Grantor Trust Arrangements within that Shareholder Payment Group shall fund the Shareholder Payment Group's Final Direct Settlement Payment for such PI/TPP Class and in what proportions, subject in all cases to the Master Shareholder Settlement Agreement and in compliance with the schedule set forth herein.

(VI) In the event that a Shareholder Payment Group's Retained Payment Reserve for such PI/TPP Class exceeds the amount needed by such Shareholder Payment Group to fund its Final Direct Settlement Payment for that PI/TPP Class, all remaining funds in such Retained Payment Reserve after payment of such Final Direct Settlement Payment shall be released to such Shareholder Payment Group according to the instructions of the Sackler Parties' Representative.

(VII) In the event that a Shareholder Payment Group's Retained Payment Reserve for such PI/TPP Class is not sufficient to fund its Final Direct Settlement Payment

76

for that PI/TPP Class, such Shareholder Payment Group shall pay the amounts needed to address such insufficiency to the TPP Trust or the PI Trust, as applicable, on the Grantor Trust Release Date.

(VIII) In the event that after the finalization of the Direct Claim Settlement Retained Payment Amount for a given PI/TPP Class it is determined that the Shareholder Payment Groups, in paying their respective Initial Shareholder Direct Settlement Amounts in respect of such PI/TPP Class, retained, in the aggregate, less than the aggregate Direct Claim Settlement Retained Payment Amount Amounts in respect of such PI/TPP Class, the applicable PI/TPP Trusts shall remit to one or more Shareholder Payment Groups, an amount in cash in the aggregate, equal to such shortfall, to be allocated among Shareholder Payment Groups as directed by the Sackler Parties' Representative, to result in each Shareholder Payment Group receiving the full amount of their PG Pro Rata Share of the applicable Direct Claim Settlement Retained Payment Amount, which funds shall be remitted by the applicable PI/TPP Trustees from the applicable PI/TPP Trusts on the later of the Grantor Trust Release Date or the date the Sackler Parties' Representative delivers the relevant allocation to the applicable PI/TPP Trust.

(C) **Fees and Expenses Payable to Grantor Trust Escrow Agent in Respect of Retained Payment Reserves.** The fees and expenses payable to the Grantor Trust Escrow Agent in respect of holding each applicable Retained Payment Reserve shall be borne solely by the applicable Shareholder Payment Group, and shall not reduce amounts payable to or for the benefit of the PI/TPP Trust.

(D) **U.S. Federal Income Tax Matters Relating to the Grantor Trust Retained Payment Escrow Arrangement**. Each of the Grantor Trust Retained Payment Escrow Arrangements are intended to be treated and shall be reported as a separate qualified settlement fund within the meaning of Treasury Regulations section 1.468B-1 for U.S. federal income tax purposes and shall be treated consistently for state and local tax purposes. The Master Shareholder Settlement Agreement provides that the applicable Shareholder Payment Party shall timely elect pursuant to Treasury Regulations Section 1.468B-1(k) (and any applicable state and local income tax purposes), to treat each of the Grantor Trust Retained Payment Escrow Arrangements as a "grantor trust," all of which is owned, for federal and applicable state and local income tax purposes only, by such Shareholder Payment

77

Party, and that such Shareholder Payment Party shall maintain such election and shall not revoke such election without the prior written consent of the Master Disbursement Trust.

The following assumes that the Grantor Trust Retained Payment Escrow Arrangements are treated as grantor trusts. All parties (including the Shareholder Payment Parties, the Debtors, the Plan Administration Trustee, each applicable Creditor Trustee, the MDT Trustees and Holders of Non-Participating Claims) shall be required to report for tax purposes in a manner consistent with the foregoing. Such person as is designated in the Confirmation Order or the escrow agreement governing each of the Grantor Trust Retained Payment Escrow Arrangements shall be the "administrator" of each of the Grantor Trust Retained Payment Escrow Arrangements. The Master Shareholder Settlement Agreement provides that the applicable Shareholder Payment Party shall take into account all items of income, gain, loss, deduction and credit (including capital gains and losses) recognized by or otherwise attributable to each Grantor Trust Retained Payment Escrow Arrangements for U.S. federal (and any applicable state or local) income tax purposes on its tax returns. The applicable administrator may request an expedited determination of taxes of any of the Grantor Trust Retained Payment Escrow Arrangements under section 505(b) of the Bankruptcy Code for all returns, if any, filed for, or on behalf of, the Grantor Trust Retained Payment Escrow Arrangements for all taxable periods through the dissolution of the Grantor Trust Retained Payment Escrow Arrangements. Nothing in this Section 5.2(e)(i)(D) shall be deemed to determine, expand or contract the jurisdiction of the Bankruptcy Court under section 505 of the Bankruptcy Code.

(ii)    **Class Action Escrow Accounts**. With respect to Private Creditor Trusts that are the subject of Opt-Out Class Action Settlements, if, as of the Effective Date, the applicable Opt-Out Class Action Settlement has not been consummated, the Shareholder Direct Settlement Portion of the Initial Private Creditor Trust Distribution (exclusive of amounts that would constitute Direct Claim Settlement Retained Payment Amounts under the applicable Opt-Out Class Action Settlement, to the extent known) for such Private Creditor Trust shall be placed by the Shareholder Payment Parties into a third-party interest bearing escrow in accordance with the Master Shareholder Settlement Agreement (the "**Class Action Escrow Accounts**"). If any such Opt-Out Class Action Settlement is consummated on or prior to tenth (10th) Business Day immediately preceding the second (2nd) SSA Payment Date, then all amounts due to the members of the

relevant Class under such Opt-Out Class Action Settlement, amounts held in the applicable Class Action Escrow Account shall be distributed to the corresponding Private Creditor Trust, other than the applicable Direct Claim Settlement Retained Payment Amounts, if any, which shall be released to, or at the direction of, the Shareholder Payment Parties. If any Opt-Out Class Action Settlement is not consummated by the tenth (10th) Business Day immediately preceding the second (2nd) SSA Payment Date, amounts held in the applicable Class Action Escrow Account shall be promptly released to, or at the direction of, the Shareholder Payment Parties. If such Opt-Out Class Action Settlement is consummated after such release from the Class Action Escrow Account to, or at the direction of, the Shareholder Payment Parties, each Shareholder Payment Party shall pay to the applicable Private Creditor Trust such amounts due and payable by it within ten (10) Business Days of delivery to the Sackler Parties' Representative of notice of such Opt-Out Class Action Settlement having been consummated, pending final payment from the Shareholder Released Parties.

(iii)    **U.S. Federal Income Tax Matters Relating to the Class Action Escrow Accounts.** Each of the Class Action Escrow Accounts are intended to be treated and shall be reported as a separate qualified settlement fund within the meaning of Treasury Regulations section 1.468B-1 for U.S. federal income tax purposes and shall be treated consistently for state and local tax purposes. The Master Shareholder Settlement Agreement provides that the applicable Shareholder Payment Party shall timely elect pursuant to Treasury Regulations Section 1.468B-1(k) (and any applicable state and local income tax purposes), to treat each of the Class Action Escrow Accounts as a "grantor trust," all of which is owned, for federal and applicable state and local income tax purposes only, by such Shareholder Payment Party, and that such Shareholder Payment Party shall maintain such election and shall not revoke such election without the prior written consent of the Master Disbursement Trust.

The following assumes that the Class Action Escrow Accounts are treated as grantor trusts. All parties (including the Shareholder Payment Parties, the Debtors, the Plan Administration Trustee, each applicable Creditor Trustee, the MDT Trustees and Holders of Non-Participating Claims) shall be required to report for tax purposes in a manner consistent with the foregoing. Such person as is designated in the Confirmation Order or the escrow agreement governing each of the Class Action Escrow Accounts shall be the "administrator" of each of the Class Action Escrow Accounts. The Master Shareholder Settlement Agreement provides that the applicable Shareholder Payment Party shall take into account all items of income, gain, loss, deduction and credit (including capital gains and losses) recognized by or otherwise attributable to each Class Action Escrow Account for U.S. federal

(and any applicable state or local) income tax purposes on its tax returns. The applicable administrator may request an expedited determination of taxes of any of the Class Action Escrow Accounts under section 505(b) of the Bankruptcy Code for all returns, if any, filed for, or on behalf of, the Class Action Escrow Accounts for all taxable periods through the dissolution of the Class Action Escrow Accounts. Nothing in this Section 5.2(e)(iii) shall be deemed to determine, expand or contract the jurisdiction of the Bankruptcy Court under section 505 of the Bankruptcy Code.

(iv)     Notwithstanding anything to the contrary in the Master Shareholder Settlement Agreement or the Governmental Entity Shareholder Direct Settlement Agreement, the Master Disbursement Trust shall have an obligation under this Plan to distribute to the PI Trust, on account of the MDT PI Claim, (A) on a first priority basis, the first $50 million of proceeds, payments, and benefits (including, but not limited to, the MDT Insurance Proceeds) of (I) any MDT Causes of Action (other than those Retained Causes of Action relating to or necessary to enforce the MDT Shareholder Rights) and (II) the MDT Insurance Rights (assets described in clauses (I) and (II), collectively, the "**Subject MDT Assets**"), and (B) in the absence of payment in full of such $50 million prior to the second anniversary of the Effective Date from proceeds, payments, and benefits of the Subject MDT Assets, the remaining unpaid amount thereof (which may be the entire amount) in full in cash on the first Scheduled MDT Distribution Date following such second anniversary of the Effective Date from MDT Transferred Assets or the proceeds thereof other than the Subject MDT Assets on a priority basis in accordance with Section 5.2(g) hereof (the payment obligations described in clauses (A) and (B), the "**PI Trust Obligation**").[8]

(v)      Until such time as the PI Trust Obligation has been satisfied in full in accordance with Section 5.2 of the Plan:

(A)      the Master Disbursement Trust shall not (I) permit a Lien or other encumbrance to attach to the Subject MDT Assets or (II) incur any Claim (including any Channeled Claim) or otherwise grant any right of payment in respect of the Subject MDT Assets, in each case, senior to the PI Trust Obligation;

(B)      the Master Disbursement Trust shall afford the PI Trustee (or its designated representative) with periodic reporting

---

[8] For the avoidance of doubt, to the extent the PI Trust Obligation has not been paid in full by the second anniversary of the Effective Date in accordance with this Section 5.2(e) of the Plan, the priority of the PI Trust Obligation shall only be second to the funding of the Replenishment Transfer with Cash and cash equivalents that are Shareholder Estate Settlement Distributions, but not, for the avoidance of doubt, second with respect to application of the Total Direct Settlement Amount under the Governmental Entity Shareholder Direct Settlement Agreement.

as contemplated by Section 5.6(f)(v) of the Plan and subject to Section 5.6(f)(iv);

(C)    none of the protections with respect to the PI Trust Obligation in this Section 5.2(e) of the Plan nor the priority afforded to the PI Trust Obligation in Section 5.2(g) of the Plan shall be modified or eliminated from the MDT Agreement, the Master Shareholder Settlement Agreement, or the Governmental Entity Shareholder Direct Settlement Agreement, solely to the extent applicable, without the written consent of the PI Trustee; and

(D)    the PI Trustee reserves all legal and equitable rights under the Plan, the Confirmation Order, and federal and common law with respect to the PI Trust Obligation.

(vi)    Solely to the extent the PI Trust Obligation has not been paid in full by the second anniversary of the Effective Date in accordance with Section 5.2(e)(iv) of the Plan, the Master Disbursement Trust shall thereafter reserve amounts from the Total Direct Settlement Amount under the Governmental Entity Shareholder Direct Settlement Agreement, as needed, to satisfy the PI Trust Obligation.

(vii)    In the event the PI Trust Obligation is not satisfied in full by the first Scheduled MDT Distribution Date following the second anniversary of the Effective Date in accordance with Section 5.2 of the Plan, the PI Trustee shall be entitled to seek enforcement of the PI Trust Obligation by motion to enforce the Plan filed with the Bankruptcy Court, which shall be heard on an expedited basis subject to the Bankruptcy Court's availability, and the PI Trustee may seek legal and/or equitable remedies available under applicable law, including, but not limited to, specific performance, disgorgement, and/or damages against any successor of the Debtors or their Estates, including the Master Disbursement Trust.

(viii)    As a result of the United States-PI Claimant Medical Expense Claim Settlement, CMS's relevant interests under the Medicare Secondary Payer Act, 42 U.S.C. § 1395y(b) *et seq.*, have been satisfied and, as such, no reporting, pursuant to Section 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2007 [42 U.S.C. § 1395y(b)(8)] and related regulations and guidance should be performed by the Debtors, claimants, their representatives, or any other party.

(f)     **Non-Federal Public Entity Settlements**.[9]

(i)     On the Effective Date, the Governmental Remediation Trust and the Tribe Trust shall receive their respective Initial Public Creditor Trust Distributions, and the Governmental Remediation Trust and the Tribe Trust shall receive their respective MDT Interests. The MDT Interests shall entitle the Governmental Remediation Trust and the Tribe Trust to the payments from the Master Disbursement Trust and other benefits set forth below.

(A)     Subject to Section 5.2(g), on each MDT Distribution Date, the Master Disbursement Trust shall make Public Creditor Trust Distributions from all MDT Distributable Value in accordance with Section 5.2(f)(i)(B) of the Plan.

(B)     All Public Creditor Trust Distributions to the Governmental Remediation Trust and/or the Tribe Trust shall be allocated between the Governmental Remediation Trust and the Tribe Trust as follows, in each case, as calculated before accounting for any amounts payable pursuant to Section 5.9 of this Plan: (I) with respect to the Estate Distributions, (X) 96.7% to the Governmental Remediation Trust and (Y) 3.3% to the Tribe Trust; and (II) with respect to the Shareholder Direct Settlement Portion, (X) 96.7% of the Maximum Governmental Direct Settlement Amount on the payment dates indicated therein to the Governmental Remediation Trust, subject to, and payable in accordance with, the terms of the Governmental Entity Shareholder Direct Settlement Agreement, and (Y) 3.3% of the Maximum Governmental Direct Settlement Amount on the payment dates indicated therein to the Tribe Trust, subject to, and payable in accordance with, the terms of the Tribe Trust Agreement.

(C)     All Public Creditor Trust Distributions to the Governmental Remediation Trust shall be further allocated between States and Subdivisions in accordance with the Governmental Remediation Trust Documents. The allocation of the applicable Shareholder Direct Settlement Portion to Subdivisions who become Initial Participating Subdivisions may be higher than Later Joining Subdivisions (each as defined in and as more fully described in the Governmental Entity Shareholder Direct Settlement Agreement). Subdivisions located in Oklahoma shall be entitled to participate in the Governmental Entity Shareholder Direct Settlement as

---

[9] Any characterization of the Public School Claims in this Plan as a "Private" claimant or "Public" claimant is for administrative convenience only, and is not intended to, nor may it be construed as, having any significance for any other purpose.

though Oklahoma was a Settling State. Subdivisions in Non-Settling States and Subdivisions which previously litigated and resolved their claims against the Debtors and/or Shareholder Released Parties shall not be eligible to be Participating Subdivisions unless and until, in the case of the Subdivisions located in Non-Settling States, a Subdivision's corresponding State becomes a Settling State. For the avoidance of doubt, each Non-Settling Subdivision shall be entitled to receive Estate Distributions pursuant to Section 7.7 of the Plan upon Allowance of its Claim in accordance with Sections 7.6 or 7.9 of the Plan.

(D)    Oklahoma Litigating Political Subdivisions will receive Oklahoma's allocation, which allocation amount has already been reduced by $12.5 million that the State of Oklahoma set aside in accordance with the Oklahoma Political Subdivisions Opioid Abatement Grants Act (the "Act") for distribution to Oklahoma subdivisions pursuant to Oklahoma's settlement with the Shareholder Released Parties and the Debtors (the "**Prepetition Oklahoma Settlement**").  The Oklahoma subdivision allocation is set forth in Exhibit F of the Plan and will be administered as agreed between the State of Oklahoma and the Oklahoma Litigating Political Subdivisions. Any release requirements contained in the Prepetition Oklahoma Settlement that are a condition for a Subdivision to participate in the Purdue Oklahoma Subdivision Fund shall be waived by the Debtors and Shareholder Payment Parties such that the Oklahoma Litigating Political Subdivisions may participate in both the Purdue Oklahoma Subdivision Fund and receive distributions from the Governmental Remediation Trust. The Debtors and Shareholder Payment Parties also waive any requirement in the Prepetition Oklahoma Settlement that funds not distributed by the Purdue Oklahoma Subdivision Fund within a certain amount of time will revert to the Foundation or the National Center for Addiction Studies and Treatment established pursuant to the Prepetition Oklahoma Settlement, and acknowledge that the entire Purdue Oklahoma Subdivision Fund shall be distributed to Oklahoma subdivisions.  Oklahoma's allocation shall be paid from the Governmental Remediation Trust to a settlement fund established for the benefit of the Oklahoma Litigating Political Subdivisions. Distributions from such settlement fund to the Oklahoma Litigating Political Subdivisions shall be made in accordance with the ratios set forth in Exhibit F of the Plan. The Oklahoma Litigating Political Subdivisions shall either hire an administrator for the funds from the Remediation Trust Account or receive the funds directly

from the Governmental Remediation Trust. The administrator may be reasonably compensated by the Governmental Remediation Trust to perform its administrative function, but not to exceed 5% of the money distributed to Oklahoma Litigating Political Subdivisions by the Governmental Remediation Trust.

(ii)    On the Effective Date, the Public School Trust shall receive the Initial Public Schools Distribution (less any required payments to the Common Benefit Fund and/or in respect of attorneys' fees and expenses of the Public School District Claimants in accordance with Section 5.9(d) and (i) of the Plan) and the MDT Public School Districts Claim. On account of the MDT Public School Districts Claim, the Master Disbursement Trust shall pay to benefit the Public School Trust: (i) $7.5 million on the first anniversary of the Effective Date *less* the applicable Direct Claim Settlement Retained Payment Amount (the "***Second Public Schools Distribution***"), and (ii) $7.5 million on the second anniversary of the Effective Date *less* the applicable Direct Claim Settlement Retained Payment Amount (the "***Third Public Schools Distribution***").

(g)    **MDT Priority Waterfall**. On each MDT Distribution Date, all Cash and cash equivalents of the Master Disbursement Trust shall be applied as follows: (i) *first*, to fund any Replenishment Transfer solely to the extent such Cash and cash equivalents are Shareholder Estate Settlement Distributions; (ii) *second*, to fund the PI Trust Obligation in accordance with Section 5.2.(e)(iii) of the Plan; (iii) *third*, to fund the MDT Operating Reserve in an amount determined by the MDT Trustees; (iv) *fourth*, to the extent there are outstanding amounts then due on account of the MDT Claims, to pay the MDT Claims; (v) *fifth*, to reimburse the applicable Public Creditor Trust for any Shareholder Direct Settlement Portion previously applied in respect of adjustments implemented in accordance with Section 5.2(e)(vi); and (vi) *sixth*, as Public Creditor Trust Distributions in respect of the MDT Interests; *provided*, *however*, that, except to the extent expressly set forth in Exhibit M to the Governmental Entity Shareholder Direct Settlement Agreement, payments received by the Master Disbursement Trust: (A) on account of the Governmental Entity Shareholder Direct Settlement shall be immediately transferred to the Governmental Remediation Trust and (B) on account of the Tribal Shareholder Direct Settlement Agreement shall be immediately transferred to the Tribe Trust, and the amounts in (A) and (B) shall not be used to fund a Replenishment Transfer to fund the MDT Operating Reserve or pay the MDT Claims.

(h)    **Shareholder Settlements**. On or before the Effective Date, the Debtors, the Shareholder Payment Parties and the Settling Creditors shall enter into the Shareholder Settlement Agreements. Pursuant to the Public Entity Settlements, the Private Entity Settlements, the Shareholder Settlement Agreements and the Plan, in exchange for among other things, the Shareholder Settlement Releases and the Channeling Injunction, as set forth in Sections 10.6, 10.7 and 10.8 of the Plan, and the other agreements set forth in the Shareholder Settlement Agreements, (i) the Shareholder Payment Parties shall pay the applicable Shareholder Settlement Amount on the dates and pursuant to the terms set forth in the applicable Shareholder Settlement Agreements, (ii) the Shareholder Claims shall be deemed released on the Effective Date pursuant to Section 4.15 of the Plan, (iii) the MDT Shareholder Insurance Rights shall be transferred to the Master Disbursement Trust in accordance with Section 5.6(j) of the Plan, (iv) the Shareholder Payment Parties have agreed to support the Plan and (v) the Shareholder Payment Parties have provided the other agreements and consideration set forth in the applicable Shareholder Settlement Agreement, in each case, as more fully set forth in, and subject to the terms and conditions of, the

Shareholder Settlement Agreement. The Master Disbursement Trust shall distribute all proceeds of the MDT Shareholder Rights, including each applicable Shareholder Settlement Amount, in accordance with the Plan, including <u>Section 5.2(e)–(g)</u> of the Plan.

(i)    **United States-PI Claimant Medical Expense Claim Settlement**. The United States-PI Claimant Medical Expense Claim Settlement is as follows:

(i)    On the Effective Date of the Plan, the PI Trust shall be deemed, without further action of the Bankruptcy Court or the PI Trust, to have irrevocably assigned to the United States the PI Trust's right to receive $26 million from the Master Disbursement Trust, which amount shall be paid by the Debtors, the Master Disbursement Trust, or the PI Trust, as applicable, to the United States in the following installments: (x) $13 million to be paid on the Effective Date, consisting of (A) $12,164,100 otherwise distributable to the PI Trust from the Initial Non-NAS PI Distribution and (B) $835,900 otherwise distributable to the PI Trust from the Initial NAS PI Distribution, and (y) $13 million (the "Second Medical Expense Claim Settlement Payment"), consisting of (I) 93.57% of the first $13 million otherwise distributable to the PI Trust pursuant to <u>Section 5.2(e)(iv)</u> of the Plan, and (II) the NAS Medical Expense Claim Settlement Reserve Amount, which Second Medical Expense Claim Settlement Payment shall be paid to the United States on a proportionate basis from the amounts described in clauses (I) and (II), as and when amounts are payable to the PI Trust pursuant to <u>Section 5.2(e)(iv)</u> of the Plan. For the avoidance of doubt, in no event shall (A) the stated amount of the Initial PI Trust Distribution or amounts payable pursuant to <u>Section 5.2(e)(iv)</u> of the Plan be altered in a manner that would reduce the aggregate amount to be paid to the United States pursuant to this <u>Section 5.2(i)(i)</u> of the Plan, (B) the aggregate amount paid to the United States pursuant to this <u>Section 5.2(i)(i)</u> of the Plan exceed $26 million, or (C) the United States' claim against the Master Disbursement Trust arising from the assignment described in this <u>Section 5.2(i)(i)</u> of the Plan be released until the United States has received payments thereof aggregating to $26 million. The United States shall have the right to enforce the obligations set forth in this <u>Section 5.2(i)(i)</u> of the Plan notwithstanding the United States-PI Claimant Medical Expense Claim Releases.

(ii)    Notwithstanding <u>Section 10.19</u> of the Plan, as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the PI Trust, each Holder of a PI Claim and, in respect of each of the PI Trust and each Holder of a PI Claim, its respective agents, representatives, heirs, successors and assigns, in their respective capacities as such, shall, without any further action by the Bankruptcy Court, be conclusively, absolutely, unconditionally, irrevocably, fully, finally, forever and permanently released by each Holder of a United States-PI Claimant Medical Expense Claim of all United States-PI Claimant

Medical Expense Claims and all Causes of Action based on or relating to, or in any manner arising from, in whole or in part, the United States-PI Claimant Medical Expense Claim Settlement (other than a Cause of Action to enforce the United States-PI Claimant Medical Expense Claim Settlement, including, but not limited to, the release set forth in Section 5.2 (i)(iii) of the Plan) that each Holder of a United States-PI Claimant Medical Expense Claim has asserted or could assert on its own behalf or on behalf of another Person or party, notwithstanding section 1542 of the California Civil Code or any law of any jurisdiction that is similar, comparable or equivalent thereto (which shall conclusively be deemed waived), against the PI Trust, a Holder of a PI Claim, Distributions to Holders of PI Claims pursuant to the PI TDP or under the Plan and, in respect of each of the PI Trust and each Holder of a PI Claim, its respective agents, representatives, heirs, successors and assigns, in their respective capacities as such; *provided*, *however*, that, if a Holder of a PI Claim commences a legal action against a Holder of a United States-PI Claimant Medical Expense Claim challenging all or any portion of the United States-PI Claimant Medical Expense Claim Settlement, then, from and after the commencement of such legal action, the United States-PI Claimant Medical Expense Claim Release shall be *void ab initio* solely with respect to such Holder of a PI Claim, and the heirs, successors and assigns of such Holder of a PI Claim, in their capacities as such, and not with respect to any other Person or party, including, but not limited to, the PI Trust, counsel to such Holder of a PI Claim and, in respect of each of the PI Trust and such counsel, its respective agents, representatives, heirs, successors and assigns, in their respective capacities as such; *provided further* that no such legal action against a Holder of a United States-PI Claimant Medical Expense Claim shall impair or reduce the amount that the United States shall receive pursuant to Section 5.2(i)(i). Nothing in this Section 5.2(i)(ii) creates any rights of a Holder of a PI Claim to sue the United States or any of its agencies, including a Holder of a United States-PI Claimant Medical Expense Claim, and the United States and its agencies reserve all rights and defenses in that regard; and nothing in this paragraph is or shall be deemed a waiver of any applicable sovereign immunity with respect to any legal action against the United States or any of its agencies challenging all or any portion of the United States-PI Claimant Medical Expense Claim Settlement brought by a Holder of a PI Claim or the heirs, successors or assigns of such Holder of a PI Claim, in their capacities as such.

(iii)     As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, each Holder of a United States-PI Claimant Medical Expense Claim shall, without any further action by the Bankruptcy Court, be conclusively, absolutely, unconditionally, irrevocably, fully, finally, forever and permanently released by the PI Trust and its agents,

representatives, successors and assigns, in their respective capacities as such, of all Causes of Action based on or relating to, or in any manner arising from, in whole or in part, the United States-PI Claimant Medical Expense Claim Settlement (other than a Cause of Action to enforce the United States-PI Claimant Medical Expense Claim Settlement, including, but not limited to, any United States-PI Claimant Medical Expense Claim Release) that the PI Trust has asserted or could assert on its own behalf or on behalf of another Person or party, notwithstanding section 1542 of the California Civil Code or any law of any jurisdiction that is similar, comparable or equivalent thereto (which shall conclusively be deemed waived), against a Holder of a United States-PI Claimant Medical Expense Claim and, in respect of each Holder of a United States-PI Claimant Medical Expense Claim, its respective agents, representatives, successors and assigns, in their respective capacities as such.

(iv)     The payments made to the United States pursuant to Section 5.2(i)(i) of the Plan are a prepayment by the PI Trust of amounts that would otherwise be payable by certain Holders of PI Claims to Holders of United States-PI Claimant Medical Expense Claims upon receipt by such Holders of PI Claims of Distributions pursuant to the PI TDP and under the Plan. Such prepayment shall be borne equitably by such Holders of PI Claims in the form of a reduction in the Distributions otherwise payable to such Holders of PI Claims pursuant to the PI TDP.

(v)      The United States Department of Defense, Defense Health Agency (in respect of the TRICARE Program) submits to the jurisdiction of the Bankruptcy Court for purposes of the United States-PI Claimant Medical Expense Claim Settlement, including, but not limited to, the United States-PI Claimant Medical Expense Claim Releases.

(vi)     The United States Department of Health and Human Services, on its own behalf and on behalf of its component agencies, which are the Centers for Medicare & Medicaid Services and the Indian Health Service on behalf of its federally-operated programs; the United States Department of Defense, Defense Health Agency (in respect of the TRICARE Program); and the United States Department of Veterans Affairs submit to the exclusive jurisdiction of the Bankruptcy Court for purposes of any proceeding in respect of the interpretation or enforcement of the United States-PI Claimant Medical Expense Claim Settlement, including, but not limited to, the United States-PI Claimant Medical Expense Claim Releases.

(j)      **Individual Settlement Agreements**: Each of the Settling States, Participating Subdivisions, the Master Disbursement Trust, and the Debtors shall not enter into any side letter or separate agreement with any Sackler Family Member that grants more favorable terms or benefits,

when taken as a whole, to such Sackler Family Member's Shareholder Family Group than those set forth in the Plan and the Shareholder Settlement Agreements.

### 5.3    *The Plan Administration Trust*.

(a)    **Establishment and Purpose of Plan Administration Trust**. On or before the Effective Date, the Debtors shall take all necessary steps to form the Plan Administration Trust in accordance with the Plan and the PAT Agreement. The Plan Administration Trust shall be established for the purposes described in this Plan and any others more fully described in the PAT Agreement, shall have no objective to continue or engage in the conduct of trade or business and shall be subject to the jurisdiction of the Bankruptcy Court. The Plan Administration Trust shall, in each case in accordance with the Plan and the PAT Agreement:

(i)    hold, manage, sell and invest the PAT Assets for the benefit of Holders of Allowed Claims (other than Channeled Claims and Federal Government Unsecured Claims);

(ii)    administer, process, resolve and liquidate Claims (other than Channeled Claims and Federal Government Unsecured Claims), including through the prosecution and resolution of objections to Disputed Avrio General Unsecured Claims, Disputed Adlon General Unsecured Claims or Disputed Other General Unsecured Claims;

(iii)    hold and maintain the PAT Reserves and the PAT Distribution Account and maintain the Professional Fee Escrow Account and the account described in Section 5.3(e) of the Plan; and

(iv)    make Distributions to Holders of Allowed Claims (other than Channeled Claims and Federal Government Unsecured Claims) and other payments from the Plan Administration Trust, the Professional Fee Escrow Account and the account described in Section 5.3(e) of the Plan.

(b)    **Vesting of the PAT Assets in the Plan Administration Trust**. The Plan Administration Trust shall consist of the PAT Assets. On the Effective Date, the PAT Assets shall vest in the Plan Administration Trust, free and clear of all Claims, Interests, Liens, other encumbrances and liabilities of any kind.

(c)    **Appointment and Role of the Plan Administration Trustee**. The Plan Administration Trustee shall be an existing employee of the Debtors selected by the Debtors in their sole discretion or another individual selected by the Debtors with the consent of the Creditors' Committee and the Governmental Consent Parties (which consent shall not be unreasonably withheld, conditioned or delayed). The identity and compensation of the Plan Administration Trustee shall be disclosed in the Plan Supplement. The appointment of the Plan Administration Trustee shall be approved in the Confirmation Order, and such appointment shall be effective as of the Effective Date. In accordance with the PAT Agreement, the Plan Administration Trustee shall serve in such capacity through the earlier of (x) the date that the Plan Administration Trust is dissolved in accordance with the PAT Agreement and (y) the date the Plan Administration Trustee resigns, is terminated or is otherwise unable to serve for any reason. In furtherance of and consistent with the purpose of the Plan Administration Trust and the Plan, the Plan Administration Trustee shall:

88

(i) have the power and authority to perform all functions on behalf of the Plan Administration Trust;

(ii) undertake all administrative responsibilities as are provided in the Plan and the PAT Agreement, including filing the final monthly operating report (for the month in which the Effective Date occurs) and all subsequent quarterly operating reports and administering the closure of the Chapter 11 Cases, which reports shall be delivered to the Master Disbursement Trust;

(iii) be responsible for all decisions and duties with respect to the Plan Administration Trust and the PAT Assets; and

(iv) take such other actions as the Plan Administration Trust determines to be necessary or desirable to carry out the purposes of the Plan, *provided* that such authority shall be subject to Section 5.4 and Section 5.6 of this Plan, and nothing herein or in any Plan Supplement document shall grant the Plan Administration Trust any rights with respect to NewCo or its operations or the Master Disbursement Trust or its operations.

(d) **Funding of the Wind-Up Reserve; Costs and Expenses of the Plan Administration Trust**. On the Effective Date, the Debtors shall establish and fund the Wind-Up Reserve, which shall vest in the Plan Administration Trust and be held and maintained by the Plan Administration Trustee. In the event of any shortfall of funding in the Wind-Up Reserve, NewCo shall be obligated to satisfy any such deficiency, subject to the consent (not to be unreasonably withheld) of the NewCo Managers and the MDT Trustees (which obligation shall be assumed by NewCo and any successor to NewCo's business). The costs and expenses of the Plan Administration Trust, including the compensation, fees and expenses of the Plan Administration Trustee and its retained professionals, shall be paid out of the Wind-Up Reserve. The Plan Administration Trustee shall be entitled to reasonable compensation, in an amount to be determined by the Debtors, subject to the consent (not to be unreasonably withheld, conditioned or delayed) of the Creditors' Committee and the Governmental Consent Parties, and to retain and reasonably compensate counsel and other professionals, including any professional who represented parties in interest, including the Debtors, in the Chapter 11 Cases, to assist in its duties as Plan Administration Trustee on such terms as the Plan Administration Trustee deems appropriate without Bankruptcy Court approval, subject to the provisions of the PAT Agreement.

(e) **Attorneys' Fees and Expenses of Directors, Officers, Employees and Agents**.

(i) The Plan Administration Trust will promptly pay, as and when incurred after the Effective Date and before its sixth (6th) anniversary, the reasonable actual attorneys' fees and related out-of-pocket expenses incurred (A) by (x) any current or former director or officer, in each case entitled to indemnification, advancement and/or reimbursement by the Debtors in such capacity or (y) any current or former employee of the Debtors, in the case of both (x) and (y) other than any (i) Sackler Family Member, (ii) Excluded Party, or (iii) Shareholder Released Party that (a) is entitled to access the SOR or any other reserves established under the Plan or the Settlement or (b) actually has the applicable fees paid from the SOR or any other reserves

established under the Plan or the Settlement, and (B) in connection with such individual's cooperation with, or in connection with the defense of such individual with respect to, any investigation, prosecution and/or litigation involving conduct relating to the Debtors or the Debtors' business or property or any defense of this Plan, including its Releases and Channeling Injunction, *provided* that the scope of this section with respect to any individual shall not apply to fees and expenses incurred in connection with any criminal investigation of which such individual is the target or any criminal prosecution of such individual.

(ii)    On or before the Effective Date, the Debtors will establish and fund a segregated account in the amount of $5 million, which shall be held and maintained by the Plan Administration Trustee to fund the foregoing payment obligations. If, at any time, the balance in such segregated account falls below $2 million, NewCo (or, at any time after a sale of all or substantially all Assets of or Interests in NewCo or if NewCo is otherwise unable to do so, the Master Disbursement Trust) shall replenish such account so that amounts in the account are not less than $5 million, provided that (x) the aggregate amount deposited into such account (including the initial deposit) shall not exceed $25 million, and (y) on the sixth (6th) anniversary of the Effective Date, any funds remaining in such account shall be released to the Master Disbursement Trust, and NewCo's (and the Master Disbursement Trust's contingent) funding obligations with respect to such account will terminate.

(iii)   Notwithstanding the foregoing, the Plan Administration Trust will not pay (A) any amounts that are reimbursed from any applicable insurance policies, or (B) any otherwise reimbursable amounts incurred by any individual who (i) is found by a court of competent jurisdiction to have engaged in gross negligence, willful misconduct, any criminal act, or actual or intentional fraud, in each case relating to the Debtors or the Debtors' business or property, (ii) does not provide an appropriate undertaking consistent with the undertakings required for indemnification during the pendency of the Chapter 11 Cases, (iii) has at any time prior to the Effective Date refused or does at any time after the Effective Date refuse to testify based on a claim of privilege against self-incrimination in any proceeding relating to the Debtors or the Debtors' business or property, (iv) does not cooperate with reasonable requests by the MDT in connection with the pursuit of any MDT Causes of Action or (v) is at any time indicted for a felony relating to the Debtors or the Debtors' business or property (provided, however, that if such individual is found to be not guilty of such felony, such indictment is dismissed or such individual is otherwise exonerated, then such expenses shall be promptly paid).

(iv)    In addition to the foregoing, (i) on the Effective Date, any MDT Insurance Collateral in excess of the face amount of Mangrove

90

Risk Solutions Bermuda Ltd (formerly known as Isosceles Insurance Ltd.) policy number PPLP-01/2019 and all interest accrued as of the Effective Date on the MDT Insurance Collateral associated with each of Mangrove Risk Solutions Bermuda Ltd (formerly known as Isosceles Insurance Ltd.) policy number PPLP-02/2019 and the Columbia Casualty Product Liabilities Insurance Policies shall be released to the Master Disbursement Trust, (ii) following the Effective Date, interest accrued on MDT Insurance Collateral associated with each of the Mangrove Risk Solutions Bermuda Ltd (formerly known as Isosceles Insurance Ltd.) policy number PPLP-01/2019 and the Columbia Casualty Product Liabilities Insurance Policies shall be swept quarterly and distributed to the Master Disbursement Trust, (iii) no later than the expiration of the policy or the sixth (6th) anniversary of the Effective Date, all MDT Insurance Collateral associated with the Mangrove Risk Solutions Bermuda Ltd (formerly known as Isosceles Insurance Ltd.) policy number PPLP-01/2019 will be released to the Master Disbursement Trust, subject to the terms of such policy and (iv) following the Effective Date, any MDT Insurance Collateral associated with any other insurance policies of NewCo will be released to the Master Disbursement Trust promptly upon such MDT Insurance Collateral being released by the applicable insurer, provided it is not necessary to support renewed policies of NewCo of similar scope. The Plan Administration Trust shall, on a quarterly basis, provide NewCo and the Master Disbursement Trust with a report of any amounts paid or billed pursuant to this section during the prior quarter. All parties covered by this Section 5.3(e) shall be deemed to release any claim against any MDT Insurance Policy.

(f)    **Institution and Maintenance of Legal and Other Proceedings**. As of the date upon which the Plan Administration Trust is established, the Plan Administration Trust shall be empowered to initiate, prosecute, defend and resolve all legal actions and other proceedings related to any Asset, liability or responsibility of the Plan Administration Trust. Such legal actions and other proceedings shall be limited solely to those required for the purposes of reconciling, administering and defending against Claims (other than Channeled Claims) and the other responsibilities of the Plan Administration Trust. The Plan Administration Trust shall be empowered to initiate, prosecute, defend and resolve all such actions in the name of the Debtors or their Estates, in each case if deemed necessary or appropriate by the Plan Administration Trustee. The Plan Administration Trust shall be responsible for the payment of all damages, awards, judgments, settlements, expenses, costs, fees and other charges incurred subsequent to the date upon which the Plan Administration Trust is established arising from, or associated with, any legal action or other proceeding brought pursuant to the foregoing. For the avoidance of doubt, the Plan Administration Trust, pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and applicable state corporate law, is appointed as the successor-in-interest to, and representative of, the Debtors and their Estates for the retention, enforcement, settlement or adjustment of Claims against the Debtors (other than the Channeled Claims). For the further avoidance of doubt, neither the Plan Administration Trust nor the Plan Administration Trustee shall be vested with the rights to pursue any MDT Insurance Rights or MDT Insurance Collateral.

(g)    **U.S. Federal Income Tax Matters Relating to Plan Administration Trust**. The Plan Administration Trust is intended to be treated as a trust described in IRC sections 661

91

through 664 and the regulations promulgated thereunder (a "complex trust"). The PAT Disputed Claims Reserves are intended to be treated as part of the Plan Administration Trust and not as separate taxable entities. All parties (including the Shareholder Payment Parties, the Debtors, the Plan Administration Trustee, each applicable Creditor Trustee, the MDT Trustees and Holders of Non-Participating Claims and other Disputed Claims) shall be required to report for tax purposes in a manner consistent with the foregoing. The Plan Administration Trustee shall file (or cause to be filed) such statements, returns, or disclosures relating to the Plan Administration Trust as are required by any Governmental Unit, including IRS Form 1041, IRS Form 1041-ES, and IRS Schedule K-1. The Plan Administration Trustee shall be responsible for payment, out of the PAT Assets, of any taxes imposed on the Plan Administration Trust or the PAT Assets, including, without limitation, estimated and annual U.S. federal income taxes. The Plan Administration Trustee shall be responsible for payment, out of the assets of each of the PAT Disputed Claims Reserves, of any taxes imposed on the applicable PAT Disputed Claims Reserve or its assets. The Plan Administration Trustee may request an expedited determination of taxes of the Plan Administration Trust under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Plan Administration Trust for all taxable periods through the dissolution of the Plan Administration Trust. Nothing in this Section 5.3(g) shall be deemed to determine, expand or contract the jurisdiction of the Bankruptcy Court under section 505 of the Bankruptcy Code.

(h)     **Dissolution, Release of Reserves and Residual Value**. The Plan Administration Trust shall be dissolved and the Plan Administration Trustee shall be discharged from its duties with respect to the Plan Administration Trust upon completion of its duties as set forth in the Plan and satisfaction of the purposes of the Plan Administration Trust as set forth in the Plan and the PAT Agreement, which, for the avoidance of doubt, shall be no earlier than the later of (i) the PPLP Dissolution Date and (ii) the date on which (A) all Disputed Claims (other than Non-Participating Channeled Claims) have been resolved, (B) all PAT Assets have been liquidated and (C) all Distributions and other payments required to be made by the Plan Administration Trustee under the Plan and the PAT Agreement have been made, unless dissolution on an earlier date is authorized pursuant to a Final Order of the Bankruptcy Court. Any Cash or cash equivalents in the Plan Administration Trust remaining upon dissolution of the Plan Administration Trust, including any Surplus Reserve Cash remaining in the PAT Reserves, shall be distributed in accordance with Section 5.14(b) of the Plan.

(i)     **Exculpation and Indemnification of the Plan Administration Trustee**. To the maximum extent permitted by applicable law, the Plan Administration Trustee shall not have or incur any liability for actions taken or omitted in its capacity as the Plan Administration Trustee, or on behalf of the Plan Administration Trust, except those acts found by Final Order to be arising out of its willful misconduct, bad faith, gross negligence or fraud, and shall be entitled to indemnification, advancement and reimbursement for reasonable fees and expenses in defending any and all of its actions or inactions in its capacity as the Plan Administration Trustee, or on behalf of the Plan Administration Trust, and for any other liabilities, losses, damages, claims, costs and expenses arising out of or due to the implementation or administration of the Plan or the PAT Agreement, in each case, except for any actions or inactions found by Final Order to be arising out of its willful misconduct, bad faith, gross negligence or fraud. Any valid indemnification claim of the Plan Administration Trustee shall be satisfied from the Wind-Up Reserve.

**5.4**     *NewCo*.

(a)     **Establishment and Ownership of NewCo**. On or before the Effective Date, NewCo and any Subsidiaries of NewCo shall be formed in accordance with the Plan and the NewCo Operating Agreement. Upon completion of the Restructuring Transactions, the Foundation shall hold the NewCo Interest, representing 100% of the voting and economic Interests in NewCo.

(b)    **Purpose of NewCo**. From and after the Effective Date, NewCo shall operate the NewCo Transferred Assets in accordance with the terms of the NewCo Operating Agreement, and subject to the NewCo Operating Injunction and the NewCo Governance Covenants set forth in the Confirmation Order. NewCo shall be operated in a responsible and sustainable manner, balancing (i) the interests of its stakeholders (that include the Foundation and MDT Beneficiaries) to fund and provide abatement of the opioid crisis, (ii) effective deployment of its assets to address the opioid crisis and (iii) the interests of third parties materially affected by its conduct. In connection with any action of NewCo, all elements of NewCo's purpose as set forth in this <u>Section 5.4(b)</u> shall be taken into account, and NewCo shall not be required (and the NewCo Managers shall not be required to cause NewCo) to maximize NewCo's or NewCo's subsidiaries' sales or profits.

(c)    **Vesting of the NewCo Transferred Assets in NewCo**.

(i)    On or prior to the Effective Date, pursuant to the Plan and in accordance with the NewCo Transfer Agreement, the NewCo Transferred Assets, including the Initial NewCo Cash, shall be transferred to and vest in NewCo or one or more Subsidiaries of NewCo, in each case free and clear of all Claims, Interests, Liens, other encumbrances and liabilities of any kind; *provided* that NewCo shall comply with its obligations under the Plan, including NewCo's obligation to distribute directly to the Governmental Remediation Trust, the Tribe Trust and the Foundation the NewCo Distributable Cash in accordance with the Plan and to satisfy any deficiency of funding in the Wind-Up Reserve subject to the consent (not to be unreasonably withheld) of the NewCo Managers and the MDT Trustees (which obligation shall be assumed by NewCo and any successor to NewCo's business) and NewCo shall assume the Assumed Liabilities. Except as described in the foregoing sentence, NewCo shall have no liability for, and the NewCo Transferred Assets shall vest in NewCo free and clear of, any prepetition and postpetition Causes of Action of any kind, in each case that have been or could have been asserted against the Debtors, their Estates or their property (including, but not limited to, Claims based on successor liability) based on any acts or omissions prior to the Effective Date. On or prior to the Effective Date, the Debtors are authorized to pay up to $5 million to the Board Consulting Advisor.

(ii)    On the Effective Date, Initial NewCo Cash in an amount equal to that portion of the Tino Trial Maximum Amount that, as of the Effective Date, has not been used to fund the Purdue Arm (the "***Remaining Tino Trial Amount***") shall be deposited by NewCo into, and maintained in, a segregated, restricted operating account established by NewCo. The Remaining Tino Trial Amount held in such restricted account shall be used solely to fund the Purdue Arm. Any portion of such Remaining Tino Trial Amount that will not be utilized by NewCo to fund the Purdue Arm (the "***Unutilized Tino Trial Amount***") shall constitute NewCo Distributable Cash.

(d)      **NewCo Managers**.

(i)      Appointment. The board of managers of NewCo will consist of five (5) NewCo Managers, each with experience in one or more of the following areas: pharmaceuticals, public policy (including public health policy), law enforcement, ethics and compliance, finance, audit, general business and/or corporate governance issues. The initial NewCo Managers shall be disinterested and independent, and shall be selected by the Settling States with the consent (not to be unreasonably withheld) of the Ad Hoc Committee and in consultation with the Debtors and the Creditors' Committee, and pursuant to a selection process that is reasonably acceptable to the Debtors; *provided* that the DOJ shall have the right, in its discretion, to observe such selection process. The identity of the initial NewCo Managers shall be included in the Plan Supplement. The appointment of the initial NewCo Managers shall be approved in the Confirmation Order, and such appointment shall be effective as of the Effective Date.

(ii)     Responsibilities. The NewCo Managers shall, among other things, (A) determine appropriate expenditure levels for commercial operations and the Public Health Initiatives of NewCo, and (B) make all decisions with respect to NewCo operations, products and investments (including, for the avoidance of doubt, to effectuate a Disposition Event (as defined in the NewCo Operating Agreement)), taking into account and consistent with the public interest and NewCo's purpose; *provided*, in each of clauses (A) and (B) above, any such actions of the NewCo Managers shall be subject to oversight by the Foundation.

(e)      **NewCo Distributable Cash**. On an annual basis following the Effective Date, NewCo shall pay (i) 96.7% of the Governmental NewCo Distributable Cash directly to the Governmental Remediation Trust, (ii) 3.3% of the Governmental NewCo Distributable Cash directly to the Tribe Trust and (iii) the Foundation Distributable Cash directly to the Foundation. The obligation to pay the Governmental NewCo Distributable Cash in accordance with this Section 5.4(e) shall be otherwise documented in an agreement to be negotiated between NewCo, the Governmental Remediation Trust and the Tribe Trust.

(f)      **NewCo Insurance**. On or prior to the Effective Date, the Debtors shall fund an upfront premium payment from Effective Date Cash to purchase insurance required and appropriate for the business needs of NewCo, including liability and other insurance for NewCo, including, without limitation, product liability insurance and directors' and officers' liability insurance for the NewCo Managers, officers and other authorized agents, in an amount and on terms acceptable to the Debtors and the Governmental Consent Parties.

(g)      **NewCo Operating Injunction and NewCo Governance Covenants**. The Confirmation Order will provide for the issuance of the NewCo Operating Injunction and the NewCo Governance Covenants. Any purchaser of NewCo's opioid business shall remain subject to the NewCo Operating Injunction and the NewCo Governance Covenants.

(h)      **NewCo Monitor**. The Confirmation Order will provide for the appointment of the NewCo Monitor. The initial NewCo Monitor shall be the Purdue Monitor in place as of

94

the Effective Date or otherwise selected by the Governmental Consent Parties with the consent of the Debtors, and in consultation with the Creditors' Committee. The identity of the NewCo Monitor shall be disclosed in the Plan Supplement. The NewCo Monitor shall be responsible for reviewing NewCo's compliance with the NewCo Operating Injunction. NewCo and its professionals and representatives, including the NewCo Managers, shall cooperate and reasonably respond to requests by the NewCo Monitor in the performance of its responsibilities, including reasonable requests for access to relevant books and records of NewCo. In furtherance of the responsibilities of the NewCo Monitor, the NewCo Monitor shall be authorized to seek relief from the Bankruptcy Court to the extent necessary to carry out its obligations hereunder. The NewCo Monitor shall prepare and publish quarterly reports regarding the matters for which the NewCo Monitor is responsible, including NewCo's compliance with the NewCo Operating Injunction. All compensation, costs and fees of the NewCo Monitor and any professionals retained by the NewCo Monitor shall be paid by NewCo.

(i)     **U.S. Federal Income Tax Matters Relating to NewCo**. The NewCo Managers shall cause NewCo to make a timely election to be treated as a corporation for U.S. federal income tax purposes effective as of the date immediately succeeding the Effective Date by the deadline for making such election. NewCo shall be responsible for filing all tax returns of NewCo and the payment, out of the Assets of NewCo, of any taxes due by or imposed on NewCo or NewCo Transferred Assets, including, without limitation, estimated and annual U.S. federal income taxes.

(j)     **Exculpation and Indemnification of the NewCo Managers**. To the maximum extent permitted by applicable law, no NewCo Manager shall have or incur any liability for actions taken or omitted in his or her capacity as a NewCo Manager, or on behalf of NewCo, except those acts found by Final Order to be arising out of his or her willful misconduct, bad faith or fraud, and shall be entitled to indemnification, advancement and reimbursement for reasonable fees and expenses in defending any and all actions or inactions in his or her capacity as a NewCo Manager, or on behalf of NewCo, except for any actions or inactions found by Final Order to be arising out of his or her willful misconduct, bad faith or fraud. Any valid indemnification claim of any NewCo Manager shall be satisfied by NewCo.

**5.5**     *Foundation*.

(a)     **Establishment and Ownership of the Foundation**. On or before the Effective Date, the Foundation shall be formed in accordance with the terms of the Plan and the Foundation Bylaws.

(b)     **Appointment of the Foundation Trustees**. The board of trustees of the Foundation will consist of three (3) Foundation Trustees, each of whom shall be disinterested and independent, provided that one (but no more than one) Creditor Trustee of the Master Disbursement Trust may serve as a Foundation Trustee; *provided* further that any action taken by such individual in his or her capacity as Foundation Trustee shall not be subject to the fiduciary duties of such individual in his or her capacity as a Creditor Trustee of the Master Disbursement Trust. The initial Foundation Trustees shall be selected by the Settling States with the consent (not to be unreasonably withheld) of the Ad Hoc Committee and in consultation with the Debtors and the Creditors' Committee, and pursuant to a selection process that is reasonably acceptable to the Debtors; *provided* that the DOJ shall have the right, in its discretion, to observe such selection process. The identity of the initial Foundation Trustees shall be included in the Plan Supplement. The appointment of the initial Foundation Trustees shall be approved in the Confirmation Order, and such appointment shall be effective as of the Effective Date.

(c)     **Foundation D&O Insurance and Indemnification**. On or prior to the Effective Date, the Debtors shall fund an upfront premium payment from Effective Date Cash to purchase directors' and officers' liability insurance for the Foundation Trustees in an amount and on terms acceptable to the Debtors and the Governmental Consent Parties.

(d)　　**U.S. Federal Income Tax Matters Relating to the Foundation**. The Foundation Trustees shall cause the Foundation to (A) be formed as a corporation and (B) be organized as a corporation that is intended to be treated as an exempt organization under IRC section 501(c)(4) for U.S. federal and applicable state and local income tax purposes.

(e)　　**Exculpation and Indemnification of the Foundation Trustees**. To the maximum extent permitted by applicable law, no Foundation Trustee shall have or incur any liability for actions taken or omitted in his or her capacity as a Foundation Trustee, or on behalf of NewCo, except those acts found by Final Order to be arising out of his or her willful misconduct, bad faith or fraud, and shall be entitled to indemnification, advancement and reimbursement for reasonable fees and expenses in defending any and all actions or inactions in his or her capacity as a Foundation Trustee, or on behalf of NewCo, except for any actions or inactions found by Final Order to be arising out of his or her willful misconduct, bad faith or fraud. Any valid indemnification claim of any Foundation Trustee shall be satisfied by the Foundation.

### 5.6　　*Master Disbursement Trust*.

(a)　　**Establishment and Purpose of the Master Disbursement Trust**. On or before the Effective Date, the Debtors shall take all necessary steps to establish the Master Disbursement Trust in accordance with the Plan and the MDT Agreement. The Master Disbursement Trust shall be established for the purposes described in this Plan and any other purposes more fully described in the MDT Agreement and shall be subject to the jurisdiction of the Bankruptcy Court. The Master Disbursement Trust shall, in each case in accordance with the Plan and the MDT Agreement:

(i)　　hold, manage, sell, invest and distribute the MDT Transferred Assets for the benefit of the MDT Beneficiaries in accordance with the Private Entity Settlements and the Public Entity Settlements;

(ii)　　enforce, pursue, prosecute, compromise and/or settle the MDT Causes of Action, the MDT Insurance Rights and the MDT Shareholder Rights, including monitoring and enforcing the Shareholder Settlement Agreements;

(iii)　　make payments in satisfaction of the MDT Claims;

(iv)　　make Public Creditor Trust Distributions from MDT Distributable Value;

(v)　　hold and administer the Special Operating Reserve; and

(vi)　　serve as administrative agent with respect to the Released Claims Reserves.

(b)　　**Vesting of the MDT Transferred Assets in the Master Disbursement Trust**. The corpus of the Master Disbursement Trust shall consist of the MDT Transferred Assets. On the Effective Date, pursuant to the Plan and in accordance with the MDT Agreement, the MDT Transferred Assets shall be irrevocably transferred to and vest in the Master Disbursement Trust free and clear of all Claims, Interests, Liens, other encumbrances and liabilities of any kind; *provided* that, to the extent certain Assets comprising the MDT Transferred Assets are not known or identified as of the Effective Date, such Assets shall automatically, and without further act or deed, be transferred to and vest in the Master Disbursement Trust upon the discovery or identification thereof, including, with respect to the Surplus

Reserve Cash, in accordance with Section 5.14(b) of the Plan. The Master Disbursement Trust shall have no liability for any prepetition or postpetition Causes of Action of any kind, in each case that have been or could have been asserted against the Debtors, their Estates or their property (including, but not limited to, Claims based on successor liability) based on any acts or omissions prior to the Effective Date, except as expressly set forth in the Plan and the MDT Agreement; *provided* that the Master Disbursement Trust will assume the Channeled Claims solely for the purpose of effectuating the Master TDP in accordance with Section 5.6(g) of the Plan and issue the MDT Claims and MDT Interests in accordance with the Public Entity Settlements and the Private Entity Settlements. From and after the Effective Date, all proceeds of the MDT Transferred Assets, including, without limitation, amounts paid by Insurance Companies under the MDT Insurance Policies and amounts paid under the Master Shareholder Settlement Agreement, shall be paid to the Master Disbursement Trust to be applied in accordance with the MDT Priority Waterfall and the MDT Agreement.

(c)      **Funding of the Master Disbursement Trust**. The Master Disbursement Trust shall be funded with the proceeds of the MDT Transferred Assets.

(d)      **Appointment and Role of the MDT Trustees**. The board of trustees of the Master Disbursement Trust will consist of three (3) MDT Trustees with relevant experience. The MDT Trustees shall be disinterested and independent; *provided*, *however*, that such requirements shall not preclude any professional who represented parties in interest from serving as MDT Trustee nor any firm in which an MDT Trustee holds a financial interest from serving as a professional for the Master Disbursement Trust based solely on such previous representations. At least one (1) initial MDT Trustee shall be selected by the Settling States that have attorneys general from the Democratic Party, and at least one (1) initial MDT Trustee shall be selected by the Settling States that have attorneys general from the Republican Party, and such MDT Trustees shall select the third MDT Trustee (the "**Settling States MDT Trustees**"); *provided* that notwithstanding the above, in each case, each MDT Trustee shall be appointed with the consent of the Ad Hoc Committee in consultation with the MSGE Group and the Debtors, and the DOJ shall have the right, in its discretion, to observe such selection process. The identity of the initial MDT Trustees shall be disclosed in the Plan Supplement. The appointment of the initial MDT Trustees shall be approved in the Confirmation Order, and such appointment shall be effective as of the Effective Date. Each Settling States MDT Trustee may be removed and replaced at any time by the unanimous vote of the MDT Advisory Council Representatives from the same political party as such Settling States that selected such Settling States MDT Trustee. In furtherance of and consistent with the purpose of the Master Disbursement Trust and the Plan, the MDT Trustees shall:

(i)      have the power and authority to perform all functions on behalf of the Master Disbursement Trust;

(ii)      have the power and authority to perform all functions necessary to operate the Master Disbursement Trust, including, but not limited to, hiring employees or financial, tax, legal, or other necessary professionals to achieve the Master Disbursement Trust's objectives;

(iii)      be responsible for all decisions and duties with respect to the Master Disbursement Trust and the MDT Transferred Assets; and

(iv)      in all circumstances and at all times, act in a fiduciary capacity for the benefit and in the best interests of the MDT Beneficiaries, in furtherance of the purpose of the Master Disbursement Trust, and in accordance with the Plan, including Section 5.6(f) of the Plan, and the MDT Agreement.

97

(e)    **Appointment and Role of the MDT Advisory Council**. There shall be an MDT Advisory Council established under the MDT Agreement that will consist of a total of seven (7) representatives (the "*MDT Advisory Council Representatives*," and each an "*MDT Advisory Council Representative*"), selected in the following manner: (i) two (2) representatives shall be selected by the representatives of Settling States that have a state attorney general from the Democratic Party; (ii) two (2) representatives shall be selected by the representatives of Settling States that have a state attorney general from the Republican Party, and (iii) these four (4) MDT Advisory Council Representatives shall select the fifth MDT Advisory Council Representative. In addition, one (1) MDT Advisory Council Representative shall be selected by the MDL Plaintiffs' Executive Committee and one (1) MDT Advisory Council Representative shall be selected by the MSGE Group. Notwithstanding anything in the foregoing to the contrary, in each case, each MDT Advisory Council Representative shall be appointed with the consent of the Ad Hoc Committee. The Master Disbursement Trust shall regularly report to the MDT Advisory Council with respect to the operations and activities of the Master Disbursement Trust and the handling of all payments and Distributions made from the Master Disbursement Trust to the extent set forth in the MDT Agreement.

(f)    **Obligations of the MDT Trustees**. The MDT Trustees shall take into account the interests of, and owe fiduciary duties to, each of the MDT Beneficiaries in making all decisions on behalf of the Master Disbursement Trust. In furtherance thereof:

(i)    in the event of a Specified Breach (as defined in the Master Shareholder Settlement Agreement), the MDT Trustees will take into account the remaining rights of the Holders of MDT Claims as well as the interests of the Holders of MDT Interests in formulating and exercising appropriate remedies as they relate to the Shareholder Payment Parties and the Shareholder Release Snapback Parties, but shall in all events, to the extent there are obligations remaining to the Private Creditor Trusts upon such default, seek to utilize all other available sources of assets (including by first utilizing commercially reasonable efforts to pursue a Payment Remedy (as defined in the Master Shareholder Settlement Agreement) before electing to pursue a Shareholder Release Remedy) to pay all outstanding amounts owed to the Holders of MDT Claims then-due or to be paid in the future from amounts due from such Breaching Shareholder Family Group until such outstanding amounts have been paid in full;

(ii)    the Master Disbursement Trust shall provide no less than ten (10) Business Days' advance written notice (unless urgent circumstances require less notice) to each MDT Beneficiary of any material action proposed to be taken in respect of the MDT Shareholder Rights, including any exercise of remedies under the Shareholder Settlement Agreements or the commencement or settlement of any litigation against any Shareholder Payment Party or Shareholder Release Snapback Party;

(iii)    to the extent there are any disputes raised by any MDT Beneficiary regarding the operation of the Master Disbursement Trust or the actions of the MDT Trustees (including, without limitation, any action related to the MDT Shareholder Rights), (A) any MDT Beneficiary shall have the right to seek resolution by the

Bankruptcy Court of such a dispute, including seeking to enjoin any disputed action by the Master Disbursement Trust, and all MDT Trustees and MDT Beneficiaries shall have the right to be heard with regard to any such dispute, including by filing objections, declarations, statements in support or other pleadings (including with supporting evidence) or providing witness testimony at any hearing and (B) the Bankruptcy Court shall have exclusive jurisdiction to hear and resolve any such disputes, and shall be authorized to order appropriate relief (subject to the provisions of this <u>Section 5.6(f)</u>) and make a determination in an expedited manner, and in all events, shall make such a decision within thirty (30) days from the request for relief;

(iv)    upon the payment in full in Cash of any MDT Claim, the holder of such MDT Claim shall immediately cease to be an MDT Beneficiary for all purposes under the MDT Agreement, and the MDT Trustees shall have no further fiduciary duties to such holder, and such holder shall have no further rights to commence or participate in any action relating to the operations of the Master Disbursement Trust or the actions of the MDT Trustees;

(v)    the Master Disbursement Trust shall (A) provide reasonable reporting to each of the other Creditor Trusts that hold MDT Claims regarding the MDT Trustees' activities at least every four (4) months (both cumulatively and in the period just ended), including with regard to the MDT Shareholder Rights (or any reporting received), any insurance proceeds, assets (including the value thereof), expenditures, distributions and forward-looking projections (subject to appropriate limitations to be agreed by the Debtors, the Governmental Consent Parties and the Creditors' Committee), (B) make themselves reasonably available in addition to holding at least one (1) call every four (4) months for the other Creditor Trustees to answer questions of such other Creditor Trustees relating to the Master Disbursement Trust's activities, (C) provide each Private Creditor Trust and the Public School Trust with quarterly reporting regarding Litigation Costs (as defined in the Master Shareholder Settlement Agreement) and other items relating to litigation claims pertaining to such Creditor Trusts' applicable Creditor category as well as all other Creditor categories, and (D) provide the PI Trust with the information, consultation rights and notice as required pursuant to <u>Section 5.2(e)</u> of the Plan. Notwithstanding anything in the foregoing to the contrary, the Master Disbursement Trust shall not be required to provide any reporting to any Creditor Trust to which the Master Disbursement Trust's duties cease pursuant to <u>Section 5.6(f)(iv)</u>.

(vi)    the MDT Trustees shall be obligated to comply with the terms of the Plan, including this <u>Section 5.6(f)</u>, and the MDT Agreement; and

(vii) in the event of any inconsistency between the terms of this Section 5.6(f) and any other provision of this Plan or the MDT Agreement, the terms of this Section 5.6(f) shall govern unless the MDT Trustees and the Creditor Trustees for each of the Creditor Trusts mutually agree.

(g) **Assumption of Channeled Claims and Master TDP**. As of the Effective Date, any and all liability of the Debtors and the other Protected Parties for any and all Channeled Claims shall automatically, and without further act, deed or court order, be channeled to and assumed by the Master Disbursement Trust solely for the purpose of effectuating the Master TDP, pursuant to which each Channeled Claim shall either be automatically channeled to and assumed exclusively by a Creditor Trust or otherwise Disallowed and released in full. All Channeled Claims channeled to a Creditor Trust in accordance with the Master TDP shall be administered and resolved solely pursuant to, and solely to the extent provided in, the applicable Creditor Trust TDP for such Creditor Trust. Distributions, in accordance with the applicable Creditor Trust TDP, from the Creditor Trust to which a Channeled Claim is channeled, in accordance with the Master TDP, shall be the sole source of recovery, if any, in respect of such Channeled Claim, and the Holder of such Channeled Claim shall have no other or further recourse to the Protected Parties, including the Master Disbursement Trust. All Channeled Claims that are Disallowed and released and not channeled to a Creditor Trust in accordance with the Master TDP shall have no recourse to any Protected Party, including the Master Disbursement Trust. For the avoidance of doubt, in no event shall any Channeled Claim have any recourse to the Assets of the Master Disbursement Trust. In furtherance of the foregoing, the Master Disbursement Trust, subject to and only to the extent provided in the MDT Documents, shall have all defenses, cross-claims, offsets and recoupments regarding the Channeled Claims that the Debtors, the Released Parties and the Shareholder Released Parties, as applicable, have, or would have had, under applicable law, but solely to the extent consistent with the MDT Documents and the Plan; *provided* that, subject to Section 10.8(c), no such Claims, defenses or rights may be asserted against any Protected Party; and *provided*, *further*, that all such defenses, cross-claims, offsets and recoupments regarding any Channeled Claim that is channeled to a Creditor Trust in accordance with the Master TDP shall be transferred to such Creditor Trust with such Channeled Claim, at which point, the Master Disbursement Trust shall no longer have such defenses, cross-claims, offsets and recoupments regarding such Channeled Claim. For the avoidance of doubt, nothing in this Section 5.6(g) shall limit or affect the transfer of the MDT Insurance Rights.

(h) **MDT Operating Expenses**. On the Effective Date, the Debtors shall establish and fund the MDT Operating Reserve, which shall vest in the Master Disbursement Trust in accordance with Section 5.6(b) of the Plan and be held and maintained by the MDT Trustees. Periodically, until the dissolution of the Master Disbursement Trust, the MDT Trustees will replenish the MDT Operating Reserve from Cash held or received by the Master Disbursement Trust to the extent deemed necessary by the MDT Trustees to satisfy and pay estimated future MDT Operating Expenses; *provided*, *however*, that subject only to Section 5.2(g) of this Plan, payments received by the Master Disbursement Trust on account of the Governmental Entity Shareholder Direct Settlement shall be immediately transferred to the Governmental Remediation Trust and shall not be used to fund a Replenishment Transfer or the MDT Operating Reserve, and shall not be used to pay the MDT Claims. The MDT Trustees shall create and maintain an annual budget of MDT Operating Expenses, which shall be reviewed by, and reasonably acceptable to, the MDT Advisory Council. All MDT Operating Expenses shall be satisfied and paid from the MDT Operating Reserve. The MDT Trustees shall be entitled to reasonable compensation and to retain and reasonably compensate counsel and other professionals, including any professional who represented parties in interest in the Chapter 11 Cases, to assist in the duties of the Master Disbursement Trust on such terms as the MDT Trustees deem appropriate without Bankruptcy Court approval, subject to the provisions of the MDT Agreement. The initial compensation of the MDT Trustees shall be reasonably acceptable to

the Debtors and the Governmental Consent Parties, and thereafter shall be subject to the annual budgets prepared by the MDT Trustees.

(i)        **Transfer of the MDT Insurance Rights**. In furtherance of the transfer of the MDT Transferred Assets to the Master Disbursement Trust and in accordance with the MDT Agreement, on the Effective Date, the Debtors shall irrevocably transfer, grant and assign to the Master Disbursement Trust, and the Master Disbursement Trust shall receive and accept, any and all of the MDT Causes of Action and MDT Insurance Rights. To the extent any Insurance Company would be obligated in respect of any MDT Insurance Policy to pay any Channeled Claim on behalf of one or more of the Debtors, the Debtors shall transfer and assign to the Master Disbursement Trust the right to enforce such Insurance Company's obligation. The foregoing transfer shall be (i) free and clear of all encumbrances and Causes of Action of any nature whatsoever, (ii) made to the maximum extent possible under applicable law, (iii) absolute and without requirement of any further action by the Debtors, the Liquidating Debtors, the Plan Administration Trust, the Master Disbursement Trust, the Bankruptcy Court or any other Person, and (iv) governed by, and construed in accordance with, the Bankruptcy Code and the other applicable laws governing the applicable MDT Insurance Policies. Notwithstanding the foregoing, the Master Disbursement Trust shall become and remain liable in full for and shall satisfy, to the extent required under applicable law, any prospective premiums, deductibles, self-insured retentions and any other amounts or obligations arising in any way out of the receipt of payment from an Insurance Company in respect of the MDT Insurance Rights; *provided* that, for the avoidance of doubt, the Master Disbursement Trust will not be required to pay premiums or any other amounts for Purdue Insurance Policies that are not MDT Insurance Policies. The transfer of the MDT Insurance Rights contemplated in this <u>Section 5.6(i)</u> is not an assignment of any insurance policy itself. The Confirmation Order shall contain findings reasonably acceptable to the Creditors' Committee and the Governmental Consent Parties related to or necessary to preserve all MDT Insurance Rights.

(j)        **Transfer of MDT Shareholder Insurance Rights**. On the Effective Date, in consideration of the Shareholder Releases, the Shareholder Released Parties shall irrevocably transfer, grant, and assign to the Master Disbursement Trust, and the Master Disbursement Trust shall receive and accept, any and all MDT Shareholder Insurance Rights. Each Shareholder Released Party shall be deemed to have irrevocably transferred, granted, and assigned to the Master Disbursement Trust any and all MDT Shareholder Insurance Rights without further action and without further consideration to such Shareholder Released Party. Pursuant to the Plan, the foregoing transfer shall be (i) free and clear of all encumbrances and Causes of Action of any nature whatsoever, (ii) made to the maximum extent possible under applicable law, (iii) absolute and without requirement of any further action by the Shareholder Released Parties, the Debtors, the Liquidating Debtors, the Plan Administration Trust, the Master Disbursement Trust, the Bankruptcy Court or any other Person, and (iv) governed by, and construed in accordance with, the Bankruptcy Code and the other applicable laws governing the MDT Shareholder Insurance Rights. The transfer of the MDT Shareholder Insurance Rights is not an assignment of any insurance policy itself. For the avoidance of doubt, the transfer of the MDT Shareholder Insurance Rights is in addition to the other obligations of the Shareholder Released Parties set forth herein. The Shareholder Released Parties will make best efforts to provide the Master Disbursement Trust access to information and copies of documents that are reasonably necessary to preserve, secure, or obtain the benefit of the MDT Shareholder Insurance Rights, and will comply in all respects with the Plan to preserve, secure, or obtain the benefit of the MDT Shareholder Insurance Rights, including but not limited to the obligations set forth in <u>Section 8.8(b)</u>. The Confirmation Order shall contain findings reasonably acceptable to the Creditors' Committee and the Governmental Consent Parties related to or necessary to preserve all MDT Shareholder Insurance Rights. Notwithstanding the foregoing in this paragraph, to the extent that (y) a Shareholder Released Party has, prior to the Effective Date, provided notice of a Claim under a Reserved MDT Insurance Policy under which a Shareholder Released Party is covered and (z) such Claim is not one for which such Shareholder Released Party receives the benefit of the Shareholder Releases (a "***Retained Shareholder***

*Insurance Claim*”), such Shareholder Released Party shall not be deemed to have irrevocably transferred, granted, and assigned to the Master Disbursement Trust the Retained Shareholder Insurance Claim, and such Shareholder Released Party shall be entitled to pursue any such Retained Shareholder Insurance Claim prior to and after the Effective Date; *provided* that, notwithstanding the foregoing, with respect to the Retained Shareholder Insurance Claims, each Shareholder Released Party, in consideration of the Shareholder Releases, (A) will confer and fully cooperate with the Master Disbursement Trust in connection with the settlement of all claims or rights under such MDT Insurance Policy, including the Retained Shareholder Insurance Claims, and including but not limited to as set forth in Section 8.8(b)(i) of the Plan, and (B) in the event the Master Disbursement Trust has obtained settlement terms that it deems acceptable in its sole discretion, and such settlement terms include a settlement of any Retained Shareholder Insurance Claim, each Shareholder Released Party with rights under such Retained Shareholder Insurance Claim shall be deemed to consent to the release of any claims or rights held by such Shareholder Released Party against and under such MDT Insurance Policy, with the same effect as if such Shareholder Released Party had executed such settlement agreement, and without further consideration to such Shareholder Released Party from the insurance settlement proceeds or otherwise in respect of such settlement. After the Effective Date, no Shareholder Released Party shall be entitled to submit a claim under any MDT Insurance Policy (with the exception of a current or former director, officer, manager, authorized agent or employee that is not a Sackler Family Member, but solely to the extent such individual has a right to submit a claim after the Effective Date pursuant to Section 8.8(b)(ii) of the Plan).

(k)    **Shareholder Insurance Release**. On the Effective Date, in consideration of the Shareholder Releases, all Sackler Family Members shall irrevocably, fully and forever release and discharge any obligation to indemnify and/or defend the Sackler Family Members under the Isosceles Insurance Ltd. policy number PPLP-01/2019 for any Claim or loss of any type or nature whatsoever, whether known or unknown. The Sackler Family Members hereby surrender all rights, interest in and Claim to any benefit under the Isosceles Insurance Ltd. policy number PPLP-01/2019, and acknowledge that (i) all rights, interest in and Claim to any benefit they may have under the Isosceles Insurance Ltd. policy number PPLP-01/2019 are fully terminated on the Effective Date; and (ii) after the Effective Date, the Sackler Family Members will not receive and cannot claim any further benefits under the Isosceles Insurance Ltd. policy number PPLP-01/2019 for any time period and shall have no rights whatsoever under or relating to the Isosceles Insurance Ltd. policy number PPLP-01/2019.

(l)    **Institution and Maintenance of Legal and Other Proceedings**. As of the date upon which the Master Disbursement Trust is established, the Master Disbursement Trust shall be empowered to initiate, prosecute, defend and resolve all legal actions and other proceedings related to any Asset, liability or responsibility of the Master Disbursement Trust, including in respect of the MDT Causes of Action, the MDT Insurance Rights and the MDT Shareholder Rights. Such legal actions and other proceedings shall be limited solely to those required for the purposes of satisfying the responsibilities of the Master Disbursement Trust, including in respect of the MDT Causes of Action, the MDT Insurance Rights and the MDT Shareholder Rights. The Master Disbursement Trust shall be empowered to initiate, prosecute, defend and resolve all such actions in the name of the Debtors or their Estates, in each case if deemed necessary or appropriate by the MDT Trustees. The Master Disbursement Trust shall be responsible for the payment of all damages, awards, judgments, settlements, expenses, costs, fees and other charges incurred subsequent to the date upon which the Master Disbursement Trust is established arising from, or associated with, any legal action or other proceeding brought pursuant to the foregoing.

(m)    **U.S. Federal Income Tax Matters Relating to the Master Disbursement Trust**. The Master Disbursement Trust is intended to be treated, and shall be reported, as a “qualified settlement fund,” and the receipt of (i) any MDT Transferred Assets (and any other amounts received by the Master Disbursement Trust pursuant to the Plan) that are treated as amounts transferred to the Master Disbursement Trust for purposes of Treasury Regulations section 1.468B-2(b)(1) and (ii) the

proceeds received in respect of any MDT Transferred Assets (and any other amounts received by the Master Disbursement Trust pursuant to the Plan) that are not described in clause (i) above (including, without limitation, proceeds received in respect of the MDT Shareholder Rights) by the Master Disbursement Trust are intended to be treated as amounts transferred by, or on behalf of, a "transferor" to a "qualified settlement fund," within the meaning of Treasury Regulations section 1.468B-1 for U.S. federal income tax purposes and shall be treated consistently for state and local tax purposes, to the extent applicable. All parties (including, without limitation, the Shareholder Payment Parties, Holders of Claims against or Interests in the Debtors, the Related Parties of such Holders, the Debtors, the Creditor Trusts, the Creditor Trustees, the MDT Trustees and the Master Disbursement Trust) shall report consistently with the foregoing for all applicable tax reporting purposes. An MDT Trustee shall be the "administrator," within the meaning of Treasury Regulations section 1.468B-2(k)(3), of the Master Disbursement Trust. The administrator of the Master Disbursement Trust shall be responsible for filing all tax returns required to be filed by or on behalf of the Master Disbursement Trust and the payment, out of the Assets of the Master Disbursement Trust, of any taxes due by or imposed on the Master Disbursement Trust. The MDT Trustees may request an expedited determination under section 505(b) of the Bankruptcy Code for all tax returns filed by or on behalf of the Master Disbursement Trust for all taxable periods through the dissolution of the Master Disbursement Trust. Nothing in this Section 5.6(m) shall be deemed to determine, expand or contract the jurisdiction of the Bankruptcy Court under section 505 of the Bankruptcy Code.

(n)    **Distributions from the Master Disbursement Trust Free and Clear**. All Distributions made by the Master Disbursement Trust to the MDT Beneficiaries shall be made in accordance with the notice provisions of the Shareholder Settlement Agreements, as applicable, and in the absence of applicable notice provisions therein to the applicable Creditor Trust, as directed in writing by the corresponding trustees, on no less than ten (10) Business Days' notice to all MDT Beneficiaries; *provided* that such advance notice requirements shall not be required for the Initial Private Creditor Trust Distributions, Initial Public Creditor Trust Distributions or the Initial Public Schools Distribution. Such Distributions thereafter shall become the property of such MDT Beneficiary, free and clear of all Claims, Liens or other recourse or encumbrances, and shall not be subject to attachment, disgorgement or recoupment by any Person. Such distributions to each Creditor Trust shall become the property of such Creditor Trust, and shall be used for the administration (including the payment of Creditor Trust Operating Expenses) of such Creditor Trust, to make Distributions on account of Channeled Claims channeled to such Creditor Trust in accordance with the applicable Creditor Trust TDP and for such other purposes as may be specifically set forth in the applicable Creditor Trust Documents.

(o)    **Dissolution, Release of Reserves and Residual Value**. The Master Disbursement Trust shall be dissolved and the MDT Trustees shall be discharged from their respective duties with respect to the Master Disbursement Trust upon completion of their duties as set forth in this Plan and the MDT Agreement, which, for the avoidance of doubt, shall be no earlier than the date on which (i) all Assets held by the Master Disbursement Trust, including the MDT Transferred Assets, have been liquidated and (ii) all payments and other distributions required to be made from the Master Disbursement Trust under the Plan and the MDT Agreement have been made, including payment in full in Cash of all MDT Claims, unless dissolution on an earlier date is authorized pursuant to a Final Order of the Bankruptcy Court. Upon dissolution of the Master Disbursement Trust, any Cash remaining in the MDT Operating Reserve or otherwise held by the Master Disbursement Trust shall be distributed in accordance with the MDT Priority Waterfall and the MDT Agreement; *provided* that, in the event the Master Disbursement Trust is dissolved prior to the payment in full in Cash of all MDT Claims, all outstanding amounts under such MDT Claims shall be deemed due and payable for purposes of the distribution of such remaining Cash pursuant to the MDT Priority Waterfall. Subject to the foregoing sentences, the Master Disbursement Trust shall be dissolved at such time as the MDT Trustees determine that the administration of any remaining assets of the Master Disbursement Trust is not likely to yield sufficient additional proceeds to justify further pursuit.

(p)    **Exculpation and Indemnification of the MDT Trustee and the MDT Advisory Council Representatives**. To the maximum extent permitted by applicable law, each of the MDT Trustees and MDT Advisory Council Representatives shall not have or incur any liability for actions taken or omitted in his or her capacity as an MDT Trustee or MDT Advisory Council Representative, or on behalf of the Master Disbursement Trust, except those acts found by Final Order to be arising out of his or her willful misconduct, bad faith, gross negligence or fraud, and shall be entitled to indemnification, advancement and reimbursement for reasonable fees and expenses in defending any and all of his or her actions or inactions in his or her capacity as an MDT Trustee or MDT Advisory Council Representative, or on behalf of the Master Disbursement Trust, and for any other liabilities, losses, damages, claims, costs and expenses arising out of or due to the implementation or administration of the Plan or the MDT Agreement, in each case, except for any actions or inactions found by Final Order to be arising out of his or her willful misconduct, bad faith, gross negligence or fraud. Any valid indemnification claim of the MDT Trustees or the MDT Advisory Council Representatives shall be satisfied from the MDT Operating Reserve.

5.7    *Special Operating Reserve; Released Claims Reserves*.

(a)    **Establishment of Special Operating Reserve and Released Claims Reserves**.

(i)    On or before the Effective Date, the Debtors shall establish the Special Operating Reserve which shall vest in the Master Disbursement Trust in accordance with Section 5.6(b) of the Plan and be held and maintained by the Master Disbursement Trust. The Special Operating Reserve shall be funded initially in the aggregate amount of $200 million by withholding, in each case from Shareholder Estate Settlement Distributions, (a) $20 million from the Initial Private Creditor Trust Distributions and the Initial Public Schools Distribution and (b) $180 million from the Initial Public Creditor Trust Distributions (the "**SOR Holdback**"). The Master Disbursement Trust, as administrative agent, shall facilitate the releases from the Special Operating Reserve in accordance with terms and consent procedures set forth in Exhibit N to the Master Shareholder Settlement Agreement.

(ii)    On the Effective Date, each Creditor Trust shall establish the Released Claims Reserves and, once amounts are funded from the corresponding Creditor Trust PRA Non-Participating Claims Reserves or Select Private Creditor Trust Non-Participating Claims Reserves in accordance with Section 7.8(b) or Section 7.8(c), as applicable, be otherwise held and maintained by such Creditor Trust with the Master Disbursement Trust serving as administrative agent with respect thereto. The Master Disbursement Trust, as administrative agent, shall facilitate the releases from the Released Claims Reserves in accordance with terms and consent procedures set forth in Exhibit N to the Master Shareholder Settlement Agreement.

(b)    **Reversion of Special Operating Reserve and Released Claims Reserves**. Subject in all respects to the Master Shareholder Settlement Agreement, on the First Reversion Date, (A) one third (1/3) of the balance of each of the Special Operating Reserve and each Released Claims Reserves will be released to the Master Disbursement Trust or the applicable Creditor Trust, respectively,

after completion of all requirements set forth in the Master Shareholder Settlement Agreement and (B) Replenishment Transfers shall cease.

(i)     Unless and until Material Litigation is commenced or continued prior to any of the times set forth below against any Shareholder Released Party after the First Reversion Date, then:

(A)     Upon the first anniversary of the First Reversion Date, if and only if no Material Litigation is or has been pending for the prior thirty (30) days, fifty percent (50%) of each of the remaining balance of the Released Claims Reserves and Special Operating Reserves will be released to the applicable Creditor Trust or the Master Disbursement Trust, respectively;

(B)     Upon the second anniversary of the First Reversion Date, if and only if no Material Litigation is or has been pending for the prior thirty (30) days, fifty percent (50%) of each of the remaining balance of the Released Claims Reserves and Special Operating Reserve will be released to the applicable Creditor Trust or the Master Disbursement Trust, respectively; and

(C)     Thereafter, upon the date when no litigation is or has been pending for the prior thirty (30) days, the remaining balance of each of the Released Claims Reserves and Special Operating Reserve will be released to the applicable Creditor Trust or the Master Disbursement Trust, respectively.

(ii)    Upon a Suspension Event:

(A)     All releases from the Released Claims Reserves and Special Operating Reserve described in Section 5.7(b)(i) of the Plan shall cease; and

(B)     If the Material Litigation is of the type referenced in clause (1)(a) of the definition of "Material Litigation" in the Master Shareholder Settlement Agreement (i.e., any litigation by a Material Litigant against Shareholder Released Parties regarding Covered Conduct) or clause (2) thereof (500 or more separate lawsuits (i.e., not aggregated and not in a class) pending against Shareholder Released Parties concerning Covered Conduct being pursued by non-Material Litigants), the Master Disbursement Trust shall resume Replenishment Transfers pursuant to Section 5.7(b)(i) of the Plan.

(C)     Following a Suspension Event, a new First Reversion Date shall occur on the next date when no Material Litigation is or has been pending for thirty (30) days. The Sackler Parties' Representative shall report the

105

occurrence of a new First Reversion Date to the Master Disbursement Trust in accordance with Section 7(b)(v)(B) of <u>Exhibit N</u> the Master Shareholder Settlement Agreement. On such new First Reversion Date or as soon as reasonably practicable thereafter, Replenishment Transfers shall cease and one third (1/3) of the balance of each of the Special Operating Reserve and Released Claims Reserves will be released to the Master Disbursement Trust and/or the applicable Creditor Trust, respectively, in accordance with Section 5.7(b)(iii) of the Plan, after completion of all requirements set forth in <u>Exhibit N</u> to the Master Shareholder Settlement Agreement.

Thereafter:

(D)     Upon the first anniversary of the First Reversion Date, if and only if no Material Litigation is or has been pending for the prior thirty (30) days, one half (1/2) of the remaining balance of each of the Special Operating Reserve will be released to the Master Disbursement Trust and Released Claims Reserves will be released to the applicable Creditor Trust; and

(E)     Upon the second anniversary of the First Reversion Date, if and only if no Material Litigation is or has been pending for the prior thirty (30) days, one half (1/2) of the remaining balance of each of the Special Operating Reserve will be released to the Master Disbursement Trust and Released Claims Reserves will be released to the applicable Creditor Trust;

(F)     Thereafter, upon the date when no litigation against any of the Shareholder Released Parties with respect to Covered Conduct is or has been pending for the prior thirty (30) days, the remaining balance of each of the Special Operating Reserve will be released to the Master Disbursement Trust and Released Claims Reserves will be released to the applicable Creditor Trust;

*provided*, that if money remains in the Released Claims Reserves or the Special Operating Reserve after the twelfth (12th) SSA Payment Date, then:

(G)     All remaining funds in the Released Claims Reserves will be released to the applicable Creditor Trust no later than thirty (30) days after the first date that no Material Litigation against any of the Shareholder Released Parties with respect to Covered Conduct is pending.

(H)     All but $25 million of the remaining funds in the Special Operating Reserve will be released to the Master

106

Disbursement Trust for the benefit of the applicable Creditor Trust(s) no later than six (6) months after the first date that no Material Litigation against any of the Shareholder Released Parties with respect to Covered Conduct is pending; and all funds remaining in the Special Operating Reserve from the $25 million described in clause (H) of this proviso will be released to the Master Disbursement Trust for distribution to the Creditor Trusts pursuant to Section 5.7(b)(iii) no later than six (6) months after the first date that no litigation against any of the Shareholder Released Parties with respect to Covered Conduct is pending.

(iii)    Master Disbursement Trust shall first allocate all reversion funds received from the Special Operating Reserve to the Private Creditor Trusts in proportion to their respective SOR Holdback until they have received a cumulative amount of such reversion funds equal to the Private Claimants' Priority Reversion.

(iv)    If by the ninth (9th) SSA Payment Date the Master Disbursement Trust has not made allocations to the Private Creditor Trusts pursuant to Section 5.7(b)(iii) of the Plan in an amount equal to the Private Claimants' Priority Reversion, then the Special Operating Reserve shall release funds to the Master Disbursement Trust for distribution to the Private Creditor Trusts on the ninth (9th) SSA Payment Date in an amount equal to the shortfall. Upon a release from the Special Operating Reserve to the Master Disbursement Trust pursuant to Sections 5.7(b)(i)(C), 5.7(b)(ii)(C) of the Plan, the Master Disbursement Trust will allocate $200,000 immediately prior to such release to the Private Creditor Trusts.

(c)    **U.S. Federal Income Tax Matters Relating to the Special Operating Reserve and Released Claims Reserves.** The Special Operating Reserve and each of the Released Claims Reserves are intended to be treated and shall be reported as separate qualified settlement funds within the meaning of Treasury Regulations section 1.468B-1 for U.S. federal income tax purposes and shall be treated consistently for state and local tax purposes. The Master Shareholder Settlement Agreement provides that PRA L.P. shall timely elect pursuant to Treasury Regulations Section 1.468B-1(k) (and any applicable state and local income tax purposes), to treat the Special Operating Reserve and each of the Released Claims Reserves as a "grantor trust," all of which is owned, for federal and applicable state and local income tax purposes only, by PRA L.P., and that PRA L.P. shall maintain such election and shall not revoke such election without the prior written consent of the Master Disbursement Trust and/or the applicable Creditor Trusts, and this Section 5.7(c) assumes that is the case. All parties (including the Shareholder Payment Parties, the Debtors, the Plan Administration Trustee, each applicable Creditor Trustee, the MDT Trustees and Holders of Non-Participating Claims) shall be required to report for tax purposes in a manner consistent with the foregoing. An MDT Trustee shall be the "administrator" of the Special Operating Reserve. The Creditor Trustee corresponding to the Creditor Trust that holds each Released Claims Reserve shall be the "administrator" of each such Released Claims Reserve. The Master Shareholder Settlement Agreement provides that PRA L.P. shall take into account all items of income, gain, loss, deduction and credit (including capital gains and losses) recognized by or otherwise attributable to the Special Operating Reserve and each Released Claims Reserve for U.S. federal (and any applicable state or local) income tax purposes

107

on its tax returns. An MDT Trustee or a Creditor Trustee, as applicable, may request an expedited determination of taxes of the Special Operating Reserve or any of the Released Claims Reserves, as applicable, under section 505(b) of the Bankruptcy Code for all returns, if any, filed for, or on behalf of, the Special Operating Reserve or Released Claims Reserves for all taxable periods through the dissolution of the Special Operating Reserve or Released Claims Reserve, as applicable. Nothing in this <u>Section 5.7(c)</u> shall be deemed to determine, expand or contract the jurisdiction of the Bankruptcy Court under section 505 of the Bankruptcy Code.

### 5.8    *Creditor Trusts*.

(a)    **Establishment and Purpose of the Creditor Trusts**. The Confirmation Order shall endorse and direct, to the extent not already established, the establishment of the Creditor Trusts on or prior to the Effective Date in accordance with the terms of the respective Creditor Trust Documents. The Creditor Trusts shall be independent from the Holders of Claims against the Debtors and shall be subject to the exclusive jurisdiction of the Bankruptcy Court (other than as specifically set forth in the Creditor Trust Documents). The Creditor Trusts shall be established for the purposes described in this Plan and any other purposes more fully described in the Creditor Trust Documents. Each Creditor Trust shall, in each case, in accordance with the Plan, the Confirmation Order and the applicable Creditor Trust Documents:

> (i)    hold, manage and invest all funds and other Assets received by such Creditor Trust from the Debtors and the Master Disbursement Trust, as applicable (including, with respect to the Public Creditor Trusts, the MDT Interests), in each case, for the benefit of the beneficiaries of such Creditor Trust;
>
> (ii)    hold and maintain the Creditor Trust Operating Reserve of such Creditor Trust;
>
> (iii)    administer, process, resolve and liquidate Channeled Claims, including Non-Participating Channeled Claims, applicable to such Creditor Trust, in each case as provided in the applicable Creditor Trust Documents;
>
> (iv)    establish and administer the applicable Creditor Trust Non-Participating Claims Reserves;
>
> (v)    establish the applicable Released Claims Reserves; and
>
> (vi)    exercise rights over any proposed use of funds in the applicable Released Claims Reserve held in such Creditor Trust to the extent set forth in <u>Exhibit N</u> and <u>Exhibit Z</u> to the Master Shareholder Settlement Agreement.

(b)    **Role of the Creditor Trustees**. In furtherance of and consistent with the purposes of the Creditor Trusts and the Plan, the Creditor Trustees shall have the power and authority to perform all functions on behalf of the respective Creditor Trusts, subject to the Creditor Trust Documents for such Creditor Trusts. The Creditor Trustees shall undertake all administrative responsibilities as are provided in the Plan and the applicable Creditor Trust Documents. The Creditor Trustees shall be responsible for all decisions and duties with respect to the respective Creditor Trusts, subject to the Creditor Trust Documents for such Creditor Trusts. In all circumstances, each Creditor Trustee shall be independent and disinterested and, in its capacity as a Creditor Trustee, shall act in the best interests of the beneficiaries

of such Creditor Trust, in furtherance of the purpose of such Creditor Trust and in accordance with this Plan and the applicable Creditor Trust Documents. In accordance with the Creditor Trust Documents, each Creditor Trustee shall serve in such capacity through the earlier of (x) the date that the applicable Creditor Trust is dissolved in accordance with the applicable Creditor Trust Documents and (y) the date such Creditor Trustee resigns, is terminated or is otherwise unable to serve for any reason.

(c)    **Appointment of the Creditor Trustees and Creditor Trust Overseers**. In furtherance of and consistent with the purposes of the Creditor Trusts and the Plan, the Creditor Trust Documents for each of the Creditor Trusts shall provide for the appointment of the Creditor Trustees and, if applicable, Creditor Trust Overseers for each of the Creditor Trusts. The identity of the initial Creditor Trustees and the initial Creditor Trust Overseers shall be as disclosed in the Plan Supplement as of the date hereof, or shall otherwise be:

(i)    with respect to the Governmental Remediation Trust, selected in accordance with the terms of the Governmental Remediation Trust Documents;

(ii)    with respect to the Tribe Trust, selected by the Native American Tribe Group with the consent of the Debtors (which consent shall not be unreasonably withheld, delayed or denied);

(iii)    with respect to each of the following Private Creditor Trusts, selected as follows: (A) with respect to the TPP Trust, by the Third-Party Payor Group, (B) with respect to the Healthcare Provider Trust, by the Ad Hoc Group of Hospitals, (C) with respect to the ERP Trust, by the ERP Trustee (and, for the avoidance of doubt, the Creditor Trustee and/or Creditor Trust Overseer for the ERP Trust may be the ERP Trustee) and (D) with respect to the PI Trust, by the Ad Hoc Group of Individual Victims; and

(iv)    with respect to the Public School Trust, by the Public School District Claimants.

(d)    **PI Trust Distributions**.

(i)    The PI Trust shall, in accordance with the Plan, the Confirmation Order and the PI Trust Documents, make Distributions on account of Allowed PI Channeled Claims to Holders of such Allowed PI Channeled Claims, subject to the PI Trust Deductions and Holdbacks, which Distributions may be made directly (i) to the Holder of the PI Claim (if pro se), or (ii) to counsel for the Holder of the PI Claim by (A) payment to the respective counsel's client trust account or by sending a check to the respective counsel's address that is payable jointly to such counsel and the Holder of the PI Claim, or (B) payment to the Sub-Qualified Settlement Fund for such counsel. For the avoidance of doubt, upon the PI Trust's Distribution pursuant to this Section 5.8(d)(i)(i) or (d)(i)(ii), the PI Trust shall be deemed to have fully satisfied its obligations with respect to such Allowed PI Channeled Claim and shall be fully discharged from any and all liability or responsibility in connection therewith, and neither the PI Trust nor any of its

representatives shall have any obligation or liability with respect to the administration, handling, or disposition of such funds after such Distribution. The PI Trust shall establish the PI Trust NAS Fund and the PI Trust Non-NAS Fund, and shall deposit (i) the NAS PI Portion into the PI Trust NAS Fund and (ii) the Non-NAS PI Portion into the PI Trust Non-NAS Fund, in each case, periodically as funds are received by the PI Trust. The PI Trust shall make Distributions on account of Allowed NAS PI Channeled Claims solely from the PI Trust NAS Fund in accordance with the NAS PI TDP, and shall make Distributions on account of Allowed Non-NAS PI Channeled Claims solely from the PI Trust Non-NAS Fund in accordance with the Non-NAS PI TDP, in each case, subject to the PI Trust Deductions and Holdbacks. The PI Trust shall reserve the NAS Medical Expense Claim Settlement Reserve Amount, which shall be paid to the United States in accordance with Section 5.2(i)(i) of the Plan.

(ii)     Subject to the terms of the PI Trust Documents, checks or digital payments issued by the PI Trust directly to Holders of PI Claims shall be null and void if not negotiated or claimed, respectively, within 180 calendar days from and after the date of issuance thereof, unless, in each case, the PI Claims Administrator determines, in its sole discretion, there was good cause for any Holder's failure to do so. After such 180-calendar-day period, the relevant PI Claim (and any Claim for reissuance of the original check or digital payment) shall be automatically discharged and forever barred and all title to and all beneficial interests in the cash represented by any such non-negotiated check or unclaimed digital payment shall revert to the PI Trust and may be redistributed by the PI Trust in accordance with the terms of the Plan and the PI Trust Documents.

(iii)    Except as otherwise set forth in Section 5.8(d)(iv) of the Plan, (A) the PI Trust shall have no obligation to reserve or set aside any funds for PI Claims that may be transmitted by Kroll to the PI Trust more than fourteen (14) days after the Effective Date, and (B) the PI Trust shall be fully released and discharged from any liability or responsibility with respect to any PI Claims not affirmatively identified and delivered to the PI Trust by Kroll within fourteen (14) days following the Effective Date.

(iv)    To the extent that there are any proofs of claim filed by Holders of PI Claims on or before the Effective Date that are not provided to the PI Trust within fourteen (14) days of the Effective Date, Kroll shall indemnify the PI Trust solely for any amounts owing to such Holder  (not to exceed $15,000 per Holder) to the extent that at the time such Holder of a PI Claim seeks payment from the PI Trust, the PI Trust does not have funds and does not reasonably expect to receive funds to pay such Holder (and, for the avoidance of doubt, the PI Trust shall not be required to reserve any amounts for such payments, except as otherwise described in the Plan). For

purposes of this provision, and consistent with the PI Trust Agreement and the PI TDP, the PI Trust shall be permitted to use uncashed checks or unclaimed digital payments available pursuant to Section 5.8(d)(ii) to satisfy the amount (if any) owing to such Holder of a PI Claim and the PI Trust shall be required to exhaust such uncashed checks or unclaimed digital payments and any other available funds prior to seeking indemnification from Kroll.  Further, and for the avoidance of doubt, if the claim of any Holder of a PI Claim that filed a proof of claim as of the Bar Date is wrongly placed in a different Class under the Plan, and is later moved to Class 10(a) or Class 10(b)  after the Effective Date and such Holder is entitled to any Distribution under the PI Trust, Kroll shall not be responsible for any indemnification of such Claim, and the PI Trust shall reserve $1,000,000 for distribution to such Holders. For the avoidance of doubt, except as otherwise expressly set forth in this Section 5.8(d)(iv), nothing in Section 5.8(d) shall limit or otherwise modify the scope of the exculpation and releases granted to Kroll under this Plan, including pursuant to Sections 10.6(a), 10.6(b) and 10.12 of the Plan.

(e)     **Rights of the Creditor Trustee for the TPP Trust under the LRP Agreement**. Pursuant to and in accordance with the LRP Agreement, the Creditor Trustee for the TPP Trust shall have the right (i) to inquire periodically with the Creditor Trustee for the PI Trust, the claims administrator appointed in respect of the PI Trust and the escrow agent for the TPP LRP Escrow Account as to whether the TPP LRP Escrow Account has been properly funded and payments therefrom are being made to the LRP Participating TPPs as required under the LRP Agreement, and to request evidence of the same, and (ii) to seek entry of an order by the Bankruptcy Court enforcing the LRP Agreement, including the obligations to provide such information and evidence, in the event the Creditor Trustee for the TPP Trust reasonably believes that the TPP LRP Escrow Account has not been properly funded as required by the LRP Agreement, payments have not been made to LRP Participating TPPs as required by the LRP Agreement, and/or any of the Creditor Trustee for the PI Trust, the claims administrator appointed in respect of the PI Trust and the escrow agent for the TPP LRP Escrow Account is not responding to reasonable requests by the Creditor Trustee for the TPP Trust for such information and evidence.

(f)     **Assumption of Obligations and Liabilities**. In furtherance of the purposes of the Plan and the Creditor Trusts, pursuant to the Master TDP and subject to the applicable Creditor Trust Documents, each Creditor Trust shall (i) expressly assume sole and exclusive responsibility and liability for (A) the Channeled Claims channeled to such Creditor Trust in accordance with the Master TDP and (B) all Creditor Trust Operating Expenses of such Creditor Trust and (ii) have (A) the rights provided to such Creditor Trust in accordance with the Private Entity Settlements and Public Entity Settlements and (B) all defenses, cross-claims, offsets and recoupments regarding such Channeled Claims that the Debtors, the Released Parties and the Shareholder Released Parties, as applicable, have, or would have had, under applicable law, but solely to the extent consistent with the applicable Creditor Trust Documents and this Plan; *provided* that no such Claims, defenses or rights may be asserted against any Protected Party.

(g)     **Administration of Channeled Claims and Creditor Trust TDPs**. Pursuant to the Master TDP, (i) all Non-Federal Domestic Governmental Channeled Claims will be administered by the Governmental Remediation Trust and resolved in accordance with, and to the extent provided in, the Governmental Remediation Trust Documents, (ii) all Tribe Channeled Claims will be

administered by the Tribe Trust and resolved in accordance with, and to the extent provided in, the Tribe TDP, (iii) all Third-Party Payor Channeled Claims will be administered by the TPP Trust and resolved in accordance with, and to the extent provided in, the TPP TDP, (iv) all Healthcare Provider Channeled Claims will be administered by the Healthcare Provider Trust and resolved in accordance with, and to the extent provided in, the Healthcare Provider TDP, (v) all Public School Channeled Claims will be administered by the Public School Trust and resolved in accordance with, and to the extent provided in, the Public School TDP, (vi) all ER Physician Channeled Claims will be administered by the ERP Trust and resolved in accordance with, and to the extent provided in, the ERP TDP, and (vii) all PI Channeled Claims will be administered by the PI Trust and resolved in accordance with, and to the extent provided in, the PI TDP. Each of the Creditor Trusts shall be funded in accordance with the Public Entity Settlements and the Private Entity Settlements, as applicable. The Creditor Trust shall, in accordance with, and to the extent provided in, the applicable Creditor Trust Documents and/or the Creditor Trust TDPs, (y) determine the eligibility, amount and Allowance (if applicable) of such Channeled Claims; and (z) make all determinations with respect to Distributions to be made by the respective Creditor Trusts. The foregoing determinations by the Creditor Trusts shall be final and binding, and shall not be subject to any challenge or review of any kind, by any court or other Person, except as set forth in the Creditor Trust TDPs. Distributions by the Creditor Trusts shall be the sole source of recovery, if any, in respect of Channeled Claims, and Holders of Channeled Claims shall have no other or further recourse to the Protected Parties; *provided* that the foregoing shall not diminish, or otherwise alter, the rights of LRP Participating TPPs under the LRP Agreement or the rights of non-LRP Participating TPPs at law.

(h)    **Trust Reporting Obligations**. Each of the Creditor Trusts shall be required to provide (i) any periodic forwarding, not more frequently than every three months, of applicable bank statements with respect to the Released Claims Reserves and Claims Reserves, or, (ii) solely at the applicable trustee's election, such other reporting as provides the Master Disbursement Trust with substantially similar relevant information as appears in such bank statements, in each case, which the applicable trustee may redact (or cause to be redacted) to exclude information that it considers not reasonably necessary for the Master Disbursement Trust to provide information with respect to the Released Claims Reserves and Claims Reserves.

(i)    **Institution and Maintenance of Legal and Other Proceedings**. As of the date upon which each Creditor Trust is established, such Creditor Trust shall be empowered to initiate, prosecute, defend and resolve all legal actions and other proceedings related to any Asset, liability or responsibility of such Creditor Trust. Such legal actions and other proceedings shall be limited solely to those required for purposes of reconciling, administering or defending against the Channeled Claims channeled to such Creditor Trust and for enforcing the rights of such Creditor Trust under the Plan and the Plan Documents (including the rights of the Creditor Trustee for the TPP Trust specifically enumerated in the LRP Agreement). Each Creditor Trust shall be empowered to initiate, prosecute, defend and resolve all such actions in the name of the Debtors or their Estates, in each case if deemed necessary by the applicable Creditor Trustee to fulfill the purposes for which such Creditor Trust was created. Each Creditor Trust shall be responsible for the payment of all damages, awards, judgments, settlements, expenses, costs, fees and other charges incurred subsequent to the date upon which such Creditor Trust is established arising from, or associated with, any legal action or other proceeding brought pursuant to the foregoing. For the avoidance of doubt, each Creditor Trust, pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and applicable state corporate law, is appointed as the successor-in-interest to, and representative of, the Debtors and their Estates for the retention, enforcement, settlement or adjustment of the applicable Channeled Claims channeled to such Creditor Trust.

(j)    **Creditor Trust Operating Expenses**. The Creditor Trustees shall be entitled to reasonable compensation and to retain and reasonably compensate counsel and other professionals to assist in their duties without Bankruptcy Court approval, subject to the provisions of the

applicable Creditor Trust Documents. Creditor Trust Operating Expenses of each Creditor Trust shall be satisfied and paid from such Creditor Trust's Creditor Trust Operating Reserve in accordance with the applicable Creditor Trust Documents. Periodically, until the dissolution of a Creditor Trust, the applicable Creditor Trustee will replenish the Creditor Trust Operating Reserve from Cash held or received by such Creditor Trust to the extent deemed necessary by such Creditor Trustee to satisfy and pay estimated future Creditor Trust Operating Expenses in accordance with the Creditor Trust Documents.

(k)    **U.S. Federal Income Tax Matters Relating to the Creditor Trusts and Sub-Qualified Settlement Funds**. Each Creditor Trust (other than any Tribe Trust entity that is formed as a legal entity other than a trust) and each Sub-Qualified Settlement Fund is intended to be treated, and shall be reported, as a "qualified settlement fund," and the Initial Private Creditor Trust Distributions, distributions on account of the MDT Private Claims, Public Creditor Trust Distributions, Initial Public Schools Distribution, distributions on account of the MDT Public School Districts Claim, the right to receive Governmental NewCo Distributable Cash, distributions from the PI Trust to a Sub-Qualified Settlement Fund and any other amounts received pursuant to the Plan, as applicable, made to the applicable Creditor Trust or Sub-Qualified Settlement Fund are intended to be treated as amounts transferred by, or on behalf of, a "transferor" to a "qualified settlement fund," within the meaning of Treasury Regulations section 1.468B-1 for U.S. federal income tax purposes and shall be treated consistently for state and local tax purposes to the extent applicable. All parties (including, without limitation, the Shareholder Payment Parties, Holders of Claims against or Interests in the Debtors, the Related Parties of such Holders, the Debtors, the Creditor Trusts, the Creditor Trustees, the MDT Trustees and the Master Disbursement Trust) will be required to report consistently with the foregoing for all applicable tax reporting purposes. A Creditor Trustee from each relevant Creditor Trust shall be the "administrator" within the meaning of Treasury Regulations section 1.468B-2(k)(3) of the applicable Creditor Trust, and the order establishing each Sub-Qualified Settlement Fund shall identify the administrator for each such Sub-Qualified Settlement Fund. The administrator of each such Creditor Trust or Sub-Qualified Settlement Fund shall be responsible for filing all tax returns required to be filed by or on behalf of the applicable Creditor Trust or Sub-Qualified Settlement Fund and the payment, out of the assets of such Creditor Trust or Sub-Qualified Settlement Fund, of any taxes due by or imposed on such Creditor Trust or Sub-Qualified Settlement Fund. Each Creditor Trustee and any administrator of a Sub-Qualified Settlement Fund may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all tax returns filed by or on behalf of the applicable Creditor Trust or Sub-Qualified Settlement Fund for all taxable periods through the dissolution of such Creditor Trust or Sub-Qualified Settlement Fund. Nothing in this Section 5.8(k) shall be deemed to determine, expand or contract the jurisdiction of the Bankruptcy Court under section 505 of the Bankruptcy Code.

(l)    **Exculpation and Indemnification of the Creditor Trustees and the Creditor Trust Overseers**. To the maximum extent permitted by applicable law, each of the Creditor Trustees and Creditor Trust Overseers shall not have or incur any liability for actions taken or omitted in his or her capacity as a Creditor Trustee or Creditor Trust Overseer, or on behalf of the applicable Creditor Trust, except those acts found by Final Order to be arising out of his or her willful misconduct, bad faith, gross negligence or fraud, and shall be entitled to indemnification, advancement and reimbursement for reasonable fees and expenses in defending any and all of his or her actions or inactions in his or her capacity as a Creditor Trustee or Creditor Trust Overseer, or on behalf of the applicable Creditor Trusts, and for any other liabilities, losses, damages, claims, costs and expenses arising out of or due to the implementation or administration of the Plan or the applicable Creditor Trust Documents, in each case, except for any actions or inactions found by Final Order to be arising out of his or her willful misconduct, bad faith, gross negligence or fraud. Any valid indemnification claim of any of the Creditor Trustees or Creditor Trust Overseers shall be satisfied from the respective Creditor Trusts.

(m)    **Dissolution of the Creditor Trusts**. Each Creditor Trust shall be dissolved and the applicable Creditor Trustee shall be discharged from its duties with respect to such Creditor Trust upon completion of its duties and the satisfaction of the purposes of the Creditor Trust as set forth in this Plan and the applicable Creditor Trust Documents.

### 5.9    *Attorneys' Fees and Costs*.

(a)    **Local Government Fees**. On the Effective Date, the Local Government Fee Fund shall be established for the payment of costs and expenses (including attorneys' fees) of Holders of Non-Federal Domestic Governmental Channeled Claims (other than States) subject to the terms set forth herein, other than amounts paid pursuant to the AHC Reimbursement Agreement Assumption Order or the MSGE Group Reimbursement Order.

(i)    The Local Government Fees Fund shall be funded beginning on the second MDT Distribution Date (the "**Initial LG Fund Funding Date**") and continuing on each Scheduled MDT Distribution Date thereafter, from periodic distributions in an amount equal to 8.5% of all Distributions made on account of Non-Federal Domestic Governmental Channeled Claims, excluding (A) any Distributions relating to MDT Insurance Proceeds and proceeds of MDT Causes of Action, which will be subject to subsection (ii) below, and (B) any amounts distributed on account of such Non-Federal Domestic Governmental Channeled Claims on the Effective Date, but including, for the avoidance of doubt, any Distributions on account of amounts payable under the Governmental Entity Shareholder Direct Settlement beginning on the second MDT Distribution Date; *provided* that the amount to be distributed to the Local Government Fee Fund pursuant to this subsection shall not exceed $370 million in the aggregate (the "**Aggregate LG Fund Cap**"); *provided, further* that amounts funded pursuant to this Section 5.9(a) shall be allocated and applied in accordance with Exhibit R to the Governmental Entities Settlement Agreement, in each case, as follows:

(A)    $4 million annually for a maximum of five (5) years (plus 4.25% of any Distribution constituting a Settlement Prepayment (as defined under the Master Shareholder Settlement Agreement)), to the "Cost Fund" established in the MDL Proceeding, not to exceed $20 million in the aggregate;

(B)    for any additional amounts (I) 40% to the "Contingency Fee Fund" established in the MDL Proceeding (which fund is to be managed by the fee panel appointed in connection with the MDL Proceeding), not to exceed $140 million on account of Distributions to Non-Federal Domestic Governmental Channeled Claims other than as set forth in (ii) hereof, and (II) 60% to the "Common Benefit [Fee] Fund" established in the MDL Proceeding, not to exceed $210 million in the aggregate on account of

114

Distributions to Non-Federal Domestic Governmental Channeled Claims other than as set forth in (ii) hereof; and

(C)      as consideration for the settlement between holders of certain public and private Claims regarding Special Operating Reserves, timing of payment and allocation matters, the Local Government Fee Fund shall also be funded, on or after the Initial LG Fund Funding Date, from Distributions made on account of Non-Federal Domestic Governmental Channeled Claims (as qualified in this Section 5.9(a)(i) above) (i) in an amount equal to $6.8 million[10] and (ii) up to $1.7 million,[11] which amounts shall be subject in each case to the Aggregate LG Fund Cap;

(ii)      In addition to the amounts described in subsection (i) above, the Local Government Fee Fund shall be funded on or after the Initial LG Fund Funding Date with additional amounts equal to (I) 12.4% of the MDT Insurance Proceeds which amounts, if any, shall be deposited into an account designated by the MDL Plaintiffs' Executive Committee for the benefit of the "Common Benefit [Fee] Fund" established in the MDL Proceeding (MDL Dkt. No. 4428, May 9, 2022) to be paid as directed by the MDL PEC Co-Leads in accordance with direction from the MDL Fee Panel and the MDL Court, and (II) 12.4% of the proceeds of any MDT Causes of Action[12] which amounts, if any, shall be allocated and applied in accordance with Exhibit R to the Governmental Entities Settlement Agreement, (A) 40% to the "Contingency Fee Fund" established in the MDL Proceeding, and (B) 60% to the "Common Benefit [Fee] Fund" established in the MDL Proceeding; and all such amounts shall be incremental to, and not otherwise count against, the Aggregate LG Fund Cap; *provided*, for the avoidance of doubt, such funded amounts shall not be considered "Distributions" for the purpose of subsection (i) above; *provided, further*, such amounts in this Section 5.9(a)(i) and (ii) shall be subject to Sections 5.2(e)(iv) and 5.2(g) of this Plan, as applicable.

(iii)      Payments from the Local Government Fee Fund shall be administered in accordance with Exhibit R to the Governmental

---

[10] Such amount is equal to 8.5% of $80 million.

[11] To be calculated as 8.5% of amounts up to $20 million received by the Private Creditor Trusts in accordance with the Master Shareholder Settlement Agreement (and due when such amounts are received by the Private Creditor Trusts) in respect of (A) the Private Claimants' Priority Reversion and (B) the other amounts contemplated to be paid under Section 4(e) of Exhibit N to the Master Shareholder Settlement Agreement. For the avoidance of doubt, all of the consideration that is to be paid as part of this Section 5.9(a)(i)(C) shall be paid from Distributions made on account of Non-Federal Domestic Governmental Channeled Claims, and not from Distributions made to Private Creditor Trusts or the Public School Trust.

[12] For the avoidance of doubt, to the extent any Cause of Action that would have otherwise become an MDT Cause of Action is settled and paid pre-Effective Date, the provisions of this section shall apply to the settlement amounts for any such Cause of Action.

Entities Settlement Agreement and be the exclusive means of payment from the Public Creditor Trusts for costs and expenses (including attorneys' fees) of any Holder of a Non-Federal Domestic Governmental Channeled Claim (other than a State) or any attorney therefor, other than (i) amounts paid or to be paid from the Public Creditor Trusts in accordance with existing agreements, contracts or statutes setting forth the allocation and uses of abatement funds or backstop fee arrangements between States and their Subdivisions; and (ii) amounts paid in accordance with the order of the MDL Court establishing the Common Benefit Fund; *provided*, *however*, nothing this <u>Section 5.9(a)(iii)</u> or <u>Exhibit R</u> to the Governmental Entity Shareholder Direct Settlement Agreement shall override the payment obligations contemplated by <u>Section 5.9(a)(i)</u>.

(iv)    Except as otherwise agreed in writing by the MSGE Group and the MDL Plaintiffs' Executive Committee, the MSGE Fee Allocation Agreement shall be and remain fully enforceable and shall apply to the Local Government Fee Fund; *provided* that the costs associated with the arbitration process contemplated under the MSGE Fee Allocation Agreement shall not be paid by the Debtors, their Estates or any Creditor Trust.

(b)    **State Costs and Expenses**. On the Effective Date, the State Expenses Fund shall be established for the payment of expenses (including attorneys' fees) of the States (including any ad hoc group thereof), other than amounts already paid, or any amounts paid or payable under the AHC Reimbursement Agreement Assumption Order, the MSGE Group Reimbursement Order, or any other Order of the Bankruptcy Court; *provided* that the State Expenses Fund shall be funded beginning on the second MDT Distribution Date and continuing on each Scheduled MDT Distribution Date thereafter. The State Expenses Fund shall be funded from periodic distributions in an amount equal to 4.5% of the Distributions made on account of Non-Federal Domestic Governmental Channeled Claims, excluding any amounts distributed on account of such Non-Federal Domestic Governmental Channeled Claims on the Effective Date, but including (a) any Distributions on account of amounts payable under the Governmental Entity Shareholder Direct Settlement beginning on the second MDT Distribution Date, and (b) any Distributions relating to MDT Insurance Proceeds and proceeds of MDT Causes of Action; *provided* that such amount shall not exceed $200 million in the aggregate (the "**Aggregate State Expenses Cap**"); *provided* that such amounts in this <u>Section 5.9(b)</u> shall be subject to <u>Sections 5.2(e)(iv)</u> and <u>5.2(g)</u> of this Plan, as applicable. Amounts funded pursuant to this <u>Section 5.9(b)</u> shall be allocated and applied in accordance with <u>Exhibit S</u> to the Governmental Entities Settlement Agreement.

(c)    **Tribe Costs and Expenses**. On the Effective Date, the Tribe Attorney Fee Fund shall be established for the payment of certain attorneys' fees and costs of tribal attorneys for Holders of Tribe Channeled Claims, subject to the terms set forth herein. The Tribe Attorney Fee Fund shall be funded from periodic distributions in an amount equal to 8.5% of the Distributions made on account of the Tribe Channeled Claims including (i) any amounts distributed on account of such Tribe Channeled Claims on the Effective Date and (ii) any Distributions on account of amounts payable to Tribes by the Estate or pursuant to the Tribal Shareholder Direct Settlement, except that in the case of periodic distributions made on account of Tribe Channeled Claims relating to MDT Insurance Proceeds or MDT Causes of Action (including third-party claims) recovered by the Estate, the Tribe Attorney Fee Fund shall

116

be funded in an amount equal to 12.4% of such Distributions,[13] provided that from all such amounts, (i) $100,000 shall be set aside for reimbursement of costs of such tribal attorneys and (ii) for any additional amounts in excess of the amount set aside for costs (A) 40% shall be paid to the "Tribal Contingency Fee Fund" established in the MDL Proceeding for the payment of contingency fees and costs for tribal attorneys, and (B) 60% shall be paid to the "Common Benefit Fee Fund" established in the MDL Proceeding. The Tribe Attorney Fee Fund shall be administered in accordance with the Tribal Shareholder Direct Settlement Agreement.

For the avoidance of doubt, in no event shall (i) any of the provisions of Section 5.9(a)-(c) of this Plan, other than the recognition of the priority of Section 5.2(e)(iv) of this Plan in such provisions, or (ii) any of the provisions of Exhibit R to the Governmental Entity Shareholder Direct Settlement Agreement, have any effect on the Holders (including any Distributions to such Holders) of Claims in Classes 6-10 (or the rights of any of their attorneys to receive payment in full pursuant to their fee contracts, or the rights of any attorneys to any ad hoc group to receive payment pursuant to the rest of this Section 5.9, or the rights of any attorneys to any opt-out class actions to receive payment in accordance with any of their class action documents), except to the extent expressly set forth in Section 5.9(d) hereof.[14]

(d)    **Common Benefit Fund Assessments**. On the Effective Date, the following assessments shall be made to the Common Benefit Fund established by the MDL Court (the "**Common Benefit Fund**") (MDL Dkt. No. 4428, May 9, 2022): (i) 5% of the gross distributions made to the Private Creditor Trusts (after accounting for any Reserves) on account of Estate Distributions, to be distributed to the Common Benefit Fund when claimants receive distributions from such Private Creditor Trusts, (ii) 5% of the gross distributions made to the Private Creditor Trusts (after accounting for any Retained Payments or Reserves) on account of the Direct Claims Shareholder Settlements, including for the avoidance of doubt amounts paid to Private Creditor Trusts pursuant to the Opt-Out Class Action Settlements, and (iii) 5% of the gross distributions to the Public Schools Trust (after accounting for any Retained Payments or Reserves, as applicable), *provided* that, for the avoidance of doubt, to the extent any amounts are distributed from the Reserves to the Private Creditor Trusts or the Public Schools Trust or their beneficiaries, the assessments set forth in this Section 5.9(d) shall be applied to the gross amounts of such distributions.  The assessments payable by the Public School Trust shall be deducted from and paid at the time of the fee award described in Section 5.9(i)(ii).  All assessments made by the Private Creditor Trusts shall be transferred to and distributed in accordance with the order of the MDL Court establishing the Common Benefit Fund. To the extent a Holder of a Hospital Channeled Claim, a Third-Party Payor Channeled Claim, an NAS PI Channeled Claim, a Non-NAS PI Channeled Claim, or an ERP Channeled Claim (or any ad hoc group consisting of Holders of any of the foregoing) has retained counsel through a contingency fee arrangement, any contingency fees owed to such contingency counsel payable from Distributions under the Plan shall be reduced by the full amount payable under this Section 5.9(d).[15] However, the applicable Holder and its counsel, in their sole discretion, may agree that an amount up to but

---

[13] For the avoidance of doubt, to the extent any Cause of Action that would have otherwise become an MDT Cause of Action is settled and paid pre-Effective Date, the provisions of this subsection shall apply to the settlement amounts for any such Cause of Action.

[14] Further, the MDL Court shall not have jurisdiction to interpret, decide, hear disputes, or enforce any provision of or regarding this Plan, the Confirmation Order, or any of the Opt-Out Class Actions of any of the Private Claimants related to this Plan, nor any of the agreements or documents related thereto, nor will this Plan or Exhibit R to the Governmental Entity Shareholder Direct Settlement Agreement be construed to grant the MDL Court jurisdiction over such claimants, their counsel, or counsel to any ad hoc group of such claimants, in each case in their capacity as such, that the MDL Court does not otherwise have.

[15] For the avoidance of doubt, any amount payable to counsel to the Ad Hoc Group of Individual Victims or the Ad Hoc Group of NAS Children on an hourly basis (including incremental amounts in consideration of deferring payment of hourly fees) shall not constitute a "contingency fee," and the agreement in respect thereof shall not constitute a "contingency fee arrangement," in each case for purposes of Section 5.9 of the Plan.

not exceeding 2/5 of the amount payable under this Section 5.9(d) (i.e., the 5% referenced in (i) and (ii) above) may be applied to the reimbursement of actual costs and expenses incurred by such Holder's counsel, in which case such agreed cost-reimbursement amount shall not reduce the contingency fee amounts payable to such counsel.  For the avoidance of doubt, notwithstanding anything herein or in Exhibit R to the Governmental Entities Settlement Agreement to the contrary, the assessments set forth in this subparagraph, including for the avoidance of doubt the assessment on distributions made to Private Creditor Trusts and the Public Schools Trust pursuant to each of the Opt-Out Class Action Settlements, shall not be subject to modification or increase by the Bankruptcy Court or the MDL Court. For the avoidance of doubt, none of the Debtors, the Ad Hoc Committee, the MSGE Group, or the MDL Plaintiffs Executive Committee shall be permitted to agree to any reduced or less restrictive terms concerning the 5% Common Benefit Fund assessment (or its implementation) provided under any portion of this Section 5.9(d) (or any portion of Section 5.9) for any of the Ad Hoc Group of Hospitals, the ERP Trustee, the Third-Party Payor Group, the NAS Committee, the Ad Hoc Group of Individual Victims, or the Public School Districts, absent (with regard to the Debtors, the Ad Hoc Committee, or the MSGE Group) the express written consent of the MDL Plaintiffs Executive Committee; *provided* that if any such agreement is made, then such modification shall apply to each of such groups, *mutatis mutandis.*

(e)    **Healthcare Provider Costs and Expenses**. On the Effective Date, the Hospital Attorney Fee Fund shall be established for the payment of attorneys' fees and costs of the Ad Hoc Group of Hospitals with respect to Healthcare Provider Channeled Claims. The Hospital Attorney Fee Fund shall be funded with (i) 20% of each Estate Distribution[16] made by the Healthcare Provider Trust to Holders of Healthcare Provider Channeled Claims that have not retained (or are not part of an ad hoc group that has retained), on or before the General Bar Date as reflected in a timely filed Proof of Claim or representation to the Healthcare Provider Trust in accordance with the Healthcare Provider TDP, separate counsel through an individual contingency fee arrangement *less* (ii) the amount of such Distributions payable to the Common Benefit Fund under Section 5.9(d). The Hospital Attorney Fee Fund shall be administered by the Healthcare Provider Trust on terms acceptable to the Ad Hoc Group of Hospitals.

(f)    **Ratepayer Costs and Expenses**. In the event that the Ratepayer Mediation Participants Stipulation has been entered into on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter, the attorneys' fees of the Ratepayer Mediation Participants shall be paid from Effective Date Cash in an amount equal to $1.4 million.

(g)    **ERP Costs and Expenses**. The ERP Trust shall pay or reimburse, as applicable, the compensation, costs and expenses of professionals that represented or advised the ERP Trustee in connection with the Chapter 11 Cases, to the extent provided for in the ERP Trust Documents.

(h)    **PI Claimant Costs and Expenses**.

(i)    Debtors shall pay the reasonable and documented fees and expenses of the Ad Hoc Group of Individual Victims subject to the entry of a Final Order granting the Ad Hoc Group of Individual Victims' request for allowance of such fees and expenses under section 503(b) of the Bankruptcy Code, which request shall be supported by the Debtors and the Creditors' Committee and considered at the Confirmation Hearing. In the event such a Final

---

[16] For clarity, all legal fees in respect of settlement proceeds from the Hospital Shareholder Direct Settlement Portion shall be determined by the U.S. District Court for the District of New Mexico; counsel for the Ad Hoc Group of Hospitals will seek allowance and payment of a contingent fee (which is presently anticipated to be one-third of such proceeds, plus expenses), *provided*, that nothing herein shall impact the assessments being made to the Common Benefit Fund pursuant to section 5.9(d).

Order is (i) not entered or (ii) entered allowing fees and expenses in an amount less than reasonable and documented fees and expenses requested, then (A) the PI Trustee shall pay or reimburse, as applicable, the reasonable and documented fees and expenses of professionals that represented or advised the Ad Hoc Group of Individual Victims in connection with the Chapter 11 Cases, as and to the extent provided in the PI Trust Agreement and subject to Bankruptcy Court approval of such fees and expenses as provided in the Confirmation Order and (B) such fees and expenses paid or reimbursed, as applicable, by the PI Trust shall be deducted from Distributions from the PI Trust Non-NAS Fund to Holders of Allowed Non-NAS PI Channeled Claims pursuant to the PI Trust Documents.

(ii)     The PI Trustee shall pay or reimburse, as applicable, the reasonable and documented fees and expenses of professionals that represented or advised the NAS Committee in connection with the Chapter 11 Cases, as and to the extent provided in the PI Trust Agreement and subject to Bankruptcy Court approval of such fees and expenses as provided in the Confirmation Order.  Such compensation, costs and fees paid or reimbursed, as applicable, by the PI Trust shall be deducted from Distributions from the PI Trust NAS Fund to Holders of Allowed NAS PI Channeled Claims and pursuant to the PI Trust Documents. Nothing in this Section 5.9 shall impair or otherwise affect any fee contract that is not a contingency fee contract between the Ad Hoc Group of Individual Victims and its professionals, or between the NAS Committee and its professionals.  For the avoidance of doubt, the reasonable costs and expense of the NAS Committee's professionals shall be paid in accordance with the applicable contingency fee agreements.

(i)     **Public School Districts' Costs and Expenses**. Notwithstanding any other provision in this document, the Public School District Claimants' putative class counsel and other professionals that represented or advised the Public School District Claimants shall be paid or reimbursed, as applicable, reasonable fees and costs as follows, provided that the aggregate amount of such payments and/or reimbursements, when added to the amount payable by the Public School Trust to the Common Benefit Fund under Section 5.9(d) and this Section 5.9(i), shall not exceed 25% of the sum of the Initial Public Schools Distribution, the Second Public Schools Distribution and the Third Public Schools Distribution:

(i)     From the distributions made to benefit the Public School Trust on account of the Estate Distributions, the amount of $500,000 shall be reserved for payment or reimbursement, as applicable, of the out-of-pocket litigation expenses (including expert fees and expenses) of special bankruptcy counsel and/or other professionals that represented or advised the Public School District Claimants to be computed based upon reasonable hourly rates and costs incurred, and not to include any premium to reasonable hourly rates, subject to Bankruptcy Court approval of such litigation expenses as provided in the Confirmation Order;

(ii)    From the remaining distributions made to benefit the Public School Trust on account of the Estate Distributions, the Public School District Claimants' putative class counsel shall be paid or reimbursed, as applicable, reasonable attorneys' fees and litigation costs in an amount to be determined by mediator Ken Feinberg subject to Bankruptcy Court approval of such litigation expenses as provided in the Confirmation Order, less an amount equal to 5% of the gross distributions made to benefit the Public School Trust on account of Estate Distributions (after accounting for any Reserves) which shall be contributed as assessments to the Common Benefit Fund; and

(iii)    From the Shareholder Direct Settlement Portion with respect to the Public School Channeled Claims, the Public School District Claimants' putative class counsel shall be paid or reimbursed, as applicable, reasonable attorneys' fees and litigation costs in an amount to be determined by the U.S. District Court Judge of the District Court where the proposed public schools class action settlement is filed, less an amount equal to 5% of the gross distributions made to benefit the Public School Trust on account of the Public School District Shareholder Direct Settlement (after accounting for any Retained Payments or Reserves), which shall be contributed as assessments to the Common Benefit Fund.

(j)    **No Impairment of Contingency Fee Contracts; No Further Assessment**. Except as expressly set forth in this Section 5.9, nothing in the Plan shall impair or otherwise affect any contingency fee contract between any Holder of a Claim (or any ad hoc group of Holders of Claims) and such Holder's (or ad hoc group's) counsel, nor shall it impair or otherwise affect any fees awarded as part of any class action settlement (except as otherwise provided herein, including as set forth below). In this regard, the payment of the assessments described in this Section 5.9 shall be the only payment that such Holders (or their counsel) who receive Distributions under and in accordance with the applicable Private Creditor Trust or the Public Schools Trust shall ever have to make to the Common Benefit Fund solely with respect to amounts distributed under this Plan, and amounts distributed pursuant to the Plan to such Holders or payments to such Holders' attorneys in respect thereof shall not be subject to any further or other common benefit or similar assessments. For the avoidance of doubt, the parties agree that a common benefit fund assessment of the same type and amount (and subject to the same restrictions) as set forth herein will be applied to the Class Action Settlements, and that such assessment will be the only assessment applied to such Class Action Settlements, and no other provision of this Plan, any Direct Claims Settlement agreement, or any other document will have any force or effect on such Class Action Settlement (nor will the MDL Court have any jurisdiction over any such settlements).

(k)    **Attorney Representations**. Nothing herein shall be construed to limit, restrict, or impair the rights of attorneys to continue representation of existing clients or to provide advice regarding participation in the Plan in accordance with the applicable rules of professional conduct, nor shall any provision hereof be interpreted to impose or effectuate a waiver, restriction, or restraint on practice. Attorneys shall retain the right and ethical obligation to render independent, individualized, and candid advice to each client consistent with applicable rules of professional conduct. This Plan shall not impair or challenge such attorneys' continued representation of existing clients by virtue of divergent client positions arising from any client's decision to accept or not to accept the Shareholder Settlement or relieve such attorneys of their obligations under the applicable rules of professional conduct.

**5.10**    *Transferability of Distribution Rights*.

Any right to receive a Distribution or other payment from the Plan Administration Trust (including any PAT Distribution Account or PAT Reserve), a Creditor Trust or the Master Disbursement Trust shall not be evidenced by any certificate, security, receipt or in any other form or manner whatsoever, except on the books and records of the Plan Administration Trust (as maintained by the Plan Administration Trustee), the applicable Creditor Trust (as maintained by the applicable Creditor Trustees) or the Master Disbursement Trust (as maintained by the MDT Trustees), as applicable. Further, any right to receive a Distribution or other payment from the Plan Administration Trust (including any PAT Distribution Account or PAT Reserve), a Creditor Trust or the Master Disbursement Trust shall be nontransferable and nonassignable except by will, intestate, succession or operation of law or as otherwise provided in the Plan, the applicable Creditor Trust Documents, Governmental Entity Shareholder Direct Settlement Agreement or the MDT Agreement. Any rights to receive a Distribution or other payment from the Plan Administration Trust (including any PAT Distribution Account or PAT Reserve), a Creditor Trust or the Master Disbursement Trust shall not constitute "securities" and shall not be registered pursuant to the Securities Act. If it is determined that such rights constitute "securities," the exemption provisions of section 1145(a)(1) of the Bankruptcy Code would be satisfied and such securities would be exempt from registration.

**5.11**    *Insurance Neutrality*.

In the event of any dispute concerning any issues of insurance coverage, such dispute shall be resolved pursuant to applicable law (and all parties shall reserve all rights as to what law is applicable and what it provides) and the terms and conditions of the Purdue Insurance Policies, including the MDT Insurance Policies.

Nothing herein shall prohibit the Debtors, Master Distribution Trust, any insurer, or any other party from seeking to enter into evidence, in any action or other adjudicative proceeding concerning insurance coverage, the terms of the Plan, the Plan Documents, the Confirmation Order or any other ruling made or order entered by the Bankruptcy Court whether prior to or after the Confirmation Date. No parties shall be prohibited by the terms of the Plan, the Plan Documents or the Confirmation Order from disputing the relevance, or legal effect of any such evidence, and all rights are reserved thereto.

**5.12**    *Transfer of Books and Records; Cooperation; Privilege*.

(a)    **Transfer of Books and Records to NewCo and the Plan Administration Trust**. Except with respect to Excluded Assets, all documents, books and records of the Debtors shall be transferred and assigned to NewCo on or prior to the Effective Date pursuant to the NewCo Transfer Agreement; *provided* that, from and after the date of such transfer, the Plan Administration Trustee shall have the right to retain copies of all transferred documents, books and records and NewCo shall permit the Plan Administration Trustee and its counsel and representatives to have full access to such transferred documents, books and records. All documents, books and records of the Debtors that are Excluded Assets shall be transferred and assigned to the Plan Administration Trust; *provided* that, except for the Excluded Privileged Materials, NewCo shall receive copies of all documents, books and records of the Debtors that are Excluded Assets. Any documents transferred under this Section 5.12(a) that are documents that were produced to the Debtors by Shareholder Released Parties in connection with Purdue Legal Matters shall continue to remain subject to the terms of the Protective Order and any order of the Bankruptcy Court or provision of this Plan affording confidentiality protections to such documents, unless such documents are included in the Public Document Repository in accordance with the Plan and the Master Shareholder Settlement Agreement.

(b)       **Cooperation with the Master Disbursement Trust and the Creditor Trusts**. On the Effective Date or as soon as reasonably practicable thereafter, the Debtors shall transfer and assign, or cause to be transferred and assigned, (i) to the MDT Trustees, (A) copies of all MDT Insurance Policies, (B) information and copies of documents, including books and records of the Debtors that reasonably relate to (I) any Claims previously noticed, tendered or submitted or paid by any Insurance Company under the MDT Insurance Policies and (II) any MDT Causes of Action, and (C) other information and copies of all other documents, including books and records of the Debtors that are reasonably necessary to preserve, secure or obtain the benefit of the MDT Insurance Rights, pursue the MDT Causes of Action or liquidate any other MDT Transferred Assets and (ii) to each Creditor Trust, a copy of the Proofs of Claims for Channeled Claims channeled to such Creditor Trust. Subject to Section 5.12(c) of the Plan, the materials to be provided pursuant to this Section 5.12(b) include those in the possession of the Debtors' current and former insurance coverage counsel. On and after the Effective Date, the Plan Administration Trustee and NewCo may maintain their respective documents, books and records in accordance with their respective document retention policies set forth in the PAT Agreement and the NewCo Operating Agreement, respectively. Prior to the Effective Date, the Debtors shall use reasonable best efforts to provide the Creditors' Committee and the Governmental Consent Parties reasonable access to current employees and professionals of the Debtors (including insurance brokers) with knowledge concerning the information and documents to be provided to the Master Disbursement Trust under this Section 5.12(b), and, after the Effective Date, NewCo shall use best efforts to provide the Master Disbursement Trust reasonable access to employees and professionals of NewCo with knowledge concerning such information and documents and to facilitate access to former employees and professionals of the Debtors (including insurance brokers). The Plan Administration Trustee and NewCo shall respond to reasonable requests of (x) the MDT Trustees for information and documents related to the MDT Insurance Rights, the MDT Causes of Action or otherwise, in each case to the extent reasonably necessary for the administration of the Master Disbursement Trust, and (y) each Creditor Trustee for information and documents relating to the applicable Channeled Claims or otherwise, in each case to the extent reasonably necessary for the administration of the applicable Creditor Trust. In the event of any dispute between the MDT Trustees and NewCo regarding the delivery of information or documents requested pursuant to clause (x) of the foregoing sentence, the MDT Trustees shall have the right to request intervention by the Foundation Trustees to resolve any such dispute.

(c)       **Privilege**. The transfer or assignment of information and copies of documents, including books and records, in accordance with this Section 5.12, shall not result in the destruction or waiver of any applicable Privileges. On the Effective Date, all Privileges in connection with the information or documents transferred in accordance with this Section 5.12 shall be transferred to, and vest exclusively in, NewCo, the MDT Trustees, the Plan Administration Trustee and the Creditor Trustees in accordance herewith. Further, with respect to the transfer of Privileges to the MDT Trustees and the Creditor Trustees, such Privileges shall (i) be transferred to such MDT Trustees and Creditor Trustees for the purpose of enabling such Persons to perform their respective duties as set forth in the Plan or in the MDT Agreement or the applicable Creditor Trust Documents and for no other reason, (ii) vest solely in the MDT Trustees and the Creditor Trustees and not in the Master Disbursement Trust or the Creditor Trusts, or any other committee or subcomponent of the Master Disbursement Trust or the Creditor Trusts, or any other Person (including counsel and other professionals) who is (or has been engaged by, represents or has represented) any Holder of a Claim against or Interest in the Debtors or any Person that alleges or may allege a Claim, directly or indirectly, relating to or arising out of the Debtors' Products or operations and (iii) be preserved and not waived as a result of such transfer. For the avoidance of doubt, any such transfer shall have no effect on any right, Claim or Privilege of any Person other than the Debtors. No information subject to a Privilege shall be disclosed or communicated by the MDT Trustees or the Creditor Trustees (x) to any Person not entitled to receive such information, including for the avoidance of doubt any Person (including counsel and other professionals) who is (or has been engaged by, represents or has represented) any Holder of a Claim against or Interest in the Debtors or any Person that alleges or may allege a Claim, directly or indirectly, relating to or arising out of the Debtors' Products or operations or (y) for any reason

or in any manner other than as necessary for such Persons to perform their respective duties as set forth in the Plan or in the MDT Documents or the applicable Creditor Trust Documents. Notwithstanding the foregoing, nothing herein shall preclude the MDT Trustees from providing information or documents received pursuant to this Section 5.12 to any Insurance Company as necessary to preserve, secure or obtain the benefit of the MDT Insurance Rights.

### 5.13    *Public Document Repository*.

(a)    **Summary**. The document disclosure program provided in this Plan will lead to the public disclosure of the most significant documents about Purdue, the Sackler family and the opioid crisis, including video depositions and millions of documents that Purdue produced in investigations and litigation over the past two decades. In addition, it will lead to the public disclosure of millions of documents not previously available to the public, including documents not previously produced in any investigation or litigation and certain privileged documents from the years when Purdue developed and promoted OxyContin, as identified below. The document disclosure program and Public Document Repository will be conducted in a way to maximize public confidence and public access and will set a new standard for transparency.

(b)    **DOJ Repository Obligation**. The Debtors bear sole responsibility for complying with the DOJ document repository obligation set forth in the Plea Agreement ("***DOJ Repository Obligation***"), and the DOJ Repository Obligation is not modified by this Plan. Similarly, the Debtors' satisfaction of the DOJ Repository Obligation shall not diminish the additional commitment to disclosure provided by this Plan. Instead, the public shall receive the full benefit of both, and the Public Document Repository shall contain the full set of documents that the Debtors have agreed to host under the DOJ Repository Obligation.

(c)    **Disclosure Oversight Board**. As described further below, the disclosure program provided in this Plan shall be overseen by the DOB created on the Confirmation Date, consisting of up to four (4) representatives appointed by each of the Ad Hoc Committee, the Creditors' Committee, the States AG Negotiating Group and the MSGE Group and one (1) representative appointed by the Native American Tribe Group. No current or former director, officer, employee or attorney of the Debtors shall serve on the DOB or oversee the disclosure program. NewCo shall work cooperatively with the DOB in efficiently implementing the Plan provisions establishing a Document Repository.

(d)    **Purdue Legal Matters**. As described further below, important material for the disclosure program is contained in documents that the Debtors preserved, collected, logged and produced in connection with investigations and litigation about Purdue's opioid business. Many non-privileged documents were produced in those matters, and many privileged documents were identified and logged. This Section 5.13 provides for the disclosure of many documents from the Purdue Legal Matters, which is a broad set of investigations and litigation defined in the Plan.

(e)    **Disclosure Program Budget**. As described further below, the disclosure program is designed to avoid unnecessary expense, including by employing an unpaid volunteer oversight board and by using negotiated agreements to avoid the need for litigation. The disclosure program shall be funded in an aggregate amount of $39 million, which shall be paid in the following installments: (i) $2 million on the Effective Date, (ii) $10 million on the second Scheduled MDT Distribution Date, (iii) $10 million on the third Scheduled MDT Distribution Date, (iv) $8.5 million on the fourth Scheduled MDT Distribution Date and (v) $8.5 million on the fifth Scheduled MDT Distribution Date (collectively, the "***Disclosure Program Budget***"). The Disclosure Program Budget shall be spent at the direction of the DOB. In addition, as provided in the Plan, Domestic Governmental Entities may elect (but are not required) to direct portions of their distributions to the Public Document Repository under terms provided in the Plan. Moreover, the DOB shall be permitted, but not required, to coordinate its work on this disclosure program

with the work of state Attorneys General on related disclosures in the opioid industry, in a manner that reduces the costs and increases the benefits of this disclosure program. Finally, to make efficient use of the knowledge and expertise of the Debtors and their professionals, the Plan provides for significant materials to be collected by the Effective Date, or as soon as reasonably practicable thereafter, as described further below. For the avoidance of doubt, the Public Document Repository shall not be owned, held, administered or operated by the DOB, the Master Disbursement Trust or any Creditor Trust; the role of the DOB is to develop and oversee a temporary program to set up the appropriate Public Document Repository and achieve the goals of the disclosure program.

(f)    <b>Access Materials</b>.

    (i)    Subject to the Protected Information review, as described in Section 5.13(o) of the Plan, the Debtors, the Plan Administration Trust, or any entity or law firm designated by the Debtors or the Plan Administration Trust to assist in that review, shall provide the DOB access to a set of non-privileged materials for the purpose of accomplishing the Public Document Repository (collectively, the "*Access Materials*") on a rolling basis following the Effective Date. These Access Materials shall include:

    (A)    all transcripts and audio or video recordings of depositions taken in the Purdue Legal Matters, together with the exhibits to those depositions;

    (B)    all documents produced by the Debtors in the Purdue Legal Matters (which comprise more than thirteen million documents and more than one hundred million pages);

    (C)    the non-privileged documents from the Relativity Database (as defined below) (which are estimated to comprise more than twenty million additional documents beyond those produced in the Purdue Legal Matters);

    (D)    all privilege logs regarding documents withheld by the Debtors in the Purdue Legal Matters; and

    (E)    documents obtained during the Chapter 11 Cases by the NAS Committee regarding clinical and pre-clinical studies conducted by the Debtors or other companies associated with the Sackler Family Members.

    (ii)    The Debtors, the Plan Administration Trust, or any entity or law firm designated by the Debtors or the Plan Administration Trust, will use their best efforts to complete the review of Protected Information and production of the Access Materials no later than 12 months after the Effective Date. Following entry of the Confirmation Order, the Debtors shall pay Wiggin and Dana LLP $5 million as a retainer on account of Wiggin and Dana LLP's fees and expenses in connection with the review of Protected Information as contemplated pursuant to Section 5.13(o) of the Plan. Upon its completion of such review, Wiggin and Dana LLP shall refund any unused portion of the $5 million to the Master

124

Disbursement Trust concurrent with the final release of Access Materials to the DOB.

    (iii)    All documents containing information that is redacted as described in <u>Section 5.13(o)</u> of the Plan, and not included in the Access Materials provided to the DOB, will be provided to the Plan Administration Trust. The Plan Administration Trust will retain these materials for the period described in Section 5.13(aa).

    (g)    **Debtors' Relativity Database**. In the course of the Purdue Legal Matters, the Debtors collected a significant set of documents that are stored in a Relativity database (the "***Relativity Database***"). This collection includes files from more than two hundred custodians who played important roles at Purdue, including every Sackler Family Member who sat on the board or worked at the company. It also includes non-custodial documents, such as collections from electronic drives and paper archives. The custodial and non-custodial documents collected for the Relativity Database are from files that Purdue has preserved pursuant to broad document preservation policies in place for over twenty years, including from an email archive containing emails dating to the 1990s. Pursuant to the terms provided in this <u>Section 5.13</u>, materials from the Relativity Database created before February 2018 will be available for the disclosure program as described in this <u>Section 5.13</u>.

    (h)    **Additional Collections**. On or before the Effective Date, the DOB will identify to the Debtors the additional custodians whose documents should be collected, to the extent possible, from the email archive and other preserved files, and the Debtors will load those files into the Relativity Database for inclusion as Access Materials or Sequestered Materials, as applicable.

    (i)    **Sequestered Materials**. On the Effective Date, or as soon as reasonably practicable thereafter, the Debtors shall provide the Plan Administration Trust with certain Privileged documents, described below, collected by the Debtors during the course of the Purdue Legal Matters and stored in the Relativity Database ("***Sequestered Materials***"), to be preserved for access by the DOB. The provision of the Sequestered Materials to the Plan Administration Trust shall not constitute a waiver of any applicable privileges, and, for clarity, no waiver of any applicable Privilege shall occur prior to the Sequestration Date (as defined below). The Sequestered Materials are estimated to include hundreds of thousands of documents. To leverage efficiencies, the Debtors' current document review teams with experience reviewing Purdue's documents for privilege will screen and review, as necessary, all documents currently in the Relativity Database for Privilege, attorney work product, confidentiality, the Health Insurance Portability and Accountability Act or similar state or federal statute and critical business information before turning over documents as Access Materials or as Sequestered Materials. The DOB will aid the Debtors' document review team in setting parameters and search terms to effectuate accurate screening and review. The DOB may, confidentially and subject to privilege, request and be provided with information, and, as necessary, an appropriate, expert-aided statistically valid sampling of the relevant documents or other methodologies to aid in the foregoing review under an appropriate protective order and non-waiver agreement.

    (i)    Subject to the Sequestration Date, the Debtors agree to waive attorney client and work product privilege over documents created before May 1, 2014 ("***Cutoff Date***") that fall within the following categories:

    (A)    Marketing materials, promotional materials and sales strategies. This will include, for example, legal advice on: marketing and promotional materials as part of the medical, regulatory, legal review process and other

reviews of statements in promotional and marketing materials to ensure consistency with a product's labeling and legal requirements; sales training materials (such as how to instruct the sales team on what they can and cannot say about the products); review of all call notes and whether statements on sales calls were appropriate; call planning; and sales bulletins. For the avoidance of doubt, "sales strategies" in this paragraph includes documents related to (I) medical liaisons, (II) continuing medical education, (III) the evolve to excellence program, (IV) Purdue's interactions with medical advocacy groups, and (V) legal advice regarding the performance, selection, retention, management and compensation of personnel in sales and marketing;

(B)     Materials reflecting legal advice on submissions to the FDA and compliance with FDA regulations. This will include, for example, advice on the decision to reformulate OxyContin, advice on interactions and communications with FDA and advice on FDA requirements;

(C)     Legal advice regarding distributions to or for the benefit of the Sackler Family Members;

(D)     Legal advice regarding the organization or function of the board of directors;

(E)     Legal advice regarding grants, gifts and other payments with respect to naming rights of Purdue and its shareholders;

(F)     Legal advice regarding the performance, selection, retention, management and compensation of the CEO of Purdue Pharma;

(G)     Legal advice regarding Purdue's interactions with state licensing boards and the federation of state medical boards;

(H)     Legal advice regarding Purdue's interactions with key opinion leaders, advisory boards and treatment guidance;

(I)     Legal advice regarding advocacy before the United States Congress or a state legislative branch with respect to (i) any opioid product sold by Purdue, including OxyContin, or (ii) any public policies regarding the availability and accessibility of opioid products;

(J)     Employment records and files created before the Cutoff Date pertaining to employment terminations or disciplinary actions related to opioid sales and marketing,

including documents created before the Cutoff Date pertaining to internal investigations of personnel related to marketing of opioids, in all cases subject to applicable federal and state privacy and similar laws with respect to employees and with any redactions necessary to comply therewith; and

(K)    To the extent provided during the time period while the corporate integrity agreement was in effect, legal advice regarding compliance with the corporate integrity agreement entered into between Purdue and the DOJ Office of the Inspector General of the U.S. Department of Health and Human Services;

(L)    Legal advice regarding compliance with the consent judgments entered into between Purdue, the Debtors and the State Attorneys General and other state representatives in 2007;

(M)    Legal advice to Purdue's public relations department regarding the promotion, sales, or distribution of Purdue's opioid products, including but not limited to their safety, efficacy, addictive properties, or availability of opioid products; and

(N)    Legal advice to Purdue's compliance department regarding the organizational structure of the compliance department, including its processes for implementing order monitoring systems, suspicious order monitoring programs, and abuse deterrence and detection programs.

(ii)    Subject to the Sequestration Date, below, the Debtors agree to waive attorney client and work product privilege over the following categories of documents:

(A)    Documents reflecting law department reviews of, and decisions regarding, health care providers and pharmacies pursuant to Purdue's abuse and diversion detection, order monitoring system and suspicious order monitoring programs, which will have been or will be provided to the DOJ under a June 2019 non-waiver agreement;

(B)    Documents created before February 2018 reflecting legal review, analysis and advice with respect to advice received from McKinsey & Company, Publicis Groupe S.A., Publicis Health, LLC, Razorfish Health, Publicis Health Media, LLC, Publicis Touchpoint Solutions, Inc., or Verilogue, Inc. related to the sale and marketing of opioids; and

(C)   Documents created before June 30, 2017 reflecting legal review, analysis and advice with respect to Practice Fusion.

(iii)   To the extent documents subject to any of the foregoing waivers were previously logged on a privilege log in a Purdue Legal Matter, the Debtors shall provide the DOB with amended privilege logs that indicate the entries being produced pursuant to these waivers. For the avoidance of doubt, Privileged communications (during the applicable time periods set forth in Section 5.13(i)(i) and (ii)) about interactions with the media with respect to subject matters that are otherwise waived herein are included in such waivers.

(iv)   Nothing herein shall waive any third-party privilege or other rights, whether arising from a joint defense agreement, common interest privilege or otherwise, to which any document described in Section 5.13(i)(i) and (ii) is subject and which the Debtors do not have authority to waive. The Debtors will provide the DOB with privilege logs reflecting documents subject to such third-party privileges and rights that are identified in the course of identifying and compiling the Sequestered Materials. No documents subject to such third-party privileges and rights shall be included in the Public Document Repository, absent appropriate resolution of such third parties' rights and privileges. Further, no waiver of Privilege described herein shall be construed as subject matter waiver. Subject to the foregoing, the Debtors, and the Creditors' Committee, and the Governmental Consent Parties shall work together in good faith to ensure that all documents consistent with the Sequestered Material categories shall be available to the DOB for potential inclusion in the Public Document Repository in accordance with this Section 5.13.

(j)   **Protection of the Privilege**. For the avoidance of doubt, the Debtors do not waive any Privilege and do not agree to provide as Sequestered Materials for the Public Document Repository any Privileged documents or communications not otherwise identified in Section 5.13(i)(i) and (ii). Such Privileged documents and communications not otherwise identified in Section 5.13(i)(i) and (ii) shall be removed from the Relativity Database and separately preserved, and shall not be eligible for the Public Document Repository at any time. All Privileged documents removed from the Relativity Database, and not included in the Sequestered Materials described above, will be provided to the Plan Administration Trust, separately from the Sequestered Materials. The Plan Administration Trust will retain these materials for the period described in Section 5.13(aa). For clarity, except for the Sequestered Materials identified in Section 5.13(i)(i) and (ii), the Debtors shall not intentionally provide the Master Disbursement Trust or the DOB with access to any documents or content of documents that are Privileged. In the event that the Debtors inadvertently provide the Master Disbursement Trust or the DOB with access to Privileged documents except for those documents identified in Section 5.13(i)(i) and (ii), that inadvertent provision shall not operate as a waiver of the Privilege, and, upon discovery, the DOB and/or the Master Disbursement Trust, as applicable, must promptly take steps to return the documents to the Plan Administration Trust or destroy such documents.

(k)    **Sequestration Date**. On the date that is the earlier of (i) six years after the Effective Date and (ii) the date no Material Litigation is or has been pending for the prior six months, including the pendency of any appeals, the Plan Administration Trust shall deliver the Sequestered Materials to the Host Institution (the "***Sequestration Date***"). Those materials shall be made available for assessment by the DOB and disclosure in the Public Document Repository, subject to the other provisions of this Section 5.13.

(l)    **Responsibilities of the DOB**. The DOB shall be responsible for:

(i)    accomplishing prompt, broad, permanent, public disclosure of millions of the Debtors' documents via the Public Document Repository in accordance with this Section 5.13 to allow the public to examine the Debtors' role in the opioid crisis;

(ii)    engaging with survivors, advocates, journalists, scholars, policymakers and others to ensure that the disclosure program serves the public;

(iii)    directing the use of the Disclosure Program Budget;

(iv)    maintaining protections for Protected Information, as described below;

(v)    establishing procedures for resolution of challenges to the redaction or disclosure of information, as described below;

(vi)    overseeing the Host Institution's implementation of the disclosure program;

(vii)    coordinating, as appropriate, the disclosure of documents from other producing parties or non-parties in opioid cases whose confidential information is included in the Access Materials, including by discussing inclusion of Access Materials containing such third-party confidential information;

(viii)    ensuring the long-term sustainability and success of the disclosure program; and

(ix)    retaining and overseeing staff, counsel, or such other resources as are necessary and appropriate to accomplish the DOB's responsibilities under this Section 5.13.

(m)    **Host Institutions**. The host institution(s) shall be selected by the Governmental Consent Parties and the Creditors' Committee (the "***Host Institutions***"). The Host Institution will be responsible for hosting and maintaining the Public Document Repository in perpetuity, including but not limited to: maintaining control and security over documents in the Public Document Repository; providing an accessible user interface; and providing clear and transparent explanations of its procedures to the public. Subject to restrictions and oversight imposed by the DOB, the Host Institution may employ appropriate resources to accomplish its responsibilities, including but not limited to the use of permanent university employees, temporary employees, contractors and vendor services. Commensurate with the large responsibilities assigned to the Host Institution, and subject to the decisions and oversight of the DOB and the requirements of this Plan, much of the Disclosure Program Budget may be directed to the Host

129

Institution to fund the accomplishment of its responsibilities. As soon as practicable, the Debtors shall meet with the Host Institutions to agree upon the processes to be used by the Debtors to prepare the documents for delivery to DOB, including, for example, protocols, methodologies and technical specifications.

(n)    **Prompt Disclosure**. In keeping with the importance of the matter, the DOB shall dedicate its best efforts to ensure prompt disclosure and shall seek to ensure that the public receives substantial disclosure at least every calendar quarter. The DOB shall prioritize prompt disclosure of the transcripts and audio and video recordings of depositions taken in the Purdue Legal Matters, together with the exhibits to those depositions. The Debtors will prioritize prompt production of the documents that Debtors have agreed to host pursuant to the DOJ Repository Obligation for immediate inclusion in the Public Document Repository for the sake of efficiency and cost savings.

(o)    **Redaction of Protected Information**.

(i)    The Debtors, the Plan Administration Trust, a successor entity to the Plan Administration Trust, or any entity or law firm designated by the Debtors or the Plan Administration Trust, shall implement appropriate procedures to protect the following information ("***Protected Information***") by redacting Protected Information in documents before they are provided to the DOB or disclosed to the public in the Public Document Repository and by promptly catching and correcting errors if Protected Information is disclosed. Protected Information is (i) any information protected from disclosure by the Health Insurance Portability and Accountability Act or similar state or federal statute; (ii) Social Security or tax identification numbers; (iii) personal financial account numbers; (iv) passport numbers and drivers' license numbers; (v) home addresses, personal email addresses, residential addresses, and personal phone numbers, including mobile phone numbers; (vi) information subject to confidentiality or trade secret rights of third parties that Debtors are without authority to abrogate; (vii) information subject to current Trade Secrets protection; (viii) information regarding individuals that is of a purely personal nature and does not pertain to the Debtors' opioid business or related practices; and (ix) other personally identifiable information otherwise protected by law. For the avoidance of doubt, Protected Information that should be redacted in a written document shall also be redacted in audio or video, such as deposition recordings.

(ii)    The Plan Administration Trust must provide to the DOB a redaction log identifying the basis for the redaction with sufficient detail to allow assessment of the redaction's merits. The States AG Negotiating Group and Debtors will discuss and agree upon a robust audit process sufficient for the DOB to verify the Debtors' redactions are consistent with the final Plan, and the DOB's designee(s) and/or any auditors designated by the DOB will be given access to unredacted documents for this purpose subject to confidential safeguards to be agreed upon.

130

(iii)    The Debtors and the Plan Administration Trust will prioritize the review of certain documents and custodians at the DOB's request.

(iv)    **Trade Secret**. A 'trade secret' is information, including a formula, pattern, compilation, program, device, method, technique or process, that (i) derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure and use; and (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. Information reflecting opioid sales or promotional strategies, tactics, targeting, or data, or internal communications regarding sales or promotion of opioids will not be considered subject to trade secret protection unless the information is or contains specifically enumerated categories of Debtors' Information subject to trade secret protection set forth in Section 5.13(o)(v) of the Plan, and then only such information will be redacted.

(v)    **Debtors' Information Subject to Current Trade Secrets Protection**. The following Debtor documents will be subject to trade secret protection: (i) documents that contain Debtors' trade secrets regarding (a) ANDA/NDA information that is not publicly available or is redacted in FDA filings, including development reports, batch records, and inspections, provided the redacted information contains trade secrets, and (b) Debtors' proprietary models, including the Rebate Return Model and the License & Supply Analysis Model; and (ii) documents dated less than ten (10) years before the disclosure that contain Debtors' trade secrets regarding: (a) Internal Cost of Goods Sold (COGS), including elements and calculations used to calculate COGS such as raw material sourcing, pricing, internal overhead, and capacity allocations, (b) Return on Rebate Model Data Output, and (c) License & Supply Analysis Model Data Output, including COGS, demand data, and gross-to-net information. Only the information subject to trade secrets protection will be redacted. Information reflecting opioid sales or promotional strategies, tactics, targeting, or data, or internal communications related to sales or promotion of opioids will not be considered subject to trade secret protection unless the information is or contains the narrow categories in this section, and then only the information subject to current trade secrets protection will be redacted.

(p)    **Limits on Redaction**. There shall be no redaction of: (i) names of the Debtors' directors, officers, employees, agents, attorneys or consultants or of prescribers or of officials or employees of a government agency, or (ii) email addresses at the "pharma.com" or "purduepharma.com" domain.

(q)    **Notice to Third Parties**. Debtors shall provide notice to third parties, consistent with such third-party agreements, whose trade secrets or confidential information may appear in documents which are to be provided to the DOB.

(r) **Inadvertent Release of Privileged or Protected Information**. Notwithstanding anything else in the Plan, the Public Document Repository shall not contain or disclose any documents or content of documents that are Privileged, except for those documents identified in Section 5.13(i)(i) and (ii) above that are eligible for the Public Document Repository, or any Protected Information. Inadvertent disclosure of Privileged documents in the Public Document Repository does not operate as a waiver of Privilege, and, upon discovery, any Privileged documents shall be promptly removed from the Public Document Repository. The DOB will establish a procedure that permits any party or member of the public to identify or challenge the disclosure of any potentially Protected Information placed in the Public Document Repository. The DOB will cause any document identified through this process to be immediately removed from the Public Document Repository pending review. Any disagreements regarding whether such material is Protected Information shall be resolved by the Special Master.

(s) **Special Master**.

(i) Shortly after the Confirmation Date, the Debtors shall file an appropriate motion asking the Bankruptcy Court or the United States District Court for the Southern District of New York to select and appoint a disclosure oversight Special Master. The Special Master's qualifications shall include former service as a judicial officer, whether as a state or federal judge, and no current or former director, officer, employee or attorney of the Debtors, the Sackler Family Members, the Creditors' Committee, or the Governmental Consent Parties shall be eligible to be appointed as the Special Master, counsel or staff working under the Special Master, *provided* that prior work for a Governmental Consent Party that was completed prior to 2015 shall not preclude the appointment of a Special Master. The Special Master will adjudicate all privilege and related disputes. The Special Master's reasonable hourly fees and expenses shall be paid out of the Disclosure Program Budget except as the Special Master orders otherwise upon finding that a party advanced an argument that was frivolous, harassing or in bad faith.

(ii) Selection of Special Master. The selection of the Special Master shall be made by the Bankruptcy Court; *provided* that the Bankruptcy Court may consider a recommendation made jointly by the Debtors, the Sackler Family Members, the Creditors' Committee, and the Governmental Consent Parties. For the purposes of determining if there is to be a joint recommendation, five (5) Business Days after the Confirmation Date, the parties ((x) the Debtors, (y) the Creditors' Committee, the Governmental Consent Parties and (z) the Sackler Family Members) each shall exchange a list of up to five (5) names as recommendations for the role of Special Master. The Debtors thereafter shall make a motion to the Bankruptcy Court to select a Special Master. If there are names in common on the exchanged lists, the Debtors' motion shall be limited to any name or names that are common to all such parties' lists. If there is no name common to each of the three lists, the Debtors' motion will ask the Bankruptcy Court, in its discretion, to select a Special Master.

(iii)    <u>Disclosure Challenges</u>: To the extent that the DOB seeks to (A) challenge the Debtors' assertion of Privilege with respect to any documents withheld or redacted from production in the Purdue Legal Matters, or excluded by the Debtors from the Access Materials, or (B) disclose any Protected Information in the Public Document Repository, such efforts shall be subject to review by the Special Master, who shall have final say regarding whether (y) the DOB should be provided with such materials, and (z) such materials shall be protected from public disclosure.

(iv)    <u>Timing of Challenges</u>: All challenges to the redaction or withholding of documents from the Public Document Repository, including with regard to the Privilege and to Protected Information, including challenges brought by either the DOB or members of the public, shall be brought within the later of (A) one (1) year of the Effective Date and (B) one (1) year from when the document or information at issue is first withheld from the Public Document Repository by redaction or logging.

(v)    <u>Counsel for Challenges</u>: On or shortly after the Effective Date, the Debtors, the Governmental Consent Parties, and the Creditors' Committee shall agree to appoint a law firm to defend Privilege and Protected Information assertions against challenges ("**Defense Counsel**"); *provided, however*, that if the Debtors, the Governmental Consent Parties, and the Creditors' Committee are unable to reach an agreement regarding the identity of Defense Counsel, the Bankruptcy Court shall appoint the Defense Counsel. Third parties shall represent themselves before the Special Master and shall bear their own costs.

(vi)    <u>Procedure for Challenges</u>: Any party seeking to initiate a challenge to the Privilege or Protected Information designation of a document or information in a document or any other challenge to the inclusion or exclusion of documents in the Public Document Repository (the "**Petitioner**") must first, as a condition precedent to any such challenge, meet and confer with the relevant defense counsel by serving a written statement of the specific material being disputed and the reasons for disputing each such material. If the meet and confer does not resolve the dispute, then the Petitioner shall submit a brief to the Special Master arguing why each individual document at issue should not be considered Privileged or Protected Information or should otherwise be included or excluded. Once a challenge has been submitted, the Special Master shall set a briefing schedule, permitting defense counsel no fewer than twenty-one (21) days to respond to the challenge, which may include in camera submissions in response. At the discretion of the Special Master, the briefing schedule may also include supplemental submissions, oral argument or other procedures the Special Master deems necessary to reach a determination. The Special Master shall then evaluate and decide the challenge based upon existing legal precedent of federal law

within the U.S. Court of Appeals for the Second Circuit, and shall be empowered to determine whether such materials are subject to a valid claim of Privilege or otherwise constitute Protected Information or should have otherwise been included or excluded, but shall not be empowered to waive any Privilege ever asserted by the Debtors with respect to the Purdue Legal Matters or with respect to the Access Materials or the Sequestered Materials. If the Petitioner does not prevail, then the Special Master shall have the discretion to shift to the Petitioner some or all of the reasonable legal expense of Defense Counsel, whose reasonable fees and expenses shall otherwise be paid by the Disclosure Program Budget. If the Special Master determines that the challenge was frivolous, harassing, needlessly increasing costs or expenses, or otherwise brought for an improper purpose, then the Special Master shall shift to the Petitioner some or all of the reasonable legal expense of Defense Counsel. For avoidance of doubt, any materials determined by the Special Master to be Privileged or to contain Protected Information shall not be included in the Public Document Repository.

(vii)     Pending resolution of a challenge asserting a document was improperly disclosed, the Host Institution shall remove or redact each identified, challenged document.

(t)        **Materials Produced by Shareholder Released Parties**. The Public Document Repository shall include all Sackler Family Members' documents that were produced in the Chapter 11 Cases and that relate to the manufacturing, sale or marketing of opioids in the United States, the Debtors' alleged role or liability in connection with the opioid crisis or the regulatory approval of any opioid product sold in the United States by the Debtors, but subject to appropriate exclusions for documents covered by the attorney-client and work product privileges and certain confidential information (including exclusions for information and documents related to the finances, financing activities, taxes and tax filings, investments and third party business and advisory relationships of the Shareholder Released Parties).

(i)       The Special Master appointed in accordance with Section 5.13(s) shall resolve disputes regarding whether certain documents or information is required to be included in the document repository by the Sackler Family Members.

(ii)      The Sackler Family Members shall have the right to claw back documents that they were entitled to exclude in accordance with this provision but inadvertently produced to the Public Document Repository, and such inadvertent production shall not operate as a waiver of rights. The Special Master shall resolve any disputes between Sackler Family Members, the Governmental Consent Parties, and the DOB concerning the exercise of clawback rights.

(iii)     For the avoidance of doubt, "Sackler Family Members' documents" refer only to documents in the Sackler Family Members' possession, custody or control. Section 5.13(t) does not refer to documents including or involving Sackler Family Members that are in the Debtors' possession, custody or control.

(u)     **Release of Confidentiality Rights by Parties Receiving Releases**. With regard to the disclosure of information in the Public Document Repository as authorized by this Section 5.13, the protections provided to Released Parties and Shareholder Released Parties shall be limited to the protections provided by this Plan. To the extent that Released Parties and Shareholder Released Parties possess rights to confidentiality beyond those provided this Plan (for example, a contractual confidentiality provision) or the Direct Claims Shareholder Settlement Agreements, those rights are waived to facilitate this disclosure program in exchange for the benefit of the releases provided to the Released Parties and Shareholder Released Parties by the Plan.

(v)     **DOJ Settlement Communications**. Communications between the Debtors and DOJ regarding settlement or cooperation between 2015 and the final, non-appealable conclusion of *U.S. v. Purdue Pharma L.P.*, Case 2:20-cr-01028-MCA (D.N.J.) shall be protected from disclosure to the Master Disbursement Trust and the DOB and shall not be included in the Public Document Repository, nor shall any internal Debtor documents reflecting such communications or the strategy for such communications. The Debtors shall implement this exclusion when creating the set of Sequestered Materials.

(w)     **Documents Produced By Certain Financial Institutions**. The disclosure program shall not include the documents produced by financial institutions pursuant to the examination authorized by the Bankruptcy Court at D.I. 1143. For the avoidance of doubt, if the same information also appears in a second source that is subject to disclosure (e.g., a deposition exhibit), then the information in that second source is subject to disclosure.

(x)     **Active Vendor Contracts**. The Public Document Repository shall not disclose the NewCo's active vendor contracts or expired contracts that would reveal the sum and substance of active contracts.

(y)     **Exculpation and Indemnification of DOB members and Host Institution**. To the maximum extent permitted by applicable law, the DOB members, whenever appointed, and the Host Institution shall not have or incur any liability for actions taken or omitted in his or her capacity as a DOB member, or on behalf of the DOB, except those acts found to be arising out of his or her willful misconduct, bad faith, gross negligence or fraud, and shall be entitled to indemnification, advancement and reimbursement for reasonable fees and expenses in defending any and all of his or her actions or inactions in his or her capacity as a DOB member, except for any actions or inactions found to be arising out of his or her willful misconduct, bad faith, gross negligence or fraud. Any valid indemnification claim of any of the DOB members shall be satisfied from the Disclosure Program Budget.

(z)     **Reports**. On each of the first five anniversaries of the Effective Date, the DOB shall publish a public report describing the activities of the disclosure program, the use of any funds expended, and any funds committed for future use.

(aa)    **Wind Down**. In or after one year following the Sequestration Date, the DOB shall wind itself down. If appropriate to facilitate the long-term success of the Public Document Repository, the DOB may arrange for another long-lived institution, such as one or more Attorneys General Offices, to interact with the Host Institution after the DOB is wound down (e.g., by receiving reports). Upon the wind down of the DOB, (i) the Host Institution shall be responsible for the permanent maintenance of the Public Document Repository; *provided* that, for avoidance of doubt, the access to the Access Materials and the Sequestered Materials granted to the DOB herein shall not be transferred to any successor institution other than the Host Institution and (ii) any Access Materials or Sequestered Materials in the possession of the DOB but not included in the Public Document Repository, for any reason, shall be, at NewCo's election, delivered to NewCo or destroyed or, if all or substantially all of the Assets of or Interests in NewCo have been sold, destroyed or delivered to Defense Counsel. Within ninety (90) days of the announcement of the

dissolution of the Plan Administration Trust, the Plan Administration Trust shall use commercially reasonable efforts to return Privileged and Protected Information materials to Defense Counsel who shall retain the materials in a segregated client file.

(bb)    **Master Disbursement Trust**. For the avoidance of doubt, nothing in this Section 5.13 limits the rights of the Master Disbursement Trust, subject to and in accordance with Section 5.12 of the Plan, to access or use Privileged documents, including Excluded Privileged Materials, in connection with any potential or actual Causes of Action, including, among other things, any potential or actual Causes of Action contemplated by or that may result from, the Shareholder Settlement Agreement, including, without limitation, with respect to a Cause of Action against a Shareholder Release Snapback Party upon the filing of a Notice of Shareholder Release Snapback.

### 5.14    *Effective Date Cash; Surplus Reserved Cash*.

(a)    **Effective Date Fixed Payments**. On the Effective Date, Effective Date Cash shall be used to fund (i) the Professional Fee Escrow Account in an amount necessary to satisfy Professional Fee Claims in accordance with Section 2.1(b) of the Plan, (ii) the Priority Claims Reserve in an amount necessary to satisfy estimated Allowed Administrative Claims (other than Professional Fee Claims and the DOJ Forfeiture Judgment Claim), Allowed Secured Claims and Allowed Priority Claims, (iii) the Claims Reserves in accordance with Section 7.2 of the Plan, (iv) the Disputed Cure Claims Reserve in accordance with Section 8.2(d) of the Plan, (v) the Wind-Up Reserve in accordance with Section 5.3(d) of the Plan, (vi) the MDT Operating Reserve in accordance with Section 5.6(f) of the Plan, (vii) the Special Operating Reserve in accordance with Section 5.7(a) of the Plan, (viii) the Initial NewCo Cash in accordance with Section 5.4(c) of the Plan, (ix) the applicable PAT Distribution Account in the amounts necessary to make Distributions required in accordance with Article IV of the Plan in respect of Allowed Adlon General Unsecured Claims, Allowed Avrio General Unsecured Claims, and Allowed Other General Unsecured Claims, each to the extent Allowed as of the Effective Date, (x) the Initial Private Creditor Trust Distributions, (xi) the Initial Federal Government Distribution, (xii) the Initial Public Schools Distribution, (xiii) amounts required to establish the Public Document Repository in accordance with Section 5.13 of the Plan, (xiv) the upfront insurance premium payments and other amounts in accordance with Sections 5.3(e), 5.4(f) and 5.5(c) of the Plan, (xv) any payments to the Board Consulting Advisor pursuant to Section 5.4(c)(ii), and (xvi) any other amounts required to be paid on the Effective Date pursuant to the Plan. No later than five (5) Business Days prior to the Effective Date, the Debtors shall provide notice to the Creditors' Committee and the Governmental Consent Parties of the then-current estimated amount of Effective Date Cash and all amounts described in this Section 5.14(a), and shall promptly notify the Creditors' Committee and the Governmental Consent Parties of any changes to such estimations prior to the Effective Date. Any objection by the Creditors' Committee or the Governmental Consent Parties with respect to the Debtors' proposed amount of funding of any PAT Reserve shall be resolved by the Bankruptcy Court.

(b)    **Initial Public Creditor Trust Distributions**. On the Effective Date, all Effective Date Cash remaining after the satisfaction of all amounts described in the foregoing paragraph (a) shall be used to make the Initial Governmental Remediation Trust Distribution and the Initial Tribe Trust Distribution.

(c)    **Surplus Reserved Cash**. Prior to the dissolution of the Plan Administration Trust, the Plan Administration Trustee shall determine, on each six (6)-month anniversary of the Effective Date, whether the amounts available in any PAT Reserve exceed the amounts necessary to satisfy the purpose for which such reserves were established. If the Plan Administration Trustee determines that a surplus exists in any PAT Reserve as of the date of such determination, such Surplus Reserve Cash shall be (i) *first*, used to satisfy any funding deficiency in any other PAT Reserve and (ii) *second*, with

respect to any amounts not used to satisfy any such funding deficiency in another PAT Reserve, transferred to the Master Disbursement Trust in accordance with the MDT Agreement. All Cash and cash equivalents of the Plan Administration Trust remaining upon the dissolution of the Plan Administration Trust, including any remaining Surplus Reserve Cash in the PAT Reserves, shall be transferred to the Master Disbursement Trust in accordance with the MDT Agreement.

### 5.15    *Corporate Action*.

(a)    **Dissolution of Boards of the Debtors**. As of the Effective Date, the respective boards of directors and managers, as applicable, of each of the Debtors shall be terminated and dissolved and the members of each of the boards of directors and managers, as applicable, of the Debtors shall be deemed to have resigned.

(b)    **Continued Existence of the Liquidating Debtors**. Each of the Debtors, other than the Transferred Debtors, shall continue to exist as a Liquidating Debtor after the Effective Date in accordance with the laws of the state under which such Debtor was formed and pursuant to its certificate of incorporation, bylaws, articles of formation, operating agreement, and other organizational documents, as applicable, in effect prior to the Effective Date, except to the extent such organizational documents are amended under the Plan, for the limited purposes of liquidating all of the Assets of such Debtor's Estate and making distributions in accordance with the Plan. From and after the Effective Date, except as set forth herein, the Liquidating Debtors (i) for all purposes shall be deemed to have withdrawn their business operations from any state in which the Liquidating Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, (ii) shall be deemed to have canceled pursuant to the Plan all PPI Interests and, as of the PPLP Dissolution Date, all PPLP Interests, and (iii) shall not be liable in any manner to any taxing authority for franchise, business, license or similar taxes accruing on or after the Effective Date.

(c)    **Appointment of the PPLP Liquidator as the Sole Representative for the Liquidating Debtors**. On the Effective Date, the PPLP Liquidator shall be appointed as the sole director and sole officer of the Liquidating Debtors, and shall succeed to the powers of the Liquidating Debtors' general partners, directors and officers. From and after the Effective Date, the PPLP Liquidator shall be the sole representative of, and shall act for, the Liquidating Debtors and administer the winding up and dissolution of the Liquidating Debtors. The PPLP Liquidator shall act for the Liquidating Debtors in the same fiduciary capacity as applicable to a board of directors and officers, subject to the provisions hereof (and all certificates of formation, partnership agreements, operating agreements, membership agreements and related documents are deemed amended by the Plan to permit and authorize the same). Any fees and expenses incurred by the PPLP Liquidator shall be paid by the Plan Administration Trustee from the Wind-Up Reserve.

(d)    **Merger; Dissolution; Consolidation of the Liquidating Debtors**. On or after the date(s) upon which the Plan Administration Trust is established, the Liquidating Debtors or the PPLP Liquidator may, subject to the terms of the Plan, cause any or all of the Liquidating Debtors to be merged into one or more of the Liquidating Debtors, dissolved or otherwise consolidated and engage in any other transaction in furtherance of the Plan. Notwithstanding the foregoing, upon the dissolution of each Liquidating Debtor by the PPLP Liquidator after the completion of the acts required of such Liquidating Debtor pursuant to this Plan, such Liquidating Debtor shall be deemed dissolved for all purposes without the necessity for any other or further actions to be taken by or on behalf of such Liquidating Debtor; *provided*, *however*, that each Liquidating Debtor or the PPLP Liquidator, as applicable, shall file with the office of the Secretary of State, or other appropriate office for the state of its organization, a certificate of cancellation or dissolution.

(e)  **Charter and Bylaws**. To the extent necessary or appropriate, the charters, by-laws and other organizational documents of the Debtors shall be amended, or amended and restated as necessary, in a manner consistent with section 1123(a)(6) of the Bankruptcy Code, if applicable, and the terms of this Plan.

(f)  **No Further Action**. Each of the matters provided for under the Plan involving the corporate structure of the Debtors or the Plan Administration Trust, or corporate action to be taken by or required of the Debtors, shall, as of the Effective Date, be deemed to have occurred (unless contemplated hereunder to occur before or after the Effective Date) and be effective as provided herein, and shall be authorized and approved in all respects without any requirement of further action by any Person, including, but not limited to, the Plan Administration Trustee, the PPLP Liquidator, Holders of Claims against or Interests in the Debtors or directors or officers of the Debtors.

(g)  **Effectuating Documents**. Prior to or after the Effective Date, any appropriate officer of the Debtors or the PPLP Liquidator, as applicable, shall be authorized to execute, deliver, file or record such contracts, instruments, releases, indentures and other agreements or documents, and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

(h)  **Exculpation and Indemnification of the PPLP Liquidator**. To the maximum extent permitted by applicable law, the PPLP Liquidator shall not have or incur any liability for actions taken or omitted in its capacity as the PPLP Liquidator, except those acts found by Final Order to be arising out of its willful misconduct, bad faith, gross negligence, or fraud, and shall be entitled to indemnification, advancement and reimbursement for reasonable fees and expenses in defending any and all of its actions or inactions in its capacity as the PPLP Liquidator, except for any actions or inactions found by Final Order to be arising out of its willful misconduct, bad faith, gross negligence or fraud. Any valid indemnification claim of the PPLP Liquidator shall be satisfied from the Wind-Up Reserve.

**5.16**  *Cancellation of Notes, Interests, Instruments, Certificates and Other Documents*.

Except as otherwise provided herein, on and after the Effective Date, all PPLP Interests and PPI Interests and all notes, instruments, certificates, agreements, indentures, mortgages, security documents and other documents evidencing Claims against or Interests in the Debtors or obligations of the Debtors or the Liquidating Debtors, as applicable, thereunder or in any way related to the foregoing shall be deemed canceled, satisfied in full and of no further force or effect without any need for further action or approval of the Bankruptcy Court.

**5.17**  *Closing of Chapter 11 Cases*.

After a Debtor's Estate has been fully administered, the Plan Administration Trustee shall seek authority from the Bankruptcy Court to close the applicable Chapter 11 Case in accordance with the Bankruptcy Code and Bankruptcy Rules.

## ARTICLE VI  DISTRIBUTIONS.

**6.1**  *Distributions Generally*.

Except as otherwise provided in the Plan or the PAT Agreement, all Distributions in respect of Allowed Claims, other than Channeled Claims, shall be made by the Disbursing Agent, or such other Persons designated by the Plan, in accordance with the terms of the Plan, including this

Article VI. Except with respect to Sections 6.17, 6.20, and 6.21 of the Plan, this Article VI shall not apply to Channeled Claims.

### 6.2    *Distributions on the Effective Date*.

On the Effective Date or as soon as reasonably practicable thereafter, the Disbursing Agent shall make Distributions (a) from the Priority Claims Reserve in respect of Allowed Administrative Claims, Allowed Secured Claims and Allowed Priority Claims, each in an amount and to the extent Allowed as of the Effective Date, and (b) from the PAT Distribution Account in respect of Allowed Avrio General Unsecured Claims and Allowed Adlon General Unsecured Claims, each in an amount required in accordance with this Article VI of the Plan and solely to the extent Allowed as of the Effective Date.

### 6.3    *Date of Distributions*.

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

### 6.4    *Disbursing Agent*.

The Disbursing Agent shall be deemed to hold all property to be distributed under this Plan in trust for the Persons entitled to receive the same. The Disbursing Agent shall not hold an economic or beneficial interest in the property to be distributed under this Plan. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties.

### 6.5    *Rights and Powers of Disbursing Agent*.

The Disbursing Agent shall be empowered to (a) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Plan, (b) make all Distributions contemplated by the Plan, (c) employ professionals to represent it with respect to its responsibilities and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

The Disbursing Agent shall only be required to act and make Distributions in accordance with the terms of the Plan and the PAT Agreement, and shall have no (x) liability for actions taken in accordance with the Plan and the PAT Agreement or in reliance upon information provided to it in accordance with the Plan or (y) obligation or liability in respect of any Channeled Claims or for Distributions under the Plan to any party who does not hold an Allowed Claim administered by the Plan Administration Trust at the time of Distribution or who does not otherwise comply with the terms of the Plan; *provided*, *however*, that the foregoing shall not affect the liability that otherwise would result from any such act or omission to the extent such act or omission is determined by a Final Order to have constituted willful misconduct, gross negligence, intentional fraud or criminal conduct of any such Person.

### 6.6    *Expenses of Disbursement Agent*.

Any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date shall be paid in Cash by the Plan Administration Trustee from the Wind-Up Reserve.

**6.7**    ***Delivery of Distributions***.

Subject to Bankruptcy Rule 9010, the Disbursing Agent shall make all Distributions to any Holder of an Allowed Claim at the address of such Holder (a) as set forth on the Schedules filed with the Bankruptcy Court or (b) on the books and records of the Debtors or their agents, unless the Disbursing Agent has been notified in writing of a change of address, including, without limitation, by filing of a Proof of Claim by such Holder that contains an address for such Holder that is different than the address of such Holder as set forth in the Schedules or on such books and records of the Debtors.

**6.8**    ***Undeliverable and Unclaimed Distributions***.

In the event that any Distribution to any Holder of an Allowed Claim is returned as undeliverable, no Distribution to such Holder shall be made unless and until the Disbursing Agent has been notified of the then-current address of such Holder, at which time or as soon as reasonably practicable thereafter such Distribution shall be made to such Holder without interest; *provided*, *however*, that all Distributions made by the Disbursing Agent that are unclaimed for a period of six (6) months after the Distribution thereof shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and shall revest in the Plan Administration Trust, and any entitlement of any Holder of any Claims to such Distributions shall be extinguished and forever barred.

**6.9**    ***Distribution Record Date***.

As of the close of business on the Distribution Record Date, the Claims register shall be closed. The Disbursing Agent shall have no obligation to recognize any transfer of any such Claims occurring after the close of business on the Distribution Record Date and shall instead be entitled to recognize and deal, for all purposes under the Plan, with only those Holders of record as of the close of business on the Distribution Record Date.

**6.10**    ***Manner of Payment under Plan***.

At the option of the Disbursing Agent, any Cash payment to be made pursuant to the Plan may be made by a check or wire transfer or as otherwise required or provided in the PAT Agreement.

**6.11**    ***Minimum Cash Distributions***.

The Disbursing Agent shall not be required to make any Distributions of Cash in an amount less than $100, or such lower amount as determined by the Disbursing Agent in accordance with the PAT Agreement, to any Holder of an Allowed Claim; *provided*, *however*, that if any Distribution is not made pursuant to this Section 6.11, such Distribution shall be added to any subsequent Distribution to be made on behalf of such Holder's Allowed Claims. The Disbursing Agent shall not be required to make any final Distribution of Cash in an amount less than $25 to any Holder of an Allowed Claim. If the amount of any final Distribution to any Holder of Allowed Claims would be $25 or less, then such Distribution shall be made available for Distribution to all Holders of Allowed Claims in the same Class receiving final Distributions of at least $25.

**6.12**    ***Setoffs and Recoupment***.

Subject to Section 2.1 and Sections 10.5 through 10.13 of the Plan, the Disbursing Agent may, but shall not be required to, set off against or recoup from any Claim against the Debtors, and from any payments to be made pursuant to the Plan with respect to such Claim, any Claims of any nature

whatsoever (to the extent permitted by applicable law) that the Debtors or the Plan Administration Trust, as applicable, may have against the Holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Plan Administration Trust of any such Claim it may have against such Holder.

### 6.13    *Claims Paid or Payable by Third Parties*.

The Plan Administration Trustee shall reduce in full a Claim against the Debtors, and such Claim shall be Disallowed without a Claims objection having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from any Person that is not a Debtor. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim against the Debtors receives a Distribution on account of such Claim and receives payment from a Person that is not a Debtor on account of such Claim, such Holder shall, within fourteen (14) days of receipt thereof, repay or return the Distribution to the Plan Administration Trust to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such Distribution under the Plan. The failure of such Holder to timely repay or return such Distribution shall result in the Holder owing the Debtors annualized interest at the federal judgment rate on such amount owed for each Business Day after the fourteen (14)-day grace period specified above until the amount is repaid.

### 6.14    *Distributions after Effective Date*.

Distributions made after the Effective Date to Holders of Non-Participating Channeled Claims and other Disputed Claims that are not Allowed Claims as of the Effective Date, but which later become Allowed Claims, shall be deemed to have been made on the Effective Date (except for U.S. federal income tax purposes).

### 6.15    *No Postpetition Interest and Penalties on Claims*.

Unless otherwise provided for in the Plan or the Confirmation Order or required by the Bankruptcy Code, no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date or to penalties on any Claim. Any such interest or penalty component of any such Claims, if Allowed, shall be paid only in accordance with section 726(b) of the Bankruptcy Code.

### 6.16    *Allocation of Distributions between Principal and Interest*.

To the extent that any Allowed Claim is based upon any obligation or instrument that is treated for U.S. federal income tax purposes as indebtedness of any Debtor or any other Person and is entitled to accrued but unpaid interest thereon, it is intended, subject to applicable law, that such Distribution shall be allocated first to the principal amount of the Allowed Claim (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Allowed Claim, to accrued but unpaid interest.

### 6.17    *No Constructive Receipt*.

No Holder of Claims shall be treated as receiving a Distribution for U.S. federal income tax purposes except to the extent such Holder is entitled to receive such Distribution directly under the Plan (or such Distribution is made in satisfaction of an obligation of such Holder). All parties (including, without limitation, Holders of Claims against or Interests in the Debtors, the Related Parties of such Holders, the Debtors, the Master Disbursement Trust, the MDT Trustees and the Creditor Trusts) shall report consistently with the foregoing for U.S. federal income tax purposes.

### 6.18    *No Distribution in Excess of Amount of Allowed Claim*.

Notwithstanding anything to the contrary in this Plan, no Holder of an Allowed Claim shall receive, on account of such Allowed Claim, Distributions in excess of the Allowed amount of such Claim when combined with amounts received by such Holder from other sources.

### 6.19    *Satisfaction of Claims*.

Unless otherwise provided herein, the Distributions and deliveries to be made on account of Allowed Claims under this Plan shall, in the aggregate, be in complete and final satisfaction, settlement and discharge of, and exchange for, such Allowed Claims. The Distributions and deliveries to be made on account of Claims under this Plan shall additionally be in consideration of the release and discharge of any and all Released Claims and Shareholder Released Claims related to or arising from such Claims.

### 6.20    *Withholding and Reporting Requirements*.

(a)    **Withholding Rights**. In connection with the Plan, and all instruments or Interests issued in connection therewith and in consideration thereof, any party issuing any instrument or Interest or making any Distribution or other payment described in the Plan shall comply with all applicable withholding and reporting requirements imposed by any U.S. federal, state or local or foreign taxing authority, and all Distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements to the extent required under applicable law. In the case of a non-Cash Distribution that is subject to withholding, the distributing party may withhold a portion of such distributed property equal in value to the tax to the extent required to be withheld, and either (i) sell such withheld property to generate Cash necessary to pay over the withholding tax (or reimburse the distributing party for any advance payment of the withholding tax), or (ii) pay the withholding tax using its own funds and retain such withheld property. Any amounts withheld pursuant to this Section 6.20(a) and properly remitted to the applicable Governmental Unit shall be deemed to have been distributed to, and received by, the applicable recipient for all purposes of the Plan. In the event that any Person issues any instrument or Interest or makes any non-Cash Distribution or other payment pursuant to the Plan that is subject to withholding tax and such issuing or distributing party has not sold such withheld property to generate Cash to pay the withholding tax, or paid the withholding tax using its own funds and retained such withheld property as described above, such issuing or distributing party has the right, but not the obligation, to not make a Distribution or other payment until such Holder or other recipient has made arrangements reasonably satisfactory to such issuing or distributing party for payment of any such tax obligations, after which such issuing or distributing party shall return to such Holder or other recipient the portion of the property previously withheld.

(b)    **Forms**. Any party entitled to receive any Cash or other property under the Plan shall, upon request, deliver to the Disbursing Agent, the Master Disbursement Trust, the applicable Creditor Trust, NewCo, the Foundation or such other Person designated by the Plan Administration Trustee (which Person shall subsequently deliver to the Disbursing Agent any applicable IRS Form W-8 or Form W-9 or other forms or documents received), as applicable, a properly executed IRS Form W-9 or Form W-8, as applicable, and any other forms or documents reasonably requested by such party, to reduce or eliminate any withholding required by any U.S. federal, state, local or foreign taxing authority. Except as otherwise provided in the Creditor Trust Documents, as applicable, if any such request is made by such party in accordance with the foregoing, and the Holder fails to comply before the date that is three hundred sixty-five (365) calendar days after the request is made, the amount of such Distribution shall irrevocably revert to the Plan Administration Trust, the Master Disbursement Trust, the applicable Creditor Trust, NewCo or the Foundation, as applicable, and any Claim with respect to such Distribution shall be discharged and forever barred from assertion against such party or its property.

142

(c)      **Tax Liability**. Notwithstanding Section 6.20(a), each Holder of a Claim or other Person that receives or is to receive a Distribution pursuant to this Plan shall have the sole and exclusive responsibility for the satisfaction and payment (to the extent not withheld from such Distribution pursuant to Section 6.20(a) of the Plan) of any tax obligations imposed on such Holder by any Governmental Unit, including income, withholding and other tax obligations, on account of such Distribution.

### 6.21    *Post-Confirmation Claims*.

Except as otherwise provided in the applicable Creditor Trust TDP, in the event a Person seeks payment at any time on account of a Channeled Claim as to which no Proof of Claim was filed before the Bar Date and/or for which no motion seeking leave or order granting leave to file a late Proof of Claim was filed or entered before the Confirmation Date, or as to which no Proof of Claim was required to be filed, such Person shall not be entitled to any payment or distribution on account of such Channeled Claim unless such Channeled Claim is held by a Settling Creditor. If such Channeled Claim is held by a Settling Creditor, such Person shall be entitled to seek to recover on such Channeled Claim solely from the Creditor Trust to which such Channeled Claim is or was channeled pursuant to the Master TDP, as determined by the Bankruptcy Court, and any such recovery shall be solely in accordance with and to the extent provided in the Creditor Trust TDP for such Creditor Trust. After the Effective Date, in addition to the Person seeking to assert such Channeled Claim and any Person against which such Channeled Claim is purportedly asserted, only the MDT Trustees, the Creditor Trustees and NewCo shall have standing to participate in any action before the Bankruptcy Court (or, in the event that such actions are heard before another tribunal, before such tribunal) in respect of the foregoing. For the avoidance of doubt, nothing in this paragraph is intended or shall be construed to enlarge, amend or modify the provisions of the Bar Date Order, nor is anything in this paragraph intended to derogate from, modify or amend the terms and conditions of any Creditor Trust TDP or the Master TDP or the rights of any MDT Trustee, Creditor Trustee or claims administrator for any Creditor Trust.

## ARTICLE VII        PROCEDURES FOR NON-PARTICIPATING CHANNELED CLAIMS AND OTHER DISPUTED CLAIMS.

### 7.1    *Procedures for Non-Participating Channeled Claims and other Disputed Claims Generally*.

Except as otherwise provided in the Plan, the PAT Agreement, or the Creditor Trust Documents, all Claims against the Debtors that are Non-Participating Channeled Claims or otherwise Disputed as of the Effective Date shall be subject to the claims resolution procedures set forth in the Plan, including this Article VII. Any Distributions on account of Non-Participating Channeled Claims or other Disputed Claims shall be reserved pending the completion of the Claims resolution process in this Article VII.

### 7.2    *Creditor Trust Non-Participating Claims Reserves; PAT Disputed Claims Reserves*.

(a)      **Establishment**. On the Effective Date, the Plan Administration Trustee and each applicable Creditor Trustee shall, consistent with and subject to section 1123(a)(4) of the Bankruptcy Code, with respect to each applicable Class of Claims against the Debtors, establish the PAT Disputed Claims Reserves or the applicable Creditor Trust Non-Participating Claims Reserve(s) for such Class.

(b)      **Funding of PAT Disputed Claims Reserves**. The PAT Disputed Claims Reserves shall be (i) funded on the Effective Date with Effective Date Cash in an amount determined by

the Debtors and reasonably acceptable to the Creditors' Committee, the Governmental Consent Parties and, solely with respect to amounts funded on account of Disputed Other General Unsecured Claims, the Sackler Parties' Representative. Following establishment of the PAT Disputed Claims Reserves, the Plan Administration Trustee shall administer the applicable PAT Disputed Claims Reserve, in each case taking into account any changes in the projected distributions to Holders of the applicable Disputed Claims.

(c)     **Funding of Creditor Trust Non-Participating Claims Reserves**. With respect to the Creditor Trust Non-Participating Claims Reserves other than the Class 4 Non-Participating Claims Reserves, (i) each Creditor Trust PRA Non-Participating Claims Reserve and each Select Private Creditor Trust Non-Participating Claims Reserve will be funded on the Effective Date, and from time to time on or after the Effective Date, by the PRA Estate Distributions to which the Holders of the Non-Participating Channeled Claims in such Class would be entitled should their Claims be Allowed Claims pursuant to the applicable Creditor Trust TDP, and (ii) each Creditor Trust Non-PRA Non-Participating Claims Reserve will be funded from time to time after the Effective Date, in an amount equal to the Non-PRA Estate Distributions to which the Holders of the Non-Participating Channeled Claims in such Class would be entitled should their Claims be Allowed Claims pursuant to the applicable Creditor Trust TDP, in each case as determined by the applicable Creditor Trustee and reasonably acceptable to the Debtors, the Creditors' Committee, the Governmental Consent Parties and the Sackler Parties' Representative, and (i) with respect to the Class 5 Non-Participating Claims Reserves, the Native American Tribe Group, (ii) with respect to the Class 6 Non-Participating Claims Reserve, the Public School District Claimants, (iii) with respect to the Class 7 Non-Participating Claims Reserve, the Ad Hoc Group of Hospitals, (iv) with respect to the Class 8 Non-Participating Claims Reserve, the Third-Party Payor Group, (v) with respect to the Class 9 Non-Participating Claims Reserve, the ERP Trustee, (vi) with respect to the Class 10(a) Non-Participating Claims Reserve, the NAS Committee, and (vii) with respect to the Class 10(b) Non-Participating Claims Reserves, the Ad Hoc Group of Individual Victims.

(d)     **Funding of Class 4 Non-Participating Claims Reserves**. The Class 4 PRA Non-Participating Claims Reserve shall be funded with the Non-Settling States Holdback Distributions and the Non-Settling Subdivisions Holdback Distributions, in each case, that are PRA Estate Distributions, and the Class 4 Non-PRA Non-Participating Claims Reserve shall be funded with the Non-Settling States Holdback Distributions and the Non-Settling Subdivisions Holdback Distributions, in each case, that are Non-PRA Estate Distributions in accordance with the following requirements;

(i)     In the event that a State is a Non-Settling State on the Effective Date, then such State and each Subdivision of such State that has filed a Proof of Claim will be deemed to hold a Non-Participating Channeled Claim, and (A) a Non-Settling States Holdback Distribution on account of such State and each such Subdivision, that is a PRA Estate Distribution shall be deposited in the Class 4 Creditor Trust PRA Non-Participating Claims Reserve and (B) a Non-Settling States Holdback Distribution on account of such State and each such Subdivision, that is a Non-PRA Estate Distribution shall be deposited in the Class 4 Creditor Trust Non-PRA Non-Participating Claims Reserve. The Non-Settling States Holdback Distribution for the benefit of such Non-Settling State shall be equal to such State's share of Estate Distributions based on the interstate allocation as further described in Governmental Remediation Trust Documents. Any Non-Settling State's share shall be subdivided generally in accordance with the default state-subdivision allocation set forth in the Governmental Entity Shareholder Direct Settlement Agreement as if there was no

applicable state-subdivision agreement. The portion of a Non-Settling State's share allocated to its Subdivisions who filed Proofs of Claim shall be further subdivided based on the applicable subdivision metrics developed by the MDL Plaintiffs' Executive Committee.

(ii)    Subject to Section 7.2(d)(iii), in the event that a State is a Settling State, but one or more of its Subdivisions that filed Proofs of Claim are not Participating Subdivisions, then the amount of the total PRA Estate Distributions and Non-PRA Estate Distributions allocated to such State shall be reduced by an amount equal to the share that a Non-Settling Subdivision would have received under (A) the intrastate allocation agreement that exists between that Settling State and its Subdivisions (if an intrastate allocation agreement exists), (B) the intrastate allocation statute (if an intrastate allocation statute exists), or (C) the default state-subdivision allocation set forth in the Governmental Entity Shareholder Direct Settlement Agreement (if no intrastate allocation agreement or statute exists), with the Non-Settling Subdivision's share calculated based on the applicable subdivision metrics developed by the MDL Plaintiffs' Executive Committee, with the amounts of such reductions deposited, (X) in the case of PRA Estate Distributions, in the Class 4 PRA Non-Participating Claims Reserve and (Y) in the case of Non-PRA Estate Distributions, in the Class 4 Non-PRA Non-Participating Claims Reserve. Non-Settling Subdivisions that have filed Proofs of Claim and whose Claims are or may be Allowed may be entitled to different allocations of Estate Distributions upon such Subdivision becoming a Participating Subdivision.

(iii)    In the event a Non-Settling Subdivision is located in a Settling State that has a statutory bar against such Non-Settling Subdivision pursuing a Released Claim, such Creditor Trust shall not be required to reserve any amount on account of the Non-Participating Non-Federal Domestic Governmental Claim held by such Non-Settling Subdivision.

(iv)    The Class 4 PRA Non-Participating Claims Reserve shall be funded over time from each PRA Estate Distribution and the Class 4 Non-PRA Non-Participating Claims Reserve shall be funded over time from each Non-PRA Estate Distribution, in each case, on account of each such Class 4 Non-Participating Channeled Claim, as applicable, including such amount(s) payable on account of Attorneys' Fees under Section 5.9 of this Plan.

(e)    **U.S. Federal Income Tax Matters Relating to the Creditor Trust Non-PRA Non-Participating Claims Reserves.** Each Creditor Trust Non-PRA Non-Participating Claims Reserve is intended to be treated and shall be reported as an account of the corresponding Creditor Trust, and not as an entity separate from the corresponding Creditor Trust, for U.S. federal income tax purposes, and shall be treated consistently for state and local tax purposes, to the extent applicable. All parties (including the Shareholder Payment Parties, the Debtors, the MDT Trustees, the Plan Administration

145

Trustee, each applicable Creditor Trustee, and Holders of Non-Participating Claims and other Disputed Claims) shall be required to report for tax purposes in a manner consistent with the foregoing. Each applicable Creditor Trustee shall be responsible for payment, out of the assets of the applicable Creditor Trust Non-PRA Non-Participating Claims Reserve, of any taxes imposed on the applicable Creditor Trust Non-PRA Non-Participating Claims Reserve or its assets.

(f)      **U.S. Federal Income Tax Matters Relating to the Creditor Trust PRA Non-Participating Claims Reserves and the Select Private Creditor Trust Non-Participating Claims Reserves**. Each Creditor Trust PRA Non-Participating Claims Reserve and each Select Private Creditor Trust Non-Participating Claims Reserve is intended to be treated and shall be reported as a qualified settlement fund within the meaning of Treasury Regulations section 1.468B-1 for U.S. federal income tax purposes and shall be treated consistently for state and local tax purposes. The Master Shareholder Settlement Agreement provides that PRA L.P. shall timely elect, pursuant to Treasury Regulations Section 1.468B-1(k) (and any applicable state and local income tax purposes), to treat each Creditor Trust PRA Non-Participating Claims Reserve and each Select Private Creditor Trust Non-Participating Claims Reserve as a "grantor trust," all of which is owned, for federal and applicable state and local income tax purposes only, by PRA L.P., and that PRA L.P. shall maintain such elections and shall not revoke any of such elections without the prior written consent of the Master Disbursement Trust and the applicable Creditor Trust(s), and this Section 7.2(f) assumes that is the case. All parties (including the Shareholder Payment Parties, the Debtors, the Plan Administration Trustee, each applicable Creditor Trustee, the MDT Trustees, and Holders of Non-Participating Claims and other Disputed Claims) shall be required to report for tax purposes in a manner consistent with the foregoing. The applicable Creditor Trustee shall be the "administrator" of each Creditor Trust PRA Non-Participating Claims Reserve and each Select Private Creditor Trust Non-Participating Claims Reserve. The Master Shareholder Settlement Agreement provides that PRA L.P. shall take into account all items of income, gain, loss, deduction and credit (including capital gains and losses) recognized by or otherwise attributable to each of the Creditor Trust PRA Non-Participating Claims Reserves and each of the Select Private Creditor Trust Non-Participating Claims Reserve for U.S. federal (and any applicable state or local) income tax purposes on its tax returns. The applicable Creditor Trustee may request an expedited determination of taxes of a Creditor Trust PRA Non-Participating Claims Reserve or a Select Private Creditor Trust Non-Participating Claims Reserve, as applicable, under section 505(b) of the Bankruptcy Code for all returns, if any, filed for, or on behalf of, the Creditor Trust PRA Non-Participating Claims Reserve or Select Private Creditor Trust Non-Participating Claims Reserve for all taxable periods through the dissolution of the Creditor Trust PRA Non-Participating Claims Reserve or Select Private Creditor Trust Non-Participating Claims Reserve, as applicable. Nothing in this Section 7.2(f) shall be deemed to determine, expand or contract the jurisdiction of the Bankruptcy Court under section 505 of the Bankruptcy Code.

**7.3**      *Claim Objections*.

(a)      **Prior to Effective Date**. Prior to the Effective Date, objections to Claims against the Debtors may be interposed and prosecuted by the Debtors and any other party in interest, including, for the avoidance of doubt, any Shareholder Released Party; *provided*, that no Shareholder Released Party shall interpose any objection to a Claim held by a Settling Creditor.

(b)      **PAT Disputed Claims Reserves**. On or after the Effective Date, except as otherwise provided in the Plan or the PAT Agreement, objections to Avrio General Unsecured Claims, Adlon General Unsecured Claims, and Other General Unsecured Claims against the Debtors may be interposed and prosecuted only by the Plan Administration Trustee, provided that with respect to Disputed Other GUC Litigation Claims, such objections may be interposed and prosecuted by any other party in interest, including, for the avoidance of doubt, any Shareholder Released Party. Any objections to Avrio General Unsecured Claims, Adlon General Unsecured Claims, and Other General Unsecured Claims shall

be served on the applicable Holders of such Claims and filed with the Bankruptcy Court (A) on or before one hundred eighty (180) days following the later of (i) the Effective Date and (ii) the date that a Proof of Claim is filed or amended or a Claim is otherwise asserted or amended in writing by or on behalf of the Holder of such Claim or (B) on such later date as may be fixed by the Bankruptcy Court (including upon request by a party in interest, including, for the avoidance of doubt, any Shareholder Released Party).

(c) **Objections to Non-Participating Channeled Claims**. On or after the Effective Date, except as otherwise provided in the Plan or the applicable Creditor Trust Documents, objections to Non-Participating Channeled Claims may be interposed and prosecuted by the Master Disbursement Trust and any other party in interest, including, for the avoidance of doubt, the applicable Creditor Trustee or any Shareholder Released Party, and the Bankruptcy Court shall retain exclusive jurisdiction to the greatest extent permitted by applicable law to hear and determine such objections.

(d) **Proceedings on Objections to Creditor Trust Channeled Claims other than in Class 4**. In connection with any objection to a Non-Participating Channeled Claim other than a Non-Participating Channeled Claim in Class 4, any judgment entered (i) as to the validity of such Claim shall constitute a binding determination that such Claim is either Allowed or Disallowed; and (ii) as to the amount of such Claim shall not be binding for purposes of Distribution, which shall instead be determined in accordance with Section 7.7(b) of this Plan and the applicable Creditor Trust Documents. The Bankruptcy Court (or any other court of competent jurisdiction in connection with such an objection) may, at its discretion, decline to enter any judgment as to the amount of a Non-Participating Channeled Claim.

(e) **Proceedings on Objections to Creditor Trust Channeled Claims in Class 4**. In connection with any objection to a Non-Participating Channeled Claim in Class 4, any judgment entered (i) as to the validity of such Claim shall constitute a binding determination that such claim is either Allowed or Disallowed; and (ii) shall not determine the amount of such Claim for purposes of Distribution, which shall instead be determined in accordance with Section 7.7(c) of this Plan. The Bankruptcy Court (or any other court of competent jurisdiction in connection with such an objection) may, at its discretion, decline to enter any judgment as to the amount of a Non-Participating Channeled Claim.

(f) **Omnibus Objections to Non-Participating Channeled Claims**. On or after the Effective Date, notwithstanding anything to the contrary in Bankruptcy Rule 3007, any party in interest, including, for the avoidance of doubt, the Creditor Trustee for the applicable Creditor Trust or any Shareholder Released Party, may object to more than one Non-Participating Channeled Claim consistent with the *Omnibus Claims Objection Procedures Approved in the Bankruptcy Court's Corrected Order Approving (I) Omnibus Claims Objection Procedures, (II) Omnibus Claims Settlement Procedures and (III) Omnibus Claims Hearing Procedures* [D.I. 2878] (the "**Omnibus Claims Objection Order**") as if (solely for purposes of such procedures) such party in interest were the Debtors. Any such omnibus objection shall be governed by the Omnibus Claims Hearing Procedures set forth in the Omnibus Claims Objection Order.

(g) **Joint Hearings on Common Issues of Law or Fact**. To the extent that multiple pending objections to Non-Participating Channeled Claims in the same Class (including when brought as an omnibus objection pursuant to Section 7.3(f) of this Plan) raise common issues of law or fact, including for the avoidance of doubt issues of fact as to the Debtors' or other parties' alleged conduct, the Bankruptcy Court may, to the extent practicable and consistent with applicable law, schedule joint hearings in respect of such common issues, including joint evidentiary hearings as to issues of fact. For the avoidance of doubt, this Section 7.3(g) shall apply notwithstanding differences in the law governing Non-Participating Channeled Claims to which this Section 7.3(g) of the Plan applies.

**7.4**     ***No Distribution Pending Allowance***.

Except as otherwise expressly provided in the Plan or the PAT Agreement, if any portion of any Claim in any Class in this Plan, including any Avrio General Unsecured Claims, Adlon General Unsecured Claims, or Other General Unsecured Claims is Disputed or Non-Participating, no payment or Distribution provided under the Plan shall be made on account of such Claim unless and until such Disputed Claim or Non-Participating Claim becomes an Allowed Claim.

**7.5**     ***Estimation of Claims***.

Subject in all respects to Section 7.12 of the Plan, the Debtors (before the Effective Date), and the Plan Administration Trustee (on or after the Effective Date), or any party in interest (including, for the avoidance of doubt, any Shareholder Released Party) may, at any time, request that the Bankruptcy Court estimate, pursuant to section 502(c) of the Bankruptcy Code, any Disputed Avrio General Unsecured Claims, Disputed Adlon General Unsecured Claims or Disputed Other General Unsecured Claims that the Bankruptcy Court has jurisdiction to estimate in accordance with the Bankruptcy Code or other applicable law, regardless of whether an objection was previously filed with the Bankruptcy Court with respect to such Claim, or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim at any time during litigation concerning any objection to any such Claim, including during the pendency of any appeal relating to any such objection. If the Bankruptcy Court estimates such a Disputed Claim, such estimated amount shall constitute either the Allowed amount of such Claim, the amount used to determine the PAT Disputed Claims Reserves or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If such estimated amount constitutes a maximum limitation on such Claim, the Plan Administration Trustee or any party in interest (including, for the avoidance of doubt, any Shareholder Released Party) may elect to pursue any supplemental proceeding to object to any ultimate Distribution on account of such Claim.

**7.6**     ***Resolution of Claims***.

Subject in all respects to Section 7.12 of the Plan, and except as expressly provided in the Plan, the PAT Agreement, the applicable Creditor Trust Documents, or any order entered by the Bankruptcy Court before the Effective Date, including the Confirmation Order, the MDT Trustees, the Plan Administration Trustee and each applicable Creditor Trustee shall have and exercise any and all rights and defenses held by the Debtors with respect to any Claim against the Debtors as of the Petition Date, and, subject in all respects to Section 7.12 of the Plan, shall have the authority to compromise, settle, otherwise resolve or withdraw any objections to such Claims and to compromise, settle or otherwise resolve any Non-Participating Channeled Claims and other Disputed Claims without approval of the Bankruptcy Court; *provided*, *however*, that no Non-Participating Channeled Claim or other Disputed Claim may be resolved as contemplated in this Section 7.6 without the consent of the corresponding Creditor Trustee or Plan Administration Trustee, as applicable. Subject to the applicable Creditor Trust Documents, if the Master Disbursement Trust, the Plan Administration Trustee or the applicable Creditor Trustee, as applicable, and a Holder of a Non-Participating Channeled Claim or other Disputed Claim are unable to reach a settlement on the Non-Participating Channeled Claim or other Disputed Claim within two (2) years of the Effective Date, such Non-Participating Channeled Claim or other Disputed Claim shall be submitted to the Bankruptcy Court for resolution consistent with this Article VII of the Plan. For the avoidance of doubt, nothing in this Section 7.6 shall (i) alter the processes for determining Distributions to the Holders of Allowed Channeled Claims set forth in this Plan, any order of the Bankruptcy Court, and the applicable Creditor Trust Documents or (ii) limit the rights and obligations of the Creditor Trustees in connection with such processes.

     7.7     ***Distribution After Allowance***.

(a)     **PAT Disputed Claims Reserves**. In accordance with the PAT Agreement, on the first PAT Distribution Date following the date on which a Disputed Avrio General Unsecured Claim, Disputed Adlon General Unsecured Claim or Disputed Other General Unsecured Claim becomes an Allowed Claim, the Disbursing Agent shall remit to the respective PAT Distribution Account, for Distribution to the Holder of such Allowed Claim, the Cash or cash equivalents retained in the applicable PAT Disputed Claims Reserve in an amount equal to any amount that would have been distributed to the Holder of such Claim from the Effective Date through and including the PAT Distribution Date if such Claim had been Allowed as of the Effective Date, net of any costs and expenses, including taxes (if any), of or related to the applicable PAT Disputed Claims Reserve. Each Holder of a Disputed Avrio General Unsecured Claim, Disputed Adlon General Unsecured Claim and Disputed Other General Unsecured Claim that ultimately becomes an Allowed Claim shall have recourse only to the undistributed Cash held in the applicable PAT Disputed Claims Reserve for satisfaction of such Holders' Allowed Avrio General Unsecured Claim, Allowed Adlon General Unsecured Claim or Allowed Other General Unsecured Claim and shall have no recourse against any of the Debtors, the Plan Administration Trust, the Master Disbursement Trust, any Creditor Trust, NewCo, or any Assets previously distributed on account of any Allowed Claim. No distribution from a PAT Disputed Claims Reserve or otherwise shall be made on account of any Disputed Claim unless such Disputed Claim is Allowed by a Final Order.

(b)     **Creditor Trust Non-Participating Claims Reserves**. With respect to the Creditor Trust Non-Participating Claims Reserves other than the Class 4 Non-Participating Claims Reserves, in accordance with the applicable Creditor Trust Documents, following the date on which a Non-Participating Channeled Claim becomes an Allowed Claim, each applicable Creditor Trust shall distribute to the Holder of such Allowed Claim the Cash or cash equivalents retained in the applicable Creditor Trust Non-Participating Claims Reserve(s) in an amount equal to any Estate Distribution amount that would have been distributed to the Holder of such Claim from the Effective Date through and including the applicable distribution date if such Claim had been Allowed as of the Effective Date pursuant to the applicable Creditor Trust TDP, net of any costs and expenses, including taxes (if any), of or related to the applicable Non-Participating Claims Reserve, and shall be entitled to receive its pro rata share of Estate Distributions as a Holder of an Allowed Claim in its applicable Class if and when such distribution is made, pursuant to the applicable Creditor Trust TDP. For the avoidance of doubt, nothing herein shall entitle the Holder of a Non-Participating Claim, regardless of Allowance, to any share of the Shareholder Direct Settlement Portion. Each Holder of a Non-Participating Channeled Claim that ultimately becomes an Allowed Claim shall have no recourse against any Protected Party or any Assets previously distributed on account of any Allowed Claim.

(c)     **Class 4 Non-Participating Claims Reserve**. Upon the Allowance of a Non-Participating Channeled Claim in Class 4, (i) the Governmental Remediation Trust shall distribute from the Class 4 Non-Participating Claims Reserves to the holder of such Allowed Claim an amount equal to the Estate Distribution the Holder of such Claim would have received if such Claim was an Allowed Class 4 Claim on the Effective Date, less (A) any costs, expenses, and fees (including taxes, if any) of or related to the Class 4 Non-Participating Claims Reserves and (B) any costs, expenses, and fees incurred by the Governmental Remediation Trust, the Master Disbursement Trust, the Debtors, or any Released Party (to the extent not already claimed or paid to or on behalf of any Released Party out of the Direct Claim Settlement Retained Payment Amounts or the Special Operating Reserve) arising out of, in relation to, or in connection with litigating or in any way resolving any objection to that Class 4 Claim, and (ii) the Holders of such Claim shall be entitled to receive further Estate Distributions pursuant to <u>Article VI</u> of the Plan.

7.8 **_Disallowance of Non-Participating Channeled Claims and Other Disputed Claims_**.

(a) **PAT Disputed Claims Reserves**. Upon Disallowance of a Disputed Avrio General Unsecured Claim, Disputed Adlon General Unsecured Claim or Disputed Other General Unsecured Claim, in whole or in part, the Plan Administration Trustee shall (i) first, reallocate all amounts reserved for distribution on account of such Disallowed Claim or the Disallowed portion thereof (the "**_Disallowed Claim Distribution_**") to Holders of then Allowed and Disputed Claims in the applicable Class and (ii) second, distribute the Disallowed Claim Distribution that has been so reallocated to each Holder of an Allowed Claim in such Class and allocate to the PAT Disputed Claims Reserve for such Class, pro rata, in accordance with clause (i) of this sentence.

(b) **Creditor Trust Non-Participating Claims Reserves**. Upon Disallowance of a Non-Participating Channeled Claim other than with respect to any Non-Participating Channeled Claims in Class 4: (i) any amounts held in the applicable Creditor Trust PRA Non-Participating Claims Reserve or the applicable Select Private Creditor Trust Non-Participating Claims Reserve on account of such Non-Participating Channeled Claim shall be transferred by the applicable Creditor Trustee from the applicable Creditor Trust PRA Non-Participating Claims Reserve or the applicable Select Private Creditor Trust Non-Participating Claims Reserve directly to the corresponding Released Claims Reserve and any future Distribution that would have been funded to the applicable Creditor Trust PRA Non-Participating Claims Reserve or the applicable Select Private Creditor Trust Non-Participating Claims Reserve on account of such Non-Participating Channeled Claim shall be funded directly to the applicable Released Claims Reserve, and (ii) any amounts held in the applicable Creditor Trust Non-PRA Non-Participating Claims Reserve on account of such Non-Participating Channeled Claim shall be released to the applicable Creditor Trust for distribution pursuant to the applicable Creditor Trust Documents.

(c) **Class 4 Non-Participating Claims Reserve**. In the event a Non-Participating Channeled Claim in Class 4 is Disallowed: (i) the amount reserved on account of such Claim in the Class 4 PRA Non-Participating Claims Reserve shall be released to the corresponding Released Claims Reserve, and any future Distribution that would have been funded to the Class 4 PRA Non-Participating Claims Reserve on account of such Non-Participating Non-Federal Domestic Governmental Channeled Claim shall be funded directly to the Released Claim Reserve established in the Governmental Remediation Trust, and (ii) the amount reserved on account of such Claim in the Class 4 Non-PRA Non-Participating Claims Reserve shall be released to the Governmental Remediation Trust for distribution pursuant to the Governmental Remediation Trust Documents.

(d) **Released Claims Reserves**. All amounts funded to the Released Claims Reserves in accordance with this Section 7.8 shall be administered in accordance with the terms of the Master Shareholder Settlement Agreement, including Article 5 and Exhibit N.

7.9 **_Allowance of Non-Participating Channeled Claims_**.

(a) If no objection is affirmatively raised to the Allowance of a Non-Participating Channeled Claim (other than a Non-Participating Channeled Claim in Classes 10(a) or 10(b)) within two (2) years of the Effective Date, such claim shall be deemed Allowed and the holder thereof shall be entitled to the Estate Distribution allocated to such Channeled Claim under the applicable TDP. If no objection is affirmatively raised to the Allowance of a Non-Participating Channeled Claim in Classes 10(a) or 10(b) within eighteen (18) months of the Effective Date, such claim shall be deemed Allowed and the holder thereof shall be entitled to the Estate Distribution allocated to such Channeled Claim (if any) under the applicable TDP. Notwithstanding the foregoing, (i) any Allowance pursuant to this Section 7.9(a) of the Plan shall not constitute a determination as to the merits of such Non-Participating Channeled Claim and shall not be used as a basis to assert the merits of such Non-Participating Channeled Claim in any forum,

and (ii) any Non-Participating Channeled Claim that is Allowed (pursuant to this <u>Section 7.9</u> or otherwise) shall still be subject to, and shall only receive a distribution pursuant to, the applicable TDP.

(b)    For the purposes of Allowance of any Non-Participating Channeled Claim that is not otherwise Disallowed in accordance with the Plan, such Channeled Claim shall be deemed an Allowed Claim (i) pursuant to a settlement or other resolution in accordance with <u>Section 7.6</u> of the Plan, (ii) pursuant to <u>Section 7.9(a)</u> of the Plan, or (iii) upon entry of a Final Order finding that such Holder has a valid, compensable Channeled Claim, regardless of the allowed amount of such Channeled Claim (and, for the avoidance of doubt, such Holder shall not be required to litigate the allowed amount of its Allowed Claim). Other than as expressly contemplated by the applicable trust distribution procedures, any judgment entered as to the amount of a Non-Participating Channeled Claim shall not be binding for purposes of Distribution, which shall instead be determined in accordance with <u>Sections 7.7(b)</u> and <u>(c)</u> of this Plan. The Bankruptcy Court (or any other court of competent jurisdiction in connection with such an objection) may, at its discretion, decline to enter any judgment as to the amount of a Non-Participating Channeled Claim.

### 7.10    *Claims Resolution Procedures Cumulative*.

All of the objection, estimation, settlement and resolution procedures set forth in this Plan with respect to Claims against the Debtors are intended to be cumulative and not exclusive of one another. Claims against the Debtors may be established and subsequently settled, compromised, withdrawn or resolved in accordance with this Plan by any mechanism approved by the Bankruptcy Court.

### 7.11    *No Postpetition Interest or Penalties on Non-Participating Channeled Claims and other Disputed Claims*.

Unless otherwise specifically provided for in the Plan or the Confirmation Order or required by applicable bankruptcy law, no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date or to any penalties on any Claim. Interest and penalties shall not accrue or be paid upon any Non-Participating Channeled Claim or other Disputed Claim with respect to the period from the Effective Date to the date a Distribution is made thereon, or on and after such Non-Participating Channeled Claim or other Disputed Claim becomes an Allowed Claim.

### 7.12    *Shareholder Rights Regarding Settlement and Estimation of Claims*.

In consideration of certain compromises made under the Shareholder Settlements, notwithstanding anything to the contrary contained in the Plan, the Confirmation Order, or the other Plan Documents, neither the Debtors, the reorganized Debtors, the Estates, the Plan Administration Trust, the Plan Administration Trustee, any of the Creditor Trusts, any of the Creditor Trustees, nor any representative or successor of any of the foregoing shall be permitted to settle or seek to estimate any Non-Participating Channeled Claim or other Disputed Claim absent the express written consent of the Sackler Parties' Representative, not to be unreasonably withheld, solely to the extent that such settlement or estimation of any such Non-Participating Channeled Claim or other Disputed Claim could be reasonably expected to adversely impact any Shareholder Released Party's defense against or resolution of any claims or Causes of Action asserted or potentially asserted against any Shareholder Released Party that would have been released pursuant to the Shareholder Direct Claims Release had the Persons asserting or potentially asserting such claims or Causes of Action been Settling Creditors (including because admissions of fact or showings of evidentiary support requisite to effectuation of such settlement or estimation could adversely impact the legal defenses of any Shareholder Released Party); *provided* that no such consent shall be required to the extent that (a) such settlement or estimation of such Non-Participating Channeled Claim or other Disputed Claim is sought in an amount not exceeding $1,000,000, (b) such settlement or estimation of such Non-Participating Channeled Claim or other Disputed Claim would include no non-monetary conditions on the part of any Debtor, any reorganized Debtor, any Estate, the Plan Administration Trust,

the Plan Administration Trustee, any Creditor Trust, any Creditor Trustee, or any representative or successor of any of the foregoing, and (c) the total aggregate amount of Non-Participating Channeled Claims or other Disputed Claims or formerly Non-Participating Channeled Claims or other Disputed Claims that have been settled or estimated do not exceed $10,000,000. Whether or not the Debtors, the reorganized Debtors, the Estates, the Plan Administration Trust, the Plan Administration Trustee, any of the Creditor Trusts, any of the Creditor Trustees, or any representative or successor of any of the foregoing settles or estimates (or seeks to settle or estimate) any Non-Participating Channeled Claim or other Disputed Claim, in no event shall any Shareholder Released Parties be considered the privies of any of the foregoing for purposes of preclusion principles or otherwise. For the avoidance of doubt, nothing in this <u>Section 7.12</u> gives, or is intended to give, any party any consent rights over any determinations made by any Creditor Trustee with regard to the appropriate amount that any Holder of an Allowed Claim is entitled to receive from the applicable Creditor Trust TDP.

**ARTICLE VIII        EXECUTORY CONTRACTS AND UNEXPIRED LEASES.**

      **8.1**        *<u>Assumption and Rejection of Executory Contracts and Unexpired Leases</u>*.

      (a)        As of and subject to the occurrence of the Effective Date, all executory contracts and unexpired leases to which any Debtor is a party, subject to the terms of <u>Section 8.4</u>, shall be deemed assumed by the applicable Debtor and, except with respect to any contract or lease held by a Transferred Debtor, assigned to NewCo or its designee, except for any executory contract or unexpired lease that (i) has previously been assumed or rejected pursuant to a Final Order of the Bankruptcy Court, (ii) is specifically identified on the Schedule of Rejected Contracts, (iii) is the subject of a separate assumption or rejection motion filed by the Debtors under section 365 of the Bankruptcy Code pending on the Confirmation Date, (iv) is the subject of a pending Contract Dispute or (v) is being otherwise treated pursuant to the Plan. The Debtors reserve the right to modify the treatment of any particular executory contract or unexpired lease pursuant to this Plan with the reasonable consent to the Governmental Consent Parties. Furthermore, notwithstanding anything to the contrary in the Plan, the Debtors may alter, amend, modify or supplement the Schedule of Rejected Contracts and assume, assume and assign or reject executory contracts and unexpired leases at any time prior to the Effective Date or, with respect to any executory contract or unexpired lease subject to a Contract Dispute that is resolved after the Effective Date, within thirty (30) days following entry of a Final Order of the Bankruptcy Court resolving such Contract Dispute.

      (b)        Subject to the occurrence of the Effective Date, the payment of any applicable Cure Amount and the resolution of any Contract Dispute, the entry of the Confirmation Order shall constitute approval of the rejections, assumptions and assumptions and assignments provided for in this Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Unless otherwise indicated herein or provided in a separate order of the Bankruptcy Court, rejections, assumptions and assumptions and assignments of executory contracts and unexpired leases pursuant to the Solicitation Procedures Order and this Plan are effective as of the Effective Date. Each executory contract and unexpired lease assumed pursuant to this Plan or by order of the Bankruptcy Court shall vest in and be fully enforceable by the applicable Debtor or NewCo, in each case in accordance with its terms, except as modified by the provisions of this Plan, any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law.

      (c)        Unless otherwise provided herein (including <u>Section 8.4</u> of the Plan) or by separate order of the Bankruptcy Court, each executory contract or unexpired lease that is assumed or assumed and assigned shall include any and all modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any agreement, instrument or other document that in any

manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument or other document is listed in an Assumption Notice.

(d)    Except as otherwise expressly set forth on an Assumption Notice, any contracts, engagement letters, retention agreements, and similar arrangements, in each case between the Debtors and any attorneys, accountants, financial advisors, investment bankers or similar professionals, representatives or advisors, shall not be treated under the Plan as executory contracts subject to assumption, assumption and assignment, or rejection. Counterparties to any such contracts, engagement letters, retention agreements and similar arrangements were required to file Proofs of Claim by the General Bar Date, and any Allowed Claims relating thereto shall be treated as Other General Unsecured Claims or Co-Defendant Claims, as applicable.

### 8.2    *Determination of Contract Disputes and Deemed Consent*.

(a)    The Debtors shall serve Assumption Notices in accordance with the Solicitation Procedures Order. If a counterparty to an executory contract or unexpired lease receives an Assumption Notice, but such executory contract or unexpired lease is not listed therein, the proposed Cure Amount for such executory contract or unexpired lease shall be deemed to be zero dollars ($0).

(b)    Any counterparty to an executory contract or unexpired lease shall have the time prescribed in the Solicitation Procedures Order to object to (i) the Cure Amount identified on the Assumption Notice, (ii) adequate assurance of future performance by the applicable Debtor, NewCo or its assignee (within the meaning of section 365 of the Bankruptcy Code) and (iii) any other matter pertaining to assumption or assumption and assignment of such executory contract or unexpired lease on the terms set forth in the Plan and such Assumption Notice.

(c)    To the extent a Contract Dispute is asserted in an objection filed in accordance with the procedures set forth in the Assumption Notice, such Contract Dispute shall be heard by the Bankruptcy Court at the Confirmation Hearing. Following resolution of a Contract Dispute by Final Order of the Bankruptcy Court, the applicable executory contract or unexpired lease shall be deemed assumed or assumed and assigned effective as of the Effective Date, subject to the Debtors' right to reject such executory contract or unexpired lease at any time prior to the Effective Date or, if any Contract Dispute is resolved after the Effective Date, within thirty (30) days following entry of such Final Order of the Bankruptcy Court resolving the applicable Contract Dispute.

(d)    To the extent a Contract Dispute has not been resolved prior to the Effective Date, the Debtors shall establish the Disputed Cure Claims Reserve. Any amounts in the Disputed Cure Claims Reserve remaining after the resolution of all Disputed Cure Claims and the payment of all Cure Amounts with respect to Allowed Cure Claims for contracts and leases to be assumed or assumed and assigned shall be applied in accordance with Section 5.14(b) of the Plan.

(e)    To the extent an objection is not timely filed and properly served on the Debtors with respect to a Contract Dispute, then the counterparty to the applicable contract or lease shall be deemed to have assented to (i) the Cure Amount proposed by the Debtors and (ii) the assumption or assumption and assignment of such contract or lease on the terms set forth in the Plan and the Assumption Notice, notwithstanding any provision of the applicable contract or lease that (A) prohibits, restricts or conditions the transfer or assignment of such contract or lease or (B) terminates or permits the termination of such contract or lease as a result of any direct or indirect transfer or assignment of the rights of the Debtors under such contract or lease or a change in the ownership or control as contemplated by the Plan, and shall forever be barred and enjoined from asserting such objection against the Debtors or terminating or modifying such contract or lease on account of transactions contemplated by the Plan.

(f)      With respect to payment of any Cure Amounts or resolution of Contract Disputes, none of the Debtors, the Plan Administration Trustee, NewCo or any Transferred Debtor shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable executory contract or unexpired lease, even if such non-Debtor party has sold, assigned or otherwise transferred its Cure Claim.

**8.3      _Payments Related to Assumption of Contracts and Leases_**.

(a)      Subject to resolution of any Contract Dispute, any Cure Claim shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by the Plan Administration Trust from the Priority Claims Reserve or the Disputed Cure Claims Reserve, as applicable, or NewCo in the ordinary course of business upon assumption thereof.

(b)      Assumption or assumption and assignment of any executory contract or unexpired lease pursuant to the Plan, or otherwise, shall result in the full release and satisfaction of any Claims or defaults, subject to satisfaction of the Cure Amount, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time before the effective date of assumption or assumption and assignment. Any Proofs of Claim filed with respect to an executory contract or unexpired lease that has been assumed shall be deemed Disallowed and expunged, without further notice, or action, order or approval of the Bankruptcy Court or any other Person.

**8.4      _Co-Defendant Contracts_**.

Except as otherwise provided in the Plan or agreed by any counterparty and the Debtors (with the consent (not to be unreasonably withheld, conditioned or delayed) of the Governmental Consent Parties, and after consultation with the Creditors' Committee), the assumption of any contract or lease under the Plan shall (a) release any Causes of Action on account of any and all terms or provisions of such contract or lease solely to the extent such terms or provisions create an obligation of any party thereto (or any assignee thereof), or give rise to a derivative right in favor of any non-Debtor under any MDT Insurance Policy or any other insurance policy of any Protected Party, for the indemnification or reimbursement of any Person for costs, losses, damages, fees, expenses or any other amounts whatsoever relating to or arising from any actual or potential opioid-related litigation or dispute, whether accrued or unaccrued, asserted or unasserted, existing or hereinafter arising, based on or relating to, or in any manner arising from, in whole or in part, Opioid-Related Activities or other conduct occurring prior to the Effective Date; and (b) constitute a release by each party of each other counterparty (and any assignee thereof or successor thereto) and by each non-Debtor party of all derivative rights against Insurance Companies, in each case, from any and all Causes of Action and other rights of recovery arising under or relating to such indemnification and reimbursement rights to the extent relating to any conduct occurring prior to the Effective Date, and an agreement by each non-Debtor counterparty to release any and all Co-Defendant Claims held by such party and to channel, in accordance with the Channeling Injunction, all Channeled Claims arising under or relating to such contract, including any such Claims that might otherwise be elevated to administrative status through assumption of such contract or lease. On the Effective Date, (x) all Co-Defendant Claims arising under or related to any such assumed or assumed and assigned contract or lease shall be released and discharged with no consideration on account thereof, and all Proofs of Claim in respect thereof shall be deemed expunged, without further notice, or action, order or approval of the Bankruptcy Court or any other Person and (y) all Channeled Claims arising under or related to any such assumed or assumed and assigned contract or lease shall be channeled in accordance with the Channeling Injunction. For the avoidance of doubt, unless otherwise agreed by the counterparty to any assumed or assumed and assigned contract or lease, the foregoing shall not release or otherwise modify any term or provision of such contract or lease to the extent of any indemnification or reimbursement rights (i) accruing

after the Effective Date for conduct occurring after the Effective Date, (ii) for any amounts, if any, due to a Co-Defendant as a result of the New York Opioid Stewardship Act (2018 N.Y. Sess. Laws, ch. 57, pt. NN 7 (codified at N.Y. Pub. Health Law § 3323 and N.Y. State Fin. Law § 97-aaaaa)) or (iii) for any Co-Defendant Surviving Pre-Effective Date Claim. Notwithstanding the release, satisfaction, expungement and extinguishment of Co-Defendant Claims, a Co-Defendant retains its Co-Defendant Defensive Rights, which include the ability to recover from Persons that are not Protected Parties or from any insurance policies that are not Purdue Insurance Policies or other insurance policies of Protected Parties and retains its Settling Co-Defendant Direct Insurance Interests, if any. The counterparty to such contract or lease and all other applicable Persons shall be bound by the terms set forth in this Section 8.4. For the avoidance of doubt, notwithstanding anything else to the contrary in this Plan or the Confirmation Order, (a) any transfer of the Debtors' interests in Purdue Insurance Policies, Purdue Insurance Rights, MDT Insurance Policies, or MDT Insurance Rights shall be subject to and shall not affect, expand or diminish in any way any direct interests or rights any Settling Co-Defendant has or may in the future have to pursue insurance coverage under or insurance recoveries from any Purdue Insurance Policy or MDT Insurance Policy solely as additional or named insureds or co-insureds (the "**Settling Co-Defendant Direct Insurance Interests**") and (b) such Settling Co-Defendant Direct Insurance Interests, if any, are not being released or enjoined by the MDT Insurer Injunction or the Settling MDT Insurer Injunction. Nothing in the Plan or the Confirmation Order shall determine whether any Claim, interest, or right under any of the Purdue Insurance Policies or MDT Insurance Policies is either derivative or a Settling Co-Defendant Direct Insurance Interest, or otherwise would be disallowed or subordinated under the Bankruptcy Code, which determination shall be made, as necessary, in accordance with applicable law. The Settling Co-Defendants shall be given notice of any settlement of any Purdue Insurance Policy MDT Insurance Policy, Purdue Insurance Rights or MDT Insurance Rights, pursuant to, and to the extent required by, applicable law. Any MDT Insurance Settlement for which Court approval is sought shall be sent out on notice pursuant to Bankruptcy Rule 9019.

8.5     *Rejection Claims*.

In the event that the rejection of an executory contract or unexpired lease by any of the Debtors herein results in damages to the other party or parties to such contract or lease, any Claim for such damages shall be forever barred and shall not be enforceable against the Debtors or their Estates, properties or interests in property, unless a Proof of Claim is filed with the Bankruptcy Court and served upon the Debtors no later than thirty (30) days after the entry of the order of the Bankruptcy Court (including the Confirmation Order) authorizing the rejection of such executory contract or unexpired lease. Any such Claim shall be classified in accordance with the classification of Claims set forth in Article III of the Plan, including that any such Claims that constitute Co-Defendant Claims shall be classified as such. The Confirmation Order shall constitute the Bankruptcy Court's authorization of the rejection of all the leases and contracts identified in the Schedule of Rejected Contracts.

8.6     *Compensation and Benefit Plans*.

Except with respect to any Benefit Plans for which the Debtors have received approval of the Bankruptcy Court to reject or terminate on or before the Effective Date or that are subject to a pending motion to reject or terminate as of the Confirmation Hearing, all Benefit Plans shall be deemed to be, and shall be treated as, executory contracts under this Plan pursuant to sections 365 and 1123 of the Bankruptcy Code and shall be assumed by applicable Debtors and, unless held by a Transferred Debtor, assigned to NewCo (or one of its Subsidiaries).

8.7     *Purdue Pension Plan*.

The Purdue Pension Plan has approximately 3,200 participants. PPLP is the contributing sponsor of the Purdue Pension Plan. The Debtors that are members of the contributing sponsor's controlled-group within the meaning of 29 U.S.C. §§ 1301(a)(13), (14) are jointly and severally

liable with respect to the Purdue Pension Plan. Further, any non-debtor members of the contributing sponsor's controlled-group are also jointly and severally liable with respect to the Purdue Pension Plan.

On or prior to the Effective Date, the Debtors shall have commenced a standard termination of the Purdue Pension Plan pursuant to 29 U.S.C. § 1341 and any standard termination costs, other liabilities, or obligations remaining thereunder as of the Effective Date shall be assumed and payable by NewCo.

NewCo or its wholly owned subsidiary will assume the Purdue Pension Plan to the extent the standard termination and PBGC audit, pursuant to 29 U.S.C. § 1303, has not been completed for the Purdue Pension Plan prior to the Effective Date. Specifically, upon the Effective Date, NewCo or its wholly owned subsidiary shall be deemed to have assumed the Purdue Pension Plan (to the extent the standard termination and PBGC audit has not been completed prior to the Effective Date) and all liabilities and assets thereunder and shall comply with all applicable statutory provisions of ERISA and the IRC, including, but not limited to, satisfying the minimum funding standards pursuant to 26 U.S.C. §§ 412, 430, and 29 U.S.C. §§1082, 1083; paying the PBGC premiums in accordance with 29 U.S.C. §§ 1306 and 1307; administering the Purdue Pension Plan in accordance with its terms and the provisions of ERISA and the IRC, and completing the standard termination under 29 U.S.C. § 1341 (and NewCo reserves all rights thereunder).

Notwithstanding any provision in the Plan to the contrary, no provision contained in the Plan, the Confirmation Order, the Bankruptcy Code (including section 1141 thereof), or any other document filed in the Debtors' bankruptcy cases shall be construed as discharging, releasing, exculpating or relieving any Person (other than the Liquidating Debtors) from any fiduciary duties or liabilities under Title I of ERISA with respect to the Purdue Pension Plan. PBGC and the Purdue Pension Plan shall not be enjoined or precluded from enforcing such fiduciary duties or liabilities under Title I of ERISA as a result of any of the provisions of the Plan, the Confirmation Order, the Bankruptcy Code or any other document filed in the Debtors' bankruptcy cases. The PBGC and the Debtors agree that all Proofs of Claim filed by the PBGC shall be deemed to be withdrawn, with prejudice, as of the Effective Date.

### 8.8 *Insurance Policies*.

Notwithstanding anything to the contrary in the Plan, the Plan Documents, the Disclosure Statement or the Confirmation Order:

(a)    nothing in the Plan, the Plan Documents, the Disclosure Statement or the Confirmation Order shall terminate or otherwise reduce the coverage under any D&O Insurance Policy with respect to conduct occurring on or prior to the Effective Date, and, after the Effective Date, all directors, officers, managers, authorized agents and employees of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any applicable D&O Insurance Policy for the full term of such policy, including but not limited to any extension of coverage after the end of such policy period if an extended reporting period has been purchased, in accordance with the terms thereof, subject to (i) any release or assignment of rights by certain Shareholder Released Parties pursuant to the Shareholder Settlements or by the Settling Executives in the Settling Executive Stipulation and (ii) with respect to D&O Insurance Policies that are MDT Insurance Policies, the provisions of paragraph (b) of this Section 8.8;

(b)    after the Effective Date, in consideration of the Estate Releases and Shareholder Releases in favor of each Released Party and Shareholder Released Party that is an individual insured under any MDT Insurance Policy:

(i) each such Released Party or Shareholder Released Party (A) will fully cooperate with the Master Disbursement Trust in connection with the settlement of claims or rights under such MDT Insurance Policy, including but not limited to as set forth in this Section 8.8(b)(i), and (B) shall be deemed to consent to the release of any claims or rights held by such Released Party or Shareholder Released Party against and under such MDT Insurance Policy in the event that the Master Disbursement Trust has otherwise obtained settlement terms that it deems acceptable in its sole discretion with the same effect as if such Released Party or Shareholder Released Party had executed such settlement agreement, and without further consideration to such Released Party or Shareholder Released Party from the insurance settlement proceeds or otherwise in respect of such settlement;

(ii) no such Released Party or Shareholder Released Party (other than a Sackler Family Member) that was a director, officer, manager, authorized agent or employee of the Debtors who served in such capacity at any time prior to the Petition Date shall be entitled to submit a claim under any MDT Insurance Policy for anything other than reimbursement of attorneys' fees and related expenses incurred in connection with such individual's cooperation with, or in connection with the defense of such individual with respect to, any investigation, prosecution and/or litigation involving conduct relating to the Debtors or the Debtors' business or property or any defense of the Releases or the Channeling Injunction; and

(iii) no such Shareholder Released Party (other than a current or former director, officer, manager, authorized agent or employee that is not a Sackler Family Member, each of whom is subject to the foregoing paragraph (ii) of this Section 8.8(b)) shall be entitled to submit a claim under any MDT Insurance Policy other than in accordance with the Shareholder Settlements;

(c) on and after the Effective Date, all Purdue Insurance Policies (other than the MDT Insurance Policies) shall be deemed to be, and shall be treated as, executory contracts under the Plan, and shall be assumed pursuant to sections 105 and 365 of the Bankruptcy Code by the applicable Debtor, and such Purdue Insurance Policies shall vest, and/or the Purdue Insurance Rights (other than the MDT Insurance Rights) associated therewith shall vest, as applicable, in NewCo, the applicable Transferred Debtor or the Plan Administration Trust, as applicable, in accordance with the NewCo Transfer Agreement and the PAT Agreement and continue in full force and effect in accordance with their respective terms such that the applicable recipients of the Purdue Insurance Policies (other than the MDT Insurance Policies) and the Purdue Insurance Rights (other than the MDT Insurance Rights) shall become and remain liable in full for and shall satisfy, to the extent required under applicable law, any prospective premiums, deductibles, self-insured retentions and any other amounts or obligations arising in any way out of the receipt of payment from an Insurance Company in respect of the Purdue Insurance Policies (other than the MDT Insurance Policies); and

(d) solely with respect to Purdue Insurance Policies that are not MDT Insurance Policies, the automatic stay of section 362(a) of the Bankruptcy Code and the injunctions set forth in the Plan, if and to the extent applicable, shall be deemed lifted without further order of this

Bankruptcy Court, solely to permit (i) claimants with valid workers' compensation claims or direct action claims against Insurance Companies under applicable non-bankruptcy law to proceed with their claims; and (ii) Insurance Companies to administer, handle, defend, settle and/or pay, in the ordinary course of business and without further order of this Bankruptcy Court, (A) workers' compensation claims, (B) claims where a claimant asserts a direct claim against an Insurance Company under applicable non-bankruptcy law, or an order has been entered by this Bankruptcy Court granting a claimant relief from the automatic stay or the injunctions set forth in the Plan to proceed with its claim, and (C) all costs in relation to each of the foregoing.

> **8.9**    *Reservation of Rights*.

> (a)    Neither the exclusion nor the inclusion by the Debtors of any contract or lease on any exhibit, schedule or other annex to this Plan or in the Plan Supplement, nor anything contained in this Plan, shall constitute an admission by the Debtors that any such contract or lease is or is not an executory contract or unexpired lease or that the Debtors have any liability thereunder.

> (b)    Except as explicitly provided in this Plan, nothing herein shall waive, excuse, limit, diminish or otherwise alter any of the Estate Causes of Action under any executory or non-executory contract or unexpired lease.

> (c)    Nothing in this Plan shall increase, augment or add to any of the duties, obligations, responsibilities or liabilities of the Debtors under any executory or non-executory contract or unexpired or expired lease, including the Purdue Insurance Policies.

> (d)    If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of its assumption under this Plan, the Debtors shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

## ARTICLE IX  CONDITIONS PRECEDENT TO THE OCCURRENCE OF THE EFFECTIVE DATE.

> **9.1**    *Conditions Precedent to Effective Date*.

> The Effective Date shall not occur unless all of the following conditions precedent have been satisfied:

> (a)    the Confirmation Order shall have been entered by the Bankruptcy Court, and shall not be subject to any stay and shall not have been modified or vacated on appeal;

> (b)    the Plan Documents shall have been approved of or accepted by all applicable Persons in accordance with the respective consent rights under this Plan, and shall have been filed, executed and delivered, as applicable, and the conditions precedent contained therein shall have been satisfied or waived in accordance with the terms thereof, except with respect to such conditions that by their terms shall be satisfied substantially simultaneously with or after consummation of the Plan;

> (c)    the DOJ Resolution (including, for the avoidance of doubt, the entry of a judgment of conviction in strict accordance with the Plea Agreement and the payment in full of the DOJ Forfeiture Payment) shall have been consummated or will be consummated substantially simultaneously with consummation of the Plan;

> (d)    the NewCo Operating Agreement shall have been executed and shall be in compliance with the DOJ Resolution, the NewCo Transferred Assets shall have vested in NewCo (or one

or more of its Subsidiaries) in accordance with the NewCo Transfer Agreement and the NewCo Managers shall have been appointed;

(e)      the MDT Agreement shall have been executed, the MDT Transferred Assets shall have vested, or will vest simultaneously with the consummation of the Plan, in the Master Disbursement Trust in accordance therewith and the MDT Trustees shall have been appointed;

(f)      the Creditor Trust Documents shall have been executed and the Creditor Trustees shall have been appointed;

(g)      the Public Entity Settlements other than the Public School District Shareholder Direct Settlement shall have been consummated or will be consummated substantially simultaneously with consummation of the Plan, including (i) the payment in full of the Initial Public Creditor Trust Distributions and (ii) the issuance of the MDT Interests to the Public Creditor Trusts;

(h)      the Foundation Bylaws shall have been adopted, the Foundation Trustees shall have been appointed and the NewCo Interest shall have been issued, or will be issued simultaneously with consummation of the Plan, to the Foundation;

(i)      the Private Entity Settlements other than the Opt-Out Class Action Settlements shall have been consummated or will be consummated substantially simultaneously with consummation of the Plan, including: (i) with respect to the Creditor Trusts that are not the subject of Opt-Out Class Actions, the payment in full of the Initial Private Creditor Trust Distributions to such Creditor Trusts, subject to Section 5.2(e)(i) of the Plan, (ii) the issuance of the MDT Claims (in the case of Creditor Trusts that are the subject of Opt-Out Class Actions, to the extent that the applicable Opt-Out Class Action Settlement has been consummated) and (iii) the execution of any Plan Documents required to be executed in connection with the foregoing;

(j)      with respect to the Creditor Trusts that are the subject of Opt-Out Class Actions, payment in full of the Initial Private Creditor Trust Distributions to such Creditor Trusts, or, to the extent that the applicable Opt-Out Class Action Settlement has not been consummated, the placement of the Shareholder Direct Settlement Portion of the Initial Private Creditor Trust Distributions for such Creditor Trusts into the applicable Class Action Escrow Account;

(k)      each Shareholder Settlement Agreement other than the Opt-Out Class Action Settlements shall have been executed and all amounts required to be paid thereunder on the Effective Date shall have been received, and all of the conditions precedent to the effectiveness of each Shareholder Settlement Agreement other than the Opt-Out Class Action Settlements shall have been satisfied or waived in accordance with the terms of such Shareholder Settlement Agreement;

(l)      the Ratepayer Mediation Participants Stipulation shall have been approved by a Final Order of the Bankruptcy Court;

(m)      the PAT Agreement shall have been executed, the PAT Assets shall have vested, or will vest simultaneously with the consummation of the Plan, in the Plan Administration Trust in accordance therewith and the Plan Administration Trustee shall have been appointed;

(n)      each of the PAT Reserves, the Claims Reserves, the Professional Fee Escrow Account, the Special Operating Reserve and the PAT Distribution Accounts shall have been fully funded, or will be funded simultaneously with the consummation of the Plan, and each of the other payments and Distributions of Effective Date Cash described in Section 5.14(a) and (b) of the Plan shall have been made or will be made substantially simultaneously with consummation of the Plan;

(o) the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings and documents that are necessary to implement and effectuate the Plan;

(p) all Professional Fee Claims shall have been paid in full or amounts sufficient to pay such Claims after the Effective Date shall have been placed in the Professional Fee Escrow Account, or shall be otherwise contained in a professional fee retainer, pending approval by the Bankruptcy Court;

(q) the Debtors shall have implemented the Restructuring Transactions, or shall implement the Restructuring Transactions simultaneously with the consummation of the Plan, in a manner consistent in all material respects with this Plan;

(r) the Bankruptcy Court shall have confirmed that the Bankruptcy Code authorizes the transfer and vesting of the MDT Transferred Assets, notwithstanding any terms of the Purdue Insurance Policies or provisions of non-bankruptcy law that any Insurance Company may otherwise argue prohibits such transfer and vesting;

(s) the DOB shall have been appointed in accordance with Section 5.13(c) of the Plan;

(t) all Liens granted as contemplated by the Plan and any documents included in the Plan Supplement shall have been approved by the Bankruptcy Court;

(u) the Debtors shall have Effective Date Cash sufficient to pay the effective date fixed payments as provided in Section 5.14(a) of this Plan in full in cash; and

(v) all other actions, documents and agreements necessary to implement and effectuate the Plan shall have been effected or executed.

## 9.2 *Waiver of Conditions Precedent*.

Each of the conditions precedent to the occurrence of the Effective Date (other than the condition precedent set forth in Section 9.1(i) of the Plan) may be waived by the Debtors; *provided* that (a) with respect to any condition precedent, the waiver of which would materially and adversely affect the entitlements of any Class of Claims (or any Creditor Trust to which such Claims shall be channeled) represented by any of the Supporting Claimants, the waiver of such condition precedent shall also require the consent (not to be unreasonably withheld, conditioned or delayed) of the applicable Supporting Claimants representing such materially and adversely affected Class of Claims, it being understood that the waiver of the condition precedent set forth in Section 9.1(i) materially and adversely affects the Class of Claims and the Creditor Trust entitled to the applicable Initial Private Creditor Trust Distribution and/or MDT Claim, (b) the waiver of the conditions precedent set forth in Section 9.1(a), (b) (solely with respect to any Plan Document over which the Creditors' Committee has a consent right set forth in the Plan), (e), (f), (i), (j), (k), (l), (m), (n), (p) (solely with respect to Professional Fee Claims by Professional Persons retained by the Creditors' Committee), (q), (r), (s), and (u) of the Plan shall also require the consent of the Creditors' Committee (which consent shall not be unreasonably withheld, delayed or conditioned), (c) the waiver of the conditions precedent set forth in Section 9.1(a), (b) (solely with respect to any Plan Document over which the Governmental Consent Parties have a consent right set forth in the Plan), (d), (e), (f), (g), (i), (n),(q), (r), (s), and (u) of the Plan shall also require the consent of the Governmental Consent Parties (which consent shall not be unreasonably withheld, delayed or conditioned) and (d) the waiver of the conditions precedent set forth in Section 9.1(a), (b) (solely with respect to any Plan Document over which the Sackler Parties' Representative has a consent right set forth in the Master Shareholder Settlement

Agreement), (e), (g), (i), (j), (k), (m), (n), and (q) of the Plan shall also require the consent of the Sackler Parties' Representative (which consent shall not be unreasonably withheld, delayed or conditioned).

### 9.3    *Frustration of Conditions Precedent*.

Notwithstanding anything to the contrary herein, if the failure to satisfy any condition precedent to the Effective Date set forth in Section 9.1 was primarily caused by the action of any party (or such party's failure to act), then (i) such party's consent shall not be required for the Debtors' waiver of such condition and (ii) such party shall not be entitled to prevent or delay the Effective Date by asserting that such condition has not been satisfied.

## ARTICLE X    EFFECT OF CONFIRMATION.

### 10.1    *Binding Effect*.

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, and subject to the occurrence of the Effective Date, on and after the entry of the Confirmation Order, the provisions of this Plan and the Plan Documents shall bind every Holder of a Claim against or Interest in any Debtor and every Holder of a Channeled Claim and inure to the benefit of, and be binding on, any such Holder's respective successors and assigns, regardless of whether any Claim or Interest of such Holder is Impaired under this Plan or whether such Holder has accepted this Plan.

### 10.2    *Discharge of Claims against and Interests in the Debtors*.

Upon the Effective Date and in consideration of the Distributions to be made under this Plan, except as otherwise provided in the Plan or in the Confirmation Order, each Holder (as well as any trustee or agent on behalf of such Holder) of a Claim or Interest and any successor, assign and affiliate of such Holder shall be deemed to have forever waived, released and discharged the Debtors (other than the Liquidating Debtors), to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights and liabilities that arose prior to the Effective Date. Except as otherwise provided in this Plan, upon the Effective Date, all such Holders of Claims against or Interests in the Debtors, and their successors, assigns and affiliates, shall be forever precluded and enjoined, pursuant to sections 105, 524 and 1141 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against, or terminated Interest in, any Debtor. Pursuant to section 1141(d)(3) of the Bankruptcy Code, confirmation of the Plan will not discharge the Liquidating Debtors; *provided* that, upon confirmation of the Plan and the occurrence of the Effective Date, Holders of Claims against and Interests in the Debtors may not seek or receive any payment or other Distribution from, or seek recourse against, the Debtors or their Estates or, to the extent set forth in the Plan, any other Protected Party, except as expressly provided in the Plan. The Co-Defendant Defensive Rights shall not be waived, released or discharged and all Co-Defendant Defensive Rights are preserved, as provided in Section 10.18 of the Plan.

### 10.3    *Pre-Confirmation Injunctions, Stays, Stipulations and Discovery Orders*.

(a)    Unless otherwise provided in this Plan, all injunctions and stays arising under or entered during the Chapter 11 Cases, whether under section 105 or 362 of the Bankruptcy Code or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

(b)    Notwithstanding the foregoing paragraph (a) of this Section 10.3, on the Effective Date, without further action by or order of the Bankruptcy Court:

(i)     any and all obligations of the Shareholder Released Parties arising under the Case Stipulation shall terminate and the Case Stipulation shall be superseded by the Confirmation Order solely with respect to paragraphs 15, 17, 19, 22 and 25 of the Case Stipulation, and solely as such paragraphs apply to any Shareholder Released Party; *provided* that, for the avoidance of doubt, the terms of such paragraphs shall continue in full force and effect with respect to all other parties (if applicable), and all other provisions of the Case Stipulation shall remain in full force and effect, in each case, unless otherwise provided by the Plan;

(ii)    any and all obligations of any Shareholder Released Party arising under paragraph I of the voluntary injunction set forth in Appendix I to the Preliminary Injunction (and any predecessors or successors of the Preliminary Injunction) shall terminate, and the Preliminary Injunction shall be withdrawn, vacated and superseded by the Confirmation Order solely with respect to paragraph I of the voluntary injunction set forth in Appendix I; *provided* that, for the avoidance of doubt, all other provisions of the Preliminary Injunction shall remain in full force and effect, unless otherwise provided by the Plan; and

(iii)   any and all obligations of any Person arising under any subpoenas issued pursuant to any of *Order Pursuant to Federal Rules of Bankruptcy Procedure 2004 and 9016 Authorizing Examination of Third Parties* [D.I. 992] (as amended by the *Amended Order Pursuant to Federal Rules of Bankruptcy Procedure 2004 and 9016 Authorizing Examination of Third Parties* [D.I. 1008]), the *Order Pursuant to Rules 2004 and 9016 of the Federal Rules of Bankruptcy Procedure Authorizing Examinations of Certain Financial Institutions* [D.I. 1143], the *Order Pursuant to Federal Rules of Bankruptcy Procedure 2004 and 9016 Authorizing Examinations of and Document Production by Third Parties* [D.I. 1340] *and the Order Pursuant to Federal Rules of Bankruptcy Procedure 2004 and 9016 Authorizing Examination of Certain Former Debtor Executives, Separately Represented Debtor Personnel, and Norton Rose Fulbright Pursuant to Federal Rules of Bankruptcy Procedure 2004 and 9006* [D.I. 1788] shall terminate.

(c)     Any and all information shared or produced by any Shareholder Released Party pursuant to the agreements or orders referenced in the foregoing paragraph (b) of this Section 10.3, including any such information also shared with Persons not party to the Case Stipulation, shall remain subject to the confidentiality terms under which it was shared, including any information that was designated under the Protective Order (or confidentiality agreement that was superseded by the Protective Order), which such information shall remain confidential under the terms of the Protective Order unless such information, materials or documents are included in the Public Document Repository in accordance with the Plan and the Master Shareholder Settlement Agreement. Names or other identifying information of investments or specific third-party counterparties or advisors with whom or with which a Shareholder Released Party has or had a third-party investment, advisory or business relationship that was disclosed in documents or information produced by a Shareholder Released Party and designated Outside Professional

Eyes Only Information under the Protective Order shall retain such designation and be protected accordingly.

(d)      Except as provided in the PI TDP, nothing in this Plan shall either (i) excuse any Person from compliance with any legislative, judicial or administrative subpoena, any civil investigative demand or any request for information made in the course of a government investigation; or (ii) limit any right of any Person with respect to compliance with any legislative, judicial or administrative subpoena, any civil investigative demand or any request for information made in the course of a government investigation.

### 10.4      *Injunction against Interference with Plan*.

Subject to Section 12.4 of the Plan, upon entry of the Confirmation Order, all Holders of Claims against or Interests in the Debtors, Holders of Channeled Claims, Releasing Parties, Released Parties, Shareholder Released Parties and other parties in interests shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan and the Plan Documents. This Section 10.4 shall be included in the Confirmation Order.

### 10.5      *Plan Injunction*.

(a)      Except as otherwise provided in this Plan or in the Confirmation Order, as of the entry of the Confirmation Order but subject to the occurrence of the Effective Date, all Persons who have held, hold or may hold Claims against or Interests in the Debtors are, with respect to any such Claim or Interest, permanently enjoined after the entry of the Confirmation Order from: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting, directly or indirectly, a Debtor or an Estate or the property of any of the foregoing, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this clause (i) or any property of any such transferee or successor; (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting or otherwise recovering in any manner or by any means, whether directly or indirectly, any judgment, award, decree or order against a Debtor or an Estate or its property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this clause (a) or any property of any such transferee or successor; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against a Debtor or an Estate or any of its property, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons mentioned in this clause (iii) or any property of any such transferee or successor; (iv) acting or proceeding in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of this Plan; and (v) commencing or continuing, in any manner or in any place, any action that does not comply, or is inconsistent, with the provisions of this Plan; *provided, however*, that nothing contained herein shall preclude such Persons who have held, hold or may hold Claims against or Interests in a Debtor or an Estate from exercising their rights, or obtaining benefits, pursuant to, and consistent with, the terms of this Plan and the Plan Documents.

(b)      All Persons, including all governmental, tax and regulatory authorities, lenders, trade creditors, dealers, customers, employees, litigation claimants and other creditors holding Claims, Liens, Interests, charges, encumbrances and other interests of any kind or nature whatsoever, including rights or Claims based on any successor or transferee liability, against or in a Debtor, the NewCo Transferred Assets, the MDT Transferred Assets or the PAT Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or noncontingent, known or unknown), arising under or out of, in connection with, or in any way relating to the Debtors, the NewCo Transferred Assets, the MDT Transferred Assets, the PAT Assets, the operation of the NewCo Transferred Assets prior to the Effective

Date or the Restructuring Transactions are forever barred, estopped and permanently enjoined from asserting against the Released Parties, their respective successors and assigns, their property, the NewCo Transferred Assets, the MDT Transferred Assets or the PAT Assets, any Released Claim or any other Cause of Action the assertion of which does not comply with or is inconsistent with the provisions of this Plan, including, without limitation, by: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting, directly or indirectly, a Released Party, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this clause (i) or any property of any such transferee or successor; (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting or otherwise recovering in any manner or by any means, whether directly or indirectly, any judgment, award, decree or order against a Released Party, or any direct or indirect transferee of any property of, or direct or indirect successor-in-interest to, any of the foregoing Persons mentioned in this clause (ii) or any property of any such transferee or successor; (iii) creating, perfecting or otherwise enforcing any encumbrance of any kind or asserting any Released Claims in any manner, directly or indirectly, against a Released Party or any of its property, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons mentioned in this clause (iii) or any property of any such transferee or successor; (iv) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of this Plan; and (v) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of this Plan.

10.6    *Releases*.

(a)    Releases by Debtors.

**As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties before and during the Chapter 11 Cases to facilitate the reorganization of the Debtors and the implementation of the Restructuring Transactions, and except as otherwise explicitly provided in the Plan or in the Confirmation Order, the Released Parties shall be conclusively, absolutely, unconditionally, irrevocably, fully, finally, forever and permanently released by the Debtors and their Estates from any and all Causes of Action, including any derivative claims asserted or assertible by or on behalf of any Debtor or any of their Estates and including any claims that any Debtor or any of their Estates, or that any other Person or party claiming under or through any Debtor or any of their Estates, would have presently or in the future been legally entitled to assert in its own right (whether individually or collectively) or on behalf of any Debtor or any of their Estates or any other Person, notwithstanding section 1542 of the California Civil Code or any law of any jurisdiction that is similar, comparable or equivalent thereto (which shall conclusively be deemed waived), whether existing or hereinafter arising, in each case, based on or relating to, or in any manner arising from, in whole or in part, (i) the Debtors, as such Entities existed prior to or after the Petition Date (including the Debtors' Opioid-Related Activities, manufacture, marketing and sale of Products, interaction with regulators concerning Opioid-Related Activities or Products, and involvement in the subject matter of the Pending Opioid Actions, and the past, present or future use or misuse of any opioid by a Releasing Party), (ii) the Estates or (iii) the Chapter 11 Cases. The Debtors, the Plan Administration Trust, the Master Disbursement Trust, the Creditor Trusts, NewCo, the Foundation and any other newly-formed Persons that shall be continuing the Debtors' businesses after the Effective Date shall be bound, to the same extent the Debtors are bound, by the Releases set forth in this <u>Section 10.6(a)</u>.**

**Notwithstanding anything herein to the contrary, (x) nothing in the Plan shall release any Excluded Claim and (y) nothing in this <u>Section 10.6(a)</u> shall (A) release any contractual**

Estate Cause of Action or any Estate Cause of Action that is commercial in nature and, in each case, unrelated to either the Chapter 11 Cases or the subject matter of the Pending Opioid Actions; *provided* that, with respect to the Settling Co-Defendants, only Estate Surviving Pre-Effective Date Claims shall be retained and not released, (B) release any Estate Cause of Action against a Holder of a Claim against a Debtor, to the extent such Estate Cause of Action is necessary for the administration and resolution of such Claim solely in accordance with the Plan, *provided*, *however*, that the foregoing shall not apply to any Holder of a Co-Defendant Claim solely with respect to such Co-Defendant Claim, (C) be construed to impair in any way the Effective Date or post-Effective Date rights and obligations of any Person under the Plan, the Plan Documents, the Confirmation Order or the Restructuring Transactions, including the Shareholder Settlement Agreements, or (D) release any Claim or right to disgorge, recoup or recover compensation under the orders authorizing the Key Employee Plans or the orders with respect to the *Motion of Debtors for Entry of an Order Authorizing (I) Debtors to (A) Pay Pre-Petition Wages, Salaries, Employee Benefits and Other Compensation and (B) Maintain Employee Benefits Programs and Pay Related Administrative Obligations, (II) Employees and Retirees to Proceed with Outstanding Workers' Compensation Claims and (III) Financial Institutions to Honor and Process Related Checks and Transfers* [D.I. 6].

(b)    Releases by Releasing Parties.

**As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties before and during the Chapter 11 Cases to facilitate the reorganization of the Debtors and the implementation of the Restructuring Transactions, and except as otherwise explicitly provided in the Plan or in the Confirmation Order, the Released Parties shall be conclusively, absolutely, unconditionally, irrevocably, fully, finally, forever and permanently released by the Releasing Parties from any and all Causes of Action, including, without limitation, any Estate Cause of Action and any claims that any Releasing Party, or that any other Person or party claiming under or through any Releasing Party, would have presently or in the future been legally entitled to assert in its own right (whether individually or collectively) or on behalf of any Releasing Party or any other Person, notwithstanding section 1542 of the California Civil Code or any law of any jurisdiction that is similar, comparable or equivalent thereto (which shall conclusively be deemed waived), whether existing or hereinafter arising, in each case, (A) directly or indirectly based on, arising out of, or in any way relating to or concerning, in whole or in part, (i) the Debtors, as such Entities existed prior to or after the Petition Date, and their Affiliates, (ii) the Estates, (iii) the Chapter 11 Cases, or (iv) Covered Conduct and (B) as to which any conduct, omission or liability of any Debtor or any Estate is the legal cause or is otherwise a legally relevant factor.**

**Without limiting the foregoing: (A) the foregoing releases include any Cause of Action of a Releasing Party that has been or may be asserted against any Released Party, by such Releasing Party (whether or not such party has brought such action or proceeding) in any federal, state, or local action or proceeding (whether judicial, arbitral, or administrative) (x) directly or indirectly based on, arising out of, or in any way relating to or concerning, in whole or in part, (I) the Debtors, as such Entities existed prior to or after the Petition Date, and their Affiliates, (II) the Estates, (III) the Chapter 11 Cases, or (IV) Covered Conduct and (y) as to which any conduct, omission or liability of any Debtor or any Estate is the legal cause or is otherwise a legally relevant factor; and (B) the parties intend that these releases (including the term "Released Claims") be broad and interpreted so as to give the Released Parties the broadest possible release of any liability relating in any way to the Released Claims.**

**For the avoidance of doubt and notwithstanding anything to the contrary in this Plan or the Confirmation Order, the releases set forth in this Section 10.6(b), and all references**

to "Releasing Parties" as used herein, shall not apply to (i) Holders of Claims who do not opt-in to the releases through their applicable ballots (other than the Supporting Claimants), (ii) Holders of Claims whose releases will be governed solely and exclusively by a Direct Claims Shareholder Settlement Agreement and (iii) Holders of Non-Federal Domestic Governmental Claims, whose releases shall be governed solely and exclusively by the Governmental Entity Shareholder Direct Settlement Agreement.[17] For the avoidance of doubt and notwithstanding anything to the contrary in this Plan, none of the releases, injunctions, or other terms contained in the Plan or the Confirmation Order shall expand, limit, alter, or otherwise affect any releases, waivers, or disclaimers of liability or other terms contained in any of the Direct Claims Shareholder Settlement Agreements.

To the extent that, on or after the Effective Date, any Releasing Party negotiates and enters into a Non-Party Settlement, including in any bankruptcy case or through any plan of reorganization (whether individually or as a class of creditors), the Releasing Party will include (or in the case of a Non-Party Settlement that is part of a Chapter 11 Plan, will take reasonable best efforts to cause the debtor to include), unless prohibited from doing so under applicable law, in the Non-Party Settlement a prohibition on contribution or indemnity of any kind against the Released Parties substantially equivalent to that required from the Shareholder Released Parties in Section 10.7(b)(ii)(A) of the Plan, or a release from such Non-Released Party in favor of the Released Parties (in a form equivalent to this Section 10.6(b)) of any Claim-Over. Each Releasing Party acknowledges and agrees that it shall take reasonable steps to enforce such agreement related to indemnification and contribution, and any other agreement related to indemnification and contribution from a prior opioid settlement, in each case as applicable, for the benefit of the and the Released Parties.

Notwithstanding anything herein to the contrary, (x) nothing in the Plan shall release any Excluded Claim; (y) Co-Defendants (including, for the avoidance of doubt, Settling Co-Defendants) shall not be Released Parties or Releasing Parties for purposes of this Section 10.6(b); and (z) nothing in this Section 10.6(b) shall (A) release any Non-Opioid Excluded Claims, (B) release any Estate Cause of Action against a Holder of a Claim against a Debtor, to the extent such Estate Cause of Action is necessary for the administration and resolution of such Claim solely in accordance with the Plan, *provided*, *however*, that the foregoing shall not apply to any Holder of a Co-Defendant Claim solely with respect to such Co-Defendant Claim, or (C) be construed to impair in any way the Effective Date or post-Effective Date rights and obligations of any Person under the Plan, the Plan Documents, the Confirmation Order or the Restructuring Transactions, including the Shareholder Settlement Agreements.

Notwithstanding anything herein to the contrary, but subject to the MDT Insurer Injunction and the Settling MDT Insurer Injunction, the Debtors shall not be released from liability for any Claim (other than any Co-Defendant Claim) that is or may be covered by any Purdue Insurance Policy; *provided* that recovery for any such Claim, including by way of settlement or judgment, shall be limited to the available proceeds of such Purdue Insurance Policy (and any extra-contractual liability of the Insurance Companies with respect to the Purdue Insurance Policies), and no Person or party shall execute, garnish or otherwise attempt to collect any such recovery from any

---

[17] The Direct Claims Shareholder Settlement Agreements, including the Governmental Entity Shareholder Direct Settlement Agreement, remain subject to ongoing negotiations. The releases in the Direct Claims Shareholder Settlement Agreements, including the Governmental Entity Shareholder Direct Settlement Agreement, may differ from those provided for in this Section 10.6(b). The rights of all parties to the Direct Claims Shareholder Settlement Agreements, including the Governmental Entity Shareholder Direct Settlement Agreement, are fully reserved.

assets other than the available proceeds of the Purdue Insurance Policies. The Debtors shall be released automatically from a Claim described in this paragraph upon the earlier of (x) the abandonment of such Claim and (y) such a release being given as part of a settlement or resolution of such Claim, and shall be released automatically from all Claims described in this paragraph upon the exhaustion of the available proceeds of the Purdue Insurance Policies (notwithstanding the nonoccurrence of either event described in the foregoing clauses (x) and (y)).

(c)    Releases by Debtors of Holders of Claims.

As of the Effective Date, all Holders of Channeled Claims (excluding, in all respects, any Excluded Party, Shareholder Release Snapback Party or MDT Insurer) are hereby released by the Debtors and their Estates from any and all Causes of Action for any Claim in connection with, or arising out of, (i) the administration of the Chapter 11 Cases; the negotiation and pursuit of the Restructuring Transactions, the Plan, the Master Disbursement Trust, the Creditor Trusts (including the trust distribution procedures and the other Creditor Trust Documents) and the solicitation of votes with respect to, and confirmation of, the Plan; the funding of the Plan; the occurrence of the Effective Date; the administration of the Plan and the property to be distributed under the Plan; and the wind-up and dissolution of the Liquidating Debtors and the transactions in furtherance of any of the foregoing or (ii) such Holder's participation in the Pending Opioid Actions. The Debtors, the Plan Administration Trust, the Master Disbursement Trust, the Creditor Trusts, NewCo, the Foundation and any other newly-formed Persons that shall be continuing the Debtors' businesses after the Effective Date shall be bound, to the same extent the Debtors are bound, by the Releases set forth in this Section 10.6(c).

As of the Effective Date, all Holders of PI Channeled Claims (excluding, in all respects, any Excluded Party, Shareholder Release Snapback Party or MDT Insurer) are hereby released by the Debtors and their Estates from any and all Causes of Action for any Claim in connection with, or arising out of, (i) the Debtors, as such Entities existed prior to or after the Petition Date (including the Debtors' Opioid-Related Activities, manufacture, marketing and sale of Products, interaction with regulators concerning Opioid-Related Activities or Products, and involvement in the subject matter of the Pending Opioid Actions, and the past, present or future use or misuse of any opioid by a Releasing Party), (ii) the Estates or (iii) the Chapter 11 Cases, including, in each case, without limitation, any act, conduct, omission, event, transaction, occurrence, injury, damage, or continuing condition in any way relating to the foregoing.

Notwithstanding anything herein to the contrary, (x) nothing in the Plan shall release any Excluded Claim and (y) nothing in this Section 10.6(c) shall (A) release any contractual Estate Cause of Action or any Estate Cause of Action that is commercial in nature and, in each case, unrelated to either the Chapter 11 Cases or the subject matter of the Pending Opioid Actions, provided that, with respect to the Settling Co-Defendants, only Estate Surviving Pre-Effective Date Claims shall be retained and not released, (B) release any Estate Cause of Action against a Holder of a Claim against a Debtor, to the extent such Estate Cause of Action is necessary for the administration and resolution of such Claim solely in accordance with the Plan, provided, however, that the foregoing shall not apply to any Holder of a Co-Defendant Claim solely with respect to such Co-Defendant Claim, (C) release any claim or right arising in the ordinary course of the Debtors' or NewCo's business, including, without limitation, any such claim with respect to taxes or (D) be construed to impair in any way the Effective Date or post-Effective Date rights and obligations of any Person under the Plan, the Plan Documents, the Confirmation Order or the Restructuring Transactions, including the Shareholder Settlement Agreements.

10.7    *__Shareholder Releases__*.

(a)    Releases by Debtors.

(i) As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, and except as otherwise explicitly provided in the Plan or in the Confirmation Order, the Shareholder Released Parties shall be conclusively, absolutely, unconditionally, irrevocably, fully, finally, forever and permanently released, subject to clause (z) of the last paragraph of this __Section 10.7(a)__, by the Debtors and their Estates from any and all Causes of Action, including any Estate Causes of Action asserted or assertible by or on behalf of any Debtor or any of their Estates and including any claims that any Debtor or any of their Estates, or that any other Person or party claiming under or through any Debtor or any of their Estates, would have presently or in the future been legally entitled to assert in its own right (whether individually or collectively) or on behalf of any Debtor or any of their Estates or any other Person, notwithstanding section 1542 of the California Civil Code or any law of any jurisdiction that is similar, comparable or equivalent thereto (which shall conclusively be deemed waived), whether existing or hereinafter arising, in each case, based on or relating to, or in any manner arising from, in whole or in part, (i) the Debtors, as such Entities existed prior to or after the Petition Date (including the Debtors' Opioid-Related Activities, manufacture, marketing and sale of Products, interaction with regulators concerning Opioid-Related Activities or Products, and involvement in the subject matter of the Pending Opioid Actions, and the past, present or future use or misuse of any opioid by a Releasing Party), (ii) the Estates or (iii) the Chapter 11 Cases. The Debtors, the Plan Administration Trust, the Master Disbursement Trust, the Creditor Trusts, NewCo, the Foundation and any other newly-formed Persons that shall be continuing the Debtors' businesses after the Effective Date shall be bound, to the same extent the Debtors are bound, by the Shareholder Releases set forth in this __Section 10.7(a)__.

(ii) To the extent that, on or after the Effective Date, any Debtor Party negotiates and enters into a Non-Party Settlement, including in any bankruptcy case or through any plan of reorganization (whether individually or as a class of creditors), the Debtor Party will include (or in the case of a Non-Party Settlement that is part of a Chapter 11 Plan, will take reasonable best efforts to cause the debtor to include), unless prohibited from doing so under applicable law, in the Non-Party Settlement a prohibition on contribution or indemnity of any kind against the Shareholder Released Parties substantially equivalent to that required from the Shareholder Released Parties in __Section 10.7(b)(ii)(A)__ of the Plan, or a release from such Non-Released Party in favor of the Shareholder Released Parties (in a form equivalent to this Section 10.7(b)) of any Claim-Over. Each Debtor Party acknowledges and agrees that it shall take reasonable steps to enforce such agreement related to indemnification and contribution, and any other agreement related to indemnification and contribution from a prior opioid settlement, in each case as applicable, for the benefit of the Shareholder Released Parties.

(iii) In the event that (x) any Debtor Party, after the Effective Date, either (i) obtains a judgment with respect to Non-Party Covered Conduct against a Non-Released Party that does not contain a prohibition like that described in __Section 10.7(a)(ii)__; (ii) files a Non-Party Covered Conduct Claim against a Non-Released Party in bankruptcy and such Debtor Party does not use reasonable best efforts to obtain a prohibition/release like that described in __Section 10.7(a)(ii)__; or (iii) enters into a Non-Party Settlement without a prohibition/release like that described in __Section 10.7(a)(ii)__, and (y) such Non-Released Party asserts a Claim-Over against a Shareholder Released Party, the Shareholder Released Party shall be relieved of the prohibition in __Section 10.7(b)(ii)(B)__ with respect to that Non-Released Party and that Debtor Party and the Sackler Parties' Representative shall take the following actions to ensure that the Shareholder Released Parties do

**not pay more with respect to Covered Conduct than the amounts owed under the Plan and the Master Shareholder Settlement Agreement by Shareholder Payment Groups:**

**(I) The Sackler Parties' Representative shall notify that Debtor Party of the Claim-Over within sixty (60) calendar days of when it becomes aware of the assertion of the Claim-Over or sixty (60) calendar days of the Effective Date, whichever is later;**

**(II) The Sackler Parties' Representative and that Debtor Party shall meet and confer concerning the means to hold Shareholder Released Parties harmless and ensure that they are not required to pay more with respect to Covered Conduct than the amounts owed by the Shareholder Payment Groups under Plan and the Master Shareholder Settlement Agreement;**

**(III)       That Debtor Party and the Sackler Parties' Representative shall take steps sufficient and permissible under the law of the state of the Debtor Party to hold Shareholder Released Parties harmless from the Claim-Over and ensure Shareholder Released Parties are not required to pay more with respect to Covered Conduct than the amounts owed by the Shareholder Payment Groups under Plan and the Master Shareholder Settlement Agreement. Such steps may include, where permissible:**

**(1)       Filing of motions to dismiss or such other appropriate motion by the Sackler Parties' Representative or Shareholder Released Parties and supported by that Releasing Party, in response to any claim filed in litigation or arbitration;**

**(2)       Reduction of that Debtor Party's Claim and any judgment it has obtained or may obtain against such Non-Released Party by whatever amount or percentage is necessary to extinguish such Claim-Over under applicable law, up to the amount that Debtor Party has obtained, may obtain, or has authority to control from such Non-Released Party;**

**(3)       Placement into escrow of funds paid by the Non-Released Parties such that those funds are available to satisfy the Claim-Over;**

(4)      **Payment of monies to Shareholder Released Parties by that Debtor Party to ensure they are held harmless from such Claim-Over, up to the amount that Releasing Party has obtained, may obtain, or has authority to control from such Non-Released Party;**

(5)      **Credits to Shareholder Payment Groups under this Plan and the Master Shareholder Settlement Agreement to reduce the overall amounts to be paid under Plan and the Master Shareholder Settlement Agreement such that they are held harmless from the Claim-Over; and**

(6)      **Such other actions as that Debtor Party and Shareholder Payment Parties, the Sackler Parties' Representative may devise to hold Shareholder Released Parties harmless from the Claim-Over.**

(IV)      **To the extent the preconditions for this Section 10.7(b)(ii)(C) to apply are satisfied, the actions taken pursuant to paragraph (III) must, in combination, ensure that Shareholder Payment Groups are not required to pay more with respect to Covered Conduct than the amounts owed by them to such Debtor Party under the Plan and the Master Shareholder Settlement Agreement.**

**(iv) Each Debtor and each Estate will not transfer any Cause of Action and no Person shall prosecute any such Cause of Action on any Debtor's or Estate's behalf, in each case unless such transferee or Person has agreed to comply with Sections 10.7(a)(ii) and (iii) of the Plan.**

**(v) Notwithstanding anything herein to the contrary, (x) nothing in the Plan shall release any Excluded Claim; (y) nothing in this Section 10.7(a) shall be construed to impair in any way the Effective Date or post-Effective Date rights and obligations of any Person under the Plan, the Plan Documents, the Confirmation Order or the Restructuring Transactions, including the Shareholder Settlement Agreements and the Separation Agreements; and (z) upon the filing of a Notice of Shareholder Release Snapback, (1) the Shareholder Releases set forth in this Section 10.7(a) shall be entirely null and void, revoked and invalidated, as of the Effective Date, with respect to all members of the Breaching Shareholder Family Group and the Designated Shareholder Released Parties, (2) the _status quo ante_ shall be restored in all respects for the Debtors and the Master Disbursement Trust with respect to the members of the Breaching Shareholder Family Group and the Designated Shareholder Released Parties, and (3) the Master Disbursement Trust shall be deemed to have received and accepted all of the rights with respect to any member of the Breaching Shareholder Family Group and the Designated Shareholder Released Parties, in each case, that the Debtors and their Estates had prior to the Effective Date and that the Master Disbursement Trust would have pursuant to the transfer of the MDT Shareholder Rights to the Master Disbursement Trust if the Shareholder Releases of this Section 10.7(a) had never been granted, which rights the**

Debtors and their Estates shall be deemed to have irrevocably transferred, granted and assigned to the Master Disbursement Trust; *provided* that, for the avoidance of doubt, notwithstanding the nullification, voiding, revocation and invalidation pursuant to the foregoing clause (1), the Shareholder Releases shall continue in effect for, and shall be fully enforceable by and for the benefit of, all other Shareholder Released Parties other than the Breaching Shareholder Family Group and the Designated Shareholder Released Parties.

(b)    Releases by Releasing Parties.

(i) As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, and except as otherwise explicitly provided in the Plan or in the Confirmation Order, the Shareholder Released Parties shall be conclusively, absolutely, unconditionally, irrevocably, fully, finally, forever and permanently released, subject to clause (y) of the last paragraph of this Section 10.7(b) of the Plan, by the Releasing Parties from any and all Causes of Action, including, without limitation, any Estate Cause of Action and any claims that any Releasing Party, or that any other Person or party claiming under or through any Releasing Party, would have presently or in the future been legally entitled to assert in its own right (whether individually or collectively) or on behalf of any Releasing Party or any other Person, notwithstanding section 1542 of the California Civil Code or any law of any jurisdiction that is similar, comparable or equivalent thereto (which shall conclusively be deemed waived), whether existing or hereinafter arising, in each case, (A) directly or indirectly based on, arising out of, or in any way relating to or concerning, in whole or in part, (i) the Debtors, as such Entities existed prior to or after the Petition Date, and their Affiliates, (ii) the Estates, (iii) the Chapter 11 Cases, or (iv) Covered Conduct and (B) as to which any conduct, omission or liability of any Debtor or any Estate is the legal cause or is otherwise a legally relevant factor.

Without limiting the foregoing: (A) the foregoing releases include any Cause of Action of a Releasing Party that has been or may be asserted against any Shareholder Released Party, by such Releasing Party (whether or not such party has brought such action or proceeding) in any federal, state, or local action or proceeding (whether judicial, arbitral, or administrative) (x) directly or indirectly based on, arising out of, or in any way relating to or concerning, in whole or in part, (I) the Debtors, as such Entities existed prior to or after the Petition Date, and their Affiliates, (II) the Estates, (III) the Chapter 11 Cases, or (IV) Covered Conduct and (y) as to which any conduct, omission or liability of any Debtor or any Estate is the legal cause or is otherwise a legally relevant factor; and (B) the parties intend that these releases (including the term "Shareholder Released Claims") be broad and interpreted so as to give the Shareholder Released Parties the broadest possible release of any liability relating in any way to the Shareholder Released Claims.

For the avoidance of doubt and notwithstanding anything to the contrary in this Plan or the Confirmation Order, the releases set forth in this <u>Section 10.7(b)</u>, and all references to "Releasing Parties" as used herein, shall not apply to (i) Holders of Claims who do not opt-in to the releases through their applicable ballots (other than the Supporting Claimants and Settling Co-Defendants), (ii) Holders of Claims whose releases will be governed solely and exclusively by a Direct Claims Shareholder Settlement Agreement and (iii) Holders of Non-Federal Domestic Governmental Claims, whose releases shall be governed solely and exclusively by the Governmental Entity Shareholder Direct Settlement Agreement.[18] For the avoidance of doubt and notwithstanding anything to the contrary in this Plan, none of the releases, injunctions, or other terms contained in the Plan or the Confirmation Order shall expand, limit, alter, or otherwise affect any releases, waivers, or disclaimers of liability or other terms contained in any of the Direct Claims Shareholder Settlement Agreements.

(ii) (A) No Shareholder Released Party shall seek to recover for amounts paid under Master Shareholder Settlement Agreement and the Plan based on indemnification, contribution, or any other theory from a manufacturer, pharmacy, hospital, pharmacy benefit manager, health insurer, third-party vendor, trade association, distributor, health care practitioner; *provided* that a Shareholder Released Party shall be relieved of this prohibition with respect to any entity that asserts a Claim-Over against it.

(B) To the extent that, on or after the Effective Date, any Releasing Party negotiates and enters into a Non-Party Settlement, including in any bankruptcy case or through any plan of reorganization (whether individually or as a class of creditors), the Releasing Party will include (or in the case of a Non-Party Settlement that is part of a Chapter 11 Plan, will take reasonable best efforts to cause the debtor to include), unless prohibited from doing so under applicable law, in the Non-Party Settlement a prohibition on contribution or indemnity of any kind against the Shareholder Released Parties substantially equivalent to that required from the Shareholder Released Parties in <u>Section 10.7(b)(ii)(A)</u> of the Plan, or a release from such Non-Released Party in favor of the Shareholder Released Parties (in a form equivalent to this Section 10.7(b)) of any Claim-Over. Each Releasing Party acknowledges and agrees that it shall take reasonable steps to enforce such agreement related to indemnification and contribution, and any other agreement related to indemnification and contribution from a prior opioid settlement, in each case as applicable, for the benefit of the Shareholder Released Parties. For the avoidance of doubt, Settling Co-Defendants shall not be Releasing Parties for purposes of <u>Section 10.7(b)(ii)</u>.

(C) In the event that (x) any Releasing Party, after the Effective Date, either (i) obtains a judgment with respect to Non-Party Covered Conduct against a Non-Released Party that does not contain a prohibition like that described in <u>Section 10.7(b)(ii)(B)</u>; (ii) files a Non-Party Covered Conduct Claim against a Non-Released Party in bankruptcy and such Releasing Party does not use reasonable best efforts to obtain a prohibition/release like that described in Section 10.7(b)(ii)(B); or (iii) enters into a Non-Party Settlement without a prohibition/release like that described in <u>Section 10.7(b)(ii)(B)</u>, and (y) such Non-Released Party asserts a Claim-Over against a Shareholder Released Party, the Shareholder Released Party shall be relieved of the prohibition in <u>Section 10.7(b)(ii)(A)</u> with respect to that Non-Released Party and that Releasing Party and the

---

[18] The Direct Claims Shareholder Settlement Agreements, including the Governmental Entity Shareholder Direct Settlement Agreement, remain subject to ongoing negotiations. The releases in the Direct Claims Shareholder Settlement Agreements, including the Governmental Entity Shareholder Direct Settlement Agreement, may differ from those provided for in this Section 10.7. The rights of all parties to the Direct Claims Shareholder Settlement Agreements, including the Governmental Entity Shareholder Direct Settlement Agreement, are fully reserved.

Sackler Parties' Representative shall take the following actions to ensure that the Shareholder Released Parties do not pay more with respect to Covered Conduct than the amounts owed under the Plan and the Master Shareholder Settlement Agreement by Shareholder Payment Groups:

(I) The Sackler Parties' Representative shall notify that Releasing Party of the Claim-Over within sixty (60) calendar days of when it becomes aware of the assertion of the Claim-Over or sixty (60) calendar days of the Effective Date, whichever is later;

(II) The Sackler Parties' Representative and that Releasing Party shall meet and confer concerning the means to hold Shareholder Released Parties harmless and ensure that they are not required to pay more with respect to Covered Conduct than the amounts owed by the Shareholder Payment Groups under Plan and the Master Shareholder Settlement Agreement;

(III) That Releasing Party and the Sackler Parties' Representative shall take steps sufficient and permissible under the law of the state of the Releasing Party to hold Shareholder Released Parties harmless from the Claim-Over and ensure Shareholder Released Parties are not required to pay more with respect to Covered Conduct than the amounts owed by the Shareholder Payment Groups under Plan and the Master Shareholder Settlement Agreement. Such steps may include, where permissible:

(1) Filing of motions to dismiss or such other appropriate motion by the Sackler Parties' Representative or Shareholder Released Parties and supported by that Releasing Party, in response to any claim filed in litigation or arbitration;

(2) Reduction of that Releasing Party's Claim and any judgment it has obtained or may obtain against such Non-Released Party by whatever amount or percentage is necessary to extinguish such Claim-Over under applicable law, up to the amount that Releasing Party has obtained, may obtain, or has authority to control from such Non-Released Party;

(3) Placement into escrow of funds paid by the Non-Released Parties such that those funds are available to satisfy the Claim-Over;

(4)    **Payment of monies to Shareholder Released Parties by that Releasing Party to ensure they are held harmless from such Claim-Over, up to the amount that Releasing Party has obtained, may obtain, or has authority to control from such Non-Released Party;**

(5)    **Credits to Shareholder Payment Groups under this Plan and the Master Shareholder Settlement Agreement to reduce the overall amounts to be paid under Plan and the Master Shareholder Settlement Agreement such that they are held harmless from the Claim-Over; and**

(6)    **Such other actions as that Releasing Party and Shareholder Payment Parties, the Sackler Parties' Representative may devise to hold Shareholder Released Parties harmless from the Claim-Over.**

(IV)    **To the extent the preconditions for this Section 10.7(b)(ii)(C) to apply are satisfied, the actions taken pursuant to paragraph (III) must, in combination, ensure that Shareholder Payment Groups are not required to pay more with respect to Covered Conduct than the amounts owed by them to such Releasing Party under the Plan and the Master Shareholder Settlement Agreement.**

(D)    **To the extent that the Claim-Over is based on a contractual indemnity, the obligations under <u>Section 10.7(b)(ii)(C)</u> shall extend solely to a Non-Party Covered Conduct Claim against a clinic, hospital or other purchaser, distributor or dispenser of Products, a manufacturer that sold Products, a consultant, and/or a pharmacy benefit manager or other third-party payor. The Sackler Parties' Representative shall notify the Settling States, to the extent permitted by applicable law, in the event that any of these types of Non- Released Party asserts a Claim-Over arising out of contractual indemnity against it.**

**(iii)** Notwithstanding anything herein to the contrary, **(x)** nothing in this **Section 10.7(b)** shall **(A)** release any Excluded Claims or **(B)** be construed to impair in any way the rights and obligations of any Person under the Plan, the Plan Documents, the Confirmation Order or the Restructuring Transactions, including the Shareholder Settlement Agreements and **(y)** upon the filing of a Notice of Shareholder Release Snapback, **(A)** the Shareholder Releases set forth in this **Section 10.7(b)** shall be entirely null and void, revoked and invalidated, as of the Effective Date, with respect to all members of the Breaching Shareholder Family Group and the Designated Shareholder Released Parties and **(B)** the status quo ante shall be restored in all respects for the Releasing Parties with respect to the members of the Breaching Shareholder Family Group and the Designated Shareholder Released Parties; provided that, for the avoidance of doubt, notwithstanding the nullification, voiding, revocation and invalidation pursuant to the foregoing clause **(A)**, the Shareholder Releases shall continue in effect for, and shall be fully enforceable by and for the benefit of, all other Shareholder Released Parties other than the Breaching Shareholder Family Group and the Designated Shareholder Released Parties.

(c)    Releases by Shareholder Released Parties.

As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, and except as otherwise explicitly provided in the Plan or in the Confirmation Order, the Reciprocal Releasees shall be conclusively, absolutely, unconditionally, irrevocably, fully, finally, forever and permanently released, subject to clause **(z)** of the last paragraph of this **Section 10.7(c)**, by the Shareholder Released Parties from any and all Causes of Action, including any derivative claims asserted or assertible by or on behalf of the Debtors or their Estates and including any claims that any Shareholder Released Party, or that any other Person or party claiming under or through any Shareholder Released Party, would have presently or in the future been legally entitled to assert in its own right (whether individually or collectively) or on behalf of any Shareholder Released Party or any other Person, notwithstanding section 1542 of the California Civil Code or any law of any jurisdiction that is similar, comparable or equivalent thereto (which shall conclusively be deemed waived), whether existing or hereinafter arising, in each case, based on or relating to, or in any manner arising from, in whole or in part, **(i)** the Debtors, as such Entities existed prior to or after the Petition Date (including the Debtors' Opioid-Related Activities, manufacture, marketing and sale of Products, interaction with regulators concerning Opioid-Related Activities or Products, and involvement in the subject matter of the Pending Opioid Actions, and the past, present or future use or misuse of any opioid by a Releasing Party), **(ii)** the Estates or **(iii)** the Chapter 11 Cases.

Notwithstanding anything herein to the contrary, **(x)** nothing in the Plan shall release any Excluded Claim; **(y)** nothing in this **Section 10.7(c)** shall be construed to impair in any way the Effective Date or post-Effective Date rights and obligations of any Person under the Plan, the Plan Documents, the Confirmation Order or the Restructuring Transactions, including the Shareholder Settlement Agreements, and the Separation Agreement, and including the rights of any Shareholder Released Party that is a current or former director, officer or employee of the Debtors but is not a Sackler Family Member relating to plan treatment of any Claims held by such party; and **(z)** upon the filing of a Notice of Shareholder Release Snapback and the commencement or continuation of any action or proceeding against a member of a Breaching Shareholder Family Group or a Designated Shareholder Released Party by any Reciprocal Releasee, **(A)** the releases set forth in this **Section 10.7(c)** of any Reciprocal Releasee that has commenced or continued any such action shall be entirely null and void, revoked and invalidated, as of the Effective Date, with respect to the members of the Breaching Shareholder Family Group and the Designated Shareholder Released Parties and **(B)** the *status quo ante* shall be restored in all respects for the members of the Breaching Shareholder Family Group and the Designated Shareholder Released Parties with respect to any Reciprocal Releasee that has commenced or continued any such litigation; *provided* that, for

the avoidance of doubt, notwithstanding the nullification, voiding, revocation and invalidation pursuant to the foregoing clause (A), the releases set forth in this Section 10.7(c) shall continue in effect for, and shall be fully enforceable by and for the benefit of, all other Reciprocal Releasees, and shall be binding on, and enforceable against, all other Shareholder Released Parties, including any members of the Breaching Shareholder Family Group with respect to any Reciprocal Releasee that has not commenced any such litigation.

(d)    **Specified Settling Co-Defendant Claim-Over.**

(i)    (A) To the extent that, on or after the Effective Date, any Specified Settling Co-Defendant, in its capacity as a plaintiff, negotiates and enters into a Non-Party Settlement, including in any bankruptcy case or through any plan of reorganization (whether individually or as a class of creditors), the Specified Settling Co-Defendant will include (or in the case of a Non-Party Settlement that is part of a Chapter 11 Plan, will take reasonable best efforts to cause the debtor to include), unless prohibited from doing so under applicable law, in the Non-Party Settlement a prohibition on contribution or indemnity of any kind against the Shareholder Released Parties substantially equivalent to that required from the Shareholder Released Parties in Section 10.7(b)(ii)(A) of the Plan, or a release from such Non-Released Party in favor of the Shareholder Released Parties (in a form equivalent to Section 10.7(b)) of any Claim-Over.  For the avoidance of doubt, the foregoing obligations apply only where such Non-Party Settlement entails the payment of money to such Specified Settling Co-Defendant, and not where such Non-Party Settlement only entails release or withdrawal of claims without monetary consideration.

(B) In the event that (x) any Specified Settling Co-Defendant, in its capacity as a plaintiff, after the Effective Date, either (i) obtains a judgment with respect to Non-Party Covered Conduct against a Non-Released Party that does not contain a prohibition like that described in Section 10.7(d)(i)(A); (ii) files a Non-Party Covered Conduct Claim against a Non-Released Party in bankruptcy and such Specified Settling Co-Defendant does not use reasonable best efforts to obtain a prohibition/release like that described in Section 10.7(d)(i)(A); or (iii) enters into a Non-Party Settlement without a prohibition/release like that described in Section 10.7(d)(i)(A), and (y) such Non-Released Party asserts a Claim-Over against a Shareholder Released Party, that Specified Settling Co-Defendant and the Sackler Parties' Representative shall take the following actions to ensure such Shareholder Released Party is not required to pay any amounts on account of such Claim-Over:

(I) The Sackler Parties' Representative shall notify that Specified Settling Co-Defendant of the Claim-Over within sixty (60) calendar days of when it becomes

aware of the assertion of the Claim-Over or sixty (60) calendar days of the Effective Date, whichever is later;

(II) The Sackler Parties' Representative and that Specified Settling Co-Defendant shall meet and confer concerning the means to hold such Shareholder Released Party harmless and ensure that it is not required to pay any amounts on account of such Claim-Over;

(III) That Specified Settling Co-Defendant and the Sackler Parties' Representative shall take steps sufficient and permissible under the law of the state of the Specified Settling Co-Defendant to hold Shareholder Released Parties harmless from the Claim-Over and ensure such Shareholder Released Party is not required to pay any amounts on account of such Claim-Over. Such steps may include, where permissible:

(1)    Filing of motions to dismiss or such other appropriate motion by the Sackler Parties' Representative or Shareholder Released Parties and supported by that Specified Settling Co-Defendant, in response to any claim filed in litigation or arbitration;

(2)    Reduction of that Specified Settling Co-Defendant's Claim and any judgment it has obtained or may obtain against such Non-Released Party by whatever amount or percentage is necessary to extinguish such Claim-Over under applicable law, up to the amount that Specified Settling Co-Defendant has obtained, may obtain, or has authority to control from such Non-Released Party;

(3)    Placement into escrow of funds paid by the Non-Released Parties such that those funds are available to satisfy the Claim-Over;

(4)    Payment of monies to such Shareholder Released Party by that Specified Settling Co-Defendant to ensure it is held harmless from such Claim-Over, up to the amount that Specified Settling Co-Defendant has obtained, may obtain, or has authority to control from such Non-Released Party;

(5)    Such other actions as that such Specified Settling Co-Defendant and Shareholder Released Party may devise to hold such

Shareholder Released Party harmless from the Claim-Over.

To the extent the preconditions for this Section 10.7(d)(i)(B) to apply are satisfied, the actions taken pursuant to paragraph (III) must, in combination, ensure that such Shareholder Released Party is not required to pay any amounts on account of such Claim-Over.

(C) To the extent that the Claim-Over is based on a contractual indemnity, the obligations under Section 10.7(b)(ii)(C) shall extend solely to a Non-Party Covered Conduct Claim against a clinic, hospital or other purchaser, distributor or dispenser of Products, a manufacturer that sold Products, a consultant, and/or a pharmacy benefit manager or other third-party payor. The Sackler Parties' Representative shall notify the Settling States, to the extent permitted by applicable law, in the event that any of these types of Non-Released Party asserts a Claim-Over arising out of contractual indemnity against it.

(ii)     (A) To the extent that, on or after the Effective Date, any Shareholder Released Party, in its capacity as a plaintiff, negotiates and enters into a Non-Party Settlement, including in any bankruptcy case or through any plan of reorganization (whether individually or as a class of creditors), the Shareholder Released Party will include (or in the case of a Non-Party Settlement that is part of a Chapter 11 Plan, will take reasonable best efforts to cause the debtor to include), unless prohibited from doing so under applicable law, in the Non-Party Settlement a prohibition on contribution or indemnity of any kind against the Specified Settling Co-Defendants substantially equivalent to that required from the Shareholder Released Parties in Section 10.7(b)(ii)(A) of the Plan, or a release from such Non-Released Party in favor of the Specified Settling Co-Defendants (in a form equivalent to Section 10.7(c)) of any Claim-Over. For the avoidance of doubt, the foregoing obligations apply only where such Non-Party Settlement entails the payment of money to such Shareholder Released Party, and not where such Non-Party Settlement only entails release or withdrawal of claims without monetary consideration.

(B) In the event that (x) any Shareholder Released Party, in its capacity as a plaintiff, after the Effective Date, either (i) obtains a judgment with respect to Non-Party Covered Conduct against a Non-Released Party that does not contain a prohibition like that described in Section 10.7(d)(ii)(A); (ii) files a Non-Party Covered Conduct Claim against a Non-Released Party in bankruptcy and such Shareholder Released Party does not use reasonable best efforts to obtain a prohibition/release like that described in Section 10.7(d)(i)(A); or (iii) enters into a Non-Party Settlement without a prohibition/release like that described in Section 10.7(d)(ii)(A),

and (y) such Non-Released Party asserts a Claim-Over against a Specified Settling Co-Defendant, that Shareholder Released Party and Specified Settling Co-Defendant shall take the following actions to ensure such Specified Settling Co-Defendant is not required to pay any amounts on account of such Claim-Over:

(I) The Specified Settling Co-Defendant shall notify that Shareholder Released Party of the Claim-Over within sixty (60) calendar days of when it becomes aware of the assertion of the Claim-Over or sixty (60) calendar days of the Effective Date, whichever is later;

(II) That Shareholder Released Party and Specified Settling Co-Defendant shall meet and confer concerning the means to hold such Specified Settling Co-Defendant harmless and ensure that it is not required to pay any amounts on account of such Claim-Over;

(III) That Shareholder Released Party and Specified Settling Co-Defendant shall take steps sufficient and permissible under the law of the state of such Shareholder Released Party to hold such Specified Settling Co-Defendant harmless from the Claim-Over and ensure such Specified Settling Co-Defendant is not required to pay any amounts on account of such Claim-Over. Such steps may include, where permissible:

(1) Filing of motions to dismiss or such other appropriate motion by the Specified Settling Co-Defendant and supported by that Shareholder Released Party, in response to any claim filed in litigation or arbitration;

(2) Reduction of that Shareholder Released Party's Claim and any judgment it has obtained or may obtain against such Non-Released Party by whatever amount or percentage is necessary to extinguish such Claim-Over under applicable law, up to the amount that Shareholder Released Party has obtained, may obtain, or has authority to control from such Non-Released Party;

(3) Placement into escrow of funds paid by the Non-Released Parties such that those funds are available to satisfy the Claim-Over;

(4) Payment of monies to such Specified Settling Co-Defendant by such Shareholder Released Party to ensure it is held harmless from such Claim-Over, up to the amount that Shareholder Released Party has obtained, may

obtain, or has authority to control from such Non-Released Party;

(5)    Such other actions as that such Specified Settling Co-Defendant and Shareholder Released Party may devise to hold Shareholder Released Parties harmless from the Claim-Over.

To the extent the preconditions for this Section 10.7(d)(ii)(B) to apply are satisfied, the actions taken pursuant to paragraph (III) must, in combination, ensure that such Specified Settling Co-Defendant is not required to pay any amounts on account of such Claim-Over.

(C) To the extent that the Claim-Over is based on a contractual indemnity, the obligations under Section 10.7(b)(ii)(C) shall extend solely to a Non-Party Covered Conduct Claim against a clinic, hospital or other purchaser, distributor or dispenser of Products, a manufacturer that sold Products, a consultant, and/or a pharmacy benefit manager or other third-party payor.

### 10.8    _Channeling Injunction_.

In order to supplement the injunctive effect of the Plan Injunction, the Estate Releases and the Shareholder Releases set forth in Sections 10.5, 10.6 and 10.7 of the Plan, the Confirmation Order shall provide for the following permanent injunction to take effect as of the Effective Date:

(a)    Terms. In order to preserve and promote the settlements contemplated by and provided for in the Plan and to supplement, where necessary, the injunctive effect of the Plan Injunction, the Estate Releases and the Shareholder Releases described in Sections 10.5, 10.6 and 10.7 of the Plan, and pursuant to the exercise of the equitable jurisdiction and power of the Bankruptcy Court under section 105(a) of the Bankruptcy Code, all Persons that have held or asserted, that hold or assert or that may in the future hold or assert any Channeled Claim shall be permanently and forever stayed, restrained and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering or receiving payments, satisfaction, recovery or judgment of any form from or against any Protected Party with respect to any Channeled Claim, including:

(i)    commencing, conducting or continuing, in any manner, whether directly or indirectly, any suit, action or other proceeding, in each case, of any kind, character or nature, in any forum in any jurisdiction with respect to any Channeled Claims, against or affecting any Protected Party, or any property or interests in property of any Protected Party with respect to any Channeled Claims;

(ii)    enforcing, levying, attaching, collecting or otherwise recovering, by any means or in any manner, either directly or indirectly, any judgment, award, decree or other order against any Protected Party

or against the property of any Protected Party with respect to any Channeled Claims;

(iii)    creating, perfecting or enforcing, by any means or in any manner, whether directly or indirectly, any Lien of any kind against any Protected Party or the property of any Protected Party with respect to any Channeled Claims;

(iv)    asserting or accomplishing any setoff, right of subrogation, indemnity, contribution or recoupment of any kind, whether directly or indirectly, in respect of any obligation due to any Protected Party or against the property of any Protected Party with respect to any Channeled Claims; and

(v)    taking any act, by any means or in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan Documents, with respect to any Channeled Claims.

(b)    Reservations. Notwithstanding anything to the contrary in this Section 10.8 or the Confirmation Order, this Channeling Injunction shall not stay, restrain, bar or enjoin:

(i)    the rights of Holders of Channeled Claims to the treatment afforded them under the Plan and the Plan Documents, including the rights of Holders of Channeled Claims to assert such Channeled Claims solely in accordance with Section 6.21 of the Plan, the Master TDP and the Creditor Trust TDPs, in each case whether or not there are funds to make Distributions in respect of such Channeled Claims and whether or not such rights entitle such Holders to any Distributions;

(ii)    the rights of Persons to assert any claim, debt, litigation or liability for payment of Creditor Trust Operating Expenses solely against the applicable Creditor Trust;

(iii)    the rights of Persons to assert any claim, debt or litigation against any Excluded Party;

(iv)    the rights of the Master Disbursement Trust to pursue and enforce the MDT Shareholder Rights, the MDT Insurance Rights and the MDT Causes of Action or any other rights afforded to the Master Disbursement Trust pursuant to the Plan, the Plan Documents, the Master Shareholder Settlement Agreement and/or the Direct Claims Shareholder Settlement Agreements;

(v)    the rights of the parties to the LRP Agreement to enforce the terms thereof in accordance with the Plan;

(vi)    the Creditor Trusts from enforcing their respective rights against the Master Disbursement Trust under the Plan and the MDT Documents; or

181

(vii)    the Master Disbursement Trust and the Plan Administration Trust from enforcing their rights against NewCo under the Plan.

(c)    **Notice of Shareholder Release Snapback**. Upon the filing of a Notice of Shareholder Release Snapback, the Channeling Injunction shall terminate, be rescinded and have no application, without further order of the Bankruptcy Court, to any suit, action or other proceeding, in each case, of any kind, character or nature, brought against any member of the Breaching Shareholder Family Group and any Designated Shareholder Released Party; *provided*, *however*, that the extension of time provided by Section 10.9(a) of the Plan shall continue in effect in accordance with its terms; *provided further* that, for the avoidance of doubt, notwithstanding the termination and rescission pursuant to this Section 10.8(c), the Channeling Injunction shall continue in effect for, and shall be fully enforceable by and for the benefit of, all other Protected Parties, including all other Shareholder Released Parties, other than the Breaching Shareholder Family Group and the Designated Shareholder Released Parties; and *provided further* that, in the event of the filing of a Notice of Shareholder Release Snapback, any determination made in the claims resolution process in accordance with Section 7.6 of this Plan will not be binding against any party.

(d)    **Modifications**. Except as expressly set forth in paragraph (c) of this Section 10.8, there can be no modification, dissolution or termination of the Channeling Injunction, which shall be a permanent injunction.

(e)    **Non-Limitation of Channeling Injunction**. Except as expressly set forth in paragraphs (b) and (c) of this Section 10.8, nothing in the Plan, the MDT Documents or the Creditor Trust Documents shall be construed in any way to limit the scope, enforceability or effectiveness of the Channeling Injunction issued in connection with the Plan.

(f)    **Bankruptcy Rule 3016 Compliance**. The Debtors' compliance with the requirements of Bankruptcy Rule 3016 shall not constitute an admission that the Plan provides for an injunction against conduct not otherwise enjoined under the Bankruptcy Code.

**10.9    _Tolling of Shareholder Released Claims; Violations of Shareholder Releases and Channeling Injunction_**.

(a)    **Tolling of Shareholder Released Claims**. If applicable law, an order in any proceeding or an agreement fixes a period for commencing or continuing an action or proceeding based on a Shareholder Released Claim and such Shareholder Released Claim is released pursuant to the Shareholder Releases or such action or proceeding is enjoined by the Channeling Injunction, then such period does not expire with respect to such Shareholder Released Claim with respect to the Master Disbursement Trust (or the MDT Trustees) or the Releasing Parties until the latest of (i) the end of such period; (ii) with respect to the applicable Shareholder Family Group and any Designated Shareholder Released Party, two hundred twenty-five (225) days after the filing of a Notice of Shareholder Release Snapback with respect to such Shareholder Family Group; (iii) with respect to the applicable Shareholder Family Group and any Designated Shareholder Released Party, when such Shareholder Family Group fulfills its payment obligations under the Shareholder Settlement Agreements; and (iv) with respect to the applicable Shareholder Released Party that is a Subsidiary (as defined in the Master Shareholder Settlement Agreement) of a Shareholder Payment Party, two hundred twenty-five (225) days after the reinstatement of any Estate Cause of Action against such Shareholder Released Party pursuant to Section 10.19 of the Plan.

(b)    **Violations of Shareholder Releases and Channeling Injunction**. In the event that any Person takes any action that a Shareholder Released Party believes violates the Shareholder Releases or Channeling Injunction as it applies to any Shareholder Released Party, such Shareholder Released Party shall be entitled to make an emergency application to the Bankruptcy Court for relief, and

may proceed by contested matter rather than by adversary proceeding. The Bankruptcy Court shall have jurisdiction and authority to enter final orders in connection with any dispute over whether an action violates the Shareholder Releases or Channeling Injunction. Upon determining that a violation of the Shareholder Releases or Channeling Injunction has occurred, the Bankruptcy Court, in its discretion, may award any appropriate relief against such violating Person, including, but not limited to, (i) disgorgement from the violating Person of any funds, assets or other value received, directly or indirectly, pursuant to the Plan or Plan Documents (including fees and expenses paid pursuant to the Plan or Plan Documents on account of legal or other advisory services rendered to or for the benefit of the violating Person); (ii) the termination of any rights of the violating Person to receive any funds, assets or other value pursuant to the Plan or Plan Documents; (iii) the reduction of any payments owed by any Shareholder Released Parties under the Shareholder Settlement Agreements to the violating Person in an amount equal to the amount of disgorgement ordered from, or the reduction of future payments ordered to be made to, or on account of, the violating Person (subject to the right of the violating Person to request that any amounts actually disgorged from such violating Person offset any reduction of future payments ordered to be made to, or on account of, such violating Person); (iv) an admonition, reprimand or censure of, or citation of contempt by, the violating Person and its counsel; (v) a fine or penalty paid into the Bankruptcy Court; (vi) a bond or other security in an amount equal to any financial obligation ordered by the Bankruptcy Court in respect of the violation; (vii) an appropriate sanction on any attorney or law firm responsible for the violation; (viii) injunctive relief to prevent future violations by the Person or its counsel; and (ix) attorney and other professional fees incurred by any Shareholder Released Party arising from the violation. The provision of any one form of relief shall not preclude the provision of any other form of relief.

**10.10    _MDT Insurer Injunction_**.

(a)    **Terms**. In accordance with section 105(a) of the Bankruptcy Code, upon the occurrence of the Effective Date, all Persons that have held or asserted, that hold or assert or that may in the future hold or assert any Claim based on, arising under or attributable to an MDT Insurance Policy shall be, and hereby are, permanently stayed, restrained and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering or receiving payment or recovery on account of any such Claim based on, arising under or attributable to an MDT Insurance Policy from or against any MDT Insurer, including:

(i)    commencing, conducting or continuing, in any manner, any action or other proceeding of any kind (including an arbitration or other form of alternate dispute resolution) against any MDT Insurer, or against the property of any MDT Insurer, on account of any Claim based on, arising under or attributable to an MDT Insurance Policy;

(ii)    enforcing, attaching, levying, collecting or otherwise recovering, by any manner or means, any judgment, award, decree or other order against any MDT Insurer, or against the property of any MDT Insurer, on account of any Claim based on, arising under or attributable to an MDT Insurance Policy;

(iii)    creating, perfecting or enforcing in any manner any Lien of any kind against any MDT Insurer, or against the property of any MDT Insurer, on account of any Claim based on, arising under or attributable to an MDT Insurance Policy;

(iv)    asserting or accomplishing any setoff, right of subrogation, indemnity, contribution or recoupment of any kind, whether

directly or indirectly, against any obligation due to any MDT Insurer, or against the property of any MDT Insurer, on account of any Claim based on, arising under or attributable to an MDT Insurance Policy; and

(v)      taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan applicable to any Claim based on, arising under or attributable to an MDT Insurance Policy.

(b)      **Reservations**. The provisions of this MDT Insurer Injunction shall not preclude the Master Disbursement Trust from pursuing any Claim based on, arising under or attributable to an MDT Insurance Policy, or any other claim that may exist under any MDT Insurance Policy against any MDT Insurer, or enjoin the rights of the Master Disbursement Trust to prosecute any action based on or arising from the MDT Insurance Policies or the rights of the Master Disbursement Trust to assert any claim, debt, obligation, cause of action or liability for payment against an MDT Insurer based on or arising from the MDT Insurance Policies. The provisions of this MDT Insurer Injunction are not issued for the benefit of any MDT Insurer, and no such insurer is a third-party beneficiary of this MDT Insurer Injunction. This MDT Insurer Injunction shall not enjoin, impair or affect (i) any claims between or among MDT Insurers that are not Settling MDT Insurers; (ii) the rights of current and former directors, officers, employees and authorized agents of the Debtors that are not Sackler Family Members that are preserved under the Plan; or (iii) the terms of the Master Shareholder Settlement Agreement with respect to the MDT Shareholder Insurance Rights. For the avoidance of doubt, with respect to a Person that purports to be insured under any MDT Insurance Policy, the MDT Insurer Injunction shall enjoin only derivative claims and rights. Nothing in this Plan shall determine whether any Claim or right under any MDT Insurance Policy is either derivative or direct, or otherwise would be disallowed or subordinated under the Bankruptcy Code, which determination shall be made, as necessary, to the extent such Claim or right is not otherwise released under this Plan, in accordance with applicable law.

(c)      **Modifications**. To the extent the MDT Trustees make a good faith determination that some or all of the MDT Insurance Proceeds are substantially unrecoverable by the Master Disbursement Trust, the Master Disbursement Trust shall have the sole and exclusive authority at any time, upon written notice to any affected MDT Insurer, to terminate, reduce or limit the scope of this MDT Insurer Injunction with respect to any MDT Insurer; *provided* that any termination, reduction, or limitation of the MDT Insurer Injunction (A) shall apply in the same manner to all beneficiaries of the Creditor Trusts that are MDT Beneficiaries and (B) shall comply with any procedures set forth in the MDT Agreement.

(d)      **Non-Limitation of MDT Insurer Injunction**. Except as set forth in paragraphs (b) and (c) of this <u>Section 10.10</u>, nothing in the Plan, the MDT Documents or the Creditor Trust Documents shall be construed in any way to limit the scope, enforceability or effectiveness of the MDT Insurer Injunction issued in connection with the Plan.

### 10.11   *Settling MDT Insurer Injunction*.

(a)      **Terms**. In accordance with section 105(a) of the Bankruptcy Code, upon the occurrence of the Effective Date, all Persons that have held or asserted, that hold or assert or that may in the future hold or assert any Claim based on, arising under or attributable to an MDT Insurance Policy shall be, and hereby are, permanently stayed, restrained and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering or receiving payment or recovery on account of any such Claim based on, arising under or attributable to an MDT Insurance Policy from or against any Settling MDT Insurer, solely to the extent that such Settling MDT Insurer has been released from such Claim under such MDT Insurance Policy pursuant to an MDT Insurance Settlement, including:

(i)      commencing, conducting or continuing in any manner any action or other proceeding of any kind (including an arbitration or other form of alternate dispute resolution) against any such Settling MDT Insurer, or against the property of such Settling MDT Insurer, on account of such Claim based on, arising under or attributable to such MDT Insurance Policy;

(ii)     enforcing, attaching, levying, collecting or otherwise recovering, by any manner or means, any judgment, award, decree or other order against any such Settling MDT Insurer, or against the property of such Settling MDT Insurer, on account of such Claim based on, arising under or attributable to such MDT Insurance Policy;

(iii)    creating, perfecting or enforcing in any manner any Lien of any kind against any such Settling MDT Insurer, or against the property of such Settling MDT Insurer, on account of such Claim based on, arising under or attributable to such MDT Insurance Policy;

(iv)     asserting or accomplishing any setoff, right of subrogation, indemnity, contribution or recoupment of any kind, whether directly or indirectly, against any obligation due to any such Settling MDT Insurer, or against the property of such Settling MDT Insurer, on account of such Claim based on, arising under or attributable to such MDT Insurance Policy; and

(v)      taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan applicable to such Claim based on, arising under or attributable to such MDT Insurance Policy.

(b)      **Reduction of Insurance Judgments.** Any right, Claim or cause of action that an Insurance Company may have been entitled to assert against any Settling MDT Insurer but for the Settling MDT Insurer Injunction, if any such right, Claim or cause of action exists under applicable non-bankruptcy law, shall become a right, Claim or cause of action solely as a setoff claim against the Master Disbursement Trust and not against or in the name of the Settling MDT Insurer in question. Any such right, Claim or cause of action to which an Insurance Company may be entitled shall be solely in the form of a setoff against any recovery of the Master Disbursement Trust from that Insurance Company, and under no circumstances shall that Insurance Company receive an affirmative recovery of funds from the Master Disbursement Trust or any Settling MDT Insurer for such right, Claim or cause of action. In determining the amount of any setoff, the Master Disbursement Trust may assert any legal or equitable rights the Settling MDT Insurer would have had with respect to any right, Claim or cause of action.

(c)      **Modifications**. There can be no modification, dissolution or termination of the Settling MDT Insurer Injunction, which shall be a permanent injunction.

(d)      **Non-Limitation of Settling MDT Insurer Injunction**. Except as set forth in paragraphs (b) and (c) of this Section 10.11, nothing in the Plan, the MDT Documents or the Creditor Trust Documents shall be construed in any way to limit the scope, enforceability or effectiveness of the Settling MDT Insurer Injunction issued in connection with the Plan.

### 10.12 *Exculpation*.

To the maximum extent permitted by applicable law, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from: any Cause of Action for any Claim in connection with, or arising out of, the administration of the Chapter 11 Cases; the negotiation and pursuit of the Disclosure Statement (including any information provided, or statements made, in the Disclosure Statement or omitted therefrom), the Restructuring Transactions, the Plan, the Master Disbursement Trust (including the Master TDP and the MDT Agreement), the Creditor Trusts (including the Creditor Trust TDPs and the other Creditor Trust Documents) and the solicitation of votes for, and confirmation of, the Plan; the funding of the Plan; the occurrence of the Effective Date; the administration of the Plan and the property to be distributed under the Plan; and the wind-up and dissolution of Liquidating Debtors and the transactions in furtherance of any of the foregoing, in each case other than Causes of Action arising out of, or related to, any act or omission of an Exculpated Party that is a criminal act or constitutes fraud, gross negligence or willful misconduct. This exculpation shall be in addition to, and not in limitation of, all other Releases, indemnities, exculpations and any other applicable law or rules protecting such Exculpated Parties from liability. For the avoidance of doubt, this <u>Section 10.12</u> shall not exculpate or release any Exculpated Party with respect to any act or omission of such Exculpated Party prior to the Effective Date that is later found to be a criminal act or to constitute fraud, gross negligence or willful misconduct, including findings after the Effective Date. Notwithstanding anything herein to the contrary, nothing in the Plan shall release any Causes of Action that may be asserted against any Excluded Party.

### 10.13 *Injunction Related to Releases and Exculpation*.

To the maximum extent permitted under applicable law, the Confirmation Order shall permanently enjoin the commencement or prosecution by any Person, whether directly, derivatively or otherwise, of any Causes of Action released pursuant to this Plan, including, without limitation, the Causes of Action released or exculpated in this Plan and with respect to any Claims, Interests, Liens, other encumbrances or liabilities that are subject to <u>Sections 5.3(b)</u>, <u>5.4(c)</u> or <u>5.6(b)</u> of the Plan (but, for the avoidance of doubt, excluding any Excluded Claims).

### 10.14 *Subordinated Claims*.

The allowance, classification and treatment of all Claims and Interests and the respective Distributions and treatments in respect thereof under this Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, sections 509(c), 510(a), 510(b) or 510(c) of the Bankruptcy Code or otherwise. Pursuant to sections 509(c) and 510 of the Bankruptcy Code or otherwise, the Debtors reserve the right to reclassify any Allowed Claim or Allowed Interest in accordance with any contractual, legal or equitable subordination relating thereto.

### 10.15 *Preservation of Causes of Action and Reservation of Rights*.

As of the Effective Date, (a) the Master Disbursement Trust shall have the right to prosecute any and all MDT Causes of Action, (b) the Plan Administration Trust shall have the right to prosecute any and all Retained Causes of Action relating to and necessary for the administration of Claims against the Debtors (other than Channeled Claims) or the other responsibilities of the Plan Administration Trustee in accordance with the PAT Agreement, (c) each Creditor Trust shall have the right to prosecute any and all Retained Causes of Action relating to and necessary for the administration of the applicable Channeled Claims in accordance with the applicable Creditor Trust TDP and (d) NewCo shall have the right to prosecute any and all Retained Causes of Action constituting NewCo Transferred Assets. Pursuant

to section 1123(b) of the Bankruptcy Code, except as expressly provided in <u>Sections 10.5</u> through <u>10.13</u> of the Plan, nothing contained in this Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any Causes of Action that the Debtors had immediately before the Effective Date on behalf of the Estates or of themselves in accordance with any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including but not limited to any actions specifically enumerated in the Schedule of Retained Causes of Action. Subject to <u>Sections 10.5</u> through <u>10.13</u> of the Plan, all such Causes of Action shall be transferred to the Master Disbursement Trust, the Plan Administration Trust, the applicable Creditor Trust or NewCo, as applicable, which shall have, retain, reserve and be entitled to assert all such Causes of Action in accordance with the Plan as fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and equitable rights with respect to any Claim or Interest may be asserted after the Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

### 10.16   *Ipso Facto and Similar Provisions Ineffective*.

Any term of any policy, contract or other obligation applicable to a Debtor shall be void and of no further force or effect with respect to any Debtor to the extent such policy, contract, or other obligation is conditioned on, creates an obligation of any Debtor as a result of, or gives rise to a right of any Person based on any of the following: (a) the insolvency or financial condition of a Debtor; (b) the commencement of the Chapter 11 Cases; (c) the confirmation or consummation of this Plan, including any change of control that shall occur as a result of such consummation; or (d) the Restructuring Transactions.

### 10.17   *No Successor Liability*.

Except as otherwise expressly provided in this Plan and the Confirmation Order, each of NewCo, the Foundation, the Master Disbursement Trust, the Plan Administration Trust and the Creditor Trusts (a) is not, and shall not be deemed to assume, agree to perform, pay or otherwise have any responsibilities for any liabilities or obligations of the Debtors or any other Person relating to or arising out of the operations or the Assets of the Debtors on or prior to the Effective Date, (b) is not, and shall not be, a successor to the Debtors by reason of any theory of law or equity or responsible for the knowledge or conduct of any Debtor prior to the Effective Date and (c) shall not have any successor or transferee liability of any kind or character.

### 10.18   *Co-Defendant Defensive Rights*.

Except as provided in the MDT Insurer Injunction, the Settling MDT Insurer Injunction or clause (ii) of the penultimate sentence of this <u>Section 10.18</u>, notwithstanding anything to the contrary in this <u>Article X</u> or in the Plan as it currently exists or as it might be further amended, the Confirmation Order or any order entered in connection with the Plan (or the Plan as amended) (or any such order, as amended, modified or supplemented), or any supplement to the Plan (or the Plan as amended), nothing contained in the Plan or any of the foregoing documents or orders (including, without limitation, the classification, treatment, allowance, disallowance, release, bar, injunction, Channeling Injunction or any other provision of the Plan or the Plan as amended with respect to, impacting, affecting, modifying, limiting, subordinating, impairing, in any respect, a Co-Defendant Claim), will release, bar, enjoin, impair, alter, modify, amend, limit, prohibit, restrict, reduce, improve or enhance any Co-Defendant Defensive Rights of any Holder of a Co-Defendant Claim or Excluded Party as such rights exist or might in the future exist under applicable non-bankruptcy law. Nothing in the Plan, any of the Plan Documents or in the Confirmation Order shall preclude, operate to or have the effect of, impairing any Holder of a Co-Defendant Claim or Excluded Party from asserting in any proceeding any and all Co-Defendant Defensive Rights that it has or may have under applicable law. Nothing in the Plan, any of the Plan Documents or the Confirmation Order shall be deemed to waive any Co-Defendant Defensive Rights, and nothing in the Chapter 11 Cases, the Plan, any of the Plan Documents or the Confirmation Order may be used as evidence of any determination regarding any Co-Defendant Defensive Rights, and under no circumstances shall any

Person be permitted to assert issue preclusion or claim preclusion, waiver, estoppel or consent in response to the assertion of any Co-Defendant Defensive Rights. This Section 10.18 shall be included in the Confirmation Order. Co-Defendant Defensive Rights (i) may be used to offset, set-off, recoup, allocate or apportion fault, liability, or damages, or seek judgment reduction or otherwise defend against any Cause of Action brought by any Person against the Holder of any Co-Defendant Claim or the Excluded Party based in whole or in part on Opioid-Related Activities and (ii) subject to Section 8.4, shall in no case be used to seek or obtain any affirmative monetary recovery from any Protected Party or any Asset of any Protected Party (including from any Purdue Insurance Policy or any other insurance policy of a Protected Party) on account of any Released Claim or Shareholder Released Claim. The foregoing does not constitute a release of any Co-Defendant's Class 14 Claim or any other Excluded Party's Class 11(c) Claim.

### 10.19   *Reinstatement of Certain Shareholder Released Claims*.

As set forth in the Shareholder Settlement Agreements, if any Shareholder Released Party that is a Subsidiary (as defined in the Master Shareholder Settlement Agreement) of a Shareholder Payment Party voluntarily or involuntarily becomes subject to an insolvency, bankruptcy, reorganization, winding-up, administration, dissolution, composition or similar proceeding, upon election by notice from the Sackler Parties' Representative, with the consent of the Master Disbursement Trust, any Estate Causes of Action against such Shareholder Released Party that were previously held by the Debtors and that were released pursuant to Section 10.7(a) of the Plan shall be reinstated in full (and the Shareholder Release provided under Section 10.7(a) of the Plan shall be deemed null and void with respect thereto, and the Channeling Injunction shall terminate, be rescinded and have no application with respect thereto) and the Master Disbursement Trust, in its sole discretion and upon receipt of an advance for fees and expenses provided by the Shareholder Released Parties in an amount determined by the Master Disbursement Trust in its sole discretion (which advance shall be repaid to the extent not used), shall utilize commercially reasonable efforts to maximize the value of any such Estate Causes of Action in such insolvency or liquidation proceeding, and any recovery shall be treated in accordance with the terms as set forth in the Shareholder Settlement Agreements.

### 10.20   *Special Provisions for United States*.

(a)      As to the United States, notwithstanding anything contained in the Plan or Confirmation Order to the contrary (except Section 5.2(i) of the Plan and in respect of the United States-PI Claimant Medical Expense Claim Settlement), including but not limited to this Article X, nothing in the Plan or Confirmation Order (except Section 5.2(i) of the Plan and in respect of the United States-PI Claimant Medical Expense Claim Settlement) shall:

(i)      limit or expand the scope of discharge, release or injunction permitted to debtors under the Bankruptcy Code. The discharge, release, and injunction provisions contained in the Plan and Confirmation Order are not intended and shall not be construed to bar the United States from, subsequent to the Confirmation Order, pursuing any police or regulatory action, or any criminal action;

(ii)      discharge, release, exculpate, impair or otherwise preclude: (A) any liability to the United States that is not a "claim" within the meaning of section 101(5) of the Bankruptcy Code; (B) any Claim of the United States arising on or after the Effective Date; (C) any liability of the Debtors under police or regulatory statutes or regulations to the United States as the owner, lessor, lessee or operator of property that such Entity owns, operates or leases after the Effective Date; or (D) any liability to the United States,

188

including but not limited to any liabilities arising under the IRC, the environmental laws, the criminal laws, the civil laws or common law, of any Person, including any Released Parties, Shareholder Released Parties or any Exculpated Parties, in each case, other than the Debtors; *provided*, *however*, that the foregoing shall not (x) limit the scope of discharge granted to the Debtors under sections 524 and 1141 of the Bankruptcy Code, (y) diminish the scope of any exculpation to which any Person is entitled under section 1125(e) of the Bankruptcy Code or (z) change the treatment of the DOJ Forfeiture Judgment Claim pursuant to <u>Section 2.3</u> of the Plan or the treatment of the Federal Government Unsecured Claims pursuant to <u>Section 4.3</u> of the Plan;

(iii)    enjoin or otherwise bar the United States from asserting or enforcing, outside the Bankruptcy Court, any liability described in the preceding clause (ii); *provided*, *however*, that the non-bankruptcy rights and defenses of all Persons with respect to (A) – (D) in clause (ii) are likewise fully preserved;

(iv)    affect any valid right of setoff or recoupment of the United States against any of the Debtors; *provided*, *however*, that the rights and defenses of the Debtors with respect thereto are fully preserved (other than any rights or defenses based on language in the Plan or the Confirmation Order that may extinguish setoff or recoupment rights);

(v)    divest any court, commission or tribunal of jurisdiction to determine whether any liabilities asserted by the United States are discharged or otherwise barred by the Confirmation Order, the Plan or the Bankruptcy Code; *provided*, *however*, that the Bankruptcy Court shall retain jurisdiction as set forth in and pursuant to the terms of the Plan to the extent permitted by law; or

(vi)    be deemed to (A) determine the tax liability of any Person, including but not limited to the Debtors, (B) have determined the federal tax treatment of any item, distribution or Entity, including the federal tax consequences of the Plan or Confirmation Order, or (C) expressly expand or diminish the jurisdiction of the Bankruptcy Court to make determinations as to federal tax liability and federal tax treatment under the Bankruptcy Code and 28 U.S.C. §§ 157, 1334.

For the avoidance of doubt, the Channeling Injunction set forth in <u>Section 10.8</u> of the Plan does not apply to the rights and causes of action protected by this <u>Section 10.20</u>.

(b)    Notwithstanding anything to the contrary herein, nothing in the Plan, the Confirmation Order, the Shareholder Settlement Agreements or any other document filed in connection with the Plan shall release claims held by the United States of America against the Shareholder Released Parties; *provided* that, for the avoidance of doubt, nothing in the Plan, Confirmation Order, the Shareholder Settlement Agreements or any other document filed in connection with the Plan shall limit the releases

contained in the Settlement Agreement between the United States of America and Purdue Pharma L.P., executed on October 21, 2020, or the Settlement Agreement between the United States of America and Dr. Richard Sackler, David Sackler, Mortimer D.A. Sackler, Kathe Sackler, and the Estate of Jonathan Sackler, executed on October 21, 2020.

(c)    Several of the Debtors are parties to the various following agreements with the Secretary of the Department of Health and Human Services under which the Debtors owe rebates to third parties:

(i)    The Medicare Coverage Gap Discount Program Agreement is established under 42 U.S.C. §§ 1395w-l14A, 1395w-153 and is required should manufacturers wish to have coverage for their products under Medicare Part D. Under the Medicare Coverage Gap Discount Program Agreement, manufacturers agree to reimburse Medicare Part D plan sponsors for certain Coverage Gap discounts the plans provide to Medicare beneficiaries in the Part D coverage gap. The Centers for Medicare & Medicaid Services require that a new entity that seeks to assume a Medicare Coverage Gap Discount Program Agreement enter into a novation agreement with the Centers for Medicare & Medicaid Services with respect to the transfer of such agreement. The Debtors that have entered into Medicare Coverage Gap Discount Program Agreements with the Secretary are: Purdue Pharma L.P. (P1180) and Rhodes Pharmaceuticals L.P. (P1281);

(ii)    Certain of the Debtors are parties to the Medicare Coverage Gap Discount Program Agreement, established under 42 U.S.C. §§ 1395w-l14a, 1395w-153, and the Medicare Part D Manufacturer Discount Program Agreement, established under 42 U.S.C. § 1395w-114c (collectively, "Medicare Part D Agreements"), which are required should manufacturers wish to have coverage for their products under Medicare Part D. Under the Medicare Part D Agreements, manufacturers agree to reimburse Medicare Part D plan sponsors for certain discounts the plans provide to Medicare beneficiaries on the manufacturer's applicable drugs. The Centers for Medicare & Medicaid Services requires that a new entity that seeks to assume a Medicare Part D Agreement enter into a novation agreement with the Centers for Medicare & Medicaid Services with respect to the transfer of such agreement. The Debtors that have entered into Medicare Part D Agreements with the Secretary are: Purdue Pharma L.P. (P1180) and Rhodes Pharmaceuticals L.P. (P1281);

(iii)    The Medicaid Drug Rebate Program, established under section 1927 of the Social Security Act, requires manufacturers to enter into National Drug Rebate Agreements with the Secretary for the coverage and payment of a manufacturer's covered outpatient drugs. Under the Medicaid Drug Rebate Program, if a manufacturer has entered into and has in effect a National Drug Rebate Agreement, Medicaid covers and pays for all of the drugs of that manufacturer dispensed and paid for under the state plan,

and in return manufacturers pay applicable rebates to the states. The Debtors that have National Drug Rebate Agreements and the labeler codes associated with the National Drug Rebate Agreements are as follows: Rhodes Pharmaceuticals L.P. (42858), Purdue Pharma L.P. (59011), and Adlon Therapeutics L.P. (72912);

(iv)    Manufacturers with National Drug Rebate Agreements must also comply with the Drug Pricing Program under section 340B of the Public Health Service Act, 42 U.S.C. § 256b, and have Pharmaceutical Pricing Agreements with the Secretary of the Department of Health and Human Services. Under the Pharmaceutical Pricing Agreements, manufacturers agree to charge a price for covered outpatient drugs that will not exceed the average manufacturer price decreased by a rebate percentage. The Debtors that have Pharmaceutical Pricing Agreements and the labeler codes associated with such agreements are as follows: Rhodes Pharmaceuticals L.P. (42858), Purdue Pharma L.P. (59011), and Adlon Therapeutics L.P. (72912); and

(v)    The Medicare Part D Agreements, the Medicaid National Drug Rebate Agreements and the Pharmaceutical Pricing Agreements identified above provide that, in the event of a transfer of ownership, such agreements are automatically assigned to the new owner and all terms and conditions of such agreements remain in effect as to the new owner. Accordingly, notwithstanding anything contained in the Plan or the Confirmation Order which may be to the contrary, the Debtors shall assume such agreements pursuant to section 365 of the Bankruptcy Code, and upon the Effective Date, the Medicare Part D Agreements, the Medicaid National Drug Rebate Agreements and the Pharmaceutical Pricing Agreements identified above shall be assigned to NewCo. NewCo, as the new owner, will assume the obligations of the Debtors who are parties under such agreements from and after the Effective Date, and to fully perform all the duties and responsibilities that exist under such agreements in accordance with their terms, including the payment of discounts owed to Part D Plan sponsors or payment of rebates owed to states and wholesalers for quarters prior to the Effective Date. For the avoidance of doubt, NewCo shall be liable for any outstanding rebates or discounts owed to third parties (and any applicable interest thereon) arising prior to the Effective Date, as well as any penalties associated with noncompliance by the Debtors with the Medicare Part D Agreements, the Medicaid National Drug Rebate Agreements and the Pharmaceutical Pricing Agreements identified above prior to the Effective Date.

(d)    Notwithstanding anything to the contrary herein, nothing in the Plan, the Confirmation Order, the Shareholder Settlement Agreements or any other document filed in connection with the Plan shall bind the United States in any application of statutory, or associated regulatory, authority grounded in Title 19 of the Social Security Act, 42 U.S.C. § 1396-1 et seq. (the "***Medicaid Program***") or

in section 1115 of Title 11 of the Social Security Act. The United States is neither enjoined nor in any way prejudiced in seeking recovery of any funds owed to the United States under the Medicaid Program.

## ARTICLE XI  RETENTION OF JURISDICTION.

### 11.1  *Retention of Jurisdiction*.

(a)      The Bankruptcy Court shall retain exclusive jurisdiction of all matters arising under, arising out of or related to the Chapter 11 Cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

(i)      to hear and determine applications for the assumption or rejection of executory contracts and unexpired leases and any Disputed Cure Claims or Disputed Claims in respect of rejection damages resulting therefrom;

(ii)      to hear and determine any motions, adversary proceedings, applications, contested matters and other litigated matters pending on, or commenced after, entry of the Confirmation Order;

(iii)      to hear and resolve any disputes arising from or related to (A) any orders of the Bankruptcy Court still in effect granting relief under Bankruptcy Rule 2004 or (B) any protective orders entered by the Bankruptcy Court in connection with the foregoing (including the Protective Order);

(iv)      to ensure that Distributions to Holders of Allowed Claims are accomplished as provided in this Plan and the Confirmation Order;

(v)      to consider Claims or the allowance, classification, priority, compromise, estimation or payment of any Claim, including any Administrative Claim or, solely to the extent provided in the Master TDP and/or the applicable Creditor Trust TDP, any Channeled Claim;

(vi)      to enter, implement or enforce such orders as may be appropriate in the event that the Confirmation Order is, for any reason, stayed, reversed, revoked, modified or vacated;

(vii)      to issue and enforce injunctions, enter and implement other orders and take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation or enforcement of this Plan, the Confirmation Order or any other order of the Bankruptcy Court;

(viii)      to hear and determine any application to modify this Plan in accordance with section 1127 of the Bankruptcy Code to remedy any defect or omission or reconcile any inconsistency in this Plan, the Disclosure Statement or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(ix)    to hear and determine all Professional Fee Claims;

(x)    to resolve disputes concerning any reserves with respect to Non-Participating Channeled Claims and other Disputed Claims or the administration thereof;

(xi)    to hear and determine disputes arising in connection with the interpretation, implementation or enforcement of this Plan, the Confirmation Order, any transactions or payments in furtherance of the Plan or the Confirmation Order or any agreement, instrument or other document governing, or related to, any of the foregoing, including the Plan Documents;

(xii)    to take any action and issue such orders, including any such action or orders as may be necessary after entry of the Confirmation Order or the occurrence of the Effective Date, as may be necessary to construe, enforce, implement, execute and consummate this Plan, including any release (including, but not limited to, the United States-PI Claimant Medical Expense Claim Releases), exculpation or injunction provisions set forth in this Plan, or to maintain the integrity of this Plan following the occurrence of the Effective Date;

(xiii)    to hear and determine any other matters related to the Chapter 11 Cases and not inconsistent with the Bankruptcy Code or title 28 of the United States Code;

(xiv)    to hear, determine and resolve disputes arising in connection with the interpretation, implementation or enforcement of the Plan or Confirmation Order;

(xv)    to resolve any disputes concerning whether a Person had sufficient notice of the Chapter 11 Cases, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, any Bar Date established in the Chapter 11 Cases or any deadline for responding or objecting to a Cure Amount, in each case, for the purpose of determining whether a Claim or Interest is discharged hereunder or for any other purpose;

(xvi)    to hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Shareholder Settlement Agreements, the Public Entity Settlements and the Private Entity Settlements;

(xvii)    to hear and determine disputes arising in connection with the MDT Claims or operations of the Master Disbursement Trust or the actions of the MDT Trustees;

(xviii)    to hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Creditor Trust Documents, and to hear and determine disputes concerning violations of the Confirmation Order or the use of funds from the

Creditor Trusts in a manner inconsistent with the applicable Creditor Trust Documents; *provided* that, with respect to the Governmental Remediation Trust and the Tribe Trust, such jurisdiction shall be concurrent and not exclusive to the extent set forth in the Governmental Remediation Trust Documents and the Tribe Trust Documents, respectively, as in effect on the Effective Date;

(xix)    to hear and resolve any disputes arising from or related to (A) Liens, collateral, or other forms of credit protections that are granted or otherwise effected pursuant to the Shareholder Settlement Agreements, the Public Entity Settlements and the Private Entity Settlements, or (B) any other attempt by any Person to seek orders of attachment, Liens, or collateral involving any Assets, in full or in part, of the Shareholder Released Parties;

(xx)    to determine such other matters, and for such other purposes, as may be provided in the Confirmation Order;

(xxi)    to hear and determine all matters relating to the Plan Settlements, to the extent permitted under applicable law; and

(xxii)    to enter a final decree closing each of the Chapter 11 Cases.

(b)    The Bankruptcy Court shall retain concurrent, rather than exclusive, jurisdiction of all matters arising under, arising out of or related to the Chapter 11 Cases and the Plan to, among other things, hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including the expedited determination of taxes under section 505(b) of the Bankruptcy Code), to hear and resolve or recommend resolution of disputes related to the MDT Insurance Rights, and adjudicate any MDT Causes of Action, including but not limited to, any Retained Causes of Action against Excluded Parties and any Retained Causes of Action relating to or necessary to enforce the MDT Shareholder Rights.

(c)    Notwithstanding anything in this Article XI to the contrary, the resolution of Channeled Claims against the Debtors and the forum in which such resolution shall be determined shall be governed by, and in accordance with, Section 6.21 of the Plan, the Master TDP and the Creditor Trust TDPs, if applicable.

(d)    By consenting to the treatment provided by this Plan or otherwise supporting the Plan, no State or Tribe shall be construed to have waived any claim of Sovereign Immunity that it may have in any other action or proceeding, including any action or proceeding occurring after the Effective Date.

(e)    Nothing in this Article XI shall be construed to alter the jurisdiction of a court in which an Opt-Out Class Action is pending or was adjudicated in respect of such Opt-Out Class Action.

(f)    As of the earlier of the Effective Date or the expiration of the Preliminary Injunction, all Persons are permanently enjoined from commencing, conducting, or continuing, directly or indirectly, any litigation or prosecution of an Estate Cause of Action (including in any proceeding in a judicial, arbitral, administrative, or other forum ); *provided*, *however*, that nothing in this paragraph shall preclude NewCo, the Plan Administration Trust, each Creditor Trust or the Master Disbursement Trust

from pursuing any Retained Cause of Action vested in or transferred to such entity pursuant to the Plan. Any Person seeking to commence, conduct, or continue litigation or prosecution of a Cause of Action against a Shareholder Released Party or a Released Party may, but is not required to, seek a prior determination in the Bankruptcy Court that a Cause of Action is not an Estate Cause of Action. If any Person commences, conducts or continues litigation or prosecution of such Cause of Action without a prior determination by the Bankruptcy Court, the Person against which such Cause of Action was asserted, and the Master Disbursement Trust or NewCo, shall be entitled to make an emergency application to the Bankruptcy Court for a determination that such Cause of Action is an Estate Cause of Action and that the injunction in this <u>Section 11.1(f)</u> has been violated. In either event, the determination whether or not a Cause of Action is an Estate Cause of Action shall be based on an appropriate evidentiary record, and the only Persons with standing to be heard shall be: (i) the Person seeking to bring such Cause of Action; (ii) the Person or entity against which such Cause of Action would be or has been brought; or (iii) the Debtors, the Creditors' Committee, the PAT, each Governmental Consent Party, the Master Disbursement Trust or NewCo. Upon determining that a violation of the injunction has occurred, damages may be awarded in the amount of attorneys' fees and other litigation costs and expenses incurred by the Person against which the Estate Cause of Action was brought or who is otherwise seeking to enforce the injunction, including in connection with litigation or prosecution of the Estate Cause of Action and in connection with enforcing the injunction in this <u>Section 11.1(f)</u> subject to the discretion of the Bankruptcy Court. Without limiting the foregoing, the Bankruptcy Court, in its discretion, also may award any additional appropriate relief against a violating Person and may award any sanctions against any other Person engaging in otherwise sanctionable conduct in connection with the enforcement of the injunction in this <u>Section 11.1(f)</u>.

## ARTICLE XII  MISCELLANEOUS PROVISIONS.

### 12.1    <u>*Exemption from Certain Transfer Taxes*</u>.

To the maximum extent permitted pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property under the Plan pursuant to (a) the issuance, distribution, transfer or exchange of any debt, equity security or other interest in the Debtors, (b) the Restructuring Transactions, (c) the creation, modification, consolidation, termination, refinancing and/or recording of any mortgage, deed of trust or other security interest, or the securing of additional indebtedness by such or other means, or (d) the making, assignment, recording or surrender of any lease or sublease, or the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, including any deeds, bills of sale or other assignments or instruments of transfer, or assignments executed in connection with any disposition of Assets contemplated by the Plan (including transfers of Assets to and by the Debtors, the Plan Administration Trust, NewCo, the Foundation, the Master Disbursement Trust and the Creditor Trusts) shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles tax, transfer tax (including real estate transfer tax), mortgage tax or mortgage recording tax, sales or use tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee or other similar tax or governmental assessment, and the appropriate federal, state, provincial or local government officials or agents shall forego collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### 12.2    <u>*Dates of Actions to Implement Plan*</u>.

In the event that any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day but shall be deemed to have been completed as of the required date.

12.3    *Amendments*.

(a)    **Plan Modifications**. This Plan may be amended, modified or supplemented by the Debtors in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as otherwise ordered by the Bankruptcy Court; *provided* that (i) any such amendment, modification or supplement shall be reasonably acceptable to the Governmental Consent Parties; *provided further* that any such amendment, modification or supplement that expands the scope of the Releases or modifies any provision relating to the MDT Insurance Policies (including the scope thereof) or the transfer of the MDT Insurance Rights shall be acceptable to the Governmental Consent Parties, (ii) any such amendment, modification or supplement shall be reasonably acceptable to the Creditors' Committee to the extent that it (A) relates to the MDT Insurance Rights, (B) modifies Section 5.9 of the Plan as it relates to payment of the attorneys' fees and costs of Holders of Healthcare Provider Claims, Third-Party Payor Claims, or PI Claims, the Ad Hoc Group of Individual Victims, the Ratepayer Mediation Participants or the NAS Committee, (C) modifies the Creditors' Committee's consent rights under the Plan, (D) expands the scope of the Releases or (E) materially and adversely affects the treatment of Holders of Healthcare Provider Claims, Third-Party Payor Claims, PI Claims, ER Physician Claims or Other General Unsecured Claims (it being understood that (x) any reduction in the amount of any Initial Private Creditor Trust Distribution, the PI Trust Obligation or any Private Creditor Trust's MDT Claim, (y) any elimination of any consent rights in favor of such Holders or (z) any modification to Section 5.2, 5.6 or 5.7 of the Plan to the extent such modification relates to the Master Disbursement Trust or a Private Creditor Trust shall constitute such a material and adverse effect), and (iii) any such amendment, modification or supplement shall be acceptable to the Sackler Parties' Representative with respect to the Specified Shareholder Provisions and, to the extent set forth in the Master Shareholder Settlement Agreement, reasonably acceptable to the Sackler Parties' Representative with respect to modification of terms relating to the rights, obligations, or interests of the Shareholder Released Parties; *provided* that solely with respect to the Creditor Trust Documents, such consent shall only apply to the extent set forth in the Master Shareholder Settlement Agreement. In addition, after the Confirmation Date, as long as such action does not materially and adversely affect the treatment of Holders of Allowed Claims pursuant to this Plan, the Debtors may remedy any defect or omission or reconcile any inconsistencies in this Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes or effects of this Plan, and any Holder of a Claim or Interest that has accepted this Plan shall be deemed to have accepted this Plan as amended, modified or supplemented.

(b)    **Certain Technical Amendments**. Prior to the Effective Date, the Debtors may make appropriate technical adjustments and modifications to this Plan without further order or approval of the Bankruptcy Court; *provided*, *however*, that such technical adjustments and modifications do not adversely affect in a material way the treatment of Holders of Claims and Interests under this Plan.

12.4    *Revocation or Withdrawal of Plan*.

The Debtors reserve the right to revoke or withdraw this Plan prior to the Effective Date as to any or all of the Debtors; *provided* that each Debtor shall be entitled to revoke this Plan only in full and not in part. If, with respect to a Debtor, this Plan has been revoked or withdrawn prior to the Effective Date, or if confirmation or the occurrence of the Effective Date as to such Debtor does not occur on the Effective Date, then, with respect to such Debtor: (a) this Plan and the Plan Documents shall be null and void in all respects; (b) any settlement or compromise embodied in this Plan (including the fixing or limiting to an amount any Claim or Interest or Class of Claims or Interests), assumption or rejection of executory contracts and unexpired leases effected by this Plan and any document or agreement executed pursuant to this Plan (including the Plan Documents) shall be deemed null and void; and (c) nothing contained in this Plan shall (i) constitute a waiver or release of any Claim by or against, or any Interest in, such Debtor or any other Person, (ii) prejudice in any manner the rights of such Debtor or any other Person,

196

or (iii) constitute an admission of any sort by any Debtor or any other Person; *provided* that any provisions under the Shareholder Settlement Agreements that are expressly contemplated to survive revocation or reversal of the Plan shall survive.

**12.5    *Payment of Statutory Fees*.**

All fees payable under section 1930 of chapter 123 of title 28 of the United States Code shall be paid on or before the Effective Date by the Debtors. After the Effective Date, the Plan Administration Trust shall assume liability for and shall pay, or cause to be paid, any and all quarterly fees owed to the U.S. Trustee when due in accordance with applicable law, and shall continue to file, or cause to be filed, with the Bankruptcy Court quarterly reports to show the calculation of such fees for the Debtors' Estates. Each of the Debtors shall remain obligated to pay quarterly fees to the U.S. Trustee until such Debtor's Chapter 11 Case is closed, dismissed or converted to a case under chapter 7 of the Bankruptcy Code.

**12.6    *Severability*.**

(a)    Notwithstanding anything else contained in the Plan, (i) the Plan provisions effectuating the Releases provided by the Debtors, their Estates, and the Releasing Parties and the Channeling Injunction (A) are integrated with and integral to all other provisions of the Master Shareholder Settlement Agreement, the Plan and the Plan Documents, (B) are not and shall not be severable from the remainder of the Master Shareholder Settlement Agreement, the Plan or the Plan Documents and (C) shall not be excised or modified other than in accordance with the Plan and the Master Shareholder Settlement Agreement and (ii) if the Plan provisions effectuating the Releases provided by the Debtors, their Estates, and the Releasing Parties and the Channeling Injunction are deemed null, void, illegal or unenforceable, then the terms, provisions, covenants and restrictions of the Master Shareholder Settlement Agreement and the Plan shall be void and shall not remain in force or effect, except as specifically and expressly stated otherwise in the Master Shareholder Settlement Agreement or the Plan, or as specifically and expressly agreed in writing by all parties to the Master Shareholder Settlement Agreement.

(b)    If, prior to entry of the Confirmation Order, any term or provision of this Plan that is not related to the Master Shareholder Settlement Agreement or the Releases provided by the Debtors, their Estates, and the Releasing Parties and the Channeling Injunction is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation by the Bankruptcy Court, the remainder of the terms and provisions of this Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with this Section 12.6, is valid and enforceable pursuant to its terms.

(c)    The impact of any modification, reversal, or vacatur of the Confirmation Order, the Plan, or the Shareholder Settlements following the Effective Date will be governed by the Master Shareholder Settlement Agreement.

**12.7    *Governing Law*.**

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent that a Plan Document provides otherwise, the rights, duties and obligations arising under

this Plan and the Plan Documents shall be governed by, and construed and enforced in accordance with, the internal laws of the State of New York, without giving effect to the principles of conflicts of laws thereof (other than section 5-1401 and section 5-1402 of the New York General Obligations Law).

### 12.8    *Immediate Binding Effect*.

Subject only to Bankruptcy Rules 3020(e), 6004(h) and 7062, as applicable, upon the occurrence of the Effective Date, the terms of this Plan and the Plan Documents shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the other Protected Parties, all Holders of Claims against or Interests in the Debtors, all Holders of Channeled Claims, all Releasing Parties and each of their respective successors and assigns.

### 12.9    *Successors and Assigns*.

The rights, benefits and obligations of any Person named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or permitted assign, if any, of each such Person.

### 12.10    *Entire Agreement*.

On the Effective Date, this Plan, the Plan Supplement and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings and representations concerning such documents, all of which have become merged and integrated into this Plan.

### 12.11    *Computing Time*.

In computing any period of time prescribed or permitted by this Plan, unless otherwise set forth in this Plan or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

### 12.12    *Exhibits to Plan*.

All exhibits, schedules, supplements and appendices to this Plan (including the Plan Supplement) are incorporated into and are part of this Plan as if set forth in full herein.

### 12.13    *Notices*.

All notices, requests and demands to or upon the Debtors shall be in writing (including by facsimile transmission) and, unless otherwise provided herein, shall be deemed to have been duly given or made only when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Attn: Marshall S. Huebner, Benjamin S. Kaminetzky, Eli J. Vonnegut,
Christopher S. Robertson, Joshua Y. Sturm and Abraham Bane.

*Counsel to the Debtors*
*and Debtors in Possession*

After the occurrence of the Effective Date, the Plan Administration Trustee shall have authority to send a notice to Entities providing that, to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entities must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002; *provided*, *however*, that the U.S. Trustee need not file such a renewed request and shall continue to receive documents without any further action being necessary. After the occurrence of the Effective Date, the Debtors and the Plan Administration Trustee are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to the U.S. Trustee and those Entities that have filed such renewed requests.

### 12.14   *Dissolution of the Creditors' Committee*.

On the Effective Date, the Creditors' Committee will dissolve; *provided*, *however*, that following the Effective Date, the Creditors' Committee shall continue in existence and have standing and a right to be heard for the following limited purposes: (a) applications, and any relief related thereto, for compensation by Professional Persons and requests for allowance of fees and/or expenses under section 503(b) of the Bankruptcy Code, (b) any appeals of, or related to, the Confirmation Order or (c) any other appeal to which the Creditors' Committee is a party. Upon the dissolution of the Creditors' Committee, the Creditors' Committee, each of its members (including each officer, director, employee or agent thereof) and its respective Professional Persons will cease to have any duty, obligation or responsibility arising from, or related to, the Chapter 11 Cases and shall be released and discharged from all rights and duties from, or related to, the Chapter 11 Cases.

### 12.15   *Reservation of Rights*.

Except as otherwise provided herein, this Plan shall be of no force or effect unless the Bankruptcy Court enters the Confirmation Order. None of the filing of this Plan, any statement or provisions of this Plan or the taking of any action by the Debtors with respect to this Plan shall be, or deemed to be, an admission or waiver of any rights of the Debtors with respect to any Claim or Interest prior to the Effective Date.


Dated: November 14, 2025
By: */s/ Keith Darragh*
Name: Keith Darragh
Title: Authorized Signatory

**PURDUE PHARMA L.P.**
**PURDUE PHARMA INC.**
**PURDUE TRANSDERMAL TECHNOLOGIES L.P.**
**PURDUE PHARMA MANUFACTURING L.P.**
**PURDUE PHARMACEUTICALS L.P.**
**IMBRIUM THERAPEUTICS L.P.**
**ADLON THERAPEUTICS L.P.**
**GREENFIELD BIOVENTURES L.P.**
**SEVEN SEAS HILL CORP.**
**OPHIR GREEN CORP.**
**PURDUE PHARMA OF PUERTO RICO**
**PURDUE PRODUCTS L.P.**
**PURDUE PHARMACEUTICAL PRODUCTS L.P.**
**PURDUE NEUROSCIENCE COMPANY**
**NAYATT COVE LIFESCIENCE INC.**

**BUTTON LAND L.P.**
**RHODES ASSOCIATES L.P.**
**PAUL LAND INC.**
**QUIDNICK LAND L.P.**
**RHODES PHARMACEUTICALS L.P.**
**RHODES TECHNOLOGIES**
**UDF LP**
**SVC PHARMA LP**
**SVC PHARMA INC.**

**EXHIBIT A**

**Hospitals in Class 7 (Healthcare Provider Claims)**

| Claimant Name | Claim No. |
|---|---|
| Acquisition Bell Hospital, LLC | 149170 |
| Affinity Hospital, LLC | 148659 |
| AHS Claremore Regional Hospital, LLC | 149249 |
| AHS Cushing Hospital, LLC | 149250 |
| AHS Henryetta Hospital, LLC | 149251 |
| AHS Hillcrest Medical Center, LLC | 149252 |
| AHS Pryor Hospital, LLC | 149253 |
| AHS Southcrest Hospital, LLC | 149255 |
| Aiken Regional Medical Centers, LLC | 149138 |
| Allegheny Health Network | 254160 |
| Allegheny Health Network | 214810 |
| Allegiance Hospital of Many, LLC | 149274 |
| Allegiance Hospital of North Little Rock, LLC | 149307 |
| Allegiance Medical Center of Ruston, LLC | 146401 |
| Alliance Healthcare System | 148859 |
| American Hospital Management Corporation | 148898 |
| Amery Regional Medical Center, Inc. | 148933 |
| AMISUB (SFH), Inc. | 148634 |
| Amisub of South Carolina, Inc. | 148643 |
| Anderson Regional Health System | 148766 |
| Anna Hospital Corporation | 148878 |
| Appalachian Regional Healthcare, Inc. (ARH) | 148600 |
| ARH Mary Breckinridge Health Services, Inc. | 148601 |
| ARMC, L.P. | 148748 |
| Ashley Valley Medical Center, LLC | 149171 |
| Athens Hospital, LLC | 149263 |
| Athens Regional Medical Center, LLC | 149172 |
| Avera Gettysburg | 148950 |
| Avera Granite Falls | 148952 |
| Avera Holy Family | 148947 |
| Avera Marshall | 148944 |
| Avera McKennan | 148942 |
| Avera Queen of Peace | 148941 |
| Avera St. Anthony's Hospital | 148948 |
| Avera St. Luke's | 148940 |
| Avera St. Mary's | 148945 |

| | |
|---|---|
| Avera Tyler | 148951 |
| Bacon County Hospital, Georgia | 148176 |
| Bailey Medical Center, LLC | 149254 |
| Baptist Health Madisonville, Inc. | 148814 |
| Baptist Health Richmond, Inc. | 148815 |
| Baptist Healthcare System, Inc. | 148813 |
| Baptist Hospital, Inc. | 149154 |
| Baptist Medical Center - Leake, Inc. | 148770 |
| Baptist Medical Center - Yazoo, Inc. | 148769 |
| Baptist Memorial Hospital | 148779 |
| Baptist Memorial Hospital - Booneville, Inc. | 148778 |
| Baptist Memorial Hospital - Calhoun, Inc. | 148772 |
| Baptist Memorial Hospital - Collierville | 148777 |
| Baptist Memorial Hospital - DeSoto, Inc. | 148776 |
| Baptist Memorial Hospital - Golden Triangle, Inc. | 148774 |
| Baptist Memorial Hospital - Huntingdon | 148782 |
| Baptist Memorial Hospital - North Mississippi, Inc. | 148773 |
| Baptist Memorial Hospital - Tipton | 148780 |
| Baptist Memorial Hospital - Union City | 148783 |
| Baptist Memorial Hospital - Union County, Inc. | 148775 |
| Baptist Memorial Hospital-Jonesboro, Inc. | 148781 |
| Bartow Regional Medical Center, Inc. | 149289 |
| Bay Area Healthcare Group, Inc. | 149093 |
| BAY HOSPITAL, INC. | 149021 |
| BayCare Alliant Hospital, Inc. | 147620 |
| Bayfront HMA Medical Center, LLC | 148681 |
| BBH BMC, LLC | 148637 |
| BBH CBMC, LLC | 148639 |
| BBH PBMC, LLC | 148636 |
| BBH SBMC, LLC | 148638 |
| BBH WBMC, LLC | 148635 |
| Berwick Hospital Company LLC | 148727 |
| Bienville Medical Center, Inc. | 149280 |
| Big Bend Hospital Corporation | 148887 |
| Big Spring Hospital Corporation | 148819 |
| Biloxi HMA, LLC | 148701 |
| Blessing Hospital | 148923 |
| BlessingCare Corporation | 148924 |
| Blount Memorial Hospital, Incorporated | 148986 |
| Blue Island Hospital Company, LLC | 148871 |
| Blue Mountain Hospital | 147759 |

| | |
|---|---|
| Blue Ridge Georgia Hospital Company, LLC | 148869 |
| Bluefield Hospital Company, LLC | 148763 |
| Bluffton Health System, LLC | 148691 |
| BMC Attala, LLC | 148768 |
| Boa Vida Hospital of Aberdeen, MS, LLC | 148895 |
| Bon Secours Depaul Medical Center, Inc. | 65187 |
| Bon Secours Health System, Inc. | 70051 |
| Bon Secours Hospital Baltimore Inc. | 65412 |
| Bon Secours-Memorial Regional Medical Center, Inc. | 65160 |
| Bon Secours-Richmond Community Hospital, Incorporated | 65191 |
| Bon Secours-St. Francis Medical Center, Inc. | 65171 |
| Bon Secours-St. Francis Xavier Hospital, Inc. | 65186 |
| Bon Secours-St. Mary's Hospital of Richmond, Inc. | 65036 |
| Bourbon Community Hospital, LLC | 149173 |
| Bowling Green-Warren County Community Hospital Corporation | 148810 |
| Brandon HMA, LLC | 148705 |
| Braxton County Memorial Hospital, Inc. | 148827 |
| BRIGHAM CITY COMMUNITY HOSPITAL, INC. | 149120 |
| Broaddus Hospital Association | 148835 |
| Brownwood Hospital, L.P. | 148752 |
| BSA Hospital, LLC | 149256 |
| Bullhead City Hospital Corporation | 148667 |
| Bullock County Hospital | 146495 |
| Burleson County Hospital District | 146588 |
| Burleson County Hospital District | 147480 |
| Burleson County Hospital District | 86886 |
| Cache Valley Specialty Hospital, LLC | 149121 |
| Camden-Clark Memorial Hospital Corporation | 148824 |
| Cameron Parish Hospital and Psychiatric Facility | 49368 |
| Campbell County HMA, LLC | 148739 |
| Cape Canaveral Hospital, Inc. | 148899 |
| Care Plan Oversight, LLC | 146092 |
| CARLSBAD MEDICAL CENTER, LLC | 148715 |
| Carolinas Medical Alliance, Inc. | 148732 |
| Carondelet St. Joseph's Hospital | 148619 |
| Carondelet St. Mary's Hospital | 148618 |
| CARTERSVILLE MEDICAL CENTER, LLC | 149049 |
| Carthage Hospital, LLC | 149264 |
| Castleview Hospital, LLC | 149174 |
| Cedar Park Health System, L.P. | 148756 |
| CENTERPOINT MEDICAL CENTER OF INDEPENDENCE, LLC | 149071 |

| | |
|---|---|
| CentraCare Health System | 148939 |
| Central Florida Regional Hospital, Inc. | 149015 |
| CENTRAL TENNESSEE HOSPITAL CORPORATION | 149091 |
| CGH Hospital, Ltd. | 148651 |
| Charles A. Dean Memorial Hospital | 148979 |
| Charleston Area Medical Center, Inc. | 148785 |
| Charleston Hospital, Inc. | 148907 |
| Chatham County Hospital Authority, Georgia | 148219 |
| CHCA BAYSHORE, L.P. | 149101 |
| CHCA CLEAR LAKE, L.P. | 149095 |
| CHCA CONROE, L.P. | 149096 |
| CHCA Pearland, L.P. | 149100 |
| CHCA WEST HOUSTON, L.P. | 149103 |
| Chesapeake Hospital Corporation | 65098 |
| Chester HMA, LLC | 148734 |
| CHIPPENHAM & JOHNSTON-WILLIS HOSPITALS, INC. | 149128 |
| Christiana Care Health System, Inc. | 147583 |
| Citrus HMA, LLC | 148684 |
| Citrus Memorial Hospital, Inc. | 149016 |
| City Hospital, Inc. | 148825 |
| Clarksville Health System, G.P. | 148743 |
| Clay County Medical Corporation | 149160 |
| Cleveland Tennessee Hospital Company, LLC | 148744 |
| CLHG-Acadian, LLC | 149278 |
| CLHG-Avoyelles, LLC | 149272 |
| CLHG-DeQuincy, LLC | 149281 |
| CLHG-Leesville, LLC | 149273 |
| CLHG-Minden, LLC | 149277 |
| CLHG-Oakdale, LLC | 149275 |
| CLHG-Ruston, LLC | 146257 |
| CLHG-Ville Platte, LLC | 149279 |
| CLHG-Winn, LLC | 149276 |
| Clinch Valley Medical Center, Inc. | 149175 |
| CLINTON HMA, LLC | 148719 |
| Coastal Carolina Medical Center, Inc. | 148642 |
| Cocke County HMA, LLC | 148741 |
| COLISEUM MEDICAL CENTER, LLC | 149050 |
| College Station Hospital, L.P. | 148749 |
| Columbia Capital Medical Center Limited Partnership | 149176 |
| COLUMBIA HOSPITAL AT MEDICAL CITY DALLAS SUBSIDIARY, L.P. | 149107 |

| | |
|---|---|
| COLUMBIA HOSPITAL CORPORATION OF SOUTH BROWARD | 149048 |
| COLUMBIA MEDICAL CENTER OF ARLINGTON SUBSIDIARY, L.P. | 149106 |
| COLUMBIA MEDICAL CENTER OF DENTON SUBSIDIARY, L.P. | 149108 |
| COLUMBIA MEDICAL CENTER OF LAS COLINAS, INC. | 149111 |
| COLUMBIA MEDICAL CENTER OF LEWISVILLE SUBSIDIARY, L.P. | 149112 |
| COLUMBIA MEDICAL CENTER OF MCKINNEY SUBSIDIARY, L.P. | 149113 |
| COLUMBIA MEDICAL CENTER OF PLANO SUBSIDIARY, L.P. | 149110 |
| COLUMBIA NORTH HILLS HOSPITAL SUBSIDIARY, L.P. | 149114 |
| COLUMBIA OGDEN MEDICAL CENTER, INC. | 149125 |
| COLUMBIA PLAZA MEDICAL CENTER OF FORT WORTH SUBSIDIARY, L.P. | 149109 |
| COLUMBIA RIO GRANDE HEALTHCARE, L.P. | 149117 |
| Columbia Riverside, Inc. | 149008 |
| COLUMBIA VALLEY HEALTHCARE SYSTEM, L.P. | 149119 |
| COLUMBIA/ALLEGHANY REGIONAL HOSPITAL INCORPORATED | 149131 |
| COLUMBIA/HCA JOHN RANDOLPH, INC. | 149130 |
| Community Health Association | 148850 |
| Community Hospital of Andalusia, LLC | 149177 |
| Community Hospital, Inc. | 148846 |
| Community Hospital, LLC | 113484 |
| Cornerstone Regional Hospital, LP | 149139 |
| Cox Barton County Hospital | 148852 |
| Crestview Hospital Corporation | 148676 |
| Crestwood Healthcare, L.P. | 148658 |
| Crisp Regional Hospital, Inc. | 148998 |
| Crockett Hospital, LLC | 149178 |
| Danville Regional Medical Center, LLC | 149179 |
| Dardanelle Community Hospital, LLC | 149308 |
| Davis Memorial Hospital | 148834 |
| Deaconess Health System, LLC | 148720 |
| Delray Medical Center, Inc. | 148649 |
| Delta Regional Medical Center | 148897 |
| Deming Hospital Corporation | 148883 |
| Desert Regional Medical Center, Inc. | 148612 |
| DESERT SPRINGS HOSPITAL, INC. | 148918 |
| DHSC, LLC | 148890 |
| Dickenson Community Hospital | 148800 |

| | |
|---|---|
| District Hospital Partners, L.P. | 148922 |
| DLP Central Carolina Medical Center, LLC | 149180 |
| DLP Conemaugh Memorial Medical Center, LLC | 149181 |
| DLP Conemaugh Meyersdale Medical Center, LLC | 149182 |
| DLP Conemaugh Miners Medical Center, LLC | 149183 |
| DLP Frye Regional Medical Center, LLC | 149184 |
| DLP Harris Regional Hospital, LLC | 149185 |
| DLP Haywood Regional Medical Center, LLC | 149186 |
| DLP Maria Parham Medical Center, LLC | 149187 |
| DLP Marquette General Hospital, LLC | 149188 |
| DLP Person Memorial Hospital, LLC | 149189 |
| DLP Rutherford Regional Health System, LLC | 149190 |
| DLP Swain County Hospital, LLC | 149191 |
| DLP Twin County Regional Healthcare, LLC | 149192 |
| DLP Wilson Medical Center, LLC | 149193 |
| DOCTORS HOSPITAL OF AUGUSTA, LLC | 149052 |
| Doctors Hospital of Manteca, Inc. | 148603 |
| Doctors Medical Center of Modesto, Inc. | 148604 |
| Dodge City Healthcare Group, LLC | 149194 |
| Donalsonville Hospital, Inc. | 149002 |
| Downtown Bronx Medical Associates | 145919 |
| Drew Memorial Hospital Inc | 616050 |
| Dukes Health System, LLC | 148695 |
| Duplin General Hospital, Inc. | 148993 |
| DURANT H.M.A., LLC | 148721 |
| DVH Hospital Alliance, LLC | 149141 |
| East Baton Rouge Medical Center, LLC | 149284 |
| East Carolina Health | 148989 |
| East Carolina Health-Beaufort, Inc. | 148992 |
| East Carolina Health-Bertie | 148991 |
| East Carolina Health-Chowan, Inc. | 148990 |
| East Carolina Health-Heritage, Inc. | 148988 |
| East Cooper Community Hospital, Inc. | 148640 |
| EAST GEORGIA REGIONAL MEDICAL CENTER, LLC | 148690 |
| Eastern Idaho Health Services, Inc. | 149058 |
| Eastern Maine Medical Center | 148980 |
| EASTSIDE MEDICAL CENTER, LLC | 149053 |
| EL PASO HEALTHCARE SYSTEM, LTD. | 149094 |
| EMPORIA HOSPITAL CORPORATION | 148761 |
| ENGLEWOOD COMMUNITY HOSPITAL, INC. | 149018 |

| | |
|---|---|
| Erie County Medical Center (ECMC)[19] | 148595 |
| Essent PRMC, L.P. | 149195 |
| Evanston Hospital Corporation | 148889 |
| Evergreen Medical Center, LLC | 148656 |
| Fairview Park, Limited Partnership | 149054 |
| Faulkton Area Medical Center Foundation, Inc. | 148967 |
| Fauquier Medical Center, LLC | 149196 |
| FAWCETT MEMORIAL HOSPITAL, INC. | 149019 |
| Fayette Community Hospital, Inc. | 149301 |
| Fayetteville Arkansas Hospital Company, LLC | 148669 |
| Field Memorial Community Hospital | 148832 |
| Flaget Healthcare, Inc. | 148931 |
| Flagler Hospital, Inc. | 148843 |
| Fleming Medical Center, LLC | 149197 |
| Florida Health Sciences Center, Inc. | 148847 |
| Flushing Hospital Medical Center | 117307 |
| Foley Hospital Corporation | 148663 |
| Forrest City Arkansas Hospital Company, LLC | 148867 |
| Fort Duncan Medical Center, L.P. | 149143 |
| Fort Payne Hospital Corporation | 148864 |
| Fort Smith HMA, LLC | 148673 |
| FORT WALTON BEACH MEDICAL CENTER, INC. | 149020 |
| Fountain Valley Regional Hospital & Medical Center | 148609 |
| FRANKFORT HOSPITAL, INC. | 149064 |
| Franklin Hospital Corporation | 148760 |
| Freeman Health System | 148903 |
| Freeman Regional Health Services | 148968 |
| Gadsden Regional Medical Center, LLC | 148662 |
| Gaffney HMA, LLC | 148735 |
| GALEN HOSPITAL ALASKA, INC | 149004 |
| GALEN OF FLORIDA, INC. | 149044 |
| GALENCARE, INC. | 149013 |
| Galesburg Hospital Corporation | 148872 |
| Georgetown Community Hospital, LLC | 149198 |
| Gilliard Health Services, Inc. | 148657 |
| Good Samaritan Hospital | 149005 |
| Good Samaritan Medical Center, Inc. | 148648 |

[19] The Mediation Parties, as well as ECMC, have agreed that for purposes of the Purdue Pharma chapter 11 cases and the Hospitals Direct Sackler Settlement, Erie County Medical Center ("ECMC") shall be treated as a private acute care hospital.  All Mediation Parties and ECMC reserve all rights with respect to the status of ECMC in connection with any other proceedings involving other opioid defendants.

| | |
|---|---|
| GPCH-GP, INC | 149069 |
| Grafton City Hospital, Inc. | 148833 |
| Granbury Hospital Corporation | 148750 |
| Grand Strand Regional Medical Center, LLC | 149086 |
| Granite City Illinois Hospital Company, LLC | 148873 |
| Grant Memorial Hospital | 148863 |
| Grant-Blackford Mental Health, Inc | 145921 |
| Grayson County Hospital Foundation, Inc. | 148858 |
| Greenbrier VMC, LLC | 148764 |
| GREENVIEW HOSPITAL, INC. | 149065 |
| Greenwood Leflore Hospital | 149157 |
| Haines City HMA, LLC | 148687 |
| Halifax Hospital District | 148845 |
| Halifax Regional Medical Center, Inc. | 148994 |
| Hardin County, Kentucky | 148927 |
| Harris County Hospital District dba Harris Health System | 147111 |
| Hartsville, LLC | 149199 |
| Havasu Regional Medical Center, LLC | 149200 |
| Hawkins County Memorial Hospital, Inc. | 148802 |
| HCA HEALTH SERVICES OF FLORIDA, INC. | 149012 |
| HCA HEALTH SERVICES OF NEW HAMPSHIRE, INC. | 149078 |
| HCA HEALTH SERVICES OF TENNESSEE, INC. | 149089 |
| HCA HEALTH SERVICES OF VIRGINIA, INC. | 149129 |
| HCA-HEALTHONE LLC | 149010 |
| HDMC Holdings, LLC | 148611 |
| Healthcare Partner Investments, LLC | 113676 |
| Heart Hospital of South Dakota, LLC | 148949 |
| Hegg Memorial Hospital | 148957 |
| Henderson Hospital, LLC | 149265 |
| HENDERSONVILLE HOSPITAL CORPORATION | 149090 |
| Hendricks Community Hospital Assn & Retirement Home | 148965 |
| Hernando HMA, LLC | 148674 |
| HH/Killeen Health System, LLC | 149258 |
| Hialeah Hospital, Inc. | 148652 |
| Highlands Hospital Corporation | 148809 |
| Hillside Hospital, LLC | 149201 |
| HILTON HEAD HEALTH SYSTEM, L.P. | 148641 |
| HMA Santa Rosa Medical Center, LLC | 148677 |
| Holmes Regional Medical Center, Inc. | 148900 |
| Holy Cross Hospital, Inc. | 148620 |
| HOSPITAL CORPORATION OF UTAH | 149122 |

| | |
|---|---|
| Hospital Development of West Phoenix, Inc. | 148615 |
| Hospital Menonita Caguas, Inc. | 75149 |
| Hospital Menonita Guayama, Inc. | 75172 |
| Hospital of Barstow, Inc. | 148866 |
| Hospital of Louisa, Inc. | 148879 |
| Hospital of Morristown, Inc. | 148740 |
| Hot Springs National Park Hospital Holdings, LLC | 149202 |
| Houston - PPH, LLC | 149098 |
| Houston Northwest Operating Company, L.L.C. | 149099 |
| HTI MEMORIAL HOSPITAL CORPORATION | 149092 |
| Hudson Hospital, Inc. | 148935 |
| Hudson Regional Hospital | 117163 |
| Hughston Hospital, Inc. | 149300 |
| Infirmary Health Hospitals, Inc. | 135431 |
| Inland Hospital | 148981 |
| Integris - Bass Pavilion (FKA - Northwest Specialty Hospital) | 114397 |
| Integris Health - Baptist Medical Center | 115089 |
| Integris Health - Bass Baptist Hospital | 115158 |
| Integris Health - Canadian Valley Hospital | 114566 |
| Integris Health - Edmond | 115770 |
| Integris Health - Lakeside Women's Hospital | 112990 |
| Integris Health - MC Portland Ave. | 113710 |
| Integris Health - Miami Hospital | 114321 |
| Integris Health - Southwest Medical Center | 115529 |
| Integris Health, Inc | 113101 |
| Integris Health - Grove Hospital | 115113 |
| Ivy Creek of Butler, LLC | 146535 |
| Ivy Creek of Elmore, LLC | 146507 |
| Ivy Creek of Tallapoosa, LLC | 146547 |
| Jackson HMA, LLC | 148704 |
| Jackson Hospital & Clinic, Inc. | 148792 |
| Jackson Hospital Corporation | 148881 |
| Jacksonville Hospital, LLC | 149266 |
| Jamaica Hospital and Medical Center | 118550 |
| Jay Hospital, Inc. | 149155 |
| Jefferson County HMA, LLC | 148738 |
| Jefferson Parish Hospital Service District No. 1 | 147695 |
| Jefferson Parish Hospital Service District No. 2 | 115109 |
| Jennie Stuart Medical Center | 148855 |
| JFK MEDICAL CENTER LIMITED PARTNERSHIP | 149023 |
| JFK Memorial Hospital, Inc. | 148613 |

| | |
|---|---|
| Johns Hopkins Health System Corp. | 254159 |
| Johnston Memorial Hospital, Inc. | 148803 |
| KAY COUNTY OKLAHOMA HOSPITAL COMPANY, LLC | 148724 |
| KENDALL HEALTHCARE GROUP, LTD. | 149024 |
| Kennett HMA, LLC | 148711 |
| Kentucky Hospital, LLC | 149203 |
| Key West HMA, LLC | 148682 |
| Kingman Hospital, Inc. | 148837 |
| Kirksville Missouri Hospital Company, LLC | 148712 |
| Knox Hospital Company, LLC | 148694 |
| KPH-CONSOLIDATION, INC. | 149097 |
| La Porte Hospital Company, LLC | 148696 |
| Lafayette General Health System, Inc. | 111425 |
| Lake Cumberland Regional Hospital, LLC | 149205 |
| Lake Hospital System, Inc. | 115152 |
| Lake Shore HMA, LLC | 148688 |
| Lake Wales Hospital Corporation | 148675 |
| Lakeshore Home Health Care, LLC | 146147 |
| LAKEVIEW MEDICAL CENTER, LLC | 149066 |
| Lakeview Mem Hosp Assoc Inc | 148934 |
| Lakewood Regional Medical Center, Inc. | 148607 |
| Lancaster Hospital Corporation (CA) | 149146 |
| Lancaster Hospital Corporation (DE) | 148737 |
| Landmann-Jungman Memorial Hospital Corporation | 148953 |
| Laredo Regional Medical Center, LP | 149142 |
| Laredo Texas Hospital Company, L.P. | 148754 |
| LARGO MEDICAL CENTER, INC. | 149026 |
| Larkin Community Hospital Palm Springs Campus, LLC | 148839 |
| Larkin Community Hospital, Inc. | 148838 |
| Las Cruces Medical Center, LLC | 148716 |
| Laureate Psychiatric Clinic and Hospital, Inc. | 115318 |
| LAWNWOOD MEDICAL CENTER, INC. | 149027 |
| Lea Regional Hospital, LLC | 148817 |
| Lebanon HMA, LLC | 148746 |
| Lee Health System | 121306 |
| Lee Memorial Health System | 145903 |
| Leesburg Regional Medical Center, Inc. | 148820 |
| Lester E. Cox Medical Centers | 148854 |
| LEWIS-GALE MEDICAL CENTER, LLC | 149134 |
| Lexington Hospital Corporation | 148886 |
| Lexington Medical Center | 145956 |

10

| | |
|---|---|
| LifeBrite Hospital Group of Early, LLC | 148997 |
| LifeBrite Hospital Group of Stokes, LLC | 148996 |
| Lifemark Hospitals of Florida, Inc. | 148654 |
| Live Oak HMA, LLC | 148678 |
| Livingston Regional Hospital, LLC | 149206 |
| Logan General Hospital, LLC | 149207 |
| Logan Memorial Hospital, LLC | 149208 |
| LONE PEAK HOSPITAL, INC. | 149123 |
| Longivew Medical Center, L.P. | 148758 |
| Loretto Hospital | 149287 |
| Los Alamitos Medical Center, Inc. | 148608 |
| LOS ROBLES REGIONAL MEDICAL CENTER | 149006 |
| Lourdes Hospital, LLC | 149209 |
| Lovelace Health System, Inc. | 149271 |
| Macon Northside Hospital, LLC | 149051 |
| Madison HMA, LLC | 148707 |
| Magnolia Regional Health Center | 148788 |
| Maine Coast Regional Health Facilities | 148983 |
| Manatee Memorial Hospital, L.P. | 148921 |
| MARION COMMUNITY HOSPITAL, INC. | 149034 |
| Marion Hospital Corporation | 148877 |
| Marion Regional Medical Center, Inc. | 149164 |
| Marshall County HMA, LLC | 148722 |
| Marshall County Memorial Hospital | 148963 |
| Mary Black Health System, LLC | 148736 |
| Mary Immaculate Hospital Incorporated | 65193 |
| Maryview Hospital | 64983 |
| Mat-Su Valley Medical Center, LLC | 148664 |
| Maverick County Hospital District, Texas | 145118 |
| McAllen Hospitals, L.P. | 149147 |
| McBride Orthopedic Hospital | 113029 |
| McKenzie Tennessee Hospital Company, LLC | 148876 |
| McKenzie Williamette Regional Medical Center Associates, LLC | 148865 |
| MCSA, LLC | 148668 |
| Meadowview Regional Medical Center, LLC | 149210 |
| MEMORIAL HEALTHCARE GROUP, INC. | 149029 |
| Memorial Hospital Corporation | 148841 |
| Mennonite General Hospital | 73893 |
| Mercy Hospital | 148984 |
| Mercy Medical Center, Inc. | 115203 |
| Methodist Healthcare System of San Antonio, Ltd., L.L.P. | 149116 |

| | |
|---|---|
| Metro Knoxville HMA, LLC | 148742 |
| Mexia Principal Healthcare Limited Partnership | 149211 |
| MH ANGEL MEDICAL CENTER, LLLP | 149079 |
| MH BLUE RIDGE MEDICAL CENTER, LLLP | 149080 |
| MH HIGHLANDS-CASHIERS MEDICAL CENTER, LLLP | 149081 |
| MH MISSION HOSPITAL MCDOWELL, LLLP | 149083 |
| MH MISSION HOSPITAL, LLLP | 149082 |
| MH TRANSYLVANIA REGIONAL HOSPITAL, LLLP | 149084 |
| MIAMI BEACH HEALTHCARE GROUP, LTD | 149011 |
| Middlesex Health System, Inc. | 113452 |
| Midwest Division - LRHC, LLC | 149072 |
| MIDWEST DIVISION - LSH, LLC | 149073 |
| MIDWEST DIVISION - RMC, LLC | 149074 |
| Midwest Division-MMC, LLC | 149061 |
| Midwest Division-OPRMC, LLC | 149062 |
| Midwest Division-RBH, LLC | 149070 |
| Midwest Regional Medical Center, Inc. | 148723 |
| Mississippi Baptist Medical Center, Inc. | 148771 |
| Mizell Memorial Hospital, Inc. | 148794 |
| MMC of Nevada, LLC | 148884 |
| Moberly Hospital Company, LLC | 148710 |
| Mobridge Regional Health Care Foundation | 148966 |
| Monongalia County General Hospital Company | 148840 |
| Monroe HMA LLC | 148816 |
| Montclair Hospital, LLC | 149260 |
| MONTGOMERY REGIONAL HOSPITAL, INC. | 149132 |
| Mooresville Hospital Management Associates, LLC | 148718 |
| Morton Plant Hospital Association, Inc. | 149291 |
| Mount Sinai Hospital and St. Luke's-Roosevelt Hospital Center ("Mount Sinai") | 146892 |
| Mountain States Health Alliance | 148801 |
| MOUNTAIN VIEW HOSPITAL, INC. | 149124 |
| MRH Corp. | 148982 |
| Nacogdoches Medical Center | 148625 |
| Naples Community Hospital, Inc. | 115404 |
| Naples HMA, LLC | 148683 |
| Nason Medical Center, LLC | 149212 |
| Nassau University Medical Center | 49455 |
| Natchez Hospital Company, LLC | 148702 |
| National Healthcare of Mt. Vernon, Inc. | 148875 |
| Navarro Hospital, L.P. | 148751 |
| NCH Healthcare System, Inc. | 112919 |

| | |
|---|---|
| NEW PORT RICHEY HOSPITAL, INC. | 149028 |
| NHCI of Hillsboro, Inc. | 148757 |
| NORTH ARKANSAS REGIONAL MEDICAL CENTER | 148911 |
| North Broward Hospital District | 148860 |
| NORTH FLORIDA REGIONAL MEDICAL CENTER, INC. | 149032 |
| North Houston - TRMC, LLC | 149102 |
| North Mississippi Medical Center, Inc. | 149159 |
| North Shore Medical Center, Inc. | 148653 |
| North Sunflower Medical Center | 148278 |
| North Texas - MCA, LLC | 149105 |
| NORTHERN UTAH HEALTHCARE CORPORATION | 149126 |
| Northern Virginia Community Hospital, LLC | 149137 |
| Northwell Health | 628676 |
| Northwell Health | 616025 |
| Northwest Arkansas Hospitals, LLC | 148670 |
| Northwest Hospital, LLC | 148665 |
| NORTHWEST MEDICAL CENTER, INC. | 149033 |
| Northwest Medical Center, Inc. | 146126 |
| Northwest Texas Healthcare System, Inc. | 149145 |
| Norton Community Hospital | 148804 |
| Norton Hospitals, Inc. | 148929 |
| NOTAMI HOSPITALS OF FLORIDA, INC. | 149025 |
| Nueces County Hospital District | 145077 |
| Oak Hill Hospital Corporation | 148765 |
| Ochsner Bayou, LLC d/b/a Ochsner St. Anne General Hospital | 135450 |
| Ochsner Clinic Foundation | 149282 |
| Ochsner Medical Center – Hancock, LLC | 149286 |
| Ochsner Medical Center - Kenner, LLC | 149283 |
| Ochsner Medical Center - Northshore, LLC | 149285 |
| OKALOOSA HOSPITAL, INC. | 149045 |
| OKEECHOBEE HOSPITAL, INC. | 149042 |
| ORANGE PARK MEDICAL CENTER, INC. | 149035 |
| Oro Valley Hospital, LLC | 148666 |
| ORTHOPEDIC HOSPITAL, LTD. | 149118 |
| Osceola Community Hospital, Inc. | 148958 |
| OSCEOLA REGIONAL HOSPITAL, INC. | 149036 |
| Osceolasc LLC | 148689 |
| OU Medicine, Inc. | 114630 |
| Our Lady of Bellefonte Hospital, Inc. | 65155 |
| Our Lady of Lourdes Regional Medical Center, Inc. | 147632 |
| Our Lady of the Angels Hospital, Inc. | 147628 |

| | |
|---|---|
| Our Lady of the Lake Hospital, Inc. | 147666 |
| OVIEDO MEDICAL CENTER, LLC | 149037 |
| Owensboro Health, Inc. | 113671 |
| Paintsville Hospital Company, LLC | 148880 |
| Palestine Principal Healthcare Limited Partnership | 149213 |
| Palm Bay Hospital, Inc. | 148901 |
| Palm Beach Gardens Community Hospital, Inc. | 148646 |
| PALMS WEST HOSPITAL LIMITED PARTNERSHIP | 149039 |
| Park Nicollet Methodist Hospital | 148936 |
| PARKRIDGE MEDICAL CENTER, INC. | 149088 |
| Pascack Valley Hospital, LLC | 149259 |
| Patients' Choice Medical Center of Claiborne, LLC | 35110 |
| Patients' Choice Medical Center of Erin, Tennessee | 37482 |
| Patients' Choice Medical Center of Humphreys County, LLC | 35151 |
| Pearl River County Hospital & Nursing Home | 149166 |
| Petersburg Hospital Company, LLC | 148762 |
| PHC-Cleveland, Inc. | 149214 |
| PHC-Elko, Inc. | 149215 |
| PHC-Fort Mohave, Inc. | 149216 |
| PHC-Fort Morgan, Inc. | 149217 |
| PHC-Las Cruces, Inc. | 149218 |
| PHC-Los Alamos, Inc. | 149219 |
| Phillips Hospital Company, LLC | 148868 |
| Physicians Surgical Hospitals, LLC | 149257 |
| Piedmont Athens Regional Medical Center, Inc. | 149296 |
| Piedmont Henry Hospital, Inc. | 149298 |
| Piedmont Hospital, Inc. | 149297 |
| Piedmont Mountainside Hospital, Inc. | 149302 |
| Piedmont Newnan Hospital, Inc. | 149303 |
| Piedmont Newton Hospital, Inc. | 149304 |
| Piedmont Rockdale Hospital, Inc. | 149305 |
| Piedmont Walton Hospital, Inc. | 149306 |
| Pikeville Medical Center, Inc. | 148844 |
| PineLake Regional Hospital, LLC | 149220 |
| Piney Woods Healthcare System, L.P. | 148759 |
| Pitt County Memorial Hospital, Incorporated | 148987 |
| Pittsburg Hospital, LLC | 149267 |
| Placentia-Linda Hospital, Inc. | 148610 |
| PLANTATION GENERAL HOSPITAL, L.P. | 149031 |
| Pocatello Hospital, LLC | 149261 |
| POINCIANA MEDICAL CENTER, INC. | 149040 |

| | |
|---|---|
| Pontotoc Health Services, Inc. | 149161 |
| Poplar Bluff Regional Medical Center, LLC | 148713 |
| Port Charlotte HMA, LLC | 148680 |
| Portage Hospital, LLC | 149221 |
| Porter Hospital, LLC | 148697 |
| Potomac Valley Hospital of W. Va., Inc. | 148831 |
| PRHC-Ennis, L.P. | 149222 |
| Princeton Community Hospital Association, Inc. | 148849 |
| Professional Resource Management of Rabun, LLC | 148795 |
| Progressive Medical Management of Batesville | 148893 |
| ProMedica Health System, Inc. | 146184 |
| Providence Hospital, LLC | 149223 |
| Providence St. Joseph's Health | 146688 |
| PULASKI COMMUNITY HOSPITAL, INC. | 149133 |
| Punta Gorda HMA, LLC | 148686 |
| PUTNAM COMMUNITY MEDICAL CENTER OF NORTH FLORIDA, LLC | 149041 |
| QHG of Enterprise, Inc. | 148661 |
| QHG of South Carolina, Inc. | 148733 |
| Quitman County Hospital, LLC | 148912 |
| Quitman Hospital, LLC | 149268 |
| Raleigh General Hospital, LLC | 149224 |
| RAPIDES HEALTHCARE SYSTEM, L.L.C. | 149067 |
| RCCH Trios Health, LLC | 149225 |
| RCHP Billings-Missoula, LLC | 149226 |
| RCHP-Florence, LLC | 149227 |
| RCHP-Ottumwa, LLC | 149228 |
| RCHP-Sierra Vista, Inc. | 149229 |
| RCHP-Wilmington, LLC | 149230 |
| Red Bud Illinois Hospital Company, LLC | 148874 |
| Redmond Park Hospital, LLC | 149057 |
| Regional Health Services Foundation | 148962 |
| Regions Hospital | 148938 |
| Rehabilitation Hospital, LLC | 149270 |
| Resolute Hospital Company, LLC | 148624 |
| RESTON HOSPITAL CENTER, LLC | 149135 |
| Reynolds Memorial Hospital, Inc | 148826 |
| RHN Clark Memorial Hospital, LLC | 149231 |
| RHN Scott Memorial Hospital, LLC | 149232 |
| River Oaks Hospital, LLC | 148708 |
| Riverton Memorial Hospital, LLC | 149233 |
| Riverview Medical Center, LLC | 149234 |

| | |
|---|---|
| ROH, LLC | 148709 |
| Roswell Hospital Corporation | 148818 |
| Rush Health Systems, Inc. | 149167 |
| Russellville Holdings, LLC | 149235 |
| Russellville Hospital, Inc. | 148891 |
| Russellville Hospital, Inc. | 146124 |
| RUSTON LOUISIANA HOSPITAL COMPANY, LLC | 148700 |
| Sacred Heart Health Services | 148943 |
| Sage LTAC, LLC | 146134 |
| Saint Elizabeth Medical Center, Inc. | 148807 |
| Saint Francis Health System Inc. | 115605 |
| Saint Francis Healthcare System | 148906 |
| Saint Francis Hospital - Bartlett, Inc. | 148633 |
| Saint Francis Hospital Muskogee, Inc. | 116210 |
| Saint Francis Hospital South, LLC | 115381 |
| Saint Francis Hospital Vinita, Inc. | 115638 |
| Saint Francis Hospital, Inc. | 112617 |
| Saint Joseph Health System, Inc. | 148928 |
| Salem Hospital Corporation | 148714 |
| Saline Hospital, LLC | 149236 |
| San Angelo Hospital, L.P. | 148755 |
| San Jose Medical Center, LLC | 149007 |
| San Miguel Hospital Corporation | 148882 |
| Sanford Bismarck | 148974 |
| Sanford Health Network | 148971 |
| Sanford Health Network North | 148973 |
| Sanford Health of Northern Minnesota | 148972 |
| Sanford Medical Center | 148976 |
| Sanford Medical Center Fargo | 148975 |
| Sarasota County Public Hospital District d/b/a Sarasota Memorial Healthcare System | 627852 |
| Sarasota County Public Hospital District d/b/a Sarasota Memorial Healthcare System | 624513 |
| Sarasota County Public Hospital District d/b/a Sarasota Memorial Healthcare System | 624514 |
| Sarasota County Public Hospital District d/b/a Sarasota Memorial Healthcare System | 624515 |
| Sarasota County Public Hospital District d/b/a Sarasota Memorial Healthcare System | 624491 |
| Sarasota County Public Hospital District d/b/a Sarasota Memorial Healthcare System | 624495 |
| Sarasota County Public Hospital District d/b/a Sarasota Memorial Healthcare System | 624502 |

| | |
|---|---|
| Sarasota County Public Hospital District d/b/a Sarasota Memorial Healthcare System | 618482 |
| Sarasota County Public Hospital District dba Sarasota Memorial Healthcare System | 147246 |
| SARASOTA DOCTORS HOSPITAL, INC. | 149017 |
| Sarasota Memorial Hospital | 179 |
| Sarasota Memorial Hospital | 103 |
| Savannah Health Services, LLC | 149055 |
| Scranton Hospital Company LLC | 148729 |
| Scranton Quincy Hospital Company, LLC | 148728 |
| Sebasticook Valley Health | 148985 |
| SEBRING HEALTH SERVICES, LLC | 149022 |
| Seminole HMA, LLC | 148725 |
| Sharkey-Issaquena Community Hospital and Nursing Home | 149168 |
| Shelby County Healthcare Corporation | 148894 |
| Shelbyville Hospital Company, LLC | 148747 |
| Sierra Vista Hospital, Inc. | 148606 |
| Siloam Springs Arkansas Hospital Company, LLC | 148671 |
| Singing River Health System | 148602 |
| Sioux Center Health | 148959 |
| Skaggs Community Hospital Assn. | 148853 |
| Smyth County Community Hospital | 148805 |
| South Broward Hospital District d/b/a Memorial Healthcare System | 88984 |
| South Central Regional Medical Center | 149169 |
| South Florida Baptist Hospital, Inc. | 149292 |
| South Shore Hospital Corporation | 148916 |
| Southeastern Psychiatric Management, Inc. | 146544 |
| Southern Hills Medical Center, LLC | 149076 |
| Southern Illinois Health Care Foundation, Inc. d/b/a SIHF Healthcare | 149288 |
| Southern Tennessee Medical Center, LLC | 149237 |
| Southwest Mississippi Regional Medical Center | 135445 |
| Southwestern Illinois Health Facilities, Inc | 114620 |
| Southwestern Medical Center, LLC | 149238 |
| Sparks Family Hospital, Inc. | 149144 |
| Spotsylvania Medical Center, Inc. | 149136 |
| Spring View Hospital, LLC | 149239 |
| St. Anthony's Hospital, Inc. | 149293 |
| St. Barnabas Health System Bronx NY | 147243 |
| St. Benedict Health Center | 148946 |
| St. Claire Medical Center, Inc. | 148808 |
| St. David's Healthcare Partnership, L.P., LLP | 149104 |

| | |
|---|---|
| St. Dominic-Jackson Memorial Hospital | 147629 |
| St. Francis Health System | 121320 |
| St. Francis Health, LLC | 149240 |
| St. Francis Hospital, Inc | 65167 |
| St. Francis Medical Center | 42375 |
| St. Francis Medical Center, Inc. | 147638 |
| St. John's Riverside Hospital | 121335 |
| St. Joseph Health System, LLC | 148699 |
| St. Joseph Hospital, LLC | 149241 |
| St. Joseph's Hospital of Buckhannon, Inc. | 148829 |
| St. Joseph's Hospital, Inc. | 149294 |
| St. Joseph's/Candler Health System, Inc. | 145910 |
| St. Mary's Medical Center, Inc. | 148647 |
| St. Michael's Hospital, Inc. | 148954 |
| Starke HMA, LLC | 148685 |
| Statesville HMA, LLC | 148717 |
| Stonewall Jackson Memorial Hospital Company | 148842 |
| Summerlin Hospital Medical Center, LLC | 148920 |
| Sumner County Hospital District No 1 | 147763 |
| Sumner Regional Medical Center, LLC | 149242 |
| SUN CITY HOSPITAL, INC. | 149043 |
| Sunflower County, Mississippi, Districts 1, 2 & 3 (Board of Supervisors) | 148914 |
| Sunrise Hospital and Medical Center, LLC | 149077 |
| Sunrise MountainView Hospital, Inc. | 149075 |
| SV Healthcare System, Inc. | 148645 |
| T.J. Samson Community Hospital | 148930 |
| Takoma Regional Hospital, Inc. | 148806 |
| TALLAHASSEE MEDICAL CENTER, INC. | 149014 |
| Taylor County Hospital District Health Facilities Corporation | 148857 |
| Taylor Regional Hospital, Inc. | 41770 |
| Temecula Valley Hospital, Inc. | 149150 |
| Tenet Hospitals, Ltd. | 148614 |
| TERRE HAUTE REGIONAL HOSPITAL, L.P. | 149060 |
| The Aroostook Medical Center | 148977 |
| The Blount County Health Care Authority | 146103 |
| The Blue Hill Memorial Hospital | 148978 |
| The Charles Town General Hospital | 148830 |
| The Harrison Memorial Hospital, Inc. | 148856 |
| The Healthcare Authority of Winfield, Alabama | 146116 |
| The Lutheran Foundation, Inc. | 148693 |
| The Medical Center at Clinton County, Inc. | 148811 |

| | |
|---|---|
| The Medical Center at Franklin, Inc. | 148812 |
| The Medical Center, Inc. | 149299 |
| The Orthopedic Hospital at Parkview North, LLC | 148698 |
| The Outer Banks Hospital, Inc. | 148995 |
| The Titusville Area Hospital | 148597 |
| The Villages Tri-County Medical Center, Inc. | 148821 |
| Thomas Health System, Inc. | 148908 |
| TIMPANOGOS REGIONAL MEDICAL SERVICES, INC. | 149127 |
| Tippah County Hospital | 148798 |
| Tishomingo Health Services, Inc. | 149163 |
| Tooele Hospital Corporation | 148888 |
| Topeka Hospital, LLC | 149262 |
| TPG Hospital, LLC (DBA Northwest Surgical Hospital) | 115691 |
| Triad of Alabama, LLC | 148660 |
| Trident Medical Center, LLC | 149087 |
| Trousdale Medical Center, LLC | 149243 |
| Trustees of Mease Hospital, Inc | 149290 |
| Tucson Medical Center | 146387 |
| Tullahoma HMA, LLC | 148745 |
| Tunkhannock Hospital Company, LLC | 148730 |
| Twin Cities Community Hospital, Inc. | 148605 |
| Tyler Regional Hospital, LLC | 149269 |
| UHS of Oklahoma, LLC | 149149 |
| UHS of Texoma, Inc. | 149151 |
| UHS-Corona, Inc. | 149140 |
| United Hospital Center, Inc. | 148823 |
| Universal Health Services of Rancho Springs, Inc | 149148 |
| University Health Services, Inc. | 149310 |
| University Health System, Inc. | 149309 |
| UNIVERSITY HEALTHCARE SYSTEM L.C. | 149068 |
| UNIVERSITY HOSPITAL, LTD. | 149046 |
| University McDuffie County Regional Medical Center, Inc. | 149311 |
| Valley Health System LLC | 148919 |
| Valley Hospital Medical Center, Inc. | 148917 |
| Van Buren HMA, LLC | 148672 |
| Vanderbilt University Medical Center | 214811 |
| Vaughan Regional Medical Center, LLC | 149244 |
| Venice HMA, LLC | 148679 |
| VHS Acquisition Subsidiary Number 1, Inc. | 148617 |
| VHS Acquisition Subsidiary Number 3, Inc. | 148626 |
| VHS Acquisition Subsidiary Number 9, Inc. | 148644 |

| | |
|---|---|
| VHS Brownsville Hospital Company, LLC | 148622 |
| VHS Children's Hospital of Michigan, Inc. | 148632 |
| VHS Detroit Receiving Hospital, Inc. | 148631 |
| VHS Harlingen Hospital Company, LLC | 148621 |
| VHS Huron Valley-Sinai Hospital, Inc. | 148629 |
| VHS of Arrowhead, Inc. | 148616 |
| VHS of Illinois, Inc. | 149000 |
| VHS San Antonio Partners, LLC | 148623 |
| VHS Sinai-Grace Hospital, Inc. | 148630 |
| VHS West Suburban Medical Center, Inc. | 148627 |
| VHS Westlake Hospital, Inc. | 148628 |
| Vicksburg Healthcare, LLC | 148703 |
| Victoria of Texas, L.P. | 148753 |
| Viera Hospital, Inc. | 148902 |
| Virginia Commonwealth University Health System Authority (VCUHS) | 148970 |
| Wagner Community Memorial Hospital | 148955 |
| Walterboro Community Hospital, Inc. | 149085 |
| Warsaw Health System, LLC | 148692 |
| Watertown Medical Center, LLC | 149245 |
| Waukegan Illinois Hospital Company, LLC | 148870 |
| Weatherford Health Services, LLC | 149115 |
| Webster County Memorial Hospital, Inc. | 148836 |
| Webster Health Services, Inc. | 149162 |
| Weirton Medical Center, Inc. | 148905 |
| Wellington Regional Medical Center, LLC | 149152 |
| Wellmont Health System | 148799 |
| Wesley Health System, LLC | 148706 |
| Wesley Medical Center, LLC | 149063 |
| West Boca Medical Center, Inc. | 148650 |
| WEST FLORIDA - MHT, LLC | 149030 |
| WEST FLORIDA - PPH, LLC | 149038 |
| WEST FLORIDA REGIONAL MEDICAL CENTER, INC. | 149047 |
| West Harrison Hospital District | 148862 |
| WEST HILLS HOSPITAL | 149009 |
| WEST VALLEY MEDICAL CENTER, INC. | 149059 |
| West Virginia University Hospitals, Inc. | 148822 |
| West Volusia Hospital Authority | 627957 |
| West Volusia Hospital Authority | 627956 |
| West Volusia Hospital Authority | 627958 |
| West Volusia Hospital Authority | 627960 |
| West Volusia Hospital Authority | 89648 |

| | |
|---|---|
| West Volusia Hospital Authority | 43254 |
| Western Reserve Hospital, LLC | 115133 |
| Westfields Hospital, Inc. | 148937 |
| Wetzel County Hospital Association | 148828 |
| Wheeling Hospital, Inc. | 148909 |
| White County Medical Center | 148596 |
| White River Health System, Inc. | 148599 |
| Willamette Valley Medical Center, LLC | 149246 |
| Williamston Hospital Corporation | 148885 |
| Winnie Community Hospital, L.L.C | 148915 |
| Winston Medical Center | 49450 |
| Winter Haven Hospital, Inc | 149295 |
| Woman's Hospital Foundation | 148598 |
| Woodford Hospital, LLC | 149247 |
| Woodward Health System, LLC | 148726 |
| Wyoming Valley Care Systems, Inc. | 148731 |
| Wythe County Community Hospital, LLC | 149248 |
| Yale New Haven Health Services Corporation | 113503 |
| Yuma Regional Medical Center | 148913 |

**EXHIBIT B**

**Hospitals in Class 4 (Non-Federal Domestic Governmental Entity Claims)**

| Claimant Name | Claim No. |
|---|---|
| Acadia-St. Landry Hospital Service District d/b/a Acadia-St. Landry Hospital | 115200 |
| Attentus Moulton, LLC | 146064 |
| Bexar County Hospital District | 147340 |
| Bexar County Hospital District | 75156 |
| Bibb County Healthcare Authority | 148789 |
| Bowdle Healthcare Foundation | 148969 |
| Candler County Hospital Authority | 148925 |
| Citizens Memorial Hospital District | 148904 |
| Clarksdale HMA, LLC | 148896 |
| Clay County Healthcare Authority | 146520 |
| Clinch County Hospital Authority | 148926 |
| Colquitt County Hospital Authority | 149001 |
| Comanche County Hospital Authority | 146510 |
| Cullman Regional Medical Center, Inc. | 146203 |
| D.W. McMillan Memorial Hospital | 148793 |
| Dale Medical Center | 148790 |
| Dallas County Hospital District | 148848 |
| DCH Health Care Authority | 148851 |
| Dodge County Hospital Authority d/b/a Dodge County Hospital | 49499 |
| Elberton-Elbert County Hospital Authority | 148999 |
| Evans Memorial Hospital, Inc. | 38782 |
| Floyd Valley Hospital Foundation | 148956 |
| Geneva County Healthcare Authority, Inc. | 148797 |
| Gonzales Healthcare Systems, Inc. | 149156 |
| Goodland Regional Medical Center | 147766 |
| Greene County Hospital | 148791 |
| Guadalupe Regional Medical Center | 148784 |
| Habersham County Hospital, Georgia | 136480 |
| Health Care Authority of Clarke County, Alabama | 148786 |
| Healthcare Authority for the City of Anniston | 146024 |
| Hennepin Healthcare System, Inc. | 148932 |
| HH Health System-Athens Limestone, LLC | 146004 |
| HH Health System-Marshall, LLC | 146068 |
| HH Health System-Morgan, LLC | 145975 |
| HH Health System-Shoals, LLC | 146011 |

| | |
|---|---|
| Hospital Authority of Baxley and Appling County d/b/a Appling Health Care System | 49033 |
| Hospital Authority of Bleckley County d/b/a Bleckley Memorial Hospital | 41812 |
| Hospital Authority of the City of Bainbridge and Decatur County | 149003 |
| Hospital Service District No. 1 of the Parish of Avoyelles, State of Louisiana, d/b/a Bunkie General Hospital | 93915 |
| Hospital Service District No. 1 of The Parish of LaSalle, State of Louisiana, d/b/a Hardtner Medical Center | 94168 |
| J. Paul Jones Hospital, Inc. | 149158 |
| Jackson County Hospital District | 134462 |
| Kershaw County, South Carolina and the Kershaw County and the Kershaw County Hospital Board A/K/A Kershawhealth D/B/A Health Services District of Kershaw County | 147847 |
| Kershaw Hospital, LLC | 149204 |
| Lakeland Community Hospital, Inc. | 146125 |
| Lakeland Community Hospital, Inc., | 148892 |
| Lakes Regional Healthcare Foundation | 148961 |
| Marshall Medical Centers | 147118 |
| Mason Hospital District, Mason County, IL | 143798 |
| Massac Memorial, LLC | 148910 |
| Medical University Hospital Authority | 39088 |
| Medical West Hospital Authority, an Affiliate of UAB Health System | 148767 |
| Mitchell County Hospital | 147764 |
| Monroe County Healthcare Authority | 135438 |
| North Caddo Hospital Service District d/b/a North Caddo Medical Center | 147503 |
| North Oaks Medical Center, LLC | 86787 |
| Ochiltree County Hospital District | 149165 |
| Opelousas General Hospital Authority, a Louisiana Public Trust, d/b/a Opelousas General Health System | 112853 |
| Palo Pinto County Hospital District | 148787 |
| Parish Hospital Service District for the Parish of Orleans - District A | 143973 |
| Pipestone Medical Clinic | 148960 |
| Pointe Coupee Parish Health Services District Number 1 | 15998 |
| Rawlins County Health Center | 147770 |
| Redfield Community Memorial Hospital and Clinic Foundation, Inc. | 148964 |
| Slidell Memorial Hospital | 147471 |
| SLIDELL MEMORIAL HOSPITAL | 67993 |
| Southeast Georgia Health Services, LLC | 149056 |
| St. Tammany Parish Hospital Service District No. 1, d/b/a St. Tammany Health Systems | 147447 |

23

| | |
|---|---|
| Tarrant County Hospital District | 144955 |
| The Colbert County-Northwest Alabama Health Care Authority | 146015 |
| The Health Care Authority for Baptist Health, an Affiliate of UAB Health System | 148655 |
| The Health Care Authority of Athens and Limestone County | 146027 |
| The Health Care Authority of Cullman County | 147222 |
| The Health Care Authority of Haleyville and Winston County, AL | 146131 |
| The Health Care Authority of Morgan County - City of Decatur | 146000 |
| The Health Care Authority of The City of Huntsville | 145978 |
| The Hospital Authority of Valdosta and Lowndes County, Georgia | 145866 |
| The Hospital Authority of Wayne County, Georgia | 144114 |
| The Jackson County Health Care Authority | 145946 |
| The Lawrence County Health Care Authority | 146075 |
| The Marshall County Health Care Authority | 145979 |
| The Medical University of South Carolina | 41191 |
| The MetroHealth System | 94348 |
| The Sylacauga Health Care Authority | 148861 |
| Tombigbee Healthcare Authority | 148796 |
| Troy Hospital Healthcare Authority | 146525 |
| UAB Health System | 149312 |
| University Medical Associates of the Medical University of South Carolina | 41188 |
| WAYNE COUNTY GENERAL HOSPITAL (MISSISSIPPI) | 38819 |
| West Ascension Hospital Service District d/b/a Prevost Memorial Hospital | 144097 |
| West Wharton County Hospital District | 149153 |
| William Newton Memorial Hospital | 88889 |
| Yalobusha County, MS General Hospital | 143228 |
| Yalobusha County, MS General Hospital | 38809 |

<u>EXHIBIT C</u>

**Non-Hospitals in Class 7 (Healthcare Provider Claims)**

| Claimant Name | Claim No. |
|---|---|
| 1 Method Center | 146733 |
| A Change INto Recovery | 145873 |
| A Forever Recovery | 146794 |
| A Safe Haven Foundation | 70039 |
| A Safe Haven, LLC | 70006 |
| AAC Holdings, Inc. | 146622 |
| Aaron E. Henry Community Health Services, Inc | 615979 |
| Acorn Addiction Center, Indianapolis, IN | 616137 |
| Acqua Recovery | 145883 |
| Ambrose of NJ, Medford, NJ | 615970 |
| Amhealth Behavioral Inc. | 146176 |
| Amin, Kumar Bipin | 3189 |
| A-MMED Ambulance, Inc., d/b/a A-MED Ambulance Service | 116196 |
| ApolloMD Business Services, LLC | 147264 |
| Aprahamian Marquez, Kathryn Lozano | 5688 |
| Aquila Recovery Clinic | 145878 |
| Aquila VA | 145893 |
| Arcadia Trails | 114571 |
| ARREDONDO, ADAM | 379 |
| Asana Recovery | 146183 |
| Aspen Ridge North | 145969 |
| Aspen Ridge Recovery | 145909 |
| ATON CENTER, INC. | 146179 |
| ATTALLA, YASSIR AH | 2061 |
| AVIN, NADEGE | 495 |
| Awakening Behavioral Health | 146186 |
| Awakenings Rehabilitation, Inc | 146793 |
| BADREDDINE, HANA MO | 74654 |
| Beaches Recovery | 146182 |
| Behavioral Rehabilitation Services, Inc. | 146706 |
| Bellator Health Care Management, LLC | 146043 |
| Bellefonte Physician Services, Inc. | 65152 |
| BELLO, MARY RUTH | 23400 |
| Bennet, Davis | 972 |
| BEREZOVSKI, ROMAN G. | 530 |
| Best Drug Rehabilitation | 146791 |

| | |
|---|---|
| Beyond the Basics | 145963 |
| BLADEN, BOYD KENT | 6509 |
| Bolt Surgery Center | 146197 |
| Bon Secours-Virginia Healthsource, Inc | 65151 |
| Boshers, Beau | 5000 |
| BOULDER INTEGRATED HEALTH LLC DBA: BOLDER LIFE | 146199 |
| BRC Recovery Inc. | 146200 |
| BREGOLI, ARTHUR R. | 509 |
| Bridge House Corporation | 116615 |
| Bridging the Gaps Inc. | 146384 |
| BRIGGS-MEAD, MERILEE CA | 932 |
| Bristol SL Holdings | 146630 |
| CAI, WENHUI | 242 |
| CALDWELL, EDDY LLOYD | 79210 |
| California Prime Recovery | 146191 |
| Calument Counseling & Dui Services, Inc | 616138 |
| Camcare Health Corp | 618540 |
| Camcare Health Corp | 147765 |
| Capo Canyon Recovery LLC | 146710 |
| Casa Recovery Inc. | 146714 |
| CCT-OTC, LLC | 146034 |
| Center Point, Inc. | 147794 |
| Changing Tides Treatment LLC. | 146615 |
| Choices Recovery Inc. | 146689 |
| CHP Properties, LLC | 146084 |
| Cirque Lodge, Oreau, UT | 616013 |
| CLAYBON, ERNEST | 79188 |
| CNV Detox | 146540 |
| Coastline Recovery for Men, Coastline Recovery for Women | 146202 |
| COLKER, CARLON M. | 685 |
| Community Based Care of Brevard, Inc. d/b/a Brevard Family Partnership | 147797 |
| Community Partnership for Children, Inc. | 147796 |
| Companion Home Services, LLC | 146135 |
| Comprehensive Alcohol Rehabilitation Programs, Inc. | 147219 |
| Crittenden, William J | 146819 |
| CROSS TIMBERS HOSPICE | 342 |
| Dacco Behavioral Health, Tampa, FL | 616006 |
| Davis, Leon D. | 6445 |
| Delphi Behavioral Health | 146570 |
| Denver Womens Recovery | 146063 |
| Desert Cove Recovery | 147400 |

| | |
|---|---|
| Desert Mountain Detox | 146067 |
| Diamond House Detox | 146071 |
| Disc Village, Tallahassee, FL | 616228 |
| Dixon, Michael W | 208 |
| DOLOWICH, GARY ALAN | 5190 |
| DOYLE, MICHAEL | 2579 |
| EARLY, MICHAEL WAYNE | 250 |
| ECI Healthcare Partners, LLC | 113193 |
| EDCare Management, Inc. | 104798 |
| Elite Care, Inc. | 146204 |
| Elite Care, Inc. | 146391 |
| ESPARZA, OVET | 2370 |
| Etowah-Dekalb-Cherokee Mental Health Board, Incorporated | 146090 |
| EVNSQ, Inc. | 146074 |
| Faith Recovery Center Inc. | 146211 |
| Family Health Care Clinic, Inc | 616149 |
| Family Health Care Clinic, PSC | 69865 |
| Family Health Care Clinic, PSC | 69944 |
| Family Health Care Clinic, PSC as class representative for all similarly-situated rural health clinics under Fed.R.Civ.P. 23 | 69939 |
| Family Practice Clinic of Booneville, Inc. | 65022 |
| Family Practice Clinic of Booneville, Inc. as class representative for all similarly-situated Rural Health Clinics under Fed.R.Civ.P. 23 | 64973 |
| Fifth Street Counseling Center, Plantation FL | 616200 |
| Foster Hill Wellness, Inc. | 146216 |
| Fox, Robert J. | 473 |
| Freedom House | 146917 |
| Freedom Recovery LLC. | 146086 |
| GAUS, VICTORIA | 10925 |
| GIPSON, STEPHEN | 249 |
| GOFFAS, GEORGE THOMAS | 75035 |
| Goforth Inspired | 146094 |
| Gordon, M.D., Roger L. | 43470 |
| Grace Hospice of New Orleans, LLC | 145881 |
| GREGORY, BEVERLY DIANE | 31385 |
| GROWNEY, JOHN | 836 |
| GROWNEY, JOHN THOMAS | 961 |
| GROWNEY, JOHN THOMAS | 1107 |
| Guest House Ocala, LLC | 146093 |
| Gullett, Brian | 12733 |
| Hansei Solutions | 146734 |

| | |
|---|---|
| Harmony Hollywood, LLC | 146609 |
| Health Care & Rehab Services Southeastern Vermont, Inc. | 147799 |
| Health Help Incorporated | 147767 |
| Henry J Austin Health Center Inc. | 147761 |
| High Watch Recovery Center | 147386 |
| Hilaga, Dr. Ferdinand B. | 70221 |
| HOBBS, HANA C. | 797 |
| Homedica of Louisiana, LLC | 146130 |
| Ignite Teen Treatment, LLC | 146112 |
| I-Kare Treatment Center, LLC | 49509 |
| Imperial Healing Estate | 146104 |
| Infinity Behavioral Health Group | 146502 |
| Infinity Behavioral Health Services | 614549 |
| Infinity Behavioral Health Services | 146461 |
| Inland Detox Inc. | 615901 |
| Integris ProHealth, Inc. | 115477 |
| Integrity Billing | 146581 |
| iRecover Treatment Centers Inc. DBA: Serenity Palms | 146117 |
| Ivy Healthcare, LLC | 146327 |
| J. Herndons, LLC dba Addiction Therapeutic Services | 146840 |
| JBRC Medcial Group LLC | 73885 |
| JBRC Medical Group Center, LLC. | 147748 |
| JBRC Medical Group Center, LLC. | 70224 |
| JBRC Medical Group Center, LLC. | 73860 |
| JBRC Medical Group LLC | 147323 |
| JBRC Medical Group LLC | 147329 |
| JBRC Medical Group LLC | 147331 |
| JBRC Medical Group LLC | 147504 |
| JBRC Medical Group LLC | 147508 |
| JBRC Medical Group LLC | 147514 |
| JBRC Medical Group LLC | 147712 |
| JBRC Medical Group LLC | 147714 |
| JBRC Medical Group LLC | 147717 |
| JBRC Medical Group LLC | 70030 |
| JBRC Medical Group LLC | 73873 |
| JBRC Medical Group LLC | 70009 |
| JBRC Medical Group LLC | 70227 |
| JBRC Medical Group LLC | 73683 |
| JBRC Medical Group LLC | 70081 |
| JBRC Medical Group, LLC | 89103 |
| JBRC Medical Group, LLC | 147669 |

| | |
|---|---|
| JBRC Medical Group, LLC | 147704 |
| JBRC Medical Group, LLC | 147724 |
| JBRC Medical Group, LLC | 147728 |
| JBRC Medical Group, LLC | 147746 |
| JBRC Medical Group, LLC | 70090 |
| JBRC Medical Group, LLC | 70196 |
| JBRC Medical Group, LLC | 70213 |
| JBRC Medical Group, LLC | 73685 |
| JBRC Medical Group, LLC. | 147174 |
| JBRC Medical Group, LLC. | 147266 |
| JBRC Medical Group, LLC. | 147278 |
| JBRC Medical Group, LLC. | 147281 |
| JBRC Medical Group, LLC. | 147288 |
| JBRC Medical Group, LLC. | 147291 |
| JBRC Medical Group, LLC. | 147295 |
| JBRC Medical Group, LLC. | 147301 |
| JBRC Medical Group, LLC. | 147356 |
| JBRC Medical Group, LLC. | 147375 |
| JBRC Medical Group, LLC. | 147418 |
| JBRC Medical Group, LLC. | 147421 |
| JBRC Medical Group, LLC. | 147429 |
| JBRC Medical Group, LLC. | 89044 |
| JBRC Medical Group, LLC. | 147674 |
| JBRC Medical Group, LLC. | 147680 |
| JBRC Medical Group, LLC. | 147740 |
| JBRC Medical Group, LLC. | 147742 |
| JBRC Medical Group, LLC. | 73673 |
| JBRC Medical Group, LLC. | 73676 |
| JBRC Medical LLC | 89642 |
| JBRC Medical LLC | 70063 |
| Johnson, Dr. Angelo R | 5200 |
| Joseph, Richard Anthony | 930 |
| JRBC Medical Group LLC | 70031 |
| Just Believe Recovery Center LLC | 147713 |
| Just Believe Recovery Center LLC | 69976 |
| Just Believe Recovery Center LLC | 70008 |
| Just Believe Recovery Center LLC | 70091 |
| Just Believe Recovery Center of Port Saint Lucie LLC | 147325 |
| Just Believe Recovery Center of Port Saint Lucie LLC | 147512 |
| Just Believe Recovery Center of Port Saint Lucie LLC | 147519 |
| Just Believe Recovery Center of Port Saint Lucie LLC | 147521 |

| | |
|---|---|
| Just Believe Recovery Center of Port Saint Lucie LLC | 89639 |
| Just Believe Recovery Center of Port Saint Lucie LLC | 147710 |
| Just Believe Recovery Center of Port Saint Lucie LLC | 147716 |
| Just Believe Recovery Center of Port Saint Lucie LLC | 70179 |
| Just Believe Recovery Center of Port Saint Lucie LLC | 73730 |
| Just Believe Recovery Center of Port Saint Lucie LLC | 75115 |
| Just Believe Recovery Center of Port Saint Lucie LLC | 73804 |
| Just Believe Recovery Center of Port Saint Lucie LLC | 70085 |
| Just Believe Recovery Center of Port Saint Lucie LLC | 73743 |
| Just Believe Recovery Center of Port Saint Lucie LLC | 73902 |
| Just Believe Recovery Center of Port Saint Lucie, LLC | 147678 |
| Just Believe Recovery Center of Port Saint Lucie, LLC. | 147270 |
| Just Believe Recovery Center of Port Saint Lucie, LLC. | 147279 |
| Just Believe Recovery Center of Port Saint Lucie, LLC. | 147287 |
| Just Believe Recovery Center of Port Saint Lucie, LLC. | 147289 |
| Just Believe Recovery Center of Port Saint Lucie, LLC. | 147293 |
| Just Believe Recovery Center of Port Saint Lucie, LLC. | 147294 |
| Just Believe Recovery Center of Port Saint Lucie, LLC. | 147296 |
| Just Believe Recovery Center of Port Saint Lucie, LLC. | 147297 |
| Just Believe Recovery Center of Port Saint Lucie, LLC. | 147300 |
| Just Believe Recovery Center of Port Saint Lucie, LLC. | 147366 |
| Just Believe Recovery Center of Port Saint Lucie, LLC. | 147423 |
| Just Believe Recovery Center of Port Saint Lucie, LLC. | 147433 |
| Just Believe Recovery Center of Port Saint Lucie, LLC. | 147445 |
| Just Believe Recovery Center of Port Saint Lucie, LLC. | 147652 |
| Just Believe Recovery Center of Port Saint Lucie, LLC. | 147672 |
| Just Believe Recovery Center of Port Saint Lucie, LLC. | 147707 |
| Just Believe Recovery Center of Port Saint Lucie, LLC. | 147725 |
| Just Believe Recovery Center of Port Saint Lucie, LLC. | 147726 |
| Just Believe Recovery Center of Port Saint Lucie, LLC. | 89591 |
| Just Believe Recovery Center of Port Saint Lucie, LLC. | 147745 |
| Just Believe Recovery Center of Port Saint Lucie, LLC. | 73702 |
| Just Believe Recovery Center of Port Saint Lucie, LLC. | 73719 |
| Just Believe Recovery Center of Port Saint Lucie, LLC. | 73731 |
| Just Believe Recovery Center of Port Saint Lucie, LLC. | 73734 |
| Just Believe Recovery Center of Port Saint Lucie, LLC. | 73798 |
| Just Believe Recovery Center of Port Saint Lucie, LLC. | 89201 |
| Just Believe Recovery Center of Port Saint Lucie, LLC. | 89035 |
| Just Believe Recovery Center, LLC | 70222 |
| Just Believe Recovery Center, LLC | 73789 |
| Just Believe Recovery Center, LLC | 73851 |

| | |
|---|---|
| Just Believe Recovery Center, LLC. | 89574 |
| Just Believe Recovery Center, LLC. | 147280 |
| Just Believe Recovery Center, LLC. | 147285 |
| Just Believe Recovery Center, LLC. | 147663 |
| Just Believe Recovery Center, LLC. | 89623 |
| Just Believe Recovery Center, LLC. | 73649 |
| KAPLAN, DANIEL A. | 806 |
| KAPLAN, DANIEL A. | 864 |
| KAPLAN, PERRY | 230 |
| KEELS, SR., DONN WILSON | 494 |
| KEELS, SR., DONN WILSON | 529 |
| Keys, Marc S. | 41554 |
| Kids First of Florida, Inc. | 147800 |
| Koura, Firas | 14638 |
| KWETKOWSKI, BRIAN | 209 |
| Lab Express LLC | 146662 |
| Lake Hughes Recovery Estates Inc, DBA First Responders First | 146218 |
| Lake Hughes Recovery, Inc. | 146217 |
| Lakeview Center, Inc. | 147802 |
| LEE, JAMES BAE | 508 |
| LifeSpring, Inc, | 147769 |
| LIN, JOSEPH CHI-HSIUNG | 236 |
| Living Rebos LLC | 146219 |
| LLOYD-TURNEY, CELIA | 931 |
| LLOYD-TURNEY, CELIA | 1048 |
| Los Angeles Recovery Centers | 146611 |
| MALAMENT, IRWIN BERNARD | 9430 |
| Malibu Behavioral Health Services | 146224 |
| Mannino, Paul | 521 |
| Mark, Medder L. | 912 |
| Markewich, MD, Stephen | 889 |
| Martens, James | 859 |
| Martinez, Jorge A. | 70 |
| Masoud Bamdad, M.D., O.B.O. State of CA | 654 |
| McCarthy, Edward | 206 |
| MELENDEZ POVENTUD, LUIS HUMBERTO | 74492 |
| Mercy House Teen Challenge | 43312 |
| Mercy Medical, Kankakee, IL | 616001 |
| Mia Health Group | 11722 |
| MURANO, RAYMOND S. | 801 |
| NACIER, PAUL | 3392 |

| | |
|---|---|
| NACIER, PAUL | 3484 |
| Narconon Suncoast, Inc. | 146725 |
| NAVARRO, FRANK J. | 3995 |
| New Balance OM, Merrillville, IL | 616134 |
| New Found Life | 147393 |
| New Freedom Recovery Center LLC. | 146101 |
| New Orleans Mission, Inc. | 57380 |
| Newman's Medical Services, INC. | 121181 |
| NIGRO, NICKI L. | 807 |
| Niznik Behavioral Health | 146227 |
| NOLA SJH II, LLC | 146154 |
| Northeast Kingdom Human Services, Inc. | 75143 |
| OC Revive | 146229 |
| OHOTNICKY, DAVID J. | 1127 |
| OLAGBEMI, OLAKUNLE TEMITOPE | 651 |
| OLAGBEMI, OLAKUNLE TEMITOPE | 655 |
| OSARO, ODUAH DANIEL | 572 |
| OSARO, ODUAH DANIEL | 793 |
| Pacific Recovery Solutions | 146232 |
| PCI Westlake Centers | 146230 |
| Perspectives II | 146100 |
| Perspectives III | 146119 |
| Phoenix House Mid Atlantic | 146612 |
| Porter-Starke Services Inc | 117140 |
| POSC of Orange | 146225 |
| Primary Purpose Center, Inc. | 57006 |
| Project New Start, Inc.- New Life Church of God (similarly situated as Creditor Mercy House Teen Challenge) | 74462 |
| Rancho Milagro Recovery, Inc. | 146756 |
| Raphael, Stephen D. | 258 |
| Rayl Enterprises, Inc. | 147381 |
| REGAN, JOHN E. | 493 |
| Renaissance Ranch | 146599 |
| Renaissance Recovery | 146237 |
| Resurgence Behavioral Health | 146505 |
| REYNARD, MICHAEL | 800 |
| RINDFLEISCH, DALLAS GE | 885 |
| Riverbend Center for Mental Health | 146111 |
| RMP Enterprises, LLC, Port St Lacie, FL | 616179 |
| Rodriguez, Hector P. | 6442 |
| Roots Counseling Services, LLC | 147383 |
| Royal Life Centers, Del Ray Beach, FL | 616136 |

| | |
|---|---|
| RS Medical Inc | 12325 |
| RUST, DOUGLAS A. | 5692 |
| Safe Harbor Treatment center | 147066 |
| SAFE HAVEN RECOVERY, INC. | 146676 |
| Saint Francis Outreach Services, LLC | 111648 |
| Saint Francis Pharmacy Services, Inc. | 115470 |
| SAUER, RICHARD NEILL | 3992 |
| SAUER, RICHARD NEILL | 4175 |
| SAXENA, SANDHYA | 11103 |
| SAXENA, SHAILENDRA K. | 14508 |
| Schumacher Group of Arkansas, Inc. | 113233 |
| Schumacher Medical Corporation | 111462 |
| Schumacher Medical Corporation of Alabama, Inc | 113166 |
| Sea Change Santa Monica, LP d/b/a Sea Change Recovery | 146236 |
| Serenity Springs Recovery | 146121 |
| Sherman, Adam B | 42656 |
| Silicon Beach Outpatient Center | 146235 |
| Silver Lining Recovery Center DBA: Recovery BLVD | 146115 |
| Silver Sands Recovery, LLC | 146127 |
| Simons, Bernie | 4223 |
| Singing River Mental Health/Mental Retardation Services Region XIV Commission | 146256 |
| SMITH, LEROY ROY ANDREW | 497 |
| SMITH, LEROY ROY ANDREW | 547 |
| Smith, Richard W | 894 |
| SNYDER, MATTHEW R. | 43491 |
| Sober Life Recovery Solutions | 146500 |
| South Coast Counseling | 146242 |
| South Florida Behavioral Health Network | 43214 |
| South Florida Recovery, Greenacers, FL | 616097 |
| Southern California Recovery, LLC, Beverly Hills, CA | 616133 |
| SPENCER, JEFFREY | 75049 |
| St. Francis Physician Services, Inc. | 65188 |
| St. Joseph Hospice & Palliative Care-Northshore, LLC | 145907 |
| St. Joseph Hospice and Palliative Care of Monroe, LLC | 145889 |
| St. Joseph Hospice of Acadiana, LLC | 145861 |
| St. Joseph Hospice of Bayou Region | 145870 |
| St. Joseph Hospice of Cenla, LLC | 145887 |
| St. Joseph Hospice of Houston, LLC | 145950 |
| St. Joseph Hospice of South Alabama, LLC | 145973 |
| St. Joseph Hospice of Southern Mississippi, LLC | 145929 |
| St. Joseph Hospice of Southwest Louisiana, LLC | 145991 |

| | |
|---|---|
| St. Joseph Hospice of West Mississippi, LLC | 145935 |
| St. Joseph Hospice, LLC | 145857 |
| St. Vincent Charity Medical Center (& Rosary Hall) | 135459 |
| Stat Home Health Florida Panhandle, LLC | 146030 |
| Stat Home Health Houston Bellaire, LLC | 146059 |
| Stat Home Health Houston, LLC | 146060 |
| Stat Home Health of Cenark, LLC | 146161 |
| Stat Home Health of Northwest Louisiana, LLC | 146062 |
| Stat Home Health of Southeast Louisiana, LLC | 146155 |
| Stat Home Health of Southwest Louisiana, LLC | 146057 |
| Stat Home Health, LLC | 145994 |
| Stat Home Health-North, LLC | 146016 |
| Stat-Home Health-West, LLC | 146025 |
| Stepping Stones of San Diego | 146128 |
| Sterling Group Physician Services, LLC | 111669 |
| Summit Behavioral Health of Arizona, LLC | 146240 |
| Summit County Women's Recovery | 147160 |
| Summit Estate Recovery Center | 147081 |
| Sunshine Behavioral Health Group | 103587 |
| Surf City Recovery | 146351 |
| Surf City Recovery | 146132 |
| TANDAN, BIRENDRA NATH | 537 |
| TAYLOR, PEGGY B. | 503 |
| TAYLOR, PEGGY B. | 658 |
| Telang, Frank W | 6182 |
| The Bloc Outpatient | 147161 |
| The Carpenter Hospice of Northwest Louisiana, LLC | 135435 |
| The Counseling Service of Addison County, Inc. | 147798 |
| The Heights Treatment, LLC | 146454 |
| The Marshall-Jackson Mental Health Board, Inc. | 146096 |
| The Physicians' Group, LLC | 114102 |
| The Schumacher Group of Colorado, Inc. | 111459 |
| The Schumacher Group of Florida, Inc. | 111659 |
| The Schumacher Group of Illinois, Inc. | 113214 |
| The Schumacher Group of Indiana, Inc. | 104479 |
| The Schumacher Group of Kentucky, Inc. | 113111 |
| The Schumacher Group of Louisiana, Inc. | 111664 |
| The Schumacher Group of Michigan, Inc. | 111614 |
| The Schumacher Group Of Mississippi, Inc | 111623 |
| The Schumacher Group of Missouri, Inc. | 111647 |
| The Schumacher Group of Montana, Inc. | 103471 |

| | |
|---|---|
| The Schumacher Group of Nevada, Inc. | 110721 |
| The Schumacher Group of New Jersey, Inc. | 113208 |
| The Schumacher Group of New Mexico, Inc. | 103768 |
| The Schumacher Group of New York, Inc. | 103786 |
| The Schumacher Group of North Carolina, Inc. | 111644 |
| The Schumacher Group of Ohio, Inc. | 113163 |
| The Schumacher Group of Oklahoma, Inc. | 111665 |
| The Schumacher Group of Pennsylvania, Inc. | 111643 |
| The Schumacher Group of South Carolina, Inc. | 112736 |
| The Schumacher Group of Tennessee, Inc. | 103830 |
| The Schumacher Group of Texas, Inc. | 103812 |
| The Schumacher Group Of Virginia, Inc | 111629 |
| The Schumacher Group Of Washington, Inc | 111468 |
| The Schumacher Group Of West Virginia, Inc | 111635 |
| The Well Recovery Partners | 146579 |
| The Well Recovery Partners | 146651 |
| Torr, David | 5127 |
| TRAN-KIEM, DUY-TAM | 1733 |
| Transcend Living, Inc. | 147103 |
| Transitions Recovery Program | 121354 |
| Triad Health Systems Inc | 69941 |
| Triad Health Systems, Inc. as class representative for all similarly-situated Federally Qualified Healthcare Systems and Clinics under Fed.R.Civ.P. 23 | 73811 |
| True Accountability LLC | 147159 |
| VELAZQUEZ BENITEZ, LORRAINE Y. | 500 |
| VELAZQUEZ, BELINDA MELISSA | 811 |
| Victoria Wexley DDS | 42449 |
| Villaverde, John J. | 147390 |
| Volunteers of America Mid-States, Inc. and Subsidiaries | 146804 |
| VU, HONG THUY | 471 |
| VU, HONG THUY | 514 |
| WALKER, GRACE LEE CHILI | 527 |
| Warren Clinic, Inc. | 115308 |
| Wavelengths Recovery LLC | 147158 |
| WAYNEWOOD, FREEMAN LEE | 2149 |
| WEISBERG, MARK F. | 14400 |
| Wellstone, Inc. | 146309 |
| Westside Treatment, LLC. | 146483 |
| Wexley, MD, Lilia | 42013 |
| Workman, Theodore Ed | 1515 |
| Y and Y Recovery | 146663 |

| | |
|---|---|
| YANKILEVICH, LEO | 35296 |
| ZUZUKIN, GEORGE VLADIMIR | 879 |

## EXHIBIT D

**MSGE Fee Allocation Agreement**

**Exhibit E**

**Oklahoma Litigating Political Subdivisions**

| | |
|---|---|
| Atoka County | Beckham County |
| Caddo County | Choctaw County |
| Cimarron County | Cleveland County |
| Coal County | Comanche County |
| Craig County | Creek County |
| Custer County | Delaware County |
| Dewey County | Garvin County |
| Grady County | Greer County |
| Harmon County | Harper County |
| Haskell County | Hughes County |
| Jackson County | Jefferson County |
| Johnston County | Kay County |
| Kiowa County | Latimer County |
| LeFlore County | Lincoln County |
| Logan County | Love County |
| Major County | Mayes County |
| McClain County | McCurtain County |
| Muskogee County | Noble County |
| Nowata County | Okfuskee County |
| Oklahoma County | Okmulgee County |
| Osage County | Ottawa County |
| Pawnee County | Payne County |
| Pittsburg County | Pottawatomie County |
| Roger Mills County | Rogers County |
| Seminole County | Stephens County |
| Texas County | Tillman County |
| Tulsa County | Washington County |
| Woods County | Woodward County |
| City of Ada | City of Altus |
| City of Anadarko | City of Bethany |
| City of Broken Arrow | City of Collinsville |
| City of Edmond | City of El Reno |
| City of Elk City | City of Enid |

| | |
|---|---|
| City of Guthrie | City of Jenks |
| City of Lawton | City of Midwest City |
| City of Muskogee | City of Mustang |
| City of Oklahoma City | City of Owasso |
| City of Ponca City | City of Seminole |
| City of Shawnee | City of Stillwater |
| City of Tulsa | City of Yukon |

## Exhibit B

**NewCo Operating Injunction**

**DEBTORS/NEWCO OPERATING INJUNCTION**

## I.      DEFINITIONS

A.      "Bankruptcy Court" or "Court" shall mean the court presiding over the chapter 11 proceedings *In re Purdue Pharma L.P. et al.*, Case No. 19-23649 (SHL) (Bankr. S.D.N.Y.).

B.      "CDC Guideline Recommendations" shall mean the 12 enumerated Recommendations published by the U.S. Centers for Disease Control and Prevention (CDC) for the prescribing of opioid pain medication for patients 18 and older in primary care settings as part of its 2016 Guideline for Prescribing Opioids for Chronic Pain (CDC Guidelines), as updated or amended by the CDC.

C.      "Chapter 11 Plan of Reorganization" or "Plan of Reorganization" or "Plan" shall mean the *Fourteenth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors*, filed on September 26, 2025 [D.I. 7911], as the same may be amended, modified, or supplemented from time to time.

D.      "Company" shall mean the Debtors as defined in these chapter 11 proceedings *In re Purdue Pharma L.P. et al.*, Case No. 19-23649 (SHL) (S.D.N.Y.).    Following the Effective Date, "Company" shall mean "NewCo," a newly formed Delaware limited liability company to be created in accordance with Section 5.4 of the Plan to directly or indirectly receive the NewCo Transferred Assets and operate such NewCo Transferred Assets in accordance with the NewCo Operating Agreement, the NewCo Governance Covenants and the NewCo Operating Injunction.

E.      "Confirmation Order" shall mean the order of the Bankruptcy Court (or other court of competent jurisdiction) confirming the Chapter 11 Plan.

F.      "Downstream Customer Data" shall mean transaction information that the Company collects relating to the Company's direct customers' sales to downstream customers, including but not limited to chargeback data tied to the Company providing certain discounts, "867 data," and IQVIA data.

G.      "Effective Date" means the date on which the Plan of Reorganization becomes effective.

H.      "Governance Covenants" shall have the meaning set forth in the NewCo Operating Agreement.

I.      "Health Care Provider" shall mean any U.S.-based physician or other health care practitioner who is licensed to provide health care services or to prescribe pharmaceutical products and any medical facility, medical practice, hospital, clinic or pharmacy.

J.      "Including but not limited to," when followed by a list or examples, shall mean that list or examples are illustrative instances only and shall not be read to be restrictive.

K.    "In-Kind Support" shall mean payment or assistance in the form of goods, commodities, services, or anything else of value.

L.    "Lobby" shall mean to engage in "lobbying activities" or "lobbying contacts" under the federal lobbying disclosure act, 2 U.S.C. § 1602 *et seq*., and any analogous state or local provisions governing the person or entity being lobbied in that particular state or locality. As used in this injunction, "Lobby" includes Lobbying directly or indirectly, through grantees or Third Parties.

M.    "NewCo Disposition Event" shall have the meaning assigned to the term "Disposition Event" as set forth in the NewCo Operating Agreement.

N.    "NewCo Operating Agreement" shall have the meaning set forth in the Plan of Reorganization.

O.    "Opioid(s)" shall mean all natural, semi-synthetic, or synthetic chemicals that interact with opioid receptors and act like opium. For the avoidance of doubt, the term Opioid shall not include the opioid antagonists naloxone and nalmefene.

P.    "Opioid Product(s)" shall mean all current and future medications containing Opioids approved by the U.S. Food & Drug Administration (FDA) and listed by the Drug Enforcement Administration (DEA) as Schedule II, III, or IV drugs pursuant to the federal Controlled Substances Act, including but not limited to codeine, fentanyl, hydrocodone, hydromorphone, meperidine, morphine, oxycodone, oxymorphone, tapentadol, and tramadol.

Q.    "OUD" shall mean opioid use disorder defined in the *Diagnostic and* Statistical *Manual of Mental Disorders, Fifth Edition (DSM–5)*, as updated or amended.

R.    "PHI Product(s)" shall have the meaning set forth in the NewCo Operating Agreement, which for the avoidance of doubt includes, buprenorphine-naloxone combination tablets, over-the-counter naloxone nasal spray, injectable nalmefene, and any other medicines as determined by NewCo's Board provided that such medicines must be approved by the FDA for treatment of opioid addiction and/or reversing opioid overdoses, but for purposes of this injunction does not include methadone and generic versions of Subutex® sublingual buprenorphine tablets.

S.    "Promote," "Promoting," and "Promotion" shall mean dissemination of information or other practices intended or that could be reasonably anticipated to influence prescribing practices in a manner that increases sales, prescriptions, or the utilization of prescription products.

T.    "Qualified Researcher" shall mean any researcher holding a faculty appointment or research position at an institution of higher education, a research organization, a nonprofit organization, or a government agency.

U.    "Section" shall mean, unless the context requires otherwise, a Section of this injunction.

V.    "Shareholder Released Parties" shall mean the Estate of Beverly Sackler, David A. Sackler, Ilene Sackler, the Estate of Jonathan D. Sackler, Kathe Sackler, Mortimer D.A. Sackler, Richard S. Sackler, Theresa Sackler, any trusts of which any of the foregoing are beneficiaries, and the trustees thereof (solely in their capacities as such), each Shareholder Party and each other entity or person that directly or indirectly owns equity in, or has voting control over, any of the Debtors, and in the event of the death of a Shareholder Released Party who is a natural person, other than a natural person who is a Shareholder Released Party solely in the capacity as a trustee, the estate of such person.

W.    "State Monitor Committee" shall mean a bipartisan, volunteer committee comprising representatives from 5-7 States.

X.    "Suspicious Order" shall have the same meaning as provided by the Controlled Substances Act, 21 U.S.C. §§ 801-904, and the regulations promulgated thereunder, final DEA administrative decisions that are published in the Federal Register, and analogous state laws and regulations.

Y.    "Third Party" shall mean any person or entity other than the Company or a government entity.

Z.    "Treatment of Pain" means the provision of therapeutic modalities to alleviate or reduce pain. "Treatment of Pain" does not include (i) the provision of therapeutic modalities to treat a disease or condition that is something other than pain but for which a side effect or impact of the treatment of such disease or condition is a reduction in pain caused by such disease or condition, or (ii) Tinostamustine or Sunobinop.

## II.    SCOPE AND ENFORCEMENT

A.    This injunction shall apply to and be binding on NewCo on the Effective Date; and on any transferee or successor to, or subsequent operator of, all or any portion of NewCo's Opioid business (a "Transferee/Successor") as set forth below.

B.    The Debtors and NewCo consent to the entry of a final judgment or consent order, substantially in the form of this injunction, imposing all of the provisions of this injunction in each state and territorial court on the Debtors, NewCo and any Transferee/Successor, at any time after the Effective Date (the "Consent Judgment"), as well as to the jurisdiction of those state and territorial courts with respect to a Consent Judgment. A Consent Judgment shall apply to and be binding on NewCo after the Effective Date; and on any Transferee/Successor.

C.    Until this injunction is effective, the Voluntary Injunction initially entered on November 6, 2019 in *Purdue Pharma L.P. v. Massachusetts*, Adv. Pro. No. 19-08289 (Bankr. S.D.N.Y) as Exhibit 1 to the Second Amended Order Pursuant to 11 U.S.C. § 105(a) Granting Motion for a Preliminary Injunction and re-entered thereafter, shall remain in full force and effect on the Company and NewCo.

D.    Without limiting the foregoing:

3

1.      NewCo shall be required to obtain the consent of any Transferee/Successor to be bound by this injunction and to submit to the jurisdiction of this Court and each state and territorial court for enforcement of the terms of this injunction as a condition to a transfer of all or any portion of NewCo's Opioid business.

2.      Nothing in this injunction applies to the operation of a Transferee/Successor's pre-existing Opioid business. Any Transferee/Successor shall be subject only to Sections III.A-C and III.E-H.

3.      Nothing requires that this injunction be enforced exclusively in this Court or limits the jurisdiction of any state or territorial court to enforce the terms of this injunction.

## III.    INJUNCTIVE RELIEF

### A.    Ban on Promotion

1.      The Company shall not engage in the Promotion of Opioids or Opioid Products, including but not limited to, by:

   a.      Employing or contracting with sales representatives or other persons to Promote Opioids or Opioid Products to Health Care Providers or patients.

   b.      Using speakers, key opinion leaders, thought leaders, lecturers, and/or speaking events for Promotion of Opioids or Opioid Products.

   c.      Sponsoring, or otherwise providing financial support or In-Kind Support to medical education programs that include references to Opioids or Opioid Products.

   d.      Creating, sponsoring, operating, controlling, or otherwise providing financial support or In-Kind Support to any website, network, and/or social or other media account for the Promotion of Opioids or Opioid Products.

   e.      Creating, sponsoring, distributing, or otherwise providing financial support or In-Kind Support for materials Promoting Opioids or Opioid Products, including but not limited to brochures, newsletters, pamphlets, journals, books, and guides.

   f.      Creating, sponsoring, or otherwise providing financial support or In-Kind Support for advertisements that Promote Opioids or Opioid Products, including but not limited to internet advertisements or similar content, and providing hyperlinks or otherwise directing internet traffic to advertisements.

   g.      Engaging in Internet search engine optimization or other techniques designed to Promote Opioids or Opioid Products, including by improving

4

rankings or making content appear among the top results in an Internet search or otherwise be more visible or more accessible to the public on the Internet.

h.   Utilizing electronic health records software or other digital health platforms to create alerts, workflows, or disseminate information known or reasonably expected to increase utilization of Opioids or Opioid Products.

2.   Notwithstanding Sections III.A.1 and III.C, the Company may:

a.   Maintain corporate websites.

b.   Maintain a website for any Opioid Product that contains principally the following content: the FDA-approved package insert, medication guide, and labeling, and a statement directing patients or caregivers to speak with a licensed Health Care Provider; Risk Evaluation and Mitigation Strategy (REMS) materials; and contact information to report an adverse event or product complaint.

c.   Provide information or support the provision of information as expressly required by law, settlement, court order or any state or federal government agency, including providing all information necessary in order for the Company to comply with its regulatory obligations pursuant to the Federal Food, Drug, and Cosmetic Act or the Controlled Substances Act, and/or provide information about legal proceedings involving the Company.

d.   Engage and compensate Health Care Providers or other Third Parties to assist the Company in responding to, preparing for and participating in any of the following activities held by any state or federal government or state or federal agencies or regulators, including the FDA: advisory committees, working groups, meetings and or/hearings.

e.   Provide the following by mail, electronic mail, on or though the Company's corporate or product websites or through other electronic or digital methods: FDA-approved package insert, medication guide, approved labeling for Opioid Products, REMS materials or other prescribing information for Opioid Products that are published by a state or federal government agency.   State materials may be provided only within the applicable state.

f.   Provide scientific and/or medical information in response to an unsolicited request by a Health Care Provider concerning Opioid Products consistent with the  recommendations set forth in the FDA's Draft Guidance for Industry, *Responding to Unsolicited Requests for Off-Label Information About Prescription Drugs and Medical Devices* (Dec. 2011, as updated or amended by the FDA) and Guidance for Industry, *Good Reprint Practices for the Distribution of Medical Journal Articles and Medical or Scientific*

*Reference Publications on Unapproved New Uses of Approved Drugs and Approved or Cleared Medical Devices* (Jan. 2009, as updated or amended by the FDA). Such responses should be handled by medical or scientific personnel at the Company who are independent from the sales or marketing departments.

g.    Provide a response to any unsolicited question or request from a patient or caregiver, directing the patient or caregiver to the FDA-approved labeling and to the extent that the question cannot be answered solely by reference to a specific provision of the FDA-approved labeling, providing a response that is truthful, balanced, non-misleading and fully consistent with the FDA-approved labeling or recommending the patient or caregiver speak with a licensed Health Care Provider without naming any specific provider or healthcare institution; or directing the patient or caregiver to speak with their insurance carrier regarding coverage of an Opioid Product.

h.    Provide information to a payor, formulary committee, distributor, or other similar entity with knowledge and expertise in the area of health care economics concerning the cost or availability of a Company Opioid Product, including the costs compared to the cost of an Opioid Product manufactured or distributed by another company. Such information may include information about the stocking of the Opioid Product as described in the FDA-approved labeling; tier status; applicable prescribing guidelines that are consistent with the FDA-approved labeling; step-edits for Opioid Products; restrictions; and/or prior authorization status concerning an Opioid Product. Provided further that information provided pursuant to this subparagraph shall also be posted on the website permitted by Section III.A.2.b, except for information that is commercially sensitive or otherwise confidential, which instead shall be provided to the Monitor and the State Monitor Committee.

i.    Sponsor or provide financial support or In-Kind Support for an accredited or approved continuing medical education program required by either an FDA-approved REMS program or other federal or state law or regulation in accordance with applicable requirements, settlement with a governmental entity, or court order, through an independent Third Party, which shall be responsible for the continuing medical education program's content without the participation of the Company.

j.    Provide rebates, discounts, fees and other customary pricing adjustments to DEA-registered customers and contracting intermediaries, such as Buying Groups, Group Purchasing Organizations, Managed Care Plans and Pharmacy Benefit Managers, except as prohibited by Section III.E.

k.    Promote PHI Products, and provide information about, discuss, or comment on, issues regarding mechanisms for preventing opioid abuse

and misuse, including the prevention, education and treatment of opioid overdose.  Except that the Company shall not:

> (i)  Employ or contract with sales representatives to detail PHI Products (i.e., through direct interaction, whether in-person or virtual, with individual prescribing or dispensing health care professionals or their staffs) who are compensated based on sales or volume of PHI Products. The Company will document interactions related to PHI Products between Company sales representatives and health care professionals or their staffs and will retain documents and information relating to those communications; and/or

> (ii) In addition to Section III.A.2.k.i, with regard to PHI Products that are Opioid Products indicated for the treatment of substance abuse disorders, employ or contract with sales representatives to detail such PHI Products (i.e., through direct interaction, whether in-person or virtual, with individual prescribing or dispensing health care professionals or their staffs).  Nothing in this Section III.A.2.k.ii shall be construed to prohibit personal contact between non-sales representatives of the Company and health care professionals or their staffs regarding PHI Products that are Opioids. The Company will document interactions regarding PHI Products that are Opioids between Company non-sales representatives and health care professionals or their staffs and will retain documents and information relating to those communications.

> (iii)  Any and all documents and information relating to communications related to the activities described in Subsections (i) and (ii) of this Section III.A.2.k shall be provided to the Monitor at his request for his review.

> (iv) Nothing in this section shall be construed to permit the Promotion of methadone or generic versions of Subutex® sublingual buprenorphine tablets except pursuant to Sections III.A.2.a-j.

3.    The Company shall not engage in the following specific Promotional activity relating to any products for the treatment of Opioid-induced side effects except as permitted by Section III.A.2.k, above:

> a.    Employing or contracting with sales representatives or other persons to Promote products for the treatment of Opioid-induced side effects to Health Care Providers or patients.

    b.      Using speakers, key opinion leaders, thought leaders, lecturers, and/or speaking events for Promotion of products for the treatment of Opioid-induced side effects.

    c.      Sponsoring, or otherwise providing financial support or In-Kind Support to medical education programs relating to products for the treatment of Opioid-induced side effects except as required by REMs, court orders or settlements.

    d.      Creating, sponsoring, or otherwise providing financial support or In-Kind Support for advertisements that Promote products for the treatment of Opioid-induced side effects, including but not limited to internet advertisements or similar content, and providing hyperlinks or otherwise directing internet traffic to advertisements.

    e.      Engaging in any other Promotion of products for the treatment of Opioid-induced side effects in a manner that encourages the utilization of Opioids or Opioid Products or normalizes the use of Opioids or Opioid Products for chronic pain.

    f.      Utilizing electronic health records software or other digital health platforms to create alerts, workflows, or disseminate information known or reasonably expected to increase utilization of Opioids or Opioid Products.

4.      Treatment of Pain

    a.      The Company shall not, either through the Company or through Third Parties, engage in Promotion of the Treatment of Pain in a manner that directly or indirectly encourages the use of Opioids or Opioid Products.

    b.      The Company shall not, either through the Company or through Third Parties, Promote the concept that pain is undertreated in a manner that directly or indirectly encourages the use of Opioids or Opioid Products.

5.      To the extent that the Company engages in conduct permitted by Section III.A.2, the Company shall do so in a manner that is:

    a.      Consistent with the CDC Guideline Recommendations, as applicable.

    b.      Truthful, not misleading, accurate, and not deceptive.

6.      For the avoidance of doubt, nothing in this injunction shall be construed or used to prohibit the Company from taking legal or factual positions in litigation, bankruptcy proceedings, investigations, regulatory actions, or other legal or administrative proceedings  or prohibit or limit the Company's right to make public statements or respond to media reports or inquiries relating to any

litigation, bankruptcy proceedings, investigations, regulatory actions, or other legal, administrative, or legislative proceedings.

**B.     No Reward or Discipline Based on Volume of Opioid Sales**

1.      The Company shall not provide financial or non-financial incentives to its employees or discipline its employees based upon sales volume or sales quotas for Opioid Products.

2.      The Company shall not offer or pay any remuneration (including any kickback, bribe, or rebate) directly or through a Third Party, to or from any person in return for the prescribing, sale, use or distribution of an Opioid Product.  For the avoidance of doubt, this subparagraph shall not prohibit the provision of rebates and/or chargebacks to the extent permitted by Section III.A.2.j.

3.      The Company's compensation policies and procedures shall be designed to ensure compliance with this injunction and other legal requirements.

**C.     Ban on Funding/Grants to Third Parties**

Except with respect to PHI Products:

1.      The Company shall not directly or indirectly provide financial support or In-Kind Support to any Third Party for the purpose of  Promoting Opioids, Opioid Products, the Treatment of Pain, or products intended to treat Opioid-related side effects, including educational programs or websites that Promote Opioids, Opioids Products, the Treatment of Pain, or products intended to treat Opioid-related side effects, but excluding financial support otherwise allowed by this injunction, including REMS, settlements, and court orders or as required by a federal or state agency.

2.      The Company shall not operate, control, create, sponsor, provide financial support or In-Kind Support to any medical society or patient advocacy group relating to any Opioids, Opioid Products, the Treatment of Pain, or products intended to treat Opioid-related side effects, except with regard to REMS or to comply with settlements, court orders, or federal or state law.

3.      The Company shall not provide links to any Third-Party website or materials or otherwise distribute materials created by a Third Party relating to any Opioids, Opioid Products, the Treatment of Pain, or products intended to treat Opioid-related side effects.

4.      The Company shall not use or pay any Third Party to engage in any activity that the Company itself would be prohibited from engaging in pursuant to the injunction.

5.      The Company shall not enter into any contract or agreement with any person or entity or otherwise attempt to influence any person or entity in such a manner that

has the purpose or likely effect of limiting the dissemination of information regarding the risks and side effects of using Opioids.

6.  The Company shall not compensate or provide In-Kind Support to Health Care Providers or organizations to advocate for formulary access or treatment guideline changes that would have the effect of increasing access to any Opioid Product by third-party payors, *i.e.*, any entity, other than an individual, that pays or reimburses for the dispensing of prescription medicines, including but not limited to managed care organizations and pharmacy benefit managers. For the avoidance of doubt, nothing herein shall prohibit the Company from compensating Third Parties for engaging in conduct otherwise permitted under this injunction

7.  No current director, officer, or management-level employee of the Company may serve as a director, board member, employee, agent, or officer of any entity that engages in Promotion relating to Opioids, Opioid Products, the Treatment of Pain, or products intended to treat Opioid-related side effects except insofar as such service would be consistent with Section III.A.2, or except for services relating to (i) the treatment of OUD, (ii) the prevention, education or treatment of opioid abuse, addiction or overdose, including medication-assisted treatment for opioid addiction and/or (iii) rescue medication for opioid overdose.

8.  The Company shall play no role in appointing persons to the board, or hiring persons to the staff, of any entity that principally engages in Promotion relating to any Opioids, Opioid Products, the Treatment of Pain, or products intended to treat Opioid-related side effects.

9.  The Company shall ensure that any employee serving on the board of any organization that engages in lobbying or educating state and federal officials on policies and regulations, the impact of which would be to more easily enable or Promote the use of Opioids or Opioid Products, recuse himself/herself from any board discussion or decisions relating to Opioids, including any determinations the organization may make related to lobbying efforts with respect to opioids. Further, the Company shall ensure that any such employees will refrain from participation in any working group of such organization that focus on the Promotion of Opioids or Opioid Products or which focus on issues that would otherwise not be permitted under this injunction.

10. For the avoidance of doubt, nothing in Section III.C shall be construed or used to prohibit the Company from providing financial or In-Kind Support to:

    a.  medical societies and patient advocate groups, who are principally involved in issues relating to (i) the treatment of OUD; (ii) the prevention, education, and treatment of opioid abuse, addiction, or overdose, including medication-assisted treatment for opioid addiction; and/or (iii) rescue medications for opioid overdose.

b.    universities, medical institutions, or hospitals, for the purpose of addressing, or providing education on, issues relating to (i) the treatment of OUD; (ii) the prevention, education, and treatment of opioid abuse, addiction, or overdose, including medication-assisted treatment for opioid addiction; and/or (iii) rescue medications for opioid overdose.

**D.    Lobbying Restrictions**

1.    The Company shall not Lobby for or against the enactment of any federal, state or local legislation or promulgation of any rule or regulation that:

a.    Encourages or requires Health Care Providers to prescribe Opioids or sanctions Health Care Providers for failing to prescribe Opioids or failing to treat pain with Opioids;

b.    Would have the effect of limiting access to any non-Opioid alternative pain treatments;

c.    Pertains to the prohibitions against misbranding or adulteration in the Federal Food, Drug, and Cosmetic Act; or

d.    Pertains to the classification of any Opioid or Opioid Product as a scheduled drug under the Controlled Substances Act.

2.    The Company shall not directly, or by employing or controlling a Third Party, Lobby against the enactment of any federal, state or local legislation or promulgation of any rule or regulation that supports:

a.    The use of non-pharmacologic therapy and/or non-Opioid pharmacologic therapy to treat chronic pain over or instead of Opioid therapy, including but not limited to Third Party payment or reimbursement for such therapies;

b.    The use and/or prescription of immediate release Opioids instead of extended release Opioids when Opioid therapy is initiated, including but not limited to Third Party reimbursement or payment for such prescriptions;

c.    The prescribing of the lowest effective dose of an Opioid, including but not limited to Third Party reimbursement or payment for such prescription;

d.    The limitation of initial prescriptions of Opioids to treat acute pain;

e.    The prescribing and other means of distribution of naloxone to minimize the risk of overdose, including but not limited to Third Party reimbursement or payment for naloxone;

11

f.    The use of urine testing before starting Opioid therapy and annual urine testing when Opioids are prescribed, including but not limited to Third Party reimbursement or payment for such testing;

g.    Evidence-based treatment (such as using medication-assisted treatment with buprenorphine or methadone in combination with behavioral therapies) for Opioid Use Disorder, including but not limited to third party reimbursement or payment for such treatment; or

h.    The implementation or use of Opioid drug disposal systems that have proven efficacy for the Company's Opioid Products.

i.    The Company shall not directly, or indirectly by employing or controlling a Third Party, Lobby against the enactment of any federal, state or local legislation or promulgation of any rule or regulation limiting the operation or use of prescription drug monitoring programs ("PDMPs"), including, but not limited to, provisions requiring Health Care Providers to review PDMPs when Opioid therapy is initiated and with every prescription thereafter.

j.    The Company shall not establish any Political Action Committees or make campaign contributions to candidates for political office at any time prior to the NewCo Disposition Event.

3.    Provided, however, that nothing in Section III.D of this injunction limits the Company from:

a.    Challenging the enforcement of, or suing to stop the enactment of, or for declaratory or injunctive relief with respect to any legislation, rules or regulations;

b.    Responding to a statute, rule, regulation, or order requiring such communication;

c.    Appearing before a federal or state legislative or administrative body, committee, or subcommittee as a result of a mandatory order, or subpoena commanding that person to testify;

d.    Responding, in a manner consistent with this injunction, to an unsolicited request for the input on the passage of legislation or the promulgation of any rule or regulation when such request is submitted in writing specifically to the Company from a government entity directly involved in the passage of that legislation or promulgation of that rule or regulation;

e.    Responding to unsolicited requests from the DEA, the FDA, or any other Federal or state agency and/or participating in FDA or other agency panels at the request of the agency;

f.     Communicating with governmental officials regarding access to, availability of, procurement of, or use of PHI Products.

g.     Monitoring any pending or proposed legislation, rule or regulation relating to its business, including directly or indirectly through grantees or Third Parties.

4.     The Company shall not Lobby by affirmatively advocating either for or against the enactment of any federal, state, or local legislation or promulgation of any rule or regulation or the appointment of any individual to public office, unless NewCo's Board shall have determined that the request comports with the Company's Purpose (as defined in the NewCo Operating Agreement). If NewCo's Board so determines, then the Company shall provide advance notice to the Monitor of its intention to Lobby on the issue. The Monitor shall then have the sole and absolute discretion to direct that the activity not take place if the Monitor exercises such discretion and determines that the request approved by the NewCo Board (a) is expressly prohibited by the terms of this injunction, or (b) does not reasonably comport with the Company's Purpose (as defined in the NewCo Operating Agreement). Nothing in Section III.D.4 shall permit advocacy that is otherwise prohibited under Section III.D.

5.     The Company shall require all of its officers, employees, and agents engaged in conduct described in Section III.D to certify annually in writing or by appropriate electronic means to the Company that they are aware of and will fully comply with the provisions of this injunction with respect to Lobbying on behalf of the Company.

6.     On a quarterly basis, NewCo will report its Lobbying activities to the Monitor and the Board. The requirements of Section III.D shall remain in effect until the NewCo Disposition Event.

## E.    Ban on Prescription Savings Cards

1.     The Company shall not directly or through a Third Party offer prescription savings cards or coupons for its Opioid Products (other than PHI Products) except to existing, commercially insured, non-cash paying patients. Nothing in this paragraph shall prohibit the Company from utilizing unsolicited electronic point-of-dispense programs for the benefit of commercially-insured, non-cash paying patients.

2.     The Company shall not directly or indirectly assist patients, Health Care Providers, or pharmacies regarding the claims and/or prior authorization process required for third-party payors to approve claims involving any Opioid Product.

## F.    Monitoring and Reporting of Direct and Downstream Customers

1.     The Company shall operate an effective monitoring and reporting system in compliance with 21 C.F.R. § 1301.71(a), 21 C.F.R. §1301.74(b), 21 U.S.C. §

13

823(d) and Section 3292 of the SUPPORT for Patients and Communities Act and final DEA administrative decisions that are published in the Federal Register.

2.  The monitoring and reporting system shall include processes and procedures pertaining to Opioid Products that:

a.  Utilize all reasonably available information and conduct appropriate due diligence to identify a Suspicious Order of an Opioid Product by a direct customer, including, but not limited to, utilizing appropriate algorithms to identify orders of unusual size, unusual frequency and/or that deviate from a normal pattern.

b.  Review all Suspicious Orders to determine whether circumstances warrant permitting a Suspicious Order to be cleared for shipment.  As part of this review, the Company shall conduct appropriate due diligence including, but not limited to, collecting additional information and documentation from direct customers that explain whether the order is legitimate, and conducting a site visit if warranted.  No Suspicious Order may be cleared absent adequate, documented justification.

c.  In addition to the review above, each month the Company shall make a selection of previously cleared orders for further review.  Such additional review will include, but not be limited to gathering information pertaining to the legitimacy of the customer's orders and investigating whether there are indicators that a direct or downstream customer poses a risk of diversion. The Company shall document its review and findings.

d.  Require all direct customers to annually complete a Wholesaler Due Diligence Questionnaire ("Questionnaire"), utilize all information that the Company receives through such Questionnaire, and require any direct customer that provides incomplete, unsigned, or unresponsive responses, or fails to provide referenced accompanying information to correct the deficiency.  The Company will conduct site visits to corroborate the information obtained from its customers.  Once the Questionnaire review process is complete, any Questionnaire that is incomplete, unsigned or unresolved shall result in denial of clearance for shipment.

e.  Utilize all reasonably available Downstream Customer Data to identify whether a downstream customer poses a material risk of diversion of an Opioid Product, including, but not limited to: a monthly review of Downstream Customer Data; review of Downstream Customer Data to identify downstream customers that consistently have a large volume of chargebacks meriting further investigation; the establishment of objective methods for identifying chargeback units that merit further review; and the review of chargeback reports to identify downstream customers that have higher chargebacks on a repeat basis.  If chargeback data reveals suspicious indicia (e.g. the number or frequency of chargebacks), the

14

Company shall investigate further. To the extent the inquiry does not resolve the concern, the Company shall report the identity of the downstream customer to DEA and to the relevant direct customers.

f.   Utilize all reasonably available information that the Company receives that indicates an unreasonable risk of a direct customer's or a downstream customer's diversion activity or potential for diversion activity, including reports by the Company's employees, customers, Health Care Providers, law enforcement, state, tribal, or federal agencies, or the media.

g.   Upon request (unless otherwise required by law), report to any requesting State Attorney General or State controlled substances regulatory agency or Department of Justice component any direct customer or downstream customer in such requesting State Attorney General's or agency's State identified as part of the monitoring required by Sections III.F.2(a)-(f), and any customer relationship in such State terminated by the Company relating to diversion or potential for diversion. DEA will be notified of all Suspicious Orders. Additionally, rejected order information will be shared with DEA in compliance with governing statutes and regulations. These reports shall include the following information, to the extent known to the Company:

   i.    The identity of the downstream customer and the direct customer(s) engaged in the controlled substance transaction(s), to include each registrant's name, address, business type, and DEA registration number.

   ii.   The dates of reported distribution of controlled substances by direct customers to the downstream customer during the relevant time period.

   iii.  The drug name, drug family or NDC and dosage amounts reportedly distributed.

   iv.   The transaction or order number of the reported distribution.

   v.    A brief narrative providing a description of the circumstances leading to the Company's suspicion that there is a risk of diversion.

h.   The Company will retain record copies of documentation associated with Sections III.F.2(a)-(g), and make such documentation available to any federal, state, or local law enforcement agency upon request.

3.   The Company shall not provide to any direct customer an Opioid Product to fill an order identified as a Suspicious Order unless the Company investigates and finds that the identified order is not suspicious. The Company may not find an identified order is not suspicious solely based on a threshold review. Where the

Company has reviewed an order identified as a Suspicious Order and determined that the identified order is not suspicious, the Company must document the basis for its determination, and provide such documentation to the Monitor. The Company will retain record copies of documents provided to the Monitor, and make such documentation available to any federal, state, or local law enforcement agency upon request.

4. The Company shall promptly notify the DEA of findings by the Monitor related to the Company's suspicious order monitoring program.

5. The Company shall employ sufficient staff so that the suspicious order monitoring can be robust, the review of customer provided Questionnaires can be thorough, and the documentation of all decisions related to Suspicious Orders can be thorough and complete.

6. Upon request, the Company shall provide full cooperation and assistance to any federal, state or local law enforcement investigations of potential diversion or suspicious circumstances involving Opioid Products, including criminal law enforcement agencies, drug control agencies, professional licensing boards, and Attorney General's offices. For the avoidance of doubt, the Company must provide full cooperation to DEA and any component of the Department of Justice.

7. The Company will refrain from providing an Opioid Product (other than a PHI Product) directly to a retail pharmacy location or Health Care Provider or otherwise engaging in activity that requires it to be registered as a distributor under the Controlled Substances Act. Nothing in this provision, however, prevents the Company from acting as a distributor of PHI Products consistent with applicable law.

**G. General Terms**

1. To the extent that a provision in this injunction conflicts with federal or relevant state law or regulation, the requirements of the law or regulation will prevail. To the extent that any provision in the injunction is in conflict with federal or relevant state law such that the Company cannot comply with both the statute or regulation and a provision of this injunction, the Company may comply with such statute or regulation. To the extent that the Company makes any such determination, it will disclose the conflict and its determination to the affected State Attorney(s) General, the Director, Consumer Protection Branch, Department of Justice, and the Monitor as soon as reasonably practicable and in advance of any change to the Company's policies or practices.

2. The Company shall not make any written or oral statement about Opioids, Opioid Products or PHI Products that is unfair, false, misleading or deceptive, or unconscionable.

3. The Company shall not represent that Opioids, Opioid Products or PHI Products have approvals, characteristics, uses, benefits, or qualities that they do not have or are inconsistent with the products' FDA-approved labeling.

4. For the avoidance of doubt, nothing in this injunction is intended to or shall be construed to prohibit the Company in any way whatsoever from taking legal or factual positions with regard to its Opioid Product(s) in defense of litigation or other legal proceedings or investigations.

5. Upon the request of any State Attorney General or federal component, the Company shall provide the requesting State Attorney General or federal component with the following, within 30 days of the request:

   a. Notification as to whether the Company has received any litigation or civil or criminal law enforcement subpoenas or Civil Investigative Demands relating to the Company's Opioid Product(s), as well as the identity of the state or federal component(s) that issued any such subpoenas or Civil Investigative Demands.

   b. Copies of warning or untitled letters issued by the FDA regarding the Company's Opioid Product(s) and all non-confidential correspondence between the Company and the FDA related to such letters.

6. Whenever possible, each provision of this injunction shall be interpreted in such manner as to be effective and valid under applicable law and regulation, but if any provision of this injunction is held to be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of this injunction.

## H. Compliance with All Laws and Regulations Relating to the Sale, Promotion, and Distribution of Any Opioid Product

1. The Company shall comply with all laws and regulations that relate to the sale, Promotion, distribution, and disposal of any Opioid Product or PHI Product including but not limited to:

   a. State controlled substances acts.

   b. The Federal Controlled Substance Act and any regulation promulgated thereunder.

   c. The Federal Food, Drug and Cosmetic Act, or any regulation promulgated thereunder.

   d. Federal health care offenses, as defined in 18 U.S.C. § 24.

   e. State consumer protection and unfair trade practices acts.

17

f.     State laws and regulations related to prescribing, distribution and disposal of Opioid Products.

g.     Bribery, Foreign Corrupt Practices Act, Anti-Kickback, and Stark laws and regulations.

**I.     Compliance Deadlines**

1.     As of 90 days after the Effective Date, the Company must be in full compliance with the provisions included in this injunction.

**J.     Training**

1.     The Company shall provide regular training, at least once per year, to relevant employees on their obligations imposed by this injunction.  The Company shall provide training to any new employees at the time of their onboarding.

## IV.     CLINICAL DATA TRANSPARENCY

**A.     Data to Be Shared**

1.     The Company shall share the following clinical data to the extent and in a manner permitted by applicable law and contracts, including data privacy laws, informed consent forms and clinical trial protocols through a third-party data archive that conforms to the requirements defined below to increase the transparency of its clinical research.

a.     The Company shall make available all clinical data and/or information it possesses in electronic form that can be located following a reasonably diligent search, regarding OxyContin® Tablets, Butrans® Transdermal System and Hysingla® Tablets previously disclosed to the FDA.

b.     The Company shall make available all previously unreleased, clinical data it possesses in electronic form that can be located following a reasonably diligent search, regarding OxyContin® Tablets, Butrans® Transdermal System and Hysingla® Tablets, for both approved and unapproved indications, including:

i.     Full analyzable data set(s) (including individual participant-level data de-identified by an independent biostatistician);

ii.     The clinical study report(s) redacted for commercial or personal identifying information;

iii.     The full protocol(s) (including the initial version, final version, and all amendments); and

iv.     Full statistical analysis plan(s) (including all amendments and documentation for additional work processes) and analytic code.

**B.    Third-Party Data Archive**

1.    The Company shall share the clinical data and information described in Section IV.A.1 via a third-party data archive that makes clinical data available to Qualified Researchers with a bona fide scientific research proposal.

2.    The Company shall begin sharing information identifying the clinical data and information described in Section IV.A.1.a and b with the vendor no later than 30 days following entry of the Confirmation Order and shall complete that process of identifying the clinical data and information described in Section IV.A.1.a and b no later than 90 days following entry of the Confirmation Order.

3.    The data archive shall have a panel of reviewers with independent review authority to determine whether the researchers are qualified, whether a research application seeks data for bona fide scientific research, and whether a research proposal is complete.

4.    The panel may exclude research proposals with a commercial interest.

**C.    Non-Interference**

1.    The Company shall not interfere with decisions made by the staff or reviewers associated with the third-party data archive.

2.    Unless expressly stated herein, the Company shall have no communications directly or indirectly with a Qualified Researcher, including with regard to the data added to the third-party archive.

**D.    Data Use Agreement**

1.    Any data sharing agreement with a Qualified Researcher who receives shared data via the third-party data archive shall contain contact information for the Company's pharmacovigilance staff.  Every agreement shall require the lead qualified researcher to inform the Company's pharmacovigilance staff within 24 hours of any determination that research findings could detrimentally impact the risk-benefit assessment regarding the product.    The Company's pharmacovigilance staff shall take all necessary and appropriate steps upon receipt of such safety information, including but not limited to notifying regulatory authorities or the public.  The lead Qualified Researcher may also inform regulatory authorities of the safety signal impacting the risk-benefit assessment as well as provide reasonable notice to the Company.

**E.    Cost**

1.      The Company shall bear all costs for making data and/or information until the NewCo Disposition Event.

## V.      DISPUTE RESOLUTION

A.      For the purposes of resolving disputes with respect to compliance with this injunction, should any State Attorney General or federal agency have reason to believe that the Company has violated a provision of this injunction subsequent to the Effective Date, then such Attorney General or federal agency shall notify the Company in writing of the specific objection, identify with particularity the provisions of this injunction that the practice appears to violate, and give the Company 30 days to respond to the notification.

B.      Upon 30 days of receipt of written notice from such State Attorney General or federal agency, the Company shall provide a written response, containing either a statement explaining why the Company believes it is in compliance with this injunction or a detailed explanation of how the alleged violation occurred and a statement explaining how and when the Company intends to remedy or has remedied the alleged violation.

C.      Such State Attorney General may not take any action concerning the alleged violation of this injunction during the 30-day response period.  Nothing shall prevent such State Attorney General from agreeing in writing to provide the Company with additional time beyond the 30 days to respond to the notice.  However, such State Attorney General may take any action, including, but not limited to legal action to enforce compliance with the [Confirmation Order/consent judgment specified by Section II.B], without delay if such State Attorney General believes that, because of the specific practice, a threat to the health or safety of the public requires immediate action.

D.      Such State Attorney General may bring an action against the Company to enforce the terms of the [Confirmation Order/consent judgment specified by Section II.B], but only after providing the Company an opportunity to respond to the notification as described above or within any other period as agreed to by the Company and such State Attorney General.

E.      Nothing in this injunction shall be interpreted to limit any State Attorney General's Civil Investigative Demand ("CID") or investigative subpoena authority and any federal agency's subpoena or investigative authority, to the extent such authority exists under applicable state or federal law.  The Company agrees to comply with such CID, subpoenas, or other demands or requests issued pursuant to such authority.

F.      Nothing herein shall be construed to exonerate any failure to comply with any provision of this injunction after the Effective Date, or to compromise the authority of any State Attorney General to take action for any failure to comply with this injunction.

## VI.      INDEPENDENT MONITOR

**A.      Monitor Selection and Engagement**

1.      The Company shall engage a Monitor to review its compliance with this injunction.

2.      Stephen Bullock, the Monitor approved by the Bankruptcy Court on March 1, 2021, to oversee compliance with the Voluntary Injunction, shall continue to serve as Monitor with respect to this injunction after the Effective Date.

3.      If a new Monitor must be appointed due to the Monitor resigning or otherwise becoming unable to perform the specified tasks, the Foundation shall select a new Monitor, who must be approved by the State Monitor Committee which approval shall not be unreasonably withheld and approved by the Court.  The selected Monitor approved by the State Monitor Committee may serve while Court approval is pending.

4.      The Monitor may employ or retain personnel who have appropriate qualifications related to the pharmaceutical industry and the laws governing the manufacture, marketing and sale of pharmaceuticals and controlled substances and the applicable requirements of federal and state law. The Monitor may also retain the services of additional third-parties to the extent that additional expertise is required for the engagement.  The Monitor may consult with and seek input from the Company and the State Monitor Committee prior to finalizing the retentions described in this paragraph. The Company shall pay the Monitor, and any personnel or third parties employed or retained by the Monitor, their reasonable fees and expenses for services under this injunction.

## B.      Term

1.      The Company shall retain a Monitor until the NewCo Disposition Event(s).

2.      As required under Section II.A, any person or entity that acquires some or all of the Company's Opioid Products, including through the NewCo Disposition Event, shall retain the Monitor for at least one (1) year after the effective date of the transaction.

## C.      Monitor's Scope of Work

1.      The Monitor shall review the Company's ongoing compliance with the requirements of this injunction, except for Section III.H.

2.      The Monitor will report his or her findings as provided in Section VI.F.

3.      In the event that in the course of reviewing the Company's compliance with the requirements of this injunction the Monitor becomes aware of action or conduct by the Company that the Monitor believes may pose a threat to the health or safety of the public or otherwise requires prompt action, the Monitor may in his or her sole discretion, notify the Company and the States of such action or conduct without following the procedures provided in Section VI.F below.

21

4.    Within thirty (30) calendar days after the Effective Date, the State Monitor Committee and the Company shall confer with the Monitor on a work plan and contract. In the event a new Monitor is appointed within thirty (30) days prior to the Effective Date, the State Monitor Committee and the Company shall have sixty (60) days from the Effective Date to confer with the Monitor on a work plan and contract. The work plan shall set forth the substance of the Monitor's review and the manner in which the Monitor will carry out his or her review of the Company's compliance with this injunction, including the general scope of information that the Monitor will seek to review. The Monitor shall have final authority to determine the content and substance of the work plan. The Monitor may select the period of time covered by the work plan, not to exceed one year. Any work plan and contract in place before the Effective Date may continue to be used upon agreement of the State Monitor Committee, the Company, and the Monitor

5.    At least annually, and more frequently if appropriate, the Company and the State Monitor Committee will meet in person or virtually to discuss the monitorship and any suggestions, comments, or improvements the Company may wish to discuss with or propose to the State Monitor Committee, unless the Company and the State Monitor Committee believe such a meeting is unnecessary.

## D.    Monitor Access to Information

1.    In connection with its review of the Company's compliance with this injunction, the Monitor shall be vested with broad discretion to review the Company's operations, including access to documents and the right to interview employees, as the Monitor determines is reasonably necessary to fulfill its duties under this injunction, with reasonable notice to the Company and without unreasonable interference in the Company's or its employees' ability to perform day-to-day operations. The Monitor shall have all powers reasonable and necessary to efficiently and effectively discharge its responsibilities subject to appropriate confidentiality. The Monitor, and each of his employees or consultants, shall enter into a confidentiality agreement, the terms of which will be consistent with the confidentiality restrictions imposed by the Bankruptcy Court in the Third Amended Protective Order (Doc. 1935, Nov. 12, 2020).

2.    The Company's Chief Legal Officer or their designee shall serve as the primary point of contact for the Monitor to facilitate the Monitor's reasonable access to documents, materials, or employees necessary to review for compliance with this injunction.  The Monitor shall have unfettered access to the Chief Compliance Officer.  The Monitor shall make a good faith effort to leverage the Company's existing compliance mechanisms when reviewing the Company's compliance with this injunction.  The Monitor shall communicate any request for documents, materials, or access to employees to the Chief Legal Officer or their designee, but, subject to the terms hereof, is not prohibited from speaking with any other current or former employees of the Company.

3.      The Company shall not intimidate, harass, threaten, or penalize any employee or former employee for his or her cooperation with or assistance to the Monitor.

4.      If at any time the Monitor reasonably believes that there is undue delay, resistance, interference, limitation, or denial of access to any records or to any employee deemed necessary by the Monitor to implement or review compliance by the Company with this injunction, the Monitor may meet and confer with the Company's Chief Legal Officer or their designee.  If the Monitor cannot resolve such limitation or denial, it shall be immediately reported to the Board of NewCo. If the issue remains unresolved after consultation with the Board of NewCo, the Monitor shall report the issue to the State Monitor Committee.

**E.      Access to Monitor**

1.      There shall be no limitation on the ability of the Monitor to communicate at any time with States and the United States, including any agency or component of the United States, regarding the Company's conduct.

**F.      Monitor Reports**

1.      Observations and Recommendations

   a.      If the Monitor notes any areas for potential improvement regarding the Company's compliance with this injunction during the course of his or her reviews, the Monitor shall include any such recommendations in the Final Report described below.

   b.      Collectively, any such questions, concerns or recommendations will be referred to as "Observations and Recommendations."

2.      Draft and Final Reports

   a.      For purposes of the reporting described below, the Monitor's work will be divided into three-month periods for at least the first two reports, and the Monitor shall issue reports no later than every six months thereafter ("Reporting Periods").

   b.      No later than ten (10) calendar days after the close of a Reporting Period and/or at any other time deemed reasonably necessary by the Monitor, the Monitor shall separately provide the Company and the State Monitor Committee with draft reports identifying and detailing any Observations and Recommendations and Potential Violations and the bases therefore (the "Draft Report").  Potential Violations shall mean the Company's failure to comply with the provisions of this injunction, as reasonably determined by the Monitor.  The Company shall have the right to cure any Potential Violation, in accordance with the below provisions.  The Draft

Report will also contain detailed descriptions of any Observations and Recommendations for Improvement.

c.    Within seven (7) calendar days of its receipt of the Draft Report, the Company will provide comments to the Draft Report. The Company may also:

    i.    Respond to each Potential Violation, including, where appropriate, explaining why no violation occurred, or describing any corrective action taken (or to be taken) as a result of the findings made by the Monitor, including, where appropriate, providing documentation supporting a relevant decision or additional context explaining the Potential Violation and why it occurred.

    ii.    Respond to each Observation and Recommendation for Improvement.

d.    After receipt of the Company's comments and responses and the State Monitor Committee's comments, if any, the Monitor will provide a final report (the "Final Report") simultaneously to the State Monitor Committee and the Company.

e.    The Final Report shall set forth:

    i.    The Monitor's evaluation of the Company's compliance with this injunction and the factual basis for the Monitor's conclusions, including whether a Potential Violation has occurred and an explanation of the nature of the Potential Violation.

    ii.    The Monitor's conclusion as to whether the Company has cured any Potential Violations.

    iii.    The Final Report shall include a listing of the Observations and Recommendations for Improvement made by the Monitor and responses of the Company. Recommendations shall not be deemed to be incorporated into the terms of this injunction.

    iv.    The Monitor shall create a public version of each Final Report. The public version of each Final Report shall exclude all information that the Monitor determines, in consultation with the Company, to be trade secret or otherwise commercially sensitive and shall be posted on the Company's website.

## VII.   SHAREHOLDER RELEASED PARTIES

A.   The Shareholder Released Parties shall not take any action that would interfere with the Company's compliance with its obligations under this injunction.

## **Exhibit C**

**NewCo Governance Covenants**

## NEWCO GOVERNANCE COVENANTS

These Governance Covenants will bind NewCo (the "**Company**") and the Company's Subsidiaries to operating requirements and controls that ensure that the Company and the Company's Subsidiaries (i) develop, manufacture, distribute and sell all of their products, including all opioid products, in a safe and secure manner that limits the risk of diversion, (ii) comply with their respective obligations under the Public Entity Settlements and the Private Entity Settlements, (iii) pursue and implement Public Health Initiatives, (iv) comply with the Operating Injunction and (v) otherwise operate in accordance with the Company's Purpose and take into account long-term public health interests relating to the opioid crisis and responsible, transparent and sustainable practices in the management of a pharmaceutical business.

| Category | Covenant |
|---|---|
| Governance | **Purpose and Principles**<br><br>• In accordance with Section 2.3(a) of the Limited Liability Company Operating Agreement of the Company (the "**Operating Agreement**"), the purpose of the Company shall be to, directly and/or through the Company's Subsidiaries, operate the Company Transferred Assets and any other assets of the Company or any of its Subsidiaries (i) in accordance with the terms of the Agreement, the Plan and the Confirmation Order, (ii) subject to the Operating Injunction and these Governance Covenants, and (iii) in a responsible and sustainable manner balancing: (x) the interests of its stakeholders (including the Member and the MDT Beneficiaries), to fund and provide abatement of the opioid crisis, (y) effective deployment of the Company's and the Company's Subsidiaries' Assets to address the opioid crisis, and (z) the interests of third parties materially affected by the Company's and the Company's Subsidiaries' conduct (collectively, the "**Company's Purpose**").<br><br>• In accordance with Section 2.3(b) of the Operating Agreement, the Company shall not be required (and the Board shall not be required to cause the Company) to maximize the Company's or the Company's Subsidiaries' sales or profits, but rather shall take all elements of the Company's Purpose into account.<br><br>**Effectuation of the Company's Purpose**<br><br>• In accordance with Section 2.3 of the Operating Agreement, the Company shall, and shall cause the Company's Subsidiaries to, conduct their respective business in a manner that complies with the Operating Injunction and these Governance Covenants in order to ensure that each of the Company and the Company's Subsidiaries, (i) develops, manufactures, distributes and sells all of its products, including all opioid products, in a safe and secure manner that limits the risk of diversion, (ii) complies with its obligations under the Public Entity Settlements, the Private Entity Settlements and the Master Shareholder Settlement Agreement, (iii) pursues and implements Public Health Initiatives, and (iv) otherwise operates in accordance with the Company's Purpose and takes into account long-term public health interests relating to the national opioid crisis and responsible and transparent practices in the management of a |

pharmaceutical business.

- The Company shall integrate the Company's Purpose into material business activities and systems by:

  - providing relevant employees with at least annual training on the Purpose, the Injunction and these Governance Covenants. The Company shall provide appropriate, relevant training to new employees at the time of their onboarding.
  - incorporating, under the oversight of the Board, to the extent relevant, the Company's Purpose, the Injunction and these Governance Covenants into the Company's controls, performance management programs, management and leadership oversight, and executive compensation schemes.
  - vesting the appropriate committee of the Company Board with the responsibility for oversight of policy-setting and monitoring with respect to the Company fulfilling its Purpose; compensating and managing its workforce; maintaining legal compliance and otherwise fulfilling its obligations under these Governance Covenants.
  - authorizing the Board and Board committees with the ability and the funding to retain external subject matter experts who may provide insight, recommendations and review of the Company's strategic plans and programs for implementing these Covenants.
  - subject to the Company's obligation to make distributions and payments in accordance with Section 6.5 of the Operating Agreement, using reasonable efforts to ensure, in consultation with the Board, that the amount of unrestricted cash and cash equivalents held by the Company and the Company's Subsidiaries, as reflected on the consolidated balance sheet of the Company and the Company's Subsidiaries, is adequate for purposes of ensuring the Company's ability to comply with its obligation to fund Operating Expenses consistent with the Company's Purpose and these Governance Covenants.
  - taking, as determined by the Company Board, steps as needed to ensure that these Governance Covenants are integrated into the Company's strategic plans, management controls and day to day operations.

- The Company will maintain programs and controls reasonably designed to manage risk and protect and strengthen its resilience and capacity to anticipate and manage business threats and disruptions. This shall include plans and programs relating to: (i) business continuity, (ii) crisis management; (iii) physical security; (iv) emergency management and response; and (v) IT disaster recovery. The Board (or an authorized committee thereof) shall review Purdue's then-current Business Continuity Plan and may decide to have it apply to the Company or whether another business continuity plan should be adopted in a manner consistent with the

2

| | |
|---|---|
| | Company's Purpose. The Board (or an authorized committee thereof) will review its business continuity plan from time to time and amend it if appropriate, in a manner consistent with the Company's Purpose.<br><br>**Transparency & Reporting**<br><br>• The Board shall cause the Company to prepare (i) in accordance with Section 8.3(c) of the Operating Agreement, semi-annual public benefit reports to be published publicly, which shall describe the effectuation of the Company's Purpose and the public benefits being achieved consistent with the Company's Purpose ("**Public Benefit Reports**"), and (ii) in accordance with Section 8.3(b) of the Operating Agreement semi-annual financial and operating reports to be delivered to the Foundation.<br><br>• The Board shall cause the Company to, from time to time, solicit and consider feedback from those stakeholders that the Board determines to be appropriate, in identifying material threats, opportunities, megatrends and material topics to the company to inform the Public Benefit Reports. |
| **Access to Medicine - Public Health Initiatives** | **PHI Funding and Implementation**<br><br>• Subject to the parameters set forth in Section 6.2 of the Operating Agreement and consistent with the Company's Purpose, the Board will determine appropriate expenditure levels for the Public Health Initiatives. |
| **Product Diversion and Security** | • The Company will maintain product security and diversion controls reasonably designed to ensure that the Company's Products are sold and distributed in a manner that is safe, compliant and minimizes the risk of diversion and that is otherwise compliant with:<br><br>    o The Operating Injunction.<br>    o applicable Drug Enforcement Administration regulations.<br>    o relevant Standard Operating Procedures for Purdue Pharma L.P. and Associated US Companies including, without limitation, those governing the receipt, destruction, procurement, and handling of controlled substances, provided that such procedures may be reviewed and amended from time to time by the Board (or an authorized committee thereof).<br><br>• The Company shall operate a robust supply chain security program. The Board (or an authorized committee thereof) shall review Purdue's current applicable policies and program and decide whether to have them apply to the Company, or whether another program should be implemented, consistent with the Operating Injunction after taking into account the Company's Purpose. The Board (or an authorized committee thereof) will review the supply chain security program from time to time and amend the |

| | |
|---|---|
| | program if appropriate, in a manner consistent with the Company's Purpose. |
| **Compliance and Ethics** | **Compliance and Regulatory Programs**<br><br>The Company will implement a comprehensive internal compliance management and assurance program that:<br><br> o is designed to ensure adherence to the Operating Injunction and these Governance Covenants in accordance with Section 6.6 of the Operating Agreement.<br> o is designed to ensure compliance with all applicable laws and regulations.<br> o is consistent with: (i) the Office of Inspector General Compliance Program Guidance for Pharmaceutical Manufacturers; (ii) the US Department of Justice Guidance on the Evaluation of Corporate Compliance Programs; and (iii) the PhRMA Code on Interactions with Healthcare Professionals.<br> o is reasonably designed to mitigate compliance risks applicable to a pharmaceutical business including, without limitation, those relating to: bribery and corruption; conflicts of interest; physical and product security; bioethics; clinical trial transparency and patient safety; provided that such Code of Ethics and policies may be reviewed and amended from time to time by the Board (or an authorized committee thereof) in a manner consistent with the Company's Purpose, and implemented through a Code of Ethics and the adoption of procedures, standards and other controls. |
| **Environmental, Health, & Safety** | **Environmental, Workplace Health & Safety**<br><br> • The Company will maintain environment, workplace health and safety policies, programs and controls that:<br><br> o are reasonably likely to ensure compliance with applicable laws and regulations.<br> o are reasonably designed to minimize any adverse impacts on the environment associated with the Company's operations or products, whether in use or at the end of their useful life.<br> o are reasonably designed to educate and enable Company employees and contractors to work in a safe, healthy and environmentally responsible manner.<br> o reflect and embed leadership commitment to maintaining a safe, "zero injury" workplace.<br> o are reasonably designed to proactively identify and manage workplace hazards to employees and third parties.<br> o are reasonably designed to embed a culture of safety and wellbeing throughout the Company.<br> o are reasonably designed to continuously improve performance.<br> o enable the Company to transparently communicate performance to |

| | |
|---|---|
| | stakeholders through the Public Benefit Reports. |
| **Oversight** | • On an annual basis, the CEO of the Company shall certify, solely in his or her capacity as an officer of the Company, that, after reasonable inquiry and based on his or her knowledge, the Company is in material compliance with these Covenants. The certification shall be provided to the Board, the State Monitor Committee (as defined in the Operating Injunction) and upon request, any State Attorney General.<br><br>• In accordance with the Operating Agreement, under the oversight of the Board, the Company and its representatives shall cooperate with, and reasonably respond to requests for assistance by, the Monitor in the performance of the Monitor's duties and responsibilities as provided for in the Plan, the Confirmation Order and the Operating Injunction, including by responding to reasonable requests for access to relevant books and records of the Company and the Company's Subsidiaries. The reasonable compensation of, and costs and expenses incurred by, the Monitor in connection with its duties and responsibilities, including the fees and expenses of professionals retained by the Monitor shall be paid by the Company.<br><br>• The Company will not amend the Operating Agreement, including by merger, consolidation, division or otherwise, (i) in any manner that is inconsistent with the Plan or the Confirmation Order without (I) an order of the Bankruptcy Court approving such modification, and (II) to the extent such proposed amendment adversely affects the Governmental Remediation Trust or the Tribe Trust, the unanimous consent of the trustees of the Governmental Remediation Trust or the Tribe Trust, as applicable. The Company will give the Monitor 7 business days' written notice of any amendment to the Operating Agreement and will reasonably consider comments of the Monitor solely to the extent that the contemplated amendment would or would potentially alter, undermine or limit or interfere with the effectiveness or the implementation of the Operating Injunction. The Monitor shall promptly deliver such notice to the State Monitor Committee (as defined in the Operating Injunction). |
| **Successors** | • Any successor owner (whether through one transaction or a series of related transactions) of the Opioid Business, shall be obligated to comply with the provisions of these Governance Covenants that are specifically enumerated under the category "Product Diversion and Security" and the matters described in clauses (i) and (iv) of Section 2.3(c) of the Operating Agreement; provided (x) that the obligations of any successor to comply with the Operating Injunction shall be as set forth in the Operating Injunction and (y) as long as a successor maintains internal standard operating procedures similar to the Standard Operating Procedures for Purdue Pharma L.P. and Associated US Companies, as may be amended from time to time by the Board, as appropriate and reasonable for such |

5

| | successor, taking into account such successor's size and resources, such successor shall not be obligated to adopt the Company's standard operating procedures. |