**UNITED STATES BANKRUPTCY COURT**　　　　**FOR PUBLICATION**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x

In re:　　　　　　　　　　　　　　　　　　　　Chapter 11

PURDUE PHARMA L.P., *et al.*,　　　　　　　　Case No. 19-23649 (SHL)

　　　　　　　　　　　Debtors.　　　　　　　(Jointly Administered)

-----------------------------------------------------------------x

### MODIFIED BENCH RULING GRANTING CONFIRMATION OF THE EIGHTEENTH AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF PURDUE PHARMA L.P. AND ITS AFFILIATED DEBTORS [1]

**A P P E A R A N C E S :**

**DAVIS POLK & WARDWELL LLP**
*Counsel to the Debtors*
450 Lexington Avenue
New York, New York 10017
By:　　Marshall S. Huebner, Esq.
　　　　Benjamin S. Kaminetzky, Esq.
　　　　Eli J. Vonnegut, Esq.
　　　　James I. McClammy, Esq.
　　　　Marc J. Tobak, Esq.
　　　　Abraham Bane, Esq.
　　　　Joshua N. Shinbrot, Esq.

**REED SMITH LLP**
*Insurance Counsel to the Debtors*
599 Lexington Avenue
New York, New York 10022
By:　　Ann V. Kramer, Esq.

　　　　-and-

---

[1]　　This written decision memorializes the Court's bench ruling that was read into the record on the morning of November 18, 2025. While the substance of the decision remains the same, edits have been made for ease of comprehension and for the sake of accuracy of citation. None of the changes in any way affects the factual or legal grounds for the Court's ruling. Because of its origins as a bench ruling, this decision has a more conversational tone than a traditional written decision.

Reed Smith Centre
225 Fifth Avenue
Pittsburgh, Pennsylvania 15222
By:    Paul M. Singer, Esq.
        Andrew J. Muha, Esq.
        Luke A. Sizemore, Esq.

**AKIN GUMP STRAUSS HAUER & FELD LLP**
*Counsel to the Official Committee of Unsecured Creditors of Purdue Pharma L.P., et al.*
One Bryant Park
New York, New York 10036
By:    Arik Preis, Esq.
        Ira Dizengoff, Esq.
        Sara L. Brauner, Esq.
        Mitchell P. Hurley, Esq.
        Katherine Porter, Esq.
        Theodore James Salwen, Esq.
        Kaila Zaharis, Esq.

**HERBERT SMITH FREEHILLS KRAMER (US) LLP**
*Counsel to the Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants*
1177 Avenue of the Americas
New York, New York 10036
By:    Kenneth H. Eckstein, Esq.
        Rachael Ringer, Esq.
        David E. Blabey Jr., Esq.
        Elan Daniels, Esq.
        Andrew Pollack, Esq.
        Ashish Virmani, Esq.

**GILBERT LLP**
*Counsel to the Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants*
700 Pennsylvania Avenue, SE
Washington, D.C. 20003
By:    Kami E. Quinn, Esq.
        Richard D. Shore, Esq.
        Emily P. Grim, Esq.
        Ethan H. Kaminsky, Esq.

**BROWN RUDNICK LLP**
*Counsel to the Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants*
7 Times Square
New York, New York 10036
By:    David J. Molton, Esq.
        Gerard Cicero, Esq.

**OTTERBOURG P.C.**
*Counsel to the Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants*
230 Park Avenue
New York, New York 10169
By:     Melanie L. Cyganowski, Esq.
        Jennifer S. Feeney, Esq.

**CAPLIN & DRYSDALE, CHARTERED**
*Counsel to the Multi-State Governmental Entities Group*
1200 New Hampshire Ave. NW, 8th Floor
Washington, D.C. 20036
By:     Kevin C. Maclay, Esq.
        Todd E. Phillips, Esq.
        Serafina Concannon, Esq.
        Lucas Self, Esq.
        Ariel K. Hayes, Esq.

**WHITE & CASE LLP**
*Co-Counsel to the Ad Hoc Group of Individual Victims of Purdue Pharma L.P., et al.*
Southeast Financial Center, Suite 4900
200 South Biscayne Boulevard
Miami, Florida 33131
By:     Thomas E. Lauria, Esq.

        -and-

1221 Avenue of the Americas
New York, New York 10020
By:     J. Christopher Shore, Esq.
        Michele J. Meises, Esq.

**ASK LLP**
*Co-Counsel to the Ad Hoc Group of Individual Victims of Purdue Pharma L.P., et al.*
60 East 42nd Street, 46th Floor
New York, New York 10165
By:     Edward E. Neiger, Esq.
        Jennifer A. Christian, Esq.

**ANDREWS & THORNTON**
*Mass Torts Legal Advisor for Ad Hoc Group of Individual Victims of Purdue Pharma L.P., et al.*
 4701 Von Karman Ave., Suite 300
Newport Beach, California 92660
By:     Anne Andrews, Esq.
        Sean T. Higgins, Esq.
        Robert S. Siko, Esq.

**OFFICE OF THE NEW YORK STATE ATTORNEY GENERAL**
*Counsel to the State of New York*
28 Liberty Street
New York, New York 10005
By:    M. Umair Khan, Esq.

**DEBEVOISE & PLIMPTON LLP**
*Counsel to Beacon Company*
66 Hudson Boulevard
New York, New York 10001
By:    Jasmine Ball, Esq.
       Maura Kathleen Monaghan, Esq.
       Jeffrey J. Rosen, Esq.

**MILBANK LLP**
*Counsel to the Raymond Sackler Family*
55 Hudson Yards
New York, New York 10001
By:    Dennis F. Dunne, Esq.
       Alexander B. Lees, Esq.

**GHU ASSOCIATES LLC**
*Counsel to the Raymond Sackler Family*
One Liberty Plaza
165 Broadway, 23rd Floor
New York, New York 10006
By:    Gerard H. Uzzi, Esq.

**JOSEPH HAGE AARONSON LLC**
*Counsel to the Raymond Sackler Family*
800 Third Avenue, 30th Floor
New York, New York 10022
By:    Gregory P. Joseph, Esq.
       Mara Leventhal, Esq.
       Christopher J. Stanley, Esq.
       Eric K. Stodola, Esq.

**PENACHIO MALARA LLP**
*Counsel to Richard Sackler*
245 Main Street
White Plains, New York 10601
By:    Anne Penachio, Esq.

**THE LAW OFFICE OF JAMES J. RUFO**
*Counsel to Lin Gao*
222 Bloomingdale Road
White Plains, New York 10605
By:    James J. Rufo, Esq.

**WILLKIE FARR & GALLAGHER LLP**
*Counsel to National Union Fire Insurance Company of Pittsburgh, Pa.*
787 Seventh Avenue
New York, New York 10019-6099
By:    Christopher J. St. Jeanos, Esq.
         Genevieve M. DiSpirito, Esq.

         -and-

1875 K. Street, NW
Washington, DC 20006-1238
By:    Joseph G. Davis, Esq.

         -and-

600 Travis Street
Houston, Texas 77002
By:    Jennifer J. Hardy, Esq.

**COZEN O'CONNOR**
*Co-Counsel to Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company, and Liberty Insurance Corporation*
3 WTC, 175 Greenwich Street, 55th Floor
New York, New York 10007
By:    Frederick E. Schmidt, Jr., Esq.
         Mark E. Felger, Esq.

**MINTZ, LEVIN, COHN, FERRIS, GLOVSKY AND POPEO, P.C.**
*Co-Counsel to Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company, and Liberty Insurance Corporation*
One Financial Center
Boston, Massachusetts 02111
By:    Kim V. Marrkand, Esq.
         Nicholas C. Cramb, Esq.

**BATESCAREY LLP**
*Counsel to Swiss Re Corporate Solutions Elite Insurance Corporation, formerly*
*known as North American Elite Insurance Company, and Aspen American Insurance Company*
191 N Wacker Drive, Suite 2400
Chicago, Illinois 60606
By:     Adam H. Fleischer, Esq.
        R. Patrick Bedell, Esq.

**HURWITZ & FINE, P.C.**
*Counsel to Swiss Re Corporate Solutions Elite Insurance Corporation, formerly*
*known as North American Elite Insurance Company, and Aspen American Insurance Company*
1200 Liberty Building
Buffalo, New York 14202
By:     Dan D. Kohane, Esq.
        Lee Siegel, Esq.

**SIMPSON THACHER & BARTLETT LLP**
*Counsel to The Travelers Indemnity Company, Gulf Underwriters Insurance*
*Company, and St. Paul Fire and Marine Insurance Company*
425 Lexington Avenue
New York, New York 10017
By:     Bryce L. Friedman, Esq.
        William T. Russell, Jr., Esq.
        David R. Zylberberg, Esq.

**BATESCAREY LLP**
*Counsel to Navigators Specialty Insurance Company*
191 North Wacker Drive, Suite 2400
Chicago, Illinois 60606
By:     Colleen P. Sorensen, Esq.

**WILMER CUTLER PICKERING HALE AND DORR LLP**
*Counsel to Navigators Specialty Insurance Company*
7 World Trade Center
250 Greenwich Street
New York, New York 10007
By:     Philip D. Anker, Esq.

**PLEVIN & TURNER LLP**
*Counsel to American Guarantee and Liability Insurance Company and Steadfast Insurance*
*Company*
580 California Street, 12th Floor
San Francisco, California 94104
By:     Mark D. Plevin, Esq.

**SHOOK HARDY AND BACON, L.L.P.**
*Counsel to American Guarantee and Liability Insurance Company and Steadfast Insurance Company*
111 S. Wacker Dr. 4700
Chicago, Illinois 60606
 By:    Lynn H. Murray, Esq.
        David E. Schoenfeld, Esq.
        Riley C. Mendoza, Esq.

**DENTONS US LLP**
*Counsel to XL Insurance America, Inc.*
1221 Avenue of the Americas
New York, New York 10020-1089
By:     Lauren Macksoud, Esq.

        -and-

233 South Wacker Drive, Suite 5900
Chicago, Illinois 60606-6361
By:     Patrick Maxcy, Esq.
        Keith Moskowitz, Esq.

        -and-

1400 Wewatta Street, Suite 700
Denver, Colorado 80202
By:     Kathryn Guinn, Esq.

**FOX SWIBEL LEVIN & CARROLL LLP**
*Counsel to Old Republic Insurance Company*
200 W. Madison Street, Suite 3000
Chicago, Illinois 60606
By:     Margaret M. Anderson, Esq.
        Kenneth M. Thomas, Esq.

**O'MELVENY & MYERS LLP**
*Counsel to Johnson & Johnson and Affiliates*
400 South Hope Street
Los Angeles, California 90071
By:     Evan M. Jones, Esq.
        Jordan A. Weber, Esq.

        -and-

2501 North Harwood Street, Suite 1700
Dallas, Texas 75201
By:    Laura L. Smith, Esq.

**DIAMOND MCCARTHY LLP**
*Counsel to Mayor & City Council of Baltimore*
2200 Post Oak Blvd., Suite 1000
Houston, Texas 77056
By:    Allan B. Diamond, Esq.
       Christopher D. Johnson, Esq.
       Justin Strother, Esq.

**SUSMAN GODFREY LLP**
*Counsel to Mayor & City Council of Baltimore*
One Manhattan West
New York, New York 10001
By:    Seth Ard, Esq.
       Max Straus, Esq.

**RONALD BASS**
*Pro Se*

**AMANDA MORALES**
*Pro Se*

**ROSEMARY WALKER**
*Pro Se*

**JAMES HARRY RAND**
*Pro Se*

**LAUREEN FERRANTE**
*Pro Se*

**CARRIE L. MCGAHA**
*Pro Se*

**TAMMEY CLARKE**
*Pro Se*

**PAMALA K. BARTZ-HALASCHAK**
*Pro Se*

**JOSEPH KENNEY**
*Pro Se*

**DIANE PIKE**
*Pro Se*

**BRADLEY W. KENNEDY**
*Pro Se*

**VITALY PINKUSOV**
*Pro Se*

**MARIA ECKE**
*Pro Se*

**CHARLES MOORE**
*Pro Se*

**KEITH REDWOOD**
*Pro Se*

**MARY S. JANNOTTA**
*Pro Se*

**JACQUELINE TORRES HERRERA**
*Pro Se*

**ESTATE OF JANE REDWOOD**
*Pro Se*

**ELLEN ISAACS**
*Pro Se*

**LAURIE DANIELLE PITTS-TILLMAN**
*Pro Se*

**JOSE TERAN**
*Pro Se*

**FREDERICK HILL**
*Pro Se*

**SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

The wrongful use of opioid products—including their marketing and distribution—has

resulted in a massive public health crisis in this country.  These bankruptcy cases arise out of that

crisis.  More particularly, these cases arise out of the role of the above-captioned debtors

(collectively, the "Debtors") and their owners in that crisis, given the extraordinarily harmful

effects of the Debtors' primary product—the prescription drug OxyContin—and other synthetic

opioids.  This harm has been borne by countless individuals and their families as well as by

numerous entities, including States, territories, local governments, hospitals, first responders and

Native American tribes.

        As was observed at the confirmation hearing, words fail when confronted with the

profound loss and pain suffered by individuals arising out of the opioid crisis.  Nothing that we

can do in these bankruptcy cases will bring back a loved one who died from opioid use or heal

the pain that opioid use has caused to the health and happiness of affected families across

America.  It would be a lie to say otherwise.  My heart goes out to all those who have suffered

such pain.

        But it is the job of the parties in these cases—and the Court—to do the best that we all

can to administer these bankruptcy cases under applicable law for the benefit of the victims

here—both individuals and entities—who are creditors (and often also referred to as claimants)

because they have been harmed by use of the  Debtors' products.  That goal has culminated in the

Debtors' now-pending request for approval before this Court to confirm their proposed current

plan of reorganization: the *Eighteenth Amended Joint Chapter 11 Plan of Reorganization of

Purdue Pharma L.P. and Its Affiliated Debtors* [ECF No. 8233] (which I will refer to simply as

the "Plan").  The Plan here delivers some $6.5 to $7 billion in value from the Debtors' former

shareholders and is supported by more than 99% of voting creditors, and by every major

organized creditor constituency.  The Plan provides hundreds of millions of distributable dollars

for personal injury claimants.  It also provides billions of dollars to States, municipalities, and

10

other creditor groups for opioid abatement efforts.  Such desperately needed abatement funding will be used for the treatment and prevention of opioid use disorder and will support community-led efforts to reduce overdose deaths and other tragic opioid-related harms.

As I will explain in more detail, the terms of this Plan reflect numerous related settlements that the Court finds are reasonable and appropriate under the facts here.  Said in the more precise terms used in the bankruptcy law, the settlements here are fair and equitable and in the best interest these bankruptcy estates.  And as I will also explain, the Plan satisfies all applicable requirements of the Bankruptcy Code for confirmation.  Of particular importance, the releases in the Plan for the Sackler Parties (as defined below) who are providing funds to claimants is consistent with the Supreme Court's 2024 decision in these cases.  That is because the releases here are provided only on a consensual basis, with claimants being given the choice to provide the releases—to "opt in" using the terms of the bankruptcy world—and, by doing so, to obtain the additional value provided as part of the Sackler settlement.  But no one is required to do so.  Parties are free to preserve their right to sue the Sackler Parties, with such a right preserved unless the party takes the affirmative step of opting in to the release.

The Plan is supported by nearly all of the Debtors' creditor constituencies, including the Official Committee of Unsecured Creditors appointed in the Debtors' cases (the "UCC"), the negotiating group for the States Attorney General, the Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants (the "AHC"), the Multi-State Governmental Entity Group (the "MSGE Group"), the Native American Tribes Group, the Ad Hoc Group of Individual Victims, the Ad Hoc Group of Hospitals, the ER Physicians, the Third-Party Payor Group, the Ratepayer Mediation Participants, the NAS Committee, and the Public School District Claimants.  *See, e.g., The Ad Hoc Group of Individual Victims' Statement in Support of*

11

*Confirmation of the Debtors' Joint Chapter 11 Plan of Reorganization and Limited Reply to Certain Plan Objections* [ECF No. 8151]; *The Multi-State Governmental Entities Group's Statement in Support of the Fourteenth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [ECF No. 8153]; *Statement of the Official Committee of Unsecured Creditors in Support of Confirmation of the Fourteenth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [ECF No. 8165]; *Ad Hoc Committee's Reply to Plan Objections* [ECF No. 8172].  Ninety-nine percent of creditors have voted to approve the Plan.

As further discussed below, all counseled objections to confirmation of the Plan have either been resolved or withdrawn, which further reflects the remarkable consensus here for this Plan to move forward.  Numerous parties have objected to confirmation of the Plan on a *pro se* basis, but for the reasons that I will explain, the Court overrules these objections and grants confirmation of the Plan.

With this overview, the Court will now provide a brief explanation of the factual background of these cases, the settlements in the Plan, and provide an explanation of the confirmation requirements and how they apply here.  The Court will conclude by addressing the remaining objections to the Plan.  Three technical notes before I continue.  First, I will be using various terms defined in the Plan and confirmation briefing.  Second, unless I note otherwise, all Case Management/Electronic Case Filing ("ECF") references are to Case No. 19-23649.  Finally, references to the Joint Exhibits ("JX") refer to those contained within Exhibits A and B of the Notice of Certain Exhibit Lists, located at ECF No. 8247.

## BACKGROUND

While familiarity with these bankruptcy cases is assumed, the Court will provide a short description of the history of these cases and a summary of the Plan terms.  This description is in no way meant to supplement or supersede the terms of the Plan, and the terms of the Plan control.

In September 2019, the Debtors filed for relief under Chapter 11 of the Bankruptcy Code.  *See generally Voluntary Petition for Non-Individuals Filing for Bankruptcy* [ECF No. 1].  The Debtors consist of Purdue Pharma L.P. ("Purdue Pharma"), its general partner Purdue Pharma Inc. ("PPI"), and Purdue Pharma's wholly owned direct and indirect subsidiaries.  Purdue Pharma and its subsidiaries are ultimately owned by numerous trusts for the benefit of certain members of the Sackler family and other Sackler-related entities (collectively, the "Sackler Parties").

At the time of filing, the Debtors operated pharmaceutical companies that manufactured opioid medications, among other things, the opioid OxyContin.  *See Declaration of Jesse DelConte* ¶ 33 [ECF No. 8148] (the "DelConte Declaration"); *In re Purdue Pharma L.P.*, 633 B.R. 53, 58 (Bankr. S.D.N.Y. 2021).  As of the Debtors' bankruptcy filing, there were approximately 2,600 lawsuits pending against Purdue in connection with its marketing, manufacturing, and sale of opioid medications.  *See* DelConte Decl. ¶ 37; *In re Purdue*, 633 B.R. at 90 n.5.  The plaintiffs that brought these suits included individuals, businesses, States, territories, Native American tribes, and municipalities and the suits asserted claims under a range of legal theories, including product liability, wrongful death, negligence, fraud, fraudulent concealment, unjust enrichment, public nuisance, and claims under state consumer protection and controlled substances laws.  *See* DelConte Decl. ¶ 37.  Many of these suits also named as

13

defendants certain parties that were related to Purdue, including numerous Sackler Parties. *See, e.g.*, JX-0798 (Tribal Plaintiffs' Short Form for Supplementing Complaint and Amended Defendants and Jury Demand, *In re Nat'l Prescription Opiate Litig., rel. Eastern Shoshone Tribe v. Purdue Pharma L.P.* (N.D. Ohio, August 12, 2019) [MDL No. 2804, ECF No. 2]); JX-0840 (Second Amended Complaint, *State of Connecticut v. Purdue Pharma L.P.*, (Conn. Super. Ct., July 1, 2019) [Case No. X07 HHD-CV-19-6105325-S]).  The Debtors had also been the subject of an investigation by the United States Department of Justice (the "DOJ") since at least June 2016. *See Motion Authorizing and Approving Settlements Between the Debtors and the United States* at ¶ 16 [ECF No. 1828].

Shortly before the bankruptcy filing, the Debtors, their shareholders, and a critical number of plaintiff constituencies reached an agreement in principle on a framework for a global resolution of this litigation (the "Initial Settlement Framework").  *See* Declaration of John S. Dubel ¶ 37 [ECF No. 8147] (the "Dubel Declaration").  The Initial Settlement Framework had three main components that required Purdue's shareholders to: (i) relinquish their equity interests in the Debtors; (ii) undertake a sale process for their non-U.S. pharmaceutical businesses; and (iii) make a multi-billion-dollar payment over time to the Debtors' estates.  *See Debtors' Memorandum of Law in Support of Confirmation of Debtors' Fourteenth Amended Joint Plan of Reorganization of Purdue Pharma L.P. and its Debtor Affiliates and Omnibus Reply to Objections Thereto* ¶ 23 [ECF No. 8161] (the "Debtors' MOL").  The Initial Settlement Framework was the starting point for further negotiations towards a resolution of the Debtors' bankruptcy and a settlement with the Sackler Parties.  *See* Dubel Decl. ¶ 37; *see, e.g.*, Hr'g Tr. 19:12-13 (Sept. 17, 2019) [ECF No. 324]; Hr'g Tr. 31:15-18 (Mar. 18, 2020) [ECF No. 974] ("[T]here's still a lot of work they've required in this case to determine whether parties support

the settlement framework."); Hr'g Tr. 28:19-22 (Mar. 24, 2021) [ECF No. 2608] ("[T]he

Debtors, the AHC, the UCC, the MSGE [Group] on the one hand, and the Sacklers on the other,

are productively and seriously engaged virtually seven days a week and around the clock

working to attempt to bring to fruition the settlement.").

        In November 2020, the Bankruptcy Court approved Purdue Pharma's entry into (i) a

plea agreement with the United States (the "Plea Agreement"), and (ii) a civil settlement

agreement with the United States (the "Civil Settlement" and, together with the Plea Agreement,

the "DOJ Resolution") to resolve the United States' civil and criminal investigations into the

Debtors' past practices related to the production, sale, marketing, and distribution of opioid

products. *See Order Authorizing and Approving Settlements Between the Debtors and the United

States* [ECF No. 2004].  Consistent with the DOJ Resolution, Purdue Pharma pled guilty in the

U.S. District Court for the District of New Jersey to an information charging it with three felony

offenses. *See* JX-2094 (Plea Agreement); JX-2095 (Civil Settlement).  Under the Plea

Agreement, the Debtors and the United States agreed to a criminal forfeiture judgment in the

amount of $2 billion (the "Forfeiture Judgment") to be treated in these bankruptcy cases as an

allowed superpriority administrative expense claim against Purdue Pharma.  The United States

further agreed to provide a credit offsetting the Forfeiture Judgment (the "Forfeiture Judgment

Credit") of up to $1.775 billion for value distributed by Purdue Pharma under a bankruptcy plan

with respect of claims by state, tribal, or local government entities.  *See* Dubel Decl. ¶¶ 58, 68.

This arrangement incentivized other creditors—who face the possibility of receiving nothing in

the absence of the DOJ Resolution and related credit—to join in a settlement that maximizes the

value dedicated to abatement purposes.  *See id.*

Early in the Debtors' bankruptcy cases, the Court also entered a voluntary injunction at the Debtors' request to ban the Debtors' promotion of opioids or opioid products. *See* DelConte Decl. ¶ 38. The Debtors requested this relief to assure parties-in-interest that the Debtors were not continuing to engage in the conduct implicated in the pre-petition lawsuits during the pendency of the bankruptcy proceeding. *See* DelConte Decl. ¶ 38. Thereafter, the Court broadened this injunction to include, among other things, (i) limits on lobbying for opioid-enhancing legislation, (ii) an agreement by the Debtors to abide by the Food & Drug Administration's decision related to high dose opioids, (iii) affirmative obligations on the Company with respect to self-monitoring, and (iv) oversight by an independent monitor to report on the Debtors' compliance with the injunction. *See* DelConte Decl. ¶ 38. It also prohibited certain of the Sackler Parties from actively engaging in the opioid business in the United States. *See* DelConte Decl. ¶ 38.

Meanwhile, the Debtors and their various creditor constituencies and interested parties continued to engage in diligence, investigation, and mediation. The Special Committee of the Debtors' Board of Directors (the "Special Committee") engaged in a comprehensive investigation of claims that the Debtors might have against the Sackler Parties and associated entities. *See* Dubel Decl. ¶¶ 17-36. The Special Committee, which was formed in May 2019, was vested with exclusive authority over all transactions between Purdue and the Sackler Parties and over the prosecution, defense, and settlement of any causes of action that the Debtors might assert against their shareholders and the Sackler Parties and their affiliates in bankruptcy. *See* Dubel Decl. ¶¶ 8, 10-11. The Special Committee was comprised of four restructuring and pharmaceutical professionals with no prior connection to the Sackler Parties. *See* Dubel Decl. ¶¶ 13-16. To safeguard the independence of the Special Committee, the Debtors put into place a

governance measure at the outset of these cases through which PPI's shareholders granted PPI's general counsel an irrevocable proxy to exercise certain shareholder rights, including the right to appoint and remove the chairman of the Board of Directors and the certain Directors, all of whom serve on the Special Committee.  *See* Dubel Decl. ¶ 12.  A Court-appointed independent examiner that was selected by the DOJ determined that the Special Committee "acted independently" in performing its work and "was not controlled or influenced, or subjected to attempted control or influence, by the Sackler Parties."  JX-0873 (Examiner's Report) at 3-4.

The Special Committee's investigation began in Spring of 2019 and continued for the next 22 months.  *See* Dubel Decl. ¶ 17.  It involved the review of allegations made in lawsuits by the States and in the news media; identification of possible legal claims that might be brought against the Sackler Parties and associated entities; an analysis of key legal issues; the collection and review of hundreds of thousands of documents; forensic analyses of transfers made to or for the benefit of the Sackler Parties; expert analysis of the Debtors' solvency; and cooperation on all of the foregoing with the UCC.  *See* Dubel Decl. ¶¶ 21-36.

The Debtors, the UCC, and the Sackler Parties also reached an agreement under which the Debtors and the Sackler Parties provided diligence materials to the UCC and others.  *See Case Stipulation among the Debtors, the Official Committee of Unsecured Creditors and Certain Related Parties* ¶¶ 7, 17 [ECF No. 291] (the "UCC Stipulation").  The UCC Stipulation also contained important commitments from the Sackler Parties, including a provision barring certain Sackler Parties from taking any action with respect to their property with the intent or material effect of frustrating any judgment that might be obtained against them, as well as commitments to provide material amounts of information and presentations on the value, location, and format of their assets.  *See* UCC Stipulation ¶¶ 13, 17.

Over the next year and a half, the Debtors produced approximately 100 million pages of documents to estate stakeholders on a wide variety of issues, including materials going to both estate claims and underlying opioid liability claims.  *See* DelConte Decl. ¶ 32; *In re Purdue*, 633 B.R. at 86.  This discovery included, among other things, all documents produced by the Debtors in federal multi-district litigations; millions of pages of documents produced to the DOJ in its investigation of the Debtors; millions of pages of materials that the Debtors collected from over 50 custodians, including from Sackler family custodians and directors for time periods going back 25 years; and additional historical analysis and diligence to enable the parties to assess the economics of the Initial Settlement Framework.  *See* Debtors' MOL ¶ 31; *In re Purdue*, 633 B.R. at 86.

The UCC also conducted its own independent investigation into potential claims against the Sackler Parties.  *See* JX-3519 (UCC Amended Standing Motion) at 9-10; JX-0873 (Examiner's Report) at 5; JX-2869 (UCC Plan Support Letter).  In connection with its investigation, the UCC and certain then non-consenting States took depositions of the Sackler Parties, current and former Board members, current employees of the Debtors, and other parties; analyzed millions of documents; evaluated the legal merits of potential claims against the Sackler Parties, including intentional and constructive fraudulent transfer, breach of fiduciary duty, and direct claims arising out of the Sackler Parties' involvement in the Debtors' prepetition marketing of opioids; and performed due diligence on the proposed resolution contemplated by the Initial Settlement Framework.  *See* JX-3519 (UCC Amended Standing Motion) at 10; *In re Purdue*, 633 B.R. at 87 (describing the UCC's "extensive analysis of potential estate claims"); JX-2869 (UCC Plan Support Letter); *Official Committee of Unsecured Creditors' Motion to Compel Production of Purportedly Privileged Documents, or for In Camera Review, Based on*

*Failure of the Sacklers and the Debtors to Demonstrate Documents Identified on Logs Are Privileged* [ECF No. 1752]; *Official Committee of Unsecured Creditors' Motion to Compel Production of Purportedly Privileged Documents, or for In Camera Review, Based on Good Cause, Crime Fraud, and at Issue Exceptions to Claims of Privilege* [ECF No. 1753].  With the consent of the Debtors and the AHC, the UCC also moved for an order granting it sole standing to commence and prosecute the causes of action of the Debtors' estates, which request was granted by the Court in November 2024.  *See Amended Motion of the Official Committee of Unsecured Creditors for Sole Standing to Commence and Prosecute Estate Causes of Action* [ECF No. 6685]; *see also* Dubel Decl. ¶ 57; *Order Granting the Official Committee of Unsecured Creditors of Purdue Pharma L.P., et al. Sole Standing to Commence and Prosecute Estate Causes of Action* [ECF No. 6979].

Starting in mid-2020, the Debtors and core creditor constituencies participated in three phases of mediation to resolve various intercreditor disputes and certain potential causes of action against the Sackler Parties (the "Pre-Confirmation Mediation").  *See* Dubel Decl. ¶ 38; JX-1637 (Phase One Mediators' Report); JX-1638 (Phase Two Mediators' Report); JX-1639 (Phase Three Mediators' Report); *Debtors' Motion for Entry of an Order Appointing Mediators* [ECF No. 855]; *Order Appointing Mediators* [ECF No. 895].  The initial objective of the Pre-Confirmation Mediation was to resolve disputes among certain non-federal public claimants and private claimants regarding the allocation of value or proceeds available from the Debtors' estates among those claimants, including the proceeds of any settlements.  *See* Dubel Decl. ¶ 38. The Pre-Confirmation Mediation was subsequently expanded to mediate the potential claims or causes of action held by the Debtors and by any non-federal public claimants against the Sackler Parties.  *See* Dubel Decl. ¶ 38; *Order Expanding Scope of Mediation* [ECF No. 1756].  These

efforts resulted in a settlement between five of the six mediating parties, under which the Sackler
Parties' aggregate contribution increased from $3 billion under the Initial Settlement Framework
to $4.275 billion.  *See* JX-1638 (Phase Two Mediators' Report) at 9.  In 2021, additional
mediation took place between certain then non-consenting States and the Sackler Parties with
respect to disagreements over the terms of a shareholder settlement agreement.  *See* Dubel Decl.
¶ 51*; Order Appointing the Honorable Shelley C. Chapman as Mediator* [ECF No. 2820].  These
negotiations resulted in 15 additional States agreeing to an enhanced shareholder settlement
agreement.  *See* Dubel Decl. ¶ 52.

The Debtors subsequently filed the *Debtors' Twelfth Amended Joint Chapter 11 Plan of
Reorganization of Purdue Pharma L.P. and its Affiliated Debtors* [ECF No. 3726] (the "Twelfth
Amended Plan").  Starting in August 2021, Judge Robert D. Drain (Ret.) of this Court presided
over a hearing on confirmation of the Twelfth Amended Plan.  Confirmation of the Twelfth
Amended Plan was supported by a broad consensus of parties-in-interest, but opposed by a
handful of States, several *pro se* claimants, and the United States Trustee.  These objecting
parties raised several arguments in opposition to confirmation of the Twelfth Amended Plan, but
the main challenge was to the legality of the non-consensual releases of claims held by non-
debtors against other non-debtors (also known as "Third-Party Releases") that were contained in
the Twelfth Amended Plan.

In September 2021, Judge Drain issued a bench ruling and a subsequent order confirming
the Twelfth Amended Plan, which included approval of the non-consensual Third-Party Releases.
*See Findings of Fact, Conclusions of Law, and Order Confirming the Twelfth Amended Joint
Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors* [ECF No.
3787] (the "Confirmation Order"); Dubel Decl. ¶¶ 48-49.  The United States Trustee, eight States

20

and the District of Columbia, certain Canadian municipalities and indigenous tribes, the City of

Seattle, and certain individual claimants appealed the Confirmation Order to the United States

District Court for the Southern District of New York, primarily on the grounds that the

Bankruptcy Code does not authorize non-consensual Third-Party Releases.  *See Disclosure*

*Statement for Thirteenth Amended. Joint Chapter 11 Plan of Reorganization* at Art. I.B [ECF No.

7637] (the "Disclosure Statement"); Dubel Decl. ¶ 50.  In December 2021, the District Court

vacated the Confirmation Order, holding that the Bankruptcy Code does not authorize non-

consensual Third-Party Releases.  *See In re Purdue Pharma, L.P.*, 635 B.R. 26 (S.D.N.Y. 2021);

Dubel Decl. ¶ 50.  The District Court rejected other challenges related to the Bankruptcy Court's

subject matter jurisdiction to approve the release of claims against non-debtors and the Twelfth

Amended Plan's classification and treatment of unsecured creditors.  *See In re Purdue*, 635 B.R.

at 83-89, 115-118.

The Debtors and certain other parties appealed the District Court decision to the United

States Court of Appeals for the Second Circuit.  *See* Dubel Decl. ¶ 51.  This appeal precipitated a

new round of mediation that led to changes in the Twelfth Amended Plan that resolved the appeal

by the objecting States and the District of Columbia.  *See* Disclosure Statement Art. I.B; Dubel

Decl. ¶¶ 51-52.  These changes included an additional $1.175 to $1.675 billion in contributions

from the Sackler Parties and other Sackler-related entities, which brought their total contribution

under the Twelfth Amended Plan to $5.5 to $6 billion.  *See* Dubel Decl. ¶ 52.  In May 2023, the

Second Circuit reversed the District Court and affirmed the Confirmation Order.  *See generally*

*In re Purdue Pharma L.P.*, 69 F.4th 45 (2d Cir. 2023); Dubel Decl. ¶ 54.

The United States Supreme Court ultimately granted certiorari to consider the

permissibility of nonconsensual Third-Party Releases.  *See* Dubel Decl. ¶ 54.  In June 2024, the

Supreme Court reversed the decision of the Second Circuit in a 5 to 4 vote. *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204 (2024); *see* Dubel Decl. ¶ 56. In *Harrington*, the Supreme Court held that the Bankruptcy Code does not authorize a nonconsensual release and injunction of claims of a non-debtor against another non-debtor, as was provided by the Twelfth Amended Plan. *See* Dubel Decl. ¶ 56. The Supreme Court remanded the case for further proceedings consistent with its opinion. *See* Dubel Decl. ¶ 56.

After remand to this Court, the Debtors went back to the drawing board. Beginning in the second half of 2024, numerous parties-in-interest engaged in a months' long mediation process to modify the settlement with the Sackler Parties and portions of the Twelfth Amended Plan in a manner consistent with the Supreme Court's *Harrington* ruling. *See* Dubel Decl. ¶¶ 57, 60. These new rounds of mediation included the Debtors, the UCC, the AHC, the MSGE Group, certain of the Sackler Parties, an Ad Hoc Group of Hospitals, the NAS Committee, an Ad Hoc Group of Individual Victims, the Third-Party Payor Group, the Public School District Claimants, the Ratepayer Mediation Participants, and one or more negotiating committee(s) of State Attorneys General as active participants. *See* Debtors' MOL ¶ 49. This mediation resulted in the global agreement that serves as the framework for the Plan that is now before the Court, providing for more than $7 billion to creditors through a series of interconnected, interdependent settlements that avoid litigation between the States and creditor groups that would drain estate assets. *See* Dubel Decl. ¶ 60. The Plan incorporates several changes to comply with the Supreme Court's *Harrington* decision. Specifically, the Third-Party Releases of direct creditor claims against the Sackler Parties and other non-debtor parties that are contained in the Plan will only bind those creditors that affirmatively elect to grant them. *See* Disclosure Statement Art. I.B; Plan § 1.1. Creditors that elect to grant the Third-Party Releases will receive additional

distributions in exchange for their release.  *See* Disclosure Statement Art. I.B.  Those parties that

do not elect to grant the Third-Party Releases will not have their direct claims against the Sackler

Parties or other non-Debtors released or otherwise compromised.  *See* Disclosure Statement Art.

I.B.

As previously noted, the Plan contains several interrelated settlements.  The first such

agreement is the core settlement between and among public and private creditors that was

developed in 2020 and 2021 and was a foundation of the Twelfth Amended Plan.  The second are

two distinct but interconnected settlements with third parties: (i) a settlement of the Debtors'

claims against certain former shareholders, officers and directors, including the Sackler Parties;

and (ii) the aforementioned optional settlements by creditors of their direct claims against the

Sackler Parties.  *See* Debtors' MOL ¶ 7.  The settlement of the estates' claims will resolve the

Debtors' claims against the Sackler Parties arising out of the Debtors' production, marketing, and

sale of opioid medications, and allocate the proceeds of the settlement to the Debtors' creditors.

*See id.*

The Plan will use the Debtors' assets and settlement funds to help address and abate the

opioid crisis.  *See* DelConte Decl. ¶ 4.  Under the Plan and the various settlements with the

Sackler Parties, billions of dollars will be transferred into public and private trusts and will go

towards compensating victims and funding remediation and compensation efforts for the benefit

of claimants harmed by the opioid crisis, including States and localities, Native American Tribes,

healthcare providers, public schools, emergency room physicians and qualified personal injury

claimants.  *See* Disclosure Statement Art. I.B; DelConte Decl. ¶¶ 4-6.

Under the terms of the settlements among the Debtors and the Sackler Parties, the Sackler

Parties will pay up to $7 billion over fifteen years in settlement of both the Debtors' claims

against the Sackler Parties and direct claims against the Sackler Parties held by creditors that elect to settle those claims. *See* Disclosure Statement Art. I.B; DelConte Decl. ¶ 4. Up to $1.5 billion of that total is due on the Effective Date of the Plan. *See* Disclosure Statement Art. I.B. These payments exceed the amount of the Sackler Parties' prior commitments set forth in the Twelfth Amended Plan. *See* Disclosure Statement Art. I.B. The primary consideration being granted to the Sackler Parties in exchange for these payments is the release and injunction provisions provided for under the Plan and in the various settlements. *See* Disclosure Statement Art. I.B.

The Plan provides for the settlement of the Debtors' claims against the Sackler Parties and allocates the proceeds from the settlement among the Debtors' creditors (the "Estate Claims Settlement"). *See* Disclosure Statement Art. I.B. Consistent with the Supreme Court's ruling in *Harrington*, the Plan also provides for the voluntary settlement of direct claims held by creditors ("Direct Claims Settlements") against the Sackler Parties, who will provide cash distributions to public and private claimants that elect to participate in the Direct Claims Settlements and grant the Third-Pary Releases of their direct claims. *See* Disclosure Statement Art. I.B. A claimant's vote on the Plan is independent of whether they elect to grant the Third-Party Releases in exchange for an increased recovery. *See* Disclosure Statement Art. I.B.

The majority of Purdue's current value, including the proceeds secured through the Estate Claims Settlement, will be transferred to nine trusts for the benefit of the Debtors' public and private creditors. *See* DelConte Decl. ¶¶ 4-5. These trusts will include a Master Disbursement Trust, two Public Creditor Trusts (the Governmental Remediation Trust and Tribe Trust), the Public School Trust, four Private Creditor Trusts (the PI Trust, Healthcare Provider Trust, TPP Trust, and ERP Trust), and a Plan Administration Trust. *See* DelConte Decl. ¶ 5.

The PI Trust will make distributions on claims for alleged opioid-related personal injuries.  *See* Plan §§ 1.1, 5.8.  Various trust distribution procedures govern how a personal injury claim becomes eligible for payment.  *See Declaration of Edgar C. Gentle III, Esq. in Support of the Ad Hoc Group of Individual Victims' Statement in Support of Confirmation of the Debtors' Joint Chapter 11 Plan of Reorganization and Limited Reply to Certain Plan Objections* ¶ 10 [ECF No. 8154] (the "Gentle Declaration"); *Order (I) Appointing PI and TPP Claims Administrators; (II) Authorizing the Establishment of Claims Deadlines and Claims Objection Procedures; and (III) Granting Related Relief* [ECF No. 7382].  Under these trust distribution procedures, a claims administrator will determine whether a personal injury claim is qualified and substantiated and is thereby eligible to receive a distribution from the trust on account of the claim.  *See* Gentle Decl. ¶ 13.  The trust distribution procedures also set forth what forms and qualifying evidence holders of personal injury claims need to submit to be eligible to receive a distribution.  *See* Gentle Decl. ¶ 16.  These include, among other things, holding such a claim against one or more Debtors, providing proof that demonstrates use of a qualifying prescribed opioid prior to the petition date, having timely filed a claim against the Debtors, and having submitted the applicable personal injury claim form and HIPAA consent form.  *See* Gentle Decl. ¶ 16.  To ease the burden on personal injury claimants, they were not required to resubmit any documents or supporting information that had previously been submitted as part of their proofs of claim filed against the Debtors.  *See* Gentle Decl. ¶ 28.  Additionally, a claim that is found by the administrator to be deficient will receive the opportunity to cure that deficiency.  *See* Gentle Decl. ¶¶ 13, 29.  The claims administrator's review of personal injury claims has been ongoing since the Summer of 2025 to expedite the process and prevent delay in distributions to those that qualify.  *See* Gentle Decl. ¶¶ 26-27, 29, 32.

The payments that are made by the Sackler Parties will be split between the Estate
Claims Settlement and the Direct Claims Settlements. *See* Disclosure Statement Art. I.B. Those
creditors that choose to grant the Third-Party Releases will receive *pro-rata* distributions from
both the Estate Claims Settlement and the Direct Claims Settlements so long as they qualify
under the applicable trust distribution procedures. *See* Disclosure Statement Art. I.B; Gentle
Decl. ¶ 13. Creditors that do not grant the Third-Party Releases may only receive *pro-rata*
distributions from the Estate Claims Settlement and other estate value (if they meet the
applicable trust distribution procedures), but not from the Direct Claims Settlement. *See*
Disclosure Statement Art. I.B. But those creditors that do not grant the Third-Party Releases will
be able to pursue litigation of their direct claims against the Shareholder Released Parties (as
defined in the Plan). *See* Disclosure Statement Art. I.B. Additionally, those creditors that do not
grant the Third-Party Releases will only receive distributions upon the allowance of their claims,
which may be subject to objections by the Debtors and other parties-in-interest in accordance
with the Bankruptcy Code and the Plan. *See* Disclosure Statement Art. I.B. Debtors' counsel
represented at the hearing on confirmation that those parties that grant the Third-Party Releases
but subsequently have their proof of claim disallowed as untimely against the Debtors prior to
the Debtors' emergence from bankruptcy will retain their direct claims against the Sackler
Parties because their ballot and election to grant the Third-Party Releases will essentially be null
and void. *See* Hr'g Tr. 52:10-12 (Nov. 14, 2025) [ECF No. 8253] (Debtors' counsel stating that
"if your claim gets disallowed prior to emergence, you're not bound to the release, you're not
treated as a claimant in the case."). As the Sackler Parties' increased settlement contributions are
occurring without the global Third-Party Releases of the Twelfth Amended Plan, the current Plan
and related settlements provide that certain litigation costs and expenses incurred by the Sackler

Parties related to creditor claims that do not participate in the Direct Claims Settlement will reduce the Sackler Parties' settlement payment obligations. *See* Disclosure Statement Art. I.B.

The deadline for creditors to opt into the Third-Party Releases in the Plan had originally been tied to the occurrence of the Effective Date of the Plan, specifically 30 days prior to the Effective Date. At the confirmation hearing, there was a discussion about the difficulty of determining the Effective Date and a creditor's inability to ascertain when that date would occur. As a result, the Debtors stated on the record that they would change the deadline to opt into the Third-Party Releases to a date certain, specifically March 1, 2026, and would send out a notice so that creditors would be aware of their deadline to opt in. *See* Hr'g Tr. 44:6-46:25 (Nov. 14, 2025).

Upon the Effective Date of the Plan, Purdue Pharma will cease to exist and the Debtors' businesses will be transferred to a newly created company called Knoa Pharma LLC ("Knoa") that will be wholly owned by an independent entity that will be treated as an exempt organization under Section 501(c)(4) of the Internal Revenue Code and will be charged with the express purpose of addressing the opioid crisis. *See* Disclosure Statement Art. I.B; Plan § 5.4(a); DelConte Decl. ¶¶ 4, 7. Knoa will be a "public benefit corporation" that is required to operate in a responsible manner, will be subject to the same laws and regulations as any other U.S. pharmaceutical company, and will be governed by a charter that will require it to deploy its assets to address the opioid crisis. *See* Disclosure Statement Art. I.B; DelConte Decl. ¶ 7. The Plan also establishes a system of safeguards to ensure that Knoa will operate the Debtors' businesses for the public benefit. *See* DelConte Decl. ¶¶ 8-13. These include Knoa and any successor owners being subject to an operating injunction imposing certain restrictions on the marketing of opioid products. *See* DelConte Decl. ¶ 10; Plan § 5.4(g). Knoa will receive

substantially all the Debtors' non-cash assets and $135 million of unrestricted cash and cash equivalents; the proceeds of Knoa's business will be used to fund public health initiatives to develop medications to treat opioid addiction, to reverse opioid overdoses, and to make distributions to the trusts established to administer the distribution of value to fund opioid abatement efforts.  *See* DelConte Decl. ¶¶ 5, 14.

The Plan also creates a public document repository that will make available materials for public review.  *See* Plan § 5.13; DelConte Decl. ¶ 32.  The repository will be accessible to the public online, will be hosted by an academic institution or library, and will include more than 13 million documents produced to litigants in these Chapter 11 cases, in addition to approximately 30 million documents collected during other Purdue legal matters and certain categories of documents currently subject to attorney-client privilege.  *See* Plan § 5.13; DelConte Decl. ¶ 32.

The voting results reflect extraordinary support among creditors for the Plan.  Across all classes of voting creditors, more than 99% of the ballots cast and the amount of total voting dollars voted to accept the Plan.  *See Supplemental Declaration of Craig E. Johnson of Kroll Restructuring Administration LLC Regarding Service and Publication of the Confirmation Hearing Notice and the Solicitation of Votes and Tabulation of Ballots Cast on the Thirteenth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors*, Ex. A [ECF No. 8173] (the "Supplemental Johnson Declaration").  This exceeds the consensus reached in connection with confirmation of the Twelfth Amended Plan.  Exhibit A of the Supplemental Johnson Declaration sets out the voting results as follows:

**Purdue Pharma L.P., *et al.***

Exhibit A - Final Tabulation

| Plan Class | Plan Class Description | Number Accepting % | Number Rejecting % | Amount Accepting % | Amount Rejecting % | Class Voting Result |
|---|---|---|---|---|---|---|
| 3 | Federal Government Unsecured Claims | No valid Ballot submitted by a holder entitled to vote in the class | | | | Deemed to Accept[1] |
| 4 | Non-Federal Domestic Governmental Claims | 3,351 | 8 | $3,351.00 | $8.00 | Accept |
| | | 99.76% | 0.24% | 99.76% | 0.24% | |
| 5 | Tribe Claims | 59 | 10 | $59.00 | $10.00 | Accept |
| | | 85.51% | 14.49% | 85.51% | 14.49% | |
| 6 | Public School Claims | 173 | 1 | $173.00 | $1.00 | Accept |
| | | 99.43% | 0.57% | 99.43% | 0.57% | |
| 7 | Healthcare Provider Claims | 604 | 1 | $604.00 | $1.00 | Accept |
| | | 99.83% | 0.17% | 99.83% | 0.17% | |
| 8 | Third-Party Payor Claims | 19,410 | 1 | $19,410.00 | $1.00 | Accept |
| | | 99.99% | 0.01% | 99.99% | 0.01% | |
| 9 | ER Physician Claims | 1 | 0 | $1.00 | $0.00 | Accept |
| | | 100% | 0% | 100% | 0% | |
| 10(a) | NAS PI Claims | 3,337 | 4 | $3,337.00 | $4.00 | Accept |
| | | 99.88% | 0.12% | 99.88% | 0.12% | |
| 10(b) | Non-NAS PI Claims | 54,599 | 222 | $54,599.00 | $222.00 | Accept |
| | | 99.60% | 0.40% | 99.60% | 0.40% | |
| 11(c) | Other General Unsecured Claims | 95 | 2 | $8,400,087.11 | $751.00 | Accept |
| | | 97.94% | 2.06% | 99.99% | 0.01% | |

[1] It is Kroll's understanding that Section 3.3 of the Plan provides: "With respect to each Debtor, if a Class contains Claims eligible to vote and no Holder of Claims eligible to vote in such Class votes to accept or reject this Plan by the Voting Deadline, this Plan shall be presumed accepted by the Holders of Claims in such Class."

I.    The Confirmation Trial

A trial was held on confirmation of the Plan on November 12th, November 13th, and November 14th, 2025, during which 19 witnesses testified in support of confirmation and 13 *pro-se* parties were heard. *See Joint Witness List* [ECF No. 8163] (the "Joint Witness List"); *Notice to Pro Se Claimants* [ECF No. 8202]; Hr'g Tr. (Nov. 12, 2025) [ECF No. 8245]; Hr'g Tr. (Nov. 13, 2025) [ECF No. 8252]; Hr'g Tr. (Nov. 14, 2025) [ECF No. 8253]. The Debtors called eight witnesses, and one witness offered by each of the multiple entities supporting the Plan, including the UCC, the AHC, the MSGE Group, and the Ad Hoc Group of Personal Injury Victims. *See generally* Joint Witness List. The various Sackler Parties called a total of eight witnesses. *See generally* Joint Witness List. In the interest of judicial economy, each of these witnesses identified and adopted their respective written declarations as their direct testimony. Certain Witnesses introduced joint exhibits, which were then offered and admitted into evidence. *See Notice of Certain Exhibit Lists*, Ex. A [ECF No. 8247].[2]

The Debtors called Jesse DelConte, David DeRamus, John Dubel, Gautam Gowarisakaran, Craig E. Johnson, Richard Collura, Deborah Greenspan, and Mark Rule. *See generally* Joint Witness List; Hr'g Tr. (Nov. 12, 2025). There was no objection to the introduction of any of the testimony of the Debtors' witnesses or to the exhibits introduced as part of their testimony. *See id.* A brief description of these witnesses helps to place their testimony in context.

Mr. DelConte's testimony addressed the mechanics of the Plan, the factual background of the Debtors' history, the financial projections of Knoa, and the Debtors' insurance policies. *See*

---

[2]    Certain exhibits were admitted at trial that are not reflected within Exhibit A. For example, joint exhibit 3666 was admitted at trial through Mr. Gentle, but is not listed in Exhibit A. *See* Hr'g Tr. 119:4-120:9 (Nov. 12, 2025). However, given that no party raised an objection to any exhibit this discrepancy is of no consequence. *See* Hr'g Tr. 32:4-33:6 (Nov. 13, 2025).

Hr'g Tr. 146:6-13 (Nov. 12, 2025); *see generally* DelConte Decl; *Expert Report of Jesse DelConte* [ECF No. 8138] (the "DelConte Report").  Mr. DelConte also explained that the Plan satisfied the requirements of the 2020 DOJ Resolution.  Mr. Johnson's testimony covered the voting procedures and results, which demonstrated the overwhelming approval of the Plan by creditors.  *See* Hr'g Tr. 151:9-16 (Nov. 12, 2025); *see generally* Supplemental Johnson Decl.  Ms. Greenspan offered expert testimony comparing the trust distribution mechanisms of the Plan with other similar successful trust mechanisms in complex mass tort settlements, an analysis she offered as to both the feasibility and equitability of the Plan.  *See* Hr'g Tr. 155:10-19 (Nov. 12, 2025); *Declaration of Deborah E. Greenspan* [ECF No. 8140].  Finally, Mr. Gowrisankaran provided an economic analysis about the use of Plan funds for opioid remediation and how that use conferred value beyond the funds that were directly distributed.  *See* Hr'g Tr. 156:20-157:2 (Nov. 12, 2025); *Declaration of Gautam Gowrisankaran* [ECF No. 8141].

Substantial evidence was offered to show to show the settlements in the Plan were fair, equitable, reasonable, and in the best interests of both the creditors and the Debtors' estates.  *See* Hr'g Tr. 150:8-11 (Nov. 12, 2025).  More specifically, Mr. Dubel testified about the efforts of the Debtors' Special Committee to investigate potential claims the Debtors may have against the Sacklers Parties.  *See* Hr'g Tr. 149:13-16 (Nov. 12, 2025); *see generally* Dubel Decl.  Mr. Rule's testimony analyzed 37 pre-petition transfers worth some $1.4 billion between the Debtors and the Sacklers, concluding the Sacklers did not provide reasonable value.  *See* Hr'g Tr. 154:12-25 (Nov. 12, 2025); *Declaration of Mark F. Rule, CFA* [ECF No. 8136].  Mr. Collura testified as to his own independent investigation into potential fraudulent transfer claims that might be recovered against the Sacklers.  *See* Hr'g Tr. 153:8-15 (Nov. 12, 2025); *Declaration of Richard A. Collura* [ECF No. 8135].

Four other witnesses—Michael Atkinson, Jessica Horewitcz, Kirk Lane, and Edgar Gentle III—were put forward by various creditor groups in support of confirmation. *See generally* Hr'g Tr. (Nov. 12, 2025). Like the Debtors' witnesses, there were no objection to the testimony of any of these creditor witnesses or to the exhibits entered as part of their testimony. *See id.* The UCC called Mr. Atkinson to speak to his investigation into the feasibility of recovering on claims against the Sacklers as well as to the benefits of the negotiated settlements in the Plan when compared with further litigation. *See* Hr'g Tr. 157:22-158:17 (Nov. 12, 2025); *Declaration of Michael Atkinson in Support of the Statement of the Official Committee of Unsecured Creditors in Support of Confirmation of the Fourteenth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [ECF No. 8166]. Mr. Lane was called by the MSGE Group. He testified to the success of opioid remediation efforts in Arkansas as a demonstration of the value provided by opioid abatement funds. *See* Hr'g Tr. 157:11-19 (Nov. 12, 2025); *Declaration of Kirk Lane* [ECF No. 8153-1]. As trustee for the proposed Personal Injury Trust, Mr. Gentle was offered as a witness by the Ad Hoc Committee of Personal Injury Claimants to explain the differences in recovery between claimants who do or do not chose to opt-in to release the Sacklers, as well as the specifics of how claims will be reviewed by the Personal Injury Trust. *See* Hr'g Tr. 155:22-156:6 (Nov. 12, 2025); *Declaration of Edgar C. Gentle III, Esq. in Support of the Ad Hoc Group of Individual Victims' Statement in Support of Confirmation of the Debtors' Joint Chapter 11 Plan of Reorganization and Limited Reply to Certain Plan Objections* [ECF No. 8154]. Mr. Gentle's testimony was offered to support the feasibility of implementation of the Plan. Finally, the Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants called Ms. Horewitz to provide an insolvency analysis of the Debtors given their dwindling assets and the estimated opioid claim

liability lies between $4.54.125 billion and $8.834 trillion dollars.  *See* Hr'g Tr. 159:24-160:8

(Nov. 12, 2025); *Declaration of Jessica B. Horewitz, Ph.D In Support of the Ad Hoc Committee's*

*Reply to Plan Objections and in Support of Plan Confirmation in Support* [ECF No. 8170].

The Sackler Family, through Side A or Side B, introduced seven witnesses at the trial:

Michael Cushing, Timothy Martin, Kevin McElroy, Jonathan White, Jennifer Blouin, Maureen

M. Chakraborty, and Lawrence A. Hamermesh.  *See generally* Hr'g Tr. (Nov. 12, 2025); Hr'g Tr.

(Nov. 13, 2025).  The testimony supported the reasonableness of the settlements in the Plan.

More specifically, these witnesses countered the narrative of the Debtors and the other Plan

supporters about (1) the value of the Sackler Parties' assets, (2) the difficulty in reaching those

assets, and (3) the likelihood of success in reaching those assets to satisfy any judgment.  These

witnesses testified that the Sacklers were contributing substantially all their assets to the Master

Trust.  Specifically, Mr. Martin was called by both sides of the Sackler family to testify and

identify pre-petition assets, estimating assets of some $3.5526 billion from Side A and $5.0405

Billion from Side B.  *See* Hr'g Tr. 160:21-161:6 (Nov. 12, 2025); *Declaration of Timothy J.*

*Martin* [ECF No. 8142]; *Declaration of Timothy J. Martin* [ECF No. 8160].  Ms. Chakraborty

testified about the Debtor's solvency during the years leading up the "wave of litigation" in

2017.  *See* Hr'g Tr. 163:7-9 (Nov. 12, 2025); *Declaration of Maureen Chakraborty, Ph.D.* [ECF

No. 8143].  There was also testimony about the difficulty in reaching the assets of the Sackler

Parties, with Mr. White testifying about the complex nature of the trusts that contain the assets of

Side A of the Sackler family, and the challenges of reaching those assets in litigation as opposed

to settlement.  *See* Hr'g Tr. 162:5-19 (Nov. 12, 2025); *Declaration of Jonathan Greville White*

[ECF No. 8145].  Similarly, Mr. Cushing testified that the Side A trusts, principally located in the

Bailiwick of Jersey, might be found by the Jersey Royal Court to be unreachable by creditors.

33

*See Expert Report of Michael Cushing* [ECF No. 8157].  Other witnesses explained the defenses that the Sacklers could raise against litigation seeking to recover transferred assets.  For example, Ms. Blouin's testified that $4.559 billion in tax distributions made by the Debtors to the Sacklers were made for reasonable value.  *See* Hr'g Tr. 163:9-15 (Nov. 12, 2025); *Declaration of Jennifer Blouin* [ECF No. 8146].  Mr. McElroy explained the value of various received for various transfers.  *See Expert Report of Kevin T. McElroy* [ECF No. 8155].  Finally, Mr. Hamermesh offered his opinion that the Sacklers could successfully argue that their participation on the Debtor's Board of Directors was consistent with customary norms of corporate practices, insulating them from personal liability in that capacity.  *See* Hr'g Tr. 163:16-22 (Nov. 12, 2025); *Declaration of Prof. Lawrence A. Hamermesh* [ECF No. 8144].  Mr. Hamermesh's testimony was the only testimony of any witness that drew an objection as to its admissibility; the Court overruled that objection, finding his testimony to be relevant.  *See* H'rg Tr. 126:15-127:10 (Nov. 12, 2025); Hr'g Tr. 18:11-24 (Nov. 13, 2025).

At the conclusion of the testimony of all the witnesses, the Debtors offered additional exhibits in support of confirmation, none of which were objected to by any party.  *See* Hr'g Tr. 32:4-17 (Nov. 13, 2025).  Hearing no objections, the Court admitted these remaining exhibits into evidence.  *See* Hr'g Tr. 32:4-33:6 (Nov. 13, 2025); *Notice of Certain Exhibit Lists*, Ex. B [ECF No. 8247].  Accordingly, all of the testimony and exhibits offered by the parties were admitted for purposes of the confirmation hearing.  *See, e.g.*, H'rg Tr. 126:15-127:10 (Nov. 12, 2025); Hr'g Tr. 18:11-24 (Nov. 13, 2025).

Several counseled objections to confirmation of the Plan were filed but were subsequently resolved during the course of the confirmation hearing.  These included an objection by the City of Baltimore and several limited objections by insurance companies that

issued policies to the Debtors prior to the petition date.  *See Mayor & City Council of Baltimore's Objection to the Thirteenth Amended Joint Chapter 11 Plan of Reorganization* [ECF No. 7955]; *Certain Insurers' Limited Objection to Confirmation of the Thirteenth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [ECF No. 7895]; *Joinder and Objection of the Travelers Indemnity Company to the Thirteenth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors* [ECF No. 7896]; *Limited Objection of Navigators Specialty Insurance Company, American Guarantee and Liability Insurance Company, Steadfast Insurance Company, and XL Insurance America, Inc. to Confirmation of the Thirteenth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors* [ECF No. 7897]; *see also Stipulation Resolving the Objection of the Mayor & City Council of Baltimore to the Debtors' Chapter 11 Plan of Reorganization* [ECF No. 8134]; Hr'g Tr. 65:16-70:8 (Nov. 12, 2025) (discussion of resolution with City of Baltimore and approval of stipulation); Hr'g Tr. 15:23-25, 18:22-22:13 (Nov. 14, 2025) (discussion of resolution with insurers).

## **DISCUSSION**

The Court will turn now from the factual background to the applicable legal landscape. Two subjects are the focus of the Court's discussion: the settlements in the Plan and the confirmation requirements.  I will discuss the settlements first.

I.    The Settlements

In the Second Circuit, settlements in a Chapter 11 plan of reorganization are subject to the same standards applied to the settlements under Rule 9019 of the Federal Rule of Bankruptcy Procedure.  *See In re Chemtura Corp.*, 439 B.R. 561, 608 (Bankr. S.D.N.Y. 2010) (approving settlement under Rule 9019 framework as part of plan of reorganization); *In re AMR Corp.*, 502

B.R. 23, 42-43 (Bankr. S.D.N.Y. 2013); *see also Protective Comm. for Indep. S'holders of TMT Trailer Ferry v. Anderson,* 390 U.S. 414, 424 (1968) (holding that in plan confirmation context, courts must "determine that a proposed compromise forming part of a reorganization plan is fair and equitable."); *Resolution Trust Corp. v. Best Prods. Co. (In re Best Prods. Co., Inc.)*, 177 B.R. 791, 794 n.4 (S.D.N.Y. 1995) ("Irrespective of whether a claim is settled as part of a plan pursuant to [S]ection 1123(b)(3)(A) of the Bankruptcy Code or pursuant to separate motion under Bankruptcy Rule 9019, the standards applied by the Bankruptcy Court for approval are the same."), *aff'd*, 68 F.3d 26 (2d Cir. 1995); *cf. In re Sabine Oil & Gas Corp*., 555 B.R. 180, 256 (Bankr. S.D.N.Y. 2016) (noting that "[c]ompromises are a normal part of the process of reorganization.").

Bankruptcy Rule 9019(a) provides that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a). In the same vein, Section 1123(b) of the Bankruptcy Code specifically provides that a Chapter 11 plan may include a settlement of any claim belonging to the estates and "any other appropriate provision not inconsistent with the applicable provisions of [the Bankruptcy Code]." 11 U.S.C. § 1123(b)(3)(A), (b)(6).

The decision to approve or deny a particular compromise or settlement involving a bankruptcy estate lies within the discretion of the bankruptcy court. *See Vaughn v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.)*, 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991); *see also Nellis v. Shugrue*, 165 B.R. 115, 122-23 (S.D.N.Y. 1994). As a general matter, "[s]ettlements and compromises are favored in bankruptcy as they minimize costly litigation and further parties' interests in expediting the administration of the bankruptcy estate." *In re Dewey & LeBoeuf LLP*, 478 B.R. 627, 640 (Bankr. S.D.N.Y. 2012) (quoting *In re*

*MF Global Inc*., 2012 WL 3242533, at *5 (Bankr. S.D.N.Y Aug. 10, 2012)); *see also Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 455 (2d Cir. 2007) (stating that settlements are important in bankruptcy because they "help clear a path for the efficient administration of the bankrupt estate"); 10 COLLIER ON BANKRUPTCY ¶ 9019.01 (16th ed. 2024) (highlighting that "compromises [] are favored in bankruptcy."). A court assessing a settlement in bankruptcy may exercise its discretion "in light of the general public policy favoring settlements." *In re Hibbard Brown & Co., Inc*., 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998).

To approve a proposed settlement under Rule 9019, a court must determine that it is fair, equitable, and in the best interests of the estate. *See Anderson*, 390 U.S. at 424; *Air Line Pilots Assoc. v. Am. Nat'l Bank & Trust Co. of Chi. (In re Ionosphere Clubs, Inc.)*, 156 B.R. 414, 426 (S.D.N.Y. 1993), *aff'd*, 17 F.3d 600 (2d Cir. 1994); *In re MF Global Inc*., 2012 WL 3242533, at *5; *In re Mrs. Weinberg's Kosher Foods, Inc.*, 278 B.R. 358, 361 (Bankr. S.D.N.Y. 2002). In so doing, however, the court need not conduct a "mini-trial" or decide the numerous issues of law and fact raised by a compromise or settlement, but must only "canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness." *In re Dewey & LeBoeuf LLP*, 478 B.R. at 640 (quoting *In re Adelphia Commc'ns Corp.*, 327 B.R. 143, 159 (Bankr. S.D.N.Y. 2005)). To be approved, therefore, a settlement "need not be the best that the debtor could have obtained." *In re Sabine*, 555 B.R. at 257 (quoting *In re Adelphia Commc'ns Corp.,* 368 B.R. 140, 225 (Bankr. S.D.N.Y. 2007)). "Indeed, '[i]f courts required settlements to be perfect, they would seldom be approved.'" *In re Sabine*, 555 B.R. at 257 (quoting *Official Comm. of Unsecured Creditors v. CIT Grp./Bus. Credit Inc. (In re Jevic Holding Corp.)*, 787 F.3d 173, 180 (3d Cir. 2015)); *see also In re Best Prods. Co.*, 168 B.R. 35, 51 (Bankr. S.D.N.Y. 1994)

(noting that "little would be saved by the settlement process if bankruptcy courts could approve settlements only after an exhaustive investigation and determination of the underlying claims."). "Rather, 'there is a range of reasonableness with respect to a settlement—a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion.'" *In re Sabine*, 555 B.R. at 257-58 (quoting *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972)).

In the Second Circuit, the *Iridium* decision directs courts to balance seven interrelated factors in deciding whether a settlement is fair and equitable:

> (1) the balance between the litigation's possibility of success and the settlement's future benefits; (2) the likelihood of complex and protracted litigation, with its attendant expense, inconvenience, and delay, including the difficulty in collecting on the judgment; (3) the paramount interests of the creditors, including each affected class's relative benefits and the degree to which creditors either do not object to or affirmatively support the proposed settlement; (4) whether other parties in interest support the settlement; (5) the competency and experience of counsel supporting, and [t]he experience and knowledge of the bankruptcy court judge reviewing the settlement; (6) the nature and breadth of releases to be obtained by officers and directors; and (7) the extent to which the settlement is the product of arm's length bargaining.

*In re Iridium*, 478 F.3d at 462 (internal citations and quotations omitted).

In assessing the reasonableness of a settlement, the court "may rely on the opinions of the debtor, the parties to the settlement, and professionals in evaluating the necessary facts, and it should factor in the debtor's exercise of its business judgment in recommending the settlement." *In re NII Holdings*, 536 B.R. 61, 99 (Bankr. S.D.N.Y. 2015) (citing *In re Dewey & LeBoeuf*, 478 B.R. at 641); *see also In re Best Prod.*, 168 B.R. at 50 ("[T]he court may credit and consider the opinion of counsel that the settlement is fair and equitable."). While a bankruptcy court may consider the objections lodged by parties in interest, "such objections are not controlling . . .

[and] the bankruptcy court must still make informed and independent judgment." *In re WorldCom, Inc.*, 347 B.R. 123, 137 (Bankr. S.D.N.Y. 2006).

Here, the *Iridium* factors weigh overwhelmingly in favor of approval of the settlements in the Plan. The Plan incorporates a number of interrelated settlements, including, but not limited to: (i) the Shareholder Settlement Agreement; (ii) the Public Entity Settlements; (iii) the Private Entity Settlements; (iv) the Public Entity Allocation; (v) other intracreditor allocations; and (vi) certain fee arrangements. The settlements are a global resolution of claims and controversies against the Debtors and a comprehensive, consensual resolution of claims against the Sackler Parties arising out of the Debtors' production, marketing, and sale of opioid medications. These value-maximizing settlements are the product of years of diligent investigations, several rounds of mediation, and hard-fought negotiations, and will result in up to $7 billion contributed by the Sackler Parties being provided to public and private creditor trusts, including approximately $865.8 million for distribution to qualified personal injury claimants. For the sake of the clarity of the record, only certain aspects of these many settlements—for example the Estate Claims Settlement and the settlement of direct claims held by Personal Injury Claimants and Third-Party Payors—are directly implemented by the Plan. As such, it is only those portions of those settlements—together with the additional compromises contained in the Plan (which the Debtors refer to as the "Plan Settlement")—for which Debtors seek approval. However, the remaining components of the Settlements—such as the Direct Claims Settlement Agreements—are interrelated with the Plan Settlement.

All of the settlements satisfy the first two *Iridium* factors. To be sure, the Debtors believe that the estates have meritorious claims against certain of the Debtors' shareholders. The UCC has articulated its own view of these claims in a 203-page, 22-count draft complaint, assembled

after a thorough investigation of the breadth of claims that can be pursued against the Sackler

Parties and their related entities. *See In re Purdue.*, 633 B.R. at 86 (finding discovery in these

cases "produced . . . an almost unfathomable record that nevertheless teams of lawyers for the

creditor groups have pored through to find anything suggesting a claim against the shareholder

released parties").  But litigation of such claims would take years and success is not assured.  The

risks of litigation are heightened by the enormous number of complicated legal and factual issues

as to the claims and possible defenses.  The potential litigation claims also need to be assessed in

light of the commitment of the Sackler Parties and other Sackler entities to litigate vigorously

absent a settlement and the possibility of substantial obstacles to collection on any resulting

judgment.  Much of the extensive evidence offered without objection at the confirmation trial on

this Plan— and on the Twelfth Amended Plan—addressed the views of the various parties on the

potential litigation.  The Debtors and other Plan supporters offered their views about the amount

of the transfers by the Sackler Parties, the potential challenges to such transfers under applicable

law including fraudulent transfer litigation, and the defenses to such litigation; such views were

not shared by the Sackler Parties. *Compare Declaration of Mark F. Rule, CFA with Expert

Report of Kevin T. McElroy*.  The settlements here avoid the need in these bankruptcy cases for

complex, highly value-destructive, and potentially decades-long legal proceedings in multiple

jurisdictions.  Moreover, the settlements embodied in the Plan also enable these bankruptcy

estates to secure the full benefits of the DOJ Resolution and Forfeiture Judgment Credit.

Without reaching an agreement that satisfies the terms of the DOJ Resolution and qualifies for

the Forfeiture Judgment Credit, it is possible that the Debtors might be obligated to pay the entire

$2 billion Forfeiture Judgment to the DOJ, thus wiping out a significant portion of the value of

these bankruptcy estates.

The third, fourth, fifth and seventh *Iridium* factors are satisfied given the clear value of

the settlements to all stakeholders, the fact that these settlements were reached after fierce

negotiations among parties with sophisticated and highly competent counsel and that the

settlements have the support of every single organized creditor group in these Chapter 11 cases.

Finally, the sixth *Iridium* factor is satisfied given that the nature and breadth of any release here

is entirely consistent with the Supreme Court's 2024 decision because the releases here are

consensual, occurring only where a party chooses to opt into a release in exchange for the value

provided by the Sackler Parties.

II.     The Confirmation Requirements

The Court finds that the Debtors have satisfied the provisions of Section 1129 of the

Bankruptcy Code by a preponderance of the evidence.  *See In re Sabine*, 555 B.R. at 310.  Said

another way, the Plan here complies with Section 1129(a)(1) of the Bankruptcy Code, which

requires that a plan of reorganization comply with all applicable provisions of the Bankruptcy

Code.

This includes compliance with Section 1122(a) of the Bankruptcy Code, which provides

that "a plan may place a claim or an interest in a particular class only if such claim or interest is

substantially similar to the other claims or interests of such class."  11 U.S.C. § 1122(a).  Plan

proponents have significant flexibility under Section 1122(a) to place similar claims into

different classes as long as there is a rational basis for doing so.  *See In re Drexel Burnham

Lambert Grp., Inc.*, 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992) ("A plan proponent is afforded

significant flexibility in classifying claims under [Section] 1122(a) if there is a reasonable basis

for the classification scheme and if all claims within a particular class are substantially similar.");

*Bos. Post Rd. Ltd. P'ship v. FDIC (In re Bos. Post Rd. Ltd. P'ship)*, 21 F.3d 477, 483 (2d Cir.

41

1994) (recognizing similar claims may be separately classified unless sole purpose is to engineer

assenting impaired class).

The Plan's classification scheme here satisfies Section 1122. Under the Plan, claims and

interests are classified into 21 classes based on, among other things, their legal rights to the

Debtors' property, their priority, and their relative treatment as agreed to by the relevant holders

of those claims pursuant to the Plan Settlement. *See* Plan § 3.2. For example, the Plan

appropriately classifies certain claims asserting domestic opioid litigation liability together—

including those filed by States and local government entities in Class 4—because these opioid

litigation claims are all unsecured claims for damages arising out of the Debtors' manufacturing,

marketing, and sale of opioid medications in the United States. *See In re Quigley Co., Inc.*, 377

B.R. 110, 116 (Bankr. S.D.N.Y. 2007) (quoting *In re Drexel Burnham Lambert Grp.*, 138 B.R. at

757) (holding that because those claims have "substantially similar rights to the *[D]ebtors'*

*assets*," they are "similar" for the purposes of section 1122 and are properly classified together

(emphasis in original)). Similarly, claims of adults on account of "alleged opioid-related

personal injury" are classified together, regardless of the alleged mechanism of injury or nature

of damages, because such claims have the same legal nature and relationship to the property of

the estates. *See* Plan Art. IV (explaining treatment of claims and interests). There is also a

reasonable basis for the Plan's classification of similar opioid litigation claims into separate

classes. That classification framework, which arranges opioid litigation claims into nine classes

(Classes 3 through 10(b)), reflects the results of the first phase of mediation in these cases and is

consistent with a similar classification framework used as part of the Twelfth Amended Plan.

Consistent with the prior plan, the Plan here channels opioid claims to respective Creditor Trusts

that will either fund abatement programs across the United States or make cash distributions to

creditors pursuant to trust distribution procedures. *See* Plan §§ 4.34.10. This approach is

consistent with numerous mass tort and other large-scale Chapter 11 plans involving multi-trust distribution frameworks. *See, e.g.*, *In re Sabine*, 555 B.R. at 310-11 (plan proponents must only show a rational or reasonable business, factual, and/or legal basis to justify separate classification of similar claims); *see also* Twelfth Amended Plan §§ 4.3-4.10.

Section 1123(a) of the Bankruptcy Code sets forth seven mandatory requirements that every Chapter 11 plan must meet. *See* 11 U.S.C. § 1123(a)(1)-(7). The Plan meets each of these requirements. For example, the Plan complies with Sections 1123(a)(1), (2), and (3) of the Bankruptcy Code, which requires a plan to designate classes of claims or interests subject to Section 1122, specify the classes of claims and interests that are not impaired, and specify the treatment of such claims and interests under the plan that are impaired, respectively. The Plan also complies with Section 1123(a)(4), which requires that a plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." 11 U.S.C. § 1123(a)(4). This "same treatment" standard only "requires equality of treatment, not equality of result." *In re Breitburn Energy Partners LP*, 582 B.R. 321, 358 (Bankr. S.D.N.Y. 2018). The "key inquiry under [Section] 1123(a)(4) is not whether all of the claimants in a class obtain the same thing, but whether they have the same opportunity" to recover. *In re Dana Corp.*, 412 B.R. 53, 62 (S.D.N.Y. 2008); *In re W.R. Grace & Co.*, 729 F.3d 311, 327 (3d Cir. 2013) ("What matters, then, is not that claimants recover the same amount but that they have equal opportunity to recover on their claims."). The Plan here satisfies Section 1123(a)(4) of the Bankruptcy Code because each class of claims or interests under the Plan receives the same opportunity to recover as every other claim or interest in such class. For example, Classes 4 through 10(b) consist of different classes of opioid litigation claims, each of which will be channeled to separate Creditor

Trusts where the claims in each such class will receive distributions consistent with the

applicable trust distribution procedures.

The Plan also satisfies Section 1123(a)(5) of the Bankruptcy Code, which requires that a

plan provide "adequate means" for its implementation. The Plan, Plan Supplements, and terms

of the confirmation order provide for adequate and proper means of implementation, including

but not limited to:

- Authorization and approval of the various Plan Settlements, *see* Plan § 5.2;
- Establishment of the Plan Administration Trust, including the vesting of the PAT Assets in the PAT and the appointment of the Plan Administration Trustee, *see* Plan § 5.3;
- Establishment of Knoa, including the vesting of the Knoa Transferred Assets in Knoa and the appointment of the Knoa Managers and the establishment of the Foundation, including the appointment of the Foundation Trustees, *see* Plan §§ 5.4, 5.5;
- Establishment of the Master Disbursement Trust, *see* Plan § 5.6;
- Establishment of the Creditor Trusts, *see* Plan § 5.8; and
- Establishment of the Public Document Repository, *see* Plan § 5.13.

Similarly, the Plan satisfies Section 1123(a)(6), as the Knoa Operating Agreement

prohibits the issuance of non-voting securities to the extent prohibited by Section 1123(a)(6) of

the Bankruptcy Code. *See* Plan § 5.15(e); JX-3610 (Knoa Operating Agreement) § 2.7. The

Plan satisfies Section 1123(a)(7) of the Bankruptcy Code because the Plan describes a method of

selection of directors and officers for the post-emergence Debtors that is consistent with the

interests of creditors and public policy. The Plan describes an organizational structure for Knoa

whereby the board of managers will consist of five disinterested and independent managers, each

with experience in one or more of various areas relevant to the Debtors' postemergence business.

Section 1123(b) of the Bankruptcy Code sets forth various discretionary provisions that

may be incorporated into a Chapter 11 plan. The Plan satisfies Section 1123(b)(1), which

provides that a plan may impair or leave unimpaired any class of claims. Consistent with this

provision, the Plan provides that (i) Classes 1, 2, 11(a), 11(b), 12, and 18 are unimpaired or potentially unimpaired, and (ii) Classes 3, 4, 5, 6, 7, 8, 9, 10(a), 10(b), 11(c), 12, 13, 14, 15, 16, 17, and 18 are impaired or potentially impaired under the Plan. Section 1123(b)(2) is satisfied because the Plan provides that all executory contracts and unexpired leases to which any Debtor is a party, as amended pursuant to Section 8.4 of the Plan, shall be deemed assumed by the applicable Debtor and, except with respect to any contract or lease held by a Transferred Debtor, assigned to Knoa or its designee, with additional exceptions as described in the Plan. *See* Plan §§ 8.1, 8.4.

Section 1123(b)(3)(A) states that a plan may provide for the settlement or adjustment of any claim belonging to the debtor or the estate. As previously discussed, the Plan here provides for a series of settlements, including settlements of claims or interests belonging to the Debtors. As for Section 1123(b)(3)(B), the Plan provides for the retention and enforcement of certain claims by the Debtors' successors in interest. *See, e.g.*, Plan §§ 5.6(a)(ii), 10.15. Sections 10.6(a) and 10.7(a) of the Plan provide for releases by the Debtors of claims and causes of action. It is well settled that "[d]ebtors have considerable leeway in issuing releases of any claims the Debtors themselves own." *In re Adelphia*, 368 B.R. at 263 n.289. The Bankruptcy Code itself states that a plan of reorganization may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate." 11 U.S.C. § 1123(b)(3)(A). The inquiry therefore is whether the releases are in the "best interests of the estate" or that granting the releases is a valid exercise of the debtor's business judgment. *See In re DBSD N. Am., Inc.*, 419 B.R. 179, 217 (Bankr. S.D.N.Y. 2009). As previously explained, the resolutions contemplated by the settlements are fair and reasonable, and in the best interests of the estates. *See supra*. Absent the releases by the Debtors, the Sackler Parties would not contribute the

billions in value to the Debtors and their creditors, and the estates would be forced to pursue the

Sackler Parties in uncertain litigation that would likely take years before realizing any recovery.

Section 1123(b)(6) provides that a plan may include any other appropriate provision not

inconsistent with applicable provisions of this title. Here, Sections 10.6(b) and 10.7(b) of the

Plan provide for consensual non-debtor Third-Party Releases by the Releasing Parties of certain

direct and derivative claims and causes of action against the Released Parties and Shareholder

Released. *See* Plan §§ 10.6(b), 10.7(b). Consistent with the Supreme Court's mandate in

*Harrington*, the Plan provides that the Third-Party Releases "shall not apply to [] Holders of

Claims who do not opt-in to the releases through their applicable ballots" (other than the

Supporting Claimants and Settling Co-Defendants, who otherwise affirmatively consent to the

releases). *Id.* The Third-Party Releases provided for under the Plan utilize an opt-in

mechanism, as "[a] clearer form of 'consent' can hardly be imagined." *In re Chassix Holdings,*

*Inc.*, 533 B.R. 64, 80 (Bankr. S.D.N.Y. 2015).

The Plan Injunction and Channeling Injunction are consistent with the Bankruptcy Code

and the Supreme Court's decision in this case, and they are approved. Such injunctions are a key

component of implementing releases included in a plan of reorganization. *See, e.g.*, *In re GOL*

*Linhas Aéreas Inteligentes S.A.*, 672 B.R. 129, 172 (Bankr. S.D.N.Y. 2025). As the Plan contains

only consensual non-debtor releases, the Plan Injunction and Channeling Injunction will not

have the effect of releasing any creditor's claim absent consent. Injunctions of this type are

customary and appropriate to accompany the releases included in a plan. *See, e.g.*, *In re GOL*,

672 B.R. at 172; *In re Tommy's Fort Worth, LLC*, 2025 WL 2092193, at *71 (Bankr. N.D. Tex.

July 24, 2025). Here, the Plan Injunction and Channeling Injunction are necessary to enforce the

Releases, Third-Party Releases, and Exculpation, and are narrowly tailored to that purpose.

Accordingly, the Plan Injunction and Channeling Injunction should be approved. The MDT

Insurer Injunction and Settling MDT Insurer injunction are appropriate and permissible to protect the value of the Debtors' insurance policies that are being transferred to the Master Disbursement Trust under the Plan and serve as a meaningful source of value for the contemplated creditor distributions.

The Plan also includes customary and appropriate exculpation of negligence-based claims in connection with, or arising out of, the administration of the Chapter 11 cases, that expressly excludes from its scope any claim against an Exculpated Party arising out of any criminal act or from fraud, gross negligence, or willful misconduct. *See* Plan § 10.12. *See, e.g.*, *In re Odebrecht Engenharia e Construção S.A. – Em Recuperação Jud.*, 669 B.R. 457, 471 (Bankr. S.D.N.Y. 2025); *In re GOL*, 672 B.R. at 142, 173; *In re Genesis Glob. Holdco, LLC*, 660 B.R. 439, 528 (Bankr. S.D.N.Y. 2024).

Section 1129(a)(2) of the Bankruptcy Code requires that plan proponents comply with all applicable provisions of the Code, including "the disclosure and solicitation requirements under [S]ections 1125 and 1126 of the Bankruptcy Code." *In re Ditech Holding Corp.*, 606 B.R. 544, 578 (Bankr. S.D.N.Y. 2019). Here, the Debtors have complied with all applicable provisions of the Bankruptcy Code, including Sections 1125 and 1126. Section 1125 of the Bankruptcy Code prohibits the Debtors from soliciting acceptances or rejections of the Plan "unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement, approved after notice and a hearing, by the court as containing adequate information." 11 U.S.C. § 1125(b). After the Court's approval of the Disclosure Statement, the Debtors complied with the solicitation materials requirement by timely mailing solicitation packages to holders of Claims in the Voting Classes. *See generally Affidavit of Service of Solicitation Materials* [ECF No. 7987]. Section 1126 of the Bankruptcy Code outlines the requirements for acceptance of the Plan. 11 U.S.C. § 1126. Overall, across all

47

classes of voting creditors, more than 99% of the ballots cast and more than 99% of the amount of total voting dollars voted to accept the Plan. *See* Supplemental Johnson Decl., Ex. A. Thus, each and every class of creditors that voted has overwhelmingly voted to accept the Plan.

Section 1127(a) of the Bankruptcy Code provides that a plan proponent may modify its plan at any time before confirmation so long as such modified plan meets the requirements of Sections 1122 and 1123 of the Bankruptcy Code. *See* 11 U.S.C. § 1127(a). Bankruptcy Rule 3019 provides that modifications after a plan has been accepted will be deemed accepted by all creditors who previously accepted the plan, if the court finds that the proposed modifications do not adversely change the treatment of the claim of any creditor. *See* Fed. R. Bankr. P. 3019(a). Courts interpreting Bankruptcy Rule 3019 have held that a proposed modification to a previously accepted plan will be deemed accepted if such modification is not material or does not adversely affect the way creditors and stakeholders are treated. *See, e.g.*, *In re Glob. Safety Textiles Holdings LLC*, 2009 WL 6825278, at *4 (Bankr. D. Del. Nov. 30, 2009). Bankruptcy Rule 3019 is satisfied because the Plan's modifications leading up to confirmation do not "adversely change the treatment" of the claim of any creditor or the interest of any equity security holder who has not accepted the modification in writing.

Section 1129(a)(3) requires that a plan have been both "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). "Whether a reorganization plan has been proposed in good faith must be viewed in the totality of the circumstances," and the requirement "speaks more to the process of plan development than to the content of the plan." *In re Chemtura Corp.*, 439 B.R. 561, 608 (Bankr. S.D.N.Y. 2010). The central inquiry is whether "the plan was proposed with honesty and good intentions and with a basis for expecting that a reorganization can be effected." *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988). The record is abundantly clear that the Plan here has been proposed in good faith and the

Court finds no basis for challenging that conclusion.  The Debtors and parties in interest, including the Debtors' major organized creditor constituencies, have engaged in numerous rounds of mediation under the auspices of court-appointed mediators, whose credentials and neutrality in these cases have never been seriously questioned.  The overwhelming vote in favor of the Plan further confirms the good faith here.  A number of *pro se* objectors advanced a number of theories as to why the Plan is not proposed in good faith, including that individuals could not participate directly in the mediation process, *see McGaha Obj.* at 2 [ECF No. 7432]; *McGaha Obj.* at 1 [ECF No. 7522]); that Knoa "will not actually benefit the public", *Jannotta Obj.* at § 1 [ECF No. 7909]; and that the amount of time it took to achieve the Plan settlements was "excessive", *Moore Obj.* at 1 [ECF No. 7661].  But such complaints are unsupported by the record and instead largely reflect the massive scope and complexities of these cases. As the Court has previously explained at numerous prior hearings in these cases, the mediation here was "what one might call a plan mediation. . . not a mediation of individual claims."  Hr'g Tr. 97:1-15 (Feb. 25, 2025) [ECF No. 7285].  Individual claims are instead addressed through the claims allowance process described in the Plan.  There is nothing problematic about proceeding in that fashion.  Indeed, it is the only feasible way to proceed given the many thousands of claims asserted in these cases.  Finally, there is nothing to support the notion that Knoa will not act consistent with its charge as a public benefit company, particularly given the safeguards in its operations that are reflected in the Plan.

Section 1129(a)(4) of the Bankruptcy Code requires that certain professional fees and expenses paid by the plan proponent, the debtor, or a person issuing securities or acquiring property under the plan, be subject to approval of the bankruptcy court as reasonable.  11 U.S.C. § 1129(a)(4).  Here, all payments made or to be made by the Debtors for services or for costs and expenses relating to these Chapter 11 cases have been approved by, or are subject to the approval

of the Court as reasonable. Section 1129(a)(5) requires the plan proponent to disclose the "identity and affiliations of the proposed officers and directors of the reorganized debtors." 11 U.S.C. § 1129(a)(5). The Plan complies with this section as the Plan provides that Knoa will consist of five managers, each with experience in one or more enumerated industries and practices.

Section 1129(a)(7) requires that, with respect to each impaired class of claims or interests, each individual holder of a claim or interest has either accepted the plan or will receive or retain property having a present value, as of the effective date of the plan, of not less than the value such holder would so receive if the debtor were liquidated under Chapter 7 of the Bankruptcy Code at that time. 11 U.S.C. § 1129(a)(7); *Johns-Manville Corp.*, 843 F.2d at 649. This standard, commonly referred to as the "best interests of creditors" test, is satisfied so long as the estimated recoveries for a debtors' creditors in a hypothetical Chapter 7 liquidation would be less than or equal to the estimated recoveries under the debtors' plan of reorganization for a holder of an impaired claim that votes to reject the plan. *See In re Adelphia*, 368 B.R. at 252. The Plan clearly provides creditors with no less than they would receive in a hypothetical Chapter 7 liquidation. *See DelConte Report ¶ 8. A detailed and unchallenged liquidation analysis sets forth the estimated recoveries for each class of impaired creditors in a hypothetical Chapter 7 liquidation scenario. *See DelConte Report ¶ 10; Disclosure Statement, App. C at Ex. 1. Jesse DelConte, a Managing Director of AlixPartners and financial advisor to the Debtors prepared and supervised the preparation of the liquidation analysis. *See DelConte Report ¶¶ 3, 5, 11-13. Mr. DelConte concludes that "estimated recoveries for all creditor groups under the Plan are no less than, and in many cases significantly greater than, the estimated recoveries for creditor groups in a hypothetical [C]hapter 7 liquidation." *See DelConte Report ¶ 8. As the detailed analysis of Mr. DelConte demonstrates, a liquidation scenario would result in nothing

50

left for distribution to personal injury claimants, States, tribes, or municipalities in all but one of the scenarios tested.  *See* DelConte Report ¶ 10.  Moreover, liquidation proceedings would be costly and would deplete the Debtors' assets even further.  The contrast between a hypothetical Chapter 7 liquidation and the Plan is stark: at least an estimated $7.4 billion dollars of cash in creditor recoveries plus significant additional non-monetary benefits under the Plan, as compared with, at most, roughly $3.4 billion, $2 billion of which would satisfy the claim resulting from the DOJ Forfeiture Judgment.  *See* DelConte Report ¶ 16.

Section 1129(a)(8) of the Bankruptcy Code requires that each class of impaired claims or interests must accept the plan.  Here, at least one voting impaired class of claims at each Debtor entity affirmatively voted to accept the Plan.  *See* Plan §§ 3.2, Art. IV; Supplemental Johnson Decl., Ex. A.

Section 1129(a)(9) of the Bankruptcy Code requires that certain priority claims be paid in full on the effective date of a plan and that the holders of certain other priority claims receive deferred cash payments.  The Debtors have satisfied the requirements of Section 1129(a)(9) because Article II of the Plan provides that all Allowed Administrative Claims, Priority Tax Claims, and Other Priority Claims will either be paid in cash in full on the Effective Date, or will receive other treatment consistent with the provisions of Section 1129(a)(9) of the Bankruptcy Code.

Section 1129(a)(10) of the Bankruptcy Code provides that, if a class of claims is impaired under the plan, at least one impaired class of claims must accept the plan, excluding acceptance by any insider.  11 U.S.C. § 1129(a)(10).  The Debtors have satisfied this requirement because at least one impaired Class of Claims voted to accept the Plan at each Debtor entity.  *See* Supplemental Johnson Decl., Ex. A.

Section 1129(a)(11) of the Bankruptcy Code requires that a court determine that a plan is feasible to be confirmed. Specifically, a court must find that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11). But success need not be a certainty. *See Johns-Manville*, 843 F.2d at 649. Rather, a debtor must demonstrate a "reasonable assurance" that consummation of the plan will not likely result in a further need for financial reorganization of the post-emergence debtors. *See id.* The evidence here establishes that the post emergence Debtors will be able to meet their obligations under the Plan, and these Chapter 11 cases are unlikely to be followed by a liquidation or further reorganization except as provided for in the Plan. As reflected in the Debtors' projected cash flows, the up to $6.5 billion in contributions under the Master Shareholder Settlement Agreement combined with the Debtors' current assets and projected cash generation by Knoa will enable the post-emergence Debtors to meet their annual obligations under the Plan, including their obligations to the Department of Justice, the Public Creditor Trusts, and the MDT. *See* DelConte Decl. ¶ 46. In addition, as no party has credibly disputed, the trust distribution procedures contemplated under the Plan will allow for efficient and effective distributions to the Debtors' creditors.

Section 1129(a)(12) requires that the plan provide for the payment of all fees to the United States Trustee, among others, on the effective date. 11 U.S.C. § 1129(a)(12). Here, after the Effective Date, the Plan Administration Trust shall assume liability for and shall pay, or cause to be paid, any and all quarterly fees owed to the United States Trustee.

Section 1129(b) of the Bankruptcy Code provides that, if all applicable requirements of Section 1129(a) are met other than Section 1129(a)(8), a plan may be confirmed so long as the requirements set forth in Section 1129(b) are satisfied as to each rejecting class. *See* 11 U.S.C. §

1129(b)(1).  As each class has accepted the Plan, Section 1129(a)(8) is satisfied.  But even if the

Plan here does not satisfy (a)(8), the Debtors would satisfy the so-called "cram down"

requirements.  To confirm a plan that has not been accepted by all impaired classes (thereby

failing to satisfy Section 1129(a)(8)), the plan proponent must show that the plan "does not

discriminate unfairly" and is "fair and equitable" with respect to the non-accepting impaired

classes.  *Id.*  Here, the Plan does not discriminate unfairly with respect to any rejecting class.  As

described above, claims in the impaired rejecting classes—Class 13 (Shareholder Claims), Class

14 (Co-Defendant Claims), Class 15 (Other Subordinated Claims), Class 16 (PPLP Interests) and

Class 17 (PPI Interests), and, to the extent that they are not reinstated and do not otherwise

receive any distributions under the Plan, Class 12 (Intercompany Claims) and Class 18

(Intercompany Interests)—are specifically classified in such manner because of, among other

things, the differences in the legal nature and/or propriety of the underlying obligation.  None of

the holders of claims and interests in such classes are receiving dissimilar treatment from any

other similarly situated claims, nor has anyone in these classes made such an argument.

Section 1129(b)(2)(B)(ii) of the Bankruptcy Code provides, among other things, that a

plan is fair and equitable with respect to a class of impaired unsecured claims if, under the plan,

no holder of any junior claim or interest will receive or retain property under the plan on account

of such junior claim or interest.  *See* 11 U.S.C. § 1129(b)(2)(B)(ii).  This standard is satisfied

here as no holder of a claim or interest junior to claims in Class 13 (Shareholder Claims), Class

14 (Co-Defendant Claims), Class 15 (Other Subordinated Claims), or, to the extent that they are

not reinstated and do not otherwise receive any distributions under the Plan, Class 12

(Intercompany Claims), will receive or retain any property or distribution under the Plan.

Section 1129(b)(2)(C) of the Bankruptcy Code provides, among other things, that a plan

is fair and equitable with respect to a class of interests if the holder of any interest that is junior

to the interests of such class will not receive or retain under the plan on account of such junior interest any property. 11 U.S.C. § 1129(b)(2)(C)(ii). Under the Plan, no holder of an interest junior to interests in Class 16 (PPLP Interests), Class 17 (PPI Interests), or, to the extent that they are not reinstated and do not otherwise receive any distributions under the Plan, Class 18 (Intercompany Interests), will receive or retain any property or distribution under the Plan.

Finally, Section 1129(d) of the Bankruptcy Code states "the court may not confirm a plan if the principal purpose of the plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933." The purpose of the Plan is not to avoid taxes or the application of section 5 of the Securities Act of 1933.

III.   <u>Objections to the Plan</u>

With the discussion of the confirmation requirements complete, the Court turns now to our last topic: a discussion of the remaining objections to confirmation. The only objections remaining to the Plan have been asserted by parties who are not represented by counsel. There are several unifying themes behind these objections, with some ten different categories that the Court will address. These categories include: (1) requests to adjourn the confirmation hearing; (2) objections relating to any potential criminal culpability or liability related to the Debtors or the Sacklers; (3) objections that the releases in the Plan violate the Supreme Court's decision in *Harrington*; (4) objections regarding the classification of claims and how individual personal injury claims are treated under the Plan; (5) objections about how the funds will be divided between individual claimants and public entities, such as the States and municipalities; (6) objections related to discharge citing 11 U.S.C. §§ 523 and 727; (7) objections about the creation of Knoa as a public interest company and its governance; (8) objections that the Plan was not filed in good faith and that the bad faith here warrants dismissal of these bankruptcy cases or sanctions; (9) objections based on the 5th and 14th Amendments of the U.S. Constitution; and (10)

other miscellaneous objections.  The Court overrules each of these objections but will address

them separately.

A.  <u>Requests to Adjourn the Confirmation Hearing</u>

Rosemary Walker requested that the confirmation hearing be adjourned until the

conclusion of the government shutdown to ensure that the United States Trustee could participate

in the proceeding.  *See, e.g.*, ECF Nos.  8098, 8099, 8108.  In fact, counsel for the United States

Trustee was present and remotely attended the confirmation hearing notwithstanding the

shutdown, an accomplishment that was most appreciated by the Court.  Moreover, the United

States Trustee did not object to confirmation in these cases.  After the remand by the Supreme

Court in *Harrington*, the Court understands that the Debtors and other creditor groups worked

closely with the United States Trustee to achieve consensus to allow these cases to go forward

without the burden of further litigation if at all possible.  That goal has been largely achieved.  A

second objector on this issue, Mary Jannotta, filed an emergency motion to continue the

confirmation hearing on the morning that the hearing commenced, based on the Debtors having

recently filed a new version of the Plan after the plan solicitation period had closed.  As

explained at the confirmation hearing and discussed above, however, Section § 1127(a) permits

the party proposing a plan to modify such plan at any time before confirmation so long as the

modification does not meaningfully change the plan so much that the plan no longer meets the

requirements of Sections 1122 and 1123.  "Simply stated, if a modification is nonmaterial, no

resolicitation is required."  *In re Mesa Air Group, Inc.*, 2011 Bankr. LEXIS 3855 at *15

(S.D.N.Y. January 20, 2011) (quoting 7 COLLIER ON BANKRUPTCY ¶ 1127.02[3] (16th ed. 2010)).

The changes in subsequent versions of the Plan after solicitation involved nonmaterial changes

addressing language and fine-tuning certain agreements and changes to resolve only objections

that implicated the rights of certain objecting parties.  As such changes do not affect the

treatment or recovery of creditors such as Ms. Jannotta, no resolicitation was required and no

adjournment was necessary.

B.  Objections Related to Criminal Culpability

Several parties complain that the Plan is merely a mechanism allowing the Sacklers to

"get away with it."  *See, e.g.*, *Isaacs Obj.* [ECF No. 7972].  More specifically, numerous parties

complain that the Purdue bankruptcy protects Purdue and the Sacklers from criminal liability.

*See, e.g.*, *Pinkusov Letter* [ECF No. 7597]; *Isaacs Obj.* [ECF No. 7972], *Ferrante Obj.* [ECF No.

7420].  But as explained by Judge Drain in his previous confirmation decision, the Plan does not

contain a release of criminal conduct of any kind for any party.  *See In re Purdue*, 633 B.R. at 77-

78.  That is crystal clear in the Plan and has been explained at numerous hearings in these cases.

In fact, as previously mentioned, the Debtors have been the subject of a criminal investigation by

the DOJ, with Purdue Pharma pleading guilty to three felony offenses.  *See* JX-2094 (Plea

Agreement); JX-2095 (Civil Settlement).

C.  Objections Related to the Third-Party Releases

Some objections contend that the Plan coerces parties into releasing their direct claims

against the Sacklers in violation of the Supreme Court's decision in *Harrington*.  *See, e.g.*,

*Jannotta Obj.* [ECF No. 7909]; *McGaha Letter* at 7-8 [ECF No. 7432].  But consistent with the

Supreme Court's guidance in *Harrington*, this Plan does not compel victims to forfeit their rights

to pursue the Sacklers.  Only claimants that affirmatively opt into the releases provided to the

Sackler Parties waive their rights to pursue such claims.  These sorts of consensual releases are

specifically carved out of the *Harrington* decision, where the Supreme Court stated that

"[n]othing in what we have said should be construed to call into question consensual third-party

56

releases offered in connection with a bankruptcy reorganization plan[.]" *Harrington*, 603 U.S. at 226. Moreover, a decision not to opt into the releases provided to the Sackler Parties is separate and apart—and does not prevent any claimant—from voting in favor of the Plan or receiving a distribution from the Purdue bankruptcy estates.

D. Objections Related to Classification of Claims

Other objections relate to classification of claims under the Plan. Certain *pro se* objectors oppose the Plan's classification scheme, arguing that their claims are fundamentally different from others based on the nature of the injury or the damages sought. *See, e.g.*, *Morales Obj.* [ECF. No. 7355 at 8-11]; *Redwood Obj.* [ECF Nos. 7865, 7944, 7945, 7947, 7997, 8078]. But these distinctions do not meaningfully alter the priority or legal bases of these claims. Moreover, any attempt to divide the creditor body in the granular way suggested by objectors would result in an unworkably complex classification scheme. Keith Redwood objects that the claim form does not permit him to address the economic damages he suffered as a personal injury claimant. *See Redwood Obj.* [ECF No. 8132; 7946]. But this objection ignores the conscious and reasonable decision in the Plan to avoid a compensation program for economic damages that would "require extensive documentation, individualized analysis, and would generate substantial administrative costs—thereby depleting the funds and causing delay in compensation." *See* JX-3621 (Amended Report of Deborah E. Greenspan) at 36 n.33. And it is this version of the Plan that received over 99% of the vote in favor by personal injury claimants who voted on the Plan.

E. Objections Related to Allocation

Several parties complain that the Plan's distribution scheme is inequitable because governmental entities are not required to prove individualized harm, while personal injury victims must do so, and they object to the larger recoveries received by the governmental

entities. *See, e.g.*, *Jannotta Obj.* § 3 [ECF. No. 7909]; *Ferrante Obj.* [ECF No. 7604] (objecting to States' distribution under the Plan). These objections are often paired with a distrust that the States will appropriately use funds received under the Plan, with comparisons drawn to the States' use of funds received here with the settlement in the multi-state tobacco litigation.

But the different classifications here reflect meaningful distinctions between the personal injury victims and the governmental entities. The Bankruptcy Code allows for different treatment for differently-situated creditors, with the class of personal injury claimants (being individual, natural persons) being different in nature to those held by the governmental entities (not individuals, not natural persons). As a threshold matter, the Court notes that the allocation here essentially follows form with the allocation contained in the Twelfth Amended Plan, an allocation approved as reasonable by Judge Drain and by the District Court on appeal. Indeed, it remains appropriate now. In considering such differences, the Ad Hoc Group of Personal Injury Victims' own counsel drew attention to the fact that the numerous State lawsuits against Purdue Pharma and the Sacklers were the driving cause for these bankruptcy filings. The two groups are also treated differently for recovery, consistent with their differences. The personal injury claimants here will receive their distributions "virtually immediately after the [E]ffective [D]ate," whereas governmental entities and all other creditors will be paid over the course of the 15 years of the Plan—with the attendant risk associated with such delay—and "contingent upon the sale prices obtained by the Sacklers for their non-Purdue businesses." Hr'g Tr. 44:21-45:2, 58:13-17 (Nov. 12, 2025). Moreover, there is evidence here of the value of opioid abatement efforts to be conducted by the governmental entities. Mr. Lane testified as to the success of the opioid remediation efforts in Arkansas, funded by opioid abatement funds, and how these state programs have saved lives. *See* Hr'g Tr. 157:11-19 (Nov. 12, 2025). In addition, the funds

58

received by the governmental entities are subject to conditions and they must be spent on opioid remediation efforts, making them starkly unlike the funds that were paid in the multi-state tobacco settlement.

### F.  Objections Related to Discharge

Some objections argue that the Plan improperly purports to discharge debts in violation of 11 U.S.C. §§ 523 and 727.  *See Morales Obj.* [ECF Nos. 7818, 7819]; *McGaha Obj.* [ECF Nos. 7432, 7451].  Specifically, these parties contend that the Debtors are not entitled to a discharge for fraud-related conduct.  *See, e.g.*, *Morales Obj.* [ECF Nos. 7818, 7819]; *McGaha Obj.* [ECF Nos. 7432, 7451].  But as pointed out by the Debtors, Section 523 prohibits the discharge of certain debts obtained through actual fraud for "an individual debtor"—not, as is the case here, for corporate debtors.  *See* 11 U.S.C. § 523(a).  Ms. Morales' invocation of Section 727 of the Bankruptcy Code is likewise inapplicable here because that provision applies to Chapter 7 bankruptcies, and this is a Chapter 11 bankruptcy.  *See Morales Obj.* at 8-9 [ECF No. 7818].  At the confirmation hearing, Ms. Morales cited to a different statutory section in support of the same argument: 11 U.S.C. § 1192.  But Section 1192 is a provision of Subchapter V, a procedure to streamline the Chapter 11 reorganization process for certain small business debtors; as the Debtors do not qualify as a small business, Section 1192 does not apply to these cases.  *See Avion Funding, L.L.C. v. GFS Indus.*, *L.L.C.* (*In re GFS Indus., L.L.C.*), 99 F.4th 223, 225-26 (5th Cir. 2024).

### G.  Objections Related to Knoa

Some parties object to the newly created company Knoa.  Ms. Janotta argues that the creation of Knoa is improper because the company has no binding commitment to help victims, would lack appropriate oversight, and lack accountability.  *See* Hr'g Tr. 83:3-23 (Nov. 13, 2025)

However, the Plan requires Knoa to operate in a responsible manner, will be subject to the same laws and regulations as any other U.S. pharmaceutical company, and will be governed by a charter that will require it to deploy its assets to address the opioid crisis. *See* Disclosure Statement Article 1.B; DelConte Decl. ¶ 7. The Plan also establishes a system of safeguards designed to ensure that Knoa will operate the Debtors' businesses for the public benefit. *See* DelConte Decl. ¶¶ 8-13. These include Knoa and any successor owners being subject to an operating injunction imposing certain restrictions on the marketing of opioid products. *See* DelConte Decl. ¶ 10; Plan § 5.4(g). For these reasons, Ms. Janotta's objection is overruled.

H. Objections Related to Bad Faith

A few objectors contend that the Plan was proposed in bad faith. *See, e.g.*, *Isaacs Obj.* [ECF No. 7972]; *Walker Obj.* [ECF Nos. 7771, 7825, 7835, 7855]. The Court has already addressed such objections in the context of the confirmation hearing but comments now on the request to dismiss this case or for imposition of sanctions for the same reasons. *See, e.g.*, *Isaacs Obj.* [ECF No. 7972]; *Ecke Obj.* [ECF Nos. 8096, 8097, 8131]. Section 1112(b) of the Bankruptcy Code instructs that a Chapter 11 case may be dismissed only upon a showing of cause to dismiss, and that dismissal is in the best interests of both the estate and its creditors. *See* 11 U.S.C. § 1112(b)(1). Dismissal of a Chapter 11 case for bad faith is warranted only where the debtors had "an intent to abuse the judicial process, and the purpose of the reorganization process." *Clean Air Car Serv. & Parking Branch Three, LLC v. Operr Plaza, LLC*, 2025 WL 1181698, at *4-6 (E.D.N.Y. Apr. 23, 2025). No party has shown bad faith here. As has been explained in depth, this Plan is the result of extensive collaboration among stakeholders—in and out of mediation—resulting in voting support by 99% of creditors. This reorganization stands as

the best opportunity for legions of creditors to receive benefits that would not exist if this case

was dismissed or converted.

### I.    Objections Based on the Constitution

There is a contention that the 5th and 14th Amendments of the U.S. Constitution make this

Plan patently unconfirmable because the Plan constitutes a taking without just compensation.

*See, e.g.*, *Ecke Obj.* [ECF No. 8096].  While Congress's power to legislate on bankruptcy is

subject to the takings limitations of the Constitution, *see Hanover Nat'l Bank v. Moyses*, 186 U.S.

181, 192, (1902), this case does not involve a taking of property from any claimant.  Indeed, the

only rights given up are done so in the form of releases which, consistent with the Supreme

Court's decision in *Harrington*, is being done with consent.

### J.    Other Objections

The tenth and final category is a variety of miscellaneous objections.  The first of these is

by Vitaly Pinkusov who requested that *pro se* parties have the opportunity to object to expert

witness qualifications generally and have the ability to cross examine witnesses.  *See Pinkusov*

*Letter* [ECF No. 7755].  The Court permitted any party to object to witness testimony and cross-

examine witnesses in person.  *See Notice of Hearing to Pro Se Claimants Who Have Filed*

*Objections to the Plan Regarding Their Participation in the Hearing to Consider Confirmation*

*of the Fifteenth Amended Chapter 11 Plan Filed by the Debtors* [ECF No. 8202].  Mr. Pinkusov

in fact did cross-examine certain witnesses, including Deborah Greenspan regarding her

involvement in the September 11th fund distributions.  *See, e.g.*, Hr'g Tr. 99:13–21 (Nov. 12,

2025).  Mr. Pinkusov did not object to the qualifications of any expert, but did object to the

introduction of Professor Hamermesh's written direct testimony.  *See* Hr'g Tr. 126:19-24 (Nov.

12, 2025).  This objection was overruled as no valid basis was offered to cast doubt on the

relevance of Professor Hamermesh's testimony, but instead at best goes only to the weight of his

testimony.  *See* Hr'g Tr. 135:20–23 (Nov. 12, 2025).  As Mr. Pinkusov, along with other parties,

was able to raise objections and cross examine witnesses, his objection is moot.

Numerous objections have sought to have their individual claims addressed on the merits

or to address whether their claims were timely filed or are entitled to a jury trial.  *See, e.g.*,

*Teran Obj.* [ECF No. 7843] (timeliness issue); *Moore Obj.* [ECF No. 7660] (raising jury trial

issue).  But as was explained at the confirmation hearing—and at Court proceedings leading up

to the confirmation hearing—any issues involving individual claims will be addressed after

confirmation consistent with the trust procedures set up in the Plan.  *See, e.g.*, *Memorandum of

Decision and Order Regarding Filings By Pro Se Claimant Amanda Morales* [ECF No. 7941];

*Memorandum Endorsed Order*, dated Sept. 12, 2025 [ECF No. 7846] (adjourning issue of

timeliness of claim of Rosemary Walker until after confirmation).  Lastly, one objection

complains that the transactions here were an improper use of the so-called Texas Two Step, a

specific kind of corporate transaction that has been featured in the news on occasion.  *See

Morales Obj.* [ECF No. 8205].  But that is factually inaccurate as no Texas Two Step

transaction has occurred here.

To the extent any other objections have not been specifically addressed by the Court, they

are overruled as not providing a basis to deny confirmation of this Plan.  To be sure, this Plan is

not perfect.  The Court wishes it could do more to ease the suffering of the victims of the opioid

crisis.  But given our task here in these bankruptcy cases, the parties should take solace that the

Plan here is consistent with the result contemplated by Congress when it created the Bankruptcy

Code because the Plan maximizes the value of these bankruptcy estates for the benefits of all

stakeholders and, by so doing, provides a modest measure of relief to victims and the prospect of

helping to abate future suffering from opioids.

## **CONCLUSION**

For the reasons stated above, the Plan is confirmed.[3]  As this *Modified Bench Ruling* was

read into the record on November 18, 2025, an order confirming the Plan has already been

entered in the Debtors' cases.  *See Findings of Fact, Conclusions of Law, and Order Confirming*

---

[3]      Even before the Court had provided its bench ruling or entered an order confirming the Plan, *pro se* party
Rosemary Walker had sought a stay of confirmation of the Plan.  *See Walker Letter*, entered on November 17, 2025
[ECF No. 8259]; *Walker Letter*, entered on November 18, 2025 [ECF No. 8261]; *Walker Letter*, entered on
November 18, 2025 [ECF No. 8264].  On November 15, 2025, Ms. Walker also filed a notice of appeal.  *See Notice
of Appeal* [ECF No. 8248].

Under Rule 8007 of the Federal Rules of Bankruptcy Procedure, "a party must move first in the bankruptcy
court" for "a stay of the bankruptcy court's judgment, order, or decree pending appeal[,]" or "an order suspending,
modifying, restoring, or granting an injunction while an appeal is pending[.]"  Fed. R. Bankr. P. 8007(a)(1)(A), (C).
The Court considers four factors in determining whether to grant a motion to stay an order pending appeal:

> 1) whether the stay applicant has made a strong showing that he is likely to succeed on
> the merits; 2) whether the applicant will be irreparably injured absent a stay; 3) whether
> issuance of the stay will substantially injure other parties interested in the proceeding;
> and 4) where the public interest lies.

*Nken v. Holder*, 556 U.S. 418, 434 (2009) (internal citations and quotations omitted).  A court's determination of
whether to grant a stay pending appeal is "an exercise of judicial discretion, and the propriety of its issue is
dependent upon the circumstances of the particular case."  *Id.* at 433 (internal citations and quotations omitted).
"The movant's burden is a heavy one[,]" with the movant required to "show satisfactory evidence on all four
criteria."  *In re 473 W. End Realty Corp.*, 507 B.R. 496, 501 (Bankr. S.D.N.Y. 2014) (internal citations and
quotations omitted).

The Court finds that the requirements for a stay have not been met here.  Ms. Walker does not address any
of the four factors that the Court should consider in granting a motion to stay an order pending appeal.  *See Walker
Letter* at 6 [ECF No. 8264].  Instead, Ms. Walker raises various arguments against the Plan that have already been
addressed in various forms throughout this ruling.  *See, e.g.*, *id.* at 6.  Given the lack of merit in Ms. Walker's
arguments and the harm that will be caused to claimants by a delay in these proceedings after six long years, the
Court denies the request.

*the Eighteenth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its*

*Affiliated Debtors* [ECF No. 8263].

Dated:  White Plains, New York
        November 20, 2025

                              **/s/ Sean H. Lane**                       
                              UNITED STATES BANKRUPTCY JUDGE