UNITED STATES BANRUPCY COURT

SOUTHERN DUSTRICT OF NEW YORK

Purdue Pharma L.P.,st al.                                    Chapter 11

PURDUE PHARMA L.P., P.F. LABORATORIES, INC.,

PURDUE PHARMACEUTICALS L.P.,          Case No. 19-23649.

PURDUE PHARMA TECHNOLOGIES, INC.,
and   RHODES TECHNOLOGIES,

 DEFENDANTS

AMANDA MORALES

PLANTIFF

Motion for Contempt Of Court

SECTION 727(a)(6)(A) *Refusal* to comply with a court order both the bankruptcy court and the debtors

Section 727(a)(6)(A) of the Bankruptcy Code provides in relevant part that "[t]he court shall grant the debtor a discharge, unless, the debtor has *refused*, in the case – (A) to obey any lawful order of the court, other than an order to respond to a material question or to testify."  Therefore, "refusal" is a predicate to a §727(a)(6)(A) claim.  However, the term "refused" is not defined in the Bankruptcy Code, giving

rise to the question what does it mean to refuse to obey a lawful order of the court? Courts have come to different conclusions.

The majority of courts have held that the mere failure or inability to comply with a court order, by itself, does not warrant a denial or revocation of discharge. These courts require a willful and intentional refusal to obey a court order. *In re Appleby, 634 B.R. 84 (Bankr.S.D.Ohio 2021)* took this position. Here, the court noted that there is a difference between the words "fail" and "refuse." It noted that in other sections of the Bankruptcy Code, a mere failure to do an act actionable. However, §727(a)(6)(A) focuses on refusal.

*Appleby* noted that "failure" is defined as an "omission of occurrence or performance." *Id. at 69*. "Refuse," on the other hand, is a word derived from "refusal," which is defined as "to show or express unwillingness to do or comply with." *Id.* The court noted that "[d]efinitionally, these two words have different meanings as a 'failure' is merely an omission whereas a 'refusal' requires intent based on unwillingness. Absent this unwillingness to obey – or refusal – there is no claim." *Id.[1]*

Similarly, in *In re Tahseen, 650 B.R. 883, 899 (Bankr.N.D.Ill.2023)*, the court held that a plaintiff must prove a "willful or intentional act. Consequently, an inadvertent or negligent failure to comply with an order should not result in denial of discharge. In *In re Cableton-Wells, 2024 WL 63033 at \*4 (Bankr.D.Utah Jan. 4, 2024)* the court also noted that for purposes §727(a)(6)(A) "refused" means that debtor could have obeyed the order, but they made an intentional choice either to not obey it or to take another action that they knew would make it improbable or impossible for them to obey it. Thus, *Cableton-Wells* noted that if a debtor was unaware of the order in question or if it was impossible for the debtor to comply with it, through no fault of his own, then he has merely "failed" to comply, which does not implicate t§727(a)(6)(A). See also, *In re Gauri, 663 B.R. 88, 108) (Bankr.N.D.Ill.2024)* (he Court agrees with the majority. Accordingly, Parent may meet its burden by showing that Gauri willfully or intentionally failed to comply with the terms of the Case Management Procedures order.)

Other courts have found the concept of "refusal" for purposes of §727(a)(6) to be akin to a charge of civil contempt, which does not require the element of intent. Courts that have taken this position include *United States v. Richardson (in re Richardson)*, 85 B.R. 1008, 1011 (Bankr.W.D.Mo.1988); *Hunter v. Magack (In re Magack)*, 247 B.R. 406, 409-10 (Bankr.N.D.Ohio 1999); and *In re Thompson*, 383 B.R. 407 (Bankr.N.D.Ohio 2007) (Debtor will be found to have "refused" to obey lawful order of court, within meaning of discharge exception, when debtor's inaction would give rise to charge of civil contempt. To hold party liable for civil contempt, complainant must establish the following three elements: (1) that the alleged contemnor had knowledge of order which he is said to have violated; (2) the alleged contemnor did in fact violate order; and (3) that order violated was specific and definite.). See also, *Smith v. Jordan (In re Jordan)*, 521 F.3d 430, 433 (4th Cir.2008) ("The term used in §727(a)(6)(A) is 'refused' not 'failed.'"); *Wilmington Tr. v Jarrell (In re Jarrell)*, 129 B.R. 29, 33 (Bankr.D.Del.1991); and *Concannon v. Constantini (In re Constantini)*, 201 B.R. 312, 315-16 (Bankr.M.D.Fla.1996)

Article III Judicial Power.

*See generally Land-O-Sun Dairies, Inc. v. Fla. Supermarkets, Inc. (In re Finevest Foods, Inc.)*, 143 B.R. 964 (Bankr. M.D. Fla. 1992) (28 U.S.C. § 157 accords with Art. III of the Constitution); *see Gruntz v. County of Los Angeles*, 202 F.3d 1074, 1080 (9th Cir. 2000)(separation of core and non-core proceedings "creates a distinction between those judicial acts deriving from the plenary Article I bankruptcy power and those subject to general Article III federal court jurisdiction"); *Lebovits v. Scheffel (In re Lehal Realty Assocs.)*, 101 F.3d 272 (2d Cir. 1996) (distinction between core and non-core proceedings is intended to deal with problem of vesting Art. III judicial power in Art. I judges); *Hudgins v. Shah (In re Sys. Eng'g & Energy Mgmt. Assocs., Inc.)*, 252 B.R. 635 (Bankr. E.D. Va. 2000) (discussing importance of

"public rights" nature of bankruptcy proceedings to designation of "core" proceedings); *Noonan v. Cellu Tissue Corp. (In re Palmer Trucking Co.)*, 201 B.R. 9 (Bankr. D. Mass. 1996). Although the bankruptcy court is not an Article III court, its jurisdiction is limited by the constitutional standing requirement. *United States V. Amoskeag Bank Shares, Inc. (In re Amoskeag Bank Shares, Inc.)*, 239 B.R. 653, 657 n.3 (D.N.H. 1998).

Current Bankruptcy Rule 9020 provides that, with respect to findings of contempt for acts not committed in the presence of the bankruptcy judge, the bankruptcy court's ruling is subject to review in the manner provided in Rule 9033(b) which governs review of proposed finds of fact and conclusions of law in non-core proceedings. As noted above, the case law is split on whether bankruptcy judges have independent contempt authority, and the Advisory Committee on Bankruptcy Rules viewed current Rule 9020 as inappropriately staking out a substantive position on the question, i.e., that *de novo* review is required. Thus, Rule 9020 will be amended, as of December 1, 2001, simply to provide that Rule 9014, governing contested matters, will govern a motion for an order of contempt made by the United States trustee or a party in interest.

My claims are not related to the opioid crisis or addiction and my wrongful death claims are not a "core" issue. Refusal to allow my claims to be decided on the merits is an injustice and action done to prolong my pain and suffering beyond justification, lacking moral and ethical values. The court and debtors know the laws and court rules better than I do and act as if it doesn't apply to them continuously as does the court.

**Knowing and Fraudulent Conduct In Connection with the Bankruptcy Case**

Section 727 also provides for non-dischargeability in circumstances involving knowing and fraudulent conduct in connection with the business's Chapter 7 or 11 bankruptcy case. Specifically, under Section 727(a)(4), a denial of discharge is warranted if the business:

> Makes a false statement or submits a false account under oath;Makes a false claim; Solicits, receives, offers or provides "a promise of money, property, or advantage, for acting or forbearing to act;" or, Withholds books, records or information from the bankruptcy trustee or any other officer of the bankruptcy estate.

> Purdue acted in bad faith to pretend to want to settle with me in 2021. It was an *offer* made by them in bad faith. Purdue's intentions to avoid accountability for the harm they have done has been one false statement after another and no remorse whatsoever. Just sweep all the claims under the rug or in a corner where the victims are prevented or limited in the justice they can seek. It's peoples lives not anything like the *debt* owed in bankruptcy cases.

A Chapter 11 corporate debtor's monetary penalty obligation owed to the Federal Communications Commission ("FCC"), resulting from "fraud on consumers," survived the debtor's reorganization plan discharge, even when the FCC "was not a victim of the fraud," held the U.S. District Court for the Southern District of New York on Sept. 2, 2021. *In re Fusion Connect Inc.*, 2021 WL 3932346, *1 (S.D.N.Y. Sept. 2, 2021). On appeal, the court reversed the bankruptcy court's dismissal of the Government's non-dischargeability complaint, explaining that the fraud exception to dischargeability reaches debts owed to "creditors who were not themselves defrauded," such as the Government here. *Id.*, at *2. According to the court, the bankruptcy court had confirmed the debtor's reorganization plan with a broad discharge (i.e., release) of pre-bankruptcy debt, but the plan confirmation order put "stakeholders… on notice that [the FCC Penalty] could attach to the newly

constituted [reorganized] entity," when its terms made the dischargeability of that liability "an open issue." *Id.*, at *12.

The *Fusion* decision is important. A corporate debtor seeking chapter 11 reorganization relief ordinarily wants to clean up its balance sheet by eliminating unsecured liabilities with a discharge provision in a reorganization plan, permanently barring creditors from enforcing their pre-bankruptcy claims. When the bankruptcy court confirms the plan, the discharge will be a key part of the confirmation order. As the Third Circuit recently stressed in a similar context, "debtors [must] know their liabilities [in order to] implement a viable plan to obtain a fresh start." *Ellis v. Westinghouse Electric Co., LLC*, 2021 WL 3852612, *7 (3d Cir. Aug. 30, 2021). According to the Third Circuit, though, "the debtor's interest in a fresh start is not absolute, as the Bankruptcy Code tries to strike the 'delicate balance between the competing interests of creditors pursuing their claims and debtors in obtaining a fresh start and finality.'" *Id.*, at *4 (citation omitted).

The debtor's predecessor's ("B") had been engaged in defrauding consumers "for years." WL 3932346 at *1. As a result, B entered into a consent decree with the FCC in 2016, acknowledging its fraud, agreeing to issue refunds to consumers and to pay a "$4.2 million civil penalty to the United States ("FCC Penalty") in equal monthly installments over five years…. By its terms the consent decree bound [B's] successors, assigns, and transferees." *Id.* B later paid $1.2 million in refunds and credits to consumers and began paying the FCC Penalty. *Id.* *2. During 2018, however, Fusion, the debtor here, had merged with B's parent company, leaving "Fusion as the owner of [B's] business, and responsible for the outstanding FCC Penalty." *Id.*

Fusion filed a Chapter 11 petition in 2019 with "$2.1 million of the $4.2 million FCC Penalty" unpaid. The FCC filed a proof of claim for that amount and the bankruptcy court in late 2019 confirmed the Fusion reorganization plan. When confirming the

plan, the bankruptcy court "stated that Fusion's continuing obligation for the outstanding civil penalty [to the FCC] 'shall depend upon a determination of whether those obligations are dischargeable'" — i.e., whether they would survive the reorganization plan. *Id.*

The Government filed a non-dischargeability complaint in early 2020, alleging that the FCC Penalty was not dischargeable under Code §523(a)(2)(A), made applicable by Code §1141(d)(6). Although the Government conceded that the fraud exception to discharge in §523(a) applied only to bankruptcy cases "involving individual debtors…, Congress, by enacting the Abuse Prevention and Consumer Protection Act of 2005, in Code §1141(d)(6), had extended [the fraud exception to discharge] to corporate debtors in chapter 11 [cases]." *Id.*

The bankruptcy court granted Fusion's motion to dismiss the Government's complaint. It "agreed with Fusion that the exception to dischargeability for liabilities arising from fraud does not apply to the FCC Penalty because that exception does not reach debts owed to creditors who were not themselves defrauded. Because the victims of [B's] fraud consisted of consumers, and not the Government, [reasoned the bankruptcy court,] Section 523(a)(2)(A), and hence Section 1141(d)(6)(A), does not reach the FCC Penalty." *Id.* at *2.

The appellate court noted that the "Government's appeal presents a pure question of law: whether a civil penalty payable to the United States rising out of [**a consumer fraud**] constitutes a debt arising from [fraud], such that the penalty is exempted from discharge in bankruptcy under [Code] § 1141(d)(6)." *Id.* at *3.

*Statutory Framework and Binding Precedent.* A chapter 11 reorganization plan "discharges the debtor from any debt that arose before the date of such confirmation." Code § 1141(d)(1). "The discharge of such claims serves the bankruptcy policy of providing debtors with a 'fresh start' to permit their continued

operation free of pre-bankruptcy debts." *DPWN Holdings (U.S.A.) Inc. v. United Airlines*, 747 F.3d 145, 150 (2d Cir. 2014).

Code § 523(a)(2)(A) "has… long prohibited debtors from discharging liabilities on account of their fraud, embodying a basic policy animating the Code of affording relief only to 'an honest but unfortunate debtor.'" *Cohen v. de La Cruz*, 523 U.S. 213, 217-18 (1998). This provision ordinarily applies in chapter 7 cases involving individual debtors. Congress thus intended to insure that "all debts arising out of fraud are excepted from discharge, no matter what their form." *Archer v. Warner*, 538 U.S. 314, 321 (2003).

The Supreme Court affirmed in *Cohen* that a chapter 7 debtor's actual fraud made his liability nondischargeable under § 523(a)(2)(A). It also held "that an award of 'treble damages assessed on account of the fraud'" was not dischargeable because it "fell within the scope of 'any debt' respecting 'money, property, services, or credit' that the debtor has fraudulently obtained." *Id.*, at *4, quoting *Cohen*, 523 U.S. at 218 and Code § 523(a)(2)(A). The Court stressed that because the "award of treble damages" in *Cohen* fell within the fraud exception to discharge, "the creditor ha[d] a corresponding 'right to payment'" of those damages. *Id.*, at *5, quoting *Cohen*, 523 U.S. at 218-19.

*Section 1141(d)(6)(A)*. Congress "imported [in 2005] the relevant content of Code § 523(a)(2)(A) into chapter 11 [cases] via § 1141(d)(6)…." *Id.* "Section 1141(d)(6)(A) extends § 523(a)(2)(A) to [chapter 11 cases], by exempting from 'discharge a debtor that is a corporation from any debt… of a kind specified in paragraph (2)(A) or (2)(B) of section 523(a) that is owed to a domestic governmental unit." *Id.* at *5. By extending § 523(a)(A) to corporate debtors in chapter 11 cases, reasoned the court in *Fusion*, Congress was "presumed… to [have] adopt[ed]" the Supreme Court's interpretation in *Cohen*. *Id.* The district court therefore treated the *Cohen* analysis as "governing the issue presented" here. *Id.*, at *6.

*FCC Penalty Nondischargeable Under Code 1141(d)(6)(A)*. The district court thus held that the "FCC Penalty fits within the § 523(a)(2)(A) exception to dischargeability, as analyzed in *Cohen*, and as extended to chapter 11 corporate debtors through 1141(d)(6)(A)." *Id.*, at *7. It first stressed the "breadth" of the Supreme Court's *Cohen* reasoning: "§ 523(a)(2)(A) bars the discharge of <u>all liability arising from fraud</u>." *Id.* (emphasis in text), quoting *Cohen*, 523 U.S. at 222. The district court also relied on other appellate decisions. *See*, e.g. *In re Pleasants*, 219 F.3d 372, 375 (4th Cir. 2000) (nondischargable debt "need not be owed, either in whole or part, to a victim of the fraud, or represent compensation" to the victim); *Hatfield v. Thompson*, 555 B.R. 1, 12 (10th Cir. BAP 2016) ("[T]here is no requirement that the debt be for something that the debtor obtains from the creditor.").

Rejecting Fusion's argument that the fraud in question "must have been directed at the creditor holding the debt," the district court relied on "decisions by the Eleventh and Third Circuits holding that § 523(a)(2)(A)'s requirement of a fraud consistent with the common-law elements of fraud is satisfied where the defrauded party or parties were person(s) other than the creditor in the bankruptcy [case]." 2021 WL 3932, 346, at *9. For example, the Securities and Exchange Commission ("SEC") had obtained a nondischargeable civil fraud judgment against the debtor because of his defrauding investors "[e]ven though the fraud had not been directed at the SEC." *Id.*, citing *In re Bilzerian*, 153 F.3d 1278, 1280 (11th Cir. 1998). And the Third Circuit held that the SEC's civil fraud judgments against the debtor were "nondischargeable because the evidence of fraud had been met as to [the debtor's] clients… even though the fraud had not been directed at the SEC." *In re Bocchino*, 194 F.3d 376, 382-83 (3d Cir. 2015).

The district court also rejected as "unusually unpersuasive" Fusion's argument that reversing the bankruptcy court "would saddle the stakeholders of the reorganized entity with the burden of [B's] wrongdoings that occurred even prior to Fusion's

acquisition of the company." *Id.*, at \*12. Not only did the "stakeholders knowingly" assume B's preexisting liability to the United States, but the bankruptcy court had also put them on notice that the FCC Penalty might survive any discharge that Fusion obtained in the plan confirmation order. "A stakeholder in the new company thus had their eyes open that [this] liability, like other continuing liabilities or business costs and risk, might live on." *Id.*

More important, permitting Fusion "to shed a regulatory fraud penalty in this manner could invite mischief." *Id.* For example, it might encourage "the strategic offloading of such a liability onto a successor entity primed soon to file for reorganization under chapter 11," particularly when the entity "had a recent history of fraud." *Id.* "…[C]ourts have warned against interpreting the Code in a manner that would create perverse incentives for debtors that do not align with the Code's purposes." *Id.*, citing *In re Murphy*, 282 F.3d 828, 874 (5th Cir. 2002); *KeyBank Nat'l Ass'n v. Franklin Advisers Inc., Co.*, 600 B.R. 214, 231 (S.D.N.Y. 2019) (rejecting a "rule that would… create perverse incentives for the parties to engage in delay and gamesmanship in both the bankruptcy reorganization and the related litigation").

When contemplating bankruptcy, businesses cannot lawfully transfer assets to affiliates, subsidiaries, owners, owners' family members or other parties in an effort to shield these assets from the bankruptcy process. If a business seeks to improperly shield assets from the process and secure a discharge, this can lead to a claim for non-dischargeability under Section 727(a)(2).

### Refusal to Comply with a Court Order

Creditors and trustees can seek to prevent discharge in a business bankruptcy case under Chapter 7 or 11 if the business refuses to obey any lawful court order issued during the bankruptcy proceeding. They can also file claims for non-dischargeability

based on the business's refusal to testify or respond to a material question approved by the court.

Supreme Court ruling isn't being followed, it's been "restructured" to technically comply but doesn't actually comply with the the Supreme Court ruling to shield the Sacklers from litigation or accountability. Even if people opt out the only option is criminal charges against the Sacklers when it shouldn't be limited in any way to civil or criminal lawsuits against them. The preliminary injunction was extended once again and that can't justified.

 The Supreme Court's Purdue Pharma ruling in June 2024 ended permanent, non-consensual third-party releases in Chapter 11 plans, meaning the Sackler family couldn't get blanket immunity from opioid lawsuits through the bankruptcy plan. However, the ruling specifically left open the question of **temporary preliminary injunctions** (Section 105(a) injunctions) that pause litigation against non-debtors (like the Sacklers) while a plan is being *negotiated*, and courts have since allowed these temporary injunctions to continue in the Purdue case and others. This means litigation against the Sacklers was paused temporarily under a preliminary injunction while a new, compliant settlement was *negotiated*, which the Supreme Court eventually approved in late 2024/early 2025.

Bankruptcy courts continued to grant and extend preliminary injunctions, keeping lawsuits against the Sacklers on hold while they *negotiated* a revised plan that would comply with the Supreme Court's ruling.

- To meet the standard for granting a preliminary injunction, the party seeking the injunction must show (1) there is a likelihood of success on the merits of the case, and (2) the movant will likely suffer irreparable loss unless the injunction is issued. Prior to *Purdue Pharma*, the "likelihood of success" element could be met by showing that the court was likely to confirm a plan including non-consensual releases. The temporary injunction would therefore be appropriate to preserve the status quo until the plan, which

would function as a permanent injunction, was confirmed. Now, because permanent, non-consensual third-party release cannot be premised on the likelihood of confirming a plan that includes such a release.

The probability a party will win the case based on its legal arguments, not just procedural hopes. Debtors can't argue they'll likely win their case *because* the court will eventually confirm a plan that includes a prohibited release; that's circular reasoning. Now, because permanent, non-consensual third-party release are prohibited, "likelihood of success on the merits" clearly not met.

The Supreme Court concluded that nationwide injunctions (i) lack a statutory basis and (ii) are impermissible unless necessary and appropriate to **fully** redress a plaintiff's injury.  In support for this holding, the Supreme Court held that the English equity practice of a "bill of peace" has "evolved into the modern class action, which is governed in federal court by Rule 23 of the Federal Rules of Civil Procedure."  Specifically, on page 14 of the opinion, the Supreme Court notes the following:

Rule 23's limits on class actions underscore a significant problem with universal injunctions.  A "properly conducted class action," we have said, "can come about in federal courts in just one way — through the procedure set out in Rule 23." [citations omitted] . . . . Why bother with a Rule 23 class action when the quick fix of a universal injunction is on the table . . . ?  The principal dissent's suggestion that these suits could have satisfied Rule 23's requirements simply proves that universal injunctions are a class-action workaround.

On page 26 of the opinion, the Supreme Court further notes that preliminary injunctions may be issued only to the extent necessary and appropriate to provide complete relief to the plaintiff before the court. A typical class action involves injured parties electing when and where to commence litigation against a

defendant. In bankruptcy, a third-party release flips the script and entails the would-be defendants (here, the non-debtors associated with the debtor) selecting when and where to obtain a final judgment against the injured parties. However, there are several severe flaws with this position. First, this argument neglects to recognize that pursuant to section 105 of the Bankruptcy Code, bankruptcy courts have jurisdiction to grant broad injunctions to bind "parties in interest" from litigating against certain parties associated with a debtor. Moreover, aside from section 524(g) of the Bankruptcy Code, which explicitly notes that third-party releases in asbestos cases are subject to Rule 23, there is no requirement that other bankruptcy injunctions comply with Rule 23. The Supreme Court's decision in *Purdue* also made clear that the Bankruptcy Code does not authorize nonconsensual third-party releases. Having just considered third-party releases last year, it is unlikely that *CASA* could be interpreted to wipeout all other third-party releases. The *CASA* argument also fails to consider that third-party releases are much narrower, and not equivalent to, a universal injunction, which prohibits the enforcement of a law, policy, or regulation against anyone, not just "parties in interest" that received notice.

*In re Cont'l Airlines*, 203 F.3d 203, 214-15 (3d Cir. 2000) (holding that a third-party injunction would be proper under § 105(a) if the proponents of the injunction demonstrated with specificity that such an injunction was both necessary to the reorganization and fair).

## 11 U.S. Code § 1141 - Effect of confirmation

(6) Notwithstanding paragraph (1), the confirmation of a plan does not discharge a debtor that is a corporation from any debt—

(A) of a kind specified in paragraph (2)(A) or (2)(B) of <u>section 523(a)</u> that is owed to a domestic governmental unit, or owed to a person as the result of an action filed under subchapter III of chapter 37 of title 31 or any similar State statute;

*Field v. Mans*, 516 U.S. 59, 69 (1995), which it interpreted as establishing the general principle that creditors are protected by 523(a)(2) only if they rely on the misrepresentations at issue and are damaged by such reliance

## Exception in Section 1141(d)(3) where the provisions of Section 727 become relevant to a Chapter 11 corporate debtor.

There is a specific exception in Section 1141(d)(3) where the provisions of Section 727 become relevant to a Chapter 11 case: a corporation will be denied a Chapter 11 discharge if. The plan provides for the **liquidation** of all or substantially all of the corporation's property. The corporation does not engage in business after the plan is carried out. The corporation would be denied a discharge under Section 727(a) if the case had been filed under Chapter 7.

The grounds for denying a discharge under Section 727(a) generally relate to debtor misconduct, such as: Transferring or concealing property with intent to defraud creditors. Concealing or destroying financial records. The Sacklers did in fact transfer money for themselves to defraud creditors of the government and individual creditors to avoid and limt accountability in a very calculated strategic move that shows intent of their actions. Making a false oath or account in the bankruptcy case. Failing to explain a loss of assets satisfactorily.

In essence, Section 727 interacts with Chapter 11 to prevent a corporation from liquidating its assets, ceasing business operations, and still receiving a discharge of debts while having committed acts that would bar a discharge in a standard liquidation case Under Section 727(a)(2), a business that files for bankruptcy under Chapter 7 or 11 is not eligible for discharge if the business "with intent to hinder,

delay, or defraud a creditor or an officer of the estate . . . has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed . . . property of the debtor, within one year before the date of the filing of the petition." This is what is commonly referred to as a "fraudulent transfer."

Bankruptcy Code does not authorize a release and injunction that, as part of a plan, seeks to *discharge* claims against a nondebtor without consent of the affected creditor. A consensual release shouldn't be interpreted here as any "release" to change or alter the meaning of being "in compliance" with the supreme courts ruling. It's not on a technicality and the debtors know this and know what the ruling means and are fully aware of how yet again they are preventing justice for the lives lost and ruined by their actions life changing harm done to people and still no meaningful remorse but continuous games based on technicalities and very broad applications that put the victims once again at a disadvantage to Purdue and the Sacklers for another disappointment in any fair possibility of justice. It's a pattern it hasn't stopped and the insistence is egregious to say the least.

Just because a debtor *hopes* to confirm a plan with a broad release for third parties, because those releases are now generally prohibited if not consented to; instead, "likelihood of success" must rest on real legal grounds, not just the possibility of a future confirmed plan with such a release, A court order issued *before* a final decision to maintain the status quo or prevent harm, requiring proof of four things, including "likelihood of success on the merits" and "irreparable harm".

*Mapother & Mapother, P.S.C. v. Cooper (In re Downs)*, 103 F.3d 472 (6th Cir. 1996) (bankruptcy courts have inherent power to sanction improper conduct; decisions under

Fed. R. Bankr. P. 9011, which tracks Fed. R. Civ. P. 11, are reviewed only for abuse of discretion);

## Conclusion

The bankruptcy court has refused and failed to properly evaluate whether the bankruptcy court would have jurisdiction under every conceivable claim falling under the widest interpretation of the gatekeeper provision. Plaintiff requests emergency stay pending appeal to vacate plan provisions that extinguish *all* opioid claims including failure to warn OxyContin interactions with antidepressants causing serotonin syndrome and death unrelated to the opioid crisis or addiction and remand with instructions that such claims be decided on the merits.

Amanda Morales

ajlare356@gmail.com

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this

December 9, 2025 a copy of the document(s) entitled emergency supreme court **motion for contempt**

To Defendants was/were emailed to.

Marshall Huebner
marshall.huebner@davispolk.com  Townes, Esther C. <esther.townes@davispolk.com>