Vitaly Pinkusov
3338 Richlieu Rd Apt T285
Bensalem, PA 19020

FILED
U.S. ...
2026 JAN 13 P 4: 37
... OF N.Y.

January 5, 2026

Judge Sean Lane
US Bankruptcy Court for
the Southern District of
New York
300 Quarropas Street
White Plains, NY 10601

Re: Notice of Filing of Sixth
Plan Supplement Pursuant to the
Eighteenth Amended Joint Chapter 11
Plan of Reorganization of Purdue
PHARMA L.P. and its Affiliated
Debtors

Dear Judge Lane!
Enclosed please find a copy of Pages 1, 17, 19, 33 and
91 (out of 116 total pages) that are parts of the
abovementioned Sixth Plan Supplement.

(1)

This Notice of Filing (ECF 8434) has been mailed to me by KROLL Restructuring Administration and other Claimants. I have received it on Monday, January 5, 2026 and I have decided to test out my hypothesis that most people will not understand the full meaning of that Sixth Plan Supplement. I had to go to my doctor appointment in Center City Philadelphia. And then I had free time. The weather was mild and I decided to ask 100 random people on the street of Philadelphia to read 1 page out of the 116 pages that make up this ("wonderful") report. After spending 4 hours doing this "research", I stopped once I got 50 respondents to look at 1 random page, to read several pages, and to write the reviews. I asked them if they could describe their impressions with one phrase and to give

(2)

a "Yes" or a "No" answer to my ultimate question. "Can you understand at least 75% of the information provided in any 1 (one) page that you have read?"

Those people who answered "Yes" were asked to provide their educational level and their current job title and the description of their work.

3 out of 50 people answered "Yes". That amount to 6% percent. One lady was a financial adviser at PNC Bank, two gentlemen stated that they are Attorneys. Attorney A.S. used to be a Corporate who worked as a litigation attorney at a big law firm and another attorney turned out out to be an actual Attorney specializing in Personal Bankruptcies

③

The comments have ranged from "?", "What kind of the elite and unique marijuana does one have to smoke to understand 20% of this gibberish" to "Are you kidding me?", "Really", "These idiots should have spent some time with the real people who would tell them that no normal person who did not go to law school would be able to decipher this document written in the "legalese" language." One Person has written "It is a sad day for America". One Person has written her answers entirely in Albanian. And when I asked her to write the answer in English, she asked me why? I told her because I do not understand Albanian. She laughed and told me that my inability to understand Albanian was the reason she decided to answer in the language that she thought I would not understand.

④

I was curious to find out what did she write in Albanian. She laughed again and she has written the story of the Attempt to build the Tower of Babylon. I laughed again. "How fitting!", I thought.

Some other comments have contained the kind of language that is totally inappropriate by any account.

Your Honor! I would like to make a Request that Your Honor exercises common sense, empathy, and the Power of Discretion and Orders that Kroll Restructuring Administration Hires an Attorney with extensive Linguistic Experience who will be

⑤

able to translate this Document into Plain English.

This World is full of Naysayers:

"This Would Never Happen!"

"You are Too Hopeful".

"This Court would never approve it because...

a) ... It is too expensive!
b) ... Mr. Huebner will definitely react by filing

    aa) Motion to Allow to file Motion to Oppose in Excess of 40 pages

    bb) Motion for an Emergency Hearing to hear the Oral Arguments about the Motions

    cc) Motion to Approve the Semi-Annual Increase of Mr. Huebner's Hourly Rate of $1650.

⑥

(gezillion dollars) to (1,950 gezillion dollars)

This World is full of people like myself, full of hope. Dum Spiro Spero. And while I breathe, I hope!

I hope that you will consider My Request. I hope that you will make this order and I hope that any subsequent notices subject to ~~both~~ the Translation into Plain Engl.

Sincerely,

V. Pinter

1/5/26

KROLL RESTRUCTURING ADMINISTRATION
FDR Station, PO Box 5293
New York NY 10150-9998

FIRST CLASS M
U.S. POSTAGE
PAID
Toppan Merril



15

WINDSOR 2325 SRF 93835 PACKID: 48 ADRID: 30282127 SVC: PRO SE
PINKUSOV, VITALY
3338 RICHLIEU RD.
APT. T285
BENSALEM PA 19020

SRF 93835

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Eli J. Vonnegut
Christopher S. Robertson
Joshua Y. Sturm
Abraham Bane

*Counsel to the Debtors
and Debtors in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| In re: | Chapter 11 |
|---|---|
| PURDUE PHARMA L.P., *et al.*, | Case No. 19-23649 (SHL) |
| Debtors.[1] | (Jointly Administered) |

### NOTICE OF FILING OF SIXTH PLAN SUPPLEMENT PURSUANT TO THE EIGHTEENTH AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF PURDUE PHARMA L.P. AND ITS AFFILIATED DEBTORS

**PLEASE TAKE NOTICE** that on July 1, 2025, the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") filed solicitation versions of (i) the *Thirteenth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 7636] (as modified, amended or supplemented from time to time, the "**Thirteenth Amended Plan**") and (ii) the *Disclosure Statement for Thirteenth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its*

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Purdue Products L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

Sackler (a/k/a the RSS BRP Trust); (iv) Trust under agreement dated June 16, 1980 f/b/o Richard S. Sackler (a/k/a the RSS FPC Trust); (v) Trust under agreement dated December 23, 1980 f/b/o Richard S. Sackler (a/k/a the RSS XPC Trust); (vi) Trust DTD 8/29/2003 FBO the Issue of Richard Sackler; (vii) 1974 Irrevocable Trust FBO BS and RSS; (viii) Raymond R. Sackler Trust 1B dtd 12/23/89; (ix) 50% of the Shared Trust Pledgors, each as may be altered by the Permitted Trust Restructuring; (x) Trust under agreement date 8/25/92 FBO the Issue of Richard S. Sackler (a/k/a '92 RSS Trust); (xi) RSS 2012 Family Trust; (xii) Rockpoint Land Trust dated 2/2/2023; (xiii) Rockpoint Residence Trust dated 2/2/2023; (xiv) Richard R. Sackler Life Insurance Trust, (xv) each Beverly Sackler Trust Pledgor; (xvi) BS Irrevocable Trust Agreement 1 dated 12/20/89 f/b/o DAS (DAS Gallo 1); (xvii) David A. Sackler 2012 Trust dated 1/27/2012; (xviii) BS Irrevocable Trust Agreement 2 dated 12/20/89 f/b/o DAS (DAS Gallo 2); (xix) BS Irrevocable Trust Agreement 3 dated 12/20/89 f/b/o DAS (DAS Gallo 3); (xx) BS Irrevocable Trust Agreement 1 dated 12/20/89 f/b/o MRS (MRS Gallo 1); (xxi) Marianna R. Sackler 2012 Trust dated 1/27/2012; (xxii) BS Irrevocable Trust Agreement 2 dated 12/20/89 f/b/o MRS (MRS Gallo 2); (xxiii) BS Irrevocable Trust Agreement 3 dated 12/20/89 f/b/o MRS (MRS Gallo 3); (xxiv) BS Irrevocable Trust Agreement 1 dated 12/20/89 f/b/o RKS (RKS Gallo 1); (xxv) Rebecca K. Sackler 2012 Trust dated 1/27/2012; (xxvi) BS Irrevocable Trust Agreement 2 dated 12/20/89 f/b/o RKS (RKS Gallo 2); (xxvii) BS Irrevocable Trust Agreement 3 dated 12/20/89 f/b/o RKS (RKS Gallo 3); (xxviii) Raymond R. Sackler Irrevocable Trust 1 dated 9/19/95 (RSS 1995 Landing Trust); (xxix) Selikoff Family Investment Trust dated 12/30/2020; (xxx) Data Trust; (xxxi) Crystal Trust; (xxxii) Marianna R. Sackler Captain Trust; and (xxxiii) RSS Fiduciary Management Trust, each as may be altered by the Permitted Trust Restructuring. Each of the foregoing is an "**Trust Pledgor**."

"**Trust Pledgor Collateral**" as defined in Section 3.01(a).

"**UCC**" shall mean the Uniform Commercial Code or any successor provision thereof (or similar code or statute) as in effect from time to time in any applicable state or jurisdiction, to the extent it may be required to apply to any item or items of Collateral.

"**Valuation Date**" as defined in Section 6.01(d).

"**Value**" means, as of any date of determination, with respect to the Collateral or assets of the Pledgors, the value thereof determined in accordance with Section 1.04.

Section 1.03    Interpretative Provisions. The rules of construction set forth in Section [1.02] of the Master Settlement Agreement shall apply *mutatis mutandis* to this Credit Support Annex. The use herein of the word "include" or "including", when following any general statement, term or matter, shall not be construed to limit such statement, term or matter to the specific items or matters set forth immediately following such word or to similar items or matters, whether or not non-limiting language (such as "without limitation" or "but not limited to" or words of similar import) is used with reference thereto, but rather shall be deemed to refer to all other items or matters that fall within the broadest possible scope of such general statement, term or matter. References herein to any Section, Schedule, Appendix or Exhibit shall be to a Section, a Schedule, an Appendix or an Exhibit, as the case may be, of this Credit Support Annex unless otherwise specifically provided. In addition, (i) the term "descendants" shall include all issue, including grandchildren, stepchildren and adoptive relationships, and current and former spouses and (ii) the term "spouse" shall include qualified domestic partners.

Section 1.04    Valuation Methodology.

(a)    It is understood and agreed that for purposes of preparing the quarterly and annual financial reports described in this Credit Support Annex and calculating compliance with any covenant contained in this Credit Support Annex (including with respect to the Value of the initial Collateral as of

Section 1.06    **Family Offices**. Summer Road and any Pledgor or Investment Holding Vehicle may transfer such asset management authority to one or more other "family offices" that are exclusively controlled by one or more other members of the Richard Sackler family or trusts for their benefit, so long as such assignee agrees to requirements, obligations and pledges that are equivalent to those concerning Summer Road as set forth in this Credit Support Annex.

## ARTICLE II.
## SETTLEMENT PAYMENT OBLIGATIONS

Section 2.01    **Payment of Applicable Payment Group Settlement Payment Obligations**.

(a)    Notwithstanding Section 2.01(c) of the Master Settlement Agreement, with respect to each Payment Party in the Applicable Payment Group, on each Payment Date:

(i)    [The Beverly Sackler Trust Pledgors shall pay, or cause to be paid, the Settlement Payment Obligation of the Applicable Payment Group by the applicable Payment Date (other than SOR and RCR "top-off payments");]

(ii)    50% of the Shared Trust Pledgors that exist for the benefit of the Richard Sackler Family Group shall pay all cash and cash equivalents, or cause to be paid, the Settlement Payment Obligation of the Applicable Payment Group by the applicable Payment Date, but solely to the extent such obligation is not paid pursuant to clause (i) above;

(iii)    The Trust Pledgors (other than 50% of the Shared Trust Pledgors [and the Beverly Sackler Trust Pledgors]) shall pay, or cause to be paid (on a joint and several basis with the other Trust Pledgors [who are not Beverly Sackler Trust Pledgors]), to the MDT the Applicable Payment Group's Settlement Payment Obligation by the applicable Payment Date, but solely to the extent such obligation is not paid pursuant to clauses (i) and (ii) above; and

(iv)    The Non-Trust Pledgor Payment Parties shall pay, or cause to be paid (on a joint and several basis with the other Non-Trust Pledgor Payment Parties), to the MDT the Applicable Payment Group's Settlement Payment Obligation by the applicable Payment Date, but solely to the extent such obligation is not paid pursuant to clauses (i), (ii), or (iii) above;

provided, that:

A.    No [Beverly Sackler Trust Pledgor] shall have any obligation to make any payment (and shall not be in breach or otherwise liable to the MDT for failure to make any such payment) if and to the extent (i) it does not have sufficient liquid assets to do so (excluding any liquid assets reserved in good faith for the payment of Taxes or administrative expenses (including professional fees)) and (ii) such payment is made by another member of the Applicable Payment Group;[2]

B.    No Shared Trust Pledgor shall have any obligation to make any payment (and shall not be in breach or otherwise liable to the MDT for failure to make any such payment) if and to the extent (i) it does not have sufficient liquid assets to do so (excluding any liquid assets reserved in good faith for the payment of Taxes or administrative expenses (including professional fees)) and (ii) such payment is made by another member of the Applicable Payment Group;

---

[2] NTD: Term "administrative expenses" to conform to CT probate statute definition. If there is a Specified Breach following a missed payment, that breach would apply to all members of the Payment Group, including the probate estates.

13
Annex E

19-23649-shl    Doc 8434    Filed 12/20/25    Entered 12/20/25 17:39:18    Main Document
Pg 33 of 116

(c) Indebtedness for Borrowed Money that constitutes purchase money indebtedness incurred in connection with the acquisition of assets (including real estate), so long as (x) any Liens securing such Indebtedness for Borrowed Money are limited solely to the assets being acquired, (y) such assets being acquired are acquired and remain owned by the Holding Company Pledgor or Subsidiary incurring such purchase money indebtedness and (z) such assets are acquired within ninety (90) days of the incurrence of such indebtedness, and any extensions, refinancings, renewals and replacements thereof, so long as such extension, refinancing, renewal or replacement does not exceed in a principal amount the Indebtedness for Borrowed Money being renewed, extended, replaced or refinanced plus accrued interest, fees and premiums (if any) thereon and reasonable fees and expenses associated with the extension, refinancing, renewal or replacement;

(d) Indebtedness for Borrowed Money (i) pursuant to tenders, statutory obligations, bids, leases, governmental contracts, trade contracts, surety, stay, customs, appeal, performance and/or return of money bonds or other similar obligations incurred in the ordinary course of business, consistent with past practice or consistent with the investment management and/or financial services industries and (ii) in respect of letters of credit, bank guarantees, surety bonds, performance bonds or similar instruments to support any of the foregoing items;

(e) (i) Indebtedness for Borrowed Money incurred in the ordinary course of business, consistent with past practice or consistent with the investment management and/or financial services industries in respect of obligations of the Holding Company Pledgors and their Subsidiaries to pay the deferred purchase price of goods or services or progress payments in connection with such goods and services, in each case, for the benefit of the applicable Pledgor and its Subsidiaries and (ii) Indebtedness for Borrowed Money in respect of letters of credit, bankers' acceptances, bank guarantees, surety bonds, performance bonds or similar instruments with respect to such Indebtedness for Borrowed Money entered into in the ordinary course of business, consistent with past practice or consistent with the investment management and/or financial services industries;

(f) Indebtedness for Borrowed Money existing, or pursuant to commitments existing, on the Settlement Effective Date and any extensions, refinancings, renewals and replacements thereof, so long as such extension, refinancing, renewal or replacement does not exceed in a principal amount the Indebtedness for Borrowed Money being renewed, extended, replaced or refinanced plus accrued interest, fees and premiums (if any) thereon and reasonable fees and expenses associated with the extension, refinancing, renewal or replacement;

(g) Indebtedness for Borrowed Money consisting of the financing of insurance premiums;

(h) Indebtedness for Borrowed Money representing deferred compensation to current or former directors, trustees, beneficiaries, officers, employees, members of management, managers, members, partners, independent contractors and consultants in the ordinary course of business, consistent with past practice or consistent with the investment management and/or financial services industries; and

(i) Indebtedness for Borrowed Money in an aggregate principal amount not to exceed $5,000,000 at any time outstanding with respect to the Applicable Payment Group.

Section 5.04    Liens. The Holding Company Pledgors and their Subsidiaries shall not, and shall not permit any direct or indirect Subsidiary or Investment Holding Vehicle to, incur, create, assume or grant or (in the case of any consolidations, mergers or divisions otherwise permitted hereunder) cause or suffer to exist, any Lien on any of its property or assets, except:

(i) Liens created by the Security Documents;

continue in effect solely with respect to each Trust Pledgor that is obligated in respect of such Payment Obligations, any Subsidiaries of such Trust Pledgors, each Affiliate of such Trust Pledgors, and any Subsidiaries of such Affiliates, and shall otherwise terminate as provided above (it being understood that the term "Affiliate" for purposes of this Article VIII shall have the same meaning therefor as set forth in Section 7.01(a)(i) of Article VII of this Credit Support Annex).

## ARTICLE IX.
## MISCELLANEOUS

Section 9.01    **Escrow Accounts.**

(a)    Consistent with the Master Settlement Agreement's definition of "Retained Payment Amount," all amounts paid by or on behalf of the Applicable Payment Group into an escrow account on or following the Settlement Effective Date, whether pursuant to this Agreement or any other Settlement Agreement (including direct settlements, such as opt-out class action settlements that have not become effective as of the Settlement Effective Date), shall be deemed to have been actually paid by the Applicable Payment Group on such Payment Date and shall reduce the Applicable Payment Group's Full Outstanding Settlement Amount as of that date.

(b)    If any portion of such escrowed amounts is subsequently returned to the Applicable Payment Group pursuant to the Master Settlement Agreement or the applicable Settlement Agreement, then:

(i)    such returned amounts shall no longer be deemed to have been paid as of the original Payment Date (and the Full Outstanding Settlement Amount shall be adjusted accordingly); and

(ii)    such amounts received by Trust Pledgors (directly or indirectly) shall be promptly deposited into the Collateral and become subject to this Credit Support Annex.

(c)    The Trust Pledgors' share of any escrowed amounts held in escrow accounts required by the Master Settlement Agreements (including Grantor Trust Escrow Accounts described in Exhibit Z), the "Project Apollo IAC escrow accounts" and any other escrow account holding funds to be applied towards Payment Obligations shall be deemed to be held in Holding Company Pledgors (including for purposes of the thresholds set forth in Section 3.01 and determining the Target Value).

Section 9.02    **Certain Representations.** Each of the Trust Pledgors represents and warrants to the MDT on the Settlement Effective Date that:

(a)    **Related Party Loan Transactions.** The aggregate principal amount of Indebtedness for Borrowed Money owing by (i) any Holding Company Pledgor or any of its Subsidiaries, on the one hand, to (ii) Related Parties (other than Holding Company Pledgors and their respective Subsidiaries), on the other hand, and outstanding as of the Settlement Effective Date does not exceed $25,000,000 in the aggregate.

(b)    **Existing Indebtedness.** The aggregate principal amount of debt for borrowed money of the Holding Company Pledgors and their respective Subsidiaries outstanding as of the Settlement Effective Date, that is not otherwise permitted under Section 5.03 (other than Section 5.03(f)), does not exceed $25,000,000 in the aggregate.