HERBERT SMITH FREEHILLS KRAMER (US) LLP
Kenneth H. Eckstein
Rachael Ringer
David E. Blabey Jr.
1177 Avenue of the Americas
New York, NY 10036
Telephone: (212) 715-9100

*Attorneys for the Purdue Master Disbursement Trust*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **In re:** | : | **Chapter 11** |
| **PURDUE PHARMA L.P., et al.,** | : | **Case No. 19-23649 (SHL)** |
| | : | **Jointly Administered** |
| **Plan Administration Trust.**[1] | : | |

## STATEMENT IN RESPONSE TO
## EXPEDITED MOTION TO ENFORCE CONFIRMATION ORDER

The Purdue Master Disbursement Trust (the "MDT"), which was created pursuant to the Debtors' Eighteenth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors [D.I. 7368] (the "Plan") and the related Findings of Fact, Conclusions of Law, and Order Confirming the Eighteenth Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors [D.I. 8263] (the "Confirmation Order"), by and through its

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, were as follows: Purdue Pharma L.P. (7484); Purdue Pharma, Inc. (7486); Purdue Transdermal Technologies L.P. (1868); Purdue Pharma Manufacturing L.P. (3821); Purdue Pharmaceuticals L.P. (0034; Imbrium Therapeutics L.P. (8810); Adlon Therapeutics L.P. (6745); Greenfield Bio Ventures L.P. (6150); Seven Seas Hill Corp. (4591); Ophir Green Corp. (4594); Purdue Pharma of Puerto Reco (3925); Purdue Products L.P. (4140); Purdue Pharmaceutical Products L.P. (3902); Purdue Neuroscience Company (4712); Nayatt Cove Lifescience Inc. (7805); Button Land L.P. (7502); Rhodes Associates L.P. (N/A); Paul Land Inc. (7425); Quidnick Land L.P. (7584); Rhodes Pharmaceuticals L.P. (6166); Rhodes Technologies (7143); UDF LP (0495); SVC Pharma LP (5717); and SVC Pharma Inc. (4014). The Debtors' corporate headquarters was located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

trustees, files this statement in response (the "Response") to the expedited motion (the "Motion") filed by Frank S. Vellucci, Daniel S. Connolly, and Rory Held, in their capacities as trustees of certain trusts in the B-Side Payment Group 1 (collectively, the "Trustees"), seeking to enforce the Shareholder Settlement Document Undertakings provisions of the Confirmation Order (the "Undertakings") and to direct Richard S. Sackler and Lin Gao (together, the "RSS Parties") to comply with their obligations thereunder and under the Settlement Stipulation Dismissing Proceedings Without Prejudice, filed at D.I. No. 7713 on August 1, 2025 (the "Stipulation").[2,3]

**PRELIMINARY STATEMENT**

1. The actions taken by the RSS Parties in Wyoming and Connecticut—just days after the Plan went effective—to revive certain disputes between those parties and the Trustees (and pursue others) are a blatant violation of the Undertakings contained in the Confirmation Order and the related Stipulation incorporated therein. The Stipulation and Undertakings were designed to achieve two goals: first, to ensure ***for the lifetime of the settlement*** that there will be no actions taken that might destabilize the Plan and threaten the ability of the members of the B-Side Payment Group 1 to comply with their obligations thereunder, and, second, to prevent any actions with respect to the Wyoming Litigation (as defined below) or any attempt to bring "any causes of action against any other Litigation Party" by the RSS Parties for a period of 14 months following the Effective Date. Stipulation ¶ 3. These documents were extensively negotiated among the Trustees, the RSS Parties, and various Debtor and creditor stakeholders, and their enforcement—which is

[2] The RSS Parties filed two responses to the Motion: The Response of Dr. Richard Sackler and Lin Gao to Expedited Motion to Enforce the Confirmation Order [D.I. 9204] (the "RSS Filing"); and the Supplemental Objection to The Motion Of Frank Vellucci, Daniel Connolly And Rory Held And Request To Compel Production Of Information To Satisfy Settlement Payment Obligations [D.I. 9359] (the "Supplemental Objection")

[3] Capitalized terms used but not defined herein have the meaning ascribed to them in the Confirmation Order and/or the Motion.

subject to the exclusive jurisdiction of this Court—is critical to effectuate the spirit and purpose of the Plan and the underlying global settlement.

2. Thus, in response to the apparent breaches by the RSS Parties occurring on the heels of the Effective Date, the MDT supports this Court fashioning appropriate relief to facilitate compliance with the Stipulation, the Undertakings, and the Confirmation Order, and to ensure the parties are made whole, including as a result of having to incur costs in response to such breaches. While the MDT will defer to the Trustees regarding the propriety and timing of the requests for specific information by the RSS Parties, the MDT does understand that the RSS Parties are the recipients of significant historical and ongoing information about the activities of the Trusts, and the latest attempts to re-cast their objections as "information requests" should not be permitted to delay resolution of the Motion to Enforce—specifically a finding by this Court that the pending litigations must be withdrawn ***immediately*** and the Stipulation and Confirmation Order followed in all respects. The Court should not sanction the RSS Parties' disregard of their Court-ordered obligations and commitments, nor should it permit those parties to undermine the Plan, Confirmation Order, and global settlement that have just recently, and at long last, gone effective.

## BACKGROUND AND RESPONSE

### *The Plan Negotiation and Stipulation History*

1. In early 2025, while most stakeholders were diligently renegotiating a plan of reorganization, Dr. Richard Sackler filed, under seal, litigation concerning certain trusts in the B-1 Payment Group and their trustees in Wyoming state court. That litigation spawned multiple counterclaims (collectively, the "Wyoming Litigation").

2. When creditors learned of this Wyoming Litigation in July 2025, key stakeholders pushed the RSS Parties and the Trustees to dismiss the Wyoming Litigation lest it undermine or threaten negotiation of the Plan and Master Shareholder Settlement Agreement ("MSA"). The

litigants ultimately agreed to that dismissal and voluntarily entered into the Stipulation on August 1, 2025, which provided in relevant part for:

a. Dismissal of pending litigation without prejudice (Stipulation ¶ 2);

b. A 14-month "Litigation Standstill" following the Plan Effective Date (i.e., a Litigation Standstill through July 2027) (Stipulation ¶ 3);

c. Covenants by the RSS Parties not to interfere with the implementation of the MSA or the Trustees' performance thereunder (Stipulation ¶ 5);

d. Irrevocable acknowledgements that "the actions of the Trustees prior to the date hereof and taken in the future (including by predecessor and successor trustees, respectively) in the negotiation, approval, and furtherance of the Purdue/Sackler Settlement Agreements are hereby ***consented to and ratified***" (Stipulation ¶ 5(a)(ii)); and

e. Third-party beneficiary status to the MDT to allow for the enforcement thereof (Stipulation ¶ 8).

3. In the event of a breach of the Stipulation by any of the parties to the Wyoming Litigation (including the RSS Parties), the Stipulation provided that the non-breaching parties, as well as any third-party beneficiaries of the Stipulation, could "exercise and seek all remedies available at law and equity with respect to such breach, including specific performance and the right to seek damages." Stipulation ¶ 6.

4. The MDT, later incorporated on April 13, 2026, was expressly named as a third-party beneficiary under the Stipulation, and is a successor to certain rights of the Debtors and a successor to the interests of those stakeholders who negotiated the above-described provisions of the Stipulation.

5. With the Stipulation in effect, creditors and other key stakeholders were able to move forward with negotiating the Plan and global settlement, justifiably believing that the initial two payments from the Payment Parties would proceed without the threat or interference of any litigation from the RSS Parties for at least the duration of the Litigation Standstill. The parties

also negotiated for certainty that other issues (e.g., questions regarding the Trustees' authority to enter into the settlement and performance thereunder) would be entirely off the table and could not be raised by the RSS Parties for the full duration of the global settlement. This specifically included avoiding any challenges to, or second-guessing of, judgments by the Trustees to sell or liquidate trust assets relied upon to fund the more than $1.8 billion of settlement payments due over time by the B-1 Payment Group (approximately $143 million of which is due May 1, 2027).

6. Due to their importance, the provisions of the Stipulation were incorporated in the Confirmation Order, in the form of the Undertakings. Those Undertakings provide:

> "The rights and obligations set forth in the [Stipulation] . . . remain in full force and effect including the acknowledgements and agreement contained therein that [the RSS Parties] will not directly or indirectly (i) interfere, now or at any time in the future, with any Trustees' (as defined in the Settlement Stipulation), Shareholder Payment Parties' or the B-Side Payment Group 1's ability to consummate, implement, and perform under the Plan and Shareholder Settlement Agreements; (ii) take (or fail to take) any action that interferes with, delays, frustrates, or impairs the ability of any party to enter into or satisfy its obligations under the Plan or the Shareholder Settlement Agreements, or that would undermine the validity or enforceability of the Plan or the Shareholder Settlement Agreements . . . ."

Confirmation Order ¶ 33(a).

7. To ensure the enforcement of the Undertakings, the Bankruptcy Court retained "exclusive jurisdiction of all matters arising under, arising out of, or related to the obligations set forth" in the Stipulation. Confirmation Order ¶ 33(j).

8. Relatedly, to accomplish the Plan's primary purpose—to distribute cash to creditors—the Confirmation Order also incorporated Exhibit M to the MSA ("Exhibit M"), which sets forth payment dates on which the various Payment Groups must make payments to the MDT. The Litigation Standstill in the Stipulation was negotiated against the backdrop of this payment schedule, with the duration of the standstill sized to ensure that the initial two payments—on the

Plan Effective Date, May 1, 2026, and its anniversary, May 1, 2027—would fall during the Litigation Standstill.

***<u>The RSS Parties' Post-Confirmation Obstruction and Delay</u>***

9. Despite the Stipulation and the terms of the Confirmation Order, the RSS Parties' tactics continued, requiring multiple post-confirmation judicial conferences, including on December 12, 2025 and February 24, 2026. At the latter conference, the Court specifically directed Dr. Richard Sackler's compliance with his obligations under the Confirmation Order. *See* Order to (i) Enforce the Confirmation Order And (ii) To Show Cause Regarding Compliance with the Confirmation Order [D.I. 8764] (Feb. 24, 2026).

10. In response to this behavior, the final global settlement documentation also references and/or incorporates the Stipulation. In addition to a reservation of rights tied to the Stipulation in every document that was signed by Dr. Richard Sackler, the obligations to comply with the Stipulation and the consequences for RSS Parties' failure to comply, were incorporated into multiple provisions of global settlement documents.

11. For example, under Annex G to the MSA, Dr. Richard Sackler agreed that the MDT could notify him that the RSS Parties had breached the Stipulation. *See* MSA Annex G § 6.02(a). The delivery of such notice thereunder would constitute a "Breach Trigger," which, if not cured within thirty days, could mature into a "Specified Breach." *Id.* Such a Specified Breach by the RSS Parties could result in an "Enforcement Event," (*Id*. at §1.02, "Enforcement Event" definition subsection (i) and (ii)), and allow for the MDT to exercise remedies without regard to the last-out collateral protections set forth in Section 6.03 of Annex G. *See* MSA Annex G § 6.03 ("Upon the occurrence and during the continuance of any Enforcement Event not arising from a Specified

Breach set forth in the immediately preceding sentence, the Secured Party may at any time exercise remedies with respect to the Collateral.”).

***The RSS Parties’ Violation of the Stipulation and Confirmation Order***

12. Mere days after the Effective Date, the RSS Parties violated the Confirmation Order and the Stipulation with four filings (collectively, the “Interference Actions”):

a. A “Motion for Remedy for Breach” in the Wyoming Litigation asking the Wyoming State Court to terminate the Stipulation and reverse the order dismissing the Wyoming Litigation (the “Rule 60 Motion”);

b. An affidavit recorded in the town of Greenwich, Connecticut pursuant to Conn. Gen. Stat §47-12a, purporting to provide notice of a judicial proceeding (*i.e.*, the previously dismissed Wyoming Litigation they sought to revive) and to cloud the title to 60 Field Point Circle, Greenwich, Connecticut (the “Greenwich Property”) (a Trust real estate asset);

c. In the same court as the Wyoming Litigation, a separate petition against Data LLC (an entity controlled by Data Trust, a Litigation Party in the Wyoming Litigation), seeking an accounting and distributions from four trusts for which Data LLC is trustee.[4]

d. With the State of Connecticut, the recording of a *lis pendens* on the Greenwich Property, which purports to provide notice of a new civil action against ARIT Investment Holdings LLC (a Shareholder Payment Party and Trust Pledgor), in order to cloud title to the Greenwich Property.[5]

13. In addition to breaching the Litigation Standstill in the Stipulation, the immediate effect of the Interference Actions is to threaten to delay and cloud the potential sale of Trust Assets.

***The RSS Parties’ Mischaracterizations***

14. The RSS Parties’ history of obstructionism has carried through in their response to the Motion, which contains glaring mischaracterizations and falsehoods. *See generally* RSS

---

[4] The Rule 60 Motion, the Connecticut affidavit, the Data LLC petition, and the *lis pendens* are filed under seal as Exhibits B, C, D, and E, respectively, to the Motion. Dr. Richard Sackler’s counsel provided the MDT an unredacted copy of the Connecticut affidavit, which describes the Interference Actions, on a non-confidential basis on May 12, 2026. These are also described in the RSS Filing (defined below), filed with the Court on May 18, 2026.

[5] The *lis pendens* indicates that this new civil action was commenced on May 11, 2026, in the Superior Court for the Judicial District of Stamford/Norwalk.

Filing. And while the Supplemental Objection seems to dramatically shift focus to purported information requests instead of the prior mischaracterizations, it is important that each of these mischaracterizations be corrected for the record as they are critical to the performance of the settlement (and were key to its negotiation).

15. First, by characterizing the Interference Actions as merely a permissible "intra-family dispute," the RSS Parties completely disregard that the RSS Parties agreed to refrain from doing *exactly* what they have sought to do with the filing of the Interference Actions (through the comprehensive Litigation Standstill) for a period of at least 14 months from the Effective Date. And the underlying litigation that is the subject of the Interference Actions actually seeks to *control* assets that are **not** personal assets of the RSS Parties but assets of the Trusts, which is something the RSS Parties are not permitted to interfere with for the entirety of the settlement.

16. In this regard, the RSS Filing states that "Dr. Richard Sackler's beneficial interest in [the Greenwich Property] is pledged as security in support of the Master Settlement Agreement Settlement [sic] in this proceeding as part of a 'naked [or last out] pledge'" and suggests that the Greenwich Property, as one of Dr. Richard Sackler's individual property interests, "would be used to fund the settlement only to the extent that other available assets had been exhausted without fully funding the settlement." *See* RSS Filing at 5-6. This effort to suggest that the Trustees must first sell other assets before looking to the Greenwich Property in a form of quasi-marshalling, is entirely false. The Greenwich Property is owned by various trusts in the B-1 Payment Group and is not a personal asset of Dr. Richard Sackler. Upon information and belief, the trusts hold these assets through an investment holding vehicle whose equity has been pledged in connection with Annex E to the MSA, and there are no relevant restrictions on its use to fund payments under the Plan and MSA.

17. Pursuant to the Stipulation and Confirmation Order, the RSS Parties are prohibited for the duration of the settlement from interfering with the implementation of the MSA or the Trustees' performance thereunder. Actions by the RSS Parties attempting to dictate how and when the Trustees liquidate assets to satisfy the settlement payments are simply not permitted during the settlement years, and would only become ripe—if ever—at the conclusion of the settlement if any assets were still left in the relevant Trusts.

18. Second, the RSS Filing and the RSS Parties' Supplemental Objection both invent a non-existent "reservation of rights" *in the Stipulation* and suggests that it affords them *carte blanche* to litigate so-called "intra-family disputes" in any forum, apparently irrespective of their impact on the Trustees' performance under the MSA. RSS Filing 4, 10; Supplemental Objection at pages 1, 7. Whatever supposed "reservation of rights" the RSS Parties believe they negotiated for in the Stipulation, it does not permit them to override the core protections afforded to the Trustees and the express third-party beneficiaries thereunder to global peace for the remainder of the Litigation Standstill and Protected Performance (as defined in the Stipulation) thereafter.

19. Finally, the Supplemental Objection further offers an unfounded post-hoc rationalization for the Interference Actions, suggesting the Interference Actions actually support the Plan. *See* Supplemental Objection at Page 6. But under the Plan, the *MDT* is charged with enforcing the MSA. *See* Plan at 27 ("'MDT Shareholder Rights' means . . . any and all rights . . . including without limitation to the extent arising under, or attributable to, the MSA and any related [agreements] . . ."). It is thus *the MDT*, not the RSS Parties, that would be entitled to "ensure" the "integrity of the plan" in the event such exercise were actually necessary. *Compare Id. with* Supplemental Objection at Page 6. It is not. The Interference Actions should be withdrawn or dismissed.

***<u>The Need for Court Action</u>***

20. Through the Interference Actions, the RSS Parties violated both the Stipulation and the Undertaking in paragraph 33 of the Confirmation Order. The Interference Actions are "actions . . . with respect to the Wyoming Litigation," in contradiction of paragraph 3 of the Stipulation; they directly concern the Wyoming Litigation (including by trying to reinstitute it) and yet have been brought in fora other than this Court, in contravention of paragraph 33(j) of the Confirmation Order; and the Interference Actions attempt to interfere with the Trustees' ability to (i) "consummate, implement, and perform under the Plan and Shareholder Settlement Agreements," and (ii) "satisfy [their] obligations under the Plan or the Shareholder Settlement Agreements," in contravention of paragraph 33(a) of the Confirmation Order and the Stipulation itself. [6]

21. As set forth in the Motion, the Confirmation Order should be enforced under sections 105(a) and 1142(b) of the Bankruptcy Code and pursuant to its own terms, and this Court has authority to enforce its own orders—especially where the RSS Parties expressly consented to the Court's exclusive jurisdiction and enforcement powers. *See* Motion ¶ 7, *et seq*.[7]

---

[6] The RSS Parties' Supplemental Objection also asks for the Court to order the production of three categories of documents and "Full and complete accountings for" eight different trusts. Supplemental Objection at pages 9-11. The MDT takes no position on the merits of this request as a matter of applicable state law, but notes that, far from resolving the present dispute and restoring the global peace, if awarded this relief, the RSS Parties apparently intend to use such information as more fuel for the Interference Actions. *See* Supplemental Objection at Page 10 (requesting that this Court "deny or hold in abeyance the Pending Motion and, . . . enter an order on an expedited basis compelling [production and an accounting]").

[7] Remarkably, despite seeking to undermine the Confirmation Order and Plan through their actions, the RSS Parties initially sought to forestall a full inquiry into those actions by cloaking their filings in secrecy. Dr. Richard Sackler, through counsel, asserted that the Wyoming pleadings are sealed by order of the Wyoming state court pursuant to Wyoming law (a confidentiality they requested), and refused to provide them to the MDT, its trustees and trust advisory council *even confidentially*. Only when this Court ordered the relevant documents be turned over did the RSS Parties finally provide documents to the MDT.

22. The Court should accordingly grant the relief requested in the Motion, and further direct the RSS Parties to reimburse the MDT for their reasonable legal fees and expenses related to this Response.

## <u>RESERVATION OF RIGHTS</u>

23. By supporting the Motion and seeking reimbursement of fees and expenses incurred related to this Response, the MDT in no way waives any potential additional or alternative relief, including but not limited to compensatory, punitive, and consequential damages for, and/or an award of additional costs and fees for, expenses incurred in connection with this or other violations of the Plan, the Confirmation Order, the Stipulation, the MSA, Annex G, or any other settlement document, whether such violation has already occurred or is yet to occur, and the MDT hereby expressly reserves any and all potential current or future such rights, claims, and/or relief, whether relating to the Interference Actions or otherwise.

## <u>CONCLUSION</u>

WHEREFORE, the MDT respectfully requests this Court enter an order (i) providing the relief requested in the Motion; (ii) directing the RSS Parties to reimburse the MDT for its reasonable legal fees and expenses related to this Response, and (iii) granting the MDT such other and further relief as is just.

Dated: June 23, 2026

Respectfully submitted

/s/ *Rachael Ringer*

Kenneth H. Eckstein
Rachael Ringer
David E. Blabey Jr.
HERBERT SMITH FREEHILLS KRAMER (US) LLP
1177 Avenue of the Americas
New York, NY 10036
Telephone: (212) 715-9100
Email: Kenneth.Eckstein@hsfkramer.com
Rachael.Ringer@hsfkramer.com
David.Blabey@hsfkramer.com

*Attorneys for the Purdue Master Disbursement Trust*