**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------X **For Publication**

In re: Chapter 11

PURDUE PHARMA L.P., *et al.*, Case No. 19-23649 (SHL)

Debtors. (Jointly Administered)

-----------------------------------------------------X

**MODIFIED BENCH RULING GRANTING THE SIDE B TRUSTEE'S MOTION TO ENFORCE THE CONFIRMATION ORDER**

**A P P E A R A N C E S:**

**HERBERT SMITH FREEHILLS KRAMER (US) LLP**
*Counsel to the Purdue Master Disbursement Trust*
1177 Avenue of the Americas
New York, New York 10036
By: Kenneth H. Eckstein, Esq.
Rachael Ringer, Esq.
David E. Blabey Jr., Esq.

**KATTEN MUNCHIN ROSENMAN LLP**
*Counsel for Certain Side-B Trustees*
50 Rockefeller Plaza
New York, New York 10020
By: Julia Winters, Esq.
Joshua Rubenstein, Esq.
Bonnie Lynn Chmil, Esq.

**PENACHIO MALARA LLP**
*Counsel to Richard Sackler and Lin Gao*
245 Main Street
White Plains, New York 10601
By: Anne Penachio, Esq.

**HARRIS ST. LAURENT, LLP**
*Counsel to Richard Sackler and Lin Gao*
1775 Pennsylvania Avenue, NW, Suite 650
Washington, D.C. 20006
By: Barry Pollack, Esq.

**LAW OFFICES OF CHARLES KURMAY**
*Counsel to Lin Gao*
61 Cherry Street, Suite 1
Milford, CT 06460
By: Charles L. Kurmay, Esq.

**SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court is the motion of Frank S. Vellucci, Daniel S. Connolly and Rory Held, in their capacities as trustees of certain trusts in the Side B Payment Group 1 (the so-called "Side B Trustees") who have filed a motion seeking to enforce the Shareholder Settlement Document Undertakings provisions of the Confirmation Order in these bankruptcy cases and to direct Richard Sackler and Lin Gao (the so-called "RSS Parties") to comply with their obligations under the Confirmation Order and a related stipulation [ECF No. 9189] (the "Motion"). The Motion was prompted by certain actions taken by the RSS Parties that the Side B Trustees allege violate the Confirmation Order and a related stipulation; the Side B Trustees argue that these actions interfere with the Master Settlement Agreement reached in these bankruptcy cases between the Purdue Master Disbursement Trust and a multitude of parties, including the Debtors, the Sackler family, the RSS Parties, and trusts controlled by the Sackler family. *See* Master Settlement Agreement [ECF No. 9132]. For all the reasons explained below, the Motion is granted. [1]

[1] This written decision memorializes the Court's bench ruling that was read into the record on August 21, 2026. While the substance of the decision remains the same, edits have been made for ease of comprehension and for the sake of accuracy of citation. None of the changes in any way affect the factual or legal grounds for the Court's ruling. Because of its origins as a bench ruling, this decision has a more conversational tone than a traditional written decision.

**BACKGROUND**

The history of these cases is long and complex. *See In re Purdue Pharma L.P.,* 675 B.R. 632 (Bankr. S.D.N.Y. 2025). The Court will recount only those facts that are necessary to address the pending Motion. Those facts are undisputed, even if the parties disagree about the legal significance of these facts. The facts are taken from the parties' submissions and the entire record of the proceedings in these bankruptcy cases.

These cases arise out of the public health crisis caused by the explosion of opioid addiction. *Id.* The Debtors' role in that crisis—and the role of their owners—arise from the extraordinarily harmful effects of the Debtors' primary product—the prescription drug OxyContin—and other synthetic opioids that the Debtors deceptively marketed as "less addictive" and suitable for use in a wide range of circumstances. *Id.* In 2021, the Court confirmed the Debtors' plan of reorganization, which contained a broad non-consensual release on behalf of certain non-debtors—namely, the Sackler family—in exchange for payments by the Sackler family in these bankruptcy cases. The decision confirming that plan was appealed. On appeal, the Supreme Court ultimately held that the Bankruptcy Code does not allow for the non-consensual release of claims against the non-debtor Sackler family members. *See Harrington v. Purdue Pharma L.P.*, 603 U.S. 204 (2024). After the Supreme Court's decision, the case was remanded to this Court. On remand, the stakeholders in these bankruptcy cases resumed their negotiations of a potential plan of reorganization. To facilitate that negotiation, the parties returned to mediation to determine whether a settlement could be reached with the Sackler family in a manner consistent with the Supreme Court's guidance.

Generally speaking, the Sackler family is made up of two halves that descended from the two brothers who founded the Debtors. The first half, known as "Side A," are the members of

the Sackler family descended from Mortimer Sackler; the other half, known as "Side B," are members descended from Raymond Sackler. Richard Sackler is one of the members of the Side B group.

Notwithstanding the ongoing settlement negotiations after the remand, Richard Sackler filed litigation under seal in early 2025 where he sought various relief in Wyoming state court (the "Wyoming Litigation"). The Wyoming Litigation challenged the Side B Trustees' authority to act on behalf of all Side B family members, and alleged that the Side B Trustees were improperly "stripping" Richard Sackler's powers over certain family trusts. *See* Motion, Ex. B. As was explained at oral argument on the pending Motion here, the Wyoming Litigation threatened the very heart of the then ongoing settlement discussions because it challenged the Side B Trustee's authority to consummate a settlement in these bankruptcy cases; the litigation raised concerns that the parties negotiating with the Side B Trustees would not have confidence in the Side B Trustees' ability to consummate and perform any obligations to which they agreed on behalf of Side B. *See* Hr'g Tr. 54:5-55:18 (June 29, 2026) [ECF No. 9424].

Against this backdrop, the parties to the Wyoming Litigation engaged in settlement discussions. *See* Notice of Filing of Stipulation concerning Shareholder Settlement Agreements ¶ C [ECF No. 7713]. To that end, the parties engaged a mediator to discuss a resolution of intra-family disputes regarding the Sackler family's contribution to any settlement of the Debtors' claims against the Sacklers. *Id.* ¶ F. At the request of the mediator, other interested parties from these bankruptcy cases joined the mediation, including the Committee of Unsecured Creditors and the Ad Hoc Committee of Government and other Contingent Claimants. *Id.* Ultimately, the parties reached a resolution, which was memorialized in a stipulation dated August 1, 2025 (the

"Stipulation"). *Id.* ¶¶ G, J, 2. The Stipulation includes four provisions that are of particular relevance here:

1. Dismissal of the pending Wyoming Litigation without prejudice (Stipulation ¶ 2);

2. A 14-month "Litigation Standstill" to follow the Effective Date of the Plan of Reorganization in these bankruptcy cases—which was still in the future—during which time the parties to the Wyoming Litigation (including the RSS Parties) would not "take any actions, directly or indirectly, with respect to the [Wyoming Litigation] or any of the facts alleged or causes of action asserted in the [Wyoming Litigation]" and would not "threaten in writing or commence litigation" against any other party to the Wyoming Litigation "in any court" (Stipulation ¶ 3);

3. Covenants by the RSS Parties not to interfere with the implementation of these bankruptcy cases or any settlement reached by the Debtors and the Sacklers (Stipulation ¶ 5); and

4. Irrevocable acknowledgment that the actions of the Side B Trustees are hereby "consented to and ratified," whether taken prior to the date of the Stipulation or in the future, with respect to the negotiation, approval, and furtherance of the settlements contemplated by the Plan and any settlement agreement that is ultimately reached between the Debtors and the Sacklers. (Stipulation ¶ 5(a)(ii)).

In the event of a breach of the Stipulation by any of the parties to the Wyoming Litigation (including the RSS Parties), the Stipulation provides that the non-breaching parties, as well as any third-party beneficiaries of the Stipulation, may "exercise and seek all remedies available at law and equity with respect to such breach, including specific performance and the right to seek damages." *See* Stipulation ¶ 6. The Master Disbursement Trust ("MDT"), an entity incorporated in April 2026 to administer the distribution of settlement funds in these bankruptcy cases, was expressly named as a third party beneficiary under the Stipulation, and is a successor to certain rights of the Debtors and a successor to the interests of those stakeholders who negotiated the above-described provisions of the Stipulation. Stipulation ¶ 8.

After the parties' agreement was memorialized in the Stipulation, the parties continued with settlement negotiations that eventually resulted in the Plan and Master Shareholder

Settlement Agreement ("MSA"). The MSA memorialized the settlement between the Debtors, the MDT, the Sackler parties, and entities controlled by the Sackler parties, with such settlement resolving the Debtors' claims against the Sacklers. *See generally,* MSA. In general terms, the settlement embodied in the MSA required the Sacklers to, among other things, pay over $6 billion to the Debtors' estate, it barred the Sacklers from selling opioid products in the United States, and it dissolved the Debtors in favor of a public benefit corporation dedicated to opioid remediation.

As is relevant to the current dispute, the MSA outlined specific obligations of the Side B parties, including the payment of certain amounts on a specified timeline. *Id.* Of particular relevance to those payments are two annexes to the MSA: Annex E and Annex G. Annex E outlines the payment obligations of Side B Payment Group 1, which is a group consisting of one individual and more than fifty trusts over which Side B members have control or in which Side B members have a beneficial interest. *See* MSA, Ex. A (listing the various payment groups for both Side A and Side B). Annex E also contains a list of Trust Pledgors, who are entities committed to making payments under the MSA. *See* Annex E, § 1.02. Under Annex E, the Trust Pledgors pledge—as security for the payments owed under the MSA—100% of the equity interests owned by each Trust Pledgor in the so-called Holding Company Pledgors, and all of the proceeds and products of those holdings. Annex E § 3.01(a)(i). In turn, each Holding Company Pledgor pledges all the assets of the Holding Company as well as all the proceeds and assets of the foregoing. *See* Annex E, § 3.01(a)(ii). In other words, all of the trusts owned or controlled by the Side B Payment Group 1—and their assets—were pledged as security to ensure that the Side B Payment Group 1 would make the payments owed under the MSA. *See id,* §3.01, MSA Ex. A. Among the assets held by the Trust Pledgors is 60 Field Point Circle, a property in

Greenwich, Connecticut (the "Greenwich Property"), which is where the RSS Parties and their minor children reside. MSA Ex. A; Reply, Ex. A. Annex E also contains certain negative covenants that, among other things, prohibit the Trust Pledgors and Holding Company Pledgors from making any payments other than those explicitly enumerated in the MSA and also prohibit the Holding Company Pledgors from permitting the creation of any liens against the property or assets held by the Pledgors. *See* Annex E, §§ 5.01, 5.04.

The second annex, Annex G, outlines the specific payment obligations under the MSA of Richard Sackler, as distinct from the obligations of the Side B Payment Group 1 parties of which Richard Sackler is not a party in his individual capacity. Under Annex G, Richard Sackler pledged certain assets to ensure payment of his obligations under the MSA. *See* Annex G, § 2.01. His pledged assets consist of 100% of the equity interests in a single specific limited liability company, 100% of the pledged shares in Sackler-controlled non-debtor foreign companies owned by Richard Sackler, each bank account related to a Sackler-controlled non-debtor foreign company owned by Richard Sackler and the amounts held therein, and the proceeds and products of these assets. *Id.* Unlike Side B Payment Group 1, however, Richard Sackler negotiated a so-called "naked pledge," meaning that his personal assets would only be looked to last for payments under the MSA and that Richard Sackler would have "unfettered control" over his personal assets in the meantime. *See* Annex G, § 6.03 (stating that the MDT "shall first exercise remedies against Non-RSS Collateral in order to satisfy the outstanding Secured Obligations and, only to the extent any Secured Obligations remain outstanding following exercise remedies by the Secured Party against the Non-RSS Collateral and the application of the proceeds thereof" to the amounts owed under the MSA); *see also* Hr'g Tr. 27:9-20, 28:22-29:1 (June 29, 2026). In exchange for this "naked pledge," the RSS Parties

agreed among other things that (1) they would not "directly or indirectly interfere now or at any time in the future, in any way with the [Side B] Trustees' . . . or the B-Side Payment Group 1's ability to consummate, implement, and perform under the [Plan and MSA] [or] (2) take (or fail to take) any action that would in any way interfere with, delay, postpone, frustrate, or impair the ability of any party (including the [Side B] Trustees) to enter into or satisfy its obligations" under the Plan and MSA. Stipulation ¶ 5(a).

The provisions of the Stipulation were incorporated in the Confirmation Order [ECF No. 8263] entered by the Court on November 18, 2025 that confirmed the Eighteenth Amended Joint Plan of Reorganization. *See In re Purdue Pharma*, 675 B.R. 632 (Bankr. S.D.N.Y 2025). The relevant provisions of the Stipulation are referenced as the "Shareholder Settlement Document Undertakings" in paragraph 33 of the Confirmation Order. Those undertakings in the Confirmation Order reiterate the parties' commitments under the Stipulation by providing in relevant part that:

> The rights and obligations set forth in the [Stipulation] . . . remain in full force and effect including the acknowledgements and agreement contained therein that [the RSS Parties] will not directly or indirectly (i) interfere, now or at any time in the future, with any Trustees' (as defined in the Settlement Stipulation). . . or the B-Side Payment Group 1's ability to consummate, implement, and perform under the Plan and [MSA and other settlement agreements] (ii) take (or fail to take) any action that interferes with, delays, frustrates, or impairs the ability of any party to enter into or satisfy its obligations under the Plan or the [MSA and other settlement agreements], or that would undermine the validity or enforceability of the Plan or the [MSA and other settlement agreements]. . .

Confirmation Order ¶ 33(a). The very next paragraph of the Confirmation Order directs "each of the RSS Parties and the other members of the [Side B Payment Group 1] . . . to comply with the [MSA, Stipulation and Plan]." *Id.* ¶ 33(b).

The Confirmation Order provides for enforcement of the parties' agreement. The Confirmation Order requires all Sackler parties, including the RSS Parties, to finalize and

execute documents memorializing the MSA, including Annexes E and G, by a specific date. *Id.* ¶ 33(c), (e). The Confirmation Order also provides mechanisms for the Court to compel compliance with the Confirmation Order. *See id.* ¶ 33(i). Under paragraph 33(j), the Court retains "exclusive jurisdiction of all matters arising under, arising out of, or related to the obligations set forth herein, including to resolve any dispute or failure of performance by Richard Sackler or any other party, and to impose sanctions, including, without limitation, findings of contempt, monetary sanctions, or such other relief as the Bankruptcy Court determines appropriate for any failure to negotiate in good faith or otherwise comply with any obligation set forth herein." *Id.* ¶¶ 33(i), (j); *see also* Plan §§ 11.1(vii), (xii), (xx), (xxi) (applicable retention of jurisdiction provisions).

On the record at the confirmation hearing in November 2025, counsel for the RSS Parties confirmed that both Richard Sackler and Lin Gao agreed to be bound by these provisions, including the obligation to comply with the terms of the Stipulation. *See* Hr'g Tr. 39:13-23 (Nov. 14, 2025) [ECF No. 8253] (Counsel for Richard Sackler stating "on behalf of Dr. Sackler, I confirm that he agrees to the provision set forth in the [rider]," including paragraph 33 of the Confirmation Order); *see also id.* at 71:12-72:6 (counsel for Lin Gao confirming that Ms. Gao "has agreed upon all of the necessary changes and we are committed to moving forward with" the provisions of paragraph 33). The Confirmed Plan went effective on May 1, 2026, thereby triggering the fourteen-month Litigation Standstill memorialized in the Stipulation. *See* Notice of Occurrence of Effective Date [ECF No. 9133]; Stipulation ¶ 3. Given that Effective Date, the fourteen-month Litigation Standstill extends through July 2027.

Notwithstanding all the agreements set forth in the Confirmation Order, the MSA, and the Stipulation, peace did not last long in the valley. Mere days after the Effective Date, the RSS

Parties filed pleadings in various state courts in which the RSS Parties challenged the actions of the Side B Trustees and sought relief as to property pledged under Annex E. The Side B Trustees refer to these collectively as the "Interference Actions." These four Interference Actions—which are the subject of the pending Motion—are as follows:

1. A "Motion for Remedy for Breach" filed in the Wyoming Litigation asking the Wyoming State Court to terminate the Stipulation and reverse the order dismissing the Wyoming Litigation (the "Rule 60 Motion"); *see* Motion ¶ 3(a), Ex. B;

2. An affidavit recorded in the town of Greenwich, Connecticut under Connecticut General Statute §47-12a, purporting to i) provide notice of a judicial proceeding (i.e., the previously dismissed Wyoming Litigation) and ii) seek to quiet title to the Greenwich Property in favor of the RSS Parties, with the RSS Parties asserting that the pending Wyoming Litigation challenges the Side B Trustees' authority to convey or encumber the Greenwich Property and may impact title to the property (the "Quite Title Affidavit"); *see* Motion ¶ 3 (c), Ex. D;

3. A separate petition filed in the Wyoming State Court against Data LLC (an entity controlled by Data Trust, a Litigation Party in the Wyoming Litigation) that seeks an accounting and distributions from four trusts for which Data LLC is trustee (the "Data LLC Petition"); *see* Motion ¶ 3 (b), Ex. C;

4. A *lis pendens* filed and recorded on the Greenwich Property in Connecticut which purports to provide notice of a new civil action against ARIT Investment Holdings LLC (a Shareholder Payment Party and Trust Pledgor) that notes the dispute over the Greenwich Property by competing interests, thus clouding the title to that property (the "Lis Pendens"); *see* Motion ¶ 3 (d), Ex. E.

Given these developments, the Side B Trustees now request the entry of an order enforcing the Confirmation Order, the MSA, and the Stipulation by directing the RSS Parties to immediately withdraw or dismiss (as applicable) all of the four Interference Actions, and also to withdraw or dismiss any other filings that the RSS Parties have subsequently made in violation of the Confirmation Order, the MSA, or the Stipulation. The Side B Trustees also seek an order directing the RSS Parties to reimburse the Side B Trustees for their reasonable legal fees and expenses in filing the Motion. The Motion is joined by the MDT, whose submission explains that the Stipulation and undertakings memorialized in the Confirmation Order were negotiated to

specifically prohibit any conduct that would destabilize the Confirmed Plan and the MSA, including the ability of the Side B Payment Group 1 members to comply with their payment obligations. The MDT concurs with the Side B Trustees that the Interference Actions directly undermine those goals. *See* Statement in Response [ECF No. 9389] ("MDT Response").

The Motion was opposed by Richard Sackler and Lin Gao, who contend that the Interference Actions are permissible under a reservation of rights provision contained in the MSA. The RSS parties also seek documents that they say are relevant to this dispute. *See* Response of Dr. Richard Sackler and Lin Gao to Expedited Motion to Enforce the Confirmation Order [ECF No. 9204] ("RSS Obj."); *see also* Supplemental Objection to the Motion Of Frank Vellucci, Daniel Connolly and Rory Held and Request to Compel Production of Information to Satisfy Settlement Payment Obligations [ECF No. 9359] ("RSS Supp. Obj.").[2] After the Side B Trustees filed a reply, *see* Reply in Further Support of Expedited Motion to Enforce the Confirmation Order [ECF No. 9390] ("Reply"), the Court held a hearing on June 29, 2026. *See generally* Hr'g Tr. (June 29, 2026) [ECF No. 9424].

**DISCUSSION**

As a threshold matter, this Court has jurisdiction to consider this matter under 28 U.S.C. §§ 157 and 1334, and under paragraph 33(j) of the Confirmation Order, which provides the Bankruptcy Court with "exclusive jurisdiction of all matters arising under, arising out of, or

[2] While the RSS Supplemental Objection indicates that the RSS Parties intend to file a separate motion to compel the production of these documents, no such motion was ever filed with the Court. *See* RSS Supp. Obj. at 8.

related to the obligations set forth herein;" jurisdiction also exists under paragraph 9 of the Stipulation that was approved by this Court.

Turning to the substance of the dispute, the question before the Court is whether the Interference Actions violate the terms of the Confirmation Order, the MSA, and the Stipulation. In short, the Court concludes that they clearly do.

A confirmed Chapter 11 plan operates as a binding contract among the parties. *See In re Arcapita Bank B.S.C.(c)*, 520 B.R. 15, 22 (Bankr. S.D.N.Y. 2014) ("Together the plan and disclosure statement constitute a binding contract among the parties."); *see also In re Northwestern Corp*., 2005 Bankr. LEXIS 2146, at *18 (Bankr. D. Del. Oct. 25, 2005) (finding that under section 1141 of the Bankruptcy Code, the confirmed plan "acts like a contract that binds the parties who participate in the bankruptcy case or should have participated in the case"); *In re AB Liquidating Corp.*, 2006 Bankr. LEXIS 4812, at *9 (B.A.P. 9th Cir. Dec. 22, 2006) ("Generally, a Chapter 11 plan should be interpreted as a contract."); *In re Texaco, Inc*., 668 B.R. 1, 28 (Bankr. S.D.N.Y. 2025) ("A confirmed plan of reorganization is in effect a contract between the parties and the terms of the plan describe their rights and obligations.") (internal citations omitted).

The MSA was filed as a plan supplement to the Debtors' Eighteenth Amended Joint Chapter 11 Plan of Reorganization, which was confirmed by the Court. *See* Confirmation Order. The terms of the Stipulation were also incorporated into the Confirmation Order. Accordingly, the Confirmed Plan, the Stipulation, and the MSA are binding on the RSS Parties. Indeed, no party has argued otherwise. And it is abundantly clear that the Interference Actions taken by the RSS Parties violate the terms of the Confirmed Plan, the MSA, and the Stipulation.

For that determination, we start with a discussion of the parties obligated to make payments under the Confirmed Plan, and MSA as well as the assets pledged to ensure such payments. Annex E of the MSA includes a list of Trust Pledgors whose assets are pledged as security to ensure payments by the Side B Payment Group 1. Importantly, all of the trusts targeted by the Interference Actions are Side B Payment Group 1 Trust Pledgors, meaning that all of those trusts assets are pledged as security for the Side B Payment Group 1's obligations under the MSA. *See* MSA, Annex E. As is relevant to the current discussion, these trusts include the AR Irrevocable Trust; BRP Trust A; FPC Trust A; XPC Trust A; RSS PRAH Trust; Rockpoint Land Trust; Rockpoint Residence Trust; Data Trust; and the Crystal Trust. *See* Annex E, § 1.02 (listing the trust entities that constitute the "Trust Pledgors"); *see also* Hr'g Tr. 9:17-11:15 (June 29, 2026). One of these—the AR Irrevocable Trust—currently holds the title to the Greenwich Property; the Rockpoint Residence Trust and Rockpoint Land Trust formerly held title to the Greenwich Property before title was transferred to the AR Irrevocable Trust. Reply, Ex. A; *see also* Hr'g Tr. 9:17-11:15 (June 29, 2026). Thus, it is clear—and once again not disputed by any party—that the Greenwich Property is pledged as security for the Side B Payment Group 1 payments. Further, all of the trustees at issue in the Interference Actions (including Data LLC) are "Trustees" as that term is defined in the Stipulation. *See* Stipulation ¶ 5(a).

Each of the Interference Actions improperly violates the Confirmed Plan, the MSA, and the Stipulation by interfering with the pledges that guarantee the payment obligation of the Side B Payment Group 1. As to the first action—the Rule 60 Motion—that pleading attempts to assert control over the Greenwich Property, an asset pledged by Side B Payment Group 1 under Annex E to ensure payment of the Side B Payment Group 1's financial obligations under the

Confirmed Plan and MSA. *See e.g.* Motion, Ex. B (RSS parties arguing that the defendants in the Wyoming Litigation have violated the Stipulation by taking "affirmative, irreversible steps to liquidate" the Greenwich Property). The Rule 60 Motion directly interferes with the ability of the Side B Trustees to "enter into or satisfy its obligations under the [Plan and Stipulation]" by seeking to revive the very litigation that the parties settled. *Id.* ¶ 3. More specifically, the RSS Parties seek to reverse the order that dismissed the Wyoming Litigation, which flatly contradicts the RSS Parties' agreement to dismiss the Wyoming Litigation and to enter into the fourteen-month Litigation Standstill that extends through July 2027.[3]

Similarly, the second and fourth Interference Actions improperly seek to cloud title to the Greenwich Property by filing the Lis Pendens and otherwise seek to encumber or restrict the Greenwich Property. These actions are explicitly prohibited by the Stipulation. The Stipulation specifically provides that the Litigation Parties, which include the RSS Parties, will not "directly or indirectly . . . interfere now or at any time in the future, in any way with the . . . the B-Side Payment Group 1's ability to consummate, implement, and perform" under the Confirmed Plan, MSA, and Stipulation or "take (or fail to take) any action that would in any way interfere with, delay, postpone, frustrate, or impair the ability of any party (including the [Side B] Trustees) to enter into or satisfy its obligations" under the Confirmed Plan, the MSA, and the Stipulation or "undermine the validity or enforceability of " those agreements. Stipulation ¶ 5(a). The protections of the Stipulation include, without limitation, a prohibition on parties "exercising a power of appointment over property held by" a trust obligated to make payments under the MSA

[3] Even after July 2027, the relief sought in the Wyoming Litigation would appear improper because the Wyoming Litigation explicitly challenges the authority of the Side B Trustees to consummate the terms of the Confirmed Plan, the MSA, and the Stipulation, notwithstanding that the RSS Parties' agreed that the Side B Trustees are "validly acting" and "have had and retain all necessary authority to" perform under the Confirmed Plan and the MSA.

"in a manner that interferes with, affects, or undermines" the Confirmed Plan, the MSA, and the Stipulation. *Id*. As the Greenwich Property is owned by trusts within Side B Payment Group 1, it is pledged as security for the Side B Payment Group 1's obligations under the MSA. The filing of the Lis Pendens and Quiet Title Affidavit directly interferes with the Side B Payment Group 1's obligations under the MSA because those actions cloud the title to the Greenwich Property, which make it more difficult, if not impossible, for the Side B Trustees to liquidate that asset.

The final Interference Action filed by the RSS Parties fares no better. In this new petition to the Wyoming State Court, the RSS Parties seek relief against Data LLC, as trustee of the FPC Trust, BRP Trust, XPC Trust, and the PRAH Trust. The RSS Parties seek not only to compel Data LLC to provide an accounting for the four trusts of which Data LLC is a trustee but also to direct Data LLC to make income distributions to Richard Sackler. *See* Motion, Ex. C. But once again, these trusts are Trust Pledgors under Annex E, so this action violates not only the Litigation Standstill but also the RSS Parties' promise not to interfere with the Side B Trustees' administration of the trusts pledged under Annex E. While the RSS Parties attempt to minimize the impact of this lawsuit by characterizing it as merely a request for information, *see* RSS Obj. at 3, RSS Supp. Obj ¶ 15, that is flatly inaccurate. The Data LLC Petition goes far beyond a mere request for information, as the RSS Parties seek a court order "*direct[ing]* Data to make all such income distributions owed to Dr. Richard [Sackler] for the period of August 1, 2019 through April 30, 2026." Motion, Ex. C (emphasis added). Thus, this request seeks to compel the Side B Trustees to distribute millions of dollars to Richard Sackler rather than using those funds to satisfy the Side B payment obligations under the MSA, *see* Hr'g Tr. 20:3-6 (June 29, 2026). In addition to the Data LLC Petition violating the Litigation Standstill, the payments

sought by the RSS Parties would violate the negative covenants of Annex E that prohibit the Trust Pledgors from making payments other than those explicitly enumerated in the MSA. *See* MSA, Annex E, § 5.01.

In response to the Motion, the RSS Parties do not challenge the validity of the Confirmation Order, the MSA, or the Stipulation, nor do they dispute that the Interference Actions are directed at assets pledged under Annex E by Side B Payment Group 1. Rather, the RSS Parties argue that the Interference Actions are permissible under the reservation of rights provision included in the MSA. *See generally* RSS Obj.; RSS Supplemental Obj. That reservation includes the fiduciary duties of the Side B Trustees and provides that

> The duties and obligations of the trustees of the B-Side Family Group 1 trusts to all beneficiaries of the B-Side Family Group 1 trusts are preserved and not waived by any provision herein; provided, however, that nothing herein shall prevent or preclude such trustees from complying in all respects with their fiduciary duties as trustees, including taking all actions necessary to comply with the B-Side Payment Group 1's payment obligations under this Agreement.

MSA § 11.23. The RSS parties argue that the Wyoming Litigation is an "intra-family dispute . . involv[ing] trust control, fiduciary misconduct, beneficiary rights, and the validity of trust decantings" and thus does not arise under or relate to the obligations in paragraph 33 of the Confirmation Order. RSS Obj. at 4. The Interference Actions are, they argue, merely an exercise of the reserved rights that do not interfere with the Plan. *See generally* RSS Obj.

The Court disagrees. It is well settled that, when interpreting a confirmed plan's provisions, courts apply ordinary principles of contract interpretation. *See In re AMR Corp.*, 562 B.R. 20, 28-29 (Bankr. S.D.N.Y. 2016); *In re Arcapita Bank B.S.C.(c)*, 520 B.R. at 21–22 (citing *In re WorldCom, Inc.*, 352 B.R. 369, 377 (Bankr. S.D.N.Y. 2006)). It is also well settled that where general and specific provisions of a contract are inconsistent, the specific provision controls. *In re Arcapita Bank B.S.C.(c)*, 520 B.R. at 26; *In re Lehman Bros. Holdings Inc.*, 761

F.3d 303, 313 (2d Cir. 2014) ("To the extent that there appears to be conflict between these provisions, the specific governs the general."); *John Hancock Mut. Life Ins. Co. v. Carolina Power & Light Co.*, 717 F.2d 664, 669 n.8 (2d Cir. 1983) ("New York law recognizes that definitive, particularized contract language takes precedence over expressions of intent that are general, summary, or preliminary."). It cannot be that the general reservation of rights invoked by the RSS Parties trumps the very specific terms of the MSA that outline the detailed obligations—and prohibitions—of both the Side B Payment Group 1 and Richard Sackler. Indeed, it is impossible to square the RSS Parties' position with the very specific language of the Stipulation that prohibits the RSS Parties' attempt to revive the Wyoming Litigation, and to challenge the Side B Trustees' authority to act and liquidate the Annex E assets. Notably, the Stipulation was incorporated into the Confirmation Order, and that Confirmation Order confirmed the plan that contains the MSA. It is unclear to this Court how the Side B Trustees could be violating their fiduciary duties (as contended by the RSS parties) if the Side B Trustees are liquidating assets specifically pledged under Annex E of the MSA and taking actions specifically contemplated by the Confirmation Order, the MSA, and the Stipulation.

The RSS Parties suggest some unfairness here by virtue of the liquidation of the Greenwich Property now. But that argument also fails. The Greenwich Property is one of the assets in a trust pledged in Annex E to guarantee the payment obligation of the Side B Payment Group 1. The RSS Parties have not pointed to any restriction on the timing of the liquidation of such assets or the order in which the assets should be liquidated. While the RSS Parties contend that the terms of the MSA do not "authorize discretionary liquidation of any asset of the Side B Trustees' choosing" (such as the Greenwich Property), *see* RSS Obj. at 6, that is precisely what the MSA permits. The Side B Trustees are governed by Section 2.01 of the Annex E, which

makes abundantly clear that the Greenwich Property is available to satisfy the Side B Payment Group 1 obligations. *See* Hr'g Tr. 15:3-21 (June 29, 2026). To add the proverbial cherry on top of the sundae here, the RSS Parties' position also flagrantly ignores that the RSS Parties "consented to and ratified" the actions of the Side B Trustees taken in furtherance of the settlement. Stipulation ¶ 5(a).

The RSS Parties' stance here also suggests that they are somehow being unfairly singled out when compared with the other Side B Payment Group 1 parties. This implies that the RSS Parties have unique ownership rights to the Greenwich Property. But that is not so. While the RSS Parties characterize the Greenwich Property as a "unique family residence," the reality is that there are more than a dozen beneficiaries of the trust that owns the Greenwich Property. MDT Response ¶ 16; Hr'g Tr. 65:5-7 (June 29, 2026). So while the RSS Parties' suggestion that the Side B Trustees are targeting Richard Sackler's assets before looking to any other available assets, the argument fails because the Side B Trustees' actions only implicate the assets in Annex E, such as the Greenwich Property, for which there are many beneficiaries. Finally, the RSS Parties' suggestion that Richard Sackler is being treated worse than the Side B Payment Group 1 parties conveniently ignores that Richard Sackler alone received unique consideration among the Side B Payment Group 1 parties by receiving a "naked pledge" that allows him unfettered control of assets owned exclusively by him unless and until all other pledged assets are liquidated and the payment obligations under the MSA have still not been satisfied. The RSS Parties seem to suggest Richard Sackler's interest in the Greenwich Property is subject to the "naked pledge." See RSS Obj. at 5 ("Richard Sackler's beneficial interest in [the Greenwich Property] is pledged as security in support of the Master Settlement Agreement Settlement in this proceeding as part of a 'naked pledge.'") But the RSS Parties do not—and cannot—dispute that

the Greenwich Property is included as an asset of trusts in the Side B Payment Group 1. Not surprisingly, then, the RSS Parties do not argue anywhere that the Greenwich Property is solely Richard Sackler's asset rather than Richard Sackler being one of many beneficiaries.

In conclusion, and for all the reasons already explained, the Motion is granted in full. For the same reasons, the RSS Parties' request for document production is denied as moot and lacking in merit as the Court does not need any of the requested documents to decide the Motion, given that the clear and precise terms of the Confirmation Order, the MSA, and the Stipulation are unambiguous. It is not the Court's place to renegotiate the agreements reached by the RSS Parties, the Side B Payment Group 1, and all the other parties in these bankruptcy cases, agreements that are included in the MSA and the Stipulation and further memorialized in the Confirmation Order. Richard Sackler's actions in defiance of his obligations in these bankruptcy cases have real world consequences and costs that come at the expense of the creditor victims here. His actions are particularly troubling given other prior issues brought to the Court's attention about his prior lack of compliance on other fronts in these bankruptcy cases. *See* Hr'g Tr. (Feb. 25, 2026) [ECF No. 8862] (discussing Richard Sackler's failure to comply with his obligations in connection with the Confirmation Order, including his refusal to timely execute documents required for the Confirmed Plan to become effective). Given the full record here, the Court will award reasonable attorneys' fees and costs for the filing and prosecution of the Motion as it is crystal clear that the RSS Parties have breached the clear unambiguous terms of the Confirmation Order, the MSA, and the Stipulation. The award of such attorneys' fees and costs will help to minimize the harm from the improper actions of the RSS Parties. Accordingly, the Court will entertain applications from the Side B Trustees and the MDT for such attorneys' fees and costs, consistent with the provisions of the Confirmation Order. *See* Confirmation Order ¶

33(j) (providing that the Court may award sanctions, including monetary sanctions, for any failure to comply with any obligation set forth in the Confirmation Order).

## CONCLUSION

For the reasons stated above, the Motion is granted. The Court initially provided this decision as a bench ruling given representations to the Court about the confidentiality of various pleadings and activity in the Wyoming Litigation, and the Court's uncertainty about what matters were, in fact, subject to seal. However, the parties to the Motion subsequently have confirmed that nothing in the Court's ruling needs to be redacted or filed under seal. *See* Submission Regarding Sealing of Bench Ruling [ECF No. 9614]; Letter from Anne Penachio, Esq. dated October 1, 2026 [ECF No. 9620]. Accordingly, the Court is issuing this written decision on the public docket given the public interest in these proceedings and the value of transparency in court proceedings generally. [4]

Dated: White Plains, New York
October 8, 2026

***/s/ Sean H. Lane***
UNITED STATES BANKRUPTCY JUDGE

---

[4] After the Court's bench ruling was read into the record on August 21, 2026, an order granting the Motion was entered in the Debtors' cases. *See* Order Enforcing the Findings of Fact, Conclusions of Law, and Order Confirming the Eighteenth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors [ECF No. 9590]. Accordingly, no order will be entered in connection with the issuance of this written decision.