MCDERMOTT WILL & SCHULTE LLP
Julia M. Winters
One Vanderbilt Avenue
New York, NY 10017
Telephone: (212) 547-5400

KATTEN MUCHIN ROSENMAN LLP
Joshua S. Rubenstein
Bonnie Lynn Chmil
50 Rockefeller Plaza
New York, NY 10020
Telephone (212) 940-8800

*Co-Counsel for Frank S. Vellucci, Daniel S. Connolly and Rory Held, as Successor Co-Trustees of the Crystal Trust and the Data Trust*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **PURDUE PHARMA L.P., et al., Plan Administration Trust.**[1] | **Case No. 19-23649 (SHL)** **Jointly Administered** |

# THE TRUSTEES' OBJECTION TO THE RSS PARTIES' MOTION TO ENFORCE CONFIRMATION ORDER AND SETTLEMENT STIPULATION

Frank S. Vellucci, Daniel S. Connolly and Rory Held, in their capacities as trustees of certain trusts in the B-Side Payment Group 1 (collectively, the "Trustees"), file this objection (the "Objection") to the *RSS Parties' Motion to Enforce Confirmation Order and Settlement Stipulation* [D.I. 9622] (the "RSS Motion").[2]

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, were as follows: Purdue Pharma L.P. (7484); Purdue Pharma, Inc. (7486); Purdue Transdermal Technologies L.P. (1868); Purdue Pharma Manufacturing L.P. (3821); Purdue Pharmaceuticals L.P. (0034; Imbrium Therapeutics L.P. (8810); Adlon Therapeutics L.P. (6745); Greenfield Bio Ventures L.P. (6150); Seven Seas Hill Corp. (4591); Ophir Green Corp. (4594); Purdue Pharma of Puerto Reco (3925); Purdue Products L.P. (4140); Purdue Pharmaceutical Products L.P. (3902); Purdue Neuroscience Company (4712); Nayatt Cove Lifescience Inc. (7805); Button Land L.P. (7502); Rhodes Associates L.P. (N/A); Paul Land Inc. (7425); Quidnick Land L.P. (7584); Rhodes Pharmaceuticals L.P. (6166); Rhodes Technologies (7143); UDF LP (0495); SVC Pharma LP (5717); and SVC Pharma Inc. (4014). The Debtors' corporate headquarters was located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

[2] Capitalized terms used but not defined herein have the meaning ascribed to them in the Court's *Modified Bench Ruling Granting the Side B Trustees' Motion to Enforce the Confirmation Order* [D.I. 9639] (the "Bench Ruling").

## PRELIMINARY STATEMENT

1. Since the Plan went effective on May 1, 2026, the RSS Parties have been principally after two things: *first*, preventing the Trustees from selling the Greenwich Property and *second*, extracting millions in distributions from four trusts for which Dr. Sackler is an income beneficiary; both of which have caused the Trustees and the MDT to spend considerable time and money in responding to false and baseless allegations. The four Interference Actions that were the subject of the Trustees' *Expedited Motion to Enforce the Confirmation Order* [D.I. 9189] were state court missiles aimed at those targets; and now, the RSS Parties seek the same outcomes from this Court.[3] All this after the RSS Parties negotiated a favorable, "naked pledge" whereby Dr. Sackler's personal assets are "last out" and remain free from any restrictions. *See* Bench Ruling at 18.

2. The RSS Parties' desired outcomes are (still) barred by the MSA, the Stipulation and the Confirmation Order; the Court has so ruled already. In any event, the Trustees have not violated the Stipulation or Confirmation Order, either before or since the Court's initial bench ruling; indeed, the RSS Parties consented to and ratified the Trustees' actions that they now contend are violative. Stip. ¶ 5(a); *see also* Bench Ruling at 18. Ultimately, the instant RSS Motion and the RSS Parties' efforts to obstruct the sale of the Greenwich Property (discussed in section III below) demonstrate their continued blatant and shameless violation of the Stipulation and Confirmation Order, and continued interference with the MSA and Plan.

3. A few factual matters bear repeating. *First*, as of the effective date of the MSA, the Greenwich Property was a pledged asset pursuant to Annex E. Thus, even if the RSS Parties were successful (and for many reasons they cannot be) in unwinding the decanting of trusts, the

[3] Although the RSS Parties' *Limited Motion for Reargument* [D.I. 9611] purports now to seek only an accounting, there should be no doubt that the request for an "accounting," when a plethora of information has already been provided to Dr. Sackler, is a likely precursor to another demand for distributions.

Greenwich Property would remain Annex E Collateral.[4] As such, the Trustees would still have unfettered authority over the Greenwich Property, including the right to sell it. *See* Bench Ruling at 17. Similarly, even if the RSS Parties were able to install new trustees (and for many reasons they cannot), any successor trustee would be precluded from diverting Annex E Collateral to the RSS Parties (notwithstanding his naked pledge) and would have the exact same rights and obligations under the MSA as the Trustees do. *See* Stip. ¶ 5(a) (defining "Trustees" to include "any successor trustee.")

4. *Second*, the Stipulation was not a tolling agreement or an agreement among litigation parties to "maintain the status quo," or a mere intra-family dispute unrelated to the bankruptcy case. RSS Mot. at 5, ¶ 23. As the Court found, the Wyoming litigation "threatened the very heart of the then ongoing [bankruptcy] settlement discussions because it challenged the Side B Trustee's authority to consummate a settlement in these bankruptcy cases." Bench Ruling at 4. And the "intra-family dispute" that the Stipulation ultimately resolved was a dispute "***regarding the contribution to the Purdue/Sackler Settlement Agreement (defined below) and related matters under the proposed credit support annexes***," negotiated with the bankruptcy parties by a bankruptcy mediator. Stip. ¶ F (emphasis added).

5. *Third*, the RSS Motion contends that "it cannot be that the RSS Parties gave up their claims regarding which trust owned the property or their rights under the governing trust documents or that they were agreeing that the Trustees could do anything they wanted with 60 Field Point Circle during Litigation Standstill." RSS Mot. ¶ 25. ***But that is exactly what paragraph 5(a) of the Stipulation and paragraph 33 of the Confirmation Order provide***, and the

[4] As the Court already found (and the RSS Parties do not dispute), the Rockpoint Trusts are Trust Pledgors as defined in Annex E. The original Field Point Circle Trusts are not Trust Pledgors (because they did not exist at the time the MSA was negotiated), but if Trust Pledgor Collateral (such as the Greenwich Property) were transferred to them, they would become "New Trust Pledgors" under section 3.03 of Annex E. (*See* MSA, Annex E at 10-11, 17-18.)

RSS Parties confirmed their agreement to be so bound at the confirmation hearing. *See* Bench Ruling at 9.

6. At practically every hearing since the confirmation hearing, the Court has had to patiently explain to individual claimants why they are bound by the Plan and why the Court will not revisit the Confirmation Order. The Court should not have to do the same for the RSS Parties, sophisticated and wealthy individuals who have had at least ten different lawyers appear in this Court on their behalf and who ***acknowledged and agreed*** to be bound by the terms of the Confirmation Order on the record at the confirmation hearing. The RSS Parties' continued efforts to skirt their agreements and undertakings while enjoying the benefit of unfettered access to Dr. Sackler's personal assets—precisely what the RSS Motion is aimed at—must stop.

**OBJECTION**

7. The RSS Motion seeks an order finding that the Trustees have breached the Stipulation and "directing the Trustees to not take any action during the Litigation Standstill to interfere with the ability of the RSS Parties and their children to reside at 60 Field Point Circle or, should Dr. Sackler's wife, Lin Gao, survive him, the ability of her or her minor children to reside at 60 Field Point Circle unless and until 60 Field Point Circle has been sold to fund the settlement pursuant to the MSA." RSS Mot. ¶ 19. Notably, the RSS Parties' proposed order goes even further: it seeks to bar the Trustees from taking any action to "transfer ownership of 60 Field Point Circle." *Id.* Ex. A, ¶ 3.

8. Much of the RSS Motion's arguments as to why their relief should be granted were already presented and rejected by the Court. The time to seek reconsideration of those rulings has passed. *See* FED. R. BANKR. P. 9023 (incorporating FED. R. CIV. P. 59). To the extent the RSS Parties offer new grounds (or new twists on their old grounds) for relief based on events that

occurred prior to the Bench Ruling, those arguments are barred by *res judicata*. As to purported violations of the Stipulation and Confirmation Order following the Bench Ruling, the Trustees have done nothing other than what the Court ruled they are expressly authorized to do, including attempting to sell the Greenwich Property.

## I. The RSS Parties' Regurgitation of Their Arguments on the Trustees' Motion to Enforce Should Be Rejected (Again)

9. The arguments that the RSS Parties advance with respect to pre-Bench Ruling events are nearly a complete regurgitation of arguments the RSS Parties made in opposition to the Trustees' Motion to Enforce and were soundly rejected by the Court already. For example, the RSS Motion contends that the Trustees "purported to transfer [the Greenwich Property] into ARIT LLC, which is owned by AR Trust, and eliminated Ms. Gao's right to continue living at the premises should Dr. Sackler pre-decease her," which "violated both the letter and the spirit of the Settlement Stipulation."[5] RSS Mot. ¶ 23. The RSS Parties made this very argument in their first response to the Trustees' Motion to Enforce, asserting that the Trustees were breaching the Stipulation by taking "affirmative, irreversible steps to sell [the Greenwich Property]." RSS Obj. at 4-5. The Court rejected this argument, noting that the MSA "authorize[s] discretionary liquidation of any asset of the Side B Trustees' choosing." Bench Ruling at 17.

[5] The RSS Parties assert that at oral argument on the Trustees' motion, "counsel for the Trustees acknowledged that the Rockpoint Residence Trust and the Rockpoint Land Trust were included as Payment Parties as 'belt and suspenders' in case the transfer to ARIT LLC was found to have violated the Settlement Stipulation. RSS Mot. ¶ 23. That is incorrect. The Court asked counsel for the Trustees to identify which Annex E Trust Pledgors were implicated in the Interference Actions and counsel included the Rockpoint Residence Trust and Rockpoint Land Trust along with the trusts specifically named in the Interference Actions. The Court asked whether counsel included them as "belt and suspenders," and counsel confirmed. *See* June 29 Hr'g Tr. at 14:18-15:19 ("That's exactly right, Your Honor. Even if, even if the RSS parties were correct, that there was something improper or violating of the stipulation by transferring 60 Field Point Circle out of the Rockpoint Trust and the property should remain in the Rockpoint Trust, those entities, just like the AR Irrevocable Trust, are trust pledgors and would be bound by the same obligations and the same rights under Annex E with respect to this settlement.").

10. Similarly, the RSS Motion asserts that the Greenwich Property "does not need to be liquidated now; and precluding its sale and the eviction of the RSS Parties and their children from [the Greenwich Property] during the Litigation Standstill does not undermine the Trustees' ability to make payments that are due under the MSA, which have been, and can continue to be, fully funded without violating the Litigation Standstill." RSS Mot. ¶ 26. Again, the RSS Parties previously made this argument and the Court already rejected it: "While the RSS Parties contend that the terms of the MSA do not 'authorize discretionary liquidation of any asset of the Side B Trustees' choosing' (such as the Greenwich Property), *see* RSS Obj. at 6, that is precisely what the MSA permits." Bench Ruling at 17.

11. Having lost on these very issues already, the RSS Parties are precluded from attempting to reassert them here. *See In re AMR Corp.*, No. 11-15463 (SHL), 2014 WL 5073574 at *5 (Bankr. S.D.N.Y. Oct. 9, 2014) (Lane, J.) (*res judicata* bars a party from asserting new claims that could have been raised in the prior action, including claims asserted under different legal theories, where they arise from the same transaction, occurrence, or nucleus of operative fact); *see also, In re Sears Holdings Corp.*, No. 18-23538 (SHL), 2022 WL 16703174, at *2–3 (Bankr. S.D.N.Y. Nov. 3, 2022) (Lane, J.) (denying reconsideration where movants raised "neither new matters nor controlling decisions that the Court overlooked"). It makes no difference that in the first instance the arguments were raised in the RSS Parties' objections prior to the RSS Parties asserting them affirmatively in the RSS Motion. *See Trikona Advisers Ltd. v. Chugh*, 846 F.3d 22, 32 (2d Cir. 2017) (affirmative claims "based in substance on the same allegations" the party had raised as defenses in a prior proceeding were barred because "those defenses were necessarily resolved against" it); *Cieszkowska v. Gray Line N.Y.*, 295 F.3d 204, 205 (2d Cir. 2002) ("Even

claims based upon different legal theories are barred provided they arise from the same transaction or occurrence.") (quotation omitted).

## II. The RSS Parties (Still) Misinterpret the Stipulation

12. The RSS Motion, like the RSS Parties' objections to the Trustees' Motion to Enforce, attempt to cast the Stipulation as a resolution of an intra-family dispute with the Litigation Standstill as its "primary component." RSS Mot. ¶ 25. The Court is of course intimately familiar with the facts and circumstances that led to the Stipulation (and the Stipulation's incorporation into the Confirmation Order) and knows that could not be further from the truth. The Stipulation is not a tolling agreement with respect to the Wyoming Litigation, and paragraph 5, not paragraph 3 is its cornerstone – indeed, it is these undertaking provisions that were expressly incorporated into paragraph 33 of the Confirmation Order. *See* Bench Ruling at 8. Pursuant to paragraph 5, the RSS Parties ***irrevocably agreed and acknowledged*** that "the actions of the Trustees prior to the date hereof and taken in the future (including by predecessor and successor trustees, respectively) in . . . furtherance of the Purdue/Sackler Settlement Agreements are hereby consented to and ratified." Stip. ¶ 5(a)(ii). The Court has held that the Trustees' efforts to sell the Greenwich Property are in furtherance of the MSA, and therefore, the RSS Parties gave up the right to challenge that effort on August 1, 2025. Bench Ruling at 17 ("the very specific language of the Stipulation . . . prohibits the RSS Parties' attempt to . . . challenge the Side B Trustees' authority to act and liquidate the Annex E assets.").

13. Moreover, the RSS Parties did not "bargain for the right to pursue their claims regarding [the Greenwich Property] when the Litigation Standstill ends" (RSS Mot. ¶ 25); rather, they bargained for the right to have Dr. Sackler's personal assets be subject to a naked pledge. *See* Bench Ruling at 7. In exchange, the Trustees and the bankruptcy stakeholders bargained for

assurances that the RSS Parties would not "interfere with, delay, postpone, frustrate, or impair" the administration of Annex E Trust business. *Id*. at 7-8.

**III. It Is the RSS Parties Who (Continue to) Breach the Stipulation and Confirmation Order Since the Bench Ruling**

14. As to the notion that the Trustees are now violating the Stipulation by attempting to sell the Greenwich Property and requiring the RSS Parties to vacate, the Trustees are at a loss as to how anyone could interpret the Court's rejection of that argument as "dicta." RSS Mot. ¶ 24, n.8. The Court concluded that the Interference Actions violated the Stipulation and Confirmation Order, among other reasons, ***because they interfered with the Trustees' efforts to market and sell the Greenwich Property***. *See* Bench Ruling at 13-15.

15. In order to present the Greenwich Property for sale in a way that maximizes its value as Collateral under the MSA, on August 25, 2026, the Trustees told the RSS Parties they needed to vacate by October 31, 2026. That gave the RSS Parties over two months to arrange to move into one of the other four houses that Dr. Sackler owns, including the Florida home he lists as his primary residence on his tax returns. Notably, the RSS Parties have known since April 2026, that the Trustees are selling the Greenwich Property, and they have known since June 29, 2026, that the Court was very likely to agree the Trustees have the right to do so. *See* June 29 Hr'g Tr. at 71:10-14 ("I am of the very strong opinion that . . . the Interference Actions are, in fact, a violation of the [Stipulation] and the Confirmation Order and essentially the grand bargain that was struck here."). Moreover, before the Trustees listed the Greenwich Property for sale, they offered (twice, on April 7, 2026, and August 25, 2026) all beneficiaries, including Dr. Sackler, the opportunity to purchase it at market value. The RSS Parties declined to do so.

16. Likewise, the Trustees' efforts to safeguard the artwork located in the residence—50% of which is owned by Trust Pledgors (*see* RSS Parties' Sept. 10, 2026, letter [D.I. 9591])—

is not interference, it is prudent handling of Annex E Collateral. To be clear, the Trustees do not intend to sell the artwork, they only seek to move it to a safe location, which has become urgently necessary due to the poor condition of the residence (and is additionally appropriate due to the eventual sale of the Greenwich Property). If the RSS Parties want the unfettered right to use and enjoy the artwork (and risk its damage), they must purchase the Trust's share at fair market value. Otherwise, the artwork must be put in safe storage as soon as possible.

17. To be clear, Ms. Gao has no right to continue residing in the Greenwich Property, and Dr. Sackler has no greater right to live there than any of the other dozen beneficiaries of the ARIT Trust, and neither of them have the right to obstruct the Trustees' efforts to sell it. Bench Ruling at 18. While the RSS Parties have "allowed" for a handful of showings of the Greenwich Property, their behavior during such showings and the condition of the home suggest they are using their presence to make a sale very difficult for the broker, as the broker has confirmed in writing. These conditions undoubtedly "make it more difficult, if not impossible, for the Side B Trustees to liquidate that asset." Bench Ruling at 15.

18. In short, the RSS Motion seeks to allow the RSS Parties to stay in the Greenwich Property (without buying it), with the artwork remaining in jeopardy (without buying out the Trust Pledgors) until the Greenwich Property is sold, while at the same time making it difficult, if not impossible, for the Trustees actually to sell it and maximize its value as Collateral under the MSA. These facts and circumstances are all the more troubling in light of the relief sought in the RSS Parties' proposed order—which brazenly seeks to preclude the Trustees from selling the Greenwich Property at all—as well as the RSS Parties' other obstructive conduct.[6] *See* Bench

---

[6] Including, Dr. Sackler's unwillingness to contribute his portion of the "Apollo Escrow Accounts" toward the settlement (as was required by the purchaser of the Apollo assets and adhered to by all other Sackler Parties (A-Side and B-Side) as well as his interference with Beverly Sackler's estate's (for whom he is a fiduciary) participation in the settlement.

Ruling at 19. Accordingly, in addition to denying the RSS Motion, the Trustees respectfully request that the Court find the RSS Parties in contempt of the Confirmation Order, order the RSS Parties to vacate the Greenwich Property and allow the artwork to be safeguarded by October 31, 2026, and award monetary sanctions, in the amount of $10,000 per day, for each day following October 31, 2026, that the RSS Parties, their guests, and/or the artwork remain on the premises. *See* Conf. Order ¶¶ 33(i), 33(j).

**CONCLUSION**

For the reasons set forth herein, the Trustees respectfully request that the Court (i) deny the RSS Motion in its entirety; (ii) find the RSS Parties in contempt of the Confirmation Order; (iii) order the RSS Parties (and their guests) to vacate the Greenwich Property by October 31, 2026; (iv) order the RSS Parties to allow the Trustees to remove the artwork to safe storage by October 31, 2026; (v) impose monetary sanctions in the amount of $10,000 per day for each day after October 31, 2026 that the RSS Parties, their guests and/or the artwork remain on the premises; (vi) direct the RSS Parties to reimburse the Trustees' reasonable fees and expenses related to the RSS Motion; and (vii) grant the Trustees such other and further relief as is just.

Dated: New York, New York
October 21, 2026

MCDERMOTT WILL & SCHULTE LLP

By: */s/ Julia M. Winters*
Julia M. Winters
One Vanderbilt Avenue
New York, NY 10017
Telephone: (212) 547-5400
Email: jwinters@mcdermottlaw.com

-and-

KATTEN MUCHIN ROSENMAN LLP
Joshua S. Rubenstein
Bonnie Lynn Chmil

50 Rockefeller Plaza
New York, NY 10020
Telephone: (212) 940-8800
Email: joshua.rubenstein@katten.com
bonnie.chmil@katten.com

*Co-Counsel to Frank S. Vellucci, Daniel S. Connolly and Rory Held, as Successor Co-Trustees of the Crystal Trust and the Data Trust*