UNITED STATES BANRUPCY COURT
SOUTHERN DISTRICT OF NEW YORK

Purdue Pharma L.P.,st al. Chapter 11 Case No. 19 -23649.

AMANDA MORALES

*PLANTIFF*

PURDUE PHARMA L.P., P.F. LABORATORIES, INC.,

PURDUE PHARMACEUTICALS L.P.,

PURDUE PHARMA TECHNOLOGIES, INC.,

and RHODES TECHNOLOGIES,

*DEFENDANT*

**ADDENDUM OMNIBUS HEARING AGENDA NUMBER 12 ON HAS BEEN RULED ON AND DOES NOT NEED TO BE SCHEDLUED FOR OMNIBUS HEARING**

Amanda Morales, Number 12 on Addendum Omnibus Agenda to be scheduled for the omnibus hearing December 10, 2026. Motion to reconsider objection to Cornerstone research and HSF Kramer final fee application. Bankruptcy Court already failed properly apply the law and granted this firm's final fee application for $70 million. This motion has already been ruled on.

HSF Kramer is a merger firm (2025). The firm Kramer Levin Naftails & Frankel (Retained in 2019) and international firm Herbert Smith freehills headquarters in London England and Sydney Australia to form HSF Kramer (US) LLP.

Wondershare PDFelement

The issue of HSF Kramer being an unapproved firm by failing to amend the Retention Order, failing to file any disclosures and filing a single fee application for both firms was completely ignored. Transparency, Bankrupcy rules and the opioid crisis aren't as important as an international firm collecting money from this case. In the motion to reconsider my Objection to the fees I stated that the "Notice of name change and email address change" [Docket 7502] (App., page 27-28) can't replace amending the Retention Order. The title of the document on the docket sounds like an administrative change and as a non lawyer I shouldn't be expected to sift through hundreds of documents on the docket to discover hidden notice of a *merger*. HSF Kramer should have amended the Retention Order but they didn't. They didn't file any disclosure statements.

**Transparency and Disclosures**

Over the past year, concerns regarding the pervasiveness of litigation funding, funder control over litigation, and the involvement of foreign actors have all been realized. HSF Kramer, as an entity headquartered in London and Sydney, represents a vast global web of cross-border corporate relationships. By failing to file amended conflict disclosures upon its merger, the firm denies the U.S. Trustee any mechanism to verify if foreign sovereign wealth funds or outside capital actors are quietly backing or influencing components of this multi-state litigation framework.

Backing lawsuits to get a piece of the outcome has become a multi-billion-dollar, lightly regulated industry," according to *Bloomberg Law*. The amount of outside

money flowing in U.S. litigation appears to be exponentially growing. Major dedicated commercial litigation funders alone had more than $15 billion invested in U.S. litigation in 2023. Burford Capital, the largest dedicated litigation funder, grew from a $130 million investment fund in 2009 to an investment portfolio of $7.4 billion this year.

Since these arrangements are often not disclosed, courts and the parties may not know of a lender's predatory practices or a hidden obstacle to settlement. Allowing a newly merged global entity to siphon $70 million out of the Purdue Pharma estate without certifying its complete independence from third-party funders transforms a public interest remedy into a black-box operation, directly violating the transparency mandates established by this Court. HSF Kramer does offer third party funding on their website. (App., page 35-39)

**Mandatory Conflict Disclosures: Bankruptcy Rule 2019 The Continuous Duty to Disclose**

Federal Rule of Bankruptcy Procedure 2019(a) requires a professional seeking employment to file a verified statement setting forth the professional's connections with the debtor, creditors, and any other party in interest. A corporate merger completely reshuffles the firm's client list, conflicts, and connections. Disclosures are not a one-time event; firms have a continuous obligation to supplement their disclosures. Attempting to bypass a supplemental Rule 2019 disclosure by bundling post-merger fees into a combined application denies the United States Trustee, creditors, and the court the opportunity to vet the new entity for "disinterestedness" or impermissible conflicts of interest.

**HSF KRAMER CANNOT USE KRAMER LEVIN NAFTAILS & FRANKEL'S RETENTION ORDER AS THEIR OWN**

My objection to HSF Kramer's final fee application is currently on appeal, an emergency stay application has been filed in the Second Circuit.

HSF Kramer response to Stay pending appeal motion on page 7 of their response

> "The Bankruptcy Court approved this arrangement by order dated December 2, 2019 (the "Retention Order") [Bankr. Dkt. No. 553], finding that doing so was "in the best interests of the Debtors, their estates, their creditors and all parties in interest."

HSF Kramer did not exist in 2019 and cannot use a different Firm's Retention Order and claim it applies to them. Two separate entities cannot file a *single* final fee application. (Docket 533 App., page 29-34)

On page 8 of their response it states (App., page 12)

> "In all the Firm filed 79 *monthly* applications"

If HSF Kramer was formed in 2025 it is impossible to have filed *79 monthly* fee applications. The Firm is combining fee applications of both HSF Kramer and Kramer Levin Naftails & Frankle into a single final fee application which is a *clear* violation of the fee sharing rules.

**The Firm Failed to Serve *Notice of Change of Firm Name and Email Addresses* Docket No. 7502 and Cannot Establish Notice**

Appendix page 9

Page 5 of their response states

Wondershare PDFelement

"Ms. Morales knew or should have known of the facts allegedly supporting her objection to the Firm's fees since June 2025 (the date the Firm publicly disclosed the merger on the Bankruptcy Court docket). Yet not only did she fail to raise her concerns at that time—instead delaying for over a year—she also did not raise the relevant objection (which is largely procedural) to the Firm's final application until after the deadline for doing so had passed. Ms. Morales' dilatory conduct should not be rewarded with the "extraordinary" remedy of a stay. See In re 461 7th Ave. Mkt., Inc., 623 B.R. 681, 691 (S.D.N.Y. 2020), aff'd, 2021 WL 5917775 (2d Cir. Dec. 15, 2021)."

A *Notice of Change of Firm Name and Email Addresses* was filed [Docket No. 7502] (App., B) on June 4, 2025. A "Notice of Change of Firm Name and Email Addresses" sounds like a routine, administrative update (like a lawyer changing offices or updating a phone number). This title did not conspicuously or reasonably alert a non-lawyer that a fundamental corporate merger—which might impact the Firm's eligibility, conflict-of-interest status, or fee structures—had occurred. I wasn't served with the notice so I lacked *actual* notice even if it was filed on the public docket the title doesn't notify creditors of the merger. Holding a *pro se* party to the standard of sniffing out a major corporate transaction hidden under an administrative "change of name" header is unjust. The Notification of the changed name and email addresses wasn't served to anyone and it doesn't have any proof of service attached to it.

**Administrative costs are paid off the top before a single dollar reaches the net abatement pool.**

Opioid settlement funds are structurally designed to establish robust abatement infrastructure—such as expanding Medically Assisted Treatment (MAT) facilities, funding residential rehab beds, and providing same-day prescriptions for recovery medications like buprenorphine. When these limited funds are pulled into non-

approved channels, the immediate consequence is a severe reduction in actual, operational treatment capacity. Clinicians and local crisis clinics are forced to turn away individuals in active withdrawal due to artificial shortages of staff, medicine, or clinic space.

CONCLUSION

The court failed to properly apply the law when granting HSF Kramer's final fee application and it will certainly limit life saving money from the abatement program and also for other creditors. It's one fund, one pool of money for all creditors regardless of opt in or opt out of the settlement and confirmation plan. The damage has been done. There is no need to have the motion for reconsideration scheduled for the December hearing. My objection is currently on appeal with the higher courts who will be handling the matter going forward.

Amanda Morales

Wondershare PDFelement

## Appendix

HSF Kramer Response Stay Pending Appeal SDNY............1-26

Notice of Change of Name [Docket No. 7502]........................27-28

Retention Order [Docket No. 553]......................................29-34

HSF Kramer Website (Third Party Funding)..........................35-39

Wondershare PDFelement

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:**<br><br>**PURDUE PHARMA L.P., *et al.*,**<br><br>**Debtors.**[1] | **Case No. 26-cv-07338 (NSR)** |

**MEMORANDUM OF LAW IN OPPOSITION TO APPELLANT'S MOTION TO STAY**

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Purdue Products L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717), and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Fed. R. Bankr. P. 8012(b)(1), Appellee Herbert Smith Freehills Kramer states that it does not have any parent corporation, and no publicly held corporation owns 10% or more of its stock.

Wondershare PDFelement

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........ iv

PRELIMINARY STATEMENT ........ 1

BACKGROUND ........ 5

A. General Background ........ 5

B. The Firm's Fee Applications ........ 7

C. Ms. Morales' Objection(s) ........ 9

D. The Bankruptcy Court's Order and this Appeal ........ 11

ARGUMENT ........ 13

I. Ms. Morales Has Made No Showing That She Is Likely To Succeed on the Merits – Nor Can She ........ 14

A. Ms. Morales Lacks Appellate Standing ........ 14

B. Ms. Morales' Appeal Has No Evidentiary or Legal Support ........ 17

II. Ms. Morales Has Not Shown She Will Be Irreparably Injured ........ 18

III. The Remaining Factors Weigh Against a Stay ........ 19

CONCLUSION ........ 19

Wondershare PDFelement

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 22 Fiske Place, LLC*,
2023 WL 4278189 (2d Cir. June 30, 2023)....................15

*In re 461 7th Ave. Mkt., Inc.*,
623 B.R. 681 (S.D.N.Y. 2020)....................5

*Drawbridge Special Opportunities Fund LP v. Barnet (In re Barnet)*,
737 F.3d 238 (2d Cir. 2013)....................14, 15

*In re Eletson Holdings Inc.*,
2025 WL 2710411 (S.D.N.Y. Sept. 22, 2025)....................15

*Harvis Trien & Beck, P.C. v. Fed. Home Loan Mortg. Corp.*,
153 F.3d 61 (2d Cir. 1998)....................17

*Nken v. Holder*,
556 U.S. 418 (2009)....................*passim*

*In re Purdue Pharma, L.P.*,
675 B.R. 632 (Bankr. S.D.N.Y. 2025)....................6, 16

**Statutes**

11 U.S.C. § 327....................7, 18

11 U.S.C. § 330....................11

11 U.S.C. § 363....................7

11 U.S.C. § 504....................4, 11, 17, 18

**Other Authorities**

Fed. R. Bankr. P. 2014....................11, 18

Wondershare PDFelement

Herbert Smith Freehills Kramer (US) LLP ("**HSF Kramer**"), which was counsel to the Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants (the "**AHC**") in the bankruptcy cases of Purdue Pharma L.P. and its affiliates (the "**Debtors**"), files this memorandum of law in opposition to the motion for a stay pending appeal (the "**Motion**") [Dkt. No. 8] filed by Amanda Morales.

## PRELIMINARY STATEMENT

The firm now known as HSF Kramer (the "**Firm**") was counsel to the AHC in the Debtors' bankruptcy. In that capacity, the Firm provided a variety of services over the course of the case, including advising the AHC in connection with the negotiation, structuring, and confirmation of the Debtors' chapter 11 plan. By virtue of an order entered at the outset of the bankruptcy case, nearly seven years ago, the Firm was entitled to be compensated for its services from the Debtors' estates. The Bankruptcy Court approved this arrangement after finding that the AHC's constituents, which included States and local governments, had a unique role to play in the case, and that the reimbursement of the fees of their counsel was in the best interests of the Debtors' estates. Thereafter, the Firm submitted monthly fee applications and (subject to certain approved procedures that are described in more detail below) received regular payments on account of its monthly invoices. These payments were made on a current basis during the case and were subject to final Bankruptcy Court approval at the conclusion of the case.

Case 7:26-cv-07138-NSR Document 15 Filed 11/16/26 Page 6 of 26

Purdue's plan was confirmed on November 18, 2025, and went effective on May 1, 2026. Thereafter, all professionals who were entitled to estate compensation—including the Firm—were required to submit their final fee applications. The Firm submitted its application, requesting final approval of approximately $71 million in fees and expenses, approximately $60 million of which had already been paid during the case. No party objected to that application other than Ms. Morales, who filed two objections, the second of which was untimely.

In her first objection, Ms. Morales appeared to object to the reasonableness of the fees requested, contending, for example, that certain time entries were duplicative, excessive, or unnecessary. In her second, untimely, objection, Ms. Morales argued that the merger of Kramer Levin Naftalis & Frankel with Herbert Smith Freehills in 2025 posed an impediment to the approval of the Firm's fees. This second objection was a cursory two pages; it contained no evidentiary support for its factual assertions and no case law support for its legal positions. The issues raised in this second, untimely, objection, however, are the crux of the issues raised on appeal.

The Bankruptcy Court overruled Ms. Morales' objection(s) to the Firm's fees and approved their payment by order dated August 4, 2026 (the "**Fee Order**") [Bankr. Dkt. No. 9524]. Ms. Morales appealed to this Court, with her statement of issues on appeal focusing on those identified in her second, untimely objection (and

Case 7:26-cv-07738-NSR Document 15 Filed 11/19/26 Page 7 of 26

not the reasonableness-type objections contained in her first objection). She asked the Bankruptcy Court for a stay of the Fee Order pending appeal, but that request was denied by order dated August 20, 2026. She now asks this Court for the same relief; it should be denied for the same reasons it was denied below.

The motion fails to satisfy any of the factors courts consider in evaluating a stay, *see Nken v. Holder*, 556 U.S. 418, 426 (2009), and should be denied.

*First*, Ms. Morales has no chance of success on the merits, for several reasons:

- **No appellate standing**. Ms. Morales lacks appellate standing because she has no pecuniary interest in the outcome of this appeal. It was the *Debtors' estates* that paid the Firm's fees and it is therefore the *Debtors' estates* that stand to benefit (if at all) from a successful appeal. To be sure, there may be instances in which a recovery to a chapter 11 debtor might also benefit a creditor, but this is not such a case. The Debtors' plan has been confirmed and gone effective, and, under that plan, personal injury claimants such as Ms. Morales are to share in a fixed fund. Any theoretical influx of cash to the Debtors (if that were even a proper remedy) is thus of no benefit to her.[2]

[2] For this reason, as has been previewed for the Court in the Firm's initial response to the stay motion [Docket No 9] and pre-motion letter [Docket No. 13] the Firm intends to file a motion to dismiss this appeal for lack of appellate standing.



Wondershare PDFelement

- **No evidentiary or legal support.** Ms. Morales' perfunctory motion assumes the truth of factual assertions that have no record support and legal propositions that have no case law support. She says that the Firm engaged in unauthorized "sharing" of fees—but does not identify which fees were shared with whom, nor provide any evidence (account statements, wire transfers, testimony, etc.) showing the alleged sharing. She says that the Firm was created from a "structural corporate merger," not a "name change"—but provides no corporate documents or legal filings reflecting the alleged changes (let alone explaining their significance). She appears to argue that section 504(a) of the Bankruptcy Code prohibits sharing of fees between pre- and post-merger entities—but cites no case law supporting that reading of the statute, nor explaining why such sharing—if there were any—is not otherwise *permitted* by section 504(b).

*Second*, Ms. Morales has not shown that she will be irreparably injured without a stay. Her sole argument in this regard is that her appeal will become equitably moot. But as the Bankruptcy Court held, the risk of mootness alone is not generally considered sufficient to warrant a stay. *See also, e.g.*, *Nken*, 556 U.S. at 434-35 (mere "possibility" of injury is not enough).

*Third*, while the foregoing factors are most important, Ms. Morales likewise cannot satisfy the remaining stay factors. The Firm would be harmed by the imposition of any stay.[3] And the public interest disfavors a stay as well. Ms. Morales knew or should have known of the facts allegedly supporting her objection to the Firm's fees since June 2025 (the date the Firm publicly disclosed the merger on the Bankruptcy Court docket). Yet not only did she fail to raise her concerns at that time—instead delaying for over a year—she also did not raise the relevant objection (which is largely procedural) to the Firm's final application until after the deadline for doing so had passed. Ms. Morales' dilatory conduct should not be rewarded with the "extraordinary" remedy of a stay. *See In re 461 7th Ave. Mkt., Inc.*, 623 B.R. 681, 691 (S.D.N.Y. 2020), *aff'd*, 2021 WL 5917775 (2d Cir. Dec. 15, 2021).

For these and other reasons set forth below, the Motion should be denied.

## BACKGROUND

### A. General Background

The Debtors filed for bankruptcy in September 2019. At the time, they faced extensive opioid liabilities, including more than 2,600 lawsuits, the majority of which had been brought by States and local governments. *See* Bankr. Dkt. No. 17, at 1, 38. Shortly before their bankruptcy, the Debtors had reached an agreement in

[3] For the avoidance of doubt, the Firm has already received the payments authorized by the Fee Order. For this reason, the Court may conclude that Ms. Morales' request for a stay is moot.

principle concerning a framework for resolution of their liabilities in bankruptcy. The parties to that agreement included a coalition of States and local governments, as well as the Plaintiffs' Executive Committee (the "**PEC**") in the multidistrict litigation captioned *In re National Prescription Opiate Litigation*, Case No. 17-md-02804 (N.D. Ohio). *See* Bankr. Dkt. No. 17, at 3-4.

The prepetition settlement, which included only a subset of the Debtors' creditors, was a framework only, and left many issues for future resolution. As the Bankruptcy Court later explained: "The Initial Settlement Framework was the starting point for further negotiations towards a resolution of the Debtors' bankruptcy and a settlement with the Sackler Parties [i.e., the Debtors' former owners]." *In re Purdue Pharma, L.P.*, 675 B.R. 632, 648 (Bankr. S.D.N.Y. 2025). And, indeed, following years of efforts by the parties, the global settlement that was ultimately included in the Debtors' confirmed chapter 11 plan reflected improved terms and an "extraordinary" degree of creditor support. *Id.* at 655-56.

The AHC was a central part of this process. Comprised of ten States, six local government entities, one Tribe, and the PEC, *see* Bankr. Dkt. No. 279, its members were the same parties that led the negotiations resulting in the prepetition settlement framework. That settlement, as reflected in a term sheet filed with the Bankruptcy Court, included a provision requiring the Debtors to seek authority to pay the fees of the AHC professionals during the bankruptcy case. *See* Bankr. Dkt. No. 257 at Exh.

A, ¶ 1. In accordance with the term sheet, the Debtors sought such authority from the Bankruptcy Court shortly after filing for bankruptcy. *See* Bankr. Dkt. No. 394.

The Bankruptcy Court approved this arrangement by order dated December 2, 2019 (the "**Retention Order**") [Bankr. Dkt. No. 553], finding that doing so was "in the best interests of the Debtors, their estates, their creditors and all parties in interest." Retention Order at 2; *see also* Bankr. Dkt. No. 550, at 160:25-161:18 (hearing transcript at which the Bankruptcy Court noted that the AHC's members had a "unique role" to play in the case). Importantly, the Bankruptcy Court approved payment of the AHC professional fees pursuant to section 363 of the Bankruptcy Code, *see* Retention Order ¶ 2, rejecting arguments that some other statutory provision should apply, *see* Bankr. Dkt. No. 550, at 153:8-157:16.

### B. The Firm's Fee Applications

As counsel to the *AHC*, not the Debtors, the Firm was not an estate professional retained under section 327 of the Bankruptcy Code. Instead, as noted, the Bankruptcy Court approved payment of the AHC professional fees pursuant to section 363. The AHC's professionals were nevertheless directed to comply with the same procedures for filing fee applications applicable to estate-retained professionals. *See* Retention Order ¶ 4.[4]

[4] For the avoidance of doubt, none of the AHC professionals were required to comply with any of the disinterestedness or disclosure-related obligations of estate-retained professionals mandated by the Bankruptcy Code. *See generally id.*



Wondershare PDFelement

Those procedures, set forth in the Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Retained Professionals (the "**Interim Compensation Order**") [Bankr. Dkt. No. 529], required each covered professional (including the Firm) to file detailed monthly fee applications on the docket. Interim Compensation Order ¶ 2. Parties—including a court-appointed fee examiner appointed by separate order (*see* Bankr. Dkt. No. 1023)—were given the opportunity to object to each application. Failing any objection (or upon its resolution), the Debtors were authorized to pay the fees and expenses requested in the monthly fee application, less a "holdback" equal to 20% of the fees. Each professional was also required to file interim fee applications, covering the preceding four monthly applications, and upon approval of the interim application, the Debtors were generally authorized to pay the outstanding holdback for the four-month period. Interim Compensation Order ¶ 2(xv). As is typical in bankruptcies, the payments made during the case to a professional were subject to approval of a final fee application by the respective professional at the end of the case. *Id.* ¶2(ix), ¶2(xv).

In accordance with these procedures, the professionals retained by the AHC—including the Firm—filed monthly fee applications throughout the case. In all, the Firm filed 79 monthly applications. *See, e.g.*, Bankr. Dkt. Nos. 634 (first), 792

(second), 930 (third), 9115 (seventy-seventh), 9302 (seventy-eighth), 9328 (seventy-ninth). No creditor objected to any of these monthly applications.[5]

The Debtors' chapter 11 plan (the "**Plan**") [Bankr. Dkt. No. 8263, Exh. A] was confirmed in November 2025 and became effective on May 1, 2026. *See* Bankr. Dkt. No. 9133. The Plan required any professionals seeking final awards of compensation (such as the Firm) to file their final fee applications within 45 days of the Plan's effective date. *See* Plan Art. 2.1(b).

The Firm filed its final fee application on June 15, 2026. *See* Bankr. Dkt. No. 9363 (the "**Final Fee Application**"). The application sought final approval of approximately $70 million in fees and $964,000 in expenses over the course of the case. *Id*. at 2. Of these amounts, approximately $60 million of the fees and $948,000 of the expenses had already been paid during the course of the case. *Id*. at 3.[6]

### C. Ms. Morales' Objection(s)

The deadline to object to final fee applications (including the Firm's) was 4:00 p.m. (prevailing Eastern Time) on July 14, 2026. *See* Bankr. Dkt. No. 9382, at 4.

Ms. Morales filed her initial objection to the Firm's final fee application on July 13, 2026. *See* Bankr. Dkt. No. 9445 (the "**Initial Objection**"). The Initial Objection took issue with the reasonableness of certain of the Firm's fees, alleging,

[5] The fee examiner, as is typical, engaged with the Firm informally to negotiate certain reductions to its bills over the course of the case, and those agreed reductions were reflected in the amounts ultimately paid by the Debtors.
[6] The delta between the amount paid during the case and the amount sought in the Final Fee Application was equivalent (roughly) to the amounts billed by the Firm during the final four-month interim compensation period.



Wondershare PDFelement

among other things, duplication of effort and excessive and unnecessary time. *See id.* at 2-3. This objection was filed alongside other "reasonableness" objections by Ms. Morales to other estate-paid professionals' fees.

Ms. Morales then filed a second objection to the Firm's final fee application. *See* Bankr. Dkt. No. 9461 (the "**Second Objection**"). The file-stamped copy on the docket reflects that the Second Objection was filed on July 15, 2026, the day after the objection deadline, and was entered on the docket on July 17, 2026. *See id.* Ms. Morales has contended that she actually filed the Second Objection (by way of the pro se upload tool) on July 14, 2026 at 11:57 p.m. *See* Bankr. Dkt. No. 9469. Even if true, this was still approximately 8 hours after the 4 p.m. deadline.

Ms. Morales' Second Objection focused on the merger between Kramer Levin Naftalis & Frankel and Herbert Smith Freehills. The merger had been disclosed by the Firm by notice filed on June 4, 2025 (over a year before the Second Objection). *See* Bankr. Dkt. No. 7502 (the "**Notice of Merger**"). The Notice of Merger stated that "on June 1, 2025, Kramer Levin Naftalis & Frankel LLP, co-counsel to the Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants . . . merged with Herbert Smith Freehills LLP." *Id.* at 1. It went on to say that the "new name of the firm is Herbert Smith Freehills Kramer (US) LLP ('HSF Kramer')," and that "HSF Kramer will remain counsel for the Ad Hoc Committee." *Id.* Following the Notice of Merger, each of the Firm's monthly fee applications



Wondershare PDFelement

included a footnote mentioning the merger. *See, e.g.*, Bankr. Dkt. No. 7585, at 2 n.2.

Ms. Morales' Second Objection was a short two pages. It did not so much articulate an objection to approval of the Final Fee Application as simply list a series of things that Ms. Morales believed the Firm should have done in the wake of the merger. It referenced (though did not discuss in any detail) sections 330 and 504 of the Bankruptcy Code, and Bankruptcy Rule 2014. It did not contain any meaningful discussion of the facts of the merger or the fees paid to the Firm, nor did it cite or reference any evidence. Its entire discussion of the alleged facts was as follows:

> Kramer Levin Naftalis & Frankel officially combined with international firm Herbert Smith Freehills on June 1, 2025, to form Herbert Smith Freehills Kramer (branded as HSF Kramer in the US). At the beginning of this case Kramer Levin Naftalis & Frankle [sic] were retained by the debtors. When they merged with the firm Herbert Smith Freehills to form Herbert Smith Freehills Kramer they failed to file a Supplemental Declaration and did not file a final fee application for the Pre-Merger Firm they just continued billing.

Second Objection at 1.[7]

### D. The Bankruptcy Court's Order and this Appeal

The Bankruptcy Court held a hearing on the final fee applications (including the Firm's) on July 21, 2026. Ms. Morales argued her objection briefly, asserting:

> And then for the Herbert and to the Kramer firm, that one—let's see. So Kramer Levin Naftalis & Frankel officially combined with the international firm Herbert Smith Freehills on June 1st,

[7] For the avoidance of doubt, the Firm was never "retained by the Debtors"; it was retained by the AHC.



Wondershare PDFelement

> 2025 to form Herbert Smith Freehills Kramer. At the beginning of this case, Kramer Levin Naftalis & Frankel were retained when they merged with the firm HSF Kramer. They failed to file a supplemental declaration. Under Section 504 of the Bankruptcy Code, lawyers are generally prohibited from fee sharing. Firms must explicitly disclose how merger structures—the compensation, and ensure it does not violate the fee-splitting law. And that's all I have for that one.

Bankr. Dkt. No. 9502 ("**Hr'g Tr.**") at 39:18-40:5.

The Bankruptcy Court overruled Ms. Morales' objection(s) to the Firm's fees, finding the Firm's disclosures to be sufficient. Hr'g Tr. at 62:25-63:1. As the court explained:

> [T]here is a distinction between professionals retained by the Debtors and official committees and folks retained by other parties here. And I think that the firm disclosed it, as was already explained on the record shortly after the event happened . . .
>
> As a practical matter, I will say law firms merge on a fairly routine basis. And this is an issue the Court has to deal with on a regular basis. And I think the way it was handled here was consistent with what was appropriate and what's done in other instances like this.

Hr'g Tr. at 63:2-15.

The Bankruptcy Court thereafter entered the Fee Order, which provided that "[t]he Plan Administration Trust is authorized and directed to pay each Applicant, from funds held in the Professional Fee Escrow Account (as defined in the [Plan]), the fees and expenses approved by this Order and set forth in the Schedules, less any amounts previously paid to such Applicant during these chapter 11 cases on account

of such fees and expenses." Fee Order ¶ 2. The Firm has since received payment of the fees authorized by the Fee Order.

Ms. Morales filed a notice of appeal [Bankr. Dkt. No. 9530], and she also moved the Bankruptcy Court for a stay pending appeal [Bankr. Dkt. No. 9533]. By Order dated August 20, 2026, the Bankruptcy Court denied the request for a stay. Bankr. Dkt. No. 9550. Focusing principally on irreparable harm, the Bankruptcy Court wrote:

> Ms. Morales' argument relies entirely on equitable mootness as justification for a stay. But her position ignores potential remedies, such as disgorgement, if Ms. Morales is successful in her appeal. *See e.g., In re Gorski,* 519 B.R. 67, 75 (Bankr. S.D.N.Y. 2014) (ordering disgorgement of attorney fees for failure to comply with Section 329(a) of the Bankruptcy Code). Moreover, "that . . . [an] appeal may be rendered moot in the absence of a stay is not a bar to finding that the imminent injury factor weighs against Debtor-Appellant." *Mongiello v. Eastman* (*In re Mongiello),* 2024 U.S. Dist. LEXIS 30425, 2024 WL 729865, at *2 n.3 (S.D.N.Y. Feb. 22, 2024) (internal citations and quotations omitted); *see also In re Calpine Corp.,* 2008 Bankr. LEXIS 217, 2008 WL 207841, at *4 (Bankr. S.D.N.Y. Jan. 24, 2008) (stating that "merely invoking equitable mootness . . . is not sufficient to demonstrate irreparable harm").

*Id.* at 2-3.

Ms. Morales then filed her current stay motion with this Court.

## ARGUMENT

A stay pending appeal is an "intrusion into the ordinary processes of administration and judicial review, and accordingly is not a matter of right, even if

irreparable injury might otherwise result to the appellant." *Nken*, 556 U.S. at 427 (cleaned up). Courts consider four factors in evaluating a request for a stay: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Id.* at 426 (cleaned up). Here, Ms. Morales cannot satisfy any of the four factors.

## I. Ms. Morales Has Made No Showing That She Is Likely To Succeed on the Merits – Nor Can She

Ms. Morales has not made a strong showing that she is likely to succeed on the merits of her appeal, and she is not. To begin with, she lacks appellate standing. Beyond that threshold defect, she can identify no legal or factual error committed by the Bankruptcy Court. Indeed, to the extent her untimely arguments can be considered at all, they are supported by no record evidence and no case law.

### A. Ms. Morales Lacks Appellate Standing

The test for bankruptcy appellate standing is "stricter than Article III's 'injury in fact' test." *Drawbridge Special Opportunities Fund LP v. Barnet (In re Barnet)*, 737 F.3d 238, 242 (2d Cir. 2013) (cleaned up). In the bankruptcy context, an appellant must be "a person directly and adversely affected pecuniarily by the challenged order of the bankruptcy court." *Id.* (cleaned up). Mere "potential harm

from a bankruptcy court order is insufficient to justify appellate standing." *Id.* at 243 (cleaned up). An indirect, potential, or future effect is not enough. *See id.*

Here, the Fee Order has no effect on Ms. Morales. She therefore lacks standing to appeal it. The payments made under the Fee Order were made by the Debtors, and thus any even potential or theoretical relief on appeal would redound to the benefit of the Debtors and their estates, not Ms. Morales. The Second Circuit's opinion in *In re 22 Fiske Place, LLC*, 2023 WL 4278189 (2d Cir. June 30, 2023) is instructive. There, the sole member of a chapter 11 LLC debtor sought to appeal a bankruptcy court order granting interim fees to the trustee's counsel, arguing that the fee payments reduced the funds ultimately available to him as the LLC's sole member. The Second Circuit rejected that theory, holding that the appellant "does not have a direct financial interest in the court's interim fee order" because "the money awarded to pay counsel's costs and fees is withdrawn from Debtor's Estate, not [appellant's] own pocket." *Id.* at *3.

The same logic applies with even greater force here. The Debtors' Plan has been confirmed and gone effective.[8] Under the terms of the Plan, personal injury (or "**PI**") claimants such as Ms. Morales are the beneficiaries of a finite, defined trust—not participants in any residual value from the estate.

[8] While a limited number of pro se parties have appealed the Plan, those appeals have no effect on the current enforceability of the unstayed Plan. *See, e.g.*, *In re Eletson Holdings Inc.*, 2025 WL 2710411, at *12 (S.D.N.Y. Sept. 22, 2025) (citing *Maness v. Meyers*, 419 U.S. 449, 458 (1975)).

In particular, the Plan channeled all PI claims into the "PI Trust," which assumed liability for those claims. Plan Art. 4.1(a). The PI Trust was funded by an initial cash contribution of approximately $750 million, plus $50 million of proceeds obtained from certain causes of action. Plan Art 4.1(a) & 5.2(e)(iv) (incorporating definitions from Plan Art. 1.1).[9] Beyond that specifically defined obligation, the Plan grants the PI Trust no current or future interest in the residual estate of the Debtors. Thus, as the Bankruptcy Court observed in confirming the Plan: "The personal injury claimants here will receive their distributions virtually immediately after the Effective Date, whereas governmental entities and all other creditors will be paid over the course of the 15 years of the Plan—with the attendant risk associated with such delay." *In re Purdue Pharma, L.P.*, 675 B.R. 632, 673 (Bankr. S.D.N.Y. 2025) (cleaned up).

Because of this structure, there is no possibility that Ms. Morales' appeal of the Fee Order, even if successful, would result in any change in her entitlements under the Plan or recoveries from the PI Trust – her sole avenue for recovery on any claims asserted against the Debtors. She therefore lacks standing.

[9] At the time of the Plan's confirmation, the exact date at which the additional $50 million would be contributed to the PI Trust was uncertain, but that contribution has since been made, eliminating the contingency. *See* Bankr. Dkt. No. 9113.



Wondershare PDFelement

## B. Ms. Morales' Appeal Has No Evidentiary or Legal Support

As for the merits of her appeal, Ms. Morales has made no showing that her appeal has any likelihood of success. *See, e.g.*, *Nken*, 556 U.S. at 434 ("It is not enough that the chance of success on the merits be 'better than negligible.'") (citation omitted). She recites a handful of alleged "facts" concerning the merger and the alleged sharing, but none are supported by evidence of any kind. She makes various assertions about the meaning and application of section 504 of the Bankruptcy Code, but none are supported by case law. This is not enough.

Turning first to the evidence, Ms. Morales' appeal depends on two central assertions: first, that the merger of Kramer Levin Naftalis & Frankel and Herbert Smith Freehills was a "structural corporate merger," and not just a "simple 'name change,'" and second, that the Firm engaged in "fee-splitting." Motion at 3. Both are factual assertions, yet neither is supported by *any* record evidence or citation. Instead, the truth of her assertions, and their upshot, is left entirely to speculation. The entire absence of evidentiary support is not a basis for a successful objection or appeal, and therefore falls woefully short of the standards required for a stay.[10]

Ms. Morales' legal presentation is similarly deficient.[11] She asserts that section 504(a) of the Bankruptcy Code prohibits sharing of fees between a

---

[10] And, in any event, an appeal is not an appropriate forum to develop a record.

[11] Her legal arguments should also be deemed forfeited, based on her failure to timely raise them below. *See, e.g.*, *Harvis Trien & Beck, P.C. v. Fed. Home Loan Mortg. Corp.*, 153 F.3d 61 (2d Cir. 1998).

predecessor firm and a merged firm (Motion at 3)—but with no caselaw citation, there is no reason to think that this is so. Section 504(a) does prohibit certain forms of fee sharing. *See generally* 11 U.S.C. § 504(a). Importantly, however, the very next subsection of the Code expressly *permits* the sharing of fees between members, partners, or associates in a firm. *See* 11 U.S.C. § 504(b). Ms. Morales contends that section 504(b) is inapplicable (Motion at 7), but cites no case law and provides no reasoned analysis explaining why this is so. Even assuming the truth of her unproven factual assertions, this is plainly insufficient to establish a likelihood of success on appeal.[12]

## II. Ms. Morales Has Not Shown She Will Be Irreparably Injured

Ms. Morales has also not shown that she will be irreparably injured without a stay. Her sole argument in this regard is that her appeal may become equitably moot. *See* Motion at 2. The Bankruptcy Court properly rejected this assertion, *see supra* at 13, and its decision was fully consistent with the *Nken* standard. There, the Court wrote that "simply showing *some possibility* of irreparable injury fails to satisfy the second factor." *Nken*, 556 U.S. at 434-35 (emphasis added) (quotation marks omitted). Because mootness is, inherently, a determination that awaits a future resolution, its invocation now is speculative and provides no basis for a stay.

[12] Ms. Morales also contends that the Firm violated Bankruptcy Rule 2014 by allegedly failing to file certain disclosures. Motion at 7. That Rule, however, applies only to retentions of estate professionals under section 327 of the Bankruptcy Code—and, as noted above, the Firm was not an estate-retained professional, and therefore was not required to comply with the requirements of that section.

Wondershare PDFelement

Furthermore, for the same reasons that Ms. Morales lacks standing, she cannot show she will suffer any injury, let alone an irreparable one. *See supra* at 15-16.

## III. The Remaining Factors Weigh Against a Stay

While the foregoing factors "are the most critical," *Nken*, 556 U.S. at 434, the remaining factors weigh against a stay, as well.

The Firm would be harmed by the imposition of a stay. And the public interest disfavors a stay. Ms. Morales knew or should have known of the facts allegedly supporting her objection to the payment of the Firm's fees since June 2025. *See* Motion at 2 (referencing Bankr. Dkt. No. 7502, which was filed on June 4, 2025). Yet not only did she fail to raise her concerns at that time—instead delaying for over a year thereafter—she also did not raise the relevant objection to the Firm's fees until after the deadline for doing so had passed. The public interest is ill served by rewarding such delay with the extraordinary remedy of a stay.

## CONCLUSION

For the reasons set forth above, the Motion should be denied.

Dated: October 16, 2026

Respectfully submitted

/s/ *Rachael Ringer*
Kenneth H. Eckstein
Rachael Ringer
David E. Blabey Jr.
HERBERT SMITH FREEHILLS KRAMER (US) LLP
1177 Avenue of the Americas
New York, NY 10036
Telephone: (212) 715-9100
Email: Kenneth.Eckstein@hsfkramer.com
Rachael.Ringer@hsfkramer.com
David.Blabey@hsfkramer.com

Wondershare PDFelement

**<u>CERTIFICATE OF SERVICE</u>**

I, Rachael Ringer, certify that on October 16, 2026, I caused the foregoing Memorandum to be served on the Appellant, by electronic delivery via email and by physical delivery via certified mail.

Wondershare PDFelement

## WORD COUNT CERTIFICATION

Pursuant to Local Rule 7.1(c), I hereby certify that the preceding Memorandum of Law (the "Memo"), exclusive of the caption and signature block, contains 4,463 words, and therefore complies with the 8,750 word limitation that is applicable to memoranda of law filed in response to a motion. In determining the Memo's compliance, I relied on the word count of the word processing system that was used to prepare the Memo.

Dated: October 16, 2026

Respectfully submitted

/s/ *Rachael Ringer*
Kenneth H. Eckstein
Rachael Ringer
David E. Blabey Jr.
HERBERT SMITH FREEHILLS KRAMER (US) LLP
1177 Avenue of the Americas
New York, NY 10036
Telephone: (212) 715-9100
Email: Kenneth.Eckstein@hsfkramer.com
Rachael.Ringer@hsfkramer.com
David.Blabey@hsfkramer.com

Wondershare PDFelement

HERBERT SMITH FREEHILLS KRAMER (US) LLP
Kenneth H. Eckstein
Rachael Ringer
David E. Blabey Jr.
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Fax: (212) 715-8000

*Attorneys for the Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **PURDUE PHARMA L.P, *et al.*,** | **Case No. 19-23649 (SHL)** |
| **Debtors.**[1] | |

**NOTICE OF CHANGE OF FIRM NAME AND EMAIL ADDRESSES**

Notice is hereby provided that on June 1, 2025, Kramer Levin Naftalis & Frankel LLP, co-counsel to the Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants (the "Ad Hoc Committee") of the above-captioned debtors and debtors-in-possession, merged with Herbert Smith Freehills LLP. The new name of the firm is Herbert Smith Freehills Kramer (US)

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

LLP ("HSF Kramer"). HSF Kramer will remain counsel for the Ad Hoc Committee in the above-captioned case and in any related adversary proceedings.

The new email addresses for the attorneys appearing in this case are set forth below. The firm address and telephone number remain the same.

Herbert Smith Freehills Kramer (US) LLP
Kenneth H. Eckstein
Rachael Ringer
David E. Blabey Jr.
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Kenneth.Eckstein@hsfkramer.com
Rachael.Ringer@hsfkramer.com
David.Blabey@hsfkramer.com

Dated: June 4, 2025
New York, New York

HERBERT SMITH FREEHILLS KRAMER (US) LLP

/s/ *Kenneth H. Eckstein*
Kenneth H. Eckstein
Rachael Ringer
David E. Blabey Jr.
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000
Email: Kenneth.Eckstein@hsfkramer.com
Rachael.Ringer@hsfkramer.com
David.Blabey@hsfkramer.com

*Attorneys for the Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants*

Wondershare PDFelement

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **PURDUE PHARMA L.P.,** ***et al.*****,** | **Case No. 19-23649 (RDD)** |
| **Debtors.**[1] | **(Jointly Administered)** |

**ORDER AUTHORIZING THE DEBTORS TO ASSUME THE REIMBURSEMENT AGREEMENT AND PAY THE FEES AND EXPENSES OF THE AD HOC COMMITTEE'S PROFESSIONALS**

Upon the motion (the "**Motion**")[2] of Purdue Pharma L.P. and its affiliates that are debtors and debtors in possession in these cases (collectively, the "**Debtors**"), pursuant to sections 105(a), 363(b) and 365 of title 11 of the United States Code (the "**Bankruptcy Code**"), for an order (this "**Order**") (a) authorizing the Debtors to assume the Reimbursement Agreement, attached to the Motion as **Exhibit B**, and (b) authorizing but not directing the Debtors to pay the reasonable and documented fees and expenses under the Reimbursement Agreement, without the need for further motion, fee application or order of the Court, as more fully set forth in the Motion; and the Court having jurisdiction to decide the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157(a)-(b) and 1334(b) and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.); and consideration of the Motion and the requested relief being a

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Motion.

19-23649-rdd Doc 553 Filed 12/02/19 Entered 12/02/19 12:21:57 Main Document
Pg 2 of 6

core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the relief requested in the Motion having been provided, such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and upon the objections (or joinders to objections) to the relief requested in the Motion filed by the Ad Hoc Group of Individual Victims, the NAS Babies Ad Hoc Committee, the Official Committee of Unsecured Creditors, the Private Insurance Plaintiffs, the U.S. Trustee, and Certain Native American Tribes [Docket Nos. 454, 458, 459, 462, 463 and 468] and the responses thereto; and the Court having held a hearing to consider the relief requested in the Motion on November 19, 2019 (the "**Hearing**"); and upon the record of the Hearing and all of the proceedings had before the Court; and after due deliberation and for the reasons stated by the Court in its bench ruling at the Hearing the Court having determined that the legal and factual bases set forth in the Motion establish good and sufficient cause for the relief granted herein, which is in the best interests of the Debtors, their estates, their creditors and all parties in interest; now, therefore,

**IT IS HEREBY ORDERED THAT:**

1. The Motion is granted to the extent set forth herein.

2. The Debtors are authorized to perform the Reimbursement Agreement pursuant to section 363 of the Bankruptcy Code, subject to and as modified by the terms of this Order.

3. Specifically, the Debtors are authorized, but not directed, to pay (i) Brown Rudnick LLP, (ii) Gilbert, LLP, (iii) Kramer Levin Naftalis & Frankel LLP, (iv) Otterbourg PC, (v) FTI Consulting, Inc., (vi) Compass Lexecon and (vii) Coulter & Justice (collectively, the "**Professionals**") for their reasonable and documented fees and expenses in accordance with the terms and conditions of the Reimbursement Agreement and this Order; *provided* that, for the avoidance of doubt, the Debtors shall have no obligation to pay any fees, expenses or other

19-23649-rdd Doc 553 Filed 12/02/19 Entered 12/02/19 12:21:57 Main Document
Pg 3 of 6

amounts incurred after the termination of the Reimbursement Agreement in accordance with its terms.

4. The authorization of the Debtors to pay (i) the reasonable and documented fees and expenses of the Professionals (other than those Professionals set forth in paragraph 3(vi) and (vii) above, which are addressed in subsection (z) of this paragraph 4 below) and (ii) reasonable and documented expenses (e.g., hotels, meals, travel costs, etc., but excluding the fees and expenses of any professional, including internal counsel, retained or employed by any Ad Hoc Committee member) incurred by the Ad Hoc Committee members in furtherance of their service on the Ad Hoc Committee (the "**Member Expenses**") shall be subject, *mutatis mutandis*, to the procedures with respect to authorization of payment of the fees and expenses of the professionals of the Debtors and the UCC set forth in the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Retained Professionals* [Docket No. 529] (as may be modified or amended by any subsequent order of the Court with respect thereto, the "**Interim Compensation Order**") including, for the avoidance of doubt, the filing of Monthly Fee Statements and Applications (in each case as defined in the Interim Compensation Order), Interim Fee Hearings (as defined in the Interim Compensation Order), the expiration of the Objection Deadline (as defined in the Interim Compensation Order) or resolution of any Objections (as defined in the Interim Compensation Order) with respect each Monthly Fee Statement, and the 20% holdback with respect to fees until further order of the Court; *provided* that the standard for authorization of payment of the fees and expenses of the Professionals shall be whether such fees and expenses are (a) reasonable and documented and (b) reimbursable under the Reimbursement Agreement (including, without limitation, that such fees and expenses are not duplicative of other Professionals and are within the Scope (as defined in the Reimbursement Agreement)); *provided*

19-23649-rdd Doc 553 Filed 12/02/19 Entered 12/02/19 12:21:57 Main Document
Pg 4 of 6

*further* that, for the avoidance of doubt, that the Professionals shall not be considered retained professionals of the Debtors or UCC and the retention of the Professionals shall not be required to satisfy the standards for retention set forth in sections 327-328 or 1103 of the Bankruptcy Code; *provided further* that, the Professionals shall seek reimbursement only for fees and expenses that are within the Scope (and, for the avoidance of doubt, neither filing objections to the claims of other creditors or advancing or prosecuting the claims of the individual members of the Ad Hoc Committee shall be considered within the Scope); *provided further* that, (x) the aggregate amount authorized to be paid pursuant to this Order shall not exceed $1,500,000 with respect to the fees and expenses of the Professionals (including Compass Lexecon and Coulter & Justice) incurred prior to the Petition Date, (y) such prepetition fees and expenses of the Professionals, together with any prepetition Member Expenses, shall be sought only upon the earlier of (1) the execution of a restructuring support agreement among parties including the Debtors and each member of the Ad Hoc Committee and (2) confirmation of a chapter 11 plan for the Debtors, and (z) the Debtors shall not be authorized to pay any amounts to the Professionals set forth in paragraph 3(vi) and 3(vii) above (who are not currently actively engaged) unless and until authorized to do so by subsequent order of this Court in connection with one of the Applications referred to above; *provided further* that the fees and expenses of the Professionals incurred in connection with or relating to the allocation of value among the Debtors' creditors (the "**Allocation Fees**"), shall be segregated and recorded in separate matters or projects and shall be sought by Application only upon the earlier of (a) the approval by the Court of a restructuring support agreement among parties including the Debtors and each member of the Ad Hoc Committee (the "**RSA**") or (b) confirmation of a chapter 11 plan for the Debtors; *provided further* that to the extent an emergency relief fund for the use, prior to confirmation, of a substantial amount of the Debtors' cash to provide emergency relief and

19-23649-rdd Doc 553 Filed 12/02/19 Entered 12/02/19 12:21:57 Main Document
Pg 5 of 6

assistance with respect to the opioid crisis (an "**ERF**") has not previously been sought or approved by the Court, the RSA shall have within it a valid and credible proposal for an ERF; *provided further* that prior to the earlier of approval by the Court of an RSA or confirmation of a chapter 11 plan for the Debtors, each Professional that submits a Monthly Fee Statement or Application will include a representation therein that it has separately recorded its Allocation Fees and has not, to the best of its knowledge, included Allocation Fees in such Monthly Fee Statement or Application.

5. Notwithstanding anything to the contrary herein, the Debtors shall not be authorized to pay the fees and any expenses of any advisor to the Ad Hoc Committee other than the Professionals (as defined in paragraph 3), and the authorization to pay the fees and expenses of any advisor to the Ad Hoc Committee other than the Professionals (including any investment banker, as contemplated by the Reimbursement Agreement) shall be sought by a supplemental motion to this Court, *provided* that the Debtors are authorized to pay the fees of an investment banker, as contemplated by the Reimbursement Agreement, subject the same procedures applicable to the Professionals (as defined in paragraph 3), with the consent of the Debtors, U.S. Trustee and UCC to the retention of such investment banker and the terms of such retention.

6. Pursuant to and consistent with information and confidentiality protocols to be agreed between the Ad Hoc Committee, the Ad Hoc Group of Non-Consenting States[3] and the Governmental Entities Group[4], and acceptable to the Debtors, and any protective order in these cases, the work product of certain financial professionals engaged by the Ad Hoc Committee, including FTI Consulting, Inc., shall be made available to the Ad Hoc Group of Non-Consenting States and the Governmental Entities Group with respect to matters on which such parties share a

[3] The Bankruptcy Rule 2019 statement for the Ad Hoc Group of Non-Consenting States is filed at Docket No. 296.

[4] The Bankruptcy Rule 2019 statement for the Governmental Entities Group is filed at Docket No. 409.

Wondershare PDFelement

common interest, subject to the terms therein, and where such work product does not contain, reflect or reference confidential information of the Debtors that they have provided to the Ad Hoc Committee but not provided to the Ad Hoc Group of Non-Consenting States and the Governmental Entities Group. The delivery of information pursuant to such information protocols described in this paragraph shall not be deemed a waiver of any common interest privilege, attorney-client privilege, work product protection, or any other applicable privileges or protections with respect thereto.

7. The contents of the Motion and the notice procedures set forth therein constitute good and sufficient notice and satisfy the Bankruptcy Rules and the Local Rules, and no other or further notice of the Motion or the entry of this Order shall be required.

8. Nothing in this Order shall be deemed to constitute (i) a grant of third-party beneficiary status or bestowal of any additional rights on any third party or (ii) a waiver of any rights, claims or defenses of the Debtors.

9. The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

10. The relief granted herein shall be binding upon any chapter 11 trustee appointed in any of these chapter 11 cases or upon any chapter 7 trustee appointed in the event of a subsequent conversion of any of these chapter 11 cases to cases under chapter 7.

11. The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated: December 2, 2019
White Plains, New York

/s/ Robert D. Drain
THE HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE

Wondershare PDFelement

2:42

hsfkramer.com/insig

# What is third-party fundi

- Third Party Funding is when an independent funder provides the funds to pursue your case, usually in in return for a share of the damages

- Depending on (i) the estimated damages, and; (ii) likelihood of success of the case, Third Party Funding can cover:
  - Your legal fees and disbursements
  - Any potential exposure to adverse costs in the event of an unsuccessful award

- Reputable funders will respect the lawyer client relationship and have a very limited role in the running of any arbitration or the tactics in the arbitration itself. However, regular updates will be given to the funder, particularly on the progress of the arbitration, decisions that have been taken and any changes to the prospects of success. Given the funder's financial stake in the dispute, they will also need to be informed of any settlement offers and be given the opportunity to discuss any such offers.




- Once your arbitration has been funded, there may be a requirement (from the law of the seat or institutional rules) to disclose the fact the funding is in place.
- There are some common tactical steps that counterparties can take against funded parties. These are well-known to funders and to us. We will explain these to you and plan for them with you.

- If you have a strong case and want to offset the potential legal costs and risk, funding may be available to you. However, funders will usually want to see a quantum to cost ratio of around 10:1 (eg costs of $1 million against a claim value of $10 million). Funding is also usually a more obvious fit for a claimant than a respondent, although there can be exceptions to this.
- ***Please note: third party funding is not permissible in some jurisdictions, HSF can investigate what is possible based on each specific case and explore other options with you as needed.***

- This largely depe
the necessary do
review the disput
- The funder's initia
four weeks. If a fu
there is typically a
will run their own
their initial fundin

Wondershare PDFelement




Wondershare PDFelement

HERBERT SMITH FREEHILLS KRAMER

# HERBERT SMITH FREEHILLS KRAMER THIRD PARTY COMPLIANCE STANDARDS

## September 2026

Herbert Smith Freehills Kramer provides a full and extensive range of legal services to a diverse body of clients. We seek excellence in every aspect of our business and are committed to the highest standards of professionalism, ethics and integrity. This includes a commitment to working with **third parties**[1] to ensure a high level of compliance. We look for compliance in the categories set out below and expect third parties to share our commitment and to have their own internal policies and procedures in place to support such commitment. Where incorporated into any contract, these Compliance Standards shall survive the contractual term.

### 1. Confidentiality

1.1 Herbert Smith Freehills Kramer treats the information of our clients and staff with the utmost respect. As a law firm we have professional obligations of confidentiality and it is important that you understand this.

1.2 We expect you to keep all information received about any Herbert Smith Freehills Kramer entity, client, or staff member confidential. You must put in place safeguards to ensure that access to confidential information is appropriately restricted. We may require you to enter into a non-disclosure agreement on appropriate terms when confidential information is to be shared outside of other contractual protections.

### 2. Information Security

2.1 We are committed to maintaining the highest standards of information security when it comes to handling our clients', employees', and our own, information.

2.2 You are expected to put in place appropriate technical and organisational measures to protect information received about any Herbert Smith Freehills Kramer entity, its clients or its staff.

2.3 We expect you to have your own internal information security policy and if applicable, security compliance certifications, which will be made available to us for review. If we have concerns about the adequacy of the security measures, we may require you to comply with Herbert Smith Freehills Kramer's Information Security Policy and Supplier Security Standards, which outline the behaviours and security measures required in protecting the information of our clients and the firm.

### 3. Artificial Intelligence

3.1 Any AI used in the course of performing the services is expected to meet the Information Security requirements above, and to have been implemented in line with industry best practices. Use of information received from us in public generative AI tools or in any AI system where it may be used to develop, train or fine-tune an AI model or system is strictly prohibited.

3.2 We expect you to maintain records of AI processing activities and to notify us without undue delay of any suspected unauthorised disclosure, retention, or misuse of confidential information by AI systems, including if such information may have been incorporated into training data or otherwise exposed.

3.3 We expect you to take all reasonable steps upon completion of your engagement with the firm to ensure that our confidential information has been deleted from AI systems and cannot be recovered or reconstructed from any AI model or system memory.

3.4 We expect you to be aware of and comply with all applicable laws and regulations, including but not limited to the EU AI Act 2024, and any sector-specific AI governance requirements that may apply to your operations.

---

[1] We use "third parties" in this document to mean both (i) service providers and other suppliers who provide services or goods to Herbert Smith Freehills Kramer entities and (ii) service providers and other suppliers (including law firms) who provide services to our clients, where we are involved in their engagement (although only as an agent or intermediary for our client).



Wondershare PDFelement

## 4. Data Protection and Privacy

4.1 Herbert Smith Freehills Kramer is fully committed to compliance with its obligations in relation to the handling and use of personal data under applicable data protection and privacy laws in force from time to time. These laws include, but are not limited to, the EU General Data Protection Regulation, the UK General Data Protection Regulation, the UK Data Protection Act 2018, the Australian Privacy Act 1988, the California Consumer Privacy Act, and all other data protection and privacy legislation applicable in the jurisdictions in which we operate or to which our personal data is transferred or in which it is processed (together, "Applicable Data Protection Laws").

4.2 We expect you to be fully aware of, and comply with, all Applicable Data Protection Laws relevant to your engagement with us. Where you process personal data on our behalf, on behalf of our associated entities, or our clients, there may be jurisdiction-specific data protection and privacy provisions which you will need to comply with. You must not do, or omit to do, anything that would prevent us, our associated entities, or our clients from complying with Applicable Data Protection Laws.

## 5. Anti-Bribery and Corruption

5.1 Herbert Smith Freehills Kramer is committed to preventing bribery and corruption. Herbert Smith Freehills Kramer has anti-bribery policies designed to prevent persons employed by or performing services on its behalf from paying or receiving bribes.

5.2 It is important to us that you share our commitment to preventing bribery and corruption. We expect you to have similar policies, or to comply with Herbert Smith Freehills Kramer's anti-bribery policies.

5.3 Our policy specifically prohibits dealings for the purpose of improperly obtaining or retaining business or for any other improper purpose or business advantage, as well as the making of facilitation payments.

5.4 We expect you to act in the best interests of us or our client and take steps to avoid, or disclose, conflicts in your provision of goods or services to us or our client.

5.5 You must not offer any partner or employee of Herbert Smith Freehills Kramer or a client any gift or hospitality of such value that it might have the effect, or perceived effect, of improperly influencing their decisions.

## 6. Sanctions Compliance

6.1 It is the firm's policy to adhere to all applicable sanctions laws and regulations and we expect you to do the same.

6.2 You must not cause us to breach applicable sanctions laws. You must tell us if you (or any parent, subsidiary, involved supplier or other connected party) become subject to sanctions and if you (or any of the related parties mentioned) are, or become, owned or controlled by a sanctioned person to any extent.

## 7. Tax Evasion

7.1 It is the firm's policy to adhere to all applicable tax laws and we expect you to do the same. We expect you to implement appropriate procedures, systems and controls relevant to your business to prevent the criminal facilitation of tax evasion.

7.2 We do not tolerate tax evasion (or any form of financial crime) and any third parties found to be engaging in these practices may be reported to the relevant authorities.

## 8. Fraud

8.1 Herbert Smith Freehills Kramer is committed to preventing the commission of fraud. It is the firm's policy to comply with all applicable fraud laws and regulations.

8.2 We expect you to share our commitment to preventing fraud. You must implement reasonable measures to prevent and detect fraudulent conduct by your employees, subcontractors and others acting on your behalf in connection with the goods or services you provide to our people.

## 9. Modern Slavery

9.1 Our Modern Slavery statement is published on our website. We are continually working towards ensuring that our policies and procedures comply with the requirements of applicable modern slavery legislation and operate in accordance with our Responsible Procurement policy.

9.2 We expect you to consider the requirements of any applicable legislation, and to the extent possible examine your own supply chain to highlight the risk areas in relation to slavery and human trafficking.

9.3 We expect you (whether you are required to comply with the applicable legislation or not) to give due consideration to what the legislation seeks to address (including considering and addressing parts of your own supply chain that are at risk of slavery and human trafficking) and act in accordance with the spirit of the legislation.

## 10. Workplace Health & Safety

10.1 We expect you to be fully aware of and abide by your obligations under applicable workplace health and safety legislation, regulations and standards, and to have in place an internal policy to ensure compliance with such obligations.

10.2 We expect you to have an internal policy governing discrimination, harassment (including sexual harassment) and other unacceptable behaviours. Such policy should make it clear that unacceptable behaviour by your staff towards third parties (including our people) will not be tolerated.

## 11. Labour Laws (including Labour Hire Licensing)

11.1 We expect you to pay fair wages and compensate workers in accordance with all applicable labour laws, including those relating to minimum wages, overtime hours and legally mandated benefits.

11.2 We expect you to follow all applicable laws and regulations with respect to working hours.

11.3 We adhere to all applicable labour hire licensing laws and, where required by law, we will only engage suppliers of labour hire services who hold and maintain a labour hire licence. Where applicable, providers must provide any necessary labour hire licences to us prior to the provision of services and at other times on our request.

## 12. Competition

12.1 It is the firm's policy to comply with relevant competition laws. We expect you to do the same and to assist us in our compliance.

12.2 Accordingly, you must not share information with us which might result in an anti-competitive effect or object. This would include for example: specific information about significant costs of our competitor firms, the markets in which they compete, and the means by which they deliver key services and make key strategic decisions. If in any doubt, describe to us in advance the nature of information you consider passing to us, and we will advise whether we are able to receive it.

## 13. Regulatory Compliance

13.1 As a global firm of legal professionals, our practice and conduct are regulated in every jurisdiction where we operate. Our regulators have a say in the way we do business, and they regulate our relationships with third party suppliers and service providers. We expect you to recognise the fact that we are subject to such regulatory obligations (the nature and extent of which may differ from one jurisdiction to the next) and that it may affect our dealings with you.

13.2 Where you have access to confidential information, we expect you to permit audits to be carried out as required by our professional regulators and to provide every assistance reasonably requested.

## 14. Dignity and Respect

14.1 We do not tolerate any form of discrimination, bullying, harassment (including sexual harassment) or unacceptable/inappropriate behaviour. We expect our suppliers to share our commitment, which includes demonstrating through your actions that you treat all individuals, including both our people and your own employees and suppliers, with dignity and respect.

## 15. Continued responsibility

15.1 Notwithstanding your involvement or engagement of any employees, subcontractors, agents, service providers or other third parties, or your use of artificial intelligence tools or systems, in connection with the goods or services you provide to us, you remain responsible for compliance with these Compliance Standards. You must ensure that any such persons, entities, tools or systems act or operate in compliance with these Compliance Standards as if they applied directly to them. This reminder does not, in itself, constitute authorisation to use artificial intelligence tools or engage other service providers.

Wondershare PDFelement